# EXHIBIT 4

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRANDON BIER, on Behalf of Himself and All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>   v.<br><br>ENDO INTERNATIONAL PLC f/k/a/ ENDO HEALTH SOULTIONS INC; KANISHKA LIYANAARCHCHIE DE SILVA; TERRANCE J. COUGJLIN; SUSAN HALL, AND MATTHEW DAVIS<br><br>                    Defendants. | Case No. 2:17-cv-03711-TJS |

**MAQSOOD SHEIKH, YUHAI DING, AND RA CONSULTING APS'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR APPOINTMENT <u>AS LEAD PLAINTIFF AND APPROVAL OF THEIR SELECTION OF</u> <u>COUNSEL</u>**

Maqsood Sheikh, Yuhai Ding, and RA Consulting Aps ("Movants") move the Court for an order appointing them as Lead Plaintiff on behalf of themselves and all others similarly situated who purchased or otherwise acquired common stock of Endo International PLC ("Endo" or the "Company") during the period of November 30, 2012, and July 6, 2017, inclusive (the "Class Period"). Movants also seek approval of their selection of the law firm of Levi & Korsinsky, LLP ("Levi & Korsinsky") as Lead Counsel and O'Kelly Ernst & Joyce, LLC ("O'Kelly Ernst & Joyce") as Liaison Counsel. They makes this motion pursuant to Section 21D(a)(3)(B) of the Securities and Exchange Act of 1934 (the "Exchange Act"), as amended by Section 101(a) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B).

## I. PRELIMINARY STATEMENT

Pending before the Court is the above-captioned securities class action (the "Action") brought on behalf of all persons who purchased or otherwise acquired the common stock of Endo during the Class Period. Plaintiff in the Action alleges violations of the Exchange Act against the Company, Kanishka Liyanaarchchie De Silva ("De Silva"), Terrance J. Coughlin ("Coughlin"), Susan Hall ("Hall"), and Matthew Davis ("Davis").[1]

Movants lost approximately $124,722.82 as a result of the alleged fraud during the Class Period. Movants respectfully submit this motion for (i) appointment as Lead Plaintiffs pursuant to the PSLRA, 15 U.S.C. § 78u-4(a)(3)(B), and (ii) approval of their selection of Levi & Korsinsky as Lead Counsel and O'Kelly Ernst & Joyce as Liaison Counsel.

---

[1] Specifically, plaintiffs in the Action allege that defendants Kanishka Liyanaarchchie De Silva, Terrance J. Coughlin, Susan Hall, and Matthew Davis, (the "Individual Defendants") and the Company violated Sections 10(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder. In addition, plaintiffs in the Action allege that the Individual Defendants violated Section 20(a) of the Exchange Act.

The PSLRA provides for the Court to appoint as lead plaintiff(s) the movant(s) that has the largest financial interest in the litigation and has made a *prima facie* showing that he, she, or it is an adequate class representative under Rule 23 of the Federal Rules of Civil Procedure. *See generally In re Cendant Corp. Litig.*, 264 F.3d 201, 262-65 (3d Cir. 2001). Movants satisfy both requirements.

Movants believe that they have the largest financial interest in the outcome of the case.[2] As such, Movants meet the requirements of the PSLRA for appointment as Lead Plaintiffs. Moreover, Movants satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure in that their claims are typical of the claims of the Class and they will fairly and adequately represent the interests of the Class.[3]

Accordingly, Movants respectfully submit that they should be appointed as the lead plaintiff. Additionally, Movants' selection of Levi & Korsinsky as Lead Counsel and O'Kelly Ernst & Joyce as Liaison Counsel for plaintiffs and the proposed class should be approved by this Court.

## II. STATEMENT OF FACTS

Endo is a Global specialty healthcare company focused on branded and generic pharmaceuticals and devices. ¶ 2.[4] The Complaint alleges that throughout the Class Period the Company made several representations about the safety and abuse-deterrent advantages of

---

[2] Movants' charts detailing their losses are attached to the Declaration of Ryan M. Ernst dated October 17, 2017 ("Ernst Decl."), as Exhibit B.

[3] The "Class" is comprised of all persons who purchased or otherwise acquired Endo securities during the Class Period and were damaged upon revelation of the truth. The Class excludes the Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

[4] Citations to "¶ __" are to paragraphs of the Class Action Complaint (the "Complaint") filed in the Action. The facts set forth in the Complaint are incorporated herein by reference.

2

"crush-resistant" reformulated Opana ("Reformulated Opana") when in fact (i) Reformulated Opana was not resistant to crushing; (ii) Reformulated Opana was not abuse-deterrent and its use carried an inherent risk of abuse by grinding, snorting and injecting; (iii) the Reformulated Opana was participating to an opioid public health crisis; (iv) Endo would ultimately remove Reformulated Opana from the market; and (v) as a result of the foregoing, Endo's public statements were materially false and misleading at all relevant times.. ¶ 6.

At the start of the Class Period on November 30, 2012, the Company filed a complaint against the FDA, urging its determination on Endo's citizen petition ("2012 Petition") before the upcoming January 1, 2013 release of a generic drug in the market ("2012 Complaint"). ¶ 33. The 2012 Complaint stated in relevant part:

> The current formulation of Opana® ER is designed to be crush resistant ("Opana® ER CRF"), and thus offers significant safety advantages over the Original Formulation
> \* \* \*
> Endo, a pharmaceutical company heavily regulated by FDA, has done as the agency has requested and invested significant time and significant sums to develop a novel abuse-deterrent opioid formulation - Opana® ER CRF
> \* \* \*
> Thus, the CRF version is resistant to crushing. The Opana® ER CRF formulation also has properties that make it difficult to manipulate into a soluble form that could be easily drawn up in a syringe and subsequently injected by potential abusers.

*Id.*

On or about early April 2013, the FDA withdrew from the market the original formulation of OxyContin (a similar drug manufactured by Purdue Pharma LP) for safety reasons and for it to be replaced by reformulated crush-resistant OxyContin. ¶ 34. On April 23, 2013 Endo supplemented its 2012 Petition to the FDA, alleging that Reformulated Opana had "virtually identical" abuse-deterrent properties than crush-resistant reformulated Oxycontin, thus deserving the same determination. ¶ 35.

3

On May 07, 2013, the Company held a conference call to discuss the Company's financial and operating results for the first fiscal quarter ended March 31, 2013. ¶ 36. During the Conference Call, Endo's CEO, De Silva, reported in relevant part that the Company believed that the OPANA ER situation was similar to the OxyContin decision made by the FDA and that there had been a sharp decrease in abuse of the brand due to the launch of the abuse-deterrent product. ¶ 36.

Then, on May 10, 2013, the FDA responded to the 2012 Petition, refuting Endo's allegations that the Reformulated Opana carried safety advantages over Original Opana, and that Reformulated Opana carried identical abuse deterrent properties than reformulated OxyContin. ¶ 37. The FDA concluded that Opana was not withdrawn from the market for safety reasons. *Id*. The same day, the Company issued a responsive press release announcing that the FDA's denial of the 2012 Petition would negatively affect the Company's revenue from Reformulated Opana. ¶ 38. On this news, shares of the Company's common stock fell $1.26 per share from a closing price of $34.97 per share on May 10, 2013, to close at $33.71 on May 13, 2013. ¶ 39.

During the next two years the Company held multiple conference calls where it repeatedly reported to the public that the Company continually supported Opana ER and its abuse-deterrent formulation, and were moving towards a label update sometime in 2017. ¶¶ 40-46. In January 2016, Endo resubmitted a request to the FDA on Reformulated Opana's labeling for abuse-deterrent properties for intravenous abuse. ¶ 47.

On February 29, 2016, Endo issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2015 ("FY 2015 Press Release"). ¶ 49. For the quarter and the year, the Company reported materially lower net revenue for Reformulated

4

Opana as compared to the same periods in the previous year. *Id.* The same day, the Company held a conference call to discuss its financial and operating results for the fourth fiscal quarter and year ended December 31, 2015 where De Silva attempted to reassure investors in light of the reduced Opana revenues. ¶ 50. Nevertheless, in response to this news, the Company's share price fell $11.13 per share, or over 21% to close at $41.81 per share on February 29, 2016. ¶ 51.

After the close of trading that same day, Endo filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2015, which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. ¶ 52. Throughout the filing, the Company reapproved the previous statements, and added in pertinent part:

> In September 2013, our subsidiaries, EPI and EHSI, received a subpoena from the State of New York Office of Attorney General seeking documents and information regarding the sales and marketing of OPANA®. ***In February 2016, EPI and EHSI agreed with the State of New York Office of Attorney General to an Assurance of Discontinuance pursuant to the provisions of New York law, whereby EPI and EHSI agreed to modify certain business practices related to the marketing and sale of OPANA®, as well as to pay certain monetary penalties***. The cost of those penalties has been incorporated into our legal loss contingency reserve

*Id*. (Emphasis added.)

On March 3, 2016, the settlement between Endo and the Office of the Attorney General ("OAG") of the State of New York was disclosed which revealed that multiple studies were conducted on Opana ER regarding its abuse-deterrent formula and that many of those studies failed thus prompting the FDA to deny the updated product labeling. ¶ 53. The Settlement also revealed that Endo was also prohibited by the OAG from making statements that Reformulated Opana ER is, is designed to be, or is crush resistant, unless such statements are supported by the FDA-approved product labeling. *Id.* On this news, the Company's share price fell $0.68 per

5

share from a closing price of $43.85 on March 2, 2016, to close at $43.17 per share on March 3, 2016.  ¶ 54.

In the summer of 2016 during multiple conference calls, Endo continually discussed Opana's abuse-deterrent reformulation. ¶¶ 55-56. Then on August 12. 2016, Endo issued a press release, announcing that following a discussion with representatives of the FDA, Endo would withdraw its abuse-deterrent labeling application for Reformulated Opana to generate additional data to appropriately advance its product.  ¶ 58.  On the release of the news, over the course of two trading days, the price per share of Endo's common stock fell $1.26 per share, or over 5%, to close at $22.92 per share on August 16, 2016. ¶ 59.

On January 10, 2017, before the market opened, the FDA announced a Joint Meeting of the Drug Safety and Risk Management Advisory Committee and the Anesthetic and Analgesic Drug Products Advisory Committee which announced the committees would discuss pre- and post-marketing data about the abuse of Reformulated Opana, overall risk-benefit of the product, abuse of generic oxymorphone ER, and oxymorphone immediate-release (IR) products. ¶ 60. On this news, over the course of two trading days, the price per share of Endo's common stock fell $2.40, or over 14% to close at $14.01 on January 11, 2017. ¶ 61.

On March 14, 2017, the FDA's Drug Safety and Risk Management and Anesthetic and Analgesic Drug Products Advisory Committees voted that the benefits of Reformulated Opana no longer outweighed its risks and recommended that Reformulated Opana remained on the market with additional regulatory restrictions to mitigate its risks. ¶ 62. The same day, Endo issued a responsive press release attempting to controvert the FDA committees' decision. ¶ 63. On this news, over the course of two trading days, the price per share of Endo's common stock fell $0.45 per share, or over 4.2%, to close at $10.22 per share on March 14, 2017. ¶ 64.

6

On June 8, 2017, the FDA issued a press-release ("June 2017 FDA Press Release") requesting Endo to voluntarily remove Reformulated Opana from the market and stated that should the Company choose not to remove the product, the FDA intended to take steps to formally require its removal by withdrawing approval. ¶ 66. The June 2017 FDA Press Release stated that FDA's decision was based on a review of all available post-marketing data, which demonstrated a significant shift in the route of abuse of Reformulated Opana, from nasal to injection, the later associated with a serious outbreak of HIV and hepatitis C, as well as cases of a serious blood disorder (thrombotic microangiopathy). *Id.* Also, on June 8, 2017, Endo issued a press release, also attached as exhibit 99.1 to a Form 8-K filed with the SEC responding to the June 2017 FDA Press Release reported in relevant part that the Company is responsible for taking steps to minimize potential misuse of its products and stated:

> Despite the FDA's request to withdraw OPANA®ER from the market, this request does not indicate uncertainty with the product's safety or efficacy when taken as prescribed. Endo remains confident in the body of evidence established through clinical research demonstrating that OPANA® ER has a favorable risk-benefit profile when used as intended in appropriate patients

¶ 67. On this news, over the course of two trading days, the price per share of Endo's common stock fell $2.68, or over 19.4% to close at $11.35 on June 12, 2017. ¶ 68.

Then, on July 6, 2017, the Company issued a press release providing an update on Opana ER announcing that it decided to remove Reformulated Opana from the market. The Company stated, in relevant part, "after careful consideration and consultation with the FDA following the FDA's June 2017 withdrawal request, the Company has decided to voluntarily remove OPANA® ER from the market." ¶ 70. On this news, the price per share of Endo's common stock fell $0.22 per share, or approximately 2%, from a closing price of $11.39 on July 5, 2017, to close at $11.15 per share on July 06, 2017. ¶ 71.

7

## III. THE COURT SHOULD APPOINT MOVANTS AS LEAD PLAINTIFFS

### A. The Procedure that the PSLRA Requires

The PSLRA establishes the procedure for appointment of the lead plaintiff in "each private action arising under [the Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a) and (a)(3)(B). The plaintiff(s) who files the initial action must publish notice to the class within 20 days after filing the action, informing class members of his/her right to file a motion for appointment of lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A). The PSLRA requires the Court to consider within 90 days all motions filed within 60 days after publication of that notice by any person or group of persons who are members of the proposed class to be appointed lead plaintiff(s). 15 U.S.C. §§ 78u-(a)(3)(A)(i)(II) and (a)(3)(B)(i).

The PSLRA provides a presumption that the most "adequate plaintiff" to serve as lead plaintiff is the "person or group of persons" that:

>  (aa)   has either filed the complaint or made a motion in response to a notice;
>
>  (bb)   in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
>  (cc)   otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The presumption may be rebutted only upon proof by a class member that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

As set forth below, Movants satisfy the foregoing criteria and are not aware of any unique defenses that Defendants could raise against them. Therefore, Movants are entitled to the

8

presumption that they are the most adequate plaintiffs to represent the Class and, as a result, should be appointed Lead Plaintiff in the Action.

### 1. Movants Are Willing to Serve as Class Representatives

On August 18, 2017, counsel in the Action caused a notice (the "Notice") to be published pursuant to Section 21D(a)(3)(A) of the Exchange Act, which announced that a securities class action had been filed against Endo and the Individual Defendants, which advised class members that they had until October 17, 2017 to file a motion to seek appointment as a lead plaintiff in the action.[5] Movants have reviewed the complaint filed in the Action and have timely filed this motion pursuant to the Notice.

### 2. Movants Have the Requisite Financial Interest in the Relief Sought by the Class

During the Class Period, Movants purchased Endo shares in reliance upon the materially false and misleading statements issued by Defendants, and was injured thereby. In addition, Movants suffered a combined substantial loss of $124,722.82. *See* Ernst Decl., Ex. B. Movants thus have a significant financial interest in the outcome of this case. To the best of their knowledge, there are no other applicants who have sought, or are seeking, appointment as Lead Plaintiff that have a larger financial interest and also satisfy Rule 23.

## B. Movants Satisfy the Requirements of Rule 23(a) of the Federal Rules of Civil Procedure

In addition to possessing the largest financial interest in the outcome of the litigation, the lead plaintiff(s) must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules

---

[5] The first-filed action was the above-captioned case filed in this Court on August 18, 2017. The same day, the original Notice was published over *Business Wire*, a widely-circulated national business-oriented wire service. *See* Ernst Decl. Ex. C.

9

of Civil Procedure." 15 U.S.C. §78u-4(a)(3)(B). Rule 23(a) provides that a party may serve as a class representative if the following four requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Of the four prerequisites to class certification outlined in Fed. R. Civ. P. 23, only two – typicality and adequacy – are recognized as appropriate for consideration at this stage. *See Cendant,* 264 F.3d at 263. Furthermore, only a "preliminary showing" of typicality and adequacy is required at this stage. *See id.* (citations omitted). Consequently, in deciding a motion to serve as Lead Plaintiff, the Court should limit its inquiry to the typicality and adequacy prongs of Rule 23(a), and defer examination of the remaining requirements until the Lead Plaintiff moves for class certification. *See id.* at 244 n.24.

As detailed below, Movants satisfy both the typicality and adequacy requirements of Rule 23(a), thereby justifying their appointment as Lead Plaintiffs.

### 1. Movants' Claims Are Typical of the Claims of All Class Members

Under Rule 23(a)(3), typicality exists where "the claims . . . of the representative parties" are "typical of the claims . . . of the class." The typicality requirement of Rule 23(a)(3) is satisfied if the claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *In re Party City Secs. Litig.*, 189 F.R.D. 91, 107 (D.N.J. 1999) (citation omitted). The

10

requirement that a proposed class representative's claims be typical of the claims of the class does not mean, however, that the claims must be identical. *See id.* (citations omitted).

In this case, the typicality requirement is met because Movant's claims are identical to, and neither compete nor conflict with, the claims of the other Class members. Movants and all of the Class members purchased Endo securities and suffered damages as a result of these purchases due to Defendants' misrepresentations and omissions. Therefore, Movants' claims and injuries stem from "the same course of conduct" from which the other class members' claims and injuries arise. *Id*. Movants are not aware of any unique or special defenses that Defendants could raise against them. Therefore, Movants meet the typicality requirement of Rule 23(a).

### 2. Movants Will Adequately Represent the Class

Under Rule 23(a)(4), the representative party must "fairly and adequately protect the interests of the class." The PSLRA directs the Court to limit its inquiry regarding the adequacy of the movant to whether the interests of the movant are clearly aligned with the members of the putative Class and whether there is evidence of any antagonism between the interests of the movant and other members of the Class. 15 U.S.C. §78u-4(a)(3)(B); s*ee Party City,* 189 F.R.D. at 108.

Movants' interests are aligned with those of the other members of the Class. Not only is there no evidence of antagonism between Movants and the other Class members, but Movants have a significant, compelling interest in prosecuting the action to a successful conclusion based upon the very large financial losses they have suffered as a result of the wrongful conduct alleged in these action. This motivation, combined with Movants' identical interest with the members of the Class, demonstrates that Movants will vigorously pursue the interests of the

11

Class. In addition, Movants have selected law firms to represent them and the Class that are highly experienced in prosecuting securities class actions.

In sum, because of Movants' common interests with the Class members, their clear motivation and ability to vigorously pursue the action, and their competent counsel, the typicality and adequacy requirements of Rule 23(a)(3) and (4) are met. Because Movants meets those typicality and adequacy requirements and have sustained the largest amount of losses from Defendants' alleged wrongdoing, Movants are the presumptive Lead Plaintiffs in accordance with 15 U.S.C. §78u-4(a)(3)(B)(iii)(I), and should be appointed as such to lead the action.

## IV. MOVANTS' CHOICE OF COUNSEL SHOULD BE APPROVED

The PSLRA vests authority in the lead plaintiff to select and retain lead counsel, subject to Court approval. 15 U.S.C. § 78u-4(a)(3)(B)(v). The Court should interfere with the lead plaintiff's selection of counsel only when necessary "to protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa).

Movants have selected and retained Levi & Korsinsky as the proposed Lead Counsel, and O'Kelly Ernst & Joyce as Liaison Counsel for the Class. The members of Levi & Korsinsky have extensive experience in prosecuting complex securities class actions such as this, and are well-qualified to represent the Class. *See* Ernst Decl. Ex. D (firm résumé of Levi & Korsinsky). Additionally, the members of O'Kelly Ernst & Joyce have substantial experience in prosecuting complex actions and representing stockholder plaintiffs, and as such, are well-qualified to serve as Liaison Counsel for the Class. *See* Ernst Decl. Ex. E (firm résumé of O'Kelly Ernst & Joyce).

## V. CONCLUSION

For the foregoing reasons, Movants respectfully request that this Court (1) appoint

Movants as Lead Plaintiffs for the Class in the Action and (2) approve Levi & Korsinsky as Lead Counsel and O'Kelly Ernst & Joyce as Liaison Counsel for the Class.

Dated: October 17, 2017

Respectfully submitted,

**O'KELLY ERNST & JOYCE, LLC**

/s/ Ryan M. Ernst
Ryan M. Ernst (No. 202191)
Daniel P. Murray (No. 313112)
901 N. Market Street, Suite 1000
Wilmington, DE 19081
Tel: (302) 778-4000
Fax: (302) 295-2873
rernst@oelegal.com
dmurray@oelegal.com

-and-

**LEVI KORSINSKY, LLP**
Nicholas I. Porritt
Adam M. Apton
1101 30th Street NW
Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com
(*Pro hac vice to be submitted*)

*Proposed Counsel for Movants Maqsood Sheikh, Yuhai Ding, RA Consulting Aps and the Class*