*NOT FOR PUBLICATION*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

CREIGHTON TAKATA, individually and on behalf of all others similarly situated,

    Plaintiff,

v.

RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY G. MCGONEGAL,

    Defendants.

Civil Action No. 18-2293 (FLW) (TJB)

**OPINION**

---

JOSEPH J. KLAPPER, JR., individually and on behalf of all others similarly situated,

    Plaintiff,

v.

RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY G. MCGONEGAL,

    Defendants.

Civil Action No. 18-8031 (FLW) (TJB)

---

**WOLFSON, United States District Judge**:

    Pending before the Court are two separate securities fraud class action lawsuits (the "Related Actions") filed against Riot Blockchain, Inc. ("the Company" or "Riot"); John O'Rourke, a Director and the Chief Executive Officer; and Jeffrey G. McGonegal, the Chief Financial Officer (collectively, "Defendants"). Presently, three separate plaintiffs or groups of

1

plaintiffs move to seek appointment as lead plaintiff, and separately, appointment of lead counsel in the Related Actions. The movants are: Plaintiffs Simon Lee, Bryan Siegel, and Vivek Singhal ("Lee Movants") who seek to appoint The Rosen Law Firm P.A. as lead counsel; Plaintiffs Joseph J. Klapper, Jr., Ashish Rana, and Sonia C. Estoesta ("Klapper Movants") who seek to appoint Levi & Korsinsky, LLP as lead counsel; and Dr. Stanley Golovac, who seeks to appoint Motley Rice LLC as lead counsel (Golovac, Klapper Movants, and Lee Movants will be collectively referred to as "Moving Plaintiffs"). In addition, Klapper Movants separately move to consolidate the Related Actions.

For the reasons set forth herein, the Related Actions are consolidated, Dr. Golovac is appointed as Lead Plaintiff, and the law firm of Motley Rice is appointed as Lead Counsel.

I. **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Riot, a Nevada corporation with principle executive offices purportedly in Colorado, builds and supports various blockchain technologies, and invests primarily in Bitcoin and Ethereum blockchains. Compl. at ¶ 7.[1] The Complaints allege that, in October of 2017, the Company shifted its focus from animal healthcare and veterinary products to "being a strategic investor and operator in the blockchain ecosystem," and concurrently changed its name from Bioptix, Inc. to Riot. *Id.* at ¶ 15.

The Related Actions allege that, after this name change, Riot issued a pair of press releases adjourning scheduled annual stockholder meetings that were set to take place in Boca Raton, Florida. *Id.* at ¶¶ 19-20. Shortly thereafter, CNBC published an article "regarding

---

[1] "Compl." refers to the class action complaint filed in the earlier-filed action, *Takata v. Riot Blockchain, et al.*, No. 18-229, ECF No. 1.

2

questionable practices at Riot," reporting that, after its name change, Riot's "stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto," but that Riot did not appear to have meaningful involvement in the cryptocurrency business. *Id.* at ¶ 22. Based in large part on information in the CNBC article, the Complaints accuse Riot of (1) failing to disclose that Riot's principle executive offices were not in Colorado, but rather in Florida, the same location as a large, influential shareholder, Barry C. Honig, who had a previous working relationship with Defendant O'Rourke; (2) failing to disclose that Riot never intended to hold the two canceled annual stockholder meetings; and (3) making material misstatements about Riot's business, operations, and prospects. *Id.* at ¶ 21. The Related Actions assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

On February 17, 2018, the first of the Related Actions (the "Takata Action") was commenced against the Company and certain of its officers, and/or directors, for violations under the Exchange Act on behalf of all persons and entities, other than defendants and their affiliates, who purchased publicly traded Riot securities from November 13, 2017 through February 15, 2018 (the "Class Period"). ECF No. 1. That same day, an early notice was issued, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), advising class members of, *inter alia,* the allegations and claims in the Complaint, the Class Period, and advising class members of their option to seek appointment as lead plaintiff. Declaration of Laurence Rosen ("Rosen Decl."), Exhibit B. On April 18, 2018, the second of the Related Actions (the "Klapper Action") was filed in this Court, asserting the same claims based on largely the same facts as in

3

the Takata Action. *Klapper v. Riot, et al.*, 18-cv-8031, ECF No. 1. Thereafter, each of the Moving Plaintiffs filed the present motions.[2]

## II. **MOTION TO CONSOLIDATE**

Klapper Movants have moved to consolidate the Related Actions in this case. Rule 42(a) of the Federal Rules of Civil Procedure allows consolidation of two or more actions that involve common questions of law and fact. *See also Nanavati v. Burdette Tomlin Mem'l Hosp.*, 857 F.2d 96, 103 n. 3 (3d Cir. 1988) (consolidation is appropriate where there are actions involving common questions of law or fact); *Fields v. Biomatrix, Inc.*, 198 F.R.D. 451, 454 (D.N.J. 2000) (same) (citations omitted); *Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.*, 149 F.R.D. 65, 80 (D.N.J. 1993) ("Rule 42(a) gives the district court 'broad powers to consolidate actions involving common questions of law or fact if, in its discretion, such consolidation would facilitate the administration of justice.'").

Here, no parties have opposed the consolidation motion, and there is no dispute that these cases involve nearly identical questions of law and fact. Each action names the same defendants, asserts two counts alleging violations of Sections 10(b) and 20(a) of the Exchange Act, presents the same or similar theories for recovery, and is based on the same allegedly wrongful course of conduct. Accordingly, both civil actions will be consolidated for trial purposes.

---

[2] Three other plaintiffs also filed motions to be appointed lead plaintiff, but subsequently withdrew their applications. See ECF Nos. 21, 25, 26. In addition, another plaintiff, Saroor Alam, also filed a lead plaintiff motion, but, instead of filing an opposition brief, submitted a response recognizing "that he does not possess the largest financial interest among the various lead plaintiff movants," but "stands ready, willing, and able to assume that role on behalf of the class" "[s]hould the Court determine that the movants with the largest financial interest are unable, unwilling, or unqualified to serve as lead plaintiff." ECF No. 20 at 1. As the Court has determined that Dr. Golovac is an adequate lead plaintiff, Alam's motion is denied.

4

### III. <u>MOTIONS TO APPOINT LEAD PLAINTIFF</u>

#### A. The PSLRA

The PSLRA governs the appointment of the lead plaintiff in "each private action arising under the [Exchange Act] that is brought as a plaintiff class action pursuance to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(1). Under the PSLRA, the plaintiff who files the initial action must, within 20 days of filing the complaint, publish notice to the class informing class members of the pendency of the action, the claims asserted in the complaint, the class period, and their right to serve as lead plaintiff. *Id.* § 78u-4(a)(3)(A)(i). Within 60 days of the publication of the notice, any putative class member may move the court for appointment to serve as lead plaintiff. *Id.* § 78u-4(a)(3)(A)(i)(ii). Within 90 days of the publication of the notice, the court must consider any motion made by a purported class member, and appoint as lead plaintiff the member or members that the court determines to be most capable of adequately representing the interests of the class members. *Id.* § 78u-4(a)(3)(B)(i).

Here, Moving Plaintiffs had 60 days from the date of the first published notice, i.e. February 17, 2018, to move for appointment of lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). Thus, Moving Plaintiffs had until April 18, 2018 to file their motions. As each of the Moving Plaintiffs timely filed their motions, the Court finds that the parties have sufficiently complied with those requirements.

Next, the PSLRA sets out a two-step procedure in which "the court first identifies the presumptive lead plaintiff, and then determines whether any member of the putative class has rebutted the presumption." *In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001) (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)-(II)). The court must adopt a presumption that the most

5

adequate plaintiff "is the person or group or persons that…has the largest financial interest in the relief sought by the class; and otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). To do so, the court must conclude whether the movant with the largest financial interest has made a *prima facie* showing of Rule 23's typicality and adequacy requirements. *Cendant*, 264 F.3d at 263. If contested, the court must find whether a movant has rebutted the presumption. A movant may rebut the presumption with proof that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class; or is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

### B. Largest Financial Loss

Courts have discretion to appoint an investor with the largest stake in the litigation as lead plaintiff. *See Cendant*, 264 F.3d at 262. The Third Circuit has concluded that "largest financial interest" means the largest loss. *Id.* at 364; *see also In re Able Labs Sec. Litig.*, 425 F.Supp.2d. 562, 567 (D.N.J. 2006). However, observing that "the Reform Act provides no formula for courts to follow in making this assessment," the Third Circuit recommends that, in cases that do not present a clear choice as to the largest financial interest, courts should also consider, *inter alia*, (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs. *In re Cendant,* 264 F.3d 201 at 262.

Here, Moving Plaintiffs do not dispute each other's purported losses. Lee Movants assert that, collectively, they purchased 175,150 shares of Riot stock and 900 options contracts during the Class Period; expended over $4.7 million in net funds; and lost $1,733,507.47. *See* Rosen

Decl., Exhibit 3. Klapper Movants asserts a loss of approximately $715,015.25. *See* Declaration of Donald Enright ("Enright Decl."), Exhibit 2. Dr. Golovac asserts that he purchased 145,000 shares of Riot common stock; expended more than $3.0 million in net funds; and lost approximately $463,232. *See* Declaration of Joseph DePalma ("DePalma Decl."), Exhibits B, C.

Therefore, based on these uncontested loss numbers, Lee Movants suffered the largest financial loss.

### C. Typicality and Adequacy

Having determined that Lee Movants suffered the largest financial loss, the Court turns to whether they satisfy PSLRA's typicality and adequacy requirements. For the reasons that follow, despite suffering larger financial losses than Dr. Golovac, both Lee Movants and Klapper Movants fail to satisfy the adequacy requirement, rendering them both inappropriate lead plaintiffs.

The "threshold determination of whether the movant with the largest financial losses satisfies the typicality and adequacy requirements should be a product of the court's independent judgment." *Cendant*, 264 F.3d at 263. This inquiry "need not be extensive." *Id.* at 264. The court "may and should consider the pleadings that have been filed, the movant's application, and any other information that the court requires to be submitted," but "the court generally will not consider at this stage any arguments by other members of the putative class." *Id.* To make this determination, the court applies traditional Fed. R. Civ. P. 23 principles, namely "whether the circumstances of the movant with the largest losses 'are markedly different or the legal theory upon which the claims [of that movant] are based differ[ ] from that upon which the claims of other class members will perforce be based.'" *Id.* at 265 (quoting *Hassine v. Jeffes*, 846 F.2d

169, 177 (3d Cir. 1988)) (alterations in original); *see also Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 631 (3d Cir. 1996). That is, "the typicality requirement is satisfied when the 'plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory.'" *In re Party Sec. Litig.*, 189 F.R.D. 91, 106 (D.N.J. 1999) (quoting *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994)).

Assessing a movant's adequacy requires a court to consider whether the movant "has the ability and incentive to represent the claims of the class vigorously, [whether it] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class." *Cendant*, 264 F.3d at 265 (quoting *Hassine*, 846 F.2d at 179) (alterations in original); *see also Georgine*, 83 F.3d at 630 (stating that the adequacy of representation inquiry involves consideration of both whether "the interests of the named plaintiffs [are] sufficiently aligned with those of the absentees" and whether "class counsel [is] qualified and [will] serve the interests of the entire class"); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d at 800 (same).

In the PSLRA context, there are two additional factors regarding adequacy. *Cendant*, 264 F.3d at 265. The first of these additional factors is "whether the movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel . . . ." *Id.* (citing *In re Quintus Sec. Litig.*, 201 F.R.D. 475, 485 (N.D. Cal. 2001)).[3] The second additional adequacy factor, and the crucial factor in this case,

---

[3] This factor is not at issue here, and, moreover, it does not require a particularly difficult showing, as "the question at this stage is not whether the court would 'approve' that movant's choice of counsel or the terms of its retainer agreement or whether another movant may have chosen better lawyers or negotiated a better fee agreement; rather, the question is whether the choices made by the movant with the largest losses are so deficient as to demonstrate that it will

8

"arise[s] only when the movant with the largest interest in the relief sought by the class is a group rather than an individual person or entity." *Id.* at 266. In light of the PSLRA lead plaintiff provision's goal of "locat[ing] a person or entity whose sophistication and interest in the litigation are sufficient to permit that person or entity to function as an active agent for the class," and as part of the PSLRA's larger goal of encouraging party-driven—as opposed to lawyer-driven—litigation, where a group seeks appointment as lead plaintiff, the court must "determine . . . [whether] the way in which . . . [the] group . . . was formed or the manner in which it is constituted would preclude it from fulfilling the tasks assigned to a lead plaintiff." *Id.* If the court determines that the makeup of a group or the way in which it was formed would prevent it from carrying out its duties as lead plaintiff, the Court "should disqualify that movant on the grounds that it will not fairly and adequately represent the interests of the class." *Id.*

Of particular concern when "group" plaintiffs seek lead plaintiff status, is the possibility that "the movant 'group' with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel." *Id.* at 267. In that regard, a court "could well conclude, based on this history, that the members of that 'group' could not be counted on to monitor counsel in a sufficient manner." *Id.* (citing *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 307–08 (S.D.N.Y. 2001) (refusing to appoint as lead plaintiff a group that, in the court's view, was "simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as 'lead plaintiff,' which can then select the equally artificial grouping of counsel as 'lead counsel'"). Thus, when evaluating group

---

not fairly and adequately represent the interests of the class, thus disqualifying it from serving as lead plaintiff at all." *Cendant*, 264 F.3d at 266.

9

plaintiffs, movants must show their cohesiveness and independence from proposed counsel, including "how and when they were joined together, how they intend to conduct discovery or how they will coordinate litigation efforts and strategy." *See Eichenholtz v. Verifone Holdings, Inc.*, No. 07-06140, 2008 WL 3925289, at *9 (N.D. Cal. Aug. 22, 2008) (rejecting proposed group, in part, because it was "unclear whether the entities that comprise this group were related prior to the litigation").

Here, Lee Movants failed to include any facts in their moving brief detailing the relationship between the plaintiffs that comprise the group. Notwithstanding this failure, which could, by itself, be a basis for denying lead plaintiff status, *see id.*, Lee Movants belatedly submitted a supplemental joint declaration as part of its opposition brief that attempts to establish the group's cohesiveness and independence from counsel. This joint declaration does not allay the *Cendant* court's concerns about appointing a loose, attorney-driven group of investors as lead plaintiff. In fact, the joint declaration seems to confirm that the members of the group had never communicated before their counsel submitted the joint motion on their behalf, merely stating that the members "were aware of each other" prior to the motion. *See* ECF No. 22-2 at 2. The declaration does indicate that, since filing the motion, the plaintiffs "have spoken to each other multiple times," and in the future "will communicate regularly with counsel and with one another by email and by telephone regarding major litigation events, such as motions, settlement discussions, trial preparation, and trial." ECF No 22-2 at 3. Still, the group is made of up of three seemingly unconnected strangers from across the county,[4] and "the Joint Declaration does not provide… any information regarding how these…apparent strangers from different states found

---

[4] Singhal is from New York, Lee is from Florida, and Siegel is from California.

10

each other." *Stires v. Eco Science Solutions, Inc.*, No. 17-3707, 2018 U.S. Dist. LEXIS 25088, at *15 (D.N.J. Feb. 13, 2018) (denying lead plaintiff motion of a group of geographically dispersed plaintiffs that did not state how they were joined together). In that regard, the Court has serious concerns regarding how these Plaintiffs will monitor their proposed counsel such that they can adequately represent the class. Lee Movants are, therefore, not adequate lead plaintiffs in this matter.[5]

In the same vein, Klapper Movants have failed to establish that they possess the requisite cohesiveness or independence to be appointed lead plaintiff. Although they submitted a timely declaration, the declaration lacks any mention of contact prior to filing the motion: it merely states that the group is made up of investors who have shared "interests in prosecuting the case in a collaborative, likeminded manner," an *identical* representation to one that a court in this district rejected as "conclusory." *Stires*, 2018 U.S. Dist. LEXIS 25088, at *14-15; *see also Int'l Union of Operating Eng'rs Local No. 478 Pension Fund v. FXCM Inc.*, No. 15-CV-3599, 2015 WL 7018024, at *4 (S.D.N.Y. Nov. 12, 2015) (rejecting group that "failed to provide the Court with anything beyond conclusory assurances that appointing a group of unrelated investors will not lead to fragmentation"); *In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 119 (E.D.N.Y. Jan. 26, 2012) (holding insufficient group whose declaration stated its members "are similarly situated," "share

---

[5] In their reply brief, Lee Movants assert that Lee, individually, with over $690,000 in losses, has the largest loss of any individual movant, and, thus, "if the Court were inclined to appoint only an individual as Lead Plaintiff, it would have to be Mr. Lee." ECF No. 27 at 6. However, counsel for Lee Movants only suggested this theory when confronted with Dr. Golovac's argument that a loosely connected group cannot effectively monitor counsel. This belated offer to break apart the group and request Lee as lead plaintiff does not assuage the Court's concerns that the attorneys, and not the plaintiffs, have initiated Lee Movants' efforts.

11

common goals," and have "'shared belief regarding the role of corporate governance in detecting and preventing securities fraud'"); *Frias v. Dendreon Corp.*, 835 F. Supp. 2d 1067, 1074 (W.D. Wash. 2011) (rejecting proposed group whose "joint declaration contain[ed] myriad conclusory statements and generalizations, such as that they are a 'small, cohesive group' who 'intend to work closely together['] and they will 'communicat[e], individually or as a group, with each other and with counsel, to the extent [they] determine necessary to fairly and adequately represent the interests of the Class'") (third and fourth alteration in original).

Thus, neither Lee Movants nor Klapper Movants are entitled to presumptive lead plaintiff status.[6]

### D. Dr. Golovac's Lead Plaintiff Status

Having determined that Lee Movants and Klapper Movants are not adequate lead plaintiffs, the Court turns to Dr. Golovac. *See Cendant*, 264 F.3d at 268 (stating that if the class members with the highest financial interest are not entitled to presumptive lead plaintiff status, "the court must begin the process anew…[by] identifying which of the remaining movants has the highest financial interest in the class's recovery, assessing whether that movant satisfies the threshold typicality and adequacy requirements, and determining whether the presumption has been rebutted.").[7]

Dr. Golovac satisfies the typicality requirement because his claims arise from the same

---

[6] As neither group is entitled to presumptive lead plaintiff status, the Court need not address rebuttal arguments asserted by the parties.
[7] As the only remaining potentially adequate lead plaintiff, Dr. Golovac, of course, has the highest financial interest of remaining movants.

12

events and course of conduct as the other class members, are based on the same legal theories as the claims of the other class members, and he seeks the same relief. Just as is alleged in the Complaint, Dr. Golovac claims that, during the Class Period, he purchased securities from Riot in reliance on false or misleading statements or omissions in the Riot press releases, and was thereby damaged.

Further, as to adequacy, there is no indication that Dr. Golovac is not incentivized to prosecute the proposed class vigorously; rather, as discussed further in the next section, Dr. Golovac has selected counsel experienced in securities class actions, and, as an individual with no other co-plaintiffs with whom to coordinate, he can be expected "to monitor counsel in a sufficient manner." *Cendant*, 264 F.3d at 267.

For these reasons, and because none of the other Moving Plaintiffs have presented any rebuttal evidence as to why Dr. Golovac cannot fairly and adequately represent the proposed class, Dr. Golovac will be appointed Lead Plaintiff.

### IV. MOTIONS TO APPOINT LEAD COUNSEL

Under the PSLRA, the task of selecting lead counsel is given to the most adequate plaintiff, subject to the approval of the court. 15 U.S.C. § 78u-4(a)(3)(B)(v). The court must make "an independent evaluation of, among other considerations, the effectiveness of proposed class counsel to ensure the protection of the class." *In re Milestone Scientific Sec. Litig.*, 187 F.R.D. 165, 176 (D.N.J. 1999).

Dr. Golovac seeks approval of his counsel, Motley Rice, as lead counsel. After reviewing the firm's resume, the Court is satisfied that the firm is competent to represent the proposed class, as it has been selected as lead or co-lead counsel in multiple securities class actions. *See*

13

DePalma Decl. Ex. D. Furthermore, the opposing plaintiffs do not dispute the firm's competency. Accordingly, the Court approves Dr. Golovac's selection of Motley Rice as Lead Counsel.[8]

## V. **CONCLUSION**

For the foregoing reasons, the Court will consolidate the two actions into a single putative class action, will appoint Dr. Golovac as Lead Plaintiff, and Motely Rice as Lead Counsel.

Dated:  November 6, 2018                                              /s/ Freda L. Wolfson

                                                                                                                      Hon. Freda L. Wolfson
                                                                                                                      United States District Judge

---

[8] In addition to Motley Rice, a South Carolina-based firm, Dr. Golovac is also represented by a New Jersey-based firm, Lite DePalma Greenberg, which has not independently moved to be appointed by the Court to a particular role.

14