# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated, | : : | Civil Action No.: 18-2293(FLW)(TJB) |

CREIGHTON TAKATA, Individually and on
behalf of all others similarly situated,      :

                           :     Civil Action No.: 18-2293(FLW)(TJB)

                           :

        *Plaintiff*,           :     CONSOLIDATED ACTION

                           :

        v.               :     **CONSOLIDATED CLASS ACTION**

                           :     **COMPLAINT FOR VIOLATIONS OF**

RIOT BLOCKCHAIN, INC. F/K/A,   :     **THE FEDERAL SECURITIES LAW**

BIOPTIX, INC., JOHN O'ROURKE, and  :

JEFFREY G. MCGONEGAL,      :     **JURY TRIAL DEMANDED**

                           :

        *Defendants*.      :

                           :

**LITE DEPALMA GREENBERG, LLC**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice* pending)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for Dr. Stanley Golovac*
*and Lead Counsel for the Class*

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

JURISDICTION AND VENUE ......................................................................................4

PARTIES .......................................................................................................................4

SUBSTANTIVE ALLEGATIONS ................................................................................6

    A.    Cryptocurrency ...........................................................................................6

    B.    The Blockchain ...........................................................................................8

    C.    Bioptix Changes its Name to "Riot Blockchain" And Purportedly Enters the Crytocurrency Business ...........................................................................9

    D.    Developments at Riot After Defendants O'Rourke and Honig Sold Their Shares ...............................................................................................19

    E.    A CNBC Article Partially Reveals the Truth About the Company .......................20

    F.    Defendants O'Rourke, Honig, and Their Allies' Related Business Schemes Raise Questions About Their Integrity at Riot ...........................27

    G.    The SEC Investigates Riot, Then Charges Defendants O'Rourke, Honig, and Others For Pump-and-Dump Schemes ................................................29

DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD.................................................................................30

THE TRUTH BEGINS TO EMERGE, YET DEFENDANTS CONTINUE TO MISLEAD THE MARKET........................................................................................46

THE TRUTH IS FULLY REVEALED.......................................................................64

POST-CLASS PERIOD DEVELOPMENTS...............................................................65

ADDITIONAL SCIENTER ALLEGATIONS............................................................66

LOSS CAUSATION/ECONOMIC LOSS ..................................................................70

CLASS ACTION ALLEGATIONS ............................................................................73

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND AFFILIATED UTE PRESUMPTION...........................................................................76

i

COUNT I
Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against Riot, O'Rourke,
McGonegal, and Beeghley ........................................................................................................79

COUNT II
Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated
Thereunder Against All Defendants ........................................................................................81

COUNT III
Violation of Section 20(a) of The Exchange Act Against O'Rourke, McGonegal,
and Beeghley ............................................................................................................................82

PRAYER FOR RELIEF ...........................................................................................................84

DEMAND FOR TRIAL BY JURY ..........................................................................................84

Court-appointed Lead Plaintiff Dr. Stanley Golovac ("Lead Plaintiff"), individually and on behalf of all other persons and entities similarly situated, by Lead Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review and analysis of filings by Riot Blockchain, Inc. ("Riot" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); press releases, analyst reports, news articles, media, and other public statements about the Company; Riot's corporate website; as well as court filings in related ligation against Defendants (defined below), including *Securities and Exchange Commission v. Honig, et al.*, No. 1:19-cv-08175 (S.D.N.Y.) (the "*Honig* Action").

The investigation of Lead Plaintiff's attorneys is continuing, yet certain additional facts supporting these allegations are known only to Defendants or are exclusively within their custody or control.  Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **<u>INTRODUCTION</u>**

1.      This is a federal securities class action on behalf of all purchasers of the common stock of Riot between October 3, 2017, and September 6, 2018, inclusive (the "Class Period"), seeking to pursue remedies against the Company, certain of its former executive officers and/or directors, and Barry Honig ("Honig"), a substantial shareholder of Riot who used the Company to orchestrate a pump-and-dump scheme at the expense of Riot's other investors.  Lead Plaintiff brings claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule l0b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

2.      Prior to and during the Class Period, Defendants engaged in a massive pump-and-dump scheme to defraud investors and issued materially false and misleading statements and omitted material information concerning the purported transformation of Riot from a biotech company into a purported miner of cryptocurrency.  This scheme was orchestrated by Honig, a Florida-based investor later charged by the SEC for masterminding numerous pump-and-dump schemes, and John O'Rourke ("O'Rourke"), Riot's Chief Executive Officer ("CEO") during the Class Period, as well as certain other Company insiders, their associates, and their related entities.

3.      Up until October 4, 2017, the company now known as Riot Blockchain, Inc. was a biologics company known as Bioptix, Inc. ("Bioptix").  In an attempt to capitalize on investor interest in cryptocurrency, including Bitcoin, Riot set out to reinvent itself as a new player in the cryptocurrency market.  The Company's name change became effective on October 19, 2017.

4.      Despite grandiose promises that Riot would be a "pure play" that would "leverage our expertise, and network, to build and support blockchain technology companies," in reality the Company had limited meaningful investments in cryptocurrency products and did not have a meaningful cryptocurrency business plan.  Rather, Defendants and their unscrupulous allies, who have a history of engaging in pump-and-dump schemes, sought to exploit investor interest in the rapidly expanding cryptocurrency markets.  As SEC Chairman Jay Clayton testified before Congress – in what one reporter described as a "thinly-veiled sot at Riot" – "***Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain.***"

5.      This, however, is precisely what Riot and its executives did.  Instead of operating a legitimate cryptocurrency business, Defendants touted the Company's prospects and then sold

their stock at artificially inflated prices for millions of dollars in proceeds before the truth about their scheme was revealed.

6.      In fact, Defendants O'Rourke and Honig have a history of questionable financial dealings and joint investments.  Defendant O'Rourke has even admitted that he has "a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."  Both Defendants O'Rourke and Honig capitalized on Riot's name change and purported change of focus (from biotech to Bitcoin) by selling millions of dollars' worth of the Company's securities in the weeks following that name change.

7.      Indeed, so entrenched was Defendant Honig's control over Riot that the Company's principal executive offices were not in Colorado, as officially represented by the Company, but instead were effectively located in Florida in the same location as Defendant Honig, which allowed him effectively to control or exercise undue influence over Riot and its operations and affairs.

8.      Unfortunately, as has become clear over the past few months, Defendant O'Rourke and Defendant Honig's fraudulent actions are not limited to Riot.  The SEC has charged both individuals, along with others, with similar pump-and-dump schemes at several other publicly traded companies.  Describing the group as "microcap fraudsters," the SEC has alleged that "Honig was the primary strategist, calling upon other Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity."  The SEC further alleged that "[i]n each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse merger or by participating in financings on terms highly unfavorable to the company."

9.      Defendant O'Rourke resigned in the wake of these allegations and certain of the individuals charged by the SEC have already settled those charges.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

12.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the misleading statements entered into and the subsequent damages took place within this district.

13.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

14.     Lead Plaintiff, as set forth in the accompanying certification, purchased Riot common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Riot purports to build and support various blockchain technologies. The Company claims to invest primarily in Bitcoin and Ethereum blockchains. The Company is a Nevada corporation with its principal executive offices purportedly located at 834-F South Perry Street, Suite 443, Castle Rock, Colorado 80104. Riot's securities trade on NASDAQ under the symbol "RIOT." As of April 13, 2018, the Company had 13,417,132 shares of common stock outstanding.

4

16.     Defendant O'Rourke served as the Company's CEO and Chairman of the Board from November 3, 2017 until September 8, 2018, when he resigned following the filing of a complaint against him by the SEC for engaging in pump-and-dump schemes in other companies. Defendant O'Rourke is a defendant in the *Honig* Action.

17.     Defendant Jeffrey G. McGonegal ("McGonegal") was the Company's Chief Financial Officer ("CFO") from 2003 to February 28, 2018, from which point he served solely as the Company's Principal Accounting Officer until April 30, 2018.  McGonegal then served as a consultant to the Company until August 30, 2018.

18.     Defendant Michael Beeghley ("Beeghley") was the Company's Chairman and CEO until he was replaced by Defendant O'Rourke.

19.     Defendants O'Rourke, McGonegal, and Beeghley are herein referred to as the "Individual Defendants."

20.     Defendant Honig is a Florida-based investor who acquired a substantial equity stake in Bioptix and Riot.  Defendant Honig is a defendant in the *Honig* Action.

21.     Collectively, Riot, Honig, and the Individual Defendants are herein referred to as "Defendants."

22.     Riot is liable for the acts of the Individual Defendants and the Company's employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

23.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Riot under *respondeat superior* and agency principles.

762295.2

## SUBSTANTIVE ALLEGATIONS

**A.      Cryptocurrency**

24.      A cryptocurrency is a digital or virtual currency that uses cryptography for security. Many cryptocurrencies are decentralized systems based on blockchain technology, a distributed ledger enforced by a disparate network of computers.  A defining feature of a cryptocurrency, and arguably its biggest allure, is its organic nature; it is not issued by any central authority, rendering it theoretically immune to government regulation or manipulation.

25.      Cryptocurrencies are systems that allow for the secure payments of online transactions that are denominated in terms of a virtual "token," representing ledger entries internal to the system itself.   "Crypto" refers to the fact that various encryption algorithms and cryptographic techniques, such as elliptical curve encryption, public-private key pairs, and hashing functions, are employed.

26.      Cryptocurrencies hold the promise of making it easier to transfer funds directly between two parties in a transaction, without the need for a trusted third party such as a bank or credit card company; these transfers are facilitated through the use of public keys and private keys for security purposes.  In modern cryptocurrency systems, a user's "wallet," or account address, has the public key, and the private key is used to sign transactions.  Fund transfers are done with minimal processing fees, allowing users to avoid the fees charged by most banks and financial institutions for wire transfers.

27.      The first blockchain-based cryptocurrency was Bitcoin, which still remains the most popular and most valuable.  Today, there are thousands of alternate cryptocurrencies with various functions or specifications.  Some of these are clones of Bitcoin while others are forks, or new cryptocurrencies that split off from an already existing one.

762295.2

28.     Bitcoin was created by developer Satoshi Nakamoto (which is believed to be an alias for an individual or group of individuals).  It is not a proper currency in the truest sense, but an alternative, digital method of payment.  It is a borderless digital currency and decentralized payment method.  It can be converted into nearly any currency.  While dollars are broken down to hundredths, Bitcoin is calculated to the hundredth millionth (eight digits after the decimal point).

29.     Bitcoins have to be generated through a computational process called mining. Mining is achieved by computers calculating complex mathematical equations.  To keep the supply of coins generated steady, the mining process is linked to a difficulty rating.  As more computer power joins the network, the difficulty rating increases.

30.     When Bitcoin was launched in 2009, very little hardware was required to mine it. As mining increased, the mining difficulty parameters also increased so that new blocks on the Bitcoin network remained ten minutes apart.

31.     In early 2013, a microchip designed specifically to mine bitcoin, ASIC (application-specific integrated circuit), was created.  While vastly superior to any other type of hardware used for mining Bitcoin, ASICs require a lot of power.  Given this need for electricity, mining for Bitcoins is unprofitable unless the miner has access to cheap or free electricity.

32.     Bitcoin can be purchased at Bitcoin exchanges, often through a trading engine that automatically matches buy and sell orders.

33.     The Bitcoin price is determined under principles of supply and demand.  The supply of Bitcoin is limited to 21 million "coins" – which is to be reached by May 7, 2140.  Accordingly, while central banks may boost liquidity by carrying out quantitative easing, Bitcoin has a fixed liquidity cap of 21 million coins.  Bitcoin had nearly no value until 2011, after which it started

increasing in value.   As of December 8, 2018, however, there were 17,415,100 Bitcoins in circulation and Bitcoin was trading at $3,410.00 per Bitcoin.

34.     Bitcoin's success has spawned a number of competing cryptocurrencies, known as "altcoins," including Litecoin, Namecoin, Peercoin, Ethereum, EOS, and Cardano.   There are thousands of cryptocurrencies in existence, with an aggregate market value of over $200 billion, of which Bitcoin currently represents more than 50% of the total value.

35.     Major financial institutions such as JPMorgan Chase see potential in cryptocurrencies to lower transaction costs by making payment processing more efficient. However, because cryptocurrencies are virtual and do not have a central repository, a digital cryptocurrency balance can be wiped out by a computer crash if a backup copy of the holdings does not exist, or if the owner loses his or her private keys (passwords) to his or her Bitcoin wallet.

36.     Since prices are based on supply and demand, the rate at which a cryptocurrency can be exchanged for another currency can fluctuate widely.   However, much research has been undertaken to identify the fundamental price drivers of cryptocurrencies.   Bitcoin has experienced some rapid surges and collapses in value, reaching as high as $19,000 per Bitcoin in December of 2017 before returning to approximately $7,000 in the following months.   Some research has identified that the cost of producing a Bitcoin, which takes an increasingly large amount of energy, is directly related to its market price.

**B.     The Blockchain**

37.     Blockchain protocols offer a secure way to store and relay information without the need for middlemen.   The blockchain uses a decentralized and encrypted ledger that offers a secure, efficient, verifiable, and permanent way of storing records and other information.   A blockchain is basically a continuously growing record book that uses cryptography to link and

762295.2

secure individual records, which are called "blocks."  Bitcoin helped revolutionize digital currency because it utilized blockchain as the public ledger for its transactions.  Blockchain protocols are the backbone of numerous digital cryptocurrencies including Bitcoin, Ethereum, and Litecoin.

38.     Central to the appeal and function of Bitcoin is the blockchain technology it uses to store an online ledger of all the transactions that have ever been conducted using Bitcoins, providing a data structure for this ledger that is exposed to a limited threat from hackers and can be copied across all computers running Bitcoin software.  Every new block generated must be verified by the ledgers of each user on the market, making it almost impossible to falsify transaction histories.   Many experts see this blockchain as having important uses in technologies such as online voting and crowdfunding.

39.     Cryptocurrencies' blockchains are secure, but other aspects of a cryptocurrency ecosystem are not immune to the threat of hacking.  In Bitcoin's almost ten-year history, several online exchanges have been the subject of hacking and theft, sometimes with millions of dollars worth of "coins" stolen.  Still, many observers look at cryptocurrencies as hope that a currency can exist that preserves value, facilitates exchange, is more transportable than precious metals, and due to its decentralization is less subject to regulation by central banks and governments than traditional fiat currencies.

C.      **Bioptix Changes its Name to "Riot Blockchain" And Purportedly Enters the Crytocurrency Business**

40.     Bioptix was a biotech company formerly based in Castle Rock, Colorado, that focused on biotech diagnostic machinery.  The company was previously known as Venaxis Inc. ("Venaxis"), but changed its name after buying out Bioptix in 2016.  Venaxis was a medical products company that sought to develop a blood test for determining which patients suffering

from abdominal pain were less likely to be suffering from acute appendicitis than from other ailment.

41.     In early 2015, the U.S. Food and Drug Administration ruled that the test did not meet or exceed the current standard of care.  That meant Venaxis no longer had a marketable product and found itself facing delisting from the NASDAQ because its share price plunged below the exchange's minimum.

42.     Venaxis still had plenty of cash, however, having raised $20 million in a stock offering the previous year.  Therefore, in March 2016, it executed a 1-for-8 reverse stock split. That reduced its outstanding shares to less than 4 million and lifted its stock price well above $1 a share — enough for Venaxis to keep its listing on the NASDAQ.

43.     Shortly thereafter, Defendant Honig acquired an 8.65 percent stake in Venaxis, through several entities he controlled.  In September 2016, Defendant Honig reported that his stake had risen to 9.6 percent.   In addition, Catherine DeFrancesco ("DeFrancesco"), an ally of Defendants O'Rourke and Honig, also had been acquiring shares and disclosed that she had acquired a 7.5 percent interest in Venaxis.

44.     In addition to accumulating shares in Venaxis, Defendant Honig sought to block Venaxis's plan to acquire Bioptix.  Venaxis objected by arguing that Defendant Honig wanted Venaxis to combine with a different company in which he had an interest.

45.     Despite Defendant Honig's objections, Venaxis and Bioptix forged ahead with their deal, which increased the number of shares outstanding by almost 20%.  Defendant Honig kept acquiring shares of the company (by this point called Bioptix), eventually obtaining more than ten percent.

762295.2

46.     In late 2016, Defendant Honig waged a proxy fight for control of Bioptix, demanding the removal of five of Bioptix's six directors and the payment of a $7.5 million special dividend.  Defendant Honig offered five names to fill the board vacancies, including Defendant O'Rourke and John R. Stetson Stetson ("Stetson").

47.     Defendant Honig then filed a lawsuit in state court in Colorado, seeking to force a special meeting of shareholders that would include a vote on the proposed changes.  Bioptix sought to placate Defendant Honig by appointing one of his allies – Defendant Beeghley – to its board of directors.

48.     Defendant Honig and DeFrancesco continued acquiring shares and held nearly 23 percent of Bioptix's stock in January 2017.  Shortly thereafter, three of Bioptix's board members resigned, on the basis that Defendant Honig was likely to prevail in his legal fight and that mounting a defense would waste corporate recourses.

49.     Defendant O'Rourke, who has been involved with Defendant Honig since at least 2011, and another of Defendant Honig's allies were each appointed to one of the three vacant board seats.  Then, in March 2017, a longtime Bioptix director stepped down, and Defendant Honig's group found itself with a majority of the seats on the board and control of the company.

50.     Once Defendant Honig and his allies took over, Bioptix raised an additional $7 million through two private placements.  Defendant Honig, his business partners, and other associates bought nearly all of the stock, warrants, and convertible notes sold in those placements, which were priced at a 30 percent discount to the market.  The financing transactions were completed on March 16, 2017 (the "March 2017 Placements").

51.     Defendant Honig bought at least $1.75 million of the notes.  The shares underlying those notes and warrants, plus his original open-market stock purchases, gave Defendant Honig the equivalent of a 20 percent stake in Bioptix on a fully diluted basis.

52.     Thereafter, in April 2017, Bioptix's CEO resigned and was replaced by Defendant Beeghley.  That same month, Bioptix filed a registration statement covering the resale of 5.6 million shares.  It covered all 900,000 shares sold in the previous month's placement, plus 1.9 million shares underlying the convertible notes and 2.8 million shares underlying the warrants. The filing listed Bioptix's two top shareholders as Defendant Honig and Titan Multi-Strategy Fund I Ltd. ("Titan"), managed by Defendant Honig's brother, Jonathan Honig.

53.     According to the filing, Defendant Honig offered to sell just over 1.4 million shares, all of them underlying notes or warrants from the March 2017 Placements.  Titan offered to sell 1.6 million shares, also linked to the notes and warrants.  The registration statement also reported that Defendant Honig would hold 504,000 shares after those sales.  That number equaled his original open-market purchases during the proxy fight.

54.     The registration statement listed Mark E. Groussman ("Groussman"), an ally of Defendant Honig who the SEC would later charge for engaging in pump-and-dump schemes, as controlling 500,000 shares – half in common stock and half in warrants.  Groussman's share holdings included 340,000 shares and warrants owned by his company, Melechdavid, Inc., another of the defendants in the *Honig* Action.  Groussman's other 160,000 shares and warrants were held by two accounts benefitting Groussman's children.  Groussman offered to sell all 500,000 shares.

55.     The filing also listed one of Stetson's companies, Stetson Capital Management LLC, as holding 413,517 Bioptix shares.  It offered to sell 406,017 shares, nearly of all of them underlying notes and warrants from the March 2017 placement.

56.   Based on the table in the registration statement, Defendant Honig, Titan, Groussman, and Stetson controlled slightly over 4.4 million shares of common stock, which amounted to more than 40 percent of the company, on a fully diluted basis.  In sum, Defendant Honig and the others were offering 4 million of their shares for resale.

57.   The other selling shareholders included:

- Aifos Capital LLC, controlled by Edward Karr ("Karr"), the chairman and chief executive of U.S. Gold.  Karr also was a director of Majesco Entertainment ("Majesco") prior to its merger with PolarityTE.

- JAD Capital Inc., controlled by Jason Theofilos ("Theofilos"), the chief executive of a digital advertising company called MUNDOmedia Ltd. Securities filings and media reports show that Defendant Honig, Jonathan Honig, Defendant O'Rourke, Stetson, and Groussman each held stakes in MUNDOmedia Ltd.

- Adrian James ("James"), a stock promoter who previously touted other Honig-backed companies, including Pershing Gold, MusclePharm Inc., and Valor Gold Corp.

58.   In April 2017, Defendant Honig belatedly filed a belated Form 13D in which he reported that he had purchased $2.25 million of the $4.75 million in convertible notes sold in March 2017.  Defendant Honig amended that filing the next day, indicating he purchased only $1.75 million.

59.   Registration statements also show that $500,000 in notes were acquired by Karr, Theofilos, James, and three other of Defendant Honig's allies, who also were listed as selling shareholders.

60.   Richard Molinsky ("Molinsky"), a former stockbroker at D.H. Blair & Co. who was barred from the industry in 2000 after pleading guilty to criminal charges related to market manipulation and fraudulent sales practices, was one such associate listed on the registration statement.  Molinsky has been an investor in numerous Honig-backed companies, including PolarityTE, Pershing Gold, and Vapor Corp.

13

61.     US Commonwealth Life, A.I. Policy No. 2013-17 purchased $500,000 in convertible notes, owning roughly 40,000 shares underlying the notes, and 40,000 shares underlying warrants.  It offered all 80,000 for resale.  Mohit Bhansali ("Bhansali"), the co-founder of Equity Stock Transfer LLC ("Equity Stock Transfer") and former director of PolarityTE, had investment control over the securities held in the insurance policy's name.  Equity Stock Transfer is the transfer agent for PolarityTE.  It acted as transfer agent for Riot when the Bioptix paid a special dividend in 2017.  *See* ¶ 66.

62.     Financial statements that Equity Stock Transfer filed with the SEC show that it has received financing from entities connected to Harvey J. Kesner ("Kesner"), a New York-based attorney who was securities counsel for Riot and PolarityTE.  Kesner also was securities counsel for BioZone Pharmaceuticals Inc. ("Biozone") and Mabvax Therapeutics Holdings Inc. ("Mabvax"), two of the companies believed to be at the center of the *Honig* Action.  Kesner's former law firm, Sichenzia Ross Ference LLC, also represented the third company believed to be implicated in the pump-and-dump scheme in the *Honig* Action, MGT Capital Investments Inc. ("MGT").  Kesner abruptly retired from that firm just before the SEC announced the charges against Defendant Honig's group.  Bhansali also was an employee of Kesner's previous law firm.

63.     Shortly before changing its name, Bioptix filed amended versions of its registration statement in July, August, and September of 2017.  The number of shares listed for Defendant Honig remained unchanged, as did those for most other selling shareholders.  Between the filing of the first registration statement in May 2017 and the filing of the fourth one in September 2017, Bioptix's average daily trading volume was well below 50,000 shares, so the ability to sell large amounts of shares was limited.

64.     On September 20, 2017, Bioptix retired the $4.75 million in convertible notes it had issued earlier in the year, swapping them for Series A preferred stock convertible to 1.92 million common shares.

65.     On September 29, 2017, Bioptix made a $3 million investment in goNumerical Ltd, a Canadian cryptocurrency exchange that does business as Coinsquare, which was to become the Company's first move in its transformation to a Bitcoin company.  Bioptix did not disclose at the time of the Coinsquare deal that Defendant Honig, Jonathan Honig, Stetson, Groussman, and Michael Brauser ("Brauser"), who is also a defendant in the *Honig* Action, also had invested in Coinsquare.  An amended filing submitted to the SEC on May 25, 2018, nearly nine months after the fact, included a chart with their holdings.  It also listed that MUNDOmedia's CEO, Theofilos, and at least six others connected to that company also owned Coinsquare stock.  In the Company's 2017 Form 10-K, filed on April 17, 2018, Riot disclosed that "GRQ Consultants, Inc., a related party of Mr. Honig, received a cash payment of $50,000 for diligence services in connection with the Company's investment in Coinsquare."

66.     On October 2, 2017, two days before announcing the Company's name-change to Riot Blockchain, Inc., Bioptix's board (which was controlled by Defendant Honig) approved a dividend payout of more than $9.5 million.  Bioptix stated that the dividend would be payable on October 18, 2017, to shareholders of record on October 13, 2018.  Bioptix's stock increased by approximately 25 percent, from $6.44 to $8.09 per share, on a volume approximately four times the previous day's total.

67.     Defendant Honig took advantage of the price surge, selling 47,420 shares on October 4, 2017, at an average of $8.92 per share, collecting approximately $424,000.  Defendant Honig then sold an additional 21,400 shares on October 5 and October 6, 2017, for approximately

$162,000.  A belated disclosure statement also shows that Defendant Honig sold 202,544 shares on October 9 and 10, 2017, for approximately $1.78 million.

68.     Defendant Honig then acquired more than 630,000 shares on October 11, 2017 – 128,988 through warrant exercises and 505,124 through the conversion of much of his preferred stock.  Defendant Honig's acquisitions were offset by his sale of 293,916 shares on October 11, 2017, and 41,600 shares on October 12, 2017.  The proceeds from those transactions totaled just under $3.3 million.  All told, a Form 13-D shows that Defendant Honig sold more than 600,000 shares in a ten-day period, collecting nearly $5.7 million.

69.     In the six weeks that followed the payment of the special dividend announced on October 2, 2017, and name change on October 4, 2017, the Company's stock price nearly tripled, as deals with two Bitcoin-related businesses in which Defendant Honig and his associates had undisclosed stakes attracted investors.  When Riot's stock hit $24 per share on the day after Thanksgiving 2017, the shares issued through the March 2017 Placements were worth more than $100 million.

70.     During this time period, with the Company's stock price having risen dramatically, Defendant Honig sold nearly all of his remaining Riot shares, collecting more than $17 million.  Defendant Honig, however, failed to report those sales promptly, as required under SEC rules for investors who own 5 percent or more of a company's stock.

71.     From October 2017 to January 2018, three of Defendant Honig's associates – his brother, Jonathan Honig, and longtime partners Groussman and Stetson – likely sold more than $20 million of Riot stock.  Riot's shares peaked at $46.20 per share in December 2017.

762295.2

**ACTUAL AND POTENTIAL PROCEEDS OF HONIG GROUP'S RIOT BLOCKCHAIN SHARE SALES**

|  | SHARES AT 10/2017 | SHARES AT 2/2018 | PROCEEDS AT $10 | PROCEEDS AT $15 | PROCEEDS AT $20 |
|---|---|---|---|---|---|
| Barry Honig | 1.65 million | 0 | $17.6 million (1) | NA | NA |
| Jonathan Honig | 1.45 million | 200,000 | $12.5 million | $18.7 million | $25 million |
| Mark Groussman | 400,000 | 0 | $4 million | $5.9 million | $8 million |
| John Stetson | 330,000 | 0 (2) | $3.3 million | $4.9 million | $6.6 million |
| Catherine DeFrancesco | 516,000 | 11,000 | $5 million | $7.6 million | $10.1 million |

(1)   Actual total from disclosed sales in Form 13D filing
(2)   Projection based on actions of others; no SEC disclosure

*Note: Share totals at 2/18 do not include additional stock acquired through placements or acquisitions*

72.     On October 16, 2017, Riot announced that it was acquiring a 52 percent stake in another Bitcoin-related business, Tess, Inc. ("TESS"), which, like Coinsquare, was based in Toronto.  Riot paid for TESS with $320,000 in cash and 75,000 shares of stock.

73.     In late October of 2017, Riot adopted a new Code of Ethics and Business Conduct that included a detailed section on conflicts of interest.  The new code of ethics expressly stated that a conflict could exist if a director, officer, or employee "***lends to, borrows from, or has a material interest (equity or otherwise) in a competitor, supplier, or customer of the Company, or any entity or organization with which the Company does business or seeks to do business***." It added that any such person would require a waiver from the board.

74.     On November 3, 2017, Riot announced it had acquired Kairos Global Technology Inc. ("Kairos"), an upstart Bitcoin miner.  Kairos's main asset was $2 million of mining equipment, but for which Riot paid ***$11.9 million*** in preferred convertible stock.  Unbeknown to investors, Defendant Honig owned approximately 8.6% of Kairos and DeFrancesco owned approximately 6.3%.

75.     CNBC later reported that "Kairos appears to have many links to Riot. The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company." CNBC further reported that "Kairos' president was Michael Ho . . . a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC."

76.     That same day, November 3, 2017, Riot's CEO, Defendant Beeghley, stepped down. He was replaced by Defendant O'Rourke, who was given an annual salary of $300,000, plus 344,000 shares of restricted stock and 100,000 options exercisable at $10 each. Defendant O'Rourke also was elevated to Chairman of the Board.

77.     At the time of his appointment, Defendant O'Rourke was a significant investor in Marathon Patent, by virtue of his voting and investment authority over Revere Investments' $5.3 million in convertible notes and the millions of warrants that went along with them. Accordingly, when Marathon Patent announced on November 2, 2017 that it had agreed to acquire Global Bit Ventures – another Bitcoin miner – Defendant O'Rourke was in violation of Riot's newly adopted conflict-of-interest policy. Riot did not disclose Defendant O'Rourke's involvement with Marathon Patent.

78.     On November 16, 2017, Riot announced that it had made an investment in another cryptocurrency company, Verady LLC. The Company's stock price increased from $8.13 per share on November 17, 2017, to $10.35 per share on November 18, 2017, to $15.99 per share on November 22, 2017, and to $23.60 per share on November 24, 2017. More than 40 million shares changed hands in that period.

18

79.     On December 11, 2017, Riot announced that TESS had entered into an agreement in which it would go public through a reverse merger with Cresval, a Vancouver-based mining company.  The terms called for Cresval to issue 80 million shares to TESS's owners, giving them 90 percent of the stock in the combined company.  Riot reported it would receive 41.6 million shares.  Cresval reported that Defendant Honig was the intermediary who introduced its CEO to Defendant O'Rourke for the purposes of discussing the Cresval-TESS merger.

80.     The news about TESS going public resulted in another surge in Riot's share price, from a close of $15.86 per share on Friday, December 8, 2017, to an opening price of $19.06 per share on Monday, December 11, 2017, and a closing price of $23.08 per share that same day, with more than 20 million shares traded.  The stock closed at $28.20 per share on December 12, 2017, after reaching an intraday high of $33.27 per share.  More than 36 million shares changed hands. Trading remained heavy for the next week, with the stock climbing above $40 per share for the first time on December 18, 2017, and then peaking at $46.20 per share on December 19, 2017.

81.     On December 27, 2017, Riot announced that it had postponed its 2017 Annual Meeting of Stockholders, purportedly "to achieve a quorum on the proposals to be approved."

82.     Shortly thereafter, on December 29, 2017, Defendant O'Rourke sold 30,383 shares of Riot stock for proceeds of $869,256.35.  Those sales were not made pursuant to a 10(b)5-1 trading plan.

**D.     Developments at Riot After Defendants O'Rourke and Honig Sold Their Shares**

83.     On January 5, 2018, Riot filed a Form 8-K with the SEC announcing that the Company had dismissed EisnerAmper LLP as its independent auditor and engaged MNP LLP.

84.     On January 9, 2018, *Seeking Alpha* published an article titled, "Riot Blockchain: This Crypto Clown Car Continues Hurtling Toward the Abyss."   The article highlighted the

dismissal of Riot's auditor, noting that the Company had employed three different auditors over the course of a year.

85.     On January 31, 2018, Riot issued a press release announcing that the Company's 2017 Annual Meeting of Stockholders was being postponed for a second time, without announcing a new date and time for its annual meeting.  Riot also announced that it had received a notification from the NASDAQ that the Company had not held its annual meeting of shareholders within twelve months of the end of Riot's fiscal year-end, in accordance with NASDAQ's Listing Rules 5620(a) and 5810(c)(2)(G).

**E.     A CNBC Article Partially Reveals the Truth About the Company**

86.     On February 16, 2018, CNBC published an article titled "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket," reporting a slew of questionable practices and behavior at the Company.  The article stated:

> As bitcoin hit record highs in late December, a hot new stock was making news on a daily basis. Riot Blockchain's stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto.
>
> ***But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease.***
>
> That might sound somewhat like the type of newly minted blockchain company that has gained SEC attention.
>
> ***"Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain," SEC Chairman Jay Clayton said, speaking in generalities in recent testimony to Congress. The SEC declined to comment to CNBC about Riot Blockchain.***
>
> The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.

That purchase and the company's name change aren't Riot's only questionable moves.

*A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in.*

\*      \*      \*

Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida. The resort is known as the "pink palace" and has luxury yachts lined up on its dock.

*But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for Feb. 1. It's not clear the company ever planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity.*

*Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.*

That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton. That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose office is a short drive from the hotel. He once owned more than 11 percent of the outstanding common stock, according to SEC filings.

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone. "It was an investment where I had a return. And I sold some shares. There's nothing wrong with doing that."

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

21

"Typically, Barry Honig invests his hard-earned money into a company, and he also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

A visit to the site now only reveals the text: "Under construction."

From the outside, Honig's office is nondescript. There does not appear to be any evidence of his company's existence on the building's directory or on the door of his office.

**When CNBC crew members walked into the office, they didn't find Honig, they found O'Rourke. That's the same O'Rourke who made headlines when — less than three months after the company changed names and business plans — he sold about $869,000 worth of shares, according to an SEC filing**. He told the crew he was there for a meeting with Honig and that we had just missed him.

O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed." Then, late the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.

He agreed to answer questions via email instead. One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.

"I have my own office in a separate location," O'Rourke said in an email sent by his lawyer, Nick Morgan, a partner with Paul Hastings. "I do have a good relationship with Mr. Honig and we speak often."

"John O'Rourke does not work out of my office," Honig said. "John O'Rourke has his own office . . . at one time John O'Rourke had space in my office . . . we speak often."

**Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information.**

**"You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or dialogue about what's appropriate for the company on a day to day basis or in the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP.**

Despite Honig's website saying he gives advice on who should lead a company, Honig said he had nothing to do with O'Rourke becoming CEO.

"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

*"I see a company that has had a change of control of the board. I see a company that has had a change in business. I see a company that has had several dilutive issuances immediately following the change of the board and change of the business. And I see a stock that has gone zoom," he said. "And what I understand a significant amount of insider selling. So yes, these are red flags."*

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million. On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings. Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent. After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants. His purchase price ranged from $2.77 to $5.32 per share, according to the list of trades he provided to the SEC in 2017. Honig's investment dropped below 5 percent, the threshold for SEC filing, on Nov. 28. At that point, the stock had already climbed above $20.

Honig did not disclose his dramatically reduced position in the stock until this week.

*But that may not be the true extent of Honig's selling. Buried deep in the footnotes of Riot filings, it's clear Honig also accumulated more than 700,000 new warrants that he could convert to stock at $3.56 per share and more than 700,000 promissory notes that he could convert to stock at $2.50 a share.*

23

*What about those warrants and promissory notes? It's not clear, as he never mentioned them in either 13D. But in another footnote from a recent Riot filing, there is no longer a mention of them.*

He declined to further clarify what happened to them.

"It's all disclosed in the public filings. And those are all the obligations I have," he said. "I'm very comfortable with what I had to do and what I was obligated to do. . . . I'm not going to talk about my personal trading history or my bank account."

*Birns questioned how Honig made his filings. "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant amount of stock. Or has the potential to own significant amount of stock in excess of what is reported on the 13D," he said.*

This is not the first time Honig has faced questions over his actions. In 2000, he was alleged to have committed stock manipulation. Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse.

"The answer's no," Honig said when asked if he still manipulates stocks.

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to SEC filings.

When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up.

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

*One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase. Kairos' main asset was $2 million of mining equipment. Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings.*

O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.

24

Kairos appears to have many links to Riot. The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada. Despite the many press releases, there has been no formal mining announcement.

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining. SEC filings are silent on mining activity.

As for professional poker players advising Riot? O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social media followers. He called them "thought leaders."

***Riot is not O'Rourke and Honig's first cryptocurrency investment.***

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. ***"I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."***

Honig acknowledges the investment.

The questions continue for Riot Blockchain.

25

On Tuesday, Riot filed to withdraw prior SEC filings.

"It is not the result of any government inquiry," O'Rourke said in an email. "It was just corporate clean up from our securities counsel."

As for the annual shareholders' meeting, "We did not have a quorum of shareholders required for a vote," O'Rourke said in the email from his lawyer. "We are also working on other corporate action items that would require shareholder approval and a shareholder meeting as well. We did not want to waste the time and expense of potentially having two shareholder meetings within a short period of time. Thus we adjourned the meetings, which is not an uncommon practice."

There is no new date for the shareholders' meeting.

***"You see companies adjourn meetings in a context of a contested election and the like," Birns said. "I just don't think in this instance, there's any reason to adjourn their annual meeting."***

And as to O'Rourke selling stock in December?

He told CNBC in the email: "I sold less than 10 percent of my overall position to assist with covering tax obligations as a result of so-called phantom income tax from the vesting of restricted stock awards. It is common for Executives to sell stock to cover such tax obligations. I could have sold more stock in that window but chose to sell just 30,383 shares."

O'Rourke welcomes increased regulation and transparency for the cryptocurrency industry. "Unfortunately, as with many new hot sectors, it [blockchain] has attracted some bad actors trying to capitalize on the hype," he said. "Riot is all for increased transparency and properly imposed regulation."

***Honig would not disclose how much he made on his investment in Riot***, "I wasn't fortunate enough to do as well as you might think and people might speculate . . . I don't regret anything."

(Emphases added).

87.    On this news, the price per share of Riot stock at closing fell $5.74 per share, or approximately ***33.4%***, from the previous day's closing price, to close at $11.46 per share on February 16, 2018, causing damage to Lead Plaintiff and the other members of the Class.

26

F.  **Defendants O'Rourke, Honig, and Their Allies' Related Business Schemes Raise Questions About Their Integrity at Riot**

88.  The allegations against Defendant Honig in the *Honig* Action, as well as the allegations in this case, are not one-off events.  For example, in 2014, Joseph Noel ("Noel") pleaded guilty to securities fraud in connection with a company named YesDTC.  As part of Noel's plea agreement, Noel stated that Defendant Honig, who arranged a reverse merger of the company:

> wanted to use promotions to drive up the price of YesDTC shares and then sell his shares.  Honig introduced me to David Zazoff who Honig said would promote YesDTC stock.  Honig said Zazoff was a "magic maker," who could make the price of YesDTC stock rise through his services.  Honig made it clear that I should not ask questions about how Zazoff achieved his success.
>
> *    *    *
>
> ***At Honig's direction I caused Sonoma Winston to send $45,000 of the proceeds to Zazoff as partial compensation for his promotion of YesDTC stock.***
>
> In January 2011, Zazoff conducted a second promotion of YesDTC stock.  ***At Honig's direction, I caused YesDTC to compensate Zazoff as partial compensation for his promotion of YesDTC stock***.
>
> *    *    *
>
> In July 2011, Zazoff conducted a third promotion of YesDTC stock. . . . ***Honig instructed me to cause YesDTC to send compensation to Zazoff for the July 2011 promotion of its stock, but I refused***.

*United States v. Noel*, No. CR 14-264 VC, ECF No. 11 at 3-5 (N.D. Cal. Nov. 19, 2014) (emphases added).

89.  In addition, the Honig group's involvement in Riot and PolarityTE fit that same pattern.  In particular, SEC filings and Canadian regulatory filings show that:

- From April 2017 to October 2017 – just before the surge in Riot's stock price – Defendant Honig, Jonathan Honig, Groussman, and Stetson controlled roughly a third of its outstanding common shares.  SEC filings show that another Honig associate, DeFrancesco, owned an additional 11 percent at the start of that period.

- As recently as February 2018, Defendant Honig, Groussman, Frost (defined below), and Brauser held nearly 35 percent of PolarityTE's outstanding common

27

shares. Stetson, who was an officer and director, was listed as owning an additional 7 percent.

- Certain supposedly independent board members at both companies had undisclosed ties to Defendant Honig and his associates.  For example, PolarityTE directors Steve Gorlin ("Gorlin") and Jon Mogford also were board members at Medovex Corp. ("Medovex"), a medical products company.  Gorlin was Medovex's founder and former chairman.   SEC filings show that Defendant Honig, Stetson, Groussman, and Defendant O'Rourke provided funding to Medovex through stock placements in 2016 and 2017, and once held as much as 15 percent of its shares.

- Riot director Andrew J. Kaplan was on the board of Majesco Entertainment when Defendant Honig was CEO.  He also is a director of U.S. Gold Corp., another company in which Defendant Honig, Stetson, and Groussman were major investors.  A second supposedly independent director (now ex-director), was the chief legal and development officer at MUNDOmedia Ltd., a digital advertising company in which Defendant Honig, Defendant O'Rourke, Stetson, and Groussman had stakes.  That director, Eric So, is also a director of Therapix Biosciences Ltd., an Israeli company that listed on the NASDAQ in 2017.  Stetson was Therapix's top U.S. shareholder and Groussman was a board member.

90.    A *Sharesleuth* investigation found that a small number of writers, both real and imaginary, contributed nearly 600 bullish articles about Honig-backed companies to various financial sites over the past six years.  The list of featured companies included BioZone, MGT, and Mabvax, which are believed to be subjects of the SEC's investigation and subsequent complaint.  *See* ¶¶ 62.  *Sharesleuth*'s investigation found that certain writers in the stealth-promotion network also produced a dozen favorable stories about PolarityTE and Riot, some just before their shares skyrocketed.

91.    This stealth network also produced numerous stories touting or defending Opko Health Inc. ("Opko"), especially after it came under scrutiny from short sellers in 2013 and 2014.

92.    The investigation further found that Defendant Honig and his associates used the same private placement-and-special dividend maneuver at Majesco as they did at Riot.

93.    *Sharesleuth* also reported that virtually all of the doctors who have spoken favorably about PolarityTE's technology in news stories and at scientific and investment

conferences are members of the company's board or advisory council. They have been compensated with stock or options, in some cases hundreds of thousands of dollars' worth.

94.     *Sharesleuth* reported that PolarityTE, Riot, and another Honig-backed company whose stock made a big, sudden move in 2017 were linked by undisclosed relationships that raised red flags about deals that helped attract investors, boost share prices, and enrich certain individuals. *Sharesleuth* found that Defendant Honig and a handful of associates sold at least $70 million of stock in Riot, PolarityTE, and Marathon Patent as those companies' share prices rose by triple digits, then fell significantly. The companies had less than $1 million in combined revenue in fiscal 2017 and $180 million in losses.

95.     *Sharesleuth* also found that surges in these companies' share prices were aided by a daisy chain of deals involving Defendant Honig and a recurring cast of partners and investors, including Defendant O'Rourke, Stetson, and Groussman (all of whom are defendants in the *Honig* Action). *Sharesleuth* reported how a limited partnership purportedly controlled by Defendant O'Rourke provided $5.3 million in financing to Marathon Patent in August and September 2017, just before that company pivoted into the Bitcoin business.

### G.     The SEC Investigates Riot, Then Charges Defendants O'Rourke, Honig, and Others For Pump-and-Dump Schemes

96.     On April 9, 2018, the SEC issued a subpoena pursuant to a formal order of investigation. According to Riot, the SEC's "inquires include the proper asset classification, applicability of the Investment Company Act [of] 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency."

97.     On September 7, 2018, the SEC named Defendants O'Rourke and Honig, as well as several other individuals and entities, including Groussman, Stetson, and Dr. Philip Frost ("Frost"), Opko's CEO and Chairman, as defendants in a long-running microcap "pump-and-

762295.2

dump" scheme.  According to the SEC, the charges relate to the manipulation of the share price in three unidentified companies (believed to be BioZone, MGT, and Mabvax), which generated over $27 million from unlawful sales and left retail investors with "virtually worthless stock."

98.     One of the unifying themes of the SEC's fraud case is that the defendants functioned as a unit and that they exerted control over the companies and their management by virtue of their combined shareholdings and the infusions of cash they provided.

99.     The SEC further alleged that Defendant O'Rourke helped facilitate the group's manipulative trading of Mabvax shares by touting the company in story posted at SeekingAlpha.com, under the pseudonym "Wall Street Advisors.'' The article was headlined "Opko Spots Another Overlooked Opportunity in Mabvax Therapeutics," and claimed that Opko had a strong track record of identifying undervalued companies and later monetizing its stakes in them.

100.     In response to the filing of the *Honig* Action, Defendant O'Rourke resigned as CEO and Chairman.  The Company's stock price fell from $5.82 per share during trading on September 7, 2018, to close at $4.30 per share that same day, a drop of approximately *26.1%* during the trading day, damaging Lead Plaintiff and members of the Class.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD[1]

101.     As well as engaging in a scheme to defraud in violation of Rule 10b-5(a) and (c) during the Class Period, Defendants also disseminated materially false and misleading statements, and otherwise violated an obligation to disclose material information, concerning:  (1) the pump-and-dump scheme orchestrated by Defendants O'Rourke and Honig; (2) Riot's limited meaningful

---

[1] In this section, statements that are **bold and italicized** are specifically alleged to be false and misleading.  Statements that are not bold and italicized are provided for context.

investments in cryptocurrency products and absence of a meaningful cryptocurrency business plan; (3) Defendant O'Rourke's insider trading and violation of the Company's internal policies; (4) the location of the Company's principal executive offices (which were not in Colorado as stated by the Company, but instead in Florida in the same location as Defendant Honig); (5) Defendant Honig's effective control and undue influence over Riot's operations and affairs; (6) the Company's lack of intent to hold its 2017 Annual Meeting of Shareholders; and (7) the Company's failure to maintain adequate internal controls.

**October 3, 2017 Press Release**

102.    The Class Period commences on October 3, 2017.  On that date, Bioptix issued a press released in which it stated that the "Board of Directors authorized a special dividend of approximately $1.00 per common share (including [preferred stock] common share equivalents) in cash, payable on or about October 18, 2017 to shareholders of record as of October 13, 2017." The press release quoted Defendant Beeghley as stating:  "***This special dividend is a positive step to return value to all Bioptix shareholders.  We continue to explore options for delivering additional value to shareholders with our streamlined overhead and cash position***."

103.    The statements in ¶ 102 were materially false and misleading and omitted material information in that:  (i) the dividend was not a "***positive step to return value to all Bioptix shareholders***," but was rather part of a front for a pump-and-dump scheme perpetrated by Defendants O'Rourke, Honig, and others; and (ii) Riot was not "***explor[ing] options for delivering additional value to shareholders***" because the Company had transformed overnight from a biopharmaceutical company to a purported player in the cryptocurrency business without any experience.  In reality, the change in the Company's focus was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business, but was in fact nothing more than

a façade to allow Defendants O'Rourke, Honig, and others to take advantage of investor enthusiasm over cryptocurrency to execute a pump-and-dump scheme. Moreover, the statements in ¶ 102 were materially false and misleading and omitted material information in that the dividend payment was designed to benefit investors participating in the March 2017 Placements, namely Defendant Honig and his allies, rather than "*all Bioptix shareholders*."

**October 4, 2017 Press Release**

104. On October 4, 2017, Riot issued a press release, titled "Bioptix Changing Name to Riot Blockchain as Company Shifts Focus to Strategic Investor and Operator in Blockchain Technologies." The press release commented on the name change and directional shift of the Company, stating, in relevant part:

> CASTLE ROCK, Colo., Oct. 4, 2017 /PRNewswire/ -- Bioptix Inc. (Nasdaq: BIOP) today announced it is changing its name to Riot Blockchain, Inc., and has reserved and plans to change its Nasdaq ticker symbol to RIOT, in line with a shift in direction of the company. The name and symbol change are subject to Nasdaq approval. *Moving forward, Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem with a particular focus on the Bitcoin and Ethereum blockchains*.
>
> *As part of this focus, the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies*. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.
>
> "*At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets*," said Michael Beeghley, Chief Executive Officer of Riot Blockchain. "With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector."

105. The statements in ¶ 104 were materially false and misleading and omitted material information in that: (i) Riot's focus was not "*as a strategic investor and operator in the blockchain ecosystem*," but was rather a front for a pump-and-dump scheme perpetrated by

Defendants O'Rourke, Honig, and others; (ii) Riot did not have "**the insight and network to effectively grow and develop blockchain assets**" because the Company had transformed overnight from a biopharmaceutical company to a purported player in the cryptocurrency business without any experience; and (iii) as alleged in ¶ 65, the Company failed to disclose that Defendant Honig had an undisclosed interest in Coinsquare.  In reality, the change in the Company's focus was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business, but was in fact nothing more than a façade to allow Defendants O'Rourke, Honig, and others to take advantage of investor enthusiasm over cryptocurrency to execute a pump-and-dump scheme.

**October 5, 2017 Investor Presentation**

106.    On October 5, 2017, the Company filed a Form 8-K with an attached "Investor Presentation" with the SEC.  The Investor Presentation described the Company's as being "part of the disruptive technology and activities revolutionizing transactions and noted a $150 billion market opportunities for companies seeking to invest in blockchain technologies."  The Investor Presentation stated:

> "*Our investment strategy will consist of identifying unique projects which decentralize markets; combining real world applications with an active development team, strong fundamental, and large addressable markets.*"

> "Moving forward, **Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem, with a particular focus on the Bitcoin and Ethereum blockchains.**"

> Riot was a "first mover" and a "**NASDAQ listed pure play Blockchain company**."

> "*At Riot Blockchain Inc. we leverage our expertise, and network, to build and support blockchain technology companies.  We provide investment exposure to the rapidly growing blockchain ecosystem.*"

> "**Riot Blockchain has made a strategic investment for an undisclosed % of Coinsquare.  This investment into a leading digital currency exchange is**

*indicative of other Riot Blockchain will pursue*, including possible acquisitions of businesses touching the blockchain ecosystem."

"*The company is experiencing explosive growth in a budding industry, already demonstrating strong potential*."

107.    The statements in ¶ 106 were materially false and misleading and omitted material information because in reality the Company was a front for a pump-and-dump scheme perpetrated by Defendants O'Rourke, Honig, and others.  The Company had transformed overnight from a biopharmaceutical company to a purported player in the cryptocurrency business without any experience.  The change in the Company's focus was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business, but was in fact nothing more than a façade to allow Defendants O'Rourke, Honig, and others to take advantage of investor enthusiasm over cryptocurrency to execute a pump-and-dump scheme.  In addition, the Company's "*strategic investment*" in Coinsquare was designed to benefit Defendant Honig.  *See* ¶ 65.  Riot's failure to disclose this conflict of interest was therefore also an omission of material information.

**October 17, 2017 Press Release**

108.    On October 17, 2017, the Company issued a press release announcing that it was to acquire a majority interest in TESS, a blockchain development company.  The press release provided commentary on the TESS acquisition, stating, in relevant part:

"*Riot Blockchain is committed to building and supporting the blockchain ecosystem*," said Michael Beeghley, CEO of Riot Blockchain. "The telecom payment platform of TESS is a prime example of how blockchain-based technologies can be leveraged to disrupt established industries.  I believe that Riot Blockchain is poised to take advantage of this revolution in digital transactions as we see increasing adoption of blockchain protocols in our everyday lives."

109.    Defendant Beeghley's statement in ¶ 108 was materially false and misleading and omitted material information because Riot was not "*committed to building and supporting the blockchain ecosystem*."  In reality, the Company was a front for a pump-and-dump scheme

perpetrated by Defendants O'Rourke, Honig, and others.  The Company had transformed overnight from a biopharmaceutical company to a purported player in the cryptocurrency business without any experience.  The change in the Company's focus was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business, but was in fact nothing more than a façade to allow Defendants O'Rourke, Honig, and others to take advantage of investor enthusiasm over cryptocurrency to execute a pump-and-dump scheme.

**<u>October 23, 2017 Form 8-K</u>**

110.    On October 23, 2017, the Company filed a Form 8-K with the SEC.  In it, Riot reported as follows:  "***The Company's strategy will be to continue to pursue opportunistic investments and controlling positions in these new and emerging technologies which will continue to expose the Company to the numerous risks and volatility associated with this section***."

111.    The Form 8-K filed on October 23, 2017 also stated:  "***The Company anticipates it will continue to increase its exposure to this industry through passive investment, majority owned or controlled investments, and organic expansion***, but does not presently intend to invest in any manner that would result in the Company being required to register as an investment company . . . ."

112.    In the Company's "Objectives," Riot stated:  "***The Company seeks to build a diversified blockchain company through the development and ownership of operating assets in the blockchain ecosystem***."

113.    The statements in ¶¶ 110-12 were materially false and misleading and omitted material information because, rather than "***seek[ing] to build a diversified blockchain company through the development and ownership of operating assets in the bockchain ecosystem***," in

35

reality the Company was a front for a pump-and-dump scheme perpetrated by Defendants O'Rourke, Honig, and others. The Company had transformed overnight from a biopharmaceutical company to a purported player in the cryptocurrency business without any experience. The change in the Company's focus was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business, but was in fact nothing more than a façade to allow Defendants O'Rourke, Honig, and others to take advantage of investor enthusiasm over cryptocurrency to execute a pump-and-dump scheme.

**Riot's Code of Ethics and Business Conduct**

114.   On October 23, 2017, adopted an amended and restated Code of Ethics and Business Conduct (the "Code of Conduct"), which was made publicly available to investors on the Company's website. The Code of Conduct provides that "*[t]he business of Riot Blockchain, Inc. . . . shall be conducted with honesty and integrity and in accordance with the highest ethical and legal standards*," and the Code of Conduct was adopted to provide written standards and guidance to the Company's directors, officers and employees (collectively, "Covered Persons") to promote:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Compliance with applicable governmental laws, rules and regulations;

- Full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company;

- The prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and

- Accountability for adherence to the Code.

115.   The Code of Conduct provides, as to "Fair Dealing," that:

Each Covered Person should endeavor to deal fairly with the Company's employees, officers, directors, customers, suppliers and competitors. *No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice*.

116. The Code of Conduct provides, as to "Compliance with this Code," that:

*Covered Persons are expected to comply with all of the provisions of this Code*. Each Covered Person has an obligation to promptly notify the Compliance Officer in writing of any situation that may involve violation of this Code. The Company will not allow retaliation for reports of potential violations that are made in good faith.

117. In addition to the Code of Conduct, Riot also issued a separate Insider Trading Policy, which "applies to purchases, sales, hedges, shorts, or any other direct or indirect 'Transaction' in the Company's securities including common stock, options for common stock and any other securities issued by the Company." The "Policy applies to directors, officers, employees, consultants, and contractors of the Company and its subsidiaries" who are privy to material inside information about the Company. The Insider Trading policy was made publicly available on Riot's website.

118. The Insider Trading Policy states that "information should be regarded as material if there is a reasonable likelihood that it would be considered important to an investor considering completing a Transaction in the Company's securities." With respect to "Trading on Material Inside Information," the Insider Trading Policy provides that "*[a]n Insider shall not engage in any Transaction while in possession of Inside Information*."

119. The Insider Trading Policy contains a "Black-out Period" "during which directors, executive officers, direct reports of directors and executive officers, and all employees of the finance department are prohibited from completing any Transactions." The quarterly Black-out Period provides that:

37

The trading window is closed beginning at 9 a.m. on the calendar day that is two (2) days before the end of each calendar quarter and reopens at 9 a.m. on the first (1st) calendar day after the Company filed the required SEC reports for that applicable quarter.

*　　　*　　　*

***Even when the Trading Window is open, any person possessing Inside Information concerning the Company should not engage in any Transactions until such information has been known publicly for at least two Trading Days, whether or not the Company has recommended a suspension of trading to that person***. Transactions in the Company's securities when the Trading Window is "open" should not be considered a "safe harbor," and all directors, executive officers and other persons should use good judgment at all times.

120.　Defendants' statements in ¶¶ 114-16 and 118-19 regarding Riot's newly adopted Code of Conduct and Insider Trading Policy, and the terms of the Code of Conduct and Insider Trading Policy, were materially false and misleading and omitted material information because the Company actively eschewed compliance with its Code of Conduct and Insider Trading Policy. For example, earlier in October 2017, Defendant Honig sold over 600,000 shares on inside information. *See* ¶ 68. Moreover, as detailed in ¶ 82, on December 29, 2017, Defendant O'Rourke made nearly $900,000 of insider sales while in possession of inside information regarding the Company's pump-and-dump scheme.

### October 27, 2017 Form 8-K and Investor Presentation

121.　On October 27, 2017, the Company filed with the SEC a Form 8-K with an updated Investor Presentation attached. The updated Investor Presentation stated that the value of the cryptocurrency market "has increased from $17.7 billion to over $170 billion in 2017" — a figure $20 billion higher than the figure presented in the Company's October 5, 2017 Investor Presentation. In addition to providing information concerning the Company's business acquisitions, the updated Investor Presentation also stated:

- the Company would provide "***a gateway to blockchain***" as "one of the only Nasdaq listed companies with this focus."

38

- "*Riot Blockchain intends to gain exposure to the blockchain ecosystem through targeted investments in the sector, with a primary focus on the Bitcoin and Ethereum blockchains*."

- "*Our investment strategy will consist of identifying unique projects which decentralize markets; combining real world applications with an active development team, strong fundamental, and large addressable markets*."

- "Moving forward, *Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem, with a particular focus on the Bitcoin and Ethereum blockchains*."

- described Riot as a "first mover" as a "*NASDAQ listed pure play Blockchain company*."

- "*At Riot Blockchain Inc. we leverage our expertise, and network, to build and support blockchain technology companies.  We provide investment exposure to the rapidly growing blockchain ecosystem*."

- "*Riot Blockchain has made a strategic investment in Coinsquare.  This investment into a leading Canadian digital currency exchange is indicative of other Riot Blockchain will pursue, including possible acquisitions of businesses touching the blockchain ecosystem*."

- "*The company is experiencing steady growth in a budding industry*."

122.    The statements in ¶ 121 were materially false and misleading and omitted material information because, rather than provide investors "*exposure*" to the "*growing blockchain ecosystem*," in reality Riot was a front for a pump-and-dump scheme perpetrated by Defendant O'Rourke, Honig, and others.  The Company had transformed overnight from a biopharmaceutical company to a purported player in the cryptocurrency business without any experience.  Instead, the change in the Company's focus was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business.  In reality, however, the Company's purported focus was nothing more than a façade to allow Defendant O'Rourke, Honig, and others to take advantage of investor enthusiasm over cryptocurrency to execute a pump-and-dump scheme.

123.    In addition, the following statements in ¶ 121 were false and misleading because the Company failed to disclose the Defendant Honig had an undisclosed interest in Coinsquare and the transaction was executed to benefit him:   "***Riot Blockchain has made a strategic investment in Coinsquare.  This investment into a leading Canadian digital currency exchange is indicative of other Riot Blockchain will pursue, including possible acquisitions of businesses touching the blockchain ecosystem.***"

**November 2, 2017 Press Release**

124.    On November 2, 2017, the Company issued a press release announcing that it entered into an agreement for the acquisition of 1,200 Bitcoin mining equipment.   In the press release, Defendant O'Rourke stated:

> The acquisition positions us to launch our cryptocurrency mining operations, at a time that Bitcoin and other digital currencies are gaining increased attention and adoption . . . . ***We plan to leverage the mining technology to help realize our vision of becoming a leader in blockchain technologies***.   Mining bitcoin helps secure the bitcoin blockchain, while providing us direct exposure to accumulating bitcoin in the process.

125.    Defendant O'Rourke's statement in ¶ 124 that "***we plan to leverage the mining technology to help realize our vision of becoming a leader in blockchain technologies***" was materially false and misleading and omitted material information because, in reality, the Company was a front for a pump-and-dump scheme perpetrated by Defendants O'Rourke, Honig, and others. The Company had transformed overnight from a biopharmaceutical company to a purported player in the cryptocurrency business without any experience.   Instead, the change in the Company's focus was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business.   In reality, however, the Company's purported focus was nothing more than a façade to allow Defendants O'Rourke, Honig, and others to take advantage of investor enthusiasm over cryptocurrency to execute a pump-and-dump scheme.

**November 13, 2017 Form 10-Q**

126.    On November 13, 2017, Riot filed its quarterly report on Form 10-Q for the period ended September 30, 2017 (the "3Q17 10-Q") with the SEC, which provided the Company's quarterly financial results and position. The 3Q17 10-Q was signed by Defendants O'Rourke and McGonegal.  Pursuant to §302 of SOX, and also covered by §§ 304 and 906 of SOX, Defendants O'Rourke and McGonegal certified that they had designed and evaluated effective internal and disclosure controls over financial reporting, which assured the reliability of financial reporting, and also that Riot's financial statements fairly and accurately presented the financial condition of the Company.  Those SOX certifications stated as follows:

1.    I have reviewed this quarterly report on Form 10-Q of Riot Blockchain, Inc.;

2.    Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the*

41

*reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

(c) *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      *The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)*:

(a) *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

(b) *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting*.

127.    Defendants O'Rourke and McGonegal's SOX certifications in ¶ 126 were false and misleading because Riot did not maintain an effective control environment as of the date of the filing because it allowed Defendant O'Rourke and others to engage in the pump-and-dump scheme.   Additionally, the SOX certifications were materially false and misleading because contrary to the representation that Riot's SEC filing did "not contain any untrue statement of a material fact" or omission, the 3Q17 10-Q contained numerous false and misleading statements, as set forth below.

128.    In addition, the 3Q17 10-Q stated that by purchasing Riot securities, cryptocurrency holders "**realized exponential value**" and could "**lock in**" that price appreciation.

129.    The statements in ¶ 128 were materially false and misleading and omitted material information because in reality the Company was a front for a pump-and-dump scheme perpetrated by Defendant O'Rourke, Honig, and others.   The Company had transformed overnight from a biopharmaceutical company to a purported player in the cryptocurrency business without any experience.   Instead, the change in the Company's focus was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business.   In reality, however, the Company's purported focus was nothing more than a façade to allow Defendants O'Rourke, Honig, and others to take advantage of investor enthusiasm over cryptocurrency to execute a pump-and-dump scheme.

130.    The 3Q17 10-Q also stated that the Company's principle executive offices were located at "**202 6th Street, Suite 401, Castle Rock, CO 80104**."

131.    The statement in ¶ 130 regarding the location of the Company's principle executive offices was materially false and misleading and omitted material information because in reality the Company was based in Florida, to allow Defendant Honig to control Riot's operations.  *See* ¶ 86.

132.    Under "Risk Factors," the 3Q17 10-Q stated, in part:

> As a result, **the value of the Company's securities, and the value of cryptocurrencies generally may be more likely to fluctuate due to changing investor confidence in future appreciation (or depreciation) in market prices, profits from related or unrelated investments or holdings of cryptocurrency**. Such factors or events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, or on the price of the Company's securities, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

133.    The statements in the Company's Risk Factors in ¶ 132 were materially false and misleading and omitted material information because while Riot enumerated the above risks

43

762295.2

concering "cryptocurrencies," the Company did not disclose the risk to investors associated with Defendants O'Rourke, Honig, and their allies' pump-and-dump scheme, namely that the value of Riot investments was likely to fall when the truth about the Company's operations was revealed.

134.    The 3Q17 10-Q also discussed the Company's "Evaluation of Disclosure Controls and Procedures," stating, in relevant part:

> Evaluation of Disclosure Controls and Procedures
>
> Management of the Company, including the Chief Executive Officer and the Chief Financial Officer, has conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rule 13a-15(e)) as of the last day of the period of the accompanying financial statements.  Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that **_our disclosure controls and procedures are effective as of September 30, 2017_**.
>
> Changes in Internal Control Over Financial Reporting
>
> **_There was no change in the Company's internal control over financial reporting that occurred during the fiscal quarter to which this report relates that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting_**.

135.    The statements in ¶ 134 were materially false and misleading and omitted material information because Riot lacked effective disclosure controls and procedures to prevent the pump-and-dump scheme, as demonstrated by the fact the Company allowed Defendants O'Rourke, Honig, and others to engage in the pump-and-dump scheme.

**November 16, 2017 Press Release**

136.    On November 16, 2017, the Company issued a press release announcing that it made a strategic investment in Verady, LLC, a company providing accounting, audit, and verification for blockchain based assets.  In the press release, Defendant O'Rourke stated, "With recent highs in Bitcoin and other cryptocurrency valuations, there is significant market potential

762295.2

for blockchain and digital asset technologies.  *We will continue to increase our involvement and support of the blockchain ecosystem, as we ramp up our Bitcoin mining operations*."

137.    Defendant O'Rourke's statement in ¶ 136 was materially false and misleading and omitted material information because Riot did not plan to "*continue to increase our involvement and support of the blockchain ecosystem, as we ramp up our Bitcoin mining operations*," but was rather purchasing the mining technology to prop up its pump-and-dump scheme.  In reality, the Company was a front for a pump-and-dump scheme perpetrated by Defendants O'Rourke, Honig, and others.  The Company had transformed overnight from a biopharmaceutical company to a purported player in the cryptocurrency business without any experience.  Instead, the change in the Company's focus was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business.  In reality, however, the Company's purported focus was nothing more than a façade to allow Defendants O'Rourke, Honig, and others to take advantage of investor enthusiasm over cryptocurrency to execute a pump-and-dump scheme.

**2017 Proxy Statement**

138.    On December 12, 2017, the Company issued  a proxy statement pursuant to Section 14(a) of the Exchange Act (the "2017 Proxy Statement").  Regarding the Company's Code of Conduct, the 2017 Proxy Statement stated:

> Our Code of Conduct (the "Code"), which was amended and restated as of October 2017, applies to the Company's employees, directors, officers, contractors, consultants, and persons performing similar functions ("Covered Persons"). This includes our CEO and Chairman, our CFO, and our controller/treasurer. *We require that they avoid conflicts of interest, comply with applicable laws, protect Company assets, and conduct business in an ethical and responsible manner and in accordance with the Code*. The Code prohibits employees from taking unfair advantage of our business partners, competitors, and employees through manipulation, concealment, misuse of confidential or privileged information, misrepresentation of material facts, or any other practice of unfair dealing or improper use of information. The Code requires employees to comply with all applicable laws, rules, and regulations wherever in the world we conduct business.

This includes applicable laws on privacy and data protection, anti-corruption and anti-bribery, and trade sanctions. Our Code was amended and restated in October 2017 to better reflect our expanding global operations and diverse employee base, enhance its clarity and general readability, and to make other stylistic changes to more closely align the Code with our overall brand. Our Code is publicly available and can be found on our website at www.riotblockchain.com by following the link to "Investors" and then to "Governance."

139.    The statement in ¶ 138 was false and misleading because, despite assertions to the contrary, Riot did not "*require that [the Individual Defendants] avoid conflicts of interest, comply with applicable laws, protect Company assets, and conduct business in an ethical and responsible manner and in accordance with the Code*."  To the contrary, Riot allowed Defendant O'Rourke to engage in insider trading that allowed him to realize illicit proceeds of nearly $900,000.  *See* ¶ 82.

## THE TRUTH BEGINS TO EMERGE, YET DEFENDANTS CONTINUE TO MISLEAD THE MARKET

140.    On December 19, 2017, after the market closed, CNBC's *Fast Money* aired an interview with Andrew Left ("Left"), founder of Citron Research, who made shocking revelations about Riot:

> "Even worse than the [initial coin offerings] that you see present white papers . . . [Riot] ha[s] a few small investments, just enough to go ahead and put it public.  And they roll it out, and with enough promotion, and obviously with the hype behind crypto and the lack of assets, there it goes.  ***The whole time really misrepresenting the fact that nothing that they have is [ ] a real player in the crypto industry***."

> "[Riot] ha[s] a small investment in . . . Coinsquare and think it might be right now like ***the number 200 trader of bitcoin***, a really insignificant investment.  So you shouldn't be surprised . . . . ***Out of Boca Raton Florida***, buys some assets in Canada, do the normal shuffle, and then it goes to stock."

> Left was then asked if it was his contention that "there's actual fraud going on at [Riot] or that it is simply overstating its relationship to blockchain and bitcoin?" Left responded:  "***If you want to talk about people front running the stock before they make announcements, I'm sure you could look at that***."

46

141.    In response, Riot's stock price fell by **6.42%**, from a closing price of $38.60 per share on December 19, 2017, to a closing price of $36.12 per share on December 20, 2017, damaging Lead Plaintiff and members of the Class.

142.    On December 21, 2017, numerous articles were released that suggested that Riot's name change to include the word "Blockchain" was a publicity stunt. *Reuters*, for example, reported that the Company was one of the "growing list of companies jumping onto blockchain bandwagon, courtesy of Bitcoin's stratospheric rise." *Zacks* then published an article entitled "Why Trendy Bitcoin Stocks like Riot Blockchain Are Tanking – ZACKSC." In discussing Riot's stock price, the article stated:  "the popular biotech firm turned blockchain investor, Riot Blockchain, has slumped about 30% from its highs.  Questions about the legitimacy of Riot's business model, which sees the once-dying diagnostics machinery company invest in various firms involved in the bitcoin and Ethereum ecosystems, were exacerbated this week after the stock was targeted by Citron Research."

143.    The following day, December 22, 2017, *Business Insider* reported:

> It looks like Riot Blockchain put the horse before the carriage.  The company, which pivoted to blockchain after operating for more than a decade as a biotech firm under the name BiOptix Diagnostics, is on the hunt for a chief technology officer, according to a job posting on LinkedIn.  "Riot Blockchain is seeking a technically experienced and highly motivated CTO candidate with a passion for blockchain technology," the ad said.  The candidate should be able to juggle a number of tasks, including the "implementation of technical aspects, recruit top developers and blockchain specialists, and build bridges and network with blockchain community."  The CTO will also help build out the firm's crypto-mining operations.  ***Still, a technical background in cryptocurrencies is not required***.  "Technical experience in cryptocurrency or cryptocurrency mining is a big plus," the ad said.

144.    Also on December 22, 2017, *Reuters* published the article entitled, "ANALYSIS-Cryptocurrency stocks holding gains despite bitcoin pullback – RTRS."  The article stated that Riot and other "crypto stocks came under pressure on Friday."  Regarding such stocks, the article

47

noted, in relevant part:  "While the stocks are susceptible to price moves in bitcoin itself, analysts caution investors should make sure the company has a credible business model."

145.     As a result of the disclosures in ¶¶ 142-44, Riot's stock price declined $11.60 per share, or *34.75%*, over the course of two trading days.  The Company's stock price declined from a closing price of $36.12 per share on December 20, 2017, to a closing price of $24.52 on December 22, 2017, damaging Lead Plaintiff and members of the Class.

**<u>December 27, 2017 Press Release</u>**

146.     On December 27, 2017, the Company issued a press release, titled "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders."  The press release announced that the 2017 Annual Meeting of Stockholders, which was scheduled for the following day, had been cancelled.  The release stated, in relevant part:  "***Riot Blockchain, Inc. (Nasdaq: RIOT) (the 'Company') today announced that its 2017 Annual Meeting of Stockholders scheduled for December 28, 2017 (the 'Annual Meeting'), was adjourned to achieve a quorum on the proposals to be approved***."

147.     The statement in ¶ 146 was materially false and misleading and omitted material information in that the Company never intended to hold its 2017 Annual Meeting of Shareholders scheduled for December 28, 2017.  As CNBC reported, "[i]t's not clear the company ever planned to have the meeting [scheduled for the Boca Raton Resort and Club in Florida].  Numerous employees at the hotel told CNBC it had no reservations for either name under the name of Riot Blockchain or any affiliated entity."  Moreover, when asked about the adjournment by CNBC, Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP, stated:  "I just don't think in this instance, there's any reason to adjourn their annual meeting."

**January 31, 2018 Press Release**

148.    On January 31, 2018, the Company issued a second press release, titled "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders."   The press release announced that the 2017 Annual Meeting of Stockholders, which was scheduled for the following day, had again been cancelled.   The release stated, in relevant part:   "***Riot Blockchain, Inc. (Nasdaq: RIOT) (the 'Company') today announced that its 2017 Annual Meeting of Stockholders (the 'Annual Meeting') was adjourned for a second time to achieve a quorum on the proposals to be approved***."

149.    The statement in ¶ 148 was materially false and misleading and omitted material information in that the Company never intended to hold its 2017 Annual Meeting of Shareholders scheduled for February 1, 2018.  As CNBC reported, "[i]t's not clear the company ever planned to have the meeting [scheduled for the Boca Raton Resort and Club in Florida].  Numerous employees at the hotel told CNBC it had no reservations for either name under the name of Riot Blockchain or any affiliated entity."  Moreover, when asked about the adjournment by CNBC, Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP, stated:  "I just don't think in this instance, there's any reason to adjourn their annual meeting."

150.    As described in ¶ 82, on December 29, 2017, after the market closed and going into a three-day holiday weekend, Defendant O'Rourke sold 30,383 shares of Riot for proceeds of $869,256.

151.    On January 2, 2018, *Reuters* published an article prior to the market open entitled, "BUZZ-Riot Blockchain down after CEO reports stock offering – RTRS."  The article stated that Riot's stock price was down 4.44% in pre-market trading after Defendant O'Rourke had reported his sale of over 30,000 shares.  An article published during early morning trading hours, on the

popular investor website, *The Motley Fool*, entitled, "Riot Blockchain's CEO Just Sold a Lot of

Stock," detailed Defendant O'Rourke's suspicious trading, stating in relevant part:

> No one knows a company better than its insiders.  For this reason, it's my view that prices at which companies and their insiders buy and sell stock give a hint about a company's true value.

> \*        \*        \*

> **An insider dumps his shares**

> Right before a holiday weekend, and two days after the company announced it was adjourning its annual shareholders meeting until February, Riot Blockchain's chief executive officer, John R. O'Rourke III, filed a Form 4 with the SEC disclosing he and his firm, ATG Capital LLC, sold 30,383 shares of Riot on Dec. 29.

> \*        \*        \*

> These sales are material, representing about 37% of shares he and ATG Capital owned or would soon control prior to the transactions.

> O'Rourke now holds 12,500 shares through ATG Capital LLC, in addition to 39,500 shares of stock in his own name that he currently owns, or will receive over the next 60 days from his role as Riot's chief executive officer.  (O'Rourke received 344,000 restricted shares that vest in 24 monthly installments when he became CEO in November.)

> **Hiding bad news**

> These sales were curiously timed.  O'Rourke sold his shares and filed the Form 4 after market close before a major holiday weekend, when most investors would be thinking about their New Year's Eve plans rather than their investment portfolios.

> Stock analysts, journalists, and political-types refer to this activity as a "Friday night dump," a common practice of releasing otherwise newsworthy information at a time when people are least likely to be paying attention.  One study from 2005 found that "Friday announcements are 20 percent more likely to present negative earnings than announcements on other weekdays."  Insider selling certainly fits in the "negative" category.

> O'Rourke has every reason to sell quietly.  When taken together with Riot's deeply discounted equity raise earlier this month, his sales suggest recent market prices are a better price at which to sell its shares than buy them.  It's also interesting to me that O'Rourke is selling before a postponed annual shareholders meeting in which Riot is asking shareholders for the right to add another 750,000 shares of stock to the company's bonus pool for insiders.

152.     On this news, Riot's stock price declined $4.04 per share, or *14.45%*, over two trading days, from $28.40 per share on December 29, 2017, to $24.36 per share on January 3, 2018, damaging Lead Plaintiff and members of the Class.

153.     On January 5, 2018, after the close of trading on a Friday, leading into a weekend, Riot filed a registration statement on Form S-3 for the disposition of approximately 3.3 million shares and warrants.  The 1.65 million common shares being registered represented over 14% of the 11.6 million outstanding common shares.  The filing also disclosed that investors who had purchased in the March 2017 Placements would be free to sell their shares once the registration statement was declared effective.  The possibility of private investors, who bought shares below market value, selling out at a premium, like Defendants Honig and O'Rourke, created a negative market response.  The registration statement also confirmed that Riot had overpaid for Kairos.  It confirmed that Kairos had purchased its equipment for $2,089,679 and the excess purchase price paid by Riot was recorded as $8,637,545, confirming that the Company paid more than four times the price for Kairos's equipment.

154.     The market reacted negatively to the January 5, 2018 news once trading began on Monday, January 8, 2018, with the Company's stock price declining $1.01 per share, or *4.13%*, from $24.41 per share on January 5, 2018, to $23.42 per share on January 8, 2018, damaging Lead Plaintiff and members of the Class.

155.     On January 31, 2018, before the market opened, *The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."  The article referenced how Defendant Honig had taken an aggressive stake in the Company when it was still in the medical diagnostics business and how he drove out Bioptix's CEO and others, replacing them with his own allies, including Defendant O'Rourke.  Also on January 31, 2018, Riot

announced that its previously scheduled annual meeting would be adjourned for *a second time*, purportedly to allow the Company to seek a quorum.

156.    As a result of these disclosures on January 31, 2018, Riot's stock price declined $1.98 per share, *or 14.26%*, over the course of two trading days, from $14.28 per share on January 30, 2018, to $12.30 per share on February 1, 2018, damaging Lead Plaintiff and members of the Class.

157.    On February 16, 2017, CNBC published the article "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket" regarding questionable practices at Riot, stating in relevant part:

> As bitcoin hit record highs in late December, a hot new stock was making news on a daily basis. Riot Blockchain's stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto.
>
> *But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease.*
>
> That might sound somewhat like the type of newly minted blockchain company that has gained SEC attention.
>
> *"Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain," SEC Chairman Jay Clayton said, speaking in generalities in recent testimony to Congress. The SEC declined to comment to CNBC about Riot Blockchain.*
>
> The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.
>
> That purchase and the company's name change aren't Riot's only questionable moves.
>
> *A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors,*

*SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in.*

*        *        *

*Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida.* The resort is known as the "pink palace" and has luxury yachts lined up on its dock.

*But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for Feb. 1. It's not clear the company ever planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity*.

Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.

*That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton. That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose office is a short drive from the hotel. He once owned more than 11 percent of the outstanding common stock, according to SEC filings.*

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone. "It was an investment where I had a return. And I sold some shares. There's nothing wrong with doing that."

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

"Typically, Barry Honig invests his hard-earned money into a company, and he also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

53

A visit to the site now only reveals the text: "Under construction."

From the outside, Honig's office is nondescript. There does not appear to be any evidence of his company's existence on the building's directory or on the door of his office.

**When CNBC crew members walked into the office, they didn't find Honig, they found O'Rourke.** That's the same O'Rourke who made headlines when — less than three months after the company changed names and business plans — he sold about $869,000 worth of shares, according to an SEC filing. He told the crew he was there for a meeting with Honig and that we had just missed him.

O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed." Then, late the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.

He agreed to answer questions via email instead. One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.

"I have my own office in a separate location," O'Rourke said in an email sent by his lawyer, Nick Morgan, a partner with Paul Hastings. "I do have a good relationship with Mr. Honig and we speak often."

"John O'Rourke does not work out of my office," Honig said. "John O'Rourke has his own office ... at one time John O'Rourke had space in my office ... we speak often."

**Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information.**

**"You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or dialogue about what's appropriate for the company on a day to day basis or in the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP.**

Despite Honig's website saying he gives advice on who should lead a company, Honig said he had nothing to do with O'Rourke becoming CEO.

"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

54

*"I see a company that has had a change of control of the board. I see a company that has had a change in business. I see a company that has had several dilutive issuances immediately following the change of the board and change of the business. And I see a stock that has gone zoom," he said. "And what I understand a significant amount of insider selling. So yes, these are red flags."*

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million. On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings. Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent. After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants. His purchase price ranged from $2.77 to $5.32 per share, according to the list of trades he provided to the SEC in 2017. Honig's investment dropped below 5 percent, the threshold for SEC filing, on Nov. 28. At that point, the stock had already climbed above $20.

Honig did not disclose his dramatically reduced position in the stock until this week.

*But that may not be the true extent of Honig's selling. Buried deep in the footnotes of Riot filings, it's clear Honig also accumulated more than 700,000 new warrants that he could convert to stock at $3.56 per share and more than 700,000 promissory notes that he could convert to stock at $2.50 a share.*

*What about those warrants and promissory notes? It's not clear, as he never mentioned them in either 13D. But in another footnote from a recent Riot filing, there is no longer a mention of them.*

He declined to further clarify what happened to them.

"It's all disclosed in the public filings. And those are all the obligations I have," he said. "I'm very comfortable with what I had to do and what I was obligated to do. ... I'm not going to talk about my personal trading history or my bank account."

*Birns questioned how Honig made his filings. "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant amount of stock. Or has the potential to own significant amount of stock in excess of what is reported on the 13D," he said.*

This is not the first time Honig has faced questions over his actions. In 2000, he was alleged to have committed stock manipulation. Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse.

"The answer's no," Honig said when asked if he still manipulates stocks.

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to SEC filings.

When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up.

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase. Kairos' main asset was $2 million of mining equipment. Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings.

O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.

Kairos appears to have many links to Riot. The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada. Despite the many press releases, there has been no formal mining announcement.

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining. SEC filings are silent on mining activity.

As for professional poker players advising Riot? O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social media followers. He called them "thought leaders."

### Riot is not O'Rourke and Honig's first cryptocurrency investment.

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. "I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."

Honig acknowledges the investment.

The questions continue for Riot Blockchain.

On Tuesday, Riot filed to withdraw prior SEC filings.

"It is not the result of any government inquiry," O'Rourke said in an email. "It was just corporate clean up from our securities counsel."

As for the annual shareholders' meeting, "We did not have a quorum of shareholders required for a vote," O'Rourke said in the email from his lawyer. "We are also working on other corporate action items that would require shareholder approval and a shareholder meeting as well. We did not want to waste the time and expense of potentially having two shareholder meetings within a short period of time. Thus we adjourned the meetings, which is not an uncommon practice."

There is no new date for the shareholders' meeting.

"You see companies adjourn meetings in a context of a contested election and the like," Birns said. "I just don't think in this instance, there's any reason to adjourn their annual meeting."

And as to O'Rourke selling stock in December?

He told CNBC in the email: "I sold less than 10 percent of my overall position to assist with covering tax obligations as a result of so-called phantom income tax from the vesting of restricted stock awards. It is common for Executives to sell stock to cover such tax obligations. I could have sold more stock in that window but chose to sell just 30,383 shares."

O'Rourke welcomes increased regulation and transparency for the cryptocurrency industry. "Unfortunately, as with many new hot sectors, it [blockchain] has attracted some bad actors trying to capitalize on the hype," he said. "Riot is all for increased transparency and properly imposed regulation."

Honig would not disclose how much he made on his investment in Riot, "I wasn't fortunate enough to do as well as you might think and people might speculate. ... I don't regret anything."

(Emphases added).

158.    On this news, shares of Riot fell $5.74 per share, or approximately **33.4%**, to close at $11.46 per share on February 16, 2018, damaging Lead Plaintiff and Class members.

159.    In response to the CNBC article, on February 16, 2018, Riot issued the following press release:

Dear Shareholders,

Thank you for your support in our vision to build a leading blockchain technology company. *I believe we are well positioned at the forefront of this industry with many exciting opportunities on the horizon*.

Today, CNBC released a negative one-sided piece on companies that seek to jump on the blockchain bandwagon by changing their name and profiled our company. Had the journalist used even a modest amount of professional diligence, CNBC would have also reported on the numerous achievements we have made in becoming an early entrant in the support of blockchain and cryptocurrency technologies. To my knowledge, we were also the first Nasdaq listed company to

have blockchain in its name and had no idea what the market reaction would be when the transition was made.

Not to be deterred, I wish to provide an update of where Riot Blockchain stands today and respond to some of their attacks. ***We have made significant inroads in building a diversified portfolio of investments and to begin securing digital assets***.

*       *       *

***We take our SEC reporting obligations seriously and diligently file all reports and filings.  We have expended enormous effort to inform investors of the risks of our foray into uncharted territory.***

160.    The bold and italicized statements in ¶ 159 were false and misleading because Riot had not "***made significant inroads in building a diversified portfolio of investments and to begin securing digital assets***."   Rather, the Company was a front for a pump-and-dump scheme perpetrated by Defendants O'Rourke, Honig, and others.  The Company had transformed overnight from a biopharmaceutical company to a purported player in the cryptocurrency business without any experience.  Instead, the change in the Company's focus was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business.   In reality, however, the Company's purported focus was nothing more than a façade to allow Defendants O'Rourke, Honig, and others to take advantage of investor enthusiasm over cryptocurrency to execute a pump-and-dump scheme.

161.    In addition, the following statements in ¶ 159 were false and misleading and omitted material information:  "***We take our SEC reporting obligations seriously and diligently file all reports and filings.  We have expended enormous effort to inform investors of the risks of our foray into uncharted territory***."  Riot did not take its SEC reporting obligations seriously because it failed to disclose that the Company was a front for a pump-and-dump scheme perpetrated by Defendants O'Rourke, Honig, and others.  In addition, Riot had not "***expended enormous effort to inform investors of the risks of our foray into uncharted territory.***"  Instead,

59

the Company actively misled investors regarding Riot's operations, including the pump-and-dump scheme.

**March 14, 2018 Form 8-K and Investor Presentation**

162.    On March 14, 2018, Riot filed a Form 8-K with the SEC, which included an Investor Presentation.  In the Investor Presentation, Riot stated as follows:

> "***Riot Blockchain intends to gain exposure to the blockchain ecosystem through its mining operations, internally developed businesses, joint ventures, and targeted investments in the sector.  Its primary focus is on Bitcoin and general blockchain technology.***"

> "***Our investment strategy consists of operating one of the largest cryptocurrency mining operations listed on the NASDAQ or NYSE; identifying unique projects which decentralize markets; combining real work applications with an active development team, strong fundamental, and large addressable markets.***"

163.    The statements in ¶ 162 were materially false and misleading and omitted material information because the Company was a front for a pump-and-dump scheme perpetrated by Defendants O'Rourke, Honig, and others.  The Company had transformed overnight from a biopharmaceutical company to a purported player in the cryptocurrency business without any experience.  Instead, the change in the Company's focus was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business.  In reality, however, the Company's purported focus was nothing more than a façade to allow Defendants O'Rourke, Honig, and others to take advantage of investor enthusiasm over cryptocurrency to execute a pump-and-dump scheme.

**April 17, 2018 Annual Report**

164.    On April 17, 2018, Riot filed an annual report with the SEC on a Form 10-K, disclosing that on April 9, 2018 it had received a subpoena from the SEC requesting "certain information."  The Company reported that new annual revenues unrelated to its prior business of pet-medicine licenses was $172,959.  Net losses widened to $20 million, compared to a loss of

60

$4.3 million in 2016.  Because of a funding round in December, the Company said it also has a cash and cash equivalents of $41.7 million.

165.    On this news, the Company's stock price fell $0.34 per share, or approximately **5.9%**, from the previous day's closing price, to close at $6.87 per share on April 18, 2018, damaging Lead Plaintiff and Class members.

166.    Despite this, Defendants continued to mislead the market by making materially false and misleading statements and omitting material information, stating the following in the Form 10-K:

> "*In addition to mining, we are seeking to pursue our diversified blockchain and cryptocurrency focused strategy, in part through targeted investments in, and acquisitions of, businesses and assets within the blockchain ecosystem. As of December 31, 2017, we owned approximately 12.9% of goNumerical Ltd., (d/b/a 'Coinsquare') which operates a leading Canadian exchange for purchasing and selling cryptocurrencies.*"

> "*The primary focus of the company is its cryptocurrency mining operations currently located in Oklahoma City and potentially establishment of other mining operations around the world, along with the Company's decision to investigate the launch of a cryptocurrency exchange in the United States.*"

167.    The statements in ¶ 166 were materially false and misleading and omitted material information because the Company was a front for a pump-and-dump scheme perpetrated by Defendants O'Rourke, Honig, and others.  The Company had transformed overnight from a biopharmaceutical company to a purported player in the cryptocurrency business without any experience.  Instead, the change in the Company's focus was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business.  In reality, however, the Company's purported focus was nothing more than a façade to allow Defendants O'Rourke, Honig, and others to take advantage of investor enthusiasm over cryptocurrency to execute a pump-and-dump scheme.

168.    The statement in ¶ 166 regarding Riot's ownership of "*approximately 12.9% of goNumerical Ltd., (d/b/a 'Coinsquare') which operates a leading Canadian exchange for purchasing and selling cryptocurrencies*" was false and misleading and omitted material information in that the Company failed to disclose that it had purchased an interest in Coinsquare to benefit Defendant Honig, who had a substantial personal interest in Coinsquare.  *See* ¶ 65.

169.    In addition, the Form 10-K stated:  "*"We failed to hold the [annual shareholder] meeting because we did not have a quorum of shareholders required for a vote*."

170.    The statement in ¶ 169 was materially false and misleading and omitted material information in that the Company never intended to hold its 2017 Annual Meeting of Shareholders scheduled for February 1, 2018.  As CNBC reported, "[i]t's not clear the company ever planned to have the meeting [scheduled for the Boca Raton Resort and Club in Florida].  Numerous employees at the hotel told CNBC it had no reservations for either name under the name of Riot Blockchain or any affiliated entity."  Moreover, when asked about the adjournment by CNBC, Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP, stated:  "I just don't think in this instance, there's any reason to adjourn their annual meeting."

171.    Further, the Form 10-K stated:  "*Our principal executive offices are located at 202 6th Street, Suite 401, Castle Rock, CO 80104* . . . ."

172.    The statement in ¶ 171 was materially false and misleading and omitted material information in that in reality the Company was based in Florida, to allow Defendant Honig to control Riot's operations.  *See* ¶ 86.

173.    In addition, the Form 10-K contained SOX certifications signed by Defendants O'Rourke and McGonegal that were identical to those in ¶ 126 (except they referred to the Form

10-K rather than Form 10-Q).  Those SOX certifications were false and misleading for the same reasons stated in ¶ 127.

**May 17, 2018 Form 10-Q**

174.   On May 17, 2018, Riot filed a quarterly report with the SEC on a Form 10-Q in which it provided additional information on the SEC investigation.  The Form 10-Q stated, in relevant part:

> On April 9, 2018, the Company received a subpoena requesting documents from the U.S. Securities and Exchange Commission pursuant to a formal order of investigation.

> As part of its ongoing review of the Company's SEC filings, the Company has received and responded to comments from the staff of the SEC regarding certain developments and the Company's ongoing development of a blockchain/cryptocurrency business model.  These inquires include the proper asset classification, applicability of the Investment Company Act or 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency. The resolution of these matters is ongoing . . . .

**June 21, 2018 Form 8-K and Investor Presentation**

175.   On June 21, 2018, Riot filed a Form 8-K with the SEC, which included an Investor Presentation.  The Investor Presentation stated as follows:

> ***"Riot Blockchain intends to gain exposure to the blockchain ecosystem through its mining operations, internally developed businesses, joint ventures, and targeted investments in the sector.  Its primary focus is on Bitcoin and general blockchain technology."***

176.   The statements in ¶ 175 were materially false and misleading and omitted material information because the Company was a front for a pump-and-dump scheme perpetrated by Defendants O'Rourke, Honig, and others.  The Company had transformed overnight from a biopharmaceutical company to a purported player in the cryptocurrency business without any experience.  Instead, the change in the Company's focus was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business.  In reality, however, the Company's

purported focus was nothing more than a façade to allow Defendants O'Rourke, Honig, and others to take advantage of investor enthusiasm over cryptocurrency to execute a pump-and-dump scheme.

### THE TRUTH IS FULLY REVEALED

177.    On September 7, 2018, the SEC filed the *Honig* Action against Defendants O'Rourke and Honig, as well as Frost, Stetson, Groussman, Brauser, and others, for numerous violations of the Exchange Act and Securities Act.  The *Honig* Action is captioned *Securities and Exchange Commission v. Honig, et al.*, No. 1:19-cv-08175 (S.D.N.Y.).  The SEC alleged that the defendants were involved in "three highly profitable 'pump-and-dump' schemes . . . from 2013 through 2018 in the stock of three public companies (Company A, Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares."  SEC Compl. ¶ 1.

178.    According to the SEC, "Honig was the primary strategist, calling upon other Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity."  The SEC further alleged that "[i]n each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse merger or by participating in financings on terms highly unfavorable to the company."  *Id.*, ¶ 2.

179.    The *Honig* Action also alleges that, "[t]o profit from their investment, in each scheme, Honig and his associates would arrange and pay for the promotion of the stock, directing their co-defendant Ford, or a similar promoter, to write favorable and materially misleading articles about the company whose stock price they wanted to inflate.  In several instances, to magnify the intended boost to volume and price that would follow a promotional article's release, ***Honig***, Brauser, ***O'Rourke***, Groussman, Melechdavid and ATG ***engaged in pre-release manipulative***

64

*trading to generate a misleading picture of market interest in the company's stock, priming investor interest.*"  *Id.*, ¶ 3 (emphases added).

180.    In an accompanying press release, Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement, stated that "Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets."

181.    On this news, the price of Riot's stock declined $1.38 per share, or approximately *26.1%*, from the previous day's closing price, to close at $4.30 per share on September 7, 2018.

182.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Class members have suffered significant losses and damages.

## POST-CLASS PERIOD DEVELOPMENTS

183.    On November 19, 2018, Riot filed a Form 10-Q with the SEC, in which the Company addressed the ongoing SEC investigation as follows: "The comments raise matters related to, among other things, the unsettled nature of accounting treatment for the Company's cryptocurrency mining and the fair value method selected by the Company . . . ."

184.    Riot also announced that the Company had made $2,342,508 in cryptocurrency revenue in Q3 2018 and a net loss of in excess of $6.2 million.

185.    On December 20, 2018, the SEC filed a letter to inform the court that "certain Defendants have agreed to settlements in principle" and that "[c]ertain other Defendants have approached the staff to discuss possible settlement and to share their views about the allegations in the existing Complaint."

186.    A week later, on December 27, 2018, the SEC announced a proposed settlement with one of the defendants, Frost, pursuant to which Frost will pay $5.5 million to the SEC and is permanently barred from participating in offerings of penny stocks (with limited exceptions).

187.    On January 2, 2019, Opko settled the pump-and-dump charges with the SEC in the *Honig* Actionand agreed to pay a $100,000 fine.

188.    On January 10, 2019, the SEC filed a consent judgement of the charges against Opko.  As part of that settlement, in addition to the penalty of $100,000, Opko also agreed to the following, among other things:  (i) the establishment of a "Management Investment Committee" that will make recommendations to an "Independent Investment Committee" of the Board of Directors "to handle existing and future strategic minority investments for so long as Dr. Philip Frost ('Frost') is a shareholder in or holds any management or board-level position" at Opko; and (ii) retain an Independent Compliance Consultant to review "prior starategic minority investments by [Opko] made at the suggestion of and in tandem with Frost"; and (iii) review Opko's "existing policies and procedures to determine whether they are sufficient to ensure compliance with Exchange Act Section 13(d)."

## ADDITIONAL SCIENTER ALLEGATIONS

189.    As alleged herein, Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Riot, their control over, and/or receipt and/or modification of Riot's allegedly materially misleading misstatements, and/or their associations with the Company,

which made them privy to confidential proprietary information, participated in the fraudulent scheme alleged herein.

190.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

191.    The Individual Defendants were each members of Riot's executive management group during the Class Period.  Based on their roles at Riot, each of the Individual Defendants would have been involved with, or had knowledge of, the wrongdoing alleged herein.

192.    At a minimum, Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions.

193.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing, and/or disseminating the false and misleading  statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

194.     Each of the Individual Defendants was a senior executive involved in Riot's daily operations with access to all material information regarding the Company's core operations.  Each of the Individual Defendants is presumed to have knowledge of all material facts regarding Riot's core business.

195.     Defendants' scienter is further demonstrated by the fact that cryptocurrency and, in particular, Bitcoin mining was allegedly a central part of the Company's success.  Bitcoin was allegedly the cornerstone of (and critically important to) the Company's growth strategy and, as such, constituted a core operation of the Company.  The fact that the misstatements and omissions at issue here pertained directly to Riot's core operations further supports a strong inference of scienter.

196.     When, as here, a senior officer of a company makes false and misleading public statements regarding its core operations, there is a strong inference that such officer knew the statement was materially false and misleading when made.  Stated otherwise, knowledge of falsity can be imputed to key officers who should have known of facts relating to the core operations of their company.  Moreover, as signatories to the Company's SEC filings, the Individual Defendants had an affirmative obligation to familiarize themselves with the facts relevant to Riot's core operations.

197.     In addition, throughout the Class Period, Riot had very few employees, further strengthening the inference of scienter.  For example, in the Company's annual report filed on April 30, 2018, Riot stated that "[a]s of March 31, 2018, we had nine employees, all of whom are full-time."

198.     The allegations above also establish a strong inference that Riot, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents

762295.2

had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.

199.    Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Riot's true operating condition and present and expected financial performance from investors.  By concealing these material facts from investors, Riot maintained and/or increased its artificially inflated common stock price throughout the Class Period.

200.    As executives of Riot, the Individual Defendants are all candidates for imputing corporate scienter to the Company.

201.    In addition, an executive's insider sales can be probative of scienter.  Here, Defendant O'Rourke's massive insider sales during the Class Period reveals his motive to commit fraud.  On December 29, 2017, Defendant O'Rouke sold 30,383 shares of Riot stock for proceeds of $869,256.35.  These sales were not made pursuant to a 10(b)5-1 trading plan, further adding to the inference of scienter.  These sales were made just days before the Company announced the dismissal of its auditor and a month before Riot canceled its annual meeting for the second time, causing the NASDAQ to inform the Company that it has violated the NASDAQ's listing requirements.  In addition, indicating that Defendant O'Rouke wanted to sell his stock with minimum attention, his sales were made on the Friday before a holiday weekend.

202.    Likewise, the SEC investigation and filing of the *Honig* Action and subsequent settlements add to the inference of scienter.  On April 9, 2018, the SEC issued a subpoena pursuant to a formal order of investigation.  According to Riot, the SEC's "inquires include the proper asset

classification, applicability of the Investment Company Act [of] 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency."

203.    Then, on August 14, 2018, Riot filed a Form 10-Q with the SEC, in which it provided more details about the SEC's investigation.  In particular, the Company reported that the SEC was looking into a number of Riot's registration statements, as well as its acquisition of a minority stake in Coinsquare (the entity in which Defendant Honig had a personal stake.

204.    In its November 13, 2018 Form 10-Q, the Company announced that the SEC's investigation was still ongoing.  According to Jake Zamansky, of the securities law firm Zamansky LLC:  "Recent disclosure shows that a cloud still hangs over this company so long as the SEC investigation continues.   The fact that the division of enforcement remains involved and a registration statement was withdrawn are ominous events for Riot Blockchain."

205.    Finally, the fact that the SEC filed a complaint against Defendants O'Rourke, Honig, and other Riot insiders for similar alleged wrongdoing with multiple other companies adds to the inference of scienter.  That certain individuals and entities charged in the *Honig* Action have already settled with the SEC further adds to the inference of scienter.

206.    These facts, in conjunction with the additional indicia of scienter detailed in the substantive allegations section above, particularly Defendants' specific and repeated statements and the nature of the alleged scheme, collectively support a strong inference of each Individual Defendant's scienter.

## <u>LOSS CAUSATION/ECONOMIC LOSS</u>

207.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Riot's common stock and operated as a fraud or deceit on Class Period purchasers of the Company's common stock.  When Defendants' prior

762295.2

misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of Riot's common stock fell precipitously as the artificial inflation was removed.

208.    As a result of their purchases of Riot common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused the Company's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $46.20 per share on December 19, 2017.

209.    On December 19, 2017, CNBC's *Fast Money* aired an interview with Left, which called into question Defendants' integrity. *See* ¶ 140.  In response, Riot's stock price fell by ***6.42%***, from a closing price of $38.60 per share on December 19, 2017, to a closing price of $36.12 per share on December 20, 2017, damaging Lead Plaintiff and members of the Class.

210.    On December 21 and 22, 2017, numerous articles were released that suggested that Riot's name change to include the word "Blockchain" was a publicity stunt and questioning the legitimacy of the Company.   *See* ¶¶ 142-44.  As a result of the disclosures, Riot's stock price declined $11.60 per share, or ***34.75%***, over the course of those two trading days, damaging Lead Plaintiff and members of the Class.

211.    On January 2, 2018, *Reuters* published an article prior to the market open entitled, "BUZZ-Riot Blockchain down after CEO reports stock offering – RTRS."  The article stated that Riot's stock price was down 4.44% in pre-market trading after Defendant O'Rourke had reported his sale of over 30,000 shares.  An article published during early morning trading hours, on the popular investor website, *The Motley Fool*, entitled, "Riot Blockchain's CEO Just Sold a Lot of Stock," detailed Defendant O'Rourke's suspicious trading. *See* ¶ 151.  On this news, Riot's stock price declined $4.04 per share, or ***14.45%***, over two trading days, from $28.40 per share on

December 29, 2017, to $24.36 per share on January 3, 2018, damaging Lead Plaintiff and members of the Class.

212.    On January 5, 2018, after the close of trading, Riot filed a registration statement on Form S-3 for the disposition of approximately 3.3 million shares and warrants.  The 1.65 million common shares being registered represented over 14% of the 11.6 million outstanding common shares.  The filing also disclosed that investors who had purchased in the March 2017 Placements would be free to sell their shares once the registration statement was declared effective.  The possibility of private investors, who bought shares below market value, selling out at a premium, like Defendants Honig and O'Rourke, created a negative market response.  The registration statement also confirmed that Riot had overpaid for Kairos.  It confirmed that Kairos had purchased its equipment for $2,089,679 and the excess purchase price paid by Riot was recorded as $8,637,545, confirming that the Company paid more than four times the price for Kairos's equipment.  The Company's stock price declinrf $1.01 per share, or *4.13%*, from $24.41 per share on January 5, 2018, to $23.42 per share on January 8, 2018, damaging Lead Plaintiff and members of the Class.

213.    On January 31, 2018, before the market opened, *The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."  The article referenced how Defendant Honig had taken an aggressive stake in the Company when it was still in the medical diagnostics business and how he drove out Bioptix's CEO and others, replacing them with his own allies, including Defendant O'Rourke.  Also on January 31, 2018, Riot announced that its previously scheduled annual meeting would be adjourned for *a second time*, purportedly to allow the Company to seek a quorum.  As a result of these disclosures on January 31, 2018, Riot's stock price declined $1.98 per share, *or 14.26%*, over the course of two trading

days, from $14.28 per share on January 30, 2018, to $12.30 per share on February 1, 2018, damaging Lead Plaintiff and members of the Class.

214.     On February 16, 2017, CNBC published the article "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket" regarding questionable practices at Riot.  *See* ¶ 86.  In response, shares of Riot fell $5.74 per share, or approximately *33.4%*, to close at $11.46 per share on February 16, 2018, damaging Lead Plaintiff and Class members.

215.     On April 17, 2018, Riot filed an annual report on Form 10-K, disclosing that on April 9, 2018 it had received a subpoena from the SEC.  See ¶ 164.  On this news, the Company's stock price fell $0.34 per share, or approximately *5.9%*, from the previous day's closing price, to close at $6.87 per share on April 18, 2018, damaging Class members.

216.     On September 7, 2018, the SEC filed the *Honig* Action against several individuals and entities with which they were associated, including Defendants O'Rourke and Honig, for numerous violations of the Exchange Act and Securities Act.  The price of Riot's stock dropped $1.38 per share, or approximately *26.1%*, from the previous day's closing price, to close at $4.30 per share on September 7, 2018, damaging Class members.

217.     As shown above, the timing and magnitude of the price declines in Riot's common stock negate any inference that the losses suffered by Lead Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraud.

## CLASS ACTION ALLEGATIONS

218.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Riot during the Class Period (the "Class"); and were

damaged upon the revelation of the alleged corrective disclosure.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

219.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class.  The Company reported that as of April 12, 2018, it had approximately 1,030 holders of record of its consumer stock.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

220.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

221.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

222.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether Defendants engaged in a fraudulent scheme;

(g)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(h)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

223.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

224.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

762295.2

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded an efficient market;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ and was covered by analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Lead Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

225.     Based on the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTION**

226.     Lead Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine as enunciated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

76

227.    With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Lead Plaintiff and other members of the Class purchased common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

228.    At all relevant times, the market for Riot's common stock was efficient for the following reasons, among others:

(a)    the Company's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)    as a regulated issuer, Riot filed periodic public reports with the SEC and the NASDAQ;

(c)    Riot regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

77

     (d)     Riot was followed by stock analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

229.    As a result of the foregoing, the market for Riot's common stock promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of the common stock.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of such common stock at artificially inflated prices, and a presumption of reliance applies.

230.    In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims alleged are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Riot's business operations and financial performance – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.

231.    Rather, all that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

232.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were any

762295.2

forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward looking statements pleaded herein, Defendants are liable for those false forward-looking statements  because at the time each of those forward-looking statements was made, the particular speaker knew  that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against Riot, O'Rourke, McGonegal, and Beeghley

233.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

234.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

235.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

236.    The Company and the Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:  employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the

79

statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and Class members in connection with their purchases of the Company's securities during the Class Period.

237.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

238.    Individual Defendants, who were the senior officers and/or directors of the Company during the Class Period, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Lead Plaintiff and members of the Class.

239.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the falsity of the Company's and the

762295.2

Individual Defendants' statements, Lead Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

240.    Had Lead Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

241.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

242.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants**

243.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

244.    As early as 2016, and continuing throughout the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, did:  (i) deceive the investing public, including Lead Plaintiff and other members of the Class, as alleged herein; (ii) enable Riot

to artificially inflate the price of the Company's common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Riot's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the following actions:

(a)     Misrepresented that Riot had changed from a biopharmaceutical company to a purported player in the cryptocurrency business.  This scheme was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business;

(b)     Hid the fact that Defendants O'Rourke, Honig, and others were taking advantage of the investor enthusiasm over cryptocurrency and the Company's purported change to a cryptocurrency business to execute a pump-and-dump scheme; and

(c)     Issued false and misleading statements in furtherance of the scheme.

245.    Each and every Defendant is sued as a primary participant in the wrongful and illegal conduct charged herein.

246.    The scheme, plan, and course of conduct alleged herein was intended to, and did, drive sales of Riot's common stock, and with it, the Company's profits and share price.

## COUNT III

### Violation of Section 20(a) of The Exchange Act
### Against O'Rourke, McGonegal, and Beeghley

247.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

248.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

249.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

250.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.   The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

251.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company.   By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

252.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

A.      Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Motley Rice LLC as class counsel pursuant to Rule 23(g);

B.      Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.      Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E.      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury of all issues so triable.

**LITE DEPALMA GREENBERG, LLC**

Dated:  January 15, 2019          */s/ Joseph J. DePalma*
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Lead Plaintiff Dr. Stanley Golovac*

762295.2

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice* pending)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Lead Plaintiff Dr. Stanley
Golovac and Lead Counsel for the Class*

85