## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated, | Civil No. 3:18-CV-02293(FLW)(TJB) |
| Plaintiff, | ORAL ARGUMENT REQUESTED |
| v. | MOTION DATE:  July 1, 2019 |
| RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY G. McGONEGAL, | |
| Defendants. | |

---

## MEMORANDUM OF LAW IN SUPPORT OF RIOT BLOCKCHAIN DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

---

THOMAS A. ZACCARO
*thomaszaccaro@paulhastings.com*
D. SCOTT CARLTON
*scottcarlton@paulhastings.com*
PAUL HASTINGS LLP
515 South Flower Street (25th Floor)
Los Angeles, California 90071-2228
Telephone:  1(213) 683-6000
Facsimile:  1(213) 627-0705

CHAD J. PETERMAN
*chadpeterman@paulhastings.com*
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone:  1(212) 318-6000
Facsimile:  1(212) 319-4090

*Attorneys for Defendants*
*RIOT BLOCKCHAIN, INC., JOHN O'ROURKE, MICHAEL BEEGHLEY, AND JEFFERY G. MCGONEGAL*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................1

II.   RELEVANT BACKGROUND AS TO DEFENDANTS ...........................4

    A.   The Riot Blockchain Defendants .........................................4

    B.   Riot's Investments in the Cryptocurrency Business ...........................5

    C.   Lead Plaintiff's Allegations Related to the Riot Blockchain Defendants...........................................................................8

III.  THE SECTION 10(B) CLAIM AGAINST THE RIOT BLOCKCHAIN DEFENDANTS SHOULD BE DISMISSED ..................10

    A.   The Reform Act's Heightened Pleading Standards ..........................10

    B.   Lead Plaintiff Does Not Plead Any Actionable Misrepresentations or Omissions as to the Riot Blockchain Defendants...........................................................................12

        1.   The Complaint's Allegations Concerning Participation in a Pump-and-Dump Scheme Are Insufficient as a Matter of Law ...............................................................13

        2.   Riot's Statements Concerning Its Cryptocurrency Investments and Business Plan Are Inactionable Puffery.......17

        3.   Riot's Statements Concerning Its Internal Policies Are Not Materially False or Misleading .........................................18

        4.   Riot's Statements Concerning the Location of Its Principal Offices Are Not Specifically Alleged to Be False .................................................................................20

        5.   The Riot Blockchain Defendants Had No Duty to Disclose Honig's Alleged Control over the Company ...........22

        6.   The Complaint Fails to Allege That Riot Did Not Intend to Hold Its 2017 Annual Meeting of Shareholders.................24

        7.   The Complaint Does Not Allege with Any Particularity That the Riot Blockchain Defendants Failed to Maintain an Effective Control Environment ..........................................25

    C.   The Complaint Does Not Contain Specific Facts Giving Rise to a Cogent and Compelling Inference That the Riot Blockchain Defendants Acted with Scienter.......................................28

# TABLE OF CONTENTS
(continued)

**Page**

    1.    Lead Plaintiff's Assumption That the Riot Blockchain Defendants "Must Have" Acted with Scienter Fails as a Matter of Law.............................................................................29

    2.    O'Rourke's Trades of Riot Shares on December 29, 2017, Do Not Establish a Strong Inference of Scienter..........31

    3.    The SEC's Investigation of Riot and Filing of the *Honig* Action Do Not Establish a Strong Inference of Scienter.........33

    4.    Viewed as a Whole, the Complaint Fails to Create a Strong Inference of Scienter ....................................................34

  D.    Lead Plaintiff Does Not Adequately Allege "Scheme Liability" Under Section 10(b) .............................................................36

IV.    THE SECTION 20(A) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED .............................................38

V.    CONCLUSION...............................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanta Corp. Secs. Litig.*,
180 F.3d 525, 539 (3d Cir. 1999) ...........................................................30, 33, 35

*In re Aetna, Inc. Secs. Litig.*,
617 F.3d 272 (3d Cir. 2010) ........................................................................16, 17

*In re Alpharma Secs. Litig.*,
372 F.3d 137 (3d Cir. 2004) .................................................................................39

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
505 F. Supp. 2d 662 (D. Colo. 2007).................................................................20

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)...............................................................................................22

*In re Bio–Tech. Gen. Corp. Secs. Litig.*,
380 F. Supp. 2d 574 (D.N.J. 2005)......................................................................30

*Bond Opportunity Fund v. Unilab Corp.*,
87 F. App'x 772 (2d Cir. 2004) ...........................................................................23

*In re Braskem S.A. Secs. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017) ...............................................................19

*Brophy v. Jiangbo Pharms., Inc.*,
781 F.3d 1296 (11th Cir. 2015) ...........................................................................33

*In re Burlington Coat Factory Secs. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ....................................................................*passim*

*Cal. Pub. Empls.' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) .........................................................................15, 21

*City of Monroe Empls.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
No. 10 CIV. 2835 NRB,
2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011). .................................................27

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
  713 F. Supp. 2d 378 (D. Del. 2010),
  *affirmed*, 442 F. App'x 672 (3d Cir. 2011) ........................................................28

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
  686 F. Supp. 2d 404 (D. Del. 2009)............................................................20, 26

*In re Cognizant Tech. Sols. Corp. Secs. Litig.*,
  No. 216CV06509WHWCLW,
  2018 WL 3772675 (D.N.J. Aug. 8, 2018) ........................................................20

*In re Craftmatic Secs. Litig. v. Kraftsow*,
  890 F.2d 628 (3d Cir. 1989) .............................................................................18

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).........................................................................................11

*In re Equimed, Inc. Secs. Litig.*,
  No. 98-CV-5374, 2000 WL 562909 (E.D. Pa. May 9, 2000) ...........................39

*Fox Int'l Relations v. Fiserv Secs. Inc.*,
  490 F. Supp. 2d 590 (E.D. Pa. 2007).................................................................38

*In re Gentiva Secs. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...............................................................27

*Glazer Capital Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ............................................................................34

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir.2004) ..............................................................................32

*In re Heartland Payment Sys., Inc. Secs. Litig.*,
  No. 09–1043, 2009 WL 4798148,
  2009 U.S. Dist. LEXIS 114866 (D.N.J. Dec. 7, 2009)......................................30

*In re Hertz Glob. Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018) ...............................................................................3

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Hertz Glob. Holdings, Inc. Secs. Litig.*,
   No. CV 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017),
   *aff'd sub nom,*. 905 F.3d 106 (3d Cir. 2018) ......................................................33

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ..................................................................12, 16, 35

*In re Intelligroup Secs. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007)......................................................................26

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)........................................................................................2, 10

*Jones v. Intelli–Check, Inc.*,
   274 F. Supp. 2d 615 (D.N.J. 2003)......................................................................13

*Lautenberg Found. v. Madoff*,
   No. CIV. A. 09-816, 2009 WL 2928913 (D.N.J. Sept. 9, 2009).................37, 38

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ................................................................................37

*Limantour v. Cray Inc.*,
   432 F. Supp. 2d 1129 (W.D. Wash. 2006) ..........................................................36

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010)................................................................18, 34

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
   834 F.3d 481 (3d Cir. 2016) ................................................................................19

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) ..........................................................22, 23, 31, 33

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
   998 F.2d 1192 (3d Cir. 1993) ................................................................................4

*In re Radian Secs. Litig.*,
   612 F. Supp. 2d 594 (E.D. Pa. 2009)...................................................................26

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013) ..............................................................................14

*Retail Wholesale & Dep't Store Union Local 388 Ret. Fund v. Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ...........................................................................19

*In re Rockefeller Ctr. Props., Inc. Secs. Litig.*,
  311 F.3d 198 (3d Cir. 2002) ..............................................................................11

*SEC v. Honig*,
  No. 1:18-cv-08175 (S.D.N.Y.) ..........................................................................10

*SEC v. Lucent Techs., Inc.*,
  610 F. Supp. 2d 342 (D.N.J. 2009) ....................................................................36

*Securities and Exchange Commission v. Honig, et al.*,
  No. 1:19-cv-08175 (S.D.N.Y.). ...................................................................33, 34

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992) ..............................................................................39

*In re Suprema Specialties, Inc. Secs. Litig.*,
  438 F.3d 256 (3d Cir. 2006) .......................................................................11, 23

*In re Synchronoss Secs. Litig.*,
  705 F. Supp. 2d 367 (D.N.J. 2010)....................................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)....................................................................................12, 30

*In re Urban Outfitters, Inc. Secs. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015)................................................................30

*Utesch v. Lannett Co.*,
  316 F. Supp. 3d 895 (E.D. Pa. 2018)................................................................29

*In re Verisign, Inc., Derivative Litig.*,
  531 F. Supp. 2d 1173 (N.D. Cal. 2007)............................................................36

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Wenger v. Lumisys, Inc.*,
2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................................... 17

*Zavolta v. Lord, Abbett & Co.*,
No. CIV.A 2:08-CV-4546, 2010 WL 686546
(D.N.J. Feb. 24, 2010) ...................................................................... 28

**Statutes**

15 U.S.C.
§ 10(b) ..................................................................................... *passim*
§ 20(a) ............................................................................... 4, 38, 39
§ 78u–4(b) ................................................................................... 11
§ 78u–4(b)(1) ........................................................................ 13, 15

Private Securities Litigation Reform Act of 1995 (the "Reform Act") ............ *passim*

**Other Authorities**

17 C.F.R.
§ 229.406(a) ............................................................................... 20
§ 229.406(b) ............................................................................... 20

Fed. R. Civ. P.
R. 9(b) ................................................................................... *passim*
R. 12(b)(6) ................................................................................... 1

SEC Rule
R. 10b-5 ............................................................................... 22, 38
R. 10b-5(a) ........................................................................... 37, 38
R. 10b-5(b) ........................................................................... 36, 37
R. 10b-5(c) ........................................................................... 37, 38

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995 (the "Reform Act"), Defendants Riot Blockchain, Inc. ("Riot" or the "Company"), Michael Beeghley ("Beeghley"), John O'Rourke ("O'Rourke"), and Jeffery G. McGonegal ("McGonegal" and Riot, Beeghley, and O'Rourke, are collectively the "Riot Blockchain Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss Lead Plaintiff Dr. Stanley Golovac's ("Lead Plaintiff") Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint").[1]

## I.  **INTRODUCTION**

Lead Plaintiff contends that the Riot Blockchain Defendants and co-defendant Barry Honig ("Honig"), a Riot investor, committed federal securities violations via a purported "pump-and-dump" scheme.  Lead Plaintiff's theory is premised entirely on unsupported allegations that Defendants artificially inflated Riot's stock based on alleged misrepresentation and omissions related to Riot's shift from a biopharmaceutical focus to a cryptocurrency technologies company. Not only are Lead Plaintiff's allegations unsupported by particularized facts, the allegations in the Complaint contradict any notion that the Riot Blockchain

---

[1] The "Individual Defendants" include Beeghley, O'Rourke, and McGonegal. Riot, the Individual Defendants, and Honig are collectively referred to as "Defendants."  Since Honig is represented by separate counsel, this Motion refers to Riot and the Individual Defendants collectively as the "Riot Blockchain Defendants."

Defendants made false or misleading statements regarding Riot's transition into a cryptocurrency business.

The cryptocurrency market is a well-known, emerging virtual currency market, which has been highly volatile while in its relative infancy. Lead Plaintiff's allegations are a blatant attempt to exploit the volatility of the market through generalized allegations of fraud by hindsight. As Lead Plaintiff concedes, Riot made real and meaningful investments in the cryptocurrency space in an effort to build its cryptocurrency business. Those investments were perfectly consistent with Riot's stated intent of shifting from a biopharmaceutical focus to a cryptocurrency technologies company. Thus, instead of alleging fraudulent activity by the Riot Blockchain Defendants, Lead Plaintiff is left with asserting that Riot "did not have a meaningful cryptocurrency business plan" and that Defendants "sought to exploit investor interest in the rapidly expanding cryptocurrency markets." (Dkt. No. 52, Compl. ¶ 4.) Those allegations are non-actionable, pejorative-laced opinions. They are certainly not *factual* allegations that satisfy the heightened pleading standards required to plead a violation of Section 10(b) of the Securities Exchange Act ("Exchange Act") against the Riot Blockchain Defendants.

*First*, Lead Plaintiff has not and cannot adequately plead actionable misrepresentations or omissions to sustain a Section 10(b) claim. Generalized

statements regarding Riot's business plan and strategy—many of which constitute inactionable puffery—are not false and misleading.  Moreover, courts universally hold that Lead Plaintiff's allegations that amount to corporate mismanagement do not constitute federal securities fraud.  To the extent Lead Plaintiff relies on alleged omissions, Lead Plaintiff has failed to plead a duty to disclose.  Lead Plaintiff's bald allegations that the Riot Blockchain Defendants orchestrated a pump-and-dump scheme or that Honig held "undue influence over Riot's operations and affairs" do not impose some general duty of disclosure.

*Second*, and equally compelling, the claims in the Complaint are infected by Lead Plaintiff's failure to plead a cogent and compelling inference of scienter.  The Complaint relies on no internal documents, confidential witness statements, or any other credible information that suggests that the Riot Blockchain Defendants acted with scienter.  Instead, Lead Plaintiff offers vague and specious assertions that the Riot Blockchain Defendants "must have" acted with scienter because of their positions as executives or because the U.S. Securities and Exchange Commission ("SEC") opened an investigation regarding certain Defendants.  (Compl. ¶¶ 93, 201.)  This barebones pleading approach has been explicitly rejected by the Third Circuit.  *See, e.g.*, *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 115 (3d Cir. 2018).

*Third*, Lead Plaintiff's attempt to plead a claim based on "scheme liability" requires him to allege with particularity an illegal scheme "separate and apart" from any alleged misrepresentations and omissions. Here, the purported "scheme" Lead Plaintiff alleges is simply a reiteration of Lead Plaintiff's allegation that the Riot Blockchain Defendants made misleading statements and/or omissions. This theory therefore fails as a matter of law.

Since the Complaint fails to adequately allege a primary violation under Section 10(b) against any Defendant, the claim for control person liability against the Riot Blockchain Defendants under Section 20(a) must also be dismissed. The Riot Blockchain Defendants therefore request that the Court dismiss all the claims against them in their entirety.

## II.  <u>RELEVANT BACKGROUND AS TO DEFENDANTS</u>

### A.  **The Riot Blockchain Defendants**

Riot is a corporation headquartered in Castle Rock, Colorado, and is listed on NASDAQ under the symbol "RIOT." (Compl. ¶ 15.)[2] Riot builds and supports various blockchain technologies. (*Id.*)

---

[2] The facts set forth below are taken from the allegations in the Complaint and publicly available documents that are appropriate for judicial notice. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("We now hold that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."). The facts alleged in the Complaint are only taken as true for purposes of this Motion.

Beeghley was Riot's Chairman and Chief Executive Officer ("CEO") from April 2017 until November 3, 2017.  (*Id.* ¶¶ 18, 52, 76.)  O'Rourke served as Riot's Chairman and CEO from November 3, 2017 until September 8, 2018.  (*Id.* ¶ 16.)[3]  McGonegal was Riot's Chief Financial Officer from 2003 to February 28, 2018, where he served as Riot's Principal Accounting Officer until April 30, 2018.  (*Id.* ¶ 17.)  McGonegal subsequently served as a consultant to Riot and was later appointed CEO of Riot in February 2019.  (*Id.*; (Declaration of Thomas Zaccaro In Support of Riot Blockchain Defendants' Motion to Dismiss ("Zaccaro Decl."), Ex. A (*Riot Blockchain, Inc.*, February 5, 2019 Press Release)).)

B.  **Riot's Investments in the Cryptocurrency Business**

Riot was formerly known as Bioptix, Inc. ("Bioptix"), with a business focus on biotechnology.  (Compl. ¶ 40.)  Bioptix was based in Castle Rock, Colorado.  (*Id.*)  As of January 14, 2017, Bioptix announced that it had adopted a plan to exit the business of biotechnology and commence a significant reduction in workforce.  (Zaccaro Decl., Ex. G (Bioptix, Inc. Form S-3 (Amendment No. 3) at 6, filed on Sept. 25, 2017).)  Bioptix announced that it had "begun evaluating potential strategic alternatives.  We expect, in the near term, to establish the primary criteria

---

[3] The Complaint was filed on behalf of "all purchasers of the common stock of Riot, between October 3, 2017, and September 6, 2018, inclusive (the 'Class Period') . . . ."  (Compl. ¶ 1.)

we will consider as we evaluate our next steps and strategic path forward with the goal of maximizing value for our stockholders." (*Id.*)

On September 29, 2017, Bioptix made a $3 million investment in goNumerical Ltd., a Canadian cryptocurrency exchange that does business as Coinsquare. (*Id.* ¶ 65.) In an October 3, 2017 press release, Bioptix announced that its Board of Directors authorized a special dividend of approximately $1.00 per common stock, payable on October 18, 2017, to shareholders as of October 13, 2017. (*Id.* ¶ 102.) Beeghley commented that Bioptix was "explor[ing] options for delivering additional value to shareholders . . . ." (*Id.*) Bioptix also noted that it had been "reviewing other strategic alternatives, including shifting its focus to new technologies in unrelated markets." (Zaccaro Decl., Ex. B (*Riot Blockchain, Inc.*, October 3, 2017 Press Release).)

The next day, Bioptix announced that it was changing its name to Riot Blockchain, Inc. (RIOT) and that its new focus will be as a "strategic investor and operator in the blockchain ecosystems with a particular focus on the Bitcoin and Ethereum blockchains." (*See* Zaccaro Decl., Ex. C October 4, 2017 Form 8-K, Exhibit No. 99.1.) Riot described its new line of business as "leverage[ing] its expertise and network to build and support blockchain technology companies" and "provid[ing] investment exposure to the rapidly growing blockchain ecosystem." (*Id.*) The Company stated that it was "establishing an Advisory Board with

technical experience intending to become a leading authority and supporter of blockchain and provides investment exposure to the rapidly growing blockchain ecosystem." (*Id.*)

Lead Plaintiff alleges that the new focus on blockchain technology was some nefarious "attempt to capitalize on investor interest in cryptocurrency," particularly through a name change, to artificially inflate Riot's stock price. (Compl. ¶¶ 4–6.) Lead Plaintiff, of course, ignores that Riot's stock did not react to its name change. (*See* Zaccaro Decl., Ex. H (Riot's Historical Stock Price Chart).) In fact, Riot's stock price remained flat over the six weeks following the announced transition. (*See id.*)[4]

Riot's stock price only began to increase after Riot made several additional strategic investments in blockchain technology companies consistent with its new focus.[5] Following the earlier acquisition of Coinsquare, on October 16, 2017, the Company acquired approximately 52 percent of Tess, Inc. ("Tess"), a Canadian company which developed blockchain solutions for telecommunications

---

[4] On October 3, 2017, Riot's stock price closed at $8.09 per share. (*See* Zaccaro Decl., Ex. H (Riot's Historical Stock Price Chart).) The next day, following Riot's announced transition to a cryptocurrency company, Riot's stock price closed at $8.18 per share. (*Id.*) On October 5, 2017, following the announcement of Riot's name change, Riot's stock price dropped to $7.30 per share. (*Id.*) Approximately six weeks later, on November 15, 2017, Riot's stock price closed at $7.93 per share. (*Id.*)

[5] Like many stocks in the cryptocurrency market, Riot's stock price is closely tied to the stock movement of Bitcoin.

companies.  (*See* Compl. ¶ 72.)  On November 3, 2017, Riot announced that it

acquired Kairos Global Technology, Inc. ("Kairos"), a Nevada cryptocurrency

mining company, by issuing 1,750,001 shares of Series B Convertible Preferred

Stock, which are convertible to Riot's common stock, to Kairos shareholders.  (*See*

Zaccaro Decl., Ex. D November 1, 2017 Form 8-K.)

On November 16, 2017, Riot announced that it had made a strategic

investment in Verady, LLC, a company that provides cryptocurrency accounting

and audit technology services.  (*See* Zaccaro Decl., Ex. E November 16, 2017

Form 8-K, Exhibit No. 99.1.)  Finally, on December 11, 2017, Riot announced that

Tess was merging with Cresval Capital Corp., a Canadian mining company, and

will be publicly traded on the TSX Venture Exchange after the closing of the

merger.  (*See* Zaccaro Decl., Ex. F December 11, 2017 Form 8-K, Exhibit

No. 99.1.)

### C.    Lead Plaintiff's Allegations Related to the Riot Blockchain Defendants

Lead Plaintiff contends that Defendants made misrepresentations and/or

omissions in connection with an alleged "pump-and-dump" scheme orchestrated

by Honig and O'Rourke.  (Compl. ¶ 101.)  Lead Plaintiff principally asserts that

unsubstantiated allegations made by the SEC against O'Rourke and Honig,

claiming they were involved in a pump-and-dump scheme concerning wholly

unrelated businesses, confirms that Defendants were engaged in a pump-and-dump scheme with Riot.  (*See id.* ¶¶ 177–82.)

Lead Plaintiff claims that Defendants artificially inflated Riot's stock by allegedly making the following misleading statements or omissions:

(1)    Failing to disclose the alleged pump-and-dump scheme;

(2)    Failing to disclose "Riot's limited meaningful investments in cryptocurrency products and absence of meaningful cryptocurrency business plan";

(3)    Failing to disclose O'Rourke's alleged "insider trading and misrepresenting compliance with the Company's internal policies" based on O'Rourke's sale of 30,383 shares of Riot stock on December 29, 2017;

(4)    Misrepresenting the "location of the Company's principal executive offices";

(5)    Failing to disclose "Honig's effective control and undue influence over Riot's operations and affairs";

(6)    Misrepresenting that Riot had maintained adequate internal controls; and

(7)    Misleading investors about Riot's intent to hold its 2017 Annual Meeting of Shareholders.

(*See id.* ¶¶ 82, 101.)[6]

Lead Plaintiff also relies on allegations made by the SEC in *SEC v. Honig*, No. 1:18-cv-08175 (S.D.N.Y.). (*Id.* ¶ 97.) In that enforcement action, the SEC asserts that O'Rourke, Honig, and other individuals were involved in a pump-and-dump scheme involving businesses *wholly unrelated* to Riot. (*Id.*) The SEC's allegations, as Lead Plaintiff admits, did not involve Riot, and did not result in any determination of fault or wrongdoing against the Riot Blockchain Defendants. (*See id.* ¶¶ 97, 188.) Moreover, that enforcement action did not relate to Beeghley or McGonegal at all. Lead Plaintiff also alleges that the SEC's investigation involving Riot suggests some wrongdoing. (*Id.* ¶¶ 202–03.)

III. **THE SECTION 10(B) CLAIM AGAINST THE RIOT BLOCKCHAIN DEFENDANTS SHOULD BE DISMISSED**

A. **The Reform Act's Heightened Pleading Standards**

To properly state a claim under Section 10(b), Lead Plaintiff must allege that: (1) Defendants made material misrepresentations or omissions; (2) Defendants acted with scienter for each alleged misrepresentation or omission;

---

[6] As indicated below, Beeghley was not even an executive at Riot when O'Rourke's trade occurred, when Riot certified the effectiveness of its controls, or when the initial meeting date for the 2017 Annual Meeting of Shareholders was cancelled. A Section 10(b) claim is therefore not viable against Beeghley for those alleged statements and omissions. *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it").

(3) there was a connection with the purchase or sale of a security; (4) Lead Plaintiff relied on each alleged misrepresentation or omission; (5) Lead Plaintiff suffered economic loss; and (6) the alleged misrepresentation or omission caused the loss from which Lead Plaintiff seeks to recover damages.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).  But securities fraud claims are subject to "heightened pleading requirements of Rule 9(b) . . . ."  *In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006).  At minimum, Rule 9(b) requires Lead Plaintiff to support all of his allegations of security fraud with the essential factual background that would accompany "the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue."  *Id.* at 277 (internal quotation marks omitted).

In addition to the stringent pleading requirements imposed by Rule 9(b), the Reform Act imposes "another layer of factual particularity to allegations of securities fraud."  *In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002).  The Reform Act requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b).

Furthermore, the Reform Act makes a "sharp break with Rule 9(b)," requiring a plaintiff to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)) (emphasis added).  Thus, to survive a motion to dismiss, a plaintiff must plead that the defendant acted with a "mental state intent to deceive, manipulate or defraud." *Tellabs*, 551 U.S. at 319. But a "strong inference" exists "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw . . . ." *Id.* at 324.  Hence, courts cannot examine any one allegation of scienter in isolation, but rather, after evaluating all the facts as alleged, consider any plausible opposing inferences.  *Id.*

### B. Lead Plaintiff Does Not Plead Any Actionable Misrepresentations or Omissions as to the Riot Blockchain Defendants

The "particularity requirement has been rigorously applied in securities fraud cases." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997).  When stating the "falsity," *i.e.*, "material misrepresentation" element of its Section 10(b) claim, a securities fraud plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on

which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  In this case, the allegations in the Complaint do not come close to meeting the particularity requirement for establishing the falsity of any material representations.[7]

      1.     <u>The Complaint's Allegations Concerning Participation in a Pump-and-Dump Scheme Are Insufficient as a Matter of Law</u>

Lead Plaintiff contends that certain public statements made by Riot were false because Riot was purportedly a "front for a pump-and-dump scheme perpetuated by Defendants O'Rourke, Honig, and others."  (*See, e.g.*, Compl. ¶¶ 103, 105, 107, 109, 113.)  These public statements include the following:

- "Riot Blockchain is committed to building and supporting the blockchain ecosystem."  (*Id.* ¶ 108.)

- "The Company's strategy will be to continue to pursue opportunistic investments and controlling positions in these new and emerging technologies which will continue to expose the Company to the numerous risks and volatility associated with this section."  (*Id.* ¶ 110.)

---

[7] In addition to Lead Plaintiff's failure to adequately plead falsity, for several of the alleged misstatements and omissions Lead Plaintiff does not specifically attribute the statements to any of the Riot Blockchain Defendants.  Lead Plaintiff's use of "group pleading" provides an additional basis to dismiss the fraud claims.  *See Jones v. Intelli–Check, Inc.*, 274 F. Supp. 2d 615, 646 (D.N.J. 2003) (holding that the Reform Action has rendered group pleading unavailable to securities fraud plaintiffs).

- "The Company seeks to build a diversified blockchain company through the development and ownership of operating assets in the blockchain ecosystem." (*Id.* ¶ 111.)

- "Riot Blockchain intends to gain exposure to the blockchain ecosystem through targeted investments in the sector, with a primary focus on the Bitcoin and Ethereum Blockchains." (*Id.* ¶ 121.)

Lead Plaintiff's allegations fail to allege specific facts to show that these statements by Riot were false and/or misleading when made. *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 241 (3d Cir. 2013) (holding that the Reform Act requires that a complaint must state with particularity, the facts constituting the alleged violation). In fact, Lead Plaintiff's own allegations *contradict* the notion that Riot's statements were false and/or misleading.

The statements alleged by Lead Plaintiff are either indisputably truthful or constitute inactionable puffery. For example, the Complaint details Riot's significant investments into the cryptocurrency business, including, (1) a $3 million investment in Coinsquare, a Canadian cryptocurrency exchange, (Compl. ¶ 65); (2) acquiring approximately 52 percent of Tess, a Canadian company which developed blockchain solutions for telecommunication companies that later executed an agreement to merge with Cresval Capital Corp., a cryptocurrency mining company, (*id.* ¶¶ 72, 79); (3) acquiring Kairos, a Nevada-based

cryptocurrency mining corporation, (*id.* ¶ 74); and (4) an investment in Verady, LLC, a company that provides cryptocurrency accounting and audit technologies. (*Id.* ¶ 78.)  Riot's investments thus demonstrate its commitment to "pursue opportunistic investments and controlling positions in these new and emerging technologies which will continue to expose the Company to the numerous risks and volatility associated with this section."  (*Id.* ¶ 110.)

Although Lead Plaintiff concludes that all of the challenged statements were false because Riot was allegedly a pump-and-dump scheme, the Complaint is completely devoid of any facts showing *how* Riot was in fact a pump-and-dump scheme.  *See Cal. Pub. Empls.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004) ("Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of 15 U.S.C. § 78u–4(b)(1).").  Rather, Lead Plaintiff's "argument is facially circular" because it asks the Court to assume that there is a pump-and-dump scheme, but offers no particularized facts that establish actual misrepresentations or omissions statements artificially inflated (*i.e.*, pumped) Riot's stock price.  *In re Synchronoss Secs. Litig.*, 705 F. Supp. 2d 367, 416 (D.N.J. 2010).[8]

---

[8] As stated above, Riot's stock price remained flat from the start of the Class Period until November 15, 2017.  Beeghley, however, left Riot by November 3, 2017.  (Compl. ¶¶ 18, 52, 76.)  Lead Plaintiff thus cannot plausibly explain what role Beeghley had in artificially inflating Riot's stock.

Since Lead Plaintiff cannot offer particularized allegations, it relies entirely on the unsubstantiated allegation that O'Rourke and Honig were involved in a pump-and-dump scheme at other companies to infer that Defendants must be involved in a similar scheme at Riot.  (*See* Compl. ¶¶ 88–89.)[9]  By doing so, Lead Plaintiff all but admits that he cannot allege facts showing the "who, what, when, where and how" of any alleged pump-and-dump scheme at Riot.  *Avaya, Inc.*, 564 F.3d at 253.

Regardless of Lead Plaintiff's boilerplate allegations of falsity, Riot's statements, which generally pertain to the Company's commitment to building a diversified blockchain company by investing in blockchain technology, are not actionable.  The Third Circuit has expressly clarified that "[c]laims that ... expressions of hope by corporate managers could dupe the market have been [] uniformly rejected by the courts."  *In re Burlington Coat Factory,* 114 F.3d at 1427 (holding that the statement that the company believed it could continue to grow net earnings at a faster rate than sales was vague and inactionable).  "[O]pinions, motives and intentions, or general statements of optimism" are considered "no more than puffery and are understood by reasonable investors as such."  *In re Aetna, Inc. Secs. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (internal quotation marks

---

[9] Even more telling, Lead Plaintiff makes no attempt whatsoever to connect either Beeghley or McGonegal to the unsubstantiated allegation regarding O'Rourke and Honig.

-16-

omitted).  Riot's statements are thus "too vague to be actionable" and are "obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage."  *Id.* (internal quotation marks omitted).

        2.    <u>Riot's Statements Concerning Its Cryptocurrency Investments and Business Plan Are Inactionable Puffery</u>

Lead Plaintiff alleges that Riot's statements that it would be a "pure play that would leverage [its] expertise, and network, to build and support blockchain technology companies" was false and misleading because the Company had "limited meaningful investments in cryptocurrency products and did not have a meaningful cryptocurrency business plan."  (Compl. ¶ 4 (internal quotation marks omitted).)  These statements are quintessential puffery, and are thus "immaterial as a matter of law."  *In re Aetna, Inc.*, 617 F.3d at 283–84 (finding defendants' characterization of the pricing of medical insurance premiums as "disciplined" to be puffery).  Riot's descriptions are merely vague and general statements of optimism that cannot support Lead Plaintiff's Section 10(b) claim.  *See Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245–46 (N.D. Cal. 1998) (holding defendant's statements that it "represents a pure play in the emergence of" an industry that was "finally coming of age[,]" that it was a "leader in a rapidly growing market[,]" and that it was "a good company" that was well positioned, were "not specific enough to perpetrate fraud on the market.").

Moreover, Lead Plaintiff's allegations that Riot lacked a "meaningful cryptocurrency business plan" amount to allegations of corporate mismanagement. *See In re Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628, 638 (3d Cir. 1989) ("claims *essentially* grounded on corporate mismanagement are not cognizable under federal law.") (emphasis added).  But "concerns underlying the securities acts are not implicated simply because management has failed to characterize . . . its financial reporting and accounting controls as inadequate and ineffective[.]"  *Id.* at 640.  Thus, courts uniformly hold that allegations of corporate mismanagement do not create liability under the federal securities laws.  *See Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 541 n.20 (D.N.J. 2010) (allegations of corporate mismanagement are not actionable under Section 10(b)).

### 3.     Riot's Statements Concerning Its Internal Policies Are Not Materially False or Misleading

Lead Plaintiff claims that Riot's statements contained in its Code of Conduct and Insider Trading Policy, adopted on October 23, 2017, were materially false and misleading because O'Rourke and Honig allegedly traded on inside information regarding the Company's pump-and-dump scheme.  (Compl. ¶ 120.)  But Riot's statements concerning its Code of Conduct and Insider Trading Policy were not materially false or misleading.

First, Lead Plaintiff does not establish that statements in either the Code of Conduct or the Insider Trading Policy were false when made by Riot.  Instead,

Lead Plaintiff attempts to prove "fraud by hindsight" because the purported

violations occurred *after* the Code of Conduct and the Insider Trading Policy were

issued by Riot.  *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 497 (3d

Cir. 2016).  The Third Circuit "has long rejected" attempts to plead fraud by

hindsight.  *Id.*[10]

Second, a company's code of conduct and insider trading policy are

"inherently aspirational," so "it simply cannot be that every time a violation of that

code occurs, a company is liable under federal law for having chosen to adopt the

code at all."  *In re Braskem S.A. Secs. Litig.*, 246 F. Supp. 3d 731, 755 (S.D.N.Y.

2017).  A code of conduct is not an affirmative guarantee that "all staff, directors,

and offices always adhere to its aspirations"; it merely expresses an opinion "as to

what actions are preferable . . . ."  *Retail Wholesale & Dep't Store Union Local

388 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017).

Moreover, because companies are effectively required to adopt a code of conduct

---

[10] Lead Plaintiff also does not offer any particularized allegations that either the
Code of Conduct or the Insider Trading Policy had been violated.  Honig is not an
employee, officer, or director of the Company.  There are no allegations
establishing how the Code of Conduct or Insider Trading Policy are applicable to
Honig's alleged trades.  Beeghley is not alleged to have made any trades and was
not even employed at Riot at the time O'Rourke made alleged trades.  And finally,
there are no allegations specifying how O'Rourke actually violated either of the
policies.  The conclusory allegations that O'Rourke traded while in possession of
some unidentified insider information is not sufficient to state a claim for federal
securities fraud.  *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d at 1418
("boilerplate and conclusory allegations will not suffice").

under SEC regulations and NASDAQ rules, *see* 17 C.F.R. § 229.406(a)–(b), "all

public companies—whether run by crooks or angels—will adopt such a code."

*Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 686 (D.

Colo. 2007).

  As such, companies are not required to disclose violations of a code of

conduct or an insider trading policy. *See City of Roseville Empls.' Ret. Sys. v.

Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009) (holding that

plaintiffs failed to plead falsity under the Reform Act with respect to the statements

contained in defendant's code of ethics, even though plaintiffs alleged that the

defendants failed to disclose that its employees had violated the code of ethics).

Thus, as a matter of law, the alleged failure of Riot to disclose O'Rourke's and

Honig's unsubstantiated violations of its policies cannot support Lead Plaintiff's

Section 10(b) claim. *Id.*; *see also In re Cognizant Tech. Sols. Corp. Secs. Litig.*,

No. 216CV06509WHWCLW, 2018 WL 3772675, at *17 (D.N.J. Aug. 8, 2018)

(holding that statements within a company's code of conduct cannot serve as the

basis for securities fraud liability).

    4. <u>Riot's Statements Concerning the Location of Its Principal</u>
      <u>Offices Are Not Specifically Alleged to Be False</u>

  Lead Plaintiff alleges that Riot's statement that its principal executive

offices are located in Colorado was false and misleading because "in reality the

Company was based in Florida, to allow Defendant Honig to control Riot's

operations." (Compl. ¶¶ 131, 171.)  But there are no particularized facts alleged in the Complaint that would suggest that the Company's offices were located in Florida.

Lead Plaintiff attempts to rely on a February 16, 2018 CNBC article, in which CNBC crew members claim they visited co-Defendant Honig's office and ran into O'Rourke.  (*Id.* ¶ 86.)[11]  These allegations are insufficient to allege falsity because they fail to allege particular facts that Riot's principal executive offices are not in Colorado.  Riot's headquarters are, in fact, in Colorado.  (Zaccaro Decl., Ex. G (Bioptix, Inc. Form S-3 (Amendment No. 3) at 1, filed on Sept. 25, 2017)).)  The allegation that O'Rourke was present in Honig's office one day in February 2018 does not suggest that Riot's offices are not located in Colorado.  *See Cal. Pub. Emp. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 157 (3d Cir. 2004) (affirming dismissal of securities fraud claims after concluding that plaintiffs failed to allege falsity where the allegations were consistent with the defendant's public statements).

This allegation is also typical of securities fraud complaints that "often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage."  *In re*

---

[11] Beeghley was no longer employed at Riot when the alleged misstatement was made about the location of Riot's principal executive offices.  (*See* Compl. ¶¶ 76, 126, 130.)  This alleged misstatement therefore cannot be attributed to Beeghley.

*Burlington Coat Factory,* 114 F.3d at 1426.  The Complaint provides no basis to

assume that such an inconsequential fact—the location of Riot's principal

executive offices—is material to Riot's investors.

5.    The Riot Blockchain Defendants Had No Duty to Disclose
Honig's Alleged Control over the Company

Lead Plaintiff asserts that Riot failed to disclose co-Defendant Honig's

effective control and undue influence over the Company.  (*See, e.g.*, Compl. ¶¶ 7,

66, 101.)  According to Lead Plaintiff, Honig exerted control over Riot because

O'Rourke and a group of investors (none of whom are defendants in this action)

were purportedly allies of Honig.  (*See id.* ¶¶ 50, 56–59, 71.)  These conclusory

allegations offered by Lead Plaintiff do not state a federal securities claim.

First, setting aside the conclusory nature of the allegations, the Riot

Blockchain Defendants did not have a duty to disclose to Lead Plaintiff their

purported allegiances or personal relationships to investors.  "Silence, absent a

duty to disclose, is not misleading under Rule 10b–5."  *Basic Inc. v. Levinson*, 485

U.S. 224, 239 n.17 (1988); *see also Oran*, 226 F.3d at 285 ("Even non-disclosure

of material information will not give rise to liability under Rule 10b–5 unless the

defendant had an affirmative duty to disclose that information."); *In re Burlington

Coat Factory*, 114 F.3d at 1432 ("Except for specific periodic reporting

requirements . . . there is no general duty on the part of a company to provide the

public with all material information.").  A duty to disclose only arises when "there

-22-

is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Oran*, 226 F.3d at 285–86.  None of these circumstances exist here.  Therefore, the Riot Blockchain Defendants' alleged failure to disclose their relationship with Honig cannot sustain Lead Plaintiff's Section 10(b) claim as a matter of law.

Second, Lead Plaintiff's claim that the Riot Blockchain Defendants failed to disclose Honig's purported control over Riot is contradicted by the Complaint. Lead Plaintiff supports his claim by alleging that Honig and his "allies" had, at one point owned a large amount of Bioptix or Riot shares.  (*See* Compl. ¶¶ 53, 56, 71.) Yet, according to Lead Plaintiff's allegations, it was publicly disclosed the amount of Riot shares that Honig and his purported allies have owned.  (*See, e.g.*, *id.* ¶ 71 (describing shares acquired by Honig's "allies" using information gleaned from Riot's registration statements and other publicly filed documents).  Moreover, Lead Plaintiff fails to allege specific facts which show when and how Honig actually controlled, either directly or indirectly, the Company.  *See In re Suprema Specialties, Inc.*, 438 F.3d at 276 (requiring plaintiffs bringing securities fraud claims to allege the "who, what, when, where and how" of the events at issue); *Bond Opportunity Fund v. Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004) (holding that "mere speculation is insufficient to satisfy the PSLRA pleading standard").  Simply alleging that Honig had "allies" that helped him control the

Company are emblematic of conclusory allegations that Rule 9(b) and the Reform Act uniformly reject.

  6. <u>The Complaint Fails to Allege That Riot Did Not Intend to Hold Its 2017 Annual Meeting of Shareholders</u>

  Lead Plaintiff claims that Riot's announcement scheduling its 2017 Annual Meeting of Shareholders were misleading because Riot never intended to hold its shareholder meeting at the Boca Raton Resort and Club.  (Compl. ¶¶ 146, 148, 170.)  While the meeting was originally scheduled for December 28, 2017, and was later rescheduled to February 1, 2018, Riot canceled the meeting because it "did not have a quorum of shareholders required for a vote." (*Id.* ¶ 169.)  Lead Plaintiff nevertheless maintains that Riot did not intend to have the meeting at all, citing again a February 16, 2018 CNBC article on Riot, which claimed that employees at the Boca Raton Resort and Club said that there were no reservations under the name of Riot or any affiliated entity.  (*Id.* ¶ 170.)  The article also quotes the opinion of an attorney who is not involved in this matter as saying, "I just don't think in this instance, there's any reason to adjourn their annual meeting."  (*Id.*)

  These allegations do not demonstrate falsity.  The allegation that some employees at the Boca Raton Hotel Resort and Club did not know of a reservation under Riot's name is hardly dispositive.[12]  Simply because Riot failed to hold the

---

[12] Similar to Lead Plaintiff's allegation that Riot misstated the location of its principal executive offices, the date of Riot's shareholder meeting is obviously

shareholder meeting does not mean that Riot never intended to hold the meeting. On the contrary, Riot's explanations for cancelling the meeting—(1) that there was not a quorum of shareholders required for a vote; (2) that it was working on other corporate action items that would require shareholder approval; and (3) that it did not want to waste the time and expense of potentially having two shareholder meetings in a short timeframe—are far more plausible than Lead Plaintiff's explanation.  (Compl. ¶ 86.)  Lead Plaintiff offers no explanation of why Riot or the Individual defendants would not want to hold the shareholder meeting.  *See In re Burlington Coat Factory*, 114 F.3d at 1422–23 (requiring plaintiffs to identify circumstances indicating conscious or reckless behavior or allege facts showing both a motive and opportunity to allege fraudulent intent).

7. <u>The Complaint Does Not Allege with Any Particularity That the Riot Blockchain Defendants Failed to Maintain an Effective Control Environment</u>

Lead Plaintiff alleges that the Riot Blockchain Defendants "did not maintain an effective control environment" because it allowed Defendants to engage in the pump-and-dump scheme.  (*Id.* ¶ 127.)  In turn, Lead Plaintiff concludes that the SOX certifications, which accompanied the Company's Form 10-Q for the period ending in September 30, 2017, and signed by O'Rourke and McGonegal, were

---

immaterial.  *See In re Burlington Coat Factory,* 114 F.3d at 1426.  In addition, this alleged misstatement cannot be attributed to Beeghley because he was not employed at the company when the alleged statement was made.

false and misleading.  (*Id.*)  But the SOX certifications simply affirmed the effectiveness of the Company's internal controls over financial reporting and disclosure controls and procedures; the certifications certainly do not qualify as a material misrepresentation.  (*Id.*)

An erroneous SOX certification cannot independently create the requisite strong inference of scienter.  *In re Intelligroup Secs. Litig.*, 527 F. Supp. 2d 262, 288 (D.N.J. 2007)  (SOX certifications establish scienter only if facts are set forth to show that defendants had actual knowledge or "turned a 'blind eye'" to information showing that the certification was erroneous).  To the contrary, Lead Plaintiff must "allege facts indicating that certifying defendants had clear reasons to doubt the validity of financials being certified but kept turning their blind eye to all 'red flags.'"  *Id.* at 289.  This requirement, for example, could be satisfied through allegations that "defendants improperly changed accounting journal entries in order to artificially inflate revenue and then execute a SOX certification while being well aware of the impropriety of the change."  *Id.*  In light of this requirement, Lead Plaintiff's allegations are woefully inadequate.  *See In re Radian Secs. Litig.*, 612 F. Supp. 2d 594, 620 (E.D. Pa. 2009) (SOX certifications do not support a strong inference of scienter unless the defendants actually knew or at a minimum turned a blind eye to information indicating that the certifications were erroneous); *City of Roseville*, 686 F. Supp. 2d at 420 (SOX certifications do

not support inference of scienter where the plaintiff fails to "plead with sufficient particularity that [the defendants were] aware or should have been aware of" the alleged falsity "at the time those certifications were made").

Moreover, the Complaint does not contain any particularized allegations suggesting that the actions enumerated in the SOX certifications were, in fact, not actually undertaken by O'Rourke and McGonegal. *See In re Gentiva Secs. Litig.*, 932 F. Supp. 2d 352, 371 (E.D.N.Y. 2013) (granting defendants' motion to dismiss because the plaintiff failed to allege facts that suggest that individual defendants did not undertake the actions described in the SOX certification or any allegations concerning the company's financial reporting processes). The Complaint is devoid of "any facts pertaining to the Company's internal structure for financial reporting, much less that [the Company] lacked adequate internal controls." *City of Monroe Empls.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10 CIV. 2835 NRB, 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011). Accordingly, Lead Plaintiff's allegations of "lack of controls . . . [are] conclusory assertions without any factual support . . ." and cannot survive a motion to dismiss. *Id.* (second alteration in original).

C.    **The Complaint Does Not Contain Specific Facts Giving Rise to a Cogent and Compelling Inference That the Riot Blockchain Defendants Acted with Scienter**

The Complaint fails to allege specific facts establishing that any of the Riot Blockchain Defendants acted with the requisite scienter in connection with any assumed Section 10(b) violation.[13]  Instead, Lead Plaintiff offers (1) vague and boilerplate allegations of scienter against the Riot Blockchain Defendants that relies on "core operations" theory; (2) O'Rourke's sale of Riot stock, which occurred after the supposed fraud was disclosed to the public; and (3) inferences from unrelated investigations and actions by the SEC.  (Compl. ¶¶ 189–206.) These allegations fail to meet the Reform Act's exacting pleading standards for any of the Riot Blockchain Defendants.  And when viewed collectively, Lead Plaintiff's allegations fail to create a cogent and compelling inference of scienter that is at least as strong as any competing non-culpable inference of scienter.  In

---

[13] To evaluate the scienter of a corporate defendant (*e.g.*, Riot), courts "look to the state of mind of the individual corporate official or officials who make or issue the statement . . . ."  *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 402 (D. Del. 2010), *affirmed*, 442 F. App'x 672 (3d Cir. 2011).  Therefore, a corporate defendant cannot be held liable "absent a showing that at least one individual officer who made, or participated in the making of, a false or misleading statement did so with scienter."  *Id.* at 403; *see also Zavolta v. Lord, Abbett & Co.*, No. CIV.A 2:08-CV-4546, 2010 WL 686546, at *7 (D.N.J. Feb. 24, 2010) ("A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter.").  Because Lead Plaintiff does not specifically allege that the Riot Blockchain Defendants—who are the only parties in this action who are officers of the Company—acted with the requisite scienter, Lead Plaintiff also fails to allege that Riot acted with the requisite scienter.

fact, neither McGonegal nor Beeghley are ever specifically mentioned in the Complaint with respect to any of the scienter allegations.

      1.     <u>Lead Plaintiff's Assumption That the Riot Blockchain Defendants "Must Have" Acted with Scienter Fails as a Matter of Law</u>

Lead Plaintiff concludes that the Riot Blockchain Defendants must have known and/or recklessly disregarded the false and/or misleading statements simply by virtue of their "high-level positions" at Riot.  (Compl. ¶¶ 189–91, 193.)  Lead Plaintiff alleges that because the Individual Defendants were involved in the day-to-day operations of the Company, which included the drafting, producing, and reviewing of the Company's public statements and SEC filings, the Riot Blockchain Defendants are "presumed" to have knowledge of all material facts concerning the Company.  (*Id.* ¶¶ 193–95.)  These allegations do not come close to meeting the demands of the Reform Act.  *See Utesch v. Lannett Co.,* 316 F. Supp. 3d 895, 906 (E.D. Pa. 2018) (reasoning that "it is one thing to say that" the defendants were aware of the importance of an issue for the company, but it "is another to infer that" defendants "must have known" of a fraud related to that issue).

"[I]t is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest that the officer had

knowledge of the fact in question." *In re Heartland Payment Sys., Inc. Secs. Litig.*, No. 09–1043, 2009 WL 4798148, at *7, 2009 U.S. Dist. LEXIS 114866, at *21 (D.N.J. Dec. 7, 2009); *In re Bio–Tech. Gen. Corp. Secs. Litig.*, 380 F. Supp. 2d 574, 596 (D.N.J. 2005).  Under "the core operations doctrine, misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives give rise to an inference of scienter when taken together with additional allegations connecting the executives' positions *to their knowledge*." *In re Urban Outfitters, Inc. Secs. Litig.*, 103 F. Supp. 3d 635, 653–54 (E.D. Pa. 2015) (emphasis added).

Here, the Complaint alleges nothing about the roles, duties, or actions of any of the Individual Defendants, other than their status as senior officers of Riot.  (*See* Compl. ¶¶ 193–96.)  Accordingly, the Complaint fails to allege that the Riot Blockchain Defendants acted with requisite scienter.  *See In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) ("[A]llegations that a securities-fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.") (alteration in original) (internal quotation marks omitted), *abrogated on other grounds by Tellabs,* 551 U.S. 308.

2. <u>O'Rourke's Trades of Riot Shares on December 29, 2017, Do Not Establish a Strong Inference of Scienter</u>

Lead Plaintiff claims that O'Rourke's sale of Riot shares on December 29, 2017 somehow "reveals his motive to commit fraud." (Compl. ¶ 200.) Lead Plaintiff further claims that these sales "were made just days before the Company announced the dismissal of its auditor and a month before Riot canceled its meeting for the second time, causing the NASDAQ to inform the Company that it has violated the NASDAQ's listing requirement." (*Id.*) These allegations – which do not apply to either McGonegal or Beeghley – are wholly insufficient to support the element of scienter; fraudulent intent cannot be inferred "from the mere fact that some officers sold stock." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d at 1424 (recognizing that corporate executives routinely sell their own company's stock and finding that plaintiffs' allegations that the officer-defendants had traded company stock during the class period insufficient to produce a strong inference of fraudulent intent).

Lead Plaintiff must allege additional facts to show that O'Rourke's trades were made at times and in quantities that were suspicious enough to support the necessary "strong inference of scienter." *Oran v. Stafford*, 226 F.3d 275, 290 (3d Cir. 2000) (finding that the plaintiffs' allegations as to the individual defendants' trading patterns did not establish the requisite strong inference of scienter). The Complaint fails to allege facts to suggest that O'Rourke's sales were

unusual or suspicious.  *See GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir.2004) ("Motives that are generally possessed by most corporate directors and officers do not suffice . . . .").

In fact, Lead Plaintiff's own allegations militate against any inference that O'Rourke's December 29, 2017 trades were unusual.  The Complaint alleges that O'Rourke's trade occurred *after* the purported fraud was already disclosed.  (*See* Compl. ¶¶ 140–144.)  For example, the Complaint notes that on December 19, 2017, CNBC aired an interview with Andrew Left, a short-seller of Riot shares and founder of Citron Research, who claimed that Riot "misrepresent[ed] the fact that nothing that they have is a real player in the crypto industry."  (*Id.* ¶ 140.)  Lead Plaintiff also cites December 21, 2017 articles from *Reuters* and *Zacks*, which purportedly disclosed that "Riot's name change to include the word 'Blockchain' was a publicity stunt."  (*Id.* ¶ 142.)  According to Lead Plaintiff, these alleged disclosures caused Riot's stock price to decline to "$11.60 per share, or **34.75%** over the course of two trading days."  (*Id.* ¶ 145 (emphasis in the original).)

Moreover, the Complaint alleges that O'Rourke's trades represented less than 10 percent of his overall position, which was sold to cover his tax obligations resulting from the vesting of restricted stock awards.  (*Id.* ¶ 86 (quoting a February 16, 2018 CNBC article on Riot).)  Thus, the timing and scope of O'Rourke's December 29, 2017 trades undercut Lead Plaintiff's scienter

allegations as they do not demonstrate any effort to dispose a large number of shares before the alleged fraud was disclosed. *See Oran*, 226 F.3d at 290; *Advanta Corp.*, 180 F.3d at 540 (finding an insider's sale of seven percent of his holdings did not support a strong inference of fraud).

3. The SEC's Investigation of Riot and Filing of the *Honig* Action Do Not Establish a Strong Inference of Scienter

In a last-ditch effort to meet the Reform Act's exacting scienter requirements, Lead Plaintiff alleges that the "SEC investigation and filing of the *Honig* Action and subsequent settlements add to the inference of scienter." (*Id.* ¶ 202.) Not so. An SEC investigation that has not resulted in any finding of wrongdoing or filing of formal charges does not support an inference of scienter. *In re Hertz Glob. Holdings, Inc. Secs. Litig.*, No. CV 13-7050, 2017 WL 1536223, at *17 (D.N.J. Apr. 27, 2017), *aff'd sub nom,* 905 F.3d 106 (3d Cir. 2018).[14] The SEC's investigation of Riot—which has not resulted in any formal charges— cannot support a strong inference of scienter against Riot. And while the *Honig* action does involve O'Rourke, it does not involve McGonegal or Beeghley. Moreover, Lead Plaintiff admits that the action does not pertain to O'Rourke's

---

[14] *See also Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 628 n.2 (4th Cir. 2008) (finding that an SEC investigation is "too speculative to add much, if anything, to an inference of scienter"); *Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1304 (11th Cir. 2015) ("The mere existence of an SEC investigation likewise does not equip a reviewing court to explain which inferences might be available beyond a general suspicion of wrongdoing.") (internal quotation marks omitted).

actions at Riot, nor did it lead to any findings of wrongdoing by Riot, O'Rourke, or

any of the other Individual Defendants.  (Compl. ¶ 97.)

The fact that "certain individuals and entities charged in the *Honig* Action

have already settled with the SEC" (none of whom are Defendants in this case) is

similarly unavailing.  (*Id.* ¶ 205.)  The Complaint does not suggest that these

settlements resulted in any admissions or legal conclusions involving Riot.  *Glazer*

*Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) (affirming

district court's finding that settlement agreements involving defendants with the

DOJ and SEC were not sufficient to meet the pleading requirements of the Reform

Act because the admissions were largely legal conclusions rather than

particularized facts giving rise to a strong inference of scienter).  Lead Plaintiff's

reliance on the SEC's investigation and involvement in the unrelated *Honig* matter

does not create a strong inference that Riot Blockchain Defendants acted with

scienter.

4.     Viewed as a Whole, the Complaint Fails to Create a Strong
       Inference of Scienter

Finally, taken together, Lead Plaintiff's allegations fail to create any strong

inference of scienter that is at least as strong as any non-culpable inference of

scienter.  *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 558 (determining that

the plaintiff's complaint, even when viewed in its entirety, failed to establish a

strong inference of scienter where the court had already found the plaintiff's

insider trading, group pleading, and GAAP violation allegations to be insufficient).

The Complaint does not offer "facts to show that defendants had both motive and

opportunity to commit fraud" or "facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness."  *In re Burlington Coat*

*Factory*, 114 F.3d at 1418 (describing the methods by which a strong inference of

fraud may be established).

Lead Plaintiff fails to allege any motive on behalf of the Riot Blockchain

Defendants to defraud Riot investors whatsoever.  *Avaya, Inc.*, 564 F.3d at 278

("[M]otives that are generally possessed by most corporate directors and officers

do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the

individual defendants resulting from this fraud.") (alteration in original).  Lead

Plaintiff simply asserts that O'Rourke "reveal[ed] his motive to commit fraud"

when he purportedly sold Riot stock during the Class Period, *but after* the alleged

fraud was disclosed.  (Compl. ¶ 201.)  These "catch-all allegations that defendants

stood to benefit from [the] wrongdoing and had the opportunity to implement a

fraudulent scheme are no longer sufficient because they do not state facts with

particularity or give rise to a strong inference of scienter."  *Advanta Corp.*, 180

F.3d at 535.

Similarly, Lead Plaintiffs completely fail to allege any strong circumstantial

evidence of conscious misbehavior or recklessness.  For example, the Complaint

offers no witnesses, no sources, or any contemporaneous documents which would show "what each defendant knew, when he/she knew it, or how he/she acquired that knowledge." *In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1207 (N.D. Cal. 2007); *see also Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1152 (W.D. Wash. 2006) (finding that plaintiffs have failed to allege scienter because they offered no witnesses or circumstantial evidence that defendants intended to inflate the company's stock in furtherance of a pump-and-dump scheme).

In sum, the Court should dismiss the Section 10(b) claim brought against the Riot Blockchain Defendants because Lead Plaintiff does not come anywhere close to pleading cogent and compelling facts to establish scienter. Indeed, as to Beeghley and McGonegal, the Complaint contains *no* allegations whatsoever, let alone particularized ones, to support a scienter inference. And the only allegations regarding O'Rourke—that he sold Riot shares—is patently inadequate to support a scienter inference.

### D.  Lead Plaintiff Does Not Adequately Allege "Scheme Liability" Under Section 10(b)

For a Section 10(b) claim based on scheme liability to survive a motion to dismiss, Lead Plaintiff must identify deceptive or manipulative acts that are *separate and apart* from any alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim. *See SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d

342, 361 (D.N.J. 2009) (dismissing scheme liability claim because the "alleged deception . . . arose from the failure to disclose the real terms of the deal, which is nothing more than a reiteration of the misrepresentations and omissions that underlie plaintiffs disclosure claim") (internal quotation marks omitted); *Lautenberg Found. v. Madoff*, No. CIV. A. 09-816, 2009 WL 2928913, at *12 (D.N.J. Sept. 9, 2009) ("A Rule 10b-5(a) and/or (c) claim cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim."); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (holding no scheme liability "where the sole basis for such claims is alleged misrepresentations or omissions . . . ."). Here, Lead Plaintiff's claim based on "scheme liability" is nothing more than a reiteration of the material misrepresentation and/or omission claims. Lead Plaintiff's Section 10(b) claim based on scheme liability should therefore be dismissed.

The Complaint does not allege that the Riot Blockchain Defendants committed deceptive or manipulative acts separate and apart from Lead Plaintiff's misrepresentation and omissions claim. Lead Plaintiff only alleges that the Defendants committed the following actions in furtherance of the alleged scheme:

(1) "*Misrepresented* that Riot had changed from a biopharmaceutical company to a purported player in the cryptocurrency business."

(2) "*Hid* the fact that Defendants O'Rourke, Honig, and others were taking

advantage of the investor enthusiasm over cryptocurrency and the

Company's purported change to a cryptocurrency business . . . ."

(3) "*Issued* false and misleading *statements* in furtherance of the scheme."

(Compl. ¶ 244 (emphasis added).)

Lead Plaintiff's scheme liability claim thus restates his allegation that the

Riot Blockchain Defendants had made material misstatements and/or omissions in

violation of Rule 10b-5 and offers no additional facts beyond these alleged

misrepresentations or omissions.  (*See id.* ¶ 244.)  Consequently, Lead Plaintiff's

scheme liability claim must be dismissed.  *See Lautenberg Found.*, 2009 WL

2928913, at *12 (dismissing Rule 10b-5(a) and (c) claims where the plaintiffs

failed to allege "deceptive acts, separate and apart from the omissions of material

fact . . ." the defendant undertook in furtherance of the alleged scheme).

## IV.  THE SECTION 20(A) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED

To recover under Section 20(a), a plaintiff must show: (1) one person

controlled another person or entity; (2) that the controlled person or entity

committed a primary violation of the securities laws; and (3) that the defendant

was a culpable participant in the fraud.  *Fox Int'l Relations v. Fiserv Secs. Inc.*,

490 F. Supp. 2d 590, 601 (E.D. Pa. 2007) (citing *In re Suprema Specialties, Inc.*

*Secs. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006)).  If no controlled person is liable, no

controlling person liability exists.  *In re Alpharma Secs. Litig.*, 372 F.3d 137, 153

(3d Cir. 2004); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 279 (3d Cir. 1992).

As shown above, Lead Plaintiff fails to sufficiently plead either a primary

violation of the Exchange Act or culpable participation in the alleged fraud.  *See In*

*re Equimed, Inc. Secs. Litig.*, No. 98-CV-5374, 2000 WL 562909, at *10 (E.D. Pa.

May 9, 2000) ("The heightened standards of the Reform Act apply to a § 20(a)

claim, so a plaintiff must plead particularized facts of the controlling person's

conscious misbehavior as a culpable participant in the fraud.") (internal quotation

marks omitted) (quoting *In re Cendant Corp. Secs. Litig.*, 76 F. Supp. 2d 539, 549

n.5 (D.N.J. 1999)).  The Section 20(a) claim therefore must be dismissed.

## V.    <u>CONCLUSION</u>

For the reasons stated above, the Riot Blockchain Defendants respectfully

request that the Court dismiss the Section 10(b) and Section 20(a) claims brought

against them.

DATED:      March 18, 2019                    PAUL HASTINGS LLP


                                              By:  /s/ *Chad J. Peterman*
                                                     CHAD J. PETERMAN

                                              *chadpeterman@paulhastings.com*
                                              200 Park Avenue
                                              New York, NY 10166
                                              Telephone:  1(212) 318-6000
                                              Facsimile:  1(212) 319-4090

                                              THOMAS A. ZACCARO
                                              *thomaszaccaro@paulhastings.com*
                                              D. SCOTT CARLTON
                                              *scottcarlton@paulhastings.com*
                                              515 South Flower Street
                                              Twenty-Fifth Floor
                                              Los Angeles, CA  90071
                                              Telephone:  1(213) 683-6000
                                              Facsimile:  1(213) 627-0705

                                              Attorneys for Defendants
                                              RIOT BLOCKCHAIN, INC., JOHN
                                              O'ROURKE, MICHAEL BEEGHLEY,
                                              AND JEFFERY G. MCGONEGAL