**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY MCGONEGAL,<br><br>Defendants. | Civil Action No.: 18-2293(FLW)(TJB)<br><br>*ORAL ARGUMENT REQUESTED* |

**DEFENDANT BARRY C. HONIG'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED CLASS ACTION COMPLAINT**

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

*Attorneys for Defendant Barry C. Honig*

Dated: March 18, 2018

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................4

I. FACTUAL BACKGROUND ..........................................................................4

A. The Defendants ..........................................................................................4

B. The Company's Prior Business Strategy Was Unsuccessful for Years. ..................4

C. The Company Adds New Independent Board Members, Who Later Decide to Transition the Business Into Cryptocurrency and Blockchain. ...........................6

D. The Company Returns Some Cash to Shareholders And Uses The Remainder to Acquire Valuable Cryptocurrency and Blockchain Assets. ..............6

E. Mr. Honig Was Merely a Shareholder Who Did Not Participate or Influence The Decisions of Riot's Board. ..............................................................8

F. The Board's Decisions Made Riot A Far More Valuable Company, But Riot's Stock Price Was Driven By Underlying Price Swings of Bitcoin. ...............9

II. APPLICABLE LEGAL STANDARDS ...........................................................10

A. Motion to Dismiss Under Rule 12(b)(6) ...........................................................10

B. Complaints Alleging Securities Fraud, Like This One, Must Be Dismissed Unless They Satisfy The Heightened Pleading Standards Of Rule 9(b) And The PSLRA. ..............................................................................................11

III. THE SOLE CAUSE OF ACTION AGAINST MR. HONIG SHOULD BE DISMISSED BECAUSE IT FAILS TO PLEAD HIS PARTICIPATION IN ANY "SCHEME" WITH THE HEIGHTENED FACTUAL PARTICULARITY REQUIRED BY RULE 9(B) AND THE PSLRA. .........................................................13

A. The Complaint Fails To Allege Facts Showing That Mr. Honig Committed Any Deceptive or Manipulative Act. .......................................................14

1. *The Public Disclosures Identified In The Complaint Are Demonstrably True, And In Any Event, Mr. Honig Did Not Make Them.* ..........................................................................................14

2. *The Complaint Fails To Allege Any Facts Tending To Show That Mr. Honig Engaged In Manipulative Trading Activity.* .............................16

B. The Complaint Fails to Allege Particularized Facts Giving Rise to Any Inference, Much Less A Strong Inference, That Mr. Honig Acted With Scienter. ...........................................................................................18

C. The Complaint Fails to Allege Causation, Reliance, and Economic Loss. ...........20

CONCLUSION ....................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*In re Able Labs. Sec. Litig.*
No. 05-cv-02681, 2008 WL 1967509 (D.N.J. Mar. 24, 2008) ....................13, 20

*In re Aetna Inc. Sec. Litig.*
34 F. Supp. 2d 935 (E.D. Pa. 1999) ....................19

*Affiliated Ute Citizens of Utah v. United States*
406 U.S. 128 (1972) ....................22

*In re Almost Family, Inc. Sec. Litig.*
No. 3:10-CV-00520-H, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ....................21

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*
413 F. Supp. 2d 378 (E.D. Pa. 2005) ....................19

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ....................10, 11

*Associated Builders, Inc. v. Alabama Power Co.*
505 F.2d 97 (5th Cir. 1974) ....................15

*Basic Inc. v. Levinson*
485 U.S. 224 (1988) ....................22

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) ....................10

*Berry v. Coleman*
172 Fed. App'x 929 (11th Cir. 2006) ....................15

*Burlington Coat Factory Sec. Litig.*
114 F.3d 1410 (3d Cir. 1997) ....................11

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*
511 U.S. 164 (1994) ....................3, 4, 13, 14, 16

*Chiarella v. United States*
445 U.S. 222 (1980) ....................13

*In re Clearly Canadian Sec. Litig.*
875 F. Supp. 1410 (N.D. Cal. 1995) ....................17

*De Vito v. Liquid Holdings Grp., Inc.*
No. 15-cv-06969, 2018 WL 6891832 (D.N.J. Dec. 31, 2018) ....................13

*Dura Pharm., Inc. v. Broudo*
544 U.S. 336 (2005)....................13, 20

*In re Exxon Mobil Corp. Sec. Litig.*
387 F. Supp. 2d 407 (D.N.J. 2005), *aff'd*, 500 F.3d 189 (3d Cir. 2007), *as amended* (Nov. 20, 2007)....................18, 19, 20

*Fowler v. UPMC Shadyside*
578 F.3d 203 (3d Cir. 2009)....................11

*Frederico v. Home Depot*
507 F.3d 188 (3d Cir. 2007)....................11

*GSC Partners CDO Fund v. Washington*
368 F.3d 228 (3d Cir. 2004)....................18

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*
286 F.3d 613 (2d Cir. 2002)....................9

*In re Home Health Corp. of Am., Inc.*
No. CIV. A. 98-834, 1999 WL 79057 (E.D. Pa. Jan. 29, 1999)....................20

*Institutional Investors Group v. Avaya, Inc.*
564 F.3d 242 (3d Cir. 2009)....................12

*In re Int'l Bus. Machines Corp. Sec. Litig.*
163 F.3d 102 (2d Cir. 1998)....................17

*Janus Capital Grp., Inc. v. First Derivative Traders*
564 U.S. 135 (2011)....................13

*Liberty Nat. Ins. Holding Co. v. Charter*
734 F.2d 545 (11th Cir. 1984)....................9

*Loos v. Immersion Corp.*
762 F.3d 880 (9th Cir. 2014), *as amended* (Sept. 11, 2014)....................21

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litigation*
MDL No. 1658 (SRC), 2011 WL 3444199 (D.N.J. Aug. 8, 2011)....................12

*In re Merck & Co., Inc. Sec. Litig.*
432 F.3d 261 (3d Cir. 2005)....................21

*Meyer v. Greene*
710 F.3d 1189 (11th Cir. 2013)....................21

*Motient Corp. v. Dondero*
529 F.3d 532 (5th Cir. 2008)....................9

*In re NAHC, Inc. Sec. Litig.*
306 F.3d 1314 (3d Cir. 2002)....................11

*In re Omnicom Grp., Inc. Sec. Litig.*
597 F.3d 501 (2d Cir. 2010)....................21

*Phillips v. Cnty. of Allegheny*
515 F.3d 224 (3d Cir. 2008)....................10

*In re Rockefeller Ctr. Props. Sec. Litig.*
311 F.3d 198 (3d Cir. 2002)....................11, 12

*In re Royal Dutch/Shell Transp.*
No. 04-374(JAP), 2006 WL 2355402 (D.N.J. Aug. 14, 2006)....................14, 16, 17, 18

*S.E.C. v. Lucent Techs., Inc.*
610 F. Supp. 2d 342 (D.N.J. 2009)....................13, 14, 15, 16

*Sterling v. Provident Life & Accident Ins. Co.*
519 F. Supp. 2d 1195 (M.D. Fla. 2006)....................15

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*
552 U.S. 148 (2008)....................20

*In re Suprema Specialties, Inc. Sec. Litig.*
438 F.3d 256 (3d Cir. 2006)....................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
551 U.S. 308 (2007)....................12

*Winer Family Trust v. Queen*
503 F.3d 319 (3d Cir. 2007)....................12

**<u>Federal: Statutes, Rules, Regulations, Constitutional Provisions</u>**

Fed. R. Civ. P. 9(b)....................1, 3, 11, 12, 13, 17, 23

Fed. R. Civ. P. 12(b)(6)....................1, 10, 11, 23

Private Securities Litigation Reform Act of 1995
15 U.S.C. § 78u-4....................1, 3, 11, 12, 13, 14, 18, 19

Securities Exchange Act of 1934, Section 10(b)
15 U.S.C. § 78j(b)....................3, 4, 13, 14, 16, 17, 19, 20, 21, 22

Securities Exchange Act of 1934, Section 20(a)
15 U.S.C. § 78t(a)....................3, 19

Securities and Exchange Commission Rule 10b-5
17 C.F.R. § 240.10b-5....................4, 13, 14, 16, 17, 20, 22

**Other Authorities**

5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2002) ....................15

Defendant Barry C. Honig ("**Mr. Honig**") submits the following memorandum in support of his Motion to Dismiss Count II of Lead Plaintiff's Consolidated Class Action Complaint (the "**Complaint**" or "**CCAC**"), for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act of 1995 ("**PSLRA**"), 15 U.S.C. § 78u-4, *et seq.* Mr. Honig also joins the concurrently filed motion to dismiss of Riot Blockchain, Inc. ("**Riot**" or the "**Company**"), John O'Rourke, Jeffrey McGonegal and Michael Beeghley, and expressly incorporates herein the arguments made in Sections III.B.1-B.4 their brief.

## INTRODUCTION

*Forbes* pronounced 2017 as "The Year of Bitcoin,"[1] and no wonder – that year saw an unprecedented explosion of worldwide interest in cryptocurrencies and an accompanying investor frenzy. The price of Bitcoin rose an astounding 2,700%, with most of that increase occurring in just the last three months of the year, as millions of speculators worldwide rushed to stake their claims in a modern day goldrush. But unsurprisingly, the boom was followed by a bust. Bitcoin lost half its value in January 2018, and by the end of 2018 was trading more than 80% below its December 2017 peak.

As 2017 dawned, defendant Riot was a fifteen year-old, failing biotech and medical device company. Its Board of Directors ("**Board**") decided to shutter its prior business and consider strategic alternatives for the deployment of the Company's cash in the hope of providing value to its shareholders. After approximately eight months of consideration, and seeing unignorable investor interest in cryptocurrencies and blockchain technology, the Board chose to transition the Company towards those technologies, changed the Company's name to reflect its new business, and became one of the first publicly-traded stocks with "pure play" exposure to Bitcoin and blockchain technologies. The timing of the business transition was incredibly fortuitous, as it occurred just as the value of Bitcoin rocketed from around $4,200 to $19,800 in just eleven weeks. Riot's stock price was swept up in Bitcoin's wild ride, much like a

[1] Itai Damti, *2017 Will Be Remembered As The Year Of Bitcoin*, Forbes (Oct. 25, 2017, 2:11 AM), https://www.forbes.com/sites/outofasia/2017/10/25/bitcoins-ipo-moment-has-arrived/#6fdbb3231c1f.

surfer who happened to paddle into the ocean right when a "once in a hundred year wave" rolled in. Riot's stock price rocketed up, and fell back to Earth, in parallel with the price of Bitcoin:

**Riot Blockchain Inc. (RIOT) and Bitcoin – USD (BTCUSD) Price**[2]
**October 3, 2017 – September 6, 2018**




Absolutely none of cryptocurrencies' rise and subsequent fall was caused by the defendants in this lawsuit. Unfortunately, that did not deter Plaintiffs from concocting this fraud-in-hindsight lawsuit, which attempts to blame Plaintiffs' losses from a speculative investment upon four individuals while ignoring the massive market momentum surrounding Bitcoin that drove Riot's stock price in parallel during the alleged Class Period.[3]

One of the individual defendants is Mr. Honig. He is situated differently than the other defendants as he is a private, outside investor who has never been a director, officer or employee of Riot or its predecessors. He invested in the Company when it operated as a biotech business called Venaxis, and he remained a modest minority shareholder through the Company's 2017

---

[2] This visual line chart represents a comparison of the price of Riot stock (represented by the red line) and Bitcoin (represented by the blue line) for the period October 3, 2017 through September 6, 2018, downloaded from www.barchart.com on March 15, 2019, and is also incorporated into Exhibit M of the concurrently filed Declaration of Robert D. Weber ("**Weber Decl**.").

[3] This is discussed below in Section I.F., *infra*, and shown visually by stock charts attached as Exhibits D, L and M to the concurrently filed Declaration of Robert D. Weber.

business transition to cryptocurrency and blockchain. Mr. Honig did not draft or publish a single one of the statements which the Complaint alleges to be misleading. Mr. Honig did not control Riot's Board in any way, and the Complaint does not even identify a single communication that Mr. Honig had with any Riot director or officer during the Class Period. To the contrary, while Plaintiffs specifically allege that defendants O'Rourke, McGonegal and Beeghley are liable under Section 20(a) of the Exchange Act because they are "controlling persons" of Riot (*see* Complaint, Count III), the Complaint notably does <u>not</u> name Mr. Honig in its controlling person count.

Mr. Honig is named solely in Count II of the Complaint, which alleges his participation in a supposed "scheme" to manipulate the market price of Riot's common stock. But despite the Complaint's 85-page length, it contains only conclusory statements about what acts Mr. Honig specifically performed in furtherance of the alleged scheme. The <u>only</u> acts during the Class Period that the Complaint specifically attributes to Mr. Honig are that he (1) bought and sold some Riot stock, (2) shared an office suite with Defendant O'Rourke (a Riot director, and later, CEO), and (3) introduced O'Rourke to a prospective merger candidate for Riot. None of those facts amount to a "scheme," much less a scheme to manipulate Riot's stock price. In the absence of facts tending to connect Mr. Honig to a scheme involving Riot, the Complaint instead dedicates itself to attempted character assassination, by cutting-and-pasting a host of innuendoes and unproven allegations concerning Mr. Honig's investments in *other* companies that have nothing to do with Riot. That lazy pleading is a complete failure to comply with the heightened pleading requirements for securities fraud under Rule 9(b) and the PSLRA.

The Complaint itself confirms that Riot maintained an independent Board and management who made all of the decisions and statements about which Plaintiffs now complain. Mr. Honig had nothing to do with those decisions. The Complaint seemingly seeks to pin liability on Mr. Honig for aiding and abetting some of those decisions, but the Supreme Court ruled twenty-five years ago that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S.

164, 191 (1994). The so-called "scheme" allegations against Mr. Honig asserting violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder are precisely the kinds of improper short cuts meant to circumvent *Central Bank* that courts consistently prohibit. Plaintiffs' Second Cause of Action against Mr. Honig should be dismissed.

## ARGUMENT

### I.      FACTUAL BACKGROUND

#### A.      The Defendants

Defendant Riot is a technology company that operates and owns stakes in several blockchain and cryptocurrency-related businesses. Defendant Jeffrey McGonegal was hired as the Chief Financial Officer of Riot's predecessor company, Venaxis, in June 2003, and continued to serve in that position until February 28, 2018.[4] Defendant Michael Beeghley was the Company's Chairman and Chief Executive Officer from April 6, 2017 until November 3, 2017. *See* Riot's November 3, 2017 Form 8-K [Weber Decl. Ex. C]; RJN p. 2. Following Beeghley's resignation, Riot's independent Board appointed John O'Rourke as a replacement, and he served as the company's CEO and Chairman until September 8, 2018. [CCAC ¶ 16].

Barry Honig is a successful and prolific private investor who has provided growth capital to hundreds of companies over the past two decades. He was a minority shareholder of the Company during the alleged Class Period, having first acquired his position in early 2016 when it was a biotech company called Venaxis, Inc. ("**Venaxis**"). [CCAC ¶ 20].

#### B.      The Company's Prior Business Strategy Was Unsuccessful for Years.

Riot began its existence in the early 2000s as Venaxis, which for years developed and tried to obtain clearance from the U.S. Food and Drug Administration for a blood test for use in the diagnosis and treatment of acute appendicitis. [CCAC ¶ 40]. Venaxis burned through investor capital, reporting losses of $9,212,000, $12,149,000, $10,443,000 and $8,758,000 in years 2012

---

[4] CCAC ¶ 17; *see also* Venaxis Form 10-K for the year ended December 31, 2015, at p. 57 [Weber Decl. Ex. A]. The Court may properly consider on a motion to dismiss documents filed with the SEC, as explained in Mr. Honig's concurrently filed Request for Judicial Notice ("**RJN**").

through 2015, on revenues of only $42,000, $56,000, $167,000 and $101,000 during those same years.[5] In 2015, the FDA ruled that Venaxis's blood test did not meet or exceed the current standard of care, which meant that the Company no longer had a marketable product. [CCAC ¶ 42].

With meager revenue and an unmarketable product, in 2015 Venaxis wound down its blood test business and explored strategic alternatives. But more than a year later, in mid-2016, the Company had no plan, and was wasting the only attractive asset on its balance sheet – $16.1 million of cash short term investments, the remnant of a capital raise that had occurred in April 2014. [CCAC ¶ 42]. During the first half of 2016, the Company was burning cash at a rate of approximately $300,000 per month,[6] and had zero sales, which led the market to value the Company at millions of dollars less than the value of its cash on hand.[7]

Turning the situation from bad to worse, in September 2016 the Company's prior CEO engineered the acquisition of another struggling company called BiOptix Diagnostics, Inc., a company that manufactured a medical research instrument that could be used for drug development, but which only sold a few of those instruments each year and had severely negative cash flow. [CCAC ¶ 40]. Believing that the acquisition would accelerate the Company's cash drain, and that the deal was consummated mainly for the purpose of entrenching the Company's CEO and Board, Mr. Honig commenced a brief activist campaign towards the Company. He initiated a proxy fight demanding the removal of the Company's directors, and later filed a lawsuit seeking to force a special meeting of shareholders to vote on the proposed removal. [CCAC ¶¶ 46, 47]. In response to that campaign, three of the Company's directors

---

[5] *See* Venaxis Form 10-K for the year ended Dec. 31, 2015, at p. 23 [Weber Decl. Ex. A].

[6] *See* Venaxis Form 10-Q for the quarterly period ended June 30, 2016, at p. 4 [Weber Decl. Ex. B]; RJN p. 2.

[7] The closing price of Venaxis stock on June 30, 2016 was $3.51/share. *See* Historical Stock Price Chart [Weber Decl. Ex. D]. Based upon the 3,876,961 shares of Venaxis common stock issued and outstanding on that date (*see* Venaxis Form 10-Q for the period ended June 30, 2016 at p. 3 [Weber Decl. Ex. B]), the company's market capitalization was only $13,608,133.

resigned in early January 2017, and were replaced as directors by defendants John O'Rourke, Mike Beeghley and one other individual. [CCAC ¶ 48].

### C. **The Company Adds New Independent Board Members, Who Later Decide to Transition the Business Into Cryptocurrency and Blockchain.**

The reconstituted independent Board immediately adopted a plan to discontinue the BiOptix business, instituted a significant workforce reduction to slow the cash burn,[8] and commenced a new strategic review of potential business alternatives. The Company disclosed to its investors that the review included the possibility of the Company "shifting its focus to new technologies in unrelated markets."[9]

The Complaint does not allege any facts tending to show that Mr. Honig played any role in the strategic review, and in fact, he did not. Mr. Honig remained only an outside investor in the Company, and over the next several months he gradually reduced his holdings in the Company, from a reported 11.2% of the Company's outstanding common stock in January 2017,[10] to 9.48% in July 2017,[11] and then to 8.09% as of September 20, 2017.[12]

### D. **The Company Returns Some Cash to Shareholders And Uses The Remainder to Acquire Valuable Cryptocurrency and Blockchain Assets.**

After months of analysis, Riot's independent Board settled upon a new direction for the Company. First, the Board decided to return capital to legacy shareholders by approving a special cash dividend pursuant to which each shareholder received $1.00 for each share of

---

[8] This move proved successful; once the terminations became effective, the Company reduced its total operating expenses from $1,533,104 during the third quarter of 2016 to only $614,676 during the third quarter of 2017, a burn rate of just over $200,000 per month. *See* Riot's Form 10-Q for the quarterly period ended Sept. 30, 2017 [Weber Decl. Ex. E] at p. 4.

[9] *Bioptix Announces Special Cash Dividend*, Riot Blockchain (Oct. 3, 2017), *available at* https://www.riotblockchain.com/news-media/press-releases/detail/9/bioptix-announces-special-cash-dividend.

[10] See Mr. Honig's Schedule 13 D/A filed with the SEC on January 4, 2017 [Weber Decl. Ex. F].

[11] See Company's Proxy Statement Pursuant to Section 14(a) filed with the SEC on July 10, 2017 [Weber Decl. Ex. G] at p. 8 (listing beneficial ownership as of July 3, 2017).

[12] See Company's Registration Statement on Form S-3/A filed with the SEC on September 25, 2017 [Weber Decl. Ex. H] at p. 9 (listing beneficial ownership as of Sept. 20, 2017).

Common Stock held. [CCAC ¶ 66]. The cash dividend totaled approximately $9,562,000, and was paid to every shareholder who held stock on the close of business on October 13, 2017. *Id.*

Second, on October 4, 2017, the Company announced that it would realign its business to become a strategic investor and operator of blockchain and cryptocurrency businesses. [CCAC ¶ 104]. The Company simultaneously announced that it was changing its name to "Riot Blockchain" to reflect its new business focus. *Id.* The Company stated that it would pursue its new strategy for building shareholder value and future prospects by pursuing "acquisitions of businesses serving the blockchain ecosystem." *Id.*

Riot's management then proceeded to do exactly what it said it would do:

- It announced in the October 4, 2017 press release that it had acquired a minority interest in a Canadian cryptocurrency exchange called Coinsquare.[13] At the time of Riot's investment, Coinsquare was valued at $30 million. Just four months later, Coinsquare closed a follow-on financing round led by Canaccord Genuity Group (Canada's largest independent investment dealer) which valued Coinsquare at over $300 million;[14]
- On October 16, 2017, Riot acquired a 52% stake in Tess, Inc., a company that is developing blockchain-based payment solutions for telecommunications companies;[15]
- On November 3, 2017, Riot announced the acquisition of Kairos Global Technology, Inc., ("Kairos"), a company that owned 1,200 specialized Bitcoin mining servers that Riot would use to build a Bitcoin mining operation. [CCAC ¶¶ 74, 124];
- On November 16, 2017, Riot made an investment in Verady, LLC, a private company which provides accounting, audit and verification services for blockchain based assets such as cryptocurrencies;[16]

[13] CCAC ¶ 65. Through several subsequent transaction, Riot ultimately came to own approximately 12.9% of Coinsquare. *See* Riot's 2017 Form 10-K [Weber Decl. Ex. I] at p. 57.

[14] *See Canadian Digital Currency Exchange Coinsquare Closes Record $30 Million Investment*, Cision (Feb. 8, 2018), https://www.newswire.ca/news-releases/canadian-digital-currency-exchange-coinsquare-closes-record-30-million-investment-673374003.html.

[15] CCAC ¶ 72; *see also* Riot's 2017 Form 10-K [Weber Decl. Ex. I] at p. 4.

- In November 2017 and February 2018, Riot bolstered its Bitcoin mining operation by acquiring an additional 3,800 Bitcoin miners from Prive Technologies, Inc., and 3,000 miners from Blockchain Mining Supply & Services Ltd.;[17] and,
- On March 26, 2018, Riot acquired 92.5% of Logical Brokerage Corp., a futures introducing broker headquartered in Miami, Florida registered with the Commodity Futures Trading Commission ("CFTC"), and a member of the National Futures Association ("NFA").[18]

**E. <u>Mr. Honig Was Merely a Shareholder Who Did Not Participate or Influence The Decisions of Riot's Board.</u>**

Throughout the latter half of 2017 and into 2018 when Riot underwent these changes, Mr. Honig was an outsider – a private investor who held a small, non-controlling amount of stock. The decision to transition the Company's business into blockchain and cryptocurrencies was made by the Company's independent Board, not by Mr. Honig. He did not suggest that the Company change its name; that was a management decision. Mr. Honig did not direct any of Riot's half-dozen acquisitions listed above.[19] Nor did Mr. Honig have anything to do with the disclosures that Riot made about its business; the Company's press releases and SEC filings were prepared entirely by Riot's employees, and all responsibility for disclosing material information resided with those persons. Indeed, the Complaint does not detail even a single instance of Mr. Honig communicating with anyone on the Board during the putative Class Period.

The only things that the Complaint alleges that Mr. Honig actually did during the putative Class Period were (a) acquire and sell some Riot stock [*see* CCAC ¶¶ 67, 68, 70), (b) share office space with Mr. O'Rourke, who was an *outside director* of Riot until November 3, 2017, and (c)

---

[16] CCAC ¶¶ 78, 136; *see also* Riot's November 16, 2017 Form 8-K [Weber Decl. Ex. J].

[17] *See* Riot's 2017 Form 10-K [Weber Decl. Ex. I] at p. 73.

[18] *See* Riot's 2017 Form 10-K [Weber Decl. Ex. I] at pp. 5 and 74.

[19] The Complaint states that when Riot decided to invest in Coinsquare, Mr. Honig "also had invested in Coinsquare," [*see* CCAC ¶ 79], misleadingly implying that Mr. Honig purchased his stake before Riot. The truth is that Riot and Mr. Honig purchased their interests in Coinsquare simultaneously, and on the same terms.

introduce Mr. O'Rourke to the CEO of Canadian public company Cresval (a potential merger partner). [CCAC ¶ 79]. None of this alleged conduct is wrongful, none of this constitutes a "scheme" and nothing in the Complaint comes even close to attempting to articulate facts substantiating the conclusory allegations that Mr. Honig "controlled" the Company's Board [CCAC ¶ 66] and directed its decisions. Simply sharing office space with one outside director does not establish "control" over that director, much less the entire Board. And in regards to Mr. Honig's stock transactions, the Complaint never purports to explain how they were wrongful, and even concedes that the transactions were *fully and publicly disclosed*.[20]

**F. <u>The Board's Decisions Made Riot A Far More Valuable Company, But Riot's Stock Price Was Driven By Underlying Price Swings of Bitcoin.</u>**

While Mr. Honig did not play a role in the transformation of Riot from a failing company into one with a promising future, he *and all other Riot shareholders* equally benefitted from the Board's smart business decisions. As a result of the change in business strategy and associated acquisitions, Riot *tripled* the value of the assets on its balance sheet, from $17 million at year end 2016 to $52 million at year end 2017, most of which was the hard assets of cash, property and equipment.[21] Riot's management also added a viable revenue stream to the business – Bitcoin mining – which in its first year of operation would generate over six million dollars, more than ten times the revenue that the Company generated in the years 2012-2016 combined.[22] In short, Riot's Board and Management dumped a failed business and replaced it with one with a promising future.

[20] While the Complaint goes on to allege that Mr. Honig did not disclose those sales and acquisitions "promptly," Mr. Honig denies that allegation, and in any event, there does not exist a private right of action for money damages against a shareholder who allegedly fails to timely report transactions under the applicable SEC rules and regulations. *See Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 620 (2d Cir. 2002); *Motient Corp. v. Dondero*, 529 F.3d 532, 536 (5th Cir. 2008); *Liberty Nat. Ins. Holding Co. v. Charter*, 734 F.2d 545, 564 n. 41 (11th Cir. 1984).

[21] *See* Riot's 2017 Form 10-K [Weber Decl. Ex. I] at p. 43.

[22] *See* Riot's Form 10-Q for the quarterly period ended September 30, 2018 [Weber Decl. Ex. K] at p. 5.

However, the market price of Riot stock appears to have not been driven by the Company's fundamentals, but rather, by momentum swings in the underlying price of Bitcoin. As evidenced by the price charts submitted as Exhibits D, L and M to the Weber Declaration, it can clearly be seen that Riot's market price closely mirrored the price of Bitcoin. From the start of the Class Period, Bitcoin rose 470% from $4,219 to its all-time high of $19,870 on December 17, 2017; Riot's stock precisely mirrored Bitcoin's movement, rising 470% from $8.09/share to its all-time high close of $38.60 on December 19, 2019. Bitcoin then lost half of its value in January 2018, matched by a decline in Riot's market price. Similarly, the stock prices of other public companies with significant exposure to cryptocurrency price fluctuations, such as Overstock and Grayscale Bitcoin Trust,[23] mirrored these price movements. *See* Exhibit N to the Weber Declaration. Just a glance at these charts reveals that Riot's stock price moved in lock step with Bitcoin; Mr. Honig's alleged conduct had nothing to do with it.

## II. APPLICABLE LEGAL STANDARDS

### A. Motion to Dismiss Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In order for a complaint to survive a 12(b)(6) motion, it must state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim for relief is facially plausible when the plaintiff pleads enough facts, taken as true, to allow a court to draw a reasonable inference that the defendant is liable for

[23] Grayscale Bitcoin Trust describes itself as "the first publicly quoted securities solely invested in and deriving value from the price of bitcoin." *See* https://grayscale.co/bitcoin-trust/

the alleged conduct. *Id.* If the facts only allow a court to draw a reasonable inference that the defendant is possibly liable, then the complaint must be dismissed. *Id.* Mere legal conclusions are not to be accepted as true and do not establish a plausible claim for relief. *Id.* ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

As a general matter, courts ruling on a motion to dismiss may not consider matters extraneous to the complaint. *Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). However, an exception to the general rule is that a "'document integral to or explicitly relied upon in the complaint'" may be considered "'without converting the motion [to dismiss] into one for summary judgment.'" *Id.* (internal citation omitted). The Court also may consider SEC filings, even if those filings are not relied on in the complaint. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).

**B. Complaints Alleging Securities Fraud, Like This One, Must Be Dismissed Unless They Satisfy The Heightened Pleading Standards Of Rule 9(b) And The PSLRA.**

"Independent of the standard applicable to Rule 12(b)(6) motions," Federal Rule of Civil Procedure 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). The particularity requirement is rigorously applied to complaints alleging securities fraud. *See Burlington Coat*, 114 F.3d at 1417. To satisfy this heightened pleading standard, a plaintiff must state the circumstances of his alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (*quoting Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004)). Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* (citing *Lum*, 361 F.3d at 224). The Third Circuit has advised that, at a minimum,

Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 216).

In addition to Rule 9(b)'s heightened pleading requirements, Congress enacted the PSLRA to require an even higher pleading standard for plaintiffs bringing private securities fraud actions. *See Id.* at 276. This heightened pleading standard is targeted at preventing abusive securities litigation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 313 (2007). The PSLRA "imposes another layer of factual particularity to allegations of securities fraud" (*Rockefeller*, 311 F.3d at 217) by providing two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, under 15 U.S.C. § 78u–4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u–4(b)(1)). Second, the complaint must, "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

This heightened level of factual detail must be pleaded in a complaint as to <u>each</u> of the named defendants. *Winer Family Trust*, 503 F.3d at 335–36 ("The PSLRA requires [plaintiffs] to specify the role of each defendant, demonstrating each Defendant's involvement . . . ."); *In re Merck & Co., Inc. Sec., Deriv. & ERISA Litigation*, MDL No. 1658 (SRC), 2011 WL 3444199 at *19 (D.N.J. Aug. 8, 2011) (citing *Winer*, 503 F.3d). A complaint's failure to comply with any of these specific pleading requirements mandates dismissal. 15 U.S.C. § 78u–4(b)(3)(A).

### III. THE SOLE CAUSE OF ACTION AGAINST MR. HONIG SHOULD BE DISMISSED BECAUSE IT FAILS TO PLEAD HIS PARTICIPATION IN ANY "SCHEME" WITH THE HEIGHTENED FACTUAL PARTICULARITY REQUIRED BY RULE 9(B) AND THE PSLRA.

There exist two bases for liability under Section 10(b) of the Exchange Act and Rule 10b-5: the "making of a material misstatement (or omission);" and, "the commission of a manipulative act." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994). In the present Complaint, the Plaintiffs do not allege that Mr. Honig participated in the making of material misstatements, nor that he possessed information he had a duty to provide to the public.[24] The Complaint alleges only that Mr. Honig participated in a "scheme" involving the commission of "manipulative acts." *See* Complaint Count II. Manipulative conduct goes beyond misrepresentations and omissions and generally is "intended to mislead investors by artificially affecting market activity, such as wash sales, matched orders, or rigged prices." *See De Vito v. Liquid Holdings Grp., Inc.*, No. 15-cv-06969, 2018 WL 6891832, at *41-43 (D.N.J. Dec. 31, 2018) (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977)).

The elements of a "scheme liability" claim for violation of Rule 10b–5(a) and (c) are: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance. *S.E.C. v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 350 (D.N.J. 2009). A complaint must also plead loss causation and economic loss. *See In re Able Labs. Sec. Litig.*, No. 05-cv-02681, 2008 WL 1967509, at *18 (D.N.J. Mar. 24, 2008) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)); *see also* 15 U.S. Code § 78u–4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused

---

[24] Plaintiffs would have to allege facts demonstrating that Mr. Honig was a maker of misstatements or owed a duty to disclose omitted information. For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. *Id.* When an allegation of fraud under Rule 10(b) is based upon nondisclosure, there can be no fraud absent a duty to speak. *Chiarella v. United States*, 445 U.S. 222, 235 (1980). Plaintiffs fail to allege Mr. Honig owed such a duty.

the loss for which the plaintiff seeks to recover damages."). To avoid dismissal, each of these elements must be pleaded with factual particularity including "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue." *In re Royal Dutch/Shell Transp.*, No. 04-374(JAP), 2006 WL 2355402, at *7 (D.N.J. Aug. 14, 2006) (citing *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (S.D.N.Y. 2006)).

For a putative "scheme liability" claim to survive dismissal, a plaintiff must identify deceptive or manipulative acts that are ***separate and apart*** from any alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim. *See Lucent Techs.*, 610 F. Supp. 2d at 361. Plaintiff's Complaint does not come close to meeting the heightened standards for pleading a scheme liability claim against Mr. Honig, as the Complaint's "scheme" claim is nothing more than a repackaging of Plaintiffs' misrepresentation claim in Count I.

### A. <u>The Complaint Fails To Allege Facts Showing That Mr. Honig Committed Any Deceptive or Manipulative Act.</u>

#### 1. *The Public Disclosures Identified In The Complaint Are Demonstrably True, And In Any Event, Mr. Honig Did Not Make Them.*

"[A] plaintiff's allegations under Rule 10b–5(a) or (c) must entail a defendant's undertaking of a deceptive scheme or course of conduct that went beyond misrepresentations." *In re Royal Dutch*, 2006 WL 2355402, at *8. A "plaintiff may not seek to hold a defendant liable for misleading statements under subsections (a) and (c) by alleging that the defendant is liable for the misleading statements because he or she was a participant in a scheme through which the statements were made." *Id.* Such a theory would "permit a plaintiff to evade the pleading requirements of 15 U.S.C. § 78u–4(b)(1) that are imposed in misrepresentation cases" and would also permit a plaintiff to "circumvent *Central Bank's* limitations on liability for a secondary actor's involvement in the preparation of false and misleading statements." (internal quotations and citations omitted) (referencing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)). The actions beyond misrepresentations alleged by a plaintiff

must be inherently deceptive. *See S.E.C. v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 360 (D.N.J. 2009).

Plaintiff's conclusory claims revolve primarily around a series of disclosures made by Riot that, in Plaintiff's opinion, falsely represented that Riot would shift its business focus toward the cryptocurrency space. In reality, these statements were demonstrably true, as explained in detail in the concurrently filed motion to dismiss brought by the other defendants. Further, Plaintiffs' conclusory allegations that Riot misrepresented its intention to develop a cryptocurrency-related business model are internally contradicted by other factual allegations relating to Riot's multiple acquisitions and investments that expanded its cryptocurrency operations, which Riot disclosed in SEC filings cited by plaintiff. *See* Section I.D., *supra*, and Complaint ¶¶ 65, 72, 74, 80, 124, 136. In short, Riot told the public that it would invest in blockchain-related businesses, and then proceeded to do exactly that. An investor might disagree with the wisdom of those business decisions, but that the decisions were made and accurately reported is true – and not false, as alleged.

The Court, therefore, should reject Plaintiff's claims of misrepresentations that are belied by contradictory allegations elsewhere in the Complaint. *See Berry v. Coleman*, 172 Fed. App'x 929, 932 (11th Cir. 2006) ("On a motion to dismiss, '[c]onclusory allegations and unwarranted deductions of fact are not admitted as true.' *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974). *This is particularly true when the conclusory allegations contradict the other facts alleged in the complaint*.") (emphasis added); *see also Sterling v. Provident Life & Accident Ins. Co.*, 519 F. Supp. 2d 1195, 1209 (M.D. Fla. 2006) ("While courts must liberally construe and accept as true allegations of fact in the complaint and inferences reasonably deductive there from, they need not accept factual claims that are internally inconsistent; facts which run counter to facts of which the court can take judicial notice; conclusory allegations; unwarranted deductions; or mere legal conclusions asserted by a party."); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2002) ("The court will not accept conclusory allegations concerning the legal effect of the events the plaintiff has set out if

these allegations do not reasonably follow from the pleader's description of what happened, or if these allegations are contradicted by the description itself.").

2. *The Complaint Fails To Allege Any Facts Tending To Show That Mr. Honig Engaged In Manipulative Trading Activity.*

The Complaint is absolutely devoid of any allegations that Mr. Honig engaged in any of the commonly known types of manipulative trading activity such as wash sales, matched orders, rigged pricing, or other conduct intended to mislead investors by artificially affecting market activity. As noted above, the Complaint also does not allege that Mr. Honig played any role in injecting information about Riot into the marketplace. All that the Complaint does allege is the repeated conclusory assertion that Mr. Honig "perpetrated" or "orchestrated" a pump-and-dump scheme. Complaint ¶¶ 2, 66, 101, 103, 105, 107, 109, 113, 122, 125, 129, 137, 160, 161, 163, 167, 175. As to how or when this supposed scheme was perpetrated, the Complaint is silent. In an attempt to mask this glaring and fatal pleading deficiency, the Complaint instead is filled with innuendo cribbed from unrelated matters and online publications. *See, e.g.*, Complaint ¶¶ 201-06, 209-16. All of this is completely irrelevant to whether Mr. Honig participated in any scheme involving Riot.

The Court need not accept Plaintiffs' conclusory allegations that fail to "specify, with particularity, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue.'" *In re Royal Dutch/Shell Transp.*, No. 04-374(JAP), 2006 WL 2355402, at *7 (D.N.J. Aug. 14, 2006). Having elected not to plead a Rule 10b-5(b) claim against Mr. Honig, Plaintiffs may not then use Rule 10b-5(a) and (c) claims "as a short cut to circumvent *Central Bank*'s limitations on liability for a secondary actor's involvement in making misleading statements." *S.E.C. v. Lucent Techs.*, Inc., 610 F. Supp. 2d 342, 360–61 (D.N.J. 2009) (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), which held that the Exchange Act did not authorize private claims for aiding and abetting Section 10(b) violations). "Subsection (a) and (c) may only be used to state a claim against a defendant for the underlying deceptive devices or frauds themselves." *Lucent Techs.*, 610 F. Supp. at 361. Plaintiff's Rule 10b-5(a) and

(c) allegations against Mr. Honig "must entail a defendant's undertaking of a deceptive scheme or course of conduct that went beyond misrepresentations." *In re Royal Dutch*, 2006 WL 2355402, at *8.

Here, Plaintiffs fail to assert any inherently manipulative or deceptive conduct by Mr. Honig beyond Riot's purported misrepresentations and omissions in which he had no involvement. In fact, the Plaintiffs concede that Count II of their Complaint (asserting "scheme liability" under Rule 10b-5(a) and (c)) is simply a repackaging of Count I of the Complaint (alleging misrepresentations representations in violation of Rule 10b-5(b)):

> In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the following actions: (a) ***Misrepresented*** that Riot had changed from a biopharmaceutical company to a purported player in the cryptocurrency business. This scheme was designed to, and did, attract investors keen to gain exposure to the cryptocurrency business; (b) ***Hid the fact*** that Defendants O'Rourke, Honig, and others were taking advantage of the investor enthusiasm over cryptocurrency and the Company's purported change to a cryptocurrency business to execute a pump-and-dump scheme; and (c) Issued ***false and misleading statements*** in furtherance of the scheme.

Complaint ⁋ 244 (emphasis added). In other words, Plaintiffs pled their Rule 10b–5(a) or (c) claims in the precise manner deemed impermissible by both this Court and the Supreme Court. The Complaint is otherwise devoid of allegations regarding "what manipulative acts [Mr. Honig] performed, . . when the manipulative acts were performed and what effect the scheme had on the securities at issue," as required by Rule 9(b). *In re Royal Dutch*, 2006 WL 2355402, at *7.

Lastly, the acts which the Complaint attributes to Mr. Honig that occurred prior to the Class Period are not actionable. Only allegations of fraudulent activity occurring during the Class Period are relevant to Plaintiffs' claim. *See, e.g., In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995) ("As the class period defines the time during which defendants' fraud was allegedly alive in the market, statements made or insider trading allegedly occurring before or after the purported class period are irrelevant to plaintiffs' fraud claims."); *see also In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("A defendant. . . is liable only for those statements made during the class period.").

### B. The Complaint Fails to Allege Particularized Facts Giving Rise to Any Inference, Much Less A Strong Inference, That Mr. Honig Acted With Scienter.

In regards to Mr. Honig, the Complaint does not allege any facts "giving rise to a strong inference that the defendant acted with the required state of mind," as required by the PSLRA's heightened pleading standards. 15 U.S.C. § 78u–4(b)(2). "[A] plaintiff may establish the [PSLRA's] requisite strong inference of scienter by stating either: "(1) facts which show that defendants had both motive and opportunity to commit fraud"; or (2) "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior." *In re Royal Dutch*, 2006 WL 2355402, at *3. The Complaint alleges neither as to Mr. Honig.

First, the Complaint does not plead facts tending to show that Mr. Honig had either the motive or opportunity to commit fraud. "Under the motive and opportunity test, Plaintiffs must allege facts showing that each defendant had the motive to commit fraud and a 'clear opportunity'" to do so. *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 428 (D.N.J. 2005), *aff'd*, 500 F.3d 189 (3d Cir. 2007), *as amended* (Nov. 20, 2007). Motive entails "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Id.* (internal citation and quotations omitted). Simply pleading "[m]otives that are generally possessed by most corporate directors and officers do not suffice" to satisfy the heightened pleading requirements. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004). All that the Complaint alleges regarding Mr. Honig's "motive" is a generalized assertion that he sought to profit through a so-called "pump and dump" scheme, without pleading a single fact tending to show what concrete action Mr. Honig took himself (or encouraged others) to fraudulently "pump" up Riot's stock price. This type of generalized allegation of motive is precisely the type of pleading that this Court found deficient in *Exxon*. *See In re Exxon*, 387 F. Supp. at 429 (analyzing persuasive case law in articulating what this Court requires of plaintiffs to demonstrate motive and opportunity).

More significantly, the Complaint utterly fails to allege facts showing that Mr. Honig actually had a "clear opportunity" to further any scheme to manipulate Riot's stock price. *Id.* at 428. Opportunity refers to "the means and likely prospect of achieving such concrete benefits by

the means alleged." *Id.* (internal citation and quotations omitted). In *Exxon*, this court considered whether plaintiffs adequately alleged that Lee R. Raymond, the then-Chairman, Chief Executive Officer, and President of Exxon, had the opportunity to lie about impairments to the value of Exxon's oil and gas properties in order to complete a merger with Mobil. While his positions would suggest he played an integral role within Exxon's decision-making processes, the court nonetheless found that plaintiffs failed to plead Raymond's scienter as required by the PSLRA. The court highlighted the absence of allegations regarding Raymond's opportunity to commit the alleged fraud, noting that "Plaintiffs offer no details of Raymond's involvement in Exxon's decision not to record the SFAS 121 impairments." *Id.* at 430.

Mr. Honig's connection to Riot is far more distant than CEO Raymond's connection was to Exxon. Unlike Exxon CEO Raymond, Mr. Honig is not an officer, director, or employee of Riot – he is an outsider. Plaintiffs do not allege how Mr. Honig influenced any executive, director, or decision-maker within Riot.[25] Plaintiffs do not identify any communications Mr. Honig had with any insiders concerning Company business. The Complaint does not allege that Mr. Honig was involved in the drafting of the purported misstatements or decisions to withhold information, what the withheld information was, or how Mr. Honig came to possess it. Plaintiffs levy only conclusory accusations that Mr. Honig perpetrated and orchestrated a misrepresentation and omission scheme. Such claims are "exactly the kind of conclusory allegation prohibited by the PSLRA mandate," *id.*, and courts have regularly dismissed securities fraud claims for failing to adequately allege opportunity in pleading scienter. *See In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 413 F. Supp. 2d 378, 402 (E.D. Pa. 2005) (dismissing Section 10(b) claim against outside director where plaintiffs failed to allege that director "had the opportunity to cause the defendants to make the allegedly materially misleading statements and omissions in the company's press releases and SEC filings . . . [and] was an active participant in the alleged fraudulent scheme"); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 956 (E.D. Pa. 1999)

[25] Plaintiff's failure to plead such facts is consistent with his failure to assert a Section 20(a) control person claim against Mr. Honig.

(dismissing Section 10(b) claim against outside director where complaint failed to allege that defendant "had the means to cause Defendant Compton to make the statements he made, to cause Aetna to issue the press releases and alleged overstated financial statements that it did"); *In re Home Health Corp. of Am., Inc.*, No. CIV. A. 98-834, 1999 WL 79057, at *21 (E.D. Pa. Jan. 29, 1999) (dismissing Section 10(b) claim against vice president relying on conclusory allegations of scienter where plaintiffs failed to allege that defendant "had either the opportunity or the authority to correct public statements made by other HHCA officers" and "made or contributed to any of the challenged statements").

Second, the Complaint fails to plead any circumstantial evidence giving rise to a strong inference that Mr. Honig acted with recklessness or conscious misbehavior. "A reckless statement is a material misstatement or omission involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Exxon*, 387 F. Supp. at 430-31. The allegations must give rise to a strong inference of scienter, and generalized imputations of knowledge do not suffice. *Id.* at 431. Plaintiffs have failed to allege any conduct by Mr. Honig to carry out this purported misrepresentation and omission scheme, whether violative or benign, let along conduct that amounts to "an extreme departure from the standards of ordinary care."

### C.     The Complaint Fails to Allege Causation, Reliance, and Economic Loss.

In *Dura Pharm., Inc. v. Broudo*, the Supreme Court held that to adequately plead a Section 10(b) claim, a plaintiff must allege a defendant's misrepresentation or other fraudulent conduct proximately caused the plaintiff's economic loss. 544 U.S. 336, 346 (2005). A plaintiff must also allege that he in fact relied upon respondents' deceptive conduct. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 149 (2008). This court has confirmed these requirements must be met when alleging a Rule 10b-5(a) and (c) claim. *See In re Able Labs. Sec. Litig.*, No. 05-cv-02681, 2008 WL 1967509, at *18 (D.N.J. Mar. 24, 2008).

In support of its loss causation and economic loss argument, Plaintiffs primarily cite a number of negative interviews and news articles that Plaintiffs assert caused the company's share price to drop, "damaging Lead Plaintiff and members of the Class." Complaint ¶¶ 209-16. However, these press reports fail to constitute corrective disclosures of fraud that would suffice to show loss causation, as required to sustain a claim under Section 10(b), as they simply represent pundits' personal opinions or negative commentary and speculation regarding already-disclosed information. *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270–71 (3d Cir. 2005) (holding that the *Wall Street Journal*'s analysis of previously available information is not a corrective disclosure); *see also Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) ("If every analyst or short-seller's opinion based on already-public information could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst's negative analysis of public filings as a corrective disclosure. That cannot be—nor is it—the law."); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions.").

Plaintiffs also allege that disclosures relating to an SEC investigation support a strong inference of scienter. Complaint ¶¶ 201-06. Numerous circuit and federal district courts have held that disclosures revealing investigations are insufficient to constitute a corrective disclosure for purposes of Section 10(b). *See, e.g.*, *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), *as amended* (Sept. 11, 2014) ("The announcement of an investigation does not 'reveal' fraudulent practices to the market."); *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) ("In our view, the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b). The announcement of an investigation reveals just that—an investigation—and nothing more."); *In re Almost Family, Inc. Sec. Litig.*, No. 3:10-CV-00520-H, 2012 WL 443461, at *13 (W.D. Ky. Feb. 10, 2012) ("Numerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure.").

With regard to reliance, Plaintiffs improperly invoke the presumption of reliance afforded in securities fraud actions where (1) there is an omission of a material fact by one with a duty to disclose, *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–154 (1972), and (2) under the fraud-on-the-market doctrine, when the statements at issue become public. *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). Neither presumption applies here, as Plaintiffs have not alleged Mr. Honig possessed or had a duty to disclose information, nor have they alleged that Mr. Honig was the maker of alleged public misrepresentations. Therefore, Plaintiffs must provide specific proof of reliance on deceptive or manipulative conduct by Mr. Honig. Plaintiffs fail to allege such conduct and reliance.

For these reasons, Plaintiffs fail to allege causation, reliance, and resulting economic loss, and their Section 10(b) and Rule 10b-5(a) and (c) claim against Mr. Honig should be dismissed.

**CONCLUSION**

For the foregoing reasons, Mr. Honig respectfully asks the Court to grant his motion to dismiss the Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) and the PSRLA, and dismiss Count II of the Complaint against him, with prejudice.

Respectfully submitted,

Dated: March 18, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700

By: /s/ *Tyler E. Baker*
Tyler E. Baker, ESQ.
New Jersey Bar No. 44392011
tbaker@sheppardmullin.com

and

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Robert D. Weber (*pro hac vice*)
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA 90067
(310) 228-3700

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Christopher Bosch (*pro hac vice*)
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700

*Attorneys for Defendant Barry C. Honig*