## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated, | Civil Action No.: 18-2293(FLW)(TJB) |
| *Plaintiff,* | CONSOLIDATED ACTION |
| v. | **CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW** |
| RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY G. MCGONEGAL, | |
| *Defendants.* | **JURY TRIAL DEMANDED** |


**LITE DEPALMA GREENBERG**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for Dr. Stanley Golovac
and Lead Counsel for the Class*

1

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................... 1

II.     JURISDICTION AND VENUE.......................................................... 6

III.    PARTIES ........................................................................................... 7

IV.     RELEVANT NON-PARTIES ........................................................... 11

V.      THE "HONIG GROUP" .................................................................. 18

VI.     SUBSTANTIVE ALLEGATIONS.................................................... 19

        A.      The Honig Group Has Engaged in Similar Pump-and-Dump Schemes at
                Numerous Publicly Traded Microcap Companies ................................... 19

                1.      The SEC Has Sued Honig, O'Rourke, Stetson, and Brouser for
                        Recently Engaging in Pump-and-Dump Schemes at Three
                        Companies.................................................................................... 20

                a.      Biozone Pharmaceuticals, Inc. (a/k/a "Company A") ................ 21

                b.      MGT Capital Investments Inc. (a/k/a "Company B") ................ 22

                c.      MabVax Therapeutics Holdings, Inc.  (a/k/a "Company C")...... 25

                2.      YesDTC Holdings, Inc.................................................................. 27

                3.      Marathon Patent Group, Inc......................................................... 28

                4.      WPCS International Incorporated and BXT Trader ................... 30

                5.      PolarityTE (f/k/a Majesco Entertainment)................................... 32

                6.      Pershing Gold Corp...................................................................... 32

                7.      MUNDOmedia Ltd. ...................................................................... 33

        B.      In 2016, Defendants Target Venaxis, Riot's Predecessor, Using Their
                Typical Playbook .................................................................................... 34

        C.      Defendants Cause Bioptix to Register and Sell Shares of Bioptix (and
                Later Riot) Through False and Misleading Securities Registration
                Statements (Form S-3) ............................................................................ 39

        D.      Nine Days After the Filing the September 25 Form S-3, Bioptix Changes
                Its Name to "Riot Blockchain," and in the Weeks That Followed
                Announces a Series of Strategic Investments, Causing Riot's Share Price
                to Soar .................................................................................................... 42

                1.      The Coinsquare Transaction ....................................................... 44

                2.      The Tess Transaction ................................................................... 45

                3.      The Kairos Transaction............................................................... 47

        E.      October 27, 2017 Riot Disseminates an "Updated" Investor Presentation
                ............................................................................................................... 50

1

F.    Defendant Honig's Brother, Jonathon Honig, and Defendant Groussman Attempt to Dispel Any Notion that Their Ownership in Riot Is Part of a Control Group ........................................................................................... 51

G.    On November 6, 2017, Riot "Names John O'Rourke as Chairman and CEO" and Announces Another Strategic Investment ............................... 51

H.    Riot Announces that It More than Tripled Its Investment in Coinsquare 52

I.    Riot's Board of Directors Issues A Proxy Statement That Further Enables The Honig Group To Conceal The Fraudulent Scheme ......................... 52

J.    Riot Announces a New Transaction Related to Its Investment in Tess: Riot's "Decision to Take the Company Public" in a Merger .................. 53

K.    On December 19, 2017, Riot "Announces $37 Million Private Placement" – Defendants Honig and Defransco Take Part But Are Not Disclosed ............................................................................................... 55

L.    After Defendants O'Rourke and Honig Sold Most of Their Shares, Riot Fires Its Auditor and the Company's Stock Continues to Decline .......... 56

M.    On February 16, 2018, a CNBC Expose Partially Reveals Honig's Close Ties to Riot and O'Rourke ..................................................................... 56

N.    Also on February 16, 2018, Riot Announces Its Purchase of "3,800 Bitcoin Mining Machines" Without Disclosing that It Was Buying These Machines from an Entity Owned by Honig and DeFrancesco at Vastly Inflated Prices ....................................................................................... 63

O.    On February 21, 2018, Riot Enters into a "Consulting Agreement" Through Which the Company Agrees to pay $4,000,000 to "Ingenium International LLC" .................................................................................. 65

P.    On September 7, 2018, after an Investigation, the SEC Charges Defendants Honig, O'Rourke, Stetson, and Their Associates with Engaging in Three Other Pump-and-Dump Schemes Involving Companies Connected to Riot ................................................................ 66

VII.   DEFENDANTS ENGAGED IN A MANIPULATIVE DEVICE, SCHEME, ARTIFICE, AND CONSPIRACY TO DEFRAUD RIOT'S PUBLIC SHAREDHOLDERS ........................................................................................ 67

VIII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ............................................ 68

A.    April 20, 2017 – Securities Registration Statement (Form S-3/A) .......... 69

B.    April 27, 2017 – Annual Report (Form 10-K/A) .................................... 70

C.    July 19, 2017 – Securities Registration Statement (Form S-3/A) ............ 73

D.    August 24, 2017 – Securities Registration Statement (Form S-3/A) ....... 75

E.    September 25, 2017 Securities Registration Statement (Form S-3/A) .... 77

F.    October 3, 2017 – Riot Announces "Special Dividend" of $1.00 per Share ........................................................................ 79

G.    October 4, 2017 – "Bioptix Changing Name to Riot Blockchain"........... 81

H.    October 5, 2017 – "Investor Presentation" ............................................. 82

I.    October 6, 2017 – Defendant Beeghely Speaks to *The Denver Post*....... 84

J.    October 17, 2017 – Riot "to Acquire Majority Interest in Tess"............. 85

K.    October 23, 2017 – Riot Issues "Business Strategy Statement".............. 85

L.    October 27, 2017 – "Updated Investor Presentation"............................. 86

M.    November 2-3, 2017 – Riot Agrees to Acquire "1,200 Bitcoin Mining Machines" from Kairos........................................................................... 88

N.    November 6, 2017 – Riot Closes Its Deal with Kairos........................... 91

O.    November 13, 2017 – Quarterly Report (Form 10-Q)............................ 93

P.    November 15, 2017 – O'Rourke Is Interviewed on CBS and the Company Announces "Riot Blockchain Featured in 5-Part Series on CBS" ...................................................................................................... 95

Q.    November 16, 2017 – Riot Announces an Investment in Verady, LLC.. 97

R.    November 17, 2017 – CBS Publishes More Commentary by O'Rourke 98

S.    December 11, 2017 – Riot Announces TessPay's "Intent for Merger with Publicly Traded Cresval Capital Corp." ................................................ 100

T.    December 12, 2017 Proxy Statement (Form DEF 14A)....................... 102

U.    December 19, 2017 Press Release – "Riot Blockchain Announces $37 Million Private Placement".................................................................... 104

IX.    AS TRUTH BEGINS TO EMERGE, DEFENDANTS CONTINUE TO MISLEAD THE MARKET ........................................................................ 105

A.    December 19, 2017 CNBC Interview with Andrew Left of Citron Research .............................................................................................. 105

B.    December 27, 2017 – Riot Abruptly Cancels Its Annual Shareholder Meeting ............................................................................................... 107

C.    December 29, 2017 – O'Rourke Sells 30,383 Shares for Proceeds of $869,256.............................................................................................. 109

D.    January 5, 2018 Securities Registration Statement (Form S-3)............. 110

E.    January 4-5, 2018 –Riot Fires Its Independent Auditor and Files an Amended Form 8-K/A Disclosing Audited Financial Statements of Kairos Revealing that Riot Vastly Overpaid ......................................... 112

F.    January 17, 2018 – Riot Announces Tess's "Definitive Agreement for Transaction with Publicly Traded Cresval Capital Corp." .................... 112

G.     January 31, 2018 – *The Wall Street Journal* Writes About Riot and Honig and Riot Again Cancels Its Annual Shareholder Meeting ...................114

H.     February 7, 2018 – Securities Registration Statement (Form S-3/A)....115

I.     February 11, 2018 – *The Denver Post* Publishes Statements by O'Rourke and Honig ...............................................................................................117

J.     February 13, 2018 – Honig Files an Amended Statement of Beneficial Ownership (Form SC 13D/A) ...............................................................118

K.     February 16, 2018 – CNBC Publishes a Video Entitled "CNBC Investigates:  Red Flags Raised Over Riot Blockchain" ......................119

L.     February 16, 2018 – "CNBC Investigates . . . Riot Blockchain" ..........121

M.     February 16, 2018 – Riot and O'Rourke Respond to CNBC ...............127

N.     Also on February 16, 2018, Riot Announces Its Purchase of "3,800 Bitcoin Mining Machines" from Prive Technologies LLC ...................129

O.     March 26, 2018 – Definitive Proxy Statement (Schedule 14A) ...........129

P.     April 30, 2018 – Amended Annual Report (Form 10-K/A) .................130

Q.     May 17, 2018 – Quarterly Report (Form 10-Q) ...................................131

R.     May 25, 2018 – Amended Current Report (Form 8-K/A)....................131

S.     June 29, 2018 – Amended Annual Report (Form 10-K/A) ..................132

T.     July 10, 2018 – Securities Registration Statement (Form S-3).............134

X.     SEC FILES SUIT AGAINST DEFENDANTS HONIG, O'ROURKE, STETSON, AND OTHERS ...............................................................................................134

XI.     POST-CLASS PERIOD DEVELOPMENTS ...................................................136

XII.     ADDITIONAL SCIENTER ALLEGATIONS .................................................139

XIII.     LOSS CAUSATION/ECONOMIC LOSS.......................................................145

XIV.     CLASS ACTION ALLEGATIONS...................................................................148

XV.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTION .................................150

XVI.     NO SAFE HARBOR.........................................................................................152

COUNT I .....................................................................................................................153

COUNT II ....................................................................................................................155

COUNT III...................................................................................................................156

PRAYER FOR RELIEF ..............................................................................................157

DEMAND FOR TRIAL BY JURY .............................................................................158

Court-appointed Lead Plaintiff Dr. Stanley Golovac ("Lead Plaintiff"), individually and on behalf of all other persons and entities similarly situated, by Lead Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review and analysis of filings by Riot Blockchain, Inc. ("Riot" or the "Company") and other public companies with the U.S. Securities and Exchange Commission ("SEC"); press releases, analyst reports, news articles, investment industry commentary, media, and other public statements about Riot and other companies; corporation registrations and filings with state governments; the corporate websites of Riot and other companies; court filings in various ligation involving Defendants (defined below), including *Securities and Exchange Commission v. Honig, et al.*, No. 1:18-cv-08175 (S.D.N.Y.) (the "*Honig* Action"); and an investigation conducted by and through Lead Plaintiff's attorneys.

The investigation of Lead Plaintiff's attorneys is continuing, yet certain additional facts supporting these allegations are known only to Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a federal securities class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) on behalf of Lead Plaintiff and all other persons or entities who purchased or otherwise acquired the securities of Riot and/or Bioptix (NASDAQ:  RIOT, BIOP) between April 20, 2017, and September 6, 2018, inclusive (the "Class Period"), and were damaged thereby. Lead Plaintiff brings this action to pursue remedies against the Company, certain of its current or

1

former executive officers and/or directors, and several of Riot's largest shareholders, including Barry Honig ("Honig"), who as a group conspired with one another and acted in concert with a wider group of other Riot shareholders to (1) amass a controlling interest in Riot; (2) conceal their control; (3) drive up the price and trading volume of Riot stock through manipulative trading, promotional activity, and false and misleading disclosures; (4) engage in fraudulent related-party transactions at the expense of the Company and its shareholders; and (5) dump their shares into the artificially inflated market on unsuspecting retail investors.

2.      Defendants' pump-and-dump scheme involved the purported transformation of Riot from a biotech company into an investor and "miner" of cryptocurrency such as Bitcoin.  This scheme was orchestrated by Honig, a Florida-based investor who has been charged by the SEC for masterminding numerous other pump-and-dump schemes, John O'Rourke ("O'Rourke"), Riot's Chief Executive Officer ("CEO") during the Class Period, as well as certain other Company insiders and several of their associates, and their related entities.

3.      In early 2016, the company now known as Riot Blockchain, Inc. was an "in vitro" diagnostics company known as Venaxis, Inc. ("Venaxis").  Venaxis was a medical products company whose executives, Board, and employees sought to develop a blood test for determining which patients suffering from abdominal pain were less likely to be suffering from acute appendicitis than from other ailment.

4.      In early 2015, the U.S. Food and Drug Administration ("FDA") denied approval for Venaxis's developmental blood test, and Venaxis, without a marketable product, found itself facing delisting from the NASDAQ because its share price had fallen below the exchange's minimum.

5.      Venaxis still had plenty of cash, however, having raised $20 million in a stock offering the previous year.  Therefore, in March 2016, Venaxis executed a 1-for-8 reverse stock split.  That reduced its outstanding shares to less than 4 million and lifted its stock price well above $1 a share — enough for Venaxis to keep its listing on the NASDAQ.  Shortly thereafter, Honig and his associates began buying stock in Venaxis.

6.      On September 12, 2016, Venaxis acquired BiOptix Diagnostics, Inc., and changed its name to Bioptix, Inc. ("Bioptix").  Shortly thereafter, Defendants Honig and DeFrancesco both wrote letters to then-CEO Stephen Lundy ("Lundy"), touting their combined 16.2% stake in the Company.  Honig also spoke several times on the telephone with members of Venaxis's then-existing Board of Directors.  During these telephone conversations, Honig implied that he had control of 40% of the Venaxis's shares through his stock ownership and the stock ownership of Honig's friends and relatives, according to a former Venaxis Board member present during the conversations.

7.      On September 13, 2016, Honig attempted to nominate his own slate of new directors of Bioptix, including Defendants O'Rourke, Beeghley, and Stetson, and several other of Honig's associates.  When Venaxis's then-existing Board of Directors were considering Beeghley as a nominee for election to the Board, Beeghley told them that he did not know Honig, according to an individual present at the time.

8.      In his September 13, 2016 letter to then-CEO Lundy, Honig wrote that Venaxis was "wast[ing] precious resources with no clear direction or strategy . . . while board fees and management salaries continue to be paid . . . ."  Honig offered an alternative.  In early discussions with Venaxis's Board, Honig raised the possibility of turning Venaxis into a marijuana-related company, according to an individual present at the time.  After suing several longtime members

of the Venaxis Board, Honig successfully ousted them.  Finally, Honig and his associates achieved complete control over the Company, with Beeghley becoming CEO and O'Rourke joining the Board.

9.      After abandoning their idea to pivot Bioptix into the marijuana business, Defendants instead chose a strategy they had employed (with devastating results for shareholders) at several other public companies.  Defendants set out to reinvent Bioptix as a new player in cryptocurrency.  Thus, on October 4, 2017, Bioptix announced that it had become "Riot Blockchain."

10.     Despite grandiose promises that Riot would be a "pure play" in cryptocurrency that would "leverage our expertise, and network, to build and support blockchain technology companies," in reality the Company had limited meaningful investments in cryptocurrency products and did not have a meaningful cryptocurrency business plan.  Rather, Defendants and their unscrupulous business associates, many whom have a history of engaging in pump-and-dump schemes, sought to exploit investor interest in the rapidly expanding cryptocurrency markets.  As SEC Chairman Jay Clayton testified before Congress – in what one reporter described as a "thinly-veiled sot at Riot" – "***Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain.***"

11.     This, however, is precisely what Riot and its executives did.  Instead of operating a legitimate cryptocurrency business, Defendants artificially "hype[d]" the Company's prospects by issuing a flurry of press releases, SEC filings, and interviews with television and newspaper journalists – all designed to give investors the false impression that Riot was a serious cryptocurrency company.  This was not true.   Defendants' so-called investments in crypto

currency were, in reality, egregiously wasteful related-party transactions with entities that were secretly owned and control by Defendants and their associates through a labyrinth of limited liability companies formed weeks before in Nevada, Florida, and Canada by Defendants' associates.  These related-party transactions, and the individuals behind them, mirrored similar schemes that Defendants and their associates have perpetrated at other public companies.  Meanwhile, Defendants and their associates sold their Riot stock at inflated prices for millions of dollars in proceeds before the truth about their scheme was revealed by investigative journalists and the lawyers at the SEC.

12.     Unbeknownst to Riot shareholders during the Class Period, O'Rourke, Honig, and other Defendants have a history of questionable financial dealings and joint investments.  After the scheme was partially revealed in February 2018, Defendant O'Rourke admitted that he has "a good relationship with Mr. Honig."  Defendant Honig has also weighed in publicly on his business relationship with Defendant O'Rourke stating, "at one point in time John O'Rourke had space in my office . . . we speak often."  Yet, during the Class Period Defendants went to great lengths to hide Honig's ties to Company insiders and other Riot shareholders by flouting, for example, SEC disclosure rules related to beneficial ownership and SEC rules requiring disclosure of transactions with related parties.

13.     Indeed, so entrenched was Defendant Honig's control over Riot that the Company's principal executive offices were not in Colorado, as officially represented by the Company, but instead were effectively located in Florida where Defendants O'Rourke, Honig, and Stetson shared the same office, which allowed them and their associates effectively to control or exercise undue influence over Riot and its operations and affairs.

14.     Unfortunately, as has become clear over the past few months, Defendants' fraudulent actions are not limited to Riot.  The SEC has charged Defendants Honig, O'Rourke, and Stetson with similar pump-and-dump schemes at several other publicly traded companies. Describing the group as "microcap fraudsters," the SEC has alleged that "Honig was the primary strategist, calling upon other [affiliated co-investors] to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity."  The SEC further alleged that "[i]n each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse merger or by participating in financings on terms highly unfavorable to the company."  Defendant O'Rourke resigned in the wake of these allegations and certain of the individuals charged by the SEC have already settled those charges.

15.     According to the SEC, Defendant Honig had been in the process of settling these charges, but in a court filing on May 7, 2019, Honig and the SEC stated that "[t]he parties do not believe there is a possibility of prompt settlement of this case."

## II.     JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

18.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the misleading statements entered into and the subsequent damages took place within this district.

19.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

20.     Lead Plaintiff purchased Riot common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

21.     Defendant Riot is a Nevada corporation with its principal executive offices purportedly located at 834-F South Perry Street, Suite 443, Castle Rock, Colorado 80104.  The Company's securities trade on NASDAQ under the symbol "RIOT," and previously traded as "BIOP."  Riot purports to invest in various blockchain technologies and mine cryptocurrencies such as Bitcoin.  As of April 13, 2018, Riot had 13,417,132 shares of common stock outstanding.

22.     Defendant Honig is a resident of Boca Raton, Florida, and, at all relevant times, worked at an office in Boca Raton with O'Rourke.  Stetson, and at times Groussman, also worked out of Honig's Boca Raton office.  Defendant Honig is a defendant in the *Honig* Action.  Honig, through his ownership of Riot securities, was in a position to exercise influence over Riot's top executives, including O'Rourke and Beeghley, and Riot's Board of Directors.  Honig also was a fiduciary of Riot by, among other things, his actions calculated to dictate the structure of the Company.  Honig, through his continuous course of business dealings with Riot, acted as a control person of the Company.  Honig has been involved in dozens of small companies that issued public securities, primarily through mergers with the shells of failed or failing businesses, in return for significant amounts of stock or convertible notes.  Honig sold at least 1,583,005 shares of his stock in the Company for at least $17 million in proceeds while maintaining close ties with Company insiders who had access to material, nonpublic information about Riot.  As alleged herein, Honig

has longstanding business ties and/or co-investments with O'Rourke, Beeghley, Stetson, and Groussman, and other Relevant Non-Parties listed below. Honig is a trustee of GRQ 401K, which has been a shareholder of Riot since at least September 14, 2016. Honig had voting and dispositive power over GRQ 401K's securities of Riot. Honig has been a shareholder of Riot in his individual capacity since September 19, 2016. Honig was formerly CEO of PolarityTE and was a Director of Pershing Gold.

23.    Defendant O'Rourke, born in 1985, is a resident of Fort Lauderdale, Florida. O'Rourke served as Riot's President since at least October 3, 2017,[1] and as Riot's CEO and Chairman of the Board from November 3, 2017 until September 8, 2018, when he resigned after the SEC charged him in the *Honig* Action along with Honig, Stetson, Brouser, and others. Defendants O'Rourke and Stetson reside in homes located approximately 800 feet apart. O'Rourke's 2017 executive compensation included a $60,000 salary, $2,322.00 in stock awards, $609,842 in option awards, which totaled to $2,991,842 in compensation. Additionally, O'Rourke sold at least 30,383 shares of his stock for at least $869,256.35 of profit while he had access to material, nonpublic information about Riot. At least as of October 3, 2017, O'Rourke was President of Riot. O'Rourke has longstanding business ties and/or co-investments with Honig, Stetson, Groussman, and Brouser.

24.    Defendant Catherine DeFrancesco was the beneficial owner of shares in Riot through at least six different entities: DSB Capital, Ltd., a Turks & Caicos company; DeFrancesco Motorsports, Inc., an Ontario corporation; Delavalco Holdings, Inc., an Ontario corporation; Delavalco Holdings, Inc., a Florida corporation; Marcandy Investments Corp., an Ontario

---

[1] O'Rourke listed himself as a "President" of "Riot Blockchain, Inc." in "Articles of Merger" that O'Rourke signed and filed with the Nevada Secretary of State on October 3, 2017.

corporation; Namaste Gorgie, Inc., an Ontario corporation.  DeFrancesco began acquiring Riot shares no later than September 14, 2016.  DeFrancesco is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.

25.     Defendant Michael Beeghley ("Beeghley") was the Company's Chairman and CEO until he was replaced by Defendant O'Rourke.  Beeghley was Riot's CEO from April 2017 to November 2017; Chairman of the Board from January 2017 to November 2017; and a Director from November 2016 to November 2017.  In 2017, Riot paid Beeghley $339,739 in compensation, including $9,000 of salary, $270,000 in stock awards, and $60,739 in option awards.

26.     Defendant John Stetson ("Stetson") is a resident of Fort Lauderdale, Florida, where Defendants Stetson and O'Rourke reside in houses approximately 800 feet apart. Stetson is the former CFO of PolarityTE.  Stetson is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.

27.     Defendant Mark Groussman ("Groussman") is a resident of Miami Beach, Florida, and works out of the same office in Boca Raton with Honig, O'Rourke, and Stetson. Groussman owns Melechdavid.  Groussman purchased his house in Miami Beach, Florida, with a $700,000 mortgage loan from Honig, Groussman's mortgage holder.  Groussman is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.

28.     Defendant Andrew Kaplan ("Kaplan") has been a director of the Company since May 2017 is a member of the Audit Committee and Compensation Committee, and Chair of the Governance Committee.  In 2017, Kaplan received total compensation of $88,220, including his fees paid in cash of $8,000 and stock awards of $80,220.  Kaplan previously served on the board of directors of Majesco Entertainment Company ("Majesco Entertainment") while Honig was CEO.  Kaplan is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.

29.    Defendant Mike Dai ("Dai") has been a Director of Riot since January 2017.

30.    Defendant Jeffrey G. McGonegal ("McGonegal") was the Company's Chief Financial Officer ("CFO") from 2003 to February 28, 2018, from which point he served solely as the Company's Principal Accounting Officer until April 30, 2018.  McGonegal then served as a consultant to the Company until August 30, 2018.  McGonegal was replaced as CFO by Rob Chang ("Chang").  In 2015 and 2016, McGonegal was paid $651,207 and $513,625, respectively, in total compensation.  According to the Company's Schedule 14A filed with the SEC on March 26, 2018 (the "2017 Proxy"), effective June 30, 2017, the Company entered into a retention agreement with McGonegal providing for McGonegal's continued service as the Company's CFO and Principal Accounting Officer until April 30, 2018, at an annual base salary of $275,005.  Additionally, in 2017, McGonegal received $127,800 in stock awards, $140,000 from a non-equity incentive plan, and $169,843 in supplemental compensation.  Together with his salary, this amounts to total compensation of $709,648.  Pursuant to a modification of the retention agreement, McGonegal served solely as the Company's Principal Accounting Officer until April 30, 2018, and continued for four months thereafter as a consultant of the Company to provide transition services as requested by the CEO, CFO, and Board.

31.    Defendant Jason Les ("Les") has been a director of the Company since November 2017 and is a member of the Company's Audit Committee and Governance Committee, and Chair of the Compensation Committee.  According to the 2017 Proxy, Les is a professional poker player and is qualified to serve as a director "based on the fact that he has been active in the industry as a miner, studying protocol development and evaluating a variety of crypto investment strategies."  Les received total compensation of $56,625 in 2017, which includes $6,000 of fees paid in cash and $50,625 of stock awards.

32.     Defendant Eric So served as a director of the Company from October 2017 until February 2018, and served as Chair of the Audit Committee and a member of the Compensation Committee and the Governance Committee.   In 2017, So was paid $65,675 in compensation, including $2,000 in fees paid in cash and $63,675 in stock awards. So was previously the chief legal and development officer at MUNDOmedia Ltd., a company in which Honig and O'Rourke have heavily invested.

## IV.     RELEVANT NON-PARTIES

33.     Aifos Capital Management, LLC ("Afios") is controlled by Karr, its Managing Member.

34.     ATG Capital LLC ("ATG") is a Florida corporation owned and operated by Defendant O'Rourke and for which O'Rourke makes investment decisions.  ATG's principal place of business is in Florida.  ATG's was incorporated in or around 2012.

35.     Biozone Pharmaceuticals, Inc. ("Biozone") is a Nevada corporation with principal place of business in Pittsburg, California.  The SEC has sued Defendants Honig, O'Rourke, and Stetson in connection with their investment in Biozone.

36.     Mohit Bhansali ("Bhansali"), is a former Director of Majesco and Director and PolarityTE.  Bhansali is the co-founder of EST.  Bhansali is a former employee of Sichenzia Friedman Ference LLP and Haynes and Boone, LLP.

37.     Michael Brauser ("Brauser") is a resident of Lighthouse Point, Florida.  Brauser invested in Riot through Grander Holdings, Inc. 401K.  Brauser also owned 112,499 shares of goNumerical Lftd. ("goNumerical"), a leading Canadian Blockchain company known as Coinsquare Ltd.  The SEC sued Brauser along with Honig, O'Rourke, and Stetson for their pump-and-dump schemes involving Biozone, MGT, and MabVax.

38.     Cresval Capital Corp. ("Cresval") a Canadian mineral exploration company based in Vancouver, British Columbia, whose President is Lee Ann Wolfin.

39.     Equity Stock Transfer ("EST") is a transfer agent financed by Kesner.  EST's COO and CEO, Bhansali, who worked Kenser's law firm.  EST handled Riot's October 3, 2017 special dividend.

40.     Ingenium Global, Inc. ("Ingenium") is a Nevada corporation that was incorporated on October 19, 2019 by Laxague, the same day as Kairos.  Ho is Ingenium's President, Secretary, and Treasurer.  Pascual and Silverman are Directors of Ingenium.

41.     JAD Capital Inc. ("JAD") is a corporation located in Ontario, Canada, whose Director, with voting and dispositive control over JAD, is Theofilos.

42.     Kairos Global Technology Inc. ("Kairos") is a Nevada corporation that was incorporated on October 19, 2019 by Laxague.  Ho is Kairos's President, Secretary, and Treasurer. Pascual and Silverman are Directors of Kairos.

43.     Edward M. Karr ("Karr") is a Director of both Pershing Gold and Levon, and was a Director of Majesco Entertainment prior to its merger with PolarityTE.  Karr is also the chairman and chief executive of U.S. Gold.  Karr invested in Riot through Aifos, a company Karr controls.

44.     Harvey Kesner ("Kesner") is the long-time lawyer of Defendant Honig.  Kesner is the owner of Paradox Capital Partners ("Paradox").  Kesner represented Honig in connection with his investments in Riot and MabVax.  Kenser and/or Paradox invested in Riot and MabVax. Kesner is an owner and manager of EST, which Kesner financed with more than $100,000 through Paradox.  Kesner is a former partner with Haynes and Boone, LLP and Sichenzia Friedman Ference LLP ("Sichenzia").  In 2018, MabVax sued Sichenzia for malpractice due to Kesner's allegedly conflicted legal representation of both Honig and MabVax. Acccording to a article in

*Barron's*, "nearly two dozen public companies backed by Honig, or other defendants in last month's SEC complaint, used" Kesner " until he retired . . . just before the [*Honig*] action.  Those companies also happened to use [EST] . . . ."

45.     Global Bit Ventures, Inc. ("GBI") is a Nevada corporation that Marathon planned but failed to merge with in order to convert Marathon into a "blockchain" company.

46.     Grander Holdings, Inc. 401K ("Grander") is a Florida corporation that Brauser owns and operates as Trustee.  The SEC sued Grander with Brauser Honig, O'Rourke, and Stetson in connection pump-and-dump schemes involving Biozone, MGT, and MabVax.

47.     GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("GRQ 401K") is an entity for which Honig serves as Trustee.  As of September 14, 2016, GRQ owned at least 389,159 shares of common stock of Riot (then-Venaxis) (8.6% of voting stock), and later increased its stake to 9.99%.

48.     Michael Ho ("Ho") was the President, Secretary, and Treasurer of both Kairos and Ingenium, which were both incorporated on the same day, October 19, 2017, in Nevada.  Ho is also a Manager of Prive.  In various corporate filings in Nevada and Florida, Ho has listed his address as either Dubai, Los Angeles, or Tampa.

49.     Alan Honig is the father of Barry Honig.  As of at least September 25, 2017, Alan Honig personally owned 20,000 shares of Riot common stock representing approximately 0.33% of the Company's common stock beneficially owned.

50.     Jonathan Honig is the brother of Barry Honig and is the Manager of Titan Multi-Strategy Fund I Ltd.  As at least September 25, 2017, Jonathan Honig beneficially owned, through Titan Multi-Strategy Fund I Ltd., 597,300 shares of Riot common stock representing 9.99% of the Company's common stock beneficially owned.

51.     Adrian James ("James"), a stock promoter who previously touted other Honig-backed companies, including Pershing Gold, MusclePharm Inc. (the parent of Biozone), and Valor Gold Corp.  James is the President & CEO of Stockwire, through which James invested in Riot.

52.     Laxague Law Inc. ("Laxague") is a law firm in Reno, Nevada, operated by Partner Joe Laxague, which incorporated both Kairos and Ingenium on October 19, 2018.

53.     Bryan Pascual is a Director of Kairos and Ingenium Global, Inc. and a Manager of Prive.

54.     Levon Resources Ltd. ("Levon") is another mineral exploration company in which Defendant Honig is former Director and Karr is a current Director.  Levon was founded by Arthur Wolfin, the father of Lee Ann Wolfin, the President of Cresval.

55.     MabVax Therapeutics Holdings, Inc. ("MabVax") a Delaware corporation, with its principal place of business in San Diego County, California.  The SEC has sued Defendants O'Rourke, Honig, and Stetson in connection with their investments in MabVax.

56.     Marathon Patent Group Inc. ("Marathon") is a public company that trades on the NASDAQ that Honig, O'Rourke, Groussman, Stetson, Brauser, and others also invested in an attempted to convert into a "blockchain" company.

57.     Marcandy Investments Corp. ("Marcandy") is an Ontario corporation owned and controlled by its President, DeFrancesco.

58.     Melechdavid Inc. ("Melachdavid") is a Florida corporation whose principal place of business is Miami Beach, Florida, and whose President is Defendant Groussman.

59.     MGT Capital Investments Inc. ("MGT") is a Delaware corporation based in Durham, North Carolina.  The SEC has sued Defendants O'Rourke, Honig, and Stetson in connection with their investments in MGT.

60.     Richard Molinsky ("Molinksy") is a former stockbroker at D.H. Blair & Co. who was barred from the industry in 2000 after pleading guilty[2] to criminal charges related to market manipulation and fraudulent sales practices, was one such associate listed on the registration statement.   Molinsky has been an investor in numerous Honig-backed companies, including PolarityTE, Pershing Gold, Vapor Corp., and Riot.   Molinsky was a shareholder of Riot since at least September 25, 2017, when he disclosed owning 1.78% of Riot common stock.

61.     MUNDOmedia Ltd. ("MUNDOmedia") is a marketing company based in Toronto, Ontario, Canada founded by its CEO, Theofilos.

62.     Namaste Gorgie Inc. is an Ontario corporation owned and controlled by its President, DeFrancesco.

63.     Northurst Inc. ("Northurst") is a Canadian company that owned 9.99% percent of Riot stock and was also an investor in Kairos. Northurst's controlling shareholder, Jakub Malczewski, was managing director of Ahaka Capital with David Baazov, the former CEO of an online gambling company who Canadian authorities charged with insider trading and market manipulation.   Through Ahaka Capital, Messrs. Malczewski and Baazov were investors in MUNDOMedia alongside Honig, O'Rourke, Stetson, and Groussman.   Northurst was also an investor in GBV, which was nearly acquired by Marathon.

64.     Paradox Capital Partners LLC ("Paradox"). The registered address in Florida for Paradox Capital Partners (owned by Kesner) is the same Boca Raton building that Honig uses as his business address.

---

[2] *See In the Matter of Breitner et al.*, No. 3-11105 (S.E.C. May 5, 2003), available at https://www.sec.gov/litigation/admin/34-47797.htm ("Molinsky pled guilty to and was convicted of the charge of Attempt to Commit the Crime of Enterprise Corruption and one count of Martin Act securities fraud (*see People of New York v. D.H. Blair, et al.*, Ind. No. 3282/00).").

65.     Bryan Pascual ("Pascual"), a resident of Tampa, Florida, is a Director of Kairos and Ingenium, and a Manager of Prive.

66.     Pershing Gold Corp. ("Pershing Gold") is an emerging gold producer whose primary asset is the Relief Canyon Mine in Pershing County, Nevada.  Defendant Honig was a Director of Pershing Gold.

67.     PolarityTE Inc. ("PolarityTE") was formerly a video game company known as Majesco Entertainment, and is now a purported biotechnology company based in Salt-Lake City, Utah.  Polarity's Co-Chairmen were Defendant Honig and Brauser.  Honig was also Polarity's CEO.  Defendant Stetson was Polarity's CFO.  Karr and Defendant Kaplan were Directors of Polarity.

68.     Prive Technologies LLC ("Prive") is a Florida limited liability corporation that was incorporated on October 31, 2017, with its Principal Address at 218 S. Audobon Avenue, Tampa, Florida 33609.  Prive's Managers are Ho and Pascual.

69.     Robert O'Braitis ("O'Braitis"), a part-time resident of Boca Raton, Florida, owned as of at least September 25, 2017, owned 80,410 shares of Riot common stock representing 1.46% of the Company's common stock beneficially owned (the exact amount owned on that same date by Theofilos through JAD Capital Inc., and by Groussman in two separate UTMA accounts).  O'Braits has been an investor in other Honig-backed companies, including PolarityTE and Marathon, in which he was party to a "Securities Purchase Agreement with proposed Riot Board member Jesse Sutton.

70.     Moses D. Silverman ("Silverman"), a resident of Miami Beach, became a Director of Kairos and Ingenium on October 19, 2018.

71.     Stetson Capital Management, LLC ("Stetson Capital") is a Florida limited liability company incorporated in April 2016 whose manager and registered registered agent is Defendant Stetson.  Stetson Capital's Articles of Incorporation list Defendant Stetson's previous residence less than one mile from Defendant O'Rourke's residence in Fort Lauderdale, Florida.  Stetson Capital invested in at least 4.99% of Riot's common stock.

72.     Stockwire Research Group, Inc. ("Stockwire") is a Florida corporation whose principal place of business is in Miami-Dade County, Florida, and whose President and CEO is Adrian James.

73.     Tess Inc. ("Tess") is a company based in Toronto, Ontario, whose Chief Software Architect is Tanasescu.

74.     Jason Theofilos ("Theofilos") is the chief executive of MUNDOmedia Ltd., a digital advertising company in which Defendant Honig, Jonathan Honig, O'Rourke, Stetson, and Groussman each held shares.  Theofilos is the Director of JAD Capital Inc. and the President of 2330573 Ontario Inc.  As of at least September 25, 2017, Theofilos owned JAD Capital Inc., which owned 80,410 shares of Riot common stock representing 1.46% of the Company's common stock beneficially owned (the exact amount owned on that same date by O'Braitis and by Groussman in two separate UTMA accounts).

75.     Sorin Tanasescu was Tess's Chief Software Architect and was concurrently a Director of an entity called Ingenium IT Compusoft and a Managing Director of a company called VoiceWay.

76.     Titan Multi-Strategy Fund I, Ltd. ("Titan") is a Florida corporation.  Titan is owned and controlled by Jonathan Honig, who is Titan's Manager.

77.     US Commonwealth Life, A.I. Policy No. 2013-17 ("Policy No. 2013-17") is controlled by Bhansali, who caused Policy No. 2013-17 to purchase convertible notes and warrants resulting in approximately 80,000 Riot shares, which Policy No. 2013-17 sold publicly.

78.     WPCS International Incorporated ("WPCS") was a global engineering, communications, and infrastructure "with over 500 employees in 10 operations centers on three continents."  In 2012, Defendant Honig, through GRQ 401, invested in WPCS when its stock was trading in excess of $1,000 per share.  In 2013, WPCS purchased BTX Trader, a bitcoin trading platform, from Defendant O'Rourke.  In January 2018, WPCS's changed its name to "Dropcare, Inc." and is now a cloud-services-for-cares company whose stock trades on NASDAQ under the ticker "DCAR" for approximately $2.01 per share.

## V.     THE "HONIG GROUP"

79.     The "Honig Group" is used herein to refer to Honig, the other Defendants, and any other current or former holders of Riot securities (including common stock, preferred stock, warrants, and notes) who had a material relationship with Honig, any of the other Defendants, and/or any other member of the Honig Group.  As alleged herein, the Honig Group included, among others and without limitation:  Afios, ATG, Bhansali, Brauser, Karr, Kesner, Grander, GRQ 401K, Alan Honig, Jonathan Honig, JAD, James, Marcandy, Melechdavid, MGT, Molinsky, Namaste, Northurst, Paradox, O'Braitis, Stetson Capital, Theofilos, Titan, and Policy No. 2013-17, and other affiliated shareholders.  As alleged herein, and as illustrated below, each of the members of the Honig group has invested in one or more previous public companies affiliated with Honig and the other Defendants including, without limitation, Biozone, MGT, MabVax, Marathon WPCS, PolarityTE, Pershing Gold, and MUNDOmedia Ltd.

**Honig Group**          **Prior Pump-and-Dump Companies**[3]

| | Biozone | MGT | MabVax | PolarityTE | Pershing Gold | Mundo | Marathon |
|---|---|---|---|---|---|---|---|
| Aifos | | | X | X | X | | |
| ATG | | X | X | X | X | | |
| Bhansali | | | | X | | | |
| Brauser | | | X | X | X | | X |
| Grander | X | X | X | X | X | | X |
| GRQ 401K | X | X | X | X | X | | X |
| Honig, Alan | | | X | | X | | X |
| Honig, Jonathan | | | X | | X | X | |
| JAD Capital Inc. | | | | | | X | |
| James | | | | | X | | |
| Karr | | | X | X | X | | X |
| Kesner | X | X | X | X | X | | X |
| Marcandy | | | | | | | |
| Melechdavid | | X | X | X | X | X | X |
| Molinsky | | | | X | X | | X |
| Namaste | | | | X | | | |
| Northurst | | | | | | | X |
| O'Braitis | | | | X | | | X |
| Paradox | | | X | X | X | | X |
| Policy No. 2013-17 | | | | X | | | |
| Richardson | | | | | X | | X |
| Stetson Capital | | X | | X | X | X | X |
| Stockwire | | | | | X | | |

## VI. SUBSTANTIVE ALLEGATIONS

### A. The Honig Group Has Engaged in Similar Pump-and-Dump Schemes at Numerous Publicly Traded Microcap Companies

80. Numerous members of the Honig Group have engaged in prior pump-and-dump schemes at other publicly traded companies, at depicted by the following chart and discussed below.

---

[3] The absence of a checked box is not intended to indicate the lack of a relationship.

**The Honig Group's Prior Target Companies[4]**

|  | Biozone | MGT | MabVax | PolarityTE | Pershing Gold | Mundo | Marathon |
|---|---|---|---|---|---|---|---|
| **Honig** | X | X | X | X | X | X | X |
| **O'Rourke** | X | X | X | X | X | X | X |
| **Brauser** | X | X | X | X | X |  | X |
| **Stetson** | X | X | X | X | X | X | X |
| **Groussman** | X | X | X | X | X | X | X |
| **DeFrancesco** |  |  |  | X |  |  |  |
| **Beeghley** |  |  |  | X |  |  |  |
| **Kaplan** |  |  |  | X |  |  |  |
| **So** |  |  |  |  |  | X |  |

### 1.     The SEC Has Sued Honig, O'Rourke, Stetson, and Brouser for Recently Engaging in Pump-and-Dump Schemes at Three Companies

81.     The Honig Group's three most recent schemes are detailed in a March 8, 2019 First Amended Complaint filed by the SEC against Honig, O'Rourke, Stetson, Brouser, and related defendants.   The SEC alleged that "Honig was the primary strategist, calling upon other Defendants to, among other things, acquire or sell stock, arrange for the issuance of shares, negotiate transactions, and/or engage in promotional activity."  SEC Am. Cmpl. ¶ 2.[5]  The SEC alleged that Honig, O'Rourke, Stetson, Brouser engaged in pump-and-dump schemes at "Company A" (Biozone), "Company B" (MGT), and "Company C" (MabVax):

> All told, the three schemes earned Defendants and their associates millions of dollars:  Company A's pump and dump generated approximately $9.3 million in stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities, and affiliates.  Company B's pump and dump generated more than $9.5 million for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities, affiliates, and/or certain frequent co-investors.  And, most recently, the pump and dump of Company C brought in over $8.3 million in stock sales proceeds

---

[4] The absence of a checked box is not intended to indicate the lack of a relationship.

[5] Citations to "SEC Cmpl. ¶ __" are to paragraph of the SEC's Complaint.  Citations to "SEC Am. Cmpl. ¶ __" are to paragraphs of the SEC's First Amended Complaint.  *See SEC v. Honig et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 8, 2009) (ECF No. 105).

for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities and/or certain frequent co-investors.  These profits were made at the expense of investors who purchased shares in [Biozone], [MGT] and [MabVax] at artificially high prices based on misleading flattering articles or coverage in the media and matched trades that were orchestrated by the Defendants.

*Id.* ¶ 8.

### a.    Biozone Pharmaceuticals, Inc. (a/k/a "Company A")

82.    As alleged by the SEC, a member of Biozone's board of directors explained that "[t]he real power is with Barry Honig and Mike Brauser," *id.* ¶ 91, but that Honig and Brauser failed to keep their promises to invest in research and development at Biozone, *id.* ¶ 93.  Instead, "Honig and Brauser used the financings they orchestrated to amass more, ever-cheaper [Biozone] shares for themselves and their associates" so that by April 1, 2013, "Honig, Brauser and other co-investors, including Stetson . . . had amassed 28,153,845 shares, or almost 45% of the [Biozone] shares outstanding, with Honig alone holding 5,542,654 shares, or 8.8% of the company's outstanding shares."  *Id.* ¶ 95.

83.    To facilitate the pump and dump scheme, "[i]n September 2013, Honig directed O'Rourke to reach out to Ford to arrange for him to post his purportedly independent investment analysis of [Biozone] on the Seeking Alpha website pursuant to the understanding Honig and Ford had reached in 2012." *Id.* ¶ 102.  In turn, "O'Rourke contacted Ford and proposed that Ford write a [Biozone] article in exchange for Ford obtaining [Biozone] shares at a below-market price." *Id.* ¶ 103.

84.    The SEC alleged that "[o]n Monday, September 23, 2013, Honig and some associates began trading [Biozone] shares to create the appearance of market activity and interest in [Biozone] in advance of the planned Ford article.  That day, the trading volume of [Biozone] shares soared to 302,000 from zero volume the previous trading day." *Id.* ¶ 104.  "The September 23rd trading also gave Honig a way to pay Ford surreptitiously for his upcoming favorable article

on [Biozone].  On the morning of Friday, September 20, 2013, O'Rourke called Ford and told him

to put in buy orders for [Biozone] stock at $0.40 per share to ensure his order was executed against

the corresponding sell order later placed by Honig."  *Id.* ¶ 105.  "O'Rourke joined the trading at

the end of the trading day on September 23rd to 'mark the close,' i.e., to ensure that the last price

of the day would be higher, giving the false impression that [Biozone's] share price was on an

upward trajectory."  *Id.* ¶ 107.

85.    As directed, "Ford published his [Biozone] article on the Seeking Alpha website

less than half an hour before market close on September 26, 2013. . . .  In it, Ford presented a

bullish outlook for [Biozone] and concluded that '[Biozone] should be trading for more than twice

today's valuation.'"  *Id.* ¶ 108.

86.    Not surprisingly, Biozone's "share price increased from an average of about $0.48

during August 2013 to an intraday price of $0.97 on October 17, 2013."  *Id.* ¶ 111.  At the same

time, "[b]etween the start of the manipulative trading on September 23, 2013 and December 31,

2013, Honig and his co-investors sold shares into the inflated market for proceeds of approximately

$9,350,000."  *Id.* ¶ 112.

### b.    MGT Capital Investments Inc. (a/k/a "Company B")

87.    With respect to MGT, the SEC alleged:

During 2015 and 2016, Honig and his associates used [MGT], once a publicly
traded shell, as another vehicle for their pump-and-dump schemes.  Honig and his
partners used many of the same tactics they had employed in the [Biozone] scheme:
they bought millions of cheap shares, intending to exercise control over the
management and policies of the company; exercised that control; orchestrated a
misleading promotion of the company that drove up the price and the trading
volume of the company's shares; and dumped their shares for a profit in the inflated
market.

*Id.* ¶ 125.

88.    As before, "Stetson, with the knowledge and consent of the Honig-led investor group, then enlisted Ford to write a promotional piece, published on the Seeking Alpha website on November 5, 2012, which touted MGT's prospects for providing a "2X near-Term Return," and predicting that MGT's stock could rise to $18 a share (nearly triple its price on the previous trading day)." *Id.* ¶ 128.

89.    This was not sufficient for Defendant Honig, however, because "after Ford's piece was published, MGT's stock price failed to reach the level desired by the Honig-led group." *Id.* ¶ 129.   Accordingly, Honig directed Stetson and/or O'Rourke to retain Ford to write another Seeking Alpha article on [MGT]." *Id.*   "This time Ford's article had the desired effect, pushing [MGT's] share price from $3.50 on April 10, 2013 to almost $4.50 on April 16, 2013, and increasing trading volume significantly.   MGT's market capitalization went from under $16 million on April 10, 2013 to over $20 million on April 16, 2013.   Honig sold approximately 250,000 shares into the inflated market, earning $967,224." *Id.* ¶ 130.

90.    This was not the end of the pump-and-dump scheme at MGT.   The SEC alleged that, "[i]n 2015, Honig and his associates began planning a new scheme to pump and dump [MGT's] shares." *Id.* ¶ 133.   As part of this, "[o]n September 27, 2015, Honig directed Stetson to send the proposal to Ladd, [MGT's] CEO.   The deal contemplated the issuance of 2.8 million MGT shares, along with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker.   This deal structure allowed the investors repeatedly to convert and sell their shares while appearing individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings." *Id.* ¶ 134.   Then, "[h]aving coordinated the accumulation of stock with Brauser, Stetson and O'Rourke, Honig, with his partners'

knowledge and consent, then arranged for a promotion that included materially misleading information." *Id.* ¶ 138.

91.     Following this, the SEC alleged that

> On or around January 21, 2016, by which time Honig, Brauser, Stetson, O'Rourke and Affiliate 1 through Affiliate 1 Entity, had acquired at least 16.3% of [MGT's] outstanding stock, Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of [MGT]. Shortly thereafter, the stock promoter paid a portion of the money he had received from [MGT] to a writer he instructed to publish a tout on [MGT]. On February 3, 2016, the writer published his piece online. In it, he described [MGT's] rosy prospects in social and "real money" gaming sites and intellectual property relating to slot machines. The article did not disclose that the author had been paid by [MGT] - at Honig's direction - to write the article. After the article was published on February 3, 2016, there was a 7000% increase from [MGT's] previous day's trading volume, and an intraday price increase of over 60%.

*Id.* ¶ 139.

92.     Following this, "Honig, Ladd, Stetson and O'Rourke took advantage of the promotion's boost to [MGT's] stock price and trading volume and sold over 430,000 shares into this inflated market for proceeds of approximately $198,800." *Id.* ¶ 140.

93.     The Honig group's third scheme at MGT occurred in 2016 and involved O'Rourke, "[a]t Honig's direction," "t[aking] the lead on arranging a deal between [MGT] and [a] Cybersecurity Innovator." *Id.* ¶ 142.

94.     As part of this, "[o]n May 9, 2016, at 8:30 a.m., [MGT] issued a press release announcing its merger with CI Company." *Id.* ¶ 144. In connection with this, "[t]he press release misleadingly described the Cybersecurity Innovator's prior financial success by falsely claiming that the Cybersecurity Innovator had 'sold his antivirus company to Intel for $7.6 billion,' suggesting that [MGT] might achieve similar success. Yet . . . the sale of the Cybersecurity Innovator's namesake company to Intel at that price had occurred over a decade after the Cybersecurity Innovator's departure from that company." *Id.*

95.     Honig then began trading in MGT stock "later that morning . . . to create the misleading appearance of an active market." *Id.* ¶ 145.  A Honig affiliate at MGT "paid StockBeast.com for [an] article to ensure a wide distribution of the news of the impending merger with the CI Company." *Id.* ¶ 146.  This had the intended effect, with MGT's share price increasing and its market capitalization increasing "from just over $8 million on May 6, 2016 to over $95 million on May 17, 2016." *Id.* ¶ 147.  Honig, O'Rourke, Stetson, and Brauser, along with an affiliate, "pursuant to their tacit or explicit agreement to acquire, hold, vote, and/or disperse of their shares in concert, sold over 9.2 million [MGT] shares" and "grossed $9.4 millions from the May 2016 sales into the inflated market." *Id.* ¶ 148.

### c.     MabVax Therapeutics Holdings, Inc.  (a/k/a "Company C")

96.     With respect to MabVax, the SEC alleged that "[i]n early 2014, Honig identified a publicly traded shell company that was unencumbered by debt, and sought an appropriate private company for purposes of a reverse merger and pump and dump scheme." *Id.* ¶ 159.  Honig was able to do so because that company's CEO "was looking for funding for its research and development efforts in cancer therapies and diagnostic products." *Id.* ¶ 160.

97.     Once Honig had taken control of MabVax through two entities (without disclosing his identity to MabVax), "[i]n approximately April 2014" Honig "first called up [MabVax's] CEO, [and] announced in words or substance:  'I'm the owner of your company.  You better do what I tell you to do.'" *Id.* ¶ 162.

98.     As part of the scheme at MabVax, the SEC alleges that "[o]n April 3, 2015, O'Rourke, acting at Honig's direction, circulated a press release (with input from [MabVax's] CEO, Honig and Brauser) announcing the $12 million private placement in which Investor 1 and his entities had participated, drawing on Investor 1's reputation among retail investors as a successful biopharma investor." *Id.* ¶ 185.  "Honig, with the knowledge of Brauser and Stetson,

then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym 'Wall Street Advisors' on the Seeking Alpha website on April 8, 2015 at 11:13 a.m. The article, titled 'Opko Spots Another Overlooked Opportunity in MabVax Therapeutics,' highlighted Investor 1 Company's and Opko's investment in MabVax, and was designed to inspire Investor 1's retail investor devotees to follow his lead and buy MabVax stock.  Despite his involvement in facilitating the MabVax financing and his extensive business relationships with Honig, Brauser, Investor 1 and Stetson, in his article, O'Rourke knowingly and falsely claimed that '[t]he author has no business relationship with [MabVax].'  He also knowingly and falsely claimed that he was 'not receiving compensation for [writing the article].'" *Id.* ¶ 186.

99.    Accordingly, "[a]nticipating the release of O'Rourke's Seeking Alpha article, ATG and O'Rourke engaged in early trading of [MabVax] shares on April 8, 2015 with the intention of creating a false appearance of market interest in the stock.  That trading included at least one matched trade, with a Honig associate submitting the buy order and ATG submitting the sell order for the same price at 9:38 a.m.  The share price of [MabVax] opened that day at $3.14 and reached $3.73 in the minutes before the promotional article was released." *Id.* ¶ 187.

100.   The SEC alleged that "[t]he promotional campaign was successful." *Id.* ¶ 188.  In particular:

> The trading volume of [MabVax] shares rose almost 7500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, following the announcement of the Series E private placement involving Investor 1.  The trading volume further increased to 858,709 on April 9, 2015, the day after O'Rourke's article was published. [MabVax's] share price went from a closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015, increasing the company's market capitalization by $23 million. Honig and his affiliates, listed below, acting pursuant to their agreement to acquire, hold, vote and/or dispose of their [MabVax] shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of over $5.5 million.

*Id.*

101.    Then, "[i]n June 2015, when the market for [MabVax] shares had cooled from over $4 per share to closing prices hovering just above $2 per share, O'Rourke recruited Ford to publish another [MabVax] tout on Ford's blog." *Id.* ¶ 189.  Ford obliged, and on July 1, 2015, "published an article titled 'MabVax: Near-Term Catalysts Could Push Shares from $2 to over $5.'  The article contained materially false statements (as Honig, Brauser, Stetson and O'Rourke knew, or were reckless in not knowing) including that a licensing deal was imminent, when it was not, and that there were near-term therapy development events that could take the share price to $5, when in fact clinical trials were only in early stages.  As before, although Honig compensated Ford for writing the blog post, Ford did not disclose that he had been paid." *Id.*

102.    Once again, the SEC alleged that Honig's scheme was successful:

> Ford's article had the desired impact on the market: [MabVax] trading volume increased from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015. Likewise, [MabVax's] share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015.  Pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig and his affiliates sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million.

*Id.* ¶ 190.

### 2.    YesDTC Holdings, Inc.

103.    The allegations against Defendant Honig in the Honig *Action*, as well as the allegations in this case, are not one-off events.  For example, in 2014, Joseph Noel ("Noel") pleaded guilty to securities fraud in connection with a company named YesDTC Holdings, Inc. ("YesDTC").  As part of Noel's plea agreement, Noel stated that Defendant Honig, who arranged a reverse merger of the company:

> wanted to use promotions to drive up the price of YesDTC shares and then sell his shares.  Honig introduced me to David Zazoff who Honig said would promote YesDTC stock.  Honig said Zazoff was a "magic maker," who could make the price

of YesDTC stock rise through his services.  Honig made it clear that I should not ask questions about how Zazoff achieved his success.

* * *

**At Honig's direction I caused Sonoma Winston to send $45,000 of the proceeds to Zazoff as partial compensation for his promotion of YesDTC stock.**

In January 2011, Zazoff conducted a second promotion of YesDTC stock.  **At Honig's direction, I caused YesDTC to compensate Zazoff as partial compensation for his promotion of YesDTC stock**.

* * *

In July 2011, Zazoff conducted a third promotion of YesDTC stock. . . . **Honig instructed me to cause YesDTC to send compensation to Zazoff for the July 2011 promotion of its stock, but I refused**.[6]

104.    In December 2011, Defendant Honig filed a federal lawsuit again Noel to recover "$150,000" that "Plaintiff Honig lent Defendant Noel" on or about August 24, 2011.[7]

### 3.    Marathon Patent Group, Inc.

105.    This case is also not the only time that Defendants and their allies – including Honig, O'Rourke, Groussman, Stetson, Brauser, and others – have jointly engaged in pump-and-dump style scheme to transform a public company into a *cryptocurrency* company. Defendants engaged in a strikingly similar "blockchain" scheme as Riot with another NASDAQ-listed company called Marathon Patent Group, Inc.  Honig and his associates were among Marathon's biggest investors, but their familiar schemes did not benefit Marathon or its public shareholders.

106.    Originally named "Verve Ventures, Inc.," the company changed its name in December 2011 to "American Strategic Minerals Corporation."  During this time period, Honig, then a Director of Pershing Gold, invested in the company.  In January 2012, the company entered

---

[6] *United States v. Noel*, No. CR 14-264 VC, ECF No. 11, at 3-5 (N.D. Cal. Nov. 19, 2014) (emphases added).
[7] *See Honig v. Noel*, No. 3:11-cv-06706-JSW (N.D. Cal.) (ECF No.1).

into an agreement to "to acquire certain uranium exploration rights and properties held by Pershing." By 2013, the company had changed its name to "Marathon Patent" and stated that it was "an intellectual property ('IP') company that serves patent owners ranging from individual inventors to Fortune 500 corporations." Groussman and Stetson were Marathon's former CEO and COO, respectively, until resigning in 2012.

107. On November 2, 2017 (the exact same day that Riot announced its purchase of 1,200 bitcoin mining machines from Kairos), Marathon announced that it had agreed to acquire Global Bit Ventures Inc. ("GBI"), a company incorporated in Nevada in August 2017. A Uniform Commercial Code (UCC) filing shows that Defendant Stetson, through his entity Contrarian Investments LLC, had a security interest GBI. GBI's CEO, Jesse Sutton (the former CEO of Majesco Entertainment, which later morphed into PolarityTE) was later nominated by Honig to the Board of Directors of Riot.

108. On November 27, 2017, Marathon's auditor resigned. A November 29, 2017 prospectus offering stock to the public showed that O'Rourke, through an entity he solely controlled, Revere Investments LP, held 41% of Marathon's common stock.

109. In February 2018, Marathon announced that it had purchased "1,400 of Bitmain's Antminer S9 miners" that were "purchased by [GBV]."

110. In February 2018, Marathon announced that it "Expands Cryptocurrency Mining Operations by Opening of Second Facility in Canada" where it "anticipates putting its recently purchased 1,400 Bitmain's Antminer S9 miners ("Antminer S9s") into production."

111. On April 3, 2018, a merger agreement between Marathon and Global Bit Acquisition Corp. stated that a limited liability company managed by O'Rourke and registered at his home address, Azzura Holdings LLC, as holding 147,645 shares of "Series C Preferred" stock

and 14,764,421 shares of "Common Underlying Series C Preferred" stock in Global Bit Ventures, Inc.  The same agreement listed Northurst holding 147,645 shares of "Series C Preferred" stock and 14,764,421 shares of "Common Underlying Series C Preferred" stock – the exact same amount as O'Rourke's entity.  The same agreement stated that Brauser, through Grander, stood to receive 131,241 shares of Marathon common stock.  "Mike Ho" stood to receive 131,241 shares of Global Bit Ventures, Inc.  – the exact same amount as Brauser.  Molinksy stood to receive 78,745 shares. O'Braitis stood to receive 65,621 shares.  Erick Richardson (a 3.61% shareholder of Riot on September 25, 2018) stood to receive 65,621 shares – the exact same amount as O'Braitis.

112.    In March 2018, Marathon announced that its "Facility in Quebec Has Commenced Bitcoin Mining Operations."

113.    In June 2018, Marathon walked away from its acquisition of GBI.

114.    In July 2018, Marathon announced that it had "[r]eceive[d] Deficiency Letter from NASDAQ Related to Two Director Resignations . . . ."  Marathon's stock currently trades at less than $3.00 per share.

115.    According to an article in *Seeking Alpha* by Hindenburg Investment Research, "Marathon has multiple concerning parallels to Riot Blockchain, which recently engineered a similarly dubious pivot to the "blockchain."  The article noted that Marathon's "blockchain focus has come about through a series of rapid shifts that are eerily similar to the questionable moves" undertaken by Riot.  The article noted that "[b]oth Riot and Marathon seemingly paid above-market rates to acquire entities containing cryptomining equipment that could have been purchased directly."

### 4.    WPCS International Incorporated and BXT Trader

116.    Before Marathon, Honig, O'Rourke, and other associates also jointly engaged in pump-and-dump style scheme to transform another public company, WPCS International

Incorporation, into a cryptocurrency operation.  Before that, WPCS was a global engineering, communications, and infrastructure "with over 500 employees in 10 operations centers on three continents."  In 2012, Defendant Honig, through GRQ 401K, invested in WPCS.  On December 17, 2013, WPCS purchased BTX Trader, a cryptocurrency company, from Defendant O'Rourke. In January 2018, WPCS's changed its name to "DropCar, Inc." and is now a cloud-services-for-cars company whose stock trades on NASDAQ under the ticker "DCAR" for approximately $2.01 per share.

117.   In its February 16, 2016 article, CNBC described Honig's and O'Rourke's involvement with WPCS and confirmed that both Honig and O'Rourke "acknowledge[d] the investment":

> Riot is not O'Rourke and Honig's first cryptocurrency investment.
>
> In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.
>
> WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.
>
> At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.
>
> Just last month, the company changed its to DropCar after a merger and is now a cloud-services-for-cars company.
>
> O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. "I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."
>
> Honig acknowledges the investment.

118.   Honig's lawyer, Kesner, was a Director of WPCS in 2013 and 2014.

### 5. PolarityTE (f/k/a Majesco Entertainment)

119.   PolarityTE is a biotechnology company based in Salt Lake City, Utah.  PolarityTE was previously a company known as Majesco Entertainment, a company that designed video games for more than 25 years.  Then, in October 2015, Majesco Entertainment merged with another company called PolarityTE.  At that point, Defendant Stetson, Polarity's then-CFO, appointed Defendants Honig and Brauser as Co-Chairmen of the Board of Directors, and named Karr and Kaplan as Directors.

120.   On March 18, 2019, PolarityTE received a subpoena from the SEC, and its "shares tumble[d] after it says SEC is looking into possible manipulation," according to a CNBC article. The subpoena "asked about the company's lead product as well as communications and agreements between Polarity and its former CFO.

121.   In the wake of the SEC's charges against Stetson, PolarityTE immediately terminated Stetson, according to a press release by PolarityTE, stating that "the Company, management, and Board of Directors do not tolerate the behavior outlined in the complaint."[8]

### 6. Pershing Gold Corp.

122.   Pershing Gold is an emerging gold producer whose primary asset is the Relief Canyon Mine in Pershing County, Nevada.  The company is listed on the NASDAQ Global Market and the Toronto Stock Exchange under the symbol PGLC.  Defendant Honig was Chairman of Pershing Gold until February 9, 2012, when he resigned but remained a Director.  As of September 19, 2018, Defendant Honig owned approximately 38% of the common stock of Pershing Gold,

---

[8] *See* PolarityTE, Inc. Issues Statement Regarding Mr. John Stetson and his Termination from the Company, https://www.prnewswire.com/news-releases/polarityte-inc-issues-statement-regarding-mr-john-stetson-and-his-termination-from-the-company-300709106.html

according to a Schedule 13S.  Karr, an investor in Riot discussed below, was also a Director of Pershing Gold and owned 33% of its common stock as of August 31, 2018.

123.    As of August 31, 2018, Defendants O'Rourke, Stetson, and Groussman – along with Jonathan Honig, Molinsky, and Riot shareholder Erick Richardson – were all shareholders of Pershing Gold seeking to sell their shares in an offering pursuant to a Prospectus.

124.    On December 13, 2017, Hindenburg Research published an article stating that "the company's key asset, Relief Canyon Mine, was purchased from a hedge fund whose executives, including Mark Nordlicht, were federal indicted for operating 'like a Ponzi Scheme,' according to prosecutors."

125.    On September 7, 2018, *Seeking Alpha* reported that "Thinly traded nano cap Pershing Gold (PGLC -14.7%) slumps on almost an 8x surge in volume in reaction to the SEC's stock promotion charges against majority investors Phillip Frost and Barry Honig."

126.    According to a September 10, 2018 press release by Pershing Gold, released in response to the SEC's announcement "that it has commenced a legal action against Honig and various other parties who are alleged to have violated federal securities laws," Defendant Honig was a Director of Pershing Gold until he "resigned from the Company's Board of Directors in August 2018."

### 7.    MUNDOmedia Ltd.

127.    MUNDOmedia is a marketing company based in Toronto, Ontario, Canada founded by its CEO, Jason Theofilos.  On September 2, 2016, MUNDOmedia announced that a Theofilos had "led a buyout of 100% of the outstanding equity of [MUNDOmedia]" and that "Barry Honig is among the notable private equity investors that participated."  On July 28, 2017, Private Capital Journal reported that MUNDOmedia had "withdrawn its proposed initial public offering" that "would have consisted of $30 million treasury offering" involving "selling

shareholders" that included "Mansfield International Trade Ltd. (David Baazov/Ahaka Capital), Four Kids Investment Fund LLC, Stetson Capital Management LLC, ATG Capital LLC, Melechdavid Inc., Barry Honig, John O'Rourke and Jonathan Honig."

**B.     In 2016, Defendants Target Venaxis, Riot's Predecessor, Using Their Typical Playbook**

128.     As noted above, Riot was once called "Venaxis."  Venaxis was a medical products company whose executives, Board, and employees sought to develop a blood test for determining which patients suffering from abdominal pain were less likely to be suffering from acute appendicitis than from other ailment.

129.     In early 2015, the FDA denied approval for Venaxis's developmental blood test, and Venaxis, without a marketable product, found itself facing delisting from the NASDAQ because its share price had fallen below the exchange's minimum.

130.     Venaxis still had plenty of cash, however, having raised $20 million in a stock offering the previous year.  Therefore, in March 2016, Venaxis executed a 1-for-8 reverse stock split.  That reduced its outstanding shares to less than 4 million and lifted its stock price well above $1 a share — enough for Venaxis to keep its listing on the NASDAQ.  Shortly thereafter, Honig and his associates began buying stock in Venaxis.

131.     On September 12, 2016, Venaxis acquired BiOptix Diagnostics, Inc., and changed its name to "Bioptix."

132.     Displeased with this acquisition, Defendants Honig and DeFrancesco both wrote letters to then-CEO Lundy, touting their combined 16.2% stake in the Company.  Honig also spoke several times on the telephone with members of Venaxis's then-existing Board of Directors.  During these telephone conversations, Mr. Honig implied that he had control of 40% of the

Venaxis's shares through his stock ownership and the stock ownership of Mr. Honig's friends and relatives, according to a former Venaxis Board member present during the conversations.

133.    Also on September 13, 2016, Honig attempt to nominate his own slate of new directors of Bioptix, including Defendants O'Rourke, Beeghley, and Stetson, and several other of Honig's associates.

134.    In his September 13, 2016 letter to then-CEO Lundy, Honig wrote that Venaxis was "wast[ing] precious resources with no clear direction or strategy . . . while board fees and management salaries continue to be paid:":

> Dear Mr. Lundy,
>
> **As Venaxis' largest shareholder, it has become increasingly clear to me that changes must be made to <u>protect shareholders' interests</u> and attempt to <u>create value</u> from the company's assets.** Venaxis' management and board of directors have failed in this regard. The current management and board own a nominal amount of equity in aggregate, and as a result they are not aligned with the company's shareholders.
>
> The first change that needs to be made is to immediately reconstitute Venaxis' board . . . .
>
> **Venaxis' board has continued allowing the company to waste precious resources with no clear direction or strategy . . . .**
>
> **Meanwhile, Venaxis' cash continues to dwindle while board fees and management salaries continue to be paid . . . .**
>
> Shareholders cannot continue to wait around with question marks and a board that has proven to be distracted and ineffective.
>
> In the essence of preserving some of Venaxis' cash for its rightful owners, the shareholders, we are also asking the shareholders to authorize a special dividend of $7,500,000 as a return of capital to the shareholders . . . .
>
> The cash dividend returns immediate value to shareholders and diverts a portion of Venaxis ' assets away from board discretion, who only have managed to deplete the cash available for shareholders through failed strategies, while entrenching their positions with the Company instead of maximizing shareholder value.
>
> My preference is working together with you on these courses of action to effectuate the proposals immediately with your support rather than going through the steps of

voting to remove your board that we have today initiated through a special meeting. **I believe working together we can most effectively <u>protect and grow</u> <u>shareholders' interests</u>.** I hope that you agree.

Sincerely yours,

/s/ Barry Honig

135.    In late 2016, Defendant Honig waged a proxy fight for control of Bioptix, demanding the removal of five of Bioptix's six directors and the payment of a $7.5 million special dividend.  Defendant Honig offered five names to fill the board vacancies, including Defendants O'Rourke and Stetson.

136.    To "protect and grow shareholders' interests," Honig offered an alternative.  In early discussions with Venaxis's Board of Directors, Honig raised the possibility of turning Venaxis into a marijuana-related company, according to an individual present at the time.

137.    Defendant Honig then filed a lawsuit in state court in Colorado, seeking to force a special meeting of shareholders that would include a vote on the proposed changes.  Bioptix sought to placate Defendant Honig by appointing one of his allies – Defendant Beeghley – to its board of directors. When Venaxis's then-existing Board of Directors were considering Beeghley as a nominee for election to the Board, Beeghley told them that he did not know Honig, according to an individual present at the time.

138.    Defendant Honig and DeFrancesco continued acquiring shares and held nearly 23 percent of Bioptix's stock in January 2017.  Shortly thereafter, three of Bioptix's board members resigned, on the basis that Defendant Honig was likely to prevail in his legal fight and that mounting a defense would waste corporate recourses.  Then, in March 2017, a longtime Bioptix director stepped down, and Defendant Honig's group found itself with a majority of the seats on the board and control of the company.

139.    Finally, Honig and his associates had obtained control over Riot.   Using that control, Beeghley became CEO of Bioptix and O'Rourke joining the company's Board.

140.    Once Defendant Honig and his allies took over, Bioptix raised an additional $7 million through two private placements.   Defendant Honig, his business partners, and other associates bought nearly all of the stock, warrants, and convertible notes sold in those placements, which were priced at a 30 percent discount to the market.   The financing transactions were completed on March 16, 2017 (the "March 2017 Placements").

141.    Defendant Honig bought at least $1.75 million of the notes.   The shares underlying those notes and warrants, plus his original open-market stock purchases, gave Defendant Honig the equivalent of a 20 percent stake in Bioptix on a fully diluted basis.

142.    Thereafter, in April 2017, Bioptix's CEO resigned and was replaced by Defendant Beeghley.   That same month, Bioptix filed a registration statement covering the resale of 5.6 million shares.   It covered all 900,000 shares sold in the previous month's placement, plus 1.9 million shares underlying the convertible notes and 2.8 million shares underlying the warrants. The filing listed Bioptix's two top shareholders as Defendant Honig and Titan, a fund managed by Defendant Honig's brother, Jonathan Honig.

143.    According to the filing, Defendant Honig offered to sell just over 1.4 million shares, all of them underlying notes or warrants from the March 2017 Placements.   Titan offered to sell 1.6 million shares, also linked to the notes and warrants.   The registration statement also reported that Defendant Honig would hold 504,000 shares after those sales.   That number equaled his original open-market purchases during the proxy fight.

144.    The registration statement listed Groussman, an ally of Defendant Honig who the SEC would later charge for engaging in pump-and-dump schemes, as controlling 500,000 shares

– half in common stock and half in warrants.  Groussman's share holdings included 340,000 shares and warrants owned by his company, Melechdavid, Inc., another of the defendants in the *Honig* Action.  Groussman's other 160,000 shares and warrants were held by two accounts benefitting Groussman's children.  Groussman offered to sell all 500,000 shares.

145.    The filing also listed one of Stetson's companies, Stetson Capital Management LLC, as holding 413,517 Bioptix shares.  It offered to sell 406,017 shares, nearly of all of them underlying notes and warrants from the March 2017 placement.

146.    Based on the table in the registration statement, Defendant Honig, Titan, Groussman, and Stetson controlled slightly over 4.4 million shares of common stock, which amounted to more than 40 percent of the company, on a fully diluted basis.  In sum, Defendant Honig and the others were offering 4 million of their shares for resale.

147.    The other selling shareholders included Aifos, JAD, and James.

148.    In April 2017, Defendant Honig belatedly filed a belated Form 13D in which he reported that he had purchased $2.25 million of the $4.75 million in convertible notes sold in March 2017.  Defendant Honig amended that filing the next day, indicating he purchased only $1.75 million.

149.    Registration statements also show that $500,000 in notes were acquired by Karr, Theofilos, James, and three other of Defendant Honig's allies, who also were listed as selling shareholders.

150.    Molinsky, a former stockbroker at D.H. Blair & Co. who was barred from the industry in 2000 after pleading guilty to criminal charges related to market manipulation and fraudulent sales practices, was one such associate listed on the registration statement.  Molinsky

has been an investor in numerous Honig-backed companies, including PolarityTE, Pershing Gold, and Vapor Corp.

151.    Policy No. 2013-17 purchased $500,000 in convertible notes, owning roughly 40,000 shares underlying the notes, and 40,000 shares underlying warrants.  It offered all 80,000 for resale.  Bhansali, the co-founder of EST and former director of PolarityTE, had investment control over the securities held in the insurance policy's name.  EST is the transfer agent for PolarityTE.  EST acted as transfer agent for Riot when the Bioptix paid a special dividend in 2017.

152.    Financial statements that EST filed with the SEC show that it has received financing from entities connected to Kesner, who was securities counsel for Riot and PolarityTE, as well as BioZone and Mabvax, two of the companies at the center of the *Honig* Action.  Kesner's former law firm, Sichenzia Ross Ference LLC, also represented the third company believed to be implicated in the pump-and-dump scheme in the *Honig* Action, MGT.  Kesner abruptly retired from that firm just before the SEC announced the charges against Defendant Honig's group.  Bhansali also was an employee of Kesner's previous law firm.

153.    Shortly before changing its name, Bioptix filed amended versions of its registration statement in July, August, and September of 2017.  The number of shares listed for Defendant Honig remained unchanged, as did those for most other selling shareholders.  Between the filing of the first registration statement in May 2017 and the filing of the fourth one in September 2017, Bioptix's average daily trading volume was well below 50,000 shares, so the ability to sell large amounts of shares was limited.

C.    **Defendants Cause Bioptix to Register and Sell Shares of Bioptix (and Later Riot) Through False and Misleading Securities Registration Statements (Form S-3)**

154.    Beginning in April 2017, Defendants caused Riot to file multiple false and misleading securities registration statements on Form S-3 in order to sell millions of shares of Riot

common stock to unsuspecting retail investors.  For example, on September 25, 2017, Bioptix filed an S-3 Registration Statement (the "September 25 S-3") with the SEC disclosing that certain "selling stockholders" intend to register and potentially sell or dispose of some or all of their common stock in Bioptix.  The September 25 S-3 provided certain indemnity rights to the selling stockholders under the federal securities laws and disclosed to shareholders that "none" of the selling stockholders had a "material relationship" with "us," (i.e., the Company or its board of directors) aside from their investment in Bioptix.  The list of selling stockholders, along with their holdings as reported in the September 25 S-3 is as follows:

| Name of Selling Stockholder | Shares of Common Stock Offered in this Offering |
|---|---|
| Acquisition Group Limited | 200,000 (1) |
| Northurst Inc. | 800,000 (2) |
| Erick Richardson | 200,000 (3) |
| Melechdavid Inc. | 340,000 (4) |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) |
| Barry Honig | 402,050 (8) |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 1,005,124 (11) |
| Titan Multi-Strategy Fund I, Ltd. | 1,688,198 (13) |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,205 (14) |
| Robert R. O'Braitis | 80,410 (15) |
| Stockwire Research Group, Inc. | 40,205 (16) |
| Aifos Capital LLC | 120,615 (17) |
| Stetson Capital Management, LLC | 402,050 (19) |
| JAD Capital Inc. | 80,410 (20) |
| Richard Molinsky | 40,205 (22) |
| Alan Honig | 20,000 (23) |

155.    Significantly, nearly every shareholder listed above in fact *had* a material relationship with Defendant O'Rourke (then a Bioptix board member), Defendant Beeghley (then CEO), and/or Bioptix.  By way of example, Defendant Honig, who also controlled the entities GRQ, and through his brother Jonathan Honig, Titan Multi-Strategy Fund I, Ltd., had numerous previous co-investments with O'Rourke.

156.    Additionally, according to the SEC Complaint, Defendants Honig and O'Rourke shared an office (along with other selling stockholders) during the Class Period.  This unusual connection between a company insider and an outside large shareholder was first made public when CNBC visited Honig's office on February 16, 2018 only to find O'Rourke, who promptly closed the door.  Not to mention, Honig admitted that he and O'Rourke shared an office.  Not surprisingly, the fact that Honig and O'Rourke shared an office was not publicly disclosed until the CNBC story was published.  That same day, Riot's stock dropped by approximately 33.4%.

157.    As for Defendant Honig's ties to the Company, at the time the September 25 Form S-3 was filed Honig was both as an advisor to Bioptix and as an investor in Coinsquare, a company in which Bioptix had been considering an investment since August 2017.  On October 2, 2017, which was only one week after the September 25 S-3 was filed, several of the selling stockholders, including Honig, signed a shareholder agreement *with Bioptix* that "govern[ed] their relationship as shareholders of [Coinsquare] and to set out the manner in which the Company and its business will be conducted and to make certain provision herein for the continuing harmonious and advantageous operation of the Company."  The following chart lists the selling stockholders who were also shareholders in Coinsquare along with share allotments:

| Name | Issued Share Capital |
| --- | --- |
| Virgile Rostand | 10,000,000 Common Shares |
| Cole Diamond | 2,500,000 Common Shares |

| | |
|---|---|
| Michael Diamond | 2,765,168 Common Shares |
| Robert Furse | 375,092 Common Shares |
| Jazse Holdings Inc. | 265,168 Common Shares |
| Tread Lightly, LLC | 265,168 Common Shares |
| TWG Startup Investment 2 Corp. | 300,018 Common Shares |
| Bioptix Inc | 2,249,985 Common Shares |
| 2330573 Ontario Inc | 918,745 Common Shares |
| Jeff Cordeiro | 11,250 Common Shares |
| Peter Simeon | 15,000 Common Shares |
| Eduardo Vivas | 149,999 Common Shares |
| Argyle LLC | 149,999 Common Shares |
| Eric So | 93,749 Common Shares |
| Ross Levinsohn | 37,500 Common Shares |
| Sean Lai | 11,250 Common Shares |
| Michael Brauser | 112,499 Common Shares |
| Barry Honig | 112,499 Common Shares |
| GRQ Consultants Inc Roth 401K FBO Barry Honig | 75,000 Common Shares |
| Erica and Mark Groussman Foundation | 37,500 Common Shares |
| Titan Multi-Strategy Fund I, Ltd. | 75,000 Common Shares |
| Stetson Capital Investments Inc. | 37,500 Common Shares |
| Kent Farrell | 37,500 Common Shares |

158.    Though Riot disclosed, two days later, through a Form 8-K filed with the SEC the *existence* of the Coinsquare shareholders' agreement,  it was not until May 25, 2018 – more than eight months after the agreement was signed – that Riot first disclosed that Honig and other of the selling shareholders referenced in the September 25 S-3 were also shareholders in Coinsquare.

**D.    Nine Days After the Filing the September 25 Form S-3, Bioptix Changes Its Name to "Riot Blockchain," and in the Weeks That Followed Announces a Series of Strategic Investments, Causing Riot's Share Price to Soar**

159.    On October 2, 2017, two days before announcing the Company's name-change to Riot Blockchain, Inc., Bioptix's board (which was controlled by Defendant Honig) approved a

42

dividend payout of more than $9.5 million.  Bioptix stated that the dividend would be payable on October 18, 2017, to shareholders of record on October 13, 2018.  Bioptix's stock increased by approximately 25 percent, from $6.44 to $8.09 per share, on a volume approximately four times the previous day's total.

160.    Defendant Honig took advantage of the price surge, selling 47,420 shares on October 4, 2017, at an average of $8.92 per share, collecting approximately $424,000.  Defendant Honig then sold an additional 21,400 shares on October 5 and October 6, 2017, for approximately $162,000.  A belated disclosure statement also shows that Defendant Honig sold 202,544 shares on October 9 and 10, 2017, for approximately $1.78 million.

161.    Defendant Honig then acquired more than 630,000 shares on October 11, 2017 – 128,988 through warrant exercises and 505,124 through the conversion of much of his preferred stock.  Defendant Honig's acquisitions were offset by his sale of 293,916 shares on October 11, 2017, and 41,600 shares on October 12, 2017.  The proceeds from those transactions totaled just under $3.3 million.  All told, a Form 13-D shows that Defendant Honig sold more than 600,000 shares in a ten-day period, collecting nearly $5.7 million.

162.    In the six weeks that followed the payment of the special dividend announced on October 2, 2017, and name change on October 4, 2017, the Company's stock price nearly tripled, as deals with two Bitcoin-related businesses in which Defendant Honig and his associates had undisclosed stakes attracted investors.  When Riot's stock hit $24 per share on the day after Thanksgiving 2017, the shares issued through the March 2017 Placements were worth more than $100 million.

163.    During this time period, with the Company's stock price having risen dramatically, Defendant Honig sold nearly all of his remaining Riot shares, collecting more than $17 million.

Defendant Honig, however, failed to report those sales promptly, as required under SEC rules for investors who own 5 percent or more of a company's stock.

164.    From October 2017 to January 2018, three of Defendant Honig's associates – his brother, Jonathan Honig, and longtime partners Groussman and Stetson – likely sold more than $20 million of Riot stock.  Riot's shares peaked at $46.20 per share in December 2017.

### ACTUAL AND POTENTIAL PROCEEDS OF HONIG GROUP'S RIOT BLOCKCHAIN SHARE SALES

|  | SHARES AT 10/2017 | SHARES AT 2/2018 | PROCEEDS AT $10 | PROCEEDS AT $15 | PROCEEDS AT $20 |
|---|---|---|---|---|---|
| Barry Honig | 1.65 million | 0 | $17.6 million (1) | NA | NA |
| Jonathan Honig | 1.45 million | 200,000 | $12.5 million | $18.7 million | $25 million |
| Mark Groussman | 400,000 | 0 | $4 million | $5.9 million | $8 million |
| John Stetson | 330,000 | 0 (2) | $3.3 million | $4.9 million | $6.6 million |
| Catherine DeFrancesco | 516,000 | 11,000 | $5 million | $7.6 million | $10.1 million |

(1)   Actual total from disclosed sales in Form 13D filing
(2)   Projection based on actions of others; no SEC disclosure

Note: Share totals at 2/18 do not include additional stock acquired through placements or acquisitions

165.    In late October of 2017, Riot adopted a new Code of Ethics and Business Conduct that included a detailed section on conflicts of interest.  The new code of ethics expressly stated that a conflict could exist if a director, officer, or employee "***lends to, borrows from, or has a material interest (equity or otherwise) in a competitor, supplier, or customer of the Company, or any entity or organization with which the Company does business or seeks to do business***." It added that any such person would require a waiver from the board.

### 1.    The Coinsquare Transaction

166.    On October 4, 2017 Bioptix announced via a Form 8-K filed with the SEC the Company's transformation to Riot.  Attached to the filing were Articles of Merger dated October 3, 2017 that under Nevada law allowed Bioptix to officially change its corporate name.  Signing

the Articles of Merger for Bioptix was Defendant Beegley; Defendant O'Rourke signed for Riot.

Also attached to the 8-K was a press release describing Bioptix's official pivot away from its prior

business into cryptocurrency and also touting the Company's Coinsquare transaction, which closed

two days earlier:

> As part of this focus [in cryptocurrency], the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.

167.    The following day, Riot filed its October 5, 2017 Investor Presentation through a

Form 8-K filed with the SEC.  Aside from providing an overview of cryptocurrencies and the

Company new strategic direction, Riot again touted the Company's Coinsquare investment stating

that "[Coinsquare] is experiencing explosive growth in a budding industry, already demonstrating

strong potential."   Again, as explained above, Riot made no effort in these or other public

announcements – which were arguably some of the more critical public filings for Riot

shareholders given that they disclose, for the first time, the Company's complete transformation

away from its prior business – that several large shareholders in Riot also participated in the

Coinsquare investment.

168.    With the ink hardly dry on the Coinsquare shareholders agreement, Riot quickly

announced another transaction with an alleged player in the cryptocurrency space.

### 2.    The Tess Transaction

169.    On October 17, 2017, Riot issued a press release announcing that it had acquired a

majority (52%) stake in Tess, which Riot described as a company "based in Toronto, Ontario" that

was "engaged in a blockchain-based payment service for wholesale telecom carriers."   Riot

reported that the Tess acquisition "reflects [Riot's] efforts to own or control companies who are

contributing to the development of the blockchain ecosystem."   Tess's CEO touted Tess's

"ambitious business plans around blockchain."  But like the Coinsquare investment, Riot's announcement failed to disclose that Tess and its founders (who had only recently created the company)[9] maintained ties to Riot and Kairos, another entity owned in part by Defendants Honig and Defranscesco and, as explained below, that Riot would invest in only two weeks later.

170.    Tess's legitimacy as a "blockchain" company is subject to question.  Tess's Chief Software Architect, Sorin Tanasescu, was concurrently a Director of an entity called Ingenium IT Compusoft ("Ingenium") and a Managing Director of a company called VoiceWay.  VoiceWay appears to have been associated with a Bitcoin phishing website.  Specifically, on a Bitcoin forum called BitcoinTalk, one user conveyed that Google was displaying advertisements for "mt-qox.com," a clever misspelling of the then-popular Mount Gox bitcoin trading website. That same user noted that the "mt-qox.com" website completely duplicated the real Mount Gox website.  The apparent imposter site was registered to Cristian Talle at the address 196 Judith Ave., Toronto, Canada, which appears to be a residence, based on a Google Maps search. That same address houses Tanasescu's other businesses including VoiceWay and Ingenium. In addition, Talle used a VoiceWay email address to register the mt-qox.com site. Reddit users also noticed the site and started a thread entitled "[SCAM] watch out for mt-qox.com."  The users reported the site to Mount Gox and Google. Google subsequently took action and blocked it as a phishing website, according to the thread. (Note that the VoiceWay website itself was also registered by an individual named Cristian Talle - under a Rogers Communications email address).

171.    Tess and Tanasescu also appear to have had undisclosed ties to the individuals who formed Kairos, and thus to Riot and its controlling investors.  On the same day (October 19, 2017) that Kairos was registered as a corporation in Nevada by its registered agent, Laxague Law, that

---

[9] The Tesspay.io website shows that it was initially registered on July 18, 2017.

same law firm also set up an entity called Ingenium Global, Inc., which has a unique name that is similar to an entity in which Sorin Tanasescu manages:  Ingenium IT Compusoft.  According to the Nevada Secretary of State's website, Ingenium Global, Inc. has the exact same officers and directors as Kairos (Michael Ho of Dubai, Bryan Pascual of Tampa, Florida, and Moses D. Silverman of Miami Beach, Florida) and registered the exact same "par share count" (40,000,000), "par share value" ($0.0001 per share) and "capital amount" ($40,000.00).

### 3.  The Kairos Transaction

172.  On November 2, 2017, Riot issued a press release announcing that it had acquired "1,200 Bitcoin Mining Machines . . . consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by industry leader Bitmain."  The next day, Riot filed a Form 8-K disclosing that the machines had been purchased through a "share exchange agreement . . . with Kairos Global Technology, Inc., a Nevada corporation."  Riot disclosed that it gave Kairos 1,750,001 shares of "Series B Convertible Preferred Stock."  Riot did not disclose, however, that (1) Kairos was in part owned by Defendants Honig and Defrancesco; and (2) Riot appeared to have vastly overpaid Kairos *more than seven times* the amount that Riot could have paid to acquire the same equipment directly from the original manufacturer, Bitmain.

173.  In disclosing Riot's transaction with Kairos, the Company did not disclose that Kairos was owned and controlled by Defendants Honig[10] and DeFrancesco.[11]  Indeed, it was not until April 17, 2018, that Riot disclosed that "[e]ach of Mr. Honig and Ms. DeFrancesco was a

---

[10] Honig belatedly disclosed his ownership of Kairos on April 18, 2018 in an amended SEC filing on Form 13D/A noting that on November 1, 2017, he had exchanged 151,210 shares of Kairos common stock for 151,210 shares of Riot Series B Preferred Shares.

[11] *See* Riot Blockchain, Inc., Annual Report (Form 10-Q) at 15 (Apr. 17, 2018) ("Two principal shareholders held 24.8% and 18.4%, respectively, of Prive, at the time of its acquisition by the Company.  These holders held 10.7% and 5.7%, respectively of Kairos at the time of Kairos acquisition by the Company in October 2017.").

shareholder of Kairos at the time of its acquisition by the Company, with Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned approximately 6.3% of Kairos."[12] Defendants Groussman and Brauser were also reportedly owners of Kairos.[13] Kairos's registered agent in Nevada, Laxague Law, also filed the Statements of Beneficial Ownership of Bioptix stock on behalf of Catherine DeFrancesco.

174.    Further, two of Kairos's original officers and directors, Michael Ho and Moses David Silverman, also were shareholders of Global Bit Ventures. The two, were to receive 131,241 and 98,431 Marathon shares, respectively, from the Global Bit Ventures merger, according to filings by Marathon.[14] Silverman was also an investor in Polarity, and is a former director of Therapix Biosciences Ltd. Defendant Stetson disclosed in an SEC filing in April 2018 that he held a 5.9 percent stake in the company. Groussman also serves on that company's board.

175.    According to Riot's January 5, 2018 Form S-3, on November 1, 2017 Riot paid $12,162,500 in stock and $1,000,000 in future royalties[15] for 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by Bitmain:

> On November 1, 2017, we acquired 100% of Kairos Global Technology, Inc. ("Kairos") in consideration for the issuance of 1,750,001 shares of our Series B Convertible Preferred Stock, which are convertible into an aggregate of 1,750,001 shares of our Common Stock, which we issued to the shareholders of Kairos. Kairos is the owner of certain new computer equipment and other assets used for the mining of cryptocurrency, specifically servers consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by Bitmain. Certain of the shareholders of

---

[12] *Id.*

[13] *See* http://sharesleuth.com/investigations/2018/07/cool-mara-riot-the-big-money-bitcoin-biotech-daisy-chain.

[14] *See* http://sharesleuth.com/investigations/2018/07/cool-mara-riot-the-big-money-bitcoin-biotech-daisy-chain.

[15] Riot's stock price was $6.95 on November 1st. Riot purchased this mining equipment from Kairos for 1,750,001 shares of Riot stock and also $1,000,000 in future royalties to "Certain of the shareholders of Kairos." Thus, Riot paid $12,162,500 worth of Riot stock and $1,000,000 in cash for the equipment.

Kairos also received a royalty to be paid from cash flow generated from operations, which shall entitle such shareholders to receive 40% of the gross profits generated on a monthly basis until they have received a total of $1,000,000, at which point the royalty is extinguished.

176.    Kairos paid exactly $2,089,679 for this mining equipment.[16]  However, Riot could have easily purchased this same equipment online from Bitmain.[17]  On October 29, 2017, a Bitmain Antminer S9 could be purchased for $1,265 and a Bitmain Antminer L3 could be purchased for $2,040.[18]  Below is an image of the website from which Riot could have purchased this equipment:



---

[16] On January 5, 2018, Riot belatedly disclosed Kairos's "financial statements . . . for the period from [Kairos's] inception (October 19, 2017) to November 3, 2017."  Riot Amended Current Report (Form 8-K/A) (Jan. 5, 2018), *available at* https://ir.riotblockchain.com/sec-filings-email/content/0001079973-18-000009/ex99x1.htm (listing "Equipment" of $"2,089,679").

[17] *See* https://www.bitmain.com.

[18] This can be verified by typing "https://shop.bitmain.com" into www.archive.org and viewing Bitmain's website as of October 29, 2017.

177.    Thus for Riot to purchase 700 Antminer S9s (700 * $1,415) and 500 Antminer L3s (500 * $1,712) would have cost Riot $1,846,500, slightly less than Kairos paid.  Instead, Riot paid Kairos and Honig's associates more than $13 million for this equipment worth less than $2 million.

**E.    October 27, 2017 Riot Disseminates an "Updated" Investor Presentation**

178.    On October 27, 2017, the Company filed with the SEC a Form 8-K with an updated Investor Presentation attached.  The updated Investor Presentation stated that the value of the cryptocurrency market "has increased from $17.7 billion to over $170 billion in 2017" — a figure $20 billion higher than the figure presented in the Company's October 5, 2017 Investor Presentation.  In addition to providing information concerning the Company's recent investments in Coinsquare and Tess, the updated Investor Presentation also stated:

- the Company would provide "***a gateway to blockchain***" as "one of the only Nasdaq listed companies with this focus."

- "***Riot Blockchain intends to gain exposure to the blockchain ecosystem through targeted investments in the sector, with a primary focus on the Bitcoin and Ethereum blockchains***."

- "***Our investment strategy will consist of identifying unique projects which decentralize markets; combining real world applications with an active development team, strong fundamental, and large addressable markets***."

- "Moving forward, ***Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem, with a particular focus on the Bitcoin and Ethereum blockchains***."

- that Riot was a "first mover" as a "***NASDAQ listed pure play Blockchain company***."

- "***At Riot Blockchain Inc. we leverage our expertise, and network, to build and support blockchain technology companies.  We provide investment exposure to the rapidly growing blockchain ecosystem***."

- "***Riot Blockchain has made a strategic investment in Coinsquare.  This investment into a leading Canadian digital currency exchange is indicative of other Riot Blockchain will pursue, including possible acquisitions of businesses touching the blockchain ecosystem***."

- "*The company is experiencing steady growth in a budding industry*."

**F.    Defendant Honig's Brother, Jonathon Honig, and Defendant Groussman Attempt to Dispel Any Notion that Their Ownership in Riot Is Part of a Control Group**

179.    Soon after Bioptix's announcement that it had changed its name to Riot and was transitioning into a cryptocurrency business, on October 11, 2017, Jonathon Honig, who is the brother Defendant Honig, filed a Form 13G with the SEC disclosing beneficial ownership of 9.5% of Riot's common stock, not including 808,198 shares of common stock that he controlled and that were issuable upon the conversion of Series A Preferred A stock.  Notably, the 13-G specifically disclaimed Jonathon Honig's intent to influence or control Riot or that he was otherwise acting "in connection with or as a participant in" others' attempt to influence control over Riot:

> By signing below I certify that, to the best of my knowledge and belief, *the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect*.

180.    The same statement appeared two days later in a Form 13G signed by Defendant Groussman wherein he disclosed beneficial ownership of 5.93% of Riot common stock. Groussman, like Jonathon Honig, maintained a close financial relationship with Defendant Honig. Public records indicate that Honig is the lender on Groussman's $700,000 mortgage.  Addtionally, Groussman has a long history of investing with Defendant Honig.

**G.    On November 6, 2017, Riot "Names John O'Rourke as Chairman and CEO" and Announces Another Strategic Investment**

181.    On November 3, 2017, Riot's CEO, Defendant Beeghley, stepped down.  He was replaced by Defendant O'Rourke, who was given an annual salary of $300,000, plus 344,000

shares of restricted stock and 100,000 options exercisable at $10 each.  Defendant O'Rourke also was elevated to Chairman of the Board.

### H.     Riot Announces that It More than Tripled Its Investment in Coinsquare

182.    On December 4, 2017, Riot issued a press release that was filed on a Form 8-K touting Riot's "milestone" investment in Coinsqaure.  The press release stated in relevant part:

### Riot Blockchain's Coinsquare Receives Milestone Investment

*Coinsquare closes CAD $10.5 million investment from a global asset manager at a CAD $110.5 million Post-Money Valuation*

CASTLE ROCK, Colo., Dec. 4th, 2017 — Riot Blockchain, Inc. (Nasdaq: RIOT) (the "Company") today announced that one of its strategic portfolio holdings, goNumerical Ltd (dba "Coinsquare"), has closed a CAD $10.5 million investment at a CAD $110.5 million post-money valuation.  A prominent global asset manager with over a trillion dollars under management led the round with a CAD $10 million investment.  goNumerical operates Coinsquare, a leading Canadian digital currency exchange.  ***The new valuation for Coinsquare is over 3x the valuation from Riot's investment in September, 2017.***

Coinsquare has reported profitable operations and has grown over 300% in several different financial metrics since Riot's investment in September.  Although competitor information is not widely available, Riot believes Coinsquare is one of the largest, if not the largest, Canadian digital currency exchange.

"We are thrilled with this latest sign of confidence in Coinsquare, the digital currency market, and the important role Coinsquare is playing in growing this market in Canada," commented John O'Rourke, Chairman and Chief Executive Officer of Riot Blockchain. "Coinsquare was our first strategic investment and is well positioned to continue executing on their lofty ambitions and vision of their CEO, and Riot advisor, Cole Diamond."

### I.     Riot's Board of Directors Issues A Proxy Statement That Further Enables The Honig Group To Conceal The Fraudulent Scheme

183.    On December 12, 2017, Riot filed its Annual Definitive Proxy Statement under Schedule 14A (the "2017 Proxy") with the SEC.  The 2017 Proxy announced that the Company's Annual Meeting would take place on December 28, 2017 and that Riot shareholders were invited to attend and encouraged to vote on (1) the re-election of the current slate of directors, including

Defendants O'Rourke, Kaplan, So, and Les; (2) the ratification of a change in Riot's auditor; and (3) matters pertaining to executive compensation.

184.    Rather than provide Riot shareholders with the information necessary to make informed vote, however, the 2017 Proxy falsely represents that

> none of the directors or named executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its common stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company.

185.    In other words, the 2017 Proxy statement, which was likely approved by Defendants O'Rourke, Kaplan, So, and Les states that – notwithstanding the various related party transactions taking place in the months leading up to this filing, including the Coinsquare, Tess, and Kairos investments, for example – "none" of the directors, officers, or 5% shareholders "has any material interest, direct or indirect, in any transaction, or in any proposed transaction."  This ignores of course that Honig and various members of the Honig Group maintained financial ties to each of these transactions and that two Riot directors, Defendants Kaplan and So, were themselves investors in Coinsquare – investments that (allegedly) tripled in value in the previous two months.  These are clear "direct" financial interests that should have been timely disclosed to Riot shareholders.

**J.    Riot Announces a New Transaction Related to Its Investment in Tess:  Riot's "Decision to Take the Company Public" in a Merger**

186.    On December 11, 2017, Riot issued a press release announcing that Tess had signed a "letter of intent" to merge with Cresval Capital Corp. ("Cresval"), which Riot emphasized was a "Publicly Traded" company.  The press release quoted Tess's CEO, Jeff Mason:  ***The decision to take the company public provides us access to traditional capital markets as we continue developing our blockchain technology solution. This environment will also foster transparency***

*and accountability moving forward, providing confidence to investors and prospective customers alike."*   Nothing could be further from the truth.   In reality, Cresval was an undercapitalized, money-losing mineral exploration company that according to its 2017 annual report, was experiencing "material uncertainties may cast significant doubt on the Company`s ability to continue as a going concern."

187.   Specifically, Cresval was a mineral exploration company (i.e., gold and copper mining, not bitcoin "mining") that as of 2017 had merely CAD 181,687 in assets and a "Shareholders Deficiency" or "Deficit" of CAD 2,2551,185.   In 2016 and 2017, Cresval operated at losses of CAD 111,153 and CAD 152,010, respectively.   On December 22, 2017, no shares of Cresval had publicly traded since November 1, 2017, when on that one day, 900 shares changed hands at a price of CAD 0.06 per share in a transaction valued at CAD 54.00.   Pictures from Cresval's corporate website appear to depict the company's operations:[19]



---

[19] See https://www.cresval.com/properties/photo-gallery.

188.    It appears that Riot chose to merge Tess with Cresval not because of Cresval's assets, profitability, experience in cryptocurrency, or access to liquidity and the public markets, but instead because Defendant Honig, acting as an intermediary, introduced Defendant O'Rourke to Lee Ann Wolfin, Cresval's President. Ms. Wolfin's father, Arthur Wolfin, was Cresval's founder and chief executive. Mr. Wolfin also headed Levon, another mineral exploration company in which Honig had a "former position on board of directors." Levon did deals with other companies whose stockholders included Defendants Honig, O'Rourke, and Brauser. For example, Levon was "a former significant stockholder" of Pershing Gold Corp., a company in which Honig, O'Rourke, and Brauser were investors. Levon also did a reverse merger with SciVac Therapeutics Inc., which is now part of VBI Vaccines, in which Honig and Brauser were shareholders.

**K.    On December 19, 2017, Riot "Announces $37 Million Private Placement" – Defendants Honig and Defransco Take Part But Are Not Disclosed**

189.    On December 19, 2017, the Company issued a press release announcing that Riot had entered into private placement agreements with unnamed accredited investors to sell $37 million units of securities at a purchase price of $22.50 per unit. Each unit consisted of one share of the Company's common stock and a three year warrant to purchase one share of common stock at an exercise price of $40.00 per share. The December 19, 2017 press release stated that "[t]he $37 million in gross proceeds from the Investment will be used for the expansion of the Company's Bitcoin mining operations, strategic investments, and general working capital." The press release failed to disclose, however, that two large shareholders and members of the Honig Group – Defendants Honig and Defrancesco – were among the so-called "accredited investors" who were invited to participate in the private placement, or that Defendant Honig had invested $500,000 and Defendant Defrancesco had invested $360,000.

**L.    After Defendants O'Rourke and Honig Sold Most of Their Shares, Riot Fires Its Auditor and the Company's Stock Continues to Decline**

190.    On January 5, 2018,d Riot filed a Form 8-K with the SEC announcing that the Company had dismissed EisnerAmper LLP as its independent auditor and engaged MNP LLP.

191.    On January 9, 2018, *Seeking Alpha* published an article titled, "Riot Blockchain: This Crypto Clown Car Continues Hurtling Toward the Abyss."   The article highlighted the dismissal of Riot's auditor, noting that the Company had employed three different auditors over the course of a year.

192.    On January 31, 2018, Riot issued a press release announcing that the Company's 2017 Annual Meeting of Stockholders was being postponed for a second time, without announcing a new date and time for its annual meeting.  Riot also announced that it had received a notification from the NASDAQ that the Company had not held its annual meeting of shareholders within twelve months of the end of Riot's fiscal year-end, in accordance with NASDAQ's Listing Rules 5620(a) and 5810(c)(2)(G).

**M.    On February 16, 2018, a CNBC Expose Partially Reveals Honig's Close Ties to Riot and O'Rourke**

193.    On February 16, 2018, CNBC published an article titled "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket," reporting a slew of questionable practices and behavior at the Company.  The article stated:

> As bitcoin hit record highs in late December, a hot new stock was making news on a daily basis. Riot Blockchain's stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto.
>
> ***But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease.***
>
> That might sound somewhat like the type of newly minted blockchain company that has gained SEC attention.

*"Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain," SEC Chairman Jay Clayton said, speaking in generalities in recent testimony to Congress. The SEC declined to comment to CNBC about Riot Blockchain.*

The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.

That purchase and the company's name change aren't Riot's only questionable moves.

*A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in.*

\* \* \*

Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida. The resort is known as the "pink palace" and has luxury yachts lined up on its dock.

*But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for Feb. 1. It's not clear the company ever planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity.*

*Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.*

That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton. That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose office is a short drive from the hotel. He once owned more than 11 percent of the outstanding common stock, according to SEC filings.

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone. "It was an investment where I had a return. And I sold some shares. There's nothing wrong with doing that."

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

"Typically, Barry Honig invests his hard-earned money into a company, and he also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

A visit to the site now only reveals the text: "Under construction."

From the outside, Honig's office is nondescript. There does not appear to be any evidence of his company's existence on the building's directory or on the door of his office.

***When CNBC crew members walked into the office, they didn't find Honig, they found O'Rourke. That's the same O'Rourke who made headlines when — less than three months after the company changed names and business plans — he sold about $869,000 worth of shares, according to an SEC filing***. He told the crew he was there for a meeting with Honig and that we had just missed him.

O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed." Then, late the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.

He agreed to answer questions via email instead. One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.

***"I have my own office in a separate location," O'Rourke said in an email sent by his lawyer, Nick Morgan, a partner with Paul Hastings. "I do have a good relationship with Mr. Honig and we speak often."***

***"John O'Rourke does not work out of my office," Honig said. "John O'Rourke has his own office . . . at one time John O'Rourke had space in my office . . . we speak often."***

58

*Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information.*

*"You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or dialogue about what's appropriate for the company on a day to day basis or in the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP.*

*Despite Honig's website saying he gives advice on who should lead a company, Honig said he had nothing to do with O'Rourke becoming CEO.*

*"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.*

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

*"I see a company that has had a change of control of the board. I see a company that has had a change in business. I see a company that has had several dilutive issuances immediately following the change of the board and change of the business. And I see a stock that has gone zoom," he said. "And what I understand a significant amount of insider selling. So yes, these are red flags."*

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million. On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings. Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent. After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants. His purchase price ranged from $2.77 to $5.32 per share, according to the list of trades he provided to the SEC in 2017. Honig's

investment dropped below 5 percent, the threshold for SEC filing, on Nov. 28. At that point, the stock had already climbed above $20.

Honig did not disclose his dramatically reduced position in the stock until this week.

***But that may not be the true extent of Honig's selling. Buried deep in the footnotes of Riot filings, it's clear Honig also accumulated more than 700,000 new warrants that he could convert to stock at $3.56 per share and more than 700,000 promissory notes that he could convert to stock at $2.50 a share.***

***What about those warrants and promissory notes? It's not clear, as he never mentioned them in either 13D. But in another footnote from a recent Riot filing, there is no longer a mention of them.***

He declined to further clarify what happened to them.

"It's all disclosed in the public filings. And those are all the obligations I have," he said. "I'm very comfortable with what I had to do and what I was obligated to do. . . . I'm not going to talk about my personal trading history or my bank account."

***Birns questioned how Honig made his filings. "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant amount of stock. Or has the potential to own significant amount of stock in excess of what is reported on the 13D," he said.***

This is not the first time Honig has faced questions over his actions. In 2000, he was alleged to have committed stock manipulation. Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse.

"The answer's no," Honig said when asked if he still manipulates stocks.

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to SEC filings.

When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up.

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

*One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase. Kairos' main asset was $2 million of mining equipment. Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings*.

O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.

Kairos appears to have many links to Riot. The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada. Despite the many press releases, there has been no formal mining announcement.

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining. SEC filings are silent on mining activity.

As for professional poker players advising Riot? O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social media followers. He called them "thought leaders."

***Riot is not O'Rourke and Honig's first cryptocurrency investment.***

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. ***"I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."***

Honig acknowledges the investment.

The questions continue for Riot Blockchain.

On Tuesday, Riot filed to withdraw prior SEC filings.

"It is not the result of any government inquiry," O'Rourke said in an email. "It was just corporate clean up from our securities counsel."

As for the annual shareholders' meeting, "We did not have a quorum of shareholders required for a vote," O'Rourke said in the email from his lawyer. "We are also working on other corporate action items that would require shareholder approval and a shareholder meeting as well. We did not want to waste the time and expense of potentially having two shareholder meetings within a short period of time. Thus we adjourned the meetings, which is not an uncommon practice."

There is no new date for the shareholders' meeting.

***"You see companies adjourn meetings in a context of a contested election and the like,"*** Birns said. ***"I just don't think in this instance, there's any reason to adjourn their annual meeting."***

And as to O'Rourke selling stock in December?

He told CNBC in the email: "I sold less than 10 percent of my overall position to assist with covering tax obligations as a result of so-called phantom income tax from the vesting of restricted stock awards. It is common for Executives to sell stock to cover such tax obligations. I could have sold more stock in that window but chose to sell just 30,383 shares."

O'Rourke welcomes increased regulation and transparency for the cryptocurrency industry. "Unfortunately, as with many new hot sectors, it [blockchain] has attracted some bad actors trying to capitalize on the hype," he said. "Riot is all for increased transparency and properly imposed regulation."

***Honig would not disclose how much he made on his investment in Riot***, "I wasn't fortunate enough to do as well as you might think and people might speculate . . . I don't regret anything."

(Emphases added).

194.    On this news, the price per share of Riot stock at closing fell approximately ***33.4%***, or $5.74 per share, on heavy volume, from closing at $17.20 per share on February 15, 2018, to close at $11.46 per share on February 16, 2018, causing damage to Lead Plaintiff and the other members of the Class.

## N.    Also on February 16, 2018, Riot Announces Its Purchase of "3,800 Bitcoin Mining Machines" Without Disclosing that It Was Buying These Machines from an Entity Owned by Honig and DeFrancesco at Vastly Inflated Prices

195.    On Friday, February 16, 2018, at 4:54 p.m., the same day that Riot's stock price fell 33.4% in response to the above CNBC investigative report, Riot issued a Form 8-K disclosing that Riot's subsidiary Kairos had agreed to purchase "3,800 AntMiner S9s, all manufactured by industry leader Bitmain" from Prive for $11 million in cash and 1 million shares of Riot common stock, with 200,000 of the shares escrowed pending certain performance milestones.  In all, the consideration suggests a total transaction value at the time of the agreement of approximately $28.2 million or a price per machine of $7,421 ($2,895 in cash and $4,526 in stock) paid to Prive. However, as of January 13, 2018, Riot could have purchased these same machines directly from their manufacturer, Bitmain (and have them shipped fairly quickly) for only $2,320 each for a total of $8,816,000, suggesting that Riot overpaid for these machines by approximately $19 million.



196.   Riot's Form 8-K did not disclose that Prive was a related party that was owned and controlled by Defendants Honig, DeFrancesco, and other members of the Honig Group.  It would not be until November 19, 2018, that Riot would disclose that "[t]wo principal shareholders held 24.8% and 18.4%, respectively, of Prive, at the time of its acquisition by the Company" and that "[t]hese holders held 10.7% and 5.7%, respectively of Kairos at the time of Kairos acquisition by the Company in October 2017.[20]

197.   Furthermore, Prive's corporate registration in Florida confirms that Prive was incorporated on October 31, 2017, only two weeks after Kairos was incorporated in Nevada. Moreover, the individuals who incorporated Kairos and Ingenium Global Inc. in Nevada on October 19, 2017 – Michael Ho and Bryan Pascual – are the **same persons** who incorporated Prive in Florida on October 31, 2017.  Indeed, the same address that Bryan Pascual gave in registering

---

[20] Riot Blockchain, Inc., Quarterly Report (Form 10-Q) at 15 (Nov. 19, 2018).

as a Director of Kairos – 218 S. Audobon Ave, Tampa, Florida – is the address of Prive's "principal office."[21]

198.    While Riot issued a press release on September 15, 2018, touting its purchase of the 3,800 machines (without mentioning Privy by name), this same press release conveniently omitted anything about Riot's concurrent purchase of another 3,000 of those same machines from another party at a much lower price.  Indeed, in the same February 16 Form 8-K, Riot announced that it had purchased another "3,000 AntMiner S9s, all manufactured by industry leader Bitmain" from another company, Blockchain Mining Supply & Services Ltd. ("MBSS"), a corporation incorporated under the laws of the Province of Ontario ("BMSS") for $8,500,000 or only $2,833 per machine.  Thus, that Riot substantially overpaid for the 3,800 machines it purchased from Privy for $7,421 each is confirmed by the fact that it simultaneously purchased 3,000 of the same machines for $2,833 each from BMSS, which appears to have not been a related party.

**O.    On February 21, 2018, Riot Enters into a "Consulting Agreement" Through Which the Company Agrees to pay $4,000,000 to "Ingenium International LLC"**

199.    On February 21, 2018, Riot entered into a "Consulting Agreement" through which Riot agreed to pay $4,000,000 to "Ingenium International LLC" to for "consulting services . . . for a twelve-month period" involving "the installation and deployment of . . . cryptocurrency miners" purchased from Prive and BMSS, according to Riot's November 19, 2018 Form 10-Q.  Riot noted

---

[21] The address that Michael Ho gave as President, Secretary, and Treasurer of both Kairos and Ingenium Global Inc. – 5709 Cayan Tower in Dubai – is *different* from the address he gave to the State of Florida in registering Prive (218 S. Audobon Avenue, Tampa, Florida), which in turn is *also different* from Mr. Ho's address in Prive's Articles of Incorporation (1217 N. Horn Avenue, Los Angeles, California).  Thus, Mr. Ho appears to use at least three different addresses to incorporate businesses in different jurisdictions.

that the "controlling principals of Ingenium International LLC., are shareholders in the Company by virtue of the previous acquisitions of Kairos and Prive."

      **P.**      **On September 7, 2018, after an Investigation, the SEC Charges Defendants Honig, O'Rourke, Stetson, and Their Associates with Engaging in Three Other Pump-and-Dump Schemes Involving Companies Connected to Riot**

200.    On April 9, 2018, the SEC issued a subpoena pursuant to a formal order of investigation.  According to Riot, the SEC's "inquires include the proper asset classification, applicability of the Investment Company Act [of] 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency."

201.    On September 7, 2018, the SEC named Defendants O'Rourke and Honig, as well as several other individuals and entities, including Groussman, Stetson, and Dr. Philip Frost ("Frost"), Opko's CEO and Chairman, as defendants in a long-running microcap "pump-and-dump" scheme.  According to the SEC, the charges relate to the manipulation of the share price in three unidentified companies (believed to be BioZone, MGT, and Mabvax), which generated over $27 million from unlawful sales and left retail investors with "virtually worthless stock."

202.    One of the unifying themes of the SEC's fraud case is that the defendants functioned as a unit and that they exerted control over the companies and their management by virtue of their combined shareholdings and the infusions of cash they provided.

203.    In response to the filing of the *Honig* Action, Defendant O'Rourke resigned as CEO and Chairman.  The Company's stock price fell approximately ***24.2%***, or $1.38 per share, on heavy volume, from closing at $5.68 per share on September 6, 2018, to closing at $4.30 per share on September 7, 2018, damaging Lead Plaintiff and members of the Class.

## VII.   DEFENDANTS ENGAGED IN A MANIPULATIVE DEVICE, SCHEME, ARTIFICE, AND CONSPIRACY TO DEFRAUD RIOT'S PUBLIC SHAREDHOLDERS

204.   In committing the wrongful acts alleged herein, Defendants engaged in a manipulative device, scheme, artifice, and conspiracy to defraud Riot's public shareholders in violation of the federal securities laws.  Defendants have also pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  Defendants have also caused the Company to misrepresent and conceal the truth and further aided and abetted and assisted each other in violating the federal securities laws.

205.   The purpose and effect of Defendants' device, scheme, artifice, conspiracy, common enterprise, and common course of conduct was, among other things, to:  (i) deceive the investing public, including stockholders of Riot, as to the Company's operations, financial condition, and compliance policies; (ii) facilitate Defendants' illicit sales of millions of dollars of their Riot shares while in possession of material, nonpublic information; and (iii) enhance certain of Defendants' executive and directorial positions at Riot and the profits, power, and prestige that the several of the Defendants enjoyed as a result of holding these positions.

206.   Defendants accomplished their scheme, conspiracy, common enterprise, and common course of conduct by purposely misrepresenting and concealing (and causing the Company to misrepresent and conceal) material facts, failing to correct such misrepresentations, and violating the federal securities laws.  As shareholders, officers, and/or directors of Riot, each of the Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

207.   Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of

wrongdoing, each of the Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

208.    At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of Riot and was at all times acting within the course and scope of such agency.

## VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD[22]

209.    In connection with Defendants' efforts to defraud Riot's public shareholders during the Class Period as part of a fraudulent scheme or plan in violation of Rule 10b-5(a) and (c), Defendants also disseminated materially false and misleading statements, and otherwise violated an obligation to disclose material information in violations of Rule 10b-5(b).   Defendants' materially false and misleading statements and omissions concerned: (1) the numerous disavowed and undisclosed "material relationship[s]" among members of the Honig Group and various Company insiders, including Defendants O'Rourke, Beeghley, McGonegal, Kaplan and So, through which they exercised control and influence over the Company to accomplish their pump-and-dump scheme; (2) the Honig Group's and various Company insiders' influence over and participation in a series of related-party transactions – including multiple Form S-3 securities offerings by Riot, and Riot's investments in Coinsquare, Kairos, Tess, and Prive – that funneled funds raised away from Riot's public shareholders to the Honig Group; (3) the Company's resulting limited meaningful investments in legitimate cryptocurrency assets or operations and the

---

[22] In this section, statements that are ***bold and italicized*** are specifically alleged to be false and misleading.  Statements that are **only bold** are to indicate emphasis.  Statements that are neither bold nor italicized are provided for context.

absence of a legitimate cryptocurrency business plan; and (4) Defendants' undisclosed and coordinated accumulation and insider selling of Riot shares in furtherance of their pump-and-dump scheme.

### A.  April 20, 2017 – Securities Registration Statement (Form S-3/A)

210.  On April 20, 2017 Bioptix filed a Form S-3/A registering, for sale to the investing public, 5,657,161 shares of common to be sold by the following "Selling Stockholders":

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.63% | 200,000 (1) | 0 | * |
| Andrew Schwartzberg | 549,800 (2) | 9.99% | 900,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.63% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.10% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,860 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 596,400 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 598,100 (12) | 9.99% | 1,624,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.20% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,400 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |

\*   Less than 1%.
\*\*  Based on 4,903,971 shares of Common Stock outstanding as of April 14, 2017.

211.  The April 20, 2017 S-3/A was signed by Defendants Beeghley, McGonegal, O'Rourke, and Dai and stated that *"[n]one of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities."*

212.  The above statement in Bioptix's April 20, 2017 Form S-3/A was materially false and misleading when made because it states that "*none*" of the selling stockholders "*has had a material relationship*" with the Company when in fact, as explained herein, Defendant Honig and various members of the Honig Group maintained numerous financial ties to Defendant O'Rourke, a Bioptix Board member during this time,  Defendant Beegley, then Bioptix's CEO.

213.    Additionally, according to the allegations in the *Honig* Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson and Groussman.  This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, Florida, in February 2018 and instead found Defendant O'Rourke.  These and other personal and financial interests belie the statement that "none" of the selling stockholders in the April 20, 2017 S-3/A had a material relationship with the Company.

214.    Additionally, the April 20, 2017 S-3/A is materially false and misleading because it failed to disclose that virtually **all** of the "selling stockholders" were members of the Honig Group, had invested together in multiple previous public companies, and were engaged in a common scheme and conspiracy to artificially inflate Riot's stock at the expense of other would-be public shareholders.  Altogether, this group of Honig-associated stockholders accounted for at least 55% of Riot's common stock[23] (and likely more) without taking into count the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January 10, 2017.[24]

**B.    April 27, 2017 – Annual Report (Form 10-K/A)**

215.    On April 27, 2017, Bioptix filed an Amended Annual report under Form 10-K/A. In a section of the Annual Report entitled, "Certain Relationships and Related Transactions and Director Independence" the report stated:

> Except for the employment agreements previously entered into between the Company and certain of its named executive officers (as described in Item 11

---

[23] Specifically, the following April 20, 2017 Selling Stockholders (and their percentage of stock owned) were associates of Honig and members of the Honig Group:  Richardson (3.63%); Melechdavid (6.10%); Groussman (1.47% each in two UTMA funds for a total of 2.94%); Honig (9.99%); GRQ 401K (9.99%); Titan (9.99%); O'Braitis (1.48%); Stockwire (i.e., James) (0.75%); Aifos (i.e., Theofilos) (2.20%); Stetson Capital (i.e., Stetson) (4.99%); JAD (1.48%); Molinsky (1.80%), and Policy No. 2013-17 (i.e., Bhansali) (0.75%).

[24] *See* Riot Blockchain, Inc., Amended Annual Report (Form 10-K/A) at 52 (Jun 29, 2018).

above), since January 1, 2016, ***none of the directors or named executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its Common Stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company.***

216.    The above statement in Bioptix's April 27, 2017 Form 10-K/A was materially false and misleading when made because it states that "none" of the directors, officers, or any person owning 5% or more of the company's common stock has "***any material interest, direct or indirect, in any transaction, or in any proposed transaction***" when, in fact, as explained herein, Defendant Honig and various members of the Honig Group and Company insiders maintained numerous financial ties to Defendants O'Rourke, a Board member during this time, and Defendant Beegley, then Bioptix's CEO.

217.    Additionally, according to the allegations in the *Honig* Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson and Groussman.  This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke.  These and other personal and financial interests belie the statement in the April 27, 2017 10-K/A that "***none***" of the directors, officers, or any person owning 5% or more of the company's common stock has "***any material interest, direct or indirect, in any transaction, or in any proposed transaction.***"

218.    The April 27, 2017 10-K/A was signed by Defendants O'Rourke and McGonegal. Pursuant to §302 of SOX, and also covered by §§ 304 and 906 of SOX, Defendants O'Rourke and McGonegal certified that they had designed and evaluated effective internal and disclosure controls over financial reporting, which assured the reliability of financial reporting, and also that

Riot's financial statements fairly and accurately presented the financial condition of the Company.

Those SOX certifications stated as follows:

1.   I have reviewed this quarterly report on Form 10-K of Bioptix, Inc.;

2.   Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

(c)   *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)***:

    (a)   ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

    (b)   ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

219.   Defendant Beeghley's and McGonegal's SOX certifications in ¶ 218 were false and misleading because, as explained in ¶ 217, the statement that "***none***" of the directors, officers, or any person owning 5% or more of the company's common stock has "***any material interest, direct or indirect, in any transaction, or in any proposed transaction***" was an untrue statement that only served to advance Defendants' common scheme and conspiracy to artificially inflate Riot's stock at the expense of other would-be public shareholders.  Altogether, this group of Honig-associated stockholders accounted for at least 55% of Riot's common stock (and likely more) without taking into count the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January 10, 2017.

**C.   July 19, 2017 – Securities Registration Statement (Form S-3/A)**

220.   On July 19, 2017, Bioptix filed a Form S-3/A registering, for sale to the investing public, 5,657,161 shares of common to be sold by the following "Selling Stockholders":

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northurst Inc. | 554,100 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 595,600 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 592,400 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | 0.19% | 20,000 (23) | 0 | * |

\*   Less than 1%.
\*\* Based on 5,392,503 shares of Common Stock outstanding as of July 14, 2017.

221.    The July 19, 2017 S-3/A was signed by Defendants Beeghley, McGonegal, O'Rourke, Dai, and Kaplan and stated that **"[n]one of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities."**

222.    The above statement in Bioptix July 19, 2017 Form S-3/A was materially false and misleading when made because it states that "**none**" of the selling stockholders "**has had a material relationship**" with the Company when in fact, as explained herein, Defendant Honig and various members of the Honig Group maintained numerous financial ties to Defendant O'Rourke, a Bioptix Board member during this time, and Defendant Beegley, then Bioptix's CEO.

223.    Additionally, according to the allegations in the *Honig* Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson and Groussman.  This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at

his office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke. These and other personal and financial interests belie the statement that "none" of the selling stockholders in the July 19, 2017 S-3/A had a material relationship with the Company.

224.    Additionally, the July 19, 2017 S-3/A is materially false and misleading because it failed to disclose that virtually ***all*** of the "selling stockholders" were members of the Honig Group, had invested together in multiple previous public companies, and were engaged in a common scheme and conspiracy to artificially inflate Riot's stock at the expense of other would-be public shareholders. Altogether, this group of Honig-associated stockholders accounted for at least 55% of Riot's common stock[25] (and likely more) without taking into count the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January 10, 2017.

**D.    August 24, 2017 – Securities Registration Statement (Form S-3/A)**

225.    On August 24, 2017, Bioptix filed a Form S-3/A registering, for sale to the investing public, 5,657,161 shares of common to be sold by the following "Selling Stockholders":

---

[25] Specifically, the following July 19, 2017 Selling Stockholders (and their percentage of stock owned) were associates of Honig and members of the Honig Group:  Richardson (3.64%); Melechdavid (6.11%); Groussman (1.47% each in two UTMA funds for a total of 2.94%); Honig (9.99%); GRQ 401K (9.99%); Titan (9.99%); O'Braitis (1.48%); Stockwire (i.e., James) (0.75%); Aifos (i.e., Theofilos) (2.20%); Stetson Capital (i.e., Stetson) (4.99%); JAD (1.48%); Molinsky (1.80%); and Policy No. 2013-19 (i.e., Bhansali) (~0.7%).

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northurst Inc. | 555,400 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600 (10) | * | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 593,650 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | * | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | * | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | * | 20,000 (23) | 0 | * |

\* Less than 1%.
\*\* Based on 5,403,919 shares of Common Stock outstanding as of August 21, 2017.

226.   The August 24, 2017 S-3/A was signed by Defendants Beeghley, McGonegal, O'Rourke, Dai and Kaplan and stated that *"[n]one of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities."*

227.   The above statement in Bioptix's August 24, 2017 Form S-3/A was materially false and misleading when made because it states that "*none*" of the selling stockholders "*has had a material relationship*" with the Company when in fact, as explained herein, Defendant Honig and various members of the Honig Group maintained numerous financial ties to Defendant O'Rourke, a Bioptix Board member during this time, and Defendant Beegley, then Bioptix's CEO.

228.   Additionally, according to the allegations in the *Honig* Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson and Groussman.   This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at

this office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke.  These and other personal and financial interests belie the statement that "none" of the selling stockholders in the August 24, 2017 S-3/A had a material relationship with the Company.

229.   The August 24, 2017 S-3/A is also materially false and misleading because it failed to disclose that virtually **all** of the "selling stockholders" were members of the Honig Group, had invested together in multiple previous public companies, and were engaged in a common scheme and conspiracy to artificially inflate Riot's stock at the expense of other would-be public shareholders.  Altogether, this group of Honig-associated stockholders accounted for at least 55% of Riot's common stock[26] (and likely more) without taking into count the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January 10, 2017.

E.   **September 25, 2017 Securities Registration Statement (Form S-3/A)**

230.   On September 25, 2017 Bioptix filed a Form S-3/A registering, for sale to the investing public, 5,677,102 shares of common to be sold by the following "Selling Stockholders":

---

[26] Specifically, the following April 20, 2017 Selling Stockholders (and their percentage of stock owned) were associates of Honig and members of the Honig Group:  Eric Richardson (3.63%); Melechdavid, Inc. (6.10%); Mark Groussman (1.47% each in two UTMA funds for a total of 2.94%); Honig (9.99%); GRQ Consultants, Inc. Roth 401K FBO Barry Honig (9.99%); Titan Multi-Strategy Fund I, Ltd. (9.99%); Robert O'Braitis (1.48%); Stockwire Research Group (i.e., James) (0.75%); Aifos Capital Management, LLC (i.e., Theofilos) (2.20%); Stetson Capital Management, LLC (i.e., Stetson) (4.99%); JAD Capital Inc. (1.48%); and Richard Molinsky (1.80%).

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000(1) | 3.61% | 200,000(1) | 0 | * |
| Northrust Inc. | 559,000(2) | 9.99% | 800,000(2) | 0 | * |
| Erick Richardson | 200,000(3) | 3.61% | 200,000(3) | 0 | * |
| Melechdavid Inc. | 340,000(4) | 6.06% | 340,000(4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000(5) | 1.46% | 80,000(5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000(6) | 1.46% | 80,000(6) | 0 | * |
| Barry Honig | 544,400(7) | 9.99% | 402,050(8) | 504,000(9) | 8.09% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600(10) | * | 1,005,124(11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 597,300(12) | 9.99% | 1,688,198(13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,205(14) | * | 40,205(14) | 0 | * |
| Robert R. O'Braitis | 80,410(15) | 1.46% | 80,410(15) | 0 | * |
| Stockwire Research Group, Inc. | 40,205(16) | * | 40,205(16) | 0 | * |
| Aifos Capital LLC | 120,615(17) | 2.17% | 120,615(17) | 0 | * |
| Stetson Capital Management, LLC | 285,150(18) | 4.99% | 402,050(19) | 7,500 | * |
| JAD Capital Inc. | 80,410(20) | 1.46% | 80,410(20) | 0 | * |
| Richard Molinsky | 97,392(21) | 1.78% | 40,205(22) | 57,187 | 1.04% |
| Alan Honig | 20,000(23) | * | 20,000(23) | 0 | * |

\*   Less than 1%.

\*\*  Based on 5,436,503 shares of Common Stock outstanding as of September 20, 2017.

231.   The September 25, 2017 S-3/A was signed by Defendants Beeghley, McGonegal, O'Rourke, Dai, and Kaplan and stated that *"[n]one of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities."*

232.   The above statement in Bioptix's September 25, 2017 Form S-3/A was materially false and misleading when made because it states that "***none***" of the selling stockholders "***has had a material relationship***" "***in the past three years***" with the Company when in fact Defendant Honig and various other selling stockholders, including Honig Group members Groussman and Stetson, as well as then-current Bioptix board members O'Rourke, Kaplan and So, had ***existing*** financial ties to Bioptix by virtue of their undisclosed investment in Coinsquare.  As investors in Coinsquare, Defendants Kaplan and So were parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement – an agreement in which Bioptix was also a party.

233.    In addition, the above statement in Bioptix's September 25, 2017 Form S-3/A was materially false and misleading when made because, according to the allegations in the *Honig* Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson and Groussman. This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, Florida, in February 2018 and instead found Defendant O'Rourke.

234.    The September 25, 2017 S-3/A is also materially false and misleading because it failed to disclose that virtually ***all*** of the "selling stockholders" were members of the Honig Group had invested together in multiple previous public companies (*see* charts at ¶¶ 79-80), and were engaged in a common scheme and conspiracy to artificially inflate Riot's stock at the expense of other would-be public shareholders.  Altogether, this group of Honig-associated stockholders accounted for at least 55% of Riot's common stock[27] (and likely more) without taking into count the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January 10, 2017.

F.    **October 3, 2017 – Riot Announces "Special Dividend" of $1.00 per Share**

235.    On October 3, 2017, Bioptix issued a press released (the "October 3 Press Release") in which it stated that the "Board of Directors authorized a special dividend of approximately $1.00

---

[27] Specifically, the following April 20, 2017 Selling Stockholders (and their percentage of stock owned) were associates of Honig and members of the Honig Group:  Eric Richardson (3.63%); Melechdavid, Inc. (6.10%); Mark Groussman (1.47% each in two UTMA funds for a total of 2.94%); Honig (9.99%); GRQ Consultants, Inc. Roth 401K FBO Barry Honig (9.99%); Titan Multi-Strategy Fund I, Ltd. (9.99%); Robert O'Braitis (1.48%); Stockwire Research Group (i.e., James) (0.75%); Aifos Capital Management, LLC (i.e., Theofilos) (2.20%); Stetson Capital Management, LLC (i.e., Stetson) (4.99%); JAD Capital Inc. (1.48%); and Richard Molinsky (1.80%).

per common share (including [preferred stock] common share equivalents) in cash, payable on or about October 18, 2017 to shareholders of record as of October 13, 2017." The press release quoted Defendant Beeghley as stating: "***This special dividend is a positive step to return value to all Bioptix shareholders. We continue to explore options for delivering additional value to shareholders with our streamlined overhead and cash position***."

236.    The statement above was false and misleading when made or otherwise omitted material information because it purported "***return value to all Bioptix investors***" when, in fact, the Honig Group at this time collectively owned a controlling stake of Bioptix's outstanding shares (and likely much more) and were acting in concert – along with Defendants Beeghley, McGonegal, O'Rourke, Dai, and Kaplan – as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

237.    To be sure, this one-time special dividend predominantly benefited the Honig Group which at this time already held a majority ownership interest in Bioptix and (unlike other public shareholders) was keenly aware that the Company had plans to transition into the cryptocurrency business given that various members of the Honig Group, including Defendant Honig himself, were undisclosed parties to a October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement, a transaction that kicked off Bioptix's transformation into cryptocurrency. This Company transformation was first disclosed to the public on October 4, 2017, the day ***after*** the October 3 Press Release was issued. Yet, nothing in the October 3 Press Release discloses these facts or that the Honig's Group exercised de facto control over Bioptix through beneficial ownership and insider affiliations, giving the Honig Group the ability to influence the strategic direction of the Company.

238.    In response to the October 3 Press Release, Bioptix's stock price **increased by more than 25% in one trading day** from an closing price of $6.44 per share on October 2, 2017, to a closing price of $8.09 per share on October 3, 2017.

### G.    October 4, 2017 – "Bioptix Changing Name to Riot Blockchain"

239.    On October 4, 2017, Riot issued a press release (the "October 4 Press Release"), titled "Bioptix Changing Name to Riot Blockchain as Company Shifts Focus to Strategic Investor and Operator in Blockchain Technologies."   The press release commented on the name change and directional shift of the Company, stating, in relevant part:

> CASTLE ROCK, Colo., Oct. 4, 2017 /PRNewswire/ -- Bioptix Inc. (Nasdaq: BIOP) today announced it is changing its name to Riot Blockchain, Inc., and has reserved and plans to change its Nasdaq ticker symbol to RIOT, in line with a shift in direction of the company. The name and symbol change are subject to Nasdaq approval. ***Moving forward, Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem with a particular focus on the Bitcoin and Ethereum blockchains***.
>
> ***As part of this focus, the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies***. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.
>
> "***At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets***," ***said Michael Beeghley, Chief Executive Officer of Riot Blockchain. "With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector***."

240.    The above statements in Riot's October 4 Press Release were materially false and misleading or otherwise omit material information because they fail to disclose the Honig Group's role in the Company's transformation from biotechnology to cryptocurrency or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert – along with Defendants Beeghley, McGonegal, O'Rourke,

Dai and Kaplan – as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

241.    The October 4 Press Release also failed to disclose the Honig Group's participation in Riot's "***strategic investment in Coinsquare***" or that members of the Honig Group had existing financial and contractual ties to Bioptix (and later Riot) through this transaction – including as parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement.

242.    Additionally, the October 4 Press Release is materially false and misleading because it failed to disclose that Defendants Honig, Stetson, and Groussman shared an office with a Riot insider, namely Defendant O'Rourke, who at this time was a Riot board member and acting Company president.  Indeed, Defendant O'Rouke signed the October 3, 2017 Articles of Merger on ***behalf of Riot*** as part of the corporate name change from Bioptix to Riot under Nevada law. This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig in his office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke.

### H.    October 5, 2017 – "Investor Presentation"

243.    On October 5, 2017, Riot filed a Form 8-K with an attached "Investor Presentation" with the SEC (the "October 5 Investor Presentation").  The Investor Presentation appeared to be authored by Defendant Beeghley and described Riot as being "part of the disruptive technology

and activities revolutionizing transactions and noted a $150 billion market opportunities for companies seeking to invest in blockchain technologies." The Investor Presentation stated:

> *"Our investment strategy will consist of identifying unique projects which decentralize markets; combining real world applications with an active development team, strong fundamental, and large addressable markets."*

> "Moving forward, ***Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem, with a particular focus on the Bitcoin and Ethereum blockchains.***"

> Riot was a "first mover" and a "***NASDAQ listed pure play Blockchain company***."

> *"At Riot Blockchain Inc. we leverage our expertise, and network, to build and support blockchain technology companies.  We provide investment exposure to the rapidly growing blockchain ecosystem."*

> "***Riot Blockchain has made a strategic investment for an undisclosed % of Coinsquare.  This investment into a leading digital currency exchange is indicative of other Riot Blockchain will pursue***, including possible acquisitions of businesses touching the blockchain ecosystem."

> "***The company is experiencing explosive growth in a budding industry, already demonstrating strong potential***."

244.    The above statements in Riot's October 5, 2017 Investor Presentation were materially false and misleading when made and/or omitted material information because they failed to disclose the Honig Group's role in the Company's transformation from biotechnology to cryptocurrency or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert – along with Defendants Beeghley, McGonegal, O'Rourke, Dai, and Kaplan – as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

245.    The October 5 Investor Presentation also failed to disclose the Honig's Group's participation in Riot's "***strategic investment***" in Coinsquare or that members of the Honig Group had existing financial and contractual ties to Riot through this transaction – including as parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement.

246.     Additionally, the October 5 Investor Presentation was false and misleading because it failed to disclose that, according to the allegations in the *Honig* Action, Defendants Honig, Stetson, and Groussman shared an office with a Riot insider, namely Defendant O'Rourke, who at this time was a Riot board member and acting Company president.  Indeed, Defendant O'Rouke signed the October 3, 2017 Articles of Merger on **behalf of Riot** as part of the corporate name change from Bioptix to Riot under Nevada law.  This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at this office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke.

**I.     October 6, 2017 – Defendant Beeghely Speaks to *The Denver Post***

247.     On October 6, 2017, the *Denver Post* published a "phone interview" that Defendant Beeghley gave to the newspaper:

> *"When I got on the board, they had made an acquisition that we decided as a board did not make sense, so we closed that down and then decided to change our focus," he said in a phone interview.  "We looked at the sector and said, 'How can we participate in this, and how can our shareholders participate in this very exciting industry that's like the beginning of the internet?'"*
>
> The company is paying a few million dollars for about a 12 percent interest in Coinsquare, and has warrants to increase its stake to 20 percent, Beeghley said. Next, the CEO is looking to buy companies focused on bitcoin mining, blockchain and security software.[28]

248.     The above statements on October 6, 2017 made by Defendant Beeghley to the *Denver Post* were materially false and misleading when made or omitted material information because they failed to disclose the Honig Group's role in the Company's "**change [in] focus**" from biotechnology to cryptocurrency or that at this time the Honig Group beneficially owned in excess

---

[28] *Bioptix starts over; focus is on cryptocurrency*, The Denver Post (Oct. 6, 2017).

of 55% of Riot's outstanding shares (and likely much more) and were acting in concert – along with Defendants Beeghley, McGonegal, O'Rourke, Dai and Kaplan – as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

J.    **October 17, 2017 – Riot "to Acquire Majority Interest in Tess"**

249.    On October 17, 2017, the Company issued a press release announcing that it was to acquire a majority interest in Tess, a blockchain development company.   The press release provided commentary on the Tess acquisition, stating, in relevant part:

> "***Riot Blockchain is committed to building and supporting the blockchain ecosystem***," said Michael Beeghley, CEO of Riot Blockchain. "***The telecom payment platform of TESS is a prime example of how blockchain-based technologies can be leveraged to disrupt established industries.   I believe that Riot Blockchain is poised to take advantage of this revolution in digital transactions as we see increasing adoption of blockchain protocols in our everyday lives***."

250.    The above statements in Riot's October 17, 2017 press release were materially false and misleading when made or omit material information because Riot's announcement failed to disclose that Tess and its founders (who had only created the company three months earlier)[29] maintained close ties to Kairos, an entity owned in part by members of the Honig Group, namely Defendants Honig and Defrancsesco.   Two weeks after the Tess transaction was announced, Riot announced an investment in Kairos without also disclosing Defendant Honig's and Defendant Defranscesco's ownership interest.

K.    **October 23, 2017 – Riot Issues "Business Strategy Statement"**

251.    On October 23, 2017, the Company filed a Form 8-K with the SEC.   In it, Riot reported as follows:   "***The Company's strategy will be to continue to pursue opportunistic***

_____

[29] The Tesspay.io website shows that it was initially registered on July 18, 2017.

*investments and controlling positions in these new and emerging technologies which will continue to expose the Company to the numerous risks and volatility associated with this section*."

252.     The Form 8-K filed on October 23, 2017 also stated: "***The Company anticipates it will continue to increase its exposure to this industry through passive investment, majority owned or controlled investments, and organic expansion***, but does not presently intend to invest in any manner that would result in the Company being required to register as an investment company . . . .*"

253.     In the Company's "Objectives," Riot stated: "***The Company seeks to build a diversified blockchain company through the development and ownership of operating assets in the blockchain ecosystem***."

254.     The above "Business Strategy Statements" in Riot's October 23, 2017 Form 8-K were materially false and misleading or omitted material information because they failed to disclose the Honig Group's role in, among other things, Riot's "***development and ownership of operating assets in the blockchain ecosystem***" or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert – along with Defendants Beeghley, McGonegal, O'Rourke, Dai, and Kaplan – as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

**L.     October 27, 2017 – "Updated Investor Presentation"**

255.     On October 27, 2017, the Company filed with the SEC a Form 8-K with an "Updated Investor Presentation attached.  The Updated Investor Presentation stated that the value of the cryptocurrency market "has increased from $17.7 billion to over $170 billion in 2017" — a figure $20 billion higher than the figure presented in the Company's October 5, 2017 Investor

Presentation.   In addition to providing information concerning the Company's business acquisitions, the updated Investor Presentation also stated:

- the Company would provide "*a gateway to blockchain*" as "one of the only Nasdaq listed companies with this focus."

- "*Riot Blockchain intends to gain exposure to the blockchain ecosystem through targeted investments in the sector, with a primary focus on the Bitcoin and Ethereum blockchains*."

- "*Our investment strategy will consist of identifying unique projects which decentralize markets; combining real world applications with an active development team, strong fundamental, and large addressable markets*."

- "Moving forward, *Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem, with a particular focus on the Bitcoin and Ethereum blockchains*."

- described Riot as a "first mover" as a "*NASDAQ listed pure play Blockchain company*."

- "*At Riot Blockchain Inc. we leverage our expertise, and network, to build and support blockchain technology companies.  We provide investment exposure to the rapidly growing blockchain ecosystem*."

- "*Riot Blockchain has made a strategic investment in Coinsquare.  This investment into a leading Canadian digital currency exchange is indicative of other Riot Blockchain will pursue, including possible acquisitions of businesses touching the blockchain ecosystem*."

- "*The company is experiencing steady growth in a budding industry*."

256.   The above statements in Riot's October 27, 2017 Updated Investor Presentation filed on Form 8-K were materially false and misleading when made or omitted material information because they failed to disclose the Honig Group's role in the Company's "*strategic investment*" and "*focus [ ] as a strategic investor and operator in the blockchain ecosystem*" or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert – along with Defendants Beeghley, McGonegal,

O'Rourke, Dai and Kaplan – as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

257.    The October 27 Investor Presentation also failed to disclose the Honig Group's participation in Riot's "***strategic investment in Coinsquare***" or that members of the Honig Group had existing financial and contractual ties to Riot through the Coinsquare transaction – including as parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement.

258.    Additionally, the October 5 Investor Presentation was materially false and misleading because it fails to disclose that, according to the allegations in the *Honig* Action, Defendant Honig shared an office with a Riot insider, namely Defendant O'Rourke, who at this time was a Riot board member and acting Company president.  Indeed, Defendant O'Rouke signed the October 3, 2017 Articles of Merger on ***behalf of Riot*** as part of the corporate name change from Bioptix to Riot under Nevada law.  This highly unusual arrangement between a Company and significant outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke.

**M.    November 2-3, 2017 – Riot Agrees to Acquire "1,200 Bitcoin Mining Machines" from Kairos**

259.    On November 2, 2017, Riot issued a press release announcing that it entered into an agreement for the acquisition of "1,200 Bitcoin mining machines."  In the press release, Defendant O'Rourke stated:

> CASTLE ROCK, Colo., Nov. 2, 2017 /PRNewswire/ -- ***Riot Blockchain Inc. (Nasdaq: RIOT) (the "Company") today announced it has entered into a definitive agreement to acquire cryptocurrency mining equipment consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by industry leader Bitmain.***  Riot has secured a location for the operation of the mining equipment at

a competitive electric cost, with infrastructure in place for expansion.   The transaction is anticipated to close on or before November 15, 2017.

*"The acquisition positions us to launch our cryptocurrency mining operations, at a time that Bitcoin and other digital currencies are gaining increased attention and adoption," said John O'Rourke, President of Riot Blockchain. "We plan to leverage the mining technology to help realize our vision of becoming a leader in blockchain technologies.  Mining bitcoin helps secure the bitcoin blockchain, while providing us direct exposure to accumulating bitcoin in the process."*

The mining equipment will be strategically located to utilize hydroelectric power to help minimize utility costs while maximizing potential efficiency and output. Riot Blockchain intends to utilize the mining equipment and lease existing datacenter infrastructure to provide all services necessary for its operations.  The total hashing power of the equipment is expected to be 9.8 Petahash of SHA 256 Bitcoin mining computing power and 250,000 MH of X11 for Litecoin mining.

260.    On November 3, 2017, Riot filed a Form 8-K further describing Riot's acquisition of these 1,200 bitcoin mining machines:

On November 1, 2017, Riot Blockchain, Inc. (the "Company") entered into a share exchange agreement (the "Agreement") with Kairos Global Technology, Inc., a Nevada corporation ("Kairos"). Pursuant to the Agreement, upon satisfaction of certain closing conditions, the shareholders of Kairos agreed to exchange all outstanding shares of Kairos' common stock to the Company and the Company agreed to issue an aggregate of One Million Seven Hundred Fifty Thousand and One (1,750,001) newly designated shares of Series B Convertible Preferred Stock (the "Series B Preferred Stock") which are convertible into an aggregate of One Million Seven Hundred Fifty Thousand and One (1,750,001) shares of the Company's common stock, no par value per share (the transaction, the "Kairos Transaction") to such shareholders. On November 3, 2017, the Company closed the Kairos Transaction.

*Upon closing of the Karios Transaction, the Company became the owner of certain computer equipment and other assets used for the mining of cryptocurrency, specifically servers consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by industry leader Bitmain.*

261.    Riot's November 2, 2017 press release, and Defendant O'Rourke's statements therein, and Riot's November 3, 2017 Form 8-K were materially false and misleading when made and omitted material information because they failed to disclose that Kairos was in part owned by

Defendants Honig[30] and DeFrancesco.[31]  Indeed, it was not until May 17, 2018 that Riot disclosed that "*[e]ach of Mr. Honig and Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company*, with Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned approximately 6.3% of Kairos."[32]

262.    The November 2, 2017 press release and November 3, 2017 Form 8-K also failed to disclose that Kairos had only been incorporated in Nevada October 19, 2017, just two weeks earlier.  Thus, Kairos had virtually no operating history at the time Riot touted this latest cryptocurrency investment.  Further, the statements above fail to disclose that Riot appears to have significantly overpaid for the "*certain computer equipment and other assets used for the mining of cryptocurrency*" that the Company acquired in this transaction.

263.    Additionally, Defendant O'Rourke's statement that "*we plan to leverage the mining technology to help realize our vision of becoming a leader in blockchain technologies*" was materially false and misleading when made and omitted material information because it failed to disclose the Honig Group's role in the Company's "*vision*" or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert – along with Defendants O'Rourke, McGonegal, Dai, and Kaplan – as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

---

[30] Honig belatedly disclosed his ownership of Kairos on April 18, 2018 in an amended SEC filing on Form 13D/A noting that on November 1, 2017, he had exchanged 151,210 shares of Kairos common stock for 151,210 shares of Riot Series B Preferred Shares.

[31] *See* Riot Blockchain, Inc., Quarterly Report (Form 10-Q) at 15 (Nov. 19, 2018) ("Two principal shareholders held 24.8% and 18.4%, respectively, of Prive, at the time of its acquisition by the Company.  These holders held 10.7% and 5.7%, respectively of Kairos at the time of Kairos acquisition by the Company in October 2017.").

[32] Riot, Quarterly Report (Form 10-Q) at 26 (Nov. 19, 2018).

N.      **November 6, 2017 – Riot Closes Its Deal with Kairos**

264.    On November 6, 2017, Riot issued a press release announcing that it closed the

Karios transaction:

> CASTLE ROCK, Colo., Nov. 6, 2017 /PRNewswire/ -- ***Riot Blockchain, Inc.***
> ***(Nasdaq: RIOT) (the "Company") today announced that it has closed on its***
> ***acquisition of cryptocurrency mining equipment consisting of 700 AntMiner S9s***
> ***and 500 AntMiner L3s, all manufactured by industry leader Bitmain.*** The total
> hashing power of the equipment is expected to be 9.8 petahash of SHA 256 Bitcoin
> mining computing power and 250,000 megahash of X11 Litecoin mining.
>
> ***In conjunction with the transaction, the Company announced that President***
> ***John O'Rourke has been named Chairman and Chief Executive Officer of Riot***
> ***Blockchain.***
>
> ***"The closing of this acquisition has positioned us to launch our cryptocurrency***
> ***mining operation,"*** said John O'Rourke, Chairman and CEO of Riot Blockchain.
> ***"Cryptocurrency mining will be a focal point moving forward, gaining us***
> ***leveraged exposure to bitcoin and other digital currencies while we help secure***
> ***blockchains."***

265.    Riot's November 6, 2017 press release, and Defendant O'Rourke's statements

therein, were materially false and misleading when made and omitted material information because

they failed to disclose that Kairos was in part owned by Defendants Honig[33] and DeFrancesco.[34]

Indeed, it was not until May 17, 2018 that Riot disclosed that "***[e]ach of Mr. Honig and Ms.***

***DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company***, with

Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned

approximately 6.3% of Kairos."[35]

---

[33] Honig belatedly disclosed his ownership of Kairos on April 18, 2018 in an amended SEC filing
on Form 13D/A noting that on November 1, 2017, he had exchanged 151,210 shares of Kairos
common stock for 151,210 shares of Riot Series B Preferred Shares.

[34] *See* Riot Blockchain, Inc., Quarterly Report (Form 10-Q) at 15 (Nov. 19, 2018) ("Two principal
shareholders held 24.8% and 18.4%, respectively, of Prive, at the time of its acquisition by the
Company.  These holders held 10.7% and 5.7%, respectively of Kairos at the time of Kairos
acquisition by the Company in October 2017.").

[35] Riot, Quarterly Report (Form 10-Q) at 23 (May 17, 2018).

266.    The November 2, 2017 press release and November 3, 2017 Form 8-K also failed to disclose that Kairos had only been incorporated in Nevada weeks earlier on October 19, 2017. Thus, Kairos had virtually no operating history at the time Riot announced this investment. Moreover, the statements above failed to disclose that Riot appears to have significantly overpaid for the "*certain computer equipment and other assets used for the mining of cryptocurrency*" that the Company acquired in this transaction. As shareholders of Kairos, this overpayment would have personally benefited Defendants Honig and Defrancesco.

267.    Additionally, Defendant O'Rourke's statement that "*we plan to leverage the mining technology to help realize our vision of becoming a leader in blockchain technologies*" was materially false and misleading when made and omitted material information because it failed to disclose the Honig Group's role in the Company's "*vision*" or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert – along with Defendants O'Rourke, McGonegal, Dai, and Kaplan – as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

268.    Finally, the November 6, 2018 press release was also false and misleading when made or otherwise omitted material information because while it discusses O'Rourke's new role as CEO of Riot it failed to disclose that Defendants Honig, Stetson, and Groussman shared an office in Florida with Defendant O'Rourke at this time. This highly unusual arrangement between a Company CEO and significant outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, Florida, in February 2018 and instead found Defendant O'Rourke.

O.        **November 13, 2017 – Quarterly Report (Form 10-Q)**

269.      On November 13, 2017, Riot filed its quarterly report on Form 10-Q for the period

ended September 30, 2017 (the "3Q17 10-Q") with the SEC, which provided the Company's

quarterly financial results and position.

270.      The 3Q17 10-Q was signed by Defendants O'Rourke and McGonegal.  Pursuant to

§ 302 of SOX, and also covered by §§ 304 and 906 of SOX, Defendants O'Rourke and McGonegal

certified that they had designed and evaluated effective internal and disclosure controls over

financial reporting, which assured the reliability of financial reporting, and also that Riot's

financial statements fairly and accurately presented the financial condition of the Company.  Those

SOX certifications stated as follows:

1.    I have reviewed this quarterly report on Form 10-Q of Riot Blockchain, Inc.;

2.    Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

  (d)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

  (e)    *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the*

*reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

(f)   *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   *The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)*:

(c)   *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

(d)   *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting*.

271.   Defendants O'Rourke and McGonegal's SOX certifications in ¶ 270 were false and misleading because Riot did not maintain an effective control environment as of the date of the filing because it allowed Defendant O'Rourke and others to engage in the pump-and-dump scheme.   Additionally, the SOX certifications were materially false and misleading because contrary to the representation that Riot's SEC filing did "not contain any untrue statement of a material fact" or omission, the 3Q17 10-Q contained numerous false and misleading statements, as set forth below.

272.     For example, while the 3Q17 10-Q discussed both the Coinsqaure and Kairos acquisitions, it failed to disclose that members of the Honig Group and Defendants Kaplan and So were also investors in Coinsquare or that Defendants Honig and Defrancesco were investors in Kairos.   The 3Q17 10-Q also failed to disclose that Defendant Honig, at this time a significant shareholder in Riot, received $50,000 in "due diligence" consulting fees from Bioptix related to the Company's investment in Coinsquare.

273.     The 3Q17 10-Q was also materially false and misleading and otherwise omitted material information because it failed to disclose the Honig Group's role in the Company or that at this time the Honig Group beneficially owned a controlling stake in Riot's outstanding shares (and likely much more) and were acting in concert – along with Defendants O'Rourke, McGonegal, Dai, and Kaplan – as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

274.     Finally, the 3Q17 10-Q was also materially false and misleading because while it references Defendant O'Rourke as CEO of Riot it failed to disclose that Defendants Honig, Stetson and Groussman shared an office in Florida with Defendant O'Rourke.   This highly unusual arrangement between Riot's CEO and significant outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig in February 2018 and instead found Defendant O'Rourke at Honig's office.

**P.     November 15, 2017 – O'Rourke Is Interviewed on CBS and the Company Announces "Riot Blockchain Featured in 5-Part Series on CBS"**

275.     On November 15, 2017, Defendant O'Rourke appeared on CBS's TechRepublic touting Riot's investment, less than a month earlier, in 52% of the stock of Tess, which O'Rourke said was "developing a blockchain technology to disrupt the telecom industry."



**JOHN O'ROURKE**
CEO OF RIOT BLOCKCHAIN

**[Interviewer:]**   The blockchain is disrupting a number of industries.  You mentioned real estate a moment ago, certainly Wall Street.  What other industries are heavily impacted by the blockchain right now?

**[O'Rourke:]**  I would say a couple that jump to mind for me are, you know, some industries that are probably a little antiquated in how they're run.  One is the telecom industry. I think it's a good example.  ***Riot Blockchain, our company, we own 52 percent of a company called Tess that is developing a blockchain technology to disrupt the telecom industry. . . . they're developing a token technology where all funds are held in a trust account and they basically have their own blockchain technology system that would allow the bypass of all these different intermediaries.***[36]

276.   The same day, Riot issued a press release titled "Riot Blockchain Featured in 5-Part Series on CBA Interactive This Week," in which the Company touted Defendant O'Rourke's appearance in [t]he segments released thus far."[37]

277.   O'Rourke's above statements during his November 15, 2017 appearance on CBS TechRepublic and in the Company's coordinated press release were materially false and misleading when made because they led the market to believe that Riot's partial ownership in Tess

---

[36] CBS, Tech Republic:  Why the blockchain will disrupt the enterprise (Nov. 15, 2017).

[37] Each of O'Rourke's 2-3 minute "segments" in this "5-Part Series on CBS" was clearly filmed during a single sitting.  The interview could have lasted no longer than ten minutes.

was part of a legitimate strategy to develop "blockchain technology" to "disrupt the telecom industry" when in fact, and unknown to investors, Riot's investment in Tess was a conflicted, related-party transaction involving some of the same individuals who set up the conflicted Kairos transaction.  Moreover, Riot had already signed a letter of intent to merge Tess with another undisclosed related party, Cresval, which was an undercapitalized and illiquid company with ties to Defendants and various members of the Honig Group.

278.   In response, Riot's stock *price increased by 11.6%* from an opening price of $7.10 per share on November 15, 2017, to a closing price of $7.93 per share on November 15, 2017.

**Q.     November 16, 2017 – Riot Announces an Investment in Verady, LLC**

279.   On November 16, 2017, the Company issued a press release announcing that it had made a strategic investment in Verady, LLC, a company providing accounting, audit, and verification for blockchain based assets.  In the press release, Defendant O'Rourke stated, "With recent highs in Bitcoin and other cryptocurrency valuations, there is significant market potential for blockchain and digital asset technologies.  *We will continue to increase our involvement and support of the blockchain ecosystem, as we ramp up our Bitcoin mining operations*."

280.   The above statement in Riot's November 16, 2017 press release was materially false and misleading when made and otherwise omitted material information because it failed to disclose the Honig Group's role in the Company's operations or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert – along with Defendants O'Rourke, McGonegal, O'Rourke, Dai and Kaplan – as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

281.   The November 16, 2017 press release was also false and misleading because it necessarily implied that Riot as of this time had active mining operations that it could "*ramp up*"

when in fact the Company did not begin to actively mine cryptocurrencies until much later in 2018. Indeed, the Company's April 14, 2018 Form 10-K, which was issued five months after this press release, states that as of April 2018 Riot was still in the process of "building" a cryptocurrency mining operation, "*[t]he Company is building a cryptocurrency mining operation . . .*"  Thus, Defendant O'Rourke's statement on November 14, 2017 that Riot was "ramp[ing] up" its mining operations was materially false and misleading when made.

282.   In response to the November 16, 2017 press release, Riot's stock price increased by about 2% from an opening price of $7.93 per share on November 15, 2017, to a closing price of $8.12 per share on November 16, 2017.

### R.   November 17, 2017 – CBS Publishes More Commentary by O'Rourke

283.   On November 17, 2017, CBS TechRepublic published further footage of O'Rourke's interview, in which O'Rourke touted Riot as a means for investors to "Get Started with Blockchain Tech."



**[Interviewer:]  John O'Rourke, CEO of Riot Blockchain.  I wonder if you could leave us with some advice.  If my company is interested in investing in, or at least becoming involved with the blockchain, what are the best first steps?**

**[Defendant O'Rourke:]  *I would say the best first steps to get involved in bitcoin or blockchain -- so it's kind of a difficult thing right now for the average person to get exposure to bitcoin or to blockchain technologies.  One of our driving forces at Riot Blockchain was to try to provide that access and gateway to blockchain through potential investment in Riot Blockchain.*  So we have two different blockchain technology companies underneath our hood.  We're building out a cryptocurrency mining division, but -- so the goal was right now, for the average person, it's difficult to get that exposure, because whether you're trying to buy bitcoin directly, it's not an easy onboarding process.  You have to create an account with an exchange, create a wallet, there's some security issues if you don't know what you're doing.  *So that's what we're attempting to solve. That's a problem we're attempting to solve to provide, you know, one way where a person could potentially, you know, get exposure to the industry through a traditional capital markets company that's listed on the NASDAQ.***

284.    The above statements in Riot's November 17, 2017 press release were materially false and misleading when made for the reasons articulated in Section V, and because they led the market to mistakenly believe that investing in Riot was among the "best first steps" that investors could take "to get involved in bitcoin or blockchain" because, as O'Rourke stated "[o]ne of our driving forces at Riot Blockchain was to try to provide that access and gateway to blockchain through potential investment in Riot Blockchain" so that investors could " get exposure to the industry through a traditional capital markets company that's listed on the NASDAQ."  In fact, Riot was not a "traditional capital markets company listed on NASDAQ" and it did not provide investors to "access and gateway to blockchain" because at that time, Riot was not mining blockchain, and its only investments in equipment to do so had resulted in massive funneling of money to Defendants and their associates by overpaying for equipment that was available at retail prices seven times lower.  Thus, an "investment in Riot" was not a "gateway to blockchain" but rather a unrecoverable gift to Defendants, their associates, and various undisclosed related parties.

285.    Following O'Rourke's second appearance on CBS, Riot's stock price continued to increase over the next three days from $8.12 per share on November 16, 2017, to a closing price of $11.26 per share on November 21, 2017 – an ***increase of 38.6%*** on increased trading volume.

286.    On November 21, 2017, *Zack's Investment Research* commented that "[s]hares" of "the former biotech equipment company, which now focuses on buying cryptocurrency and blockchain businesses, have . . . soared nearly 50% in the past five days" and noted that "The company exploded into popularity on investing social media forums only recently. . . ."[38]

**S.    December 11, 2017 – Riot Announces TessPay's "Intent for Merger with Publicly Traded Cresval Capital Corp."**

287.    On December 11, 2017, Riot announced that TessPay had signed a "letter of intent" for a merger with Cresval:

> CASTLE ROCK, Colo., Dec. 11, 2017 /PRNewswire/ -- Riot Blockchain Inc. (Nasdaq: RIOT) (the "Company"") today announced that its majority owned Tess Inc. ("TessPay") has entered into a non-binding letter of intent ("LOI") to merge with Cresval Capital Corp. ("Cresval") (TSX-V: CRV). TessPay is a blockchain company developing a supply chain payment platform for businesses to attempt to guarantee payment on time and in full. After the closing of the anticipated merger, TessPay will be publicly traded on the TSX Venture Exchange (the "TSXV") and change its name to "TessPay Inc.".
>
> The LOI provides that TessPay will be issued 80,000,000 shares of Cresval, and the present shareholders of Cresval will retain 8,400,000 shares of the combined company TessPay post-merger. Riot Blockchain will receive 41,600,000 shares resulting from its 52% ownership of TessPay.
>
> Assuming that TessPay and Cresval enter into a definitive agreement, ***the parties expect that the merger can be completed by the 2nd quarter of 2018.*** No assurance can be given that a definitive agreement will be entered into, that the proposed

---

[38] Ryan McQueeney, *Meet Riot Blockchain, Wall Street's Latest Trendy Stock*, Zack's Investment Research (Nov. 21, 2017).

merger will be consummated, or that the combined company will be able to obtain adequate funds needed to fund its business plan.

***The merger would be the first of Riot Blockchain's investments to become a stand-alone public company.***  Haywood Securities Inc acted as a financial advisor on the transaction.

Jeff Mason, Chief Executive Officer of TessPay, stated, ***"The decision to take the company public provides us access to traditional capital markets as we continue developing our blockchain technology solution. This environment will also foster transparency and accountability moving forward, providing confidence to investors and prospective customers alike."***

288.    The above statements in Riot's December 11, 2017 press release – and in particular the statements that "***[t]he decision to take [TessPay] public provides us access to traditional capital markets as we continue developing our blockchain technology solution***" and that "***[t]his environment will also foster transparency and accountability moving forward, providing confidence to investors and prospective customers alike***" – were materially false and misleading when made or omitted material information because they failed to disclose the Honig Group's role in the Company or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert – along with Defendants Beeghley, McGonegal, O'Rourke, Dai, and Kaplan – as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

289.    The October 27 Investor Presentation also failed to disclose the Honig's Group's participation in Riot's "***strategic investment in Coinsquare***" or that members of the Honig Group had existing financial and contractual ties to Riot through this transaction – including as parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement.

290.    Additionally, the October 5 Investor Presentation was false and misleading because it failed to disclose that, according to the allegations in the *Honig* Action, Defendant Honig shared an office with a Riot insider, namely Defendant O'Rourke, who at this time was a Riot board

member and acting Company president.  Indeed, Defendant O'Rouke signed the October 3, 2017

Articles of Merger on **behalf of Riot** as part of the corporate name change from Bioptix to Riot

under Nevada law.  This highly unusual arrangement between the President of the Company and

a significant outside shareholder was confirmed even before the allegations appeared in the *Honig*

Action when CNBC attempted to interview Defendant Honig in February 2018 and instead found

Defendant O'Rourke at Honig's office.

291.    In response to Riot's December 11, 2017 announcement of TessPay's "intent" to

merger with Cresval, Riot's stock price **increased by more than 45%**, or $7.22 per share, from an

opening price of $15.86 per share on December 8, 2017, to a closing price of $23.08 per share on

December 12, 2017.  Trading in Riot's stock reached all-time records, with more than **20 million**

**shares** of Riot stock traded on December 11 alone.  As discussed below, this merger ultimately

never occurred.[39]

### T.    December 12, 2017 Proxy Statement (Form DEF 14A)

292.    On December 12, 2017, the Company issued a Proxy Statement on Form DEF 14A

pursuant to Section 14(a) of the Exchange Act (the "2017 Proxy Statement").

**Certain Relationships and Related Transactions**

The Audit Committee[40] has responsibility for reviewing and, if appropriate, for
approving any related party transactions that would be required to be disclosed
pursuant to applicable SEC rules.  This includes current or proposed transactions in
which the Company was or is to be a participant, the amount involved exceeds the
lower of either $120,000 or 1% of the average of the Company's total assets at year-
end for the last two completed fiscal years, and in which any of the Company's
executive officers, directors, or greater than five percent shareholders, or any

---

[39] Ultimately, on February 15, 2018, Cresval announced that it had "terminated its proposed plan
of arrangement with Tess Inc. . . . due to Tess' inability to complete the application for listing of
the resulting issuer, TessPay Inc., on the TSX Venture Exchange."  *See*
https://www.globenewswire.com/news-release/2019/02/15/1733509/0/en/Cresval-Capital-Corp-
Terminates-Arrangement-With-Tess.html.

[40] On December 12, 2017, Riot's Audit Committee consisted of Defendants Les, Kaplan, and So.

members of their immediate families, has a direct or indirect material interest. Apart from any transactions disclosed herein, no such transaction was entered into with any director or executive officer during the last fiscal year.  Such transactions will be entered into only if found to be in the best interest of the Company and approved in accordance with the Company's Code of Ethics, which are available on the Company's web site.

***Except for the employment agreements previously entered into between the Company and certain of its named executive officers, since January 1, 2016, none of the directors or named executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its common stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company.***

293.    The above statements in Riot's 2017 Proxy Statement were materially false and misleading when made and omitted material information because it stated that "***none***" of the directors, officers, or any person owning 5% or more of the company's common stock had "***any material interest, direct or indirect, in any transaction, or in any proposed transaction***" when in fact Defendant Honig and various members of the Honig Group and Company insiders participated in transactions completed in the months leading up to the filing of the 2017 Proxy Statement.  Most notably, as explained in Section V, above, members of the Honig Group and Defendants Kaplan and So were investors in Coinsquare and parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement – an agreement in which the Company was also a party.   In addition, Defendants Honig and DeFrancesco were undisclosed shareholders of in Kairos, a Company that Riot acquired.

294.    From December 11 to 12, 2017, Riot's stock price ***increased an additional than 22%*** from a closing price of $23.08 per share on December 11, 2017, to a closing price of $28.20 per share on December 12, 2017.  Trading in Riot's stock continued to reach new records, with more than ***36 million shares*** of Riot stock traded on December 12 alone.

**U.    December 19, 2017 Press Release – "Riot Blockchain Announces $37 Million Private Placement"**

295.    On December 19, 2017, the Company issued a press release announcing that Riot had entered into private placement agreements with unnamed accredited investors to sell $37 million units of securities at a purchase price of $22.50 per unit.  Each unit consisted of one share of the Company's common stock and a three year warrant to purchase one share of common stock at an exercise price of $40.00 per share.  The December 19, 2017 press release states in relevant part:

**Riot Blockchain Announces $37 Million Private Placement**

*Proceeds to be used for expansion of Bitcoin mining operations and strategic investments*

CASTLE ROCK, Colo., Dec 19, 2017 — Riot Blockchain Inc. (Nasdaq: RIOT) (the "Company") today announced that it has entered into subscription agreements with accredited investors for the purchase of 1,644,444 restricted units of the Company at a purchase price of $22.50 per unit (the "Investment").  Each unit consists of one share of restricted common stock and one warrant to purchase one share of restricted common stock at an exercise price of $40.00 per share for a period of three years.  The closing of the Investment is subject to customary closing conditions, including approval of the listing of the securities on The NASDAQ Stock Market LLC.

***The $37 million in gross proceeds from the Investment will be used for the expansion of the Company's Bitcoin mining operations, strategic investments, and general working capital.***

Canaccord Genuity Inc acted as a financial advisor to the Company on the transaction.

296.    The above statements in Riot's December 19, 2017 press release were materially false and misleading when made or omit material information because they fail to disclose that two large shareholders and members of the Honig Group, namely Defendants Honig and Defrancesco, were among the "***accredited investors***" who were invited to participate in the private placement, with Defendant Honig investing $500,000 and Defendant Defrancesco investing $360,000.

297.     The above statements in the December 19, 2017 press release were also misleading when made because when read in context with the Company's 2017 Proxy which was only filed five days earlier, they led the market to believe that "***none***" of the Company's 5% shareholders "***has any material interest, direct or indirect, in any transaction, or in any proposed transaction***." In other words, the 2017 Proxy and the December 19, 2017 press release when read together imply that no 5% (or higher) shareholders were participating in the $37 million private placement when in fact Defendant Honig and Defendant Defrancesco were among the "***accredited investors***" in the transaction.

298.     In addition, the statement from the December 19, 2017 press release that "***[t]he $37 million in gross proceeds from the Investment will be used for the expansion of the Company's Bitcoin mining operations***" was false and misleading when made because, as explained in Section V above, Riot had no "***mining operations***" at this time.   In fact, months later in April 2017, Company was still "***building***" its mining operations.

## IX.    AS TRUTH BEGINS TO EMERGE, DEFENDANTS CONTINUE TO MISLEAD THE MARKET

### A.     December 19, 2017 CNBC Interview with Andrew Left of Citron Research

299.     On December 19, 2017, after the market closed, CNBC's *Fast Money* aired an interview with Andrew Left ("Left"), founder of Citron Research, who made shocking revelations about Riot:

> "Even worse than the [initial coin offerings] that you see present white papers . . . [Riot] ha[s] a few small investments, just enough to go ahead and put it public. And they roll it out, and with enough promotion, and obviously with the hype behind crypto and the lack of assets, there it goes. ***The whole time really misrepresenting the fact that nothing that they have is [ ] a real player in the crypto industry***."

> "[Riot] ha[s] a small investment in . . . Coinsquare and think it might be right now like ***the number 200 trader of bitcoin***, a really insignificant investment.  So you shouldn't be surprised . . . . ***Out of Boca Raton Florida***, buys some assets in Canada, do the normal shuffle, and then it goes to stock."

Left was then asked if it was his contention that "there's actual fraud going on at [Riot] or that it is simply overstating its relationship to blockchain and bitcoin?" Left responded:  "***If you want to talk about people front running the stock before they make announcements, I'm sure you could look at that***."

300.     In response, Riot's stock price fell by ***6.42%,*** on continued heavy trading, from a closing price of $38.60 per share on December 19, 2017, to a closing price of $36.12 per share on December 20, 2017, damaging Lead Plaintiff and members of the Class.

301.     On December 21, 2017, several articles were released that suggested that Riot's name change to include the word "Blockchain" was a publicity stunt.  *Reuters*, for example, reported that Riot was one of the "growing list of companies jumping onto blockchain bandwagon, courtesy of Bitcoin's stratospheric rise."  *Zacks* also published an article entitled "Why Trendy Bitcoin Stocks like Riot Blockchain Are Tanking – ZACKSC."  In discussing Riot's stock price, the article stated:  "the popular biotech firm turned blockchain investor, Riot Blockchain, has slumped about 30% from its highs.  Questions about the legitimacy of Riot's business model, which sees the once-dying diagnostics machinery company invest in various firms involved in the bitcoin and Ethereum ecosystems, were exacerbated this week after the stock was targeted by Citron Research."

302.     The next day, December 22, 2017, *Business Insider* reported that Riot lacked a Chief Technology Officer with experience in cryptocurrency, and was seeking such an employee, and while technical background in cryptocurrencies was not required, Riot said such experience would be "a big plus":

It looks like Riot Blockchain put the horse before the carriage.  The company, which pivoted to blockchain after operating for more than a decade as a biotech firm under the name BiOptix Diagnostics, is on the hunt for a chief technology officer, according to a job posting on LinkedIn.  "Riot Blockchain is seeking a technically experienced and highly motivated CTO candidate with a passion for blockchain technology," the ad said.  The candidate should be able to juggle a

number of tasks, including the "implementation of technical aspects, recruit top developers and blockchain specialists, and build bridges and network with blockchain community."  The CTO will also help build out the firm's crypto-mining operations.  ***Still, a technical background in cryptocurrencies is not required. "Technical experience in cryptocurrency or cryptocurrency mining is a big plus,"*** the ad said.

303.    Also on December 22, 2017, *Reuters* published the article entitled, "ANALYSIS-Cryptocurrency stocks holding gains despite bitcoin pullback – RTRS."  The article stated that Riot and other "crypto stocks came under pressure on Friday."  Regarding such stocks, the article noted, in relevant part:  "While the stocks are susceptible to price moves in bitcoin itself, analysts caution investors should make sure the company has a credible business model."

304.    As a result of the disclosures on December 19 through 22, 2017, Riot's stock price declined $11.60 per share, or ***34.75%***, on heavy trading over the course of two trading days.  The Company's stock price declined from a closing price of $36.12 per share on December 20, 2017, to a closing price of $24.52 on December 22, 2017, damaging Lead Plaintiff and members of the Class.

### B.    December 27, 2017 – Riot Abruptly Cancels Its Annual Shareholder Meeting

305.    On December 27, 2017, the Company issued a press release, titled "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders."  The press release announced that the 2017 Annual Meeting of Stockholders, which was scheduled for the following day, had been cancelled.  The release stated, in relevant part:  "***Riot Blockchain, Inc. (Nasdaq: RIOT) (the 'Company') today announced that its 2017 Annual Meeting of Stockholders scheduled for December 28, 2017 (the 'Annual Meeting'), was adjourned to achieve a quorum on the proposals to be approved***."

306.    These statements were also misleading because the Company never intended to hold its 2017 Annual Meeting of Shareholders scheduled for December 28, 2017.  As CNBC

reported, "[i]t's not clear the company ever planned to have the meeting [scheduled for the Boca Raton Resort and Club in Florida].   Numerous employees at the hotel told CNBC it had no reservations for either name under the name of Riot Blockchain or any affiliated entity." Moreover, when asked about the adjournment by CNBC, Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP, stated:  "I just don't think in this instance, there's any reason to adjourn their annual meeting."

307.    On January 2, 2018, *Reuters* published an article prior to the market open entitled, "BUZZ-Riot Blockchain down after CEO reports stock offering – RTRS."  The article stated that Riot's stock price was down 4.44% in pre-market trading after Defendant O'Rourke had reported his sale of over 30,000 shares.  An article published during early morning trading hours, on the popular investor website, *The Motley Fool*, entitled, "Riot Blockchain's CEO Just Sold a Lot of Stock," detailed Defendant O'Rourke's suspicious trading, stating in relevant part:

> No one knows a company better than its insiders.  For this reason, it's my view that prices at which companies and their insiders buy and sell stock give a hint about a company's true value.
>
> \*   \*   \*
>
> **An insider dumps his shares**
>
> Right before a holiday weekend, and two days after the company announced it was adjourning its annual shareholders meeting until February, Riot Blockchain's chief executive officer, John R. O'Rourke III, filed a Form 4 with the SEC disclosing he and his firm, ATG Capital LLC, sold 30,383 shares of Riot on Dec. 29.
>
> \*   \*   \*
>
> These sales are material, representing about 37% of shares he and ATG Capital owned or would soon control prior to the transactions.
>
> O'Rourke now holds 12,500 shares through ATG Capital LLC, in addition to 39,500 shares of stock in his own name that he currently owns, or will receive over the next 60 days from his role as Riot's chief executive officer.  (O'Rourke received 344,000 restricted shares that vest in 24 monthly installments when he became CEO in November.)

**Hiding bad news**

These sales were curiously timed. O'Rourke sold his shares and filed the Form 4 after market close before a major holiday weekend, when most investors would be thinking about their New Year's Eve plans rather than their investment portfolios.

Stock analysts, journalists, and political-types refer to this activity as a "Friday night dump," a common practice of releasing otherwise newsworthy information at a time when people are least likely to be paying attention. One study from 2005 found that "Friday announcements are 20 percent more likely to present negative earnings than announcements on other weekdays." Insider selling certainly fits in the "negative" category.

O'Rourke has every reason to sell quietly. When taken together with Riot's deeply discounted equity raise earlier this month, his sales suggest recent market prices are a better price at which to sell its shares than buy them. It's also interesting to me that O'Rourke is selling before a postponed annual shareholders meeting in which Riot is asking shareholders for the right to add another 750,000 shares of stock to the company's bonus pool for insiders.

308.    On this news, Riot's stock price declined $4.04 per share, or ***14.45%***, over two trading days, from $28.40 per share on December 29, 2017, to $24.36 per share on January 3, 2018, damaging Lead Plaintiff and members of the Class.

### C.    December 29, 2017 – O'Rourke Sells 30,383 Shares for Proceeds of $869,256

On December 29, 2017, after the market closed and going into a three-day holiday weekend, Defendant O'Rourke sold 30,383 shares of Riot for proceeds of $869,256. O'Rourke's sale was quickly picked up by media outlets.[41]

---

[41] *See, e.g.*, *John R. O'Rourke III Sells 30,383 Shares of Riot Blockchain Inc (RIOT) Stock*, American Banking and Market News (Dec. 30, 2017) ("CEO John R. O'Rourke III sold 30,383 shares of the firm's stock in a transaction dated Friday, December 29th. The shares were sold at an average price of $28.61, for a total transaction of $869,257.63.").

### D.   January 5, 2018 Securities Registration Statement (Form S-3)

309.   On January 5, 2018, after the close of trading on a Friday, leading into a weekend, Riot filed a Securities Registration Statement on Form S-3 registering, for sale to the investing public, 3,292,226 shares of common to be sold by the following "Selling Stockholders":

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| 2330573 Ontario Inc. | 96,444 (1) | * | 88,888 (33) | 52,000 | * |
| Acquisition Group Limited | 135,556 (2) | 1.16% | 71,112 (33) | 100,000 (34) | * |
| Armand Reale | 4,000 (3) | * | 8,000 (33) | - | * |
| Catherine DeFrancesco ITF Ava Defrancesco | 22,911 (4) | * | 7,112 (33) | 19,355 (35) | * |
| Catherine DeFrancesco ITF Devlin DeFrancesco | 22,911 (5) | * | 7,112 (33) | 19,355 (36) | * |
| Catherine DeFrancesco ITF Lachlan Defrancesco | 22,911 (6) | * | 7,112 (33) | 19,355 (37) | * |
| Catherine DeFrancesco ITF Summer Defrancesco | 22,911 (7) | * | 7,112 (33) | 19,355 (38) | * |
| Clara Serruya | 266,667 (8) | 2.29% | 533,334 (33) | - | * |
| DeFrancesco Motorsports Inc. | 5,333 (9) | * | 10,666 (33) | - | * |
| Delavaco Holdings Inc. | 10,667 (10) | * | 21,334 (33) | - | * |
| Eduardo Vivas | 6,667 (11) | * | 13,334 (33) | - | * |
| First Canadian Insurance Corp | 14,000 (12) | * | 28,000 (33) | - | * |
| Glass Investments LP | 13,444 (13) | * | 26,888 (33) | - | * |
| Grander Holdings, Inc. 401K | 217,733 (14) | 1.86% | 266,666 (33) | 84,400 (39) | * |
| GRQ Consultants, Inc. | 22,222 (15) | * | 44,444 (33) | - | * |
| GT Capital Inc | 29,436 (16) | * | 26,666 (33) | 16,103 (40) | * |
| Hudson Bay Master Fund Ltd | 333,334 (17) | 2.87% | 666,668 (33) | - | * |
| Interward Capital Corp. | 4,000 (18) | * | 8,000 (33) | - | * |
| Intracoastal Capital LLC | 133,334 (19) | 1.15% | 266,668 (33) | - | * |
| LDIC Inc. ITF McGilligan Barry Investments Ltd. | 11,100 (20) | * | 22,200 (33) | - | * |
| Marcandy Investments Corp. | 5,333 (21) | * | 10,666 (33) | - | * |
| Monroe Capital, LLC | 22,000 (22) | * | 44,000 (33) | - | * |
| Melechdavid Inc. | 131,945 (23) | 1.13% | 88,890 (33) | 87,500 (41) | * |
| Michael Ference | 4,444 (24) | * | 8,888 (33) | - | * |
| Millennium Insurance Corp. | 7,000 (25) | * | 14,000 (33) | - | * |
| MMCAP International Inc. SPC | 366,667 (26) | 3.15% | 733,334 (33) | - | * |
| Namaste Gorgie, Inc. | 42,927 (27) | * | 21,334 (33) | 32,260 (42) | * |
| Northurst, Inc. | 589,317 (28) | 4.99% | 177,778 (33) | 593,996 (43) | 4.99% |
| Paradox Capital Partners LLC | 4,444 (29) | * | 8,888 (33) | - | * |
| Rockhaven Holdings Ltd. | 6,000 (30) | * | 12,000 (33) | - | * |
| Sunnybrook Preemie Investments Inc. | 11,666 (31) | * | 23,332 (33) | - | * |
| York Plains Investment Corp. | 8,900 (32) | * | 17,800 (33) | - | * |

\*   Less than 1%.

\*\*   Based on 11,622,112 shares of Common Stock outstanding as of January 4, 2018.

310.   As in previous Forms S-3, Riot stated that **"[n]one of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our**

*subsidiaries within the past three years other than as a result of the ownership of our shares or other securities."*

311.    The above statement in Riot's January 5, 2018 Form S-3 was materially false and misleading when made because it states that "***none***" of the selling stockholders "***has had a material relationship*" "*in the past three years***" with the Company when in fact Defendant Honig and various other selling stockholders, including Honig Group members Groussman and Stetson, as well as then-current Riot board members Kaplan and So, had ***existing*** financial ties to Riot by virtue of their undisclosed investment in Coinsquare.  As investors in Coinsquare these Defendants were parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement – an agreement in which Riot was also a party.  Additionally, Defendants Honig and DeFrancesco were undisclosed investors in Kairos, a company that Riot acquired in November 2017.

312.    In addition, the above statement in Riot's January 5, 2018 Form S-3 was materially false and misleading when made due to Honig's relationship with Defendant O'Rourke. According to the allegations in the *Honig* Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson, and Groussman.  This highly unusual arrangement between a Company CEO and outside shareholder appeared to be confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke.  Additionally, as demonstrated by the chart in ¶¶ 79-80, Defendant O'Rourke has had several previous investments with Defendant Honig and other members of the Honig Group.

E.   **January 4-5, 2018 – Riot Fires Its Independent Auditor and Files an Amended Form 8-K/A Disclosing Audited Financial Statements of Kairos Revealing that Riot Vastly Overpaid**

313.   On January 5, 2018, Riot filed a Form 8-K disclosing that on January 4, 2018 it had "dismissed EisnerAmper LLP . . . as its independent registered public accounting firm" and that on January 5, 2018, Riot had engaged MNP LLP.

314.   Later on January 5, 2018, Riot filed an amended Form 8-K/A that disclosed "audited financial statements of Kairos Global Technology, Inc." "as of November 3, 2017," as prepared and audited by Riot's new accountant (since the day before) MNP LLP.  These financial confirmed that Kairos had paid $2,089,679 for the mining equipment it quickly turned around and sold to Riot for more than $13 million.  The financial statements confirmed that Kairos "purchased equipment of $2,089,679 from a company controlled by the president[42] of the Company," and that this was a "[r]elated party transaction[]."  The financial statements also stated that "as at November 3, 2017 . . . the equipment purchased was not yet operational."

315.   The market reacted negatively to the January 5, 2018 news once trading began on Monday, January 8, 2018, with the Company's stock price declining $1.01 per share, or ***4.13%***, from $24.41 per share on January 5, 2018, to $23.42 per share on January 8, 2018, damaging Lead Plaintiff and members of the Class.

F.   **January 17, 2018 – Riot Announces Tess's "Definitive Agreement for Transaction with Publicly Traded Cresval Capital Corp."**

316.   On January 17, 2018, Riot issued a press release announcing the Company's "majority-owned Tess Inc." had "entered into a definitive agreement . . . to complete a transaction with [Cresval]."  The press release further stated:

---

[42] Michael Ho was the President of Kairos, according to the Nevada Secretary of State's website.

TessPay is a blockchain company developing a supply chain payment platform for businesses to attempt to guarantee payment on time and in full. After the closing of the anticipated transaction and subject to the terms and conditions of the Agreement, TessPay expects its shares to be publicly traded on the TSX Venture Exchange (the "TSXV") and change its name to "TessPay Inc." ("TessPay").

The Agreement provides that each share of TessPay will be exchanged for common shares of TessPay on the basis of 15.36 TessPay shares for every one (1) Tess share. Cresval will be issued 8,400,000 TessPay shares, which will be distributed pro rata to shareholders of Cresval as part of the transaction. Riot Blockchain will receive 41,600,000 shares resulting from its 52% ownership of TessPay. One of the conditions of the proposed transaction includes Tess completing a private placement financing of CAD $3,500,000 in the form of an unsecured convertible note at CAD $0.10 per share into TessPay.

The parties expect that the proposed transaction can be completed by the 2nd quarter of 2018. No assurance can be given that the proposed transaction will be consummated, or that the combined company will be able to obtain adequate funds needed to fund its business plan.

The merger would be the first of Riot Blockchain's investments to become a stand-alone public company.

317.   The above statement in Riot's January 17, 2018 press release were materially false and misleading when made for the reasons articulated in Sections V above, and because they led the market to believe that Riot's partial ownership in Tess was part of a legitimate strategy to develop "blockchain technology" to "disrupt the telecom industry" when in fact, and unknown to investors, Riot's investment in Tess was a conflicted, related-party transaction involving some of the same individuals who set up the conflicted Kairos transaction.  Moreover Cresval was an undercapitalized and illiquid company with ties to Defendants and various members of the Honig Group.

318.   In response to Riot's announcement on January 17, 2018, Riot's stock price *increased __11.4%__*, from $17.76 per share on January 16, 2018, to $19.80 per share on January 17, 2018.

G.       **January 31, 2018 –** *The Wall Street Journal* **Writes About Riot and Honig
         and Riot Again Cancels Its Annual Shareholder Meeting**

319.     On January 31, 2018, before the market opened, *The Wall Street Journal* published
an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."[43]   The
article described how Defendant Honig had taken an aggressive stake in the Company when it was
still in the medical diagnostics business and how he drove out Bioptix's CEO and others, replacing
them with his own allies, including Defendant O'Rourke.   The article quoted Gail Schoettler, a
former lieutenant governor of Colorado who was Chair and Director of Bioptix before it became
Riot, regarding Defendant Honig:  "This guy trolls for small companies with cash and cheap shares
. . . ."  The article also noted that "Honig . . . said in an interview that he sold a significant portion
of his shares in recent weeks.  'When stock goes up, you take a profit,' he said."

320.     Also on January 31, 2018, the Company issued a second press release, titled "Riot
Blockchain Announces Adjournment of Annual Meeting of Stockholders."   The press release
announced that the 2017 Annual Meeting of Stockholders, which was scheduled for the following
day, had again been cancelled.   The release stated, in relevant part:   "***Riot Blockchain, Inc.
(Nasdaq: RIOT) (the 'Company') today announced that its 2017 Annual Meeting of
Stockholders (the 'Annual Meeting') was adjourned for a second time to achieve a quorum on
the proposals to be approved***."

321.     As a result of these revelations and disclosures, Riot's stock price ***declined <u>14.26%</u>***
($1.98 per share) from $14.28 per share on January 30, 2018, to $12.30 per share on February 1,
2018, damaging Lead Plaintiff and members of the Class.

---

[43] Ianthe Jeanne Dugan, *Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake; Barry
Honig pares back stake in Riot Blockchain, whose shares soared last year after a change of name*,
The Wall Street Journal (Jan. 31, 2018).

**H.      February 7, 2018 – Securities Registration Statement (Form S-3/A)**

322.    On February 7, 2018, after the close of trading on a Friday, leading into a weekend, Riot filed a Securities Registration Statement on Form S-3 registering, for sale to the investing public, 3,292,226 shares of common to be sold by the following "Selling Stockholders":

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| 2330573 Ontario Inc. | 96,444 (1) | * | 88,888 (33) | 52,000 | * |
| Acquisition Group Limited | 135,556 (2) | 1.16% | 71,112 (33) | 100,000 (34) | * |
| Armand Reale | 4,000 (3) | * | 8,000 (33) | - | * |
| Catherine DeFrancesco ITF Ava Defrancesco | 22,911 (4) | * | 7,112 (33) | 19,355 (35) | * |
| Catherine DeFrancesco ITF Devlin DeFrancesco | 22,911 (5) | * | 7,112 (33) | 19,355 (36) | * |
| Catherine DeFrancesco ITF Lachlan Defrancesco | 22,911 (6) | * | 7,112 (33) | 19,355 (37) | * |
| Catherine DeFrancesco ITF Summer Defrancesco | 22,911 (7) | * | 7,112 (33) | 19,355 (38) | * |
| Clara Serruya | 266,667 (8) | 2.29% | 533,334 (33) | - | * |
| DeFrancesco Motorsports Inc. | 5,333 (9) | * | 10,666 (33) | - | * |
| Delavaco Holdings Inc. | 10,667 (10) | * | 21,334 (33) | - | * |
| Eduardo Vivas | 6,667 (11) | * | 13,334 (33) | - | * |
| First Canadian Insurance Corp | 14,000 (12) | * | 28,000 (33) | - | * |
| Glass Investments LP | 13,444 (13) | * | 26,888 (33) | - | * |
| Grander Holdings, Inc. 401K | 217,733 (14) | 1.86% | 266,666 (33) | 84,400 (39) | * |
| GRQ Consultants, Inc. | 22,222 (15) | * | 44,444 (33) | - | * |
| GT Capital Inc | 29,436 (16) | * | 26,666 (33) | 16,103 (40) | * |
| Hudson Bay Master Fund Ltd | 333,334 (17) | 2.87% | 666,668 (33) | - | * |
| Interward Capital Corp. | 4,000 (18) | * | 8,000 (33) | - | * |
| Intracoastal Capital LLC | 133,334 (19) | 1.15% | 266,668 (33) | - | * |
| McGilligan Barry Investment | 11,100 (20) | * | 22,200 (33) | - | * |
| Marcandy Investments Corp. | 5,333 (21) | * | 10,666 (33) | - | * |
| Monroe Capital, LLC | 22,000 (22) | * | 44,000 (33) | - | * |
| Melechdavid Inc. | 131,945 (23) | 1.12% | 88,890 (33) | 87,500 (41) | * |
| Michael Ference | 4,444 (24) | * | 8,888 (33) | - | * |
| Millennium Insurance Corp. | 7,000 (25) | * | 14,000 (33) | - | * |
| MMCAP International Inc. SPC | 366,667 (26) | 3.15% | 733,334 (33) | - | * |
| Namaste Gorgie, Inc. | 42,927 (27) | * | 21,334 (33) | 32,260 (42) | * |
| Northurst, Inc. | 592,089 (28) | 4.99% | 177,778 (33) | 612,000 (43) | 4.99% |
| Paradox Capital Partners LLC | 4,444 (29) | * | 8,888 (33) | - | * |
| Rockhaven Holdings Ltd. | 6,000 (30) | * | 12,000 (33) | - | * |
| Sunnybrook Preemie Investments Inc. | 11,666 (31) | * | 23,332 (33) | - | * |
| York Plains Investment Corp. | 8,900 (32) | * | 17,800 (33) | - | * |

\*   Less than 1%.

\*\*  Based on 11,652,270 shares of Common Stock outstanding as of February 5, 2018.

323.    As in previous Forms S-3, Riot stated that *"[n]one of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our*

*subsidiaries within the past trhee years other than as a result of the ownership of our shares or other securities."*

324.    The above statements in Riot's February 7, 2018 Form S-3/A were materially false and misleading when made and otherwise omitted material information because it states that "*none*" of the selling stockholders "*has had a material relationship*" "*in the past three years*" with the Company when in fact Defendant Honig and various other selling stockholders, including Honig Group members Groussman and Stetson, as well as then-current Riot board members Kaplan and So, had *existing* financial ties to Riot by virtue of their undisclosed investment in Coinsquare.  As investors in Coinsquare these Defendants were parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement – an agreement in which Riot was also a party.  Additionally, Defendants Honig and Defrancesco were undisclosed investors in Kairos, a company that Riot acquired in November 2017.

325.    In addition, the above statement in Riot's February 7, 2018 Form S-3 was materially false and misleading when made due to Honig's relationship with Defendant O'Rourke. According to the allegations in the *Honig* Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson, and Groussman.  This highly unusual arrangement between a Company CEO and a significant outside shareholder appeared to be confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke. Additionally, as demonstrated by the charts in ¶¶ 79-80, Defendant O'Rourke has had several previous investments with Defendant Honig and other members of the Honig Group.

I.     **February 11, 2018 – *The Denver Post* Publishes Statements by O'Rourke and Honig**

326.    On February 7, 2018, *The Denver Post* published an article based on interviews with Defendants O'Rourke and Honig.  The article quoted O'Rourke:

> ***"I'm a big believer in the company and in what we're working on. We're the best situated in the space.  We're well capitalized."***

* * *

> ***"In this day and age, there are a lot of skeptics and naysayers.  People are looking to short and distort,"*** O'Rourke said.  ***"But ultimately, there is an explanation for everything.  Hopefully that's the story here."***

327.    The article also quoted Defendant Honig:

> Many of Riot's current investors are newer to the company but Barry Honig, the investor who could be credited with the company's new destiny, was there in 2016 when it was called Venaxis.  He said that he got involved only after a friend told him about the money losing stock.  He saw that the biotech firm never quite recovered from a U.S. Food and Drug Administration rejection, still had cash and overpaid its executives.

> "In two years, the stock is up five times," said Honig, who earlier had joined O'Rourke in suing another small startup run by anti virus icon John McAfee for breach of contract.  ***"Myself, being involved as an early shareholder, people who followed me, they've benefited."***

* * *

> "***At the end of the day, the CEO of the company changed the name and direction***," Honig said. "***Not me.***"[44]

328.    Defendants O'Rourke and Honig's above statements published by *The Denver Post* were materially false and misleading when made and otherwise omitted material information because they attempted to dispel the allegation in some "***skeptics and naysayers***" in the media that Defendant Honig exercised certain influence or control over the Company's affairs, including Riot's transformation into cryptocurrency, through his and other Honig Group members'

---

[44] Tamara Chuang, *What's all the Riot?*, The Denver Post (Feb. 11, 2018).

beneficial share ownership or close ties to O'Rourke and other Riot insiders. These statements were also materially false and misleading in that they attempted to rebut recent allegations of insider trading.

**J.      February 13, 2018 – Honig Files an Amended Statement of Beneficial Ownership (Form SC 13D/A)**

329.    Honig belatedly revealed that as of January 4, 2018, he had sold all but a 1.47% stake in Riot. His previous filing, on January 5, 2017, had disclosed an 11.19% stake in Riot "as of November 11, 2016. Thus, nearly a year had passed since Honig had filed a Form 13D.

330.    In an interview with CNBC, former SEC Chairman Harvey Pitt said this length of time is nowhere close to what he would consider to be "timely" disclosure.[45]

331.    Indeed, according to 17 CFR § 240.13d-2, "If any material change occurs in the facts set forth in the Schedule 13D (§ 240.13d-101) required by § 240.13d-1(a), including, but not limited to, any material increase or decrease in the percentage of the class beneficially owned, the person or persons who were required to file the statement shall promptly file or cause to be filed with the Commission an amendment disclosing that change. An acquisition or disposition of beneficial ownership of securities in an amount equal to one percent or more of the class of securities shall be deemed "material" for purposes of this section . . . ."

---

[45] Specifically, former-Chairman Pitt stated: "Timely is, particularly if you have a critical position with the company or have already been disclosed as an owner, you're supposed to file updates promptly, and certainly not longer than 10 days at the most," Pitt said. *See* CNBC, Former SEC chair on market manipulation and regulating cryptocurrency, available at https://www.cnbc.com/video/2018/02/16/former-sec-chair-on-market-manipulation-and-regulating-cryptocurrency.html. *See also* https://www.sec.gov/fast-answers/answerssched13htm.html ("Any material changes in the facts contained in the [Schedule 13D] require a prompt amendment."); https://en.m.wikipedia.org/wiki/Schedule_13D ("A filer must promptly update the Schedule 13D filing to reflect any material change in the facts disclosed, including, among other things, the acquisition or disposition of 1% or more of the class of securities that are the subject of the filing.").

**K.      February 16, 2018 – CNBC Publishes a Video Entitled "CNBC Investigates: Red Flags Raised Over Riot Blockchain"**

332.     According to CNBC's Michelle Caruso Cabrera:

We wanted to find out who was behind Riot Blockchain, but for weeks no one would talk to us.  So we decided to see if we could get answers here at the swanky Boca Raton Resort and Club in Florida.  That's where Riot's annual shareholders' meeting was set to take place.  It would be an upscale setting for this upstart company with red ink, as far as their most recent quarterly report shows.  But as we quickly learned, that annual meeting wasn't going to take place.  Twice Riot Blockchain announced they were going to hold their annual shareholders' meeting here at the Boca Raton Resort and Club.  Twice at the very last minute, in fact the night before, they announced that they were postponing the meeting.  ***And in fact the hotel tells us there was never a meeting room ever booked under the name Riot Blockchain.  So we drove to this nearby office building, trying to find Barry Honig.  According to SEC filings, he may be the man behind the curtain.  He was an early investor in Riot, back when it was Venaxis, a medical testing company, and then eventually Bioptix.  He led an activist move to replace the board, and he eventually won.   The new board changed the name from Bioptix to Riot Blockchain.   "Hello? Hi. Michelle Caruso-Cabrera."   As the elevator door opened in front of us, not Barry Honig, but this man, John O'Rourke, the CEO of Riot Blockchain, the same John O'Rourke who made news in December for selling about $869,000 worth of Riot stock just two months after the company changed its name.  O'Rourke quickly closed the door.***   Five minutes later he emerged and agreed to talk to us, but only off camera.  He said he was here for a meeting with Honig when he arrived, and that we had just missed him.  O'Rourke insisted that he does not work out of Barry Honig's office, even though we found him there.



333.    The CNBC broadcast narrated their encounter with Defendant O'Rourke:

During that hour-long off-camera meeting, O'Rourke told us his Riot stock sale was merely to pay taxes on his restricted stock. And as for the sharp rise in shares of Riot, O'Rourke said that was unexpected and ridiculous. ***He also said he isn't worried about the SEC because "we over-disclose."***

334.    CNBC noted that when Honig "agree[d] to talk to [CNBC] by phone", he "downplayed his influence with Riot and John O'Rourke":

"MR. HONIG:  ***John O'Rourke's an adult, and he makes his own decisions, okay?***

**[MS. CARUSO-CABRERA:] In 2000 you were fined for $25,000 and suspended ten days by FINRA for stock manipulation.  You're no longer a licensed broker.  Do you still manipulate stocks?**

**[MR. HONIG:]** ***<u>The answer's no.</u>***  Continue.  I'm a successful investor.  I'm a comfortable person.  I don't need to work today.  I have a beautiful family that's college educated, and I'm very comfortable.  **I am very comfortable.** ***The truth will come out."***

335.    CNBC's Ms. Caruso-Cabrera further reported that "***Honig acknowledged he's done this before.  Five years ago he and John O'Rourke were involved in another company that changed its business model to blockchain.  That stock also skyrocketed***.  Today it's trading around two bucks a share.  Oh, and it's changed its business model again, to cloud computing for cars.

336.    As CNBC's Ms. Caruso-Cabrera noted, "Just this week a new filing from Barry Honig, which shows he sold a massive amount of shares, his common stock down to little more than 173,000.  So as Riot was issuing press release after press release promising great plans for the company, Honig was selling, making millions of dollars along the way."

**L.        February 16, 2018 – "CNBC Investigates . . . Riot Blockchain"**

337.     On February 16, 2017, at 9:54 a.m., CNBC published the article "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket" regarding questionable practices at Riot, stating in relevant part:

> As bitcoin hit record highs in late December, a hot new stock was making news on a daily basis. Riot Blockchain's stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto.
>
> **But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease.**
>
> That might sound somewhat like the type of newly minted blockchain company that has gained SEC attention.
>
> **"Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain," SEC Chairman Jay Clayton said, speaking in generalities in recent testimony to Congress. The SEC declined to comment to CNBC about Riot Blockchain.**
>
> The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.
>
> That purchase and the company's name change aren't Riot's only questionable moves.
>
> **A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in.**
>
> * * *
>
> **Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida.** The resort is known as the "pink palace" and has luxury yachts lined up on its dock.
>
> **But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for Feb. 1. It's not clear the company ever**

121

*planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity.*

Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.

*That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton. That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose office is a short drive from the hotel. He once owned more than 11 percent of the outstanding common stock, according to SEC filings.*

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone. "*It was an investment where I had a return. And I sold some shares. There's nothing wrong with doing that*."

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

"Typically, Barry Honig invests his hard-earned money into a company, and he also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

A visit to the site now only reveals the text: "Under construction."

From the outside, Honig's office is nondescript. There does not appear to be any evidence of his company's existence on the building's directory or on the door of his office.

*When CNBC crew members walked into the office, they didn't find Honig, they found O'Rourke.* That's the same O'Rourke who made headlines when — less than three months after the company changed names and business plans — he sold about $869,000 worth of shares, according to an SEC filing. He told the crew he was there for a meeting with Honig and that we had just missed him.

O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed." Then, late the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.

He agreed to answer questions via email instead. One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.

*"I have my own office in a separate location," O'Rourke said in an email sent by his lawyer, Nick Morgan, a partner with Paul Hastings. "I do have a good relationship with Mr. Honig and we speak often."*

*"John O'Rourke does not work out of my office," Honig said. "John O'Rourke has his own office ... at one time John O'Rourke had space in my office ... we speak often."*

*Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information.*

*"You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or dialogue about what's appropriate for the company on a day to day basis or in the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP.*

Despite Honig's website saying he gives advice on who should lead a company, Honig said he had nothing to do with O'Rourke becoming CEO.

*"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.*

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

*"I see a company that has had a change of control of the board. I see a company that has had a change in business. I see a company that has had several dilutive issuances immediately following the change of the board and change of the business. And I see a stock that has gone zoom," he said. "And what I understand a significant amount of insider selling. So yes, these are red flags."*

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million.  On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings. Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent. After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants. *His purchase price ranged from $2.77 to $5.32 per share, according to the list of trades he provided to the SEC in 2017*. *Honig's investment dropped below 5 percent, the threshold for SEC filing, on Nov. 28.  At that point, the stock had already climbed above $20.*

Honig did not disclose his dramatically reduced position in the stock until this week.

*But that may not be the true extent of Honig's selling. Buried deep in the footnotes of Riot filings, it's clear Honig also accumulated more than 700,000 new warrants that he could convert to stock at $3.56 per share and more than 700,000 promissory notes that he could convert to stock at $2.50 a share.*

*What about those warrants and promissory notes? It's not clear, as he never mentioned them in either 13D. But in another footnote from a recent Riot filing, there is no longer a mention of them.*

He declined to further clarify what happened to them.

*"It's all disclosed in the public filings. And those are all the obligations I have," he said. "I'm very comfortable with what I had to do and what I was obligated to do. ... I'm not going to talk about my personal trading history or my bank account."*

*Birns questioned how Honig made his filings. "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant amount of stock. Or has the potential to own significant amount of stock in excess of what is reported on the 13D," he said.*

*This is not the first time Honig has faced questions over his actions. In 2000, he was alleged to have committed stock manipulation. Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse.*

*"The answer's no,"* Honig said when asked if he still manipulates stocks.

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to SEC filings.

When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up.

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

***One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase. Kairos' main asset was $2 million of mining equipment. Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings.***

***O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.***

Kairos appears to have many links to Riot. The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

***O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada. Despite the many press releases, there has been no formal mining announcement.***

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining. ***SEC filings are silent on mining activity***.

As for professional poker players advising Riot?  O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social media followers.  He called them "thought leaders."

Riot is not O'Rourke and Honig's first cryptocurrency investment.

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. "*I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot*."

Honig acknowledges the investment.

The questions continue for Riot Blockchain.

On Tuesday, Riot filed to withdraw prior SEC filings.

"It is not the result of any government inquiry," O'Rourke said in an email. "It was just corporate clean up from our securities counsel."

As for the annual shareholders' meeting, "We did not have a quorum of shareholders required for a vote," O'Rourke said in the email from his lawyer. "We are also working on other corporate action items that would require shareholder approval and a shareholder meeting as well. We did not want to waste the time and expense of potentially having two shareholder meetings within a short period of time. Thus we adjourned the meetings, which is not an uncommon practice."

There is no new date for the shareholders' meeting.

"You see companies adjourn meetings in a context of a contested election and the like," Birns said. "I just don't think in this instance, there's any reason to adjourn their annual meeting."

And as to O'Rourke selling stock in December?

*He told CNBC in the email: "I sold less than 10 percent of my overall position to assist with covering tax obligations as a result of so-called phantom income tax from the vesting of restricted stock awards. It is common for Executives to sell*

*stock to cover such tax obligations. **I could have sold more stock in that window but chose to sell just 30,383 shares.***"

O'Rourke welcomes increased regulation and transparency for the cryptocurrency industry. "***Unfortunately, as with many new hot sectors, it [blockchain] has attracted some bad actors trying to capitalize on the hype***," he said. "Riot is all for increased transparency and properly imposed regulation."

Honig would not disclose how much he made on his investment in Riot, "***I wasn't fortunate enough to do as well as you might think and people might speculate. ... I don't regret anything***."

(Emphases added).

338.    As the market reacted to CNBC's video and article regarding Riot, the Company's

***share price fell 33.4%***, or $5.74 per share, from closing at $17.20 per share on February 15, 2018,

to closing at $11.46 per share on February 16, 2018, damaging Lead Plaintiff and the other Class

members.

339.    Other news outlets and investment analysts immediately picked up, republished,

and commented on CNBC's reporting.  For example, the same day *Zacks Investment Research*

published a report titled "Here's Why Riot Blockchain Stock Crashed Today."[46]

**M.     February 16, 2018 – Riot and O'Rourke Respond to CNBC**

340.    In response to the CNBC article, on February 16, 2018, Riot issued the following

press release in which Defendant O'Rourke directly addressed the Company's shareholders:

Dear Shareholders,

Thank you for your support in our vision to build a leading blockchain technology company. ***I believe we are well positioned at the forefront of this industry with many exciting opportunities on the horizon***.

Today, CNBC released a negative one-sided piece on companies that seek to jump on the blockchain bandwagon by changing their name and profiled our company. Had the journalist used even a modest amount of professional diligence, CNBC

---

[46] Ryan McQueeney, *Here's Why Riot Blockchain Stock Crashed Today*, Zacks Investment Research (Feb. 16, 2018).

would have also reported on the numerous achievements we have made in becoming an early entrant in the support of blockchain and cryptocurrency technologies. To my knowledge, we were also the first Nasdaq listed company to have blockchain in its name *and had no idea what the market reaction would be when the transition was made.*

Not to be deterred, I wish to provide an update of where Riot Blockchain stands today and respond to some of their attacks. *We have made significant inroads in building a diversified portfolio of investments and to begin securing digital assets.*

\* \* \*

*We take our SEC reporting obligations seriously and diligently file all reports and filings. We have expended enormous effort to inform investors of the risks of our foray into uncharted territory.*

341.    Also on February 16, 2018, O'Rourke gave "an interview with Business Insider" during which O'Rourke "called the [CNBC] report 'one-sided' and a 'hit piece' that has 'wiped out significant shareholder value.'"[47]   During the interview, O'Rourke also stated: "'I sold less than 10% of my overall position to assist with covering tax obligations as a result of so-called phantom income tax from the vesting of restricted stock awards,' he told Business Insider.  '*I am not wealthy and am working to build a business here*.'"

342.    Defendant O'Rourke's statements above to Riot shareholders in the Company's February 16, 2018 press release and during O'Rourke's interview with Business Insider were materially false and misleading when made because Riot <u>not</u> "*did diligently file all reports and filings*" prior to the CNBC report.  For example, it was not until May 2018 that Riot first disclosed in amended SEC filings that Defendant Honig and other large shareholders participated in previously undisclosed related party transactions, including Coinsquare, Karios and Riot's December 19, 2017 Private Placement offering.  Indeed, not only did the Company fail to disclose

---

[47] *See*  Graham Rapier, Riot Blockchain plummets after CNBC investigation finds no evidence of an advertised shareholders meeting (RIOT) https://markets.businessinsider.com/news/stocks/riot-blockchain-plummets-after-cnbc-investigation-2018-2-1016030467.

these and other financial interests, it affirmatively represented in its 2017 Proxy Statement that no such transactions had occurred.

343.    In addition, O'Rourke's statement to Business Insider that he was "***not wealthy***" was materially misleading because in 2017, Riot paid O'Rourke $2,991,842 in compensation, during which time O'Rourke resided in a 3,955-square foot waterfront home with an assessed value of $1.4 million.

### N.    Also on February 16, 2018, Riot Announces Its Purchase of "3,800 Bitcoin Mining Machines" from Prive Technologies LLC

344.    On Friday, February 16, 2018, at 4:54 p.m., the same day that Riot's stock price fell 33.4% in response to the above CNBC investigative report, Riot issued a Form 8-K disclosing that Riot's subsidiary Kairos had agreed to purchase "3,800 AntMiner S9s, all manufactured by industry leader Bitmain" from a company named Prive Technologies LLC ("Prive") for $11 million in cash and 1 million shares of Riot common stock, with 200,000 of the shares escrowed pending certain performance milestones.

345.    The above statements in Riot's February 16, 2018 Form 8-K were materially false and misleading when made for the reasons discussed above, similar to Riot's transaction with Kairos, Riot had purchased these machines from Prive at grossly inflated prices from what it could have paid in an unconflicted retail transaction at the time, and had not disclosed that Prive was in fact substantially owned by Defendants Honig and DeFrancesco.

### O.    March 26, 2018 – Definitive Proxy Statement (Schedule 14A)

346.    On March 26, 2018, Riot filed its Definitive Proxy Statement on Schedule 14A ("2018 Proxy").   In its filing, which was signed by Defendants O'Rourke and Kaplan, Riot disavowed any undisclosed related-party transactions by any "any of our executive officers,

directors, or greater than five percent shareholders, or any members of their immediate families .

. . *during the last fiscal year*":

### Certain Relationships and Related Transactions

*Except for the employment agreements previously entered into between us and certain of our named executive officers, since January 1, 2016, none of our directors or named executive officers, nor any person who owned of record or was known to own beneficially more than 5% of the outstanding shares of our common stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect us.*

347.    For all the reasons that the Company's 2017 Proxy Statement was false and misleading, the same is true for the 2018 Proxy.

### P.    April 30, 2018 – Amended Annual Report (Form 10-K/A)

348.    On April 30, 2018, Riot filed an Amended Annual Report on Form 10-K/A.  The report stated:

### ITEM 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

*Except for the employment agreements previously entered into between the Company and certain of its named executive officers (as described in Item 11 above), since January 1, 2017, none of the directors or named executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its Common Stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company.*

349.    For all the reasons that the Company's 2017 Proxy Statement was false and misleading, the same is true for the 2018 Proxy.

### Q.      May 17, 2018 – Quarterly Report (Form 10-Q)

350.      On May 17, 2018, Riot filed a quarterly report with the SEC on a Form 10-Q in

which it provided additional information on the SEC investigation.  The Form 10-Q stated, in

relevant part:

> On April 9, 2018, the Company received a subpoena requesting documents from
> the U.S. Securities and Exchange Commission pursuant to a formal order of
> investigation.
>
> As part of its ongoing review of the Company's SEC filings, the Company has
> received and responded to comments from the staff of the SEC regarding certain
> developments      and      the      Company's      ongoing      development      of      a
> blockchain/cryptocurrency business model.  These inquires include the proper asset
> classification, applicability of the Investment Company Act or 1940, to the
> Company's business and affairs and accounting treatment of its cryptocurrency.
> The resolution of these matters is ongoing . . . .

### R.      May 25, 2018 – Amended Current Report (Form 8-K/A)

351.      On May 25, 2018, Riot filed a Form 8-K/A in which the Company amended its

Form 8-K filed on October 4, 2017, by disclosing for the first time the "Amended and Restated

Unanimous Shareholder Agreement, dated October 2, 2017," pursuant to which Riot (then still

called Bioptix) had invested $3 million to purchased units of Coinsquare.  According to the

agreement, in addition to Bioptix, the following individual were also "ISSUED SHARE

CAPITAL" as part of Riot's agreement with Coinsquare:

- Barry Honig
- GRQ Consultants Inc Roth 401K FBO Barry Honig
- Titan Multi-Strategy Fund I, Ltd. (Jonathan Honig is the Manager)
- Michasel Brauser
- Erica and Mark Groussman Foundation
- Stetson Capital Investments Inc.
- Eric So
- Jason Theofilos, CEO of Mundo, Inc. (via "2330573 Ontario Inc.")
- Ross Levinson, Executive Chairman of Mundo, Inc.

S.     **June 29, 2018 – Amended Annual Report (Form 10-K/A)**

352.    On June 29, 2018 – Amended Annual Report on Form 10-K/A whose "purpose" was "to response to certain comments made by the staff . . . of the [SEC] in a comment letter dated June 15, 2018" to "Item 1, Item 1A, Item 10 and Item 13 information." In the June 29, 2018 Form 10-K/A, Riot admitted that it had purchased its "***specialized servers manufactured by Bitmain***" from "third parties, some of whom were shareholders in the Company" and that Riot "paid a premium over the listed retail cost from the manufacturers" to those shareholders:

**ITEM 1. BUSINESS . . .**

***The Company has acquired all of its servers from third parties, some of whom were shareholders in the Company** as well, and certain of the acquisitions have included access to operating facilities, support and related equipment for which **the Company has paid a premium over the listed retail cost from the manufacturers**.*

353.    The June 29, 2018 Form 10-K/A also disclosed that the above-referenced third-party shareholders to whom Riot had paid premiums included Defendants Honig and DeFrancesco:

**ITEM 13.     CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.**

The Audit Committee has responsibility for reviewing and, if appropriate, for approving any related party transactions that would be required to be disclosed pursuant to applicable SEC rules. This includes current or proposed transactions in which the Company was or is to be a participant, the amount involved exceeds the lower of either $120,000 or 1% of the average of the Company's total assets at year-end for the last two completed fiscal years, and in which any of the Company's executive officers, directors, or greater than five percent shareholders, or any members of their immediate families, has a direct or indirect material interest. Apart from any transactions disclosed herein, no such transaction was entered into with any director or executive officer during the last fiscal year. Such transactions will be entered into only if found to be in the best interest of the Company and approved in accordance with the Company's Code of Ethics, which are available on the Company's web site.

As previously reported by us, per Schedules 13D filed with the Securities and Exchange Commission, certain persons reported that they had beneficially owned greater than 10% of the dispositive and voting power of the Company's common stock.

Mr. Barry Honig reported beneficial ownership of approximately 11.2% of the Company's common stock as of January 5, 2017 (based upon 4,503,971 shares outstanding at that time).  Pursuant to Schedule 13D/A filed by Mr. Honig on February 12, 2018 Mr. Honig reported that he ceased to be the beneficial owner of more than 5% of the common stock of the Company on November 28, 2017.  Mr. Honig invested $1,750,000 in the March 2017 Convertible Note Private Placement (see Note 7 of the 10-K) and $500,000 in the December 2017 Common Shares Private Placement (see Note 7 of the 10K). GRQ Consultants, Inc., a related party of Mr. Honig, received a cash payment of $50,000 for diligence services in connection with the Company's investment in Coinsquare (see Note 4 of the 10-K).

Ms. Catherine Joanna DeFrancesco reported beneficial ownership of approximately 11.45% of the Company's common stock as of January 10, 2017 (based upon 4,503,971 shares outstanding at that time).  Per Schedule 13D/A filed by Ms. DeFrancesco with the SEC, Ms. DeFrancesco reported that she beneficially owned greater than 5% of the dispositive and voting power of the Company's common stock on January 10, 2017.  Ms. DeFrancesco reported beneficial ownership of approximately 11.45% of the Company's common stock as of January 10, 2017. Ms. DeFrancesco invested $360,000 in the Company's December 2017 Common Shares Private Placement (see Note 7 of the 10K).

As previously disclosed, on November 1, 2017, the Company entered into a business combination share exchange agreement (the "Agreement") with Kairos Global Technology, Inc., a Nevada corporation ("Kairos") and on November 3, 2017, closed on the agreement.  Under the Agreement, the shareholders of Kairos agreed to exchange all outstanding shares of Kairos' common stock to the Company and the Company agreed to issue an aggregate of 1,750,001 shares of Series B Convertible Preferred Stock (the "Series B Preferred Stock") which are convertible into an aggregate of 1,750,001 shares of the Company's common stock(the "Kairos Transaction") to such shareholders. The shareholders of Kairos also will also be entitled to a royalty (the "Royalty") to be paid from cash flow generated from operations, which shall entitle such shareholders to receive 40% of the gross profits generated on a monthly basis until they have received a total of $1,000,000, at which point the royalty is extinguished.

**Mr. Honig was a shareholder of Kairos at the time of its acquisition by the Company on November 3, 2017** (see Note 2 of the 10-K).  **Based upon information provided by Kairos at the closing of the Kairos Transaction, Mr. Honig owned approximately 8.6% of Kairos.**  Accordingly, Mr. Honig would receive his proportionate allocation of the purchase price shares of Series B Preferred Stock and Royalty described above. As of November 3, 2017 the closing price per share of common stock of the Company as reported on NASDAQ was $6.75 per share.  Accordingly, the pro rata consideration received by Mr. Honig in the transaction would have been equal to the value of approximately 150,500 shares of common stock upon conversion of Series B Preferred Stock.

**Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company on November 3, 2017** (see Note 2 of the 10-K). **Based upon information provided by Kairos at the closing of the Kairos Transaction Ms. DeFrancesco owned approximately 6.3% of Kairos.** Accordingly, Ms. DeFrancesco would receive her proportionate allocation of the purchase price shares of Series B Preferred Stock and Royalty described above. As of November 3, 2017 the closing price per share of common stock of the Company as reported on NASDAQ was $6.75 per share. The pro rata consideration received by Ms. DeFrancesco in the transaction would have been equal to the value of approximately 110,250 shares of common stock upon conversion of Series B Preferred Stock.

354.    On this news, the price of Riot's stock declined approximately *26.1%*, or $1.38 per share, from the previous day's closing price, to close at $4.30 per share on September 7, 2018.

### T.    July 10, 2018 – Securities Registration Statement (Form S-3)

355.    On July 10, 2018, Riot filed Registered Statement on Form S-3 for the registration of up to $100,000,000 of common stock, preferred stock, warrants, and units. The July 10, 2018 Form S-3 incorporated by reference Riot's 2017 Form 10-K, as amended; May 17, 2018 Form 10-Q; Definitive Proxy Statement and additional materials filed from March through June 2018; and various Current Reports filed between January 5, 2018 and June 15, 2018

356.    Riot's July 10, 2018 Form S-3 was materially false and misleading to the Company's public investors for the reasons discussed in Section V, above with reference to materials incorporated by reference in the Form S-3.

## X.    SEC FILES SUIT AGAINST DEFENDANTS HONIG, O'ROURKE, STETSON, AND OTHERS

357.    On September 7, 2018, the SEC filed the *Honig* Action against Defendants O'Rourke, Honig, Stetson, and Groussman, as well as Frost, Brauser, and others, for numerous violations of the Exchange Act and Securities Act. The *Honig* Action is captioned *Securities and Exchange Commission v. Honig, et al.*, No. 1:18-cv-08175 (S.D.N.Y.). The SEC alleged that the defendants were involved in "three highly profitable 'pump-and-dump' schemes . . . from 2013

through 2018 in the stock of three public companies (Company A, Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares."  SEC Compl. ¶ 1.

358.    According to the SEC, "Honig was the primary strategist, calling upon other Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity."  The SEC further alleged that "[i]n each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse merger or by participating in financings on terms highly unfavorable to the company."  *Id.*, ¶ 2.

359.    The *Honig* Action also alleges that, "[t]o profit from their investment, in each scheme, Honig and his associates would arrange and pay for the promotion of the stock, directing their co-defendant Ford, or a similar promoter, to write favorable and materially misleading articles about the company whose stock price they wanted to inflate.  In several instances, to magnify the intended boost to volume and price that would follow a promotional article's release, ***Honig***, Brauser, ***O'Rourke***, ***Groussman***, Melechdavid and ATG ***engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock, priming investor interest***."  *Id.*, ¶ 3 (emphases added).

360.    In an accompanying press release, Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement, stated that "Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets."

361.    On this news, the price of Riot's stock declined $1.38 per share, or approximately ***26.1%***, from the previous day's closing price, to close at $4.30 per share on September 7, 2018.

362.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Class members have suffered significant losses and damages.

## XI.    POST-CLASS PERIOD DEVELOPMENTS

363.    On November 19, 2018, Riot filed a Form 10-Q with the SEC, in which Riot disclosed that it had received an "SEC Subpoena" on April 9, 2018.

364.    Riot also disclosed that Defendant Honig, "together with other group members," and Defendant DeFrancesco each "owned greated than 10% of the dispositive and voting power of the Company's common stock":

**Note 13. Related Party Transactions:**

**Per Schedules 13D filed with the Securities and Exchange Commission, each of <u>Barry Honig (together with other group members</u>) and <u>Catherine Johanna DeFrancesco</u> during a portion of 2017 beneficially <u>owned greater than 10% of the dispositive and voting power of the Company's common stock.</u>** Mr. Honig reported beneficial ownership of approximately 11.2% of the Company's common stock as of January 5, 2017 and Ms. DeFrancesco reported beneficial ownership of approximately 11.45% of the Company's common stock as of January 10, 2017. Mr. Honig invested $1,750,000 in the Company's March 2017 Convertible Note Private Placement. GRQ Consultants, Inc., a related party of Mr. Honig, received a cash payment of $50,000 for diligence services in connection with the Company's September 2017 investment in Coinsquare. Each of Mr. and Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company, with Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned approximately 6.3% of Kairos. Each of Mr. Honig and Ms. DeFrancesco invested in the December 2017 Common Share Private Placement, with Mr. Honig investing $500,000 and Ms. DeFrancesco investing $360,000. See also disclosures in Notes 3, 12 and 14.

365.    Riot also disclosed that the SEC's Division of Corporation Finance and the Division of Investment Management had issued Riot "several comment letters" concerning the "unsettled

nature of accounting treatment for the Company's cryptocurrency mining and the fair value method selected by the Company . . . ."[48]

366.    Riot also disclosed that the SEC had issued an Order Directing Examination and Designating Officers Pursuant to Section 8(e)[49] of the Securities Act of 1933 with respect to the Company's Forms S-3 and S-3/A filed on (1) July 19, 2017; (2) January 5, 2018; (3) February 7, 2018; and (4) July 10, 2018, and that while SEC had terminated its Section 8(e) examination, the "SEC investigation associated with the subpoena received by the Company on April 9, 2018 is still ongoing."

367.    Riot also announced that the Company had made $2,342,508 in cryptocurrency revenue in Q3 2018 and a net loss of in excess of $6.2 million.

368.    On December 20, 2018, the SEC filed a letter to inform the *Honig* Action court that "certain Defendants have agreed to settlements in principle" and that "[c]ertain other Defendants have approached the staff to discuss possible settlement and to share their views about the allegations in the existing Complaint."

369.    A week later, on December 27, 2018, the SEC announced a proposed settlement with one of the defendants, Frost, pursuant to which Frost will pay $5.5 million to the SEC and is permanently barred from participating in offerings of penny stocks (with limited exceptions).

---

[48] Riot disclosed that the SEC's comments involved the Company's disclosures in Riot's (1) Quarterly Report for the period ended March 31, 2018 (May 17, 2018 Form 10-Q); and (2) Annual Report for period ended December 31, 2017 (Apr. 17, 2018 Form 10-K); (3) Amended Annual Reports for period ended December 31, 2017, which Riot filed as Forms 10-K/A on April 30, 2018 ("Amendment No. 1") and June 29, 2018 ("Amendment No. 2"); and (4) October 4, 2017 Current Report on Form 8-K.

[49] Under Sections 8(d)-(e), the SEC "is empowered to make an examination" and if "it appears to the [SEC] . . . that [a] registration statement includes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading," the SEC may "issue a stop order suspending the effectiveness of the registration statement."  15 U.S.C. § 77h(c)-(d).

370.     On January 2, 2019, Opko settled the pump-and-dump charges with the SEC in the *Honig* Action and agreed to pay a $100,000 fine.

371.     On January 10, 2019, the SEC filed a consent judgement of the charges against Opko.  As part of that settlement, in addition to the penalty of $100,000, Opko also agreed to the following, among other things:  (i) the establishment of a "Management Investment Committee" that will make recommendations to an "Independent Investment Committee" of the Board of Directors "to handle existing and future strategic minority investments for so long as Dr. Philip Frost ('Frost') is a shareholder in or holds any management or board-level position" at Opko; and (ii) retain an Independent Compliance Consultant to review "prior starategic minority investments by [Opko] made at the suggestion of and in tandem with Frost"; and (iii) review Opko's "existing policies and procedures to determine whether they are sufficient to ensure compliance with Exchange Act Section 13(d)."

372.     On January 18, 2019, Defendant Groussman settled the charges brought against him in the *Honig* Action.  As part of the settlement, Defendant Groussman was barred from participating in any offering of penny stock for five years and ordered to pay disgorgement of $1,051,360, plus prejudgment interest of $170,554.78, and a civil penalty of $160,000.  *See* No. 1:18-cv-08175-ER (S.D.N.Y.), ECF No. 93.

373.     On March 8, 2019, the SEC filed a First Amended Complaint in the *Honig* Action, which substantially built on the allegations in the original complaint.  Several weeks later, on April 26, 2019, the SEC wrote to the court to request a stay of briefing following an "agreement in principle to settle the Commission's claims for liability against Defendant Honig and his entity, GRQ Consultants, Inc."  *See* No. 1:18-cv-08175-ER (S.D.N.Y.), ECF No. 114.

## XII.   ADDITIONAL SCIENTER ALLEGATIONS

374.   As alleged herein, Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Riot, their control over, and/or receipt and/or modification of Riot's allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information, participated in the fraudulent scheme alleged herein.

375.   Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Defendants.

376.   Several of the Defendants were members of Riot's executive management group during the Class Period.  Based on their roles at Riot, each of these Defendants would have been involved with, or had knowledge of, the wrongdoing alleged herein.

377.   At a minimum, Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Honig was privy to this information through his relationship with, and control over, the Defendants.

378.    Likewise, certain of the Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  Honig was privy to this information through his relationship with, and control over, the Defendants.  Certain of the Defendants had the ultimate authority over and were involved in drafting, producing, reviewing, and/or disseminating the false and misleading  statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

379.    Certain of the Defendants were senior executives involved in Riot's daily operations with access to all material information regarding the Company's core operations.  These Defendants are presumed to have knowledge of all material facts regarding Riot's core business.  Honig was privy to this information through his relationship with, and control over, the Defendants.

380.    Defendants' scienter is further demonstrated by the fact that cryptocurrency and, in particular, Bitcoin mining was allegedly a central part of the Company's success.  Bitcoin was allegedly the cornerstone of (and critically important to) the Company's growth strategy and, as such, constituted a core operation of the Company.  The fact that the misstatements and omissions at issue here pertained directly to Riot's core operations further supports a strong inference of scienter.

381.    When, as here, a senior officer of a company makes false and misleading public statements regarding its core operations, there is a strong inference that such officer knew the

statement was materially false and misleading when made.  Stated otherwise, knowledge of falsity can be imputed to key officers who should have known of facts relating to the core operations of their company.  Moreover, as signatories to the Company's SEC filings, certain of the Defendants had an affirmative obligation to familiarize themselves with the facts relevant to Riot's core operations.

382.    In addition, throughout the Class Period, Riot had very few employees, further strengthening the inference of scienter.  For example, in the Company's annual report filed on April 30, 2018, Riot stated that "[a]s of March 31, 2018, we had nine employees, all of whom are full-time."

383.    The allegations above also establish a strong inference that Riot, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.

384.    Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Riot's true operating condition and present and expected financial performance from investors.  By concealing these material facts from investors, Riot maintained and/or increased its artificially inflated common stock price throughout the Class Period.

385.    As executives of Riot, these Defendants are all candidates for imputing corporate scienter to the Company.

386.    In addition, an executive's insider sales can be probative of scienter.  Here, Defendant O'Rourke's massive insider sales during the Class Period reveals his motive to commit

fraud.  On December 29, 2017, Defendant O'Rouke sold 30,383 shares of Riot stock for proceeds of $869,256.35.  These sales were not made pursuant to a 10(b)5-1 trading plan, further adding to the inference of scienter.  These sales were made just days before the Company announced the dismissal of its auditor and a month before Riot canceled its annual meeting for the second time, causing the NASDAQ to inform the Company that it has violated the NASDAQ's listing requirements.  In addition, indicating that Defendant O'Rouke wanted to sell his stock with minimum attention, his sales were made on the Friday before a holiday weekend.

387.    Likewise, the SEC investigation and filing of the *Honig* Action and subsequent settlements add to the inference of scienter.  On April 9, 2018, the SEC issued a subpoena pursuant to a formal order of investigation.  According to Riot, the SEC's "inquires include the proper asset classification, applicability of the Investment Company Act [of] 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency."

388.    Then, on August 14, 2018, Riot filed a Form 10-Q with the SEC, in which it provided more details about the SEC's investigation.  In particular, the Company reported that the SEC was looking into a number of Riot's registration statements, as well as its acquisition of a minority stake in Coinsquare (the entity in which Defendant Honig had a personal stake).

389.    As noted above, Defendants caused Riot to repeatedly issue stock to retail investors based on the misrepresentation that "none" of the "selling stockholders had a material relationship" with Riot or its subsidiaries.  *See* Section V, *supra*.  On September 10, 2018, a video was posted on YouTube[50] showing Defendants Honig and O'Rourke together in the same room meeting with

---

[50] *See* https://www.youtube.com/watch?v=CrCpLJ5dZYE ("During a CNBC investigation into Riot Blockchain, attorney Harvey Kesner told reporters he didn't know anything about Barry Honig, according to the article. This video shows otherwise. During the '14 Roth Capital conference Barry Honig & his attorney Harvey Kesner allegedly took a bunch of edibles. They got so high, according to our source, that Barry bugged out and called an ambulance on himself. This

Groussman and Harvey Kesner, Honig's longtime lawyer.  The group appear to be recovering together in a hospital room after reportedly attending the 2014 Roth Capital Conference.  The video depicted Riot's CEO, O'Rourke, meeting with "Selling Stockholder" Honig:



390.    Another image from this same meeting, posted on Twitter on October 9, 2018, demonstrates shows "Selling Stockholders" Honig and Kesner:

---

is the video of the aftermath. Also making an appearance in this video are former Riot Blockchain CEO John O'Rourke and Mark Groussman. Everyone depicted in the video (except for Kesner) were subsequently named in an SEC-complaint on September 7th 2018 alleging that the group (along with other individuals and entities) participated in multiple micro-cap pump & dump schemes.").



391.    Groussman is also depicted meeting with Honig, O'Rourke, and Kesner.  This meeting further confirm that Honig, O'Rourke, Groussman, and Kesner knew they were part of a concerted group of associates with a close "material relationship" outside the context of their being merely owners of Riot stock.

392.    The above allegations are specifically included to contradict Kesner's statement to CNBC:  "When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up."[51]

393.    In its November 13, 2018 Form 10-Q, the Company announced that the SEC's investigation was still ongoing.  According to Jake Zamansky, of the securities law firm Zamansky LLC:  "Recent disclosure shows that a cloud still hangs over this company so long as the SEC investigation continues.  The fact that the division of enforcement remains involved and a

---

[51]    *See*   https://www.cnbc.com/2018/02/16/public-company-changes-name-to-riot-blockchain-sees-shares-rocket.html.

registration statement was withdrawn are ominous events for Riot Blockchain."  According to the Company's annual report filed on April 2, 2019, the SEC's investigation remains "ongoing."

394.    Finally, the fact that the SEC filed a complaint against Defendants O'Rourke, Honig, Stetson, and Groussman, as well as other Riot insiders for similar alleged wrongdoing with multiple other companies further adds to the inference of scienter.  *See* Section V, above.  That "multiple defendants"," including Groussman, have already settled with the SEC – "and cumulatively paid more than $7.8 million in disgorgement of ill-gotten gains together with prejudgment interest thereon and civil penalties"[52] – further adds to the inference of scienter.

395.    These facts, in conjunction with the additional indicia of scienter detailed above, particularly Defendants' specific and repeated statements and the nature of the alleged scheme, collectively support a strong inference of Honig and each Individual Defendant's scienter.

## XIII.   LOSS CAUSATION/ECONOMIC LOSS

396.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Riot's common stock and operated as a fraud or deceit on Class Period purchasers of the Company's common stock.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of Riot's common stock fell precipitously as the artificial inflation was removed.

397.    As a result of their purchases of Riot common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused the Company's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $46.20 per share on December 19, 2017.

---

[52] *See* https://www.sec.gov/litigation/litreleases/2019/lr24431.htm.

398.    On December 19, 2017, CNBC's *Fast Money* aired an interview with Left, which called into question Defendants' integrity.  In response, Riot's stock price fell by ***6.42%***, from a closing price of $38.60 per share on December 19, 2017, to a closing price of $36.12 per share on December 20, 2017, damaging Lead Plaintiff and members of the Class.

399.    On December 21 and 22, 2017, numerous articles were released that suggested that Riot's name change to include the word "Blockchain" was a publicity stunt and questioning the legitimacy of the Company.  As a result of the disclosures, Riot's stock price declined $11.60 per share, or ***34.75%***, over the course of those two trading days, damaging Lead Plaintiff and members of the Class.

400.    On January 2, 2018, *Reuters* published an article prior to the market open entitled, "BUZZ-Riot Blockchain down after CEO reports stock offering – RTRS."  The article stated that Riot's stock price was down 4.44% in pre-market trading after Defendant O'Rourke had reported his sale of over 30,000 shares.  An article published during early morning trading hours, on the popular investor website, *The Motley Fool*, entitled, "Riot Blockchain's CEO Just Sold a Lot of Stock," detailed Defendant O'Rourke's suspicious trading.  On this news, Riot's stock price declined $4.04 per share, or ***14.45%***, over two trading days, from $28.40 per share on December 29, 2017, to $24.36 per share on January 3, 2018, damaging Lead Plaintiff and members of the Class.

401.    On January 5, 2018, after the close of trading, Riot filed a registration statement on Form S-3 for the disposition of approximately 3.3 million shares and warrants.  The 1.65 million common shares being registered represented over 14% of the 11.6 million outstanding common shares.  The filing also disclosed that investors who had purchased in the March 2017 Placements would be free to sell their shares once the registration statement was declared effective.  The

possibility of private investors, who bought shares below market value, selling out at a premium, like Defendants Honig and O'Rourke, created a negative market response.   The registration statement also confirmed that Riot had overpaid for Kairos.  It confirmed that Kairos had purchased its equipment for $2,089,679 and the excess purchase price paid by Riot was recorded as $8,637,545, confirming that the Company paid more than four times the price for Kairos's equipment.  The Company's stock price declinrf $1.01 per share, or *4.13%*, from $24.41 per share on January 5, 2018, to $23.42 per share on January 8, 2018, damaging Lead Plaintiff and members of the Class.

402.   On January 31, 2018, before the market opened, *The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."  The article referenced how Defendant Honig had taken an aggressive stake in the Company when it was still in the medical diagnostics business and how he drove out Bioptix's CEO and others, replacing them with his own allies, including Defendant O'Rourke.  Also on January 31, 2018, Riot announced that its previously scheduled annual meeting would be adjourned for *a second time*, purportedly to allow the Company to seek a quorum.  As a result of these disclosures on January 31, 2018, Riot's stock price declined $1.98 per share, *or 14.26%*, over the course of two trading days, from $14.28 per share on January 30, 2018, to $12.30 per share on February 1, 2018, damaging Lead Plaintiff and members of the Class.

403.   On February 16, 2017, CNBC published the article "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket" regarding questionable practices at Riot.  In response, shares of Riot fell $5.74 per share, or approximately *33.4%*, to close at $11.46 per share on February 16, 2018, damaging Lead Plaintiff and Class members.

404.    On April 17, 2018, Riot filed an annual report on Form 10-K, disclosing that on April 9, 2018 it had received a subpoena from the SEC.  On this news, the Company's stock price fell $0.34 per share, or approximately *5.9%*, from the previous day's closing price, to close at $6.87 per share on April 18, 2018, damaging Class members.

405.    On September 7, 2018, the SEC filed the *Honig* Action against several individuals and entities with which they were associated, including Defendants O'Rourke and Honig, for numerous violations of the Exchange Act and Securities Act.  The price of Riot's stock dropped $1.38 per share, or approximately *26.1%*, from the previous day's closing price, to close at $4.30 per share on September 7, 2018, damaging Class members.

406.    As shown above, the timing and magnitude of the price declines in Riot's common stock negate any inference that the losses suffered by Lead Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraud.

## XIV.   CLASS ACTION ALLEGATIONS

407.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those persons or entities who purchased or otherwise acquired the securities of Riot and/or Bioptix (NASDAQ:  RIOT, BIOP) during the Class Period (the "Class") and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

408.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time

and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class.  The Company reported that as of April 12, 2018, it had approximately 1,030 holders of record of its consumer stock.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

409.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

410.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

411.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts as alleged violated the federal securities laws;

(b)    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether Defendants engaged in a fraudulent scheme;

(g) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(h) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

412. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XV. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTION

413. Lead Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine as enunciated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

414. With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Lead Plaintiff and other members of the Class purchased common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

415.    At all relevant times, the market for Riot's common stock was efficient for the following reasons, among others:

(a)    the Company's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)    as a regulated issuer, Riot filed periodic public reports with the SEC and the NASDAQ;

(c)    Riot regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Riot was followed by stock analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

416.    As a result of the foregoing, the market for Riot's common stock promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of the common stock.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of such common stock at artificially inflated prices, and a presumption of reliance applies.

417.    In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims alleged are grounded on Defendants' material omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding Riot's business operations and financial performance – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.

418.    Moreover, when, as here, a defendant (Honig) has engaged in conduct that amounts to manipulation, that conduct creates and independent duty to disclose.  Participants in the securities markets are entitled to presume that all relevant actors are behaving legally and silence that conceals illegal activity is deemed intrinsically misleading.

419.    All that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XVI.   NO SAFE HARBOR

420.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

<u>**COUNT I**</u>

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Riot, O'Rourke, McGonegal, Beeghley, Kaplan, and So**

421.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

422.    This Count is asserted against the Company, O'Rourke, McGonegal, Beeghley, Kaplan, and So, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

423.    During the Class Period, the Company and the other Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were materially misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

424.    The Company and Defendants O'Rourke, McGonegal, Beeghley, Kaplan, and So violated § 10(b) of the Exchange Act and Rule 10b-5(b) in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they

were made, not materially misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and Class members in connection with their purchases of the Company's securities during the Class Period.

425.    The Company and O'Rourke, McGonegal, and Beeghley acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

426.    Defendants O'Rourke, McGonegal, Beeghley, Kaplan, and So, who were the senior officers and/or directors of the Company during the Class Period, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Lead Plaintiff and members of the Class.

427.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the falsity of the Company's and O'Rourke, McGonegal, Beeghley, Kaplan, and So's statements, Lead Plaintiff and the other

members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and O'Rourke, McGonegal, Beeghley, Kaplan, and So's materially false and misleading statements.

428.    Had Lead Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the O'Rourke, McGonegal, Beeghley, Kaplan, and So's materially misleading statements and by the material adverse information which the Company's and Defendants O'Rourke, McGonegal, Beeghley, Kaplan, and So did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

429.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

430.    By reason of the foregoing, the Company and the Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants

431.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

432.    As early as 2016, and continuing throughout the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, did:  (i) deceive the investing public, including Lead Plaintiff and other members of the Class, as alleged herein; (ii) enable Riot

to artificially inflate the price of the Company's common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Riot's common stock at artificially inflated prices.  The various elements of Defendants' scheme are laid out in detail in Section V.

433.    Each and every Defendant is sued as a primary participant in the wrongful and illegal conduct charged herein.

434.    The scheme, plan, and course of conduct alleged herein was intended to, and did, drive sales of Riot's common stock, and with it, the Company's profits and share price.

## COUNT III

### Violation of Section 20(a) of The Exchange Act
### Against Defendants O'Rourke, McGonegal, Beeghley, Kaplan, and So

435.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

436.    During the Class Period, Defendants O'Rourke, McGonegal, Beeghley, Kaplan, and So participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Each of the foregoing individuals owed fiduciary duties to the Company and its shareholders.  Because of their positions and interconnected relationships, they knew the adverse non-public information regarding the Company's business practices.

437.    As officers, directors and/or fiduciaries of a publicly owned company, these defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.  They also had an obligation to act, at all times, in the best interests of the Company and its shareholders and to refrain from self-dealing for the own benefit at the expense of Riot and the Class.

438.    Because of their positions of control and authority, Honig and the other individuals named in this count were able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, Honig and the other individuals named in this count exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Honig and the other individuals named in this count, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

439.    Honig and the other individuals named on this count, therefore, acted as a controlling person of the Company.   By reason of their senior management positions and/or being directors, officers, and/or fiduciaries of the Company and/or their interconnected relationships, each of them had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.   Each individual named in this count exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

440.    By reason of the above conduct, O'Rourke, McGonegal, Beeghley, Kaplan, and So are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

A.      Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Motley Rice LLC as class counsel pursuant to Rule 23(g);

B.      Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.      Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E.      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  May 9, 2019                    Respectfully submitted,

**LITE DEPALMA GREENBERG**

*By: /s/ Joseph J. DePalma*
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Lead Plaintiff Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)

158

28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Lead Plaintiff Dr. Stanley Golovac
and Lead Counsel for the Class*

David P. Abel
**US. MARKET ADVISORS LAW GROUP PLLC**
5335 Wisconsin Ave. NW, Ste. 440
Washington, D.C.  20015
202-274-0237 Telephone
202-686-2877 Facsimile
dabel@usmarketlaw.com

*Counsel for Lead Plaintiff Dr. Stanley Golovac*