# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, JEFFREY G. McGONEGAL, BARRY HONIG, CATHERINE DEFRANCESCO, MICHAEL BEEGHLEY, JOHN STETSON, MARK GROUSSMAN, ANDREW KAPLAN, MIKE DAI, JASON LES, and ERIC SO,<br><br>Defendants. | Civil No. 3:18-CV-02293(FLW)(TJB)<br><br>MOTION DATE:  November 4, 2019<br><br>**ORAL ARGUMENT REQUESTED** |

---

**MEMORANDUM OF LAW IN SUPPORT OF RIOT BLOCKCHAIN DEFENDANTS' MOTION TO DISMISS THE CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

---

THOMAS A. ZACCARO
*thomaszaccaro@paulhastings.com*
D. SCOTT CARLTON
*scottcarlton@paulhastings.com*
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071-2228
Telephone:  1(213) 683-6000
Facsimile:  1(213) 627-0705

CHAD J. PETERMAN
*chadpeterman@paulhastings.com*
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone:  1(212) 318-6000
Facsimile:  1(212) 319-4090

*Attorneys for Defendants*
*RIOT BLOCKCHAIN, INC., JOHN O'ROURKE, MICHAEL BEEGHLEY AND*
*JEFFERY G. MCGONEGAL*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................1

II.  RELEVANT BACKGROUND AS TO DEFENDANTS .............................4

    A.   The Riot Blockchain Defendants ...........................................4

    B.   Riot's Investments in the Cryptocurrency Business ............................5

    C.   Lead Plaintiff's Allegations Related to the Riot Blockchain Defendants ...................................................................................8

III. THE SECTION 10(B) CLAIM AGAINST THE RIOT BLOCKCHAIN DEFENDANTS SHOULD BE DISMISSED ....................9

    A.   The Reform Act's Heightened Pleading Standards ............................9

    B.   Lead Plaintiff Does Not Plead Any Actionable Misrepresentations or Omissions as to the Riot Blockchain Defendants ...................................................................................10

        1.   The Corrected Complaint's Does Not Allege that Riot Made any False or Misleading Statements Regarding "Material Relationships" Between the Riot and the Honig Group......................................................................................11

        2.   Riot Did Not Fail to Disclose Any Wasteful Related-Party Transaction ....................................................................13

        3.   Lead Plaintiff's Allegations Concerning the Pump-and-Dump Scheme at Riot Fail as a Matter of Law......................19

        4.   Riot's Statements Concerning Its Cryptocurrency Investments and Business Plan Are Inactionable Puffery .......23

        5.   The Corrected Complaint Does Not Allege with Sufficient Particularity That the Riot Blockchain Defendants Failed to Maintain an Effective Control Environment.....................................................................24

    C.   Lead Plaintiff Does Not Adequately Allege "Scheme Liability" Under Section 10(b) .........................................................26

    D.   The Corrected Complaint Does Not Contain Specific Facts Giving Rise to a Cogent and Compelling Inference That the Riot Blockchain Defendants Acted with Scienter..............................29

## TABLE OF CONTENTS
(continued)

**Page**

1.   Lead Plaintiff's Assumption That the Riot Blockchain Defendants "Must Have" Acted with Scienter Fails as a Matter of Law.................................................................30

2.   The SEC's Investigation of Riot and Filing of the Honig Action Do Not Establish a Strong Inference of Scienter.........31

3.   SOX Certifications Do Not Establish a Strong Inference of Scienter .................................................................33

4.   Mr. O'Rourke's Purported Personal Relationship Cannot Create Any Inference of Scienter as to the Riot Blockchain Defendants ............................................................34

5.   Mr. O'Rourke's Trades of Riot Shares on December 29, 2017, Do Not Establish a Strong Inference of Scienter...........35

6.   Viewed as a Whole, the Corrected Complaint Fails to Create a Strong Inference of Scienter .....................................37

IV.   THE SECTION 20(A) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED .............................................39

V.   CONCLUSION.............................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999) ...........................................................3, 31, 37, 38

*In re Aetna, Inc. Secs. Litig.*,
617 F.3d 272 (3d Cir. 2010) ......................................................................22, 23

*In re AgFeed USA, LLC*,
546 B.R. 318 (Bankr. D. Del. 2016)..................................................................19

*In re Alpharma Secs. Litig.*,
372 F.3d 137 (3d Cir. 2004) ..............................................................................39

*Brophy v. Jiangbo Pharms., Inc.*,
781 F.3d 1296 (11th Cir. 2015) .........................................................................32

*In re Burlington Coat Factory Secs. Litig.*,
114 F.3d 1410 (3d Cir. 1997) .......................................................10, 22, 35, 37

*Cal. Pub. Empls.' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ..............................................................................21

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)............................................................................................27

*Ciresi v. Citicorp*,
782 F. Supp. 819 (S.D.N.Y. 1991) ....................................................................17

*City of Monroe Empls.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011) ...........................................25, 26

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
686 F. Supp. 2d 404 (D. Del. 2009)...................................................................33

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
713 F. Supp. 2d 378 (D. Del. 2010)...................................................................29

*Cozzarelli v. Inspire Pharms., Inc.*,
549 F.3d 618 (4th Cir. 2008) .............................................................................32

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Craftmatic Secs. Litig. v. Kraftsow*,
890 F.2d 628 (3d Cir. 1989) ...............................................................24

*In re Equimed, Inc. Secs. Litig.*,
2000 WL 562909 (E.D. Pa. May 9, 2000)...........................................39

*Fox Int'l Relations v. Fiserv Secs. Inc.*,
490 F. Supp. 2d 590 (E.D. Pa. 2007)...................................................39

*In re Gentiva Secs. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................25

*Glazer Capital Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ..............................................................32

*Glover v. DeLuca*,
2006 WL 2850448 (W.D. Pa. Sept. 29, 2006)....................................17

*GSC Partners CDO Fund v. Washington*,
368 F.3d 228 (3d Cir. 2004) ...............................................................36

*In re Heartland Payment Sys., Inc. Secs. Litig.*,
2009 WL 4798148, 2009 U.S. Dist. LEXIS 114866 (D.N.J. Dec. 7,
2009) ....................................................................................................30

*In re Hertz Glob. Holdings, Inc. Secs. Litig.*,
2017 WL 1536223 (D.N.J. Apr. 27, 2017)..........................................32

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242, 253 (3d Cir. 2009) ...........................................10, 22, 38

*In re Intelligroup Secs. Litig.*,
527 F. Supp. 2d 262 (D.N.J. 2007)......................................................33

*Jones v. Intelli–Check, Inc.*,
274 F. Supp. 2d 615 (D.N.J. 2003)......................................................11

*Limantour v. Cray Inc.*,
432 F. Supp. 2d 1129 (W.D. Wash. 2006) ..........................................38

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Lorenzo v. SEC,*
  139 S. Ct. 1094 (2019)......................................................................28

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011)............................................................................12

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.,*
  720 F. Supp. 2d 517 (D.N.J. 2010)........................................17, 24, 37

*Oran v. Stafford,*
  226 F.3d 275 (3d Cir. 2000) .........................................................36, 37

*Rahman v. Kid Brands, Inc.,*
  736 F.3d 237 (3d Cir. 2013) ...............................................................19

*In re Rockefeller Ctr. Props., Inc. Secs. Litig.,*
  311 F.3d 198 (3d Cir. 2002) .................................................................9

*In re Royal Dutch/Shell Transp.,*
  2006 WL 2355402 (D.N.J. Aug. 14, 2006) .......................................26

*SEC v. Honig,*
  No. 1:18-cv-08175 (S.D.N.Y.) .....................................................*passim*

*Semerenko v. Cendant Corp.,*
  223 F.3d 165 (3d Cir. 2000) ...............................................................17

*Shapiro v. UJB Fin. Corp.,*
  964 F.2d 272 (3d Cir. 1992) ...............................................................39

*Stichting Pensioenfonds ABP v. Merck & Co.,*
  2012 WL 3235783 (D.N.J. Aug. 1, 2012) .........................................26

*In re Suprema Specialties, Inc. Secs. Litig.,*
  438 F.3d 256 (3d Cir. 2006) .................................................................9

*In re Synchronoss Secs. Litig.,*
  705 F. Supp. 2d 367 (D.N.J. 2010)....................................................21

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................10

*In re Tellium, Inc. Sec. Litig.*,
   2005 WL 2090254 (D.N.J. Aug. 26, 2005) ......................................16

*Trustcash Holdings, Inc. v. Moss*,
   668 F.Supp.2d 650 (D.N.J. 2009) ....................................................26

*In re Urban Outfitters, Inc. Secs. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) ...............................................31

*Utesch v. Lannett Co.*,
   316 F. Supp. 3d 895 (E.D. Pa. 2018) ...............................................30

*In re Verisign, Inc., Derivative Litig.*,
   531 F. Supp. 2d 1173 (N.D. Cal. 2007) ............................................38

*Wenger v. Lumisys, Inc.*,
   2 F. Supp. 2d 1231 (N.D. Cal. 1998) ...............................................23

*Winer Family Trust v. Queen*,
   503 F.3d 319 (3d Cir. 2007) .............................................................31

### Statutes

15 U.S.C.
   § 10(b) ......................................................................................*passim*
   § 20(a) .............................................................................3, 4, 39, 40
   § 78a (Private Securities Litigation Reform Act of 1995 (the
   "Reform Act")) ........................................................................*passim*
   § 78u–4(b) .........................................................................................10
   § 78u–4(b)(1) ...............................................................................11, 21

### Other Authorities

17 C.F.R. § 229.404 ...................................................................*passim*

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Fed. R. Civ. P.
9(b) ....................................................................................................9, 10, 26, 31
10b-5(a) ...........................................................................................................26
10b-5(a) & (c) ..................................................................................................28

I.  **<u>INTRODUCTION</u>**

The Corrected Consolidated Amended Class Action Complaint (the "Corrected Complaint" or "CCAC") epitomizes the type of hollow and conclusory allegations that the Private Securities Litigation Reform Act ("the Reform Act") intended to curb. [1]  The Corrected Complaint states no viable claim under the federal securities laws against the Riot Blockchain Defendants; instead, the Corrected Complaint contains a hodgepodge of allegations that, for the most part, have nothing to do with Riot.  Lead Plaintiff merely masks a dearth of relevant allegations by littering the Corrected Complaint with allegations regarding activities of certain Defendants at ***other companies***.  On the occasion that Lead Plaintiff manages to offer allegations pertaining to Riot, the allegations challenge the business judgment of Riot's board of directors and executives rather than set forth a viable claim for securities ***fraud***.

First, the Corrected Complaint fails to state an actionable misrepresentation or omission with the requisite specificity.  Lead Plaintiff's principal argument is that the Riot Blockchain Defendants failed to disclose their "material relationships" with selling stockholders in Riot's publicly filed registration

---

[1] The "Riot Blockchain Defendants" include Riot Blockchain, Inc. ("Riot" or the "Company"), Michael Beeghley, John O'Rourke, and Jeffery G. McGonegal.  The "Individual Defendants" include Mr. Beeghley, Mr. O'Rourke, Mr. McGonegal, Andrew Kaplan, Eric So, Jason Les, Barry Honig, Catherine DeFrancesco, John Stetson, Mark Groussman, and Mike Dai.  Riot and the Individual Defendants are collectively referred to as "Defendants."

statements.  However, the federal securities laws do not impose a general duty of disclosure and the Corrected Complaint fails to offer any allegations that would otherwise impose such a duty under the circumstances.  While the Corrected Complaint contends that Riot's registration statements contained misrepresentations, as explained below, no plausible interpretation of the relevant language in the registration statements would render the registration statements misleading.  And to the extent that Lead Plaintiff argues that Riot engaged in a number of undisclosed "wasteful related-party transactions," those allegations do not involve any "related party" or were, in fact, adequately disclosed to investors.

Lead Plaintiff also alleges that Riot's statements regarding its cryptocurrency business were false and misleading because Riot's transformation from a biotech company into an investor and miner of cryptocurrency was a "pump-and-dump scheme."  (*See* CCAC ¶ 2.)  Lead Plaintiff alleges no specific facts that demonstrate how Riot was a "pump-and-dump scheme."  Indeed, the Corrected Complaint undercuts Lead Plaintiff's argument; it details numerous, meaningful investments by Riot into cryptocurrency, which, among other things, renders Riot's statements truthful.  (*See, e.g.*, *id.* ¶¶ 169–77.)

Second, Lead Plaintiff fails to allege a cognizable a Section 10(b) claim under an alternative theory of scheme liability.  The bizarre allegations in the Corrected Complaint come nowhere close to resurrecting the Section 10(b) claim

because they fail to identify any inherently deceptive or manipulative act. Instead, the Corrected Complaint regurgitates the inactionable allegations that the Riot Blockchain Defendants made misleading statements and/or omissions.

Regardless, under either theory of liability, the Court should dismiss the Corrected Complaint because it fails to allege specific facts giving rise to a cogent and compelling inference that the Riot Blockchain Defendants acted with scienter. Lead Plaintiff offers no allegations regarding the Riot Blockchain Defendants' motives or any other circumstantial evidence of scienter, such as the testimony of confidential witnesses, sources, or contemporaneous documents. Instead, Lead Plaintiff assumes that the Riot Blockchain Defendants must have known that the statements were false due to their roles as officers of the Company. This, however, is not enough to state a securities claim. "Generalized imputations of knowledge do not suffice [to allege scienter], regardless of the defendants' positions within the company." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999).

Since the Corrected Complaint lacks actionable allegations supporting a claim that any Defendants committed a primary violation under Section 10(b), the Section 20(a) claim for control person liability against the Riot Blockchain

Defendants must also be dismissed.  The Riot Blockchain Defendants therefore request that the Court dismiss all the claims against them in their entirety.[2]

## II.   <u>RELEVANT BACKGROUND AS TO DEFENDANTS</u>

### A.   **The Riot Blockchain Defendants**

Riot is a corporation headquartered in Castle Rock, Colorado, and is listed on NASDAQ under the symbol "RIOT."  (CCAC ¶ 21.)  Riot builds and supports various blockchain technologies.  (*Id.*)  Lead Plaintiff made his initial purchase of Riot stock on December 19, 2017.  (*See* Dkt. No. 17-2 (Ex. C).)  Lead Plaintiff purchased and sold various amounts Riot of stock over the next several months, disposing of all of his Riot stock by February 23, 2018.  (*Id.*)

Mr. Beeghley was Riot's Chairman and Chief Executive Officer ("CEO") from April 2017 until November 3, 2017, leaving the Company before Lead Plaintiff ever invested in Riot.  (CCAC ¶ 25.)  Mr. O'Rourke served as Riot's Chairman and CEO from November 3, 2017 until September 8, 2018.  (*Id.* ¶ 23.)[3] Mr. McGonegal was Riot's Chief Financial Officer from 2003 to February 28, 2018, during which he served as Riot's Principal Accounting Officer until April 30, 2018.  (*Id.* ¶ 30.)  Mr. McGonegal subsequently served as a consultant to Riot

---

[2] The Riot Blockchain Defendants also join and incorporate herein the arguments made in the Director Defendants' concurrently filed Motion, including arguments with respect to loss causation.

[3] The putative "Class" consists of "all purchasers of the common stock of Riot, between April 20, 2017, and September 6, 2018, inclusive."  (CCAC ¶ 1.)

and was later appointed CEO of Riot in February 2019.  (*Id.*; Declaration of Thomas Zaccaro In Support of Defendants' Motion to Dismiss ("Zaccaro Decl."), Ex. A at 1 (*Riot Blockchain, Inc.*, February 5, 2019 Press Release).)

Messrs. Kaplan, So, Les, and Dai are all current or former directors of Riot (collectively, the "Director Defendants").  Defendants Honig, DeFrancesco, Stetson, and Groussman were never directors, officers or employees of Riot, but are alleged to have "longstanding business ties and/or co-investments" with Mr. O'Rourke.  (CCAC ¶ 23.)

### B.     Riot's Investments in the Cryptocurrency Business

Riot, formerly known as Bioptix, Inc. ("Bioptix"), is a business formerly focused on biotechnology.  (CCAC ¶ 21.)  In January 2017, Bioptix announced that it adopted a plan to exit the biotechnology business and commence a significant reduction in workforce.  (Zaccaro Decl., Ex. G at 6 (Bioptix, Inc. Form S-3 (Amendment No. 3), filed on Sept. 25, 2017).)  Bioptix began "evaluating potential strategic alternatives" and was evaluating a "strategic path forward with the goal of maximizing value for our stockholders."  (*Id.*)

On September 29, 2017, Bioptix made a $3 million investment in goNumerical Ltd., a Canadian cryptocurrency exchange that does business as Coinsquare.  (Zaccaro Decl., Ex. C at 2 (Riot's Form 8-K, filed on Oct. 4, 2017).)  On October 4, 2017, Bioptix changed its name to Riot Blockchain, Inc. (RIOT),

acting as a "strategic investor and operator in the blockchain ecosystems with a particular focus on the Bitcoin and Ethereum blockchains." (*See* Zaccaro Decl., Ex. C at 4 (October 4, 2017 Form 8-K, Exhibit No. 99.1).) Riot described its new line of business as "leverage[ing] its expertise and network to build and support blockchain technology companies" and "provid[ing] investment exposure to the rapidly growing blockchain ecosystem." (*Id.*) The Company intended "to become a leading authority and supporter of blockchain." (*Id.*)[4]

After changing its name to Riot, on October 16, 2017, the Company acquired approximately 52 percent of Tess, Inc. ("Tess"), a Canadian company, which developed blockchain solutions for telecommunications companies. (*See* CCAC ¶ 169.) Then, on November 3, 2017, Riot announced that it acquired Kairos Global Technology, Inc. ("Kairos"), a Nevada cryptocurrency mining company, by issuing 1,750,001 shares of Series B Convertible Preferred Stock, which are convertible to Riot's common stock, to Kairos shareholders. (*See* Zaccaro Decl., Ex. D at 2 (November 1, 2017 Form 8-K).)

On November 16, 2017, Riot announced that it had made a strategic investment in Verady, LLC, a company providing cryptocurrency accounting and audit technology services. (*See* Zaccaro Decl., Ex. E at 1 (November 16, 2017

---

[4] Like many stocks in the cryptocurrency market, Riot's stock price is closely tied to the stock movement of Bitcoin. (*See* Zaccaro Decl., Ex. J (attaching chart comparing Riot and Bitcoin prices during the Class Period).)

Form 8-K, Exhibit No. 99.1).)  On December 4, 2017, Riot announced that its

investment in Coinsquare had effectively tripled, since Coinsquare was valued at

over three times the valuation from Riot's September 2017 investment following

the investment in Coinsquare by an independent third party.  (CCAC ¶ 182.)

Subsequently, on December 11, 2017, Riot announced that Tess had agreed to

merge with Cresval Capital Corp., a Canadian mining company, and would be

publicly traded on the TSX Venture Exchange after the closing of the merger.  (*See*

Zaccaro Decl., Ex. F at 1 (December 11, 2017 Form 8-K, Exhibit No. 99.1).)

On February 16, 2018, Riot announced that Kairos purchased 3,800

cryptocurrency mining computers in exchange for $11 million and 1 million shares

of Riot's restricted common stock from Prive Technologies LLC ("Prive").

(CCAC ¶ 195.)  Prive also provided Riot with access to operating facilities,

including a lease to a 107,000-square foot facility in Oklahoma City, Oklahoma,

data center improvements, support, and related equipment.  (Zaccaro Decl., Ex. I at

4 (Riot's Form 10-K filed on April 17, 2018).)  As a result, Riot disclosed that it

paid Prive a premium over the retail cost from the manufacturers, mostly because

many of the mining computers "are in short supply and the cost of acquisition of

servers especially in large numbers, when available, varies widely."  (*Id.*)

C.    **Lead Plaintiff's Allegations Related to the Riot Blockchain Defendants**

Lead Plaintiff contends that the Riot Blockchain Defendants made misrepresentations and omissions in connection with an alleged "pump-and-dump" scheme orchestrated by Messrs. Honig and O'Rourke.  (CCAC ¶ 209.)  Lead Plaintiff asserts that they "sought to exploit investor interest in the rapidly expanding cryptocurrency markets."  (*Id.* ¶ 10.)  According to Lead Plaintiff, "the Company had limited meaningful investments in cryptocurrency products and did not have a meaningful cryptocurrency business plan."  (*Id.*)

Lead Plaintiff alleges that the Riot Blockchain Defendants inflated Riot's stock price by making the following misleading statements or omissions:  (1) failing to disclose "material relationship[s]" among members of the "Honig Group" and Riot insiders;[5] (2) failing to disclose related-party transactions; (3) failing to disclose "the Company's limited meaningful investments in cryptocurrency products and absence of a meaningful cryptocurrency business plan"; and (4) failing to disclose Defendants' "undisclosed and coordinated accumulation and insider selling of Riot shares in furtherance of their pump-and-dump scheme."  (*See id.* ¶ 209.)

---

[5] The Corrected Complaint references the "Honig Group" as a group of individuals and companies, which  "have invested in one or more previous public companies affiliated with Barry Honig "and the other Defendants including, without limitation, Biozone, MGT, MabVax, Marathon WPCS, PolarityTE, Pershing Gold, and MUNDOmedia Ltd."  (CCAC ¶ 79.)

III.    **THE SECTION 10(B) CLAIM AGAINST THE RIOT BLOCKCHAIN
DEFENDANTS SHOULD BE DISMISSED**

    A.    **The Reform Act's Heightened Pleading Standards**

To state a claim under Section 10(b), Lead Plaintiff must allege:  (1)
Defendants made material misrepresentations or omissions; (2) Defendants acted
with scienter for each alleged misrepresentation or omission; (3) there was a
connection with the purchase or sale of a security; (4) Lead Plaintiff relied on each
alleged misrepresentation or omission; (5) Lead Plaintiff suffered economic loss;
and (6) the alleged misrepresentation or omission caused the loss from which Lead
Plaintiff seeks to recover damages.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563
U.S. 27, 37–38 (2011).

Securities fraud claims are subject to "heightened pleading requirements of
Rule 9(b) . . . ."  *In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 276 (3d
Cir. 2006).  At minimum, Rule 9(b) requires Lead Plaintiff to support all of his
allegations of security fraud with the essential factual background that would
accompany "the first paragraph of any newspaper story—that is, the who, what,
when, where and how of the events at issue."  *Id.* at 277 (internal quotation marks
omitted).  The Reform Act also imposes "another layer of factual particularity to
allegations of securities fraud."  *In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311
F.3d 198, 217 (3d Cir. 2002).  The Reform Act requires that "the complaint shall
specify each statement alleged to have been misleading, the reason or reasons why

the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b).

The Reform Act makes a "sharp break with Rule 9(b)," requiring a plaintiff to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (emphasis added).  Thus, to survive a motion to dismiss, a plaintiff must plead that the defendant acted with a "mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  A "strong inference" exists "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw . . . ."  *Id.* at 324.  Hence, courts cannot examine any one allegation of scienter in isolation, but rather, after evaluating all the facts as alleged, consider any plausible opposing inferences.  *Id.*

B.   **Lead Plaintiff Does Not Plead Any Actionable Misrepresentations or Omissions as to the Riot Blockchain Defendants**

The "particularity requirement has been rigorously applied in securities fraud cases."  *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997).  When stating the "falsity," *i.e.*, "material misrepresentation" element of its Section 10(b) claim, a securities fraud plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is

misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In this case, the allegations in the Corrected Complaint do not come close to meeting the particularity requirement for establishing the falsity of any material representations.[6]

### 1. The Corrected Complaint's Does Not Allege that Riot Made any False or Misleading Statements Regarding "Material Relationships" Between the Riot and the Honig Group

Lead Plaintiff contends "Defendants caused Riot to file false and misleading securities registration statements on Form-S-3" because the registration statements stated that none of the selling stockholders had a "material relationship" with "us." (CCAC ¶ 154.) Lead Plaintiff argues that certain selling stockholders, which Lead Plaintiff dubs the "Honig Group," had a material relationship with Riot because (1) Honig had "numerous previous co-investments with Mr. O'Rourke" (*id.* ¶ 155); (2) Messrs. Honig and O'Rourke "shared an office (along with other selling stockholders) during the Class Period" (*id.* ¶ 156); and (3) Bioptix, Mr. Honig, and other shareholders of Coinsquare had signed a shareholder agreement pertaining to the management of Coinsquare (*id.* ¶ 157). None of these alleged facts establishes a material relationship between Riot and the Honig Group requiring disclosure. 17

---

[6] For several of the alleged misstatements and omissions, Lead Plaintiff fails to attribute the statements to any of the Individual Defendants. Reliance on "group pleading" provides an additional basis to dismiss the fraud claims. *See Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 646 (D.N.J. 2003).

C.F.R. § 229.404 (excluding co-investors and co-tenants from "related parties"); Standard of Financial Accounting Standards No. 57 ("FAS 57") (same).

Lead Plaintiff deliberately misinterprets the language of the Form S-3s to manufacture a misleading statement. (*See, e.g.*, CCAC ¶ 154.)[7] Lead Plaintiff incorrectly *redefines* "us" in the Form S-3s to include the board of directors even though the Form S-3s define "us" as including only the Company "unless context otherwise requires." (*See* Zaccaro Decl., Ex. G at 2 (excerpting Riot's Form S-3).) In other words, Lead Plaintiff contends the statement made in the Form S-3s to refer not only to "material relationships" with Riot, but also to include "material relationships" with each individual member of Riot's board of directors.

Lead Plaintiff's interpretation is also nonsensical. The relevant statement made in the Form S-3s is as follows: "None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of *our* subsidiaries within the past three years other than as a result of the ownership of *our* shares or other securities." (*Id.* (emphasis added).) The sentence clearly refers only to Riot, because members of the board of directors are not issuers of securities nor do they have any subsidiaries. Lead Plaintiff's clear

---

[7] Lead Plaintiff does not allege, nor could he, that Riot had a separate duty to disclose "material relationships". *See Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 44 (2011) ("§ 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information.").

misreading of Riot's Form S-3s is fatal to any claim that Riot's Form S-3s contained false and misleading statements.[8]

### 2.   <u>Riot Did Not Fail to Disclose Any Wasteful Related-Party Transaction</u>

Lead Plaintiff claims that the Riot Blockchain Defendants failed to disclose that Riot's investments into the cryptocurrency business, which include investments involving Coinsquare, Tess, Kairos, and Prive, were "wasteful related-party transactions with entities that were secretly owned and control [sic] by Defendants and their associates." (CCAC ¶ 11.) But the Corrected Complaint does not allege any facts that show that these transactions were wasteful or made with undisclosed related parties.

### a.   The Corrected Complaint Does Not Allege that Riot Engaged in Any Undisclosed Related-Party Transactions

Lead Plaintiff alleges that Riot's investment into Coinsquare was a related-party investment because "two Riot directors, Defendants Kaplan and So, were themselves investors in Coinsquare – investments that (allegedly) tripled in value in the previous two months." (CCAC ¶ 185.) But Mr. So only became a Riot director *after* Riot made its investment into Coinsquare. (*Compare* Zaccaro Decl.,

---

[8] Lead Plaintiff's attempt to manufacture a material relationship is also unavailing because the Corrected Complaint fails to show that the Honig Group had any significant influence over Riot's operations or that Riot had participated in any undisclosed transactions with the Honig Group.

Ex. C at 2 (announcement of Bioptix's September 29, 2017 investment into Coinsquare) *with* CCAC ¶ 32 ("Defendant Eric So served as a director of the Company from October 2017 until February 2018 . . . .").)  Moreover, the Corrected Complaint expressly contradicts any implication that Mr. Kaplan maintained a personal investment in Coinsquare whatsoever.  (*See* CCAC ¶ 157 (listing Coinsquare's selling shareholders, but not including Mr. Kaplan).)

Lead Plaintiff also alleges that Riot's investment into Tess was a related-party transaction—not by virtue of any relationship between Riot and Tess—but, instead, because of purported ties between Tess's Chief Software Architect (Sorin Tanasescu ("Tanasescu")) and the individuals who formed Kairos.  (*Id.* ¶ 171.) Lead Plaintiff alleges that Tanasescu is a director of Ingenium IT Compusoft, and that Kairos's directors manage a company that shares a similar name, Ingenium Global, Inc.  (*Id.*)  According to Lead Plaintiff's faulty logic, the fact that Tanasescu is a director of a company that has a similar name to another company managed by individuals that formed Kairos is enough to establish a relationship between Tess and Kairos "and thus to Riot and its controlling investors."  (*Id.*)  But this ridiculous attempt to connect Tess and Kairos does not establish that Riot's investment in Tess was a related-party transaction.  Indeed, Riot invested in Tess *before* the Company's acquisition of Kairos.  (*Compare id.* ¶ 169 ("On October 17, 2017, Riot . . . announced it had acquired a majority (52%) stake in Tess . . . .")

*with* Zaccaro Decl., Ex. D at 2 (Riot's November 3, 2017 announcement of its acquisition of Kairos).)

Similarly, Lead Plaintiff claims that Riot's announcement pertaining to Tess and Cresval's proposed merger was misleading because Riot failed to disclose that Cresval's "ties to Defendants and various members of the Honig Group." (CCAC ¶ 317.) According to Lead Plaintiff, Cresval was related to Riot because Honig purportedly introduced O'Rourke to Cresval's president. (*Id.* ¶ 188.) And Cresval's president's father, who was also Cresval's founder and chief executive, headed a different company, in which Honig formerly held a position. (*Id.*) Lead Plaintiff also alleges that Cresval's founder and chief executive, along with Mr. Honig, and Mr. O'Rourke, were investors of Pershing Gold Corporation. (*Id.*). Yet none of these "connections" establish a material relationship between Riot and Cresval, because they do nothing to show that Cresval had significant influence over Riot's management or operating policies. *See* 17 C.F.R. § 229.404 (excluding third-party investments shared amongst directors of different companies under its definition of "related parties"); FAS 57, ¶ 21 (not all control relationships must be disclosed and only those which the controlling party has the ability to affect the enterprise in a manner that could lead to significantly different operating results or financial positions than if the enterprises were autonomous require disclosure).

Lead Plaintiff's assertion that Riot's acquisition of Kairos was an undisclosed related-party transaction fares no better than his mischaracterization of the Coinsquare and Tess transactions. Lead Plaintiff alleges that Defendants Honig and DeFrancesco owned 8.6% and 6.3%, respectively, of Kairos at the time of Riot's acquisition. (CCAC ¶ 265.) However, Lead Plaintiff also alleges that Riot disclosed Honig and DeFrancesco's interest in Kairos less than a month after Mr. Honig filed his Form 13D/A disclosing that he "had exchanged 151,210 shares of Kairos common stock for 151,210 shares of Riot Series B Preferred Shares." (*Id.* ¶ 265 n.33, n.34.) Moreover, Lead Plaintiff does not allege he suffered any loss following the disclosures (*id.* ¶¶ 396–406), which is fatal to any claim. *See In re Tellium, Inc. Sec. Litig.,* 2005 WL 2090254, at *3 (D.N.J. Aug. 26, 2005) (plaintiff must allege a corrective disclosure or some other corrective event).

Finally, Lead Plaintiff argues that Riot's transaction with Prive is a related-party transaction because selling shareholders of Prive, Michael Ho and Bryan Pascual, also owned approximately 10.7% and 5.7% of Kairos at the time of its acquisition by Riot.[9] (CCAC ¶ 196.) But Riot disclosed less than two months after the transaction took place that both Mr. Ho and Mr. Pascal had ownership

---

[9] The Corrected Complaint also states that defendants Honig, DeFrancesco, and "other members of the Honig Group" controlled and owned Prive. (CCAC ¶ 196.) However, the Corrected Complaint fails to allege specific facts that show the Honig Group members' ownership interest in or control over Prive. Messrs. Ho and Pascual are not alleged to be Honig Group members.

interests in both Riot and Prive.  (*See* Zaccaro Decl., Ex. I at 4 (April 17, 2018

Form 10-K).)  In any event, Lead Plaintiff purchased and sold his shares in Riot

well before this transaction took place, *see* Dkt. No. 17-2 (Ex. C), which vitiates

any allegations of reliance based on the alleged omission.  *See Semerenko v.*

*Cendant Corp.,* 223 F.3d 165, 174 (3d Cir. 2000) ("It is axiomatic that a private

action for securities fraud must be dismissed when a plaintiff fails to plead that he

or she reasonably and justifiably relied on an alleged misrepresentation.").

In sum, Lead Plaintiff has not and cannot plead any actionable omissions as

to the Riot Blockchain Defendants for failing to disclose related-party transactions

because the Corrected Complaint enumerates transactions that either (1) did not

involve a related party, defined by 17 C.F.R. § 229.404 or FAS 57, or (2) were

adequately disclosed to investors.

### b.    Riot's Investment Decisions in Cryptocurrency Are Not Actionable Under the Federal Securities Laws

Lead Plaintiff's allegations challenge the investment decisions made by

Riot's board of directors.  Alleging a bad business decision or mismanagement by

a company's board or management does not state a claim for securities fraud.  *See*

*Glover v. DeLuca*, 2006 WL 2850448, at *25 (W.D. Pa. Sept. 29, 2006); *Ciresi v.*

*Citicorp,* 782 F. Supp. 819, 823 (S.D.N.Y. 1991) (recognizing that "the law does

not impose a duty to disclose . . . mismanagement"); *Nat'l Junior Baseball League*

*v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 541 (D.N.J. 2010) ("[T]his

allegation is insufficient on a Section 10(b) claim because it amounts to essentially allegations of corporate mismanagement, which is not actionable.").

Even if allegations of mismanagement were actionable, Lead Plaintiff's allegations still fall far short. For example, Lead Plaintiff misconstrues the nature of Riot's acquisition of Kairos. Indeed, Riot did not overpay for Kairos's equipment by over $13 million; Riot and Kairos engaged in a "share exchange agreement," where Riot acquired Kairos (including all of the company's assets) in exchange for 1,750,001 shares of the Company's Series B Convertible Preferred Stock. (Zaccaro Decl., Ex. D at 2 (November 3, 2017 Form 8-K).)

Lead Plaintiff's depiction of Riot's purchase of bitcoin mining machines from Prive is similarly misleading. Although Lead Plaintiff claims that Riot overpaid by approximately $19 million (CCAC ¶ 195), Lead Plaintiff ignores that Riot explained that it had "paid a premium over the listed retail cost" because the machines that are "in short supply," making it difficult to acquire the machines in large quantities at retail prices. (Zaccaro Decl., Ex. I at 4 (April 17, 2018 Form 10-K).) Thus, Riot acquired all of the machines from "third parties, some of whom were shareholders [Mr. Ho and Mr. Pascual] in the Company as well . . . ." (*Id.*) Moreover, Riot's transaction with Prive included access to a 107,000-square foot

operating facility, support, and related equipment.[10]  (*Id.*)  While Lead Plaintiff may disagree with these transactions, such disagreement does not amount to securities fraud.

3.  **Lead Plaintiff's Allegations Concerning the Pump-and-Dump Scheme at Riot Fail as a Matter of Law**

Lead Plaintiff asserts that Defendants were involved in a "pump-and-dump scheme" at Riot, to "artificially inflate the price of the Company's stock at the expense of other public shareholders."  (*See, e.g.*, CCAC ¶ 236.)  Lead Plaintiff further contends that, because Riot was purportedly a front for Defendants' pump-and-dump scheme, a number of public statements made by Riot were false.  But Lead Plaintiff's allegations fail to allege specific facts to show that these statements by Riot were false and/or misleading when made.  *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 241 (3d Cir. 2013) (holding that the Reform Act requires that a complaint must state with particularity, the facts constituting the alleged violation).  In fact, Lead Plaintiff's own allegations *contradict* the notion that Riot's statements were false and/or misleading.

---

[10] To make matters worse, Lead Plaintiff also completely fails to allege facts "regarding who approved the transfers, on what terms or process the transfers were approved" or which of the Riot Blockchain Defendants had any role in the Kairos or Prive transactions.  *In re AgFeed USA, LLC*, 546 B.R. 318, 333 (Bankr. D. Del. 2016) (dismissing bare and conclusory allegations that transactions were wasteful as failing to overcome the business judgment rule).

The statements alleged by Lead Plaintiff are either indisputably truthful or constitute inactionable puffery. (*See, e.g.*, CCAC ¶¶ 239, 243, 259.) For example, the Corrected Complaint details Riot's significant investments into the cryptocurrency business, including, (1) making a $3 million investment in Coinsquare, a Canadian cryptocurrency exchange, (*id.* ¶ 166); (2) acquiring approximately 52 percent of Tess, a Canadian company which developed blockchain solutions for telecommunication companies that later contemplated a merger with Cresval Capital Corp., a cryptocurrency mining company, (*id.* ¶¶ 169, 186); (3) acquiring Kairos, a Nevada-based cryptocurrency mining corporation, (*id.* ¶ 172); (4) making an investment in Verady, LLC, a company that provides cryptocurrency accounting and audit technologies; and (5) acquiring cryptocurrency mining computers, operating facilities, support, and related equipment from Prive. (*Id.* ¶ 195; Zaccaro Decl., Ex. I at 4 (April 17, 2018 Form 10-K).) Riot's investments demonstrate its commitment to "pursue opportunistic investments and controlling positions in these new and emerging technologies which will continue to expose the Company to the numerous risks and volatility associated with this section." (CCAC ¶ 251.)

Although Lead Plaintiff concludes that all of the challenged statements were false because Riot was allegedly a pump-and-dump scheme, the Corrected Complaint is completely devoid of any facts showing *how* Riot was in fact a pump-

-20-

and-dump scheme.  *See Cal. Pub. Empls.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126,

155 (3d Cir. 2004) ("Generic and conclusory allegations based upon rumor or

conjecture are undisputedly insufficient to satisfy the heightened pleading standard

of 15 U.S.C. § 78u–4(b)(1).").  Rather, Lead Plaintiff's "argument is facially

circular" because it asks the Court to assume that there is a pump-and-dump

scheme, but offers no particularized facts that establish actual misrepresentations

or omissions statements artificially inflated (*i.e.*, pumped) Riot's stock price.  *In re*

*Synchronoss Secs. Litig.*, 705 F. Supp. 2d 367, 416 (D.N.J. 2010).[11]  It is also

nonsensical because only one of Riot's former officers and directors is alleged to

have sold any shares (i.e., "dumped" after the alleged "pump").  (CCAC ¶ 386.)

Since Lead Plaintiff cannot offer particularized allegations, it relies entirely

on the unsubstantiated allegation that Messrs. O'Rourke and Honig were involved

in a pump-and-dump scheme at *other companies* to infer that the Riot Blockchain

---

[11] Riot's stock price remained flat from the start of the Class Period until
November 15, 2017.  On October 3, 2017, Riot's stock price closed at $8.09 per
share.  (*See* Zaccaro Decl., Ex. H (Riot's Historical Stock Price Chart).)  The next
day, following Riot's announced transition to a cryptocurrency company, Riot's
stock price closed at $8.18 per share.  (*Id.*)  On October 5, 2017, following the
announcement of Riot's name change, Riot's stock price dropped to $7.30 per
share.  (*Id.*)  Mr. Beeghley, however, left Riot by November 3, 2017.  (CCAC ¶ 25;
Zaccaro Decl., Ex. D at 3.)  Lead Plaintiff thus cannot plausibly explain what role
Mr. Beeghley had in artificially inflating Riot's stock.

Defendants must be involved in a similar scheme at Riot.  (*See Id.* ¶¶ 81–101.)[12]
By doing so, Lead Plaintiff all but admits that he cannot allege facts showing the
"who, what, when, where and how" of any alleged pump-and-dump scheme at
Riot.  *Avaya, Inc.*, 564 F.3d at 253.

Regardless, Riot's statements pertaining to the Company's commitment to
building a diversified blockchain company by investing in blockchain technology
are inactionable puffery.  The Third Circuit has expressly clarified that "[c]laims
that . . . expressions of hope by corporate managers could dupe the market have
been [] uniformly rejected by the courts."  *Burlington Coat Factory,* 114 F.3d at
1427 (holding that the statement that the company believed it could continue to
grow net earnings at a faster rate than sales was vague and inactionable).
"[O]pinions, motives and intentions, or general statements of optimism" are
considered "no more than puffery and are understood by reasonable investors as
such."  *In re Aetna, Inc. Secs. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (internal
quotation marks omitted).  Riot's statements are thus "too vague to be actionable"
and are "obviously so unimportant that courts can rule them immaterial as a matter
of law at the pleading stage."  *Id.* (internal quotation marks omitted).

---

[12] Even more telling, Lead Plaintiff does not attempt to connect either Messrs.
Beeghley or McGonegal to the unsubstantiated allegations regarding Messrs.
O'Rourke and Honig.

4.   **Riot's Statements Concerning Its Cryptocurrency
Investments and Business Plan Are Inactionable Puffery**

Lead Plaintiff alleges that Riot's statements that it would be a "pure play that
would leverage [its] expertise, and network, to build and support blockchain
technology companies" was false and misleading because the Company had
"limited meaningful investments in cryptocurrency products and did not have a
meaningful cryptocurrency business plan." (CCAC ¶ 10 (internal quotation marks
omitted).) These statements are quintessential puffery, and are thus "immaterial as
a matter of law." *In re Aetna, Inc.*, 617 F.3d at 283–84 (finding defendants'
characterization of the pricing of medical insurance premiums as "disciplined" to
be puffery). Riot's descriptions are merely vague and general statements of
optimism that cannot support Lead Plaintiff's Section 10(b) claim. *See Wenger v.
Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245–46 (N.D. Cal. 1998) (holding defendant's
statements that it "represents a pure play in the emergence of" an industry that was
"finally coming of age[,]" that it was a "leader in a rapidly growing market[,]" and
that it was "a good company" that was well positioned, were "not specific enough
to perpetrate fraud on the market").

Moreover, Lead Plaintiff's allegations that Riot lacked a "meaningful
cryptocurrency business plan" (even though Lead Plaintiff's own allegations
demonstrate a portion of Riot's business plan) amount to more allegations of
corporate mismanagement. *See Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628,

-23-

638 (3d Cir. 1989) ("claims *essentially* grounded on corporate mismanagement are not cognizable under federal law.") (emphasis added). "[C]oncerns underlying the securities acts are not implicated simply because management has failed to characterize . . . its financial reporting and accounting controls as inadequate and ineffective[.]" *Id.* at 640. Thus, courts uniformly hold that allegations of corporate mismanagement do not create liability under the federal securities laws. *See Pharmanet Dev. Grp.*, 720 F. Supp. 2d at 541 n.20 (allegations of corporate mismanagement are not actionable under Section 10(b)).

5.   **The Corrected Complaint Does Not Allege with Sufficient Particularity That the Riot Blockchain Defendants Failed to Maintain an Effective Control Environment**

Lead Plaintiff alleges that the Riot Blockchain Defendants "did not maintain an effective control environment" because it allowed Defendants to engage in the pump-and-dump scheme. (CCAC ¶ 271.) In turn, Lead Plaintiff concludes that the SOX certifications, which accompanied the Company's Form 10-K for the period ending in April 27, 2017 and the Company's Form 10-Q for the period ending in November 13, 2017, were false and misleading. (*Id.* ¶¶ 218, 270) However, the SOX certifications simply affirmed the effectiveness of the Company's internal controls; the certifications certainly do not qualify as a material misrepresentation. (*Id.*)

First, Mr. Beeghley was not an executive at Riot when Riot certified the effectiveness of its controls.  A Section 10(b) claim is therefore not viable against Mr. Beeghley for those alleged statements and omissions.  *See Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011) ("[M]aker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

Second, the Corrected Complaint does not contain any particularized allegations suggesting that the actions enumerated in the SOX certifications were, in fact, not actually undertaken by Messrs. O'Rourke and McGonegal.[13]  *See In re Gentiva Secs. Litig.*, 932 F. Supp. 2d 352, 371 (E.D.N.Y. 2013) (granting defendants' motion to dismiss because the plaintiff failed to allege facts that suggest that individual defendants did not undertake the actions described in the SOX certification or any allegations concerning the company's financial reporting processes).  The Corrected Complaint is devoid of "any facts pertaining to the Company's internal structure for financial reporting, much less that [the Company] lacked adequate internal controls."  *City of Monroe Empls.' Ret. Sys. v. Hartford*

---

[13] Riot's SOX certifications were not signed by any other Individual Defendant (*e.g.*, Messrs. Beeghley, Kaplan, Les, Dai, or So).  (*See, e.g.*, CCAC ¶ 218.)  Lead Plaintiff's misrepresentation and/or omission claim based on SOX certifications cannot be attributed to any Riot Blockchain Defendant, other than Riot, O'Rourke, and McGonegal.  *Kaplan v. Utilcorp, Inc.*, 9 F.3d 405, 407 (5th Cir. 1993) (holding that defendants could not be liable for false statements and/or omissions if there are no allegations that those defendants took part, or were responsible for, such statements and/or omissions).

*Fin. Servs. Grp., Inc.*, 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011).

Accordingly, Lead Plaintiff's allegations of "lack of controls . . . [are] conclusory

assertions without any factual support" and cannot survive a motion to dismiss. *Id.*

(second alteration in original).

### C.    Lead Plaintiff Does Not Adequately Allege "Scheme Liability" Under Section 10(b)

To state a claim for scheme liability, Lead Plaintiff must allege that the Riot

Blockchain Defendants "(1) committed a manipulative or deceptive act (2) in

furtherance of the alleged scheme to defraud [investors], (3) scienter, (4) and

reliance." *Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 661–62 (D.N.J.

2009) (enumerating pleading requirements to state a claim under Rule 10b-5(a)

and/or (c)).  Scheme liability claims must comply with the heightened pleading

requirements of the Federal Rule of Civil Procedure 9(b) and with the specificity

requirements of the Reform Act for scienter. *Stichting Pensioenfonds ABP v.

Merck & Co.*, 2012 WL 3235783, at *7 (D.N.J. Aug. 1, 2012).

Consequently, Lead Plaintiff must set forth, with specificity, "what

manipulative acts were performed, which defendants performed them, when the

manipulative acts were performed and what effect the scheme had on the securities

at issue." *In re Royal Dutch/Shell Transp.*, 2006 WL 2355402, at *7 (D.N.J. Aug.

14, 2006) (quoting *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (S.D.N.Y.

2006).  Lead Plaintiff nevertheless fails to allege any manipulative acts that were

performed by the Riot Blockchain Defendants—let alone which Defendant performed them.  (*See* CCAC ¶ 432.)

None of Lead Plaintiff's scheme liability allegations against the Riot Blockchain Defendants involve any inherently deceptive or manipulative act. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177–78 (1994) ("We cannot amend [section 10(b)] to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute."). For example, as argued above, the Riot Blockchain Defendants' purported "deception" of the investing public amounts to little more than a failure to disclose information that they were not required to be disclosed by 17 C.F.R. § 229.404, FAS 57, or any other applicable law or regulation.  (*See supra*, Sections III(B)(1) and (2).)  Moreover, Lead Plaintiff does not allege any specific facts which show when and how the Honig Group actually influenced, either directly or indirectly, Riot.  *See Suprema Specialties, Inc.*, 438 F.3d at 276 (requiring plaintiffs bringing securities fraud claims to allege the "who, what, when, where and how" of the events at issue); *Bond Opportunity Fund v. Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004) (holding that "mere speculation is insufficient to satisfy the PSLRA pleading standard").  Simply asserting that the Honig Group influenced Riot is emblematic of conclusory allegations that Rule 9(b) and the Reform Act uniformly reject.

Riot's purported "inflation" of the Company's common stock consisted of either truthful statements regarding Riot's cryptocurrency business, or inactionable puffery followed by the Company's meaningful investments in cryptocurrency. (*See id.*, Sections III(B)(3) and (4).)  The "scheme liability" claim amounts to nothing more than a repackaging of the faulty material misrepresentation and/or omission claims.  Lead Plaintiff therefore fails to state a scheme liability claim against the Riot Blockchain Defendants.

To the extent that Lead Plaintiff argues that the Supreme Court's recent decision in *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019) permits a private plaintiff to assert a scheme liability claim based on a material misrepresentation or omission, that reliance is misplaced.  In *Lorenzo*, the defendant was found liable for Rule 10b-5(a) and (c) violations when he knowingly disseminated admittedly false statements to investors.  *Id.* at 1111.  The Supreme Court did not consider the falsity of defendant's representations (which defendant did not appeal) and, therefore did not address whether scheme liability applies when a private plaintiff fails to adequately allege—with particularity—actionable misrepresentations or omissions, or other deceptive conduct.  Here, Lead Plaintiff has not adequately alleged that the Riot Blockchain Defendants committed any deceptive or manipulative acts, whether by misrepresentation or omission, or some other form of deceptive conduct accordingly, his scheme liability claim must be dismissed.

### D. The Corrected Complaint Does Not Contain Specific Facts Giving Rise to a Cogent and Compelling Inference That the Riot Blockchain Defendants Acted with Scienter

The Corrected Complaint fails to allege specific facts establishing that any of the Riot Blockchain Defendants acted with the requisite scienter in connection with any assumed Section 10(b) violation.[14]  Instead, Lead Plaintiff offers (1) vague and boilerplate allegations of scienter against the Riot Blockchain Defendants that relies on "core operations" theory; (2) O'Rourke's sale of Riot stock, which occurred after the supposed fraud was disclosed to the public; (3) Riot's purported failure to disclose O'Rourke's personal relationships with Honig and other individuals who are not parties to this action; and (4) inferences from unrelated investigations and actions by the SEC.  (CCAC ¶¶ 374–94.)  Each allegation fails to meet the Reform Act's exacting pleading standards for any of the Riot Blockchain Defendants.  Indeed, non-culpable inferences drawn from the allegations are far more cogent and compelling than fraudulent inferences.

---

[14] To evaluate the scienter of a corporate defendant (*e.g.*, Riot), courts "look to the state of mind of the individual corporate official or officials who make or issue the statement . . . ."  *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 402 (D. Del. 2010).  Therefore, a corporate defendant cannot be held liable "absent a showing that at least one individual officer who made, or participated in the making of, a false or misleading statement did so with scienter." *Id.* at 403.  Since Lead Plaintiff does not specifically allege that the Riot Blockchain Defendants—who are the only parties in this action who are officers of the Company—acted with the requisite scienter, Lead Plaintiff also fails to allege that Riot acted with the requisite scienter.

1.    **Lead Plaintiff's Assumption That the Riot Blockchain Defendants "Must Have" Acted with Scienter Fails as a Matter of Law**

Lead Plaintiff concludes that the Riot Blockchain Defendants must have known and/or recklessly disregarded the false and/or misleading statements simply by virtue of their "high-level positions" at Riot. (CCAC ¶¶ 376–78, 381.)  Lead Plaintiff alleges that because the Individual Defendants were involved in the "core operations" of the Company, which included the drafting, producing, and reviewing of the Company's public statements and SEC filings, the Riot Blockchain Defendants are "presumed" to have knowledge of all material facts concerning the Company. (*Id.* ¶ 379.)  These allegations do not come close to meeting the demands of the Reform Act. *See Utesch v. Lannett Co.,* 316 F. Supp. 3d 895, 906 (E.D. Pa. 2018) ("[i]t is one thing to say that" the defendants were aware of the importance of an issue for the company, but it "is another to infer that" defendants "must have known" of a fraud related to that issue).

"[I]t is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest that the officer had knowledge of the fact in question." *In re Heartland Payment Sys., Inc. Secs. Litig.*, 2009 WL 4798148, at *7 (D.N.J. Dec. 7, 2009).  Under "the core operations doctrine, misstatements and omissions made on 'core matters of central

-30-

importance' to the company and its high-level executives give rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *In re Urban Outfitters, Inc. Secs. Litig.*, 103 F. Supp. 3d 635, 653–54 (E.D. Pa. 2015). In other words, Lead Plaintiff is required to "specify the role of *each* defendant, demonstrating *each* defendant's involvement in [the] misstatements and omissions." *Winer Family Trust v. Queen*, 503 F.3d 319, 335–36 (3d Cir. 2007) (emphasis added).

Here, the Corrected Complaint alleges nothing about the particular roles, duties, or actions of any of the Individual Defendants, other than vaguely alluding to their status as officers or directors of Riot. (*See* CCAC ¶ 379.) As such, the Corrected Complaint fails to allege that the Riot Blockchain Defendants acted with requisite scienter. *See In re Advanta*, 180 F.3d at 539 ("[A]llegations that a securities-fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.") (alteration in original).

### 2.   The SEC's Investigation of Riot and Filing of the *Honig* Action Do Not Establish a Strong Inference of Scienter

Lead Plaintiff alleges that the "SEC investigation [of Riot] and filing of the *Honig* Action and subsequent settlements add to the inference of scienter." (CCAC ¶ 387.) Not so. An SEC investigation not resulting in any finding of

wrongdoing does not support an inference of scienter.  *In re Hertz Glob. Holdings, Inc. Secs. Litig.*, 2017 WL 1536223, at *17 (D.N.J. Apr. 27, 2017).[15]  The SEC's investigation of Riot—which has not resulted in any formal charges—cannot support a strong inference of scienter against Riot.  And while the *Honig* action does involve Mr. O'Rourke, the case is unrelated to Riot and it does not involve Messrs. Beeghley, McGonegal, Kaplan, Les, So or Dai.  Moreover, Lead Plaintiff admits that the action does not pertain to Mr. O'Rourke's actions at Riot, and did not lead to any findings of wrongdoing by Riot or Mr. O'Rourke.  (CCAC ¶ 81; *see also* Zaccaro Decl., Ex. L (attaching the SEC's July 12, 2019 Press Release concerning the *Honig* Action).)  Nor has any judgment been entered against Mr. O'Rourke in that case.

The fact that "certain individuals and entities charged in the *Honig* Action have already settled with the SEC" (none of whom are Defendants in this case) is similarly unavailing.  (*Id.* ¶ 394.)  The Corrected Complaint does not suggest that these settlements resulted in any admissions or legal conclusions involving Riot.  *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) (settlement agreements involving defendants with the DOJ and SEC were not

---

[15] *See also Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 628 n.2 (4th Cir. 2008) (finding that an SEC investigation is "too speculative to add much, if anything, to an inference of scienter"); *Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1304 (11th Cir. 2015) ("The mere existence of an SEC investigation likewise does not equip a reviewing court to explain which inferences might be available beyond a general suspicion of wrongdoing.") (internal quotation marks omitted).

sufficient to meet the pleading requirements of the Reform Act because the admissions were largely legal conclusions rather than particularized facts giving rise to a strong inference of scienter).  Lead Plaintiff's misplaced reliance on the SEC's investigation and involvement in the unrelated *Honig* matter does not create a strong inference that Riot Blockchain Defendants acted with scienter.

3. **SOX Certifications Do Not Establish a Strong Inference of Scienter**

A SOX certification does not create the requisite strong inference of scienter.  *In re Intelligroup Secs. Litig.*, 527 F. Supp. 2d 262, 288 (D.N.J. 2007) (SOX certifications establish scienter only if defendants had actual knowledge or "turned a 'blind eye'" to information showing that the certification was erroneous). To the contrary, Lead Plaintiff must "allege facts indicating that certifying defendants had clear reasons to doubt the validity of financials being certified but kept turning their blind eye to all 'red flags.'"  *Id.* at 289.

The pleading requirements, for example, could be satisfied through allegations that "defendants improperly changed accounting journal entries in order to artificially inflate revenue and then execute a SOX certification while being well aware of the impropriety of the change."  *Id.*  In light of the requirements, Lead Plaintiff's allegations are woefully inadequate.  *See City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 420 (D. Del. 2009) (SOX certifications do not support inference of scienter where the plaintiff fails to "plead

with sufficient particularity that [the defendants were] aware or should have been aware of" the alleged falsity "at the time those certifications were made").

4.   **Mr. O'Rourke's Purported Personal Relationship Cannot Create Any Inference of Scienter as to the Riot Blockchain Defendants**

Lead Plaintiff asserts that because Mr. O'Rourke had met with Messrs. Honig, Groussman, and Kesner in 2014 and, in October 2018, that they had a "material relationship outside the context of their being merely owners of Riot stock."  (CCAC ¶ 391 (internal quotation marks omitted).)  Lead Plaintiff then concludes that Riot's representation that "none of the selling stockholders had a material relationship with Riot or its subsidiaries," was false and misleading, and thus creates a strong inference of scienter.  (*Id.* ¶ 389 (internal quotation marks omitted).)  These allegations, however, cannot create any inference of scienter as to the Riot Blockchain Defendants.

As argued above, Riot did not have a duty to disclose Mr. O'Rourke's purported personal relationships with Messrs. Honig, Groussman, or Kesner (who is not alleged by Lead Plaintiff to own any shares of Riot stock).  Rather, Riot was only obliged to disclose transactions with "related parties," as defined under 17 C.F.R. § 229.404—which excludes co-investors or personal relationships from its definition.  Nevertheless, Riot complied with the demands of Regulation S-K when it disclosed that Messrs. Honig and Groussman were beneficial owners of over 5%

of Riot stock.  (*See, e.g.*, *id.* ¶ 164.)  Lead Plaintiff also fails to allege any facts

whatsoever that demonstrate Messrs. Honig, Groussman, or Kesner's—or anyone

else from the alleged Honig Group for that matter—significant control over Riot's

operations.  *See* FAS 57, ¶ 21.  Consequently, Riot's purported failure to disclose

Mr. O'Rourke's personal relationships cannot create an inference of scienter as to

any of the Riot Blockchain Defendants.

### 5.    Mr. O'Rourke's Trades of Riot Shares on December 29, 2017, Do Not Establish a Strong Inference of Scienter

Lead Plaintiff claims that Mr. O'Rourke's sale of Riot shares on December

29, 2017 somehow "reveals his motive to commit fraud."  (CCAC ¶ 386.)  Lead

Plaintiff further claims that these sales "were made just days before the Company

announced the dismissal of its auditor and a month before Riot canceled its

meeting for the second time, causing the NASDAQ to inform the Company that it

has violated the NASDAQ's listing requirements."  (*Id.*)  These allegations—

which do not apply to Messrs. McGonegal, Beeghley, Kaplan, Les, So or Dai—are

wholly insufficient to support the element of scienter; fraudulent intent cannot be

inferred "from the mere fact that some officers sold stock."  *Burlington Coat*

*Factory*, 114 F.3d at 1424 (recognizing that corporate executives routinely sell

their own company's stock and finding that plaintiffs' allegations that the officer-

defendants had traded company stock during the class period insufficient to

produce a strong inference of fraudulent intent).

Lead Plaintiff must allege additional facts to show that Mr. O'Rourke's trades were made at times and in quantities that were suspicious enough to support the necessary "strong inference of scienter." *Oran v. Stafford*, 226 F.3d 275, 290 (3d Cir. 2000) (finding that the plaintiffs' allegations as to the individual defendants' trading patterns did not establish the requisite strong inference of scienter). The Corrected Complaint fails to allege facts to suggest that Mr. O'Rourke's sales were unusual or suspicious. *See GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) ("Motives that are generally possessed by most corporate directors and officers do not suffice . . . .").

In fact, Lead Plaintiff's own allegations militate against any inference that Mr. O'Rourke's trades were unusual. The Corrected Complaint alleges that O'Rourke's trade occurred *after* the purported fraud was already disclosed. (*See* CCAC ¶¶ 299, 308.) For example, the Corrected Complaint notes that on December 19, 2017, CNBC aired an interview with Andrew Left, a short-seller of Riot shares and founder of Citron Research, who claimed that Riot "misrepresent[ed] the fact that nothing that they have is a real player in the crypto industry." (*Id.* ¶ 299.) Lead Plaintiff also cites December 21, 2017 articles from *Reuters* and *Zacks*, which purportedly disclosed that "Riot's name change to include the word 'Blockchain' was a publicity stunt." (*Id.* ¶ 301.) According to Lead Plaintiff, these disclosures caused Riot's stock price to decline. (*Id.* ¶ 304.)

Moreover, the Corrected Complaint alleges that Mr. O'Rourke's trades represented less than 10 percent of his overall position, which was sold to cover his tax obligations resulting from the vesting of restricted stock awards. (*Id.* ¶ 341 (quoting a February 16, 2018 CNBC article on Riot).) Thus, the timing and scope of Mr. O'Rourke's December 29, 2017 trades undermine Lead Plaintiff's scienter allegations as they do not demonstrate any effort to dispose a large number of shares before the alleged fraud was disclosed. *See Oran*, 226 F.3d at 290; *Advanta Corp.*, 180 F.3d at 540 (finding an insider's sale of seven percent of his holdings did not support a strong inference of fraud).

### 6.    <u>Viewed as a Whole, the Corrected Complaint Fails to Create a Strong Inference of Scienter</u>

Taken together, Lead Plaintiff's allegations fail to create any strong inference of scienter that is at least as strong as any non-culpable inference of scienter. *Pharmanet Dev. Grp.*, 720 F. Supp. 2d at 558 (plaintiff's complaint, even when viewed in its entirety, failed to establish a strong inference of scienter where the court had already found the plaintiff's insider trading, group pleading, and GAAP violation allegations to be insufficient). The Corrected Complaint does not offer "facts to show that defendants had both motive and opportunity to commit fraud" or "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Burlington Coat Factory*, 114 F.3d at 1418 (describing the methods by which a strong inference of fraud may be established).

Lead Plaintiff allege no motive on behalf of the Riot Blockchain Defendants to defraud Riot investors whatsoever. *Avaya, Inc.*, 564 F.3d at 278 ("[M]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud.") (alteration in original). Lead Plaintiff simply asserts that Mr. O'Rourke "reveal[ed] his motive to commit fraud" when he purportedly sold Riot stock during the Class Period, *but after* the alleged fraud was disclosed. (CCAC ¶ 386.) These "catch-all allegations that defendants stood to benefit from [the] wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." *Advanta Corp.*, 180 F.3d at 535. In fact, Lead Plaintiff's focus on Mr. O'Rourke only serves to highlight the lack of specific allegations regarding the other Individual Defendants, including Messrs. Beeghley and McGonegal.

Similarly, the Corrected Complaint lacks allegations constituting strong circumstantial evidence of conscious misbehavior or recklessness. For example, the Corrected Complaint offers no witnesses, no sources, or any contemporaneous documents, which would show "what each defendant knew, when he/she knew it, or how he/she acquired that knowledge." *In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1207 (N.D. Cal. 2007); *see also Limantour v. Cray Inc.*, 432

F. Supp. 2d 1129, 1152 (W.D. Wash. 2006) (plaintiffs failed to allege scienter because they offered no witnesses or circumstantial evidence showing defendants intended to inflate the stock price in furtherance of a pump-and-dump scheme).

In sum, the Court should dismiss the Section 10(b) claim brought against the Riot Blockchain Defendants because Lead Plaintiff does not come anywhere close to pleading cogent and compelling facts to establish scienter. Indeed, as to Messrs. Beeghley and McGonegal, the Corrected Complaint contains *no* allegations whatsoever, let alone particularized ones, to support a scienter inference. And the only allegations regarding Mr. O'Rourke—that he sold Riot shares—is patently inadequate to support a scienter inference.

## IV.   <u>THE SECTION 20(A) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED</u>

For Section 20(a) liability, a plaintiff must show: (1) a person controlled another person or entity; (2) that the controlled person or entity committed a primary violation of the securities laws; and (3) that the defendant was a culpable participant in the fraud. *Fox Int'l Relations v. Fiserv Secs. Inc.*, 490 F. Supp. 2d 590, 601 (E.D. Pa. 2007). If no controlled person is liable, no controlling person liability exists. *In re Alpharma Secs. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004).

As demonstrated above, Lead Plaintiff cannot plead either a primary violation of the Exchange Act or culpable participation in the alleged fraud. *See In re Equimed, Inc. Secs. Litig.*, 2000 WL 562909, at *10 (E.D. Pa. May 9, 2000)

("The heightened standards of the Reform Act apply to a § 20(a) claim, so a

plaintiff must plead particularized facts of the controlling person's conscious

misbehavior as a culpable participant in the fraud.") (internal quotation marks

omitted) (quoting *In re Cendant Corp. Secs. Litig.*, 76 F. Supp. 2d 539, 549 n.5

(D.N.J. 1999)).  The Section 20(a) claim therefore must be dismissed.

V.    **<u>CONCLUSION</u>**

       For the reasons stated above, and for those reasons stated in the concurrently

filed Motion by the Director Defendants, the Riot Blockchain Defendants

respectfully request that the Court dismiss the Section 10(b) and Section 20(a)

claims brought against them.


DATED:     September 3, 2019          PAUL HASTINGS LLP


                                      By:  /s/ *Chad J. Peterman*
                                      _____
                                           CHAD J. PETERMAN

                                      *chadpeterman@paulhastings.com*
                                      200 Park Avenue
                                      New York, NY 10166
                                      Telephone:  1(212) 318-6000
                                      Facsimile:  1(212) 319-4090

THOMAS A. ZACCARO
thomaszaccaro@paulhastings.com
D. SCOTT CARLTON
scottcarlton@paulhastings.com
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA  90071
Telephone:  1(213) 683-6000
Facsimile:  1(213) 627-0705

Attorneys for Defendants
RIOT BLOCKCHAIN, INC., JOHN
O'ROURKE, MICHAEL BEEGHLEY,
AND JEFFERY G. MCGONEGAL