## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CREIGHTON TAKATA, Individually and
on behalf of all others similarly situated,

　　　　　　　　　　Plaintiff,

　　　vs.

RIOT BLOCKCHAIN, INC. F/K/A,
BIOPTIX, INC., JOHN O'ROURKE, and
JEFFREY MCGONEGAL,

　　　　　　　　　　Defendants.

Civil Action No.: 18-2293(FLW)(TJB)

*ORAL ARGUMENT REQUESTED*

## DEFENDANT BARRY C. HONIG'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS LEAD PLAINTIFF'S CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

SHEPPARD, MULLIN, RICHTER &
　HAMPTON LLP

*Attorneys for Defendant Barry C. Honig*

Dated:  September 5, 2019

SMRH:4824-6325-2631.3

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

ARGUMENT ......................................................................................................4

I.     FACTUAL BACKGROUND ..........................................................................4

     A.     The Defendants. ......................................................................4

     B.     The Company's Prior Business Strategy Was Unsuccessful for Years. .................5

     C.     The Company Adds New Independent Board Members, Who Later Decide to Transition the Business Into Cryptocurrency and Blockchain. ..........................6

     D.     The Company Returns Some Cash to Shareholders And Uses The Remainder to Acquire Valuable Cryptocurrency and Blockchain Assets. .............7

     E.     Mr. Honig Was a Minority Shareholder Who Did Not Participate In or Influence The Decisions of Riot's Board. .................................................9

     F.     The Board's Decisions Made Riot A Far More Valuable Company, But Riot's Stock Price Was Driven By Underlying Price Swings of Bitcoin. .............10

II.     APPLICABLE LEGAL STANDARDS ...........................................................11

     A.     Motion to Dismiss Under Rule 12(b)(6) ...........................................11

     B.     Complaints Alleging Securities Fraud, Like This One, Must Be Dismissed Unless They Satisfy The Heightened Pleading Standards Of Rule 9(b) And The PSLRA. .............................................................................12

III.    THE SOLE CAUSE OF ACTION AGAINST MR. HONIG SHOULD BE DISMISSED BECAUSE IT FAILS TO PLEAD HIS PARTICIPATION IN ANY "SCHEME" WITH THE HEIGHTENED FACTUAL PARTICULARITY REQUIRED BY RULE 9(B) AND THE PSLRA. ..........................................13

     A.     The Corrected Complaint Fails To Allege Facts Showing That Mr. Honig Committed Any Deceptive or Manipulative Act. .................................15

         1.     *The Public Disclosures Identified In The Corrected Complaint Are Demonstrably True, And In Any Event, Mr. Honig Did Not Make Them.* ....................................................................15

         2.     *The Corrected Complaint Fails To Allege Any Facts Which Show That Mr. Honig Engaged In Manipulative Trading Activity.* ...................16

3.     *The Corrected Complaint Fails to Allege Facts Sufficient To Establish The Existence of a "Group."* ....................................................18

B.     The Corrected Complaint Fails to Allege Particularized Facts Giving Rise to Any Inference, Much Less A Strong Inference, That Mr. Honig Acted With Scienter. ......................................................................................................19

C.     The Corrected Complaint Fails to Allege Loss Causation, Economic Loss or Reliance. .......................................................................................................22

CONCLUSION...............................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**<u>Federal Cases</u>**

*In re Able Labs. Sec. Litig.*
    No. 05-cv-02681, 2008 WL 1967509 (D.N.J. Mar. 24, 2008) .........................................14, 22

*In re Aetna Inc. Sec. Litig.*
    34 F. Supp. 2d 935 (E.D. Pa. 1999) .....................................................................................20

*Affiliated Ute Citizens of Utah v. United States*
    406 U.S. 128 (1972)..............................................................................................................24

*In re Almost Family, Inc. Sec. Litig.*
    No. 3:10-CV-00520-H, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012)....................................21

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*
    413 F. Supp. 2d 378 (E.D. Pa. 2005) ...................................................................................20

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009)..............................................................................................................11

*Associated Builders, Inc. v. Alabama Power Co.*
    505 F.2d 97 (5th Cir. 1974) ..................................................................................................16

*Basic Inc. v. Levinson*
    485 U.S. 224 (1988)..............................................................................................................24

*Bell Atlantic Corp. v. Twombly*
    550 U.S. 544 (2007)..............................................................................................................11

*Berry v. Coleman*
    172 Fed. App'x 929 (11th Cir. 2006) ...................................................................................16

*Burlington Coat Factory Sec. Litig.*
    114 F.3d 1410 (3d Cir. 1997)................................................................................................11

*California Public Employees' Ret. Sys. v. Chubb Corp.*
    394 F.3d 126 ..........................................................................................................................25

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*
    511 U.S. 164 (1994)....................................................................................................3, 13, 15

*Chiarella v. United States*
    445 U.S. 222 (1980)..............................................................................................................14

*In re Clearly Canadian Sec. Litig.*
    875 F. Supp. 1410 (N.D. Cal. 1995) .....................................................................................17

*De Vito v. Liquid Holdings Grp., Inc.*
   No. 15-cv-06969, 2018 WL 6891832 (D.N.J. Dec. 31, 2018)..................................14

*Dura Pharmaceuticals, Inc. v. Broudo*
   544 U.S. 336 (2005).........................................................................................22

*In re Exxon Mobil Corp. Sec. Litig.*
   387 F. Supp. 2d 407 (D.N.J. 2005), *aff'd*, 500 F.3d 189
   (3d Cir. 2007), *as amended* (Nov. 20, 2007) ..............................................19, 20, 21

*Fowler v. UPMC Shadyside*
   578 F.3d 203 (3d Cir. 2009)..............................................................................11

*Frederico v. Home Depot*
   507 F.3d 188 (3d Cir. 2007)...........................................................................12, 13

*GSC Partners CDO Fund v. Washington*
   368 F.3d 228 (3d Cir. 2004)...............................................................................19

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*
   286 F.3d 613 (2d Cir. 2002)...............................................................................10

*In re Home Health Corp. of Am., Inc.*
   No. CIV. A. 98-834, 1999 WL 79057 (E.D. Pa. Jan. 29, 1999) .............................21

*Institutional Investors Group v. Avaya, Inc.*
   564 F.3d 242 (3d Cir. 2009)...............................................................................13

*In re Int'l Bus. Machines Corp. Sec. Litig.*
   163 F.3d 102 (2d Cir. 1998)...............................................................................17

*Janus Capital Grp., Inc. v. First Derivative Traders*
   564 U.S. 135 (2011).........................................................................................14

*Liberty Nat. Ins. Holding Co. v. Charter*
   734 F.2d 545 (11th Cir. 1984) ...........................................................................10

*Loos v. Immersion Corp.*
   762 F.3d 880 (9th Cir. 2014), *as amended* (Sept. 11, 2014)..................................21

*Mathews v. Centex Telemanagement, Inc.*
   1994 WL *269734* (N.D.Cal. June 8, 1994).........................................................22

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litigation*
   MDL No. 1658 (SRC), 2011 WL 3444199 (D.N.J. Aug. 8, 2011) .........................13

*In re Merck & Co., Inc. Sec. Litig.*
   432 F.3d 261 (3d Cir. 2005)...............................................................................23

*Meyer v. Greene*
      710 F.3d 1189 (11th Cir. 2013) ...................................................................21, 23

*Motient Corp. v. Dondero*
      529 F.3d 532 (5th Cir. 2008) ...................................................................10

*In re MRU Holdings Sec. Litig.*
      769 F.Supp.2d 500 (S.D.N.Y.2011)...................................................................22

*In re NAHC, Inc. Sec. Litig.*
      306 F.3d 1314 (3d Cir. 2002)...................................................................12

*In re Omnicom Grp., Inc. Sec. Litig.*
      597 F.3d 501 (2d Cir. 2010)...................................................................23

*Oppenheimer v. Novell, Inc.*
      851 F.Supp. 412 (D.Utah 1994)...................................................................22

*Phillips v. Cnty. of Allegheny*
      515 F.3d 224 (3d Cir. 2008)...................................................................11

*In re Rockefeller Ctr. Props. Sec. Litig.*
      311 F.3d 198 (3d Cir. 2002)...................................................................12, 13

*In re Royal Dutch/Shell Transp.*
      No. 04-374(JAP), 2006 WL 2355402 (D.N.J. Aug. 14, 2006) ..............................14, 15, 17, 20

*S.E.C. v. Lucent Techs., Inc.*
      610 F. Supp. 2d 342 (D.N.J. 2009) ...................................................................14, 15, 17, 18

*Sterling v. Provident Life & Accident Ins. Co.*
      519 F. Supp. 2d 1195 (M.D. Fla. 2006)...................................................................16

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*
      552 U.S. 148 (2008)...................................................................22

*In re Suprema Specialties, Inc. Sec. Litig.*
      438 F.3d 256 (3d Cir. 2006)...................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
      551 U.S. 308 (2007)...................................................................12

*Winer Family Trust v. Queen*
      503 F.3d 319 (3d Cir. 2007)...................................................................13, 18

**Federal: Statutes, Rules, Regulations, Constitutional Provisions**

15 U.S.C.
    § 78u-4 ..................................................................................................4, 12, 13, 14, 21
    § 78u–4(b)(1) ......................................................................................................13, 15
    § 78u–4(b)(2) ......................................................................................................13, 18
    § 78u–4(b)(3)(A) .......................................................................................................13
    § 78u–4(b)(4) ............................................................................................................14

Exchange Act
    § 10(b) ............................................................................................2, 3, 13, 21, 23, 24, 25

Fed. R. Civ. P.
    9(b) ....................................................................................................4, 12, 13, 14, 25
    10(b) ..........................................................................................13, 14, 17, 24, 25
    10b-5(a) and (c) .....................................................................................................2, 3
    10b-5(b) ......................................................................................................................2
    12(b)(6) ..................................................................................................11, 12, 25

## INTRODUCTION

*Forbes* pronounced 2017 as "The Year of Bitcoin."[1] The price of Bitcoin rocketed an astounding 2,700% upwards in just the last three months of that year, as millions of speculators worldwide rushed to stake their claims in a modern day goldrush. Unsurprisingly, the boom was followed by a bust; Bitcoin lost half its value in January 2018, and by year-end was trading more than 80% below its December 2017 peak.

Riot Blockchain, Inc. ("**Riot**" or the "**Company**") was swept along with that wild ride. At the beginning of 2017, the company was a fifteen year-old, failing biotech developer. Its Board of Directors ("**Board**") decided to shutter its biotech business and consider strategic alternatives that would provide better value to shareholders. Observing investor interest in cryptocurrencies and blockchain, the Board chose to transition the Company towards those technologies, and in October 2017 became one of the first publicly-traded stocks with "pure play" exposure to Bitcoin and blockchain. The timing of that business transition was incredibly fortuitous, as it happened just as the value of Bitcoin rocketed from $4,200 to $19,800 in only eleven weeks. Riot's stock price was swept along by Bitcoin's massive rise, much like a surfer who happened to paddle into the ocean right when a "once in a hundred year wave" rolled in:



**Riot Blockchain Inc. (RIOT) and Bitcoin – USD (BTCUSD) Price[2]**
**October 3, 2017 – September 6, 2018**

[1] Itai Damti, *2017 Will Be Remembered As The Year Of Bitcoin*, Forbes (Oct. 25, 2017, 2:11 AM), https://www.forbes.com/sites/outofasia/2017/10/25/bitcoins-ipo-moment-has-arrived/#6fdbb3231c1f.

SMRH:4824-6325-2631.3

The ups and downs of Riot's stock price were driven by the market price of Bitcoin,[2] not by any particular press release issued by the Company. Unfortunately, that did not deter Lead Plaintiff from concocting this fraud-in-hindsight lawsuit, which attempts to blame his alleged losses upon a few individuals rather than the massive market momentum that affected the price of Bitcoin, and in turn Riot's stock price, during the putative Class Period.[3]

One of the defendants is Mr. Barry Honig ("**Mr. Honig**"), who unlike many of the other defendants was never a director, officer or employee of Riot or its predecessors.  Mr. Honig is a private investor who purchased a stake in the Company during 2016 when it was operating as a biotech, and he remained a modest minority shareholder through the Company's 2017 business transition to cryptocurrency and blockchain. Mr. Honig did not draft or disseminate a single one of the statements alleged to be misleading in the Corrected Consolidated Amended Complaint ("**Corrected Complaint**" or "**CCAC**"). The Corrected Complaint does not identify a single communication that Mr. Honig had with any Riot director or officer during the Class Period. And Mr. Honig did not exercise control over the Board in any way during the Class Period, which is likely why Lead Plaintiff does **not** name Mr. Honig in the complaint's Section 20(a) cause of action which seeks to impose liability upon "controlling persons" of Riot (*see* Corrected Complaint, Count III).

The only count of the Corrected Complaint that names Mr. Honig is Count II, which alleges a "scheme" to manipulate Riot's stock price in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c). This count weaves a fanciful tale depicting Mr. Honig as a sort of Svengali who supposedly "directed" the actions of Riot's independent directors, its officers, and over a dozen third parties in an alleged attempt to "pump" Riot's stock price before "dumping" his shares. This, despite the facts that Mr. Honig was a minority shareholder, he is not alleged to

---

[2] This chart represents a comparison of the price of Riot stock (red line) and Bitcoin (blue line) for the period October 3, 2017 through September 6, 2018, downloaded from www.barchart.com. It also is incorporated into Exhibit M of the concurrently filed Declaration of Robert D. Weber ("**Weber Decl.**").

[3] This is discussed below in Section I.F., *infra*, and shown visually by stock charts attached as Exhibits D, L and M to the concurrently filed Declaration of Robert D. Weber.

have made any of public statements about Riot, and the Corrected Complaint contains precisely zero allegations showing how Mr. Honig "directed" any one or had any power to do so.

A "scheme liability" claim asserted pursuant to Rule 10b-5(a) and (c) can survive dismissal only if the complaint pleads facts showing that the defendant engaged in "manipulative acts" that distort market activity, such as wash sales, matched orders, or rigged prices. The overly long Corrected Complaint contains no such allegations. The only allegations the Court will observe concerning Mr. Honig's actions during the putative Class Period are that he is alleged to have (1) lawfully bought and sold Riot stock, (2) once shared an office suite with Defendant O'Rourke (a Riot director, and later, CEO), (3) owned a minor stake in one of the several companies that Riot acquired, and (4) introduced O'Rourke to a prospective merger candidate for Riot. These acts are neither manipulative nor unlawful.

The Corrected Complaint itself confirms that Riot maintained an independent Board and management who made all of the decisions and statements about which Lead Plaintiff now complains. Mr. Honig had nothing to do with those decisions. The Corrected Complaint seemingly seeks to pin liability on Mr. Honig for aiding and abetting some of the Board's business decisions, but the Supreme Court ruled twenty-five years ago that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994). The so-called "scheme" allegations made against Mr. Honig are precisely the kinds of improper short cuts meant to circumvent *Central Bank* that courts consistently prohibit.

Lead Plaintiff also completely fails to meet the Reform Act requirement to plead particularized facts raising a strong inference that Mr. Honig acted with the requisite scienter. To the contrary, the Corrected Complaint acknowledges that Mr. Honig sold some of his Riot stock holdings *before* the alleged "pump and dump" began in October 2017, and then later *bought* $500,000 of Riot shares in December 2017 as the stock price neared its all-time high. Both of those acts are precisely the opposite of the conduct one would expect of an alleged market manipulator, and thus tend to negate any inference that Mr. Honig acted with scienter.

In the absence of facts connecting Mr. Honig to a scheme involving Riot, the Complaint instead dedicates dozens of pages to innuendoes and attempted character assassination. Virtually all of the "new" material added to this latest iteration of the complaint concerns Mr. Honig's investments *in other companies* that have nothing to do with Riot. The Corrected Complaint bottoms out with the low-brow inclusion of two photos of Mr. Honig and his lawyer in a hospital, having nothing to do with anyone's investment in Riot (which did not occur until years later), and which are offered solely as an attempt to embarrass. No plaintiff would stoop to this level of nonsense if he actually had a viable case.

The Corrected Complaint is the fourth attempt at pleading a cause of action against Mr. Honig,[4] and while each of the complaints have gotten exponentially longer, they have not and cannot plead facts sufficient to meet the heightened pleading requirements for securities fraud under Rule 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, *et seq.* ("**PSLRA**"). Accordingly, Mr. Honig respectfully asks the Court to dismiss the Corrected Complaint's Second Cause of Action asserted against him, with prejudice

## ARGUMENT

## I.   FACTUAL BACKGROUND

### A.   The Defendants.

Defendant Riot is a technology company that operates and owns stakes in several blockchain and cryptocurrency-related businesses. [CCAC ¶ 21]. Defendant Jeffrey McGonegal was hired as the Chief Financial Officer of Riot's predecessor company, Venaxis, in June 2003, and continued to serve in that position until February 28, 2018.[5] Defendant Michael Beeghley was the Company's Chairman and Chief Executive Officer from April 6, 2017 until November 3,

---

[4] The original complaint was filed in this matter on February 17, 2018 [Dkt. 1]. Following appointment of the Lead Plaintiff, a  Consolidated Complaint was filed on January 15, 2019 [Dkt. 52]. In response to motions to dismiss the Consolidated Complaint, Lead Plaintiff filed his Consolidated Amended Complaint on May 8, 2019 [Dkt. 72] and a Corrected Consolidated Amended Complaint on May 9, 2019 [Dkt. 73].

[5] CCAC ¶ 30; *see also* Venaxis Form 10-K for the year ended December 31, 2015, at p. 57 [Weber Decl. Ex. A]. The Court may properly consider documents filed with the SEC, as explained in Mr. Honig's concurrently filed Request for Judicial Notice ("**RJN**").

2017.[6] Following Beeghley's resignation, Riot's independent Board appointed John O'Rourke as a replacement, and he served as the company's CEO and Chairman until September 8, 2018. [CCAC ¶ 23]. Defendants Michael Dai, Jason Les, Andrew Kaplan and Eric So are current or former Riot directors. [CCAC ¶¶ 28, 29, 31 and 32].

Barry Honig is a successful private investor who has provided growth capital to hundreds of companies over the past two decades. He was a minority shareholder of the Company during the putative Class Period, having first acquired his position during 2016 when it was a biotech company called Venaxis, Inc. ("**Venaxis**"). [CCAC ¶ 22, 47, 130]. Defendants Stetson, DeFrancesco and Groussman were other outside investors in Riot. [CCAC ¶¶ 24, 26, 27].

### B.    The Company's Prior Business Strategy Was Unsuccessful for Years.

Riot began its existence in the early 2000s as Venaxis and for years tried to develop a blood test for use in the diagnosis and treatment of acute appendicitis. [CCAC ¶ 128]. Venaxis burned through investor capital, reporting losses of $9,212,000, $12,149,000, $10,443,000 and $8,758,000 in years 2012 through 2015, on revenues of only $42,000, $56,000, $167,000 and $101,000 during those same years.[7] In 2015, the Food and Drug Administration ruled that Venaxis's blood test did not meet or exceed the current standard of care, which meant that the Company no longer had a marketable product. [CCAC ¶ 129].

With meager revenue and an unmarketable product, in 2015 Venaxis wound down its blood test business and explored strategic alternatives for the use of the only attractive asset on its balance sheet – the remnants of a $20 million capital raise that had occurred in April 2014. [CCAC ¶ 130]. During the first half of 2016, the Company was burning cash at a rate of approximately $300,000 per month,[8] and had zero sales, which led the market to value the Company at millions of dollars less than the value of its cash on hand.[9]

---

[6] CCAC ¶ 25; *see also* Riot's November 3, 2017 Form 8-K [Weber Decl. Ex. C]; RJN p. 2.

[7] *See* Venaxis Form 10-K for the year ended Dec. 31, 2015, at p. 23 [Weber Decl. Ex. A].

[8] *See* Venaxis Form 10-Q for the quarterly period ended June 30, 2016, at p. 4 [Weber Decl. Ex. B]; RJN p. 2.

[9] The closing price of Venaxis stock on June 30, 2016 was $3.51/share. *See* Historical Stock Price Chart [Weber Decl. Ex. D]. Based upon the 3,876,961 shares of Venaxis common stock

Turning the situation from bad to worse, in September 2016 the Company's prior CEO engineered the acquisition of another struggling company called BiOptix Diagnostics, Inc., a company that had severely negative cash flow. [CCAC ¶ 131]. Believing that the acquisition would accelerate the Company's cash drain, and that the deal was consummated mainly for the purpose of entrenching the Company's long-time CEO Stephen Lundy and its Board, Mr. Honig commenced a brief activist campaign. He initiated a proxy fight to remove the Company's directors. [CCAC ¶¶ 133 – 135, 137].

### C.   The Company Adds New Independent Board Members, Who Later Decide to Transition the Business Into Cryptocurrency and Blockchain.

In response to that campaign, three of the Company's legacy directors resigned in early January 2017 [CCAC ¶ 137], and they were replaced on the Company's Board by defendants Beeghley, O'Rourke and Dai. [CCAC ¶¶ 25, 29, 137].  At that point, the majority of the Company's four-member Board were (1) CEO Lundy, against whom Mr. Honig had waged a proxy fight [CCAC ¶¶ 134-35], (2) outside director Beeghley, who "did not know Honig" [CCAC ¶¶ 7, 137], and outside director Mike Dai, who the CCAC does not allege had any prior relationship with Mr. Honig [CCAC ¶ 29]. The Company's Chief Financial Officer was McGonegal, who had worked at the Company since 2003 and also had no prior relationship with Mr. Honig. It is these people who Lead Plaintiff argues somehow were "directed" by outside minority investor Mr. Honig.

The reconstituted independent Board immediately adopted a plan to discontinue the BiOptix business, instituted a significant workforce reduction to slow the cash burn, and commenced a new strategic review of potential business alternatives.[10] This move proved successful; the Company reduced its total operating expenses from $1,533,104 during the third quarter of 2016 to only $614,676 during the third quarter of 2017, a burn rate of just over

---

issued and outstanding on that date (*see* Venaxis Form 10-Q for the period ended June 30, 2016 at p. 3 [Weber Decl. Ex. B]), the company's market capitalization was only $13,608,133.

[10] *See* Riot's Form 8-K dated January 20, 2017 [Weber Decl. Ex. O].

$200,000 per month.[11] The Company later disclosed to its investors that the review included the possibility of the Company "shifting its focus to new technologies in unrelated markets."[12]

The Complaint does not allege any facts establishing that Mr. Honig played any role in the strategic review, and in fact, he did not. Mr. Honig remained only an outside investor in the Company, and over the next several months he gradually reduced his holdings in the Company, from a reported 11.2% of the Company's outstanding common stock in January 2017,[13] to 9.48% in July 2017,[14] and then to 8.09% as of September 20, 2017.[15]

## D. The Company Returns Some Cash to Shareholders And Uses The Remainder to Acquire Valuable Cryptocurrency and Blockchain Assets.

After months of analysis, Riot's independent Board settled upon a new direction for the Company. First, the Board decided to return capital to legacy shareholders by approving a special cash dividend pursuant to which every shareholder received $1.00 for each share of Common Stock held. [CCAC ¶ 159]. Incredibly, Lead Plaintiff asserts that this **payment of cash** to all shareholders was part of the fraudulent "scheme." CCAC ¶ 236.

Second, on October 4, 2017, the Company announced that it was changing its strategic direction to become an investor in, and operator of, blockchain and cryptocurrency businesses. [CCAC ¶ 166]. The Company simultaneously announced that it was changing its name to "Riot Blockchain" to reflect its new business focus. *Id.* The Company stated that it would pursue its new strategy for building shareholder value and future prospects by pursuing "acquisitions of businesses serving the blockchain ecosystem." *Id.*

---

[11] *See* Riot's Form 10-Q for the quarterly period ended Sept. 30, 2017 [Weber Decl. Ex. E], p. 4.

[12] *Bioptix Announces Special Cash Dividend*, Riot Blockchain (Oct. 3, 2017), *available at* https://www.riotblockchain.com/news-media/press-releases/detail/9/bioptix-announces-special-cash-dividend.

[13] *See* Mr. Honig's Schedule 13 D/A filed with the SEC on January 4, 2017 [Weber Decl. Ex. F].

[14] *See* Riot's Proxy Statement Pursuant to Section 14(a) filed with the SEC on July 10, 2017 [Weber Decl. Ex. G] at p. 8 (listing beneficial ownership as of July 3, 2017).

[15] *See* Riot's Registration Statement on Form S-3/A filed with the SEC on September 25, 2017 [Weber Decl. Ex. H] at p. 9 (listing beneficial ownership as of Sept. 20, 2017); *see also* CAC ¶ 154.

Riot's management then proceeded to do exactly what it said it would do:

- It announced on October 4, 2017 that it had acquired a minority interest in a Canadian cryptocurrency exchange called Coinsquare.[16] At the time of Riot's investment, Coinsquare was valued at $30 million. Within just two months, the value of that investment increased threefold [CCAC ¶ 182];

- On October 16, 2017, Riot acquired a 52% stake in Tess, Inc., a company that is developing blockchain-based payment solutions for telecommunications companies;[17]

- On November 3, 2017, Riot announced the acquisition of Kairos Global Technology, Inc., ("**Kairos**"), a company that owned 1,200 specialized Bitcoin mining servers that Riot would use to build a Bitcoin mining operation. [CCAC ¶ 172];

- On November 16, 2017, Riot made an investment in Verady, LLC, a private company which provides accounting, audit and verification services for blockchain based assets such as cryptocurrencies;[18]

- In November 2017 and February 2018, Riot bolstered its Bitcoin mining operation by acquiring an additional 3,800 Bitcoin miners from Prive Technologies, Inc., and 3,000 miners from Blockchain Mining Supply & Services Ltd.;[19] and,

- On March 26, 2018, Riot acquired 92.5% of Logical Brokerage Corp., a futures introducing broker registered with the Commodity Futures Trading Commission, and a member of the National Futures Association.[20]

After Riot changed its strategic direction, and after several of the acquisitions noted above had occurred, Riot added Eric So and Jason Les to its Board of Directors [CCAC ¶¶ 31, 32], and John O'Rourke replaced Michael Beeghley as the Company's CEO. [CCAC ¶ 180]. There is no

---

[16] CCAC ¶ 166. Through several subsequent transaction, Riot ultimately came to own approximately 12.9% of Coinsquare. *See* Riot's 2017 Form 10-K [Weber Decl. Ex. I] at p. 57.

[17] CCAC ¶ 169; *see also* Riot's 2017 Form 10-K [Weber Decl. Ex. I] at p. 4.

[18] CCAC ¶ 278; *see also* Riot's November 16, 2017 Form 8-K [Weber Decl. Ex. J].

[19] CCAC ¶¶ 194, 197; *see also* Riot's 2017 Form 10-K [Weber Decl. Ex. I] at p. 73.

[20] *See* Riot's 2017 Form 10-K [Weber Decl. Ex. I] at pp. 5 and 74.

allegation in the Corrected Complaint that Mr. Honig played any role whatsoever in those management changes.

    **E.**    **Mr. Honig Was a Minority Shareholder Who Did Not Participate In or Influence The Decisions of Riot's Board.**

Throughout the latter half of 2017 and into 2018 when Riot underwent these changes, Mr. Honig was an outsider – a private investor who personally owned a modest, non-controlling amount of Riot stock. The decision to transition the Company's business into blockchain and cryptocurrencies was made by the Company's independent Board, not by Mr. Honig. He did not suggest that the Company change its name; that was a management decision. Mr. Honig did not "direct" any of Riot's half-dozen acquisitions listed above. Nor did Mr. Honig have anything to do with the disclosures that Riot made about its business; the Company's press releases and SEC filings were prepared entirely by Riot's employees. Indeed, the Corrected Complaint does not detail even a single instance of Mr. Honig communicating with anyone on the Board during the putative Class Period.

The only things that the Corrected Complaint alleges that Mr. Honig actually did during the putative Class Period were (1) acquire and sell some Riot stock [CCAC ¶¶ 154, 157, 160, 161, 189], (2) share office space with Mr. O'Rourke, who was an *outside director* of Riot (not an officer) until November 3, 2017 [CCAC ¶¶ 154, 157], (3) own a small, 8.6% stake in Kairos when it was acquired by Riot [CCAC ¶ 174], and (4) introduce O'Rourke to the President of Canadian public company Cresval, a potential merger partner [CCAC ¶ 188]. None of this alleged conduct is wrongful, none of this constitutes a "scheme" and nothing in the Corrected Complaint comes even close to attempting to articulate facts substantiating the conclusory allegations that Mr. Honig "directed" the Company's Board to do anything. Simply sharing office space with one outside director does not establish "control" over that director, much less the entire Board. And in regards to Mr. Honig's stock transactions, the Corrected Complaint

never purports to explain how they were wrongful, and concedes that the transactions were *fully and publicly disclosed*.[21]

### F.   The Board's Decisions Made Riot A Far More Valuable Company, But Riot's Stock Price Was Driven By Underlying Price Swings of Bitcoin.

While Mr. Honig did not play a role in the transformation of Riot from a failing company into one with a promising future, he and all other Riot shareholders equally benefitted from the Board's smart business decisions. As a result of the change in business strategy and associated acquisitions, Riot tripled the value of the assets on its balance sheet, from $17 million at year end 2016 to $52 million at year end 2017, most of which were hard assets of cash, property and equipment.[22] Riot's management also added a viable revenue stream to the business – Bitcoin mining – which in its first year of operation would generate over six million dollars, more than *ten times* the revenue that the Company generated in the years 2012-2016 combined.[23]

However, the market price of Riot stock was not driven by the Company's fundamentals, but rather, by momentum swings in the underlying price of Bitcoin. As evidenced by the price charts submitted as Exhibits D, L and M to the Weber Declaration, it can clearly be seen that Riot's market price closely mirrored the price of Bitcoin. From October 4, 2017, the day on which Riot announced its business transformation, Bitcoin rose 470% from $4,219 to its all-time high of $19,870 on December 17, 2017, while Riot's stock precisely mirrored Bitcoin's 470% rise, advancing from $8.09/share to its all-time high close of $38.60 on December 19, 2017. Bitcoin then lost half of its value in January 2018, mirrored by a decline in Riot's market price. Similarly, the stock prices of other public companies with significant exposure to cryptocurrency

---

[21] While the Complaint alleges that Mr. Honig did not disclose his acquisitions and sales "promptly," Mr. Honig denies that allegation, and in any event, there does not exist a  private right of action for money damages against a shareholder who allegedly fails to timely report transactions under the applicable SEC rules and regulations. *See Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 620 (2d Cir. 2002); *Motient Corp. v. Dondero*, 529 F.3d 532, 536 (5th Cir. 2008); *Liberty Nat. Ins. Holding Co. v. Charter*, 734 F.2d 545, 564 n. 41 (11th Cir. 1984).

[22] *See* Riot's 2017 Form 10-K [Weber Decl. Ex. I] at p. 43.

[23] *See* Riot's Form 10-Q for the quarterly period ended September 30, 2018 [Weber Decl. Ex. K] at p. 5.

price fluctuations, such as Overstock and Grayscale Bitcoin Trust,[24] mirrored these price movements. *See* Exhibit N to the Weber Declaration. Just a glance at these charts reveals that Riot's stock price moved in lock step with Bitcoin.

## II.   APPLICABLE LEGAL STANDARDS

### A.   Motion to Dismiss Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In order for a complaint to survive a 12(b)(6) motion, it must state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim for relief is facially plausible when the plaintiff pleads enough facts, taken as true, to allow a court to draw a reasonable inference that the defendant is liable for the alleged conduct. *Id.* If the facts only allow a court to draw a reasonable inference that the defendant is possibly liable, then the complaint must be dismissed. *Id.* Mere legal conclusions are not to be accepted as true and do not establish a plausible claim for relief. *Id.* ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

As a general matter, courts ruling on a motion to dismiss may not consider matters extraneous to the complaint. *Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.

---

[24] Grayscale Bitcoin Trust describes itself as "the first publicly quoted securities solely invested in and deriving value from the price of bitcoin." *See* https://grayscale.co/bitcoin-trust/

1997). However, an exception to the general rule is that a "'document integral to or explicitly relied upon in the complaint'" may be considered "'without converting the motion [to dismiss] into one for summary judgment.'" *Id.* (internal citation omitted). The Court also may consider SEC filings, even if those filings are not relied on in the complaint. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).

B.      **Complaints Alleging Securities Fraud, Like This One, Must Be Dismissed Unless They Satisfy The Heightened Pleading Standards Of Rule 9(b) And The PSLRA.**

"Independent of the standard applicable to Rule 12(b)(6) motions," Federal Rule of Civil Procedure 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). The particularity requirement is rigorously applied to complaints alleging securities fraud. *See Burlington Coat*, 114 F.3d at 1417. To satisfy this heightened pleading standard, a plaintiff must state the circumstances of his alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (*quoting Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004)). Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* (citing *Lum*, 361 F.3d at 224). The Third Circuit has advised that, at a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 216).

In addition to Rule 9(b)'s heightened pleading requirements, Congress enacted the PSLRA to require an even higher pleading standard for plaintiffs bringing private securities fraud actions. *See Id.* at 276. This heightened pleading standard is targeted at preventing abusive securities litigation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA "imposes another layer of factual particularity to allegations of securities fraud"

(*Rockefeller*, 311 F.3d at 217) by providing two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, under 15 U.S.C. § 78u–4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u–4(b)(1)). Second, the complaint must, "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

This heightened level of factual detail must be pleaded in a complaint as to <u>each</u> of the named defendants. *Winer Family Trust*, 503 F.3d at 335–36 ("The PSLRA requires [plaintiffs] to specify the role of each defendant, demonstrating each Defendant's involvement . . . ."); *In re Merck & Co., Inc. Sec., Deriv. & ERISA Litigation*, MDL No. 1658 (SRC),  2011 WL 3444199 at *19 (D.N.J. Aug. 8, 2011) (citing *Winer*, 503 F.3d). And these pleading requirements specifically apply to "scheme" liability claims such as those asserted against Mr. Honig here. *Stichting Pensioenfonds ABP v. Merck & Co*., 2012 WL 3235783, at *7 (D.N.J. Aug. 1, 2012). A complaint's failure to comply with any of these specific pleading requirements mandates dismissal. 15 U.S.C. § 78u–4(b)(3)(A).

## III.   THE SOLE CAUSE OF ACTION AGAINST MR. HONIG SHOULD BE DISMISSED BECAUSE IT FAILS TO PLEAD HIS PARTICIPATION IN ANY "SCHEME" WITH THE HEIGHTENED FACTUAL PARTICULARITY REQUIRED BY RULE 9(B) AND THE PSLRA.

There exist two bases for liability under Section 10(b) of the Exchange Act and Rule 10b-5: the "making of a material misstatement (or omission);" and, "the commission of a manipulative act." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver*, *N.A.*, 511 U.S. 164, 177 (1994). The Corrected Complaint does <u>not</u> allege that Mr. Honig participated in the

making of material misstatements, nor that he possessed information he had a duty to provide to the public.[25]

Instead, Lead Plaintiff alleges that Mr. Honig and the other defendants perpetrated a "scheme" to manipulate Riot's stock price, in violation of Section 10 and Rule 10b–5(a) and (c). *See* Complaint Count II. The elements of a "scheme liability" claim are: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance. *S.E.C. v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 350 (D.N.J. 2009). A complaint must also plead loss causation and economic loss. *See In re Able Labs. Sec. Litig.*, No. 05-cv-02681, 2008 WL 1967509, at *18 (D.N.J. Mar. 24, 2008) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)); *see also* 15 U.S. Code § 78u–4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). To avoid dismissal, each of these elements must be pleaded with factual particularity including "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue." *In re Royal Dutch/Shell Transp.*, No. 04-374(JAP), 2006 WL 2355402, at *7 (D.N.J. Aug. 14, 2006) (citing *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (S.D.N.Y. 2006)).

A "manipulative act" is an act that goes beyond a misrepresentation or omission and generally is "intended to mislead investors by artificially affecting market activity, such as wash sales, matched orders, or rigged prices." *See De Vito v. Liquid Holdings Grp., Inc.*, No. 15-cv-06969, 2018 WL 6891832, at *41-43 (D.N.J. Dec. 31, 2018) (quoting *Santa Fe Indus., Inc. v.*

---

[25] Plaintiffs would have to allege facts demonstrating that Mr. Honig was a maker of misstatements or owed a duty to disclose omitted information. For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. *Id.* When an allegation of fraud under Rule 10(b) is based upon nondisclosure, there can be no fraud absent a duty to speak. *Chiarella v. United States*, 445 U.S. 222, 235 (1980). Plaintiffs fail to allege Mr. Honig owed such a duty.

*Green*, 430 U.S. 462, 476 (1977)). For a "scheme liability" claim to survive dismissal, a plaintiff must identify deceptive or manipulative acts that are ***separate and apart*** from any alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim. *See Lucent Techs.*, 610 F. Supp. 2d at 361.

   A.     **The Corrected Complaint Fails To Allege Facts Showing That Mr. Honig Committed Any Deceptive or Manipulative Act.**

      1.     *The Public Disclosures Identified In The Corrected Complaint Are Demonstrably True, And In Any Event, Mr. Honig Did Not Make Them.*

Plaintiff's Complaint does not come close to meeting the heightened standards for pleading a scheme liability claim against Mr. Honig, as the Complaint's "scheme" claim is nothing more than a repackaging of Plaintiffs' misrepresentation claims. "[A] plaintiff's allegations under Rule 10b–5(a) or (c) must entail a defendant's undertaking of a deceptive scheme or course of conduct that went *beyond misrepresentations*."  *In re Royal Dutch*, 2006 WL 2355402, at *8 (emphasis added). A "plaintiff may not seek to hold a defendant liable for misleading statements under subsections (a) and (c) by alleging that the defendant is liable for the misleading statements because he or she was a participant in a scheme through which the statements were made." *Id.* Such a theory would "permit a plaintiff to evade the pleading requirements of 15 U.S.C. § 78u–4(b)(1) that are imposed in misrepresentation cases" and would also permit a plaintiff to "circumvent *Central Bank's* limitations on liability for a secondary actor's involvement in the preparation of false and misleading statements." (internal quotations and citations omitted) (referencing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)). The actions beyond misrepresentations alleged by a plaintiff must be *inherently deceptive*. *See S.E.C. v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 360 (D.N.J. 2009) (emphasis added).

Lead Plaintiff's conclusory claims revolve primarily around a series of disclosures made by Riot that, in Lead Plaintiff's opinion, falsely represented that Riot would shift its business focus toward the cryptocurrency space. In reality, these statements were demonstrably true, as explained in detail in the concurrently filed motion to dismiss brought by Riot itself. Further,

Plaintiffs' conclusory allegations that Riot misrepresented its intention to develop a cryptocurrency-related business model are internally contradicted by other factual allegations relating to Riot's multiple acquisitions and investments that expanded its cryptocurrency operations, which Riot disclosed in SEC filings cited by plaintiff. *See* Section I.D., *supra*, and CCAC ¶¶ 166, 167, 169, 172, 186, 195, 198. In short, Riot told the public that it would invest in blockchain-related businesses, and then proceeded to do exactly that. An investor might disagree with the wisdom of those business decisions, but that the decisions were made and accurately reported is true – and not false, as alleged.

The Court, therefore, should reject Plaintiff's claims of misrepresentations that are belied by contradictory allegations elsewhere in the Complaint. *See Berry v. Coleman*, 172 Fed. App'x 929, 932 (11th Cir. 2006) ("On a motion to dismiss, '[c]onclusory allegations and unwarranted deductions of fact are not admitted as true.' *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974). *This is particularly true when the conclusory allegations contradict the other facts alleged in the complaint.*") (emphasis added); *see also Sterling v. Provident Life & Accident Ins. Co.*, 519 F. Supp. 2d 1195, 1209 (M.D. Fla. 2006) ("While courts must liberally construe and accept as true allegations of fact in the complaint and inferences reasonably deductive there from, they need not accept factual claims that are internally inconsistent; facts which run counter to facts of which the court can take judicial notice; conclusory allegations; unwarranted deductions;

2. *The Corrected Complaint Fails To Allege Any Facts Which Show That Mr. Honig Engaged In Manipulative Trading Activity.*

The Corrected Complaint is absolutely devoid of any allegations that Mr. Honig engaged in any of the commonly known types of manipulative trading activity, such as wash sales, matched orders, rigged pricing, or other conduct that artificially affects market pricing. As noted above, the Corrected Complaint also does not allege that Mr. Honig played any role in injecting information about Riot into the marketplace. All that the Corrected Complaint does allege is the repeated conclusory assertion that Mr. Honig "perpetrated" or "orchestrated" a scheme to boost the market price of Riot stock. As to how, when or what Mr. Honig did to perpetrate this

supposed scheme, the Corrected Complaint is silent. In an attempt to mask this glaring and fatal pleading deficiency, the Corrected Complaint instead is filled with innuendo cribbed from unrelated matters and online publications. All of this is completely irrelevant to whether Mr. Honig participated in any scheme involving Riot.

The Court need not accept Plaintiffs' conclusory allegations that fail to "specify, with particularity, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue.'" *In re Royal Dutch/Shell Transp.*, No. 04-374(JAP), 2006 WL 2355402, at *7 (D.N.J. Aug. 14, 2006). Having elected not to plead a Rule 10b-5(b) claim against Mr. Honig, Plaintiffs may not then use Rule 10b-5(a) and (c) claims "as a short cut to circumvent *Central Bank*'s limitations on liability for a secondary actor's involvement in making misleading statements." *S.E.C. v. Lucent Techs.*, Inc., 610 F. Supp. 2d 342, 360–61 (D.N.J. 2009) (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164 (1994), which held that the Exchange Act did not authorize private claims for aiding and abetting Section 10(b) violations).

Here, Lead Plaintiff fails to assert any inherently manipulative or deceptive conduct by Mr. Honig beyond Riot's purported misrepresentations and omissions in which he had no involvement. While Count II of the Corrected Complaint says that "The various elements of Defendants' scheme are laid out in detail in Section V" [ CCAC ¶ 433], Section V of the Corrected Complaint consists of just a single paragraph which doesn't mention any Defendant's involvement with Riot, and the subsequent Section VI.a. describes Mr. Honig's alleged involvement in nine companies other than Riot, years before he invested in Riot.  The acts which the Complaint attributes to Mr. Honig that occurred prior to the Class Period are not actionable. Only allegations of fraudulent activity occurring during the Class Period are relevant to Plaintiffs' claim. *See, e.g., In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995) ("As the class period defines the time during which defendants' fraud was allegedly alive in the market, statements made or insider trading allegedly occurring before or after the purported class period are irrelevant to plaintiffs' fraud claims."); *see also In re Int'l Bus.*

*Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("A defendant. . . is liable only for those statements made during the class period.").

> 3.   *The Corrected Complaint Fails to Allege Facts Sufficient To Establish The Existence of a "Group."*

The Corrected Complaint improperly labels a handful of persons who invested in some of the same companies over a span of many years as a "Group," in an attempt to imply that those persons acted in lockstep in regards to Riot. Presumably, Lead Plaintiff points to these individuals' past connections, many of which are extremely tenuous, because Lead Plaintiff can allege no facts showing any concerted and coordinated activity that they took in regards to Riot.

This type of pleading is plainly insufficient. The PSLRA requires plaintiffs to specify the role of each defendant's involvement in an alleged fraud. *Winer Family Trust*, 503 F.3d at 336-37 (*citing* 15 U.S.C. § 78u–4(b)(2)). The Third Circuit has held that the PSLRA abolished the "group pleading" doctrine in regards to published statements alleged to be false or misleading *Winer Family Trust*, 503 F.3d at 336-337. The same rationale should be applied to allegations that individuals undertook any sort of "group" activity; for instance, as alleged by Lead Plaintiff here, that a group undertook coordinated actions in an attempt to manipulate Riot's stock price. The specifics of each person's actions must be pleaded with particularity.

Of course, the Corrected Complaint does not contain <u>any</u> allegations showing that the members of the alleged "Group" coordinated their activities in any way, and furthermore, facts alleged by Lead Plaintiff show the opposite. Members of the alleged "Group" purchased Riot shares at different times. Members of the alleged "Group" sold their Riot shares at different times. There is no allegation that any Members of the "Group" voted their Riot shares in a coordinated manner during the Class Period, nor is there any allegation that any Members of the "Group" even communicated with each other during the alleged Class Period.  Lead Plaintiff asks the Court to accept the contention that Mr. Honig and various other defendants acted as a coordinated group, simply due to the happenstance that different combinations of those persons invested in the same public companies at various points in the past. Absent the pleading of particularized facts detailing any express agreement amongst the defendants to coordinate their

actions *in regards to Riot Blockchain*, what the members of the alleged "group" did years ago in connection with other issuers is completely irrelevant to the present case, and fails to state and actionable claim.

**B.     The Corrected Complaint Fails to Allege Particularized Facts Giving Rise to Any Inference, Much Less A Strong Inference, That Mr. Honig Acted With Scienter.**

In regards to Mr. Honig, the Corrected Complaint does not allege any facts "giving rise to a strong inference that the defendant acted with the required state of mind," as required by the PSLRA's heightened pleading standards. 15 U.S.C. § 78u–4(b)(2). "[A] plaintiff may establish the [PSLRA's] requisite strong inference of scienter by stating either: "(1) facts which show that defendants had both motive and opportunity to commit fraud"; or (2) "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior." *In re Royal Dutch*, 2006 WL 2355402, at *3. The Corrected Complaint alleges neither as to Mr. Honig.

First, the Corrected Complaint does not plead facts tending to show that Mr. Honig had either the motive or opportunity to commit fraud. "Under the motive and opportunity test, Plaintiffs must allege facts showing that each defendant had the motive to commit fraud and a 'clear opportunity'" to do so. *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 428 (D.N.J. 2005), *aff'd*, 500 F.3d 189 (3d Cir. 2007), *as amended* (Nov. 20, 2007). Motive entails "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Id.* (internal citation and quotations omitted). Simply pleading "[m]otives that are generally possessed by most corporate directors and officers do not suffice" to satisfy the heightened pleading requirements. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004). All that the Corrected Complaint alleges regarding Mr. Honig's "motive" is a generalized assertion that he sought to profit through a so-called "pump and dump" scheme, without pleading a single fact tending to show what concrete action Mr. Honig took himself (or encouraged others) to fraudulently "pump" up Riot's stock price. This type of generalized allegation of motive is precisely the type of pleading that this Court found deficient

in *Exxon*. *See In re Exxon*, 387 F. Supp. at 429 (analyzing persuasive case law in articulating what this Court requires of plaintiffs to demonstrate motive and opportunity).

More significantly, the Corrected Complaint utterly fails to allege facts showing that Mr. Honig actually had a "clear opportunity" to further any scheme to manipulate Riot's stock price. *Id.* at 428. Opportunity refers to "the means and likely prospect of achieving such concrete benefits by the means alleged." *Id.* (internal citation and quotations omitted). In *Exxon*, this court considered whether plaintiffs adequately alleged that Lee R. Raymond, the then-Chairman, Chief Executive Officer, and President of Exxon, had the opportunity to lie about impairments to the value of Exxon's oil and gas properties in order to complete a merger with Mobil. While his positions would suggest he played an integral role within Exxon's decision-making processes, the court nonetheless found that plaintiffs failed to plead Raymond's scienter as required by the PSLRA. The court highlighted the absence of allegations regarding Raymond's opportunity to commit the alleged fraud, noting that "Plaintiffs offer no details of Raymond's involvement in Exxon's decision not to record the SFAS 121 impairments." *Id.* at 430.

Mr. Honig's connection to Riot is <u>far</u> more distant than CEO Raymond's connection was to Exxon. Unlike Exxon CEO Raymond, Mr. Honig was not an officer, director, or employee of Riot – he was an outsider. Lead Plaintiff does not allege how Mr. Honig influenced any executive, director, or decision-maker within Riot. Lead Plaintiff does not identify any communications Mr. Honig had with any insiders concerning Company business. Lead Plaintiff levies only conclusory accusations that Mr. Honig "directed" the actions of others. Such claims are "exactly the kind of conclusory allegation prohibited by the PSLRA mandate," *id.,* and courts have regularly dismissed securities fraud claims for failing to adequately allege opportunity in pleading scienter. *See In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 413 F. Supp. 2d 378, 402 (E.D. Pa. 2005) (dismissing Section 10(b) claim against outside director where plaintiffs failed to allege that director "had the opportunity to cause the defendants to make the allegedly materially misleading statements and omissions in the company's press releases and SEC filings . . . [and] was an active participant in the alleged fraudulent scheme"); *In re Aetna Inc. Sec. Litig.*, 34 F.

Supp. 2d 935, 956 (E.D. Pa. 1999); *In re Home Health Corp. of Am., Inc.*, No. CIV. A. 98-834, 1999 WL 79057, at *21 (E.D. Pa. Jan. 29, 1999).

Second, the Complaint fails to plead any circumstantial evidence giving rise to a strong inference that Mr. Honig acted with recklessness or conscious misbehavior. "A reckless statement is a material misstatement or omission involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Exxon*, 387 F. Supp. at 430-31. The allegations must give rise to a strong inference of scienter, and generalized imputations of knowledge do not suffice. *Id.* at 431. Plaintiffs have failed to allege any conduct by Mr. Honig to carry out the purported scheme, whether violative or benign, let along conduct that amounts to "an extreme departure from the standards of ordinary care."

The disclosure of Mr. Honig's involvement with an SEC investigation and enforcement action unrelated to his investment in Riot [CCAC ⁋⁋ 81-102, 357-362] also does not support a strong inference of his scienter in connection with his Riot investment. To begin with, the Corrected Complaint acknowledges that the SEC Action involves companies *other than Riot*. [CCAC ⁋ 81]. Moreover, numerous circuit and federal district courts have held that disclosures revealing investigations are insufficient to constitute a corrective disclosure for purposes of Section 10(b). *See, e.g.*, *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), *as amended* (Sept. 11, 2014) ("The announcement of an investigation does not 'reveal' fraudulent practices to the market."); *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) ("In our view, the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b). The announcement of an investigation reveals just that—an investigation—and nothing more."); *In re Almost Family, Inc. Sec. Litig.*, No. 3:10-CV-00520-H, 2012 WL 443461, at *13 (W.D. Ky. Feb. 10, 2012) ("Numerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure.").

Lastly, the Corrected Complaint alleges certain facts which actually tend to negate an inference that Mr. Honig acted with scienter. Specifically, Lead Plaintiff acknowledges that Mr. Honig sold a considerable amount of his Riot stock during the summer of 2017,[26] *before* the alleged "pump and dump" commenced in October 2017. The Corrected Complaint further concedes that months after the "inflation" scheme began, Mr. Honig then *bought* $500,000 of Riot shares in December 2017 as the stock price neared its all-time high.  [CCAC ¶ 189].  These are not the actions of a person who intends to engage in a scheme to fraudulently inflate the market price of a security. Transactions that are inconsistent with a complaint's allegations that the defendant "fraudulently inflated" the market price of those securities tend to negate any inference of the defendant's scienter. *See In re MRU Holdings Sec. Litig.*, 769 F.Supp.2d 500, 516 (S.D.N.Y.2011); *Oppenheimer v. Novell, Inc.,* 851 F.Supp. 412, 417 (D.Utah 1994); *Mathews v. Centex Telemanagement, Inc.,* 1994 WL *269734,* at *8 (N.D.Cal. June 8, 1994) ("It would have made no sense to purchase [the] stock if defendants knew the prices to be inflated.").

C.      **The Corrected Complaint Fails to Allege Loss Causation, Economic Loss or Reliance.**

In *Dura Pharmaceuticals, Inc. v. Broudo*, the Supreme Court held that to adequately plead a Section 10(b) claim, a plaintiff must allege a defendant's misrepresentation or other fraudulent conduct proximately caused the plaintiff's economic loss. 544 U.S. 336, 346 (2005). A plaintiff must also allege that he in fact relied upon respondents' deceptive conduct. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 149 (2008). This court has confirmed these requirements must be met when alleging a Rule 10b-5(a) and (c) claim. *See In re Able Labs. Sec. Litig.*, No. 05-cv-02681, 2008 WL 1967509, at *18 (D.N.J. Mar. 24, 2008).

In support of its loss causation and economic loss argument, Lead Plaintiff identifies several negative media reports that he asserts caused the company's share price to drop which Lead Plaintiff contends "damag[ed] Lead Plaintiff and members of the Class." CAC ¶¶ 300, 304, 308, 321, 338, 398-402. However, these press reports fail to constitute corrective disclosures of

---

[26] *See* CCAC ¶¶ 143, 154 and 158; *see also* discussion at page I.C., *infra,* and Weber Decl. Exs. F, G and H.

fraud that would suffice to show loss causation, as required to sustain a claim under Section 10(b), as they simply represent pundits' personal opinions or negative commentary and speculation regarding already-disclosed information. *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270–71 (3d Cir. 2005) (holding that the *Wall Street Journal*'s analysis of previously available information is not a corrective disclosure); *see also Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) ("If every analyst or short-seller's opinion based on already-public information could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst's negative analysis of public filings as a corrective disclosure. That cannot be—nor is it—the law."); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions.").

Furthermore, Lead Plaintiff fails to note the inconvenient coincidence that on several of the days he flags, the drop in the price of Riot stock was virtually identical to a decline in the broader Bitcoin market. This suggests that Lead Plaintiff's alleged "loss" had nothing to do with news about Riot and everything to do with swings in the price of Bitcoin. For instance, the Corrected Complaint avers that the release of "numerous articles" on December 21 and 22, 2017 "questioning the legitimacy" of Riot was the cause of a 34.75% decline in the market price of the Company's stock [CCAC ¶ 399]; but Lead Plaintiff fails to mention that the price of Bitcoin dropped 34% over those same two days.[27] Similarly, Lead Plaintiff alleges that a 4.13% decline in Riot's stock price from January 5 to 8, 2018 was caused by the Company's filing of a Form S-3 disclosing that certain insiders were selling shares and that "Riot had overpaid for Kairos" [CCAC ¶ 401]; but the Corrected Complaint fails to mention that the price of Bitcoin declined more than 11% over the same span. The Corrected Complaint also alleges that a 14.26% decline in Riot's stock price on January 31, 2018 supposedly was caused by a *Wall Street Journal* article

---

[27] *See* Weber Decl. Ex. L (historical Bitcoin prices).

[CCAC ¶ 402], even though the far more likely cause of the decline of Riot's stock price that day was the 13.65% drop in the price of Bitcoin.

With regard to reliance, Lead Plaintiff improperly invokes the presumption of reliance afforded in securities fraud actions where (1) there is an omission of a material fact by one with a duty to disclose, *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–154 (1972), and (2) under the fraud-on-the-market doctrine, when the statements at issue become public. *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). Neither presumption applies to Mr. Honig, as the Corrected Complaint does not allege that Mr. Honig possessed or had a duty to disclose information, nor does it allege that Mr. Honig was the maker of alleged public misrepresentations. Therefore, Lead Plaintiff must provide specific proof of reliance on deceptive or manipulative conduct by Mr. Honig. Lead Plaintiff fails to allege such conduct and reliance.

For these reasons, Lead Plaintiff fails to allege causation, reliance, and resulting economic loss, and his Section 10(b) and Rule 10b-5(a) and (c) claim against Mr. Honig should be dismissed.

## **CONCLUSION**

For the foregoing reasons, Mr. Honig respectfully asks the Court to grant his motion to dismiss Count II of the Corrected Complaint for failure to state a claim pursuant to Rules of Civil Procedure 9(b) and 12(b)(6),  and the PSRLA. As the Corrected Complaint is the fourth failed attempt to plead a claim against  Mr. Honig, further leave to amend would be futile, so Mr. Honig accordingly asks that the dismissal be made with prejudice. *See California Public Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 166 at fn. 28 (3d Cir. 2004) (district court properly dismissed claims with prejudice where the district court found that further amendment would be futile).

Respectfully submitted,

Dated:  September 5, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700

By: _/s/ Tyler E. Baker_____
    Tyler E. Baker, ESQ.
    New Jersey Bar No. 44392011
    tbaker@sheppardmullin.com

and

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Robert D. Weber (*pro hac vice*)
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA 90067
(310) 228-3700

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Christopher Bosch (*pro hac vice*)
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700