Thomas O. Gorman (*Pro Hac*)
Laura Lestrade
Dorsey & Whitney, LLP
51 West 52nd Street
New York, New York
212 - 415-9200
202 - 442-3507
301 - 602-9988 (mobile)
*Gorman.tom@Dorsey.com*

Stephen Weingold (*Pro Hac*)
Dorsey & Whitney, LLP
1400 Wewatta St. No. 400
Denver Colorado 8020

Attorneys For Defendant
Mike Dai

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CREIGHTON TAKATA, individually and on behalf of all others similarly situated, :<br><br>*Plaintiff*, : <br><br>v. :<br>RIOT BLOCKCHAIN, INC. f/k/a BIOPTIX, INC., JOHN O'ROURKE, JEFFREY MCGONEGAL, BARRY HONIG, CATHERINE DEFRANCESCO, MICHAEL BEEGHLEY, JOHN STETSON, MARK GROUSSMAN, ANDREW KAPLAN, MIKE DAI, JASON LES and ERIC SO, :<br><br>*Defendants*. : | Civil Action No.3:18-02293 (FLW) (TJB)<br><br>Motion Day: November 4, 2019<br><br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
## AMENDED CORRECTED COMPLAINT BY DEFENDANT MIKE DAI

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

STATEMENT .....................................................................................................2

    A.     Background .................................................................................2

    B.     The S-3 registration statements ...............................................3

    C.     New Direction for Bioptix .........................................................4

    D.     Continued Roll Out of the Strategy..........................................4

    E.     The Truth Emerges ...................................................................5

ARGUMENT .....................................................................................................7

    A.     The elements of, and pleading requirements for, a Section 10(b) claim.................8

        1.  The elements of a claim ........................................................8

        2.  Pleading standards.................................................................9

    B.     The claims asserted as to Mr. Dai fail ...................................11

        1: No Material Misrepresentation/Omission by Mike Dai .........................11

            a.     The registration statements..................................11

            b.     The corporate events .............................................13

        2: No strong inference of scienter as to Mike Dai .........................17

        3.  No reliance .........................................................................19

        4.  No Loss Causation................................................................23

CONCLUSION ...............................................................................................25

SERVICE.........................................................................................................26

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999) .................................................................................10

*In re Aetna Sec. Litig.*,
    617 F.3d 272 (3d Cir. 2010) ..................................................................................8

*Affiliated Ute Citizens v. U.S.*,
    406 U.S. 128 (1972) ....................................................................................... *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................................8

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1998) .............................................................................................19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...............................................................................................9

*United States ex rel. Bookwalter v. UPMC*,
    2019 U.S. App. LEXIS 27937, 2019 WL 4437732 (3d Cir. January 28, 2019) .......................9

*In re Cambrex Corp. Secs. Litig.*,
    2005 U.S. Dist. LEXIS 25339, 2005 WL 2840336 (D.N.J. October 27, 2005) .....................10

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D. N.J. 1989) ...........................................................19, 20, 22

*In re Caremark Int'l*,
    698 A.2d 959 (Del. Ch. 1996) ..............................................................................15

*Central Bank of Denver v. First Interstate*
    511 U.S. 164 (1997) .............................................................................................14

*Chiarella v. United States*,
    445 U.S. 222 (1980) .............................................................................................12

*Dura Pharmaceuticals, Inc., v. Broudo*,
    544 U.S. 336 (2005) .................................................................................8,18, 19, 23

*In re DVI Inc. Sec. Litig.*,
    249 F.R.D. 196 (D.N.J. 2008) .......................................................................12, 13,22

*Ernst & Ernst v. Hochfleder*,
    425 U.S. 185 (1976) ........................................................................8, 15, 16

*Fan v. StoneMor Partners LP*,
    927 F.3d 710 (3d Cir. 2019) ................................................................10

*Fernander v. Amanze*,
    2007 U.S. Dist. LEXIS 84899, 2007 WL 4083769 (E.D. Pa. November 15,
    2017) ...................................................................................................13

*FindWhat Investor Grp. v. FindWhat.com*,
    658 F. 3d 1282 (11th Cir. 2011) .........................................................23

*Foley v. Wells Fargo Bank, N.A.*,
    772 F.3d 63 (1st Cir. 2014) ..............................................................9, 21

*Grimes v. Avis Budget Grp.*,
    762 Fed. Appx. 130 (3d Cir. 2019) .......................................................9

*Gross v. Diversified Mortg. Investors*,
    431 F. Supp. 1080 (S.D.N.Y. 1977) .....................................................15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S.Ct.2399 (2014) ..........................................................................18

*Hull v. Global Dig. Sols., Inc.*,
    2017 U.S. Dist. LEXIS 208191, 2017 WL 6493148(D.N.J. December 19,
    2017) ...................................................................................................23

*In re Initial Pub. Offering Sec. Litig.*,
    260 F.R.D. 81 (S.D.N.Y. 2009) ...........................................................22

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ......................................................................14, 15

*Kanter v. Barella*,
    489 F.3d 170 (3d Cir. 2007) ................................................................10

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tx. 2001) .....................................................20, 21

*La. Mun. Police Emples. Ret. Sys. v. Hesse*,
    962 F. Supp. 2d 576 (S.D.N.Y. 2013) ..................................................15

*LabMD, Inc. v. Tiversa Holding Corp.*,
    2019 U.S. App. LEXIS 27452 (3d Cir. September 11, 2019) ........................9, 16, 21

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*
   762 F. 3d 1248 (11th Cir 2014) ...................................................................19

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019) ......................................................................14, 15

*McCabe v. Ernst & Young, LLP*,
   494 F.3d 418 (3d Cir. 2007)..............................................................23

*Merrill, Lynch, Pierce, Fenner and Smith v. Dabit*,
   547 U.S. 71 (2006)..........................................................................10, 11

*Meyer v. Greene*,
   710 F. 3d 1189 (11th Cir. 2013) ......................................................23

*Michel v. NYP Holdings, Inc.*,
   816 F.3d 686 (11th Cir. 2016) ........................................................9, 21

*Monk v. Johnson & Johnson*,
   2011 WL 6339825 (D.N.J. Dec. 19, 2011) ....................................18

*National Junior Baseball League v. Pharma Dev. Group, Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) ................................................18

*O'Neil v. Appel*,
   165 F.R.D. 479 (W.D. Mich. 1995) ................................................20

*In re Party City Sec. Litig.*,
   147 F. Supp. 2d 282 (D.N.J. 2001) ................................................15

*Pure Earth, Inc. v. Call*,
   531 Fed. Appx. 256 (3d Cir. 2013) ..................................................8

*Rowinski v. Salomon Smith Barney Inc.*,
   398 F.3d 294 (3d Cir. 2005)..............................................................7

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Madoff)*,
   594 B.R. 167 (Bankr. S.D.N.Y. 2018) ............................................9

*SEC v. Curshen*,
   888 F Supp 2d 1299 (S.D. Fla. 2012) ............................................13

*Serfaty v. International Automated Sys.*,
   180 F.R.D. 418 (D. Utah 1998) ......................................................21

*Stone v. Ritter*,
   911 A.2d 362 (Del. 2006) ................................................................15

*Stoneridge Investment Partners, LLC v. Scientific-Atlantic*,
　　552 U.S. 148 (2008)..........................................................................................................19, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　　551 U.S. 308 (2007)....................................................................................................1, 16, 17

*United States v. Clark*,
　　717 F.3d 790 (10th Cir. 2013) ...............................................................................................12

*United States v. Dynkowski*,
　　720 F. Supp. 2d 475 (D. Del. 2010).......................................................................................13

## Statutes

Exchange Act Section 10(b) ............................................................................................. *passim*

Exchange Act Section 21D(b) .......................................................................................... *passim*

Private Securities Litigation Reform Act of 1995 ("PSLRA")............................................ *passim*

## Other Authorities

*Efficient Market Hypothesis Doesn't Always Work*, Shailesh Kumar,
　　www.nasdaq.com, available from https://www.nasdaq.com/articles/efficient-
　　market-hypothesis-doesnt-always-work-2012-02-01 (last accessed September
　　28, 2019) ...............................................................................................................................20

Fed. R. Civ. P. 8(a) ......................................................................................................7, 8, 10

Fed. R. Civ. P. 9(b) ...................................................................................................7, 8, 9, 10

## INTRODUCTION

### *"Sound and fury signifying nothing" - William Shakespeare*

Mike Dai "has been a director of Riot [Blockchain, Inc. ("Company")] since January 2017," according to the Amended Corrected Complaint.[1] No other facts about Mr. Dai are contained in the Corrected Complaint. The date he began serving as a director is not stated. The date he stepped down from his directorship is not revealed. His profession is not stated. His ownership of Company stock is not specified.

Company filings with the Securities and Exchange Commission ("SEC") state he resigned as a director on November 1, 2018.[2] There is no allegation that he bought or sold a share of Company stock during his tenure -- he did not.

The Corrected Complaint has, however, made every effort to tie Mr. Dai to what it claims is a pump-and-dump market manipulation of the Company shares. To that end the Corrected Complaint has:

1) Tried to re-write four S-3 registration statements filed with the SEC to paint Mr. Dai, who signed those filings as a director along with others, as a manipulator and scofflaw;

2) Omitted the date he terminated his brief directorship – just after the Company pivoted from money losing pharmaceutical firm to newly minted crypto – blockchain want-to-be, to conceal that date and enable its claims that he acted wrongfully as a director regarding events after his resignation date;

---

[1] (Dkt. No. 73) ("Corrected Complaint" or "CC") (CC ¶ 29).

[2] The Court may take judicial notice of materials such as Company filings with the SEC on a Motion to Dismiss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) (documents that the court takes judicial notice of can be considered on a motion to dismiss). Those materials are attached hereto to the Declaration of Stephen R. Weingold as an Exhibit ("Ex.").

3) Tried to expand the reach of Exchange Act Section 10(b) to include some kind of secondary aiding and abetting claim, contrary to dictates of the Supreme Court; and

4) Admitted that he is not a member of the Honig Group, a loose collective of those who have in the past participated in deals with Defendant Barry Honig and who supposedly conducted the pump-and-dump market manipulation of the Company stock at issue.

The claims against Mr. Dai fail. The Corrected Complaint, the by-product of over a year of revisions aimed at creating a claim that could survive the rigorous scrutiny Congress directed given to these kinds of cases, says nothing about Mike Dai participating in any wrongful conduct or stock manipulation. The Corrected Complaint should be dismissed with prejudice as to Mike Dai.

## STATEMENT

**A.      Background [3]**

Bioptix, Inc. (" Bioptix" or the "Company") was a pharmaceutical company born of a September 2016 merger (Ex. at 133). Previously, the Federal Food and Drug Administration failed to approve the firm's only product (CC ¶ 2).

Mike Dai joined the Bioptix board of directors in January 2017 (CC ¶29). The Corrected Complaint does not provide information on Mike Dai or even the date of his resignation. Company filings state that he resigned on November 1, 2017 (Ex. at 226).

Bioptix was not profitable during Mr. Dai's tenure. Three consecutive quarterly reports filed with the Securities and Exchange Commission ("SEC") record losses (Ex. at 9 (March 31, 2017), 44 (June 30, 2017), and 81 (September 30, 2017))). By the end of the third quarter, the pharmaceutical firm had incurred a significant net operating loss. (Ex. at 106) Bioptix's, whose

---

[3] Since the Corrected Complaint frequently repeats allegations the fact cites are representative and not necessarily all inclusive.

shares are listed on NASDAQ, did not discuss future business plans in its quarterly SEC filings during the first part of 2017. By the third quarter of the year, however, the Company was exploring strategic alternatives (Ex. 106).

**B.      The S-3 registration statements**

In the first half of the 2017 Bioplix filed four Form S-3 registration statements with the SEC. Each was signed by Mr. Dai and others. (CC ¶¶ 211, 221, 226, and 231). The first was filed on April 20, 2017 (CC ¶ 211), the second on July 19 (CC ¶ 221), the third on August 24 (CC ¶ 226) and the fourth on September 25, 2017 (CC ¶ 231).

Each registration statement included securities held by a number of company shareholders. Each filing contained a table identifying the selling shareholder by name and the number of shares included in the offering (¶¶ 210, 220, 225, and 230). The company represented in each registration statement that "None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with *us* or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities" (Ex. at 137 (S-3, April 20, 2017), 162 (S-3A, July 19, 2017), 186 (S-3A, August 24, 2017), 209 (S-3A, September 25, 2017) (emphasis added). The term "us" is defined in each registration statement as the Company, the seller of the securities it issued (Ex. at 133, 157, 181, and 204).

The Corrected Complaint claims that each registration statement is false and has material omissions because "the Honig Group maintained numerous financial ties to Defendant O'Rourke, a Bioptix Board member during this time . . ." and other company executives (CC ¶¶ 211-213, 221 -223, 226 – 228, 231 - 233). The Corrected Complaint does not inform the reader that it altered the text of the four registration statements to assert these claims. It does not offer any explanation for making those alternations. It does not offer any explanation for rewriting and expanding the definition of "us" to include the Honig Group and others.

C.     **New Direction for Bioptix**

In early October, Company president Michael Beeghley announced that Bioptix was changing its name to Riot Blockchain, signaling the adoption of a new business focus (CC ¶ 239). He also decided to pay a special dividend of $1 per share to each shareholder of record (CC ¶¶ 227, 337).

Subsequently, a new Company crypto-blockchain business strategy was marketed to the public. Those efforts included: An investor presentation authored by Mr. Beeghley, filed with the SEC in a Form 8-K on October 5, 2017 (CC ¶ 243); an interview with the *Denver Post* by Mr. Beeghley on October 6, 2017 (CC ¶ 247); and a discussion of that strategy in another Form 8-K filing made on October 23, 2017 (CC ¶ 254).

The Corrected Complaint claims that each announcement was false and misleading and/or contained material omissions because it "failed to discuss the Honig Group's participation . . . and that members of that Group had existing financial and contractual ties to Bioptix . . ." executives (CC ¶¶ 242, 245-6, 254, 256 - 257). Each also claimed that Mr. Dai and certain others were acting "along with" the Honig Group (CC ¶¶ 235, 239, 240).

The Honig Group does not include Mr. Dai as a member, according to the Corrected Complaint (CC ¶ 79). Nor does the Corrected Complaint present facts supporting the claim that Mr. Dai joined the Group. It does not present any facts showing that Mr. Dai participated in any decision or process regarding the corporate name change, the adoption of the new business strategy or the payment of the special dividend – the President made those decisions. It does admit that the President of the Company made those decisions (CC ¶¶ 227, 237, 239).

D.     **Continued Roll Out of the Strategy**

In November and December the Company continued to roll out the new business strategy. To that end it announced: The acquisition of 1,200 bitcoin mining machines in early

November 2017 (CC ¶ 259); an interview given by Mr. O'Rourke to CBS on November 15, 2017 (CC ¶ 275); and an acquisition on December 11, 2017 (CC ¶ 287).

The Corrected Complaint claims that each announcement is materially false and misleading because the Honig Group was not discussed using language similar to the quotes cited above (CC ¶¶ 261 – 262, 280 -281, 287 - 288) – essentially the same claim stated above. In each instance it claims that Mr. Dai and others "acted" with the Honig Group (*Id.*).

None of the claims are supported by facts. The Corrected Complaint does not dispute that any of the announced corporate events occurred. That complaint does not claim that any of the corporate events were improper business transactions. No facts are presented to demonstrate that Mr. Dai joined the Honing Group. No facts are presented demonstrating that Mr. Dai had any connection with, or participation in, any of the events. The Corrected Complaint also does not provide any facts to explain how Mr. Dai participated in each of these events as a director of the Company after his resignation from the board of directors.

## E.    The Truth Emerges[4]

In late December 2017 the truth began to emerge about the pump-and-dump market manipulation, according to the Corrected Complaint – that Mr. Honig and his Group were conducting it. These revelations are made, according to the Corrected Complaint, in essentially two groups of announcements. The first group includes items such as: A CNBC report recounting statements by an analyst that the Company is "not really a player in the crypto industry . . ." and a *Business Insider Report* story stating that the Company should have started searching for a Chief Technology Officer sooner (CC ¶ 301); a December 27, 2017 Company press release stating that the annual shareholder meeting had been adjourned "to achieve a

---

[4]Section IX of the Corrected Complaint is titled As Truth Begins to Emerge, Defendants Continued to Mislead the Market, ¶¶ 299 – 356.

quorum . . ." (CC ¶ 307) and a subsequent report by the *Wall Street Journal* noting that a second meeting was canceled for the same reason (CC ¶ 402); a report that Mr. O'Rourke filed in a SEC Form 4 disclosing the sale of 30,383 shares on the last trading day of the year (CC ¶ 307); a February 2018 discovery by the Company auditor that it overpaid for the assets purchased in a business transaction (CC ¶¶ 313-316); a *Denver Post* interview with Messrs. O'Rourke and Honing, published in February 2018, in which Mr. Honig stated that "in this day and age, there are a lot of skeptics and naysayers . . ." (CC ¶ 326); and the filing of a Form 13/D/A with the SEC by Mr. Honig in January 2018 noting that he had reduced his stake in the company to 1.4%, although a similar filing made the day before stated that he owned 11.4% of the outstanding shares (CC ¶ 329).

None of these reports state that the company shares have been manipulated or that the share price was at an artificial level. None of these reports state that Mr. Honig and/or his Group were conducting a pump-and-dump market manipulation with respect to the Company shares or that they had engaged in any fraudulent activities.[5]

The second group of items which reveal the truth about the claimed manipulation and its perpetrators, according to the Corrected Complaint, are: The filing of two Form S-3 registration statements, one on January 5, 2018 (CC ¶ 309) and a second in February 13, 2018 (CC ¶ 326) under which the stock of certain shareholders listed in each filing was sold; and a January 17, 2018 Company press release stating that a business transaction announced earlier closed with the

---

[5] Other events mentioned in this section of the Corrected Complaint also fail to support the claim that the truth about the so-called market manipulation emerged. Likewise, the events cited in Section XIII of the Corrected Complaint, which supplements Section IX, do not reveal the claimed truth about the so-called market manipulation. Those events are: News articles suggesting that the new firm name is a publicity stunt (CC ¶ 399); a Reuters article noting that Mr. O'Rourke sold shares (CC ¶ 400); and a CNBC report stating that it is investigating that company name change (CC ¶ 405). Inexplicably, the section also notes that another S-3 registration statement was filed which is false and contains material omissions based on assertions that echo those made regarding the S-3 registration statements discussed earlier (CC ¶ 401).

execution of a definitive agreement (CC ¶ 326). Each announcement is false and misleading and contain material omissions for essentially the same reasons as the others discussed, according to the Corrected Complaint (CC ¶¶ 329-330).

Neither event in the second group mentions a pump-and dump manipulation. Neither event mentions the Honig Group. No facts are presented to explain how two false press releases reveal the truth about the claimed fraudulent conduct. There is no mention of Mr. Dai in any of the items in either group.

## ARGUMENT

### The Corrected Complaint Should Be Dismissed as to Mike Dai Since It Fails to Plead Facts Demonstrating that He Engaged in Fraudulent, Manipulative Acts and Acted with Scienter

The Corrected Complaint should be dismissed as to Mr. Dai since it fails to allege facts demonstrating that he engaged in fraudulent conduct in violation of Exchange Act Section 10(b). Not only has the Corrected Complaint failed to properly plead -- a claim, setting aside its improper efforts to expand the text of Section 10(b) -- its credibility and veracity is belied by the repeated use of tactics such as rewriting securities offering documents to try and create a false statement and omitting the date Mr. Dai resigned from the board of directors to claim that he participated in alleged fraudulent corporate events as a director after his resignation. Indeed, these and other similar tactics are type of conduct Congress sought to eliminate from the securities markets, the courts and securities litigation in the PSLRA. *See, e.g., Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 298 (3d Cir. 2005) (noting that congress imposed additional stringent requirements through the PSLRA in order to "curb abuses in private class action securities litigation"). In view of its failure to present any facts as to Mr. Dai and the

repeated use of sharp tactics, the Corrected Complaint should be dismissed with prejudice as to him.

## A.      The elements of, and pleading requirements for, a Section 10(b) claim

To plead a cause of action for damages under Exchange Act Section 10(b) a securities law plaintiff has a two-fold burden. First, he or she must detail facts which, if established, would prove manipulative and deceptive conduct in violation of the statute. Second, the facts pleaded must meet three specific pleading requirements: Fed. R. Civ. P. 8(a) which requires that those facts present a "plausible claim" for relief; Fed. R. Civ. P. 9(b) which dictated that fraud allegations be pleaded with specificity; and those of the PSLRA which imposes pleading requires that are higher than Rule 9(b) on a Section 10(b) for class action securities fraud cases.

### 1.      The elements of a claim

Section 10(b) has been repeatedly described as a "catch-all," but what it catches must be fraud. *See, e.g. Ernst & Ernst v. Hochfleder*, 425 U.S. 185, 203 (1976) (noting that Section 10(b) is "rightly described as a 'catchall' clause" for fraud). That means as to each person alleged to have violated the statute, the complaint must present specific facts demonstrating that the person engaged in conduct which is prohibited by the express text of the statute.

To plead a cause of action under Section 10(b) a securities law plaintiff must state facts in the complaint demonstrating that there was: 1) a material misrepresentation or omission; 2) scienter - the individual had a wrongful state of mind; 3) reliance – the injured party relied on the fraudulent conduct; and 4) transaction causation -- the wrongful conduct proximately caused the claimed injury. *See, e.g., Dura Pharmaceuticals, Inc., v. Broudo*, 544 U.S. 336 (2005) (listing elements); *Pure Earth, Inc. v. Call*, 531 Fed. Appx. 256, 259-260 (3d Cir. 2013) (same) *In re Aetna Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010) (listing elements and dismissing case for failing to satisfy them).

- 8 -

2.      **Pleading standards**

The pleading standards for a Section 10(b) claim in a securities class action are tiered up from those which apply to all matters, to a heightened standard for fraud and to an even higher and more stringent standard for securities class actions. Pleading a Section 10(b) claim begins with Rule 8(a) which requires that a plausible claim for relief be presented. This means that the complaint must set forth facts which present a claim demonstrating that the pleader is entitled to relief. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Stated differently, the claim must make sense, demonstrating that defendant engaged in wrongful conduct which proximately injured plaintiff, entitling him or her to relief. *United States ex rel. Bookwalter v. UPMC*, 2019 U.S. App. LEXIS 27937, *9, 2019 WL 4437732 (3d Cir. January 28, 2019) ("*Plausible* does not mean *possible*. If the allegations are "merely consistent with" misconduct, then they state no claim"); *Grimes v. Avis Budget Grp.*, 762 Fed. Appx. 130, 132 (3d Cir. 2019) (dismissing complaint where plaintiff "generally allege[d that defendant] harmed him in various ways while providing no detail on those alleged harms, which is insufficient to state a claim."); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Madoff)*, 594 B.R. 167, 202, (Bankr. S.D.N.Y. 2018) (dismissing claim because plaintiff aid failed to provide an adequate answer to the "ultimate question" of whether the plaintiffs alleged "plausible claim" that "ma[d]e sense").

When assessing if the complaint meets this standard, conclusory allegations and unsupported claims must be set aside. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-557 (2007) (stating that plain assertions of wrongdoing are not sufficient to support a complaint); *LabMD, Inc. v. Tiversa Holding Corp.*, 2019 U.S. App. LEXIS 27452, *6 (3d Cir. September 11, 2019) (noting that the court would "disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements."); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703-704 (11th Cir. 2016) (disregarding conclusory allegations and setting them aside before

analyzing whether plaintiff had sufficiently supported his cause of action); *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 75 (1st Cir. 2014) (noting that when evaluating a motion to dismiss courts should "set aside any statements that are merely conclusory") (internal punctuation omitted).

Rule 9(b) raises the basic pleading standards for fraud claims. It requires that the fraud component of any plausible claim be supported by setting forth in the complaint specific facts which support it. This requirement is typically referred to as the "who, what, when, where and how" of the cause of action. *Kanter v. Barella*, 489 F.3d 170, 175 (3d Cir. 2007) (noting that Rule 9(b) heightens the notice requirements of Rule 8(a)).

When the claim is a class action based on the federal securities laws, Congress has concluded that a pleading standard which is more stringent than Rule 9(b) must be used. The PSLRA thus added Section 21D(b) to the Exchange Act. It requires that "the complaint . . . specify each statement alleged to have been misleading. . . ." This means that each claimed fraudulent act must be supported by detailed facts or be dismissed. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 (3d Cir. 1999) (describing PLSRA's heightened pleading requirements and emphasizing that "[f]ailure to meet these requirements will result in dismissal of the complaint"); *In re Cambrex Corp. Secs. Litig.*, 2005 U.S. Dist. LEXIS 25339, *10-11, 561, 2005 WL 2840336 (D.N.J. October 27, 2005) (noting that securities fraud "allegations in the complaint which are not alleged to be misleading with sufficient detail or those not alleged to be misleading at all must be dismissed"). This requirement was specifically designed to weed-out claims at the motion to dismiss stage of the proceedings unless they are supported by detailed, specific facts. *Id. see also Merrill, Lynch, Pierce, Fenner and Smith v. Dabit,* 547 U.S. 71 (2006) (discussing purpose of PSLRA); *Fan v. StoneMor Partners LP*, 927 F.3d 710, 714 (3d Cir. 2019)

- 10 -

(noting that the PLSRA "imposes greater particularity requirements concerning alleged material misrepresentations and scienter" than the already-heightened pleading requirements of Rule 9(b)).

**B.     The claims asserted as to Mr. Dai fail**

The Corrected Complaint fails to plead facts establishing that Mr. Dai violated Section 10(b). It says virtually nothing about Mr. Dai. Nothing is not the stuff of a securities class action fraud claim.

**1: No Material Misrepresentation/Omission by Mike Dai**

The Corrected Complaint fails to establish that Mr. Dai engaged in fraudulent conduct within the meaning of Exchange Act Section 10(b). Here the claims regarding the S-3 registration statements, as well as those based on actions of the Company, are built on sleight of hand and sharp tactics, not facts demonstrating that he engaged in manipulative, fraudulent conduct.

**a.     The registration statements**

The Corrected Complaint tries, but should not be permitted, to create a false statement/omission claim by improperly rewriting the four documents filed with the SEC. Each claim hinges on the contrived contention that each filing is a false statement because the description of the selling shareholders' relationships to the company is false. As the Corrected Complaint clearly states, that claim turns on Lead Plaintiff's description of claimed relationships among the members of the so-called manipulation group rather the those of the Company and the selling shareholders. Yet each registration statement makes it clear that it is the Company making the representation about its relationships to the sellers. No mention is made about others. This is because it is the Company is making the representation. It is the Company making the filings with the SEC. It is the Company acting to ensure that the sales comply the securities laws.

It is in this context that the Company defined the word "us" in the passage from the documents quoted above as itself.

Lead Plaintiff's effort to rewrite the filings to try and create a false statement or omission is wrong. It is telling that the word "us" – a specifically defined term in each filling -- is deleted in the passages referred to above in the Corrected Complaint and ignored. It was this kind of tactic that Congress sought to eliminate by passing the PSLRA. *See, e.g., Merrill, Lynch, Pierce, Fenner and Smith v. Dabit,* 547 U.S. 71 (2006) (discussing purpose of PSLRA).

Equally clear is the fact that there were no material omissions in the four S-3 registration statements. The Corrected Complaint's attempt to rely on *Affiliated Ute Citizens v. U.S.,* 406 U.S. 128 (1972) to try and transform routine corporate SEC filings into a weapon of manipulation is belied by the fact that it ignored the teachings of that case. *Affiliated Ute* makes it clear that there is no obligation to disclose even material information absent a specific duty. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151-152 (1972) (finding of a duty to disclose is a prerequisite to finding defendants liable for failing to do so); *see also, Chiarella v. United States*, 445 U.S. 222, 228 (1980) (same); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 629 (3d Cir. 2011) (refusing class certification for securities fraud claims against party that had no duty to disclose information to the plaintiff investors). Stated differently, if there is no duty to disclose, there is no material omission within the meaning of Section 10(b). Since the Corrected Complaint fails to allege any duty on the part of the Company to add a discussion about the so-called Honig Group or others, the claim fails.

Finally, the efforts of Lead Plaintiff to contort the four registration statements into cogs in some type of market manipulation should be seen for what they are – economically irrational acts that taint the entire Corrected Complaint. The filing of the registration statements by the

Company with assistance by Mr. Dai before he left, flatly undercut any notion of a market manipulation, contrary to the claims in the Corrected Complaint. The SEC has long recognized that when issuers conduct secondary securities offerings the price of its securities will drop. This is because the addition of the new shares increases the number available in the market-place. That in turn dilutes the price. Accordingly, the SEC has banned selling short before such offerings as a riskless transaction that can disadvantage other market participants who are not aware the transaction will be forth coming. *See, e.g.,* Exchange Act Regulation M, Rule 105 (prohibiting short selling shortly before a secondary offering); s*ee also United States v. Clark*, 717 F.3d 790, 796 n. 1 (10th Cir. 2013); *SEC v. Curshen*, 888 F Supp 2d 1299, 1301 n. 3 (S.D. Fla. 2012); *United States v. Dynkowski*, 720 F. Supp. 2d 475, 477 n. 3 (D. Del. 2010).

### b.    The corporate events

The Corrected Complaint's claim that a series of corporate events are false and misleading because Mr. Dai supposedly acted "along with. . . " the so-called Honig Group (CC ¶ 237) lacks any merit. Again the claim fails to present facts demonstrating that Mike Dai engaged in manipulative and deceptive conduct within the meaning of Section 10(b).

The Corrected Complaint attempts to transform a series of standard business transactions and events such as a change in the corporate name, declaring a special dividend, acquiring business equipment and even giving an interview to a newspaper into fraud by linking each to a claim about not discussing the Honig Group as was done with the S-3 registration statements. Again, the claims are wrong.

Each event is a standard business transaction as the Corrected Complaint tacitly admits – there is no claim that any of the events are fraudulent in and of themselves. Trying to tie a claimed obligation to discuss the Honig Group and its alleged manipulation does not alter that fact. This is particularly true here where Lead Plaintiff fails to identify any facts imposing such a

disclosure obligation. *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 629 (3d Cir. 2011) (refusing class certification for securities fraud claims against party that had no duty to disclose information to the plaintiff investors); *Fernander v. Amanze*, 2007 U.S. Dist. LEXIS 84899, *10, 2007 WL 4083769 (E.D. Pa. November 15, 2017) (emphasizing that "[o]ne who fails to disclose material information prior to the consummation of a transaction commits common law fraud only when he is under a duty to do so"); RESTATEMENT 2D OF TORTS, § 551(1) (noting that a party is liable for fraud for a failure to disclose "if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question."

Likewise, in asserting these claims the Corrected Complaint again fails to establish a key components of the alleged fraud claim – control of its distribution or participation in the event. If Mr. Dai did not control the dissemination of the claimed false statement, then there is no claim under subsection (b) of Rule 10(b)-5. *See, e.g., Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 137 (2011) (For Rule 10b-5(b) purposes, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it; without control, a person or entity can merely suggest what to say, not "make" a statement in its own right).

If Mr. Dai did not participate in the fraudulent conduct then there is no scheme liability claim under Section 10(b). *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019) (holding that a party must participate in a fraud to be held liable, and that liability is not appropriate for actors who are only tangentially involved in allegedly fraudulent conduct).

Here the only claim is that papers describing the corporate events contained false statements. There is no claim that Mr. Dai had the authority to disseminate the filings as required by *Jannis* or that he participated in the fraudulent conduct as required by *Lorenzo.*

The claim that Mr. Dai committed securities fraud by somehow acting "along with" the Honig Group in its alleged manipulation fails to transform that unsupported supposition into a Section 10(b) cause of action. It is well established that there is no aiding and abetting or secondary liability under Section 10(b) – the conduct either violates the text of the statute or there is no implied cause of action. *Central Bank of Denver v. First Interstate* 511 U.S. 164, 180 (1997). Stated differently, the conduct must be either manipulative or deceptive as those terms are used in the text of the statute or there is no violation. The repeated efforts of the Corrected Complaint to reach beyond the text of Exchange Act Section 10(b) by using phrases such as "along with" and "aiding and abetting" should be seen for what they are – efforts to broaden Section 10(b) far from its moorings. *Central Bank of Denver v. First Interstate,* 511 U.S. at 180; *see also Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 137 (2011) ("Rule 10b-5's private right of action does not include suits against aiders and abettors who contribute "substantial assistance" to the making of a statement but do not actually make it"); *SEC v. Lorenzo,* 139 S. Ct. 1094, 1100 (2019) (Section 10(b)'s reach is limited to its text); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976) ("despite the broad view of the Rule advanced by the Commission. . . [the rule's] scope cannot exceed the power granted the Commission by Congress under § 10(b)").

Finally, the Corrected Complaint's effort to properly plead a Section 10(b) claim is belied by its failure to comply with the pleading requirements of the PSLRA, Rule 9(b) and 8(a). Despite the well establish fact that the PSLRA requires each fact supporting a Section 10(b) claim to be stated, the Correct Complaint not only fails to do so, no facts about Mr. Dai presented. This failure is telling – it should be taken as a tacit admission that Mr. Dai did not engage in any action that violates the statute. *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282,

300 (D.N.J. 2001) (dismissing complaint with prejudice because plaintiffs failed to specify the acts they believed were wrongful, which "at a minimum," needed to be pleaded with specificity; *see also Gross v. Diversified Mortg. Investors*, 431 F. Supp. 1080, 1087 (S.D.N.Y. 1977) ("first is to inhibit the filing of a complaint as a pretext for discovery of unknown wrongs").

The point is fortified by the fact that the Corrected Complaint fails to even mention the threshold requirement for establishing a claim against a corporate director – a breach of the duty to monitor the controls and systems of the company. *See, e.g., In re Caremark Int'l*, 698 A.2d 959, 967 (Del. Ch. 1996); *see also La. Mun. Police Emples. Ret. Sys. v. Hesse*, 962 F. Supp. 2d 576, 588 (S.D.N.Y. 2013); *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). Absent such a violation there is no claim against a corporate director. Yet here there is no allegation that Mr. Dai failed to perform his duties. There is no allegation that Mike Dai engaged in wrongful conduct.[6]

In the end, the true character and merit of the claims asserted against Mr. Dai is reflected not just in the failures of the Corrected Complaint to properly plead a cause of action but its resort to slight of hand. Omitting the date of Mr. Dai's resignation and then claiming that he engaged in fraudulent conduct as a corporate officer after that date, attempting to rewrite Company SEC filings, and trying to expand the text of Section 10(b) far from the statutory language is not the kind of stuff on which to build a securities fraud claim. It is the type of sharp tactics Congress wrote the PSLRA to eliminate from the federal courts.[7]

---

[6]While Lead Plaintiff claims that the company disclosure controls were not effective in the context of a SOX certification, the claim is conclusory and not supported by any specific facts. That bare and unsupported allegation should be set aside on a motion to dismiss. *LabMD, Inc. v. Tiversa Holding Corp.*, 2019 U.S. App. LEXIS 27452, *6 (3d Cir. September 11, 2019) (noting that the court would "disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements.").

[7] As with the S-3 registration statements, the Corrected Complaint also fails to plead an *Affiliated Ute* duty to support its omission claim. According, it must be dismissed.

**2: No strong inference of scienter as to Mike Dai**

Lead plaintiff also fails to plead sufficient facts to establish a strong, cogent and compelling inference that Mr. Dai acted with scienter. Exchange Act Section 21D(b)(2), added to the statute by the PSLRA as a check against abusive securities class actions, requires that the complaint present facts which would establish a "strong inference" of the requisite state of mind. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). While Congress chose not to define that state of mind, it has been universally held that that it is scienter, defined as an intention "to deceive, manipulate or defraud," is the standard. *See, e.g.Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 and n. 12 (1976).

The Supreme Court crafted the test for determining if the Section 21D(b)(2) standard has been met in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). There the Court held that to determine if there is a strong inference within the meaning of the statute, all of the inferences must be carefully assessed, not just those proposed by plaintiff. To qualify as 'strong' within the meaning of Section 21D(b)(2), the Court held that the inference must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. *Id*. at 2505 – 2506. Stated differently, the allegations of the complaint must be considered holistically, and the competing inferences balanced to determine if there is a strong, cogent inference of intent to manipulate or deceive by the defendant. In making this assessment vague claims and missing allegations must be held against plaintiff. *Tellabs at* 326 ("omissions and ambiguities count against inferring scienter").

Here, there should be no doubt that the claims in the Corrected Complaint fail to comport with the dictates of Section 21D(b)(2) and *Tellabs*. The few facts pleaded about Mr. Dai demonstrate that he acted lawfully and in accord with his obligations as a director for the short

period he was with the Company: He signed four S-3 registration statements as part of his duties as a director; he took no steps to implement the new crypto – blockchain strategy the Corrected Complaint claims to be part of the manipulation; and he resigned his post shortly after that strategy began to roll out.

On the other side of the balance is nothing. There are no facts which support a strong or any inference of scienter on the part of Mr. Dai.

There are, however, critical items missing or inadequately presented which count against Lead Plaintiff in the *Tellabs* balancing process. Those include: Misstating the text of the four registration statements and to try and to paint Mr. Dai as a fraudster; omitting Mr. Dai's departure date from the Corrected Complaint and then trying to claim he acted as a corporate director with regard to a series of Company actions taken after his departure from the firm; trying to expand the scope of Section 10(b) beyond its limits to paint Mr. Dai a wrongdoer; relying on vague, unsupported allegations to try and link Mr. Dai to the group alleged to be conducting a fraudulent market manipulation by invoking the core business doctrine ( CC ¶¶ 379 – 380) in the absence of specific allegations of wrongful conduct;[8] and failing to plead facts for any motive or reason for Mr. Dai to participate in any fraudulent scheme.

The point is clear: Viewed individually or holistically, the facts as presented in the Corrected Complaint not only fail to support a strong inference of scienter, they negate the possibility.

---

[8] *See, e.g., National Junior Baseball League v. Pharma Dev. Group, Inc.,* 720 F. Supp. 2d 517, 556 (D.N.J. 2010) (rejects must have known type claims just because defendant was a senior corporate office in absence of additional facts); *see generally Monk v. Johnson & Johnson,* 2011 WL 6339825 at 10 (D.N.J. Dec. 19, 2011) (rejecting group pleading doctrine as inconsistent with PSLRA).

### 3.  No reliance

The Corrected Complaint fails to detail the facts necessary to excuse proof of individual reliance – a key element of a Section 10(b) claim not pleaded in the Corrected Complaint. While that complaint assets that proof of reliance is excused based on either the fraud-on- the market presumption or *Affiliated Ute* (CC ¶¶ 415-417), the claim is incorrect.

First, proof of individual reliance is only excused by the fraud-on-the market exception if plaintiff establishes that the shares of the company trade in an efficient market. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct.2399, 412 (2014) (discussing the fraud-on-the-market doctrine)*; see also Dura Pharms. Inc. v. Broudo,* 544 U.S. U.S. 336, 341-42 (2005) (reliance is a key element of a Section 10(b) claim). That is because the exception is predicated on the fact that a security is efficient – the individual security, not the stock exchange – it reflects available information about the stock. Since purchasers who buy shares in the open market are presumed to rely on the price if the stock, if that stock trades efficiently it will reflect not just the truthful material information available, but also the fraudulent information. *See, e.g., Basic Inc. v. Levinson,* 485 U.S. 224, 246 (1998).

If, however, the stock does not trade efficiently, the price does not reflect the available information. Stated differently, when purchasing the shares in an open market transaction the buyer cannot rely on a fraud tainted price if the stock is not efficient because the share price has not absorbed the fraudulent information. Under those circumstances the securities law plaintiff must plead and establish specific facts demonstrating that each plaintiff relied on the fraudulent misrepresentations to establish a claim. *Dura* at 345 (rejecting interpretation of Rule 10b-5 in which recovery would be permitted despite a lack of affirmative evidence of non-reliance by the plaintiff on the alleged misrepresentation or omission); *see also Stoneridge Investment Partners, LLC v. Scientific-Atlantic,* 552 U.S. 148, 157 (2008) (emphasizing the importance of reliance

element because "[a]llowing plaintiffs to circumvent the reliance requirement would disregard the careful limits on 10b-5 recovery mandated by our earlier cases").

To determine if a security trades in an efficient market courts typically consider the factors developed in *Cammer v. Bloom*, 711 F. Supp. 1264 (D. N.J. 1989); *see also Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.* 762 F. 3d 1248, 1255 (11th Cir 2014). *Cammer* focused on the confluence of five key factors: 1) The trading volume since an actively traded stock is more likely to reflect available material information; 2) if a number of analysts follow the firm who could be expected to analyze information about the company that would be available to investors; 3) whether the SEC will permit the firm to sell securities using a short form S-3 registration statement which requires that a pool of information about the company be available; 4) whether transaction costs are low, suggesting liquidity which contributes to information flow; and 5) the size and capitalization of the firm since there is typically more information available about well capitalized companies.

The Corrected Complaint ignores *Cammer*, failing to plead facts which even begin to suggest that the Company shares trade efficiently. For example, no facts are pleaded about the trading volume of the Company shares, the identity and number of the analysts who follow the stock, the transactions costs or the size of the firm and its capitalization. Yet each is a key component of the *Cammer* analysis of efficiency.

Rather, the Corrected Complaint presents unsupported claims that the stock is efficient. That complaint claims, for example, that since the company met the NASDAQ listing requirements and trades on that market it is efficient. Yet those standards are not designed to test efficiency. While many securities listed on an exchange such as NASDAQ are clearly efficient, others are not. *O'Neil v. Appel*, 165 F.R.D. 479, 504 (W.D. Mich. 1995) (emphasizing that while

NASDAQ may be an efficient trading platform, and while some companies that trade on that platform are efficient, other NASDAQ stocks are not, and that trading on the "lower tier" of the NASDAQ system likely indicates that the stock is inefficient, rather than that it is efficient); Shailesh Kumar, *Efficient Market Hypothesis Doesn't Always Work*, www.nasdaq.com, available from https://www.nasdaq.com/articles/efficient-market-hypothesis-doesnt-always-work-2012-02-01 (last accessed September 28, 2019) (noting that small capitalization stocks are not valued efficiently because they are "not adequately covered by Wall Street"). Accordingly, neither of these factors support Lead Plaintiff's supposition.

Similarly, while the Corrected Complaint's assertion that the Company distributed press releases is correct, that says little about efficiency. *See Krogman v. Sterritt*, 202 F.R.D. 467, 475 (N.D. Tx. 2001) (the existence of one analyst and of news articles and readily available internet information was "insufficient" to weigh in favor of a finding of market efficiency). The point is not simply news items like those that would be published by a newspaper or aired in a television broadcast but the ready availability of expert financial analysis supplied by market professionals who regularly follow the firm and stock as *Cammer* makes clear. According, the identity of the analysts and the houses with which they are associated can indicate a depth of analytical information about the firm and the security that contributes to efficiency, particularly when combined with the information from other factors.

Viewed in this context the Corrected Complaint's vague claim that analysts follow the company is unilluminating since it fails to identify any analysts or the houses where they are employed. *LabMD, Inc. v. Tiversa Holding Corp.*, 2019 U.S. App. LEXIS 27452, *6 (3d Cir. September 11, 2019) (noting that the court would "disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements."); *Michel v. NYP Holdings,*

*Inc.*, 816 F.3d 686, 703-704 (11th Cir. 2016) (disregarding conclusory allegations and setting them aside before analyzing whether plaintiff had sufficiently supported his cause of action); *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 75 (1st Cir. 2014) (noting that when evaluating a motion to dismiss courts should "set aside any statements that are merely conclusory") (internal punctuation omitted). It is telling that while the Corrected Complaint cites a number of news articles about the Company, not one report from an analyst following the stock is cited. *Krogman v. Sterritt*, 202 F.R.D. 467, 475 (N.D. Tx. 2001) (the existence of one analyst and of news articles and readily available internet information was "insufficient" to weigh in favor of a finding of market efficiency); *Serfaty v. International Automated Sys.*, 180 F.R.D. 418, 422 (D. Utah 1998) (noting that the absence of any analysts "weighs against a finding of market efficiency").

Similarly, the Corrected Complaint fails to include any market statistics about the stock such as transaction costs, trading volume, the size of the float or the capitalization of the firm. Yet these are the key indicators of liquidity which contributes to efficiency. *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 99 (S.D.N.Y. 2009) (noting that trading data suggested that market was not efficient but rather was having difficulty valuing a stock).

In the end, while one *Cammer* factor is present here – the company can use an S-3 registration statement because it files periodic reports with the SEC – that factor standing alone is not sufficient to establish that the shares are efficient. It is for this reason that one factor about a small, undercapitalized firm such as the Company is not a basis for evaluating efficiency. *See generally, In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 210 n. 23 (D.N.J. 2008) (recognizing that the S-3 remains a valuable factor in an efficiency analysis, but its role is limited).

Lead Plaintiff's citation to *Affiliated Ute* as a substitute for proof of reliance is also unavailing. The predicate for invoking that decision is a duty to disclose. Again the Corrected Complaint fails to identify any such duty. Accordingly, the Corrected Complaint not only fails to plead the key element of reliance, but also fails to present sufficient facts to establish that such proof should be excused. *Stoneridge Investment Partners, LLC v. Scientific-Atlantic,* 552 U.S. 148, 157 (2008) (emphasizing the importance of reliance element because "[a]llowing plaintiffs to circumvent the reliance requirement would disregard the careful limits on 10b-5 recovery mandated by our earlier cases").

### 4.      Loss Causation

The Corrected Complaint also fails to plead facts which establish loss causation, a key element of a Section 10(b) clam. The PSLRA requires that a securities class action complaint specifically plead facts demonstrating loss causation. As Exchange Act Section 21D(b)(3) states: "plaintiff shall have the burden of proving that the act or omission of the defendant alleged to have violated this title caused the loss for which plaintiff seeks to recover damages." Loss causation ensures that "only losses actually attributable to a given misrepresentation are cognizable." *Meyer v. Greene*, 710 F. 3d 1189, 1196 (11th Cir. 2013). *See also McCabe v. Ernst & Young, LLP,* 494 F.3d 418, 435-436 (3d Cir. 2007) ("It is not enough for § 10(b) plaintiffs to show that a misstatement or omission induced them to buy or sell securities at a price less favorable to them . . . they must show that the misstated or omitted facts were a substantial factor in causing an economic loss actually incurred by the plaintiffs.")

To establish this element the complaint must plead specific facts which if proven would establish that the claimed fraud proximately caused the loss alleged in the complaint. It is not sufficient to claim that the price of the security was inflated at the time of the purchase. This is because under those circumstances there is no link, no proximate cause tying the false price to

the claimed injury. *See, e.g., Dura Pharmaceuticals Inc. v. Broudo*, 554 U.S. 336, 346 (2005).

This means that plaintiff must present facts which demonstrate that the alleged fraudulent

misrepresentation and material omissions artificially inflated the price of the stock *and* that when

the truth about the fraud began to emerge, the fraud generated artificial price collapsed to its

unmanipulated level. *Id. See, also Meyer*, 710 F. 3d at 1196-97; *FindWhat Investor Grp. v.

FindWhat.com*, 658 F. 3d 1282, 1311 n. 28 (11th Cir. 2011) ("because a corrective disclosure

must reveal a previously concealed truth, it obviously must disclose new information and cannot

be merely confirmatory"); *Hull v. Global Dig. Sols., Inc.*, 2017 U.S. Dist. LEXIS 208191, *39,

2017 WL 6493148 (D.N.J. December 19, 2017) (declining to find loss causation where "the

announcements made in the 2013 and 2014 Forms 10-K did not disclose any prior

misrepresentation to the market resulting in a subsequent price drop in stock price").

Here the Corrected Complaint not only fails to present facts which demonstrate that the

previously concealed truth was revealed, it is contradictory. On the one hand Lead Plaintiff

presents a series of news clips and allegations that question the new business strategy of the

Company, claiming the new name is a publicity stunt, asserting that the Company over paid on a

business deal and noting that Mr. Honig sold shares of stock at year end. Although this litany of

facts is supposed to demonstrate that the truth about the alleged manipulation is being revealed,

in fact it they say nothing about that topic. No information is revealed about a market

manipulation, a pump-and-dump scheme or manipulative trading such as wash sales and

matched orders.

On the other hand, the Corrected Complaint claims that two S-3 registration statements

filed in the first quarter of 2018 contain false and misleading facts and have material omissions,

essentially mimicking the claims made about the first half of 2017 S-3 filings. Not only do these

- 24 -

filings fail to reveal any facts about a claimed pump-and dump manipulation by the Honig Group or anyone else, just how additional false statements and material omissions – setting aside the vagueness of the allegations – reveal the truth about wrongful conduct is not explained.

Perhaps more importantly, the filing of these registration statements would be expected to drive the share price down. That activity would shroud the market impact of any revelation of the truth since the filings would also drive the price down. Under those circumstances it could be impossible to sort out the impact of any price drop by the stock, negating any proof of loss causation.

In the end the only point that is clear about the Corrected Complaint is that all claims as to Mike Dai should be dismissed with prejudice. There is nothing demonstrating that he participated in fraudulent conduct. There is nothing suggesting that he acted with scienter. There is nothing that says he did anything but serve faithfully as a director of a troubled firm for a few months before leaving when faced with a new crypto-blockchain business approach. Nothing is not securities fraud. Nothing requires dismissal.

## CONCLUSION

With the passage of the PSLRA Congress sought to eliminate securities class actions that are based on inadequate claims, sharp tactics and which lacked merit. It is for this reason that the Act imposed a stay on all such actions pending a careful examination of a motion to dismiss that rigorously tests compliance with the statute.

The Corrected Complaint not only fails to properly assert detail a Section 10(b) claim while disregarding the pleading requirements of the PSLRA and the Federal Rules, its repeated use of sharp tactics and economically irrational claims compelling dismissal. This is particularly true here where the claims as to Mr. Dai are what the English board stated long ago: Sound and fury signifying nothing. There is nothing pleaded as to Mike Dai.

WHEREFORE, for the foregoing reasons Mr. Dai respectfully requests that the pending complaint be dismissed as to him.

Date: September 30, 2019                                  Dorsey & Whitney LLP


By: */s/ Thomas O. Gorman*
     Thomas O. Gorman
     Laura Lestrade

     Dorsey & Whitney LLP
     51 West 52nd Street
     New York, New York
     Telephone: 212 – 415-9200

     Stephen Weingold
     Dorsey & Whitney
     1400 Wewatta St.
     Denver, Colorado 80202

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on this 30th day of September 2019,

copies of the foregoing NOTICE OF MOTION TO DISMISS AMENDED CORRECTED

COMPLAINT BY DEFENDANT MIKE DAI, DEFENDANT MIKE DAI'S MEMORANDUM

IN SUPPORT OF MOTION TO DISMISS AMENDED CORRECTED COMPLAINT,

UNSWORN and DECLARATION OF STEPHEN R. WEINGOLD IN SUPPORT OF

MOTION, were filed electronically through the Court's ECF system. Notice of such filing will

be sent to all parties of record by operation of the Court's electronic filing system. The parties

may access this filing through the Court's system. In addition, Defendant Mike Dai was served

by e-mail.

Date: September 30, 2019                    Dorsey & Whitney LLP


                                    By: */s/ Thomas O. Gorman*
                                        Thomas O. Gorman
                                        Laura Lestrade


                                        Dorsey & Whitney LLP
                                        51 West 52nd Street
                                        New York, New York
                                        Telephone: 212-415-9200

                                        Stephen Weingold
                                        Dorsey & Whitney
                                        1400 Wewatta St.
                                        Denver, Colorado 80202