Dorsey & Whitney LLP
Laura M. Lestrade
Thomas O. Gorman (Admitted *Pro Hac Vice*)
51 West 52nd Street
New York, NY 10019-6119
Telephone:  (212) 415-9227
Fax:  (212) 953-7201
Email:  lestrade.laura@dorsey.com
Email:  gorman.tom@dorsey.com

Dorsey & Whitney LLP
Stephen R. Weingold (Admitted *Pro Hac Vice*)
1400 Wewatta Street, Suite 400
Denver, Colorado 80202
Telephone:  (303) 629-3400
Fax:  (303) 629-3450
Email:  weingold.stephen@dorsey.com

*Attorneys for Defendant Mike Dai*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CREIGHTON TAKATA, individually and on behalf of all others similarly situated, | (<br>(  Civil Action No.:  18-2293<br>(  (FLW) (ZNQ)<br>( |
| Plaintiff, | (<br>( |
| v. | (  **UNSWORN DECLARATION OF**<br>(  **STEPHEN R. WEINGOLD IN** |
| RIOT BLOCKCHAIN, INC., f/k/a BIOPTIX, INC., JOHN O'ROURKE, JEFFREY MCGONEGAL, BARRY HONIG, CATHERINE DEFRANCESCO, MICHAEL BEEGHLEY, JOHN STETSON, MARK GROUSSMAN, ANDREW KAPLAN, MIKE DAI, JASON LES, and ERIC SO, | (  **SUPPORT OF MOTION TO**<br>(  **DISMISS AMENDED**<br>(  **CORRECTED COMPLAINT BY**<br>(  **DEFENDANT MIKE DAI**<br>(<br>(<br>(<br>(<br>( |
| Defendants. | ( |

I, Stephen Weingold, hereby declare and state as follows:

1.      I am an attorney licensed to practice law in Colorado and have been admitted *pro hac vice* in this District.  I am an associate at the law firm of Dorsey & Whitney LLP and counsel for Defendant Mike Dai in the above-captioned matter.  I submit this Declaration in support of Motion to Dismiss Amended Corrected Complaint by Defendant Mike Dai.  I have personal knowledge of the matters set forth in this Declaration, and if called to testify in this case I would and could competently testify as to such matters.

2.      Attached hereto at page 5 is a true and correct copy of Riot Blockchain's FORM 10-Q for the quarterly period ended March 31, 2017, as filed with the Securities and Exchange Commission on May 15, 2017.

3.      Attached hereto at page 39 is a true and correct copy of Riot Blockchain's FORM 10-Q for the quarterly period ended June 30, 2017, as filed with the Securities and Exchange Commission on August 11, 2017.

4.      Attached hereto at page 77 is a true and correct copy of Riot Blockchain's FORM 10-Q for the quarterly period ended September 30, 2017, as filed with the Securities and Exchange Commission on November 13, 2017.

5.      Attached hereto at page 129 is a true and correct copy of Riot Blockchain's FORM S-3, as filed with the Securities and Exchange Commission on April 20, 2017.

6.      Attached hereto at page 153 is a true and correct copy of Riot Blockchain's FORM S-3 (Amendment No. 1), as filed with the Securities and Exchange Commission on July 19, 2017.

7.      Attached hereto at page 177 is a true and correct copy of Riot Blockchain's FORM S-3 (Amendment No. 2), as filed with the Securities and Exchange Commission on August 24, 2017.

8.      Attached hereto at page 200 is a true and correct copy of Riot Blockchain's FORM S-3 (Amendment No. 3), as filed with the Securities and Exchange Commission on September 25, 2017.

9.      Attached hereto at page 223 is a true and correct copy of Riot Blockchain's FORM 8-K, Date of Report (Date of earliest event reported): November 1, 2017, as filed with the Securities and Exchange Commission on November 3, 2017.

I declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct.

Respectfully submitted this 30th day of September, 2019.

/s/ Stephen R. Weingold
Stephen R. Weingold

# FORM 10-Q for the quarterly period ended March 31, 2017

10-Q 1 bioptix_10q-033117.htm FORM 10-Q

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-Q**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2017**

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

Commission file number: 001-33675

# **Bioptix, Inc.**

(Exact name of registrant as specified in its charter)

| **Colorado** | **84-1553387** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**834-F South Perry Street, Suite 443  Castle Rock, CO  80104**
(Address of principal executive offices) (Zip Code)

**(303) 794-2000**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     Yes ?   No ?

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).     Yes ?   No ?

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ?    Accelerated filer ?    Non-accelerated filer ?  Smaller reporting company ?  Emerging growth company ?

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ?

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).     Yes ?   No ?

The number of shares of no par value common stock outstanding as of May 10, 2017 was 5,410,013.

**BIOPTIX, INC.**

**Page**

PART I - Financial Information

| | | |
|---|---|---|
| Item 1. | Condensed Consolidated Financial Statements | |
| | Consolidated Balance Sheets as of March 31, 2017 (unaudited) and December 31, 2016 | 3 |
| | Consolidated Statements of Operations for the Three Months Ended March 31, 2017 and 2016 (unaudited) | 4 |
| | Consolidated Statements of Cash Flows for the Three Months Ended March 31, 2017 and 2016 (unaudited) | 5 |
| | Notes to Condensed Consolidated Financial Statements (unaudited) | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 24 |
| Item 4. | Controls and Procedures | 25 |
| | PART II - Other Information | |
| Item 1. | Legal Proceedings | 26 |
| Item 1A. | Risk Factors | 26 |
| Item 6. | Exhibits | 26 |
| | Signatures | 27 |

CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION AND STATEMENTS

Certain statements in this Quarterly Report on Form 10-Q, including in Management's Discussion and Analysis of Financial Condition and Results of Operations, are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended, and are subject to the safe harbor created thereby. These statements relate to future events or the Company's future financial performance and involve known and unknown risks, uncertainties and other factors that may cause the actual results, levels of activity, performance or achievements of the Company or its industry to be materially different from those expressed or implied by any forward-looking statements. In some cases, forward-looking statements can be identified by terminology such as "may," "will," "could," "would," "should," "expect," "plan," "anticipate," "intend," "believe," "estimate," "predict," "potential" or other comparable terminology. Please see the "Risk Factors" in Part II, Item 1A of this Quarterly Report on Form 10-Q and in Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2016 for a discussion of certain important factors that relate to forward-looking statements contained in this report. Although the Company believes that the expectations reflected in these forward-looking statements are reasonable, it can give no assurance that such expectations will prove to be correct. Unless otherwise required by applicable securities laws, the Company disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

**PART I — FINANCIAL INFORMATION**
**Item I. Condensed Consolidated Financial Statements**

**Bioptix, Inc. and Subsidiary**
**Consolidated Balance Sheets**

**PART I — FINANCIAL INFORMATION**
**Item I. Condensed Consolidated Financial Statements**

**Bioptix, Inc. and Subsidiary**
**Consolidated Balance Sheets**

| | March 31, 2017 | December 31, 2016 |
|---|---|---|
| | (Unaudited) | (Reclassified) |
| **ASSETS** | | |
| Current assets (Note 1): | | |
| Cash and cash equivalents | $    11,981,618 | $    5,529,848 |
| Short-term investments | - | 7,506,761 |
| Prepaid expenses and other current assets | 155,757 | 219,991 |
| Current assets of discontinued operations (Note 2) | 200,167 | 486,890 |
| Total current assets | 12,337,542 | 13,743,490 |
| Property and equipment, net (Note 3) | 5,063 | 5,538 |
| Other long term assets, net (Note 4) | 932,291 | 938,038 |
| Noncurrent assets of discontinued operations (Note 2) | 47,000 | 2,353,749 |
| Total assets | $    13,321,896 | $    17,040,815 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $    269,767 | $    253,817 |
| Accrued compensation | 22,499 | 1,520 |
| Accrued expenses | 77,565 | 304,675 |
| Notes and other obligations, current portion (Note 5) | 56,158 | 139,611 |
| Deferred revenue, current portion (Note 8) | 96,698 | 96,698 |
| Current liabilities of discontinued operations (Note 2) | 348,564 | 258,819 |
| Total current liabilities | 871,251 | 1,055,140 |
| Private placement notes held in escrow – representing 2% Convertible Notes Payable amounting to $4,750,000 and 1,900,000 warrants, all net of $4,750,000 of proceeds held in escrow (Note 6) | - | - |
| Accrued interest (Note 6) | 3,904 | - |
| Deferred revenue, less current portion (Note 8) | 1,041,141 | 1,065,316 |
| Total liabilities | 1,916,296 | 2,120,456 |
| Commitments and contingencies (Notes 6, 8 and 9) | | |
| Stockholders' equity (Notes 6 and 7): | | |
| Common stock, no par value, 60,000,000 shares authorized; shares issued 5,410,013 (2017) and 4,503,971 (2016) and shares outstanding 5,410,013, including 500,000 common shares in escrow (2017) and shares outstanding 4,503,971 (2016) | 125,614,652 | 124,775,635 |
| Private placement units held in escrow – representing 500,000 common shares and 500,000 warrants, all net of $1,250,000 of proceeds held in escrow | - | - |
| Accumulated deficit | (114,209,052) | (109,855,276) |
| Total equity | 11,405,600 | 14,920,359 |
| Total liabilities and stockholders' equity | $    13,321,896 | $    17,040,815 |

See Accompanying Notes to Unaudited Condensed Consolidated Financial Statements

3

**Bioptix, Inc. and Subsidiary**
**Consolidated Statements of Operations Three Months Ended March 31,**
**(Unaudited)**

|  | 2017 | 2016 |
|---|---:|---:|
| Other revenue – fee (Note 8) | $ 24,175 | $ 24,175 |
|  |  |  |
| Operating expenses: |  |  |
| Selling, general and administrative | 1,034,653 | 1,030,126 |
| Research and development | 17,692 | 372,586 |
| Total operating expenses | 1,052,345 | 1,402,712 |
|  |  |  |
| Operating loss from continuing operations | (1,028,170) | (1,378,537) |
| Other (expense) income: |  |  |
| Gain on sale of property and equipment (Note 3) | - | 1,919,361 |
| Interest expense | (4,834) | (25,598) |
| Investment income | 26,220 | 44,285 |
|  |  |  |
| Total other income | 21,386 | 1,938,048 |
|  |  |  |
| (Loss) income from continuing operations | (1,006,784) | 559,511 |
| Discontinued operations (Note 2): |  |  |
| Loss from operations | (642,636) | - |
| Impairment loss | (2,704,356) | - |
| Total loss from discontinued operations | (3,346,992) | - |
|  |  |  |
| Net income (loss) | $ (4,353,776) | $ 559,511 |
| Basic and diluted net (loss) income per share (Note 1): |  |  |
| Continuing operations | $ (0.22) | $ 0.14 |
| Discontinued operations | (0.73) | - |
| Net (Loss) Income | $ (0.95) | $ 0.14 |
| Basic and diluted weighted average number of shares outstanding (Note 1) | 4,599,184 | 3,876,960 |

See Accompanying Notes to Unaudited Condensed Consolidated Financial Statements

4

**Bioptix, Inc. and Subsidiary**
**Consolidated Statements of Cash Flows**
**Three Months Ended March 31,**
**(Unaudited)**

|  | 2017 | 2016 |
|---|---:|---:|
| Cash flows from operating activities: |  |  |
| Continuing operations: |  |  |

**Bioptix, Inc. and Subsidiary**
**Consolidated Statements of Cash Flows**
**Three Months Ended March 31,**
**(Unaudited)**

|  | 2017 | 2016 |
|---|---|---|
| Cash flows from operating activities: | | |
| Continuing operations: | | |
| Net (loss) income | $ (4,353,776) | $ 559,511 |
| (Loss) from discontinued operations | (3,346,992) | - |
| (Loss) income from continuing operations | (1,006,784) | 559,511 |
| Adjustments to reconcile net (loss) income from continuing operations to net cash used | | |
| in operating activities of continuing operations: | | |
| Stock-based compensation for services | 133,043 | 47,884 |
| Depreciation and amortization | 18,133 | 19,401 |
| Amortization of license fees | (24,175) | (24,175) |
| Other non-cash charges | 1,500 | 133,899 |
| Gain on sale of property and equipment | - | (1,919,361) |
| Change in: | | |
| Prepaid expenses and other current assets | 62,733 | 69,155 |
| Accounts payable | 15,950 | (380,010) |
| Accrued compensation | 20,979 | (437,324) |
| Accrued expenses | (223,206) | 28,058 |
| Net cash (used in) operating activities of continuing operations | (1,001,827) | (1,902,962) |
| Net cash (used in) operating activities of discontinued operations | (661,998) | - |
| Net cash (used in) operating activities | (1,663,825) | (1,902,962) |
| | | |
| Cash flows from investing activities: | | |
| Continuing operations: | | |
| Purchases of short-term investments | - | (7,537,862) |
| Proceeds from sales of short-term investments | 7,506,761 | 9,648,744 |
| Proceeds from sale of property and equipment | - | 1,748,571 |
| Purchases of patent and trademark application costs | (11,911) | (10,778) |
| Net cash provided by investing activities of continuing operations | 7,494,850 | 3,848,675 |
| Net cash (used in) investing activities of discontinued operations | (1,776) | - |
| Net cash provided by investing activities | 7,493,074 | 3,848,675 |
| | | |
| Cash flows from financing activities: | | |
| Continuing operations: | | |
| Net proceeds from issuance of common stock, net of $294,026 in offering expenses | 705,974 | - |
| Repayment of notes payable and other obligations | (83,453) | (116,931) |
| | | |
| Net cash provided by (used in) financing activities of continuing operations | 622,521 | (116,931) |
| | | |
| Net increase in cash and cash equivalents | 6,451,770 | 1,828,782 |
| | | |
| Cash and cash equivalents at beginning of period | 5,529,848 | 2,012,283 |
| | | |
| Cash and cash equivalents at end of period | $ 11,981,618 | $ 3,841,065 |
| | | |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the period for interest | $ 1,256 | $ 31,140 |
| Supplemental disclosure of investing information: | | |
| Liability payoffs upon property sale | $ - | $ 2,064,758 |

See Accompanying Notes to Unaudited Condensed Consolidated Financial Statements

5

---

**Bioptix, Inc. and Subsidiary**
**Notes to Condensed Consolidated Financial Statements**
**(Unaudited)**

## INTERIM FINANCIAL STATEMENTS

The accompanying consolidated financial statements of Bioptix, Inc. (the "Company," "we," or "Bioptix") have been prepared in accordance with the instructions to quarterly reports on Form 10-Q. In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and changes in financial position at March 31, 2017 and for all periods presented have been made. Certain information and footnote data necessary for fair presentation of financial position and results of operations in conformity with accounting principles generally accepted in the United States of America have been condensed or omitted. It is therefore suggested that these consolidated financial statements be read in conjunction with the summary of significant accounting policies and notes to financial statements included in the Company's Annual Report on Form 10-K for the year ended December 31, 2016. The results of operations for the period ended March 31, 2017 are not necessarily an indication of operating results for the full year.

**Management's plans and basis of presentation:**

The Company has experienced recurring losses and negative cash flows from operations. At March 31, 2017, the Company had approximate balances of cash and cash equivalents of $11,982,000, working capital of $11,466,000, total stockholders' equity of $11,406,000 and an accumulated deficit of $114,209,000. To date, the Company has in large part relied on equity financing to fund its operations.

Effective January 14, 2017, the Company adopted a plan to exit the business of BiOptix Diagnostics, Inc. ("BDI") and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. Accordingly, the historical results of BDI have been classified as discontinued operations for all periods presented.

The Company expects to continue to incur losses from operations for the near-term and these losses could be significant as professional and other associated expenses in connection with possible strategic considerations, evaluations and transactions, additional costs associated with the exit of operations of the Company's subsidiary BDI may be incurred, and public company and administrative related expenses are incurred. The Company believes that its current working capital position will be sufficient to meet its currently estimated cash needs through May 2018, subject to any possible strategic transactions. The Company continues to explore obtaining additional financing. The Company is closely monitoring its cash balances, cash needs and expense levels.

Management's strategic plans include the following:

- exploring other possible strategic options and financing opportunities available to the Company;
- evaluating options to monetize, partner or license the Company's assets, including the appendicitis product portfolio; and
- continuing to implement cost control initiatives to conserve cash.

## Note 1. Significant accounting policies:

**Principles of consolidation**

The consolidated financial statements of the Company include the accounts of Bioptix and its wholly-owned subsidiary, BDI. Intercompany accounts and transactions have been eliminated in the consolidation.

**Cash, cash equivalents and investments:**

The Company considers all highly liquid investments with an original maturity of three months or less at the date of acquisition to be cash equivalents. From time to time, the Company's cash account balances exceed the balances as covered by the Federal Deposit Insurance System. The Company has never suffered a loss due to such excess balances.

6

**Bioptix, Inc. and Subsidiary**
**Notes to Condensed Consolidated Financial Statements**
**(Unaudited)**

## INTERIM FINANCIAL STATEMENTS

The accompanying consolidated financial statements of Bioptix, Inc. (the "Company," "we," or "Bioptix") have been prepared in accordance with the instructions to quarterly reports on Form 10-Q. In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and changes in financial position at March 31, 2017 and for all periods presented have been made. Certain information and footnote data necessary for fair presentation of financial position and results of operations in conformity with accounting principles generally accepted in the United States of America have been condensed or omitted. It is therefore suggested that these consolidated financial statements be read in conjunction with the summary of significant accounting policies and notes to financial statements included in the Company's Annual Report on Form 10-K for the year ended December 31, 2016. The results of operations for the period ended March 31, 2017 are not necessarily an indication of operating results for the full year.

**Management's plans and basis of presentation:**

The Company has experienced recurring losses and negative cash flows from operations. At March 31, 2017, the Company had approximate balances of cash and cash equivalents of $11,982,000, working capital of $11,466,000, total stockholders' equity of $11,406,000 and an accumulated deficit of $114,209,000. To date, the Company has in large part relied on equity financing to fund its operations.

Effective January 14, 2017, the Company adopted a plan to exit the business of BiOptix Diagnostics, Inc. ("BDI") and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. Accordingly, the historical results of BDI have been classified as discontinued operations for all periods presented.

The Company expects to continue to incur losses from operations for the near-term and these losses could be significant as professional and other associated expenses in connection with possible strategic considerations, evaluations and transactions, additional costs associated with the exit of operations of the Company's subsidiary BDI may be incurred, and public company and administrative related expenses are incurred. The Company believes that its current working capital position will be sufficient to meet its currently estimated cash needs through May 2018, subject to any possible strategic transactions. The Company continues to explore obtaining additional financing. The Company is closely monitoring its cash balances, cash needs and expense levels.

Management's strategic plans include the following:

- exploring other possible strategic options and financing opportunities available to the Company;
- evaluating options to monetize, partner or license the Company's assets, including the appendicitis product portfolio; and
- continuing to implement cost control initiatives to conserve cash.

**Note 1. Significant accounting policies:**

**Principles of consolidation**

The consolidated financial statements of the Company include the accounts of Bioptix and its wholly-owned subsidiary, BDI. Intercompany accounts and transactions have been eliminated in the consolidation.

**Cash, cash equivalents and investments:**

The Company considers all highly liquid investments with an original maturity of three months or less at the date of acquisition to be cash equivalents. From time to time, the Company's cash account balances exceed the balances as covered by the Federal Deposit Insurance System. The Company has never suffered a loss due to such excess balances.

The Company invests excess cash from time to time in highly-liquid debt and equity investments of highly-rated entities, which are classified as trading securities. Historically, the purpose of the investments has been to fund research and development, product development, FDA clearance-related activities and general corporate purposes. Such amounts are recorded at market values using Level 1 inputs in determining fair value and are generally classified as current, as the Company does not intend to hold the investments beyond twelve months. Investment securities classified as trading are those securities that are bought and held principally for the purpose of selling them in the near term, with the objective of preserving principal and generating profits. These securities are reported at fair value with unrealized gains and losses reported as an element of other (expense) income in current period earnings. The Company's Board of Directors has approved an investment policy covering the investment parameters to be followed with the primary goals being the safety of principal amounts and maintaining liquidity. The policy provides for minimum investment rating requirements as well as limitations on investment duration and concentrations. Based upon market conditions, the investment guidelines have been tightened to increase the minimum acceptable investment ratings required for investments and shorten the maximum investment term. As of March 31, 2017, 100% of the investment portfolio was in cash and cash equivalents, which is presented as such on the accompanying balance sheet.  To date, the Company's cumulative realized market loss from the investments has not been significant. For the three months ended March 31, 2017 and 2016, there was approximately $4,400 and $5,900, respectively, in management fee expenses.

The Company's short-term investments comprise certificates of deposit, commercial paper and corporate bonds, all of which are classified as trading securities and carried at their fair value based upon quoted market prices of the securities at December 31, 2016.  Net realized and unrealized gains and losses on trading securities are included in net loss.  For purposes of determining realized gains and losses, the cost of securities sold is based on specific identification.

The composition of trading securities is as follows at December 31, 2016:

| | December 31, 2016 | |
| --- | --- | --- |
| | Cost | Fair Value |
| Certificates of deposit / commercial paper | $ 2,378,222 | $ 2,373,891 |
| Corporate bonds | 5,138,182 | 5,132,870 |
| Total trading securities | 7,516,404 | 7,506,761 |

Investment income for the three months ended March 31, 2017 and 2016 consists of the following:

| | 2017 | 2016 |
| --- | --- | --- |
| Interest income | $ 22,130 | $ 24,530 |
| Realized (losses) | (21) | (1,151) |
| Unrealized gains | 8,542 | 26,818 |
| Management fee expenses | (4,431) | (5,912) |
| Net investment income | $ 26,220 | $ 44,285 |

7

**Fair value of financial instruments:**

The Company accounts for financial instruments under Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic ("ASC") 820, *Fair Value Measurements*.  This statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements.  To increase consistency and comparability in fair value measurements, ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

**Fair value of financial instruments:**

The Company accounts for financial instruments under Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic ("ASC") 820, *Fair Value Measurements*.  This statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements.  To increase consistency and comparability in fair value measurements, ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

Level 1— quoted prices (unadjusted) in active markets for identical assets or liabilities;

Level 2 — observable inputs other than Level 1, quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, and model-derived prices whose inputs are observable or whose significant value drivers are observable; and

Level 3 — assets and liabilities whose significant value drivers are unobservable.

Observable inputs are based on market data obtained from independent sources, while unobservable inputs are based on the Company's market assumptions.  Unobservable inputs require significant management judgment or estimation.  In some cases, the inputs used to measure an asset or liability may fall into different levels of the fair value hierarchy.  In those instances, the fair value measurement is required to be classified using the lowest level of input that is significant to the fair value measurement.  Such determination requires significant management judgment. There were no financial assets or liabilities measured at fair value, with the exception of cash, cash equivalents and short-term investments as of March 31, 2017 and December 31, 2016.

The carrying amounts of the Company's financial instruments (other than cash, cash equivalents and short-term investments as discussed above) approximate fair value because of their variable interest rates and/or short maturities combined with the recent historical interest rate levels.

**Revenue Recognition:**

Revenue recognition related to the license agreement is based upon the licensee's right to use the technology and the Company's ongoing obligations to maintain and defend the patented rights and comply with the terms of the sub-license agreement whereby the license fees and milestone payments received from the agreement, net of the amounts due to third parties, have been recorded as deferred revenue and are amortized over the term of the license agreement.

**Inventories:**

Inventories acquired as part of the BDI purchase are stated at the lower of cost or net realizable value. Cost is determined on the first-in, first-out (FIFO) method. The elements of cost in inventories include materials, labor and overhead.

**Goodwill:**

The Company performs a goodwill impairment analysis in the fourth quarter of each year, or whenever there is an indication of impairment.  When conducting its annual goodwill impairment assessment, the Company initially performs a qualitative evaluation to determine if it is more likely than not that the fair value of its reporting unit is less than its carrying amount as a basis for determining whether it is necessary to perform a two-step goodwill impairment test.  The Company has determined, based on its evaluation, that the goodwill associated with the BDI acquisition was impaired and was written off as of March 31, 2017. The accumulated goodwill amortization of $60,712 arose prior to January 1, 2002 when the FASB revised the policy for goodwill amortization.

8

**Recently issued and adopted accounting pronouncements:**

The Company continually assesses any new accounting pronouncements to determine their applicability. When it is determined that a new accounting pronouncement affects the Company's financial reporting, the Company undertakes a study to determine the consequences of the change

**Recently issued and adopted accounting pronouncements:**

The Company continually assesses any new accounting pronouncements to determine their applicability. When it is determined that a new accounting pronouncement affects the Company's financial reporting, the Company undertakes a study to determine the consequences of the change to its consolidated financial statements and assures that there are proper controls in place to ascertain that the Company's consolidated financial statements properly reflect the change.

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standard Update No. 2014-09, *Revenue from Contracts with Customers* (Topic 606) ("ASU 2041-09"), which supersedes nearly all existing revenue recognition guidance. The standard's core principle is that an entity should recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The standard creates a five-step model to achieve its core principle: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction's price to the separate performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. In addition, entities must disclose sufficient information to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. Qualitative and quantitative disclosures are required about: (i) the entity's contracts with customers; (ii) the significant judgments, and changes in judgments, made in applying the guidance to those contracts; and (iii) any assets recognized from the costs to obtain or fulfill a contract with a customer.

In August 2015, the FASB issued ASU 2015-14, Revenue from Contracts with Customers (Topic 606) - Deferral of the Effective Date, which deferred the effective date of ASU 2014-09 to interim and annual periods beginning after December 15, 2017. The standard allows entities to apply the standard retrospectively to each prior period presented ("full retrospective adoption") or retrospectively with the cumulative effect of initially applying the standard recognized at the date of initial application ("modified retrospective adoption"). The Company plans to adopt this guidance on January 1, 2018, and continues to evaluate the impact of adopting under the modified retrospective adoption versus the full retrospective method. The Company is currently in the process of determining the impact of the new revenue recognition guidance on its revenue transactions, including any impacts on associated processes, systems, and internal controls. The Company's preliminary assessment indicates implementation of this standard will not have a material impact on financial results. The Company's evaluation has included determining whether the unit of account (i.e., performance obligations) will change as compared to current GAAP, as well as determining the standalone selling price of each performance obligation. The Company continues to evaluate the impact of this guidance and its subsequent amendments on the consolidated financial position, results of operations, and cash flows, and any preliminary assessments are subject to change.

In January 2016, the FASB issued ASU No. 2016-01, *Recognition and Measurement of Financial Assets and Financial Liabilities*. ASU No. 2016-01 supersedes and amends the guidance to classify equity securities with readily determinable fair values into different categories (that is, trading or available-for-sale) and require equity securities to be measured at fair value with changes in the fair value recognized through net income. The amendments allow equity investments that do not have readily determinable fair values to be re-measured at fair value either upon the occurrence of an observable price change or upon identification of an impairment. The amendments also require enhanced disclosures about those investments. ASU No. 2016-01 is effective for annual reporting beginning after December 15, 2017, including interim periods within the year of adoption, and calls for prospective application. The Company is currently in the process of evaluating the impact that will result from adopting ASU 2016-01.

In February 2016, the FASB issued ASU 2016-02, *Leases* (Topic 842). This standard requires a lessee to recognize the lease assets and lease liabilities arising from operating leases in the balance sheet. Qualitative along with specific quantitative disclosures are required by lessees and lessors to meet the objective of enabling users of financial statements to assess the amount, timing, and uncertainty of cash flows arising from leases. ASU 2016-02 is effective for fiscal years beginning after December 15, 2018 including interim periods within those fiscal years. The Company is currently evaluating the impact that will result from adopting ASU 2016-02.

In March 2016, the FASB issued ASU 2016-09, *Improvements to Employee Share Based Payment Accounting* ("ASU 2016-09"), which amends guidance issued in Accounting Standards Codification ("ASC") Topic 718, Compensation - Stock Compensation. ASU 2016-09 simplifies several aspects of the accounting for share-based payment transactions, including the income tax consequences, classification of awards as either equity or liabilities, and classification on the statement of cash flows. ASU 2016-09 is effective for fiscal years beginning after December 15, 2016, and interim periods within those fiscal years and early adoption is permitted. The Company has adopted as of January 1, 2017. The principal impact was that to the extent a tax benefit or expense from stock compensation arises it will be presented in the income tax line of the Statement of Operations rather than the current presentation as a component of equity on the Balance Sheet. Also the tax benefit or expense will be presented as activity in Cash Flow from Operating Activity rather than the current presentation as Cash Flow from Financing Activity in the Statement of Cash Flows. The Company continues to estimate forfeitures of stock grants as allowed by ASU 2016-09.

In August 2016, the FASB issued ASU 2016-15, *Statement of Cash Flows* (Topic 230): Classification of Certain Cash Receipts and Cash Payments. This standard provides guidance for eight cash flow classification issues in current GAAP. ASU 2016-15 is effective for fiscal years beginning after December 15, 2017 and interim periods within those fiscal years. The Company is currently evaluating the impact that will result from adopting ASU 2016-02.

In January 2017, the FASB issued an ASU 2017-01, *Business Combinations (Topic 805) Clarifying the Definition of a Business*. The amendments in this Update is to clarify the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. The definition of a business affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The guidance is effective for annual periods beginning after December 15, 2017, including interim periods within those periods. The Company adopted this guidance effective January 1, 2017. The adoption of this ASU had no impact on the Company's consolidated financial statements.

In January 2017, the FASB issued ASU 2017-04, *Intangibles - Goodwill and Other (Topic 350)*: Simplifying the Accounting for Goodwill Impairment. ASU 2017-04 removes Step 2 of the goodwill impairment test, which requires a hypothetical purchase price allocation. A goodwill impairment will now be the amount by which a reporting unit's carrying value exceeds its fair value, not to exceed the carrying amount of goodwill. This standard will be effective for the Company beginning in the first quarter of fiscal year 2020 and is required to be applied prospectively. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company is currently evaluating the impact this standard will have on its consolidated financial statements.

**Income (loss) per share:**

ASC 260, *Earnings Per Share*, requires dual presentation of basic and diluted earnings per share ("EPS") with a reconciliation of the numerator and denominator of the basic EPS computation to the numerator and denominator of the diluted EPS computation. Basic EPS excludes dilution. Diluted EPS reflects the potential dilution that could occur if securities or other contracts to issue common stock were exercised or converted into common stock or resulted in the issuance of common stock that then shared in the earnings of the entity.

Basic net earnings (loss) per share includes no dilution and is computed by dividing net earnings (loss) available to common shareholders by the weighted average number of common shares outstanding for the period. Diluted net earnings (loss) per share reflect the potential dilution of securities that could share in the Company's earnings (loss). The effect of the inclusion of the dilutive shares would have resulted in a decrease in loss per share for the three months ended March 31, 2017. For the three months ended March 31, 2016, the effect of inclusion of the dilutive shares would have resulted in an increase in income per share, under the treasury stock method. Accordingly, the weighted average shares outstanding have not been adjusted for dilutive shares for any period presented. Outstanding stock options, warrants and other dilutive rights are not considered in the calculation, as the impact of the potential common shares (totaling approximately 1,588,000 shares and 757,000 shares for each of the three month periods ended March 31, 2017 and 2016, respectively) would be anti-dilutive. As of March 31, 2017 the dilutive rights held in escrow from the March 2017 private placement totaling approximately 4,802,000 share rights (3,802,000 share rights from the convertible notes financing and 1,000,000 share rights from the common stock offering) are also not considered in the calculation, as the impact would be anti-dilutive.

**Note 2. Acquisition and Discontinued Operations:**

**Acquisition:**

On September 12, 2016, the Company completed the strategic acquisition of BDI, a privately-held entity. The decision to acquire BDI was made based on the evaluation that the Company's resources would primarily be used for market development and commercial launch of the product and the market opportunity was estimated to be sizable. Pursuant to a purchase agreement (the "Purchase Agreement"), through a wholly-owned subsidiary ("Venaxis Sub"), the Company acquired all of the outstanding shares of Series 1 Preferred Stock of BDI from the selling shareholders (the "Seller"), representing more than 98% of the outstanding voting stock of BDI, and BDI thereupon become a majority owned subsidiary of the Company.

Under the terms of the Purchase Agreement, the consideration consisted of an aggregate of 627,010 shares of the Company's common stock (the "Shares") which Shares were distributed in accordance with the liquidation preferences set forth in BDI's Fifth Amended and Restated Certificate of Incorporation, as amended. The Shares were valued at approximately $2,577,000 (based upon the closing value of our common stock on the acquisition date) and the issuance represented approximately 14% of the outstanding Bioptix common stock at the closing. The Purchase Agreement contained customary representations and warranties of the parties, including BDI, and the Sellers have customary indemnification obligations to the Company relating to BDI, which are subject to certain limitations described further in the Purchase Agreement. The issuance of the Shares was effected as a private placement of securities. The Company also entered into a registration rights agreement with the Sellers.

In January 2017, the FASB issued ASU 2017-04, *Intangibles - Goodwill and Other (Topic 350)*: Simplifying the Accounting for Goodwill Impairment. ASU 2017-04 removes Step 2 of the goodwill impairment test, which requires a hypothetical purchase price allocation. A goodwill impairment will now be the amount by which a reporting unit's carrying value exceeds its fair value, not to exceed the carrying amount of goodwill. This standard will be effective for the Company beginning in the first quarter of fiscal year 2020 and is required to be applied prospectively. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company is currently evaluating the impact this standard will have on its consolidated financial statements.

**Income (loss) per share:**

ASC 260, *Earnings Per Share*, requires dual presentation of basic and diluted earnings per share ("EPS") with a reconciliation of the numerator and denominator of the basic EPS computation to the numerator and denominator of the diluted EPS computation. Basic EPS excludes dilution. Diluted EPS reflects the potential dilution that could occur if securities or other contracts to issue common stock were exercised or converted into common stock or resulted in the issuance of common stock that then shared in the earnings of the entity.

Basic net earnings (loss) per share includes no dilution and is computed by dividing net earnings (loss) available to common shareholders by the weighted average number of common shares outstanding for the period. Diluted net earnings (loss) per share reflect the potential dilution of securities that could share in the Company's earnings (loss). The effect of the inclusion of the dilutive shares would have resulted in a decrease in loss per share for the three months ended March 31, 2017. For the three months ended March 31, 2016, the effect of inclusion of the dilutive shares would have resulted in an increase in income per share, under the treasury stock method. Accordingly, the weighted average shares outstanding have not been adjusted for dilutive shares for any period presented. Outstanding stock options, warrants and other dilutive rights are not considered in the calculation, as the impact of the potential common shares (totaling approximately 1,588,000 shares and 757,000 shares for each of the three month periods ended March 31, 2017 and 2016, respectively) would be anti-dilutive. As of March 31, 2017 the dilutive rights held in escrow from the March 2017 private placement totaling approximately 4,802,000 share rights (3,802,000 share rights from the convertible notes financing and 1,000,000 share rights from the common stock offering) are also not considered in the calculation, as the impact would be anti-dilutive.

**Note 2. Acquisition and Discontinued Operations:**

**Acquisition:**

On September 12, 2016, the Company completed the strategic acquisition of BDI, a privately-held entity. The decision to acquire BDI was made based on the evaluation that the Company's resources would primarily be used for market development and commercial launch of the product and the market opportunity was estimated to be sizable. Pursuant to a purchase agreement (the "Purchase Agreement"), through a wholly-owned subsidiary ("Venaxis Sub"), the Company acquired all of the outstanding shares of Series 1 Preferred Stock of BDI from the selling shareholders (the "Seller"), representing more than 98% of the outstanding voting stock of BDI, and BDI thereupon become a majority owned subsidiary of the Company.

Under the terms of the Purchase Agreement, the consideration consisted of an aggregate of 627,010 shares of the Company's common stock (the "Shares") which Shares were distributed in accordance with the liquidation preferences set forth in BDI's Fifth Amended and Restated Certificate of Incorporation, as amended. The Shares were valued at approximately $2,577,000 (based upon the closing value of our common stock on the acquisition date) and the issuance represented approximately 14% of the outstanding Bioptix common stock at the closing. The Purchase Agreement contained customary representations and warranties of the parties, including BDI, and the Sellers have customary indemnification obligations to the Company relating to BDI, which are subject to certain limitations described further in the Purchase Agreement. The issuance of the Shares was effected as a private placement of securities. The Company also entered into a registration rights agreement with the Sellers.

The total consideration transferred consisted of the 627,010 shares of the Company's common stock with a value of $2,577,000.

Under the acquisition method of accounting, the total estimated purchase consideration was allocated to the acquired tangible and intangible assets and assumed liabilities based on their estimated fair values as of the acquisition date. Following was the allocation of the purchase consideration:

| | | |
|---|---|---|
| Cash and cash equivalents | $ | 17,000 |
| Accounts receivable | | 21,000 |
| Inventory | | 379,000 |
| Prepaid and other assets | | 51,000 |
| Equipment | | 1,000 |
| Identifiable intangible assets: | | |

| | | |
|---|---|---:|
| Trademarks (5 year estimated useful life) | | 99,000 |
| Customer base (6 year estimated useful life) | | 37,000 |
| Developed technology (4 year estimated useful life) | $ | 1,864,000 |
| Total identifiable intangible assets | | 2,000,000 |
| Goodwill | | 430,000 |
| Accounts payable | | (118,000) |
| Accrued and other liabilities | | (175,000) |
| Non-controlling interest | | (29,000) |
| Purchase price | $ | 2,577,000 |

10

Intangible assets acquired consisted of the following as of December 31, 2016:

| | | |
|---|---|---:|
| Trademarks | $ | 99,000 |
| Customer base | | 37,000 |
| Developed technology | | 1,864,000 |
| Total | | 2,000,000 |
| Less accumulated amortization | | (148,264) |
| Balance at December 31, 2016 | $ | 1,851,736 |

As of November 30, 2016, the Company paid approximately $29,000 to acquire the non-controlling interest in BDI, which was accounted for as an equity transaction.

The unaudited supplemental pro forma information for the three months ended March 31, 2016, as if the BDI acquisition had occurred as of January 1, 2016, would have reflected total revenue of $55,000, net loss of $399,000 and loss per share of $0.09. These pro forma condensed consolidated financial results have been prepared for comparative purposes only and include certain adjustments to reflect the pro forma results of operations as if the acquisition had occurred as of the beginning of the periods presented, such as increased amortization for the fair value of acquired intangible assets. The pro forma information does not reflect the effect of costs or synergies that would have been expected to result from the integration of the acquisition. The pro forma information does not purport to be indicative of the results of operations that actually would have resulted had the combination occurred at the beginning of each period presented, or of future results of the consolidated entities.

As of December 31, 2016 inventories, included with current assets of discontinued operations, totaled approximately $416,000, consisting of $188,000 in raw materials and $228,000 in finished goods, all associated with the BDI operations. As of March 31, 2017 inventories, included with current assets of discontinued operations, totaled approximately $49,000, consisting of finished goods.

**Discontinued operations:**

During the quarter ended March 31, 2017, the Company made the decision to discontinue the operations of its wholly-owned subsidiary BDI. BDI had developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017 of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. The Company expects to dispose of the assets and operations during 2017 by selling the assets and licensing the intellectual property rights.   The Company has recognized the exit of BDI in accordance with Accounting Standards Codification (ASC) 205-20, *Discontinued Operations*. As such, the historical results of BDI, following its 2016 acquisition, have been classified as discontinued operations.

11

The Company's historical financial statements have been revised to present the operating results of the BDI business as a discontinued operation. Assets and liabilities related to the discontinued operations of BDI are approximately as follows as of March 31, 2017 and December 31, 2016:

The Company's historical financial statements have been revised to present the operating results of the BDI business as a discontinued operation. Assets and liabilities related to the discontinued operations of BDI are approximately as follows as of March 31, 2017 and December 31, 2016:

|  | March 31, 2017 | December 31, 2016 |
|---|---|---|
| Current assets: | | |
| Accounts receivable | $ 146,000 | $ 5,000 |
| Inventories | 49,000 | 416,000 |
| Prepaid expenses | 5,000 | 66,000 |
| Total current assets | $ 200,000 | $ 487,000 |
| | | |
| Equipment and furnishings, net | $ 10,000 | $ 36,000 |
| Intangible assets, net | - | 2,281,000 |
| Deposit | 37,000 | 37,000 |
| Total noncurrent assets | $ 47,000 | $ 2,354,000 |
| | | |
| Current liabilities: | | |
| Accounts payable | $ 166,000 | $ 174,000 |
| Accrued expenses | 46,000 | 85,000 |
| Deferred revenue | 137,000 | - |
| Total current liabilities | $ 349,000 | $ 259,000 |

Summarized results of the discontinued operation are as follows for the three months ended March 31, 2017:

| | |
|---|---|
| Sales | $ 13,000 |
| Cost of sales | 2,000 |
| Gross margin | 11,000 |
| Operating expenses | 654,000 |
| Operating loss | (643,000) |
| Impairment loss | (2,704,000) |
| | |
| Loss from discontinued operations | $ (3,347,000) |

Included in the impairment loss recognized on the discontinuance of BDI are impairment losses recognized on inventories of $408,000, equipment and furnishings of $38,000, identifiable intangible assets of $1,833,000, goodwill of $430,000, net of $5,000 in other items, all associated with the assets and operations of BDI. Additional costs associated with the exit of operations of the Company's subsidiary BDI may be incurred as strategic options for BDI are evaluated.

**Note 3. Property and equipment:**

Property and equipment consisted of the following:

|  | March 31, 2017 (Unaudited) | December 31, 2016 |
|---|---|---|
| Office and computer equipment | $ 116,510 | $ 116,510 |
| Less accumulated depreciation | 111,447 | 110,972 |
| | $ 5,063 | $ 5,538 |

**Note 3. Property and equipment:**

Property and equipment consisted of the following:

|  | March 31, 2017 (Unaudited) | December 31, 2016 |
|---|---|---|
| Office and computer equipment | $ 116,510 | $ 116,510 |
| Less accumulated depreciation | 111,447 | 110,972 |
|  | $ 5,063 | $ 5,538 |

Depreciation expense totaled approximately $500 and $400 for the three month periods ended March 31, 2017 and 2016, respectively.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party for a purchase price of approximately $4,053,000. The sale resulted in a gain of approximately $1,919,000 and generated approximately $1,749,000 in net cash after expenses and mortgage payoffs. The Company is leasing back space in the building under a short-term lease agreement that provides storage space.

**Note 4.  Other long-term assets:**

Other long-term assets consisted of the following as of March 31, 2017 and December 31, 2016:

|  | Beginning Balance | Additions | Impairments | Ending Balance |
|---|---|---|---|---|
| **March 31, 2017:** |  |  |  |  |
| Cost: |  |  |  |  |
| Patents | $ 1,032,982 | $ 11,911 | $ — | $ 1,044,893 |
| Goodwill | 447,951 | — | — | 447,951 |
| Total | 1,480,933 | 11,911 | — | 1,492,844 |
| Accumulated Amortization: |  |  |  |  |
| Patents | (482,183) | (17,658) | — | (499,841) |
| Goodwill | (60,712) | — | — | (60,712) |
| Total | (542,895) | (17,658) | — | (560,553) |
| Net Other Long Term Assets | $ 938,038 | $ (5,747) | $ — | $ 932,291 |

The Company capitalizes legal costs and filing fees associated with obtaining patents on its new discoveries. Once the patents have been issued, the Company amortizes these costs over the shorter of the legal life of the patent or its estimated economic life using the straight-line method. Based upon the current status of the above intangible assets, the aggregate amortization expense is estimated to be approximately $71,000 for each of the next five fiscal years. The Company tests intangible assets with finite lives for impairment upon significant changes in the Company's business environment. The testing resulted in no patent impairment for the three months ended March 31, 2017 and $134,000 for the three months ended March 31, 2016. The impairment charges are related to the Company's ongoing analysis of which specific country patents in its portfolio are determined as potentially worth pursuing.

**Note 5. Notes and Other Obligations:**

**Note 4.  Other long-term assets:**

Other long-term assets consisted of the following as of March 31, 2017 and December 31, 2016:

| | Beginning Balance | Additions | Impairments | Ending Balance |
|---|---|---|---|---|
| **March 31, 2017:** | | | | |
| Cost: | | | | |
| Patents | $ 1,032,982 | $ 11,911 | $ — | $ 1,044,893 |
| Goodwill | 447,951 | — | — | 447,951 |
| | | | | |
| Total | 1,480,933 | 11,911 | — | 1,492,844 |
| | | | | |
| Accumulated Amortization: | | | | |
| Patents | (482,183) | (17,658) | — | (499,841) |
| Goodwill | (60,712) | — | — | (60,712) |
| Total | (542,895) | (17,658) | — | (560,553) |
| | | | | |
| Net Other Long Term Assets | $ 938,038 | $ (5,747) | $ — | $ 932,291 |

The Company capitalizes legal costs and filing fees associated with obtaining patents on its new discoveries. Once the patents have been issued, the Company amortizes these costs over the shorter of the legal life of the patent or its estimated economic life using the straight-line method. Based upon the current status of the above intangible assets, the aggregate amortization expense is estimated to be approximately $71,000 for each of the next five fiscal years. The Company tests intangible assets with finite lives for impairment upon significant changes in the Company's business environment. The testing resulted in no patent impairment for the three months ended March 31, 2017 and $134,000 for the three months ended March 31, 2016. The impairment charges are related to the Company's ongoing analysis of which specific country patents in its portfolio are determined as potentially worth pursuing.

**Note 5. Notes and Other Obligations:**

Notes and other obligations consisted of the following:

| | March 31, 2017 (Unaudited) | December 31, 2016 |
|---|---|---|
| Mortgage notes | $ — | $ — |
| Other short-term installment obligations | 56,158 | 139,611 |
| | | |
| | 56,158 | 139,611 |
| Less current portion | 56,158 | 139,611 |
| | $ — | $ — |

**Mortgage notes:**

Prior to the February 2016 sale of the corporate headquarters, the Company had a permanent mortgage on its land and building that was refinanced in May 2013. The mortgage was held by a commercial bank and included a portion guaranteed by the U. S. Small Business Administration ("SBA").  The loan was collateralized by the real property and the SBA portion was also personally guaranteed by a former officer of the Company. The commercial bank loan terms included a payment schedule based on a fifteen year amortization, with a balloon maturity at five years. The commercial bank portion had an interest rate fixed at 3.95%, and the SBA portion bore interest at the rate of 5.86%. The commercial bank portion of the loan required total monthly payments of approximately $11,700, which included approximately $4,500 per month in interest. The

**Mortgage notes:**

Prior to the February 2016 sale of the corporate headquarters, the Company had a permanent mortgage on its land and building that was refinanced in May 2013. The mortgage was held by a commercial bank and included a portion guaranteed by the U. S. Small Business Administration ("SBA").  The loan was collateralized by the real property and the SBA portion was also personally guaranteed by a former officer of the Company. The commercial bank loan terms included a payment schedule based on a fifteen year amortization, with a balloon maturity at five years. The commercial bank portion had an interest rate fixed at 3.95%, and the SBA portion bore interest at the rate of 5.86%. The commercial bank portion of the loan required total monthly payments of approximately $11,700, which included approximately $4,500 per month in interest. The SBA portion of the loan required total monthly payments of approximately $9,000 through July 2023, which included approximately $3,500 per month in interest and fees in 2016.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land and building, and also paid off its mortgage obligations. See Note 3.

**Future maturities:**

The Company's total debt obligations require minimum annual principal payments of approximately $56,000 for the remainder of 2017, through the terms of the applicable debt agreements.

**Note 6. Stockholders' equity:**

**Restricted common stock award:**

During the three months ended March 31, 2017, the Company approved the award of 165,000 restricted shares to members of its Board of Directors, of which 6,042 common shares were vested as of March 31, 2017 (see Note 7).

**Private placement offerings:**

In March 2017, the Company completed private placements totaling $7,000,000. Included was a common stock unit financing for $2,250,000 with certain accredited investors. The common stock unit offering totalled 900,000 units, consisted of 400,000 units for $1,000,000 less $294,026 of offering expenses, has been released to the respective parties, with the balance of 500,000 units for $1,250,000 held in escrow pending completion of release conditions.  The common stock offering sold units (the "Units") at a purchase price of $2.50 per Unit. Each Unit consists of one share of the Company's common stock and a three-year warrant to purchase one share of the Company's common stock at an exercise price of $3.50 per share. The Company also closed on a convertible note financing with certain accredited investors with gross proceeds totaling $4,750,000. The convertible note financing proceeds are in escrow pending successful completion of release conditions.  Following release from escrow, the notes shall be convertible into shares of common stock at an initial conversion price of $2.50 per share. Warrants to purchase 1,900,000 shares of the Company's common stock at an initial exercise price of $3.56 per share were also issued with the convertible note financing. Pursuant to the terms of the convertible note purchase agreements, the Company has agreed to file a proxy to hold a special meeting of its shareholders to among other provisions, approve the terms of the offering and authorize preferred stock, all as specified in the agreements.

The portion of the common stock unit financing held in escrow and the convertible note financing, held in escrow, have been reflected in the consolidated balance sheet at the face amount of the securities issued and held in escrow less the cash received for those securities, which is also held in escrow.  When the release conditions have been met, the cash, common stock units and convertible notes will be reflected gross at their carrying amounts, net of any discounts.

In addition, since the warrants given with the common stock unit and convertible note financings are also held in escrow pending the release conditions, their issuance is contingent upon satisfaction of release conditions, as defined in the agreements.  Accordingly, they will be valued and financing proceeds will be allocated to them at the time the contingency is resolved.  Any beneficial conversion feature resulting from the allocation of proceeds among the convertible notes and warrants will also be recorded at that time.

The convertible notes accrue interest at 2% per annum commencing with their execution and as a result, the Company has recorded approximately $3,900 in interest expense during the three months ended March 31, 2017 and accrued interest of approximately $3,900 is included in the consolidated balance sheet as of March 31, 2017.

15

The Company has evaluated the guidance ASC 480-10 *Distinguishing Liabilities from Equity and* ASC 815-40 *Contracts in an Entity's Own Equity* to determine the appropriate classification of the instruments.

In connection with the private placements, the Company also entered into a Registration Rights Agreement, with the investors pursuant to which the Company agreed to file a registration statement covering the resale of the shares of common stock issuable upon exercise or conversion of the securities and to maintain its effectiveness until all such securities have been sold or may be sold without restriction. In the event a registration statement covering such shares of common stock is not effective, the Company is required to pay to the investors on a monthly basis an amount equal to 1% of the investors' investment, subject to conditions as defined in the agreement.

**Note 7. Stock based compensation, options and warrants:**

**Stock based compensation:**

The Company recognized total expenses for stock-based compensation during the three months ended March 31, 2017 and 2016, which are included in the accompanying condensed consolidated statements of operations, in the following categories:

|  | 2017 | 2016 |
|---|---|---|
| Selling, general and administrative expenses | $ 133,043 | $ 45,324 |
| Research and development expenses | — | 2,560 |
| Total stock-based compensation | $ 133,043 | $ 47,884 |

The Company recognized total stock-based compensation expense during the three months ended March 31, 2017 and 2016, from the following categories:

|  | 2017 | 2016 |
|---|---|---|
| Restricted stock awards | $ 30,431 | $ — |
| Stock options awards under the Plan | 63,806 | 47,884 |
| Non-qualified stock option awards | 38,806 | — |
| Total stock-based compensation | $ 133,043 | $ 47,884 |

**Restricted stock awards:**

A summary of the Company's restricted stock activity in the three months ended March 31, 2017 is presented here:

|  | Number of Shares | Weighted Average Grant-Date Fair Value |
|---|---|---|
| Outstanding at January 1, 2017 | - | $ - |
| Granted | 165,000 | 3.13 |
| Forfeited | (20,000) | 3.13 |
| Outstanding at March 31, 2017 | 145,000 | $ 3.13 |
|  |  |  |
| Vested at March 31, 2017 | 6,042 | $ 3.13 |

During the three months ended March 31, 2017, the Company granted 165,000 restricted shares to members of its Board of Directors. Upon the resignation of a Director, 20,000 shares were subsequently forfeited. The weighted-average fair value of restricted shares granted during the three months ended March 31, 2017 was $3.13 per share based upon the share price as of the date of grant. The total fair value of restricted stock granted during the three months ended March 31, 2017 was approximately $516,000.

The value of restricted stock grants are measured based on their fair value on the date of grant and amortized over the vesting period of twenty-four months. As of March 31, 2017, there was approximately $423,000 of unrecognized compensation cost related to unvested restricted stock awards, which is expected to be recognized over a remaining weighted-average vesting period of approximately 1.9 years.

**Stock options:**

The Company currently provides stock-based compensation to employees, directors and consultants, both under the Company's 2002 Stock Incentive Plan, as amended (the "Plan"), and non-qualified options and warrants issued outside of the Plan. During November, 2016, the Company's shareholders approved amendments to the Plan to increase the number of shares reserved under the Plan from 709,141 to 895,000. The Company estimates the fair value of the share-based awards on the date of grant using the Black-Scholes option-pricing model (the "Black-Scholes model"). Using the Black-Scholes model, the value of the award that is ultimately expected to vest is recognized over the requisite service period in the statement of operations. Option forfeitures are estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. The Company attributes compensation to expense using the straight-line single option method for all options granted.

The Company's determination of the estimated fair value of share-based payment awards on the date of grant is affected by the following variables and assumptions:

- Grant date exercise price – the closing market price of the Company's common stock on the date of the grant;
- Estimated option term – based on historical experience with existing option holders;
- Estimated dividend rates – based on historical and anticipated dividends over the life of the option;
- Term of the option – based on historical experience, grants have lives of approximately 3-5 years;
- Risk-free interest rates – with maturities that approximate the expected life of the options granted;
- Calculated stock price volatility – calculated over the expected life of the options granted, which is calculated based on the daily closing price of the Company's common stock over a period equal to the expected term of the option; and
- Option exercise behaviors – based on actual and projected employee stock option exercises and forfeitures.

During the three months ended March 31, 2017 and 2016, respectively, no options were exercised.

**Stock incentive plan options:**

The Company currently provides stock-based compensation to employees, directors and consultants under the Plan. The Company did not grant any stock-based compensation to employees, directors or consultants for the three month periods ended March 31, 2017 or 2016.

A summary of activity under the Plan for the three months ended March 31, 2017 is presented below:

| | Shares Underlying Options | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value | |
|---|---|---|---|---|---|---|
| Outstanding at January 1, 2017 | 566,747 | $ | 20.46 | | | |
| Granted | - | | - | | | |
| Exercised | - | | - | | | |
| Forfeited | (14,836) | | 42.86 | | | |
| Outstanding at March 31, 2017 | 551,911 | $ | 19.85 | 7.1 | $ | 270,636 |
| Exercisable at March 31, 2017 | 472,911 | $ | 22.68 | 6.7 | $ | 184,486 |

The aggregate intrinsic value in the table above represents the total intrinsic value (the difference between the Company's closing stock price on March 31, 2017 and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders, had all option holders been able to, and in fact had, exercised their options on March 31, 2017.

**Stock options:**

The Company currently provides stock-based compensation to employees, directors and consultants, both under the Company's 2002 Stock Incentive Plan, as amended (the "Plan"), and non-qualified options and warrants issued outside of the Plan. During November, 2016, the Company's shareholders approved amendments to the Plan to increase the number of shares reserved under the Plan from 709,141 to 895,000. The Company estimates the fair value of the share-based awards on the date of grant using the Black-Scholes option-pricing model (the "Black-Scholes model").  Using the Black-Scholes model, the value of the award that is ultimately expected to vest is recognized over the requisite service period in the statement of operations.  Option forfeitures are estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates.  The Company attributes compensation to expense using the straight-line single option method for all options granted.

The Company's determination of the estimated fair value of share-based payment awards on the date of grant is affected by the following variables and assumptions:

- Grant date exercise price – the closing market price of the Company's common stock on the date of the grant;
- Estimated option term – based on historical experience with existing option holders;
- Estimated dividend rates – based on historical and anticipated dividends over the life of the option;
- Term of the option – based on historical experience, grants have lives of approximately 3-5 years;
- Risk-free interest rates – with maturities that approximate the expected life of the options granted;
- Calculated stock price volatility – calculated over the expected life of the options granted, which is calculated based on the daily closing price of the Company's common stock over a period equal to the expected term of the option; and
- Option exercise behaviors – based on actual and projected employee stock option exercises and forfeitures.

During the three months ended March 31, 2017 and 2016, respectively, no options were exercised.

**Stock incentive plan options:**

The Company currently provides stock-based compensation to employees, directors and consultants under the Plan. The Company did not grant any stock-based compensation to employees, directors or consultants for the three month periods ended March 31, 2017 or 2016.

A summary of activity under the Plan for the three months ended March 31, 2017 is presented below:

| | Shares Underlying Options | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value | |
|---|---|---|---|---|---|---|
| Outstanding at January 1, 2017 | 566,747 | $ | 20.46 | | | |
| Granted | - | | - | | | |
| Exercised | - | | - | | | |
| Forfeited | (14,836) | | 42.86 | | | |
| Outstanding at March 31, 2017 | 551,911 | $ | 19.85 | 7.1 | $ | 270,636 |
| Exercisable at March 31, 2017 | 472,911 | $ | 22.68 | 6.7 | $ | 184,486 |

The aggregate intrinsic value in the table above represents the total intrinsic value (the difference between the Company's closing stock price on March 31, 2017 and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders, had all option holders been able to, and in fact had, exercised their options on March 31, 2017.

During the three months ended March 31, 2017, a total of 14,836 options that were granted under the Plan were forfeited, of which 836 were vested and 14,000 were unvested. The vested options were exercisable at an average of $710.40 per share, the unvested options were exercisable at an average of $3.00 per share. During the three months ended March 31, 2016, a total of 7,382 options that were granted under the Plan were forfeited, of which 3,762 were vested and 3,620 were unvested. The vested options were exercisable at an average of $26.61 per share and the unvested options were exercisable at an average of $15.13 per share.

The total fair value of stock options granted to employees, directors and consultants that vested and became exercisable during the three months ended March 31, 2017 and 2016, was approximately $51,000 and $127,000, respectively.   Based upon the Company's experience, approximately 80% of the outstanding nonvested stock options, or approximately 63,000 options, are expected to vest in the future, under their terms.

A summary of the activity of nonvested options under the Plan to acquire common shares granted to employees, officers, directors and consultants during the three months ended March 31, 2017 is presented below:

| Nonvested Shares | Nonvested Shares Underlying Options | Weighted Average Exercise Price | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Nonvested at January 1, 2017 | 97,738 | $ 3.51 | $ 2.58 |
| Granted | - | - | - |
| Vested | (4,738) | 15.12 | 10.74 |
| Forfeited | (14,000) | 3.00 | 2.25 |
| Nonvested at March 31, 2017 | 79,000 | $ 2.91 | $ 2.15 |

At March 31, 2017, based upon employee, officer, director and consultant options granted under the Plan to that point, there was approximately $45,000 of additional unrecognized compensation cost related to stock options that will be recorded over a weighted average future period of one year.

**Other common stock purchase options and warrants:**

As of March 31, 2017, in addition to the Plan options discussed above, the Company had outstanding 897,003 non-qualified options and warrants in connection with warrants issued with offerings, an officer's employment, and options issued to six new employees, hired in connection with the Company's acquisition of BDI that were not issued under the Plan.

During the three month periods ended March 31, 2017 and 2016 no options were granted outside of the Plan.  Operating expenses for the three months ended March 31, 2017 included $38,806 related to stock-based compensation and the three months ended March 31, 2016 did not include any value related to stock-based compensation of non-qualified options and warrants.

In March 2017, the Company completed a $1 million private placement of securities and in connection with that offering, granted investors in the offering warrants which are classified as equity, exercisable after six-months, to purchase a total of 400,000 shares of common stock at an exercise price of $3.50 per share and expiring in May 2020 (see Note 6).

Following is a summary of outstanding options and warrants that were issued outside of the Plan for the three months ended March 31, 2017:

| | Shares Underlying Options / Warrants | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2017 | 527,003 | $ 13.36 | | |
| Granted | 400,000 | 3.50 | | |
| Exercised | - | - | | |
| Forfeited | (30,000) | 3.78 | | |
| Outstanding at March 31, 2017 | 897,003 | $ 9.29 | 2.5 | $ 214,300 |
| Exercisable at March 31, 2017 | 464,503 | $ 15.47 | 1.0 | $ 7,150 |

The total fair value of stock options granted to employees, directors and consultants that vested and became exercisable during the three months ended March 31, 2017 and 2016, was approximately $51,000 and $127,000, respectively.   Based upon the Company's experience, approximately 80% of the outstanding nonvested stock options, or approximately 63,000 options, are expected to vest in the future, under their terms.

A summary of the activity of nonvested options under the Plan to acquire common shares granted to employees, officers, directors and consultants during the three months ended March 31, 2017 is presented below:

| Nonvested Shares | Nonvested Shares Underlying Options | Weighted Average Exercise Price | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Nonvested at January 1, 2017 | 97,738 | $ 3.51 | $ 2.58 |
| Granted | - | - | - |
| Vested | (4,738) | 15.12 | 10.74 |
| Forfeited | (14,000) | 3.00 | 2.25 |
| Nonvested at March 31, 2017 | 79,000 | $ 2.91 | $ 2.15 |

At March 31, 2017, based upon employee, officer, director and consultant options granted under the Plan to that point, there was approximately $45,000 of additional unrecognized compensation cost related to stock options that will be recorded over a weighted average future period of one year.

**Other common stock purchase options and warrants:**

As of March 31, 2017, in addition to the Plan options discussed above, the Company had outstanding 897,003 non-qualified options and warrants in connection with warrants issued with offerings, an officer's employment, and options issued to six new employees, hired in connection with the Company's acquisition of BDI that were not issued under the Plan.

During the three month periods ended March 31, 2017 and 2016 no options were granted outside of the Plan.  Operating expenses for the three months ended March 31, 2017 included $38,806 related to stock-based compensation and the three months ended March 31, 2016 did not include any value related to stock-based compensation of non-qualified options and warrants.

In March 2017, the Company completed a $1 million private placement of securities and in connection with that offering, granted investors in the offering warrants which are classified as equity, exercisable after six-months, to purchase a total of 400,000 shares of common stock at an exercise price of $3.50 per share and expiring in May 2020 (see Note 6).

Following is a summary of outstanding options and warrants that were issued outside of the Plan for the three months ended March 31, 2017:

| | Shares Underlying Options / Warrants | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2017 | 527,003 | $ 13.36 | | |
| Granted | 400,000 | 3.50 | | |
| Exercised | - | - | | |
| Forfeited | (30,000) | 3.78 | | |
| Outstanding at March 31, 2017 | 897,003 | $ 9.29 | 2.5 | $ 214,300 |
| Exercisable at March 31, 2017 | 464,503 | $ 15.47 | 1.0 | $ 7,150 |

During the three months ended March 31, 2017 and 2016, no warrants were exercised.  Included at March 31, 2017 in the 897,003 total outstanding options are 829,503 non-compensatory rights, exercisable at an average of $9.66 per common share, expiring through May 2020, granted in connection with public offerings, and 67,500 rights exercisable at an average of $4.65 per common share, expiring through September 2021, issued under compensatory arrangements.

The aggregate intrinsic value in the table above represents the total intrinsic value (the difference between the Company's closing stock price on March 31, 2017 and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders, had all option holders been able to, and in fact had, exercised their options on March 31, 2017.

**Note 8.  Animal Health License Agreements:**

Effective May 1, 2004, Washington University in St. Louis ("WU") and Bioptix entered into an Exclusive License Agreement ("WU License Agreement"), which grants Bioptix exclusive license and right to sublicense WU's technology (as defined under the WU License Agreement) for veterinary products worldwide, except where such products are prohibited under U.S. laws for export. The term of the WU License Agreement continues until the expiration of the last of WU's patents (as defined in the WU License Agreement) expire.  Bioptix has agreed to pay minimum annual royalties of $20,000 during the term of the WU License Agreement and such amounts are creditable against future royalties.  Royalties payable to WU under the WU License Agreement for covered product sales by Bioptix carry a mid-single digit royalty rate and for sublicense fees received by Bioptix carry a low double-digit royalty rate.  The WU License Agreement contains customary terms for confidentiality, prosecution and infringement provisions for licensed patents, publication rights, indemnification and insurance coverage.  The WU License Agreement is cancelable by Bioptix with ninety days advance notice at any time and by WU with sixty days advance notice if Bioptix materially breaches the WU License Agreement and fails to cure such breach.

In July 2012, the Company entered into an Exclusive License Agreement (the "License Agreement") with Ceva Santé Animale S.A. ("Licensee"), pursuant to which the Company granted the Licensee an exclusive royalty-bearing license, until December 31, 2028, to the Company's intellectual property and other assets, including patent rights and know-how, relating to recombinant single chain reproductive hormone technology for use in non-human mammals (the "Company's Animal Health Assets"). The License Agreement is subject to termination by the Licensee (a) for convenience on 180 days prior written notice, (b) in the Licensee's discretion in the event of a sale or other disposal of the Company's animal health assets, (c) in the Licensee's discretion upon a change in control of the Company, (d) for a material breach of the License Agreement by the Company, or (e) in the Licensee's discretion, if the Company becomes insolvent.  The License Agreement is also terminable by the Company if there is a material breach of the License Agreement by the Licensee, or if the Licensee challenges the Company's ownership of designated intellectual property.  The License Agreement includes a sublicense of the technology licensed to the Company by WU. Under the terms of the WU License Agreement, a portion of license fees and royalties Bioptix receives from sublicensing agreements will be paid to WU. The obligation for such license fees due to WU is included in accrued expenses at March 31, 2017.

Under the License Agreement, the Licensee obtained a worldwide exclusive license to develop, seek regulatory approval for and offer to sell, market, distribute, import and export luteinizing hormone ("LH") and/or follicle-stimulating hormone ("FSH") products for bovine (cattle), equine and swine in the field of the assistance and facilitation of reproduction in bovine, equine and swine animals.

Under the License Agreement, as of March 31, 2017, the following future milestone payments are provided, assuming future milestones are successfully achieved:

• Milestone payments, totaling up to a potential of $1.1 million in the aggregate, based on the satisfactory conclusion of milestones as defined in the License Agreement;
• Potential for milestone payments of up to an additional $2 million for development and receipt of regulatory approval for additional licensed products; and
• Royalties, at low double digit rates, based on sales of licensed products.

Revenue recognition related to the License Agreement and WU License Agreement is based primarily on the Company's consideration of ASC 808-10-45, "*Accounting for Collaborative Arrangements.*"  For financial reporting purposes, the license fees and milestone payments received from the License Agreement, net of the amounts due to third parties, including WU, have been recorded as deferred revenue and are amortized over the term of the License Agreement.  License fees and milestone revenue currently totaling a net of approximately $1,556,000 commenced being amortized into income upon the July 2012 date of milestone achievement. As of March 31, 2017, deferred revenue of $96,698 has been classified as a current liability and $1,041,141 has been classified as a long-term liability. The current liability represents the next twelve months' portion of the amortizable milestone revenue. During each of the three months ended March 31, 2017 and 2016, $24,175 was recorded as the amortized license fee revenue arising from the Ceva License Agreement.

19

A tabular summary of the revenue categories and cumulative amounts of revenue recognition associated with the License Agreement follows:

| Category | Totals |
|---|---:|
| License fees and milestone amounts paid / achieved | $    1,920,000 |
| Third party obligations recorded, including WU | (363,700) |
| Deferred revenue balance | 1,556,300 |
| Revenue amortization to March 31, 2017 | (418,461) |
| Net deferred revenue balance at March 31, 2017 | $    1,137,839 |

| | |
|---|:---:|
| Commencement of license fees revenue recognition | Upon signing or receipt |
| Commencement of milestone revenue recognition | Upon milestone achievement over then remaining life |
| Original amortization period | 197 months |

## Note 9.  Commitments and contingencies:

**Commitments:**

The Company's subsidiary, BDI, has a lease commitment on its office and laboratory space that expires March 31, 2018 and requires future non-cancellable lease payments of approximately $233,000 for the remainder of 2017 and $78,000 in 2018.  The agreement requires monthly base rent of approximately $15,700 and common area maintenance costs are currently approximately $10,200 per month. Rent expense for the three months ended March 31, 2017 totaled approximately $87,000 which included short term facility rental expenses plus $80,000 in expense for the subsidiary's office and laboratory space. The Company had no rent expense for the three months ended 2016. Subsequent to March 31, 2017, an agreement with the subsidiary's landlord was reached to terminate the lease with a prepayment of rent through July 31, 2017 and surrender of the $37,000 lease deposit.

As of March 31, 2017, the Company has employment agreements with three officers providing aggregate annual minimum commitments totaling approximately $900,000.  The agreements contain customary confidentiality and benefit provisions.

**Contingencies:**

In the ordinary course of business and in the general industry in which the Company is engaged, it is not atypical to periodically receive a third party communication which may be in the form of a notice, threat, or "cease and desist" letter concerning certain activities.  For example, this can occur in the context of the Company's pursuit of intellectual property rights.  This can also occur in the context of operations such as the using, making, having made, selling, and offering to sell products and services, and in other contexts.  The Company makes rational assessments of each situation on a case-by-case basis as such may arise.  The Company periodically evaluates its options for trademark positions and considers a full spectrum of alternatives for trademark protection and product branding.

We are currently not a party to any legal proceedings, the adverse outcome of which would, in our management's opinion, have a material adverse effect on our business, financial condition and results of operations.

20

## Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

**Management's plans and basis of presentation:**

The Company has experienced recurring losses and negative cash flows from operations.  At March 31, 2017, the Company had approximate balances of cash and cash equivalents of $11,982,000, working capital of $11,466,000, total stockholders' equity of $11,406,000 and an accumulated deficit of $114,209,000. To date, the Company has in large part relied on equity financing to fund its operations. The Company expects to continue to incur losses from operations for the near-term and these losses could be significant as we incur costs and expenses associated with the exit of the BDI operations and public company and administrative related expenses are incurred. The Company believes that its current working capital position will be sufficient to meet its estimated cash needs for at least a year and a day from this filing.  The Company is closely monitoring its cash balances, cash needs and expense levels.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Management's plans and basis of presentation:**

The Company has experienced recurring losses and negative cash flows from operations. At March 31, 2017, the Company had approximate balances of cash and cash equivalents of $11,982,000, working capital of $11,466,000, total stockholders' equity of $11,406,000 and an accumulated deficit of $114,209,000. To date, the Company has in large part relied on equity financing to fund its operations. The Company expects to continue to incur losses from operations for the near-term and these losses could be significant as we incur costs and expenses associated with the exit of the BDI operations and public company and administrative related expenses are incurred. The Company believes that its current working capital position will be sufficient to meet its estimated cash needs for at least a year and a day from this filing. The Company is closely monitoring its cash balances, cash needs and expense levels.

Effective January 14, 2017, we adopted a plan to exit the business of BDI and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. We are reviewing possible strategic alternatives relative to the business to maximize shareholder value.

Management's strategic plans include the following:

- exploring other possible strategic options and financing opportunities available to the Company;

- evaluating options to monetize, partner or license the Company's assets, including appendicitis product portfolio; and;

- continuing to implement cost control initiatives to conserve cash.

**NASDAQ listing:**

On April 10, 2017, the Company was notified by The NASDAQ Stock Market, LLC of its failure to comply with Nasdaq Listing Rule 5605 (the "Rule") which requires that the Company's audit committee be comprised of at least three independent directors, as defined under the Rule. The notice has no immediate effect on the listing or trading of the Company's common stock on The NASDAQ Capital Market and, at this time, the common stock will continue to trade on The NASDAQ Capital Market under the symbol "BIOP".

**Results of Operations**

**Comparative Results for the Three Months Ended March 31, 2017 and 2016**

During the three month periods ended March 31, 2017 and 2016, $24,000 in each period, of license payments under the License Agreement was recognized as revenue.

Selling, general and administrative expenses in the three months ended March 31, 2017 totaled $1,035,000, which is approximately $5,000, or 0.5%, increase as compared to the 2016 period. Stock based compensation increased by approximately $85,000 for the three months ended March 31, 2017 as compared to the 2016 period due to additional rights being granted. Compensation related expense increased by $108,000 due primarily to retention bonuses. Accounting and auditing fees increased by approximately $95,000 in connection with a change in auditors. A decrease of approximately $295,000 in strategic evaluation expenses in 2017 as compared to the 2016 period, was due to the termination in late 2016 of the strategic evaluation process. Commercialization, marketing and compensation related expenses decreased by approximately $42,000 in the 2017 period as the Company finished winding down *APPY*1 commercialization activities in 2016. A decrease of approximately $63,000 in general operating expenses in 2017 following the sale of the facility in early 2016.

Research and development expenses in the three months ended March 31, 2017 totaled $18,000, which is approximately a $355,000, or 95%, decrease as compared to the 2016 period. This decrease resulted from the wind down activities of development and manufacturing activities from our previous area of focus, the *APPY*1 Test, in 2016.

Interest expense for the three months ended March 31, 2017, decreased to $5,000 compared to $26,000 in the 2016 period due to the payoff of mortgage debt obligations with the sale of the building in early 2016. For the three months ended March 31, 2017, the Company recorded investment income of approximately $26,000 compared to investment income of $44,000 in the 2016 period, generally due to lower average

invested balances.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party at a purchase price of $4,053,000. The sale resulted in a gain of approximately $1,919,000 and generated approximately $1,749,000 in net cash after expenses and mortgage payoffs. The Company is leasing back space in the building under short term lease agreements that provide office and storage space required for its current level of operations.

No income tax benefit was recorded on the net loss for the three months ended March 31, 2017 and 2016, as management was unable to determine that it was more likely than not that such benefit would be realized.

21

**Liquidity and Capital Resources**

At March 31, 2017, we had working capital of $11,466,000, which included cash and cash equivalents of $11,982,000.  We reported a net loss of $4,354,000, consisting of a net loss from continuing operations of $1,007,000 and a net loss from discontinued operations of $3,347,000, during the three months ended March 31, 2017.  The net loss from continuing operations included $129,000 in non-cash items consisting of stock-based compensation totaling $133,000, depreciation, amortization and non-cash charges totaling $20,000, net of amortization of license fees totaling $24,000.

In March 2017 we entered into private placement agreements, under which we received gross proceeds before offering expenses of $1,000,000 from the sale of 400,000 shares of common stock, including the issuance of 400,000 warrants. An additional $1,250,000 in proceeds from the common stock offering is held in escrow which may be released pending satisfaction of escrow conditions, which are outside the control of the Company.

In March 2017, the Company also closed on a convertible note financing with certain accredited investors with gross proceeds totaling $4,750,000. The convertible note financing proceeds are in escrow pending successful completion of release conditions.

We expect to continue to incur losses from operations for the near-term and these losses could be significant as we incur costs and expenses associated with the exit of the BDI operations and public company and administrative related expenses are incurred. We believe that our current working capital position will be sufficient to meet our estimated cash needs for at least a year and a day from this filing. We may pursue potential additional financing opportunities.  However, there can be no assurance that we will be able to obtain sufficient additional financing on terms acceptable to us, if at all.   We are closely monitoring our cash balances, cash needs and expense levels. The accompanying financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that might result in our possible inability to continue as a going concern.

In July 2012, we entered into an exclusive license agreement (the "License Agreement") with Ceva Santé Animale S.A. ("Licensee"), pursuant to which we granted the Licensee an exclusive royalty-bearing license, until December 31, 2028, to our intellectual property and other assets, including patent rights and know-how, relating to recombinant single chain reproductive hormone technology for use in non-human mammals (the "Company's Animal Health Assets"). The License Agreement is subject to termination by the Licensee (a) for convenience on 180 days prior written notice, (b) in the Licensee's discretion in the event of a sale or other disposal of the Company's Animal Health Assets, (c) in the Licensee's discretion upon a change in control of the Company, (d) for a material breach of the License Agreement by us, or (e) in the Licensee's discretion, if we become insolvent.  The License Agreement is also terminable by us if there is a material breach of the License Agreement by the Licensee, or if the Licensee challenges our ownership of designated intellectual property. The License Agreement includes a sublicense of the technology licensed to the Company by Washington University in St. Louis ("WU"). Under the terms of an exclusive license agreement ("WU License Agreement"), a portion of license fees and royalties we receive from sublicensing agreements will be paid to WU. The obligation for such license fees due to WU is included in accrued expenses at March 31, 2017.

Under the License Agreement, as of March 31, 2017, the following future milestone payments are provided, assuming future milestones are successfully achieved:

- Milestone payments, totaling up to a potential of $1.1 million in the aggregate, based on the satisfactory conclusion of milestones as defined in the License Agreement;
- Potential for milestone payments of up to an additional $2 million for development and receipt of regulatory approval for additional licensed products; and

**Liquidity and Capital Resources**

At March 31, 2017, we had working capital of $11,466,000, which included cash and cash equivalents of $11,982,000.  We reported a net loss of $4,354,000, consisting of a net loss from continuing operations of $1,007,000 and a net loss from discontinued operations of $3,347,000, during the three months ended March 31, 2017.  The net loss from continuing operations included $129,000 in non-cash items consisting of stock-based compensation totaling $133,000, depreciation, amortization and non-cash charges totaling $20,000, net of amortization of license fees totaling $24,000.

In March 2017 we entered into private placement agreements, under which we received gross proceeds before offering expenses of $1,000,000 from the sale of 400,000 shares of common stock, including the issuance of 400,000 warrants. An additional $1,250,000 in proceeds from the common stock offering is held in escrow which may be released pending satisfaction of escrow conditions, which are outside the control of the Company.

In March 2017, the Company also closed on a convertible note financing with certain accredited investors with gross proceeds totaling $4,750,000. The convertible note financing proceeds are in escrow pending successful completion of release conditions.

We expect to continue to incur losses from operations for the near-term and these losses could be significant as we incur costs and expenses associated with the exit of the BDI operations and public company and administrative related expenses are incurred. We believe that our current working capital position will be sufficient to meet our estimated cash needs for at least a year and a day from this filing. We may pursue potential additional financing opportunities.  However, there can be no assurance that we will be able to obtain sufficient additional financing on terms acceptable to us, if at all.   We are closely monitoring our cash balances, cash needs and expense levels. The accompanying financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that might result in our possible inability to continue as a going concern.

In July 2012, we entered into an exclusive license agreement (the "License Agreement") with Ceva Santé Animale S.A. ("Licensee"), pursuant to which we granted the Licensee an exclusive royalty-bearing license, until December 31, 2028, to our intellectual property and other assets, including patent rights and know-how, relating to recombinant single chain reproductive hormone technology for use in non-human mammals (the "Company's Animal Health Assets"). The License Agreement is subject to termination by the Licensee (a) for convenience on 180 days prior written notice, (b) in the Licensee's discretion in the event of a sale or other disposal of the Company's Animal Health Assets, (c) in the Licensee's discretion upon a change in control of the Company, (d) for a material breach of the License Agreement by us, or (e) in the Licensee's discretion, if we become insolvent.  The License Agreement is also terminable by us if there is a material breach of the License Agreement by the Licensee, or if the Licensee challenges our ownership of designated intellectual property. The License Agreement includes a sublicense of the technology licensed to the Company by Washington University in St. Louis ("WU"). Under the terms of an exclusive license agreement ("WU License Agreement"), a portion of license fees and royalties we receive from sublicensing agreements will be paid to WU. The obligation for such license fees due to WU is included in accrued expenses at March 31, 2017.

Under the License Agreement, as of March 31, 2017, the following future milestone payments are provided, assuming future milestones are successfully achieved:

- Milestone payments, totaling up to a potential of $1.1 million in the aggregate, based on the satisfactory conclusion of milestones as defined in the License Agreement;
- Potential for milestone payments of up to an additional $2 million for development and receipt of regulatory approval for additional licensed products; and
- Royalties, at low double digit rates, based on sales of licensed products.

The Company periodically enters into generally short-term consulting agreements, which at this time are primarily for assistance with our strategic evaluations.  Such commitments at any point in time may be significant but the agreements typically contain cancellation provisions.

Prior to the February 2016 sale of its corporate headquarters, the Company had a permanent mortgage on its land and building that was refinanced in May 2013. The mortgage was held by a commercial bank and included a portion guaranteed by the U. S. Small Business Administration ("SBA"). The loan was collateralized by the real property and the SBA portion was also personally guaranteed by a former officer of the Company. The commercial bank loan terms included a payment schedule based on a fifteen year amortization, with a balloon maturity at five years. The commercial bank portion had an interest rate fixed at 3.95%, and the SBA portion bore interest at the rate of 5.86%. The commercial bank

Prior to the February 2016 sale of its corporate headquarters, the Company had a permanent mortgage on its land and building that was refinanced in May 2013. The mortgage was held by a commercial bank and included a portion guaranteed by the U. S. Small Business Administration ("SBA"). The loan was collateralized by the real property and the SBA portion was also personally guaranteed by a former officer of the Company. The commercial bank loan terms included a payment schedule based on a fifteen year amortization, with a balloon maturity at five years. The commercial bank portion had an interest rate fixed at 3.95%, and the SBA portion bore interest at the rate of 5.86%. The commercial bank portion of the loan required total monthly payments of approximately $11,700, which included approximately $4,500 per month in interest. The SBA portion of the loan required total monthly payments of approximately $9,000 through July 2023, which included approximately $3,500 per month in interest and fees in 2016.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party at a purchase price of $4,053,000. The sale resulted in a gain of approximately $1,919,000 and generated approximately $1,749,000 in net cash after expenses and mortgage payoffs. The Company is leasing back space in the building under a short-term lease agreement that provide storage space.

Due to recent market events that have adversely affected all industries and the economy as a whole, management has placed increased emphasis on monitoring the risks associated with the current environment, particularly the investment parameters of the short-term investments, the recoverability of current assets, the fair value of assets, and the Company's liquidity. At this point in time, there has not been a material impact on the Company's assets and liquidity. Management will continue to monitor the risks associated with the current environment and their impact on the Company's results.

**Operating Activities**

Net cash consumed by operating activities was $1,664,000, consisting of $1,002,000 from continuing operations and $662,000 from discontinued operations during the three months ended March 31, 2017. Cash was consumed from continuing operations by the loss of $1,007,000, less non-cash items of $129,000 consisting of stock-based compensation totaling $133,000, depreciation, amortization and non-cash charges totaling $20,000, net of amortization of license fees totaling $24,000. Increases in prepaid and other current assets of $63,000 used cash, primarily related to routine changes in operating activities.  There was a net $190,000 decrease in accounts payable and accrued expenses in the three months ended March 31, 2017, primarily due to the payment of 2016 litigation settlement in early 2017.

Net cash consumed by operating activities was $1,903,000 during the three months ended March 31, 2016. Cash was generated by a net income of $560,000, less non-cash expenses of $201,000 for stock-based compensation, depreciation and amortization, and impairment of patent costs, offset by the gain on sale of property and equipment of $1,919,000 and amortization of license fees totaling $24,000. Decreases in prepaid and other current assets of $69,000 provided cash, primarily related to routine changes in operating activities.  There was a $789,000 decrease in accounts payable and accrued expenses in the three months ended March 31, 2016, primarily due to the payment of 2015 accrued incentives in early 2016, and a reduction in overall expenses due to the wind down of activities for our previous area of focus, the *APPY*1 Test.

**Investing Activities**

Net cash inflows from investing activities provided cash of $7,493,000, consisting of $7,495,000 from continuing operations and a cash outflow of $2,000 from discontinued operations during the three months ended March 31, 2017. Sales of marketable securities investments totaling approximately $7,507,000 provided cash.  A $12,000 use of cash was attributable to additional costs incurred from patent filings.

Net cash inflows from investing activities provided $3,849,000 during the three months ended March 31, 2016. Sales of marketable securities investments totaling approximately $9,649,000 provided cash net of marketable securities purchased totaling approximately $7,538,000.  An $11,000 use of cash was attributable to additional costs incurred from patent filings.  The sale of the land, building and assets generated approximately $1,749,000 in cash.

**Financing Activities**

Net cash inflows from financing activities provided $623,000 during the three months ended March 31, 2017 consisting of $706,000 from the sale of common stock and warrants net of $83,000 in scheduled payments under debt agreements.

Net cash outflows from financing activities consumed $117,000 during the three months ended March 31, 2016 in scheduled payments under debt agreements.

**Critical Accounting Policies**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America (GAAP) requires management to make estimates and assumptions about future events that affect the amounts reported in the financial statements and

accompanying notes. Future events and their effects cannot be determined with absolute certainty. Therefore, the determination of estimates requires the exercise of judgment. Actual results inevitably will differ from those estimates, and such differences may be material to the financial statements. The most significant accounting estimates inherent in the preparation of our financial statements include estimates associated with revenue recognition, impairment analysis of intangibles and stock-based compensation.

23

---

The Company's financial position, results of operations and cash flows are impacted by the accounting policies the Company has adopted. In order to get a full understanding of the Company's financial statements, one must have a clear understanding of the accounting policies employed. A summary of the Company's critical accounting policies follows:

*Investments*:   The Company invests excess cash from time to time in highly liquid debt and equity securities of highly rated entities which are classified as trading securities. Such amounts are recorded at market and are generally classified as current, as the Company does not intend to hold the investments beyond twelve months. Such excess funds are invested under the Company's investment policy but an unexpected decline or loss could have an adverse and material effect on the carrying value, recoverability or investment returns of such investments. Our Board has approved an investment policy covering the investment parameters to be followed with the primary goals being the safety of principal amounts and maintaining liquidity of the fund. The policy provides for minimum investment rating requirements as well as limitations on investment duration and concentrations.

*Intangible Assets*:   Intangible assets primarily represent legal costs and filings associated with obtaining patents on the Company's new discoveries.  The Company amortizes these costs over the shorter of the legal life of the patent or its estimated economic life using the straight-line method.  The Company tests intangible assets with finite lives upon significant changes in the Company's business environment. The testing resulted in no patent impairment charges written off during the three month period ended March 31, 2017 and $134,000 net patent impairment charges written off during the three months ended March 31, 2016..

*Long-Lived Assets*:   The Company records property and equipment at cost. Depreciation of the assets is recorded on the straight-line basis over the estimated useful lives of the assets. Dispositions of property and equipment are recorded in the period of disposition and any resulting gains or losses are charged to income or expense when the disposal occurs. The Company reviews for impairment whenever there is an indication of impairment.

*Revenue Recognition*:   The Company's revenues are recognized when products are shipped or delivered to unaffiliated customers. The Securities and Exchange Commission's Staff Accounting Bulletin (SAB) No. 104 provides guidance on the application of GAAP to select revenue recognition issues. The Company has concluded that its revenue recognition policy is appropriate and in accordance with SAB No. 104. Revenue is recognized under sales, license and distribution agreements only after the following criteria are met: (i) there exists adequate evidence of the transactions; (ii) delivery of goods has occurred or services have been rendered; and (iii) the price is not contingent on future activity; and (iv) collectability is reasonably assured.

*Stock-based Compensation*:   ASC 718, *Share-Based Payment*, defines the fair-value-based method of accounting for stock-based employee compensation plans and transactions used by the Company to account for its issuances of equity instruments to record compensation cost for stock-based employee compensation plans at fair value as well as to acquire goods or services from non-employees. Transactions in which the Company issues stock-based compensation to employees, directors and consultants and for goods or services received from non-employees are accounted for based on the fair value of the equity instruments issued. The Company utilizes pricing models in determining the fair values of options and warrants issued as stock-based compensation. These pricing models utilize the market price of the Company's common stock and the exercise price of the option or warrant, as well as time value and volatility factors underlying the positions.

### *Recently issued and adopted accounting pronouncements*:

The Company has evaluated all recently issued accounting pronouncements and believes such pronouncements do not have a material effect on the Company's financial statements.

### Item 3.   Quantitative and Qualitative Disclosures About Market Risk

### General

We have limited exposure to market risks from instruments that may impact the Balance Sheets, Statements of Operations, and Statements of Cash Flows. Such exposure is due primarily to changing interest rates.

The Company's financial position, results of operations and cash flows are impacted by the accounting policies the Company has adopted. In order to get a full understanding of the Company's financial statements, one must have a clear understanding of the accounting policies employed. A summary of the Company's critical accounting policies follows:

***Investments***:   The Company invests excess cash from time to time in highly liquid debt and equity securities of highly rated entities which are classified as trading securities. Such amounts are recorded at market and are generally classified as current, as the Company does not intend to hold the investments beyond twelve months. Such excess funds are invested under the Company's investment policy but an unexpected decline or loss could have an adverse and material effect on the carrying value, recoverability or investment returns of such investments. Our Board has approved an investment policy covering the investment parameters to be followed with the primary goals being the safety of principal amounts and maintaining liquidity of the fund. The policy provides for minimum investment rating requirements as well as limitations on investment duration and concentrations.

***Intangible Assets***:   Intangible assets primarily represent legal costs and filings associated with obtaining patents on the Company's new discoveries. The Company amortizes these costs over the shorter of the legal life of the patent or its estimated economic life using the straight-line method.  The Company tests intangible assets with finite lives upon significant changes in the Company's business environment. The testing resulted in no patent impairment charges written off during the three month period ended March 31, 2017 and $134,000 net patent impairment charges written off during the three months ended March 31, 2016..

***Long-Lived Assets***:   The Company records property and equipment at cost. Depreciation of the assets is recorded on the straight-line basis over the estimated useful lives of the assets. Dispositions of property and equipment are recorded in the period of disposition and any resulting gains or losses are charged to income or expense when the disposal occurs. The Company reviews for impairment whenever there is an indication of impairment.

***Revenue Recognition***:   The Company's revenues are recognized when products are shipped or delivered to unaffiliated customers. The Securities and Exchange Commission's Staff Accounting Bulletin (SAB) No. 104 provides guidance on the application of GAAP to select revenue recognition issues. The Company has concluded that its revenue recognition policy is appropriate and in accordance with SAB No. 104. Revenue is recognized under sales, license and distribution agreements only after the following criteria are met: (i) there exists adequate evidence of the transactions; (ii) delivery of goods has occurred or services have been rendered; and (iii) the price is not contingent on future activity; and (iv) collectability is reasonably assured.

***Stock-based Compensation***:   ASC 718, *Share-Based Payment*, defines the fair-value-based method of accounting for stock-based employee compensation plans and transactions used by the Company to account for its issuances of equity instruments to record compensation cost for stock-based employee compensation plans at fair value as well as to acquire goods or services from non-employees. Transactions in which the Company issues stock-based compensation to employees, directors and consultants and for goods or services received from non-employees are accounted for based on the fair value of the equity instruments issued. The Company utilizes pricing models in determining the fair values of options and warrants issued as stock-based compensation. These pricing models utilize the market price of the Company's common stock and the exercise price of the option or warrant, as well as time value and volatility factors underlying the positions.

***Recently issued and adopted accounting pronouncements***:

The Company has evaluated all recently issued accounting pronouncements and believes these do not have a material effect on the Company's financial statements.

**Item 3.   Quantitative and Qualitative Disclosures About Market Risk**

**General**

We have limited exposure to market risks from instruments that may impact the Balance Sheets, Statements of Operations, and Statements of Cash Flows. Such exposure is due primarily to changing interest rates.

**Interest Rates**

The primary objective for our investment activities is to preserve principal while maximizing yields without significantly increasing risk. This is accomplished by investing excess cash in highly liquid debt and equity investments of highly rated entities which are classified as trading securities.  As of March 31, 2017, 100% of the investment portfolio was in cash and cash equivalents with very short-term maturities and therefore not subject to any significant interest rate fluctuations. We have no investments denominated in foreign currencies and therefore our investments are not subject to foreign currency exchange risk.

24

## Item 4.  Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

Management of the Company, including the Chief Executive Officer and the Chief Financial Officer, has conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rule 13a-15(e)) as of the last day of the period of the accompanying financial statements.  Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective as of March 31, 2017.

### Changes in Internal Control Over Financial Reporting

There was no change in the Company's internal control over financial reporting that occurred during the fiscal quarter to which this report relates that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

25

## PART II - OTHER INFORMATION

### Item 1.   Legal Proceedings

We are not a party to any legal proceedings, the adverse outcome of which would, in our management's opinion, have a material adverse effect on our business, financial condition and results of operations.

### Item 1A.  Risk Factors

There have been no material changes from the risk factors disclosed in our Annual Report on Form 10-K, for the year ended December 31, 2016.

### Item 6.   Exhibits

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 10.1 | Form of Separation Agreement between Bioptix, Inc. and Stephen Lundy (incorporated by reference to the Registrant's Current Report on Form 8-K, dated April 6, 2017, and filed April 7, 2017). |
| 31.1 | Rule 13a-14(a)/15d-14(a) - Certification of Chief Executive Officer. Filed herewith. |
| 31.2 | Rule 13a-14(a)/15d-14(a) - Certification of Chief Financial Officer. Filed herewith. |
| 32 | Section 1350 Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Furnished herewith. |
| 101 | Interactive data files pursuant to Rule 405 of Regulation S-T: (i) the Balance Sheets, (ii) the Statements of Operations, (iii) the Statement of Cash Flows and (iv) the Notes to Condensed Financial Statements. |

26

SIGNATURES

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Bioptix, Inc.
(Registrant)

Dated: May 15, 2017

/s/ Michael Beeghley
Michael Beeghley,
Chief Executive Officer and Chairman of the Board (Principal Executive Officer)

/s/ Jeffrey G. McGonegal
Dated: May 15, 2017                    Jeffrey G. McGonegal,
Chief Financial Officer (Principal Financial and Accounting Officer)

27

# FORM 10-Q for the quarterly period ended June 30, 2017

10-Q 1 bioptix_10q-063017.htm FORM 10-Q

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-Q**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2017**

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

Commission file number: 001-33675

# Bioptix, Inc.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Colorado** | **84-1553387** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**834-F South Perry Street, Suite 443  Castle Rock, CO  80104**

(Address of principal executive offices) (Zip Code)

**(303) 794-2000**

(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     Yes ?   No ?

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).     Yes ?  No ?

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ?    Accelerated filer ?    Non-accelerated filer ?   Smaller reporting company ?  Emerging growth company ?

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ?

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).     Yes ?   No ?

The number of shares of no par value common stock outstanding as of August 11, 2017 was 5,403,919.

**BIOPTIX, INC.**

**BIOPTIX, INC.**

|  |  | Page |
|---|---|---|
| | PART I - Financial Information | |
| Item 1. | Condensed Consolidated Financial Statements | |
| | Consolidated Balance Sheets as of June 30, 2017 (unaudited) and December 31, 2016 | 3 |
| | Consolidated Statements of Operations for the Three and Six Months Ended June 30, 2017 and 2016 (unaudited) | 4 |
| | Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2017 and 2016 (unaudited) | 5 |
| | Notes to Condensed Consolidated Financial Statements (unaudited) | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 25 |
| Item 4. | Controls and Procedures | 25 |
| | PART II - Other Information | |
| Item 1. | Legal Proceedings | 26 |
| Item 1A. | Risk Factors | 26 |
| Item 6. | Exhibits | 26 |
| | Signatures | 27 |

CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION AND STATEMENTS

Certain statements in this Quarterly Report on Form 10-Q, including in Management's Discussion and Analysis of Financial Condition and Results of Operations, are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended, and are subject to the safe harbor created thereby. These statements relate to future events or the Company's future financial performance and involve known and unknown risks, uncertainties and other factors that may cause the actual results, levels of activity, performance or achievements of the Company or its industry to be materially different from those expressed or implied by any forward-looking statements. In some cases, forward-looking statements can be identified by terminology such as "may," "will," "could," "would," "should," "expect," "plan," "anticipate," "intend," "believe," "estimate," "predict," "potential" or other comparable terminology. Please see the "Risk Factors" in Part II, Item 1A of this Quarterly Report on Form 10-Q and in Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2016 for a discussion of certain important factors that relate to forward-looking statements contained in this report. Although the Company believes that the expectations reflected in these forward-looking statements are reasonable, it can give no assurance that such expectations will prove to be correct. Unless otherwise required by applicable securities laws, the Company disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

2

**PART I — FINANCIAL INFORMATION**
**Item I. Condensed Consolidated Financial Statements**

**Bioptix, Inc. and Subsidiary**

**PART I — FINANCIAL INFORMATION**
**Item I. Condensed Consolidated Financial Statements**

**Bioptix, Inc. and Subsidiary**
**Consolidated Balance Sheets**

| | | June 30, 2017 | | December 31, 2016 |
|---|---|---|---|---|
| | | (Unaudited) | | (Reclassified) |
| **ASSETS** | | | | |
| Current assets (Note 1): | | | | |
| Cash and cash equivalents | $ | 11,933,573 | $ | 5,529,848 |
| Short-term investments | | - | | 7,506,761 |
| Prepaid expenses and other current assets | | 51,741 | | 219,991 |
| Current assets of discontinued operations (Note 2) | | 1,076 | | 486,890 |
| Total current assets | | 11,986,390 | | 13,743,490 |
| Property and equipment, net (Note 3) | | 4,587 | | 5,538 |
| Other long term assets, net (Note 4) | | 915,687 | | 938,038 |
| Noncurrent assets of discontinued operations (Note 2) | | - | | 2,353,749 |
| Total assets | $ | 12,906,664 | $ | 17,040,815 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 239,403 | $ | 253,817 |
| Accrued compensation | | 6,726 | | 1,520 |
| Accrued expenses | | 242,631 | | 304,675 |
| Notes and other obligations, current portion (Note 5) | | - | | 139,611 |
| Deferred revenue, current portion (Note 8) | | 96,698 | | 96,698 |
| Current liabilities of discontinued operations (Note 2) | | 264,082 | | 258,819 |
| Total current liabilities | | 849,540 | | 1,055,140 |
| Private placement notes held in escrow – representing 2% Convertible Notes Payable amounting to $4,750,000 and 1,900,000 warrants, all net of $4,750,000 of proceeds held in escrow (Note 6) | | - | | - |
| Accrued interest (Note 6) | | 27,589 | | - |
| Deferred revenue, less current portion (Note 8) | | 1,016,967 | | 1,065,316 |
| Total liabilities | | 1,894,096 | | 2,120,456 |
| Commitments and contingencies (Notes 6, 8 and 9) | | | | |
| Stockholders' equity (Notes 6 and 7): | | | | |
| Common stock, no par value, 60,000,000 shares authorized; shares issued and outstanding 5,392,503 (2017) and 4,503,971 (2016) | | 126,533,391 | | 124,775,635 |
| Accumulated deficit | | (115,520,823) | | (109,855,276) |
| Total stockholders' equity | | 11,012,568 | | 14,920,359 |
| Total liabilities and stockholders' equity | $ | 12,906,664 | $ | 17,040,815 |

See Accompanying Notes to Unaudited Condensed Consolidated Financial Statements

3

**Bioptix, Inc. and Subsidiary**
**Consolidated Statements of Operations**
**Three and Six Months Ended June 30,**
**(Unaudited)**

|  | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
|  | 2017 | 2016 | 2017 | 2016 |
| Other revenue – fee (Note 8) | $ 24,174 | $ 24,174 | $ 48,349 | $ 48,349 |
| Operating expenses: | | | | |
| Selling, general and administrative | 1,062,540 | 822,835 | 2,097,193 | 1,852,961 |
| Research and development | 27,658 | 73,085 | 45,350 | 445,671 |
| Total operating expenses | 1,090,198 | 895,920 | 2,142,543 | 2,298,632 |
| Operating loss from continuing operations | (1,066,024) | (871,746) | (2,094,194) | (2,250,283) |
| Other income (expense): | | | | |
| Gain on sale of property and equipment (Note 3) | - | 912 | - | 1,920,273 |
| Interest expense | (24,065) | (148) | (28,899) | (25,746) |
| Investment income | 26,124 | 35,107 | 52,344 | 79,392 |
| Total other income (expense) | 2,059 | 35,871 | 23,445 | 1,973,919 |
| Loss from continuing operations | (1,063,965) | (835,875) | (2,070,749) | (276,364) |
| Discontinued operations (Note 2): | | | | |
| Loss from operations | (332,843) | - | (975,479) | - |
| Escrow forfeiture gain (Note 6) | 134,812 | - | 134,812 | - |
| Impairment (loss) | (49,775) | - | (2,754,131) | - |
| Total loss from discontinued operations | (247,806) | - | (3,594,798) | - |
| Net loss | $ (1,311,771) | $ (835,875) | $ (5,665,547) | $ (276,364) |
| Basic and diluted net loss per share (Note 1) | | | | |
| Continuing operations | $ (0.21) | $ (0.22) | $ (0.43) | $ (0.07) |
| Discontinued operations | (0.05) | - | (0.74) | - |
| Basic and diluted net loss per share (Note 1) | $ (0.26) | $ (0.22) | $ (1.17) | $ (0.07) |
| Basic and diluted weighted average number of shares outstanding (Note 1) | 5,103,739 | 3,876,961 | 4,852,855 | 3,876,961 |

See Accompanying Notes to Unaudited Condensed Consolidated Financial Statements

4

**Bioptix, Inc. and Subsidiary**
**Consolidated Statements of Cash Flows**
**Six Months Ended June 30,**
**(Unaudited)**

|  | 2017 | 2016 |
|---|---:|---:|
| Cash flows from operating activities: | | |
| Continuing operations: | | |
| Net (loss) | $ (5,665,547) | $ (276,364) |
| (Loss) from discontinued operations | (3,594,798) | - |
| (Loss) from continuing operations | (2,070,749) | (276,364) |
| Adjustments to reconcile net loss from continuing operations to net cash used | | |
| in operating activities of continuing operations: | | |
| Stock-based compensation for services | 271,054 | 224,272 |
| Depreciation and amortization | 37,767 | 46,031 |
| Amortization of license fees | (48,349) | (48,350) |
| Other non-cash (credits) charges | - | 168,077 |
| Gain on sale of property and equipment | - | (1,920,273) |
| Change in: | | |
| Prepaid expenses and other current assets | 166,749 | 193,930 |
| Accounts payable | (14,414) | (506,465) |
| Accrued compensation | 5,206 | (436,465) |
| Accrued expenses | (34,455) | 9,531 |
| Net cash (used in) operating activities of continuing operations | (1,687,191) | (2,546,076) |
| Net cash (used in) operating activities of discontinued operations | (888,787) | - |
| Net cash (used in) operating activities | (2,575,978) | (2,546,076) |
| | | |
| Cash flows from investing activities: | | |
| Continuing operations: | | |
| Purchases of short-term investments | - | (10,149,937) |
| Proceeds from sales of short-term investments | 7,506,761 | 13,612,516 |
| Proceeds from sale of property and equipment | - | 1,749,484 |
| Purchases of patent and trademark application costs | (12,965) | (14,378) |
| Net cash provided by investing activities of continuing operations | 7,493,796 | 5,197,685 |
| Net cash provided by investing activities of discontinued operations | 4,004 | - |
| Net cash provided by investing activities | 7,497,800 | 5,197,685 |
| | | |
| Cash flows from financing activities: | | |
| Continuing operations: | | |
| Net proceeds from issuance of common stock, net of $336,476 in offering expenses | 1,913,509 | - |
| Redemption of equity rights | (291,995) | - |
| Repayment of notes payable and other obligations | (139,611) | (174,083) |
| | | |
| Net cash provided by (used in) financing activities of continuing operations | 1,481,903 | (174,083) |
| | | |
| Net increase in cash and cash equivalents | 6,403,725 | 2,477,526 |
| | | |
| Cash and cash equivalents at beginning of period | 5,529,848 | 2,012,283 |
| | | |
| Cash and cash equivalents at end of period | $ 11,933,573 | $ 4,489,809 |
| | | |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the period for interest | $ 1,571 | $ 31,362 |
| Supplemental disclosure of investing information: | | |
| Liability payoffs upon property sale | $ - | $ 2,064,758 |

See Accompanying Notes to Unaudited Condensed Consolidated Financial Statements

5

**Bioptix, Inc. and Subsidiary**
**Notes to Condensed Consolidated Financial Statements**
**(Unaudited)**

## INTERIM FINANCIAL STATEMENTS

The accompanying consolidated financial statements of Bioptix, Inc. (the "Company,"  "we," or "Bioptix") have been prepared in accordance with the instructions to quarterly reports on Form 10-Q. In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and changes in financial position at June 30, 2017 and for all periods presented have been made. Certain information and footnote data necessary for fair presentation of financial position and results of operations in conformity with accounting principles generally accepted in the United States of America have been condensed or omitted. It is therefore suggested that these consolidated financial statements be read in conjunction with the summary of significant accounting policies and notes to financial statements included in the Company's Annual Report on Form 10-K for the year ended December 31, 2016. The results of operations for the period ended June 30, 2017 are not necessarily an indication of operating results for the full year.

**Management's plans and basis of presentation:**

The Company has experienced recurring losses and negative cash flows from operations.  At June 30, 2017, the Company had approximate balances of cash and cash equivalents of $11,934,000, working capital of $11,137,000, total stockholders' equity of $11,013,000 and an accumulated deficit of $115,521,000. To date, the Company has in large part relied on equity financing to fund its operations.

Effective January 14, 2017, the Company adopted a plan to exit the business of BiOptix Diagnostics, Inc. ("BDI") and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. Accordingly, the historical results of BDI have been classified as discontinued operations for all periods presented.

The Company expects to continue to incur losses from operations for the near-term and these losses could be significant as professional and other associated expenses in connection with possible strategic considerations, evaluations and transactions, additional costs associated with the exit of operations of the Company's subsidiary BDI may be incurred, and public company and administrative related expenses are incurred. The Company believes that its current working capital position will be sufficient to meet its currently estimated cash needs for at least a year and a day from this filing, subject to any possible strategic transactions. The Company continues to explore obtaining additional financing.  The Company is closely monitoring its cash balances, cash needs and expense levels.
Management's strategic plans include the following:

- exploring other possible strategic options and financing opportunities available to the Company;
- evaluating options to monetize, partner or license the Company's assets, including the appendicitis product portfolio; and;
- continuing to implement cost control initiatives to conserve cash.

**Note 1.  Significant accounting policies:**

**Principles of consolidation**

The consolidated financial statements of the Company include the accounts of Bioptix and its wholly-owned subsidiary, BDI. Intercompany accounts and transactions have been eliminated in the consolidation.

**Cash, cash equivalents and investments:**

The Company considers all highly liquid investments with an original maturity of three months or less at the date of acquisition to be cash equivalents. From time to time, the Company's cash account balances exceed the balances as covered by the Federal Deposit Insurance System. The Company has never suffered a loss due to such excess balances.

**Bioptix, Inc. and Subsidiary**
**Notes to Condensed Consolidated Financial Statements**
**(Unaudited)**

## INTERIM FINANCIAL STATEMENTS

The accompanying consolidated financial statements of Bioptix, Inc. (the "Company," "we," or "Bioptix") have been prepared in accordance with the instructions to quarterly reports on Form 10-Q. In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and changes in financial position at June 30, 2017 and for all periods presented have been made. Certain information and footnote data necessary for fair presentation of financial position and results of operations in conformity with accounting principles generally accepted in the United States of America have been condensed or omitted. It is therefore suggested that these consolidated financial statements be read in conjunction with the summary of significant accounting policies and notes to financial statements included in the Company's Annual Report on Form 10-K for the year ended December 31, 2016. The results of operations for the period ended June 30, 2017 are not necessarily an indication of operating results for the full year.

### Management's plans and basis of presentation:

The Company has experienced recurring losses and negative cash flows from operations.  At June 30, 2017, the Company had approximate balances of cash and cash equivalents of $11,934,000, working capital of $11,137,000, total stockholders' equity of $11,013,000 and an accumulated deficit of $115,521,000. To date, the Company has in large part relied on equity financing to fund its operations.

Effective January 14, 2017, the Company adopted a plan to exit the business of BiOptix Diagnostics, Inc. ("BDI") and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. Accordingly, the historical results of BDI have been classified as discontinued operations for all periods presented.

The Company expects to continue to incur losses from operations for the near-term and these losses could be significant as professional and other associated expenses in connection with possible strategic considerations, evaluations and transactions, additional costs associated with the exit of operations of the Company's subsidiary BDI may be incurred, and public company and administrative related expenses are incurred. The Company believes that its current working capital position will be sufficient to meet its currently estimated cash needs for at least a year and a day from this filing, subject to any possible strategic transactions. The Company continues to explore obtaining additional financing.  The Company is closely monitoring its cash balances, cash needs and expense levels.
Management's strategic plans include the following:

- exploring other possible strategic options and financing opportunities available to the Company;
- evaluating options to monetize, partner or license the Company's assets, including the appendicitis product portfolio; and
- continuing to implement cost control initiatives to conserve cash.

### Note 1.  Significant accounting policies:

### Principles of consolidation

The consolidated financial statements of the Company include the accounts of Bioptix and its wholly-owned subsidiary, BDI. Intercompany accounts and transactions have been eliminated in the consolidation.

### Cash, cash equivalents and investments:

The Company considers all highly liquid investments with an original maturity of three months or less at the date of acquisition to be cash equivalents. From time to time, the Company's cash account balances exceed the balances as covered by the Federal Deposit Insurance System. The Company has never suffered a loss due to such excess balances.

The Company invests excess cash from time to time in highly-liquid debt and equity investments of highly-rated entities, which are classified as trading securities. Historically, the purpose of the investments has been to fund research and development, product development, FDA clearance-related activities and general corporate purposes. Such amounts are recorded at market values using Level 1 inputs in determining fair value and are generally classified as current, as the Company does not intend to hold the investments beyond twelve months. Investment securities classified as trading are those securities that are bought and held principally for the purpose of selling them in the near term, with the objective of preserving principal and generating profits. These securities are reported at fair value with unrealized gains and losses reported as an element of other (expense) income in current period earnings. The Company's Board of Directors has approved an investment policy covering the investment parameters to be followed with the primary goals being the safety of principal amounts and maintaining liquidity. The policy provides for minimum investment rating requirements as well as limitations on investment duration and concentrations. Based upon market conditions, the investment guidelines have been tightened to increase the minimum acceptable investment ratings required for investments and shorten the maximum investment term. As of June 30, 2017, 100% of the investment portfolio was in cash and cash equivalents, which is presented as such on the accompanying balance sheet.

The Company's short-term investments comprise certificates of deposit, commercial paper and corporate bonds, all of which are classified as trading securities and carried at their fair value based upon quoted market prices of the securities at December 31, 2016.  Net realized and unrealized gains and losses on trading securities are included in net loss.  For purposes of determining realized gains and losses, the cost of securities sold is based on specific identification.

The composition of trading securities is as follows at December 31, 2016:

|  | December 31, 2016 | |
|---|---|---|
|  | Cost | Fair Value |
| Certificates of deposit / commercial paper | $ 2,378,222 | $ 2,373,891 |
| Corporate bonds | 5,138,182 | 5,132,870 |
| Total trading securities | $ 7,516,404 | $ 7,506,761 |

Investment income for the six months ended June 30, 2017 and 2016 consists of the following:

|  | 2017 | 2016 |
|---|---|---|
| Interest income | $ 49,225 | $ 64,550 |
| Realized (losses) | (21) | (2,893) |
| Unrealized gains | 11,575 | 29,089 |
| Management fee expenses | (8,435) | (11,354) |
| Net investment income | $ 52,344 | $ 79,392 |

7

**Fair value of financial instruments:**

The Company accounts for financial instruments under Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic ("ASC") 820, *Fair Value Measurements*.  This statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements.  To increase consistency and comparability in fair value measurements, ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three

**Fair value of financial instruments:**

The Company accounts for financial instruments under Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic ("ASC") 820, *Fair Value Measurements*.  This statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements.  To increase consistency and comparability in fair value measurements, ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

Level 1— quoted prices (unadjusted) in active markets for identical assets or liabilities;

Level 2 — observable inputs other than Level 1, quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, and model-derived prices whose inputs are observable or whose significant value drivers are observable; and

Level 3 — assets and liabilities whose significant value drivers are unobservable.

Observable inputs are based on market data obtained from independent sources, while unobservable inputs are based on the Company's market assumptions.  Unobservable inputs require significant management judgment or estimation.  In some cases, the inputs used to measure an asset or liability may fall into different levels of the fair value hierarchy.  In those instances, the fair value measurement is required to be classified using the lowest level of input that is significant to the fair value measurement.  Such determination requires significant management judgment. There were no financial assets or liabilities measured at fair value, with the exception of short-term investments as of June 30, 2017 and December 31, 2016.

The carrying amounts of the Company's financial instruments (other than short-term investments as discussed above) approximate fair value because of their variable interest rates and/or short maturities combined with the recent historical interest rate levels.

**Revenue Recognition:**

Revenue recognition related to the license agreement is based upon the licensee's right to use the technology and the Company's ongoing obligations to maintain and defend the patented rights and comply with the terms of the sub-license agreement whereby the license fees and milestone payments received from the agreement, net of the amounts due to third parties, have been recorded as deferred revenue and are amortized over the term of the license agreement.

**Goodwill:**

The Company performs a goodwill impairment analysis in the fourth quarter of each year, or whenever there is an indication of impairment.  When conducting its annual goodwill impairment assessment, the Company initially performs a qualitative evaluation to determine if it is more likely than not that the fair value of its reporting unit is less than its carrying amount as a basis for determining whether it is necessary to perform a two-step goodwill impairment test.  The Company has determined, based on its evaluation, that the goodwill associated with the BDI acquisition was impaired and was written off during the six months ended June 30, 2017. The accumulated goodwill amortization of $60,712 arose prior to January 1, 2002 when the FASB revised the policy for goodwill amortization.

**Recently issued and adopted accounting pronouncements:**

The Company continually assesses any new accounting pronouncements to determine their applicability. When it is determined that a new accounting pronouncement affects the Company's financial reporting, the Company undertakes a study to determine the consequences of the change to its consolidated financial statements and assures that there are proper controls in place to ascertain that the Company's consolidated financial statements properly reflect the change.

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standard Update No. 2014-09, *Revenue from Contracts with Customers* (Topic 606) ("ASU 2041-09"), which supersedes nearly all existing revenue recognition guidance. The standard's core principle is that an entity should recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standard Update No. 2014-09, *Revenue from Contracts with Customers* (Topic 606) ("ASU 2041-09"), which supersedes nearly all existing revenue recognition guidance. The standard's core principle is that an entity should recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The standard creates a five-step model to achieve its core principle: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction's price to the separate performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. In addition, entities must disclose sufficient information to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. Qualitative and quantitative disclosures are required about: (i) the entity's contracts with customers; (ii) the significant judgments, and changes in judgments, made in applying the guidance to those contracts; and (iii) any assets recognized from the costs to obtain or fulfill a contract with a customer.

In August 2015, the FASB issued ASU 2015-14, *Revenue from Contracts with Customers* (Topic 606) - Deferral of the Effective Date, which deferred the effective date of ASU 2014-09 to interim and annual periods beginning after December 15, 2017. The standard allows entities to apply the standard retrospectively to each prior period presented ("full retrospective adoption") or retrospectively with the cumulative effect of initially applying the standard recognized at the date of initial application ("modified retrospective adoption"). The Company plans to adopt this guidance on January 1, 2018, and continues to evaluate the impact of adopting under the modified retrospective adoption versus the full retrospective method. The Company is currently in the process of determining the impact of the new revenue recognition guidance on its revenue transactions, including any impacts on associated processes, systems, and internal controls. The Company's preliminary assessment indicates implementation of this standard will not have a material impact on financial results. The Company's evaluation has included determining whether the unit of account (i.e., performance obligations) will change as compared to current GAAP, as well as determining the standalone selling price of each performance obligation. The Company continues to evaluate the impact of this guidance and its subsequent amendments on the consolidated financial position, results of operations, and cash flows, and any preliminary assessments are subject to change.

In January 2016, the FASB issued ASU No. 2016-01, *Recognition and Measurement of Financial Assets and Financial Liabilities*. ASU No. 2016-01 supersedes and amends the guidance to classify equity securities with readily determinable fair values into different categories (that is, trading or available-for-sale) and require equity securities to be measured at fair value with changes in the fair value recognized through net income. The amendments allow equity investments that do not have readily determinable fair values to be re-measured at fair value either upon the occurrence of an observable price change or upon identification of an impairment. The amendments also require enhanced disclosures about those investments. ASU No. 2016-01 is effective for annual reporting beginning after December 15, 2017, including interim periods within the year of adoption, and calls for prospective application. The Company is currently in the process of evaluating the impact that will result from adopting ASU 2016-01.

In February 2016, the FASB issued ASU 2016-02, *Leases* (Topic 842). This standard requires a lessee to recognize the lease assets and lease liabilities arising from operating leases in the balance sheet. Qualitative along with specific quantitative disclosures are required by lessees and lessors to meet the objective of enabling users of financial statements to assess the amount, timing, and uncertainty of cash flows arising from leases. ASU 2016-02 is effective for fiscal years beginning after December 15, 2018 including interim periods within those fiscal years. The Company is currently evaluating the impact that will result from adopting ASU 2016-02.

In March 2016, the FASB issued ASU 2016-09, *Improvements to Employee Share Based Payment Accounting* ("ASU 2016-09"), which amends guidance issued in Accounting Standards Codification ("ASC") Topic 718, Compensation - Stock Compensation. ASU 2016-09 simplifies several aspects of the accounting for share-based payment transactions, including the income tax consequences, classification of awards as either equity or liabilities, and classification on the statement of cash flows. ASU 2016-09 is effective for fiscal years beginning after December 15, 2016, and interim periods within those fiscal years and early adoption is permitted. The Company has adopted ASU 2016-09 as of January 1, 2017. The principal impact was that to the extent a tax benefit or expense from stock compensation arises it will be presented in the income tax line of the Statement of Operations rather than the current presentation as a component of equity on the Balance Sheet. Also the tax benefit or expense will be presented as activity in Cash Flow from Operating Activity rather than the current presentation as Cash Flow from Financing Activity in the Statement of Cash Flows. The Company continues to estimate forfeitures of stock grants as allowed by ASU 2016-09.

In August 2016, the FASB issued ASU 2016-15, *Statement of Cash Flows* (Topic 230): Classification of Certain Cash Receipts and Cash Payments. This standard provides guidance for eight cash flow classification issues in current GAAP. ASU 2016-15 is effective for fiscal years beginning after December 15, 2017 and interim periods within those fiscal years. The Company is currently evaluating the impact that will result from adopting ASU 2016-02.

In January 2017, the FASB issued an ASU 2017-01, *Business Combinations (Topic 805) Clarifying the Definition of a Business*. The amendments

In August 2016, the FASB issued ASU 2016-15, *Statement of Cash Flows* (Topic 230): Classification of Certain Cash Receipts and Cash Payments. This standard provides guidance for eight cash flow classification issues in current GAAP. ASU 2016-15 is effective for fiscal years beginning after December 15, 2017 and interim periods within those fiscal years. The Company is currently evaluating the impact that will result from adopting ASU 2016-02.

In January 2017, the FASB issued an ASU 2017-01, *Business Combinations (Topic 805) Clarifying the Definition of a Business*. The amendments in this Update is to clarify the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. The definition of a business affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The guidance is effective for annual periods beginning after December 15, 2017, including interim periods within those periods. The Company adopted this guidance effective January 1, 2017. The adoption of this ASU had no impact on the Company's consolidated financial statements.

In January 2017, the FASB issued ASU 2017-04, *Intangibles - Goodwill and Other (Topic 350)*: Simplifying the Accounting for Goodwill Impairment. ASU 2017-04 removes Step 2 of the goodwill impairment test, which requires a hypothetical purchase price allocation. A goodwill impairment will now be the amount by which a reporting unit's carrying value exceeds its fair value, not to exceed the carrying amount of goodwill. This standard will be effective for the Company beginning in the first quarter of fiscal year 2020 and is required to be applied prospectively. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company is currently evaluating the impact this standard will have on its consolidated financial statements.

In May 2017, the FASB issued ASU No. 2017-09, "Compensation-Stock Compensation: Scope of modification accounting". ASU 2017-09 provides guidance about which changes to the terms or conditions of a share-based payment award require an entity to apply modification accounting in Topic 718. ASU No. 2017-09 is effective for fiscal years beginning after December 15, 2017, with early adoption permitted, including during an interim period for which financial statements have not yet been made available for issuance. The amendments should be applied prospectively to an award modified on or after the adoption date. The Company is currently evaluating the impact that the adoption of ASU 2017-09 will have on its consolidated financial statements.

In July 2017, the FASB issued ASU No. 2017-11, "Earnings Per Share (Topic 260) Distinguishing Liabilities from Equity (Topic 480) Derivatives and Hedging (Topic 815)," which addresses the complexity of accounting for certain financial instruments with down round features. Down round features are features of certain equity-linked instruments (or embedded features) that result in the strike price being reduced on the basis of the pricing of future equity offerings. Current accounting guidance creates cost and complexity for entities that issue financial instruments (such as warrants and convertible instruments) with down round features that require fair value measurement of the entire instrument or conversion option. For public business entities, the amendments in Part I of this Update are effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2018. For all other entities, the amendments in Part I of this Update are effective for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020. The Company is currently evaluating the impact of adopting this guidance on its consolidated financial statements.

**Income (loss) per share:**

ASC 260, *Earnings Per Share*, requires dual presentation of basic and diluted earnings per share ("EPS") with a reconciliation of the numerator and denominator of the basic EPS computation to the numerator and denominator of the diluted EPS computation. Basic EPS excludes dilution. Diluted EPS reflects the potential dilution that could occur if securities or other contracts to issue common stock were exercised or converted into common stock or resulted in the issuance of common stock that then shared in the earnings of the entity.

Basic net earnings (loss) per share includes no dilution and is computed by dividing net earnings (loss) available to common shareholders by the weighted average number of common shares outstanding for the period, excluding any nonvested restricted common shares. Diluted net earnings (loss) per share reflect the potential dilution of securities that could share in the Company's earnings (loss). The effect of the inclusion of the dilutive shares would have resulted in a decrease in loss per share for the periods ended June 30, 2017 and 2016. Outstanding stock options, warrants and other dilutive rights are not considered in the calculation, as the impact of the potential common shares (totaling approximately 1,500,000 shares and 966,000 shares for each of the six month periods ended June 30, 2017 and 2016, respectively) would be anti-dilutive. For the six months ended June 30, 2017 the dilutive rights held in escrow from the March 2017 private placements totaling approximately 3,811,000 share rights, respectively from the convertible notes financings are also not considered in the calculation, as the impact would be anti-dilutive.

**Note 2. Acquisition and Discontinued Operations:**

**Acquisition:**

On September 12, 2016, the Company completed the strategic acquisition of BDI, a privately-held entity. The decision to acquire BDI was made based on the evaluation that the Company's resources would primarily be used for market development and commercial launch of the product and the market opportunity was estimated to be sizable.  Pursuant to a purchase agreement (the "Purchase Agreement"), through a wholly-owned subsidiary ("Venaxis Sub"), the Company acquired all of the outstanding shares of Series 1 Preferred Stock of BDI from the selling shareholders (the "Seller"), representing more than 98% of the outstanding voting stock of BDI, and BDI thereupon become a majority owned subsidiary of the Company.

Under the terms of the Purchase Agreement, the consideration consisted of an aggregate of 627,010 shares of the Company's common stock (the "Shares") which Shares were distributed in accordance with the liquidation preferences set forth in BDI's Fifth Amended and Restated Certificate of Incorporation, as amended.  The Shares were valued at approximately $2,577,000 (based upon the closing value of our common stock on the acquisition date) and the issuance represented approximately 14% of the outstanding Bioptix common stock at the closing. The Purchase Agreement contained customary representations and warranties of the parties, including BDI, and the Sellers have customary indemnification obligations to the Company relating to BDI, which are subject to certain limitations described further in the Purchase Agreement. The issuance of the Shares was effected as a private placement of securities.  The Company also entered into a registration rights agreement with the Sellers.

The total consideration transferred consisted of the 627,010 shares of the Company's common stock with a value of $2,577,000.

Under the acquisition method of accounting, the total estimated purchase consideration was allocated to the acquired tangible and intangible assets and assumed liabilities based on their estimated fair values as of the acquisition date. Following was the allocation of the purchase consideration:

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 17,000 |
| Accounts receivable | | 21,000 |
| Inventory | | 379,000 |
| Prepaid and other assets | | 51,000 |
| Equipment | | 1,000 |
| Identifiable intangible assets: | | |
| Trademarks (5 year estimated useful life) | | 99,000 |
| Customer base (6 year estimated useful life) | | 37,000 |
| Developed technology (4 year estimated useful life) | | 1,864,000 |
| Total identifiable intangible assets | | 2,000,000 |
| Goodwill | | 430,000 |
| Accounts payable | | (118,000) |
| Accrued and other liabilities | | (175,000) |
| Non-controlling interest | | (29,000) |
| Purchase price | $ | 2,577,000 |

Intangible assets acquired consisted of the following as of December 31, 2016:

| | | |
|---|---|---:|
| Trademarks | $ | 99,000 |
| Customer base | | 37,000 |
| Developed technology | | 1,864,000 |
| Total | | 2,000,000 |
| Less accumulated amortization | | (148,264) |
| Balance at December 31, 2016 | $ | 1,851,736 |

As of November 30, 2016, the Company paid approximately $29,000 to acquire the non-controlling interest in BDI, which was accounted for as an equity transaction.

11

The unaudited supplemental pro forma information for the six months ended June 30, 2016, as if the BDI acquisition had occurred as of January 1, 2016, would have reflected total revenue of $174,000, net loss of $2,102,000 and loss per share of $0.47. These pro forma condensed consolidated financial results have been prepared for comparative purposes only and include certain adjustments to reflect the pro forma results of operations as if the acquisition had occurred as of the beginning of the periods presented, such as increased amortization for the fair value of acquired intangible assets. The pro forma information does not reflect the effect of costs or synergies that would have been expected to result from the integration of the acquisition. The pro forma information does not purport to be indicative of the results of operations that actually would have resulted had the combination occurred at the beginning of each period presented, or of future results of the consolidated entities.

As of December 31, 2016 inventories, included with current assets of discontinued operations, totaled approximately $416,000, consisting of $188,000 in raw materials and $228,000 in finished goods, all associated with the BDI operations. As of June 30, 2017 no inventories were on hand.

**Discontinued operations:**

During the quarter ended March 31, 2017, the Company made the decision to discontinue the operations of its wholly-owned subsidiary BDI. BDI had developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017 of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. The Company expects to dispose of the assets and operations during 2017 by selling the assets and licensing the intellectual property rights.   The Company has recognized the exit of BDI in accordance with Accounting Standards Codification (ASC) 205-20, *Discontinued Operations*. As such, the historical results of BDI, following its 2016 acquisition, have been classified as discontinued operations.

The Company's historical financial statements have been revised to present the operating results of the BDI business as a discontinued operation. Assets and liabilities related to the discontinued operations of BDI are approximately as follows as of June 30, 2017 and December 31, 2016:

|  | June 30, 2017 | | December 31, 2016 |
|---|---|---|---|
| Current assets: | | | |
| Accounts receivable | $ 1,000 | $ | 5,000 |
| Inventories | - | | 416,000 |
| Prepaid expenses | - | | 66,000 |
| Total current assets | $ 1,000 | $ | 487,000 |
| | | | |
| Equipment and furnishings, net | $ - | $ | 36,000 |
| Intangible assets, net | - | | 2,281,000 |
| Deposit | - | | 37,000 |
| Total noncurrent assets | $ - | $ | 2,354,000 |
| | | | |
| Current liabilities: | | | |
| Accounts payable | $ 99,000 | $ | 174,000 |
| Accrued expenses | 28,000 | | 85,000 |
| Deferred revenue | 137,000 | | - |
| Total current liabilities | $ 264,000 | $ | 259,000 |

Summarized results of the discontinued operation are as follows for the three and six months ended June 30, 2017:

|  | Three Months | | Six Months |
|---|---|---|---|
| Sales | $ 17,000 | $ | 30,000 |
| Cost of sales | 3,000 | | 5,000 |
| Gross margin | 14,000 | | 25,000 |
| Operating expenses | 347,000 | | 1,001,000 |
| Operating loss | (333,000) | | (976,000) |
| Escrow forfeiture gain | 135,000 | | 135,000 |
| Impairment (loss) | (50,000) | | (2,754,000) |

| | | |
|---|---|---|
| Loss from discontinued operations | $ (248,000) | $ (3,595,000) |

Included in the impairment loss recognized on the discontinuance of BDI are impairment losses recognized on inventories of $453,000, equipment and furnishings of $29,000, identifiable intangible assets of $1,833,000, goodwill of $430,000, and $9,000 from all other items, all associated with the assets and operations of BDI.  Additional costs associated with the exit of operations of the Company's subsidiary BDI may be incurred as strategic options for BDI are evaluated.

12

**Note 3. Property and equipment:**

Property and equipment consisted of the following:

| | June 30, 2017 | December 31, 2016 |
|---|---|---|
| Office and computer equipment | $ 114,309 | $ 116,510 |
| Less accumulated depreciation | 109,722 | 110,972 |
| | $ 4,587 | $ 5,538 |

Depreciation expense totaled approximately $500 and $400, and $1,000 and $800, for the three and six month periods ended June 30, 2017 and 2016, respectively.  Depreciation and amortization expenses also included $1,500 and $9,000, for the six month periods ended June 30, 2017 and 2016, respectively, on short-term assets included with prepaid expenses.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party for a purchase price of approximately $4,053,000. The sale resulted in a gain of approximately $1,920,000 and generated approximately $1,749,000 in net cash after expenses and mortgage payoffs. The Company is leasing back space in the building under a short-term lease agreement that provides storage space.

**Note 4.  Other long-term assets:**

Other long-term assets consisted of the following as of June 30, 2017 and December 31, 2016:

| | Beginning Balance (December 31, 2016) | Additions | Impairments | Ending Balance (June 30, 2017) |
|---|---|---|---|---|
| Cost: | | | | |
| Patents | $ 1,032,982 | $ 12,965 | $ — | $ 1,045,947 |
| Goodwill | 447,951 | — | — | 447,951 |
| Total | 1,480,933 | 12,965 | — | 1,493,898 |
| | | | | |
| Accumulated Amortization: | | | | |
| Patents | (482,183) | (35,316) | — | (517,499) |
| Goodwill | (60,712) | — | — | (60,712) |
| Total | (542,895) | (35,316) | — | (578,211) |
| | | | | |
| Net Other Long Term Assets | $ 938,038 | $ (22,351) | $ — | $ 915,687 |

The Company capitalizes legal costs and filing fees associated with obtaining patents on its new discoveries. Once the patents have been issued, the Company amortizes these costs over the shorter of the legal life of the patent or its estimated economic life using the straight-line method. Based

**Note 3. Property and equipment:**

Property and equipment consisted of the following:

|  | June 30, 2017 | December 31, 2016 |
|---|---|---|
| Office and computer equipment | $ 114,309 | $ 116,510 |
| Less accumulated depreciation | 109,722 | 110,972 |
|  | $ 4,587 | $ 5,538 |

Depreciation expense totaled approximately $500 and $400, and $1,000 and $800, for the three and six month periods ended June 30, 2017 and 2016, respectively.  Depreciation and amortization expenses also included $1,500 and $9,000, for the six month periods ended June 30, 2017 and 2016, respectively, on short-term assets included with prepaid expenses.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party for a purchase price of approximately $4,053,000. The sale resulted in a gain of approximately $1,920,000 and generated approximately $1,749,000 in net cash after expenses and mortgage payoffs. The Company is leasing back space in the building under a short-term lease agreement that provides storage space.

**Note 4.  Other long-term assets:**

Other long-term assets consisted of the following as of June 30, 2017 and December 31, 2016:

|  | Beginning Balance (December 31, 2016) | Additions | Impairments | Ending Balance (June 30, 2017) |
|---|---|---|---|---|
| Cost: |  |  |  |  |
| Patents | $ 1,032,982 | $ 12,965 | $ — | $ 1,045,947 |
| Goodwill | 447,951 | — | — | 447,951 |
| Total | 1,480,933 | 12,965 | — | 1,493,898 |
|  |  |  |  |  |
| Accumulated Amortization: |  |  |  |  |
| Patents | (482,183) | (35,316) | — | (517,499) |
| Goodwill | (60,712) | — | — | (60,712) |
| Total | (542,895) | (35,316) | — | (578,211) |
|  |  |  |  |  |
| Net Other Long Term Assets | $ 938,038 | $ (22,351) | $ — | $ 915,687 |

The Company capitalizes legal costs and filing fees associated with obtaining patents on its new discoveries. Once the patents have been issued, the Company amortizes these costs over the shorter of the legal life of the patent or its estimated economic life using the straight-line method. Based upon the current status of the above intangible assets, the aggregate amortization expense is estimated to be approximately $71,000 for each of the next five fiscal years. The Company tests intangible assets with finite lives for impairment upon significant changes in the Company's business environment. The testing resulted in no patent impairment for the three and six months ended June 30, 2017 and $34,000 and $168,000, for the three and six months ended June 30, 2016, respectively. The impairment charges are related to the Company's ongoing analysis of which specific country patents in its portfolio are determined as potentially worth pursuing.

13

**Note 5. Notes and Other Obligations:**

**Note 5. Notes and Other Obligations:**

Notes and other obligations consisted of short-term installment obligations, arising primarily from insurance premium financing programs bearing interest at 4.5%, with outstanding balances of zero and $139,611, as of June 30, 2017 and December 31, 2016, respectively.

**Mortgage notes:**

Prior to the February 2016 sale of the corporate headquarters, the Company had a permanent mortgage on its land and building. The mortgage was held by a commercial bank and included a portion guaranteed by the U. S. Small Business Administration ("SBA"). The loan was collateralized by the real property and the SBA portion was also personally guaranteed by a former officer of the Company. The commercial bank loan terms included a payment schedule based on a fifteen year amortization, with a balloon maturity at five years. The commercial bank portion had an interest rate fixed at 3.95%, and the SBA portion bore interest at the rate of 5.86%.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land and building, and also paid off its mortgage obligations. See Note 3.

**Note 6. Stockholders' equity:**

**Restricted common stock award:**

During the six months ended June 30, 2017, 197,000 restricted shares were granted to Directors and Officers, of which 40,000 were terminated upon the individuals separation from the Company and 21,333 restricted common shares were vested as of June 30, 2017 (see Note 7).

**Private placement offerings:**

In March 2017, the Company completed private placements totaling $7,000,000. Included was a common stock unit financing for $2,250,000 with certain accredited investors. The common stock unit offering totaled 900,000 units, of which 400,000 units for $1,000,000 was released to the respective parties in March 2017, and the balance of 500,000 units for $1,250,000 was released in May 2017, less a total of $336,491 of offering expenses. The common stock offering sold units (the "Units") at a purchase price of $2.50 per Unit. Each Unit consists of one share of the Company's common stock and a three-year warrant to purchase one share of the Company's common stock at an exercise price of $3.50 per share. The Company also closed on a convertible note financing with certain accredited investors with gross proceeds totaling $4,750,000. The convertible note financing proceeds are in escrow pending successful completion of release conditions. Following release from escrow, the notes shall be convertible into shares of common stock at an initial conversion price of $2.50 per share. Warrants to purchase 1,900,000 shares of the Company's common stock at an initial exercise price of $3.56 per share were also issued with the convertible note financing. Pursuant to the terms of the convertible note purchase agreements, the Company has filed a proxy to hold a special meeting of its shareholders to among other provisions, approve the terms of the offering and authorize preferred stock, all as specified in the agreements.

The convertible note financing, held in escrow, has been reflected in the accompanying June 30, 2017, consolidated balance sheet at the face amount of the securities issued and held in escrow less the cash received for those securities, which is also held in escrow.   When the release conditions have been met, the cash and convertible notes will be reflected gross at their carrying amounts, net of any discounts.

In addition, since the warrants given with the convertible note financings are also held in escrow pending the release conditions, their issuance is contingent upon satisfaction of release conditions, as defined in the agreements.  Accordingly, they will be valued and financing proceeds will be allocated to them at the time the contingency is resolved.  Any beneficial conversion feature resulting from the allocation of proceeds among the convertible notes and warrants will also be recorded at that time.

The convertible notes accrue interest at 2% per annum commencing with their execution and as a result, the Company has recorded interest expense of approximately $23,700 during the three months ended June 30, 2017 and $27,600 during the six months ended June 30, 2017, respectively, and accrued interest of approximately $27,600 is included in the accompanying consolidated balance sheet as of June 30, 2017.

The Company has evaluated the guidance ASC 480-10 *Distinguishing Liabilities from Equity and* ASC 815-40 *Contracts in an Entity's Own*

The convertible notes accrue interest at 2% per annum commencing with their execution and as a result, the Company has recorded interest expense of approximately $23,700 during the three months ended June 30, 2017 and $27,600 during the six months ended June 30, 2017, respectively, and accrued interest of approximately $27,600 is included in the accompanying consolidated balance sheet as of June 30, 2017.

The Company has evaluated the guidance ASC 480-10 *Distinguishing Liabilities from Equity* and ASC 815-40 *Contracts in an Entity's Own Equity* to determine the appropriate classification of the instruments.

In connection with the private placements, the Company also entered into a Registration Rights Agreement, with the investors pursuant to which the Company agreed to file a registration statement covering the resale of the shares of common stock issuable upon exercise or conversion of the securities and to maintain its effectiveness until all such securities have been sold or may be sold without restriction. In the event a registration statement covering such shares of common stock is not effective, the Company is required to pay to the investors on a monthly basis an amount equal to 1% of the investors' investment, subject to conditions as defined in the agreement.

**Common stock escrow forfeiture:**

During the six months ended June 30, 2017, under an agreement between the Company and one of the selling shareholders from the Company's 2016 acquisition of BDI, rights to 32,801 common shares held in escrow on behalf of the selling shareholder were waived by the shareholder and returned to the Company where they were cancelled. Under the agreement each party mutually released each other from any and all claims that might relate to or arise from the acquisition of BDI. As a result of this cancellation, the $134,812, estimated value of the common shares, based upon $4.11 per share, was recorded as a gain in the BDI discontinued operations and a reduction in common stock.

**Equity rights terminations:**

During the six months ended June 30, 2017, the Company negotiated and executed agreements with holders of stock rights (stock options and restricted shares) to have such holders waive their rights to the stock rights in exchange for a one time cash payment. The majority of the holders had previously terminated from the Company or the agreements were made as part of separation agreements upon the individuals' termination from the Company.  Under the agreements, a total of 532,911 rights were forfeited, consisting of; 494,578 stock options under the Company's 2002 Stock Incentive Plan, 37,500 non-qualified options issued outside of the Plan and 833 restricted common shares. The total consideration under the agreements was $299,500.  For financial reporting purposes the amounts paid to each holder was compared to the fair value of the stock rights forfeited using a Black-Scholes valuation and to the extent the amount paid exceeded the value of the stock rights forfeited, the payment amount was charged to stock-based compensation. For purposes of the Black-Scholes valuation, the Company assumed a dividend yield of 0%, expected price volatility of 49% to 99% risk free interest rates of 0.8% to 2.3% and expected terms based upon the remaining lives of the instruments. Of the total amount paid, $291,995 was charged to stockholders' equity and $7,505 was charged to stock-based compensation.

**Note 7. Stock based compensation, options and warrants:**

**Stock based compensation:**

The Company recognized total expenses for stock-based compensation during the three and six months ended June 30, 2017 and 2016 which are included in the accompanying statements of operations, from the following categories:

|  | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
|  | **2017** | **2016** | **2017** | **2016** |
| Restricted stock awards under the Plan | $ 57,745 | $ — | $ 88,176 | $ — |
| Stock option awards under the Plan | 31,452 | 176,388 | 95,258 | 224,272 |
| Non-qualified stock option awards | 48,814 | — | 87,620 | — |
| Total stock-based compensation | $ 138,011 | $ 176,388 | $ 271,054 | $ 224,272 |

15

**Restricted stock awards:**

A summary of the Company's restricted stock activity in the six months ended June 30, 2017 is presented here:

|  | Number of Shares | Weighted Average Grant-Date Fair Value |
|---|---|---|
| Total restricted shares | | |
| Outstanding at January 1, 2017 | - | $ - |
| Granted | 197,000 | 3.26 |
| Forfeited | (40,000) | 3.13 |
| Outstanding at June 30, 2017 | 157,000 | $ 3.30 |
| Total vested restricted shares | | |
| Outstanding at January 1, 2017 | - | $ - |
| Vested | 22,166 | 3.14 |
| Forfeited | (833) | 3.13 |
| Vested at June 30, 2017 | 21,333 | $ 3.14 |

During the six months ended June 30, 2017, the Company granted 177,000 restricted shares to members of its Board of Directors and 20,000 restricted shares to an officer. Upon the separation of two Directors, 40,000 restricted shares were subsequently forfeited, including 833 restricted shares that were re-acquired by the Company as part of the equity rights terminations (see Note 6). The weighted-average fair value of restricted shares granted during the six months ended June 30, 2017 was $3.26 per share based upon the share price as of the date of grant. The total fair value of restricted stock granted during the six months ended June 30, 2017 was approximately $643,200.

The value of restricted stock grants are measured based on their fair value on the date of grant and amortized over their respective vesting periods, generally twenty-four months. As of June 30, 2017, there was approximately $435,200 of unrecognized compensation cost related to unvested restricted stock awards, which is expected to be recognized over a remaining weighted-average vesting period of approximately 1.6 years.

**Stock options:**

The Company currently provides stock-based compensation to employees, directors and consultants, both under the Company's 2002 Stock Incentive Plan, as amended (the "Plan"), and non-qualified options and warrants issued outside of the Plan. During November, 2016, the Company's shareholders approved amendments to the Plan to increase the number of shares reserved under the Plan from 709,141 to 895,000. The Company estimates the fair value of the share-based awards on the date of grant using the Black-Scholes option-pricing model (the "Black-Scholes model"). Using the Black-Scholes model, the value of the award that is ultimately expected to vest is recognized over the requisite service period in the statement of operations. Option forfeitures are estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. The Company attributes compensation to expense using the straight-line single option method for all options granted.

The Company's determination of the estimated fair value of share-based payment awards on the date of grant is affected by the following variables and assumptions:

- Grant date exercise price – the closing market price of the Company's common stock on the date of the grant;
- Estimated option term – based on historical experience with existing option holders;
- Estimated dividend rates – based on historical and anticipated dividends over the life of the option;
- Term of the option – based on historical experience, grants have lives of approximately 3-5 years;
- Risk-free interest rates – with maturities that approximate the expected life of the options granted;
- Calculated stock price volatility – calculated over the expected life of the options granted, which is calculated based on the daily closing price of the Company's common stock over a period equal to the expected term of the option; and
- Option exercise behaviors – based on actual and projected employee stock option exercises and forfeitures.

During the six months ended June 30, 2017 and 2016, respectively, no options were exercised.

**Stock incentive plan options:**

The Company currently provides stock-based compensation to employees, directors and consultants under the Plan. The Company utilized assumptions in the estimation of fair value of stock-based compensation for the six months ended June 30, 2017 and 2016 as follows:

| | 2017 | 2016 |
|---|---|---|
| Dividend yield | 0% | 0% |
| Expected price volatility | 101% | 99% |
| Risk free interest rate | 1.92% | 1.20% |
| Expected term | 5 years | 5 years |

A summary of activity under the Plan for the six months ended June 30, 2017 is presented below:

| | Shares Underlying Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2017 | 566,747 | $ 20.46 | | |
| Granted | 20,000 | 4.02 | | |
| Exercised | - | - | | |
| Forfeited | (495,414) | 22.98 | | |
| Outstanding at June 30, 2017 | 91,333 | $ 3.16 | 7.3 | $ 84,290 |
| Exercisable at June 30, 2017 | 59,000 | $ 2.93 | 6.1 | $ 68,070 |

The aggregate intrinsic value in the table above represents the total intrinsic value (the difference between the Company's closing stock price on June 30, 2017 and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders, had all option holders been able to, and in fact had, exercised their options on June 30, 2017.

During the six months ended June 30, 2017, 20,000 options were issued to a director under the Plan, exercisable at $4.02 per share with a grant date fair value of $3.04 per share. The options expire ten years from the date of grant and vest monthly over a period of 24 months in arrears.

During the six months ended June 30, 2016, 77,000 options were issued to non-employee directors under the Plan, exercisable at an average of $2.89 per share. The options expire ten years from the date of grant and vest 50% upon the date of grant, and 25% on each of July 1, 2016 and October 1, 2016. During the six months ended June 30, 2016, 150,000 options were issued to officers and employees under the Plan, exercisable at an average of $2.89 per share. The options expire ten years from the date of grant and vest 50% upon each of the six month and the one year anniversary of the grant date.

During the six months ended June 30, 2017, a total of 495,414 options granted under the Plan were forfeited as part of the equity rights terminations (see Note 6). Of the total, 438,414 options were vested, exercisable at an average exercise price of $25.59 and 57,000 were unvested, exercisable at an average exercise price of $2.92. During the six months ended June 30, 2016, a total of 25,445 options that were granted under the Plan were forfeited, of which 21,825 were vested and 3,620 were unvested. The vested options were exercisable at an average of $39.81 per share and the unvested options were exercisable at an average of $15.13 per share.

The total fair value of stock options granted to employees and directors that vested and became exercisable during the six months ended June 30, 2017 and 2016, was approximately $103,000 and $271,000, respectively.   Based upon the Company's experience, approximately 80% of the outstanding nonvested stock options, or approximately 26,000 options, are expected to vest in the future, under their terms.

**Stock incentive plan options:**

The Company currently provides stock-based compensation to employees, directors and consultants under the Plan. The Company utilized assumptions in the estimation of fair value of stock-based compensation for the six months ended June 30, 2017 and 2016 as follows:

|  | 2017 | 2016 |
|---|---|---|
| Dividend yield | 0% | 0% |
| Expected price volatility | 101% | 99% |
| Risk free interest rate | 1.92% | 1.20% |
| Expected term | 5 years | 5 years |

A summary of activity under the Plan for the six months ended June 30, 2017 is presented below:

| | Shares Underlying Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2017 | 566,747 | $ 20.46 | | |
| Granted | 20,000 | 4.02 | | |
| Exercised | - | - | | |
| Forfeited | (495,414) | 22.98 | | |
| Outstanding at June 30, 2017 | 91,333 | $ 3.16 | 7.3 | $ 84,290 |
| Exercisable at June 30, 2017 | 59,000 | $ 2.93 | 6.1 | $ 68,070 |

The aggregate intrinsic value in the table above represents the total intrinsic value (the difference between the Company's closing stock price on June 30, 2017 and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders, had all option holders been able to, and in fact had, exercised their options on June 30, 2017.

During the six months ended June 30, 2017, 20,000 options were issued to a director under the Plan, exercisable at $4.02 per share with a grant date fair value of $3.04 per share. The options expire ten years from the date of grant and vest monthly over a period of 24 months in arrears.

During the six months ended June 30, 2016, 77,000 options were issued to non-employee directors under the Plan, exercisable at an average of $2.89 per share. The options expire ten years from the date of grant and vest 50% upon the date of grant, and 25% on each of July 1, 2016 and October 1, 2016. During the six months ended June 30, 2016, 150,000 options were issued to officers and employees under the Plan, exercisable at an average of $2.89 per share. The options expire ten years from the date of grant and vest 50% upon each of the six month and the one year anniversary of the grant date.

During the six months ended June 30, 2017, a total of 495,414 options granted under the Plan were forfeited as part of the equity rights terminations (see Note 6). Of the total, 438,414 options were vested, exercisable at an average exercise price of $25.59 and 57,000 were unvested, exercisable at an average exercise price of $2.92. During the six months ended June 30, 2016, a total of 25,445 options that were granted under the Plan were forfeited, of which 21,825 were vested and 3,620 were unvested. The vested options were exercisable at an average of $39.81 per share and the unvested options were exercisable at an average of $15.13 per share.

The total fair value of stock options granted to employees and directors that vested and became exercisable during the six months ended June 30, 2017 and 2016, was approximately $103,000 and $271,000, respectively.   Based upon the Company's experience, approximately 80% of the outstanding nonvested stock options, or approximately 26,000 options, are expected to vest in the future, under their terms.

A summary of the activity of nonvested options under the Plan to acquire common shares granted to employees, officers, directors and consultants during the six months ended June 30, 2017 is presented below:

| Nonvested Shares | Nonvested Shares Underlying Options | Weighted Average Exercise Price | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Nonvested at January 1, 2017 | 97,738 | $ 3.51 | $ 2.58 |
| Granted | 20,000 | 4.02 | 3.04 |
| Vested | (28,405) | 5.00 | 3.62 |
| Forfeited | (57,000) | 2.92 | 2.16 |
| Nonvested at June 30, 2017 | 32,333 | $ 3.58 | $ 2.70 |

At June 30, 2017, based upon employee and director options granted under the Plan to that point, there was approximately $63,000 of additional unrecognized compensation cost related to stock options that will be recorded over a weighted average future period of approximately 1.3 years.

**Other common stock purchase options and warrants:**

As of June 30, 2017, in addition to the Plan options discussed above, the Company had outstanding 1,272,929 non-qualified options and warrants in connection with warrants issued with offerings and options issued to certain employees, hired in connection with the Company's acquisition of BDI that were not issued under the Plan.

During the six month periods ended June 30, 2017 and 2016 no options were granted outside of the Plan. Operating expenses for the three and six months ended June 30, 2017 included $48,814 and $87,620, respectively, related to stock-based compensation and the three and six months ended June 30, 2016 did not include any value related to stock-based compensation of non-qualified options and warrants.

In March 2017, the Company completed a $2.25 million private placement of securities and in connection with that offering, granted investors in the offering warrants which are classified as equity, exercisable after six-months, to purchase a total of 900,000 shares of common stock at an exercise price of $3.50 per share and expiring in May 2020 (see Note 6).

Following is a summary of outstanding options and warrants that were issued outside of the Plan for the six months ended June 30, 2017:

| | Shares Underlying Options / Warrants | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2017 | 527,003 | $ 13.36 | | |
| Granted | 900,000 | 3.50 | | |
| Exercised | - | - | | |
| Forfeited | (154,074) | 19.68 | | |
| Outstanding at June 30, 2017 | 1,272,929 | $ 5.58 | 2.3 | $ 526,500 |
| Exercisable at June 30, 2017 | 372,929 | $ 10.59 | 0.4 | $ 4,500 |

During the six months ended June 30, 2017 and 2016, no warrants were exercised. Included at June 30, 2017 in the 1,272,929 total outstanding options are 1,257,929 non-compensatory rights, exercisable at an average of $5.60 per common share, expiring through March 2020, granted in connection with public offerings, and 15,000 rights exercisable at an average of $3.78 per common share, expiring July 31, 2017, issued under

A summary of the activity of nonvested options under the Plan to acquire common shares granted to employees, officers, directors and consultants during the six months ended June 30, 2017 is presented below:

| Nonvested Shares | Nonvested Shares Underlying Options | Weighted Average Exercise Price | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Nonvested at January 1, 2017 | 97,738 | $ 3.51 | $ 2.58 |
| Granted | 20,000 | 4.02 | 3.04 |
| Vested | (28,405) | 5.00 | 3.62 |
| Forfeited | (57,000) | 2.92 | 2.16 |
| Nonvested at June 30, 2017 | 32,333 | $ 3.58 | $ 2.70 |

At June 30, 2017, based upon employee and director options granted under the Plan to that point, there was approximately $63,000 of additional unrecognized compensation cost related to stock options that will be recorded over a weighted average future period of approximately 1.3 years.

**Other common stock purchase options and warrants:**

As of June 30, 2017, in addition to the Plan options discussed above, the Company had outstanding 1,272,929 non-qualified options and warrants in connection with warrants issued with offerings and options issued to certain employees, hired in connection with the Company's acquisition of BDI that were not issued under the Plan.

During the six month periods ended June 30, 2017 and 2016 no options were granted outside of the Plan. Operating expenses for the three and six months ended June 30, 2017 included $48,814 and $87,620, respectively, related to stock-based compensation and the three and six months ended June 30, 2016 did not include any value related to stock-based compensation of non-qualified options and warrants.

In March 2017, the Company completed a $2.25 million private placement of securities and in connection with that offering, granted investors in the offering warrants which are classified as equity, exercisable after six-months, to purchase a total of 900,000 shares of common stock at an exercise price of $3.50 per share and expiring in May 2020 (see Note 6).

Following is a summary of outstanding options and warrants that were issued outside of the Plan for the six months ended June 30, 2017:

| | Shares Underlying Options / Warrants | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2017 | 527,003 | $ 13.36 | | |
| Granted | 900,000 | 3.50 | | |
| Exercised | - | - | | |
| Forfeited | (154,074) | 19.68 | | |
| Outstanding at June 30, 2017 | 1,272,929 | $ 5.58 | 2.3 | $ 526,500 |
| Exercisable at June 30, 2017 | 372,929 | $ 10.59 | 0.4 | $ 4,500 |

During the six months ended June 30, 2017 and 2016, no warrants were exercised. Included at June 30, 2017 in the 1,272,929 total outstanding options are 1,257,929 non-compensatory rights, exercisable at an average of $5.60 per common share, expiring through March 2020, granted in connection with public offerings, and 15,000 rights exercisable at an average of $3.78 per common share, expiring July 31, 2017, issued under compensatory arrangements.

During the six months ended June 30, 2017, a total of 154,074 options that were granted outside of the Plan were forfeited.  Of the total forfeited, 45,000 lapsed due to the individuals' terminations from the Company, all of which were unvested. The unvested options were exercisable at an average of $3.78 per share. An additional 71,574 expired under their terms.  The remaining 37,500, which were forfeited resulted from negotiated payments made to each holder to waive their rights to the outstanding options (See Note 6).

The aggregate intrinsic value in the table above represents the total intrinsic value (the difference between the Company's closing stock price on June 30, 2017 and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders, had all option holders been able to, and in fact had, exercised their options on June 30, 2017.

**Note 8.  Animal Health License Agreements:**

Effective May 1, 2004, Washington University in St. Louis ("WU") and Bioptix entered into an Exclusive License Agreement ("WU License Agreement"), which grants Bioptix exclusive license and right to sublicense WU's technology (as defined under the WU License Agreement) for veterinary products worldwide, except where such products are prohibited under U.S. laws for export. The term of the WU License Agreement continues until the expiration of the last of WU's patents (as defined in the WU License Agreement) expire.  Bioptix has agreed to pay minimum annual royalties of $20,000 during the term of the WU License Agreement and such amounts are creditable against future royalties.  Royalties payable to WU under the WU License Agreement for covered product sales by Bioptix carry a mid-single digit royalty rate and for sublicense fees received by Bioptix carry a low double-digit royalty rate.  The WU License Agreement contains customary terms for confidentiality, prosecution and infringement provisions for licensed patents, publication rights, indemnification and insurance coverage.  The WU License Agreement is cancelable by Bioptix with ninety days advance notice at any time and by WU with sixty days advance notice if Bioptix materially breaches the WU License Agreement and fails to cure such breach.

In July 2012, the Company entered into an Exclusive License Agreement (the "License Agreement") with Ceva Santé Animale S.A. ("Licensee"), pursuant to which the Company granted the Licensee an exclusive royalty-bearing license, until December 31, 2028, to the Company's intellectual property and other assets, including patent rights and know-how, relating to recombinant single chain reproductive hormone technology for use in non-human mammals (the "Company's Animal Health Assets"). The License Agreement is subject to termination by the Licensee (a) for convenience on 180 days prior written notice, (b) in the Licensee's discretion in the event of a sale or other disposal of the Company's animal health assets, (c) in the Licensee's discretion upon a change in control of the Company, (d) for a material breach of the License Agreement by the Company, or (e) in the Licensee's discretion, if the Company becomes insolvent.  The License Agreement is also terminable by the Company if there is a material breach of the License Agreement by the Licensee, or if the Licensee challenges the Company's ownership of designated intellectual property.  The License Agreement includes a sublicense of the technology licensed to the Company by WU. Under the terms of the WU License Agreement, a portion of license fees and royalties Bioptix receives from sublicensing agreements will be paid to WU. The obligation for such license fees due to WU is included in accrued expenses at June 30, 2017.

Under the License Agreement, the Licensee obtained a worldwide exclusive license to develop, seek regulatory approval for and offer to sell, market, distribute, import and export luteinizing hormone ("LH") and/or follicle-stimulating hormone ("FSH") products for bovine (cattle), equine and swine in the field of the assistance and facilitation of reproduction in bovine, equine and swine animals.

Under the License Agreement, as of June 30, 2017, the following future milestone payments are provided, assuming future milestones are successfully achieved:

- Milestone payments, totaling up to a potential of $1.1 million in the aggregate, based on the satisfactory conclusion of milestones as defined in the License Agreement;
- Potential for milestone payments of up to an additional $2 million for development and receipt of regulatory approval for additional licensed products; and
- Royalties, at low double digit rates, based on sales of licensed products.

Revenue recognition related to the License Agreement and WU License Agreement is based primarily on the Company's consideration of ASC 808-10-45, "*Accounting for Collaborative Arrangements.*"  For financial reporting purposes, the license fees and milestone payments received from the License Agreement, net of the amounts due to third parties, including WU, have been recorded as deferred revenue and are amortized over the term of the License Agreement.  License fees and milestone revenue currently totaling a net of approximately $1,556,000 commenced being amortized into income upon the July 2012 date of milestone achievement. As of June 30, 2017, deferred revenue of $96,698 has been classified as a current liability and $1,016,967 has been classified as a long-term liability.  The current liability represents the next twelve months' portion of the amortizable milestone revenue. During each of the six months ended June 30, 2017 and 2016, $48,349 was recorded as the amortized license fee revenue arising from the Ceva License Agreement.

During the six months ended June 30, 2017, a total of 154,074 options that were granted outside of the Plan were forfeited.  Of the total forfeited, 45,000 lapsed due to the individuals' terminations from the Company, all of which were unvested. The unvested options were exercisable at an average of $3.78 per share. An additional 71,574 expired under their terms.  The remaining 37,500, which were forfeited resulted from negotiated payments made to each holder to waive their rights to the outstanding options (See Note 6).

The aggregate intrinsic value in the table above represents the total intrinsic value (the difference between the Company's closing stock price on June 30, 2017 and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders, had all option holders been able to, and in fact had, exercised their options on June 30, 2017.

**Note 8.  Animal Health License Agreements:**

Effective May 1, 2004, Washington University in St. Louis ("WU") and Bioptix entered into an Exclusive License Agreement ("WU License Agreement"), which grants Bioptix exclusive license and right to sublicense WU's technology (as defined under the WU License Agreement) for veterinary products worldwide, except where such products are prohibited under U.S. laws for export. The term of the WU License Agreement continues until the expiration of the last of WU's patents (as defined in the WU License Agreement) expire.  Bioptix has agreed to pay minimum annual royalties of $20,000 during the term of the WU License Agreement and such amounts are creditable against future royalties.  Royalties payable to WU under the WU License Agreement for covered product sales by Bioptix carry a mid-single digit royalty rate and for sublicense fees received by Bioptix carry a low double-digit royalty rate.  The WU License Agreement contains customary terms for confidentiality, prosecution and infringement provisions for licensed patents, publication rights, indemnification and insurance coverage.  The WU License Agreement is cancelable by Bioptix with ninety days advance notice at any time and by WU with sixty days advance notice if Bioptix materially breaches the WU License Agreement and fails to cure such breach.

In July 2012, the Company entered into an Exclusive License Agreement (the "License Agreement") with Ceva Santé Animale S.A. ("Licensee"), pursuant to which the Company granted the Licensee an exclusive royalty-bearing license, until December 31, 2028, to the Company's intellectual property and other assets, including patent rights and know-how, relating to recombinant single chain reproductive hormone technology for use in non-human mammals (the "Company's Animal Health Assets"). The License Agreement is subject to termination by the Licensee (a) for convenience on 180 days prior written notice, (b) in the Licensee's discretion in the event of a sale or other disposal of the Company's animal health assets, (c) in the Licensee's discretion upon a change in control of the Company, (d) for a material breach of the License Agreement by the Company, or (e) in the Licensee's discretion, if the Company becomes insolvent.  The License Agreement is also terminable by the Company if there is a material breach of the License Agreement by the Licensee, or if the Licensee challenges the Company's ownership of designated intellectual property.  The License Agreement includes a sublicense of the technology licensed to the Company by WU. Under the terms of the WU License Agreement, a portion of license fees and royalties Bioptix receives from sublicensing agreements will be paid to WU. The obligation for such license fees due to WU is included in accrued expenses at June 30, 2017.

Under the License Agreement, the Licensee obtained a worldwide exclusive license to develop, seek regulatory approval for and offer to sell, market, distribute, import and export luteinizing hormone ("LH") and/or follicle-stimulating hormone ("FSH") products for bovine (cattle), equine and swine in the field of the assistance and facilitation of reproduction in bovine, equine and swine animals.

Under the License Agreement, as of June 30, 2017, the following future milestone payments are provided, assuming future milestones are successfully achieved:

- Milestone payments, totaling up to a potential of $1.1 million in the aggregate, based on the satisfactory conclusion of milestones as defined in the License Agreement;
- Potential for milestone payments of up to an additional $2 million for development and receipt of regulatory approval for additional licensed products; and
- Royalties, at low double digit rates, based on sales of licensed products.

Revenue recognition related to the License Agreement and WU License Agreement is based primarily on the Company's consideration of ASC 808-10-45, "*Accounting for Collaborative Arrangements.*"  For financial reporting purposes, the license fees and milestone payments received from the License Agreement, net of the amounts due to third parties, including WU, have been recorded as deferred revenue and are amortized over the term of the License Agreement.  License fees and milestone revenue currently totaling a net of approximately $1,556,000 commenced being amortized into income upon the July 2012 date of milestone achievement. As of June 30, 2017, deferred revenue of $96,698 has been classified as a current liability and $1,016,967 has been classified as a long-term liability. The current liability represents the next twelve months' portion of the amortizable milestone revenue. During each of the six months ended June 30, 2017 and 2016, $48,349 was recorded as the amortized license fee revenue arising from the Ceva License Agreement.

A tabular summary of the revenue categories and cumulative amounts of revenue recognition associated with the License Agreement follows:

| Category | Totals |
|---|---|
| License fees and milestone amounts paid / achieved | $ 1,920,000 |
| Third party obligations recorded, including WU | (363,700) |
| Deferred revenue balance | 1,556,300 |
| Revenue amortization to June 30, 2017 | (442,635) |
| Net deferred revenue balance at June 30, 2017 | $ 1,113,665 |

| | |
|---|---|
| Commencement of license fees revenue recognition | Upon signing or receipt |
| Commencement of milestone revenue recognition | Upon milestone achievement over then remaining life |
| Original amortization period | 197 months |

**Note 9.  Commitments and contingencies:**

**Commitments:**

The Company's subsidiary, BDI, had a lease commitment on its office and laboratory space that was scheduled to expire March 31, 2018, requiring future non-cancellable lease payments of approximately $233,000 for the remainder of its term. During May 2017, an agreement with the subsidiary's landlord was reached to terminate the lease by surrendering the facility in May 2017, making a prepayment of rent through July 31, 2017 and surrendering the $37,000 lease deposit. Total rent expense for the six months ended June 30, 2017 totaled approximately $229,000 which included payment of the early termination fee and the surrender of the $37,000 lease deposit. The Company's rent expense for the six months ended June 30, 2016 was immaterial.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party at a purchase price of $4,053,000. The sale resulted in a gain of approximately $1,900,000 and generated approximately $1,700,000 in net cash after expenses and mortgage payoffs. The Company is leasing back space in the building under short-term lease agreements that provide office and storage space required for its current level of operations.

As of June 30, 2017, the Company has an employment agreement with one officer providing aggregate annual minimum commitments totaling approximately $272,000.  The agreements contain customary confidentiality and benefit provisions.

**Contingencies:**

In the ordinary course of business and in the general industry in which the Company is engaged, it is not atypical to periodically receive a third party communication which may be in the form of a notice, threat, or "cease and desist" letter concerning certain activities.  For example, this can occur in the context of the Company's pursuit of intellectual property rights.  This can also occur in the context of operations such as the using, making, having made, selling, and offering to sell products and services, and in other contexts.  The Company makes rational assessments of each situation on a case-by-case basis as such may arise.  The Company periodically evaluates its options for trademark positions and considers a full spectrum of alternatives for trademark protection and product branding.

We are currently not a party to any legal proceedings, the adverse outcome of which would, in our management's opinion, have a material adverse effect on our business, financial condition and results of operations.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Management's plans and basis of presentation:**

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Management's plans and basis of presentation:**

The Company has experienced recurring losses and negative cash flows from operations.  At June 30, 2017, the Company had approximate balances of cash and cash equivalents of $11,934,000, working capital of $11,137,000, total stockholders' equity of $11,013,000 and an accumulated deficit of $115,521,000. To date, the Company has in large part relied on equity financing to fund its operations. The Company expects to continue to incur losses from operations for the near-term and these losses could be significant as we incur costs and expenses associated with the exit of the BDI operations and public company and administrative related expenses are incurred. The Company believes that its current working capital position will be sufficient to meet its estimated cash needs for at least a year and a day from this filing.  The Company is closely monitoring its cash balances, cash needs and expense levels.

Effective January 14, 2017, we adopted a plan to exit the business of BDI and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required.  We are reviewing possible strategic alternatives relative to the business to maximize shareholder value.

Management's strategic plans include the following:

- exploring other possible strategic options and financing opportunities available to the Company;
- evaluating options to monetize, partner or license the Company's assets, including appendicitis product portfolio; and;
- continuing to implement cost control initiatives to conserve cash.

**NASDAQ listing:**

On April 10, 2017, the Company was notified by The NASDAQ Stock Market, LLC of its failure to comply with Nasdaq Listing Rule 5605 (the "Rule") which requires that the Company's audit committee be comprised of at least three independent directors, as defined under the Rule. On May 5, 2017, the Company appointed a new independent director to the Board of Directors and to the Company's audit committee, which resulted in the Company regaining compliance with the Rule.

**Results of Operations**

**Comparative Results for the Six Months Ended June 30, 2017 and 2016**

During each of the six month periods ended June 30, 2017 and 2016, $48,000 of license payments under the Exclusive License Agreement (the "License Agreement") with Ceva Santé Animale S.A. ("Licensee") was recognized as revenue.   See further discussion regarding the License Agreement below under the heading "Liquidity and Capital Resources."

Selling, general and administrative expenses in the six months ended June 30, 2017 totaled $2,097,000, which is an approximately $244,000, or 13%, increase as compared to the 2016 period. Compensation related expenses increased by approximately $526,000 due to separation and retention payments made during the 2017 period. Stock based compensation also increased by approximately $49,000 for the six months ended June 30, 2017, as compared to the 2016 period due to additional equity rights being granted to directors and officers. Legal and accounting expenses increased by $290,000 for the 2017 period due to additional legal services on various matters and costs associated with a change in audit firms. A decrease in strategic evaluation costs of approximately $456,000 related to the completion of strategic evaluations in 2016. Commercialization and marketing related expenses decreased by approximately $84,000 in the 2017 period as the Company had substantially wound down *APPY*1 commercialization activities in 2016.  A decrease of $81,000 in general operating expenses was due to the winding down of operations combined with the sale of Company's facility in 2016.

Research and development expenses in the six months ended June 30, 2017 totaled $45,000, which is an approximately $400,000, or 90%, decrease as compared to the 2016 period. Substantially all of the decrease was due to winding down development and commercialization of *APPY*2 and *APPY*1 operations that had ceased in 2016.

Interest expense for the six months ended June 30, 2017 totaled $29,000, compared to $26,000 in the 2016 period. The interest expense in the 2017 period primarily related to the convertible note offering in March 2017, and in 2016 primarily related to the mortgage loans on the building that was paid off in the first quarter of 2016 upon the building's sale. For the six months ended June 30, 2017, the Company recorded investment income of approximately $52,000, compared to investment income of $79,000 in the 2016 period, with the difference resulting from an average lower invested balance of funds.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party at a purchase price of $4,053,000. The sale resulted in a gain of approximately $1,900,000 and generated approximately $1,700,000 in net cash after expenses and mortgage payoffs. The Company is leasing back space in the building under short-term lease agreements that provide office and storage space required for its current level of operations.

No income tax benefit was recorded on the net loss for the six months ended June 30, 2017 and 2016, as management was unable to determine that it was more likely than not that such benefit would be realized.

**Comparative Results for the Three Months Ended June 30, 2017 and 2016**

During the three month periods ended June 30, 2017 and 2016, $24,000 in each period, of license payments under the License Agreement was recognized as revenue.

Selling, general and administrative expenses in the three months ended June 30, 2017 totaled $1,063,000, which is approximately $240,000, or 29%, increase as compared to the 2016 period. Compensation related expenses increased by approximately $354,000 due to separation and retention payments made during the 2017 period. Legal and accounting expenses increased by $145,000 for the 2017 period due to additional legal services on various matters and costs associated with a change in audit firms. A decrease in strategic evaluation costs of approximately $160,000 related to the completion of strategic evaluations in 2016. Stock based compensation decreased by approximately $38,000 for the three months ended June 30, 2017, as compared to the 2016 period due to less equity rights being granted to directors and officers. Commercialization and marketing related expenses decreased by approximately $42,000 in the 2017 period as the Company had substantially wound down *APPY*1 commercialization activities in 2016. A decrease of $18,000 in general operating expenses was due to the winding down of operations combined with the sale of Company's facility in 2016.

Research and development expenses in the three months ended June 30, 2017 totaled $28,000, which is approximately a $45,000, or 62%, decrease as compared to the 2016 period. This decrease resulted from the wind down activities of development and manufacturing activities from our previous area of focus, the *APPY*1 Test, in 2016, combined with lower animal health related expenses in 2017.

Interest expense for the three months ended June 30, 2017, totaled approximately $24,000 compared to virtually nil in the 2016 period. The interest expense in the 2017 period primarily related to the convertible note offering in March 2017.

**Liquidity and Capital Resources**

At June 30, 2017, we had working capital of $11,137,000, which included cash and cash equivalents of $11,934,000. We reported a net loss of $5,666,000, consisting of a net loss from continuing operations of $2,071,000 and a net loss from discontinued operations of $3,595,000, during the six months ended June 30, 2017. The net loss from continuing operations included $261,000 in non-cash items consisting of stock-based compensation totaling $271,000, depreciation and amortization totaling $38,000, net of amortization of license fees totaling $48,000.

In March 2017 we entered into private placement agreements, under which during the six months ended June 30, 2017, we received gross proceeds before offering expenses of $2,250,000 from the sale of 900,000 shares of common stock, including the issuance of 900,000 warrants.

In March 2017, the Company also closed on a convertible note financing with certain accredited investors with gross proceeds totaling $4,750,000. The convertible note financing proceeds are in escrow pending successful completion of release conditions, which are outside the control of the Company.

During the six months ended June 30, 2017, the Company negotiated and executed agreements with holders of stock rights (stock options and restricted shares) to have such holders waive their rights to the stock rights in exchange for a one time cash payment. Under the agreements, a total of 532,911 rights were forfeited, consisting of; 494,578 stock options under the Company's 2002 Stock Incentive Plan, 37,500 non-qualified options issued outside of the Plan and 833 restricted common shares. The total consideration under the agreements was $299,500. Of the total paid,

Interest expense for the six months ended June 30, 2017 totaled $29,000, compared to $26,000 in the 2016 period.  The interest expense in the 2017 period primarily related to the convertible note offering in March 2017, and in 2016 primarily related to the mortgage loans on the building that was paid off in the first quarter of 2016 upon the building's sale. For the six months ended June 30, 2017, the Company recorded investment income of approximately $52,000, compared to investment income of $79,000 in the 2016 period, with the difference resulting from an average lower invested balance of funds.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party at a purchase price of $4,053,000. The sale resulted in a gain of approximately $1,900,000 and generated approximately $1,700,000 in net cash after expenses and mortgage payoffs. The Company is leasing back space in the building under short-term lease agreements that provide office and storage space required for its current level of operations.

No income tax benefit was recorded on the net loss for the six months ended June 30, 2017 and 2016, as management was unable to determine that it was more likely than not that such benefit would be realized.

**Comparative Results for the Three Months Ended June 30, 2017 and 2016**

During the three month periods ended June 30, 2017 and 2016, $24,000 in each period, of license payments under the License Agreement was recognized as revenue.

Selling, general and administrative expenses in the three months ended June 30, 2017 totaled $1,063,000, which is approximately $240,000, or 29%, increase as compared to the 2016 period. Compensation related expenses increased by approximately $354,000 due to separation and retention payments made during the 2017 period. Legal and accounting expenses increased by $145,000 for the 2017 period due to additional legal services on various matters and costs associated with a change in audit firms. A decrease in strategic evaluation costs of approximately $160,000 related to the completion of strategic evaluations in 2016. Stock based compensation decreased by approximately $38,000 for the three months ended June 30, 2017, as compared to the 2016 period due to less equity rights being granted to directors and officers. Commercialization and marketing related expenses decreased by approximately $42,000 in the 2017 period as the Company had substantially wound down *APPY*1 commercialization activities in 2016.  A decrease of $18,000 in general operating expenses was due to the winding down of operations combined with the sale of Company's facility in 2016.

Research and development expenses in the three months ended June 30, 2017 totaled $28,000, which is approximately a $45,000, or 62%, decrease as compared to the 2016 period. This decrease resulted from the wind down activities of development and manufacturing activities from our previous area of focus, the *APPY*1 Test, in 2016, combined with lower animal health related expenses in 2017.

Interest expense for the three months ended June 30, 2017, totaled approximately $24,000 compared to virtually nil in the 2016 period. The interest expense in the 2017 period primarily related to the convertible note offering in March 2017.

**Liquidity and Capital Resources**

At June 30, 2017, we had working capital of $11,137,000, which included cash and cash equivalents of $11,934,000.  We reported a net loss of $5,666,000, consisting of a net loss from continuing operations of $2,071,000 and a net loss from discontinued operations of $3,595,000, during the six months ended June 30, 2017.  The net loss from continuing operations included $261,000 in non-cash items consisting of stock-based compensation totaling $271,000, depreciation and amortization totaling $38,000, net of amortization of license fees totaling $48,000.

In March 2017 we entered into private placement agreements, under which during the six months ended June 30, 2017, we received gross proceeds before offering expenses of $2,250,000 from the sale of 900,000 shares of common stock, including the issuance of 900,000 warrants.

In March 2017, the Company also closed on a convertible note financing with certain accredited investors with gross proceeds totaling $4,750,000. The convertible note financing proceeds are in escrow pending successful completion of release conditions, which are outside the control of the Company.

During the six months ended June 30, 2017, the Company negotiated and executed agreements with holders of stock rights (stock options and restricted shares) to have such holders waive their rights to the stock rights in exchange for a one time cash payment.  Under the agreements, a total of 532,911 rights were forfeited, consisting of; 494,578 stock options under the Company's 2002 Stock Incentive Plan, 37,500 non-qualified options issued outside of the Plan and 833 restricted common shares. The total consideration under the agreements was $299,500. Of the total paid, $291,995 was charged to stockholders' equity and $7,505 was charged to stock-based compensation.

We expect to continue to incur losses from operations for the near-term and these losses could be significant as we incur costs and expenses associated with the exit of the BDI operations and public company and administrative related expenses are incurred. We believe that our current working capital position will be sufficient to meet our estimated cash needs for at least a year and a day from this filing. We may pursue potential additional financing opportunities.  However, there can be no assurance that we will be able to obtain sufficient additional financing on terms acceptable to us, if at all.   We are closely monitoring our cash balances, cash needs and expense levels. The accompanying financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that might result in our possible inability to continue as a going concern.

In July 2012, we entered into an exclusive license agreement (the "License Agreement") with Ceva Santé Animale S.A. ("Licensee"), pursuant to which we granted the Licensee an exclusive royalty-bearing license, until December 31, 2028, to our intellectual property and other assets, including patent rights and know-how, relating to recombinant single chain reproductive hormone technology for use in non-human mammals (the "Company's Animal Health Assets"). The License Agreement is subject to termination by the Licensee (a) for convenience on 180 days prior written notice, (b) in the Licensee's discretion in the event of a sale or other disposal of the Company's Animal Health Assets, (c) in the Licensee's discretion upon a change in control of the Company, (d) for a material breach of the License Agreement by us, or (e) in the Licensee's discretion, if we become insolvent.  The License Agreement is also terminable by us if there is a material breach of the License Agreement by the Licensee, or if the Licensee challenges our ownership of designated intellectual property. The License Agreement includes a sublicense of the technology licensed to the Company by Washington University in St. Louis ("WU"). Under the terms of an exclusive license agreement ("WU License Agreement"), a portion of license fees and royalties we receive from sublicensing agreements will be paid to WU. The obligation for such license fees due to WU is included in accrued expenses at June 30, 2017.

Under the License Agreement, as of June 30, 2017, the following future milestone payments are provided, assuming future milestones are successfully achieved:

- Milestone payments, totaling up to a potential of $1.1 million in the aggregate, based on the satisfactory conclusion of milestones as defined in the License Agreement;
- Potential for milestone payments of up to an additional $2 million for development and receipt of regulatory approval for additional licensed products; and
- Royalties, at low double digit rates, based on sales of licensed products.

The Company periodically enters into generally short-term consulting agreements, which at this time are primarily for assistance with our strategic evaluations.  Such commitments at any point in time may be significant but the agreements typically contain cancellation provisions.

Prior to the February 2016 sale of its corporate headquarters, the Company had a permanent mortgage on its land and building that was refinanced in May 2013. The mortgage was held by a commercial bank and included a portion guaranteed by the U. S. Small Business Administration ("SBA"). The loan was collateralized by the real property and the SBA portion was also personally guaranteed by a former officer of the Company. The commercial bank loan terms included a payment schedule based on a fifteen year amortization, with a balloon maturity at five years. The commercial bank portion had an interest rate fixed at 3.95%, and the SBA portion bore interest at the rate of 5.86%. The commercial bank portion of the loan required total monthly payments of approximately $11,700, which included approximately $4,500 per month in interest. The SBA portion of the loan required total monthly payments of approximately $9,000 through July 2023, which included approximately $3,500 per month in interest and fees in 2016.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party at a purchase price of $4,053,000. The sale resulted in a gain of approximately $1,919,000 and generated approximately $1,749,000 in net cash after expenses and mortgage payoffs. The Company is leasing back space in the building under a short-term lease agreement that provide storage space.

Due to recent market events that have adversely affected all industries and the economy as a whole, management has placed increased emphasis on monitoring the risks associated with the current environment, particularly the investment parameters of the short-term investments, the recoverability of current assets, the fair value of assets, and the Company's liquidity. At this point in time, there has not been a material impact on the Company's assets and liquidity. Management will continue to monitor the risks associated with the current environment and their impact on the Company's results.

**Operating Activities**

We expect to continue to incur losses from operations for the near-term and these losses could be significant as we incur costs and expenses associated with the exit of the BDI operations and public company and administrative related expenses are incurred. We believe that our current working capital position will be sufficient to meet our estimated cash needs for at least a year and a day from this filing. We may pursue potential additional financing opportunities.  However, there can be no assurance that we will be able to obtain sufficient additional financing on terms acceptable to us, if at all.   We are closely monitoring our cash balances, cash needs and expense levels. The accompanying financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that might result in our possible inability to continue as a going concern.

In July 2012, we entered into an exclusive license agreement (the "License Agreement") with Ceva Santé Animale S.A. ("Licensee"), pursuant to which we granted the Licensee an exclusive royalty-bearing license, until December 31, 2028, to our intellectual property and other assets, including patent rights and know-how, relating to recombinant single chain reproductive hormone technology for use in non-human mammals (the "Company's Animal Health Assets"). The License Agreement is subject to termination by the Licensee (a) for convenience on 180 days prior written notice, (b) in the Licensee's discretion in the event of a sale or other disposal of the Company's Animal Health Assets, (c) in the Licensee's discretion upon a change in control of the Company, (d) for a material breach of the License Agreement by us, or (e) in the Licensee's discretion, if we become insolvent.  The License Agreement is also terminable by us if there is a material breach of the License Agreement by the Licensee, or if the Licensee challenges our ownership of designated intellectual property. The License Agreement includes a sublicense of the technology licensed to the Company by Washington University in St. Louis ("WU"). Under the terms of an exclusive license agreement ("WU License Agreement"), a portion of license fees and royalties we receive from sublicensing agreements will be paid to WU. The obligation for such license fees due to WU is included in accrued expenses at June 30, 2017.

Under the License Agreement, as of June 30, 2017, the following future milestone payments are provided, assuming future milestones are successfully achieved:

- Milestone payments, totaling up to a potential of $1.1 million in the aggregate, based on the satisfactory conclusion of milestones as defined in the License Agreement;
- Potential for milestone payments of up to an additional $2 million for development and receipt of regulatory approval for additional licensed products; and
- Royalties, at low double digit rates, based on sales of licensed products.

The Company periodically enters into generally short-term consulting agreements, which at this time are primarily for assistance with our strategic evaluations.  Such commitments at any point in time may be significant but the agreements typically contain cancellation provisions.

Prior to the February 2016 sale of its corporate headquarters, the Company had a permanent mortgage on its land and building that was refinanced in May 2013. The mortgage was held by a commercial bank and included a portion guaranteed by the U. S. Small Business Administration ("SBA"). The loan was collateralized by the real property and the SBA portion was also personally guaranteed by a former officer of the Company. The commercial bank loan terms included a payment schedule based on a fifteen year amortization, with a balloon maturity at five years. The commercial bank portion had an interest rate fixed at 3.95%, and the SBA portion bore interest at the rate of 5.86%. The commercial bank portion of the loan required total monthly payments of approximately $11,700, which included approximately $4,500 per month in interest. The SBA portion of the loan required total monthly payments of approximately $9,000 through July 2023, which included approximately $3,500 per month in interest and fees in 2016.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party at a purchase price of $4,053,000. The sale resulted in a gain of approximately $1,919,000 and generated approximately $1,749,000 in net cash after expenses and mortgage payoffs. The Company is leasing back space in the building under a short-term lease agreement that provide storage space.

Due to recent market events that have adversely affected all industries and the economy as a whole, management has placed increased emphasis on monitoring the risks associated with the current environment, particularly the investment parameters of the short-term investments, the recoverability of current assets, the fair value of assets, and the Company's liquidity. At this point in time, there has not been a material impact on the Company's assets and liquidity. Management will continue to monitor the risks associated with the current environment and their impact on the Company's results.

**Operating Activities**

Net cash consumed by operating activities was $2,576,000, consisting of $1,687,000 from continuing operations and $889,000 from discontinued operations during the six months ended June 30, 2017. Cash was consumed from continuing operations by the loss of $2,071,000, less non-cash

items of $261,000 consisting of stock-based compensation totaling $271,000, depreciation and amortization totaling $38,000, net of amortization of license fees totaling $48,000. Decreases in prepaid and other current assets of $167,000 provided cash, primarily related to reductions in operating activities.  There was a net $44,000 decrease in accounts payable and accrued expenses in the six months ended June 30, 2017, primarily due to reductions in operating activities and the payment of 2016 litigation settlement accrual in early 2017.

23

Net cash consumed by operating activities was $2,546,000 during the six months ended June 30, 2016. Cash was consumed by the loss of $276,000, less non-cash expenses of $438,000 for stock-based compensation, depreciation and amortization, and impairment of patent costs, offset by the gain on sale of property and equipment of $1,920,000 and amortization of license fees totaling $48,000. Decreases in prepaid and other current assets of $194,000 provided cash, primarily related to routine changes in operating activities.  There was a $933,000 decrease in accounts payable and accrued expenses in the six months ended June 30, 2016, primarily due to the payment of 2015 accrued incentives in early 2016, and a reduction in overall expenses due to the wind-down of the *APPY*1 activities.

**Investing Activities**

Net cash inflows from investing activities provided cash of $7,498,000, consisting of $7,494,000 from continuing operations and a cash inflow of $4,000 from discontinued operations during the six months ended June 30, 2017. Sales of marketable securities investments totaling approximately $7,507,000 provided cash.  A $13,000 use of cash was attributable to additional costs incurred from patent filings.

Net cash inflows from investing activities provided $5,198,000 during the six months ended June 30, 2016. Sales of marketable securities investments totaling approximately $13,613,000 provided cash net of marketable securities purchased totaling approximately $10,150,000.  A $14,000 use of cash was attributable to additional costs incurred from patent filings.  The sale of the land, building and assets generated approximately $1,749,000 in cash.

**Financing Activities**

Net cash inflows from financing activities provided $1,482,000 from continuing operations, during the six months ended June 30, 2017 consisting of net proceeds of $1,914,000 from the sale of common stock and warrants, net of $140,000 in scheduled payments under debt agreements, and net of $292,000 consumed from the option termination payments.

Net cash outflows from financing activities consumed $174,000 during the six months ended June 30, 2016 in scheduled payments under debt agreements.

**Critical Accounting Policies**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America (GAAP) requires management to make estimates and assumptions about future events that affect the amounts reported in the financial statements and accompanying notes. Future events and their effects cannot be determined with absolute certainty. Therefore, the determination of estimates requires the exercise of judgment. Actual results inevitably will differ from those estimates, and such differences may be material to the financial statements. The most significant accounting estimates inherent in the preparation of our financial statements include estimates associated with revenue recognition, impairment analysis of intangibles and stock-based compensation.

The Company's financial position, results of operations and cash flows are impacted by the accounting policies the Company has adopted. In order to get a full understanding of the Company's financial statements, one must have a clear understanding of the accounting policies employed. A summary of the Company's critical accounting policies follows:

*Investments*:   The Company invests excess cash from time to time in highly liquid debt and equity securities of highly rated entities which are classified as trading securities. Such amounts are recorded at market and are generally classified as current, as the Company does not intend to hold the investments beyond twelve months. Such excess funds are invested under the Company's investment policy but an unexpected decline or loss could have an adverse and material effect on the carrying value, recoverability or investment returns of such investments. Our Board has approved an investment policy covering the investment parameters to be followed with the primary goals being the safety of principal amounts and maintaining liquidity of the fund. The policy provides for minimum investment rating requirements as well as limitations on investment duration

Net cash consumed by operating activities was $2,546,000 during the six months ended June 30, 2016. Cash was consumed by the loss of $276,000, less non-cash expenses of $438,000 for stock-based compensation, depreciation and amortization, and impairment of patent costs, offset by the gain on sale of property and equipment of $1,920,000 and amortization of license fees totaling $48,000. Decreases in prepaid and other current assets of $194,000 provided cash, primarily related to routine changes in operating activities.  There was a $933,000 decrease in accounts payable and accrued expenses in the six months ended June 30, 2016, primarily due to the payment of 2015 accrued incentives in early 2016, and a reduction in overall expenses due to the wind-down of the *APPY*1 activities.

### Investing Activities

Net cash inflows from investing activities provided cash of $7,498,000, consisting of $7,494,000 from continuing operations and a cash inflow of $4,000 from discontinued operations during the six months ended June 30, 2017. Sales of marketable securities investments totaling approximately $7,507,000 provided cash.  A $13,000 use of cash was attributable to additional costs incurred from patent filings.

Net cash inflows from investing activities provided $5,198,000 during the six months ended June 30, 2016. Sales of marketable securities investments totaling approximately $13,613,000 provided cash net of marketable securities purchased totaling approximately $10,150,000.  A $14,000 use of cash was attributable to additional costs incurred from patent filings.  The sale of the land, building and assets generated approximately $1,749,000 in cash.

### Financing Activities

Net cash inflows from financing activities provided $1,482,000 from continuing operations, during the six months ended June 30, 2017 consisting of net proceeds of $1,914,000 from the sale of common stock and warrants, net of $140,000 in scheduled payments under debt agreements, and net of $292,000 consumed from the option termination payments.

Net cash outflows from financing activities consumed $174,000 during the six months ended June 30, 2016 in scheduled payments under debt agreements.

### Critical Accounting Policies

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America (GAAP) requires management to make estimates and assumptions about future events that affect the amounts reported in the financial statements and accompanying notes. Future events and their effects cannot be determined with absolute certainty. Therefore, the determination of estimates requires the exercise of judgment. Actual results inevitably will differ from those estimates, and such differences may be material to the financial statements. The most significant accounting estimates inherent in the preparation of our financial statements include estimates associated with revenue recognition, impairment analysis of intangibles and stock-based compensation.

The Company's financial position, results of operations and cash flows are impacted by the accounting policies the Company has adopted. In order to get a full understanding of the Company's financial statements, one must have a clear understanding of the accounting policies employed. A summary of the Company's critical accounting policies follows:

*Investments*:   The Company invests excess cash from time to time in highly liquid debt and equity securities of highly rated entities which are classified as trading securities. Such amounts are recorded at market and are generally classified as current, as the Company does not intend to hold the investments beyond twelve months. Such excess funds are invested under the Company's investment policy but an unexpected decline or loss could have an adverse and material effect on the carrying value, recoverability or investment returns of such investments. Our Board has approved an investment policy covering the investment parameters to be followed with the primary goals being the safety of principal amounts and maintaining liquidity of the fund. The policy provides for minimum investment rating requirements as well as limitations on investment duration and concentrations.

*Intangible Assets*:   Intangible assets primarily represent legal costs and filings associated with obtaining patents on the Company's new discoveries.  The Company amortizes these costs over the shorter of the legal life of the patent or its estimated economic life using the straight-line method.  The Company tests intangible assets with finite lives upon significant changes in the Company's business environment. The testing resulted in no patent impairment charges written off during the six month period ended June 30, 2017 and $168,000 net patent impairment charges written off during the six months ended June 30, 2016.

*Long-Lived Assets*:   The Company records property and equipment at cost. Depreciation of the assets is recorded on the straight-line basis over the

estimated useful lives of the assets. Dispositions of property and equipment are recorded in the period of disposition and any resulting gains or losses are charged to income or expense when the disposal occurs. The Company reviews for impairment whenever there is an indication of impairment.

---

24

---

**Revenue Recognition:**  The Company's revenues are recognized when products are shipped or delivered to unaffiliated customers. The Securities and Exchange Commission's Staff Accounting Bulletin (SAB) No. 104 provides guidance on the application of GAAP to select revenue recognition issues. The Company has concluded that its revenue recognition policy is appropriate and in accordance with SAB No. 104. Revenue is recognized under sales, license and distribution agreements only after the following criteria are met: (i) there exists adequate evidence of the transactions; (ii) delivery of goods has occurred or services have been rendered; and (iii) the price is not contingent on future activity; and (iv) collectability is reasonably assured.

**Stock-based Compensation:**  ASC 718, *Share-Based Payment*, defines the fair-value-based method of accounting for stock-based employee compensation plans and transactions used by the Company to account for its issuances of equity instruments to record compensation cost for stock-based employee compensation plans at fair value as well as to acquire goods or services from non-employees. Transactions in which the Company issues stock-based compensation to employees, directors and consultants and for goods or services received from non-employees are accounted for based on the fair value of the equity instruments issued. The Company utilizes pricing models in determining the fair values of options and warrants issued as stock-based compensation. These pricing models utilize the market price of the Company's common stock and the exercise price of the option or warrant, as well as time value and volatility factors underlying the positions.

**Recently issued and adopted accounting pronouncements:**

The Company has evaluated all recently issued accounting pronouncements and believes such pronouncements do not have a material effect on the Company's financial statements.

## Item 3.   Quantitative and Qualitative Disclosures About Market Risk

### General

We have limited exposure to market risks from instruments that may impact the Balance Sheets, Statements of Operations, and Statements of Cash Flows. Such exposure is due primarily to changing interest rates.

### Interest Rates

The primary objective for our investment activities is to preserve principal while maximizing yields without significantly increasing risk. This is accomplished by investing excess cash in highly liquid debt and equity investments of highly rated entities which are classified as trading securities.  As of June 30, 2017, 100% of the investment portfolio was in cash and cash equivalents with very short-term maturities and therefore not subject to any significant interest rate fluctuations. We have no investments denominated in foreign currencies and therefore our investments are not subject to foreign currency exchange risk.

## Item 4.   Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

Management of the Company, including the Chief Executive Officer and the Chief Financial Officer, has conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rule 13a-15(e)) as of the last day of the period of the accompanying financial statements.  Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective as of June 30, 2017.

### Changes in Internal Control Over Financial Reporting

There was no change in the Company's internal control over financial reporting that occurred during the fiscal quarter to which this report relates that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

***Revenue Recognition***:  The Company's revenues are recognized when products are shipped or delivered to unaffiliated customers. The Securities and Exchange Commission's Staff Accounting Bulletin (SAB) No. 104 provides guidance on the application of GAAP to select revenue recognition issues. The Company has concluded that its revenue recognition policy is appropriate and in accordance with SAB No. 104. Revenue is recognized under sales, license and distribution agreements only after the following criteria are met: (i) there exists adequate evidence of the transactions; (ii) delivery of goods has occurred or services have been rendered; and (iii) the price is not contingent on future activity; and (iv) collectability is reasonably assured.

***Stock-based Compensation***:  ASC 718, *Share-Based Payment*, defines the fair-value-based method of accounting for stock-based employee compensation plans and transactions used by the Company to account for its issuances of equity instruments to record compensation cost for stock-based employee compensation plans at fair value as well as to acquire goods or services from non-employees. Transactions in which the Company issues stock-based compensation to employees, directors and consultants and for goods or services received from non-employees are accounted for based on the fair value of the equity instruments issued. The Company utilizes pricing models in determining the fair values of options and warrants issued as stock-based compensation. These pricing models utilize the market price of the Company's common stock and the exercise price of the option or warrant, as well as time value and volatility factors underlying the positions.

### Recently issued and adopted accounting pronouncements:

The Company has evaluated all recently issued accounting pronouncements and believes such pronouncements do not have a material effect on the Company's financial statements.

## Item 3.   Quantitative and Qualitative Disclosures About Market Risk

### General

We have limited exposure to market risks from instruments that may impact the Balance Sheets, Statements of Operations, and Statements of Cash Flows. Such exposure is due primarily to changing interest rates.

### Interest Rates

The primary objective for our investment activities is to preserve principal while maximizing yields without significantly increasing risk. This is accomplished by investing excess cash in highly liquid debt and equity investments of highly rated entities which are classified as trading securities.  As of June 30, 2017, 100% of the investment portfolio was in cash and cash equivalents with very short-term maturities and therefore not subject to any significant interest rate fluctuations. We have no investments denominated in foreign currencies and therefore our investments are not subject to foreign currency exchange risk.

## Item 4.   Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

Management of the Company, including the Chief Executive Officer and the Chief Financial Officer, has conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rule 13a-15(e)) as of the last day of the period of the accompanying financial statements.  Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective as of June 30, 2017.

### Changes in Internal Control Over Financial Reporting

There was no change in the Company's internal control over financial reporting that occurred during the fiscal quarter to which this report relates that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

## PART II - OTHER INFORMATION

## Item 1.   Legal Proceedings

## PART II - OTHER INFORMATION

### Item 1.   Legal Proceedings

We are not a party to any legal proceedings, the adverse outcome of which would, in our management's opinion, have a material adverse effect on our business, financial condition and results of operations.

### Item 1A.   Risk Factors

There have been no material changes from the risk factors disclosed in our Annual Report on Form 10-K, for the year ended December 31, 2016.

### Item 6.   Exhibits

| EXHIBIT | DESCRIPTION |
|---|---|
| 10.1 | Form of Separation Agreement between Bioptix, Inc. and Stephen Lundy (incorporated by reference to the Registrant's Current Report on Form 8-K, dated April 6, 2017, and filed April 7, 2017). |
| 10.2 | Form of Separation Agreement between Bioptix, Inc. and Richard J. Whitcomb (incorporated by reference to the Registrant's Current Report on Form 8-K, dated and filed June 15, 2017). |
| 10.3 | Form of Retention Agreement between Bioptix, Inc. and Jeffrey McGonegal (incorporated by reference to the Registrant's Current Report on Form 8-K, dated June 30, 2017, and filed July 3, 2017). |
| 31.1 | Rule 13a-14(a)/15d-14(a) - Certification of Chief Executive Officer. Filed herewith. |
| 31.2 | Rule 13a-14(a)/15d-14(a) - Certification of Chief Financial Officer. Filed herewith. |
| 32 | Section 1350 Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Furnished herewith. |
| 101 | Interactive data files pursuant to Rule 405 of Regulation S-T: (i) the Balance Sheets, (ii) the Statements of Operations, (iii) the Statement of Cash Flows and (iv) the Notes to Condensed Financial Statements. |

26

---

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Bioptix, Inc.
(Registrant)

Dated: August 11, 2017

/s/ Michael Beeghley

Michael Beeghley,
Chief Executive Officer and Chairman of the Board (Principal Executive Officer)

/s/ Jeffrey G. McGonegal

Dated: August 11, 2017

Jeffrey G. McGonegal,
Chief Financial Officer (Principal Financial and Accounting Officer)

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Bioptix, Inc.
(Registrant)

Dated: August 11, 2017

/s/ Michael Beeghley

Michael Beeghley,
Chief Executive Officer and Chairman of the Board (Principal Executive Officer)

/s/ Jeffrey G. McGonegal

Dated: August 11, 2017

Jeffrey G. McGonegal,
Chief Financial Officer (Principal Financial and Accounting Officer)

27

# FORM 10-Q for the quarterly period ended September 30, 2017

10-Q 1 riot_10q-093017.htm FORM 10-Q FOR THE PERIOD ENDED 9/30/2017

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-Q**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the quarterly period ended September 30, 2017**

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

Commission file number: 001-33675

# Riot Blockchain, Inc.

(Exact name of registrant as specified in its charter)

| **Nevada** | **84-1553387** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**202 6th Street, Suite 401  Castle Rock, CO  80104**

(Address of principal executive offices) (Zip Code)

**(303) 794-2000**

(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ?   No ?

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ?  No ?

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ?    Accelerated filer ?    Non-accelerated filer ?   Smaller reporting company ?  Emerging growth company ?

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ?

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ?   No ?

The number of shares of no par value common stock outstanding as of November 13, 2017 was 8,321,137.

## RIOT BLOCKCHAIN, INC.

PART I - Financial Information

|  |  | Page |
|---|---|---|
| Item 1. | Consolidated Financial Statements |  |
|  | Consolidated Balance Sheets as of September 30, 2017 (unaudited) and December 31, 2016 | 3 |
|  | Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2017 and 2016 (unaudited) | 4 |
|  | Consolidated Statement of Stockholders' Equity for the Nine Months Ended September 30, 2017 (unaudited) | 5 |
|  | Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2017 and 2016 (unaudited) | 6 |
|  | Notes to Consolidated Financial Statements (unaudited) | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 29 |
| Item 4. | Controls and Procedures | 29 |
|  | PART II - Other Information |  |
| Item 1. | Legal Proceedings | 30 |
| Item 1A. | Risk Factors | 30 |
| Item 6. | Exhibits | 38 |
|  | Signatures | 39 |

### CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION AND STATEMENTS

Certain statements in this Quarterly Report on Form 10-Q, including in Management's Discussion and Analysis of Financial Condition and Results of Operations, are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended, and are subject to the safe harbor created thereby. These statements relate to future events or the Company's future financial performance and involve known and unknown risks, uncertainties and other factors that may cause the actual results, levels of activity, performance or achievements of the Company or its industry to be materially different from those expressed or implied by any forward-looking statements. In some cases, forward-looking statements can be identified by terminology such as "may," "will," "could," "would," "should," "expect," "plan," "anticipate," "intend," "believe," "estimate," "predict," "potential" or other comparable terminology. Please see the "Risk Factors" in Part II, Item 1A of this Quarterly Report on Form 10-Q and in Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2016 for a discussion of certain important factors that relate to forward-looking statements contained in this report. Although the Company believes that the expectations reflected in these forward-looking statements are reasonable, it can give no assurance that such expectations will prove to be correct. Unless otherwise required by applicable securities laws, the Company disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

**PART I — FINANCIAL INFORMATION**
**Item 1. Consolidated Financial Statements**

**Riot Blockchain, Inc. and Subsidiaries**
**Consolidated Balance Sheets**

| | | September 30, 2017 | | December 31, 2016 |
|---|---|---|---|---|
| | | **(Unaudited)** | | **(Reclassified)** |
| **ASSETS** | | | | |
| Current assets (Note 1): | | | | |
| Cash and cash equivalents | $ | 13,139,722 | $ | 5,529,848 |
| Short-term investments | | - | | 7,506,761 |
| Prepaid expenses and other current assets | | 295,059 | | 219,991 |
| Current assets of discontinued operations (Note 9) | | 11,532 | | 486,890 |
| Total current assets | | 13,446,313 | | 13,743,490 |
| Property and equipment, net (Note 3) | | 4,113 | | 5,538 |
| Investment in Coinsquare (Note 2) | | 3,000,000 | | - |
| Other long term assets, net (Note 4) | | 899,319 | | 938,038 |
| Noncurrent assets of discontinued operations (Note 9) | | - | | 2,353,749 |
| Total assets | $ | 17,349,745 | $ | 17,040,815 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 248,820 | $ | 253,817 |
| Accrued compensation | | 4,659 | | 1,520 |
| Accrued expenses | | 122,990 | | 304,675 |
| Notes and other obligations, current portion (Note 5) | | 215,712 | | 139,611 |
| Deferred revenue, current portion (Note 8) | | 96,698 | | 96,698 |
| Current liabilities of discontinued operations (Note 9) | | 202,080 | | 258,819 |
| Total current liabilities | | 890,959 | | 1,055,140 |
| Deferred revenue, less current portion (Note 8) | | 992,792 | | 1,065,316 |
| Total liabilities | | 1,883,751 | | 2,120,456 |
| Commitments and contingencies (Notes 6, 8 and 10) | | | | |
| Stockholders' equity (Notes 6 and 7): | | | | |
| Preferred Stock, no par value, 15,000,000 (2017) and 0 (2016) shares authorized; 2,000,000 (2017) and 0 (2016) shares designated as 2% Series A Convertible Stock, 19,194.72 shares issued and outstanding (2017) | | 4,798,671 | | - |
| Common stock, no par value, 170,000,000 (2017) and 60,000,000 (2016) shares authorized; shares issued and outstanding 5,447,792 (2017) and 4,503,971 (2016) | | 131,490,219 | | 124,775,635 |
| Accumulated deficit | | (120,822,896) | | (109,855,276) |
| Total stockholders' equity | | 15,465,994 | | 14,920,359 |
| Total liabilities and stockholders' equity | $ | 17,349,745 | $ | 17,040,815 |

See Accompanying Notes to Unaudited Consolidated Financial Statements

3

**Riot Blockchain, Inc. and Subsidiaries**
**Consolidated Statements of Operations**
**Three and Nine Months Ended September 30,**
**(Unaudited)**

|  | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
|  | 2017 | 2016 | 2017 | 2016 |
| Other revenue – fee (Note 8) | $ 24,175 | $ 24,175 | $ 72,524 | $ 72,524 |
| Operating expenses: |  |  |  |  |
| Selling, general and administrative | 597,018 | 1,480,141 | 2,694,211 | 3,333,102 |
| Research and development | 17,658 | 52,963 | 63,008 | 498,634 |
| Total operating expenses | 614,676 | 1,533,104 | 2,757,219 | 3,831,736 |
| Operating loss from continuing operations | (590,501) | (1,508,929) | (2,684,695) | (3,759,212) |
| Other income (expense): |  |  |  |  |
| Gain on property and equipment sale (Note 3) | - | 13,062 | - | 1,933,335 |
| Interest expense | (4,773,397) | (2,384) | (4,802,296) | (28,130) |
| Investment income | 30,903 | 23,639 | 83,247 | 103,031 |
| Total other income (expense) | (4,742,494) | 34,317 | (4,719,049) | 2,008,236 |
| Loss from continuing operations | (5,332,995) | (1,474,612) | (7,403,744) | (1,750,976) |
| Discontinued operations (Note 9): |  |  |  |  |
| Income (loss) from operations | 30,922 | (236,473) | (944,557) | (236,473) |
| Escrow forfeiture gain (Note 6) | - | - | 134,812 | - |
| Impairment (loss) | - | - | (2,754,131) | - |
| Total income (loss) from discontinued operations | 30,922 | (236,473) | (3,563,876) | (236,473) |
| Net loss | $ (5,302,073) | $ (1,711,085) | $ (10,967,620) | $ (1,987,449) |
| Basic and diluted net income (loss) per share (Note 1) |  |  |  |  |
| Continuing operations | $ (0.99) | $ (0.37) | $ (1.47) | $ (0.45) |
| Discontinued operations | 0.01 | (0.06) | (0.71) | (0.06) |
| Basic and diluted net loss per share (Note 1) | $ (0.98) | $ (0.43) | $ (2.18) | $ (0.51) |
| Basic and diluted weighted average number of shares outstanding (Note 1) | 5,401,552 | 3,999,637 | 5,037,764 | 3,918,151 |

See Accompanying Notes to Unaudited Consolidated Financial Statements

4

**Riot Blockchain, Inc. and Subsidiaries**
**Consolidated Statements of Operations**
**Three and Nine Months Ended September 30,**
**(Unaudited)**

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | **2017** | **2016** | **2017** | **2016** |
| Other revenue – fee (Note 8) | $ 24,175 | $ 24,175 | $ 72,524 | $ 72,524 |
| | | | | |
| Operating expenses: | | | | |
| Selling, general and administrative | 597,018 | 1,480,141 | 2,694,211 | 3,333,102 |
| Research and development | 17,658 | 52,963 | 63,008 | 498,634 |
| | | | | |
| Total operating expenses | 614,676 | 1,533,104 | 2,757,219 | 3,831,736 |
| | | | | |
| Operating loss from continuing operations | (590,501) | (1,508,929) | (2,684,695) | (3,759,212) |
| | | | | |
| Other income (expense): | | | | |
| Gain on property and equipment sale (Note 3) | - | 13,062 | - | 1,933,335 |
| Interest expense | (4,773,397) | (2,384) | (4,802,296) | (28,130) |
| Investment income | 30,903 | 23,639 | 83,247 | 103,031 |
| | | | | |
| Total other income (expense) | (4,742,494) | 34,317 | (4,719,049) | 2,008,236 |
| | | | | |
| Loss from continuing operations | (5,332,995) | (1,474,612) | (7,403,744) | (1,750,976) |
| | | | | |
| Discontinued operations (Note 9): | | | | |
| Income (loss) from operations | 30,922 | (236,473) | (944,557) | (236,473) |
| Escrow forfeiture gain (Note 6) | - | - | 134,812 | - |
| Impairment (loss) | - | - | (2,754,131) | - |
| Total income (loss) from discontinued operations | 30,922 | (236,473) | (3,563,876) | (236,473) |
| Net loss | $ (5,302,073) | $ (1,711,085) | $ (10,967,620) | $ (1,987,449) |
| | | | | |
| Basic and diluted net income (loss) per share (Note 1) | | | | |
| Continuing operations | $ (0.99) | $ (0.37) | $ (1.47) | $ (0.45) |
| Discontinued operations | 0.01 | (0.06) | (0.71) | (0.06) |
| Basic and diluted net loss per share (Note 1) | $ (0.98) | $ (0.43) | $ (2.18) | $ (0.51) |
| | | | | |
| Basic and diluted weighted average number of shares outstanding (Note 1) | 5,401,552 | 3,999,637 | 5,037,764 | 3,918,151 |

See Accompanying Notes to Unaudited Consolidated Financial Statements

4

**Riot Blockchain, Inc. and Subsidiaries**
**Consolidated Statement of Stockholders' Equity**
**Nine Months Ended September 30, 2017**

**Riot Blockchain, Inc. and Subsidiaries**
**Consolidated Statement of Stockholders' Equity**
**Nine Months Ended September 30, 2017**
**(Unaudited)**

| | Preferred Stock | | Common Stock | | Accumulated | |
| --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares | Amount | Deficit | Total |
| **Balance, January 1, 2017** | — | $    — | 4,503,971 | $124,775,635 | $(109,855,276) | $ 14,920,359 |
| Private placement of Common Stock (Note 6) | — | — | 900,000 | 1,913,509 | — | 1,913,509 |
| Common Shares in escrow forfeited and retired (Note 6) | — | — | (32,801) | (134,812) | — | (134,812) |
| Equity rights redemption (Note 6) | — | — | — | (291,995) | — | (291,995) |
| Discount on Convertible Debt arising from values of (Note 6): | | | | | | |
| Warrants | — | — | — | 2,325,151 | — | 2,325,151 |
| Beneficial conversion feature | — | — | — | 2,424,849 | — | 2,424,849 |
| Preferred Stock issued upon Notes payable conversion (Note 6) | 19,194.72 | 4,798,671 | — | — | — | 4,798,671 |
| Exercise of stock options | — | — | 34,000 | 98,260 | — | 98,260 |
| Stock-based compensation issued for services | — | — | 42,622 | 379,622 | — | 379,622 |
| Net loss for the period | — | — | — | — | (10,967,620) | (10,967,620) |
| **Balance, September 30, 2017** | 19,194.72 | $  4,798,671 | 5,447,792 | $131,490,219 | $(120,822,896) | $ 15,465,994 |

See Accompanying Notes to Unaudited Consolidated Financial Statements

5

**Riot Blockchain, Inc. and Subsidiaries**
**Consolidated Statements of Cash Flows**
**Nine Months Ended September 30,**
**(Unaudited)**

| | 2017 | 2016 |
| --- | --- | --- |
| Cash flows from operating activities: | | |
| Continuing operations: | | |
| Net (loss) | $    (10,967,620) | $    (1,987,449) |
| (Loss) from discontinued operations | (3,563,876) | (236,473) |
| (Loss) from continuing operations | (7,403,744) | (1,750,976) |
| Adjustments to reconcile net loss from continuing operations to net cash used | | |
| in operating activities of continuing operations: | | |
| Amortization of discount on convertible debt | 4,750,000 | - |
| Stock-based compensation for services | 379,622 | 368,459 |
| Depreciation and amortization | 55,899 | 74,098 |
| Amortization of license fees | (72,524) | (72,524) |
| Other non-cash (credits) charges | - | 200,108 |

**Riot Blockchain, Inc. and Subsidiaries**
**Consolidated Statements of Cash Flows**
**Nine Months Ended September 30,**
**(Unaudited)**

| | 2017 | 2016 |
|---|---:|---:|
| Cash flows from operating activities: | | |
| Continuing operations: | | |
| Net (loss) | $ (10,967,620) | $ (1,987,449) |
| (Loss) from discontinued operations | (3,563,876) | (236,473) |
| (Loss) from continuing operations | (7,403,744) | (1,750,976) |
| Adjustments to reconcile net loss from continuing operations to net cash used | | |
| in operating activities of continuing operations: | | |
| Amortization of discount on convertible debt | 4,750,000 | - |
| Stock-based compensation for services | 379,622 | 368,459 |
| Depreciation and amortization | 55,899 | 74,098 |
| Amortization of license fees | (72,524) | (72,524) |
| Other non-cash (credits) charges | - | 200,108 |
| Gain on sale of property and equipment | - | (1,933,335) |
| Change in: | | |
| Prepaid expenses and other current assets | 192,071 | 222,474 |
| Accounts payable | (4,997) | (483,410) |
| Accrued compensation | 3,139 | (120,775) |
| Accrued expenses | (133,014) | 30,042 |
| Net cash (used in) operating activities of continuing operations | (2,233,548) | (3,465,839) |
| Net cash (used in) operating activities of discontinued operations | (930,323) | (375,228) |
| Net cash (used in) operating activities | (3,163,871) | (3,841,067) |
| | | |
| Cash flows from investing activities: | | |
| Continuing operations: | | |
| Purchases of short-term investments | - | (13,818,949) |
| Proceeds from sales of short-term investments | 7,506,761 | 16,522,853 |
| Investment in Coinsquare | (3,000,000) | - |
| Proceeds from sale of property and equipment | - | 1,799,143 |
| Purchases of patent and trademark application costs | (14,255) | (14,378) |
| Net cash provided by investing activities of continuing operations | 4,492,506 | 4,488,669 |
| Net cash provided by investing activities of discontinued operations | 4,004 | 16,673 |
| Net cash provided by investing activities | 4,496,510 | 4,505,342 |
| | | |
| Cash flows from financing activities: | | |
| Continuing operations: | | |
| Net proceeds from issuance of convertible notes | 4,750,000 | - |
| Net proceeds from issuance of common stock, net of $336,491 in offering expenses | 1,913,509 | - |
| Net proceeds from exercise of stock options | 98,260 | - |
| Redemption of equity rights | (291,995) | - |
| Repayment of notes payable and other obligations | (192,539) | (229,238) |
| | | |
| Net cash provided by (used in) financing activities of continuing operations | 6,277,235 | (229,238) |
| | | |
| Net increase in cash and cash equivalents | 7,609,874 | 435,037 |
| | | |
| Cash and cash equivalents at beginning of period | 5,529,848 | 2,012,283 |
| | | |
| Cash and cash equivalents at end of period | $ 13,139,722 | $ 2,447,320 |
| | | |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the period for interest | $ 1,571 | $ 33,331 |
| Supplemental disclosure of noncash investing and financing activities: | | |

84

| Conversion of notes payable and accrued interest to preferred stock | $ | 4,798,671 | $ | - |
| Liability payoffs upon property sale | $ | - | $ | 2,064,758 |

See Accompanying Notes to Unaudited Consolidated Financial Statements

6

---

**Riot Blockchain, Inc. and Subsidiaries**
**Notes to Consolidated Financial Statements**
**(Unaudited)**

## INTERIM FINANCIAL STATEMENTS

The accompanying consolidated financial statements of Riot Blockchain, Inc., (f/k/a Bioptix, Inc.) (the "Company," "we," or "Riot Blockchain") have been prepared in accordance with the instructions to quarterly reports on Form 10-Q. In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and changes in financial position at September 30, 2017 and for all periods presented have been made. Certain information and footnote data necessary for fair presentation of financial position and results of operations in conformity with accounting principles generally accepted in the United States of America have been condensed or omitted. It is therefore suggested that these consolidated financial statements be read in conjunction with the summary of significant accounting policies and notes to financial statements included in the Company's Annual Report on Form 10-K for the year ended December 31, 2016. The results of operations for the period ended September 30, 2017 are not necessarily an indication of operating results for the full year.

Effective October 19, 2017, the Company's name was changed to Riot Blockchain, Inc., from Bioptix, Inc.
**Management's plans and basis of presentation:**

The Company has experienced recurring losses and negative cash flows from operations. At September 30, 2017, the Company had approximate balances of cash and cash equivalents of $13,140,000, working capital of $12,555,000, total stockholders' equity of $15,466,000 and an accumulated deficit of $120,823,000. To date, the Company has in large part relied on equity financing to fund its operations.

The recently announced Kairos Global Technology, Inc. ("Kairos"), Tess, Inc., ("TESS") and goNumerical, Inc. (d/b/a "Coinsquare") acquisitions, as well as our new name, reflect a new focus (in addition to veterinary and life science oriented businesses of the Company) being pursued by the Company. The decision to invest in companies exposed to blockchain and digital currency related risks is a strategic decision by the Company. The Company's strategy will be to continue to pursue opportunistic investments and controlling positions in these new and emerging technologies which will continue to expose the Company to the numerous risks and volatility associated with this sector.

Effective January 14, 2017, the Company adopted a plan to exit the business of BiOptix Diagnostics, Inc. ("BDI") and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. Accordingly, the historical results of BDI have been classified as discontinued operations for all periods presented.

The Company expects to continue to incur losses from operations for the near-term and these losses could be significant as we incur costs and expenses associated with our recent and potential future acquisitions and investments, as well as public company and administrative related expenses are incurred and winding-down BDI's operations. The Company believes its upcoming near-term cash needs relative to the recent acquisitions will be covered by cash acquired in the acquisitions combined with the Company's available cash. The Company believes that its current working capital position will be sufficient to meet its estimated cash needs for at least a year and a day from this filing. The Company is closely monitoring its cash balances, cash needs and expense levels.

Management's strategic plans include the following:

- continuing to evaluate opportunities for investments in the blockchain and digital currency sector;
- exploring other possible strategic options and financing opportunities available to the Company;
- evaluating options to monetize, partner or license the Company's assets, including the appendicitis product portfolio; and
- continuing to implement cost control initiatives to conserve cash.

**Note 1.  Significant accounting policies:**

**Principles of consolidation**

**Riot Blockchain, Inc. and Subsidiaries**
**Notes to Consolidated Financial Statements**
**(Unaudited)**

## INTERIM FINANCIAL STATEMENTS

The accompanying consolidated financial statements of Riot Blockchain, Inc., (f/k/a Bioptix, Inc.) (the "Company," "we," or "Riot Blockchain") have been prepared in accordance with the instructions to quarterly reports on Form 10-Q. In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and changes in financial position at September 30, 2017 and for all periods presented have been made. Certain information and footnote data necessary for fair presentation of financial position and results of operations in conformity with accounting principles generally accepted in the United States of America have been condensed or omitted. It is therefore suggested that these consolidated financial statements be read in conjunction with the summary of significant accounting policies and notes to financial statements included in the Company's Annual Report on Form 10-K for the year ended December 31, 2016. The results of operations for the period ended September 30, 2017 are not necessarily an indication of operating results for the full year.

Effective October 19, 2017, the Company's name was changed to Riot Blockchain, Inc., from Bioptix, Inc.

**Management's plans and basis of presentation:**

The Company has experienced recurring losses and negative cash flows from operations. At September 30, 2017, the Company had approximate balances of cash and cash equivalents of $13,140,000, working capital of $12,555,000, total stockholders' equity of $15,466,000 and an accumulated deficit of $120,823,000. To date, the Company has in large part relied on equity financing to fund its operations.

The recently announced Kairos Global Technology, Inc. ("Kairos"), Tess, Inc., ("TESS") and goNumerical, Inc. (d/b/a "Coinsquare") acquisitions, as well as our new name, reflect a new focus (in addition to veterinary and life science oriented businesses of the Company) being pursued by the Company. The decision to invest in companies exposed to blockchain and digital currency related risks is a strategic decision by the Company. The Company's strategy will be to continue to pursue opportunistic investments and controlling positions in these new and emerging technologies which will continue to expose the Company to the numerous risks and volatility associated with this sector.

Effective January 14, 2017, the Company adopted a plan to exit the business of BiOptix Diagnostics, Inc. ("BDI") and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. Accordingly, the historical results of BDI have been classified as discontinued operations for all periods presented.

The Company expects to continue to incur losses from operations for the near-term and these losses could be significant as we incur costs and expenses associated with our recent and potential future acquisitions and investments, as well as public company and administrative related expenses are incurred and winding-down BDI's operations. The Company believes its upcoming near-term cash needs relative to the recent acquisitions will be covered by cash acquired in the acquisitions combined with the Company's available cash. The Company believes that its current working capital position will be sufficient to meet its estimated cash needs for at least a year and a day from this filing. The Company is closely monitoring its cash balances, cash needs and expense levels.

Management's strategic plans include the following:

- continuing to evaluate opportunities for investments in the blockchain and digital currency sector;
- exploring other possible strategic options and financing opportunities available to the Company;
- evaluating options to monetize, partner or license the Company's assets, including the appendicitis product portfolio; and
- continuing to implement cost control initiatives to conserve cash.

## Note 1.  Significant accounting policies:

**Principles of consolidation**

The consolidated financial statements of the Company include the accounts of Riot Blockchain and its wholly-owned subsidiary, BDI. Intercompany accounts and transactions have been eliminated in the consolidation.

**Investment in affiliate**

The Company's 10.9% investment in Coinsquare is accounted for on the cost method.

**Cash, cash equivalents and short-term investments:**

The Company considers all highly liquid investments with an original maturity of three months or less at the date of acquisition to be cash equivalents. From time to time, the Company's cash account balances exceed the balances as covered by the Federal Deposit Insurance System. The Company has never suffered a loss due to such excess balances.

7

The Company invests excess cash from time to time in highly-liquid debt and equity investments of highly-rated entities, which are classified as trading securities. Such amounts are recorded at market values using Level 1 inputs in determining fair value and are generally classified as current, as the Company does not intend to hold the investments beyond twelve months. Investment securities classified as trading are those securities that are bought and held principally for the purpose of selling them in the near term, with the objective of preserving principal and generating profits. These securities are reported at fair value with unrealized gains and losses reported as an element of other (expense) income in current period earnings. The Company's Board of Directors has approved an investment policy covering the investment parameters to be followed with the primary goals being the safety of principal amounts and maintaining liquidity. The policy provides for minimum investment rating requirements as well as limitations on investment duration and concentrations. Based upon market conditions, the investment guidelines have been tightened to increase the minimum acceptable investment ratings required for investments and shorten the maximum investment term. As of September 30, 2017, 100% of the investment portfolio was in cash and cash equivalents, which is presented as such on the accompanying balance sheet.

The Company's short-term investments comprise certificates of deposit, commercial paper and corporate bonds, all of which are classified as trading securities and carried at their fair value based upon quoted market prices of the securities at December 31, 2016.  Net realized and unrealized gains and losses on trading securities are included in net loss.  For purposes of determining realized gains and losses, the cost of securities sold is based on specific identification.

The composition of trading securities is as follows at December 31, 2016:

|  | December 31, 2016 | |
|---|---|---|
|  | Cost | Fair Value |
| Certificates of deposit / commercial paper | $ 2,378,222 | $ 2,373,891 |
| Corporate bonds | 5,138,182 | 5,132,870 |
| Total trading securities | $ 7,516,404 | $ 7,506,761 |

Investment income for the nine months ended September 30, 2017 and 2016 consists of the following:

|  | 2017 | 2016 |
|---|---|---|
| Interest income | $ 84,177 | $ 101,236 |
| Realized (losses) | (21) | (2,893) |
| Unrealized gains | 11,575 | 21,501 |
| Management fee expenses | (12,484) | (16,813) |
| Net investment income | $ 83,247 | $ 103,031 |

8

**Fair value of financial instruments:**

The Company accounts for financial instruments under Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic ("ASC") 820, *Fair Value Measurements*.  This statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements.  To increase consistency and comparability in fair value measurements, ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

Level 1— quoted prices (unadjusted) in active markets for identical assets or liabilities;

Level 2 — observable inputs other than Level 1, quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, and model-derived prices whose inputs are observable or whose significant value drivers are observable; and

Level 3 — assets and liabilities whose significant value drivers are unobservable.

Observable inputs are based on market data obtained from independent sources, while unobservable inputs are based on the Company's market assumptions.  Unobservable inputs require significant management judgment or estimation.  In some cases, the inputs used to measure an asset or liability may fall into different levels of the fair value hierarchy.  In those instances, the fair value measurement is required to be classified using the lowest level of input that is significant to the fair value measurement.  Such determination requires significant management judgment. There were no financial assets or liabilities measured at fair value, with the exception of short-term investments as of December 31, 2016.

The carrying amounts of the Company's financial instruments (other than short-term investments as discussed above) approximate fair value because of their variable interest rates and/or short maturities combined with the recent historical interest rate levels.

**Revenue Recognition:**

Revenue recognition related to the license agreement is based upon the licensee's right to use the technology and the Company's ongoing obligations to maintain and defend the patented rights and comply with the terms of the sub-license agreement whereby the license fees and milestone payments received from the agreement, net of the amounts due to third parties, have been recorded as deferred revenue and are amortized over the term of the license agreement.

**Goodwill:**

The Company performs a goodwill impairment analysis in the fourth quarter of each year, or whenever there is an indication of impairment.  When conducting its annual goodwill impairment assessment, the Company initially performs a qualitative evaluation to determine if it is more likely than not that the fair value of its reporting unit is less than its carrying amount as a basis for determining whether it is necessary to perform a two-step goodwill impairment test.  The Company has determined, based on its evaluation, that the goodwill associated with the BDI acquisition was impaired and was written off during the nine months ended September 30, 2017, included as part of the discontinued operations impairment loss.

**Recently issued and adopted accounting pronouncements:**

The Company continually assesses any new accounting pronouncements to determine their applicability. When it is determined that a new accounting pronouncement affects the Company's financial reporting, the Company undertakes a study to determine the consequences of the change to its consolidated financial statements and assures that there are proper controls in place to ascertain that the Company's consolidated financial statements properly reflect the change.

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standard Update No. 2014-09, *Revenue from Contracts with Customers* (Topic 606) ("ASU 2041-09"), which supersedes nearly all existing revenue recognition guidance. The standard's core principle is that an entity should recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The standard creates a five-step model to achieve its core principle: (i)

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standard Update No. 2014-09, *Revenue from Contracts with Customers* (Topic 606) ("ASU 2041-09"), which supersedes nearly all existing revenue recognition guidance. The standard's core principle is that an entity should recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The standard creates a five-step model to achieve its core principle: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction's price to the separate performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. In addition, entities must disclose sufficient information to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. Qualitative and quantitative disclosures are required about: (i) the entity's contracts with customers; (ii) the significant judgments, and changes in judgments, made in applying the guidance to those contracts; and (iii) any assets recognized from the costs to obtain or fulfill a contract with a customer.

In August 2015, the FASB issued ASU 2015-14, *Revenue from Contracts with Customers* (Topic 606) - Deferral of the Effective Date, which deferred the effective date of ASU 2014-09 to interim and annual periods beginning after December 15, 2017. The standard allows entities to apply the standard retrospectively to each prior period presented ("full retrospective adoption") or retrospectively with the cumulative effect of initially applying the standard recognized at the date of initial application ("modified retrospective adoption"). The Company plans to adopt this guidance on January 1, 2018, and continues to evaluate the impact of adopting under the modified retrospective adoption versus the full retrospective method. The Company is currently in the process of determining the impact of the new revenue recognition guidance on its revenue transactions, including any impacts on associated processes, systems, and internal controls. The Company's preliminary assessment indicates implementation of this standard will not have a material impact on financial results. The Company's evaluation has included determining whether the unit of account (i.e., performance obligations) will change as compared to current GAAP, as well as determining the standalone selling price of each performance obligation. The Company continues to evaluate the impact of this guidance and its subsequent amendments on the consolidated financial position, results of operations, and cash flows, and any preliminary assessments are subject to change.

In January 2016, the FASB issued ASU No. 2016-01, *Recognition and Measurement of Financial Assets and Financial Liabilities*. ASU No. 2016-01 supersedes and amends the guidance to classify equity securities with readily determinable fair values into different categories (that is, trading or available-for-sale) and require equity securities to be measured at fair value with changes in the fair value recognized through net income. The amendments allow equity investments that do not have readily determinable fair values to be re-measured at fair value either upon the occurrence of an observable price change or upon identification of an impairment. The amendments also require enhanced disclosures about those investments. ASU No. 2016-01 is effective for annual reporting beginning after December 15, 2017, including interim periods within the year of adoption, and calls for prospective application. The Company does not expect the adoption of ASU 2016-01 to have a material impact on its consolidated financial statements.

In February 2016, the FASB issued ASU 2016-02, *Leases* (Topic 842). This standard requires a lessee to recognize the lease assets and lease liabilities arising from operating leases in the balance sheet. Qualitative along with specific quantitative disclosures are required by lessees and lessors to meet the objective of enabling users of financial statements to assess the amount, timing, and uncertainty of cash flows arising from leases. ASU 2016-02 is effective for fiscal years beginning after December 15, 2018 including interim periods within those fiscal years. The Company does not expect the adoption of ASU 2016-02 to have a material impact on its consolidated financial statements.

In March 2016, the FASB issued ASU 2016-09, *Improvements to Employee Share Based Payment Accounting* ("ASU 2016-09"), which amends guidance issued in Accounting Standards Codification ("ASC") Topic 718, Compensation - Stock Compensation. ASU 2016-09 simplifies several aspects of the accounting for share-based payment transactions, including the income tax consequences, classification of awards as either equity or liabilities, and classification on the statement of cash flows. ASU 2016-09 is effective for fiscal years beginning after December 15, 2016, and interim periods within those fiscal years and early adoption is permitted. The Company has adopted ASU 2016-09 as of January 1, 2017. The principal impact was that to the extent a tax benefit or expense from stock compensation arises it will be presented in the income tax line of the Statement of Operations rather than the current presentation as a component of equity on the Balance Sheet. Also the tax benefit or expense will be presented as activity in Cash Flow from Operating Activity rather than the current presentation as Cash Flow from Financing Activity in the Statement of Cash Flows. The Company does not expect the adoption of ASU 2016-09 to have a material impact on its consolidated financial statements.

In August 2016, the FASB issued ASU 2016-15, *Statement of Cash Flows* (Topic 230): Classification of Certain Cash Receipts and Cash Payments.

In August 2016, the FASB issued ASU 2016-15, *Statement of Cash Flows* (Topic 230): Classification of Certain Cash Receipts and Cash Payments. This standard provides guidance for eight cash flow classification issues in current GAAP. ASU 2016-15 is effective for fiscal years beginning after December 15, 2017 and interim periods within those fiscal years. The Company is currently evaluating the impact that will result from adopting ASU 2016-02.

In January 2017, the FASB issued an ASU 2017-01, *Business Combinations (Topic 805) Clarifying the Definition of a Business*. The amendments in this Update is to clarify the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. The definition of a business affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The guidance is effective for annual periods beginning after December 15, 2017, including interim periods within those periods. The Company adopted this guidance effective January 1, 2017. The adoption of this ASU had no impact on the Company's consolidated financial statements.

In January 2017, the FASB issued ASU 2017-04, *Intangibles - Goodwill and Other (Topic 350)*: Simplifying the Accounting for Goodwill Impairment. ASU 2017-04 removes Step 2 of the goodwill impairment test, which requires a hypothetical purchase price allocation. A goodwill impairment will now be the amount by which a reporting unit's carrying value exceeds its fair value, not to exceed the carrying amount of goodwill. This standard will be effective for the Company beginning in the first quarter of fiscal year 2020 and is required to be applied prospectively. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company does not expect the adoption of ASU 2017-04 to have a material impact on its consolidated financial statements.

In May 2017, the FASB issued ASU No. 2017-09, "Compensation-Stock Compensation: Scope of modification accounting". ASU 2017-09 provides guidance about which changes to the terms or conditions of a share-based payment award require an entity to apply modification accounting in Topic 718. ASU No. 2017-09 is effective for fiscal years beginning after December 15, 2017, with early adoption permitted, including during an interim period for which financial statements have not yet been made available for issuance. The amendments should be applied prospectively to an award modified on or after the adoption date. The Company is currently evaluating the impact that the adoption of ASU 2017-09 will have on its consolidated financial statements.

In July 2017, the FASB issued ASU No. 2017-11, "Earnings Per Share (Topic 260) Distinguishing Liabilities from Equity (Topic 480) Derivatives and Hedging (Topic 815)," which addresses the complexity of accounting for certain financial instruments with down round features. Down round features are features of certain equity-linked instruments (or embedded features) that result in the strike price being reduced on the basis of the pricing of future equity offerings. Current accounting guidance creates cost and complexity for entities that issue financial instruments (such as warrants and convertible instruments) with down round features that require fair value measurement of the entire instrument or conversion option. For public business entities, the amendments in Part I of this Update are effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2018. For all other entities, the amendments in Part I of this Update are effective for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020. The Company is currently evaluating the impact of adopting this guidance on its consolidated financial statements.

**Income (loss) per share:**

ASC 260, *Earnings Per Share*, requires dual presentation of basic and diluted earnings per share ("EPS") with a reconciliation of the numerator and denominator of the basic EPS computation to the numerator and denominator of the diluted EPS computation. Basic EPS excludes dilution. Diluted EPS reflects the potential dilution that could occur if securities or other contracts to issue common stock were exercised or converted into common stock or resulted in the issuance of common stock that then shared in the earnings of the entity.

Basic net income (loss) per share includes no dilution and is computed by dividing net income (loss) available to common shareholders by the weighted average number of common shares outstanding for the period, excluding any nonvested restricted common shares. Diluted net income (loss) per share reflect the potential dilution of securities that could share in the Company's income (loss). The effect of the inclusion of the dilutive shares would have resulted in a decrease in loss per share for the periods ended September 30, 2017 and 2016. Outstanding stock options, warrants and other dilutive rights are not considered in the calculation, as the impact of the potential common shares (totaling approximately 5,474,000 shares and 1,061,000 shares for each of the nine month periods ended September 30, 2017 and 2016, respectively) would be anti-dilutive. For the nine months ended September 30, 2017 the dilutive rights not considered in the calculation, include shares of Series A Convertible Preferred Stock ("Series A Preferred Stock") outstanding that are convertible into 1,919,472 common shares.

For periods when shares of preferred stock are outstanding, the two-class method is used to calculate basic and diluted earnings (loss) per common share since such preferred stock is a participating security under ASC 260 *Earnings per Share*. The two-class method is an earnings allocation formula that determines earnings per share for each class of common stock and participating security according to dividends declared (or accumulated) and participation rights in undistributed earnings. Under the two-class method, basic earnings (loss) per common share is computed by dividing net earnings (loss) attributable to common share after allocation of earnings to participating securities by the weighted-average number of shares of common stock outstanding during the year. Diluted earnings (loss) per common share, when applicable, is computed using the more dilutive of the two-class method or the if-converted method. In periods of net loss, no effect is given to participating securities since they do not contractually participate in the losses of the Company.

Under the provisions of ASC 260, "Earnings Per Share," basic EPS shall be computed by dividing income available to common stockholders (the numerator) by the weighted-average number of common shares outstanding (the denominator) during the period. Income available to common stockholders shall be computed by deducting both the dividends declared in the period on preferred stock and the dividends accumulated for the period on cumulative preferred stock from income from continuing operations. Dividends during the nine months ended September 30, 2017 were *de minimis*.

**Note 2. Investment in Coinsquare:**

As of September 29, 2017, the Company acquired a minority interest for $3,000,000 USD, in Coinsquare, which operates a digital crypto-currency exchange platform operating in Canada.  The Company acquired approximately 10.9% of the voting common stock of Coinsquare. In connection with the investment, the Company also received warrants, expiring May 30, 2018, to acquire shares of common stock of Coinsquare, which if exercised in full by the Company, would result in the Company owning an approximate total of 14.7% of Coinsquare, including the initial investment. The fair value of the warrants were determined to be *de minimis*. The Company has evaluated the guidance ASC 325-20 *Investments – Other*, in determining to account for the investment on the cost method since the equity securities are not marketable and do not give us significant influence over Coinsquare.    As of September 30, 2017, the Company considers the fair value of the investment to approximate the cost of the investment due to the proximity of the time of the investment to period end.

**Note 3. Property and equipment:**

Property and equipment consisted of the following:

|  | September 30, 2017 | | December 31, 2016 | |
| --- | --- | --- | --- | --- |
| Office and computer equipment | $ | 114,309 | $ | 116,510 |
| Less accumulated depreciation | | 110,196 | | 110,972 |
|  | $ | 4,113 | $ | 5,538 |

Depreciation expense totaled approximately $500 and $800, and $1,400 and $2,700, for the three and nine month periods ended September 30, 2017 and 2016, respectively.  Depreciation and amortization expenses also included $1,500 and $12,000, for the nine month periods ended September 30, 2017 and 2016, respectively, on short-term assets included with prepaid expenses.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party for a purchase price of approximately $4,053,000. The sale and subsequent equipment sales resulted in a gain of approximately $1,933,000 and generated approximately $1,799,000 in net cash after expenses and mortgage payoffs.

12

**Note 4.  Other long-term assets:**

Other long-term assets consisted of the following as of September 30, 2017 and December 31, 2016:

|  | Beginning Balance (December 31, | | Ending Balance (September 30, |
| --- | --- | --- | --- |

**Note 4.  Other long-term assets:**

Other long-term assets consisted of the following as of September 30, 2017 and December 31, 2016:

| | Beginning Balance (December 31, 2016) | Additions | Impairments | Ending Balance (September 30, 2017) |
|---|---|---|---|---|
| Cost: | | | | |
| Patents | $ 1,032,982 | $ 14,255 | $ — | $ 1,047,237 |
| Goodwill | 447,951 | — | — | 447,951 |
| Total | 1,480,933 | 14,255 | — | 1,495,188 |
| | | | | |
| Accumulated Amortization: | | | | |
| Patents | (482,183) | (52,974) | — | (535,157) |
| Goodwill | (60,712) | — | — | (60,712) |
| Total | (542,895) | (52,974) | — | (595,869) |
| | | | | |
| Net Other Long Term Assets | $ 938,038 | $ (38,719) | $ — | $ 899,319 |

The Company capitalizes legal costs and filing fees associated with obtaining patents on its new discoveries. Once the patents have been issued, the Company amortizes these costs over the shorter of the legal life of the patent or its estimated economic life using the straight-line method. Based upon the current status of the above intangible assets, the aggregate amortization expense is estimated to be approximately $71,000 for each of the next five fiscal years. The Company tests intangible assets with finite lives for impairment upon significant changes in the Company's business environment. The testing resulted in no patent impairment for the three and nine months ended September 30, 2017 and $32,000 and $200,000, for the three and nine months ended September 30, 2016, respectively. The impairment charges are related to the Company's ongoing analysis of which specific country patents in its portfolio are determined as potentially worth pursuing.

**Note 5. Notes and Other Obligations:**

Notes and other obligations consisted of short-term installment obligations, arising from insurance premium financing programs bearing interest at approximately 4.5%, with outstanding balances of $215,712 and $139,611, as of September 30, 2017 and December 31, 2016, respectively.

**Convertible notes:**

In March 2017, the Company completed a convertible note financing with certain accredited investors with gross proceeds totaling $4,750,000. The convertible notes bearing interest at 2% were issued March 16, 2017 and had a balloon payment maturity date of September 16, 2018, when any then outstanding principal and accrued interest, would be due.  The unsecured notes were convertible into shares of the Company's common stock at the holder's option or automatically into shares of preferred stock, upon achievement of defined conditions, including shareholder approval of a class of preferred stock, all at an initial conversion price of $2.50 (initially 1,900,000 common shares).  In connection with the financing investors were issued warrants exercisable into a total of 1,900,000 common shares at an exercise price of $3.56, expiring March 15, 2020.  The convertible note financing proceeds were held in escrow pending successful completion of defined release conditions. As of August 18, 2017, the lead investor in the convertible note financing, agreed to waive the release conditions and the cash proceeds and securities were released from escrow. Subsequently, upon the successful completion of conditions specified in the offering documents, and as further described in Note 6, the notes automatically converted into shares of Series A Preferred Stock.  The convertible notes accrued interest at 2% per annum commencing with their execution and the Company recorded interest expense of $48,671 through the date of conversion, which was also exchanged for shares of preferred stock. See Note 6.

**Mortgage notes:**

Prior to the February 2016 sale of the corporate headquarters, the Company had a permanent mortgage on its land and building. The mortgage was held by a commercial bank and included a portion guaranteed by the U. S. Small Business Administration ("SBA").  The loan was collateralized by the real property and the SBA portion was also personally guaranteed by a former officer of the Company. The commercial bank loan terms included a payment schedule based on a fifteen year amortization, with a balloon maturity at five years. The commercial bank portion had an interest rate fixed at 3.95%, and the SBA portion bore interest at the rate of 5.86%.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land and building, and also paid off its mortgage obligations.

See Note 3.

13

## Note 6. Stockholders' equity:

**Articles of Incorporation amendments:**

Effective September 19, 2017, the Company changed its state of incorporation from Colorado to Nevada (the "Reincorporation"). In connection with the Reincorporation and as approved by the Company's shareholders at a special meeting held August 21, 2017 Special Shareholders' Meeting, the Company's Articles of Incorporation were amended to increase the number of shares of common stock authorized for issuance to 170,000,000 from 60,000,000.  Additionally, the Articles of Incorporation were amended to authorize 15,000,000 shares of "blank check" preferred stock.

On September 20, 2017, 2,000,000 shares of preferred stock were designated as "2% Series A Convertible Preferred Stock" in connection with the filing of a Certificate of Designation of Rights, Powers, Preferences, Privileges and Restrictions of 2% Series A Convertible Preferred Stock with the Secretary of State of the State of Nevada.

**Common Share Private Placement offering:**

In March 2017, the Company completed a common stock unit financing private placement totaling $2,250,000, with certain accredited investors. The purchase price was $2.50 per unit (the "Units"). Each Unit consisted of one share of the Company's common stock and a three-year warrant to purchase one share of the Company's common stock at an exercise price of $3.50 per share. The fair value of the 900,000 warrants was estimated to be approximately $2,114,000, using the Black-Scholes option-pricing model using the assumptions of a three year term, expected price volatility of 114%, dividend yield of 0% and a risk free interest rate of 1.66%. The Company sold 900,000 units consisting of an aggregate of 900,000 shares of common stock and 900,000 warrants, of which 400,000 units for $1,000,000 were released to the respective parties in March 2017, and the balance of 500,000 units for $1,250,000 were released in May 2017.  The offering net of $336,491 of offering expenses, resulted in proceeds of $1,913,509 recorded as additional equity.

In connection with the private placements, the Company also entered into a Registration Rights Agreement, with the investors as further disclosed with the convertible note private placement offering described below.

**Convertible Note Private Placement offering:**

In March 2017, the Company completed a 2% convertible note financing with certain accredited investors with gross proceeds totaling $4,750,000. The convertible note financing proceeds were held in escrow pending successful completion of defined release conditions. As of August 18, 2017, the lead investor in the convertible note financing, agreed to waive the release conditions and the cash proceeds and securities were released from escrow. Upon the successful completion of conditions specified in the offering documents, primarily approval by the Company's shareholders for authorization of preferred shares and approval of the Nasdaq Capital Market ("NASDAQ"), the notes automatically converted into shares of Series A Preferred Stock, convertible into shares of common stock at an initial equivalent conversion price of $2.50 per common share. The specified conditions were successfully completed as of September 20, 2017, resulting in the conversion of $4,750,000 in principal and accrued interest of $48,671 for a total of $4,798,671 worth of convertible notes, exchanged for 19,194.72 shares of Series A Preferred Stock, with a stated value of $250 per share, equaling rights to 1,919,472 shares of common stock. The convertible notes accrued interest at 2% per annum commencing with their execution and the Company recorded interest expense of $48,671 through the date of conversion of the notes.

The Series A Preferred Stock are convertible into shares of common stock based on a conversion calculation equal to the stated value ($250.00 per share) of such shares of Series A Preferred Stock, plus all accrued and unpaid dividends, if any, on such shares of Series A Preferred Stock, divided by the conversion price of $2.50, subject to adjustments. The shares of Series A Preferred Stock are subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events. Shares of capital stock of the Company shall be junior in rank to all shares of Series A Preferred Stock with respect to the preferences as to dividends, distributions and payments upon the liquidation, dissolution and winding-up of the Company. Each holder of shares of Series A Preferred Stock shall be entitled to receive dividends, which dividends shall be paid by the Company out of funds legally available therefor, payable, subject to the conditions and other terms hereof, in shares of common stock or cash on the stated value of such shares of Series A Preferred Stock at the dividend rate of two percent (2%) per annum, which shall be cumulative and shall continue to accrue and compound monthly whether or not declared. Holders of shares of Series A Preferred Stock, shall be entitled to vote on any proposals voted on by the common shareholders.

Warrants to purchase 1,900,000 shares of the Company's common stock at an initial exercise price of $3.56 per share and expiring March 15, 2020,

**Note 6. Stockholders' equity:**

**Articles of Incorporation amendments:**

Effective September 19, 2017, the Company changed its state of incorporation from Colorado to Nevada (the "Reincorporation"). In connection with the Reincorporation and as approved by the Company's shareholders at a special meeting held August 21, 2017 Special Shareholders' Meeting, the Company's Articles of Incorporation were amended to increase the number of shares of common stock authorized for issuance to 170,000,000 from 60,000,000.  Additionally, the Articles of Incorporation were amended to authorize 15,000,000 shares of "blank check" preferred stock.

On September 20, 2017, 2,000,000 shares of preferred stock were designated as "2% Series A Convertible Preferred Stock" in connection with the filing of a Certificate of Designation of Rights, Powers, Preferences, Privileges and Restrictions of 2% Series A Convertible Preferred Stock with the Secretary of State of the State of Nevada.

**Common Share Private Placement offering:**

In March 2017, the Company completed a common stock unit financing private placement totaling $2,250,000, with certain accredited investors. The purchase price was $2.50 per unit (the "Units"). Each Unit consisted of one share of the Company's common stock and a three-year warrant to purchase one share of the Company's common stock at an exercise price of $3.50 per share. The fair value of the 900,000 warrants was estimated to be approximately $2,114,000, using the Black-Scholes option-pricing model using the assumptions of a three year term, expected price volatility of 114%, dividend yield of 0% and a risk free interest rate of 1.66%. The Company sold 900,000 units consisting of an aggregate of 900,000 shares of common stock and 900,000 warrants, of which 400,000 units for $1,000,000 were released to the respective parties in March 2017, and the balance of 500,000 units for $1,250,000 were released in May 2017.  The offering net of $336,491 of offering expenses, resulted in proceeds of $1,913,509 recorded as additional equity.

In connection with the private placements, the Company also entered into a Registration Rights Agreement, with the investors as further disclosed with the convertible note private placement offering described below.

**Convertible Note Private Placement offering:**

In March 2017, the Company completed a 2% convertible note financing with certain accredited investors with gross proceeds totaling $4,750,000. The convertible note financing proceeds were held in escrow pending successful completion of defined release conditions. As of August 18, 2017, the lead investor in the convertible note financing, agreed to waive the release conditions and the cash proceeds and securities were released from escrow. Upon the successful completion of conditions specified in the offering documents, primarily approval by the Company's shareholders for authorization of preferred shares and approval of the Nasdaq Capital Market ("NASDAQ"), the notes automatically converted into shares of Series A Preferred Stock, convertible into shares of common stock at an initial equivalent conversion price of $2.50 per common share. The specified conditions were successfully completed as of September 20, 2017, resulting in the conversion of $4,750,000 in principal and accrued interest of $48,671 for a total of $4,798,671 worth of convertible notes, exchanged for 19,194.72 shares of Series A Preferred Stock, with a stated value of $250 per share, equaling rights to 1,919,472 shares of common stock. The convertible notes accrued interest at 2% per annum commencing with their execution and the Company recorded interest expense of $48,671 through the date of conversion of the notes.

The Series A Preferred Stock are convertible into shares of common stock based on a conversion calculation equal to the stated value ($250.00 per share) of such shares of Series A Preferred Stock, plus all accrued and unpaid dividends, if any, on such shares of Series A Preferred Stock, divided by the conversion price of $2.50, subject to adjustments. The shares of Series A Preferred Stock are subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events. Shares of capital stock of the Company shall be junior in rank to all shares of Series A Preferred Stock with respect to the preferences as to dividends, distributions and payments upon the liquidation, dissolution and winding-up of the Company. Each holder of shares of Series A Preferred Stock shall be entitled to receive dividends, which dividends shall be paid by the Company out of funds legally available therefor, payable, subject to the conditions and other terms hereof, in shares of common stock or cash on the stated value of such shares of Series A Preferred Stock at the dividend rate of two percent (2%) per annum, which shall be cumulative and shall continue to accrue and compound monthly whether or not declared. Holders of shares of Series A Preferred Stock, shall be entitled to vote on any proposals voted on by the common shareholders.

Warrants to purchase 1,900,000 shares of the Company's common stock at an initial exercise price of $3.56 per share and expiring March 15, 2020, were also issued with the convertible note financing.

The Company has evaluated the guidance ASC 480-10 *Distinguishing Liabilities from Equity,* ASC 815-40 *Contracts in an Entity's Own Equity* and ASC 470-20 *Debt with Conversion and Other Options* to determine the appropriate classification of the instruments. Upon their release from escrow, the convertible notes and warrants were evaluated for beneficial conversion feature ("BCF") resulting from the allocation of proceeds among the convertible notes and warrants. The warrants were determined to meet requirements for equity classification.  Accordingly, the relative fair value computed for the warrants, totaling $2,325,151 has been allocated to equity. The fair value of the warrants was estimated using the Black-Scholes option-pricing model using the assumptions of a three year term, expected price volatility of 108%, dividend yield of 0% and a risk free interest rate of 1.47%. The convertible debt was also evaluated for BCF. Based upon the effective conversion price of the convertible notes after considering the stock price at the date of the escrow release and the allocation of value to the warrants, it was determined that the convertible notes contain a BCF. The value of the BCF was computed to be $2,424,849, which has been capped not to exceed the total proceeds from the convertible notes after deducting the value allocated to the warrants. The resulting discount on the convertible debt was being amortized to interest expense over the term of the convertible notes. Upon the September 20, 2017 conversion of the convertible notes into Series A Preferred Stock, the then remaining unamortized discount was recorded as additional interest, resulting in a total of $4,750,000 being recorded as interest expense in the period ended September 30, 2017.

In connection with the private placements, the Company also entered into a registration rights agreement, with the investors pursuant to which the Company agreed to file a registration statement covering the resale of the shares of common stock issuable upon exercise or conversion of the securities and to maintain its effectiveness until all such securities have been sold or may be sold without restriction. In the event a registration statement covering such shares of common stock is not effective, the Company is required to pay to the investors on a monthly basis an amount equal to 1% of the investors' investment, not to exceed a total of 6%, subject to conditions as defined in the agreement. On April 20, 2017, the Company filed a registration statement with the Securities and Exchange Commission.  As of the date of this filing, the registration statement is not yet effective.

**Restricted common stock award:**

During the nine months ended September 30, 2017, 422,000 restricted shares were granted to directors and officers, of which 40,000 were terminated upon the individuals' separation from the Company. As of September 30, 2017, 42,622 restricted common shares had vested and been issued. See Note 7.

**Common stock escrow forfeiture:**

During the nine months ended September 30, 2017, under an agreement between the Company and one of the selling shareholders from the Company's 2016 acquisition of BDI, rights to 32,801 common shares held in escrow on behalf of the selling shareholder were waived by the shareholder and returned to the Company where they were cancelled. Under the agreement each party mutually released each other from any and all claims that might relate to or arise from the acquisition of BDI.  As a result of this cancellation, $134,812, which was the estimated fair market value of the 32,801 common shares, based upon $4.11 per share, was recorded as a gain in the BDI discontinued operations and a reduction in common stock.

**Equity rights terminations:**

During the nine months ended September 30, 2017, the Company negotiated and executed agreements with holders of stock rights (stock options and restricted shares) to have such holders waive their rights to the stock rights in exchange for a one time cash payment. The majority of the holders had previously terminated from the Company or the agreements were made as part of separation agreements upon the individuals' termination from the Company.   Under the agreements, a total of 532,911 rights were forfeited, consisting of; 494,578 stock options under the Company's 2002 Stock Incentive Plan (the "2002 Plan"), 37,500 non-qualified options issued outside of the 2002 Plan and 833 restricted common shares. The total consideration under the agreements was $299,500.  For financial reporting purposes the amounts paid to each holder was compared to the fair value of the stock rights forfeited using a Black-Scholes valuation and to the extent the amount paid exceeded the value of the stock rights forfeited, the payment amount was charged to stock-based compensation. For purposes of the Black-Scholes valuation, the Company assumed a dividend yield of 0%, expected price volatility of 49% to 99% risk free interest rates of 0.8% to 2.3% and expected terms based upon the remaining lives of the instruments. Of the total amount paid, $291,995 was charged to stockholders' equity and $7,505 was charged to compensation expense.

**Subsequent Stockholders' Equity transactions:**

See Note 11 for stockholders' equity transactions subsequent to September 30, 2017.

15

**Note 7. Stock based compensation, options and warrants:**

**Stock based compensation:**

The Company recognized total expenses for stock-based compensation during the three and nine months ended September 30, 2017 and 2016 which are included in the accompanying statements of operations, from the following categories:

| | Three Months Ended | | | | Nine Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2017** | | **2016** | | **2017** | | **2016** | |
| Restricted stock awards under the Plan | $ | 100,396 | $ | — | $ | 188,572 | $ | — |
| Stock option awards under the Plan | | 8,172 | | 137,367 | | 103,430 | | 361,639 |
| Non-qualified stock option awards | | — | | 6,820 | | 87,620 | | 6,820 |
| Total stock-based compensation | $ | 108,568 | $ | 144,187 | $ | 379,622 | $ | 368,459 |

**Restricted stock awards:**

A summary of the Company's restricted stock activity in the nine months ended September 30, 2017 is presented here:

| | Number of Shares | | Weighted Average Grant-Date Fair Value | |
| --- | --- | --- | --- | --- |
| Unvested at January 1, 2017 | | - | $ | - |
| Granted | | 422,000 | | 3.69 |
| Vested | | (42,622) | | 3.20 |
| Forfeited | | (40,000) | | 3.13 |
| Unvested at September 30, 2017 | | 339,378 | $ | 3.75 |

During the nine months ended September 30, 2017, the Company granted 402,000 restricted shares to members of its Board of Directors and 20,000 restricted shares to an officer. Upon the separation of two Directors, 40,000 restricted shares were subsequently forfeited, including 833 restricted shares that were re-acquired by the Company as part of the equity rights terminations (see Note 6). The weighted-average grant date fair value of restricted shares granted during the nine months ended September 30, 2017 was $3.69 per share based upon the share price as of the date of grant. The total fair value of restricted stock granted, net of forfeitures, during the nine months ended September 30, 2017 was approximately $1,431,000, including approximately $136,000 which vested in the period.

The value of restricted stock grants are measured based on their fair market value on the date of grant and amortized over their respective vesting periods, generally twenty-four months. As of September 30, 2017, there was approximately $1,248,000 of unrecognized compensation cost related to unvested restricted stock awards, which is expected to be recognized over a remaining weighted-average vesting period of approximately 1.6 years.

16

**Stock options:**

The Company currently provides stock-based compensation to employees, directors and consultants, both under the Company's 2017 Equity Incentive Plan (the "Plan"), and with non-qualified options and warrants issued outside of the Plan. During August 2017, the Company's shareholders approved the Plan including reservation of 895,000 shares of common stock under the Plan. The Company estimates the fair value of the share-based awards on the date of grant using the Black-Scholes option-pricing model (the "Black-Scholes model").  Using the Black-Scholes

**Stock options:**

The Company currently provides stock-based compensation to employees, directors and consultants, both under the Company's 2017 Equity Incentive Plan (the "Plan"), and with non-qualified options and warrants issued outside of the Plan. During August 2017, the Company's shareholders approved the Plan including reservation of 895,000 shares of common stock under the Plan. The Company estimates the fair value of the share-based awards on the date of grant using the Black-Scholes option-pricing model (the "Black-Scholes model"). Using the Black-Scholes model, the value of the award that is ultimately expected to vest is recognized over the requisite service period in the statement of operations. Option forfeitures are estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. The Company attributes compensation to expense using the straight-line single option method for all options granted.

The Company's determination of the estimated fair value of share-based payment awards on the date of grant is affected by the following variables and assumptions:

- Grant date exercise price – the closing market price of the Company's common stock on the date of the grant;
- Estimated option term – based on historical experience with existing option holders;
- Estimated dividend rates – based on historical and anticipated dividends over the life of the option;
- Term of the option – based on historical experience, grants have lives of approximately 3-5 years;
- Risk-free interest rates – with maturities that approximate the expected life of the options granted;
- Calculated stock price volatility – calculated over the expected life of the options granted, which is calculated based on the daily closing price of the Company's common stock over a period equal to the expected term of the option; and
- Option exercise behaviors – based on actual and projected employee stock option exercises and forfeitures.

**Stock incentive plan options:**

The Company currently provides stock-based compensation to employees, directors and consultants under the Plan. The Company utilized assumptions in the estimation of fair value of stock-based compensation for the nine months ended September 30, 2017 and 2016 as follows:

|  | 2017 | 2016 |
| --- | --- | --- |
| Dividend yield | 0% | 0% |
| Expected price volatility | 101% | 99-100% |
| Risk free interest rate | 1.92% | 1.20% |
| Expected term | 5 years | 5 years |

A summary of activity under the Plan for the nine months ended September 30, 2017 is presented below:

|  | Shares Underlying Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value |
| --- | --- | --- | --- | --- |
| Outstanding at January 1, 2017 | 566,747 | $ 20.46 | | |
| Granted | 20,000 | 4.02 | | |
| Exercised | (34,000) | 2.89 | | |
| Forfeited | (495,414) | 22.98 | | |
| Outstanding at September 30, 2017 | 57,333 | $ 3.32 | 9.1 | $ 105,700 |
| Exercisable at September 30, 2017 | 27,500 | $ 3.07 | 8.8 | $ 57,500 |

The aggregate intrinsic value in the table above represents the total intrinsic value (the difference between the Company's closing stock price on September 30, 2017 and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders, had all option holders been able to, and in fact had, exercised their options on September 30, 2017.

During the nine months ended September 30, 2017, 20,000 options were issued to a director under the Plan, exercisable at $4.02 per share with a grant date fair value of $3.04 per share. The options expire ten years from the date of grant and vest monthly in arrears, over a 24 month period.

During the nine months ended September 30, 2017, 34,000 options outstanding under the Plan were exercised generating $98,260 in cash proceeds. The 34,000 options exercised had a total intrinsic value when exercised of $53,180. During the nine months ended September 30, 2016, no options were exercised.

During the nine months ended September 30, 2016, 77,000 options were issued to non-employee directors under the Plan, exercisable at an average of $2.89 per share. The options expire ten years from the date of grant and vest 50% upon on the date of grant, and 25% on each of July 1, 2016 and October 1, 2016. During the nine months ended September 30, 2016, 150,000 options were issued to officers and employees under the Plan, exercisable at an average of $2.89 per share. The options expire ten years from the date of grant and vest 50% upon each of the nine month and the one year anniversary of the grant date.

During the nine months ended September 30, 2017, a total of 495,414 options granted under the Plan were forfeited as part of the equity rights terminations (see Note 6). Of the total, 438,414 options were vested, exercisable at an average exercise price of $25.59 and 57,000 were unvested, exercisable at an average exercise price of $2.92. During the nine months ended September 30, 2016, a total of 25,445 options that were granted under the Plan were forfeited as a result of option holders' terminations from the Company, of which 21,825 were vested and 3,620 were unvested. The vested options were exercisable at an average of $39.81 per share and the unvested options were exercisable at an average of $15.13 per share.

The total fair value of stock options granted to employees and directors that vested and became exercisable during the nine months ended September 30, 2017 and 2016, was approximately $110,000 and $363,000, respectively.   Based upon the Company's experience, approximately 80% of the outstanding September 30, 2017 nonvested stock options, or approximately 24,000 options, are expected to vest in the future, under their terms.

18

A summary of the activity of nonvested options under the Plan to acquire common shares granted to employees, officers, directors and consultants during the nine months ended September 30, 2017 is presented below:

| Nonvested Shares | Nonvested Shares Underlying Options | Weighted Average Exercise Price | | Weighted Average Grant Date Fair Value | |
|---|---|---|---|---|---|
| Nonvested at January 1, 2017 | 97,738 | $ | 3.51 | $ | 2.58 |
| Granted | 20,000 | | 4.02 | | 3.04 |
| Vested | (30,905) | | 4.92 | | 3.57 |
| Forfeited | (57,000) | | 2.92 | | 2.16 |
| Nonvested at September 30, 2017 | 29,833 | $ | 3.54 | $ | 2.67 |

At September 30, 2017, based upon employee and director options granted under the Plan to that point, there was approximately $54,000 of additional unrecognized compensation cost related to stock options that will be recorded over a weighted average future period of approximately one year.

**Other common stock purchase options and warrants:**

As of September 30, 2017, in addition to the Plan options discussed above, the Company had outstanding 3,157,929 warrants in connection with offerings that were not issued under the Plan.

In March 2017, the Company completed a total of $7.0 million in private placements of securities and in connection with those offerings, granted

A summary of the activity of nonvested options under the Plan to acquire common shares granted to employees, officers, directors and consultants during the nine months ended September 30, 2017 is presented below:

| Nonvested Shares | Nonvested Shares Underlying Options | Weighted Average Exercise Price | | Weighted Average Grant Date Fair Value | |
|---|---|---|---|---|---|
| Nonvested at January 1, 2017 | 97,738 | $ | 3.51 | $ | 2.58 |
| Granted | 20,000 | | 4.02 | | 3.04 |
| Vested | (30,905) | | 4.92 | | 3.57 |
| Forfeited | (57,000) | | 2.92 | | 2.16 |
| Nonvested at September 30, 2017 | 29,833 | $ | 3.54 | $ | 2.67 |

At September 30, 2017, based upon employee and director options granted under the Plan to that point, there was approximately $54,000 of additional unrecognized compensation cost related to stock options that will be recorded over a weighted average future period of approximately one year.

**Other common stock purchase options and warrants:**

As of September 30, 2017, in addition to the Plan options discussed above, the Company had outstanding 3,157,929 warrants in connection with offerings that were not issued under the Plan.

In March 2017, the Company completed a total of $7.0 million in private placements of securities and in connection with those offerings, granted investors in the offerings, warrants which are classified as equity, exercisable six-months after issuance, to purchase a total of 2,800,000 shares of common stock, with 900,000 warrants at an exercise price of $3.50 per share and 1,900,000 warrants at an exercise price of $3.56 per share, all expiring in March 2020. See Note 6.

During the nine month period ended September 30, 2016, 95,000 options were granted outside of the Plan. During the nine months ended September 30, 2017, these 95,000 options were forfeited.  Operating expenses for the nine months ended September 30, 2017 and 2016, included $87,620 and $6,820, respectively, related to stock-based compensation.

Following is a summary of outstanding options and warrants that were issued outside of the Plan for the nine months ended September 30, 2017:

| | Shares Underlying Options / Warrants | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value | |
|---|---|---|---|---|---|---|
| Outstanding at January 1, 2017 | 527,003 | $ | 13.36 | | | |
| Granted | 2,800,000 | | 3.54 | | | |
| Exercised | - | | - | | | |
| Forfeited | (169,074) | | 18.62 | | | |
| Outstanding at September 30, 2017 | 3,157,929 | $ | 4.37 | 2.3 | $ | 4,534,000 |
| Exercisable at September 30, 2017 | 3,157,929 | $ | 4.37 | 2.3 | $ | 4,534,000 |

The aggregate intrinsic value in the table above represents the total intrinsic value (the difference between the Company's closing stock price on September 30, 2017 and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders, had all option holders been able to, and in fact had, exercised their options on September 30, 2017.

During the nine months ended September 30, 2017 and 2016, no warrants were exercised.  At September 30, 2017 the 3,157,959 total outstanding warrants are non-compensatory rights, exercisable at an average of $4.37 per common share, expiring through March 2020, granted in connection

with offerings. No rights are outstanding that have been granted under compensatory arrangements.

19

During the nine months ended September 30, 2017, a total of 169,074 options and warrants that were granted outside of the Plan were forfeited.  Of the total forfeited, 71,574 warrants expired under their terms and 60,000 options lapsed (15,000 vested and 45,000 unvested) due to the holders' terminations from the Company. The 60,000 options which lapsed were exercisable at an average of $3.78 per share. The remaining 37,500, which were forfeited resulted from negotiated payments made to each holder to waive their rights to the outstanding options. See Note 6.

**Note 8.  Animal Health License Agreements:**

Effective May 1, 2004, Washington University in St. Louis ("WU") and the Company entered into an Exclusive License Agreement ("WU License Agreement"), which granted the Company exclusive license and right to sublicense WU's technology (as defined under the WU License Agreement) for veterinary products worldwide, except where such products are prohibited under U.S. laws for export. The term of the WU License Agreement continues until the expiration of the last of WU's patents (as defined in the WU License Agreement) expire. The Company agreed to pay minimum annual royalties of $20,000 during the term of the WU License Agreement and such amounts are creditable against future royalties.  Royalties payable to WU under the WU License Agreement for covered product sales by the Company carry a mid-single digit royalty rate and for sublicense fees received by the Company carry a low double-digit royalty rate.  The WU License Agreement contains customary terms for confidentiality, prosecution and infringement provisions for licensed patents, publication rights, indemnification and insurance coverage.  The WU License Agreement is cancelable by the Company with ninety days advance notice at any time and by WU with sixty days advance notice if the Company materially breaches the WU License Agreement and fails to cure such breach.

In July 2012, the Company entered into an Exclusive License Agreement (the "License Agreement") with Ceva Santé Animale S.A. ("Licensee"), pursuant to which the Company granted the Licensee an exclusive royalty-bearing license, until December 31, 2028, to the Company's intellectual property and other assets, including patent rights and know-how, relating to recombinant single chain reproductive hormone technology for use in non-human mammals (the "Company's Animal Health Assets"). The License Agreement is subject to termination by the Licensee (a) for convenience on 180 days prior written notice, (b) in the Licensee's discretion in the event of a sale or other disposal of the Company's animal health assets, (c) in the Licensee's discretion upon a change in control of the Company, (d) for a material breach of the License Agreement by the Company, or (e) in the Licensee's discretion, if the Company becomes insolvent.  The License Agreement is also terminable by the Company if there is a material breach of the License Agreement by the Licensee, or if the Licensee challenges the Company's ownership of designated intellectual property.  The License Agreement includes a sublicense of the technology licensed to the Company by WU. Under the terms of the WU License Agreement, a portion of license fees and royalties the Company receives from sublicensing agreements will be paid to WU. The obligation for such license fees due to WU is included in accrued expenses at September 30, 2017.

Under the License Agreement, the Licensee obtained a worldwide exclusive license to develop, seek regulatory approval for and offer to sell, market, distribute, import and export luteinizing hormone ("LH") and/or follicle-stimulating hormone ("FSH") products for bovine (cattle), equine and swine in the field of the assistance and facilitation of reproduction in bovine, equine and swine animals.

Under the License Agreement, as of September 30, 2017, the following future milestone payments are provided, assuming future milestones are successfully achieved:

•   milestone payments, totaling up to a potential of $1.1 million in the aggregate, based on the satisfactory conclusion of milestones as defined in the License Agreement;
•   potential for milestone payments of up to an additional $2 million for development and receipt of regulatory approval for additional licensed products; and
•   royalties, at low double digit rates, based on sales of licensed products.

Revenue recognition related to the License Agreement and WU License Agreement is based primarily on the Company's consideration of ASC 808-10-45, "*Accounting for Collaborative Arrangements.*"  For financial reporting purposes, the license fees and milestone payments received from the License Agreement, net of the amounts due to third parties, including WU, have been recorded as deferred revenue and are amortized over the term of the License Agreement.  License fees and milestone revenue currently totaling a net of approximately $1,556,000 commenced being amortized into income upon the July 2012 date of milestone achievement. As of September 30, 2017, deferred revenue of $96,698 has been classified as a current liability and $992,792 has been classified as a long-term liability. The current liability represents the next twelve months' portion of the amortizable milestone revenue. During each of the nine months ended September 30, 2017 and 2016, $72,524 was recorded as the amortized license fee revenue arising from the License Agreement.

During the nine months ended September 30, 2017, a total of 169,074 options and warrants that were granted outside of the Plan were forfeited.  Of the total forfeited, 71,574 warrants expired under their terms and 60,000 options lapsed (15,000 vested and 45,000 unvested) due to the holders' terminations from the Company. The 60,000 options which lapsed were exercisable at an average of $3.78 per share. The remaining 37,500, which were forfeited resulted from negotiated payments made to each holder to waive their rights to the outstanding options. See Note 6.

### Note 8.  Animal Health License Agreements:

Effective May 1, 2004, Washington University in St. Louis ("WU") and the Company entered into an Exclusive License Agreement ("WU License Agreement"), which granted the Company exclusive license and right to sublicense WU's technology (as defined under the WU License Agreement) for veterinary products worldwide, except where such products are prohibited under U.S. laws for export. The term of the WU License Agreement continues until the expiration of the last of WU's patents (as defined in the WU License Agreement) expire.  The Company agreed to pay minimum annual royalties of $20,000 during the term of the WU License Agreement and such amounts are creditable against future royalties.  Royalties payable to WU under the WU License Agreement for covered product sales by the Company carry a mid-single digit royalty rate and for sublicense fees received by the Company carry a low double-digit royalty rate.  The WU License Agreement contains customary terms for confidentiality, prosecution and infringement provisions for licensed patents, publication rights, indemnification and insurance coverage.  The WU License Agreement is cancelable by the Company with ninety days advance notice at any time and by WU with sixty days advance notice if the Company materially breaches the WU License Agreement and fails to cure such breach.

In July 2012, the Company entered into an Exclusive License Agreement (the "License Agreement") with Ceva Santé Animale S.A. ("Licensee"), pursuant to which the Company granted the Licensee an exclusive royalty-bearing license, until December 31, 2028, to the Company's intellectual property and other assets, including patent rights and know-how, relating to recombinant single chain reproductive hormone technology for use in non-human mammals (the "Company's Animal Health Assets"). The License Agreement is subject to termination by the Licensee (a) for convenience on 180 days prior written notice, (b) in the Licensee's discretion in the event of a sale or other disposal of the Company's animal health assets, (c) in the Licensee's discretion upon a change in control of the Company, (d) for a material breach of the License Agreement by the Company, or (e) in the Licensee's discretion, if the Company becomes insolvent.  The License Agreement is also terminable by the Company if there is a material breach of the License Agreement by the Licensee, or if the Licensee challenges the Company's ownership of designated intellectual property.  The License Agreement includes a sublicense of the technology licensed to the Company by WU. Under the terms of the WU License Agreement, a portion of license fees and royalties the Company receives from sublicensing agreements will be paid to WU. The obligation for such license fees due to WU is included in accrued expenses at September 30, 2017.

Under the License Agreement, the Licensee obtained a worldwide exclusive license to develop, seek regulatory approval for and offer to sell, market, distribute, import and export luteinizing hormone ("LH") and/or follicle-stimulating hormone ("FSH") products for bovine (cattle), equine and swine in the field of the assistance and facilitation of reproduction in bovine, equine and swine animals.

Under the License Agreement, as of September 30, 2017, the following future milestone payments are provided, assuming future milestones are successfully achieved:

- milestone payments, totaling up to a potential of $1.1 million in the aggregate, based on the satisfactory conclusion of milestones as defined in the License Agreement;
- potential for milestone payments of up to an additional $2 million for development and receipt of regulatory approval for additional licensed products; and
- royalties, at low double digit rates, based on sales of licensed products.

Revenue recognition related to the License Agreement and WU License Agreement is based primarily on the Company's consideration of ASC 808-10-45, "*Accounting for Collaborative Arrangements.*"  For financial reporting purposes, the license fees and milestone payments received from the License Agreement, net of the amounts due to third parties, including WU, have been recorded as deferred revenue and are amortized over the term of the License Agreement.  License fees and milestone revenue currently totaling a net of approximately $1,556,000 commenced being amortized into income upon the July 2012 date of milestone achievement. As of September 30, 2017, deferred revenue of $96,698 has been classified as a current liability and $992,792 has been classified as a long-term liability. The current liability represents the next twelve months' portion of the amortizable milestone revenue. During each of the nine months ended September 30, 2017 and 2016, $72,524 was recorded as the amortized license fee revenue arising from the License Agreement.

20

A tabular summary of the revenue categories and cumulative amounts of revenue recognition associated with the License Agreement follows:

A tabular summary of the revenue categories and cumulative amounts of revenue recognition associated with the License Agreement follows:

| Category | Totals |
|---|---|
| License fees and milestone amounts paid / achieved | $ 1,920,000 |
| Third party obligations recorded, including WU | (363,700) |
| Deferred revenue balance | 1,556,300 |
| Revenue amortization to September 30, 2017 | (466,810) |
| Net deferred revenue balance at September 30, 2017 | $ 1,089,490 |

| | |
|---|---|
| Commencement of license fees revenue recognition | Upon signing or receipt |
| Commencement of milestone revenue recognition | Upon milestone achievement over then remaining life |
| Original amortization period | 197 months |

## Note 9. Acquisition and Discontinued Operations:

**Acquisition:**

On September 12, 2016, the Company completed the strategic acquisition of BDI, a privately-held entity. Pursuant to a purchase agreement (the "Purchase Agreement"), through a wholly-owned subsidiary ("Venaxis Sub"), the Company acquired all of the outstanding shares of Series 1 Preferred Stock of BDI from the selling shareholders (the "Seller"), representing more than 98% of the outstanding voting stock of BDI, and BDI thereupon become a majority owned subsidiary of the Company.

Under the terms of the Purchase Agreement, the consideration consisted of an aggregate of 627,010 shares of the Company's common stock (the "Shares") which Shares were distributed in accordance with the liquidation preferences set forth in BDI's Fifth Amended and Restated Certificate of Incorporation, as amended.  The Shares were valued at approximately $2,577,000 (based upon the closing value of our common stock on the acquisition date) and the issuance represented approximately 14% of the Company's then outstanding common stock at the closing. The Purchase Agreement contained customary representations and warranties of the parties, including BDI, and the Sellers have customary indemnification obligations to the Company relating to BDI, which are subject to certain limitations described further in the Purchase Agreement. The issuance of the Shares was effected as a private placement of securities.  The Company also entered into a registration rights agreement with the Sellers.

The total consideration transferred consisted of the 627,010 shares of the Company's common stock with a value of $2,577,000.

Under the acquisition method of accounting, the total estimated purchase consideration was allocated to the acquired tangible and intangible assets and assumed liabilities based on their estimated fair values as of the acquisition date. Following was the allocation of the purchase consideration:

| | |
|---|---|
| Cash and cash equivalents | $ 17,000 |
| Accounts receivable | 21,000 |
| Inventory | 379,000 |
| Prepaid and other assets | 51,000 |
| Equipment | 1,000 |
| Identifiable intangible assets: | |
| Trademarks (5 year estimated useful life) | 99,000 |
| Customer base (6 year estimated useful life) | 37,000 |
| Developed technology (4 year estimated useful life) | 1,864,000 |
| Total identifiable intangible assets | 2,000,000 |
| Goodwill | 430,000 |
| Accounts payable | (118,000) |
| Accrued and other liabilities | (175,000) |
| Non-controlling interest | (29,000) |
| Purchase price | $ 2,577,000 |

21

Intangible assets acquired consisted of the following as of December 31, 2016:

Intangible assets acquired consisted of the following as of December 31, 2016:

| | | |
|---|---|---:|
| Trademarks | $ | 99,000 |
| Customer base | | 37,000 |
| Developed technology | | 1,864,000 |
| Total | | 2,000,000 |
| Less accumulated amortization | | (148,264) |
| Balance at December 31, 2016 | $ | 1,851,736 |

As of November 30, 2016, the Company paid approximately $29,000 to acquire the non-controlling interest in BDI, which was accounted for as an equity transaction.

The unaudited supplemental pro forma information for the nine months ended September 30, 2016, as if the BDI acquisition had occurred as of January 1, 2016, would have reflected total revenue of $174,000, net loss of $2,102,000 and loss per share of $0.47. These pro forma condensed consolidated financial results have been prepared for comparative purposes only and include certain adjustments to reflect the pro forma results of operations as if the acquisition had occurred as of the beginning of the periods presented, such as increased amortization for the fair value of acquired intangible assets. The pro forma information does not reflect the effect of costs or synergies that would have been expected to result from the integration of the acquisition. The pro forma information does not purport to be indicative of the results of operations that actually would have resulted had the combination occurred at the beginning of each period presented, or of future results of the consolidated entities.

As of December 31, 2016 inventories, included with current assets of discontinued operations, totaled approximately $416,000, consisting of $188,000 in raw materials and $228,000 in finished goods, all associated with the BDI operations. As of September 30, 2017 no inventories were on hand.

**Discontinued operations:**

During the quarter ended March 31, 2017, the Company made the decision to discontinue the operations of its wholly-owned subsidiary BDI. BDI had developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017 of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. The Company expects to dispose of the assets and operations during 2017 by selling the assets and licensing the intellectual property rights.   The Company has recognized the exit of BDI in accordance with Accounting Standards Codification (ASC) 205-20, *Discontinued Operations*. As such, the historical results of BDI, following its 2016 acquisition, have been classified as discontinued operations.

The Company's historical financial statements have been revised to present the operating results of the BDI business as a discontinued operation. Assets and liabilities related to the discontinued operations of BDI are approximately as follows as of September 30, 2017 and December 31, 2016:

| | September 30, 2017 | | December 31, 2016 | |
|---|---:|---|---:|---|
| Current assets: | | | | |
| Accounts receivable | $ | 8,000 | $ | 5,000 |
| Inventories | | - | | 416,000 |
| Prepaid expenses | | 4,000 | | 66,000 |
| Total current assets | $ | 12,000 | $ | 487,000 |
| | | | | |
| Equipment and furnishings, net | $ | - | $ | 36,000 |
| Intangible assets, net | | - | | 2,281,000 |
| Deposit | | - | | 37,000 |
| Total noncurrent assets | $ | - | $ | 2,354,000 |
| | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 37,000 | $ | 174,000 |
| Accrued expenses | | 28,000 | | 85,000 |
| Deferred revenue | | 137,000 | | - |
| Total current liabilities | $ | 202,000 | $ | 259,000 |

Summarized results of the discontinued operation are as follows for the three and nine months ended September 30, 2017:

|  | Three Months | Nine Months |
|---|---|---|
| Sales | $ 7,000 | $ 37,000 |
| Cost of sales | 2,000 | 6,000 |
| Gross margin | 5,000 | 31,000 |
| Operating expenses (credit) | (26,000) | 975,000 |
| Operating income (loss) | 31,000 | (944,000) |
| Escrow forfeiture gain | - | 135,000 |
| Impairment (loss) | - | (2,754,000) |
| Income (loss) from discontinued operations | $ 31,000 | $ (3,563,000) |

Included in the impairment loss recognized for the nine months ended September 30, 2017 on the discontinuance of BDI are impairment losses recognized on inventories of $453,000, equipment and furnishings of $29,000, identifiable intangible assets of $1,833,000, goodwill of $430,000, and a $9,000, net expense from all other items, all associated with the assets and operations of BDI. For the three and nine months ended September 30, 2016 the loss from discontinued operations of $236,000, consisted of revenues of $2,000, less operating and other expenses totaling $238,000, including amortization and depreciation of $24,000.  Additional costs associated with the exit of operations of the Company's subsidiary BDI may be incurred as strategic options for BDI are evaluated.

**Note 10.  Commitments and contingencies:**
**Commitments:**

The Company's subsidiary, BDI, had a lease commitment on its office and laboratory space that was scheduled to expire March 31, 2018, requiring future non-cancellable lease payments as of May 2017 of approximately $294,000 for the remainder of its original term. During May 2017, an agreement with the subsidiary's landlord was reached to terminate the lease by surrendering the facility in May 2017, making a $80,419 prepayment of rent through July 31, 2017 and surrendering the $37,000 lease deposit. Rent expense for the nine months ended September 30, 2017 totaled approximately $229,000, including $216,000 in rent expense for BDI, inclusive of the payment of the early termination fee and the surrender of the $37,000 lease deposit and $13,000 in rent expense incurred by the Company under short-term rent agreements. The Company's rent expense for the nine months ended September 30, 2016 was immaterial.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party at a purchase price of $4,053,000. The sale resulted in a gain of approximately $1,933,000 and generated approximately $1,799,000 in net cash after expenses and mortgage payoffs. The Company is renting space in the building under short-term lease agreements that provide certain storage space.

As of September 30, 2017, the Company has an employment agreement with one officer providing aggregate annual minimum commitments totaling approximately $272,000.  The agreement contains customary confidentiality and benefit provisions.

**Contingencies:**

In the ordinary course of business and in the general industry in which the Company is engaged, it is not atypical to periodically receive a third party communication which may be in the form of a notice, threat, or "cease and desist" letter concerning certain activities.  For example, this can occur in the context of the Company's pursuit of intellectual property rights.  This can also occur in the context of operations such as the using, making, having made, selling, and offering to sell products and services, and in other contexts.  The Company makes rational assessments of each situation on a case-by-case basis as such may arise.  The Company periodically evaluates its options for trademark positions and considers a full spectrum of alternatives for trademark protection and product branding.

We are currently not a party to any legal proceedings, the adverse outcome of which would, in our management's opinion, have a material adverse effect on our business, financial condition and results of operations.

**Note 11.  Subsequent Events:**

**Corporate Name Change:**

On October 2, 2017 the Board of Directors of the Company approved a merger (the "Merger") of the Company with its wholly-owned subsidiary, Riot Blockchain, Inc., a Nevada corporation (the "Merger Sub"), solely for the purpose of changing the name of the Company. Upon consummation of the Merger, the separate existence of Merger Sub ceased. As permitted by Chapter 92A.180 of Nevada Revised Statutes, the purpose of the Merger was to effect a change of the Company's name to Riot Blockchain, Inc. from Bioptix, Inc. Upon approval by NASDAQ, on October 19, 2017, the Company's name was thereupon changed.

**Cash Dividend:**

On October 2, 2017, the Company's Board of Directors approved a cash dividend pursuant to which the holders of the Company's common stock and Series A Preferred Stock, would receive $1.00 for each share of Common Stock held, including each share of Common Stock that would be issuable upon conversion of the Series A Preferred Stock, on an as converted basis. The cash dividend totaled approximately $9,562,000 with a record date of the close of business on October 13, 2017 and payment date of October 18, 2017.

**Temporary Reduction in Warrant Exercise Prices:**

On October 10, 2017, the Company's Board of Directors approved a temporary reduction in the exercise price of warrants issued in the March 2017 private offerings to $3.00 per share.  The approval covered any of the 2,800,000 outstanding warrants which would be exercised by their holders from October 10, 2017 through October 20, 2017, for cash. During that period 620,000 warrants were exercised for cash, as described below. Any such warrant holder who exercises such warrants for cash at the reduced price shall not be entitled to the benefit of any cashless exercise feature on such exercised warrants for cash. The fair value of the temporary modification of the exercise price will be recorded as an additional expense and a credit to capital in the fourth quarter of 2017.  The fair value will be computed based upon the 620,000 warrants actually exercised times the increase in value of the warrants immediately before and immediately after the reduction in exercise price.

**Common Stock Transactions:**

Subsequent to September 30, 2017, the holders of 8,284.04 shares of Series A Preferred Stock exercised their right to convert such shares into 828,404 shares of common stock.     Separately, the holders of 620,000 warrants issued in the March 2017 private offerings (420,000 from the common stock offering and 200,000 from the convertible note offering), exercised their warrants for cash during the temporary reduction in exercise price period, described above, and were issued 620,000 shares of common stock generating $1,860,000 in cash proceeds. Additionally, the holders of 2,060,000 warrants issued in the March 2017 private offerings (360,000 from the common stock offering, exercisable at $3.50 per share and 1,700,000 from the convertible note offering, exercisable at $3.56 per share), exercised their warrants on a cashless basis, as provided in the offering agreements and were issued 1,228,690 shares of common stock in exchange for surrender of their warrants.

**Tess Inc. Acquisition:**

On October 20, 2017, the Company acquired approximately 52% of TESS which is developing blockchain solutions for telecommunications companies. Under the terms of the Purchase Agreement (the "Purchase Agreement") the Company invested cash of $320,000 and issued 75,000 shares of restricted Common Stock in exchange for 2,708,333 shares of common stock of TESS.  Accordingly, TESS became a majority-owned subsidiary of the Company.  In connection with the transaction, the Company and TESS entered into a registration rights agreement pursuant to which the Company agreed to file a registration statement within three months to register the resale of 25,000 shares (of 75,000 shares) of Common Stock issued to TESS. As of October 20, 2017 TESS has net tangible assets of approximately $10,000 and the Company expects that the purchase price will be allocated to intangible assets including in-process research and development and goodwill.

**Kairos Global Technology, Inc. Acquisition:**

On November 1, 2017, the Company entered into a business combination share exchange agreement (the "Agreement") with Kairos Global Technology, Inc., a Nevada corporation and on November 3, 2017, closed on the agreement.  Under the Agreement, the shareholders of Kairos agreed to exchange all outstanding shares of Kairos' common stock to the Company and the Company agreed to issue an aggregate of One Million Seven Hundred Fifty Thousand and One (1,750,001) newly-designated shares of Series B Convertible Preferred Stock (the "Series B Preferred Stock") which are convertible into an aggregate of One Million Seven Hundred Fifty Thousand and One (1,750,001) shares of the Company's common stock, no par value per share (the transaction, the "Kairos Transaction") to such shareholders. The shareholders of Kairos also will receive a royalty to be paid from cash flow generated from operations, which shall entitle such shareholders to receive 40% of the gross profits generated on a monthly basis until they have received a total of $1,000,000, at which point the royalty is extinguished. Karios is the owner of certain computer equipment and other assets used for the mining of cryptocurrency, specifically servers consisting of 700 AntMiner S9s and 500 AntMiner L3s, all

manufactured by Bitmain.

The shares of Series B Preferred Stock are convertible into shares of common stock based on a conversion calculation equal to the stated value of the Series B Preferred Stock, plus all accrued and unpaid dividends, if any, on such Series B Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series B Preferred Stock is $6.80 and the initial conversion price is $6.80 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events. The holders of Series B Preferred Stock are entitled to receive dividends if and when declared by the Company's board of directors. The Series B Preferred Stock will participate on an "as converted" basis, with all dividends when and if declared, on the Company's common stock. Each holder is entitled to vote on all matters submitted to stockholders of the Company, and will have the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series B Preferred Stock. Under the agreement the Company is prohibited from effecting a conversion of the Series B Preferred Stock to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% percent of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series B Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99% percent. The Series B Preferred Stock contains a blocker pursuant to which, if the Company has not obtained the approval of its shareholders in accordance with NASDAQ Listing Rule 5635(d), then the Company may not issue upon conversion of the Series B Preferred Stock a number of shares of common stock, which, when aggregated with any other shares of common stock  underlying the Series B Preferred Stock issued pursuant to the Agreement would exceed 19.99% of the shares of common stock issued and outstanding as of the date of the Agreement, subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the common stock that occur after the date of the Agreement.

24

---

## Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

### Management's plans and basis of presentation:

The Company has experienced recurring losses and negative cash flows from operations.  At September 30, 2017, the Company had approximate balances of cash and cash equivalents of $13,140,000, working capital of $12,555,000, total stockholders' equity of $15,466,000 and an accumulated deficit of $120,823,000. To date, the Company has in large part relied on equity financing to fund its operations. The Company expects to continue to incur losses from operations for the near-term and these losses could be significant as we incur costs and expenses associated with our recent and potential future acquisitions and investments, as well as public company and administrative related expenses are incurred and winding-down BDI's operations. The Company believes its upcoming near-term cash needs relative to the recent acquisitions will be covered by cash acquired in the acquisitions combined with the Company's available cash. The Company believes that its current working capital position will be sufficient to meet its estimated cash needs for at least a year and a day from this filing.  The Company is closely monitoring its cash balances, cash needs and expense levels.

The recently announced Kairos, Tess and Coinsquare acquisitions, as well as our new name, reflect a new focus (in addition to veterinary and life science oriented businesses of the Company) being pursued by the Company.  The decision to invest in companies exposed to blockchain and digital currency related risks is a strategic decision by the Company.  The Company's strategy will be to continue to pursue opportunistic investments and controlling positions in these new and emerging technologies which will continue to expose the Company to the numerous risks and volatility associated with this sector.

Effective January 14, 2017, we adopted a plan to exit the business of BDI and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required.  We are reviewing possible strategic alternatives relative to the business to maximize shareholder value.

Management's strategic plans include the following:

- continuing to evaluate opportunities for investments in the blockchain and digital currency sector;
- exploring other possible strategic options and financing opportunities available to the Company;
- evaluating options to monetize, partner or license the Company's assets, including appendicitis product portfolio; and

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Management's plans and basis of presentation:**

The Company has experienced recurring losses and negative cash flows from operations.  At September 30, 2017, the Company had approximate balances of cash and cash equivalents of $13,140,000, working capital of $12,555,000, total stockholders' equity of $15,466,000 and an accumulated deficit of $120,823,000. To date, the Company has in large part relied on equity financing to fund its operations. The Company expects to continue to incur losses from operations for the near-term and these losses could be significant as we incur costs and expenses associated with our recent and potential future acquisitions and investments, as well as public company and administrative related expenses are incurred and winding-down BDI's operations. The Company believes its upcoming near-term cash needs relative to the recent acquisitions will be covered by cash acquired in the acquisitions combined with the Company's available cash. The Company believes that its current working capital position will be sufficient to meet its estimated cash needs for at least a year and a day from this filing.  The Company is closely monitoring its cash balances, cash needs and expense levels.

The recently announced Kairos, Tess and Coinsquare acquisitions, as well as our new name, reflect a new focus (in addition to veterinary and life science oriented businesses of the Company) being pursued by the Company.  The decision to invest in companies exposed to blockchain and digital currency related risks is a strategic decision by the Company.  The Company's strategy will be to continue to pursue opportunistic investments and controlling positions in these new and emerging technologies which will continue to expose the Company to the numerous risks and volatility associated with this sector.

Effective January 14, 2017, we adopted a plan to exit the business of BDI and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required.  We are reviewing possible strategic alternatives relative to the business to maximize shareholder value.

Management's strategic plans include the following:

- continuing to evaluate opportunities for investments in the blockchain and digital currency sector;
- exploring other possible strategic options and financing opportunities available to the Company;
- evaluating options to monetize, partner or license the Company's assets, including appendicitis product portfolio; and
- continuing to implement cost control initiatives to conserve cash.

**NASDAQ listing:**

On April 10, 2017, the Company was notified by The NASDAQ Stock Market, LLC of its failure to comply with Nasdaq Listing Rule 5605 (the "Rule") which requires that the Company's audit committee be comprised of at least three independent directors, as defined under the Rule. On May 5, 2017, the Company appointed a new independent director to the Board of Directors and to the Company's audit committee, which resulted in the Company regaining compliance with the Rule.

**Results of Operations**

**Comparative Results for the Nine Months Ended September 30, 2017 and 2016**

During each of the nine month periods ended September 30, 2017 and 2016, $73,000 of license payments under the License Agreement was recognized as revenue.   See further discussion regarding the License Agreement below under the heading "Liquidity and Capital Resources."

Selling, general and administrative expenses in the nine months ended September 30, 2017 totaled $2,694,000, which is an approximately $639,000, or 19%, decrease as compared to the 2016 period. Compensation related expenses decreased by approximately $316,000 due to fewer employees and lower bonuses in the 2017 period. Legal and accounting expenses increased by $204,000 for the 2017 period due to additional legal services on various matters and costs associated with a change in audit firms. A decrease in strategic evaluation costs of approximately $373,000 related to the completion of strategic evaluations in 2016. Commercialization and marketing related expenses decreased by approximately $133,000 in the 2017 period as the Company had substantially wound down *APPY*1 commercialization activities in 2016.  A decrease of $48,000 in general operating expenses was due to the winding down of operations combined with the sale of Company's facility in 2016.

Research and development expenses in the nine months ended September 30, 2017 totaled $63,000, which is an approximately $436,000, or 87%, decrease as compared to the 2016 period. Substantially all of the decrease was due to winding down development and commercialization of *APPY*2 and *APPY*1 operations that had ceased in 2016.

Interest expense for the nine months ended September 30, 2017 totaled $4,802,000, compared to $28,000 in the 2016 period. The interest expense in the 2017 period primarily related to the accrual of interest on the March 2017 convertible note offering combined with the interest recognized in the period from the accretion of values allocated to the value of the warrants and the beneficial conversion feature computed upon the release of the securities from escrow. Interest in 2016, primarily related to the mortgage loans on the building that was paid off in the first quarter of 2016 upon the building's sale. For the nine months ended September 30, 2017, the Company recorded investment income of approximately $83,000, compared to investment income of $103,000 in the 2016 period, with the difference resulting from an average lower invested balances and lower rates on average investments with shorter maturities.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party at a purchase price of $4,053,000. The sale including subsequent equipment sales resulted in a gain of approximately $1,933,000 and generated approximately $1,799,000 in net cash after expenses and mortgage payoffs.

No income tax benefit was recorded on the net loss for the nine months ended September 30, 2017 and 2016, as management was unable to determine that it was more likely than not that such benefit would be realized.

**Comparative Results for the Three Months Ended September 30, 2017 and 2016**

During each of the three month periods ended September 30, 2017 and 2016, $24,000 in each period, of license payments under the License Agreement was recognized as revenue.

Selling, general and administrative expenses in the three months ended September 30, 2017 totaled $597,000, which is approximately $883,000, or 60%, decrease as compared to the 2016 period. Compensation related expenses decreased by approximately $744,000 due to fewer employees and lower bonuses in the 2017 period. Legal and accounting expenses decreased by $86,000 for the 2017 period due the level of legal and audit services on various matters in the 2017 period. Stock based compensation decreased by approximately $36,000 for the three months ended September 30, 2017, as compared to the 2016 period due to less equity rights being outstanding. Commercialization and marketing related expenses decreased by approximately $49,000 in the 2017 period as the Company had substantially wound down *APPY*1 commercialization activities in 2016.

Research and development expenses in the three months ended September 30, 2017 totaled $18,000, which is approximately a $35,000, or 67%, decrease as compared to the 2016 period. This decrease resulted from the wind down activities of development and manufacturing activities from our previous area of focus, the *APPY*1 Test, in 2016, combined with lower animal health related expenses in 2017.

Interest expense for the three months ended September 30, 2017, totaled approximately $4,773,000 compared to virtually nil in the 2016 period. The interest expense in the 2017 period primarily related to the accrual of interest on the March 2017 convertible note offering combined with the interest recognized in the period from the accretion of values allocated to the value of the warrants and the beneficial conversion feature upon the release of the convertible note securities from escrow and conversion to Series A Preferred Stock.

**Liquidity and Capital Resources**

At September 30, 2017, we had working capital of $12,555,000, which included cash and cash equivalents of $13,140,000. We reported a net loss of $10,968,000, consisting of a net loss from continuing operations of $7,404,000 and a net loss from discontinued operations of $3,564,000, during the nine months ended September 30, 2017. The net loss from continuing operations included $5,113,000 in non-cash items consisting of amortization of debt discount to interest of $4,750,000, stock-based compensation totaling $380,000, depreciation and amortization totaling $56,000, net of amortization of license fees totaling $73,000.

In March 2017, the Company entered into private placement agreements, under which during the nine months ended September 30, 2017, the Company received net proceeds after offering expenses totaling $1,914,000 from the sale of 900,000 shares of common stock, including the issuance of 900,000 warrants.

In March 2017, the Company also closed on a convertible note financing with certain accredited investors with gross proceeds totaling $4,750,000. The convertible note financing proceeds were held in escrow until their release in August 2017, upon waiver of release conditions by the lead investor.

Research and development expenses in the nine months ended September 30, 2017 totaled $63,000, which is an approximately $436,000, or 87%, decrease as compared to the 2016 period. Substantially all of the decrease was due to winding down development and commercialization of *APPY*2 and *APPY*1 operations that had ceased in 2016.

Interest expense for the nine months ended September 30, 2017 totaled $4,802,000, compared to $28,000 in the 2016 period.  The interest expense in the 2017 period primarily related to the accrual of interest on the March 2017 convertible note offering combined with the interest recognized in the period from the accretion of values allocated to the value of the warrants and the beneficial conversion feature computed upon the release of the securities from escrow. Interest in 2016, primarily related to the mortgage loans on the building that was paid off in the first quarter of 2016 upon the building's sale. For the nine months ended September 30, 2017, the Company recorded investment income of approximately $83,000, compared to investment income of $103,000 in the 2016 period, with the difference resulting from an average lower invested balances and lower rates on average investments with shorter maturities.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party at a purchase price of $4,053,000. The sale including subsequent equipment sales resulted in a gain of approximately $1,933,000 and generated approximately $1,799,000 in net cash after expenses and mortgage payoffs.

No income tax benefit was recorded on the net loss for the nine months ended September 30, 2017 and 2016, as management was unable to determine that it was more likely than not that such benefit would be realized.

**Comparative Results for the Three Months Ended September 30, 2017 and 2016**

During each of the three month periods ended September 30, 2017 and 2016, $24,000 in each period, of license payments under the License Agreement was recognized as revenue.

Selling, general and administrative expenses in the three months ended September 30, 2017 totaled $597,000, which is approximately $883,000, or 60%, decrease as compared to the 2016 period. Compensation related expenses decreased by approximately $744,000 due to fewer employees and lower bonuses in the 2017 period. Legal and accounting expenses decreased by $86,000 for the 2017 period due the level of legal and audit services on various matters in the 2017 period. Stock based compensation decreased by approximately $36,000 for the three months ended September 30, 2017, as compared to the 2016 period due to less equity rights being outstanding. Commercialization and marketing related expenses decreased by approximately $49,000 in the 2017 period as the Company had substantially wound down *APPY*1 commercialization activities in 2016.

Research and development expenses in the three months ended September 30, 2017 totaled $18,000, which is approximately a $35,000, or 67%, decrease as compared to the 2016 period. This decrease resulted from the wind down activities of development and manufacturing activities from our previous area of focus, the *APPY*1 Test, in 2016, combined with lower animal health related expenses in 2017.

Interest expense for the three months ended September 30, 2017, totaled approximately $4,773,000 compared to virtually nil in the 2016 period. The interest expense in the 2017 period primarily related to the accrual of interest on the March 2017 convertible note offering combined with the interest recognized in the period from the accretion of values allocated to the value of the warrants and the beneficial conversion feature upon the release of the convertible note securities from escrow and conversion to Series A Preferred Stock.

**Liquidity and Capital Resources**

At September 30, 2017, we had working capital of $12,555,000, which included cash and cash equivalents of $13,140,000.  We reported a net loss of $10,968,000, consisting of a net loss from continuing operations of $7,404,000 and a net loss from discontinued operations of $3,564,000, during the nine months ended September 30, 2017.  The net loss from continuing operations included $5,113,000 in non-cash items consisting of amortization of debt discount to interest of $4,750,000, stock-based compensation totaling $380,000, depreciation and amortization totaling $56,000, net of amortization of license fees totaling $73,000.

In March 2017, the Company entered into private placement agreements, under which during the nine months ended September 30, 2017, the Company received net proceeds after offering expenses totaling $1,914,000 from the sale of 900,000 shares of common stock, including the issuance of 900,000 warrants.

In March 2017, the Company also closed on a convertible note financing with certain accredited investors with gross proceeds totaling $4,750,000. The convertible note financing proceeds were held in escrow until their release in August 2017, upon waiver of release conditions by the lead investor.

During the nine months ended September 30, 2017, the Company negotiated and executed agreements with holders of stock rights (stock options and restricted shares) to have such holders waive their rights to the stock rights in exchange for a one time cash payment.  Under the agreements, a total of 532,911 rights were forfeited, consisting of; 494,578 stock options under the Company's 2002 Plan, 37,500 non-qualified options issued outside of the Plan and 833 restricted common shares. The total consideration under the agreements was $299,500. Of the total paid, $291,995 was charged to stockholders' equity and $7,505 was charged to compensation expense.

In September 2017, the Company acquired a minority interest for $3,000,000 USD, in Coinsquare, which operates a digital crypto-currency exchange platform operating in Canada.

In October 2017, the Company acquired approximately 52% of TESS, which is developing blockchain solutions for telecommunications companies. Under the terms of the purchase agreement the Company invested cash of $320,000 and issued 75,000 shares of restricted common stock in exchange for 2,708,333 shares of common stock of TESS.  Accordingly, TESS became a majority-owned subsidiary of the Company.

On October 2, 2017, the Company's Board of Directors approved a cash dividend which was paid on October 18, 2017, and totaled approximately $9,562,000.

In October 2017, the holders of 620,000 warrants issued in the March 2017 private offerings (420,000 from the common stock offering and 200,000 from the convertible note offering), exercised their warrants and were issued 620,000 shares of common stock generating $1,860,000 in cash proceeds.

We expect to continue to incur losses from operations for the near-term and these losses could be significant as we incur costs and expenses associated with our recent and potential future investments, as well as public company and administrative related expenses are incurred and any possible expenses which may be incurred from final shutdown of BDI's operations. We believe that our current working capital position will be sufficient to meet our estimated cash needs for at least a year and a day from this filing. We may pursue potential additional financing opportunities. However, there can be no assurance that we will be able to obtain sufficient additional financing on terms acceptable to us, if at all.   We are closely monitoring our cash balances, cash needs and expense levels. The accompanying financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that might result in our possible inability to continue as a going concern.

In July 2012, we entered the License Agreement with the Licensee, pursuant to which we granted the Licensee an exclusive royalty-bearing license, until December 31, 2028, to our intellectual property and other assets, including patent rights and know-how, relating to recombinant single chain reproductive hormone technology for use in non-human mammals. The License Agreement is subject to termination by the Licensee (a) for convenience on 180 days prior written notice, (b) in the Licensee's discretion in the event of a sale or other disposal of the Company's Animal Health Assets, (c) in the Licensee's discretion upon a change in control of the Company, (d) for a material breach of the License Agreement by us, or (e) in the Licensee's discretion, if we become insolvent.  The License Agreement is also terminable by us if there is a material breach of the License Agreement by the Licensee, or if the Licensee challenges our ownership of designated intellectual property. The License Agreement includes a sublicense of the technology licensed to the Company by WU. Under the terms of the WU license agreement, a portion of license fees and royalties we receive from sublicensing agreements will be paid to WU. The obligation for such license fees due to WU is included in accrued expenses at September 30, 2017.

Under the License Agreement, as of September 30, 2017, the following future milestone payments are provided, assuming future milestones are successfully achieved:

- milestone payments, totaling up to a potential of $1.1 million in the aggregate, based on the satisfactory conclusion of milestones as defined in the License Agreement;
- potential for milestone payments of up to an additional $2 million for development and receipt of regulatory approval for additional licensed products; and
- royalties, at low double digit rates, based on sales of licensed products.

The Company periodically enters into generally short-term consulting agreements, which at this time are primarily for assistance with our strategic evaluations.  Such commitments at any point in time may be significant but the agreements typically contain cancellation provisions.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party at a purchase price of $4,053,000. The sale including subsequent equipment sales resulted in a gain of approximately $1,933,000 and generated approximately $1,749,000 in net cash after expenses and mortgage payoffs. The Company is leasing back space in the building under a short-term lease agreement that provide storage space.

During the nine months ended September 30, 2017, the Company negotiated and executed agreements with holders of stock rights (stock options and restricted shares) to have such holders waive their rights to the stock rights in exchange for a one time cash payment. Under the agreements, a total of 532,911 rights were forfeited, consisting of; 494,578 stock options under the Company's 2002 Plan, 37,500 non-qualified options issued outside of the Plan and 833 restricted common shares. The total consideration under the agreements was $299,500. Of the total paid, $291,995 was charged to stockholders' equity and $7,505 was charged to compensation expense.

In September 2017, the Company acquired a minority interest for $3,000,000 USD, in Coinsquare, which operates a digital crypto-currency exchange platform operating in Canada.

In October 2017, the Company acquired approximately 52% of TESS, which is developing blockchain solutions for telecommunications companies. Under the terms of the purchase agreement the Company invested cash of $320,000 and issued 75,000 shares of restricted common stock in exchange for 2,708,333 shares of common stock of TESS. Accordingly, TESS became a majority-owned subsidiary of the Company.

On October 2, 2017, the Company's Board of Directors approved a cash dividend which was paid on October 18, 2017, and totaled approximately $9,562,000.

In October 2017, the holders of 620,000 warrants issued in the March 2017 private offerings (420,000 from the common stock offering and 200,000 from the convertible note offering), exercised their warrants and were issued 620,000 shares of common stock generating $1,860,000 in cash proceeds.

We expect to continue to incur losses from operations for the near-term and these losses could be significant as we incur costs and expenses associated with our recent and potential future investments, as well as public company and administrative related expenses are incurred and any possible expenses which may be incurred from final shutdown of BDI's operations. We believe that our current working capital position will be sufficient to meet our estimated cash needs for at least a year and a day from this filing. We may pursue potential additional financing opportunities. However, there can be no assurance that we will be able to obtain sufficient additional financing on terms acceptable to us, if at all. We are closely monitoring our cash balances, cash needs and expense levels. The accompanying financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that might result in our possible inability to continue as a going concern.

In July 2012, we entered the License Agreement with the Licensee, pursuant to which we granted the Licensee an exclusive royalty-bearing license, until December 31, 2028, to our intellectual property and other assets, including patent rights and know-how, relating to recombinant single chain reproductive hormone technology for use in non-human mammals. The License Agreement is subject to termination by the Licensee (a) for convenience on 180 days prior written notice, (b) in the Licensee's discretion in the event of a sale or other disposal of the Company's Animal Health Assets, (c) in the Licensee's discretion upon a change in control of the Company, (d) for a material breach of the License Agreement by us, or (e) in the Licensee's discretion, if we become insolvent. The License Agreement is also terminable by us if there is a material breach of the License Agreement by the Licensee, or if the Licensee challenges our ownership of designated intellectual property. The License Agreement includes a sublicense of the technology licensed to the Company by WU. Under the terms of the WU license agreement, a portion of license fees and royalties we receive from sublicensing agreements will be paid to WU. The obligation for such license fees due to WU is included in accrued expenses at September 30, 2017.

Under the License Agreement, as of September 30, 2017, the following future milestone payments are provided, assuming future milestones are successfully achieved:

- milestone payments, totaling up to a potential of $1.1 million in the aggregate, based on the satisfactory conclusion of milestones as defined in the License Agreement;
- potential for milestone payments of up to an additional $2 million for development and receipt of regulatory approval for additional licensed products; and
- royalties, at low double digit rates, based on sales of licensed products.

The Company periodically enters into generally short-term consulting agreements, which at this time are primarily for assistance with our strategic evaluations. Such commitments at any point in time may be significant but the agreements typically contain cancellation provisions.

On February 25, 2016, the Company completed the sale of its corporate headquarters, land, building and certain fixtures and equipment to a third party at a purchase price of $4,053,000. The sale including subsequent equipment sales resulted in a gain of approximately $1,933,000 and generated approximately $1,749,000 in net cash after expenses and mortgage payoffs. The Company is leasing back space in the building under a short-term lease agreement that provide storage space.

Due to recent market events that have adversely affected all industries and the economy as a whole, management has placed increased emphasis on

monitoring the risks associated with the current environment, particularly the investment parameters of the short-term investments, the recoverability of current assets, the fair value of assets, and the Company's liquidity. At this point in time, there has not been a material impact on the Company's assets and liquidity. Management will continue to monitor the risks associated with the current environment and their impact on the Company's results.

**Operating Activities**

Net cash consumed by operating activities was $3,164,000, consisting of $2,234,000 from continuing operations and $930,000 from discontinued operations during the nine months ended September 30, 2017. Cash was consumed from continuing operations by the loss of $7,404,000, less non-cash items of $5,113,000 in non-cash items consisting of amortization of debt discount to interest of $4,750,000, stock-based compensation totaling $380,000, depreciation and amortization totaling $56,000, net of amortization of license fees totaling $73,000. Decreases in prepaid and other current assets of $192,000 provided cash, primarily related to reductions in operating activities.  There was a net $135,000 decrease in accounts payable and accrued expenses in the nine months ended September 30, 2017, primarily due to reductions in operating activities and the payment of 2016 litigation settlement accrual in early 2017.

Net cash consumed by operating activities was $3,841,000, consisting of $3,466,000 from continuing operations and $375,000 from discontinued operations during the nine months ended September 30, 2016. Cash was consumed from continuing operations by the loss of $1,751,000, less non-cash expenses of $643,000 for stock-based compensation, depreciation and amortization, and impairment of patent costs, offset by the gain on sale of property and equipment of $1,933,000 and amortization of license fees totaling $73,000. Increases in prepaid and other current assets of $222,000 used cash, primarily related to routine changes in operating activities.  There was a $574,000 decrease in accounts payable and accrued expenses in the nine months ended September 30, 2016, primarily due to the payment of 2015 accrued incentives in early 2016, and a reduction in overall expenses due to the wind-down of the *APPY*1 activities.

**Investing Activities**

Net cash inflows from investing activities provided cash of $4,497,000, consisting of $4,493,000 from continuing operations and a cash inflow of $4,000 from discontinued operations during the nine months ended September 30, 2017. Sales of marketable securities investments totaling approximately $7,507,000 provided cash. Cash of $3,000,000 was used in the Coinsquare investment.  A $14,000 use of cash was attributable to additional costs incurred from patent filings.

Net cash inflows from investing activities provided cash of $4,505,000, consisting of $4,489,000 from continuing operations and a cash inflow of $17,000 from discontinued operations during the nine months ended September 30, 2016. Sales of marketable securities investments totaling approximately $16,523,000 provided cash, net of marketable securities purchased totaling approximately $13,819,000.  A $14,000 use of cash was attributable to additional costs incurred from patent filings.  The sale of the land, building and assets generated approximately $1,799,000 in cash. As part of the BDI acquisition $17,000 in cash was acquired.

**Financing Activities**

Net cash inflows from financing activities provided $6,277,000 from continuing operations, during the nine months ended September 30, 2017 consisting of net proceeds of $4,750,000 from convertible notes payable, $2,012,000 from the sale of common stock and exercise of warrants and options, net of $193,000 in scheduled payments under debt agreements, and $292,000 consumed from the redemption of equity rights payments.

Net cash outflows from financing activities consumed $229,000 during the nine months ended September 30, 2016 in scheduled payments under debt agreements.

**Critical Accounting Policies**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America (GAAP) requires management to make estimates and assumptions about future events that affect the amounts reported in the financial statements and accompanying notes. Future events and their effects cannot be determined with absolute certainty. Therefore, the determination of estimates requires the exercise of judgment. Actual results inevitably will differ from those estimates, and such differences may be material to the financial statements. The most significant accounting estimates inherent in the preparation of our financial statements include estimates associated with revenue recognition, impairment analysis of intangibles and stock-based compensation.

Net cash consumed by operating activities was $3,841,000, consisting of $3,466,000 from continuing operations and $375,000 from discontinued operations during the nine months ended September 30, 2016. Cash was consumed from continuing operations by the loss of $1,751,000, less non-cash expenses of $643,000 for stock-based compensation, depreciation and amortization, and impairment of patent costs, offset by the gain on sale of property and equipment of $1,933,000 and amortization of license fees totaling $73,000. Increases in prepaid and other current assets of $222,000 used cash, primarily related to routine changes in operating activities. There was a $574,000 decrease in accounts payable and accrued expenses in the nine months ended September 30, 2016, primarily due to the payment of 2015 accrued incentives in early 2016, and a reduction in overall expenses due to the wind-down of the *APPY*1 activities.

**Investing Activities**

Net cash inflows from investing activities provided cash of $4,497,000, consisting of $4,493,000 from continuing operations and a cash inflow of $4,000 from discontinued operations during the nine months ended September 30, 2017. Sales of marketable securities investments totaling approximately $7,507,000 provided cash. Cash of $3,000,000 was used in the Coinsquare investment. A $14,000 use of cash was attributable to additional costs incurred from patent filings.

Net cash inflows from investing activities provided cash of $4,505,000, consisting of $4,489,000 from continuing operations and a cash inflow of $17,000 from discontinued operations during the nine months ended September 30, 2016. Sales of marketable securities investments totaling approximately $16,523,000 provided cash, net of marketable securities purchased totaling approximately $13,819,000. A $14,000 use of cash was attributable to additional costs incurred from patent filings. The sale of the land, building and assets generated approximately $1,799,000 in cash. As part of the BDI acquisition $17,000 in cash was acquired.

**Financing Activities**

Net cash inflows from financing activities provided $6,277,000 from continuing operations, during the nine months ended September 30, 2017 consisting of net proceeds of $4,750,000 from convertible notes payable, $2,012,000 from the sale of common stock and exercise of warrants and options, net of $193,000 in scheduled payments under debt agreements, and $292,000 consumed from the redemption of equity rights payments.

Net cash outflows from financing activities consumed $229,000 during the nine months ended September 30, 2016 in scheduled payments under debt agreements.

**Critical Accounting Policies**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America (GAAP) requires management to make estimates and assumptions about future events that affect the amounts reported in the financial statements and accompanying notes. Future events and their effects cannot be determined with absolute certainty. Therefore, the determination of estimates requires the exercise of judgment. Actual results inevitably will differ from those estimates, and such differences may be material to the financial statements. The most significant accounting estimates inherent in the preparation of our financial statements include estimates associated with revenue recognition, impairment analysis of intangibles and stock-based compensation.

The Company's financial position, results of operations and cash flows are impacted by the accounting policies the Company has adopted. In order to get a full understanding of the Company's financial statements, one must have a clear understanding of the accounting policies employed. A summary of the Company's critical accounting policies follows:

*Investments:* Our investments in equity securities of companies over which we do not have significant influence are accounted for under the cost method. The investment is originally recorded at cost and adjusted for additional contributions or distributions. Management periodically reviews cost-method investments for instances where fair value is less than the carrying amount and the decline in value is determined to be other than temporary. If the decline in value is judged to be other than temporary, the carrying amount of the security is written down to fair value and the resulting loss is charged to operations. We currently do not have investments in which we own 20% to 50% and exercise significant influence over operating and financial policies, therefore we do not account for any investment under the equity method.

*Intangible Assets*: Intangible assets primarily represent legal costs and filings associated with obtaining patents on the Company's new discoveries. The Company amortizes these costs over the shorter of the legal life of the patent or its estimated economic life using the straight-line method. The Company tests intangible assets with finite lives upon significant changes in the Company's business environment. The testing resulted in no patent impairment charges written off during the nine month period ended September 30, 2017 and $168,000 net patent impairment charges written off during the nine months ended September 30, 2016.

***Revenue Recognition***:  The Company's revenues are recognized when products are shipped or delivered to unaffiliated customers. The Securities and Exchange Commission's Staff Accounting Bulletin (SAB) No. 104 provides guidance on the application of GAAP to select revenue recognition issues. The Company has concluded that its revenue recognition policy is appropriate and in accordance with SAB No. 104. Revenue is recognized under sales, license and distribution agreements only after the following criteria are met: (i) there exists adequate evidence of the transactions; (ii) delivery of goods has occurred or services have been rendered; and (iii) the price is not contingent on future activity; and (iv) collectability is reasonably assured.

***Stock-based Compensation***:  ASC 718, *Share-Based Payment*, defines the fair-value-based method of accounting for stock-based employee compensation plans and transactions used by the Company to account for its issuances of equity instruments to record compensation cost for stock-based employee compensation plans at fair value as well as to acquire goods or services from non-employees. Transactions in which the Company issues stock-based compensation to employees, directors and consultants and for goods or services received from non-employees are accounted for based on the fair value of the equity instruments issued. The Company utilizes pricing models in determining the fair values of options and warrants issued as stock-based compensation. These pricing models utilize the market price of the Company's common stock and the exercise price of the option or warrant, as well as time value and volatility factors underlying the positions.

***Recently issued and adopted accounting pronouncements***:

The Company has evaluated all recently issued accounting pronouncements and believes such pronouncements do not have a material effect on the Company's financial statements.

### Item 3.   Quantitative and Qualitative Disclosures About Market Risk

### General

We have limited exposure to market risks from instruments that may impact the Balance Sheets, Statements of Operations, and Statements of Cash Flows. Such exposure is due primarily to changing interest rates.

### Interest Rates

The primary objective for our investment activities is to preserve principal while maximizing yields without significantly increasing risk. This is accomplished by investing excess cash in highly liquid debt and equity investments of highly rated entities which are classified as trading securities.  As of September 30, 2017, 100% of the investment portfolio was in cash and cash equivalents with very short-term maturities and therefore not subject to any significant interest rate fluctuations. We have no investments denominated in foreign currencies and therefore our investments are not subject to foreign currency exchange risk.

### Item 4.  Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

Management of the Company, including the Chief Executive Officer and the Chief Financial Officer, has conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rule 13a-15(e)) as of the last day of the period of the accompanying financial statements.  Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective as of September 30, 2017.

### Changes in Internal Control Over Financial Reporting

There was no change in the Company's internal control over financial reporting that occurred during the fiscal quarter to which this report relates that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

***Revenue Recognition***:   The Company's revenues are recognized when products are shipped or delivered to unaffiliated customers. The Securities and Exchange Commission's Staff Accounting Bulletin (SAB) No. 104 provides guidance on the application of GAAP to select revenue recognition issues. The Company has concluded that its revenue recognition policy is appropriate and in accordance with SAB No. 104. Revenue is recognized under sales, license and distribution agreements only after the following criteria are met: (i) there exists adequate evidence of the transactions; (ii) delivery of goods has occurred or services have been rendered; and (iii) the price is not contingent on future activity; and (iv) collectability is reasonably assured.

***Stock-based Compensation***:   ASC 718, *Share-Based Payment*, defines the fair-value-based method of accounting for stock-based employee compensation plans and transactions used by the Company to account for its issuances of equity instruments to record compensation cost for stock-based employee compensation plans at fair value as well as to acquire goods or services from non-employees. Transactions in which the Company issues stock-based compensation to employees, directors and consultants and for goods or services received from non-employees are accounted for based on the fair value of the equity instruments issued. The Company utilizes pricing models in determining the fair values of options and warrants issued as stock-based compensation. These pricing models utilize the market price of the Company's common stock and the exercise price of the option or warrant, as well as time value and volatility factors underlying the positions.

### Recently issued and adopted accounting pronouncements:

The Company has evaluated all recently issued accounting pronouncements and believes such pronouncements do not have a material effect on the Company's financial statements.

## Item 3.   Quantitative and Qualitative Disclosures About Market Risk

### General

We have limited exposure to market risks from instruments that may impact the Balance Sheets, Statements of Operations, and Statements of Cash Flows. Such exposure is due primarily to changing interest rates.

### Interest Rates

The primary objective for our investment activities is to preserve principal while maximizing yields without significantly increasing risk. This is accomplished by investing excess cash in highly liquid debt and equity investments of highly rated entities which are classified as trading securities.  As of September 30, 2017, 100% of the investment portfolio was in cash and cash equivalents with very short-term maturities and therefore not subject to any significant interest rate fluctuations. We have no investments denominated in foreign currencies and therefore our investments are not subject to foreign currency exchange risk.

## Item 4.  Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

Management of the Company, including the Chief Executive Officer and the Chief Financial Officer, has conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rule 13a-15(e)) as of the last day of the period of the accompanying financial statements.  Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective as of September 30, 2017.

### Changes in Internal Control Over Financial Reporting

There was no change in the Company's internal control over financial reporting that occurred during the fiscal quarter to which this report relates that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

# PART II - OTHER INFORMATION

## Item 1.   Legal Proceedings

We are not a party to any legal proceedings, the adverse outcome of which would, in our management's opinion, have a material adverse effect on our business, financial condition and results of operations.

## Item 1A.  Risk Factors

If any of the risks as disclosed below or as disclosed in our Annual Report on Form 10-K, for the year ended December 31, 2016, actually occur, they could materially adversely affect our business, financial condition or operating results. In that case, the trading price of our common stock could decline.

## RISK FACTORS

**An investment in the Company's common stock involves a high degree of risk. In determining whether to purchase the Company's common stock, an investor should carefully consider all of the material risks described below, together with the other information contained in this report and the Company's other public filings before making a decision to purchase the Company's securities. An investor should only purchase the Company's securities if he or she can afford to suffer the loss of his or her entire investment.**

**The following risk factors are intended to supplement and should be read along with the "Risk Factors" contained in our Annual Report on Form 10-K filed with the SEC, and our other filings and reports with the SEC, which risk factors are incorporated herein by reference.**

## General Cryptocurrency Risks

*Cryptocurrency exchanges and other trading venues (including the Company's Coinsquare exchange) are relatively new and, in most cases, largely unregulated and may therefore may be subject to fraud and failures*

When cryptocurrency exchanges or other trading venues (whether involving the Company's Coinsquare exchange or others) are involved in fraud or experience security failures or other operational issues, such events could result in a reduction in cryptocurrency prices or confidence and impact the success of the Company and have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company.

Cryptocurrency market prices depend, directly or indirectly, on the prices set on exchanges and other trading venues, which are new and, in most cases, largely unregulated as compared to established, regulated exchanges for securities, commodities or currencies. For example, during the past three years, a number of bitcoin exchanges have closed due to fraud, business failure or security breaches. In many of these instances, the customers of the closed exchanges were not compensated or made whole for partial or complete losses of their account balances. While smaller exchanges are less likely to have the infrastructure and capitalization that may provide larger exchanges with some stability, larger exchanges may be more likely to be appealing targets for hackers and "malware" (i.e., software used or programmed by attackers to disrupt computer operation, gather sensitive information or gain access to private computer systems) and may be more likely to be targets of regulatory enforcement action. The Company does not maintain any insurance to protect from such risks, and does not expect any insurance for customer accounts to be available (such as federal deposit insurance) at any time in the future, putting customer accounts at risk from such events.  In the event the Company faces fraud, security failures, operational issues or similar events such factors would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company.

*Regulatory changes or actions may alter the nature of an investment in the Company or restrict the use of cryptocurrencies in a manner that adversely affects the Company's business, prospects or operations.*

As cryptocurrencies have grown in both popularity and market size, governments around the world have reacted differently to cryptocurrencies, with certain governments deeming them illegal while others have allowed their use and trade. On-going and future regulatory actions may impact the ability of the Company to continue to operate and such actions could affect the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company.

The effect of any future regulatory change on the Company or any cryptocurrency that the Company may mine or hold for others is impossible to predict, and such change could have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company.

Governments may in the future curtail or outlaw the acquisition, use or redemption of cryptocurrencies. Ownership of, holding or trading in cryptocurrencies may then be considered illegal and subject to sanction. Governments may also take regulatory action that may increase the cost and/or subject cryptocurrency companies to additional regulation.

On July 25, 2017 the SEC released an investigative report which states that the United States  would, in some circumstances, consider the offer and sale of blockchain tokens pursuant to an initial coin offering ("ICO") subject to federal securities laws.  Thereafter, China released statements and took similar actions.  Although the Company does not participate in ICOs, its clients and customers may participate in ICOs and these actions may be a prelude to further action that chills widespread acceptance of blockchain and cryptocurrency adoption and have a material adverse effect the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company.

Governments may in the future take regulatory actions that prohibit or severely restrict the right to acquire, own, hold, sell, use or trade cryptocurrencies or to exchange cryptocurrencies for fiat currency. Similar actions by governments or regulatory bodies (such as an exchange on which the Company's securities are listed, quoted or traded) could result in restriction of the acquisition, ownership, holding, selling, use or trading in the Company's securities. Such a restriction could result in the Company liquidating its inventory at unfavorable prices and may adversely affect the Company's shareholders and have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, raise new capital or maintain a securities listing with an exchange (such as the Company's current listing with NASDAQ) which would have a material adverse effect on the business, prospects or operations of the Company and harm investors in the Company's securities.

*The development and acceptance of cryptographic and algorithmic protocols governing the issuance of and transactions in cryptocurrencies is subject to a variety of factors that are difficult to evaluate.*

The use of cryptocurrencies to, among other things, buy and sell goods and services and complete transactions, is part of a new and rapidly evolving industry that employs digital assets based upon a computer-generated mathematical and/or cryptographic protocol. The growth of this industry in general, and the use of cryptocurrencies in particular, is subject to a high degree of uncertainty, and the slowing or stopping of the development or acceptance of developing protocols may occur and is unpredictable. The factors include, but are not limited to:

- Continued worldwide growth in the adoption and use of cryptocurrencies;
- Governmental and quasi-governmental regulation of cryptocurrencies and their use, or restrictions on or regulation of access to and operation of the network or similar cryptocurrency systems;
- Changes in consumer demographics and public tastes and preferences;
- The maintenance and development of the open-source software protocol of the network;
- The availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies;
- General economic conditions and the regulatory environment relating to digital assets; and
- Negative consumer sentiment and perception of bitcoin specifically and cryptocurrencies generally.

Such events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm investors in the Company's securities.

*Banks and financial institutions may not provide banking services, or may cut off services, to businesses that provide cryptocurrency-related services or that accept cryptocurrencies as payment, including financial institutions of investors in the Company's securities.*

A number of companies that provide bitcoin and/or other cryptocurrency-related services have been unable to find banks or financial institutions that are willing to provide them with bank accounts and other services. Similarly, a number of companies and individuals or businesses associated with cryptocurrencies may have had and may continue to have their existing bank accounts closed or services discontinued with financial institutions. We also may be unable to obtain or maintain these services for our business. The difficulty that many businesses that provide bitcoin and/or other cryptocurrency-related services have and may continue to have in finding banks and financial institutions willing to provide them services may be decreasing the usefulness of cryptocurrencies as a payment system and harming public perception of cryptocurrencies and could decrease its usefulness and harm its public perception in the future. Similarly, the usefulness of cryptocurrencies as a payment system and the public perception of cryptocurrencies could be damaged if banks or financial institutions were to close the accounts of businesses providing bitcoin and/or other cryptocurrency-related services.  This could occur as a result of compliance risk, cost, government regulation or public pressure. The risk

Governments may in the future take regulatory actions that prohibit or severely restrict the right to acquire, own, hold, sell, use or trade cryptocurrencies or to exchange cryptocurrencies for fiat currency. Similar actions by governments or regulatory bodies (such as an exchange on which the Company's securities are listed, quoted or traded) could result in restriction of the acquisition, ownership, holding, selling, use or trading in the Company's securities. Such a restriction could result in the Company liquidating its inventory at unfavorable prices and may adversely affect the Company's shareholders and have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, raise new capital or maintain a securities listing with an exchange (such as the Company's current listing with NASDAQ) which would have a material adverse effect on the business, prospects or operations of the Company and harm investors in the Company's securities.

*The development and acceptance of cryptographic and algorithmic protocols governing the issuance of and transactions in cryptocurrencies is subject to a variety of factors that are difficult to evaluate.*

The use of cryptocurrencies to, among other things, buy and sell goods and services and complete transactions, is part of a new and rapidly evolving industry that employs digital assets based upon a computer-generated mathematical and/or cryptographic protocol. The growth of this industry in general, and the use of cryptocurrencies in particular, is subject to a high degree of uncertainty, and the slowing or stopping of the development or acceptance of developing protocols may occur and is unpredictable. The factors include, but are not limited to:

- Continued worldwide growth in the adoption and use of cryptocurrencies;
- Governmental and quasi-governmental regulation of cryptocurrencies and their use, or restrictions on or regulation of access to and operation of the network or similar cryptocurrency systems;
- Changes in consumer demographics and public tastes and preferences;
- The maintenance and development of the open-source software protocol of the network;
- The availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies;
- General economic conditions and the regulatory environment relating to digital assets; and
- Negative consumer sentiment and perception of bitcoin specifically and cryptocurrencies generally.

Such events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm investors in the Company's securities.

*Banks and financial institutions may not provide banking services, or may cut off services, to businesses that provide cryptocurrency-related services or that accept cryptocurrencies as payment, including financial institutions of investors in the Company's securities.*

A number of companies that provide bitcoin and/or other cryptocurrency-related services have been unable to find banks or financial institutions that are willing to provide them with bank accounts and other services. Similarly, a number of companies and individuals or businesses associated with cryptocurrencies may have had and may continue to have their existing bank accounts closed or services discontinued with financial institutions. We also may be unable to obtain or maintain these services for our business. The difficulty that many businesses that provide bitcoin and/or other cryptocurrency-related services have and may continue to have in finding banks and financial institutions willing to provide them services may be decreasing the usefulness of cryptocurrencies as a payment system and harming public perception of cryptocurrencies and could decrease its usefulness and harm its public perception in the future. Similarly, the usefulness of cryptocurrencies as a payment system and the public perception of cryptocurrencies could be damaged if banks or financial institutions were to close the accounts of businesses providing bitcoin and/or other cryptocurrency-related services.  This could occur as a result of compliance risk, cost, government regulation or public pressure. The risk applies to securities firms, clearance and settlement firms, national stock and commodities exchanges, the over the counter market and the Depository Trust Company, which, if any of such entities adopts or implements similar policies, rules or regulations, could result in the inability of our investors to open or maintain stock or commodities accounts, including the ability to deposit, maintain or trade the Company's securities. Such factors would have a material adverse effect the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and harm investors.

*The price of the Company's shares could be subject to wide price swings since the value of cryptocurrencies may be subject to pricing risk and have historically been subject to wide swings in value.*

*The price of the Company's shares could be subject to wide price swings since the value of cryptocurrencies may be subject to pricing risk and have historically been subject to wide swings in value.*

The Company's shares are subject to arbitrary pricing factors that are not necessarily associated with traditional factors that influence stock prices or the value of non-cryptocurrency assets such as revenue, cashflows, profitability, growth prospects or business activity levels since the value and price, as determined by the investing public, may be influenced by future anticipated adoption or appreciation in value of cryptocurrencies or the blockchain generally, factors over which the Company has little or no influence or control. The Company's share prices may also be subject to pricing volatility due to supply and demand factors associated with few or limited public company options for investment in the segment, which may benefit the Company in the near term and change over time.

Cryptocurrency market prices are determined primarily using data from various exchanges, over-the-counter markets, and derivative platforms. Furthermore, such prices may be subject to factors such as those that impact commodities, more so than business activities, which could be subjected to additional influence from fraudulent or illegitimate actors, real or perceived scarcity, and political, economic, regulatory or other conditions. Pricing may be the result of, and may continue to result in, speculation regarding future appreciation in the value of cryptocurrencies, or the Company or its share price, inflating and making their market prices more volatile or creating "bubble" type risks.

In addition, the success of the Company, the Company's share price, and the interest in investors and the public in the Company as an early entrant into the blockchain and cryptocurrency ecosystem may in large part be the result of the Company's early emergence as a publicly traded company in which holders of appreciated cryptocurrency have an opportunity to invest inflated cryptocurrency profits for shares of the Company, which could be perceived as a way to maintaining investing exposure to the blockchain and cryptocurrency markets without exposing the investor to the risk in a particular cryptocurrency. Cryptocurrency holders have realized exponential value due to large increases in the prices of cryptocurrencies and may seek to lock in cryptocurrency appreciation, which investing in the Company's securities may be perceived as a way to achieve that result, but may l not continue in the future. As a result, the value of the Company's securities, and the value of cryptocurrencies generally may be more likely to fluctuate due to changing investor confidence in future appreciation (or depreciation) in market prices, profits from related or unrelated investments or holdings of cryptocurrency. Such factors or events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, or on the price of the Company's securities, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

*The impact of geopolitical events on the supply and demand for cryptocurrencies is uncertain.*

Crises may motivate large-scale purchases of cryptocurrencies which could increase the price of cryptocurrencies rapidly. This may increase the likelihood of a subsequent price decrease as crisis-driven purchasing behavior wanes, adversely affecting the value of the Company's inventory. Such risks are similar to the risks of purchasing commodities in general uncertain times, such as the risk of purchasing, holding or selling gold.

As an alternative to gold or fiat currencies that are backed by central governments, cryptocurrencies, which are relatively new, are subject to supply and demand forces. How such supply and demand will be impacted by geopolitical events is uncertain but could be harmful to the Company and investors in the Company's securities. Nevertheless, political or economic crises may motivate large-scale acquisitions or sales of cryptocurrencies either globally or locally. Such events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

32

*Acceptance and/or widespread use of cryptocurrency is uncertain*

Currently, there is a relatively small use of bitcoins and/or other cryptocurrencies in the retail and commercial marketplace for goods or services. In comparison there is relatively large use by speculators contributing to price volatility. .

*Acceptance and/or widespread use of cryptocurrency is uncertain*

Currently, there is a relatively small use of bitcoins and/or other cryptocurrencies in the retail and commercial marketplace for goods or services.  In comparison there is relatively large use by speculators contributing to price volatility.  .

The relative lack of acceptance of cryptocurrencies in the retail and commercial marketplace limits the ability of end-users to use them to pay for goods and services. Such lack of acceptance or decline in acceptances would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

*Possibility of the cryptocurrency algorithm transitioning to proof of stake validation and other mining related risks*

Proof of stake is an alternative method in validating cryptocurrency transactions. Should the algorithm shift from a proof of work validation method to a proof of stake method, mining would require less energy and may render any Company that maintains advantages in the current climate (for example from lower priced electric, processing, real estate, or hosting) less competitive.  The Company, which does not presently own or operate a mining facility, may be exposed to risk if it owns or acquires such a facility in the future, but may still be impacted to the extent that counterparties with which the Company interacts or who participate with Coinsquare, are affected.  Such events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

*If a malicious actor or botnet obtains control of more than 50% of the processing power on a cryptocurrency network, such actor or botnet could manipulate the blockchain to adversely affect the Company which would adversely affect an investment in the Company or the ability of the Company to operate.*

If a malicious actor or botnet (a volunteer or hacked collection of computers controlled by networked software coordinating the actions of the computers) obtains a majority of the processing power dedicated to mining a cryptocurrency, it may be able to alter the blockchain on which transactions of cryptocurrency resides and rely by constructing fraudulent blocks or preventing certain transactions from completing in a timely manner, or at all. The malicious actor or botnet could control, exclude or modify the ordering of transactions, though it could not generate new units or transactions using such control. The malicious actor could "double-spend" its own cryptocurrency (i.e., spend the same bitcoins in more than one transaction) and prevent the confirmation of other users' transactions for so long as it maintained control. To the extent that such malicious actor or botnet did not yield its control of the processing power on the network or the cryptocurrency community did not reject the fraudulent blocks as malicious, reversing any changes made to the blockchain may not be possible.  The foregoing description is not the only means by which the entirety of the blockchain or cryptocurrencies may be compromised, but is only and example.

Although there are no known reports of malicious activity or control of the blockchain achieved through controlling over 50% of the processing power on the network, it is believed that certain mining pools may have exceeded the 50% threshold in bitcoin. The possible crossing of the 50% threshold indicates a greater risk that a single mining pool could exert authority over the validation of bitcoin transactions. To the extent that the bitcoin ecosystem, and the administrators of mining pools, do not act to ensure greater decentralization of bitcoin mining processing power, the feasibility of a malicious actor obtaining control of the processing power will increase, which may adversely affect an investment in the Company. Such lack of controls and responses to such circumstances would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm investors.

*To the extent that the profit margins of bitcoin mining operations are not high, operators of bitcoin mining operations are more likely to immediately sell bitcoins earned by mining in the market, resulting in a reduction in the price of bitcoins that could adversely impact the Company and similar actions could affect other cryptocurrencies.*

Over the past two years, bitcoin mining operations have evolved from individual users mining with computer processors, graphics processing units and first generation ASIC servers. Currently, new processing power is predominantly added by incorporated and unincorporated "professionalized" mining operations. Professionalized mining operations may use proprietary hardware or sophisticated ASIC machines acquired from ASIC manufacturers. They require the investment of significant capital for the acquisition of this hardware, the leasing of operating space (often in data centers or warehousing facilities), incurring of electricity costs and the employment of technicians to operate the mining farms. As a result, professionalized mining operations are of a greater scale than prior miners and have more defined, regular expenses and liabilities. These regular expenses and liabilities require professionalized mining operations to more immediately sell bitcoins earned from mining operations,

whereas it is believed that individual miners in past years were more likely to hold newly mined bitcoins for more extended periods. The immediate selling of newly mined bitcoins greatly increases the supply of bitcoins, creating downward pressure on the price of bitcoins.

The extent to which the value of bitcoin mined by a professionalized mining operation exceeds the allocable capital and operating costs determines the profit margin of such operation. A professionalized mining operation may be more likely to sell a higher percentage of its newly mined bitcoin rapidly if it is operating at a low profit margin—and it may partially or completely cease operations if its profit margin is negative. In a low profit margin environment, a higher percentage could be sold more rapidly, thereby potentially reducing bitcoin prices. Lower bitcoin prices could result in further tightening of profit margins, particularly for professionalized mining operations with higher costs and more limited capital reserves, creating a network effect that may further reduce the price of bitcoin until mining operations with higher operating costs become unprofitable and remove mining power. The network effect of reduced profit margins resulting in greater sales of newly mined bitcoin could result in a reduction in the price of bitcoin that could adversely impact the Company.

The foregoing risks associated with bitcoin could be equally applicable to other cryptocurrencies, existing now or introduced in the future. Such circumstances would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm investors.

33

---

*Political or economic crises may motivate large-scale sales of Bitcoins and Ethereum, or other cryptocurrencies, which could result in a reduction in value and adversely affect the Company.*

As an alternative to fiat currencies that are backed by central governments, digital assets such as bitcoins and Ethereum, which are relatively new, are subject to supply and demand forces based upon the desirability of an alternative, decentralized means of buying and selling goods and services, and it is unclear how such supply and demand will be impacted by geopolitical events. Nevertheless, political or economic crises may motivate large-scale acquisitions or sales of bitcoins and Ethereum and other cryptocurrencies either globally or locally. Large-scale sales of bitcoins and Ethereum or other cryptocurrencies would result in a reduction in their value and could adversely affect the Company. Such circumstances would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm investors.

*It may be illegal now, or in the future, to acquire, own, hold, sell or use bitcoins, Ethereum, or other cryptocurrencies, participate in the blockchain or utilize similar digital assets in one or more countries, the ruling of which would adversely affect the Company.*

Although currently bitcoins, Ethereum, and other cryptocurrencies, the blockchain and digital assets generally are not regulated or are lightly regulated in most countries, including the United States, one or more countries such as China and Russia may take regulatory actions in the future that could severely restrict the right to acquire, own, hold, sell or use these digital assets or to exchange for fiat currency. Such restrictions may adversely affect the Company. Such circumstances would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm investors.

*If regulatory changes or interpretations require the regulation of bitcoins or other digital assets under the securities laws of the United States or elsewhere, including the Securities Act of 1933, the Securities Exchange Act of 1934 and the Investment Company Act of 1940 or similar laws of other jurisdictions and interpretations by the SEC, CFTC, IRS, Department of Treasury or other agencies or authorities, the Company may be required to register and comply with such regulations, including at a state or local level. To the extent that the Company decides to continue operations, the required registrations and regulatory compliance steps may result in extraordinary expense or burdens to the Company. The Company may also decide to cease certain operations. Any disruption of the Company's operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to the Company.*

Current and future legislation and SEC rulemaking and other regulatory developments, including interpretations released by a regulatory authority, may impact the manner in which bitcoins or other cryptocurrency is viewed or treated for classification and clearing purposes. In particular, bitcoins and other cryptocurrency may not be excluded from the definition of "security" by SEC rulemaking or interpretation requiring registration of all transactions, unless another exemption is available, including transacting in bitcoin or cryptocurrency amongst owners and require registration of trading platforms as "exchanges" such as Coinsquare.  The Company cannot be certain as to how future regulatory developments will

121

*Political or economic crises may motivate large-scale sales of Bitcoins and Ethereum, or other cryptocurrencies, which could result in a reduction in value and adversely affect the Company.*

As an alternative to fiat currencies that are backed by central governments, digital assets such as bitcoins and Ethereum, which are relatively new, are subject to supply and demand forces based upon the desirability of an alternative, decentralized means of buying and selling goods and services, and it is unclear how such supply and demand will be impacted by geopolitical events. Nevertheless, political or economic crises may motivate large-scale acquisitions or sales of bitcoins and Ethereum and other cryptocurrencies either globally or locally. Large-scale sales of bitcoins and Ethereum or other cryptocurrencies would result in a reduction in their value and could adversely affect the Company. Such circumstances would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm investors.

*It may be illegal now, or in the future, to acquire, own, hold, sell or use bitcoins, Ethereum, or other cryptocurrencies, participate in the blockchain or utilize similar digital assets in one or more countries, the ruling of which would adversely affect the Company.*

Although currently bitcoins, Ethereum, and other cryptocurrencies, the blockchain and digital assets generally are not regulated or are lightly regulated in most countries, including the United States, one or more countries such as China and Russia may take regulatory actions in the future that could severely restrict the right to acquire, own, hold, sell or use these digital assets or to exchange for fiat currency. Such restrictions may adversely affect the Company. Such circumstances would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm investors.

*If regulatory changes or interpretations require the regulation of bitcoins or other digital assets under the securities laws of the United States or elsewhere, including the Securities Act of 1933, the Securities Exchange Act of 1934 and the Investment Company Act of 1940 or similar laws of other jurisdictions and interpretations by the SEC, CFTC, IRS, Department of Treasury or other agencies or authorities, the Company may be required to register and comply with such regulations, including at a state or local level. To the extent that the Company decides to continue operations, the required registrations and regulatory compliance steps may result in extraordinary expense or burdens to the Company. The Company may also decide to cease certain operations. Any disruption of the Company's operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to the Company.*

Current and future legislation and SEC rulemaking and other regulatory developments, including interpretations released by a regulatory authority, may impact the manner in which bitcoins or other cryptocurrency is viewed or treated for classification and clearing purposes. In particular, bitcoins and other cryptocurrency may not be excluded from the definition of "security" by SEC rulemaking or interpretation requiring registration of all transactions, unless another exemption is available, including transacting in bitcoin or cryptocurrency amongst owners and require registration of trading platforms as "exchanges" such as Coinsquare.  The Company cannot be certain as to how future regulatory developments will impact the treatment of bitcoins and other cryptocurrencies under the law. If the Company determines not to comply with such additional regulatory and registration requirements, the Company may seek to cease certain of its operations or be subjected to fines, penalties and other governmental action. Any such action may adversely affect an investment in the Company. Such circumstances would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm investors.

*Lack of liquid markets, and possible manipulation of blockchain/cryptocurrency based assets*

Digital assets that are represented and trade on a ledger-based platform may not necessarily benefit from viable trading markets. Stock exchanges have listing requirements and vet issuers, requiring them to be subjected to rigorous listing standards and rules and monitoring investors transacting on such platform for fraud and other improprieties. These conditions may not necessarily be replicated on a distributed ledger platform, depending on the platform's controls and other policies. The more lax a distributed ledger platform is about vetting issuers of digital assets or users that transact on the platform, the higher the potential risk for fraud or the manipulation of digital assets. These factors may decrease liquidity or volume, or increase volatility of digital securities or other assets trading on a ledger-based system, which may adversely affect the Company. Such circumstances would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm investors.

## Company Blockchain and Cryptocurrency Risks

*The Company has an evolving business model*

As digital assets and blockchain technologies become more widely available, the Company expects the services and products associated with them to evolve. As a result to stay current with the industry, the Company's business model may need to evolve as well. From time to time, the Company may modify aspects of its business model relating to its product mix and service offerings. The Company cannot offer any assurance that these or any other modifications will be successful or will not result in harm to the business. The Company may not be able to manage growth effectively, which could damage its reputation, limit its growth and negatively affect its operating results. Such circumstances would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm investors.

*The Company operations, investment strategies, and profitability may be adversely affected by competition from other methods of investing in cryptocurrencies.*

The Company competes with other users and/or companies that are mining cryptocurrencies and other potential financial vehicles, including securities backed by or linked to cryptocurrencies through entities similar to the Company, such as ETF (exchange traded fund). Market and financial conditions, and other conditions beyond the Company's control, may make it more attractive to invest in other financial vehicles, or to invest in cryptocurrencies directly which could limit the market for the Company's shares and reduce their liquidity.  The emergence of other financial vehicles and ETFs have been scrutinized by regulators and such scrutiny and negative impressions or conclusions could be applicable to the Company and impact the ability of the Company to successfully pursue this segment or operate at all, or to establish or maintain a public market for its securities.  Such events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

*Cryptocurrency inventory, including that maintained by or for the Company, may be exposed to cybersecurity threats and hacks.*

As with any computer code generally, flaws in cryptocurrency codes may be exposed by malicious actors. Several errors and defects have been found previously, including those that disabled some functionality for users and exposed users' information. Flaws in and exploitations of the source code allow malicious actors to take or create money have previously occurred. A hacking occurred in July 2017 and a hacker exploited a critical flaw to drain three large wallets that had a combined total of over $31 million worth of Ethereum. If left undetected, the hacker could have been able to steal an additional $150 million. Such events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

*Competing blockchain platforms and technologies*

The development and acceptance of competing blockchain platforms or technologies may cause consumers to use alternative distributed ledgers or an alternative to distributed ledgers altogether.  This may adversely affect the Company and its exposure to various blockchain technologies. Such circumstances would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm investors.

*The Company's coins may be subject to loss, theft or restriction on access.*

*The Company's coins may be subject to loss, theft or restriction on access.*

There is a risk that some or all of the Company's coins could be lost or stolen. Access to the Company's coins could also be restricted by cybercrime (such as a denial of service ("DOS") attack) against a service at which the Company maintains a hosted online wallet. Any of these events may adversely affect the operations of the Company and, consequently, its investments and profitability.  The loss or destruction of a private key required to access the Company's digital wallets may be irreversible and the Company denied access for all time to its cryptocurrency holdings or the holdings of others. The Company's loss of access to its private keys or its experience of a data loss relating to the Company's digital wallets could adversely affect its investments and assets.

Cryptocurrencies are controllable only by the possessor of both the unique public and private keys relating to the local or online digital wallet in which they are held, which wallet's public key or address is reflected in the network's public blockchain. The Company will publish the public key relating to digital wallets in use when it verifies the receipt of transfers and disseminates such information into the network, but it will need to safeguard the private keys relating to such digital wallets. To the extent such private keys are lost, destroyed or otherwise compromised, the Company will be unable to access its cryptocurrency coins and such private keys will not be capable of being restored by any network. Any loss of private keys relating to digital wallets used to store the Company's or its client's cryptocurrencies would have a material adverse effect the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

*Incorrect or fraudulent coin transactions may be irreversible*

Cryptocurrency transactions are irrevocable and stolen or incorrectly transferred coins may be irretrievable. As a result, any incorrectly executed or fraudulent coin transactions could adversely affect the Company's investments and assets.

Coin transactions are not, from an administrative perspective, reversible without the consent and active participation of the recipient of the transaction. In theory, cryptocurrency transactions may be reversible with the control or consent of a majority of processing power on the network. Once a transaction has been verified and recorded in a block that is added to the blockchain, an incorrect transfer of a coin or a theft of coin generally will not be reversible and the Company may not be capable of seeking compensation for any such transfer or theft. It is possible that, through computer or human error, or through theft or criminal action, the Company's coins could be transferred in incorrect amounts or to unauthorized third parties, or to uncontrolled accounts. Such events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

*If the award of coins for solving blocks and transaction fees are not sufficiently high, miners may not have an adequate incentive to continue mining and may cease their mining operations.*

As the number of coins awarded for solving a block in the blockchain decreases, the incentive for miners to continue to contribute processing power to the network will transition from a set reward to transaction fees. Either the requirement from miners of higher transaction fees in exchange for recording transactions in the blockchain or a software upgrade that automatically charges fees for all transactions may decrease demand for the relevant coins and prevent the expansion of the network to retail merchants and commercial businesses, resulting in a reduction in the price of the relevant cryptocurrency that could adversely impact the Company's cryptocurrency inventory and investments.

In order to incentivize miners to continue to contribute processing power to the network, the network may either formally or informally transition from a set reward to transaction fees earned upon solving for a block. This transition could be accomplished either by miners independently electing to record on the blocks they solve only those transactions that include payment of a transaction fee or by the network adopting software upgrades that require the payment of a minimum transaction fee for all transactions. If transaction fees paid for the recording of transactions in the Blockchain become too high, the marketplace may be reluctant to accept the network as a means of payment and existing users may be motivated to switch between cryptocurrencies or to fiat currency. Decreased use and demand for coins may adversely affect their value and result in a reduction in the market price of coins.

In order to incentivize miners to continue to contribute processing power to the network, the network may either formally or informally transition from a set reward to transaction fees earned upon solving for a block. This transition could be accomplished either by miners independently electing to record on the blocks they solve only those transactions that include payment of a transaction fee or by the network adopting software upgrades that require the payment of a minimum transaction fee for all transactions. If transaction fees paid for the recording of transactions in the Blockchain become too high, the marketplace may be reluctant to accept the network as a means of payment and existing users may be motivated to switch between cryptocurrencies or to fiat currency. Decreased use and demand for coins may adversely affect their value and result in a reduction in the market price of coins.

If the award of coins for solving blocks and transaction fees for recording transactions are not sufficiently high to incentivize miners, miners may cease expending processing power to solve blocks and confirmations of transactions on the Blockchain could be slowed temporarily. A reduction in the processing power expended by miners could increase the likelihood of a malicious actor or botnet obtaining control in excess of 50 percent of the processing power active on the blockchain, potentially permitting such actor or botnet to manipulate the blockchain in a manner that adversely affects the Company's activities.

If the award of coins for solving blocks and transaction fees are not sufficiently high, miners may not have an adequate incentive to continue mining and may cease their mining operations. Miners ceasing operations would reduce collective processing power, which would adversely affect the confirmation process for transactions (i.e., decreasing the speed at which blocks are added to the blockchain until the next scheduled adjustment in difficulty for block solutions) and make the network more vulnerable to a malicious actor or botnet obtaining control in excess of 50 percent of the processing power. A reduction in confidence in the confirmation process or processing power of the network could result and be irreversible.  Such events would have a material adverse effect on the ability of the Company to continue to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

*The price of coins may be affected by the sale of coins by other vehicles investing in coins or tracking cryptocurrency markets.*

To the extent that other vehicles investing in coins or tracking cryptocurrency markets form and come to represent a significant proportion of the demand for coins, large redemptions of the securities of those vehicles and the subsequent sale of coins by such vehicles could negatively affect cryptocurrency prices and therefore affect the value of the inventory held by the Company. Such events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

*Risk related to shortages, technological obsolescence and difficulty in obtaining hardware*

Should new services/software embodying new technologies emerge, the Company's or its investments' ability to recognize the value of the use of existing hardware and equipment and its underlying technology, may become obsolete and require substantial capital to replace such equipment.

The increase in interest and demand for cryptocurrencies has led to a shortage of mining hardware as individuals purchase equipment for mining at home and large scale mining evolved. For example, according to PC Gamer, AMD's Radeon RX 580 and Radeon RX 570 have been out of stock for months and are widely viewed as hardware that is unique for cryptocurrency purposes.  Equipment in the mining facilities will require replacement from time to time. Shortages of graphics processing units may lead to unnecessary downtime for miners and limit the availability or accessibility of mining processing capabilities in the industry. Such events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

*Since there has been limited precedence set for financial accounting of bitcoin, Ethereum, and other digital assets, it is unclear how the Company will be required to account for digital assets transactions in the future.*

*Since there has been limited precedence set for financial accounting of bitcoin, Ethereum, and other digital assets, it is unclear how the Company will be required to account for digital assets transactions in the future.*

Since there has been limited precedence set for the financial accounting of digital assets, it is unclear how the Company will be required to account for digital asset transactions or assets. Furthermore, a change in regulatory or financial accounting standards could result in the necessity to restate the Company's financial statements. Such a restatement could negatively impact the Company's business, prospects, financial condition and results of operation. Such circumstances would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account and harm investors.

**Item 6.    Exhibits**

| EXHIBIT | DESCRIPTION |
|---|---|
| 10.1 | Form of Subscription Agreement between Riot Blockchain, Inc. (f/k/a Bioptix, Inc.) and goNumerical Ltd. * |
| 10.2 | Form of Purchase Agreement between Riot Blockchain, Inc. and Tess Inc. * |
| 10.3 | Form of Registration Rights Agreement between Riot Blockchain, Inc. and Tess Inc. * |
| 10.4 | Form of Share Exchange Agreement by and among Riot Blockchain, Inc., Kairos Global Technology, Inc., and the shareholders of Kairos Global Technology, Inc.* |
| 10.5 | Form of Separation Agreement between Riot Blockchain, Inc. and Michael Beeghley * |
| 10.6 | Form of Employment Agreement between Riot Blockchain, Inc. and John O'Rourke * |
| 31.1 | Rule 13a-14(a)/15d-14(a) - Certification of Chief Executive Officer. * |
| 31.2 | Rule 13a-14(a)/15d-14(a) - Certification of Chief Financial Officer.* |
| 32 | Section 1350 Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Furnished herewith. |
| 101 | Interactive data files pursuant to Rule 405 of Regulation S-T: (i) the Balance Sheets, (ii) the Statements of Operations, (iii) the Statement of Cash Flows and (iv) the Notes to Condensed Financial Statements. |

* Filed herewith.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Riot Blockchain, Inc.
(Registrant)

Dated: November 13, 2017

/s/ John O'Rourke
John O'Rourke
Chief Executive Officer and Chairman of the Board (Principal Executive Officer)

/s/ Jeffrey G. McGonegal

Dated: November 13, 2017
Jeffrey G. McGonegal
Chief Financial Officer (Principal Financial and Accounting Officer)

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Riot Blockchain, Inc.
(Registrant)

Dated: November 13, 2017

/s/ John O'Rourke

John O'Rourke
Chief Executive Officer and Chairman of the Board (Principal Executive Officer)

/s/ Jeffrey G. McGonegal

Dated: November 13, 2017

Jeffrey G. McGonegal
Chief Financial Officer (Principal Financial and Accounting Officer)

39

# FORM S-3, as filed with the Securities and Exchange Commission on April 20, 2017

S-3 1 bioptix_s3.htm FORM S-3

**As filed with the Securities and Exchange Commission on April 20, 2017**

Registration No. 333-

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM S-3**

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# BIOPTIX, INC.

(Exact name of registrant as specified in its charter)

| **Colorado** | **84-155337** |
|---|---|
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

**Jeffrey G. McGonegal**
**Chief Financial Officer**
**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

**Approximate date of commencement of proposed sale to the public:** From time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box.   ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box.   ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.   ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.   ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box.   ☐

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box.   ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box.   ☐

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of " *large accelerated filer* ", " *accelerated filer* " and " *smaller reporting company* " in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer  ☐          Accelerated filer  ☐          Non-accelerated filer  ☐          Smaller reporting company  ☐
(do not check if smaller
reporting company)

## CALCULATION OF REGISTRATION FEE

| Title of each class of securities to be registered | Amount to be Registered(1) | Proposed maximum offering price per share | Proposed maximum aggregate offering price | Amount of registration fee |
|---|---|---|---|---|
| Common stock, no par value per share | 900,000 | $ 4.16 (2) | $ 3,739,500 | $ 433.41 |
| Common stock, no par value per share, issuable upon conversion of convertible promissory notes (3) | 1,957,161 | $ 4.16 (2) | $ 8,132,004 | $ 942.50 |
| Common stock, no par value per share, issuable upon exercise of warrants | 2,800,000 | $ 4.16 (2) | $ 11,634,000 | $ 1,348.38 |
| TOTAL | **5,657,161** | $ 4.16 | $ 23,505,504 | $ 2,724.29 |

(1) Pursuant to Rule 416 under the Securities Act of 1933, as amended, this registration statement also covers such additional shares as may hereafter be issued resulting from stock splits, stock dividends, recapitalizations or certain other capital adjustments.

(2) Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(c) under the Securities Act of 1933, as amended. In accordance with Rule 457(c) of the Securities Act of 1933, as amended, the price shown is the average of the high and low sales prices of the Common Stock on April 17, 2017 as reported on The NASDAQ Capital Market.

(3) Includes shares of Common Stock issuable for accrued interest under the terms of the promissory notes, computed to the maturity date.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment that specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until this Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

<span style="color:red">**The information in this prospectus is not complete and may be changed. We may not sell these securities or accept an offer to buy these securities until the Securities and Exchange Commission declares our registration statement effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.**</span>

<span style="color:red">**SUBJECT TO COMPLETION, DATED April 20, 2017**</span>

**PROSPECTUS**

**BIOPTIX, INC.**

The information in this prospectus is not complete and may be changed. We may not sell these securities or accept an offer to buy these securities until the Securities and Exchange Commission declares our registration statement effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

**SUBJECT TO COMPLETION, DATED April 20, 2017**

**PROSPECTUS**

**BIOPTIX, INC.**

**900,000 Shares of Common Stock Offered by the Selling Stockholders**
**1,957,161 Shares of Common Stock Issuable Upon Conversion of 2% Convertible Promissory Notes Offered by the Selling Stockholders**
**2,800,000 Shares of Common Stock Issuable Upon Exercise of Warrants Offered by the Selling Stockholders**

This prospectus relates to the disposition from time to time of 5,601,566 shares of common stock, no par value per share (the "Common Stock"), which includes (i) 900,000 shares of Common Stock, (ii) 1,957,161 shares of Common Stock issuable upon the conversion of outstanding 2% convertible promissory notes (the "Notes") and (iii) 2,800,000 shares of Common Stock issuable upon the exercise of outstanding warrants held by the selling stockholders named in this prospectus.  We will not receive any of the proceeds from the sale of shares by the selling stockholders.

The selling stockholders may sell the shares of Common Stock described in this prospectus in a number of different ways and at varying prices. We provide more information about how the selling stockholders may sell their shares of Common Stock in the section entitled "Plan of Distribution" on page 8. The selling stockholders will bear all commissions and discounts, if any, attributable to the sale or disposition of the shares, or interests therein. We will bear all costs, expenses and fees in connection with the registration of the shares. We will not be paying any underwriting discounts or commissions in this offering.

Our Common Stock is presently listed on The NASDAQ Capital Market under the symbol "BIOP."  On April 17, 2017 the last reported sale price of our Common Stock was $4.15. The applicable prospectus supplement will contain information, where applicable, as to any other listing on The NASDAQ Capital Market or any securities market or other exchange of the securities, if any, covered by the prospectus supplement.

**Investing in our securities involves various risks.  See "Risk Factors" contained herein for more information on these risks.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities, or passed upon the adequacy or accuracy of this prospectus or any accompanying prospectus supplement.  Any representation to the contrary is a criminal offense.**

The date of this Prospectus is April 20, 2017.

---

**TABLE OF CONTENTS**

| | Page |
|---|---|
| OUR BUSINESS | 1 |
| RISK FACTORS | 2 |
| FORWARD-LOOKING STATEMENTS | 3 |
| USE OF PROCEEDS | 3 |
| SELLING STOCKHOLDERS | 4 |
| PLAN OF DISTRIBUTION | 8 |
| DESCRIPTION OF CAPITAL STOCK | 9 |
| LEGAL MATTERS | 12 |
| EXPERTS | 12 |
| WHERE YOU CAN FIND MORE INFORMATION | 13 |
| INCORPORATION OF DOCUMENTS BY REFERENCE | 13 |

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| OUR BUSINESS | 1 |
| RISK FACTORS | 2 |
| FORWARD-LOOKING STATEMENTS | 3 |
| USE OF PROCEEDS | 3 |
| SELLING STOCKHOLDERS | 4 |
| PLAN OF DISTRIBUTION | 8 |
| DESCRIPTION OF CAPITAL STOCK | 9 |
| LEGAL MATTERS | 12 |
| EXPERTS | 12 |
| WHERE YOU CAN FIND MORE INFORMATION | 13 |
| INCORPORATION OF DOCUMENTS BY REFERENCE | 13 |

i

**Company References**

In this prospectus, "Bioptix," "the Company," "we," "us," and "our" refer to Bioptix, Inc., a Colorado corporation, unless the context otherwise requires.

## OUR BUSINESS

Through our wholly owned subsidiary, BiOptix Diagnostics, Inc. ("BDI"), which we acquired in September 2016, we have developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions.  We acquired a Surface Plasma Resonance (SPR) platform which seeks to combine high sensitivity with microarray detection capability to allow researchers to understand whether their target molecules have functionality against the disease targeted. SPR is an advanced and highly sensitive optical technology that can measure refractive index changes on a sensor chip's gold surface due to a change in mass that occurs during a binding event. This change can be used to monitor biological interactions such as the concentration of target molecules, kinetic rates and affinity constants.

BDI is a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions.  BDI manufactures, sells and services instruments and consumables to pharmaceutical researchers allowing them to develop new drugs faster than by using older technologies such as enzyme-linked immunosorbent assay or "ELISA". BDI was originally established with technology developed in conjunction with Dr. John L. "Jan" Hall, Adjoint Professor, JILA (University of Colorado), who shared the Nobel Prize for Physics in 2005 for his work on laser-based precision spectroscopy and the optical frequency comb technique. SPR is the core of the BDI products and intellectual property.  Dr. Hall, in conjunction with the scientists at BDI, created a common path interferometer that was commercialized to become the 404pi instrument.

When it was acquired by us in September 2016, BDI was in the initial stages of rolling out its first commercial product, the 404pi system. BDI's initial revenue was generated in 2014 with first sales to customers including sales to leading academic researchers and biotech companies. BDI did not experience any significant seasonality to its business and provided normal terms to its customers, generally 30-60 days, net. Currently there is no back-log of orders.

Following the September 2016 acquisition of BDI, we began hiring sales, marketing and operational employees, adding a total of eight employees to the twelve hired in connection with the acquisition.

The BDI products include a reader instrument (404pi) and the consumable test products consisting of test chips (cassettes) and packaging. The instrument is assembled in-house using primarily off the shelf parts and certain customized components.  Consumable test product components are manufactured at the BDI facility using certain sub-assemblies processed by third-party contractors. Raw materials and certain sub-components are acquired from a number of suppliers.

**Company References**

In this prospectus, "Bioptix," "the Company," "we," "us," and "our" refer to Bioptix, Inc., a Colorado corporation, unless the context otherwise requires.

**OUR BUSINESS**

Through our wholly owned subsidiary, BiOptix Diagnostics, Inc. ("BDI"), which we acquired in September 2016, we have developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions.  We acquired a Surface Plasma Resonance (SPR) platform which seeks to combine high sensitivity with microarray detection capability to allow researchers to understand whether their target molecules have functionality against the disease targeted. SPR is an advanced and highly sensitive optical technology that can measure refractive index changes on a sensor chip's gold surface due to a change in mass that occurs during a binding event. This change can be used to monitor biological interactions such as the concentration of target molecules, kinetic rates and affinity constants.

BDI is a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions.  BDI manufactures, sells and services instruments and consumables to pharmaceutical researchers allowing them to develop new drugs faster than by using older technologies such as enzyme-linked immunosorbent assay or "ELISA". BDI was originally established with technology developed in conjunction with Dr. John L. "Jan" Hall, Adjoint Professor, JILA (University of Colorado), who shared the Nobel Prize for Physics in 2005 for his work on laser-based precision spectroscopy and the optical frequency comb technique. SPR is the core of the BDI products and intellectual property.  Dr. Hall, in conjunction with the scientists at BDI, created a common path interferometer that was commercialized to become the 404pi instrument.

When it was acquired by us in September 2016, BDI was in the initial stages of rolling out its first commercial product, the 404pi system. BDI's initial revenue was generated in 2014 with first sales to customers including sales to leading academic researchers and biotech companies. BDI did not experience any significant seasonality to its business and provided normal terms to its customers, generally 30-60 days, net. Currently there is no back-log of orders.

Following the September 2016 acquisition of BDI, we began hiring sales, marketing and operational employees, adding a total of eight employees to the twelve hired in connection with the acquisition.

The BDI products include a reader instrument (404pi) and the consumable test products consisting of test chips (cassettes) and packaging. The instrument is assembled in-house using primarily off the shelf parts and certain customized components.  Consumable test product components are manufactured at the BDI facility using certain sub-assemblies processed by third-party contractors. Raw materials and certain sub-components are acquired from a number of suppliers.

1

**Recent Developments**

Effective January 14, 2017, we adopted a plan to exit this acquired business and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required.  We are reviewing possible strategic alternatives relative to the business to maximize shareholder value. Our continuing evaluation following adoption of the plan, estimates that we will incur charges to operations in early 2017 of approximately, $2.7 million, consisting of 1) write-down of tangible and intangible assets estimated at approximately $2.2 million, and 2) wind-down, severance and transaction expenses estimated at approximately $500,000.

Following the recent decision to exit the BDI business, we have begun evaluating potential strategic alternatives. We expect, in the near term, to establish the primary criteria we will consider as we evaluate our next steps and strategic path forward with the goal of maximizing value for our stockholders. Additionally, we will focus on attempting to locate an acquirer or partner for the BDI operations as well as continuing to attempt to locate an interested party for the appendicitis assets.

**Recent Developments**

Effective January 14, 2017, we adopted a plan to exit this acquired business and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required.  We are reviewing possible strategic alternatives relative to the business to maximize shareholder value. Our continuing evaluation following adoption of the plan, estimates that we will incur charges to operations in early 2017 of approximately, $2.7 million, consisting of 1) write-down of tangible and intangible assets estimated at approximately $2.2 million, and 2) wind-down, severance and transaction expenses estimated at approximately $500,000.

Following the recent decision to exit the BDI business, we have begun evaluating potential strategic alternatives. We expect, in the near term, to establish the primary criteria we will consider as we evaluate our next steps and strategic path forward with the goal of maximizing value for our stockholders. Additionally, we will focus on attempting to locate an acquirer or partner for the BDI operations as well as continuing to attempt to locate an interested party for the appendicitis assets.

**Historical Operations**

We also hold an exclusive license agreement with Washington University ("WU") in St. Louis which granted us an exclusive license and right to sublicense its technology for veterinary products worldwide, subject to certain exceptions. In July 2012, we granted Ceva Sante Animale S.A. ("Ceva") an exclusive royalty-bearing license to our intellectual property and other assets, relating to recombinant single chain reproductive hormone technology for use in non-human mammals.  This license includes a sublicense of the technology licensed to us by WU.  Ceva continues to advance development of the bovine rFSH product and cumulative cash payments received to date by us from Ceva have been approximately $2 million.

On February 25, 2016, we completed the sale of our corporate headquarters, land and building, to a third party at a purchase price of $4,053,000.  The sale generated approximately $1.8 million in net cash after expenses and mortgage payoffs. In addition to agreeing to the sale, we rented back space in the building under short-term lease agreements that provide storage space required for our current level of operations.

**Company Information**

We were incorporated on July 24, 2000 in the state of Colorado under the name "AspenBio Pharma, Inc." In December 2012, we changed our name to "Venaxis, Inc." and in 2016, in connection with our acquisition of BiOptix Diagnostics, Inc., we changed our name to "Bioptix, Inc." Our principal executive offices are located at 834-F South Perry Street, Suite 443, Castle Rock, CO 80104and our telephone number is (303) 794-2000. Our website address is www.venaxis.com. The information contained on, or accessible through, our website is not part of this prospectus or any prospectus supplement.

**RISK FACTORS**

Investing in our securities involves a high degree of risk. Before making an investment decision, you should carefully consider the risks, uncertainties and forward-looking statements described under "Risk Factors" in Item 1A of our most recent Annual Report on Form 10-K for the fiscal year ended December 31, 2016 filed with the Securities and Exchange Commission (the "SEC") on March 31, 2017, as well as information incorporated by reference into this prospectus. If any of these risks were to occur, our business, financial condition or results of operations would likely suffer. In that event, the value of our securities could decline, and you could lose part or all of your investment. The risks and uncertainties we describe are not the only ones facing us. Additional risks not presently known to us or that we currently deem immaterial may also impair our business operations. In addition, our past financial performance may not be a reliable indicator of future performance, and historical trends should not be used to anticipate results in the future.  See "Forward-Looking Statements" below.

2

**FORWARD-LOOKING STATEMENTS**

This prospectus, including the documents that we incorporate by reference, contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Exchange Act. Such forward-looking statements include those that express plans, anticipation, intent, contingency, goals, targets or future development and/or otherwise are not

## FORWARD-LOOKING STATEMENTS

This prospectus, including the documents that we incorporate by reference, contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Exchange Act. Such forward-looking statements include those that express plans, anticipation, intent, contingency, goals, targets or future development and/or otherwise are not statements of historical fact. These forward-looking statements are based on our current expectations and projections about future events and they are subject to risks and uncertainties known and unknown that could cause actual results and developments to differ materially from those expressed or implied in such statements.

In some cases, you can identify forward-looking statements by terminology, such as "expects," "anticipates," "intends," "estimates," "plans," "believes," "seeks," "may," "should", "could" or the negative of such terms or other similar expressions. Accordingly, these statements involve estimates, assumptions and uncertainties that could cause actual results to differ materially from those expressed in them. Any forward-looking statements are qualified in their entirety by reference to the factors discussed throughout this prospectus.

You should read this prospectus and the documents that we reference herein and therein and have filed as exhibits to the registration statement, of which this prospectus is part, completely and with the understanding that our actual future results may be materially different from what we expect. You should assume that the information appearing in this prospectus is accurate as of the date on the front cover of this prospectus or such prospectus supplement only. Because the risk factors referred to above, as well as the risk factors referred to on page 4 of this prospectus and incorporated herein by reference, could cause actual results or outcomes to differ materially from those expressed in any forward-looking statements made by us or on our behalf, you should not place undue reliance on any forward-looking statements. Further, any forward-looking statement speaks only as of the date on which it is made, and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which the statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict which factors will arise. In addition, we cannot assess the impact of each factor on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. We qualify all of the information presented in this prospectus and any accompanying prospectus supplement, and particularly our forward-looking statements, by these cautionary statements.

## USE OF PROCEEDS

The net proceeds from any disposition of the shares covered hereby would be received by the selling stockholders. We will not receive any of the proceeds from the sale of our Common Stock by the selling stockholders other than the net proceeds of any warrants exercised for cash.

## DESCRIPTION OF TRANSACTIONS

On March 10, 2017, we sold $2,250,000 of units of our securities, pursuant to separate purchase agreements with certain of the selling stockholders, at a purchase price of $2.50 per unit.  Each unit consists of one share of our Common Stock and a three year warrant to purchase one share of Common Stock, at an exercise price of $3.50 per share.

The warrants are exercisable, at any time on or after the sixth month anniversary of the date of issuance, at a price of $3.50 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the warrants on a cashless basis. We are prohibited from effecting an exercise of any warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such warrant.

3

---

On March 15, 2017, we entered into separate securities purchase agreements pursuant to which we agreed to sell up to $4,750,000 of principal amount of Notes and three year warrants to certain of the selling stockholders.  On March 16, 2017, we satisfied all closing conditions and closed the transaction. The Notes are convertible into shares of Common Stock at an initial conversion price of $2.50.  Each warrant is exercisable into shares of Common Stock at an exercise price equal to $3.56 per share.

The Notes are convertible and the warrants are exercisable at any time after we have received approval of the transaction from our stockholders as required by Nasdaq Listing Rule 5635. We are prohibited from effecting a conversion of any Note or exercise of any warrant to the extent that, as a result of any such conversion or exercise, the holder would beneficially own more than 9.99% of the number of shares of Common

On March 15, 2017, we entered into separate securities purchase agreements pursuant to which we agreed to sell up to $4,750,000 of principal amount of Notes and three year warrants to certain of the selling stockholders.  On March 16, 2017, we satisfied all closing conditions and closed the transaction. The Notes are convertible into shares of Common Stock at an initial conversion price of $2.50.  Each warrant is exercisable into shares of Common Stock at an exercise price equal to $3.56 per share.

The Notes are convertible and the warrants are exercisable at any time after we have received approval of the transaction from our stockholders as required by Nasdaq Listing Rule 5635. We are prohibited from effecting a conversion of any Note or exercise of any warrant to the extent that, as a result of any such conversion or exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon conversion of such Note or exercise of such warrant, as the case may be.

We have agreed to file a preliminary proxy statement within 45 days of closing of the March 16, 2017 transaction for a special meeting of our stockholders, in order to submit to our stockholders a proposal to approve an amendment to our Articles of Incorporation authorizing the creation of 15,000,000 shares of "blank check" preferred stock and, thereafter, we shall designate  shares of preferred stock as "Series A Preferred Stock" by filing a Certificate of Designations, Preferences and Rights of 0% Series A Convertible Preferred Stock with the Secretary of State (such date of filing, the "Filing Date"). On the Filing Date, the Notes shall automatically, and without any further action on the part of the holders, be exchanged for shares of Series A Preferred Stock based on a ratio of $1.00 of stated value of Series A Preferred Stock for each $1.00 of then outstanding principal amount plus any accrued but unpaid interest thereon, pursuant to Section 3(a)(9) of the Securities Act.

## SELLING STOCKHOLDERS

This prospectus relates to the sale or other disposition of up to 5,657,161 shares of our Common Stock by the selling stockholders named below, and their donees, pledgees, transferees or other successors-in-interest selling shares of Common Stock or interests in shares of Common Stock received after the date of this prospectus from a selling stockholder as a gift, pledge, partnership distribution or other transfer, which includes:

(i)    900,000 shares of Common Stock;

(ii)    1,957,161 shares of Common Stock issuable upon the conversion of outstanding convertible promissory notes; and

(iii)    2,800,000 shares of Common Stock issuable upon the exercise of outstanding warrants.

The following table, based upon information currently known by us, sets forth as of April 14, 2017, (i) the number of shares held of record or beneficially by the selling stockholders as of such date (as determined below) and (ii) the number of shares that may be sold or otherwise disposed of under this prospectus by each selling stockholder. Percentage ownership is based on 4,903,971 shares of Common Stock outstanding as of March 31, 2017, plus 500,000 shares of Common Stock held in escrow assumed offered in this offering, plus securities deemed to be outstanding with respect to individual stockholders pursuant to Rule 13d-3(d)(1) under the Exchange Act. Beneficial ownership includes shares of Common Stock plus any securities held by the holder exercisable for or convertible into shares of Common Stock within 60 days after March 31, 2017, in accordance with Rule 13d-3(d)(1) under the Exchange Act. The inclusion of any shares in this table does not constitute an admission of beneficial ownership for the selling stockholder named below. We do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby. The selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus and may sell or otherwise dispose of shares covered hereby in transactions exempt from the registration requirements of the Securities Act. Because the selling stockholders may sell or otherwise dispose of some, all or none of the shares covered hereby, and because there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares, we cannot estimate the number of the shares that will be held by the selling stockholders after completion of the offering. However, for purposes of the following table, we have assumed that all of the shares covered hereby are sold by the selling stockholders pursuant to this prospectus.

4

None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities. Unless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law. Unless otherwise indicated below, to our knowledge, no persons named in the table are a broker-dealer or affiliate of a broker-dealer.  Unless otherwise indicated, all address are c/o Bioptix, Inc., 834-F South Perry Street, Suite 443,

None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities. Unless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law. Unless otherwise indicated below, to our knowledge, no persons named in the table are a broker-dealer or affiliate of a broker-dealer.  Unless otherwise indicated, all address are c/o Bioptix, Inc., 834-F South Perry Street, Suite 443, Castle Rock, CO 80104.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.63% | 200,000 (1) | 0 | * |
| Andrew Schwartzberg | 549,800 (2) | 9.99% | 900,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.63% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.10% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,860 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 596,400 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 598,100 (12) | 9.99% | 1,624,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.20% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,400 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |

\*   Less than 1%.
\*\* Based on 4,903,971 shares of Common Stock outstanding as of April 14, 2017.

5

(1)  Adam Arviv is the President of Acquisition Group Limited. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 100,000 shares of Common Stock of which 55,556 shares are held in escrow pending certain release conditions being met and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 55,556 shares are held in escrow pending certain release conditions being met. The address for this selling stockholder is 118 Yorkville Ave, Suite 604, Toronto, Ontario M5RIC2.

(2)  Represents (i) 450,000 shares of Common Stock of which 250,000 shares are held in escrow pending certain release conditions being met and (ii) 100,440 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 250,000 shares are held in escrow pending certain release conditions being met. Excludes 349,590 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The address for this selling stockholder is 1 Greentree Court Bethesda, MD 20817.

(3)  Represents (i) 100,000 shares of Common Stock of which 55,556 shares are held in escrow pending certain release conditions being met and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 55,556 shares are held in escrow pending certain release conditions being met. The address for this selling stockholder is 11290 Chalon Road, Los Angeles

(1)   Adam Arviv is the President of Acquisition Group Limited. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 100,000 shares of Common Stock of which 55,556 shares are held in escrow pending certain release conditions being met and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 55,556 shares are held in escrow pending certain release conditions being met. The address for this selling stockholder is 118 Yorkville Ave, Suite 604, Toronto, Ontario M5RIC2.

(2)   Represents (i) 450,000 shares of Common Stock of which 250,000 shares are held in escrow pending certain release conditions being met and (ii) 100,440 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 250,000 shares are held in escrow pending certain release conditions being met. Excludes 349,590 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The address for this selling stockholder is 1 Greentree Court Bethesda, MD 20817.

(3)   Represents (i) 100,000 shares of Common Stock of which 55,556 shares are held in escrow pending certain release conditions being met and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 55,556 shares are held in escrow pending certain release conditions being met. The address for this selling stockholder is 11290 Chalon Road, Los Angeles CA 90049.

(4)   Mark Groussman is the President of Melechdavid Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 170,000 shares of Common Stock of which 94,445 shares are held in escrow pending certain release conditions being met and (ii) 170,000 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 94,445 shares are held in escrow pending certain release conditions being met. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(5)   Mark Groussman is the Custodian of Mark Groussman c/f Alivia Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock of which 22,222 shares are held in escrow pending certain release conditions being met and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 22,222 shares are held in escrow pending certain release conditions being met. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(6)   Mark Groussman is the Custodian of Mark Groussman c/f Asher Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock of which 22,222 shares are held in escrow pending certain release conditions being met and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 22,222 shares are held in escrow pending certain release conditions being met. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(7)   Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by GRQ Consultants, Inc. 401K ("401K"), (iii) 30,600 shares of Common Stock held by GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("Roth 401K") and (iv) 39,860 shares of Common Stock issuable upon exercise of outstanding warrants held by Mr. Honig. Mr. Honig is the trustee of 401K and Roth 401K in such capacity holds voting and dispositive power over the securities held by such entities. Excludes (i) 170,000 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation, (ii) 160,140 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation, (iii) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation, and (iv) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The notes and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(8)   Represents (i) 206,017 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met.

(9)   Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by 401K and (iii) 30,600 shares of Common Stock held by Roth 401K. Mr. Honig is the trustee of 401K and Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entities.

(10)       Represents (i) 30,600 shares of Common Stock and (ii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation.  Mr. Honig is the trustee of Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entity. The note and warrants

(10)    Represents (i) 30,600 shares of Common Stock and (ii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation. Mr. Honig is the trustee of Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entity. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(11)    Represents (i) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met.

(12)    Jonathan Honig is the Manager of Titan Multi-Strategy Fund I, Ltd. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 15,000 shares of Common Stock and (ii) 583,774 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes (i) 824,066 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation and (ii) 216,226 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 5825 Windsor Court, Boca Raton, FL 33496.

(13)    Represents (i) 824,066 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 800,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval.

(14)    Candice Merren-Yates and Ghislian Ghyoot are the Authorized Signatories of US Commonwealth Life, A.I. Policy No. 2013-17. In such capacity they share voting and dispositive control over the securities held by such entity. Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 304 Ponce de Leon, Suite 1000, San Juan, Puerto Rico, 00918.

(15)    Represents (i) 41,204 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. Mr. O'Braitis is affiliated with a broker-dealer and may be deemed a statutory underwriter of the shares. The address for this selling stockholder is 43811 Grantner Pl, Ashburn, VA 20147.

(16)    Adrian James is the President & CEO of Stockwire Research Group, Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 3736 Bee Caves Road, Suite 1-105, Austin, TX 78746.

(17)    Edward Karr is the Managing Member of Aifos Capital LLC. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 61,805 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 60,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is Aifos Capital LLC, CP 5452, CH-1211 Geneva 11, Switzerland.

(18)    John Stetson is the Managing Member of Stetson Capital Management, LLC. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 7,500 shares of Common Stock, (ii) 75,900 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 130,117 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 68 Fiesta Way, Ft. Lauderdale, FL 33301.

(19)    Represents (i) 206,017 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met.

(20)    Jason Theofilos is the Director of JAD Capital Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 41,204 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii)

40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, Canada L4B 4V1.

(21)     Represents (i) 57,187 shares of Common Stock, (ii) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 51 Lord's Highway East, Weston, CT 06883.

(22)     Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met.

7

---

**PLAN OF DISTRIBUTION**

Each selling stockholder of the Common Stock and any of their pledgees, assignees and successors-in-interest may, from time to time, sell any or all of their shares of Common Stock on The NASDAQ Capital Market or any other stock exchange, market or trading facility on which the shares are traded or in private transactions. These sales may be at fixed or negotiated prices. A selling stockholder may use any one or more of the following methods when selling shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- settlement of short sales entered into after the effective date of the registration statement of which this prospectus is a part;

- broker-dealers may agree with the selling stockholders to sell a specified number of such shares at a stipulated price per share;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

- a combination of any such methods of sale; or

- any other method permitted pursuant to applicable law.

The selling stockholders may also sell shares under Rule 144 under the Securities Act of 1933, as amended, if available, rather than under this prospectus.

Broker-dealers engaged by the selling stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the selling stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated, but, except as set forth in a supplement to this prospectus, in the case of an agency transaction not in excess of a customary brokerage commission in compliance with FINRA Rule 2440; and in the case of a principal transaction a markup or markdown in compliance with FINRA IM-2440.

In connection with the sale of the Common Stock or interests therein, the selling stockholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the Common Stock in the course of hedging the positions

## PLAN OF DISTRIBUTION

Each selling stockholder of the Common Stock and any of their pledgees, assignees and successors-in-interest may, from time to time, sell any or all of their shares of Common Stock on The NASDAQ Capital Market or any other stock exchange, market or trading facility on which the shares are traded or in private transactions. These sales may be at fixed or negotiated prices. A selling stockholder may use any one or more of the following methods when selling shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- settlement of short sales entered into after the effective date of the registration statement of which this prospectus is a part;

- broker-dealers may agree with the selling stockholders to sell a specified number of such shares at a stipulated price per share;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

- a combination of any such methods of sale; or

- any other method permitted pursuant to applicable law.

The selling stockholders may also sell shares under Rule 144 under the Securities Act of 1933, as amended, if available, rather than under this prospectus.

Broker-dealers engaged by the selling stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the selling stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated, but, except as set forth in a supplement to this prospectus, in the case of an agency transaction not in excess of a customary brokerage commission in compliance with FINRA Rule 2440; and in the case of a principal transaction a markup or markdown in compliance with FINRA IM-2440.

In connection with the sale of the Common Stock or interests therein, the selling stockholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the Common Stock in the course of hedging the positions they assume. The selling stockholders may also sell shares of the Common Stock short and deliver these securities to close out their short positions, or loan or pledge the Common Stock to broker-dealers that in turn may sell these securities. The selling stockholders may also enter into option or other transactions with broker-dealers or other financial institutions or the creation of one or more derivative securities which require the delivery to such broker-dealer or other financial institution of shares offered by this prospectus, which shares such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

8

The selling stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act of 1933, as amended, in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act of 1933, as amended. Each selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock.

The selling stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act of 1933, as amended, in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act of 1933, as amended. Each selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock.

We are required to pay certain fees and expenses incurred by us incident to the registration of the shares. We have agreed to indemnify the selling stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act of 1933, as amended.

Because selling stockholders may be deemed to be "underwriters" within the meaning of the Securities Act of 1933, as amended, they will be subject to the prospectus delivery requirements of the Securities Act of 1933, as amended, including Rule 172 thereunder. In addition, any securities covered by this prospectus which qualify for sale pursuant to Rule 144 under the Securities Act of 1933, as amended may be sold under Rule 144 rather than under this prospectus. There is no underwriter or coordinating broker acting in connection with the proposed sale of the resale shares by the selling stockholders.

We agreed to keep this prospectus effective until the earlier of (i) the date on which the shares may be resold by the selling stockholders without registration and without the requirement to be in compliance with Rule 144(c)(1) and otherwise without restriction or limitation pursuant to Rule 144 or (ii) all of the shares have been sold pursuant to this prospectus or Rule 144 under the Securities Act or any other rule of similar effect. The resale shares will be sold only through registered or licensed brokers or dealers if required under applicable state securities laws. In addition, in certain states, the resale shares may not be sold unless they have been registered or qualified for sale in the applicable state or an exemption from the registration or qualification requirement is available and is complied with.

Under applicable rules and regulations under the Securities Exchange Act of 1934, as amended, any person engaged in the distribution of the resale shares may not simultaneously engage in market making activities with respect to the Common Stock for the applicable restricted period, as defined in Regulation M, prior to the commencement of the distribution. In addition, the selling stockholders will be subject to applicable provisions of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, including Regulation M, which may limit the timing of purchases and sales of shares of the Common Stock by the selling stockholders or any other person. We will make copies of this prospectus available to the selling stockholders and have informed them of the need to deliver a copy of this prospectus to each purchaser at or prior to the time of the sale (including by compliance with Rule 172 under the Securities Act of 1933, as amended).

## DESCRIPTION OF CAPITAL STOCK

**General**

The following description of our capital stock summarizes the material terms and provisions of our Common Stock. For the complete terms of our Common Stock, please refer to our Articles of Incorporation and our Bylaws that are incorporated by reference into the registration statement of which this prospectus is a part or may be incorporated by reference in this prospectus. The terms of these securities may also be affected by the Colorado Revised Statutes. The summary below is qualified in its entirety by reference to our amended and restated Articles of Incorporation and our amended and restated Bylaws.

As of the date of this prospectus, our authorized capital stock consisted of 60,000,000 shares of Common Stock, no par value per share. As of the date of this prospectus, there were 4,903,971 shares of our Common Stock issued and outstanding.

**Common Stock**

Holders of Common Stock are entitled to one vote for each share held on all matters submitted to a vote of shareholders, except that in the election of directors each shareholder shall have as many votes for each share held by him, her or it as there are directors to be elected and for whose election the shareholder has a right to vote. Cumulative voting is not permitted. Generally, all matters to be voted on by shareholders must be approved by a majority, or, in the case of the election of directors, by a plurality, of the votes cast at a meeting at which a quorum is present. Holders of outstanding shares of our Common Stock are entitled to those dividends declared by the Board of Directors out of legally available funds, and, in the event of our liquidation, dissolution or winding up of our affairs, holders are entitled to receive ratably our net assets available to the shareholders.  Holders of our outstanding Common Stock have no preemptive, conversion or redemption rights.  All of the issued and outstanding shares of our Common Stock are, and all unissued shares of our Common Stock, when offered and sold will be, duly authorized, validly issued, fully paid and nonassessable.  To the extent that additional shares of our Common Stock may be issued in the future, the relative interests of the then existing shareholders may be diluted.

## Warrants

On March 10, 2017, we issued to purchasers of our units warrants to purchase an aggregate of 900,000 shares of Common Stock. The warrants are exercisable at a price of $3.50 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the warrants on a cashless basis. We are prohibited from effecting an exercise of any warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such warrant.  55.5556% of the warrants (and common stock) issued to each investor are being held in escrow pending the satisfaction of certain release conditions.

On March 16, 2017, we issued warrants to purchase an aggregate of 1,900,000 shares of Common Stock with each warrant based upon the number of shares of Common Stock equal to 100% of such investor's subscription amount divided by the conversion price of $2.50. The warrants are exercisable at a price of $3.56 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the warrants on a cashless basis. We are prohibited from effecting an exercise of any warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such warrant.  The exercise of these warrants is subject to approval of the transaction from our stockholders as required by Nasdaq Listing Rule 5635. The Notes and warrants issued to each investor are being held in escrow pending the satisfaction of certain release conditions.

If we, at any time while the warrants are outstanding: (i) pay a stock dividend or otherwise make a distribution or distributions payable in shares of Common Stock or any Common Stock equivalents (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company upon exercise of the warrants), (ii) subdivide outstanding shares of Common Stock into a larger number of shares, (iii) combine (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares or (iv) issue, in the event of a reclassification of shares of the Common Stock, any shares of capital stock, then the exercise price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding any treasury shares of the Company) outstanding immediately before such event, and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event.

## Convertible Promissory Notes

The Notes are convertible at a per share price of $2.50 per share, subject to adjustment, at any time after we have received approval of the transaction from our stockholders as required by Nasdaq Listing Rule 5635. The number of shares of Common Stock issuable upon a conversion shall be determined by the quotient obtained by dividing the outstanding principal amount of such holder's Note to be converted by the conversion price. We are prohibited from effecting a conversion of any Note to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon conversion of such Note.

Except as otherwise provided in the Note, we may not prepay or redeem the Note in whole or in part without the prior written consent of the holder, and to the extent we agree with other holders to prepay or redeem other Notes in whole or in part, we shall offer such prepayment or redemption of the Note on a pro rata basis on the same terms and conditions.

If we, at any time while the Note is outstanding: (i) pay a stock dividend or otherwise make a distribution or distributions payable in shares of Common Stock or any Common Stock equivalents (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company upon conversion of the Notes), (ii) subdivide outstanding shares of Common Stock into a larger number of shares, (iii) combine (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares or (iv) issue, in the event of a reclassification of shares of the Common Stock, any shares of capital stock, then the conversion price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding any treasury shares of the Company) outstanding immediately before such event, and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event.

Holders of the Notes shall be entitled to receive, and we shall pay, cumulative interest on the outstanding principal amount of the Note at the annual rate of two (2%) percent (all subject to increase as set forth in the Note), payable on the maturity date of September 16, 2018 in cash or shares issuable in lieu of the cash payment of interest on the Notes in accordance with the terms of the Notes. Interest on the Notes shall be calculated on the basis of a 360-day year and the actual number of days elapsed. Payments made in connection with the Notes shall be applied first

If we, at any time while the Note is outstanding: (i) pay a stock dividend or otherwise make a distribution or distributions payable in shares of Common Stock or any Common Stock equivalents (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company upon conversion of the Notes), (ii) subdivide outstanding shares of Common Stock into a larger number of shares, (iii) combine (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares or (iv) issue, in the event of a reclassification of shares of the Common Stock, any shares of capital stock, then the conversion price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding any treasury shares of the Company) outstanding immediately before such event, and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event.

Holders of the Notes shall be entitled to receive, and we shall pay, cumulative interest on the outstanding principal amount of the Note at the annual rate of two (2%) percent (all subject to increase as set forth in the Note), payable on the maturity date of September 16, 2018 in cash or shares issuable in lieu of the cash payment of interest on the Notes in accordance with the terms of the Notes. Interest on the Notes shall be calculated on the basis of a 360-day year and the actual number of days elapsed. Payments made in connection with the Notes shall be applied first to amounts due thereunder other than principal and interest, thereafter to interest and finally to principal. Conversion privileges set forth in the Notes shall remain in full force and effect immediately from the date thereof and until the Note is paid in full.

We have agreed to file a preliminary proxy statement for a special meeting of our stockholders, in order to submit to our stockholders a proposal to approve an amendment to our Articles of Incorporation authorizing the creation of 15,000,000 shares of "blank check" preferred stock and, thereafter, we shall designate  shares of preferred stock as "Series A Preferred Stock" by filing a Certificate of Designations, Preferences and Rights of 0% Series A Convertible Preferred Stock with the Secretary of State. On the Filing Date, the Notes shall automatically, and without any further action on the part of the holders, be exchanged for shares of Series A Preferred Stock based on a ratio of $1.00 of stated value of Series A Preferred Stock for each $1.00 of the then outstanding principal amount plus any accrued but unpaid interest thereon, pursuant to Section 3(a)(9) of the Securities Act. The Notes and warrants issued to each investor are being held in escrow pending the satisfaction of certain release conditions.

## Anti-Takeover Effects of Certain Provisions of our Articles of Incorporation, Bylaws and the Colorado Revised Statutes ("CRS")

Certain provisions of our Articles of Incorporation and Bylaws, which are summarized in the following paragraphs, may have the effect of discouraging potential acquisition proposals or making a tender offer or delaying or preventing a change in control, including changes a stockholder might consider favorable. Such provisions may also prevent or frustrate attempts by our stockholders to replace or remove our management. In particular, the Articles of Incorporation and Bylaws and Colorado law, as applicable, among other things:

?  provide the board of directors with the ability to alter the Bylaws without stockholder approval;

?  place limitations on the removal of directors; and

?  provide that vacancies on the board of directors may be filled by a majority of directors in office, although less than a quorum.

These provisions are expected to discourage certain types of coercive takeover practices and inadequate takeover bids and to encourage persons seeking to acquire control of us to first negotiate with our board. These provisions may delay or prevent someone from acquiring or merging with us, which may cause our market price of our common stock to decline.

11

## Limitations on Liability, Indemnification of Officers and Directors and Insurance

Our Articles of Incorporation and Bylaws require us to indemnify any person entitled to indemnity under the CRS, as it currently exists or may be amended, to the fullest extent permitted by the CRS, and, to the maximum extent permitted by the CRS, purchase and maintain insurance providing such indemnification.

Our Bylaws specifically sets forth that we shall indemnify any proper person against reasonably incurred expenses (including attorneys' fees), judgments, penalties, fines (including any excise tax assessed with respect to an employee benefit plan) and amounts paid in settlement reasonably incurred by him in connection with such action, suit or proceeding if it is determined that he conducted himself in good faith and that he reasonably believed (i) in the case of conduct in his official capacity with the corporation, that his conduct was in the corporation's best interests, or (ii) in all other cases (except criminal cases), that his conduct was at least not opposed to the corporation's best interests, or (iii) in the case of any criminal proceeding, that he had no reasonable cause to believe his conduct was unlawful. Official capacity means, when used with respect to a director, the office of director and, when used with respect to any other proper person, the office in a corporation held by the officer or the

**Limitations on Liability, Indemnification of Officers and Directors and Insurance**

Our Articles of Incorporation and Bylaws require us to indemnify any person entitled to indemnity under the CRS, as it currently exists or may be amended, to the fullest extent permitted by the CRS, and, to the maximum extent permitted by the CRS, purchase and maintain insurance providing such indemnification.

Our Bylaws specifically sets forth that we shall indemnify any proper person against reasonably incurred expenses (including attorneys' fees), judgments, penalties, fines (including any excise tax assessed with respect to an employee benefit plan) and amounts paid in settlement reasonably incurred by him in connection with such action, suit or proceeding if it is determined that he conducted himself in good faith and that he reasonably believed (i) in the case of conduct in his official capacity with the corporation, that his conduct was in the corporation's best interests, or (ii) in all other cases (except criminal cases), that his conduct was at least not opposed to the corporation's best interests, or (iii) in the case of any criminal proceeding, that he had no reasonable cause to believe his conduct was unlawful. Official capacity means, when used with respect to a director, the office of director and, when used with respect to any other proper person, the office in a corporation held by the officer or the employment, fiduciary or agency relationship undertaken by the employee, fiduciary, or agent on behalf of the corporation.

**Authorized but Unissued Shares**

Our authorized but unissued shares of Common Stock will be available for future issuance without your approval. We may use additional shares for a variety of purposes, including future public offerings to raise additional capital, to fund acquisitions and as employee compensation. The existence of authorized but unissued shares of Common Stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

**Transfer Agent and Registrar**

The transfer agent and registrar for our Common Stock is Corporate Stock Transfer, Inc., Denver, Colorado.

**LEGAL MATTERS**

The validity of the issuance of the securities offered hereby will be passed upon for us by counsel. Additional legal matters may be passed upon for us or any underwriters, dealers or agents, by counsel that we will name in the applicable prospectus supplement.

**EXPERTS**

The consolidated balance sheet of Bioptix, Inc. as of December 31, 2016, and the related consolidated statements of operations, stockholders' equity, and cash flows for the year then ended, have been audited by EisnerAmper LLP, independent registered public accounting firm, as stated in their report which is incorporated herein by reference. Their report includes an explanatory paragraph relating to auditing the adjustments to the 2015 financial statements to retrospectively reflect the reverse stock split.  Such financial statements have been incorporated herein by reference in reliance on the report of such firm given upon their authority as experts in accounting and auditing.

The audited financial statements, incorporated herein by reference, for the year ended December 31, 2015 have been audited by GHP Horwath, P.C., ("GHP") independent registered public accounting firm, for the period and to the extent set forth in their report.  Their report includes an explanatory paragraph relating to the effects of the adjustments to retroactively apply the impact of the reverse stock split to the December 31, 2015 financial statements. Such financial statements have been so incorporated in reliance upon the report of such firm given upon the firm's authority as an expert in auditing and accounting. Effective January 1, 2017, the partners and employees of GHP joined another independent registered public accounting firm.  As of January 13, 2017, the client-auditor relationship between us and GHP ceased.  On February 3, 2017, our Board of Directors appointed EisnerAmper LLP as our independent registered public accounting firm.

12

**WHERE YOU CAN FIND MORE INFORMATION**

This prospectus constitutes a part of a registration statement on Form S-3 filed under the Securities Act.  As permitted by the SEC's rules, this prospectus and any prospectus supplement, which form a part of the registration statement, do not contain all the information that is included in the registration statement.  You will find additional information about us in the registration statement.  Any statements made in this prospectus or any prospectus supplement concerning legal documents are not necessarily complete and you should read the documents that are filed as exhibits to

## WHERE YOU CAN FIND MORE INFORMATION

This prospectus constitutes a part of a registration statement on Form S-3 filed under the Securities Act. As permitted by the SEC's rules, this prospectus and any prospectus supplement, which form a part of the registration statement, do not contain all the information that is included in the registration statement. You will find additional information about us in the registration statement. Any statements made in this prospectus or any prospectus supplement concerning legal documents are not necessarily complete and you should read the documents that are filed as exhibits to the registration statement or otherwise filed with the SEC for a more complete understanding of the document or matter.

We file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read, without charge, and copy the documents we file at the SEC's public reference rooms in Washington, D.C. at 100 F Street, NE, Room 1580, Washington, DC 20549, or in New York, New York and Chicago, Illinois. You can request copies of these documents by writing to the SEC and paying a fee for the copying cost. Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms. Our SEC filings are also available to the public at no cost from the SEC's website at http://www.sec.gov. In addition, we make available on or through our Internet site copies of these reports as soon as reasonably practicable after we electronically file or furnish them to the SEC. Our Internet site can be found at www.venaxis.com.

## INCORPORATION OF DOCUMENTS BY REFERENCE

We have filed a registration statement on Form S-3 with the Securities and Exchange Commission under the Securities Act. This prospectus is part of the registration statement but the registration statement includes and incorporates by reference additional information and exhibits. The Securities and Exchange Commission permits us to "incorporate by reference" the information contained in documents we file with the Securities and Exchange Commission, which means that we can disclose important information to you by referring you to those documents rather than by including them in this prospectus. Information that is incorporated by reference is considered to be part of this prospectus and you should read it with the same care that you read this prospectus. Information that we file later with the Securities and Exchange Commission will automatically update and supersede the information that is either contained, or incorporated by reference, in this prospectus, and will be considered to be a part of this prospectus from the date those documents are filed. We have filed with the Securities and Exchange Commission, and incorporate by reference in this prospectus:

- Annual Report on Form 10-K for the year ended December 31, 2016 filed on March 31, 2017;

- Current Reports on Form 8-K or Form 8-K/A (excluding any reports or portions thereof that are deemed to be furnished and not filed) filed on January 6, 2017, January 11, 2017, January 20, 2017, January 20, 2017, February 8, 2017, February 9, 2017, February 9, 2017, March 16, 2017, March 17, 2017, April 7, 2017 and April 13, 2017.

We also incorporate by reference all additional documents that we file with the Securities and Exchange Commission under the terms of Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act that are made after the date of the initial registration statement but prior to effectiveness of the registration statement and after the date of this prospectus but prior to the termination of the offering of the securities covered by this prospectus. We are not, however, incorporating, in each case, any documents or information that we are deemed to furnish and not file in accordance with Securities and Exchange Commission rules.

You may request, and we will provide you with, a copy of these filings, at no cost, by calling us at (303) 545-5550 or by writing to us at the following address:

Bioptix, Inc.

834-F South Perry Street, Suite 443

Castle Rock, CO 80104

(303) 794-2000

13

---

## PART II

## INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 14.  Other Expenses of Issuance and Distribution.**

## PART II

### INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 14.  Other Expenses of Issuance and Distribution.**

The following table sets forth an estimate of the fees and expenses relating to the issuance and distribution of the securities being registered hereby, other than underwriting discounts and commissions, all of which shall be borne by the Registrant.  All of such fees and expenses, except for the SEC registration fee are estimated:

| | | |
|---|---|---:|
| SEC registration fee | $ | 2,724 |
| Transfer agent's fees and expenses | $ | 1,000 |
| Legal fees and expenses | $ | 10,000 |
| Printing fees and expenses | $ | 1,000 |
| Accounting fees and expenses | $ | 7,500 |
| Miscellaneous fees and expenses | $ | 776 |
| | | |
| Total | $ | 23,000 |

**Item 15.  Indemnification of Officers and Directors.**

Our Articles of Incorporation and Bylaws require us to indemnify our officers, directors, employees and agents against reasonably incurred expenses (including legal fees), judgments, penalties, fines and amounts incurred in the settlement of any action, suit or proceeding if it is determined that such person conducted himself in good faith and that he reasonably believed (i) in the case of conduct in his official capacity, that his conduct was in our best interest, (ii) in all other cases (except criminal proceedings) that his conduct was at least not opposed to our best interests, or (iii) in the case of any criminal proceeding, that he has not reasonable cause to believe that his conduct was unlawful.

This determination shall be made by a majority vote of directors at a meeting at which a quorum is present, provided however that the quorum can only consist of directors not parties to the proceeding.  If a quorum cannot be obtained, the determination may be made by a majority vote of a committee of the board, consisting of two or more directors who are not parties to the proceeding.  Directors who are parties to the proceeding may participate in the designation of members to serve on the committee.  If a quorum of the board or a committee cannot be established, the determination may be made (i) by independent legal counsel selected by a vote of the board of directors or committee in the manner described in this paragraph or, if a quorum cannot be obtained or a committee cannot be established, by independent legal counsel selected by a majority of the full board (including directors who are parties to the proceeding) or (ii) by a vote of the shareholders.  Any officer, director, employee or agent may seek court-ordered indemnification from the court conducting the proceeding.  The court may then determine whether such person should be entitled to indemnification.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of us pursuant to the foregoing provisions, or otherwise, we have been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable.  In the event that a claim for indemnification against such liabilities (other than the payment by us of expenses incurred or paid by a director, officer or controlling person of the Company in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, we will, unless in the opinion of our counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by us is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

Section 7-108-402 of the Colorado Business Corporation Act (the "Act") provides, generally, that the Articles of Incorporation may contain a provision eliminating or limiting the personal liability of a director to the corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except that any such provision shall not eliminate or limit the liability of a director (i) for any breach of the director's duty of loyalty to the corporation or its shareholders, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) acts specified in Section 7-108-403 of the Act (unlawful distributions), or (iv) any transaction from which the director directly or indirectly derived an improper personal benefit. Such provision may not eliminate or limit the liability of a director for any act or omission occurring prior to the date on which such provision becomes effective.  Our Articles of Incorporation contain such a provision.

Section 7-109-103 of the Act provides, that a corporation organized under Colorado law shall be required to indemnify a person who is or was a director of the corporation or an individual who, while serving as a director of the corporation, is or was serving at the corporation's request as a director, an officer, an agent, an associate, an employee, a fiduciary, a manager, a member, a partner, a promoter, or a trustee of, or to hold any similar position with, another domestic or foreign corporation or other person or of an employee benefit plan (a "Director") of the corporation and who was wholly successful, on the merits or otherwise, in the defense of any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal (a "Proceeding"), in which he was a party, against reasonable expenses incurred by him in connection with the Proceeding, unless such indemnity is limited by the corporation's Articles of Incorporation.

Section 7-109-102 of the Act provides, generally, that a corporation may indemnify a person made a party to a Proceeding because the person is or was a Director against any obligation incurred with respect to a Proceeding to pay a judgment, settlement, penalty, fine (including an excise tax assessed with respect to an employee benefit plan) or reasonable expenses incurred in the Proceeding if the person conducted himself or herself in good faith and the person reasonably believed, in the case of conduct in an official capacity with the corporation, the person's conduct was in the corporation's best interests and, in all other cases, his or her conduct was at least not opposed to the corporation's best interests and, with respect to any criminal proceedings, the person had no reasonable cause to believe that his or her conduct was unlawful. A corporation may not indemnify a Director in connection with any Proceeding by or in the right of the corporation in which the Director was adjudged liable to the corporation or, in connection with any other Proceeding charging that the Director derived an improper personal benefit, whether or not involving actions in an official capacity, in which Proceeding the Director was judged liable on the basis that he or she derived an improper personal benefit. Any indemnification permitted in connection with a Proceeding by or in the right of the corporation is limited to reasonable expenses incurred in connection with such Proceeding.

## Item 16.  Exhibits.

a) Exhibits.

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Amended and Restated Articles of Incorporation filed March 30, 2016 (Incorporated by reference from the Registrant's Current Report on Form 8-K, filed March 29, 2016) |
| 3.2 | Articles of Amendment to the Articles of Incorporation filed November 30, 2016 (Incorporated by reference from the Registrant's Current Report on Form 8-K, filed December 2, 2016) |
| 3.3 | Amended and Restated Bylaws, effective March 27, 2008 (Incorporated by reference from the Registrant's Quarterly Report on Form 10-Q, filed May 15, 2008) |
| 5.1* | Opinion of counsel as to the legality of the securities being registered |
| 23.1* | Consent of counsel (included in Exhibit 5.1) |
| 23.2 | Consent of EisnerAmper LLP |
| 23.3 | Consent of GHP Horwath, P.C. |
| 24.1 | Power of Attorney (included on signature pages to the registration statement) |

\*     To be filed by amendment.

II-2

## Item 17.   Undertakings.

(a)     The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be

**Item 17.   Undertakings.**

(a)     The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

*provided*, *however*, that paragraphs (a)(1)(i), (a)(1)(ii), and (a)(1)(iii) above do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement, or is contained in a form of prospectus filed pursuant to Rule 424(b) that is a part of the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(b)     The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(c)     Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

II-3

---

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on this Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Castle Rock, State of Colorado on the 20th day of April, 2017.

/s/ Michael M. Beeghley

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on this Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Castle Rock, State of Colorado on the 20th day of April, 2017.

|  | /s/ Michael M. Beeghley |
|--|--|
|  | Michael M. Beeghley |
|  | Chief Executive Officer |
|  | (Principal Executive Officer) |
|  | |
|  | /s/ Jeffrey G. McGonegal |
|  | Jeffrey G. McGonegal |
|  | Chief Financial Officer |
|  | (Principal Financial and Accounting Officer) |

The Registrant and each person whose signature appears below hereby appoint Michael M. Beeghley and Jeffrey G. McGonegal as their attorneys-in-fact, with full power of substitution, to execute in their names and on behalf of the Registrant and each such person, individually and in each capacity stated below, one or more amendments (including post-effective amendments and registration statements filed pursuant to Rule 462(b) under the Securities Act of 1933, as amended and otherwise) to this Registration Statement as the attorney-in-fact acting on the premise shall from time to time deem appropriate and to file any such amendment to this Registration Statement with the Securities and Exchange Commission.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
|------|-------|------|
| /s/ Michael M. Beeghley<br>Michael M. Beeghley | Chief Executive Officer, Director<br>(Principal Executive Officer) | April 20, 2017 |
| /s/ Jeffrey G. McGonegal<br>Jeffrey G. McGonegal | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | April 20, 2017 |
| /s/ John R. O'Rourke<br>John R. O'Rourke | Director | April 20, 2017 |
| /s/ Mike Dai<br>Mike Dai | Director | April 20, 2017 |

II-4

151

# FORM S-3 (Amendment No. 1), as filed with the Securities and Exchange Commission on July 19, 2017

S-3/A 1 bioptix_s3.htm FORM S-3 AMENDMENT NO 1

As filed with the Securities and Exchange Commission on July 19, 2017

Registration No. 333-217397

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM S-3**
**(Amendment No. 1)**

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# BIOPTIX, INC.

(Exact name of registrant as specified in its charter)

| **Colorado** | **84-155337** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

**Jeffrey G. McGonegal**
**Chief Financial Officer**
**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

**Approximate date of commencement of proposed sale to the public:** From time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box.  ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box.  ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box.  ☐

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box.  ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box.   ☐

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of " *large accelerated filer* ", " *accelerated filer* " and " *smaller reporting company* " in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer  ? | Accelerated filer  ? | Non-accelerated filer  ? (do not check if smaller reporting company) | Smaller reporting company ? | Emerging growth company ? |
|---|---|---|---|---|

---

### CALCULATION OF REGISTRATION FEE

| Title of each class of securities to be registered | Amount to be Registered(1) | Proposed maximum offering price per share | Proposed maximum aggregate offering price | Amount of registration fee |
|---|---|---|---|---|
| Common stock, no par value per share | 900,000 | $ 4.16 (2) | $ 3,739,500 | $ 433.41 |
| Common stock, no par value per share, issuable upon conversion of convertible promissory notes (3) | 1,957,161 | $ 4.16 (2) | $ 8,132,004 | $ 942.50 |
| Common stock, no par value per share, issuable upon exercise of warrants | 2,800,000 | $ 4.16 (2) | $ 11,634,000 | $ 1,348.38 |
| TOTAL | **5,657,161** | $ 4.16 | $ 23,505,504 | $ 2,724.29* |

(1)  Pursuant to Rule 416 under the Securities Act of 1933, as amended, this registration statement also covers such additional shares as may hereafter be issued resulting from stock splits, stock dividends, recapitalizations or certain other capital adjustments.

(2)  Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(c) under the Securities Act of 1933, as amended.  In accordance with Rule 457(c) of the Securities Act of 1933, as amended, the price shown is the average of the high and low sales prices of the Common Stock on April 17, 2017 as reported on The NASDAQ Capital Market.

(3)  Includes shares of Common Stock issuable for accrued interest under the terms of the promissory notes, computed to the maturity date.

(4)  Previously Paid.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment that specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until this Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

---

**The information in this prospectus is not complete and may be changed. We may not sell these securities or accept an offer to buy these securities until the Securities and Exchange Commission declares our registration statement effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.**

**SUBJECT TO COMPLETION, DATED July 19, 2017**

**PROSPECTUS**

**BIOPTIX, INC.**

The information in this prospectus is not complete and may be changed. We may not sell these securities or accept an offer to buy these securities until the Securities and Exchange Commission declares our registration statement effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

**SUBJECT TO COMPLETION, DATED July 19, 2017**

**PROSPECTUS**

**BIOPTIX, INC.**

**900,000 Shares of Common Stock Offered by the Selling Stockholders**

**1,957,161  Shares of Common Stock Issuable Upon Conversion of 2% Convertible Promissory Notes Offered by the Selling Stockholders**

**2,800,000 Shares of Common Stock Issuable Upon Exercise of Warrants Offered by the Selling Stockholders**

This prospectus relates to the disposition from time to time of 5,657,161 shares of common stock, no par value per share (the "Common Stock"), which includes (i) 900,000 shares of Common Stock, (ii) 1,957,161 shares of Common Stock issuable upon the conversion of outstanding 2% convertible promissory notes (the "Notes") and (iii) 2,800,000 shares of Common Stock issuable upon the exercise of outstanding warrants held by the selling stockholders named in this prospectus.  We will not receive any of the proceeds from the sale of shares by the selling stockholders.

The selling stockholders may sell the shares of Common Stock described in this prospectus in a number of different ways and at varying prices. We provide more information about how the selling stockholders may sell their shares of Common Stock in the section entitled "Plan of Distribution" on page 8. The selling stockholders will bear all commissions and discounts, if any, attributable to the sale or disposition of the shares, or interests therein. We will bear all costs, expenses and fees in connection with the registration of the shares. We will not be paying any underwriting discounts or commissions in this offering.

Our Common Stock is presently listed on The NASDAQ Capital Market under the symbol "BIOP."  On July 17, 2017 the last reported sale price of our Common Stock was $4.00. The applicable prospectus supplement will contain information, where applicable, as to any other listing on The NASDAQ Capital Market or any securities market or other exchange of the securities, if any, covered by the prospectus supplement .

**Investing in our securities involves various risks.  See "Risk Factors" contained herein for more information on these risks.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities, or passed upon the adequacy or accuracy of this prospectus or any accompanying prospectus supplement.  Any representation to the contrary is a criminal offense.**

The date of this Prospectus is July 19, 2017.

**TABLE OF CONTENTS**

| | Page |
|---|---|
| OUR BUSINESS | 1 |
| RISK FACTORS | 2 |
| FORWARD-LOOKING STATEMENTS | 3 |
| USE OF PROCEEDS | 3 |
| SELLING STOCKHOLDERS | 4 |
| PLAN OF DISTRIBUTION | 8 |
| DESCRIPTION OF CAPITAL STOCK | 9 |
| LEGAL MATTERS | 12 |
| EXPERTS | 12 |
| WHERE YOU CAN FIND MORE INFORMATION | 13 |
| INCORPORATION OF DOCUMENTS BY REFERENCE | 13 |

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| OUR BUSINESS | 1 |
| RISK FACTORS | 2 |
| FORWARD-LOOKING STATEMENTS | 3 |
| USE OF PROCEEDS | 3 |
| SELLING STOCKHOLDERS | 4 |
| PLAN OF DISTRIBUTION | 8 |
| DESCRIPTION OF CAPITAL STOCK | 9 |
| LEGAL MATTERS | 12 |
| EXPERTS | 12 |
| WHERE YOU CAN FIND MORE INFORMATION | 13 |
| INCORPORATION OF DOCUMENTS BY REFERENCE | 13 |

i

---

**Company References**

In this prospectus, "Bioptix," "the Company," "we," "us," and "our" refer to Bioptix, Inc., a Colorado corporation, unless the context otherwise requires.

## OUR BUSINESS

Through our wholly owned subsidiary, BiOptix Diagnostics, Inc. ("BDI"), which we acquired in September 2016, we have developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions.  We acquired a Surface Plasma Resonance (SPR) platform which seeks to combine high sensitivity with microarray detection capability to allow researchers to understand whether their target molecules have functionality against the disease targeted. SPR is an advanced and highly sensitive optical technology that can measure refractive index changes on a sensor chip's gold surface due to a change in mass that occurs during a binding event. This change can be used to monitor biological interactions such as the concentration of target molecules, kinetic rates and affinity constants.

BDI is a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions.  BDI manufactures, sells and services instruments and consumables to pharmaceutical researchers allowing them to develop new drugs faster by using older technologies such as enzyme-linked immunosorbent assay or "ELISA". BDI was originally established with technology developed in conjunction with Dr. John L. "Jan" Hall, Adjoint Professor, JILA (University of Colorado), who shared the Nobel Prize for Physics in 2005 for his work on laser-based precision spectroscopy and the optical frequency comb technique. SPR is the core of the BDI products and intellectual property.  Dr. Hall, in conjunction with the scientists at BDI, created a common path interferometer that was commercialized to become the 404pi instrument.

When it was acquired by us in September 2016, BDI was in the initial stages of rolling out its first commercial product, the 404pi system. BDI's initial revenue was generated in 2014 with first sales to customers including sales to leading academic researchers and biotech companies. BDI did not experience any significant seasonality to its business and provided normal terms to its customers, generally 30-60 days, net. Currently there is no back-log of orders.

Following the September 2016 acquisition of BDI, we began hiring sales, marketing and operational employees, adding a total of eight employees to the twelve hired in connection with the acquisition.

The BDI products include a reader instrument (404pi) and the consumable test products consisting of test chips (cassettes) and packaging. The instrument is assembled in-house using primarily off the shelf parts and certain customized components.  Consumable test product components are manufactured at the BDI facility using certain sub-assemblies processed by third-party contractors. Raw materials and certain sub-components are acquired from a number of suppliers.

**Company References**

In this prospectus, "Bioptix," "the Company," "we," "us," and "our" refer to Bioptix, Inc., a Colorado corporation, unless the context otherwise requires.

## OUR BUSINESS

Through our wholly owned subsidiary, BiOptix Diagnostics, Inc. ("BDI"), which we acquired in September 2016, we have developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions. We acquired a Surface Plasma Resonance (SPR) platform which seeks to combine high sensitivity with microarray detection capability to allow researchers to understand whether their target molecules have functionality against the disease targeted. SPR is an advanced and highly sensitive optical technology that can measure refractive index changes on a sensor chip's gold surface due to a change in mass that occurs during a binding event. This change can be used to monitor biological interactions such as the concentration of target molecules, kinetic rates and affinity constants.

BDI is a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions. BDI manufactures, sells and services instruments and consumables to pharmaceutical researchers allowing them to develop new drugs faster than by using older technologies such as enzyme-linked immunosorbent assay or "ELISA". BDI was originally established with technology developed in conjunction with Dr. John L. "Jan" Hall, Adjoint Professor, JILA (University of Colorado), who shared the Nobel Prize for Physics in 2005 for his work on laser-based precision spectroscopy and the optical frequency comb technique. SPR is the core of the BDI products and intellectual property. Dr. Hall, in conjunction with the scientists at BDI, created a common path interferometer that was commercialized to become the 404pi instrument.

When it was acquired by us in September 2016, BDI was in the initial stages of rolling out its first commercial product, the 404pi system. BDI's initial revenue was generated in 2014 with first sales to customers including sales to leading academic researchers and biotech companies. BDI did not experience any significant seasonality to its business and provided normal terms to its customers, generally 30-60 days, net. Currently there is no back-log of orders.

Following the September 2016 acquisition of BDI, we began hiring sales, marketing and operational employees, adding a total of eight employees to the twelve hired in connection with the acquisition.

The BDI products include a reader instrument (404pi) and the consumable test products consisting of test chips (cassettes) and packaging. The instrument is assembled in-house using primarily off the shelf parts and certain customized components. Consumable test product components are manufactured at the BDI facility using certain sub-assemblies processed by third-party contractors. Raw materials and certain sub-components are acquired from a number of suppliers.

1

**Recent Developments**

Effective January 14, 2017, the Company adopted a plan to exit the business of BDI and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. Accordingly, the historical results of BDI have been classified as discontinued operations for all periods presented.

Following the recent decision to exit the BDI business, we have begun evaluating potential strategic alternatives. We expect, in the near term, to establish the primary criteria we will consider as we evaluate our next steps and strategic path forward with the goal of maximizing value for our stockholders. Additionally, we will focus on attempting to locate an acquirer or partner for the BDI operations as well as continuing to attempt to locate an interested party for the appendicitis assets.

**Historical Operations**

**Recent Developments**

Effective January 14, 2017, the Company adopted a plan to exit the business of BDI and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. Accordingly, the historical results of BDI have been classified as discontinued operations for all periods presented.

Following the recent decision to exit the BDI business, we have begun evaluating potential strategic alternatives. We expect, in the near term, to establish the primary criteria we will consider as we evaluate our next steps and strategic path forward with the goal of maximizing value for our stockholders. Additionally, we will focus on attempting to locate an acquirer or partner for the BDI operations as well as continuing to attempt to locate an interested party for the appendicitis assets.

**Historical Operations**

We also hold an exclusive license agreement with Washington University ("WU") in St. Louis which granted us an exclusive license and right to sublicense its technology for veterinary products worldwide, subject to certain exceptions.  In July 2012, we granted Ceva Sante Animale S.A. ("Ceva") an exclusive royalty-bearing license to our intellectual property and other assets, relating to recombinant single chain reproductive hormone technology for use in non-human mammals.  This license includes a sublicense of the technology licensed to us by WU.  Ceva continues to advance development of the bovine rFSH product and cumulative cash payments received to date by us from Ceva have been approximately $2 million.

On February 25, 2016, we completed the sale of our corporate headquarters, land and building, to a third party at a purchase price of $4,053,000.  The sale generated approximately $1.8 million in net cash after expenses and mortgage payoffs. In addition to agreeing to the sale, we rented back space in the building under short-term lease agreements that provide storage space required for our current level of operations.

**Company Information**

We were incorporated on July 24, 2000 in the state of Colorado under the name "AspenBio, Inc.", which was subsequently changed to AspenBio Pharma, Inc.  In December 2012, we changed our name to "Venaxis, Inc." and in 2016, in connection with our acquisition of BiOptix Diagnostics, Inc., we changed our name to "Bioptix, Inc."  Our principal executive offices are located at 834-F South Perry Street, Suite 443, Castle Rock, CO 80104 and our telephone number is (303) 794-2000. Our website address is www.venaxis.com. The information contained on, or accessible through, our website is not part of this prospectus or any prospectus supplement.

## RISK FACTORS

Investing in our securities involves a high degree of risk. Before making an investment decision, you should carefully consider the risks, uncertainties and forward-looking statements described under "Risk Factors" in Item 1A of our most recent Annual Report on Form 10-K for the fiscal year ended December 31, 2016 filed with the Securities and Exchange Commission (the "SEC") on March 31, 2017, as well as information incorporated by reference into this prospectus and the additional risk factor set forth below. If any of these risks were to occur, our business, financial condition or results of operations would likely suffer. In that event, the value of our securities could decline, and you could lose part or all of your investment. The risks and uncertainties we describe are not the only ones facing us. Additional risks not presently known to us or that we currently deem immaterial may also impair our business operations. In addition, our past financial performance may not be a reliable indicator of future performance, and historical trends should not be used to anticipate results in the future.  See "Forward-Looking Statements" below.

*Our March 2017 note financing grants certain rights to the Lead Investor in the financing.  As such, the Lead Investor may waive defaults and amend terms with or without the consent of the additional investors in the March 2017 note financing.*

The Notes and proceeds from our March 2017 note financing are currently being held in escrow pursuant to an Escrow Agreement we have entered with the investors and the escrow agent.  Unless the conditions to release of escrow have been satisfied, or waived, the Notes and proceeds may be released only upon the execution of definitive documents for a Qualified Transaction (as defined in the note purchase agreement). Barry Honig, as the Lead Investor, has the right among other things, to waive the investor conditions to release of the escrow (and delivery of the Notes to the investors and funds to the Company).  No other investor has the ability to waive conditions for the escrow release.  If we fail to execute definitive documents for a Qualified Transaction within the required timeframe, and Mr. Honig does not waive such requirement, we may not receive the proceeds from the sale of the notes.

159

2

# FORWARD-LOOKING STATEMENTS

This prospectus, including the documents that we incorporate by reference, contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Exchange Act. Such forward-looking statements include those that express plans, anticipation, intent, contingency, goals, targets or future development and/or otherwise are not statements of historical fact. These forward-looking statements are based on our current expectations and projections about future events and they are subject to risks and uncertainties known and unknown that could cause actual results and developments to differ materially from those expressed or implied in such statements.

In some cases, you can identify forward-looking statements by terminology, such as "expects," "anticipates," "intends," "estimates," "plans," "believes," "seeks," "may," "should," "could" or the negative of such terms or other similar expressions. Accordingly, these statements involve estimates, assumptions and uncertainties that could cause actual results to differ materially from those expressed in them. Any forward-looking statements are qualified in their entirety by reference to the factors discussed throughout this prospectus.

You should read this prospectus and the documents that we reference herein and therein and have filed as exhibits to the registration statement, of which this prospectus is part, completely and with the understanding that our actual future results may be materially different from what we expect. You should assume that the information appearing in this prospectus is accurate as of the date on the front cover of this prospectus or such prospectus supplement only. Because the risk factors referred to above, as well as the risk factors referred to on page 4 of this prospectus and incorporated herein by reference, could cause actual results or outcomes to differ materially from those expressed in any forward-looking statements made by us or on our behalf, you should not place undue reliance on any forward-looking statements. Further, any forward-looking statement speaks only as of the date on which it is made, and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which the statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict which factors will arise. In addition, we cannot assess the impact of each factor on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. We qualify all of the information presented in this prospectus and any accompanying prospectus supplement, and particularly our forward-looking statements, by these cautionary statements.

# USE OF PROCEEDS

The net proceeds from any disposition of the shares covered hereby would be received by the selling stockholders. We will not receive any of the proceeds from the sale of our Common Stock by the selling stockholders other than the net proceeds of any warrants exercised for cash.

# DESCRIPTION OF TRANSACTIONS

On March 10, 2017, we sold $2,250,000 of units of our securities, pursuant to separate purchase agreements with certain of the selling stockholders, at a purchase price of $2.50 per unit.  Each unit consists of one share of our Common Stock and a three year warrant to purchase one share of Common Stock, at an exercise price of $3.50 per share.

The warrants are exercisable, at any time on or after the sixth month anniversary of the date of issuance, at a price of $3.50 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the warrants on a cashless basis. We are prohibited from effecting an exercise of any warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such warrant.

On May 25, 2017, the Lead Investor (as defined below) waived the requirement that the securities and purchase price remain in escrow subject to the occurrence of a "Qualified Transaction" and the Common Stock and warrants and the proceeds from the sale of the Common Stock and warrants were released from escrow to the investors and the Company, respectively .

3

On March 15, 2017, we entered into separate securities purchase agreements pursuant to which we agreed to sell up to $4,750,000 of principal amount of Notes and three year warrants to certain of the selling stockholders.  On March 16, 2017, we satisfied all closing conditions and closed the transaction. The Notes are convertible into shares of Common Stock at an initial conversion price of $2.50.  Each warrant is exercisable into shares of Common Stock at an exercise price equal to $3.56 per share.

At any time, a selling stockholder may submit a conversion or exercise notice indicated their intent to convert its Note or exercise its warrant. However, the Company may not issue any shares of its Common Stock upon such conversion to the extent such issuance (when aggregate with all other applicable issuances) would exceed 19.99% of the Company's issued and outstanding Common Stock, until after the Company has received approval from NASDAQ and holders of its Common Stock, in order to remain compliant with NASDAQ Listing Rule 5635. We are also prohibited from effecting a conversion of any Note or exercise of any warrant to the extent that, as a result of any such conversion or exercise, the holder would beneficially own more than 4.99% or 9.99%, respectively, of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon conversion of such Note or exercise of such warrant, as the case may be.

We agreed to file a preliminary proxy statement within 45 days of closing of the March 16, 2017 transaction, which preliminary proxy statement was filed on April 28, 2017, for a special meeting of our stockholders, in order to submit to our stockholders a proposal to approve an amendment to our Articles of Incorporation authorizing the creation of 15,000,000 shares of "blank check" preferred stock and, thereafter, we shall designate  shares of preferred stock as "Series A Preferred Stock" by filing a Certificate of Designations, Preferences and Rights of 0% Series A Convertible Preferred Stock with the Secretary of State (such date of filing, the "Filing Date"). On the Filing Date, the Notes shall automatically, and without any further action on the part of the holders, be exchanged for shares of Series A Preferred Stock based on a ratio of $1.00 of stated value of Series A Preferred Stock for each $1.00 of then outstanding principal amount plus any accrued but unpaid interest thereon, pursuant to Section 3(a)(9) of the Securities Act.

As of the date hereof, the Notes and proceeds from the Notes remain in escrow.  During this time, the selling stockholders are at market risk inasmuch as the price of the Company's Common Stock may fall below the purchase price of the Notes on or before such securities are released from escrow, if at all. The Notes and corresponding proceeds would be released upon the execution of definitive documents for a Qualified Transaction (as defined in the securities purchase agreement).  The selling stockholders are not irrevocably bound to receive the Notes as a Qualified Transaction may never be consummated. In the event the Company fails to execute such definitive documents within the proscribed time period, the Lead Investor (as defined as defined below) has the right to waive such requirement and may approve the release of escrow in writing. The selling stockholders (other than the Lead Investor) do not have the ability to determine satisfaction of the escrow release.

The Lead Investor is Barry Honig, who is also a selling stockholder, both individually and through GRQ Consultants, Inc. Roth 401K FBO Barry Honig, for which Mr. Honig is trustee.

## SELLING STOCKHOLDERS

This prospectus relates to the sale or other disposition of up to 5,657,161 shares of our Common Stock by the selling stockholders named below, and their donees, pledgees, transferees or other successors-in-interest selling shares of Common Stock or interests in shares of Common Stock received after the date of this prospectus from a selling stockholder as a gift, pledge, partnership distribution or other transfer, which includes:

    (i)     900,000 shares of Common Stock;

    (ii)    1,957,161 shares of Common Stock issuable upon the conversion of outstanding convertible promissory notes; and;

    (iii)   2,800,000 shares of Common Stock issuable upon the exercise of outstanding warrants.

The following table, based upon information currently known by us, sets forth as of July 14, 2017, (i) the number of shares held of record or beneficially by the selling stockholders as of such date (as determined below) and (ii) the number of shares that may be sold or otherwise disposed of under this prospectus by each selling stockholder. Percentage ownership is based on 5,392,503 shares of Common Stock outstanding as of July 14, 2017, plus securities deemed to be outstanding with respect to individual stockholders pursuant to Rule 13d-3(d)(1) under the Exchange Act. Beneficial ownership includes shares of Common Stock plus any securities held by the holder exercisable for or convertible into shares of Common Stock within 60 days after July 14, 2017, in accordance with Rule 13d-3(d)(1) under the Exchange Act. The inclusion of any shares in this table does not constitute an admission of beneficial ownership for the selling stockholders named below. We do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby.

The selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus and may sell or otherwise dispose of shares covered hereby in transactions exempt from the registration requirements of the Securities Act. Because the selling stockholders may sell or otherwise dispose of some, all or none of the shares covered hereby, and because there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares, we cannot estimate the number of the shares that will be held by the selling stockholders after completion of the offering. However, for purposes of the following table, we have assumed that all of the shares covered hereby are sold by the selling stockholders pursuant to this prospectus.

4

None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities. Unless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law. Unless otherwise indicated below, to our knowledge, no persons named in the table are a broker-dealer or affiliate of a broker-dealer.  Unless otherwise indicated, all addresses are c/o Bioptix, Inc., 834-F South Perry Street, Suite 443, Castle Rock, CO 80104.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northurst Inc. | 554,100 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 595,600 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 592,400 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | 0.19% | 20,000 (23) | 0 | * |

*   Less than 1%.
** Based on 5,392,503 shares of Common Stock outstanding as of July 14, 2017.

5

(1)        Adam Arviv is the President of Acquisition Group Limited. In such capacity he has voting and dispositive control over the securities

(1)     Adam Arviv is the President of Acquisition Group Limited. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Yorkville Ave, Suite 604, Toronto, Ontario M5RIC2.

(2)     Jake Malczewski is the Controlling Shareholder of Northurst Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 400,000 shares of Common Stock and (ii) 154,100 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 245,900 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares of Common Stock offered in this offering, include the 245,900 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Cragmore Ave, Pointe-Claire, Quebec, H9R 5M1.

(3)     Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 11290 Chalon Road, Los Angeles CA 90049.

(4)     Mark Groussman is the President of Melechdavid Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 170,000 shares of Common Stock and (ii) 170,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(5)     Mark Groussman is the Custodian of Mark Groussman c/f Alivia Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(6)     Mark Groussman is the Custodian of Mark Groussman c/f Asher Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(7)     Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by GRQ Consultants, Inc. 401K ("401K"), (iii) 30,600 shares of Common Stock held by GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("Roth 401K") and (iv) 39,860 shares of Common Stock issuable upon exercise of outstanding warrants held by Mr. Honig. Mr. Honig is the trustee of 401K and Roth 401K in such capacity holds voting and dispositive power over the securities held by such entities. Excludes (i) 170,000 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation, (ii) 160,140 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation, (iii) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation, and (iv) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(8)     Represents (i) 206,017 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met.

(9)     Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by 401K and (iii) 30,600 shares of Common Stock held by Roth 401K. Mr. Honig is the trustee of 401K and Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entities.

6

(10)    Represents (i) 30,600 shares of Common Stock and (ii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation.  Mr. Honig is the trustee of Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entity. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively.  The Notes and warrants are being held in escrow pending the satisfaction of certain release conditions. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(11)    Represents (i) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 500,000

(10)    Represents (i) 30,600 shares of Common Stock and (ii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation. Mr. Honig is the trustee of Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entity. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending the satisfaction of certain release conditions. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(11)    Represents (i) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met.

(12)    Jonathan Honig is the Manager of Titan Multi-Strategy Fund I, Ltd. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 55,000 shares of Common Stock and (ii) 537,400 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes (i) 824,066 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation and (ii) 256,226 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 5825 Windsor Court, Boca Raton, FL 33496.

(13)    Represents (i) 40,000 shares of Common Stock and (ii) 824,066 shares of Common Stock issuable upon conversion of a convertible promissory note and (Iii) 840,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met .

(14)    Candice Merren-Yates and Ghislian Ghyoot are the Authorized Signatories of US Commonwealth Life, A.I. Policy No. 2013-17. In such capacity they share voting and dispositive control over the securities held by such entity. Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively . The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 304 Ponce de Leon, Suite 1000, San Juan, Puerto Rico, 00918.

(15)    Represents (i) 41,204 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively . The Notes and warrants are being held in escrow pending certain release conditions being met. Mr. O'Braitis is affiliated with a broker-dealer and may be deemed a statutory underwriter of the shares. The address for this selling stockholder is 43811 Grantner Pl, Ashburn, VA 20147.

(16)    Adrian James is the President & CEO of Stockwire Research Group, Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively.  The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 3736 Bee Caves Road, Suite 1-105, Austin, TX 78746.

(17)    Edward Karr is the Managing Member of Aifos Capital LLC.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 61,805 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 60,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively.  The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is Aifos Capital LLC, CP 5452, CH-1211 Geneva 11, Switzerland.

(18)    John Stetson is the Managing Member of Stetson Capital Management, LLC.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 7,500 shares of Common Stock, (ii) 75,800 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 130,217 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively.  The Notes and warrants are being held in escrow pending certain release conditions being met. The

address for this selling stockholder is 68 Fiesta Way, Ft. Lauderdale, FL 33301.

(19)    Represents (i) 206,017 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met.

(20)    Jason Theofilos is the Director of JAD Capital Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 41,204 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, Canada L4B 4V1.

(21)    Represents (i) 57,187 shares of Common Stock, (ii) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively.  The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 51 Lord's Highway East, Weston, CT 06883.

(22)    Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively.  The Notes and warrants are being held in escrow pending certain release conditions being met.

(23)    Represents (i) 10,000 shares of Common Stock and (ii) 10,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 200 East 69 St, Apt 21B, New York, NY 10021.

7

---

# PLAN OF DISTRIBUTION

Each selling stockholder of the Common Stock and any of their pledgees, assignees and successors-in-interest may, from time to time, sell any or all of their shares of Common Stock on The NASDAQ Capital Market or any other stock exchange, market or trading facility on which the shares are traded or in private transactions. These sales may be at fixed or negotiated prices. A selling stockholder may use any one or more of the following methods when selling shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- settlement of short sales entered into after the effective date of the registration statement of which this prospectus is a part;

- broker-dealers may agree with the selling stockholders to sell a specified number of such shares at a stipulated price per share;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

- a combination of any such methods of sale; or

- any other method permitted pursuant to applicable law.

## PLAN OF DISTRIBUTION

Each selling stockholder of the Common Stock and any of their pledgees, assignees and successors-in-interest may, from time to time, sell any or all of their shares of Common Stock on The NASDAQ Capital Market or any other stock exchange, market or trading facility on which the shares are traded or in private transactions. These sales may be at fixed or negotiated prices. A selling stockholder may use any one or more of the following methods when selling shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- settlement of short sales entered into after the effective date of the registration statement of which this prospectus is a part;

- broker-dealers may agree with the selling stockholders to sell a specified number of such shares at a stipulated price per share;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

- a combination of any such methods of sale; or

- any other method permitted pursuant to applicable law.

The selling stockholders may also sell shares under Rule 144 under the Securities Act of 1933, as amended, if available, rather than under this prospectus.

Broker-dealers engaged by the selling stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the selling stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated, but, except as set forth in a supplement to this prospectus, in the case of an agency transaction not in excess of a customary brokerage commission in compliance with FINRA Rule 2440; and in the case of a principal transaction a markup or markdown in compliance with FINRA IM-2440.

In connection with the sale of the Common Stock or interests therein, the selling stockholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the Common Stock in the course of hedging the positions they assume. The selling stockholders may also sell shares of the Common Stock short and deliver these securities to close out their short positions, or loan or pledge the Common Stock to broker-dealers that in turn may sell these securities. The selling stockholders may also enter into option or other transactions with broker-dealers or other financial institutions or the creation of one or more derivative securities which require the delivery to such broker-dealer or other financial institution of shares offered by this prospectus, which shares such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

8

The selling stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act of 1933, as amended, in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act of 1933, as amended. Each selling stockholder has informed us that it does not have any written or oral agreement or

The selling stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act of 1933, as amended, in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act of 1933, as amended. Each selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock.

We are required to pay certain fees and expenses incurred by us incident to the registration of the shares. We have agreed to indemnify the selling stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act of 1933, as amended.

Because selling stockholders may be deemed to be "underwriters" within the meaning of the Securities Act of 1933, as amended, they will be subject to the prospectus delivery requirements of the Securities Act of 1933, as amended, including Rule 172 thereunder. In addition, any securities covered by this prospectus which qualify for sale pursuant to Rule 144 under the Securities Act of 1933, as amended may be sold under Rule 144 rather than under this prospectus. There is no underwriter or coordinating broker acting in connection with the proposed sale of the resale shares by the selling stockholders.

We agreed to keep this prospectus effective until the earlier of (i) the date on which the shares may be resold by the selling stockholders without registration and without the requirement to be in compliance with Rule 144(c)(1) and otherwise without restriction or limitation pursuant to Rule 144 or (ii) all of the shares have been sold pursuant to this prospectus or Rule 144 under the Securities Act or any other rule of similar effect. The resale shares will be sold only through registered or licensed brokers or dealers if required under applicable state securities laws. In addition, in certain states, the resale shares may not be sold unless they have been registered or qualified for sale in the applicable state or an exemption from the registration or qualification requirement is available and is complied with.

Under applicable rules and regulations under the Securities Exchange Act of 1934, as amended, any person engaged in the distribution of the resale shares may not simultaneously engage in market making activities with respect to the Common Stock for the applicable restricted period, as defined in Regulation M, prior to the commencement of the distribution. In addition, the selling stockholders will be subject to applicable provisions of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, including Regulation M, which may limit the timing of purchases and sales of shares of the Common Stock by the selling stockholders or any other person. We will make copies of this prospectus available to the selling stockholders and have informed them of the need to deliver a copy of this prospectus to each purchaser at or prior to the time of the sale (including by compliance with Rule 172 under the Securities Act of 1933, as amended).

## DESCRIPTION OF CAPITAL STOCK

### General

The following description of our capital stock summarizes the material terms and provisions of our Common Stock. For the complete terms of our Common Stock, please refer to our Articles of Incorporation and our Bylaws that are incorporated by reference into the registration statement of which this prospectus is a part or may be incorporated by reference in this prospectus. The terms of these securities may also be affected by the Colorado Revised Statutes. The summary below is qualified in its entirety by reference to our amended and restated Articles of Incorporation and our amended and restated Bylaws.

As of the date of this prospectus, our authorized capital stock consisted of 60,000,000 shares of Common Stock, no par value per share. As of the date of this prospectus, there were 5,392,503 shares of our Common Stock issued and outstanding.

### Common Stock

Holders of Common Stock are entitled to one vote for each share held on all matters submitted to a vote of shareholders, except that in the election of directors each shareholder shall have as many votes for each share held by him, her or it as there are directors to be elected and for whose election the shareholder has a right to vote.  Cumulative voting is not permitted. Generally, all matters to be voted on by shareholders must be approved by a majority, or, in the case of the election of directors, by a plurality, of the votes cast at a meeting at which a quorum is present. Holders of outstanding shares of our Common Stock are entitled to those dividends declared by the Board of Directors out of legally available funds, and, in the event of our liquidation, dissolution or winding up of our affairs, holders are entitled to receive ratably our net assets available to the shareholders.  Holders of our outstanding Common Stock have no preemptive, conversion or redemption rights.  All of the issued and outstanding shares of our Common Stock are, and all unissued shares of our Common Stock, when offered and sold will be, duly authorized, validly issued, fully paid and nonassessable.  To the extent that additional shares of our Common Stock may be issued in the future, the relative interests of the then existing shareholders may be diluted.

## Warrants

On March 10, 2017, we issued to purchasers of our units warrants to purchase an aggregate of 900,000 shares of Common Stock. The warrants are exercisable at a price of $3.50 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the warrants on a cashless basis. We are prohibited from effecting an exercise of any warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such warrant.  55.5556% of the warrants (and common stock) issued to each investor were being held in escrow pending the satisfaction of certain release conditions. On May 25, 2017, the warrants (and associated shares of common stock) and the proceeds from the sale therefrom were released from escrow to the investors and the Company, respectively, and no longer remain subject to a "Qualified Transaction."

On March 16, 2017, we issued warrants to purchase an aggregate of 1,900,000 shares of Common Stock with each warrant based upon the number of shares of Common Stock equal to 100% of such investor's subscription amount divided by the conversion price of $2.50. The warrants are exercisable at a price of $3.56 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the warrants on a cashless basis. We are prohibited from effecting an exercise of any warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such warrant.  The warrants issued to each investor are being held in escrow pending the satisfaction of certain release conditions.

At any time, a selling stockholder may submit an exercise notice indicated its intent to exercise its warrant. However, the Company may not issue any shares of its Common Stock upon such exercise to the extent such issuance (when aggregate with all other applicable issuances) would exceed 19.99% of the Company's issued and outstanding Common Stock, until after the Company has received approval from NASDAQ and holders of its Common Stock, in order to remain compliant with NASDAQ Listing Rule 5635 .

If we, at any time while the warrants are outstanding: (i) pay a stock dividend or otherwise make a distribution or distributions payable in shares of Common Stock or any Common Stock equivalents (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company upon exercise of the warrants), (ii) subdivide outstanding shares of Common Stock into a larger number of shares, (iii) combine (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares or (iv) issue, in the event of a reclassification of shares of the Common Stock, any shares of capital stock, then the exercise price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding any treasury shares of the Company) outstanding immediately before such event, and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event.

## Convertible Promissory Notes

The Notes are convertible at a per share price of $2.50 per share, subject to adjustment, and conversion shares will be issued at any time after we have received approval of the transaction from our stockholders as required by Nasdaq Listing Rule 5635. At any time, a selling stockholder may submit a conversion notice indicated its intent to convert its Note. However, the Company may not issue any shares of its Common Stock upon such conversion to the extent such issuance (when aggregate with all other applicable issuances) would exceed 19.99% of the Company's issued and outstanding Common Stock, until after the Company has received approval from NASDAQ and holders of its Common Stock, in order to remain compliant with NASDAQ Listing Rule 5635.  The number of shares of Common Stock issuable upon a conversion shall be determined by the quotient obtained by dividing the outstanding principal amount of such holder's Note to be converted by the conversion price. We are also prohibited from effecting a conversion of any Note to the extent that, as a result of any such exercise, the holder would beneficially own more than 4.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon conversion of such Note .

Except as otherwise provided in the Note, we may not prepay or redeem the Note in whole or in part without the prior written consent of the holder, and to the extent we agree with other holders to prepay or redeem other Notes in whole or in part, we shall offer such prepayment or redemption of the Note on a pro rata basis on the same terms and conditions.

If we, at any time while the Note is outstanding: (i) pay a stock dividend or otherwise make a distribution or distributions payable in shares of Common Stock or any Common Stock equivalents (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company upon conversion of the Notes), (ii) subdivide outstanding shares of Common Stock into a larger number of shares, (iii) combine (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares or (iv) issue, in the event of a reclassification of shares of the Common Stock, any shares of capital stock, then the conversion price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding any treasury shares of the Company) outstanding immediately before such event, and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event.

Holders of the Notes shall be entitled to receive, and we shall pay, cumulative interest on the outstanding principal amount of the Note at the annual rate of two (2%) percent (all subject to increase as set forth in the Note), payable on the maturity date of September 16, 2018 in cash or shares issuable in lieu of the cash payment of interest on the Notes in accordance with the terms of the Notes. Interest on the Notes shall be calculated on the basis of a 360-day year and the actual number of days elapsed. Payments made in connection with the Notes shall be applied first to amounts due thereunder other than principal and interest, thereafter to interest and finally to principal. Conversion privileges set forth in the Notes shall remain in full force and effect immediately from the date thereof and until the Note is paid in full.

We agreed to file a preliminary proxy statement for a special meeting of our stockholders,  which preliminary proxy statement was filed on April 28, 2017, in order to submit to our stockholders a proposal to approve an amendment to our Articles of Incorporation authorizing the creation of 15,000,000 shares of "blank check" preferred stock and, thereafter, we shall designate  shares of preferred stock as "Series A Preferred Stock" by filing a Certificate of Designations, Preferences and Rights of 0% Series A Convertible Preferred Stock with the Secretary of State. On the Filing Date, the Notes shall automatically, and without any further action on the part of the holders, be exchanged for shares of Series A Preferred Stock based on a ratio of $1.00 of stated value of Series A Preferred Stock for each $1.00 of the then outstanding principal amount plus any accrued but unpaid interest thereon, pursuant to Section 3(a)(9) of the Securities Act. The Notes and warrants issued to each investor are being held in escrow pending the satisfaction of certain release conditions.

As of the date hereof, the Notes and proceeds from the Notes remain in escrow.  During this time, the selling stockholders are at market risk inasmuch as the price of the Company's Common Stock may fall below the purchase price of the Notes on or before such securities are released from escrow, if at all.  The Notes and corresponding proceeds would be released upon the execution of definitive documents for a Qualified Transaction (as defined in the securities purchase agreement).  The selling stockholders are not irrevocably bound to receive the Notes as a Qualified Transaction may never be consummated. In the event the Company fails to execute such definitive documents within the proscribed time period, the Lead Investor has the right to waive such requirement and may approve the release of escrow in writing.  The selling stockholders (other than the Lead Investor) do not have the ability to determine satisfaction of the escrow release .

## Anti-Takeover Effects of Certain Provisions of our Articles of Incorporation, Bylaws and the Colorado Revised Statutes ("CRS")

Certain provisions of our Articles of Incorporation and Bylaws, which are summarized in the following paragraphs, may have the effect of discouraging potential acquisition proposals or making a tender offer or delaying or preventing a change in control, including changes a stockholder might consider favorable. Such provisions may also prevent or frustrate attempts by our stockholders to replace or remove our management. In particular, the Articles of Incorporation and Bylaws and Colorado law, as applicable, among other things:

? provide the board of directors with the ability to alter the Bylaws without stockholder approval;

? place limitations on the removal of directors; and

? provide that vacancies on the board of directors may be filled by a majority of directors in office, although less than a quorum.

These provisions are expected to discourage certain types of coercive takeover practices and inadequate takeover bids and to encourage persons seeking to acquire control of us to first negotiate with our board. These provisions may delay or prevent someone from acquiring or merging with us, which may cause our market price of our Common Stock to decline .

## Limitations on Liability, Indemnification of Officers and Directors and Insurance

**Limitations on Liability, Indemnification of Officers and Directors and Insurance**

Our Articles of Incorporation and Bylaws require us to indemnify any person entitled to indemnity under the CRS, as it currently exists or may be amended, to the fullest extent permitted by the CRS, and, to the maximum extent permitted by the CRS, purchase and maintain insurance providing such indemnification.

Our Bylaws specifically sets forth that we shall indemnify any proper person against reasonably incurred expenses (including attorneys' fees), judgments, penalties, fines (including any excise tax assessed with respect to an employee benefit plan) and amounts paid in settlement reasonably incurred by him in connection with such action, suit or proceeding if it is determined that he conducted himself in good faith and that he reasonably believed (i) in the case of conduct in his official capacity with the corporation, that his conduct was in the corporation's best interests, or (ii) in all other cases (except criminal cases), that his conduct was at least not opposed to the corporation's best interests, or (iii) in the case of any criminal proceeding, that he had no reasonable cause to believe his conduct was unlawful. Official capacity means, when used with respect to a director, the office of director and, when used with respect to any other proper person, the office in a corporation held by the officer or the employment, fiduciary or agency relationship undertaken by the employee, fiduciary, or agent on behalf of the corporation.

**Authorized but Unissued Shares**

Our authorized but unissued shares of Common Stock will be available for future issuance without your approval. We may use additional shares for a variety of purposes, including future public offerings to raise additional capital, to fund acquisitions and as employee compensation. The existence of authorized but unissued shares of Common Stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

**Transfer Agent and Registrar**

The transfer agent and registrar for our Common Stock is Corporate Stock Transfer, Inc., Denver, Colorado.

## LEGAL MATTERS

The validity of the issuance of the securities offered hereby will be passed upon for us by counsel. Additional legal matters may be passed upon for us or any underwriters, dealers or agents, by counsel that we will name in the applicable prospectus supplement.

## EXPERTS

The consolidated balance sheet of Bioptix, Inc. and Subsidiary, as of December 31, 2016, and the related consolidated statements of operations, stockholders' equity, and cash flows for the year then ended, have been audited by EisnerAmper LLP, independent registered public accounting firm, as stated in their report which is incorporated herein by reference, which report includes an explanatory paragraph relating to auditing the adjustments to the 2015 financial statements to retrospectively reflect the reverse stock split. Such financial statements have been incorporated herein by reference in reliance on the report of such firm given upon their authority as experts in accounting and auditing.

The audited financial statements, incorporated herein by reference, for the year ended December 31, 2015 have been audited by GHP Horwath, P.C. ("GHP"), independent registered public accounting firm, for the period and to the extent set forth in their report. Their report includes an explanatory paragraph relating to the effects of the adjustments to retroactively apply the impact of the reverse stock split to the December 31, 2015 financial statements. Such financial statements have been so incorporated in reliance upon the report of such firm given upon the firm's authority as an expert in auditing and accounting.

Effective January 1, 2017, the partners and employees of GHP joined another independent registered public accounting firm. As of January 13, 2017, the client-auditor relationship between us and GHP ceased. On February 3, 2017, our Board of Directors appointed EisnerAmper LLP as our independent registered public accounting firm .

12

---

## WHERE YOU CAN FIND MORE INFORMATION

## WHERE YOU CAN FIND MORE INFORMATION

This prospectus constitutes a part of a registration statement on Form S-3 filed under the Securities Act.  As permitted by the SEC's rules, this prospectus and any prospectus supplement, which form a part of the registration statement, do not contain all the information that is included in the registration statement.  You will find additional information about us in the registration statement.  Any statements made in this prospectus or any prospectus supplement concerning legal documents are not necessarily complete and you should read the documents that are filed as exhibits to the registration statement or otherwise filed with the SEC for a more complete understanding of the document or matter.

We file annual, quarterly and current reports, proxy statements and other information with the SEC.  You may read, without charge, and copy the documents we file at the SEC's public reference rooms in Washington, D.C. at 100 F Street, NE, Room 1580, Washington, DC 20549, or in New York, New York and Chicago, Illinois.  You can request copies of these documents by writing to the SEC and paying a fee for the copying cost.  Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms.  Our SEC filings are also available to the public at no cost from the SEC's website at http://www.sec.gov.  In addition, we make available on or through our Internet site copies of these reports as soon as reasonably practicable after we electronically file or furnish them to the SEC. Our Internet site can be found at www.venaxis.com.

## INCORPORATION OF DOCUMENTS BY REFERENCE

We have filed a registration statement on Form S-3 with the Securities and Exchange Commission under the Securities Act. This prospectus is part of the registration statement but the registration statement includes and incorporates by reference additional information and exhibits. The Securities and Exchange Commission permits us to "incorporate by reference" the information contained in documents we file with the Securities and Exchange Commission, which means that we can disclose important information to you by referring you to those documents rather than by including them in this prospectus. Information that is incorporated by reference is considered to be part of this prospectus and you should read it with the same care that you read this prospectus. Information that we file later with the Securities and Exchange Commission will automatically update and supersede the information that is either contained, or incorporated by reference, in this prospectus, and will be considered to be a part of this prospectus from the date those documents are filed. We have filed with the Securities and Exchange Commission, and incorporate by reference in this prospectus:

- Annual Report on Form 10-K for the year ended December 31, 2016 filed on March 31, 2017 and the Annual Report on Form 10-K/A filed on April 27, 2017;

- Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2017 filed on May 15, 2017;

- Definitive Proxy Statement 14A filed on July 10, 2017;

- Current Reports on Form 8-K or Form 8-K/A (excluding any reports or portions thereof that are deemed to be furnished and not filed) filed on January 6, 2017, January 11, 2017, January 20, 2017, January 20, 2017, February 8, 2017, February 9, 2017, February 9, 2017, March 16, 2017, March 17, 2017, April 7, 2017, April 13, 2017, May 8, 2017, May 18, 2017, May 25, 2017, June 15, 2017 and July 3, 2017.

We also incorporate by reference all additional documents that we file with the Securities and Exchange Commission under the terms of Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act that are made after the date of the initial registration statement but prior to effectiveness of the registration statement and after the date of this prospectus but prior to the termination of the offering of the securities covered by this prospectus. We are not, however, incorporating, in each case, any documents or information that we are deemed to furnish and not file in accordance with Securities and Exchange Commission rules.

You may request, and we will provide you with, a copy of these filings, at no cost, by calling us at (303) 545-5550 or by writing to us at the following address:

Bioptix, Inc.
834-F South Perry Street, Suite 443
Castle Rock, CO 80104
(303) 794-2000

13

## PART II

## INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 14.  Other Expenses of Issuance and Distribution.**

The following table sets forth an estimate of the fees and expenses relating to the issuance and distribution of the securities being registered hereby, other than underwriting discounts and commissions, all of which shall be borne by the Registrant.  All of such fees and expenses, except for the SEC registration fee are estimated:

| | | |
|---|---|---:|
| SEC registration fee | $ | 2,724 |
| Transfer agent's fees and expenses | $ | 1,000 |
| Legal fees and expenses | $ | 10,000 |
| Printing fees and expenses | $ | 1,000 |
| Accounting fees and expenses | $ | 7,500 |
| Miscellaneous fees and expenses | $ | 776 |
| | | |
| Total | $ | 23,000 |

**Item 15.  Indemnification of Officers and Directors.**

Our Articles of Incorporation and Bylaws require us to indemnify our officers, directors, employees and agents against reasonably incurred expenses (including legal fees), judgments, penalties, fines and amounts incurred in the settlement of any action, suit or proceeding if it is determined that such person conducted himself in good faith and that he reasonably believed (i) in the case of conduct in his official capacity, that his conduct was in our best interest, (ii) in all other cases (except criminal proceedings) that his conduct was at least not opposed to our best interests, or (iii) in the case of any criminal proceeding, that he has not reasonable cause to believe that his conduct was unlawful.

This determination shall be made by a majority vote of directors at a meeting at which a quorum is present, provided however that the quorum can only consist of directors not parties to the proceeding.  If a quorum cannot be obtained, the determination may be made by a majority vote of a committee of the board, consisting of two or more directors who are not parties to the proceeding.  Directors who are parties to the proceeding may participate in the designation of members to serve on the committee.  If a quorum of the board or a committee cannot be established, the determination may be made (i) by independent legal counsel selected by a vote of the board of directors or committee in the manner described in this paragraph or, if a quorum cannot be obtained or a committee cannot be established, by independent legal counsel selected by a majority of the full board (including directors who are parties to the proceeding) or (ii) by a vote of the shareholders.  Any officer, director, employee or agent may seek court-ordered indemnification from the court conducting the proceeding.  The court may then determine whether such person should be entitled to indemnification.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of us pursuant to the foregoing provisions, or otherwise, we have been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable.  In the event that a claim for indemnification against such liabilities (other than the payment by us of expenses incurred or paid by a director, officer or controlling person of the Company in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, we will, unless in the opinion of our counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by us is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

Section 7-108-402 of the Colorado Business Corporation Act (the "Act") provides, generally, that the Articles of Incorporation may contain a provision eliminating or limiting the personal liability of a director to the corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except that any such provision shall not eliminate or limit the liability of a director (i) for any breach of the director's duty of loyalty to the corporation or its shareholders, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) acts specified in Section 7-108-403 of the Act (unlawful distributions), or (iv) any transaction from which the director directly or indirectly derived an improper personal benefit. Such provision may not eliminate or limit the liability of a director for any act or omission occurring prior to the date on which such provision becomes effective.  Our Articles of Incorporation contain such a provision.

Section 7-109-103 of the Act provides, that a corporation organized under Colorado law shall be required to indemnify a person who is or was a director of the corporation or an individual who, while serving as a director of the corporation, is or was serving at the corporation's request as a director, an officer, an agent, an associate, an employee, a fiduciary, a manager, a member, a partner, a promoter, or a trustee of, or to hold any similar position with, another domestic or foreign corporation or other person or of an employee benefit plan (a "Director") of the corporation and who was wholly successful, on the merits or otherwise, in the defense of any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal (a "Proceeding"), in which he was a party, against reasonable expenses incurred by him in connection with the Proceeding, unless such indemnity is limited by the corporation's Articles of Incorporation.

Section 7-109-102 of the Act provides, generally, that a corporation may indemnify a person made a party to a Proceeding because the person is or was a Director against any obligation incurred with respect to a Proceeding to pay a judgment, settlement, penalty, fine (including an excise tax assessed with respect to an employee benefit plan) or reasonable expenses incurred in the Proceeding if the person conducted himself or herself in good faith and the person reasonably believed, in the case of conduct in an official capacity with the corporation, the person's conduct was in the corporation's best interests and, in all other cases, his or her conduct was at least not opposed to the corporation's best interests and, with respect to any criminal proceedings, the person had no reasonable cause to believe that his or her conduct was unlawful. A corporation may not indemnify a Director in connection with any Proceeding by or in the right of the corporation in which the Director was adjudged liable to the corporation or, in connection with any other Proceeding charging that the Director derived an improper personal benefit, whether or not involving actions in an official capacity, in which Proceeding the Director was judged liable on the basis that he or she derived an improper personal benefit. Any indemnification permitted in connection with a Proceeding by or in the right of the corporation is limited to reasonable expenses incurred in connection with such Proceeding.

## Item 16.  Exhibits.

a) Exhibits.

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Amended and Restated Articles of Incorporation filed March 30, 2016 (Incorporated by reference from the Registrant's Current Report on Form 8-K, filed March 29, 2016) |
| 3.2 | Articles of Amendment to the Articles of Incorporation filed November 30, 2016 (Incorporated by reference from the Registrant's Current Report on Form 8-K, filed December 2, 2016) |
| 3.3 | Amended and Restated Bylaws, effective March 27, 2008 (Incorporated by reference from the Registrant's Quarterly Report on Form 10-Q, filed May 15, 2008) |
| 5.1* | Opinion of counsel as to the legality of the securities being registered |
| 23.1* | Consent of counsel (included in Exhibit 5.1) |
| 23.2 | Consent of EisnerAmper LLP |
| 23.3 | Consent of GHP Horwath, P.C. |
| 24.1 | Power of Attorney (included on signature pages to the registration statement) |

\*      To be filed by amendment.

## Item 17.   Undertakings.

(a)    The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be

**Item 17.   Undertakings.**

(a)    The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

*provided*, *however*, that paragraphs (a)(1)(i), (a)(1)(ii), and (a)(1)(iii) above do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement, or is contained in a form of prospectus filed pursuant to Rule 424(b) that is a part of the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(b)    The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(c)    Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

II-3

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on this Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Castle Rock, State of Colorado on the 19th day of July, 2017.

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on this Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Castle Rock, State of Colorado on the 19th day of July, 2017.

/s/ Michael M. Beeghley
Michael M. Beeghley
Chief Executive Officer
(Principal Executive Officer)

/s/ Jeffrey G. McGonegal
Jeffrey G. McGonegal
Chief Financial Officer
(Principal Financial and Accounting Officer)

The Registrant and each person whose signature appears below hereby appoint Michael M. Beeghley and Jeffrey G. McGonegal as their attorneys-in-fact, with full power of substitution, to execute in their names and on behalf of the Registrant and each such person, individually and in each capacity stated below, one or more amendments (including post-effective amendments and registration statements filed pursuant to Rule 462(b) under the Securities Act of 1933, as amended and otherwise) to this Registration Statement as the attorney-in-fact acting on the premise shall from time to time deem appropriate and to file any such amendment to this Registration Statement with the Securities and Exchange Commission.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
| --- | --- | --- |
| /s/ Michael M. Beeghley<br>Michael M. Beeghley | Chief Executive Officer, Director<br>(Principal Executive Officer) | July 19, 2017 |
| /s/ Jeffrey G. McGonegal<br>Jeffrey G. McGonegal | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | July 19, 2017 |
| /s/ John R. O'Rourke<br>John R. O'Rourke | Director | July 19, 2017 |
| /s/ Mike Dai<br>Mike Dai | Director | July 19, 2017 |
| /s/ Andrew Kaplan<br>Andrew Kaplan | Director | July 19, 2017 |

II-4

175

# FORM S-3 (Amendment No. 2), as filed with the Securities and Exchange Commission on August 24, 2017

S-3/A 1 bioptix_s3.htm FORM S-3 AMENDMENT NO 2

**As filed with the Securities and Exchange Commission on August 24, 2017**

Registration No. 333-217397

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM S-3**
**(Amendment No. 2)**

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# BIOPTIX, INC.

(Exact name of registrant as specified in its charter)

| **Colorado** | **84-155337** |
|---|---|
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

**Jeffrey G. McGonegal**
**Chief Financial Officer**
**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

**Approximate date of commencement of proposed sale to the public:** From time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box.   ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box.   ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.   ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.   ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box.   ☐

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box.   ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box.   ☐

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of " *large accelerated filer* ", " *accelerated filer* ", " *smaller reporting company* " and "*emerging growth company*" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ? | Accelerated filer ? | Non-accelerated filer ? (do not check if smaller reporting company) | Smaller reporting company ? | Emerging growth company ? |
|---|---|---|---|---|

### CALCULATION OF REGISTRATION FEE

| Title of each class of securities to be registered | Amount to be Registered(1) | Proposed maximum offering price per share | Proposed maximum aggregate offering price | Amount of registration fee |
|---|---|---|---|---|
| Common stock, no par value per share | 900,000 | $ 4.16 (2) | $ 3,739,500 | $ 433.41 |
| Common stock, no par value per share, issuable upon conversion of convertible promissory notes (3) | 1,957,161 | $ 4.16 (2) | $ 8,132,004 | $ 942.50 |
| Common stock, no par value per share, issuable upon exercise of warrants | 2,800,000 | $ 4.16 (2) | $ 11,634,000 | $ 1,348.38 |
| TOTAL | 5,657,161 | $ 4.16 | $ 23,505,504 | $ 2,724.29* |

(1)  Pursuant to Rule 416 under the Securities Act of 1933, as amended, this registration statement also covers such additional shares as may hereafter be issued resulting from stock splits, stock dividends, recapitalizations or certain other capital adjustments.

(2)  Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(c) under the Securities Act of 1933, as amended.  In accordance with Rule 457(c) of the Securities Act of 1933, as amended, the price shown is the average of the high and low sales prices of the Common Stock on April 17, 2017 as reported on The NASDAQ Capital Market.

(3)  Includes shares of Common Stock issuable for accrued interest under the terms of the promissory notes, computed to the maturity date.

\*    Previously Paid.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment that specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until this Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

**The information in this prospectus is not complete and may be changed. We may not sell these securities or accept an offer to buy these securities until the Securities and Exchange Commission declares our registration statement effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.**

**SUBJECT TO COMPLETION, DATED August 24, 2017**

**PROSPECTUS**

**BIOPTIX, INC.**

**The information in this prospectus is not complete and may be changed. We may not sell these securities or accept an offer to buy these securities until the Securities and Exchange Commission declares our registration statement effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.**

**SUBJECT TO COMPLETION, DATED August 24, 2017**

**PROSPECTUS**

**BIOPTIX, INC.**

**900,000 Shares of Common Stock Offered by the Selling Stockholders**

**1,957,161 Shares of Common Stock Issuable Upon Conversion of 2% Convertible Promissory Notes Offered by the Selling Stockholders**

**2,800,000 Shares of Common Stock Issuable Upon Exercise of Warrants Offered by the Selling Stockholders**

This prospectus relates to the disposition from time to time of 5,657,161 shares of common stock, no par value per share (the "Common Stock"), which includes (i) 900,000 shares of Common Stock, (ii) 1,957,161 shares of Common Stock issuable upon the conversion of outstanding 2% convertible promissory notes (the "Notes") and (iii) 2,800,000 shares of Common Stock issuable upon the exercise of outstanding warrants held by the selling stockholders named in this prospectus.  We will not receive any of the proceeds from the sale of shares by the selling stockholders.

The selling stockholders may sell the shares of Common Stock described in this prospectus in a number of different ways and at varying prices. We provide more information about how the selling stockholders may sell their shares of Common Stock in the section entitled "Plan of Distribution" on page 8. The selling stockholders will bear all commissions and discounts, if any, attributable to the sale or disposition of the shares, or interests therein. We will bear all costs, expenses and fees in connection with the registration of the shares. We will not be paying any underwriting discounts or commissions in this offering.

Our Common Stock is presently listed on The NASDAQ Capital Market under the symbol "BIOP."  On August 23, 2017 the last reported sale price of our Common Stock was $3.47.

**Investing in our securities involves various risks.  See "Risk Factors" contained herein for more information on these risks.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities, or passed upon the adequacy or accuracy of this prospectus or any accompanying prospectus supplement.  Any representation to the contrary is a criminal offense.**

The date of this Prospectus is August 24, 2017.

**TABLE OF CONTENTS**

| | Page |
|---|---|
| OUR BUSINESS | 1 |
| RISK FACTORS | 2 |
| FORWARD-LOOKING STATEMENTS | 3 |
| USE OF PROCEEDS | 3 |
| SELLING STOCKHOLDERS | 4 |
| PLAN OF DISTRIBUTION | 8 |
| DESCRIPTION OF CAPITAL STOCK | 9 |
| LEGAL MATTERS | 12 |
| EXPERTS | 12 |
| WHERE YOU CAN FIND MORE INFORMATION | 13 |
| INCORPORATION OF DOCUMENTS BY REFERENCE | 13 |

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| OUR BUSINESS | 1 |
| RISK FACTORS | 2 |
| FORWARD-LOOKING STATEMENTS | 3 |
| USE OF PROCEEDS | 3 |
| SELLING STOCKHOLDERS | 4 |
| PLAN OF DISTRIBUTION | 8 |
| DESCRIPTION OF CAPITAL STOCK | 9 |
| LEGAL MATTERS | 12 |
| EXPERTS | 12 |
| WHERE YOU CAN FIND MORE INFORMATION | 13 |
| INCORPORATION OF DOCUMENTS BY REFERENCE | 13 |

4

---

**Company References**

In this prospectus, "Bioptix," "the Company," "we," "us," and "our" refer to Bioptix, Inc., a Colorado corporation, unless the context otherwise requires.

**OUR BUSINESS**

**Historical Operations**

We hold an exclusive license agreement with Washington University ("WU") in St. Louis which granted us an exclusive license and right to sublicense its technology for veterinary products worldwide, subject to certain exceptions.  In July 2012, we granted Ceva Sante Animale S.A. ("Ceva") an exclusive royalty-bearing license to our intellectual property and other assets, relating to recombinant single chain reproductive hormone technology for use in non-human mammals.  This license includes a sublicense of the technology licensed to us by WU.  Ceva continues to advance development of the bovine rFSH product and cumulative cash payments received to date by us from Ceva have been approximately $2 million.

On February 25, 2016, we completed the sale of our corporate headquarters, land and building, to a third party at a purchase price of $4,053,000.  The sale generated approximately $1.8 million in net cash after expenses and mortgage payoffs. In addition to agreeing to the sale, we rented back space in the building under short-term lease agreements that provide storage space required for our current level of operations.

Through our wholly owned subsidiary, BiOptix Diagnostics, Inc. ("BDI"), which we acquired in September 2016, we have developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions.  We acquired a Surface Plasma Resonance (SPR) platform which seeks to combine high sensitivity with microarray detection capability to allow researchers to understand whether their target molecules have functionality against the disease targeted. SPR is an advanced and highly sensitive optical technology that can measure refractive index changes on a sensor chip's gold surface due to a change in mass that occurs during a binding event. This change can be used to monitor biological interactions such as the concentration of target molecules, kinetic rates and affinity constants.

BDI is a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions.  BDI manufactures, sells and services instruments and consumables to pharmaceutical researchers allowing them to develop new drugs faster than by using older technologies such as enzyme-linked immunosorbent assay or "ELISA".  BDI was originally established with technology developed in conjunction with Dr. John L. "Jan" Hall, Adjoint Professor, JILA (University of Colorado), who shared the Nobel Prize for Physics in 2005 for his work on laser-based precision spectroscopy and the optical frequency comb technique. SPR is the core of the BDI products and intellectual property.  Dr. Hall, in conjunction with the scientists at BDI, created a common path interferometer that was commercialized to become the 404pi instrument.

**Company References**

In this prospectus, "Bioptix," "the Company," "we," "us," and "our" refer to Bioptix, Inc., a Colorado corporation, unless the context otherwise requires.

**OUR BUSINESS**

**Historical Operations**

We hold an exclusive license agreement with Washington University ("WU") in St. Louis which granted us an exclusive license and right to sublicense its technology for veterinary products worldwide, subject to certain exceptions.  In July 2012, we granted Ceva Sante Animale S.A. ("Ceva") an exclusive royalty-bearing license to our intellectual property and other assets, relating to recombinant single chain reproductive hormone technology for use in non-human mammals.  This license includes a sublicense of the technology licensed to us by WU.  Ceva continues to advance development of the bovine rFSH product and cumulative cash payments received to date by us from Ceva have been approximately $2 million.

On February 25, 2016, we completed the sale of our corporate headquarters, land and building, to a third party at a purchase price of $4,053,000.  The sale generated approximately $1.8 million in net cash after expenses and mortgage payoffs. In addition to agreeing to the sale, we rented back space in the building under short-term lease agreements that provide storage space required for our current level of operations.

Through our wholly owned subsidiary, BiOptix Diagnostics, Inc. ("BDI"), which we acquired in September 2016, we have developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions.  We acquired a Surface Plasma Resonance (SPR) platform which seeks to combine high sensitivity with microarray detection capability to allow researchers to understand whether their target molecules have functionality against the disease targeted. SPR is an advanced and highly sensitive optical technology that can measure refractive index changes on a sensor chip's gold surface due to a change in mass that occurs during a binding event. This change can be used to monitor biological interactions such as the concentration of target molecules, kinetic rates and affinity constants.

BDI is a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions.  BDI manufactures, sells and services instruments and consumables to pharmaceutical researchers allowing them to develop new drugs faster than by using older technologies such as enzyme-linked immunosorbent assay or "ELISA". BDI was originally established with technology developed in conjunction with Dr. John L. "Jan" Hall, Adjoint Professor, JILA (University of Colorado), who shared the Nobel Prize for Physics in 2005 for his work on laser-based precision spectroscopy and the optical frequency comb technique. SPR is the core of the BDI products and intellectual property.  Dr. Hall, in conjunction with the scientists at BDI, created a common path interferometer that was commercialized to become the 404pi instrument.

5

---

When it was acquired by us in September 2016, BDI was in the initial stages of rolling out its first commercial product, the 404pi system. BDI's initial revenue was generated in 2014 with first sales to customers including sales to leading academic researchers and biotech companies. BDI did not experience any significant seasonality to its business and provided normal terms to its customers, generally 30-60 days, net. Currently there is no back-log of orders.

Following the September 2016 acquisition of BDI, we began hiring sales, marketing and operational employees, adding a total of eight employees to the twelve hired in connection with the acquisition.

The BDI products include a reader instrument (404pi) and the consumable test products consisting of test chips (cassettes) and packaging. The instrument is assembled in-house using primarily off the shelf parts and certain customized components.  Consumable test product components are manufactured at the BDI facility using certain sub-assemblies processed by third-party contractors. Raw materials and certain sub-components are acquired from a number of suppliers.

Effective January 14, 2017, the Company adopted a plan to exit the business of BDI and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the

When it was acquired by us in September 2016, BDI was in the initial stages of rolling out its first commercial product, the 404pi system. BDI's initial revenue was generated in 2014 with first sales to customers including sales to leading academic researchers and biotech companies. BDI did not experience any significant seasonality to its business and provided normal terms to its customers, generally 30-60 days, net. Currently there is no back-log of orders.

Following the September 2016 acquisition of BDI, we began hiring sales, marketing and operational employees, adding a total of eight employees to the twelve hired in connection with the acquisition.

The BDI products include a reader instrument (404pi) and the consumable test products consisting of test chips (cassettes) and packaging. The instrument is assembled in-house using primarily off the shelf parts and certain customized components.  Consumable test product components are manufactured at the BDI facility using certain sub-assemblies processed by third-party contractors. Raw materials and certain sub-components are acquired from a number of suppliers.

Effective January 14, 2017, the Company adopted a plan to exit the business of BDI and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. Accordingly, the historical results of BDI have been classified as discontinued operations for all periods presented.

Following the recent decision to exit the BDI business, we have begun evaluating potential strategic alternatives. We expect, in the near term, to establish the primary criteria we will consider as we evaluate our next steps and strategic path forward with the goal of maximizing value for our stockholders. Additionally, we will focus on attempting to locate an acquirer or partner for the BDI operations as well as continuing to attempt to locate an interested party for the appendicitis assets.

**Company Information**

We were incorporated on July 24, 2000 in the state of Colorado under the name "AspenBio, Inc.", which was subsequently changed to AspenBio Pharma, Inc.  In December 2012, we changed our name to "Venaxis, Inc." and in 2016, in connection with our acquisition of BiOptix Diagnostics, Inc., we changed our name to "Bioptix, Inc."  Our principal executive offices are located at 834-F South Perry Street, Suite 443, Castle Rock, CO 80104 and our telephone number is (303) 794-2000. Our website address is www.venaxis.com. The information contained on, or accessible through, our website is not part of this prospectus or any prospectus supplement.

**RISK FACTORS**

Investing in our securities involves a high degree of risk. Before making an investment decision, you should carefully consider the risks, uncertainties and forward-looking statements described under "Risk Factors" in Item 1A of our most recent Annual Report on Form 10-K for the fiscal year ended December 31, 2016 filed with the Securities and Exchange Commission (the "SEC") on March 31, 2017, as amended as of April 27, 2017 and August 15, 2017, as well as information incorporated by reference into this prospectus. If any of these risks were to occur, our business, financial condition or results of operations would likely suffer. In that event, the value of our securities could decline, and you could lose part or all of your investment. The risks and uncertainties we describe are not the only ones facing us. Additional risks not presently known to us or that we currently deem immaterial may also impair our business operations. In addition, our past financial performance may not be a reliable indicator of future performance, and historical trends should not be used to anticipate results in the future.  See "Forward-Looking Statements" below.

6

**FORWARD-LOOKING STATEMENTS**

This prospectus, including the documents that we incorporate by reference, contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Exchange Act. Such forward-looking statements include those that express plans, anticipation, intent, contingency, goals, targets or future development and/or otherwise are not statements of historical fact. These forward-looking statements are based on our current expectations and projections about future events and they

## FORWARD-LOOKING STATEMENTS

This prospectus, including the documents that we incorporate by reference, contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Exchange Act. Such forward-looking statements include those that express plans, anticipation, intent, contingency, goals, targets or future development and/or otherwise are not statements of historical fact. These forward-looking statements are based on our current expectations and projections about future events and they are subject to risks and uncertainties known and unknown that could cause actual results and developments to differ materially from those expressed or implied in such statements.

In some cases, you can identify forward-looking statements by terminology, such as "expects," "anticipates," "intends," "estimates," "plans," "believes," "seeks," "may," "should", "could" or the negative of such terms or other similar expressions. Accordingly, these statements involve estimates, assumptions and uncertainties that could cause actual results to differ materially from those expressed in them. Any forward-looking statements are qualified in their entirety by reference to the factors discussed throughout this prospectus.

You should read this prospectus and the documents that we reference herein and therein and have filed as exhibits to the registration statement, of which this prospectus is part, completely and with the understanding that our actual future results may be materially different from what we expect. You should assume that the information appearing in this prospectus is accurate as of the date on the front cover of this prospectus or such prospectus supplement only. Because the risk factors referred to above, as well as the risk factors incorporated herein by reference, could cause actual results or outcomes to differ materially from those expressed in any forward-looking statements made by us or on our behalf, you should not place undue reliance on any forward-looking statements. Further, any forward-looking statement speaks only as of the date on which it is made, and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which the statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict which factors will arise. In addition, we cannot assess the impact of each factor on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. We qualify all of the information presented in this prospectus and any accompanying prospectus supplement, and particularly our forward-looking statements, by these cautionary statements.

## USE OF PROCEEDS

The net proceeds from any disposition of the shares covered hereby would be received by the selling stockholders. We will not receive any of the proceeds from the sale of our Common Stock by the selling stockholders other than the net proceeds of any warrants exercised for cash.

## DESCRIPTION OF TRANSACTIONS

On March 10, 2017, we sold $2,250,000 of units of our securities, pursuant to separate purchase agreements with certain of the selling stockholders, at a purchase price of $2.50 per unit.  Each unit consists of one share of our Common Stock and a three year warrant to purchase one share of Common Stock, at an exercise price of $3.50 per share.  On August 21, 2017, the exercise price of the warrants was adjusted to $3.00 per share following stockholder approval.

The warrants are exercisable at any time on or after the sixth month anniversary of the date of issuance and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the warrants on a cashless basis. We are prohibited from effecting an exercise of any warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such warrant.

On May 25, 2017, the Lead Investor (as defined below) waived the requirement that the securities and purchase price remain in escrow subject to the occurrence of a "Qualified Transaction" and the Common Stock and warrants and the proceeds from the sale of the Common Stock and warrants were released from escrow to the investors and the Company, respectively.

7

---

On March 15, 2017, we entered into separate securities purchase agreements pursuant to which we agreed to sell up to $4,750,000 of principal amount of Notes and three year warrants to certain of the selling stockholders.  On March 16, 2017, we satisfied all closing conditions and closed the transaction. The Notes are convertible into shares of Common Stock at an initial conversion price of $2.50.  Each warrant is exercisable

On March 15, 2017, we entered into separate securities purchase agreements pursuant to which we agreed to sell up to $4,750,000 of principal amount of Notes and three year warrants to certain of the selling stockholders.  On March 16, 2017, we satisfied all closing conditions and closed the transaction. The Notes are convertible into shares of Common Stock at an initial conversion price of $2.50.  Each warrant is exercisable into shares of Common Stock at an exercise price equal to $3.56 per share. On August 21, 2017, the exercise price of the warrants was adjusted to $3.00 per share following stockholder approval.

We are prohibited from effecting a conversion of any Note or exercise of any warrant to the extent that, as a result of any such conversion or exercise, the holder would beneficially own more than 4.99% or 9.99%, respectively, of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon conversion of such Note or exercise of such warrant, as the case may be.

On August 18, 2017, the Lead Investor waived the requirement that the securities and purchase price remain in escrow subject to the occurrence of a "Qualified Transaction" and the Notes and warrants and the proceeds from the sale of the Notes and warrants were released from escrow to the investors and the Company, respectively.

Pursuant to the terms of the transaction, on August 21, 2017, at a special meeting of our stockholders, our stockholders approved an amendment to our Articles of Incorporation authorizing the creation of 15,000,000 shares of "blank check" preferred stock.  Upon filing of a Certificate of Designations, Preferences and Rights of 0% Series A Convertible Preferred Stock with the Secretary of State, the Notes shall automatically, and without any further action on the part of the holders, be exchanged for shares of Series A Preferred Stock based on a ratio of $1.00 of stated value of Series A Preferred Stock for each $1.00 of the then outstanding principal amount plus any accrued but unpaid interest thereon, pursuant to Section 3(a)(9) of the Securities Act.  As of the date hereof, the Company had not filed the Certificate of Designations and the exchange has not been consummated.

The Lead Investor is Barry Honig who is also a selling stockholder, both individually and through GRQ Consultants, Inc. Roth 401K FBO Barry Honig, for which Mr. Honig is trustee.

## SELLING STOCKHOLDERS

This prospectus relates to the sale or other disposition of up to 5,657,161 shares of our Common Stock by the selling stockholders named below, and their donees, pledgees, transferees or other successors-in-interest selling shares of Common Stock or interests in shares of Common Stock received after the date of this prospectus from a selling stockholder as a gift, pledge, partnership distribution or other transfer, which includes:

    (i)      900,000 shares of Common Stock;

    (ii)     1,957,161 shares of Common Stock issuable upon the conversion of outstanding convertible promissory notes; and;

    (iii)    2,800,000 shares of Common Stock issuable upon the exercise of outstanding warrants.

The following table, based upon information currently known by us, sets forth as of August 21, 2017, (i) the number of shares held of record or beneficially by the selling stockholders as of such date (as determined below) and (ii) the number of shares that may be sold or otherwise disposed of under this prospectus by each selling stockholder. Percentage ownership is based on 5,403,919 shares of Common Stock outstanding as of August 21, 2017, plus securities deemed to be outstanding with respect to individual stockholders pursuant to Rule 13d-3(d)(1) under the Exchange Act. Beneficial ownership includes shares of Common Stock plus any securities held by the holder exercisable for or convertible into shares of Common Stock within 60 days after August 21, 2017, in accordance with Rule 13d-3(d)(1) under the Exchange Act. The inclusion of any shares in this table does not constitute an admission of beneficial ownership for the selling stockholder named below. We do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby.

The selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus and may sell or otherwise dispose of shares covered hereby in transactions exempt from the registration requirements of the Securities Act. Because the selling stockholders may sell or otherwise dispose of some, all or none of the shares covered hereby, and because there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares, we cannot estimate the number of the shares that will be held by the selling stockholders after completion of the offering. However, for purposes of the following table, we have assumed that all of the shares covered hereby are sold by the selling stockholders pursuant to this prospectus.

8

None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities. Unless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law. Unless otherwise indicated below, to our knowledge, no persons named in the table are a broker-dealer or affiliate of a broker-dealer.  Unless otherwise indicated, all addresses are c/o Bioptix, Inc., 834-F South Perry Street, Suite 443, Castle Rock, CO 80104.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northurst Inc. | 555,400 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600 (10) | * | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 593,650 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | * | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | * | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | * | 20,000 (23) | 0 | * |

\*   Less than 1%.
\*\*  Based on 5,403,919 shares of Common Stock outstanding as of August 21, 2017.

9

(1)      Adam Arviv is the President of Acquisition Group Limited. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Yorkville Ave, Suite 604, Toronto, Ontario M5RIC2.

(2)      Jake Malczewski is the Controlling Shareholder of Northurst Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 400,000 shares of Common Stock and (ii) 155,400 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 244,600 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares of Common Stock offered in this offering, includes the 244,600 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Cragmore Ave, Pointe-Claire, Quebec, H9R 5M1 .

(3)      Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 11290 Chalon Road, Los Angeles CA 90049.

(4)      Mark Groussman is the President of Melechdavid Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 170,000 shares of Common Stock and (ii) 170,000 shares of Common Stock issuable upon exercise of

(1)      Adam Arviv is the President of Acquisition Group Limited. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Yorkville Ave, Suite 604, Toronto, Ontario M5RIC2.

(2)      Jake Malczewski is the Controlling Shareholder of Northurst Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 400,000 shares of Common Stock and (ii) 155,400 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 244,600 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares of Common Stock offered in this offering, includes the 244,600 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Cragmore Ave, Pointe-Claire, Quebec, H9R 5M1 .

(3)      Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 11290 Chalon Road, Los Angeles CA 90049.

(4)      Mark Groussman is the President of Melechdavid Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 170,000 shares of Common Stock and (ii) 170,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(5)      Mark Groussman is the Custodian of Mark Groussman c/f Alivia Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(6)      Mark Groussman is the Custodian of Mark Groussman c/f Asher Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(7)      Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by GRQ Consultants, Inc. 401K ("401K"), (iii) 30,600 shares of Common Stock held by GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("Roth 401K") and (iv) 39,860 shares of Common Stock issuable upon exercise of outstanding warrants held by Mr. Honig. Mr. Honig is the trustee of 401K and Roth 401K in such capacity holds voting and dispositive power over the securities held by such entities. Excludes (i) 170,000 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation, (ii) 160,140 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation, (iii) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation, and (iv) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(8)      Represents (i) 206,017 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(9)      Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by 401K and (iii) 30,600 shares of Common Stock held by Roth 401K. Mr. Honig is the trustee of 401K and Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entities.

(10)      Represents 30,600 shares of Common Stock. Excludes 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, and 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contain a 4.99% and 9.99% beneficial ownership limitation, respectively.  Mr. Honig is the trustee of Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entity. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(11)      Represents (i) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation.

(12)      Jonathan Honig is the Manager of Titan Multi-Strategy Fund I, Ltd. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 55,000 shares of Common Stock and (ii) 538,650 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes (i) 822,816 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation and (ii) 256,226 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation.  The address for this selling stockholder is 5825 Windsor Court, Boca Raton, FL 33496

(10)     Represents 30,600 shares of Common Stock. Excludes 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, and 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contain a 4.99% and 9.99% beneficial ownership limitation, respectively.  Mr. Honig is the trustee of Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entity. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(11)     Represents (i) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation.

(12)     Jonathan Honig is the Manager of Titan Multi-Strategy Fund I, Ltd. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 55,000 shares of Common Stock and (ii) 538,650 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes (i) 822,816 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation and (ii) 256,226 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation.  The address for this selling stockholder is 5825 Windsor Court, Boca Raton, FL 33496

(13)     Represents (i) 40,000 shares of Common Stock and (ii) 824,066 shares of Common Stock issuable upon conversion of a convertible promissory note and (Iii) 840,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(14)     Candice Merren-Yates and Ghislian Ghyoot are the Authorized Signatories of US Commonwealth Life, A.I. Policy No. 2013-17. In such capacity they share voting and dispositive control over the securities held by such entity. Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants.  The address for this selling stockholder is 304 Ponce de Leon, Suite 1000, San Juan, Puerto Rico, 00918.

(15)     Represents (i) 41,204 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants.  Mr. O'Braitis is affiliated with a broker-dealer and may be deemed a statutory underwriter of the shares. The address for this selling stockholder is 43811 Grantner Pl, Ashburn, VA 20147.

(16)     Adrian James is the President & CEO of Stockwire Research Group, Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants.  The address for this selling stockholder is 3736 Bee Caves Road, Suite 1-105, Austin, TX 78746.

(17)     Edward Karr is the Managing Member of Aifos Capital LLC.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 61,805 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 60,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is Aifos Capital LLC, CP 5452, CH-1211 Geneva 11, Switzerland.

(18)     John Stetson is the Managing Member of Stetson Capital Management, LLC. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 7,500 shares of Common Stock, (ii) 75,800 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 130,217 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation.  The address for this selling stockholder is 68 Fiesta Way, Ft. Lauderdale, FL 33301.

(19)     Represents (i) 206,017 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(20)     Jason Theofilos is the Director of JAD Capital Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 41,204 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, Canada L4B 4V1.

(21)     Represents (i) 57,187 shares of Common Stock, (ii) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants.  The address for this selling stockholder is 51 Lord's Highway East, Weston, CT 06883.

(22)     Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(23)     Represents (i) 10,000 shares of Common Stock and (ii) 10,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 200 East 69 St, Apt 21B, New York, NY 10021.

## PLAN OF DISTRIBUTION

Each selling stockholder of the Common Stock and any of their pledgees, assignees and successors-in-interest may, from time to time, sell any or all of their shares of Common Stock on The NASDAQ Capital Market or any other stock exchange, market or trading facility on which the shares are traded or in private transactions. These sales may be at fixed or negotiated prices. A selling stockholder may use any one or more of the following methods when selling shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- settlement of short sales entered into after the effective date of the registration statement of which this prospectus is a part;

- broker-dealers may agree with the selling stockholders to sell a specified number of such shares at a stipulated price per share;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

- a combination of any such methods of sale; or

- any other method permitted pursuant to applicable law.

The selling stockholders may also sell shares under Rule 144 under the Securities Act of 1933, as amended, if available, rather than under this prospectus.

Broker-dealers engaged by the selling stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the selling stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated, but, except as set forth in a supplement to this prospectus, in the case of an agency transaction not in excess of a customary brokerage commission in compliance with FINRA Rule 2440; and in the case of a principal transaction a markup or markdown in compliance with FINRA IM-2440.

In connection with the sale of the Common Stock or interests therein, the selling stockholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the Common Stock in the course of hedging the positions they assume. The selling stockholders may also sell shares of the Common Stock short and deliver these securities to close out their short positions, or loan or pledge the Common Stock to broker-dealers that in turn may sell these securities. The selling stockholders may also enter into option or other transactions with broker-dealers or other financial institutions or the creation of one or more derivative securities which require the delivery to such broker-dealer or other financial institution of shares offered by this prospectus, which shares such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

12

The selling stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act of 1933, as amended, in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act of 1933, as amended. Each selling stockholder has informed us that it does not have any written or oral agreement or

The selling stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act of 1933, as amended, in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act of 1933, as amended. Each selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock.

We are required to pay certain fees and expenses incurred by us incident to the registration of the shares. We have agreed to indemnify the selling stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act of 1933, as amended.

Because selling stockholders may be deemed to be "underwriters" within the meaning of the Securities Act of 1933, as amended, they will be subject to the prospectus delivery requirements of the Securities Act of 1933, as amended, including Rule 172 thereunder. In addition, any securities covered by this prospectus which qualify for sale pursuant to Rule 144 under the Securities Act of 1933, as amended may be sold under Rule 144 rather than under this prospectus. There is no underwriter or coordinating broker acting in connection with the proposed sale of the resale shares by the selling stockholders.

We agreed to keep this prospectus effective until the earlier of (i) the date on which the shares may be resold by the selling stockholders without registration and without the requirement to be in compliance with Rule 144(c)(1) and otherwise without restriction or limitation pursuant to Rule 144 or (ii) all of the shares have been sold pursuant to this prospectus or Rule 144 under the Securities Act or any other rule of similar effect. The resale shares will be sold only through registered or licensed brokers or dealers if required under applicable state securities laws. In addition, in certain states, the resale shares may not be sold unless they have been registered or qualified for sale in the applicable state or an exemption from the registration or qualification requirement is available and is complied with.

Under applicable rules and regulations under the Securities Exchange Act of 1934, as amended, any person engaged in the distribution of the resale shares may not simultaneously engage in market making activities with respect to the Common Stock for the applicable restricted period, as defined in Regulation M, prior to the commencement of the distribution. In addition, the selling stockholders will be subject to applicable provisions of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, including Regulation M, which may limit the timing of purchases and sales of shares of the Common Stock by the selling stockholders or any other person. We will make copies of this prospectus available to the selling stockholders and have informed them of the need to deliver a copy of this prospectus to each purchaser at or prior to the time of the sale (including by compliance with Rule 172 under the Securities Act of 1933, as amended).

## DESCRIPTION OF CAPITAL STOCK

### General

The following description of our capital stock summarizes the material terms and provisions of our Common Stock. For the complete terms of our Common Stock, please refer to our Articles of Incorporation and our Bylaws that are incorporated by reference into the registration statement of which this prospectus is a part or may be incorporated by reference in this prospectus. The terms of these securities may also be affected by the Colorado Revised Statutes. The summary below is qualified in its entirety by reference to our amended and restated Articles of Incorporation and our amended and restated Bylaws.

As of the date of this prospectus, our authorized capital stock consisted of 60,000,000 shares of Common Stock, no par value per share. As of the date of this prospectus, there were 5,403,919 shares of our Common Stock issued and outstanding.

### Common Stock

Holders of Common Stock are entitled to one vote for each share held on all matters submitted to a vote of shareholders, except that in the election of directors each shareholder shall have as many votes for each share held by him, her or it as there are directors to be elected and for whose election the shareholder has a right to vote.  Cumulative voting is not permitted. Generally, all matters to be voted on by shareholders must be approved by a majority, or, in the case of the election of directors, by a plurality, of the votes cast at a meeting at which a quorum is present. Holders of outstanding shares of our Common Stock are entitled to those dividends declared by the Board of Directors out of legally available funds, and, in the event of our liquidation, dissolution or winding up of our affairs, holders are entitled to receive ratably our net assets available to the shareholders.  Holders of our outstanding Common Stock have no preemptive, conversion or redemption rights.  All of the issued and outstanding shares of our Common Stock are, and all unissued shares of our Common Stock, when offered and sold will be, duly authorized, validly issued, fully paid and nonassessable.  To the extent that additional shares of our Common Stock may be issued in the future, the relative interests of the then existing shareholders may be diluted.

## Warrants

On March 10, 2017, we issued to purchasers of our units warrants to purchase an aggregate of 900,000 shares of Common Stock. The warrants were exercisable at a price of $3.50 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the warrants on a cashless basis. We are prohibited from effecting an exercise of any warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such warrant.  55.5556% of the warrants (and common stock) issued to each investor were being held in escrow pending the satisfaction of certain release conditions. On May 25, 2017, the warrants (and associated shares of common stock) and the proceeds from the sale therefrom were released from escrow to the investors and the Company, respectively, and no longer remain subject to a "Qualified Transaction."

On March 16, 2017, we issued warrants to purchase an aggregate of 1,900,000 shares of Common Stock with each warrant based upon the number of shares of Common Stock equal to 100% of such investor's subscription amount divided by the conversion price of $2.50. The warrants were exercisable at a price of $3.56 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the warrants on a cashless basis. We are prohibited from effecting an exercise of any warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such warrant.  The warrants issued to each investor were held in escrow pending the satisfaction of certain release conditions. On August 18, 2017, the warrants (and associated Notes) and the proceeds from the sale therefrom were released from escrow to the investors and the Company, respectively, and no longer remain subject to a "Qualified Transaction."

On August 21, 2017, at a special meeting of our stockholders, our stockholders approved an amendment to the exercise price of the warrants issued on March 10, 2017 and March 16, 2017 to $3.00 per share.

If we, at any time while the warrants are outstanding: (i) pay a stock dividend or otherwise make a distribution or distributions payable in shares of Common Stock or any Common Stock equivalents (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company upon exercise of the warrants), (ii) subdivide outstanding shares of Common Stock into a larger number of shares, (iii) combine (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares or (iv) issue, in the event of a reclassification of shares of the Common Stock, any shares of capital stock, then the exercise price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding any treasury shares of the Company) outstanding immediately before such event, and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event.

## Convertible Promissory Notes

The Notes are convertible at a per share price of $2.50 per share, subject to adjustment, and conversion shares will be issued at any time after we have received approval of the transaction from our stockholders as required by Nasdaq Listing Rule 5635. At any time, a selling stockholder may submit a conversion notice indicated its intent to convert its Note.  The number of shares of Common Stock issuable upon a conversion shall be determined by the quotient obtained by dividing the outstanding principal amount of such holder's Note to be converted by the conversion price. We are prohibited from effecting a conversion of any Note to the extent that, as a result of any such exercise, the holder would beneficially own more than 4.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon conversion of such Note.

Except as otherwise provided in the Note, we may not prepay or redeem the Note in whole or in part without the prior written consent of the holder, and to the extent we agree with other holders to prepay or redeem other Notes in whole or in part, we shall offer such prepayment or redemption of the Note on a pro rata basis on the same terms and conditions.

If we, at any time while the Note is outstanding: (i) pay a stock dividend or otherwise make a distribution or distributions payable in shares of Common Stock or any Common Stock equivalents (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company upon conversion of the Notes), (ii) subdivide outstanding shares of Common Stock into a larger number of shares, (iii) combine (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares or (iv) issue, in the event of a

If we, at any time while the Note is outstanding: (i) pay a stock dividend or otherwise make a distribution or distributions payable in shares of Common Stock or any Common Stock equivalents (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company upon conversion of the Notes), (ii) subdivide outstanding shares of Common Stock into a larger number of shares, (iii) combine (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares or (iv) issue, in the event of a reclassification of shares of the Common Stock, any shares of capital stock, then the conversion price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding any treasury shares of the Company) outstanding immediately before such event, and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event.

Holders of the Notes shall be entitled to receive, and we shall pay, cumulative interest on the outstanding principal amount of the Note at the annual rate of two (2%) percent (all subject to increase as set forth in the Note), payable on the maturity date of September 16, 2018 in cash or shares issuable in lieu of the cash payment of interest on the Notes in accordance with the terms of the Notes. Interest on the Notes shall be calculated on the basis of a 360-day year and the actual number of days elapsed. Payments made in connection with the Notes shall be applied first to amounts due thereunder other than principal and interest, thereafter to interest and finally to principal. Conversion privileges set forth in the Notes shall remain in full force and effect immediately from the date thereof and until the Note is paid in full.

On August 18, 2017, the Lead Investor waived the requirement that the securities and purchase price remain in escrow subject to the occurrence of a "Qualified Transaction" and the Notes and warrants and the proceeds from the sale of the Notes and warrants were released from escrow to the investors and the Company, respectively.

Pursuant to the terms of the transaction, on August 21, 2017, at a special meeting of our stockholders, our stockholders approved an amendment to our Articles of Incorporation authorizing the creation of 15,000,000 shares of "blank check" preferred stock. On the filing date of the Certificate of Designation, the Notes shall automatically, and without any further action on the part of the holders, be exchanged for shares of Series A Preferred Stock based on a ratio of $1.00 of stated value of Series A Preferred Stock for each $1.00 of the then outstanding principal amount plus any accrued but unpaid interest thereon, pursuant to Section 3(a)(9) of the Securities Act. As of the date hereof, the Company has not filed the Certificate of Designations and the exchange has not been consummated.

**Anti-Takeover Effects of Certain Provisions of our Articles of Incorporation, Bylaws and the Colorado Revised Statutes ("CRS")**

Certain provisions of our Articles of Incorporation and Bylaws, which are summarized in the following paragraphs, may have the effect of discouraging potential acquisition proposals or making a tender offer or delaying or preventing a change in control, including changes a stockholder might consider favorable. Such provisions may also prevent or frustrate attempts by our stockholders to replace or remove our management. In particular, the Articles of Incorporation and Bylaws and Colorado law, as applicable, among other things:

? provide the board of directors with the ability to alter the Bylaws without stockholder approval;

? place limitations on the removal of directors; and

? provide that vacancies on the board of directors may be filled by a majority of directors in office, although less than a quorum.

These provisions are expected to discourage certain types of coercive takeover practices and inadequate takeover bids and to encourage persons seeking to acquire control of us to first negotiate with our board. These provisions may delay or prevent someone from acquiring or merging with us, which may cause our market price of our Common Stock to decline.

15

**Limitations on Liability, Indemnification of Officers and Directors and Insurance**

Our Articles of Incorporation and Bylaws require us to indemnify any person entitled to indemnity under the CRS, as it currently exists or may be amended, to the fullest extent permitted by the CRS, and, to the maximum extent permitted by the CRS, purchase and maintain insurance providing such indemnification.

Our Bylaws specifically sets forth that we shall indemnify any proper person against reasonably incurred expenses (including attorneys' fees), judgments, penalties, fines (including any excise tax assessed with respect to an employee benefit plan) and amounts paid in settlement reasonably incurred by him in connection with such action, suit or proceeding if it is determined that he conducted himself in good faith and that he

**Limitations on Liability, Indemnification of Officers and Directors and Insurance**

Our Articles of Incorporation and Bylaws require us to indemnify any person entitled to indemnity under the CRS, as it currently exists or may be amended, to the fullest extent permitted by the CRS, and, to the maximum extent permitted by the CRS, purchase and maintain insurance providing such indemnification.

Our Bylaws specifically sets forth that we shall indemnify any proper person against reasonably incurred expenses (including attorneys' fees), judgments, penalties, fines (including any excise tax assessed with respect to an employee benefit plan) and amounts paid in settlement reasonably incurred by him in connection with such action, suit or proceeding if it is determined that he conducted himself in good faith and that he reasonably believed (i) in the case of conduct in his official capacity with the corporation, that his conduct was in the corporation's best interests, or (ii) in all other cases (except criminal cases), that his conduct was at least not opposed to the corporation's best interests, or (iii) in the case of any criminal proceeding, that he had no reasonable cause to believe his conduct was unlawful. Official capacity means, when used with respect to a director, the office of director and, when used with respect to any other proper person, the office in a corporation held by the officer or the employment, fiduciary or agency relationship undertaken by the employee, fiduciary, or agent on behalf of the corporation.

**Authorized but Unissued Shares**

Our authorized but unissued shares of Common Stock will be available for future issuance without your approval. We may use additional shares for a variety of purposes, including future public offerings to raise additional capital, to fund acquisitions and as employee compensation. The existence of authorized but unissued shares of Common Stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

**Transfer Agent and Registrar**

The transfer agent and registrar for our Common Stock is Corporate Stock Transfer, Inc., Denver, Colorado.

**LEGAL MATTERS**

The validity of the issuance of the securities offered hereby will be passed upon for us by counsel. Additional legal matters may be passed upon for us or any underwriters, dealers or agents, by counsel that we will name in the applicable prospectus supplement.

**EXPERTS**

The consolidated balance sheet of Bioptix, Inc. and Subsidiary, as of December 31, 2016, and the related consolidated statements of operations, stockholders' equity, and cash flows for the year then ended, have been audited by EisnerAmper LLP, independent registered public accounting firm, as stated in their report which is incorporated herein by reference, which report includes an explanatory paragraph relating to auditing the adjustments to the 2015 financial statements to retrospectively reflect the reverse stock split.  Such financial statements have been incorporated herein by reference in reliance on the report of such firm given upon their authority as experts in accounting and auditing.

The audited financial statements, incorporated herein by reference, for the year ended December 31, 2015 have been audited by GHP Horwath, P.C. ("GHP"), independent registered public accounting firm, for the period and to the extent set forth in their report.  Their report includes an explanatory paragraph relating to the effects of the adjustments to retroactively apply the impact of the reverse stock split to the December 31, 2015 financial statements. Such financial statements have been so incorporated in reliance upon the report of such firm given upon the firm's authority as an expert in auditing and accounting.

Effective January 1, 2017, the partners and employees of GHP joined another independent registered public accounting firm.  As of January 13, 2017, the client-auditor relationship between us and GHP ceased.  On February 3, 2017, our Board of Directors appointed EisnerAmper LLP as our independent registered public accounting firm.

16

**WHERE YOU CAN FIND MORE INFORMATION**

This prospectus constitutes a part of a registration statement on Form S-3 filed under the Securities Act.  As permitted by the SEC's rules,

## WHERE YOU CAN FIND MORE INFORMATION

This prospectus constitutes a part of a registration statement on Form S-3 filed under the Securities Act. As permitted by the SEC's rules, this prospectus and any prospectus supplement, which form a part of the registration statement, do not contain all the information that is included in the registration statement. You will find additional information about us in the registration statement. Any statements made in this prospectus or any prospectus supplement concerning legal documents are not necessarily complete and you should read the documents that are filed as exhibits to the registration statement or otherwise filed with the SEC for a more complete understanding of the document or matter.

We file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read, without charge, and copy the documents we file at the SEC's public reference rooms in Washington, D.C. at 100 F Street, NE, Room 1580, Washington, DC 20549, or in New York, New York and Chicago, Illinois. You can request copies of these documents by writing to the SEC and paying a fee for the copying cost. Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms. Our SEC filings are also available to the public at no cost from the SEC's website at http://www.sec.gov. In addition, we make available on or through our Internet site copies of these reports as soon as reasonably practicable after we electronically file or furnish them to the SEC. Our Internet site can be found at www.venaxis.com.

## INCORPORATION OF DOCUMENTS BY REFERENCE

We have filed a registration statement on Form S-3 with the Securities and Exchange Commission under the Securities Act. This prospectus is part of the registration statement but the registration statement includes and incorporates by reference additional information and exhibits. The Securities and Exchange Commission permits us to "incorporate by reference" the information contained in documents we file with the Securities and Exchange Commission, which means that we can disclose important information to you by referring you to those documents rather than by including them in this prospectus. Information that is incorporated by reference is considered to be part of this prospectus and you should read it with the same care that you read this prospectus. Information that we file later with the Securities and Exchange Commission will automatically update and supersede the information that is either contained, or incorporated by reference, in this prospectus, and will be considered to be a part of this prospectus from the date those documents are filed. We have filed with the Securities and Exchange Commission, and incorporate by reference in this prospectus:

- Annual Report on Form 10-K for the year ended December 31, 2016 filed on March 31, 2017 and the Annual Reports on Form 10-K/A filed on April 27, 2017 and August 15, 2017;

- Quarterly Reports on Form 10-Q filed on May 15, 2017 and August 11, 2017;

- Definitive Proxy Statement 14A filed on July 10, 2017;

- Current Reports on Form 8-K or Form 8-K/A (excluding any reports or portions thereof that are deemed to be furnished and not filed) filed on January 6, 2017, January 11, 2017, January 20, 2017, January 20, 2017, February 8, 2017, February 9, 2017, February 9, 2017, March 16, 2017, March 17, 2017, April 7, 2017, April 13, 2017, May 8, 2017, May 18, 2017, May 25, 2017, June 15, 2017, July 3, 2017, August 18, 2017 and August 23, 2017.

We also incorporate by reference all additional documents that we file with the Securities and Exchange Commission under the terms of Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act that are made after the date of the initial registration statement but prior to effectiveness of the registration statement and after the date of this prospectus but prior to the termination of the offering of the securities covered by this prospectus. We are not, however, incorporating, in each case, any documents or information that we are deemed to furnish and not file in accordance with Securities and Exchange Commission rules.

You may request, and we will provide you with, a copy of these filings, at no cost, by calling us at (303) 545-5550 or by writing to us at the following address:

Bioptix, Inc.
834-F South Perry Street, Suite 443
Castle Rock, CO 80104
(303) 794-2000

17

## PART II

## INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 14.  Other Expenses of Issuance and Distribution.**

    The following table sets forth an estimate of the fees and expenses relating to the issuance and distribution of the securities being registered hereby, other than underwriting discounts and commissions, all of which shall be borne by the Registrant.  All of such fees and expenses, except for the SEC registration fee are estimated:

| | | |
|---|---|---:|
| SEC registration fee | $ | 2,724 |
| Transfer agent's fees and expenses | $ | 1,000 |
| Legal fees and expenses | $ | 10,000 |
| Printing fees and expenses | $ | 1,000 |
| Accounting fees and expenses | $ | 7,500 |
| Miscellaneous fees and expenses | $ | 776 |
| Total | $ | 23,000 |

**Item 15.  Indemnification of Officers and Directors.**

    Our Articles of Incorporation and Bylaws require us to indemnify our officers, directors, employees and agents against reasonably incurred expenses (including legal fees), judgments, penalties, fines and amounts incurred in the settlement of any action, suit or proceeding if it is determined that such person conducted himself in good faith and that he reasonably believed (i) in the case of conduct in his official capacity, that his conduct was in our best interest, (ii) in all other cases (except criminal proceedings) that his conduct was at least not opposed to our best interests, or (iii) in the case of any criminal proceeding, that he has no reasonable cause to believe that his conduct was unlawful.

    This determination shall be made by a majority vote of directors at a meeting at which a quorum is present, provided however that the quorum can only consist of directors not parties to the proceeding.  If a quorum cannot be obtained, the determination may be made by a majority vote of a committee of the board, consisting of two or more directors who are not parties to the proceeding.  Directors who are parties to the proceeding may participate in the designation of members to serve on the committee.  If a quorum of the board or a committee cannot be established, the determination may be made (i) by independent legal counsel selected by a vote of the board of directors or committee in the manner described in this paragraph or, if a quorum cannot be obtained or a committee cannot be established, by independent legal counsel selected by a majority of the full board (including directors who are parties to the proceeding) or (ii) by a vote of the shareholders.  Any officer, director, employee or agent may seek court-ordered indemnification from the court conducting the proceeding.  The court may then determine whether such person should be entitled to indemnification.

    Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of us pursuant to the foregoing provisions, or otherwise, we have been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable.  In the event that a claim for indemnification against such liabilities (other than the payment by us of expenses incurred or paid by a director, officer or controlling person of the Company in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, we will, unless in the opinion of our counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by us is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

    Section 7-108-402 of the Colorado Business Corporation Act (the "Act") provides, generally, that the Articles of Incorporation may contain a provision eliminating or limiting the personal liability of a director to the corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except that any such provision shall not eliminate or limit the liability of a director (i) for any breach of the director's duty of loyalty to the corporation or its shareholders, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) acts specified in Section 7-108-403 of the Act (unlawful distributions), or (iv) any transaction from which the director directly or indirectly derived an improper personal benefit. Such provision may not eliminate or limit the liability of a director for any act or omission occurring prior to the date on which such provision becomes effective.  Our Articles of Incorporation contain such a provision.

Section 7-109-103 of the Act provides, that a corporation organized under Colorado law shall be required to indemnify a person who is or was a director of the corporation or an individual who, while serving as a director of the corporation, is or was serving at the corporation's request as a director, an officer, an agent, an associate, an employee, a fiduciary, a manager, a member, a partner, a promoter, or a trustee of, or to hold any similar position with, another domestic or foreign corporation or other person or of an employee benefit plan (a "Director") of the corporation and who was wholly successful, on the merits or otherwise, in the defense of any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal (a "Proceeding"), in which he was a party, against reasonable expenses incurred by him in connection with the Proceeding, unless such indemnity is limited by the corporation's Articles of Incorporation.

Section 7-109-102 of the Act provides, generally, that a corporation may indemnify a person made a party to a Proceeding because the person is or was a Director against any obligation incurred with respect to a Proceeding to pay a judgment, settlement, penalty, fine (including an excise tax assessed with respect to an employee benefit plan) or reasonable expenses incurred in the Proceeding if the person conducted himself or herself in good faith and the person reasonably believed, in the case of conduct in an official capacity with the corporation, the person's conduct was in the corporation's best interests and, in all other cases, his or her conduct was at least not opposed to the corporation's best interests and, with respect to any criminal proceedings, the person had no reasonable cause to believe that his or her conduct was unlawful.  A corporation may not indemnify a Director in connection with any Proceeding by or in the right of the corporation in which the Director was adjudged liable to the corporation or, in connection with any other Proceeding charging that the Director derived an improper personal benefit, whether or not involving actions in an official capacity, in which Proceeding the Director was judged liable on the basis that he or she derived an improper personal benefit. Any indemnification permitted in connection with a Proceeding by or in the right of the corporation is limited to reasonable expenses incurred in connection with such Proceeding.

## Item 16.  Exhibits.

a) Exhibits.

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Amended and Restated Articles of Incorporation filed March 30, 2016 (Incorporated by reference from the Registrant's Current Report on Form 8-K, filed March 29, 2016) |
| 3.2 | Articles of Amendment to the Articles of Incorporation filed November 30, 2016 (Incorporated by reference from the Registrant's Current Report on Form 8-K, filed December 2, 2016) |
| 3.3 | Amended and Restated Bylaws, effective March 27, 2008 (Incorporated by reference from the Registrant's Quarterly Report on Form 10-Q, filed May 15, 2008) |
| 5.1 | Opinion of counsel as to the legality of the securities being registered |
| 23.1 | Consent of counsel (included in Exhibit 5.1) |
| 23.2 | Consent of EisnerAmper LLP |
| 23.3 | Consent of GHP Horwath, P.C. |
| 24.1 | Power of Attorney (included on signature pages to the registration statement) |

19

## Item 17.  Undertakings.

(a)    The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the

**Item 17.   Undertakings.**

(a)    The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

*provided*, *however*, that paragraphs (a)(1)(i), (a)(1)(ii), and (a)(1)(iii) above do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement, or is contained in a form of prospectus filed pursuant to Rule 424(b) that is a part of the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(b)    The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(c)    Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

20

---

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on this Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Castle Rock, State of Colorado on the 24th day of August, 2017.

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on this Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Castle Rock, State of Colorado on the 24th day of August, 2017.

/s/ Michael M. Beeghley
Michael M. Beeghley
Chief Executive Officer
(Principal Executive Officer)

/s/ Jeffrey G. McGonegal
Jeffrey G. McGonegal
Chief Financial Officer
(Principal Financial and Accounting Officer)

The Registrant and each person whose signature appears below hereby appoint Michael M. Beeghley and Jeffrey G. McGonegal as their attorneys-in-fact, with full power of substitution, to execute in their names and on behalf of the Registrant and each such person, individually and in each capacity stated below, one or more amendments (including post-effective amendments and registration statements filed pursuant to Rule 462(b) under the Securities Act of 1933, as amended and otherwise) to this Registration Statement as the attorney-in-fact acting on the premise shall from time to time deem appropriate and to file any such amendment to this Registration Statement with the Securities and Exchange Commission.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Michael M. Beeghley<br>Michael M. Beeghley | Chief Executive Officer, Director<br>(Principal Executive Officer) | August 24, 2017 |
| /s/ Jeffrey G. McGonegal<br>Jeffrey G. McGonegal | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | August 24, 2017 |
| /s/ John R. O'Rourke<br>John R. O'Rourke | Director | August 24, 2017 |
| /s/ Mike Dai<br>Mike Dai | Director | August 24, 2017 |
| /s/ Andrew Kaplan<br>Andrew Kaplan | Director | August 24, 2017 |

21

# FORM S-3 (Amendment No.3 ), as filed with the Securities and Exchange Commission on September 25, 2017

S-3/A 1 bioptix_s3.htm FORM S-3 AMENDMENT NO 3

**As filed with the Securities and Exchange Commission on September 25, 2017**

Registration No. 333-217397

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM S-3**
**(Amendment No. 3 )**

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# BIOPTIX, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Nevada** | **84-155337** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

**Jeffrey G. McGonegal**
**Chief Financial Officer**
**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

**Approximate date of commencement of proposed sale to the public:** From time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box.   ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box.   ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.   ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.   ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box.   ☐

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box.   ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box.   ☐

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of " *large accelerated filer* ", " *accelerated filer* ", " *smaller reporting company* " and "*emerging growth company*" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ? | Accelerated filer ? | Non-accelerated filer ? (do not check if smaller reporting company) | Smaller reporting company ? | Emerging growth company ? |
| --- | --- | --- | --- | --- |

### CALCULATION OF REGISTRATION FEE

| Title of each class of securities to be registered | Amount to be Registered(1) | Proposed maximum offering price per share | Proposed maximum aggregate offering price | Amount of registration fee |
| --- | --- | --- | --- | --- |
| Common stock, no par value per share | 900,000 | $ 4.16 (2) | $ 3,739,500 | $ 433.41 |
| Common stock, no par value per share, issuable upon conversion of Series A Convertible Preferred Stock (3) | 1,977,102 | $ 4.16 (2) | $ 8,214,859 | $ 952.10 |
| Common stock, no par value per share, issuable upon exercise of warrants | 2,800,000 | $ 4.16 (2) | $ 11,634,000 | $ 1,348.38 |
| TOTAL | 5,677,102 | $ 4.16 | $ 23,588,359 | $ 2,733.89* |

(1) Pursuant to Rule 416 under the Securities Act of 1933, as amended, this registration statement also covers such additional shares as may hereafter be issued resulting from stock splits, stock dividends, recapitalizations or certain other capital adjustments.

(2) Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(c) under the Securities Act of 1933, as amended.  In accordance with Rule 457(c) of the Securities Act of 1933, as amended, the price shown is the average of the high and low sales prices of the Common Stock on April 17, 2017 as reported on The NASDAQ Capital Market.

(3) Includes shares of Common Stock issuable in connection with a 2% annual dividend, computed for a period of eighteen (18) months.

*   $2,724.29 Previously Paid.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment that specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until this Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

**The information in this prospectus is not complete and may be changed. We may not sell these securities or accept an offer to buy these securities until the Securities and Exchange Commission declares our registration statement effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.**

**SUBJECT TO COMPLETION, DATED September 25, 2017**

**PROSPECTUS**

**BIOPTIX, INC.**

The information in this prospectus is not complete and may be changed. We may not sell these securities or accept an offer to buy these securities until the Securities and Exchange Commission declares our registration statement effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

**SUBJECT TO COMPLETION, DATED September 25, 2017**

**PROSPECTUS**

**BIOPTIX, INC.**

**900,000 Shares of Common Stock Offered by the Selling Stockholders**
**1,977,102 Shares of Common Stock Issuable Upon Conversion of 2% Series A Convertible Preferred Stock by the Selling Stockholders**
**2,800,000 Shares of Common Stock Issuable Upon Exercise of Warrants Offered by the Selling Stockholders**

This prospectus relates to the disposition from time to time of 5,677,102 shares of common stock, no par value per share (the "Common Stock"), which includes (i) 900,000 shares of Common Stock, (ii) 1,977,102 shares of Common Stock issuable upon the conversion of 19,194.72 outstanding shares of Series A Convertible Preferred Stock and 57,630 shares of Common Stock issuable in connection with a 2% annual dividend, computed for a period of eighteen (18) months (the "Series A Preferred Stock") and (iii) 2,800,000 shares of Common Stock issuable upon the exercise of outstanding warrants held by the selling stockholders named in this prospectus. We will not receive any of the proceeds from the sale of shares by the selling stockholders .

The selling stockholders may sell the shares of Common Stock described in this prospectus in a number of different ways and at varying prices. We provide more information about how the selling stockholders may sell their shares of Common Stock in the section entitled "Plan of Distribution" on page 8. The selling stockholders will bear all commissions and discounts, if any, attributable to the sale or disposition of the shares, or interests therein. We will bear all costs, expenses and fees in connection with the registration of the shares. We will not be paying any underwriting discounts or commissions in this offering.

Our Common Stock is presently listed on The NASDAQ Capital Market under the symbol "BIOP."  On September 22, 2017 the last reported sale price of our Common Stock was $4.27.

**Investing in our securities involves various risks.  See "Risk Factors" contained herein for more information on these risks.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities, or passed upon the adequacy or accuracy of this prospectus or any accompanying prospectus supplement.  Any representation to the contrary is a criminal offense.**

The date of this Prospectus is September 25, 2017.

**TABLE OF CONTENTS**

| | Page |
|---|---|
| OUR BUSINESS | 1 |
| RISK FACTORS | 2 |
| FORWARD-LOOKING STATEMENTS | 3 |
| USE OF PROCEEDS | 3 |
| SELLING STOCKHOLDERS | 4 |
| PLAN OF DISTRIBUTION | 8 |
| DESCRIPTION OF CAPITAL STOCK | 9 |
| LEGAL MATTERS | 12 |
| EXPERTS | 12 |

**TABLE OF CONTENTS**

| | Page |
|---|---|
| OUR BUSINESS | 1 |
| RISK FACTORS | 2 |
| FORWARD-LOOKING STATEMENTS | 3 |
| USE OF PROCEEDS | 3 |
| SELLING STOCKHOLDERS | 4 |
| PLAN OF DISTRIBUTION | 8 |
| DESCRIPTION OF CAPITAL STOCK | 9 |
| LEGAL MATTERS | 12 |
| EXPERTS | 12 |
| WHERE YOU CAN FIND MORE INFORMATION | 13 |
| INCORPORATION OF DOCUMENTS BY REFERENCE | 13 |

4

**Company References**

In this prospectus, "Bioptix," "the Company," "we," "us," and "our" refer to Bioptix, Inc., a Colorado corporation, unless the context otherwise requires.

**OUR BUSINESS**

**Historical Operations**

We hold an exclusive license agreement with Washington University ("WU") in St. Louis which granted us an exclusive license and right to sublicense its technology for veterinary products worldwide, subject to certain exceptions.  In July 2012, we granted Ceva Sante Animale S.A. ("Ceva") an exclusive royalty-bearing license to our intellectual property and other assets, relating to recombinant single chain reproductive hormone technology for use in non-human mammals.  This license includes a sublicense of the technology licensed to us by WU.  Ceva continues to advance development of the bovine rFSH product and cumulative cash payments received to date by us from Ceva have been approximately $2 million.

On February 25, 2016, we completed the sale of our corporate headquarters, land and building, to a third party at a purchase price of $4,053,000.  The sale generated approximately $1.8 million in net cash after expenses and mortgage payoffs. In addition to agreeing to the sale, we rented back space in the building under short-term lease agreements that provide storage space required for our current level of operations.

Through our wholly owned subsidiary, BiOptix Diagnostics, Inc. ("BDI"), which we acquired in September 2016, we have developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions.  We acquired a Surface Plasma Resonance (SPR) platform which seeks to combine high sensitivity with microarray detection capability to allow researchers to understand whether their target molecules have functionality against the disease targeted. SPR is an advanced and highly sensitive optical technology that can measure refractive index changes on a sensor chip's gold surface due to a change in mass that occurs during a binding event. This change can be used to monitor biological interactions such as the concentration of target molecules, kinetic rates and affinity constants.

BDI is a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions.  BDI manufactures, sells and services instruments and consumables to pharmaceutical researchers allowing them to develop new drugs faster than by using older technologies such as enzyme-linked immunosorbent assay or "ELISA". BDI was originally established with technology developed in conjunction with Dr. John L. "Jan" Hall, Adjoint Professor, JILA (University of Colorado), who shared the Nobel Prize for Physics in 2005 for his work on laser-based precision spectroscopy and the optical frequency comb technique. SPR is the core of the BDI products and intellectual property.  Dr. Hall, in conjunction with the scientists at BDI, created a common path interferometer that was commercialized to become the 404pi instrument.

**Company References**

In this prospectus, "Bioptix," "the Company," "we," "us," and "our" refer to Bioptix, Inc., a Colorado corporation, unless the context otherwise requires.

## OUR BUSINESS

**Historical Operations**

We hold an exclusive license agreement with Washington University ("WU") in St. Louis which granted us an exclusive license and right to sublicense its technology for veterinary products worldwide, subject to certain exceptions.  In July 2012, we granted Ceva Sante Animale S.A. ("Ceva") an exclusive royalty-bearing license to our intellectual property and other assets, relating to recombinant single chain reproductive hormone technology for use in non-human mammals.  This license includes a sublicense of the technology licensed to us by WU.  Ceva continues to advance development of the bovine rFSH product and cumulative cash payments received to date by us from Ceva have been approximately $2 million.

On February 25, 2016, we completed the sale of our corporate headquarters, land and building, to a third party at a purchase price of $4,053,000.  The sale generated approximately $1.8 million in net cash after expenses and mortgage payoffs. In addition to agreeing to the sale, we rented back space in the building under short-term lease agreements that provide storage space required for our current level of operations.

Through our wholly owned subsidiary, BiOptix Diagnostics, Inc. ("BDI"), which we acquired in September 2016, we have developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions.  We acquired a Surface Plasma Resonance (SPR) platform which seeks to combine high sensitivity with microarray detection capability to allow researchers to understand whether their target molecules have functionality against the disease targeted. SPR is an advanced and highly sensitive optical technology that can measure refractive index changes on a sensor chip's gold surface due to a change in mass that occurs during a binding event. This change can be used to monitor biological interactions such as the concentration of target molecules, kinetic rates and affinity constants.

BDI is a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions.  BDI manufactures, sells and services instruments and consumables to pharmaceutical researchers allowing them to develop new drugs faster than by using older technologies such as enzyme-linked immunosorbent assay or "ELISA". BDI was originally established with technology developed in conjunction with Dr. John L. "Jan" Hall, Adjoint Professor, JILA (University of Colorado), who shared the Nobel Prize for Physics in 2005 for his work on laser-based precision spectroscopy and the optical frequency comb technique. SPR is the core of the BDI products and intellectual property.  Dr. Hall, in conjunction with the scientists at BDI, created a common path interferometer that was commercialized to become the 404pi instrument.

When it was acquired by us in September 2016, BDI was in the initial stages of rolling out its first commercial product, the 404pi system. BDI's initial revenue was generated in 2014 with first sales to customers including sales to leading academic researchers and biotech companies. BDI did not experience any significant seasonality to its business and provided normal terms to its customers, generally 30-60 days, net. Currently there is no back-log of orders.

Following the September 2016 acquisition of BDI, we began hiring sales, marketing and operational employees, adding a total of eight employees to the twelve hired in connection with the acquisition.

The BDI products include a reader instrument (404pi) and the consumable test products consisting of test chips (cassettes) and packaging. The instrument is assembled in-house using primarily off the shelf parts and certain customized components.  Consumable test product components are manufactured at the BDI facility using certain sub-assemblies processed by third-party contractors. Raw materials and certain sub-components are acquired from a number of suppliers.

Effective January 14, 2017, the Company adopted a plan to exit the business of BDI and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the

When it was acquired by us in September 2016, BDI was in the initial stages of rolling out its first commercial product, the 404pi system. BDI's initial revenue was generated in 2014 with first sales to customers including sales to leading academic researchers and biotech companies. BDI did not experience any significant seasonality to its business and provided normal terms to its customers, generally 30-60 days, net. Currently there is no back-log of orders.

Following the September 2016 acquisition of BDI, we began hiring sales, marketing and operational employees, adding a total of eight employees to the twelve hired in connection with the acquisition.

The BDI products include a reader instrument (404pi) and the consumable test products consisting of test chips (cassettes) and packaging. The instrument is assembled in-house using primarily off the shelf parts and certain customized components.  Consumable test product components are manufactured at the BDI facility using certain sub-assemblies processed by third-party contractors. Raw materials and certain sub-components are acquired from a number of suppliers.

Effective January 14, 2017, the Company adopted a plan to exit the business of BDI and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. Accordingly, the historical results of BDI have been classified as discontinued operations for all periods presented.

Following the recent decision to exit the BDI business, we have begun evaluating potential strategic alternatives. We expect, in the near term, to establish the primary criteria we will consider as we evaluate our next steps and strategic path forward with the goal of maximizing value for our stockholders. Additionally, we will focus on attempting to locate an acquirer or partner for the BDI operations as well as continuing to attempt to locate an interested party for the appendicitis assets.

## Company Information

We were incorporated on July 24, 2000 in the state of Colorado under the name "AspenBio, Inc.", which was subsequently changed to AspenBio Pharma, Inc.  In December 2012, we changed our name to "Venaxis, Inc." and in 2016, in connection with our acquisition of BiOptix Diagnostics, Inc., we changed our name to "Bioptix, Inc."  In September 2017, we changed our state of incorporation to Nevada from Colorado. Our principal executive offices are located at 834-F South Perry Street, Suite 443, Castle Rock, CO 80104 and our telephone number is (303) 794-2000. Our website address is www.venaxis.com. The information contained on, or accessible through, our website is not part of this prospectus or any prospectus supplement .

## RISK FACTORS

Investing in our securities involves a high degree of risk. Before making an investment decision, you should carefully consider the risks, uncertainties and forward-looking statements described under "Risk Factors" in Item 1A of our most recent Annual Report on Form 10-K for the fiscal year ended December 31, 2016 filed with the Securities and Exchange Commission (the "SEC") on March 31, 2017, as amended as of April 27, 2017 and August 15, 2017, as well as information incorporated by reference into this prospectus. If any of these risks were to occur, our business, financial condition or results of operations would likely suffer. In that event, the value of our securities could decline, and you could lose part or all of your investment. The risks and uncertainties we describe are not the only ones facing us. Additional risks not presently known to us or that we currently deem immaterial may also impair our business operations. In addition, our past financial performance may not be a reliable indicator of future performance, and historical trends should not be used to anticipate results in the future.  See "Forward-Looking Statements" below.

6

## FORWARD-LOOKING STATEMENTS

This prospectus, including the documents that we incorporate by reference, contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Exchange Act. Such forward-looking statements include those that express plans, anticipation, intent, contingency, goals, targets or future development and/or otherwise are not

## FORWARD-LOOKING STATEMENTS

This prospectus, including the documents that we incorporate by reference, contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Exchange Act. Such forward-looking statements include those that express plans, anticipation, intent, contingency, goals, targets or future development and/or otherwise are not statements of historical fact. These forward-looking statements are based on our current expectations and projections about future events and they are subject to risks and uncertainties known and unknown that could cause actual results and developments to differ materially from those expressed or implied in such statements.

In some cases, you can identify forward-looking statements by terminology, such as "expects," "anticipates," "intends," "estimates," "plans," "believes," "seeks," "may," "should", "could" or the negative of such terms or other similar expressions. Accordingly, these statements involve estimates, assumptions and uncertainties that could cause actual results to differ materially from those expressed in them. Any forward-looking statements are qualified in their entirety by reference to the factors discussed throughout this prospectus.

You should read this prospectus and the documents that we reference herein and therein and have filed as exhibits to the registration statement, of which this prospectus is part, completely and with the understanding that our actual future results may be materially different from what we expect. You should assume that the information appearing in this prospectus is accurate as of the date on the front cover of this prospectus or such prospectus supplement only. Because the risk factors referred to above, as well as the risk factors incorporated herein by reference, could cause actual results or outcomes to differ materially from those expressed in any forward-looking statements made by us or on our behalf, you should not place undue reliance on any forward-looking statements. Further, any forward-looking statement speaks only as of the date on which it is made, and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which the statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict which factors will arise. In addition, we cannot assess the impact of each factor on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. We qualify all of the information presented in this prospectus and any accompanying prospectus supplement, and particularly our forward-looking statements, by these cautionary statements.

## USE OF PROCEEDS

The net proceeds from any disposition of the shares covered hereby would be received by the selling stockholders. We will not receive any of the proceeds from the sale of our Common Stock by the selling stockholders other than the net proceeds of any warrants exercised for cash.

## DESCRIPTION OF TRANSACTIONS

On March 10, 2017, we sold $2,250,000 of units of our securities, pursuant to separate purchase agreements with certain of the selling stockholders, at a purchase price of $2.50 per unit.  Each unit consists of one share of our Common Stock and a three year warrant to purchase one share of Common Stock, at an exercise price of $3.50 per share .

The warrants are exercisable at any time on or after the sixth month anniversary of the date of issuance and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the warrants on a cashless basis. We are prohibited from effecting an exercise of any warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such warrant.

On May 25, 2017, the Lead Investor (as defined below) waived the requirement that the securities and purchase price remain in escrow subject to the occurrence of a "Qualified Transaction" and the Common Stock and warrants and the proceeds from the sale of the Common Stock and warrants were released from escrow to the investors and the Company, respectively.

On March 15, 2017, we entered into separate securities purchase agreements pursuant to which we agreed to sell up to $4,750,000 of principal amount of Notes and three year warrants to certain of the selling stockholders.  On March 16, 2017, we satisfied all closing conditions and closed the transaction. The Notes are convertible into shares of Common Stock at an initial conversion price of $2.50.  Each warrant is exercisable

On March 15, 2017, we entered into separate securities purchase agreements pursuant to which we agreed to sell up to $4,750,000 of principal amount of Notes and three year warrants to certain of the selling stockholders.  On March 16, 2017, we satisfied all closing conditions and closed the transaction. The Notes are convertible into shares of Common Stock at an initial conversion price of $2.50.  Each warrant is exercisable into shares of Common Stock at an exercise price equal to $3.56 per share.

On August 18, 2017, the Lead Investor waived the requirement that the securities and purchase price remain in escrow subject to the occurrence of a "Qualified Transaction" and the Notes and warrants and the proceeds from the sale of the Notes and warrants were released from escrow to the investors and the Company, respectively.

Pursuant to the terms of the transaction, on August 21, 2017, at a special meeting of our stockholders, our stockholders approved an amendment to our Articles of Incorporation authorizing the creation of 15,000,000 shares of "blank check" preferred stock.  On September 20, 2017, we designated 2,000,000  shares of preferred stock as "2% Series A Convertible Preferred Stock" in connection with the filing of a Certificate of  of Designations, Preferences and Rights of 2% Series A Convertible Preferred Stock with the Secretary of State of the State of Nevada, at which time the Notes automatically, and without any further action on the part of the holders, were exchanged for shares of Series A Preferred Stock based on a ratio of $1.00 of stated value of Series A Preferred Stock for each $1.00 of the then outstanding principal amount plus any accrued but unpaid interest on the exchanged Note, pursuant to Section 3(a)(9) of the Securities Act.  The Company issued an aggregate of 19,194.72 shares of Series A Convertible Preferred Stock, convertible into an aggregate of 1,919,472 shares of Common Stock, which such shares of Common Stock are being registered for resale hereunder.

On August 21, 2017, stockholders of the Company authorized that the existing warrants issued to investors in the private placements on March 10, 2017 to purchase an aggregate of 900,000 shares of common stock at an exercise price of $3.50 per share and on March 16, 2017 to purchase an aggregate of 1,900,000 shares of common stock at an exercise price of $3.56 per share, may, at the discretion of the Board of Directors, be temporarily reset from $3.50 per share and $3.56 per share, respectively, to $3.00 per share for a period during which the Company will provide a one-time option to holders of the warrants to exercise their warrants at such lower price. Holders of warrants that opt to exercise at the temporarily lower exercise price of $3.00 will only be allowed to exercise their warrants in cash, as, in exchange for lowering the exercise price, the warrants will no longer contain a cashless exercise feature for such period that the exercise price is $3.00.  No action has as of the date of this registration statement been taken to adjust the warrant exercise prices.

The Lead Investor is Barry Honig who is also a selling stockholder, both individually and through GRQ Consultants, Inc. Roth 401K FBO Barry Honig, for which Mr. Honig is trustee.

## SELLING STOCKHOLDERS

This prospectus relates to the sale or other disposition of up to 5,677,102 shares of our Common Stock by the selling stockholders named below, and their donees, pledgees, transferees or other successors-in-interest selling shares of Common Stock or interests in shares of Common Stock received after the date of this prospectus from a selling stockholder as a gift, pledge, partnership distribution or other transfer, which includes:

(i)      900,000 shares of Common Stock;

(ii)     1,977,102 shares of Common Stock issuable upon the conversion of outstanding Series A Convertible Preferred Stock (including shares of common stock issuable upon a 2% annual dividend, calculated for a period of eighteen (18) months), and;

(iii)    2,800,000 shares of Common Stock issuable upon the exercise of outstanding warrants.

The following table, based upon information currently known by us, sets forth as of September 20, 2017, (i) the number of shares held of record or beneficially by the selling stockholders as of such date (as determined below) and (ii) the number of shares that may be sold or otherwise disposed of under this prospectus by each selling stockholder. Percentage ownership is based on 5,436,503 shares of Common Stock outstanding as of September 20, 2017, plus securities deemed to be outstanding with respect to individual stockholders pursuant to Rule 13d-3(d)(1) under the Exchange Act. Beneficial ownership includes shares of Common Stock plus any securities held by the holder exercisable for or convertible into shares of Common Stock within 60 days after September 20, 2017, in accordance with Rule 13d-3(d)(1) under the Exchange Act. The inclusion of any shares in this table does not constitute an admission of beneficial ownership for the selling stockholder named below. We do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby .

The selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus and may sell or otherwise dispose of shares covered hereby in transactions exempt from the registration requirements of the Securities Act. Because the selling stockholders may sell or otherwise dispose of some, all or none of the shares covered hereby, and because there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares, we cannot estimate the number of the shares that will be held by the selling stockholders

after completion of the offering. However, for purposes of the following table, we have assumed that all of the shares covered hereby are sold by the selling stockholders pursuant to this prospectus.

---

8

---

None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities. Unless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law. Unless otherwise indicated below, to our knowledge, no persons named in the table are a broker-dealer or affiliate of a broker-dealer.  Unless otherwise indicated, all addresses are c/o Bioptix, Inc., 834-F South Perry Street, Suite 443, Castle Rock, CO 80104.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000(1) | 3.61% | 200,000(1) | 0 | * |
| Northurst Inc. | 559,000(2) | 9.99% | 800,000(2) | 0 | * |
| Erick Richardson | 200,000(3) | 3.61% | 200,000(3) | 0 | * |
| Melechdavid Inc. | 340,000(4) | 6.06% | 340,000(4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000(5) | 1.46% | 80,000(5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000(6) | 1.46% | 80,000(6) | 0 | * |
| Barry Honig | 544,400(7) | 9.99% | 402,050(8) | 504,000(9) | 8.09% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600(10) | * | 1,005,124(11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 597,300(12) | 9.99% | 1,688,198(13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,205(14) | * | 40,205(14) | 0 | * |
| Robert R. O'Braitis | 80,410(15) | 1.46% | 80,410(15) | 0 | * |
| Stockwire Research Group, Inc. | 40,205(16) | * | 40,205(16) | 0 | * |
| Aifos Capital LLC | 120,615(17) | 2.17% | 120,615(17) | 0 | * |
| Stetson Capital Management, LLC | 285,150(18) | 4.99% | 402,050(19) | 7,500 | * |
| JAD Capital Inc. | 80,410(20) | 1.46% | 80,410(20) | 0 | * |
| Richard Molinsky | 97,392(21) | 1.78% | 40,205(22) | 57,187 | 1.04% |
| Alan Honig | 20,000(23) | * | 20,000(23) | 0 | * |

\*   Less than 1%.
\*\*  Based on 5,436,503 shares of Common Stock outstanding as of September 20, 2017.

---

9

---

(1)   Adam Arviv is the President of Acquisition Group Limited. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Yorkville Ave, Suite 604, Toronto, Ontario M5R1C2.

(2)   Jake Malczewski is the Controlling Shareholder of Northurst Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 400,000 shares of Common Stock and (ii) 159,000 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 241,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares of Common Stock offered in this offering, includes the 241,000 shares of Common Stock issuable

(1)   Adam Arviv is the President of Acquisition Group Limited. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Yorkville Ave, Suite 604, Toronto, Ontario M5RIC2.

(2)   Jake Malczewski is the Controlling Shareholder of Northurst Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 400,000 shares of Common Stock and (ii) 159,000 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 241,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares of Common Stock offered in this offering, includes the 241,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Cragmore Ave, Pointe-Claire, Quebec, H9R 5M1.

(3)   Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 11290 Chalon Road, Los Angeles CA 90049.

(4)   Mark Groussman is the President of Melechdavid Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 170,000 shares of Common Stock and (ii) 170,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(5)   Mark Groussman is the Custodian of Mark Groussman c/f Alivia Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(6)   Mark Groussman is the Custodian of Mark Groussman c/f Asher Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(7)   Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by GRQ Consultants, Inc. 401K ("401K"), (iii) 30,600 shares of Common Stock held by GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("Roth 401K") and (iv) 71,000 shares of Common Stock issuable upon exercise of outstanding warrants held by Mr. Honig. Mr. Honig is the trustee of 401K and Roth 401K in such capacity holds voting and dispositive power over the securities held by such entities. Excludes (i) 202,050 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock a convertible promissory note, which contains a 4.99% beneficial ownership limitation, (ii) 129,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation, (iii) 505,124 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock, which contain a 4.99% beneficial ownership limitation, and (iv) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(8)   Represents (i) 202,050 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(9)   Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by 401K and (iii) 30,600 shares of Common Stock held by Roth 401K. Mr. Honig is the trustee of 401K and Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entities.

(10)   Represents 30,600 shares of Common Stock. Excludes 505,124 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock, and 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contain a 4.99% and 9.99% beneficial ownership limitation, respectively.  Mr. Honig is the trustee of Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entity. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(11)   Represents (i) 505,124 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (iii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation.

(12)   Jonathan Honig is the Manager of Titan Multi-Strategy Fund I, Ltd. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 55,000 shares of Common Stock and (ii) 542,300 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes (i) 808,198 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock, which contain a 4.99% beneficial ownership limitation and (ii) 297,700 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation.  The address for this selling stockholder is 5825 Windsor Court, Boca Raton, FL 33496

(10) Represents 30,600 shares of Common Stock. Excludes 505,124 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock, and 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contain a 4.99% and 9.99% beneficial ownership limitation, respectively.  Mr. Honig is the trustee of Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entity. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(11) Represents (i) 505,124 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (iii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation.

(12) Jonathan Honig is the Manager of Titan Multi-Strategy Fund I, Ltd. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 55,000 shares of Common Stock and (ii) 542,300 shares of Common Stock issuable upon exercise of outstanding warrants, which contain a 9.99% beneficial ownership limitation. Excludes (i) 808,198 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock, which contain a 4.99% beneficial ownership limitation and (ii) 297,700 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation.  The address for this selling stockholder is 5825 Windsor Court, Boca Raton, FL 33496

(13) Represents (i) 40,000 shares of Common Stock and (ii) 808,198 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (Iii) 840,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(14) Candice Merren-Yates and Ghislian Ghyoot are the Authorized Signatories of US Commonwealth Life, A.I. Policy No. 2013-17. In such capacity they share voting and dispositive control over the securities held by such entity. Represents (i) 20,205 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants.  The address for this selling stockholder is 304 Ponce de Leon, Suite 1000, San Juan, Puerto Rico, 00918.

(15) Represents (i) 40,410 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants.  Mr. O'Braitis is affiliated with a broker-dealer and may be deemed a statutory underwriter of the shares. The address for this selling stockholder is 43811 Grantner Pl, Ashburn, VA 20147.

(16) Adrian James is the President & CEO of Stockwire Research Group, Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 20,205 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants.  The address for this selling stockholder is 3736 Bee Caves Road, Suite 1-105, Austin, TX 78746.

(17) Edward Karr is the Managing Member of Aifos Capital LLC.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 60,615 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 60,000 shares of Common Stock issuable upon exercise of outstanding warrants.  The address for this selling stockholder is Aifos Capital LLC, CP 5452, CH-1211 Geneva 11, Switzerland.

(18) John Stetson is the Managing Member of Stetson Capital Management, LLC.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 7,500 shares of Common Stock, (ii) 77,650 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (iii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 124,400 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock, which contain a 4.99% beneficial ownership limitation.  The address for this selling stockholder is 68 Fiesta Way, Ft. Lauderdale, FL 33301.

(19) Represents (i) 202,050 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(20) Jason Theofilos is the Director of JAD Capital Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,410 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, Canada L4B 4V1.

(21) Represents (i) 57,187 shares of Common Stock, (ii) 20,205 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (iii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants.  The address for this selling stockholder is 51 Lord's Highway East, Weston, CT 06883.

(22) Represents (i) 20,205 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(23) Represents (i) 10,000 shares of Common Stock and (ii) 10,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 200 East 69 St, Apt 21B, New York, NY 10021.

## PLAN OF DISTRIBUTION

Each selling stockholder of the Common Stock and any of their pledgees, assignees and successors-in-interest may, from time to time, sell any or all of their shares of Common Stock on The NASDAQ Capital Market or any other stock exchange, market or trading facility on which the shares are traded or in private transactions. These sales may be at fixed or negotiated prices. A selling stockholder may use any one or more of the following methods when selling shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- settlement of short sales entered into after the effective date of the registration statement of which this prospectus is a part;

- broker-dealers may agree with the selling stockholders to sell a specified number of such shares at a stipulated price per share;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

- a combination of any such methods of sale; or

- any other method permitted pursuant to applicable law.

The selling stockholders may also sell shares under Rule 144 under the Securities Act of 1933, as amended, if available, rather than under this prospectus.

Broker-dealers engaged by the selling stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the selling stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated, but, except as set forth in a supplement to this prospectus, in the case of an agency transaction not in excess of a customary brokerage commission in compliance with FINRA Rule 2440; and in the case of a principal transaction a markup or markdown in compliance with FINRA IM-2440.

In connection with the sale of the Common Stock or interests therein, the selling stockholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the Common Stock in the course of hedging the positions they assume. The selling stockholders may also sell shares of the Common Stock short and deliver these securities to close out their short positions, or loan or pledge the Common Stock to broker-dealers that in turn may sell these securities. The selling stockholders may also enter into option or other transactions with broker-dealers or other financial institutions or the creation of one or more derivative securities which require the delivery to such broker-dealer or other financial institution of shares offered by this prospectus, which shares such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

12

The selling stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act of 1933, as amended, in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act of 1933, as amended. Each selling stockholder has informed us that it does not have any written or oral agreement or

The selling stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act of 1933, as amended, in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act of 1933, as amended. Each selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock.

We are required to pay certain fees and expenses incurred by us incident to the registration of the shares. We have agreed to indemnify the selling stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act of 1933, as amended.

Because selling stockholders may be deemed to be "underwriters" within the meaning of the Securities Act of 1933, as amended, they will be subject to the prospectus delivery requirements of the Securities Act of 1933, as amended, including Rule 172 thereunder. In addition, any securities covered by this prospectus which qualify for sale pursuant to Rule 144 under the Securities Act of 1933, as amended may be sold under Rule 144 rather than under this prospectus. There is no underwriter or coordinating broker acting in connection with the proposed sale of the resale shares by the selling stockholders.

We agreed to keep this prospectus effective until the earlier of (i) the date on which the shares may be resold by the selling stockholders without registration and without the requirement to be in compliance with Rule 144(c)(1) and otherwise without restriction or limitation pursuant to Rule 144 or (ii) all of the shares have been sold pursuant to this prospectus or Rule 144 under the Securities Act or any other rule of similar effect. The resale shares will be sold only through registered or licensed brokers or dealers if required under applicable state securities laws. In addition, in certain states, the resale shares may not be sold unless they have been registered or qualified for sale in the applicable state or an exemption from the registration or qualification requirement is available and is complied with.

Under applicable rules and regulations under the Securities Exchange Act of 1934, as amended, any person engaged in the distribution of the resale shares may not simultaneously engage in market making activities with respect to the Common Stock for the applicable restricted period, as defined in Regulation M, prior to the commencement of the distribution. In addition, the selling stockholders will be subject to applicable provisions of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, including Regulation M, which may limit the timing of purchases and sales of shares of the Common Stock by the selling stockholders or any other person. We will make copies of this prospectus available to the selling stockholders and have informed them of the need to deliver a copy of this prospectus to each purchaser at or prior to the time of the sale (including by compliance with Rule 172 under the Securities Act of 1933, as amended).

## DESCRIPTION OF CAPITAL STOCK

**General**

The following description of our capital stock summarizes the material terms and provisions of our Common Stock. For the complete terms of our Common Stock, please refer to our Articles of Incorporation and our Bylaws that are incorporated by reference into the registration statement of which this prospectus is a part or may be incorporated by reference in this prospectus. The terms of these securities may also be affected by the Nevada Revised Statutes. The summary below is qualified in its entirety by reference to our amended and restated Articles of Incorporation and our amended and restated Bylaws .

As of the date of this prospectus, our authorized capital stock consisted of 170,000,000 shares of Common Stock, no par value per share. As of the date of this prospectus, there were 5,436,503 shares of our Common Stock issued and outstanding .

**Common Stock**

Holders of Common Stock are entitled to one vote for each share held on all matters submitted to a vote of shareholders, except that in the election of directors each shareholder shall have as many votes for each share held by him, her or it as there are directors to be elected and for whose election the shareholder has a right to vote.  Cumulative voting is not permitted. Generally, all matters to be voted on by shareholders must be approved by a majority, or, in the case of the election of directors, by a plurality, of the votes cast at a meeting at which a quorum is present. Holders of outstanding shares of our Common Stock are entitled to those dividends declared by the Board of Directors out of legally available funds, and, in the event of our liquidation, dissolution or winding up of our affairs, holders are entitled to receive ratably our net assets available to the shareholders.  Holders of our outstanding Common Stock have no preemptive, conversion or redemption rights.  All of the issued and outstanding shares of our Common Stock are, and all unissued shares of our Common Stock, when offered and sold will be, duly authorized, validly issued, fully paid and nonassessable.  To the extent that additional shares of our Common Stock may be issued in the future, the relative interests of the then existing shareholders may be diluted.

**Warrants**

On March 10, 2017, we issued to purchasers of our units warrants to purchase an aggregate of 900,000 shares of Common Stock. The warrants were exercisable at a price of $3.50 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the warrants on a cashless basis. We are prohibited from effecting an exercise of any warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such warrant. 55.5556% of the warrants (and common stock) issued to each investor were being held in escrow pending the satisfaction of certain release conditions. On May 25, 2017, the warrants (and associated shares of common stock) and the proceeds from the sale therefrom were released from escrow to the investors and the Company, respectively, and no longer remain subject to a "Qualified Transaction."

On March 16, 2017, we issued warrants to purchase an aggregate of 1,900,000 shares of Common Stock with each warrant based upon the number of shares of Common Stock equal to 100% of such investor's subscription amount divided by the conversion price of $2.50. The warrants were exercisable at a price of $3.56 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the warrants on a cashless basis. We are prohibited from effecting an exercise of any warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such warrant. The warrants issued to each investor were held in escrow pending the satisfaction of certain release conditions. On August 18, 2017, the warrants (and associated Notes) and the proceeds from the sale therefrom were released from escrow to the investors and the Company, respectively, and no longer remain subject to a "Qualified Transaction."

On August 21, 2017, stockholders of the Company authorized that the existing warrants issued to investors in the private placements on March 10, 2017 to purchase an aggregate of 900,000 shares of common stock at an exercise price of $3.50 per share and on March 16, 2017 to purchase an aggregate of 1,900,000 shares of common stock at an exercise price of $3.56 per share, may, at the discretion of the Board of Directors, be temporarily reset from $3.50 per share and $3.56 per share, respectively, to $3.00 per share for a period during which the Company will provide a one-time option to holders of the warrants to exercise their warrants at such lower price. Holders of warrants that opt to exercise at the temporarily lower exercise price of $3.00 will only be allowed to exercise their warrants in cash, as, in exchange for lowering the exercise price, the warrants will no longer contain a cashless exercise feature for such period that the exercise price is $3.00. No action has as of the date of this registration statement been taken to adjust the warrant exercise prices.

If we, at any time while the warrants are outstanding: (i) pay a stock dividend or otherwise make a distribution or distributions payable in shares of Common Stock or any Common Stock equivalents (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company upon exercise of the warrants), (ii) subdivide outstanding shares of Common Stock into a larger number of shares, (iii) combine (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares or (iv) issue, in the event of a reclassification of shares of the Common Stock, any shares of capital stock, then the exercise price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding any treasury shares of the Company) outstanding immediately before such event, and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event.

**Series A Convertible Preferred Stock**

Pursuant to the terms of the transaction, on August 21, 2017, at a special meeting of our stockholders, our stockholders approved an amendment to our Articles of Incorporation authorizing the creation of 15,000,000 shares of "blank check" preferred stock. On September 20, 2017, we designated 2,000,000 shares of preferred stock as "2% Series A Convertible Preferred Stock" in connection with the filing of a Certificate of Designations, Preferences and Rights of 2% Series A Convertible Preferred Stock with the Secretary of State of the State of Nevada, at which time the Notes automatically, and without any further action on the part of the holders, were exchanged for shares of Series A Preferred Stock based on a ratio of $1.00 of stated value of Series A Preferred Stock for each $1.00 of the then outstanding principal amount plus any accrued but unpaid interest thereon, pursuant to Section 3(a)(9) of the Securities Act. The Company issued an aggregate of 19,194.72 shares of Series A Convertible Preferred Stock, convertible into an aggregate of 1,919,472 shares of Common Stock, which such shares of Common Stock are being registered for resale hereunder.

**Series A Convertible Preferred Stock**

Pursuant to the terms of the transaction, on August 21, 2017, at a special meeting of our stockholders, our stockholders approved an amendment to our Articles of Incorporation authorizing the creation of 15,000,000 shares of "blank check" preferred stock.  On September 20, 2017, we designated 2,000,000  shares of preferred stock as "2% Series A Convertible Preferred Stock" in connection with the filing of a Certificate of Designations, Preferences and Rights of 2% Series A Convertible Preferred Stock with the Secretary of State of the State of Nevada, at which time the Notes automatically, and without any further action on the part of the holders, were exchanged for shares of Series A Preferred Stock based on a ratio of $1.00 of stated value of Series A Preferred Stock for each $1.00 of the then outstanding principal amount plus any accrued but unpaid interest thereon, pursuant to Section 3(a)(9) of the Securities Act.  The Company issued an aggregate of 19,194.72 shares of Series A Convertible Preferred Stock, convertible into an aggregate of 1,919,472 shares of Common Stock, which such shares of Common Stock are being registered for resale hereunder.

The shares of Series A Preferred Stock are convertible into shares of Common Stock based on a conversion calculation equal to the stated value of the Series A Preferred Stock, plus all accrued and unpaid dividends, if any, on such Series A Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series A Preferred Stock is $250 and the initial conversion price is $2.50 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events.

The holders of Series A Preferred Stock are entitled to receive dividends if and when declared by the Company's board of directors. The Series A Preferred Stock will participate on an "as converted" basis, with all dividends declared on the Company's Common Stock. Such dividends will be paid by the Company out of funds legally available therefor, payable, subject to the conditions and other terms hereof, in shares of Common Stock on the stated value of such Series A Preferred Stock at the dividend rate or two (2%) percent per annum, which shall be cumulative and shall continue to accrue and compound monthly whether or not declared and whether or not in any fiscal year there shall be net profits or surplus available for the payment of dividends in such fiscal year. In addition, if the Company grants, issues or sells any rights to purchase securities pro rata to all record holders of Common Stock, each holder of Series A Preferred Stock will be entitled to acquire such securities applicable to the granted purchase rights as if the holder had held the number of shares of Common Stock acquirable upon complete conversion of all Series A Preferred Stock then held.

The Company is prohibited from effecting a conversion of the Series A Preferred Stock to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon conversion of the Series A Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder is entitled to vote on all matters submitted to stockholders of the Company, and will have the number of votes equal to the number of shares of Common Stock issuable upon conversion of such holder's Series A Preferred Stock, based on an effective conversion price of $2.50 per share of Common Stock, and not in excess of the beneficial ownership limitations.

15

---

**Transfer Agent and Registrar**

The transfer agent and registrar for our Common Stock is Corporate Stock Transfer, Inc., Denver, Colorado.

**LEGAL MATTERS**

The validity of the issuance of the securities offered hereby will be passed upon for us by counsel. Additional legal matters may be passed upon for us or any underwriters, dealers or agents, by counsel that we will name in the applicable prospectus supplement.

**EXPERTS**

The consolidated balance sheet of Bioptix, Inc. and Subsidiary, as of December 31, 2016, and the related consolidated statements of operations, stockholders' equity, and cash flows for the year then ended, have been audited by EisnerAmper LLP, independent registered public accounting firm, as stated in their report which is incorporated herein by reference, which report includes an explanatory paragraph relating to auditing the adjustments to the 2015 financial statements to retrospectively reflect the reverse stock split.  Such financial statements have been incorporated herein by reference in reliance on the report of such firm given upon their authority as experts in accounting and auditing.

**Transfer Agent and Registrar**

The transfer agent and registrar for our Common Stock is Corporate Stock Transfer, Inc., Denver, Colorado.

## LEGAL MATTERS

The validity of the issuance of the securities offered hereby will be passed upon for us by counsel. Additional legal matters may be passed upon for us or any underwriters, dealers or agents, by counsel that we will name in the applicable prospectus supplement.

## EXPERTS

The consolidated balance sheet of Bioptix, Inc. and Subsidiary, as of December 31, 2016, and the related consolidated statements of operations, stockholders' equity, and cash flows for the year then ended, have been audited by EisnerAmper LLP, independent registered public accounting firm, as stated in their report which is incorporated herein by reference, which report includes an explanatory paragraph relating to auditing the adjustments to the 2015 financial statements to retrospectively reflect the reverse stock split.  Such financial statements have been incorporated herein by reference in reliance on the report of such firm given upon their authority as experts in accounting and auditing.

The audited financial statements, incorporated herein by reference, for the year ended December 31, 2015 have been audited by GHP Horwath, P.C. ("GHP"), independent registered public accounting firm, for the period and to the extent set forth in their report.  Their report includes an explanatory paragraph relating to the effects of the adjustments to retroactively apply the impact of the reverse stock split to the December 31, 2015 financial statements. Such financial statements have been so incorporated in reliance upon the report of such firm given upon the firm's authority as an expert in auditing and accounting.

Effective January 1, 2017, the partners and employees of GHP joined another independent registered public accounting firm.  As of January 13, 2017, the client-auditor relationship between us and GHP ceased.  On February 3, 2017, our Board of Directors appointed EisnerAmper LLP as our independent registered public accounting firm.

16

## WHERE YOU CAN FIND MORE INFORMATION

This prospectus constitutes a part of a registration statement on Form S-3 filed under the Securities Act.  As permitted by the SEC's rules, this prospectus and any prospectus supplement, which form a part of the registration statement, do not contain all the information that is included in the registration statement.  You will find additional information about us in the registration statement.  Any statements made in this prospectus or any prospectus supplement concerning legal documents are not necessarily complete and you should read the documents that are filed as exhibits to the registration statement or otherwise filed with the SEC for a more complete understanding of the document or matter.

We file annual, quarterly and current reports, proxy statements and other information with the SEC.  You may read, without charge, and copy the documents we file at the SEC's public reference rooms in Washington, D.C. at 100 F Street, NE, Room 1580, Washington, DC 20549, or in New York, New York and Chicago, Illinois.  You can request copies of these documents by writing to the SEC and paying a fee for the copying cost.  Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms.  Our SEC filings are also available to the public at no cost from the SEC's website at http://www.sec.gov.  In addition, we make available on or through our Internet site copies of these reports as soon as reasonably practicable after we electronically file or furnish them to the SEC. Our Internet site can be found at www.venaxis.com.

## INCORPORATION OF DOCUMENTS BY REFERENCE

We have filed a registration statement on Form S-3 with the Securities and Exchange Commission under the Securities Act. This prospectus is part of the registration statement but the registration statement includes and incorporates by reference additional information and exhibits. The Securities and Exchange Commission permits us to "incorporate by reference" the information contained in documents we file with the Securities and Exchange Commission, which means that we can disclose important information to you by referring you to those documents rather than by including them in this prospectus. Information that is incorporated by reference is considered to be part of this prospectus and you should read it with the same care that you read this prospectus. Information that we file later with the Securities and Exchange Commission will automatically update and supersede the information that is either contained, or incorporated by reference, in this prospectus, and will be considered

## WHERE YOU CAN FIND MORE INFORMATION

This prospectus constitutes a part of a registration statement on Form S-3 filed under the Securities Act. As permitted by the SEC's rules, this prospectus and any prospectus supplement, which form a part of the registration statement, do not contain all the information that is included in the registration statement. You will find additional information about us in the registration statement. Any statements made in this prospectus or any prospectus supplement concerning legal documents are not necessarily complete and you should read the documents that are filed as exhibits to the registration statement or otherwise filed with the SEC for a more complete understanding of the document or matter.

We file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read, without charge, and copy the documents we file at the SEC's public reference rooms in Washington, D.C. at 100 F Street, NE, Room 1580, Washington, DC 20549, or in New York, New York and Chicago, Illinois. You can request copies of these documents by writing to the SEC and paying a fee for the copying cost. Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms. Our SEC filings are also available to the public at no cost from the SEC's website at http://www.sec.gov. In addition, we make available on or through our Internet site copies of these reports as soon as reasonably practicable after we electronically file or furnish them to the SEC. Our Internet site can be found at www.venaxis.com.

## INCORPORATION OF DOCUMENTS BY REFERENCE

We have filed a registration statement on Form S-3 with the Securities and Exchange Commission under the Securities Act. This prospectus is part of the registration statement but the registration statement includes and incorporates by reference additional information and exhibits. The Securities and Exchange Commission permits us to "incorporate by reference" the information contained in documents we file with the Securities and Exchange Commission, which means that we can disclose important information to you by referring you to those documents rather than by including them in this prospectus. Information that is incorporated by reference is considered to be part of this prospectus and you should read it with the same care that you read this prospectus. Information that we file later with the Securities and Exchange Commission will automatically update and supersede the information that is either contained, or incorporated by reference, in this prospectus, and will be considered to be a part of this prospectus from the date those documents are filed. We have filed with the Securities and Exchange Commission, and incorporate by reference in this prospectus:

- Annual Report on Form 10-K for the year ended December 31, 2016 filed on March 31, 2017 and the Annual Reports on Form 10-K/A filed on April 27, 2017 and August 15, 2017;

- Quarterly Reports on Form 10-Q filed on May 15, 2017 and August 11, 2017;

- Definitive Proxy Statement 14A filed on July 10, 2017;

- Current Reports on Form 8-K or Form 8-K/A (excluding any reports or portions thereof that are deemed to be furnished and not filed) filed on January 6, 2017, January 11, 2017, January 20, 2017, January 20, 2017, February 8, 2017, February 9, 2017, February 9, 2017, March 16, 2017, March 17, 2017, April 7, 2017, April 13, 2017, May 8, 2017, May 18, 2017, May 25, 2017, June 15, 2017, July 3, 2017, August 18, 2017, August 23, 2017, September 1, 2017 and September 25, 2017.

We also incorporate by reference all additional documents that we file with the Securities and Exchange Commission under the terms of Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act that are made after the date of the initial registration statement but prior to effectiveness of the registration statement and after the date of this prospectus but prior to the termination of the offering of the securities covered by this prospectus. We are not, however, incorporating, in each case, any documents or information that we are deemed to furnish and not file in accordance with Securities and Exchange Commission rules.

You may request, and we will provide you with, a copy of these filings, at no cost, by calling us at (303) 794-2000 or by writing to us at the following address :

Bioptix, Inc.
834-F South Perry Street, Suite 443
Castle Rock, CO 80104
(303) 794-2000

17

217

## PART II

### INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 14.  Other Expenses of Issuance and Distribution.**

The following table sets forth an estimate of the fees and expenses relating to the issuance and distribution of the securities being registered hereby, other than underwriting discounts and commissions, all of which shall be borne by the Registrant.  All of such fees and expenses, except for the SEC registration fee are estimated:

| | | |
|---|---|---:|
| SEC registration fee | $ | 2,723 |
| Transfer agent's fees and expenses | $ | 1,000 |
| Legal fees and expenses | $ | 10,000 |
| Printing fees and expenses | $ | 1,000 |
| Accounting fees and expenses | $ | 7,500 |
| Miscellaneous fees and expenses | $ | 766 |
| | | |
| Total | $ | 23,000 |

**Item 15.   Indemnification of Officers and Directors.**

Nevada Revised Statutes Sections 78.7502 and 78.751 provide us with the power to indemnify any of our directors and officers. The director or officer must have conducted himself/herself in good faith and reasonably believe that his/her conduct was in, or not opposed to, our best interests. In a criminal action, the director, officer, employee or agent must not have had reasonable cause to believe his/her conduct was unlawful.

Under Revised Statutes Section 78.751, advances for expenses may be made by agreement if the director or officer affirms in writing that he/she believes he/she has met the standards and will personally repay the expenses if it is determined such officer or director did not meet the standards.

Our Articles of Incorporation provide that our officers and directors shall be indemnified and held harmless to the fullest extent legally permissible under the laws of the State of Nevada against all expenses, liability and loss (including attorneys' fees, judgments, fines and amounts paid or to be paid in settlement) reasonably incurred or suffered by them in connection with any civil, criminal, administrative or investigative action, suit or proceeding related to their service as an officer or director. Such right of indemnification shall be a contract right which may be enforced in any manner desired by such person. We must pay the expenses of officers and directors incurred in defending a civil or criminal action, suit or proceeding as they are incurred and in advance of the final disposition of the action, suit or proceeding, upon receipt of an undertaking by or on behalf of the director or officer to repay the amount if it is ultimately determined by a court of competent jurisdiction that he is not entitled to be indemnified by us. Such right of indemnification shall not be exclusive of any other right which such directors or officers may have or hereafter acquire.

Our Articles of Incorporation provide that we may adopt bylaws to provide at all times the fullest indemnification permitted by the laws of the State of Nevada, and may purchase and maintain insurance on behalf of any of officers and directors. The indemnification provided in our Articles of Incorporation shall continue as to a person who has ceased to be a director, officer, employee or agent, and shall inure to the benefit of the heirs, executors and administrators of such person.

Our Bylaws provide that a director or officer shall have no personal liability to us or our stockholders for damages for breach of fiduciary duty as a director or officer, except for damages for breach of fiduciary duty resulting from (a) acts or omissions which involve intentional misconduct, fraud, or a knowing violation of law, or (b) the payment of dividends in violation of Nevada Revised Statutes Section 78.3900.

**Item 16.  Exhibits.**

a) Exhibits.

**Item 16.  Exhibits.**

a) Exhibits.

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Articles of Incorporation filed September 20, 2017 (Incorporated by reference from the Registrant's Current Report on Form 8-K, filed September 25, 2017) |
| 3.2 | Bylaws, effective September 20, 2017 (Incorporated by reference from the Registrant's Current Report on Form 8-K, filed September  25, 2017) |
| 5.1 | Opinion of counsel as to the legality of the securities being registered  (previously filed) |
| 23.1 | Consent of counsel (included in Exhibit 5.1)  (previously filed) |
| 23.2 | Consent of EisnerAmper LLP |
| 23.3 | Consent of GHP Horwath, P.C. |
| 24.1 | Power of Attorney (previously filed) |

19

---

**Item 17.   Undertakings.**

(a)     The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

*provided*, *however*, that paragraphs (a)(1)(i), (a)(1)(ii), and (a)(1)(iii) above do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement, or is contained in a form of prospectus filed pursuant to Rule 424(b) that is a part of the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(b)     The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing

**Item 17.   Undertakings.**

(a)    The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

*provided*, *however*, that paragraphs (a)(1)(i), (a)(1)(ii), and (a)(1)(iii) above do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement, or is contained in a form of prospectus filed pursuant to Rule 424(b) that is a part of the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(b)    The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(c)    Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

20

---

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on this Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Castle Rock, State of Colorado on the 25th day of September, 2017.

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on this Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Castle Rock, State of Colorado on the 25th day of September, 2017.

/s/ Michael M. Beeghley

Michael M. Beeghley
Chief Executive Officer
(Principal Executive Officer)

/s/ Jeffrey G. McGonegal

Jeffrey G. McGonegal
Chief Financial Officer
(Principal Financial and Accounting Officer)

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Michael M. Beeghley<br>Michael M. Beeghley | Chief Executive Officer, Director<br>(Principal Executive Officer) | September 25, 2017 |
| /s/ Jeffrey G. McGonegal<br>Jeffrey G. McGonegal | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | September 25, 2017 |
| *<br>John R. O'Rourke | Director | September 25, 2017 |
| *<br>Mike Dai | Director | September 25, 2017 |
| *<br>Andrew Kaplan | Director | September 25, 2017 |

*By: */s/ Jeffrey G. McGonegal*
       Jeffrey G. McGonegal

21

# FORM 8-K, Date of Report (Date of earliest event reported): November 1, 2017

8-K 1 riot_8k.htm FORM 8-K

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 8-K**

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): November 1, 2017

**Riot Blockchain, Inc.**
(Exact name of registrant as specified in its charter)

| **Nevada** | **001-33675** | **84-1553387** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification Number) |

**202 6th Street, Suite 401**
**Castle Rock, CO 80104**
(Address of principal executive offices) (zip code)

**(303) 794-2000**
(Registrant's telephone number, including area code)

**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
(Former Name or Former Address, if Changed Since Last Report)

Copies to:
Harvey Kesner, Esq.
Sichenzia Ross Ference Kesner LLP
1185 Avenue of the Americas, 37th Floor
New York, New York 10036
Phone: (212) 930-9700
Fax: (212) 930-9725

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

? Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
? Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
? Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
? Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b2 of the Securities Exchange Act of 1934 (§240.12b2 of this chapter).

Emerging growth company ?

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ?

**Item 1.01. Entry into a Material Definitive Agreement.**

**Item 1.01. Entry into a Material Definitive Agreement.**

On November 1, 2017, Riot Blockchain, Inc. (the "Company") entered into a share exchange agreement (the "Agreement") with Kairos Global Technology, Inc., a Nevada corporation ("Kairos").  Pursuant to the Agreement, upon satisfaction of certain closing conditions, the shareholders of Kairos agreed to exchange all outstanding shares of Kairos' common stock to the Company and the Company agreed to issue an aggregate of One Million Seven Hundred Fifty Thousand and One (1,750,001) newly designated shares of Series B Convertible Preferred Stock (the "Series B Preferred Stock") which are convertible into an aggregate of One Million Seven Hundred Fifty Thousand and One (1,750,001) shares of the Company's common stock, no par value per share (the transaction, the "Kairos Transaction") to such shareholders.  On November 3, 2017, the Company closed the Kairos Transaction.

Upon closing of the Karios Transaction, the Company became the owner of certain computer equipment and other assets used for the mining of cryptocurrency, specifically servers consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by industry leader Bitmain.

The shares of Series B Preferred Stock are convertible into shares of common stock based on a conversion calculation equal to the stated value of the Series B Preferred Stock, plus all accrued and unpaid dividends, if any, on such Series B Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series B Preferred Stock is $6.80 and the initial conversion price is $6.80 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events.

The holders of Series B Preferred Stock are entitled to receive dividends if and when declared by the Company's board of directors. The Series B Preferred Stock will participate on an "as converted" basis, with all dividends declared on the Company's common stock. Such dividends will be paid by the Company out of funds legally available therefor, payable, subject to the conditions and other terms hereof, in cash on the stated value of such Series B Preferred Stock.

The Company is prohibited from effecting a conversion of the Series B Preferred Stock to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% percent of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series B Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99% percent. Each holder is entitled to vote on all matters submitted to stockholders of the Company, and will have the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series B Preferred Stock.

The Series B Preferred Stock contains a blocker pursuant to which, if the Company has not obtained the approval of its shareholders in accordance with NASDAQ Listing Rule 5635(d), then the Company may not issue upon conversion of the Series B Preferred Stock a number of shares of common stock, which, when aggregated with any other shares of common stock  underlying the Series B Preferred Stock issued pursuant to the Agreement would exceed 19.99% of the shares of common stock issued and outstanding as of the date of the Agreement, subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the common stock that occur after the date of the Agreement.

The foregoing description of the Agreement does not purport to be complete and is qualified in its entirety by reference to the complete text of the Agreement, a copy of which will be filed as an exhibit to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2017.

The foregoing description of the Series B Preferred Stock does not purport to be complete and is qualified in its entirety by reference to the complete text of the Form of Series B Certificate of Designation of Rights, Powers, Preferences, Privileges and Restrictions of 0% Series B Convertible Preferred Stock (the "Certificate of Designation"), a copy of which is filed as Exhibit 3.1 to this Current Report on Form 8-K and is incorporated by reference herein.

**Item 3.02. Unregistered Sales of Equity Securities.**

Item 1.01 is incorporated by reference in its entirety into this Item 3.02. The Kairos Transaction was conducted pursuant to the exemption set forth in Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act") and safe-harbor set forth in Regulation S adopted under the Securities Act.

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

*Departure of Chief Executive Officer and Chairman*

On November 3, 2017, Michael Beeghley resigned as a director and the Chief Executive Officer of the Company.   Such resignation was tendered and accepted by the Board of Directors of the Company (the "Board").  Mr. Beeghley's resignation was not the result of any disagreement with the Company, any matter related to the Company's operations, policies or practices, the Company's management or the Board.  On November 3, 2017, Mr. Beeghley entered into a separation agreement with the Company (the "Separation Agreement"), pursuant to which all of his rights and interests in all unvested options and unvested restricted stock units will become vested and, in addition, the Company shall issue an additional award of 40,000 shares of restricted common stock of the Company.  The foregoing description of the Separation Agreement does not purport to be complete and is qualified in its entirety by reference to the complete text of the Separation Agreement, a copy of which will be filed as an exhibit to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2017.

*Appointment of Chief Executive Officer and Chairman*

On November 3, 2017, to fill the vacancy created by Mr. Beeghley's resignation, the Board appointed John O'Rourke as Chief Executive Officer and Chairman of the Board. Mr. O'Rourke currently serves as President of the Company and as a member of the Board.  There is no family relationship between Mr. O'Rourke and any of the Company's other officers or directors.

In connection with the appointment of Mr. O'Rourke as Chief Executive Officer and Chairman of the Board, the Board approved (i) a monthly salary of $25,000, (ii) a restricted stock award of 344,000 shares of common stock which shall vest in 24 equal monthly installments beginning one month from the date of issuance and (iii) an option to purchase up to 100,000 shares of the Company's common stock, at an exercise price $10.00, the exercisability of which is subject to shareholder approval of an increase to the amount of shares available for issuance under the Company's equity incentive plan, and as more fully set forth in an employment agreement (the "Employment Agreement") which shall have a term of two years. The foregoing description of the Employment Agreement does not purport to be complete and is qualified in its entirety by reference to the complete text of the Employment Agreement, a copy of which will be filed as an exhibit to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2017.

*Departure of Director*

On November 1, 2017, Mike Dai resigned from his position as a member of the Board and all committees thereof.  Mr. Dai's resignation is not due to any disagreement related to the financial status or financial statements of the Company.

*Appointment of Director*

On November 3, 2017, the Company appointed Jason Les as a director of the Company.  Mr. Les is deemed an "independent" non-employee director as defined by NASDAQ Rule 5605(a)(2).  There are no family relationships between Mr. Les and any of our other officers and directors. Mr. Les shall receive the Company's equity award for new independent directors of 7,500 restricted stock units as compensation, which shall vest in 24 equal monthly installments over a two year period, beginning on the one month anniversary of the date of issuance. Mr. Les was appointed to the Nominating and Governance Committee, Audit Committee and Compensation Committee (Chairman) of the Board.

Set forth below is the biographical information of the newly appointed director, as required by Item 401 of Regulation S-K.

Mr. Les graduated from U.C. Irvine in 2010 with a B.S. in Information and Computer Science. Mr. Les is an established professional poker player. Mr. Les successfully competed in high stakes heads-up games online for several years and was twice selected as the human benchmark for testing the world's best poker artificial intelligence in what was dubbed Man vs Machine at Carnegie Mellon University. Mr. Les was chosen as a director based on the fact that he has been active in the industry as a miner, studying protocol development and evaluating a variety of crypto investment strategies.

**Item 5.03. Amendments to Articles of Incorporation or Bylaws; Changes in Fiscal Year.**

On November 3, 2017, the Company designated 1,750,001 shares of preferred stock as "0% Series B Convertible Preferred Stock" in connection with the filing of the Certificate of Designation with the Secretary of State of the State of Nevada.  The details of the Series B Preferred Stock and Certificate of Designation are described in Item 1.01, which is incorporated by reference in its entirety into this Item 5.03. The Certificate of Designation is filed as Exhibit 3.1 hereto.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

The exhibits listed in the following Exhibit Index are filed as part of this Current Report on Form 8-K.

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Form of Certificate of Designations, Preferences and Right of the 0% Series B Convertible Preferred Stock of Riot Blockchain, Inc. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**RIOT BLOCKCHAIN, INC.**

Dated: November 3, 2017                    By:    /s/ Jeffrey G. McGonegal

                                                           Name: Jeffrey G. McGonegal
                                                           Title: Chief Financial Officer

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**RIOT BLOCKCHAIN, INC.**

Dated: November 3, 2017

By:   /s/ Jeffrey G. McGonegal
      Name: Jeffrey G. McGonegal
      Title: Chief Financial Officer