# Exhibit 1

**SANJAY WADHWA**
**SENIOR ASSOCIATE REGIONAL DIRECTOR**
**Michael Paley**
**Charu Chandrasekhar**
**Nancy Brown**
**Katherine Bromberg**
**Jon Daniels**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-1023 (Brown)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------------x
```
**SECURITIES AND EXCHANGE COMMISSION,**      :
                                             :
                             **Plaintiff,**   :
                                             :      **18 Civ. 8175 (ER)**
             **– against –**                  :
                                             :      **ECF CASE**
**BARRY C. HONIG, MICHAEL BRAUSER,**         :
**JOHN STETSON, JOHN R. O'ROURKE III,**      :
**ROBERT LADD, ELLIOT MAZA, BRIAN KELLER,**  :
**JOHN H. FORD, ATG CAPITAL LLC, GRQ**       :      **FIRST AMENDED**
**CONSULTANTS, INC., HS CONTRARIAN**         :      **COMPLAINT**
**INVESTMENTS, LLC, GRANDER HOLDINGS, INC.,**:      **AND JURY DEMAND**
**and STETSON CAPITAL INVESTMENTS INC.,**    :
                                             :
                             **Defendants.**  :
```
------------------------------------------------------------------------x
```

Plaintiff Securities and Exchange Commission ("Commission"), for its first Amended

Complaint against Defendants Barry C. Honig ("Honig"), Michael Brauser ("Brauser"), John

Stetson ("Stetson"), John R. O'Rourke III ("O'Rourke"), Robert Ladd ("Ladd"), Elliot Maza

("Maza"), Brian Keller ("Keller"), John H. Ford ("Ford")[1], ATG Capital LLC ("ATG"), GRQ

---

[1] Defendant Ford has consented to entry of a judgment imposing permanent injunctions
against him on the charges stated in the Commission's original Complaint, and leaving his

Consultants, Inc. ("GRQ"), HS Contrarian Investments, LLC ("HSCI"), Grander Holdings, Inc.

("Grander") and Stetson Capital Investments Inc. ("SCI") (collectively, "Defendants"), alleges as

follows:

## SUMMARY OF ALLEGATIONS

1.        This case involves a series of highly profitable "pump-and-dump" schemes

involving the stock of three public companies, "Company A," "Company B" and "Company C."

At the center of all three schemes were Defendants Honig, Brauser, Stetson and O'Rourke, as

well as some combination of their entities, Defendants GRQ, Grander, SCI, HSCI and ATG.  In

all three schemes, these Defendants amassed a controlling interest in the issuer, concealed their

control, drove up the price and trading volume of the stock through manipulative trading and/or

paid promotional activity, and then dumped their shares into the artificially inflated market on

unsuspecting retail investors.

2.        Across all three schemes, Honig was the primary strategist, calling upon other

Defendants to, among other things, acquire or sell stock, arrange for the issuance of shares,

negotiate transactions, and/or engage in promotional activity.  In each scheme, Honig and some

combination of Brauser, Stetson and O'Rourke (and often other individuals), either explicitly or

tacitly agreed to acquire, hold, vote and/or dispose of their shares in coordination with one

another.  Once Honig and his associates had secured substantial ownership of the issuer, they

acted as an undisclosed control group.  Honig and/or other members of the particular investor

group, with the knowledge and consent of the other group members, directed the issuer's

management for their benefit, including orchestrating transactions designed to create market

---

liability for monetary relief for further resolution.  (Docket Entry 28.)  The Commission states no
new charges against him in this Amended Complaint.

interest in the company or to solidify their control.

3.     Honig and his associates needed to create liquidity so they could sell their stock and profit from their investments in Company A, Company B and Company C.  To accomplish this goal, in each scheme, Honig and his associates would arrange and pay for the promotion of the relevant stock by directing Ford or a similar promoter to write favorable and materially misleading articles about the company whose trading volume and stock price they wanted to inflate.  In several instances, to magnify the intended boost to the trading volume and stock price that would follow a promotional article's release, Honig, Brauser, O'Rourke and ATG and their associates engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock.

4.     Honig and his associates had to conceal their plan to promote and dump stock for each scheme to work.  They accomplished this concealment by, among other things, evading their reporting obligations under the federal securities laws and ensuring that the executives of Company A, Company B and Company C did not accurately report Defendants' collective control.

5.     Specifically, Honig, Brauser, Stetson and O'Rourke, as well as certain of their entities and other associates, violated provisions of the federal securities laws that require individuals and groups who hold more than a five percent ownership interest in a publicly traded company to notify the Commission and inform the investing public by filing a form that accurately reflects their ownership interest and that of all members of any group in which they are a member.  Honig, Brauser, Stetson, O'Rourke, their entities and certain of their associates failed to make their required disclosures while acting as a group in the acquisition, holding, voting and/or disposition of their shares in Company B and Company C.  They also failed

appropriately to disclose their intention to exercise (and their actual exercise of) control over Company B and Company C.

6.     Defendants Maza (Company A's CEO), Keller (Company A's Chief Scientific Officer and a director) and Ladd (Company B's CEO), acted separately at the direction of Honig and his confederates to take steps beneficial to the respective Honig-led group at the expense of each company's public shareholders, and signed public filings they knew, or were reckless in not knowing, to be false, to hide the respective group's beneficial ownership and existence.

7.     Maza and Keller signed Company A's public filings, in which they knowingly or recklessly failed to disclose that Honig, Brauser, Stetson, their affiliates, and/or their respective entities, owned shares of Company A as a group. Company A's filings similarly failed to disclose the size of each member of the Honig group's holdings and thereby concealed the extent of their control over the company from other shareholders and the public. Similarly, Company B's CEO, Ladd, signed false public filings, making material omissions about Honig's, Brauser's, Stetson's, O'Rourke's, their associates' and their respective entities' group ownership.

8.     All told, the three schemes earned Defendants and their associates millions of dollars: Company A's pump and dump generated approximately $9.3 million in stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities, and affiliates. Company B's pump and dump generated more than $9.5 million for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities, affiliates, and/or certain frequent co-investors. And, most recently, the pump and dump of Company C brought in over $8.3 million in stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities and/or certain frequent co-investors. These profits were made at the expense of investors who purchased shares in Company A, Company B and Company C at artificially high prices based on

misleading flattering articles or coverage in the media and matched trades that were orchestrated by the Defendants.

## **VIOLATIONS**

9. By virtue of the conduct alleged herein, each of the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws as follows:

10. Honig violated:

- Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Sections 9(a)(1) and (a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") [15.U.S.C. §§ 78i(a)(1) and (a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

11. Brauser violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 9(a)(1) of the Exchange Act [15.U.S.C. § 78i(a)(1)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

5

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

12. Stetson violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

13. O'Rourke violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Sections 9(a)(1) and (a)(2) of the Exchange Act [15.U.S.C. §§ 78i(a)(1) and (a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

14. Ladd violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Sections 17(a)(1)

and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)] and

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a)

and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] and by aiding and

abetting Company B's violations of Section 13(a) of the Exchange Act [15

U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1

thereunder [17 C.F.R. § 240.13a-1].

15.    Maza violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5
  thereunder [17 C.F.R. § 240.10b-5]; and

- Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting
  Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. §
  78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

16.    Keller violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b)
  thereunder [17 C.F.R. § 240.10b-5(b)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of
  the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's,
  Brauser's, Stetson's, O'Rourke's and others' violations of Sections 17(a)(1)
  and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)] and
  Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a)
  and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], and by aiding and

abetting Company A's violations of Section 15(d) of the Exchange Act [15
U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

17.     Ford violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]; and

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b)
  thereunder [17 C.F.R. § 240.10b-5(b)].

18.     ATG violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and
  (a)(3)];

- Sections 9(a)(1) and (a)(2) of the Exchange Act [15.U.S.C. §§ 78i(a)(1) and
  (a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a)
  and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a)
  thereunder [17 C.F.R. § 240.13d-1(a)].

19.     GRQ violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5
  thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a)
  thereunder [17 C.F.R. § 240.13d-1(a)].

20.     HSCI violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

21.     Grander violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

22.     SCI violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

23.     The Commission seeks final judgments permanently enjoining Defendants from violating the federal securities laws, requiring each Defendant to disgorge his or its ill-gotten gains and to pay prejudgment interest on those amounts; requiring Defendants to pay civil

monetary penalties; barring Defendants from participating in future penny stock offerings;

barring Defendants Ladd, Maza and Keller from serving as officers or directors of publicly

traded companies; and seeking any other relief that the Court deems just and appropriate.

24.     Unless Defendants are permanently restrained and enjoined, they each will

again engage in the acts, practices, and courses of business set forth in this Complaint, or in acts

and transactions of similar type and object.

## JURISDICTION AND VENUE

25.     The Commission brings this action pursuant to the authority conferred by

Sections 20(b) and (d) of the Securities Act [15 U.S.C. §§ 77t(b) and (d)], and Sections 21(d) and

(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

26.     This Court has jurisdiction over this action pursuant to Sections 22(a) and (c)

of the Securities Act [15 U.S.C. §§ 77v(a) and 77v(c)], and Section 27 of the Exchange Act [15

U.S.C. § 78aa.  Defendants, directly or indirectly, singly or in concert, have made use of the

means or instrumentalities of transportation or communication in, interstate commerce, or of the

mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

27.     Venue lies in this district pursuant to Sections 22(a) and (c) of the Securities

Act [15 U.S.C. §§ 77v(a) and (c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

Certain of the transactions, acts, practices and courses of business constituting the violations

alleged herein occurred within the Southern District of New York.  Among other things, at all

relevant times, Company B's principal place of business was in Harrison, New York, within this

District, and certain Defendants solicited investments in securities from investors in this District

and sold securities through a broker-dealer located in this District.

## THE DEFENDANTS

### Individual Defendants

28.      **Honig**, born in 1971, is a resident of Boca Raton, Florida and, at all relevant times, worked at an office in Boca Raton with Stetson and O'Rourke.  Honig owns GRQ.  Honig also owns a majority stake in HSCI, as to which Stetson is the named managing member.  Honig was also the president and one-third owner of Southern Biotech, Inc. ("Southern Biotech"), a now-dissolved Nevada entity.

29.      **Brauser**, born in 1956, is a resident of Lighthouse Point, Florida.  He owns Grander, and owned one third of Southern Biotech.

30.      **Stetson**, born in 1985, is a resident of Fort Lauderdale, Florida and, at all relevant times, worked at an office in Boca Raton with Honig and O'Rourke.  Stetson owns SCI, and has a minority investment in HSCI, of which he is the named managing member.

31.      **O'Rourke**, born in 1985, is a resident of Fort Lauderdale, Florida and, at all relevant times, worked at an office in Boca Raton with Honig and Stetson.  O'Rourke owns ATG.

32.      **Maza**, born in 1955, is a resident of New York, New York.  He was the CEO of Company A from June 2011 to January 2014.  He is a CPA licensed in New York, as well as an attorney licensed in New York.

33.      **Keller**, born in 1956, is a resident of California.  He was Chief Scientific Officer of Company A from about March 2011 to January 2014, and was a member of its board of directors.  He currently works as President of Sales and Senior Vice President of Research and Development at Company A's successor company.

34.      **Ladd**, born in 1959, is a resident of Raleigh, North Carolina.  At all relevant times, he was a resident of New York, New York.  He has been the CEO of Company B since

11

February 10, 2011.

35.     **Ford**, born in 1956, is a resident of Bolinas, California.

### Entity Defendants

36.     **ATG** is a Florida corporation owned and operated by Defendant O'Rourke and for which O'Rourke makes investment decisions. Its principal place of business is in Florida. ATG was incorporated in or around 2012.

37.     **GRQ** is a Florida corporation owned and operated by Defendant Honig and for which Honig makes investment decisions. Its principal place of business is in Florida. GRQ was incorporated in or around 2004.

38.     **Grander** is a Florida corporation owned and operated by Defendant Brauser and for which Brauser makes investment decisions. Its principal place of business is in Florida. Grander was incorporated in or around 2010.

39.     **HSCI** is a Delaware corporation incorporated in 2011. Its principal place of business is in Florida.

40.     **SCI** is a Florida corporation owned and operated by Defendant Stetson and for which Stetson makes investment decisions. Its principal place of business is in Florida. SCI was incorporated in or around 2011.

### OTHER RELEVANT PERSONS AND ENTITIES

41.     **Company A** is a Delaware corporation headquartered in Georgia. It was incorporated in Nevada in 2006. Company A was controlled by Honig and Brauser between March 2011 and early 2014. The company filed periodic reports, including Forms 10-K and 10-Q with the Commission. Company A's stock was quoted on OTC Link (formerly known as the "Pink Sheets"), an electronic interdealer quotation system operated by OTC Markets Group, Inc. In early 2014, Company A engaged in a reverse merger with a company associated with Honig

and his associates.  The successor company is currently quoted on OTC Link.  At all relevant times, Company A's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)], and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

42.     **Company B** is a Delaware corporation headquartered in Durham, North Carolina, formerly headquartered in Harrison, New York, and was incorporated in 2000.  Its common stock is registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and it files periodic reports, including Forms 10-K and 10-Q with the Commission.  Company B's common stock was listed on NYSE MKT from 2007 until its October 19, 2016 delisting.  Its stock is currently quoted on OTC Link.

43.     **Company C** is a Delaware corporation headquartered in San Diego, California, and was incorporated in 1988.  Company C's common stock is registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and its common stock has been listed on NASDAQ since August 2016.  At relevant times, Company C's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

44.     **Investor 1** was a frequent co-investor with Honig and other Defendants.  He is a large shareholder, CEO and Chairman of a public company (referred to herein as **"Investor 1 Company"**), trustee and indirect beneficiary of a trust (referred to herein as **"Investor 1 Trust"**) and president of a limited liability company (referred to herein as **"Investor 1 Group"**), and he sometimes used Southern Biotech to co-invest with Honig and Brauser.  He enjoys a reputation as a successful biopharmaceutical investor and has a substantial following among retail investors.

45.     **Affiliate 1** occasionally works at Honig's office in Boca Raton.  Affiliate 1

was a frequent co-investor with Honig, Brauser, Stetson and O'Rourke, investing in at least 36 issuers alongside Honig (and/or a Honig entity) from 2011 through August 2018, either individually, or through his entity, "**Affiliate 1 Entity**." Affiliate 1 invested in each of Company A, Company B and Company C alongside Honig, Brauser, Stetson and O'Rourke.

46. **Affiliate 2** is a foreign corporation and hedge fund that invested alongside Honig in many issuers since 2011. Affiliate 2 invested in Company A alongside Honig, Brauser, Stetson and O'Rourke.

47. **Southern Biotech** was a Nevada corporation that Stetson incorporated at Honig's direction in 2014. It was dissolved in 2017. Honig was listed as the sole officer and president. Southern Biotech was co-owned by Honig, Brauser, and Investor 1. It made investments in multiple public companies, often in addition to investments each co-owner made separately. At Honig's direction, with Brauser's knowledge and approval, and Stetson's help in executing the investment, Southern Biotech made investments in Company C.

## BACKGROUND

48. "Pump-and-dump" schemes typically have two parts. In the first, the fraudsters acquire a large amount of stock at little or no cost whereupon a promotion scheme is implemented to boost the price of the stock or create trading volume by stimulating market interest with false or misleading statements about the company. Once the stock price and trading volume have been pumped up, fraudsters move on to the second part, in which they dump their large holdings of the stock into the public market at an enormous profit for themselves. After these fraudsters dump their shares and stop hyping the stock, the price typically falls, trading volume dries up, and investors lose their money. Critical to the success of such a scheme is disguising the fact that the fraudsters beneficially own and control a large amount of the

unrestricted stock which, if known to investors and market participants, would inform investors that control persons of the company were dumping their stock.

49.　　The federal securities laws are designed to ensure transparency by requiring that investors be provided with timely, accurate information about companies and persons who own large amounts of company stock and thus are in a control relationship with the company. The Securities Act and the Exchange Act have several provisions designed to ensure that companies, their officers, and large shareholders provide the marketplace with adequate information.　For example, when a person or group of persons acquires beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of the Exchange Act, the person or group is required to make a filing under Exchange Act 13(d) with the Commission.　When a group of persons agrees to act together to acquire, sell, vote or hold more than 5% in the aggregate of any issuer's stock, they must each file a disclosure, even if their individual ownership is below 5%.　These disclosure provisions are intended to alert the company's stockholders and the marketplace to dramatic changes in securities ownership that indicate potential for changes in control of the company.

50.　　Similarly, the Exchange Act requires that issuers with registered securities file annual reports called Form 10-K with the Commission.　The Form 10-K provides investors with key information about an issuer's business, its finances, management and the securities beneficially owned by management and certain large shareholders.

51.　　The registration provisions of the Securities Act are also designed to ensure that investors have key information when the company or its control persons seek to sell securities.　Companies are generally required to disclose important financial information in a registration statement filed with the Commission, which is available to the public.　When

participants in a pump-and-dump scheme sell large blocks of stock to the investing public without registering the transaction, the offer or sale of that stock can violate the registration requirements of the Securities Act.

52.     Fraudulent promotion or manipulative trading used to pump the company's stock price and trading volume can violate the antifraud provisions of the Securities Act and the Exchange Act.  For example, fraudsters may use online newsletters, bulletin boards, or social media to disseminate false and misleading statements to the public in order to encourage investors to purchase their undisclosed stake at inflated prices.  Promoters may falsely claim to offer independent, unbiased recommendations in newsletters and other touts when they stand to profit from convincing others to buy or sell certain stocks – often, but not always, penny stocks. Fraudsters frequently use this ploy with small, thinly traded companies because it is easier to manipulate a stock when there is little or no information available about the company, and where fraudsters can obtain control of a substantial portion of the company's unrestricted shares.  To help investors evaluate a stock promotion, promoters are required to disclose any compensation they receive from an issuer, underwriter or dealer for touting a security in any media.

53.     In addition to false promotional pieces, fraudsters sometimes use matched trades to drive up the price of a security.  Members of a scheme will trade shares between themselves, gradually inflating the price.  A rising stock price creates the false impression that there is investor demand for the security, and thus serves to encourage other investors to buy.  If the fraudsters have disguised their ownership and control of securities being traded, investors are deceived into believing that the matched trades are by outside market participants seeking to invest in the company.  For this reason, the Exchange Act prohibits entering an order for the purchase or sale of a security with knowledge that an order or orders of substantially the same

size, at substantially the same time and substantially the same price, for the sale or purchase of a security, had been or would be entered.

54.     Collectively, these and other provisions of the federal securities laws protect investors from pump-and-dump schemes and ensure that investors understand who is controlling a company and whether any large shareholders have amassed a position that will allow them to control or influence the company and its securities.  When these required disclosures are evaded or issued in a misleading fashion, investors are deprived of material information about an issuer.

**FACTS**

**A.  Overview of Defendants' Pattern of Investments**

        **1.     The Partnership Among Honig, Brauser, Stetson and O'Rourke**

55.     Honig, Brauser, Stetson and O'Rourke, individually or through their entities, invested alongside one another in at least 19 issuers at or about the same time, from 2011 to the present.  While this action concerns three of those issuers, in most cases in which Honig, Brauser, Stetson and O'Rourke co-invested, the investments followed a pattern:  Honig or Brauser would identify a target company and arrange a financing or financings that would give them and their chosen co-investors (including Stetson and O'Rourke, among others) a controlling position in the company's outstanding common stock at lower-than-market prices. Honig, Brauser, Stetson and O'Rourke would then exercise that control by dictating terms of the company's material management decisions and policies, and voting together to direct the company's major business decisions.  When the group determined that the time had arrived to exit the investment, they would engineer a publicity-generating event that would both drive the price of the stock higher, and also create market demand and trading volume that would allow them to sell their positions.  Typically, Honig, Brauser, Stetson and O'Rourke would dictate some kind of transaction for management to undertake – for example, an acquisition or merger,

17

or a new investment by a well-known investor, like Investor 1 – and paid writers, bloggers or other public relations professionals to write about it. Once the publicity had its intended effect on the stock's price and trading volume, Honig, Brauser, Stetson, O'Rourke and the other hand-picked co-investors would sell their respective positions – generally staggered over a course of weeks – into the artificially inflated market.

56.     Throughout these stages, Honig, Stetson and O'Rourke were in nearly daily contact because they worked out of the same office and were in frequent email and telephone contact, at times purposefully moving their conversations to the less permanent medium of text or instant messaging. Honig, Stetson and O'Rourke were each in frequent contact with Brauser, with whom they shared office space until late 2013.

57.     Honig, Brauser, Stetson and O'Rourke obtained their interests in these issuers at the same time, and agreed to act as a group in holding, disposing and voting the stock they acquired, with Honig leading the combined effort. As O'Rourke put it in a February 3, 2014 email to the officer of a potential merger target, "Barry Honig is the principal investor of our small group." Honig carefully controlled his "small group's" participants in the financings he arranged so that shares were held only by individuals and entities that (1) permitted Honig to direct how they voted their shares and/or acquiesced in Honig's control of the management of the company, and (2) refrained from selling their shares until the optimal time for group members to profit from the planned post-pump dump.

58.     Honig worked with Stetson to ensure that members of his groups voted their shares in unison. At times, members of the group reached out to Stetson to find out how they should vote on various proposals. For example, with respect to one of the issuers in which they had co-invested, in July 2015, Brauser forwarded an email request from a co-investor's staffer to

Stetson, asking whether to vote for or against a proposal. Stetson, in an email that same day, copying Honig, replied "Yes, vote 'For.'" In a November 2016 email to members of a Honig group of investors in another issuer, Stetson responded to a request for "instructions to vote" with "[v]oting in favor of [two named directors]. Against all other members and actions."

59. While Honig was the primary architect of the three schemes detailed below, email traffic among Honig, Brauser, Stetson and O'Rourke demonstrates the various key roles each of these Defendants played in the typical Honig-led investment.

60. Brauser is a long-time co-investor with Honig, investing (individually, through his entity, Grander, or through family members' accounts) alongside Honig (and/or a Honig entity) in more than 40 issuers between approximately 2011 and mid-2018. From at least October 2010 to approximately 2013, Brauser rented an office with Honig at 4400 Biscayne Boulevard in Miami, Florida. Brauser's business association with Honig was sometimes noted by keen market observers: As early as 2013, a short seller published a report on a company in which the two had invested and noted that a factor negatively affecting the value of the company's stock was the CEO's close financial ties with "two serial stock promoters," whom it identified as Honig and Brauser.

61. For some of the issuers in which Brauser co-invested alongside Honig, Brauser took an active role, at times directing the issuer's management, finding and negotiating transactions for the issuer or bringing in additional investors. In others – particularly while Honig and Brauser worked through one of their periodic disputes about who owed whom money – Brauser was content to let Honig direct the steps in the scheme; since Brauser had been closely involved with respect to the other issuers in which he had co-invested with Honig, he was well-familiar with the playbook, knew that Honig would follow it and understood that Honig would

signal to Brauser when it was time to sell his shares.

62.     Stetson shared office space with Honig and O'Rourke at all relevant times. Individually, through his entity SCI, or through HSCI (the vehicle he nominally controlled), Stetson invested alongside Honig (and/or a Honig entity) in more than 65 issuers between 2011 and August 2018.  In connection with most of these investments, Stetson executed Honig's directions, managed the administrative aspects of the Honig group's investments, and performed pre-investment due diligence.  For example, Stetson communicated with brokers to effect Honig's trades, deposited Honig's shares with brokers, communicated investment terms and wire instructions to investors Honig had lined up, tracked the ownership of each group member in a particular issuer, corralled shareholder votes from co-investors (and, in some cases, even told co-investors how to vote), prepared financial analysis of proposed investments and conveyed Honig's instructions to issuer management.  From 2012 to 2013, Stetson also frequently managed Honig's arrangements with Ford to write paid promotional articles about issuers in which Honig and his group had invested.

63.     O'Rourke shared office space with Honig and Stetson at all relevant times, beginning in 2012.  Through his entity, ATG, or individually, O'Rourke invested alongside Honig (and/or a Honig entity) in over 75 issuers between 2011 and August 2018.  Beginning in 2013, O'Rourke managed the Honig group's promotional efforts by working with writers and bloggers to publish favorable articles and posts about issuers the Honig group controlled.  He arranged for those writers to be compensated for their promotional pieces.  For example, in 2013 and 2014, O'Rourke compensated "Writer E" for writing positive promotional articles. O'Rourke made the payments through personal checks and/or sham stock purchases, designed to disguise the true purpose of the compensation.  O'Rourke knew, or was reckless in not knowing,

that Writer E did not disclose these payments in the promotional pieces he published on these issuers.

64.     At times, and with Honig's knowledge and consent, or at his direction, O'Rourke wrote and published the promotional articles himself.  O'Rourke used a pseudonym for the byline and did not disclose his relationship to the issuer being promoted or the compensation Honig was paying him for the articles.

65.     In addition to his work with promoters and his own promotional activities, in at least one instance, O'Rourke took the lead in negotiating a transaction for Company B, in which he, Honig, Brauser and Stetson and/or certain of their entities had invested.  After about his first year with Honig, O'Rourke also began assisting Stetson with the administrative aspects of each group investment.

66.     Investor 1 invested alongside Honig (or a Honig entity) in several issuers from 2011.  For Honig and his co-investors, Investor 1's participation in a deal brought an aura of legitimacy, important publicity for the issuer, and – most helpful in creating market interest in the particular issuer – his substantial following among retail investors.  As a consequence, Honig and Brauser frequently sought to persuade Investor 1 to invest alongside them.  As Stetson put it in a 2015 email to the CEO of Company C, the "following of [Investor 1] is worth its weight and [sic] gold."

### 2.     Honig's Efforts to Conceal the Extent of His Investments

67.     Honig sought to conceal the size of his investments in issuers.  To that end, Honig set up various investment vehicles through which he could invest indirectly and surreptitiously.

68.     One such Honig investment vehicle was HSCI, a limited liability company that Honig and Stetson set up in 2011.  While Honig and Stetson named Stetson as HSCI's sole

managing member, Honig controlled 94% of its membership interests and directed many of

HSCI's investment decisions, including the size of the allocation HSCI would take in a particular

financing, the timing of when HSCI would deposit shares or sell its position, and the brokers

HSCI would use for its transactions. For example, in a November 20, 2013 email, Honig

directed Stetson to "convert, deposit and purchase [shares in a particular issuer]. . . from

HS[CI]." In a January 5, 2014 email, Honig directed Stetson to wire $1,700,000 from HSCI to

accounts at his broker and bank. In a June 1, 2014 email in which Honig laid out a list of tasks

for Stetson, he directed Stetson to "change warrant to HS[CI]. Have HS[CI] buy it for $1000."

On June 17, 2014, Honig instructed Stetson to "wire out of hs[ci] and then get money wired bacl

[sic] to me." In July 2015, Honig directed Stetson to transfer Honig's Company C shares and

those held by HSCI to an investment relations consultant he wanted involved in the promotion of

Company C. And, more recently, in October 2016, Honig negotiated terms for an investment in

an issuer, which, according to an October 7, 2016 Honig email, included a "$650,000 investment

from me and or my assignees and I get 100,000 shares for due diligence and structuring fee."

Stetson had no part in the negotiations. When the issuer sent the final deal documents, both the

subscription agreement, and the consulting agreement for "due diligence services" were in the

name of HSCI, and Stetson signed them both on behalf of HSCI.

69.     Honig treated HSCI as his own entity in other ways as well. For example,

Honig directed Stetson to pay through HSCI certain of Honig's own expenses, including airfare,

a private jet rental, and a 2015 $75,000 payment to one of the boxers in the stable of professional

boxers Honig sponsored.

70.     Stetson understood that HSCI was Honig's investment vehicle. When Honig

asked Stetson to list Honig's various positions in issuers, Stetson would reply with a list that

included HSCI's position.  But both Stetson and Honig worked to hide that fact from others.  In a March 9, 2011 application to open a brokerage account for HSCI, where the questionnaire asked Stetson for "a list of all principals and beneficial ownership percentage," Stetson failed to identify Honig at all, writing, instead:  "John Stetson 100%."

71.     HSCI was not the only vehicle Honig used to conceal his investments.  Honig used Southern Biotech as an entity through which he, Brauser and Investor 1 could each funnel their investments in issuers, including Company C, thus shielding the size of their individual investments from disclosure.  That Honig was using these vehicles to disguise the extent of his and others' investments was a goal he acknowledged in 2016 in connection with his efforts to set up yet another corporate investment vehicle.  In a November 2016 email among Honig, O'Rourke and others, including Honig's brother, concerning the setup of a corporation as an investment vehicle, Honig agreed that "[t]he goal is to stop people from knowing what Barry invests in and avoiding them blogging on the Internet."

### 3.     The Concealed Agreement with Stock Promoter Ford

72.     Honig first met Ford in the summer of 2012 in San Francisco after having read articles Ford had written promoting investments in public companies.  By 2012, Ford had developed an investor following for his reports on various issuers posted on the *Seeking Alpha* website, a popular investor forum.  During their meeting, Honig asked Ford how much he was paid to write an article about a publicly traded company.  Ford answered that his rate was $45,000 per article.  Honig proposed that he could compensate Ford to write articles for his issuers by inviting him to participate in the private placement financings with his chosen group of investors that he negotiated with issuers.  Ford understood the value of that opportunity since Honig hand-picked the investors invited to participate, the private placement shares were valued below market, and Honig's track record of "successful" investments meant that the shares Ford

obtained would likely rise in value. Ford also understood that Honig's invitation to participate in his group of investors would be contingent on Ford's agreement to write favorable articles about issuers at Honig's, Stetson's and O'Rourke's requests. By the end of the meeting, Honig and Ford had agreed that Honig would secretly compensate Ford to write about companies that Honig introduced to him, and that Ford would not publicly disclose that compensation so that investors would believe Ford's articles to be the product of his independent analysis and free from any conflict of interest.

73.     During their first meeting, Honig presented Ford with a riskless transaction that Ford understood was Honig's way of enticing Ford to participate in the scheme. Honig proposed that Ford purchase securities of issuer S ("Issuer S") (an issuer in which Honig, Stetson and O'Rourke were also invested) in a private transaction with a designated third party, and then immediately sell the securities at a higher price to another designated party.

74.     Ford agreed to participate in the transaction and coordinated the specific details over email with Stetson in July 2012. In an email on July 27, 2012, Stetson told Ford the amount of the purchase wires and the information Ford should put in the reference line for the purchase wires. In that same email, Stetson informed Ford that a $125,000 wire had been deposited into Ford's account, even though Ford had yet to purchase the stock for which he was receiving the funds. On August 7, 2012, Stetson sent Ford the purchase agreements for the Issuer S shares he had "purchased two weeks ago." Ultimately, Ford earned profits of approximately $90,000.

75.     Pursuant to the agreement Ford and Honig reached in their summer 2012 meeting in California, Ford began writing articles at Honig's behest, with assistance initially provided by Stetson, and later by O'Rourke. For example, in September 2012, Stetson arranged for Ford to conduct an interview for a promotional article Ford was writing on Investor 1

Company. Also, in 2012, as described more fully below, at Honig's direction, Stetson arranged

to sell some of his Company B shares at a discount to Ford in exchange for Ford writing two

favorable articles about Company B. Stetson knew, or was reckless in not knowing, that Ford

was being compensated to write these articles, and that Ford was not disclosing the arrangement

in the disclaimers he included with his posts.

76.     During the period 2012-2015, Ford wrote and published seemingly

independent articles about various companies in which Honig and his co-investors had an

interest. He did so at Honig's direction – often communicated through Stetson or O'Rourke –

and in return for the right to participate in off-market securities transactions or Honig-led private

placements. He also received at least $125,000 in cash payments during this period. Honig

structured the cash payments to Ford to disguise their source by enlisting third-party Honig

associates to enter into sham consulting agreements with Ford, and funneling the payments to

Ford through the associates, ostensibly pursuant to those agreements.

77.     Ford communicated with Honig, Stetson and O'Rourke about the companies,

compensation, and articles. Honig, Stetson and O'Rourke knew that Ford was writing the

favorable articles because he was being compensated for doing so, and all three knew that Ford

was not disclosing this compensation to the public readership; indeed, all three understood that if

Ford had disclosed that he was being paid, investors would have discounted the independence of

his analysis and would have been less likely to follow Ford's recommendations.

78.     Brauser, too, knew, or was reckless in not knowing, that Honig was paying

Ford to write promotional pieces without disclosing their arrangement. For example, in

November 2013, Honig copied Brauser and O'Rourke on an email outlining a promotional plan

for Investor 1 Company, which included the publication of a Ford article. Honig noted in this

email that "we are assisting" on the drafting of the "John Ford article." In December 2013, O'Rourke sent Brauser an email linking Ford's Investor 1 Company article, which did not disclose that Ford had been paid to write it. More basically, Brauser (like Stetson and O'Rourke) knew, or was reckless in not knowing, that each participant in Honig private placement deals – Honig's "following" – had been invited to participate in these private transactions in exchange for some value each could bring to the deal, and that Ford was no different. Brauser understood, for example, that Investor 1 brought his retail investor following and reputation as a successful investor to provide liquidity when the participants wished to sell. Brauser knew that others, like Affiliates 1 and 2, brought needed cash and a willingness to follow Honig's directions on how to vote or when to sell. Because Honig was inviting Ford to participate in these transactions, Brauser knew, or was reckless in not knowing, that Ford was providing value to the group in authoring favorable articles on the issuers in which the group was invested.

79.     Brauser, like Honig, Stetson and O'Rourke, also regularly followed news and articles written about the companies in which they were invested. As a result, each of them knew, or was reckless in not knowing, that Ford's promotional articles did not disclose his compensation arrangement with Honig.

### B. The Company A Scheme

#### 1.     *Honig and Brauser Obtain Control of Company A*

80.     In the Company A scheme, Honig and Brauser generated approximately $9.3 million in proceeds for themselves and their co-investors by secretly paying for a misleading promotional campaign, engaging in manipulative trading, and then unlawfully selling Company A shares into the artificially inflated trading volume and stock prices that they had generated.

81.     To acquire control of Company A, Honig and Brauser, acting with Investor 1, caused the company to issue shares to them, certain of their entities, and certain of their

associates through a series of so-called "private investments in public equities," or "PIPE" financings.

82.     In November 2010, Honig, along with his nominees, including Stetson and Affiliate 1, purchased one-third of a publicly traded shell company.  In December 2010, Brauser and Investor 1 each purchased one-half of the remaining two-thirds of the company.  Honig, Brauser and Stetson each disguised his role in the acquisition by purchasing the shares of an intermediary entity that owned a majority of the shell company shares.  The shell company disclosed only the ownership interest of the intermediate entity in its public filings, allowing Honig, Brauser and Stetson to conceal their respective ownership interests.  Soon after they acquired the shell, Honig, Brauser and Investor 1 installed an associate of Investor 1 (the "Investor 1 Associate") as the sole director of the company.

83.     In late 2010, Honig and Brauser approached management of a private biotech company then in the business of manufacturing over-the-counter pharmaceutical products ("Company A Labs") with a proposal to take the company public.

84.     At the time, Company A Labs and Keller, its Chief Scientific Officer and a director, were working on developing a formulation using a patented technology called "Qusomes" that Company A Labs hoped to use in large-scale drug markets, but lacked funding to support its development.  Honig and Brauser promised Keller and the CEO of Company A Labs (the "Company A Labs CEO") that the public company deal would include raising $11-$13 million to support research and development ("R&D") of the Qusomes technology.

85.     On "Honig, Brauser, [Investor 1] Group" letterhead, Brauser sent Company A Labs management a Letter of Intent in late January 2011, and Company A Labs management countersigned the agreement, as amended, on February 1, 2011.  Pursuant to that Letter of Intent,

Company A Labs agreed to a reverse merger into the publicly traded shell controlled by Honig, Brauser and Investor 1. Company A Labs CEO, Keller, and a research scientist employed by Company A Labs were each promised 6,650,000 shares of the newly created public company.

86.     The proposed merger of Company A Labs into the publicly traded shell hit a snag in March 2011. Pursuant to a $3 million credit line Company A Labs had with a San Francisco community bank (the "Community Bank"), the Community Bank had authority to approve all major transactions. In a letter sent on March 14, 2011, it declined to approve the reverse merger, as well as the $2 million bridge financing contemplated to pay for that reverse merger, among other things.

87.     According to its letter, the Community Bank declined to approve the reverse merger for two reasons: First, "[u]nder the proposed new transaction, persons who are not known to the Bank . . . would assume control of [Company A Labs]. . . ." As its second reason, the Community Bank noted:

> The proposed acquisition creates enormous conflicts of interest. There is substantial reason to believe that the resulting entity would act for the benefit of [the Honig investor group] as a whole, rather than the interests of [Company A Labs].

In conclusion, the Community Bank warned that if Company A Labs nonetheless proceeded with the transactions, they would constitute events of default, and the full amount owing under the credit line would become immediately due and payable.

88.     Despite these warnings, Company A Labs completed the reverse merger and the $2 million bridge financing. The Community Bank thereafter sent a default notice. After the merger, on September 8, 2011, Maza, who had been installed as the CFO and a director of the newly created Company A by Honig and Brauser, authorized the company to pay off the credit line.

89.     After the merger, Company A listed its corporate address at 4400 Biscayne Boulevard in Miami, the same business address then shared by Honig, Brauser and Investor 1.

90.     As a result of the reverse merger, Honig, Brauser and Investor 1 controlled the vast majority of Company A's outstanding shares.  In addition, Honig and Brauser, with the knowledge and approval of Stetson and other co-investors, also exercised control over the management of Company A.  After the merger, for example, Honig and Brauser, acting with the knowledge and consent of Stetson and other co-investors, elevated Maza from CFO to CEO of Company A.  Thereafter, Maza sought approval from Honig, Brauser and sometimes Investor 1 for material business decisions.  For example, at the direction of Honig and Brauser, Maza agreed to divert funds from Company A to pay rent for the office of an unrelated entity co-owned by Honig and Brauser, also located at 4400 Biscayne Boulevard.  Maza also sought the permission of Honig and Brauser to take on financing from outside sources.  In one email to Brauser on February 28, 2013, copying Honig, Maza reported that Honig and Investor 1 were on board with the proposals from two separate lenders and sought Brauser's concurrence: "[Investor 1] is OK if you're OK with it.  Work for u?"  Maza also sent Honig, Brauser and Investor 1 updates at least every month providing details on business operations and business opportunities, as well as seeking their approval for material business decisions.  For example, in June 2013, Maza sent Honig and Brauser, among others, a "business memo for your consideration," which outlined "an approach to stabilize the company" and set out "priority initiatives."  In its first public filing after the merger, Company A disclosed that it had retained new corporate counsel ("Issuer's Counsel") – the same firm as well as the same partner at that firm ("Issuer's Counsel Partner") that Honig had insisted other issuers in which he was invested retain.

29

91.     In their capacity as two of the three board members of Company A, Keller and Maza concealed Honig's and Brauser's control of Company A by signing off on public filings that failed to disclose the involvement of Honig, Brauser, Stetson, and Affiliate 1, omissions that made those filings materially misleading. At the time they signed these filings, Keller and Maza understood that Honig and Brauser substantially controlled Company A's management, and not Maza. As Keller explained in a February 12, 2012 email to a Company A colleague, "[t]he real power is with Barry Honig and Mike Brauser. Elliot [Maza] is just a mouth piece." Following the merger, Company A's filings nonetheless identified only Investor 1, but not Honig, Brauser, or the group of Honig, Brauser, and others, including Stetson and Affiliate 1, as owning a greater than 5% interest in Company A.

92.     Post-closing, Honig and Brauser orchestrated a series of additional PIPE financings between March 2011 and June 2012 on very attractive terms for themselves, including debt convertible at pennies per share into millions of shares, and warrants for the cheap acquisition of even more shares. Some of these financings allowed Company A to refinance debt it had amassed both in order to close the reverse merger into the public shell and as a result of defaulting on the Community Bank loan.

93.     Honig and Brauser failed to keep their promises to invest money in Company A for R&D. Instead, they limited their personal investments to whatever minimum amount was necessary to keep Company A's business operating and to fund Maza's and Keller's generous compensation. Keller's compensation substantially increased once he began working with Honig and Brauser, and Maza's annual compensation ranged from $300,000 to $600,000. As a result of the failure to invest money and the high executive compensation payouts, however, Company A lacked funds for R&D, and it was forced to abandon its R&D efforts entirely by mid-2012.

94.     Honig and Brauser used the financings they orchestrated to amass more, ever-cheaper Company A shares for themselves and their associates.  Honig and Brauser also sold some of their convertible debt to their associates, including to Affiliate 1, on September 23, 2013, and to both Stetson and O'Rourke on October 3, 2013, giving them conversion rights to purchase Company A shares for $0.20 a share.  Although these financings did nothing to enhance Company A's continued growth, Maza and Keller went along with them.  Over the course of their respective tenures at Company A, Maza and Keller received millions of shares of Company A stock.

95.     By April 1, 2013, and pursuant to their tacit or explicit agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig, Brauser and other co-investors, including Stetson, Investor 1 Company, Investor 1 Group and Investor 1 Trust, had amassed 28,153,845 shares, or almost 45% of the Company A shares outstanding, with Honig alone holding 5,542,654 shares, or 8.8% of the company's outstanding shares.  But Company A did not disclose the group's combined ownership.  On September 11, 2013, Stetson notified management that the beneficial ownership table should be amended to reflect Honig's substantial share ownership, and on September 12, 2013, Stetson provided Maza with the green light to file an Amended Form 10-K annual report for the 2012 fiscal year.  Nonetheless, even though Company A's September 13, 2013 Form 10-K/A, signed by Maza, Keller, and the Investor 1 Associate, disclosed that Company A's amendment was to update the beneficial ownership table, the annual report failed to disclose the existence of the Honig-allied group, which beneficially owned slightly less than half of Company A's outstanding shares.

96.     On July 16, 2012, Company A Labs' CEO – who had been ousted from Company A by Honig and Brauser – sued Company A, Honig, Brauser, Maza, and Investor 1,

among other defendants, seeking, in part, the 6.65 million shares he had been promised, but which had never been delivered to him out of escrow. Company A, acting at Honig's and Brauser's direction (on behalf of the Honig-led investor group), or with their consent, counter-sued the CEO. In public filings about the suit, Company A represented that the CEO had breached his contract with the Company, and reported that the Company was seeking damages and cancellation of the escrowed shares.

97.     Brauser, who was not an officer or director of Company A, took the lead in negotiating a settlement of the dispute with Company A Labs' CEO on behalf of Company A, frequently updating Honig on his negotiations, and soliciting his views on settlement proposals over email. In September 2013, Brauser and Honig reached settlement terms with Company A Labs' CEO, agreeing to pay him $2 million in return for his relinquishing his claim to the Company A shares he had been promised, and that he had never received. Maza ratified the settlement terms on September 5, 2013.

## 2.     *The Company A Pump and Dump*

98.     In preparation for the Company A pump and dump, during August and September, 2013, Stetson, at Honig's direction, deposited in a brokerage account almost 4 million Company A shares that had been issued to Honig. Stetson worked closely with Honig and Brauser and each of their brokers, Company A, and Company A's transfer agent to help Honig and Brauser ready their Company A shares for sale into the public market. Since part of Stetson's role in working with Honig was to keep track of the amount of each associated investor's holdings, and he had reviewed Company A's Form 10-K/A, setting out Honig's and Brauser's ownership and the number of Company A's outstanding shares, Stetson knew, or was reckless in not knowing, how much of Company A's stock Honig and Brauser controlled.

Stetson also knew, or was reckless in not knowing, that Honig and Brauser were directing Company A's management and policies.

99.     Nonetheless, in connection with the deposit of Honig's shares, on at least two occasions, on August 19 and August 30, 2013, Stetson submitted Honig's signed answers to the broker's questionnaire that both he and Honig knew were false. Honig's answers falsely denied any relationship between him and Company A or its affiliates, and also falsely denied that Honig was an affiliate. At the time that Stetson made that submission, and Honig signed it, each knew, or was reckless in not knowing, that Honig was an affiliate of Company A because of the control Honig exerted over Company A.

100.     On September 6, 2013, Stetson was copied on the transmittal of false attorney opinion letters to Company A's transfer agent in order to remove restrictive legends from Honig's Company A share certificates. These opinion letters were sought by Honig because both he and Stetson knew that removal of the restrictive legend was a necessary step in readying Honig's Company A shares for sale to the public. Each of the letters contained the material misrepresentation that Honig was not an affiliate of Company A, a representation that Stetson and Honig knew, or were reckless in not knowing, was false, given what each knew about Honig's control over Company A.

101.     As part of the process for depositing Honig's shares with a broker – another necessary step, as Honig and Stetson knew, in selling Honig's shares to the public – CEO Maza was also required to issue a representation letter concerning the stock certificates. In a letter to the broker-dealer, dated September 10, 2013, Maza wrote "[w]e further acknowledge and agree that there is no other agreement or understanding between Barry Honig and [Company A] that would preclude Barry Honig from selling or otherwise disposing of shares represented above."

Maza knew, or was reckless in not knowing, that this statement was false because Honig was an affiliate of Company A, and that, as an affiliate, Honig's ability to sell his Company A shares would be subject, under the federal securities laws, to volume limitations.

102.    Once the restrictive legends were lifted from Honig's shares and the shares were deposited into a brokerage account, Honig was ready to sell them.  In September 2013, Honig directed O'Rourke to reach out to Ford to arrange for him to post his purportedly independent investment analysis of Company A on the *Seeking Alpha* website pursuant to the understanding Honig and Ford had reached in 2012.

103.    O'Rourke contacted Ford and proposed that Ford write a Company A article in exchange for Ford obtaining Company A shares at a below-market price.  At that time, Honig, Brauser, Investor 1, Investor 1 Company and other co-investors, including Stetson, owned about 45% of the outstanding Company A shares, and the market for Company A stock was virtually nonexistent (with zero trading volume on Friday, September 20, 2013).  O'Rourke instructed Ford to focus his article on Investor 1's involvement, and the supposed rosy prospects of Company A's R&D.

104.    On Monday, September 23, 2013, Honig and some associates began trading Company A shares to create the appearance of market activity and interest in Company A in advance of the planned Ford article.  That day, the trading volume of Company A shares soared to 302,000 from zero volume the previous trading day.

105.    The September 23rd trading also gave Honig a way to pay Ford surreptitiously for his upcoming favorable article on Company A.  On the morning of Friday, September 20, 2013, O'Rourke called Ford and told him to put in buy orders for Company A stock at $0.40 per share to ensure his order was executed against the corresponding sell order later placed by

34

Honig. Because there was so little trading at that time in Company A shares, O'Rourke and Honig knew that Ford's bid would be hit by Honig on the following Monday, September 23, 2013. In that transaction, Honig sold 180,000 Company A shares to Ford at $0.40 per share, a price well below the price at which these shares otherwise traded during that day.

106. O'Rourke joined the trading at the end of the trading day on September 23rd to "mark the close," *i.e.,* to ensure that the last price of the day would be higher, giving the false impression that Company A's share price was on an upward trajectory. Specifically, at 3:58 p.m. that day, O'Rourke, through his entity ATG, placed a bid to buy Company A shares at $0.68 per share, a significantly higher price than the prior buy order at $0.55 per share, which had been entered at about 3:06 p.m. Another Honig associate, who had purchased shares from Honig earlier in the day, placed a corresponding sell order to complete the transaction at the inflated price.

107. In further preparation for the publication of the Ford article touting Company A, and to enhance the false picture of an active market for the stock, near the end of the trading day on September 26th, Honig and his associates engaged in a series of coordinated trades. For example, the Barry & Renee Honig Charitable Foundation, controlled by Honig, sold Company A shares to a Honig associate at $0.68 per share, and two minutes later another entity affiliated with Honig executed a transaction against ATG, O'Rourke's entity, at $0.68 per share.

108. Ford published his Company A article on the *Seeking Alpha* website less than half an hour before market close on September 26, 2013. That article, touting Investor 1's investment in Company A, bore the title Honig and O'Rourke had supplied to Ford: "[Investor 1 Company] and Its Billionaire CEO Invested in [Company A]." In it, Ford presented a bullish outlook for Company A and concluded that "Company A should be trading for more than twice

today's valuation."

109.     Keller reviewed Ford's Company A article prior to its publication, and knew, or was reckless in not knowing, that Ford was preparing a promotional article.  Ford's article included a question and answer interview of Keller, which O'Rourke had arranged earlier in September.  Ford quoted Keller touting the benefits of Company A's Qusomes technology.  Specifically, Ford quoted Keller's misleading statement that Company A had a formulation ready for testing to be brought to the billion-dollar injectable drug market.  Yet, as Keller knew, as of summer 2012, Company A had shut down all R&D efforts without the successful formulation of an injectable drug and Company A had ceased all efforts to develop this technology in mid-2012.

110.     Ford's article was also materially false and misleading in failing to disclose that Ford had been compensated by Honig for writing the article through Honig's sale to him of below-market Company A shares on September 23.  Instead, Ford included a disclaimer that was itself false and misleading:  "I am long [Company A].  I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article."

111.     The market reacted strongly to the Company A promotion:  the trading volume of Company A stock rose from approximately 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013 and to more than 6 million shares on October 2, 2013.  The share price increased from an average of about $0.48 during August 2013 to an intraday price of $0.97 on October 17, 2013.  Because many of the Defendants had acquired their shares so cheaply, they did not need to capture the immediate post-publication price jump in order to

profit handsomely, and thus they sold their shares in transactions staggered over a three month period. Staggering their sales over a longer period of time allowed them to avoid pushing the stock price lower and the scrutiny that might have resulted from the Honig group's simultaneous selling.

112.     Between the start of the manipulative trading on September 23, 2013 and December 31, 2013, Honig and his co-investors sold shares into the inflated market for proceeds of approximately $9,350,000:

| Company A Pump and Dump Proceeds | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2013)** | **Net Quantity Sold** | **Proceeds** |
| **Honig** | 9/23 – 12/16 | (5,892,689) | $3,416,455.17 |
| **Brauser and Grander** | 9/27 – 12/23 | (2,259,770) | $1,234,630.77 |
| **Affiliates (including Investor 1 Trust, Investor 1 Group, Affiliate 1 and Affiliate 1 Entity, and Affiliate 2)** | 9/26 – 11/27 | (6,989,357) | $4,276,318.19 |
| **Stetson and SCI** | 9/27 – 12/18 | (500,000) | $279,859.68 |
| **O'Rourke and ATG** | 9/23 – 12/27 | (250,000) | $148,443.68 |
| **Total** | | **(15,891,816)** | **$9,355,707.49** |

113.     To compensate O'Rourke for his work, including working with Ford on the promotional piece, on October 4, 2013, Honig sold to O'Rourke's ATG one of Honig's Company A notes, with a face value of $50,000, which O'Rourke immediately converted into 250,000 Company A shares. Despite the fact that Company A shares were trading at a price as high as $0.58, pursuant to the terms of the Company A note he bought from Honig, O'Rourke paid less than half that price at $0.20 a share when he converted through ATG. O'Rourke then sold his ATG shares into the market at the much higher average price of about $0.59 per share between September 26, 2013 and December 27, 2013.

### 3.     The Unlawful Distribution of Company A Shares by Honig and Brauser

114.     Honig and Brauser obtained the Company A shares directly from Company A or a Company A affiliate in transactions not involving any public offering.  Therefore, the Company A shares these Defendants sold were restricted securities as defined in Securities Act Rule 144(a)(3)(i).  No registration statement was in effect for any of the Company A stock sales by Honig or Brauser in the September through December 2013 period.  No exemption from registration was available to either of them, or their entities, with respect to these shares.

115.     Honig and Brauser were also statutory underwriters under Securities Act Section 2(a)(11) because they acquired these securities from the issuer or an affiliate of the issuer with a view to public distribution.  As statutory underwriters, in order to resell the securities to the public in reliance on Securities Act Section 4(a)(1), they were required to comply with the applicable conditions of Securities Act Rule 144, which they did not.

116.     Each of Honig and Brauser, and their respective relevant entities, were under common control with Company A, making each of these Defendants an affiliate of Company A under Securities Act Rule 144(a)(1).  The beneficial ownership of almost 45% of the outstanding stock of Company A by Honig, Brauser and Grander, and other co-investors including Affiliate 1, Affiliate 1 Entity, Stetson, SCI, Investor 1 Company, Investor 1 Trust and Investor 1 Group, gave them collective control over the issuer – control they exercised as demonstrated by the active involvement of Honig and Brauser, with the knowledge and consent of Stetson, in the operations and promotion of Company A.

117.     As affiliates, Honig and Brauser did not comply with the conditions of Securities Act Rule 144 in connection with their distribution of Company A securities.  Because Company A did not trade on a national securities exchange, as affiliates of Company A, these

Defendants could only lawfully sell 1% of the company's total shares outstanding in any three-month period pursuant to Securities Act Rule 144(e). As of September 2013, Company A had approximately 69 million shares outstanding, and as of November 15, 2013, it had approximately 75 million shares outstanding. Honig and Brauser each sold shares in excess of 1% of the total outstanding shares during the September through December period.

### 4. Honig's, Brauser's, Stetson's and O'Rourke's Post-Promotion Use of Company A's Assets and Marketable Securities for Their Personal Benefit

118. After profiting on their sales of Company A stock into the inflated market they had created with their paid promotion, Honig, Brauser, Stetson and O'Rourke continued to use their control over Company A for their own enrichment. Throughout the period preceding the September 2013 pump and dump, behind the scenes Honig, Brauser, Stetson and O'Rourke conspired to sell Company A's assets to another issuer they controlled ("Company M").

119. Each of Honig, Brauser, Stetson and O'Rourke had invested in Company M by the fall of 2013. Honig and another frequent co-investor each also held a lucrative consulting contract with Company M at least through July 2013.

120. Honig and Brauser exercised influence over the management decisions of Company M. Using that influence, Honig and Brauser arranged for Company M to make a $2,000,000 investment in Company A on August 26, 2013 through the purchase of a convertible promissory note with a one-year term and a 10% interest rate. The terms of this note also included a warrant to purchase 10,000,000 Company A shares for either $0.40 per share or on a cashless basis in the event that the Company A shares were not registered. Under Company A's analysis, the value of the warrant alone was almost $2,500,000, even without including the capacity for the conversion of the value of the note plus interest into shares, making this deal

extraordinarily favorable to Company M at the expense of Company A shareholders.

121.     On November 12, 2013, after Honig, Brauser, Stetson and O'Rourke had sold
Company A shares for millions of dollars, Company A announced that it would sell its assets,
including its intellectual property and manufacturing facility, to Company M in return for
1,200,000 shares of Company M's stock. Maza, Company A's titular CEO, did not learn of this
extraordinary transaction until it was announced.

122.     With Company A now stripped of its assets and rendered a public shell, and
less than two months after Ford had been compensated to laud Company A's prospects, Honig
and Brauser arranged a reverse merger of Company A with a private company (the "Private
Company") in which some of their close co-investor associates had a substantial ownership
interest. Under the terms of the merger agreement, Company A shareholders would own 40% of
the newly combined entity and the owners of the Private Company would own 60% of the
shares.

123.     On December 26, 2013, Company A filed a Form 8-K in which it disclosed a
conversion of notes held by Honig and Brauser into newly issued Company A common stock.

124.     On or about January 2, 2014, the reverse merger of Company A and the Private
Company closed. Through that merger, Honig and Brauser were able to enhance the value of
their investments in Company A stock, which, pre-merger, had essentially become an investment
in a public shell. Post-merger, the value of Honig's and Brauser's Company A stock was
supported by the newly acquired Private Company assets, and Honig and Brauser monetized
those investments in subsequent post-merger sales of their Company A shares to public market
investors.

**C.  The Company B Scheme**

125.     During 2015 and 2016, Honig and his associates used Company B, once a

40

publicly traded shell, as another vehicle for their pump-and-dump schemes. Honig and his partners used many of the same tactics they had employed in the Company A scheme: they bought millions of cheap shares, intending to exercise control over the management and policies of the company; exercised that control; orchestrated a misleading promotion of the company that drove up the price and the trading volume of the company's shares; and dumped their shares for a profit in the inflated market. As with Company A, Company B engaged Issuer's Counsel as company counsel. Despite their control over various actions taken by Company B, and their tacit or explicit agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig, Brauser, Stetson and O'Rourke took numerous steps to conceal their involvement, and to perpetuate the false appearance that the company was actually being controlled by its CEO.

### 1. Pre-2015 Investments in Company B by Honig, Brauser, Stetson and O'Rourke

126. By 2015, Company B was well-known to Honig, Brauser, Stetson and O'Rourke – and they were well known to Company B's CEO Ladd – from an earlier pump and dump perpetrated by Honig and his associates in 2012-2013.

127. In October 2012, Honig, Affiliate 1 and Stetson had purchased cheap Company B convertible preferred shares and 5 year warrants through a $4.5 million PIPE transaction. Honig made the transaction contingent on Company B using $300,000 from the capital raise to promote Company B's stock. As was Honig's practice, he dictated the group of investors who would join him, including Affiliate 1 and Stetson.

128. Stetson, with the knowledge and consent of the Honig-led investor group, then enlisted Ford to write a promotional piece, published on the *Seeking Alpha* website on November 5, 2012, which touted Company B's prospects for providing a "2X near-Term Return," and predicting that Company B's stock could rise to $18 a share (nearly triple its price on the

previous trading day). Ford's promotional piece failed to disclose the compensation he had received from Honig, instead assuring investors that he was "express[ing] his own opinions," and was not "receiving compensation for it (other than from Seeking Alpha)."

129. When, after Ford's piece was published, Company B's stock price failed to reach the level desired by the Honig-led group, Honig directed Stetson and/or O'Rourke to retain Ford to write another *Seeking Alpha* article on Company B. At Honig's direction, in November 2012, Stetson sold Ford Company B shares and warrants at a discount in payment for Ford's planned articles on Company B. Ladd knew that Ford held these shares, and had obtained them from someone who had participated in the PIPE transaction, because Ford was listed as one of the selling shareholders of Company B's stock in its November 30, 2012 Form S-3 Registration Statement, signed by Ladd.

130. In his second *Seeking Alpha* article, published on April 11, 2013, Ford touted Company B's imminent settlement of a patent enforcement action that would bring Company B a substantial recovery. Ford again predicted a significant stock price jump and again failed to disclose that he had been compensated pursuant to his agreement with Honig. Ladd knew that Ford's prediction was false, since Company B's patent enforcement action was not on the brink of settlement. This time Ford's article had the desired effect, pushing Company B's share price from $3.50 on April 10, 2013 to almost $4.50 on April 16, 2013, and increasing trading volume significantly. Company B's market capitalization went from under $16 million on April 10, 2013 to over $20 million on April 16, 2013. Honig sold approximately 250,000 shares into the inflated market, earning $967,224.

131. Ladd was aware of the promotional efforts of the Honig-led group. He even agreed to be interviewed by Ford for the November 2012 *Seeking Alpha* article, and spoke to

Ford several times before the article's publication. He also knew, or was reckless in not knowing, that Ford had a connection to Honig and his group because he received emails about Ford's Company B investment from Stetson in early 2013. Ladd knew that Ford's April 2013 article had successfully boosted Company B's stock price. And Ladd knew, or was reckless in not knowing, that Ford was being compensated by Honig and his associates and that he was concealing that fact from his *Seeking Alpha* readers in the April 2013 article, just as he had concealed it in his November 2012 article.

132.    Honig, Stetson and O'Rourke also knew, or were reckless in not knowing, that Ford's April 2013 article failed to disclose the compensation he was receiving from Honig. They each also knew, or were reckless in not knowing, that the article falsely claimed that Company B was in settlement talks and on the brink of a lucrative settlement when it was not. Indeed, the only settlement Company B reached in its patent lawsuits was a single $100,000 recovery many months after the April 11, 2013 Ford article had been published.

### 2.    *Honig and Associates Amass Company B Shares in 2015-2016*

133.    In 2015, Honig and his associates began planning a new scheme to pump and dump Company B's shares. Honig set the scheme in motion on September 26, 2015 when he emailed Stetson: "We need to put together a term sheet for [Company B]. . . similar one to the [Company B] one we used the first time" and outlined proposed terms of an investment deal. The terms included specific provisions designed for Honig and his investor group to have access to shares quickly, warrants for more shares on favorable terms, and the ability to restrict Company B's ability to raise other funds.

134.    On September 27, 2015, Honig directed Stetson to send the proposal to Ladd, Company B's CEO. The deal contemplated the issuance of 2.8 million Company B shares, along

with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker. This deal structure allowed the investors repeatedly to convert and sell their shares while appearing individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings. By ostensibly staying below the 5% ownership threshold, and evading the public reporting requirements, Honig and his associates increased the likelihood that they could conceal the millions of shares that they had amassed and thereby mask their scheme to pump up the Company B share price and trading volume in anticipation of a profitable sell-off to unsuspecting investors.

135. On October 1, 2015, Ladd emailed Honig that "NYSE MKT wants to know the buyers. $175,000 x 4 investors will be each at 4.9%. . . ." Honig replied that same day, copying Brauser and Stetson, that he would "get back to you with names shortly for now use Barry Honig Mike Brauser [and] OBAN [an LLC created by Stetson]." On October 5, 2015, Stetson provided Company B with the investors Honig had selected to participate in the financing, which included GRQ (Honig), Grander (Brauser), SCI (Stetson) and ATG (O'Rourke), as well as other Honig-approved investors. Over the next few days, Honig continued to negotiate the terms of his and his investors' deal with Ladd.

136. The Honig-led financing ultimately provided $700,000 to Company B (the "October 2015 Company B Financing"). On October 8, 2015, Company B filed a Form 8-K with the Commission disclosing that the company had "entered into separate subscription agreements . . . with accredited investors . . . relating to the issuance and sale of $700,000 of units . . . ." The Form 8-K did not disclose the investors' identities.

137. Ladd knew that Honig (through GRQ), Brauser (through Grander), Stetson (through SCI) and O'Rourke (through ATG) and other Honig affiliates were operating as a

44

group, that they had acquired Company B shares together, and that they were collectively
exercising control over the company. In November 2015, Ladd wrote Honig: "As for the cap
table, we have 17.2 million common shares outstanding, including **your group's** 2.8 million . . .
." (emphasis added). Ladd nonetheless failed to disclose Honig's, Brauser's, Stetson's and
O'Rourke's combined interest in, and control over, the company in Company B's public filings.

### 3. The Company B Pump and Dump in February 2016

138.     Having coordinated the accumulation of stock with Brauser, Stetson and
O'Rourke, Honig, with his partners' knowledge and consent, then arranged for a promotion that
included materially misleading information.

139.     On or around January 21, 2016, by which time Honig, Brauser, Stetson,
O'Rourke and Affiliate 1 through Affiliate 1 Entity, had acquired at least 16.3% of Company B's
outstanding stock, Honig directed Ladd to wire $125,000 to a well-known stock promoter as an
up-front payment for the promotion of Company B. Shortly thereafter, the stock promoter paid a
portion of the money he had received from Company B to a writer he instructed to publish a tout
on Company B. On February 3, 2016, the writer published his piece online. In it, he described
Company B's rosy prospects in social and "real money" gaming sites and intellectual property
relating to slot machines. The article did not disclose that the author had been paid by Company
B – at Honig's direction – to write the article. After the article was published on February 3,
2016, there was a 7000% increase from Company B's previous day's trading volume, and an
intraday price increase of over 60%.

140.     Honig, Ladd, Stetson and O'Rourke knew the promotional article was slated to
appear, and each either knew, or was reckless in not knowing, that the article's author failed to
disclose that he was being compensated by Company B to write it. Honig, Ladd, Stetson and

O'Rourke took advantage of the promotion's boost to Company B's stock price and trading volume and sold over 430,000 shares into this inflated market for proceeds of approximately $198,800.

| Company B Pump and Dump Proceeds, Following February 2016 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2016) | Net Quantity Sold | Proceeds |
| Honig and GRQ | 2/3 – 4/6 | (231,050) | $123,154.87 |
| Stetson | 2/3 – 2/11 | (40,000) | $20,483.33 |
| O'Rourke (and through ATG) | 2/3 – 2/9 | (64,366) | $15,960.72 |
| Ladd | 2/3 – 5/3 | (96,072) | $39,204.12 |
| Total | | (431,488) | $198,803.04 |

### 4. The Company B Pump and Dump in May 2016

141.    Honig soon identified a potential acquisition target for Company B that would give Honig and his associates another way to profit from their interest in Company B. The proposed deal involved a well-known cybersecurity innovator who had created a popular antivirus software bearing his name (the "Cybersecurity Innovator").

142.    At Honig's direction (and with the knowledge and consent of Brauser and Stetson), O'Rourke took the lead in arranging a deal between Company B and the Cybersecurity Innovator. On March 29, 2016, O'Rourke sent the Cybersecurity Innovator a term sheet for the asset purchase of Cybersecurity Innovator's company ("CI Company") by a "NYSE listed company." After CI Company indicated interest on April 3, 2016, O'Rourke wrote to Honig on April 3, 2016 and asked Honig if he would "still want to pursue [Cybersecurity Innovator] deal." Honig replied to O'Rourke that same day: "Yea!" O'Rourke introduced Ladd to the Cybersecurity Innovator on April 4, 2016 to begin negotiating a transaction between Company B and the Cybersecurity Innovator's various business interests.

143.    Subsequent correspondence between Ladd and O'Rourke, and between O'Rourke and Honig, reflect the ongoing and significant role Honig and O'Rourke played in

orchestrating the deal. Company B and the Cybersecurity Innovator agreed to terms on May 8, 2016.

144. On May 9, 2016, at 8:30 a.m., Company B issued a press release announcing its merger with CI Company, and attached it to a Form 8-K, signed by Ladd, filed that same day with the Commission. The press release misleadingly described the Cybersecurity Innovator's prior financial success by falsely claiming that the Cybersecurity Innovator had "sold his anti-virus company to Intel for $7.6 billion," suggesting that Company B might achieve similar success. Yet, as Ladd knew or was reckless in not knowing, the sale of the Cybersecurity Innovator's namesake company to Intel at that price had occurred over a decade after the Cybersecurity Innovator's departure from that company.

145. Knowing that Company B's misleading announcement of the deal would be disseminated later that morning, on May 9, 2016, Honig traded in Company B stock to create the misleading appearance of an active market. In pre-market trading that morning, Honig bought and sold small quantities of Company B stock dozens of times. Joining the effort to paint a false picture of legitimate market interest in the stock, Brauser engaged in coordinated trades in Company B stock with Honig in trading early that morning.

146. That same day, StockBeast.com, a well-known internet stock promotion website, published an article by an unnamed author entitled "[Company B] Beastmode engaged – [Cybersecurity Innovator] driving the Bus." Ladd, through Company B, had paid StockBeast.com for the article to ensure a wide distribution of the news of the impending merger with the CI Company. The StockBeast.com article touted Company B and highlighted the Cybersecurity Innovator's involvement, proclaiming: "This is big big big!" It also repeated Ladd's materially false claim contained in Company B's press release that the Cybersecurity

Innovator had "sold his startup company to Intel for $7.6BB."

147.    This promotion and Honig's and Brauser's manipulative trading on May 9 were effective in driving up both Company B's trading volume and stock price: on May 6, 2016 (the last day of trading prior to the promotion), Company B had trading volume of 71,005 shares and a closing share price of $0.36.  On May 9, 2016, the stock closed at $0.49 (representing an increase of 34 percent over the prior day's close) with trading volume of more than 10 million shares.  The trading volume for Company B stock peaked at 109,384,614 shares on May 17, 2016 with a closing share price of $4.15.  Company B's market capitalization went from just over $8 million on May 6, 2016 to over $95 million on May 17, 2016.

148.    In the days immediately following the announcement of the CI Company acquisition, Honig, Brauser, Stetson and O'Rourke, along with Affiliate 1, pursuant to their tacit or explicit agreement to acquire, hold, vote, and/or dispose of their shares in concert, sold over 9.2 million Company B shares.  In order to maximize their Company B profits, Honig, Brauser, Stetson and O'Rourke each negotiated with Ladd from May 10 to May 12, 2016 in order to exercise their warrants early, giving them more shares to sell into the inflated market.  Ladd facilitated this warrant exercise and Honig, Brauser, Stetson and O'Rourke were able to dump millions more shares than they otherwise could have.  Ladd joined them in selling shares during this period, capitalizing on the false publicity he had knowingly or recklessly helped to create.  All told, Honig, Brauser, Stetson, O'Rourke, Ladd and Affiliate 1 grossed $9.4 million from their May 2016 sales into the inflated market:

| Company B Pump and Dump Proceeds, Following May 2016 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2016) | Net Quantity Sold | Proceeds |
| Honig and GRQ | 5/9 – 5/20 | (3,783,001) | $2,393,915.52 |
| Brauser and Grander | 5/9 – 5/18 | (2,137,668) | $3,839,295.64 |
| Stetson (through SCI) | 5/9 – 5/12 | (750,000) | $660,798.20 |
| O'Rourke (through ATG) | 5/9 – 5/16 | (750,000) | $990,661.97 |
| Ladd | 5/9 – 5/31 | (471,000) | $516,554.08 |
| Affiliate 1 (through Affiliate 1 Entity) | 5/9 – 5/11 | (1,415,870) | $999,873.56 |
| Total | | (9,307,539) | $9,401,098.97 |

149. After successfully capitalizing on the promotions, Ladd purported to clarify his own false statements that had worked to create the market enthusiasm and that had pushed up the price and trading volume of Company B's stock. In its May 23, 2016 Form 10-Q, signed by Ladd and filed with the Commission, Company B stated: "[The Cybersecurity Innovator] founded [Cybersecurity Innovator's company] in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010." While the new disclosure omitted the prior false claim that the Cybersecurity Innovator had sold his company to Intel, the May 23 Form 10-Q failed to acknowledge the prior misstatement in the Company's May 9, 2016 Form 8-K and press release, and failed to disclose that the Cybersecurity Innovator had left his company years prior to its multi-billion dollar sale to Intel. In any event, the purportedly clarifying disclosure came well after the Honig-associated investors and Ladd himself had already profited from the misleading press release. By that time, Honig (GRQ), Brauser (Grander), Stetson (SCI), O'Rourke (ATG) and Ladd, had already sold their Company B shares into the inflated market.

### 5. *False Statements by Honig, Brauser, Stetson, O'Rourke and Ladd in Beneficial Ownership Reports and Company B Filings*

150. Although they were acting in concert, and pursuant to an agreement to do so, Honig, Brauser, Stetson and O'Rourke knowingly or recklessly concealed their concerted efforts

from the investing public. Ladd, with full knowledge of both the Honig investors' stock

ownership and their collective direction of the management and policies of Company B, also

kept their control a secret, signing Company B public filings that did not disclose the full extent

of their ownership or control.

151.     After the October 2015 Company B Financing closed, Honig, Brauser, Stetson

and O'Rourke collectively owned at least 1.7 million shares, or over 12% of the shares

outstanding (as reported in Company B's August 14, 2015 Form 10-Q) after the issuance, and

their obligation to file a Schedule 13D under Exchange Act Section 13(d) arose as of October 8,

2015. Moreover, Honig, Brauser, Stetson and O'Rourke each had warrants to obtain a total of an

additional 3.4 million Company B shares, which, if they were all converted, would have resulted

in Honig, Brauser, Stetson and O'Rourke collectively controlling at least 36% of the total

common shares outstanding at that time.

152.     Honig, Brauser, Stetson and O'Rourke collectively exercised control over Ladd

and the management and policies of Company B. For example, on October 1, 2015, Ladd asked

for and received Honig's direction with respect to how to disclose the Honig group's stock

acquisitions to the NYSE MKT exchange. O'Rourke, at Honig's direction, negotiated on

Company B's behalf the terms on which the Cybersecurity Innovator would sell CI Company to

Company B. Indeed, in emails after the CI Company acquisition, Honig freely accepted credit

for his role in the transaction. On May 12, 2016, for example, Honig received an email from an

investment firm congratulating him on the recent transaction: "You're invovlved [sic] with

[Company B]? Impressive!" Honig responded that he was the "[l]argest shareholder, funder and

[had the] relationship with [the Cybersecurity Innovator]." In early August 2016, Honig

celebrated his undisclosed role at Company B in a chat conversation with Stetson: "its great in

[Company B] because we are behind the scenes."

153.      Brauser, too, sought to keep his involvement behind the scenes, going so far as to lie about his relationship to Honig and Company B in a published interview.  In a May 18, 2016 article in *Business Insider*, the author quoted Brauser and reported:  "'I had no idea whatsoever about any deal at [Company B] or with [the Cybersecurity Innovator] . . . [G]ot lucky I guess' as to the moves at [Company B] since he has never had any contact with anyone at [Company B] or Ladd himself . . .  [and] has had no contact with Honing [sic] regarding [Company B] or anything else in some time."  In fact, as Brauser knew, Brauser had been in contact with Ladd by email on multiple occasions, including on October 1, 2015 in connection with Grander's investment in the October 2015 financing, and in connection with his attempt to convert his warrants into more Company B shares on May 10, 2016.  And while the CI Company transaction was being negotiated, Brauser was in frequent contact with Honig about their co-investments, by phone and by email.  Indeed, in a May 10, 2016 email between Brauser and Honig, Honig acknowledged his understanding that Brauser had recently sold $1,000,000 in Company B shares following the May 2016 promotion.

154.      Because they acted in concert to control the management and policies of Company B and pursuant to an agreement to acquire, hold, vote, and/or dispose  of Company B shares in coordination with one another, each of Honig, Brauser, Stetson and O'Rourke was a member of a group and considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of the group and disclosing the number of shares each of them beneficially owned.  However, none of Honig, Brauser, Stetson or O'Rourke ever made a Schedule 13D filing disclosing their respective ownership or

membership in a group, acting intentionally to conceal from the market the size of their group's position and their coordination and thereby to deceive investors.

155.     Instead, on October 19, 2015, Honig filed a Schedule 13G, claiming only his own 6.59% beneficial ownership and falsely stating that the securities "are not held for the purpose of or with the effect of changing or influencing the control of the issuer" – a representation he knew, or was reckless in not knowing, to be false.  Indeed, because Honig and his associates exercised control over Company B's management and policies – as Honig candidly acknowledged in emails – he was disqualified from making a 13G filing.  In February 2016, Honig filed an amended Schedule 13G disclosing an ownership percentage of 9.1%.  Brauser filed a Schedule 13G on May 4, 2016, in which he claimed 7.4 % beneficial ownership via his entity Grander.  In each of these filings, Honig and Brauser also falsely claimed that they were passive investors without any intention to influence or change control of the company and omitted the fact that each was a member of a group.

156.     By October 2015, if not before then, Honig, Brauser, Stetson and O'Rourke all understood what their respective reporting obligations were under Exchange Act Section 13(d), and that the information included in such filings was material to investors.  Indeed, a mere seven months earlier, in February 2015, Honig and Brauser had filed a lawsuit in Harris County, Texas, alleging that counter-parties had violated Exchange Act Section 13(d) by failing to make requisite 13G filings for the more than 5% position they controlled as a group, and that that failure constituted a material omission that defrauded Honig and Brauser in their purchase of securities from those defendants.  In their Complaint in that lawsuit, *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct.) (filed February 26, 2015), Honig and Brauser alleged:

> [I]nformation regarding a significant beneficial ownership interest in [the issuer's stock] was material. It is the kind of information that the SEC requires to be disclosed in connection with solicitations for mergers and in various other filings (*e.g.*, Schedules 13D and/or 13G) precisely because of its materiality. Defendants' failure to disclose to plaintiffs their significant beneficial ownership interest in [the issuer] . . . is a material and materially misleading omission. . . . Plaintiffs would not have purchased the Shares if they had known the undisclosed facts that [defendants] controlled such a large interest in [the issuer's] stock. . . .

157.    In email exchanges leading up to its filing, Honig and Brauser discussed drafts of the Complaint, and circulated them to Stetson and O'Rourke – non-parties to the lawsuit – seeking their comments. Honig and Brauser also discussed with Stetson and O'Rourke each of their respective understandings of the requirements imposed by Exchange Act Section 13(d). Nonetheless, and despite their understanding of what Section 13(d) required them to disclose and how and why those disclosures were material to investors, neither Honig, nor Brauser, Stetson or O'Rourke made the requisite filings with respect to Company B.

158.    Similarly, Company B's 2015 Form 10-K filed with the Commission on April 11, 2016 disclosed only Honig as a beneficial owner, holding 8.6%. Notwithstanding that Ladd knew that Honig, Brauser, Stetson and O'Rourke were working together as a group, he signed the 2015 Form 10-K, failing to disclose their group's beneficial ownership. Ladd also signed a materially misleading November 6, 2015 Form S-1 registration statement, filed with the Commission, for the 8,400,000 Company B shares issued in the October 2015 Company B Financing, failing to disclose the group beneficial ownership of GRQ, Grander, ATG and SCI.

### D. The Company C Scheme

#### 1. *Honig and Stetson Obtain Control of Company C*

159.    In early 2014, Honig identified a publicly traded shell company that was unencumbered by debt, and sought an appropriate private company for purposes of a reverse merger and pump and dump scheme. While Honig preferred "'33 Act shells" – namely, public

companies that would not be subject to Exchange Act Section 13(d) reporting obligations – in later years, those shells became too expensive, and the shell he identified in early 2014 was a "'34 Act shell," subject to Section 13(d) reporting.

160.    At or about the same time as Honig identified the shell, the CEO of privately-held Company C ("Company C's CEO") was looking for funding for its research and development efforts in cancer therapies and diagnostic products. Company C's CEO was introduced to "Entity H," a hedge fund that frequently invested alongside Honig and Brauser. Entity H suggested to Company C's CEO that he turn Company C into a public company by engaging in a reverse merger with a public shell. Although Company C's CEO did not know it, the public shell Entity H had in mind was one that Honig had identified. Company C's CEO agreed to proceed with the reverse merger Entity H had suggested.

161.    In an initial $3 million capital raise in February 2014, in connection with the contemplated merger with Company C, HSCI – a company Stetson falsely identified as his own to Company C's CEO – invested $1 million and Entity H invested $1.7 million in return for a substantial position in the shell. In fact, while Stetson was the sole named managing member of HSCI, Honig actually directed and controlled HSCI's investment decisions, a fact that Stetson did not disclose to Company C's CEO or to the market.

162.    Soon after Stetson had introduced HSCI as his company, however, Company C's CEO learned that Honig was actually behind the HSCI investment. In approximately April 2014, when Honig first called up Company C's CEO, Honig announced in words or substance: "I'm the owner of your company. You better do what I tell you to do." Thereafter, Honig began peppering Company C's CEO with frequent telephone calls demanding various corporate actions, including directing changes to the composition of the Company C Board, the

engagement of Issuer's Counsel, and the retention of public relations consultants favored by Honig, as described below. Company C's CEO, in need of funding for his company, took those calls and often acceded to Honig's demands.

163.     Sometimes Honig worked with Stetson to exert his influence over management. As early as May 18, 2014, for example, Stetson emailed Company C's CEO to get updates on "IR and PR." Stetson was referring to investor relations ("IR") and public relations ("PR"), and was pressing his and Honig's demand that Company C begin aggressively marketing itself and paying promoters to do so. Honig added to the discussion the topic of future financings: "[a]nd the money raise."

164.     On June 1, 2014, Brauser and Affiliate 1 each committed to make a substantial investment in the public shell, before the merger into Company C was finalized. As the ringleaders for the investor group in Company C, Honig and Stetson led the merger negotiations on the group's behalf.

165.     On July 8, 2014, Company C executed the reverse merger of the company into the public shell controlled by Entity H, HSCI, and, by then, Brauser and Affiliate 1 Entity. At or around the time the merger closed, ATG, Brauser and Affiliate 1 Entity also made investments in Company C. After the merger, the stake of Entity H, HSCI, Brauser, Affiliate 1 Entity and ATG (including conversion of all warrants) amounted to almost 48% of the authorized shares of the newly public Company C. The terms of the merger included granting a "Consent Right" to Entity H and its affiliates, by which Entity H could block or approve many kinds of transactions by Company C, including the issuance of additional shares, any change of control and other significant corporate actions.

166.     In connection with the July 2014 reverse merger, the merger investors obtained

warrants that they agreed would not be exercisable until July 8, 2015. However, on September 3, 2014, Company C agreed to allow merger investors to exercise warrants for additional Company C shares before the previously agreed-upon July 8, 2015 exercise date. This warrant exercise allowed investors to exchange warrants for shares cheaply. In connection with that exercise, Stetson submitted warrants on behalf of several investors, including ATG and Affiliate 1 Entity. In a September 15, 2014 email, Company C's CFO asked Stetson which entities were his or HSCI's affiliates. Stetson answered falsely that he was "not affiliated with any of those entities," and that he "just made private sales for my warrants."

### 2. The Series D and Series E Financings

167.     In March and April, 2015, Honig orchestrated two private placement financings for Company C that would tighten Honig's, Brauser's, Stetson's and O'Rourke's control of the company: the Series D and Series E offerings. Honig described the deal to Stetson, Brauser and Investor 1 in a March 5, 2015 email, characterizing it as a "real good opportunity" that would allow them to "make $35 million conservatively in 4 months and our money out [in] 4 weeks. . . . I will trade out of it for us."

168.     Honig and Stetson pitched the first of these financings, the Series D financing, to Company C management as a way to buy out Entity H's position and repackage the financing on more favorable terms to Company C.

169.     As Company C's CFO understood, Honig structured both financings to avoid disclosing his, Brauser's, Stetson's and O'Rourke's holdings on Schedule 13D or 13G. Since the requirement to make those filings is triggered by voting control of securities, Honig insisted that the Series D and Series E offerings consist of preferred, convertible and non-voting shares with blocker provisions. Pursuant to those blocker provisions, Company C was prohibited from

56

converting any holder's preferred shares that would give him or it more than 4.99% voting control of the total outstanding common shares.

170.     Honig's control of the financing group was clear to Company C's management; indeed, when deciding whether a potential investor could take part in the March 2015 Series D financing round, Company C's CEO explicitly deferred to Honig, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might want to allow to invest along with the current group. Viewed this as your choice not mine. That is why I asked him to call you."

171.     Stetson kept up the pressure on Company C to close the financings on the terms he and Honig dictated. On March 10, 2015, Stetson told Company C's CEO in an email that he needed to reach an understanding by the next day to proceed with the buyout of the Entity H notes and fund the company.

172.     Honig and Stetson also made it a condition of the March 2015 Series D financing round that Company C retain Issuer's Counsel and Issuer's Counsel Partner after the closing – the law firm and partner that they had required Company A to retain, and the same law firm retained by Company B. Not only did Honig and Stetson insist that Issuer's Counsel represent Company C, in a March 12, 2015 email to Company C's CFO, Stetson also demanded that Company C set aside a year of prepaid legal fees as an additional condition to doing the deal.

173.     Stetson managed the financing process with the investors and lawyers, as though he were Company C management, and told Company C management about substantive decisions, including, but not limited to, sending a March 18, 2015 email to Company C management informing them which bank would be used for a contemplated escrow agreement.

174.     Stetson introduced Company C management to his and Honig's chosen IR consultant on March 14, 2015, and at Honig's direction, insisted that the financing include a grant of 300,000 Company C shares as payment to the consultant.  On March 23, 2015, Honig directed Stetson to engage another IR consultant for Company C, who was also granted Company C shares.

175.     Honig and his associates recognized that the participation of Investor 1 was critical to the success of the transaction by creating the market demand necessary for them to sell their shares after the planned promotion. As Stetson explained in an email to Company C leadership on March 9, 2015, the "following of [Investor 1] is worth its weight and [sic] gold . . . ."

176.     To that end, Honig again demonstrated his control over the selection of investors when he asked Brauser to "do [him] a favor" on April 1, 2015 and forego his participation in the Series E financing because, as Honig explained, "I would like to let some of our friends do it . . . [I]t would be best if we let [Investor 1 and Investor 1 Company and an Investor 1 Company executive ("Investor 1 Co. Officer")] take their full allocation."

177.     At the same time, Honig and Brauser understood that public market investors might not want to follow Investor 1 into a company dominated by Honig and Brauser, and their group.  Thus, like Honig's decision to conceal his initial investment by making it through HSCI, Honig and Brauser determined to disguise the full extent of their participation in the financings by funneling some of their share acquisitions through a company they co-owned, Southern Biotech.  Honig informed Stetson and Brauser in early March 2015, "I would like us to do [the investment] through Southern Biotech."

178.     In an email to Stetson and Brauser on March 13, 2015, Honig laid out a more

detailed list of investors as well as the proposed investment amount and the method of investment for both the Series D and Series E financings: "Southern biotech will invest 3 million to purchase [Entity H's] notes – 1 million each," and "[Investor 1] is going to lead pipe [private investment in public equity] for 1 million at .75 cents."

179. Issuer's Counsel also understood the importance of keeping Honig's and Brauser's investment through Southern Biotech undisclosed. Right before the closing of the Series D financing, different counsel involved in the transaction sent proposed Form 8-K language to Issuer's Counsel (which was not yet counsel to Company C and was acting as placement agent's counsel) in which Company C's then-counsel named Southern Biotech as an investor in a footnote. Immediately, on March 25, 2015, Issuer's Counsel Partner and another lawyer from Issuer's Counsel wrote back that "[n]o stockholder [investor] should be named." Further, at Stetson's and Honig's direction, Issuer's Counsel changed the beneficial ownership blocker requirement to 2.49% to create an artificial and deceptive "cap" on the amount of common stock that could be held at one time. Stetson explained in a March 24, 2015 email to Company C's CFO that the requirement was "due to Barry being the beneficial owner of both GRQ [] and Southern Bio." While that 2.49% cap prevented GRQ and Southern Biotech from collectively owning more than 5%, it did nothing to prevent their aggregate group ownership with other associates from exceeding 5% – the reporting threshold – even if their individual common stock ownership was kept to 2.49% or below.

180. In an April 2015 email to his Board, Company C's CEO detailed the demands of the Honig investors, including that Investor 1 Co. Officer be granted a lucrative consulting agreement, and that a new board member, satisfactory to Investor 1 Co. Officer, be appointed at a later date. The Board capitulated and pursuant to the consulting agreement, Investor 1 Co.

Officer was granted 200,000 Company C shares – worth more than $400,000 at the time – in exchange for his services.  In fact, Investor 1 Co. Officer never provided any services to Company C.

181.     The Series D financing closed in late March 2015 and included a buyout of Entity H's notes, including the Consent Right, at a favorable purchase price to the investors who purchased the notes.  The investors who purchased the notes included various entities owned and controlled by Defendants Honig, Brauser, Stetson and O'Rourke:  HSCI (Honig and Stetson), GRQ (Honig), Grander (Brauser) and ATG (O'Rourke).  After this transaction closed, Company C had 5,827,327 shares of common stock outstanding, and the Series D investors had preferred shares convertible into over 23,764,700 shares of common stock.  Southern Biotech held only 145,000 common stock shares at the time, but had conversion rights to as many as 13,376,382 common shares – more than twice as many common shares than Company C had outstanding at the time of the financing.

182.     The Series E financing, which closed April 6, 2015, included warrants, and raised $12 million for Company C on terms highly favorable to Investor 1, Investor 1 Trust and Investor 1 Company.  Honig and his associates managed the Investor 1, Investor 1 Trust and Investor 1 Company investments through the Series E financing.  For example, Investor 1 Company's investment documentation was transmitted to and discussed with Stetson and Brauser rather than any individuals at Company C, reflecting the fact that Honig and his co-investors were orchestrating the deal rather than Company C itself.

183.     Investor 1's participation gave Honig, Brauser, Stetson and O'Rourke leverage in negotiating with Company C, including in solidifying the group's control over Company C's board.  When negotiating the final terms of the Series E financing, including Investor 1

Company's right to designate replacement board members, Stetson sought reassurance from Issuer's Counsel Partner in an April 3, 2015 email, asking: "Are you comfortable that we will get control of the board with this language?"

184.    After the financings closed, Honig attempted to further exert his control over Company C. For example, Honig spoke with Company C's CEO about changing the composition of the company's Board and suggested a specific individual as a candidate. After Company C's CEO interviewed the candidate, Issuer's Counsel Partner sent the candidate a letter containing the signature line of Company C's CEO inviting him to join the Board on April 1, 2015. When Company C's CEO learned of the offer, he contacted Issuer's Counsel Partner in an April 14, 2015 email and instructed him to rescind the offer because it had not been authorized by the Board. Issuer's Counsel Partner agreed to do so, explaining to Company C's CEO that he had been following Honig's directions in sending the offer letter on behalf of Company C's CEO.

### 3.    The Company C Pump and Dump in April 2015

185.    One of the goals of the private placement financings, as Honig, Brauser, Stetson and O'Rourke knew, was to generate market interest and boost trading volume in Company C stock in preparation for a planned stock promotion. On April 3, 2015, O'Rourke, acting at Honig's direction, circulated a press release (with input from Company C's CEO, Honig and Brauser) announcing the $12 million private placement in which Investor 1 and his entities had participated, drawing on Investor 1's reputation among retail investors as a successful biopharma investor.

186.    Honig, with the knowledge of Brauser and Stetson, then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym "Wall Street

61

Advisors" on the *Seeking Alpha* website on April 8, 2015 at 11:13 a.m.  The article, titled

"[Investor 1 Company] Spots Another Overlooked Opportunity in [Company C]," highlighted

Investor 1 Company's and Investor 1's investment in Company C, and was designed to inspire

Investor 1's retail investor devotees to follow his lead and buy Company C stock.  Despite his

involvement in facilitating the Company C financing and his extensive business relationships

with Honig, Brauser, Investor 1 and Stetson, in his article, O'Rourke knowingly and falsely

claimed that "[t]he author has no business relationship with [Company C]."  He also knowingly

and falsely claimed that he was "not receiving compensation for [writing the article]."

187.     Anticipating the release of O'Rourke's *Seeking Alpha* article, ATG and

O'Rourke engaged in early trading of Company C shares on April 8, 2015 with the intention of

creating a false appearance of market interest in the stock.  That trading included at least one

matched trade, with a Honig associate submitting the buy order and ATG submitting the sell

order for the same price at 9:38 a.m.  The share price of Company C opened that day at $3.14

and reached $3.73 in the minutes before the promotional article was released.

188.     The promotional campaign was successful.  The trading volume of Company C

shares rose almost 7500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6,

2015, following the announcement of the Series E private placement involving Investor 1.  The

trading volume further increased to 858,709 on April 9, 2015, the day after O'Rourke's article

was published.  Company C's share price went from a closing price of $1.91 on April 1, 2015 to

a closing price of $4.30 on April 9, 2015, increasing the company's market capitalization by $23

million.  Honig and his affiliates, listed below, acting pursuant to their agreement to acquire,

hold, vote and/or dispose of  their Company C shares in concert, sold shares into the market from

April 6 to June 30, 2015 for total proceeds of over $5.5 million, as detailed below:

| Company C Pump and Dump Proceeds, Following April 2015 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2015) | Net Quantity Sold | Proceeds |
| Brauser | 4/13 – 6/30 | (576,400) | $1,600,826.76 |
| Stetson and Honig (through HSCI) | 4/6 – 6/30 | (1,080,379) | $3,607,248.91 |
| O'Rourke and ATG | 4/8 –  6/30 | (30,064) | $69,744.51 |
| Affiliate 1 (through Affiliate 1 Entity) | 4/6 – 6/23 | (99,616) | $342,984.59 |
| Total | | (1,786,459) | $5,620,804.77 |

### 4.     The Company C Pump and Dump in June/July 2015

189.     In June 2015, when the market for Company C shares had cooled from over $4 per share to closing prices hovering just above $2 per share, O'Rourke recruited Ford to publish another Company C tout on Ford's blog.  On July 1, 2015, Ford published an article titled "[Company C]: Near-Term Catalysts Could Push Shares from $2 to over $5."  The article contained materially false statements (as Honig, Brauser, Stetson and O'Rourke knew, or were reckless in not knowing) including that a licensing deal was imminent, when it was not, and that there were near-term therapy development events that could take the share price to $5, when in fact clinical trials were only in early stages.  As before, although Honig compensated Ford for writing the blog post, Ford did not disclose that he had been paid.

190.     Ford's article had the desired impact on the market:  Company C trading volume increased from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015. Likewise, Company C's share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015.  Pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig and his affiliates sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million, as detailed below:

| Company C Pump and Dump Proceeds, Following June 2015 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2015) | Net Quantity Sold | Proceeds |
| Brauser | 7/1 – 10/7 | (363,050) | $749,025.45 |
| Stetson and Honig (through HSCI) | 7/1 – 12/7 | (682,539) | $1,525,588.49 |
| O'Rourke and ATG | 7/1 – 12/31 | (179,690) | $235,253.20 |
| Affiliate 1 (through Affiliate 1 Entity) | 7/15 – 12/18 | (212,034) | $243,250.96 |
| Total | | (1,437,313) | $2,753,118.10 |

191.     Honig and Stetson thereafter continued to invest in Company C and conferred benefits on members of their group and directed critical business decisions for Company C.  For example, on more than one occasion, Honig or Stetson directed Company C's CEO to appoint Honig's candidate to Company C's board.  And on August 15, 2016, at Honig's and Stetson's direction, as a condition to HSCI providing additional financing to Company C, HSCI and Company C's CEO executed a letter agreement requiring Company C to hire the public relations firm that Honig and Stetson had selected.  Honig even prevailed on Company C to pay Affiliate 1 Entity a six-figure "Investor Due Diligence" fee in August 2016.

### 5.     *False Beneficial Ownership Reports by Honig, Brauser, Stetson and O'Rourke*

192.      Given the agreement among Honig, Brauser, Stetson and O'Rourke to acquire, hold, vote and/or dispose of their Company C shares in concert; the group's direction of Company C management and policies; and their combined share ownership, all of the members of the group were required to make Schedule 13D filings that they did not make.  They did not make the appropriate filings so that the investing public would not discover their control, much less the extent of their control, over Company C, and to obscure from investors that they were positioning themselves for a pump-and-dump scheme.

193.     By the end of April 2015 after the closing of the private placement financings,

Stetson, HSCI, Brauser (through Grander) and O'Rourke (through ATG) all had substantial deposits of Company C shares in their brokerage accounts. Therefore, they were all individually obligated to make a Schedule 13D filing, disclosing their own holdings and that they were members of the group because they were acting together for the purpose of acquiring, holding, voting and/or disposing of Company C shares, and collectively owned greater than 5% of Company C's outstanding shares.

194.    Other Defendants who invested in Company C also improperly made Schedule 13G filings, by which they falsely represented themselves as passive investors, and also failed to disclose their membership in the group, in violation of disclosure requirements. For example, Honig filed a Schedule 13G on February 17, 2017 disclosing only his 6.22% ownership through GRQ; Stetson filed a Schedule 13G on September 19, 2017, disclosing only his 5.64% (nominal) ownership through HSCI; Brauser filed a Schedule 13G on February 2, 2017, disclosing only his 5.44% ownership through Grander. Each of these Defendants should have made Schedule 13D filings because they were not passive investors, and each should have disclosed the existence of, and membership in, a group. Nor were the eventual Schedule 13D filings made by Stetson on February 12, 2018, Honig on February 13, 2018, and a Schedule 13D/A filed by Honig on February 16, 2018 (all filed after they became aware of a pending regulatory investigation), compliant with the federal securities laws since none of them disclosed the existence of a group or their membership in it.

### FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Honig, Brauser, Stetson, O'Rourke, GRQ, Grander, HSCI and Maza)

195.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

196.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, Brauser, Stetson, O'Rourke, GRQ, Grander, HSCI and Maza, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

197.     Honig (acting individually and/or through the entities he controlled, including GRQ and HSCI, and pursuant to tacit or explicit agreements with Brauser, Stetson, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices.  Honig further violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by engaging in manipulative trading in the securities of Company A and Company B.  With respect to Company A, Honig further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, directly or indirectly, knowingly or recklessly making materially false statements to

brokers and submitting materially false attorney opinion letters to transfer agents, relating to his relationship to Company A. With respect to Company B, Honig further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making materially false and misleading Schedule 13G filings, concealing both his control over Company B's management and policies, as well as his membership in a group with Brauser, Stetson and O'Rourke, and other affiliates, pursuant to their tacit or explicit agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another. With respect to Company C, Honig further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making both a materially false and misleading Schedule 13G filing (by which he concealed his control over Company C's management and policies as well as his membership in a group with Brauser, Stetson, O'Rourke, and offer affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another), and a materially false and misleading Schedule 13D filing (by which he concealed his membership in a group with Brauser, Stetson, O'Rourke, and offer affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another) Honig's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

198.    Brauser (acting individually and/or through the entities he controlled, including Grander, and pursuant to tacit or explicit agreements with Honig, Stetson, O'Rourke and other

affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; and selling shares of Company A, Company B and Company C into the market into trading volume and at prices he knew or was reckless in not knowing were artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for and orchestrated. Brauser further violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by engaging in coordinated trading in the securities of Company B. With respect to Company B and Company C, Brauser further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making materially false and misleading Schedule 13G filings, concealing both his control over Company B's and Company C's management and policies through his agreement with Honig and other affiliates to acquire, hold, vote and/or dispose of Company B and Company C securities in coordination with one another, as well as his membership in a group with Honig, Stetson, O'Rourke and other affiliates pursuant to that agreement. Brauser's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

199.     Stetson (acting individually and/or through the entities he ostensibly and actually controlled, including HSCI, and pursuant to tacit or explicit agreements with Honig,

Brauser, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices. With respect to Company A, Stetson further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, knowingly or recklessly submitting materially false statements to brokers, and Company A's transfer agent, relating to Honig's relationship to Company A. With respect to Company C, Stetson further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making materially false and misleading Schedule 13G and Schedule 13D filings, concealing (with respect to his Schedule 13G filings) his control over Company C's management and policies, and (with respect to his Schedule 13D and 13G filings) his membership in a group with Honig, Brauser, O'Rourke and other affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another. Stetson's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

200. O'Rourke (acting individually and/or through the entities he controlled,

including ATG, and pursuant to tacit or explicit agreements with Honig, Brauser, Stetson and

other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A,

Company B and Company C in coordination with one another) violated Exchange Act Section

10(b) and Rule 10b-5 thereunder by, among other things, directly or indirectly, with scienter:

obtaining and exercising undisclosed control of the management and policies of Company A,

Company B and Company C; paying undisclosed compensation to writers and bloggers to write

enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock

price, and, on at least one occasion, writing and publishing his own materially false and

misleading article about Company C; and selling shares of each company into the market at

artificially high prices.  With respect to Company A, O'Rourke further violated Exchange Act

Section 10(b) and Rule 10b-5 thereunder by intentionally engaging through his entity, ATG, in

manipulative trading in Company A securities to mark the close on September 23, 2013, and

intentionally engaging in matched trading in Company A securities through his entity, ATG on

September 26, 2013.  O'Rourke further violated Exchange Act Section 10(b) and Rule 10b-5

thereunder by intentionally engaging, through ATG, in matched trading of Company C stock on

April 8, 2015.  O'Rourke further violated Exchange Act Section 10(b) and Rule 10b-5(b)

thereunder by writing and publishing a promotional article about Company C in which he

knowingly and falsely disclaimed any business relationship with Company C or that he had

received any compensation for writing the article, both material misstatements.  O'Rourke's

intentional or reckless failure to make timely and appropriate filings under Exchange Act Section

13(d) with respect to his and his group's holdings of Company B and Company C shares also

violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that

facilitated his scheme to defraud investors about his and his group's control of the management

and policies of, and the magnitude of their individual and collective investment in, both companies.

201.     Maza, pursuant to a tacit or explicit agreement with Honig, Brauser, Stetson and O'Rourke, with respect to Company A, violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by intentionally or recklessly omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies.  Maza further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly submitting materially false statements to Company A's transfer agent about Honig's relationship to Company A in connection with Honig's preparation to sell his Company A shares.

202.     By reason of the foregoing, Honig, Brauser, Stetson, O'Rourke, GRQ, Grander, HSCI and Maza, directly or indirectly, singly or in concert, violated, are violating, and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF
**Violations of Section 17(a)(1)-(3) of the Securities Act**
**(Against Honig, Brauser, Stetson, O'Rourke, GRQ, Grander, HSCI and Maza)**

203.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

204.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, Brauser, Stetson, O'Rourke, GRQ, Grander, HSCI and Maza, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, in the offer or sale of Company A, Company B, and/or Company C securities, have: (a) with scienter, employed devices, schemes, and artifices to defraud; (b)

knowingly, recklessly or negligently obtained money or property by means of any untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Company A, Company B and/or Company C.

205.     Honig (acting individually and/or through the entities he controlled, including GRQ and HSCI, and pursuant to tacit or explicit agreements with Brauser, Stetson, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices.  Honig further violated Securities Act Sections 17(a)(1) and (a)(3) by engaging in manipulative trading in the securities of Company A and Company B.  With respect to Company A, Honig also violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by, among other things, directly or indirectly, knowingly or recklessly, making materially false statements to brokers, and knowingly or recklessly submitting materially false attorney opinion letters to transfer agents, relating to his relationship to Company A, and subsequently sold shares in Company A by means of those false statements. With respect to Company B, Honig further violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly making materially false and misleading Schedule 13G filings,

concealing both his control over Company B's management and policies, as well as his membership in a group with Brauser, Stetson, O'Rourke and other affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another. With respect to Company C, Honig violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly making both a materially false and misleading Schedule 13G filing, and materially false and misleading Schedule 13D filings, concealing (with respect to his Schedule 13G filings) his control over Company C's management and policies, and (with respect to his Schedule 13D and 13G filings) his membership in a group with Brauser, Stetson, O'Rourke and other affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another. By means of Honig's false and misleading filings under Exchange Act Section 13(d) with respect to his stock ownership of Company B and Company C, Honig was able to acquire additional shares of both companies, and was able to sell his shares in the dump into artificially inflated trading volume and stock price. Alternatively, Honig violated Securities Act Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances. Honig's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies. Alternatively, Honig violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

206.    Brauser (acting individually and/or through the entities he controlled, including

Grander, and pursuant to tacit or explicit agreements with Honig, Stetson, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; and selling shares of Company A, Company B and Company C into the market into trading volume and at prices he knew or was reckless in not knowing were artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for and orchestrated. Brauser further violated Securities Act Sections 17(a)(1) and (a)(3) by engaging in coordinated trading in the securities of Company B.  With respect to Company B and Company C, Brauser further violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly making materially false and misleading Schedule 13G filings, concealing both his control over Company B's and Company C's management and policies through his agreement with Honig and other affiliates to acquire, hold, vote and/or dispose of Company B and Company C securities in coordination with one another, as well as his membership in a group with Honig, Stetson, O'Rourke and other affiliates pursuant to that agreement.  By means of Brauser's false and misleading filings under Exchange Act Section 13(d) with respect to his stock ownership of Company B and Company C, Brauser was able to acquire additional shares of both companies, and was able to sell his shares in the dump into an artificially inflated trading volume and stock price.  Alternatively, Brauser violated Securities Act Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.  Brauser's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B

74

and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies. Alternatively, Brauser violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

207. Stetson (acting individually and/or through the entities he ostensibly and actually controlled, including HSCI, and pursuant to tacit or explicit agreements with Honig, Brauser, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices. With respect to Company A, Stetson also violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly submitting materially false statements to brokers, and Company A's transfer agent, relating to Honig's relationship to Company A, and Honig subsequently sold shares in Company A by means of those false statements. With respect to Company C, Stetson violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly making materially false and misleading Schedule 13G and Schedule 13D filings, concealing (with respect to his Schedule 13G filings) his control over Company C's management and policies, and (with respect to his Schedule 13D and 13G filings) his membership in a group

with Honig, Brauser, O'Rourke and other affiliates, pursuant to their agreement to acquire, hold,
vote and/or dispose of their shares in coordination with one another. By means of Stetson's false
and misleading filings under Exchange Act Section 13(d) with respect to his stock ownership of
Company C, Stetson was able to acquire additional shares, and was able to sell his shares into the
artificially inflated trading volume and stock price. Alternatively, Stetson violated Securities Act
Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct that a reasonably
careful person would use under like circumstances. Stetson's intentional or reckless failure to
make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and
his group's holdings of Company B and Company C shares also violated Securities Act Sections
17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about
his and his group's control of the management and policies of, and the magnitude of their
individual and collective investment in, both companies. Alternatively, Stetson violated
Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a
reasonably careful person would use under like circumstances.

208. O'Rourke (acting individually and/or through the entities he controlled,
including ATG, and pursuant to tacit or explicit agreements with Honig, Brauser, Stetson and
other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A,
Company B and Company C in coordination with one another) violated Securities Act Sections
17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and
exercising undisclosed control of the management and policies of Company A, Company B and
Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and
deceptive articles on each issuer to artificially boost trading volume and stock price, and, on at
least one occasion, writing and publishing his own materially false and misleading article about

Company C; and selling shares of each company into the market at artificially high prices. With respect to Company A, O'Rourke further violated Securities Act Sections 17(a)(1) and (a)(3) by intentionally engaging through his entity, ATG, in manipulative trading in Company A securities to mark the close on September 23, 2013, and intentionally engaging in coordinated trading in Company A securities through his entity, ATG, with another affiliate on September 26, 2013. O'Rourke further violated Securities Act Sections 17(a)(1) and (a)(3) by intentionally engaging, through his entity, ATG, in matched trading of Company C stock with another affiliate on April 8, 2015. O'Rourke also violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by writing and publishing a promotional article about Company C in which he knowingly and falsely disclaimed any business relationship with Company C or that he had received any compensation for writing the article, both material misstatements, and O'Rourke, and his entity, ATG, subsequently sold shares in Company C by means of those false statements. Alternatively, O'Rourke violated Securities Act Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances. O'Rourke's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies. Alternatively, O'Rourke violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

209.	Maza, pursuant to a tacit or explicit agreement with Honig, Brauser, Stetson and O'Rourke, with respect to Company A, violated Securities Act Sections 17(a)(1), (a)(2) and

(a)(3) by intentionally or recklessly omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies. Maza further violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly submitting materially false statements to Company A's transfer agent about Honig's relationship to Company A in connection with Honig's efforts to remove the restrictive legends from his Company A shares, and Honig subsequently sold shares in Company A by means of those false statements. Alternatively, Maza violated Securities Act Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

210. By reason of the foregoing, Honig, Brauser, Stetson, O'Rourke, GRQ, Grander, HSCI and Maza, directly or indirectly, singly or in concert, violated, are violating, and, unless restrained and enjoined, will continue to violate Sections 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)-(3)].

### THIRD CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against Ford, Ladd and Keller)**

211. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

212. By engaging in the acts and conduct described in this Complaint, Defendants Ford, Ladd and Keller, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have made untrue statements of material

facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

213.     Ford violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, knowingly or recklessly making material misstatements in the articles Honig and his affiliates paid him to write about Company A and Company C, including that he was not being paid by anyone other than *Seeking Alpha*.

214.     Ladd violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, knowingly or recklessly authoring and issuing Company B's May 9, 2016 press release in which he made materially false statements about the sale of Cybersecurity Innovator's former company to Intel.  Ladd further violated Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly failing to disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company B's management and policies, in Company B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed.

215.     Keller violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, intentionally or recklessly omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies.  Keller further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making materially false statements to Ford – which he knew (or was reckless in not knowing) were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.

216.     By reason of the foregoing, Ford, Ladd and Keller, directly or indirectly, singly

or in concert, violated, are violating, and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### FOURTH CLAIM FOR RELIEF
### Violations of Section 17(a)(2) of the Securities Act
### (Against Ford, Ladd and Keller)

217.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

218.    By engaging in the acts and conduct described in this Complaint, Defendants Ford, Ladd and Keller, knowingly, recklessly or negligently, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, in the offer or sale of Company A, Company B and/or Company C securities, have obtained money or property by means of any untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

219.    Ford violated Securities Act Section 17(a)(2) by, among other things, knowingly, recklessly or negligently making material misstatements in the articles Honig and his affiliates paid him to write about Company A and Company C, including that he was not being paid by anyone other than *Seeking Alpha*.

220.    Ladd violated Securities Act Section 17(a)(2) by, among other things, knowingly, recklessly or negligently authoring and issuing Company B's May 9, 2016 press release in which he made materially false statements about the sale of Cybersecurity Innovator's former company to Intel.  Ladd further violated Section 17(a)(2) by knowingly, recklessly or negligently failing to disclose the true extent of the stock ownership of Honig, Brauser, Stetson,

O'Rourke and other affiliates, and their collective control over Company B's management and policies in Company B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed. By means of those false statements, Ladd, along with Honig, Brauser, Stetson and O'Rourke, sold shares in Company B.

221. Keller violated Securities Act Section 17(a)(2) by, among other things, intentionally, recklessly or negligently omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies. Keller further violated Securities Act Section 17(a)(2) thereunder by knowingly, recklessly or negligently making materially false statements to Ford – which he knew (or was reckless or negligent in not knowing) were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology. By means of those false statements, Honig, Brauser, Stetson and O'Rourke sold shares in Company A.

222. By reason of the foregoing, Ford, Ladd and Keller, directly or indirectly, singly or in concert, violated, are violating, and, unless restrained and enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**FIFTH CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)**
**(Against SCI and ATG)**

223. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

224. By engaging in the acts and conduct described in this Complaint, Defendants SCI and ATG, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the

facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have: (a) employed devices, schemes, or artifices to defraud; or (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

225.      SCI, acting through its owner, Stetson, and pursuant to tacit or explicit agreements with Honig, Brauser, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another, violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; and selling its shares into the market into trading volume and at prices it knew or was reckless in not knowing were artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for and orchestrated.  SCI's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to its and its group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated the scheme to defraud investors about the group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

226.      ATG, acting through its owner, O'Rourke, and pursuant to tacit or explicit agreements with Honig, Brauser, Stetson and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another, violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the

management and policies of Company A, Company B and Company C; and selling its shares into the market into trading volume and at prices it knew or was reckless in not knowing were artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for and orchestrated. With respect to Company A, ATG further violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) by intentionally engaging in coordinated trading in Company A securities to mark the close on September 23, 2013, and intentionally engaging in manipulative trading in Company A securities on September 26, 2013. ATG further violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) by intentionally engaging in manipulative trading of Company C stock on April 8, 2015. ATG's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to its and its group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated the scheme to defraud investors about the group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

227.        By reason of the foregoing, SCI and ATG, directly or indirectly, singly or in concert, violated, are violating, and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## SIXTH CLAIM FOR RELIEF
### Violations of Sections 17(a)(1) and (a)(3) of the Securities Act
### (Against SCI and ATG)

228.        The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

229.        By engaging in the acts and conduct described in this Complaint, Defendants

SCI and ATG directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, in the offer or sale of Company A, Company B, and/or Company C securities, have (a) with scienter, employed devices, schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Company A, Company B and/or Company C.

230. SCI, acting through its owner, Stetson, and pursuant to tacit or explicit agreements with Honig, Brauser, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another, violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; and selling its shares into the market into trading volume and at prices it knew or was reckless in not knowing were artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for and orchestrated. Alternatively, SCI violated Securities Act Section 17(a)(3) because SCI, acting through Stetson, failed to use the degree of care in this conduct that a reasonably careful person would use under like circumstances. SCI's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to its and its group's holdings of Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated the scheme to defraud investors about the group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies. Alternatively, SCI, acting through Stetson, violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person

would use under like circumstances.

231.     ATG, acting through its owner, O'Rourke, and pursuant to tacit or explicit

agreements with Honig, Brauser, Stetson and other affiliates to acquire, hold, vote and/or dispose

of shares they acquired in Company A, Company B and Company C in coordination with one

another, violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or

indirectly, with scienter:  obtaining and exercising undisclosed control of the management and

policies of Company A, Company B and Company C; and selling its shares into the market into

trading volume and at prices it knew or was reckless in not knowing were artificially inflated by

promotional articles that Honig had directly or indirectly secretly paid for and orchestrated.

Alternatively, ATG violated Securities Act Section 17(a)(3) because ATG, acting through

O'Rourke, failed to use the degree of care in this conduct that a reasonably careful person would

use under like circumstances.  With respect to Company A, ATG further violated Securities Act

Sections 17(a)(1) and (a)(3) by intentionally engaging in coordinated trading in Company A

securities to mark the close on September 23, 2013, and intentionally engaging in manipulative

trading in Company A securities on September 26, 2013.  ATG further violated Securities Act

Sections 17(a)(1) and (a)(3) by intentionally engaging in manipulative trading of Company C

stock on April 8, 2015.  ATG's intentional or reckless failure to make timely and appropriate

filings under Exchange Act Section 13(d) with respect to its and its group's holdings of

Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as

material omissions that facilitated the scheme to defraud investors about the group's control of

the management and policies of, and the magnitude of their individual and collective investment

in, both companies.  Alternatively, ATG, acting through O'Rourke, violated Securities Act

Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful

person would use under like circumstances.

232.     By reason of the foregoing, SCI and ATG, directly or indirectly, singly or in

concert, violated, are violating, and, unless restrained and enjoined, will continue to violate

Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)].

**SEVENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section**
**10(b) of the Exchange Act and Rules 10b-5(a) and (c)**
**(Against Ladd and Keller)**

233.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 194 of this Complaint.

234.     By engaging in the acts and conduct described in this Complaint, Defendants

Ladd and Keller directly or indirectly, singly or in concert, provided knowing and substantial

assistance to Honig, Brauser, Stetson and O'Rourke, and others, who, directly or indirectly,

singly or in concert with others, in connection with the purchase or sale of a security, with

scienter, used the means or instrumentalities of interstate commerce or of the mails or of a

facility of a national securities exchange to (a) employ devices, schemes, or artifices to defraud;

and (b) engage in acts, practices, or courses of business which operated or would operate as a

fraud or deceit upon others.

235.     Ladd provided knowing and substantial assistance to Honig's, Brauser's,

Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act, and Rules

10b-5(a) and (c), as alleged above in the First Claim for Relief, by, among other things,

authoring and issuing Company B's May 9, 2016 press release in which he made materially false

statements about the sale of Cybersecurity Innovator's former company to Intel.  Ladd provided

further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and

others' violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) by

86

knowingly or recklessly failing to disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company B's management and policies, in Company B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed.

236.      Keller provided knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c), as alleged above in the First Claim for Relief, by, among other things, omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company A's management and policies. Keller provided further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) by making materially false statements to Ford – which he knew were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.

237.      By reason of the foregoing, Ladd and Keller, aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting, Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## EIGHTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Sections 17(a)(1) and (a)(3) of the Securities Act
### (Ladd and Keller)

238.      The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

239.    By engaging in the acts and conduct described in this Complaint, Defendants Ladd and Keller directly or indirectly, singly or in concert, provided knowing and substantial assistance to Honig, Brauser, Stetson, O'Rourke and others, who, directly or indirectly, singly or in concert with others, in the offer or sale of a security, used the means or instruments of transportation or communication in interstate commerce or used the mails to (a) with scienter employed devices schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Company A or Company B.

240.    Ladd provided knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act, as alleged in the Second Claim for Relief above, by, among other things, authoring and issuing Company B's May 9, 2016 press release in which he made materially false statements about the sale of Cybersecurity Innovator's former company to Intel.  Ladd provided further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act by knowingly or recklessly failing to disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company B's management and policies, in Company B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed.

241.    Keller provided knowing and substantial assistance to Honig's, Brauser's, Stetson's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act, as alleged in the Second Claim for Relief above, by, among other things, omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company A's management and policies.

Keller provided further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act by making materially false statements to Ford – which he knew were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.

242.     By reason of the foregoing, Ladd and Keller, aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting Honig's, Brauser's, Stetson's and O'Rourke's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

**NINTH CLAIM FOR RELIEF**
**Violations of Section 9(a)(1) of the Exchange Act**
**(Against Honig, Brauser, O'Rourke and ATG)**

243.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

244.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, Brauser, O'Rourke and ATG, directly or indirectly, singly or in concert, by use of the mails or the means or instrumentalities of interstate commerce, or of a facility of a national securities exchange for the purpose of creating a false or misleading appearance of active trading in Company A, Company B and/or Company C securities, or a false or misleading appearance with respect to the market for Company A, Company B and/or Company C securities, entered an order or orders for the purchase and/or sale of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time and substantially the same price, for the sale and/or purchase of such security, had been or would be entered by or for the

same or different parties.

245.     Honig violated Section 9(a)(1) of the Exchange Act by, among other things,

engaging with scienter, through the Barry & Renee Honig Foundation, which he controlled, in

matched trading of Company A shares on September 26, 2013.  Honig further violated Section

9(a)(1) by engaging with scienter in matched trading of Company B shares on May 9, 2016 with

Brauser and another associate.

246.     Brauser violated Section 9(a)(1) of the Exchange Act by, among other things,

engaging with scienter, in matched trading of Company B shares with Honig and another

associate on May 9, 2016.

247.     O'Rourke, through ATG, and ATG violated Section 9(a)(1) of the Exchange

Act by, among other things, engaging with scienter in matched trading of Company C shares on

April 8, 2015.

248.     By virtue of the foregoing, Honig, Brauser, O'Rourke and ATG violated, and,

unless restrained and enjoined, will continue violating Section 9(a)(1) of the Exchange Act [15

U.S.C. § 78i(a)(1)].

## TENTH CLAIM FOR RELIEF
### Violations of Section 9(a)(2) of the Exchange Act
### (Against Honig, O'Rourke and ATG)

249.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 194 of this Complaint.

250.     By engaging in the acts and conduct described in this Complaint, Defendants

Honig, O'Rourke and ATG, directly or indirectly, singly or in concert, by use of the mails or the

means or instrumentalities of interstate commerce, or of a facility of a national securities

exchange effected, alone or with one or more other persons, a series of transactions in the

securities of Company A and/or Company B creating actual or apparent active trading in such

security, or raising or depressing the price of such security, for the purpose of inducing the

purchase or sale of such security by others.

251.     Honig violated Exchange Act Section 9(a)(2) by, among other things,

intentionally entering dozens of small buy and sell orders of Company B shares on the morning

of May 9, 2016 for the purpose of creating actual or apparent active trading in Company B shares

for the purpose of inducing the purchase of Company B shares by other market participants.

252.     O'Rourke, through ATG, and ATG violated Exchange Act Section 9(a)(2) by,

among other things, intentionally placing a bid at the end of the trading day on September 23,

2013 to buy Company A shares at a price significantly higher than the prior buy order in order to

give the market the false impression that Company A's share price was moving higher.

253.     By virtue of the foregoing, Honig, O'Rourke and ATG violated, and, unless

restrained and enjoined, will continue violating Section 9(a)(2) of the Exchange Act [15 U.S.C. §

78i(a)(2)].

### ELEVENTH CLAIM FOR RELIEF
**Unregistered Offering or Sale of Securities in Violation of Sections 5(a) and (c) of the
Securities Act
(Against Honig, Brauser and Grander)**

254.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 194 of this Complaint.

255.     By engaging in the acts and conduct described in this Complaint, Defendants

Honig, Brauser and Grander, directly or indirectly, singly or in concert, made use of the means or

instruments of transportation or communication in interstate commerce or of the mails to offer or

sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be

carried through the mails or in interstate commerce, by means or instruments of transportation,

securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable. The shares of Company A that Honig, Brauser and Grander offered and sold as alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

256.    Honig violated Securities Act Sections 5(a) and (c) with respect to his offer and sale of Company A shares, by, among other things, selling Company A shares into the public market from September through December 2013 while no registration statement was in effect for any of the sales, and no exemption from registration was available.

257.    Brauser and the entity he controlled, Grander, violated Securities Act Sections 5(a) and (c) with respect to his and/or its offer and sale of Company A shares, by, among other things, selling Company A shares into the public market from September through December 2013 while no registration statement was in effect for any of the sales, and no exemption from registration was available.

258.    By reason of the foregoing, Honig, Brauser and Grander have violated, and, unless restrained and enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

### TWELFTH CLAIM FOR RELIEF
#### Violations of Section 13(d) of the Exchange Act and Rule 13d-1(a)
#### (Against Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI)

259.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

260.    Pursuant to Exchange Act Section 13(d)(1) and Rule 13d-1(a) thereunder, persons who directly or indirectly acquire beneficial ownership of more than 5% of a Section 12-registered class of equity securities are required to make a Schedule 13D filing, or, in limited

circumstances, a Schedule 13G filing. Section 13(d)(3) states that "act[ing] as a . . . group" in furtherance of acquiring, holding, voting and/or disposing of equity securities is enough to establish the group as a single "person." When a group is required to make a Schedule 13D filing, that group must "identify all members of the group."

261.     Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander and SCI acquired and held beneficial ownership of more than 5% shares in Company B from on or about October 8, 2015 through at least on or about May 20, 2016, and collectively controlled the management and policies of that company throughout this period.  Each of them acquired, held, voted and/or disposed of those shares pursuant to an agreement among them to do so.

262.     Honig, Stetson and HSCI acquired and held beneficial ownership of more than 5% shares in Company C from on or about February 2014, and collectively controlled the management and policies of that company from that time.  Each of them acquired, held, voted and/or disposed of those shares pursuant to an agreement among them to do so.

263.     Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI acquired and held beneficial ownership of more than 5% shares in Company C from on or about April 2015 through at least on or about December 2015, and collectively controlled the management and policies of that company throughout this period.  Each of them acquired, held, voted and/or disposed of those shares pursuant to an agreement among them to do so.

264.     Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI were each under an obligation to file with the Commission true and accurate reports with respect to their ownership of the Company B and Company C securities, and failed to do so, thereby violating Exchange Act Section 13(d) and Rule 13d-1(a) thereunder.

265.     By reason of the foregoing, Honig, Brauser, Stetson, O'Rourke, ATG, GRQ,

Grander, HSCI and SCI violated, and, unless enjoined and restrained, will continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

## THIRTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 (Against Ladd)

266.　　The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

267.　　By engaging in the acts and conduct described in this Complaint, Company B violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1 [17 C.F.R. § 240.13a-1(a)] thereunder, which require issuers of registered securities under the Exchange Act to file annual reports on Form 10-K with the Commission that, among other things, do not contain untrue statements of material fact or omit to state material information necessary in order to make the required statements, in the light of the circumstances under which they are made, not misleading.

268.　　Ladd aided and abetted Company B's violation of Exchange Act Section 13(a) and Rule 12b-20 and 13a-1 thereunder, by, among other things, providing knowing and substantial assistance to Company B's filing of a materially false and misleading annual report in signing its 2015 Form 10-K that failed to disclose the group ownership of Company B stock by Honig, Brauser, Stetson, O'Rourke and others.

269.　　By reason of the foregoing, Ladd aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting, Company B's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1(a) thereunder [17 C.F.R. § 240.13a-1(a)], in violation of Section 20(e) of the Exchange Act [15

U.S.C. § 78t(e)].

## FOURTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 15(d) of the Exchange Act and Rule 15d-1 (Against Maza and Keller)

270.      The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

271.      By engaging in the acts and conduct described in this Complaint, Company A violated Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1], which require issuers of registered securities under the Securities Act to file annual reports on Form 10-K with the Commission that, among other things, do not contain untrue statements of material fact or omit to state material information necessary in order to make the required statements, in the light of the circumstances under which they are made, not misleading.

272.      Maza and Keller aided and abetted Company A's violation of Exchange Act Section 15(d) and Rule 15d-1 thereunder, by, among other things, providing knowing and substantial assistance to Company A's filing of a materially false and misleading annual report in signing its 2012 amended Form 10-K that failed to disclose the group ownership of Company A stock by Honig, Brauser, Stetson and other affiliates.

273.      By reason of the foregoing, Maza and Keller aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting, Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## FIFTEENTH CLAIM FOR RELIEF
### Violations of Section 17(b) of the Securities Act
### (Against Ford)

274.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

275.    By engaging in the acts and conduct described in this Complaint, Defendant Ford directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or by the use of the mails, in the offer or sale of Company A and/or Company C securities, has published, given publicity to, or circulated any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, described such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

276.    Ford violated Securities Act Section 17(b) by, among other things, obtaining compensation directly or indirectly from Honig, Brauser, Stetson and/or O'Rourke – each a statutory underwriter of Company A and Company C – and/or from certain of Honig's, Brauser's, Stetson's and/or O'Rourke's associates– for writing the promotional articles he published on Company A and Company C without disclosing his receipt or the amount of that compensation.

277.    By reason of the foregoing, Ford, directly or indirectly, violated, is violating, and, unless restrained and enjoined, will continue to violate Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief, in a Final Judgment:

### I.

Finding that Defendants violated the federal securities laws and rules promulgated thereunder as alleged against them herein;

### II.

Permanently restraining and enjoining Honig, Brauser, Grander, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

### III.

Permanently restraining and enjoining Honig, Brauser, Stetson, O'Rourke, Ladd, Maza, Keller, Ford, ATG, GRQ, Grander, HSCI and SCI, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### IV.

Permanently restraining and enjoining Ford, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)];

**V.**

Permanently restraining and enjoining Honig, Brauser, O'Rourke and ATG, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

**VI.**

Permanently restraining and enjoining Honig, Brauser, Stetson, O'Rourke, Ladd, Maza, Keller, Ford, ATG, GRQ, Grander, HSCI and SCI, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**VII.**

Permanently restraining and enjoining Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)];

**VIII.**

Permanently restraining and enjoining Ladd, his respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and

abetting future violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules

12b-20 [17 C.F.R. § 240.12b-20] and 13a-1 thereunder [17 C.F.R. § 240.13a-1];

## IX.

Permanently restraining and enjoining Maza and Keller, their respective agents, servants,

employees and attorneys and all persons in active concert or participation with them, who

receive actual notice of the injunction by personal service or otherwise, and each of them, from

aiding and abetting future violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]

and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1];

## X.

Permanently barring Ladd, Maza and Keller from acting as an officer or director of a

public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## XI.

Permanently prohibiting all Defendants from participating in any offering of penny stock

pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the

Exchange Act [15 U.S.C. § 78u(d)(6)].

## XII.

Ordering Defendants to disgorge all of the ill-gotten gains from the violations alleged in

this complaint, and ordering them to pay prejudgment interest thereon;

## XIII.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d)(2) of the

Securities Act [15 U.S.C. § 77t(d)(2)] and Section 21(d)(3) of the Exchange Act [15 U.S.C.

§78u(d)(3)]; and

**XIV.**

Granting such other and further relief as this Court deems just and proper.

## <u>JURY DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury as to all issues so triable.

Dated: March 8, 2019
      New York, New York

By:      _Sanjay Wadhwa_

        Sanjay Wadhwa
        Michael Paley
        Charu Chandrasekhar
        Nancy Brown
        Katherine Bromberg
        Jon Daniels
        Attorneys for Plaintiff
        SECURITIES AND EXCHANGE COMMISSION
        New York Regional Office
        200 Vesey Street, Suite 400
        New York, New York 10281-1022
        (212) 336-1023 (Brown)
        Email: BrownN@sec.gov