# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CREIGHTON TAKATA, Individually and on behalf of all others similarly situated,

      *Plaintiff*,

      v.

RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY G. MCGONEGAL,

      *Defendants*.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.: 18-2293(FLW)(TJB)

**LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CORRECTED AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**LITE DEPALMA GREENBERG**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for Dr. Stanley Golovac
and Lead Counsel for the Class*

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ..................................................................................1

II.    STATEMENT OF FACTS ........................................................................................3

       A.     Defendants Honig, O'Rourke, Stetson, and Groussman Have Operated as a
              "Small Group," from the "Same Office," Collaborating with Their "Chosen Co-
              Investors" in a "Pattern" of Fraud Involving Dozens of Companies.....................3

       B.     Beginning in 2016, Defendants and the Honig Group Acquire a Controlling
              Interest in the Company and Takeover Control of the Board.................................6

              1.     September 2016 – Honig and DeFrancesco, Along with "Honig's Friends
                     and Relatives," Acquire a Controlling Stake in the Company....................6

              2.     January 2017 – Honig and DeFrancesco Oust Three Previous Board
                     Members and Appoint O'Rourke, Beeghely, and Dai to the Board ...........8

       C.     In Control, Defendants Obtain Discounted Shares from the Company and Sell
              Their Shares to the Public through Materially False and Misleading Securities
              Registration Statements that Deny and Conceal the Honig Group's "Material
              Relationship" with the Company and Its Managers and Directors.........................9

       D.     With Millions More Shares Publicly Trading, Defendants Commence a Publicity
              Campaign to Convince Retail Investors that "Riot" Is a "Pure Play" Investment in
              Cryptocurrency by Touting Transactions They Know Are Wasteful, Benefit
              Related-Parties, and/or of De Minimus Value ......................................................11

              1.     October 4, 2017 – Defendants Announce that "Bioptix [Is] Changing [Its]
                     Name to Riot Blockchain" and Making a "Strategic Investment" in
                     Coinsquare, Which "Is Experiencing Explosive Growth".........................12

              2.     October 5 and 27, 2017 – Defendants Tout Riot as a "NASDAQ Listed
                     *Pure Play* Blockchain Company" and a "Gateway to Blockchain" ..........13

              3.     October 17, 2017 – Riot Touts Acquiring a "52% Stake in Tess" ............13

              4.     November 2, 2017 – Riot Purchases "1,200 Bitcoin Mining Machines"
                     from Kairos, But Secretly Overpaid $11 Million to Related Parties .........14

              5.     November 15-17, 2017 – O'Rourke Appears on CBS Touting an
                     "Investment in Riot" as a "Gateway to Blockchain" for the "Average
                     Person . . . Through a Traditional Capital Markets Company" ................15

              6.     November 16, 2017 – Riot Makes a "*Strategic* Investment in Verady"....16

              7.     December 11, 2017 – Tess "to Merge with Publicly Traded Cresval"......17

              8.     December 12, 2017 – O'Rourke and the Board Deny "Any Related Party
                     Transactions" Involving Shareholders of "More than 5%" .....................18

              9.     January 5 and February 7, 2018 – Riot Issues Further False and
                     Misleading Form S-3/A Securities Registration Statements ....................19

              10.    February 16, 2018 – Riot Purchases "3,800 Bitcoin Mining Machines"
                     from Prive While Secretly Overpaying $19 Million to Related Parties ....20

       E.     As the Truth Is Revealed, Riot's Retail Investors Suffer Millions in Losses ........21

ii

F.   In 2019, Riot Reported an Accumulated Shareholder Deficit of $212 Million and "Substantial Doubt[ed]" Its Ability to "Continue as a Going Concern" ...............24

III.   ARGUMENT .................................................................................................25

A.   The Complaint Adequately Alleged Claims for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) ...........................................................26

1.   The Complaint Adequately Alleges Defendants' Materially False and Misleading Statements and Omissions ....................................................27

a.   The Riot Defendants Made False and Misleading Statements Hiding Their "Material Relationship" with the Honig Group .......27

b.   Defendants' Statements and Omissions Regarding Riot's Related-Party Transactions Were False and Misleading............................32

c.   Defendants' Publicity Campaign to Convince the Market that Riot Had Transformed Into "Pure Play" Cryptocurrency Company Was Materially False and Misleading.................................................36

2.   The Complaint Adequately Alleges that Defendants Acted with Scienter41

a.   Defendants' Prior Fraudulent Schemes and Business Dealings Support a Strong Inference of Scienter..........................................42

b.   Defendants Had Motive and Opportunity to Commit Securities Fraud ......................................................................................43

c.   Defendants' Public Statements Add to the Inference of Scienter ..44

d.   O'Rourke's Stock Sales Support a Strong Inference of Scienter ..44

e.   The SEC *Honig* Action and Settlements and the Investigation and Subpoena to Riot Support a Strong Inference of Scienter ............45

f.   The Circumstances Surrounding O'Rourke's Sudden Departure Support a Strong Inference of Scienter..........................................47

g.   Defendants' Concealment of Their Related-Party Transactions and Stock Sales Supports a Strong Inference of Scienter...................48

h.   Defendants' SOX Certifications Add to the Inference of Scienter48

i.   Plaintiff is Entitled to a Core Operations Inference......................49

j.   The Inference of Scienter Is At Least as Compelling as the Non-culpable Inference Articulated By Defendants .............................50

3.   The Complaint Adequately Pleads Loss Causation ...................................50

B.   The Complaint Adequately Alleges Claims for Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) ...........................................................54

C.   The Complaint Adequately Alleges Claims Under Section 20(a) ........................60

IV.   CONCLUSION ...........................................................................................60

# TABLE OF AUTHORITIES

<u>CASES</u>

*ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46 (1st Cir. 2007)................................................ 58

*Adams v. Amplidyne, Inc.*, 2000 WL 34603180 (D.N.J. Oct. 24, 2000)....................................... 49

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) .................................. 53, 54

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)............................................................................... 53

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ............................................................... 25

*Belmont v. MB Inv. Partners, Inc.*, 2010 WL 2348703
    (E.D. Pa. June 10, 2010), *aff'd*, 708 F.3d 470 (3d Cir. 2013)................................................ 60

*Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) ............................................... 53

*Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256 (D.N.J. Mar. 2, 2016)................................ 60

*Bond Opportunity Fund II, LLC v. Heffernan*, 340 F. Supp. 2d 146 (D.R.I. 2004) .................... 28

*Brendon v. Allegiant Travel Co.*, 2019 WL 4255051 (D. Nev. Sept. 9, 2019)............................ 45

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004).................................. 27

*City of Bristol Pension Fund v. Vertex Pharms., Inc.*, 12 F. Supp. 3d 225
    (D. Mass. 2014) ...................................................................................................................... 50

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 40
    (D. Del. 2009) ......................................................................................................................... 48

*Cohen v. Kitov Pharm. Holdings, Ltd.*, 2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) .............. 53

*Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807 (S.D.N.Y. 2006)............................................ 54

*De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832 (D.N.J. Dec. 31, 2018) .................... 49

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)..................................................................... 50

*Eastwood Enters., LLC v. Farha*, No. 8:07-cv-1940-T-33EAJ, 2009 WL 3157668
    (M.D. Fla. Sept. 28, 2009) ..................................................................................................... 46

*Eletrobras*, 2017 WL 1157138 ................................................................................................... 48

*EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865 (3d Cir. 2000)................................... 27, 51

*Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ........................................ 27

*Freer v. Mayer*, 1991 WL 355062 (S.D.N.Y. Apr. 26, 1991) ................................................ 33, 34

*Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10 (D. Mass. 2000)................................................ 42

*GFL Advantage Fund, Ltd., v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) ..................................... 54, 55

*Harriman v. E.I. DuPont De Nemours & Co.*, 372 F. Supp. 101 (D. Del. 1974)........................ 31

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ......................................................... 55

*Hull v. Glob. Digital Sols., Inc.*, 2017 WL 6493148 (D.N.J. Dec. 19, 2017)........................ 45, 54

*In re Able Labs. Sec. Litig.*, 2008 WL 1967509 (D.N.J. Mar. 24, 2008)..................................... 26

*In re Advanced Battery Techs., Inc. Sec. Litig.*, 2012 WL 3758085
(S.D.N.Y. Aug. 29, 2012) ............................................................... 43

*In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004) ...................................... 44

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 413 F. Supp. 2d 378 (E.D. Pa. 2005) ...................... 50

*In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124 (3d Cir. 2017) .................................... 26

*In re Amarin Corp. PLC*, 2015 WL 3954190 (D.N.J. June 29, 2015) ......................................... 7

*In re Apollo Grp., Inc. Sec. Litig.*, 2010 WL 5927988 (9th Cir.  June 23, 2010) ........................ 52

*In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011) ............................................... 53

*In re Bristol-Myers Squibb Sec. Litig.*, 2005 U.S. Dist. LEXIS 18448
(D.N.J. Aug. 17, 2005) ............................................................... 36

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410(3d Cir. 1997) .................................. 26

*In re Cephalon Sec. Litig.*, 1997 WL 570918, at *2 (E.D. Pa. Aug. 29, 1997) ............................ 26

*In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68 (E.D.N.Y. 1999) ............... 40

*In re CytRx Corp. Securities Litigation*, 2015 WL 5031232 (C.D. Cal. July 13, 2015).............. 49

*In re Delmarva Sec. Litig.*, 794 F. Supp. 1293 (D. Del. 1992) ............................................ 8

*In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479 (E.D. Pa. 2018)..................................... 43

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549
(S.D. Tex. 2002) ..................................................................... 42

*In re Enzymotec Sec. Litig.*, 2015 WL 8784065 (D.N.J. Dec. 15, 2015)........................ 39, 40, 44

*In re Equimed, Inc. Sec. Litig.*, 2000 WL 562909 (E.D. Pa. May 9, 2000)................................. 60

*In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145 (D. Or. 2015).......................... 48

*In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352 (E.D.N.Y. 2013)......................................... 46

*In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519 (D. Del. 2012)................................... 47

*In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13-7050, 2015 WL 4469143
(D.N.J. July 22, 2015) ............................................................... 44

*In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 281 (S.D.N.Y. 2003) ............................ 31

*In re Majesco Sec. Litig.*, 2006 WL 2846281 (D.N.J. Sept. 29, 2006)..................................... 27

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006).............. 42

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199
(D.N.J. Aug. 8, 2011).............................................................. 38, 53

*In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996 (S.D. Cal. 2011).................................. 52

*In re Par Pharm. Sec. Litig.*, 2009 WL 3234273 (D.N.J. Sept. 30, 2009) ............................ 40, 47

*In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337 (S.D.N.Y. 2015)....................................... 52

*In re Questcor Sec. Litig.*, No. SA CV 12-01623 DMG, 2013 WL 5486762
(C.D. Cal. Oct. 1, 2013)............................................................. 45

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130
(D. Colo. 2005) ....................................................................................... 42

*In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332
(D. Mass. 2009) ...................................................................................... 39

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) ........................ 26, 41, 56

*In re Tyson Foods, Inc. Sec. Litig.*, 2004 WL 1396269 (D. Del. June 17, 2004) ........................ 51

*In re U.S. Bioscience Sec. Litig.*, 806 F. Supp. 1197 (E.D. Pa. 1992) .................................... 32, 34

*In re Unisys Corp. Sec. Litig.*, 2000 WL 1367951 (E.D. Pa. Sept. 21, 2000) ............................ 26

*In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635 (E.D. Pa. 2015) ............................ 49

*In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220 (S.D.N.Y. 2006).................................. 49

*Institutional Inv'rs Grp. V. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) ............................ 41, 43, 44

*Jones v. Intelli-Check, Inc.* 274 F. Supp. 2d 615 (D.N.J. 2003) (J. Wolfson) ........................ 54, 60

*Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480 (3d Cir. 1994) ................................................ 31

*Lopez v. Rica Foods, Inc.*, No. 06-20710-CIV, 2007 WL 9701171
(S.D. Fla. Apr. 6, 2007) ......................................................................... 28

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019).................................................................. 3, 54, 59

*Marsden v. Select Med. Corp.*, No. 04-4020, 2006 WL 891445 (E.D. Pa. Apr. 6, 2006) ........... 50

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ........................................ 25

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) ...................................................... 8

*Payne v. DeLuca*, 433 F. Supp. 2d 547 (W.D. Pa. 2006) ........................................ 39

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008).................................... 25, 61

*PTC Therapeutics*, 2017 WL 3705801 ................................................................ 44

*S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248 (W.D. Wash. 2009).................... 44

*S.E.C. v. Lucent Technologies, Inc.*, 610 F. Supp. 2d 342 (D.N.J. 2009)................ 54

*Se. Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 466958
(M.D. Pa. Feb. 8, 2016) ......................................................................... 47

*SEC v. China N.E. Petrol. Holdings Ltd.*, 27 F. Supp. 3d 379 (S.D.N.Y. 2014).......... 36

*SEC v. Desai*, 145 F. Supp. 3d 329 (D.N.J. 2015)............................................ 48

*SEC v. Straub*, 2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016) ................................. 3

*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) ........................ 51

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992) ................................ 39

*Snellink v. Gulf Resources, Inc.*, 870 F. Supp. 2d 930 (C.D. Cal. 2012) .................... 28

*Stroup v. United Airlines, Inc.*, 2016 WL 7176717 (D. Colo. Sept. 16, 2016)........... 16

*Sun v. Han*, 2015 WL 9304542 (D.N.J. Dec. 21, 2015) ........................................ 42

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008) .................................................................. 42

vi

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ................................. 25, 41, 44

*The Winer Family Trust v. Queen*, 2004 WL 2203709
    (E.D. Pa. Sept. 27, 2004) ........................................................................ 60

*Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650 (D.N.J. 2009) ........................ 54

*United States v. Johnson*, 199 F.3d 123 (3d Cir. 1999) .......................................... 3

*Viropharma*, 21 F. Supp. 3d........................................................................ 45

*Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F.Supp.3d 93
    (D. Mass. 2014) ................................................................................ 45

*Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997) ................................... 39

*Williams v. Globus Med., Inc.*, 869 F.3d 235 (3d Cir. 2017)...................................... 31

*Winer Family Tr. v. Queen*, 503 F.3d 319 (3d Cir. 2007) .......................................... 3

## R<small>EGULATIONS</small>

17 C.F.R § 240.13d-2........................................................................... 2, 48, 53

17 C.F.R. § 229.404 ...................................................................... 28, 30, 33, 35

17 C.F.R. § 229.404(a).......................................................................... 28

17 C.F.R. § 229.404(a)(1)....................................................................... 28

17 C.F.R. § 240.10b-5.......................................................................... 54

Court-appointed Lead Plaintiff Dr. Stanley Golovac ("Plaintiff") respectfully submits this omnibus memorandum of law in opposition to the motions to dismiss (the "Motions") the Corrected Amended Consolidated Class Action Complaint (the "Complaint") filed by Defendants Riot Blockchain, Inc. ("Riot" or the "Company"), Barry Honig, John O'Rourke, Michael Beeghley, Jeffrey G. McGonegal, Catherine DeFrancesco, Andrew Kaplan, Eric So, and Jason Les (the "Individual Defendants," and together with Riot, "Defendants").[1]

## I.    PRELIMINARY STATEMENT

The Complaint alleges in detail how each of the Individual Defendants participated, together with approximately 20 affiliated investors (the "Honig Group, ¶ 79), in a classic "pump-and-dump" scheme to (1) amass a controlling interest in Riot; (2) conceal their control through materially false SEC filings and disclosure violations; (3) drive up the price and trading volume of Riot stock through false and misleading promotional campaign and fraudulent related-party transactions at the expense of the Company and its shareholders; and (4) dump their shares into the artificially inflated market on unsuspecting retail investors.  Defendants' scheme closely mirrors the same *modus operandi* that the SEC has alleged that Defendants Honig, O'Rourke, Stetson, and Groussman have perpetrated at multiple other public companies – each time with members of the Honig Group.  *See* § II.A *infra*.

Even the most suspicious-minded of Riot's public investors could have had no way of knowing that on the other side of their presumably arm's-length stock purchases stood an

---

[1] Capitalized terms herein have the same meanings as in the Complaint (ECF No. 73), paragraphs of which are cited herein as "¶ __."  Defendants' memoranda of law in support of their Motions are cited herein as follows:  the Riot Blockchain Defendants' memorandum (ECF No. 107-1) is cited as "Riot Br. _"; the Director Defendants' memorandum (ECF No. 108-1) is cited as "Director Br. __"; Defendant DeFrancesco's memorandum (ECF No. 112-1) is cited as "DeFrancesco Br. _"; and Defendant Honig's memorandum (ECF No. 118-1) is cited as "Honig Br. _".  All emphasis is added and internal quotations and citations are omitted, unless otherwise noted.

undisclosed control group of affiliated shareholders who were working in close collaboration with Riot's management to siphon away millions of dollars from the Company (and thus its investors) through a series of wasteful related-party transactions. The details of these transactions and the extent of Honig and his affiliates' involvement in the Company were unknown to Riot's public investors because in selling the Honig Group's shares, Riot repeatedly represented that (1) "[n]one" of these "Selling Stockholders" "had a material relationship" with the Company; and (2) that no shareholders that beneficially owned "more than 5% of the Company's outstanding shares" had any "material interest" in "any transaction" that had "materially affected" the Company. Both categories of statements were materially false and misleading and otherwise served to facilitate and further Defendants' fraudulent scheme. *See* §§ III.A(a)-(b) & III.C, *infra*.[2]

Honig – who O'Rourke has described as "the principal investor of our small group" – and DeFrancesco also facilitated Defendants' scheme by clearly violating their duties – as Riot's largest shareholders – under 17 C.F.R § 240.13d-2 to "promptly" disclose their sales of Riot common stock during the Class Period. Between January 5, 2017 (when Honig reported owning 11.2%) until February 13, 2018 (when Honig reported owning 1.47%) – while Defendants were operating their scheme – Honig never disclosed to the market that he was covertly dumping hundreds of thousands shares into the market. ¶¶ 329, 353. As Honig bragged to CNBC on January 31, 2018, while he was continuing to violate § 240.13d-2: "When stock goes up, you take a profit . . . ." ¶ 319. Similarly, DeFrancesco reported owning 11.45% of Riot's stock on January 10, 2017, on Form 13D/A, but never filed another Form 13D/A until Riot's January 5, 2018 Form S-3 revealed that DeFrancesco and her entities held less than 1% of Riot's stock. ¶ 309.

---

[2] ***Two*** former Chairmen of the SEC – Jay Clayton and Harvey Pitt – have spoken out condemning Defendants' illegal conduct as executives and shareholders of Riot. ¶¶ 10, 193, 330.

Defendants' arguments for dismissal fail. Plaintiff has alleged materially false and misleading statements, a strong inference of Defendants' scienter, and loss causation, as well as demonstrating that Defendants' scheme falls within the "***wide range of conduct***" that the Supreme Court recently confirmed is prohibited by Rules 10b-5(a) and (b). *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019). The Court should deny Defendants' Motions in their entireties.

## II.   STATEMENT OF FACTS

### A.   Defendants Honig, O'Rourke, Stetson, and Groussman Have Operated as a "Small Group," from the "Same Office," Collaborating with Their "Chosen Co-Investors" in a "Pattern" of Fraud Involving Dozens of Companies

According to the SEC's March 8, 2019 Complaint,[3] "Honig, Brauser, Stetson and O'Rourke" operated as a "partnership" that "individually or through their entities, invested alongside one another in ***at least 19 issuers*** [i.e., public companies] at or about the same time, from 2011 to the present." Ex. 1 ¶ 55. According to the SEC, "in most cases in which Honig, Brauser, Stetson and O'Rourke co-invested, the investments followed a pattern[4]:

> Honig or Brauser would identify a target company and arrange a financing or financings ***that would give them and their chosen co-investors (including Stetson and O'Rourke, among others) a controlling position in the company's outstanding common stock at lower-than-market prices.*** Honig, Brauser, Stetson and O'Rourke would then exercise that control by dictating terms of the company's material management decisions and policies, and voting together to direct the company's major business decisions. ***When the group determined that the time had arrived to exit the investment, they would engineer a publicity-generating event that would both drive the price of the stock higher, and also create market demand and trading volume that would allow them to sell their positions.*** Typically, Honig, Brauser, Stetson and O'Rourke would dictate some kind of

---

[3] The SEC' Complaint is incorporated by reference into the Complaint and is "integral to [and is] explicitly relied upon by" the Complaint. *Winer Family Tr. v. Queen*, 503 F.3d 319, 328 (3d Cir. 2007) (district court properly considered documents attached to the defendants' motion to dismiss).

[4] "[E]vidence of conduct and acts that predate" Defendants conduct at Riot "may still be admissible at trial to prove the existence of [Defendants'] scheme, its background, and the knowledge and intent of the Defendants." *SEC v. Straub*, 2016 WL 5793398, at *20 n.7 (S.D.N.Y. Sept. 30, 2016); *see also United States v. Johnson*, 199 F.3d 123, 128 (3d Cir. 1999) ("evidence of the prior robbery for the purpose of showing a common plan" was admissible under Fed. R. Evid. 404(b)).

transaction for management to undertake — for example, an acquisition or merger, or a new investment by a well-known investor, . . . and paid writers, bloggers or other public relations professionals to write about it. ***Once the publicity had its intended effect on the stock's price and trading volume, Honig, Brauser, Stetson, O'Rourke and the other hand-picked co-investors would sell their respective positions — generally staggered over a course of weeks — into the artificially inflated market.***

*Id.* "Throughout these stages, ***Honig, Stetson and O'Rourke were in nearly daily contact because they worked out of the same office and were in frequent email and telephone contact, at times purposefully moving their conversations to the less permanent medium of text or instant messaging.***" *Id.* ¶ 56. "Honig, Stetson and O'Rourke were each in frequent contact . . . ." *Id.*

"***As O'Rourke put it in a February 3, 2014 email to the officer of a potential merger target, "Barry Honig is the principal investor of our small group."*** *Id.* ¶ 57. The SEC detailed how this "small group" – led by Honig – coordinated its actions:

> ***Honig, Brauser, Stetson and O'Rourke obtained their interests in these issuers at the same time, and agreed to act as a group in holding, disposing and voting the stock they acquired, with Honig leading the combined effort. . . . Honig carefully controlled his "small group's" participants in the financings he arranged*** so that shares were held only by individuals and entities that (1) permitted ***Honig to direct how they voted*** their shares and/or acquiesced in ***Honig's control of the management of the company, and (2) refrained from selling their shares until the optimal time for group members to profit from the planned post-pump dump.***
>
> ***Honig worked with Stetson to ensure that members of his groups voted their shares in unison.*** At times, members of the group reached out to Stetson to find out how they should vote on various proposals. For example, . . . in July 2015, Brauser forwarded an email request from a co-investor's staffer to Stetson, asking whether to vote for or against a proposal. ***Stetson, in an email that same day, copying Honig, replied "Yes, vote 'For.'"***

*Id.* In November 2016 – at the same time that Honig was waging a proxy fight for control of Riot (*see* § I.B.) – Stetson wrote an "***email to members of a Honig group of investors in another issuer***," in which "***Stetson responded to a request for 'instructions to vote'***"

with '*voting in favor of [two named directors].  **Against all other members and actions**.*"
*Id.*

The SEC alleged that "***Honig was the primary architect***" of the schemes,[5] but that "email traffic among Honig, Brauser, Stetson and O'Rourke demonstrate the various key roles each of these Defendants play in the typical Honig-led investment."  *Id.* ¶ 59.  The SEC alleged that for several years, Honig, O'Rourke, Stetson, and Brauser "shared office space."  *Id.* ¶¶ 56, 62-63.  All told, O'Rourke and Stetson "invested alongside Honig" in ***more than 75 and 65 issuers***, respectively between 2011 and August 2018.  *Id.* ¶¶ 62-63.

Plaintiff's Complaint also details Defendants' prior involvement in six additional companies:  PolarityTE, Pershing Gold, Mundo, Marathon, YesDTC, and WPCS.  ¶¶ 103-27.  Two companies – Marathon and WPCS – were purported (and failed) attempts to transform an existing company into a cryptocurrency operation (just like Riot).  *See* ¶¶ 105-15, 116-18.  In each instance, Defendants worked hand-in-hand with a several – and often many – of the same group of "hand-picked co-investors" – the Honig Group.  *See* ¶¶ 79-80.

On January 18, 2019, Groussman settled with SEC and agreed to pay $1.38 million in disgorgement and penalties, and to a five-year ban on taking part in penny-stock offerings.  ¶ 372.[6]

---

[5] *See also* ¶ 98 ("Honig . . . directed O'Rourke to write a promotional article" that "knowingly and falsely claimed that '[t]he author has no business relationship with [MabVax].'"); ¶ 98 ("O'Rourke, at Honig's direction, circulated a press release . . . announcing the $12 million private placement").

[6] Given his settlement, Groussman is not discussed in the SEC's March 8, 2019 amended complaint.  Ex. 1.  However, the SEC's initial complaint alleges that "***[i]n every scheme***, Honig, and some combination of Stetson, Brauser, O'Rourke, ***Groussman*** and Frost, either explicitly or tacitly agreed to buy, hold or sell their shares in coordination with one another, knowing that a pump and dump was in the offing that would allow them all to profit handsomely."  Ex. 2 ¶ 2.  Groussman's participation in the schemes involving Biozone, MGT, and MabVax included "pre-release manipulative trading" with Honig, Brauser, O'Rourke, Melechdavid and ATG.  *Id.* ¶ 3.  "Honig, Brauser, Stetson, O'Rourke, Frost ***and Groussman***, as well as certain of their entities, also violated beneficial ownership reporting requirements of the federal securities laws by failing to disclose their group beneficial ownership of shares and the fact that as a group they were looking

On June 10, 2019, Honig settled with SEC in exchange for his agreement, among other things, to (1) be "permanently barred from participating in any offering of penny stock"; (2) be "permanently prohibited" from holding greater than 4.99% of any penny stock company; and (3) "pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty" to be determined upon a forthcoming motion by the SEC.  Ex. 3.  Groussman has agreed to a similar five-year ban.  Ex. 4 at 5.  Several other members of the Honig Group – Melechdavid, ¶ 58, and GRQ Consultants, ¶ 74 – have also settled with the SEC.  Exs. 5, 6.

The SEC's case is ongoing.  As shown below, Defendants' fraudulent scheme with Riot followed the same basic pattern as those alleged by the SEC.

### B.    Beginning in 2016, Defendants and the Honig Group Acquire a Controlling Interest in the Company and Takeover Control of the Board

In early 2016, Honig and his group identified yet another a "target company" in which they "and their chosen co-investors," which again "included Stetson and O'Rourke," would seek "a controlling position in the company's outstanding common stock at lower-than-market prices." Ex. 1 ¶ 55.

### 1.    September 2016 – Honig and DeFrancesco, Along with "Honig's Friends and Relatives," Acquire a Controlling Stake in the Company

On September 13, 2016, Honig and DeFrancesco wrote letters to the Company's then-CEO touting their combined 16.2% stake in the Company.  ¶¶ 6, 132.  Honig also spoke several times with members of the Company's then-existing Board of Directors.  ¶¶ 6, 132.  *During these telephone conversations, Honig implied that he had control of 40% of the Venaxis's[7] shares*

---

to exercise (and, in fact, did exercise) control over the issuers."  *Id.* ¶ 4.  "***Groussman*** . . . work[ed] at an office in Boca Raton with Honig, Stetson and O'Rourke."  *Id.* ¶ 38.

[7] Originally called Venaxis, the Company became "Bioptix" on September 12, 2016.  ¶¶ 6, 131.

*through his stock ownership and the stock ownership of Honig's friends and relatives,*
<u>*according to a former Venaxis Board member present during the conversations*</u>. *Id.*[8]

On September 13, 2016, Honig attempted to nominate his own slate of new directors of Bioptix, including O'Rourke, Beeghley, and Stetson, and several other of Honig's associates. ¶ 7. When Venaxis's then-existing Board were considering Beeghley as a nominee , ***Beeghley told [the Board] that*** <u>***he did not know Honig, according to an individual present at the time***</u>. ¶¶ 7, 137.[9]

On December 8, 2016, Defendant Honig filed a lawsuit in state court in Colorado, seeking to force a special meeting of shareholders that would include a vote on the proposed changes. ¶ 137. Honig's lawsuit alleged that "[o]n September 14, 2016, Ms. DeFrancesco sent a letter to [CEO] Lundy . . . in support of Barry Honig and his demand for a special meeting of the shareholders of the Company for all of the purposes set forth herein." Ex. 10 at 4 ¶ 18.

---

[8] Defendants argue that the Complaint "offers no . . . testimony of confidential witnesses." Riot Br. 3. To the contrary, the Complaint is bolstered by testimony provided to Plaintiff's counsel by "a former Venaxis Board member present during the conversations" with Defendants Honig and Beeghley. ¶¶ 132, 137. This individual's "source[] of knowledge" (being "present during the conversations" with Honig and Beeghley) and "the reliability of the source[]" (which is "high, by virtue of [this individual's] position at [Venaxis]" as a "former . . . Board member"), and "the corroborative nature of other facts alleged" (Honig's established *modus operandi* set forth in the SEC Complaint) "are not wanting; thus, the Court [should] not discount [the former Venaxis Board member's] allegations simply because [this individual] is anonymous." *In re Amarin Corp. PLC*, 2015 WL 3954190, at *14 (D.N.J. June 29, 2015).

[9] Defendant Honig quotes Beeghley's statement to the Board that he "'did not know Honig'" as if this representation were actually true. Honig Br. 6 (quoting ¶¶ 7, 137). Honig misses the point. Beeghley's statement was knowingly false because as of September 2016, Beeghley and Honig had served together for one year as Director and Chairman/CEO, respectively, of Majesco (later called PolarityTE). Specifically, Beegley was a Director of Majesco from December 18, 2015 until October 18, 2017, and Honig was Chairman and CEO of Majesco from September 30, 2015 until December 1, 2016. *See* Ex. 7 at 4; Ex. 8 at 2; Ex. 9 at 18, 22. In other words, Beeghley joined Majesco/PolarityTE's board when Honig was already Chairman and CEO of that board. Numerous other Defendants and Honig Group members have close ties to Majesco/PolarityTE. *See* ¶¶ 22, 26, 36, 43, 60, 65, 67, 69, 79-80, 119-21.

DeFrancesco followed up her September 14, 2016 letter with another letter to Lundy on September 20, 2016, in which she stated that "I repeat my demand . . . for a special meeting of the shareholders" and "join in Mr. Honig's prior nomination" of Ex. 11 at Ex. 99.1.  DeFrancesco further stated:

> The purposes of the meeting should be, as set forth in Mr. Honig's meeting demand: (1) to vote on the removal of five (5) directors, aside from you, currently serving on the Board of Directors, (2) to vote on a $7,500,000 shareholder dividend, and (3) to set the size of the board at no more than six (6) directors and for the election of five (5) new directors as follows:  John Stetson, John O'Rourke, Jesse Sutton,[10] Michael Beeghley, and David Danziger.  I join in Mr. Honig's prior nomination of these individuals to serve as members of the board of directors, a copy of which is attached as Exhibit C hereto and incorporated by reference.

*Id.*  Honig's nomination of Stetson, O'Rourke, Beeghley, and others (attached to DeFrancesco's letter) also stated:  "Should you have any questions regarding the foregoing, please do not hesitate to **contact our counsel Harvey Kesner, Esq. . . . .**"  *Id.* at 26.

By exercising warrants and notes, Honig's "friends and relatives" soon controlled more than 55% of Riot's outstanding shares.  *See* ¶¶ 214 n.23, 224 n.25, 229 n.26, 234 n.27.

### 2. January 2017 – Honig and DeFrancesco Oust Three Previous Board Members and Appoint O'Rourke, Beeghely, and Dai to the Board

On January 6, 2017, three legacy directors resigned from the Board.  ¶ 138.  In a letter filed with the SEC on Form 8-K,[11] Gail Schoettler, Susan Evans, and David Welch wrote that "[t]he members of the Board of the Company have engaged in discussions with principal shareholders

---

[10] Jesse Sutton is the former CEO of Majesco.  ¶ 107.

[11] "SEC filings fall within this category of public records that can be judicially noticed."  *In re Delmarva Sec. Litig.*, 794 F. Supp. 1293, 1299 (D. Del. 1992); *see also Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (ruling that courts may take judicial notice of SEC filings in ruling on a motion to dismiss).

of the Company[12] subsequent to the commencement of [Honig's legal action] and, based on such discussions, have determined that if such special meeting were to be held, the proposals submitted by Mr. Honig would be approved by the shareholders." Ex. 12 at 7; *see also* ¶¶ 138-39.

> **C.   In Control, Defendants Obtain Discounted Shares from the Company and Sell Their Shares to the Public through Materially False and Misleading Securities Registration Statements that Deny and Conceal the Honig Group's "Material Relationship" with the Company and Its Managers and Directors**

On March 16, 2017, the Company privately issued $7,000,000 in stock and warrants to Defendant Honig and members of the Honig Group, who bought nearly all of the stock, warrants, and convertible notes sold in those placements, which were priced at a 30 percent discount to the market. ¶¶ 140-41, 143, 145. Then, on April 6, 2017, Defendant Beeghley became CEO of Riot, replacing Lundy. ¶ 142.

Beginning on April 20, 2017, the Riot Defendants began filing multiple false and misleading registration statements on Forms S-3/A in order for the Honig Group to sell millions of shares of the Company's common stock to unsuspecting retail investors. ¶ 154. Specifically, the Riot Defendants caused the Company to issue four separate Securities Registration Statements on Form S-3/A on April 20, 2017, ¶¶ 210-14; July 19, 2017, ¶¶ 220-24; August 24, 2017, ¶¶ 225-29; and September 25, 2017, ¶¶ 230-34. O'Rourke, Beegley, McGonegal, and Dai signed all four Forms S-3/A and Kaplan signed the final three. ¶¶ 211, 221, 226, 231. Altogether, between April and September 2017, the "Selling Stockholders"[13] – the majority (and possibly all) of whom were

---

[12] The "principal shareholders of the Company" is a clear reference to Defendants Honig and DeFrancesco.

[13] The "Selling Stockholders" in the April-September Forms S-3/A who were members of the Honig Group included Eric Richardson; Melechdavid; Groussman; Honig; GRQ Consultants 401K; Titan; O'Braitis; Stockwire Research Group (i.e., James) (0.75%); Aifos Capital Management, LLC (i.e., Theofilos) (2.20%); Stetson Capital Management, LLC (i.e., Stetson) (4.99%); JAD Capital Inc. (1.48%); and Richard Molinsky (1.80%). In each Form S-3/A, "Honig-

members of the Honig Group – registered for sale 22,648,585 of Riot common stock.  *See* ¶¶ 210-15, 220-24, 225-29, 230-34.

In each Form S-3/A, the Riot Defendants represented to investors that "*[n]one of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities*."  ¶¶ 211, 215, 221, 226.   Beeghley knew Karr, ¶ 43 – who was a significant Selling Stockholder in all four April–September Forms S-3/A through his entity Aifos, ¶ 33 – because Karr was also a Director of Majesco/PolarityTE, ¶ 43.  Indeed, Karr was appointed to Majesco/PolarityTE's board on September 25, 2015, the same day as Defendants Honig, Brauser, and Kaplan.  ¶ 119.  *See* Ex. 8 at 4.[14]

Similarly, O'Rourke (a Board member when each Form S-3/A was published) had previously admitted that "Honig" – one of the primary "selling stockholders" – "is the principal investor of *our small group*."  Ex. 1 ¶ 57.  Indeed, O'Rourke had "invested alongside Honig" in *more than 75 companies* between 2011 and August 2018.  Ex. 1 ¶¶ 62-63.  O'Rourke had also co-invested with Beeghley, Stetson, Groussman, DeFrancesco, and Kaplan in various prior companies.  ¶¶ 79-80.  Similarly, Defendant Kaplan, who joined Riot's Board on May 5, 2017, ¶ 28, Ex. 14 at 3, had been a director of Majesco/PolarityTE since October 2015, ¶ 119, and therefore equally knew the various directors, officers, and shareholder of Polarity.[15]

---

associated stockholders accounted for at least 55% of Riot's common stock" as of each Form S-3/A.  *See* ¶¶ 214 n.23, 224 n.25, 229 n.26, 234 n.27.

[14] Karr resigned as a director of Polarity on December 1, 2016, the same day that Honig and Brauser also resigned.  Ex. 13 at 10.

[15] Indeed, the individuals involved with the scheme at Riot is virtually an "alumni reunion" of PolarityTE's officers, directors, and shareholders, who included Defendants Honig, DeFrancesco, O'Rourke, Beeghley, Groussman, and Kaplan, as well as Honig Group members Aifos, ATG, Bhansali, Brauser, Grander, GRQ, Karr, Kesner, Melechdavid, Molinksy, Namaste, O'Braitis, Paradox, Policy No. 2013-17, and Stetson Capital.  *See* ¶¶ 79-80.

On October 3, 2017, Bioptix announced that its Board had authorized a special dividend of approximately $1.00 per common share in cash, "payable on or about October 18, 2017 to shareholders of record as of October 13, 2017." ¶ 235. In response to the announcement of the payment of this future dividend, Bioptix's stock price increased by more than 25% in one trading day. ¶ 238. This dividend predominantly benefited the Honig Group, which at that time already held a majority ownership interest in Bioptix and (unlike other public shareholders) was keenly aware that the Company had plans to transition into the cryptocurrency business. ¶ 237.

> **D.  With Millions More Shares Publicly Trading, Defendants Commence a Publicity Campaign to Convince Retail Investors that "Riot" Is a "Pure Play" Investment in Cryptocurrency by Touting Transactions They Know Are Wasteful, Benefit Related-Parties, and/or of De Minimus Value**

"When the [Honig] [G]roup determine[s] that the time ha[s] arrived to exit the[ir] investment, they . . . engineer a publicity-generating event that w[ill] both drive the price of the stock higher, and also create market demand and trading volume that w[ill] allow them to sell their positions." Ex. 1 ¶ 55. In October 4, 2017, Defendants began this chapter on their scheme at the company they would now call "Riot Blockchain."

In an effort to lend public credibility and validation to Riot's purported transformation into a blockchain company, Defendants caused the Company to engage in a series of transactions involving Coinsquare, Kairos, Prive, Tess, Ingenium, and Verady. Defendants misleadingly hyped these transactions as leaving Riot "positioned . . . to launch our cryptocurrency mining operation," ¶ 264, and "poised to take advantage of this revolution in digital transactions," ¶ 249.

Overall, Riot paid Coinsquare, Kairos, Prive, Tess, Ingenium, and Verady approximately $49.3 million.[16]  However, $30 million of these payments were egregious overpayments to Kairos and Prive (companies incorporated on the same day by the same individuals) for computers that Riot could have purchased online for approximately $30.4 million less.  *See* ¶¶ 175-77 ("Riot paid . . . more than $13 million for . . . equipment worth less than $2 million"); ¶ 195 ("Riot overpaid for these machines by approximately $19 million").[17]  Thus, Riot's wasteful overpayments to related parties constituted approximately ***61.5%*** ($30.4 million/$49.5 million) of Riot's total purported investments in cryptocurrency.[18]

Moreover, Kairos, Prive, and Ingenium were each related-party transactions involving Honig, DeFrancesco, and related parties with overlapping ownership and/or control of these three entities.  *See* Ex. 17.  With respect to Tess, Riot has since written down the value of this investment by 90%.  Exs. 21-22.  And while Riot initially proclaimed the Verady transaction as a "***Strategic***," Defendants later admitted that it was actually "***de minimus***."

### 1.   October 4, 2017 – Defendants Announce that "Bioptix [Is] Changing [Its] Name to Riot Blockchain" and Making a "Strategic Investment" in Coinsquare, Which "Is Experiencing Explosive Growth"

On October 4, 2017, the Company announced that it was changing its name to "Riot Blockchain" and was "shift[ing]" its "focus" to being a "strategic investor and operator in blockchain technologies."  ¶¶ 239-42.  In the same press release, Riot announced its "strategic

---

[16] Riot paid $3 million to Coinsquare (¶ 351); $956,750 to Tess (*see* § II.D.1.3); $13,162,500 to Kairos (¶ 175); $28.2 million to Prive (¶ 195); $200,000 to Verady (Ex. 15 at 1); and $4 million to Ingenium (¶ 199) for a total of $49,519,250.

[17] Specifically, Plaintiff estimates that Riot overpaid Kairos by $11,072,821 (¶¶ 175-77) and overpaid Prive by $19, 3884,000 (¶ 195) for a total overpayment of $30,456,821.

[18] As discussed in § II.F, the $30.4 million that Riot overpaid Kairos and Prive for computers is strikingly similar to the $29.2 million impairment charge that Riot took at year-end 2018 "related to impairments of our digital currency mining equipment."  Ex. 16 at 36.

investment in Coinsquare Ltd." ¶¶ 166-68, 178, 239-42.[19]   In announcing the Coinsquare transaction, however, Riot failed to disclose that the parties to that transaction included Honig, Brauser, Groussman (via a family foundation), Stetson (via Stetson Capital), So, GRQ 401K, Titan, Theofilos (CEO of Mundo), and Ross Levinson, Executive Chairman of Mundo.  ¶ 351. This information would not be public until Riot filed an amended 8-K/A on May 25, 2018.  *Id.*[20]

### 2.    October 5 and 27, 2017 – Defendants Tout Riot as a "NASDAQ Listed *Pure Play* Blockchain Company" and a "Gateway to Blockchain"

On October 5, 2017, Riot published an "investor presentation" in which the Company claimed, among other things, that it was a "NASDAQ listed pure play Blockchain company" and that "is experiencing explosive growth in a budding industry, already demonstrating strong potential."  ¶ 243.  Similarly, on October 27, 2017, Riot filed an updated Investor Presentation with the SEC in which Defendants claimed that Riot provided investors with "a gateway to blockchain" as "one of the only Nasdaq listed companies with this focus."  ¶ 178.

### 3.    October 17, 2017 – Riot Touts Acquiring a "52% Stake in Tess"

On October 17, 2017, Riot announced in a press release that it had acquired a 52% stake in Tess, which Riot described as a company "based in Toronto, Ontario" that was "engaged in a blockchain-based payment service for wholesale telecom carriers."  ¶ 169.  Based on this acquisition, Beeghley touted that "*Tess is a prime example of how blockchain technologies can be leveraged to disrupt established industries.  I believe that Riot Blockchain is poised to take advantage of this revolution in digital transactions . . . .*"  ¶ 249.

---

[19] O'Rourke later admitted that "we were presented with the opportunity to invest in Coinsquare" in "August 2017" – before Riot issued its September 25, 2017 Form S-3/A.  Ex. 18 at 2.

[20] Riot also failed to disclose until November 19, 2018 (the same day it disclosed having received a subpoena from the SEC), that "GRQ Consultants, Inc., a related party of Mr. Honig, received a cash payment of $50,000 for diligence services in connection with the Company's September 2017 investment in Coinsquare."  ¶ 364.

Unbeknownst to investors, Tess did not even exist three months earlier, ¶ 250 n.29, and appears to have had ties Kairos (an entity partly owned by Honig and DeFrancesco) and several other related entities. ¶ 170. In addition, public records support that Tess's Chief Software Architect is connected to a Bitcoin phishing scam. *Id.*

Riot appears to have paid approximately $956,750 in October 2017 for its purported 52% stake in Tess.[21] However, on May 10, 2019, Riot disclosed that "the Company's ownership in Tess [has been] reduced to approximately 9%, such that Tess will thereafter no longer be consolidated within the Company's financial statements," and that Riot currently values the "Tess shares held by Riot" at $90,174 – a 90% loss of Riot's approximate initial investment. *See* Ex. 21 at 21.[22] As of August 8, 2019 Form 10-Q, Riot valued the "Tess shares held by Riot" at $90,174. Ex. 22 at 14.

### 4.   November 2, 2017 – Riot Purchases "1,200 Bitcoin Mining Machines" from Kairos, But Secretly Overpaid $11 Million to Related Parties

On November 2, 2017, Riot announced that it had purchased "1,200 Bitcoin Mining Machines" from Kairos. ¶¶ 259-63. "In conjunction with the [Kairos] transaction, the Company announced that President John O'Rourke has been named Chairman and [CEO] of Riot Blockchain. ¶ 264.[23] Unbeknownst to investors, however, "Riot paid . . . more than $13 million for . . . equipment worth less than $2 million." ¶¶ 175-77. Also unbeknownst to investors, Honig and DeFrancesco (who each owned more than 10% of Riot, ¶ 353) secretly owned 8.6% and 6.3%,

---

[21] Specifically, on October 20, 2017, Riot's stock closed at $8.49 per share. Ex. 19. Thus, Riot paid approximately $956,750 (75,000 * $8.49 = $636,750) + $320,000) for 52% of Tess on October 20, 2017. *See* Ex. 20 at 2 (Riot "agreed to pay $320,000 in cash and to issue 75,000 shares of the Company's restricted common stock to TESS").

[22] Riot stated that its interest in Tess was diluted by Tess's issuance of "23.8 million shares." *Id.*

[23] O'Rourke signed as "President" in Riot's "Articles of Merger" on October 3, 2017. ¶ 23 n.1.

respectively, of Kairos.  ¶ 173.  Investors also did not know that Kairos had been incorporated by

DeFrancesco's lawyer, Laxague, ¶¶ 171, 173, who had also incorporated another entity, Ingenium,

on the same day, ¶ 52.  Investors were also unaware that Kairos was controlled by the same

individuals that controlled Prive and Ingenium (*see* ¶¶ 42, 52, 173, 197-99 n.21, 337), with which

Riot would soon engage in further wasteful related-party transactions.  *See* § III.A.1.b.  It was not

until June 29, 2018 that Riot disclosed (when forced by "comments made by the staff . . . of the

[SEC]") that Honig and DeFrancesco had both "owned" 8.6% and 6.3%, respectively, of "Kairos."

¶ 353-54.

### 5.    November 15-17, 2017 – O'Rourke Appears on CBS Touting an "Investment in Riot" as a "Gateway to Blockchain" for the "Average Person . . . Through a Traditional Capital Markets Company"

On November 15 and 17, 2017, O'Rourke appeared as "CEO of Riot Blockchain" in two

separate online video interviews published by CBS's TechRepublic.  ¶¶ 275-85.  During his

November 15 interview, O'Rourke stated that "we own 52 percent of a company called Tess that

is developing a blockchain technology to disrupt the telecom industry . . . ."  ¶ 275.  O'Rourke

appeared on November 17 in a program titled "How to Get Started with Blockchain."  ¶ 283.  In

the interview, O'Rourke described Riot as one of "the best first steps to get involved in bitcoin or

blockchain" by noting that "we [i.e., Riot] have two different blockchain technology companies

underneath our hood.  We're building out a cryptocurrency mining division . . . ."  *Id.*  O'Rourke

went on to note how "right now, for the average person, it's difficult to get that exposure [i.e.,

investment exposure to bitcoin or blockchain] because whether you're trying to buy bitcoin

directly, it's not an easy onboarding process.  You have to create an account with an exchange,

create a wallet, there's some security issues if you don't know what you're doing."  *Id.*   The

solution O'Rourke offered was for the "average person" to invest in Riot:  "That's a problem we're

attempting to solve to provide, you know, one way where a person could potentially, you know,

get exposure to the industry through a traditional capital markets company that's listed on the NASDAQ." *Id.*

Retail investors responded to O'Rourke's misleading publicity stunts. On November 15, Riot stock price increased 11.6%, ¶ 278, and between November 16 and 21, Riot's stock price increased another 38.6%, ¶ 285. On November 21, Zack's Investment Research noted how Riot had "exploded into popularity on investing social media forums," *id.*, which as the SEC has alleged, is O'Rourke's specialty. Ex. 1 ¶ 63 ("O'Rourke managed the Honig group's promotional efforts by working with writers and bloggers").

### 6.    November 16, 2017 – Riot Makes a "*Strategic* Investment in Verady"

On November 16, 2017, Defendants announced that Riot had made a "***Strategic Investment in Verady, a Blockchain Technology Company***." ¶¶ 279-82; *see also* Ex. 23. Riot stated that "Verady follows recent investments the Company has made into Coinsquare, Tess, and its Bitcoin mining operation." Ex. 23. Defendant O'Rourke touted that "[t]his investment continues our commitment to building blockchain technologies . . . ." *Id.*

It was not until February 7, 2018, however, that Riot would disclose that its "investment in Verady" was merely "a $200,000 minority convertible note." Ex. 15. And it was not until April 17, 2018, that investors would learn that this note gave Riot "a maximum ownership interest of approximately 12%" and "no other relationship or rights." Ex. 24 at 58. And it was not until November 11, 2018, that Riot would admit that "[t]he investment in Verady is considered a ***de minimis*** investment." Ex. 25. By touting Riot's "***Strategic***[24] Investment in Verady" without

---

[24] "Webster's New Collegiate Dictionary defines 'strategic' as '***necessary to or important*** in the initiation, conduct or completion of a strategic plan' or '***of great importan[ce]*** within an integrated whole or to a planned effect.'" *Stroup v. United Airlines, Inc.*, 2016 WL 7176717, at *1 (D. Colo. Sept. 16, 2016); *see also* https://www.merriam-webster.com/dictionary/strategic (same).

disclosing that it was a "*de minimus*" $200,000 unsecured note amounting to a 12% interest, Riot and O'Rourke's clear intention was to exaggerate this transaction to artificially pump the Company's stock price.[25]

### 7.     December 11, 2017 – Tess "to Merge with Publicly Traded Cresval"

On December 11, 2017, Riot announced that TessPay had signed a "letter of intent" for a merger with Cresval.  ¶¶ 287-91.  In a press release, Riot quoted Tess's CEO:  "The decision to take the company public provides us access to traditional capital markets as we continue developing our blockchain technology solution.  This environment will also foster transparency and accountability moving forward, providing confidence to investors and prospective customers alike."  ¶ 186.  That same day, Riot's stock price increased by more than 45% with more than 20 million shares trading hands.[26]  ¶ 291.   In reality, however, Cresval was an undercapitalized, money-losing mineral exploration company (i.e., gold/copper mining *not* bitcoin "mining") that according to its 2017 annual report had a shareholder deficit of CAD 2,2551,185, and was experiencing "material uncertainties may cast significant doubt on the Company`s ability to continue as a going concern."  ¶¶ 186-87.  And far from giving Tess "access to traditional capital markets," there was essentially no market for Cresval's shares, which had not traded at all since November 1, 2017, when shares worth CAD 54.00 had changed hands.  ¶ 187.  Unbeknownst to investors, Cresval's founder, Arthur Wolfin, was linked to Defendants Honig, O'Rourke, and Brauser through "significant" investments in other companies including Pershing Gold.  ¶ 188.[27]

---

[25] Indeed, Verady did not issue its own press release about Riot's investment.  *See* Ex. 26.

[26] On December 11, 2017, Riot only had 9.660 million shares of stock outstanding.  *See* Ex. 27.  Thus, on average, each share changed hands that day twice.

[27] Cresval's link, through its founder, to Pershing Gold also links Cresval to at least *16 members of the Honig Group* that were also investors in Pershing Gold.  *See* ¶ 79.

### 8.   December 12, 2017 – O'Rourke and the Board Deny "Any Related Party Transactions" Involving Shareholders of "More than 5%"

On December 12, 2017, Riot filed its annual Proxy Statement, ¶¶ 292-94, in which Defendant O'Rourke wrote as "President and [CEO]" to "[s]incerely" to Riot's "Dear Shareholder[s]," "cordially invit[ing]" them to "attend the 2017 Annual Meeting of Shareholders" on December 28, 2017, "[at] the Boca Raton Resort and Club . . . ." Ex. 28 at 2.  The 2017 Proxy Statement stated was issued "***By Order of the Board of Directors of Riot Blockchain, Inc.***" and "in connection with the solicitation by the [Board] . . . of proxies . . . to be used at the Annual Meeting . . . ." *Id.* at 4, 6.  The 2017 Proxy Statement also stated:

> ***The Audit Committee[28] has responsibility for reviewing and, if appropriate, for approving any related party transactions that would be required to be disclosed pursuant to applicable SEC rules.***  This includes current or proposed transactions in which the Company was or is to be a participant, the amount involved exceeds the lower of either $120,000 or 1% of the average of the Company's total assets at year end for the last two completed fiscal years, and in which any of the Company's executive officers, directors, or greater than five percent shareholders, or any members of their immediate families, has a direct or indirect material interest. ***Apart from any transactions disclosed herein, no such transaction was entered into with any director or executive officer during the last fiscal year.  Such transactions will be entered into only if found to be in the best interest of the Company and approved in accordance with the Company's Code of Ethics, which are available on the Company's web site.***
>
> ***Except for the employment agreements previously entered into between the Company and certain of its named executive officers, since January 1, 2016, none of the directors or named executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its common stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company.***

¶ 292; *see also* Ex. 28 at 2.  These representations were false.  As Riot would later admit on June 29, 2018 (when forced by the "staff . . . of the [SEC]"), Honig and DeFrancesco owned 8.6% and

---

[28] At this time, Riot's Audit Committee consisted of Defendants Les, Kaplan, and So.  ¶ 292 n.40.

6.3%, respectively, of Kairos "at the closing of the Kairos Transaction" with Riot on November 3, 2017.  ¶ 353.  Honig and DeFrancesco also beneficially owned 11.2% and 11.45%, respectively, of Riot's common stock as of January 5 and 10, 2017, respectively.  *Id.*  Honig continued to beneficially own "more than 5%" of Riot's common stock until November 28, 2017 (after the Kairos Transaction)  – but never promptly disclosed any of his sales of Riot stock from January 5, 2017 (when Honig reported owning 11.2% as of November 11, 2016) until February 13, 2018 (when Honig reported owning 1.47% as of January 4, 2018).  ¶¶ 329, 353.[29]

### 9.  January 5 and February 7, 2018 – Riot Issues Further False and Misleading Form S-3/A Securities Registration Statements

On January 5 and February 7, 2018, Riot again issued Form S-3/A Registration Statements in which an even larger group of Selling Stockholders offered Riot common stock for sale to retail investors.  ¶¶ 309-11, 322-25.  This time, however, the stock was trading at much higher prices than in April-September of 2017.[30]  In both Forms S-3/A, Riot made the same false representation that "*[n]one of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities*."  ¶¶ 310, 323.

---

[29] On March 26, 2018, O'Rourke and the Board again denied "any related Party transactions" involving shareholders of "more than 5%", in Riot's 2018 Proxy Statement.  ¶¶ 346-47.  Like the 2017 Proxy Statement (*see* § II.D.8 *supra*), the 2018 Proxy Statement was signed by O'Rourke and solicited proxies from Riot shareholders "by Order of the Board . . . ."  Ex. 29 at 2-3.  Also like the 2017 Proxy Statement, the 2018 Proxy Statement stated that no "person who own of record or was known to own beneficially more than 5%" of Riot's "outstanding shares of common stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect us."  ¶ 346; *see also* Ex. 29 at 16.  Like the 2017 Proxy Statement, this statement was false.

[30] Specifically, on January 5 and February 7, 2018, Riot stock closed at $24.43 and $14.32, respectively.  Ex. 19.

Then-CEO O'Rourke knew that Honig and Brauser – both significant "Selling Stockholder" in both the January 5 and February 7, 2018 Forms S-3/A through their entities GRQ Consultants and Grander, ¶¶ 46-47, 309, 322 – had material relationships with the Company (of which O'Rourke was CEO) because O'Rourke had invested with Honig "in over 75 issuers" and alongside Honig *and* Brauser "in at least 19 issuers since 2011." Ex. 1 ¶¶ 55, 63. O'Rourke had also invested in PolarityTE in 2016 when Brauser was a director. Ex. 30. O'Rourke also knew that:

- DeFrancesco – who was also a significant "Selling Shareholder" in both the January 5 and February 7, 2018 Forms S-3/A through seven of her entities – had a material relationship with the Company because DeFrancesco and those same entities had demanded a special meeting of shareholders in September 2016 to appoint O'Rourke to the Company's Board. Ex. 11.

- Kesner, through his entity Paradox – which was also a "Selling Shareholder" in both the January 5 and February 7, 2018 Forms S-3/A – had a material relationship with the Company because Kesner represented O'Rourke, Beeghley, Honig, and Stetson in connection with their nomination to the Company's Board. *Id.* at 26 ("do not hesitate to contact our counsel Harvey Kesner, Esq.").

- GRQ Consultants – an entity owned by Honig that was a "Selling Shareholder in both the January 5 and February 7, 2018 Forms S-3/A – had a material relationship with the Company because Riot had paid GRQ $50,000 for diligence services in connection with the Company's September 2017 investment in Coinsquare." ¶ 364.

### 10. February 16, 2018 – Riot Purchases "3,800 Bitcoin Mining Machines" from Prive While Secretly Overpaying $19 Million to Related Parties

On February 16, 2018, the same day that Riot's stock price fell 33.4% in response to CNBC's investigative report, Riot issued a Form 8-K disclosing that its subsidiary, Kairos, had agreed to purchase "3,800 AntMiner S9s, all manufactured by industry leader Bitmain" from Prive for $11 million in cash and 1 million shares of Riot common stock. ¶ 195. In all, the consideration suggests a total transaction value at the time of the agreement of approximately $28.2 million. *Id.* As shown in the Complaint, however, Riot could have purchased the exact same machines online

from their manufacturer – for delivery in about one month – for only $8,816,000.  *Id.*  Thus, Riot overpaid for these machines by approximately $19 million.  ¶ 195.

In announcing the Prive transaction, Riot also did not disclose that Prive was a related-party transaction involving the same President, Secretary, and Treasurer, and the same Directors, as Kairos, which had been incorporated on the same day by DeFrancesco's lawyer.  ¶¶ 42, 52, 173, 197-99 n.21, 337.[31]

### E.    As the Truth Is Revealed, Riot's Retail Investors Suffer Millions in Losses

Beginning in December 2017, a series of news articles began revealing the truth about Defendants' pump-and-dump scheme.  As more information was revealed and events unfolded, Riot's stock price to declined, culminating in the SEC's subpoena on Riot, and the *Honig* Action.

On December 19, CNBC interviewed securities analyst Andrew Left, who stated that Riot "ha[s] a few small investments, just enough to go ahead and put it public.  And they roll it out, and with enough promotion, and obviously with the hype behind crypto and the lack of assets, there it goes.  The time really misrepresenting the fact that nothing that they have is [ ] a real player in the crypto industry."  ¶ 299.  Mr. Left further noted:  "If you want to talk about people front running the stock before they make announcements, I'm sure you could look at that."  *Id.*  In response, Riot's stock price fell ***6.42%*** between December 19 and 20, 2017.

On December 22, 2017, *Business Insider* reported that Riot was "on the hunt for a chief technology officer, according to a job posting on LinkedIn," but that "a technical background in

---

[31] Investors later learned that Riot had paid $4 million to Ingenium to for "consulting services . . . for a twelve-month period" involving "the installation and deployment of . . . cryptocurrency miners" purchased from Prive and BMSS.  ¶ 199.  Riot revealed that the "controlling principals of Ingenium International LLC., are shareholders in the Company by virtue of the previous acquisitions of Kairos and Prive."  *Id.*  Specifically, Ingenium's President, Secretary, Treasurer, and Directors were the same persons who controlled Kairos and Prive.  ¶¶ 40, 48, 52-53, 65, 70, 199.  DeFrancesco's personal lawyer incorporated both Ingenium and Kairos.  *See* Ex. 17.

cryptocurrencies is not required. "'Technical experience in cryptocurrency or cryptocurrency mining' was merely 'a big plus.'" ¶ 302. Between December 19 and 22, 2017, Riot's shares declined **34.75%**. ¶ 304.

On December 27, 2017, Riot abruptly canceled its scheduled annual shareholder meeting, saying it "adjourned to achieve a quorum . . . ." ¶ 305. However, on December 28, 2017, CNBC reported that "[n]umerous employees" at the meeting's venue, the Boca Raton Resort and Club, said that hotel "had no reservations" involving Riot. ¶ 306.

Then, on January 2, 2018, *Reuters* reported that O'Rourke's had sold 30,383 shares of his Riot stock on December 29, 2017 – after the market closed on the final trading day of the year before the holiday weekend. On this news, between December 29, 2017, and January 3, 2018, Riot's shares declined by **14.45%**. ¶ 308. While Riot's stock price was falling on Company-specific news, the price of Bitcoin was rising sharply. *See* Ex. 31.

On January 31, 2018, *The Wall Street Journal* published an article about Riot and Honig. ¶ 319. The same day, the Company again canceled its increasingly delayed annual shareholder meeting. ¶ 320. On these revelations, Riot's share price declined by **14.26%**. ¶ 321.

On February 13, 2018, Honig filed a Form SC 13D/A – his first since January 5, 2017 – reporting that he had sold all but 1.47% of his shares of Riot. ¶¶ 329-31. Former SEC Chairman Harvey Pitt told CNBC that Honig's failure, as a shareholder who was "already disclosed as an owner," to "timely" disclose his sales of Riot shares, was "certainly" a violation of the law. ¶ 330 n.45.

On February 16, 2018, CNBC published a detailed investigation into Riot. ¶¶ 332-39. The SEC visited Honig's office after Riot had cancelled it annual meeting, thinking that Honig "may be the man behind the curtain." ¶ 332. At Honig's office, CNBC instead found O'Rourke. *Id.*

When questioned about his recent stock sales of $869,000, O'Rourke told CNBC that "*he isn't worried about the SEC because 'we over-disclose.*'"  ¶ 333.  In the same report, CNBC asked Honig if he "still manipulate[s] stocks?"  Honig responded:  "*The answer's no.*" ¶ 334.  Based on their interview with Honig, CNBC stated that "Honig acknowledged he's done this before.  Five years ago he and John O'Rourke were involved in another company that changed its business model to blockchain.  That stock also skyrocketed. Today it's trading around two bucks a share." ¶ 335.  As the market reacted to the information CNBC's reports, Riot's share price declined by *33.4%.*  ¶ 403.  While Riot's stock price plummeted, the price of Bitcoin was rising.  *See* Ex. 31.

On April 17, 2018, Riot announced that it had received a subpoena from the SEC.  ¶ 350. Riot also disclosed that "each of Barry Honig (together with other group members) and Catherine Johanna DeFrancesco beneficially owned greater than 10% of the dispositive and voting power of the Company's common stock."  Ex. 24 at 73.  On this news, Riot's share price declined by *5.9%*. ¶ 404.  As Riot's stock price fell, the price of Bitcoin rose sharply.  *See* Ex. 31.  The same day, Riot disclosed that "short-term rented facility in Quebec, Canada"[32] in which it kept the "servers" it purchased from Kairos had "certain infrastructure deficiencies" that "became more problematic . . . due to storm water leakage into the facility" and that as a result, "119 servers" valued at "approximately $426,000" with "visible evidence of exposure to water" and "visible signs of damage." Ex. 24 at 74.[33]

On April 18, 2018, Defendant Honig filed another untimely Form 13D/A in which he revealed additional details about his stock trading during the Class Period. *See* Ex. 33.  The Form

---

[32] Coincidentally, "[i]n March 2018, Marathon announced that its '*Facility in Quebec* Has Commenced Bitcoin Mining Operations.'"  ¶ 112.  Like Kairos, Marathon has ties to "Mike Ho" through Global Bit Ventures, Inc.  *Id.*  Marathon, in turn, has ties to Honig, O'Rourke, Brauser, Stetson, Groussman, and a dozen other members of the Honig Group.  ¶¶ 79-80, 105-11.

[33] Riot later stated that "there was no damage" to the "119 servers."  Ex. 32 at 15.

13D/A revealed that after disclosing his ownership of 11.2% of Riot's stock on January 5, 2017, Honig sold hundreds of thousands of shares during the Class Period. *Id.* at 10-12. For example, between November 24 and 30, 2017, Honig sold more than 400,000 shares of Riot stock (at prices between $11.77 and $16.94 per share) for proceeds of more than $5.5 million – without disclosing his sales to the public as required by 17 C.F.R § 240.13d-2. *See* Ex. 33 at 10-12.

On September 7-8, 2018, the SEC filed the *Honig* Action. ¶¶ 357-60. The next day, September 8, Defendant O'Rourke resigned as CEO of Riot. ¶ 23. As the market reacted, the price of Riot's shares declines by ***26.1%***. ¶ 405.

### F.   In 2019, Riot Reported an Accumulated Shareholder Deficit of $212 Million and "Substantial Doubt[ed]" Its Ability to "Continue as a Going Concern"

As a result of Defendants' "transformation of Riot," the Company did not set out to a "promising future." Honig Br. 10. Rather, Riot hemorrhaged cash, reporting progressively larger losses $4,273,000, $19,971,000, and $60,212,528 in 2016, 2017, and 2018, respectively. *See* Exs. 34, 24, 16; *see also* Ex. 37 at 1 (depicting Riot's mounting losses following its transformation). And while Riot reported that it had purportedly "tripled the value of [its] assets . . . from $17 million at year end 2016 to $52 million at year end 2017," Honig Br. 10 – those numbers were themselves false and misleading, as later asset impairments would show. *See* Ex. 37 at 2 (Riot's assets were less in Q4 2018 than Q4 2016, when Honig and DeFrancesco waged their proxy fight).

Specifically, by year-end 2018, Riot admitted that it had taken "asset impairment charges of $35,266,000," including "approximately $29,238,000 related to impairments of our digital currency mining equipment." Ex. 16 at 36. Notably, this asset impairment charge was almost exactly equal to the approximately $30.4 million that Plaintiff alleges that Riot had overpaid for this same "digital currency mining equipment" in arcane related-party transactions benefitting Honig and DeFrancesco through Kairos, *see* ¶¶ 175-77 ("Riot paid . . . more than $13 million for

. . . equipment worth less than $2 million"), and with the related company Prive, which was incorporated on the same day by the same individuals, *see* ¶ 195 ("Riot overpaid for these machines by approximately $19 million").

As of August 8, 2019, Riot reported an accumulated stockholders' deficit of "$212.0 million." Ex. 22 at 9. In May 2019, Riot reported an "accumulated deficit" of $210 million as among the "factors, among other, [that] raise substantial doubt about the ability of the Company to continue as a going concern." Ex. 21 at 7.

On September 30, 2019, Riot's stock price closed at $1.78 per share, *see* Ex. 14 – *only 3.8%* of Riot's Class Period-high of $46.20 on December 19, 2017. ¶ 397.

## III.    ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). In ruling on a 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007). Dismissal is inappropriate even where "it appears unlikely that a plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). Despite Rule 9(b)'s requirements, the Third Circuit has cautioned, "'in applying Rule 9(b), courts should be 'sensitive' to situations in which 'sophisticated defrauders' may 'successfully conceal the details of their fraud.'" *In re Able Labs.*

*Sec. Litig.*, 2008 WL 1967509, at *11 (D.N.J. Mar. 24, 2008) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)).[34]

### A.   The Complaint Adequately Alleged Claims for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)

To state a claim under Rule 10b-5 (b), a complaint must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a nexus between the misrepresentation or omission and the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation." *In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 129 (3d Cir. 2017).   Allegations of fraud under Section 10(b) must meet the heightened pleading requirements of Rule 9(b) by pleading the who, what, when and where of the conduct alleged.   *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006).   Despite Rule 9(b)'s stringent requirements, the Third Circuit has cautioned, "'in applying Rule 9(b), courts should be 'sensitive' to situations in which 'sophisticated defrauders' may 'successfully conceal the details of their fraud.'"   *See In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *11 (D.N.J. Mar. 24, 2008) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)).

The PSLRA "does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim." *In re Cephalon Sec. Litig.*, 1997 WL 570918, at *2 (E.D. Pa. Aug. 29, 1997); *see also In re Unisys Corp. Sec. Litig.*, 2000 WL 1367951, at *4 (E.D. Pa. Sept. 21, 2000) (noting the PSLRA "'was not intended to create an insurmountable pleading hurdle for plaintiffs in such cases'").

---

[34] The PSLRA "does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim." *In re Cephalon Sec. Litig.*, 1997 WL 570918, at *2 (E.D. Pa. Aug. 29, 1997); *see also In re Unisys Corp. Sec. Litig.*, 2000 WL 1367951, at *4 (E.D. Pa. Sept. 21, 2000) (noting the PSLRA "'was not intended to create an insurmountable pleading hurdle for plaintiffs in such cases'").

### 1. The Complaint Adequately Alleges Defendants' Materially False and Misleading Statements and Omissions

Under the PSLRA, a complaint need only allege facts "'sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). A misrepresentation or omission "'is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000) (alteration in original).[35] Courts ***do not*** require "an exhaustive cataloging of facts "to satisfy the PSLRA's particularity requirement," and, as such, they do "not require plaintiffs to plead issues that may have been concealed by the defendants." *In re Majesco Sec. Litig.*, 2006 WL 2846281, at *6 (D.N.J. Sept. 29, 2006) (particularity requires pleading facts that are "sufficient to provide assurance that plaintiffs have investigated the alleged fraud and reasonably believe that a wrong has occurred").

### a. The Riot Defendants Made False and Misleading Statements Hiding Their "Material Relationship" with the Honig Group

In April, July, August, and September 2017, and again in January and February 2018, Riot filed multiple false and misleading Securities Registration Statements on Form S-3/A in order for members of the Honig Group – including Defendants Honig, DeFrancesco, Groussman, and Stetson – to sell millions of shares of Riot stock to unsuspecting retail investors. ¶¶ 210-14, 220-34, 309-12, 322-25. Each Form S-3/A disclosed that these Selling Stockholders intended to register and sell some or all of their common stock. *Id.* Each Form S-3/A disclosed to potential

---

[35] A plaintiff need only plead the existence of a single materially misleading statement or omission in order to withstand a motion to dismiss. *See, e.g.*, *Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409, at *4 n.2 (C.D. Cal. Mar. 5, 2013) ("Plaintiff can survive a motion to dismiss by alleging a single material misrepresentation.").

purchasers that "*none*" of the Selling Stockholders had a "*material relationship*" with "*us*" (i.e., the Company and its officers and directors) "*other than as a result of the ownership of our shares or other securities.*"  *Id.*

Defendants' claim that "us" "clearly refers only to Riot" and not the Company's "board of directors."  Riot Br. 12.  This is nonsensical.  Indeed, the very regulation that Defendants rely for the proposition that "co-investors" need not be disclosed, 17 C.F.R. § 229.404, references "director[s]" *16 times*.  *See* 17 C.F.R. § 229.404 (defining "related person" to include "[a]ny director or executive officer of the registrant" and "[a]ny immediate family member of a director or executive officer of the registrant[.]"); *see also Snellink v. Gulf Resources, Inc.*, 870 F. Supp. 2d 930, 933-34, 936, 939 (C.D. Cal. 2012) (holding that "[plaintiffs adequately pleaded falsity" under "Rule 10b-5" where "Gulf's SEC filings failed to disclose related party transactions by hiding the fact that . . . Gulf is related to [the related parties] through ownership and control of Gulf's directors (mainly Yang, Gulf's [*non-executive*] Chairman of the Board of Directors")) (citing 17 C.F.R. § 229.404(a)).[36]

As explained above, both O'Rourke and Kaplan were *directors of Riot* at the time the S-3's were issued.  Moreover, as it relates to the 2018 S-3's alleged in the Complaint, at the time those were issued O'Rourke was CEO.  Thus, like Beeghley, he was within even Defendants' definition of "us."

---

[36] *See also Bond Opportunity Fund II, LLC v. Heffernan*, 340 F. Supp. 2d 146, 158 (D.R.I. 2004) ("Item 404(a) includes among the persons whose interest must be disclosed: '(1) [a]ny director or officer of the registrant . . . .'" (quoting 17 C.F.R. § 229.404(a)(1)); *Lopez v. Rica Foods, Inc.*, No. 06-20710-CIV, 2007 WL 9701171, at *11 (S.D. Fla. Apr. 6, 2007) ("Regulation S-K deals with disclosure of transactions in which directors or officers of the 'registrant' . . . have a material interest and where the registrant is a party to the transaction."), *aff'd in part, rev'd in part*, 277 F. App'x 931 (11th Cir. 2008) (citing 17 C.F.R. § 229.404(a)).

But even setting this argument aside, at the same time these Forms S-3 were filed, Beeghley, who had previous ties to "Selling Stockholders" Honing and Stetson from another penny stock company, Mejesco/PolarityTE (¶¶ 67, 119-20), was part of "us" because he was serving as Riot's CEO *and* Chairman.  ¶¶ 25, 139.  In fact, as the Complaint makes clear that it was Honig (with DeFrancesco's support) who nominated Beeghley as CEO.  ¶¶ 136-42.[37]

O'Rourke's ties to the "Selling Stockholders" are even more glaring.   For example, unbeknownst to Riot investors until the CNBC expose in February 2018, O'Rourke "had space" in Honig's office in Florida.  ¶¶ 332, 337.  The SEC later alleged that several of the Selling Stockholders, including Stetson and Groussman, also shared office space with O'Rourke.  *See* § II.A *supra*.  Of course, the SEC did not stop there and has alleged sweeping allegations of fraud against Honig, O'Rourke, Groussman and Stetson (among others) at several other penny stock companies, including Biozone, MGT, and Mabvax.  ¶¶ 81-102; 357-360; *see also* § II.A *supra*. By way of example, regarding O'Rourke's role in the scheme – a virtual blueprint for the pump-and-dump scheme alleged here – the SEC stated that O'Rourke previously admitted to knowing Honig as "the principal investor of *our small group*" (Ex. 1 ¶ 570) and as having "invested alongside Honig" in *more than 75* between 2011 and August 2018.  Ex. 1 ¶¶ 62-63.

Aside from Beeghley and O'Rourke, Defendant Kaplan, another Riot insider, also had material ties to the "Selling Stockholders" by virtue of his service, alongside Honig and Beeghley, on the board of directors of Majesco/PolarityTE. ¶ 119.[38]

---

[37] *See* 7 at 4; Ex. 8 at 4; Ex. 9 at 18, 22.

[38] O'Rourke also had ties to Majesco/PolarityTE as an investor in that company.  Ex. 30 at 10; *see also* Exs. 38-45 (PolarityTE Forms 4 showing investments by Beeghly, DeFrancesco, Groussman, Kaplan, Brauser, Bhansali, and Karr).

In addition to arguing that "us" does not include "Riot's board of directors," Defendants also argue that their affirmative misrepresentation of the Honig Group's "material relationship" is justified because "co-investors" are excluded from disclosure under 17 C.F.R. § 229.404.  Riot Br. 11-12.  Defendants provide no authority for this interpretation (other than the statute itself), which does not specifically mention "co-investors."

But even if Defendants' interpretation of § 229.404 were correct, the Selling Stockholders in the Honig Group were not merely "co-investors" but operated as a centrally organized "control group" ***coordinating their trades down to the single share***.  In that regard, closer scrutiny of Riot's April-September 2017 Forms S-3/A reveals how various members of the Honig Group precisely coordinated shareholdings, resulting in implausibly coincidental numbers of shares these purportedly "unrelated" stockholders (and their investment entities) held.  For example, in the April 20, 2017 Form S-3/A, ¶ 210, O'Braitis and JAD Capital (a corporation in Ontario owned by Theofilos, the CEO of MUNDOMedia Ltd., a company in which Defendant Honig, his brother, O'Rourke, Stetson, and Groussman each held shares, ¶ 41) ***both*** reported beneficially owning "***81,204***" shares representing "***1.48%***" of the Company's common stock.  *Id.*  The other Forms S-3/A reveal similar coordinated shareholdings by supposedly "unrelated" stockholders.[39]  Such

---

[39] For example, in the July 19, 2015 Form S-3/A, O'Braitis and Aifos ***both*** reported beneficially owning "***40,602***" shares representing "***0.75%***" of the Company's common stock.  ¶ 220.  Similarly, in the August 24, 2017 Form S-3/A, "Policy No. 2013-17," ¶ 77 (owned by Bhansali, a Director of Majesco/PolarityTE, ¶ 36) and Stockwire, ¶ 72 (a Florida corporation owned by James, ¶ 51, a stock promoter who has touted various Honig-backed companies including Pershing Gold, MusclePharm Inc. (the parent of Biozone), and Valor Gold Corp.) ***both*** reported ***also owning*** "***40,602***" shares representing "***[l]ess than 1%***" of the Company's common stock.  ¶ 220.  Similarly, in the September 25, 2017 Form S-3/A, O'Braitis and JAD Capital ***both*** reported beneficially owning "***80,410***" shares representing "***1.46%***" of the Company's common stock.  ¶ 230.  And although Policy No. 2013-17 and Stockwire both sold all of their 40,602 shares in the August 24, 2017 Form S-3/A, ¶225, the September 25, 2017 Form S-3/A disclosed that these two "Selling Stockholders" had returned and now both owned "***40,205***" shares representing "***[l]ess than 1%***" of the Company's common stock, all of which they both planned to sell.  ¶ 230.

coordination could only be achieved by the sort of "carefully controlled" coordination that Hoing's "small group" achieved through their "nearly daily contact" through "frequent email and telephone" communications, as well as "text or instant messaging." Ex. 1 ¶¶ 56-57.

At bottom, the statement that "none" of the Selling Stockholders has a "material relationship" with "us" is a technical half-truth that merely serves Defendants interests – rather than Riot investors – by shielding from public view Defendants' attempts to operate as a group to control Riot for their own personal benefit.  Courts in this circuit have been careful not to accept corporate disclosures that result in such a slight-of-hand.  *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) ("[O]nce a company has chosen to speak on an issue . . . . it cannot omit material facts related to that issue so as to make the disclosure misleading.") (quoting *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480 (3d Cir. 1994) ("[E]ncompassed within that general obligation [to speak truthfully] is also an obligation to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated")).[40]

---

[40] Furthermore, by virtue of Honig's fiduciary relationship with the Company, a duty to disclose existed.  *See Grand Union Supermarkets of the V.I., Inc. v. Lockhart Realty, Inc.*, 493 F. App'x 248, 252 (3d Cir. 2012) ("A duty to disclose arises where there is a fiduciary relationship between the parties.").  Specifically, Honig effectively controlled Riot's operations and thus assumed a fiduciary relationship with the Company.  *See Harriman v. E.I. DuPont De Nemours & Co.*, 372 F. Supp. 101, 105-06 (D. Del. 1974) ("[W]hen a person affirmatively undertakes to dictate the destiny of the corporation . . . he assumes such a fiduciary duty.").  Honig also assumed a duty to disclose because "[w]here a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b–5(a) or (c), that misconduct creates an independent duty to disclose. . . . This is so because participants in the securities markets are entitled to presume that all of the actors are behaving legally; silence that conceals illegal activity is therefore intrinsically misleading . . . ."  *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 281, 381-82 (S.D.N.Y. 2003).

b.   **Defendants' Statements and Omissions Regarding Riot's Related-Party Transactions Were False and Misleading**

The Riot Defendants also made actionable misstatements and omissions in Riot's 2017 and 2018 Proxy Statements because they represented that "***none***" of Riot's directors, officers, or any person holding 5% or more of the Company's common stock had "***any material interest, direct or indirect, in any transaction, or in any proposed transaction***," ¶¶ 292, 346, when, in fact, Honig and DeFrancesco participated in related-party transactions including the Kairos transaction (¶¶ 292-93, 346, 353-54).[41]   Indeed, in an amended Form 10-K/A filed with the SEC in June 2018 (i.e., nearly seven months later), the Company *admitted* that Honing and Defrancesco had participated in the Kairos transaction as 8.6% and 6.3% shareholder of Kairos (14.9% combined) after having last reported (in January 2017) been 11.2% and 11.45% shareholders of Riot (22.65% combined).  *See* ¶¶ 352-353.  Similarly, on November 19, 2018, Riot filed a Form 10-Q in which Riot admitted that Kairos and Coinsquare (another related-party transaction in which Honig participated with Riot through an allotment of 112,499 shares, ¶ 157, and through a $50,000 payment to Honig's consulting entity, GRQ, ¶ 363), Riot admitted that Honig and DeFrancesco's involvement in Kairos and Coinsquare amounted to "Related Party Transactions" because "Barry Honig (together with other group members) and Catherine Johanna DeFrancesco during a portion of 2017 beneficially owned greater than 10% of the dispositive stock and voting power of the

---

[41] Because O'Rourke signed the 2017 and 2018 Proxy Statements, which were issued "By Order of the Board," O'Rourke and Defendants Kaplan, Les, and So (who were Directors and members of the Audit Committee) are liable for the misstatements therein.  *See* Exs. 28 at 2-6, 29 at 2-3.  This is particularly so given Riot's small size and the fact that Les was "active in the industry as a miner."  ¶ 31.  In such circumstances, it is appropriate to hold them responsible.  *See In re U.S. Bioscience Sec. Litig.*, 806 F. Supp. 1197, 1203 (E.D. Pa. 1992)  ("Because the outside director defendants have valuable expertise in Bioscience's industry, it is unreasonable, at least in the present procedural context, to assume that they were ceremonial figures who did not understand the workings of the company.").

Company's common stock." ¶ 364. Indeed, in her motion, DeFrancesco *assumes* that her 4,503,971 shares of Riot stock constituted at least 6.2% of Riot's shares outstanding as of November 13, 2017 – twelve days after Riot announced the Kairos transaction. DeFrancesco Br. 14. Based on Honig's April 2018 Form 13D/A, Honig continued to be a more than 5% shareholder at the time of the Kairos transaction Ex. 33; *see also* ¶ 164 (Honig held at least "1.65 million" shares as of October 2017).

Additionally, Defendant So, who was a director (and on the Company's Audit Committee)[42] at the time the proxy was issued was also an investor in Coinsquare (¶¶ 157; 293). This was yet another reason for Riot (and in particular So, Kaplan, and Les given their roles on the Audit Committee, ¶¶ 28, 31, 32) to disclose Coinsquare as a related-party transaction. *See Freer v. Mayer*, 1991 WL 355062, at *2 (S.D.N.Y. Apr. 26, 1991) ("When a business transaction concerns a member of the board, it must be described in the proxy." (citing 17 C.F.R. § 229.404)).

In light of their beneficial ownership in Riot and personal financial interests in these transactions, and in the case of So his role as a director, and given disclosures made in the amended Form 10-K referenced above, it is indisputable that Coinsquare and Kairos transactions should have been disclosed in Riot's 2017 and 2018 proxy statements as related-party transactions. Not only were they not disclosed for nearly *seven* months (enabling Defendants' efforts to keep their pump-and-dump scheme alive), it was affirmatively represented by those responsible for "reviewing" and "approving" their disclosure – namely, So, Kaplan and Les – that "none" of these transactions existed at that time or "during the last fiscal year." ¶ 292. Accordingly, Plaintiff has

---

[42] Plaintiff points out in addition to allegations that So, Kaplan, and Les were members of Riot's Audit Committee at the time of the 2017 proxy was issued, the Complaint also alleges that they had responsibility for "reviewing" and "approving" "any related party transactions that would be required to be disclosed pursuant to applicable SEC rules." ¶ 292.

alleged that the Riot Defendants made materially false and misleading statements in the 2017 and 2018 proxy statements.

The Riot Defendants also made actionable misstatements and omissions in Riot's 2017 and 2018 proxy statements because they represented that "***none***" of Riot's directors, officers, or any person holding 5% or more of the Company's common stock had "***any material interest, direct or indirect, in any transaction, or in any proposed transaction***," ¶¶ 292, 346, when, in fact, Honig, DeFrancesco, and/or So participated in such related-party transactions – including and Kairos (¶¶ 172-77) and Coinsquare (¶¶ 157, 166-68).[43]   Indeed, at the time of these transactions were announced in October 2017, Riot had approximately 5.4 million shares of common stock outstanding.  ¶ 230.  Also at that time, Honig held approximately 1.6 million shares (¶ 164) and Defrancesco held approximately 516,000 shares (*id*.).  Thus, both Honig and Defrancesco each owned more than 5% of Riot's 5.4 million shares at the time the Coinsquare and Kairos transactions were announced.  Additionally, Defendant So, who was a director (and on the Company's Audit Committee)[44] at the time the proxy was issued was also an investor in Coinsquare (¶ 157, 185).  *See Freer v. Mayer*, 1991 WL 355062, at *2 (S.D.N.Y. Apr. 26, 1991)

---

[43] Because O'Rourke signed the 2017 and 2018 Proxy Statements, which were issued "By Order of the Board," O'Rourke and Defendants Kaplan, Les, and So (who were Directors and members of the Audit Committee) are liable for the misstatements therein.  *See* Exs. 28 at 2-6, 29 at 2-3. This is particularly so given Riot's small size and the fact that Les was "active in the industry as a miner."  ¶ 31.  In such circumstances, it is appropriate to hold them responsible.  *See In re U.S. Bioscience Sec. Litig.*, 806 F. Supp. 1197, 1203 (E.D. Pa. 1992)  ("Because the outside director defendants have valuable expertise in Bioscience's industry, it is unreasonable, at least in the present procedural context, to assume that they were ceremonial figures who did not understand the workings of the company.").

[44] Plaintiff points out in addition to alleging that So, Kaplan, and Les were members of Riot's Audit Committee at the time of the 2017 proxy was issued, the Complaint also alleges that they had responsibility for "reviewing" and "approving" "any related party transactions that would be required to be disclosed pursuant to applicable SEC rules."  ¶ 292.

("When a business transaction concerns a member of the board, it must be described in the proxy." (citing 17 C.F.R. § 229.404)).

In light of their beneficial ownership in Riot and personal financial interests in these transactions, and in the case of So, given his role as a director, the Coinsquare and Kairos transactions should have been disclosed in Riot's proxy statement as transactions with related parties. But not only were these transactions not disclosed in the proxy, they were affirmatively represented by those responsible for "reviewing" and "approving" their disclosure – namely, So, Kaplan and Les – that "none" existed. Accordingly, Plaintiff has alleged that the Riot Defendants made materially false and misleading statements in the 2017 and 2018 proxy statements.

In addition to the Coinsquare and Kairos transactions, which are explicitly referenced in the Riot's 2017 and 2018 proxy statements, the Complaint also alleges that several other acquisitions, most notably Prive, Tess, and Ingenuim, in addition to being connected to certain members of the Honig Group, were of dubious value to Riot notwithstanding the tens of millions of that Riot paid for these assets. *See* § II.D *supra*. Defendants attempt to paint all of these allegations (including the allegations concerning Coinsquare and Kairos) with a broad brush, claiming that the Complaint alleges "no facts that show these transactions were wasteful or made with undisclosed related parties." Riot Br. 13-16; *see also* Director Br. 8-9.

Defendant's efforts should be rejected. As explained above, Riot has already admitted that the Coinsquare and Kairos transactions required disclosure. As to the remaining transactions (Prive, Tess, and Ingenuim) the Complaint also provides well-pleaded allegations that these transactions provided a windfall to Honig, DeFrancesco, and their affiliates while of nominal value to Riot. For example, Plaintiff has alleged that Riot overpaid for Prive by nearly ***$19 million***. *See, e.g.*, ¶ 65 (Bryan Pascual); 48 (Michael Ho); 195-198 (explaining that Messrs. Pascual and Ho are

connected to both Prive and Kairos).  While Defendants suggest that this "premium" was properly disclosed and effectively related to market forces (Riot Br. 18), at best this is a reach.  Riot investors were never told when this transaction was announced in February 2018 that Riot was paying a decidedly sky-high premium or that both Pascual and Ho were shareholders in both Prive and Kairos (or that they were affiliated with Ingenuim).  Defendants concede as much.  Riot Br. 18 (confirming that the "premium" for Prive was not disclosed until April 17, 2018).  But even then, the amount of the premium, $19 million, was not disclosed to Riot investors.[1]

The Complaint tells a similar story about other dubious acquisitions with ties back to Honig (through Messrs. Pascual and Ho, no less) that served to "pump" Riot's stock price and enrich himself and his affiliates.  ¶¶ 169-171 and 186-188 (describing Pascual's and Ho's ties to Tess), 48, 53, 170-171, 197, 199 (describing Pascual's and Ho's ties to Ingenuim).[45]

### c. Defendants' Publicity Campaign to Convince the Market that Riot Had Transformed Into "Pure Play" Cryptocurrency Company Was Materially False and Misleading

In addition to falsely denying that Riot had engaged in any material related-party transactions with any of the Company's shareholders of "more than 5%" (*see* § III.A.1.b), Defendants also publicly touted the Company's "strategic investments" and transactions in order to mislead investors into believing that Riot was a "pure play Blockchain company" that "provides

---

[45] Even if the Court were to find that some of Riot's transactions during the Class Period may have been (in part) legitimate, "the fact that [Riot] continued to make legitimate expenditures at the same time that it was engaging in related-party activity does not absolve [Riot] of the responsibility to include these related-party transactions in its SEC filings."  *SEC v. China N.E. Petrol. Holdings Ltd.*, 27 F. Supp. 3d 379, 391 (S.D.N.Y. 2014).  Likewise, even if portions of Defendants' statements about these transactions were objectively true, "even an objectively true statement, if it leaves out material information may be actionable." *In re Bristol-Myers Squibb Sec. Litig.*, 2005 U.S. Dist. LEXIS 18448, at *63-64 (D.N.J. Aug. 17, 2005).

investment exposure to the rapidly growing blockchain ecosystemic." ¶ 243. Between October and December 2017, Riot, Beeghley, and O'Rourke repeatedly touted Riot's transformation:

- Riot's "strategic investment in Coinsquare Ltd." was "indicative of similar opportunities Riot . . . plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem." ¶ 239. "At Riot Blockchain, *our team has the insight and network to effectively grow and develop blockchain assets* . . . ." ¶ 239.

- "Moving forward, *[Riot's] focus will be as a strategic investor and operator in the blockchain ecosystem* . . . . ¶ 243.

- *"Riot was a 'first mover' and a "NASDAQ listed pure play Blockchain company. At Riot Blockchain Inc. we leverage our expertise, and network, to build and support blockchain technology companies*." ¶ 243.

- *"We provide investment exposure to the rapidly growing blockchain ecosystem*." *Id.*

- "Riot Blockchain has made a strategic investment for an undisclosed % of Coinsquare. This investment into a *leading digital currency exchange* is indicative of other Riot Blockchain will pursue, including possible acquisitions of businesses touching the blockchain ecosystem. . . . *The company is experiencing explosive growth* in a budding industry, already demonstrating strong potential." *Id.*

- Riot's decision to "*Acquire Majority Interest in Tess*," whose "telecom payment platform . . . is a prime example of how blockchain-based technologies can be leveraged to disrupt established industries . . . *I believe that Riot Blockchain is poised to take advantage of this revolution in digital transactions* . . . ." ¶ 249.

- *"[T]he company is experiencing steady growth in a budding industry.*" ¶ 255.

- "Riot Closes Its Deal with Kairos" – "The closing of this acquisition has positioned us to launch our cryptocurrency mining operation . . . ." ¶ 259.

- "*[W]e own 52% of a company called Tess that is developing a blockchain technology to disrupt the telecom industry.*" ¶ 275.

- "*Riot . . . Announces Strategic Investment in Verady, a Blockchain . . . Company.*" ¶ 297; *see also* Ex. 23.

- *Riot's* "*majority owned Tess Inc. . . . to merge*" with "*publicly traded Cresval Capital Corp.*" which "*provides us access to traditional capital markets* . . . ." ¶ 287.

The above statements were materially false and misleading. *First*, it was materially misleading for Riot to present itself as a "pure play blockchain company" that "provide[d]

investment exposure to the rapidly growing blockchain ecosystem" based on Riot's investments in Coinsquare, Kairos, Priv, Tess, and Ingenium when 61% of all the funds it expended on those same investments were actually overpayments in related-party transactions with Kairos and Prive. *See* § II.D *supra*.

*Second*, it was misleading for Defendants to tout Riot's "strategic investment in Coinsquare" without disclosing that Honig, Stetson, and Groussman, as well as other affiliates were all co-investors in Coinsquare.   ¶ 154.   Further, far from a "leading cryptocurrency exchange," ¶ 243, Coinsquare only had "7%" of the "Canadian [Market] Share by Volume."  Ex. 35 at 24.  Thus, Riot's 12% interest in Coinsquare's 7% market shares amounted to Riot having a *0.8%* foothold in Canada's cryptocurrecy market.  Thus, Defendant's statements," even if "literally accurate" were "through their context and manner of presentation, devices [that] mislead investors."  *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011) ("the disclosure required by the securities laws is measured not by literal truth but by the ability of the material to accurately inform rather than mislead prospective buyers").

*Third,* it was materially misleading for Defendants to tout that they possessed the "insight and network to effectively grow and develop blockchain assets."   To the contrary, Riot's "network" was actually Honig and his inner circle, which was siphoning money out of the Riot through its ownership and control of related parties like Kairos and Prive.  *See* § III.A.1b *supra*.

*Fourth*, it was misleading for Beeghley and O'Rourke to issue press releases and appear on CBS, ¶¶ 249, 275, touting Riot's "majority" investment in Tess as making Riot "poised to take advantage" of the blockchain "revolution."  Specifically, Tess's Chief Software Architect, Sorin Tanasescu, is tied through his address to a cryptocurrency phishing scam.  ¶ 170.  Moreover, to

date Riot has written the value of its Tess shares, which have now been diluted to only 9% of Tess, at only $90,174.  Ex. 21 at 21.

*Fifth*, it was even more misleading for Defendants to publish press releases touting that Tess's supposedly planned merger with Cresval would give Tess "access to traditional capital markets" given that the Cresval transaction clearly involved undisclosed related-party and Cresval was an undercapitalized, loss-making company whose shares essentially hardly traded all.  ¶ 288.

Defendants next contend that certain statements "are either indisputably truthful or constitute inactionable puffery."  Riot Br. 20 (citing ¶¶ 239, 243, 259).  The "puffery" doctrine "comes into play when a court is considering the materiality of statements alleged to have been misleading."  *Payne v. DeLuca*, 433 F. Supp. 2d 547, 561 (W.D. Pa. 2006).  "In other words, a statement is considered puffery only when it is immaterial."  *In re Enzymotec*, 2015 WL 87884065, at *14.  "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts ***are peculiarly for the trier of fact***."  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 (3d Cir. 1992); *see also Weiner v. Quaker Oats Co.*, 129 F.3d 310 (3d Cir. 1997) ("[T]he emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings").  Here, the challenged statements were material to investors because the went to the heart of Riot's operations. See *In re Enzymotec*, 2015 WL 87884065, at *14 ("Given the inferences owed to Plaintiffs, the Court concludes at this stage of the litigation that reasonable minds could differ on the question of materiality with respect to the statements regarding InFat sales.").   Defendants' puffery arguments are therefore unavailing.[46]

---

[46] In addition, "courts have held that only purely forward-looking statements are entitled to protection as 'mere puffery.'  ***Statements of present or historical fact are not mere 'puffery.'***"  *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 332, 342 (D. Mass. 2009); *see also*

The Riot Defendants next argue that "the Corrected Complaint is completely devoid of any facts showing *how* Riot was in fact a pump-and-dump scheme." Riot Br. 20-21. This is belied by any fair reading of the Complaint, which lays out Defendants' pump-and-dump scheme in detail over 157 pages and 440 enumerated paragraphs. The Riot Defendants go on to argue that Plaintiff "relies entirely on the unsubstantiated allegation that Messrs. O'Rourke and Honig were involved in a pump-and-dump scheme at *other companies* to infer that the Riot Blockchain Defendants must be involved in a similar scheme at Riot." *Id.* First, Plaintiff's allegations that Honig and O'Rourke were involved in pump-and-dump schemes at other companies is far from "unsubstantiated," as evidenced by the *Honig* Action and Honig and Groussman's recent settlements with the SEC. ¶ 372; Ex. 3. Second, the Complaint alleges numerous facts that show Defendants were involved in a pump-and-dump scheme at Riot. *See* § III.B *infra*.[47]

---

*In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *10 (D.N.J. Sept. 30, 2009) ("These filings are not . . . puffery because they misrepresented historical facts."); *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (statements that company's "business is stronger than ever," that there was "strong worldwide demand" for its products, and that company's "business fundamentals are strong" were actionable). Several of the challenged statements are thus not protected on this basis. *See, e.g.*, ¶ 243 ("The Company *is* experiencing explosive growth . . . ." (emphasis added)); ¶ 259 ("The acquisition positions us to launch our cryptocurrency mining operations . . . .").

[47] In addition to issuing false and misleading Registration Statements and Proxy Statements and engaging in a fraudulent publicity campaign touting wasteful related-party and/or *de minimus* transactions, Defendants also issued materially false and misleading SOX certifications. ¶¶ 218, 270. These SOX certifications, which falsely assured investors of the adequacy of Riot's internal controls, "had no reasonable basis" because material deficiencies in those internal controls "allowed" Defendants "to engage in the . . . fraudulent behavior" alleged in this case. *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015). In response, Defendants argue that the "Complaint does not contain any particularized allegations suggesting that the actions enumerated in the SOX certifications were, in fact, not actually undertaken by Messrs. O'Rourke and McGonegal." Riot Br. 25. This argument is misplaced because Defendants O'Rourke and McGonegal could not have truthfully fulfilled their responsibilities under SOX while signing Riot's false and misleading Forms S-3/A (O'Rourke and McGonegal, *e.g.*, ¶¶ 211, 221, 226, 231); signing Riot's false and misleading Proxy Statements (O'Rourke, § II.D.8 *supra*), and actively advancing the Honig Group's fraudulent scheme as that scheme's principal publicist (O'Rourke, § II.A *supra*).

## 2. The Complaint Adequately Alleges that Defendants Acted with Scienter

To plead scienter in the Third Circuit, a plaintiff must "allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'" *Institutional Inv'rs Grp. V. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009). The pertinent question is "'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.* at 272 (quoting *Tellabs*, 551 U.S. at 323).[48]

As the Supreme Court has explained, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but merely "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *see also Avaya*, 564 F.3d at 269 (noting scienter analysis "will ultimately rest . . . on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter"). "[A]llegations of scienter 'need not be irrefutable, *i.e.*, of the "smoking-gun" genre.'" *Avaya*, 564 F.3d at 269 (citing *Tellabs*, 551 U.S. at 330). Allegations that a defendant "willfully turned a blind eye to[] the fraud" adequately pleads scienter. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 281 (3d Cir. 2006).[49]

---

[48] The Riot Defendants repeatedly ignore *Tellabs*'s mandate by arguing that that "***[e]ach*** allegation fails to meet the Reform Act's exacting pleading standards for any of the Riot Blockchain Defendants." Riot Br. 29. *See also id.* at 30 ("Lead Plaintiff concludes that the Riot Blockchain Defendants must have known and/or recklessly disregarded the false and/or misleading statements **simply** by virtue of their 'high-level positions' at Riot.").

[49] The Riot Defendants misstate the standard for Riot's scienter. *See* Riot Br. 29 n.14 ("Since Lead Plaintiff does not specifically allege that the Riot Blockchain Defendants . . . acted with the requisite scienter, Lead Plaintiff also fails to allege that Riot acted with the requisite scienter."). A corporate defendant's scienter is adequately alleged "where 'the pleaded facts create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite

### a. Defendants' Prior Fraudulent Schemes and Business Dealings Support a Strong Inference of Scienter

When, as here, defendants have engaged in similar misconduct on other occasions, an inference of scienter is warranted. *See Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 15 (D. Mass. 2000) (that defendants previously "engaged in the same improper . . . practices" was "strongly probative of scienter").[50]  Here, the Complaint is replete with allegations that O'Rourke engaged in similar schemes at other companies with Honig, Stetson, and Groussman, as evidenced by the fact that the SEC has charged those individuals. *See, e.g.*, ¶¶ 81-102, 357, 360.[51]

To accomplish these schemes, "Honig, Stetson and O'Rourke were in nearly daily contact because they worked out of the same office and were in frequent email and telephone contact, at times purposefully moving their conversations to the less permanent medium of text or instant messaging." Ex. 1 at ¶ 56.  This close contact continued during the Class Period is supported by the fact that CNBC discovered O'Rourke in Honig's office, ¶ 332, and the fact that O'Rourke and Stetson reside in homes located approximately 800 feet apart, ¶ 23.

---

scienter,'" including management-level executives, whether or not they are named defendants. *Sun v. Han*, 2015 WL 9304542, at *12 (D.N.J. Dec. 21, 2015) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).  Moreover, there is "no requirement that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006).  In any event, the Riot Defendants' misstatement of the law is irrelevant because Plaintiff adequately alleges the Individual Defendants' scienter.

[50] *See also In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1138-39, 1147 (D. Colo. 2005) (pattern of "manipulations and misrepresentations" supported inference of scienter); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 689 (S.D. Tex. 2002) (prior misconduct, though time-barred, was admissible as "evidence of a scheme and/or scienter").

[51] Given the Complaint's detailed allegations of each defendant's wrongdoing and relationship with the Company, the Riot Defendants' argument that "the Corrected Complaint alleges nothing about the particular roles, duties, or actions of any of the Individual Defendants, other than vaguely alluding to their status as officers or directors of Riot," Riot Br. 31, is misplaced.

### b.    Defendants Had Motive and Opportunity to Commit Securities Fraud

Allegations of a defendant's motive and opportunity, while insufficient standing alone, "may be used to 'strengthen the inference of scienter.'" *In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 512 (E.D. Pa. 2018) (citing *Avaya*, 564 F.3d at 277-78).  When, as here, a plaintiff pleads that a defendant "used . . . shareholder money . . . to fund undisclosed related party transactions, "the inference that [the defendant] did so with fraudulent intent is not merely strong, it is inescapable." *In re Advanced Battery Techs., Inc. Sec. Litig.*, 2012 WL 3758085, at *11 (S.D.N.Y. Aug. 29, 2012).  Here, Plaintiff has alleged that Defendants were motivated to profit at the expense of Riot's non-affiliated public – just as numerous of the Defendants have previously done at other microcap companies.  And contrary to Defendants' suggestion that "Plaintiff alleges no motive on behalf of the Riot Blockchain Defendants to defraud Riot investors whatsoever," Riot Br. 38, O'Rourke was motivated to pump Riot's stock to reap more than $860,000 in proceeds that were entirely unrelated to normal executive compensation.  ¶¶ 307-08.[52]  In addition to their motivations as Selling Stockholdres, Honig and DeFrancesco were also motivated by their opportunity to participate in lucrative related-party transactions with the Company.  *See, e.g.*, § II.D.4 *supra* (overpaying $11 million to related-party Kairos owned by Honig and DeFrancesco).[53]

---

[52] The Director Defendants claim that "Plaintiff fails to mention any of the Director Defendants whatsoever with respect to *any* of his scienter allegations."  Dir. Br. 6 (citing ¶¶ 374-95).  As Director Defendants well know, Plaintiff's scienter allegations are not limited to those paragraphs (which refer to Plaintiff's "*ADDITIONAL* SCIENTER ALLEGATIONS").  Numerous allegations go to the Director Defendants' scienter.  *See, e.g.*, ¶¶ 184, 221-22, 231-32, 235-36, 272-73, 293, 324, 346.

[53] Similarly, Honig's assertion that "Plaintiff does not allege how Mr. Honig influenced any executive, director, or decision-maker within Riot," Honig Br. 20, is contradicted by numerous allegations in the Complaint.  *See, e.g.*, ¶¶ 13, 14 (SEC alleging "Honig was the primary strategist"), 22, 81, 135.

### c.   Defendants' Public Statements Add to the Inference of Scienter

The fact that O'Rourke and Beegley spoke extensively to the market about the Company's operations and business "implied that [they] had first-hand knowledge" of the subject and "further . . . bolster[s] the inference" that they "'knew at the time that [their] statements were false or w[ere] reckless in disregarding the obvious risk of misleading the public,'" *PTC Therapeutics*, 2017 WL 3705801, at *17 (quoting *Avaya*, 564 F.3d at 273).  Alternatively, if these defendants did not have knowledge of the matters on which they spoke, such statements were actionable reckless.  *See S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (when defendant speaks but does not have "actual knowledge" about the subject, "it would be at least actionably reckless to reassure the public about these matters at all").

### d.   O'Rourke's Stock Sales Support a Strong Inference of Scienter

Although a securities plaintiff is not required to plead motive, *see Tellabs*, 551 U.S. at 325, if "'stock sales were unusual in scope *or* timing, they may support an inference of scienter,'" *Avaya*, 564 F.3d at 279.[54]  Here, Plaintiff's allegations regarding O'Rourke's Class Period sales of Riot stock support a strong inference of scienter because those sales were unusual in timing.  On December 29, 2017, O'Rourke sold 30,383 shares of Riot stock for proceeds of $869,256.35, just days before the Company announced the dismissal of its auditor and a month before Riot canceled its annual meeting for the second time, causing the NASDAQ to inform the Company that it has

---

[54] The factors bearing on whether such sales are unusual in scope include "'the amount of profit made, . . . whether the sales were "normal and routine," and whether the profits were substantial relative to the seller's ordinary compensation.'"  *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at *20 (D.N.J. July 22, 2015). Stock sales are unusually timed when they are incongruous with "the timing of past trades," *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 152 (3d Cir. 2004), or when they take place "at a time when the price of the stock was allegedly artificially inflated due to Defendants' misrepresentations," and the executive knew, or should have known, the "severe negative impact" that would be caused by the disclosure of the truth, *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *19.

violated the NASDAQ's listing requirements, causing the Company's stock price to fall.   ¶ 386.

In addition, those sales were not made pursuant to a 10(b)5-1 trading plan, further adding to the

inference of scienter.   *See Brendon v. Allegiant Travel Co.*, 2019 WL 4255051, at *8 (D. Nev.

Sept. 9, 2019) (only "[s]tock sales conducted pursuant to a pre-determined Rule 10b5-1 trading

plan may 'rebut [ ] an inference of scienter.'").   O'Rourke's made his sales after the market closed

on the day before New Year's holiday weekend, suggesting he sought to avoid raising attention.

¶ 386.   Thus, "O'Rourke's sales were [both] unusual [and] suspicious."   Riot Br. 36.[55]

> **e.**   **The SEC *Honig* Action and Settlements and the Investigation and Subpoena to Riot Support a Strong Inference of Scienter**

Numerous courts have held that "[g]overnment investigation[s] can be seen as one more

piece of the puzzle . . . add[ing] up to a strong inference of scienter."   *Washtenaw Cty. Emps. Ret.*

*Sys. v. Avid Tech., Inc.*, 28 F.Supp.3d 93, 115 (D. Mass. 2014).   Here, more than a mere

"investigation, Plaintiff draws on particularized "allegations" in a "civil Complaint [the *Honig*

Action] charging Defendants . . . with multiple counts of securities fraud . . . ."   *Hull v. Glob.*

*Digital Sols., Inc.*, 2017 WL 6493148, at *18 (D.N.J. Dec. 19, 2017) (considering "SEC civil

enforcement proceedings" in evaluating inference of scienter).

Here, on April 9, 2018, the SEC issued a subpoena pursuant to a formal order of

investigation.   ¶ 387.   According to Riot, the SEC's "inquires include the proper asset

---

[55] Plaintiff has also alleged numerous suspicious insider sales by Honig, DeFrancesco, Stetson, and Groussman.   *See, e.g.*, ¶¶ 160-63.   Furthermore, when, as here, the overall timing of stock sales is suspicious, a delay between the last sale and a corrective disclosure "does not negate the inference of scienter."   *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *17 (C.D. Cal. Oct. 1, 2013).   Moreover, a court can find an inference of scienter even when only some defendants had insider sales during the class period.   *See, e.g.*, *Viropharma*, 21 F. Supp. 3d at 473 (upholding allegations, notwithstanding two of four individual defendants were "not alleged to have engaged in insider trading").   As such, the Director Defendants' reliance on the fact that they "did not sell any Riot stock during the Class Period" does not help them.   Director Br. 12.

classification, applicability of the Investment Company Act [of] 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency."  *Id.*  Several months later, on August 14, 2018, Riot filed a Form 10-Q with the SEC, in which it provided more details about the SEC's investigation.  In particular, the Company reported that the SEC was looking into a number of Riot's registration statements, as well as its acquisition of a minority stake in Coinsquare (an entity in which Honig had a personal stake).  ¶ 388.  In its November 13, 2018 Form 10-Q and April 2, 2019 annual report, the Company announced that the SEC's investigation was still ongoing.  ¶ 393.  The SEC filed a complaint against O'Rourke, Honig, Stetson, and Groussman, as well as other Riot insiders, for similar alleged wrongdoing with multiple other companies.  ¶ 394.

Faced with these allegations, the Riot Defendants argue that "[a]n SEC investigation not resulting in any finding of wrongdoing does not support an inference of scienter."  Riot Br. 31-32.  The Riot Defendants' blanket assertion is incorrect.  *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("Certainly, courts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter."); *Eastwood Enters., LLC v. Farha*, 2009 WL 3157668, at *4 (M.D. Fla. Sept. 28, 2009) ("Courts commonly hold that pending government investigations are relevant and provide notice of a possible fraud, i.e., that the pendency of an investigation serves to suggest that a fraud may have occurred and may not be ignored." (collecting cases).

Riot then attempts to deflect from this reality by arguing that "none" of the "'individuals and entities charged in the Honig Action [that] have already settled with the SEC' . . . are Defendants in this case . . . ."  Riot Br. 32 (quoting ¶ 394.)  This is demonstrably false.  *See* ¶ 394

(noting that "Groussman" has "settled with the SEC").[56]  The Riot Defendants also conveniently ignore that Honig has settled with the SEC.  As part of that settlement, Honig is, among other things, permanently barred from participating in an offering of penny stock and permanently prohibited from, holding any beneficial ownership in any issuer of Penny Stock that amounts to greater than 4.99 percent of that issuer's outstanding common stock.  *See* § II.A.

## f.   The Circumstances Surrounding O'Rourke's Sudden Departure Support a Strong Inference of Scienter

Courts routinely hold that the suspicious circumstances and timing of high-level employee departures contribute to an inference of scienter.  *See Se. Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 466958, at *5 (M.D. Pa. Feb. 8, 2016) (relying on "allegations regarding the timing of the resignation of senior management" in finding inference of scienter); *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 541 (D. Del. 2012) (same); *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *10 (same).

Here, Defendant O'Rourke resigned as CEO and Chairman of Riot on September 8, 2018, ***the day after*** the SEC named him another others, including Honig, as defendants in a long-running microcap pump-and-dump scheme.  *See* ¶¶ 23, 201-03.  Riot did not provide an explanation for this unexpected announcement and Defendants remain conspicuously silent on the issue now.  Accordingly, the only plausible inference is that Defendant O'Rourke resigned because of the wrongdoing alleged by the SEC.

---

[56] Groussman's investment entity, Melechdavid, a "selling shareholder" in this action, ¶ 58, has also settled with the SEC.  *See* Ex. 5.

g.   **Defendants' Concealment of Their Related-Party Transactions and Stock Sales Supports a Strong Inference of Scienter**

When a defendant takes steps to hide or cover up misconduct, a strong inference of scienter is appropriate. *See SEC v. Desai*, 145 F. Supp. 3d 329, 337 (D.N.J. 2015) (defendant's "effort to mask his violations of federal securities law demonstrates a high degree of scienter"). The same analysis applies here, where, for example, numerous transactions during the Class Period were structured to hide the roles of, and benefits received by, members of the Honig Group. *See, e.g.*, ¶¶ 154-58, 210-14. Further, neither Honig nor DeFrancesco – as Riot's largest shareholders – "promptly" disclosed their sales of Riot stock as required by 17 C.F.R § 240.13d-2. §§ I, II.E.[57]

h.   **Defendants' SOX Certifications Add to the Inference of Scienter**

SOX "is not directed solely at ensuring numerical accuracy and preventing dishonest accounting practices." *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 419 (D. Del. 2009) ("Any interpretation restricting its scope to these purposes would be artificially narrow and inconsistent with the remedial purpose of the statute.").

Here, Defendants O'Rourke, Beeghley, and McGonegal personally attested in their SOX certifications that they had personally taken steps to verify the adequacy of Riot's internal controls, which given wasteful related-party transactions and misrepresentations occurring, were clearly deficient at the time those SOX certifications were issued. ¶¶ 218, 270. Defendants' failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006).

---

[57] *See also Eletrobras*, 2017 WL 1157138, at *11 (inference of corporate scienter where issuer concealed bribes by capitalizing them); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (executive's "alleged attempts to hide" the misconduct "also support a strong inference of scienter").

### i.      Plaintiff is Entitled to a Core Operations Inference

When, as here, "the matter at issue is central to the 'core business' of the company, there is a strong inference that high-level employees, such as officers and directors, had knowledge of the facts surrounding the matter." *Adams v. Amplidyne, Inc.*, 2000 WL 34603180, at *7 (D.N.J. Oct. 24, 2000). "[U]nder the core operations doctrine, misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015). Here, it is indisputable that the Individual Defendants portrayed themselves as being highly knowledgeable about Riot's "core business." *See, e.g.*, ¶¶ 178, 235, 239, 234, 247, 249, 259, 264, 275, 283.[58]

Moreover, the core operations doctrine is particularly appropriate here given the small number of employees at Riot. *See De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *36 (D.N.J. Dec. 31, 2018) ("[D]efendants have been deemed to be aware of the facts ***when they were part of a small management team and the alleged misstatements involved the company's core business***."). Here, the fact that Riot had nine employees further strengthens the inference of the Riot Defendants' scienter. ¶ 382. *See In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *10 (C.D. Cal. July 13, 2015) (CytRx is a small company with only seventeen employees, which raises the inference that Kriegsman was aware of what his employees, including Haen and his own assistant, were doing to promote company stock.").

---

[58] The Riot Defendants contend that "Plaintiff also fails to allege any facts whatsoever that demonstrate Messrs. Honig, Groussman, or Kesner's—or anyone else from the alleged Honig Group for that matter—[exercised] significant control over Riot's operations." Riot Br. 35. This argument is without merit. *See, e.g.*, ¶¶ 4, 11, 13, 14, 22, 32, 81, 132, 135, 138-39, 202, 332, 237.

### j. The Inference of Scienter Is At Least as Compelling as the Non-culpable Inference Articulated By Defendants

Taken together, Plaintiff's inference of scienter is at least as compelling as Defendants' competing inference. In a case involving a pump-and-dump scheme orchestrated by defendants who have been charged by – and in some cases, settled with – the SEC for similar wrongdoing at multiple companies, the analysis is not even close.

### 3. The Complaint Adequately Pleads Loss Causation

A complaint need only allege a "short and plain statement . . . provid[ing] the defendant with fair notice" of plaintiffs' loss causation theory. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (applying "ordinary pleading rules" of Rule 8(a)(2) which should not "impose a great burden upon a plaintiff.") Under *Dura*, a plaintiff need merely "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347.[59]

The complaint need not show that "a misrepresentation was the sole reason for the investments' decline in value." *In re Tyson Foods, Inc. Sec. Litig.*, 2004 WL 1396269, at *12-13 (D. Del. June 17, 2004). "So long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing

---

[59] The Riot Defendants' argument that because "Plaintiff does not allege he suffered any loss following the disclosures [of Honig and DeFrancesco's ownership of Kairos]," it "is fatal to any claim," Riot Br.16, is without merit. Courts within the Third Circuit and elsewhere agree that lead or named plaintiffs establish class standing as long as they have individual standing for at least one statement at issue. *See In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 413 F. Supp. 2d 378, 393 (E.D. Pa. 2005) (finding that "if plaintiffs do allege valid claims based on statements made before they purchased their ABFS stock . . . I will not dismiss their allegations regarding defendants' post-purchase statements provided that they are evidence of a common scheme to defraud"); *Marsden v. Select Med. Corp.*, 2006 WL 891445, at *9 n.3 (E.D. Pa. Apr. 6, 2006) (rejecting defendants' argument that "statements made after the last date when a lead plaintiff purchased stock are per se inactionable"); *City of Bristol Pension Fund v. Vertex Pharms., Inc.*, 12 F. Supp. 3d 225, 235 (D. Mass. 2014) ("In cases of multiple allegedly misleading statements, a lead plaintiff need not have purchased stock after all statements were made, as long as those statements were part of a 'common scheme to defraud.'").

forces will not bar recovery."  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 186-87 (3d Cir. 2000). Moreover, the issue of loss causation is usually not resolved on a motion to dismiss.  *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) ("Whether the plaintiff has proven [loss] causation is usually reserved for the trier of fact.").

Plaintiff has easily alleged loss causation under these standards.  The Complaint alleges that Riot's stock price was inflated by material misstatements and omissions concerning (1) the Selling Stockholders' "material relationship" with the Company; (2) the legitimacy of Riot's purported "strategic" transactions and investments; and (3) the Company's purported "business strategy" and "explosive growth."  Ultimately, a multitude of outlets – including *CNBC*, *The Wall Street Journal*, *Reuters*, *Business Insider*, investment analysts and commentators, and the lawyers at the SEC – revealed (1) the close connections among Riot's management, board, and principal shareholders (including their reprehensible history of pump-and-dump schemes); (2) the truth and extent of the Company's egregiously wasteful related-party transactions; and (3) that much of the Company's (and O'Rourke and Beeghley's) media blitz of press releases and interviews was, as O'Rourke himself described it, "some bad actors trying to capitalize on the hype" around blockchain, ¶ 193; *see also* ¶¶ 396-406.  The gestalt of these revelations was summed up by SEC Chairman Jay Clayton in his testimony to Congress:  "Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain."  ¶¶ 10, 193.

Defendants argue that the corrective disclosures Complaint did not "reveal or correct any previous deceptive conduct."  Director Br. 17.  This is incorrect.  For example, on February 16, 2018, CNBC's article revealed that "[o]ne of" Riot's "acquisition was "Kairos Global Technologies Inc., which had been founded less than two weeks before the purchase.  Kairos' main

asset was $2 million of mining equipment.  Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings. . . . Kairos appears to have many links to Riot," which CNBC described in detail.  ¶ 337.[60]  On this and CNBC's related disclosures, including that Riot's "SEC filings are silent on mining activity," Riot's "***share price fell <u>33.4%</u>***." *Id.*  The reason:  this new information[61] "reveal[ed] and correct[ed]" that contrary to O'Rourke's claim that the Kairos transaction "positions us to launch our cryptocurrency mining operations," ¶ 259, the Company had allowed the majority of its funds ("more than seven times," to be precise, ¶ 172) to a "poker player" named "Michael Ho" who played poker with "two other professional poker players" on "Riot's advisory board," ¶ 337.

Honig argues that "on several of the days" the Riot's stock and "the boarder Bitcoin market" both declined.  Honig Br. 23.  As an initial matter, on numerous days – including January 2, 2018, ¶ 400; February 16, 2018; April 17, 2018, ¶ 404 – Riot's stock sharply declined in response to corrective disclosures while the price of Bitcoin was sharply increasing – as is clearly

---

[60] It is a testament to Defendants' brazenness that on February 16, 2017 – the same day that CNBC reported that Riot had squandered millions in the Kairos transaction, ¶ 337 – Defendants doubled-down on their fraudulent scheme by announcing the Prive Transaction, ¶ 195, in which Defendants and associates employed the same scheme to siphon off nearly twice the funds originally misappropriated months earlier through Kairos, ¶¶ 195-98.

[61] Honig cites inapposite cases to argue that the information revealed by CNBC and other sources was "previously available," "already-public," and merely "negative journalistic characterization[s]."  Honig Br. 23.  This is simply untrue:  each progressive new disclosure – such as CNBC discovering O'Rourke in Honig's office, ¶¶ 332, 403 (***33.4%*** one-day decline) and the SEC's filing of the *Honig* Action against Honig, O'Rourke, Stetson, Groussman, and others, ¶ 405 (***26.1%*** one-day decline), provided "additional [and] more authoritative fraud-related information that deflated the stock price."  *In re Apollo Grp., Inc. Sec. Litig.*, 2010 WL 5927988, at *1 (9th Cir.  June 23, 2010).  That there were "partial disclosures at . . . earlier date[s] [does] not negate loss causation upon fuller disclosure of the relevant truth that proximately caused Plaintiffs' loss."  *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1021 (S.D. Cal. 2011).  Here, the revelations of Defendants' scheme were not "merely negative characterization[s] of already-public information[,]" because they included previously unknown, additional news."  *In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 343-44 (S.D.N.Y. 2015) ("At a later stage, defendants may challenge the novelty and accuracy of plaintiffs' alleged news and its impact on the market").

seen in Exhibit 31 (comparing Riot's share price with price of Bitcoin). Moreover, even assuming that on some days Riot's stock price did move in the same direction as the price of Bitcoin, it is irrelevant at the pleading stage. *See In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *31 (D.N.J. Aug. 8, 2011) (finding that on a motion to dismiss "[p]laintiffs' [c]omplaint need not rule out the possibility that other market forces" caused the stock drop).[62]

Finally, "the loss causation element is satisfied where a fraudulent misrepresentation or omission induces the plaintiff to enter into the challenged transaction." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 223 (3d Cir. 2006). Here, if the market had known that each of Riot's Forms S-3/A, which claimed the Selling Stockholders had no "material relationship" with the Company, were patently false and concealed and facilitated a concerted by those same Selling Stockholders to pump the stock and drain the Company's funds through related-party transactions, also involving many of those same Selling Stockholders, it is nearly certain that these shares would never have been registered and issued and never traded in the market to begin with.[63]

---

[62] *See also In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*, 763 F. Supp. 2d 423, 507 (S.D.N.Y. 2011) (at the pleading stage a complaint "need not rule out all competing theories" of stock price decline); *Cohen v. Kitov Pharm. Holdings, Ltd.*, 2018 WL 1406619, at *6 (S.D.N.Y. Mar. 20, 2018) (complaint need not "disaggregate losses" or "rule out other causes").

[63] Honig argues that there can be no presumption of reliance invoked as to him under either *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) or *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972) because he (1) had not duty to disclose anything; and (2) made no public statements. Honig Br. 24. Neither premise is correct. *First*, Honig violated his legal duty under 17 C.F.R § 240.13d-2 to "promptly" disclose his substantial sales of Riot common stock. *Second*, Honig made numerous false and misleading public statements in SEC filings, ¶ 134, and on CNBC, ¶¶ 323, 334, 337, all of which served to facilitate and perpetuated his group's fraudulent scheme. Riot's public investors relied upon (to their extreme detriment) Honig to not publicly mislead them about his intentions to "protect and grow [Riot] shareholders' interests," ¶ 134, and falsely deny he did not "still manipulate stocks," ¶ 334, 337, while violating his disclosure duties. Thus, Plaintiff has both alleged Honig's affirmative misrepresentations as well as "information that was not disclosed" by Honig in violation of his clear duties. *Hull*, 2017 WL 6493148, at *18.

**B.      The Complaint Adequately Alleges Claims for Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)**

The Complaint also sufficiently alleges a "distinct cause of action" under Rules 10b-5(a) and (c) for committing a deceptive or manipulative act.  *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 821 (S.D.N.Y. 2006); *see also S.E.C. v. Lucent Techs.*, *Inc.*, 610 F. Supp. 2d 342, 360-61 (D.N.J. 2009) (recognizing that "inherently deceptive" conduct can give rise to a manipulation claim under subsections (a) and (c)).

The "gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators."  *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001).  Such deception can be related to "*any*" "course of business," "device, scheme, or artifice." 17 C.F.R. § 240.10b-5; *see also Affiliated Ute*, 406 U.S. at 151 (noting that the "proscriptions [in §10(b) and Rule 10b-5] are broad and, by repeated use of the word 'any,' are obviously meant to be inclusive").

While there is no clear Third Circuit precedent on the standard for pleading a manipulation claim under Rules 10b-5 (a) and (c), *Lucent*, 610 F. Supp. 2d at 361, courts in this District recognize that a plaintiff must allege that one or more defendants "(1) committed a manipulative or deceptive act, (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance." *Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 661-62 (D.N.J. 2009); *see also Jones v. Intelli-Check, Inc.* 274 F. Supp. 2d 615, 627 (D.N.J. 2003) (Wolfson, J.) (stating similar standard).

More recently, the Supreme Court in *Lorenzo v. S.E.C.*, 139 S.Ct. 1094 (2019), expanded the range of manipulative or deceptive conduct that can give rise to liability under subsections (a) and (c).   In *Lorenzo*, the defendant-employee of a registered broker-dealer, Lorenzo, sent emails to prospective investors that included language in a prospectus – authored by Lorenzo's

boss – that Lorenzo knew contained false and misleading statements. *Id.* at 1099. The SEC ultimately held that in disseminating the prospectus to investors Lorenzo ran afoul of subsections (a), (b), and (c) of Rule 10(b)-5. *Id.* at 1099-1100.

Lorenzo appealed the SEC's findings to the Second Circuit. As to the SEC's manipulation claim under subsections (a) and (c), the Second Circuit ruled that Lorenzo's conduct – even if it did not give rise to liability under subsection (b) – was nevertheless deceptive. *Id.* The Supreme Court affirmed, explaining that a claim for market manipulation under subsections (a) and (c) "*[c]apture[s] a wide range of conduct*" (*id.* at 1101), including instances where the claim may "overlap" with a claim brought under subsection (b) of Rule 10b-5. The court stated:

> We conclude that dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b–5, as well as the relevant statutory provisions. In our view, that is so even if the disseminator did not "make" the statements and consequently falls outside subsection (b) of the Rule . . . . [T]his Court and the Commission have long recognized considerable overlap among the subsections of [Rule 10b-5] and related provisions of the securities laws. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983) ("[I]t is hardly a novel proposition that" different portions of the securities laws prohibit the same conduct."

*Id.* at 1100-02.

Here, the Complaint alleges that Defendants participated in a scheme to "rig[]" the "natural interplay," *Colkitt,* 272 F.3d at 205, of Riot common stock by (1) gaining de facto control over Riot through "coordinated" share purchases, ¶¶ 132, 209, and the placement of close affiliates on Riot's board of directors and in management positions at the Company, ¶¶ 6-7; 135-39; (2) hiding that control by ignoring SEC reporting requirements, *e.g.*, ¶¶ 329-31; (3) disseminating false and misleading statements (particularly in Riot's Forms S-3/As and Proxy Statements, *see* § III.A.1.a *supra*; (3) artificially pumping the value of Riot's stock through a series of rapid-fire and highly touted transactions of minimal value to Riot, § II.D; and (4) surreptitiously dumping their shares

during the Class Period at inflated prices, ¶¶ 22, 160-64, 307-09, 336.  In other words, the Complaint has alleged the "who, what, when, where, how" of a scheme that could easily pass for the "the first paragraph of a newspaper story."  *In re Suprema Specialities, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006).

The Complaint also carefully describes each Defendants' role in this scheme under the leadership of Defendant Honig.  ¶¶ 81-82.  Specifically, the Complaint alleges how Honig – as the "primary strategist" of at least "three highly profitable pump-and-dump schemes" alleged by the SEC, ¶¶ 357-58 – maintained close business, investment, and/or personal ties to nearly every Individual Defendant in this case including O'Rourke,[64] Beeghley,[65] Stetson,[66]; Groussman,[67] Defrancesco,[68] Kaplan,[69] and So.[70]

As explained above, beginning in 2016, Honing used these close ties to gain control the Company through (1) coordinated share purchases of Bioptix stock with many of these same defendants, ¶¶ 14, 358; and beginning with DeFrancesco in 2016,.  Honing and DeFrancesco, working together, were able place others within Honig's inner circle, namely Beeghley, O'Rourke, Kaplan, and So, in positions of management and/or on Riot's board of directors.  Once in control, Honig, Defrancesco and these newly placed insiders took steps to hide their control through false

---

[64] *See* ¶¶ 12-14, 22, 35, 55, 56, 59, 63, 71, 80-81, 82-86, 87-95, 96-102, 111, 122-27, 155-56, 193, 332-33, 357-60.

[65] *See* ¶¶ 7-8, 22, 25, 80, 133, 137-39, 142, 155, 209, 212, 216, 222, 235-37.

[66] *See* ¶¶ 13-14, 22-23, 27, 35, 37, 46, 55-56, 59, 63, 67, 74, 80-81, 82, 87-95, 96-102, 105-15, 119-21, 122-26, 127, 145-46, 154, 156-157, 164, 174, 200-03, 351, 357.

[67] *See* ¶¶ 22, 27, 63, 74, 80, 105-106, 173, 174, 180, 213, 351, 357, 359, 372, 389, 391, 394.

[68] *See* ¶¶ 6, 24, 80, 132, 138, 172-74, 189, 214, 296, 353, 364.

[69] *See* ¶¶ 28, 67, 80, 119, 183, 209, 248, 292.

[70] *See* ¶¶ 32, 80, 157-158, 183-185, 209, 232, 272, 292-93, 309-11, 351

and misleading Forms S-3/A and Proxy Statements, and other beneficial ownership disclosure violations under Section 13(d) of the Securities and Exchange Act.  Meanwhile, Honig's insiders "generate[d] a misleading picture of market interest in the company's stock, priming investor interest," by touting a series of acquisitions that (1) obscured Honig and other Defendants' personal financial interests, or otherwise (2) were of questionable tangible benefit to Riot Blockchain, Before Riot's investors (other than the Individuals Defendants) learned of, among other things, Honig's highly unusual ties to O'Rourke (Riot's CEO and Board Chairman) and what this could portend for the Company's future prospects, Honig, DeFrancesco, and others "dumped" hundreds of thousands of shares of Riot for proceeds in the tens of millions of dollars.  ¶ 164.

Defendants, rather than address in any meaningful way these specific allegations, instead effectively resort to a boilerplate "there's nothing to see here" approach.  *See* Riot Br. 2 ("no specific facts" of a pump-and-dump scheme); Director Br. 1 ("no allegations remotely suggesting fraud"); Honig Br. 2 ("a fanciful tale"; "simply due to happenstance"); DeFrancesco Br. 2 ("Plaintiff's allegations . . . . are not remotely sufficient").  By any measure, Plaintiff's allegations are not "fanciful" or unspecific.  Indeed, the Complaint connects *each defendant* to the "primary strategist" (Honig)[71] in a specific and deceptive scheme to "pump up" the value of Riot stock with the assistance of affiliated (but undisclosed) insiders (O'Rourke, Beegley, Kaplan, and So) and co-investors (DeFrancesco, Groussman, and Stetson) and then "dump" Riot stock (Honig, O'Rourke, DeFrancesco, Groussman, and Stetson) before legitimate investors in the Company could figure out what actually occurred.  That different individuals played different roles in the scheme is of no

---

[71] Honig argues that the Complaint "does not identify a single communication that Mr. Honig had with any Riot director or officer during the Class Period."  Honig Br. 2.  To be clear, Honig communicated with Riot's officers and directors on numerous occasions.  *See* ¶¶ 6, 134, 332, 337.

consequence – the Complaint alleges that each of these Individual Defendants took part in a deceptive act that was part-and-parcel of a broader scheme to manipulate Riot stock.[72]

The myriad of connections to Honig as set forth in the Complaint are not "due to happenstance." Honig Br. 18. Not even close. Thousands of companies are publicly traded in the United States.[73] That this same group of individuals, *by chance*, happened to invest in and hold a management and/or board positions these numerous overlapping penny stock companies is simply not plausible. *See* Ex. 36. [74]

Defendants argue that the *Honig* Action is "unrelated" and "[has] nothing to do with Riot." Riot Br. 1, 33; Honig Br. 17. To the contrary, the SEC has sued several of the same Defendants in this case – Honig, O'Rourke, Groussman, and Stetson – for orchestrating *the exact same scheme* at three other companies. ¶¶ 200-03; 357-60; *see also* Ex. 1. Honig has since settled these claims by agreeing to "permanent" prohibitions against the same genre of misconduct alleged in this case. Ex. 3 at 7.[75] Groussman has also settled out of the *Honig* Action while the case continues against O'Rourke and Stetson.

---

[72] Defendants also claim that Plaintiff's allegations fail because the Complaint "offers no witnesses, no sources, or any contemporaneous documents which would show 'what each defendant know, when he/she knew it or how she acquired that knowledge'"). Riot Br. 38; *see also* Director Br. 12-13. Of course, nothing in the Federal Rules or the PSLRA requires plaintiffs to plead *evidence* at this stage. *See ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 63 (1st Cir. 2007) ("[T]he PSLRA does not require plaintiffs to plead evidence.")

[73] According to *The Wall Street Journal*, there were 3,671 domestic, publicly traded companies in the United states as of November 2017. https://www.wsj.com/articles/where-have-all-the-public-companies-gone-1510869152 (last visited Sep. 29, 2019).

[74] While PolarityTE is likely the most obvious example of another penny stock company where the Individual Defendants (other than Les, So and McGonegal) were insiders and/or co-investors (¶¶ 67, 80, 119-21), the Complaint goes a step further and alleges several others (¶¶ 80, 82-86, 87-95, 96-102, 105-15, 122-26).

[75] As part of his settlement, Honig also agreed to be "precluded from arguing that he did not violate the federal securities laws as alleged in the [*Honig* Action]." *Id.* at 8

Defendants also argue that the Complaint's Rule 10b-5(a) and (c) claim is nothing more than a "repackage[ed]" or "relabeled" claim under Rule 10b-5(b). Riot Br. 28; Directors Br. 14-15; Honig Br. 17; Defrancesco Br. 10. Even if this were true (it is not), it is beside the point: *Lorenzo* makes clear that knowing dissemination of false and misleading statements qualifies as deceptive conduct that is actionable under Rule 10b-5(a) and (c). *Lorenzo*, 139 S.Ct. 1100.

The same logic applies here. The following categories of false and misleading statements and omissions as alleged in the Complaint relate to Plaintiff's (a) and (c) claim: (1) Forms S-3/A and Proxy Statements; (2) undisclosed related-party transactions; and (3) the failure to comply with SEC's reporting requirements. Each misstatement and omission served to facilitate and further Defendants' scheme. In other words, the Complaint does not allege that these misstatements and omissions – in and of themselves – form the basis of Plaintiff's scheme claim. Instead, Defendants' false and misleading statements "overlap" with the other well-pled allegations concerning intertwining machinations of Defendants and their Related Parties – *see* Ex. 36 – to illustrate Defendants' broader scheme to pump and dump Riot's stock. *See Lorenzo*, 139 S.Ct. at 1102 ("'[I]t is hardly a novel proposition that' different portions of the securities laws prohibit the same conduct.").

Lastly, Defendants challenge the Complaint's scienter allegations as "generalized" (Honig Br. 19) and "not remotely sufficient" (DeFrancesco Br. 2) and nothing more than that they "must have known" "by virtue of their high-level positions at Riot" (Riot Br. 30; Director Br. 7). To the contrary, for all the reasons discussed in Section III.A.b., the inference that Defendants knowingly, or at least recklessly, engaged in a fraudulent scheme to manipulate Riot's stock in violation of Rule 10b-5(a) and (c) is strong, cogent, and compelling given the Individual Defendants'

multifarious and intertwined relationships with each other and with Honig, and their willingness to misrepresent and conceal these relationships to further their scheme.

### C.   The Complaint Adequately Alleges Claims Under Section 20(a)

To plead a claim under Section 20(a), "plaintiffs must establish (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions." *Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256, at *4 (D.N.J. Mar. 2, 2016).  Claims under Section 20(a) are subject only to Rule 8's notice pleading standards.  *The Winer Family Trust v. Queen*, 2004 WL 2203709, at *22 (E.D. Pa. Sept. 27, 2004).  "[T]he 'overwhelming trend in this circuit' is that culpable participation does not have to be plead in order to survive a motion to dismiss." [76]  *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 645 (D.N.J. 2003) (Wolfson, J.); *see also Bing*, 2016 WL 827256, at *4 (same).

Here, O'Rourke, Beeghley, and McGonegal were Riot's CEOs and CFO and thus its most senior executives.  Each person had the authority to, and in fact did, frequently make public statements and sign SEC filings on Riot's behalf.  *See, e.g.*, ¶¶ 211, ¶¶ 218-19, 222, 226, 231, 270-71.  These allegations are adequate to plead control.  *Intelli-Check, Inc.*, 274 F. Supp. 2d at 645.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' Motions should be denied in their entirety.[77]

Dated:  October 1, 2019                                     Respectfully submitted,

                                                **LITE DEPALMA GREENBERG**

---

[76] Ignoring the overwhelming trend in this Circuit, the Riot Defendants incorrectly argue that Plaintiff must plead "particularized facts of the controlling person's conscious misbehavior as a culpable participant."  Riot Br. 40 (quoting *In re Equimed, Inc. Sec. Litig.*, 2000 WL 562909, at *10 (E.D. Pa. May 9, 2000).  However, no reported case has followed in *Equimed*'s holding, and at least one court has cited and it.  *See Belmont v. MB Inv. Partners, Inc.*, 2010 WL 2348703, at *9 (E.D. Pa. June 10, 2010), *aff'd*, 708 F.3d 470 (3d Cir. 2013).

[77] If the Court dismisses any part of the Complaint, Plaintiff respectfully requests leave to amend.  *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

By: */s/ Joseph J. DePalma*
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Lead Plaintiff Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Lead Plaintiff Dr. Stanley Golovac and Lead Counsel for the Class*

David P. Abel
**US. MARKET ADVISORS LAW GROUP PLLC**
5335 Wisconsin Ave. NW, Ste. 440
Washington, D.C.  20015
202-274-0237 Telephone
202-686-2877 Facsimile
dabel@usmarketlaw.com

*Counsel for Lead Plaintiff Dr. Stanley Golovac*