# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, JEFFREY G. McGONEGAL, BARRY HONIG, CATHERINE DEFRANCESCO, MICHAEL BEEGHLEY, JOHN STETSON, MARK GROUSSMAN, ANDREW KAPLAN, MIKE DAI, JASON LES, and ERIC SO,<br><br>    Defendants. | Civil No. 3:18-CV-02293(FLW)(ZNQ)<br><br>MOTION DATE:  November 4, 2019<br><br>**ORAL ARGUMENT REQUESTED** |

## DECLARATION OF THOMAS A. ZACCARO IN SUPPORT OF REPLY BRIEFS IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS AND MOTION TO STRIKE IMPROPER ALLEGATIONS AND IMAGES FROM THE CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

THOMAS A. ZACCARO
*thomaszaccaro@paulhastings.com*
D. SCOTT CARLTON
*scottcarlton@paulhastings.com*
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071-2228
Telephone:  1(213) 683-6000
Facsimile:  1(213) 627-0705

CHAD J. PETERMAN
*chadpeterman@paulhastings.com*
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone:  1(212) 318-6000
Facsimile:  1(212) 319-4090

*Attorneys for Defendants*
*RIOT BLOCKCHAIN, INC., JOHN O'ROURKE, MICHAEL BEEGHLEY,*
*JEFFERY G. MCGONEGAL, ANDREW KAPLAN, JASON LES AND ERIC SO*

## DECLARATION OF THOMAS A. ZACCARO

I, Thomas A. Zaccaro, declare and state as follows:

1.     I am an attorney duly admitted to practice in the State of California

and to appear before this Court *pro hac vice*.  I am a partner in the firm of Paul

Hastings LLP, counsel of record for Defendants Riot Blockchain ("Riot" or the

"Company"), John O'Rourke, Michael Beeghley, Jeffery G. McGonegal, Andrew

Kaplan, Jason Les, and Eric So (collectively, the "Defendants") in the above-

captioned matters.  I make this declaration in support of (1) Reply Brief in Support

of the Riot Blockchain Defendants' Motion to Dismiss the Corrected Consolidated

Amended Class Action Complaint for Violations of the Federal Securities Laws;

(2) Reply Brief in Support of the Director Defendants' Motion to Dismiss the

Corrected Consolidated Amended Class Action Complaint for Violations of the

Federal Securities Laws; and (3) Reply Brief in Support of Defendants' Motion to

Strike Improper Allegations and Images from the Corrected Consolidated

Amended Class Action Complaint for Violations of the Federal Securities Laws.  I

have personal knowledge of the facts stated herein and, if called upon to testify

under oath, I could and would testify competently thereto.

2.     Attached hereto as Exhibit "A" are true and correct excerpts from

Riot's February 7, 2018 Form S-3 Registration Statement filed before the Security

and Exchange Commission (the "SEC"), as obtained by my office from the SEC's

publicly available EDGAR website at

https://www.sec.gov/Archives/edgar/data/1167419/000107997318000093/riot_s3a.

htm.

3.     Attached hereto as Exhibit "B" is a true and correct copy of Riot's

form Share Exchange Agreement filed before the SEC, as obtained by my office

from the SEC's publicly available EDGAR website at

https://www.sec.gov/Archives/edgar/data/1167419/000107997317000667/ex10x4.

htm.

4.     Attached hereto as Exhibit "C" is a true and correct copy of a

December 11, 2017 article entitled "Riot Blockchain: Sudden Business Pivot,

Suspicious Acquisitions, Questionable Special Dividend" published by

Hindenburg Investment Research on SeekingAlpha.com, as obtained by my office

from Seeking Alpha's publicly available website at

https://seekingalpha.com/article/4131031-riot-blockchain-sudden-business-pivot-

suspicious-acquisitions-questionable-special-dividend.

5.     Attached hereto as Exhibit "D" are true and correct excerpts from

Riot's Schedule 14A Proxy Statement filed before the SEC on December 12, 2017,

as obtained by my office from the SEC's publicly available EDGAR website at

https://www.sec.gov/Archives/edgar/data/1167419/000107997317000733/riot_def

14a.htm.

6.     Attached hereto as Exhibit "E" are true and correct excerpts from Riot's Schedule 14A Proxy Statement filed before the SEC on March 26, 2018, as obtained by my office from the SEC's publicly available EDGAR website at https://www.sec.gov/Archives/edgar/data/1167419/000107997318000202/riot_def 14a.htm.

7.     Attached hereto as Exhibit "F" are true and correct excerpts from Riot's Form 10-K for the fiscal year ending on December 31, 2017 filed before the SEC on April 17, 2018, as obtained by my office from the SEC's publicly available EDGAR website at https://www.sec.gov/Archives/edgar/data/1167419/000107997318000264/riot_10k -123117.htm.

8.     Attached hereto as Exhibit "G" is a true and correct copy of Riot's Form 8-K for January 4, 2018 filed before the SEC, as obtained by my office from the SEC's publicly available EDGAR website at https://www.sec.gov/Archives/edgar/data/1167419/000107997318000008/riot_8k-010518.htm.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed on the 22nd day of October 2019, at Los Angeles, California.


_/s/ Thomas A. Zaccaro_
Thomas A. Zaccaro

# EXHIBIT A

# EXHIBIT A

S-3/A 1 riot_s3a.htm FORM S-3/A

As filed with the Securities and Exchange Commission on February 7, 2018

Registration No. 333-222450

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**Amendment No. 1 to**
**FORM S-3**

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# RIOT BLOCKCHAIN, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Nevada** | **84-155337** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

**202 6th Street, Suite 401**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

**Jeffrey G. McGonegal**
**Chief Financial Officer**
**202 6th Street, Suite 401**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*With copies to:*
**Harvey Kesner, Esq.**
**Sichenzia Ross Ference Kesner LLP**
**1185 Avenue of the Americas, 37th Floor**
**New York, New York 10036**
**(212) 930-9700**

**Approximate date of commencement of proposed sale to the public:** From time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration

statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

https://www.sec.gov/Archives/edgar/data/1167419/000107997318000093/riot_s3a.htm

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | | Shares of Common Stock Beneficially Owned After this Offering | | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|---|---|---|
| 2330573 Ontario Inc. | 96,444 | (1) | * | 88,888 | (33) | 52,000 | | * |
| Acquisition Group Limited | 135,556 | (2) | 1.16% | 71,112 | (33) | 100,000 | (34) | * |
| Armand Reale | 4,000 | (3) | * | 8,000 | (33) | - | | * |
| Catherine DeFrancesco ITF Ava Defrancesco | 22,911 | (4) | * | 7,112 | (33) | 19,355 | (35) | * |
| Catherine DeFrancesco ITF Devlin DeFrancesco | 22,911 | (5) | * | 7,112 | (33) | 19,355 | (36) | * |
| Catherine DeFrancesco ITF Lachlan Defrancesco | 22,911 | (6) | * | 7,112 | (33) | 19,355 | (37) | * |
| Catherine DeFrancesco ITF Summer Defrancesco | 22,911 | (7) | * | 7,112 | (33) | 19,355 | (38) | * |
| Clara Serruya | 266,667 | (8) | 2.29% | 533,334 | (33) | - | | * |
| DeFrancesco Motorsports Inc. | 5,333 | (9) | * | 10,666 | (33) | - | | * |
| Delavaco Holdings Inc. | 10,667 | (10) | * | 21,334 | (33) | - | | * |
| Eduardo Vivas | 6,667 | (11) | * | 13,334 | (33) | - | | * |
| First Canadian Insurance Corp | 14,000 | (12) | * | 28,000 | (33) | - | | * |
| Glass Investments LP | 13,444 | (13) | * | 26,888 | (33) | - | | * |
| Grander Holdings, Inc. 401K | 217,733 | (14) | 1.86% | 266,666 | (33) | 84,400 | (39) | * |
| GRQ Consultants, Inc. | 22,222 | (15) | * | 44,444 | (33) | - | | * |
| GT Capital Inc | 29,436 | (16) | * | 26,666 | (33) | 16,103 | (40) | * |
| Hudson Bay Master Fund Ltd | 333,334 | (17) | 2.87% | 666,666 | (33) | - | | * |
| Interward Capital Corp. | 4,000 | (18) | * | 8,000 | (33) | - | | * |
| Intracoastal Capital LLC | 133,334 | (19) | 1.15% | 266,668 | (33) | - | | * |
| McGilligan Barry Investment | 11,100 | (20) | * | 22,200 | (33) | - | | * |
| Marcandy Investments Corp. | 5,333 | (21) | * | 10,666 | (33) | - | | * |
| Monroe Capital, LLC | 22,000 | (22) | * | 44,000 | (33) | - | | * |
| Melechdavid Inc. | 131,945 | (23) | 1.12% | 88,890 | (33) | 87,500 | (41) | * |
| Michael Ference | 4,444 | (24) | * | 8,888 | (33) | - | | * |
| Millennium Insurance Corp. | 7,000 | (25) | * | 14,000 | (33) | - | | * |
| MMCAP International Inc. SPC | 366,667 | (26) | 3.15% | 733,334 | (33) | - | | * |
| Namaste Gorgie, Inc. | 42,927 | (27) | * | 21,334 | (33) | 32,260 | (42) | * |
| Northurst, Inc. | 592,089 | (28) | 4.99% | 177,778 | (33) | 612,000 | (43) | 4.99% |
| Paradox Capital Partners LLC | 4,444 | (29) | * | 8,888 | (33) | - | | * |
| Rockhaven Holdings Ltd. | 6,000 | (30) | * | 12,000 | (33) | - | | * |
| Sunnybrook Preemie Investments Inc. | 11,666 | (31) | * | 23,332 | (33) | - | | * |
| York Plains Investment Corp. | 8,900 | (32) | * | 17,800 | (33) | - | | * |

*   Less than 1%.

**   Based on 11,652,270 shares of Common Stock outstanding as of February 5, 2018.

7

(1)   Represents 96,444 shares of Common Stock. Jason Theofilos is the President of 2330573 Ontario Inc. In such capacity he has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, L4B 4V1, Canada.

(2)   Represents (i) 115,556 shares of Common Stock and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. Adam Arviv is the President of Acquisition Group Limited. In such capacity he has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 118 Yorkville Ave, Suite 604, Toronto, Ontario M5R1C2.

(3)   Represents 4,000 shares of Common Stock.   The address for this selling stockholder is 85 Vickers Rd   Toronto, ON M9B 1C1.

(4)   Represents (i) 3,556 shares of Common Stock and (ii) 19,355 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding.   The address for this selling stockholder is 366 Bay St., #200, Toronto ON M5H 4B2.

(5)   Represents (i) 3,556 shares of Common Stock and (ii) 19,355 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding.   The address for this selling stockholder is 366 Bay St., #200, Toronto ON M5H 4B2.

(6)   Represents (i) 3,556 shares of Common Stock and (ii) 19,355 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding.   The address for this selling stockholder is366 Bay St., #200, Toronto ON M5H 4B2.

(7)   Represents (i) 3,556 shares of Common Stock and (ii) 19,355 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding.   The address for this selling stockholder is366 Bay St., #200, Toronto ON M5H 4B2.

(8)   Represents 266,667 shares of Common Stock.   The address for this selling stockholder is210 Shields Crt , Markham, ONT   L3R-8V2.

(9)   Represents 5,333 shares of Common Stock. Catherine DeFrancesco is the President of DeFrancesco Motor Sports Inc. In such capacity she has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 366 Bay St., #200, Toronto ON M5H 4B2.

(10)   Represents 10,667 shares of Common Stock. Catherine DeFrancesco is the President of Delavaco Holdings Inc. In such capacity she has voting and dispositive control over the securities held by such entity.   The address for this selling stockholder is 366 Bay St., #200, Toronto ON M5H 4B2.

(11)   Represents 6,667 shares of Common Stock. The address for this selling stockholder is 341 Fibert Street, San Francisco, CA 94133.

(12)   Represents 14,000 shares of Common Stock. Marc Sontrop is the President of First Canadian Insurance Corp. In such capacity he has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 320 Sioux Rd., Sherwood Park, AB T8A 3X6.

(13)   Represents 13,444 shares of Common Stock. Marc Sontrop is the President of Glass Investments LP. In such capacity he has voting and dispositive control over the securities held by such entity.   The address for this selling stockholder is PO Box 212 St. Martins House Le Bordage, St Peters Port Guernsey, Channel Islands GYI 4UE.

(14)   Represents (i) 142,733 shares of Common Stock and (ii) 75,000 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding. Michael Brauser is the Trustee of Grander Holdings, Inc 401K. In such capacity he has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 2650 N. Military Trail, Suite 300, Boca Raton, FL 33431. The address for this selling stockholder is 2650 N. Military Trail, Suite 300, Boca Raton, FL 33431.

(15)   Represents 22,222 shares of Common Stock.   Barry Honig is the trustee of GRQ Consultants, Inc. In such capacity he has voting and dispositive power over the securities held by such entity. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(16)   Represents (i) 5,333 shares of Common Stock and (ii) 16,103 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding. Andrea DeFrancesco is the President of GT Capital Inc. In such capacity she has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 366 Bay St., #200, Toronto, Ontario M5H 4B2.

(17)   Represents 333,334 shares of Common Stock. Scott Black is the CCO of Hudson Bay Master Fund Ltd. In such capacity he has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 777 Third Avenue, 30th Floor, New York, NY 10017.

(18)   Represents 4,000 shares of Common Stock. Marc Sontrop is the Director of Interward Capital Corp. In such capacity he has voting and dispositive control over the securities held by such entity.   The address for this selling stockholder is 7 Saint Thomas St., Suite 802, Toronto, ON M5S 2B7.

(19)   Represents 133,334 shares of Common Stock. Mitchell P. Kopin and Daniel B. Asher, each of whom are managers of

Intracoastal Capital LLC ("Intracoastal"), have shared voting control and investment discretion over the securities reported herein that are held by Intracoastal. As a result, each of Mr. Kopin and Mr. Asher may be deemed to have beneficial ownership of the securities reported herein that are held by Intracoastal. Mr. Asher, who is a manager of Intracoastal, is also a control person of a broker-dealer. As a result of such common control, Intracoastal may be deemed to be an affiliate of a broker-dealer. Intracoastal acquired the ordinary shares being registered hereunder in the ordinary course of business, and at the time of the acquisition of the ordinary shares and warrants described herein, Intracoastal did not have any arrangements or understandings with any person to distribute such securities. The address for this selling stockholder is 245 Palm Trail, Delray Beach, FL 33483.

(20) Represents 11,100 shares of Common Stock. Michael Decter is the CIO, Principal of McGilligan Barry Investments. In such capacity he has voting and dispositive control over the securities held by such entity.  The address for this selling stockholder is 130 King St., W., Suite 2130, Toronto, ON M5X 1E2.

(21) Represents 5,333 shares of Common Stock. Catherine DeFrancesco is the President of Marcandy Investments Corp. In such capacity she has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 366 Bay St., #200, Toronto, Ontario M5H 4B2.

(22) Represents 22,000 shares of Common Stock. Mark B. Fisher is the Managing Member of Monroe Capital, LLC. In such capacity he has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 301 W 41st Street, Suite 300, Miami Beach, FL 33140.

(23) Represents (i) 44,445 shares of Common Stock, (ii) 87,500 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding. Mark Groussman is the President of Melechdavid Inc. In such capacity he has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 5154 La Gorce Drive, Miami Beach, FL 33140.

(24) Represents 4,444 shares of Common Stock. The address for this selling stockholder is 8 John St., Demarest, NJ 07627.

(25) Represents 7,000 shares of Common Stock. Marc Sontrop is the President of Millennium Insuance Corp. In such capacity he has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 320 Sioux Rd., Sherwood Park, AB T8A 3X6.

(26) Represents 366,667 shares of Common Stock. Mathew MacIsaac is the Director of MMCAP International Inc. SPC. In such capacity he has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is George Town Financial Centre, 90 Fort St., Grand Cayman Islands KY1-1104.

(27) Represents (i) 10,667 shares of Common Stock and (ii) 32,260 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding. Catherine DeFrancesco is the President of Namaste Gorgie Inc. In such capacity she has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 366 Bay St., #200, Toronto, Ontario M5H 4B2.

(28) Represents (i) 388,889 shares of Common Stock, (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants and (ii) 103,200 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding. Does not include 396,800 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding. The Series B Preferred Stock contains a 4.99% beneficial ownership blocker. Jake Malczewski is the Controlling Shareholder of Northurst Inc. In such capacity he has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 118 Cragmore Ave, Pointe-Claire, Quebec H9R 5M1.

(29) Represents 4,444 shares of Common Stock. Harvey Kesner is the Manager of Paradox Capital Partners LLC. In such capacity he has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 1151 N. Ft Lauderdale Beach Blvd., 14D, Ft. Lauderdale, FL 33304.

(30) Represents 6,000 shares of Common Stock. Marc Sontrop is the Director of Rockhaven Holdings Ltd. In such capacity he has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 7 Saint Thomas St., Suite 802, Toronto, ON M5S 2B7.

(31) Represents 11,666 shares of Common Stock. Carmela DeFrancesco is the President of Sunnybrook Preemie Investments Inc. In such capacity she has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 366 Bay St., #200, Toronto, Ontario M5H 4B2.

(32) Represents 8,900 shares of Common Stock. Shawn Dym is the Managing Director of York Plains Investment Corp. In such capacity he has voting and dispositive control over the securities held by such entity. The address for this selling stockholder is 25 Sheppard Ave. W., Toronto, ON M2N 6S6.

(33) Of the shares of Common Stock offered in this offering, 50% of total shares represent shares of Common Stock and 50% represent shares of Common Stock issuable upon exercise of outstanding warrants ("Warrants"). The Warrants to purchase one share of Common Stock, expire after three years, at an exercise price of $40.00 per share and are not exercisable until six months following their issuance.

(34) Represents (i) 80,000 shares of Common Stock and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(35) Represents 19,355 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding.

(36) Represents 19,355 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding.

(37) Represents 19,355 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding.

(38) Represents 19,355 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding.

(39) Represents (i) 9,400 shares of Common Stock and (ii) 75,000 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding.

(40) Represents 16,103 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock

outstanding.

(41) Represents 87,500 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding.

(42) Represents 32,260 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding.

(43) Represents (i) 300,000 shares of Common Stock, (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants and (ii) 212,000 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding. Does not include 288,000 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock outstanding. The Series B Preferred Stock contains a 4.99% beneficial ownership blocker.

9

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on this Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Castle Rock, State of Colorado on the 7th day of February, 2018.

/s/ John R. O'Rourke
John R. O'Rourke
Chief Executive Officer
(Principal Executive Officer)

/s/ Jeffrey G. McGonegal
Jeffrey G. McGonegal
Chief Financial Officer
(Principal Financial and Accounting Officer)

**POWER OF ATTORNEY**

The Registrant and each person whose signature appears below hereby appoint John R. O'Rourke and Jeffrey G. McGonegal as their attorneys-in-fact, with full power of substitution, to execute in their names and on behalf of the Registrant and each such person, individually and in each capacity stated below, one or more amendments (including post-effective amendments and registration statements filed pursuant to Rule 462(b) under the Securities Act of 1933, as amended and otherwise) to this Registration Statement as the attorney-in-fact acting on the premise shall from time to time deem appropriate and to file any such amendment to this Registration Statement with the Securities and Exchange Commission.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ John R. O'Rourke<br>John R. O'Rourke | Chief Executive Officer, Director<br>(Principal Executive Officer) | February 7, 2018 |
| /s/ Jeffrey G. McGonegal<br>Jeffrey G. McGonegal | Chief Financial Officer<br>(Principal Financial and Accounting<br>Officer) | February 7, 2018 |
| /s/ Andrew Kaplan<br>Andrew Kaplan | Director | February 7, 2018 |
| /s/ Eric So<br>Eric So | Director | February 7, 2018 |
| /s/ Jason Les<br>Jason Les | Director | February 7, 2018 |

II-3

# EXHIBIT B

# EXHIBIT B

EX-10.4 8 ex10x4.htm EXHIBIT 10.4

Exhibit 10.4

## SHARE EXCHANGE AGREEMENT

This SHARE EXCHANGE AGREEMENT (this "Agreement"), dated as of [_____], 2017, is by and among Riot Blockchain, Inc., a Nevada corporation (the "Parent"), Kairos Global Technology, Inc., a Nevada corporation (the "Company"), and the shareholders of the Company (each a "Shareholder" and collectively the "Shareholders"). Each of the parties to this Agreement is individually referred to herein as a "Party" and collectively as the "Parties."

## BACKGROUND

The Company has 1,750,001 shares of common stock, $0.001 par value per share (the "Company Shares") outstanding, all of which are held by the Shareholders. The Shareholders have agreed to transfer the Company Shares in exchange for an aggregate of 1,750,001 newly issued shares of Series B Convertible Preferred Stock (the "Parent Stock") which are convertible into an aggregate of One Million Seven Hundred and Fifty Thousand and One (1,750,001) shares of common stock, no par value per share, of the Parent (the "Parent Common Stock") and have such terms and rights as set forth in the Certificate of Designation of Rights, Powers, Preferences, Privileges and Restrictions of 0% Series B Convertible Preferred Stock, in the form attached hereto as Exhibit A (the "Certificate of Designations").

The exchange of Company Shares for Parent Stock is intended to constitute a reorganization within the meaning of the Internal Revenue Code of 1986, as amended (the "Code"), or such other tax free reorganization or restructuring provisions as may be available under the Code.

The Board of Directors of each of the Parent and the Company has determined that it is desirable to affect this plan of reorganization and share exchange.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration the receipt and sufficiency is hereby acknowledged, the Parties hereto intending to be legally bound hereby agree as follows:

### Exchange of Shares

(a)        Exchange by the Shareholders. At the Closing (as defined in Section 1.02), the Shareholders shall sell, transfer, convey, assign and deliver to the Parent all of the Company Shares free and clear of all Liens in exchange for an aggregate of 1,750,001 shares of Parent Stock, as set forth on Exhibit B, attached hereto.

Closing. The closing (the "Closing") of the transactions contemplated by this Agreement (the "Transactions") shall take place at such location to be determined by the Company and Parent, commencing upon the satisfaction or waiver of all conditions and obligations of the Parties to consummate the Transactions contemplated hereby (other than conditions and obligations with respect to the actions that the respective Parties will take at Closing) or such other date and time as the Parties may mutually determine (the "Closing Date").

<u>Representations and Warranties of the Shareholders</u>

Each Shareholder individually, hereby represents and warrants to the Parent, as follows:

<u>Good Title</u>.  The Shareholder is the record and beneficial owner, and has good and marketable title to its Company Shares, with the right and authority to sell and deliver such Company Shares to Parent as provided herein.  Upon registering of the Parent as the new owner of such Company Shares in the share register of the Company, the Parent will receive good title to such Company Shares, free and clear of all liens, security interests, pledges, equities and claims of any kind, voting trusts, shareholder agreements and other encumbrances (collectively, "<u>Liens</u>").

<u>Power and Authority</u>.  All acts required to be taken by the Shareholder to enter into this Agreement and to carry out the Transactions have been properly taken.  This Agreement constitutes a legal, valid and binding obligation of the Shareholder, enforceable against such Shareholder in accordance with the terms hereof.

<u>No Conflicts</u>.  The execution and delivery of this Agreement by the Shareholder and the performance by the Shareholder of his obligations hereunder in accordance with the terms hereof: (i) will not require the consent of any third party or any federal, state, local or foreign government or any court of competent jurisdiction, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign ("<u>Governmental Entity</u>") under any statutes, laws, ordinances, rules, regulations, orders, writs, injunctions, judgments, or decrees (collectively, "<u>Laws</u>"); (ii) will not violate any Laws applicable to such Shareholder; and (iii) will not violate or breach any contractual obligation to which such Shareholder is a party.

<u>No Finder's Fee</u>.  The Shareholder has not created any obligation for any finder's, investment banker's or broker's fee in connection with the Transactions that the Company or the Parent will be responsible for.

<u>Purchase Entirely for Own Account</u>.  The Parent Stock proposed to be acquired by the Shareholder hereunder will be acquired for investment for his own account, and not with a view to the resale or distribution of any part thereof, and the Shareholder has no present intention of selling or otherwise distributing the Parent Stock or the shares of Parent Common Stock issuable upon conversion thereof (the "<u>Parent Conversion Shares</u>"), except in compliance with applicable securities laws.

<u>Available Information</u>.  The Shareholder has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Parent.

<u>Non-Registration</u>. The Shareholder understands that the Parent Stock and the Parent Conversion Shares have not been registered under the Securities Act of 1933, as amended (the "<u>Securities Act</u>") and, if issued in accordance with the provisions of this Agreement, will be issued by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Shareholder's representations as expressed herein.

Restricted Securities. The Shareholder understands that the Parent Stock and the Parent Conversion Shares are characterized as "restricted securities" under the Securities Act inasmuch as this Agreement contemplates that, if acquired by the Shareholder pursuant hereto, the Parent Stock and the Parent Conversion Shares would be acquired in a transaction not involving a public offering. The Shareholder further acknowledges that if the Parent Stock and the Parent Conversion Shares are issued to the Shareholder in accordance with the provisions of this Agreement and the Certificate of Designations, such Parent Stock and Parent Conversion Shares may not be resold without registration under the Securities Act or the existence of an exemption therefrom. The Shareholder represents that it is familiar with Rule 144 promulgated under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

Legends. It is understood that the Parent Stock and the Parent Conversion Shares will bear the following legend or another legend that is similar to the following:

> NEITHER [THE SHARES REPRESENTED BY THIS CERTIFICATE / THIS WARRANT] NOR THE SECURITIES INTO WHICH [SUCH SHARES / THIS WARRANT] IS [CONVERTIBLE / EXERCISABLE] HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. [THE SHARES REPRESENTED BY THIS CERTIFICATE / THIS WARRANT] AND THE SECURITIES INTO WHICH [SUCH SHARES / THIS WARRANT] IS [CONVERTIBLE / EXERCISABLE] HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL, IN A FORM ACCEPTABLE TO THE COMPANY, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT.

and any legend required by the "blue sky" laws of any state to the extent such laws are applicable to the securities represented by the certificate so legended.

Accredited Investor. The Shareholder is an "accredited investor" within the meaning of Rule 501 under the Securities Act and the Shareholder was not organized for the specific purpose of acquiring the Parent Stock.

SECTION 2.11 Shareholder Acknowledgment. Each of the Shareholders acknowledges that he or she has read the representations and warranties of the Company set forth in Article III herein and such representations and warranties are, to the best of his or her knowledge, true and correct as of the date hereof.

Representations and Warranties of the Company

The Company represents and warrants to the Parent, except as set forth in the disclosure schedules provided in connection herewith (the "Company Disclosure Schedules"), as follows:

Organization, Standing and Power. The Company is duly incorporated or organized, validly existing and in good standing under the laws of the State of Nevada and has the corporate power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold its properties and assets and to conduct its businesses as presently conducted, other than such franchises, licenses, permits, authorizations and approvals the lack of which, individually or in the aggregate, has not had and would not reasonably be expected to have a material adverse effect on the Company, a material adverse effect on the ability of the Company to perform its obligations under this Agreement or on the ability of the Company to consummate the Transactions (a "Company Material Adverse Effect"). The Company is duly qualified to do business in each jurisdiction where the nature of its business or its ownership or leasing of its properties make such qualification necessary, except where the failure to so qualify would not reasonably be expected to have a Company Material Adverse Effect. The Company has delivered to the Parent true and complete copies of the articles of incorporation and bylaws of the Company, each as amended to the date of this Agreement (as so amended, the "Company Charter Documents"). The Company has no direct or indirect subsidiaries..

Capital Structure. The authorized share capital of the Company consists of thirty million (30,000,000) shares of common stock, with 1,750,001 shares of common stock issued and outstanding, and ten million (10,000,000) shares of preferred stock authorized of which no shares of preferred stock are issued and outstanding. No shares or other voting securities of the Company are issued, reserved for issuance or outstanding. All outstanding Company Shares are duly authorized, validly issued, fully paid and non-assessable and not subject to or issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of the applicable corporate laws of its state of incorporation, the Company Charter Documents or any Contract (as defined in Section 3.04) to which the Company is a party or otherwise bound. There are no bonds, debentures, notes or other indebtedness of the Company having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which holders of Company Shares may vote ("Voting Company Debt"). As of the date of this Agreement, there are no options, warrants, rights, convertible or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, commitments, Contracts, arrangements or undertakings of any kind to which the Company is a party or by which the Company is bound (i) obligating the Company to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares or other equity interests in, or any security convertible or exercisable for or exchangeable into any shares or capital stock or other equity interest in, the Company or any Voting Company Debt, (ii) obligating the Company to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking or (iii) that give any person the right to receive any economic benefit or right similar to or derived from the economic benefits and rights occurring to holders of the shares or capital stock of the Company.

Authority; Execution and Delivery; Enforceability. The Company has all requisite corporate power and authority to execute and deliver this Agreement and to consummate the Transactions. The execution and delivery by the Company of this Agreement and the consummation by the Company of the Transactions have been duly authorized and approved by the Board of Directors of the Company and no other corporate proceedings on the part of the Company are necessary to authorize this Agreement and the Transactions. When executed and delivered, this Agreement will be enforceable against the Company in accordance with its terms, subject to bankruptcy, insolvency and similar laws of general applicability as to which the Company is subject.

No Conflicts; Consents.

The execution and delivery by the Company of this Agreement does not, and the consummation of the Transactions and compliance with the terms hereof and thereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or result in the creation of any Lien upon any of the properties or assets of the Company under any provision of (i) the Company Charter Documents, (ii) any material contract, lease, license, indenture, note, bond, agreement, permit, concession, franchise or other instrument (a "Contract") to which the Company is a party or by which any of their respective properties or assets is bound or (iii) subject to the filings and other matters referred to in Section 3.04(b), any material judgment, order or decree ("Judgment") or material Law applicable to the Company or its properties or assets, other than, in the case of clauses (ii) and (iii) above, any such items that, individually or in the aggregate, have not had and would not reasonably be expected to have a Company Material Adverse Effect.

Except for required filings with the Securities and Exchange Commission (the "SEC") and applicable "Blue Sky" or state securities commissions, no material consent, approval, license, permit, order or authorization ("Consent") of, or registration, declaration or filing with, or permit from, any Governmental Entity is required to be obtained or made by or with respect to the Company in connection with the execution, delivery and performance of this Agreement or the consummation of the Transactions.

Taxes.

The Company has timely filed, or has caused to be timely filed on its behalf, all Tax Returns required to be filed by it, and all such Tax Returns are true, complete and accurate, except to the extent that any failure to file or any inaccuracies in any filed Tax Returns, individually or in the aggregate, have not had and would not reasonably be expected to have a Company Material Adverse Effect. All Taxes shown to be due on such Tax Returns, or otherwise owed, have been timely paid, except to the extent that any failure to pay, individually or in the aggregate, has not had and would not reasonably be expected to have a Company Material Adverse Effect. There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company know of no basis for any such claim.

If applicable, the Company has established an adequate reserve reflected on its financial statements for all Taxes payable by the Company (in addition to any reserve for deferred Taxes to reflect timing differences between book and Tax items) for all Taxable periods and portions thereof through the date of such financial statements. No deficiency with respect to any Taxes has been proposed, asserted or assessed against the Company, and no requests for waivers of the time to assess any such Taxes are pending, except to the extent any such deficiency or request for waiver, individually or in the aggregate, has not had and would not reasonably be expected to have a Company Material Adverse Effect.

For purposes of this Agreement:

"Taxes" includes all forms of taxation, whenever created or imposed, and whether of the United States or elsewhere, and whether imposed by a local, municipal, governmental, state, foreign, federal or other Governmental Entity, or in connection with any agreement with respect to Taxes, including all interest, penalties and additions imposed with respect to such amounts.

"Tax Return" means all federal, state, local, provincial and foreign Tax returns, declarations, statements, reports, schedules, forms and information returns and any amended Tax return relating to Taxes.

Benefit Plans.  The Company does not have or maintain any collective bargaining agreement or any bonus, pension, profit sharing, deferred compensation, incentive compensation, share ownership, share purchase, share option, phantom stock, retirement, vacation, severance, disability, death benefit, hospitalization, medical or other plan, arrangement or understanding (whether or not legally binding) providing benefits to any current or former employee, officer or director of the Company (collectively, "Company Benefit Plans").  As of the date of this Agreement there are no severance or termination agreements or arrangements between the Company and any current or former employee, officer or director of the Company, nor does the Company have any general severance plan or policy.

Litigation.  There is no action, suit, inquiry, notice of violation, proceeding (including any partial proceeding such as a deposition) or investigation pending or threatened in writing against or affecting the Company, or any of its properties before or by any court, arbitrator, governmental or administrative agency, regulatory authority (federal, state, county, local or foreign), stock market, stock exchange or trading facility ("Action") which (i) adversely affects or challenges the legality, validity or enforceability of any of this Agreement or the Parent Stock or (ii) could, if there were an unfavorable decision, individually or in the aggregate, have or reasonably be expected to result in a Company Material Adverse Effect.  Neither the Company nor any director or officer thereof (in his or her capacity as such), is or has been the subject of any Action involving a claim or violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty.

Compliance with Applicable Laws.  The Company is in compliance with all applicable Laws, including those relating to occupational health and safety and the environment, except for instances of noncompliance that, individually and in the aggregate, have not had and would not reasonably be expected to have a Company Material Adverse Effect.  This Section 3.08 does not relate to matters with respect to Taxes, which are the subject of Section 3.05.

Brokers; Schedule of Fees and Expenses.  Except for those brokers as to which the Company and Parent shall be solely responsible, no broker, investment banker, financial advisor or other person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Company.

Contracts.  Except as disclosed in the Company Disclosure Schedule, there are no Contracts that are material to the business, properties, assets, condition (financial or otherwise), results of operations or prospects of the Company and its subsidiaries taken as a whole.  The Company is not in violation of or in default under (nor does there exist any condition which upon the passage of time or the giving of notice would cause such a violation of or default under) any Contract to which it is a party or by which it or any of its properties or assets is bound, except for violations or defaults that would not, individually or in the aggregate, reasonably be expected to result in a Company Material Adverse Effect.

Title to Properties.  The Company does not own any real property.  The Company has sufficient title to, or valid leasehold interests in, all of its properties and assets used in the conduct of its businesses all of which are set forth on the Company Disclosure Schedule.  All such assets and properties, other than assets and properties in which the Company has leasehold interests, are free and clear of all Liens other than those Liens that, in the aggregate, do not and will not materially interfere with the ability of the Company to conduct business as currently conducted.

Labor Relations.  No labor dispute exists or, to the knowledge of the Company, is imminent with respect to any of the employees of the Company, which could reasonably be expected to result in a Company Material Adverse Effect. None of the Company's or its subsidiaries' employees is a member of a union that relates to such employee's relationship with the Company or such subsidiary, and neither the Company nor any of its subsidiaries is a party to a collective bargaining agreement, and the Company and its Subsidiaries believe that their relationships with their employees are good. To the knowledge of the Company, no executive officer of the Company or any subsidiary, is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement, or any other contract or agreement or any restrictive covenant in favor of any third party, and the continued employment of each such executive officer does not subject the Company or any of its subsidiaries to any liability with respect to any of the foregoing matters. The Company and its subsidiaries are in compliance with all U.S. federal, state, local and foreign laws and regulations relating to employment and employment practices, terms and conditions of employment and wages and hours, except where the failure to be in compliance could not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

Insurance.  The Company does not hold any insurance policy.

Transactions With Affiliates and Employees.  Except as set forth on the Company Disclosure Schedule, none of the officers or directors of the Company and, to the knowledge of the Company, none of the employees of the Company is presently a party to any transaction with the Company (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner.

Application of Takeover Protections.  The Company has taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's charter documents or the laws of its state of incorporation that is or could become applicable to the Shareholders as a result of the Shareholders and the Company fulfilling their obligations or exercising their rights under this Agreement, including, without limitation, the issuance of the Parent Stock and the Shareholders' ownership of the Parent Stock.

No Additional Agreements.  The Company does not have any agreement or understanding with any Shareholder with respect to the Transactions other than as specified in this Agreement.

Investment Company.  The Company is not, and is not an affiliate of, and immediately following the Closing will not have become, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Disclosure.  The Company confirms that neither it nor any person acting on its behalf has provided the Shareholders or their respective agents or counsel with any information that the Company believes constitutes material, non-public information, except insofar as the existence and terms of the proposed transactions hereunder may constitute such information and except for information that will be disclosed by the Parent under a current report on Form 8-K filed no later than four (4) business days after the Closing.  The Company understands and confirms that the Parent will rely on the foregoing representations and covenants in effecting transactions in securities of the Parent.  All disclosure provided to the Parent regarding the Company, its business and the Transactions, furnished by or on behalf of the Company (including the Company's representations and warranties set forth in this Agreement) are true and correct and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

Absence of Certain Changes or Events.   Except in connection with the Transactions and as disclosed in the Company Disclosure Schedule, since inception, the Company has conducted its business only in the ordinary course, and during such period there has not been:

any change in the assets, liabilities, financial condition or operating results of the Company, except changes in the ordinary course of business that have not caused, in the aggregate, a Company Material Adverse Effect;

any damage, destruction or loss, whether or not covered by insurance, that would have a Company Material Adverse Effect;

any waiver or compromise by the Company of a valuable right or of a material debt owed to it;

any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and the satisfaction or discharge of which would not have a Company Material Adverse Effect;

any material change to a material Contract by which the Company or any of its assets is bound or subject;

any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and does not materially impair the Company's ownership or use of such property or assets;

any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

any alteration of the Company's method of accounting or the identity of its auditors;

any declaration or payment of dividend or distribution of cash or other property to the Shareholders or any purchase, redemption or agreements to purchase or redeem any Company Shares;

any issuance of equity securities to any officer, director or affiliate; or

any arrangement or commitment by the Company to do any of the things described in this Section.

Foreign Corrupt Practices.   Neither the Company, nor, to the Company's knowledge, any director, officer, agent, employee or other person acting on behalf of the Company has, in the course of its actions for, or on behalf of, the Company (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

SECTION 3.21    Compliance.   Neither the Company nor any subsidiary: (i) is in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by the Company or any subsidiary under), nor has the Company or any subsidiary received written notice of a claim that it is in default under or that it is in violation of, any indenture, loan or credit agreement or any other agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (ii) is in violation of any judgment, decree or order of any court, arbitrator or other governmental authority or (iii) is or has been in violation of any statute, rule, ordinance or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws relating to taxes, environmental protection, occupational health and safety, product quality and safety and employment and labor matters, except in each case as could not have or reasonably be expected to result in a Company Material Adverse Effect.

SECTION 3.22    Regulatory Permits. The Company and its subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct their respective businesses as described on the Company Disclosure Schedule, except where the failure to possess such permits could not reasonably be expected to result in a Company Material Adverse Effect ("Material Permits"), and neither the Company nor any subsidiary has received any written notice of proceedings relating to the revocation or modification of any Material Permit.

SECTION 3.23    Intellectual Property. The Company has, or has rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, trade secrets, inventions, copyrights, licenses and other intellectual property rights and similar rights necessary or required for use in connection with their respective businesses and which the failure to so have could have a Company Material Adverse Effect (collectively, the "Intellectual Property Rights").   All Intellectual Property Rights are set forth on the Company Disclosure Schedule. None of, and neither the Company nor any subsidiary has received a written notice that any of, the Intellectual Property Rights has expired, terminated or been abandoned, or is expected to expire or terminate or be abandoned, within two (2) years from the date of this Agreement. Neither the Company nor any subsidiary has received a written notice of a claim or otherwise has any knowledge that the Intellectual Property Rights violate or infringe upon the rights of any person, except as could not have or reasonably be expected to not have a Company Material Adverse Effect. All such Intellectual Property Rights are enforceable and there is no existing infringement by another person of any of the Intellectual Property Rights. The Company and its subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of all of their intellectual properties, except where failure to do so could not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

SECTION 3.24    Office of Foreign Assets Control. Neither the Company nor any of its Subsidiaries nor, to the Company's knowledge, any director, officer, agent, employee or affiliate of the Company is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC").

SECTION 3.25    U.S. Real Property Holding Corporation. The Company is not and has never been a U.S. real property holding corporation within the meaning of Section 897 of the Internal Revenue Code of 1986, as amended.

Section 3.26     <u>Bank Holding Company Act</u>. Neither the Company nor any of its subsidiaries or affiliates is subject to the Bank Holding Company Act of 1956, as amended (the "<u>BHCA</u>") and to regulation by the Board of Governors of the Federal Reserve System (the "<u>Federal Reserve</u>"). Neither the Company nor any of its subsidiaries or affiliates owns or controls, directly or indirectly, five percent (5%) or more of the outstanding shares of any class of voting securities or twenty-five percent or more of the total equity of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve. Neither the Company nor any of its subsidiaries or affiliates exercises a controlling influence over the management or policies of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve.

SECTION 3.27     <u>Money Laundering</u>. The operations of the Company and its subsidiaries are and have been conducted at all times in compliance with applicable financial record-keeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, applicable money laundering statutes and applicable rules and regulations thereunder (collectively, the "<u>Money Laundering Laws</u>"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any subsidiary with respect to the Money Laundering Laws is pending or, to the knowledge of the Company or any subsidiary, threatened

<u>Representations and Warranties of the Parent</u>

The Parent represents and warrants as follows to the Shareholders and the Company, that, except as set forth in the reports, schedules, forms, statements and other documents filed by the Parent with the SEC and publicly available prior to the date of the Agreement (the "<u>Parent SEC Documents</u>") or specifically referenced on a disclosure schedule (the "<u>Parent Disclosure Schedules</u>"):

<u>Organization, Standing and Power</u>.  The Parent is duly organized, validly existing and in good standing under the laws of the State of Nevada and has full corporate power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold its properties and assets and to conduct its businesses as presently conducted, other than such franchises, licenses, permits, authorizations and approvals the lack of which, individually or in the aggregate, has not had and would not reasonably be expected to have a material adverse effect on the Parent, a material adverse effect on the ability of the Parent to perform its obligations under this Agreement or on the ability of the Parent to consummate the Transactions (a "<u>Parent Material Adverse Effect</u>").  The Parent is duly qualified to do business in each jurisdiction where the nature of its business or their ownership or leasing of its properties make such qualification necessary and where the failure to so qualify would reasonably be expected to have a Parent Material Adverse Effect.  The Parent has delivered to the Company true and complete copies of the articles of incorporation of the Parent, as amended to the date of this Agreement (as so amended, the "<u>Parent Charter</u>"), and the Bylaws of the Parent, as amended to the date of this Agreement (as so amended, the "<u>Parent Bylaws</u>").

<u>Subsidiaries; Equity Interests</u>.  Except as set forth in the Parent SEC Documents, the Parent does not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any person.

Capital Structure.  The authorized capital stock of the Parent consists of One Hundred and Seventy Million (170,000,000) shares of Parent Common Stock, no par value per share, and Fifteen Million (15,000,000) shares of preferred stock, no par value per share, of which (i) 8,179,680 shares of Parent Common Stock are issued and outstanding, (ii) Two Million (2,000,000) shares of preferred stock are designated as Series A Convertible Preferred Stock of which 11,112.73 shares of Series A Convertible Preferred Stock are issued and outstanding and convertible into 1,111,273shares of Parent Common Stock, and (iii) no shares of Parent Common Stock or preferred stock are held by the Parent in its treasury.  Except as set forth in the SEC Documents, no other shares of capital stock or other voting securities of the Parent were issued, reserved for issuance or outstanding.  All outstanding shares of the capital stock of the Parent are, and all such shares that may be issued prior to the date hereof will be when issued, duly authorized, validly issued, fully paid and non-assessable and not subject to or issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of the Nevada Revised Statutes, the Parent Charter, the Parent Bylaws or any Contract to which the Parent is a party or otherwise bound.  Except as set forth in the SEC Documents, there are no bonds, debentures, notes or other indebtedness of the Parent having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which holders of Parent Stock may vote ("Voting Parent Debt").  Except in connection with the Transactions or as described in the SEC Documents, as of the date of this Agreement, there are no options, warrants, rights, convertible or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, commitments, Contracts, arrangements or undertakings of any kind to which the Parent is a party or by which it is bound (i) obligating the Parent to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock or other equity interests in, or any security convertible or exercisable for or exchangeable into any capital stock of or other equity interest in, the Parent or any Voting Parent Debt, (ii) obligating the Parent to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking or (iii) that give any person the right to receive any economic benefit or right similar to or derived from the economic benefits and rights occurring to holders of the capital stock of the Parent.  As of the date of this Agreement, there are no outstanding contractual obligations of the Parent to repurchase, redeem or otherwise acquire any shares of capital stock of the Parent.  Other than as set forth in the SEC Documents, the Parent is not a party to any agreement granting any security holder of the Parent the right to cause the Parent to register shares of the capital stock or other securities of the Parent held by such security holder under the Securities Act.  The stockholder list provided to the Company is a current stockholder list generated by its stock transfer agent, and such list accurately reflects all of the issued and outstanding shares of the Parent Stock as at the Closing.

Authority; Execution and Delivery; Enforceability.  The execution and delivery by the Parent of this Agreement and the consummation by the Parent of the Transactions have been duly authorized and approved by the Board of Directors of the Parent and no other corporate proceedings on the part of the Parent are necessary to authorize this Agreement and the Transactions. This Agreement constitutes a legal, valid and binding obligation of the Parent, enforceable against the Parent in accordance with the terms hereof.

No Conflicts; Consents.

The execution and delivery by the Parent of this Agreement, does not, and the consummation of Transactions and compliance with the terms hereof and thereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, or result in the creation of any Lien upon any of the properties or assets of the Parent under, any provision of (i) the Parent Charter or Parent Bylaws, (ii) any material Contract to which the Parent is a party or by which any of its properties or assets is bound or (iii) subject to the filings and other matters referred to in Section 4.05(b), any material Judgment or material Law applicable to the Parent or its properties or assets, other than, in the case of clauses (ii) and (iii) above, any such items that, individually or in the aggregate, have not had and would not reasonably be expected to have a Parent Material Adverse Effect.

No Consent of, or registration, declaration or filing with, or permit from, any Governmental Entity is required to be obtained or made by or with respect to the Parent in connection with the execution, delivery and performance of this Agreement or the consummation of the Transactions, other than the (A) filing with the SEC of a Current Report on Form 8-K disclosing the Transactions contemplated hereby, including all required exhibits thereto; (B) filings under state "blue sky" laws, as each may be required in connection with this Agreement and the Transactions; (C) the listing of the Parent Conversion Shares with The NASDAQ Capital Market pursuant to a Listing of Additional Shares Application with The NASDAQ Stock Market LLC ("NASDAQ Listing Approval") and (D) the approval of the Parent's stockholders pursuant to Rule 5635 of The NASDAQ Stock Market LLC ("Parent Stockholder Approval").

SEC Documents; Undisclosed and Liabilities.

The Parent has filed all Parent SEC Documents for the prior two years, pursuant to Sections 13 and 15 of the Exchange Act, as applicable.

As of its respective filing date, each Parent SEC Document complied in all material respects with the requirements of the Exchange Act and the rules and regulations of the SEC promulgated thereunder applicable to such Parent SEC Document, and did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. Except to the extent that information contained in any Parent SEC Document has been revised or superseded by a later filed Parent SEC Document, none of the Parent SEC Documents contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The financial statements of the Parent included in the Parent SEC Documents comply as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with the U.S. generally accepted accounting principles ("GAAP") (except, in the case of unaudited statements, as permitted by the rules and regulations of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly present the financial position of Parent as of the dates thereof and the results of its operations and cash flows for the periods shown (subject, in the case of unaudited statements, to normal year-end audit adjustments).

Except as set forth in the Parent SEC Documents, the Parent has no liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) required by GAAP to be set forth on a balance sheet of the Parent or in the notes thereto. The Parent SEC Documents sets forth all financial and contractual obligations and liabilities (including any obligations to issue capital stock or other securities of the Parent) due after the date hereof.

Information Supplied. None of the information supplied or to be supplied by the Parent for inclusion or incorporation by reference in any Parent SEC Document or report contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

Absence of Certain Changes or Events. Except as disclosed in the filed Parent SEC Documents, from the date of the most recent audited financial statements included in the filed Parent SEC Documents to the date of this Agreement, the Parent has conducted its business only in the ordinary course, and during such period there has not been:

any change in the assets, liabilities, financial condition or operating results of the Parent from that reflected in the Parent SEC Documents, except changes in the ordinary course of business that have not caused, in the aggregate, a Parent Material Adverse Effect;

any damage, destruction or loss, whether or not covered by insurance, that would have a Parent Material Adverse Effect;

any waiver or compromise by the Parent of a valuable right or of a material debt owed to it;

any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Parent, except in the ordinary course of business and the satisfaction or discharge of which would not have a Parent Material Adverse Effect;

any material change to a material Contract by which the Parent or any of its assets is bound or subject;

any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

any resignation or termination of employment of any officer of the Parent;

any mortgage, pledge, transfer of a security interest in, or lien, created by the Parent, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Parent's ownership or use of such property or assets;

any loans or guarantees made by the Parent to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

any declaration, setting aside or payment or other distribution in respect of any of the Parent's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by the Parent;

any alteration of the Parent's method of accounting or the identity of its auditors;

any issuance of equity securities to any officer, director or affiliate, except pursuant to existing Parent stock option plans; or

any arrangement or commitment by the Parent to do any of the things described in this Section 4.08.

Case 3:18-cv-02293-GC-RLS   Document 149   Filed 10/22/19   Page 29 of 93 PageID: 4757

Taxes.

The Parent has timely filed, or has caused to be timely filed on its behalf, all Tax Returns required to be filed by it, and all such Tax Returns are true, complete and accurate, except to the extent any failure to file, any delinquency in filing or any inaccuracies in any filed Tax Returns, individually or in the aggregate, have not had and would not reasonably be expected to have a Parent Material Adverse Effect.  All Taxes shown to be due on such Tax Returns, or otherwise owed, has been timely paid, except to the extent that any failure to pay, individually or in the aggregate, has not had and would not reasonably be expected to have a Parent Material Adverse Effect.

The most recent financial statements contained in the Parent SEC Documents reflect an adequate reserve for all Taxes payable by the Parent (in addition to any reserve for deferred Taxes to reflect timing differences between book and Tax items) for all Taxable periods and portions thereof through the date of such financial statements.  No deficiency with respect to any Taxes has been proposed, asserted or assessed against the Parent, and no requests for waivers of the time to assess any such Taxes are pending, except to the extent any such deficiency or request for waiver, individually or in the aggregate, has not had and would not reasonably be expected to have a Parent Material Adverse Effect.

There are no Liens for Taxes (other than for current Taxes not yet due and payable) on the assets of the Parent.  The Parent is not bound by any agreement with respect to Taxes.

Absence of Changes in Benefit Plans.  From the date of the most recent audited financial statements included in the Parent SEC Documents to the date of this Agreement, there has not been any adoption or amendment in any material respect by Parent of any collective bargaining agreement or any bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock option, phantom stock, retirement, vacation, severance, disability, death benefit, hospitalization, medical or other plan, arrangement or understanding (whether or not legally binding) providing benefits to any current or former employee, officer or director of Parent (collectively, "Parent Benefit Plans").  Except as set forth in the Parent SEC Documents, as of the date of this Agreement there are not any employment, consulting, indemnification, severance or termination agreements or arrangements between the Parent and any current or former employee, officer or director of the Parent, nor does the Parent have any general severance plan or policy.

ERISA Compliance; Excess Parachute Payments.  The Parent does not, and since its inception never has, maintained, or contributed to any "employee pension benefit plans" (as defined in Section 3(2) of ERISA), "employee welfare benefit plans" (as defined in Section 3(1) of ERISA) or any other Parent Benefit Plan for the benefit of any current or former employees, consultants, officers or directors of Parent.

Litigation.  Except as disclosed in the Parent SEC Documents, there is no Action which (i) adversely affects or challenges the legality, validity or enforceability of any of this Agreement or the Parent Stock or (ii) could, if there were an unfavorable decision, individually or in the aggregate, have or reasonably be expected to result in a Parent Material Adverse Effect.  Neither the Parent nor any director or officer thereof (in his or her capacity as such), is or has been the subject of any Action involving a claim or violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty.

Compliance with Applicable Laws.  Except as disclosed in the Parent SEC Documents, the Parent is in compliance with all applicable Laws, including those relating to occupational health and safety, the environment, export controls, trade sanctions and embargoes, except for instances of noncompliance that, individually and in the aggregate, have not had and would not reasonably be expected to have a Parent Material Adverse Effect.  Except as set forth in the Parent SEC Documents, the Parent has not received any written communication during the past two years from a Governmental Entity that alleges that the Parent is not in compliance in any material respect with any applicable Law.  The Parent is in compliance with all effective requirements of the Sarbanes-Oxley Act of 2002, as amended, and the rules and regulations thereunder, that are applicable to it, except where such noncompliance could not have or reasonably be expected to result in a Parent Material Adverse Effect.

Contracts.  Except as disclosed in the Parent SEC Documents, there are no Contracts that are material to the business, properties, assets, condition (financial or otherwise), results of operations or prospects of the Parent taken as a whole.  The Parent is not in violation of or in default under (nor does there exist any condition which upon the passage of time or the giving of notice would cause such a violation of or default under) any Contract to which it is a party or by which it or any of its properties or assets is bound, except for violations or defaults that would not, individually or in the aggregate, reasonably be expected to result in a Parent Material Adverse Effect.

      Title to Properties.  The Parent has good title to, or valid leasehold interests in, all of its properties and assets used in the conduct of its businesses.  All such assets and properties, other than assets and properties in which the Parent has leasehold interests, are free and clear of all Liens and except for Liens that, in the aggregate, do not and will not materially interfere with the ability of the Parent to conduct business as currently conducted.  The Parent has complied in all material respects with the terms of all material leases to which it is a party and under which it is in occupancy, and all such leases are in full force and effect.  The Parent enjoys peaceful and undisturbed possession under all such material leases.

      Intellectual Property.  The Parent owns, or is validly licensed or otherwise has the right to use, all Intellectual Property Rights which are material to the conduct of the business of the Parent taken as a whole.  No claims are pending or, to the knowledge of the Parent, threatened that the Parent is infringing or otherwise adversely affecting the rights of any person with regard to any Intellectual Property Right.  To the knowledge of the Parent, no person is infringing the rights of the Parent with respect to any Intellectual Property Right.

      Labor Matters.  There are no collective bargaining or other labor union agreements to which the Parent is a party or by which it is bound.  No material labor dispute exists or, to the knowledge of the Parent, is imminent with respect to any of the employees of the Parent.

      Transactions With Affiliates and Employees.  Except as set forth in the Parent SEC Documents, none of the officers or directors of the Parent and, to the knowledge of the Parent, none of the employees of the Parent is presently a party to any transaction with the Parent or any subsidiary (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Parent, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner.

      Application of Takeover Protections.  The Parent has taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Parent's charter documents or the laws of its state of incorporation that is or could become applicable to the Shareholders as a result of the Shareholders and the Parent fulfilling their obligations or exercising their rights under this Agreement, including, without limitation, the issuance of the Parent Stock and the Shareholders' ownership of the Parent Stock.

      No Additional Agreements.  The Parent does not have any agreement or understanding with the Shareholders with respect to the Transactions other than as specified in this Agreement.

      Investment Company.  The Parent is not, and is not an affiliate of, and immediately following the Closing will not have become, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

      Disclosure.  The Parent confirms that neither it nor any person acting on its behalf has provided any Shareholder or its respective agents or counsel with any information that the Parent believes constitutes material, non-public information except insofar as the existence and terms of the proposed transactions hereunder may constitute such information and except for information that will be disclosed by the Parent under a current report on Form 8-K filed after the Closing.  All disclosure provided to the Shareholders regarding the Parent, its business and the transactions contemplated hereby, furnished by or on behalf of the Parent (including the Parent's representations and warranties set forth in this Agreement) are true and correct and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

Certain Registration Matters.  Except as specified in the Parent SEC Documents or on the Parent Disclosure Schedules, the Parent has not granted or agreed to grant to any person any rights (including "piggy-back" registration rights) to have any securities of the Parent registered with the SEC or any other governmental authority that have not been satisfied.

Listing and Maintenance Requirements.  The Parent is, and has no reason to believe that it will not in the foreseeable future continue to be, in compliance with the listing and maintenance requirements for continued listing of the Parent Conversion Shares on the trading market on which the shares of Parent Common Stock are currently listed or quoted.  Subject to Parent Stockholder Approval and NASDAQ Listing Approval, the issuance and sale of the shares of Parent Stock under this Agreement does not contravene the rules and regulations of the trading market on which the Parent Stock are currently listed or quoted.

Parent Stock.  Upon issue to the Shareholders, the Parent Stock will be duly and validly issued, fully paid and non-assessable shares of preferred stock in the capital of the Company having such rights as are set forth in the Certificate of Designations.

Deliveries

Deliveries of the Shareholders.

Concurrently herewith the Shareholders are delivering to the Parent this Agreement executed by the Shareholders.

At or prior to the Closing, the Shareholders shall deliver to the Parent:

This Agreement, executed by the Shareholders

this Agreement which shall constitute a duly executed share transfer power for transfer by the Shareholders of their Company Shares to the Parent (which Agreement shall constitute a limited power of attorney in the Parent or any officer thereof to effectuate any Share transfers as may be required under applicable law, including, without limitation, recording such transfer in the share registry maintained by the Company for such purpose).

<u>Deliveries of the Parent</u>.

Concurrently herewith, the Parent is delivering to the Shareholders and to the Company, a copy of this Agreement executed by the Parent.

At or prior to the Closing, the Parent shall deliver to the Company:

A stamped copy of the Certificate of Designations as filed with the Secretary of State of the State of Nevada.

Promptly following the Closing, the Parent shall deliver to the Shareholders, certificates representing the new shares of Parent Stock issued to the Shareholders set forth on <u>Exhibit B</u>.

<u>Deliveries of the Company</u>.

Concurrently herewith, the Company is delivering to the Parent this Agreement executed by the Company.

At or prior to the Closing, the Company shall deliver to the Parent"

a certificate from the Company, signed by its Secretary or Assistant Secretary certifying that the attached copies of the Company's Charter Documents and resolutions of the Board of Directors of the Company approving this Agreement and the Transactions, are all true, complete and correct and remain in full force and effect; and

A shareholder list, certified by the Company's Chief Financial Officer.

Conditions to Closing

<u>Shareholders and Company Conditions Precedent</u>.  The obligations of the Shareholders and the Company to enter into and complete the Closing is subject, at the option of the Shareholders and the Company, to the fulfillment on or prior to the Closing Date of the following conditions.

<u>Representations and Covenants</u>. The representations and warranties of the Parent contained in this Agreement shall be true in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.  The Parent shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by the Parent on or prior to the Closing Date.  The Parent shall have delivered to the Shareholder and the Company, a certificate, dated the Closing Date, to the foregoing effect.

<u>Litigation</u>.  No action, suit or proceeding shall have been instituted before any court or governmental or regulatory body or instituted or threatened by any governmental or regulatory body to restrain, modify or prevent the carrying out of the Transactions or to seek damages or a discovery order in connection with such Transactions, or which has or may have, in the reasonable opinion of the Company or the Shareholders, a materially adverse effect on the assets, properties, business, operations or condition (financial or otherwise) of the Parent.

Case 3:18-cv-02293-GC-RLS   Document 149   Filed 10/22/19   Page 33 of 93   PageID: 4761

No Material Adverse Change.  There shall not have been any occurrence, event, incident, action, failure to act, or transaction since June 30, 2017 which has had or is reasonably likely to cause a Parent Material Adverse Effect.

Post-Closing Capitalization.  At, and immediately after, the Closing, the authorized capitalization, and the number of issued and outstanding shares of capital stock of the  Parent, on a fully-diluted basis, shall be as described in the Parent SEC Documents.

SEC Reports.  The Parent shall have filed all reports and other documents required to be filed by Parent under the U.S. federal securities laws through the Closing Date.

NASDAQ Listing.  The Parent shall have maintained its status as a Company whose common stock is listed on The NASDAQ Capital Market and Parent shall not have received any notice that any reason shall exist as to why such status shall not continue immediately following the Closing.

Deliveries.  The deliveries specified in Section 5.02 shall have been made by the Parent.

No Suspensions of Trading in Parent Stock; Listing.  Trading in the Parent Common stock shall not have been suspended by the SEC or any trading market (except for any suspensions of trading of not more than one trading day solely to permit dissemination of material information regarding the Parent) at any time since the date of execution of this Agreement, and the Parent Common Stock shall have been at all times since such date listed for trading on a trading market.

Satisfactory Completion of Due Diligence.  The Company and the Shareholders shall have completed their legal, accounting and business due diligence of the Parent and the results thereof shall be satisfactory to the Company and the Shareholders in their sole and absolute discretion.

Parent Conditions Precedent.  The obligations of the Parent to enter into and complete the Closing are subject, at the option of the Parent, to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by the Parent in writing.

Representations and Covenants.  The representations and warranties of the Shareholders and the Company contained in this Agreement shall be true in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.  The Shareholders and the Company shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by the Shareholders and the Company on or prior to the Closing Date.  The Company shall have delivered to the Parent a certificate, dated the Closing Date, to the foregoing effect.

Litigation.  No action, suit or proceeding shall have been instituted before any court or governmental or regulatory body or instituted or threatened by any governmental or regulatory body to restrain, modify or prevent the carrying out of the Transactions or to seek damages or a discovery order in connection with such Transactions, or which has or may have, in the reasonable opinion of the Parent, a materially adverse effect on the assets, properties, business, operations or condition (financial or otherwise) of the Company.

No Material Adverse Change.  There shall not have been any occurrence, event, incident, action, failure to act, or transaction since the date hereof which has had or is reasonably likely to cause a Company Material Adverse Effect.

Deliveries.  The deliveries specified in Section 5.01 and Section 5.03 shall have been made by the Shareholders and the Company, respectively.

Post-Closing Capitalization.  At, and immediately after, the Closing, the authorized capitalization, and the number of issued and outstanding shares of the Company, on a fully-diluted basis, shall be described in the Company Disclosure Schedule.

Satisfactory Completion of Due Diligence.  The Parent shall have completed its legal, accounting and business due diligence of the Company and the results thereof shall be satisfactory to the Parent in its sole and absolute discretion.

Cash on Hand.  The Company shall have delivered evidence that, as of the Closing Date, it has a minimum of Nine Hundred Thousand Dollars ($900,000) of cash on hand.

Covenants

Public Announcements.  The Parent and the Company will consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press releases or other public statements with respect to the Agreement and the Transactions and shall not issue any such press release or make any such public statement prior to such consultation, except as may be required by applicable Law, court process or by obligations pursuant to any listing agreement with any national securities exchanges.

Fees and Expenses.  All fees and expenses incurred in connection with this Agreement shall be paid by the Party incurring such fees or expenses, whether or not this Agreement is consummated.

Continued Efforts.  Each Party shall use commercially reasonable efforts to (a) take all action reasonably necessary to consummate the Transactions, and (b) take such steps and do such acts as may be necessary to keep all of its representations and warranties true and correct as of the Closing Date with the same effect as if the same had been made, and this Agreement had been dated, as of the Closing Date.

Exclusivity.  Each of the Parent and the Company shall not (and shall not cause or permit any of their affiliates to) engage in any discussions or negotiations with any person or take any action that would be inconsistent with the Transactions and that has the effect of avoiding the Closing contemplated hereby.  Each of the Parent and the Company shall notify each other immediately if any person makes any proposal, offer, inquiry, or contact with respect to any of the foregoing.

Filing of 8-K and Press Release.  The Parent shall file, no later than four (4) business days of the Closing Date, a current report on Form 8-K with the SEC disclosing the terms of this Agreement and other requisite disclosure regarding the Transactions.

Access.  Each Party shall permit representatives of any other Party to have full access to all premises, properties, personnel, books, records (including Tax records), contracts, and documents of or pertaining to such Party.

Preservation of Business.  From the date of this Agreement until the Closing Date, the Company shall operate only in the ordinary and usual course of business consistent with their respective past practices, and shall use reasonable commercial efforts to (a) preserve intact their respective business organizations, (b) preserve the good will and advantageous relationships with customers, suppliers, independent contractors, employees and other persons material to the operation of their respective businesses, and (c) not permit any action or omission that would cause any of their respective  representations or warranties contained herein to become inaccurate or any of their respective covenants to be breached in any material respect.

Company Financial Statements.  The Company shall, not later than 45 days after execution of this Agreement, deliver to the Parent its opening balance sheet audited by a PCAOB firm as well as pro forma financial statements of the post-Transaction balance sheet of the Parent, on a consolidated basis,  and such additional information as is required for the Parent's preliminary proxy statement on Schedule 14A (the "Proxy Statement") relating to the Parent's obligation to obtain Parent Stockholder Approval and NASDAQ Listing Approval and the related Current Reports on Form 8-K required in connection with the Closing.

SECTION 7.09   Royalty.  After the Closing, the Parent shall pay to the Shareholders set forth on Exhibit C, on a pro rata basis based on their percentage of ownership in the Company prior to Closing, as set forth on Exhibit B hereto, a royalty (the "Royalty") equal to Forty Percent (40%) of the Gross Profits generated from the operations of the Company on a post merger basis.  The Royalty will be calculated on a quarterly basis and paid within thirty (30) days of the end of Parent's fiscal quarter.   The Royalty will terminate upon the Company making total payments to the Shareholders, on an aggregate basis, of One Million Dollars ($1,000,000).   For purposes of this Section 7.09, "Gross Profits" shall be defined as the sum of all gross sources of revenue less the sum of all direct costs incurred in the generation of such revenues, as computed under GAAP.Upon the request of any Shareholder delivered to the Parent in writing, the Parent shall supply the requesting Shareholder a statement reflecting the Parent's calculation of Gross Profits, as defined herein, and the royalty payments paid or to be paid to the Shareholder, for any specified Parent fiscal quarter.

<u>Miscellaneous</u>

        <u>Notices</u>.  All notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be deemed given upon receipt by the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

        If to the Parent, to:
Riot Blockchain, Inc.
834-F South Perry Street, Suite 443
Castle Rock, CO 80104
Attn: President

        With a copy to (which shall not constitute notice):
Sichenzia Ross Ference Kesner LLP
1185 Avenue of the Americas, 37th Floor
New York, NY 10036
Attn: Harvey J. Kesner, Esq.

        If to the Company, to:
Kairos Global Technology, Inc.
1815 Purdy Avenue
Miami Beach, FL 33139

        With a copy to (which shall not constitute notice):

Laxague Law, Inc.
1 East Liberty, Suite 600
Reno, NV 89501
Attn: Joe Laxague, Esq.

        If to the Shareholders at the addresses set forth in <u>Exhibit A</u> hereto.

        <u>Amendments; Waivers; No Additional Consideration</u>.  No provision of this Agreement may be waived or amended except in a written instrument signed by the Company, Parent and the Shareholders.  No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any Party to exercise any right hereunder in any manner impair the exercise of any such right.

        <u>Replacement of Securities</u>.  If any certificate or instrument evidencing any Parent Stock is mutilated, lost, stolen or destroyed, the Parent shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof, or in lieu of and substitution therefore, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Parent of such loss, theft or destruction and customary and reasonable indemnity, if requested.  The applicants for a new certificate or instrument under such circumstances shall also pay any reasonable third-party costs associated with the issuance of such replacement Parent Stock.  If a replacement certificate or instrument evidencing any Parent Stock is requested due to a mutilation thereof, the Parent may require delivery of such mutilated certificate or instrument as a condition precedent to any issuance of a replacement.

        <u>Remedies</u>.  In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, the Shareholders, Parent and the Company will be entitled to specific performance under this Agreement.  The Parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations described in the foregoing sentence and hereby agrees to waive in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

        <u>Limitation of Liability</u>.  Notwithstanding anything herein to the contrary, each of the Parent and the Company acknowledge and agree that the liability of the  Shareholders arising directly or indirectly, under any transaction document of any and every nature whatsoever shall be satisfied solely out of the assets of the Shareholders, and that no trustee, officer, other investment vehicle or any other affiliate of the Shareholders or any investor, shareholder or holder of shares of beneficial interest of the Shareholders shall be personally liable for any liabilities of the Shareholders.

<u>Interpretation</u>.  When a reference is made in this Agreement to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

<u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule or Law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that Transactions contemplated hereby are fulfilled to the extent possible.

<u>Counterparts; Facsimile Execution</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties.  Facsimile execution and delivery of this Agreement is legal, valid and binding for all purposes.

<u>Entire Agreement; Third Party Beneficiaries</u>. This Agreement, taken together with the Company Disclosure Schedule, (a) constitutes the entire agreement, and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the Transactions and (b) are not intended to confer upon any person other than the Parties any rights or remedies.

<u>Governing Law</u>.  This Agreement, the legal relations between the parties and any Action, whether contractual or non-contractual, instituted by any party with respect to any matter arising between the parties, including but not limited to matters arising under or in connection with this Agreement, such as the negotiation, execution, interpretation, coverage, scope, performance, breach, termination, validity, or enforceability of this Agreement, shall be governed by and construed in accordance with the internal laws of the State of New York without reference to principles of conflicts of laws.  The parties hereto hereby irrevocably submit to the exclusive jurisdiction of the courts of the State of New York and the Federal Courts of the United States of America located within the Eastern or Southern District of New York with respect to any matter arising between the parties, and hereby waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or thereof, that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue thereof may not be appropriate or that this Agreement or any such document may not be enforced in or by such courts, and the parties hereto irrevocably agree that all claims with respect to such action or proceeding shall be heard and determined in such a New York State or Federal court.  The parties hereby consent to and grant any such court jurisdiction over the person of such parties and over the subject matter of such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in any manner as may be permitted by applicable Law, shall be valid and sufficient service thereof.  With respect to any particular action, suit or proceeding arising between the parties, including but not limited to matters arising under or in connection with this Agreement, venue shall lie solely in any New York County or any Federal Court of the United States of America sitting in the Eastern or Southern District of New York.

<u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by operation of law or otherwise by any of the Parties without the prior written consent of the other Parties.  Any purported assignment without such consent shall be void.  Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

    IN WITNESS WHEREOF, the parties hereto have executed and delivered this Share Exchange Agreement as of the date first above written.


The Parent:

                                    **RIOT BLOCKCHAIN, INC.**


                                    By:  _____
                                    Name:
                                    Title:


The Company:

                                    **KAIROS GLOBAL TECHNOLOGY, INC.**


                                    By:  _____
                                    Name:  Michael Ho
                                    Title:   President

The Shareholders:

            Name:

            Number of Shares:

            _____

            _____

# EXHIBIT C

# EXHIBIT C

Case 3:18-cv-02293-GC-RLS   Document 140   Filed 10/22/19   Page 43 of 93 PageID: 4751

# Seeking Alpha$^\alpha$

# Riot Blockchain: Sudden Business Pivot, Suspicious Acquisitions, Questionable Special Dividend

Dec. 11, 2017 9:39 AM ET194 comments
by: Hindenburg Investment Research

## Summary

- Riot made a dramatic pivot from a "life science tools" business to a blockchain company mere months ago.

- The company paid approximately $12 million for a two-week-old crypo-mining entity that owned only about $1.9 million in crypto mining assets.

- A second acquisition raises additional red flags.

- Riot depleted an estimated 63% of company cash through a special dividend that appears to have disproportionately advantaged insiders.

- Regardless of one's views on blockchain technology, we believe Riot is a name that should be avoided.

With "blockchain mania" in full swing, a new self-described leader has emerged. Riot Blockchain (NASDAQ:RIOT) purports to be "a Leading Blockchain Company & Only Nasdaq Listed Pure Play Blockchain Company." With share prices nearly quadrupling in the past three months, we decided to examine the name more closely.

The company's blockchain focus has come about through a series of rapid moves. Mere months ago, Riot was known as Bioptix, Inc. and operated "a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions."

On October 4th of this year, Bioptix announced that it was changing its name and ticker from Bioptix. Inc. (BIOP) to Riot Blockchain (RIOT), and indicated that it would be pursuing a completely different business model focused on strategic investment and operations in the blockchain ecosystem.

We find such a dramatic pivot in business operations to be concerning in its own right, but we believe it is even more questionable given that the seismic shift has come about in conjunction with a series of dubious transactions.

**Riot Paid Approximately $12 million To Acquire Kairos Global Technology - A *Two-Week-Old* Crypto-Mining Company That Owned Only About $1.9 Million in Crypto Mining Assets**

On November 2, 2017, the company announced via press release that it had "entered into a definitive agreement to acquire cryptocurrency mining equipment consisting of 700 Antminer S9s and 500 Antminer L3s, all manufactured by industry leader Bitmain." Upon closing of the purchase the company issued another press release on November 6, 2017, stating that "it has closed on its acquisition of cryptocurrency mining equipment". A basic reading of the press releases might lead a reader to believe that the company had purchased the equipment directly.

However, a reading of the November 1, 2017, Form 8-K that described the transaction leaves us with a different impression. The 8-K clarified that Riot had actually acquired a corporate *entity* called Kairos Global Technology ("Kairos") that held the cryptocurrency mining equipment described above.

The form 8-K described a share exchange agreement with Kairos whereby the company exchanged Convertible Preferred Stock (convertible into 1,750,001 common shares of Riot) for all outstanding shares of Kairos's common stock. Given that Riot's stock closed at $6.95 per share on November 1, 2017, we estimate the share transaction value at approximately $12.1 million (As of this writing those same shares would be worth an estimated $27 million.) In addition, Riot included a potential $1 million royalty sweetener for Kairos's shareholders:

> The shareholders of Kairos also will receive a royalty to be paid from cash flow generated from operations, which shall entitle such shareholders to receive 40% of the gross profits generated on a monthly basis until they have received a total of $1,000,000, at which point the royalty is extinguished.

All told, we estimate the transaction provided anywhere from $12-13 million in value to Kairos's shareholders on the day of closing. Our belief is that Riot grossly overpaid. As above, Riot's stated motive for the transaction was to acquire 700 Antminer S9s and 500 Antminer L3s used to mine cryptocurrency.

However, if Riot had simply purchased the above servers directly from Bitmain, we estimate that the price would have been $1,905,000. In order to arrive at this number, we checked a historical capture of the Bitmain website as of October 16th, 2017, and found

that Antminer S9 servers were selling for $1,265 and that Antminer L3s were selling for $2,040.

We contacted Bitmain to see if it was experiencing massive backlogs or any other scenario that could justify an overpayment of roughly $10 million for $1.9 million of machines. We have not heard back from Bitmain as of this writing. The historical capture of the Bitmain website from October 16th shows that machines would have been expected to ship in just over one month from that date (November 21st-November 30th).

Adding to our skepticism of the Kairos deal is the fact that Kairos appears to have had no operations and/or website (despite registering a domain name) and that the entity was formed on October 19, 2017 - less than two weeks prior to its announced acquisition by Riot. We believe the fact pattern indicates that Riot's acquisition of Kairos's assets is highly irregular.

Furthermore, it is unclear to us who ultimately benefited from the apparent generous payment terms for Kairos. The entity was registered to the address of a believed one-man law firm called Laxague Law, Inc. ("Laxague Law"). Its officers consisted of a Dubai resident and its directors consisted of two Floridians, though the underlying shareholder structure was not publicly disclosed.

## Riot's Acquisition of a Majority Stake in Another Blockchain Technology Company Raises Additional Questions

Riot's acquisition of newly-established Tess, Inc. raises additional red flags. On October 20, 2017, Riot announced that it had acquired a majority (52%) stake in Tess, which Riot described as a company that was "developing blockchain solutions for telecommunications companies." A "whois" search of the Tesspay.io website shows that it was initially registered on July 18, 2017. Tess then released a seven-page whitepaper in August 2017 describing (i) its plans for an initial coin offering ("ICO"); and (ii) the role its coins intend to play in telecommunications transactions. Those representations aside, the resumes of Tess's principals leave us skeptical of Tess's odds of success:

- Tess's CEO, Jeff Mason, concurrently holds the same CEO position at two other companies, according to his LinkedIn profile: PowerCases and Wiztel;
- Tess's CFO, Fraser Mason, concurrently hold the position of Senior Vice President of PowerCases, according to his LinkedIn profile; and
- Tess's Chief Software Architect, Sorin Tanasescu, concurrently holds various senior roles at other companies, including: (A) Managing Director of VoiceWay; (B) Director of

Middleware Integration for Rogers Communications; and (C) Director of an entity called Ingenium IT Compusoft ("Ingenium").

Tanasescu's other companies give us additional cause for concern. Namely, VoiceWay appears to have been associated with a Bitcoin phishing website.

On a Bitcoin forum called *BitcoinTalk*, one user conveyed that Google was displaying advertisements for "mt-**q**ox.com," a clever misspelling of the then-popular Mount Gox bitcoin trading website. That same user noted that the "mt-qox.com" website completely duplicated the real Mount Gox website.

The apparent imposter site was registered to Cristian Talle at the address 196 Judith Ave., Toronto, Canada, which appears to be a residence, based on a Google Maps search. That same address houses Tanasescu's other businesses including VoiceWay and Ingenium. In addition, Talle used a VoiceWay email address to register the mt-qox.com site. *Reddit* users also noticed the site and started a thread entitled "[SCAM] watch out for mt-qox.com". The users reported the site to Mount Gox and Google. Google subsequently took action and blocked it as a phishing website, according to the thread. (Note that the VoiceWay website itself was also registered by an individual named Cristian Talle - under a Rogers Communications email address).

Furthermore on the subject of Tess: On the same day that Laxague Law set up Kairos (October 19, 2017), the same law firm also set up an entity called Ingenium Global, Inc., which has a unique name that is similar to an entity in which Tanasescu manages (Ingenium IT Compusoft). Even more interestingly, Ingenium Global, Inc. listed the exact same officers/directors as Kairos (an individual in Dubai and two from Florida) and registered the exact same par value and share count. Given that Riot announced the acquisition of Tess the very next day (October 20, 2017), we cannot help but wonder whether the selling parties in the Kairos transactions were in any way related to the shareholders of Ingenium, and ultimately to the selling parties in the Tess transaction.

## Riot Depleted An Estimated 63% of the Company's Cash Through a Special Dividend That Appears To Have Disproportionately Advantaged Company Insiders

Bioptix/Riot recently engineered a "special cash dividend" that stripped the fledgling company of approximately 63% of its cash, seemingly handing a significant portion of those funds to company insiders. That kind of cash giveaway - announced one day ahead of a shift to a new, speculative business model - gives us significant concerns. The sequence of events was as follows:

10/10/2019 Riot Blockchain's Sudden Business Pivot, Suspicious Acquisitions, and Questionable Special Dividend - Riot Blockchain, Inc. (NASDAQ:RIO...

Case 3:18-cv-02293-GC-RLS Document 140 Filed 10/22/19 Page 47 of 93 PageID: 4757

In March 2017, Bioptix announced the completion of private placements that included a convertible note financing and also included warrants to purchase 1,900,000 shares of common stock.

On September 25, 2017, Bioptix made the following disclosures:

1. Bioptix filed a Form 8-K stating, in part, that notes from the March 2017 Offerings had been exchanged for shares of Series A Convertible Preferred Stock.
2. Bioptix filed an amended Registration Statement Form S-3 which described how holders of Series A Convertible Preferred Stock "are entitled to receive dividends if and when declared by the Company's board of directors. The Series A Preferred Stock will participate **on an 'as converted' basis**, with all dividends declared on the Company's Common Stock."

Then on October 4, 2017, the newly-named Riot filed a Form 8-K stating that the company had approved a cash dividend:

> Pursuant to which, the holders of the Company's common stock, no par value per share (the 'Common Stock'), and Series A Convertible Preferred Stock, no par value per share (the 'Series A Preferred Stock'), as of the close of business on October 13, 2017, shall receive $1.00 for each share of Common Stock, including each share of Common Stock that would be issuable upon conversion of the Series A Preferred Stock, **on an as converted basis**.

The magnitude of the dividend is significant. The payout "totaled approximately $9,562,000" whereas Riot's financial statements reflected that at the close of Q3 2017 - two days before the October 2017 dividend was approved - the company had only $13,139,722 in cash and cash equivalents. When factoring in an added $1.86 million in cash proceeds from warrant conversion, the October 2017 dividend depleted an estimated 63% of the company's cash and cash equivalents balance. Consequently, we find its size relative to Riot's available cash to be troubling.

The timing of related warrant conversions is similarly concerning. Riot's quarterly filing prior to the October 2017 dividend indicates that 2,060,000 warrants from the March offering were converted into 1,228,690 common shares on a cashless basis. In addition, 620,000 warrants were exercised for cash during a period where Riot's board of directors authorized on October 10th a "temporary reduction in exercise price" of convertible securities from the March 2017 private offerings. Given that the record date of the October 2017 dividend was October 13, 2017 (with a payment date of October 18, 2017), both the

10/10/2019 Riot Blockchain: Sudden Business Pivot Suspicious Acquisitions Questionable Special Dividend - Riot Blockchain, Inc. (NASDAQ:RIO…

Case 3:18-cv-02293-GC-RLS  Document 140  Filed 10/22/19  Page 48 of 93 PageID: 4776

cashless warrant conversion and the conversion from the reduction in exercise price of the March 2017 securities appear to have conspicuously occurred just prior to the payment of the October 2017 dividend.

## Who Benefited From the Special Dividend?

In the press release announcing the special dividend, the company's CEO stated: "This special dividend is a positive step to return value to all Bioptix shareholders." Despite this pronouncement, we believe Riot insiders and participants in the March 2017 private placements benefited disproportionately.

The amended Form S-3 detailing the convertible and warrant offerings prominently mentioned one individual in particular. Per the filing, "The Lead Investor is Barry Honig who is also a selling stockholder." Moreover, Honig-related entities, as well as Honig's family members including brother Jonathan and father Alan, also participated in the transactions.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000(1) | 3.61% | 200,000(1) | 0 | * |
| Northant Inc. | 359,000(2) | 9.99% | 800,000(2) | 0 | * |
| Erick Richardson | 200,000(3) | 3.61% | 200,000(3) | 0 | * |
| Melechdavid Inc. | 340,000(4) | 6.06% | 340,000(4) | 0 | * |
| Mark Groossman c f Alivia Groossman UTMA FL | 80,000(5) | 1.48% | 80,000(5) | 0 | * |
| Mark Groossman c f Asher Groossman UTMA FL | 80,000(6) | 1.48% | 80,000(6) | 0 | * |
| Barry Honig | 544,400(7) | 9.99% | 402,830(8) | 504,000(9) | 8.08% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600(10) | * | 1,005,124(11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 397,500(12) | 9.99% | 1,688,198(13) | 13,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,205(14) | * | 40,205(14) | 0 | * |
| Robert E. O'Beaht | 80,410(15) | 1.48% | 80,410(15) | 0 | * |
| Stockvest Research Group, Inc. | 40,205(16) | * | 40,205(16) | 0 | * |
| Aifos Capital LLC | 120,615(17) | 2.17% | 120,615(17) | 0 | * |
| Stetson Capital Management, LLC | 283,150(18) | 4.99% | 402,050(19) | 7,500 | * |
| JAD Capital Inc. | 80,410(20) | 1.48% | 80,410(20) | 0 | * |
| Richard Molinsky | 97,392(21) | 1.78% | 40,205(22) | 57,187 | 1.04% |
| Alan Honig | 20,000(23) | * | 20,000(23) | 0 | * |

\* Less than 1%
\*\* Based on 5,436,503 shares of Common Stock outstanding as of September 20, 2017.

Later, in two Schedule 13G filings filed as an event date of October 10th - just days prior to the dividend ex-date - Jonathan Honig and an individual named Mark Groussman reported common stock ownership stakes of 9.51% and 5.93% respectively. Jonathan Honig's filing also mentioned that the 9.51% figure "does not include 808,198 shares of common stock issuable upon conversion of Series A Preferred Stock." it is unclear from the filings where Barry Honig's ownership on a common stock and on a convertible/exercised basis stands currently.

Note that the same filing mentioned that there were only 5,436,503 shares of common stock outstanding as of September 20th. By November 13th, the number of common shares had spiked up to 8,321,137, a roughly 53% increase in common shares in less than two months. Such a jump indicates that a significant amount of dilution has affected common stockholders in a short amount of time.

## Conclusion

We have no strong bearish or bullish view on the future of blockchain. We genuinely hope the technology is implemented broadly and that currency and information can be effectively decentralized through its use. Regardless of one's views on blockchain technology however, we think Riot is a name that investors should avoid. We urge cautious investing to all.

**Disclosure:** I am/we are short RIOT. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it. I have no business relationship with any company whose stock is mentioned in this article.

**Additional disclosure:** Use of Hindenburg Research's research is at your own risk. In no event should Hindenburg Research or any affiliated party be liable for any direct or indirect trading losses caused by any information in this report. You further agree to do your own research and due diligence, consult your own financial, legal, and tax advisors before making any investment decision with respect to transacting in any securities covered herein. You should assume that as of the publication date of any short-biased report or letter, Hindenburg Research (possibly along with or through our members, partners, affiliates, employees, and/or consultants) along with our clients and/or investors has a short position in all stocks (and/or options of the stock) covered herein, and therefore stands to realize significant gains in the event that the price of any stock covered herein declines. Following publication of any report or letter, we intend to continue transacting in the securities covered herein, and we may be long, short, or neutral at any time hereafter regardless of our initial recommendation, conclusions, or opinions. This is not an offer to sell or a solicitation of an offer to buy any security, nor shall any security be offered or sold to any person, in any jurisdiction in which such offer would be unlawful under the securities laws of such jurisdiction. Hindenburg Research is not registered as an investment advisor in the United States or have similar registration in any other jurisdiction. To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. However, such information is presented "as is," without warranty of any kind – whether express or implied. Hindenburg Research makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. All expressions of opinion are subject to change without notice, and Hindenburg Research does not undertake to update or supplement this report or any of the information contained herein. Hindenburg Research and the terms, logos and marks included on this report are proprietary materials. Copyright in the pages and in the screens of this report, and in the information and material therein, is proprietary material owned by Hindenburg Research unless otherwise indicated. Unless otherwise noted, all information provided in this report is subject to copyright and trademark laws. Logos and marks contained in links to third party sites belong to their respective owners. All users may not reproduce, modify, copy, alter in any way, distribute, sell, resell, transmit, transfer, license, assign or publish such information.

Editor's Note: This article covers one or more microcap stocks. Please be aware of the risks associated with these stocks.

## Comments (194)

**Austin Wentzlaff**

Agreed. Thanks for putting this together. The only reason RIOT is rising right now is because they put "blockchain" in their name and nothing else. Reminds me of a pump and dump stock....

11 Dec 2017, 09:43 AM

Case 3:18-cv-02293-GC-RLS Document 140 Filed 10/22/19 Page 50 of 93 PageID: 4572

**colinmaclaren**

agree completely. and totally obvious. it's like under armour adding the word bitcoin to their name :-)

11 Dec 2017, 11:39 AM

# EXHIBIT D

# EXHIBIT D

Case 3:18-cv-02293-GC-RLS Document 149 Filed 10/22/19 Page 52 of 93 PageID: 4780

DEF 14A 1 riot_def14a.htm DEFINITIVE 14A

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## SCHEDULE 14A

### Proxy Statement Pursuant to Section 14(a) of the
### Securities Exchange Act of 1934

Filed by the Registrant [X]
Filed by a Party other than the Registrant [ ]

Check the appropriate box:

|  |  |  |
|---|---|---|
| [_] | Preliminary Proxy Statement | |
| [_] | **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))** | |
| [X] | Definitive Proxy Statement | |
| [_] | Definitive Additional Materials | |
| [_] | Soliciting Material Pursuant to Rule Sec.240.14a-12 | |

## RIOT BLOCKCHAIN, INC.
### (Name of Registrant as Specified In Its Charter)

### (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X]  No fee required

[_]  Fee computed on table below per Exchange Act Rules 14a-6(i) (1) and 0-11.

(1)  Title of each class of securities to which transaction applies:

(2)  Aggregate number of securities to which transaction applies:

(3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4)  Proposed maximum aggregate value of transaction:

(5)  Total fee paid:

[_]  Fee paid previously with preliminary materials:

[_]  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)  Amount previously paid:

(2)  Form, Schedule or Registration Statement No.:

(3)  Filing Party:

(4)  Date Filed:

**RIOT BLOCKCHAIN, INC.**
202 6th Street, Suite 401
Castle Rock, CO 80104
(303) 794-2000

Dear Shareholder,

      You are cordially invited to attend the 2017 Annual Meeting of Shareholders (the "Annual Meeting") of Riot Blockchain, Inc. to be held at 10:00 a.m. (local time) on December 28, 2017, aat the Boca Raton Resort and Club, 501 East Camino Real, Boca Raton, FL 33422. The attached notice of Annual Meeting and proxy statement describe the matters to be presented at the Annual Meeting and provide information about us that you should consider when you vote your shares.

      The principal business of the meeting will be (i) to elect as directors the nominees named in this proxy statement to serve until 2018 Annual Meeting of Shareholders and until their successors are duly elected and qualified, (ii) to ratify the appointment of EisnerAmper LLP as our independent public accountant for the fiscal year ending December 31, 2017, (iii) to advise us as to whether you approve the compensation of our named executive officers (Say-on-Pay), (iv) to approve an amendment to the Company's 2017 Equity Incentive Plan to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares and (v) to transact such other business as may be properly brought before the Annual Meeting and any adjournments thereof.

      We hope you will be able to attend the Annual Meeting. Whether you plan to attend the Annual Meeting or not, it is important that your shares are represented. Therefore, when you have finished reading the proxy statement, you are urged to complete, sign, date and return the enclosed proxy card promptly in accordance with the instructions set forth on the card. This will ensure your proper representation at the Annual Meeting, whether or not you can attend.

      Sincerely,

      *John O'Rourke*
      *President and Chief Executive Officer, Chairman*

**YOUR VOTE IS IMPORTANT.**
**PLEASE RETURN YOUR PROXY PROMPTLY.**

**RIOT BLOCKCHAIN, INC.**
202 6th Street, Suite 401
Castle Rock, CO 80104
(303) 794-2000

**NOTICE OF ANNUAL MEETING OF SHAREHOLDERS**
**To be Held December 28, 2017**

To the Shareholders of Riot Blockchain, Inc.:

NOTICE IS HEREBY GIVEN that the 2017 Annual Meeting of Shareholders (the "Annual Meeting") of Riot Blockchain, Inc., a Nevada corporation (the "Company"), will be held at 10:00 a.m. (local time) on December 28, 2017, or such later date or dates as such Annual Meeting date may be adjourned, at the Boca Raton Resort and Club, 501 East Camino Real, Boca Raton, FL 33422, for the purpose of considering and taking action on the following proposals:

1. Elect as directors the nominees named in the proxy statement;
2. To ratify the appointment of EisnerAmper LLP as our independent public accountant for the fiscal year ending December 31, 2017;
3. To advise us as to whether you approve the compensation of our named executive officers (Say-on-Pay);
4. To approve an amendment to the Company's 2017 Equity Incentive Plan to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares; and
5. To transact such other business as may be properly brought before the Annual Meeting and any adjournments thereof.

The foregoing business items are more fully described in the following pages, which are made part of this notice.

The Board recommends that you vote as follows:

- **"FOR"** for the election of the Board nominees as directors;
- **"FOR"** ratification of the selection of EisnerAmper LLP as our independent public accountant for our fiscal year ending December 31, 2017;
- **"FOR"** the compensation of our named executive officers as set forth in this proxy statement; and
- **"FOR"** an amendment to the Company's 2017 Equity Incentive Plan to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares.

You may vote if you were the record owner of the Company's common stock at the close of business on December 11, 2017. The Board of Directors of the Company has fixed the close of business on December 11, 2017 as the record date (the "Record Date") for the determination of shareholders entitled to notice of and to vote at the Annual Meeting and at any adjournments thereof.

As of the Record Date, there were 9,659,919 shares of common stock outstanding entitled to vote at the Annual Meeting. The foregoing shares are referred to herein as the "Shares." A list of shareholders of record will be available at the meeting and, during the 10 days prior to the meeting, at the office of the Secretary of the Company at 202 6th Street, Suite 401, Castle Rock, CO 80104.

All shareholders are cordially invited to attend the Annual Meeting. Whether you plan to attend the Annual Meeting or not, you are requested to complete, sign, date and return the enclosed proxy card as soon as possible in accordance with the instructions on the proxy card. A pre-addressed, postage prepaid return envelope is enclosed for your convenience.

By Order of the Board of Directors of Riot Blockchain, Inc.,

Sincerely,

John O' Rourke
*President and Chief Executive Officer, Chairman*

**YOUR VOTE AT THE ANNUAL MEETING IS IMPORTANT**

Your vote is important. Please vote as promptly as possible even if you plan to attend the Annual Meeting.

For information on how to vote your shares, please see the instruction from your broker or other fiduciary, as applicable, as well as "Information About the Meeting and Voting" in the proxy statement accompanying this notice.

We encourage you to vote by completing, signing, and dating the proxy card, and returning it in the enclosed envelope.

If you have questions about voting your shares, please contact our Corporate Secretary at Riot Blockchain, Inc., at 202 6th Street, Suite 401, Castle Rock, CO 80104, telephone number (303) 794-2000.

If you decide to change your vote, you may revoke your proxy in the manner described in the attached proxy statement/prospectus at any time before it is voted.

We urge you to review the accompanying materials carefully and to vote as promptly as possible. Note that we have enclosed with this notice a proxy statement.

**THE PROXY STATEMENT IS AVAILABLE AT: www.riotblockchain.com**

By Order of the Board of Directors,

Sincerely,

John O'Rourke
*President and Chief Executive Officer, Chairman*

---

**IMPORTANT NOTICE REGARDING THE AVAILABILITY OF PROXY MATERIALS FOR THE ANNUAL MEETING OF SHAREHOLDERS TO BE HELD ON DECEMBER 28, 2017 AT 10:00 A.M. LOCAL TIME.**

**The Notice of Annual Meeting of Shareholders and our Proxy Statement are available at:**
www.riotblockchain.com

---

**REFERENCES TO ADDITIONAL INFORMATION**

This proxy statement incorporates important business and financial information about Riot Blockchain, Inc. that is not included in or delivered with this document. You may obtain this information without charge through the Securities and Exchange Commission ("SEC") website (www.sec.gov) or upon your written or oral request by contacting the Chief Executive Officer, 202 6th Street, Suite 401, Castle Rock, CO 80104 or by calling (303) 794-2000.

**To ensure timely delivery of these documents, any request should be made no later than December 14, 2017 to receive them before the annual meeting.**

For additional details about where you can find information about Riot Blockchain, Inc., please see the section entitled "Where You Can Find More Information" in this proxy statement.

2

**Table of Contents**

|                                                                                                                                                   | Page |
| ------------------------------------------------------------------------------------------------------------------------------------------------- | ---- |
| GENERAL INFORMATION ABOUT THE ANNUAL MEETING                                                                                                       | 4    |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT                                                                                     | 8    |
| PROPOSAL 1:  ELECTION OF DIRECTORS                                                                                                                 | 9    |
| CORPORATE GOVERNANCE                                                                                                                               | 10   |
| CODE OF CONDUCT                                                                                                                                    | 14   |
| EXECUTIVE OFFICERS AND MANAGEMENT                                                                                                                  | 15   |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS                                                                                                     | 15   |
| EXECUTIVE COMPENSATION                                                                                                                             | 16   |
| PROPOSAL 2:  RATIFICATION OF APPOINTMENT OF INDEPENDENT PUBLIC ACCOUNTANT                                                                          | 20   |
| PROPSOAL 3: ADVISORY VOTE TO APPROVE THE COMPENSATION OF OUR NAMED EXECUTIVE OFFICERS                                                              | 21   |
| PROPOSAL 4: TO APPROVE AN AMENDMENT TO THE COMPANY'S 2017 EQUITY INCENTIVE PLAN TO INCREASE THE RESERVATION OF COMMON STOCK FOR ISSUANCE THEREUNDER TO 1,645,000 SHARES FROM 895,000 SHARES | 22   |
| OTHER MATTERS                                                                                                                                      | 25   |

3

**Audit Committee**

The Audit Committee is responsible for, among other things:

- appointing; approving the compensation of; overseeing the work of; and assessing the independence, qualifications, and performance of the independent auditor;
- reviewing the internal audit function, including its independence, plans, and budget;
- approving, in advance, audit and any permissible non-audit services performed by our independent auditor;
- reviewing our internal controls with the independent auditor, the internal auditor, and management;
- reviewing the adequacy of our accounting and financial controls as reported by the independent auditor, the internal auditor, and management;
- overseeing our financial compliance system; and
- overseeing our major risk exposures regarding the Company's accounting and financial reporting policies, the activities of our internal audit function, and information technology.

The Audi Committee has reviewed and discussed the Company's audited financial statements for the year ended December 31, 2016 with management of the Company and has discussed with EisnerAmper LLP the matters required to be discussed by the statement on Auditing Standards No. 61, as amended, as adopted by the Public Company Accounting Oversight Board in Rule 3200T.

The Board has affirmatively determined that each member of the Audit Committee meets the additional independence criteria applicable to audit committee members under SEC rules and the Stock Market Rules. The Board of Directors has adopted a written charter setting forth the authority and responsibilities of the Audit Committee. The Board has affirmatively determined that Eric So meets the qualifications of an Audit Committee financial expert. The Company's Audit Committee currently consists of the following members: Andrew Kaplan, Eric So and Jason Les. Mr. So serves as Chairman of the Audit Committee.

### REPORT OF THE AUDIT COMMITTEE

To the Board of Directors of Riot Blockchain, Inc.

Management is responsible for our internal controls and the financial reporting process. The independent accountants are responsible for performing an independent audit of our financial statements in accordance with generally accepted auditing standards and to issue a report on our financial statements. Our responsibility is to monitor and oversee those processes. We hereby report to the Board of Directors that, in connection with the financial statements for the year ended December 31, 2016, we have:

- reviewed and discussed the audited financial statements with management and the independent accountants;
- approved the appointment of the independent accountants;
- discussed with the independent accountants the matters required to be discussed by SAS 61 (Codification of Statements on Auditing Standards, AU section 380), as modified by SAS 89 and SAS 90; and
- received the written disclosures and the letter from the independent accountants required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the Audit Committee concerning independence, and discussed with the independent accountant the accountant's independence.

Based on the discussions and our review discussed above, we recommended to the Board of Directors that the audited financial statements for the year ended December 31, 2016 be included in the Company's 2016 Annual Report to Shareholders on Form 10-K for that fiscal year.

Respectfully submitted,
The Audit Committee of Riot Blockchain, Inc.
Jason Les
Andrew Kaplan
Eric So

12

**Compensation Committee**

The Compensation Committee is responsible for, among other things:

- reviewing and making recommendations to the Board with respect to the compensation of our officers and directors, including the CEO;
- overseeing and administering the Company's executive compensation plans, including equity-based awards;
- negotiating and overseeing employment agreements with officers and directors; and
- overseeing how the Company's compensation policies and practices may affect the Company's risk management practices and/or risk-taking incentives.

The Board has adopted a written charter setting forth the authority and responsibilities of the Compensation Committee.

When evaluating the compensation of our executive officers, the Compensation Committee evaluates factors including the executive's responsibilities, experience and the competitive marketplace. The Compensation Committee may also invite the senior executives and other members of management to participate in their deliberations, or to provide information to the Compensation Committee for its consideration with respect to such deliberations, except that the Chief Executive Officer may not be present for the deliberation of or the voting on compensation for the Chief Executive Officer. The Chief Executive Officer may, however, be present for the deliberation of or the voting on compensation for any other officer.

The Compensation Committee has authority to retain such compensation consultants, outside counsel and other advisors as the Compensation Committee in its sole discretion deems appropriate. The Compensation Committee did not retain any such advisor for 2016. The Compensation Committee held six meetings and took two actions by written consent during the year ended December 31, 2016.The Company's Compensation Committee currently consists of the following members: Andrew Kaplan, Eric So and Jason Les. Mr. Les serves as Chairman of the Compensation Committee. The Board has affirmatively determined that each member of the Compensation Committee meets the additional independence criteria applicable to compensation committee members under SEC rules and the Stock Market Rules.

**Nominating and Corporate Governance Committee**

The Nominating and Corporate Governance Committee, among other things, is responsible for:

- reviewing and assessing the development of the executive officers, and considering and making recommendations to the Board regarding promotion and succession issues;
- evaluating and reporting to the Board on the performance and effectiveness of the directors, committees, and the Board as a whole;
- working with the Board to determine the appropriate and desirable mix of characteristics, skills, expertise, and experience, including diversity considerations, for the full Board and each committee;
- annually presenting to the Board a list of individuals recommended to be nominated for election to the Board;
- reviewing, evaluating, and recommending changes to the Company's Corporate Governance Principles and committee Charters;
- recommending to the Board individuals to be elected to fill vacancies and newly created directorships;
- overseeing the Company's compliance program, including the Code of Conduct; and
- overseeing and evaluating how the Company's corporate governance and legal and regulatory compliance policies and practices, including leadership, structure, and succession planning, may affect the Company's major risk exposures.

The Board of Directors has adopted a written charter setting forth the authority and responsibilities of the Corporate Governance/Nominating Committee. The Company's Nominating and Corporate Governance Committee currently consists of the following members: Andrew Kaplan, Eric So and Jason Les. Mr. Kaplan serves as Chairman of the Nominating and Corporate Governance Committee.

**Consideration of Director Nominees**

As specified in our Corporate Governance Principles, we seek directors with the highest standards of ethics and integrity, sound business judgment, and the willingness to make a strong commitment to the Company and its success. The Nominating and Corporate Governance Committee works with the Board on an annual basis to determine the appropriate and desirable mix of characteristics, skills, expertise, and experience for the full Board and each committee, taking into account both existing directors and all nominees for election as directors, as well as any diversity considerations and the membership criteria reflected in the Corporate Governance Principles. The Nominating and Corporate Governance Committee and the Board, which do not have a formal diversity policy, consider diversity in a broad sense when evaluating board composition and nominations; and they seek to include directors with a diversity of experience, professions, viewpoints, skills, and backgrounds that will enable them to make significant contributions to the Board and the Company, both as individuals and as part of a group of directors. The Board evaluates each individual in the context of the full Board, with the objective of recommending a group that can best contribute to the success of the business and represent shareholder interests through the exercise of sound judgment. In determining whether to recommend a director for re-election, the Nominating and Corporate Governance Committee also considers the director's attendance at meetings and participation in and contributions to the activities of the Board and its committees.

The Nominating and Corporate Governance Committee will consider director candidates recommended by shareholders, and its process for considering such recommendations is no different than its process for screening and evaluating candidates suggested by directors, management of the Company, or third parties.

**Corporate Governance Matters**

We are committed to maintaining strong corporate governance practices that benefit the long-term interests of our shareholders by providing for effective oversight and management of the Company. Our governance policies, including our Corporate Governance Principles, Code of Conduct, and Committee Charters can be found on our website at *www.riotblockchain.com* by following the link to "Investors" and then to "Governance."

The Nominating and Corporate Governance Committee regularly reviews our Corporate Governance Principles, Code of Conduct, and Committee Charters to ensure that they take into account developments at the Company, changes in regulations and listing requirements, and the continuing evolution of best practices in the area of corporate governance.

The Board conducts an annual self-evaluation in order to assess whether the directors, the committees, and the Board are functioning effectively.

**Code of Conduct**

Our Code of Conduct (the "Code"), which was amended and restated as of October 2017, applies to the Company's employees, directors, officers, contractors, consultants, and persons performing similar functions ("Covered Persons"). This includes our CEO and Chairman, our CFO, and our controller/treasurer. We require that they avoid conflicts of interest, comply with applicable laws, protect Company assets, and conduct business in an ethical and responsible manner and in accordance with the Code. The Code prohibits employees from taking unfair advantage of our business partners, competitors, and employees through manipulation, concealment, misuse of confidential or privileged information, misrepresentation of material facts, or any other practice of unfair dealing or improper use of information. The Code requires employees to comply with all applicable laws, rules, and regulations wherever in the world we conduct business. This includes applicable laws on privacy and data protection, anti-corruption and anti-bribery, and trade sanctions. Our Code was amended and restated in October 2017 to better reflect our expanding global operations and diverse employee base, enhance its clarity and general readability, and to make other stylistic changes to more closely align the Code with our overall brand. Our Code is publicly available and can be found on our website at *www.riotblockchain.com* by following the link to "Investors" and then to "Governance."

If we make substantive amendments to the Code, or grant any waiver, including any implicit waiver, from a provision of the Code to our CEO and Chairman, CFO, controller/treasurer, and any of our other officers, financial professionals, and persons performing similar functions, we will disclose the nature of such amendment or waiver on our website or in a report filed with the SEC on Form 8-K.

14

**Communications with the Board of Directors**

Shareholders and other parties may communicate directly with the Board of Directors or the relevant board member by addressing communications to:

> Riot Blockchain, Inc.
> c/o Corporate Secretary
> 202 6th Street, Suite 401
> Castle Rock, CO 80104

All shareholder correspondence will be compiled by our corporate secretary and forwarded as appropriate.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934 requires the Company's directors, executive officers, and shareholders who own more than 10% of the Company's stock to file forms with the SEC to report their ownership of the Company's stock and any changes in ownership. The Company assists its directors and executives by identifying reportable transactions of which it is aware and preparing and filing the forms on their behalf. All persons required to file forms with the SEC must also send copies of the forms to the Company. We have reviewed all forms provided to us. Based on that review and on written information given to us by our executive officers and directors, we believe that all Section 16(a) filings during the past fiscal year were filed on a timely basis and that all directors, executive officers and 10% beneficial owners have fully complied with such requirements during the past fiscal year.

**Certain Relationships and Related Transactions**

The Audit Committee has responsibility for reviewing and, if appropriate, for approving any related party transactions that would be required to be disclosed pursuant to applicable SEC rules. This includes current or proposed transactions in which the Company was or is to be a participant, the amount involved exceeds the lower of either $120,000 or 1% of the average of the Company's total assets at year-end for the last two completed fiscal years, and in which any of the Company's executive officers, directors, or greater than five percent shareholders, or any members of their immediate families, has a direct or indirect material interest. Apart from any transactions disclosed herein, no such transaction was entered into with any director or executive officer during the last fiscal year. Such transactions will be entered into only if found to be in the best interest of the Company and approved in accordance with the Company's Code of Ethics, which are available on the Company's web site.

Except for the employment agreements previously entered into between the Company and certain of its named executive officers, since January 1, 2016, none of the directors or named executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its common stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company.

## EXECUTIVE OFFICERS AND MANAGEMENT

The following persons are our executive officers and hold the offices set forth opposite their names.

| Name | Age | Principal Occupation | Officer Since |
|------|-----|----------------------|---------------|
| John R. O'Rourke | 32 | Chief Executive Officer, President and Chairman | 2017 |
| Jeffrey G. McGonegal | 66 | Chief Financial Officer | 2003 |

**John R. O'Rourke**. The biography of Mr. O'Rourke is contained in the information disclosures relating to the Company's nominees for director.

**Jeffrey G. McGonegal** became Chief Financial Officer of the Company in June 2003, was appointed Corporate Secretary in January 2010 and served as interim President in December 2004 and January 2005. Mr. McGonegal served from 2003 to January 1, 2011 as Chief Financial Officer of PepperBall Technologies, Inc. Until his resignation in September 2013, Mr. McGonegal served on a limited part-time basis as Senior Vice President — Finance of Cambridge Holdings, Ltd., a small publicly held company with limited business activities. Mr. McGonegal served as Chief Financial Officer of Bactolac Pharmaceutical, Inc. and had been associated with its predecessors through October 2006, a company (publicly held until September 2006) engaged in manufacturing and marketing of vitamins and nutritional supplements. From 1974 to 1997, Mr. McGonegal was an accountant with BDO Seidman LLP. While at BDO Seidman LLP, Mr. McGonegal served as Managing Partner of the Denver, Colorado office. Until his resignation in March 2012, Mr. McGonegal was elected in 2005 to serve on the board of Imagenetix, Inc., a publicly held company in the nutritional supplements industry. He received a B.A. degree in accounting from Florida State University.

# EXHIBIT E

# EXHIBIT E

DEF 14A 1 riot_def14a.htm DEFINITIVE 14A

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## SCHEDULE 14A

### Proxy Statement Pursuant to Section 14(a) of the
### Securities Exchange Act of 1934

Filed by the Registrant [X]
Filed by a Party other than the Registrant [ ]

Check the appropriate box:

       [_]      Preliminary Proxy Statement

       [_]      **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

       [X]      Definitive Proxy Statement

       [_]      Definitive Additional Materials

       [_]      Soliciting Material Pursuant to Rule Sec.240.14a-12

### RIOT BLOCKCHAIN, INC.
### (Name of Registrant as Specified In Its Charter)

### (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X]   No fee required

[_]   Fee computed on table below per Exchange Act Rules 14a-6(i) (1) and 0-11.

(1)   Title of each class of securities to which transaction applies:

(2)   Aggregate number of securities to which transaction applies:

(3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4)   Proposed maximum aggregate value of transaction:

(5)   Total fee paid:

[_]   Fee paid previously with preliminary materials:

[_]   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)   Amount previously paid:

(2)   Form, Schedule or Registration Statement No.:

(3)  Filing Party:

(4)  Date Filed:

## RIOT BLOCKCHAIN, INC.

202 6th Street, Suite 401

Castle Rock, CO 80104

(303) 794-2000

Dear Shareholder,

You are cordially invited to attend the 2017 Annual Meeting of Shareholders (the "Annual Meeting") of Riot Blockchain, Inc. to be held at 10:00 a.m. (local time) on May 9, 2018, at 7725 W Reno Ave, Oklahoma City, OK 73127. The attached notice of Annual Meeting and proxy statement describe the matters to be presented at the Annual Meeting and provide information about us that you should consider when you vote your shares.

The principal business of the meeting will be (i) to elect as directors the nominees named in this proxy statement to serve until the 2018 Annual Meeting of Shareholders and until their successors are duly elected and qualified, (ii) to ratify the appointment of MNP LLP as our independent public accountant for the fiscal year ending December 31, 2017, (iii) to advise us as to whether you approve the compensation of our named executive officers (Say-on-Pay), (iv) to approve an amendment to the Company's 2017 Equity Incentive Plan to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares and (v) to transact such other business as may be properly brought before the Annual Meeting and any adjournments thereof.

We hope you will be able to attend the Annual Meeting. Whether you plan to attend the Annual Meeting or not, it is important that your shares are represented. Therefore, when you have finished reading the proxy statement, you are urged to complete, sign, date and return the enclosed proxy card promptly in accordance with the instructions set forth on the card. This will ensure your proper representation at the Annual Meeting, whether or not you can attend. We were forced to adjourn this meeting on two occasions due to an inability to obtain a quorum, and strongly encourage shareholders to vote their shares is it relates to this adjourned Annual Meeting.

Sincerely,

*John O'Rourke*
*Chairman and Chief Executive Officer*

**YOUR VOTE IS IMPORTANT.**
**PLEASE RETURN YOUR PROXY PROMPTLY.**

**RIOT BLOCKCHAIN, INC.**

202 6th Street, Suite 401

Castle Rock, CO 80104(303) 794-2000

**NOTICE OF ANNUAL MEETING OF SHAREHOLDERS**

**To be Held May 9, 2018**

To the Shareholders of Riot Blockchain, Inc.:

NOTICE IS HEREBY GIVEN that the 2017 Annual Meeting of Shareholders (the "Annual Meeting") of Riot Blockchain, Inc., a Nevada corporation (the "Company"), will be held at 10:00 a.m. (local time) on May 9, 2018, or such later date or dates as such Annual Meeting date may be adjourned, at 7725 W Reno Ave, Oklahoma City, OK 73127, for the purpose of considering and taking action on the following proposals:

1.  Elect as directors the nominees named in the proxy statement;
2.  To ratify the appointment of MNP LLP as our independent public accountant for the fiscal year ending December 31, 2017;
3.  To advise us as to whether you approve the compensation of our named executive officers (Say-on-Pay);
4.  To approve an amendment to the Company's 2017 Equity Incentive Plan to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares; and
5.  To transact such other business as may be properly brought before the Annual Meeting and any adjournments thereof.

The foregoing business items are more fully described in the following pages, which are made part of this notice.

The Board recommends that you vote as follows:

- "**FOR**" for the election of each of the Board nominees as directors;
- "**FOR**" ratification of the selection of MNP LLP as our independent public accountant for our fiscal year ending December 31, 2017;
- "**FOR**" the compensation of our named executive officers as set forth in this proxy statement; and
- "**FOR**" an amendment to the Company's 2017 Equity Incentive Plan to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares.

You may vote if you were the record owner of the Company's common stock at the close of business on March 22, 2018. The Board of Directors of the Company has fixed the close of business on March 22, 2018 as the record date (the "Record Date") for the determination of shareholders entitled to notice of and to vote at the Annual Meeting and at any adjournments thereof.

As of the Record Date, there were 13,177,615 shares of common stock outstanding entitled to vote at the Annual Meeting. The foregoing shares are referred to herein as the "Shares." A list of shareholders of record will be available at the meeting and, during the 10 days prior to the meeting, at the office of the Secretary of the Company at 202 6th Street, Suite 401, Castle Rock, CO 80104.

**All shareholders are cordially invited to attend the Annual Meeting. Whether you plan to attend the Annual Meeting or not, so that we can ensure your vote will be counted, you are requested to complete, sign, date and return the enclosed proxy card as soon as possible in accordance with the instructions on the proxy card or vote via**

**Internet or telephone according to the instructions on the proxy card. Shareholders attending the meeting may vote in person even if they have previously returned proxy cards.. A pre-addressed, postage prepaid return envelope is enclosed for your convenience. Shareholders attending the meeting may vote in person even if they have previously returned proxy cards**.

By Order of the Board of Directors of Riot Blockchain, Inc.,

Sincerely,

John O' Rourke
*Chairman and Chief Executive Officer*

**YOUR VOTE AT THE ANNUAL MEETING IS IMPORTANT**

Your vote is important. Please vote as promptly as possible even if you plan to attend the Annual Meeting.

For information on how to vote your shares, please see the instruction from your broker or other fiduciary, as applicable, as well as "Information About the Meeting and Voting" in the proxy statement accompanying this notice.

We encourage you to vote by completing, signing, and dating the proxy card, and returning it in the enclosed envelope.

If you have questions about voting your shares, please contact our Corporate Secretary at Riot Blockchain, Inc., at 202 6th Street, Suite 401, Castle Rock, CO 80104, telephone number (303) 794-2000.

If you decide to change your vote, you may revoke your proxy in the manner described in the attached proxy statement/prospectus at any time before it is voted.

We urge you to review the accompanying materials carefully and to vote as promptly as possible. Note that we have enclosed with this notice a proxy statement.

**THE PROXY STATEMENT IS AVAILABLE AT: www.RiotBlockchain.com**

By Order of the Board of Directors,

Sincerely,

John O'Rourke
*Chairman and Chief Executive Officer*

---

**IMPORTANT NOTICE REGARDING THE AVAILABILITY OF PROXY MATERIALS FOR THE ANNUAL MEETING OF SHAREHOLDERS TO BE HELD ON MAY 9, 2018 AT 10:00 A.M. LOCAL TIME.**

**The Notice of Annual Meeting of Shareholders and our Proxy Statement are available at:**
www.RiotBlockchain.com

---

## REFERENCES TO ADDITIONAL INFORMATION

This proxy statement incorporates important business and financial information about Riot Blockchain, Inc. that is not included in or delivered with this document. You may obtain this information without charge through the Securities and Exchange Commission ("SEC") website (www.sec.gov) or upon your written or oral request by contacting the Chief Executive Officer, 202 6th Street, Suite 401, Castle Rock, CO 80104 or by calling (303) 794-2000.

For additional details about where you can find information about Riot Blockchain, Inc., please see the section entitled "Where You Can Find More Information" in this proxy statement.

2

**Table of Contents**

| | Page |
|---|---|
| GENERAL INFORMATION ABOUT THE ANNUAL MEETING | 4 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 9 |
| PROPOSAL 1: ELECTION OF DIRECTORS | 10 |
| CORPORATE GOVERNANCE | 11 |
| CODE OF CONDUCT | 15 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 16 |
| EXECUTIVE OFFICERS AND MANAGEMENT | 17 |
| EXECUTIVE COMPENSATION | 18 |
| PROPOSAL 2: RATIFICATION OF APPOINTMENT OF INDEPENDENT PUBLIC ACCOUNTANT | 23 |
| PROPSOAL 3: ADVISORY VOTE TO APPROVE THE COMPENSATION OF OUR NAMED EXECUTIVE OFFICERS | 26 |
| PROPOSAL 4: TO APPROVE AN AMENDMENT TO THE COMPANY'S 2017 EQUITY INCENTIVE PLAN TO INCREASE THE RESERVATION OF COMMON STOCK FOR ISSUANCE THEREUNDER TO 1,645,000 SHARES FROM 895,000 SHARES | 27 |
| OTHER MATTERS | 30 |

3

**Audit Committee**

The Audit Committee is responsible for, among other things:

- appointing; approving the compensation of; overseeing the work of; and assessing the independence, qualifications, and performance of the independent auditor;
- reviewing the internal audit function, including its independence, plans, and budget;
- approving, in advance, audit and any permissible non-audit services performed by our independent auditor;
- reviewing our internal controls with the independent auditor and management;
- reviewing the adequacy of our accounting and financial controls as reported by the independent auditor and management;
- overseeing our financial compliance system; and
- overseeing our major risk exposures regarding our accounting and financial reporting policies, the activities of our internal audit function, and information technology.

The Audi Committee has reviewed and discussed the Company's audited financial statements for the year ended December 31, 2016 with management of the Company and has discussed with EisnerAmper LLP the matters required to be discussed by the statement on Auditing Standards No. 61, as amended, as adopted by the Public Company Accounting Oversight Board in Rule 3200T.

The Board has affirmatively determined that each member of the Audit Committee meets the additional independence criteria applicable to audit committee members under SEC rules and the Stock Market Rules. The Board of Directors has adopted a written charter setting forth the authority and responsibilities of the Audit Committee. The Board has affirmatively determined that Remo Mancini meets the qualifications of an Audit Committee financial expert. The Company's Audit Committee currently consists of the following members: Andrew Kaplan, Remo Mancini and Jason Les. Mr. Mancini serves as Chairman of the Audit Committee.

## REPORT OF THE AUDIT COMMITTEE

To the Board of Directors of Riot Blockchain, Inc.

Management is responsible for our internal controls and the financial reporting process. The independent accountants are responsible for performing an independent audit of our financial statements in accordance with generally accepted auditing standards and to issue a report on our financial statements. Our responsibility is to monitor and oversee those processes. We hereby report to the Board of Directors that, in connection with the financial statements for the year ended December 31, 2016, we have:

- reviewed and discussed the audited financial statements with management and the independent accountants;
- approved the appointment of the independent accountants;
- discussed with the independent accountants the matters required to be discussed by SAS 61 (Codification of Statements on Auditing Standards, AU section 380), as modified by SAS 89 and SAS 90; and
- received the written disclosures and the letter from the independent accountants required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the Audit Committee concerning independence, and discussed with the independent accountant the accountant's independence.

Based on the discussions and our review discussed above, we recommended to the Board of Directors that the audited financial statements for the year ended December 31, 2016 be included in the Company's 2016 Annual Report to Shareholders on Form 10-K for that fiscal year.

Respectfully submitted,

The Audit Committee of Riot Blockchain, Inc.

Remo Mancini

Jason Les

Andrew Kaplan

13

## Compensation Committee

The Compensation Committee is responsible for, among other things:

- reviewing and making recommendations to the Board with respect to the compensation of our officers and directors, including the CEO;
- overseeing and administering the Company's executive compensation plans, including equity-based awards;
- negotiating and overseeing employment agreements with officers and directors; and
- overseeing how the Company's compensation policies and practices may affect the Company's risk management practices and/or risk-taking incentives.

The Board has adopted a written charter setting forth the authority and responsibilities of the Compensation Committee.

When evaluating the compensation of our executive officers, the Compensation Committee evaluates factors including the executive's responsibilities, experience and the competitive marketplace. The Compensation Committee may also invite the senior executives and other members of management to participate in their deliberations, or to provide information to the Compensation Committee for its consideration with respect to such deliberations, except that the Chief Executive Officer may not be present for the deliberation of or the voting on compensation for the Chief Executive Officer. The Chief Executive Officer may, however, be present for the deliberation of or the voting on compensation for any other officer.

The Compensation Committee has authority to retain such compensation consultants, outside counsel and other advisors as the Compensation Committee in its sole discretion deems appropriate. The Compensation Committee did not retain any such advisor for 2016. The Compensation Committee held six meetings and took two actions by written consent during the year ended December 31, 2016.The Company's Compensation Committee currently consists of the following members: Andrew Kaplan, Remo Mancini and Jason Les. Mr. Les serves as Chairman of the Compensation Committee. The Board has affirmatively determined that each member of the Compensation Committee meets the additional independence criteria applicable to compensation committee members under the Stock Market Rules.

## Nominating and Corporate Governance Committee

The Nominating and Corporate Governance Committee, among other things, is responsible for:

- reviewing and assessing the development of the executive officers, and considering and making recommendations to the Board regarding promotion and succession issues;
- evaluating and reporting to the Board on the performance and effectiveness of the directors, committees, and the Board as a whole;
- working with the Board to determine the appropriate and desirable mix of characteristics, skills, expertise, and experience, including diversity considerations, for the full Board and each committee;
- annually presenting to the Board a list of individuals recommended to be nominated for election to the Board;
- reviewing, evaluating, and recommending changes to the Company's Corporate Governance Principles and committee Charters;
- recommending to the Board individuals to be elected to fill vacancies and newly created directorships;
- overseeing the Company's compliance program, including the Code of Conduct; and
- overseeing and evaluating how the Company's corporate governance and legal and regulatory compliance policies and practices, including leadership, structure, and succession planning, may affect the Company's major risk exposures.

The Board of Directors has adopted a written charter setting forth the authority and responsibilities of the Corporate Governance/Nominating Committee. The Company's Nominating and Corporate Governance Committee currently consists of the following members: Andrew Kaplan, Remo Mancini and Jason Les. Mr. Kaplan serves as Chairman of the Nominating and Corporate Governance Committee.

14

**Consideration of Director Nominees**

As specified in our Corporate Governance Principles, we seek directors with the highest standards of ethics and integrity, sound business judgment, and the willingness to make a strong commitment to the Company and its success. The Nominating and Corporate Governance Committee works with the Board on an annual basis to determine the appropriate and desirable mix of characteristics, skills, expertise, and experience for the full Board and each committee, taking into account both existing directors and all nominees for election as directors, as well as any diversity considerations and the membership criteria reflected in the Corporate Governance Principles. The Nominating and Corporate Governance Committee and the Board, which do not have a formal diversity policy, consider diversity in a broad sense when evaluating board composition and nominations; and they seek to include directors with a diversity of experience, professions, viewpoints, skills, and backgrounds that will enable them to make significant contributions to the Board and the Company, both as individuals and as part of a group of directors. The Board evaluates each individual in the context of the full Board, with the objective of recommending a group that can best contribute to the success of the business and represent shareholder interests through the exercise of sound judgment. In determining whether to recommend a director for re-election, the Nominating and Corporate Governance Committee also considers the director's attendance at meetings and participation in and contributions to the activities of the Board and its committees.

The Nominating and Corporate Governance Committee will consider director candidates recommended by shareholders, and its process for considering such recommendations is no different than its process for screening and evaluating candidates suggested by directors, our management, or third parties.

**Corporate Governance Matters**

We are committed to maintaining strong corporate governance practices that benefit the long-term interests of our shareholders by providing for effective oversight and management of the Company. Our governance policies, including our Corporate Governance Principles, Code of Conduct, and Committee Charters can be found on our website at *www.riotblockchain.com* by following the link to "Investors" and then to "Governance."

The Nominating and Corporate Governance Committee regularly reviews our Corporate Governance Principles, Code of Conduct, and Committee Charters to ensure that they take into account developments at the Company, changes in regulations and listing requirements, and the continuing evolution of best practices in the area of corporate governance.

The Board conducts an annual self-evaluation in order to assess whether the directors, the committees, and the Board are functioning effectively.

**Code of Conduct**

Our Code of Conduct (the "Code"), which was amended and restated as of October 2017, applies to our employees, directors, officers, contractors, consultants, and persons performing similar functions ("Covered Persons"). This includes our CEO and Chairman, our CFO, and our controller/treasurer. We require that they avoid conflicts of interest, comply with applicable laws, protect our assets, and conduct business in an ethical and responsible manner and in accordance with the Code. The Code prohibits employees from taking unfair advantage of our business partners, competitors, and employees through manipulation, concealment, misuse of confidential or privileged information, misrepresentation of material facts, or any other practice of unfair dealing or improper use of information. The Code requires employees to comply with all applicable laws, rules, and regulations wherever in the world we conduct business. This includes applicable laws on privacy and data protection, anti-corruption and anti-bribery, and trade sanctions. Our Code was amended and restated in October 2017 to better reflect our expanding operations and employee base, enhance its clarity and general readability, and to make other stylistic changes to more closely align the Code with our overall brand. Our Code is publicly available and can be found on our website at *www.riotblockchain.com* by following the link to "Investors" and then to "Governance."

If we make substantive amendments to the Code, or grant any waiver, including any implicit waiver, from a provision of the Code to our CEO and Chairman, CFO, controller/treasurer, and any of our other officers, financial

professionals, and persons performing similar functions, we will disclose the nature of such amendment or waiver on our website or in a report filed with the SEC on Form 8-K.

15

**Communications with the Board of Directors**

Shareholders and other parties may communicate directly with the Board of Directors or the relevant board member by addressing communications to:

Riot Blockchain, Inc.
c/o Corporate Secretary
202 6th Street, Suite 401
Castle Rock, CO 80104

All shareholder correspondence will be compiled by our corporate secretary and forwarded as appropriate.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934 requires the Company's directors, executive officers, and shareholders who own more than 10% of the Company's stock to file forms with the SEC to report their ownership of the Company's stock and any changes in ownership. The Company assists its directors and executives by identifying reportable transactions of which it is aware and preparing and filing the forms on their behalf. All persons required to file forms with the SEC must also send copies of the forms to the Company. We have reviewed all forms provided to us. Based on that review and on written information given to us by our executive officers and directors, we believe that all Section 16(a) filings during the past fiscal year were filed on a timely basis and that all directors, executive officers and 10% beneficial owners have fully complied with such requirements during the past fiscal year.

**Certain Relationships and Related Transactions**

The Audit Committee has responsibility for reviewing and, if appropriate, for approving any related party transactions that would be required to be disclosed pursuant to applicable SEC rules. This includes current or proposed transactions in which we were or are to be a participant, the amount involved exceeds the lower of either $120,000 or 1% of the average of our total assets at year-end for the last two completed fiscal years, and in which any of our executive officers, directors, or greater than five percent shareholders, or any members of their immediate families, has a direct or indirect material interest. Apart from any transactions disclosed herein, no such transaction was entered into with any director or executive officer during the last fiscal year. Such transactions will be entered into only if found to be in the best interest of the Company and approved in accordance with the Company's Code of Ethics, which are available on our web site.

Except for the employment agreements previously entered into between us and certain of our named executive officers, since January 1, 2016, none of our directors or named executive officers, nor any person who owned of record or was known to own beneficially more than 5% of the  outstanding shares of our common stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect us.

16

# EXHIBIT F

# EXHIBIT F

10-K 1 riot_10k-123117.htm FORM 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2017**
or

☐ **TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from            to

**Commission file number** 001-33675

# RIOT BLOCKCHAIN, INC.

(Exact name of registrant as specified in its charter)

| **Nevada** | **84-155336** |
|---|---|
| (State or other jurisdiction of Incorporation or organization) | (I.R.S. Employer Identification No.) |

| **202 6th Street, Suite 401** | |
| **Castle Rock, CO** | **80104** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code **(303) 794-2000**

Securities registered under Section 12(b) of the Exchange Act:

| **Common Stock no par value per share** | **The NASDAQ Stock Market LLC** |
|---|---|
| (Title of class) | (Name of each exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Exchange Act: None.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Note - Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Exchange Act from their obligations under those Sections.

Indicate by check mark whether the registrant (1) filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was

required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers in response to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendments to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company=. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                      Accelerated filer ☐

Non-accelerated filer ☐                                      Smaller reporting company ☒
(Do not check if a smaller reporting
company)

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [_]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐  No ☒

As of June 30, 2017, the aggregate market value of the common stock, no par value, held by non-affiliates of the registrant, based on the closing sale price of the common stock, no par value per share was approximately $21.9 million.

As of April 13, 2018, the registrant had 13,417,132 shares of common stock outstanding.

DOCUMENTS INCORPORATED BY REFERENCE List hereunder the following documents if incorporated by reference and the Part of the Form 10-K (e.g., Part I, Part II, etc.) into which the document is incorporated: (1) Any annual report to security holders; (2) Any proxy or information statement; and (3) Any prospectus filed pursuant to Rule 424(b) or (c) under the Securities Act of 1933.

Not applicable.

# RIOT BLOCKCHAIN, INC.
## INDEX TO ANNUAL REPORT ON FORM 10-K

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business. | 2 |
| Item 1A. | Risk Factors. | 9 |
| Item 1B. | Unresolved Staff Comments. | 31 |
| Item 2. | Properties. | 31 |
| Item 3. | Legal Proceedings. | 32 |
| Item 4. | Mine Safety Disclosures | 32 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities. | 33 |
| Item 6. | Selected Financial Data. | 34 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations. | 34 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk. | 40 |
| Item 8. | Financial Statements and Supplementary Data. | 40 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure. | 75 |
| Item 9A. | Controls and Procedures. | 75 |
| Item 9B. | Other Information. | 76 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance. | |
| Item 11. | Executive Compensation. | 77 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters. | 77 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence. | 77 |
| Item 14. | Principal Accountant Fees and Services. | 77 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules. | 77 |

1

The Company is currently not a party to any other legal proceedings, the adverse outcome of which would, in the Company's opinion, have a material adverse effect on our business, financial condition and results of operations.

On April 9, 2018, the Company received a subpoena requesting document from the U.S. Securities and Exchange Commission. We intend to fully cooperate with the SEC inquiry.

As part of its review of the Company's public filings, the Securities and Exchange Commission ("SEC") has inquired about certain of the Company's assets' classification as, and amount of, possible Investment Company assets. The Company is responding to the SEC's inquiries. Should an ultimate determination be made that the Company was or is an inadvertent Investment Company, it could have an impact on the Company's decision to hold certain assets and / or the Company's financial reporting. The Company's position is that it was or is not subject to the Investment Company regulations.

**Note 13. Related Party Transactions**:

Per Schedules 13D filed with the Securities and Exchange Commission, each of Barry Honig (together with other group members) and Catherine Johanna DeFrancesco beneficially owned greater than 10% of the dispositive and voting power of the Company's common stock. Mr. Honig reported beneficial ownership of approximately 11.2% of the Company's common stock as of January 5, 2017 and Ms. DeFrancesco reported beneficial ownership of approximately 11.45% of the Company's common stock as of January 10, 2017. Mr. Honig invested $1,750,000 in the March 2017 Convertible Note Private Placement (see Note 7). GRQ Consultants, Inc., a related party of Mr. Honig, received a cash payment of $50,000 for diligence services in connection with the Company's investment in Coinsquare (see Note 4). Each of Mr. Honig and Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company (see Note 2), with Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned approximately 6.3% of Kairos. Each of Mr. Honig and Ms. DeFrancesco invested in the December 2017 Common Share Private Placement, with Mr. Honig investing $500,000 and Ms. DeFrancesco investing $360,000 (see Note 7).

**Note 14. Subsequent Events**:

*Bitcoin Auction*

In January 2018, through a sealed bid auction conducted by the U.S. Marshals Service, the Company acquired 500 bitcoins for approximately $5,625,000.

*Asset Purchase Agreement with Prive Technologies LLC*

On February 21, 2018, the Company and Kairos Global Technology Inc., a wholly-owned subsidiary of the Company ("Kairos"), completed an asset purchase under an agreement (the "Prive Purchase Agreement") with Prive Technologies LLC ("Prive"), on behalf of certain persons and entities who owned certain bitcoin mining machines and related equipment (the "Prive Equipment"). Pursuant to the Purchase Agreement, the aggregate consideration for the Prive Equipment consisted of (i) Eleven Million Dollars ($11,000,000) and (ii) One Million (1,000,000) shares of the Company's common stock, no par value per share (the " Prive Shares"). Upon closing of the transaction, and pursuant to the terms of the Purchase Agreement, Kairos became the owner of the Prive Equipment and other assets used for the mining of cryptocurrency, including, but not limited to, 3,800 Bitmain AntMiner S9s.

Mr. Michael Ho and Mr. Bryan Pascal were selling shareholders of Prive, with Mr. Ho owning approximately 24.8% of Prive and Mr. Pascal owning approximately 18.4% of Prive, at the time of its acquisition by the Company. In November 2017, at the time of the Kairos acquisition, (see Note 2), Mr. Ho and Mr. Pascal became Series B Preferred Shareholders of the Company having owned approximately 10.7% and 5.7%, respectively of Kairos at the time of its acquisition by the Company.

Prive Shares were deposited into an escrow account with an escrow agent to be held in escrow as provided in an escrow agreement. Under this escrow agreement, the escrowed Prive Shares will be released to the Sellers upon the later of August 21, 2018 and the date on which the Company and Kairos have generated Net Cash Flow (as defined in the Prive Purchase Agreement) of at least Ten Million Dollars ($10,000,000) from the Prive Equipment. If the Escrow Shares have not been released to the Sellers on or before February 21, 2020, then these escrowed Prive Shares shall be returned to the Company for cancellation.

The Company has commenced an evaluation of the financial reporting for this transaction considering the provisions of FASB ASU 2017-01, Business Combinations (Topic 805). The assessment is preliminary and subject to additional evaluation, with the transaction expected to be accounted for as an acquisition of assets based on the estimated fair value as of the acquisition date.

### Asset Purchase Agreement with Blockchain Mining Supply & Services Ltd.

On February 21, 2018, the Company completed an asset purchase under an agreement (the "BMSS Purchase Agreement") with Blockchain Mining Supply & Services Ltd. ("BMSS"), which owned 3,000 AntMiner S9 bitcoin mining machines (the "BMSS Equipment"). Pursuant to the BMSS Purchase Agreement, the Company purchased the BMSS Equipment for aggregate consideration of Eight Million Five Hundred Thousand Dollars ($8,500,000).

Seven Million Dollars ($7,000,000) of the purchase price was paid at closing. The remaining One Million Five Hundred Thousand Dollars ($1,500,000) of the purchase price shall be payable on the earlier of August 20, 2018 and such time when the BMSS Equipment becomes operational.

### Ingenium International LLC Consulting Agreement.

On February 21, 2018, the Company entered into a Consulting Agreement with Ingenium International LLC (the "Consultant") to provide consulting services related to the Company's business for a 12-month period. Certain members of the Consultant were also affiliated with Prive. Pursuant to the Consulting Agreement Consultant's services are defined as follows: complete the installation and deployment of 8,000+ ASIC cryptocurrency miners, which included the Prive Equipment and the BMSS Equipment; assist in managing and monitoring the operation of the 8,000+ cryptocurrency miners on an ongoing basis; promptly responding to and troubleshooting any issues as they arise in the management and monitoring of the operations; continuing the buildout of up to 40 Megawatts of energy capacity, with the ultimate goal to secure the power and build the location for up to 80 Megawatts of energy capacity; and to make strategic introductions to other cryptocurrency business opportunities and contacts in the sector. In connection with the Consulting Agreement the Company made a lump sum payment of $4,000,000 to the Consultant.

Mr. Michael Ho and Mr. Bryan Pascal are controlling principals of Ingenium International LLC. As disclosed in this Note 14 above and Note 2, Mr. Ho and Mr. Pascal are shareholders in the Company by virtue of the previous Kairos and Prive transactions.

73

*Oklahoma Lease Agreement.*

On February 27, 2018, Kairos ("Tenant") entered into a lease agreement (the "Lease") with 7725 Reno #1, LLC (the "Landlord"), pursuant to which the Tenant leases an approximately 107,600 square foot warehouse located in Oklahoma City, Oklahoma, including improvements thereon. Pursuant to the terms of the Lease, the initial term of one year terminates on February 15, 2019, unless terminated earlier pursuant to the terms of the Lease, subject to the Tenant's options to renew the Lease. Tenant has four one-year renewal options that may be exercised so long as Tenant is not in default, subject to increases in base rent. Tenant has the right to operate from the premises on a 24 hour/seven day a week basis. At least three months, but no more than six months, prior to the expiration of the initial Lease term or renewal term, as applicable, Tenant shall give Landlord written notice of its intent to exercise the applicable renewal option, which also includes incremental payment for additional electric capacity delivery. If Tenant does not elect to exercise a renewal option, all remaining renewal options, if any, shall terminate.

Base rent for the premises during the first 12 months is equal to $55.95/kW per month for a total of 4 Megawatts (MW) of available electrical power, or $223,800 per month. Base rent is calculated based upon the monthly electrical power made available to Tenant within the premises, and not based on Tenant's actual usage. In connection with the Lease, Parent has provided a limited guarantee of Tenant's failure to make payment of base rent or additional rent pursuant to the Lease. As soon as practicable after the effective date of the Lease, Landlord, at Landlord's expense, agreed to provide additional 12.5 kV transformer equipment to increase the electrical power available for Tenant's use by an additional 2MW, which will result in additional rent of $55.12/kW for the additional 2MW of power when it is made available. Provided that Tenant is not in default under the Lease beyond any applicable notice and cure periods, Tenant may request Landlord to further increase the electrical power available, in increments from 6.01 MW up to 12.0 MW, by giving written notice to Landlord of the requested increase. Landlord, at Landlord's expense, would then provide an additional 12.5kV of electrical transforming equipment to increase the electrical power available for Tenant's use by the additional MW requested by Tenant. Effective as of the date the additional power is made available to Tenant, base rent will increase by an amount equivalent to the additional MW requested by Tenant multiplied by $55.12 per kW. If Tenant exercises all of its renewal options, then the base rent for the first 4MW of available power would increase to $57.63 per kW in year two, $59.36 per kW in year three, $61.14 per kW in year four and $62.97 per kW in year five. In each case, available power of greater than 4MW and up to 12MW would result in base rent of $55.12 per kW.

On March 26, 2018, Kairos entered into a first amendment to the above lease (the "Lease Amendment"), whereby 7725 Reno agreed to increase the electrical power available for Kairos's use from 6MW to 12MW, and the base rent under the lease was increased to approximately $665,760 per month, effective as of the date when such additional power is available.

*Kairos Operations and Equipment Status.*

During January 2018 certain infrastructure deficiencies in the Kairos short-term rented facility in Quebec, Canada became more problematic. Kairos noted that due to storm water leakage into the facility, servers consisting of 90 AntMiner S9s and 29 AntMiner L3s had visible evidence of exposure to water. These servers were taken off line and Kairos is currently investigating the extent of possible damage and functionality of the 119 servers. Kairos has notified the landlord regarding a possible claim for damage and loss. While the extent of the damage, if in fact the units are damaged, has not been determined or quantified, the total fair value cost of the servers was approximately $426,000. Kairos' ability to recover all or any portion of the damage and loss, should the servers in fact be damaged or unusable, has not been determined.

As a result of the issues with the Kairos original rented facility and the subsequent execution of the lease of the approximate 107,600 square foot warehouse located in Oklahoma City, Oklahoma Lease with 7725 Reno #1, LLC, as discussed above, Kairos determined to take all 1,200 of the servers acquired in the Kairos November 3, 2017, acquisition off-line in Canada and relocate them to the new facility. This was completed in March 2018 for all of the servers except the 119 servers that showed visible signs of damage, which are still being evaluated at the facility in Quebec, Canada.

*Acquisition of Logical Brokerage Corp.*

On March 26, 2018, the Company entered into and closed a stock purchase agreement (the "Logical Brokerage Purchase Agreement") between the Company and Mark Bradley Fisher (the "Logical Brokerage Seller"). Pursuant to the Logical Brokerage Purchase Agreement, the Company purchased from the Logical Brokerage Seller 9.25 shares of Logical Brokerage Corp. ("Logical Brokerage"), representing 92.5% of the outstanding capital stock of Logical Brokerage, for a

cash purchase price of $600,000. Logical Brokerage, a futures introducing broker headquartered in Miami, FL is registered with the Commodity Futures Trading Commission, or CFTC, and a member of the National Futures Association, or NFA. As of the date of these financial statements the initial accounting for the business combination with Logical Brokerage is incomplete and the Company is currently not able to provide additional financial disclosures, including pro forma information, that might be required.

In connection with the closing of the Logical Brokerage Purchase Agreement, on March 26, 2018, the Company entered into a stockholders' agreement (the "Stockholders Agreement") with Logical Brokerage and Mark Bradley Fisher. The Stockholders Agreement provides, among other things, that, subject to certain exceptions, the Logical Brokerage Seller may not transfer any of his remaining shares of Logical Brokerage without the written consent of the Company. The Stockholders Agreement also provides that, subject to certain exceptions, in the event the Company proposes to transfer 35% or more of Logical Brokerage's total issued and outstanding capital stock, the Logical Brokerage Seller will be entitled to certain "tag-along" rights.

*Corporate Lease Agreement.*

On April 9, 2018 the Company entered into a commercial lease covering 1,694 rentable square feet of office space in Fort Lauderdale, FL, with a third-party. The lease is for an initial term of thirty-nine months, with one five-year option to renew. The lease requires initial monthly rent of approximately $7,000, including base rent and associated operating expenses.

74

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf on April 17, 2018 by the undersigned thereunto duly authorized.

**RIOT BLOCKCHAIN, INC.**

/s/ John O'Rourke
_____
John O'Rourke,
Chief Executive Officer

/s/ Robby Chang
_____
Robby Chang,
Chief Financial Officer

/s/ Jeffrey G McGonegal
_____
Jeffrey G. McGonegal,
Principal Accounting Officer

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints each of John O'Rourke and Robby Chang as true and lawful attorney-in-fact and agent, with full power of substitution and re-substitution, for them and in their name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission (the "SEC"), and generally to do all such things in their names and behalf in their capacities as officers and directors to enable the Company to comply with the provisions of the Securities Exchange Act of 1934 and all requirements of the SEC, granting unto each said attorney-in-fact and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he or she might or could do in person, ratifying and confirming all that said attorney-in-fact and agent, or their or his or her substitutes or substitute, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant on April 17, 2018 in the capacities indicated.

/s/ John O'Rourke
_____
John O'Rourke,
Chief Executive Officer and Director (principal executive officer)

/s/ Robby Chang
_____
Robby Chang, Chief Financial Officer

/s/ Jeffrey G. McGonegal
_____
Jeffrey G. McGonegal, Principal Financial Officer

/s/ Remo Mancini
_____
Remo Mancini, Director

/s/ Andrew Kaplan
_____
Andrew Kaplan, Director

/s/ Jason Les
_____

Jason Les, Director

# EXHIBIT G

# EXHIBIT G

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 8-K

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported): January 4, 2018**

# Riot Blockchain, Inc.

**(Exact name of Registrant as specified in its charter)**

| Nevada | 001-33675 | 84-155337 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

| 202 6th Street, Suite 401 Castle Rock, CO | 80104 |
|---|---|
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code:**      **(303) 545-5550**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ _ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ _ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ _ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ _ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b2 of the Securities Exchange Act of 1934 (§240.12b2 of this chapter).

Emerging growth company [ _ ]

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [ _ ]

Case 3:18-cv-02293-GC-RLS Document 149 Filed 10/22/19 Page 92 of 93 PageID: 4820

## Item 4.01 Changes in Registrant's Certifying Accountant

### (a) Dismissal of EisnerAmper LLP

On January 4, 2018, Riot Blockchain, Inc. (the "Registrant" or the "Company") dismissed EisnerAmper LLP ("EisnerAmper") as its independent registered public accounting firm.

The report of EisnerAmper on the Company's financial statements for the fiscal year ended December 31, 2016 did not contain any adverse opinion or disclaimer of opinion, nor was it qualified or modified as to audit scope or accounting principles. The report did include an explanatory paragraph relating to auditing the adjustments to the 2015 financial statements to retrospectively reflect the reverse stock split.

During the period of EisnerAmper's engagement as the Company's independent registered public accounting firm from February 3, 2017 through January 4, 2018 (the "Engagement Period"), there were no disagreements as defined in Item 304 of Regulation S-K with EisnerAmper on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of EisnerAmper, would have caused it to make reference in connection with any opinion to the subject matter of the disagreement. Further, during the Engagement Period, there were no reportable events (as defined in Item 304(a)(1)(v) of Regulation S-K).

In accordance with Item 304(a)(3) of Regulation S-K, we provided EisnerAmper with a copy of this Report prior to its filing with the SEC and requested EisnerAmper to furnish the Registrant with a letter addressed to the SEC, stating whether or not it agrees with the statements made by the Company herein in response to Item 304(a) of Regulation S-K as the same pertain to EisnerAmper and, if not, stating the respect in which it does not agree. A copy of EisnerAmper's letter confirming its agreement with the disclosures in this Item 401 is attached as Exhibit 16.1 to this Form 8-K.

### (b) Engagement of MNP LLP

On January 5, 2018, the Company engaged MNP LLP ("MNP"), an independent registered public accounting firm which is registered with, and governed by the rules of, the Public Company Accounting Oversight Board, as our independent registered public accounting firm. During our two most recent fiscal years through December 31, 2016, and the subsequent interim period through January 4, 2018 neither us nor anyone on our behalf consulted MNP regarding either (1) the application of accounting principles to a specified transaction regarding us, either completed or proposed, or the type of audit opinion that might be rendered on our financial statements; or (2) any matter regarding us that was either the subject of a disagreement (as defined in Item 304(a)(1)(iv) of Regulation S-K and related instructions to Item 304 of Regulation S-K) or a reportable event (as defined in Item 304(a)(1)(v) of Regulation S-K).

## Item 9.01 Financial Statements and Exhibits

(d) Exhibits

16.1      Letter from EisnerAmper LLP, dated January 5, 2018.

Case 3:18-cv-02293-GC-RLS Document 149 Filed 10/22/19 Page 93 of 93 PageID: 4821

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Riot Blockchain, Inc.
(Registrant)

January 5, 2018                    By:    /s/ Jeffrey G. McGonegal
                                          Name:     Jeffrey G. McGonegal
                                          Title:    Chief Financial Officer