# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated, | : | Civil Action No.: 18-2293(FLW)(TJB) |
| | : | |
| *Plaintiff*, | : | |
| | : | **LEAD PLAINTIFF'S OMNIBUS** |
| v. | : | **MEMORANDUM OF LAW IN** |
| | : | **OPPOSITION TO DEFENDANTS DAI,** |
| RIOT BLOCKCHAIN, INC. F/K/A, | : | **GROUSSMAN, AND STETSON'S** |
| BIOPTIX, INC., JOHN O'ROURKE, and | : | **MOTIONS TO DISMISS THE** |
| JEFFREY G. MCGONEGAL, | : | **CORRECTED AMENDED** |
| | : | **CONSOLIDATED CLASS ACTION** |
| *Defendants*. | : | **COMPLAINT** |
| | : | |

**LITE DEPALMA GREENBERG**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for Dr. Stanley Golovac
and Lead Counsel for the Class*

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ................................................................................. 1

II.  STATEMENT OF FACTS .................................................................................... 3

    A.  Dai's Deceptive Acts in Furtherance of the Pump-and-Dump Scheme ........... 4

        1.  Dai's Prior Connections with the DeFrancescos, O'Rourke, Stetson, Jonathan Honig, and Other Members of the Honig Group .................. 4

        2.  January 2017 – Honig and DeFrancesco Appoint Dai to the Board, Which Commences a "Review[] of Possible Strategic Alternatives" .... 5

        3.  March 2017 – Dai and the Board Approve Two Private Placements of Discounted Securities to Honig and the Honig Group ...................... 6

        4.  April-September 2017 – Dai Signs Riot's Materially False and Misleading Securities Registration Statements ........................................ 6

        5.  October 4, 2017 – Dai and the Board Approve the Company's Change to "Riot Blockchain," Special Dividend, and Coinsquare Transaction ......................................................................................... 7

        6.  November 1-3, 2017 – Riot Enters Into the Wasteful Related-Party Kairos Transaction; Dai and Beeghley Both Immediately Resign ........ 8

    B.  Groussman's Deceptive Acts in Furtherance of the Pump-and-Dump Scheme ........................................................................................................... 9

        1.  Groussman's Prior Relationship with the Honig Group ......................... 9

        2.  Groussman Violated His Duty to Timely Disclose His Ownership and Material Transactions of the Company's Stock ........................... 9

        3.  Groussman's Deceptive Conduct Facilitated Defendants' Fraudulent Scheme to Manipulate the Price of the Company's Stock ........................................................................................................ 12

    C.  Stetson's Deceptive Acts in Furtherance of the Pump-and-Dump Scheme .... 12

        1.  Stetson's Prior Relationship with the Honig Group ........................... 12

        2.  Stetson's Deceptive Conduct Facilitated Defendants' Fraudulent Scheme to Manipulate the Price of the Company's Stock .................. 14

III.  ARGUMENT ................................................................................................... 15

    A.  The Complaint Adequately Alleges Claims Against Defendant Dai for Misleading Statements and Omissions and Deceptive and Manipulative Conduct in Violation of Section 10(b) and Rules 10b-5(a), (b), and (c) .......... 15

        1.  Defendant Dai Signed Riot's Materially False and Misleading Securities Registration Statements that Denied and Concealed the Honig Group's "Material Relationship" with the Company ............... 15

        2.  Defendant Dai Engaged in Manipulative and Deceptive Conduct ...... 19

        3.  The Complaint Raises a Strong Inference of Defendant Dai's Scienter .................................................................................................. 20

**B.** **The Complaint Adequately Alleges a Claim Against Defendant Groussman for Engaging in Manipulative and Deceptive Conduct in Violation of Section 10(b) and Rules 10b-5(a) and (c)** ....................................**22**

**C.** **The Complaint Adequately Alleges a Claim Against Defendant Stetson for Engaging in Manipulative and Deceptive Conduct in Violation of Section 10(b) and Rules 10b-5(a) and (c)** ...........................................................**26**

**D.** **Defendant Dai's "Market Efficiency" Arguments Are Premature and Demonstrably Incorrect** ........................................................................**27**

**E.** **The Complaint Adequately Pleads Loss Causation**...........................................**30**

**IV.** **CONCLUSION** ........................................................................................................ **30**

# TABLE OF AUTHORITIES

### CASES

*Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008) .......... 21

*Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331 (D.N.J. 2018) ................................................ 30

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ...................................................... 27, 29, 30

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
    No. CIV.A. 12-5275, 2015 WL 5097883 (D.N.J. Aug. 31, 2015) .......................................... 27

*CMG Worldwide, Inc. v. Glaser*, No. 1:14-CV-00928-RLY, 2015 WL 133742
    (S.D. Ind. Jan. 9, 2015) ............................................................................................................. 4

*de la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250 (S.D.N.Y. 2003) ............................ 25

*Fischer v. Ocwen Loan Servicing, LLC*, No. CV-14-94-BLG-SPW-CSO,
    2014 WL 6685987 (D. Mont. Nov. 25, 2014) ....................................................................... 16

*GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) ........................................... 22

*Hayes v. Gross*, 982 F.2d 104 (3d Cir. 1992) .............................................................................. 28

*Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259 (N.D. Cal. 2011) ................................................ 28

*Howard v. Everex Sys., Inc.*, 228 F.3d 1057 (9th Cir. 2000) ....................................................... 16

*In re DVI Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008) ........................................ 29

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002) ....... 25

*In re Initial Public Offering Securities Litigation*, 260 F.R.D. 81 (S.D.N.Y. 2009) ................... 29

*In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584 (N.D. Cal. 2009) ................................. 28

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447 (S.D.N.Y. 2014) ....... 21

*In re Luxottica Grp. S.p.A., Sec. Litig.*, 293 F. Supp. 2d 224 (E.D.N.Y. 2003) ........................... 23

*In re Merck & Co., Inc., Vytorin/Zetia Sec. Litig.*, No. CIV.A. 08-2177 DMC,
    2012 WL 4482041 (D.N.J. Sept. 25, 2012) ........................................................................... 30

*In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002) ..................................................... 4, 5

*In re Openwave Sec. Litig.*, 582 F. Supp. 2d 236 (S.D.N.Y. 2007) ............................................... 5

*In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480 (D. Del. 2001) .................................................. 16

*In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................... 21

*In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010 (N.D. Ohio 2000) ..................................... 21

*Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615 (D.N.J. 2003) (J. Wolfson) ........................... 22

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ......................................................... 27, 28

*Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v.
    Regions Financial Corp.*, 762 F.3d 1248 (11th Cir. 2014) .................................................... 29

*Marcus v. J.C. Penney Co., Inc.*, No. 6:13-CV-736, 2017 WL 907996
    (E.D. Tex. Mar. 8, 2017) ......................................................................................................... 28

*O'Neil v. Appel*, 165 F.R.D. 479 (W.D. Mich. 1995) ................................................................. 29

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) ................................................................ 4

*SEC v. Desai*, 145 F. Supp. 3d 329 (D.N.J. 2015) ........................................................ 26

*SEC v. Megalli*, No. 1:13-CV-3783-AT, 2015 WL 13021472 (N.D. Ga. Dec. 15, 2015)............ 21

*SEC v. Teo*, No. CIV.A. 04-1815 (SDW), 2009 WL 1684467 (D.N.J. June 12, 2009).......... 10, 23

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017)........................................................ 26

*Serfaty v. International Automated Systems, Inc.*, 180 F.R.D. 418 (D. Utah 1998) ..................... 29

*Stepnes v. Ritschel*, No. CV 08-5296 (ADM/JJK), 2010 WL 11646709
   (D. Minn. Mar. 1, 2010).................................................................................... 16

*Stoyas v. Toshiba Corp.*, 896 F.3d 933 (9th Cir. 2018) ..................................................... 4

*Strougo v. Barclays PLC*, 105 F. Supp. 3d 330 (S.D.N.Y. 2015)................................................. 25

*Tanzanian Royalty Expl. Corp. v. Crede CG III, Ltd.*, No. 18 CIV. 4201 (LGS),
   2019 WL 1368570 (S.D.N.Y. Mar. 26, 2019) ............................................... 11, 26

*Telenor E. Invest AS v. Altimo Holdings & Investments Ltd.*, 567 F. Supp. 2d 432
   (S.D.N.Y. 2008)................................................................................................ 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................................. 4

*The Winer Family Tr. v. Queen*, No. CIV.A. 03-4318, 2004 WL 2203709
   (E.D. Pa. Sept. 27, 2004) .................................................................................. 29

*Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650 (D.N.J. 2009) ........................................ 22

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)............................................................ 23

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*, No. 13 Civ. 6057(PAC),
   2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014)......................................................... 24

*Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019) ................................ 30

*Walsh v. Chittenden Corp.*, 798 F. Supp. 1043 (D. Vt. 1992) ..................................................... 29

**STATUTES**

15 U.S.C. § 78m(d) ........................................................................................................ 11

**OTHER AUTHORITIES**

William Shakespeare, *Much Ado About Nothing* ...................................................................... 19

**REGULATIONS**

17 C.F.R. § 229.404 ...................................................................................................... 11

17 C.F.R. § 240.13d–1 .................................................................................................. 10

17 C.F.R. § 240.13d-2 ................................................................................................... 26

17 C.F.R. § 240.13d-2(a) .............................................................................................. 11

Court-appointed Lead Plaintiff Dr. Stanley Golovac ("Plaintiff") respectfully submits this omnibus memorandum of law in opposition to the motions to dismiss filed by Defendants Mike Dai, Mark Groussman, and John Stetson.[1]

## I.    PRELIMINARY STATEMENT

The Complaint alleges that each of the Individual Defendants – including Defendants Dai, Groussman, and Stetson – participated, together with approximately 20 affiliated investors (the "Honig Group," ¶ 79), in a classic "pump-and-dump" scheme at Riot that mirrors the same *modus operandi* uncovered by the SEC at several other publicly traded companies, namely to (1) covertly amass a controlling interest in Riot; (2) conceal their control through materially false SEC filings and disclosure violations; (3) drive up the price and trading volume of Riot stock through false and misleading promotional campaign and fraudulent related-party transactions at the expense of the Company and its shareholders; and (4) dump their shares into the artificially inflated market on unsuspecting retail investors.

Defendants Dai, Groussman, and Stetson each chose to play a material role in this scheme by affirmatively engaging in deceptive and manipulative acts that facilitated and furthered the

---

[1] Capitalized terms herein have the same meanings as in the Corrected Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF No. 73), paragraphs of which are cited herein as "¶ __." The memoranda of Defendants Groussman, Dai, and Stetson (ECF Nos. 131-1, 132-1, 134-1) are cited herein as "Groussman Br. __," "Dai Br. __," and "Stetson Br. __," respectively. The Riot Blockchain Defendants' memorandum (ECF No. 107-1) is cited herein as "Riot Br. __." Defendant Honig's memorandum is cited herein as "Honig Br. __." Plaintiff's prior October 1, 2019 omnibus memorandum in opposition to the other defendants' motions to dismiss (ECF No. 136) ("Plaintiff's Prior Brief") is cited herein as "Pl.'s Br. __." References to "Ex. __" are to the Exhibits to the accompanying Declaration of Joseph J. DePalma in Support of Lead Plaintiff's Omnibus Memorandum of Law in Opposition to Defendants Dai, Groussman, and Stetson's Motions to Dismiss the Corrected Amended Class Action Complaint. Plaintiff incorporates by reference the arguments made in Plaintiff's Prior Brief. All emphasis is added and internal quotations and citations are omitted, unless otherwise noted.

fraud on Riot's public investors.  Having reaped millions of dollars in ill-gotten gains, they cannot be heard to complain now that their participation in the scheme has been revealed.

Defendant Dai – a chartered public accountant – accepted appointment to the Board by Defendants DeFrancesco and Honig based on Dai's prior business connections to Defendant DeFrancesco's husband, Andrew DeFrancesco, including since 2014 as co-executive and co-director with Mr. DeFrancesco of Santa Maria Petroleum Inc. ("Santa Maria"), a company whose "controlling" shareholders included Defendant Stetson, Jonathan Honig, and several other relatives of Defendant DeFrancesco.  Once appointed in 2016 to the Bioptix Board, Dai participated in the Board's decision to transform the Company into a purported cryptocurrency operation – as confirmed by Defendant Honig in his brief.  *See* Honig Br. 6-7.  As a director of Riot, Dai also approved Riot's private placement of discount shares to the Honig Group; approved Riot's special dividend; personally signed each of Riot's four misleading 2017 Forms S-3/A; and approved Riot's related-party transactions involving Coinsquare and Kairos.  Tellingly, Dai resigned the ***same day*** that the Company entered into the egregiously wasteful Kairos transaction; the very next day, Beeghley also resigned as CEO (to be replaced as CEO by O'Rourke).

Defendant Groussman also had longstanding connections with the Honig Group.  The SEC described Groussman as a "microcap fraudster" and charged him with stock manipulation at several other public companies.  Groussman recently settled those charges for a total of nearly $1.5 million and a five-year ban from participating in penny-stock offerings.  Groussman was also involved in similar wrongdoing at Riot.  He was one of the Honig Group's largest investors in the Company, eventually holding – and without timely disclosing, as required by law – over 9% of the Company's common stock.  As a "Selling Stockholder" during the Class Period, Groussman

2

reaped significant profits through his role in the manipulative scheme while concealing his stock sales from the market.

Defendant Stetson, another long-term ally of Honig and his associates (who shared an office with Honig, Groussman, and O'Rourke), has also been implicated by the SEC in pump-and-dump schemes at other public companies, and is a defendant in the *Honig* Action. Stetson was also involved in the fraud at Riot from the start, as one of the pawns Honig put up as a candidate for the Venaxis Board of Directors and then as a 4.99% shareholder. Stetson was also a "Selling Stockholder" in the Company's securities registrations during the Class Period, which allowed him to reap millions of dollars in profits as a beneficiary of Defendants' fraudulent scheme.

In response to Plaintiff's well-pled allegations, each Defendant has moved to dismiss. Many of their arguments are merely reprisals or variations or the same meritless contentions that Plaintiff has already put to rest in his prior briefing. The one significant new argument, made by Defendant Dai – that the Complaint does not adequately "plead facts" proving that Riot's securities traded in an efficient market – is merely an attempt to distract the Court from his participation in the wrongdoing. The Court can dispense with this argument summarily because it is premature at this stage of the litigation (on a Rule 12(b)(6) motion to dismiss) and instead is an issue properly before the Court upon a Rule 23 motion for class certification. Indeed, not a single other defendant has advanced such an argument.

## II.    STATEMENT OF FACTS

Plaintiff incorporates by reference the Statement of Facts in Plaintiff's Prior Brief. *See* Pl.'s Br. 3-25. The following facts are also relevant to Defendants Dai, Groussman, and Stetson.

A. **Dai's Deceptive Acts in Furtherance of the Pump-and-Dump Scheme**

1. **Dai's Prior Connections with the DeFrancescos, O'Rourke, Stetson, Jonathan Honig, and Other Members of the Honig Group**

Before joining Riot's Board of Directors, Defendant Dai already had established business ties with Defendant DeFrancesco's husband, Andrew, and other relatives, as well as Defendants O'Rourke and Stetson, Jonathan Honig, and other members of the Honig Group. Specifically, as of December 1, 2016, Dai "serve[d] as chief financial officer and Director of Santa Maria Petroleum Inc. (TSXV:SMQ.H) a position he ha[d] held since 2014," according to Defendant Honig's SEC filing nominating Dai to the Bioptix Board. Ex. 1 at 2-3.[2]

Dai became CFO and a Director of Santa Maria on May 22, 2014, the same day that Andrew DeFrancesco became Santa Maria's "President and CEO." Ex. 2 at 1.[3]

On December 2, 2016, Santa Maria filed an OTCQB Certification with the OTC Markets stock exchange.[4]  *See* Ex. 4.[5]  According to Santa Maria's OTCQB  Certification, the following

---

[2] As Defendant Dai acknowledges in his motion, "[t]he Court may take judicial notice of materials such as . . . filings with the SEC on a Motion to Dismiss." Dai Br. 1 n.2 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)); *see also In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (affirming court's decision to take judicial notice "documents filed with the SEC, but not relied upon in the Complaint"); *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (holding that courts may take judicial notice of SEC filings in ruling on a motion to dismiss).

[3] A Form D filed by Santa Maria with the SEC on October 7, 2016, and signed by Dai as "Chief Financial Officer," confirms that both Dai and Mr. DeFrancesco were "Executive Officer[s]" and "Director[s]" of that company. Ex. 3 at 2, 7.

[4] The "OTC Markets Group" is "an 'SEC regulated' and 'SEC-registered' alternative trading system" that operates an "over-the-counter market." *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 946 (9th Cir. 2018) ("tak[ing] judicial notice" that the "OTC Markets Group" is on "the [SEC's] list of registered alternative trading systems").

[5] Like materials filed with the SEC, Santa Maria's OTCQB Certification is the proper subject of judicial notice because it is analogous to a regulatory filing of the sort regularly judicially noticed by federal courts and because there is no legitimate basis to dispute its authenticity. *See CMG Worldwide, Inc. v. Glaser*, No. 1:14-CV-00928-RLY, 2015 WL 133742, at *1 (S.D. Ind. Jan. 9, 2015) (taking judicial notice of a "company profile downloaded from OTC Markets . . . because

individuals and entities were "control persons [who] are beneficial owners of more than five percent (5%) of any class of [Santa Maria's] equity securities)":  ATG Capital (i.e., O'Rourke, ¶ 34) (6.7%); GT Capital (Andrea DeFrancesco) (10%); Jonathan Honig (*see* ¶ 50) (6.8%); Stetson Capital Management, LLC (i.e., Defendant Stetson, ¶ 71) (6%); and Sunnybrook Preemie Investments Inc. (Carmella DeFrancesco) (5.3%).[6]  In other words, Defendant Dai was the CFO and director of the same company – Santa Maria – that Defendant DeFrancesco's husband was also the President, CEO, and a director, and whose control-person shareholders included Defendants O'Rourke and Stetson (through ATG and Stetson Capital) and Honig Group member Jonathan Honig, and Selling Stockholder Carmella DeFrancesco.  Ex. 4 at 1-2; *see also* ¶¶ 34, 50, 71.  Moreover, Santa Maria's OTCQB Certification was "prepared by . . . Mike Dai, CFO" and "Andrew DeFrancesco, CEO" and was signed by "/s/ MIKE DAI" as "Certifying . . . CFO."  *Id.*[7]

### 2.    January 2017 – Honig and DeFrancesco Appoint Dai to the Board, Which Commences a "Review[] of Possible Strategic Alternatives"

After being nominated to the Board by Honig and DeFrancesco in December 2016, ¶¶ 135-38,[8] Defendant Dai was appointed to the Board (alongside O'Rourke and Beeghley) on January 6,

---

the document was a "public record[] . . . 'whose accuracy cannot reasonably be questioned.'"); *see also NAHC*, 306 F.3d at 1331.

[6] "Sunnybrook Preemie Investments Inc." was a "Selling Stockholder" in the January 5 and February 7, 2018 Forms S-3/A.  ¶¶ 309, 322 (publicly offering 23,332 shares of common stock).

[7] Contrary to Groussman's arguments that "events pre-dating the Class Period have no bearing on Plaintiff's claim here," Groussman Br. 16-17, courts recognize that "the inference of scienter extends from [defendants'] pre-class period [conduct] into the class period during which the fraud is alleged to have continued," *In re Openwave Sec. Litig.*, 582 F. Supp. 2d 236, 250 (S.D.N.Y. 2007).

[8] According to Honig's December 1, 2016 letter, filed with the SEC, nominating Defendant Dai to the Company's Board of Directors, "Dai is a Chartered Public Accountant and Chartered Financial Analyst with experience working in a variety of audit, advisory, M&A and valuation engagements."  Ex. 1 at 3.  Dai "has been involved in a number of public and private market transactions, including business acquisitions and reverse takeovers, both domestically and internationally."  *Id.*

2017, ¶ 29; *see also* Ex. 5.  Then, on January 20, 2017, Riot issued a press release announcing that the reconstituted Board – now including Dai, O'Rourke, and Beeghley – had "immediately adopted a plan to discontinue the BiOptix business, instituted a significant workforce reduction . . . , and commenced a new strategic review of potential business alternatives."  Honig Br. 6-7 (noting that the "reconstituted . . . Board settled upon a new direction for the Company" by "becom[ing]" a "cryptocurrency business"); *see also* Ex. 6.

### 3.    March 2017 – Dai and the Board Approve Two Private Placements of Discounted Securities to Honig and the Honig Group

On March 16, 2017, the Company's Board – including Dai – adopted resolutions approving the private placement of $7,000,000 of convertible notes and warrants priced at a 30 percent discount to the market.  ¶ 140; *see also* Ex. 7 at 3.1 ("the Board . . . adopted the following resolutions").  Defendant Honig privately bought at least $2.25 million of the notes.  ¶ 148.  Other Honig Group members – including Stetson and Titan – also received notes and warrants in the March 2017 Private Placements.  ¶¶ 143, 145.  The shares acquired by the Honig Group through conversion of the notes and warrants issued to them in the March 2017 Private Placements were later registered and offered for sale in the four S-3 registration statements filed between April and September 2017.  ¶¶ 142-45.

### 4.    April-September 2017 – Dai Signs Riot's Materially False and Misleading Securities Registration Statements

On April 20, 2017, July 19, 2017, August 24, 2017, and September 25, 2017, Riot filed four separate Securities Registration Statements on Form S-3/A.  ¶¶ 210-14, 220-24, 225-29, 230-34.  Each Form S-3/A was signed by Defendant Dai (as well as by Defendants Beeghley, McGonegal, and O'Rourke).  *Id.*; *see also* Ex. 8 at II-4; Ex. 9 at II-4; Ex. 10 at 21; Ex. 11 at 21.  As alleged in the Complaint (and discussed at length in Plaintiff's Prior Brief), each "Form S-3/A

was materially false and misleading by stating that 'none' of the selling stockholders 'has had a material relationship' with the Company when in fact . . . Defendant Honig and various members of the Honig Group maintained numerous financial ties to Defendant O'Rourke, a Bioptix Board member during this time, Defendant [Beeghley], then Bioptix's CEO."  ¶¶ 212, 222, 226, 232. One example of these material ties is a company called PolarityTE, through which Beeghley, O'Rourke, Honig, DeFrancesco, Kaplan, and more than a dozen Selling Stockholders were connected.  ¶¶ 22, 26, 36, 43, 60, 67, 69, 79-80, 119; *see also* Pl.'s Br. 9-11, 27-31.  Similarly, Dai knew that he himself (as a director of the Company) was materially connected to Selling Stockholders such as Stetson and Jonathan Honig, Ex. 8 at 5-7, through Dai's involvement in Santa Maria, Ex. 4 at 1-2.

### 5.    October 4, 2017 – Dai and the Board Approve the Company's Change to "Riot Blockchain," Special Dividend, and Coinsquare Transaction

On October 2, 2017, the Company's Board – including Dai – approved a special dividend payout of more than $9.5 million. ¶¶ 159, 235.  The dividend predominantly benefited the Honig Group, which at this time already held a majority ownership interest in the Company.  ¶ 236.  The Company announced the dividend on October 3, 2017 – the day before the Company announced its name-change to "Riot Blockchain" and strategic shift to cryptocurrency – causing the Company's stock price to increase by 25% on the eve of that announcement.  ¶¶ 235-39.

The next day, on October 4, 2017, the Company's "Board of Directors" – including Dai – "approved a merger . . . with its wholly-owned subsidiary, Riot Blockchain, Inc. . . . solely for the purpose of changing the name of the Company."  Ex. 12 at 2.  On the same day and as part of the same announcement, Riot announced its "strategic investment in Coinsquare."  ¶¶ 166-68, 239-42.  Although not disclosed to Riot's public investors until May 25, 2018, the Coinsquare transaction involved related parties including Defendants Groussman, O'Rourke, and Stetson; and

Defendant Dai would have known that Stetson was a "control[ling]" shareholder of Santa Maria/Kalytera given that Dai was CFO of that same company. *See* Ex. 4. In fact, Defendant Stetson used the same entity – Stetson Capital – to invest in Santa Maria, *see id.*, that he used to invest in Coinsquare, *see* ¶ 157. Another "control[ling]" Santa Maria shareholder, Jonathan Honig, also invested in Coinsquare (through Titan Multistrategy Fund, ¶ 76), which the four Forms S-3/A that Dai signed disclosed as being "control[led]" by Jonathan Honig. *See* Ex. 8 at 7, Ex. 9 at 7, Ex. 10 at 11, Ex. 11 at 11.[9]

### 6.     November 1-3, 2017 – Riot Enters Into the Wasteful Related-Party Kairos Transaction; Dai and Beeghley Both Immediately Resign

On November 1, 2017, Riot entered into the wasteful, related-party Kairos transaction. *See* ¶ 260 ("On November 1, 2017, Riot entered into a share exchange agreement . . . with Kairos"). The transaction wasted more than $11 million. *See* Pl.'s Br. 12 n.17, 14-15. The next day, Riot issued a press release announcing the Kairos transaction. ¶¶ 169, 259. However, Riot did not reveal until November 3, 2017, when it filed its press release with the SEC on Form 8-K (*see* ¶ 260), that on November 1 – ***the same day that Riot had entered into the Kairos transaction*** – Dai had "terminated his directorship." Dai Br. 1-2; *see also* Ex. 13 at 3.[10] Even more striking: on November 3, 2017, Defendant Beeghley also resigned as CEO. *Id.*

---

[9] Dai was also a member of the Board on October 17, 2019, when Riot entered into the Tess transaction. ¶¶ 169-71; *see also* Pl.'s. Br. 13-14.

[10] Defendant Dai confirms that he "terminated his directorship" and "stepped down from his directorship" on November 1, 2017. *See* Dai Br. 1-2 & Ex. at 226 thereto. Dai also speculates (without any support) that the Complaint "[o]mitted the date [Dai] terminated his directorship . . . to conceal that date" – and on that basis accuses Plaintiff of "sl[e]ight of hand" and "sharp tactics." Dai Br. 1, 16. To the contrary, the Complaint's omission of the date of Dai's resignation was entirely inadvertent, as confirmed by the fact that the date of Dai's resignation supports Plaintiff's allegations concerning the Kairos transaction.

**B.      Groussman's Deceptive Acts in Furtherance of the Pump-and-Dump Scheme**

**1.      Groussman's Prior Relationship with the Honig Group**

Defendant Groussman, another member of the Honig Group, worked out of Honig's Boca Raton office.  ¶ 22.  In fact, so connected were Groussman and Honig that Groussman purchased his house in Miami Beach, Florida with a $700,000 mortgage loan from Honig.  ¶ 27.

Groussman has been implicated as part of the Honig Group in prior pump-and-dump schemes at numerous other companies, including Biozone, MGT, MabVax, PolarityTE, Pershing Gold, Mundo, and Marathon.  ¶ 80.  The SEC named Groussman as a defendant in the *Honig* Action.  ¶ 201.  In its complaint, the SEC alleged that Groussman and others "'***engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock, priming investor interest***,'" ¶ 359 (citing *Honig* Compl. ¶ 3), and "'***engaged in brazen market manipulation*** that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets,'" ¶ 360 (citing SEC press release accompanying filing of the *Honig* Action).  On January 18, 2019, Defendant Groussman settled the charges brought against him in the *Honig* Action, as part of which he was barred from participating in any offering of penny stock for five years and ordered to pay disgorgement of $1,051,360, plus prejudgment interest of $170,554.78, and a civil penalty of $160,000.  ¶ 372.

**2.      Groussman Violated His Duty to Timely Disclose His Ownership and Material Transactions of the Company's Stock**

In late 2016, Defendant Honig told members of Venaxis's then-existing Board of Directors that he had control of 40% of Venaxis's shares through his stock ownership and the stock ownership of Honig's friends and relatives, according to a former Venaxis Board member present during the conversations.  ¶¶ 6, 132.  The Company's public investors had no way of knowing,

however, that Groussman, one of Honig's longtime associates, had invested alongside Honig and DeFrancesco as part of this control group.  ¶ 144.

On April 20, 2017, Riot filed a Form S-3/A registering for sale to the public certain shares of the Company's common stock.  ¶ 210. The shares registered included 340,000 shares (6.10% of the total shares outstanding) owned by Melechdavid Inc. (owned and controlled by Defendant Groussman), and two other accounts controlled by Groussman (i.e., Mark Groussman c/f Alivia Groussman UTMA/FL and Mark Groussman c/f Asher Groussman UTMA/FL) each held 1.47% (80,000 shares each).  ¶ 210.  Thus, as of April 20, 2017, Groussman beneficially owned *500,000* of Riot shares representing *9.04%* of the Company's total common stock outstanding.[11]  The Form S-3/A – which was the first time Groussman was revealed to be a Riot shareholder – also stated that Groussman had held these shares "[b]efore this [o]ffering."  ¶ 210.  The Form S-3 did not disclose, however, when Groussman had first acquired Riot's stock or when his holdings first exceeded 5% of Riot's total shares outstanding.

On July 19, August 24, and September 25, 2017, Riot filed additional Forms S-3, each disclosing that Groussman (through these three entities) continued to hold similar numbers of shares representing a similar percentage of Riot's shares outstanding.  *See* ¶¶ 220, 225, 230.  Given his holdings of more than 5% of Riot's outstanding shares, Groussman had a continuing duty to disclose these holdings within ten days on Schedule 13D or 13G.  *See SEC v. Teo*, No. CIV.A. 04-1815 (SDW), 2009 WL 1684467, at *1 (D.N.J. June 12, 2009) ("[A] Schedule 13D . . . must be filed when an investor or group of investors acquire beneficial ownership of more than 5% of a public company's shares" (citing 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d–1)); *see also*

---

[11] Groussman's 9.04% stake in the Company as of April 20, 2017, was only slightly less than Defendant Honig and DeFrancesco's respective 11.2% and 11.45% stakes as of January 5 and 10, 2017.  ¶ 364.

Groussman Br. 13 (conceding that "stockholders who own more than 5% of an issuer's shares must report their ownership on a Schedule 13D or 13G").[12]  Yet, Groussman did not file a Schedule 13G until October 13, 2017, when he disclosed owning 399,202 shares, representing "5.93% (based on 6,730,272 shares of common stock outstanding as of October 10, 2017)."  Thus, Groussman violated his duties to file a Schedule 13D or 13G for approximately six months (from April 20 to October 13, 2017), during which time he apparently sold approximately 100,000 shares of Riot stock without promptly reporting those sales as required.  *See* Pl.'s Br. 28-30, 32-35 (discussing reporting obligations under 17 C.F.R. § 229.404).[13]

On October 13, 2017, Defendant Groussman finally disclosed a beneficial ownership of 5.93% of Riot common stock and certified that the securities "were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not held in connection with or as a participant in any transaction having that purpose or effect."  ¶¶ 179-80.  Groussman was also reportedly an owner of Kairos.  ¶ 173.  In addition, Groussman had financial ties to Riot and other members of the Honig Group through his undisclosed investment in Coinsquare.  ¶ 324.

After filing his Schedule 13G on October 13, 2017, Groussman failed to file another Schedule 13G or 13D, despite continuing to sell thousands of shares.  Specifically, on January 5,

---

[12] "Section 13(d) . . . requires a party acquiring beneficial ownership of more than 5% of the equity securities of an issuer to file an SEC disclosure, known as a Schedule 13D, ***within ten days of the acquisition***."  *Telenor E. Invest AS v. Altimo Holdings & Investments Ltd.*, 567 F. Supp. 2d 432, 442 (S.D.N.Y. 2008) (citing 15 U.S.C. § 78m(d)).  "The investor is required to amend the Schedule 13D promptly if it materially increases or decreases the percentage of shares held."  *Tanzanian Royalty Expl. Corp. v. Crede CG III, Ltd.*, No. 18 CIV. 4201 (LGS), 2019 WL 1368570, at *4 (S.D.N.Y. Mar. 26, 2019) (citing 17 C.F.R. § 240.13d-2(a)).

[13] To be clear, Plaintiff is not attempting to assert a private cause of action against Defendant Groussman (or any other defendant) for a failure to file a Schedule 13D or 13G.  Rather, these allegations are part of Plaintiff's allegations that Defendants engaged in a fraudulent scheme in violation of Rules 10b-5(a) and (c).

2018, Riot filed a Form S-3 reporting that Melechdavid Inc. (i.e., Groussman) owned 131,945 shares representing 1.13% of Riot's common stock. ¶ 309. Thus, between October 13, 2017 (when Melechdavid owned 271,458 shares, Ex. 14 at 2, 3, 6) and January 5, 2018 (when Melechdavid owned 131,945 shares, ¶ 309) – Groussman had caused Melechdavid to sell at least 139,513 shares – while continuously violating his disclosure duties under Section 13(d).

### 3. Groussman's Deceptive Conduct Facilitated Defendants' Fraudulent Scheme to Manipulate the Price of the Company's Stock

Groussman facilitated the fraudulent scheme at Riot as a substantial shareholder and "Selling Stockholder." ¶ 27. The registration statement for the March 2017 Placements listed Groussman as controlling 500,000 shares – 340,000 through his company, Melechdavid, Inc., and 160,000 in accounts benefitting his children. ¶ 144. Along with Honig, Titan, and Stetson, Groussman controlled more than 40% of the Company. ¶ 146. Through these share sales Groussman is estimated to have made between $4 million and $8 million based on share prices of $10 per share or $20 per share, respectively. ¶ 164.

Contrary to the Company's representations, Groussman had a "material relationship" with Riot. Specifically, Groussman was an owner of Kairos, ¶ 173, shared an office with Defendants Honig, O'Rourke, and Stetson, which Riot did not disclose to the SEC, ¶ 268, and had existing ties to Riot through his undisclosed investment in Coinsquare, ¶ 324.

### C. Stetson's Deceptive Acts in Furtherance of the Pump-and-Dump Scheme

### 1. Stetson's Prior Relationship with the Honig Group

As a member of the Honig Group, Defendant Stetson has long-standing business ties and co-investments with several of the defendants, including Defendants Honig and Groussman. ¶ 23. Stetson has been implicated as part of the Honig Group in prior pump-and-dump schemes at numerous other companies, including Biozone, MGT, MabVax, PolarityTE, Pershing Gold,

Mundo, and Marathon.  ¶ 80.  In fact, Stetson, along with others, has previously engaged in a pump-and-dump scheme to transform a public company into a cryptocurrency company, at Marathon Patent Group, Inc.  ¶¶ 105-15.  Groussman and Stetson were Marathon's former CEO and COO, respectively, until resigning in 2012.  ¶ 106.  In addition, as discussed in Plaintiff's Prior Brief, the SEC alleges that Defendant Stetson operated as part of a group that "'invested alongside one another in *at least 19 issuers*.'"  Pl.'s Br. 3 (citing *Honig* Compl. ¶ 55).[14]  Then, "[w]hen the group determined that the time had arrived to exit the investment, they would engineer a publicity-generating event that would both drive the price of the stock higher, and also create market demand and trading volume that would allow them to sell their positions."  *Id.*  As part of this, the SEC alleged that "Honig worked with Stetson to ensure that members of his group voted their shares in union."  *Id.* at 3 (quoting *Honig* Compl. ¶ 57).

The SEC charged Stetson with similar pump-and-dump schemes at several other publicly traded companies, Biozone, MGT, and MabVax, ¶¶ 81, 201, and described Stetson as one of a group of "microcap fraudsters," ¶ 14.  In one scheme, Stetson paid for the publication of false promotional pieces and took advantage of the promotional boost to MGT's stock price and trading volume to sell, along with others, over 430,000 shares into the inflated market.  ¶¶ 88-92.  As part of another scheme at MGT, the Honig Group, including Stetson, misrepresented a merger possibility with a "Cybersecurity Investor" to inflate MGT's stock price and sell over 9.2 million shares into the inflated market that allowed them to gross $9.4 million.  ¶¶ 92-95.[15]

---

[14] All told, O'Rourke and Stetson "'invested alongside Honig' in more than 75 and 65 issuers, respectively between 2011 and August 2018."  Pl.'s Br. 5 (citing *Honig* Compl. ¶¶ 62-63).

[15] Defendant Stetson, along with Defendants O'Rourke and Groussman, were also selling shareholders of Pershing Gold, a company that, according to an analyst report, purchased its key asset "from a hedge fund whose executives . . . were federally indicted for operating like a Ponzi scheme, according to prosecutors."  ¶ 124.  Pershing Gold subsequently announced that "it has

### 2. Stetson's Deceptive Conduct Facilitated Defendants' Fraudulent Scheme to Manipulate the Price of the Company's Stock

Stetson facilitated the fraudulent scheme at Riot as a substantial shareholder and "Selling Stockholder." ¶ 26. On April 20, July 19, August 24, and September 25, 2017, Stetson owned 283,400; 283,300; 283,300; and 285,150 shares, respectively, of the Company's common stock – on each date representing exactly 4.99% of the Company's outstanding shares. ¶¶ 210, 220, 225, 230.[16] Through those offerings, from October 2017 to January 2018, Stetson, along with Groussman and Honig's brother, likely sold more than $20 million of Riot stock. ¶ 164.

Contrary to Stetson's argument that Plaintiff "fails to identify any role at all played by Stetson in the alleged scheme, beyond noting that Stetson owned and traded shares in Riot at certain points in late 2017 and early 2018," Stetson Br. 1, Plaintiff alleges that: (i) Honig attempted to nominate Stetson to Venaxis's then-existing Board of Directors on September 13, 2016, ¶ 7; (ii) Stetson shared an office with Defendants Honig, O'Rourke, and Groussman, and was in regular communications with those individuals, ¶ 13; and (iii) Stetson had undisclosed financial ties to Riot through his investment in Coinsquare, ¶ 324. Accordingly, Stetson had a "material relationship" with Beeghley, O'Rourke, Kaplan, and Dai – and thus, with the Company – at the time the April, July, August and September 2017 Forms S-3 were filed. ¶ 155.[17]

---

commenced a legal action against Honig and various other parties who are alleged to have violated federal securities laws." ¶ 126.

[16] By holding 4.99% of the Company's stock, Stetson was able to avoid the SEC's disclosure requirements. It is only fair to assume that this was not by coincidence.

[17] In addition, Defendant Stetson was formerly the CFO of PolarityTE. ¶ 67. In this role, Stetson appointed Brauser and Defendant Honig as Co-Chairmen of PolarityTE's Board of Directors. ¶ 119. On March 28, 2019, PolarityTE received a subpoena from the SEC, causing its "shares to tumble after it says SEC is looking into possible manipulation," according to a CNBC article. ¶ 120. The subpoena "asked about the company's lead product as well as communications and agreements between Polarity and its former CFO." *Id.* In response, PolarityTE immediately terminated Stetson and issued a press release that stated that "the Company, management, and Board of Directors do not tolerate the behavior outlined in the complaint." ¶ 121. Through

## III.   ARGUMENT

### A.   The Complaint Adequately Alleges Claims Against Defendant Dai for Misleading Statements and Omissions and Deceptive and Manipulative Conduct in Violation of Section 10(b) and Rules 10b-5(a), (b), and (c)

#### 1.   Defendant Dai Signed Riot's Materially False and Misleading Securities Registration Statements that Denied and Concealed the Honig Group's "Material Relationship" with the Company

As noted above in Section II.A.4, between April and September 2017, Dai signed four materially false and misleading securities registration statements on Form S-3/A.[18]  As detailed in Plaintiff's Prior Brief, these Forms S-3/A were materially false and misleading when made because they disclosed to Riot's public investors that "none" of the Selling Stockholders listed in the S-3s had a "material relationship" with "us" (i.e., the Company and its officers and directors) "other than as a result of the ownership of our shares or other securities."  *See* Pl.'s Br. 27-28.  Plaintiff's Prior Brief detailed the numerous "material ties" that Defendants Beeghley, O'Rourke, and Kaplan – as directors and/or officers of Riot – each had with various "Selling Stockholders" – including Defendants Honig, Groussman, and Stetson, through their prior business connections – particularly through Majesco/PolarityTE, another NASDAQ-listed company.[19]

---

PolarityTE, Stetson was tied to Defendants Honig (its CEO and Co-Chairman), ¶ 67, Kaplan, ¶ 67, Groussman, ¶ 79, DeFrancesco, ¶ 79, and over a dozen members of the Honig Group, ¶¶ 79-80.

[18] The Complaint inadvertently omitted Defendant Dai from Count I while naming each of the other "senior officers and/or directors of the Company" who "knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading . . . ."  ¶¶ 421-30 (listing Defendants O'Rourke, McGonegal, Beeghley, Kaplan, and So under Count I).  However, the Complaint clearly alleges that Defendant Dai "signed" each of the four 2017 Forms S-3/A and that these S-3s were "materially false and misleading when made. . . ." ¶¶ 211-12, 221-22, 226-27, 231-32.  Indeed, Dai's motion directly addresses Plaintiff's claims asserted against Dai "under Section 10(b)" for "a material misrepresentation" and subsection (b) of Rule 10(b)-5."  *See* Dai Br. 8-16.

[19] For example, Defendants Beeghley and Kaplan knew Selling Stockholders Defendant Honig, Defendant Stetson, and Aifos (i.e., Karr) through their mutual ties as directors and/or officers of another NASDAQ-traded company – PolarityTE.  *See* Pl.'s Br. 7 n.9, 10, 29.  Defendant O'Rourke knew Selling Stockholders Groussman, Honig, and Stetson because this group had "worked out of

Like Beeghley, O'Rourke, and McGonegal, Defendant Dai also signed the Company's four 2017 Forms S-3/A.  ¶¶ 211, 221, 226, 231.  Accordingly, Dai is liable for the Company's false statements contained therein.  *See In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 503 (D. Del. 2001) ("a corporate official . . . who, acting with scienter, signs a SEC filing containing misrepresentations 'make[s]' a statement so as to be liable as a primary violator under § 10(b)" (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061-62 (9th Cir. 2000)).  Indeed, in his motion, Dai admits that he provided "the Company with assistance" in "[t]he filing of the registration statements before he left" the Company.  Dai Br. 12-13.[20]

Faced with this, Defendant Dai accuses Plaintiff of "sharp tactics"[21] and "sl[e]ight of hand" by "delet[ing]" and "ignor[ing]" the "word 'us'";  "rewriting and expanding the definition of 'us'

---

the same office" from which they had invested alongside one another "in at least 19 issuers" with "Barry Honig [as] the principal investor of [their] small group."  *Id.* at 3-5, 29.  In all, the defendants who were officers, directors, and/or shareholders of PolarityTE included Defendants Honig, DeFrancesco, O'Rourke, Beeghley, Groussman, and Kaplan, as well as Honig Group members Aifos, ATG, Bhansali, Brauser, Grander, GRQ, Karr, Kesner, Melechdavid, Molinksy, Namaste, O'Braitis, Paradox, Policy No. 2013-17, and Stetson Capital.  *See* ¶¶ 79-80; *see also* Pl.'s Br. 29 n.38 (citing PolarityTE Forms 4 showing investments by Beeghley, DeFrancesco, Groussman, Kaplan, Brauser, Bhansali, and Karr).

[20] Dai argues that "when issuers conduct secondary offerings the price of its [*sic*] securities will drop" because "the addition of the new shares . . . dilutes the price." Dai Br. 13.  As a result, Dai appears to argue (citing inapposite case law regarding "short" selling) that it would have been "economically irrational" for Defendants to engage in "market manipulation" in connection with Riot's Forms S-3.  Dai Br. 12-13.  Dai's argument is itself illogical and ignores the Complaint's allegations that, consistent with their previous pump-and-dump schemes,  Defendants issued the Forms S-3 to increase the Company's "trading volume" because their previous "ability to sell large amounts of shares was limited."  ¶¶ 1, 153.  Under Dai's logic, it would be "economically irrational" for any issuer to raise funds from the market through a misleading secondary offering.

[21] Without any justification but *ipse dixit*, and contrary to any conceivable reading of the Complaint alongside Riot's Forms S-3, Defendant Dai accuses Plaintiff *five times* of engaging in "sharp tactics."  *See* Dai Br. 8, 11, 16, 25.  "It is, at the very least, a sharp practice to accuse fellow members of the bar of transgressing [the] important ethical obligation" that "lawyers shall not knowingly make any false statements of fact or law to a tribunal" – "especially where there is no substantial justification for such a charge."  *Stepnes v. Ritschel*, No. CV 08-5296 (ADM/JJK), 2010 WL 11646709, at *5 (D. Minn. Mar. 1, 2010); *see also Fischer v. Ocwen Loan Servicing, LLC*, No. CV-14-94-BLG-SPW-CSO, 2014 WL 6685987, at *3 (D. Mont. Nov. 25, 2014)

to include the Honig Group"; and "alter[ing] the text of the four registration statements."  Dai Br. 1, 3, 12, 16.  This bewildering argument – which is unlike any argument by any other defendant in this case[22] – is utterly false and unsupported by any possible reading of the Complaint and the Forms S-3, which the Complaint correctly and accurately quotes.

*First*, the Complaint does not "delete" the word "us" or "rewrite" that word's definition. To the contrary, the Complaint quotes the word "us" in its full and accurate context.  *See* ¶¶ 211, 221, 226, 231 (quoting Form S-3/A:  "*[n]one of the selling stockholders has held any position or office, or has otherwise had a material relationship, with <u>us</u> or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities*."). Indeed, the Complaint alleges that the Forms S-3 were "materially false and misleading when made because [they stated] that 'none' of the selling stockholders 'has had a material relationship' *with the Company"* and that "the Company" encompasses "O'Rourke, a Bioptix Board member" and "Beeghley, then Bioptix's CEO."  ¶¶ 211, 221, 226, 231.  Indeed, if "us" meant only "the Company" but *not* the Company's officers or directors (including Beeghley, O'Rourke, McGonegal, and Dai, who personally signed these same S-3s) then to whose "knowledge" do the S-3s refer in stating (in the same paragraph) that "*to our knowledge*, all persons named in the table

_____

("accus[ing] . . . counsel of 'sharp practice'" when not "substantiated by facts" was "*ad hominem* argument" that was "not helpful to the Court").

[22] Unlike Dai, who argues that Plaintiff "expand[s] the definition of 'us' *to include the Honig Group and others*," Dai Br. 3, the Riot Blockchain Defendants argue that Plaintiff "incorrectly redefines 'us' in the Form S-3s *to include the board of directors* even though the Form S-3s define 'us' as including only the Company . . . ."  Riot Br. 12.  Neither argument makes any sense (and even the Riot Blockchain Defendants do not attempt to argue that "us" and "the Company" does not include the Company's CEO) but at least the Riot Blockchain Defendants' attempt to narrow the definition of "us" to exclude some of their number (the directors) is a logical response to Plaintiff's allegation that it was false and misleading for Riot to deny that the "Selling Stockholders" (i.e., the Honig Group) had "material relationship" with "the Company."  ¶¶ 211, 221, 226, 231.  Dai, in contrast, takes an entirely different tack that miscomprehends the Complaint.

have sole voting and investment power with respect to their shares"?  *See* Ex. 8 at 1, 5, II-4; Ex. 9 at 1, 5, II-4; Ex. 10 at 5, 9, 21; Ex. 11 at 5, 9, 21 (defining "our" as "the Company").[23]

    ***Second***, the Complaint does not "alter" the text of the Forms S-3.  Indeed, while Dai argues that the Complaint "does not offer any explanation for making those alternations [*sic*]," nowhere does Dai ever specifically explain (apart from supposedly deleting "us") what those supposed "alterations" are – for the simple reason that they do not exist.  Thus, it has never been Plaintiff's theory – as Defendant Dai appears to suggest – that by "us" the Forms S-3 referred to the Selling Stockholders or their the intragroup relationships, or that the Selling Stockholders (and not the Company) were making representations in the Forms S-3.  Such an argument is misplaced and irrelevant to this case.

    Dai's argument appears to be based on a mistaken reading that "Plaintiff's claim turns on . . . Plaintiff's description of claimed relationships among the members of the so-called manipulation group rather [than] those of the Company and the selling shareholders." Dai. Br. 11. Dai's confused accusations concerning the Form S-3 Registration Statements appear to be the result of a total misreading and misunderstanding of Plaintiff's theory of why the Forms S-3 were false and misleading.  While Plaintiff disagrees with the Riot Blockchain Defendants' arguments

---

[23] It appears that by accusing Plaintiff of "deleting" the word "us," what Defendant Dai really means is that the Complaint does not also cite to another sentence of the Forms S-3, approximately four pages away from the Discussion of the "Selling Stockholders," in which the S-3s define "us" to mean "the Company" and having not quoted that definition, "expand[s] the definition of 'us' to include the Honig Group and others."  Dai Br. 3.  As an initial matter, not quoting language elsewhere in a document that an opposing party wishes to highlight is not the same as "deleting" or "re-writing" or "altering" that document.  More to the point, however, is that the Complaint makes clear that the relationship that the Forms S-3 falsely and misleadingly denied is that of the "selling stockholders . . . ***with the Company***."  ¶¶ 212, 222, 227, 232.  Indeed, it is not "us" that includes "the Honig Group and others" – it is the "selling stockholders" as is clear from the Complaint's listing of the members of the Honig Group, ¶¶ 34-79, and the Forms S-3 listing of those same individuals, ¶¶ 210, 220, 225, 230.

regarding the Forms S-3, these defendants appear to grasp Plaintiff's theory as to why those S-3s were materially false and misleading.[24]   Ultimately, Dai's suggestion that Plaintiff has deleted, rewritten, altered, or expanded anything in the Forms S-3 is "much ado about nothing."[25]

### 2.     Defendant Dai Engaged in Manipulative and Deceptive Conduct

As a director of Riot, Dai played an indispensable role in approving and ratifying the corporate transactions at the hard of the Company's deceptive and manipulative pump-and-dump scheme.   ***First***, as a director, Dai participated in the Board's approval of the Company's merger with and name-change into "Riot Blockchain, Inc.," and the related amendment to the Company's Articles of Incorporation.   Ex. 12 at 2.   Dai argues that "he took no steps to implement the new crypto – blockchain strategy . . . ."   Dai. Br. 18.   To the contrary, "[t]he decision to transition the Company's business into blockchain and cryptocurrencies was made by the Company's independent Board" – of which Dai was a member.   Honig Br. 9.

***Second***, as a member of the Board, Dai approved the Coinsquare transaction.   ¶¶ 166-68, 239-42; Ex. 12.

***Third***, Dai was a member of the Board when Riot issued its false and misleading October 5, 23, and 27, 2017 Investors Presentations.   ¶¶ 243-46, 251-54.

---

[24] Indeed, the Riot Blockchain Defendants – who also signed these same Forms S-3/A – do not make any argument even remotely similar to Defendant Dai.   *See* Riot Br. 11-12.   Rather, the Riot Blockchain Defendants argue that "Lead Plaintiff incorrectly redefines 'us' in the Form S-3s to include the board of directors even though the Form S-3s define 'us' as including only the Company . . . ."   *Id.* at 12.   While this argument (that "the Company" excludes its own "Board") is illogical and without merit, the Riot Blockchain Defendants at least appear to correctly understand Plaintiff's straightforward theory (as clearly stated in the Complaint) that the Forms S-3 were "materially false and misleading when made because [they stated] that 'none' of the selling stockholders [i.e., the various members of the Honig Group] 'has had a material relationship' ***with the Company*.*"   ¶¶ 212, 222, 227, 232.

[25] William Shakespeare, *Much Ado About Nothing*.

**Fourth**, Dai and the rest of the members of the Board approved a necessary step in the Kairos transaction.  Specifically, as a member of the Board on November 1, 2017, Dai was part of the Board resolution to create 1,750,001 "newly designated shares of Series B Convertible Preferred Stock" that the Company used to pay for the Kairos transaction.  Ex. 13 at 2.  Dai's approval of the issuance of these new shares was a key step in the Company's transaction with Kairos, which was partly owned by related-party Defendants Honig and DeFrancesco.  ¶¶ 172, 261, 364.

Dai argues that these "corporate events" were "standard business transactions."  Dai Br. 13.[26]  If Dai believed this, the question remains why Dai (a chartered public accountant and chartered financial analyst) resigned *on the same day* that Riot entered into the Kairos transaction, and why Defendant Beeghley reigned the next day.[27]  The answer is simple:  Dai in all likelihood knew that these transactions, and the larger scheme they facilitated, were fraudulent.[28]

### 3.    The Complaint Raises a Strong Inference of Defendant Dai's Scienter

The Complaint raises a strong inference of scienter as to Defendant Dai.  **First**, Dai's prior business dealings with the DeFrancescos, O'Rourke, Stetson, Jonathan Honig, and other members of the Honig Group supports a strong inference that Dai knew or was reckless in not knowing that the "Selling Stockholders" had a "material relationship" with the Company.  Indeed, Dai was appointed to the Board by Defendants Honig and DeFrancesco based on these prior relationships.

---

[26] Plaintiff has not brought a claim against Defendant Dai (or any other defendant) for "breach" of fiduciary "duty to monitor" the Company's "controls and systems."  *See* Dai Br. 16 (citing three inapposite shareholder derivative cases).

[27] Dai and Beeghley's resignations immediately upon the Board's approval of the Kairos transaction should have placed the other defendants who remained at the Company and/or stepped into Dai and Beeghley's shoes – i.e., O'Rourke, Kaplan, Les, and So – on notice that financial irregularities were underway at Riot.

[28] Such an analysis in no way detracts from Dai's wrongdoing prior to the Kairos transaction.

**Second**, Dai's sudden resignation **on the same day** as the Kairos transaction (followed by Beeghley's resignation the very next day) supports a strong inference that Dai knew that the Kairos transaction was egregiously wasteful, benefitted related parties, and that its announcement served to mislead the Company's public investors. *See* § II.A.6, *supra*. Indeed, Dai admits that "he resigned his post shortly after that strategy began to roll out." Dai Br. 18.

**Third**, Dai's financial sophistication as a chartered public accountant and current or former CFO of Santa Maria/Kalytera further bolster the inference of his knowledge of the irregularities involving the Company's Forms S-3, various purported "strategic" cryptocurrently transactions, and the egregiously wasteful related-party Kairos transaction. *See SEC v. Megalli*, No. 1:13-CV-3783-AT, 2015 WL 13021472, at *4 (N.D. Ga. Dec. 15, 2015) ("given [defendant's] degree of . . . financial sophistication" he "knew what he was doing was wrong"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 470 (S.D.N.Y. 2014) (holding "that plaintiffs have adequately pled scienter" was supported by the "financial sophistication" of "[e]ach defendant"); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1157 (S.D. Cal. 2008) (that "Defendants were financially sophisticated" contributed to strong "inference of scienter").[29]

Indeed, as a chartered public accountant, Dai could have alerted public investors of the fraudulent scheme and transactions he helped to facilitate against Riot's public shareholders in favor of related parties such as DeFrancesco and Honig. Instead, Dai did nothing to protect the real owner of the Company – Riot's public shareholders.

---

[29] *See also In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) ("It is simply not a plausible opposing inference that the Company's officers—sophisticated executives actively engaged in the planning of these transactions—were ignorant of the transactions' consequences . . . ."); *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1031 (N.D. Ohio 2000) (defendants' "training" and "background" as "financially sophisticated individuals" added to inference that they were "on notice" that "accounting decisions . . . were improper").

Defendant Dai concludes: "Nothing requires dismissal." Dai Br. 25. Malapropism aside, Dai did not do "nothing." Dai furthered the pump-and-dump scheme by: accepting appointment to the Board by DeFrancesco and Honig (who he knew); approving – as a director – the Company's strategic shift to "Riot Blockchain"; signing the false and misleading Forms S-3 listing his various known Honig Group associates; approving the related-party Coinsquare and Kairos transactions; acquiescing to Riot's early publicity campaign; and resigning as director the same day as the Kairos transaction without revealing the misconduct.

**B.** **The Complaint Adequately Alleges a Claim Against Defendant Groussman for Engaging in Manipulative and Deceptive Conduct in Violation of Section 10(b) and Rules 10b-5(a) and (c)**

As explained in Plaintiff's Prior Brief (Pl.'s Br. 54), the "gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001). Plaintiff also explained that courts in this district recognize that in order to plead a scheme claim under Rules 10b-5(a) and (c), he must allege that one or more defendants "(1) committed a manipulative or deceptive act, (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance." *Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 661-62 (D.N.J. 2009); *see also Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 627 (D.N.J. 2003) (J. Wolfson) (enumerating similar standard for scheme claim); *see also* Pl.'s Br. 54. A "manipulative or deceptive act" under Rules (a) and (c) includes the dissemination of a false and misleading statement even if that conduct may overlap with subsection (b) of Rule 10b-5. *See* Pl.s' Br. 54-55.

Here, Plaintiff has alleged that Groussman committed deceptive acts.  For example, on October 13, 2017 Groussman filed with the SEC a Schedule 13G that included his signature and the following false and misleading statement:

> ***By signing below I certify that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer [i.e., Riot] of the securities*** and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect.  After reasonable inquiry and to the best of my knowledge and belief, ***I certify that the information set forth in this statement is true, complete and correct***.[30]

Given Groussman's prior connections to Honig, Stetson, O'Rourke, and other members of the Honig Group, as set forth in the Complaint, ¶¶ 22, 27, 63, 74,80, 105-106, 173, 174, 213, 351, 357, 359, 372, 389, 391, 394, the statement that "***the securities referred to above were not acquired and are not held***" in order to "***change***[]" or "***influence***[]" "***control of the issuer***" was false and misleading when made in violation of the federal securities laws.  *See Teo*, 2009 WL 1684467, at *7 ("[A] false or misleading statement made on a Schedule 13D may be actionable under the antifraud provision of § 10(b)." (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991))); *In re Luxottica Grp. S.p.A., Sec. Litig.*, 293 F. Supp. 2d 224, 234 (E.D.N.Y. 2003) ("An antifraud claim under Section 10(b) may be premised on a false or misleading statement made on a Schedule 13D . . . or, as it is here, on a failure to timely file a Schedule 13D.").

Indeed, as Plaintiff made clear in his earlier brief, far from "perfunctory," Groussman Br. 5, this same allegation – that Groussman and members of the Honig Group controlled Riot – were raised against Groussman in the *Honig* Action:

> in every scheme, ***Honig and some combination of Stetson, Brauser, O'Rourke, Groussman and Frost,*** either explicitly or tacitly agreed to buy, hold and sell their

---

[30]  Riot Blockchain, Inc., Statement of Beneficial Ownership (Schedule 13G) (Oct. 13, 2017); *see also* ¶ 180.

shares in coordination with one another, knowing that a pump and dump was in the offing that would allow them to profit handsomely.

Pl.'s Br. 5 n.6.

The SEC's complaint goes on to allege that Groussman and others violated the beneficial ownership reporting requirements under Sections 13(d) and 13(g) – the same Schedule 13G that Plaintiff alleges is at issue here, ¶ 180 – by failing to publicly disclose their group ownership and control over Biozone, MGT, and Mabvax.  Pl.'s Br. 5 n.6.[31]  Not to mention, Groussman **settled** these allegations by agreeing to pay $1.38 million disgorgement and penalties and agreeing to a five-year ban on taking part in penny stock offerings.  ¶ 372.  As part of this settlement, he agreed not to "take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis."  Ex. 15 at 4.

Thus, Groussman cannot credibly claim that he was not trading or otherwise acting as a "group" with Honig, Stetson, and others, at several other penny stock companies.  While he takes the view that the *Honig* Action is "irrelevant," Groussman Br. 16, to what may have occurred at Riot, this defies common sense and runs contrary to how other courts have viewed allegations related to a government investigation, particularly the SEC.  *See Vanleeuwen v. Keyuan Petrochemicals, Inc.*, No. 13 Civ. 6057(PAC), 2014 WL 3891351, at *4 (S.D.N.Y. Aug. 8, 2014)

---

[31] As explained in § II.B.2 *supra*, Groussman delayed – for nearly six months – filing his October 13, 2017 Schedule 13G.  Indeed, according to the Forms S-3, Groussman (including Melechdavid, an entity controlled by him) held greater than 5% of the outstanding shares of Bioptix at least as of April 20, 2017.  Similar allegations were made against Groussman by the SEC.  *See* Pl.'s Br. 5 n.6 ("Honig, Brauser, Stetson, Frost **and Groussman**, as well as certain of their entities, also violated beneficial ownership reporting requirements of the federal securities laws by failing to disclose their group beneficial ownership of shares and the fact that as a group they were looking to exercise (and, in fact, did) control over the issuers.").

("[T]here is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims under the PSLRA"); *de la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003) ("The PSLRA does not require that a plaintiff re-invent the wheel before filing a complaint; and one could argue that a complaint predicated on the results of an SEC investigation has far more 'evidentiary support' than one based on rumor and innuendo gleaned from 'Heard on the Street.'"); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015) (explaining that a plaintiff in a PSLRA action may rely on an unadjudicated complaint filed by the New York Attorney General because the allegations "are derived from a credible complaint based on facts obtained after an investigation.").[32]

Moreover, it is well-established that similar wrongdoing at one company – or in Defendants' cases, numerous companies – adds to the inference of scienter. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 693 (S.D. Tex. 2002) (holding that "the scienter pleading requirement is partially satisfied by allegations of a regular pattern of related and repeated conduct").

Aside from claiming that the allegations in the *Honig* Action are not fair game, Groussman also avers that his Schedule 13G was "fully accurate," Groussman Br. 3, and that Plaintiff has failed to allege "that there was even a group for Groussman to join," *id.* at 2. This, of course, belies Plaintiff's well-pled allegations concerning the seemingly unending connections between Honig and the various defendants in this case. *See* Pl.'s Br. 54-56. Included among these is that Groussman shared office space with Honig, O'Rourke, and Stetson, ¶ 22, and that, according to public records, Groussman's mortgage is held by Honig, ¶¶ 27, 180.[33] The notion that there was

---

[32] For the same reason, Stetson's argument that "[t]he mere fact of an SEC investigation or civil filing does not support an inference of fraudulent intent," Stetson Br. 2, is without merit.

[33] Notably, Groussman does not dispute any of these allegations. *See* Groussman Br. 1-23.

no "group to join" also rings hollow in light of the detailed allegations lodged against Honig Group

members by the SEC – and several Defendants' settlements related to those charges.  And as

explained in Plaintiff's Prior Brief, Groussman and his "group" ties are not by chance or otherwise

in vein of an innocent bystander.  *See* Pl.'s Br. 56.  Rather, as his settlement with the SEC makes

clear, these ties concern specific and intentional co-investments as a willing co-conspirator.

Not to mention, as a more than 5% shareholder of the Company (like Honig and

DeFrancesco), Groussman failed in his duty to "promptly" disclose his holdings and sales of Riot

stock as required by 17 C.F.R. § 240.13d-2.  Thus, "[t]he inference of fraudulent intent is buttressed

by [Groussman's] failure to file timely Schedules 13D, reporting [his] purchases and sales of [the

Company's] stock."  *Tanzanian Royalty Expl. Corp.*, 2019 WL 1368570, at *10; *see also SEC v.

Desai*, 145 F. Supp. 3d 329, 337 (D.N.J. 2015) (defendant's "effort to mask his violations of federal

securities law demonstrates a high degree of scienter"); *SEC v. Wey*, 246 F. Supp. 3d 894, 930

(S.D.N.Y. 2017) (holding scienter adequately alleged where defendant "file[d] a Schedule 13D . . .

that omitted significant . . . holdings" and which "helped [defendant] and his associates to create a

network of nominees with secret control over shares . . . , conceal that control from regulators,

exchanges and others, evade mandatory reporting requirements, and profit from the scheme").

This is precisely what Plaintiff has alleged occurred at Riot:  Groussman "evade[d] mandatory

reporting requirements" so that he could profit handsomely from the scheme.

### C. The Complaint Adequately Alleges a Claim Against Defendant Stetson for Engaging in Manipulative and Deceptive Conduct in Violation of Section 10(b) and Rules 10b-5(a) and (c)

As for Stetson's role in the alleged scheme, many of the same "group" allegations that

apply to Groussman also apply to Stetson.  For example, Plaintiff has alleged that Stetson shared

office space with Honig and other group members.  ¶ 22.  And rather than Stetson "barely

register[ing]" in the alleged scheme, Stetson Br. 2, his role figures almost as prominently as Honig and O'Rourke when allegations in the *Honig* Action are also considered.  For example, the SEC has alleged that Stetson was in nearly "daily contact" with Honig Group members:

> ***Honig, Stetson, and O'Rourke were in nearly daily contact because they worked out of the same office and were in frequent email and telephone contact***, at time purposefully moving their conversations to the less permanent medium of text and instant messaging.

Pl.'s Br.  4 (citing *Honig* Compl. ¶ 56).

The Complaint is replete with additional allegations of Stetson's ties to Honig, O'Rourke, and other members of the Honig Group, ¶¶ 7, 13, 14, 23, 26, 105-107, 119-121, 123, 127, 133, his participation in the Forms S-3, ¶¶ 210, 220, 225, 230, and significant insider selling, ¶ 164, all of which supports the inference that Stetson intended to commit securities fraud.  *See* Pl.'s Br. 42-43, 44-46.

### D.    Defendant Dai's "Market Efficiency" Arguments Are Premature and Demonstrably Incorrect

Defendant Dai – perhaps acknowledging the weaknesses in his other arguments – advances a desperate attempt to escape liability by arguing that Plaintiff has failed to allege that Riot's securities traded in an efficient market.  *See* Dai Br. 19-23.[34]  In so doing, Defendant Dai runs through the factors in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) (commonly known as the "*Cammer* factors") and contends that the "Complaint ignores *Cammer*, failing to plead facts which even begin to suggest the Company shares traded efficiently."  Dai Br. 20.[35]  Tellingly, not

---

[34] Plaintiff incorporates the arguments regarding the presumption of reliance made in Plaintiff's Prior Brief.  *See* Pl.'s Br. 53 n.63.

[35] Defendant Dai also discusses the "*Krogman* factors" in his memorandum.  *See* Dai Br. 22 (citing *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001)).  *Krogman* was decided on a motion for class certification and is irrelevant for the reasons herein.  *See City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, No. CIV.A. 12-5275, 2015 WL 5097883, at *6 (D.N.J. Aug. 31, 2015) (discussing *Krogman* factors on motion for class certification).

a single other defendant advances these same arguments, and for good reason – Defendant Dai's

arguments are premature.  As the Third Circuit has recognized,

> the question on a motion to dismiss is not whether plaintiff has proved an efficient
> market, but whether he has pleaded one.  Plaintiff alleges that "there was an open,
> efficient, impersonal, well developed market for the trading of shares of Bell
> wherein the market price reflected publicly disseminated information."  Plaintiff
> further avers that the average weekly trading volume for Bell stock was
> approximately 38,000 shares; that Bell stock was listed on the NASDAQ/National
> Market System, which gave investors access to up to the minute information,
> including real time prices; and that Bell was actively followed during the class
> period by at least five market analysts whose reports were widely disseminated to
> the public.  The complaint thus alleges an efficient market.

*Hayes v. Gross*, 982 F.2d 104, 107 (3d Cir. 1992) (internal citations omitted).[36]  Similarly here,

the Complaint alleges "the Company's common stock traded in an efficient market," ¶ 414(c),

because, among other things, the Company traded on the NASDAQ, an efficient market, ¶ 414(a);

Riot filed Form S-3 registration statements, ¶¶ 154, 175, 210, 220, 225, 230, 309, 322, 355; was

followed by multiple analysts, ¶ 339; and had significant weekly trading volumes, ¶¶ 159, 194,

203, 285, 291 (alleging that "more than *20 million shares* of Riot traded on December 11[, 2017]

alone"), 294 (alleging that "more than *36 million shares* of Riot stock traded on December 12[,

2017] alone").  Plaintiff's allegations are thus more than sufficient at the pleading stage.  *See The*

*Winer Family Tr. v. Queen*, No. CIV.A. 03-4318, 2004 WL 2203709, at *3 (E.D. Pa. Sept. 27,

---

[36] Analysis of the *Cammer* factors is an issue for expert analysis, further demonstrating the
premature nature of Defendant Dai's arguments.  *See Marcus v. J.C. Penney Co., Inc.*, No. 6:13-
CV-736, 2017 WL 907996, at *3 (E.D. Tex. Mar. 8, 2017) ("An expert's application of the
*Cammer* factors to common stock may be sufficient to trigger the presumption of reliance for
§ 10(b) claims based on options."); *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 591
(N.D. Cal. 2009) ("Plaintiffs' expert analyzed the *Cammer* factors in sufficient detail to show that
the market was efficient."); *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 269 (N.D. Cal. 2011)
("the Court finds that Plaintiffs' expert has analyzed the Cammer factors in sufficient detail to
show that the market was efficient.").  Indeed, *Krogman*, a class certification decision upon which
Defendant Dai relies, makes clear the necessity of expert evidence in determining market
efficiency.  *See* 202 F.R.D. at 474-77 (discussing parties' experts' analyses of relevant market
efficiency factors).

2004) ("The Third Circuit has, however, made it clear that a complaint need not establish the *Cammer* factors to survive a motion to dismiss."); *Walsh v. Chittenden Corp.*, 798 F. Supp. 1043, 1051 (D. Vt. 1992) ("Whether Chittenden stock in fact traded in a market sufficiently well developed to support the presumption of reliance may remain an issue in this case, but it is not an issue that can be decided on a motion to dismiss.").[37]

Even if Defendant Dai's arguments are to be credited (and they should not), his assertions are flatly contradicted by the Complaint.  For example, Defendant Dai argues that "no facts are pleaded about the trading volume of the Company shares," Dai Br. 20, but the Complaint alleges, among other things, that more than 20 million Riot shares were traded on December 11, 2017, ¶ 291, more than 36 million Riot shares were traded on December 12, 2017, and "Bioptix's stock increased by approximately 25 percent, from $6.44 to $8.09 per share, on a volume approximately four times the previous day's total," ¶ 159.  *See also* ¶¶ 194, 203, 285 (alleging increased and heavy trading volumes).  Likewise, Defendant Dai's argument that "no facts are pleaded about . . . the identity and number of analysts who follow the stock," Dai Br. 20, is rebutted by the Complaint's allegation that "Zacks Investment Research published a report titled 'Here's Why Riot Blockchain Stock Crashed Today,'" ¶ 339.[38]

---

[37] Indeed, *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Financial Corp.*, 762 F.3d 1248 (11th Cir. 2014), *O'Neil v. Appel*, 165 F.R.D. 479 (W.D. Mich. 1995), *Serfaty v. International Automated Systems, Inc.*, 180 F.R.D. 418 (D. Utah 1998), and *In re DVI Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008), cases upon which Defendant Dai relies, *see* Dai Br. 20-22, concerned motions for class certification.  *In re Initial Public Offering Securities Litigation*, 260 F.R.D. 81 (S.D.N.Y. 2009), also cited by Defendant Dai, *see* Dai Br. 22, concerned the certification of a settlement class.

[38] In addition to *Zacks Investment Research*, the Company was also followed by, among others, CNBC, ¶¶ 332-37, *Business Insider*, ¶¶ 30, 341-42, *Reuters*, ¶ 307, *The Motley Fool*, ¶ 307, *American Banking and Market News*, ¶ 308 n.41, and *The Wall Street Journal*, ¶ 319.

In sum, while Defendant Dai will have the opportunity to put forward his arguments about the efficiency of the market in which Riot's securities traded, this is not the appropriate time.  *See, e.g.*, *In re Merck & Co., Inc., Vytorin/Zetia Sec. Litig.*, No. CIV.A. 08-2177 DMC, 2012 WL 4482041, at *5 (D.N.J. Sept. 25, 2012) (discussing *Cammer* factors on motion for class certification); *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 343 (D.N.J. 2018), *aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019) (same).

### E.      The Complaint Adequately Pleads Loss Causation

Defendants Groussman and Dai argue that Plaintiff has not adequately pleaded loss causation.  *See* Groussman Br. 20-22; Dai Br. 23-25.  But Defendants conveniently ignore, as an example, the Company's 33.4% stock price decline on February 16, 2018, in direct response to CNBC's in-depth exposé revealing numerous "red flags" at the Company.  ¶¶ 332-43, 403.  For the reasons set forth in Plaintiff's Prior Brief, which are incorporated herein, Plaintiff has adequately alleged loss causation.  *See* Pl.'s Br. 50-53.

## IV.     CONCLUSION

For the reasons set forth above, Defendants Dai, Groussman, and Stetson's Motions should be denied in their entirety.[39]

Dated:  October 28, 2019                       Respectfully submitted,

                                               **LITE DEPALMA GREENBERG**

                                               *By:  /s/ Joseph J. DePalma*
                                               Joseph J. DePalma
                                               570 Broad Street, Suite 1201
                                               Newark, NJ 07102
                                               Telephone: (973) 623-3000
                                               Facsimile: (973) 623-0858
                                               jdepalma@litedepalma.com

---

[39] If the Court dismisses any part of the Complaint, Plaintiff respectfully requests leave to amend. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

*Local Counsel for Lead Plaintiff Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Lead Plaintiff Dr. Stanley Golovac and Lead Counsel for the Class*

David P. Abel
**US. MARKET ADVISORS LAW GROUP PLLC**
5335 Wisconsin Ave. NW, Ste. 440
Washington, D.C.  20015
202-274-0237 Telephone
202-686-2877 Facsimile
dabel@usmarketlaw.com

*Counsel for Lead Plaintiff Dr. Stanley Golovac*