# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated, | : : : | Civil Action No.: 18-2293(FLW)(TJB) |
| *Plaintiff*, | : : : : | **DECLARATION OF** **JOSEPH J. DEPALMA** **IN SUPPORT OF LEAD PLAINTIFF'S** |
| v. | : : | **OMNIBUS MEMORANDUM OF LAW** **IN OPPOSITION TO DEFENDANTS** |
| RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, JEFFREY G. MCGONEGAL, | : : : : : | **DAI, GROUSSMAN, AND STETSON'S** **MOTIONS TO DISMISS THE** **CORRECTED AMENDED** **CONSOLIDATED CLASS ACTION** **COMPLAINT** |
| *Defendants*. | : : | |

**LITE DEPALMA GREENBERG**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for Dr. Stanley Golovac*
*and Lead Counsel for the Class*

## DECLARATION OF JOSEPH J. DEPALMA

I, Joseph J. DePalma, hereby declare as follows:

1.      I am an attorney admitted to practice in the state of New Jersey and am admitted to practice before this Court in the above-captioned case.  I am a member of Lite DePalma Greenberg, Local Counsel for Dr. Stanley Golovac.

2.      I respectfully submit to the Court, pursuant to 28 U.S.C. § 1746, this declaration and the attached materials that are referenced in Lead Plaintiff's Omnibus Memorandum of Law in Opposition to Defendants Dai, Groussman, and Stetson's Motions to Dismiss the Corrected Amended Consolidated Class Action Complaint.

3.      Submitted herewith are true and correct copies of the following:

| Exhibit | Description |
|---------|-------------|
| 1 | Pages excerpted from Riot Blockchain, Inc. (f/k/a Venaxis, Inc.) Form SC 13D/A (Amended Statement of Beneficial Ownership), filed with the U.S. Securities and Exchange Commission ("SEC") by Barry Honig on December 1, 2016. |
| 2 | Santa Maria Petroleum Inc. Press Release, "Santa Maria Petroleum Inc. Announces the Appointments of Andrew DeFrancesco as CEO, Michael Dai as CFO and Changes to the Board of Directors," dated May 22, 2014. |
| 3 | Santa Maria Petroleum Inc., SEC Form D (Notice of Exempt Offering of Securities) signed by Mike Dai as Chief Financial Officer on October 6, 2016, and filed with the SEC on October 7, 2016. |
| 4 | OTCQB Certification for Santa Maria Petroleum Inc., signed by Mike Dai as Chief Financial Officer, dated December 2, 2016. |
| 5 | Riot Blockchain, Inc. (f/k/a Bioptix, Inc.) Form 8-K, signed by Jeffrey McGonegal as Chief Financial Officer, and filed with the SEC on January 6, 2017. |
| 6 | Riot Blockchain, Inc. (f/k/a Bioptix, Inc.) Form 8-K, signed by Jeffrey McGonegal as Chief Financial Officer, filed with the SEC on January 20, 2017. |
| 7 | Pages excerpted from Riot Blockchain Inc. (f/k/a Bioptix, Inc.) Form 8-K (Current Report), signed by Jeffrey McGonegal as Chief Financial Officer, filed with the SEC on March 17, 2017. |

| Exhibit | Description |
|---------|-------------|
| 8 | Pages excerpted from Riot Blockchain, Inc. (f/k/a Bioptix, Inc.) Form S-3 (Securities Registration Statement) signed by Michael M. Beeghley as Chief Executive Officer and Jeffrey McGonegal as Chief Financial Officer, filed with the SEC on April 20, 2017. |
| 9 | Pages excerpted from Riot Blockchain, Inc. (f/k/a Bioptix, Inc.) Form S-3/A (Securities Registration Statement) signed by Michael M. Beeghley as Chief Executive Officer and Jeffrey McGonegal as Chief Financial Officer, filed with the SEC on July 19, 2017. |
| 10 | Pages excerpted from Riot Blockchain, Inc. (f/k/a Bioptix, Inc.) Form S-3/A (Securities Registration Statement) signed by Michael M. Beeghley as Chief Executive Officer and Jeffrey McGonegal as Chief Financial Officer, filed with the SEC on August 24, 2017. |
| 11 | Pages excerpted from Riot Blockchain, Inc. (f/k/a Bioptix, Inc.) Form S-3/A (Securities Registration Statement) signed by Michael Beeghley as Chief Executive Officer and Jeffrey McGonegal as Chief Financial Officer, filed with the SEC on September 25, 2017. |
| 12 | Pages excerpted from Riot Blockchain, Inc. (f/k/a Bioptix, Inc.) Form 8-K (Current Report), signed by Michael M. Beeghley as Chief Executive Officer of Bioptix, Inc., signed by John O'Rourke as President of Riot Blockchain, Inc., and filed with the SEC on October 4, 2017. |
| 13 | Pages excerpted from Riot Blockchain, Inc. Form 8-K, signed by Jeffrey McGonegal as Chief Financial Officer, filed with the SEC on November 3, 2017. |
| 14 | Pages excerpted from Riot Blockchain, Inc. (f/k/a Bioptix, Inc.) Form SC 13G, filed with the SEC by Barry Honig on October 13, 2017. |
| 15 | Pages excerpted from Final Judgment as to Defendant Mark Groussman [ECF No. 93] filed in *S.E.C. v. Barry C. Honig, et al.*, Civil Action No. 1:18-cv-08175 (ER) (S.D.N.Y.), on February 6, 2019. |

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of October, 2019, in Newark, New Jersey.

*/s/ Joseph DePalma*
Joseph J. DePalma

# Exhibit 1

**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 13D/A**
**Amendment No.4**
**( Rule 13d-101)**

**INFORMATION TO BE INCLUDED IN STATEMENTS FILED PURSUANT**
**TO RULE 13d-1(a) AND AMENDMENTS THERETO FILED PURSUANT TO**
**RULE 13d-2(a)**

**VENAXIS, INC.**
(Name of Issuer)

**Common Stock, no par value**
(Title of Class of Securities)

**92262A206**
(CUSIP Number)

**Barry Honig**
**555 South Federal Highway #450**
**Boca Raton, FL 33432**

**Copy To:**
**Sichenzia Ross Ference Kesner LLP**
**61 Broadway, 32nd Floor**
**New York, NY 10006**
**Attn: Harvey J. Kesner, Esq.**
(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

**December 1, 2016**
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§ 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. [X]

**Note:**  Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits.  See § 240.13d-7 for other parties to whom copies are to be sent.

*The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

Pursuant to the procedures for nominating a director candidate to the Board of Directors (the "Board") of the Company, I hereby wish to nominate the following candidates to stand for election at the Meeting called to take place on a date of the Company's choosing within the timeframe allowed pursuant to the CRS and the Company's Bylaws:

1. <u>John O'Rourke</u>
   a. 808 Solar Isle Dr., Fort Lauderdale, FL 33301
   b. T: 610-247-3917, F: 561-235-5379, E: john@atgcapitalllc.com
   c. Mr. O'Rourke is an analyst and investor who currently serves as Managing Member of ATG Capital LLC, an investment fund focused on small and mid-cap growth companies possessing distinct competitive advantages and superior management teams. Mr. O'Rourke currently serves on the Board of Directors of Customer Acquisition Network Inc., a leading global performance based marketing company that reaches more than two billion users per month. Mr. O'Rourke formerly served on the Board of Directors of Rant, Inc., an innovator in U.S. digital media, prior to its sale to a Nasdaq listed company. He was formerly CFO of Fidelity Property Group, a real estate development company with a focus in California. He received his Bachelor of Science in Accounting with Honors from the University of Maryland and a Master of Science in Finance from George Washington University.
   d. There are no family relationships between this nominee and any director or executive officer of the Company.
   e. No involvement in any legal proceedings (10 years).
   f. This nominee's security ownership of the Company is as follows:

| Title of Class | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|
| Common Stock | 20,470 Shares (1) | .45%(2) |

(1) Represents 20,470 shares of common stock held by ATG Capital LLC ("ATG"). Mr. O'Rourke is the sole manager and member of ATG and in such capacity holds voting and dispositive power over the securities held by ATG.

(2) Calculated based on 4,503,971 shares of the Common Stock outstanding as of November 11, 2016, as reported in the Company's Form 10-Q for the period ended September 30, 2016 filed with the SEC on November 14, 2016.

   g. There were no related party transactions between this nominee and the Company.

2. <u>Michael Galloro</u>
   a. 1103-25 Adelaide St E, Toronto Ontario, Canada M5C3A1
   b. T: 416-907-5644 x105, F: 647-476-5351, E: mgalloro@aloefinance.com
   d. Mr. Michael Bernardino Galloro, CA, CPA has been the Chief Executive Officer, President and Chief Financial Officer of Goldstream Minerals Inc. since December 2015 and a director of Goldstream Minerals Inc. since April 2013. He serves as the Chief Financial Officer of Yangaroo Inc. He serves as the Chief Financial Officer and Director for private and publicly listed companies operating abroad. He served as an Interim Chief Financial Officer of Alberta Oilsands Inc. from July 2012 to February 2016. Mr. Galloro served as Director, Chief Executive Officer, President and Chief Financial Officer of Black Sparrow Capital Corp, from 2011 to 2014. He continues to serve as as Interim Chief Financial Officer of Yangaroo Inc. since November 2010. He is a Founding Member of ALOE Financial Inc., a financial consulting and transaction advisory firm, established in 2010. He has been an Independent Director
   of Santa Maria Petroleum Inc. since May 2014. He is a Chartered Professional Accountants having earned his designation while working for KPMG LLP. Mr. Galloro obtained his Honours Bachelor of Accounting in 1998 from Brock University.
   d. There are no family relationships between this nominee and any director or executive officer of the Company.
   e. No involvement in any legal proceedings (10 years).
   f. This nominee's security ownership of the Company is as follows: No ownership.
   g. There were no related party transactions between this nominee and the Company.

3. <u>Mike Dai</u>
   a. 66 Snow Leopard Court, Brampton, Ontario, Canada L6R 2L7
   b. T: 416-907-5644 x140, F: 647-476-5351, E: mdai@aloefinance.com

c.   Mike Dai has been an associate with ALOE Finance Inc., a financial consulting and transaction advisory firm since 2012. Prior to his involvement with ALOE Finance, Mr. Dai held various roles at Grant Thornton LLP, an audit, tax and advisory firm between 2007 and 2012. Mr. Dai also serves as chief financial officer and director of Santa Maria Petroleum Inc. (TSXV:SMQ.H), a position he has held since 2014.

d.   There are no family relationships between this nominee and any director or executive officer of the Company.

e.   No involvement in any legal proceedings (10 years).

f.   This nominee's security ownership of the Company is as follows: No ownership.

g.   There were no related party transactions between this nominee and the Company.

Furthermore, attached hereto as Exhibit D are the signed written consents of the nominees for election as director of the Company.

I have additionally satisfied each of the additional requirements under the Venaxis' nomination procedures and bylaws as well as the objections posed by Mary Mullaney, Esq. and David Stauss, Esq., counsel to the Company in their prior correspondence. We reserve all rights to protest the exclusion of my prior director nominations and other proposals as set forth in my prior letter and demand for special meeting dated September 12, 2016 and to object to the results of such meeting, including the validity of the election of directors and shareholder vote held November 30, 2016. The 2016 Annual Meeting failed to include the opportunity for shareholders to vote on the proposals that I set forth and the proposals made by the Company differed from the matters set forth in my demand for special meeting.

Should you have any questions regarding the foregoing, please do not hesitate to contact our counsel Harvey Kesner, Esq. at (212) 930-9700.

Very truly yours,

/s/ Barry Honig
Barry Honig, individually and as trustee

-3-

# Exhibit 2



*Source: DSA Corporate Services Inc.*

*May 22, 2014 17:05 ET*

# Santa Maria Petroleum Inc. Announces the Appointments of Andrew DeFrancesco as CEO, Michael Dai as CFO and Changes to the Board of Directors

**TORONTO, ONTARIO--(Marketwired - May 22, 2014) -**

**NOT FOR DISTRIBUTION TO U.S. NEWS WIRE SERVICES OR FOR DISSEMINATION IN THE U.S.**

Santa Maria Petroleum Inc. (TSX VENTURE:SMQ.H) ("Santa Maria" or the "Company") today announces the appointment of Andrew DeFrancesco as President and CEO and Michael Dai, as CFO of Santa Maria, effective May 20, 2014.

Mr. DeFrancesco has been a member of the Board of Directors since July 7, 2011 and became Chairman of the Board on August 5, 2011. Mr. Dai C.P.A., C.A., C.F.A is a Chartered Public Accountant and Chartered Financial Analyst with over 7 years of experience working in a variety of audit, advisory, M&A and valuation engagements. Mr. Dai has been involved in a number of public and private market transactions, including business acquisitions and reverse takeovers, both domestically and internationally. Mr. Dai is an alumnus of Grant Thornton LLP and obtained his Master of Accounting from the University of Waterloo.

The Company is pleased to announce the appointments of Mr. Michael Galloro and Mr. Michael Dai, to the Board of Directors, effective May 20, 2014. Mr. Galloro, C.A., C.P.A. has 18 years experience focused on finance and capital markets, valuations, mergers & acquisitions, initial public offerings, financial reporting and corporate governance. He is an experienced officer and director of private and publicly listed companies operating domestically and in emerging markets and is a member of the Institute of Chartered Accountants of Ontario.

Mr. Ron MacMicken and Mr. Cameron Dow, C.A. resigned as CEO and CFO on May 20, 2014. The company thanks Mr. MacMicken and Mr. Dow for their commitment and hard work during their tenure with the Company.

Santa Maria also announces that it has received and accepted the resignations of Mr. Ron MacMicken and Mr. Gerald Feldman from the Board of Directors, effective May 20, 2014. The Company wishes to thank Mr. MacMicken and Mr. Feldman for their services and many contributions to the Company.

**About Santa Maria Petroleum Inc.**

Santa Maria is a junior oil and gas company that has completed the disposition of its private participating interests in 4 blocks in the Llanos Basin of Colombia.

**Cautionary Statements**

This news release may contain forward-looking information and forward-looking statements within the meaning of applicable securities laws (together, "forward-looking information"). The use of any of the words "expect", "anticipate", "continue", "estimate", "believe", "plans", "intends", "confident", "may", "objective", "ongoing", "will", "should", "project", "should" and similar expressions are intended to identify forward-looking information.

The forward-looking information is based on certain key expectations and assumptions made by Santa Maria, including expectations and assumptions concerning the operational results in Colombia. Although Santa Maria believes that the expectations and assumptions on which the forward-looking information are based are reasonable, undue reliance should not be placed on the forward-looking information because Santa Maria can give no assurance that they will prove to be correct.

Since forward-looking information addresses future events and conditions, by its very nature it involves inherent risks and uncertainties. Actual results could differ materially from those currently anticipated due to a number of factors and risks. These include, but are not limited to, the inherent risks involved in the exploration and development of oil and gas properties, the uncertainties involved in interpreting drilling results and other geological data, uncertainties relating to fluctuating oil and gas prices, the possibility of cost overruns or unanticipated costs and expenses and other factors including unforeseen delays. Anticipated exploration and development plans relating to Santa Maria's properties are subject to change.

The foregoing list of assumptions, risks and uncertainties is not exhaustive. The forward-looking information contained in this press release is made as of the date hereof and Santa Maria undertakes no obligation to update publicly or revise any forward-looking statements or information, whether as a result of new information, future events or otherwise, unless so required by applicable securities laws.

NEITHER THE TSX VENTURE EXCHANGE NOR ITS REGULATION SERVICES PROVIDER (AS THAT TERM IS DEFINED IN THE POLICIES OF THE TSX VENTURE EXCHANGE) ACCEPTS RESPONSIBILITY FOR THE ADEQUACY OR ACCURACY OF THIS RELEASE.

Contact Information:

Santa Maria Petroleum Inc.
Andrew DeFrancesco
President and Chief Executive Officer
(954) 779-1930

# Exhibit 3

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION
Washington, D.C.**

| OMB APPROVAL |
| --- |
| OMB Number: 3235-0076 |
| Estimated Average burden hours per response: 4.0 |

# FORM D

**Notice of Exempt Offering of Securities**

## 1. Issuer's Identity

**CIK (Filer ID Number)**

0001395961

**Name of Issuer**

Santa Maria Petroleum Inc.

**Jurisdiction of Incorporation/Organization**

ONTARIO, CANADA

**Previous Name(s)** ☐ None

Quetzal Energy Ltd.

SOUTHAMPTON VENTURES INC

**Entity Type**

☒ Corporation
☐ Limited Partnership
☐ Limited Liability Company
☐ General Partnership
☐ Business Trust
☐ Other

**Year of Incorporation/Organization**

☒ Over Five Years Ago
☐ Within Last Five Years (Specify Year)
☐ Yet to Be Formed

## 2. Principal Place of Business and Contact Information

**Name of Issuer**

Santa Maria Petroleum Inc.

**Street Address 1**

1103-44 Victoria Street

**Street Address 2**

| City | State/Province/Country | ZIP/Postal Code | Phone No. of Issuer |
| --- | --- | --- | --- |
| TORONTO | ONTARIO, CANADA | M5C 1Y2 | 416-907-5644 |

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| DeFrancesco | Andrew | |

| Street Address 1 | Street Address 2 |
|---|---|
| 1103-44 Victoria Street | |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| Toronto | ONTARIO, CANADA | M5C 1Y2 |

Relationship:   ☒ Executive Officer   ☒ Director   ☐ Promoter

Clarification of Response (if Necessary)

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Dai | Mike | |

| Street Address 1 | Street Address 2 |
|---|---|
| 1103-44 Victoria Street | |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| Toronto | ONTARIO, CANADA | M5C 1Y2 |

Relationship:   ☒ Executive Officer   ☒ Director   ☐ Promoter

Clarification of Response (if Necessary)

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Galloro | Michael | |

| Street Address 1 | Street Address 2 |
|---|---|
| 1103-44 Victoria Street | |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| Toronto | ONTARIO, CANADA | M5C 1Y2 |

Relationship:   ☐ Executive Officer   ☒ Director   ☐ Promoter

Clarification of Response (if Necessary)

## 4. Industry Group

☐ **Agriculture**

**Banking & Financial Services**
- ☐ **Commercial Banking**
- ☐ **Insurance**
- ☐ **Investing**
- ☐ **Investment Banking**
- ☐ **Pooled Investment Fund**
- ☐ **Other Banking & Financial Services**

☐ **Business Services**

**Energy**
- ☐ **Coal Mining**
- ☐ **Electric Utilities**
- ☐ **Energy Conservation**
- ☐ **Environmental Services**
- ☐ **Oil & Gas**
- ☐ **Other Energy**

**Health Care**
- ☐ **Biotechnology**
- ☐ **Health Insurance**
- ☐ **Hospitals & Physicians**
- ☐ **Pharmaceuticals**
- ☐ **Other Health Care**

☐ **Manufacturing**

**Real Estate**
- ☐ **Commercial**
- ☐ **Construction**
- ☐ **REITS & Finance**
- ☐ **Residential**
- ☐ **Other Real Estate**

☐ **Retailing**

☐ **Restaurants**

**Technology**
- ☐ **Computers**
- ☐ **Telecommunications**
- ☐ **Other Technology**

**Travel**
- ☐ **Airlines & Airports**
- ☐ **Lodging & Conventions**
- ☐ **Tourism & Travel Services**
- ☐ **Other Travel**

☒ **Other**

## 5. Issuer Size

| Revenue Range | Aggregate Net Asset Value Range |
|---|---|
| ☐ **No Revenues** | ☐ **No Aggregate Net Asset Value** |
| ☐ **$1 - $1,000,000** | ☐ **$1 - $5,000,000** |
| ☐ **$1,000,001 - $5,000,000** | ☐ **$5,000,001 - $25,000,000** |
| ☐ **$5,000,001 - $25,000,000** | ☐ **$25,000,001 - $50,000,000** |
| ☐ **$25,000,001 - $100,000,000** | ☐ **$50,000,001 - $100,000,000** |
| ☐ **Over $100,000,000** | ☐ **Over $100,000,000** |
| ☒ **Decline to Disclose** | ☐ **Decline to Disclose** |
| ☐ **Not Applicable** | ☐ **Not Applicable** |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ **Rule 504(b)(1) (not (i), (ii) or (iii))**    ☐ **Rule 505**

☐ **Rule 504 (b)(1)(i)**    ☒ **Rule 506(b)**

☐ **Rule 504 (b)(1)(ii)**    ☐ **Rule 506(c)**

☐ **Rule 504 (b)(1)(iii)**    ☐ **Securities Act Section 4(a)(5)**

                              ☐ **Investment Company Act Section 3(c)**

## 7. Type of Filing

☒ **New Notice**      **Date of First Sale** 2016-09-23    ☐ **First Sale Yet to Occur**

☐ **Amendment**

## 8. Duration of Offering

**Does the Issuer intend this offering to last more than one year?**    ☐ **Yes**    ☒ **No**

## 9. Type(s) of Securities Offered (select all that apply)

☐ **Pooled Investment Fund Interests**    ☒ **Equity**

☐ **Tenant-in-Common Securities**    ☐ **Debt**

☐ **Mineral Property Securities**    ☐ **Option, Warrant or Other Right to Acquire Another Security**

☐ **Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security**    ☐ **Other (describe)**

## 10. Business Combination Transaction

**Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?**    ☐ **Yes**    ☒ **No**

**Clarification of Response (if Necessary)**

## 11. Minimum Investment

**Minimum investment accepted from any outside investor**    $ 0 **USD**

## 12. Sales Compensation

| | | |
|---|---|---|
| **Recipient** | **Recipient CRD Number** | ☐ None |
| **(Associated) Broker or Dealer** ☐ None | **(Associated) Broker or Dealer CRD Number** | ☐ None |
| **Street Address 1** | **Street Address 2** | |

**City**          **State/Province/Country**          **ZIP/Postal Code**

**State(s) of Solicitation**   ☐   **All States**

## 13. Offering and Sales Amounts

| | | | |
|---|---|---|---|
| Total Offering Amount | $ **536314** USD | ☐ | Indefinite |
| Total Amount Sold | $ **536314** USD | | |
| Total Remaining to be Sold | $ **0** USD | ☐ | Indefinite |

**Clarification of Response (if Necessary)**

## 14. Investors

☐    Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors,
Number of such non-accredited investors who already have invested in the offering

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:    **9**

## 15. Sales Commissions & Finders' Fees Expenses

**Provide separately the amounts of sales commissions and finders' fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.**

| | | | |
|---|---|---|---|
| Sales Commissions | $ **0** USD | ☐ | Estimate |
| Finders' Fees | $ **0** USD | ☐ | Estimate |

**Clarification of Response (if Necessary)**

## 16. Use of Proceeds

**Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.**

$ **0** USD    ☐ Estimate

**Clarification of Response (if Necessary)**

# Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each Issuer named above is:

- **Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, the information furnished to offerees.**

- **Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the Issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against it in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.**

- **Certifying that the Issuer is not disqualified from relying on any Regulation D exemption it has identified in Item 6 above for one of the reasons stated in Rule 505(b)(2)(iii).**

**Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.**

**For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.**

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| **Santa Maria Petroleum Inc.** | **/s/ Mike Dai** | **Mike Dai** | **Chief Financial Officer** | **2016-10-06** |

# Exhibit 4



# OTCQB Certification

I, <u>Mike Dai</u>, <u>Chief Financial Officer</u> of <u>Santa Maria Petroleum Inc.</u> ("the Company"), certify that:

a.   The Company is registered or required to file periodic reporting with the SEC or is exempt from SEC registration as indicated below (mark the box below that applies with an "X"):

    [ _ ]  Company is registered under Section 12(g) of the Exchange Act
    [x]  Company is relying on Exchange Act Rule 12g3-2(b)
    [ _ ]  Company is a bank that reports to a Bank Regulator under Section 12(i) of the Exchange Act
    [ _ ]  Company is a bank that is non-SEC reporting but is current in its reporting to a Banking Regulator
    [ _ ]  Company is reporting under Section 15(d) of the Exchange Act.
    [ _ ]  Other (describe) _____

b. The Company is current in its reporting obligations as of the most recent fiscal year end and any subsequent quarters, and such information has been posted either on the SEC's EDGAR system or the OTC Disclosure & News Service, as applicable.

c. The Company Profile displayed on <u>www.otcmarkets.com</u> is current and complete as of <u>December 1, 2016</u> and includes the total shares outstanding, authorized, and in the public float as of that date.

d. The following is a complete list of attorney(s) and law firm(s) who advised or assisted in the preparation of the Company's most recent annual report, including in-house counsel: (If no attorney assisted in putting together the disclosure, indicate the person or persons who prepared the disclosure and their relationship to the company.)

<u>No attorneys. Disclosures were prepared by:</u>

<u>Mike Dai, CFO</u>
<u>Andrew DeFrancesco, CEO</u>
<u>Michael Galloro, Director</u>

e. The following is a complete list of third party providers, including names and addresses, engaged by the Company, its officers, directors or controlling shareholders, during the period from the Company's prior fiscal year end to the date of this OTCQB Certification, to provide investor relations services, public relations services, or other related services to the Company including promotion of the Company or its securities:

<u>None</u>

f. Listed below are the names, legal addresses and % of shares owned by all Officers, Directors and Control Persons (control persons are beneficial owners of more than five percent (5%) of any class of the issuer's equity securities). If any of the beneficial shareholders are corporate shareholders, the name and address of the person(s) owning or controlling such corporate shareholders and the resident agents of the corporate shareholders must also be included.

| Name | Address (City and State only) | % Shares Owned |
|---|---|---|
| Andrew DeFrancesco | Toronto, Ontario | 0% |
| Mike Dai | Toronto, Ontario | 0% |
| Michael Galloro | Toronto, Ontario | 0% |
| ATG Capital LLC** | Fort Lauderdale, FL | 6.7% |
| DSB Capital Ltd.** | Providenciales, Turks & Caicos | 9.9% |
| GT Capital (Andrea DeFrancesco) | Mississauga, Ontario | 10.0% |
| Jonathan Honig | Boca Raton, FL | 6.8% |
| Stetson Capital Management, LLC** | Fort Lauderdale, FL | 6.0% |

OTC Markets

| | | |
|---|---|---|
| Sunnybrook Preemie Investments Inc. (Carmella DeFrancesco) | Etobicoke, Ontario | 5.3% |
| | | |
| | | |
| | | |
| | | |
| ** the primary controller of this entity is not known to the issuer at this time | | |

Date: December 2, 2016

Name of Certifying CEO or CFO: Mike Dai

Title: CFO

Signature: "/s/ MIKE DAI"
(Digital Signatures should appear as "/s/ [OFFICER NAME]")

# Exhibit 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

# FORM 8-K

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported) January 6, 2017**

# Bioptix, Inc.

**(Exact name of Registrant as specified in its charter)**

| Colorado | 001-33675 | 84-155337 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

| 1775 38 th Street Boulder, Colorado | 80301 |
|---|---|
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code:**      **(303) 545-5550**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02.   Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On January 6, 2017, Bioptix, Inc. (the "Company") appointed John O'Rourke and Mike Dai as directors of the Company following the resignation of Gail S. Schoettler, Susan A. Evans and David E. Welch from the Board of Directors of the Company.  Mr. O'Rourke and Mr. Dai constitute independent non-employee directors as defined by NASDAQ Rule 5605(a)(2).  Mr. O'Rourke constitutes an audit committee financial expert within the meaning of Item 407(d)(5)(ii) of Regulation S-K promulgated under the Securities Act of 1933, as amended.  Mr. Beeghley, Mr. O'Rourke and Mr. Dai were each appointed to the Nominating and Governance Committee (Mr. Beeghley, Chairman), Audit Committee (Mr. O'Rourke Chairman) and Compensation Committee (Mr. Dai Chairman) and all other directors were removed from such committees.

Mr. O'Rourke is an analyst and investor who currently serves as Managing Member of ATG Capital LLC, an investment fund focused on small and mid-cap growth companies possessing distinct competitive advantages and superior management teams.  Mr. O'Rourke currently serves on the Board of Directors of Customer Acquisition Network Inc., a leading global performance based marketing company that reaches more than two billion users per month.  Mr. O'Rourke formerly served on the Board of Directors of Rant, Inc., an innovator in U.S. digital media, prior to its sale to a Nasdaq listed company. He was formerly CFO of Fidelity Property Group, a real estate development company with a focus in California. He received his Bachelor of Science in Accounting with Honors from the University of Maryland and a Master of Science in Finance from George Washington University.

Mr. Dai has been an associate with ALOE Finance Inc., a financial consulting and transaction advisory firm since 2012. Prior to his involvement with ALOE Finance, Mr. Dai held various roles at Grant Thornton LLP, an audit, tax and advisory firm between 2007 and 2012. Mr. Dai also serves as chief financial officer and director of Santa Maria Petroleum Inc. (TSXV:SMQ.H), a position he has held since 2014.

Each of the resigning directors affirmed that the resignation was not related to any disagreement or concerns related to the financial status or financial statements of the Company.

**Item 9.01.   Financial Statements and Exhibits.**

(d)        Exhibits

**Exhibits**

99.1      Letter of Resignation

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Bioptix, Inc. (formerly known as Venaxis, Inc.)
(Registrant)

January 6, 2017                    By:    /s/ Jeffrey G. McGonegal

                                          Name:    Jeffrey G. McGonegal
                                          Title:    Chief Financial Officer

**EXHIBIT INDEX**

Exhibit No.    Description

99.1           Letter of Resignation

Exhibit 99.1

January 6, 2017

Bioptix, Inc.
1775 38th Street
Boulder, CO 80301
Attn:  Chief Executive Officer

Dear Steve:

On December 8, 2016, Barry Honig, the beneficial owner of more than ten percent of the outstanding shares of Bioptix, Inc. (the "Company"), commenced a legal action in Colorado State court to compel the Company to hold a special meeting of shareholders to remove Gail Schoettler, Susan Evans and David Welch from the Company's Board of Directors and to elect three nominees proposed by Mr. Honig.  The members of the Board of the Company have engaged in discussions with principal shareholders of the Company subsequent to the commencement of such action, and, based on such discussions, have determined that if such special meeting were to be held, the proposals submitted by Mr. Honig would be approved by the shareholders.  Therefore, in the best interests of the Company and its shareholders, in order to preserve the assets of the Company to be used for business purposes, each of the undersigned directors hereby resigns from the Board and each Committee of the Board on which he or she serves, effective as of January 6, 2017.

Each of the undersigned resigning directors affirms that this resignation is not related to any disagreement or concerns related to the financial status or financial statements of the Company.

Sincerely,


 /s/ Gail Schoettler
Gail Schoettler

 /s/ Susan Evans
Susan Evans

/s/ David Welch
David Welch

# Exhibit 6

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

# FORM 8-K

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (Date of earliest event reported): January 14, 2017**

# Bioptix, Inc.

**(Exact name of Registrant as specified in its charter)**

| Colorado | 001-33675 | 84-155337 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

| 1775 38 th Street Boulder, Colorado | 80301 |
|---|---|
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code:**     **(303) 545-5550**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01      Entry Into a Material Definitive Agreement.**

On January 18, 2017, Bioptix, Inc. (the "Company") entered into an agreement (the "Agreement") with certain shareholders of the Company (the "Shareholders") providing for termination of certain pending litigation related to the Shareholders' demand for the Company to hold a Special Meeting of its shareholders for the purpose of (a) removing three (3) members of the Company's Board of Directors; (b) setting the size of the Board of Directors at no more than six (6) members and (c) electing three (3) candidates proposed by the Shareholders to the Company's Board of Directors (the "Proposals").  The Agreement followed the resignation of (3) three members of the Board of Directors of the Company effective January 6, 2017 and appointment of two (2) of the director candidates proposed by the Shareholders, as previously reported on the Company's Current Report on Form 8-K dated January 6, 2017.

In connection with the Agreement, the Shareholders agreed to withdraw the action pending before the District Court, Douglas County, Colorado (the "Action") under which the court issued an order requiring the Company to (a) issue to its shareholders notice of the Special Meeting on or prior to January 10, 2017; (b) hold a Special Meeting of shareholders to consider the Proposals pursuant to Section 7-107-103(1)(b) of the Colorado Revised Statutes not less than 10 nor more than 60 days from the date of notice; (c) bear the expense of sending notice of the Special Meeting and (d)  pay the reasonable costs and expenses incurred and to be incurred, including reasonable attorneys' fees.

**Item 2.05      Costs Associated with Exit or Disposal Activities.**

On January 14, 2017, the Board of Directors of the Company adopted a plan under which the Company will terminate certain employees associated with the September 2016 acquisition of Bioptix Diagnostics, Inc.  The Company commenced terminations on January 16, 2017 and terminations are expected to be completed within 30 days.  The Company may pay severance benefits in certain circumstances of up to one month base salary.  The Board of Directors determined to take the action following a review and assessment of the anticipated time to realization of benefits from the acquisition, further product development required and the sales forecasts, costs and results of operations projected during the near to mid-term period.  The Company is also reviewing possible strategic alternatives for the business.  The Company is unable in good faith to make a determination at this time of an estimate or range of estimate of costs associated with the decision and undertakes to file an amended Current Report on Form 8-K within four business days after making a determination of such estimate or range of estimates.

**Item 8.01      Other Events**

On January 20, 2017 , the Company issued a press release announcing the plans discussed in Item 2.05 herein. The press release is attached as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated herein by reference.

**Item 9.01      Financial Statements and Exhibits.**

(d) Exhibits.

| Number | Exhibit |
| --- | --- |
| 10.1 | Agreement dated January 18, 2017 |
| 99.1 | Press release dated January 20, 2017 |

**SIGNATURES**


Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.


Bioptix, Inc.
(Registrant)

January 20, 2017                                    By:    /s/ Jeffrey G. McGonegal
                                                                  Name:      Jeffrey G. McGonegal
                                                                  Title:        Chief Financial Officer

Exhibit 10.1

**AGREEMENT**

**WHEREAS** , Barry Honig, in his individual capacity and as trustee of GRQ Consultants Inc. 401K ('collectively, " <u>Honig</u> "), and Catherine DeFrancesco, in her individual capacity and as the controlling person of DSB Capital, Ltd., DeFrancesco Motorsports, Inc., Delavalco Holdings, Inc. (an Ontario corporation), Delavalco Holdings, Inc. (a Florida corporation), Marcandy Investments Corp. and Namaste Gorgie, Inc. (collectively, " <u>DeFrancesco</u> " and with Honig, the " <u>Shareholders</u> ") have filed Schedule 13D filings and amendments thereto (the " <u>Schedule 13D Filings</u> ") with respect to Bioptix, Inc. (f/k/a Venaxis, Inc.), a Colorado corporation (the " <u>Company</u> ") to report ownership, of greater than ten percent (10%) of the common stock of the Company, and have made a demand (the " <u>Demand</u> ") for a special meeting of shareholders (the " <u>Special Meeting</u> ") of the Company for the purposes of: (a) removing three (3) members of the Company's Board of Directors; (b) setting the size of the Board of Directors of the Company at no more than six (6) members; and (c) electing three (3) candidates proposed by the Shareholders to the Company's Board of Directors (the " <u>Special Meeting Proposals</u> ").

**WHEREAS** , pursuant to that certain "Order" dated December 21, 2016 in the matter of <u>Barry Honig v Bioptix, Inc</u> . (Case No. 16CV31207) pending in the District Court, Douglas County, Colorado (the " <u>Action</u> ") the Company is required to: (a) issue to its shareholders notice of the Special Meeting on or prior to January 10, 2017; (b) hold a Special Meeting of shareholders to consider the Special Meeting Proposals pursuant to Section 7-107-103(1)(b) of the Colorado Revised Statutes not less than 10 nor more than 60 days from the date of notice; (c) bear the expense of sending notice of the Special Meeting; and (d)  pay the reasonable costs and expenses of Honig incurred and to be incurred, including reasonable attorneys fees.

**WHEREAS** , on January 6, 2017 Gail S. Schoettler, Susan A. Evans and David E. Welch resigned as members of the Board of Directors of the Company and Michael Dai and John O'Rourke were appointed to the Board of Directors to fill two of three vacancies resulting from the resignations.  The Company and the Shareholders desire to enter into this Agreement (the " <u>Agreement</u> ") in order to provide for the withdrawal of the Special Meeting Proposals and termination of the Action.

**NOW, THEREFORE** , based on adequate consideration, the sufficiency of which is acknowledged, the parties to this Agreement, enter into this legal and binding Agreement as follows.

1.        <u>Withdrawal of Demand</u> .  The Shareholders hereby withdraw the Special Meeting Demand.

2.        <u>Stipulation of Dismissal</u> .  Within three (3) business days of payment set forth in paragraph 3 hereof, the Company and the Shareholders shall enter into a stipulation dismissing the Action, without prejudice.

3.        <u>Payment of Fees</u> .  Within two (2) business days following the execution of this Agreement the Company shall wire funds not to exceed such amount as authorized by the Company's Board of Directors, to the account(s) designated by Shareholders.

4.         <u>Injunctive Relief</u> .  Each Shareholder agrees that money damages may not be a sufficient remedy for any breach of this Agreement by such Shareholder and that in addition to all other remedies the Company shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach.  If any provision or portion of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable for any reason, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by applicable law.

5.        Entire Agreement .  This Agreement contains the full and complete understanding of the parties with respect to the subject matter hereof and supersedes all prior representations and understandings regarding the subject matter hereof, whether oral or written.  Failure to exercise or delay in exercising any remedy hereunder shall not be deemed a waiver thereof. Each party represents that this Standstill Agreement is being signed by a duly authorized officer

6.        Governing Law .  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida.  E ach party hereby irrevocably and unconditionally submits to the exclusive jurisdiction of any State or Federal court sitting in Palm Beach County, Florida over any suit, action or proceeding arising out of or relating to this Agreement.  Each party hereby irrevocably and unconditionally waives any objection to the placing of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.  EACH OF THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY WAIVES ANY DEMAND FOR A JURY TRIAL.

7.        Miscellaneous .  This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute one and the same agreement.  The exchange of copies of this Agreement and of signature pages by facsimile transmission or electronic mail in .pdf or similar format shall constitute effective execution and delivery of this Agreement as to the parties.  For purposes of this Agreement any reference to "written" or "in writing" shall be deemed to include correspondence by signed letter or facsimile or by e-mail.

**BIOPTIX, INC.**

By:  /s/ Steve Lundy
        Stephen T. Lundy, President
        and Chief Executive Officer

**Barry Honig as an individual**
**Barry Honig for GRQ Consultants Inc. 401K, as Trustee**

By:  /s/ Barry Honig
        Barry Honig

**Catherine Johanna DeFrancesco as an individual**
**Catherine Johanna DeFrancesco  for DSB Capital, Ltd., a Turks & Caicos company, as Trustee,**
**Catherine Johanna DeFrancesco for DeFrancesco Motorsports, Inc., an Ontario corporation, as President,**
**Catherine Johanna DeFrancesco  for Delavalco Holdings, Inc., an Ontario corporation, as President,**
**Catherine Johanna DeFrancesco  for Delavalco Holdings, Inc., a Florida corporation, as President,**
**Catherine Johanna DeFrancesco  for Marcandy Investments Corp., an Ontario corporation, as President,**
**Catherine Johanna DeFrancesco for Namaste Gorgie, Inc., an Ontario corporation, as President**

By:  /s/ Catherine Johanna DeFrancesco
        Catherine Johanna DeFrancesco

Dated:  January 18, 2017

Exhibit 99.1

**Bioptix Announces Streamlining of Workforce**

BOULDER, Colo., January 20, 2017 /PRNewswire/ --  Bioptix, Inc. (BIOP) ("Bioptix" or the "Company"), announced that o n January 14, 2017 the Board of Directors of the Company adopted a plan under which the Company will terminate certain employees associated with the September 2016 acquisition of its subsidiary, Bioptix Diagnostics, Inc.  The Company commenced terminations on January 16, 2017 and terminations are expected to be completed within 30 days.  The Company may pay severance benefits in certain circumstances of up to one month base salary.  The Board determined to take the action following a review and assessment of the anticipated time to realization of benefits from the acquisition, further product development required and the sales forecasts, costs and results of operations projected during the near to mid-term period.  The Company is reviewing possible strategic alternatives relative to the business.

None of the Company's current Board members, with the exception of the CEO, were employees or Board members of the Company at the time of the Bioptix purchase.

Michael Beeghley, Chairman of the Board of Directors commented "The Board and executive team are committed to growing the business of the Company and enhancing prospects for growth and increasing shareholder value.  In this endeavor we may explore strategic alternatives that would be accretive to the Company as a whole and that would maximize shareholder value."

**About Bioptix, Inc.**

Bioptix, Inc., through its subsidiary Bioptix Diagnostics, Inc., acquired Enhanced Surface Plasmon Resonance ("eSPR") instruments designed to increase the flexibility and reliability of SPR for a broad range of applications during 2016.  The Company is developing a plan to address technical and other initiatives related to eSPR while it continues to be a licensor of important patents and technology in its intellectual property portfolio.

**Forward Looking Statements:**

This press release contains "forward-looking statements" regarding matters that are not historical facts, including statements relating to the Company's operations and future strategic acquisitions. Because such statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by such forward-looking statements. Words such as "anticipates," "plans," "expects," "intends," "will," "potential," "hope" and similar expressions are intended to identify forward-looking statements.  These forward-looking statements are based upon current expectations of the Company and involve assumptions that may never materialize or may prove to be incorrect. Actual results and the timing of events could differ materially from those anticipated in such forward-looking statements as a result of various risks and uncertainties. Detailed information regarding factors that may cause actual results to differ materially from the results expressed or implied by statements in this press release relating to the Company may be found in the Company's periodic filings with the Securities and Exchange Commission, including the factors described in the section entitled "Risk Factors" in its annual report on Form 10-K for the fiscal year ended December 31, 2015, as amended and supplemented from time to time and the Company's Quarter Reports on Form 10-Q and other filings submitted by the Company to the SEC, copies of which may be obtained from the SEC's website at www.sec.gov . The parties do not undertake any obligation to update forward-looking statements contained in this press release.

Contact:  InvestorRelations@venaxis.com

# Exhibit 7

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

# FORM 8-K

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (Date of earliest event reported): March 16, 2017**

# Bioptix, Inc.
**(Exact name of Registrant as specified in its charter)**

| Colorado | 001-33675 | 84-155337 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

| 1775 38th Street Boulder, Colorado | 80301 |
|---|---|
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code:**      **(303) 545-5550**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[_] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[_] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[_] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[_] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into a Material Definitive Agreement.**

*Private Placement of Notes*

      As previously disclosed on a Current Report on Form 8-K, filed with the Securities and Exchange Commission on March 16, 2017, on March 15, 2017, Bioptix, Inc. (the "Company") entered into separate securities purchase agreements (the "Purchase Agreements") pursuant to which it agreed to sell up to $4,750,000 of principal amount of convertible promissory notes (the "Notes") and three year warrants to purchase shares of the Company's common stock, no par value per share (the "Common Stock") (the "Warrants") to accredited investors (the "Investors")(the "Private Placement").  On March 16, 2017, the Company satisfied all closing conditions and closed the Private Placement. The Notes were issued to each Investor in such Investor's subscription amount and are convertible into shares of Common Stock at an initial conversion price of $2.50 (the "Conversion Price").  Each Warrant is exercisable into shares of Common Stock at an exercise price equal to $3.56 per share.

      The Notes are convertible at the Conversion Price at any time after the Company has received (i) NASDAQ Approval (as defined in the Purchase Agreement) and (ii) Shareholder Approval (as defined in the Notes).  The Company is prohibited from effecting a conversion of any Note to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon conversion of such Note.

      Pursuant to the Purchase Agreement, within 45 days of closing, the Company shall file a preliminary proxy statement for a special meeting of its stockholders, in order to submit to its stockholders a proposal to approve an amendment to the Company's Articles of Incorporation authorizing the creation of 15,000,000 shares of "blank check" preferred stock and, thereafter, the Company shall designate  shares of preferred stock as "Series A Preferred Stock" by filing a Certificate of Designations, Preferences and Rights of 0% Series A Convertible Preferred Stock (the "Certificate of Designations") with the Secretary of State (such date of filing, the "Filing Date"). On the Filing Date, the Notes shall automatically, and without any further action on the part of the Investors, be exchanged for shares of Series A Convertible Preferred Stock (the "Preferred Shares") based on a ratio of $1.00 of stated value of Preferred Share for each $1.00 of then outstanding principal amount plus any accrued but unpaid interest thereon, pursuant to Section 3(a)(9) of the Securities Act of 1933, as amended.

      The Warrants are exercisable, at a price of $3.56 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the Warrants on a cashless basis. The Company is prohibited from effecting an exercise of any Warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such Warrant.

      The conversion of the Notes (and Preferred Shares) and exercise of the Warrants are subject to the approval of the Company's stockholders pursuant to rules of The NASDAQ Stock Market LLC.

      The offering was made pursuant to an exemption from registration under Section 4(a)(2) of the Securities Act.  Additionally, the Company entered into separate registration rights agreements (the "Registration Rights Agreement") with each of the Investors, pursuant to which the Company will undertake to file a registration statement to register the shares of Common Stock issuable upon (i) conversion of the Notes; (ii) exercise of the  Warrants and (iii) conversion of the Preferred Shares issued or issuable pursuant to the Purchase Agreement, within forty-five days following the date of closing, to cause such registration statement to be declared effective by the Securities and Exchange Commission within one hundred and twenty days of the filing date and to maintain the effectiveness of the registration statement until all of such shares of Common Stock registered have been sold or are otherwise able to be sold pursuant to Rule 144.  In the event the Company fails to file, or obtain effectiveness of, such registration statement with the given period of time, the Company will be obligated to pay liquidated damages to the Investors for every thirty-days during which such filing is not made and/or effectiveness obtained, such fee being subject to certain exceptions.

      The proceeds of the Private Placement were deposited into an escrow account with Signature Bank, as escrow agent (the "Escrow Agent") pursuant to an escrow deposit agreement (the "Cash Escrow Agreement") entered into by and between the Company, the Lead Investor (as defined in the Purchase Agreement) and the Escrow Agent.  The Notes, Warrants and Preferred Shares (when exchanged for the Notes) were or will be deposited and delivered to Corporate Stock Transfer, Inc., as securities escrow agent (the "Securities Escrow Agent") pursuant to an escrow agreement (the "Securities Escrow Agreement"), entered into by and between the Company, the Lead Investor (as defined in the Purchase Agreement) and the Securities Escrow Agent all to be held in escrow pending the occurrence or non-occurrence of a Qualified Transaction (as defined in the Purchase Agreement).

      Canaccord Genuity, Inc. acted as financial advisor to the Company in the financing.

      The foregoing description of the Purchase Agreement, Registration Rights Agreement, Cash Escrow Agreement, Securities Escrow Agreement, Certificate of Designation, Note and Warrant is not complete and is qualified in its entirety by reference to the full text of the Form of Purchase Agreement, Form of Registration Rights Agreement, Form of Cash Escrow Agreement, Form of Securities Escrow Agreement, Form of Certificate of Designation, Form of Note and Form of Warrant, copies of which are filed as Exhibit 10.1, Exhibit 10.2, Exhibit 10.3, Exhibit 10.4, Exhibit 3.1, Exhibit 4.1 and Exhibit 4.2, respectively, to this Report and are incorporated by reference herein.

**Item 3.02 Unregistered Sales of Equity Securities**

***Private Placement of Notes***

      On March 16, 2017, the Company completed the closing of the Private Placement and issued the Notes in an aggregate principal amount of $4,750,000 and Warrants, to purchase an aggregate of 2,800,000 shares of Common Stock, in consideration for aggregate gross proceeds of $4,750,000. The details of this transaction are described in Item 1.01, which is incorporated by reference, in its entirety, into this Item 3.02.

      The Notes, the Warrants, the shares of Common Stock issuable upon conversion of the Notes and the Preferred Shares (when exchanged for Notes) and the shares of Common Stock issuable upon exercise of the Warrants have not been registered under the Securities Act, or the securities laws of any state, and were offered and issued in reliance on the exemption from registration under the Securities Act, afforded by Section 4(a)(2).

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| | |
|---|---|
| 3.1 | Form of Certificate of Designations |
| 4.1 | Form of Note |
| 4.2 | Form of Warrant |
| 10.1 | Form of Purchase Agreement |
| 10.2 | Form of Registration Rights Agreement |
| 10.3 | Form of Cash Escrow Agreement |
| 10.4 | Form of Securities Escrow Agreement |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Bioptix, Inc.
(Registrant)

March 17, 2017

By:   /s/ Jeffrey G. McGonegal

          Name:    Jeffrey G. McGonegal
          Title:     Chief Financial Officer

Exhibit 3.1

**CERTIFICATE OF DESIGNATION OF RIGHTS, POWERS, PREFERENCES, PRIVILEGES AND RESTRICTIONS OF THE
2% SERIES A CONVERTIBLE PREFERRED STOCK OF
BIOPTIX, INC.**

I, [_____], hereby certify that I am the [_____] of Bioptix, Inc. (the " **Company** "), a corporation organized and existing under the Colorado Revised Statutes (the " **CRS** "), and further do hereby certify:

That, pursuant to the authority expressly conferred upon the Board of Directors of the Company (the " **Board** ") by the Company's Articles of Incorporation, as amended (the " **Articles of Incorporation** "), the Board on [___], 2017 adopted the following resolutions creating a series of shares of Preferred Stock designated as 2% Series A Convertible Preferred Stock, none of which shares has been issued:

RESOLVED, that the Board designates the 2% Series A Convertible Preferred Stock and the number of shares constituting such series, and fixes the rights, powers, preferences, privileges and restrictions relating to such series in addition to any set forth in the Articles of Incorporation as follows:

**TERMS OF SERIES A CONVERTIBLE PREFERRED STOCK**

1.      <u>Designation and Number of Shares</u> . There shall hereby be created and established by this Certificate of Designation of Rights, Powers, Preferences, Privileges and Restrictions (this " **Certificate of Designation** ") a series of preferred stock of the Company designated as "0% Series A Convertible Preferred Stock" (the " **Preferred Shares** ").  The authorized number of Preferred Shares shall be [___] (      ) shares . Each Preferred Share shall have no par value. Capitalized terms not defined herein shall have the meaning as set forth in Section 23 below or in the Purchase Agreement.

2.      <u>Ranking</u> . Except to the extent that the holders of at least a majority of the outstanding Preferred Shares, including the Lead Investor (as defined in the Purchase Agreement) (the " **Required Holders** ") expressly consent to the creation of Parity Stock (as defined below) or Senior Preferred Stock (as defined below) in accordance with Section 12, all shares of capital stock of the Company shall be junior in rank to all Preferred Shares with respect to the preferences as to dividends, distributions and payments upon the liquidation, dissolution and winding-up of the Company (such junior stock is referred to herein collectively as " **Junior Stock** "). The rights of all such shares of capital stock of the Company shall be subject to the rights, powers, preferences and privileges of the Preferred Shares.  Without limiting any other provision of this Certificate of Designation, without the prior express consent of the Required Holders, voting separate as a single class, the Company shall not hereafter authorize or issue any additional or other shares of capital stock that is (i) of senior rank to the Preferred Shares in respect of the preferences as to dividends, distributions and payments upon the liquidation, dissolution and winding-up of the Company (collectively, the " **Senior Preferred Stock** "), (ii) of pari passu rank to the Preferred Shares in respect of the preferences as to dividends, distributions and payments upon the liquidation, dissolution and winding-up of the Company (collectively, the " **Parity Stock** ") or (iii) any Junior Stock having a maturity date (or any other date requiring redemption or repayment of such shares of Junior Stock) that is prior to the date on which any Preferred Shares remain outstanding. In the event of the merger or consolidation of the Company with or into another corporation, the Preferred Shares shall maintain their relative rights, powers, designations, privileges and preferences provided for herein and no such merger or consolidation shall result inconsistent therewith.

3.       <u>Dividends</u> . (a) In addition to Sections 5(a) and 11 below, from and after the first date of issuance of any Preferred Shares (the " **Initial Issuance Date** "), each holder of a Preferred Share (each, a " **Holder** " and, collectively, the " **Holders** ") shall be entitled to receive dividends (" **Dividends** "), which Dividends shall be paid by the Company out of funds legally available therefor, payable, subject to the conditions and other terms hereof, in shares of Common Stock or cash on the Stated Value  of such Preferred Share at the Dividend Rate, which shall be cumulative and shall continue to accrue and compound monthly whether or not declared and whether or not in any fiscal year there shall be net profits or surplus available for the payment of dividends in such fiscal year.  Dividends on the Preferred Shares shall commence accumulating on the Initial Issuance Date and shall be computed on the basis of a 365-day year and actual days elapsed.  Dividends shall be payable quarterly in arrears on the first day of the next applicable quarter (each, a " **Dividend Date** ") .  If a Dividend Date is not a Business Day, then the Dividend shall be due and payable on the Business Day immediately following such Dividend Date.

(b)   Dividends shall be payable on each Dividend Date, to the record holders of the Preferred Shares on the applicable Dividend Date, in shares of Common Stock (" **Dividend Shares** ") so long as the delivery of Dividend Shares would not violate the provisions of Section **Error! Reference source not found.** ; provided, however, that the Company may, at its option, pay Dividends on any Dividend Date in cash (" **Cash Dividends** ") or in a combination of Cash Dividends.  The Company shall deliver a written notice (each, a " **Dividend Election Notice** ") to each Holder on the Dividend Notice Due Date (the date such notice is delivered to all of the Holders, the " **Dividend Notice Date** ") which notice either (A) confirms that Dividends to be paid on such Dividend Date shall be paid entirely in Dividend Shares or (B) elects to pay Dividends as Cash Dividends or a combination of Cash Dividends and Dividend Shares and specifies the amount of Dividends that shall be paid as Cash Dividends and the amount of Dividends, if any, that shall be paid in Dividend Shares.

(c)   When any Dividend Shares are to be paid on an Dividend Date to any Holder, the Company shall (i) (A) provided that (x) the Transfer Agent is participating in the Depository Trust Company (" **DTC** ") Fast Automated Securities Transfer Program and (y) either a registration statement for the resale by the applicable Holder of the Dividend Shares or such Dividend Shares to be so issued are otherwise eligible for resale pursuant to Rule 144, credit such aggregate number of Dividend Shares to which such Holder shall be entitled to such Holder's or its designee's balance account with DTC through its Deposit/Withdrawal at Custodian system, or (B) if either of the immediately preceding clauses (x) or (y) are not satisfied, issue and deliver on the applicable Dividend Date, to the address set forth in the register maintained by the Company or to such address as specified by such Holder in writing to the Company at least two (2) Business Days prior to the applicable Dividend Date, a certificate, registered in the name of such Holder or its designee, for the number of Dividend Shares to which such Holder shall be entitled and (ii) with respect to each Dividend Date, pay to such Holder, in cash by wire transfer of immediately available funds, the amount of any Cash Dividend.  The Company shall pay any and all taxes that may be payable with respect to the issuance and delivery of Dividend Shares.

4. <u>Conversion</u> . Each Preferred Share shall be convertible into validly issued, fully paid and non-assessable shares of Common Stock on the terms and conditions set forth in this Section 4.

(a) <u>Holder's Conversion Right</u> . Subject to the provisions of Section 4(e) and 4(f), at any time or times on or after the Initial Issuance Date, each Holder shall be entitled to convert any whole number of Preferred Shares into validly issued, fully paid and non-assessable shares of Common Stock in accordance with Section 4(c) at the Conversion Rate (as defined below).

(b) <u>Conversion Rate</u> . The number of validly issued, fully paid and non-assessable shares of Common Stock issuable upon conversion of each Preferred Share pursuant to Section 4(a) shall be determined according to the following formula (the " **Conversion Rate** "):

Base Amount

Conversion Price

No fractional shares of Common Stock are to be issued upon the conversion of any Preferred Shares. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share of Common Stock up to the nearest whole share.

(c) <u>Mechanics of Conversion</u> . The conversion of each Preferred Share shall be conducted in the following manner:

(i) <u>Holder's Conversion</u> . To convert a Preferred Share into validly issued, fully paid and non-assessable shares of Common Stock on any date (a " **Conversion Date** "), a Holder shall deliver (whether via facsimile or otherwise), for receipt on or prior to 11:59 p.m., New York time, on such date, a copy of an executed notice of conversion of the share(s) of Preferred Shares subject to such conversion in the form attached hereto as **Exhibit I** (the " **Conversion Notice** ") to the Company. If required by Section 4(c)(vi), within five (5) Trading Days following a conversion of any such Preferred Shares as aforesaid, such Holder shall surrender to a nationally recognized overnight delivery service for delivery to the Company the original certificates representing the share(s) of Preferred Shares (the " **Preferred Share Certificates** ") so converted as aforesaid.

(ii) <u>Company's Response</u> . On or before the first (1 st ) Trading Day following the date of receipt of a Conversion Notice, the Company shall transmit by facsimile, or if requested by Holder, by email, an acknowledgment of confirmation, in the form attached hereto as **Exhibit II** , of receipt of such Conversion Notice to such Holder and the transfer agent for the Company's Common Stock (the " **Transfer Agent** "), which confirmation shall constitute an instruction to the Transfer Agent to process such Conversion Notice in accordance with the terms herein. On or before the second (2 nd ) Trading Day following the date of receipt by the Company of such Conversion Notice, the Company shall (1) provided that the Transfer Agent is participating in DTC Fast Automated Securities Transfer Program, credit such aggregate number of shares of Common Stock to which such Holder shall be entitled to such Holder's or its designee's balance account with DTC through its Deposit and Withdrawal at Custodian system, or (2) if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver (via reputable overnight courier) to the address as specified in such Conversion Notice, a certificate, registered in the name of such Holder or its designee, for the number of shares of Common Stock to which such Holder shall be entitled. If the number of Preferred Shares represented by the Preferred Share Certificate(s) submitted for conversion pursuant to Section 4(c)(vi) is greater than the number of Preferred Shares being converted, then the Company shall, if requested by such Holder, as soon as practicable and in no event later than three (3) Trading Days after receipt of the Preferred Share Certificate(s) and at its own expense, issue and deliver to such Holder (or its designee) a new Preferred Share Certificate representing the number of Preferred Shares not converted.

        (iii)      <u>Record Holder</u> . The Person or Persons entitled to receive the shares of Common Stock issuable upon a conversion of Preferred Shares shall be treated for all purposes as the record holder or holders of such shares of Common Stock on the Conversion Date.

        (iv)      <u>Company's Failure to Timely Convert</u> . If the Company shall fail, for any reason or for no reason, except in the case that the relevant Preferred Share Certificate is required to be and shall not have been timely received by the Transfer Agent, to issue to a Holder within three (3) Trading Days after the Company's receipt of a Conversion Notice (whether via facsimile or otherwise) (the " **Share Delivery Deadline** "), a certificate for the number of shares of Common Stock to which such Holder is entitled and register such shares of Common Stock on the Company's share register or to credit such Holder's or its designee's balance account with DTC for such number of shares of Common Stock to which such Holder is entitled upon such Holder's conversion of any Preferred Shares (as the case may be) (a " **Conversion Failure** "), then, in addition to all other remedies available to such Holder, such Holder, upon written notice to the Company, (x) may void its Conversion Notice with respect to, and retain or have returned (as the case may be) any Preferred Shares that have not been converted pursuant to such Holder's Conversion Notice, provided that the voiding of a Conversion Notice shall not affect the Company's obligations to make any payments that have accrued prior to the date of such notice pursuant to the terms of this Certificate of Designation or otherwise and (y) the Company shall pay in cash to such Holder on each day after such third (3rd) Trading Day that the issuance of such shares of Common Stock is not timely effected an amount equal to 1.0 % of the product of (A) the aggregate number of shares of Common Stock not issued to such Holder on a timely basis and to which the Holder is entitled and (B) the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the last possible date on which the Company could have issued such shares of Common Stock to the Holder without violating Section 4(c).  In addition to the foregoing, if within three (3) Trading Days after the Company's receipt of a Conversion Notice (whether via facsimile or otherwise), the Company shall fail to issue and deliver a certificate to such Holder and register such shares of Common Stock on the Company's share register or credit such Holder's or its designee's balance account with DTC for the number of shares of Common Stock to which such Holder is entitled upon such Holder's conversion hereunder (as the case may be), and, if on or after such third (3rd) Trading Day, such Holder (or any other Person in respect, or on behalf, of such Holder) purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by such Holder of all or any portion of the number of shares of Common Stock, or a sale of a number of shares of Common Stock equal to all or any portion of the number of shares of Common Stock, issuable upon such conversion that such Holder so anticipated receiving from the Company, then, in addition to all other remedies available to such Holder, the Company shall, within three (3) Business Days after such Holder's request and in such Holder's discretion, either (i) pay cash to such Holder in an amount equal to such Holder's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the shares of Common Stock so purchased (including, without limitation, by any other Person in respect, or on behalf, of such Holder) (the " **Buy-In Price** "), at which point the Company's obligation to so issue and deliver such certificate or credit such Holder's balance account with DTC for the number of shares of Common Stock to which such Holder is entitled upon such Holder's conversion hereunder (as the case may be) (and to issue such shares of Common Stock) shall terminate, or (ii) promptly honor its obligation to so issue and deliver to such Holder a certificate or certificates representing such shares of Common Stock or credit such Holder's balance account with DTC for the number of shares of Common Stock to which such Holder is entitled upon such Holder's conversion hereunder (as the case may be) and pay cash to such Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of shares of Common Stock multiplied by (B) the lowest Closing Sale Price of the Common Stock on any Trading Day during the period commencing on the date of the applicable Conversion Notice and ending on the date of such issuance and payment under this clause (ii).

(v)     <u>Pro Rata Conversion; Disputes</u> . In the event the Company receives a Conversion Notice from more than one Holder for the same Conversion Date and the Company can convert some, but not all, of such Preferred Shares submitted for conversion, the Company shall convert from each Holder electing to have Preferred Shares converted on such date a pro rata amount of such Holder's Preferred Shares submitted for conversion on such date based on the number of Preferred Shares submitted for conversion on such date by such Holder relative to the aggregate number of Preferred Shares submitted for conversion on such date. In the event of a dispute as to the number of shares of Common Stock issuable to a Holder in connection with a conversion of Preferred Shares, the Company shall issue to such Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 22.

(vi)     <u>Book-Entry</u> . Notwithstanding anything to the contrary set forth in this Section 4, upon conversion of any Preferred Shares in accordance with the terms hereof, no Holder thereof shall be required to physically surrender the certificate representing the Preferred Shares to the Company following conversion thereof unless (A) the full or remaining number of Preferred Shares represented by the certificate are being converted (in which event such certificate(s) shall be delivered to the Company as contemplated by this Section 4(c)(vi)) or (B) such Holder has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of Preferred Shares upon physical surrender of any Preferred Shares. Each Holder and the Company shall maintain records showing the number of Preferred Shares so converted by such Holder and the dates of such conversions or shall use such other method, reasonably satisfactory to such Holder and the Company, so as not to require physical surrender of the certificate representing the Preferred Shares upon each such conversion. In the event of any dispute or discrepancy, such records of the Company establishing the number of Preferred Shares to which the record holder is entitled shall be controlling and determinative in the absence of manifest error. A Holder and any transferee or assignee, by acceptance of a certificate, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of any Preferred Shares, the number of Preferred Shares represented by such certificate may be less than the number of Preferred Shares stated on the face thereof.  Each certificate for Preferred Shares shall bear the following legend:

> ANY TRANSFEREE OR ASSIGNEE OF THIS CERTIFICATE SHOULD CAREFULLY REVIEW THE TERMS OF THE CORPORATION'S CERTIFICATE OF DESIGNATION RELATING TO THE SHARES OF SERIES A PREFERRED STOCK THAT MAY BE REPRESENTED BY THIS CERTIFICATE, INCLUDING SECTION 4(c)(vi) THEREOF. THE NUMBER OF SHARES OF SERIES A PREFERRED STOCK REPRESENTED BY THIS CERTIFICATE MAY BE LESS THAN THE NUMBER OF SHARES OF SERIES A PREFERRED STOCK STATED ON THE FACE HEREOF PURSUANT TO SECTION 4(c)(vi) OF THE CERTIFICATE OF DESIGNATION RELATING TO THE SHARES OF SERIES A PREFERRED STOCK REPRESENTED BY THIS CERTIFICATE.

(d)     <u>Taxes</u> . The Company shall pay any and all documentary, stamp, transfer (but only in respect of the registered holder thereof), issuance and other similar taxes that may be payable with respect to the issuance and delivery of shares of Common Stock upon the conversion of Preferred Shares.

      (e)    <u>Limitation on Beneficial Ownership</u> .  Notwithstanding anything to the contrary set forth in this Certificate of Designation, at no time may all or a portion of the Series A Preferred Stock be converted if the number of shares of Common Stock to be issued pursuant to such conversion would exceed, when aggregated with all other shares of Common Stock owned by the Holder at such time, the number of shares of Common Stock that would result in the Holder beneficially owning (as determined in accordance with Section 13(d) of the 1934 Act and the rules thereunder) more than 4.99% of all of the Common Stock outstanding at such time (the " **4.99% Beneficial Ownership Limitation** "); <u>provided</u> , <u>however</u> , that, upon the Holder providing the Corporation with sixty-one (61) days' advance notice (the " **4.99% Waiver Notice** ") that the Holder would like to waive this Section 4(e) with regard to any or all shares of Common Stock issuable upon conversion of the Preferred Shares, this Section 4(e) will be of no force or effect with regard to all or a portion of the Series A Preferred Stock referenced in the 4.99% Waiver Notice but shall in no event waive the 9.99% Beneficial Ownership Limitation described below.  Notwithstanding anything to the contrary set forth in this Certificate of Designation, at no time may all or a portion of the Preferred Shares be converted if the number of shares of Common Stock to be issued pursuant to such conversion, when aggregated with all other shares of Common Stock owned by the Holder at such time, would result in the Holder beneficially owning (as determined in accordance with Section 13(d) of the 1934 Act and the rules thereunder) in excess of 9.99% of the then-issued and outstanding shares of Common Stock outstanding at such time (the " **9.99% Beneficial Ownership Limitation** " and the lower of the 9.99% Beneficial Ownership Limitation and the 4.99% Beneficial Ownership Limitation then in effect, the " **Maximum Percentage** ")). By written notice to the Company, a holder of Preferred Shares may from time to time decrease the Maximum Percentage to any other percentage specified in such notice. For purposes hereof, in determining the number of outstanding shares of Common Stock, the Holder may rely on the number of outstanding shares of Common Stock as reflected in (1) the Company's most recent Annual Report on Form 10-K, Quarterly Report on Form 10-Q, Current Report on Form 8-K or other public filing with the Securities and Exchange Commission, as the case may be, (2) a more recent public announcement by the Company or (3) any other notice by the Company setting forth the number of shares of Common Stock outstanding.  For any reason at any time, upon the written or oral request of a holder of Preferred Shares, the Company shall within three (3) Business Days confirm orally and in writing to such holder the number of shares of Common Stock then outstanding.  In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including the Preferred Shares, by the Holder and its Affiliates since the date as of which such number of outstanding shares of Common Stock was reported, that in any event are convertible or exercisable, as the case may be, into shares of the Company's Common Stock within 60 days' of such calculation and that are not subject to a limitation on conversion or exercise analogous to the limitation contained herein.  The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 4(e) to correct this paragraph (or any portion hereof) that may be defective or inconsistent with the intended beneficial ownership limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such limitation.

6

(f)     Principal Market Regulation . The Company shall not issue any shares of Common Stock upon conversion of the Preferred Shares and the Holder shall not have the right to receive upon conversion of any Preferred Shares any shares of Common Stock, until such time as the Company obtains the approval of its stockholders as required by NASDAQ Listing Rule 5635 ( "Shareholder Approval "). The limitations contained in this paragraph shall apply to a successor holder of Preferred Shares.

5.     Rights Upon Issuance of Purchase Rights and Other Corporate Events .

(a)     Purchase Rights . In addition to any adjustments pursuant to Section 7 below, if at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the " **Purchase Rights** "), then each Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights that such Holder could have acquired if such Holder had held the number of shares of Common Stock acquirable upon complete conversion of all the Preferred Shares (without taking into account any limitations or restrictions on the convertibility of the Preferred Shares) held by such Holder immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights; provided , however , to the extent that such Holder's right to participate in any such Purchase Right would result in such Holder exceeding the Maximum Percentage, then such Holder shall not be entitled to participate in such Purchase Right to such extent (or beneficial ownership of such shares of Common Stock as a result of such Purchase Right to such extent) and such Purchase Right to such extent shall be held in abeyance for such Holder until such time, if ever, as its right thereto would not result in such Holder exceeding the Maximum Percentage.

(b)     Other Corporate Events . In addition to and not in substitution for any other rights hereunder, prior to the consummation of any Fundamental Transaction pursuant to which holders of shares of Common Stock are entitled to receive securities or other assets with respect to or in exchange for shares of Common Stock (a " **Corporate Event** "), the Company shall make appropriate provision to ensure that each Holder will thereafter have the right to receive upon a conversion of all the Preferred Shares held by such Holder (i) in addition to the shares of Common Stock receivable upon such conversion, such securities or other assets to which such Holder would have been entitled with respect to such shares of Common Stock had such shares of Common Stock been held by such Holder upon the consummation of such Corporate Event (without taking into account any limitations or restrictions on the convertibility of the Preferred Shares contained in this Certificate of Designation) or (ii) in lieu of the shares of Common Stock otherwise receivable upon such conversion, such securities or other assets received by the holders of shares of Common Stock in connection with the consummation of such Corporate Event in such amounts as such Holder would have been entitled to receive had the Preferred Shares held by such Holder initially been issued with conversion rights for the form of such consideration (as opposed to shares of Common Stock) at a conversion rate for such consideration commensurate with the Conversion Rate. The provisions of this Section 5(b) shall apply similarly and equally to successive Corporate Events and shall be applied without regard to any limitations on the conversion of the Preferred Shares contained in this Certificate of Designation.

6.          Rights Upon Fundamental Transactions .

          (a)          Assumption . The Company shall not enter into or be party to a Fundamental Transaction unless: (i) the Successor Entity assumes in writing all of the obligations of the Company under this Certificate of Designation and the other Transaction Documents in accordance with the provisions of this Section 6 pursuant to written agreements in form and substance satisfactory to the Required Holders and approved by the Required Holders prior to such Fundamental Transaction, including agreements to deliver to each holder of Preferred Shares in exchange for such Preferred Shares a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Certificate of Designation, including, without limitation, having a stated value and dividend rate equal to the stated value and dividend rate of the Preferred Shares held by the Holders and having similar ranking to the Preferred Shares, and reasonably satisfactory to the Required Holders and (ii) the Successor Entity (including its Parent Entity) is a publicly traded corporation whose shares of common stock are quoted on or listed for trading on an Eligible Market. Upon the occurrence of any Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Certificate of Designation and the other Transaction Documents referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Certificate of Designation and the other Transaction Documents with the same effect as if such Successor Entity had been named as the Company herein and therein. In addition to the foregoing, upon consummation of a Fundamental Transaction, the Successor Entity shall deliver to each Holder confirmation that there shall be issued upon conversion of the Preferred Shares at any time after the consummation of such Fundamental Transaction, in lieu of the shares of Common Stock (or other securities, cash, assets or other property (except such items still issuable under Sections 5 and 11, which shall continue to be receivable thereafter)) issuable upon the conversion of the Preferred Shares prior to such Fundamental Transaction, such shares of publicly traded common stock (or their equivalent) of the Successor Entity (including its Parent Entity) that each Holder would have been entitled to receive upon the happening of such Fundamental Transaction had all the Preferred Shares held by each Holder been converted immediately prior to such Fundamental Transaction (without regard to any limitations on the conversion of the Preferred Shares contained in this Certificate of Designation), as adjusted in accordance with the provisions of this Certificate of Designation. The provisions of this Section 6 shall apply similarly and equally to successive Fundamental Transactions and shall be applied without regard to any limitations on the conversion of the Preferred Shares.

7.          Rights Upon Issuance of Other Securities and Special Dividends .

          (a)          Intentionally Omitted .

(b)        <u>Adjustment of Conversion Price upon Subdivision or Combination of Common Stock</u>. Without limiting any provision of Sections 5 and 11, if the Company at any time on or after the Purchase Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced. Without limiting any provision of Sections 5 and 11, if the Company at any time on or after the Purchase Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination will be proportionately increased. Any adjustment pursuant to this Section 7(b) shall become effective immediately after the effective date of such subdivision or combination. If any event requiring an adjustment under this Section 7(b) occurs during the period that a Conversion Price is calculated hereunder, then the calculation of such Conversion Price shall be adjusted appropriately to reflect such event.

(c)        <u>Other Events</u>. In the event that the Company (or any Subsidiary) shall take any action to which the provisions hereof are not strictly applicable, or, if applicable, would not operate to protect any Holder from dilution or if any event occurs of the type contemplated by the provisions of this Section 7 but not expressly provided for by such provisions (including, without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features), then the Board shall in good faith determine and implement an appropriate adjustment in the Conversion Price so as to protect the rights of such Holder; <u>provided</u>, <u>however</u>, that no such adjustment pursuant to this Section 7(c) will increase the Conversion Price as otherwise determined pursuant to this Section 7; <u>provided</u>, <u>further</u>, that, if such Holder does not accept such adjustments as appropriately protecting its interests hereunder against such dilution, then the Board and such Holder shall agree, in good faith, upon an independent investment bank of nationally recognized standing to make such appropriate adjustments, whose determination shall be final and binding and whose fees and expenses shall be borne by the Company.

(d)        <u>Calculations</u>. All calculations under this Section 7 shall be made by rounding to the nearest one-hundred thousandth of a cent or the nearest 1/100 th of a share, as applicable. The number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company, and the disposition of any such shares, other than a return thereof to the Company's treasury for cancellation, shall be considered an issue or sale of Common Stock.

9

8.        Authorized Shares .

(a)        Reservation . The Company shall initially reserve out of its authorized and unissued Common Stock a number of shares of Common Stock equal to equal to the sum of (i) 100% of the Conversion Rate with respect to the Conversion Amount of each Preferred Share as of the Initial Issuance Date (assuming for purposes hereof, that all the Preferred Shares issuable pursuant to the Purchase Agreement have been issued, such Preferred Shares are convertible at the Conversion Price and without taking into account any limitations on the conversion of such Preferred Shares set forth in herein) and (ii) the maximum number of Dividend Shares issuable pursuant to the terms of this Certificate of Designations from the Initial Issuance Date through the third anniversary of the Initial Issuance Date (assuming for purposes hereof, that all the Preferred Shares issuable pursuant to the Purchase Agreement have been issued and without taking into account any limitations on the issuance of securities set forth herein). So long as any of the Preferred Shares are outstanding, the Company shall take all action necessary to reserve and keep available out of its authorized and unissued shares of Common Stock, solely for the purpose of effecting the conversion of the Preferred Shares, as of any given date, 100% of the number of shares of Common Stock as shall from time to time be necessary to effect the conversion of all of the Preferred Shares issued or issuable pursuant to the Purchase Agreement assuming for purposes hereof, that all the Preferred Shares issuable pursuant to the Purchase Agreement have been issued and without taking into account any limitations on the issuance of securities set forth herein), provided that at no time shall the number of shares of Common Stock so available be less than the number of shares required to be reserved by the previous sentence (without regard to any limitations on conversions contained in this Certificate of Designation) (the " **Required Amount** "). The initial number of shares of Common Stock reserved for conversions of the Preferred Shares and each increase in the number of shares so reserved shall be allocated pro rata among the Holders based on the number of Preferred Shares held by each Holder on the Initial Issuance Date or increase in the number of reserved shares (as the case may be) (the " **Authorized Share Allocation** "). In the event a Holder shall sell or otherwise transfer any of such Holder's Preferred Shares, each transferee shall be allocated a pro rata portion of such Holder's Authorized Share Allocation. Any shares of Common Stock reserved and allocated to any Person who ceases to hold any Preferred Shares shall be allocated to the remaining Holders of Preferred Shares, pro rata based on the number of Preferred Shares then held by such Holders.

(b)        Insufficient Authorized Shares . If, notwithstanding Section 8(a) and not in limitation thereof, at any time while any of the Preferred Shares remain outstanding, the Company does not have a sufficient number of authorized and unissued shares of Common Stock to satisfy its obligation to have available for issuance upon conversion of the Preferred Shares at least a number of shares of Common Stock equal to the Required Amount (an " **Authorized Share Failure** "), then the Company shall promptly take all action necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve and have available the Required Amount for all of the Preferred Shares then outstanding. Without limiting the generality of the foregoing sentence, as soon as practicable after the date of the occurrence of an Authorized Share Failure, but in no event later than ninety (90) days after the occurrence of such Authorized Share Failure, the Company shall hold a meeting of its shareholders or conduct a consent solicitation for the approval of an increase in the number of authorized shares of Common Stock. In connection with such meeting or consent solicitation, the Company shall provide each shareholder with a proxy statement or information statement, as relevant, and shall use its commercial best efforts to solicit its shareholders' approval of such increase in authorized shares of Common Stock and to cause its Board to recommend to the shareholders that they approve such proposal. Nothing contained in this Section 8 shall limit any obligations of the Company under any provision of the Purchase Agreement. In the event that the Company is prohibited from issuing shares of Common Stock upon a conversion of any Preferred Share due to the failure by the Company to have sufficient share of Common Stock available out of the authorized but unissued shares of Common Stock (such unavailable number of shares of Common Stock, the " **Authorization Failure Shares** "), in lieu of delivering such Authorization Failure Shares to such Holder of such Preferred Shares, the Company shall pay cash in exchange for the cancellation of such Preferred Shares convertible into such Authorized Failure Shares at a price equal to the sum of (i) the product of (x) such number of Authorization Failure Shares and (y) the Closing Sale Price on the Trading Day immediately preceding the date such Holder delivers the applicable Conversion Notice with respect to such Authorization Failure Shares to the Company and (ii) to the extent such Holder purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by such Holder of Authorization Failure Shares, any brokerage commissions and other out-of-pocket expenses, if any, of such Holder incurred in connection therewith.

10

9.        <u>Voting Rights</u> . Except as otherwise expressly required by law, each holder of Preferred Shares shall be entitled to vote on all matters submitted to shareholders of the Company and shall be entitled to the number of votes for each Preferred Share owned at the record date for the determination of shareholders entitled to vote on such matter or, if no such record date is established, at the date such vote is taken or any written consent of shareholders is solicited, equal to the number of shares of Common Stock such Preferred Shares are convertible into (voting as a class with Common Stock) based on a per share price of $[___] (the "**Voting Conversion Price**"), representing the consolidated closing bid price of the Common Stock on The NASDAQ Stock Market LLC on the date prior to the execution of the Purchase Agreement, but not in excess of the conversion limitations set forth in Section 4(e) herein. Except as otherwise required by law, the holders of Preferred Shares shall vote together with the holders of Common Stock on all matters and shall not vote as a separate class.

10.        <u>Liquidation, Dissolution, Winding-Up</u> . In the event of a Liquidation Event, the Holders shall be entitled to receive in cash out of the assets of the Company, whether from capital or from earnings available for distribution to its shareholders (the "**Liquidation Funds**"), before any amount shall be paid to the holders of any of shares of Junior Stock, an amount per Preferred Share equal to the greater of (A) the Base Amount thereof on the date of such payment and (B) the amount per share such Holder would receive if such Holder converted such Preferred Shares into Common Stock immediately prior to the date of such payment; <u>provided</u> , <u>however</u> , that, if the Liquidation Funds are insufficient to pay the full amount due to the Holders and holders of shares of Parity Stock, then each Holder and each holder of Parity Stock shall receive a percentage of the Liquidation Funds equal to the full amount of Liquidation Funds payable to such Holder and such holder of Parity Stock as a liquidation preference, in accordance with their respective certificate of designation (or equivalent), as a percentage of the full amount of Liquidation Funds payable to all holders of Preferred Shares and all holders of shares of Parity Stock. To the extent necessary, the Company shall cause such actions to be taken by each of its Subsidiaries so as to enable, to the maximum extent permitted by law, the proceeds of a Liquidation Event to be distributed to the Holders in accordance with this Section 10. All the preferential amounts to be paid to the Holders under this Section 10 shall be paid or set apart for payment before the payment or setting apart for payment of any amount for, or the distribution of any Liquidation Funds of the Company to the holders of shares of Junior Stock in connection with a Liquidation Event as to which this Section 10 applies.

11

11.        Participation . In addition to any adjustments pursuant to Section 7(b), the Holders shall, as holders of Preferred Shares, be entitled to receive such dividends paid and distributions made to the holders of shares of Common Stock to the same extent as if such Holders had converted each Preferred Share held by each of them into shares of Common Stock (without regard to any limitations on conversion herein or elsewhere) and had held such shares of Common Stock on the record date for such dividends and distributions. Payments under the preceding sentence shall be made concurrently with the dividend or distribution to the holders of shares of Common Stock; provided , however , to the extent that a Holder's right to participate in any such dividend or distribution would result in such Holder exceeding the Maximum Percentage, then such Holder shall not be entitled to participate in such dividend or distribution to such extent (or the beneficial ownership of any such shares of Common Stock as a result of such dividend or distribution to such extent) and such dividend or distribution to such extent shall be held in abeyance for the benefit of such Holder until such time, if ever, as its right thereto would not result in such Holder exceeding the Maximum Percentage.

12.        Vote to Change the Terms of or Issue Preferred Shares .  In addition to any other rights provided by law, except where the vote or written consent of the holders of a greater number of shares is required by law or by another provision of the Articles of Incorporation, without first obtaining the affirmative vote at a meeting duly called for such purpose or the written consent without a meeting of the Required Holders, voting together as a single class, the Company shall not: (a) amend or repeal any provision of, or add any provision to, its Articles of Incorporation or bylaws, or file any certificate of designation or articles of amendment of any series of shares of preferred stock, if such action would adversely alter or change in any respect the preferences, rights, privileges or powers, or restrictions provided for the benefit, of the Preferred Shares, regardless of whether any such action shall be by means of amendment to the Articles of Incorporation or by merger, consolidation or otherwise; (b) increase or decrease (other than by conversion) the authorized number of Preferred Shares; (c) without limiting any provision of Section 2, create or authorize (by reclassification or otherwise) any new class or series of shares that has a preference over or is on a parity with the Preferred Shares with respect to dividends or the distribution of assets on the liquidation, dissolution or winding-up of the Company; (d) purchase, repurchase or redeem any shares of capital stock of the Company junior in rank to the Preferred Shares (other than pursuant to equity incentive agreements (that have in good faith been approved by the Board) with employees giving the Company the right to repurchase shares upon the termination of services); (e) without limiting any provision of Section 2, pay dividends or make any other distribution on any shares of any capital stock of the Company junior in rank to the Preferred Shares; or (f) without limiting any provision of Section 16, whether or not prohibited by the terms of the Preferred Shares, circumvent a right of the Preferred Shares.

13.        Intentionally Omitted .

14.        Lost or Stolen Certificates .  Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of any certificates representing Preferred Shares (as to which a written certification and the indemnification contemplated below shall suffice as such evidence), and, in the case of loss, theft or destruction, of an indemnification undertaking by the applicable Holder to the Company in customary and reasonable form and, in the case of mutilation, upon surrender and cancellation of the certificate(s), the Company shall execute and deliver new certificate(s) of like tenor and date.

15.      <u>Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief.</u>   The remedies provided in this Certificate of Designation shall be cumulative and in addition to all other remedies available under this Certificate of Designation and any of the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and no remedy contained herein shall be deemed a waiver of compliance with the provisions giving rise to such remedy. Nothing herein shall limit any Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Certificate of Designation. The Company covenants to each Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments, conversion and the like (and the computation thereof) shall be the amounts to be received by a Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holders and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, each Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or any such threatened breach, without the necessity of showing economic loss and without any bond or other security being required. The Company shall provide all information and documentation to a Holder that is requested by such Holder to enable such Holder to confirm the Company's compliance with the terms and conditions of this Certificate of Designation.

16.      <u>Noncircumvention</u> . The Company hereby covenants and agrees that the Company will not, by amendment of its Articles of Incorporation, bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Certificate of Designation, and will at all times in good faith carry out all of the provisions of this Certificate of Designation and take all action as may be required to protect the rights of the Holders. Without limiting the generality of the foregoing or any other provision of this Certificate of Designation, the Company (i) shall not increase the par value of any shares of Common Stock receivable upon the conversion of any Preferred Shares above the Conversion Price then in effect, (ii) shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and non-assessable shares of Common Stock upon the conversion of Preferred Shares and (iii) shall, so long as any Preferred Shares are outstanding, take all action necessary to reserve and keep available out of its authorized and unissued shares of Common Stock, solely for the purpose of effecting the conversion of the Preferred Shares, the maximum number of shares of Common Stock as shall from time to time be necessary to effect the conversion of the Preferred Shares then outstanding (without regard to any limitations on conversion contained herein).

17.      <u>Failure or Indulgence Not Waiver</u> .  No failure or delay on the part of a Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party. This Certificate of Designation shall be deemed to be jointly drafted by the Company and all Holders and shall not be construed against any Person as the drafter hereof.

18.        <u>Notices</u> . The Company shall provide each Holder of Preferred Shares with prompt written notice of all actions taken pursuant to the terms of this Certificate of Designation, including in reasonable detail a description of such action and the reason therefor. Whenever notice is required to be given under this Certificate of Designation, unless otherwise provided herein, such notice must be in writing and shall be given in accordance with the Purchase Agreement. Without limiting the generality of the foregoing, the Company shall give written notice to each Holder (i) promptly following any adjustment of the Conversion Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least fifteen (15) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any grant, issuances, or sales of any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property to all holders of shares of Common Stock as a class or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided, in each case, that such information shall be made known to the public prior to, or simultaneously with, such notice being provided to any Holder.

19.        <u>Transfer of Preferred Shares</u> . Subject to the restrictions set forth in Purchase Agreement, a Holder may transfer some or all of its Preferred Shares without the consent of the Company.

20.        <u>Preferred Shares Register</u> . The Company shall maintain at its principal executive offices (or such other office or agency of the Company as it may designate and provide notice to the Holders thereof), a register for the Preferred Shares, in which the Company shall record the name, address and facsimile number of the Persons in whose name the Preferred Shares have been issued, as well as the name, address, facsimile number and tax identification number of each transferee. The Company may treat the Person in whose name any Preferred Shares is registered on the register as the owner and holder thereof for all purposes, notwithstanding any notice to the contrary, but in all events recognizing any properly made transfers.

21.        <u>Shareholder Matters; Amendment</u> .

(a)        <u>Shareholder Matters</u> . Any shareholder action, approval or consent required, desired or otherwise sought by the Company pursuant to the CRS, the Articles of Incorporation, this Certificate of Designation or otherwise with respect to the issuance of Preferred Shares may be effected by written consent of the Company's shareholders or at a duly called meeting of the Company's shareholders, all in accordance with the applicable rules and regulations of the CRS. This provision is intended to comply with the applicable sections of the CRS permitting shareholder action, approval and consent affected by written consent in lieu of a meeting.

14

(b)        Amendment . This Certificate of Designation or any provision hereof may be amended by obtaining the affirmative vote at a meeting duly called for such purpose, or written consent without a meeting in accordance with the CRS, of the Required Holders, voting separate as a single class, and with such other shareholder approval, if any, as may then be required pursuant to the CRS and the Articles of Incorporation.

22.        Dispute Resolution .

(a)        Disputes Over Closing Bid Price, Closing Sale Price, Conversion Price or Fair Market Value .

(i)        In the case of a dispute relating to a Closing Bid Price, a Closing Sale Price, a Conversion Price or fair market value (as the case may be) (including, without limitation, a dispute relating to the determination of any of the foregoing), the Company or such applicable Holder (as the case may be) shall submit the dispute via facsimile (A) within two (2) Business Days after delivery of the applicable notice giving rise to such dispute to the Company or such Holder (as the case may be) or (B) if no notice gave rise to such dispute, at any time after such Holder learned of the circumstances giving rise to such dispute. If such Holder and the Company are unable to resolve such dispute relating to such Closing Bid Price, such Closing Sale Price, such Conversion Price, such fair market value by 5:00 p.m. (New York time) on the third (3 rd ) Business Day following such delivery by the Company or such Holder (as the case may be) of such dispute to the Company or such Holder (as the case may be), then such Holder shall select an independent, reputable investment bank to resolve such dispute.

(ii)        Such Holder and the Company shall each deliver to such investment bank (A) a copy of the initial dispute submission so delivered in accordance with the first sentence of this Section 22(a) and (B) written documentation supporting its position with respect to such dispute, in each case, no later than 5:00 p.m. (New York time) by the fifth (5 th ) Business Day immediately following the date on which such Holder selected such investment bank (the " **Dispute Submission Deadline** ") (the documents referred to in the immediately preceding clauses (A) and (B) are collectively referred to herein as the " **Required Dispute Documentation** ") (it being understood and agreed that, if either such Holder or the Company fails to so deliver all of the Required Dispute Documentation by the Dispute Submission Deadline, then the party who fails to so submit all of the Required Dispute Documentation shall no longer be entitled to (and hereby waives its right to) deliver or submit any written documentation or other support to such investment bank with respect to such dispute and such investment bank shall resolve such dispute based solely on the Required Dispute Documentation that was delivered to such investment bank prior to the Dispute Submission Deadline). Unless otherwise agreed to in writing by both the Company and such Holder or otherwise requested by such investment bank, neither the Company nor such Holder shall be entitled to deliver or submit any written documentation or other support to such investment bank in connection with such dispute (other than the Required Dispute Documentation).

15

(iii)          The Company and such Holder shall use their respective commercial best efforts to cause such investment bank to determine the resolution of such dispute and notify the Company and such Holder of such resolution no later than ten (10) Business Days immediately following the Dispute Submission Deadline. The fees and expenses of such investment bank shall be borne solely by the Company, and such investment bank's resolution of such dispute shall be final and binding upon all parties absent manifest error.

(b)          <u>Disputes Over Arithmetic Calculation of the Conversion Rate.</u>

(i)          In the case of a dispute as to the arithmetic calculation of a Conversion Rate, the Company or such Holder (as the case may be) shall submit the disputed arithmetic calculation via facsimile (i) within two (2) Business Days after delivery of the applicable notice giving rise to such dispute to the Company or such Holder (as the case may be) or (ii) if no notice gave rise to such dispute, at any time after such Holder learned of the circumstances giving rise to such dispute. If such Holder and the Company are unable to resolve such disputed arithmetic calculation of such Conversion Rate by 5:00 p.m. (New York time) on the third (3rd) Business Day following such delivery by the Company or such Holder (as the case may be) of such disputed arithmetic calculation, then such Holder shall select an independent, reputable accountant or accounting firm to perform such disputed arithmetic calculation.

(ii)          Such Holder and the Company shall each deliver to such accountant or accounting firm (as the case may be) (x) a copy of the initial dispute submission so delivered in accordance with the first sentence of this Section 22(a) and (y) written documentation supporting its position with respect to such disputed arithmetic calculation, in each case, no later than 5:00 p.m. (New York time) by the fifth (5th) Business Day immediately following the date on which such Holder selected such accountant or accounting firm (as the case may be) (the "**Submission Deadline**") (the documents referred to in the immediately preceding clauses (x) and (y) are collectively referred to herein as the "**Required Documentation**") (it being understood and agreed that if either such Holder or the Company fails to so deliver all of the Required Documentation by the Submission Deadline, then the party who fails to so submit all of the Required Documentation shall no longer be entitled to (and hereby waives its right to) deliver or submit any written documentation or other support to such accountant or accounting firm (as the case may be) with respect to such disputed arithmetic calculation and such accountant or accounting firm (as the case may be) shall perform such disputed arithmetic calculation based solely on the Required Documentation that was delivered to such accountant or accounting firm (as the case may be) prior to the Submission Deadline). Unless otherwise agreed to in writing by both the Company and such Holder or otherwise requested by such accountant or accounting firm (as the case may be), neither the Company nor such Holder shall be entitled to deliver or submit any written documentation or other support to such accountant or accounting firm (as the case may be) in connection with such disputed arithmetic calculation of the Conversion Rate (other than the Required Documentation).

16

(iii)         The Company and such Holder shall use their respective commercial best efforts to cause such accountant or accounting firm (as the case may be) to perform such disputed arithmetic calculation and notify the Company and such Holder of the results no later than ten (10) Business Days immediately following the Submission Deadline. The fees and expenses of such accountant or accounting firm (as the case may be) shall be borne solely by the Company, and such accountant's or accounting firm's (as the case may be) arithmetic calculation shall be final and binding upon all parties absent manifest error.

(c)         <u>Miscellaneous</u>.  The Company expressly acknowledges and agrees that (i) this Section 22 constitutes an agreement to arbitrate between the Company and such Holder (and constitutes an arbitration agreement) under § 7501, et seq. of the New York Civil Practice Law and Rules (" **CPLR** ") and that each party shall be entitled to compel arbitration pursuant to CPLR § 7503(a) in order to compel compliance with this Section 22, (ii) a dispute relating to a Conversion Price includes, without limitation, disputes as to whether an agreement, instrument, security or the like constitutes an Option or Convertible Security (iii) the terms of this Certificate of Designation and each other applicable Transaction Document shall serve as the basis for the selected investment bank's resolution of the applicable dispute, such investment bank shall be entitled (and is hereby expressly authorized) to make all findings, determinations and the like that such investment bank determines are required to be made by such investment bank in connection with its resolution of such dispute and in resolving such dispute such investment bank shall apply such findings, determinations and the like to the terms of this Certificate of Designation and any other applicable Transaction Documents, (iv) the terms of this Certificate of Designation and each other applicable Transaction Document shall serve as the basis for the selected accountant's or accounting firm's performance of the applicable arithmetic calculation, (v) for clarification purposes and without implication that the contrary would otherwise be true, disputes relating to matters described in Section 22(a) shall be governed by Section 22(a) and not by Section 22(b), (vi) such Holder (and only such Holder), in its sole discretion, shall have the right to submit any dispute described in this Section 22 to any state or federal court sitting in The City of New York, Borough of Manhattan in lieu of utilizing the procedures set forth in this Section 22 and (vii) nothing in this Section 22 shall limit such Holder from obtaining any injunctive relief or other equitable remedies (including, without limitation, with respect to any matters described in Section 22(a) or Section 22(b)).

23.         <u>Certain Defined Terms</u>.  For purposes of this Certificate of Designation, the following terms shall have the following meanings:

(a)         " **1934 Act** "  means   the Securities Exchange Act of 1934, as amended.

(b)        " **Affiliate** " as applied to any Person, means any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For the purposes of this definition, " **control** " (including, with correlative meanings, the terms " **controlling** ", " **controlled by** " and " **under common control with** "), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.  For purposes of this definition, a Person shall be deemed to be " <u>controlled by</u> " a Person if such latter Person possesses, directly or indirectly, power to vote 10% or more of the securities having ordinary voting power for the election of directors of such former Person.

(c)        " **Base Amount** " means, with respect to each Preferred Share, as of the applicable date of determination, the sum of (1) the Stated Value thereof, plus (2) the Unpaid Dividend Amount thereon as of such date of determination.

(d)        " **Bloomberg** " means Bloomberg, L.P.

(e)        " **Business Day** " means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(f)        " **Closing Bid Price** " and " **Closing Sale Price** " means, for any security as of any date, the last closing bid price and last closing trade price, respectively, for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing bid price or the closing trade price (as the case may be) then the last bid price or last trade price, respectively, of such security prior to 4:00:00 p.m., New York time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing bid price or last trade price, respectively, of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the last closing bid price or last trade price, respectively, of such security in the over-the-counter market as reported by Bloomberg, or, if no closing bid price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported by OTC Markets Group Inc. If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price (as the case may be) of such security on such date shall be the fair market value as mutually determined by the Company and the applicable Holder. If the Company and such Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved in accordance with the procedures in Section 22. All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during such period.

(g)        " **Common Stock** " means (i) the Company's shares of common stock, no par value per share, and (ii) any capital stock into which such common stock shall have been changed or any share capital resulting from a reclassification of such common stock.

(h)           " **Conversion Price** " means, with respect to each Preferred Share, as of any Conversion Date or other applicable date of determination, $2.50, subject to adjustment as provided herein.

(i)           " **Convertible Securities** " means any stock or other security (other than Options) that is at any time and under any circumstances, directly or indirectly, convertible into, exercisable or exchangeable for, or which otherwise entitles the holder thereof to acquire, any shares of Common Stock.

(j)           " **Dividend Notice Due Date** " means the eleventh (11 th ) Trading Day immediately prior to the applicable Dividend Date.

(k)           " **Dividend Rate** " means two percent (2.0%) per annum.

(l)           " **Eligible Market** " means The New York Stock Exchange, the NYSE MKT, the Nasdaq Global Select Market, the Nasdaq Global Market, the OTCBB, the OTCQX, the OTCQB or the Principal Market (or any successor thereto).

(m)           " **Fundamental Transaction** " means that (i) the Company or any of its Subsidiaries shall, directly or indirectly, in one or more related transactions, (A) consolidate or merge with or into (whether or not the Company or any of its Subsidiaries is the surviving corporation) any other Person, or (B) sell, lease, license, assign, transfer, convey or otherwise dispose of all or substantially all of its respective properties or assets to any other Person, or (C) allow any other Person to make a purchase, tender or exchange offer that is accepted by the holders of more than 50% of the outstanding shares of Voting Stock of the Company (not including any shares of Voting Stock of the Company held by the Person or Persons making or party to, or associated or affiliated with the Persons making or party to, such purchase, tender or exchange offer), or (D) consummate a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with any other Person whereby such other Person acquires more than 50% of the outstanding shares of Voting Stock of the Company (not including any shares of Voting Stock of the Company held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock or share purchase agreement or other business combination), or (E) reorganize, recapitalize or reclassify the Common Stock, or (ii) any "person" or "group" (as these terms are used for purposes of Sections 13(d) and 14(d) of the 1934 Act and the rules and regulations promulgated thereunder) is or shall become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of 50% of the aggregate ordinary voting power represented by issued and outstanding Voting Stock of the Company.

(n)           " **Holder Pro Rata Amount** " means, with respect to any Holder, a fraction (i) the numerator of which is the number of Preferred Shares issued to such Holder in connection with the Note Exchange pursuant to the Purchase Agreement on the Initial Issuance Date and (ii) the denominator of which is the number of Preferred Shares issued to all Holders in connection with the Note Exchange pursuant to the Purchase Agreement on the Initial Issuance Date.

(o)        " **Liquidation Event** " means, whether in a single transaction or series of transactions, the voluntary or involuntary liquidation, dissolution or winding-up of the Company or such Subsidiaries the assets of which constitute all or substantially all of the assets of the business of the Company and its Subsidiaries, taken as a whole.

(p)        " **Options** " means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(q)        " **Parent Entity** " of a Person means an entity that, directly or indirectly, controls the applicable Person and whose common stock or equivalent equity security is quoted or listed on an Eligible Market, or, if there is more than one such Person or Parent Entity, the Person or Parent Entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

(r)        " **Person** " means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity or a government or any department or agency thereof.

(s)        " **Purchase Agreement** " means that certain Securities Purchase Agreement by and among the Company and the initial holders of Notes (as defined therein) which were exchanged for the Preferred Shares in the Not Exchange, dated as of the Purchase Date, as may be amended from time to time in accordance with the terms thereof.

(t)        " **Purchase Date** " means the Closing Date (as defined in the Purchase Agreement).

(u)        " **Principal Market** " means The NASDAQ Capital Market.

(v)        " **Securities** " shall have the meaning ascribed to it in the Purchase Agreement.

(w)        " **Stated Value** " shall mean $[____] per share, subject to adjustment for stock splits, stock dividends, recapitalizations, reorganizations, reclassifications, combinations, subdivisions or other similar events occurring after the Initial Issuance Date with respect to the Preferred Shares.

(x)        " **Subsidiaries** " shall have the meaning as set forth in the Purchase Agreement.

(y)        " **Successor Entity** " means the Person (or, if so elected by the Required Holders, the Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or the Person (or, if so elected by the Required Holders, the Parent Entity) with which such Fundamental Transaction shall have been entered into.

(z)        " **Trading Day** " means, as applicable, (i) with respect to all price determinations relating to the Common Stock, any day on which the Common Stock is traded on the Principal Market, or, if the Principal Market is not the principal trading market for the Common Stock, then on the principal securities exchange or securities market on which the Common Stock is then traded, provided that "Trading Day" shall not include any day on which the Common Stock is scheduled to trade on such exchange or market for less than 4.5 hours or any day that the Common Stock is suspended from trading during the final hour of trading on such exchange or market (or if such exchange or market does not designate in advance the closing time of trading on such exchange or market, then during the hour ending at 4:00:00 p.m., New York time) unless such day is otherwise designated as a Trading Day in writing by the Required Holders or (ii) with respect to all determinations other than price determinations relating to the Common Stock, any day on which The New York Stock Exchange (or any successor thereto) is open for trading of securities.

(aa)        " **Transaction Documents** " shall have the meaning ascribed to it in the Purchase Agreement.

(ä)        " **Unpaid Dividend Amount** " means, as of the applicable date of determination, with respect to each Preferred Share, all accrued and unpaid Dividends on such Preferred Share.

(cc)        " **Voting Stock** " of a Person means capital stock of such Person of the class or classes pursuant to which the holders thereof have the general voting power to elect, or the general power to appoint, at least a majority of the board of directors, managers, trustees or other similar governing body of such Person (irrespective of whether or not at the time capital stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

24.        <u>Disclosure</u> . Upon receipt or delivery by the Company of any notice in accordance with the terms of this Certificate of Designation, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, non-public information relating to the Company or any of its Subsidiaries, the Company shall simultaneously with any such receipt or delivery publicly disclose such material, non-public information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, non-public information relating to the Company or any of its Subsidiaries, the Company so shall indicate to each Holder contemporaneously with delivery of such notice, and in the absence of any such indication, each Holder shall be allowed to presume that all matters relating to such notice do not constitute material, non-public information relating to the Company or its Subsidiaries. Nothing contained in this Section 24 shall limit any obligations of the Company, or any rights of any Holder, under the Purchase Agreement.

* * * * *

21

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Designation of Series A Convertible Preferred Stock of Bioptix, Inc. to be signed by its [_____] on this [__] day of [____], 2017.

BIOPTIX, INC.

By: _____

Name:
Title:

# Exhibit 8

As filed with the Securities and Exchange Commission on April 20, 2017

Registration No. 333-

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM S-3**

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# BIOPTIX, INC.

(Exact name of registrant as specified in its charter)

|  |  |
|---|---|
| **Colorado** | **84-155337** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

**Jeffrey G. McGonegal**
**Chief Financial Officer**
**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

**Approximate date of commencement of proposed sale to the public:** From time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

**Company References**

In this prospectus, "Bioptix," "the Company," "we," "us," and "our" refer to Bioptix, Inc., a Colorado corporation, unless the context otherwise requires.

**OUR BUSINESS**

Through our wholly owned subsidiary, BiOptix Diagnostics, Inc. ("BDI"), which we acquired in September 2016, we have developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions.  We acquired a Surface Plasma Resonance (SPR) platform which seeks to combine high sensitivity with microarray detection capability to allow researchers to understand whether their target molecules have functionality against the disease targeted. SPR is an advanced and highly sensitive optical technology that can measure refractive index changes on a sensor chip's gold surface due to a change in mass that occurs during a binding event. This change can be used to monitor biological interactions such as the concentration of target molecules, kinetic rates and affinity constants.

BDI is a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions.  BDI manufactures, sells and services instruments and consumables to pharmaceutical researchers allowing them to develop new drugs faster than by using older technologies such as enzyme-linked immunosorbent assay or "ELISA". BDI was originally established with technology developed in conjunction with Dr. John L. "Jan" Hall, Adjoint Professor, JILA (University of Colorado), who shared the Nobel Prize for Physics in 2005 for his work on laser-based precision spectroscopy and the optical frequency comb technique. SPR is the core of the BDI products and intellectual property.  Dr. Hall, in conjunction with the scientists at BDI, created a common path interferometer that was commercialized to become the 404pi instrument.

When it was acquired by us in September 2016, BDI was in the initial stages of rolling out its first commercial product, the 404pi system.  BDI's initial revenue was generated in 2014 with first sales to customers including sales to leading academic researchers and biotech companies. BDI did not experience any significant seasonality to its business and provided normal terms to its customers, generally 30-60 days, net. Currently there is no back-log of orders.

Following the September 2016 acquisition of BDI, we began hiring sales, marketing and operational employees, adding a total of eight employees to the twelve hired in connection with the acquisition.

The BDI products include a reader instrument (404pi) and the consumable test products consisting of test chips (cassettes) and packaging.  The instrument is assembled in-house using primarily off the shelf parts and certain customized components.  Consumable test product components are manufactured at the BDI facility using certain sub-assemblies processed by third-party contractors. Raw materials and certain sub-components are acquired from a number of suppliers.

1

None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities. Unless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law.   Unless otherwise indicated below, to our knowledge, no persons named in the table are a broker-dealer or affiliate of a broker-dealer.  Unless otherwise indicated, all address are c/o Bioptix, Inc., 834-F South Perry Street, Suite 443, Castle Rock, CO 80104.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.63% | 200,000 (1) | 0 | * |
| Andrew Schwartzberg | 549,800 (2) | 9.99% | 900,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.63% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.10% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,860 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 596,400 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 598,100 (12) | 9.99% | 1,624,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.20% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,400 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |

\* Less than 1%.

\*\* Based on 4,903,971 shares of Common Stock outstanding as of April 14, 2017.

(1) Adam Arviv is the President of Acquisition Group Limited. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 100,000 shares of Common Stock of which 55,556 shares are held in escrow pending certain release conditions being met and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 55,556 shares are held in escrow pending certain release conditions being met. The address for this selling stockholder is 118 Yorkville Ave, Suite 604, Toronto, Ontario M5RIC2.

(2) Represents (i) 450,000 shares of Common Stock of which 250,000 shares are held in escrow pending certain release conditions being met and (ii) 100,440 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 250,000 shares are held in escrow pending certain release conditions being met. Excludes 349,590 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The address for this selling stockholder is 1 Greentree Court Bethesda, MD 20817.

(3) Represents (i) 100,000 shares of Common Stock of which 55,556 shares are held in escrow pending certain release conditions being met and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 55,556 shares are held in escrow pending certain release conditions being met. The address for this selling stockholder is 11290 Chalon Road, Los Angeles CA 90049.

(4) Mark Groussman is the President of Melechdavid Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 170,000 shares of Common Stock of which 94,445 shares are held in escrow pending certain release conditions being met and (ii) 170,000 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 94,445 shares are held in escrow pending certain release conditions being met. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(5) Mark Groussman is the Custodian of Mark Groussman c/f Alivia Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock of which 22,222 shares are held in escrow pending certain release conditions being met and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 22,222 shares are held in escrow pending certain release conditions being met. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(6) Mark Groussman is the Custodian of Mark Groussman c/f Asher Groussman UTMA/FL . In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock of which 22,222 shares are held in escrow pending certain release conditions being met and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants of which warrants to purchase 22,222 shares are held in escrow pending certain release conditions being met. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(7) Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by GRQ Consultants, Inc. 401K ("401K"), (iii) 30,600 shares of Common Stock held by GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("Roth 401K") and (iv) 39,860 shares of Common Stock issuable upon exercise of outstanding warrants held by Mr. Honig. Mr. Honig is the trustee of 401K and Roth 401K in such capacity holds voting and dispositive power over the securities held by such entities. Excludes (i) 170,000 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation, (ii) 160,140 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation, (iii) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation, and (iv) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The notes and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(8) Represents (i) 206,017 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met.

(9) Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by 401K and (iii) 30,600 shares of Common Stock held by Roth 401K. Mr. Honig is the trustee of 401K and Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entities.

(10) Represents (i) 30,600 shares of Common Stock and (ii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation.  Mr. Honig is the trustee of Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entity. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(11) Represents (i) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met.

(12) Jonathan Honig is the Manager of Titan Multi-Strategy Fund I, Ltd. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 15,000 shares of Common Stock and (ii) 583,774 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes (i) 824,066 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation and (ii) 216,226 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation.  The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 5825 Windsor Court, Boca Raton, FL 33496.

(13) Represents (i) 824,066 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 800,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval.

(14) Candice Merren-Yates and Ghislian Ghyoot are the Authorized Signatories of US Commonwealth Life, A.I. Policy No. 2013-17. In such capacity they share voting and dispositive control over the securities held by such entity. Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 304 Ponce de Leon, Suite 1000, San Juan, Puerto Rico, 00918.

(15) Represents (i) 41,204 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. Mr. O'Braitis is affiliated with a broker-dealer and may be deemed a statutory underwriter of the shares. The address for this selling stockholder is 43811 Grantner Pl, Ashburn, VA 20147.

(16) Adrian James is the President & CEO of Stockwire Research Group, Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 3736 Bee Caves Road, Suite 1-105, Austin, TX 78746.

(17) Edward Karr is the Managing Member of Aifos Capital LLC.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 61,805 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 60,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is Aifos Capital LLC, CP 5452, CH-1211 Geneva 11, Switzerland.

(18) John Stetson is the Managing Member of Stetson Capital Management, LLC.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 7,500 shares of Common Stock, (ii) 75,900 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 130,117 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 68 Fiesta Way, Ft. Lauderdale, FL 33301.

(19) Represents (i) 206,017 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met.

(20) Jason Theofilos is the Director of JAD Capital Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 41,204 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, Canada L4B 4V1.

(21) Represents (i) 57,187 shares, (ii) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 51 Lord's Highway East, Weston, CT 06883.

(22) Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The note and warrants cannot be converted or exercised without further shareholder approval. The notes and warrants are being held in escrow pending certain release conditions being met.

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on this Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Castle Rock, State of Colorado on the 20 th day of April, 2017.

/s/ Michael M. Beeghley
Michael M. Beeghley
Chief Executive Officer
(Principal Executive Officer)

/s/ Jeffrey G. McGonegal
Jeffrey G. McGonegal
Chief Financial Officer
(Principal Financial and Accounting Officer)

The Registrant and each person whose signature appears below hereby appoint Michael M. Beeghley and Jeffrey G. McGonegal as their attorneys-in-fact, with full power of substitution, to execute in their names and on behalf of the Registrant and each such person, individually and in each capacity stated below, one or more amendments (including post-effective amendments and registration statements filed pursuant to Rule 462(b) under the Securities Act of 1933, as amended and otherwise) to this Registration Statement as the attorney-in-fact acting on the premise shall from time to time deem appropriate and to file any such amendment to this Registration Statement with the Securities and Exchange Commission.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
|------|-------|------|
| /s/ Michael M. Beeghley<br>Michael M. Beeghley | Chief Executive Officer, Director<br>(Principal Executive Officer) | April 20, 2017 |
| /s/ Jeffrey G. McGonegal<br>Jeffrey G. McGonegal | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | April 20, 2017 |
| /s/ John R. O'Rourke<br>John R. O'Rourke | Director | April 20, 2017 |
| /s/ Mike Dai<br>Mike Dai | Director | April 20, 2017 |

# Exhibit 9

As filed with the Securities and Exchange Commission on July 19, 2017

Registration No. 333-217397

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM S-3**
**(Amendment No. 1)**

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# BIOPTIX, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Colorado** | **84-155337** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

**Jeffrey G. McGonegal**
**Chief Financial Officer**
**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

**Approximate date of commencement of proposed sale to the public:** From time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

**Company References**

In this prospectus, "Bioptix," "the Company," "we," "us," and "our" refer to Bioptix, Inc., a Colorado corporation, unless the context otherwise requires.

## OUR BUSINESS

Through our wholly owned subsidiary, BiOptix Diagnostics, Inc. ("BDI"), which we acquired in September 2016, we have developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions.  We acquired a Surface Plasma Resonance (SPR) platform which seeks to combine high sensitivity with microarray detection capability to allow researchers to understand whether their target molecules have functionality against the disease targeted. SPR is an advanced and highly sensitive optical technology that can measure refractive index changes on a sensor chip's gold surface due to a change in mass that occurs during a binding event. This change can be used to monitor biological interactions such as the concentration of target molecules, kinetic rates and affinity constants.

BDI is a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions.  BDI manufactures, sells and services instruments and consumables to pharmaceutical researchers allowing them to develop new drugs faster than by using older technologies such as enzyme-linked immunosorbent assay or "ELISA". BDI was originally established with technology developed in conjunction with Dr. John L. "Jan" Hall, Adjoint Professor, JILA (University of Colorado), who shared the Nobel Prize for Physics in 2005 for his work on laser-based precision spectroscopy and the optical frequency comb technique. SPR is the core of the BDI products and intellectual property.  Dr. Hall, in conjunction with the scientists at BDI, created a common path interferometer that was commercialized to become the 404pi instrument.

When it was acquired by us in September 2016, BDI was in the initial stages of rolling out its first commercial product, the 404pi system.  BDI's initial revenue was generated in 2014 with first sales to customers including sales to leading academic researchers and biotech companies. BDI did not experience any significant seasonality to its business and provided normal terms to its customers, generally 30-60 days, net. Currently there is no back-log of orders.

Following the September 2016 acquisition of BDI, we began hiring sales, marketing and operational employees, adding a total of eight employees to the twelve hired in connection with the acquisition.

The BDI products include a reader instrument (404pi) and the consumable test products consisting of test chips (cassettes) and packaging.  The instrument is assembled in-house using primarily off the shelf parts and certain customized components.  Consumable test product components are manufactured at the BDI facility using certain sub-assemblies processed by third-party contractors. Raw materials and certain sub-components are acquired from a number of suppliers.

None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities. Unless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law.   Unless otherwise indicated below, to our knowledge, no persons named in the table are a broker-dealer or affiliate of a broker-dealer.  Unless otherwise indicated, all addresses are c/o Bioptix, Inc., 834-F South Perry Street, Suite 443, Castle Rock, CO 80104.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northurst Inc. | 554,100 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 595,600 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 592,400 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | 0.19% | 20,000 (23) | 0 | * |

\*   Less than 1%.
\*\* Based on 5,392,503 shares of Common Stock outstanding as of July 14, 2017.

(1)     Adam Arviv is the President of Acquisition Group Limited. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Yorkville Ave, Suite 604, Toronto, Ontario M5RIC2.

(2)     Jake Malczewski is the Controlling Shareholder of Northurst Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 400,000 shares of Common Stock and (ii) 154,100 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 245,900 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares of Common Stock offered in this offering, include the 245,900 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Cragmore Ave, Pointe-Claire, Quebec, H9R 5M1.

(3)     Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 11290 Chalon Road, Los Angeles CA 90049.

(4)     Mark Groussman is the President of Melechdavid Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 170,000 shares of Common Stock and (ii) 170,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(5)     Mark Groussman is the Custodian of Mark Groussman c/f Alivia Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(6)     Mark Groussman is the Custodian of Mark Groussman c/f Asher Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(7)     Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by GRQ Consultants, Inc. 401K ("401K"), (iii) 30,600 shares of Common Stock held by GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("Roth 401K") and (iv) 39,860 shares of Common Stock issuable upon exercise of outstanding warrants held by Mr. Honig. Mr. Honig is the trustee of 401K and Roth 401K in such capacity holds voting and dispositive power over the securities held by such entities. Excludes (i) 170,000 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation, (ii) 160,140 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation, (iii) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation, and (iv) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares can be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(8)     Represents (i) 206,017 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively.  The Notes and warrants are being held in escrow pending certain release conditions being met.

(9)     Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by 401K and (iii) 30,600 shares of Common Stock held by Roth 401K. Mr. Honig is the trustee of 401K and Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entities.

(10)    Represents (i) 30,600 shares of Common Stock and (ii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation. Mr. Honig is the trustee of Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entity. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending the satisfaction of certain release conditions. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(11)    Represents (i) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met.

(12)    Jonathan Honig is the Manager of Titan Multi-Strategy Fund I, Ltd. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 55,000 shares of Common Stock and (ii) 537,400 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes (i) 824,066 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation and (ii) 256,226 shares of Common Stock issuable upon conversion of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 5825 Windsor Court, Boca Raton, FL 33496.

(13)    Represents (i) 40,000 shares of Common Stock and (ii) 824,066 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 840,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met .

(14)    Candice Merren-Yates and Ghislian Ghyoot are the Authorized Signatories of US Commonwealth Life, A.I. Policy No. 2013-17. In such capacity they share voting and dispositive control over the securities held by such entity. Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 304 Ponce de Leon, Suite 1000, San Juan, Puerto Rico, 00918.

(15)    Represents (i) 41,204 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met. Mr. O'Braitis is affiliated with a broker-dealer and may be deemed a statutory underwriter of the shares. The address for this selling stockholder is 43811 Grantner Pl, Ashburn, VA 20147.

(16)    Adrian James is the President & CEO of Stockwire Research Group, Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 3736 Bee Caves Road, Suite 1-105, Austin, TX 78746.

(17)    Edward Karr is the Managing Member of Aifos Capital LLC. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 61,805 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 60,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is Aifos Capital LLC, CP 5452, CH-1211 Geneva 11, Switzerland.

(18)    John Stetson is the Managing Member of Stetson Capital Management, LLC. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 7,500 shares of Common Stock, (ii) 75,800 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 130,217 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 68 Fiesta Way, Ft. Lauderdale, FL 33301.

(19)    Represents (i) 206,017 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met.

(20)    Jason Theofilos is the Director of JAD Capital Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 41,204 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, Canada L4B 4V1.

(21)    Represents (i) 57,187 shares of Common Stock, (ii) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively. The Notes and warrants are being held in escrow pending certain release conditions being met. The address for this selling stockholder is 51 Lord's Highway East, Weston, CT 06883.

(22)  Represents (i) 20,002 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. Shares cannot be issued upon conversion of the Note or exercise of the warrants without obtaining Shareholder Approval, as defined in Section 4(f) of the Note and Section 2(f) of the warrant, respectively.  The Notes and warrants are being held in escrow pending certain release conditions being met.

(23)  Represents (i) 10,000 shares of Common Stock and (ii) 10,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 200 East 69 St, Apt 21B, New York, NY 10021.

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on this Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Castle Rock, State of Colorado on the 19 th day of July, 2017.

|  |  |
|---|---|
| | /s/ Michael M. Beeghley |
| | Michael M. Beeghley |
| | Chief Executive Officer |
| | (Principal Executive Officer) |
| | |
| | /s/ Jeffrey G. McGonegal |
| | Jeffrey G. McGonegal |
| | Chief Financial Officer |
| | (Principal Financial and Accounting Officer) |

The Registrant and each person whose signature appears below hereby appoint Michael M. Beeghley and Jeffrey G. McGonegal as their attorneys-in-fact, with full power of substitution, to execute in their names and on behalf of the Registrant and each such person, individually and in each capacity stated below, one or more amendments (including post-effective amendments and registration statements filed pursuant to Rule 462(b) under the Securities Act of 1933, as amended and otherwise) to this Registration Statement as the attorney-in-fact acting on the premise shall from time to time deem appropriate and to file any such amendment to this Registration Statement with the Securities and Exchange Commission.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
|------|-------|------|
| /s/ Michael M. Beeghley<br>Michael M. Beeghley | Chief Executive Officer, Director<br>(Principal Executive Officer) | July 19, 2017 |
| /s/ Jeffrey G. McGonegal<br>Jeffrey G. McGonegal | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | July 19, 2017 |
| /s/ John R. O'Rourke<br>John R. O'Rourke | Director | July 19, 2017 |
| /s/ Mike Dai<br>Mike Dai | Director | July 19, 2017 |
| /s/ Andrew Kaplan<br>Andrew Kaplan | Director | July 19, 2017 |

# Exhibit 10

As filed with the Securities and Exchange Commission on August 24, 2017

Registration No. 333-217397

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

---

**FORM S-3**
**(Amendment No. 2)**

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# BIOPTIX, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Colorado** | **84-155337** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

**Jeffrey G. McGonegal**
**Chief Financial Officer**
**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

---

**Approximate date of commencement of proposed sale to the public:** From time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

**Company References**

In this prospectus, "Bioptix," "the Company," "we," "us," and "our" refer to Bioptix, Inc., a Colorado corporation, unless the context otherwise requires.

## OUR BUSINESS

**Historical Operations**

We hold an exclusive license agreement with Washington University ("WU") in St. Louis which granted us an exclusive license and right to sublicense its technology for veterinary products worldwide, subject to certain exceptions.  In July 2012, we granted Ceva Sante Animale S.A. ("Ceva") an exclusive royalty-bearing license to our intellectual property and other assets, relating to recombinant single chain reproductive hormone technology for use in non-human mammals.  This license includes a sublicense of the technology licensed to us by WU.  Ceva continues to advance development of the bovine rFSH product and cumulative cash payments received to date by us from Ceva have been approximately $2 million.

On February 25, 2016, we completed the sale of our corporate headquarters, land and building, to a third party at a purchase price of $4,053,000.  The sale generated approximately $1.8 million in net cash after expenses and mortgage payoffs. In addition to agreeing to the sale, we rented back space in the building under short-term lease agreements that provide storage space required for our current level of operations.

Through our wholly owned subsidiary, BiOptix Diagnostics, Inc. ("BDI"), which we acquired in September 2016, we have developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions.  We acquired a Surface Plasma Resonance (SPR) platform which seeks to combine high sensitivity with microarray detection capability to allow researchers to understand whether their target molecules have functionality against the disease targeted. SPR is an advanced and highly sensitive optical technology that can measure refractive index changes on a sensor chip's gold surface due to a change in mass that occurs during a binding event. This change can be used to monitor biological interactions such as the concentration of target molecules, kinetic rates and affinity constants.

BDI is a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions.  BDI manufactures, sells and services instruments and consumables to pharmaceutical researchers allowing them to develop new drugs faster than by using older technologies such as enzyme-linked immunosorbent assay or "ELISA". BDI was originally established with technology developed in conjunction with Dr. John L. "Jan" Hall, Adjoint Professor, JILA (University of Colorado), who shared the Nobel Prize for Physics in 2005 for his work on laser-based precision spectroscopy and the optical frequency comb technique. SPR is the core of the BDI products and intellectual property.  Dr. Hall, in conjunction with the scientists at BDI, created a common path interferometer that was commercialized to become the 404pi instrument.

None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities. Unless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law.   Unless otherwise indicated below, to our knowledge, no persons named in the table are a broker-dealer or affiliate of a broker-dealer.  Unless otherwise indicated, all addresses are c/o Bioptix, Inc., 834-F South Perry Street, Suite 443, Castle Rock, CO 80104.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northurst Inc. | 555,400 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600 (10) | * | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 593,650 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | * | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | * | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | * | 20,000 (23) | 0 | * |

*   Less than 1%.
**  Based on 5,403,919 shares of Common Stock outstanding as of August 21, 2017.

9

(1)      Adam Arviv is the President of Acquisition Group Limited. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Yorkville Ave, Suite 604, Toronto, Ontario M5RIC2.

(2)      Jake Malczewski is the Controlling Shareholder of Northurst Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 400,000 shares of Common Stock and (ii) 155,400 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 244,600 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares of Common Stock offered in this offering, includes the 244,600 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Cragmore Ave, Pointe-Claire, Quebec, H9R 5M1 .

(3)      Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 11290 Chalon Road, Los Angeles CA 90049.

(4)      Mark Groussman is the President of Melechdavid Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 170,000 shares of Common Stock and (ii) 170,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(5)      Mark Groussman is the Custodian of Mark Groussman c/f Alivia Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(6)      Mark Groussman is the Custodian of Mark Groussman c/f Asher Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(7)      Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by GRQ Consultants, Inc. 401K ("401K"), (iii) 30,600 shares of Common Stock held by GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("Roth 401K") and (iv) 39,860 shares of Common Stock issuable upon exercise of outstanding warrants held by Mr. Honig. Mr. Honig is the trustee of 401K and Roth 401K in such capacity holds voting and dispositive power over the securities held by such entities. Excludes (i) 170,000 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation, (ii) 160,140 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation, (iii) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation, and (iv) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(8)      Represents (i) 206,017 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(9)      Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by 401K and (iii) 30,600 shares of Common Stock held by Roth 401K. Mr. Honig is the trustee of 401K and Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entities.

(10)      Represents 30,600 shares of Common Stock. Excludes 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note, and 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contain a 4.99% and 9.99% beneficial ownership limitation, respectively. Mr. Honig is the trustee of Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entity. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(11)      Represents (i) 515,042 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation.

(12)      Jonathan Honig is the Manager of Titan Multi-Strategy Fund I, Ltd. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 55,000 shares of Common Stock and (ii) 538,650 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes (i) 822,816 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation and (ii) 256,226 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The address for this selling stockholder is 5825 Windsor Court, Boca Raton, FL 33496

(13)      Represents (i) 40,000 shares of Common Stock and (ii) 824,066 shares of Common Stock issuable upon conversion of a convertible promissory note and (Iii) 840,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(14)      Candice Merren-Yates and Ghislian Ghyoot are the Authorized Signatories of US Commonwealth Life, A.I. Policy No. 2013-17. In such capacity they share voting and dispositive control over the securities held by such entity. Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 304 Ponce de Leon, Suite 1000, San Juan, Puerto Rico, 00918.

(15)      Represents (i) 41,204 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. Mr. O'Braitis is affiliated with a broker-dealer and may be deemed a statutory underwriter of the shares. The address for this selling stockholder is 43811 Grantner Pl, Ashburn, VA 20147.

(16)      Adrian James is the President & CEO of Stockwire Research Group, Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 3736 Bee Caves Road, Suite 1-105, Austin, TX 78746.

(17)      Edward Karr is the Managing Member of Aifos Capital LLC. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 61,805 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 60,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is Aifos Capital LLC, CP 5452, CH-1211 Geneva 11, Switzerland.

(18)      John Stetson is the Managing Member of Stetson Capital Management, LLC. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 7,500 shares of Common Stock, (ii) 75,800 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 130,217 shares of Common Stock issuable upon conversion of a convertible promissory note, which contains a 4.99% beneficial ownership limitation. The address for this selling stockholder is 68 Fiesta Way, Ft. Lauderdale, FL 33301.

(19)      Represents (i) 206,017 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(20)      Jason Theofilos is the Director of JAD Capital Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 41,204 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, Canada L4B 4V1.

(21)      Represents (i) 57,187 shares of Common Stock, (ii) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (iii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 51 Lord's Highway East, Weston, CT 06883.

(22)      Represents (i) 20,602 shares of Common Stock issuable upon conversion of a convertible promissory note and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(23)      Represents (i) 10,000 shares of Common Stock and (ii) 10,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 200 East 69 St, Apt 21B, New York, NY 10021.

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on this Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Castle Rock, State of Colorado on the 24 th day of August, 2017.

/s/ Michael M. Beeghley
Michael M. Beeghley
Chief Executive Officer
(Principal Executive Officer)

/s/ Jeffrey G. McGonegal
Jeffrey G. McGonegal
Chief Financial Officer
(Principal Financial and Accounting Officer)

The Registrant and each person whose signature appears below hereby appoint Michael M. Beeghley and Jeffrey G. McGonegal as their attorneys-in-fact, with full power of substitution, to execute in their names and on behalf of the Registrant and each such person, individually and in each capacity stated below, one or more amendments (including post-effective amendments and registration statements filed pursuant to Rule 462(b) under the Securities Act of 1933, as amended and otherwise) to this Registration Statement as the attorney-in-fact acting on the premise shall from time to time deem appropriate and to file any such amendment to this Registration Statement with the Securities and Exchange Commission.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Michael M. Beeghley<br>Michael M. Beeghley | Chief Executive Officer, Director<br>(Principal Executive Officer) | August 24, 2017 |
| /s/ Jeffrey G. McGonegal<br>Jeffrey G. McGonegal | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | August 24, 2017 |
| /s/ John R. O'Rourke<br>John R. O'Rourke | Director | August 24, 2017 |
| /s/ Mike Dai<br>Mike Dai | Director | August 24, 2017 |
| /s/ Andrew Kaplan<br>Andrew Kaplan | Director | August 24, 2017 |

# Exhibit 11

As filed with the Securities and Exchange Commission on September 25, 2017

Registration No. 333-217397

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

---

**FORM S-3**
**(Amendment No. 3 )**

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# BIOPTIX, INC.

(Exact name of registrant as specified in its charter)

| **Nevada** | **84-155337** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Jeffrey G. McGonegal**
**Chief Financial Officer**
**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

**Approximate date of commencement of proposed sale to the public:** From time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

**Company References**

In this prospectus, "Bioptix," "the Company," "we," "us," and "our" refer to Bioptix, Inc., a Colorado corporation, unless the context otherwise requires.

## OUR BUSINESS

**Historical Operations**

We hold an exclusive license agreement with Washington University ("WU") in St. Louis which granted us an exclusive license and right to sublicense its technology for veterinary products worldwide, subject to certain exceptions.  In July 2012, we granted Ceva Sante Animale S.A. ("Ceva") an exclusive royalty-bearing license to our intellectual property and other assets, relating to recombinant single chain reproductive hormone technology for use in non-human mammals.  This license includes a sublicense of the technology licensed to us by WU.  Ceva continues to advance development of the bovine rFSH product and cumulative cash payments received to date by us from Ceva have been approximately $2 million.

On February 25, 2016, we completed the sale of our corporate headquarters, land and building, to a third party at a purchase price of $4,053,000.  The sale generated approximately $1.8 million in net cash after expenses and mortgage payoffs. In addition to agreeing to the sale, we rented back space in the building under short-term lease agreements that provide storage space required for our current level of operations.

Through our wholly owned subsidiary, BiOptix Diagnostics, Inc. ("BDI"), which we acquired in September 2016, we have developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions.  We acquired a Surface Plasma Resonance (SPR) platform which seeks to combine high sensitivity with microarray detection capability to allow researchers to understand whether their target molecules have functionality against the disease targeted. SPR is an advanced and highly sensitive optical technology that can measure refractive index changes on a sensor chip's gold surface due to a change in mass that occurs during a binding event. This change can be used to monitor biological interactions such as the concentration of target molecules, kinetic rates and affinity constants.

BDI is a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions.  BDI manufactures, sells and services instruments and consumables to pharmaceutical researchers allowing them to develop new drugs faster than by using older technologies such as enzyme-linked immunosorbent assay or "ELISA". BDI was originally established with technology developed in conjunction with Dr. John L. "Jan" Hall, Adjoint Professor, JILA (University of Colorado), who shared the Nobel Prize for Physics in 2005 for his work on laser-based precision spectroscopy and the optical frequency comb technique.  SPR is the core of the BDI products and intellectual property.  Dr. Hall, in conjunction with the scientists at BDI, created a common path interferometer that was commercialized to become the 404pi instrument.

None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities. Unless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law.   Unless otherwise indicated below, to our knowledge, no persons named in the table are a broker-dealer or affiliate of a broker-dealer.   Unless otherwise indicated, all addresses are c/o Bioptix, Inc., 834-F South Perry Street, Suite 443, Castle Rock, CO 80104.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000(1) | 3.61% | 200,000(1) | 0 | * |
| Northurst Inc. | 559,000(2) | 9.99% | 800,000(2) | 0 | * |
| Erick Richardson | 200,000(3) | 3.61% | 200,000(3) | 0 | * |
| Melechdavid Inc. | 340,000(4) | 6.06% | 340,000(4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000(5) | 1.46% | 80,000(5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000(6) | 1.46% | 80,000(6) | 0 | * |
| Barry Honig | 544,400(7) | 9.99% | 402,050(8) | 504,000(9) | 8.09% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600(10) | * | 1,005,124(11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 597,300(12) | 9.99% | 1,688,198(13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,205(14) | * | 40,205(14) | 0 | * |
| Robert R. O'Braitis | 80,410(15) | 1.46% | 80,410(15) | 0 | * |
| Stockwire Research Group, Inc. | 40,205(16) | * | 40,205(16) | 0 | * |
| Aifos Capital LLC | 120,615(17) | 2.17% | 120,615(17) | 0 | * |
| Stetson Capital Management, LLC | 285,150(18) | 4.99% | 402,050(19) | 7,500 | * |
| JAD Capital Inc. | 80,410(20) | 1.46% | 80,410(20) | 0 | * |
| Richard Molinsky | 97,392(21) | 1.78% | 40,205(22) | 57,187 | 1.04% |
| Alan Honig | 20,000(23) | * | 20,000(23) | 0 | * |

\*   Less than 1%.
\*\* Based on 5,436,503 shares of Common Stock outstanding as of September 20, 2017.

9

(1)   Adam Arviv is the President of Acquisition Group Limited. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Yorkville Ave, Suite 604, Toronto, Ontario M5RIC2.

(2)   Jake Malczewski is the Controlling Shareholder of Northurst Inc.  In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 400,000 shares of Common Stock and (ii) 159,000 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 241,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Shares of Common Stock offered in this offering, includes the 241,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 118 Cragmore Ave, Pointe-Claire, Quebec, H9R 5M1.

(3)   Represents (i) 100,000 shares of Common Stock and (ii) 100,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 11290 Chalon Road, Los Angeles CA 90049.

(4)   Mark Groussman is the President of Melechdavid Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 170,000 shares of Common Stock and (ii) 170,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(5)   Mark Groussman is the Custodian of Mark Groussman c/f Alivia Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(6)   Mark Groussman is the Custodian of Mark Groussman c/f Asher Groussman UTMA/FL. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,000 shares of Common Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 5154 La Gorce Drive Miami Beach, FL 33140.

(7)   Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by GRQ Consultants, Inc. 401K ("401K"), (iii) 30,600 shares of Common Stock held by GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("Roth 401K") and (iv) 71,000 shares of Common Stock issuable upon exercise of outstanding warrants held by Mr. Honig. Mr. Honig is the trustee of 401K and Roth 401K in such capacity holds voting and dispositive power over the securities held by such entities. Excludes (i) 202,050 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock a convertible promissory note, which contains a 4.99% beneficial ownership limitation, (ii) 129,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation, (iii) 505,124 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock, which contain a 4.99% beneficial ownership limitation, and (iv) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(8)   Represents (i) 202,050 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(9)   Represents (i) 29,815 shares of Common Stock, (ii) 443,585 shares of Common Stock held by 401K and (iii) 30,600 shares of Common Stock held by Roth 401K. Mr. Honig is the trustee of 401K and Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entities.

(10)   Represents 30,600 shares of Common Stock. Excludes 505,124 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock, and 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contain a 4.99% and 9.99% beneficial ownership limitation, respectively. Mr. Honig is the trustee of Roth 401K and in such capacity holds voting and dispositive power over the securities held by such entity. The address for this selling stockholder is 555 S. Federal Highway, #450, Boca Raton, FL 33432.

(11)   Represents (i) 505,124 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (iii) 500,000 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation.

(12)   Jonathan Honig is the Manager of Titan Multi-Strategy Fund I, Ltd. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 55,000 shares of Common Stock and (ii) 542,300 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. Excludes (i) 808,198 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock, which contain a 4.99% beneficial ownership limitation and (ii) 297,700 shares of Common Stock issuable upon exercise of outstanding warrants, which contains a 9.99% beneficial ownership limitation. The address for this selling stockholder is 5825 Windsor Court, Boca Raton, FL 33496

(13)   Represents (i) 40,000 shares of Common Stock and (ii) 808,198 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (iii) 840,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(14)   Candice Merren-Yates and Ghislian Ghyoot are the Authorized Signatories of US Commonwealth Life, A.I. Policy No. 2013-17. In such capacity they share voting and dispositive control over the securities held by such entity. Represents (i) 20,205 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 304 Ponce de Leon, Suite 1000, San Juan, Puerto Rico, 00918.

(15)   Represents (i) 40,410 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. Mr. O'Braitis is affiliated with a broker-dealer and may be deemed a statutory underwriter of the shares. The address for this selling stockholder is 43811 Grantner Pl, Ashburn, VA 20147.

(16)   Adrian James is the President & CEO of Stockwire Research Group, Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 20,205 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 3736 Bee Caves Road, Suite 1-105, Austin, TX 78746.

(17)   Edward Karr is the Managing Member of Aifos Capital LLC. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 60,615 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 60,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is Aifos Capital LLC, CP 5452, CH-1211 Geneva 11, Switzerland.

(18)   John Stetson is the Managing Member of Stetson Capital Management, LLC. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 7,500 shares of Common Stock, (ii) 77,650 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (iii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants. Excludes 124,400 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock, which contain a 4.99% beneficial ownership limitation. The address for this selling stockholder is 68 Fiesta Way, Ft. Lauderdale, FL 33301.

(19)   Represents (i) 202,050 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 200,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(20)   Jason Theofilos is the Director of JAD Capital Inc. In such capacity he has voting and dispositive control over the securities held by such entity. Represents (i) 40,410 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 40,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 120 East Beaver Creek Road, Suite 200, Richmond Hill, Ontario, Canada L4B 4V1.

(21)   Represents (i) 57,187 shares of Common Stock, (ii) 20,205 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (iii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 51 Lord's Highway East, Weston, CT 06883.

(22)   Represents (i) 20,205 shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and (ii) 20,000 shares of Common Stock issuable upon exercise of outstanding warrants.

(23)   Represents (i) 10,000 shares of Common Stock and (ii) 10,000 shares of Common Stock issuable upon exercise of outstanding warrants. The address for this selling stockholder is 200 East 69 St, Apt 21B, New York, NY 10021.

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on this Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Castle Rock, State of Colorado on the 25th day of September, 2017.

/s/ Michael M. Beeghley
_____
Michael M. Beeghley
Chief Executive Officer
(Principal Executive Officer)

/s/ Jeffrey G. McGonegal
_____
Jeffrey G. McGonegal
Chief Financial Officer
(Principal Financial and Accounting Officer)

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Michael M. Beeghley<br>Michael M. Beeghley | Chief Executive Officer, Director<br>(Principal Executive Officer) | September 25, 2017 |
| /s/ Jeffrey G. McGonegal<br>Jeffrey G. McGonegal | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | September 25, 2017 |
| *<br>John R. O'Rourke | Director | September 25, 2017 |
| *<br>Mike Dai | Director | September 25, 2017 |
| *<br>Andrew Kaplan | Director | September 25, 2017 |

*By: /s/ Jeffrey G. McGonegal
      Jeffrey G. McGonegal

21

# Exhibit 12

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### WASHINGTON, DC 20549

# FORM 8-K

### CURRENT REPORT

#### PURSUANT TO SECTION 13 OR 15(d) OF THE
#### SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported): October 4, 2017 (September 29, 2017)**

# Riot Blockchain, Inc.
**(Exact name of Registrant as specified in its charter)**

| Nevada | 001-33675 | 84-1553387 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

| 834-F South Perry Street, Suite 443 Castle Rock, CO | 80104 |
|---|---|
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code:**          **(303) 794-2000**

# Bioptix, Inc.
**(Former name or former address, if changed since last report.)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[_] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[_] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
[_] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[_] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b2 of the Securities Exchange Act of 1934 (§240.12b2 of this chapter).

Emerging growth company [_]

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [_]

**Item 1.01**

*goNumerical Ltd Investment*

On September 29, 2017, Bioptix, Inc. (the "Company") entered into a series of agreements including a Subscription Agreement and Amended and Restated Unanimous Shareholder Agreement in connection with the purchase of $3,000,000 of units of goNumerical Ltd. ("goNumerical"), a leading Canadian Blockchain company known as Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies.  Each unit consists of (i) one share of goNumerical and (ii) a purchase warrant exercisable into such number of shares of stock at the exercise price and with such other terms and conditions as are acceptable to the Company The news release announcing the strategic investment is attached as Exhibit 99.1.

**Item 5.03. Amendments to Articles of Incorporation or Bylaws; Changes in Fiscal Year.**

On October 2, 2017 the Board of Directors of the Company approved a merger (the "Merger") of the Company with its wholly-owned subsidiary, Riot Blockchain, Inc., a Nevada corporation (the "Merger Sub"), solely for the purpose of changing the name of the Company. Upon consummation of the Merger, the separate existence of Merger Sub ceased.

As permitted by Chapter 92A.180 of Nevada Revised Statutes, the purpose of the Merger was to effect a change of the Company's name to Riot Blockchain, Inc. from Bioptix, Inc. Upon the filing of Articles of Merger (the "Articles of Merger") with the Secretary of State of Nevada on October 4, 2017, the Company's Articles of Incorporation were amended to reflect the change in the Company's corporate name to Riot Blockchain, Inc.

**Item 8.01  Other Events**

*Cash Dividend*

On October 2, 2017, the Company's Board of Directors approved a cash dividend pursuant to which, the holders of the Company's common stock, no par value per share (the "Common Stock"), and Series A Convertible Preferred Stock, no par value per share (the "Series A Preferred Stock"), as of the close of business on October 13, 2017 shall receive $1.00 for each share of Common Stock, including each share of Common Stock that would be issuable upon conversion of the Series A Preferred Stock, on an as converted basis. .  The payment date for the special cash dividend shall be on or about October 18, 2017, or such other date or dates as are authorized by the Board of Directors, as required for approval by NASDAQ.  Equity Stock Transfer has been appointed payment agent for purposes of overseeing payment of the dividend.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits.

The exhibits listed in the following Exhibit Index are filed as part of this Current Report on Form 8-K.

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Articles of Merger, as filed with the Secretary of State of the State of Nevada |
| 99.1 | Press Release dated October 4, 2017 |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Bioptix, Inc.
(Registrant)

October 4, 2017                              By:     /s/ Jeffrey G. McGonegal
                                                   Name:      Jeffrey G. McGonegal
                                                   Title:      Chief Financial Officer



*140105*



**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

# Articles of Merger

(PURSUANT TO NRS 92A.200)

## Page 1

USE BLACK INK ONLY - DO NOT HIGHLIGHT                    ABOVE SPACE IS FOR OFFICE USE ONLY

## Articles of Merger
### (Pursuant to NRS Chapter 92A)

1) Name and jurisdiction of organization of each constituent entity (NRS 92A.200):

☐ If there are more than four merging entities, check box and attach an 8 1/2" x 11" blank sheet
containing the required information for each additional entity from article one.

| Bioptix, Inc. | |
|---|---|
| **Name of merging entity** | |
| Nevada | Corporation |
| Jurisdiction | Entity type * |
| Riot Blockchain, Inc. | |
| **Name of merging entity** | |
| Nevada | Corporation |
| Jurisdiction | Entity type * |
| | |
| **Name of merging entity** | |
| | |
| Jurisdiction | Entity type * |
| | |
| **Name of merging entity** | |
| | |
| Jurisdiction | Entity type * |

and,

| Bioptix, Inc. | |
|---|---|
| **Name of surviving entity** | |
| Nevada | Corporation |
| Jurisdiction | Entity type * |

* Corporation, non-profit corporation, limited partnership, limited-liability company or business trust.

## Filing Fee: $350.00

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State 92A Merger Page 1
Revised: 1-5-15



**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

# Articles of Merger
(PURSUANT TO NRS 92A.200)

## Page 2

USE BLACK INK ONLY - DO NOT HIGHLIGHT

ABOVE SPACE IS FOR OFFICE USE ONLY

2) **Forwarding address where copies of process may be sent by the Secretary of State of Nevada (if a foreign entity is the survivor in the merger - NRS 92A.190):**

Attn: National Registered Agents, Inc.

c/o:

3) **Choose one:**

☐ The undersigned declares that a plan of merger has been adopted by each constituent entity (NRS 92A.200).

☒ The undersigned declares that a plan of merger has been adopted by the parent domestic entity (NRS 92A.180).

4) **Owner's approval (NRS 92A.200) (options a, b or c must be used, as applicable, for each entity):**

☐ If there are more than four merging entities, check box and attach an 8 1/2" x 11" blank sheet containing the required information for each additional entity from the appropriate section of article four.

(a) Owner's approval was not required from

Bioptix, Inc.
Name of **merging** entity, **if** applicable

Riot Blockchain, Inc.
Name of **merging** entity, **if** applicable

Name of **merging** entity, **if** applicable

Name of **merging** entity, **if** applicable

and, or;

Name of **surviving** entity, if applicable

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State 92A Merger Page 2
Revised: 1-5-15



**BARBARA K. CEGAVSKE**
**Secretary of State**
**202 North Carson Street**
**Carson City, Nevada 89701-4201**
**(775) 684-5708**
**Website: www.nvsos.gov**

# Articles of Merger

(PURSUANT TO NRS 92A.200)

## Page 3

USE BLACK INK ONLY - DO NOT HIGHLIGHT                                         ABOVE SPACE IS FOR OFFICE USE ONLY

(b) The plan was approved by the required consent of the owners of *:

Name of **merging** entity, if applicable

Name of **merging** entity, if applicable

Name of **merging** entity, if applicable

Name of **merging** entity, if applicable

and, or;

Name of **surviving** entity, if applicable

* Unless otherwise provided in the certificate of trust or governing instrument of a business trust, a merger must be approved by all
the trustees and beneficial owners of each business trust that is a constituent entity in the merger.



**BARBARA K. CEGAVSKE**
**Secretary of State**
**202 North Carson Street**
**Carson City, Nevada 89701-4201**
**(775) 684-5708**
**Website: www.nvsos.gov**

# Articles of Merger
(PURSUANT TO NRS 92A.200)

## Page 4

USE BLACK INK ONLY - DO NOT HIGHLIGHT                                    ABOVE SPACE IS FOR OFFICE USE ONLY

(c) Approval of plan of merger for Nevada non-profit corporation (NRS 92A.160):

The plan of merger has been approved by the directors of the corporation and by each
public officer or other person whose approval of the plan of merger is required by the
articles of incorporation of the domestic corporation.

Name of **merging** entity, if **applicable**

Name of **merging** entity, if **applicable**

Name of **merging** entity, if **applicable**

Name of **merging** entity, if **applicable**

and, or;

Name of **surviving** entity, if applicable



**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

# Articles of Merger

(PURSUANT TO NRS 92A.200)

## Page 5

USE BLACK INK ONLY - DO NOT HIGHLIGHT                              ABOVE SPACE IS FOR OFFICE USE ONLY

**5) Amendments, if any, to the articles or certificate of the surviving entity. Provide article numbers, if available. (NRS 92A.200)*:**

Article 1. Name: The name of the corporation is Riot Blockchain, Inc. (the "Corporation")

**6) Location of Plan of Merger (check a or b):**

☐ (a) The entire plan of merger is attached;

or,

☒ (b) The entire plan of merger is on file at the registered office of the surviving corporation, limited-liability company or business trust, or at the records office address if a limited partnership, or other place of business of the surviving entity (NRS 92A.200).

**7) Effective date and time of filing: (optional) (must not be later than 90 days after the certificate is filed)**

Date: _____          Time: _____

\* Amended and restated articles may be attached as an exhibit or integrated into the articles of merger. Please entitle them "Restated" or "Amended and Restated," accordingly. The form to accompany restated articles prescribed by the secretary of state must accompany the amended and/or restated articles. Pursuant to NRS 92A.180 (merger of subsidiary into parent - Nevada parent owning 90% or more of subsidiary), the articles of merger may not contain amendments to the constituent documents of the surviving entity except that the name of the surviving entity may be changed.



**BARBARA K. CEGAVSKE**
**Secretary of State**
**202 North Carson Street**
**Carson City, Nevada 89701-4201**
**(775) 684-5708**
**Website: www.nvsos.gov**

# Articles of Merger
(PURSUANT TO NRS 92A.200)
## Page 6

USE BLACK INK ONLY - DO NOT HIGHLIGHT

ABOVE SPACE IS FOR OFFICE USE ONLY

**8) Signatures - Must be signed by: An officer of each Nevada corporation; All general partners of each Nevada limited partnership; All general partners of each Nevada limited-liability limited partnership; A manager of each Nevada limited-liability company with managers or one member if there are no managers; A trustee of each Nevada business trust (NRS 92A.230)***

☐ **If there are more than four merging entities, check box and attach an 8 1/2" x 11" blank sheet containing the required information for each additional entity from article eight.**

| Bioptix, Inc. | | | |
|---|---|---|---|
| Name of **merging** entity | | | |
| **X** | /s/ Michael M. Beeghley | Chief Executive Officer | 10/03/2017 |
| **Signature** | | Title | Date |
| Riot Blockchain, Inc. | | | |
| Name of **merging** entity | | | |
| **X** | /s/ John R. O'Rourke | President | 10/03/2017 |
| **Signature** | | Title | Date |
| | | | |
| Name of **merging** entity | | | |
| **X** | | | |
| **Signature** | | Title | Date |
| | | | |
| Name of **merging** entity | | | |
| **X** | | | |
| **Signature** | | Title | Date |

and,

| Bioptix, Inc. | | | |
|---|---|---|---|
| Name of **surviving** entity | | | |
| **X** | /s/ Michael M. Beeghley | Chief Executive Officer | 10/03/2017 |
| **Signature** | | Title | Date |

* The articles of merger must be signed by each foreign constituent entity in the manner provided by the law governing it (NRS 92A.230). Additional signature blocks may be added to this page or as an attachment, as needed.

**IMPORTANT:** Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*

**Reset**

Exhibit 99.1

# Bioptix Changing Name to Riot Blockchain as Company Shifts Focus to Strategic Investor and Operator in Blockchain Technologies

### Riot Blockchain Announces Strategic Investment in Coinsquare, a Leading Canadian Digital Currency Exchange

CASTLE ROCK, Colo., Oct. 4, 2017 -- Bioptix Inc. (Nasdaq: BIOP) today announced it is changing its name to Riot Blockchain, Inc., and has reserved and plans to change its Nasdaq ticker symbol RIOT, in line with a shift in direction of the company. The name and symbol change are subject to Nasdaq approval. Moving forward, Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem with a particular focus on the Bitcoin and Ethereum blockchains.

As part of this focus, the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.

"At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets," said Michael Beeghley, Chief Executive Officer of Riot Blockchain. "With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector."

Blockchain protocols offer a secure way to store and relay information without the need for middlemen. It uses a decentralized and encrypted ledger that offers a secure, efficient, verifiable, and permanent way of storing records and other information. Blockchain protocols are the backbone of numerous digital cryptocurrencies including Bitcoin, Ethereum and Litecoin. They have a wide range of potential applications including use in processing transactions, managing medical records, recording votes, and proof of ownership across a far-reaching spectrum of applications.

**About Riot Blockchain**

Riot Blockchain Inc. (formerly Bioptix, Inc.) leverages its expertise and network to build and support blockchain technology companies. It is establishing an Advisory Board with technical experience intending to become a leading authority and supporter of blockchain and provides investment exposure to the rapidly growing blockchain ecosystem. For more information, visit http://www.riotblockchain.com/ .

The company continues to maintain its existing Bioptix business line and its royalty license stemming from an Exclusive License Agreement with Ceva Santé Animale S.A. ("Licensee"), providing an exclusive worldwide royalty-bearing license, until December 31, 2028, to develop, seek regulatory approval for and offer to sell, market, distribute, import and export luteinizing hormone ("LH") and/or follicle-stimulating hormone ("FSH") products for cattle, equine and swine for the assistance and facilitation of reproduction.

**Safe Harbor**

*The information provided in this press release may include forward-looking statements relating to future events or the future financial performance of the Company. Because such statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by such forward-looking statements. Words such as "anticipates," "plans," "expects," "intends," "will," "potential," "hope" and similar expressions are intended to identify forward-looking statements. These forward-looking statements are based upon current expectations of the Company and involve assumptions that may never materialize or may prove to be incorrect. Actual results and the timing of events could differ materially from those anticipated in such forward-looking statements as a result of various risks and uncertainties. Detailed information regarding factors that may cause actual results to differ materially from the results expressed or implied by statements in this press release relating to the Company may be found in the Company's periodic filings with the Securities and Exchange Commission, including the factors described in the sections entitled "Risk Factors", copies of which may be obtained from the SEC's website at www.sec.gov. The parties do not undertake any obligation to update forward-looking statements contained in this press release.*

**Media Contacts**
Karen Chase or Travis Kruse
Russo Partners, LLC
(646) 942-5627
(212) 845-4272
karen.chase@russopartnersllc.com
travis.kruse@russopartnersllc.com

# Exhibit 13

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 8-K**

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): November 1, 2017

**Riot Blockchain, Inc.**
(Exact name of registrant as specified in its charter)

| Nevada | 001-33675 | 84-1553387 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification Number) |

**202 6th Street, Suite 401**
**Castle Rock, CO 80104**
(Address of principal executive offices) (zip code)

**(303) 794-2000**
(Registrant's telephone number, including area code)

**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
(Former Name or Former Address, if Changed Since Last Report)

Copies to:
Harvey Kesner, Esq.
Sichenzia Ross Ference Kesner LLP
1185 Avenue of the Americas, 37th Floor
New York, New York 10036
Phone: (212) 930-9700
Fax: (212) 930-9725

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b2 of the Securities Exchange Act of 1934 (§240.12b2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01. Entry into a Material Definitive Agreement.**

On November 1, 2017, Riot Blockchain, Inc. (the "Company") entered into a share exchange agreement (the "Agreement") with Kairos Global Technology, Inc., a Nevada corporation ("Kairos").  Pursuant to the Agreement, upon satisfaction of certain closing conditions, the shareholders of Kairos agreed to exchange all outstanding shares of Kairos' common stock to the Company and the Company agreed to issue an aggregate of One Million Seven Hundred Fifty Thousand and One (1,750,001) newly designated shares of Series B Convertible Preferred Stock (the "Series B Preferred Stock") which are convertible into an aggregate of One Million Seven Hundred Fifty Thousand and One (1,750,001) shares of the Company's common stock, no par value per share (the transaction, the "Kairos Transaction") to such shareholders.  On November 3, 2017, the Company closed the Kairos Transaction.

Upon closing of the Karios Transaction, the Company became the owner of certain computer equipment and other assets used for the mining of cryptocurrency, specifically servers consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by industry leader Bitmain.

The shares of Series B Preferred Stock are convertible into shares of common stock based on a conversion calculation equal to the stated value of the Series B Preferred Stock, plus all accrued and unpaid dividends, if any, on such Series B Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series B Preferred Stock is $6.80 and the initial conversion price is $6.80 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events.

The holders of Series B Preferred Stock are entitled to receive dividends if and when declared by the Company's board of directors. The Series B Preferred Stock will participate on an "as converted" basis, with all dividends declared on the Company's common stock. Such dividends will be paid by the Company out of funds legally available therefor, payable, subject to the conditions and other terms hereof, in cash on the stated value of such Series B Preferred Stock.

The Company is prohibited from effecting a conversion of the Series B Preferred Stock to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% percent of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series B Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99% percent. Each holder is entitled to vote on all matters submitted to stockholders of the Company, and will have the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series B Preferred Stock.

The Series B Preferred Stock contains a blocker pursuant to which, if the Company has not obtained the approval of its shareholders in accordance with NASDAQ Listing Rule 5635(d), then the Company may not issue upon conversion of the Series B Preferred Stock a number of shares of common stock, which, when aggregated with any other shares of common stock  underlying the Series B Preferred Stock issued pursuant to the Agreement would exceed 19.99% of the shares of common stock issued and outstanding as of the date of the Agreement, subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the common stock that occur after the date of the Agreement.

The foregoing description of the Agreement does not purport to be complete and is qualified in its entirety by reference to the complete text of the Agreement, a copy of which will be filed as an exhibit to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2017.

The foregoing description of the Series B Preferred Stock does not purport to be complete and is qualified in its entirety by reference to the complete text of the Form of Series B Certificate of Designation of Rights, Powers, Preferences, Privileges and Restrictions of 0% Series B Convertible Preferred Stock (the "Certificate of Designation") , a copy of which is filed as Exhibit 3.1 to this Current Report on Form 8-K and is incorporated by reference herein.

**Item 3.02. Unregistered Sales of Equity Securities.**

Item 1.01 is incorporated by reference in its entirety into this Item 3.02. The Kairos Transaction was conducted pursuant to the exemption set forth in Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act") and safe-harbor set forth in Regulation S adopted under the Securities Act .

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

*Departure of Chief Executive Officer and Chairman*

On November 3, 2017, Michael Beeghley resigned as a director and the Chief Executive Officer of the Company.   Such resignation was tendered and accepted by the Board of Directors of the Company (the "Board").  Mr. Beeghley's resignation was not the result of any disagreement with the Company, any matter related to the Company's operations, policies or practices, the Company's management or the Board.  On November 3, 2017, Mr. Beeghley entered into a separation agreement with the Company (the "Separation Agreement"), pursuant to which all of his rights and interests in all unvested options and unvested restricted stock units will become vested and, in addition, the Company shall issue an additional award of 40,000 shares of restricted common stock of the Company.  The foregoing description of the Separation Agreement does not purport to be complete and is qualified in its entirety by reference to the complete text of the Separation Agreement, a copy of which will be filed as an exhibit to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2017.

*Appointment of Chief Executive Officer and Chairman*

On November 3, 2017, to fill the vacancy created by Mr. Beeghley's resignation, the Board appointed John O'Rourke as Chief Executive Officer and Chairman of the Board. Mr. O'Rourke currently serves as President of the Company and as a member of the Board.  There is no family relationship between Mr. O'Rourke and any of the Company's other officers or directors.

In connection with the appointment of Mr. O'Rourke as Chief Executive Officer and Chairman of the Board, the Board approved (i) a monthly salary of $25,000, (ii) a restricted stock award of 344,000 shares of common stock which shall vest in 24 equal monthly installments beginning one month from the date of issuance and (iii) an option to purchase up to 100,000 shares of the Company's common stock, at an exercise price $10.00, the exercisability of which is  subject to shareholder approval of an increase to the amount of shares available for issuance under the Company's equity incentive plan, and as more fully set forth in an employment agreement (the "Employment Agreement") which shall have a term of two years. The foregoing description of the Employment Agreement does not purport to be complete and is qualified in its entirety by reference to the complete text of the Employment Agreement, a copy of which will be filed as an exhibit to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2017.

*Departure of Director*

On November 1, 2017, Mike Dai resigned from his position as a member of the Board and all committees thereof.  Mr. Dai's resignation is not due to any disagreement related to the financial status or financial statements of the Company.

*Appointment of Director*

On November 3, 2017, the Company appointed Jason Les as a director of the Company.  Mr. Les is deemed an "independent" non-employee director as defined by NASDAQ Rule 5605(a)(2).  There are no family relationships between Mr. Les and any of our other officers and directors. Mr. Les shall receive the Company's equity award for new independent directors of 7,500 restricted stock units as compensation, which shall vest in 24 equal monthly installments over a two year period, beginning on the one month anniversary of the date of issuance. Mr. Les was appointed to the Nominating and Governance Committee, Audit Committee and Compensation Committee (Chairman) of the Board.

Set forth below is the biographical information of the newly appointed director, as required by Item 401 of Regulation S-K.

Mr. Les graduated from U.C. Irvine in 2010 with a B.S. in Information and Computer Science. Mr. Les is an established professional poker player. Mr. Les successfully competed in high stakes heads-up games online for several years and was twice selected as the human benchmark for testing the world's best poker artificial intelligence in what was dubbed Man vs Machine at Carnegie Mellon University. Mr. Les was chosen as a director based on the fact that he has been active in the industry as a miner, studying protocol development and evaluating a variety of crypto investment strategies.

**Item 5.03. Amendments to Articles of Incorporation or Bylaws; Changes in Fiscal Year.**

On November 3, 2017, the Company designated 1,750,001 shares of preferred stock as "0% Series B Convertible Preferred Stock" in connection with the filing of the Certificate of Designation with the Secretary of State of the State of Nevada.  The details of the Series B Preferred Stock and Certificate of Designation are described in Item 1.01, which is incorporated by reference in its entirety into this Item 5.03. The Certificate of Designation is filed as Exhibit 3.1 hereto.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

The exhibits listed in the following Exhibit Index are filed as part of this Current Report on Form 8-K.

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Form of Certificate of Designations, Preferences and Right of the 0% Series B Convertible Preferred Stock of Riot Blockchain, Inc. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**RIOT BLOCKCHAIN, INC.**

Dated: November 3, 2017

By:   /s/ Jeffrey G. McGonegal
Name: Jeffrey G. McGonegal
Title: Chief Financial Officer

# Exhibit 14

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

---

## SCHEDULE 13G
**(Rule 13d-102)**

**INFORMATION TO BE INCLUDED IN STATEMENTS FILED PURSUANT
TO RULE 13d-1(b) (c), AND (d) AND AMENDMENTS THERETO FILED PURSUANT TO
RULE 13d-2(b)**

# RIOT BLOCKCHAIN, INC.

(F/K/A BIOPTIX, INC.)

(Name of Issuer)

Common Stock

(Title of Class of Securities)

767292 105
(formerly 09074N101)
56585W203

(CUSIP Number)

October 10, 2017

(Date of Event Which Requires Filing of This Statement)

Check the appropriate box to designate the rule pursuant to which this Schedule is filed:

[ ] Rule 13d-1(b)
[x] Rule 13d-1(c)
[ ] Rule 13d-1(d)

C USIP No. 767292 105

| 1 | NAME OF REPORTING PERSONS<br>S.S. OR I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY)<br><br>Mark Groussman | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | (a) [  ]<br>(b) [  ] | |
| 3 | SEC USE ONLY | | |
| 4 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>United States | | |
| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON WITH | 5 | SOLE VOTING POWER<br><br>0 | |
| | 6 | SHARED VOTING POWER<br><br>399,202 (1) | |
| | 7 | SOLE DISPOSITIVE POWER<br><br>0 | |
| | 8 | SHARED DISPOSITIVE POWER<br><br>399,202 (1) | |
| 9 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>399,202 (1) | | |
| 10 | CHECK IF THE AGGREGATE AMOUNT IN ROW (9) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS) [  ] | | |
| 11 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW 9<br><br>5.93% (based on  6,730,272 shares of common stock outstanding as of October 10, 2017) | | |
| 12 | TYPE OF REPORTING PERSON<br><br>IN | | |

(1)   Represents (i) 271,458 shares of common stock held by Melechdavid, Inc. ("Melechdavid"), (ii) 63,872 shares of common stock held by Mark Groussman c/f Asher Groussman UTMA/FL ("Asher UTMA") and (iii) 63,872 shares of common stock held by Mark Groussman c/f Alivia Groussman UTMA/FL ("Alivia UTMA"). Mark Groussman is the President of Melechdavid and the custodian of Asher UTMA and Alivia UTMA, and in such capacities has voting and dispositive power over the securities held by such entities.

C USIP No. 767292 105

| 1 | NAME OF REPORTING PERSONS<br>S.S. OR I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY)<br><br>Melechdavid, Inc. | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | (a) [ ]<br>(b) [ ] | |
| 3 | SEC USE ONLY | | |
| 4 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>United States | | |
| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON WITH | 5 | SOLE VOTING POWER<br><br>0 | |
| | 6 | SHARED VOTING POWER<br><br>271,458 (1) | |
| | 7 | SOLE DISPOSITIVE POWER<br><br>0 | |
| | 8 | SHARED DISPOSITIVE POWER<br><br>271,458 (1) | |
| 9 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>271,458 (1) | | |
| 10 | CHECK IF THE AGGREGATE AMOUNT IN ROW (9) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS) [ ] | | |
| 11 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW 9<br><br>4.03% (based on 6,730,272 shares of common stock outstanding as of October 10, 2017) | | |
| 12 | TYPE OF REPORTING PERSON<br><br>CO | | |

(1)    Represents 271,458 shares of common stock held by Melechdavid. Mark Groussman is the President of Melechdavid and in such capacity has voting and dispositive power over the securities held by such entity.

Item 1(a).   Name of Issuer:

Riot Blockchain, Inc., a Nevada corporation ("Issuer").

Item 1(b).   Address of Issuer's Principal Executive Offices:

834-F South Perry Street, Suite 443
Castle Rock, CO 80104

Item 2(a).   Name of Person Filing.

The statement is filed on behalf of Mark Groussman, Melechdavid, Asher UTMA and Alivia UTMA (together, the "Reporting Person").

Item 2(b).   Address of Principal Business Office or, if None, Residence.

5154 La Gorce Drive, Miami Beach, FL 33140

Item 2(c).   Citizenship.

United States/Florida

Item 2(d)   Title of Class of Securities.

Common Stock, no par value.

Item 2(e).   CUSIP Number.

767292 105

Item 3.   Type of Person

Not applicable.

Item 4.   Ownership.

(a)      Amount beneficially owned: 399,202 (1)

(b)      Percent of class: 5.93% (based on 6,730,272 shares of common stock outstanding as of October 10, 2017)

(c)      Number of shares as to which the person has:

      (i)   Sole power to vote or to direct the vote: 0
      (ii)  Shared power to vote or to direct the vote: 399,202 (1)
      (iii) Sole power to dispose or to direct the disposition of: 0
      (iv)  Shared power to dispose or to direct the disposition of: 399,202 (1)

(1)   Represents (i) 271,458 shares of common stock held by Melechdavid, Inc. ("Melechdavid"), (ii) 63,872 shares of common stock held by Mark Groussman c/f Asher Groussman UTMA/FL ("Asher UTMA") and (iii) 63,872 shares of common stock held by Mark Groussman c/f Alivia Groussman UTMA/FL ("Alivia UTMA"). Mark Groussman is the President of Melechdavid and the custodian of Asher UTMA and Alivia UTMA, and in such capacities has voting and dispositive power over the securities held by such entities.

Item 5   Ownership of Five Percent or Less of a Class.

Not applicable.

Item 6.   Ownership of More than Five Percent on Behalf of Another Person.

Not applicable.

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: October 13, 2017                                        By:  */s/ Mark Groussman*
                                                                  Mark Groussman

                                                             Melechdavid, Inc.

Date: October 13, 2017                                        By:  */s/ Mark Groussman*
                                                                  Mark Groussman, President

                                                             Mark Groussman c/f Asher Groussman UTMA/FL

Date: October 13, 2017                                        By:  */s/ Mark Groussman*
                                                                  Mark Groussman, Trustee

                                                             Mark Groussman c/f Alivia Groussman UTMA/FL

Date: October 13, 2017                                        By:  */s/ Mark Groussman*
                                                                  Mark Groussman, Trustee

# Exhibit 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
SECURITIES AND EXCHANGE COMMISSION,    :
    :
    Plaintiff,    :
    :    **18 Civ. 8175 (ER)**
    -- against --    :
    :    **ECF CASE**
BARRY C. HONIG, JOHN STETSON,    :
MICHAEL BRAUSER, JOHN R. O'ROURKE III,    :
MARK GROUSSMAN, PHILLIP FROST,    :
ROBERT LADD, ELLIOT MAZA, BRIAN KELLER,    :
JOHN H. FORD, ALPHA CAPITAL ANSTALT, ATG    :
CAPITAL LLC, FROST GAMMA INVESTMENTS    :
TRUST, GRQ CONSULTANTS, INC.,    :
HS CONTRARIAN INVESTMENTS, LLC,    :
GRANDER HOLDINGS, INC., MELECHDAVID,    :
INC., OPKO HEALTH, INC.,    :
SOUTHERN BIOTECH, INC., and    :
STETSON CAPITAL INVESTMENTS INC.,    :
    :
    Defendants.    :
------------------------------------------------------------------------ x

**FINAL JUDGMENT AS TO DEFENDANT MARK GROUSSMAN**

The Securities and Exchange Commission having filed a Complaint and Defendant Mark

Groussman having entered a general appearance; consented to the Court's jurisdiction over

Defendant and the subject matter of this action; consented to entry of this Final Judgment

without admitting or denying the allegations of the Complaint (except as to jurisdiction and

except as otherwise provided herein in paragraph VIII); waived findings of fact and conclusions

of law; and waived any right to appeal from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
SECURITIES AND EXCHANGE COMMISSION,  :
                                     :
                    Plaintiff,       :
                                     :        18 Civ. 8175 (ER)
        -- against --                :
                                     :        ECF CASE
BARRY C. HONIG, JOHN STETSON,        :
MICHAEL BRAUSER, JOHN R. O'ROURKE III, :
MARK GROUSSMAN, PHILLIP FROST,       :
ROBERT LADD, ELLIOT MAZA, BRIAN KELLER, :
JOHN H. FORD, ALPHA CAPITAL ANSTALT, ATG :
CAPITAL LLC, FROST GAMMA INVESTMENTS :
TRUST, GRQ CONSULTANTS, INC.,        :
HS CONTRARIAN INVESTMENTS, LLC,      :
GRANDER HOLDINGS, INC., MELECHDAVID, :
INC., OPKO HEALTH, INC.,             :
SOUTHERN BIOTECH, INC., and          :
STETSON CAPITAL INVESTMENTS INC.,    :
                                     :
                    Defendants.      :
------------------------------------------------------------------ x

### CONSENT OF DEFENDANT MARK GROUSSMAN

1.      Defendant Mark Groussman ("Defendant") acknowledges having been served

with the complaint in this action, enters a general appearance, and admits the Court's jurisdiction

over Defendant and over the subject matter of this action.

2.      Without admitting or denying the allegations of the complaint (except as provided

herein in paragraph 11 and except as to personal and subject matter jurisdiction, which

Defendant admits), Defendant hereby consents to the entry of the final Judgment in the form

attached hereto (the "Final Judgment") and incorporated by reference herein, which, among other

things:

        (a)      permanently restrains and enjoins Defendant from violation of Sections

may arise from the facts underlying this action or immunity from any such criminal liability.

Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding,

including the imposition of any remedy or civil penalty herein. Defendant further acknowledges

that the Court's entry of a permanent injunction may have collateral consequences under federal

or state law and the rules and regulations of self-regulatory organizations, licensing boards, and

other regulatory organizations. Such collateral consequences include, but are not limited to, a

statutory disqualification with respect to membership or participation in, or association with a

member of, a self-regulatory organization. This statutory disqualification has consequences that

are separate from any sanction imposed in an administrative proceeding. In addition, in any

disciplinary proceeding before the Commission based on the entry of the injunction in this

action, Defendant understands that he shall not be permitted to contest the factual allegations of

the complaint in this action.

      11.    Defendant understands and agrees to comply with the terms of 17 C.F.R.

§ 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or

respondent to consent to a judgment or order that imposes a sanction while denying the

allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is

equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies

the allegations." As part of Defendant's agreement to comply with the terms of Section 202.5(e),

Defendant: (i) will not take any action or make or permit to be made any public statement

denying, directly or indirectly, any allegation in the complaint or creating the impression that the

complaint is without factual basis; (ii) will not make or permit to be made any public statement

to the effect that Defendant does not admit the allegations of the complaint, or that this Consent

contains no admission of the allegations, without also stating that Defendant does not deny the

allegations; (iii) upon the filing of this Consent, Defendant hereby withdraws any papers filed in

this action to the extent that they deny any allegation in the complaint; and (iv) stipulates solely

for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11

U.S.C. §523, that the allegations in the complaint are true, and further, that any debt for

disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under the

Final Judgment or any other judgment, order, consent order, decree or settlement agreement

entered in connection with this proceeding, is a debt for the violation by Defendant of the federal

securities laws or any regulation or order issued under such laws, as set forth in Section

523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).  If Defendant breaches this

agreement, the Commission may petition the Court to vacate the Final Judgment and restore this

action to its active docket.  Nothing in this paragraph affects Defendant's: (i) testimonial

obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings

in which the Commission is not a party.

      12.     Defendant hereby waives any rights under the Equal Access to Justice Act, the

Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to

seek from the United States, or any agency, or any official of the United States acting in his or

her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees,

expenses, or costs expended by Defendant to defend against this action.  For these purposes,

Defendant agrees that Defendant is not the prevailing party in this action since the parties have

reached a good faith settlement.

      13.     Defendant agrees that the Commission may present the Final Judgment to the

Court for signature and entry without further notice.

      14.     Defendant agrees that this Court shall retain jurisdiction over this matter for the

purpose of enforcing the terms of the Final Judgment.

Dated: 1-18-2019

_____
Mark Groussman

On Jan. 18th, 2019, Mark Grussman, a person known to me,
personally appeared before me and acknowledged executing the foregoing Consent.

Notary Public State of Florida
Melanie Perello
My Commission GG 190623
Expires 02/27/2022

_____
Notary Public
Commission expires: 08/27/2022

Approved as to form:

_____
Sean Hecker
Kaplan Hecker & Fink LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118

Attorneys for Defendant

6