# EXHIBIT B

Laura Lestrade
Thomas O. Gorman (*Admitted Pro Hac*)
Dorsey & Whitney, LLP
51 West 52nd Street
New York, New York
212 – 415-9200
202 – 442-3507
301 – 602-9988 (mobile)
*Gorman.tom@Dorsey.com*
Stephen Weingold (*Pro Hac*)
Dorsey & Whitney, LLP
1400 Wewatta St. No. 400
Denver Colorado 8020
*Attorneys For Defendant*
*Mike Dai*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CREIGHTON TAKATA, individually and on behalf of all others similarly situated, | ) Civil Action No.:  18-2293 (FLW)(ZNQ) |
| Plaintiff, | ) Hon. Freda L. Wolfson |
| v. | ) **DECLARATION OF LAURA LESTRADE IN SUPPORT OF** |
| RIOT BLOCKCHAIN, INC. f/k/a BIOPTIX, INC., JOHN O'ROURKE, JEFFREY MCGONEGAL, BARRY HONIG, CATHERINE DEFRANCESCO, MICHAEL BEEGHLEY, JOHN STETSON, MARK GROUSSMAN, ANDREW KAPLAN, MIKE DAI, JASON LES and ERIC SO, | ) **DEFENDANT MIKE DAI'S SUR-REPLY IN SUPPORT OF HIS MOTION TO DISMISS LEAD PLAINTIFF'S CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| Defendants. | ) |

I, Laura Lestrade, of full age, hereby declare and state that:

1.     I am an attorney associated with the firm of Dorsey & Whitney LLP, attorneys for

defendant Mike Dai ("Mr. Dai") in the above-captioned matters.  I make this Declaration in

Support of Mr. Dai's Sur-Reply in Support of His Motion to Dismiss Lead Plaintiff's Corrected

2

4849-0285-4069\1

Consolidated Class Action Complaint.  I have personal knowledge of the facts stated herein and, if called upon to testify under oath, I could and would testify competently thereto.

2.      Attached hereto as Exhibit 1: A true and correct copy of the Form 8-K, filed by Riot Blockchain, Inc. before the SEC on February 3, 2020, as obtained by my office from the SEC's publicly available EDGAR website at https://www.sec.gov/Archives/edgar/data/1167419/000107997320000074/riot_8k. htm.

3.      Attached hereto as Exhibit 2: SEC v. Farmer, No. 19-1774 (Dkt. No. 1), 2015 U.S.
Dist. LEXIS 189325 (S.D. Tex. Nov. 6, 2015).

4.      Attached hereto as Exhibit 3: SEC v. Gannon Giguiere, No. 18-1530 (Dkt. No. 1), 2018 U.S. Dist. LEXIS 233257 (S.D. Cal. Oct. 24, 2018).

5.      Attached hereto as Exhibit 4: SEC v. Dynkowski, No. 09-361 (Dkt. No. 1) 2015 U.S. Dist. LEXIS 188136  (D. Del. July 29, 2015).


DATED: February 19, 2020,


By:  _/s/ Laura M. Lestrade_____
          Laura M. Lestrade

4849-0285-4069\1

8-K 1 riot_8k.htm FORM 8-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C.  20549**

**FORM 8-K**

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): February 3, 2020 (January 29, 2020)

**Riot Blockchain, Inc.**
(Exact name of registrant as specified in its charter)

| Nevada | 001-33675 | 84-1553387 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**202 6th Street, Suite 401,**
**Castle Rock, CO  80104**
(Address of principal executive offices)

**(303) 794-2000**
(Registrant's telephone number, including area code)

(Former name, former address, and former fiscal year, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | RIOT | NASDAQ Capital Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

## Item 8.01 – Other Events.

On January 30, 2020, Riot Blockchain, Inc. ("**Riot**" the "**Company**") issued a press release announcing that on January 29, 2020, it had received written notice from the Division of Enforcement of the Securities and Exchange Commission (the "**SEC**") that the SEC had concluded its investigation of Riot (the "**SEC Investigation**"). The SEC Investigation was previously disclosed by Riot on its current report on Form 8-K filed on April 9, 2018. According to the letter, the SEC has concluded its investigation of Riot and, based on the information the SEC had as of the date of the letter, the SEC does not intend to recommend an enforcement action against Riot, with respect to the matters investigated by the SEC.

### About Riot Blockchain

Information reported in this Current Report on Form 8-K is limited to the scope of the information reportable under a Current Report on Form 8-K under the rules and regulations of the Commission. Please refer to the additional information concerning the Corporation referenced in the following notices and safe harbor provision for material risks and other uncertainties.

### Investor Notice

An investment in the Corporation's common stock involves a high degree of risk, and an investor should only purchase the Corporation's securities if he or she can afford to suffer the loss of his or her entire investment. In determining whether to purchase the Corporation's common stock, an investor should carefully consider all of the material risks described in this Current Report on Form 8-K below, together with the factors described under Item 1A under the heading "Risk Factors" in our most recent Annual Report on Form 10-K for the year ended December 31, 2019, filed with the Securities and Exchange Commission (the "SEC") on April 2, 2019, as amended on Form 10-K/A, filed with the SEC on April 23, 2019, as supplemented and updated by subsequent Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, together with the financial or other information contained or incorporated by reference in such reports. In addition to the risks discussed below, other risks not presently known to us or that we currently believe to be immaterial may also adversely affect our business, financial condition and results of operations, perhaps materially. The risks discussed below also include forward-looking statements, and actual results and events may differ substantially from those discussed or highlighted in those forward-looking statements. See also the Section entitled "Forward-Looking Statements" herein.

### Safe Harbor

The information provided in this report may include forward -looking statements relating to future events or the future financial performance of the Corporation. Because such statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by such forward-looking statements. Words such as "anticipates," "plans," "expects," "intends," "will," "potential," "hope" and similar expressions are intended to identify forward-looking statements. These forward-looking statements are based upon current expectations of the Corporation and involve assumptions that may never materialize or may prove to be incorrect. Actual results and the timing of events could differ materially from those anticipated in such forward-looking statements as a result of various risks and uncertainties. Detailed information regarding factors that may cause actual results to differ materially from the results expressed or implied by statements in report relating to the Corporation may be found in the Corporation's periodic filings with the Commission, including the factors described in the sections entitled "Risk Factors", copies of which may be obtained from the SEC's website at www.sec.gov. The Corporation does not undertake any obligation to update forward-looking statements contained in this report.

**Item 9.01.**          **Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press Release, issued by Riot Blockchain, Inc. on January 30, 2020 (furnished pursuant to Item 8.01 of this Current Report on Form 8-K).* |

\* The information contained in this Press Release is furnished but not filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

**S I G N A T U R E**

        Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

                      RIOT BLOCKCHAIN, INC.


                      By: */s/ Jeffrey McGonegal*
                          Jeffrey McGonegal
                          Chief Executive Officer


Date: February 3, 2020

EX-99.1 2 ex99x1.htm EXHIBIT 99.1

Exhibit 99.1

**Riot Blockchain Announces Termination of SEC Investigation**

*No Enforcement Action Recommended*

CASTLE ROCK, CO. / PRNewswire / January 30, 2020 / Riot Blockchain, Inc. (NASDAQ: RIOT) ("Riot" or the "Company"), one of the few Nasdaq listed public cryptocurrency mining companies in the United States, received a written notification from the Division of Enforcement of the Securities and Exchange Commission (the "SEC") on January 29, 2020. According to the letter, the SEC has concluded its investigation of Riot, which was originally announced on April 9, 2018, and based on the information the SEC has as of the date of the letter, it does not intend to recommend an enforcement action against Riot, with respect to the matters investigated by the SEC.

The Board of Directors and Management of Riot are pleased the SEC has concluded its investigation without recommending any enforcement action. Riot remains focused on the cryptocurrency sector with the goal of creating added shareholder value.

**About Riot Blockchain**

Riot Blockchain is focused on building, operating, and supporting blockchain technologies. Its primary operations consist of cryptocurrency mining, targeted development of a cryptocurrency exchange, and the identification and support of innovations within the sector. For more information, visit http://www.RiotBlockchain.com/.

**Investor Notice**

Investing in our securities involves a high degree of risk. Before making an investment decision, you should carefully consider the risks, uncertainties and forward-looking statements described under "Risk Factors" in Item 1A of our most recent Form 10-K for the fiscal year ended December 31, 2018 filed with the Securities and Exchange Commission (the "SEC") on April 2, 2019, as amended by Amendment No. 1 on Form 10-K/A on April 23, 2019, as well as those risk factors disclosed in any periodic reports we file with the SEC. If any of these risks were to occur, our business, financial condition or results of operations would likely suffer. In that event, the value of our securities could decline, and you could lose part or all of your investment. The risks and uncertainties we describe are not the only ones facing us.

Additional risks not presently known to us or that we currently deem immaterial may also impair our business operations. In addition, our past financial performance may not be a reliable indicator of future performance, and historical trends should not be used to anticipate results in the future. See "Safe Harbor" below.

**Safe Harbor**

The information provided in this press release may include forward-looking statements relating to future events or the future financial performance of the Company. Because such statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by such forward-looking statements. Words such as "anticipates," "plans," "expects," "intends," "will," "potential," "hope" and similar expressions are intended to identify forward-looking statements. These forward-looking statements are based upon current expectations of the Company and involve assumptions that may never materialize or may prove to be incorrect. Actual results and the timing of events could differ materially from those anticipated in such forward-looking statements as a result of various risks and uncertainties. Detailed information regarding factors that may cause actual results to differ materially from the results expressed or implied by statements in this press release relating to the Company may be found in the Company's periodic filings with the Securities and Exchange Commission, including the factors described in the sections entitled "Risk Factors," copies of which may be obtained from the SEC's website at www.sec.gov. The Company does not undertake any obligation to update forward-looking statements contained in this press release.

**CONTACT:**

Media Contact:

PR@RiotBlockchain.com

Investor Contact:

IR@RiotBlockchain.com

SOURCE: Riot Blockchain, Inc.

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| SECURITIES & EXCHANGE COMMISSION, ) | |
| ) | |
| **Plaintiff**, ) | Civil Action No.: **4:19-cv-1774** |
| ) | |
| **v.** ) | |
| ) | |
| **ANDREW I. FARMER,** ) | |
| **EDDIE D. AUSTIN, JR.,** ) | |
| **SCOTT R. SIECK,** ) | |
| **CAROLYN P. AUSTIN** ) | |
| **and** ) | |
| **JOHN D. BROTHERTON,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges:

## NATURE OF THE ACTION

1.     Between at least May 2011 and May 2017, Defendants, acting as a Group (hereinafter the "Group") planned and perpetrated a securities fraud scheme involving the successive, serial "pump-and-dump" of multiple different penny stocks quoted on U.S. markets. The Group's leadership included Defendants Farmer, Eddie Austin, Sieck, and, at various times, Brotherton, with Defendant Carolyn Austin also aware of the Group's activities and sharing in its illicit proceeds.  The Group coordinated its illegal pump-and-dump scheme through frequent meetings in, among other locations, a windowless conference room in Houston (to which it referred as its "war room"), as well as through encrypted communications.  Between April 2014 and May 2017 alone, the Group's scheme included at least five different penny stock issuers (hereinafter the "Issuers") and yielded at least $15 million in ill-gotten gains.

2.     A "pump-and-dump" is a species of securities fraud involving "penny stocks," which are stocks publicly quoted on U.S. over-the-counter markets and having share prices ranging from just pennies to as much as five dollars.  A "pump-and-dump" typically involves at least four major integrated, fraudulent phases, often referred to as "get the stock," "prime the pump," "pump the stock," and "dump the stock."  In the first stage, the perpetrators secretly acquire all, or virtually all, of a penny stock issuer's freely tradeable stock, typically allocating the stock's nominal ownership across an array of *alter ego* front companies.  Next, they orchestrate coordinated trading to create the false appearance of market interest in the stock and to set artificially elevated share prices.  Next, they orchestrate materially misleading promotional campaigns urging investors to buy the stock based on purported prospects of imminent gains.  Finally, they exploit the share price and trading volume rises their actions have created by unloading their stock on unsuspecting investors, who are typically left holding worthless paper after their promotional campaigns end.  A pump-and-dump typically involves violations of both the antifraud and the securities registration provisions of the federal securities laws.

3.     To implement its own pump-and-dump scheme, the Group followed this general pattern, but added additional features designed both to enhance its scheme's profitability and to frustrate its detection.  In its scheme's "get the stock" phase, the Group first obtained secret control over all, or virtually all, of each of the Issuers' outstanding stock, and installed a figurehead CEO, whose actions it could direct, at each Issuer.  The Group then proceeded fraudulently to obtain, and to deposit with its various foreign and domestic *alter ego* entities, purportedly free-trading shares of each Issuer's stock.

4.      The Group next "primed the pump" by orchestrating "matched" or otherwise
coordinated trades (in which both buyer and seller were secretly in league, working together to
create the illusion of market demand and to set artificially elevated prices) in each Issuer's stock.

5.      In order to then "pump the stock" the Group secretly arranged for and funded
massive, materially misleading promotional campaigns.  These campaigns primarily featured
email blasts and online "click ads," and the Group timed these campaigns to coincide with press
releases it caused each Issuer to disseminate.  In preparation for this phase of its scheme, the
Group had met and formulated materially misleading "story arcs" for each Issuer.  Each "story
arc" set forth the Issuer's supposed line of business and a detailed timeline for when the Issuer
would disseminate press releases and what those releases would say.  The goal of each "story
arc" was to induce investors to purchase the Issuer's stock.  When carrying out its promotional
campaigns for each Issuer, the Group followed these "story arcs."

6.      After the Group's coordinated and matched trading (priming) and promotional
campaigns (pumping) caused the price of each stock to rise, the Group dumped its stock into the
market.  It then distributed the ill-gotten gains among the Group's leaders using complex and
secretive means designed to avoid detection.

7.      From Spring 2014 to Spring 2017, the Issuers whose stocks were the subject of
the Group's pump-and-dump schemes included:

     a.   Puget Technologies, Inc., whose ticker symbol was PUGE (hereinafter
        "Puget");

     b.   Gankit Corporation, whose ticker symbol was GANK (hereinafter "Gankit");

     c.   Nhale, Inc., whose ticker symbol was NHLE (hereinafter "Nhale");

d.  Horizon Energy Corp., whose ticker symbol was HORI (hereinafter "Horizon"); and

e.  Valmie Resources, Inc., whose ticker symbol was VMRI (hereinafter "Valmie").

8.  By the conduct described herein, Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton violated the antifraud provisions of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. §§ 240.10b-5], as well as the registration provisions of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].  Defendants will continue to violate the aforementioned provisions unless restrained or enjoined by this Court.  Accordingly, the Commission seeks injunctive relief, disgorgement of ill-gotten gains, prejudgment interest, civil penalties, and other appropriate and necessary equitable and ancillary relief.

## JURISDICTION AND VENUE

9.  This Court has jurisdiction over this action pursuant to Securities Act Sections 20(d)(1) and 22(a) [15 U.S.C. §§ 77t(d)(1) and 77v(a)] and Exchange Act Sections 21(d), 21(e), 21A, and 27 [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

10.  Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails or of the facilities of a national securities exchange, in connection with the acts, practices, and courses of business alleged herein, certain of which occurred within the Southern District of Texas.

11.  Venue in this district is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of

the acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within the Southern District of Texas.

## **DEFENDANTS**

12. **Andrew Ian Farmer** ("Farmer"), age 40, is a U.S. citizen residing in Houston, Texas. As detailed below, Farmer helped oversee and coordinate virtually every aspect of the pump-and-dump scheme detailed herein. On February 1, 2019, Farmer pleaded guilty to one count of conspiracy to commit wire fraud and securities fraud in violation of 18 U.S.C. § 371 and one count of securities fraud in violation of 15 U.S.C. §§ 77q(a) and 77x, before this court in *United States v. Farmer, et al.,* Crim. No. 4:16-CR-408 (S.D. Tex.).

13. **Eddie Douglas Austin, Jr.** ("Eddie Austin"), age 68, is a U.S. citizen currently residing in Houston, Texas. Eddie Austin is married to Defendant Carolyn Austin. Eddie Austin is a former stockbroker (who was sanctioned by the New York Stock Exchange in 1986) and a former lawyer (who was permanently barred, by consent, from practicing law "in Louisiana or any other jurisdiction" in 2011 (*see In re Austin*, 60 So.3d 604 (La. 2011)), and from appearing or practicing before the Commission in 2013 (*see Matter of Eddie Douglas Austin Jr., Esq.*, Exchange Act Rel. No. 34-69326/April 5, 2013). In January 2013, he consented to a permanent antifraud injunction and penny stock bar in settlement of an SEC penny stock fraud case. *See SEC v. Sunrise Solar Corporation et al.*, Civil Action No. 5:12-CV-918 (W.D. Tex., filed Sept. 28, 2012). His role in the scheme included participating in "war room" strategy meetings, helping formulate "story arcs" for the various Issuers, and funding various expenditures he knew to be in furtherance of pump-and-dumps of the various Issuers' stock. On January 16, 2019, Eddie Austin pleaded guilty in *United States v. Farmer, et al.,* Crim. No. 4:16-CR-408 (S.D. Tex.) to one count of conspiracy to commit wire in violation of 18 U.S.C. § 371.

14.    **Scott Russell Sieck** ("Sieck"), age 60, is a U.S. citizen residing in Winter Park,

Florida.  Sieck is a former stockbroker who was permanently enjoined, by consent, in settlement

of an SEC penny stock fraud enforcement action, from violating the antifraud and registration

provisions of the federal securities laws.  *See SEC v. Scott R. Sieck et al.*, Civil Action No. 99-

6165-CIV-Dimitroulas (S.D. Fla., filed Feb. 10, 1999).  In this pump-and-dump scheme, Sieck

oversaw the Group's trading in the various Issuers' stock and, in doing so, among other things

recruited and directed brokers to effect trades in the Issuers' stock for the Group's benefit.  Sieck

also attended the Group's "war room" strategy meetings during which the "story arcs" for the

various Issuers were formulated.  On January 14, 2019, Sieck pleaded guilty in *United States v.*

*Farmer, et al.,* Crim. No. 4:16-CR-408 (S.D. Tex.) to one count of conspiracy to commit wire

fraud in violation of 18 U.S.C. § 371.

15.    **Carolyn Price Austin** ("Carolyn Austin"), age 64, is a U.S. citizen currently

residing in Houston, Texas.  She is married to Defendant Eddie Austin.  She has twice been

permanently enjoined, by consent, in settlement of separate SEC penny stock fraud enforcement

actions, the first enjoining future violations of the securities registration provisions, and the

second adding a penny stock bar.  *See SEC v. Sunrise Solar Corporation et al.*, Civil Action No.

5:12-CV-918 (W.D. Tex., filed Sept. 28, 2012) and *SEC v. Farmer et al.*, Civil Action No. 4:14-

cv-02345 (S.D. Tex., filed Aug. 14, 2014).  Her role in the scheme included attending the

Group's "war room" strategy meetings at which the Group formulated promotional strategies

concerning the various Issuers, and allowing the Group to open and to use, in furtherance of the

scheme, accounts bearing her name.  On January 16, 2019, Carolyn Austin pleaded guilty in

*United States v. Farmer, et al.,* Crim. No. 4:16-CR-408 (S.D. Tex.) to one count of misprision of

a felony in violation of 18 U.S.C. § 4.

16.     **John David Brotherton** ("Brotherton"), age 59, is a U.S. citizen currently residing in a federal detention facility in Conroe, Texas, where he is awaiting sentencing in *United States v. Farmer, et al.,* Crim. No. 4:16-CR-408 (S.D. Tex.).  Brotherton participated in "war room" strategy meetings—during which he and others formulated the "story arcs" for the various Issuers—and coordinated promotions for the Group's pump-and-dumps through late 2013.  Brotherton later rejoined the Group's scheme during its Valmie pump-and-dump, in which he assisted in formulating promotional strategies and received distributions of illicit stock-sale proceeds.  On February 12, 2019, Brotherton pleaded guilty in *United States v. Farmer, et al.,* Crim. No. 4:16-CR-408 (S.D. Tex.) to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371.

## THE ISSUERS

17.     **Puget Technologies, Inc. ("Puget")** is a Nevada corporation headquartered, during the relevant period, first in Fort Lauderdale, Florida, and then in Englewood, Colorado. Puget was in the business of developing "innovative cannabinoid products and therapies" for the treatment of various diseases.  At all relevant times, Puget's securities were quoted on OTC Link under the symbol "PUGE."  Puget filed periodic reports, including Forms 10-K and 10-Q, with the Commission until September 23, 2015.  From June 2013 through May 2014, the Group (i) made an unregistered offering of 14.95 million shares of Puget's stock, comprising over 99.6% of the Company's unlegended shares, (ii) conducted a massive, materially misleading promotional campaign touting Puget, and (iii) dumped its artificially inflated shares of Puget stock into an unsuspecting market.  By so doing, the Group reaped, from its securities registration and securities fraud violations, at least $1.33 million in illicit Puget trading profits in May 2014 alone.

7

18.    **Gankit Corporation** ("**Gankit**") was a Nevada corporation headquartered in
Houston, Texas that purportedly operated an online auction website.  At all relevant times,
Gankit's securities were quoted on the OTC Link under the ticker symbol "GANK."  Gankit
filed periodic reports, including Forms 10-K and 10-Q, with the Commission until April 11,
2014.  (On June 13, 2014, Gankit's name and ticker symbol were changed to Nhale, Inc. and
NHLE, described below.)  From August 2013 through June 12, 2014, the Group (i) made an
unregistered offering of as many as 5.8 million shares of Gankit's stock, comprising as much as
58% of the Company's unlegended shares, (ii) conducted a massive, materially misleading
promotional campaign touting Gankit, and (iii) dumped its artificially inflated shares of Gankit
stock into an unsuspecting market.  By so doing, the Group reaped, from its securities
registration and securities fraud violations, at least $100,650 in illicit Gankit trading profits
between May and mid-June 2014 alone.

19.    **Nhale, Inc.** ("**Nhale**"), the successor to Gankit (see above), was a Nevada
corporation headquartered in Houston, Texas that purportedly engaged in the distribution of non-
flame smoking devices and in the pursuit of marijuana legalization.  At all relevant times,
Nhale's securities were quoted on the OTC Link under the ticker symbol "NHLE."  Nhale filed
periodic reports, including Forms 10-K and 10-Q, with the Commission until January 13, 2017.
From June 13, 2014 through at least January 7, 2015, the Group (i) made an unregistered
offering of as many as 4.2 million shares of Nhale's stock, comprising as much as 42% of the
Company's unlegended shares, (ii) conducted a massive, materially misleading promotional
campaign touting Nhale, and (iii) dumped its artificially inflated shares of Nhale stock into an
unsuspecting market.  By so doing, the Group reaped, from its securities registration and

securities fraud violations, at least $1.1 million in illicit Nhale trading profits between June 2014 and January 2015 alone.

20.     **Horizon Energy Corp.** ("**Horizon**") was a Wyoming corporation headquartered in Gulfport, Mississippi that purported to produce solar energy products and solutions.  At all relevant times, Horizon's securities were quoted on the OTC Link under the ticker symbol "HORI."  Horizon filed periodic reports, including Forms 10-K and 10-Q, with the Commission until November 12, 2014.  From June 19, 2013 through at least October 20, 2014, the Group (i) made an unregistered offering of as many as 5.229 million shares of Horizon's stock, comprising as much as 52.9% of the Company's unlegended shares, (ii) conducted a massive, materially misleading promotional campaign touting Horizon, and (iii) dumped its artificially inflated shares of Horizon stock into an unsuspecting market.  By so doing, the Group reaped, from its securities registration and securities fraud violations, at least $1.436 million in illicit Horizon trading profits between May and October 2014 alone.

21.     **Valmie Resources, Inc.**  ("**Valmie**") is a Nevada corporation with its principal place of business in Houston, Texas.  Originally incorporated in 2011, and quoted on OTC Link since December 2012, Valmie underwent several changes to its business plan before characterizing itself, beginning in January 2015, as a provider of unmanned aerial vehicle services, or "drones."  At all relevant times, Valmie's securities were quoted on the OTC Link under the ticker symbol "VMRI."  Valmie filed periodic reports, including Forms 10-K and 10-Q, with the Commission until April 13, 2017.  The Commission suspended trading in VMRI on May 4, 2017.  From May 2014 through May 3, 2017, the Group utilized fraudulent devices that included filing false registration statements, coordinating trading, and secretly funding promotional campaigns to reap at least $7.67 million in illicit Valmie trading profits.

## OTHER RELEVANT PERSONS AND ENTITIES

22.     **Black Diamond Media, Inc.** ("**Black Diamond**") was, at all relevant times a Texas corporation (incorporated in September 2016) with its principal place of business in Houston, Texas.  The Group used Black Diamond to arrange for and fund promotions of Valmie and receive distributions of Valmie stock sale proceeds.

23.     **Meridian Investment Group Inc.** ("**Meridian**") was, at all relevant times, a Wyoming corporation with its principal place of business in Oviedo, FL, and owned by Sieck. The Group used Meridian as a platform to effect matched and coordinated trading in, as well as sales of, the various stocks comprising the scheme in furtherance of each pump-and-dump's prime the pump and dump the stock phases.

24.     **Spot Marketing LLC** ("**Spot Marketing**") was, at all relevant times, a Wyoming corporation (incorporated in March 2012) with its principal place of business in Houston, Texas. The Group used Spot Marketing to arrange and fund promotions of the scheme's various stocks and to receive distributions of their trading proceeds.

## FACTS

**Defendants' Years-Long Pump-and-Dump Scheme**

25.     In 2011, Defendants Farmer, Eddie Austin, Sieck, and Brotherton formed their Group (the "Group"), which they dedicated to perpetrating serial, successive pump-and-dump frauds with U.S. penny stocks, with Carolyn Austin to share, with Eddie Austin, in the Group's profits.

26.     Throughout the next six years, Farmer, Sieck, and Eddie Austin were Partners in the Group, in that, on an informal and unaudited basis overseen by Farmer, each received approximately equivalent distributions of each pump-and-dump's net proceeds (except that

10

Eddie and Carolyn Austin together constituted a single Partner share). Brotherton was a Partner in all of the Group's pump-and-dumps occurring during his Group participation, which was continuous until in or around late 2013, and that resumed by 2015, during the Group's Valmie pump-and-dump. For purposes of various of its pump-and-dumps within the past five years, and typically with Eddie Austin's concurrence, Farmer also caused the Group to add an additional Partner or Partners.

27.     Between at least its formation in or about May 2011 and May 2017, the Group committed pump-and-dump frauds with penny stocks quoted for trading on U.S. markets. Of these pump-and-dumps, the five involving the Issuers occurred, in whole or in part, within the most recent five years.

28.     In perpetrating the scheme, the Group carried out essentially the same steps with each Issuer's stock. Each pump-and-dump fraud began with the Group acquiring control of a shell company either having, or that it soon outfitted with, what the Group considered to be an appealing-to-penny-stock-investors business plan, and over which it installed, as CEO, either a Group employee or a figurehead it recruited, whose activities the Group could, and did, direct. Each also involved a company with little to no genuine business or revenue that the Group nonetheless would aggressively promote as supposedly offering extremely lucrative prospects for buyers of its stock. Each involved massive and profitable dumping of the stock by the Group, through its foreign and domestic front companies, into the price and volume rises its promotional campaigns triggered. This dumping, in each case, also violated the registration provisions. And in each, the investors the Group deceived were left holding virtually worthless paper after the Group's promotions ceased.

**I. Phase One: Getting the Stock (in both "unrestricted" and market-tradeable form)**

    **A. Making A Sham Public Offering (Gankit/Nhale and Horizon)**

    29.    In the case of three of the Issuers (Gankit, which became Nhale, and Horizon, which had started as Solar America), the Group effected a sham public offering, for the purpose of delivering purportedly free-trading stock to its *alter ego* front companies while, in fact, evading the securities registration provisions of the federal securities laws. In orchestrating these sham offerings, the Group acted principally through Farmer and, in the case of Solar America/Horizon, through Eddie Austin as well. For these Issuers, the sham offerings were the subject of S-1 registration statements filed with the Commission.

    30.    Although Solar America's S-1 was filed on June 7, 2011 and became effective on March 29, 2012, the Group's distribution of Horizon shares in reliance on that S-1 continued into October 2014.

    31.    Although Gankit's S-1 was filed on July 29, 2012 and became effective on November 28, 2012, the Group's distribution of Gankit and Nhale shares in reliance on that S-1 continued into January 2015.

    32.    Both Solar America's S-1 and Gankit's S-1 purported to register a "self-underwritten, best-efforts" offering through which each company's CEO, without assistance from agents or other third parties, would attempt to sell the offered shares to *bona fide*, unaffiliated purchasers. Each of these claims, however, was materially false and misleading because the offerings that actually occurred were drastically different from those described in the registration statements.

    33.    In fact, the Group rigged both offerings in a manner designed to give the Group control of millions of shares of purportedly unrestricted stock while creating the false appearance

that *bona fide* purchasers, and not the Group, were the shares' buyers.  The Group did this by lining up straw purchasers, with the understanding that each would be afforded an opportunity in six months' time to remit the stock back to Farmer, or other Group personnel, for a 50% profit, and with the expectation (nearly always justified) that each straw purchaser would do so. Although each purchaser signed a subscription agreement and paid by check or wire, ostensibly evidencing a *bona fide* purchase, these transactions were not legitimate because of, among other things, the expectation that these purchasers would later sell their shares back to the Group.

34.     During the Solar America offering, for example, Eddie Austin emailed a relative on April 10, 2012, saying, in part:  "Hi ….  Another chance for you to make a 50% return within six months.  $10,000 investment.  Talk tomorrow.  Love ya."  This email included a forwarded message from Farmer saying in part, "Eddie, here is the subscription agreement for [your relative] to sign," and attaching a Solar America subscription agreement.  The relative promptly signed and returned the agreement, along with a $10,000 check (to subscribe for 500,000 Solar America shares), to Farmer's office.  Within four months, by August 15, 2012 (following a 3-for-1 stock split), certificates for 1.5 million Solar America shares had been issued in the relative's name.  On October 31, 2012, Farmer bought back these shares from the relative at the 50% return Eddie Austin had promised, using a $15,000 check drawn on one of the Group's domestic *alter ego* companies' account.

35.     Like Eddie Austin's relative, the vast majority of the purported purchasers of Solar America's offering likewise soon resold their shares to a Group *alter ego* entity.  In making these "sales," each did so at the very same share price, and on or about the same dates, as one another.  As a result of these transactions, virtually all the Solar America offering's shares were soon reconsolidated into share certificates issued in the names of the Group's foreign and

domestic *alter ego* entities, which, in the case of that offering, totaled nine in number. As noted above, the Group's public sales of the shares that were reconsolidated continued into October 2014, by which time Solar America had become Horizon.

36. Similarly, in the case of Gankit/Nhale, the Group lined up thirty-seven straw purchasers to purportedly fully subscribe to every last share in the Gankit offering. By pre-arrangement, every single share so purchased was likewise reconsolidated into share certificates issued in the names of the Group's foreign and domestic *alter ego* entities, which, in the case of that offering, totaled six in number. As noted above, the Group's public sales of the shares that were reconsolidated continued into January 2015, by which time Gankit had become Nhale.

37. The above-described conduct gave the false impression of *bona fide* public offerings for both Solar America/Horizon and Gankit/Nhale, which, if genuine, would have made each's securities freely tradeable on the secondary market. In reality, however, because the offerings were shams, Solar America/Horizon and Gankit/Nhale's stock remained restricted, and the Group's subsequent sales of that stock, which continued until October 2014 and January 2015, respectively, constituted unregistered offerings of securities in violation of the registration provisions of the federal securities laws.

**B. Filing Fraudulent Market-Quotation Applications (Gankit/Nhale and Horizon)**

38. Also in the case of Gankit/Nhale and Horizon (which started as Solar America), the Group, acting principally through Farmer, orchestrated a materially false and misleading application to FINRA to have each company's shares quoted on the Over-the-Counter ("OTC") market (and thus readily tradeable by retail investors through their brokerage accounts).

39. In particular, the Group arranged for these Issuers to engage a market maker to file a Form 211 with FINRA applying to have each Issuer's stock cleared for quotation on the

OTC.  A Form 211 calls for disclosure of certain detailed information about the issuer, which

FINRA uses, along with any supplemental information supplied in response to its follow-up

questions, to determine whether the issuer meets the relevant regulatory requirements.  With

respect to Gankit/Nhale and Solar America/Horizon, the Group was able to obtain this clearance

only by misleading FINRA into believing there was sufficient investor interest in each

company's business to warrant its clearing each company's stock for such quotation.

     40.     As additional groundwork for this second step, the Group, principally through

taking steps devised during its "war room" strategy meetings, ensured that both companies

sustained a nominal level of operations and filed audited financial statements and periodic

reports.  This, together with the purported demonstrated interest and participation of individual

investors in each company's registered offerings (34 such investors in Solar America's and 37 in

Gankit's) created a façade lending to each the appearance of a legitimate startup company.

     41.     Despite the fact that the Solar America/Horizon and Gankit/Nhale 211

Applications were, before being submitted by their market maker sponsor, reviewed and signed

by each company's CEO, it was in fact the Group, acting primarily through Farmer, that either

directed the 211 Application's preparation, or helped prepare or review it.  The same was true of

both Issuers' responses to FINRA's follow-up questions during FINRA's review of the

applications.

     42.     In both cases, either the original application, or the responses to FINRA's follow-

up questions, or both, included materially false and misleading representations.  Solar

America/Horizon's 211 file, for example, included a false claim that "no past, present or future

arrangement exists by which any person or entity would control … the sale, transfer, disposition

… or any other aspect of the shares listed on the shareholder list other than the person or entity

identified as the shareholder."  As Farmer and his Partners in the Group well knew, however, the Group in fact had arrangements in place with every person on the shareholder list that it expected would result (and in virtually every case *did* result) in those persons' shares being reconsolidated into the hands of the Group.  For its part, Gankit/Nhale's 211 File includes the false and materially misleading claims that, among other things, the thirty-seven individuals who purportedly purchased all the shares in Gankit's public offering had been drawn to the company through one of their number's happening to come across the Company's website, and then recruiting the others.

### C.  Obtaining "Free Trading" Shares (All Issuers)

#### a.  Solar America/Horizon and Gankit/Nhale

43.    Because of the false appearance that Solar America's/Horizon's and Gankit's/Nhale's stock had been issued in *bona fide* public offerings, and because the Group concealed from the transfer agents (i) its direct role in the aforementioned public offerings and (ii) its common ownership of all the foreign and domestic entities requesting cancellation and reissuance of shares in these Issuers' stock, each transfer agent mistakenly concluded that each Issuer's stock could be issued without restrictive legend.

44.    Shares issued without restrictive legend are immediately and freely tradeable.  But shares obtained through a sham public offering orchestrated by persons controlling the Issuer, as the Group's Solar America, Horizon, Gankit, and Nhale shares were obtained, were, and should have been legended as, restricted.  That is because Securities Act Rule 144(a)(3)(i) provides that "restricted securities means securities acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering."

16

45.     Thus, the Group caused each transfer agent to erroneously issue stock without restrictive legend for Solar America/Horizon and Gankit/Nhale, thereby allowing the stocks to be immediately and freely tradeable.

### b.  Puget and Valmie

46.     The Group accomplished the same result in the case of Puget and Valmie as well, for in the case of both Issuers, the Group acquired *all* of their outstanding shares from an affiliate of the Issuer, that is, from a party that controlled the Issuer.  The Group then proceeded to obtain the cancellation of every share certificate it was able to obtain, and reissuance of those shares to various *alter ego* front companies it controlled, without disclosing to transfer agents its common ownership of those entities.

47.     By these means, the Group succeeded in having the transfer agents for all five Issuers' stocks issue share certificates bearing no restrictive legend to the Group's various foreign and domestic *alter ego* front companies.  This, in turn, enabled the Group to sell all five stocks to the public on the market while avoiding applicable registration requirements and trading restrictions.

### c.  Additional Machinations as to Valmie

48.     In or about September 2014, authorities in Belize executed search and seizure warrants at certain locations in Belize, including a brokerage house holding millions of the Valmie shares that the Group had secretly acquired, as described above, from a party that had controlled Valmie.  In the aftermath of these seizures, the Group was unable to deposit and sell the aforementioned Valmie shares, as it had planned to do, through various of the Group's foreign and domestic entities.

17

49.     To redress its shortfall of Valmie shares, the Group proceeded to cause Valmie to issue millions of additional shares, through a combination of debt offerings and private placements, to various of the Group's foreign and domestic *alter ego* entities.  Acting primarily through Farmer, the Group caused Valmie to file with the Commission materially false and misleading registration statements on Form S-1 concerning these offerings, which characterized the various Group entities receiving Valmie shares in these offerings as "selling shareholders."

50.     In particular, these registration statements falsely claimed that an array of different, specific individuals exercised "sole voting and investment power" over the Valmie shares issued to each entity, and, further, that none of the various entities receiving shares in these offerings were affiliated with each other.  In fact, however, as Farmer and the Group's other leaders well knew, each entity was *de facto* controlled by the Group, and all were intimately affiliated with each other, as Group *alter ego* entities whose holdings and trading were under the Group's common control at all times.  Thus, here again, the transactions registered were not the transactions that actually occurred; and all the shares issued in the private offerings were in fact issued to affiliates of the Company and remained restricted and subject to the holding periods and volume limitations set forth in Securities Act Rule 144.  Accordingly, the Group's subsequent offers and sales of millions of shares of Valmie stock were, in fact, unregistered offerings that did not comply with Rule 144's strictures.

51.     The part of the scheme detailed heretofore subverted the SEC registration process because, in the case of all five Issuers, the stock the Group obtained, through the means described above, should have been restricted.  Accordingly, the Group's subsequent sales of all five Issuers' stock, so obtained, violated the registration provisions.

18

## II.  Phase Two:  Priming the Pump

52.     The next step in each of the Group's five pump-and-dumps detailed herein was to "prime the pump" by orchestrating matched or otherwise coordinated trades (in which both buyer and seller are secretly in league, working together to create the illusion of market demand and to set artificially elevated prices).  The purpose of this activity was to create the artificial appearance of real market interest in each Issuer's stock, and to set artificially elevated share prices from which the Group could launch its promotional campaigns for each Issuer's stock.

53.     To carry out this stage, the Group's Partners and employees shared with one another (with the respective account-holder's authorization) the user names and passwords to facilitate access, online, to the brokerage accounts of the Group's various *alter ego* front companies.  Several of the Group's Partners and employees, including Farmer and Sieck, also opened individual accounts in their own names at discount brokerage firms, which they could—and did—use for one side of matched or coordinated trades in the various pumped-and-dumped Issuers.

54.     Sieck's primary role in the Group was to oversee its trading activity.  To carry out this role, Sieck, among other things, lined up a group of traders, including several working from his Meridian entity's warehouse, to log in to many of the Group's various *alter ego* front companies' brokerage accounts and effect the trading.

## III.  Phase Three:  Pumping the Stock

### A.  Formulating Materially Misleading "Story Arcs"

55.     As part of their pump-and-dump scheme, the Group created, for each of the five Issuers, what the Defendants referred to as "story arcs" (or "story boards" or "press arcs").  Each story arc set forth each Issuer's supposed line of business and a detailed timeline for when press

19

releases would be disseminated.  The Group met in person to discuss potential story arcs, often in the Group's Houston, Texas "war room," which was a windowless conference room, as well as in other locations, such as the Bahamas and Las Vegas, Nevada.

56.     The Group, which controlled each Issuer, also took the minimal steps necessary to lend some superficial credence to the story arcs' characterizations of each Issuer's business. This included ensuring each Issuer had some level of operations or assets within its purported line of business, and that each had the minimum level of funding necessary to continue operating long enough for the Group to unload the Issuer's stock.  The Group's efforts were never oriented toward any of the Issuers achieving genuine industrial or commercial success.

57.     Farmer, the Austins and Sieck all attended or participated in some or all of these strategy meetings, as did Brotherton, except during his hiatus from the Group.

58.     The story arcs' features included pre-planned press releases, often non-substantive, exaggerated, or both, that would be timed to coincide with promotional campaigns, as discussed below, in order to artificially increase the profiles of the companies and the volume and price of the shares.

## B.  Launching Promotional Campaigns

59.     The next step in each of the five Issuers' pump-and-dumps was the Group's design, coordination, and disguised funding of massive, materially misleading promotional campaigns urging investors to buy the stock in question.  These campaigns, which accorded with the fraudulent "story arcs" the Group had created, typically included both online banner-ad (also known as "click ad") and email-blast components, and were timed to coincide with Issuer press releases.  Because it controlled each Issuer, the Group was able to direct these releases' content and dissemination schedule.

60.     The promotions were typically materially misleading in claiming each Issuer was poised to generate commercial success leading to profitable returns for purchasers of its stock. In fact, however, as all the Defendants well knew, none of the Issuers had any genuine prospect of any such success, for the reasons stated at paragraph 56 above. Such materially misleading claims included:

     a.  Assertions in a May 7, 2015 blast email from an online newsletter called *The Street Alert* that Valmie "is an amazing Drone Technology Company which has become the talk of the Street lately" and "is ready to move!";

     b.  Assertions in a September 29, 2014 blast email from an online newsletter called *Small Cap Crowd* that Nhale "develops and sells leading edge grow technology in the marijuana space ready for rapid commercialization" and that "Nhale is growing fast and working hard to ensure maximum returns for each of its shareholders";

     c.  Assertions in April 28, 2014 "click ads" that Puget was "Poised For Huge Growth! Invest Now!" and was "Becoming a Major Player in Booming Market. Invest in PUGE Now"; and

     d.  Assertions in August 4, 2014 and April 30, 2014 "click ads," respectively, that Horizon was "Helping Revitalize American Oilfields" and was "Poised For Huge Growth. Invest Today!".

61.     The promotions' disclaimers also included materially misleading statements claiming that "a non-affiliate third party" had paid for them, when, in fact, the Group paid for the promotions for all five of the Issuers. The Defendants facilitated these materially misleading statements by routing their funding of the promotions through various third parties. For example

(i) the Valmie email blast from *The Street Alert*, referenced above, included the claim that the newsletter had "received a total of $15,000 from a non affiliate third party[, Media Company A]" for disseminating the blast and (ii) the Nhale *Small Cap Crowd* email blast, referenced above, included the claim that the newsletter had "been compensated up to two thousand dollars for the marketing awareness budgeting efforts on NHLE via wire/transfer by an unrelated third party, [Media Company B]."  In fact, however, in both cases, one of the Group's domestic *alter ego* entities had paid for the promotion, and had those funds routed through two intermediary entities to obscure their origin.  In other cases, the Group drew upon other funding sources available to it. These included using various of the Defendants' American Express cards, and then reimbursing them from Group *alter ego* entities' accounts.

62.    All the Defendants materially contributed to the Group's promotional efforts concerning the Issuers.

63.    Between 2014 and 2017, Spot Marketing and Black Diamond Media entities were the primary vehicles through which the Group coordinated promotions of the Issuers' stock.  All the Defendants contributed to funding these promotional campaigns during this period, whether through applying portions of their stock sale profits, or making payments using their American Express cards, or otherwise.

**IV.  Phase Four:  Dumping the Stock**

**A.  Selling the Stock, After Artificially Driving Up Price and Volume**

64.    In each of its pump-and-dump frauds, the Group's materially misleading promotional efforts resulted in increases to each stock's share price and trading volume, which the Group exploited by massively dumping, i.e. selling, its shares into those rises.  This dumping

typically took place simultaneously through the Group's various *alter ego* accounts, both foreign and domestic.

65.     This selling, like that in the "prime the pump" phase described above, was overseen by Sieck, with the knowledge of the other Defendants.

**B.  Distributing the Ill-Gotten Proceeds of the Scheme**

66.     The next step in each of the Group's pump-and-dump frauds was to distribute the proceeds of each fraud.

67.     Farmer oversaw these distributions, determining the amounts, net of expenses, to be distributed to each of the Group's Partners.    These distributions were generally made in accordance with the predetermined "Partner" shares, described above.

68.     The distributions were typically made in circuitous or disguised fashion.  For example, portions of the Austins' Partner share were sometimes delivered via a third party, or via wire transfer to a casino designated by Eddie Austin, or otherwise.

69.     As another example, at least $250,000 of Brotherton's share of Valmie proceeds was dispensed to him via wire, in October 2016, from one of the Group's foreign *alter ego* front companies to a purported startup company that Brotherton controlled.  This distribution was misleadingly papered as an investment in that company.

**C.  Adjusting the Group's Front Company Portfolio**

70.     At various points in time during the course of its scheme, including within the most recent five years, the Group made adjustments to its portfolio of foreign and domestic *alter ego* front companies.

71.     These adjustments included, among other things, retiring some front companies, creating others, and, in so doing, enlisting or otherwise obtaining the use of new nominees as these front companies' supposed owners.

72.     The aforementioned machinations had the intended effect of rendering the Group's activities more challenging to detect and to quantify.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### [Securities Fraud]

### Violations of Securities Act Section 17(a)
### [Against All Defendants]

73.     Paragraphs 1 through 72 are realleged and incorporated herein by reference.

74.     As described above, Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin and Brotherton, acting knowingly, recklessly, and negligently, in the offer or sale of one or more of Puget, Gankit, Nhale, Horizon, and Valmie securities, by use of the means or instruments of transportation or communication in interstate commerce or of the mails, directly or indirectly:

    a.   employed devices, schemes, or artifices to defraud;

    b.   obtained money or property by means of untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.   engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers of Puget, Gankit, Nhale, Horizon, and/or Valmie securities.

75.    By engaging in the foregoing conduct, Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM
## [Securities Fraud]

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### [Against All Defendants]

76.    Paragraphs 1 through 72 are realleged and incorporated herein by reference.

77.    As described above, Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton, acting knowingly or recklessly, directly or indirectly, in connection with the purchase or sale of one or more of Puget, Gankit, Nhale, Horizon, and Valmie securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national exchange:

a.   employed devices, schemes, or artifices to defraud;

b.   made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c.   engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person.

78.    By engaging in the foregoing conduct, Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM**
**[Unregistered Offering of Securities]**

**Violations of Securities Act Sections 5(a) and 5(c)**
**[Against All Defendants]**

79.     Paragraphs 1 through 72 are realleged and incorporated herein by reference.

80.     At all relevant times, the Puget, Gankit, Nhale, Horizon, and Valmie shares referenced above as having been offered and sold by Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

81.     Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton's offers and sales of one or more of Puget, Gankit, Nhale, Horizon, and Valmie shares were made in the United States in that: (a) sales were executed by broker-dealers firms in the United States; (b) irrevocable liability with respect to sales was incurred in the United States; and (c) title with respect to the sales passed in the United States.

82.     By reason of the foregoing, Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton, directly or indirectly, made use of the means and instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was available.

83.     By reason of the foregoing, Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton, violated and, unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

26

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that this Court enter a Judgment that:

(i)      permanently enjoins Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton, from:

       a.   violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)];

       b.   violating Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. §§ 240.10b-5];

       c.   violating Securities Act Section 5 [15 U.S.C. §§ 77e]; and

       d.   directly or indirectly, including but not limited to, through any entity each owns or controls, engaging in any activity for the purpose of inducing or attempting to induce the purchase or sale of any security, causing any person or entity to engage in any activity for the purpose of inducing or attempting to induce the purchase or sale of any security, or deriving compensation from any activity engaged in for the purpose of inducing or attempting to induce the purchase or sale of any security, provided, however, that such injunction shall not prevent each from purchasing or selling securities listed on a national securities exchange for an account that is in each's own name;

(ii)      permanently bars Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton, from:

       a.   participating in an offering of penny stock; and

       b.   acting as an officer or director of any public company pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. §78u(d)(2)];

(iii)    orders Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton, to pay civil penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] for all violative conduct occurring within five years of the filing of this Complaint;

(iv)    orders Defendants Farmer, Sieck, and Brotherton, to disgorge, with prejudgment interest, and orders Defendants Eddie and Carolyn Austin, jointly and severally, to disgorge, with prejudgment interest, any and all ill-gotten gains each received as a result of the conduct described herein within five years of the filing of this Complaint; and

(v)    grants such other relief as the Court deems just or appropriate.

Dated:   May 15, 2019                         Respectfully submitted,

s/ Matthew J. Gulde
Matthew J. Gulde
Illinois Bar No. 6272325
S.D. Texas Bar No. 1821299
U.S. Securities and Exchange Commission
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-1410 (mg)
(817) 978-4927 (facsimile)

s/ Joshua E. Braunstein
Joshua E. Braunstein
Maryland  Bar No. 9412130082 (motion for admission *pro hac vice* pending)
U.S. Securities and Exchange Commission

100 F Street, NE
Washington, DC 20549
BraunsteinJ@sec.gov
(202) 551-8470

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE COMMISSION**

Of Counsel:
J. Lee Buck II
Christopher R. Mathews
Kelly V. Silverman
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1 U.S. Government Plaintiff
- ❏ 2 U.S. Government Defendant
- ❏ 3 Federal Question *(U.S. Government Not a Party)*
- ❏ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ Pharmaceutical | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | **PERSONAL PROPERTY** | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | ❏ 370 Other Fraud | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| | ❏ 350 Motor Vehicle | ❏ 371 Truth in Lending | **LABOR** | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 355 Motor Vehicle Product Liability | ❏ 380 Other Personal Property Damage | ❏ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 360 Other Personal Injury | ❏ 385 Property Damage Product Liability | ❏ 720 Labor/Management Relations | ❏ 861 HIA (1395ff) | ❏ 485 Telephone Consumer Protection Act |
| ❏ 190 Other Contract | ❏ 362 Personal Injury - Medical Malpractice | | ❏ 740 Railway Labor Act | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 195 Contract Product Liability | | | ❏ 751 Family and Medical Leave Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 196 Franchise | | | ❏ 790 Other Labor Litigation | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| | | | ❏ 791 Employee Retirement Income Security Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ❏ 893 Environmental Matters |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 895 Freedom of Information Act |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 896 Arbitration |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 950 Constitutionality of State Statutes |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ❏ 1 Original Proceeding
- ❏ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from Another District *(specify)*
- ❏ 6 Multidistrict Litigation - Transfer
- ❏ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:

JURY DEMAND: ❏ Yes ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**    **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**    **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

MARC P. BERGER (NY Bar No. 3005275)
SANJAY WADHWA (NY Bar No. 2837151)
SHELDON L. POLLOCK (NY Bar No. 4023024)
JOHN O. ENRIGHT (NY Bar No. 4461893)
JOSEPH P. CEGLIO (Cal. Bar No. 225251)

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
Tel: (212) 336-1100

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

-----------------------------------------------------------------------:

SECURITIES AND EXCHANGE COMMISSION,   :

                   :     **'18CV1530 BEN JLB**

       Plaintiff,      :

                   :

     - against -     :     COMPLAINT

                   :

GANNON GIGUIERE,     :

OLIVER-BARRET LINDSAY,     :

ANDREW HACKETT,     :

KEVIN GILLESPIE, and     :

ANNETTA BUDHU,     :

                   :     **DEMAND FOR**

     Defendants.     :     **JURY TRIAL**

                   :

-----------------------------------------------------------------------:

     Plaintiff Securities and Exchange Commission ("Commission") for its Complaint against Defendants Gannon Giguiere ("Giguiere"), Oliver-Barret Lindsay ("Lindsay"), Andrew Hackett ("Hackett"), Kevin Gillespie ("Gillespie"), and Annetta Budhu ("Budhu" and, together, "Defendants") alleges as follows:

## SUMMARY OF THE ALLEGATIONS

     1.     This case concerns a series of fraudulent schemes conducted by the Defendants in the common stock of three penny-stock issuers—Kelvin Medical, Inc. ("KVMD"), Arias Intel

Corp. (f/k/a First Harvest Corp.) ("ASNT"), and Eco Science Solutions, Inc. ("ESSI")—between approximately December 2015 and March 2018 (the "Relevant Period").

2.      The three fraudulent schemes netted more than $10 million in illicit proceeds.

**Scheme #1 - KVMD**

3.      The first scheme concerned KVMD, a purported medical-device business. Beginning in approximately June 2016, Giguiere, a stock promoter and KVMD's undisclosed control person, caused KVMD to issue three million shares of its common stock to one of his associates, who in turn sold two tranches of 1.5 million shares to each of two nominee entities he and Lindsay, the owner and operator of a Cayman Islands-based broker-dealer, controlled.

4.      Giguiere deposited one tranche of 1.5 million shares into a U.S. brokerage account he opened in the name of his nominee, and Lindsay deposited the second tranche of 1.5 million shares into an account in the name of his nominee at his Cayman Islands broker-dealer.

5.      Between November 29, 2017 and January 26, 2018, Giguiere, Lindsay, and an associate conducted a matched trading scheme in KVMD's stock, whereby they coordinated Giguiere's sales of his 1.5 million shares of KVMD to Lindsay, who was buying those shares in his own brokerage accounts and customer accounts at his Cayman Islands broker-dealer.

6.      Unbeknownst to Giguiere and Lindsay, the associate with whom they conducted the scheme was a witness cooperating with the Federal Bureau of Investigation ("FBI"), who was recording their phone calls and preserving their encrypted email and text message communications.

7.      By January 26, 2018, as a result of their scheme, Giguiere and Lindsay had netted approximately $1.57 million in proceeds and had increased KVMD's share price from zero to $1.20.

8.      Soon thereafter, Giguiere began promoting KVMD's stock on TheMoneyStreet.com ("TheMoneyStreet"), a stock promotion website he controlled, in anticipation of his and Lindsay's sales of their second tranche of 1.5 million shares of KVMD into the buying volume generated by the promotion.

2

9.      Giguiere and Lindsay's plan to liquidate the second tranche of 1.5 million shares was stymied, however, on March 19, 2018, when the Commission suspended trading in KVMD's securities for a period of ten business days.

**Scheme #2 - ASNT**

10.     The second fraudulent scheme concerned ASNT, a purported digital media company.

11.     In early 2017, Gillespie, ASNT's chief executive officer, Budhu, a purported adviser to the company, and Hackett, a purported lender to ASNT, began laying the groundwork for a "pump and dump" of ASNT's stock.[1]

12.     In February 2017, Gillespie caused ASNT to enter into a purported "Advisory Agreement" with Budhu, under which she was paid 200,000 shares of ASNT stock for her "consulting services."  ASNT issued the stock to Budhu in March 2017, and in August 2017 she sold the shares to Hackett at a significant premium to its then trading price.

13.     Gillespie then caused ASNT to issue to Hackett a sham $300,000 convertible promissory note that would allow Hackett to convert the debt into 750,000 shares of ASNT stock.  The group planned to have Hackett ultimately sell these 950,000 shares in connection with the pump and dump and then split the proceeds among the group's members.

14.     In October 2017, the group approached the cooperating witness about promoting ASNT's stock on TheMoneyStreet in connection with their planned pump and dump. Unbeknownst to them, the cooperating witness was recording their phone calls and preserving the encrypted email and text message conversations that they sought to hide from, among others, law enforcement.

---

[1]      In a "pump and dump" scheme, a group of individuals who control the "free trading" shares of an issuer with a thinly-traded stock, also referred to as the issuer's "float," inflate the issuer's share price and trading volume through, among other things, engaging in wash and matched trading, issuing false or misleading press releases, and paying for stock promotions.  When the issuer's share price reaches a desirable level or target price, the individuals "dump" their shares into the buying volume generated during the "pump" phase for substantial financial gain.

15.     In December 2017, after he ultimately declined to promote ASNT, the cooperating witness introduced Hackett to an individual claiming to be the ringleader of a network of corrupt stockbrokers who would buy stock that Hackett was selling in the open market in their customers' accounts—and without their customers' knowledge—in exchange for a 30% kickback.  Unbeknownst to Hackett, the purported ringleader of the corrupt broker network was an undercover FBI agent ("UC").

16.     Hackett agreed, and between December 22, 2017 and January 12, 2018 he sold more than 14,000 shares of ASNT in matched trades with the UC that he coordinated with the cooperating witness in recorded phone calls and preserved encrypted text messages.

**Scheme #3 - ESSI**

17.     The third fraudulent scheme concerned ESSI, a purported technology company focused on the cannabis industry.

18.     Beginning in December 2015, Giguiere, who was acting as the company's undisclosed control person, arranged for a transfer of control of ESSI to two nominal officers.

19.     Giguiere then caused the company to enter into an agreement with one of his nominee entities, under which the nominee entity promoted ESSI's stock on TheMoneyStreet.  In exchange, ESSI paid the nominee entity millions of purportedly free trading shares of ESSI stock that the company issued pursuant to two faulty Form S-8 registration statements.

20.     Throughout 2016 and into January 2017, Giguiere liquidated the shares of ESSI stock paid to his nominee entity while he was concurrently promoting ESSI's stock on TheMoneyStreet without adequately disclosing to investors his active liquidation of his own shares.  As a result of the scheme, Giguiere earned more than $8.5 million in illicit proceeds.

## VIOLATIONS

21.     As a result of the foregoing conduct and as alleged further herein, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

4

22.    Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

23.    The Commission brings this action pursuant to authority conferred by Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking a final judgment:  (a) restraining and permanently enjoining Defendants from engaging in the acts, practices, and courses of business alleged against them herein; (b) ordering Defendants to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts; (c) imposing civil money penalties on Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) imposing penny-stock bar orders against the Defendants under Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and (e) imposing permanent officer-and-director bar orders against Giguiere and Gillespie pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] as a result of the violations alleged in this Complaint.

24.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

25.    Defendants have, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails.

26.    Venue lies in this District under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because many of the acts, practices, events, transactions, communications, courses of business, and other matters alleged herein occurred in the Southern District of California.  For example, during the relevant time period, the Defendants communicated with the

UC by telephone, email, and text message, all while the UC was located in the Southern District of California. In addition, the UC placed orders to buy ASNT stock while located in the Southern District of California.

## DEFENDANTS

27.     **Giguiere**, age 46, resides in Newport Coast, California. Giguiere has never been registered with the Commission and he holds no securities licenses. Giguiere owns and operates TheMoneyStreet, a stock promotion website. Giguiere is also the undisclosed control person of ESSI and KVMD.

28.     **Lindsay**, age 43, is a Canadian citizen who resides in Grand Cayman, Cayman Islands. Lindsay has never been registered with the Commission and he holds no U.S. securities licenses. Lindsay is the principal of CMGT Capital Management ("CMGT"), a Cayman Islands-exempt broker-dealer registered with the Cayman Islands Monetary Authority.

29.     **Hackett**, age 29, is a dual U.S.-Canadian citizen who resides in Toronto, Canada. Hackett has never been registered with the Commission and he holds no securities licenses.

30.     **Budhu**, age 53, resides in New York, New York. Budhu has never been registered with the Commission and she holds no securities licenses. Budhu is a purported adviser to ASNT.

31.     **Gillespie**, age 49, resides in Lutz, Florida. Gillespie has been a registered representative since May 1995. He is currently associated with, and is a part owner of, a broker-dealer registered with the Commission since 2000. Gillespie holds Series 7, 24, and 63 securities licenses. Gillespie is the chief executive officer of ASNT.

## OTHER RELEVANT ENTITIES

32.     **KVMD** is a Nevada corporation with a principal place of business in Nevada City, California. KVMD purports to be in the medical-device business. KVMD is a reporting company with a class of securities registered under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)]. During the relevant time period, KVMD's common stock was a "penny

stock" as defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Exchange Act Rule 3a51-1 [17 C.F.R. § 240.3a51-1].  On March 19, 2018, the Commission suspended trading in KVMD's securities for ten business days because of concerns about the accuracy and adequacy of information about KVMD's securities in the marketplace and potentially manipulative transactions in KVMD's common stock.  KVMD's shares are quoted on OTC Link, operated by OTC Markets Group, Inc. ("OTC Markets"), under the ticker symbol KVMD.[2]

33.    **ASNT** is a Nevada corporation with a principal place of business in Tampa, Florida.  ASNT purports to be a digital media company with a focus on the cannabis industry. ASNT is a reporting company with a class of securities registered under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)].  During the relevant time period, ASNT's common stock was a "penny stock" as defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Exchange Act Rule 3a51-1 [17 C.F.R. § 240.3a51-1].  ASNT's shares are quoted on OTC Link, operated by OTC Markets, under the ticker symbol ASNT.

34.    **ESSI** is a Nevada corporation with a principal place of business in Makawao, Hawaii.  ESSI purports to be a technology company focused on the cannabis industry.  ESSI is a reporting company with a class of securities registered under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)].  During the relevant time period, ESSI's common stock was a "penny stock" as defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Exchange Act Rule 3a51-1 [17 C.F.R. § 240.3a51-1].  On May 19, 2017, the Commission suspended trading in ESSI's securities for ten business days because of concerns about the accuracy and adequacy of information in the marketplace about ESSI's business.  ESSI's shares are quoted on OTC Link, operated by OTC Markets, under the ticker symbol ESSI.

---

[2]    OTC Link is an electronic inter-dealer quotation system that displays quotes from broker-dealers for many over-the-counter securities.  OTC Link is registered with the Commission as a broker-dealer and as an alternative trading system and is a member of the Financial Industry Regulatory Authority.

# FACTS

### A.     The KVMD Scheme

*Giguiere Obtains 1.5 Million Shares of KVMD Stock in Anticipation of His and Lindsay's Market Manipulation Scheme*

35.     On August 1, 2016, KVMD, a purported medical-device business, filed a Form S-1 registration statement with the Commission that, as amended, sought to register thirty million shares of its common stock ("S-1").

36.     The S-1 disclosed, among other things, that KVMD had entered into a Consulting Agreement dated June 1, 2016 with S-1 Services LLC ("S-1 Services"), a purported consultant "in the business of assisting private companies in the process of going public and getting listed on the OTC Markets through the Form S-1 Registration."

37.     The S-1 further disclosed that KVMD had paid S-1 Services three million shares of its restricted common stock as payment for S-1 Services' assistance in preparing and filing the S-1.

38.     The S-1 did not disclose that S-1 Services was an entity recently formed by a lawyer and associate of Giguiere's ("Lawyer-1"), or that Giguiere had arranged for KVMD to enter into the Consulting Agreement with S-1 Services as a means by which Giguiere could obtain control of the three million shares for his and Lindsay's benefit.

39.     On October 23, 2017, Giguiere caused Lawyer-1 to have S-1 Services enter into a Stock Purchase Agreement with Phenix Ventures LLC ("Phenix"), a nominee entity Giguiere

owned and controlled.[3]  Under the terms of the Stock Purchase Agreement, S-1 Services agreed to sell Phenix 1.5 million restricted shares of KVMD for $30,000, or $0.02 per share.

40.     On November 3, 2017, Giguiere deposited the 1.5 million shares of restricted KVMD shares into a brokerage account he had recently opened in Phenix's name.

41.     In connection with that deposit, Giguiere signed a "Rule 144 Seller's Representation Letter – Non-Affiliate" dated October 25, 2017, in which he knowingly, or at least recklessly, falsely stated that he was not an affiliate of KVMD.

42.     In reality, and as described below, Giguiere was an "affiliate" of KVMD for purposes of Rule 144 of the Securities Act of 1933 because he controlled KVMD's entire public float and he had the ability to direct KVMD to take certain corporate actions, including the filing of an 8-K with the Commission announcing the company's change in business.

43.     Giguiere similarly caused Lawyer-1 to sell a second tranche of 1.5 million shares of KVMD owned by S-1 Services to Cataleya Capital ("Cataleya"), a nominee entity Lindsay owned and controlled.  On December 5, 2017, Lindsay deposited those shares in an account in the name of Cataleya that he had opened at CMGT.

### *From November 2017 to January 2018, Giguiere and Lindsay Match Trades in KVMD's Stock, Causing Its Share Price to Increase to $1.20*

44.     KVMD's common stock began trading on November 29, 2017 when Giguiere began selling his shares to Lindsay in predetermined and coordinated trading.

45.     From November 29, 2017 to January 16, 2018, Giguiere and Lindsay engaged in a matched trading scheme to create a misleading appearance of active trading in KVMD's stock, to increase the price of KVMD stock, and to induce investors to buy KVMD stock.

---

[3]     A "nominee" in this context refers to a person or entity into whose name securities or money is transferred to facilitate transactions like stock sales while seeking to mask the identity of the beneficial owner of the securities or money.

46.     Giguiere and Lindsay coordinated their trading with the cooperating witness in telephone calls and encrypted text message chats in which they agreed to place, respectively, sell and buy orders of KVMD stock in substantially the same size, at substantially the same time, and at substantially the same price.

47.     For example, on November 30, 2017, Giguiere wrote to Lindsay in an encrypted message, "I suggest 1500 to 2000 shares a day in KV at .55 and I will just have a large offer there showing min [sic], for the next 5 to 7 trading days . . . let's let a week go by right here with a little volume and at this price . . . then we can move it . . . need the company to put out some press."  Lindsay replied, "Yes.  Good plan."

48.     Similarly, on December 8, 2017, Giguiere wrote in an encrypted message, "KVMD Gameplan for the day? . . .  As I would think it is time for some volume."

49.     And again, on December 15, 2017, Lindsay told Giguiere, "I have at least 30k shares to buy today."  Giguiere responded, "Let's do 10,000 at .95 and 20000 at 1.00 . . . and then tomorrow we can move to 1.05."

50.     Giguiere and Lindsay coordinated their trading in phone calls and in encrypted text messages in an effort to hide their conduct from law enforcement.  Indeed, in a December 8, 2017 phone call with the cooperating witness, Lindsay admitted, "I'm a little hesitant about typing all of these details into this app. . . . You can just imagine if it finds its way somewhere *it's fairly incriminating*" (emphasis added).

51.     Similarly, Lindsay told the cooperating witness in a December 20, 2017 phone call, "I just mentioned to Gannon that some of these text messages look, just like, really evil.  I'd rather just pick up the phone . . . .  [W]hen he starts saying, hey, do you think you can you finish it green, I'm like, fuck!"

52.     By January16, 2018, Giguiere had sold Phenix's 1.5 million shares of KVMD in the open market, most of which was purchased by Lindsay in accounts he controlled at CMGT, earning approximately $1.57 million in proceeds.

53.     Giguiere and Lindsay's matched trading dominated the public market for KVMD stock.  From November 29, 2017 to January 16, 2018, their trading constituted, on average, more than approximately 79% of KVMD's total trading volume on days that the stock traded.

### *Giguiere Causes KVMD to Issue a Misleading Form 8-K with the Commission, and Giguiere Begins Promoting KVMD's Stock on TheMoneyStreet*

54.     On January 18, 2018, Giguiere caused KVMD to issue a Form 8-K with the Commission announcing purported changes in the company's business plan, including "evolv[ing] into an early stage telehealth wearable technology company."

55.     The Form 8-K went on to state that KVMD was "focused on developing and launching next generation telehealth wearable technologies," and that it intended to "leverage artificial intelligence and machine learning combined with the latest advancements in monitoring and therapeutic delivery technologies to increase the recovery and performance of the body."

56.     In fact, KVMD's principals had taken no steps—and lacked the resources—to become a "wearable technology company" or to "leverage artificial intelligence."  Indeed, when Giguiere presented the Form 8-K to KVMD's nominal chief executive officer, the chief executive officer told Giguiere that it sounded good, but he had no idea what it all meant.

57.     On or about January 29, 2018, Giguiere began promoting KVMD's stock on TheMoneyStreet in an article titled "Can Machine Learning Actually Predict Therapeutic Results?"

58.     The article claimed, among other things, that TheMoneyStreet was "diving into the consumer sports and active lifestyle therapy market, specifically the sub-sector of combined

fitness tracking, artificial intelligence and therapeutic treatment" and that it had identified KVMD as "[o]ne such Company perfectly positioned to take advantage of this fast-growing category."

59.     The article then recommended investing in KVMD:

> [W]e believe that the investment opportunity is right now.  And you can't play if you aren't in the game.  Given Kelvin Medical's (OTC: KVMD) current share price, we believe that a double or triple share price value is not out of the question.  But like we always say, YOU MUST OWN KVMD in order to ride its growth.  So HURRY up and do your own research on Kelvin Medical, and make sure to show this information to your broker.

60.     Notably, the article did not disclose that Giguiere owned and controlled TheMoneyStreet, that Giguiere was a control person of KVMD, that Giguiere had caused KVMD to issue a dubious Form 8-K, that Giguiere and Lindsay's matched trading had increased KVMD's share price from zero to $1.20, or that he and Lindsay were intending to sell additional shares of KVMD they controlled into the buying volume they hoped to generate through this promotion.

61.     Indeed, by March 12, 2018, Giguiere and Lindsay had begun selling the second tranche of 1.5 million shares of KVMD held in the name of Cataleya at CMGT.

62.     In a phone call on March 13, 2018, Giguiere and Lindsay agreed to a plan to sell those shares at a predetermined price of "between a dollar fifty and a dollar seventy," with Giguiere suggesting that "I think if we're pretty astute with how we do this we can probably be done in about twenty trading days . . . and then we'll let the price appreciate into that low two dollar mark naturally."

63. Giguiere also told Lindsay in the same call that he was in the process of obtaining an additional three million shares from the company that they could then begin selling. Lindsay concurred in the plan.

64. From March 12 to March 16, 2018, KVMD's share price increased, and its trading volume almost tripled, closing at a high of $1.70 on March 15 and $1.55 on March 16, 2018, more than a 31% increase from a closing price of $1.18 on March 9.

65. On March 19, 2018, the Commission issued an order suspending trading in KVMD's securities for ten business days, citing concerns about the accuracy and adequacy of information about KVMD's securities in the marketplace and potentially manipulative transactions in KVMD's common stock.

**B.    The ASNT Scheme**

*Background*

66. ASNT was incorporated on February 27, 2013 as American Riding Tours, Inc., a shell company that, according to its filings with the Commission, planned to become a provider of "on-road" motorcycle tours of Nevada.

67. On or about March 1, 2016, Budhu brokered ASNT's then-sole officer and director's sale of (a) three million control shares of ASNT's common stock and (b) 200,000 shares of ASNT's preferred convertible stock to Gillespie for approximately $166,000. As a result, Gillespie became ASNT's majority shareholder.

68. On June 7, 2016, Gillespie was appointed ASNT's president, chief executive officer, and the chairman of its board of directors.

69. On February 10, 2017, Gillespie caused ASNT to consummate a reverse merger in which Cannavoices, Inc., a private company Gillespie controlled, was merged into the ASNT

13

shell. As a result, Cannavoices' shareholders exchanged their shares of Cannavoices for shares of ASNT.

### *Gillespie, Budhu, and Hackett Enter Into a Series of Agreements as a Means to Transfer ASNT Stock to Hackett to Sell in an Anticipated Pump-and-Dump Scheme*

70. On February 10, 2017, Gillespie caused ASNT to enter into a purported "Advisory Agreement" with "Annetta Budhu/Baywall Inc.," pursuant to which Budhu was obligated to provide various "consulting services," including "third party introductions," to ASNT in exchange for 200,000 shares of ASNT's common stock.

71. Accordingly, on or about March 15, 2017, Gillespie caused ASNT's transfer agent to issue 200,000 restricted shares of ASNT's common stock to Budhu's nominee Baywall Inc. ("Baywall") as payment for her purported "consulting services" under the Advisory Agreement.

72. On August 8, 2017, Baywall entered into a Share Purchase Agreement with Hackett's nominee FreeLife Investments, Inc. ("FreeLife"), under which Baywall sold the 200,000 shares of ASNT common stock it had previously been issued to FreeLife for $5,000, or $0.025 per share.

73. FreeLife's purchase price of $0.025 per share was at a 136 times premium to ASNT's stock's closing price that day of $3.40 per share.

74. To effect Baywall's sale of the 200,000 shares to FreeLife, ASNT's transfer agent required both entities to execute "Seller's Representation Letters" in connection with the transaction.

75. Both Budhu and Hackett made materially false misrepresentations in the Seller's Representation Letters they executed and emailed on behalf of Baywall and FreeLife, respectively, to ASNT's transfer agent.

14

76.     Budhu falsely represented and warranted in Baywall's letter, among other things, that she was "not acting in concert with any person in selling the shares" and that she had "not engaged in a plan with anyone else to dispose of the Shares."  Budhu knew, or was at least reckless in not knowing, that this statement was materially false and misleading because she was in fact acting in concert with Hackett and Gillespie to have Hackett ultimately sell the shares in a pump and dump of ASNT's stock and then split the proceeds among themselves.

77.     Hackett falsely represented and warranted in FreeLife's letter that "I am not aware of any material, non-public information about the Company."  Hackett knew, or was at least reckless in not knowing, that this statement was materially false and misleading because he was aware of material non-public information about ASNT, including that he intended to sell the shares for his, Gillespie's, and Budhu's joint benefit in connection with a pump and dump that they were planning.

78.     On August 2017, Gillespie and Hackett took steps to provide Hackett with an additional 750,000 shares of ASNT stock to sell in connection with the planned pump and dump.

79.     On August 10, 2017, Gillespie caused ASNT to issue to FreeLife a convertible promissory note in a principal amount of $300,000, and with an option to convert the debt into ASNT's common stock at $0.40 per share.  Upon conversion of the entire principal amount, then, FreeLife would be entitled to 750,000 shares of ASNT stock (i.e., 300,000/.40 = 750,000).

80.     Notwithstanding that the principal amount of the note was $300,000, on August 9, 2017 Hackett caused FreeLife to wire only $4,990 to a bank account beneficially owned and controlled by Gillespie.  Upon information and belief, that payment was the only payment FreeLife made to purchase the $300,000 convertible promissory note from ASNT.

***Budhu, Gillespie, and Hackett Agree with the Cooperating Witness to Promote ASNT's Stock on TheMoneyStreet in Connection with Their Planned Pump and Dump***

81.     From October 31 to at least December 12, 2017, Budhu, Gillespie, and Hackett agreed to a scheme in which the cooperating witness would promote ASNT's stock on TheMoneyStreet in an effort to generate investor interest and trading volume into which Hackett would sell the shares obtained by FreeLife as discussed above, and then split the proceeds with the group.

82.     On October 31, 2017, an associate of the cooperating witness ("Associate 1") first introduced Budhu to the cooperating witness by phone to discuss the cooperating witness's promotion of ASNT's stock on TheMoneyStreet.

83.     In that call, Budhu explained, among other things, that "they," i.e., the group, had 300,000 shares "with a 4a1 opinion that [Gillespie] owns and are free trading," and that those shares are "available to do something with."

84.     Budhu further explained that Hackett would have 750,000 shares upon conversion of the convertible promissory note and that "I have shares I own that I gave to Andrew."

85.     On November 1, 2017, Budhu forwarded to Associate 1's encrypted email account copies of ASNT's shareholder list and documents from the Depository Trust & Clearing Corporation showing at which broker-dealers ASNT's shareholders' shares were being held.

86.     In a call that day, Associate 1 asked Budhu, in substance to looks through those documents to identify "the big block" and let him know which ones were "friendly that we can . . . ."  Budhu then finished Associate 1's sentence, saying "have access to . . . very good."

87.     Also that day, Gillespie emailed to Budhu a screenshot of a document titled "Arias Intel Corp. Press Release Schedule" that listed the titles of ASNT's expected press

16

releases, including a release titled "Arias announces the launch of it [sic] social gaming app in the US." Budhu in turn forwarded the file to the cooperating witness's encrypted email account.

88.     On a November 6, 2017 group call, Gillespie explained to Budhu, Hackett, the cooperating witness, and Associate 1 that ASNT, which was then known as First Harvest Corp., would change its name in days and that the name change would then trigger the company's issuances of press releases.

89.     Gillespie agreed with the cooperating witness that, in order to generate investor interest in ASNT's stock, the issuances of the press releases would need to go "hand in hand" with the promotion on TheMoneyStreet.

90.     During that same call, Gillespie agreed that he would sell 300,000 shares of ASNT to the cooperating witness and Associate 1, who in turn could sell the shares and split the proceeds with the group. In response, Associate 1 told the group that he could create a bogus services contract to justify the sale.

91.     On December 9, 2017, in a phone call with Budhu, Hackett, and the cooperating witness, the group discussed setting a target price of $5.00 per share for ASNT's stock, agreeing that Hackett would not begin selling the shares on behalf of the group until that target price was reached.

92.     The group then discussed coordinating their planned trading and promotion over a particular encrypted text messaging application. Budhu interrupted them, saying that that particular app was "not good," and instead suggested using one of two other encrypted text messaging apps.

93.     On December 12, 2017, Gillespie told the cooperating witness in a phone call that he had seven to eight press releases ready to "put out quickly" to generate interest in ASNT's

stock, that he'd "space them over a few weeks," and that he thought they would have a "large impact on the stock." He then confirmed that he had his "deal worked out with Annetta and Andrew and we're happy about that," that he was using one of the encrypted text messaging apps Budhu had suggested, and that he was looking forward to "a long and mutually beneficial relationship."

### *Hackett Engages in a Matched Trading Scheme in ASNT with the UC*

94. From December 22, 2017 to January 12, 2018, Hackett engaged in a matched trading scheme in which he sold more than 14,400 shares of ASNT stock to the UC.

95. Hackett believed that the UC's network of corrupt stockbrokers would be buying his shares in their customers' accounts unbeknownst to the customers and in exchange for a 30% kickback from Hackett. For example, on December 20, 2017 the cooperating witness told Hackett in a phone call that the UC would start "working on his network" and that he got the UC to agree to "put this paper [i.e., stock] away with his crew for 30% commis[sion] . . . which means his take is nothing—he's got to pay all these brokers and fund managers most of that . . . to put this away."

96. Hackett engaged in the scheme to liquidate his holdings and to create a misleading appearance of active trading in ASNT.

97. Hackett coordinated his trading with the UC in phone calls and encrypted text message chats with the cooperating witness, in which he agreed to place sale orders of ASNT in substantially the same size, at substantially the same time, and at substantially the same prices at which he understood the UC was placing his buy orders.

98. For example, on December 22, 2017, Hackett coordinated his trading with the cooperating witness in a series of encrypted text messages. Hackett began, "We are good to go

on asnt if we have trades," to which the cooperating witness responded, "Are you ready to plug a trade[?]" Hackett responded "Yes 2.06."

99.     The cooperating witness then wrote, "Ok. One last time. My guy gonna go in and buy 4000 shares at 2.06. It's all you[rs]. Correct. I just need you to say yes. And my guy will go buy it." Hackett responded, "Yes," and the cooperating witness then confirmed, "I believe u got 3900 at 2.05 backprint. Please confirm." Hackett confirmed, "3900 asnt filled at 2.06."

100.    The cooperating witness then asked, "U want me to tell him to try to do the whole 160k?," that is, the rest of the 160,000 shares of ASNT that Hackett still owned, to which Hackett responded, "Yes!!!!"

101.    On January 4, 2018, Hackett paid the UC his 30% kickback for the trades they executed on December 22, 2017. Specifically, Hackett wired $2,875 from a Canadian bank account he controlled in the name of FreeLife to a bank account controlled by the UC in the United States.

102.    Similar to the December 22, 2017 trades, Hackett and the cooperating witness discussed additional matched trading in ASNT on January 8, 2018.

103.    The cooperating witness began by explaining to Hackett that the UC's corrupt stockbrokers were a little nervous about buying ASNT when its trading volume was low because the trades could attract the scrutiny "from the alphabet crew," a reference to law enforcement. Hackett affirmed that he understood.

104.    As a result, the cooperating witness asked if Hackett could have the company issue "news," to which Hackett agreed that company news would make the brokers' files "stronger"—that is, the brokers could point to the news as justification for buying the stock in

their customers' accounts. The cooperating witness then told Hackett, in substance, that if "the abc crews come around, you know, nobody needs to worry about orange jump suits, you know what I'm saying," to which Hackett replied, "yeah."

105. On January 8, 9, and 10, 2018, Hackett placed orders to sell 4,000 shares each day in an effort to match trades with the UC. On January 12, 2018, Hackett placed an order to sell 2,200 shares of ASNT in an effort to match trades with the UC.

106. Later on January 12, 2018, the cooperating witness sent an encrypted email to Hackett and the UC attaching a spreadsheet with an accounting of their matched trades and the kickback paid on January 4, 2018. After the UC thanked Hackett for his prompt payment, Hackett, said "No problem[.] I send funds out as quick as possible."

107. On January 16, 2018, Hackett paid a 30% kickback to the UC for his January 8-10, 2018 trades by wiring $9,620 from a Canadian bank account he controlled in the name of FreeLife to a bank account controlled by the UC in the United States.

108. Because the cooperating witness ultimately did not promote ASNT on TheMoneyStreet, the group was unable to accomplish its goal of conducting a pump and dump of ASNT's stock.

### C. The ESSI Scheme

***Giguiere Obtains Control of ESSI and Causes the Company to Enter Into an Agreement with His Nominee to Promote ESSI's Stock on TheMoneyStreet***

109. On December 17, 2015, ESSI filed a Form 8-K with the Commission disclosing a change in the company's control. The 8-K claimed that the company's then-majority shareholder had sold his shares of ESSI stock to two brothers in a private transaction, and that the brothers had been appointed as ESSI's new chief executive officer ("ESSI CEO") and chief financial officer ("ESSI CFO").

20

110.     In reality, Giguiere had arranged to pay for the majority shareholder's control block of ESSI shares and, acting as a control person of ESSI, had installed the ESSI CEO and ESSI CFO as the company's nominal officers.

111.     On January 1, 2016, Giguiere next caused ESSI to enter into a "technology licensing and marketing support" letter agreement with his nominee Separation Degrees Online, Inc. ("SDOI"), a purported technology company.  The stated purpose of the agreement was to "pursue mutual beneficial opportunities that result in the development, licensing/acquisition of, and management of on-going technology solutions and marketing campaigns for ESSI's initiatives."

112.     In reality, the "marketing support" services to be provided by SDOI under the letter agreement were Giguiere's promotion of ESSI's stock on TheMoneyStreet.

113.     In exchange for Giguiere's promotion of ESSI's stock under the letter agreement, ESSI agreed to pay SDOI $35,000 worth of ESSI common stock per month to be issued pursuant to a Form S-8 registration statement.  The letter agreement called for the stock to be issued at the greater of $0.01 per share or a 30% discount to the volume average weighted price of ESSI's stock on the date of payment.

114.     The parties amended the letter agreement on June 1 and October 1, 2016.

115.     In an "Addendum 1" to the letter agreement dated June 1, 2016, the parties agreed that ESSI would purchase from SDOI a purported "proprietary messaging and customer relationship management software platform" in exchange for payment of an additional 500,000 shares of its common stock.

116.    In an "Addendum 2" to the letter agreement dated October 1, 2016, the parties agreed to increase SDOI's monthly payments under the letter agreement to $42,000 worth of ESSI common stock to be issued pursuant to a Form S-8 registration statement.

117.    ESSI's own filings with the Commission demonstrate that the services SDOI overwhelmingly provided under the agreement were "advertising and promotion services"—i.e., stock promotion through TheMoneyStreet as described below.

118.    For example, ESSI's Form 10-K for the year ending January 31, 2017, filed with the Commission on May 1, 2017, disclosed that $1,720,914 of the $2,061,506 (approximately 83%) worth of stock paid to SDOI was for advertising and promotion services, while the balance of $340,592 (approximately 17%) was paid for purported "technology, licensing and marketing fees."

### *Giguiere Causes ESSI to Issue SDOI Millions of Shares of ESSI Stock, and Then Lies to Two Broker-Dealers in Order to Deposit the Stock*

119.    Giguiere caused ESSI to file two Form S-8 registration statements with the Commission—the first on April 4 and the second on November 23, 2016—that each purported to register five million shares of ESSI's common stock pursuant to ESSI's "2016 Equity Incentive Plan."[4]

120.    On April 6, 2016, ESSI issued its first tranche of 1,250,000 shares to SDOI under the April 4, 2016 S-8 as payment for a "portion of the month of January's salary."

---

[4]    Form S-8 registration statements allow issuers to register securities to be offered under an "employee benefit plan" (as that phrase is defined in Rule 405 of Regulation C under the Securities Act of 1933) to their "employees," which term is defined to include "consultants" and "advisors." Notably, a Form S-8 may be used to issue securities to "consultants" and "advisors" only if, among other things, the services they provide to the issuer are bona fide, the services are not performed in connection with the offer or sale of securities in a capital-raising transaction, and the services do not, directly or indirectly, promote or maintain a market for the issuer's securities.

121.    On April 18, 2016, Giguiere deposited SDOI's initial tranche of 1,250,000 shares in a brokerage account in SDOI's name.

122.    In the deposit documentation, Giguiere stated that he was not an "affiliate/control person" of ESSI and that he had not "made arrangement for the solicitation of buy orders in connection with this sale." Giguiere knew, or was at least reckless in not knowing, that these statements were materially false and misleading because he in fact controlled ESSI and was arranging for the solicitation of buy orders of ESSI stock through his promotion of the investment on TheMoneyStreet, as described below.

123.    On May 23, October 3, and October 19, 2016, Giguiere deposited approximately 3,607,000 additional shares of ESSI issued pursuant to the April 4, 2016 Form S-8 into the SDOI account, making the same false statements he made in connection with his April 18, 2016 deposit.

124.    For the October 3, 2016 deposit, Giguiere was required to submit a "Non-Affiliate Shareholder's Representations Letter" in which he also stated that he was not an affiliate of ESSI and that he was not aware of any non-public material adverse information about ESSI. Giguiere knew, or was at least reckless in not knowing, that these statements were materially false and misleading because he in fact controlled ESSI and was aware of non-public material information adverse to ESSI, namely, that it was subject to his own fraudulent scheme.

125.    The October 3, 2016 deposit also included a letter signed by Giguiere and the ESSI CEO in which Giguiere represented that he was not an affiliate of ESSI, and that Giguiere "did not directly or indirectly promote or maintain a market for the Company's securities." Giguiere knew, or was at least reckless in not knowing, that these statements were materially

23

false and misleading because he in fact controlled ESSI and was actively promoting ESSI's securities on TheMoneyStreet.

126.     On November 18 and 29, 2016, Giguiere deposited into a second brokerage account in his own name an additional 1.9 million shares of ESSI.  These 1.9 million shares were comprised of 1.4 million shares Giguiere had purchased from ESSI's prior chief executive officer for $100,000, and 500,000 shares he received from ESSI as payment for SDOI's sale of the purported communications software platform.

127.     Giguiere made the same false statement in the deposit documentation accompanying these deposits that he made in connection with his previous deposits, namely, that he was not an "affiliate/control person" of ESSI and that he had not "made arrangement for the solicitation of buy orders in connection with this sale."  Giguiere knew, or was at least reckless in not knowing, that these statements were materially false and misleading because he in fact controlled ESSI and was arranging for the solicitation of buy orders of ESSI stock through his promotion of the investment on TheMoneyStreet, as described below.

128.     On December 23, 2016, Giguiere deposited 600,000 shares of ESSI stock into another brokerage account in his own name that he opened at a second broker-dealer.  Giguiere's deposit documentation states that he obtained 500,000 of the 600,000 shares as payment from ESSI for SDOI's sale of the purported communications software platform—i.e., a duplicate tranche of 500,000 shares he had already been paid and had deposited in the first brokerage account on November 29, 2016.

129.     In connection with the latter deposit, Giguiere signed a "Stock Promotion Affidavit" dated December 29, 2016 in which the broker-dealer stated that it had "detected promotional activity that is concurrent with the deposit and/or sale of your stock.  Attached is a

sample of the information currently being circulated." The attachment was comprised of two online articles from September and December 2016 discussing the promotion of ESSI by TheMoneyStreet.

130. The affidavit asked Giguiere, "Were you aware of the promotional activity in the issue you wish to deposit or are offering for sale?" Giguiere checked "no" and then falsely stated, "I am not involved in any promotional activity whatsoever." Giguiere knew, or was at least reckless in not knowing, that these statements were materially false and misleading because he knew that he was promoting ESSI on TheMoneyStreet, as described below.

### *Giguiere Promotes ESSI's Stock on TheMoneyStreet While Concurrently Liquidating His Shares of ESSI in the Open Market*

131. Throughout 2016, Giguiere recommended ESSI's stock—a company with zero revenues and an accumulated deficit of more than $43 million by January 31, 2017—on TheMoneyStreet.

132. TheMoneyStreet published at least two multi-page articles titled "ESSI and the 2016 Elections" and "Is This the Next Big Stock for 2016[?]" The first article claimed, among other things, that

> [i]t's typically been true that most industries will not see much movement during an election year. . . . BUT once in a while, there are a few outliers that challenge this thought. AND when they do, they merit a closer look. Eco Science Solutions just may be that outlier to bring the returns you are seeking during this window of time.

133. The second article claimed, among other things, that "Eco Science seems to be taking a page out of Amazon.com's playbook" and that "[i]t's eerily similar to how Amazon started. . . . If you take a look at Eco Science's business model, one could see the similarities to Amazon's strategy."

25

134.    Neither article disclosed that Giguiere owned TheMoneyStreet, that he controlled ESSI, or that he was intending to and/or actively liquidating his ESSI stock into the market.

135.    Although TheMoneyStreet's articles recommending investing in ESSI did not disclose any of the myriad material facts about Giguiere's control of ESSI and TheMoneyStreet, the website contained a separate "Disclaimer" page that, at different points in 2016, made certain disclosures about SDOI.

136.    As of March 2016, TheMoneyStreet's "Disclaimer" page made no mention of Giguiere and affirmatively misrepresented that "[a]rticles on our website represent independent financial commentary.  The content is provided by independent authors via a common carrier platform and do not necessarily represent the opinions of our website."  Giguiere knew, or was at least reckless in not knowing, that those statements and omissions were false and misleading because Giguiere controlled TheMoneyStreet and the website's authors were not independent.

137.    Sometime thereafter, Giguiere caused the disclosures made on the TheMoneyStreet's "Disclaimer" page to be modified to disclose that TheMoneyStreet "may" be compensated by SDOI for "advertising services" and that SDOI "may" sell shares it owns in a recommended stock.  At no time, however, did the Disclaimer page disclose that Giguiere controlled all of SDOI, TheMoneyStreet, and ESSI, and that he was actively selling shares of ESSI—shares that he obtained under the Forms S-8 for the stock promotion services he was providing through TheMoneyStreet—into the market.

138.    Between April 21, 2016 and January 18, 2017, Giguiere sold more than 6.6 million shares of ESSI in his brokerage accounts for illicit proceeds of more than $8.5 million.

139.     Beginning in May 2016, Giguiere began wiring a portion of the proceeds of his stock sales to a third party, who in turn wired the money to ESSI's bank account.  The ESSI CEO and ESSI CFO then paid themselves $5,000 per month out of the ESSI account.

140.     Because ESSI earned no revenues, the third party's deposits of the proceeds of Giguiere's sales of ESSI stock were the ESSI account's primary funding source, and thus the source of the ESSI CEO's and ESSI CFO's salaries.

141.     In other words, and upon information and belief, Giguiere used the proceeds of his sales of ESSI stock to pay the ESSI CEO and ESSI CFO to act as nominal officers of the company.

## FIRST CLAIM FOR RELIEF
### Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Giguiere and Lindsay)
### KVMD

142.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 141 of this Complaint.

143.     Giguiere and Lindsay, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

144.     By reason of the foregoing, Giguiere and Lindsay, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF
### Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Gillespie, Hackett, and Budhu)
### ASNT

145.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 141 of this Complaint.

146.     Gillespie, Hackett, and Budhu, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

147.     By reason of the foregoing, Gillespie, Hackett, and Budhu, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### THIRD CLAIM FOR RELIEF
### Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Giguiere)
### ESSI

148.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 141 of this Complaint.

149.    Giguiere, directly or indirectly, singly or in concert, in connection with the

purchase or sale of securities and by the use of the means or instrumentalities of interstate

commerce or of the mails, or of the facilities of a national securities exchange, knowingly or

recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue

statements of a material fact or omitted to state a material fact necessary in order to make the

statement made, in light of the circumstances under which they were made, not misleading;

and/or (c) engaged in acts, transactions, practices, or courses of business which operated or

would operate as a fraud or deceit upon other persons.

150.    By reason of the foregoing, Giguiere, directly or indirectly, singly or in concert,

has violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Defendants, their respective agents, servants, employees, and

attorneys, and all persons in active concert or participation with them, who receive actual notice

of the injunction by personal service or otherwise, and each of them, from future violations of

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder

[17 C.F.R. § 240.10b-5(a) and (c)];

## II.

Ordering Defendants to disgorge any ill-gotten gains they received directly or indirectly,

with prejudgment interest thereon, as a result of the violations alleged in this Complaint;

## III.

Ordering Defendants to pay civil monetary penalties pursuant to Section 21(d)(3) of the

Exchange Act [15 U.S.C. § 78u(d)(3)];

## IV.

Ordering a penny-stock bar against the Defendants under Section 21(d)(6) of the

Exchange Act [15 U.S.C. § 78u(d)(6)];

## V.

Ordering Giguiere and Gillespie to be barred from serving as an officer or director of an

issuer pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] as a result of the

violations alleged in this Complaint; and

## VI.

Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated:  New York, New York
         July 6, 2018


                     By:  <u>s/ John O. Enright</u>
                         John O. Enright
                         Attorney for Plaintiff
                         Email: EnrightJ@sec.gov

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Securities and Exchange Commission | Gannon Giguiere, Oliver-Barret Lindsay, Andrew Hackett, Kevin Gillespie, and Annetta Budhu |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Orange County, CA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Marc P. Berger, Sanjay Wadhwa, Sheldon L. Pollock, John O. Enright, Joseph P. Ceglio, Securities and Exchange Commission, 200 Vesey St., Suite 400, New York, NY 10281-1022

Attorneys *(If Known)*

**'18CV1530 BEN JLB**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original Proceeding    ☐ 2   Removed from State Court    ☐ 3   Remanded from Appellate Court    ☐ 4   Reinstated or Reopened    ☐ 5   Transferred from Another District *(specify)*    ☐ 6   Multidistrict Litigation - Transfer    ☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 78j(b)
Brief description of cause:
This is a civil enforcement action by the Securities and Exchange Commission

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE   07/06/2018

SIGNATURE OF ATTORNEY OF RECORD   s/ John O. Enright

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**   **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : $\,^-$ 0 9 $-$ 3 6 1 |
| | : Case No. _____ |
| | : |
| PAWEL P. DYNKOWSKI, | : **JURY TRIAL DEMANDED** |
| MATTHEW W. BROWN, | : |
| JACOB CANCELI, | : |
| GERARD J. D'AMARO, | : |
| JOSEPH MANGIAPANE JR., | : |
| NATHAN M. MICHAUD, | : |
| MARC J. RIVIELLO, AND | : |
| ADAM S. ROSENGARD, | : |
| | : |
| Defendants. | : |
| | : |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as

follows against the Defendants named above:

## SUMMARY OF CASE

1.       This case is about a ring of serial penny stock manipulators. In 2006 and

2007, Defendant Pawel Dynkowski engaged in fraudulent pump-and-dump schemes with

at least four separate stocks: GH3 International, Inc. ("GH3"), Asia Global Holdings,

Inc. ("Asia Global"), Playstar Corp. ("Playstar"), and Xtreme Motorsports of California,

Inc. ("Xtreme Motorsports"). Each of the other Defendants in this case participated in

one or more of these frauds. The fraudulent proceeds from these schemes totaled more

than $6.2 million.

2.       The pump-and-dump schemes generally followed the same pattern.

Defendant Pawel Dynkowski and his accomplices agreed to sell large blocks of shares for penny stock companies (or "issuers") in exchange for a portion of the proceeds. The issuers put these shares in nominee accounts that Dynkowski controlled. Dynkowski and his accomplices then pumped the market price of the stocks through wash sales, matched orders, and other manipulative trading, to give the market the false impression that there was real demand for these securities. They often timed this manipulative trading to coincide with false, misleading, and touting press releases from the issuers, which Dynkowski at times prepared himself. After artificially inflating the price of the stocks, Dynkowski and his accomplices then sold the shares they obtained from the issuers to the unsuspecting market. Dynkowski, his accomplices, and the issuers shared the illicit profits.

3.  The GH3 pump-and-dump scheme occurred between October and December 2006. Dynkowski orchestrated this fraud with Defendant Matthew Brown, who operates a penny stock website called InvestorsHub.com. Brown introduced Dynkowski to a representative of GH3, and to Defendant Jake Canceli, a penny stock promoter who participated in the scheme. Brown acted as a liaison between Dynkowski, Canceli, and the issuer. Dynkowski and his associates used wash sales, matched orders, and other manipulative trading, timed to coincide with false, misleading, and touting press releases by the company, to artificially inflate the price of GH3 stock. Canceli provided the accounts from which Dynkowski subsequently sold purportedly unrestricted shares received from the issuer. The scheme culminated in mid-December 2006, with Dynkowski dumping 312 million shares of GH3 stock for total proceeds of $747,609.

4.  Brown planned the Asia Global pump-and-dump scheme with Defendants

2

Joseph Mangiapane and Marc Riviello, who were both registered representatives at a small broker-dealer in California. Dynkowski and Defendant Nathan Michaud, who met through InvestorsHub.com, pumped the price of the stock using wash sales, matched orders, and other manipulative trading, coordinated with false, misleading, and touting press releases by the company. The scheme occurred in three cycles: August-September 2006, November-December 2006, and January-February 2007. After manipulating the price of the stock, Dynkowski, Brown, Mangiapane, and Riviello dumped more than 54 million shares that had been improperly registered on SEC Form S-8 and held in nominee accounts. The illicit proceeds from this scheme totaled at least $4,050,529.

5.      Dynkowski and Defendant Gerard D'Amaro carried out the Playstar pump-and-dump scheme. The two of them met through InvestorsHub.com. D'Amaro acted as the liaison with the issuer as well as the nominee account holder for the purportedly unrestricted shares received from the company. In this scheme, which occurred during October and December 2006, Dynkowski pumped Playstar's stock through wash sales, matched orders, and other manipulative trading. After artificially manipulating the market, Dynkowski and D'Amaro sold 11.5 million shares they received from the issuer for total illicit proceeds of $1,180,294.

6.      Dynkowski and Accomplice No. 1 ("AN1") carried out the Xtreme Motorsports pump-and-dump scheme. The two of them, who met through InvestorsHub.com, pumped Xtreme Motorsports stock through wash sales, matched orders, and other manipulative trading during January and February 2007. Dynkowski's friend, Defendant Adam Rosengard, served as the nominee account holder who facilitated the dump of 13 million purportedly unrestricted shares of Xtreme Motorsports

3

stock. After pumping the stock, Dynkowski sold the shares from Rosengard's account generating illicit proceeds of $257,646.

7. The foregoing conduct violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) & 77q(a)], Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) & 78m(d)], and Rules 10b-5, 13d-1 and 13d-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 & 240.13d-2].

8. The Commission seeks to have the Court enter judgments permanently enjoining Defendants from violating the securities laws, requiring the payment of disgorgement, plus prejudgment interest, and civil monetary penalties, and barring certain of the Defendants from participating in future penny stock offerings.

9. Each of the Defendants will continue to violate the securities laws unless permanently restrained and enjoined from doing so.

## JURISDICTION

10. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

11. The District of Delaware is a proper venue for this action because certain of the acts and transactions at issue in this action occurred in this District. For example, Dynkowski engaged in substantial manipulative trading in the stock of GH3, Asia Global, Playstar and Xtreme Motorsports using on-line brokerage accounts accessed from his residence in Newark, Delaware.

4

12. Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, the means and instruments of transportations and communications in interstate commerce, and the mails in connection with the acts, practices, and courses of conduct alleged herein.

## DEFENDANTS

13. Defendant **Pawel P. Dynkowski** is a citizen of Poland and a legal resident of the U.S. During the relevant time period, Dynkowski resided in Newark, Delaware.

14. Defendant **Matthew W. Brown** is a resident of Aliso Viejo, California. Brown operates the penny stock website InvestorsHub.com.

15. Defendant **Jacob Canceli** is a resident of Mission Viejo, California. Canceli is a stock promoter.

16. Defendant **Gerard J. D'Amaro** is a resident of Pompano Beach, Florida. D'Amaro is a stock promoter.

17. Defendant **Joseph Mangiapane Jr.** is a resident of Laguna Niguel, California. Mangiapane was a registered representative at AIS Financial, Inc. Mangiapane is the CEO of Rubicon Financial, Inc., which owned AIS Financial, Inc. during the relevant time period.

18. Defendant **Nathan M. Michaud** is a resident of Boston, Massachusetts. Michaud is an internet web site designer.

19. Defendant **Marc J. Riviello** is a resident of Redwood City, California. Riviello was a registered representative at AIS Financial, Inc.

20. Defendant **Adam S. Rosengard** is a resident of Voorhees, New Jersey. Rosengard was a student at the University of Delaware during the relevant time period.

## OTHER RELEVANT ENTITIES

21.     GH3 International, Inc. ("GH3") is a Nevada company based in Las Vegas. It purports to market anti-aging products sold under the name GeroVital H3, supposedly pursuant to a license from the government of Romania. Its stock, which is not registered with the Commission, is quoted on the Pink Sheets.

22.     Asia Global Holdings, Inc. ("Asia Global") is a Nevada company purportedly operating in China with headquarters in Hong Kong. Asia Global purports to be a media company with the rights to "Who Wants to be a Millionaire" in China. Its common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)] and trades on the Over the Counter Bulletin Board.

23.     Playstar Corp. ("Playstar") (f/k/a Playstar Wyoming Holding Corp.) was an Antigua corporation with headquarters in Woodbridge, Ontario. Playstar claimed to be a communications company. During the relevant time period, Playstar's common stock was registered with the Commission under Exchange Act Section 12(g) [15 U.S.C. § 78l(g)] and was quoted on the Pink Sheets. On June 3, 2008, the Commission revoked the registration of Playstar's stock pursuant to Exchange Act Section 12(j) [15 U.S.C. § 78l(j)].

24.     Xtreme Motorsports of California, Inc. ("Xtreme Motorsports") was a Nevada company with headquarters in Bakersfield, California. Xtreme Motorsports claimed to produce "dunebuggies" and "sandcars." Its stock, which was not registered with the Commission, was quoted on the Pink Sheets during the relevant time period. On May 19, 2008, PinkSheets.com suspended quoting the company's stock.

25.     AIS Financial, Inc. (f/k/a Advantage Investment Strategies, Inc.)

6

(hereinafter "AIS") is a registered broker-dealer located in Irvine, California.

26. Market Solutions Limited, Inc. ("Market Solutions") is an entity owned by Defendant Gerard D'Amaro and located in Pompano Beach, Florida.

27. W.S. Trading, Inc. ("W.S. Trading") is an entity owned by Defendant Gerard D'Amaro and located in Pompano Beach, Florida.

28. Tetrix Financial is a Delaware corporation owned by Defendant Pawel Dynkowski.

## FACTS

### GH3 International, Inc.

29. GH3 is a Nevada company that purports to market anti-aging products. The GH3 pump-and-dump scheme occurred in October-December 2006 and generated fraudulent proceeds of $747,609. In late 2006, Brown, Dynkowski, and Canceli attended a meeting at the offices of AIS in California with a representative of GH3. Another representative of GH3 participated in the meeting by telephone. Brown, Dynkowski, Canceli, and the two representatives from GH3 planned the pump-and-dump scheme at this meeting. They agreed that GH3 would issue company stock in 52 million share increments to Canceli for $0.001 per share, with payment due after Dynkowski succeeded in inflating the market price of GH3 stock and selling those shares to unsuspecting investors. Mangiapane, who managed the AIS office, agreed to allow the meeting to be held at AIS's office in exchange for a portion of the proceeds from the pump-and-dump scheme.

30. Dynkowski inflated the market price of GH3 stock through manipulative trading timed to coincide with misleading and touting press releases. Brown helped to

7

coordinate the timing of this manipulative trading with the press releases, by serving as a liaison between Dynkowski and Canceli, who was in contact with representatives of GH3. When the scheme began, GH3 traded for merely four-hundredths of a penny ($0.0004), but the efforts of Dynkowski, Brown and others in the scheme eventually propelled the stock's price to a high of 1.8 cents per share – a gain of more than 4,000 percent.

31.     Representatives of GH3 laid the groundwork for the scheme. On October 30, 2006, they arranged for GH3 to execute a 1 for 20 reverse stock split that reduced the company's outstanding shares by 95%. This move was important because, after the split, the millions of shares issued by the company for Dynkowski to sell later in the scheme represented the vast majority of the company's outstanding stock, and any sales by existing shareholders would have less impact on the stock's price.

32.     Between December 4 and 12, 2006, GH3 transferred 312 million company shares to accounts in Canceli's name at Spartan Securities Group and Bishop Rosen & Co. A representative of GH3 instructed the transfer agent to issue the shares without restrictive legend to an individual known to GH3 representatives from previous dealings (hereinafter "the GH3 Nominee"). GH3 representatives asked the GH3 Nominee to act as a conduit and he agreed to do so.

33.     Under this arrangement, GH3 purportedly sold the shares to an entity owned by the GH3 Nominee on six different occasions, and that company then re-sold the shares to Canceli. These offers and sales of securities were unregistered and not subject to a valid exemption from registration. They were sham transactions intended to evade registration requirements. Everyone involved in these transactions intended for the

8

shares to be sold into the public market as soon as possible (as they in fact were).

34. Starting on December 4, and continuing through December 13, 2006, Dynkowski and others, such as Brown, engaged in manipulative trading of GH3 stock, including using wash sales and matched orders to inflate its price.

35. Dynkowski engaged in wash trading between his own accounts and multiple nominee accounts held in the names of his father, Tetrix Financial (a company Dynkowski owns), and Canceli. Dynkowski also traded matched orders with Brown. These wash sales and matched orders involved hundreds of millions of shares of GH3.

36. This manipulative trading artificially inflated the price of GH3's stock and made it appear to investors that GH3's stock was much more liquid than it really was. As unsuspecting buyers were attracted to GH3 in increasing numbers, the stock's volume and ultimately its price continued to increase.

37. Dynkowski timed his manipulative trading to coincide with touting press releases from the company. At the initial meeting when the GH3 pump-and-dump was planned, representatives of GH3 had promised to "provide news" as part of the scheme. Through Canceli, GH3 representatives coordinated company press releases with Dynkowski and Brown.

38. On December 7, 2006, GH3 issued a press release stating that its 2005 revenues exceeded $2.1 million. The next day, December 8, GH3 issued a second press release stating that its revenues for 2006 exceeded $3 million. Dynkowski timed his manipulative trading with these press releases, and the volume and price of GH3 stock soared. On December 7, for example, the volume of trading in GH3's stock increased over 600% from the prior day, and the price of the stock jumped more than 150% (from

9

0.7 cents to 1.8 cents).

39.    Dynkowski began dumping the shares received from the issuer on December 7 and continued selling for the next several days. Although Dynkowski was not listed as an authorized trader on Canceli's accounts, he placed sell orders directly with Canceli's brokers at Bishop Rosen and Spartan Securities. Between December 7 and December 13, 2006, Dynkowski and Canceli sold all 312 million shares they received from the issuer, generating proceeds of $747,609.

40.    In order to keep the price of the stock up while selling these shares, Dynkowski continued to engage in manipulative trading, and the company issued additional press releases. Indeed, at one point, Dynkowski instructed Brown to have the company issue a press release stating that the company had ordered a non-objecting beneficial owners ("NOBO") list from its transfer agent. The purpose of the "NOBO press release" was to mislead investors into believing that the massive selling of GH3 stock (for which Dynkowski was responsible) was attributable to short sellers. GH3 issued the misleading NOBO press release on December 8, 2006, just as Dynkowski was dumping the shares from Canceli's accounts.

41.    Brown, Canceli, Dynkowski, Mangiapane, Riviello, the GH3 Nominee and GH3 (or its representatives) divided the illicit proceeds from the scheme. Brown, Mangiapane, and Riviello laundered a substantial portion of the money in order to pay Dynkowski.

42.    After Dynkowski finished selling the 312 million shares that Canceli obtained from GH3, representatives of the company continued making additional unregistered offers and sales of GH3 stock through the GH3 Nominee that were not

10

subject to a valid exemption from registration. GH3 representatives authorized the transfer of an additional 988 million shares to the GH3 Nominee, and he sold the bulk of these securities for a few thousandths of a penny per share, realizing approximately an additional $272,000 in proceeds. The GH3 Nominee gave approximately $130,000 of this money to the company and kept the rest for himself.

## Asia Global Holdings, Inc.

43. Matt Brown, Joseph Mangiapane, and Marc Riviello planned the Asia Global pump-and-dump scheme in August 2006 with a representative of Asia Global. They used Dynkowski, whom Brown knew from InvestorsHub.com, to conduct the manipulative trading.

44. In this scheme, as with GH3, Dynkowski and his associates pumped the price of Asia Global's stock through manipulative trading and misleading or touting press releases. Mangiapane and Riviello used their positions as registered representatives at AIS to open a series of nominee accounts for this scheme. Dynkowski and Brown used these nominee accounts to sell millions of shares obtained from the issuer which were purportedly registered on Form S-8. The purpose of Form S-8 (a short form registration statement) is to register an offering of securities by an issuer under an "employee benefit plan." The shares issued in this pump-and-dump scheme did not qualify for registration on Form S-8. Accordingly, this was an unregistered offer and sale of securities that was not subject to a valid exemption from registration.

45. This pump-and-dump scheme occurred in three cycles: August-September 2006, November-December 2006, and January-February 2007. The total proceeds of the fraud were $4,050,529.

11

46. Defendant Nathan Michaud, a trader whom Dynkowski had previously met through InvestorsHub.com, also participated in this scheme. In August and September 2006, Dynkowski and Michaud, as well as others, engaged in wash sales, matched orders, and other manipulative trading to generate phony volume and artificially inflate Asia Global's stock price. When the scheme began, Asia Global traded for approximately 11 cents per share. Starting on August 9, 2006, Dynkowski and Michaud began to pump the stock using wash sales, matched orders, and other manipulative trading. Dynkowski and Michaud continued their manipulative trading through the end of September 2006.

47. This manipulative trading artificially inflated Asia Global's stock price. In the space of thirteen trading days, the price of Asia Global's stock rose from 11.5 cents per share at the close of the market on August 9, 2006, to an intraday high of 41 cents per share on August 25, 2006. Asia Global's daily volume likewise jumped by millions of shares per day during this period.

48. In the midst of the steep climb in its stock price, Asia Global directed its transfer agent on August 21, 2006 to transfer 7.75 million shares purportedly registered on Form S-8 into the nominee accounts at AIS. These 7.75 million shares represented approximately 25% of Asia Global's issued and outstanding shares. Brown and Dynkowski controlled the subsequent sale of these shares by giving sell orders to Mangiapane and Riviello, registered representatives at AIS who knew (or were reckless in not knowing) that these sales were the dump phase of the scheme. Between August 30 and September 5, 2006, they sold 7.75 million shares from the nominee accounts at AIS, resulting in illicit profits of $1,331,118.

12

49. While Dynkowski and Brown were selling shares from the nominee accounts, Dynkowski instructed Brown on August 24, 2006 to have Asia Global issue a press release hyping the company's second quarter 2006 financial results. Dynkowski told Brown to "make it sound good... like AAGH [Asia Global] announces record revenue net profits [sic]" and suggested that the press release state that the company's profits had increased by at least 300%. Dynkowski urged Brown to "make it sound ENORMOUS." On September 1, 2006, two days after Dynkowski and Brown began selling the 7.75 million shares in the nominee accounts, Asia Global issued a press release claiming that its net income for the second quarter of 2006 had increased by 370% compared to its net income in the second quarter of 2005 and that its profits for July 2006 were 745% greater than its profits for July 2005. Dynkowski timed his manipulative trading to coincide with the publication of this press release.

50. The Defendants repeated this scheme with Asia Global in November and December 2006. On October 27, 2006, the company filed another Form S-8 with the Commission. Asia Global thereafter had its transfer agent issue another 25 million shares to most of the same nominee accounts at AIS that were used in the prior round. Again, this was an improper use of a Form S-8. These 25 million shares represented 45% of Asia Global's issued and outstanding shares at the time.

51. In this second cycle of the scheme, Dynkowski again began a manipulative trading campaign using wash sales, matched orders, and other manipulative trading.

52. As in the prior pumps, Dynkowski timed the manipulative trading to coincide with company press releases. He personally wrote press releases for Asia

13

Global during this cycle, including the "Shareholder Update" issued on November 8, 2006. That press release used the same misleading NOBO tactic that Dynkowski used for GH3 one month later, and it also claimed that "July 2006 profits were up 745% over the previous years [sic] July profits." After manipulating the price of the stock, Dynkowski and Brown, through orders submitted to Mangiapane and Riviello, sold the 25 million shares held in the AIS nominee accounts at an average price of about $0.056 per share in November and December 2006. These sales yielded illicit proceeds of $1,485,704.

53. The final cycle of the scheme took place in January and February 2007. On January 31, 2006, Asia Global filed another Form S-8 for 30 million shares. That same day, Asia Global requested that its transfer agent issue 26,500,000 of these shares to largely the same group of nominee accounts at AIS as in the previous two rounds. These transfers, which represented approximately 32.5% of Asia Global's issued and outstanding shares, constituted an improper use of Form S-8.

54. On January 16, 2007, when Asia Global's stock opened at $0.06 per share, Dynkowski and his associates began to manipulate the stock. They matched orders and executed wash sales in order to artificially inflate the stock's price. By the end of January 2007, Asia Global's stock price had more than doubled (with an intraday high of $0.152 on January 23, 2007).

55. Additionally, on February 6, 2007, Asia Global issued a press release claiming that its subsidiary had just received a license to produce 104 episodes of "Who Wants to Be a Millionaire" in China. The volume of trading in Asia Global on February 6 increased by more than 65%. That day alone Dynkowski and Brown, through orders

14

submitted to Mangiapane and Riviello, were able to sell approximately 5.5 million shares held in nominee accounts, representing approximately 25% of the total volume that day.

56.     From February 2 through February 8, Dynkowski and Brown, through orders submitted to Mangiapane and Riviello, sold approximately 24.5 million shares held in the nominee accounts, making illicit profits of $1,233,707.

57.     Brown, Dynkowski, Mangiapane, Michaud, Riviello, and Asia Global (or its representatives) divided the $4 million in illicit proceeds from the scheme.

## Playstar Corp.

58.     The Playstar scheme occurred between October and December 2006 and generated approximately $1,180,294 in illicit profits. Defendant Gerard D'Amaro participated in this scheme with Dynkowski and served as the liaison with the CEO of Playstar. D'Amaro also provided the nominee accounts from which Dynkowski dumped Playstar shares provided by the company.

59.     Starting on October 19, 2006, Dynkowski and others began inflating the price of Playstar stock through manipulative trading, including using wash sales and matched orders accounting for millions of shares in volume. This manipulative trading artificially inflated the company's stock price.

60.     D'Amaro arranged with Playstar's CEO to have the company issue numerous touting or misleading press releases between November 8 and December 20, 2006, which coincided with Dynkowski's manipulative trading and helped further boost the price of the company's stock. Indeed, on November 10, 2006, Playstar used the same misleading NOBO press release tactic that Dynkowski had used days earlier for Asia Global and one month later for GH3. Playstar's NOBO press release misleadingly

15

suggested that "naked short selling" was responsible for an unexplained "large short position" in its stock. In reality, the alleged naked short selling was actually Dynkowski dumping the shares he had received from Playstar.

61. The scheme was successful at dramatically raising Playstar's stock price. On October 18, 2006, the day before Dynkowski and his associates began pumping the stock, it closed at half a penny per share. By November 9, 2006, the stock closed at 12 cents per share, an increase of 2,300%.

62. Between October 18 and December 19, 2006, Playstar arranged for more than 39.6 million shares to be transferred to two accounts that D'Amaro set up at Spartan Securities in the names of Market Solutions and W.S. Trading, entities that D'Amaro owns. At the direction of the company, the transfer agent issued these shares without restrictive legend. These offers and sales of securities were unregistered and not subject to a valid exemption from registration.

63. Dynkowski and D'Amaro controlled the sales from these accounts at Spartan Securities. Although Dynkowski is not listed as an authorized trader on the accounts, he placed the majority of the orders for Playstar stock in the Market Solutions and W.S. Trading accounts. Dynkowski and D'Amaro sold the shares from Playstar in three waves, the first on October 19, 23-27, and 31, 2006, the second on November 15, 16, and 17, 2006, and the third on December 11, 14, 15, 18 and 20, 2006. In total, Dynkowski and D'Amaro sold more than 39.6 million shares of Playstar for a profit of $1,180,294. Dynkowski and D'Amaro divided the illicit gains from this scheme between themselves and Playstar or its representatives.

16

## Xtreme Motorsports Of California, Inc.

64.     Dynkowski worked with Accomplice No. 1 ("AN1"), whom he met
through InvestorsHub.com, to pump and then dump the stock of Xtreme Motorsports in
January and February 2007.  To artificially inflate the price of the stock, Dynkowski and
AN1 engaged in manipulative trading, including wash sales and matched orders.

65.     Through this manipulative trading, Dynkowski and AN1 boosted the price
of the stock from 0.85 cents on February 2, 2007, to a high of 4.1 cents on February 7,
2007 (more than a 380% price increase in a few days).

66.     The dump began on February 7, 2007.  Prior to this date, Xtreme
Motorsports authorized its transfer agent to issue 120 million shares without restrictive
legend to a certain private company ("the Nominee Company").  The transfer agent did
not issue the shares to the Nominee Company, however, and instead issued them to ten
other individuals and entities that the Nominee Company designated.  This offer and sale
of securities was unregistered and not subject to a valid exemption from registration.

67.     Defendant Adam Rosengard received 13 million shares of Xtreme
Motorsports stock as one of these designees, even though he had no contact with the
Nominee Company.  Dynkowski arranged for the shares to be issued to Rosengard, who
gave Dynkowski electronic access to his brokerage account.  Dynkowski sold these
shares on February 7, 2007, generating illicit profits of $257,646.  Rosengard sent the
money to his personal bank account via a series of wire transfers between February 12
and May 7, 2007.  Rosengard withdrew most of this money in small increments of cash,
kept a small amount for himself, and gave the rest to Dynkowski.

17

## FIRST CLAIM

### Violations of Section 17(a) of the Securities Act

### (Defendants Dynkowski, Brown, Canceli, D'Amaro, Mangiapane, Michaud, and Riviello)

68. Paragraphs 1 – 67 are hereby incorporated by reference.

69. Defendants Dynkowski, Brown, Canceli, D'Amaro, Mangiapane,

Michaud, and Riviello knowingly or recklessly, directly or indirectly, in the offer and sale
of securities, by the use of any means or instruments of transportation or communication
in interstate commerce, or by the use of the mails:

- a. employed devices, schemes or artifices to defraud;

- b. obtained money or property by means of any untrue statements of
     material fact, or have omitted to state material facts necessary in
     order to make the statements made, in light of the circumstances
     under which there were made, not misleading; and/or

- c. engaged in transactions, practices, or courses of business which
     operated or would operate as a fraud or deceit upon the purchasers
     of securities.

70. By engaging in the foregoing conduct, Defendants Dynkowski, Brown,
Canceli, D'Amaro, Mangiapane, Michaud, and Riviello violated, and unless restrained
and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §
77q(a)].

18

## SECOND CLAIM

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

#### (Defendants Dynkowski, Brown, Canceli, D'Amaro, Mangiapane, Michaud, and Riviello)

71.     Paragraphs 1 – 70 are hereby incorporated by reference.

72.     Defendants Dynkowski, Brown, Canceli, D'Amaro, Mangiapane,

Michaud, and Riviello knowingly or recklessly, in connection with the purchase or sale

of securities, directly or indirectly, by the use of any means or instrumentality of

interstate commerce, or of the mails, or of any facility of a national securities exchange:

> a.  employed devices, schemes or artifices to defraud;
>
> b.  made untrue statements of material fact, or omitted to state
>     material facts necessary in order to make the statements made, in
>     light of the circumstances under which there were made, not
>     misleading; and/or
>
> c.  engaged in acts, practices, or courses of business which operated or
>     would operate as a fraud or deceit upon any person in connection
>     with the purchase or sale of any security.

73.     By engaging in the foregoing conduct, Defendants Dynkowski, Brown,

Canceli, D'Amaro, Mangiapane, Michaud, and Riviello violated, and unless restrained

and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## THIRD CLAIM

### Violations of Sections 5(a) and (c) of the Securities Act

### (Defendants Dynkowski, Brown, Canceli, D'Amaro, Mangiapane, Riviello, and Rosengard)

74.     Paragraphs 1 – 73 are hereby incorporated by reference.

75.     As described above, Defendants Dynkowski, Brown, Canceli, D'Amaro,

Mangiapane, Riviello, and Rosengard directly or indirectly, by the use of the means or

instruments of transportation or communication in interstate commerce or by the use of

the mails: (a) without a registration statement in effect as to the securities, sold such

securities through the use or medium of a prospectus or otherwise, or carried or caused to

be carried such securities for the purpose of sale or for delivery after sale; or (b) offered

to sell or offered to buy through the use or medium of a prospectus or otherwise securities

as to which a registration statement had not been filed.

76.     By engaging in the conduct described above, Defendants Dynkowski,

Brown, Canceli, D'Amaro, Mangiapane, Riviello and Rosengard violated, and unless

restrained and enjoined will continue to violate, Sections 5(a) and (c) of the Securities

Act [15 U.S.C. § 77e(a) & (c)].

## FOURTH CLAIM

### Violations of Exchange Act Section 13(d) and Rules 13d-1 and 13d-2 Thereunder

### (Defendants Dynkowski and Brown)

77.     Paragraphs 1 – 76 are hereby incorporated by reference.

78.     The common stock of Asia Global at all relevant times was registered

pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l].

20

79.    Pursuant to Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 [17 C.F.R. §§ 240.13d-1 and 240.13d-2], persons who are directly or indirectly the beneficial owners of more than five percent of the outstanding shares of a class of voting equity securities registered under the Exchange Act are required to file a Schedule 13D within ten days of the date in which their ownership exceeds five percent and to notify the issuer and the Commission of any material increases or decreases in the percentage of beneficial ownership by filing an amended Schedule 13D. The Schedule 13D filing requirement applies both to individuals and to two or more persons who act as a group for the purpose of acquiring, holding or disposing of securities of an issuer.

80.    As described above, Defendants Brown and Dynkowski at all relevant times acted as a group, for purposes of Exchange Act Section 13(d) and the Schedule 13D filing requirement, in acquiring, beneficially owning, and then disposing of more than five percent of Asia Global's common stock. Brown and Dynkowski together beneficially owned all of the Asia Global shares held in nominee accounts at AIS because they each had the power to dispose of these shares.

81.    Accordingly, Brown and Dynkowski were each under an obligation to file with the Commission true and accurate reports with respect to their ownership and subsequent sales of the Asia Global shares, pursuant to Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 [17 C.F.R. §§ 240.13d-1 and 240.13d-2]. Neither Brown nor Dynkowski did so.

82.    By reason of the foregoing, Defendants Brown and Dynkowski violated, and unless restrained and enjoined will continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 [17 C.F.R. §§ 240.13d-1 and

21

240.13d-2].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

a) permanently enjoin Defendants Dynkowski and Brown from engaging in future conduct in violation of Exchange Act Sections 10(b) and 13(d) [15 U.S.C. §§ 78j(b) & 78m(d)], Rules 10b-5, 13d-1 and 13d-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 & 240.13d-2], and Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c) & 77q(a)];

b) permanently enjoin Defendants Canceli, D'Amaro, Mangiapane, and Riviello from engaging in future conduct in violation of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c) & 77q(a)];

c) permanently enjoin Defendant Michaud from engaging in future conduct in violation of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Securities Act Section 17(a) [15 U.S.C. § 77q(a)];

d) permanently enjoin Defendant Rosengard from engaging in future conduct in violation of Securities Act Sections 5(a) and (c) [15 U.S.C. §§ 77e(a) & (c)];

e) order Defendants Dynkowski, Brown, Canceli, D'Amaro, Mangiapane, and Riviello to pay civil penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

f) order Defendant Michaud to pay civil penalties under Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

g) order Defendant Rosengard to pay civil penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)];

h) order Defendants Dynkowski, Brown, Canceli, D'Amaro, Mangiapane, Michaud, Riviello, and Rosengard to disgorge, with prejudgment interest, any ill-gotten gains and provide an accounting of monies they received;

i) prohibit Defendants Dynkowski, Brown, Canceli, and D'Amaro from engaging in any offering of penny stock pursuant to Securities Act

Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)];

j)  prohibit Defendant Rosengard from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)]; and

k)  grant such other relief as this Court may deem just and proper.

Respectfully submitted,

Local Counsel:

Seth Beausang D.E. I.D. No. 4071
Assistant U.S. Attorney
U.S. Attorney's Office
District of Delaware
1007 N. Orange Street
Wilmington, D.E. 19801

Paul W. Kisslinger
Frederick L. Block
Robert B. Kaplan
Brian O. Quinn
Antony Richard Petrilla

Attorneys for Plaintiff

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4030
202-551-4427 (tel) (Kisslinger)
202-772-9246 (fax) (Kisslinger)

Dated: May 20, 2009

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

≡ 0 9 - 3 6 1

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

SECURITIES AND EXCHANGE COMMISSION

## DEFENDANTS

PAWEL P. DYNKOWSKI, MATTHEW W. BROWN, JACOB CANCELI, GERARD J. D'AMARO, JOSEPH MANGIAPANE, JR., NATHAN M. MICHAUD, MARC J. RIVIELLO, ADAM S. ROSENGAR

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   New Castle Cty., Delaware
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Paul W. Kisslinger, Frederick L. Block, Securities and Exchange Commission, 100 F Street, N.E. Washington, D.C. 20549-4030, 202-551-4427

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | | |
|---|---|---|
| ☒ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                         and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation |

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Section 5(a), 5(c), 17(a) Securities Act 1933; Sections 10(b), 13(d) Securities Exchange Act 1934

Brief description of cause:
Violations of the U.S. Securities laws through penny stock manipulations.

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No |
|---|---|---|---|

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 05/18/2009 | Paul W. Kiss |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____