*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CREIGHTON TAKATA, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>    v.<br><br>RIOT BLOCKCHAIN, INC. F/K/A BIOPTIX, INC., JOHN O'ROURKE, JEFFREY G. MCGONEGAL, BARRY HONIG, CATHERINE DEFRANCESCO, MICHAEL BEEGHLEY, JOHN STETSON, MARK GROUSSMAN, ANDREW KAPLAN, MIKE DAI, JASON LES, and ERIC SO,<br><br>                Defendants. | Civ. Action No. 18-02293 (FLW)<br><br>**OPINION** |

## WOLFSON, Chief Judge:

This is a putative class action brought by shareholders against defendants Riot Blockchain, Inc. ("Riot") and certain of Riot's officers, directors and individual investors (collectively with Riot, "Defendants"). The lead plaintiff, Dr. Stanley Golovac ("Plaintiff"), alleges that he, and other shareholders, purchased Riot's stock between April 20, 2017, and September 6, 2018 (the "Class Period"), and asserts that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated under that statute, 17 C.F.R. § 240.10b-5. Plaintiff also asserts that several individual Defendants are vicariously liable under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The thrust of Plaintiff's complaint (the "Complaint") is that Defendants, acting as members of a group, participated in a "pump-and-dump" scheme to (1) amass a controlling interest in Riot; (2) conceal their control; (3)

inflate the price and trading volume of Riot's stock through manipulative trading, promotional activity, and false and misleading disclosures; (4) engage in undisclosed related-party transactions with Riot; and (5) dump their shares on unsuspecting retail investors.  (*See* Corrected Consolidated Amended Complaint ("CCAC") ¶ 1, ECF No. 73.)

Presently before the Court are seven separate motions brought by Defendants to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.[1]  For the reasons set forth below, Defendants' motions to dismiss are **GRANTED**, and the Complaint is dismissed, without prejudice.[2]  Plaintiff's generalized request for leave to amend is denied at this time; however, Plaintiff may file a separate motion seeking leave to amend his complaint in a manner consistent with this Opinion.

## I.     BACKGROUND

The following facts are drawn from the allegations in the Complaint and are accepted as true for the purposes of the present motion.[3]

---

[1]      The separate motions are as follows: ECF No. 107 by Riot Blockchain, Inc., Michael Beeghley, John O'Rourke, and Jeffrey McGonegal; ECF No. 108 by Andrew Kaplan, Eric So, and Jason Les; ECF No. 112 by Catherine DeFrancesco; ECF No. 118 by Barry Honig; ECF No. 131 by Mark Groussman; ECF No. 132 by Mike Dai; and ECF No. 134 by John Stetson.

[2]      Defendants have separately filed a motion to strike certain allegations and images in the Complaint pursuant to Rules 12(f) and 10(c) of the Federal Rules of Civil Procedure.  (*See* ECF No. 111.)  Because the Court is dismissing the Complaint in its entirety, Defendants' motion to strike is **DENIED** as moot.

[3]      In his papers in opposition to the present motions, Plaintiff refers to numerous facts and other matters that are contained within a supporting declaration filed by his counsel.  (*See* Decl. of Joseph J. DePalma ("DePalma Decl."), ECF No. 136-1.)  Defendants move to strike this declaration, arguing that the declaration "refer[s] to matters outside the pleadings, which cannot be relied on when opposing a motion to dismiss."  (Defs. Mot. to Strike, ECF No. 144-1, at 2.)  In response, Plaintiff contends that Defendants' motion to strike should be denied because "many of the exhibits attached to the [d]eclaration are expressly incorporated by reference in the Complaint" and "the [d]eclaration and its exhibits are not offered to amend the Complaint's factual allegations or provide 'supplemental factual averments.'"  (Pl. Opp. to Mot. to Strike, ECF No. 154, at 3.)  Plaintiff's assertions are incorrect.  As an initial matter, the vast majority of the exhibits attached to the declaration are documents that are not referenced anywhere in the complaint.  (*See* DePalma Decl., ECF No. 136-1, Exs. 3, 5-14, 17, 19-23, 26-27, 30-32, 34, 36-47.)  Moreover, the declaration is clearly an attempt to provide supplemental factual averments that are not alleged in the

*(Footnote continued on the next page.)*

**A.      Defendants, the Honig Group, and Their *Modus Operandi***

Riot is a publicly traded corporation on NASDAQ that supports and operates blockchain technologies.  (CCAC ¶ 21.)  Plaintiff has sued certain of Riot's officers and directors.  Defendant Michael Beeghley was Chairman of Riot from January 2017 until November 2017; CEO of Riot from April 2017 until November 2017; and served on the Board of Directors of Riot from November 2016 until November 2017.  (CCAC ¶ 25.)  Defendant John O'Rourke was Chairman and CEO of Riot from November 3, 2017 until September 8, 2018.  (CCAC ¶ 23.)  Defendant Jeffrey McGonegal was CFO of Riot from 2003 until April 30, 2018; and subsequently served as a consultant to Riot for four months.  (CCAC ¶ 30.)  Defendants Andrew Kaplan, Eric So, Jason Les, and Mike Dai, are former or current members of the Board of Directors of Riot.  (CCAC ¶¶ 28-29, 31-32.)

The Complaint also names as defendants several individual investors in Riot who did not serve as officers or directors.  In 2016, defendant Barry Honig first acquired a position in Riot when it was a biomedical company operating under a different name.  (CCAC ¶¶ 22, 47, 130.)  The Complaint alleges that, as Riot transitioned from a biomedical company to a provider of blockchain technologies, Honig led a group of investors, including defendants Catherine DeFrancesco, Mark Groussman, John Stetson, and others, into acquiring stakes in Riot.  (CCAC

---

Complaint.  Finally, while the Court may take judicial notice of certain publicly available documents, such as SEC filings and court filings, it may only do so to establish the existence of those records and the statements contained therein, and not (as Plaintiff asks the Court to do) for the truth of the matter asserted in those documents.  *See Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 292 (D.N.J. 2009) (Wolfson, J.) (citations omitted); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).  Accordingly, Defendants' motion to strike is **GRANTED**, and the Court will not consider Plaintiff's declaration for the purposes of deciding the pending motions to dismiss.  *See Foster v. Crestwood Sch. Dist.*, 2017 WL 1078195, at *5 (M.D. Pa. Mar. 22, 2017) (rejecting consideration of a plaintiff's declaration submitted in support of her opposition to a motion to dismiss); *Steinagel v. Valley Oral Surgery*, 2013 WL 5429269, at *5 (E.D. Pa. Sept. 30, 2013) (striking plaintiff's declaration which supplemented her factual averments in response to a motion to dismiss).

¶¶ 24, 26, 27, 57-58, 62, 71, 79, 128-153.)  The Complaint alleges that these individuals—which the Complaint refers to as the "Honig Group" (CCAC ¶ 79)—then, via "manipulative trading, promotional activity, and false and misleading disclosures," inflated the price of Riot's shares. (CCAC ¶ 1.)  Finally, the Complaint alleges that the Honig Group sold their holdings as the market became aware of Defendants' scheme and as Riot's stock price began to fall in early 2018.  (CCAC ¶¶ 163-64, 307-309, 329.)

Plaintiff alleges that Defendants' scheme closely mirrors the same *modus operandi* that the Securities and Exchange Commission ("SEC") has alleged, in a pending civil action in the Southern District of New York, that members of the Honig Group perpetrated at multiple other public companies.[4]  (CCAC ¶¶ 80-153, 201-203.)  Relying heavily on the allegations in the SEC's complaint, Plaintiff sets forth the prior involvement of defendants Honig, O'Rourke, Groussman, Stetson, and other members of the Honig Group in at least seven additional companies: Biozone, MGT, MabVax, PolarityTE, Pershing Gold, MUNDOmedia, and Marathon.  (CCAC ¶¶ 81-102, 105-115, 119-127.)  According to the Complaint in this action, in each instance, members of the Honig Group engaged in similar schemes to "pump-and-dump" the stock of those companies. (CCAC ¶ 80.)  As of the time of the filing of the Complaint, several of the individuals charged by the SEC had settled those charges.  (CCAC ¶¶ 14, 370-72, 394.)[5]

---

[4]    The SEC's civil action against members of the Honig group is captioned *SEC v. Honig, et al.*, No. 1:18-cv-08175 (S.D.N.Y.) and was originally filed on September 7, 2018.  (*See* CCAC ¶¶ 81, 357.)  The SEC's complaint was subsequently amended on March 8, 2019.  (*See* CCAC ¶ 81 (citing SEC's First Amended Complaint ("SEC Am. Compl."), ¶ 373).)

[5]    The Complaint in this action alleges that defendant Groussman settled with the SEC on January 18, 2019.  (CCAC ¶ 372; *see also SEC v. Honig, et al.*, No. 1:18-cv-08175 (S.D.N.Y.), ECF No. 93.)  Since the filing of the Complaint, it also appears that defendants Honig, Stetson, and O'Rourke have settled with the SEC.  (*See SEC v. Honig, et al.*, No. 1:18-cv-08175 (S.D.N.Y.), ECF Nos. 152, 227, and 228.)  Each of the settlements contains a statement that they were "consented to . . . without admitting or denying the allegations of the [SEC's] [c]omplaint."  (*Id.*, ECF Nos. 93 at 1, 152 at 1, 227 at 1, and 228 at 1.)

### B.    The Honig Group's Acquisition of Control of Riot

Plaintiff alleges that Riot began in the early 2000s as a biomedical company, attempting to develop a blood test for use in the diagnosis and treatment of acute appendicitis.  (CCAC ¶ 128.) According to the Complaint, it never achieved success in that field and, in 2015, the FDA declared that Riot's blood test did not meet or exceed the current standard of care, leaving it with no viable product.  (CCAC ¶ 129.)  As Riot searched for a new business model, in September 2016, defendants Honig and DeFrancesco allegedly wrote a letter to Riot's then-CEO, Stephen Lundy, "touting their combined 16.2%" stake and expressing their dissatisfaction with Riot's direction. (CCAC ¶¶ 132, 134.)  The Complaint also alleges that Honig spoke several times with members of Riot's then-existing Board of Directors.  (CCAC ¶ 132.)  During those phone conversations, Honig allegedly implied that he had control of 40% of Riot's shares through his stock ownership and the stock ownership of Honig's friends and relatives.  (*Id.*)

According to the Complaint, in late 2016, Honig initiated a proxy fight, and filed a lawsuit to force a shareholder meeting.  (CCAC ¶¶ 135, 137.)  Three of Riot's directors resigned in early 2017 (CCAC ¶ 138), and were replaced by defendants Beeghley, O'Rourke and Dai.  (CCAC ¶¶ 29, 137, 139.)  In April of 2017, Lundy resigned as CEO and was replaced by Beeghley.  (CCAC ¶¶ 25, 142.)  The Complaint alleges that, by exercising warrants and converting notes, Honig and his associates soon obtained a controlling stake of Riot's outstanding shares.  (CCAC ¶¶ 214 fn. 23, 224 fn. 25, 229 fn. 26, 234 fn. 27, 139-41, 144-153.)

### C.    Riot's Pivot to Blockchain and Cryptocurrency Technologies

While Riot had neither a product nor revenue following Honig's proxy fight, the Complaint alleges that it had "plenty of cash" from a $20 million stock offering in 2014.  (CCAC ¶¶ 4-5, 129-30.)  With no viable path forward as a biomedical company, Riot explored various strategic alternatives.  On October 4, 2017, Riot announced that it would pivot its business to blockchain

and cryptocurrency technologies.  (CCAC ¶ 166.)  Riot simultaneously announced that it was changing its name to "Riot Blockchain, Inc." (from its former name, "Bioptix, Inc.") to reflect its new business focus.  (*Id*.)  Riot stated that it would pursue its new strategy for building shareholder value and future prospects by pursuing "acquisitions of businesses serving the blockchain ecosystem."  (*Id*.)  Riot then used a portion of its cash holdings and stock to acquire or invest in companies in the blockchain space and to purchase computer equipment used to perform Bitcoin mining.  (CCAC ¶¶ 166, 169, 172, 182, 186, 195, 279.)

On September 29, 2017, five days before announcing its pivot towards blockchain and cryptocurrency, Riot announced that it had made a strategic investment in Coinsquare, Ltd. ("Coinsquare"), a Canadian cryptocurrency exchange.  (CCAC ¶ 166.)  After changing its name to Riot Blockchain, on October 16, 2017, Riot acquired approximately fifty-two percent of Tess, Inc. ("Tess"), a Canadian company, which developed blockchain solutions for telecommunications companies.  (CCAC ¶ 169.)  Then, on November 3, 2017, Riot announced that it had acquired Kairos Global Technology, Inc. ("Kairos"), a Nevada cryptocurrency mining company.  (CCAC ¶¶ 172, 175.)

On November 16, 2017, Riot announced that it had made a strategic investment in Verady, LLC ("Verady"), a company providing cryptocurrency accounting and audit technology services.  (CCAC ¶ 279.)  On December 4, 2017, Riot announced that its investment in Coinsquare had more than tripled.  (CCAC ¶ 182.)  Subsequently, on December 11, 2017, Riot announced that Tess had agreed to merge with Cresval Capital Corp. ("Cresval"), a Canadian mining company, and would be publicly traded on the TSX Venture Exchange.  (CCAC ¶¶ 186-87.)  On February 16, 2018, Riot announced that Kairos had purchased 3,800 cryptocurrency mining computers in

exchange for $11 million and 1 million shares of Riot's restricted common stock from Prive Technologies LLC ("Prive").  (CCAC ¶ 195.)

### D.      False and Misleading Statements and Omissions and Other Deceptive Conduct

Plaintiff alleges that, during the Class Period, Riot made various materially false and misleading statements and omissions, and engaged in other deceptive conduct, in violation of Section 10(b) of the Exchange Act and Rule 10(b)(5).  (CCAC ¶ 209.)  According to the Complaint, these allegedly false and misleading statements and omissions, and other deceptive conduct, took the form of: (1) statements in Riot's securities registration statements (Form S-3) that denied the existence of "material relationships" between Riot and selling stockholders (CCAC ¶¶ 210-14, 220-34, 309-12, 322-25); (2) statements in Riot's proxy statements (Form DEF 14A) that concerned the absence of "related-party transactions" between Riot and the counterparties to those transactions (CCAC ¶¶ 292-93, 346-47); (3) press releases and similar statements that publicly touted Riot's investments in blockchain technologies and cryptocurrency (CCAC ¶¶ 239-68, 275-291, 295-298, 316-318, 326-328, 340-345); and (4) undisclosed purchases and sales of stock in Riot by certain investors who had amassed substantial stakes in the company.  (CCAC ¶¶ 160-64, 193, 307, 329-331, 337, 386.)

### E.      Public Revelations and Drops in Riot's Stock Prices

Beginning in December of 2017, a series of news outlets and investment analysts began reporting on their suspicions of an alleged pump-and-dump scheme being perpetrated at Riot. Meanwhile, other public disclosures near the same time served to reinforce those suspicions. Plaintiff alleges in the Complaint that, following each of those revelations, Riot's stock price dropped precipitously.

On December 19, 2017, CNBC interviewed a securities analyst, who stated that Riot "ha[s] a few small investments, just enough to go ahead and put it public.  And they roll it out, and with

enough promotion, and obviously with the hype behind crypto and the lack of assets, there it goes. The whole time really misrepresenting the fact that nothing that they have is [ ] a real player in the crypto industry." (CCAC ¶ 299.) The securities analyst further noted: "If you want to talk about people front running the stock before they make announcements, I'm sure you could look at that." (*Id.*) The Complaint alleges that, in response, Riot's stock price declined by 6.42% between December 19, 2017 and December 20, 2017. (CCAC ¶¶ 300, 398.)

On December 22, 2017, Business Insider reported that Riot was "on the hunt for a chief technology officer, according to a job posting on LinkedIn," but that "a technical background in cryptocurrencies is not required." (CCAC ¶ 302.) The Complaint alleges that Riot's shares declined by 34.75% between December 20, 2017 and December 22, 2017. (CCAC ¶¶ 304, 399.)

On December 27, 2017, Riot abruptly canceled its scheduled annual shareholder meeting. (CCAC ¶ 305.) Then, on January 2, 2018, Reuters reported that O'Rourke had sold more than 30,000 shares of Riot's stock on December 29, 2017. (CCAC ¶ 307.) Also on January 2, 2018, the Motley Fool published an article opining that O'Rourke's "sales were curious timed" and referring to his trading "activity as a 'Friday night dump,' a common practice of releasing otherwise newsworthy information at a time when people are least likely to be paying attention." (*Id.*) The Complaint alleges that Riot's shares declined by 14.45% between December 29, 2017 and January 3, 2018. (CCAC ¶¶ 308, 400.)

On January 31, 2018, The Wall Street Journal published an article about Riot and Honig. (CCAC ¶ 319.) On that same day, Riot again canceled its already-delayed annual shareholder meeting. (CCAC ¶ 320.) The Complaint alleges that Riot's share price declined by 14.26% between January 30, 2018 and February 1, 2018. (CCAC ¶¶ 321, 402.)

On February 13, 2018, Honig disclosed in a filing with the SEC that he had sold all but 1.47% of his shares of Riot's stock. (CCAC ¶¶ 329-31.) Notably, the Complaint does not allege whether there was any drop in Riot's share price in response to this disclosure.

On February 16, 2018, CNBC published an article entitled "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket" regarding questionable practices at Riot. (CCAC ¶ 337.) On that same day, CNBC also published a video entitled "CNBC Investigates: Red Flags Raised Over Riot Blockchain." (CCAC ¶¶ 332-36.) In the video, CNBC reported that "as Riot was issuing press release after press release promising great plans for the company, Honig was selling, making millions of dollars along the way." (CCAC ¶ 336.) CNBC also reported that Honig "acknowledged," in an interview with the news outlet, that "he's done this before. Five years ago he and John O'Rourke were involved in another company that changed its business model to blockchain. That stock also skyrocketed. Today it's trading around two bucks a share." (CCAC ¶ 335.) The Complaint alleges that, as the market reacted to CNBC's reporting, Riot's share price declined by 33.4%. (CCAC ¶¶ 195, 338, 403.)

On April 9, 2018, the SEC issued a subpoena to Riot pursuant to a formal order of investigation. (CCAC ¶ 404.) Plaintiff alleges that, following disclosure of the subpoena in Riot's annual report on April 17, 2018, Riot's share price declined by 5.9%. (*Id.*)[6]

On September 7, 2018, the SEC filed the civil action in the Southern District of New York, implicating members of the Honig Group in pump-and-dump schemes at multiple other public

---

[6]     As of the filing of the Complaint in this action, the SEC's investigation into Riot was still ongoing. However, Defendants have subsequently informed the Court, in the form of two separate motions for leave to file sur-replies, that the SEC has determined not to recommend any enforcement action against Riot. (*See* ECF No. 161, 162.) The status of the SEC's investigation does not factor into the Court's analysis in this Opinion. Nevertheless, I find that Defendants' motions for leave to file sur-replies are brought on proper grounds, *i.e.*, to inform the Court of newly available information pertaining to their motions to dismiss. Accordingly, Defendants' motions for leave to file sur-replies are **GRANTED**.

companies.  (CCAC ¶¶ 357-60.)  On the next day, September 8, 2018, Defendant O'Rourke resigned as CEO of Riot.  (CCAC ¶ 203.)  The Complaint alleges that the price of Riot's shares declined by either 24.2% or 26.1% between September 6, 2018 and September 7, 2018.  (CCAC ¶¶ 203, 405.)[7]

### F.    Plaintiff's Claims

Plaintiff asserts three separate counts in the Complaint.  Count I alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5, subsection (b), against Riot, O'Rourke, McGonegal, Beeghley, Kaplan, and So.  Plaintiff claims that these particular defendants knowingly or recklessly issued materially false and misleading statements in Riot's securities registration statements and proxy statements, which artificially inflated the price of Riot's stock.  (CCAC ¶¶ 421-430.)

Count II alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5, subsections (a) and (c), against all Defendants.  Plaintiff claims that Defendants "carried out a plan, scheme, and course of conduct which was intended to . . . (i) deceive the investing public . . . (ii) enable Riot to artificially inflate the price of [Riot]'s common stock; and (iii) cause [P]laintiff and other members of the Class to purchase Riot's common stock at artificially inflated prices."  (CCAC ¶¶ 431-434.)

Count III asserts liability under Section 20(a) of the Exchange Act against O'Rourke, McGonegal, Beeghley, Kaplan, and So.  Plaintiff claims that they are vicariously liable as "controlling persons" for any materially false and misleading statements made by Riot.  (CCAC ¶¶ 435-440.)

---

[7]    I note that the Complaint gives inconsistent figures for the decline in Riot's stock price between September 6, 2018 and September 7, 2018.  (*Compare* CCAC ¶ 203 (alleging a decline of 24.2%) *with* CCAC ¶ 405 (alleging a decline of 26.1%).)

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This "plausibility standard" requires that the plaintiff allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). However, courts are "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (citation omitted). In deciding a Rule 12(b)(6) motion, although "a district court . . . may not consider matters extraneous to the pleadings," the court may consider documents that are "*integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted) (emphasis in original); *see also In re Donald J. Trump*

*Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 368 n. 9 (3d Cir. 1993) (stating that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document") (citation omitted).

### B.      Rule 9(b)

"Independent of the standard applicable to Rule 12(b)(6) motions," Rule 9(b) of the Federal Rules of Civil Procedure "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). Rule 9(b) states, in pertinent part: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this heightened pleading standard, a plaintiff must state the circumstances of its alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004) (alteration in original)). Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* (citing *Lum*, 361 F.3d at 224). The Third Circuit has further explained that, at a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 217).

### C.      PSLRA

In addition to the plausibility analysis under Rule 12(b)(6) and the heightened pleading requirements of Rule 9(b), Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C § 78u, *et seq.*, to require an even higher pleading standard for plaintiffs

bringing private securities fraud actions.  *See In re Suprema*, 438 F.3d at 276.  This heightened

pleading standard is targeted at preventing abusive securities litigation.  *See Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007) (stating that the PSLRA was "[d]esigned to curb

perceived abuses of the § 10(b) private action—nuisance filings, targeting of deep-pocket

defendants, vexatious discovery requests and manipulation by class action lawyers") (citations and

internal quotation marks omitted).

The PSLRA's heightened pleading standard has two distinct requirements.  First, the

complaint must "specify each statement alleged to have been misleading, the reason or reasons

why the statement is misleading, and, if an allegation regarding the statement or omission is made

on information and belief, the complaint shall state with particularity all facts on which that belief

is formed."  15 U.S.C. § 78u-4(b)(1).  Second, the complaint must, "with respect to each act or

omission alleged to violate this chapter, state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).

Both provisions require that facts be pleaded "with particularity."  *See Institutional Inv'rs Grp. v.*

*Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (stating that "Rule 9(b)'s particularity requirement

is comparable to and effectively subsumed by the requirements of . . . the PSLRA") (citations and

internal quotation marks omitted).  Furthermore, under the second requirement, a "strong

inference" exists "only if a reasonable person would deem the inference of scienter cogent and at

least as compelling as any opposing inference one could draw."  *Tellabs*, 551 U.S. at 324 (2007).

## III.  <u>DISCUSSION</u>

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with

the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the Commission may prescribe. . . ."  Exchange Act

§ 10(b), codified at 15 U.S.C § 78j(b).  To implement Section 10(b), the SEC enacted Rule 10b-5, which makes it unlawful:

(a)     To employ any device, scheme, or artifice to defraud,

(b)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security, in connection with the purchase or sale of any security.

17 CFR § 240.10b-5.  There are two categories of claims that can give rise to liability under Section 10(b) and Rule 10b-5: (1) claims under subsection (b) of Rule 10b-5 for misrepresentations or omissions of material facts, and (2) claims under subsections (a) and (c) of Rule 10b-5 for deceptive or manipulative acts.  *See In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 645 (3d Cir. 2011), *abrogated on other grounds*, 568 U.S. 455 (2013).  In this case, the Complaint asserts claims from both categories.

### A.     Count I – Fraudulent Statement Liability under Section 10(b)

Count I of the Complaint alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5, subsection (b), against Riot, O'Rourke, McGonegal, Beeghley, Kaplan, and So.[8]  Rule 10b-5(b), states that "[i]t shall be unlawful . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 CFR § 240.10b-5.  To state a claim under Rule 10b-5(b), Plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

---

[8]     In this subsection of the Opinion addressing Count I, the term "Defendants" is used to refer only to these six defendants against whom Count I is asserted, and not to any of the other named defendants.

omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (quoting *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

In their motions to dismiss Count I, Defendants contend, *inter alia*, that the Complaint fails to plead any actionable misrepresentation or omission (*i.e.*, the first element). (Defs. Br., ECF 107-1, at 10-26.) In response, Plaintiff points to three categories of statements that he contends are adequately alleged to have been materially false or misleading. (See Pl. Opp., ECF No. 136, at 27-40.) In the first category, Plaintiff asserts that statements in Riot's securities registration statements (Form S-3), which denied the existence of "material relationships," were false or misleading. (*See* Pl. Opp., ECF No. 136, at 27-32.) In the second category, Plaintiff contends that statements in Riot's proxy statements (Form DEF 14A), which concerned the absence of any "related-party transactions," were false or misleading. (*See id*. at 32-36.) In the third category, Plaintiff contends that Riot's press releases and other public statements, which touted Riot's investments in blockchain technologies and cryptocurrency, were false and misleading. (*See id*. at 36-40.)[9] I have examined all three categories of statements and find, for the reasons set forth below, that Plaintiff has failed to adequately allege that those statements were false or misleading, or are otherwise actionable under Rule 10b-5.

A misrepresentation or omission of fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision, and there

---

[9]     In addition to these three categories of alleged misrepresentations, Plaintiff also claims, in a footnote to his opposition papers, that O'Rourke and McGonegal's SOX certifications in Riot's Form S-3s were false. (Pl. Opp., ECF No. 136, at 40 fn. 47.) Plaintiff's SOX argument is premised on the assumption that the Complaint has adequately alleged that Riot's Form S-3s contained false or misleading statements. However, because I find that Plaintiff has not, in fact, identified any false or misleading statements in Riot's Form S-3s, I necessarily find that Plaintiff's SOX argument also fails.

is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted); *see also Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000).  Additionally, because materiality is a mixed question of law and fact, "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law."  *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992) (citation omitted).

However, regardless of whether a piece of information is material, Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  Rather, "[d]isclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'"  *Id.* (quoting 17 C.F.R. § 240.10b-5(b)).  Thus, "[e]ven with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market."  *Id.*, 563 U.S at 45.  As the Third Circuit has explained, "[e]ven non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information."  *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000).  The duty to disclose arises "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure."  *Id*. at 285-86.

### 1.    Statements in Riot's Registration Statements (Form S-3) About "Material Relationships"

Plaintiff alleges that, in April, July, August, and September 2017, and again in January and February 2018, Riot made false and misleading statements in multiple securities registration

statements on Form S-3 in order for members of the Honig Group to sell millions of shares of Riot's stock to unsuspecting retail investors.  (CCAC ¶¶ 210-14, 220-34, 309-12, 322-25.)  Each Form S-3 disclosed that the "selling stockholders" intended to register and sell some or all of their common stock.  (*Id.*)  In addition, each Form S-3 disclosed to potential purchasers that "none" of the selling stockholders had a "material relationship, with us or any of our subsidiaries . . . other than as a result of the ownership of our shares or other securities."  (*Id.*)  According to the Complaint, those statements were false because, at the time they were made, various members of the Honig Group—who were "selling stockholders" in each of the registered offerings—allegedly maintained financial ties to defendant O'Rourke, a Board member of Riot during this time, and defendant Beeghley, then-CEO of Riot.  (*Id.*)

In their motion papers, Defendants argue that Plaintiff misinterprets the language of the Form S-3s.  Defendants note that "us" is explicitly defined in the Form S-3s to include only "the Company," *i.e.*, Riot, "unless the context otherwise requires."  (*See* Defs. Br., ECF No. 107-1, at 12 (citing Zaccaro Decl., ECF No. 110, Ex. G at 2 (excerpting Riot's Form S-3).)  Defendants argue that the context of the challenged statements—that none of the selling stockholders had a material relationship with "us or any of *our subsidiaries*" other than as a result of the ownership of "*our shares or other securities*"—not only does not require Plaintiff's interpretation, but renders such an interpretation unreasonable.  (*Id.*)  The challenged statements in Riot's Form S-3s clearly refer only to Riot, Defendants argue, because members of the board of directors are not issuers of securities nor do they have any subsidiaries.  (*Id.*)

In response, Plaintiff does not directly address the language in the registration statements. Instead, Plaintiff refers the Court to Item 404 of Regulation SK, which addresses the need for disclosure of a transaction with a company when the company's directors or officers have a

material interest in the transaction, *i.e.*, a related-party transaction.  (Pl. Opp., ECF No. 136, at 28

(citing 17 C.F.R. § 229.404).)  In addition, Plaintiff asserts that the challenged statements are "a

technical half-truth that merely serves Defendants['] interests—rather than Riot investors—by

shielding from public view Defendants' attempts to operate as a group to control Riot for their

own personal benefit."  (*Id*. at 31.)

Having considered the parties' arguments, I find that the challenged statements in Riot's

registration statements are not false or misleading.  The registration statements unambiguously

state that any reference to "'we', 'us', and 'our' refers to Riot." (*See* Zaccaro Decl., ECF No. 110,

Ex. G at 2.)  Moreover, Plaintiff's interpretation of the language in the challenged statements is

unreasonable in light of the references to "subsidiaries," "shares, and "securities" in the statements.

(*Id*.)  For similar reasons, Plaintiff's resort to the "half-truths doctrines" is misplaced.  The "half-

truths doctrine" requires the disclosure of information that corrects the "natural and normal

implication" of a misleading statement.  *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282,

1305 (11th Cir. 2011).  The challenged statements would be misleading only if they "conveyed to

the public a false impression" of the relationship between Riot and the selling stockholders.  *Id.* at

1306 (quoting *Sec. & Exch. Comm'n v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968)).

In this case, because I have rejected Plaintiff's proposed interpretation, I find that the challenged

statements in Riot's registration statements convey no message regarding the relationship between

the *officers or directors* of Riot and the selling stockholders.  Accordingly, I find that Plaintiff has

failed to allege that the challenged statements in Riot's registration statements were false or

misleading.[10]

---

[10]     In addition to arguing that "us" in the challenged statement should include Riot's officers and
directors, Plaintiff devotes much of his argument in his opposition papers to describing the alleged "ties"
between the selling stockholders and defendants Beeghley, O'Rourke, and Kaplan.  (*See* Pl. Opp., ECF No.

*(Footnote continued on the next page.)*

2.     **Statements in Riot's Proxy Statements (Form DEF 14A) About "Related-Party Transactions"**

Plaintiff alleges that Riot made material misstatements and omissions in Riot's December 12, 2017, and March 26, 2018 proxy statements on Form DEF 14A because those statements represented that "none" of Riot's directors, officers, or any person holding 5% or more of Riot's common stock had "any material interest, direct or indirect, in any transaction, or in any proposed transaction." (CCAC ¶¶ 292-93, 346-47.) According to the Complaint, those statements were false or misleading when made, because defendants Honig and DeFrancesco—who both allegedly held more than 5% of Riot's stock at the time—held material interests in Coinsquare and Kairos. (CCAC ¶¶ 293, 347, 352-54, 364.) Additionally, Plaintiff alleges that Riot failed to disclose that defendant So—who was a director at the time of Riot's 2017 proxy statement—was also an investor in Coinsquare. (CCAC ¶¶ 157, 293.)

In their motion papers, Defendants argue that the Complaint fails to allege any facts that show that the challenged disclosure concerning related-party transactions was false or misleading. Defendants note that the disclosure in the proxy statements specifically refers to transactions "during the last fiscal year," which ended December 31, 2016. (*See* Defs. Reply Br., ECF No. 145, at 4 (citing Zaccaro Reply Decl., ECF No. 145-1, Ex. D at 12 (excerpting Riot's Form DEF 14A)).) Defendants argue that, since the Coinsquare and Kairos transactions did not occur until September 2017 and November 2017, respectively, the disclosures provided in the proxy statements were accurate at the time they were made. (*Id.* at 4.) With respect to the Coinsquare transaction, Defendants also note that So only became a director after the Coinsquare transaction

136, at 29-30.) I note that, even if I were to interpret the challenged statements in Riot's proxy statements in the manner proposed by Plaintiff, it is unlikely that I would find that any of the alleged "ties" offered by Plaintiff actually rise to the level of a "material relationship." The Complaint does not allege, for example, that Riot or its officers and directors had any financial, contractual, or familial relationship with the selling stockholders.

(*i.e.*, in October 2017) and, therefore, there was no related party transaction to disclose involving So.  (*Id.* at 4 (citing CCAC ¶ 32; *see also* Def. Br., ECF No. 136, at 13-14.)

Plaintiff provides no meaningful response to these arguments in his opposition papers. Instead, Plaintiff insists that, "[i]n light of their beneficial ownership in Riot and personal financial interests in these transactions, and in the case of So his role as a director . . . , it is indisputable that Coinsquare and Kairos transactions should have been disclosed in Riot's 2017 and 2018 proxy statements as related-party transactions."  (Pl. Opp., ECF No. 136, at 33.)  In addition, Plaintiff asserts "that several other acquisitions, most notably Prive, Tess, and Ingenuim, in addition to being connected to certain members of the Honig Group, were of dubious value to Riot."  (*Id.* at 35.)[11]

Having considered the parties' arguments, I find that Plaintiff has failed to allege facts to show that the challenged statements concerning related party transactions were false or misleading. The proxy statements unambiguously state that the challenged statements only refer to transactions that occurred "during the last fiscal year."  (*See* Zaccaro Reply Decl., ECF No. 145-1, Ex. D at 12.)  Moreover, Plaintiff has not alleged any affirmative duty that would have required Riot to disclose in its proxy statement that the Coinsquare and Kairos transactions involved related parties. While this information may have been helpful to investors had it been disclosed, the failure by Riot to make that information available is not actionable absent allegations that Riot had a duty to do so.  *See Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000) ("Even non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative

---

[11]     I note that the Complaint does not refer to any transaction with an entity by the name of "Ingenium." Furthermore, Plaintiff does not explain how or why the wasteful nature of the Tess or Prive transactions (or any other transaction) renders the challenged statements in Riot's proxy statements false or misleading. Indeed, even assuming that the Tess and Prive transactions constituted "related-party transactions," both of those transactions are alleged to have occurred after the fiscal year ending December 31, 2016—*i.e.*, in October 2017 and February 2018, respectively.  (*See* CCAC ¶¶ 169, 195.)

duty to disclose that information."); *Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, 2017 WL 4403314, at *14 (S.D.N.Y. Sept. 30, 2017) ("[T]here is no duty to disclose a fact . . . 'merely because a reasonable investor [or analyst] would very much like to know that fact . . .'") (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (alterations in original); *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) ("Requiring that disclosures be 'complete and accurate' . . . does not mean that by revealing one fact about a product [or transaction], one must reveal all others that, too, would be interesting, market-wise.") (citation omitted).  Accordingly, I find that Plaintiff has failed to allege that the challenged statements in Riot's proxy statements were false or misleading.

### 3.    Statements in Riot's Press Releases About Investments in Blockchain Technologies and Cryptocurrency

Plaintiff alleges that Defendants publicly "touted" Riot's "strategic investments" and transactions in late 2017 and early 2018 in order to mislead investors into believing that Riot was a "pure play Blockchain company" that "provides investment exposure to the rapidly growing blockchain ecosystem." (CCAC ¶ 243.)  Plaintiff points to allegations in the Complaint describing press releases and similar public statements in which Riot and defendants Beeghley and O'Rourke touted Riot's investments in blockchain technologies and cryptocurrency, including:

- October 4, 2017 Press Release: Riot's "strategic investment in Coinsquare Ltd." was "indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem."  (CCAC ¶ 239.)  "At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets . . . ."  (*Id.*)

- October 5, 2017 Investor Presentation: "Moving forward, Riot Blockhain's focus will be as a strategic investor and operator in the blockchain ecosystem."  (CCAC ¶ 243.)  "Riot

was a 'first mover' and a 'NASDAQ listed pure play Blockchain company.'  At Riot

Blockchain Inc. we leverage our expertise, and network, to build and support blockchain

technology companies."  (*Id.*)  "We provide investment exposure to the rapidly growing

blockchain ecosystem."  (*Id.*)  "Riot Blockchain has made a strategic investment for an

undisclosed % of Coinsquare.  This investment into a leading digital currency exchange is

indicative of other Riot Blockchain [sic] will pursue, including possible acquisitions of

businesses touching the blockchain ecosystem . . . The company is experiencing explosive

growth in a budding industry, already demonstrating strong potential."  (*Id.*)

- <u>October 17, 2017 Press Release</u>: Riot's decision to "Acquire Majority Interest in Tess,"
  whose "telecom payment platform . . . is a prime example of how blockchain-based
  technologies can be leveraged to disrupt established industries . . . I believe that Riot
  Blockchain is poised to take advantage of this revolution in digital transactions."  (CCAC
  ¶ 249.)

- <u>October 27, 2017 Investor Presentation</u>: "[T]he company is experiencing steady growth in
  a budding industry."  (CCAC ¶ 255.)

- <u>November 6, 2017 Press Release</u>: "Riot Closes Its Deal with Kairos"—"The closing of this
  acquisition has positioned us to launch our cryptocurrency mining operation."
  (CCAC ¶ 264.)

- <u>November 15, 2017 Interview with CBS</u>: "[W]e own 52 percent of a company called Tess
  that is developing a blockchain technology to disrupt the telecom industry."  (CCAC
  ¶ 275.)

- <u>November 16, 2017 Press Release</u>: Riot's investment in Verady—"We will continue to increase our involvement and support of the blockchain ecosystem, as we ramp up our Bitcoin mining operations."  (CCAC ¶ 279.)

- <u>December 11, 2017 Press Release</u>: Riot's "majority owned Tess Inc. . . . to merge" with "[p]ublicly [t]raded Cresval Capital Corp." which "provides us access to traditional capital markets."  (CCAC ¶ 287.)

(*See* Pl. Opp., ECF No. 136, at 37.)  According to the Complaint, these statements in Riot's press releases were false or misleading because, "in reality," Riot "had limited meaningful investments in cryptocurrency products and did not have a meaningful cryptocurrency business plan."  (CCAC ¶ 10.)  The Complaint further alleges that, "[i]nstead of operating a legitimate cryptocurrency business, Defendants artificially 'hype[d]' the Company's prospects by issuing a flurry of press releases, SEC filings, and interviews with television and newspaper journalists—all designed to give investors the false impression that Riot was a serious cryptocurrency company."  (CCAC ¶ 11.)

In their motion papers, Defendants argue that the statements identified by Plaintiff in Riot's presses releases constitute inactionable puffery.  (*See* Defs. Br., ECF No 107-1, at 22-24.)  Defendants further argue that the Complaint is devoid of any particularized allegations showing how the statements in the press releases were false or misleading.  (*See id*. at 20-21.)  Finally, Defendants contend that Plaintiff's "argument is facially circular" because it asks the Court to assume that there was a scheme to artificially inflate Riot's stock, but offers no particularized facts that establish actual misrepresentations or omissions statements artificially inflated Riot's stock price.  (*See id*. at 21.)

In response, Plaintiff offers two primary arguments in his opposition papers.  *First*, Plaintiff contends that the statements are not puffery because they "went to the heart of Riot's operations." (Pl. Opp., ECF No. 136, at 39.)  *Second*, Plaintiff claims that it was misleading for Riot (i) to present itself as a "pureplay blockchain company" that "provides investment exposure to the rapidly growing blockchain ecosystem," (ii) to present its team as possessing the "the "insight and network to effectively grow and develop blockchain assets," (iii) to describe the Coinsquare transaction as a "strategic investment" and "a leading cryptocurrency exchange," (iv) to tout Riot's "majority" investment in Tess as making riot "poised to take advantage" of the blockchain "revolution," and (v) to describe Tess's planned merger with Cresval as giving "access  to traditional capital markets."  (*Id*. at 37-39.)

Having considered the parties' arguments, I find that all of the challenged statements from Riot's press releases or similar public statements that are identified by Plaintiff in his opposition papers either constitute inactionable puffery or are not adequately alleged to have been false or misleading when made.  The Third Circuit has emphasized that "vague and general statements of optimism constitute no more than 'puffery' and are understood by reasonable investors as such." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1428 n.14 (3d Cir. 1997)) (internal quotation marks omitted). "Claims that these kinds of vague expressions of hope by corporate managers could dupe the market have been almost uniformly rejected." *In re Burlington,* 114 F.3d at 1427.  "Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material: there is no substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *In re Advanta*, 180 F.3d at 538 (quoting *TSC Indus., Inc. v.*

*Northway, Inc.*, 426 U.S. 438, 449 (1976) (internal quotation marks omitted); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 642 (3d Cir. 1989) (holding that "statements of subjective analysis or extrapolation, such as opinions, motives, and intentions" are "soft information" and hence immaterial for purposes of Rule 10b-5). "[A]lthough questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *In re Burlington*, 114 F.3d at 1426.

In this case, many of the challenged statements offered by Plaintiff are the type of general, non-specific statements of optimism or hope that has been found to be inactionable puffery. They are soft statements of the kind that has been found incapable of "duping" the market. *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 580 (D.N.J. 2001) (citing *In re Burlington,* 114 F.3d at 1427)). For example, Plaintiff argues that it was materially misleading for Riot to describe its investment in Coinsquare as "strategic" (*see* CCAC ¶ 239 (October 4, 2017 Press Release)); to present itself as a "pure play" blockchain company (*see* CCAC ¶ 243 (October 5, 2017 Investor Presentation)); to tout Riot's investment in Tess as making riot "poised to take advantage" of the blockchain "revolution" (*see* CCAC ¶ 249 (October 17, 2017 Press Release)); and to tout the merger between Tess and Cresval as providing "access" to capital markets (*see* CCAC ¶ 287 (December 11, 2017 Press Release)). (Pl. Opp., ECF No. 136, at 37-38.) These vague and general descriptions are quintessential puffery, and cannot support Plaintiff's Section 10(b) claim.[12] *See*

---

[12]    I note that Plaintiff does not alternatively advance any argument in his opposition papers for why the specific statements identified in Riot's press release announcing Riot's acquisition of Kairos (*see* CCAC ¶ 264 ("The closing of this acquisition has positioned us to launch our cryptocurrency mining operation.")) or Riot's press release announcing Riot's investment in Verady (*see* CCAC ¶ 279 ("We will continue to increase our involvement and support of the blockchain ecosystem, as we ramp up our Bitcoin mining operations.")) are actionable as materially false or misleading.

*Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245-46 (N.D. Cal. 1998) (holding defendant's statements that it "represents a pure play in the emergence of" an industry that was "finally coming of age[,]" that it was a "leader in a rapidly growing market[,]" and that it was "a good company" that was well positioned, were "not specific enough to perpetrate fraud on the market"); *In re Burlington*, 114 F.3d at 1427 (statement that company could "continue to grow net earnings at a faster rate than sales" was puffery); *In re NVE Corp. Secs. Litig.*, 551 F. Supp. 2d 871, 897 (D. Minn. 2007), *aff'd*, 527 F.3d 749 (8th Cir. 2008) (statement that defendant's licensees were "leading the race" was puffery); *In re Kidder Peabody Secs. Litig.*, 10 F. Supp. 2d 398, 413 (S.D.N.Y. 1998) (statements regarding "strategic planning" were puffery). Indeed, I am skeptical that any reasonable investor would make investment decisions based on those statements, which are not grounded in any historical or verifiable facts. *Cf. In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 436 (E.D. Pa. 2002) (holding that "statements were not puffery" where they "provided investors with concrete information about the performance of specific products").[13]

Moreover, while some of the challenged statements are closer to the sort of concrete and verifiable facts that courts do find actionable, Plaintiff does not point to any allegations in the Complaint (and the Court has been unable to locate any on its own) that demonstrate the false or

---

[13]     Plaintiff cites to several cases in his opposition that undermine his contention that the challenged statements are anything more than inactionable puffery. *See Payne v. Deluca*, 433 F. Supp. 547, 599 (W.D. Pa. 2006) (statement that "recent contract awards demonstrate our excellent reputation with a diverse range of clients and our broad and sophisticated skill base" is puffery); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 283 (3d Cir. 1992) (statement that "[the Company] looks to the future with great optimism" is puffery); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 321 (3d Cir. 1997) (statement that "we are committed to achieving a real earnings growth of at least 7 percent over time" is puffery). Furthermore, the other cases cited by Plaintiff are inapposite, as they address statements of historical and verifiable facts. *See In re Enzymotec Secs. Litig.*, 2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015) (statements that company achieved "increased market penetration"); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 342 (D. Mass. 2009) (statements regarding past demand and backlog orders); *In re Par Pharm. Secs. Litig.*, 2009 WL 3234273, at *10 (D.N.J. Sept. 30, 2009) (SEC filings containing historical facts); *In re Computer Assocs. Class Action Secs. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (statement that there was "strong worldwide demand").

misleading nature of those statements.  For example, Plaintiff argues that it was false or misleading for Riot to publicly state that it was experiencing "explosive growth" in an investor presentation on October 5, 2017 (*see* CCAC ¶ 243 (October 5, 2017 Investor Presentation)) and "steady growth" in an investor presentation on October 27, 2017 (*see* CCAC ¶ 255 (October 27, 2017 Investor Presentation)), but Plaintiff does not allege anywhere in the Complaint that Riot was *not* experiencing growth on either of those two dates.  Similarly, Plaintiff argues that the statement by O'Rourke in an interview with CBS on November 15, 2017 that Riot "own[ed] 52 percent of a company called Tess" (*see* CCAC ¶ 275 (November 15, 2017 Interview with CBS)) was false or misleading, but the Complaint nowhere alleges that Riot did not own 52% of Tess on that date. These statements may be sufficiently important to investors to be actionable; however, Plaintiff has simply failed to allege that they were in any way false or misleading on the dates that they were made.[14]  Accordingly, I find that Plaintiff has failed to sufficiently allege that  any of Riot's press releases or similar public statements were both material *and* false or misleading.[15]

In sum, I find that Plaintiff has failed to adequately allege that any of the statements identified by Plaintiff in Riot's registration statements, proxy statements, or press releases and similar public statements were materially false or misleading.  Defendants also contend that the

---

[14]     In the event Plaintiff seeks to rely on these or similar statements as a basis for his claim under Count I in an amended pleading, Plaintiff must allege specific facts that show the false or misleading nature of the statements.

[15]     I also find that the challenged statements are not actionable to the extent that they are intended to demonstrate that Riot's investments were "egregiously wasteful related-party transactions."  (CCAC ¶ 11; *see also* CCAC ¶ 277 (stating that "Riot's investment in Tess was a conflicted, related-party transaction").) It is well-settled law that corporate mismanagement is not actionable under Section 10(b).  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977); *Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628, 638 (3d Cir. 1989) (stating that "claims essentially grounded on corporate mismanagement are not cognizable under federal law.") (citation omitted); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 541 n.20 (D.N.J. 2010) (stating that claims that "amount[] to essentially allegations of corporate mismanagement . . . [are] not actionable" under Section 10(b)) (citing *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 258 n.24 (3d Cir. 2009).

Complaint fails to adequately plead scienter (i.e., the second element) or loss causation (i.e. the sixth element).  Accordingly, Plaintiff's claims under Count I of the Complaint are dismissed on that ground.  Moreover, because I find that Plaintiff has not adequately pled the first element of his claim, I do not reach whether Plaintiff has adequately pled the other elements that are challenged by Defendants—specifically scienter and loss causation.  Indeed, doing so would be difficult without knowing the nature, substance, and particularized context of any alleged statements or omissions that are false or misleading.  *See*, *e.g.*, *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 815 (S.D. Tex. 2012) (explaining that a court must "undertake scienter analysis only where [p]laintiffs have specifically tethered an alleged misrepresentation or omission to one or more of the [i]ndividual [d]efendants."; *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 644 (D.N.J. 2010) (stating that "[t]he Court does not reach [d]efendants' arguments regarding scienter and causation, in part because they are moot without the particular allegations needed, and in part because those elements also cannot be assessed without allegations regarding the timing and nature of the representations."); *Freed v. Universal Health Servs.*, Inc., 2005 WL 1030195, at *11 (E.D. Pa. May 3, 2005) (declining to "reach the question [of] whether the Amended Complaint . . . adequately pleads the elements of scienter, materiality, and loss causation" where element of false misrepresentation was not adequately pled).[16]

---

[16] While I decline to directly address the elements of scienter and loss causation, I note that, as currently pled, the Complaint does not appear to sufficiently allege *particularized* facts that would support a strong inference of scienter with respect to several individual Defendants.  Indeed, Plaintiff barely addresses the scienter of defendants Beeghley, McGonegal, Kaplan, So, or Les in his opposition brief. More specifically, Kaplan, So, and Les are not mentioned at all in the section of Plaintiff's opposition brief addressing scienter.  Furthermore, the only scienter allegations mentioned with respect to Beeghley and McGonegal are that those particular defendants personally attested in SOX certifications that they had taken steps to verify the adequacy of Riot's internal controls.  (Pl. Opp., ECF No. 136, at 48 (citing CCAC ¶¶ 218, 270).)  These allegations are, by themselves, insufficient to raise an inference of scienter—much less a "strong inference," *see* 15 U.S.C. § 78u-4(b)(2)(A).

**B.      Count II – Scheme Liability under Section 10(b)**

Count II of the Complaint alleges violations of Rule 10b-5, subsections (a) and (c), against all Defendants.  Subsections (a) and (c) allow a suit against defendants who, with scienter, "employ any device, scheme, or artifice to defraud," or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.  Unlike a claim under subsection (b) of Rule 10b-5, a claim of liability for violations of subsections (a) and (c) does not require an allegation that the defendant made a false or misleading statement; rather, liability is premised on a course of deceptive or manipulative conduct.  *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152-53 (1972) (observing that "the second subparagraph of [Rule 10b-5] specifies the making of an untrue statement of a material fact and the omission to state a material fact, [but] [t]he first and third subparagraphs are not so restricted"); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 643 (3d Cir. 2011) ("We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements."); *cf. Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158 (2008) (stating that the "suggest[ion] [that] there must be a specific oral or written statement before there could be liability under § 10(b) or Rule 10b-5 . . . would be erroneous [since] [c]onduct itself can be deceptive").

Accordingly, to state claim under subsections (a) and (c) of Rule 10-b5, Plaintiff must allege that Defendants "committed a deceptive or manipulative act," in addition to the other standard elements of a Section 10(b) violation: scienter; connection with the purchase or sale of securities; reliance; economic loss; and loss causation.  *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 350 (D.N.J. 2009); *Stoneridge Inv. Partners*, 552 U.S. at 158.  As with claims under subsection (b) of Rule 10b-5, claims under subsections (a) and (c) are subject to the PSLRA, and, thus, a "strong inference" of scienter must be pled "with particularity."  15 U.S.C. § 78u-

4(b)(2)(A).  Moreover, as these are fraud-based claims, Plaintiff must comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *See In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at * 19 (D.N.J. Mar. 24, 2008).  To meet this standard, Plaintiff must set forth "what manipulative [or deceptive] acts were performed, which defendants performed them, when the manipulative [or deceptive] acts were performed and what effect the scheme had on the securities at issue."  *In re Royal Dutch/Shell Transport Sec. Litig.*, 2006 WL 2355402, at *7 (D.N.J. Aug. 14, 2006) (quoting *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (S.D.N.Y. 2006)).

In this case, while there are multiple motions to dismiss Count II, all Defendants contend that the allegations in the Complaint do not satisfy the first element of Plaintiffs' claims under subsections (a) and (c), *i.e.*, the requirement that Defendants committed a "deceptive or manipulative act," or the second element, *i.e.*, scienter.  In addition, several Defendants argue that the Complaint does not adequately allege the elements of loss causation or reliance.  Having examined the allegations in the Complaint, I find that Plaintiff has failed to allege a "deceptive or manipulative act" with respect to defendants Beeghley, O'Rourke, McGonegal, Kaplan, So, Dai, Les, DeFrancesco, Groussman, or Stetson.  Furthermore, while I find that the Complaint adequately alleges that defendant Honig committed a "deceptive or manipulative act" and that he arguably did so with the requisite "scienter," I nevertheless conclude that Plaintiff has failed to allege that the allegedly deceptive act by Honig proximately caused any economic loss (*i.e.*, loss causation).

### 1.      Deceptive or Manipulative Act

In their motion papers, Defendants argue that the Complaint fails to attribute any inherently manipulative or deceptive acts to Defendants in furtherance of the alleged pump-and-dump scheme, beyond the alleged misrepresentations and omissions in Riot's registration statements,

proxy statements, and press releases.[17]  (*See* Defs. Br., ECF No. 107-1, at 28 ("The 'scheme liability' claim amounts to nothing more than a repackaging of the faulty material misrepresentation and/or omission claims."); Director Defs. Br., ECF No. 108-1, at 14-15 ("Plaintiff's scheme liability allegations against the Director Defendants amount to nothing more than a reiteration of his insufficiently alleged material misrepresentation and/or omission claims, which targets the exact same purported misconduct."); DeFrancesco Br., 112-1, ECF No. at 12 ("Plaintiff's sole allegations of misconduct are, at best, misstatements and omissions . . . ."); Honig Br., ECF No. 118-1, at 17 ("Plaintiff fails to assert any inherently manipulative or deceptive conduct by Mr. Honig beyond Riot's purported misrepresentations and omissions in which he had no involvement."); Groussman Br., ECF No. 131-1, at 12 ("[A]ny effort by Plaintiff to predicate scheme liability on an alleged misrepresentation by Groussman fails as a matter of law").)  In addition, some Defendants argue that any alleged acts are not the type of conduct that is actionable under Rules 10-b.  (*See* DeFrancesco Br., ECF No. 112-1, at 8; ("Plaintiff fails to plead that the Alleged Transactions are 'manipulative acts' prohibited by Rules 10b-5(a) and 10b-5(c)"); Honig Br., ECF No. 118-1, at 16 ("The Corrected Complaint is absolutely devoid of any allegations that Mr. Honig engaged in any of the commonly known types of manipulative trading activity, such as wash sales, matched orders, rigged pricing, or other conduct that artificially affects market pricing."); Groussman Br., ECF No. 131-1, at 14-15 ("Plaintiff alleges neither deception nor manipulation.").)

---

[17]    As discussed *supra* in the portion of this Opinion addressing Count I, I have found that Plaintiff has failed to adequately allege that any statements or omissions in Riot's registration statements, proxy statements, or press releases were false or misleading.  Given that conclusion, those alleged misrepresentations and omissions cannot independently serve as "deceptive or manipulative" acts to support Plaintiff's claim.

In response, Plaintiff argues that the Complaint sufficiently alleges that Defendants participated in a scheme to "rig" the "natural interplay" of Riot common stock by (1) gaining de facto control over Riot through "coordinated" share purchases, and the placement of close affiliates on Riot's board of directors and in management positions at the Company; (2) hiding that control by ignoring SEC reporting requirements; (3) disseminating false and misleading statements; (3) artificially pumping the value of Riot's stock through a series of rapid-fire and highly touted transactions of minimal value to Riot; and (4) surreptitiously dumping their shares. (Pl. Opp. Br., ECF No. 136, 55-56.) Plaintiff further asserts that Complaint carefully describes each Defendants' role in this scheme under the leadership of defendant Honig, including by alleging how Honig maintained close business, investment, and personal ties to each of the other Defendants. (*Id.* at 56.)

Having considered the parties' arguments, I find that Plaintiff has sufficiently alleged a deceptive or manipulative act by Honig; however, I find that Plaintiff has failed to allege any deceptive or manipulative acts as to the other Defendants. As an initial matter, I note that the argument raised by several Defendants that Plaintiff has not sufficiently alleged the type of conduct that is actionable under Rule 10(b)-5 is without merit. In support of this argument, Defendants cite to an oft-quoted description of "manipulative" conduct, which states that "[m]anipulation is virtually a term of art when used in connection with securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus. v. Green*, 430 U.S. 462, 476, (1977) (citations and internal quotation marks omitted). However, in making this argument, Defendants ignore that Section 10(b) prohibits not only "manipulative" acts, but also "deceptive" acts. *See* 15 U.S. Code § 78j (prohibiting any "any manipulative or deceptive device or

contrivance . . .").  Indeed, subsections (a) and (c) of Rule 10b-5 encompass a "wide range of conduct" and are not limited to the prohibition of market manipulation.  *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019); *see also In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 492 (S.D.N.Y.2005) (rejecting the defendants' claims that subsections (a) and (c) apply only to the narrow category of acts understood as manipulative in a technical sense, as "[t]his interpretation is refuted by the language of the rule as well as the case law, which make it clear that subsections (a) and (c) apply to at least some deceptive acts as much as to certain technical forms of market manipulation."); *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) (noting that the plaintiffs in that case "fail[ed] to assert a market manipulation claim, as those claims are technically understood" because they had alleged "no illegal trading activity that would artificially cause stock prices to rise," but that "subsections (a) and (c) encompass much more than illegal trading activity . . . they encompass '*any* device, scheme or artifice,' or '*any* act, practice, course of business' used to perpetrate a fraud on investors.") (citing 17 C.F.R. § 240.10b-5(a), (c)) (emphasis in original).

Furthermore, I find that Plaintiff has alleged sufficient facts to show that Honig committed a deceptive act that falls within the range of conduct prohibited by Section 10(b) and Rule 10b-5. The Complaint alleges that Honig violated his obligations—as one of Riot's largest shareholders— under SEC reporting requirements to "promptly" disclose material changes in his ownership of Riot's stock during the Class Period.  Under Section 13(d) of the Exchange Act and SEC Rule 13d-1, when a person acquires beneficial ownership of "more than 5%" of a company's registered stock, such person is required to make a filing to disclose his ownership on a schedule filed with the SEC.  *See* 17 C.F.R § 240.13d-1.  Furthermore, under SEC Rule 13d-2, when the investor's holdings materially change (for example, through further purchases or sales of the company's

stock), the investor is required to "promptly" file an amended schedule to update the market about the change in his holdings.  *See* 17 C.F.R § 240.13d-2.  The Complaint alleges that, between January 5, 2017 (when Honig reported owning 11.2%) until February 13, 2018 (when Honig reported owning 1.47%), Honig never disclosed to the market that he had materially decreased his holdings in Riot.  (CCAC ¶¶ 148, 329-331.)  These allegations plausibly allege a violation of his obligations under the appliable regulations.  Moreover, in the Court's view, the alleged failure by Honig to "promptly" disclose his material decrease in stock holdings, while not necessarily deceptive by itself, was deceptive when viewed in the wider context of Plaintiff's allegations that Honig did so in order to conceal his sales from the public as part of a scheme to pump-and-dump Riot's stock.  Thus,  I find that Plaintiff has adequately alleged a "deceptive and manipulative" act by Honig that is actionable under Section 10(b).

In contrast to the allegations with respect to Honig, Plaintiff fails to identify any allegations in the Complaint of specific acts of deception or manipulation that are attributable to the other Defendants.  Plaintiff suggests in his opposition papers that several of Defendants sold significant shares of stock in Riot during the Class Period without disclosing those sales, in violation of SEC reporting requirements.  (*See, e.g.*, Pl. Opp., ECF No. 136 at 2 (stating that "DeFrancesco reported owning 11.45% of Riot's stock on January 10, 2017, on Form 13D/A, but never filed another Form 13D/A until Riot's January 5, 2018 Form S-3 revealed that DeFrancesco and her entities held less than 1% of Riot's stock"); Pl. Opp., ECF No. 153 at 11 (stating that "Groussman violated his duties to file a Schedule 13D or 13G").)  While these accusations are similar to the allegations made against Honig, the facts to support them are not alleged in the Complaint, but rather appear to be referred to for the first time only in Plaintiff's opposition papers.  As such, the Court does not find it appropriate to consider them in deciding the pending motions to dismiss.  *See Marks v. Struble*,

347 F. Supp. 2d 136, 148 (D.N.J. 2004) (refusing to consider allegations made for the first time in response to a defendants' motion to dismiss in resolving Rule 12(b)(6) motion); *Commonwealth of Pa ex. Rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (citation omitted).  Accordingly, I find that Plaintiff has failed to adequately allege the first element of his claim under Count I against all Defendants other than Honig.

### 2.    Scienter

In his motion papers, Honig argues that the Complaint does not allege any facts "giving rise to a strong inference that the defendant acted with the required state of mind," as required by the PSLRA's heightened pleading standards.  (Honig Br., ECF No. 118-1, at 19 (citing 15 U.S.C. § 78u-4(b)(2)).)  Plaintiff does not specifically respond to Honig's scienter arguments in Plaintiff's opposition papers; however, in a section of his brief that collectively addresses the scienter of "Defendants," Plaintiff argues that an inference of scienter is supported by allegations of similar misconduct on prior occasions by Honig, motive and opportunity to commit fraud by Honig, and the failure by Honig to disclose his sales of Riot's stock.  (Pl. Opp. at 42-43, 45-48.)

Scienter means an "intent to deceive, manipulate, or defraud on the part of the defendant." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 188 (1976).  To plead scienter in the Third Circuit, a plaintiff must "allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'"  *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009) (citation omitted).  The pertinent question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id*. at 272 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).  In conducting the scienter analysis, "the court must take into account plausible opposing inferences."  *Tellabs*, 551 U.S. at 323.  Under this "inherently comparative" inquiry, "[a]

complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 323-24.   Scienter pleading does not turn on "the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269.   "Each case will present a different configuration of factual allegations, and it is the composite picture, not the isolated components, that judges must evaluate in the last instance." *Id*. at 272.   Indeed, "[i]n assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *Id*. at 272-73 (citation omitted).

In this case, the Court concludes that the allegations in the Complaint against Honig are sufficient to support the requisite strong inference of scienter.   Although Plaintiff does not cleary identify in his motion papers which allegations specifically relate to each defendant's scienter, the Court has been able to identify two categories of particularized allegations that support an inference that Honig acted with an intent to deceive.   *First*, the Complaint alleges that Honig and other members of the Honig Group have been implicated in multiple pump-and-dump schemes at other companies.   (*See* CCAC ¶¶ 80-127, 357-60.)   More specifically, Plaintiff alleges that "Honig was the primary strategist" in the other schemes, and "call[ed] upon other [d]efendants to, among other things, acquire or sell stock, arrange for the issuance of shares, negotiate transactions, and/or engage in promotional activity." (CCAC ¶ 81 (quoting SEC Am. Compl. ¶ 2).)   These allegations, which involve conduct at companies other than Riot, do not independently support an inference that Honig acted with scienter when committing the conduct at issue in this action.   However, they do suggest a pattern of fraud that lends considerable support to an inference that Honig knew that

concealing his stock sales was deceptive (or, at the very least, that he was reckless in not knowing). *See In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1138-39, 1147 (D. Colo. 2005) (finding that a "sustained pattern of repeated manipulations and misrepresentations" supported inference of scienter); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 693 (S.D. Tex. 2002) (stating that "the scienter pleading requirement is partially satisfied by allegations of a regular pattern of related and repeated conduct"); *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 15 (D. Mass. 2000) (stating that allegations that defendants previously "engaged in the same improper . . . practices" was "strongly probative of scienter"); *Pippenger v. McQuik's Oilube, Inc.*, 854 F. Supp. 1411, 1419 (S.D. Ind. 1994) (stating that scienter may be "established by a pattern of intentional deception"); *c.f.* Fed. R. Evid. 404 (stating that "[e]vidence of a crime, wrong, or other act . . . may be admissible for . . . proving . . . knowledge"). *Second*, the Complaint alleges facts showing that Honig had a motive and opportunity to profit from the concealment of his stock sales. In the Complaint, Plaintiff alleges that, through sales of his shares in Riot, Honig is estimated to have made at least $17.6 million (assuming a share price of $10 per share). (CCAC ¶ 164.) These allegations do not merely allege that Honig had "[m]otives [to profit] that are generally possessed by most corporate directors and officers." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004). Rather, the inference of fraudulent intent is buttressed by the allegations that Honig failed to "promptly" disclose the sales of his stock, in violation of SEC reporting requirements. (CCAC ¶¶ 148, 329-331.) Taking these allegations together and with all inferences construed in favor of Plaintiff, I find that the Complaint gives rise to a strong inference that Honig acted with scienter.

### 3. Loss Causation

In his motion papers, Honig argues that Plaintiff fails to allege the element of loss causation. (Honig Br. at 22-24.) With respect to the element of loss causation, Honig notes that

Plaintiff identifies several negative media reports that allegedly caused the company's share price to drop, thereby allegedly "damaging []Plaintiff and members of the Class." (*Id*. at 22.) However, Honig argues that "these press reports fail to constitute corrective disclosures of fraud that would suffice to show loss causation, . . . as they simply represent pundits' personal opinions or negative commentary and speculation regarding already-disclosed information." (*Id*. at 22-23.) Having reviewed the Complaint, I agree that Plaintiff has not adequately alleged loss causation with respect to the one deceptive act that Honig is alleged to have committed, *i.e.* the concealment by Honig of his ownership and sale of Riot's stock.

Under the PSLRA, a plaintiff asserting a claim under Section 10(b) bears the burden of proving "loss causation," *i.e.*, "that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Reading this provision of the PSLRA in conjunction with the Supreme Court's decision in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005), a plaintiff is required to "plead that the very misrepresentation at issue proximately caused them an economic loss." *Nat'l Junior Baseball League v. Pharmanet Development Group, Inc.*, 720 F. Supp. 2d 517, 559 (D.N.J. 2010) (citing *Dura Pharm.,* 544 U.S. at 345); *see also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007) ("The loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss."). Notably, a plaintiff need not allege that "a misrepresentation was the sole reason for the investment's decline in value." *In re Tyson Foods, Inc. Sec. Litig.*, 2004 WL 1396269, at *12-13 (D. Del. June 17, 2004) (quoting *Robbins v. Kroger Properties, Inc.*, 116 F.3d 1441, 1447 n. 5 (11th Cir.1997)). "So long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 186-87 (3d Cir. 2000) (citing

*Robbins*, 116 F.3d at 1447 n. 5); *see also McCabe*, 494 F.3d at 439 ("The § 10(b) loss causation standard we have reiterated here is similar to the 'substantial contributing factor' test of proximate causation under New Jersey law.") (citation omitted).

In this case, the Complaint alleges that, on February 13, 2018, Honig disclosed in an amended filing with the SEC that he had sold all but 1.47% of his shares in Riot. (CCAC ¶¶ 329-31.) However, the Complaint is devoid of any allegation that this "corrective disclosure" was a "substantial cause" of shareholders' economic losses or otherwise contributed in any way to a decline in Riot's stock price. In contrast, the Complaint is replete with allegations that other negative media reports and public disclosures caused precipitous declines in the price of Riot's stock. (*See, e.g.*, CCAC ¶ 398 (decline in stock price of 6.42% in response to CNBC report), CCAC ¶ 399 (decline of 34.75% in response to Business Insider report), CCAC ¶ 400 (decline of 14.45% in response to cancellation of shareholder meeting and news articles by Reuters and Motley Fool); CCAC ¶ 401 (decline of 4.13% in response to filing of Form S-3 registration statement); CCAC ¶ 402 (decline of 14.26% in response to Wall Street Journal article), CCAC ¶ 403 (decline of 33.4% in response to CNBC reports), ¶ 405 (decline of 26.1% in response to SEC complaint).) In the absence of any allegation of a causal link between the "corrective disclosure" by Honig on February 13, 2018 of his stock sales and an economic loss that Plaintiff allegedly suffered, I find that Plaintiff has failed to adequately allege the element of loss causation.[18]

---

[18]     Honig also argues that Plaintiff has improperly invoked a presumption of reliance, under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–154 (1972). As the basis for this argument, Honig asserts that Plaintiff has failed to allege that Honig "possessed or had a duty to disclose information" to the public, which, according to Honig, is a prerequisite for invoking the presumption under *Affiliated Ute*. (*See* Honig Br., ECF No. 118, at 24.) The Court finds that this argument is unpersuasive. As discussed above, the Complaint does, in fact, allege that Plaintiff had a duty to "promptly" disclose his sales of Riot's stock by filing an amended schedule with the SEC. (*See* CCAC ¶¶ 331 (citing 17 CFR § 240.13d-2).)

In sum, I find that the Complaint fails to allege the first element of Plaintiff's claim, *i.e.*, a "deceptive or manipulative act," with respect to defendants Beeghley, O'Rourke, McGonegal, Kaplan, So, Dai, Les, DeFrancesco, Groussman, and Stetson.  Furthermore, while I find that the Complaint has adequately alleged that Honig committed a "deceptive or manipulative act" and that he did so with the requisite "scienter," I conclude that the Complaint fails to plead the element of loss causation with respect to Honig.[19]  Accordingly, Plaintiff's claims under Count II of the Complaint are dismissed.

### C.   Count III – Control Person Liability under Section 20(a)

Count III of the Complaint asserts liability under Section 20(a) of the Exchange Act against defendants O'Rourke, McGonegal, Beeghley, Kaplan, and So.  Section 20(a) creates a cause of action against individuals who are "control persons" of companies guilty of securities fraud.  *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 644 (D.N.J. 2003).  The statutory provision states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  A plaintiff alleging a Section 20(a) violation "must plead facts showing: (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions." *Jones*, 274 F. Supp. 2d at 644-45 (D.N.J. 2003).  Thus, if the plaintiff does not establish that any controlled person is liable under the PSLRA, then there can be no

---

[19]   I do not reach the issue of whether Plaintiff has adequately pled the elements of scienter, loss causation, or reliance as to Defendants other than Honig.  Indeed, doing so would be difficult without knowing the particular context in which any allegedly deceptive or manipulative act has been committed. However, I reiterate that the Complaint does not appear to allege any particularized facts with respect to the scienter of several individual Defendants. *See supra*, Section III.A.3., footnote 16.  In the event Plaintiff opts to file an amended complaint, in addition to addressing the deficiencies identified in this Opinion, he must include additional scienter allegations that are particularized as to each defendant.

controlling person liability under Section 20(a).  *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 287 (3d Cir. 2006).

In this case, since I conclude that Plaintiff has not adequately alleged any of his claims under Section 10(b) of the Exchange Act, I find that Plaintiff has also necessarily failed to plead any facts showing an underlying violation by Riot.  Accordingly, Plaintiff's claims under Count III are dismissed.

## IV.    CONCLUSION

In summary, I find that the Complaint fails to state any claims against Defendants. Accordingly, for the above reasons, Defendants' motions to dismiss are **GRANTED**, and the Complaint is dismissed, without prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Plaintiff's request for leave to amend is denied at this time; however, Plaintiff may file a separate motion seeking leave to file an amended complaint within 30 days.[20]  An appropriate Order accompanies this Opinion.

DATED:  April 30, 2020

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge

---

[20]    Plaintiff makes a cursory request for leave to amend in a final footnote to his opposition papers. (*See* Pl. Opp., ECF No. 153, at 30 fn. 39.)  However, I decline at this time to consider such a threadbare request, which fails to provide "any indication of the particular grounds on which amendment is sought." *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 494 (3d Cir. 2017).  In the event Plaintiff chooses to file a separate motion to amend in a manner consistent with this Opinion, Plaintiff must attach a proposed pleading and clearly identify the *particularized* allegations that support *each* element of the claims.  Indeed, it is not the Court's responsibility to sift through the Complaint in order to identify those allegations that have been pled with particularity.  *See DeShields v. Int'l Resort Properties Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012) (noting that "[j]udges are not like pigs, hunting for truffles buried in briefs") (citations omitted)).