**LITE DEPALMA GREENBERG, LLC**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Lead Plaintiff*
*Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Lead Plaintiff Dr. Stanley*
*Golovac and Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated, | : : : | Civil Action No.: 18-2293 (FLW) (TJB) |
| *Plaintiff,* | : : | |
| v. | : : | **DECLARATION OF JOSEPH J.** |
| | : | **DEPALMA IN SUPPORT OF MOTION** |
| RIOT BLOCKCHAIN, INC. F/K/A, | : | **FOR LEAVE TO FILE [PROPOSED]** |
| BIOPTIX, INC., JOHN O'ROURKE, and | : | **CONSOLIDATED SECOND** |
| JEFFREY G. MCGONEGAL, | : | **AMENDED CLASS ACTION** |
| | : | **COMPLAINT FOR VIOLATIONS OF** |
| *Defendants.* | : | **THE FEDERAL SECURITIES LAW** |

I, Joseph J. DePalma, hereby declare as follows:

1. I am an attorney admitted to practice in the State of New Jersey and am admitted to practice before this Court in the above-captioned case. I am a member of Lite DePalma Greenberg, LLC, Local Counsel for Lead Plaintiff Dr. Stanley Golovac.

2. I respectfully submit to the Court, pursuant to 28 U.S.C. § 1746, this declaration and the attached materials that are referenced in Lead Plaintiff's Memorandum of Law in Support of Motion for Leave to File [Proposed] Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Law.

3.      Submitted herewith are true and correct copies of the following:

| Exhibit | Description |
|---------|-------------|
| A | [Proposed] Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Law |
| B | Redlined Version Comparing [Proposed] Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Law with Corrected Consolidated Amended Class Action Complaint for Violations of the Federal Securities Law (ECF No. 73) |

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 1st day of June, 2020, in Newark, New Jersey.


/s/ Joseph DePalma
Joseph J. DePalma

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated, | : | Civil Action No.: 18-2293(FLW)(ZNQ) |
| | : | |
| Plaintiff, | : | CONSOLIDATED ACTION |
| | : | |
| v. | : | **[PROPOSED] CONSOLIDATED** |
| | : | **SECOND AMENDED CLASS ACTION** |
| RIOT BLOCKCHAIN, INC. F/K/A, | : | **COMPLAINT FOR VIOLATIONS OF** |
| BIOPTIX, INC., JOHN O'ROURKE, and | : | **THE FEDERAL SECURITIES LAW** |
| JEFFREY G. MCGONEGAL, | : | |
| | : | **JURY TRIAL DEMANDED** |
| Defendants. | : | |
| | : | |

**LITE DEPALMA GREENBERG, LLC**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Lead Plaintiff*
*Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Lead Plaintiff Dr. Stanley*
*Golovac and Lead Counsel for the Class*

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................. 1

II.    JURISDICTION AND VENUE .......................................................... 9

III.   PARTIES ............................................................................................. 9

IV.   RELEVANT NON-PARTIES .......................................................... 13

V.    BACKGROUND ON THE HONIG GROUP ................................... 21

      A.    The SEC Has Sued Honig, O'Rourke, Groussman, and Stetson for "Acting as an Undisclosed Control Group" in Three Previous Fraudulent Pump-and-Dump Schemes Involving the Same *Modus Operandi* They Used at Riot ......... 21

            1.    Biozone Pharmaceuticals, Inc. (a/k/a "Company A") ............................ 29

            2.    MGT Capital Investments Inc. (a/k/a "Company B") ............................ 32

            3.    MabVax Therapeutics Holdings, Inc. (a/k/a "Company C") .................. 36

      B.    The Honig Group Co-Invested in Other Public Microcap Companies ............... 40

            1.    The PolarityTE (f/k/a Majesco Entertainment) ..................................... 40

            2.    YesDTC Holdings, Inc. .......................................................................... 41

            3.    Marathon Patent Group, Inc. ................................................................. 42

            4.    WPCS International Incorporated and BXT Trader ............................... 44

            5.    Pershing Gold Corp. .............................................................................. 45

            6.    MUNDOmedia Ltd. ............................................................................... 46

VI.   THE SELLING STOCKHOLDERS' CONNECTIONS TO THE HONIG GROUP ....... 47

VII.  FACTUAL BACKGROUND ON THE FRAUDULENT SCHEME ............................. 48

      A.    In 2016, Defendants Target Venaxis, Riot's Predecessor, Using Their Typical Pump-and-Dump Playbook ..................................................................... 49

      B.    A Few Months After Beeghley Assumed the Role as CEO, The Company Announced A Special Dividend and Business Transformation to "Riot Blockchain" – At the Same Time, Honig Secretly Acquires and Sells Hundreds of Thousands of Shares of Riot ......... 53

      C.    Prior to the Company's Transition to Riot, Defendants O'Rourke and Beeghley Caused the Company to Conceal Honig's Group Status by Issuing False and Misleading Registration Statements ......... 54

      D.    Honig Groups Members Honig, DeFrancesco, Groussman and Stetson Fail to File Schedules 13D ......... 54

      E.    O'Rourke and Beeghley Caused the Company to Conceal Related Party Transactions with Members of the Honig Group ......... 55

            1.    The March 2017 Private Placement ...................................................... 57

i

2.   The Coinsquare Agreement ..................................................................... 58

3.   The Kairos Transaction ............................................................................ 60

4.   The December 2017 Private Placement .................................................. 62

F.   October 11, 2017 – Defendant Groussman and Defendant Honig's Brother, Jonathon Honig, Falsely Deny that Their Ownership in Riot Is Part of a Control Group ................................................................................. 62

G.   January 5, 2018 – Riot Fires Its Auditor ............................................................ 63

H.   December 29, 2017 – O'Rourke Sells 30,383 Shares for Proceeds of $869,256 63

I.   January 4-5, 2018 –Riot Fires Its Independent Auditor and Files an Amended Form 8-K/A Disclosing Audited Financial Statements of Kairos Revealing that Riot Vastly Overpaid for Kairos's Assets ....................... 65

VIII.   THE TRUTH ABOUT HONIG'S STOCK SALES AND THE FRAUDULENT SCHEME BEGINS TO EMERGE ................................................................................. 66

IX.   DEFENDANTS ENGAGED IN A MANIPULATIVE DEVICE, SCHEME, ARTIFICE, AND CONSPIRACY TO DEFRAUD RIOT'S PUBLIC SHAREDHOLDERS DURING THE CLASS PERIOD ................................................. 78

A.   Owners and Issuers of Securities Have Well-Known Disclosure Duties Under Section 13(d), Regulation 13d, and Item 403 of Regulation S-K ............ 80

B.   Honig, O'Rourke, and Stetson Were Familiar with Section 13(d) ..................... 84

C.   Defendants Acted as an Undisclosed Control Group to Pump-and-Dump Riot Stock While Misrepresenting and Concealing their Beneficial Ownership in Violation of Section 13(d), Rule 13d-2, and Item 403 of Regulation S-K .......... 85

1.   Honig Knowingly Engaged in the Fraudulent Scheme ........................... 87

2.   Groussman Knowingly Engaged in the Fraudulent Scheme ................... 90

3.   Stetson Knowingly Engaged in the Fraudulent Scheme ......................... 93

4.   DeFrancesco Knowingly Engaged in the Fraudulent Scheme ................ 95

5.   O'Rourke Knowingly Engaged in the Fraudulent Scheme ..................... 98

6.   Beeghley Knowingly Engaged in the Fraudulent Scheme .................... 101

X.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................................................................. 103

A.   Defendants' Materially False and Misleading Statements and Omissions in Benificial Ownership Reports on Schedules 13D and 13G .............................. 104

1.   Honig's Beneficial Ownership Reports on Schedule 13D Were Materially False, Misleading, Deficient, and Untimely and Facilitated His Manipulative Trading in Riot's Common Stock .......... 105

2.   Groussman's Beneficial Ownership Reports on Schedule 13G Were Materially False, Misleading, Deficient, and Untimely ........................ 113

3. DeFrancesco's Beneficial Ownership Reports on Schedule 13D Were Materially False, Misleading, Deficient, and Untimely ....... 118

4. Stetson Failed to File Beneficial Ownership Reports with the SEC Despite Co-Investing Alongside the Undisclosed Honig Group ........... 122

B. Defendants' Materially False and Statements and Omissions Regarding the Company's Beneficial Ownership and Related-Party Transactions ................. 123

1. April 20, 2017 – Registration Statement (Form S-3/A) ........................ 124

2. April 27, 2017 – Annual Report (Form 10-K/A) .................................. 127

3. July 19, 2017 – Registration Statement (Form S-3/A) ......................... 129

4. August 24, 2017 – Registration Statement (Form S-3/A) .................... 130

5. September 25, 2017 – Registration Statement (Form S-3/A) ............... 131

6. January 5, 2018 – Registration Statement (Form S-3) .......................... 133

7. February 7, 2018 – Registration Statement (Form S-3/A) .................... 137

C. Defendants' Materially False and Misleading Statements and Omissions Regarding Riot's Related-Party Transactions with Defendants ........................ 139

1. March 16, 2017 – Current Report (Form 8-K) ...................................... 139

2. March 31, 2017 – Annual Report (Form 10-K) ..................................... 140

3. October 4, 2017 – Current Report (Form 8-K) ...................................... 140

4. November 3, 2017 – Current Report (Form 8-K) .................................. 141

5. November 13, 2017 – Quarterly Report (Form 10-Q) ........................... 143

6. December 12, 2017 – Proxy Statement (Form DEF 14A) ..................... 144

7. December 19, 2017 – Current Report (Form 8-K) and Press Release ... 149

8. January 5, 2018 – Registration Statement (Form S-3) ........................... 151

9. February 7, 2018 – Registration Statement (Form S-3/A) .................... 152

10. February 16, 2018 – Current Report (Form 8-K)  and Shareholder Letter ...................................................................................................... 152

11. March 26, 2018 - Proxy Statement (Form DEF 14A) ........................... 154

XI. POST-CLASS PERIOD DEVELOPMENTS ................................................. 155

XII. ADDITIONAL SCIENTER ALLEGATIONS ............................................... 156

XIII. LOSS CAUSATION/ECONOMIC LOSS .................................................... 161

A. January 31 – *The Wall Street Journal* – "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake" ........................................................ 162

B. February 16, 2018 – "CNBC Investigates Red Flags Raised Over Riot Blockchain" ........................................................................................... 163

iii

C.     April 17-18, 2018 – Riot Files Form 10-K Revealing Related Party Transactions ........................................................................................ 164

D.     May 29, 2018 – Riot Files a Form 8-K Revising Its Disclosures Concerning the Coinsquare Transaction ......................................... 164

E.     September 7, 2018 – SEC Files Suits Against Honig, O'Rourke, Groussman, Stetson, and Others ............................................. 165

XIV.    CLASS ACTION ALLEGATIONS .................................................. 165

XV.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTION ................................. 167

XVI.   NO SAFE HARBOR ......................................................................... 170

COUNT I ......................................................................................................... 170

COUNT II ........................................................................................................ 172

COUNT III ....................................................................................................... 176

PRAYER FOR RELIEF .................................................................................. 177

DEMAND FOR TRIAL BY JURY ................................................................. 178

iv

783086.1

Court-appointed Lead Plaintiff Dr. Stanley Golovac ("Lead Plaintiff"), individually and on behalf of all other persons and entities similarly situated, by Lead Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review and analysis of filings by Riot Blockchain, Inc. ("Riot" or the "Company") and other public companies with the U.S. Securities and Exchange Commission ("SEC"); press releases, analyst reports, news articles, investment industry commentary, media, and other public statements about Riot and other companies; corporation registrations and filings with state governments; the corporate websites of Riot and other companies; court filings in various ligation involving Defendants (defined below), including *Securities and Exchange Commission v. Honig, et al.*, No. 1:18-cv-08175 (S.D.N.Y.) (the "*Honig* Action"); and an investigation conducted by and through Lead Plaintiff's attorneys.

The investigation of Lead Plaintiff's attorneys is continuing, yet certain additional facts supporting these allegations are known only to Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION

1.      This is a federal securities class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule l0b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) on behalf of Lead Plaintiff and all other persons or entities who purchased or otherwise acquired the securities of Riot and/or Bioptix (NASDAQ:  RIOT, BIOP) between March 15, 2017, and September 6, 2018, inclusive (the "Class Period"), and were damaged thereby. Lead Plaintiff brings this action to pursue remedies against the Company, certain of its

783086.1

current or former executive officers and/or directors, and several of Riot's largest shareholders, including Barry Honig ("Honig"), who as a group conspired with one another and acted in concert with an undisclosed control group of other Riot shareholders to (1) amass a controlling interest in Riot; (2) conceal their control through false and misleading statements and omissions regarding the Company's beneficial ownership in violation of Section 13(d) of the Exchange Act, Regulation 13d, and Items 403 and 404 of Regulation S-K; (3) drive up the price and trading volume of Riot stock through manipulative trading, promotional activity, and false and misleading disclosures; (4) engage in undisclosed related-party transactions at the expense of the Company and its shareholders; and (5) dump their shares into the artificially inflated market on unsuspecting retail investors.

2.     Defendants' pump-and-dump scheme involved the purported transformation of Riot from a biotech company into an investor and "miner" of cryptocurrency such as Bitcoin.  This scheme was orchestrated by Honig, a Florida-based investor who has been charged by the SEC for masterminding multiple other pump-and-dump schemes, John O'Rourke ("O'Rourke"), Riot's Chief Executive Officer ("CEO") during the Class Period, Michael Beeghley ("Beeghley"), also Riot's CEO during the Class Period, as well as Mark Groussman ("Groussman"), John Stetson ("Stetson"), and Catherine DeFrancesco ("DeFrancesco") – investors in Riot who participated in and facilitated the pump-and-dump scheme by misrepresenting and concealing both the Honig Group's (defined below) cooperation as an undisclosed control group over the Company, as well as their own insider stock sales in violation of their obligations under the federal securities laws.

3.     Despite grandiose promises that Riot would be a "pure play" in cryptocurrency that would "leverage our expertise, and network, to build and support blockchain technology companies," in reality Defendants' primary focus was to find ways to promote and increase the

liqtuty of Riot's thinly traded stock, and then once unsuspecting public investors piled in, to sell as quickly as they could before the Company's public shareholders had figured out what happened. As SEC Chairman Jay Clayton testified before Congress – in what one reporter described as a "thinly-veiled sot at Riot" – "***Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain.***"

4.     This, however, is precisely what Riot and its executives did: "hype" the Company's prospects by issuing a flurry of press releases, SEC filings, and interviews with television and newspaper journalists – all designed to give investors the false impression that Riot was a serious cryptocurrency company.  This was not true.  Riot's so-called investments in cryptocurrency were, in reality, related-party transactions with Honig and his associates and entities that were secretly owned and controlled by him.  These related-party transactions, and the individuals behind them, mirrored similar schemes that Defendants and their associates have perpetrated at other public companies.  Meanwhile, Defendants and more than 20 affiliated Selling Stockholders – each with confirmed ties to the Honig Group through past microcap stock investments – sold their Riot stock at inflated prices for millions of dollars in proceeds before the truth about their scheme was revealed – first by investigative journalists, and ultimately by the investigators and lawyers at the SEC.

5.     Unbeknownst to Riot shareholders during the Class Period, Honig, O'Rourke, Groussman, and Stetson have a long history of co-investing in dozens and dozens of microcap public companies.  As a result, in September 2018, the SEC brought suit against these four men (and others) related to three alleged microcap pump-and-dump schemes.  Yet, during the Class Period Defendants went to great lengths to hide Honig's ties to Company insiders and other Riot

shareholders by violating the Exchange Act and SEC rules related to the disclosure beneficial ownership, stock sales, and SEC rules requiring disclosure of transactions with related parties.

6.     Indeed, so entrenched was Defendant Honig's control over Riot that the Company's principal executive offices were not in Colorado, as officially represented by the Company, but instead were effectively located in Boca Raton, Florida where Defendants O'Rourke, Honig, Groussman, and Stetson had recently shared the same office, which allowed them to closely collaborate in controling Riot and its operations, affairs, and public disclosures.

7.     Unfortunately, as has become clear over the past few years, Defendants' fraudulent actions are not limited to Riot.  The SEC has charged Defendants Honig, O'Rourke, and Stetson with strickingly similar pump-and-dump schemes at several other publicly traded companies. Describing the group as "microcap fraudsters," the SEC has alleged that "Honig was the primary strategist, calling upon other [affiliated co-investors] to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity."  The SEC further alleged that "[i]n each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse merger or by participating in financings on terms highly unfavorable to the company."  Defendant O'Rourke resigned as Riot's CEO in the wake of these allegations and certain of the individuals charged by the SEC have already settled those charges.  As a result of the SEC's action, Honig, O'Rourke, Stetson, and Groussman have each agreed to disgorge their alleged illgotten gains, pay penalties and interest, and agree to be barred from participating in any offering of penny stock, prohibited from holding greater than 4.99% of any penny stock company, and prohibited from advertising, marketing, or otherwise promoting penny stocks.  Honig and O'Rourke's prohibitions are permanent; Stetson and Groussman's prohibitions are for ten and five years, respectively.

8.      As alleged herein, during the Class Period, each of the Defendants – pursuant to explicit or tacit agreements with each other and the Selling Stockholders – agreed to acquire, hold, vote, and/or dispose of shares they acquired in Riot in coordination with one another while knowingly or recklessly obtaining and exercising undisclosed control of the management and policies of Riot and while selling shares of Riot into the market at artificially inflated prices. Defendants did so in violation of Section 13(d) of the Exchange Act and Rule 13d-2, *et seq.*, promulgated thereunder, which required Defendants to disclose their status as a "group" (as defined by Section 13(d)(3)) on Schedule 13D and to "promptly" update any material changes in their beneficial ownership of Riot's common stock in amendments (on Schedule 13D/A) to their Section 13(d) filings.  *See* § IX.A, *infra*.

9.      Defendants Honig, O'Rourke, and Stetson were familiar with their obligations under Section 13(d) – and the materiality of their disclosures to Riot's investors regarding beneficial ownership of the Company's stock – because they themselves had previously filed a lawsuit under this statute alleging that these disclosures were material to them.  *See* § IX.B, *infra*.

10.     Yet, despite this knowledge, Defendants failed to make timely and appropriate Section 13(d) filings and amendments reflecting their acquisition and disposition of Riot stock as part of scheme to defraud investors about their group's control over the management and policies of, and the magnitude of their collective investment in, Riot.  *See* § X.A, *infra*.  And having concealed their group's existence and control over Riot, Defendants proceeded to engage in manipulative trading in Riot's securities (including massive sales of Riot's common stock) while failing to make the necessary amendments to their Section 13(d) filings, which under the rules, should have promptly alerted Riot's public investors that a group of insider shareholders (indeed,

an undisclosed control group) were collectively dumping their shares into the market.  *See* §§ X.A & X.A, *infra*.

11.     And as discussed below, Defendants Honig, Groussman, Stetson, and DeFrancesco's violations of Section 13(d) were made knowingly, or at least recklessly, in light of their clear knowledge that they were acting together as a group in their scheme involving Riot. *See* §§ IX.C.1-4, *infra*.

12.     Defendants could not have accomplished their scheme, however, without the assistance of Defendants O'Rourke and Beeghley from inside the Company.  Specifically during the Class Period, Defendants O'Rourke and Beeghley, as officers and/or directors of Riot, pursuant to explicit or tacit agreements with Defendants Honig, Groussman, Stetson, and DeFrancesco, caused the Company to issue materially false and misleading public filings with the SEC – including on Forms S-3, S-3/A, and 10-K, and Schedule 14A – that materially misrepresented the Company's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K by misrepresenting and concealing the fact that many of Riot's largest shareholders – including Defendants Honig, Groussman, Stetson, and DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A – were members of a group with each other (as defined by Section 13(d)(3)) through which they agreed to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  *See* § X.B, *infra*.

13.     In causing Riot to issue its materially false and misleading Forms S-3 and S-3/A, O'Rourke and Beeghley well aware that the Honig Group (including themselves) was a closely coordinated "group" that amply fit that definition under Section 13(d)(3), and which was therefore engaged in a scheme to defraud the Company's public investors.  *See* § IX.C.5-6, *infra*.

14.     Defendants O'Rourke, Beeghley, and Riot also knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by issuing materially false and misleading Forms 8-k and 10-K that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendants Honig and DeFrancesco.  *See* § X.C, *infra*.

15.     Defendants' knowledge of their roles in the Honig Group's fraudulent scheme is amply supported.  As noted above, Honig, O'Rourke, and Stetson were well aware of their legal duties under Section 13(d) because they were involved in Honig's 2015 lawsuit under that statute, yet utterly failed to comply with those duties.  Defendants clearly knew they were a "group" as defined by Section 13(d).  According to the SEC, between 2011 and August 2018, Honig invested alongside O'Rourke in *over 75 issuers*, alongside Stetson in *over 65 issuers*, alongside Brauser in *over 40 issuers* – and alongside "some combination of Stetson, Brauser, O'Rourke, [and] Groussman" in "*nearly every scheme* . . . ."  If that were not enough, O'Rourke stated in a February 3, 2014 email that "Barry Honig is the principal investor of *our small group*."  If O'Rourke's own words were insufficient, the SEC has alleged that Honig, O'Rourke, Stetson, and often Grossman all worked together out of Honig's office in Boca Raton, Florida, which is corroborated by the fact that a letter filed with the SEC from Honig to Riot's outgoing Board indicated that O'Rourke and Stetson's fax numbers were the same fax number that Honig listed on his letterhead for his Boca Raton office.  And that is the same office where CNBC's investigative journalists discovered O'Rourke on the day of Riot's cancelled annual shareholder meeting.  Finally, emails uncovered by the SEC, and attached hereto, reveal how Honig, O'Rourke, Stetson, and Groussman coordinated their investments in numerous public microcap companies.  One such company was PolarityTE, in which Defendants Beeghley and DeFrancesco invested alongside Honig

7

(PolarityTE's then Chairman and CEO) and Stetson (PolarityTE's then CFO), as well as O'Rourke, Groussman, and many of the same Selling Stockholders (defined below) who, through the leadership and machinations of the Honig Group, became a undisclosed Section 13(d) group of investors in Riot.

16.     Defendants' scheme was revealed through a series of disclosures that revealed to the market what Defendants had taken such great lengths to misrepresent and conceal:  that they were undisclosed control group engaging in undisclosed insider sales.  On January 31, 2018, from *The Wall Street Journal* that "Mr. Honig has sold about 500,000 shares" and only "still owns about 1% of the company."  "'When stock goes up, you take a profit,' [Honig] said."  On this news, Riot's stock fell ***14.26%*** over two days.  Then, on February 16, 2017, CNBC published the article that revealed Honig as "the man behind the Riot Blockchain curtain"; that CEO O'Rourke worked out of Honig's Boca Raton office; that the "true extent of Honig's selling" of Riot stock was "[b]uried deep in the footnotes of Riot filings"; and revealed details about Riot's suspicious related-party transactions.  In response, Riot's share price fell ***33.4%***.  Next, on April 17, 2018, Riot filed an annual report disclosing the financial interests of Honig and DeFrancesco in various 2017 related-party transactions, causing Riot's stock price to fall another ***5.8%***.  A May 25, 2018 disclosure of yet further related-party transactions caused Riot's shares to decline ***6%***.  Finally, on September 7, 2018, the SEC filed the *Honig* Action against Defendants Honig, O'Rourke, Groussman, and Stetson, and their affiliates, revealing that, contrary to Defendants' misleading Schedules 13D and 13G, and Riot's misleading Forms S-3 and 10-K, the Honig Group was not only a "group" as defined by Section 13(d), but in fact a a highly-orchestrated and closely-knit partnership amongst Honig, O'Rourke, Groussman, and Stetson, who had been engaged in the same fraudulent *modus operandi* at Riot that they had perfected a dozens of previous including the

three pump-and-dump schemes described in detail by the SEC.  On this news, Riot's stock price dropped ***26.1%.***

## II.     JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

19.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the misleading statements entered into and the subsequent damages took place within this district.

20.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

21.     Lead Plaintiff purchased Riot common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22.     Defendant Riot is a Nevada corporation with its principal executive offices purportedly located at 834-F South Perry Street, Suite 443, Castle Rock, Colorado 80104.  The Company's securities trade on NASDAQ under the symbol "RIOT," and previously traded as "BIOP."  Riot purports to invest in various blockchain technologies and mine cryptocurrencies such as Bitcoin.  As of April 13, 2018, Riot had 13,417,132 shares of common stock outstanding.

9

23.     Defendant Honig is a resident of Boca Raton, Florida, and, at all relevant times, worked at an office in Boca Raton with O'Rourke.  Defendant Stetson, and at times Defendant Groussman, also worked out of Honig's Boca Raton office.  Honig is a defendant in the *Honig* Action and has been "permanently barred from participating in any offering of penny stock." Honig, through his ownership of Riot securities, was in a position to exercise influence over Riot's top executives, including O'Rourke and Beeghley, and Riot's Board of Directors.  Honig also was a fiduciary of Riot by, among other things, his actions calculated to dictate the structure of the Company.  Honig, through his continuous course of business dealings with Riot, acted as a control person of the Company.  Honig has been involved in dozens of small companies that issued public securities, primarily through mergers with the shells of failed or failing businesses, in return for significant amounts of stock or convertible notes.  Honig sold at least 1,583,005 shares of his stock in the Company for at least $17 million in proceeds while maintaining close ties with Company insiders who had access to material, nonpublic information about Riot.  As alleged herein, Honig has longstanding business ties and/or co-investments with O'Rourke, Beeghley, Stetson, and Groussman, and other Relevant Non-Parties listed below.  Honig is a trustee of GRQ 401K, which has been a shareholder of Riot since at least September 14, 2016.  Honig had voting and dispositive power over GRQ 401K's securities of Riot.  Honig has been a shareholder of Riot in his individual capacity since September 19, 2016.  Honig was Chairman and CEO of Majesco (later called PolarityTE) from September 30, 2015, until December 1, 2016.  Honig was formerly a Director of Pershing Gold.

24.     Defendant O'Rourke, born in 1985, is a resident of Fort Lauderdale, Florida.  After being nominated by Honig, O'Rourke was a Director of the Company beginning on January 6, 2017.  O'Rourke also served as Riot's President, Secretary, and Treasurer since at least September

2017,[1] and as Riot's CEO and Chairman of the Board from November 3, 2017 until September 8, 2018, when he resigned after the SEC charged him in the *Honig* Action along with Honig, Groussman, Stetson, Brauser, and others.  As a result of the *Honig* Action, O'Rourke has been "permanently barred from participating in any offering of penny stock."  O'Rourke's 2017 executive compensation included a $60,000 salary, $2,322.00 in stock awards, $609,842 in option awards, which totaled to $2,991,842 in compensation.  Additionally, O'Rourke sold at least 30,383 shares of his stock for at least $869,256.35 of profit while he had access to material, nonpublic information about Riot.  O'Rourke has longstanding business ties and/or co-investments with Honig, Groussman, and Stetson – including working out of the same office.  O'Rourke used the same fax number as Honig and Stetson.  O'Rourke and Stetson reside in homes located approximately 800 feet apart.  O'Rourke owns ATG.

25.     Defendant Groussman is a resident of Miami Beach, Florida, and worked out of the same office in Boca Raton with Honig, O'Rourke, and Stetson.  Groussman owns Melechdavid. Groussman purchased his house in Miami Beach, Florida, with a $700,000 mortgage loan from Honig, Groussman's mortgage holder.  Groussman is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period. Groussman is a defendant in the *Honig* Action and has been barred for ten years from participating in any offering of penny stock.

26.     Defendant Stetson is a resident of Fort Lauderdale, Florida, where Defendants Stetson and O'Rourke reside in houses approximately 800 feet apart.  Stetson is the former CFO of PolarityTE.   Stetson has longstanding business ties and/or co-investments with Honig,

---

[1] A December 20, 2017, filing by Riot with the Nevada Secretary of State ("Filing Number 20170535413-91") lists O'Rourke as Riot's "President," "Secretary," and "Treasurer" for "the filing period of Sep, 2017 to Sep, 2018."  O'Rourke is also identified as "President" of "Riot Blockchain, Inc." in "Articles of Merger" that O'Rourke signed and filed with the Nevada Secretary of State on October 3, 2017.

O'Rourke, and Groussman – including working out of the same office. Stetson used the same fax number as Honig and O'Rourke. Stetson owns Stetson Capital. Stetson is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period. Stetson is a defendant in the *Honig* Action and has been barred for five years from participating in any offering of penny stock.

27.    Defendant DeFrancesco was an 11%+ beneficial owner of shares in Riot through at least six different entities: DSB Capital, Ltd., a Turks & Caicos company; DeFrancesco Motorsports, Inc., an Ontario corporation; Delavalco Holdings, Inc., an Ontario corporation; Delavalco Holdings, Inc., a Florida corporation; Marcandy Investments Corp., an Ontario corporation; Namaste Gorgie, Inc., an Ontario corporation. DeFrancesco began acquiring Riot shares in August 2016. DeFrancesco is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.

28.    Defendant Beeghley was a Director of the Company since at least November 30, 2016; became CEO on April 6, 2017; and became Chairman of the Company's Board in January 2017. Beeghley was Chairman and CEO until he was replaced by Defendant O'Rourke on November 3, 2017. Beeghley was Riot's CEO from April 2017 to November 2017; Chairman of the Board from January 2017 to November 2017; and a Director from November 2016 to November 2017. In 2017, Riot paid Beeghley $339,739 in compensation, including $9,000 of salary, $270,000 in stock awards, and $60,739 in option awards. Beeghley was a Director of Majeso (later called PolarityTE) from December 18, 2015, until October 18, 2017.

29.    Defendants Honig, O'Rourke, Groussman, Stetson, DeFrancesco, and Beeghley are collectively referred to herein as the "Honig Group."

30.    Defendants Riot, O'Rourke and Beeghley are collectively referred to herein as the "Riot Defendants."

## IV.     RELEVANT NON-PARTIES

31.     2330573 Ontario Inc., whose President is Theofilos, was a Selling Stockholder in Riot's January 5 and February 7, 2018 Registration Statements on Forms S-3 and S-3/A and party to the September 29, 2017 Coinsquare shareholders' agreement with Riot.

32.     Aifos Capital Management, LLC ("Afios") is controlled by Karr, its Managing Member.

33.     ATG Capital LLC ("ATG") is a Florida corporation owned and operated by Defendant O'Rourke and for which O'Rourke makes investment decisions.  ATG's principal place of business is in Florida.  ATG's was incorporated in or around 2012.

34.     Biozone Pharmaceuticals, Inc. ("Biozone") is a Nevada corporation with principal place of business in Pittsburg, California.  The SEC has sued Defendants Honig, O'Rourke, and Stetson in connection with their investment in Biozone.

35.     Michael Brauser ("Brauser") is a resident of Lighthouse Point, Florida.  Brauser invested in Riot through Grander Holdings, Inc. 401K.  Brauser also owned 112,499 shares of goNumerical Lftd. ("goNumerical"), a leading Canadian Blockchain company known as Coinsquare Ltd.  The SEC sued Brauser along with Honig, O'Rourke, and Stetson for their pump-and-dump schemes involving Biozone, MGT, and MabVax.

36.     Cresval Capital Corp. ("Cresval") a Canadian mineral exploration company based in Vancouver, British Columbia, whose President is Lee Ann Wolfin.

37.     Mike Dai ("Dai") was a Director of Riot from January 2017 until November 3, 2017.  Dai was nominated to Riot's Board by Defendants Honig and DeFrancesco in December 2016.  Before joining Riot's Board, Dai already had established business ties with Defendant DeFrancesco's husband, Andrew, and other relatives, as well as Defendants O'Rourke and Stetson, Jonathan Honig, and other members of the Honig Group. Specifically, as of December 1, 2016,

13

Dai "serve[d] as chief financial officer and Director of Santa Maria Petroleum Inc. (TSXV:SMQ.H) a position he ha[d] held since 2014," according to Defendant Honig's SEC filing nominating Dai to the Bioptix Board.  Dai became CFO and a Director of Santa Maria on May 22, 2014, the same day that Andrew DeFrancesco became Santa Maria's "President and CEO."  According to a December 2, 2016 OTCQB Certification (which was "prepared by . . . Mike Dai, CFO" and "Andrew DeFrancesco, CEO") that was filed on behalf of Santa Maria with the OTC Markets Stock Exchange, the "beneficial owners of more than five percent" of Santa Maria's "equity securities" included Jonathan Honig, ATG (i.e., O'Rourke), Stetson Capital, and several of Defendant DeFrancesco's relatives.

38.     Global Bit Ventures, Inc. ("GBI") is a Nevada corporation that Marathon planned but failed to merge with in order to convert Marathon into a "blockchain" company.

39.     Grander Holdings, Inc. 401K ("Grander") is a Florida corporation that Brauser owns and operates as Trustee.  The SEC sued Grander with Brauser Honig, O'Rourke, and Stetson in connection pump-and-dump schemes involving Biozone, MGT, and MabVax.

40.     GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("GRQ 401K") is an entity for which Honig serves as Trustee.  As of September 14, 2016, GRQ owned at least 389,159 shares of common stock of Riot (then-Venaxis) (8.6% of voting stock), and later increased its stake to 9.99%.

41.     Michael Ho ("Ho") was the President, Secretary, and Treasurer of both Kairos and Ingenium, which were both incorporated on the same day, October 19, 2017, in Nevada.  Ho is also a Manager of Prive.  In various corporate filings in Nevada and Florida, Ho has listed his address as either Dubai, Los Angeles, or Tampa.

14

42.    Alan Honig is the father of Barry Honig.  As of at least September 25, 2017, Alan Honig personally owned 20,000 shares of Riot common stock representing approximately 0.33% of the Company's common stock beneficially owned.

43.    Jonathan Honig is the brother of Barry Honig and is the Manager of Titan Multi-Strategy Fund I Ltd.  As at least September 25, 2017, Jonathan Honig beneficially owned, through Titan Multi-Strategy Fund I Ltd., 597,300 shares of Riot common stock representing 9.99% of the Company's common stock beneficially owned.

44.    Ingenium Global, Inc. ("Ingenium") is a Nevada corporation that was incorporated on October 19, 2019 by Laxague, the same day as Kairos.  Ho is Ingenium's President, Secretary, and Treasurer.  Pascual and Silverman are Directors of Ingenium.

45.    JAD Capital Inc. ("JAD") is a corporation located in Ontario, Canada, whose Director, with voting and dispositive control over JAD, is Theofilos.

46.    Adrian James ("James"), a stock promoter who previously touted other Honig-backed companies, including Pershing Gold, MusclePharm Inc. (the parent of Biozone), and Valor Gold Corp.  James is the President and CEO of Stockwire, through which James invested in Riot.

47.    Kairos Global Technology Inc. ("Kairos") is a Nevada corporation that was incorporated on October 19, 2019 by Laxague.  Ho is Kairos's President, Secretary, and Treasurer. Pascual and Silverman are Directors of Kairos.

48.    Andrew Kaplan ("Kaplan") was a director of Riot from May 5, 2017, until his resignation on October 22, 2018.  Kaplan was a member of the Audit Committee and Compensation Committee, and Chair of the Governance Committee.  In 2017, Kaplan received total compensation of $88,220, including his fees paid in cash of $8,000 and stock awards of

$80,220.  Kaplan previously served on the board of directors of Majesco/PolarityTE from October 2015 until December 1, 2016, during the same time period that Honig was CEO of Majesco.

49.     Edward M. Karr ("Karr") is a Director of both Pershing Gold and Levon, and was a Director of Majesco Entertainment prior to its merger with PolarityTE.  Specifically, Karr was appointed to Majesco/PolarityTE's board on September 25, 2014, the same day as Honig, Brauser, and Kaplan.  ¶ 119.  Karr resigned as a director of Polarity on December 1, 2016, the same day that Honig and Brauser also resigned.  Karr invested in Riot through Aifos, a company that Karr controls.

50.     Harvey Kesner ("Kesner") is the long-time lawyer of Defendant Honig.  Kesner is the owner of Paradox Capital Partners ("Paradox").  Kesner represented Honig in connection with his investments in Riot and MabVax.  Kesner and/or Paradox invested in Riot and MabVax. Kesner is an owner and manager of EST, which Kesner financed with more than $100,000 through Paradox.  Kesner is a former partner with Haynes and Boone, LLP and Sichenzia Friedman Ference LLP ("Sichenzia").  In 2018, MabVax sued Sichenzia for malpractice due to Kesner's allegedly conflicted legal representation of both Honig and MabVax. Acccording to a article in *Barron's*, "nearly two dozen public companies backed by Honig, or other defendants in last month's SEC complaint, used" Kesner " until he retired . . . just before the [*Honig*] action.  Those companies also happened to use [EST] . . . ."

51.     Laxague Law Inc. ("Laxague") is a law firm in Reno, Nevada, operated by Partner Joe Laxague, which incorporated both Kairos and Ingenium on October 19, 2018.

52.     Jason Les ("Les") has been a director of the Company since November 2017 and is a member of the Company's Audit Committee and Governance Committee, and Chair of the Compensation Committee.  According to the 2017 Proxy, Les is a professional poker player and

is qualified to serve as a director "based on the fact that he has been active in the industry as a miner, studying protocol development and evaluating a variety of crypto investment strategies." Les received total compensation of $56,625 in 2017, which includes $6,000 of fees paid in cash and $50,625 of stock awards.

53.     Bryan Pascual is a Director of Kairos and Ingenium Global, Inc. and a Manager of Prive.

54.     Levon Resources Ltd. ("Levon") is another mineral exploration company in which Defendant Honig is former Director and Karr is a current Director.  Levon was founded by Arthur Wolfin, the father of Lee Ann Wolfin, the President of Cresval.

55.     Eric So served as a director of the Company from October 2017 until February 2018, and served as Chair of the Audit Committee and a member of the Compensation Committee and the Governance Committee.  In 2017, So was paid $65,675 in compensation, including $2,000 in fees paid in cash and $63,675 in stock awards. So was previously the chief legal and development officer at MUNDOmedia Ltd., a company in which Honig and O'Rourke have heavily invested.

56.     MabVax Therapeutics Holdings, Inc. ("MabVax") a Delaware corporation, with its principal place of business in San Diego County, California.  The SEC has sued Defendants O'Rourke, Honig, and Stetson in connection with their investments in MabVax.

57.     Marathon Patent Group Inc. ("Marathon") is a public company that trades on the NASDAQ that Honig, O'Rourke, Groussman, Stetson, Brauser, and others also invested in an attempted to convert into a "blockchain" company.

58.     Marcandy Investments Corp. ("Marcandy") is an Ontario corporation owned and controlled by its President, DeFrancesco.

17

59.     Melechdavid Inc. ("Melachdavid") is a Florida corporation whose principal place of business is Miami Beach, Florida, and whose President is Defendant Groussman.

60.     MGT Capital Investments Inc. ("MGT") is a Delaware corporation based in Durham, North Carolina.  The SEC has sued Defendants O'Rourke, Honig, and Stetson in connection with their investments in MGT.

61.     Richard Molinsky ("Molinksy") is a former stockbroker at D.H. Blair & Co. who was barred from the industry in 2000 after pleading guilty[2] to criminal charges related to market manipulation and fraudulent sales practices, was one such associate listed on the registration statement.  Molinsky has been an investor in numerous Honig-backed companies, including PolarityTE, Pershing Gold, Vapor Corp., and Riot.  Molinsky was a shareholder of Riot since at least September 25, 2017, when he disclosed owning 1.78% of Riot common stock.

62.     MUNDOmedia Ltd. ("MUNDOmedia") is a marketing company based in Toronto, Ontario, Canada founded by its CEO, Theofilos.

63.     Namaste Gorgie Inc. ("Namaste") is an Ontario corporation owned and controlled by its President, DeFrancesco.

64.     Northurst Inc. ("Northurst") is a Canadian company that owned 9.99% percent of Riot stock and was also an investor in Kairos. Northurst's controlling shareholder, Jakub Malczewski, was managing director of Ahaka Capital with David Baazov, the former CEO of an online gambling company who Canadian authorities charged with insider trading and market manipulation.  Through Ahaka Capital, Messrs. Malczewski and Baazov were investors in

---

[2] *See In the Matter of Breitner et al.*, No. 3-11105 (S.E.C. May 5, 2003), available at https://www.sec.gov/litigation/admin/34-47797.htm ("Molinsky pled guilty to and was convicted of the charge of Attempt to Commit the Crime of Enterprise Corruption and one count of Martin Act securities fraud (*see People of New York v. D.H. Blair, et al.*, Ind. No. 3282/00).").

MUNDOMedia alongside Honig, O'Rourke, Stetson, and Groussman.  Northurst was also an investor in GBV, which was nearly acquired by Marathon.

65.     Paradox Capital Partners LLC ("Paradox"). The registered address in Florida for Paradox Capital Partners (owned by Kesner) is the same Boca Raton building that Honig uses as his business address.

66.     Bryan Pascual ("Pascual"), a resident of Tampa, Florida, is a Director of Kairos and Ingenium, and a Manager of Prive.

67.     Pershing Gold Corp. ("Pershing Gold") is an emerging gold producer whose primary asset is the Relief Canyon Mine in Pershing County, Nevada.  Defendant Honig was a Director of Pershing Gold.

68.     PolarityTE Inc. ("PolarityTE") was formerly a video game company known as Majesco Entertainment, and is now a purported biotechnology company based in Salt-Lake City, Utah.  PolarityTE's Co-Chairmen were Defendant Honig and Brauser.  Honig was also Polarity's CEO.  Defendant Stetson was PolarityTE's CFO.  Karr and Defendant Kaplan were Directors of PolarityTE.

69.     Prive Technologies LLC ("Prive") is a Florida limited liability corporation that was incorporated on October 31, 2017, with its Principal Address at 218 S. Audobon Avenue, Tampa, Florida 33609.  Prive's Managers are Ho and Pascual.

70.     Robert O'Braitis ("O'Braitis"), a part-time resident of Boca Raton, Florida, owned as of at least September 25, 2017, owned 80,410 shares of Riot common stock representing 1.46% of the Company's common stock beneficially owned (the exact amount owned on that same date by Theofilos through JAD Capital Inc., and by Groussman in two separate UTMA accounts).  O'Braitis has been an investor in other Honig-backed companies, including PolarityTE and

19

Marathon, in which he was party to a "Securities Purchase Agreement with proposed Riot Board member Jesse Sutton.

71.     Moses D. Silverman ("Silverman"), a resident of Miami Beach, became a Director of Kairos and Ingenium on October 19, 2018.

72.     Stetson Capital Management, LLC ("Stetson Capital") is a Florida limited liability company incorporated in April 2016 whose manager and registered registered agent is Defendant Stetson.  Stetson Capital's Articles of Incorporation list Defendant Stetson's previous residence less than one mile from Defendant O'Rourke's residence in Fort Lauderdale, Florida.  Stetson Capital invested in at least 4.99% of Riot's common stock.

73.     Stockwire Research Group, Inc. ("Stockwire") is a Florida corporation whose principal place of business is in Miami-Dade County, Florida, and whose President and CEO is Adrian James.

74.     Tess Inc. ("Tess") is a company based in Toronto, Ontario, whose Chief Software Architect is Tanasescu.

75.     Jason Theofilos ("Theofilos") is the chief executive of MUNDOmedia Ltd., a digital advertising company in which Defendant Honig, Jonathan Honig, O'Rourke, Stetson, and Groussman each held shares.  Theofilos is the Director of JAD Capital Inc. and the President of 2330573 Ontario Inc.  As of at least September 25, 2017, Theofilos owned JAD Capital Inc., which owned 80,410 shares of Riot common stock representing 1.46% of the Company's common stock beneficially owned (the exact amount owned on that same date by O'Braitis and by Groussman in two separate UTMA accounts).

76.     Sorin Tanasescu was Tess's Chief Software Architect and was concurrently a Director of an entity called Ingenium IT Compusoft and a Managing Director of a company called VoiceWay.

77.     Titan Multi-Strategy Fund I, Ltd. ("Titan") is a Florida corporation.  Titan is owned and controlled by Jonathan Honig, who is Titan's Manager.

78.     WPCS International Incorporated ("WPCS") was a global engineering, communications, and infrastructure "with over 500 employees in 10 operations centers on three continents."  In 2012, Defendant Honig, through GRQ 401, invested in WPCS when its stock was trading in excess of $1,000 per share.  In 2013, WPCS purchased BTX Trader, a bitcoin trading platform, from Defendant O'Rourke.  In January 2018, WPCS's changed its name to "Dropcare, Inc." and is now a cloud-services-for-cares company whose stock trades on NASDAQ under the ticker "DCAR" for approximately $2.01 per share.

## V.      BACKGROUND ON THE HONIG GROUP

### A.      The SEC Has Sued Honig, O'Rourke, Groussman, and Stetson for "Acting as an Undisclosed Control Group" in Three Previous Fraudulent Pump-and-Dump Schemes Involving the Same *Modus Operandi* They Used at Riot

79.     On September 7, 2018, the SEC filed the *Honig* Action against Defendants O'Rourke, Honig, Groussman, and Stetson (as well as related-party Brauser and others) for violating the Exchange Act and Securities Act by engaging in "three highly profitable 'pump-and-dump' schemes . . . from 2013 through 2018 in the stock of three public companies (Company A, Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares."  Cmpl. ¶ 1 (attached as Exhibit A).[3]

---

[3] Citations to "Cmpl. ¶ __" are to paragraphs of the SEC's initial complaint.  *See SEC v. Honig et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 8, 2009) (ECF No. 1).

80.     On March 16, 2020, the SEC filed a Second Amended Complaint, which is attached hereto as Exhibit B.[4]  In its complaint the SEC alleges that Defendants Honig, O'Rourke, Stetson and related-party Brauser, individually or through their entities, invested alongside one another in at least 19 issuers at or about the same time, from 2011 to the present.  While this action concerns three of those issuers, in most cases in which Honig, Brauser, Stetson, and O'Rourke co-invested, the investments followed a pattern: Honig or Brauser would identify a target company and arrange a financing or financings that would give them and their chosen co-investors (including Stetson and O'Rourke, among others) a controlling position in the company's outstanding common stock at lower-than-market prices.  Honig, Brauser, Stetson, and O'Rourke would then exercise that control by dictating terms of the company's material management decisions and policies, and voting together to direct the company's major business decisions. When the group determined that the time had arrived to exit the investment, they would engineer a publicity-generating event that would both drive the price of the stock higher, and also create market demand and trading volume that would allow them to sell their positions.  Typically, Honig, Brauser, Stetson and O'Rourke would dictate some kind of transaction for management to undertake – for example, an acquisition or merger, or a new investment by a well-known investor, like Investor 1 – and paid writers, bloggers or other public relations professionals to write about it.  Once the publicity had its intended effect on the stock's price and trading volume, Honig, Brauser, Stetson, O'Rourke and the other hand-picked co-investors would sell their respective positions – generally staggered over a course of weeks – into the artificially inflated market.  2d Am. Cmpl. ¶ 57.

_____

[4] Citations to "2d Am. Cmpl. ¶ __" are to paragraphs of the SEC's Second Amended Complaint. *See SEC v. Honig et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 8, 2009) (ECF No. 233).

81.     Throughout these stages, Honig, Stetson, and O'Rourke were in nearly daily contact because they worked out of the same office and were in frequent email and telephone contact, at times purposefully moving their conversations to the less permanent medium of text or instant messaging.  Honig, Stetson and O'Rourke were each in frequent contact with Brauser, with whom they shared office space until late 2013.  *Id.* ¶ 58.

82.     Honig, Brauser, Stetson, and O'Rourke obtained their interests in these issuers at the same time, and agreed to act as a group in holding, disposing and voting the stock they acquired, with Honig leading the combined effort.  As O'Rourke put it in a February 3, 2014 email to the officer of a potential merger target, "Barry Honig is the principal investor of ***our small group***."  Honig carefully controlled his "small group's" participants in the financings he arranged so that shares were held only by individuals and entities that (1) permitted Honig to direct how they voted their shares and/or acquiesced in Honig's control of the management of the company, and (2) refrained from selling their shares until the optimal time for group members to profit from the planned post-pump dump.  *Id.* ¶ 59.

83.     Honig worked with Stetson to ensure that members of his groups voted their shares in unison.  At times, members of the group reached out to Stetson to find out how they should vote on various proposals.  For example, with respect to one of the issuers in which they had co-invested, in July 2015, Brauser forwarded an email request from a co-investor's staffer to Stetson, asking whether to vote for or against a proposal.  Stetson, in an email that same day, copying Honig, replied, "Yes, vote 'For.'" In a November 2016 email to members of a Honig group of investors in another issuer, Stetson responded to a request for "instructions to vote" with "[v]oting in favor of [two named directors]. Against all other members and actions."  *Id.* ¶ 60.

84.     While Honig was the primary architect of the three schemes detailed below, email traffic among Honig, Brauser, Stetson, and O'Rourke demonstrates the various key roles each of these individuals played in the typical Honig-led investment.  *Id.* ¶ 61.

85.     Brauser is a long-time co-investor with Honig, investing (individually, through his entity, Grander, or through family members' accounts) alongside Honig (and/or a Honig entity) in more than ***40 issuers*** between approximately 2011 and mid-2018.  From at least October 2010 to approximately 2013, Brauser rented an office with Honig at 4400 Biscayne Boulevard in Miami, Florida.  Brauser's business association with Honig was sometimes noted by keen market observers:  As early as 2013, a short seller published a report on a company in which the two had invested and noted that a factor negatively affecting the value of the company's stock was the CEO's close financial ties with "two serial stock promoters," whom it identified as Honig and Brauser.  *Id.* ¶ 62.

86.     For some of the issuers in which Brauser co-invested alongside Honig, Brauser took an active role, at times directing the issuer's management, finding and negotiating transactions for the issuer or bringing in additional investors.  In others – particularly while Honig and Brauser worked through one of their periodic disputes about who owed whom money – Brauser was content to let Honig direct the steps in the scheme; since Brauser had been closely involved with respect to the other issuers in which he had co-invested with Honig, he was well-familiar with the playbook, knew that Honig would follow it and understood that Honig would signal to Brauser when it was time to sell his shares.  *Id.* ¶ 63.

87.     Stetson shared office space with Honig and O'Rourke at all relevant times. Individually, through his entity SCI, or through HSCI (the vehicle he nominally controlled), Stetson invested alongside Honig (and/or a Honig entity) in more than ***65 issuers*** between 2011

and August 2018.  In connection with most of these investments, Stetson executed Honig's directions, managed the administrative aspects of the Honig group's investments, and performed pre-investment due diligence. For example, Stetson communicated with brokers to effect Honig's trades, deposited Honig's shares with brokers, communicated investment terms and wire instructions to investors Honig had lined up, tracked the ownership of each group member in a particular issuer, corralled shareholder votes from co-investors (and, in some cases, even told co-investors how to vote), prepared financial analyses of proposed investments and conveyed Honig's instructions to issuer management.  From 2012 to 2013, Stetson also frequently managed Honig's arrangements with Ford to write paid promotional articles about issuers in which Honig and his group had invested.  *Id.* ¶ 64.

88.     O'Rourke shared office space with Honig and Stetson at all relevant times, beginning in 2012.  Through his entity, ATG, or individually, O'Rourke invested alongside Honig (and/or a Honig entity) in over *75 issuers* between 2011 and August 2018.  Beginning in 2013, O'Rourke managed the Honig group's promotional efforts by working with writers and bloggers to publish favorable articles and posts about issuers the Honig group controlled.  He arranged for those writers to be compensated for their promotional pieces.  For example, in 2013 and 2014, O'Rourke compensated "Writer E" for writing positive promotional articles.  O'Rourke made the payments through personal checks and/or sham stock purchases, designed to disguise the true purpose of the compensation.  O'Rourke knew, or was reckless in not knowing, that Writer E did not disclose these payments in the promotional pieces he published on these issuers.  *Id.* ¶ 65.

89.     At times, and with Honig's knowledge and consent, or at his direction, O'Rourke wrote and published the promotional articles himself.  O'Rourke used a pseudonym for the byline

and did not disclose his relationship to the issuer being promoted or the compensation Honig was paying him for the articles. *Id.* ¶ 66.

90.     In addition to his work with promoters and his own promotional activities, in at lease on instance, O'Rourke took the lead in negotiating a transaction for Company B, in which he, Honig, Brauser and Stetson and/or certain of their entities had invested.  After about his first year with Honig, O'Rourke also began assisting Stetson with the administrative aspects of each group investment. *Id.* ¶ 67.

91.     Stetson and O'Rourke knew that each participant in Honig's deals – Honig's "following" – had been invited to participate in these private transactions in exchange for some value each could bring to the deal, and that Ford was no different.  For example, Groussman brought needed cash and a willingness to follow Honig's directions on how to vote or when to sell. *Id.* ¶ 80.

92.     Given his February 26, 2019 settlement with the SEC, Groussman is referred to in the SEC's Second Amended Complaint as "Affiliate 1."  However, the SEC's initial complaint, dated September 7, 2018, alleged that "*[i]n every scheme*, Honig, and some combination of Stetson, Brauser, O'Rourke, *Groussman* . . .  either explicitly or tacitly agreed to buy, hold or sell their shares in coordination with one another, knowing that a pump and dump was in the offing that would allow them all to profit handsomely."  Cmpl. at ¶ 2.  Groussman's participation in the schemes involving Biozone, MGT, and MabVax included "pre-release manipulative trading" with Honig, Brauser, O'Rourke, Melechdavid and ATG. *Id.* ¶ 3.  "Honig, Brauser, Stetson, O'Rourke, . . . *and Groussman*, as well as certain of their entities, also violated beneficial ownership reporting requirements of the federal securities laws by failing to disclose their group beneficial ownership of shares and the fact that as a group they were looking to exercise (and, in fact, did exercise)

783086.1

control over the issuers." *Id.* ¶ 4. "*Groussman* . . . work[ed] at an office in Boca Raton with Honig, Stetson and O'Rourke." *Id.* ¶ 38.

93.     As stated in a letter[5] from counsel for the SEC filed with the court in *SEC v Honig*, the SEC recently reached additional settlements with several of the same Defendants and related parties in this case, including Defendants O'Rourke[6] and Stetson,[7] and Honig Group members Brauser,[8] ATG Capital LLC, Stetson Capital Investments Inc., and Grander Holdings, Inc.

94.     These settlements follow the SEC's previous settlement with Defendant Honig, in which he agreed, among other things, to be "permanently barred from participating in any offering of penny stock"; "permanently prohibited" from holding greater than 4.99% of any penny stock company; "permanently prohibited" from "advertising, marketing, or otherwise promoting" any penny stock; and agreed to "pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty" yet to be determined upon a forthcoming motion by the SEC.[9]

---

[5] *SEC v. Honig*, No. 1:18-cv-08175-ER (ECF No. 222) (Mar. 6, 2020) (attached as Exhibit C).

[6] *SEC v. Honig*, No. 1:18-cv-08175-ER (Mar. 6, 2020) (ECF No. 228) (Final Judgment as to Defendant John R. O'Rourke III). O'Rourke's settlement permanently bars him from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, or advertising, marketing, or promoting any penny stock, and requires him to pay $1,153,326 in disgorgement, interest, and civil penalties. *Id.*

[7] *SEC v. Honig*, No. 1:18-cv-08175-ER (Mar. 6, 2020) (ECF No. 227) (Final Judgment as to Defendant John Stetson). Stetson's settlement bars him for ten years from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, or advertising, marketing, or promoting any penny stock, and requires him to pay $1,154,669.28 in disgorgement, interest, and civil penalties. *Id.*

[8] *SEC v. Honig*, No. 1:18-cv-08175-ER (Mar. 6, 2020) (ECF No. 224) (Final Judgment as to Defendant Michael Brauser). Brauser's settlement permanently bars him from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, or advertising, marketing, or promoting any penny stock, and requires him to pay $1,175,768.16 in disgorgement, interest, and civil penalties. *Id.*

[9] *SEC v. Honig*, No. 1:18-cv-08175-ER (July 7, 2019) (ECF No. 152) (Judgment as to Defendant Barry Honig).

95.     On February 26, 2019, Defendant Groussman's settled with the SEC.  Groussman agreed to a similar five-year ban on participating in any offering of penning stock, holding greater than 4.99% of any penny stock, or advertising, marketing, or promoting any penny stock and required him to pay $ 1,381,914.78 in disgorgement, interest, and civil penalties.[10]

96.     In connection with the *Honig* Action, the SEC filed with the court several emails among Honig, O'Rourke, Groussman, Stetson, and/or Brauser that confirm that these individuals personally coordinated their investments in numerous public companies. *See* Exs. D, E, F, G, H & I.  For example, on July 2, 2014, Defendants Honig, O'Rourke, Stetson, Groussman, and Brauser received an email from a lawyer concerning a "Share Purchase" and requesting "broker representation letters" for the "transfer agency for Musclepharm Corp" for "each transferee."  *See* Ex. D at 7 of 21.[11]  That same day, this lawyer issued an opinion letter to the transfer agent stating that each of these same individuals had "executed representation letters that such parties are not affiliates and were not affiliates within the three months prior to the Purchase Date."  Ex. E at 17-18 of 25.

---

[10] *SEC v. Honig*, No. 1:18-cv-08175-ER (Feb. 6, 2019) ("ECF No. 93") (Final Judgment as to Defendant Mark Groussman).

[11] This July 2, 2014 email clearly identifies "John Stetson" and "Mike Brauser."  Honig's email address is the same that he used in his September 13, 2016 letter to the Bioptix Board on Schedule 13D/A.  *See* Ex. J.  O'Rourke's email address is the same listed for him and his entity, ATG, in a December 17, 2013 Amended and Restated Limited Liability Company Agreement between O'Rourke and BTX Trader LLC filed with the SEC.  *See* https://www.sec.gov/Archives/edgar/data/1086745/000152153613001045/q1101368_ex10-1.htm.  Groussman's email address is the same listed for him and his entity, Melachdavid, in a November 13, 2013 Stock Purchase Agreement involving "Positive ID Corporation" signed by Groussman, Honig, Stetson, and Karr.  *See* https://www.sec.gov/Archives/edgar/data/1347022/000139843213000739/exh10_1.htm.  Hudson Bay Master Fund Ltd., a "Selling Stockholder" in Riot's January and February 2018 Forms S-3, was also a party to this 2013 Stock Purchase Agreement.

97.     Similarly, a January 27, 2012 email from Stetson to Honig attaches a "Share Breakdown" of the shares that Honig, Stetson, Groussman, Brauser, and their affiliates would hold in IZEA Worldwide Inc after a stock split.  Ex. H.  Another January 20, 2011 email from Stetson provides a similar breakdown for himself, Honig, Brauser, and others for "Passport Potash, Inc."  Ex. G.  Likewise, an October 2, 2013 letter shows how Honig, Grossman, Brauser, and Brauser's relatives allotted their co-investments in Senesco Technologies, Inc.  Ex. F.

98.     The FBI and Department of Justice ("DOJ") have also been pursuing a criminal investigation into the Honig Group's pump-and-dump schemes, pursuant to which the FBI interviewed Defendant Honig and the DOJ made those FBI Form FD-302[12] interview notes available to the SEC.[13]

### 1.     Biozone Pharmaceuticals, Inc. (a/k/a "Company A")

99.     The Honig Group's three most recent schemes are also detailed in the SEC's March 8, 2019 First Amended Complaint[14] filed against Honig, O'Rourke, Stetson, Brauser, and related defendants.   The SEC alleged that "Honig was the primary strategist, calling upon other Defendants to, among other things, acquire or sell stock, arrange for the issuance of shares, negotiate transactions, and/or engage in promotional activity."  Am. Cmpl. ¶ 2.  The SEC alleged

---

[12] "After FBI agents conduct a formal interview, they incorporate [ ] their handwritten notes into a more complete report of the interview on the FBI's Interview Report Form FD-302, known colloquially as a '302.'"  *Palermo v. United States*, 776 F. App'x 753, 754 (3d Cir. 2019) (quoting *United States v. Lloyd*, 807 F.3d 1128, 1158 n.11 (9th Cir. 2015) (alteration in original)).

[13] *See* Ex. K at 21-25 (counsel informing the court that "the SEC has notes of [Barry] Honig's [FBI Form FD-] 302s," which the SEC "requested," "reviewed," and "gave the 302s back to the [DOJ]" and counsel for the SEC confirming that the SEC had "review[ed] the 302s" from Honig's interview).  *See also* Ex. L (Stipulation and Order in *SEC v. Honig* providing for disclosure by SEC of "notes taken by the [FBI] at an April 23, 2019 interview of a witness").

[14] Citations to "Am. Cmpl. ¶ __" are to paragraphs of the SEC's First Amended Complaint.  *See SEC v. Honig et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 8, 2009) (ECF No. 105).

that Honig, O'Rourke, Stetson, Brauser engaged in pump-and-dump schemes at "Company A" (Biozone), "Company B" (MGT), and "Company C" (MabVax):

> All told, the three schemes earned Defendants and their associates millions of dollars: Company A's pump and dump generated approximately $9.3 million in stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities, and affiliates. Company B's pump and dump generated more than $9.5 million for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities, affiliates, and/or certain frequent co-investors. And, most recently, the pump and dump of [MabVax] brought in over $8.3 million in stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities and/or certain frequent co-investors. These profits were made at the expense of investors who purchased shares in [Biozone], [MGT] and [MabVax] at artificially high prices based on misleading flattering articles or coverage in the media and matched trades that were orchestrated by the Defendants.

*Id.* ¶ 8.

100. In the Biozone Scheme, Honig and Brauser generated approximately $9.3 million in proceeds for themselves and their co-investors by secretly paying for a misleading promotional campaign, engaging in manipulative trading, and then unlawfully selling Biozone share into the artificially inflated market that they had generated. *Id.* ¶ 80.

101. In November 2010, Honig, along with his nominees, including Stetson and Groussman, purchased one-third of a publicly traded shell company. *Id.* ¶ 82. Honig, Brauser, and Stetson each disguised his role in the acquisition through an intermediary entity. *Id.* According to the SEC, "[s]ince part of Stetson's role in working with Honig was to keep track of the amount of each associated investor's holdings, and [Stetson] had reviewed [Biozone's] Form 10-K/A, setting out Honig and Brauser's ownership and the number of [Biozone's] outstanding shares, Stetson knew, or was reckless in not knowing, how much of [Biozone's] stock Honig and Brauser controlled." SEC 2d Am. Compl. ¶ 100.

102. In late 2010, Honig and Brauser approached the management of Biozone's predecessor company to with a proposal to take the company public. *Id.* ¶ 83.

103.    Biozone's Chief Scientific Officer, Brian Keller, explained that "[t]he real power is with Barry Honig and Mike Brauser.  [Biozone CEO] Elliot [Maza] is just a mouthpiece," *id.* ¶ 91, but that Honig and Brauser failed to keep their promises to invest in research and development at Biozone, *id.* ¶ 93.   Instead, "Honig and Brauser used the financings they orchestrated to amass more, ever-cheaper [Biozone] shares for themselves and their associates" so that by April 1, 2013, "Honig, Brauser and other co-investors, including Stetson . . . had amassed 28,153,845 shares, or almost 45% of the [Biozone] shares outstanding, with Honig alone holding 5,542,654 shares, or 8.8% of the company's outstanding shares."  *Id.* ¶ 95.

104.    To facilitate the pump and dump scheme, "[i]n September 2013, Honig directed O'Rourke to reach out to Ford to arrange for him to post his purportedly independent investment analysis of [Biozone] on the Seeking Alpha website pursuant to the understanding Honig and Ford had reached in 2012."  *Id.* ¶ 102.  In turn, "O'Rourke contacted Ford and proposed that Ford write a [Biozone] article in exchange for Ford obtaining [Biozone] shares at a below-market price." *Id.* ¶ 103.

105.    The SEC alleged that "[o]n Monday, September 23, 2013, Honig and some associates began trading [Biozone] shares to create the appearance of market activity and interest in [Biozone] in advance of the planned Ford article.  That day, the trading volume of [Biozone] shares soared to 302,000 from zero volume the previous trading day."  *Id.* ¶ 104.  "The September 23rd trading also gave Honig a way to pay Ford surreptitiously for his upcoming favorable article on [Biozone].  On the morning of Friday, September 20, 2013, O'Rourke called Ford and told him to put in buy orders for [Biozone] stock at $0.40 per share to ensure his order was executed against the corresponding sell order later placed by Honig."  *Id.* ¶ 105.  "O'Rourke joined the trading at the end of the trading day on September 23rd to 'mark the close,' i.e., to ensure that the last price

of the day would be higher, giving the false impression that [Biozone's] share price was on an upward trajectory." *Id.* ¶ 107.

106. As directed, "Ford published his [Biozone] article on the Seeking Alpha website less than half an hour before market close on September 26, 2013. . . .  In it, Ford presented a bullish outlook for [Biozone] and concluded that '[Biozone] should be trading for more than twice today's valuation.'" *Id.* ¶ 108.

107. Not surprisingly, Biozone's "share price increased from an average of about $0.48 during August 2013 to an intraday price of $0.97 on October 17, 2013." *Id.* ¶ 111.  At the same time, "[b]etween the start of the manipulative trading on September 23, 2013 and December 31, 2013, Honig and his co-investors sold shares into the inflated market for proceeds of approximately $9,350,000." *Id.* ¶ 112.

### 2.      MGT Capital Investments Inc. (a/k/a "Company B")

108. With respect to MGT, the SEC alleged:

During 2015 and 2016, Honig and his associates used [MGT], once a publicly traded shell, as another vehicle for their pump-and-dump schemes.  Honig and his partners used many of the same tactics they had employed in the [Biozone] scheme: they bought millions of cheap shares, intending to exercise control over the management and policies of the company; exercised that control; orchestrated a misleading promotion of the company that drove up the price and the trading volume of the company's shares; and dumped their shares for a profit in the inflated market.

*Id.* ¶ 125.

109. As before, "Stetson, with the knowledge and consent of the Honig-led investor group, then enlisted Ford to write a promotional piece, published on the Seeking Alpha website on November 5, 2012, which touted MGT's prospects for providing a "2X near-Term Return," and predicting that MGT's stock could rise to $18 a share (nearly triple its price on the previous trading day)." *Id.* ¶ 128.

110.    This was not sufficient for Defendant Honig, however, because "after Ford's piece was published, MGT's stock price failed to reach the level desired by the Honig-led group." *Id.* ¶ 129.  Accordingly, Honig directed Stetson and/or O'Rourke to retain Ford to write another Seeking Alpha article on [MGT]." *Id.*  "This time Ford's article had the desired effect, pushing [MGT's] share price from $3.50 on April 10, 2013 to almost $4.50 on April 16, 2013, and increasing trading volume significantly.  MGT's market capitalization went from under $16 million on April 10, 2013 to over $20 million on April 16, 2013.  Honig sold approximately 250,000 shares into the inflated market, earning $967,224." *Id.* ¶ 130.

111.    This was not the end of the pump-and-dump scheme at MGT.  The SEC alleged that, "[i]n 2015, Honig and his associates began planning a new scheme to pump and dump [MGT's] shares." *Id.* ¶ 133.  As part of this, "[o]n September 27, 2015, Honig directed Stetson to send the proposal to [Robert] Ladd, [MGT's] CEO.  The deal contemplated the issuance of 2.8 million MGT shares, along with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker.  This deal structure allowed the investors repeatedly to convert and sell their shares while appearing individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings." *Id.* ¶ 134.  Then, "[h]aving coordinated the accumulation of stock with Brauser, Stetson and O'Rourke, Honig, with his partners' knowledge and consent, then arranged for a promotion that included materially misleading information." *Id.* ¶ 138.

112.    The SEC alleged that MGT's CEO, Robert Ladd, "knew" that Honig, O'Rourke, Stetson, and Brauser were "operating as a group" and had "acquired [MGT] shares together, and that they were collectively exercising control over the company."   2d Am. Cmpl. ¶ 140.  Specifically, the SEC alleged that "[i]n an email dated September 29, 2015 to [MGT] counsel,

Stetson, Honig and [MGT's] CFO – and in his October 4, 2015 email to [MGT's] Directors – Ladd referred to the potential investors as an "*investor group . . . led by Barry Honig*," and attached a "term sheet" (to the September 29 email) that defined Honig as "Lead Investor." *Id.* (emphasis added). Similarly, in November 2015, Ladd wrote Honig: "As for the cap table, we have 17.2 million common shares outstanding, including *your group's* 2.8 million . . . ." *Id.* (emphasis added). Yet, the SEC alleged that "Ladd nonetheless failed to disclose Honig's, Brauser's, Stetson's and O'Rourke's combined interest in, and control over, the company in Company B's public filings." *Id.*

113. The SEC further alleged that "on or around January 21, 2016, by which time Honig, Brauser, Stetson, O'Rourke and [Groussman] through [Groussman's] Entity, had acquired at least 16.3% of [MGT's] outstanding stock:

> Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of [MGT]. Shortly thereafter, the stock promoter paid a portion of the money he had received from [MGT] to a writer he instructed to publish a tout on [MGT]. On February 3, 2016, the writer published his piece online. In it, he described [MGT's] rosy prospects in social and "real money" gaming sites and intellectual property relating to slot machines. The article did not disclose that the author had been paid by [MGT] - at Honig's direction - to write the article. After the article was published on February 3, 2016, there was a 7000% increase from [MGT's] previous day's trading volume, and an intraday price increase of over 60%.

*Id.* ¶ 139.

114. Following this, "Honig, Ladd, Stetson and O'Rourke took advantage of the promotion's boost to [MGT's] stock price and trading volume and sold over 430,000 shares into this inflated market for proceeds of approximately $198,800." *Id.* ¶ 140.

115. The Honig group's third scheme at MGT occurred in 2016 and involved O'Rourke, "[a]t Honig's direction," "t[aking] the lead on arranging a deal between [MGT] and [a] Cybersecurity Innovator." *Id.* ¶ 142.

116.    As part of this, "[o]n May 9, 2016, at 8:30 a.m., [MGT] issued a press release announcing its merger with CI Company." *Id.* ¶ 144.  In connection with this, "[t]he press release misleadingly described the Cybersecurity Innovator's prior financial success by falsely claiming that the Cybersecurity Innovator had 'sold his antivirus company to Intel for $7.6 billion,' suggesting that [MGT] might achieve similar success.  Yet . . . the sale of the Cybersecurity Innovator's namesake company to Intel at that price had occurred over a decade after the Cybersecurity Innovator's departure from that company." *Id.*

117.    Honig then began trading in MGT stock "later that morning . . . to create the misleading appearance of an active market." *Id.* ¶ 145.  A Honig affiliate at MGT "paid StockBeast.com for [an] article to ensure a wide distribution of the news of the impending merger with the CI Company." *Id.* ¶ 146.  This had the intended effect, with MGT's share price increasing and its market capitalization increasing "from just over $8 million on May 6, 2016 to over $95 million on May 17, 2016." *Id.* ¶ 147.  Honig, O'Rourke, Stetson, and Brauser, along with an affiliate, "pursuant to their tacit or explicit agreement to acquire, hold, vote, and/or disperse of their shares in concert, sold over 9.2 million [MGT] shares" and "grossed $9.4 millions from the May 2016 sales into the inflated market." *Id.* ¶ 148.

118.    In private emails, Honig freely accepted credit for his role in MGT's strategic transactions.  On May 12, 2016, for example, Honig received an email from an investment firm congratulating him on a recent transaction involving MGT and cybersecurity businessman John McAfee:  "You're involved [sic] with [MGT]? Impressive!"  Honig responded that he was the "[l]argest shareholder, funder and [had the] relationship with [Mr. McAfee]." 2d Am. Cmpl. ¶ 157. In early August 2016, Honig celebrated his undisclosed role at MGT in a chat conversation with Stetson: "its great in [MGT] because ***we are behind the scenes***." *Id.* (emphasis added).

119.   On February 24, 2020, the court in the *Honig* Action, reviewed the SEC's allegations regarding the Honig Group's activities with respect to MGT, and held that the SEC had "amply" alleged "the agreement that is necessary for a group to come into existence, as defined in the SEC rules."[15]  Specifically, the court found:

> The Amended Complaint describes a deal that came together through negotiations between Stetson and [MGT CEO] Ladd that resulted in at least four investors each owning 4.9% of the company.  Stetson pursued that deal at Honig's direction.  The deal eventually included each member of the Honig Group, including Honig and Stetson, resulting in the Honig Group owning more than 16% of the company in January 2016.  These facts alone make it plausible that at least Honig and Stetson comprised a group that triggered the need to file a Schedule 13G or 13D as a group.

> This finding is buttressed by the bevy of circumstantial evidence surrounding the Honig Group's manipulation of MTG and its stock, including Honig and O'Rourke's collaboration in orchestrating the McAfee deal in March 2016, the alleged coordination between Honig and Brauser to match trades and create the appearance of an active market in the early morning of the day the deal was announced, and the simultaneous negotiation between [MGT CEO] Ladd and each member of the Honig Group to allow the group to exercise their warrants immediately after the successful stock bump from the McAfee announcement.  Placed in context with all of the pre-2015 conduct alleged as background, it is more than plausible that the four men [i.e., Honig, O'Rourke, Stetson, and Brauser] had agreed to work in concert on their schemes.  Ladd does not dispute whether the conduct alleged against the members of the Honig Group would otherwise be a violation of the securities laws, and so, accordingly, the SEC has properly alleged the first element of aiding and abetting liability against him.[16]

### 3.   MabVax Therapeutics Holdings, Inc. (a/k/a "Company C")

120.   With respect to MabVax, the SEC alleged that "[i]n early 2014, Honig identified a publicly traded shell company that was unencumbered by debt, and sought an appropriate private company for purposes of a reverse merger and pump and dump scheme."  Am. Cmpl. ¶ 159.  Honig was able to do so because that company's CEO "was looking for funding for its research and development efforts in cancer therapies and diagnostic products."  *Id.* ¶ 160.

---

[15] *SEC v. Honig*, No. 1:18-cv-08175-ER (S.D.N.Y.) (Opinion & Order) (ECF No. 211, at 23).

[16] *Id.*

121.     Once Honig had taken control of MabVax through two entities (without disclosing his identity to MabVax), "[i]n approximately April 2014" Honig "first called up [MabVax's] CEO, [and] announced in words or substance:  'I'm the owner of your company.  You better do what I tell you to do.'"  *Id.* ¶ 162.

122.     In March and April 2015, Honig orchestrated two private placement financings for MabVax that would tighten Honig's, O'Rourke's, Stetson's, and Brauser's and control of the company:  two Series D and Series E offerings.  Honig described the deal to Stetson, Brauser, and their co-investor in a March 5, 2015 email, characterizing it as a "real good opportunity" that would allow them to "make $35 million conservatively in 4 months and our money out [in] 4 weeks. . . . *I will trade out of it for us.*"  2d Am. Cmpl. ¶ 194 (emphasis added).  As MabVax's CFO understood, Honig structured both financings to avoid disclosing his, O'Rourke's, Stetson's, and Brauser's holdings on Schedule 13D or 13G.  *Id.* ¶ 196.

123.     Honig's control of this financing group was clear to MabVax's management; indeed, when deciding whether a potential investor could take part in the March 2015 Series D financing round, MabVax's CEO explicitly deferred to Honig on who could participate in the deal, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might want to allow to invest along with the current group.  Viewed this as your choice not mine.  That is why I asked him to call you."  *Id.* ¶ 197.

124.     Honig's control of the financing group was clear to MabVax's management; indeed, when deciding whether a potential investor could take part in the March 2015 Series D financing round, MabVax's CEO explicitly deferred to Honig, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might want to allow to invest along with the current group. Viewed this as your choice not mine. That is why I asked him to call you."

125.     That Honig selected the investors who would be allowed to participate in MabVax's financings was demonstrated by an email to Stetson and Brauser on March 13, 2015, in which Honig laid out a more detailed list of investors as well as the proposed investment amount and the method of investment for both the Series D and Series E financings:  "Southern biotech [a Neveada corporation that Stetson incorporated at Honig's direction and for which Honig was the sole officer and president, but which was co-owned by Honig, Brauser, and "Investor 1," *id.* ¶ 48] will invest 3 million to purchase [Entity H's] notes – 1 million each," and "[Investor 1] is going to lead pipe [private investment in public equity] for 1 million at .75 cents."  *Id.* ¶ 205.

126.     Similarly, Honig himself demonstrated his control over the selection of investors when on April 1, 2025, Honig asked Brauser to "do [him] a favor" and forego his participation in the Series E financing because, as Honig explained, "I would like to let some of our friends do it . . . [I]t would be best if we let [Investor 1 and Investor 1 Company and an Investor 1 Company executive ("Investor 1 Co. Officer")] take their full allocation."  *Id.* ¶ 203.

127.     As part of the scheme at MabVax, the SEC alleges that "[o]n April 3, 2015, O'Rourke, acting at Honig's direction, circulated a press release (with input from [MabVax's] CEO, Honig and Brauser) announcing the $12 million private placement in which Investor 1 and his entities had participated, drawing on Investor 1's reputation among retail investors as a successful biopharma investor."  *Id.* ¶ 185.  "Honig, with the knowledge of Brauser and Stetson, then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym 'Wall Street Advisors' on the Seeking Alpha website on April 8, 2015 at 11:13 a.m. The article, titled 'Opko Spots Another Overlooked Opportunity in MabVax Therapeutics,' highlighted Investor 1 Company's and Opko's investment in MabVax, and was designed to inspire Investor 1's retail investor devotees to follow his lead and buy MabVax stock.  Despite his

involvement in facilitating the MabVax financing and his extensive business relationships with Honig, Brauser, Investor 1, and Stetson, in his article, O'Rourke knowingly and falsely claimed that '[t]he author has no business relationship with [MabVax].' He also knowingly and falsely claimed that he was 'not receiving compensation for [writing the article].'" *Id.* ¶ 186.

128.    Accordingly, "[a]nticipating the release of O'Rourke's Seeking Alpha article, ATG and O'Rourke engaged in early trading of [MabVax] shares on April 8, 2015 with the intention of creating a false appearance of market interest in the stock. That trading included at least one matched trade, with a Honig associate submitting the buy order and ATG submitting the sell order for the same price at 9:38 a.m. The share price of [MabVax] opened that day at $3.14 and reached $3.73 in the minutes before the promotional article was released." *Id.* ¶ 187.

129.    The SEC alleged that "[t]he promotional campaign was successful." *Id.* ¶ 188. In particular:

> The trading volume of [MabVax] shares rose almost 7500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, following the announcement of the Series E private placement involving Investor 1. The trading volume further increased to 858,709 on April 9, 2015, the day after O'Rourke's article was published. [MabVax's] share price went from a closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015, increasing the company's market capitalization by $23 million. Honig and his affiliates, listed below, acting pursuant to their agreement to acquire, hold, vote and/or dispose of their [MabVax] shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of over $5.5 million.

*Id.*

130.    Then, "[i]n June 2015, when the market for [MabVax] shares had cooled from over $4 per share to closing prices hovering just above $2 per share, O'Rourke recruited Ford to publish another [MabVax] tout on Ford's blog." *Id.* ¶ 189. Ford obliged, and on July 1, 2015, "published an article titled 'MabVax: Near-Term Catalysts Could Push Shares from $2 to over $5.' The article contained materially false statements (as Honig, Brauser, Stetson and O'Rourke knew, or were

reckless in not knowing) including that a licensing deal was imminent, when it was not, and that there were near-term therapy development events that could take the share price to $5, when in fact clinical trials were only in early stages. As before, although Honig compensated Ford for writing the blog post, Ford did not disclose that he had been paid." *Id.*

131.    Once again, the SEC alleged that Honig's scheme was successful:

Ford's article had the desired impact on the market: [MabVax] trading volume increased from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015. Likewise, [MabVax's] share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015. Pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig and his affiliates sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million.

*Id.* ¶ 190.

**B.      The Honig Group Co-Invested in Other Public Microcap Companies**

**1.      The PolarityTE (f/k/a Majesco Entertainment)**

132.    PolarityTE is a biotechnology company based in Salt Lake City, Utah. PolarityTE was previously a company known as Majesco Entertainment, a company that designed video games for more than 25 years. In October 2015, Majesco Entertainment merged with another company called PolarityTE. At that point, Defendant Stetson, as Polarity's CFO, appointed Honig and Brauser as Co-Chairmen of the Board of Directors and named Kaplan and Karr as Directors.

133.    In August 2016, Honig, O'Rourke, GRQ 401K, Brauser, Grander, Melechdavid, Groussman, Paradox (Kesner), ATG, Stetson, and Stetson Capital were "Selling Stockholders" in an S-3 Registration Statement registering shares in PolarityTE for sale to the public.

134.    As of September 2016, Beeghley and Honig had served together for one year as Director and Chairman/CEO, respectively, of PolarityTE. Specifically, Beeghley was a Director of Majesco from December 18, 2015 until October 18, 2017, and Honig was Chairman and CEO

783086.1

of Majesco from September 30, 2015 until December 1, 2016.  Thus, Beeghley joined PolarityTE's

board when Honig was already Chairman and CEO of that board.

135.    On March 18, 2019, PolarityTE received a subpoena from the SEC, and its "shares

tumble[d] after it says SEC is looking into possible manipulation," according to a CNBC article.

The subpoena "asked about the company's lead product as well as communications and

agreements between Polarity and its former CFO.

136.    In the wake of the SEC's charges against Stetson, PolarityTE immediately

terminated Stetson, according to a press release by PolarityTE, stating that "the Company,

management, and Board of Directors do not tolerate the behavior outlined in the complaint."[17]

## 2.    YesDTC Holdings, Inc.

137.    The allegations against Defendant Honig in the Honig *Action*, as well as the

allegations in this case, are not one-off events.  For example, in 2014, Joseph Noel ("Noel")

pleaded guilty to securities fraud in connection with a company named YesDTC Holdings, Inc.

("YesDTC").  As part of Noel's plea agreement, Noel stated that Defendant Honig, who arranged

a reverse merger of the company:

> wanted to use promotions to drive up the price of YesDTC shares and then sell his
> shares.  Honig introduced me to David Zazoff who Honig said would promote
> YesDTC stock.  Honig said Zazoff was a "magic maker," who could make the price
> of YesDTC stock rise through his services.  Honig made it clear that I should not
> ask questions about how Zazoff achieved his success.

\* \* \*

---

[17] *See* PolarityTE, Inc. Issues Statement Regarding Mr. John Stetson and his Termination from the
Company,  https://www.prnewswire.com/news-releases/polarityte-inc-issues-statement-regarding
-mr-john-stetson-and-his-termination-from-the-company-300709106.html

**At Honig's direction I caused Sonoma Winston to send $45,000 of the proceeds to Zazoff as partial compensation for his promotion of YesDTC stock.**

In January 2011, Zazoff conducted a second promotion of YesDTC stock. **At Honig's direction, I caused YesDTC to compensate Zazoff as partial compensation for his promotion of YesDTC stock**.

\* \* \*

In July 2011, Zazoff conducted a third promotion of YesDTC stock. . . . **Honig instructed me to cause YesDTC to send compensation to Zazoff for the July 2011 promotion of its stock, but I refused**.[18]

138.    In December 2011, Defendant Honig filed a federal lawsuit again Noel to recover "$150,000" that "Plaintiff Honig lent Defendant Noel" on or about August 24, 2011.[19]

### 3.    Marathon Patent Group, Inc.

139.    This case is also not the only time that Defendants and their allies – including Honig, O'Rourke, Groussman, Stetson, Brauser, and others – have jointly engaged in pump-and-dump style scheme to transform a public company into a *cryptocurrency* company.  Defendants engaged in a strikingly similar "blockchain" scheme as Riot with another NASDAQ-listed company called Marathon Patent Group, Inc.  Honig and his associates were among Marathon's biggest investors, but their familiar schemes did not benefit Marathon or its public shareholders.

140.    Originally named "Verve Ventures, Inc.," the company changed its name in December 2011 to "American Strategic Minerals Corporation."  During this time period, Honig, then a Director of Pershing Gold, invested in the company.  In January 2012, the company entered into an agreement to "to acquire certain uranium exploration rights and properties held by Pershing."  By 2013, the company had changed its name to "Marathon Patent" and stated that it

---

[18] *United States v. Noel*, No. CR 14-264 VC, ECF No. 11, at 3-5 (N.D. Cal. Nov. 19, 2014) (emphases added).

[19] *See Honig v. Noel*, No. 3:11-cv-06706-JSW, ECF No. 1 (N.D. Cal.).

was "an intellectual property ('IP') company that serves patent owners ranging from individual inventors to Fortune 500 corporations." Groussman and Stetson were Marathon's former CEO and COO, respectively, until resigning in 2012.

141.    On November 2, 2017 (the exact same day that Riot announced its purchase of 1,200 bitcoin mining machines from Kairos), Marathon announced that it had agreed to acquire Global Bit Ventures Inc. ("GBI"), a company incorporated in Nevada in August 2017. A Uniform Commercial Code (UCC) filing shows that Defendant Stetson, through his entity Contrarian Investments LLC, had a security interest GBI. GBI's CEO, Jesse Sutton (the former CEO of Majesco Entertainment, which later morphed into PolarityTE) was later nominated by Honig to the Board of Directors of Riot.

142.    On November 27, 2017, Marathon's auditor resigned. A November 29, 2017 prospectus offering stock to the public showed that O'Rourke, through an entity he solely controlled, Revere Investments LP, held 41% of Marathon's common stock.

143.    In February 2018, Marathon announced that it had purchased "1,400 of Bitmain's Antminer S9 miners" that were "purchased by [GBV]."

144.    In February 2018, Marathon announced that it "Expands Cryptocurrency Mining Operations by Opening of Second Facility in Canada" where it "anticipates putting its recently purchased 1,400 Bitmain's Antminer S9 miners ("Antminer S9s") into production."

145.    On April 3, 2018, a merger agreement between Marathon and Global Bit Acquisition Corp. stated that a limited liability company managed by O'Rourke and registered at his home address, Azzura Holdings LLC, as holding 147,645 shares of "Series C Preferred" stock and 14,764,421 shares of "Common Underlying Series C Preferred" stock in Global Bit Ventures, Inc. The same agreement listed Northurst holding 147,645 shares of "Series C Preferred" stock

and 14,764,421 shares of "Common Underlying Series C Preferred" stock – the exact same amount as O'Rourke's entity.  The same agreement stated that Brauser, through Grander, stood to receive 131,241 shares of Marathon common stock.  "Mike Ho" stood to receive 131,241 shares of Global Bit Ventures, Inc. – the exact same amount as Brauser.  Molinksy stood to receive 78,745 shares.  O'Braitis stood to receive 65,621 shares.  Erick Richardson (a 3.61% shareholder of Riot on September 25, 2018) stood to receive 65,621 shares – the exact same amount as O'Braitis.

146.    In March 2018, Marathon announced that its "Facility in Quebec Has Commenced Bitcoin Mining Operations."

147.    In June 2018, Marathon walked away from its acquisition of GBI.

148.    In July 2018, Marathon announced that it had "[r]eceive[d] Deficiency Letter from NASDAQ Related to Two Director Resignations . . . ."  Marathon's stock currently trades at less than $3.00 per share.

149.    According to an article in *Seeking Alpha* by Hindenburg Investment Research, "Marathon has multiple concerning parallels to Riot Blockchain, which recently engineered a similarly dubious pivot to the 'blockchain.'"  The article noted that Marathon's "blockchain focus has come about through a series of rapid shifts that are eerily similar to the questionable moves" undertaken by Riot.  The article noted that "[b]oth Riot and Marathon seemingly paid above-market rates to acquire entities containing cryptomining equipment that could have been purchased directly."

### 4.    WPCS International Incorporated and BXT Trader

150.    Before Marathon, Honig, O'Rourke, and other associates also jointly engaged in pump-and-dump style scheme to transform another public company, WPCS International Incorporation, into a cryptocurrency operation.  Before that, WPCS was a global engineering, communications, and infrastructure "with over 500 employees in 10 operations centers on three

continents." In 2012, Defendant Honig, through GRQ 401K, invested in WPCS. On December 17, 2013, WPCS purchased BTX Trader, a cryptocurrency company, from Defendant O'Rourke. In January 2018, WPCS's changed its name to "DropCar, Inc." and is now a cloud-services-for-cars company whose stock trades on NASDAQ under the ticker "DCAR" for approximately $2.01 per share.

151.    In its February 16, 2016 article, CNBC described Honig's and O'Rourke's involvement with WPCS and confirmed that both Honig and O'Rourke "acknowledge[d] the investment":

> Riot is not O'Rourke and Honig's first cryptocurrency investment.
>
> In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.
>
> WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.
>
> At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.
>
> Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.
>
> O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. "I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."
>
> Honig acknowledges the investment.

152.    Honig's lawyer, Kesner, was a Director of WPCS in 2013 and 2014.

### 5.    Pershing Gold Corp.

153.    Pershing Gold is an emerging gold producer whose primary asset is the Relief Canyon Mine in Pershing County, Nevada. The company is listed on the NASDAQ Global Market and the Toronto Stock Exchange under the symbol PGLC. Defendant Honig was Chairman of

Pershing Gold until February 9, 2012, when he resigned but remained a Director.  As of September 19, 2018, Defendant Honig owned approximately 38% of the common stock of Pershing Gold, according to a Schedule 13S.  Karr, an investor in Riot discussed below, was also a Director of Pershing Gold and owned 33% of its common stock as of August 31, 2018.

154.    As of August 31, 2018, Defendants O'Rourke, Stetson, and Groussman – along with Jonathan Honig, Molinsky, and Riot shareholder Erick Richardson – were all shareholders of Pershing Gold seeking to sell their shares in an offering pursuant to a Prospectus.

155.    On December 13, 2017, Hindenburg Research published an article stating that "the company's key asset, Relief Canyon Mine, was purchased from a hedge fund whose executives, including Mark Nordlicht, were federal indicted for operating 'like a Ponzi Scheme,' according to prosecutors."

156.    On September 7, 2018, *Seeking Alpha* reported that "[t]hinly traded nano cap Pershing Gold (PGLC -14.7%) slumps on almost an 8x surge in volume in reaction to the SEC's stock promotion charges against majority investors Phillip Frost and Barry Honig."

157.    According to a September 10, 2018 press release by Pershing Gold, released in response to the SEC's announcement "that it has commenced a legal action against Honig and various other parties who are alleged to have violated federal securities laws," Defendant Honig was a Director of Pershing Gold until he "resigned from the Company's Board of Directors in August 2018."

### 6.    MUNDOmedia Ltd.

158.    MUNDOmedia is a marketing company based in Toronto, Ontario, Canada founded by its CEO, Jason Theofilos.  On September 2, 2016, MUNDOmedia announced that a Theofilos had "led a buyout of 100% of the outstanding equity of [MUNDOmedia]" and that "Barry Honig is among the notable private equity investors that participated."  On July 28, 2017,

Private Capital Journal reported that MUNDOmedia had "withdrawn its proposed initial public offering" that "would have consisted of $30 million treasury offering" involving "selling shareholders" that included "Mansfield International Trade Ltd. (David Baazov/Ahaka Capital), Four Kids Investment Fund LLC, Stetson Capital Management LLC, ATG Capital LLC, Melechdavid Inc., Barry Honig, John O'Rourke and Jonathan Honig."

159.    The Honig Group's co-investments in the companies discussed above are depicted in the following chart:

**The Honig Group's Prior Target Companies[20]**

|  | Biozone | MGT | MabVax | PolarityTE | Pershing Gold | Mundo | Marathon |
|---|---|---|---|---|---|---|---|
| **Honig** | X | X | X | X | X | X | X |
| **O'Rourke** | X | X | X | X | X | X | X |
| **Groussman** | X | X | X | X | X | X | X |
| **Stetson** | X | X | X | X | X | X | X |
| **DeFrancesco** |  |  |  | X |  |  |  |
| **Beeghley** |  |  |  | X |  |  |  |

160.    The Honig Group's interconnections through these prior target companies are depicted in the diagram attached hereto as Exhibit M.

## VI.    THE SELLING STOCKHOLDERS' CONNECTIONS TO THE HONIG GROUP

161.    During the Class Period, Riot filed a series of Securities Registration Statements on Forms S-3 and S-3/A that registered shares of Riot common stock for sale by certain "Selling Stockholders" to the investing public.   These Selling Stockholders included the following individuals and entities:  Afios, ATG, Brauser, Karr, Kesner, Grander, GRQ 401K, Alan Honig,

---

[20] The absence of a checked box is not intended to indicate the lack of a relationship.

783086.1

Jonathan Honig, JAD, James, Marcandy, Melechdavid, MGT, Molinsky, Namaste, Northurst, Paradox, O'Braitis, Stetson Capital, Theofilos, and Titan, and other affiliated shareholders.

162.    As illustrated in the chart below, each of these Selling Stockholders that registered shares of Riot stock for sale to the public invested in one or more of public companies affiliated with Honig, including:  Biozone, MGT, MabVax, Marathon WPCS, PolarityTE, Pershing Gold, and/or MUNDOmedia Ltd.

**The Selling Stockholders' Prior Target Companies[21]**

| | Biozone | MGT | MabVax | PolarityTE | Pershing Gold | Mundo | Marathon |
|---|---|---|---|---|---|---|---|
| **Aifos** | | | X | X | X | | |
| **ATG** | | X | X | X | X | | |
| **Brauser** | | | X | X | X | | X |
| **Grander** | X | X | X | X | X | | X |
| **GRQ 401K** | X | X | X | X | X | | X |
| **Honig, Alan** | | | X | | X | | X |
| **Honig, Jonathan** | | | X | | X | X | |
| **JAD Capital Inc.** | | | | | | X | |
| **James** | | | | | X | | |
| **Karr** | | | X | X | X | | X |
| **Kesner** | X | X | X | X | X | | X |
| **Marcandy** | | | | | | | |
| **Melechdavid** | | X | X | X | X | X | X |
| **Molinsky** | | | | X | X | | X |
| **Namaste** | | | | X | | | |
| **Northurst** | | | | | | | X |
| **O'Braitis** | | | | X | | | X |
| **Paradox** | | | X | X | X | | X |
| **Richardson** | | | | | X | | X |
| **Stetson Capital** | | X | | X | X | X | X |
| **Stockwire** | | | | | X | | |

163.    The Honig Group's interconnections through these prior target companies are depicted in the diagram attached hereto as Exhibit M.

## VII.    FACTUAL BACKGROUND ON THE FRAUDULENT SCHEME

---

[21] The absence of a checked box is not intended to indicate the lack of a relationship.

A.    In 2016, Defendants Target Venaxis, Riot's Predecessor, Using Their Typical Pump-and-Dump Playbook

164.    As noted above, Riot was once called "Venaxis."  Venaxis was a medical products company whose executives, Board, and employees sought to develop a blood test for determining which patients suffering from abdominal pain were less likely to be suffering from acute appendicitis than from other ailments.

165.    In early 2015, the FDA denied approval for Venaxis's developmental blood test, and Venaxis, without a marketable product, found itself facing delisting from the NASDAQ because its share price had fallen below the exchange's minimum.

166.    Venaxis still had plenty of cash, however, having raised $20 million in a stock offering the previous year.  Therefore, in March 2016, Venaxis executed a 1-for-8 reverse stock split.  That reduced its outstanding shares to less than 4 million and lifted its stock price well above $1 a share — enough for Venaxis to keep its listing on the NASDAQ.  Shortly thereafter, Honig and his associates began buying Venaxis stock.

167.    On September 12, 2016, Venaxis acquired BiOptix Diagnostics, Inc., and changed its name to "Bioptix."

168.    Displeased with this acquisition, on September 13, 2016, Defendants Honig and DeFrancesco both wrote letters to then-CEO Lundy, touting their combined 16.2% stake in the company.  Honig also spoke several times on the telephone with members of Venaxis's then-existing Board of Directors.  During these telephone conversations, Honig implied that he had control of 40% of the Venaxis's shares through his stock ownership and the stock ownership of Mr. Honig's friends and relatives, according to a former Venaxis Board member present during the conversations.

49

169.    That same day, Honig attempted to nominate his own slate of new directors of Bioptix, including Defendants O'Rourke, Beeghley, and Stetson, and several other of Honig's associates.

170.    In his September 13, 2016 letter to then-CEO Lundy, Honig wrote that Venaxis was "wast[ing] precious resources with no clear direction or strategy . . . while board fees and management salaries continue to be paid":

Dear Mr. Lundy,

**As Venaxis' largest shareholder, it has become increasingly clear to me that changes must be made to <u>protect shareholders' interests</u> and attempt to <u>create value</u> from the company's assets.**  Venaxis' management and board of directors have failed in this regard.  The current management and board own a nominal amount of equity in aggregate, and as a result they are not aligned with the company's shareholders.

The first change that needs to be made is to immediately reconstitute Venaxis' board . . . .

**Venaxis' board has continued allowing the company to waste precious resources with no clear direction or strategy . . . .**

**Meanwhile, Venaxis' cash continues to dwindle while board fees and management salaries continue to be paid . . . .**

Shareholders cannot continue to wait around with question marks and a board that has proven to be distracted and ineffective.

In the essence of preserving some of Venaxis' cash for its rightful owners, the shareholders, we are also asking the shareholders to authorize a special dividend of $7,500,000 as a return of capital to the shareholders . . . .

The cash dividend returns immediate value to shareholders and diverts a portion of Venaxis' assets away from board discretion, who only have managed to deplete the cash available for shareholders through failed strategies, while entrenching their positions with the Company instead of maximizing shareholder value.

My preference is working together with you on these courses of action to effectuate the proposals immediately with your support rather than going through the steps of voting to remove your board that we have today initiated through a special meeting. **I believe working together we can most effectively <u>protect and grow shareholders' interests</u>.** I hope that you agree.

Sincerely yours,

/s/ Barry Honig

171.    The following day, on September 14, 2016, DeFrancesco sent a similar letter to

Venaxis' CEO in support of Honig and his demand for a special meeting of the shareholders.

Ex. N.  DeFrancesco followed up this demand with another letter, dated September 20, 2016 in

which she "repeated [her] demand . . . for a special meeting of the shareholders" and "join[ed] in

Mr. Honig's prior nomination."  Ex. O.  DeFrancesco further stated:

> The purposes of the meeting should be, as set forth in Mr. Honig's meeting demand:
> (1) to vote on the removal of five (5) directors, aside from you, currently serving
> on the Board of Directors, (2) to vote on a $7,500,000 shareholder dividend, and
> (3) to set the size of the board at no more than six (6) directors and for the election
> of five (5) new directors as follows:  John Stetson, John O'Rourke, Jesse Sutton,[22]
> Michael Beeghley, and David Danziger.  I join in Mr. Honig's prior nomination of
> these individuals to serve as members of the board of directors, a copy of which is
> attached as Exhibit C hereto and incorporated by reference.

172.    DeFrancesco concluded by stating:  "Should you have any questions regarding the

foregoing, please do not hesitate to **contact our counsel Harvey Kesner, Esq. . . . .**"  Thus,

DeFrancesco's letters made clear that she was working with Honig – and indeed, sharing the same

counsel – in connection with her share ownership in Venaxis/Bioptix.

173.    Following these letters, in late 2016, Honig and DeFrancesco waged a proxy fight

for control of Bioptix, demanding the removal of five of Bioptix's six directors and the payment

of a $7.5 million special dividend.

174.    As part of his proposal to "protect and grow shareholders' interests," Honig offered

an alternative.  In early discussions with Venaxis's Board of Directors, Honig raised the possibility

---

[22] Jesse Sutton is the former CEO of Majesco.

51

of turning Venaxis into a marijuana-related company, according to an individual present at the time.

175.    Honig then filed a lawsuit in state court in Colorado, seeking to force a special meeting of shareholders that would include a vote on the proposed changes.  Bioptix sought to placate Defendant Honig by appointing one of his allies – Defendant Beeghley – to its board of directors. When Venaxis's then-existing Board of Directors were considering Beeghley as a nominee for election to the Board, Beeghley told them that he did not know Honig – according to an individual present at the time – despite the fact that Beeghley and Honig had recently served together on the board of directors of another public company, PolarityTE.

176.    Honig and DeFrancesco continued acquiring shares and held nearly 23% of Bioptix's stock as of January 2017 based on a 13D's they filed with the SEC that same month. That same month, on January 6, 2017 O'Rourke and Mike Dai joined Bioptix's board of directors. Shortly thereafter, three of Bioptix's board members resigned, on the basis that Honig was likely to prevail in his legal fight and that mounting a defense would waste corporate recourses.  Two months later, in March 2017, a longtime Bioptix director stepped down, and Honig and DeFrancesco found themselves aligned with with a majority of the seats on the board and defacto control of the company.  Using that control, in April 2017 Lundy was forced out as CEO and Beeghley was named the Company's CEO.

**B.**   **A Few Months After Beeghley Assumed the Role as CEO, The Company Announced A Special Dividend and Business Transformation to "Riot Blockchain" – At the Same Time, Honig Secretly Acquires and Sells Hundreds of Thousands of Shares of Riot**

177.    Five months after Beeghley took over as CEO of Bioptix, the Company announced that it was changing its focus away from bioscience and into the burgeoning cryptocurreny business.  As part of this conversion, in a press release on October 4, 2017, Bioptix announced that the Company's name would change to "Riot Blockchain."  The press release stated, in relevant part,

> CASTLE ROCK, Colo., Oct. 4, 2017 /PRNewswire/ -- Bioptix Inc. (Nasdaq: BIOP) today announced it is changing its name to Riot Blockchain, Inc., and has reserved and plans to change its Nasdaq ticker symbol to RIOT, in line with a shift in direction of the company. The name and symbol change are subject to Nasdaq approval. Moving forward, Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem with a particular focus on the Bitcoin and Ethereum blockchains.

> As part of this focus, the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.

> "At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets," said Michael Beeghley, Chief Executive Officer of Riot Blockchain. "With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector."

178.    The day before, on October 3, 2017, presumably in an effort to draw in new public investors into the stock, Riot announced a special dividend valued in the aggregate at $9.5 million, to be paid to all holders of Riot as of October 13, 2017.  In a press release announcing the special dividend, Defendant Beeghley stated, "This special dividend is a positive step to return value to all Bioptix shareholders.  We continue to explore options for delivering additional value to shareholders with our streamlined overhead and cash position."  Following this announcement, the

53

Company's stock price ***increased by more than 25% in one trading day*** from an closing price of $6.44 per share on October 2, 2017, to a closing price of $8.09 per share on October 3, 2017.

179.     Significantly, and unbeknownst to Riot's public shareholders, over the next 11 days leading up to the October 13 record date for the special dividend, Honig began selling hundreds of thousands of shares of the Company – and his first sales in more than two months.  For example, on October 4, 2017, Honig sold 47,420 shares at an average of $8.92 per share, collecting approximately $424,000.  Over the next two days, October 5 and 6, Honig sold 21,400 for proceeds of approximately $162,000.   Three days later, on October 9 and 10, Honig sold 202,544 shares for approximately $1.78 million.  Finally, on October 11 and 12, Honig would sell over 300,000 shares for proceeds of more than $3.3 million.  All told, and as set forth in a Schedule 13-D/A filed more than five months later (*see* ¶ 316, *infra*), Honig sold more than 600,000 shares during the ten-day period following the announcement of the special dividend and the Company's transition to cryptocurrency, collecting proceeds of nearly $5.7 million.

> **C.     Prior to the Company's Transition to Riot, Defendants O'Rourke and Beeghley Caused the Company to Conceal Honig's Group Status by Issuing False and Misleading Registration Statements**

180.     In the lead up to Riot's transformation from bioscience to cryptocurrency, from April 2017 to Sepetmeber 2017, set forth below, Defendants O'Rourke and Beeghley caused the Company to issue registration statements with the SEC that concealed that the Honig Group was in fact acting as a "group" of shareholders with respect to their shares of Riot.

> **D.     Honig Groups Members Honig, DeFrancesco, Groussman and Stetson Fail to File Schedules 13D**

181.     In order for the Honig Group to pull off their pump-and-dump scheme, and to deceive unsuspecting investors into purchasing Riot stock, the Honig Group required de facto control of Riot.  They were able to accomplish this in two ways.  First, they needed to amass a

significant number shares of the Company, giving them voting power to decide who would serve on Riot's board of directors.  Once in control of the board, the Honig Group then needed insiders to take steps to help (i) drive new public interest in the stock (thereby increasing liquidity); and (ii) increase the share price.  This is precise *modus operandi* described by SEC at "Companies A, B and C" as set forth above (*see* § V.A., *infra*) and this is what precisely what occurred at Riot, as explainer herein.

182.    Equally important as control, however, was that the Honig Group's need to operate in secret so that existing public shareholders were not privy to their stock sales or close ties to insiders.  In order to achieve this, during the Class Period and as set forth more fully herein (*see* § X.A., *infra*), Defendants Honig, Groussman, Stetson, and DeFrancesco (acting individually and/or through the investment entities they controlled) knowingly or recklessly made materially false and misleading filings under Section 13(d) – including on Schedules 13G, 13G/A, 13D, and 13D/A – and/or failed to made necessary Section 13(d) filings – *"promptly"* or at all – in order to conceal both their control over Riot's management and policies, as well as their membership in a control group.  In doing so, these Defendants knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder.

### E.    O'Rourke and Beeghley Caused the Company to Conceal Related Party Transactions with Members of the Honig Group

183.    A related-party transaction is a deal or arrangement between two parties who are joined by a preexisting business relationship or common interest.  By way of example, a contract between a major shareholder of a corporation and that corporation, agreeing that the shareholder's company will renovate the corporation's offices would be a classic example of a related-party transaction.  While transactions like this are permitted, the SEC and Generally Accepted Accounting Principles ("GAAP") require that transactions between a corporation and interested

parties (such as company insiders or 5% or greater shareholders) be disclosed in financial statements. For example, under GAAP Accounting Standards Codification ("ASC") 850, transactions between related parties, such as sales, acqusitions, purchases and transfers of real and personal property, are considered related party transactions even though they may not be given accounting recognition.

184.    Disclosure under ASC 850 includes (1) the nature of the relationship; (2) a description of the transactions including transactions to which no amounts or nominal amounts were ascribed; (3) the amounts due from the related parties as of the date of each balance sheet presented; and (4) such other information deemed necessary to understand the effects of the transaction on financial statements. *See also*, J. David Spiceland et al., Intermediate Accounting 124 ("When related-party transactions occur companies must disclose the nature of the relationship, provide a description of the transactions, report the dollar amounts of the transactions and any amounts due from or to related parties.") (citing Related Party Disclosures, Fin. Accounting Standards Bd. FAS No. 57,superseded by ASC 850).

185.    The SEC has also adopted an integrated disclosure system for publicly traded companies known as Regulation S-K. In promulgating Regulation S-K the agency sought to define what information is material in securities transactions and when and how such information should be disclosed to investors. Among other information, Regulation S-K requires disclosure of "related party transactions," known as "Item 404" which requires an issuer to "[d]escribe any transaction . . . in which the registrant was or is to be a participant, and the amount exceeds $120,000, and in which any 'related person' had or will have a direct or indirect material interest." 17 C.F.R. § 229.404(a). A "related person" includes company insiders and any 5% or greater shareholder in the issuer.

186.    These same related-party disclosure principles are also present in the instructions provided by the SEC for issuers who file reports on Forms 8-K.  These instructions require issuers following a completed transaction, acquisition, or other disposition of a significant transfer of assets, to "identity of the person(s) from whom the assets were acquired or to whom they were sold *and the nature of any material relationship . . . between such person(s) and the registrant* of any of its affiliates, or any director or officer of the registrant, or any associate of any such director or officer."

187.    As set forth below, during the Class Period Defendants O'Rourke and Beeghley caused the Company to conceal numerous related party transactions with Honig and members of the Honig Group, many of whom were greater than 5% shareholders of Riot.  These omissions not only violated the federal securities laws and GAAP, as set forth above, but they also worked to conceal the share ownership of members of the Honig Group because in many of these transactions Honig Group members acquired notes, warrants, or preferred shares that converted to Riot common stock.  Nevertheless, these transactions were not disclosed in the Company's SEC filings as transactions with related parties until months later when Riot filed its Form 10-K after the close of trading on April 17, 2018.  The following day, April 18, 2018, as the market learned of the Honig Group's previously undisclosed activities, the Company's stock declined significantly, closing down approximately *5.8%*.

### 1.    The March 2017 Private Placement

188.    On March 15, 2017, Riot (which at the time was still operating under the name "Bioptix") announced on a Form 8-K filed with the SEC that the Company had entered into a securities purchase agreement pursuant to sell $2,250,000 of principal amount of promissory notes and three year warrants to purchase up to 700,000 shares of common stock (the "March 2017 Private Placement Agreement").  The notes were convertible into shares of Riot common stock at

an initial conversion price of $2.50 per share and each warrant was exercisable into shares of common stock at an exercise price equal to $3.56 per share.

189.    Absent from the Form 8-K and all subsequent Company SEC filings in 2017 about the March 2017 Private Placement Agreement, however, is any mention of Honig's role as a related party even though at this time he held, according to a 13D he filed in January 2017, more than 10% of Riot's outstanding shares at this time.  As explained above, under applicable SEC regulations, specifically, Item 404 of Regulation S-K and ASC 850 under GAAP, the March 2017 Private Placement Agreement should have been disclosed to the Company's public shareholders in March 2017 as a related party transaction.

## 2.    The Coinsquare Agreement

190.    On September 29, 2017, the Company entered into a series of agreements including a Subscription Agreement and Amended and Restated Unanimous Shareholder Agreement (the "Coinsquare Agreement") in connection with the purchase of $3,000,000 of units of goNumerical Ltd., a privately held Canadian company known as Coinsquare Ltd. ("Coinsquare").  Each unit consisted of (i) one share of goNumerical Ltd.; and (ii) a purchase warrant exercisable into such number of shares of stock at the exercise price.

191.    At the time, then-CEO Beeghley stated the following about Riot's investment in Coinsquare, "[a]t Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets.  With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector."

192.    Yet, undisclosed from investors – *for over six months* – was that (i) Defendant Honig received a cash payment of $50,000 from Riot for diligence services in connection with the

Coinsquare transaction; and (ii) several members of the Honig Group were also among the handful

of investors who were parties to the Coinsquare Agreement.  Indeed, the $50,000 payment to Honig

was finally disclosed (and admitted by Riot to be related party transaction) in the Company's April

17, 2018 Form 10-K, while the Honig Group's co-investment role in Coinsquare was not disclosed

to investors until May 25, 2018 in a Form 8-K/A filed after the close of trading that corrected the

October 4, 2017 Form 8-K that initially announced the transaction.  The following trading day, on

May 29, 2018, Riot stock declined nearly 6%.

193.    As set forth in the chart below, which was attached to Riot's May 25, 2018 Form

8-K/A, Honig Group members Honig, DeFrancesco, Groussman and Stetson – *like Riot* – were

among the 23 investors in Coinsquare:

| Name | Issued Share Capital |
|---|---|
| Virgile Rostand | 10,000,000 Common Shares |
| Cole Diamond | 2,500,000 Common Shares |
| Michael Diamond | 2,765,168 Common Shares |
| Robert Furse | 375,092 Common Shares |
| Jazse Holdings Inc. | 265,168 Common Shares |
| Tread Lightly, LLC | 265,168 Common Shares |
| TWG Startup Investment 2 Corp. | 300,018 Common Shares |
| *Bioptix Inc (a/k/a Riot)* | *2,249,985 Common Shares* |
| 2330573 Ontario Inc | 918,745 Common Shares |
| Jeff Cordeiro | 11,250 Common Shares |
| Peter Simeon | 15,000 Common Shares |
| Eduardo Vivas | 149,999 Common Shares |
| Argyle LLC | 149,999 Common Shares |
| Eric So | 93,749 Common Shares |
| Ross Levinsohn | 37,500 Common Shares |
| Sean Lai | 11,250 Common Shares |
| *Michael Brauser* | *112,499 Common Shares* |
| *Barry Honig* | *112,499 Common Shares* |

783086.1

| | |
|---|---|
| *GRQ Consultants Inc Roth 401K FBO Barry Honig* | *75,000 Common Shares* |
| *Erica and Mark Groussman Foundation* | *37,500 Common Shares* |
| *Titan Multi-Strategy Fund I, Ltd.* | *75,000 Common Shares* |
| *Stetson Capital Investments Inc.* | *37,500 Common Shares* |
| Kent Farrell | 37,500 Common Shares |

194.    Of course, according to Riot's 13D filings, as of the date of this agreement and according to Forms 13D filed in January 2017, Honig and DeFrancesco were greater than 10% shareholders of Riot.  Indeed, no changes in their share ownership since January 2017 had been filed with the SEC.  Additionally, Groussman, who was also a signatory to the Coinsquare Agreement was a greater than 5% shareholder based on his Form 13D filings with the SEC.  Lastly, Stetson's name similarly appears on the Coinsqare shareholder agreement although according to Forms 13D he filed with the SEC, he held under 5% of the Company's outstanding shares.

195.    In any event, as the list above and the Honig Group's various Forms 13D makes clear, under applicable SEC regulations, specifically, Item 404 of Regulation S-K and ASC 850 under GAAP, the Coinsquare transaction should have been disclosed to Riot's public investors as a related party transaction.  In addition, Honig's role as a consultant for Riot in the in the transaction and his and the Honig Group members' participation in that transaction should have been disclosed to Riot's public shareholders.

### 3.    The Kairos Transaction

196.    On November 2, 2017, Riot issued a press release announcing that it had acquired "1,200 Bitcoin Mining Machines . . . consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by industry leader Bitmain."  The next day, November 3, 2017, Riot disclosed in a Form 8-K that these machines were purchased through a share exchange agreement with Kairos Global Technology, Inc. ("Kairos"), a Nevada corporation formed only weeks earlier.  Riot

announced that as consideration for the 100% interest in Kairos that the Company received it would pay Kairos' stockholders – instead of cash – preferred shares of Riot stock that was convertible to 1,750,001 shares of Riot common stock.

197.    Significantly, at this time, Riot stock was trading at approximately $7 per share. Thus, based on Riot's trading price on the date that the transaction was announced the deal was valued at approximately $12,250,000.  In addition, Riot also agreed to pay "certain" undisclosed shareholders of Kairos – in addition to preferred shares – a royalty from cash flow generated from Riot's operations, which entitled such shareholders to receive 40% of the gross profits generated on a monthly basis until they have received a total of $1,000,000, at which point the royalty would be extinguished.

198.    Once again, absent whatsoever from Riot's November 3, 2017 Form 8-K describing the Kairos transaction, was that Kairos was owned in part by Honig and DeFrancesco.  Indeed, nearly five months passed before Riot finally disclosed in the Company's April 17, 2018 Form 10-K that "[e]ach of Mr. Honig and Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company, with Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned approximately 6.3% of Kairos."

199.    In other words, Riot had entered into yet another transaction with related parties, namely Honig and DeFrancesco, and failed to disclose their involvement.  By any measure, under applicable SEC regulations and GAAP, the Kairos transaction should have been disclosed as a related party transaction given Honig and DeFrancesco's involvement.  Instead, Riot's public shareholders did not learn about Honig's and DeFrancesco's interest in Kairos, or the preferred shares of Riot that they received, until Riot filed its Form10-K on April 17, 2018.

### 4.      The December 2017 Private Placement

200.      On December 19, 2017, Riot filed a Form 8-K announcing that the Company had entered into private placement agreements with unnamed "accredited investors" to sell $37 million units of securities at a purchase price of $22.50 per unit.  Each unit consisted of one share of the Company's common stock and a three year warrant to purchase one share of common stock at $40.00 per share.  In a press release announcing the transaction Riot stated that "[t]he $37 million in gross proceeds from the investment will be used for the expansion of the Company's Bitcoin mining operations, strategic investments, and general working capital."

201.      Like the other related party transactions described above, the Form 8-K and press release omitted Honig's and DeFrancesco's participation as "accredited investors."  It was not until Riot's April 17, 2018 Form 10-K that the Company disclosed for the first time that Honig and DeFrancesco were parties to the December Private Placement Agreement, having invested $500,000 and $360,000, respectively.

### F.      October 11, 2017 – Defendant Groussman and Defendant Honig's Brother, Jonathon Honig, Falsely Deny that Their Ownership in Riot Is Part of a Control Group

202.      Soon after Bioptix's announcement that it had changed its name to Riot and was transitioning into a cryptocurrency business, on October 11, 2017, Jonathon Honig, who is Defendant Honig's brother, filed a Form 13G with the SEC disclosing his beneficial ownership of 9.5% of Riot's common stock, not including 808,198 shares of common stock that he controlled and that were issuable upon the conversion of Series A Preferred A stock.  Notably, the Form 13-G specifically disclaimed Jonathon Honig's intent to influence or control Riot or that he was otherwise acting "in connection with or as a participant in" others' attempts to influence control over Riot:

783086.1

By signing below I certify that, to the best of my knowledge and belief, ***the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect***.

203.    The same statement appeared two days later in a Form 13G signed by Defendant Groussman wherein he disclosed beneficial ownership of 5.93% of Riot's common stock. Groussman, like Jonathon Honig, maintained a close financial relationship with Defendant Honig. Public records indicate that Honig is the lender on Groussman's $700,000 mortgage. Addtionally, Groussman has a long history of investing with Defendant Honig.

### G.    January 5, 2018 – Riot Fires Its Auditor

204.    On January 5, 2018, Riot filed a Form 8-K with the SEC announcing that the Company had dismissed EisnerAmper LLP as its independent auditor and engaged MNP LLP.

205.    On January 9, 2018, *Seeking Alpha* published an article titled, "Riot Blockchain: This Crypto Clown Car Continues Hurtling Toward the Abyss." The article highlighted the dismissal of Riot's auditor, noting that the Company had employed three different auditors over the course of a year.

### H.    December 29, 2017 – O'Rourke Sells 30,383 Shares for Proceeds of $869,256

206.    On December 29, 2017, after the market closed and going into a three-day holiday weekend, Defendant O'Rourke sold 30,383 shares of Riot for proceeds of $869,256. O'Rourke's sale was quickly picked up by media outlets.[23]

---

[23] *See, e.g.*, *John R. O'Rourke III Sells 30,383 Shares of Riot Blockchain Inc (RIOT) Stock*, American Banking and Market News (Dec. 30, 2017) ("CEO John R. O'Rourke III sold 30,383 shares of the firm's stock in a transaction dated Friday, December 29th. The shares were sold at an average price of $28.61, for a total transaction of $869,257.63.").

207.    On January 2, 2018, *Reuters* published an article prior to the market open entitled, "BUZZ-Riot Blockchain down after CEO reports stock offering – RTRS."  The article stated that Riot's stock price was down 4.44% in pre-market trading after Defendant O'Rourke had reported his sale of over 30,000 shares.  An article published during early morning trading hours, on the popular investor website, *The Motley Fool*, entitled, "Riot Blockchain's CEO Just Sold a Lot of Stock," detailed Defendant O'Rourke's suspicious trading, stating in relevant part:

> No one knows a company better than its insiders.  For this reason, it's my view that prices at which companies and their insiders buy and sell stock give a hint about a company's true value.
>
> \*   \*   \*
>
> **An insider dumps his shares**
>
> Right before a holiday weekend, and two days after the company announced it was adjourning its annual shareholders meeting until February, Riot Blockchain's chief executive officer, John R. O'Rourke III, filed a Form 4 with the SEC disclosing he and his firm, ATG Capital LLC, sold 30,383 shares of Riot on Dec. 29.
>
> \*   \*   \*
>
> These sales are material, representing about 37% of shares he and ATG Capital owned or would soon control prior to the transactions.
>
> O'Rourke now holds 12,500 shares through ATG Capital LLC, in addition to 39,500 shares of stock in his own name that he currently owns, or will receive over the next 60 days from his role as Riot's chief executive officer.  (O'Rourke received 344,000 restricted shares that vest in 24 monthly installments when he became CEO in November.)
>
> **Hiding bad news**
>
> These sales were curiously timed. O'Rourke sold his shares and filed the Form 4 after market close before a major holiday weekend, when most investors would be thinking about their New Year's Eve plans rather than their investment portfolios.
>
> Stock analysts, journalists, and political-types refer to this activity as a "Friday night dump," a common practice of releasing otherwise newsworthy information at a time when people are least likely to be paying attention.  One study from 2005 found that "Friday announcements are 20 percent more likely to present negative earnings than announcements on other weekdays."  Insider selling certainly fits in the "negative" category.

64

O'Rourke has every reason to sell quietly.  When taken together with Riot's deeply discounted equity raise earlier this month, his sales suggest recent market prices are a better price at which to sell its shares than buy them.  It's also interesting to me that O'Rourke is selling before a postponed annual shareholders meeting in which Riot is asking shareholders for the right to add another 750,000 shares of stock to the company's bonus pool for insiders.

208.    On this news, Riot's stock price declined $4.04 per share, or **_14.45%_**, over two trading days, from $28.40 per share on December 29, 2017, to $24.36 per share on January 3, 2018, damaging Lead Plaintiff and members of the Class.

**I.      January 4-5, 2018 –Riot Fires Its Independent Auditor and Files an Amended Form 8-K/A Disclosing Audited Financial Statements of Kairos Revealing that Riot Vastly Overpaid for Kairos's Assets**

209.    On January 5, 2018, Riot filed a Form 8-K disclosing that on January 4, 2018 it had "dismissed EisnerAmper LLP . . . as its independent registered public accounting firm" and that on January 5, 2018, Riot had engaged MNP LLP.

210.    Later on January 5, 2018, Riot filed an amended Form 8-K/A that disclosed "audited financial statements of Kairos Global Technology, Inc." "as of November 3, 2017," as prepared and audited by Riot's new accountant (since the day before) MNP LLP.  These financial confirmed that Kairos had paid $2,089,679 for the mining equipment it quickly turned around and sold to Riot for more than $13 million.  The financial statements confirmed that Kairos "purchased equipment of $2,089,679 from a company controlled by the president[24] of the Company," and that this was a "[r]elated party transaction[]."  The financial statements also stated that "as at November 3, 2017 . . . the equipment purchased was not yet operational."

211.    The market reacted negatively to the January 5, 2018 news once trading began on Monday, January 8, 2018, with the Company's stock price declining $1.01 per share, or **_4.13%_**,

---

[24] Michael Ho was the President of Kairos, according to the Nevada Secretary of State's website.

from $24.41 per share on January 5, 2018, to $23.42 per share on January 8, 2018, damaging Lead

Plaintiff and members of the Class.

## VIII. THE TRUTH ABOUT HONIG'S STOCK SALES AND THE FRAUDULENT SCHEME BEGINS TO EMERGE

212. On January 31, 2018, *The Wall Street Journal* published an article entitled "Investor

Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."[25]   The article stated that "**Mr. Honig**

**has sold about 500,000 shares**, he said, but declined to divulge his profit.   **He said he still**

**owns about 1% of the company**."  "'When stock goes up, you take a profit,' [Honig] said."

213. As a result of this revelation by *The Wall Street Journal* of Honig's previously

undisclosed massive (and nearly complete) divestment of his shares of Riot stock (and other

revelations of Honig's role as an insider in the Company's transformation and affairs and dubious

history as a penny stock investor), the Company's stock price fell from an opening price of $14.50

per share on January 31, 2018, to close at $13.75 that same day, a decline of $0.75, or ***more than***

***5%.***

214. Later on January 31, 2018, Riot issued a press release announcing that the

Company's 2017 Annual Meeting of Stockholders was being postponed for a second time, without

announcing a new date and time for its annual meeting.  Riot also announced that it had received

a notification from the NASDAQ that the Company had not held its annual meeting of shareholders

within twelve months of the end of Riot's fiscal year-end, in accordance with NASDAQ's Listing

Rules 5620(a) and 5810(c)(2)(G).

---

[25] Ianthe Jeanne Dugan, *Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake; Barry Honig pares back stake in Riot Blockchain, whose shares soared last year after a change of name*, The Wall Street Journal (Jan. 31, 2018).

783086.1

215.     On February 16, 2018, CNBC published an article titled "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket," reporting a slew of questionable practices and behavior at the Company.  Among other information, the February 16, 2018 CNBC expose revealed to the Riot's pubic shareholders that O'Rourke, Riot's CEO and Chairman, maintained a close business relationship with Honig, a greater than 10% shareholder of the Company.  CNBC (and the market) was suspicious about O'Rourke's previously undisclosed ties to Honig for good reason.  Only two weeks earlier Honig stated to *The Wall Street Journal* that his share holdings had decreased significantly down to 1% (from 10%) while O'Rourke announced significant inside sales in early Janaury 2018.  This suggests that the two were working in concert to manipulate Riot's shareprice for their own personal gain.

216.     The close relationship between Honig and O'Rourke was most prominently evidenced when CNBC visisted Honig's office in Florida only to find O'Rourke and not Honig.  This was also surprising given that at the time Riot listed it "principal executive offices" in its SEC filings as Castle Rock, Colorado.  O'Rourke responded (after first shutting the door) that he was merely there to meet with Honig, that he did not work out of Honig's office, and that he "ha[s] a good relationship with Mr. Honig and *we speak often*."

217.     Honig, who was later interviewed for the article, was quoted as saying that "at one time John O'Rourke had space in my office."  Honig also acknowledged that he and O'Rourke "speak often."

218.     In addition to the above, the article stated :

As bitcoin hit record highs in late December, a hot new stock was making news on a daily basis. Riot Blockchain's stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto.

***But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease.***

67

That might sound somewhat like the type of newly minted blockchain company that has gained SEC attention.

*"Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain," SEC Chairman Jay Clayton said, speaking in generalities in recent testimony to Congress. The SEC declined to comment to CNBC about Riot Blockchain.*

The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.

That purchase and the company's name change aren't Riot's only questionable moves.

*A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in.*

\* \* \*

Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida. The resort is known as the "pink palace" and has luxury yachts lined up on its dock.

*But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for Feb. 1. It's not clear the company ever planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity.*

*Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.*

That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton. That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose office is a short drive from the hotel. He once owned more than 11 percent of the outstanding common stock, according to SEC filings.

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone. "It was an investment where I had a return. And I sold some shares. There's nothing wrong with doing that."

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

"Typically, Barry Honig invests his hard-earned money into a company, and he also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

A visit to the site now only reveals the text: "Under construction."

From the outside, Honig's office is nondescript. There does not appear to be any evidence of his company's existence on the building's directory or on the door of his office.

**When CNBC crew members walked into the office, they didn't find Honig, they found O'Rourke. That's the same O'Rourke who made headlines when — less than three months after the company changed names and business plans — he sold about $869,000 worth of shares, according to an SEC filing.** He told the crew he was there for a meeting with Honig and that we had just missed him.

O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed." Then, late the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.

He agreed to answer questions via email instead. One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.

**"I have my own office in a separate location," O'Rourke said in an email sent by his lawyer, Nick Morgan, a partner with Paul Hastings. "I do have a good relationship with Mr. Honig and we speak often."**

**"John O'Rourke does not work out of my office," Honig said. "John O'Rourke has his own office . . . at one time John O'Rourke had space in my office . . . we speak often."**

*Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information.*

*"You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or dialogue about what's appropriate for the company on a day to day basis or in the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP.*

*Despite Honig's website saying he gives advice on who should lead a company, Honig said he had nothing to do with O'Rourke becoming CEO.*

*"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.*

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

*"I see a company that has had a change of control of the board. I see a company that has had a change in business. I see a company that has had several dilutive issuances immediately following the change of the board and change of the business. And I see a stock that has gone zoom," he said. "And what I understand a significant amount of insider selling. So yes, these are red flags."*

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million. On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings. Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent. After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants. His purchase price ranged from $2.77 to $5.32 per share, according to the list of trades he provided to the SEC in 2017. Honig's

investment dropped below 5 percent, the threshold for SEC filing, on Nov. 28. At that point, the stock had already climbed above $20.

Honig did not disclose his dramatically reduced position in the stock until this week.

*But that may not be the true extent of Honig's selling. Buried deep in the footnotes of Riot filings, it's clear Honig also accumulated more than 700,000 new warrants that he could convert to stock at $3.56 per share and more than 700,000 promissory notes that he could convert to stock at $2.50 a share.*

*What about those warrants and promissory notes? It's not clear, as he never mentioned them in either 13D. But in another footnote from a recent Riot filing, there is no longer a mention of them.*

He declined to further clarify what happened to them.

"It's all disclosed in the public filings. And those are all the obligations I have," he said. "I'm very comfortable with what I had to do and what I was obligated to do. . . . I'm not going to talk about my personal trading history or my bank account."

*Birns questioned how Honig made his filings. "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant amount of stock. Or has the potential to own significant amount of stock in excess of what is reported on the 13D," he said.*

This is not the first time Honig has faced questions over his actions. In 2000, he was alleged to have committed stock manipulation. Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse.

"The answer's no," Honig said when asked if he still manipulates stocks.

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to SEC filings.

When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up.

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

71

*One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase. Kairos' main asset was $2 million of mining equipment. Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings.*

O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.

Kairos appears to have many links to Riot. The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada. Despite the many press releases, there has been no formal mining announcement.

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining. SEC filings are silent on mining activity.

As for professional poker players advising Riot? O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social media followers. He called them "thought leaders."

***Riot is not O'Rourke and Honig's first cryptocurrency investment.***

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

72

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. ***"I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."***

Honig acknowledges the investment.

The questions continue for Riot Blockchain.

On Tuesday, Riot filed to withdraw prior SEC filings.

"It is not the result of any government inquiry," O'Rourke said in an email. "It was just corporate clean up from our securities counsel."

As for the annual shareholders' meeting, "We did not have a quorum of shareholders required for a vote," O'Rourke said in the email from his lawyer. "We are also working on other corporate action items that would require shareholder approval and a shareholder meeting as well. We did not want to waste the time and expense of potentially having two shareholder meetings within a short period of time. Thus we adjourned the meetings, which is not an uncommon practice."

There is no new date for the shareholders' meeting.

***"You see companies adjourn meetings in a context of a contested election and the like,"*** Birns said. ***"I just don't think in this instance, there's any reason to adjourn their annual meeting."***

And as to O'Rourke selling stock in December?

He told CNBC in the email: "I sold less than 10 percent of my overall position to assist with covering tax obligations as a result of so-called phantom income tax from the vesting of restricted stock awards. It is common for Executives to sell stock to cover such tax obligations. I could have sold more stock in that window but chose to sell just 30,383 shares."

O'Rourke welcomes increased regulation and transparency for the cryptocurrency industry. "Unfortunately, as with many new hot sectors, it [blockchain] has attracted some bad actors trying to capitalize on the hype," he said. "Riot is all for increased transparency and properly imposed regulation."

***Honig would not disclose how much he made on his investment in Riot***, "I wasn't fortunate enough to do as well as you might think and people might speculate . . . I don't regret anything."

(Emphases added).

73

219.    Also on February 16, 2018, CNBC included the Riot Blockchain story referenced

above during newscasts that day, entitled "CNBC Investigates Red Flags at Riot" which included

in relevant part the following by CNBC's Michelle Caruso Cabrera:

> We wanted to find out who was behind Riot Blockchain, but for weeks no one would talk to us.  So we decided to see if we could get answers here at the swanky Boca Raton Resort and Club in Florida.  That's where Riot's annual shareholders' meeting was set to take place.  It would be an upscale setting for this upstart company with red ink, as far as their most recent quarterly report shows.  But as we quickly learned, that annual meeting wasn't going to take place.  Twice Riot Blockchain announced they were going to hold their annual shareholders' meeting here at the Boca Raton Resort and Club.  Twice at the very last minute, in fact the night before, they announced that they were postponing the meeting.  ***And in fact the hotel tells us there was never a meeting room ever booked under the name Riot Blockchain.  So we drove to this nearby office building, trying to find Barry Honig.  According to SEC filings, he may be the man behind the curtain.  He was an early investor in Riot, back when it was Venaxis, a medical testing company, and then eventually Bioptix.  He led an activist move to replace the board, and he eventually won.  The new board changed the name from Bioptix to Riot Blockchain.  "Hello? Hi. Michelle Caruso-Cabrera."  As the elevator door opened in front of us, not Barry Honig, but this man, John O'Rourke, the CEO of Riot Blockchain, the same John O'Rourke who made news in December for selling about $869,000 worth of Riot stock just two months after the company changed its name.  O'Rourke quickly closed the door.***  Five minutes later he emerged and agreed to talk to us, but only off camera.  He said he was here for a meeting with Honig when he arrived, and that we had just missed him.  O'Rourke insisted that he does not work out of Barry Honig's office, even though we found him there.

220.    The CNBC broadcast narrated their encounter with Defendant O'Rourke:

> During that hour-long off-camera meeting, O'Rourke told us his Riot stock sale was merely to pay taxes on his restricted stock. And as for the sharp rise in shares of Riot, O'Rourke said that was unexpected and ridiculous. ***He also said he isn't worried about the SEC because "we over-disclose."***

221.    CNBC noted that when Honig "agree[d] to talk to [CNBC] by phone", he

"downplayed his influence with Riot and John O'Rourke":

"MR. HONIG: *John O'Rourke's an adult, and he makes his own decisions, okay?*

**[MS. CARUSO-CABRERA:]** In 2000 you were fined for $25,000 and suspended ten days by FINRA for stock manipulation.  You're no longer a licensed broker.  Do you still manipulate stocks?

**[MR. HONIG:]** *The answer's no.*  Continue.  I'm a successful investor.  I'm a comfortable person.  I don't need to work today.  I have a beautiful family that's college educated, and I'm very comfortable.  **I am very comfortable.** *The truth will come out."*

222.    CNBC's Ms. Caruso-Cabrera further reported that "*Honig acknowledged he's done this before.  Five years ago he and John O'Rourke were involved in another company that changed its business model to blockchain.  That stock also skyrocketed*.  Today it's trading around two bucks a share.  Oh, and it's changed its business model again, to cloud computing for cars."

223.    As CNBC's Ms. Caruso-Cabrera noted, "Just this week a new filing from Barry Honig, which shows he sold a massive amount of shares, his common stock down to little more than 173,000.  So as Riot was issuing press release after press release promising great plans for the company, Honig was selling, making millions of dollars along the way."

224.    On the news reported by CNBC, including revealing that "Barry Honig may be the man behind the Riot Blockchain curtain," the price per share of Riot stock at closing fell approximately *33.4%*, or $5.74 per share, on heavy volume, from closing at $17.20 per share on February 15, 2018, to close at $11.46 per share on February 16, 2018, causing damage to Lead Plaintiff and the other members of the Class.

225.    On April 17, 2018, after trading ended that day Riot filed its Annual Report on Form 10-K.  The report included for the first time several previously undisclosed related-party transactions between Honig and/or DeFrancesco and the Company that Riot, Honig, and DeFrancesco were required to disclose, including:  (i) the March 2017 Private Placement; (ii) the

$50,000 payment Riot made to Honig related to his consulting role in the Coinsquare transaction; (iii) the Kairos transaction; and (iv) the December 2017 Private Placement.  When the market opened the following day, on April 18, 2018, Riot's stock dropped 5.8%.  Also, on April 18, 2018, Honig filed an amended 13D/A that disclosed for the first time, certain details concerning:  (i) his role in the March and December 2017 Private Placements; (ii) the preferred share conversion to common stock that occurred as part of the Kairos transaction; and (iii) his specific stock trades made during 2017.  This 13D/A is incorporated by reference and attached hereto as Ex. P.

226.    After the close of trading on May 25, 2018, Riot filed its amended Form 8-K/A that disclosed for the first time that various Honig Group members, including Defendants Honig, DeFrancesco, Groussman and Stetson were parties to the Coinsquare agreement – a transaction where Riot was also a party by virtue of its $3 million investment in Coinsquare.  As discussed above, Riot, Honig, Groussman, Stetson, and DeFrancesco were obligated to disclose their interest in Coinsquare.  On this news, on the following trading day, May 29, 2018, Riot's stock price fell from an opening share price of $7.53 to a close of $7.08 per share, a decline of nearly 6%, damaging Class members.

227.    On September 7, 2018, the SEC filed the *Honig* Action against Defendants O'Rourke, Honig, Groussman, and Stetson (as well as Honig Group affiliate Brauser and others) for violating the Exchange Act and Securities Act by engaging in "three highly profitable 'pump-and-dump' schemes . . . from 2013 through 2018 in the stock of three public companies (Company A, Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares."  Cmpl. ¶ 1.

228.    The SEC alleged that "Honig was the primary strategist, calling upon other Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage

in promotional activity."  The SEC further alleged that "[i]n each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse merger or by participating in financings on terms highly unfavorable to the company."  *Id.*, ¶ 2.

229.    The SEC also alleged that "[t]o profit from their investment, in each scheme, Honig and his associates would arrange and pay for the promotion of the stock, directing their co-defendants, or a similar promoter, to write favorable and materially misleading articles about the company whose stock price they wanted to inflate.  In several instances, to magnify the intended boost to volume and price that would follow a promotional article's release, Honig, Brauser, O'Rourke, Groussman, Melechdavid, and ATG engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock, priming investor interest." *Id.*, ¶ 3.

230.    In an accompanying press release, Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement, stated that "Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets."

231.    On this news, the price of Riot's stock declined $1.38 per share, or approximately **26.1%**, from the previous day's closing price, to close at $4.30 per share on September 7, 2018, as additional corrective information that Defendants had previously failed to disclose regarding their membership in a group entered the market.

232.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Class members have suffered significant losses and damages.

IX.   **DEFENDANTS ENGAGED IN A MANIPULATIVE DEVICE, SCHEME, ARTIFICE, AND CONSPIRACY TO DEFRAUD RIOT'S PUBLIC SHAREDHOLDERS DURING THE CLASS PERIOD**

233.   During the Class Period, each of the Defendants – pursuant to explicit or tacit agreements with each other and the Selling Stockholders – agreed to acquire, hold, vote, and/or dispose of shares they acquired in Riot in coordination with one another while knowingly or recklessly obtaining and exercising undisclosed control of the management and policies of Riot and while selling shares of Riot into the market at artificially inflated prices.  Defendants did so in violation of Section 13(d) of the Exchange Act and Rule 13d-2, *et seq.*, promulgated thereunder, which required Defendants to disclose their status as a "group" (as defined by Section 13(d)(3)) on Schedule 13D and to "promptly" update any material changes in their beneficial ownership of Riot's common stock in amendments (on Schedule 13D/A) to their Section 13(d) filings.  *See* § IX.A, *infra*.

234.   Defendants Honig, O'Rourke, and Stetson were familiar with their obligations under Section 13(d) – and the materiality of their disclosures to Riot's investors regarding beneficial ownership of the Company's stock – because they themselves had previously filed a lawsuit under this statute alleging that these disclosures were material to them.  *See* § IX.B, *infra*.

235.   Yet, despite this knowledge, Defendants failed to make timely and appropriate Section 13(d) filings and amendments reflecting their acquisition and disposition of Riot stock as part of scheme to defraud investors about their group's control over the management and policies of, and the magnitude of their collective investment in, Riot.  *See* § IX.A, *infra*.  And having concealed their group's existence and control over Riot, Defendants proceeded to engage in manipulative trading in Riot's securities (including massive sales of Riot's common stock) while failing to make the necessary amendments to their Section 13(d) filings, which under the rules, should have promptly alerted Riot's public investors that a group of insider shareholders (indeed,

an undisclosed control group) were collectively dumping their shares into the market.  *See* § X.A, *infra*.

236.    And as discussed below, Defendants Honig, Groussman, Stetson, and DeFrancesco's violations of Section 13(d) were made knowingly, or at least recklessly, in light of their clear knowledge that they were acting together as a group in their scheme involving Riot. *See* §§ IX.C.1-4, *infra*.

237.    Defendants could not have accomplished their scheme, however, without the assistance of Defendants O'Rourke and Beeghley from inside the Company.  Specifically during the Class Period, Defendants O'Rourke and Beeghley, as officers and/or directors of Riot, pursuant to explicit or tacit agreements with Defendants Honig, Groussman, Stetson, and DeFrancesco, caused the Company to issue materially false and misleading public filings with the SEC – including on Forms S-3, S-3/A, and 10-K, and Schedule 14A – that materially misrepresented the Company's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K by misrepresenting and concealing the fact that many of Riot's largest shareholders – including Defendants Honig, Groussman, Stetson, and DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A were members of a group with each other (as defined by Section 13(d)(3)) pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  *See* § X.B, *infra*.

238.    In causing Riot to issue its materially false and misleading Forms S-3, S-3/A, 10-K, and other SEC filings, O'Rourke and Beeghley well aware that the Honig Group (including themselves) was a closely coordinated "group" that amply fit that definition under Section 13(d)(3), and which was therefore engaged in a scheme to defraud the Company's public investors. *See* § IX.C.5-6, *infra*.

239.     Defendants O'Rourke, Beeghley, and Riot also knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by issuing materially false and misleading Forms 8-K and 10-K that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendants Honig, Groussman, and DeFrancesco.  *See* § X.C, *infra*.

### A.     Owners and Issuers of Securities Have Well-Known Disclosure Duties Under Section 13(d), Regulation 13d, and Item 403 of Regulation S-K

240.     The federal securities laws are designed to ensure transparency by requiring that investors be provided with timely, accurate information about companies and persons who own large amounts of company stock and thus are in a control relationship with the company.  The Securities Act and the Exchange Act have several provisions designed to ensure that companies, their officers, and large shareholders provide the marketplace with adequate information about their holdings and their purchases and sales of their companies' stock.  For example, when a person or group of persons acquires beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of the Exchange Act, such person (colloquially known as a Section 13(d) filer) or group is required to make a filing under Exchange Act Section 13(d) with the SEC within ten days.[26]  These rules are meant to prevent evasion of the disclosure requirement when two or more persons act together but keep their individual holdings below the reporting threshold.

241.     Under Section 13(d)(3), "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of

---

[26] Section 13(d)(1) of the Exchange Act and Rule 13d-1 thereunder require any person who acquires more than 5% of the aggregate shares of any issuer's stock to file a Schedule 13D (or 13G if permissible under the rules) within ten days.  *See* 15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d–1(a) and (c).

securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."  15 U.S.C. § 78m(d)(3).  Under Rule 13d-5, "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons."  17 C.F.R. § 240.13d-5(b)(1).

242.    These rules are meant to prevent evasion of the disclosure requirement when two or more persons act together but keep their individual holdings below the reporting threshold. Indeed, the rules specifically contemplate those who would use a "plan or scheme to evade the reporting requirements of section 13(d) or (g)" by providing that "[a]ny person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose of effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security.  17 C.F.R. § 240.13d-3(b).

243.    When a group of persons agrees to act together to acquire, sell, vote or hold more than 5% in the aggregate of any issuer's stock, they must each file a disclosure, even if their individual ownership is below 5%.[27]  When the holdings of a person or group of persons materially change, Section 13(d) and Rule 13d-2 thereunder [17 C.F.R. § 240.13d-2] require that Section

---

[27] Under Rule 13d-101, the "person" filing a Schedule 13D must "[s]tate the aggregate number and percentage of the class of securities . . . beneficially owned" by that "filing person," and this "*information should also be furnished with respect to persons who, together with any of the persons named in [the Schedule 13D], comprise a group within the meaning of section 13(d)(3) of the Act[.]*"  17 C.F.R. § 240.13d-101 ("Item 5. Interest in the Securities of the Issuer.") (emphasis added).

13(d) filers "promptly"[28] make an amended Schedule 13D filing to update the market about that "material change" in their holdings.[29]

244.     A person who would otherwise be obligated to file a statement on Schedule 13D may instead file a "short-form statement on Schedule 13G" if that person can attest that they "[have] not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect, including any transaction subject to § 240.13d-3(b) . . . ." 17 C.F.R. § 240.13d-1(c).

245.     These disclosure provisions are intended to alert the company's stockholders and the marketplace to changes in securities ownership that indicate potential for changes in control of the company.  Indeed, the SEC's rules warn potential filers of Schedules 13D or Schedules 13G that the disclosures are "mandatory" and can lead to civil or criminal litigation:

> Disclosure of the information specified in this schedule is mandatory. The information will be used for the primary purpose of determining and disclosing the holdings of certain beneficial owners of certain equity securities. This statement

---

[28] The SEC has noted that "promptly" means that an investor must amend its disclosure as soon as "reasonably practicable."  *In the Matter of Sequa Corp.*, Release No. 26839 (May 19, 1989). "[C]ourts have approved amendments filed within five to ten days of the material changes that triggered the need to amend."  *Standard Fin., Inc. v. LaSalle/Kross Partners, L.P.*, No. 96 C 8037, 1997 WL 80946, at *6 (N.D. Ill. Feb. 20, 1997); *see also Scott v. Multi–Amp Corp.*, 386 F.Supp. 44, 61 (D.N.J.1974) (filing within five days of material change was "prompt"); *D–Z Inv. Co. v. Holloway*, 1974 WL 440, at *3 (S.D.N.Y. Aug. 23, 1974)) (filing within "10 days" of material change was "prompt").

[29] Under Rule 13d-2(a), "If any *material change* occurs in the facts set forth in the Schedule 13D (§ 240.13d–101) required by § 240.13d–1(a), including, but not limited to, any material increase or decrease in the percentage of the class beneficially owned, the person or persons who were required to file the statement shall *promptly* file or cause to be filed with the Commission an amendment disclosing that change.  An acquisition or disposition of beneficial ownership of securities in an amount equal to *one percent* or more of the class of securities shall be deemed 'material' for purposes of this section; acquisitions or dispositions of less than those amounts may be material, depending upon the facts and circumstances."  17 C.F.R. § 240.13d-2(a) (emphases added).

will be made a matter of public record. Therefore, any information given will be available for inspection by any member of the public.

Because of the public nature of the information, the Commission can use it for a variety of purposes, including referral to other governmental authorities or securities self-regulatory organizations for investigatory purposes or in connection with litigation involving the federal securities laws or other civil, criminal or regulatory statutes or provisions.

17 C.F.R. § 240.13d-101 (Special Instructions for Complying With Schedule 13D).

246.    Similar disclosure obligations are also imposed on issuers, such as Riot.  Exchange Act Section 13(a) requires all issuers whose securities are registered pursuant to Exchange Act Section 12 (such as Riot) to file periodic reports with the SEC, and Exchange Act Rule 13a-1 requires such issuers to file annual reports – *i.e.*, a "Form 10-K."  Exchange Act Regulation S-K at Item 10 sets out the information that must be disclosed in both Forms S-1 (Registration Statements) and 10-K.  17 C.F.R. § 229.10(1).  Item 403 of Regulation S-K, in turn, requires issuers to provide a table listing:

any person (including any "group" as that term is used in section 13(d)(3) of the Exchange Act) who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities.

17 C.F.R. § 229.403(a).

247.    Thus, potential investors reviewing an issuer's annual report on Form 10-K or registration statement on Form S-3 can expect to see a table describing all persons – and all "groups" of persons – who beneficially own more than 5% of Riot's stock.  Officers who sign public filings on behalf of their companies have a duty to ensure their completeness and accuracy.

248.    Collectively, these and other provisions[30] of the federal securities laws protect investors from pump-and-dump schemes and ensure that investors understand who is controlling

---

[30] Similarly, Section 16(a) and Rule 16a–3 require people – including "persons in a group" – who have beneficial ownership of more than 10% of a company to report their ownership with the SEC

a company and whether any large shareholders have amassed a position that will allow them to control or influence the company and its securities.  When these required disclosures are evaded or issued in a misleading fashion, investors are deprived of material information about an issuer.

**B.      Honig, O'Rourke, and Stetson Were Familiar with Section 13(d)**

249.    Honig, O'Rourke, and Stetson all understood their respective reporting obligations under Exchange Act Section 13(d), and that the information included in such filings is material to investors.  Specifically, in February 2015, Honig and Brauser filed a lawsuit in Harris County, Texas, alleging that counter-parties had violated Exchange Act Section 13(d) by failing to make requisite Section 13(d) filings for the more than 5% position they controlled as a group, and that that failure constituted a material omission that defrauded Honig and Brauser in their purchase of securities from those defendants.  In their complaint in that lawsuit, *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct. Feb. 26, 2015), Honig and Brauser alleged that "the beneficial ownership table" of a "Registration Statement on Form S-4" had failed to disclosed "material, non-public information" regarding the defendants'' "significant beneficial ownership interest" in a company in which Honig and Brauser had invested.  Honig and Brauser alleged that the "omission" of this "information" "was materially misleading":

> A significant beneficial owner's sale of shares in [an] entity . . . is a negative
> indication regarding the prospects of the . . . company.  Such information regarding
> a significant beneficial ownership interest in [the issuer's stock] was material.  It is
> the kind of information that the SEC requires to be disclosed in connection with

---

in a Form 3.  15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a-3(a).  Any subsequent "change in such ownership" must also be reported in a Form 4 "before the end of the second business day following the day on which the subject transaction has been executed."  15 U.S.C. § 78p(a)(2)(C); 17 C.F.R. § 240.16a-3.  "Where persons in a group are deemed to be beneficial owners of equity securities pursuant to § 240.16a–1(a)(1) due to the aggregation of holdings, a single Form 3, 4 or 5 may be filed on behalf of all persons in the group."  17 C.F.R. § 240.16a-3.  As more than 10% shareholders, Defendants Honig and DeFrancesco were therefore required to File Forms 3 and 4 and report any changes in their ownership within two business days.  But neither Honig nor DeFrancesco ever did.

783086.1

solicitations for mergers and in various other filings (*e.g.*, Schedules 13D and/or 13G) precisely because of its materiality.  Defendants' failure to disclose to plaintiffs their significant beneficial ownership interest in [the issuer] . . . is a material and materially misleading omission. . . .  Plaintiffs would not have purchased the Shares if they had known the undisclosed facts that [defendants] controlled such a large interest in [the issuer's] stock . . . .[31]

250.    In email exchanges leading up to filing this complaint (as alleged by the SEC in the *Honig* Action[32]) Honig and Brauser discussed drafts of their complaint, and circulated them to Stetson and O'Rourke (non-parties to the lawsuit) seeking their comments.  Honig and Brauser also discussed with Stetson and O'Rourke each of their respective understandings of the requirements imposed by Section 13(d) of the Exchange Act.  Nonetheless, and despite their understanding of what Section 13(d) required them to disclose and how and why those disclosures were material to investors, neither Honig nor Stetson made the requisite Schedule 13D filings with respect to Riot, nor did O'Rourke as CEO cause Riot to made the requisite disclosure on in the Company's Forms S-3, S-3/A, and 10-K, or its proxy statements.  This knowledge goes directly to Defendants' scienter in this action.

C.    **Defendants Acted as an Undisclosed Control Group to Pump-and-Dump Riot Stock While Misrepresenting and Concealing their Beneficial Ownership in Violation of Section 13(d), Rule 13d-2, and Item 403 of Regulation S-K**

251.    "Pump-and-dump" schemes typically have two parts.  In the first, the fraudsters acquire a large amount of stock at little or no cost whereupon a promotion scheme is implemented to boost the price of the stock or create trading volume by stimulating market interest with false or misleading statements about the company.  Once the stock price and trading volume have been pumped up, the fraudsters move on to the second part, in which they dump their large holdings of

---

[31] *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct. Feb. 26, 2015) at ¶¶ 39-40.

[32] *See SEC v. Honig, et al.*, No. 18-cv-08175-ER (2d Am. Cmpl.) (ECF No. 233) at ¶¶ 161-62 (Exhibit B hereto).

the stock into the public market at an enormous profit for themselves.  After the fraudsters dump

their shares and stop hyping the stock, the price typically falls, trading volume dries up, and

investors lose their money.  Critical to the success of such a scheme is disguising the fact that the

fraudsters beneficially own and control a large amount of the unrestricted stock which, if known

to investors and market participants, would inform investors that control persons of the company

were dumping their stock.  Similarly critical to the success of such a scheme is concealing the fact

that the members of such a group are selling that large amount of stock into the market during the

"dump" phase of that scheme.

251.    As discussed below, Defendants knowingly or recklessly engaged in precisely this

type of manipulative device, scheme, artifice, and conspiracy to defraud Riot's public shareholders

in violation of the federal securities laws.  Defendants pursued, or joined in the pursuit of, a

common course of conduct, and acted in concert with and conspired with one another in

furtherance of their wrongdoing.  Defendants accomplished their scheme by purposely

misrepresenting and concealing (and causing the Company to misrepresent and conceal) material

facts, failing to correct such misrepresentations, and violating the federal securities laws.  As

insiders, controlling shareholders, officers, and/or directors of Riot, each of the Defendants was a

direct, necessary, and substantial participant in the conspiracy, common enterprise, and common

course of conduct complained of herein.  Each of the Defendants aided and abetted and rendered

substantial assistance in the wrongs complained of herein.  In taking such actions to substantially

assist the commission of wrongdoing, each of the Defendants acted with actual or constructive

knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that

wrongdoing, and was or should have been aware of his or her overall contribution to and

furtherance of the wrongdoing.  At all times relevant hereto, each of the Defendants was the agent

of each of the other Defendants and of Riot and was at all times acting within the course and scope of such agency.

### 1.    Honig Knowingly Engaged in the Fraudulent Scheme

253.   During the Class Period, Honig committed deceptive acts by knowingly misrepresenting and concealing that he was part of an undisclosed group (as defined by Section 13(d)(3)) while engaging in manipulative trading in Riot stock.  Defendant Honig's Section 13(d) filings during the Class Period misrepresented and omitted that his purported individual investment in Riot was actually part of a larger group.  *See* § X.A.1, *infra*.  Honig also repeatedly failed to make the necessary amendments to his Section 13(d) filings disclosing that he had materially changed his beneficial ownership in Riot through either purchases or (primarily) sales of Riot's stock during the Class Period.

254.   Honig did so knowingly or at least recklessly.  *First*, as discussed above, Honig (together with Brauser) had previously brought suit against several individuals under Section 13(d) in *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct.), in which Honig alleged that a violation of Section 13(d) is "material" and that he "would not have purchased the Shares if [he] had known the undisclosed facts that [the defendants] controlled such a largest interest in [the company's] stock."  Leading up to this filing, Honig discussed drafts of this complaint with O'Rourke and Stetson, seeking their comments, and discussing their respective understandings of the requirements of Section 13(d).

255.   *Second*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that between 2011 and August 2018, Honig invested alongside O'Rourke in ***over 75 issuers***, alongside Stetson in ***over 65 issuers***, and alongside Brauser in ***over 40 issuers***.  Because Honig was aware of his history of co-

87

investments with O'Rourke, Stetson, and Brauser he knew that his co-investment with these same individuals with respect to Riot was again part of a coordinated "group" under Section 13(d).

256.   *Third*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by O'Rourke's statement in a February 3, 2014 email to the officer of a potential merger target that "***Barry Honig is the principal investor of our small group***," as alleged by the SEC in its Amended Complaint in the *Honig* Action.

257.   *Fourth*, Honig knew that, at a minimum, O'Rourke, Stetson, and Groussman were part of his investing group with respect to Riot because Honig shared his office with them in Boca Raton.  In fact, a September 13, 2016 letter signed by Honig, in which he nominated O'Rourke and Stetson to the Company's Board, lists the ***same fax number*** (with Palm Beach County, Florida area code 561) for O'Rourke and Stetson as the fax number listed on Honig's letterhead for his office in Boca Raton, Palm Beach County, Florida.  Indeed, O'Rourke was discovered by CNBC reporters inside Honig's same Boca Raton office on or about the day of Riot's recently cancelled annual meeting of shareholders in Boca Raton.  Because they worked out of the same office, shared the same fax number from that office, and even met with O'Rourke in that office the day of Riot's cancelled annual meeting of shareholders, Honig knew that he O'Rourke, Stetson, and Groussman were a "group" under Section 13(d).

258.   *Fifth*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that, as noted above, Honig, O'Rourke, Groussman, Stetson, and/or Brauser personally coordinated their investments in numerous public companies.  *See* Exs. E, F, G, H, I & J.  Indeed, Honig, O'Rourke, Groussman, and Stetson accomplished this coordination through private email correspondence amongst each

88

other, *see* Ex. D at 7 of 21, in which they would coordinate the precise number of shares that each of them would hold in their target companies, *see* Ex. H.

259.   *Sixth*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Defendants Groussman, Stetson, and DeFrancesco also failed – like Honig – to report their membership in the same group with respect to the same company (Riot) during the same time period in 2017 in violation of Section 13(d).

260.   *Seventh*, that Defendant Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" that included, at a minimum, Defendant DeFrancesco is supported by the fact that Honig and DeFrancesco (both as 10%+ Riot shareholders) both engaged in an undisclosed related-party transaction in which Honig and DeFranscesco respectively owned of 8.6% and 6.3% (together 14.9%) of Kairos when Riot acquired all outstanding shares of Kairos in exchange of convertible preferred stock of Riot.  Honig and DeFrancesco's coordination of their related-party transactions with Riot O'Rourke is further supported by the fact that Riot paid more than $13 million to the owners of Kairos (including Honig and DeFrancesco) for assets worth less than $2 million.

261.   *Eighth*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Honig, Groussman, and Stetson (and Jonathan Honig, through his entity, Titan) all invested together in the October 2, 2017 related-party Coinsquare shareholders' agreement with Riot (*see* § VII.E.2, *infra*) which was not disclosed to the Company's shareholders until May 25, 2018.

262.   *Ninth*, Honig's knowledge of, and participation in, the Honig Group's pump-and-dump scheme at Riot, including his role committing Section 13(d) disclosure violations by

concealing his membership in a group of affiliated Riot stockholders while engaging in massive undisclosed sales of Riot stock, is supported by the SEC's allegations in the *Honig* Action.  Indeed, as a result of that action, Honig has been "permanently barred from participating in any offering of penny stock"; "permanently prohibited" from holding greater than 4.99% of any penny stock company; "advertising, marketing, or otherwise promoting" any penny stock.

263.   *Finally*, that Honig knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by Honig's past interconnections with the Honig Group and the Selling Stockholders, which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies" (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

## 2.   Groussman Knowingly Engaged in the Fraudulent Scheme

264.   During the Class Period, Groussman committed deceptive acts by knowingly misrepresenting and concealing that he was part of an undisclosed group (as defined by Section 13(d)(3)) while engaging in manipulative trading in Riot stock without amending his beneficial ownership disclosures as required by Section 13(d) and Rule 13d-2 thereunder.  *See* § IX.A.2, *infra*. For example, on October 13, 2017 Groussman filed with the SEC a Schedule 13G that included his signature and the following false and misleading statement:

> *By signing below I certify that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer [i.e., Riot] of the securities* and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect.  After reasonable inquiry and to the best of my knowledge and belief, *I certify that the information set forth in this statement is true, complete and correct*.

265.    Given Groussman's prior connections to Honig, O'Rourke, Stetson, and other members of the Honig Group, the statement that "the securities referred to above were not acquired and are not held" in order to "change[]" or "influence[]" "control of the issuer" was false and misleading when made in violation of the federal securities laws.

266.    Groussman's knowledge of his violations of Section 13(d) and Rule 13d-2 is supported by numerous facts.  _First_, as alleged by the SEC, Groussman's participation in Honig's previous schemes involving Biozone, MGT, and MabVax included "pre-release manipulative trading" with Honig, Brauser, O'Rourke, Melechdavid, and ATG.

267.    _Second_, as alleged by the SEC, "Groussman . . . work[ed] at an office in Boca Raton with Honig, Stetson and O'Rourke."  Thus, Groussman knew that, at a minimum, Honig, O'Rourke, and Stetson were part of his investing group with respect to Riot because Groussman shared Honig's office with them in Boca Raton.

268.    _Third_, that Groussman knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that, as noted above, Groussman, O'Rourke, Stetson, and/or Brauser personally coordinated their investments in numerous public companies.  _See_ Exs. D, E, F, G, H & I.  Indeed, Groussman, Honig, O'Rourke, and Stetson accomplished this coordination through private email correspondence amongst each other.  _See_ Ex. D at 7 of 21 (email among Groussman, Honig, O'Rourke, Stetson, Brauser, and others).

269.    _Fourth_, that Groussman knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Defendants Honig, Stetson, and DeFrancesco also failed – like Groussman – to report their

91

membership in the same group with respect to the same company (Riot) during the same time period in 2017 in violation of Section 13(d).

270. *Fifth*, that Groussman knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" with Honig, in particular, is further supported by the fact that Groussman purchased his house in Miami Beach, Florida, with a $700,000 mortgage loan from Honig, who is mortgage holder of Groussman's house.

271. *Sixth*, that Groussman knowingly violating his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Groussman, Honig, and Stetson (and Jonathan Honig, through his entity, Titan) all invested together in the October 2, 2017 related-party Coinsquare shareholders' agreement with Riot (*see* § VII.E.2, *infra*) which was not disclosed to the Company's shareholders until May 25, 2018.

272. *Seventh*, Groussman's knowledge of, and participation in, the Honig Group's pump-and-dump scheme at Riot, including his role committing Section 13(d) disclosure violations by concealing his membership in a group of affiliated Riot stockholders while engaging (along with other group members) in massive undisclosed sales of that stock, is supported by the SEC's allegations in the *Honig* Action. Indeed, as a result of that action, Groussman has been barred for five years from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, and from advertising, marketing, or promoting any penny stock.

273. *Finally*, that Groussman knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by Groussman's past interconnections with the Honig Group and the Selling Stockholders, which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies

(*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

### 3. Stetson Knowingly Engaged in the Fraudulent Scheme

274.    During the Class Period, as a purported "4.99%" shareholder of Riot, Stetson committed deceptive acts by knowingly misrepresenting and concealing that he was part of an undisclosed group (as defined by Section 13(d)(3)) and was therefore obligated to file a Schedule 13D disclosing that fact and reporting any material acquisitions or dispositions of Riot's stock.  By not doing so, Stetson knowingly participated and facilitated the Honig Group's fraudulent scheme to pump and dump Riot's stock.

275.    *First*, that Stetson knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Stetson invested alongside Honig in **over 65 issuers** between 2011and August 2018.

276.    *Second*, as noted above, Honig (together with Brauser) – in in consultation with Stetson – previously brought suit against several individuals under Section 13(d) in *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct.).  In bringing the lawsuit, Honig alleged that a violation of Section 13(d) is "material" and that he "would not have purchased the Shares if [he] had known the undisclosed facts that [the defendants] controlled such a largest interest in [the company's] stock."  Leading up to this filing, Honig discussed drafts of this complaint with Stetson and O'Rourke, seeking their comments, and discussing their respective understandings of the requirements of Section 13(d).  Thus, Stetson was well aware of his disclosure obligations under Section 13(d).

277.    *Third*, that Stetson knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that, as noted above, Stetson, Honig, O'Rourke, Groussman, and/or Brauser personally coordinated their investments

93

in numerous public companies.  *See* Exs. D, E, F, G, H & I.  Indeed, Stetson, Honig, O'Rourke, and Groussman accomplished this coordination through private email correspondence amongst each other.  *See* Ex. D at 7 of 21 (email among Stetson, Honig, O'Rourke, Groussman, Brauser, and others).  Indeed, Stetson in particular knew that he, Honig, O'Rourke, and Groussman, accomplished this coordination through private email correspondence amongst each other, *see* Ex. D at 7 of 21, in which they would coordinate the precise number of shares that each of them would hold in companies, *see* Ex. H.  For example, a January 27, 2012 email from Stetson to Honig attached a "Share Breakdown" of the shares that Honig, Stetson, Groussman, Brauser, and their affiliates would hold in IZEA Worldwide Inc. after a stock split.  Ex. H.  Another January 20, 2011 email from Stetson provided a similar breakdown for himself, Honig, Brauser, and others for "Passport Potash, Inc."  Ex. G.

278.    Indeed, Stetson's emails corroborate the SEC's allegations that Stetson worked with (or for) Honig to ensure that members of his groups voted their shares in unison, and that members of such groups would reach out to Stetson to find out how they should vote on various proposals.  For example, in July 2015, Stetson emailed a co-investor, in response to an inquiry on how to vote, by copying Honig and replying "Yes, vote 'For.'"  Similarly, in November 2016, Stetson emailed members of a Honig group of investors in an issuer in response to a request for "instructions to vote" by instructing those investors:  "[v]oting in favor of [two named directors].  Against all other members and actions."  2d Am. Cmpl. ¶ 60.

279.    *Fourth*, that Stetson knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the factthat Defendants Honig, Groussman, and DeFrancesco also failed – like Stetson – to report their

94

membership in the same group with respect to the same company (Riot) during the same time period in 2017 in violation of Section 13(d).

280.   *Fifth*, that Stetson knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Stetson, Honig and Groussman (and Jonathan Honig, through his entity, Titan) all invested together in the October 2, 2017 related-party Coinsquare shareholders' agreement with Riot (*see* § VII.E.2, *infra*), which was not disclosed to the Company's shareholders until May 25, 2018.

281.   *Sixth*, Stetson's knowledge of, and participation in, the Honig Group's pump-and-dump scheme at Riot, including his role committing Section 13(d) disclosure violations by concealing his membership in a group of affiliated Riot stockholders who were engaging in massive undisclosed sales of that stock, is supported by the SEC's allegations in the *Honig* Action. Indeed, as a result of that action, Stetson has been barred for ten years from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, and from advertising, marketing, or promoting any penny stock.

282.   *Finally*, that Stetson knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by Stetson's past interconnections with the Honig Group and the Selling Stockholders, which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

### 4.   DeFrancesco Knowingly Engaged in the Fraudulent Scheme

283.   During the Class Period, DeFrancesco engaged in deceptive acts by knowingly misrepresenting and concealing that she was part of an undisclosed group (as defined by Section

13(d)(3)) while engaging in manipulative trading in Riot stock – including massive stock sales that she failed to disclose despite being one of the Company's largest shareholder.

284.    Several facts support that DeFrancesco knowingly violating Section 13(d) and Rule 13d-2, *et seq.*, thereunder, as part of the Honig Group's scheme.  *First*, DeFrancesco's scienter in failing to "promptly" report her changes in beneficial ownership of Riot's common stock is supported by the fact that she filed nine Schedules 13D or 13D/A between September 12, 2016 and January 10, 2017 – demonstrating that she knew it was her legal obligation, as a more than 10% Riot shareholder, to report her holdings (and changes therein) to the market.  Yet, after January 10, 2017, and to this day, DeFrancesco has never filed another Schedule 13D/A.

285.    *Second*, that DeFrancesco was knowingly violating her obligation to "promptly" report her changes in beneficial ownership of Riot's common stock as required by Section 13(d) and Rule 13d-2, *et seq.*, is supported by the fact that Defendant Honig, as Riot's other largest (10%+) shareholder, with whom DeFrancesco coordinated with in a proxy fight (and letter-writing campaign) for control of Riot's Board, also committed similar violations of Section 13(d) and Rule 13d-2 by failing to promptly disclose his sales of Riot stock during the same time period.

286.    *Third*, that DeFrancesco knew that her investment in Riot was part of a coordinated "group" that involved, at a minimum, Honig, Stetson, and Brauser because she invested in PolarityTE between at least January 20, 2017 and April 25, 2017, during which time Honig was a Director of PolarityTE, Stetson was a Director and CFO of PolarityTE, Beeghely was a Director of PolarityTE, and Brauser was a Director of PolarityTE.  In addition, O'Rourke and Groussman were also investors in PolarityTE, as were the majority (if not all) of the other Selling Stockholders listed in Riot's 2017/2018 Forms S-3/A.  (*See* ¶¶ 132-36, 162-63, *supra*.)

287.   *Fourth*, that DeFrancesco knowingly violated her obligation to disclose that her investment in Riot was part of a coordinated "group" is further supported by the fact that Defendants Honig, Groussman, and Stetson also failed – like DeFrancesco – to report their membership in the same group with respect to the same company (Riot) during the same time period in 2017 in violation of Section 13(d).

288.   *Fifth*, that DeFrancesco knew that she was investing alongside the Honig Group is supported by the appointment by Honig of Mike Dai to Riot's Board on December 1, 2016, and Dai's subsequent election to the Board.  Before joining Riot's Board, Dai already had established business ties with DeFrancesco's husband, Andrew, and other relatives, as well as O'Rourke and Stetson, Jonathan Honig, and other members of the Honig Group.  Specifically, as of December 1, 2016, Dai "serve[d] as chief financial officer and Director of Santa Maria Petroleum Inc. . . . a position he ha[d] held since 2014," according to Honig's SEC filing nominating Dai to the Bioptix Board.  Dai became CFO and a Director of Santa Maria on May 22, 2014, the same day that Andrew DeFrancesco became Santa Maria's "President and CEO."  On December 2, 2016, Santa Maria filed an OTCQB Certification with the OTC Markets stock exchange.  According to Santa Maria's OTCQB Certification, the following individuals and entities were "control persons [who] are beneficial owners of more than five percent (5%) of any class of [Santa Maria's] equity securities)":  ATG Capital (i.e., O'Rourke) (6.7%); GT Capital (Andrea DeFrancesco) (10%); Jonathan Honig (6.8%); Stetson Capital (i.e., Stetson) (6%); and Sunnybrook Preemie Investments Inc. (Carmella DeFrancesco) (5.3%).  In other words, Dai was the CFO and director of the same company, Santa Maria, that DeFrancesco's husband was also the President, CEO, and Director, and whose largest shareholders were O'Rourke, Stetson, and Jonathan Honig, as wells as Selling Stockholder Carmella DeFrancesco.  Moreover, Santa Maria's OTCQB Certification was

"prepared by . . . Mike Dai, CFO" and "Andrew DeFrancesco, CEO" and was signed by "/s/ MIKE DAI" as "Certifying . . . CFO."  In sum, Dai's connections to DeFrancesco and the Honig Group further support a cogent inference that DeFrancesco knew that these individuals were working together (including by selecting the Company's Board members) as a shareholder "group" (as defined by Section 13(d)) and that she needed to disclose that group as such under Section 13(d) in her beneficial ownership filings with respect to Riot.

289.   *Finally*, that DeFrancesco knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by DeFrancesco's past interconnections with the Honig Group and the Selling Stockholders (including through PolarityTE), which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

### 5.   O'Rourke Knowingly Engaged in the Fraudulent Scheme

290.   During the Class Period, O'Rourke, as Riot's Director, President, Treasurer, Secretary, and, eventually, CEO, had full knowledge that Honig, DeFrancesco, Groussman, and Stetson (together with Beeghley, and other affiliated "selling stockholders") were all acting in concert to coordinate their acquisition and voting of Riot stock, and to control direction of the management and policies of Riot.  Yet, working from within the Company, O'Rourke knowingly or recklessly signed false and misleading public SEC filings that did not disclose that even the Honig Group constituted a "group" under Section 13(d)(3) and Item 403 of Regulation S-K, much less the full extent of the Honig Group's coordination control of Riot.

291.     Specifically, in signing Riot's April 20, July 19, August 24, and September 25, 2017 Forms S-3/A, and other filings, O'Rourke knew, at a minimum, that Honig, Groussman, and Stetson were investing together as a group.  Yet, O'Rourke signed the April 20, 2017 Form S-3/A without disclosing that these individuals were a group of which he himself was a member.  In doing so, O'Rourke knowingly or recklessly committed deceptive acts in furtherance of his and the Honig Group's pump-and-dump scheme with respect to Riot.

292.     _First_, as noted above, O'Rourke (together with Stetson) discussed Honig's (and Brauser's) previous lawsuit, in _Brauser v. Sanders Morris Harris, Inc._, No. 2015-11227 (Tex. Dist. Ct.), which alleged that a violation of Section 13(d) is "material" and that Honig and Brauser "would not have purchased the Shares if [they] had known the undisclosed facts that [the defendants] controlled such a largest interest in [the company's] stock."

293.     _Second_, O'Rourke knew that he and Honig were working together as a group because O'Rourke invested alongside Honig in **over 75 issuers** between 2011 and August 2018.

294.     _Third_, that O'Rourke knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's investments in Riot were part of a coordinated "group" is further supported by O'Rourke's statement in a February 3, 2014 email to the officer of a potential merger target that "**_Barry Honig is the principal investor of our small group_**," as alleged by the SEC in its Amended Complaint in the _Honig_ Action.

295.     _Fourth_, O'Rourke knew that, at a minimum, Honig, Stetson, and Groussman were part of his investing group with respect to Riot because O'Rourke shared Honig's office with them in Boca Raton.  In fact, a September 13, 2016 letter signed by Honig, in which he nominated O'Rourke and Stetson to the Company's Board, provides the **_same fax number_** (with Palm Beach

County, Florida area code 561) for O'Rourke and Stetson as the fax number listed on Honig's letterhead for his office in Boca Raton, Palm Beach County, Florida.  Indeed, O'Rourke was discovered by CNBC reporters inside Honig's same Boca Raton office on December 28, 2017, the day of Riot's cancelled annual meeting of shareholders in Boca Raton.  Because they worked out of the same office, shared the same fax number from that office, and O'Rourke even met with Honig (and unexpectedly, with CNBC) in that same office the day of Riot's cancelled annual meeting of shareholders, O'Rourke knew that he, Honig, Stetson, and Groussman were a "group" under Section 13(d) – a statute they had previously used to bring lawsuits against other investors.

296.    *Fifth*, that O'Rourke knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's investments in Riot were part of a coordinated "group" is further supported by the fact that, as noted above, O'Rourke, Honig, Groussman, Stetson, and/or Brauser personally coordinated their investments in numerous public companies. *See* Exs. D, E, F, G, H & I.  Indeed, O'Rourke, Honig, Groussman, and Stetson accomplished this coordination through private email correspondence amongst each other.  *See* Ex. D at 7 of 21 (email among O'Rourke, Honig, Groussman, Stetson, Brauser, and others).

297.    *Sixth*, O'Rourke's knowledge of, and participation in, the Honig Group's pump-and-dump scheme at Riot, including O'Rourke's role as CEO in disseminating false and misleading statements about related-party transactions that involve Honig while, at the same time, the Honig Group committed Section 13(d) disclosure violations by concealing their group ownership of Riot stock and massive sales of that stock.  O'Rourke's scienter is also supported by the SEC's allegations in the *Honig* Action.  Indeed, as a result of that action O'Rourke has been

permanently barred from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, and from advertising, marketing, or promoting any penny stock.

298. _Finally_, that O'Rourke knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by O'Rourke's past interconnections with the Honig Group and the Selling Stockholders, which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies (_see_ ¶ 162, _supra_) and the "Selling Stockholders' Prior Target Companies" (_see_ ¶ 163, supra), and further depicted in the diagram attached hereto as Exhibit M.

### 6. Beeghley Knowingly Engaged in the Fraudulent Scheme

299. During the Class Period, Beeghley, as Riot's CEO and Director, had full knowledge that Honig, O'Rourke, DeFrancesco Groussman, and Stetson (and other affiliated "selling stockholders") were all acting in concert to coordinate their acquisition and voting of Riot stock, and to control direction of the management and policies of Riot. Yet, working from within the Company, Beeghley knowingly or recklessly signed false and misleading public SEC filings that did not disclose that even the Honig Group constituted a "group" under Section 13(d)(3) and Item 403 of Regulation S-K, much less the full extent of the Honig Group's coordination control of Riot.

300. Specifically, in signing Riot's April 20, July 19, August 24, and September 25, 2017 Forms S-3/As, Beeghley knew, at a minimum, that Honig, Groussman, and Stetson were investing together as a group. Yet, Beeghley signed the April 20, 2017 Form S-3/A without disclosing that these individuals were a group of which he himself was a member. In doing so, Beeghley knowingly or recklessly committed deceptive acts in furtherance of his and the Honig Group's pump-and-dump scheme with respect to Riot.

301.  *First*, in signing Riot's Forms S-3/As, Beeghley knew that Honig, Groussman, and Stetson, together with Aifos, Titan, Molinksy, O'Braitis, Paradox, and Stockwire, were all previously affiliated because those same individuals and/or entities had all invested in PolarityTE when Beeghley was a Director of PolarityTE, a company of which Honig had been Chairman and CEO and Stetson had been CFO.  Thus, Beeghley knew the S-3/A violated Section 13(d) and was materially false and misleading.

302.  *Second*, that Beeghley knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by Beeghley's past interconnections with the Honig Group and the Selling Stockholders (including through PolarityTE), which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

303.  *Finally*, as the Chairman and CEO of the Company (which had only about nine employees), Beeghley would have been aware of the March 15, 2017 Private Placement in which Riot entered into agreements to sell Honig warrants and notes to purchase up to 700,000 shares of common stock.  *See* Exhibit P at 5.  Beeghley also would have been aware when, on August 18, 2017, Honig "waived the requirement for the occurrence of a Qualified Transaction and gross proceeds of the Note Private Placement were released to [Riot] and the Notes and the March 2017 Warrants were released to [Honig] . . . ."  *Id.*  Despite this fact, and the fact that the March 2017 Private Placement required Honig to file an amended Schedule 13D/A,[33] Beeghley also knew that

---

[33]   *See*   https://www.sec.gov/divisions/corpfin/guidance/reg13d-interp.htm   ("Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting") (stating that "a Schedule 13D reporting person [is] required to file an amended Schedule 13D if it acquires

102

Honig had not filed any Schedule 13D/A since January 5, 2017.  Thus, Beeghley knew that Honig was violating his disclosure obligations under Section 13(d).

## X.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD[34]

304.    In connection with Defendants' efforts to defraud Riot's public shareholders during the Class Period as part of their fraudulent scheme and plan in violation of Rule 10b-5(a) and (c), Defendants also disseminated materially false and misleading statements, and otherwise violated an obligation to disclose material information in violations of Rule 10b-5(b).  Below, Defendants false and misleading statements and omissions are grouped into three main categories:

305.    *First*, Defendants Honig, DeFrancesco, Groussman, and Stetson in their beneficial ownership reports filed on Schedule 13D and 13G, and amendments thereto on Schedules 13G/A and 13D/A.  *See* § X.A, *infra*.

306.    *Second*, the Company – at the direction of O'Rourke and Beeghley as officers and directors – issued materially false and misleading public filings with the SEC – including on Forms S-3, S-3/A, and 10-K, and Schedule 14A – that materially misrepresented Riot's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K by misrepresenting and concealing the fact that many of Riot's largest shareholders – including Defendants Honig, Groussman, Stetson, and DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A were members of a group with each other (as defined by Section 13(d)(3)) pursuant to

---

warrants from an issuer," even if "not exercisable for six months" and must disclose the warrants in its "Item 6 (contracts) disclosures and file the warrant agreement as an exhibit pursuant to Item 7 of Schedule 13D.  [Sep. 14, 2009]").

[34] In this section, statements that are ***bold and italicized*** are specifically alleged to be false and misleading.  Statements that are **only bold** are to indicate emphasis.  Statements that are neither bold nor italicized are provided for context.

their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  *See* § X.B, *infra*.

307.    *Third*, the Company – at the direction of O'Rourke and Beeghley as officers and directors – issued materially false and misleading statements with the SEC that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendants Honig, Groussman, and DeFrancesco. *See* § X.C, *infra*.

### A.    Defendants' Materially False and Misleading Statements and Omissions in Benificial Ownership Reports on Schedules 13D and 13G

308.    During the Class Period, Defendants Honig, Groussman, Stetson, and DeFrancesco (acting individually and/or through the investment entities they controlled, including GRQ 401K, ATG, Melechdavid, Stetson Capital, and Namaste, among others) knowingly or recklessly made materially false and misleading filings under Section 13(d) – including on Schedules 13G, 13G/A, 13D, and 13D/A – and/or failed to made necessary Section 13(d) filings and thereby concealed both their control over Riot's management and policies, as well as their membership in a group with each other (and with the Selling Stockholders) pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  In doing so, these Defendants knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder.

309.    Defendants further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly by failing to make timely and appropriate Section 13(d) filings and amendments (i.e., on Schedule 13D/A) reporting (whether individually or as a group) their purchases and sales of Riot stock.  Defendants' disclosure violations under Section 13(d) facilitated their scheme to defraud Riot's public investors about their group's control over the

management and policies of, and the magnitude of the collective investment in, Riot.  While failing to make the necessary amendments to their Section 13(d) filings or disclosing their membership with each other in a "group" as defined by Section 13(d)(3), Defendants engaged in manipulative trading in Riot stock – including massive undisclosed stock sales that easily exceeded the 1% minimum threshold for materiality set forth in Rule 13d-2(a) [17 C.F.R. § 240.13d-2(a)].

<div align="center">

**1.  Honig's Beneficial Ownership Reports on Schedule 13D Were Materially False, Misleading, Deficient, and Untimely and Facilitated His Manipulative Trading in Riot's Common Stock**

</div>

310.   During the Class Period, Defendant Honig facilitated and concealed the Honig Group's pump-and-dump scheme at Riot through material misrepresentations and omissions on Schedule 13D, and his amendments thereto on Schedule 13D/A.  Honig's violations of his duties under Section 13(d) of the Exchange Act 915 U.S.C. § 78m(d), and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)], also constituted violations Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

311.   Honig's Class Period filings on Schedule 13D/A (and lack thereof) were materially false and misleading in at least four ways.  _First_, Honig's Schedule 13D filings improperly failed to disclose his membership in a "group" (i.e., the Honig Group) as required by Section 13(d)(3) and Rules 13d-2, 13d-5,[35] and 13d-101.[36]  Because they acted in concert to control the management and policies of Riot and pursuant to an agreement to acquire, hold, vote, and/or dispose of Riot

---

[35] _See_ 17 C.F.R § 240.13d-5(b)(1) ("When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the _group_ formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.") (emphasis added).

[36] _See_ 17 C.F.R § 240.13d-101 ("Item 5.  Interest in Securities of the Issuer") ("The above information should also be furnished with respect to persons who, together with any of the persons named in Item 2, _comprise a group within the meaning of section 13(d)(3) of the Act . . . ._") (emphasis added).

shares in coordination with one another, each of Honig, O'Rourke, Groussman, and Stetson were each members of a group that was considered a single "person" under Exchange Act Section 13(d)(3).   As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of that group and disclosing the number of shares each of them beneficially owned.   However, neither Honig, O'Rourke, Groussman, nor Stetson ever made a Schedule 13D filing disclosing their respective ownership or membership in a group, acting intentionally to conceal from the market the size of their group's position and their coordination and thereby to deceive investors.   Instead, in each and every Schedule 13D/A that Honig filed before and during the Class Period, Honig only identified himself (and his closely related personal entities such as GRQ 401K) as the only relevant beneficial owner.

312.   *Second*, Section 13(d)(2) and Rule 13d-1(a) thereunder required Honig to make amended Schedule 13D/A filings "promptly" as material changes occurred in any such disclosures Honig had made.   In that regard, the acquisition or disposition of one percent or more of a company's common stock "shall be deemed 'material'" under Rule 13d-2(a).   Yet, after filing his January 5, 2017 Schedule 13D/A, and throughout 2017, Honig engaging in numerous massive acquisitions and dispositions of Riot stock – in considerable excess of 1%, whether considered collectively or looking at individual day's trading – but Honig did not file another Schedule 13D/A for the rest of 2017 and not until February 13, 2018.

313.   As background, starting before the Class Period, between April 4 and January 5, 2017, Honig filed a series of Schedule 13Gs and 13Ds disclosing his increasing stake in Riot's common stock.   During this time, Honig's filings disclosed his share holdings (and percentage stake in the Company) as follows:

106

- April 4, 2016 – Schedule 13G – 335,175 shares (8.65%);
- May 16, 2016 – Schedule 13G/A – 386,581 shares (9.97%);
- September 8, 2016 – Schedule 13D – 373,899 shares (9.6%);
- September 14, 2016 – Schedule 13D/A – 389,159 shares (10.04%);
- November 9, 2016 – Schedule 13D/A – 452,585 shares (10.05%);
- December 1, 2016 – Schedule 13D/A – 500,000 shares (11.10%);
- January 5, 2017 – Schedule 13D/A – 504,000 shares (11.19%) (Exhibit Q hereto);

314.    Thereafter, Honig did not file another Schedule 13D/A for the rest of 2017. Unbeknownst to Riot's public investors, however, after January 5, 2017, and throughout the rest of 2017, Honig engaged in numerous material changes in his beneficial ownership of Riot common stock – primarily massive sales outside of the public view because Honig violated Section 13(d) and Rule 13d-2(a) by failing to disclose any of these transactions to the market.

315.    Honig's failure to file any further amendments during 2017 after his January 5, 2017 Schedule 13D/A violated Section 13(d)(2) and Rule 13d-1(a) thereunder because, as set forth below, Honig engaged in numerous transactions in which he either acquired or disposed of more 1% of Riot's then-outstanding shares based on the information he later disclosed in his January 5, 2017 Schedule 13D/A (Exhibit Q) and his next Schedule 13D/A filed on April 18, 2018 (attached hereto as Exhibit P).

316.    Honig's 2017 trading is set forth in the following chart, which details Honig's puchases and (sales) and the percent change those sales constituted in Riot's total outstanding shares during that time period:

| BARRY HONIG | | | | | |
|---|---|---|---|---|---|
| EVENT DATE | SEC FORM (FILED DATE) | SHARES HELD | % OF ALL SHARES | SHARES BOUGHT (SOLD) | % CHANGE |
| 01/04/17 | Form 4 (Jan. 4, 2017) | 443,585 | | 4,000 | N/A |
| 01/04/17 | 13D/A (Jan. 5, 2017) [37] | 504,000 | 11.19% | | **+1.34%** |

---

[37] Based on 4,403,971 shares foutstanding as of November 11, 2016 (Jan. 5, 2017 Sched. 13D/A).

| | BARRY HONIG | | | | |
|---|---|---|---|---|---|
| EVENT DATE | SEC FORM (FILED DATE) | SHARES HELD | % OF ALL SHARES | SHARES BOUGHT(SOLD) | % CHANGE |
| 03/15/17[38] | 13D/A (April 18, 2018) | | | **March 2017 Private Placement Agreement** | N/A |
| 03/29/17 | 13D/A (April 18, 2018) | | | 35,000 | +0.77% |
| 03/31/17 | 13D/A (April 18, 2018) | | | (4,200) | -0.09% |
| 04/05/17 | 13D/A (April 18, 2018) | | | (800) | -0.01% |
| 04/13/17 | 13D/A (April 18, 2018) | | | (4,100) | -0.09% |
| 04/18/17 | 13D/A (April 18, 2018) | | | (4,900) | -0.09%[39] |
| 04/25/17 | 13D/A (April 18, 2018) | | | (1,200) | -0.02%[40] |
| 04/26/17 | 13D/A (April 18, 2018) | | | (100) | 0.00% |
| 04/28/17 | 13D/A (April 18, 2018) | | | (2,100) | -0.04% |
| 05/01/17 | 13D/A (April 18, 2018) | | | (4,000) | -0.08% |
| 05/09/17 | 13D/A (April 18, 2018) | | | (5,500) | -0.11% |
| 05/10/17 | 13D/A (April 18, 2018) | | | (2,500) | -0.05% |
| 05/16/17 | 13D/A (April 18, 2018) | | | (1,000) | -0.02% |
| 05/23/17 | 13D/A (April 18, 2018) | | | (1,800) | -0.03% |
| 05/31/17 | 13D/A (April 18, 2018) | | | (9,900) | -0.20% |
| 06/02/17 | 13D/A (April 18, 2018) | | | (1,971) | -0.04% |
| 06/08/17 | 13D/A (April 18, 2018) | | | (11,301) | -0.21%[41] |
| *61,672 shares sold between January 4 and June 8, 2017 = **1.14%** of 5,371,185 shares outstanding* | | | | | |
| 06/12/17 | 13D/A (April 18, 2018) | | | (1,300) | -0.02% |
| 06/13/17 | 13D/A (April 18, 2018) | | | (400) | 0.00% |
| 06/14/17 | 13D/A (April 18, 2018) | | | (3,251) | -0.06% |
| 06/15/17 | 13D/A (April 18, 2018) | | | (1,307) | -0.02% |
| 06/19/17 | 13D/A (April 18, 2018) | | | (7,412) | -0.13% |
| 06/20/17 | 13D/A (April 18, 2018) | | | (2,027) | -0.03% |
| 06/22/17 | 13D/A (April 18, 2018) | | | (9,744) | -0.18% |
| 06/23/17 | 13D/A (April 18, 2018) | | | (5,000) | -0.09% |
| 06/30/17 | 13D/A (April 18, 2018) | | | (3,000) | -0.05% |
| 07/01/17 | 13D/A (April 18, 2018) | | | (1,000) | -0.01% |
| 07/10/17 | 13D/A (April 18, 2018) | | | (1,200) | -0.02%[42] |
| 07/13/17 | 13D/A (April 18, 2018) | | | 1,502 | +0.02% |
| 07/17/17 | 13D/A (April 18, 2018) | | | (1,200) | -0.02%[43] |
| 07/18/17 | 13D/A (April 18, 2018) | | | (975) | -0.01% |
| 07/19/17 | 13D/A (April 18, 2018) | | | (1,114) | -0.02% |
| 08/04/17 | 13D/A (April 18, 2018) | | | (7) | 0.00% |

[38] "The date of event which required the filing of an amendment to the Schedule 13D after Amendment No. 5 [Honig's January 5, 2017 13D/A] was March 15, 2017," the date of the March 2017 Private Placement Agreement (Apr. 18, 2018 Sched. 13D/A).

[39] Based on 4,903,971 shares outstanding as of March 31, 2017 (Apr. 20, 2017 S-3).

[40] Based on 4,903,971 shares outstanding as of April 20, 2017 (Apr. 27, 2017 10-K/A).

[41] Based on 5,371,179 shares outstanding as of June 5, 2017 (June 6, 2017 PRER14A).

[42] Based on 5,371,170 shares outstanding as of July 3, 2017 (July 10, 2017 DEF14A).

[43] Based on 5,392,503 shares outstanding as of July 14, 2017 (July 19, 2017 Form S-3/A).

783086.1

| BARRY HONIG | | | | | |
|---|---|---|---|---|---|
| EVENT DATE | SEC FORM (FILED DATE) | SHARES HELD | % OF ALL SHARES | SHARES BOUGHT\|(SOLD) | % CHANGE |
| 10/04/17 | 13D/A (April 18, 2018) | | | (47,250) | -0.86%[44] |
| *86,187 shares sold between June 12 and October 4, 2017 = **1.58%** of Riot's 5,436,503 shares outstanding* | | | | | |
| 10/05/17 | 13D/A (April 18, 2018) | | | (11,400) \| 235,960[45] | -0.20% \| **+4.34%** |
| 10/06/17 | 13D/A (April 18, 2018) | | | (10,000) \| 58,990 | **-0.18%** \| **+1.08%** |
| 10/09/17 | 13D/A (April 18, 2018) | | | (136,028) | **-2.50%** |
| 10/10/17[46] | 13D/A (April 18, 2018) | | | (66,529) | -0.98% |
| 10/11/17 | 13D/A (April 18, 2018) | | | (293,916) \| 634,112[47] | **-4.36%** \| **+9.42%** |
| 10/12/17 | 13D/A (April 18, 2018) | | | (41,600) | -0.61% |
| 10/17/17 | 13D/A (April 18, 2018) | | | (4,000) | -0.05% |
| 10/18/17 | 13D/A (April 18, 2018) | | | (3,088) | -0.04% |
| 10/19/17 | 13D/A (April 18, 2018) | | | (3,700) | -0.05% |
| 10/20/17 | 13D/A (April 18, 2018) | | | (45,000) | -0.66% |
| *97,388 shares sold between October 12 and 20, 2017 = **1.44%** of Riot's 6,730,272 shares outstanding* | | | | | |
| 11/07/17 | 13D/A (April 18, 2018) | | | (3,800) | -0.05% |
| 11/09/17 | 13D/A (April 18, 2018) | | | (800) | -0.01% |
| 11/10/17 | 13D/A (April 18, 2018) | | | (3,972) | -0.05% |
| 11/13/17 | 13D/A (April 18, 2018) | | | (9,500) | -0.11%[48] |
| 11/14/17 | 13D/A (April 18, 2018) | | | (5,000) | -0.06% |
| 11/15/17 | 13D/A (April 18, 2018) | | | (5,268) | -0.06% |
| 11/16/17 | 13D/A (April 18, 2018) | | | (61,000) | -0.73% |
| *89,340 shares sold between November 7 - 16, 2017 = **1.07%** of Riot's 8,321,137 shares outstanding* | | | | | |
| 11/17/17 | 13D/A (April 18, 2018) | | | (18,588) \| 1,500 | -0.22% \| +0.01% |
| 11/20/17 | 13D/A (April 18, 2018) | | | (262,293) | **-3.15%** |
| 11/21/17 | 13D/A (April 18, 2018) | | | (143,475) \| 202,050[49] | **-1.72%** \| **+2.42%** |
| 11/24/17 | 13D/A (April 18, 2018) | | | (266,940) | **-3.20%** |
| 11/28/17 | 13D/A (April 18, 2018) | | | (88,000) | **-1.05%** |
| 11/29/17 | 13D/A (April 18, 2018) | | | 15,000 \| (45,835) | +0.18% \| -0.55% |
| 11/30/17 | 13D/A (April 18, 2018) | | | (5,752) | -0.06% |

---

[44] Based on 5,436,503 shares outstanding as of September 20, 2017 (Sept. 25, 2017 S-3/A).

[45] "Represents shares of Common Stock acquired from the Issuer upon exercise of [Honig's] March 2017 Warrants at an exercise price of $3.56 per share" (Apr. 18, 2018 Sched. 13D/A).

[46] Based on 6,730,272 shares outstanding as of October 10, 2017 (Oct. 13, 2017 Sched. 13G).

[47] "Represents [128,988] shares of Common Stock acquired from [Riot] upon exercise of [Honig's] March 2017 Warrants at an exercise price of $3.56 per share" and "[505,124] shares of Common Stock acquired from [Riot] upon conversion of [Honig's] Series A Preferred Shares at a conversion price of $2.50 per share" (Apr. 18, 2018 Sched. 13D/A).

[48] Based on 8,321,137 shares outstanding as of November 13, 2017 (Nov. 13, 2017 10-Q).

[49] "Represents shares of Common Stock acquired from the Issuer upon conversion of [Barry Honig's] Series A Preferred Shares at a conversion price of $2.50 per share" (Apr. 18, 2018 13D/A).

317.     As set forth in the above chart, between January 4 and June 8, 2017, Honig sold 61,672 shares of Riot common stock in 16 separate transactions, which together constituted 1.14% of Riot's 5,371,185 shares outstanding as of June 5, 2017.  Between June 12 and October 4, 2017, Honig sold a further 86,187 shares in another 16 transactions, amounting to 1.58% of the Company's outstanding shares during that time period.  Yet Honig did not disclose any of these dozens sales to the market as required by Section 13(d) and Rule 13d-2(a).  Thereafter, Honig continued to sell even more stock.  Specifically, when the Company (through O'Rourke as its new CEO) announced on October 4, 2017, that it was changing its name to "Riot Blockchain," Honig's undisclosed transactions in Riot's stock skyrocketed.  For example, on the following days, Honig transacted in more than one percent of Riot's outstanding shares of common stock:

- Jan. 4 - June 8, 2017 – sales of 61,672 shares (*1.14% disposition*);
- June 12 – Oct, 4, 2017 – sales of 86,187 shares (*1.58% disposition*);
- Oct. 5, 2017 – purchases of 235,960 shares (*4.34 % acquisition* );[50]
- Oct. 6, 2017 – purchases of 58,990 shares (*1.08% acquisition*);
- Oct. 9, 2017 – sales of 136,028 shares (*2.50 % disposition* );
- Oct. 11, 2017 – sales of 293,916 shares (*4.36% disposition* );
- Oct. 11, 2017 – purchases of 634,112 shares (*9.42% acquisition*);[51]
- Nov. 7-16, 2017 – sales of 89,340 shares (*1.07% disposition*);
- Nov. 20, 2017 – sales of 262,293 shares (*3.15% disposition*);
- Nov. 21, 2017 – sales of 143,475 shares (*1.72% disposition*);
- Nov. 21, 2017 – sales of 202,050 shares (*2.42%% acquisition*);
- Nov. 24, 2017 – sales of 266,940 shares (*3.20% disposition*); and
- Nov. 28, 2017 – saless of 88,000 shares (*1.05% disposition*).

---

[50] Honig's purchases occurred at below market prices by exercising warrants that he obtained from the Company in an agreement on March 15, 2017, which he failed to disclose on a Schedule 13D/A.  For example, on October 5, 2017, Honig purchased 235,960 shares at $3.56 per share and sold 11,400 shares at $7.47 per share.

[51] Similarly, Honig's sales on October 11, 2017, were accomplished by exercising warrants at $3.56 per share and converting notes at $2.50 per share.  Riot's public shareholders had no way to know that this substantially increased daily trading volume was a 10%+ inside shareholder exercising warrants and notes at below market prices because Honig never disclosed his warrants, or notes, or even his trades – all in violation of Section 13(d) (and in violation of Section 16(a)).

318.    The market did not learn about Honig's sales until January 31, 2018, when *The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."[52]   The article stated that "**Mr. Honig has sold about 500,000 shares, he said, but declined to divulge his profit.   He said he still owns about 1% of the company.**" "'When stock goes up, you take a profit,' [Honig] said."

319.    As a result of this revelation by *The Wall Street Journal* of Honig's previously undisclosed massive (and nearly complete) divestment of his shares of Riot stock (and other revelations of Honig's role as an insider in the Company's transformation and affairs and dubious history as a penny stock investor), the Company's stock price fell from an opening price of $14.50 per share on January 31, 2018, to close at $13.75 that same day, a decline of $0.75, or ***more than 5%.***[53]

320.    In a February 16, 2018 interview with CNBC, former SEC Chairman Harvey Pitt stated that the length of time it Honig took to disclose his stock positions was not what he would consider to be "timely" disclosure.  Former Chairman Pitt said:  "Timely is, particularly if you have a critical position with the company or have already been disclosed as an owner, you're supposed to file updates promptly, and certainly not longer than ten days at the most, so I think there is a serious problem with someone who is already over the threshold, not keeping current with his stock position movements."[54]

---

[52] Ianthe Jeanne Dugan, *Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake; Barry Honig pares back stake in Riot Blockchain, whose shares soared last year after a change of name*, The Wall Street Journal (Jan. 31, 2018).

[53] In contrast, on the same day that Riot's stock price was falling, January 31, 2018, the price of Bitcoin ***increased*** $112.90 (approximately 1.1%) from opening at $10,108.20 to closing at $10,221.10.

[54] Specifically, former-Chairman Pitt stated, "Timely is, particularly if you have a critical position with the company or have already been disclosed as an owner, you're supposed to file updates promptly, and certainly not longer than 10 days at the most," Pitt said.  *See* CNBC, Former SEC

321.    *Third*, as a Riot shareholder with more than 10% of the Company's outstanding shares, Honig violated his obligations under Exchange Act Section 16(a) and Rules 16a-2 and 16a-3 [17 C.F.R. § 240.16a-2 and 240.16a-2] to file Forms 4 by the end of the second business day following any day on which he transacted in Riot's common stock.  Indeed, Honig did file two Forms 4 on December 2, 2016, and January 4, 2017, but after that never filed another Form 4, despite the fact that Riot's April 27, 2017 Form 10-K/A stated that Honig was a 11.20% shareholder as of April 20, and despite the fact that Honig's April 18, 2018 Schedule 13D/A revealed that Honig had trading in Riot's common stock on March 29, March 31, April 5, April 13, April 14, and April 18, 2017.  By not disclosing these trades within two business days, Honig clearly violated Section 16(a) and the rules thereunder.

322.    *Fourth*, Honig's January 5, 2017 Schedule 13D/A stated:

**Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer**

Other than as described herein, there are no contracts, arrangements, understandings or relationships (legal or otherwise) between the Reporting Person and any other person with respect to the shares.

323.    This disclosure was materially false and misleading for at least two reasons.  First, Honig failed to disclose his agreement – whether express or tacit – with the Honig Group and Selling Stockholders[55] – to acquire, hold, vote, and/or dispose of shares they acquired in Riot in coordination with one another while knowingly or recklessly obtaining and exercising undisclosed control of the management and policies of Riot and while selling shares of Riot into the market at

---

chair on market manipulation and regulating cryptocurrency, available at https://www.cnbc.com/video/2018/02/16/former-sec-chair-on-market-manipulation-and-regulating-cryptocurrency.html.  *See also* https://www.sec.gov/fast-answers/answerssched13htm.html ("Any material changes in the facts contained in the [Schedule 13D] require a prompt amendment.").

[55] Such groups are "deemed a 'person' for purposes of [Section 13(d)]."  15 U.S.C § 78m(d)(2).

artificially inflated prices.  Second, "a Schedule 13D reporting person [is] required to file an amended Schedule 13D if it acquires warrants from an issuer," even if "not exercisable for six months" and must disclose the warrants in its "Item 6 (contracts) disclosures and file the warrant agreement as an exhibit pursuant to Item 7 of Schedule 13D."[56]  Here, Honig has effectively admitted, in his April 18, 2018 Schedule 13D/A, that the "first date of event which required the filing of an amendment to the Schedule 13D after Amendment No. 5 (Honig's previous January 5, 2017 Schedule 13D/A) was March 15, 2017, which was the date of the March 15, 2017 Private Placement in which Riot entered into agreements with Honig to sell Honig warrants and notes to purchase up to 700,000 shares of common stock.  Yet, Honig did not disclose this agreement until April 18, 2018.  Instead, Honig's January 5, 2017 Schedule 13D/A remained operative and informed investors that "there are no contracts, arrangements, understandings or relationships (legal or otherwise) between the Reporting Person and any other person with respect to the shares."  Thus, in addition to violating his obligations to amend his Schedule 13D/A to disclose his material acquisitions and dispositions of Riot's common stock, Honig further violated Section 13(d) by failing to disclose the March 2017 Private Placement, and affirmatively disavowing that he had any "understandings or relationships" with respect to Riot's common stock when in fact he was operating a fraudulent pump-and-dump scheme with the other members of the Honig Group, and the wider group of Selling Stockholders.

> ### 2. Groussman's Beneficial Ownership Reports on Schedule 13G Were Materially False, Misleading, Deficient, and Untimely

324.    During the Class Period, Defendant Groussman improperly made Schedule 13G filings that falsely represented him as a passive investor in violation of Rule 13d-1(c) and failed to

---

[56]    See   https://www.sec.gov/divisions/corpfin/guidance/reg13d-interp.htm   ("Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting").

disclose his membership in a "group" (i.e., the Honig Group) as required by Section 13(d)(3) and Rules 13d-2, 13d-5,[57] and 13d-101.[58]

325.    Because they acted in concert to control the management and policies of Riot and pursuant to an agreement to acquire, hold, vote, and/or dispose of Riot shares in coordination with one another, each of Honig, O'Rourke, Groussman, and Stetson were each members of a group that was considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of that group and disclosing the number of shares each of them beneficially owned.  However, Groussman never made a Schedule 13D filing disclosing his membership in a group, thus further concealing from the market the size of the Honig Group's position and coordination and thereby deceiving Riot's public investors.

326.    Not only did Groussman fail to disclose that he was investing in a group, but he also failed to file a Schedule 13D at all, instead filing only a Schedule 13G, which is reserved only for "passive" investors – which he did not qualify to do under Rule 13d-1(c).  Specifically, on October 13, 2017, Groussman filed a Schedule 13G reporting that he held 399,202 shares of Riot common stock constituting "5.93%" of shares "outstanding as of October 10, 2017."  Groussman's 13G checked a box indicating that it was filed pursuant to "Rule 13d-1(c)," which is the rule allowing a Schedule 13G to be filed in lieu of a Schedule 13D provided that the person "[h]as not

---

[57] *See* 17 C.F.R § 240.13d-5(b)(1) ("When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the ***group*** formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.") (emphasis added).

[58] *See* 17 C.F.R § 240.13d-101 ("Item 5.  Interest in Securities of the Issuer") ("The above information should also be furnished with respect to persons who, together with any of the persons named in Item 2, ***comprise a <u>group</u> within the meaning of section 13(d)(3) of the Act*** . . . .") (emphasis added).

acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect . . . ." 17. C.F.R. § 204.13d-1(c).

327.    Groussman's October 13, 2017 Schedule 13G/A also stated, above his signature, that "I certify certify that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect."

328.    In signing the Schedule 13G/As Groussman falsely identified himself as a passive 13G investor without any intention to influence or control the Company, and omitted that he was a member of a group – and not only a member of a group holding more than 5% of the Company's stock, but an undisclosed control group affiliated with O'Rourke as CEO.

329.    Similarly, on February 15, 2018, Groussman filed a Schedule 13G/A (Amendment No. 1). Groussman's 13G/A indicated that as of "December 31, 2017," he had held 188,888 shares of Riot's common stock constituting "1.62%" of shares "outstanding as of December 31, 2017." As before, Groussman's signed the Schedule 13G/A and checked the box indicating that it was filed pursuant to "Rule 13d-1(c)," and "certif[ied] that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect."

330.    The chart below details Groussman's reported holdings, together with the Company's own reports of his holdings on Schedules 13G and 13G/A, and calculates the changes

in his holdings as a percentage of Riot's most recently reported shares of common stock outstanding.

| MARK GROUSSMAN | | | | |
|---|---|---|---|---|
| **FILING DATE (EVENT DATE)** | **SCHEDULE/FORM (SHARES OUTSTANDING)** | **SHARES HELD** | **% OF ALL SHARES** | **% CHANGE** |
| 04/20/17 | S-3 (4,903,971 as of 03/31) | 500,000 | 9.04 % | N/A |
| 07/19/17 | S-3/A (5,392,503 as of 07/14) | 500,000 | 9.05 % | 0 |
| 08/24/17 | S-3/A (5,403,919 as of 08/21) | 500,000 | 9.05 % | 0 |
| 09/25/17 | S-3/A (5,436,503 as of 09/20) | 500,000 | 8.98 % | 0 |
| 10/13/17 (10/10/17) | 13G (6,730,272 as of 10/10) | 399,202 | 5.93 % | **- 1.49 %** |
| 01/05/18 (12/28/17) | S-3 (11,622,112 as of 01/04) | 131,945 | 1.13 % | **- 2.29 %** |
| 02/15/18 (12/31/17) | 13G/A (11,622,112 as of 12/31/17) | 188,888 | 1.62 % | **0.48 %** |

331. As shown above, between at least April 20, 2017 and September 25, 2017, Groussman held 500,000 shares of Riot common stock, representing approximately 9% of the Company's total outstanding shares, making Groussman one of the Company's largest shareholders. Yet, during that time, Groussman never filed any report of his beneficial ownership on either Schedule 13G or 13D as required by Section 13(d) and Rule 13d-1.

332. On October 13, 2017 (after the Company had changed its name to "Riot Blockchain" and issued a flurry of announcements about its new strategy and strategic transactions, including Coinsquare on October 2, 2017, which Groussman was an undisclosed

party to a contract with Riot), Groussman finally filed a Schedule 13G disclosing that he held 399,202 of Riot stock.  But by this time, Groussman had already sold 100,798 shares of his initial 500,000 shares, which amounted to 1.49% of Riot's total outstanding common stock.

333.    Thus, Groussman should have not only already filed a Schedule 13D disclosing his original 500,000 shares, but he should have "promptly" informed investors when he sold the 100,798 as required by Rule 13d-2(a) (requiring persons to "promptly" disclose "any material increase or decrease in the percentage of the class beneficially owned" and stating that the "acquisition or disposition" of "one percent or more of the class of securities shall be deem 'material' for purposes of this section").  However, because the October 13, 2017 Schedule 13G was Groussman's first report, it is impossible to know when he sold the 100,798 shares and whether that material sale of Riot stock was reported "promptly."

334.    It is clear, however, that Groussman's subsequent sales 267,257 shares of Riot stock (representing 2.29% of Riot's total outstanding shares) between October 13, 2017, and January 5, 2018 were *not* promptly reported as required by Rule 13d-2(a).  Instead, Groussman waited until February 15, 2018 to disclose that his stake in Riot (last reported on October 13, 2017 as 5.93 % had dropped to 1.62 %.[59]  By waiting to disclose his reduced beneficial ownership *at least 49 days* (since December 28, 2017) and likely much longer (assuming at least some of his sales occurred, like Honig's sales, in October and November 2017), Groussman violated Section 13(d) and

---

[59] Groussman may argue that he was allowed to file on February 15 by Rule 13d-2(b), which permits amendment of a Schedule 13G "[45] days after the end of the calendar year" but this rule only applies to persons who qualify to file a Schedule 13G because they are "passive" investors under Rule 13d-1(c).  As noted above, however, Groussman was not a "passive" investor but a member of the Honig Group.  Like Honig and DeFrancesco, Groussman was required to file a Schedule 13D and abide by the requirements for all 13D filers.  Like Honig and DeFrancesco, Groussman failed to comply.

facilitated the Honig Group's pump-and-dump scheme by concealing his stock sales from the market.

>    **3.    DeFrancesco's Beneficial Ownership Reports on Schedule 13D Were Materially False, Misleading, Deficient, and Untimely**

335.    During the Class Period, Defendant DeFrancesco facilitated and concealed the Honig Group's pump-and-dump scheme at Riot through material misrepresentations and omissions on Schedule 13D, and her amendments thereto on Schedule 13D/A, which violated not only DeFrancesco's duties under Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)], but also violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

336.    DeFrancesco filed her initial Schedule 13D on September 12, 2016, reporting holding 7.49% of Riot's common stock as of September 2, 2016.  DeFrancesco later filed amended Schedule 13D/As, reporting her percentage holdings of Riot's common stock up until January 10, 2017, when she reported owning 515,777 shares representing 11.45 % of Riot's outstanding common stock.  From January 10, 2017 to the present day, DeFrancesco has, inexplicably, never again reported her holdings of Riot common stock.

337.    The chart below details DeFrancesco's reported holdings, together with the Company's own reports of her holdings, and calculates change in her holdings as a percentage of Riot's most recently reported shares of common stock outstanding.

| CATHERINE DEFRANCESCO | | | | |
|---|---|---|---|---|
| **FILING DATE (EVENT DATE)** | **SCHEDULE/FORM (SHARES OUTSTANDING)** | **SHARES HELD** | **% OF ALL SHARES** | **% CHANGE** |
| 09/12/16 (9/02/16) | 13D (3,876,961 as of 8/10) | 290,404 | 7.49 % | NA |

| CATHERINE DEFRANCESCO | | | | |
|---|---|---|---|---|
| **FILING DATE (EVENT DATE)** | **SCHEDULE/FORM (SHARES OUTSTANDING)** | **SHARES HELD** | **% OF ALL SHARES** | **% CHANGE** |
| 09/14/16 (09/13/16) | 13D/A (3,876,961 as of 8/10) | 341,176[60] | 8.80 % | 1.30 % |
| 09/20/16 (09/20/16) | 13D/A (3,876,961 as of 8/10) | 341,176[61] | 8.80 % | 0 |
| 10/07/16 | PRE 14A (4,503,971 as of 09/30) | 341,176[62] | 7.60 % | 0 |
| 10/17/16 | DEF 14A (4,503,971 as of 09/30) | 341,176[63] | 7.60 % | 0 |
| 10/20/16 (10/18/16) | 13D/A (3,876,961 as of 8/10) | 362,835 | 9.36 % | 0.55 % |
| 10/25/16 (10/25/16) | 13D/A (3,876,961 as of 8/10) | 364,435 | 9.40 % | 0.04 % |
| 12/05/16 (11/30/16) | 13D/A (4,503,971 as of 11/11) | 470,676 | 10.45 % | 2.35 % |
| 12/09/16 (12/07/16) | 13D/A (4,503,971 as of 11/11) | 475,777 | 10.56 % | 0.11 % |
| 12/13/16 (12/09/16) | 13D/A (4,503,971 as of 11/11) | 478,277 | 10.62 % | 0.05 % |
| 01/10/17 (01/05/17) | 13D/A (4,503,971 as of 11/11) | 515,777 | 11.45 % | 0.83 % |
| 04/27/17 | 10-K/A (4,903,971 as of 04/20) | 515,777[64] | 11.5 %[65] | 0 |

---

[60] States that DeFrancesco's 341,176 shares "is based upon holdings reported on Schedule 13D filing and amendments, the most recent filed on September 20, 2016."

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] States that DeFrancesco's 515,777 shares "is based upon holdings reported on Schedule 13D filing and amendments, the most recent filed on January 10, 2017."

[65] *Id.*

| CATHERINE DEFRANCESCO | | | | |
|---|---|---|---|---|
| **FILING DATE (EVENT DATE)** | **SCHEDULE/FORM (SHARES OUTSTANDING)** | **SHARES HELD** | **% OF ALL SHARES** | **% CHANGE** |
| 04/28/17 | PRE14A (4,903,971 as of 04/20) | 515,777[66] | 11.5 %[67] | 0 |
| 06/06/17 | PRER14A (5,371,179 as of 06/05) | 515,777[68] | 9.60 %[69] | 0 |
| 06/28/17 | PRER14A (5,371,179 as of 06/05) | 515,777[70] | 9.60 %[71] | 0 |
| 06/29/17 | PRER14A (5,371,179 as of 06/05) | 515,777[72] | 9.60 %[73] | 0 |
| 07/10/17 | DEF 14A (5,371,170 as of 07/03) | 515,777[74] | 9.60 %[75] | 0 |
| 01/05/18 (12/28/17) | S-3 (11,622,112 as of 01/04) | 155,904 | 1.3 % | - 3.09 % |
| 02/07/18 (02/05/18) | S-3/A (11,652,270 as of 02/05) | 155,904 | 1.3 % | 0 |

338.    As shown above, in each of her nine Schedule 13D or 13/D filings, DeFrancesco reported holding an increasing stake in the Company's outstanding shares of common stock.

---

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

339.   Yet, after filing her January 10, 2017 Schedule 13D/A, and reporting her 11.45% stake in Riot, DeFrancesco never filed another disclosure, despite having reported that she was a Riot major *10%*+ shareholder (and thus insider) to report her subsequent holdings – or subsequent stock sales – to the market.[76]

340.   Although DeFrancesco never filed a Schedule 13D/A after January 10, 2017, she appears to have sold nearly all of her stake in Riot stock between January 10, 2017 and December 28, 2017.  Specifically, on January 5, 2018, Riot filed a Form S-3 reporting that as of December 28, 2017, DeFrancesco had only held 139,904 shares of Riot stock representing only 1.20 of Riot's outstanding shares.  Thus, between January 10, 2017, and December 28, 2017, DeFrancesco sold 375,873 shares of Riot stock, representing 3.22% of the Company's overall shares of common stock,[77] without ever disclosing to the market her highly material change in beneficial ownership of Riot stock (which she had last reported as 11.45%).  By failing to ever amend her January 10, 2017 Schedule 13D/A, DeFransco violated required by Section 13(d) and Rule 13d-1(a), but more importantly, actively facilitated the Honig Group's pump-and-dump scheme by denying material information to the Company's public investors she and others in Honig Group sold their shares into the market.  In sum, by violating her disclosure obligations under the federal securities laws, while engaging in manipulative trading, DeFrancesco violated Section 10(b) and Rule 10b-5.

---

[76] In addition, as a Riot shareholder with more than 10% of the Company's outstanding shares, DeFrancesco violated her obligations under Exchange Act Section 16(a) and Rules 16a-2 and 16a-3 [17 C.F.R. § 240.16a-2 and 240.16a-2] to file Forms 3 and 4 and to file an updated Form 4 within the end of the second business day following any day on which she transacted in Riot's common stock.

[77] This percentage is highly conservative because it uses as its denominator the 11,622,112 shares of Riot common stock outstanding as of January 4, 2018.  In contrast, when DeFrancesco last reported her 11.45% stake in Riot stock, the Company had last reported having 4,503,971 as of November 11, 2016.

4.    **Stetson Failed to File Beneficial Ownership Reports with the SEC Despite Co-Investing Alongside the Undisclosed Honig Group**

341.    Because Defendant Stetson acted in concert with Honig, O'Rourke, and Groussman, to control the management and policies of Riot and pursuant to an agreement to acquire, hold, vote, and/or dispose of Riot shares in coordination with one another, each of them were each members of a group that was considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of that group and disclosing the number of shares each of them beneficially owned.  However, Stetson never made a Schedule 13D filing disclosing his membership in a group, thereby concealing from the market the size of their group's position and their coordination and thereby deceiving investors.

342.    Each of Riot's April 20, July 19, August 24, and September 25, 2017 Forms S-3/A identified Stetson Capital as holding 4.99% of Riot's common stock before each of those four offerings.  Specifically, Stetson's reported shares on each date were April 20 (283,400) July 19 (283,300), August 24 (283,300), and September 25 (285,150).  By purportedly keeping his holdings below 4.99%, Stetson appeared to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings.  In other words, by ostensibly staying close to but immediately below the 5% ownership threshold, and evading the public reporting requirements, Stetson increased the likelihood that he and his associates (including Honig, DeFrancesco, and Groussman) could conceal the millions of shares that they had amassed and thereby mask their scheme to pump up Riot's share price and trading volume in anticipation of a profitable sell-off to unsuspecting investors.

343.    Structuring his shareholding in this manner was itself misleading, however, because as a member of a group, Stetson himself was required (under Section 13(d)(3) and Rules 13d-2,

122

13d-5, and 13d-101) to file a Schedule 13D identifying himself a group member.  Yet, Stetson never made any filing under Schedule 13G or 13D as a Riot stockholder.  Because Stetson never filed a Schedule 13D or amended 13D/A, Riot's public investors were not notified when, as a group member, Stetson sold his shares into the market during the group's pump-and-dump scheme.

**B.   Defendants' Materially False and Statements and Omissions Regarding the Company's Beneficial Ownership and Related-Party Transactions**

344.   As discussed above in § IX.A, similar beneficial ownership obligations as those imposed on stockholders (such as Honig, DeFrancesco Groussman, and Stetson) are also imposed on issuers (such as Riot) pursuant to Section 13(a) and Item 403 of Regulation S-K.  In violation of these obligations, Honig, O'Rourke, Groussman, Stetson, and DeFrancesco knowingly and/or recklessly concealed their concerted "group" investment in Riot from the investing public.

345.   Likewise, O'Rourke and Beeghley, as Riot executives and/or Board members who signed Riot's SEC filings, had full knowledge of that Honig, DeFrancesco Groussman, and Stetson (together O'Rourke and Beeghley, and other affiliated "selling stockholders") were all acting in concert to coordinate their acquisition and voting of Riot stock, and to control the direction of the management and policies of Riot.  Yet, working from within the Company, O'Rourke and Beeghley kept the Honig Group's scheme to control Riot a secret by signing false and misleading public SEC filings that did not disclose that even the Honig Group constituted a "group" under Section 13(d)(3) and Item 403 of Regulation S-K, much less the full extent of the Honig Group's coordination control of Riot.

346.   As discussed below, during the Class Period, O'Rourke and Beeghley knowingly caused Riot to issue materially false and misleading Securities Registration Statements on Form S-3/A, Annual Reports on Form 10-K, and Proxy Statements on Form DEF 14A.  When the true facts about the Honig Group's connections and scheme to control Riot were revealed – including

123

O'Rourke's role (while CEO of Riot) as a key member and collaborator of the Honig Group who had been taking directions from Honig himself – Riot's shareholders sustained substantial financial losses.

### 1.    April 20, 2017 – Registration Statement (Form S-3/A)

347.    On April 20, 2017 the Company filed a Form S-3/A, signed by Defendants O'Rourke and Beeghley, registering for sale to the investing public 5,657,161 shares of common to be sold by the certain "Selling Stockholders."   The Form S-3/A contained a "table" that purported to list "of April 14, 2017, . . . the number of shares held of record or beneficially by the selling stockholders as of such date" of Riot common stock, as the Form S-3/A was required to pursuant to Item 403 of Regulation S-K.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.63% | 200,000 (1) | 0 | * |
| Andrew Schwartzberg | 549,800 (2) | 9.99% | 900,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.63% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.10% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,860 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 596,400 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 598,100 (12) | 9.99% | 1,624,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.20% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,400 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |

\*   Less than 1%.
\*\* Based on 4,903,971 shares of Common Stock outstanding as of April 14, 2017.

348.    As noted above (*see* § IX.A, *supra*) this disclosure was required by Exchange Act Section 13(a) and Exchange Act Regulation S-K at Item 403, which requires issues to provide a disclosure in "tabular form" of "any person (including any 'group' as that term in used in section 13(d)(3) of the Exchange Act) who is known to the registration to be the beneficial owner of more than five percent of any class of the registrants voting securities."   17 C.F.R. § 229.403.

349.    The disclosures relating to the Selling Stockholders in the April 20, 2017 Form S-3/A were materially false and misleading.  _First_, the April 20, 2017 Form S-3/A listed Defendants Honig, Groussman, and Stetson (along with their related entities including GRQ 401K, Melachdavid, Groussman's two UTMA funds, and Stetson Capital) as Selling Stockholders, but did not disclose, as required by Exchange Act Section 13(a) and Exchange Act Regulation S-K at Item 403, that Honig, Groussman, and Stetson constituted a "'group' as that terms is defined and used in Section 13(d)(3) of the Exchange Act."  17 C.F.R. § 229.403(a).  Specifically, although the S-3/A listed Honig as a 9.99% beneficial owner; Groussman (through Melachdavid and the two UTMA accounts) as a 9.04% beneficial owner; and Stetson (through Stetson Capital) as a 4.99% owner, it failed to disclose the combined group ownership of Honig, DeFrancesco, Groussman, and Stetson (or their entities) that formed the Honig Group.

350.    Similarly, the S-3/A misrepresented and omitted that Selling Stockholders Aifos, Titan, Molinksy, O'Braitis, Paradox (i.e., Honig's longtime lawyer, Kesner), and Stockwire were all previously affiliated with the Honig Group through investments in previous companies (_see_ § X.B, _supra_) and through those prior investments and relationships, had in fact been selected and invited by the Honig Group to invest in Riot.

351.    _Second_, the majority (if not all) of the "selling stockholders" listed in the April 20, 2017 Form S-3/A had invested together in multiple previous public companies, and were engaged in a common scheme and conspiracy to artificially inflate Riot's stock at the expense of other would-be public shareholders.  Altogether, this group of Honig-associated stockholders accounted for at least 55% of Riot's common stock[78] (and likely more) without taking into count the

---

[78] Specifically, the following April 20, 2017 Selling Stockholders (and their percentage of stock owned) were associates of Honig and members of the Honig Group:  Richardson (3.63%); Melechdavid (6.10%); Groussman (1.47% each in two UTMA funds for a total of 2.94%); Honig

approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January 10, 2017.[79]

352.    _Third_, the Selling Stockholders operated as a centrally organized "control group" that coordinated their trades down to the single share.  In that regard, closer scrutiny of Riot's April-September 2017 Forms S-3/A reveals how various members of the Honig Group precisely coordinated shareholdings, resulting in implausibly coincidental numbers of shares these purportedly "unrelated" stockholders (and their investment entities) held.  For example, in the April 20, 2017 Form S-3/A, O'Braitis and JAD Capital (a corporation in Ontario owned by Theofilos, the CEO of MUNDOMedia Ltd., a company in which Defendant Honig, his brother, O'Rourke, Stetson, and Groussman each held shares, **both** reported beneficially owning "**81,204**" shares representing "**1.48%**" of the Company's common stock.  _Id_.

353.    _Fourth_, April 20, 2017 S-3/A further stated that "[u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law."  This disclosure was required by Exchange Act Section 13(a) and Exchange Act Regulation S-K at Item 403), which requires issuers to "[i]nclude such additional subcolumns or other appropriate explanation of column (3) [i.e., "Amount and Nature of Beneficial Ownership"] necessary to reflect amounts as to which the beneficial owner has (A) sole voting power, (B) shared voting power, (C) sole investment power, or (D) shared investment power."  17 C.F.R. § 229.403 (c)(2).  However, this statement in the April 20, 2017 S-3/A was materially false

---

(9.99%); GRQ 401K (9.99%); Titan (9.99%); O'Braitis (1.48%); Stockwire (i.e., James) (0.75%); Aifos (i.e., Theofilos) (2.20%); Stetson Capital (i.e., Stetson) (4.99%); JAD (1.48%); and Molinsky (1.80%).

[79] _See_ Riot Blockchain, Inc., Amended Annual Report (Form 10-K/A) at 52 (Jun 29, 2018).

and misleading when made because that Honig, Groussman, Stetson, toegether with Aifos, Titan, Molinksy, O'Braitis, Paradox, and Stockwire were investing as a group and thereby and agreed, either explicitly or implicitly, to share their voting and/or investment power with respect to Riot's common stock.

354.    *Fourth*, the April 20, 2017 S-3/A also stated that "[e]ach selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock."  However, this statement in the April 20, 2017 S-3/A was similarly materially false and misleading when made because that Honig, Groussman, Stetson, toegether with Aifos, Titan, Molinksy, O'Braitis, Paradox, and Stockwire were investing as a group and thereby and agreed, either explicitly or implicitly, to share their voting and/or investment power with respect to Riot's common stock.

355.    As discussed above, O'Rourke and Beeghley knew, at a minimum, that Honig, Groussman, and Stetson were investing together as a group, but they signed the April 20, 2017 Form S-3/A without disclosing theses individuals collective beneficial ownership of Riot.

356.    Beeghley also knew that Honig, Groussman, Stetson, toegether with various Selling Stockholders – including at least Aifos, Titan, Molinksy, O'Braitis, Paradox, and Stockwire – were all previously affiliated because those same individuals and/or entities had all invested in PolarityTE when Beeghley was a Director of PolarityTE, a company of which that Honig had been Chairman and CEO and Stetson had been CFO.  Thus, O'Rourke and Beeghley knew the S-3/A violated Section 13(d) and was materially false and misleading.

### 2.    April 27, 2017 – Annual Report (Form 10-K/A)

357.    Riot's 2016 Form 10-K, filed with the SEC on April 27, 2017, and signed by O'Rourke and Beeghley contained a table that purported to "set[] forth the beneficial ownership of the Company's common stock as of April 20, 2017 by each Company director, director nominee

and each executive officer then serving, by all directors, director nominees and executive officers as a group, and by each person who owned of record, or was known to own beneficially, more than 5% of the outstanding shares of common stock," as required by Item 403 of Regulation S-K.  The table is below

| Name and Address | Number of Shares | Percent |
|---|---|---|
| Directors: | | |
| Michael M. Beeghley (1) | 14,000 | * |
| John R. O'Rourke (2) | 29,133 | * |
| Mike Dai (3) | 3,333 | * |
| Other Executive Officers: | | |
| Jeffrey G. McGonegal (4) | 89,244 | 1.9% |
| Richard J. Whitcomb (5) | 20,405 | * |
| All Directors and Officers as a Group (5 persons) (6) | 156,115 | 3.4% |
| More than 5% Shareholders: | | |
| Barry C. Honig (7) | 504,000 | 11.2% |
| Catherine Johanna DeFrancesco (8) | 515,777 | 11.5% |
| E. Jeffrey Peierls (9) | 357,744 | 7.9% |

_____
* Holds less than 1%

358.    Although this table in Riot's April 27, 2017 Form 10-K disclosed Honig as a beneficial owner of 11.2% of Riot's outstanding common stock, and DeFrancesco as a beneficial owner of 11.5% of Riot's outstanding common stock, it failed to disclose the combined group ownership of Honig, DeFrancesco Groussman, and Stetson (and their entities). O'Rourke and Beeghley knew that Honig, DeFrancesco Groussman, and Stetson were working together as a group, but they failed to disclose in the Form 10-K the Honig Group's combined beneficial ownership of Riot's stock.

359.    Thus, Riot's Form 10-K concealed from Riot's public investors material information about the Honig Group's coordinated investment in Riot as a group as defined by Section 13(d)(3).  Such information is especially important to investors evaluating microcap issuers such as Riot, which are particularly susceptible to manipulation by undisclosed control persons.

360.     As discussed above, O'Rourke and Beeghley knew that Honig and DeFrancesco were investing with each others, with the other Honig Group members, and with various Selling Stockholders, which together constituted a group that required disclosure under Section 13(d).

### 3.      July 19, 2017 – Registration Statement (Form S-3/A)

361.     On July 19, 2017, Bioptix filed a Form S-3/A registering for sale to the investing public, 5,657,161 shares of common to be sold by the following "Selling Stockholders":

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northurst Inc. | 554,100 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 595,600 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 592,400 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | 0.19% | 20,000 (23) | 0 | * |

\*    Less than 1%.
\*\* Based on 5,392,503 shares of Common Stock outstanding as of July 14, 2017.

362.     The July 19, 2017 Form S-3/A also stated that "[u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law" and that "[e]ach selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock."

363.     The disclosures relating to the Selling Stockholders in the July 19, 2017 Form S-3/A, which was signed by Defendants O'Rourke and Beeghley, were materially false and misleading when made for the same reasons discussed above for the April 20, 2017 Form S-3/A.

364.    The July 19, 2017 S-3/A was also materially false and misleading because – like the April 20, 2017 Form S-3 – it failed to disclose that the majority (if not all) of the "selling stockholders" were members of the Honig Group, had invested together in multiple previous public companies, and were engaged in a common scheme and conspiracy to artificially inflate Riot's stock at the expense of other would-be public shareholders.  Altogether, this group of Honig-associated stockholders accounted for at least 55% of Riot's common stock[80] (and likely more) without taking into count the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January 10, 2017.

365.    Indeed, the Selling Stockholders operated as a centrally organized "control group" that coordinated their trades down to the single share.  For example, in the July 19, 2017 Form S-3/A, O'Braitis and Aifos **both** reported beneficially owning "***40,602***" shares representing "***0.75%***" of the Company's common stock.   ¶ 220.   Similarly, in the August 24, 2017 Form S-3/A, Stockwire, ¶ 72 (a Florida corporation owned by James, ¶ 51, a stock promoter who has touted various Honig-backed companies including Pershing Gold, MusclePharm Inc. (the parent of Biozone), and Valor Gold Corp.) and "Policy No. 2013-17," ¶ 77, ***both reported owning "40,602***" shares representing "***[l]ess than 1%***" of the Company's common stock.  ¶ 220.

### 4.    August 24, 2017 – Registration Statement (Form S-3/A)

366.    On August 24, 2017, Bioptix filed a Form S-3/A registering, for sale to the investing public, 5,657,161 shares of common to be sold by the following "Selling Stockholders":

---

[80] Specifically, the following July 19, 2017 Selling Stockholders (and their percentage of stock owned) were associates of Honig and members of the Honig Group:  Richardson (3.64%); Melechdavid (6.11%); Groussman (1.47% each in two UTMA funds for a total of 2.94%); Honig (9.99%); GRQ 401K (9.99%); Titan (9.99%); O'Braitis (1.48%); Northurst (9.99%); Stockwire (i.e., James) (0.73%); Aifos (i.e., Theofilos) (2.20%); Stetson Capital (i.e., Stetson) (4.99%); and JAD (1.46%); Molinsky (1.78%).

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northurst Inc. | 555,400 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600 (10) | * | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 593,650 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | * | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | * | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | * | 20,000 (23) | 0 | * |

\*   Less than 1%.
\*\* Based on 5,403,919 shares of Common Stock outstanding as of August 21, 2017.

367.    The August 24, 2017 Form S-3/A also stated that "[u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law" and that "[e]ach selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock."

368.    The disclosures relating to the Selling Stockholders in the August 24, 2017 Form S-3/A, which was signed by Defendants O'Rourke and Beeghley, were materially false and misleading when made for the same reasons discussed above for the April 20, 2017 Form S-3/A and July 19, 2017 Form S-3/A.

### 5.    September 25, 2017 – Registration Statement (Form S-3/A)

369.    On September 25, 2017 Bioptix filed a Form S-3/A registering, for sale to the investing public, 5,677,102 shares of common to be sold by the following "Selling Stockholders":

783086.1

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000(1) | 3.61% | 200,000(1) | 0 | * |
| Northurst Inc. | 559,000(2) | 9.99% | 800,000(2) | 0 | * |
| Erick Richardson | 200,000(3) | 3.61% | 200,000(3) | 0 | * |
| Melechdavid Inc. | 340,000(4) | 6.06% | 340,000(4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000(5) | 1.46% | 80,000(5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000(6) | 1.46% | 80,000(6) | 0 | * |
| Barry Honig | 544,400(7) | 9.99% | 402,050(8) | 504,000(9) | 8.09% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600(10) | * | 1,005,124(11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 597,300(12) | 9.99% | 1,688,198(13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,205(14) | * | 40,205(14) | 0 | * |
| Robert R. O'Braitis | 80,410(15) | 1.46% | 80,410(15) | 0 | * |
| Stockwire Research Group, Inc. | 40,205(16) | * | 40,205(16) | 0 | * |
| Aifos Capital LLC | 120,615(17) | 2.17% | 120,615(17) | 0 | * |
| Stetson Capital Management, LLC | 285,150(18) | 4.99% | 402,050(19) | 7,500 | * |
| JAD Capital Inc. | 80,410(20) | 1.46% | 80,410(20) | 0 | * |
| Richard Molinsky | 97,392(21) | 1.78% | 40,205(22) | 57,187 | 1.04% |
| Alan Honig | 20,000(23) | * | 20,000(23) | 0 | * |

\*    Less than 1%.
\*\*   Based on 5,436,503 shares of Common Stock outstanding as of September 20, 2017.

370.    The September 25, 2017 Form S-3/A also stated that "[u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law" and that "[e]ach selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock."

371.    The disclosures relating to the Selling Stockholders in the September 25, 2017 Form S-3/A, which was signed by Defendants O'Rourke and Beeghley, were materially false and misleading when made for the same reasons discussed above for the April 20, 2017 Form S-3/A.

372.    Additionally, the September 25, 2017 Form S-3/A was materially false and misleading because it failed to disclose that the majority (if not all) of the "selling stockholders" were members of the Honig Group had invested together in multiple previous public companies and were engaged in a common scheme and conspiracy to artificially inflate Riot's stock at the expense of other would-be public shareholders.   Altogether, this group of Honig-associated

783086.1

stockholders accounted for at least 55% of Riot's common stock[81] (and likely more) without taking into count the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January 10, 2017.

373.    Indeed, as in previous Forms S-3/A, the Selling Stockholders operated as a centrally organized "control group" that coordinated their trades down to the single share.  For example, in the September 25, 2017 Form S-3/A, O'Braitis and JAD Capital **both** reported beneficially owning "**80,410**" shares representing "**1.46%**" of the Company's common stock.  And although Policy No. 2013-17 and Stockwire both sold all of their 40,602 shares in the August 24, 2017 Form S-3/A, ¶225, the September 25, 2017 Form S-3/A disclosed that these two "Selling Stockholders" had returned and now both owned "**40,205**" shares representing "*[l]ess than 1%*" of the Company's common stock, all of which they both planned to sell.

### 6.    January 5, 2018 – Registration Statement (Form S-3)

374.    On January 5, 2018, after the close of trading on a Friday, leading into a weekend, Riot filed a Securities Registration Statement on Form S-3 registering, for sale to the investing public, 3,292,226 shares of common to be sold by the following "Selling Stockholders":

---

[81] Specifically, the following September 25, 2017 Selling Stockholders (and their percentage of stock owned) were associates of Honig and members of the Honig Group:   Northurst (9.99%); Eric Richardson (3.63%); Melechdavid, Inc. (6.06%); Mark Groussman (1.46% each in two UTMA funds for a total of 2.94%); Honig (9.99%); Titan Multi-Strategy Fund I, Ltd. (9.99%); O'Braitis (1.46%); Stockwire (i.e., James) (0.75%); Aifos (i.e., Theofilos) (2.17%); Stetson Capital Management, LLC (i.e., Stetson) (4.99%); JAD Capital Inc. (1.48%); and Richard Molinsky (1.80%).

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| 2330573 Ontario Inc. | 96,444 (1) | * | 88,888 (33) | 52,000 | * |
| Acquisition Group Limited | 135,556 (2) | 1.16% | 71,112 (33) | 100,000 (34) | * |
| Armand Reale | 4,000 (3) | * | 8,000 (33) | - | * |
| Catherine DeFrancesco ITF Ava Defrancesco | 22,911 (4) | * | 7,112 (33) | 19,355 (35) | * |
| Catherine DeFrancesco ITF Devlin DeFrancesco | 22,911 (5) | * | 7,112 (33) | 19,355 (36) | * |
| Catherine DeFrancesco ITF Lachlan Defrancesco | 22,911 (6) | * | 7,112 (33) | 19,355 (37) | * |
| Catherine DeFrancesco ITF Summer Defrancesco | 22,911 (7) | * | 7,112 (33) | 19,355 (38) | * |
| Clara Serruya | 266,667 (8) | 2.29% | 533,334 (33) | - | * |
| DeFrancesco Motorsports Inc. | 5,333 (9) | * | 10,666 (33) | - | * |
| Delavaco Holdings Inc. | 10,667 (10) | * | 21,334 (33) | - | * |
| Eduardo Vivas | 6,667 (11) | * | 13,334 (33) | - | * |
| First Canadian Insurance Corp | 14,000 (12) | * | 28,000 (33) | - | * |
| Glass Investments LP | 13,444 (13) | * | 26,888 (33) | - | * |
| Grander Holdings, Inc. 401K | 217,733 (14) | 1.86% | 266,666 (33) | 84,400 (39) | * |
| GRQ Consultants, Inc. | 22,222 (15) | * | 44,444 (33) | - | * |
| GT Capital Inc | 29,436 (16) | * | 26,666 (33) | 16,103 (40) | * |
| Hudson Bay Master Fund Ltd | 333,334 (17) | 2.87% | 666,668 (33) | - | * |
| Interward Capital Corp. | 4,000 (18) | * | 8,000 (33) | - | * |
| Intracoastal Capital LLC | 133,334 (19) | 1.15% | 266,668 (33) | - | * |
| LDIC Inc. ITF McGilligan Barry Investments Ltd. | 11,100 (20) | * | 22,200 (33) | - | * |
| Marcandy Investments Corp. | 5,333 (21) | * | 10,666 (33) | - | * |
| Monroe Capital, LLC | 22,000 (22) | * | 44,000 (33) | - | * |
| Melechdavid Inc. | 131,945 (23) | 1.13% | 88,890 (33) | 87,500 (41) | * |
| Michael Ference | 4,444 (24) | * | 8,888 (33) | - | * |
| Millennium Insurance Corp. | 7,000 (25) | * | 14,000 (33) | - | * |
| MMCAP International Inc. SPC | 366,667 (26) | 3.15% | 733,334 (33) | - | * |
| Namaste Gorgie, Inc. | 42,927 (27) | * | 21,334 (33) | 32,260 (42) | * |
| Northurst, Inc. | 589,317 (28) | 4.99% | 177,778 (33) | 593,996 (43) | 4.99% |
| Paradox Capital Partners LLC | 4,444 (29) | * | 8,888 (33) | - | * |
| Rockhaven Holdings Ltd. | 6,000 (30) | * | 12,000 (33) | - | * |
| Sunnybrook Preemie Investments Inc. | 11,666 (31) | * | 23,332 (33) | - | * |
| York Plains Investment Corp. | 8,900 (32) | * | 17,800 (33) | - | * |

\* Less than 1%.

\*\* Based on 11,622,112 shares of Common Stock outstanding as of January 4, 2018.

375.   The January 5, 2018 Form S-3/A also stated that "[u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law" and that "[e]ach selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock."

783086.1

376.     The disclosures relating to the Selling Stockholders in the January 5, 2018 Form S-3, which was signed by Defendants O'Rourke and Beeghley, were materially false and misleading when made for the same reasons discussed above for the April 20, 2017 Form S-3/A.

377.     Indeed, as in previous Forms S-3/A, the Selling Stockholders operated as a centrally organized "control group" that coordinated their trades down to the single share.  In that regard, in the January 5, 2018 Form S-3 Form S-3/A, both Michael Ference (a Partner with Sichenzia, Ross Ference LLP) and Paradox Capital Partners LLC (owned by Harvey Kesner, another partner with Sichenzia, Ross Ference LLP and Defendant Honig's long-time lawyer who represented Honig and DeFrancesco in their proxy fight to gain control of Riot), both reported owning exactly "*4,444*" shares of Riot's common stock and both offered exactly "*8,888*" shares of the Company's common stock for sale to the public, resulting in zeros shares held by them after each offering.

378.     The January S-3 also provided representations and other information about the Selling Stockholders, including the following:

> *None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years* other than as a result of the ownership of our shares or other securities.

379.     Included among the list of Selling Stockholders (as depicted above) were GRQ Consultants, a Honig-controlled entity, numerous entities affiliated with DeFrancesco and her family members, and Melachdavid, an entity controlled by Groussman.  Additionally the January 5, 2018 Form S-3 stated the following about the definition of "us":  "In this prospectus, "Riot Blockchain," "the Company," "we," "us," and "our" refer to Riot Blockchain, Inc. (f/k/a: Bioptix, Inc.), a Nevada corporation, unless the context otherwise requires."

135

380.     The January 5, 2018 Form S-3 also lists several Company transactions that occurred in the fourth quarter of 2017, including the Coinsquare transaction, the Kairos transaction and the December 2017 Private Placement.

381.     The statement above from the January 5, 2018 Form S-3 that "**_none_** of the selling stockholders . . . has had any material relationship with us or an of our subsidiaries within the past three years" was materially false and misleading when made because several of the selling stockholders _did_ in fact have a material relationship with "us or any of our subsidiaries" by virtue of their participation in at least three corporate transactions involving Riot:  Coinsquare (Honig, DeFrancesco, and Groussman, § VII.E.2), Kairos (Honig and Groussman, § VII.E.3), and the December Private Placement (Honig and DeFrancesco, § VII.E.4).  Yet, the Honig Group members' involvement in these transactions was not disclosed in the January 5, 2018 Form S-3.  Furth, with respect to the Kairos transaction, Kairos became a subsidiary of Riot as part of that transaction.

382.     O'Rourke knew or should have known that the statement above was false and misleading because he was Chairman and CEO of Riot (a company that only about nine employees at this time, and would have been involved in each of these transactions and the preparation of the January 5, 2018 Form S-3, a document that he signed.  Additionally, as set forth herein O'Rourke was a long-standing business partner of Honig (and Groussman) and by all accounts was in close contact with Honig even during his tenure as Riot's CEO and Chairman.  Thus, O'Rourke was in a position, consistent with the duties and obligations of directors under the federal securities laws, to ensure that the Company did not issue SEC filings that contained false and misleading statements or omitted material information like those included in the January S-3.

### 7.  February 7, 2018 – Registration Statement (Form S-3/A)

383.  On February 7, 2018, after the close of trading on a Friday, leading into a weekend, Riot filed a Securities Registration Statement on Form S-3 registering, for sale to the investing public, 3,292,226 shares of common to be sold by the following "Selling Stockholders":

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| 2330573 Ontario Inc. | 96,444 (1) | * | 88,888 (33) | 52,000 | * |
| Acquisition Group Limited | 135,556 (2) | 1.16% | 71,112 (33) | 100,000 (34) | * |
| Armand Reale | 4,000 (3) | * | 8,000 (33) | | * |
| Catherine DeFrancesco ITF Ava Defrancesco | 22,911 (4) | * | 7,112 (33) | 19,355 (35) | * |
| Catherine DeFrancesco ITF Devlin DeFrancesco | 22,911 (5) | * | 7,112 (33) | 19,355 (36) | * |
| Catherine DeFrancesco ITF Lachlan Defrancesco | 22,911 (6) | * | 7,112 (33) | 19,355 (37) | * |
| Catherine DeFrancesco ITF Summer Defrancesco | 22,911 (7) | * | 7,112 (33) | 19,355 (38) | * |
| Clara Serruya | 266,667 (8) | 2.29% | 533,334 (33) | - | * |
| DeFrancesco Motorsports Inc. | 5,333 (9) | * | 10,666 (33) | - | * |
| Delavaco Holdings Inc. | 10,667 (10) | * | 21,334 (33) | - | * |
| Eduardo Vivas | 6,667 (11) | * | 13,334 (33) | - | * |
| First Canadian Insurance Corp | 14,000 (12) | * | 28,000 (33) | - | * |
| Glass Investments LP | 13,444 (13) | * | 26,888 (33) | - | * |
| Grander Holdings, Inc. 401K | 217,733 (14) | 1.86% | 266,666 (33) | 84,400 (39) | * |
| GRQ Consultants, Inc. | 22,222 (15) | * | 44,444 (33) | - | * |
| GT Capital Inc | 29,436 (16) | * | 26,666 (33) | 16,103 (40) | * |
| Hudson Bay Master Fund Ltd | 333,334 (17) | 2.87% | 666,668 (33) | - | * |
| Interward Capital Corp. | 4,000 (18) | * | 8,000 (33) | - | * |
| Intracoastal Capital LLC | 133,334 (19) | 1.15% | 266,668 (33) | - | * |
| McGilligan Barry Investment | 11,100 (20) | * | 22,200 (33) | - | * |
| Marcandy Investments Corp. | 5,333 (21) | * | 10,666 (33) | - | * |
| Monroe Capital, LLC | 22,000 (22) | * | 44,000 (33) | - | * |
| Melechdavid Inc. | 131,945 (23) | 1.12% | 88,890 (33) | 87,500 (41) | * |
| Michael Ference | 4,444 (24) | * | 8,888 (33) | - | * |
| Millennium Insurance Corp. | 7,000 (25) | * | 14,000 (33) | - | * |
| MMCAP International Inc. SPC | 366,667 (26) | 3.15% | 733,334 (33) | - | * |
| Namaste Gorgie, Inc. | 42,927 (27) | * | 21,334 (33) | 32,260 (42) | * |
| Northurst, Inc. | 592,089 (28) | 4.99% | 177,778 (33) | 612,000 (43) | 4.99% |
| Paradox Capital Partners LLC | 4,444 (29) | * | 8,888 (33) | - | * |
| Rockhaven Holdings Ltd. | 6,000 (30) | * | 12,000 (33) | - | * |
| Sunnybrook Preemie Investments Inc. | 11,666 (31) | * | 23,332 (33) | - | * |
| York Plains Investment Corp. | 8,900 (32) | * | 17,800 (33) | - | * |

\*   Less than 1%.

\*\*  Based on 11,652,270 shares of Common Stock outstanding as of February 5, 2018.

384.  The February 7, 2018 Form S-3/A also stated that "[u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power

137

with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law" and that "[e]ach selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock."

385.    The disclosures relating to the Selling Stockholders in the February 7, 2018 Form S-3, which was signed by Defendants O'Rourke and Beeghley, were materially false and misleading when made for the same reasons discussed above for the April 20, 2017 Form S-3/A.

386.    Indeed, as in previous Forms S-3/A, the Selling Stockholders operated as a centrally organized "control group" that ***coordinated their trades down to the single share***.  In that regard, in the February 7, 2018 Form S-3 Form S-3/A, both Michael Ference (a Partner with Sichenzia, Ross Ference LLP) and Paradox Capital Partners LLC (owned by Harvey Kesner, another partner with Sichenzia, Ross Ference LLP and Defendant Honig's long-time lawyer who represented Honig and DeFrancesco in their proxy fight to gain control of Riot).both reported owning exactly "***4,444***" shares of Riot's common stock and both offered exactly "***8,888***" shares of the Company's common stock for sale to the public, resulting in zeros shares held by them after each offering.

387.    As noted above, the February 7, 2018 Form S-3/A listed Selling Stockholders GRQ Consultants, DeFrancesco, and Groussman, and also stated:

> ***None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years*** other than as a result of the ownership of our shares or other securities.

388.    This representation was materially false and misleading for the same reasons described above with respect to the January 5, 2018 Form S-3.

C.     **Defendants' Materially False and Misleading Statements and Omissions Regarding Riot's Related-Party Transactions with Defendants**

1.     **March 16, 2017 – Current Report (Form 8-K)**

389.     On March 16, 2017, Riot announced in a Form 8-K filed with the SEC that the Company had entered into a securities purchase agreement pursuant to which it agreed to sell $2,250,000 of principal amount of promissory notes and three year warrants to purchase up to 700,000 shares of common stock (referred to herein as the "March 2017 Private Placement Agreement") to certain undisclosed accredited investors.  One of these investors was later revealed to be Honig, who at the time the agreement was entered into was a greater than 10% shareholder of Riot.

390.     The March 16, 2017 Form 8-K was false and misleading to Riot's public investors because it failed to disclose, as is required by SEC Regulation S-K Item 404 and GAAP, that the March 2017 Private Placement Agreement was a transaction with a related party, namely Honig, a greater than 5% shareholder of Riot.  The omission was particularly important here as it allowed Honig's relationship with the Company, both in terms of shareholder ownership and numerous material agreements during the Class Period, to remain hidden from Riot's public shareholders in violation of the federal securities laws.

391.     Defendants O'Rourke and Beeghley would have been aware of the March 2017 Private Placement Agreement, Honig's role in the transaction, and his greater than 5% ownership in the Company at the time this 8-K was filed by virtue of their positions as members of the Riot's Board and their long-standing business relationship with Honig, as set forth herein.  Thus, O'Rourke and Beeghley were in a position, consistent with the duties and obligations of directors under the federal securities laws, to ensure that Honig's participation in the March 2017 Private Placement Agreement was properly disclosed to Riot's public shareholders.

### 2.      March 31, 2017 – Annual Report (Form 10-K)

392.    On March 31, 2017, Riot filed with the SEC its 2017 Annual Report under Form 10-K ("2017 10-K").  The 2017 10-K describes the March 2017 Private Placement Agreement and, similar to the March 16, 2017 Form 8-K, fails to disclose that Honig, a greater that 5% shareholder in the Company, was a party to that agreement.

393.    The 2017 10-K was false and misleading to Riot's public investors because it failed to disclose, as is required by SEC Regulation S-K Item 404 and GAAP, that the March 2017 Private Placement Agreement was a transaction with a related party, namely Honig, a greater than 5% shareholder of Riot.  The omission was particularly important here as it allowed Honig's relationship with the Company, both in terms of shareholder ownership and numerous material agreements during the Class Period, to remain hidden from Riot's public shareholders in violation of the federal securities laws.

394.    Defendants O'Rourke and Beeghley signed the 2017 10-K and would have been aware of the March 2017 Private Placement Agreement, Honig's role in the transaction, and his greater than 5% ownership in the Company by virtue of their positions as members of Riot's Board and their long-standing business relationship with Honig, as set forth herein.  Thus, O'Rourke and Beeghley were in a position, consistent with the duties and obligations of directors under the federal securities laws, to ensure that Honig's participation in the March 2017 Private Placement Agreement was properly disclosed to Riot's public shareholders.

### 3.      October 4, 2017 – Current Report (Form 8-K)

395.    On October 4, 2017 Riot announced in a Form 8-K and press release (attached to the 8-K) filed with the SEC that the Company had entered into the Coinsquare Agreement, a transaction involving a small, privately-held Canadian company.  As part of the Coinsquare Agreement, Riot invested $3 million alongside 22 other investors, including various members of

140

the Honig Group.  The terms of the transaction were memorialized in written agreement that was signed by all participating Coinsquare investors.  At the time the agreement was signed, O'Rourke served as Riot's President, Secretary, Treasurer, and as a member of the Company's Board.  At the time, Beeghley served as Riot's CEO and Chairman.

396.    The 2017 10-K was false and misleading to Riot's public investors because it failed to disclose, as is required by SEC Regulation S-K Item 404 and GAAP, that the Coinsquare Agreement included at least three related parties – Honig, Groussman, and DeFrancesco – each of whom were at this time greater than 5% shareholders of Riot.  The omission was particularly important here because it allowed Honig, Groussman's, and DeFrancesco's relationships with the Company, both in terms of shareholder ownership and material agreements, to remain hidden from Riot's public shareholders in violation of the federal securities laws.

397.    Defendants O'Rourke and Beeghley would have been aware of the Coinsquare Agreement, Honig and DeFrancesco's role in the transaction, and their greater than 5% ownership in the Company at the time this 8-K was filed, by virtue of their positions both as officers and members of Riot's Board, and by virtue of their long-standing business relationships with Honig, as set forth herein.  Thus, O'Rourke and Beeghley were in a position, consistent with their duties and obligations as officers and directors under the federal securities laws, to ensure that Honig's, DeFrancesco's, Groussman's and Stetson's participation in the Coinsquare Agreement was properly disclosed to Riot's public shareholders.

### 4.    November 3, 2017 – Current Report (Form 8-K)

398.    On November 3, 2017, Riot filed with the SEC a Form 8-K that announced the Company's agreement with Kairos, a transaction that involved the Company's purchase of various Bitcoin mining machines through a share exchange agreement.  The 8-K and related exhibit stated that as consideration for the Kairos acquisition (which included the Bitcoin mining machines) Riot

would issue to Kairos' stockholders preferred shares of Riot stock that were convertible to 1,750,001 shares of Riot common stock.  Also, as part of the transaction Riot agreed to pay "certain" undisclosed shareholders of Kairos a royalty from cash flow generated from the Company's Bitcoin mining operations, which entitled such shareholders to receive 40% of the gross profits generated on a monthly basis until they have received a total of $1,000,000, at which point the royalty is extinguished.

399.    The November 3, 2017 Form 8-K was false and misleading because it failed to disclose, as is required by SEC Regulation S-K Item 404 and GAAP, that the Kairos transaction included two related parties, namely Defendants Honig and DeFrancesco, both of whom were at this time greater than 5% shareholders of Riot.  This omission was particularly important here because it allowed Honig's and DeFrancesco's material relationships with the Riot – both in terms of share ownership and material agreements – to remain hidden from Riot's public shareholders in violation of the federal securities laws.

400.    O'Rourke would have been aware of the details of the Kairos Agreement, Honig's and DeFrancesco's involvement in the transaction, and their greater than 5% share ownership by virtue of O'Rourke's position as President, CEO, and Chairman of the Board of Directors of Riot. Indeed, the same day that the Kairos acquisition was publicly announced, O'Rourke (who was already the Company's President, Secretary, and Treasurer, and thus an officer as well as a Director) was named CEO and Chairman of the Board.  Additionally, O'Rourke would have been aware of Honig's involvement in these transactions given his long-standing business relationship with Honig and other members of the Honig Group.  O'Rourke's relationship with Honig was most prominently evidenced by the February 16, 2018 CNBC expose where reporters at CNBC arrived at Honig's office only to find O'Rourke.  Thus, O'Rourke was in a position, consistent

with his duties and obligations as an officer and director under the federal securities laws, to ensure that Honig and DeFrancesco's involvement in the Kairos transaction was properly disclosed to Riot's public shareholders.

### 5.      November 13, 2017 – Quarterly Report (Form 10-Q)

401.      On November 13, 2017 Riot filed with the SEC its November 13, 2017 10-Q (the "November 2017 10-Q") for the period that ended September 30, 2017, a document that was signed by O'Rourke.

402.      The November 2017 10-Q was false and misleading because while it described several transactions that occurred during the reporting period, including (1) March 2017 Private Placement Agreement, (2) the Coinsquare Agreement; and (3) the Kairos transaction, it failed to disclose as required by SEC Regulation S-K Item 404 and GAAP that these transactions – which were material to the Company given their size relative to Riot's size and operations – included related parties, including Defendant Honig and others.   These omissions were particularly important here because they allowed Honig, DeFrancesco, Groussman and Stetson to take part in one or more of these transactions and, at the same time, hide from public view their material relationship with Riot as shareholders of the Company.

403.      Defendant O'Rourke would have been aware of these transactions and the related parties involved, as set forth herein, by virtue of his position at this time as the President, CEO, and Chairman of the Board of Riot.  O'Rourke would also have been aware given his long-standing business relationship with Honig and other members of the Honig Group, both prior to and during his tenure at Riot.  This is most prominently evidenced by the February 16, 2018 CNBC expose where reporters at CNBC arrived at Honig's office only to find O'Rourke.  Thus, O'Rourke was in a position, consistent with his duties and obligations as an officer and director under the federal

securities laws, to ensure that these related parties' involvement in the three transactions described above were properly disclosed to Riot's public shareholders.

### 6.      December 12, 2017 – Proxy Statement (Form DEF 14A)

404.     On December 12, 2017, Riot filed its Annual Definitive Proxy Statement under Schedule 14A (the "2017 Proxy") with the SEC.  The 2017 Proxy announced that the Company's Annual Meeting would take place on December 28, 2017 and that Riot shareholders were invited to attend and encouraged to vote.  In a letter to shareholders signed by O'Rourke and included at the beginning of the 2017 Proxy, he outlines the "primary business" of the shareholder meeting.  Notably, virtually all of this business related to events taking place in fiscal year 2017.  The letter states in relevant part:

> *The principal business of the meeting will be* (i) to *elect as directors the nominees named in this proxy statement to serve until 2018 Annual Meeting of Shareholders* and until their successors are duly elected and qualified, (ii) *to ratify the appointment of EisnerAmper LLP as our independent public accountant for the fiscal year ending December 31, 2017*, (iii) to advise us as to whether you approve the compensation of our named executive officers (Say-on-Pay), (iv) *to approve an amendment to the Company's 2017 Equity Incentive Plan* to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares and (v) to transact such other business as may be properly brought before the Annual Meeting and any adjournments thereof.

405.     In addition to the above, numerous other events taking place in fiscal year 2017 are referenced in the 2017 Proxy including but not limited to the following:

(i)       Tables setting forth *current* share ownership of insiders (i.e., current as of December 2017);

(ii)      Tables setting forth *current* share ownership of 5% or greater shareholders;

(iii)     Information concerning the (alleged) independence of the *current* board members;

(iv)    Information concerning the Riot's "Code of Conduct" **which did not exist until November 2017**, and which was included under the "Audit Committee's Report".

406.    Also included in the 2017 Proxy is information concerning "Section 16(a) Beneficial Ownership":

> Section 16(a) of the Securities Exchange Act of 1934 requires the Company's directors, executive officers, and shareholders who own more than 10% of the Company's stock to file forms with the SEC to report their ownership of the Company's stock and any changes in ownership. . . . We have reviewed all forms provided to us. Based on that review and on written information given to us by our executive officers and directors, **we believe that all Section 16(a) filings during the past fiscal year were filed on a timely basis and that all directors, executive officers and 10% beneficial owners have fully complied with such requirements during the past fiscal year.**

407.    Additionally, the 2017 Proxy stated the following about related party transactions:

> **Certain Relationships and Related Transactions**
>
> **The Audit Committee has responsibility for reviewing and, if appropriate, for approving any related party transactions that would be required to be disclosed pursuant to applicable SEC rules**. This includes current or proposed transactions in which the Company was or is to be a participant, the amount involved exceeds the lower of either $120,000 or 1% of the average of the Company's total assets at year-end for the last two completed fiscal years, and in which any of the Company's executive officers, directors, or greater than five percent shareholders, or any members of their immediate families, has a direct or indirect material interest. **Apart from any transactions disclosed herein, no such transaction was entered into with any director or executive officer <u>during the last fiscal year</u>**. Such transactions will be entered into only if found to be in the best interest of the Company and approved in accordance with the Company's Code of Ethics, which are available on the Company's web site.
>
> Except for the employment agreements previously entered into between the Company and certain of its named executive officers, **<u>since January 1, 2016,</u> none of the directors or named executive officers of the Company, <u>nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its common stock, nor any associate or</u>**

*__affiliate of such persons or companies__, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company*.

408.     The statement above from the 2017 Proxy about beneficial ownership, specifically the statement that "we believe that all Section 16(a) filings during the past fiscal year were filed on a timely basis and that all directors, executive officers and 10% beneficial owners have fully complied with such requirements during the past fiscal year" was false and misleading when made or otherwise omits material information because O'Rourke knew or should have known, in light of Schedules 13D filed by Honig and DeFrancesco in January 2017, that they were beneficial owners of greater than 10% of Riot's outstanding shares.  He also knew that throughout 2017 Honig and DeFrancesco were acquiring additional shares without properly disclosing the transactions under the federal securities laws.

409.     For example, O'Rourke knew as set forth herein, that Honig and DeFrancesco were involved in related-party transactions during 2017 that *increased* their share ownership.  Indeed, Honig received convertible shares in both the March 2017 Private Placement and the Kairos transaction.  Likewise, DeFrancesco received convertible shares of Riot as part of the Kairos transaction.  Yet, as of the filing of the December 2017 Proxy, neither Honig nor DeFrancesco had updated their 13D filings since January 2017.

410.     As explained above, O'Rourke was aware of these transactions by virtue of his role as an officer and director of the Company, and would have known given this role that they resulted in Honig and DeFrancesco increasing their share ownership in the Company.  Of course, it was not until later than Riot's public shareholders learned that – rather increase their share ownership during the Class Period (through related party transactions or otherwise) – they were instead selling shares at artificially inflated prices to unsuspecting investors.

146

411.    The statement other above about related party transactions, specifically that since "January 1, 2016 [no] person who owned of record or was known to own beneficially more than 5% of the Company's shares . . . has had any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company" was also false and misleading when made or otherwise omitted material information because, because several 5% or greater shareholders did in fact have a material interest transactions during 2017, including the March 2017 Private Placement, the Coinsquare transaction, and the Kairos transaction.  O'Rourke's failure to disclose these transactions in the 2017 Proxy is both an affirmative misstatement, as explained above, and a material omission for the same or similar reasons alleged herein.

412.    Defendants may attempt to argue that in light of the statement below ("*the year ended December 31, 2016*") along with the language above "*during the last fiscal year*" – that it was unambiguously clear to Riot investors that the "Section 16(a) Beneficial Ownership" and "Certain Relationships and Related Transactions" sections of the 2017 Proxy only concerns events taking place during fiscal year 2016:

> **We [Riot's Audit Committee] hereby report to the Board of Directors that, in connection with the financial statements for the year ended December 31, 2016**, we have:
>
> - reviewed and discussed the audited financial statements with management and the independent accountants;
> - approved the appointment of the independent accountants;
> - discussed with the independent accountants the matters required to be discussed by SAS 61 (Codification of Statements on Auditing Standards, AU section 380), as modified by SAS 89 and SAS 90; and
> - received the written disclosures and the letter from the independent accountants required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications

with the Audit Committee concerning independence, and discussed with the independent accountant the accountant's independence.

Based on the discussions and our review discussed above, *we recommended to the Board of Directors that the audited financial statements* <u>*for the year ended December 31, 2016*</u> *be included in the Company's 2016 Annual Report to Shareholders on Form 10-K* <u>*for that fiscal year*</u>.

413.    However, this interpretation of "during the last fiscal year" is at best ambiguous and at worst completely off-base.  Indeed, as explained above, many other 2017 fiscal year events are referenced in the 2017 Proxy.  For example, the "Code of Conduct" section of the proxy appears immediately before the "Section 16(a) Beneficial Ownership" section, which, as noted above, describes events taking place just *one month earlier during fiscal year 2017*.  Additionally, among the bullet points that followed the statement "[w]e hereby report . . . in connection with the financial statements for the year that ended December 31, 2016" there is no reference whatsoever to whether the "report" included a review of related party transactions occurring during fiscal year 2016.  Instead, the report plainly concerns "audited financial statements" included in Riot's 2017 10-K, which was filed nine months earlier on March 31, 2017.  In other words, the 2017 Proxy does not disclose to the Company's shareholders – either way – that these specific sections of the proxy were unambiguously intended to cover a period of time in 2016 and exclude all transactions that may have taken place in the eleven months since that time (i.e., during preceding eleven months in 2017).

414.    Given other references in the 2017 Proxy to events taking place in fiscal year 2017, and in light of the fact that O'Rourke's opening letter in the proxy states that the "principle business" of the shareholder meeting occurred during 2017 and not 2016, Riot's public

148

shareholders would not have known that the "during the last fiscal year" language meant in plain and unambiguous terms, fiscal year 2016 rather than fiscal year 2017.

### 7.      December 19, 2017 – Current Report (Form 8-K) and Press Release

415.    On December 19, 2017, Riot filed an 8-K announcing that the Company had entered into private placement agreements with unnamed accredited investors to sell $37 million units of securities at a purchase price of $22.50 per unit.  Each unit consisted of one share of the Company's common stock and a three year warrant to purchase one share of common stock at an exercise price of $40.00 per share.  In a corresponding press release Riot stated that "[t]he $37 million in gross proceeds from the investment will be used for the expansion of the Company's Bitcoin mining operations, strategic investments, and general working capital."  The December 19, 2017 Form 8-K stated in relevant part:

> On December 18, 2017, Riot Blockchain, Inc. (the "Company") entered into agreements to sell $37 million units of its securities (the "Units") pursuant to separate purchase agreements (the "Securities Purchase Agreements") with accredited investors (the "Investors"), at a purchase price of $22.50 per Unit.  Each Unit consists of one share (the "Shares") of the Company's common stock, no par value per share (the "Common Stock"), and a three year warrant (the "Warrants") to purchase one share of Common Stock, at an exercise price of $40.00 per share (such sale and issuance, the "Private Placement").  The closing of the Private Placement is subject to customary closing conditions. The news release announcing the Private Placement is attached as Exhibit 99.1.
>
> The Warrants are exercisable, at any time on or after the sixth month anniversary of the closing date of the Private Placement, at a price of $40.00 per share, subject to adjustment, and expire three years therefrom. The holders may, subject to certain limitations, exercise the Warrants on a cashless basis. The Company is prohibited from effecting an exercise of any Warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such Warrant.
>
> The Company entered into separate registration rights agreements (the "Registration Rights Agreement") with each of the Investors, pursuant to which the Company will undertake to file a registration statement to register the Common Stock issued as part of the Units and the Common Stock issuable upon exercise of the Warrants, within fourteen days following the closing, to cause such registration

statement to be declared effective by the Securities and Exchange Commission within ninety days of the filing date and to maintain the effectiveness of the registration statement until all of such shares of Common Stock registered have been sold or are otherwise able to be sold pursuant to Rule 144. In the event the Company fails to file, or obtain effectiveness of, such registration statement with the given period of time, the Company will be obligated to pay liquidated damages to the Investors for every thirty-days during which such filing is not made and/or effectiveness obtained, such fee being subject to certain exceptions.

The offering was made pursuant to an exemption from registration under Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act") and/or pursuant to Rule 903 of Regulation S promulgated under the Securities Act.

416.    The foregoing descriptions of the Securities Purchase Agreement, the Registration Rights Agreement and the Warrants are not complete and are qualified in their entireties by reference to the full text of the Form of Purchase Agreement, the Form of Registration Rights Agreement and the Form of Warrant, copies of which are filed as Exhibit 10.1, Exhibit 10.2 and Exhibit 4.1, respectively, to this Report and are incorporated by reference herein.

417.    As with other related party transactions described herein, (i) the March 2017 Private Placement; (ii) the Coinsquare transaction; and (iii) the Kairos transaction, the December 19, 2017 Form 8-K and press release failed to disclose that Honig and DeFrancesco, both of whom held greater than 5% of the outstanding shares of the Company, were among the so-called "accredited investors" invited to participate in the December 2017 Private Placement and Securities Purchase Agreement. Yet, it was not until months later, on April 17, 2018, that Riot first disclosed in a Form 10-K that Honig and DeFrancesco participated in this transaction and that they invested $500,000 and $360,000, respectively. As explained above, under SEC Regulation S-K Item 404 and GAAP Honig and DeFrancesco should have been disclosed as related parties to this transaction given their ownership interest in the Company. O'Rourke was in a position, consistent with the duties and obligations of officers and directors under the federal securities laws, and as a close

business associate of Honig, to ensure that Honig and DeFrancesco's participation in the December 2017 Private Placement as related parties was properly disclosed to Riot's public shareholders.

### 8.   January 5, 2018 – Registration Statement (Form S-3)

418.   On January 5, 2018 Riot filed Registration Statement Form S-3 signed by Defendant O'Rourke announcing that certain "Selling Stockholders" would sell from time to time shares of common stock and convertible warrants at varying prices ("January S-3").  The January S-3 provided representations and other information about the Selling Stockholders, including the following:

> *None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years* other than as a result of the ownership of our shares or other securities.

419.   Included among the list of Selling Stockholders was GRQ Consultants, a Honig-controlled entity, numerous entities affiliated with DeFrancesco and her family members, and Melechdavid, an entity controlled by Groussman.  Additionally the Janaury S-3 included the following definition of "us":  "[i]n this prospectus, 'Riot Blockchain,' 'the Company,' 'we,' 'us,' and 'our' refer to Riot Blockchain, Inc. (f/k/a: Bioptix, Inc.), a Nevada corporation, unless the context otherwise requires."  The filing also lists several corporate transactions that occurred at Riot in the fourth quarter of 2017, including the Coinsquare transaction, the Kairos transaction and the December 2017 Private Placement.

420.   Defendant O'Rourke knew or should have known that the statement above was false and misleading because he was Chairman and CEO of Riot (a company that only had only about nine employees at this time), and would have been involved in each of these transactions and the preparation of the January S-3, a document that he signed.  Additionally, as set forth herein O'Rourke was a long-standing business partner of Honig and by all accounts was in close contact

with Honig even during his tenure as Riot's CEO and Chairman.  Thus, O'Rourke was in a position, consistent with the duties and obligations of directors under the federal securities laws, to ensure that the Company did not issue SEC filings that contained false and misleading statements or omitted material information like those included in the January S-3.

### 9.     February 7, 2018 – Registration Statement (Form S-3/A)

421.    February 7, 2018 Riot filed Registration Statement on Form S-3 signed by Defendant O'Rourke announcing that certain "Selling Stockholders" would sell from time to time shares of common stock and convertible warrants at varying prices ("February S-3").  The February S-3 contained the same language as the January S-3 and included many of the same selling stockholders, incuding GRQ Consultants, DeFrancesco, and Groussman.  Thus, for all the reasons the January S-3 is false and misleading the same applies, and is alleged herein, as to the February S-3.

### 10.     February 16, 2018 – Current Report (Form 8-K)
###            and Shareholder Letter

422.    On February 16, 2018, after trading closed, Riot filed a Form 8-K with the SEC that attached letter which O'Rourke directly addressed the Company's shareholders ("Shareholder Letter").  The purpose of the Shareholder Letter was to attempt to dismiss concerns raised earlier in the day by CNBC about O'Rourke's connection to Honig, his recent insider stock sales, and the integrity of the Company's SEC filings.  The letter stated, in relevant part,

> *Dear Shareholders*,
>
> Thank you for your support in our vision to build a leading blockchain technology company. I believe we are well positioned at the forefront of this industry with many exciting opportunities on the horizon.
>
> Today, CNBC released a negative one-sided piece on companies that seek to jump on the blockchain bandwagon by changing their name and profiled our company. Had the journalist used even a

modest amount of professional diligence, CNBC would have also reported on the numerous achievements we have made in becoming an early entrant in the support of blockchain and cryptocurrency technologies. To my knowledge, we were also the first Nasdaq listed company to have blockchain in its name and had no idea what the market reaction would be when the transition was made.

Not to be deterred, I wish to provide an update of where Riot Blockchain stands today and respond to some of their attacks. We have made significant inroads in building a diversified portfolio of investments and to begin securing digital assets.

                        *       *       *

*At the end of 2017, I personally sold some stock that I held in our company.  I sold less than 10% of my overall position and did so to cover tax obligations.  I could have sold more stock in the same timeframe if I so desired*.  I truly believe in what we are building and the shareholder value it will create.

                        *       *       *

*Barry Honig has been a supportive shareholder of Riot Blockchain.  Prior to my involvement with Bioptix, Mr. Honig filed a lawsuit against the company and its management as a shareholder because he believed the old management and board was not properly deploying shareholders' cash.  This led to the eventual re-examination by the board and management of the failing business, which ultimately led to the board's decision that it was in shareholders' best interest to evaluate other opportunities with its cash on hand.*

                        *       *       *

*We take our SEC reporting obligations seriously and diligently file all reports and filings*.  We have expended enormous effort to inform investors of the risks of our foray into uncharted territory.

423.    O'Rourke's statement above that "Barry Honig has been a supportive shareholder of Riot Blockchain," among other statements referenced above, were false and misleading or otherwise omitted material information because while referring to Honig as "a supporting shareholder" of the Company he also failed to disclose that Honig was much than a passive shareholder.  Indeed, as explained herein Honig was involved in at least four related party

153

transactions with the Company, none of which had been disclosed to Riot's public shareholders, in this Form 8-K or any other public filings.  In addition, O'Rourke knew or should have known as an officer and director of the Company – and as  close business associate of Honig – that during 2017 Honig repeatedly acquired shares (through share conversions that occurred through various related party transactions or other purchases) and sold shares of Riot without filing the requisite Schedules 13D and 13/A.  In other words, O'Rourke's Shareholder Letter attempted to paint a false picture of Honig's true relationship and involvement with the Company.

424.    Additionally, O'Rourke's statement above that "[w]e take our SEC reporting obligations seriously and diligently file all reports and filings" was materially false and misleading and otherwise omitted material information because under O'Rourke's leadership as a director and officer of Riot, the Company did not "take its obligations seriously" or "diligently file all reports."  Indeed, at least as early as March 16, 2017 the Company omitted to tell investors about a related party transaction with a 10% shareholder, namely Honig, as part of the Company's announcement of the March 2017 Private Placement Agreement.  As set forth herein, several other related party transactions, with Honig and other members of the Honig Group took place in 2017 and were not disclosed until months later in April 2018.  Likewise, as set forth herein, several Registration Statements also failed to disclose information about various related party transactions the Honig Group's participation as a group related to their share ownership in Riot.

**11.    March 26, 2018 - Proxy Statement (Form DEF 14A)**

425.    On March 26, 2018, Riot filed its Definitive Proxy statement under Form 14 DEFA. Because both the March 2018 Proxy and 2017 Proxy include the same language, as referenced above, for all the reasons the 2017 Proxy is false and misleading the same is true for the March 2018 Proxy.

## XI.    POST-CLASS PERIOD DEVELOPMENTS

426.    On December 20, 2018, the SEC filed a letter to inform the *Honig* Action court that "certain Defendants have agreed to settlements in principle" and that "[c]ertain other Defendants have approached the staff to discuss possible settlement and to share their views about the allegations in the existing Complaint."

427.    A week later, on December 27, 2018, the SEC announced a proposed settlement with one of the defendants, Frost, pursuant to which Frost will pay $5.5 million to the SEC and is permanently barred from participating in offerings of penny stocks (with limited exceptions).

428.    On January 2, 2019, Opko settled the pump-and-dump charges with the SEC in the *Honig* Action and agreed to pay a $100,000 fine.

429.    On January 10, 2019, the SEC filed a consent judgement of the charges against Opko.  As part of that settlement, in addition to the penalty of $100,000, Opko also agreed to the following, among other things:  (i) the establishment of a "Management Investment Committee" that will make recommendations to an "Independent Investment Committee" of the Board of Directors "to handle existing and future strategic minority investments for so long as Dr. Philip Frost ('Frost') is a shareholder in or holds any management or board-level position" at Opko; and (ii) retain an Independent Compliance Consultant to review "prior starategic minority investments by [Opko] made at the suggestion of and in tandem with Frost"; and (iii) review Opko's "existing policies and procedures to determine whether they are sufficient to ensure compliance with Exchange Act Section 13(d)."

430.    On January 18, 2019, Defendant Groussman settled the charges brought against him in the *Honig* Action.  As part of the settlement, Defendant Groussman was barred from participating in any offering of penny stock for five years and ordered to pay disgorgement of

$1,051,360, plus prejudgment interest of $170,554.78, and a civil penalty of $160,000.  *See* No. 1:18-cv-08175-ER (S.D.N.Y.), ECF No. 93.

431.    On March 8, 2019, the SEC filed a First Amended Complaint in the *Honig* Action, which substantially built on the allegations in the original complaint.  Several weeks later, on April 26, 2019, the SEC wrote to the court to request a stay of briefing following an "agreement in principle to settle the Commission's claims for liability against Defendant Honig and his entity, GRQ Consultants, Inc."  *See* No. 1:18-cv-08175-ER (S.D.N.Y.), ECF No. 114.

## XII.    ADDITIONAL SCIENTER ALLEGATIONS

432.    As alleged herein, Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Riot, their control over, and/or receipt and/or modification of Riot's allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information, participated in the fraudulent scheme alleged herein.

433.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Defendants.

434.     Several of the Defendants were members of Riot's executive management group during the Class Period.  Based on their roles at Riot, each of these Defendants would have been involved with, or had knowledge of, the wrongdoing alleged herein.

435.     At a minimum, Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Honig was privy to this information through his relationship with, and control over, the Defendants.

436.     Likewise, certain of the Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  Honig was privy to this information through his relationship with, and control over, the Defendants.  Certain of the Defendants had the ultimate authority over and were involved in drafting, producing, reviewing, and/or disseminating the false and misleading  statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

437.     Certain of the Defendants were senior executives involved in Riot's daily operations with access to all material information regarding the Company's core operations.  These Defendants are presumed to have knowledge of all material facts regarding Riot's core business.  Honig was privy to this information through his relationship with, and control over, the Defendants.

438.    Defendants' scienter is further demonstrated by the fact that cryptocurrency and, in particular, Bitcoin mining was allegedly a central part of the Company's success.  Bitcoin was allegedly the cornerstone of (and critically important to) the Company's growth strategy and, as such, constituted a core operation of the Company.  The fact that the misstatements and omissions at issue here pertained directly to Riot's core operations further supports a strong inference of scienter.

439.    When, as here, a senior officer of a company makes false and misleading public statements regarding its core operations, there is a strong inference that such officer knew the statement was materially false and misleading when made.  Stated otherwise, knowledge of falsity can be imputed to key officers who should have known of facts relating to the core operations of their company.  Moreover, as signatories to the Company's SEC filings, certain of the Defendants had an affirmative obligation to familiarize themselves with the facts relevant to Riot's core operations.

440.    In addition, throughout the Class Period, Riot had very few employees, further strengthening the inference of scienter.  For example, in the Company's annual report filed on April 30, 2018, Riot stated that "[a]s of March 31, 2018, we had nine employees, all of whom are full-time."

441.    The allegations above also establish a strong inference that Riot, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.

442.     Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Riot's true operating condition and present and expected financial performance from investors. By concealing these material facts from investors, Riot maintained and/or increased its artificially inflated common stock price throughout the Class Period.

443.     As executives of Riot, these Defendants are all candidates for imputing corporate scienter to the Company.

444.     In addition, an executive's insider sales can be probative of scienter.  Here, Defendant O'Rourke's massive insider sales during the Class Period reveals his motive to commit fraud.  On December 29, 2017, Defendant O'Rouke sold 30,383 shares of Riot stock for proceeds of $869,256.35.  These sales were not made pursuant to a 10(b)5-1 trading plan, further adding to the inference of scienter.  These sales were made just days before the Company announced the dismissal of its auditor and a month before Riot canceled its annual meeting for the second time, causing the NASDAQ to inform the Company that it has violated the NASDAQ's listing requirements.  In addition, indicating that Defendant O'Rouke wanted to sell his stock with minimum attention, his sales were made on the Friday before a holiday weekend.

445.     Likewise, the SEC investigation and filing of the *Honig* Action and subsequent settlements add to the inference of scienter.  On April 9, 2018, the SEC issued a subpoena pursuant to a formal order of investigation.  According to Riot, the SEC's "inquires include the proper asset classification, applicability of the Investment Company Act [of] 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency."

446.     Then, on August 14, 2018, Riot filed a Form 10-Q with the SEC, in which it provided more details about the SEC's investigation.  In particular, the Company reported that the

SEC was looking into a number of Riot's registration statements, as well as its acquisition of a minority stake in Coinsquare (the entity in which Defendant Honig had a personal stake).

447.   As noted above, Defendants caused Riot to repeatedly issue stock to retail investors based on the misrepresentation that "none" of the "selling stockholders had a material relationship" with Riot or its subsidiaries.  *See* Section V, *supra*.  On September 10, 2018, a video was posted on YouTube[82] showing Defendants Honig and O'Rourke together in the same room meeting with Groussman and Harvey Kesner, Honig's longtime lawyer.  The group appear to be recovering together in a hospital room after reportedly attending the 2014 Roth Capital Conference.  The video depicted Riot's CEO, O'Rourke, meeting with Honig in the same room.  In the picture, Honig appears to be addressing O'Rourke.

448.   The video, posted on Twitter on October 9, 2018, also showed Honig and Selling Stockholder Kesner, who was Honig's lawyer representing Honig in his proxy fight against the Bioptix Board side by side, apparently unconscious, in the same room.

449.   Groussman is also depicted meeting with Honig, O'Rourke, and Kesner.  This meeting further confirm that Honig, O'Rourke, Groussman, and Kesner knew they were part of a concerted group of associates with a close "material relationship" outside the context of their being merely owners of Riot stock.

---

[82] *See* https://www.youtube.com/watch?v=CrCpLJ5dZYE ("During a CNBC investigation into Riot Blockchain, attorney Harvey Kesner told reporters he didn't know anything about Barry Honig, according to the article. This video shows otherwise. During the '14 Roth Capital conference Barry Honig & his attorney Harvey Kesner allegedly took a bunch of edibles. They got so high, according to our source, that Barry bugged out and called an ambulance on himself. This is the video of the aftermath. Also making an appearance in this video are former Riot Blockchain CEO John O'Rourke and Mark Groussman. Everyone depicted in the video (except for Kesner) were subsequently named in an SEC-complaint on September 7th 2018 alleging that the group (along with other individuals and entities) participated in multiple micro-cap pump & dump schemes.").

450.    The above allegations are specifically included to contradict Kesner's statement to CNBC:  "When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up."[83]

451.    In its November 13, 2018 Form 10-Q, the Company announced that the SEC's investigation was still ongoing.  According to Jake Zamansky, of the securities law firm Zamansky LLC:  "Recent disclosure shows that a cloud still hangs over this company so long as the SEC investigation continues.   The fact that the division of enforcement remains involved and a registration statement was withdrawn are ominous events for Riot Blockchain."  According to the Company's annual report filed on April 2, 2019, the SEC's investigation remains "ongoing."

452.    Finally, the fact that the SEC filed a complaint against Defendants O'Rourke, Honig, Stetson, and Groussman, as well as other Riot insiders for similar alleged wrongdoing with multiple other companies further adds to the inference of scienter.  *See* Section V, above.  That "multiple defendants"," including Groussman, have already settled with the SEC – "and cumulatively paid more than $7.8 million in disgorgement of ill-gotten gains together with prejudgment interest thereon and civil penalties"[84] – further adds to the inference of scienter.

453.    These facts, in conjunction with the additional indicia of scienter detailed above, particularly Defendants' specific and repeated statements and the nature of the alleged scheme, collectively support a strong inference of Honig and each Individual Defendant's scienter.

## XIII.  LOSS CAUSATION/ECONOMIC LOSS

454.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Riot's common stock and operated as a fraud

---

[83]    *See*    https://www.cnbc.com/2018/02/16/public-company-changes-name-to-riot-blockchain-sees-shares-rocket.html.

[84]    *See* https://www.sec.gov/litigation/litreleases/2019/lr24431.htm.

or deceit on Class Period purchasers of the Company's common stock.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of Riot's common stock fell precipitously as the artificial inflation was removed.

455.    As a result of their purchases of Riot common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused the Company's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $46.20 per share on December 19, 2017, to close at $4.30 on September 7, 2018, after the last day of the Class Period.

A.      **January 31 – *The Wall Street Journal* – "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake"**

456.    On January 31, 2018, *The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."[85]  The article stated that "**Mr. Honig has sold about 500,000 shares, he said, but declined to divulge his profit.  He said he still owns about 1% of the company**."  "'When stock goes up, you take a profit,' [Honig] said."

457.    These revelations corrected Honig's and Riot's material misrepresentations and omissions regarding Honig's material changes in beneficial ownership of Riot's common stock – particularly his grossly deficient Schedule 13D/A filings that failed to disclose his massive stock sales throughout 2017.  *See* §§ IX.C.1 & X.A.1, *supra*.

458.    As a result of the revelation by *The Wall Street Journal* that Honig sold nearly 90% of his holdings in the Company, the Company's stock price fell from an opening price of $14.50

---

[85] Ianthe Jeanne Dugan, *Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake; Barry Honig pares back stake in Riot Blockchain, whose shares soared last year after a change of name*, The Wall Street Journal (Jan. 31, 2018).

per share on January 31, 2018, to close at $13.75 that same day, a decline of $0.75, or ***more than 5%***. The Company's stock continued to decline in the following day, February 1, 2018, related to the revelations in *The Wall Street Journal* article, falling an additional 10% that day.

459.   "Later that same day, at 5:28 p.m. (after the market closed) the Company issued a second press release, titled "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders." The press release announced that the 2017 Annual Meeting of Stockholders, which was scheduled for the following day, had again been cancelled and "was adjourned for a second time . . . ."

460.   Together, *The Wall Street Journal's* revelations of Honig's nearly total divestment of his holdings of Riot stock, Honig's role in the Company's affairs, and Riot's abrupt cancellation (for the second time) of its annual shareholder meeting (which had been scheduled for the very next day), Riot's stock price ***declined 14.26%*** ($1.98 per share) from a closing price of $14.28 per share on January 30, 2018, to close at $12.30 per share on February 1, 2018, damaging Lead Plaintiff and other members of the Class.

**B.     February 16, 2018 – "CNBC Investigates Red Flags Raised Over Riot Blockchain"**

461.   On February 16, 2017, CNBC published the article "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket" regarding questionable practices at Riot. The revelations in CNBC's article partially revealed the Honig Group's Class Period scheme to misrepresent and conceal their control over the Company, including through O'Rourke's connections with Honig as "the man behind the Riot Blockchain curtain." For example, CNBC discovered O'Rourke in Honig's office in Boca Raton on the day of the cancelled annual shareholder meeting; and shed further light on Honig's 13D violations and highlighted the suspicious circumstances surrounding the Kairos transaction.

462.     In response, shares of Riot fell $5.74 per share, or approximately *33.4%*, from closing at $17.20 on February 15, 2018, to closing at $11.46 per share on February 16, 2018, damaging Lead Plaintiff and Class members.  This decline in price corresponded with a more than 13-fold spike in trading volume, in which the daily shares traded increased from approximately 1.7 million shares traded on February 15, 2015, to approximately 12.2 million shares traded on February 16, 2018.

### C.     April 17-18, 2018 – Riot Files Form 10-K Revealing Related Party Transactions

463.     On April 17, 2018 after the market closed, Riot filed its 2017 annual report on Form 10-K, belatedly disclosing various related party transactions, as set forth herein, that took place in 2017.  These include the March 2017 Private Placement, Honig's consultancy role in the Coinsquare transaction, the Kairos Agreement, and the December 2017 Private Placement.  The following trading day, April 18, 2018, the Company's stock price fell $0.43 per share, or approximately *5.8%*, from the previous day's closing price, to close at $6.87 per share on April 18, 2018, damaging Class members.

### D.     May 29, 2018 – Riot Files a Form 8-K Revising Its Disclosures Concerning the Coinsquare Transaction

464.     After trading ended on May 25, 2018, Riot disclosed for the first time in an amended Form 8-K/A that several Honig Group members were – like Riot – parties to the Coinsquare transaction.  On this news, on the following trading day, May 29, 2018, Company's stock price fell from an opening share price $7.53 per share to $7.08 per share, a decline of nearly 6% and damaging Class members.

E.   **September 7, 2018 – SEC Files Suits Against Honig, O'Rourke, Groussman, Stetson, and Others**

465.   On September 7, 2018, the SEC filed the *Honig* Action against Defendants Honig, O'Rourke, Groussman, and Stetson, and several of their affiliates, finally revealing that, contrary to Defendants' misleading filings on Schedules 13D and 13G, and on Forms S-3 and 10-K, the Honig Group was not only a "group" as defined by Section 13(d), but in fact a a highly-orchestrated and closely-knit partnership among Honig, O'Rourke, Groussman, and Stetson, who together had been engaged in the same fraudulent *modus operandi* at Riot as at the previous companies at which they had operated the pump-and-dump schemes described by the SEC.

466.   On this news, the price of Riot's stock dropped $1.38 per share, or approximately **26.1%**, from the previous day's closing price, to close at $4.30 per share on September 7, 2018, damaging Class members.

467.   As shown above, the timing and magnitude of the price declines in Riot's common stock negate any inference that the losses suffered by Lead Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraud.

## XIV.   CLASS ACTION ALLEGATIONS

468.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those persons or entities who purchased or otherwise acquired the securities of Riot and/or Bioptix (NASDAQ:  RIOT, BIOP) during the Class Period (the "Class") and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

469.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class.  The Company reported that as of April 12, 2018, it had approximately 1,030 holders of record of its common stock.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

470.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

471.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

472.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether Defendants engaged in a fraudulent scheme;

(g)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(h)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

473.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XV.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTION

474.     Lead Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine as enunciated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

167

475.   With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   the Company's common stock traded in an efficient market;

(d)   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)   Lead Plaintiff and other members of the Class purchased common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

476.   At all relevant times, the market for Riot's common stock was efficient for the following reasons, among others:

(a)   the Company's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)   as a regulated issuer, Riot filed periodic public reports with the SEC and the NASDAQ;

(c)   Riot regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Riot was followed by stock analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

477.    As a result of the foregoing, the market for Riot's common stock promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of the common stock.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of such common stock at artificially inflated prices, and a presumption of reliance applies.

478.    In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims alleged are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Riot's business operations and financial performance – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.

479.    Moreover, when, as here, a defendant (Honig) has engaged in conduct that amounts to manipulation, that conduct creates and independent duty to disclose.  Participants in the securities markets are entitled to presume that all relevant actors are behaving legally and silence that conceals illegal activity is deemed intrinsically misleading.

480.    All that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XVI.   NO SAFE HARBOR

481.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

<div align="center">

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants**

</div>

482.   Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

483.   As early as 2016, and continuing throughout the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, did:  (i) deceive the investing public, including Lead Plaintiff and other members of the Class, as alleged herein; (ii) artificially inflate the price of the Company's common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Riot's common stock at artificially inflated prices.  The various elements of Defendants' devices, schemes, and artifices that operated as a fraud and deceit on Riot's public investors are laid out in detail in Section IX, *supra*, and summarized below.

484.   *First*, during the Class Period, Defendants Honig, Groussman, Stetson, and DeFrancesco (acting individually and/or through the investment entities they controlled, including GRQ 401K, ATG, Melechdavid, Stetson Capital, and Namaste, among others) and pursuant to explicit or tacit agreements with each other and the various Selling Stockholders and other affiliates to acquire, hold, vote, and/or dispose of shares they acquired in Riot in coordination with one another) knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by, among other things, directly or indirectly, with scienter obtaining and exercising undisclosed control of the management and policies of Riot and selling shares of Riot into the market at artificially high prices.  Defendants further violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by knowingly or recklessly making materially false and misleading filings under Section 13(d) – including on Schedules 13G, 13G/A, 13D, and 13D/A – that concealed both their control over Riot's management and policies, as well as their membership in a group with each other, pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  Defendants further violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by knowingly or recklessly by failing to make timely and appropriate Section 13(d) filings and amendments (e.g., on Schedule 13D/A) reflecting their acquisition or disposition of Riot stock (whether individuals or as a group) that facilitated their scheme to defraud investors about their group's control over the management and policies of, and the magnitude of the collective investment in, Riot.  Defendants further violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by engaging in manipulative trading in the securities of Riot while failing to make the necessary amendments to their Section 13(d) filings or disclosing their membership with each other in a "group" as defined by Section 13(d)(3).

485.   *Second*, during the Class Period, Defendants O'Rourke and Beeghley, as officers and/or directors of Riot, pursuant to explicit or tacit agreements with Defendants Honig, Groussman, Stetson, and DeFrancesco, knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by causing the Company to issue materially false and misleading public filings with the SEC – including on Forms S-3, S-3/A, and 10-K, and Schedule 14A – that materially misrepresented the Company's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K by misrepresenting and concealing the fact that many of Riot's largest shareholders – including Defendants Honig, Groussman, Stetson, and DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A were members of a group with each other (as defined by Section 13(d)(3)) pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  Defendants O'Rourke, Beeghley, and Riot also knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by issuing materially false and misleading Forms 8-k and 10-K that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendants Honig and DeFrancesco.

486.   Each and every Defendant is sued as a primary participant in the wrongful and illegal conduct charged herein.

487.   The scheme, plan, and course of conduct alleged herein was intended to, and did, drive sales of Riot's common stock, and with it, the Company's share price.

## COUNT II

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants**

488.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

489.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

490.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were materially misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.  Defendants violated § 10(b) of the Exchange Act and Rule 10b-5(b) thereunder in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

491.    _First_, during the Class Period, Defendants Honig, Groussman, Stetson, and DeFrancesco (acting individually and/or through the investment entities they controlled, including GRQ 401K, ATG, Melechdavid, Stetson Capital, and Namaste, among others) and pursuant to explicit or tacit agreements with each other and the various Selling Stockholders and other affiliates to acquire, hold, vote, and/or dispose of shares they acquired in Riot in coordination with one another) knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by, among other things, directly or indirectly, with scienter obtaining and exercising undisclosed control of the management and policies of Riot and selling shares of Riot into the market at artificially high prices.  Defendants further violated Exchange Act Section 10(b) and Rule 10b Rule 10b-5(b) thereunder by knowingly or recklessly making materially false and misleading filings under Section 13(d) – including on Schedules 13G, 13G/A, 13D, and 13D/A –

that concealed both their control over Riot's management and policies, as well as their membership in a group with each other, pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  Defendants further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly by failing to make timely and appropriate Section 13(d) filings and amendments (e.g., on Schedule 13D/A) reflecting their acquisition or disposition of Riot stock (whether individuals or as a group) that facilitated their scheme to defraud investors about their group's control over the management and policies of, and the magnitude of the collective investment in, Riot.  Defendants further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by engaging in manipulative trading in the securities of Riot while failing to make the necessary amendments to their Section 13(d) filings or disclosing their membership with each other in a "group" as defined by Section 13(d)(3).

492.  *Second*, during the Class Period, Defendants O'Rourke and Beeghley, as officers and/or directors of Riot, pursuant to explicit or tacit agreements with Defendants Honig, Groussman, Stetson, and DeFrancesco, knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by causing the Company to issue materially false and misleading public filings with the SEC – including on Forms S-3, S-3/A, and 10-K, and Schedule 14A – that materially misrepresented the Company's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K by misrepresenting and concealing the fact that many of Riot's largest shareholders – including Defendants Honig, Groussman, Stetson, and DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A were members of a group with each other (as defined by Section 13(d)(3)) pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  Defendants O'Rourke, Beeghley, and Riot also knowingly or recklessly violated Exchange Act Section 10(b) and Rule

174

Rule 10b-5(b) thereunder by issuing materially false and misleading Forms 8-k and 10-K that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendants Honig and DeFrancesco.

493.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

494.    Defendants O'Rourke and Beeghley, who were the senior officers and/or directors of the Company during the Class Period, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Lead Plaintiff and members of the Class.

495.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the falsity of the Company's and other

Defendants' statements, Lead Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and and other Defendants' materially false and misleading statements.

496.     Had Lead Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and and other Defendants' materially misleading statements and by the material adverse information which the Company's and Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

497.     As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

498.     By reason of the foregoing, the Company and the Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT III

### Violation of Section 20(a) of The Exchange Act
### Against All Defendants (Other than Riot)

499.     Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

500.     During the Class Period, Defendants O'Rourke and Beeghley participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Each of the foregoing individuals owed fiduciary duties to the Company and its shareholders.  Because of their positions and

interconnected relationships, they knew the adverse non-public information regarding the Company's business practices.

501.    As officers, directors and/or fiduciaries of a publicly owned company, these defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.  They also had an obligation to act, at all times, in the best interests of the Company and its shareholders and to refrain from self-dealing for the own benefit at the expense of Riot and the Class.

502.    Because of their positions of control and authority, Honig and the other Honig Group members named in this count were able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period.  Throughout the Class Period, these individuals named in this count exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein and, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

503.    By reason of the above conduct, all Defendants (other than Riot) are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

A.    Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Motley Rice LLC as class counsel pursuant to Rule 23(g);

783086.1

B.      Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.      Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E.      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  June 1, 2020                    Respectfully submitted,

**LITE DEPALMA GREENBERG, LLC**

*By: /s/ Joseph J. DePalma*
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Lead Plaintiff*
*Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com

178

783086.1

jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Lead Plaintiff Dr. Stanley Golovac
and Lead Counsel for the Class*


David P. Abel
**US. MARKET ADVISORS LAW GROUP PLLC**
5335 Wisconsin Ave. NW, Ste. 440
Washington, D.C.  20015
202-274-0237 Telephone
202-686-2877 Facsimile
dabel@usmarketlaw.com

*Counsel for Lead Plaintiff Dr. Stanley Golovac*

# Exhibit A

SANJAY WADHWA
SENIOR ASSOCIATE REGIONAL DIRECTOR
Michael Paley
Charu Chandrasekhar
Nancy Brown
Katherine Bromberg
Jon Daniels
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

SECURITIES AND EXCHANGE COMMISSION, :
:
Plaintiff, :
:
-- against -- :
:
BARRY C. HONIG, JOHN STETSON, :
MICHAEL BRAUSER, JOHN R. O'ROURKE III, :
MARK GROUSSMAN, PHILLIP FROST, :
ROBERT LADD, ELLIOT MAZA, BRIAN KELLER, :
JOHN H. FORD, ALPHA CAPITAL ANSTALT, ATG :
CAPITAL LLC, FROST GAMMA INVESTMENTS :
TRUST, GRQ CONSULTANTS, INC., :
HS CONTRARIAN INVESTMENTS, LLC, :
GRANDER HOLDINGS, INC., MELECHDAVID, :
INC., OPKO HEALTH, INC., :
SOUTHERN BIOTECH, INC., and :
STETSON CAPITAL INVESTMENTS INC., :
:
Defendants. :

------------------------------------------------------------ x

18 Civ. _____ (   )

ECF CASE

COMPLAINT
AND JURY DEMAND

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Barry C. Honig ("Honig"), John Stetson ("Stetson"), Michael Brauser ("Brauser"),

John R. O'Rourke III ("O'Rourke"), Mark Groussman ("Groussman"), Phillip Frost ("Frost"),

Robert Ladd ("Ladd"), Elliot Maza ("Maza"), Brian Keller ("Keller"), John H. Ford ("Ford"),

Alpha Capital Anstalt ("Alpha"), ATG Capital LLC ("ATG"), Frost Gamma Investments Trust

("FGIT"), GRQ Consultants, Inc. ("GRQ"), HS Contrarian Investments, LLC ("HSCI"), Grander

Holdings, Inc. ("Grander"), Melechdavid, Inc. ("Melechdavid"), OPKO Health, Inc. ("Opko"),

Southern Biotech, Inc. ("Southern Biotech"), and Stetson Capital Investments Inc. ("SCI")

(collectively, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.  This case involves three highly profitable "pump-and-dump" schemes

perpetrated by Honig, Stetson, Brauser, O'Rourke, Groussman, and Frost, and their entities

GRQ, SCI, Grander, HSCI, Melechdavid, ATG, Opko, FGIT, and Southern Biotech from 2013

through 2018 in the stock of three public companies (Company A, Company B, and Company C)

that, while enriching Defendants by millions of dollars, left retail investors holding virtually

worthless shares.

2.  Across all three schemes, Honig was the primary strategist, calling upon other

Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or

engage in promotional activity.  In each scheme, Honig orchestrated his and his associates'

acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell

and executing a reverse merger or by participating in financings on terms highly unfavorable to

the company.  In every scheme, Honig, and some combination of Stetson, Brauser, O'Rourke,

Groussman and Frost, either explicitly or tacitly agreed to buy, hold or sell their shares in

coordination with one another, knowing that a pump and dump was in the offing that would

allow them all to profit handsomely.  Once Honig and his associates had secured substantial

ownership of the issuer, they acted as an undisclosed control group, directing the issuer's

management for their benefit, including orchestrating transactions designed to create market

2

interest in the company or to solidify their control.

3.       To profit from their investment, in each scheme, Honig and his associates would arrange and pay for the promotion of the stock, directing their co-defendant Ford, or a similar promoter, to write favorable and materially misleading articles about the company whose stock price they wanted to inflate.  In several instances, to magnify the intended boost to volume and price that would follow a promotional article's release, Honig, Brauser, O'Rourke, Groussman, Melechdavid and ATG engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock, priming investor interest.

4.       In connection with the Company B and Company C schemes, Honig, Brauser, Stetson, O'Rourke, Frost and Groussman, as well as certain of their entities, also violated beneficial ownership reporting requirements of the federal securities laws by failing to disclose their group beneficial ownership of shares and the fact that as a group they were looking to exercise (and, in fact, did exercise) control over the issuers.

5.       Management of both Company A and Company B acted to further the schemes.  Defendants Maza (Company A's CEO), Keller (Company A's Chief Scientific Officer and a Director) and Ladd (Company B's CEO), acted separately at the direction of Honig and his confederates to take steps beneficial to that group at the expense of each company's public shareholders, and signed public filings they knew to be false to hide the group's beneficial ownership and existence.

6.       Maza and Keller signed Company A's public filings, in which they knowingly or recklessly omitted to disclose the share ownership as a group of Honig, Brauser, Frost, Stetson, and Groussman, or the size of each of their holdings.  Similarly, Company B's CEO, Ladd, also signed false public filings, making material misstatements in them about the

3

substantial group ownership of Company B shares held by Honig, Brauser, Stetson, O'Rourke, and Groussman.

7.      All told, the three schemes brought Defendants millions of dollars:  Company A's pump and dump generated for the Defendants more than $9.25 million in stock sales proceeds, and Company B's pump and dump generated more than $9.5 million.  And their most recent venture, the pump and dump scheme with respect to Company C, brought in over $8.3 million in stock sales proceeds.  In the wake of these schemes, public investors were left holding virtually worthless stock.

## **VIOLATIONS**

8.      By virtue of the conduct alleged herein, each of the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws as follows:

9.      Honig violated:

- Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Sections 9(a)(1) and (2) of the Securities Exchange Act of 1934 ("Exchange Act") [15.U.S.C. §§ 78i(a)(1) and (2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

10.      Stetson violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

11.     Brauser violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 9(a)(1) of the Exchange Act [15.U.S.C. § 78i(a)(1)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

12.     O'Rourke violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Sections 9(a)(1) and (2) of the Exchange Act [15.U.S.C. §§ 78i(a)(1) and (2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

13.     Groussman violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

14.     Frost violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

15.     Ladd violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] and by aiding and abetting Company B's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1 thereunder [17 C.F.R. § 240.13a-1].

16.    Maza violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

17.    Keller violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and

7

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], and by aiding and abetting Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

18.  Ford violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]; and

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

19.  Alpha violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

20.  ATG violated:

- Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)];

- Sections 9(a)(1) and (2) of the Exchange Act [15.U.S.C. §§ 78i(a)(1) and (2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

21.     GRQ violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

22.     HSCI violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

23.     Grander violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

24.     Melechdavid violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 9(a)(1) of the Exchange Act [15.U.S.C. § 78i(a)(1)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

25.    Opko violated:

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

26.    FGIT violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

10

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

27.    Southern Biotech violated:

- Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

28.    SCI violated:

- Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

29.    The Commission seeks final judgments permanently enjoining Defendants from violating the federal securities laws, requiring each Defendant to disgorge his or its ill-gotten gains and to pay prejudgment interest on those amounts; requiring Defendants to pay civil

monetary penalties; barring Defendants from participating in future penny stock offerings; barring Defendants Ladd, Maza, and Keller from serving as officers or directors of publicly traded companies; and seeking any other relief that the Court deems just and appropriate.

30.     Unless Defendants are permanently restrained and enjoined, they each will again engage in the acts, practices, and courses of business set forth in this Complaint, or in acts and transactions of similar type and object.

## JURISDICTION AND VENUE

31.     The Commission brings this action pursuant to the authority conferred by Sections 20(b) and (d) of the Securities Act [15 U.S.C. §§ 77t(b) and (d)], and Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

32.     This Court has jurisdiction over this action pursuant to Sections 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77v(a) and 77v(c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

33.     Venue lies in this district pursuant to Sections 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77v(a) and (c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York.  Among other things, at all relevant times, Company B's principal place of business was in Harrison, New York, within this District, and Defendants solicited investments in securities from investors in this District and sold securities through a broker-dealer located in this District.

## THE DEFENDANTS

### Individual Defendants

34.     **Honig**, born in 1971, is a resident of Boca Raton, Florida and currently works at an office in Boca Raton with Stetson and O'Rourke, and at times, Groussman. Honig owns GRQ, and co-owns, with Stetson, HSCI, and co-owns, with Brauser and Frost, Southern Biotech.

35.     **Stetson**, born in 1985, is a resident of Fort Lauderdale, Florida and currently works at an office there with Honig and O'Rourke, and at times, Groussman. Stetson owns SCI, and co-owns, with Honig, HSCI, of which he is the managing member.

36.     **O'Rourke,** born in 1985, is a resident of Fort Lauderdale, Florida and currently works at an office in Boca Raton with Honig and Stetson, and at times, Groussman. O'Rourke owns ATG.

37.     **Brauser**, born in 1956, is a resident of Lighthouse Point, Florida and currently works in an office in Miami in the same building as Frost. Brauser owns Grander.

38.     **Groussman**, born in 1973, is a resident of Miami Beach, Florida and occasionally works at an office in Boca Raton with Honig, Stetson and O'Rourke. Groussman owns Melechdavid.

39.     **Frost**, born in 1936, is a resident of Miami Beach, Florida. Frost founded Opko, and is its CEO. Frost is also the trustee for FGIT. Frost enjoys a reputation as a successful biotech investor.

40.     **Maza**, born in 1955, is a resident of New York, New York. He was the CEO of Company A from June 2011 to January 2014. He is a CPA licensed in New York, as well as an attorney licensed in New York.

41.     **Keller**, born in 1956, is a resident of California. He was Chief Scientific Officer of Company A from about March 2011 to January 2014, and was a member of its board

13

of directors. He currently works as President of Sales and Senior Vice President of Research and Development at Company A's successor company.

42. **Ladd**, born in 1959, is a resident of Raleigh, North Carolina. At all relevant times, he was a resident of New York, New York. He has been the CEO of Company B since February 10, 2011.

43. **Ford**, born in 1956, is a resident of Bolinas, California.

**Entity Defendants**

44. **Alpha** is a Lichtenstein corporation and hedge fund, managed by an unregistered investment adviser located in New York, New York.

45. **ATG** is a Florida corporation that O'Rourke owns and operates with its principal place of business in Florida. ATG was incorporated in or around 2012.

46. **FGIT** is a Florida trust that was formed in or around 2002. Frost is FGIT's Trustee.

47. **GRQ** is a Florida corporation that Honig owns and operates with its principal place of business in Florida. GRQ was incorporated in or around 2004.

48. **Grander** is a Florida corporation that Brauser owns and operates with its principal place of business in Florida. Grander was incorporated in or around 2010.

49. **HSCI** is a Delaware corporation that Honig and Stetson co-own and of which Stetson is the managing member, with its principal place of business in Florida. HSCI was established in or around 2011.

50. **Melechdavid** is a Florida corporation that Groussman owns and operates with its principal place of business in Florida. Melechdavid was incorporated in or around 2006.

51. **Opko** is a Delaware corporation. Its principal place of business is in Florida.

Frost is Opko's CEO. Opko was incorporated in or around 2007.

52.     **Southern Biotech** is a Nevada corporation that Honig operates and co-owns with Brauser and Frost with its principal place of business in Florida. Southern Biotech was incorporated in or around 2014.

53.     **SCI** is a Florida corporation that Stetson owns and operates with its principal place of business in Florida. SCI was incorporated in or around 2011.

## OTHER RELEVANT PERSONS AND ENTITIES

54.     **Company A** is a Delaware corporation headquartered in Georgia. Company A was controlled by Honig, Frost, and Brauser between March 2011 and December 2013. It was incorporated in Nevada in 2006. The company filed periodic reports, including Forms 10-K and 10-Q with the Commission. Company A's stock was quoted on OTC Link (formerly known as the "Pink Sheets"), an electronic interdealer quotation system operated by OTC Markets Group, Inc. In early 2014, Company A engaged in a reverse merger with a company associated with Honig and his associates. The successor company is currently quoted on OTC Link. At all relevant times, Company A's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)], and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

55.     **Company B** is a Delaware corporation headquartered in Harrison, New York. Its common stock is registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and it files periodic reports, including Forms 10-K and 10-Q with the Commission. Company B's common stock was listed on NYSE MKT from 2007 until its October 19, 2016 delisting. Its stock is currently quoted on OTC Link. At all relevant times, Company B's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

15

56.     **Company C** is a Delaware corporation headquartered in San Diego, California, and was incorporated in 1988. Company C's common stock is registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and its common stock is listed on NASDAQ. At all relevant times, Company C's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

## FACTS

### A. The Company A Scheme

#### 1.     *Honig, Frost and Brauser Obtain Control of Company A*

57.     In the Company A scheme, Honig and Brauser teamed up with Frost, a frequent collaborator in Honig and Brauser deals involving biotech issuers. As alleged below, the three men caused the company to issue shares to themselves and their associates through a series of so-called "private investments in public equities," or "PIPE" financings, drove the price of the stock higher by secretly paying for a misleading promotional campaign and by virtue of Honig's and Brauser's manipulative trading, and then unlawfully sold their Company A shares into the inflated market for proceeds of approximately $9,260,000.

58.     In November 2010, Honig, along with his nominees including Stetson and Groussman, purchased one-third of a publicly-traded shell company. In December 2010, Brauser and Frost each purchased one-half of the remaining two-thirds of the publicly-traded shell company. Each of Honig, Stetson, Groussman, Brauser, and Frost, disguised their role in the acquisition by purchasing the shares from an entity used to make the purchase of the shell company. Soon after they acquired the shell, Honig, Brauser, and Frost installed a Frost associate as the sole disclosed director of the company.

59.     In late 2010, Honig, Brauser, and Frost approached management of a private

16

biotech company ("Company A Labs"), including Keller, the Chief Scientific Officer and

Director, and Company A Labs then-CEO ("Company A Labs CEO") with a proposal for taking

the company public. Honig, Brauser, and Frost proposed a reverse merger, by which Company

A Labs, a privately-held California company then in the business of manufacturing over-the-

counter pharmaceutical products, would be merged into Honig's, Brauser's, and Frost's publicly-

traded shell. At the time, Company A Labs and Keller were working on developing a

formulation using a patented technology called "Qusomes" that Company A Labs hoped to use

in large-scale drug markets, and the management of Company A Labs saw the deal as creating

financing possibilities to fund the company's research.

60.     Indeed, Honig, Brauser, and Frost told Keller and Company A Labs CEO that

the public company deal would include raising $8 to $15 million dollars to support research and

development ("R&D") into Qusomes. And they further persuaded Company A Labs CEO to go

along with the merger by promising him 6,650,000 shares of the newly created public company.

61.     The proposed merger hit a snag, however, in March 2011. Pursuant to a $3

million credit line Company A Labs had with a San Francisco bank, the bank had authority to

approve all major transactions, and, in March 2011, it declined to approve the proposed merger.

The merger nonetheless closed in June 2011, and the bank thereafter sent a default notice. On

September 8, 2011, Maza, who had been installed as the CFO and director of Company A Labs

by Honig and Brauser, completed the payoff of the credit line thereby removing the obstacle to

the merger, but saddling Company A Labs with short-term, high-interest rate notes that included

a conversion option into equity of the company.

62.     In connection with the reverse merger, Honig, Brauser, and Frost arranged the

sale of certain unprofitable Frost assets to the public company in exchange for 8,345,310 shares

and the obligation of the company to file a registration statement for these shares, providing further value to Frost.

63.     After the closing of the reverse merger of Company A Labs into the shell company in June 2011, the surviving public company became Company A. Honig, Brauser, Frost, Groussman, and Stetson controlled the vast majority of the Company A's stock and were affiliates of Company A.

64.     After the merger, Company A listed its corporate address at 4400 Biscayne Boulevard in Miami, the same business address then shared by Honig, Brauser and Frost.

65.     In addition to controlling the vast majority of Company A's outstanding shares, Honig, Brauser, and Frost exercised control over the management of Company A. Before the deal closed, Honig and Brauser, acting with the knowledge and consent of Frost, Stetson and Groussman, had installed their associate, Maza, as the CFO and a director of Company A Labs. After the merger, Maza became the CEO of Company A. Thereafter, Maza sought approval from Honig and Brauser for every business decision. For example, at the direction of Honig and Brauser, Maza agreed to divert funds from Company A to pay rent for the office of an unrelated entity co-owned by Honig and Brauser.

66.     In their capacity as the three board members of Company A, Keller, Maza, and the Frost associate concealed Honig's and Brauser's control of Company A by signing off on public filings that failed to disclose the involvement of Honig, Brauser, Stetson and Groussman, omissions that made those filings materially misleading. These filings included Company A's Form 10-K filed on April 16, 2012.

67.     At the time they signed these filings, Keller and Maza understood that Honig and Brauser, with Frost's knowledge and consent, controlled Company A's management, and not

Maza. As Keller explained in a February 12, 2012 email to a Company A colleague, "[t]he real power is with Barry Honig and Mike Brauser. Elliot [Maza] is just a mouth piece." Following the merger, Company A's filings nonetheless identified only Frost, but not Honig or Brauser, as a control person.

68.     Honig, Brauser, and Frost failed to keep their promises to invest money in Company A for R&D. Instead, in a series of PIPE financings, which included warrants for additional shares, done between February 24 and March 12, 2012, they limited their investment to keep the business operating at a minimal level and to fund Maza's and Keller's generous compensation, forcing Company A to abandon its R&D efforts entirely by mid-2012. Keller's compensation more than doubled once he began working with Honig and Honig's associates, whereas Maza's annual compensation ranged from $300,000 to $600,000.

69.     Honig, Brauser, and Frost also used the financings to amass more, ever-cheaper Company A shares, and although the financings did nothing to enhance Company A's continued growth, Maza and Keller went along with them because both were promised, and ultimately awarded, substantial salaries as well as millions of Company A shares, by Company A's real control persons, which included Honig, Brauser, Frost, Stetson and Groussman.

70.     By April 1, 2013, and pursuant to an agreement to acquire, hold or sell their shares in concert, Honig, Frost, Brauser, Maza, Keller, and the Frost associate had amassed 44,818,312 shares, or almost 71% of the Company A shares outstanding, with Honig alone holding 5,542,654 shares, or 8.8% of the company's outstanding shares. Yet, even though Company A filed an amendment to its Form 10-K annual report for the 2012 fiscal year on September 13, 2013, signed by Maza, Keller, and the third board member, for the specific purpose of updating the beneficial ownership table, the annual report failed to disclose the

existence of the Honig-allied group, which beneficially owned nearly three-quarters of Company A's outstanding shares.

71.     On July 16, 2012, Company A Labs CEO – who had been ousted from Company A by Honig and Brauser with Keller's assistance – sued Company A, Honig, Brauser, Maza, and Frost. Brauser, who was not an officer or director of Company A, took the lead in negotiating a settlement on behalf of Company A, frequently updating Honig and Frost on his negotiations. In September 2013, Brauser and Honig came to terms with Company A Labs CEO, agreeing to pay him $2 million in return for his relinquishing his claim to the Company A shares he had been promised in the merger, and that he had never received. Maza then ratified the settlement terms on September 5, 2013.

### 2.     *The Company A Pump and Dump*

72.     In preparation for the Company A pump and dump, during August and September, 2013, Stetson, at Honig's direction, deposited in a brokerage account almost 4 million Company A shares that had been issued to Honig. Stetson worked closely with Honig, Brauser, and Frost and knew how much Company A stock they controlled, and that Honig and Brauser were directing Company A's management and policies. In connection with the deposit of these shares, Stetson submitted Honig's signed answers to the broker's questionnaire, falsely denying any relationship between Honig and Company A or its affiliates. At the time that Stetson made that submission, and Honig signed it, each knew, or was reckless in not knowing, that Honig was an affiliate of Company A because Company A was under Honig's control.

73.     On September 4, 2013, Stetson facilitated the issuance of false attorney opinion letters to Company A's transfer agent in order to remove restrictive legends from Honig's share certificates. These opinion letters contained the material misrepresentation that Honig was not

20

an affiliate of Company A, a representation that Stetson knew, or was reckless in not knowing, was false, given what he knew about Honig's control over Company A's management and polices.

74.　　As part of the process for depositing Honig's shares with a broker, and in preparation for the pump and dump, CEO Maza was also required to issue a letter to confirm the authenticity of the stock certificates. In a letter to the broker-dealer, dated September 10, 2013, Maza wrote "[w]e further acknowledge and agree that there is no other agreement or understanding between Barry Honig and [Company A] that would preclude Barry Honig from selling or otherwise disposing of shares represented above." Maza knew, or was reckless in not knowing, that this statement was false because Honig was an affiliate of Company A, and that, as an affiliate, Honig's ability to sell his Company A shares would be subject, under the federal securities laws, to volume limitations.

75.　　Once the restrictions were lifted from Honig's shares and the shares were deposited into a brokerage account, Honig was ready to sell them. In September 2013, Honig directed his associate, O'Rourke, to reach out to Ford, a seasoned stock promoter who used his platform on the *Seeking Alpha* website to share his purportedly independent investment analysis of selected companies. O'Rourke contacted Ford and proposed that Ford write an article on the *Seeking Alpha* website promoting Company A in exchange for below-market price Company A shares. At that time, Honig, Frost, Brauser, Stetson, Groussman, O'Rourke, Keller, Maza, and the Frost associate board member owned about 71% of the outstanding Company A shares, and the market for Company A was virtually nonexistent (with zero volume on September 20, 2013). O'Rourke instructed Ford to write a favorable article about Company A emphasizing Frost's involvement (because Frost was known as a billionaire and successful biotech investor) and the

supposed rosy prospects of Company A's R&D.

76.     On September 23, 2013, Honig and some associates began trading Company A shares to create the appearance of market activity and interest in Company A in advance of the planned Ford article. That day, the trading volume of Company A shares soared to 302,000 from zero volume the previous day.

77.     The September 23rd trading also gave Honig a way to surreptitiously pay Ford for his upcoming favorable article on Company A. O'Rourke called Ford and told him to put in buy orders for Company A stock at $0.40 in order to ensure his order was executed against the corresponding sell order placed by Honig. Honig then sold 180,000 Company A shares to Ford at $0.40 in a coordinated trade, a price well below the price at which these shares otherwise traded during that day.

78.     O'Rourke joined the trading at the end of the trading day on September 23rd to "mark the close," *i.e.,* to ensure that the last price of the day would be higher, giving the false impression that Company A's share price was on an upward trajectory. Specifically, at 3:58 pm that day, O'Rourke, through his entity ATG, placed a bid to buy Company A shares at $0.68, a significantly higher price than the prior buy order at $0.55, which had been entered at about 3:06 pm. Another Honig associate, who had purchased shares from Honig earlier in the day, placed a corresponding sell order to complete the transaction at the inflated price.

79.     In further preparation for the publication of the Ford article touting Company A, and to enhance the false picture of an active market for the stock, near the end of the trading day on September 26th, Honig and his associates engaged in a series of coordinated trades. For example, the Barry & Renee Honig Charitable Foundation, controlled by Honig, sold Company A shares to a Honig associate at $0.68, and two minutes later Groussman's entity Melechdavid

22

executed a transaction against ATG, O'Rourke's entity, at $0.68.

80.     Less than half an hour before market close on September 26, 2013, as directed by O'Rourke and Honig, and after review by Keller, Ford published a materially misleading promotional article on *Seeking Alpha*, titled "Opko and Its Billionaire CEO Invested in Company A." Ford presented a bullish outlook for Company A and concluded that "Company A should be trading for more than twice today's valuation." In the article, which included a question and answer interview of Keller, Ford quoted Keller touting the benefits of Company A's Qusomes technology. Keller misleadingly stated that Company A had a formulation ready for testing to be brought to the billion-dollar injectable drug market. Yet, as Keller knew, as of summer 2012, all R&D efforts had been shut down without the successful formulation of an injectable drug and Company A had ceased all efforts to develop this technology in mid-2012.

81.     Ford's article failed to disclose that he had been compensated by Honig for writing the article, through Honig's sale to him of below-market Company A shares on September 23, a material omission. Instead, Ford included a disclaimer that merely disclosed "I am long [Company A]. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article." (Emphasis added.)

82.     The market reacted strongly to the Company A promotion: the trading volume of Company A stock rose from approximately 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013 and to more than 6 million shares on October 2, 2013. The share price increased from an average of about $0.48 during August 2013 to an intraday price of $0.97 on October 17, 2013.

83.     Between the start of the promotion following the publication of Ford's article

on September 26, 2013 and December 31, 2013, Honig and his associates sold shares into the

inflated market for proceeds of approximately $9,260,000:

| Company A Pump and Dump Proceeds | | | |
|---|---|---|---|
| Defendants | Trade Dates (2013) | Net Quantity Sold | Proceeds |
| **Honig** | 9/23 – 12/16 | (5,892,689) | $3,416,455.17 |
| **Brauser** and **Grander** | 9/27 – 12/23 | (2,128,316) | $1,137,775.46 |
| **Frost** | 10/1 – 10/4 | (1,987,991) | $1,085,321.74 |
| **Groussman** and **Melechdavid** | 9/26 – 10/14 | (1,229,166) | $677,272.37 |
| **Stetson** and **SCI** | 9/27 – 12/18 | (500,000) | $279,859.68 |
| **O'Rourke** and **ATG** | 9/23 – 12/27 | (250,000) | $148,443.68 |
| **Alpha Capital** | 10/3 – 11/27 | (3,772,200) | $2,513,724.08 |
| **Total** | | **(15,760,362)** | **$9,258,852.18** |

84.     No registration statement was then in effect for any of Honig's, Brauser's,

Frost's or Groussman's sales in the September through December 2013 period.  No exemption

from registration was available to any of them, or their entities.  Moreover, since Company A did

not trade on a national securities exchange, as affiliates of Company A, these Defendants could

only lawfully sell 1% of the company's total shares outstanding in any three-month period.  As

of September 2013, Company A had approximately 63 million shares outstanding, and as of

November 15, 2013, it had approximately 75 million shares outstanding.  Because Honig,

Brauser, Frost, and Groussman, and their respective entities, were under common control with

Company A, each was an affiliate of Company A, and each sold shares in excess of the

applicable volume limitations.

> ### 3.     *Alpha's Company A Sales*

85.     Alpha frequently co-invested with Honig, and participated in several rounds of

the Company A PIPE financings, resulting in Company A's issuance of millions of shares to

Alpha at steeply discounted prices in January 2012, April 2013 and September 2013.

86.     On September 5, 2013, when Honig and Brauser reached their settlement with

Company A's CEO, by which he disavowed his ownership of the 6,650,000 shares to which he had been entitled, Alpha purchased 1.5 million of those shares at $0.15 per share, with the intention of selling the shares into the inflated market created by the Honig-orchestrated promotion. Company A issued the shares to Alpha on September 23, 2013, days before the Ford article appeared on *Seeking Alpha*. On October 29, 2013, Alpha obtained an attorney opinion letter that it supplied to Company A's transfer agent so that the transfer agent would remove the restrictive legend from the share certificate. The attorney opinion letter – as Alpha knew or was reckless in not knowing – falsely represented that Alpha had held the shares for at least 6 months and that the shares could be sold in accordance with the Securities Act Rule 144 safe harbor, as exempt from the registration provisions.

87.    Between October 3, 2013 and November 18, 2013, Alpha, in lockstep with Honig, Brauser, Frost, Groussman, O'Rourke, and Stetson (and their respective entities), sold 3.7 million Company A shares for proceeds of $2,513,724, including virtually all of the shares Alpha had obtained in September 2013.

### B. The Company B Scheme

#### 1. *Honig and Associates Secretly Obtain Company B Shares*

88.    During 2015 and 2016, Honig and his associates used Company B, a publicly traded shell, as another vehicle for a pump-and-dump scheme. Honig and his partners used many of the same tactics they had employed in the Company A scheme: they bought cheap shares, intending to exercise control over the management and polices of the company; exercised that control; orchestrated a misleading promotion of the company that drove up the stock price and the trading volume of the company's shares; and dumped their shares for a profit in the inflated market. Despite their control over various actions taken by Company B, and their agreement to buy, hold and/or sell their shares in concert, Honig and his associates – this time

including Groussman, Brauser, Stetson and O'Rourke – took numerous steps to conceal their involvement, and to perpetuate the false appearance that the company was actually being controlled by its CEO.

89.     In 2015, Honig and his associates began planning the pump-and-dump of Company B's shares. Honig set the scheme in motion on September 26, 2015 when he informed Stetson that "[w]e need to put together a term sheet for Company B," and outlined proposed terms of the arrangement. Honig directed Stetson to send the proposal to Ladd, Company B's CEO. The deal contemplated the issuance of 2.8 million Company B shares, along with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker. This deal structure allowed the investors repeatedly to convert and sell their shares while appearing individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings. By ostensibly staying below the 5% ownership threshold, and evading the public reporting requirements, Honig and his associates increased the likelihood that they could disguise their scheme to pump up the price of Company B's shares in anticipation of a profitable sell-off to unsuspecting investors.

90.     Ladd was fully aware of Honig and his associates' combined interest in, and control over, the company, but failed to disclose it in Company B's public filings. On October 1, 2015, Ladd emailed Honig that "NYSE MKT wants to know the buyers. $175,000 x 4 investors will be each at 4.9%. . . ." Honig replied that same day, copying Brauser and Stetson, that he would "get back to you with names shortly for now use Barry Honig Mike Brauser OBAN [an LLC created by Stetson]." On October 5, 2015, Stetson provided Company B with the investors who would participate in the financing, which included GRQ (Honig), Melechdavid (Groussman), Grander (Brauser), ATG (O'Rourke) and SCI (Stetson).

91.     The Honig-led financing ultimately provided $700,000 to Company B (the "October 2015 Company B Financing").  On October 8, 2015, Company B filed a Form 8-K disclosing that the company had "entered into separate subscription agreements . . . with accredited investors . . . relating to the issuance and sale of $700,000 of units . . ."  In keeping with Honig's desire to conceal the large ownership stake of his team, Ladd did not disclose the investors' names in the Form 8-K.

### 2.     *The Company B Pump and Dump in February 2016*

92.     Having coordinated the accumulation of stock with Groussman, Brauser, Stetson and O'Rourke, Honig, with his partners' knowledge and consent, then secretly paid for a promotion that included materially misleading information and was supported by his own manipulative trading activity.

93.     On or around January 21, 2016, by which time Honig, Groussman, Brauser, Stetson and O'Rourke had acquired at least 16.3% of Company B's outstanding stock, Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of Company B.  Shortly after the payment for the stock promotion, on February 3, 2016, an article was published online touting Company B's positive prospects in social and real money gaming sites and intellectual property relating to slot machines. The article did not disclose that the author had been paid by Company B – at Honig's direction – to write the article. After the article was published on February 3, 2016, there was a 7000% increase from the previous day's trading volume, and an intraday price increase of over 60%.  Honig, Ladd, Stetson, and O'Rourke sold over 430,000 shares into this inflated market for proceeds of approximately $198,800.

27

| Company B Pump and Dump Proceeds, Following February 2016 Promotion | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2016)** | **Net Quantity Sold** | **Proceeds** |
| **Honig** and **GRQ** | 2/3 – 4/6 | (231,050) | $123,154.87 |
| **Stetson** | 2/3 – 2/11 | (40,000) | $20,483.33 |
| **O'Rourke** and **ATG** | 2/3 – 2/9 | (64,366) | $15,960.72 |
| **Ladd** | 2/3 – 5/3 | (96,072) | $39,204.12 |
| **Total** | | **(431,488)** | **$198,803.04** |

### 3. *The Company B Pump and Dump in May 2016*

94.     Honig soon identified a potential acquisition target for Company B that would give Honig and his associates another way to profit from their interest in Company B. The proposed deal involved a well-known cybersecurity innovator who had created a popular antivirus software bearing his name ("the Cybersecurity Innovator"). O'Rourke took the lead at Honig's direction (and with the knowledge and consent of Groussman, Brauser and Stetson) in arranging a deal between Company B and the Cybersecurity Innovator. On March 29, 2016, O'Rourke sent the Cybersecurity Innovator a term sheet for the asset purchase of Cybersecurity Innovator's company, "CI Company," by an "NYSE listed company." The CI Company indicated interest on April 3, 2016. O'Rourke wrote to Honig on April 3, 2016 and asked Honig if he would "still want to pursue [Cybersecurity Innovator] deal." After Honig replied to O'Rourke that same day "Yea!", O'Rourke introduced Ladd to the Cybersecurity Innovator on April 4, 2016, to begin negotiating a transaction between Company B and the Cybersecurity Innovator's various business interests.

95.     Subsequent correspondence between Ladd and O'Rourke and between O'Rourke and Honig, reflect the ongoing and significant role Honig and O'Rourke played in orchestrating the deal. Company B and the Cybersecurity Innovator agreed to terms on May 8, 2016.

96.     On May 9, 2016, at 8:30 a.m., Company B issued a press release announcing

its merger with CI Company. In the release, Ladd misleadingly described the Cybersecurity Innovator's prior financial success. He falsely claimed that the Cybersecurity Innovator had "sold his anti-virus company to Intel for $7.6 billion," suggesting that Company B might achieve similar success. Yet, as Ladd knew or was reckless in not knowing, the sale of the Cybersecurity Innovator's namesake company to Intel at that price had occurred over a decade after the Cybersecurity Innovator's departure from that company.

97.     Knowing that Ladd's misleading announcement of the deal would be released later that morning, on May 9, 2016, Honig traded in Company B stock to create the misleading appearance of market liquidity. In pre-market trading that morning, Honig bought and sold small quantities of Company B stock dozens of times. Joining the effort to paint a false picture of legitimate market interest in the stock, Brauser, as well as Groussman, and his entity, Melechdavid, engaged in coordinated trades in Company B stock with Honig in pre-market trading that morning.

98.     That same day, StockBeast.com, a well-known internet stock promotion website, published an article by an unnamed author entitled "[Company B] Beastmode engaged – [Cybersecurity Innovator] driving the Bus." The StockBeast.com article touted Company B and highlighted the Cybersecurity Innovator's involvement, repeating Ladd's materially false claim that the Cybersecurity Innovator had "sold his startup company to Intel for $7.6BB," and proclaiming: "This is big big big!"

99.     This promotion and Honig's, Brauser's and Groussman's manipulative trading on May 9 were effective in driving up both volume and price: on May 6, 2016 (the last day of trading prior to the promotion), Company B had trading volume of 71,005 shares and a closing price of $0.36. On May 9, 2016, the stock closed at $0.49 (representing an increase of 34

29

percent over the prior day's close) with trading volume of more than 10 million shares. The trading volume for Company B stock peaked at 109,384,614 on May 17, 2016 with a closing price of $4.15.

100.     In the days immediately following the announcement of the CI Company acquisition, Honig, Brauser, Stetson, Groussman and O'Rourke, pursuant to their agreement to buy, hold and/or sell their shares in concert, sold over 9.3 million Company B shares, resulting in total proceeds of over $9.4 million:

| Company B Pump and Dump Proceeds, Following May 2016 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2016) | Net Quantity Sold | Proceeds |
| **Honig** and **GRQ** | 5/9 – 5/20 | (3,783,001) | $2,393,915.52 |
| **Brauser** and **Grander** | 5/9 – 5/18 | (2,137,668) | $3,839,295.64 |
| **Groussman** and Melechdavid | 5/9 – 5/11 | (1,415,870) | $999,873.56 |
| **Stetson** and **SCI** | 5/9 – 5/12 | (750,000) | $660,798.20 |
| **O'Rourke** and **ATG** | 5/9 – 5/16 | (750,000) | $990,661.97 |
| **Ladd** | 5/9 – 5/31 | (471,000) | $516,554.08 |
| **Total** | | **(9,307,539)** | **$9,401,098.97** |

### 4.     *False Statements by Honig, Frost, Brauser, Stetson, Groussman, O'Rourke, and Ladd in Beneficial Ownership and Company B Filings*

101.     Although they were acting in concert, and pursuant to an agreement to do so, Honig, Frost, Brauser, Stetson, Groussman and O'Rourke knowingly or recklessly concealed their concerted efforts from the investing public. Ladd, with full knowledge of both the Honig group's ownership and their direction of the management and policies of Company B, also kept their control a secret, signing Company B public filings that did not disclose the full extent of their ownership or control. After the October 2015 Company B Financing closed, Honig, Groussman, Brauser, Stetson and O'Rourke as a group collectively owned at least 2.6 million shares, or over 16% of the shares outstanding after the issuance, and their obligation to file a Schedule 13D under Exchange Act Section 13(d) arose as of October 8, 2015. Moreover, they

each had warrants to obtain a total of an additional 4.6 million Company B shares, which, if they were all converted, would have resulted in Honig, Groussman, Brauser, Stetson and O'Rourke controlling at least 42% of the total common shares outstanding at that time.

102.    Honig, Groussman, Brauser, Stetson and O'Rourke exercised control over Ladd and the management and policies of Company B. For example, on October 1, 2015, Ladd asked for and received Honig's direction with respect to how to disclose Honig's group's stock acquisitions to the NYSE MKT exchange. O'Rourke, at Honig's direction, negotiated on Company B's behalf the terms on which the Cybersecurity Innovator would sell CI Company to Company B. Indeed, in emails after the CI Company acquisition, Honig freely accepted credit for his role in the transaction. On May 12, 2016, for example, Honig received an email from an investment firm congratulating him on the recent transaction: "You're invovlved [sic] with [Company B]? Impressive!" Honig responded that he was the "[l]argest shareholder, fund and relationship with [the Cybersecurity Innovator]." In early August 2016, Honig also admitted his undisclosed role at Company B in a chat conversation with Stetson: "its great in [Company B] because we are behind the scenes."

103.    Because they acted in concert for the purpose of acquiring, holding and disposing of Company B shares, each of Honig, Groussman, Brauser, Stetson and O'Rourke was a member of a group and considered a single "person" under Exchange Act Section 13(d)(3). As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of the group and disclosing the number of shares each of them beneficially owned. However, none of Honig, Groussman, Brauser, Stetson or O'Rourke ever made a Schedule 13D filing disclosing their respective ownership or membership in a group, acting intentionally to conceal from the market the size of

their group's position and their coordination and thereby to deceive investors.

104.     Instead, on October 19, 2015, Honig filed a Schedule 13G, claiming only his own 6.59% beneficial ownership and falsely stating that the securities "are not held for the purpose of or with the effect of changing or influencing the control of the issuer" – a representation he knew, or was reckless in not knowing, to be false.  Indeed, because Honig and his associates exercised control over Company B's management and policies – as Honig candidly acknowledged in emails – he was disqualified from making a 13G filing.  In February 2016, Honig filed an amended Schedule 13G disclosing an ownership percentage of 9.1%.  Brauser filed a Schedule 13G on May 4, 2016, in which he claimed 7.4 % beneficial ownership via his entity Grander.  In each of these filings, Honig and Brauser also falsely claimed that they were passive investors without any intention to influence or change control of the company and omitted the fact that each was a member of a group.

105.     Similarly, in Company B's 2015 Form 10-K filed on April 11, 2016, only Honig was disclosed as a beneficial owner, holding 8.6%.  Notwithstanding that Ladd knew that Honig, Groussman, Brauser, Stetson and O'Rourke were working together, he signed the 2015 Form 10-K failing to disclose their group beneficial ownership.  Ladd also signed a materially misleading S-1/A registration statement filed on January 13, 2016 for the 8,400,000 Company B shares issued in the October 2015 Company B Financing, failing to disclose the group beneficial ownership of GRQ, Grander, Melechdavid, ATG and SCI.

### C. The Company C Scheme

#### 1.     *Honig and Stetson Obtain Control of Company C*

106.     In early 2014, Honig identified a publicly-traded shell company that was unencumbered by debt or pre-existing convertible debt, and sought an appropriate private company for purposes of a reverse merger and pump-and-dump scheme.

32

107.     At or about the same time, the CEO of Company C ("Company C's CEO") was introduced to "Entity H," a frequent co-investor alongside Honig and Brauser. At the time, Company C, a private company developing cancer therapies and diagnostic products, was looking for funding for its research and development efforts, and Entity H suggested to Company C's CEO that he turn Company C into a public company. On July 8, 2014, Company C executed a reverse merger of Company C into the shell company Honig had identified. Company C's CEO understood that the two lead investors in the transaction were Entity H and HSCI, both of which had signed the deal documents. Stetson had described HSCI to Company C's CEO as his own investment vehicle. In fact, while Stetson was the sole managing member of HSCI, Honig actually owned at least 94% of HSCI, a fact that Stetson did not disclose to Company C's CEO or the market.

108.     In an initial $3 million capital raise in February 2014, in connection with the contemplated merger, HSCI invested $1 million and Entity H invested $1.7 million in return for a substantial position in the shell. As a result, the stake of Entity H and HSCI (including conversion of all warrants) amounted to about 67% of the authorized shares of the newly public Company C. The terms of the merger included granting a "Consent Right" to Entity H and its affiliates, by which Entity H could block or approve many kinds of Company C transactions, including issuing additional shares, any change of control and other basic corporate actions.

109.     In March and April 2015, Honig orchestrated two private placement financings for Company C: Series D and Series E. Honig determined the amount, source and structure of, and participants in, these financings. For example, when deciding whether a potential investor could take part in the March 2015 financing round, Company C's CEO explicitly deferred to Honig, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might

want to allow to invest along with the current group. Viewed this as your choice not mine. That is why I asked him to call you."

110.     The Series D financing closed in late March 2015 and included a buyout of Entity H's notes, including the Consent Right, at a favorable purchase price. The investors who purchased the notes included various entities owned and controlled by Honig, Stetson, O'Rourke, Brauser, Frost, and Groussman: HSCI, Southern Biotech, GRQ, ATG, Grander, and Melechdavid.

111.     The Series E financing, which closed April 6, 2015, included warrants, and raised $12 million for Company C on terms highly favorable to Honig and his chosen investors, including Southern Biotech, and Frost's FGIT and Opko.

### 2.     *The Company C Pump and Dump in April 2015*

112.     One of the goals of the private placement financings, as Honig, Stetson, O'Rourke, Brauser, Frost, and Groussman knew, was to generate market interest in Company C stock in preparation for a planned stock promotion. On April 3, 2015, O'Rourke, acting at Honig's direction, drafted a press release (with input from Company C's CEO, Honig and Brauser) announcing the $12 million private placement in which Frost's entities had participated. Honig then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym "Wall Street Advisors" on *Seeking Alpha* on April 8, 2015 at 11:13 a.m. The article, titled "Opko Spots Another Overlooked Opportunity in Company C Therapeutics," highlighted Opko's and Frost's investment in Company C. Despite his involvement in facilitating the Company C financing and his extensive business relationships with Honig, Stetson, Brauser, and Frost, in his article, O'Rourke knowingly and falsely claimed that "[t]he author has no business relationship with [Company C]." He also knowingly and falsely claimed

that he was "not receiving compensation for [writing the article]."

113.     Anticipating the release of O'Rourke's *Seeking Alpha* article, ATG,

Melechdavid, and O'Rourke engaged in early trading of Company C shares on April 8, 2015

with the intention of creating a false appearance of market interest in the stock.  That trading

included at least one matched trade, with Melechdavid submitting the buy order and ATG

submitting the sell order for the same price at 9:38 a.m.  The share price of Company C opened

that day at $3.14 and reached $3.73 in the minutes before the promotion was released.

114.     The promotion was successful. The trading volume of Company C shares rose

almost 7500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, following

the announcement of the Series E private placement.  The volume increased to 858,709 on April

9, 2015, the day after O'Rourke's article was published.  Company C's share price went from a

closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015.  The

Defendants listed below, acting pursuant to their agreement to buy, hold or sell their Company C

shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of

over $5.5 million, as detailed below:

| Company C Pump and Dump Proceeds, Following April 2015 Promotion | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2015)** | **Net Quantity Sold** | **Proceeds** |
| **Brauser** | 4/13 – 6/30 | (576,400) | $1,600,826.76 |
| **Groussman** and **Melechdavid** | 4/6 – 6/23 | (99,616) | $342,984.59 |
| **Stetson** and **HSCI** | 4/6 – 6/30 | (1,080,379) | $3,607,248.91 |
| **O'Rourke** and **ATG** | 4/8 – 6/30 | (30,064) | $69,744.51 |
| **Total** | | **(1,786,459)** | **$5,620,804.77** |

### 3.     *The Company C Pump and Dump in June/July 2015*

115.     In June 2015, when the market for Company C shares had cooled, O'Rourke

recruited Ford to publish another Company C tout on Ford's blog.  On July 1, 2015, Ford

published an article titled "[Company C]: Near-Term Catalysts Could Push Shares from $2 to

over $5." The article contained materially false statements, including that a licensing deal was imminent, when it was not, and that there were near-term therapy development events that could take the share price to $5, when in fact clinical trials were in early stages. Although, as before, Honig compensated Ford for writing the blog post, Ford did not disclose that he had been paid.

116.     Ford's article had the desired impact on the market: Company C trading volume increased from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015. Likewise Company C's share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015. Pursuant to their agreement to buy, hold or dispose of their shares in concert, the Defendants listed below sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million, as detailed below.

| Company C Pump and Dump Proceeds, Following June 2015 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2015) | Net Quantity Sold | Proceeds |
| **Brauser** | 7/1 – 10/7 | (363,050) | $749,025.45 |
| **Groussman** and **Melechdavid** | 7/15 – 12/18 | (212,034) | $243,250.96 |
| **Stetson** and **HSCI** | 7/1 – 12/7 | (682,539) | $1,525,588.49 |
| **O'Rourke** and **ATG** | 7/1 – 12/31 | (179,690) | $235,253.20 |
| **Total** | | **(1,437,313)** | **$2,753,118.10** |

117.     Honig and Stetson continued to invest in Company C and directed critical business choices for Company C. For example, on more than one occasion, Honig or Stetson directed Company C's CEO to name Honig's choice to Company C's board. On January 15, 2015, Honig and Stetson decided that Company C needed to employ different attorneys and shortly thereafter directed Company C's CEO which counsel to retain in connection with Company C's corporate filings. And on August 15, 2016, at Honig's and Stetson's direction, as a condition to HSCI providing additional financing to Company C, HSCI and Company C's CEO executed a letter agreement requiring Company C to hire the public relations firm that Honig and Stetson had selected.

### 4. False Beneficial Ownership Reports by Honig and Associates

118.     Given the agreement among Honig, Brauser, Groussman, Frost, Stetson, and O'Rourke to buy, hold and/or dispose of their Company C shares in concert; the group's direction of Company C management and policies; and their combined share ownership, all of the members of the group were required to make Schedule 13D filings that they did not make. They did not make the appropriate filings so that the investing public would not discover their control over Company C, and to obscure from investors their planned pump-and-dump scheme.

119.     Stetson and HSCI were obligated to make a Schedule 13D filing as of July 2014, after Company C became public and they acquired beneficial ownership of more than 5% of Company C shares.  Similarly, as of the closing of the private placement financings in April 2015, Groussman (Melechdavid) and O'Rourke (ATG) were each obligated to make a Schedule 13D filing, disclosing their own respective holdings and that each was a member of the group because they were acting with one another and with Stetson, Honig, and Frost for the purpose of acquiring, holding or disposing of Company C shares, and collectively owned greater than 5% of Company C's outstanding shares.

120.     Even though Frost and FGIT acquired the Company C shares with an intention to control management, Frost and FGIT made a Schedule 13G filing on April 10, 2015 incorrectly indicating that they were passive investors.  Moreover, the Schedule 13G stated that Frost and FGIT had a 6.86% ownership percentage, and did not disclose they were working with Honig, Stetson, O'Rourke, Brauser, and Groussman, and that they, with the other members of their group, sought to direct and control management.  Nor did Frost file a Schedule 13D for Opko or Southern Biotech, in which those companies should have disclosed both their own holdings and that they, too, were each a member of the group.  Instead, Frost improperly made

four Schedule 13G/A filings on April 10, 2015, February 8, 2016, February 3, 2017, and January 18, 2018, ignoring the fact that he was ineligible to file a Schedule 13G because he was not a passive investor.

121.    Other Defendants who invested in Company C also improperly made Schedule 13G filings, notwithstanding that these Defendants were not passive investors, and also failed to disclose their membership in the group, in violation of an express disclosure requirement.  For example, Honig filed a Schedule 13G on February 17, 2017 disclosing only his 6.22% ownership through GRQ; Stetson filed a Schedule 13G on September 19, 2017, disclosing only his 5.64% ownership through HSCI, Brauser filed a Schedule 13G on February 2, 2017, disclosing only his 5.44% ownership through Grander.  Each of these Defendants should have made Schedule 13D filings because they were not passive investors, and each should have disclosed the existence of a group.  Additionally, a Schedule 13D filed by Stetson on February 12, 2018, a Schedule 13D filed by Honig on February 13, 2018, and a Schedule 13D/A filed by Honig on February 16, 2018 also failed to disclose the existence of a group.

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza)**

122.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

123.    By engaging in the acts and conduct described in this Complaint, Defendants Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company

C securities, have: (a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not

misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would

operate as a fraud or deceit upon any person.

  124.  By reason of the foregoing, Honig, Stetson, Brauser, O'Rourke, GRQ,

Grander, HSCI, and Maza, directly or indirectly, singly or in concert, violated Section 10(b) of

the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

<p align="center"><strong><u>SECOND CLAIM FOR RELIEF</u></strong><br>
<strong>Violations of Section 17(a)(1)-(3) of the Securities Act</strong><br>
<strong>(Against Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza)</strong></p>

  125.  The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

  126.  By engaging in the acts and conduct described in this Complaint, Defendants

Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza, directly or indirectly,

singly or in concert, by use of the means or instruments of transportation or communication in

interstate commerce, in the offer or sale of Company A, Company B, and/or Company C

securities, have: (a) with scienter, employed devices, schemes, and artifices to defraud; (b)

knowingly, recklessly or negligently obtained money or property by means of any untrue

statements of a material fact or omitted to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading;

or (c) knowingly, recklessly or negligently engaged in transactions, practices, or courses of

business which operated or would operate as a fraud or deceit upon purchasers of securities of

Company A, Company B, and/or Company C.

127.     By reason of the foregoing, Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza, directly or indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined, will continue to violate Sections 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)-(3)].

## THIRD CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against Frost, FGIT, Ford, Ladd, and Keller)

128.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

129.     By engaging in the acts and conduct described in this Complaint, Defendants Frost, FGIT, Ford, Ladd, and Keller, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130.     By reason of the foregoing, Frost, FGIT, Ford, Ladd, and Keller, directly or indirectly, singly or in concert, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## FOURTH CLAIM FOR RELIEF
### Violations of Section 17(a)(2) of the Securities Act
### (Against Frost, FGIT, Ford, Ladd, and Keller)

131.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

132.     By engaging in the acts and conduct described in this Complaint, Defendants

Frost, FGIT, Ford, Ladd, and Keller, knowingly, recklessly or negligently, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, in the offer or sale of Company A, Company B, and/or Company C securities, have obtained money or property by means of any untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

133.     By reason of the foregoing, Frost, FGIT, Ford, Ladd, and Keller, directly or indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

### FIFTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Against ATG, Southern Biotech, and SCI)

134.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

135.     By engaging in the acts and conduct described in this Complaint, Defendants ATG, Southern Biotech, and SCI, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have: (a) employed devices, schemes, or artifices to defraud; or (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

136.     By reason of the foregoing, ATG, Southern Biotech, and SCI, directly or indirectly, singly or in concert, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## SIXTH CLAIM FOR RELIEF
### Violations of Sections 17(a)(1) and (3) of the Securities Act
### (Against ATG, Southern Biotech, and SCI)

137.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

138.    By engaging in the acts and conduct described in this Complaint, Defendants ATG, Southern Biotech, and SCI directly or indirectly,  singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce,  in the offer or sale of Company A, Company B, and/or Company C securities, have (a) with scienter, employed devices, schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Company A, Company B, and/or Company C.

139.    By reason of the foregoing, ATG, Southern Biotech, and SCI, directly or indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined, will continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section
### 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder
### (Against Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller)

140.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

141.    By engaging in the acts and conduct described in this Complaint, Defendants Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller directly or indirectly, singly or in concert, provided knowing and substantial assistance to Honig, Stetson, Brauser, and O'Rourke, who, directly or indirectly, singly or in concert with others, in connection with the

purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to (a) employ devices, schemes, or artifices to defraud; and (b) engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

142.     By reason of the foregoing, Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller, aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## EIGHTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Sections 17(a)(1) and (3) of the Securities Act
### (Against Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller)

143.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

144.     By engaging in the acts and conduct described in this Complaint, Defendants Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller directly or indirectly, singly or in concert, provided knowing and substantial assistance to Honig, Stetson, Brauser, and O'Rourke, who, directly or indirectly, singly or in concert with others, in the offer or sale of a security,  used the means or instruments of transportation or communication in interstate commerce or used the mails to (a) with scienter employed devices schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Company A, Company B, and/or Company C.

145.     By reason of the foregoing, Frost, Groussman, FGIT, Melechdavid, Opko,

Ladd, and Keller, aided and abetted, and unless restrained and enjoined, will continue aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

## NINTH CLAIM FOR RELIEF
### Violations of Section 9(a)(1) of the Exchange Act
### (Against Honig, Brauser, O'Rourke, Groussman, ATG, and Melechdavid)

146.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

147.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, Brauser, O'Rourke, Groussman, ATG, and Melechdavid, directly or indirectly, singly or in concert , by use of the mails or the means or instrumentalities of interstate commerce, or of a facility of a national securities exchange for the purpose of creating a false or misleading appearance of active trading in Company A, Company B and/or Company C securities, or a false or misleading appearance with respect to the market for Company A, Company B and/or Company C securities, entered an order or orders for the purchase and/or sale of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time and substantially the same price, for the sale and/or purchase of such security, had been or would be entered by or for the same or different parties.

148.     By virtue of the foregoing, Honig, Stetson, Brauser, O'Rourke, Groussman, ATG, and Melechdavid violated, and unless restrained and enjoined, will continue violating Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)].

## TENTH CLAIM FOR RELIEF
### Violations of Section 9(a)(2) of the Exchange Act
### (Against Honig, O'Rourke, and ATG)

149.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

150.     By engaging in the acts and conduct described in this Complaint, Defendants

Honig, O'Rourke, and ATG, directly or indirectly, singly or in concert , by use of the mails or

the means or instrumentalities of interstate commerce, or of a facility of a national securities

exchange effected, alone or with one or more other persons, a series of transactions in the

securities of Company A and/or Company B creating actual or apparent active trading in such

security, or raising or depressing the price of such security, for the purpose of inducing the

purchase or sale of such security by others.

151.     By virtue of the foregoing, Honig, O'Rourke, and ATG violated, and unless

restrained and enjoined, will continue violating Section 9(a)(2) of the Exchange Act [15 U.S.C. §

78i(a)(2)].

## ELEVENTH CLAIM FOR RELIEF
### Sale of Unregistered Securities in Violation of Sections 5(a) and (c) of the Securities Act
### (Against Honig, Brauser, Groussman, Frost, Grander, Melechdavid, and Alpha)

152.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

153.     By engaging in the acts and conduct described in this Complaint, Defendants

Honig, Brauser, Groussman, Frost, Grander, Melechdavid, and Alpha, directly or indirectly,

singly or in concert, made use of the means or instruments of transportation or communication in

interstate commerce or of the mails to offer or sell securities through the use or medium of a

prospectus or otherwise, or carried or caused to be carried through the mails or in interstate

commerce, by means or instruments of transportation, securities for the purpose of sale or for

delivery after sale, when no registration statement had been filed or was in effect as to such

securities, and when no exemption from registration was applicable. The shares of Company A

that Honig, Brauser, Groussman, Frost, Grander, Melechdavid, and Alpha offered and sold as

alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

154.     By reason of the foregoing, Honig, Brauser, Groussman, Frost, Grander,

Melechdavid, and Alpha have violated and unless restrained and enjoined will continue to violate

Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)].

<div align="center">

**TWELTH CLAIM FOR RELIEF**
**Violations of Section 13(d) of the Exchange Act and Rule 13d-1(a) Thereunder**
**(Against Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ,**
**Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI)**

</div>

155.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

156.     Pursuant to Exchange Act Section 13(d)(1) and Rule 13d-1(a) thereunder,

persons who directly or indirectly acquire beneficial ownership of more than 5% of a Section 12-

registered class of equity securities are required to file a Schedule 13D, or, in limited

circumstances, a Schedule 13G. Section 13(d)(3) plainly states that "act[ing] as a … group" in

furtherance of acquiring, holding, or disposing of equity securities is enough to establish the

group as a single "person." When a group is required to make a Schedule 13D filing, that group

must "identify all members of the group."

157.     Defendants Honig, Stetson, Brauser, O'Rourke, Groussman, ATG, GRQ,

Grander, Melechdavid, and SCI acquired and held beneficial ownership of more than 5% shares

in Company B from on or about October 8, 2015 to at least on or about May 20, 2016.

158.     Honig, Stetson, and HSCI acquired and held beneficial ownership of more than

<div align="center">46</div>

5% shares in Company C from on or about February 2014.

159.     Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI acquired and held beneficial ownership of more than 5% shares in Company C from on or about April 2015 to at least on or about December 2015.

160.     Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI were sufficiently interrelated that they constituted a group for the purposes of Exchange Act Section 13(d).

161.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI were each under an obligation to file with the Commission true and accurate reports with respect to their ownership of the Company B and Company C securities, and failed to do so.

162.     By reason of the foregoing, Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI violated, and unless enjoined and restrained will continue to violate, Section 13(d)(1) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

### THIRTEENTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 Thereunder**
**(Against Ladd)**

163.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

164.     By engaging in the acts and conduct described in this Complaint, Company B violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R. §

240.12b-20] and 13a-1 [17 C.F.R. § 240.13a-1(a)] thereunder, which require issuers of registered

securities under the Exchange Act to file annual reports on Form 10-K with the Commission that,

among other things, do not contain untrue statements of material fact or omit to state material

information necessary in order to make the required statements, in the light of the circumstances

under which they are made, not misleading.

165.    By engaging in the acts and conduct described in this Complaint, Defendant

Ladd provided knowing and substantial assistance to Company B's filing of a materially false

and misleading annual report on Form 10-K.

166.    By reason of the foregoing, Ladd aided and abetted, and unless restrained and

enjoined, will continue aiding and abetting, Company B's violations of Section 13(a) of the

Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1(a)

thereunder [17 C.F.R. § 240.13a-1(a)], in violation of Section 20(e) of the Exchange Act [15

U.S.C. § 78t(e)].

### FOURTEENTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 15(d) of the Exchange Act and
Rule 15d-1 Thereunder
(Against Maza and Keller)**

167.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

168.    By engaging in the acts and conduct described in this Complaint, Company A

violated Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17

C.F.R. § 240.15d-1], which require issuers of registered securities under the Securities Act to file

annual reports on Form 10-K with the Commission that, among other things, do not contain

untrue statements of material fact or omit to state material information necessary in order to

make the required statements, in the light of the circumstances under which they are made, not

misleading.

169.     By engaging in the acts and conduct described in this Complaint, Defendants

Maza and Keller provided knowing and substantial assistance to Company A's filing of a

materially false and misleading annual report on Form 10-K.

170.     By reason of the foregoing, Maza and Keller aided and abetted, and unless

restrained and enjoined, will continue aiding and abetting, Company A's violations of Section

15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17 C.F.R. §

240.15d-1], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

<div align="center">

**FIFTEENTH CLAIM FOR RELIEF**
**Violations of Section 17(b) of the Securities Act**
**(Against Ford)**

</div>

171.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

172.     By engaging in the acts and conduct described in this Complaint, Defendant

Ford directly or indirectly, singly or in concert,  by use of the means or instruments of

transportation or communication in interstate commerce, or by the use of the mails, in the offer

or sale of Company A, and/or Company C securities, has published, given publicity to, or

circulated any notice, circular, advertisement, newspaper, article, letter, investment service, or

communication which, though not purporting to offer a security for sale, described such security

for a consideration received or to be received, directly or indirectly, from an issuer, underwriter,

or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration

and the amount thereof.

173.     By reason of the foregoing, Ford, directly or indirectly, has violated, is

violating, and unless restrained and enjoined, will continue to violate Section 17(b) of the

Securities Act [15 U.S.C. § 77q(b)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following

relief, in a Final Judgment:

### I.

Finding that Defendants violated the federal securities laws and rules promulgated

thereunder as alleged against them herein;

### II.

Permanently restraining and enjoining Honig, Brauser, Frost, Groussman, Grander,

Melechdavid, and Alpha, their agents, servants, employees and attorneys and all persons in

active concert or participation with them who receive actual notice of the injunction by personal

service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a) and

(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

### III.

Permanently restraining and enjoining Honig, Stetson, Brauser, O'Rourke, Frost,

Groussman, Ladd, Maza, Keller, Ford, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko,

Southern Biotech, and SCI, their agents, servants, employees and attorneys and all persons in

active concert or participation with them who receive actual notice of the injunction by personal

service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)];

## IV.

Permanently restraining and enjoining Ford, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)];

## V.

Permanently restraining and enjoining Honig, Brauser, O'Rourke, Groussman, ATG, and Melechdavid, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

## VI.

Permanently restraining and enjoining Honig, Stetson, Brauser, O'Rourke, Frost, Groussman, Ladd, Maza, Keller, Ford, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## VII.

Permanently restraining and enjoining Honig, Stetson, Brauser, O'Rourke, Frost, Groussman, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or

51

otherwise, and each of them, from future violations of Section 13(d) of the Exchange Act [15

U.S.C. § 78m(d)] and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)];

## VIII.

Permanently restraining and enjoining Ladd, his respective agents, servants, employees

and attorneys and all persons in active concert or participation with them, who receive actual

notice of the injunction by personal service or otherwise, and each of them, from future

violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17

C.F.R. § 240.12b-20] and 13a-1 thereunder [17 C.F.R. § 240.13a-1];

## IX.

Permanently restraining and enjoining Maza and Keller, their respective agents, servants,

employees and attorneys and all persons in active concert or participation with them, who

receive actual notice of the injunction by personal service or otherwise, and each of them, from

aiding and abetting future violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]

and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1];

## X.

Permanently barring Ladd, Maza and Keller from acting as an officer or director of a

public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## XI.

Permanently prohibiting all Defendants from participating in any offering of penny stock

pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the

Exchange Act [15 U.S.C. § 78u(d)(6)].

### XII.

Ordering Defendants to disgorge all of the ill-gotten gains from the violations alleged in this complaint, and ordering them to pay prejudgment interest thereon;

### XIII.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

### XIV.

Granting such other and further relief as this Court deems just and proper.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury as to all issues so triable.

Dated:  September 7, 2018
       New York, New York

By: _Sanjay Wadhwa_
           Sanjay Wadhwa
           Michael Paley
           Charu Chandrasekhar
           Nancy Brown
           Katherine Bromberg
           Jon Daniels
           Attorneys for Plaintiff
           SECURITIES AND EXCHANGE COMMISSION
           New York Regional Office
           200 Vesey Street, Suite 400
           New York, New York 10281-1022
           (212) 336-1023 (Brown)
           Email: BrownN@sec.gov

# Exhibit B

SANJAY WADHWA
SENIOR ASSOCIATE REGIONAL DIRECTOR
Michael Paley
Charu Chandrasekhar
Nancy Brown
Jack Kaufman
Katherine Bromberg
Jon Daniels
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | 18 Civ. 8175 (ER) |
| – against – | : | |
| | : | ECF CASE |
| BARRY C. HONIG, ROBERT LADD, | : | |
| ELLIOT MAZA, BRIAN KELLER, | : | |
| JOHN H. FORD, GRQ CONSULTANTS, INC. | : | SECOND AMENDED |
| and HS CONTRARIAN INVESTMENTS, LLC, | : | COMPLAINT |
| | : | AND JURY DEMAND |
| Defendants. | : | |

------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Second Amended

Complaint against Defendants Barry C. Honig ("Honig"), Robert Ladd ("Ladd"), Elliot Maza

("Maza"), Brian Keller ("Keller"), John H. Ford ("Ford"), GRQ Consultants, Inc. ("GRQ"), and

HS Contrarian Investments, LLC ("HSCI") (collectively, "Defendants"),[1] alleges as follows:

---

[1]     Since the filing of the First Amended Complaint (DE 105), Defendants Michael Brauser ("Brauser"), Grander Holdings, Inc. ("Grander"), John R. O'Rourke ("O'Rourke"), ATG Capital LLC ("ATG"), John Stetson ("Stetson"), and Stetson Capital Investments Inc. ("SCI") have each consented to the entry of final judgments against them in this case. (DE 224-229.)  As such, they

## SUMMARY OF ALLEGATIONS

1. This case involves a series of highly profitable "pump-and-dump" schemes involving the stock of three public companies, "Company A," "Company B" and "Company C." At the center of all three schemes were Defendants (and former Defendants)[2] Honig, Brauser, Stetson and O'Rourke, as well as some combination of their entities, Defendants GRQ and HSCI and former Defendants, Grander, SCI and ATG. In all three schemes, these Defendants amassed a controlling interest in the issuer, concealed their control, drove up the price and trading volume of the stock through manipulative trading and/or paid promotional activity, and then dumped their shares into the artificially inflated market on unsuspecting retail investors.

2. Across all three schemes, Honig was the primary strategist, calling upon other Defendants to, among other things, acquire or sell stock, arrange for the issuance of shares, negotiate transactions, and/or engage in promotional activity. In each scheme, Honig and some combination of Brauser, Stetson and O'Rourke (and often other individuals), either explicitly or tacitly agreed to acquire, hold, vote and/or dispose of their shares in coordination with one another. Once Honig and his associates had secured substantial ownership of the issuer, they acted as an undisclosed control group. Honig and/or other members of the particular investor group, with the knowledge and consent of the other group members, directed the issuer's management for their benefit, including orchestrating transactions designed to create market

---

are no longer Defendants in this action. Defendants Honig (DE 152), GRQ (DE 151), Keller (DE 113), Maza (DE 110), Ford (DE 28), and HSCI (DE 230) have each consented to entry of partial judgments imposing certain injunctive relief against them, and leaving their respective liability for monetary relief for further resolution. The Commission, while including them as named parties in this action, states no new charges against any of these Defendants in this Second Amended Complaint.

[2] Unless otherwise expressly noted, the terms "Defendants" and "Defendant" in this Second Amended Complaint refers to both current and former Defendants in this case.

interest in the company or to solidify their control.

3.    Honig and his associates needed to create liquidity so they could sell their stock and profit from their investments in Company A, Company B and Company C.  To accomplish this goal, in each scheme, Honig and his associates would arrange and pay for the promotion of the relevant stock by directing Ford or a similar promoter to write favorable and materially misleading articles about the company whose trading volume and stock price they wanted to inflate.  In several instances, to magnify the intended boost to the trading volume and stock price that would follow a promotional article's release, Honig, O'Rourke and ATG and their associates engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock.

4.    Honig and his associates had to conceal their plan to promote and dump stock for each scheme to work.  They accomplished this concealment by, among other things, evading their reporting obligations under the federal securities laws and ensuring that the executives of Company A, Company B and Company C did not accurately report Defendants' collective control.

5.    Specifically, Honig, Brauser, Stetson and O'Rourke, as well as certain of their entities and other associates, violated provisions of the federal securities laws that require individuals and groups who hold more than a five percent ownership interest in a publicly traded company to notify the Commission and inform the investing public by filing a form that accurately reflects their ownership interest and that of all members of any group in which they are a member.  Honig, Brauser, Stetson, O'Rourke, their entities and certain of their associates failed to make their required disclosures while acting as a group in the acquisition, holding, voting and/or disposition of their shares in Company B and Company C.  They also failed

appropriately to disclose their intention to exercise (and their actual exercise of) control over Company B and Company C.

6.  Defendants Maza (Company A's CEO), Keller (Company A's Chief Scientific Officer and a director) and Ladd (Company B's CEO), acted separately at the direction of Honig and his confederates to take steps beneficial to the respective Honig-led group at the expense of each company's public shareholders, and signed public filings they knew, or were reckless in not knowing, to be false, to hide the respective group's beneficial ownership and existence.

7.  Maza and Keller signed Company A's public filings, in which they knowingly or recklessly failed to disclose that Honig, Brauser, Stetson, their affiliates, and/or their respective entities, owned shares of Company A as a group.  Company A's filings similarly failed to disclose the size of each member of the Honig group's holdings and thereby concealed the extent of their control over the company from other shareholders and the public.  Similarly, Company B's CEO, Ladd, signed false public filings, making material omissions about Honig's, Brauser's, Stetson's, O'Rourke's, their associates' and their respective entities' group ownership.

8.  All told, the three schemes earned Defendants and their associates millions of dollars:  Company A's pump and dump generated approximately $9.3 million in stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities, and affiliates.  Company B's pump and dump generated more than $9.5 million for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities, affiliates, and/or certain frequent co-investors.  And, most recently, the pump and dump of Company C brought in over $8.3 million in stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities and/or certain frequent co-investors.  These profits were made at the expense of investors who purchased shares in Company A, Company B and Company C at artificially high prices based on

misleading flattering articles or coverage in the media and matched trades that were orchestrated by the Defendants.

     9.    In addition to his other violations alleged herein, Defendant Ladd (i) in May 2016, violated the stock sale registration requirements of the federal securities laws by engaging in unregistered sales of Company B stock – for which no registration exemption existed – in accounts held both in his own name and in the names of two immediate family members, "Relative A" and "Relative B" (collectively, the "Relatives"); (ii) in 2015 and 2016, as CEO of Company B, repeatedly violated the stock purchase and sales reporting requirements of the federal securities laws – and anti-fraud provisions – by failing to file with the Commission required public reports and fully and accurately disclosing his purchases and sales of Company B stock in his own account, and by filing false SEC Forms 144 regarding stock sales in his and his Relatives' accounts; and (iii) from 2012 to 2016, repeatedly violated the beneficial ownership reporting requirements of the federal securities laws by failing to file with the Commission required public reports regarding material changes in his beneficial ownership of Company B stock.

## **VIOLATIONS**

     10.    By virtue of the conduct alleged herein, each of the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws as follows:

     11.    Honig violated:

- Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Sections 9(a)(1) and (a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") [15.U.S.C. §§ 78i(a)(1) and (a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

12.    Brauser violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

13.    Stetson violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

14.    O'Rourke violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

15. Ladd violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] and by aiding and abetting Company B's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1 thereunder [17 C.F.R. § 240.13a-1];

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 13(d) of the Exchange Act, [15 U.S.C. § 78m(d)], and Rule 13d-2 thereunder [17 C.F.R. § 240.13d-2]; and

- Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)], and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3].

16. Maza violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

17. Keller violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], and by aiding and abetting Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

18. Ford violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]; and

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

19. ATG violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

20.  GRQ violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

21.  HSCI violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

22.  Grander violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

23.    SCI violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

24.    The Commission seeks final judgments permanently enjoining Defendant Ladd from violating the federal securities laws; requiring each of Defendants Ladd, Honig, GRQ, Keller, Maza, Ford, and HSCI to disgorge his or its ill-gotten gains and to pay prejudgment interest on those amounts; requiring Defendants Ladd, Honig, GRQ, Keller, Maza, Ford, and HSCI to pay civil monetary penalties; barring Defendants Ladd and Maza from participating in future penny stock offerings; barring Defendants Ladd and Maza from serving as officers or directors of publicly traded companies; and seeking any other relief that the Court deems just and appropriate.

25.    Unless Defendants Ladd and Maza are permanently restrained and enjoined as requested herein, they each will again engage in the acts, practices, and courses of business set forth in this Complaint, or in acts and transactions of similar type and object.

## <u>JURISDICTION AND VENUE</u>

26.    The Commission brings this action pursuant to the authority conferred by Sections 20(b) and (d) of the Securities Act [15 U.S.C. §§ 77t(b) and (d)], and Sections 21(d) and

(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

27.     This Court has jurisdiction over this action pursuant to Sections 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77v(a) and 77v(c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

28.     Venue lies in this district pursuant to Sections 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77v(a) and (c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York.  Among other things, at all relevant times, Company B's principal place of business was in Harrison, New York, within this District, and certain Defendants solicited investments in securities from investors in this District and sold securities through a broker-dealer located in this District.

## THE DEFENDANTS

### Individual Defendants

29.     **Honig**, born in 1971, is a resident of Boca Raton, Florida and, at all relevant times, worked at an office in Boca Raton with Stetson and O'Rourke.  Honig owns GRQ.  Honig also owns a majority stake in HSCI, as to which Stetson is the named managing member.  Honig was also the president and one-third owner of Southern Biotech, Inc. ("Southern Biotech"), a now-dissolved Nevada entity.

30.     **Maza**, born in 1955, is a resident of New York, New York.  He was the CEO of Company A from June 2011 to January 2014.  He is a CPA licensed in New York, as well as an attorney licensed in New York.

31.     **Keller**, born in 1956, is a resident of California.  He was Chief Scientific Officer

of Company A from about March 2011 to January 2014, and was a member of its board of directors. He currently works as President of Sales and Senior Vice President of Research and Development at Company A's successor company.

32. **Ladd**, born in 1958, is a resident of Raleigh, North Carolina. At all relevant times, he was a resident of Chappaqua, New York. According to Company B Commission filings, Ladd is currently the CEO and a director of Company B, and he has served as its CEO since February 10, 2011 (except for the following time periods: November 2016 through August 2017; and September 10, 2018 through April 30, 2019).

33. **Ford**, born in 1956, is a resident of Bolinas, California.

### Entity Defendants

34. **GRQ** is a Florida corporation owned and operated by Defendant Honig and for which Honig makes investment decisions. Its principal place of business is in Florida. GRQ was incorporated in or around 2004.

35. **HSCI** is a Delaware corporation incorporated in 2011. Its principal place of business is in Florida.

### Previously Charged but Fully Settled Individual and Entity Defendants

36. **Brauser**, born in 1956, is a resident of Lighthouse Point, Florida. He owns Grander, and owned one third of Southern Biotech.

37. **Stetson**, born in 1985, is a resident of Fort Lauderdale, Florida and, at all relevant times, worked at an office in Boca Raton with Honig and O'Rourke. Stetson owns SCI, and has a minority investment in HSCI, of which he is the named managing member.

38. **O'Rourke**, born in 1985, is a resident of Fort Lauderdale, Florida and, at all relevant times, worked at an office in Boca Raton with Honig and Stetson. O'Rourke owns ATG.

39.     **ATG** is a Florida corporation owned and operated by Defendant O'Rourke and for which O'Rourke makes investment decisions.  Its principal place of business is in Florida.  ATG was incorporated in or around 2012.

40.     **Grander** is a Florida corporation owned and operated by Defendant Brauser and for which Brauser makes investment decisions.  Its principal place of business is in Florida.  Grander was incorporated in or around 2010.

41.     **SCI** is a Florida corporation owned and operated by Defendant Stetson and for which Stetson makes investment decisions.  Its principal place of business is in Florida.  SCI was incorporated in or around 2011.

## OTHER RELEVANT PERSONS AND ENTITIES

42.     **Company A** is a Delaware corporation headquartered in Georgia.  It was incorporated in Nevada in 2006.  Company A was controlled by Honig and Brauser between March 2011 and early 2014.  The company filed periodic reports, including Forms 10-K and 10-Q with the Commission.  Company A's stock was quoted on OTC Link (formerly known as the "Pink Sheets"), an electronic interdealer quotation system operated by OTC Markets Group, Inc.  In early 2014, Company A engaged in a reverse merger with a company associated with Honig and his associates.  The successor company is currently quoted on OTC Link.  At all relevant times, Company A's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)], and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

43.     **Company B** is a Delaware corporation headquartered in Durham, North Carolina, formerly headquartered in Harrison, New York, and was incorporated in 2000.  At all relevant times, its common stock was registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and it is now registered under Exchange Act Section 12(g) [15 U.S.C. § 78l(g)].  It files periodic reports, including Forms 10-K and 10-Q with the Commission.

13

Company B's common stock was listed on NYSE-MKT from 2007 until its October 19, 2016 delisting. Its stock is currently quoted on OTC Link.

44. **Company C** is a Delaware corporation headquartered in San Diego, California, and was incorporated in 1988. At all relevant times, Company C's common stock was registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and it was listed on NASDAQ from August 2016 until July 11, 2018, when it was suspended and later delisted. Company C's common stock is currently quoted on OTC Link. At relevant times, Company C's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

45. **Investor 1** was a frequent co-investor with Honig and other Defendants. He is a large shareholder, CEO and Chairman of a public company (referred to herein as **"Investor 1 Company"**), trustee and indirect beneficiary of a trust (referred to herein as **"Investor 1 Trust"**) and president of a limited liability company (referred to herein as **"Investor 1 Group"**), and he sometimes used Southern Biotech to co-invest with Honig and Brauser. He enjoys a reputation as a successful biopharmaceutical investor and has a substantial following among retail investors.

46. **Affiliate 1** occasionally works at Honig's office in Boca Raton. Affiliate 1 was a frequent co-investor with Honig, Brauser, Stetson and O'Rourke, investing in at least 36 issuers alongside Honig (and/or a Honig entity) from 2011 through August 2018, either individually, or through his entity, "**Affiliate 1 Entity**." Affiliate 1 invested in each of Company A, Company B and Company C alongside Honig, Brauser, Stetson and O'Rourke.

47. **Affiliate 2** is a foreign corporation and hedge fund that invested alongside Honig in many issuers since 2011. Affiliate 2 invested in Company A alongside Honig, Brauser,

14

Stetson and O'Rourke.

48.     **Southern Biotech** was a Nevada corporation that Stetson incorporated at Honig's

direction in 2014.  It was dissolved in 2017.  Honig was listed as the sole officer and president.

Southern Biotech was co-owned by Honig, Brauser, and Investor 1.  It made investments in

multiple public companies, often in addition to investments each co-owner made separately.  At

Honig's direction, with Brauser's knowledge and approval, and Stetson's help in executing the

investment, Southern Biotech made investments in Company C.

## BACKGROUND

49.     "Pump-and-dump" schemes typically have two parts.  In the first, the fraudsters

acquire a large amount of stock at little or no cost whereupon a promotion scheme is

implemented to boost the price of the stock or create trading volume by stimulating market

interest with false or misleading statements about the company.  Once the stock price and trading

volume have been pumped up, fraudsters move on to the second part, in which they dump their

large holdings of the stock into the public market at an enormous profit for themselves.  After

these fraudsters dump their shares and stop hyping the stock, the price typically falls, trading

volume dries up, and investors lose their money.  Critical to the success of such a scheme is

disguising the fact that the fraudsters beneficially own and control a large amount of the

unrestricted stock which, if known to investors and market participants, would inform investors

that control persons of the company were dumping their stock.

50.     The federal securities laws are designed to ensure transparency by requiring that

investors be provided with timely, accurate information about companies and persons who own

large amounts of company stock and thus are in a control relationship with the company.  The

Securities Act and the Exchange Act have several provisions designed to ensure that companies,

their officers, and large shareholders provide the marketplace with adequate information about their holdings and their purchases and sales of their companies' stock. For example, when a person or group of persons acquires beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of the Exchange Act, such person (colloquially known as a Section 13(d) filer) or group is required to make a filing under Exchange Act Section 13(d) with the Commission. When a group of persons agrees to act together to acquire, sell, vote or hold more than 5% in the aggregate of any issuer's stock, they must each file a disclosure, even if their individual ownership is below 5%. When their holdings materially change, Section 13(d) and Rule 13d-2 thereunder, [17 C.F.R. § 240.13d-2], require that Section 13(d) filers make an amended Schedule 13D filing to update the market about the change in their holdings. These disclosure provisions are intended to alert the company's stockholders and the marketplace to changes in securities ownership that indicate potential for changes in control of the company.

51.     That kind of disclosure obligation is imposed on issuers, as well. Exchange Act Section 13(a) requires all issuers whose securities are registered pursuant to Exchange Act Section 12 (such as Company B) to file periodic reports with the Commission, and Exchange Act Rule 13a-1 requires such issuers to file annual reports – *i.e.,* a "Form 10-K." Exchange Act Regulation S-K at Item 10 sets out the information that must be disclosed in both Forms S-1 (Registration Statements) and 10-K. 17 C.F.R. § 229.10(a). Item 403 of Regulation S-K, in turn, requires issuers to provide a table listing:

> any person (including any "group" as that term is used in section 13(d)(3) of the Exchange Act) who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities.

17 C.F.R. § 229.403(a). Thus, potential investors reading an issuer's Form 10-K or registration

statement on Form S-1 can expect to see a table describing all persons – and all "groups" of persons – who beneficially own more than 5% of Company B's stock.  Officers who sign public filings on behalf of their companies have a duty to ensure their completeness and accuracy.

52.     The federal securities laws require disclosure about the holdings of company officers and directors, too.  Exchange Act Section 16(a) and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3] require periodic reporting by officers and directors of their purchases and sales of their company's stock.  As reflected in the legislative history of the enactment of Exchange Act Section 16(a), "the most potent weapon against the abuse of inside information is full and prompt publicity."  H.R. Rep. 73-1383, at 13, 24 (1934).  Disclosure of an insider's purchases and sales gives investors an indication of the insider's private opinion as to the prospects of the company.

53.     The registration provisions of the Securities Act are also designed to ensure that investors have key information when the company or its control persons seek to sell securities.  Companies are generally required to disclose important financial information in a registration statement filed with the Commission, which is available to the public.  When participants in a pump-and-dump scheme sell large blocks of stock to the investing public without registering the transaction, the offer or sale of that stock can violate the registration requirements of the Securities Act.

54.     Fraudulent promotion or manipulative trading used to pump the company's stock price and trading volume can violate the antifraud provisions of the Securities Act and the Exchange Act.  For example, fraudsters may use online newsletters, bulletin boards, or social media to disseminate false and misleading statements to the public in order to encourage investors to purchase their undisclosed stake at inflated prices.  Promoters may falsely claim to offer independent, unbiased recommendations in newsletters and other touts when they stand to

profit from convincing others to buy or sell certain stocks – often, but not always, penny stocks. Fraudsters frequently use this ploy with small, thinly traded companies because it is easier to manipulate a stock when there is little or no information available about the company, and where fraudsters can obtain control of a substantial portion of the company's unrestricted shares. To help investors evaluate a stock promotion, promoters are required to disclose any compensation they receive from an issuer, underwriter or dealer for touting a security in any media.

55.     In addition to false promotional pieces, fraudsters sometimes use matched trades to drive up the price of a security. Members of a scheme will trade shares between themselves, gradually inflating the price. A rising stock price creates the false impression that there is investor demand for the security, and thus serves to encourage other investors to buy. If the fraudsters have disguised their ownership and control of securities being traded, investors are deceived into believing that the matched trades are by outside market participants seeking to invest in the company. For this reason, the Exchange Act prohibits entering an order for the purchase or sale of a security with knowledge that an order or orders of substantially the same size, at substantially the same time and substantially the same price, for the sale or purchase of a security, had been or would be entered.

56.     Collectively, these and other provisions of the federal securities laws protect investors from pump-and-dump schemes and ensure that investors understand who is controlling a company and whether any large shareholders have amassed a position that will allow them to control or influence the company and its securities. When these required disclosures are evaded or issued in a misleading fashion, investors are deprived of material information about an issuer.

## FACTS

**A. Overview of Honig's, Brauser's, Stetson's and O'Rourke's Pattern of Investments**

### 1. The Partnership Among Honig, Brauser, Stetson and O'Rourke

57.     Honig, Brauser, Stetson and O'Rourke, individually or through their entities, invested alongside one another in at least 19 issuers at or about the same time, from 2011 to the present. While this action concerns three of those issuers, in most cases in which Honig, Brauser, Stetson and O'Rourke co-invested, the investments followed a pattern: Honig or Brauser would identify a target company and arrange a financing or financings that would give them and their chosen co-investors (including Stetson and O'Rourke, among others) a controlling position in the company's outstanding common stock at lower-than-market prices. Honig, Brauser, Stetson and O'Rourke would then exercise that control by dictating terms of the company's material management decisions and policies, and voting together to direct the company's major business decisions. When the group determined that the time had arrived to exit the investment, they would engineer a publicity-generating event that would both drive the price of the stock higher, and also create market demand and trading volume that would allow them to sell their positions. Typically, Honig, Brauser, Stetson and O'Rourke would dictate some kind of transaction for management to undertake – for example, an acquisition or merger, or a new investment by a well-known investor, like Investor 1 – and paid writers, bloggers or other public relations professionals to write about it. Once the publicity had its intended effect on the stock's price and trading volume, Honig, Brauser, Stetson, O'Rourke and the other hand-picked co-investors would sell their respective positions – generally staggered over a course of weeks – into the artificially inflated market.

58.     Throughout these stages, Honig, Stetson and O'Rourke were in nearly daily

contact because they worked out of the same office and were in frequent email and telephone

contact, at times purposefully moving their conversations to the less permanent medium of text

or instant messaging. Honig, Stetson and O'Rourke were each in frequent contact with Brauser,

with whom they shared office space until late 2013.

59. Honig, Brauser, Stetson and O'Rourke obtained their interests in these issuers at

the same time, and agreed to act as a group in holding, disposing and voting the stock they

acquired, with Honig leading the combined effort. As O'Rourke put it in a February 3, 2014

email to the officer of a potential merger target, "Barry Honig is the principal investor of our

small group." Honig carefully controlled his "small group's" participants in the financings he

arranged so that shares were held only by individuals and entities that (1) permitted Honig to

direct how they voted their shares and/or acquiesced in Honig's control of the management of

the company, and (2) refrained from selling their shares until the optimal time for group

members to profit from the planned post-pump dump.

60. Honig worked with Stetson to ensure that members of his groups voted their

shares in unison. At times, members of the group reached out to Stetson to find out how they

should vote on various proposals. For example, with respect to one of the issuers in which they

had co-invested, in July 2015, Brauser forwarded an email request from a co-investor's staffer to

Stetson, asking whether to vote for or against a proposal. Stetson, in an email that same day,

copying Honig, replied, "Yes, vote 'For.'" In a November 2016 email to members of a Honig

group of investors in another issuer, Stetson responded to a request for "instructions to vote"

with "[v]oting in favor of [two named directors]. Against all other members and actions."

61. While Honig was the primary architect of the three schemes detailed below, email

traffic among Honig, Brauser, Stetson and O'Rourke demonstrates the various key roles each of

20

these Defendants played in the typical Honig-led investment.

62.     Brauser is a long-time co-investor with Honig, investing (individually, through his entity, Grander, or through family members' accounts) alongside Honig (and/or a Honig entity) in more than 40 issuers between approximately 2011 and mid-2018.  From at least October 2010 to approximately 2013, Brauser rented an office with Honig at 4400 Biscayne Boulevard in Miami, Florida.  Brauser's business association with Honig was sometimes noted by keen market observers:  As early as 2013, a short seller published a report on a company in which the two had invested and noted that a factor negatively affecting the value of the company's stock was the CEO's close financial ties with "two serial stock promoters," whom it identified as Honig and Brauser.

63.     For some of the issuers in which Brauser co-invested alongside Honig, Brauser took an active role, at times directing the issuer's management, finding and negotiating transactions for the issuer or bringing in additional investors.  In others – particularly while Honig and Brauser worked through one of their periodic disputes about who owed whom money – Brauser was content to let Honig direct the steps in the scheme; since Brauser had been closely involved with respect to the other issuers in which he had co-invested with Honig, he was well-familiar with the playbook, knew that Honig would follow it and understood that Honig would signal to Brauser when it was time to sell his shares.

64.     Stetson shared office space with Honig and O'Rourke at all relevant times.  Individually, through his entity SCI, or through HSCI (the vehicle he nominally controlled), Stetson invested alongside Honig (and/or a Honig entity) in more than 65 issuers between 2011 and August 2018.  In connection with most of these investments, Stetson executed Honig's directions, managed the administrative aspects of the Honig group's investments, and performed

pre-investment due diligence.  For example, Stetson communicated with brokers to effect

Honig's trades, deposited Honig's shares with brokers, communicated investment terms and wire

instructions to investors Honig had lined up, tracked the ownership of each group member in a

particular issuer, corralled shareholder votes from co-investors (and, in some cases, even told co-

investors how to vote), prepared financial analysis of proposed investments and conveyed

Honig's instructions to issuer management.  From 2012 to 2013, Stetson also frequently

managed Honig's arrangements with Ford to write paid promotional articles about issuers in

which Honig and his group had invested.

     65.     O'Rourke shared office space with Honig and Stetson at all relevant times,

beginning in 2012.  Through his entity, ATG, or individually, O'Rourke invested alongside

Honig (and/or a Honig entity) in over 75 issuers between 2011 and August 2018.  Beginning in

2013, O'Rourke managed the Honig group's promotional efforts by working with writers and

bloggers to publish favorable articles and posts about issuers the Honig group controlled.  He

arranged for those writers to be compensated for their promotional pieces.  For example, in 2013

and 2014, O'Rourke compensated "Writer E" for writing positive promotional articles.

O'Rourke made the payments through personal checks and/or sham stock purchases, designed to

disguise the true purpose of the compensation.  O'Rourke knew, or was reckless in not knowing,

that Writer E did not disclose these payments in the promotional pieces he published on these

issuers.

     66.     At times, and with Honig's knowledge and consent, or at his direction, O'Rourke

wrote and published the promotional articles himself.  O'Rourke used a pseudonym for the

byline and did not disclose his relationship to the issuer being promoted or the compensation

Honig was paying him for the articles.

67.     In addition to his work with promoters and his own promotional activities, in at least one instance, O'Rourke took the lead in negotiating a transaction for Company B, in which he, Honig, Brauser and Stetson and/or certain of their entities had invested.  After about his first year with Honig, O'Rourke also began assisting Stetson with the administrative aspects of each group investment.

68.     Investor 1 invested alongside Honig (or a Honig entity) in several issuers from 2011.  For Honig and his co-investors, Investor 1's participation in a deal brought an aura of legitimacy, important publicity for the issuer, and – most helpful in creating market interest in the particular issuer – his substantial following among retail investors.  As a consequence, Honig and Brauser frequently sought to persuade Investor 1 to invest alongside them.  As Stetson put it in a 2015 email to the CEO of Company C, the "following of [Investor 1] is worth its weight and [sic] gold."

### 2.     Honig's Efforts to Conceal the Extent of His Investments

69.     Honig typically sought to conceal the size of his and his group's investments in issuers.  To that end, Honig set up various investment vehicles through which he could invest indirectly and surreptitiously.

70.     One such Honig investment vehicle was HSCI, a limited liability company that Honig and Stetson set up in 2011.  While Honig and Stetson named Stetson as HSCI's sole managing member, Honig controlled 94% of its membership interests and directed many of HSCI's investment decisions, including the size of the allocation HSCI would take in a particular financing, the timing of when HSCI would deposit shares or sell its position, and the brokers HSCI would use for its transactions.  For example, in a November 20, 2013 email, Honig directed Stetson to "convert, deposit and purchase [shares in a particular issuer]. . . from HS[CI]."  In a January 5, 2014 email, Honig directed Stetson to wire $1,700,000 from HSCI to

accounts at his broker and bank. In a June 1, 2014 email in which Honig laid out a list of tasks

for Stetson, he directed Stetson to "change warrant to HS[CI]. Have HS[CI] buy it for $1000."

On June 17, 2014, Honig instructed Stetson to "wire out of hs[ci] and then get money wired bacl

[sic] to me." In July 2015, Honig directed Stetson to transfer Honig's Company C shares and

those held by HSCI to an investment relations consultant he wanted involved in the promotion of

Company C. And, more recently, in October 2016, Honig negotiated terms for an investment in

an issuer, which, according to an October 7, 2016 Honig email, included a "$650,000 investment

from me and or my assignees and I get 100,000 shares for due diligence and structuring fee."

Stetson had no part in the negotiations. When the issuer sent the final deal documents, both the

subscription agreement, and the consulting agreement for "due diligence services" were in the

name of HSCI, and Stetson signed them both on behalf of HSCI.

71.    Honig treated HSCI as his own entity in other ways as well. For example, Honig

directed Stetson to pay through HSCI certain of Honig's own expenses, including airfare, a

private jet rental, and a 2015 $75,000 payment to one of the boxers in the stable of professional

boxers Honig sponsored.

72.    Stetson understood that HSCI was Honig's investment vehicle. When Honig

asked Stetson to list Honig's various positions in issuers, Stetson would reply with a list that

included HSCI's position. But both Stetson and Honig worked to hide that fact from others. In a

March 9, 2011 application to open a brokerage account for HSCI, where the questionnaire asked

Stetson for "a list of all principals and beneficial ownership percentage," Stetson failed to

identify Honig at all, writing, instead: "John Stetson 100%."

73.    HSCI was not the only vehicle Honig used to conceal his investments. Honig

used Southern Biotech as an entity through which he, Brauser and Investor 1 could each funnel

their investments in issuers, including Company C, thus shielding the size of their individual investments from disclosure. That Honig was using these vehicles to disguise the extent of his and others' investments was a goal he acknowledged in 2016 in connection with his efforts to set up yet another corporate investment vehicle. In a November 2016 email among Honig, O'Rourke and others, including Honig's brother, concerning the setup of a corporation as an investment vehicle, Honig agreed that "[t]he goal is to stop people from knowing what Barry invests in and avoiding them blogging on the Internet."

### 3. The Concealed Agreement with Stock Promoter Ford

74.     Honig first met Ford in the summer of 2012 in San Francisco after having read articles Ford had written promoting investments in public companies. By 2012, Ford had developed an investor following for his reports on various issuers posted on the *Seeking Alpha* website, a popular investor forum. During their meeting, Honig asked Ford how much he was paid to write an article about a publicly traded company. Ford answered that his rate was $45,000 per article. Honig proposed that he could compensate Ford to write articles for his issuers by inviting him to participate in the private placement financings with his chosen group of investors that he negotiated with issuers. Ford understood the value of that opportunity since Honig hand-picked the investors invited to participate, the private placement shares were valued below market, and Honig's track record of "successful" investments meant that the shares Ford obtained would likely rise in value. Ford also understood that Honig's invitation to participate in his group of investors would be contingent on Ford's agreement to write favorable articles about issuers at Honig's, Stetson's and O'Rourke's requests. By the end of the meeting, Honig and Ford had agreed that Honig would secretly compensate Ford to write about companies that Honig introduced to him, and that Ford would not publicly disclose that compensation so that investors would believe Ford's articles to be the product of his independent analysis and free

from any conflict of interest.

75.     During their first meeting, Honig presented Ford with a riskless transaction that Ford understood was Honig's way of enticing Ford to participate in the scheme.  Honig proposed that Ford purchase securities of issuer S ("Issuer S") (an issuer in which Honig, Stetson and O'Rourke were also invested) in a private transaction with a designated third party, and then immediately sell the securities at a higher price to another designated party.

76.     Ford agreed to participate in the transaction and coordinated the specific details over email with Stetson in July 2012.  In an email on July 27, 2012, Stetson told Ford the amount of the purchase wires and the information Ford should put in the reference line for the purchase wires.  In that same email, Stetson informed Ford that a $125,000 wire had been deposited into Ford's account, even though Ford had yet to purchase the stock for which he was receiving the funds.  On August 7, 2012, Stetson sent Ford the purchase agreements for the Issuer S shares he had "purchased two weeks ago."  Ultimately, Ford earned profits of approximately $90,000.

77.     Pursuant to the agreement Ford and Honig reached in their summer 2012 meeting in California, Ford began writing articles at Honig's behest, with assistance initially provided by Stetson, and later by O'Rourke.  For example, in September 2012, Stetson arranged for Ford to conduct an interview for a promotional article Ford was writing on Investor 1 Company.  Also, in 2012, as described more fully below, at Honig's direction, Stetson arranged to sell some of his Company B shares at a discount to Ford in exchange for Ford writing two favorable articles about Company B.  Stetson knew, or was reckless in not knowing, that Ford was being compensated to write these articles, and that Ford was not disclosing the arrangement in the disclaimers he included with his posts.

78.     During the period 2012-2015, Ford wrote and published seemingly independent

articles about various companies in which Honig and his co-investors had an interest. He did so at Honig's direction – often communicated through Stetson or O'Rourke – and in return for the right to participate in off-market securities transactions or Honig-led private placements. He also received at least $125,000 in cash payments during this period. Honig structured the cash payments to Ford to disguise their source by enlisting third-party Honig associates to enter into sham consulting agreements with Ford, and funneling the payments to Ford through the associates, ostensibly pursuant to those agreements.

79.     Ford communicated with Honig, Stetson and O'Rourke about the companies, compensation, and articles. Honig, Stetson and O'Rourke knew that Ford was writing the favorable articles because he was being compensated for doing so, and all three knew that Ford was not disclosing this compensation to the public readership; indeed, all three understood that if Ford had disclosed that he was being paid, investors would have discounted the independence of his analysis and would have been less likely to follow Ford's recommendations.

80.     Brauser, too, knew, or was reckless in not knowing, that Honig was paying Ford to write promotional pieces without disclosing their arrangement. For example, in November 2013, Honig copied Brauser and O'Rourke on an email outlining a promotional plan for Investor 1 Company, which included the publication of a Ford article. Honig noted in this email that "we are assisting" on the drafting of the "John Ford article." In December 2013, O'Rourke sent Brauser an email linking Ford's Investor 1 Company article, which did not disclose that Ford had been paid to write it. More basically, Brauser (like Stetson and O'Rourke) knew, or was reckless in not knowing, that each participant in Honig private placement deals – Honig's "following" – had been invited to participate in these private transactions in exchange for some value each could bring to the deal, and that Ford was no different. Brauser understood, for example, that

Investor 1 brought his retail investor following and reputation as a successful investor to provide liquidity when the participants wished to sell. Brauser knew that others, like Affiliates 1 and 2, brought needed cash and a willingness to follow Honig's directions on how to vote or when to sell. Because Honig was inviting Ford to participate in these transactions, Brauser knew, or was reckless in not knowing, that Ford was providing value to the group in authoring favorable articles on the issuers in which the group was invested.

81. Brauser, like Honig, Stetson and O'Rourke, also regularly followed news and articles written about the companies in which they were invested. As a result, each of them knew, or was reckless in not knowing, that Ford's promotional articles did not disclose his compensation arrangement with Honig.

## B. The Company A Scheme

### 1. *Honig and Brauser Obtain Control of Company A*

82. In the Company A scheme, Honig and Brauser generated approximately $9.3 million in proceeds for themselves and their co-investors by secretly paying for a misleading promotional campaign, engaging in manipulative trading, and then unlawfully selling Company A shares into the artificially inflated trading volume and stock prices that they had generated.

83. To acquire control of Company A, Honig and Brauser, acting with Investor 1, caused the company to issue shares to them, certain of their entities, and certain of their associates through a series of so-called "private investments in public equities," or "PIPE" financings.

84. In November 2010, Honig, along with his nominees, including Stetson and Affiliate 1, purchased one-third of a publicly traded shell company. In December 2010, Brauser and Investor 1 each purchased one-half of the remaining two-thirds of the company. Honig, Brauser and Stetson each disguised his role in the acquisition by purchasing the shares of an

28

intermediary entity that owned a majority of the shell company shares. The shell company disclosed only the ownership interest of the intermediate entity in its public filings, allowing Honig, Brauser and Stetson to conceal their respective ownership interests. Soon after they acquired the shell, Honig, Brauser and Investor 1 installed an associate of Investor 1 (the "Investor 1 Associate") as the sole director of the company.

85. In late 2010, Honig and Brauser approached management of a private biotech company then in the business of manufacturing over-the-counter pharmaceutical products ("Company A Labs") with a proposal to take the company public.

86. At the time, Company A Labs and Keller, its Chief Scientific Officer and a director, were working on developing a formulation using a patented technology called "Qusomes" that Company A Labs hoped to use in large-scale drug markets, but lacked funding to support its development. Honig and Brauser promised Keller and the CEO of Company A Labs (the "Company A Labs CEO") that the public company deal would include raising $11-$13 million to support research and development ("R&D") of the Qusomes technology.

87. On "Honig, Brauser, [Investor 1] Group" letterhead, Brauser sent Company A Labs management a Letter of Intent in late January 2011, and Company A Labs management countersigned the agreement, as amended, on February 1, 2011. Pursuant to that Letter of Intent, Company A Labs agreed to a reverse merger into the publicly traded shell controlled by Honig, Brauser and Investor 1. Company A Labs CEO, Keller, and a research scientist employed by Company A Labs were each promised 6,650,000 shares of the newly created public company.

88. The proposed merger of Company A Labs into the publicly traded shell hit a snag in March 2011. Pursuant to a $3 million credit line Company A Labs had with a San Francisco community bank (the "Community Bank"), the Community Bank had authority to approve all

major transactions.  In a letter sent on March 14, 2011, it declined to approve the reverse merger,

as well as the $2 million bridge financing contemplated to pay for that reverse merger, among

other things.

89.     According to its letter, the Community Bank declined to approve the reverse

merger for two reasons:  First, "[u]nder the proposed new transaction, persons who are not

known to the Bank . . . would assume control of [Company A Labs]. . . ."  As its second reason,

the Community Bank noted:

> The proposed acquisition creates enormous conflicts of interest.  There is substantial
> reason to believe that the resulting entity would act for the benefit of [the Honig investor
> group] as a whole, rather than the interests of [Company A Labs].

In conclusion, the Community Bank warned that if Company A Labs nonetheless proceeded with

the transactions, they would constitute events of default, and the full amount owing under the

credit line would become immediately due and payable.

90.     Despite these warnings, Company A Labs completed the reverse merger and the

$2 million bridge financing.  The Community Bank thereafter sent a default notice.  After the

merger, on September 8, 2011, Maza, who had been installed as the CFO and a director of the

newly created Company A by Honig and Brauser, authorized the company to pay off the credit

line.

91.     After the merger, Company A listed its corporate address at 4400 Biscayne

Boulevard in Miami, the same business address then shared by Honig, Brauser and Investor 1.

92.     As a result of the reverse merger, Honig, Brauser and Investor 1 controlled the

vast majority of Company A's outstanding shares.  In addition, Honig and Brauser, with the

knowledge and approval of Stetson and other co-investors, also exercised control over the

management of Company A.  After the merger, for example, Honig and Brauser, acting with the

knowledge and consent of Stetson and other co-investors, elevated Maza from CFO to CEO of Company A. Thereafter, Maza sought approval from Honig, Brauser and sometimes Investor 1 for material business decisions. For example, at the direction of Honig and Brauser, Maza agreed to divert funds from Company A to pay rent for the office of an unrelated entity co-owned by Honig and Brauser, also located at 4400 Biscayne Boulevard. Maza also sought the permission of Honig and Brauser to take on financing from outside sources. In one email to Brauser on February 28, 2013, copying Honig, Maza reported that Honig and Investor 1 were on board with the proposals from two separate lenders and sought Brauser's concurrence: "[Investor 1] is OK if you're OK with it. Work for u?" Maza also sent Honig, Brauser and Investor 1 updates at least every month providing details on business operations and business opportunities, as well as seeking their approval for material business decisions. For example, in June 2013, Maza sent Honig and Brauser, among others, a "business memo for your consideration," which outlined "an approach to stabilize the company" and set out "priority initiatives." In its first public filing after the merger, Company A disclosed that it had retained new corporate counsel ("Issuer's Counsel") – the same firm as well as the same partner at that firm ("Issuer's Counsel Partner") that Honig had insisted other issuers in which he was invested retain.

93. In their capacity as two of the three board members of Company A, Keller and Maza concealed Honig's and Brauser's control of Company A by signing off on public filings that failed to disclose the involvement of Honig, Brauser, Stetson, and Affiliate 1, omissions that made those filings materially misleading. At the time they signed these filings, Keller and Maza understood that Honig and Brauser substantially controlled Company A's management, and not Maza. As Keller explained in a February 12, 2012 email to a Company A colleague, "[t]he real

power is with Barry Honig and Mike Brauser.  Elliot [Maza] is just a mouth piece."  Following

the merger, Company A's filings nonetheless identified only Investor 1, but not Honig, Brauser,

or the group of Honig, Brauser, and others, including Stetson and Affiliate 1, as owning a greater

than 5% interest in Company A.

94.     Post-closing, Honig and Brauser orchestrated a series of additional PIPE

financings between March 2011 and June 2012 on very attractive terms for themselves, including

debt convertible at pennies per share into millions of shares, and warrants for the cheap

acquisition of even more shares.  Some of these financings allowed Company A to refinance debt

it had amassed both in order to close the reverse merger into the public shell and as a result of

defaulting on the Community Bank loan.

95.     Honig and Brauser failed to keep their promises to invest money in Company A

for R&D.  Instead, they limited their personal investments to whatever minimum amount was

necessary to keep Company A's business operating and to fund Maza's and Keller's generous

compensation.  Keller's compensation substantially increased once he began working with Honig

and Brauser, and Maza's annual compensation ranged from $300,000 to $600,000.  As a result of

the failure to invest money and the high executive compensation payouts, however, Company A

lacked funds for R&D, and it was forced to abandon its R&D efforts entirely by mid-2012.

96.     Honig and Brauser used the financings they orchestrated to amass more, ever-

cheaper Company A shares for themselves and their associates.  Honig and Brauser also sold

some of their convertible debt to their associates, including to Affiliate 1, on September 23,

2013, and to both Stetson and O'Rourke on October 3, 2013, giving them conversion rights to

purchase Company A shares for $0.20 a share.  Although these financings did nothing to

enhance Company A's continued growth, Maza and Keller went along with them.  Over the

course of their respective tenures at Company A, Maza and Keller received millions of shares of Company A stock.

97.     By April 1, 2013, and pursuant to their tacit or explicit agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig, Brauser and other co-investors, including Stetson, Investor 1 Company, Investor 1 Group and Investor 1 Trust, had amassed 28,153,845 shares, or almost 45% of the Company A shares outstanding, with Honig alone holding 5,542,654 shares, or 8.8% of the company's outstanding shares. But Company A did not disclose the group's combined ownership. On September 11, 2013, Stetson notified management that the beneficial ownership table should be amended to reflect Honig's substantial share ownership, and on September 12, 2013, Stetson provided Maza with the green light to file an Amended Form 10-K annual report for the 2012 fiscal year. Nonetheless, even though Company A's September 13, 2013 Form 10-K/A, signed by Maza, Keller, and the Investor 1 Associate, disclosed that Company A's amendment was to update the beneficial ownership table, the annual report failed to disclose the existence of the Honig-allied group, which beneficially owned slightly less than half of Company A's outstanding shares.

98.     On July 16, 2012, Company A Labs' CEO – who had been ousted from Company A by Honig and Brauser – sued Company A, Honig, Brauser, Maza, and Investor 1, among other defendants, seeking, in part, the 6.65 million shares he had been promised, but which had never been delivered to him out of escrow. Company A, acting at Honig's and Brauser's direction (on behalf of the Honig-led investor group), or with their consent, counter-sued the CEO. In public filings about the suit, Company A represented that the CEO had breached his contract with the Company, and reported that the Company was seeking damages and cancellation of the escrowed shares.

33

99.     Brauser, who was not an officer or director of Company A, took the lead in

negotiating a settlement of the dispute with Company A Labs' CEO on behalf of Company A,

frequently updating Honig on his negotiations, and soliciting his views on settlement proposals

over email.  In September 2013, Brauser and Honig reached settlement terms with Company A

Labs' CEO, agreeing to pay him $2 million in return for his relinquishing his claim to the

Company A shares he had been promised, and that he had never received.  Maza ratified the

settlement terms on September 5, 2013.

### 2.     *The Company A Pump and Dump*

100.     In preparation for the Company A pump and dump, during August and

September, 2013, Stetson, at Honig's direction, deposited in a brokerage account almost 4

million Company A shares that had been issued to Honig.  Stetson worked closely with Honig

and Brauser and each of their brokers, Company A, and Company A's transfer agent to help

Honig and Brauser ready their Company A shares for sale into the public market.  Since part of

Stetson's role in working with Honig was to keep track of the amount of each associated

investor's holdings, and he had reviewed Company A's Form 10-K/A, setting out Honig's and

Brauser's ownership and the number of Company A's outstanding shares, Stetson knew, or was

reckless in not knowing, how much of Company A's stock Honig and Brauser controlled.

Stetson also knew, or was reckless in not knowing, that Honig and Brauser were directing

Company A's management and policies.

101.     Nonetheless, in connection with the deposit of Honig's shares, on at least two

occasions, on August 19 and August 30, 2013, Stetson submitted Honig's signed answers to the

broker's questionnaire that both he and Honig knew were false.  Honig's answers falsely denied

any relationship between him and Company A or its affiliates, and also falsely denied that Honig

34

was an affiliate. At the time that Stetson made that submission, and Honig signed it, each knew, or was reckless in not knowing, that Honig was an affiliate of Company A because of the control Honig exerted over Company A.

102. On September 6, 2013, Stetson was copied on the transmittal of false attorney opinion letters to Company A's transfer agent in order to remove restrictive legends from Honig's Company A share certificates. These opinion letters were sought by Honig because both he and Stetson knew that removal of the restrictive legend was a necessary step in readying Honig's Company A shares for sale to the public. Each of the letters contained the material misrepresentation that Honig was not an affiliate of Company A, a representation that Stetson and Honig knew, or were reckless in not knowing, was false, given what each knew about Honig's control over Company A.

103. As part of the process for depositing Honig's shares with a broker – another necessary step, as Honig and Stetson knew, in selling Honig's shares to the public – CEO Maza was also required to issue a representation letter concerning the stock certificates. In a letter to the broker-dealer, dated September 10, 2013, Maza wrote "[w]e further acknowledge and agree that there is no other agreement or understanding between Barry Honig and [Company A] that would preclude Barry Honig from selling or otherwise disposing of shares represented above." Maza knew, or was reckless in not knowing, that this statement was false because Honig was an affiliate of Company A, and that, as an affiliate, Honig's ability to sell his Company A shares would be subject, under the federal securities laws, to volume limitations.

104. Once the restrictive legends were lifted from Honig's shares and the shares were deposited into a brokerage account, Honig was ready to sell them. In September 2013, Honig directed O'Rourke to reach out to Ford to arrange for him to post his purportedly independent

investment analysis of Company A on the *Seeking Alpha* website pursuant to the understanding Honig and Ford had reached in 2012.

105.    O'Rourke contacted Ford and proposed that Ford write a Company A article in exchange for Ford obtaining Company A shares at a below-market price.  At that time, Honig, Brauser, Investor 1, Investor 1 Company and other co-investors, including Stetson, owned about 45% of the outstanding Company A shares, and the market for Company A stock was virtually nonexistent (with zero trading volume on Friday, September 20, 2013).  O'Rourke instructed Ford to focus his article on Investor 1's involvement, and the supposed rosy prospects of Company A's R&D.

106.    On Monday, September 23, 2013, Honig and some associates began trading Company A shares to create the appearance of market activity and interest in Company A in advance of the planned Ford article.  That day, the trading volume of Company A shares soared to 302,000 from zero volume the previous trading day.

107.    The September 23rd trading also gave Honig a way to pay Ford surreptitiously for his upcoming favorable article on Company A.  On the morning of Friday, September 20, 2013, O'Rourke called Ford and told him to put in buy orders for Company A stock at $0.40 per share to ensure his order was executed against the corresponding sell order later placed by Honig. Because there was so little trading at that time in Company A shares, O'Rourke and Honig knew that Ford's bid would be hit by Honig on the following Monday, September 23, 2013.  In that transaction, Honig sold 180,000 Company A shares to Ford at $0.40 per share, a price well below the price at which these shares otherwise traded during that day.

108.    O'Rourke joined the trading at the end of the trading day on September 23rd to "mark the close," *i.e.,* to ensure that the last price of the day would be higher, giving the false

impression that Company A's share price was on an upward trajectory. Specifically, at 3:58 p.m. that day, O'Rourke, through his entity ATG, placed a bid to buy Company A shares at $0.68 per share, a significantly higher price than the prior buy order at $0.55 per share, which had been entered at about 3:06 p.m. Another Honig associate, who had purchased shares from Honig earlier in the day, placed a corresponding sell order to complete the transaction at the inflated price.

109. In further preparation for the publication of the Ford article touting Company A, and to enhance the false picture of an active market for the stock, near the end of the trading day on September 26th, Honig and his associates engaged in a series of coordinated trades. For example, the Barry & Renee Honig Charitable Foundation, controlled by Honig, sold Company A shares to a Honig associate at $0.68 per share, and two minutes later another entity affiliated with Honig executed a transaction against ATG, O'Rourke's entity, at $0.68 per share.

110. Ford published his Company A article on the *Seeking Alpha* website less than half an hour before market close on September 26, 2013. That article, touting Investor 1's investment in Company A, bore the title Honig and O'Rourke had supplied to Ford: "[Investor 1 Company] and Its Billionaire CEO Invested in [Company A]." In it, Ford presented a bullish outlook for Company A and concluded that "Company A should be trading for more than twice today's valuation."

111. Keller reviewed Ford's Company A article prior to its publication, and knew, or was reckless in not knowing, that Ford was preparing a promotional article. Ford's article included a question and answer interview of Keller, which O'Rourke had arranged earlier in September. Ford quoted Keller touting the benefits of Company A's Qusomes technology. Specifically, Ford quoted Keller's misleading statement that Company A had a formulation

37

ready for testing to be brought to the billion-dollar injectable drug market. Yet, as Keller knew, as of summer 2012, Company A had shut down all R&D efforts without the successful formulation of an injectable drug and Company A had ceased all efforts to develop this technology in mid-2012.

112.    Ford's article was also materially false and misleading in failing to disclose that Ford had been compensated by Honig for writing the article through Honig's sale to him of below-market Company A shares on September 23. Instead, Ford included a disclaimer that was itself false and misleading: "I am long [Company A]. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article."

113.    The market reacted strongly to the Company A promotion: the trading volume of Company A stock rose from approximately 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013 and to more than 6 million shares on October 2, 2013. The share price increased from an average of about $0.48 during August 2013 to an intraday price of $0.97 on October 17, 2013. Because many of the Defendants had acquired their shares so cheaply, they did not need to capture the immediate post-publication price jump in order to profit handsomely, and thus they sold their shares in transactions staggered over a three month period. Staggering their sales over a longer period of time allowed them to avoid pushing the stock price lower and the scrutiny that might have resulted from the Honig group's simultaneous selling.

114.    Between the start of the manipulative trading on September 23, 2013 and December 31, 2013, Honig and his co-investors sold shares into the inflated market for proceeds

of approximately $9,350,000. Between September 23 and December 16, 2013, Honig sold

5,892,679 shares for proceeds of $3,416,455.17.

115.    To compensate O'Rourke for his work, including working with Ford on the

promotional piece, on October 4, 2013, Honig sold to O'Rourke's ATG one of Honig's

Company A notes, with a face value of $50,000, which O'Rourke immediately converted into

250,000 Company A shares. Despite the fact that Company A shares were trading at a price as

high as $0.58, pursuant to the terms of the Company A note he bought from Honig, O'Rourke

paid less than half that price at $0.20 a share when he converted through ATG. O'Rourke then

sold his ATG shares into the market at the much higher average price of about $0.59 per share

between September 26, 2013 and December 27, 2013.

### 3.    The Unlawful Distribution of Company A Shares by Honig and Brauser

116.    Honig and Brauser obtained the Company A shares directly from Company A or a

Company A affiliate in transactions not involving any public offering. Therefore, the Company

A shares these Defendants sold were restricted securities as defined in Securities Act Rule

144(a)(3)(i). No registration statement was in effect for any of the Company A stock sales by

Honig or Brauser in the September through December 2013 period. No exemption from

registration was available to either of them, or their entities, with respect to these shares.

117.    Honig and Brauser were also statutory underwriters under Securities Act Section

2(a)(11) because they acquired these securities from the issuer or an affiliate of the issuer with a

view to public distribution. As statutory underwriters, in order to resell the securities to the

public in reliance on Securities Act Section 4(a)(1), they were required to comply with the

applicable conditions of Securities Act Rule 144, which they did not.

118.    Each of Honig and Brauser, and their respective relevant entities, were under

common control with Company A, making each of these Defendants an affiliate of Company A under Securities Act Rule 144(a)(1). The beneficial ownership of almost 45% of the outstanding stock of Company A by Honig, Brauser and Grander, and other co-investors including Affiliate 1, Affiliate 1 Entity, Stetson, SCI, Investor 1 Company, Investor 1 Trust and Investor 1 Group, gave them collective control over the issuer – control they exercised as demonstrated by the active involvement of Honig and Brauser, with the knowledge and consent of Stetson, in the operations and promotion of Company A.

119.    As affiliates, Honig and Brauser did not comply with the conditions of Securities Act Rule 144 in connection with their distribution of Company A securities. Because Company A did not trade on a national securities exchange, as affiliates of Company A, these Defendants could only lawfully sell 1% of the company's total shares outstanding in any three-month period pursuant to Securities Act Rule 144(e). As of September 2013, Company A had approximately 69 million shares outstanding, and as of November 15, 2013, it had approximately 75 million shares outstanding. Honig and Brauser each sold shares in excess of 1% of the total outstanding shares during the September through December period.

### 4.    *Honig's, Brauser's, Stetson's and O'Rourke's Post-Promotion Use of Company A's Assets and Marketable Securities for Their Personal Benefit*

120.    After profiting on their sales of Company A stock into the inflated market they had created with their paid promotion, Honig, Brauser, Stetson and O'Rourke continued to use their control over Company A for their own enrichment. Throughout the period preceding the September 2013 pump and dump, behind the scenes Honig, Brauser, Stetson and O'Rourke conspired to sell Company A's assets to another issuer they controlled ("Company M").

121.    Each of Honig, Brauser, Stetson and O'Rourke had invested in Company M by

the fall of 2013.  Honig and another frequent co-investor each also held a lucrative consulting contract with Company M at least through July 2013.

122.    Honig and Brauser exercised influence over the management decisions of Company M.  Using that influence, Honig and Brauser arranged for Company M to make a $2,000,000 investment in Company A on August 26, 2013 through the purchase of a convertible promissory note with a one-year term and a 10% interest rate.  The terms of this note also included a warrant to purchase 10,000,000 Company A shares for either $0.40 per share or on a cashless basis in the event that the Company A shares were not registered.  Under Company A's analysis, the value of the warrant alone was almost $2,500,000, even without including the capacity for the conversion of the value of the note plus interest into shares, making this deal extraordinarily favorable to Company M at the expense of Company A shareholders.

123.    On November 12, 2013, after Honig, Brauser, Stetson and O'Rourke had sold Company A shares for millions of dollars, Company A announced that it would sell its assets, including its intellectual property and manufacturing facility, to Company M in return for 1,200,000 shares of Company M's stock.  Maza, Company A's titular CEO, did not learn of this extraordinary transaction until it was announced.

124.    With Company A now stripped of its assets and rendered a public shell, and less than two months after Ford had been compensated to laud Company A's prospects, Honig and Brauser arranged a reverse merger of Company A with a private company (the "Private Company") in which some of their close co-investor associates had a substantial ownership interest.  Under the terms of the merger agreement, Company A shareholders would own 40% of the newly combined entity and the owners of the Private Company would own 60% of the shares.

41

125.     On December 26, 2013, Company A filed a Form 8-K in which it disclosed a conversion of notes held by Honig and Brauser into newly issued Company A common stock.

126.     On or about January 2, 2014, the reverse merger of Company A and the Private Company closed.  Through that merger, Honig and Brauser were able to enhance the value of their investments in Company A stock, which, pre-merger, had essentially become an investment in a public shell.  Post-merger, the value of Honig's and Brauser's Company A stock was supported by the newly acquired Private Company assets, and Honig and Brauser monetized those investments in subsequent post-merger sales of their Company A shares to public market investors.

### C.  The Company B Scheme

127.     During 2015 and 2016, Honig and his associates used Company B, once a publicly traded shell, as another vehicle for their pump-and-dump schemes.  Honig and his partners used many of the same tactics they had employed in the Company A scheme:  they bought millions of cheap shares, intending to exercise control over the management and policies of the company; exercised that control; orchestrated a misleading promotion of the company that drove up the price and the trading volume of the company's shares; and dumped their shares for a profit in the inflated market.  As with Company A, Company B engaged Issuer's Counsel as company counsel.  Despite their control over various actions taken by Company B, and their tacit or explicit agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig, Brauser, Stetson and O'Rourke took numerous steps to conceal their involvement, and to perpetuate the false appearance that the company was actually being controlled by its CEO.

### 1.  *Pre-2015 Investments in Company B by Honig, Brauser, Stetson and O'Rourke*

128.     By 2015, Company B was well-known to Honig, Brauser, Stetson and O'Rourke

– and they were well known to Company B's CEO Ladd – from an earlier pump and dump perpetrated by Honig and his associates in 2012-2013.

129.    In October 2012, Honig, Affiliate 1 and Stetson had purchased cheap Company B convertible preferred shares and 5 year warrants through a $4.5 million PIPE transaction.  Honig made the transaction contingent on Company B using $300,000 from the capital raise to promote Company B's stock, and required that the company segregate $2 million in cash.  As was Honig's practice, he dictated the group of investors who would join him, and notified Ladd in an October 11, 2012 email that Ford would be among them.

130.    Stetson, with the knowledge and consent of the Honig-led investor group, then enlisted Ford to write a promotional piece, published on the *Seeking Alpha* website on November 5, 2012, which touted Company B's prospects for providing a "2X near-Term Return," and predicting that Company B's stock could rise to $18 a share (nearly triple its price on the previous trading day).  Ford's promotional piece failed to disclose the compensation he had received from Honig, instead assuring investors that he was "express[ing] his own opinions," and was not "receiving compensation for it (other than from Seeking Alpha)."

131.    When, after Ford's piece was published, Company B's stock price failed to reach the level desired by the Honig-led group, Honig directed Stetson and/or O'Rourke to retain Ford to write another *Seeking Alpha* article on Company B.  At Honig's direction, in November 2012, Stetson sold Ford Company B shares and warrants at a discount in payment for Ford's planned articles on Company B.  Ladd knew that Ford held these shares, and had obtained them from someone who had participated in the PIPE transaction, because Ford was listed as one of the selling shareholders of Company B's stock in its November 30, 2012 Form S-3 Registration Statement, signed by Ladd.

132.     In his second *Seeking Alpha* article, published on April 11, 2013, Ford touted
Company B's imminent settlement of a patent enforcement action that would bring Company B a
substantial recovery.  Ford again predicted a significant stock price jump and again failed to
disclose that he had been compensated pursuant to his agreement with Honig.  Ladd knew that
Ford's prediction was false, since Company B's patent enforcement action was not on the brink
of settlement.  This time Ford's article had the desired effect, pushing Company B's share price
from $3.50 on April 10, 2013 to almost $4.50 on April 16, 2013, and increasing trading volume
significantly.  Company B's market capitalization went from under $16 million on April 10,
2013 to over $20 million on April 16, 2013.  Honig sold approximately 250,000 shares into the
inflated market, earning $967,224.

133.     Ladd was aware of the promotional efforts of the Honig-led group.  He even
agreed to be interviewed by Ford for the November 2012 *Seeking Alpha* article, and spoke to
Ford several times before the article's publication.  He also knew, or was reckless in not
knowing, that Ford had a connection to Honig and his group because he had been told that Ford
would be part of Honig's investment group in October 2012, and he received emails about Ford's
Company B investment from Stetson in early 2013.  Ladd knew that Ford's April 2013 article
had successfully boosted Company B's stock price.  And Ladd knew, or was reckless in not
knowing, that Ford was being compensated by Honig and his associates and that he was
concealing that fact from his *Seeking Alpha* readers in the April 2013 article, just as he had
concealed it in his November 2012 article.

134.     Honig, Stetson and O'Rourke also knew, or were reckless in not knowing, that
Ford's April 2013 article failed to disclose the compensation he was receiving from Honig.  They
each also knew, or were reckless in not knowing, that the article falsely claimed that Company B

44

was in settlement talks and on the brink of a lucrative settlement when it was not. Indeed, the only settlement Company B reached in its patent lawsuits was a single $100,000 recovery many months after the April 11, 2013 Ford article had been published.

### 2. *Honig and Associates Amass Company B Shares in 2015-2016*

135.    In 2015, Honig and his associates began planning a new scheme to pump and dump Company B's shares. At the time, Company B was running out of cash to continue its operations, and Ladd and the Board were discussing ways to keep the company going long enough to find a reverse merger partner who would be interested in Company B's clean balance sheet and listing on the NYSE-MKT. Honig set the scheme in motion on September 26, 2015 when he emailed Stetson: "We need to put together a term sheet for [Company B]. . . similar one to the [Company B] one we used the first time" and outlined proposed terms of an investment deal. The terms included specific provisions designed for Honig and his investor group to have access to shares quickly, warrants for more shares on favorable terms, and the ability to restrict Company B's ability to raise other funds.

136.    On September 27, 2015, Honig directed Stetson to send the proposal to Ladd, Company B's CEO. The deal contemplated the issuance of 2.8 million Company B shares, along with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker. This deal structure allowed the investors repeatedly to convert and sell their shares while appearing individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings. By ostensibly staying below the 5% ownership threshold, and evading the public reporting requirements, Honig and his associates increased the likelihood that they could conceal the millions of shares that they had amassed and thereby mask their scheme to pump up the Company B share price and trading volume in anticipation of a

profitable sell-off to unsuspecting investors.

137.   On October 1, 2015, Ladd emailed Honig that "NYSE MKT wants to know the buyers. $175,000 x 4 investors will be each at 4.9%. . . ."  Honig replied that same day, copying Brauser and Stetson, that he would "get back to you with names shortly for now use Barry Honig Mike Brauser [and] OBAN [an LLC created by Stetson]."  On October 5, 2015, Stetson provided Company B with the investors Honig had selected to participate in the financing, which included GRQ (Honig), Grander (Brauser), SCI (Stetson) and ATG (O'Rourke), as well as other Honig-approved investors.  Over the next few days, Honig continued to negotiate the terms of his and his investors' deal with Ladd.

138.   Ladd obtained his Board's approval of the financing by touting Honig's "m.o." as being able to make "the share price go[] up."  In an October 4, 2015 email to Company B's Directors, Ladd also told them that the company could "expect [Honig's] help in finding a reverse takeover candidate" for the company.

139.   The Honig-led financing ultimately provided $700,000 to Company B (the "October 2015 Company B Financing").  On October 8, 2015, Company B filed a Form 8-K with the Commission disclosing that the company had "entered into separate subscription agreements . . . with accredited investors . . . relating to the issuance and sale of $700,000 of units . . . ."  The Form 8-K did not disclose the investors' identities, but acknowledged that the "investment was led by Barry Honig, a private investor and a specialist in corporate finance," and listed selected successful investments in microcap companies with which Honig had been associated.

140.   Ladd knew that Honig (through GRQ), Brauser (through Grander), Stetson (through SCI) and O'Rourke (through ATG) and other Honig affiliates were operating as a

group, that they had acquired Company B shares together, and that they were collectively exercising control over the company. In an email dated September 29, 2015 to Company B counsel, Stetson, Honig and Company B's CFO – and in his October 4, 2015 email to Company B's Directors – Ladd referred to the potential investors as an "investor group . . . led by Barry Honig," and attached a "term sheet" (to the September 29 email) that defined Honig as "Lead Investor." Similarly, in November 2015, Ladd wrote Honig: "As for the cap table, we have 17.2 million common shares outstanding, including **your group's** 2.8 million . . . ." (emphasis added). Ladd nonetheless failed to disclose Honig's, Brauser's, Stetson's and O'Rourke's combined interest in, and control over, the company in Company B's public filings.

141.  By September 2015, Ladd was well versed in the requirements of Section 13(d). In connection with a 2014 proxy fight with another investor who sought to oust Ladd and seat new directors, Company B's CFO, writing on behalf of the company, accused that investor firm of violating Section 13(d) by failing to make appropriate Schedule 13D filings that disclosed the investor's affiliate relationship with another investor in Company B. In that July 3, 2014 letter, which Ladd reviewed and approved, the CFO called the omission a "concealment . . . of the ownership interests and trading activity of [the affiliate], not only to [Company B] . . . but to the SEC," and asserted that it "creates a materially misleading communication to [Company B's] stockholders."

142.  In late November 2015, and in anticipation of Honig's delivery of a reverse takeover candidate that would boost Company B's stock price, Ladd began accumulating Company B stock in a newly-opened account at E*Trade. In opening that account, as detailed in paragraph 166 below, Ladd lied about his affiliation to Company B and failed to disclose his purchases, as required in a Form 4 filed with the Commission.

### 3. The Company B Pump and Dump in February 2016

143. Having coordinated the accumulation of stock with Brauser, Stetson and O'Rourke, Honig, with his partners' knowledge and consent, then arranged for a promotion that included materially misleading information.

144. On or around January 21, 2016, by which time Honig, Brauser, Stetson, O'Rourke and Affiliate 1 through Affiliate 1 Entity, had acquired at least 16.3% of Company B's outstanding stock, Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of Company B. Shortly thereafter, the stock promoter paid a portion of the money he had received from Company B to a writer he instructed to publish a tout on Company B. On February 3, 2016, the writer published his piece online. In it, he described Company B's rosy prospects in social and "real money" gaming sites and intellectual property relating to slot machines. The article did not disclose that the author had been paid by Company B – at Honig's direction – to write the article. After the article was published on February 3, 2016, there was a 7000% increase from Company B's previous day's trading volume, and an intraday price increase of over 60%.

145. Honig, Ladd, Stetson and O'Rourke knew the promotional article was slated to appear, and each either knew, or was reckless in not knowing, that the article's author failed to disclose that he was being compensated by Company B to write it. Honig, Ladd, Stetson and O'Rourke took advantage of the promotion's boost to Company B's stock price and trading volume and sold over 430,000 shares into this inflated market for proceeds of approximately $198,800. Honig and GRQ sold 231,050 Company B shares between February 3 and April 6, 2016 for proceeds of $123,154.87. Ladd sold 96,072 Company B shares for proceeds of $39,204.12.

#### 4. The Company B Pump and Dump in May 2016

146. Honig soon identified a potential acquisition target for Company B that would give Honig and his associates another way to profit from their interest in Company B. The proposed deal involved a well-known cybersecurity innovator who had created a popular antivirus software bearing his name (the "Cybersecurity Innovator").

147. At Honig's direction (and with the knowledge and consent of Brauser and Stetson), O'Rourke took the lead in arranging a deal between Company B and the Cybersecurity Innovator. On March 29, 2016, O'Rourke sent the Cybersecurity Innovator a term sheet for the asset purchase of Cybersecurity Innovator's company ("CI Company") by a "NYSE listed company." After CI Company indicated interest on April 3, 2016, O'Rourke wrote to Honig on April 3, 2016 and asked Honig if he would "still want to pursue [Cybersecurity Innovator] deal." Honig replied to O'Rourke that same day: "Yea!" O'Rourke introduced Ladd to the Cybersecurity Innovator on April 4, 2016 to begin negotiating a transaction between Company B and the Cybersecurity Innovator's various business interests.

148. Subsequent correspondence between Ladd and O'Rourke, and between O'Rourke and Honig, reflect the ongoing and significant role Honig and O'Rourke played in orchestrating the deal. Company B and the Cybersecurity Innovator agreed to terms on May 8, 2016.

149. On May 9, 2016, at 8:30 a.m., Company B issued a press release announcing its merger with CI Company, and attached it to a Form 8-K, signed by Ladd, filed that same day with the Commission. The press release misleadingly described the Cybersecurity Innovator's prior financial success by falsely claiming that the Cybersecurity Innovator had "sold his anti-virus company to Intel for $7.6 billion," suggesting that Company B might achieve similar success. Yet, as Ladd knew or was reckless in not knowing, the sale of the Cybersecurity

49

Innovator's namesake company to Intel at that price had occurred over a decade after the Cybersecurity Innovator's departure from that company.

150. Knowing that Company B's misleading announcement of the deal would be disseminated later that morning, on May 9, 2016, Honig traded in Company B stock to create the misleading appearance of an active market. In pre-market trading that morning, Honig bought and sold small quantities of Company B stock dozens of times. In addition, and also during the pre-market hours that morning, Honig engaged in matched trades with an associate in an effort to artificially increase Company B's stock price.

151. That same day, StockBeast.com, a well-known internet stock promotion website, published an article by an unnamed author entitled "[Company B] Beastmode engaged – [Cybersecurity Innovator] driving the Bus." Ladd, through Company B, had paid StockBeast.com for the article to ensure a wide distribution of the news of the impending merger with the CI Company. The StockBeast.com article touted Company B and highlighted the Cybersecurity Innovator's involvement, proclaiming: "This is big big big!" It also repeated Ladd's materially false claim contained in Company B's press release that the Cybersecurity Innovator had "sold his startup company to Intel for $7.6BB."

152. This promotion and Honig's manipulative trading on May 9 were effective in driving up both Company B's trading volume and stock price: on May 6, 2016 (the last day of trading prior to the promotion), Company B had trading volume of 71,005 shares and a closing share price of $0.36. On May 9, 2016, the stock closed at $0.49 (representing an increase of 34 percent over the prior day's close) with trading volume of more than 10 million shares. The trading volume for Company B stock peaked at 109,384,614 shares on May 17, 2016 with a closing share price of $4.15. Company B's market capitalization went from just over $8 million

on May 6, 2016 to over $95 million on May 17, 2016.

153.    In the days immediately following the announcement of the CI Company acquisition, Honig, Brauser, Stetson and O'Rourke, along with Affiliate 1, pursuant to their tacit or explicit agreement to acquire, hold, vote, and/or dispose of their shares in concert, sold over 9.2 million Company B shares.  In order to maximize their Company B profits, Honig, Brauser, Stetson and O'Rourke each negotiated with Ladd from May 10 to May 12, 2016 in order to exercise their warrants early, giving them more shares to sell into the inflated market.  Ladd facilitated this warrant exercise and Honig, Brauser, Stetson and O'Rourke were able to dump millions more shares than they otherwise could have.  Ladd joined them in selling shares during this period, capitalizing on the false publicity he had knowingly or recklessly helped to create. All told, Honig, Brauser, Stetson, O'Rourke, Ladd and Affiliate 1 grossed $9.4 million from their May 2016 sales into the inflated market.  Honig and GRQ sold 3,783,001 Company B shares between May 9 and May 20, 2016 for proceeds of $2,393,915.52.  Ladd sold 852,863 Company B shares between May 9 and May 31, 2016 for proceeds of $1,184,662.68, including shares he sold through his own accounts and through an account in the name of his Relatives.

154.    After successfully capitalizing on the promotions, Ladd purported to clarify his own false statements that had worked to create the market enthusiasm and that had pushed up the price and trading volume of Company B's stock.  In its May 23, 2016 Form 10-Q, signed by Ladd and filed with the Commission, Company B stated:  "[The Cybersecurity Innovator] founded [Cybersecurity Innovator's company] in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010."  While the new disclosure omitted the prior false claim that the Cybersecurity Innovator had sold his company to Intel, the May 23 Form 10-Q failed to acknowledge the prior misstatement in the Company's May 9, 2016 Form 8-K and press release,

and failed to disclose that the Cybersecurity Innovator had left his company years prior to its multi-billion dollar sale to Intel. In any event, the purportedly clarifying disclosure came well after the Honig-associated investors and Ladd himself had already profited from the misleading press release. By that time, Honig (GRQ), Brauser (Grander), Stetson (SCI), O'Rourke (ATG) and Ladd, had already sold their Company B shares into the inflated market.

### 5. *False Statements by Honig, Brauser, Stetson, O'Rourke and Ladd in Beneficial Ownership Reports and Company B Filings*

155. Although they were acting in concert, and pursuant to an agreement to do so, Honig, Brauser, Stetson and O'Rourke knowingly or recklessly concealed their concerted efforts from the investing public. Ladd, with full knowledge of both the Honig investors' stock ownership and their collective direction of the management and policies of Company B, also kept their control a secret, signing Company B public filings that did not disclose the full extent of their ownership or control.

156. After the October 2015 Company B Financing closed, Honig, Brauser, Stetson and O'Rourke collectively owned at least 1.7 million shares, or over 12% of the shares outstanding (as reported in Company B's August 14, 2015 Form 10-Q) after the issuance, and their obligation to file a Schedule 13D under Exchange Act Section 13(d) arose as of October 8, 2015. Moreover, Honig, Brauser, Stetson and O'Rourke each had warrants to obtain a total of an additional 3.4 million Company B shares, which, if they were all converted, would have resulted in Honig, Brauser, Stetson and O'Rourke collectively controlling at least 36% of the total common shares outstanding at that time.

157. Honig, Brauser, Stetson and O'Rourke collectively exercised control over Ladd and the management and policies of Company B. For example, on October 1, 2015, Ladd asked for and received Honig's direction with respect to how to disclose the Honig group's stock

acquisitions to the NYSE-MKT exchange. O'Rourke, at Honig's direction, negotiated on Company B's behalf the terms on which the Cybersecurity Innovator would sell CI Company to Company B. Indeed, in emails after the CI Company acquisition, Honig freely accepted credit for his role in the transaction. On May 12, 2016, for example, Honig received an email from an investment firm congratulating him on the recent transaction: "You're invovlved [sic] with [Company B]? Impressive!" Honig responded that he was the "[l]argest shareholder, funder and [had the] relationship with [the Cybersecurity Innovator]." In early August 2016, Honig celebrated his undisclosed role at Company B in a chat conversation with Stetson: "its great in [Company B] because we are behind the scenes."

158.    Brauser, too, sought to keep his involvement behind the scenes, going so far as to lie about his relationship to Honig and Company B in a published interview. In a May 18, 2016 article in *Business Insider*, the author quoted Brauser and reported: "'I had no idea whatsoever about any deal at [Company B] or with [the Cybersecurity Innovator] . . . [G]ot lucky I guess' as to the moves at [Company B] since he has never had any contact with anyone at [Company B] or Ladd himself . . . [and] has had no contact with Honing [sic] regarding [Company B] or anything else in some time." In fact, as Brauser knew, Brauser had been in contact with Ladd by email on multiple occasions, including on October 1, 2015 in connection with Grander's investment in the October 2015 financing, and in connection with his attempt to convert his warrants into more Company B shares on May 10, 2016. And while the CI Company transaction was being negotiated, Brauser was in frequent contact with Honig about their co-investments, by phone and by email. Indeed, in a May 10, 2016 email between Brauser and Honig, Honig acknowledged his understanding that Brauser had recently sold $1,000,000 in Company B shares following the May 2016 promotion.

159.     Because they acted in concert to control the management and policies of Company B and pursuant to an agreement to acquire, hold, vote, and/or dispose of Company B shares in coordination with one another, each of Honig, Brauser, Stetson and O'Rourke was a member of a group and considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of the group and disclosing the number of shares each of them beneficially owned.  However, none of Honig, Brauser, Stetson or O'Rourke ever made a Schedule 13D filing disclosing their respective ownership or membership in a group, acting intentionally to conceal from the market the size of their group's position and their coordination and thereby to deceive investors.

160.     Instead, on October 19, 2015, Honig filed a Schedule 13G, claiming only his own 6.59% beneficial ownership and falsely stating that the securities "are not held for the purpose of or with the effect of changing or influencing the control of the issuer" – a representation he knew, or was reckless in not knowing, to be false.  Indeed, because Honig and his associates exercised control over Company B's management and policies – as Honig candidly acknowledged in emails – he was disqualified from making a 13G filing.  In February 2016, Honig filed an amended Schedule 13G disclosing an ownership percentage of 9.1%.  Brauser filed a Schedule 13G on May 4, 2016, in which he claimed 7.4 % beneficial ownership via his entity Grander.  In each of these filings, Honig and Brauser also falsely claimed that they were passive investors without any intention to influence or change control of the company and omitted the fact that each was a member of a group.

161.     By October 2015, if not before then, Honig, Brauser, Stetson and O'Rourke all understood what their respective reporting obligations were under Exchange Act Section 13(d),

and that the information included in such filings was material to investors. Indeed, a mere seven months earlier, in February 2015, Honig and Brauser had filed a lawsuit in Harris County, Texas, alleging that counter-parties had violated Exchange Act Section 13(d) by failing to make requisite 13G filings for the more than 5% position they controlled as a group, and that that failure constituted a material omission that defrauded Honig and Brauser in their purchase of securities from those defendants. In their Complaint in that lawsuit, *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct.) (filed February 26, 2015), Honig and Brauser alleged:

> [I]nformation regarding a significant beneficial ownership interest in [the issuer's stock] was material. It is the kind of information that the SEC requires to be disclosed in connection with solicitations for mergers and in various other filings (*e.g.*, Schedules 13D and/or 13G) precisely because of its materiality. Defendants' failure to disclose to plaintiffs their significant beneficial ownership interest in [the issuer] . . . is a material and materially misleading omission. . . . Plaintiffs would not have purchased the Shares if they had known the undisclosed facts that [defendants] controlled such a large interest in [the issuer's] stock. . . .

162.    In email exchanges leading up to its filing, Honig and Brauser discussed drafts of the Complaint, and circulated them to Stetson and O'Rourke – non-parties to the lawsuit – seeking their comments. Honig and Brauser also discussed with Stetson and O'Rourke each of their respective understandings of the requirements imposed by Exchange Act Section 13(d). Nonetheless, and despite their understanding of what Section 13(d) required them to disclose and how and why those disclosures were material to investors, neither Honig, nor Brauser, Stetson or O'Rourke made the requisite filings with respect to Company B.

163.    Nor did Ladd ensure that Company B made the required disclosure of Honig's, Brauser's, Stetson's and O'Rourke's group stock ownership in Company B's filings with the Commission. On November 6, 2015, Company B filed a Form S-1 registration statement with the Commission – signed by Ladd as its President, CEO, and a Director – for the 8,400,000

Company B shares issued in the October 2015 Company B Financing. The Form S-1 purported to list "each person known by [Company B] to be the beneficial owner of more than 5% of the outstanding Common stock" of Company B, as it was required to pursuant to Item 403 of Regulation S-K. Although the table listed Honig as a 5% beneficial owner, it failed to disclose the combined group ownership of Honig, Brauser, Stetson and O'Rourke (or their entities). Ladd knew that Honig, Brauser, Stetson and O'Rourke were working together as a group, but he signed the November 2015 Form S-1 without disclosing the Honig group's collective beneficial ownership of Company B stock, which amounted to more than 12% of Company B's outstanding stock.

164. Likewise, Company B's 2015 Form 10-K, filed with the Commission on April 14, 2016 and signed by Ladd, contained a table that purported to disclose "each person known by [Company B] to be the beneficial owner of more than 5% of the outstanding Common stock" of Company B as of April 11, 2016, also as required by Item 403 of Regulation S-K. Although the table disclosed Honig as a beneficial owner of 8.6%, it failed to disclose the combined group ownership of Honig, Brauser, Stetson and O'Rourke (or their entities). Ladd knew that Honig, Brauser, Stetson and O'Rourke were working together as a group, but he failed to disclose in the Form 10-K their group's beneficial ownership of Company B's stock, which amounted to more than 16% of Company B's stock.

165. Company B's Form S-1 and Form 10-K thus hid from Company B investors material information regarding potential corporate control of Company B. Such information is especially important to investors evaluating microcap issuers such as Company B, which are particularly susceptible to manipulation by undisclosed control persons.

      **6.**     ***Ladd's Unregistered May 2016 Company B Stock Sales in His and His Relatives' Accounts***

166.    During the relevant period, Ladd held at least three brokerage accounts in his own name through which he traded Company B securities:  an IRA account at TD Ameritrade that he opened in December 2008 ("TD IRA Account"); another TD Ameritrade account that he opened in January 2013 ("TD Account"); and an account at E*Trade that he opened in November 2015 ("E*Trade Account").  On his new account application for his TD Account, Ladd disclosed that he was the president of Company B.  Consequently, TD Ameritrade designated both Ladd's TD Account and previously opened TD IRA Account as associated with an "affiliate" of Company B.  However, on his new account application for his E*Trade Account, filled out in November 2015, Ladd hid his association with Company B, falsely describing his "Occupation" as "Retired," and falsely answering "No" to the question, "Director, or policy-making office of publicly-owned company?"  In November 2015, Ladd transferred all of his Company B stock from his TD Account to his newly-opened E*Trade Account, telling TD Ameritrade customer service personnel on November 25, 2015 that he was doing so because he "did not like SEC 144 form handling" at TD Ameritrade.

167.    Ladd's Relatives held a separate brokerage account at TD Ameritrade in their names ("Ladd's Relatives' Account"), opened on January 2, 2015.  On June 9, 2015, Ladd and his Relatives executed a Full Trading Authorization for the Ladd's Relatives' Account, giving Ladd full trading authority in the account and appointing him as his Relatives' agent and "attorney-in-fact for the purchase and sale of securities."  On that Trading Authorization, Ladd and his Relatives also disclosed Ladd's affiliation to Company B (as TD Ameritrade already knew from the new account form Ladd had filled out for his own TD Account).  As a result, TD Ameritrade designated the Ladd's Relatives' Account as having "affiliate" status with respect to

trading in Company B securities.

168.    Between May 9 and May 12, 2016, Ladd sold 435,000 Company B shares in his E*Trade Account, for proceeds of $414,448.39.  During that same week, on May 12, 2016, Ladd sold an additional 340,000 Company B shares in the Ladd's Relatives' Account, for additional proceeds of $551,979.44.  Thus, during the time period May 9-12, 2016, Ladd sold 775,000 shares of Company B, which generated total proceeds of $966,427.83.

169.    In addition to the proceeds of his May 2016 Company B stock sales in the E*Trade Account, Ladd also received a portion of the proceeds from the May 12, 2016 Company B stock he sold from the Ladd's Relatives' Account.  On May 13, 2016, Relative A wrote a $325,000 check on Relative A's personal bank account made payable to Ladd, which was deposited into Ladd's bank account on May 18, 2016.  On May 17, 2016, after the Company B stock sales in the Ladd's Relatives' Account had cleared – acting at either Ladd's Relatives' or Ladd's direction – TD Ameritrade issued to Ladd's Relatives a $325,000 check from the Ladd's Relatives' Account.  Thus, Ladd's Relatives transferred to Ladd $325,000 of the proceeds from the May 12, 2016 Company B stock sales in the Ladd's Relatives' Account.  Ladd's Relatives kept for themselves the remaining $226,979.44 from Ladd's May 12 Company B stock sales in the Ladd's Relatives' Account.

170.    No registration statement was in effect for any of Ladd's May 9-12, 2016, Company B stock sales in the E*Trade Account or the Ladd's Relatives' Account, and no applicable exemption from registration existed.  For example, Ladd could not rely upon the Securities Act Rule 144 "safe harbor" exemption for his May 2016 Company B stock sales because those sales exceeded the volume limitations of Rule 144(e).

171.    Securities Act Rule 144(e) sets volume limitations for sales of a company's stock

by its affiliates, including by its officers and directors (such as its CEO). Thus, a CEO cannot rely upon the Rule 144 safe harbor unless the volume of the CEO's stock sales during any three month period does not exceed the greater of: (a) 1% of the company's shares outstanding; or (b) the stock's average weekly reported trading volume during the four calendar weeks preceding the CEO's stock sales. Therefore, as Company B's CEO, Ladd could not rely upon the Rule 144 safe harbor during the time period May 9-12, 2016, if his Company B stock sales exceeded the greater of 180,982 shares (representing 1% of Company B's total outstanding shares as reported in its then most recent filing, its April 14, 2016 Form 10-K) or 392,109 shares (representing Company B's average weekly trading volume during the four weeks prior to May 9, 2016). Ladd well exceeded that trading volume limit. Through his combined Company B stock sales in his E*Trade Account and the Ladd's Relatives' Account from May 9-12, 2016, Ladd sold Company B shares that he owned, controlled, or which are aggregated for the purposes of Rule 144(e), totaling 775,000 shares, for total sales proceeds of $966,427.83.

172. The following chart summarizes Ladd's Company B stock trading from May 9-12, 2016, in the E*Trade Account and the Ladd's Relatives' Account, and the amount by which Ladd's trading exceeded the Rule 144(e) volume limitation:

| Summary of Volume Restrictions and Trading in Excess of Rule 144 in the E*Trade and Ladd's Relatives' Accounts | | | | |
|---|---|---|---|---|
| Date/Totals | Company B Shares Sold | Account Holder | Account | Proceeds |
| May 9, 2016 | 40,000 | Robert B. Ladd | E*TRADE Account | $24,766.47 |
| May 10, 2016 | 120,000 | Robert B. Ladd | E*TRADE Account | $86,003.15 |
| May 11, 2016 | 230,000 | Robert B. Ladd | E*TRADE Account | $233,248.97 |
| May 12, 2016 | 340,000 | Ladd's Relatives | Ladd's Relatives' Account | $551,979.44 |
| May 12, 2016 | 45,000 | Robert B. Ladd | E*TRADE Account | $70,429.80 |
| Total Shares Sold | 775,000 | | | |
| Total Proceeds | | | | $966,427.83 |
| Excess of Volume Limitations | 382,891 | | | $618,802.85 |

173.    During the week of May 9, 2016, due largely to Company B's announcement of its pending transaction with CI Company, average trading volume in Company B stock exploded to approximately 31 million shares for that week.  Consequently, the number of shares Ladd could sell pursuant to Rule 144 in the weeks beginning May 16, 2016 grew exponentially.

### 7.    *Ladd's Failure to Submit Appropriate and Accurate SEC Forms 144*

174.    Under Securities Act Rule 144(h), as CEO and a director of Company B, Ladd was required to file with the Commission a notification form ("Form 144") regarding Ladd's intent to sell Company B stock in reliance on Rule 144 whenever the volume of such sales during any three-month period exceeded 5,000 shares, or whenever such sales had an aggregate

sales price in excess of $50,000.[3]  Rule 144(h) further provides:

> The Form 144 shall be signed by the person for whose account the
> securities are to be sold and shall be transmitted for filing concurrently
> with either the placing with a broker of an order to execute a sale of
> securities in reliance upon this rule or the execution directly with a market
> maker of such a sale. . . . The person filing the notice required by this
> paragraph shall have a bona fide intention to sell the securities referred to
> in the notice within a reasonable time after the filing of such notice.

Thus, when Ladd relied upon Rule 144 for his Company B stock sales, he was required to file a

Form 144 notifying the Commission and the NYSE-MKT of his intent to sell his Company B

stock.  The Form 144 required Ladd to state, among other things: (1) the number of shares he

intended to sell; (2) the date of the intended sale(s); and (3) the date and amounts of any

Company B stock sales that Ladd had made during the prior three months.  The Form 144 also

contained a bolded footer: "**ATTENTION:  Intentional misstatements or omission of facts**

**constitute Federal Criminal Violations (See 18 U.S.C. § 1001).**"  Pursuant to TD Ameritrade's

policies and procedures, prior to making any sales of affiliate-owned stock, TD Ameritrade

required the customer to submit a Form 144 to it, and it agreed to file the Form with the

Commission on the customer's behalf.

175.    By at least May 9, 2016, Ladd understood the Company B stock held in the

Ladd's Relatives' Account had been coded for "no sales without approval because of Affiliate

status," due to Ladd's Relatives' relationship to Ladd and the trading authorization the three had

signed.  On May 10, 2016, and at TD Ameritrade's request, Ladd signed (purportedly as Relative

B's "attorney") and submitted to TD Ameritrade a Form 144 stating Relative B's intent to sell by

May 30, 2016, 382,863 Company B shares from the Ladd's Relatives' Account (the "Relative

---

[3]        During the time period that Company B was admitted to trading on the NYSE-MKT,
Rule 144(h) also required Ladd to transmit a copy of the Form 144 to the NYSE-MKT, and
regarding each Form 144 alleged herein, Ladd submitted the form to TD Ameritrade.

B's Form 144").  The Form 144 required Ladd to state Ladd's Relatives' "relationship to issuer."

On Relative B's Form 144, however, Ladd falsely responded "NONE" to that question, despite

the form's express instruction to include "[s]uch person's relationship to the issuer (e.g., officer,

director, 10% stockholder, *or member of immediate family of any of the foregoing*)" (emphasis

added).  Moreover, notwithstanding that Ladd stated in Relative B's Form 144 that the

approximate date of sale would be May 30, 2016, Ladd placed his order to sell the 382,863

Company B shares in the Ladd's Relatives' Account on May 12, 2016.  In addition, Form 144

requires disclosure of all sales by persons whose sales are required to be aggregated under Rule

144(e), which, under Rule 144(e)(3)(vi), includes those who "agree to act in concert for the

purpose of selling securities of an issuer," as Ladd and his Relatives had agreed to do.

Nonetheless, Ladd failed to disclose any of the sales he had made in his own E*Trade Account in

the prior three months.

176.    Ladd filed no Form 144 regarding his intent to sell Company B stock from May

9-12, 2016, from either his E*Trade Account or his TD IRA Account, even though he sold a

substantial number of shares from his E*Trade Account during the week of May 9.  Two weeks

later, however, Ladd knowingly or recklessly filed a false Form 144 regarding those sales –

which falsely indicated that Ladd was selling that Company B stock later in May and, thus

created the false appearance that his May 2016 Company B stock sales satisfied Rule 144(e)'s

volume restrictions.

177.    On or about May 25, 2016, Ladd signed and submitted to TD Ameritrade a

second Form 144 (the "Ladd Form 144") falsely stating his intent to sell by May 25, 2016,

41,000 Company B shares from his TD IRA Account and 465,171 Company B shares from his

E*Trade Account.  Those statements were knowingly false, however, because Ladd already had

sold 435,000 Company B shares out of his E*Trade account (between May 9 and May 12, 2016),

and he sold only 11,000 Company B shares after May 25, 2016 (from his TD IRA Account, but

not until May 31, 2016).

178. The Ladd Form 144 also falsely stated the amount of Company B stock that Ladd

had sold during the prior three months. The Ladd Form 144 disclosed Ladd's May 12, 2016

sales of Company B stock from the Ladd's Relatives' Account. However, as Ladd knew or

recklessly disregarded, the Ladd Form 144 failed to disclose that from his E*Trade Account: (a)

Ladd had sold 435,000 Company B shares from May 9-12, 2016; (b) Ladd had sold an additional

25,000 Company B shares between May 16 and May 17, 2016; and (c) Ladd had sold 79,072

shares of Company B stock between February 26 and May 3, 2016. Thus, the Ladd Form 144

failed to disclose total Ladd sales of 539,072 Company B shares in the prior three months (which

had generated for Ladd total sales proceeds of $512,471.78).

179. On or about May 31, 2016, Ladd filed a Form 4 with the Commission, in which

he knowingly or recklessly falsely attested that he had sold a total of 157,300 Company B shares

on May 25, 2016 for which he acknowledged beneficial ownership. As Ladd knew, he made no

Company B stock sales on or about May 25, 2016.

180. By failing to file a Form 144 that accurately reflected his May 9-12, 2016,

Company B stock sales in the E*Trade Account – combined with his false May 10 Relative B's

Form 144, his false May 25 Ladd Form 144, and his false May 31 Form 4 – Ladd knowingly or

recklessly stated falsely that his May 2016 Company B stock sales were in compliance with the

stock sale volume limitations of Securities Act Rule 144(e) when they were not.

### 8. Ladd's Failure to File SEC Forms 4 and the False and Misleading Form 4 He Did File

181. Under Exchange Act Section 16(a) and Rule 16a-3 thereunder, Company B's

officers (including Ladd) were required periodically to file certain forms with the Commission disclosing their Company B stock holdings and any of their purchases or sales of Company B stock. Thus, within 10 days of becoming a Company B officer, Ladd was required to file a Form 3 disclosing all Company B stock in which he had a direct or indirect pecuniary interest. To keep that information current, Ladd also was required (with limited exceptions not relevant to this Complaint) to file Form 4 reports disclosing any Company B stock transactions that resulted in a change in Ladd's beneficial ownership of Company B stock within two business days following the execution date of any such transaction. Finally, Ladd was required to file with the Commission an annual "clean up" statement on Form 5 within 45 days after Company B's fiscal year-end to report any transactions or holdings that should have been reported on Forms 3 or 4 during the issuer's most recent fiscal year, but were not, and any transactions eligible for deferred reporting (unless Ladd had previously reported all such transactions).

182.    Ladd did not disclose most of the open market Company B stock purchases and sales he made in his own brokerage accounts in 2015 and 2016. Ladd filed Forms 4 on October 7, 2015 and December 1, 2015, in which he failed to disclose over twelve open market purchases of Company B stock he made between August 20 and December 1, 2015. Ladd also failed to file the required Form 4 for any of the over twenty Company B open market purchases and sales he made in the E*Trade Account between December 2, 2015 and May 17, 2016 – including the 435,000 Company B shares that Ladd sold in the E*Trade Account in the May 9-12, 2016, period immediately following the May 9, 2016 press release about Company B's transaction with the CI Company.

183.    After receiving a May 22, 2016 NYSE inquiry into sales of Company B stock by company officers, Ladd finally filed a Form 4 on May 31, 2016, but, in it, he knowingly or

recklessly falsely disclosed the extent of his trading. In his May 31, 2016 Form 4, Ladd

disclosed a sale of 157,300 Company B shares on May 25, 2016, and a sale of 33,603 shares on

May 31, 2016. Ladd made no sales at all on May 25, 2016 and the Form 4 he filed omitted the

rest of his trading in Company B shares since December 1, 2015, the date of his prior Form 4.

### 9. *Ladd's Failure to File Amended Schedules 13D*

184.     Under Exchange Act Section 13(d)(1), Ladd was required to file a Schedule 13D

disclosure statement with the Commission regarding his beneficial ownership of more than 5%

of Company B stock within 10 days of acquiring that stock and, under Exchange Act Section

13(d)(2) and Rule 13d-2(a) thereunder, to make amended Schedule 13D filings "promptly" as

material changes occurred in any such disclosures Ladd previously had made. An acquisition or

disposition of 1% or more of Company B's stock is material for purposes of Rule 13d-2.

185.     In 2012, Ladd reported to the Commission that he possessed beneficial ownership

of over 30% of Company B's stock in a Schedule 13D/A filed January 10, 2012. However, Ladd

has filed no amendments to his Schedule 13D filings since 2012. Company B's 2015 Form 10-K

(filed April 14, 2016) stated that Ladd beneficially owned 5% of Company B's stock as of April

11, 2016. However, Ladd did not file a Schedule 13D/A to disclose any of the changes in his

beneficial ownership. Nor did he file a Schedule 13D/A when he sold 435,000 Company B

shares between May 9 and May 12, 2016, an amount that constituted 2.6% of Company B's

outstanding shares, as reported in its April 14, 2016 Form 10-K.

### D.  The Company C Scheme

### 1. *Honig and Stetson Obtain Control of Company C*

186.     In early 2014, Honig identified a publicly traded shell company that was

unencumbered by debt, and sought an appropriate private company for purposes of a reverse merger

and pump and dump scheme. While Honig preferred "'33 Act shells" – namely, public companies

that would not be subject to Exchange Act Section 13(d) reporting obligations – in later years, those shells became too expensive, and the shell he identified in early 2014 was a "'34 Act shell," subject to Section 13(d) reporting.

187.    At or about the same time as Honig identified the shell, the CEO of privately held Company C ("Company C's CEO") was looking for funding for its research and development efforts in cancer therapies and diagnostic products.  Company C's CEO was introduced to "Entity H," a hedge fund that frequently invested alongside Honig and Brauser.  Entity H suggested to Company C's CEO that he turn Company C into a public company by engaging in a reverse merger with a public shell.  Although Company C's CEO did not know it, the public shell Entity H had in mind was one that Honig had identified.  Company C's CEO agreed to proceed with the reverse merger Entity H had suggested.

188.    In an initial $3 million capital raise in February 2014, in connection with the contemplated merger with Company C, HSCI – a company Stetson falsely identified as his own to Company C's CEO – invested $1 million and Entity H invested $1.7 million in return for a substantial position in the shell.  In fact, while Stetson was the sole named managing member of HSCI, Honig actually directed and controlled HSCI's investment decisions, a fact that Stetson did not disclose to Company C's CEO or to the market.

189.    Soon after Stetson had introduced HSCI as his company, however, Company C's CEO learned that Honig was actually behind the HSCI investment.  In approximately April 2014, when Honig first called up Company C's CEO, Honig announced in words or substance:  "I'm the owner of your company.  You better do what I tell you to do."  Thereafter, Honig began peppering Company C's CEO with frequent telephone calls demanding various corporate actions, including directing changes to the composition of the Company C Board, the

engagement of Issuer's Counsel, and the retention of public relations consultants favored by Honig, as described below. Company C's CEO, in need of funding for his company, took those calls and often acceded to Honig's demands.

190. Sometimes Honig worked with Stetson to exert his influence over management. As early as May 18, 2014, for example, Stetson emailed Company C's CEO to get updates on "IR and PR." Stetson was referring to investor relations ("IR") and public relations ("PR"), and was pressing his and Honig's demand that Company C begin aggressively marketing itself and paying promoters to do so. Honig added to the discussion the topic of future financings: "[a]nd the money raise."

191. On June 1, 2014, Brauser and Affiliate 1 each committed to make a substantial investment in the public shell, before the merger into Company C was finalized. As the ringleaders for the investor group in Company C, Honig and Stetson led the merger negotiations on the group's behalf.

192. On July 8, 2014, Company C executed the reverse merger of the company into the public shell controlled by Entity H, HSCI, and, by then, Brauser and Affiliate 1 Entity. At or around the time the merger closed, ATG, Brauser and Affiliate 1 Entity also made investments in Company C. After the merger, the stake of Entity H, HSCI, Brauser, Affiliate 1 Entity and ATG (including conversion of all warrants) amounted to almost 48% of the authorized shares of the newly public Company C. The terms of the merger included granting a "Consent Right" to Entity H and its affiliates, by which Entity H could block or approve many kinds of transactions by Company C, including the issuance of additional shares, any change of control and other significant corporate actions.

193. In connection with the July 2014 reverse merger, the merger investors obtained

warrants that they agreed would not be exercisable until July 8, 2015. However, on September 3, 2014, Company C agreed to allow merger investors to exercise warrants for additional Company C shares before the previously agreed-upon July 8, 2015 exercise date. This warrant exercise allowed investors to exchange warrants for shares cheaply. In connection with that exercise, Stetson submitted warrants on behalf of several investors, including ATG and Affiliate 1 Entity. In a September 15, 2014 email, Company C's CFO asked Stetson which entities were his or HSCI's affiliates. Stetson answered falsely that he was "not affiliated with any of those entities," and that he "just made private sales for my warrants."

## 2. *The Series D and Series E Financings*

194. In March and April 2015, Honig orchestrated two private placement financings for Company C that would tighten Honig's, Brauser's, Stetson's and O'Rourke's control of the company: the Series D and Series E offerings. Honig described the deal to Stetson, Brauser and Investor 1 in a March 5, 2015 email, characterizing it as a "real good opportunity" that would allow them to "make $35 million conservatively in 4 months and our money out [in] 4 weeks. . . . I will trade out of it for us."

195. Honig and Stetson pitched the first of these financings, the Series D financing, to Company C management as a way to buy out Entity H's position and repackage the financing on more favorable terms to Company C.

196. As Company C's CFO understood, Honig structured both financings to avoid disclosing his, Brauser's, Stetson's and O'Rourke's holdings on Schedule 13D or 13G. Since the requirement to make those filings is triggered by voting control of securities, Honig insisted that the Series D and Series E offerings consist of preferred, convertible and non-voting shares with blocker provisions. Pursuant to those blocker provisions, Company C was prohibited from

converting any holder's preferred shares that would give him or it more than 4.99% voting control of the total outstanding common shares.

197. Honig's control of the financing group was clear to Company C's management; indeed, when deciding whether a potential investor could take part in the March 2015 Series D financing round, Company C's CEO explicitly deferred to Honig, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might want to allow to invest along with the current group. Viewed this as your choice not mine. That is why I asked him to call you."

198. Stetson kept up the pressure on Company C to close the financings on the terms he and Honig dictated. On March 10, 2015, Stetson told Company C's CEO in an email that he needed to reach an understanding by the next day to proceed with the buyout of the Entity H notes and fund the company.

199. Honig and Stetson also made it a condition of the March 2015 Series D financing round that Company C retain Issuer's Counsel and Issuer's Counsel Partner after the closing – the law firm and partner that they had required Company A to retain, and the same law firm retained by Company B. Not only did Honig and Stetson insist that Issuer's Counsel represent Company C, in a March 12, 2015 email to Company C's CFO, Stetson also demanded that Company C set aside a year of prepaid legal fees as an additional condition to doing the deal.

200. Stetson managed the financing process with the investors and lawyers, as though he were Company C management, and told Company C management about substantive decisions, including, but not limited to, sending a March 18, 2015 email to Company C management informing them which bank would be used for a contemplated escrow agreement.

201. Stetson introduced Company C management to his and Honig's chosen IR consultant on March 14, 2015, and at Honig's direction, insisted that the financing include a

grant of 300,000 Company C shares as payment to the consultant. On March 23, 2015, Honig directed Stetson to engage another IR consultant for Company C, who was also granted Company C shares.

202. Honig and his associates recognized that the participation of Investor 1 was critical to the success of the transaction by creating the market demand necessary for them to sell their shares after the planned promotion. As Stetson explained in an email to Company C leadership on March 9, 2015, the "following of [Investor 1] is worth its weight and [sic] gold . . . ."

203. To that end, Honig again demonstrated his control over the selection of investors when he asked Brauser to "do [him] a favor" on April 1, 2015 and forego his participation in the Series E financing because, as Honig explained, "I would like to let some of our friends do it . . . [I]t would be best if we let [Investor 1 and Investor 1 Company and an Investor 1 Company executive ("Investor 1 Co. Officer")] take their full allocation."

204. At the same time, Honig and Brauser understood that public market investors might not want to follow Investor 1 into a company dominated by Honig and Brauser, and their group. Thus, like Honig's decision to conceal his initial investment by making it through HSCI, Honig and Brauser determined to disguise the full extent of their participation in the financings by funneling some of their share acquisitions through a company they co-owned, Southern Biotech. Honig informed Stetson and Brauser in early March 2015, "I would like us to do [the investment] through Southern Biotech."

205. In an email to Stetson and Brauser on March 13, 2015, Honig laid out a more detailed list of investors as well as the proposed investment amount and the method of investment for both the Series D and Series E financings: "Southern biotech will invest 3 million

to purchase [Entity H's] notes – 1 million each," and "[Investor 1] is going to lead pipe [private investment in public equity] for 1 million at .75 cents."

206.    Issuer's Counsel also understood the importance of keeping Honig's and Brauser's investment through Southern Biotech undisclosed.  Right before the closing of the Series D financing, different counsel involved in the transaction sent proposed Form 8-K language to Issuer's Counsel (which was not yet counsel to Company C and was acting as placement agent's counsel) in which Company C's then-counsel named Southern Biotech as an investor in a footnote.  Immediately, on March 25, 2015, Issuer's Counsel Partner and another lawyer from Issuer's Counsel wrote back that "[n]o stockholder [investor] should be named." Further, at Stetson's and Honig's direction, Issuer's Counsel changed the beneficial ownership blocker requirement to 2.49% to create an artificial and deceptive "cap" on the amount of common stock that could be held at one time.  Stetson explained in a March 24, 2015 email to Company C's CFO that the requirement was "due to Barry being the beneficial owner of both GRQ [] and Southern Bio."  While that 2.49% cap prevented GRQ and Southern Biotech from collectively owning more than 5%, it did nothing to prevent their aggregate group ownership with other associates from exceeding 5% – the reporting threshold – even if their individual common stock ownership was kept to 2.49% or below.

207.    In an April 2015 email to his Board, Company C's CEO detailed the demands of the Honig investors, including that Investor 1 Co. Officer be granted a lucrative consulting agreement, and that a new board member, satisfactory to Investor 1 Co. Officer, be appointed at a later date.  The Board capitulated and pursuant to the consulting agreement, Investor 1 Co. Officer was granted 200,000 Company C shares – worth more than $400,000 at the time – in exchange for his services.  In fact, Investor 1 Co. Officer never provided any services to

Company C.

208.  The Series D financing closed in late March 2015 and included a buyout of Entity H's notes, including the Consent Right, at a favorable purchase price to the investors who purchased the notes.  The investors who purchased the notes included various entities owned and controlled by Defendants Honig, Brauser, Stetson and O'Rourke:  HSCI (Honig and Stetson), GRQ (Honig), Grander (Brauser) and ATG (O'Rourke).  After this transaction closed, Company C had 5,827,327 shares of common stock outstanding, and the Series D investors had preferred shares convertible into over 23,764,700 shares of common stock.  Southern Biotech held only 145,000 common stock shares at the time, but had conversion rights to as many as 13,376,382 common shares – more than twice as many common shares than Company C had outstanding at the time of the financing.

209.  The Series E financing, which closed April 6, 2015, included warrants, and raised $12 million for Company C on terms highly favorable to Investor 1, Investor 1 Trust and Investor 1 Company.  Honig and his associates managed the Investor 1, Investor 1 Trust and Investor 1 Company investments through the Series E financing.  For example, Investor 1 Company's investment documentation was transmitted to and discussed with Stetson and Brauser rather than any individuals at Company C, reflecting the fact that Honig and his co-investors were orchestrating the deal rather than Company C itself.

210.  Investor 1's participation gave Honig, Brauser, Stetson and O'Rourke leverage in negotiating with Company C, including in solidifying the group's control over Company C's board.  When negotiating the final terms of the Series E financing, including Investor 1 Company's right to designate replacement board members, Stetson sought reassurance from Issuer's Counsel Partner in an April 3, 2015 email, asking:  "Are you comfortable that we will

get control of the board with this language?"

211.    After the financings closed, Honig attempted to further exert his control over Company C.  For example, Honig spoke with Company C's CEO about changing the composition of the company's Board and suggested a specific individual as a candidate.  After Company C's CEO interviewed the candidate, Issuer's Counsel Partner sent the candidate a letter containing the signature line of Company C's CEO inviting him to join the Board on April 1, 2015.  When Company C's CEO learned of the offer, he contacted Issuer's Counsel Partner in an April 14, 2015 email and instructed him to rescind the offer because it had not been authorized by the Board.  Issuer's Counsel Partner agreed to do so, explaining to Company C's CEO that he had been following Honig's directions in sending the offer letter on behalf of Company C's CEO.

### 3.    The Company C Pump and Dump in April 2015

212.    One of the goals of the private placement financings, as Honig, Brauser, Stetson and O'Rourke knew, was to generate market interest and boost trading volume in Company C stock in preparation for a planned stock promotion.  On April 3, 2015, O'Rourke, acting at Honig's direction, circulated a press release (with input from Company C's CEO, Honig and Brauser) announcing the $12 million private placement in which Investor 1 and his entities had participated, drawing on Investor 1's reputation among retail investors as a successful biopharma investor.

213.    Honig, with the knowledge of Brauser and Stetson, then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym "Wall Street Advisors" on the *Seeking Alpha* website on April 8, 2015 at 11:13 a.m.  The article, titled "[Investor 1 Company] Spots Another Overlooked Opportunity in [Company C]," highlighted

Investor 1 Company's and Investor 1's investment in Company C, and was designed to inspire Investor 1's retail investor devotees to follow his lead and buy Company C stock. Despite his involvement in facilitating the Company C financing and his extensive business relationships with Honig, Brauser, Investor 1 and Stetson, in his article, O'Rourke knowingly and falsely claimed that "[t]he author has no business relationship with [Company C]." He also knowingly and falsely claimed that he was "not receiving compensation for [writing the article]."

214.     Anticipating the release of O'Rourke's *Seeking Alpha* article, ATG and O'Rourke engaged in early trading of Company C shares on April 8, 2015 with the intention of creating a false appearance of market interest in the stock. That trading included at least one matched trade, with a Honig associate submitting the buy order and ATG submitting the sell order for the same price at 9:38 a.m. The share price of Company C opened that day at $3.14 and reached $3.73 in the minutes before the promotional article was released.

215.     The promotional campaign was successful. The trading volume of Company C shares rose almost 7500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, following the announcement of the Series E private placement involving Investor 1. The trading volume further increased to 858,709 on April 9, 2015, the day after O'Rourke's article was published. Company C's share price went from a closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015, increasing the company's market capitalization by $23 million. Honig and his affiliates, acting pursuant to their agreement to acquire, hold, vote and/or dispose of their Company C shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of over $5.5 million. HSCI, controlled by Stetson and Honig, sold 1,080,379 Company C shares between April 6 and June 30, 2015 for proceeds of $3,607,248.91.

### 4. The Company C Pump and Dump in June/July 2015

216.    In June 2015, when the market for Company C shares had cooled from over $4 per share to closing prices hovering just above $2 per share, O'Rourke recruited Ford to publish another Company C tout on Ford's blog. On July 1, 2015, Ford published an article titled "[Company C]: Near-Term Catalysts Could Push Shares from $2 to over $5." The article contained materially false statements (as Honig, Brauser, Stetson and O'Rourke knew, or were reckless in not knowing) including that a licensing deal was imminent, when it was not, and that there were near-term therapy development events that could take the share price to $5, when in fact clinical trials were only in early stages. As before, although Honig compensated Ford for writing the blog post, Ford did not disclose that he had been paid.

217.    Ford's article had the desired impact on the market: Company C trading volume increased from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015. Likewise, Company C's share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015. Pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig and his affiliates sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million. HSCI, controlled by Stetson and Honig, sold 682,539 Company C shares between July 1 and December 7, 2015 for proceeds of $1,525,588.49.

218.    Honig and Stetson thereafter continued to invest in Company C and conferred benefits on members of their group and directed critical business decisions for Company C. For example, on more than one occasion, Honig or Stetson directed Company C's CEO to appoint Honig's candidate to Company C's board. And on August 15, 2016, at Honig's and Stetson's direction, as a condition to HSCI providing additional financing to Company C, HSCI and Company C's CEO executed a letter agreement requiring Company C to hire the public relations

firm that Honig and Stetson had selected. Honig even prevailed on Company C to pay Affiliate 1 Entity a six-figure "Investor Due Diligence" fee in August 2016.

### 5. False Beneficial Ownership Reports by Honig, Brauser, Stetson and O'Rourke

219. Given the agreement among Honig, Brauser, Stetson and O'Rourke to acquire, hold, vote and/or dispose of their Company C shares in concert; the group's direction of Company C management and policies; and their combined share ownership, all of the members of the group were required to make Schedule 13D filings that they did not make. They did not make the appropriate filings so that the investing public would not discover their control, much less the extent of their control, over Company C, and to obscure from investors that they were positioning themselves for a pump-and-dump scheme.

220. By the end of April 2015 after the closing of the private placement financings, Stetson, HSCI, Brauser (through Grander) and O'Rourke (through ATG) all had substantial deposits of Company C shares in their brokerage accounts. Therefore, they were all individually obligated to make a Schedule 13D filing, disclosing their own holdings and that they were members of the group because they were acting together for the purpose of acquiring, holding, voting and/or disposing of Company C shares, and collectively owned greater than 5% of Company C's outstanding shares.

221. Other Defendants who invested in Company C also improperly made Schedule 13G filings, by which they falsely represented themselves as passive investors, and also failed to disclose their membership in the group, in violation of disclosure requirements. For example, Honig filed a Schedule 13G on February 17, 2017 disclosing only his 6.22% ownership through GRQ; Stetson filed a Schedule 13G on September 19, 2017, disclosing only his 5.64% (nominal) ownership through HSCI; Brauser filed a Schedule 13G on February 2, 2017, disclosing only his

5.44% ownership through Grander. Each of these Defendants should have made Schedule 13D filings because they were not passive investors, and each should have disclosed the existence of, and membership in, a group. Nor were the eventual Schedule 13D filings made by Stetson on February 12, 2018, Honig on February 13, 2018, and a Schedule 13D/A filed by Honig on February 16, 2018 (all filed after they became aware of a pending regulatory investigation), compliant with the federal securities laws since none of them disclosed the existence of a group or their membership in it.

### FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Honig, GRQ, HSCI and Maza)

222.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

223.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, GRQ, HSCI and Maza, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

224.     Honig (acting individually and/or through the entities he controlled, including GRQ and HSCI, and pursuant to tacit or explicit agreements with Brauser, Stetson, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A,

Company B and Company C in coordination with one another) violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices. Honig further violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by engaging in manipulative trading in the securities of Company A and Company B. With respect to Company A, Honig further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, directly or indirectly, knowingly or recklessly making materially false statements to brokers and submitting materially false attorney opinion letters to transfer agents, relating to his relationship to Company A. With respect to Company B, Honig further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making materially false and misleading Schedule 13G filings, concealing both his control over Company B's management and policies, as well as his membership in a group with Brauser, Stetson and O'Rourke, and other affiliates, pursuant to their tacit or explicit agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another. With respect to Company C, Honig further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making both a materially false and misleading Schedule 13G filing (by which he concealed his control over Company C's management and policies as well as his membership in a group with Brauser, Stetson, O'Rourke, and offer affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another), and a materially false and misleading Schedule 13D filing (by which he concealed his membership in a

group with Brauser, Stetson, O'Rourke, and offer affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another) Honig's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

226. Maza, pursuant to a tacit or explicit agreement with Honig, Brauser, Stetson and O'Rourke, with respect to Company A, violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by intentionally or recklessly omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies. Maza further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly submitting materially false statements to Company A's transfer agent about Honig's relationship to Company A in connection with Honig's preparation to sell his Company A shares.

226. By reason of the foregoing, Honig, GRQ, HSCI and Maza, directly or indirectly, singly or in concert, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Against Brauser, Stetson, O'Rourke, Grander, SCI and ATG)

227. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

228.    By engaging in the acts and conduct described in this Complaint, Defendants
Brauser, Stetson, O'Rourke, Grander, SCI and ATG, with scienter, directly or indirectly, singly
or in concert, by use of the means or instruments of transportation or communication in interstate
commerce, or of the mails, or of the facilities of a national securities exchange, in connection
with the purchase or sale of Company A, Company B and/or Company C securities, have: (a)
employed devices, schemes, or artifices to defraud; and/or (b) engaged in acts, practices, or
courses of business which operated or would operate as a fraud or deceit upon any person.

229.    Brauser (acting individually and/or through the entities he controlled, including
Grander, and pursuant to tacit or explicit agreements with Honig, Stetson, O'Rourke and other
affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company
B and Company C in coordination with one another) violated Exchange Act Section 10(b) and
Rules 10b-5(a) and (c) thereunder by, among other things, directly or indirectly, with scienter:
obtaining and exercising undisclosed control of the management and policies of Company A,
Company B and Company C; and selling shares of Company A, Company B and Company C
into the market into trading volume and at prices he knew or was reckless in not knowing were
artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for
and orchestrated.  Brauser's intentional or reckless failure to make timely and appropriate filings
under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B
and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as
material omissions that facilitated his scheme to defraud investors about his and his group's
control of the management and policies of, and the magnitude of their individual and collective
investment in, both companies.

230.    Stetson (acting individually and/or through the entities he ostensibly and actually

controlled, including SCI and HSCI, and pursuant to tacit or explicit agreements with Honig,

Brauser, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they

acquired in Company A, Company B and Company C in coordination with one another) violated

Exchange Act Section 10(b) and Rules 10b-5(a) and (c) thereunder by, among other things,

directly or indirectly, with scienter: obtaining and exercising undisclosed control of the

management and policies of Company A, Company B and Company C; paying undisclosed

compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer

to artificially boost trading volume and stock price; and selling shares of each company into the

market at artificially high prices. Stetson's intentional or reckless failure to make timely and

appropriate filings under Exchange Act Section 13(d) with respect to his and his group's

holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and

Rules 10b-5(a) and (c) as material omissions that facilitated his scheme to defraud investors

about his and his group's control of the management and policies of, and the magnitude of their

individual and collective investment in, both companies.

231.    O'Rourke (acting individually and/or through the entities he controlled, including

ATG, and pursuant to tacit or explicit agreements with Honig, Brauser, Stetson and other

affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company

B and Company C in coordination with one another) violated Exchange Act Section 10(b) and

Rules 10b-5(a) and (c) thereunder by, among other things, directly or indirectly, with scienter:

obtaining and exercising undisclosed control of the management and policies of Company A,

Company B and Company C; paying undisclosed compensation to writers and bloggers to write

enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock

price, and, on at least one occasion, writing and publishing his own materially false and

misleading article about Company C; and selling shares of each company into the market at

artificially high prices. O'Rourke's intentional or reckless failure to make timely and appropriate

filings under Exchange Act Section 13(d) with respect to his and his group's holdings of

Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-

5(a) and (c) as material omissions that facilitated his scheme to defraud investors about his and

his group's control of the management and policies of, and the magnitude of their individual and

collective investment in, both companies.

    232.    By reason of the foregoing, Brauser, Stetson, O'Rourke, Grander, SCI and ATG

directly or indirectly, singly or in concert, violated Section 10(b) of the Exchange Act [15 U.S.C.

§ 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

<div align="center">

**THIRD CLAIM FOR RELIEF**
**Violations of Section 17(a)(1)-(3) of the Securities Act**
**(Against Honig, GRQ, HSCI and Maza)**

</div>

    233.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 221 of this Complaint.

    234.    By engaging in the acts and conduct described in this Complaint, Defendants

Honig, GRQ, HSCI and Maza, directly or indirectly, singly or in concert, by use of the means or

instruments of transportation or communication in interstate commerce, in the offer or sale of

Company A, Company B, and/or Company C securities, have: (a) with scienter, employed devices,

schemes, and artifices to defraud; (b) knowingly, recklessly or negligently obtained money or

property by means of any untrue statements of a material fact or omitted to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they

were made, not misleading; or (c) knowingly, recklessly or negligently engaged in transactions,

practices, or courses of business which operated or would operate as a fraud or deceit upon

purchasers of securities of Company A, Company B and/or Company C.

235. Honig (acting individually and/or through the entities he controlled, including GRQ and HSCI, and pursuant to tacit or explicit agreements with Brauser, Stetson, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices. Honig further violated Securities Act Sections 17(a)(1) and (a)(3) by engaging in manipulative trading in the securities of Company A and Company B. With respect to Company A, Honig also violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by, among other things, directly or indirectly, knowingly or recklessly, making materially false statements to brokers, and knowingly or recklessly submitting materially false attorney opinion letters to transfer agents, relating to his relationship to Company A, and subsequently sold shares in Company A by means of those false statements. With respect to Company B, Honig further violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly making materially false and misleading Schedule 13G filings, concealing both his control over Company B's management and policies, as well as his membership in a group with Brauser, Stetson, O'Rourke and other affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another. With respect to Company C, Honig violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly making both a materially false and misleading Schedule 13G filing, and

materially false and misleading Schedule 13D filings, concealing (with respect to his Schedule

13G filings) his control over Company C's management and policies, and (with respect to his

Schedule 13D and 13G filings) his membership in a group with Brauser, Stetson, O'Rourke and

other affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in

coordination with one another.  By means of Honig's false and misleading filings under

Exchange Act Section 13(d) with respect to his stock ownership of Company B and Company C,

Honig was able to acquire additional shares of both companies, and was able to sell his shares in

the dump into artificially inflated trading volume and stock price.  Alternatively, Honig violated

Securities Act Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct

that a reasonably careful person would use under like circumstances.  Honig's intentional or

reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with

respect to his and his group's holdings of Company B and Company C shares also violated

Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated his scheme to

defraud investors about his and his group's control of the management and policies of, and the

magnitude of their individual and collective investment in, both companies.  Alternatively,

Honig violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct

that a reasonably careful person would use under like circumstances.

236.    Maza, pursuant to a tacit or explicit agreement with Honig, Brauser, Stetson and

O'Rourke, with respect to Company A, violated Securities Act Sections 17(a)(1), (a)(2) and

(a)(3) by intentionally or recklessly omitting from Company A filings with the Commission the

true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and

their collective control over Company A's management and policies.  Maza further violated

Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly submitting

materially false statements to Company A's transfer agent about Honig's relationship to Company A in connection with Honig's efforts to remove the restrictive legends from his Company A shares, and Honig subsequently sold shares in Company A by means of those false statements. Alternatively, Maza violated Securities Act Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

237. By reason of the foregoing, Honig, GRQ, HSCI and Maza, directly or indirectly, singly or in concert, violated Sections 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)-(3)].

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**Violations of Sections 17(a)(1) and (3) of the Securities Act**
**(Against Brauser, Stetson, O'Rourke, Grander, SCI and ATG)**

</div>

238. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

239. By engaging in the acts and conduct described in this Complaint, Defendants Brauser, Stetson, O'Rourke, Grander, SCI and ATG directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, in the offer or sale of Company A, Company B, and/or Company C securities, have: (a) with scienter, employed devices, schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Company A, Company B and/or Company C.

240. Brauser (acting individually and/or through the entities he controlled, including Grander, and pursuant to tacit or explicit agreements with Honig, Stetson, O'Rourke and other

affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; and selling shares of Company A, Company B and Company C into the market into trading volume and at prices he knew or was reckless in not knowing were artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for and orchestrated. With respect to Company B and Company C, Brauser further violated Securities Act Sections 17(a)(1) and (a)(3) by knowingly or recklessly making materially false and misleading Schedule 13G filings, concealing both his control over Company B's and Company C's management and policies through his agreement with Honig and other affiliates to acquire, hold, vote and/or dispose of Company B and Company C securities in coordination with one another, as well as his membership in a group with Honig, Stetson, O'Rourke and other affiliates pursuant to that agreement. Alternatively, Brauser violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances. Brauser's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies. Alternatively, Brauser violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

241.     Stetson (acting individually and/or through the entities he ostensibly and actually controlled, including SCI and HSCI, and pursuant to tacit or explicit agreements with Honig, Brauser, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices.  With respect to Company C, Stetson violated Securities Act Sections 17(a)(1) and (a)(3) by knowingly or recklessly making materially false and misleading Schedule 13G and Schedule 13D filings, concealing (with respect to his Schedule 13G filings) his control over Company C's management and policies, and (with respect to his Schedule 13D and 13G filings) his membership in a group with Honig, Brauser, O'Rourke and other affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another. Alternatively, Stetson violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.  Stetson's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies. Alternatively, Stetson violated Securities Act Section 17(a)(3) by failing to use the degree of care

in this conduct that a reasonably careful person would use under like circumstances.

242.    O'Rourke (acting individually and/or through the entities he controlled, including ATG, and pursuant to tacit or explicit agreements with Honig, Brauser, Stetson and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price, and, on at least one occasion, writing and publishing his own materially false and misleading article about Company C; and selling shares of each company into the market at artificially high prices.  Alternatively, O'Rourke violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances. O'Rourke's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies. Alternatively, O'Rourke violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

243.    By reason of the foregoing, Brauser, Stetson, O'Rourke, Grander, SCI and ATG directly or indirectly, singly or in concert, violated Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)].

## FIFTH CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against Ford, Ladd and Keller)**

244.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

245.    By engaging in the acts and conduct described in this Complaint, Defendants Ford, Ladd and Keller, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

246.    Ford violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, knowingly or recklessly making material misstatements in the articles Honig and his affiliates paid him to write about Company A and Company C, including that he was not being paid by anyone other than *Seeking Alpha*.

247.    Ladd violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, knowingly or recklessly authoring and issuing Company B's May 9, 2016 press release in which he made materially false statements about the sale of Cybersecurity Innovator's former company to Intel.  Ladd further violated Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly failing to disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company B's management and policies, in Company B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed.  Ladd further violated Section 10(b) and Rule 10b-

5(b) thereunder by knowingly or recklessly (1) stating falsely on Relative B's Form 144 that Relative B had no relationship to Company B (as "relationship" is defined on Relative B's Form 144) and failing to disclose his own sales of Company B stock in the prior three months; (2) stating falsely on the Ladd Form 144 that Ladd intended to sell Company B stock that day, and falsely omitting his Company B stock sales during the previous three months totaling 539,072 shares; (3) falsely attesting on a Form 4 filed May 31, 2016 that Ladd had sold 157,300 shares of Company B stock on May 25, 2016 over which he acknowledged beneficial ownership and omitting the additional shares purchased and sold in his accounts since the last Form 4 filing; and (4) filing Forms 4 on October 7, 2015 and December 1, 2015 regarding Ladd's Company B stock transactions that omitted over twelve open market purchases of Company B stock between August 20, 2015 and December 1, 2015.

248.    Keller violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, intentionally or recklessly omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies.  Keller further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making materially false statements to Ford – which he knew (or was reckless in not knowing) were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.

249.    By reason of the foregoing, Ford, Ladd and Keller, directly or indirectly, singly or in concert, violated, and Ladd, unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## SIXTH CLAIM FOR RELIEF
### Violations of Section 17(a)(2) of the Securities Act
### (Against Ford, Ladd and Keller)

250.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 221 of this Complaint.

251.     By engaging in the acts and conduct described in this Complaint, Defendants

Ford, Ladd and Keller, knowingly, recklessly or negligently, directly or indirectly, singly or in

concert, by use of the means or instruments of transportation or communication in interstate

commerce, in the offer or sale of Company A, Company B and/or Company C securities, have

obtained money or property by means of any untrue statements of a material fact or omitted to state

a material fact necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading.

252.     Ford violated Securities Act Section 17(a)(2) by, among other things, knowingly,

recklessly or negligently making material misstatements in the articles Honig and his affiliates

paid him to write about Company A and Company C, including that he was not being paid by

anyone other than *Seeking Alpha*.

253.     Ladd violated Securities Act Section 17(a)(2) by, among other things, knowingly,

recklessly or negligently authoring and issuing Company B's May 9, 2016 press release in which

he made materially false statements about the sale of Cybersecurity Innovator's former company

to Intel.  Ladd further violated Section 17(a)(2) by knowingly, recklessly or negligently failing to

disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other

affiliates, and their collective control over Company B's management and policies in Company

B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed.  By means of

those false statements, Ladd, along with Honig, Brauser, Stetson and O'Rourke, sold shares in

Company B.  Ladd further violated Section 17(a)(2) by knowingly,  recklessly, or negligently: (1) stating falsely on Relative B's Form 144 that Relative B had no relationship to Company B (as "relationship" is defined on Relative B's Form 144), and failing to disclose his own sales of Company B stock in the prior three months; (2) stating falsely on the Ladd Form 144 that Ladd intended to sell Company B stock that day, and falsely omitting his Company B stock sales during the previous three months totaling 539,072 shares; (3) falsely attesting on a Form 4 filed May 31, 2016 that Ladd had sold 157,300 shares of Company B stock on May 25, 2016 over which he acknowledged beneficial ownership, and omitting the additional shares purchased and sold in his accounts since the last Form 4 filing; and (4) filing Forms 4 on October 7, 2015 and December 1, 2015 regarding Ladd's Company B stock transactions that omitted over twelve open market purchases of Company B stock between August 20, 2015 and December 1, 2015.

254.     Keller violated Securities Act Section 17(a)(2) by, among other things, intentionally, recklessly or negligently omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies.  Keller further violated Securities Act Section 17(a)(2) thereunder by knowingly, recklessly or negligently making materially false statements to Ford – which he knew (or was reckless or negligent in not knowing) were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.  By means of those false statements, Honig, Brauser, Stetson and O'Rourke sold shares in Company A.

255.     By reason of the foregoing, Ford, Ladd and Keller, directly or indirectly, singly or in concert, violated, and Ladd, unless restrained and enjoined, will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section
### 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Against Ladd and Keller)

256.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 221 of this Complaint.

257.    By engaging in the acts and conduct described in this Complaint, Defendants

Ladd and Keller directly or indirectly, singly or in concert, provided knowing and substantial

assistance to Honig, Brauser, Stetson and O'Rourke, and others, who, directly or indirectly,

singly or in concert with others, in connection with the purchase or sale of a security, with

scienter, used the means or instrumentalities of interstate commerce or of the mails or of a

facility of a national securities exchange to (a) employ devices, schemes, or artifices to defraud;

and (b) engage in acts, practices, or courses of business which operated or would operate as a

fraud or deceit upon others.

258.    Ladd provided knowing and substantial assistance to Honig's, Brauser's,

Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act, and Rules

10b-5(a) and (c), as alleged above in the Second Claim for Relief, by, among other things,

authoring and issuing Company B's May 9, 2016 press release in which he made materially false

statements about the sale of Cybersecurity Innovator's former company to Intel.  Ladd provided

further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and

others' violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) by

knowingly or recklessly failing to disclose the true extent of the stock ownership of Honig,

Brauser, Stetson, O'Rourke and others, and their collective control over Company B's

management and policies, in Company B's 2015 Form 10-K and November 6, 2015 Form S-1,

both of which Ladd signed.

259.    Keller provided knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c), as alleged above in the Second Claim for Relief, by, among other things, omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company A's management and policies.  Keller provided further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) by making materially false statements to Ford – which he knew were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.

260.    By reason of the foregoing, Ladd and Keller aided and abetted Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], and Ladd, unless restrained and enjoined, will continue aiding and abetting others' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

### EIGHTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Sections 17(a)(1) and (a)(3) of the Securities Act**
**(Against Ladd and Keller)**

261.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

262.    By engaging in the acts and conduct described in this Complaint, Defendants Ladd and Keller directly or indirectly, singly or in concert, provided knowing and substantial

assistance to Honig, Brauser, Stetson, O'Rourke and others, who, directly or indirectly, singly or in concert with others, in the offer or sale of a security, used the means or instruments of transportation or communication in interstate commerce or used the mails to (a) with scienter employed devices schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Company A or Company B.

263.    Ladd provided knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act, as alleged in the Fourth Claim for Relief above, by, among other things, authoring and issuing Company B's May 9, 2016 press release in which he made materially false statements about the sale of Cybersecurity Innovator's former company to Intel.  Ladd provided further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act by knowingly or recklessly failing to disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company B's management and policies, in Company B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed.

264.    Keller provided knowing and substantial assistance to Honig's, Brauser's, Stetson's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act, as alleged in the Fourth Claim for Relief above, by, among other things, omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company A's management and policies. Keller provided further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's  and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act by

making materially false statements to Ford – which he knew were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.

265.    By reason of the foregoing, Ladd and Keller aided and abetted Honig's, Brauser's, Stetson's and O'Rourke's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], and Ladd, unless restrained and enjoined, will continue aiding and abetting others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

### NINTH CLAIM FOR RELIEF
### Violations of Section 9(a)(1) of the Exchange Act
### (Against Honig)

266.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

267.    By engaging in the acts and conduct described in this Complaint, Defendant Honig, directly or indirectly, singly or in concert, by use of the mails or the means or instrumentalities of interstate commerce, or of a facility of a national securities exchange for the purpose of creating a false or misleading appearance of active trading in Company A, Company B and/or Company C securities, or a false or misleading appearance with respect to the market for Company A, Company B and/or Company C securities, entered an order or orders for the purchase and/or sale of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time and substantially the same price, for the sale and/or purchase of such security, had been or would be entered by or for the same or different parties.

268.     Honig violated Section 9(a)(1) of the Exchange Act by, among other things, engaging with scienter, through the Barry & Renee Honig Foundation, which he controlled, in matched trading of Company A shares on September 26, 2013.  Honig further violated Section 9(a)(1) by engaging with scienter in matched trading of Company B shares on May 9, 2016 with an associate.

269.     By virtue of the foregoing, Honig violated Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)].

<div align="center">

**TENTH CLAIM FOR RELIEF**
**Violations of Section 9(a)(2) of the Exchange Act**
**(Against Honig)**

</div>

270.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

271.     By engaging in the acts and conduct described in this Complaint, Defendant Honig, directly or indirectly, singly or in concert, by use of the mails or the means or instrumentalities of interstate commerce, or of a facility of a national securities exchange effected, alone or with one or more other persons, a series of transactions in the securities of Company A and/or Company B creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

272.     Honig violated Exchange Act Section 9(a)(2) by, among other things, intentionally entering dozens of small buy and sell orders of Company B shares on the morning of May 9, 2016 for the purpose of creating actual or apparent active trading in Company B shares for the purpose of inducing the purchase of Company B shares by other market participants.

273.     By virtue of the foregoing, Honig violated Section 9(a)(2) of the Exchange Act

[15 U.S.C. § 78i(a)(2)].

## ELEVENTH CLAIM FOR RELIEF
**Unregistered Offering or Sale of Securities in Violation of Sections 5(a) and (c) of the
Securities Act
(Against Honig and Ladd)**

274.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 221 of this Complaint.

275.     By engaging in the acts and conduct described in this Complaint, Defendants

Honig and Ladd, directly or indirectly, singly or in concert, made use of the means or

instruments of transportation or communication in interstate commerce or of the mails to offer or

sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be

carried through the mails or in interstate commerce, by means or instruments of transportation,

securities for the purpose of sale or for delivery after sale, when no registration statement had

been filed or was in effect as to such securities, and when no exemption from registration was

applicable.  The shares of Company A that Honig offered and sold, and the shares of Company B

that Ladd offered and sold, as alleged herein constitute "securities" as defined in the Securities

Act and the Exchange Act.

276.     Honig violated Securities Act Sections 5(a) and (c) with respect to his offer and

sale of Company A shares, by, among other things, selling Company A shares into the public

market from September through December 2013 while no registration statement was in effect for

any of the sales, and no exemption from registration was available.

277.     Ladd violated Securities Act Sections 5(a) and (c) with respect to his offer and

sale of Company B shares in May 2016, by, among other things, selling Company B shares into

the public market from May 9-12, 2016 while no registration statement was in effect for any of

the sales, and no exemption from registration was available for the sale of shares in excess of the volume limitations imposed upon him as an affiliate of Company B.

278.    By reason of the foregoing, Honig and Ladd violated, and Ladd, unless restrained and enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## TWELFTH CLAIM FOR RELIEF
### Violations of Section 13(d) of the Exchange Act and Rule 13d-1(a)
### (Against Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI)

279.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

280.    Pursuant to Exchange Act Section 13(d)(1) and Rule 13d-1(a) thereunder, persons who directly or indirectly acquire beneficial ownership of more than 5% of a Section 12-registered class of equity securities are required to make a Schedule 13D filing, or, in limited circumstances, a Schedule 13G filing. Section 13(d)(3) states that "act[ing] as a . . .  group" in furtherance of acquiring, holding, voting and/or disposing of equity securities is enough to establish the group as a single "person." When a group is required to make a Schedule 13D filing, that group must "identify all members of the group."

281.    Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander and SCI acquired and held beneficial ownership of more than 5% shares in Company B from on or about October 8, 2015 through at least on or about May 20, 2016, and collectively controlled the management and policies of that company throughout this period.  Each of them acquired, held, voted and/or disposed of those shares pursuant to an agreement among them to do so.

282.    Honig, Stetson and HSCI acquired and held beneficial ownership of more than 5% shares in Company C from on or about February 2014, and collectively controlled the

management and policies of that company from that time.  Each of them acquired, held, voted and/or disposed of those shares pursuant to an agreement among them to do so.

283.     Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI acquired and held beneficial ownership of more than 5% shares in Company C from on or about April 2015 through at least on or about December 2015, and collectively controlled the management and policies of that company throughout this period.  Each of them acquired, held, voted and/or disposed of those shares pursuant to an agreement among them to do so.

284.     Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI were each under an obligation to file with the Commission true and accurate reports with respect to their ownership of the Company B and Company C securities, and failed to do so, thereby violating Exchange Act Section 13(d) and Rule 13d-1(a) thereunder.

285.     By reason of the foregoing, Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI violated  Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

## THIRTEENTH CLAIM FOR RELIEF
### Violations of Section 13(d) of the Exchange Act and Rule 13d-2
### (Against Ladd)

286.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

287.     By engaging in the acts and conduct described in this Complaint, Ladd violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-2 [17 C.F.R. § 240.13d-2] thereunder, which require persons who directly or indirectly acquire beneficial ownership of more than 5% of a Section 12-registered class of equity securities to make a Schedule 13D filing, or, in limited circumstances, a Schedule 13G filing.  Exchange Act Section 13(d)(2) and Rule

100

13d-2(a) thereunder require persons to make amended Schedule 13D filings "promptly" as material changes occur in previously made disclosures. An acquisition or disposition of 1% or more of Company B's stock is material for purposes of Rule 13d-2.

288.    Ladd violated Exchange Act Section 13(d) and Rule 13d-2 thereunder by failing to make any Schedule 13D/A filings after January 10, 2012 despite the material changes to his beneficial ownership of Company B stock in the interim.

289.    By reason of the foregoing, Ladd violated, and, unless enjoined and restrained, will continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-2 thereunder [17 C.F.R. § 240.13d-2].

## FOURTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1
### (Against Ladd)

290.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

291.    By engaging in the acts and conduct described in this Complaint, Company B violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1 [17 C.F.R. § 240.13a-1(a)] thereunder, which require issuers of registered securities under the Exchange Act to file annual reports on Form 10-K with the Commission that, among other things, do not contain untrue statements of material fact or omit to state material information necessary in order to make the required statements, in the light of the circumstances under which they are made, not misleading.

292.    Ladd aided and abetted Company B's violation of Exchange Act Section 13(a) and Rule 12b-20 and 13a-1 thereunder, by, among other things, providing knowing and substantial assistance to Company B's filing of a materially false and misleading annual report in

signing its 2015 Form 10-K that failed to disclose the group ownership of Company B stock by

Honig, Brauser, Stetson, O'Rourke and others; and failing properly to disclose his own beneficial

ownership of Company B securities.

293.    By reason of the foregoing, Ladd aided and abetted, and, unless restrained and

enjoined, will continue aiding and abetting, Company B's violations of Section 13(a) of the

Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1(a)

thereunder [17 C.F.R. § 240.13a-1(a)], in violation of Section 20(e) of the Exchange Act [15

U.S.C. § 78t(e)].

<div align="center">

**FIFTEENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 15(d) of the Exchange Act and**
**Rule 15d-1**
**(Against Maza and Keller)**

</div>

294.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 221 of this Complaint.

295.    By engaging in the acts and conduct described in this Complaint, Company A

violated Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17

C.F.R. § 240.15d-1], which require issuers of registered securities under the Securities Act to file

annual reports on Form 10-K with the Commission that, among other things, do not contain

untrue statements of material fact or omit to state material information necessary in order to

make the required statements, in the light of the circumstances under which they are made, not

misleading.

296.    Maza and Keller aided and abetted Company A's violation of Exchange Act

Section 15(d) and Rule 15d-1 thereunder, by, among other things, providing knowing and

substantial assistance to Company A's filing of a materially false and misleading annual report in

signing its 2012 amended Form 10-K that failed to disclose the group ownership of Company A

stock by Honig, Brauser, Stetson and other affiliates.

297.    By reason of the foregoing, Maza and Keller aided and abetted Company A's

violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder

[17 C.F.R. § 240.15d-1], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

<div align="center">

**SIXTEENTH CLAIM FOR RELIEF**
**Violations of Section 17(b) of the Securities Act**
**(Against Ford)**

</div>

298.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 221 of this Complaint.

299.    By engaging in the acts and conduct described in this Complaint, Defendant Ford

directly or indirectly, singly or in concert, by use of the means or instruments of transportation or

communication in interstate commerce, or by the use of the mails, in the offer or sale of

Company A and/or Company C securities, has published, given publicity to, or circulated any

notice, circular, advertisement, newspaper, article, letter, investment service, or communication

which, though not purporting to offer a security for sale, described such security for a

consideration received or to be received, directly or indirectly, from an issuer, underwriter, or

dealer, without fully disclosing the receipt, whether past or prospective, of such consideration

and the amount thereof.

300.    Ford violated Securities Act Section 17(b) by, among other things, obtaining

compensation directly or indirectly from Honig, Brauser, Stetson and/or O'Rourke – each a

statutory underwriter of Company A and Company C – and/or from certain of Honig's,

Brauser's, Stetson's and/or O'Rourke's associates– for writing the promotional articles he

published on Company A and Company C without disclosing his receipt or the amount of that

compensation.

301.    By reason of the foregoing, Ford, directly or indirectly, violated Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## SEVENTEENTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 16(a) and Rule 16a-3 Thereunder
### (Against Ladd)

302.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

303.    By engaging in the acts and conduct described in this Complaint, Defendant Ladd failed to file statements, and filed inaccurate statements, with the Commission required to be filed by Exchange Act Section 16(a) and Rule 16a-3 thereunder regarding certain of Ladd's purchases and sales of Company B stock in his E*Trade Account, TD IRA Account and TD Account.

304.    By virtue of the foregoing, Defendant Ladd violated and, unless restrained and enjoined, will continue violating, Exchange Act Section 16(a), [15 U.S.C. § 78p(a)], and Rule 16a-3 thereunder, [17 C.F.R. § 240.16a-3].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief, in a Final Judgment:

### I.

Finding that Defendants violated the federal securities laws and rules promulgated thereunder as alleged against them herein;

### II.

Permanently restraining and enjoining Ladd his agents, servants, employees and attorneys and all persons in active concert or participation with him who receive actual notice of the

injunction by personal service or otherwise, and each of them, from violating, directly or

indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a) and (c), and

77q(a)]; and Sections 10(b), 13(a) and (d), and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b),

78m(a) and (d), and 78p(a)] and Rules 10b-5, 12b-20, 13a-1, 13d-2, and 16a-3 thereunder [17

C.F.R. §§ 240.10b-5, 12b-20, 13a-1, 13d-2, and 16a-3].

## III.

Permanently barring each of Ladd and Maza from acting as an officer or director of a

public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## IV.

Permanently prohibiting Ladd and Maza from participating in any offering of penny

stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of

the Exchange Act [15 U.S.C. § 78u(d)(6)].

## V.

Ordering Defendants Ladd, Honig, GRQ, Keller, Maza, Ford, and HSCI, to disgorge all

of the ill-gotten gains from the violations alleged in this complaint, and ordering them to pay

prejudgment interest thereon;

## VI.

Ordering Defendants Ladd, Honig, GRQ, Keller, Maza, Ford, and HSCI to pay civil

money penalties pursuant to Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)] and

Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

## VII.

Granting such other and further relief as this Court deems just and proper.

### **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury as to all issues so triable.

Dated: March 16, 2020
      New York, New York

By: _____

Sanjay Wadhwa
Michael Paley
Charu Chandrasekhar
Nancy Brown
Jack Kaufman
Katherine Bromberg
Jon Daniels
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

# Exhibit C



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
NEW YORK REGIONAL OFFICE
200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

NANCY A. BROWN
TELEPHONE: (212) 336-1023
EMAIL: BROWNN@SEC.GOV

March 6, 2020

**Via ECF and UPS Overnight**

Hon. Edgardo Ramos
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

      Re:    SEC v. Honig, et al.;
              No. 18 Civ. 8175 (ER)

Dear Judge Ramos:

      We represent the Plaintiff, Securities and Exchange Commission ("Commission"), in this action.

      Enclosed for the Court's consideration are courtesy copies of Final Judgments on consent against (1) Defendants Michael Brauser and his entity, Grander Holdings, Inc.; (2) John O'Rourke and his entity, ATG Capital LLC; and (3) John Stetson, and his entity, Stetson Capital Investments Inc.

      Also enclosed for the Court's consideration is a courtesy copy of a partial Judgment against Defendant HS Contrarian Investments, LLC ("HSCI"), by which Stetson, on behalf of HSCI, has consented to the imposition of injunctive relief against HSCI, leaving the Commission's claims for monetary relief against that entity for later resolution by further consent or Commission motion. The partial Judgment does not fully adjudicate the Commission's claims against HSCI and we respectfully request that the Court not terminate HSCI from the case.

      We have filed each of the proposed Judgments today on ECF. If the Final Judgments and the partial Judgment against HSCI are satisfactory to the Court, we respectfully request that the Court docket each Judgment together with its respective Consent.

                             Respectfully submitted,

                             Nancy A. Brown

Hon. Edgardo Ramos                                          March 6, 2020
                                                           Page 2


cc:     All Defendants via ECF

# Exhibit D

# Exhibit B

**To:** Jeff Machnij[jeff@bmasecurities.com]
**From:** Ben Brauser
**Sent:** Thur 7/3/2014 9:29:14 AM
**Importance:** Normal
**Subject:** FW: MSLP - Share Purchase
image001.png

Jeff,


Please see below.  The following entities are buying the following amount of shares of MSLP from COCP:


Michael Brauser - 77K

Grander 401K - 30K

Dan Brauser - 8K

Ben Brauser - 5K


The shares were bought under SPA's at $9 per share.  There is a blanket opinion at the TA as all of the shares tack back, but there is a lockup/leakout agreement that I will go over w/ you in detail.  I will also get you all of the backup.  For now though, to get the certs issued, they need the below from you guys.  Can you please put this together for the four above entities?


Thank you,


Ben Brauser, Esq.

**Law Office of Benjamin S. Brauser, P.A.**

4400 Biscayne Blvd, Ste 850

Miami, FL  33137

Office - (305) 576-9260

SEC-BMA-E-0006221

Fax - (305) 576-9298

Cell - 954-649-1821

Ben@MarlinCapital.com


**From:** Dylan Weeks [mailto:DWeeks@nasonyeager.com]
**Sent:** Wednesday, July 02, 2014 5:58 PM
**To:** 'John Stetson'; erichardson@richardsonpatel.com; tagjohn@gmail.com; Ben Brauser; Mike Brauser; dan@usell.com; shaye@briocapital.com; bcolman@colman-partners.com; Emily Fiel; Darren Goodrich; brhonig@aol.com; John Lemak (john@lemak.net); mgman@bullhunterllc.com; bk@pinnaclefund.com; richard@pointcapitalinc.com; ssmith@smithstag.com
**Cc:** Michael Harris; Brian Bernstein
**Subject:** MSLP - Share Purchase


The transfer agency for Musclepharm Corp has requested brokers representation letters for each transferee which contain the following language:


If at any time the issuer becomes non-current in their SEC filings, we will send any unsold shares back to the transfer agent to have the legend re-instated.


Please send the requested representation letters to me so that I may forward them to the transfer agent. Feel free to contact me with any questions. Thank you!


Best Regards,


cid:image001.png@01CEAD4E.86497B20
Dylan Weeks, Paralegal
**Nason, Yeager, Gerson, White & Lioce, P.A.**
1645 Palm Beach Lakes Boulevard, Suite 1200
West Palm Beach, Florida 33401

Phone:  561-471-3511
Fax:  561-471-0894
DWeeks@nasonyeager.com
www.nasonyeager.com


===========================================================
====================================

The information contained in this transmission is attorney privileged and confidential.  It is intended only for the use of

the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified

that any dissemination, distribution or copying of this communication is strictly prohibited.  If you receive this

communication in error, please notify us immediately by telephone (collect) and return the original message to us at

the above address via the U.S. Postal Service.  We will reimburse you for postage and/or telephone expenses.  Thank you.


TAX MATTERS - IRS Circular 230 Disclosure:  To ensure compliance with requirements imposed by the IRS, we

inform you that any tax advice contained in this communication (including attachments) was not intended or written

to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code

or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

===========================================================
====================================

E Think **Green!** please do not print this e-mail unless absolutely necessary.

SEC-BMA-E-0006223

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

SEC-BMA-E-0006224

# Exhibit E

# Exhibit C

# NASON YEAGER GERSON
# WHITE & LIOCE, P.A.
### ATTORNEYS AT LAW
*Established in 1960*

MARK A. PACHMAN
Also Admitted in New York

E-MAIL ADDRESS:
mpachman@nasonyeager.com

DIRECT DIAL:
(561) 471-3529

FAX NUMBER:
(561) 686-5442

July 2, 2014

Corporate Stock Transfer
3200 Cherry Creek Drive South
Suite 430
Denver, Colorado 80209
Attention: Ms. Carolyn Bell

Re:     MusclePharm Corporation / Stock Transfer

Dear Ms. Bell:

We have been requested to render our opinion regarding the removal of the restrictive legend from 600,000 shares of common stock (the "Shares") of MusclePharm Corporation ("MP") without registration under the Securities Act of 1933 (the "Act") in reliance upon the exemption contained in Rule 144 promulgated thereunder by the Securities and Exchange Commission ("SEC"). The Shares are held by the parties set forth on <u>Exhibit A</u> (the "Holders"). To the extent that this opinion is predicated upon facts, it is solely based upon our review of the documents and upon the communications referred to in this opinion.

In rendering this opinion, this firm has discussed the matters covered by this opinion with management of Cocrystal Pharma, Inc. ("Cocrystal"), reviewed representation letters submitted by Cocrystal's management and the Holders, reviewed Cocrystal's and MP's SEC filings, and conducted such other inquiries as we deemed appropriate.

As we understand the facts, on January 2, 2014, MP issued 1,200,000 shares to Cocrystal in connection with the sale of substantially all of the operating assets of Cocrystal making full payment therefor. Since January 2, 2014, Cocrystal has never owned any other shares of MP. According to MP's transfer agent: (i) MP had 11,800,722 shares of common stock outstanding as of March 24, 2014 and (ii) MP had 12,183,722 shares of common stock outstanding as of June 24, 2014 (the "Purchase Date"). Therefore, Cocrystal beneficially owned 10.2% and 9.8% of MP's common stock as of three months prior to the Purchase Date and the Purchase Date, respectively.

SEC-Legend-E-0111385

On the Purchase Date, the Holders acquired the Shares from Cocrystal, which was issued the Shares in a transaction not involving a public offering more than six months ago. The Shares are a "restricted security" as that term is defined in Rule 144(a)(3) under the Act.

Rule 144(d)(1)(i) under the Act provides for the holding period of securities acquired from a non-affiliate to be tacked to the non-affiliate's holding period. As described below and as represented in a representation letter from the Chief Executive Officer of Cocrystal as of the Purchase Date and for the three months prior, it was not an affiliate of MP. Additionally, according to a representation letter signed by the Holders, the Holders are not affiliates and have not been affiliates of MP for more than the past three months.

Rule 144 (a)(1) defines an affiliate of an issuer to be "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." Although Regulation C promulgated under the Act applies to registered offerings under such Act and not by its terms to exempt offerings, nonetheless reference to Regulation C is illuminating. Rule 405 contained in Regulation C defines an "affiliate" in a similar manner as Rule 144(a). However, it makes no reference to specific ownership or percentage of ownership. Conversely, it defines the term "promoter" to include any person who in connection with the organization of an issuer acquires 10% or more of any class of securities of the issuer except under certain circumstances.

Ultimately the issue of whether or not Cocrystal was an affiliate of MP is an issue of fact based upon whether or not it controlled or had the power to control MP. Although Cocrystal owned more than 10% of MP's common stock during the three months prior to the Purchase Date, certain facts indicate they have not been an "affiliate" of MP within the meaning of Rule 144(a)(1) for more than three months prior to the Purchase Date.

As early as 1972, the Division of Corporation Finance of the SEC held the position that "a person's status as an officer, director, or owner of 10% of the voting securities of a company is not necessarily determinative of whether such person is a control person or member of a controlling group of persons." American-Standard, ['72-'73 Decisions] CCH Fed.Sec.L.Rep. paragraph 79,071 (Avail. Oct. 11, 1972). As the American-Standard interpretive letter recognizes, a person's position of control is a factual issue.

In reaching this conclusion, the staff relied upon the definition of control in Rule 405 referred to above. Interestingly, in defining the term promoter, the SEC specifically referred to ownership of 10% or more of a class of equity securities of an issuer; in defining the term "affiliate" in Rule 144(a), the SEC makes no mention of this 10% requirement although its action in defining "promoter" in Rule 405 shows that it knew how to draft a rule in that fashion. This conscious reference gives support to the Division of Corporation Finance's 1972 interpretation that a 10% ownership status does not necessarily indicate control.

Quoting what he terms a "classic study," one authority (who later served as a Commissioner of the SEC) recognized that control stems from the power to select the board of directors or a majority of the board. Cocrystal has advised us that none of its affiliates are or have served as members of the Board of Directors of MP, nor did it have the power to elect directors of

SEC-Legend-E-0111386

MP.  See Sommer, Who's "in Control?"- S.E.C. 21 Bus. Law 559, 562-70 (1966). Another SEC Commissioner once suggested that a very practical criterion for determining whether the person or group was in control was if the individual or group has the power to cause a registration statement under the Act to be signed. Sommer, supra at 566. Prior to the sale of the Shares to the parties listed on Exhibit A, we, on behalf of Cocrystal, requested that MP register Cocrystal's shares of MP common stock at Cocrystal's expense. MP denied this request.

These legal authorities together with the facts set forth above lead us to conclude that Cocrystal was not an affiliate of MP as of the Purchase Date since it did not possess the power to control MP.  Each of the parties listed on Exhibit A has also executed representation letters that such parties are not affiliates and were not affiliates within the three months prior to the Purchase Date.

Additionally, Rule 144(b)(1)(i) requires that the issuer has been subject to the reporting provisions of Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") for at least 90 days prior to the sale (a "Reporting Issuer"). MP was subject to such provisions for more than 90 days prior to the date of this opinion.

For Reporting Issuers, another condition is found in Rule 144(c) which requires that adequate current information about the issuer be available.  Rule 144(c)(1) specifies that this test is met if the Reporting Issuer has filed all required reports under Section 13 or 15(d) of the Exchange Act during the 12 months prior to the sale, except Form 8-K. MP has filed all required reports necessary under the Rule.  Additionally, Rule 144(c)(ii) requires XBRL information to have been posted on MP's corporate website during the prior 12 months. MP's corporate website contains the required XBRL information.

Based upon the foregoing, and assuming that the factual statements set forth herein are true and correct, it is our opinion that, subject to the Securities Purchase Agreements between MP and the Holders, the Shares may be sold until 5:30 p.m. New York Time on August 14, 2014, and that the restrictive legend may be removed from such sold shares by reason of Rule 144 under the Act.

This opinion speaks of its date and we are not responsible for updating it. Our opinion, inasmuch as it is addressed to you, is not to be quoted in whole or in part or otherwise referred to nor is it to be filed with any governmental agency or other person without the prior written consent of this law firm.  Other than you, MP, Cocrystal, the parties on Exhibit A and their broker-dealers, and your counsel, no one else is entitled to rely on this opinion.

Very truly yours,

NASON, YEAGER, GERSON, WHITE & LIOCE P.A.

SEC-Legend-E-0111387

Exhibit A

| Holder | No. Of Shares (1) |
|---|---|
| | |
| Melechdavid, Inc. | |
| Barry and Renee Honig Charitable Foundation, Inc. | 20,000 |
| Stetson Capital Investments, Inc. | 15,000 |
| | |
| Michael Brauser | 77,000 |
| Grander Holdings, Inc. 401K Profit Sharing Plan | 30,000 |
| Ben Brauser | 5,000 |
| Dan Brauser | 8,000 |

| ATG Capital LLC | 5,000 |
|---|---|



| **Total** | **600,000** |
|---|---|

(1) Under the Stock Purchase Agreements executed by MP and the Holders, each of the Holders is limited to selling 12.5% of the Shares in a calendar month (with the first month beginning the date of this opinion and ending July 31, 2014). Beginning March 2, 2015, there is no limit to the amount of shares permitted to be sold (assuming Holder is not an affiliate at the time of, or the three months prior to, sale). Additionally, sales at or above $14.50 will not be included in the maximum amount allowed to be sold in any calendar month

H:\9974\Stock Transfer\MP Opinion - 6-30-14v6 - Clean.docx/bsb

SEC-Legend-E-0111389

# Exhibit F

# Exhibit D

Morgan, Lewis & Bockius LLP
502 Carnegie Center
Princeton, NJ 08540
Tel: 609.919.6600
Fax: 609.919.6701
www.morganlewis.com

# Morgan Lewis

C O U N S E L O R S   A T   L A W
A Pennsylvania Limited Liability Partnership

RANDALL B. SUNBERG
Partner-in-Charge

October 2, 2013

Via Email (opinions@amstock.com)
American Stock Transfer & Trust Company
6201 15th Avenue
Brooklyn, NY 11219

       Re:    <u>Senesco Technologies, Inc.</u>

Ladies and Gentlemen:

     We have acted as counsel for Senesco Technologies, Inc., a Delaware corporation (the "Company"), in connection with the issuance by the Company of an aggregate of 69,000,000 shares (the "Shares") of the Company's common stock, par value $0.01 per share (the "Common Stock"), to be issued pursuant to the Securities Purchase Agreement, dated September 30, 2013 (the "Purchase Agreement"), by and among the Company and the investors named on <u>Exhibit A</u> attached hereto (collectively, the "Holders") pursuant to which the Company is issuing to the Holders the Shares, and, in such capacity, have been requested by the Company to furnish you with this opinion with respect to the Shares.

     As a basis for this opinion, we have examined and are familiar with and have relied upon the Company's Amended and Restated Certificate of Incorporation, as amended, and its Amended and Restated By-Laws, records of meetings of the Board of Directors of the Company as provided to us by the Company, corporate proceedings of the Company in connection with the authorization and issuance of the Shares, the Purchase Agreement, the Registration Statement on Form S-1 (File No. 333-189998) filed by the Company with the U.S. Securities and Exchange Commission (the "Commission") (the "Registration Statement"), the effectiveness order posted by the Commission on its Electronic Data Gathering and Retrieval System indicating that as of 4:00 P.M., Washington, D.C. time, on September 30, 2013 the Registration Statement had been declared effective and such other documents as we have deemed necessary as a basis for the opinions hereinafter expressed.

     In our examination of the foregoing documents, we have made no independent investigation, and we have assumed the genuineness of all signatures, the completeness of all corporate and stock records provided to us, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as copies, the authenticity of the originals of such latter documents and the legal competence of all signatories to such documents.

Almaty  Beijing  Boston  Brussels  Chicago  Dallas  Frankfurt  Harrisburg  Houston  Irvine  London  Los Angeles  Miami
Moscow  New York  Palo Alto  Paris  Philadelphia  Pittsburgh  Princeton  San Francisco  Tokyo  Washington  Wilmington

Morgan Lewis

COUNSELORS AT LAW
A Pennsylvania Limited Liability Partnership

American Stock Transfer & Trust Company
October 2, 2013
Page 2

We express no opinion herein as to the laws of any state or jurisdiction other than the state laws of the State of New Jersey, the Delaware General Corporation Law statute and the federal laws of the United States of America. To the extent that any other laws are applicable to the matters as to which we are opining herein, we have assumed with your permission and without independent investigation that such laws are identical to the state laws of the State of New Jersey, and we express no opinion as to whether such assumption is reasonable or correct. We express no opinion with respect to the compliance or noncompliance with the "blue sky" laws of any state, or with the antifraud provisions of state and federal laws, rules and regulations concerning the issuance of securities.

Based upon and subject to the foregoing, we are of the opinion that as of the date of this opinion the Shares are registered for sale under the Securities Act under the effective Registration Statement and may be issued without a restrictive legend.

Based upon and subject to the foregoing, we are of the opinion that the Shares have been duly authorized for issuance and, when the Shares are issued in accordance with the terms and conditions of the Purchase Agreement, the Shares will be validly issued, fully paid and nonassessable.

This opinion is based upon currently existing statutes, rules, regulations and judicial decisions and is rendered as of the date hereof, and we disclaim any obligation to advise you of any change in any of the foregoing sources of law or subsequent developments in law or changes in facts or circumstances which might affect any matters or opinions set forth herein.

Please note that we are opining only as to the matters expressly set forth herein, and no opinion should be inferred as to any other matters. This opinion is being delivered to you solely in connection with your service as the Transfer Agent and Registrar of the Common Stock, and may not be relied upon by any other party or used for any other purpose without our prior written consent.

Very truly yours,

Morgan, Lewis & Bockius LLP

SEC-Legend-E-0664240



**Morgan Lewis**
COUNSELORS AT LAW
A Pennsylvania Limited Liability Partnership

## EXHIBIT A

List of Holders and Number of Shares Purchased

| Holder | Number of Shares |
|---|---|
| Barry Honig | 30,000,000 |
| Michael Brauser | 16,000,000 |
| ███████████████ |  |
| Daniel Brauser | 1,000,000 |
| Ben Brauser | 1,000,000 |
| ███████████████ | |
| Joshua Brauser | 1,000,000 |
| Melechdavid Inc. Retirement Plan | ████████ |
| Erica Groussman C/F Alicia Groussman UTMA/FL | ████████ |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

# Exhibit G

# Exhibit E

| | |
|---|---|
| **From**: | John Stetson [stetson.john@gmail.com] |
| **Sent**: | 1/20/2011 12:58:59 PM |
| **To**: | Tanya [tanya@tarmacmanagement.com] |
| **Subject**: | Subscriber List |
| **Attachments**: | Subscriber List.xlsx |

Hi Tanya,

Here is the subscriber list. I have checked off the docs from which I forwarded and wires that you received based on what you told me. Please update with anything missing.

As of yesterday, here were the currency rates we were given:

50,356 - 50,000 CAD
75,521 - 75,000
100,681 - 100,000
201,329 - 200,000
301,993 - 300,000

Thanks,

John

Confidential Treatment Requested by JS/SCI/HSCI

**Passport Potash, Inc.**

| Entity Name | Subscription $ | Doc's Rec'd? | Wire Rec'd? | |
|---|---|---|---|---|
| Frost Gamma Investments Trust | $ ███████ | Yes | Yes | |
| GRQ Consultants, Inc. 401K | $ 300,000 | Yes | | |
| Barry Honig | $ 200,000 | Yes | Yes | |
| ███████████████████████████████████████████████████ | | | | |
| Michael Brauser | $ 711,079 | Yes | Yes | *Michael Brauser wire |
| Josh Brauser | $ 10,000 | Yes | Yes | Wire included in Micha |
| Ben Brauser | $ 10,000 | Yes | Yes | Wire included in Micha |
| Dan Brauser | $ 10,000 | Yes | Yes | Wire included in Micha |
| ████████████████████████████████████████████████████████ | | | | |
| Brauser Family Trust | $ 70,296 | Yes | Yes | |
| Grander Holdings | $ 22,000 | Yes | Yes | |
| ██████████████████████████████████████████ | | | | |
| | $ 5,513,375 | | | |

d for Michael, Josh, Ben, Dan, ███ + a portion of Grandor 401K
ael's
ael's
ael's
ael's

# Exhibit H

# Exhibit F

| **From**: | John Stetson [stetson.john@gmail.com] |
|---|---|
| **Sent**: | 1/27/2012 10:05:16 AM |
| **To**: | BRHonig@aol.com [brhonig@aol.com] |
| **Subject**: | Izea |
| **Attachments**: | Breakdown(1).xlsx |

Confidential Treatment Requested by JS/SCI/HSCl

**IZEA Share Breakdown**

| Entity | Post Split Shares |
|---|---|
| Mike Brauser | 3,250,000 |
| Melechdavid (Mark Groussman) | ███████████ |
| Barry Honig | 1,940,023 |
| HS Contrarian Investments LLC (John Stetson) | 1,400,000 |
| | |
| Ben Brauser | 250,001 |
| John Stetson | 225,000 |
| Frost Gamma Investments Trust | ███████ |
| | |
| Josh Brauser | 84,444 |
| Dan Brauser | 84,444 |
| | |
| **TOTAL** | **12,500,000** |

# Exhibit I



6135 N.W. 167th Street, Suite E-21 · Miami Lakes, Florida 33015
Phone: 305-503-3873 · www.fusescience.com

November 7, 2013

Securities Transfer Corporation
2591 Dallas Parkway, Suite #102
Frisco, Texas  75034

Ladies and Gentlemen:

We are requesting that you issue an aggregate of 37,500,000 shares of common stock (the "**Shares**") of
Fuse Science, Inc. (the "**Company**") to the following persons (the "**Holders**"):

| Name | Address/ Tax ID | Number of Shares |
|---|---|---|
| GRQ Consultants, Inc. 401(K) | 555 S. Federal Highway #450 Boca Raton, FL 33432 ███████ | 20,250,000 |
| Grander Holdings, Inc. 401(K) Profit Sharing Plan | 4400 Biscayne Blvd. #850 Miami, FL 33117 ███████ | 5,500,000 |
| Daniel Brauser | ███████ | 125,000 |
| Benjamin Brauser | ███████ | 125,000 |
| Greg Brauser | ███████ | 125,000 |
| Joshua Bauser | ███████ | 125,000 |
| Melechdavid, Inc. Retirement Plan | ███████ | ███████ |
| Stetson Capital Investments, Inc. | ███████ | 2,250,000 |

7783508_1

SEC-BMA-E-0045187

| John O'Rourke | ███████████ | 2,250,000 |
| ███████████ | | 1,000,000 |

The Shares are being issued in an exchange offer exempt from registration pursuant to Section 3(a)(9) under the Securities Act of 1933, as amended. In accordance with the enclosed opinion of counsel, the certificates evidencing the Shares may be issued to the Holder free of legends or other restriction.

Upon issuance, the Shares should be delivered by DWAC pursuant to instructions to be furnished to you by the respective Holders.

Sincerely,

Brian Tuffin
Chief Executive Officer

7783508 _1

SEC-BMA-E-0045188

| Holders | Issue Date | Common Stock | Agreement | Board/Committee Consent | Conversion/Exercise Notice | TA Instruction |
|---|---|---|---|---|---|---|
| Series D conversion #1 - HS Contrarian | 6-Apr-15 | 300,000 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| Series D conversion #2 - HS Contrarian | 9-Apr-15 | 400,000 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| Series D conversion #1 - Grander Holdings 401(k) | 9-Apr-15 | 450,000 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| Cashless exercise of wts | 13-Apr-15 | 914,292 | N/A | ?? | ?? | ?? |
| Cashless exercise wts | 14-Apr-15 | 305,488 | N/A | ?? | ?? | ?? |
| Series D conversions - ATG | 17-Apr-15 | 47,200 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| Series D conversion #2 - Grander Holdings 401(k) - April 30, 2015 | 30-Apr-15 | 300,000 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| Series D conversions - Ben Brauser - May 7, 2015 | 7-May-15 | 22,900 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| Series D Conversions Daniel Brauser - May 7, 2015 | 7-May-15 | 234,200 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| Series D Conversion #3 HS Contrarian - May 7, 2015 | 7-May-15 | 300,000 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| Series D Conversion #1 GRQ consultants - May 14, 2015 | 14-May-15 | 226,200 | N/A | Board Minutes 3.25.15 | Yes | Yes |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY MABVAX THERAPEUTICS HOLDINGS, INC.

MABVAX0173273

| | | | | | | |
|---|---|---|---|---|---|---|
| Series D conversion #3 - Grander Holdings 401(k) - May 19, 2015 | 19-May-15 | 150,000 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| Ben Brauser (from GRQ) | 5-Jun-15 | 169,400 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| Daniel Brauser (from GRQ & HS Cont.) | 5-Jun-15 | 84,700 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| | | | | | | |
| ATG Capital (John O'Rourke) | 15-Jun-15 | 373,600 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| Grander Holdings Inc. 401(k) | 19-Jun-15 | 214,700 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| HS Contrarian | 19-Jun-15 | 400,000 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| MelechDavid | 23-Jun-15 | ■■■ | N/A | Board Minutes 3.25.15 | Yes | Yes |
| Grander Holdings Inc. 401(k) | 7-Jul-15 | 165,600 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| HS Contrarian | 16-Jul-15 | 500,000 | N/A | Board Minutes 3.25.15 | Yes | Yes |
| Total as of August 3, 2015 | | 25,891,072 | | | | |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY MABVAX THERAPEUTICS HOLDINGS, INC.

MABVAX0173274

# Exhibit J

**EDGAR** pro
by EDGAR Online®

# RIOT BLOCKCHAIN, INC.
## Filed by
## HONIG BARRY C

# FORM SC 13D/A
(Amended Statement of Beneficial Ownership)

# Filed 09/13/16

| | |
|---|---|
| Address | 202 6TH STREET, SUITE 401 |
| | CASTLE ROCK, CO, 80104 |
| Telephone | 303-794-2000 |
| CIK | 0001167419 |
| Symbol | RIOT |
| SIC Code | 2835 - In Vitro and In Vivo Diagnostic Substances |
| Industry | Financial & Commodity Market Operators |
| Sector | Financials |
| Fiscal Year | 12/31 |

http://pro.edgar-online.com
© Copyright 2020, EDGAR Online, a division of Donnelley Financial Solutions. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, a division of Donnelley Financial Solutions, Terms of Use.

**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 13D/A**
**Amendment No.1**
**(Rule 13d-101)**

**INFORMATION TO BE INCLUDED IN STATEMENTS FILED PURSUANT**
**TO RULE 13d-1(a) AND AMENDMENTS THERETO FILED PURSUANT TO**
**RULE 13d-2(a)**

**VENAXIS, INC.**
(Name of Issuer)

**Common Stock, no par value**
(Title of Class of Securities)

**92262A206**
(CUSIP Number)

**Copy To:**
**Sichenzia Ross Friedman Ference LLP**
**Harvey Kesner, Esq.**
**61 Broadway, 32 nd Floor**
**New York, NY 10006**
(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

**September 13, 2016**
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§ 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. [X]

**Note:** Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See § 240.13d-7 for other parties to whom copies are to be sent.

*The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

CUSIP No. 92262A206

| 1 | NAMES OF REPORTING PERSONS<br>I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY)<br><br>Barry Honig | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (See Instructions)<br>(a) [ ]<br>(b) [ ] | | |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS (See Instructions)<br>PF | | |
| 5 | CHECK IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(D) OR 2(E)<br>[ ] | | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br>United States | | |
| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON<br>WITH | 7 | SOLE VOTING POWER:<br>0 | |
| | 8 | SHARED VOTING POWER:<br>389,159 (1) | |
| | 9 | SOLE DISPOSITIVE POWER:<br>0 | |
| | 10 | SHARED DISPOSITIVE POWER:<br>389,159 (1) | |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br>389,159 (1) | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (See Instructions)<br>[ ] | | |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br>10.04% (based on 3,876,961 shares of common stock outstanding as of August 10, 2016) | | |
| 14 | TYPE OF REPORTING PERSON (See Instructions)<br>IN | | |

(1)  Represents 389,159 shares of common stock held by GRQ Consultants, Inc. 401K ("401K"). Mr. Honig is the trustee of 401K in such capacity holds voting and dispositive power over the securities held by 401K.

-1-

CUSIP No. 92262A206

| 1 | NAMES OF REPORTING PERSONS<br>I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY)<br><br>GRQ Consultants, Inc. 401K | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (See Instructions)<br>(a)  [  ]<br>(b)  [  ] | | |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS (See Instructions)<br>WC | | |
| 5 | CHECK IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(D) OR 2(E)<br>[  ] | | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br>Florida | | |
| NUMBER OF SHARES NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER:<br>0 | |
| | 8 | SHARED VOTING POWER:<br>389,159 | |
| | 9 | SOLE DISPOSITIVE POWER:<br>0 | |
| | 10 | SHARED DISPOSITIVE POWER:<br><br><br><br>389,159 (1) | |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (See Instructions)<br>[  ] | | |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br>10.04% (based on 3,876,961 shares of common stock outstanding as of August 10, 2016) | | |
| 14 | TYPE OF REPORTING PERSON (See Instructions)<br>OO | | |

(1) Mr. Honig is the trustee of 401K and in such capacity holds voting and dispositive power over the securities held by 401K.

**Item 1.   Security and Issuer**

The title and class of equity securities to which this Schedule 13D relates is common stock, no par value, of Venaxis, Inc., a Colorado corporation (the "Issuer"). The address of the principal executive offices of the Issuer is 1585 S. Perry Street, Castle Rock, CO 80104.

**Item 2.   Identity and Background**

(a) This statement is filed on behalf of Barry Honig and GRQ Consultants, Inc. 401K (collectively the "Reporting Person").

(b) The Reporting Persons' address is 555 South Federal Highway, #450, Boca Raton, FL 33432.

(c) Not applicable.

(d) During the last five years, the Reporting Person has not been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors).

(e) During the last five years, the Reporting Person has not been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result thereof was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws.

(f) The Reporting Person is a citizen of the United States and the State of Florida.

**Item 3.   Source and Amount of Funds or Other Considerations**

All shares were purchased with the Reporting Persons' personal funds or working capital.

**Item 4.   Purpose of Transaction**

All of the Issuer's securities owned by the Reporting Persons have been acquired for investment purposes only.  Except as set forth above and herein, the Reporting Persons have no present plans or proposals that relate to or would result in any of the actions required to be described in subsections (a) through (j) of Item 4 of Schedule 13D.  The Reporting Persons may, at any time, review or reconsider their positions with respect to the Issuer and formulate plans or proposals with respect to any of such matters, but has no present intention of doing so.

The Reporting Person may engage in discussions with management and security holders of the Issuer and other persons with respect to the subject class of securities, the Issuer, the Issuer's industry, business, condition, operations, structure, governance, management, capitalization, policies, plans, and prospects and related and other matters. In particular, the Reporting Person may engage in discussions with management and security holders of the Issuer regarding the complexion of the Issuer's board of directors and options for increasing shareholder value. The Reporting Person plans and proposes to review and analyze such Reporting Person's interest in the Issuer on a continuing basis and may engage in such discussions, as well as discussions with the Issuer, the Issuer's directors and officers and other persons related to the Issuer, as the Reporting Person deems necessary or appropriate in connection with the Reporting Person's interest in the Issuer.

On September 1, 2016, the Reporting Person contacted the Chief Executive Officer of the Issuer to discuss the complexion of the Issuer's current Board of Directors.  The Reporting Person requested that the Issuer take steps to diversify its Board of Directors and add individuals outside the pharmaceutical and biotechnology industry with broader diversified business background in light of changes at the Issuer.  The Reporting Person proposed to introduce individuals to the Issuer that could make meaningful contribution to the business of the Company.  The Issuer's Chief Executive Officer referred the Reporting Person to the Issuer's Procedures for Shareholder Nominations of Director Candidates and subsequently provided the Reporting Person with a copy of such procedures.

On September 13, 2016, the Reporting Person submitted a letter to the Chief Executive Officer of the Issuer conveying its previously disclosed concerns regarding the need for changes to the Issuer's Board of Directors as well as concerns regarding the Issuer's failed strategic acquisition attempts.  The aforementioned letter is attached to this Schedule 13D as Exhibit 99.2.  In connection with the Reporting Person's letter, pursuant to Section 7-107-102 of the Colorado Revised Statutes ("CRS") the Reporting Person submitted a written demand to the Issuer for the calling of a special meeting of shareholders in order to vote upon proposals for (i) the removal of five (5) directors (other than Stephen T. Lundy); (ii) the declaration of a $7,500,000 dividend; (iii) the setting of the size of the Issuer's Board of Directors at no more than six (6) directors and to require shareholder approval for removal or changes to the size of the Board of Directors; and (iv) the election of five (5) new directors.  The written demand is attached as Exhibit 99.3 to this Schedule 13D.  The Reporting Person also provided a written statement with respect to its nomination of five (5) new proposed directors to be voted upon at the special meeting; to wit: John Stetson, John O'Rourke, Jesse Sutton, Michael Beeghley, and David Danziger.  The written nomination submission was submitted to the Issuer pursuant to, and in compliance with, the Issuer's written Procedures for Shareholder Nominations of Director Candidates and is attached to this Schedule 13D as Exhibit 99.4.

Depending upon the factors described below and any other factor that is or becomes relevant, the Reporting Person plans and proposes to: (a) acquire additional amounts of the subject class of securities or different equity, debt, or other securities of the Issuer, derivative securities related to securities of the Issuer or other securities related to the Issuer (collectively, "Issuer-Related Securities") or a combination or combinations of Issuer-Related Securities, including by purchase or other method, pursuant to open market, private, tender offer, or other transactions, using borrowed or other funds or consideration of or from any source described herein or other source or via a combination or combinations of such methods, transactions, consideration, and sources; (b) dispose of all or part of the securities covered by this statement and any other Issuer- Related Securities, including by sale or other method, pursuant to open market, private, or other transactions or via a combination or combinations of such methods and transactions; (c) engage in financing, lending, hedging, pledging, or similar transactions involving the securities covered by this statement or other Issuer-Related Securities or a combination or combinations of such transactions; (d) engage in discussions and otherwise communicate with the Issuer, officers, directors, and security holders of the Issuer and other persons related to the Issuer with respect to Issuer-Related Securities, the Issuer, the Issuer's industry, business, condition, operations, structure, governance, management, capitalization, dividend policy, other policies, plans, and prospects and related and other matters; (e) suggest or recommend a transaction or transactions involving the acquisition, sale, or exchange of all or part of the Issuer-Related Securities or assets of the Issuer, other actions or a combination or combinations of such actions, in any case, which relates or relate to (or could result in) a change or changes to the Issuer's business, condition, operations, structure, governance, management, capitalization, policies, plans, and prospects and similar and other actions and changes; (f) make a proposal or proposals involving the acquisition or sale of all or part of the Issuer-Related Securities or assets of the Issuer; (g) make a proposal or proposals to request that the Issuer and/or the security holders of the Issuer consider an extraordinary or other transaction, such as a merger or reorganization, or a combination or combinations of such transactions; and (h) engage in a combination or combinations of the foregoing plans and/or proposals.

Each such plan or proposal may be subject to, and depend upon, a variety of factors, including (i) current and anticipated trading prices and the expected value of applicable Issuer-Related Securities, (ii) the Issuer's financial condition and position, results of operations, plans, prospects and strategies, (iii) general industry conditions, (iv) the availability, form and terms of financing and other investment and business opportunities, (v) general stock market and economic conditions, (vi) tax considerations and (vii) other factors. Each acquisition, disposition, transaction, discussion, communication, suggestion, recommendation, proposal and other action described herein may be effected, made or taken, as applicable, at any time and/or from time to time without prior notice. Although the plans and proposals described herein reflect the plans and proposals presently contemplated by the Reporting Person with respect to the Issuer and the Issuer-Related Securities, as applicable, each such plan and proposal is subject to change at any time and from time to time dependent upon contingencies and assumed and speculative conditions and other factors, including actions taken by the Issuer, the Issuer's board of directors, other security holders of the Issuer and other parties and the outcome of the discussions, communications, transactions and other actions described herein. There can be no assurance that any such plan or proposal will be consummated or pursued or result in any transaction described herein or other transaction or that any action contemplated by any such plan or proposal (or any similar action) will be taken.

### Item 5.  Interest in Securities of the Issuer

(a)  Mr. Honig beneficially owns 389,159 shares or 10.04% of the Issuer's common stock held by 401K.  Mr. Honig is the Trustee of 401K, and, in such capacity, has voting and dispositive power over the securities held by such entity.

(b)  Mr. Honig may be deemed to hold sole voting and dispositive power over 0 shares of common stock of the Issuer and shares voting and dispositive power over 389,159 shares of common stock.  401K may be deemed to hold shared voting and dispositive power over 389,159 of the Issuer's common stock.

(c)  On July 8, 2016, Mr. Honig sold 1,478 shares of the Issuer's common stock at a price of $3.48 per share.

On July 12, 2016, Mr. Honig purchased 100 shares of the Issuer's common stock at a purchase price of $3.46 per share.

On July 12, 2016, Mr. Honig purchased 300 shares of the Issuer's common stock at a purchase price of $3.51 per share.

On July 18, 2016, Mr. Honig sold 400 shares of the Issuer's common stock at a price of $3.66 per share.

On July 22, 2016, Mr. Honig purchased 100 shares of the Issuer's common stock at a purchase price of $3.60 per share.

On July 22, 2016, Mr. Honig purchased 100 shares of the Issuer's common stock at a purchase price of $3.62 per share.

On July 22, 2016, Mr. Honig sold 200 shares of the Issuer's common stock at a price of $3.58 per share.

On July 22, 2016, Mr. Honig purchased 100 shares of the Issuer's common stock at a purchase price of $3.61 per share.

On July 22, 2016, Mr. Honig purchased 100 shares of the Issuer's common stock at a purchase price of $3.60 per share.

On July 22, 2016, Mr. Honig purchased 100 shares of the Issuer's common stock at a purchase price of $3.61 per share.

On July 22, 2016, Mr. Honig purchased 100 shares of the Issuer's common stock at a purchase price of $3.58 per share.

On July 22, 2016, Mr. Honig sold 300 shares of the Issuer's common stock at a price of $3.60 per share

On July 22, 2016, Mr. Honig sold 100 shares of the Issuer's common stock at a price of $3.59 per share

On July 22, 2016, 401K sold 12,000 shares of the Issuer's common stock at a price of $3.63 per share.

On August 3, 2016, 401K purchased 25,000 shares of the Issuer's common stock at a purchase price of $3.26 per share.

On August 9, 2016, 401K purchased 1,300 shares of the Issuer's common stock at a purchase price of $3.18 per share.

-4-

On August 10, 2016, 401K purchased 2,400 shares of the Issuer's common stock at a purchase price of 3.03 per share.

On August 23, 2016, 401K purchased 21,000 shares of the Issuer's common stock at a purchase price of $3.24 per share.

On August 30, 2016, 401K purchased 5,000 shares of the Issuer's common stock at a purchase price of $3.56 per share.

On September 2, 2016, 401K sold 27,500 shares of the Issuer's common stock at a price of $3.87 per share.

On September 6, 2016, 401K sold 10,415 shares of the Issuer's common stock at a price of $3.84 per share.

On September 7, 2016, 401K purchased 66,278 shares of the Issuer's common stock at a purchase price of $3.81 per share.

On September 7, 2016, 401K sold 1,000 shares of the Issuer's common stock at a price of $4.00 per share.

On September 8, 2016, 401K purchased 6,260 shares of the Issuer's common stock at a purchase price of $3.75 per share.

On September 12, 2016, 401K purchased 9,000 shares of the Issuer's common stock at a purchase price of $4.14 per share.

(d) To the best knowledge of the Reporting Person, except as set forth in this Schedule 13D, no person other than the Reporting Person has the right to receive, or the power to direct the receipt of, dividends from, or the proceeds from the sale of the 389,159 shares of common stock reported in Item 5(a).

(e) Not applicable.

**Item 6.   Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer**

Other than as described herein, there are no contracts, arrangements, understandings or relationships (legal or otherwise) between the Reporting Person and any other person with respect to the Shares.

**Item 7.   Material to Be Filed as Exhibits**

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Joint Filing Agreement with GRQ Consultants, Inc. 401K |
| 99.2 | Shareholder Letter to the Issuer dated September 13, 2016 |
| 99.3 | Demand for Special Meeting dated September 13, 2016 |
| 99.4 | Nomination of Directors dated September 13, 2016 |

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: September 13, 2016

/s/ Barry Honig
Barry Honig

Dated: September12, 2016

GRQ CONSULTANTS, INC. 401K

By: /s/ Barry Honig
Barry Honig
Trustee

-6-

Exhibit 99.1

**AGREEMENT TO FILE JOINT SCHEDULE 13D**

Pursuant to Rule 13d-1(k)(1) under the Securities Exchange Act of 1934, as amended, the undersigned hereby consent to the joint filing on their behalf of a single Schedule 13D and any amendments thereto, with respect to the beneficial ownership by each of the undersigned of shares of the common stock of Venaxis, Inc., a Colorado corporation.  The undersigned hereby further agree that this statement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, but all of which counterparts shall together constitute one and the same instrument.

Dated: September 13, 2016

/s/ Barry Honig
Barry Honig

Dated: September 13, 2016

GRQ CONSULTANTS, INC. 401K

By:      /s/ Barry Honig
Barry Honig
Trustee

Exhibit 99.2

Barry Honig
555 S. Federal Highway
Suite 450
Boca Raton, FL 33432

September 13, 2016

<u>VIA EMAIL AND OVERNIGHT UPS</u>
Mr. Stephen Lundy
Venaxis, Inc
1585 South Perry Street
Castle Rock, CO 80104

Dear Mr. Lundy,

As Venaxis' largest shareholder, it has become increasingly clear to me that changes must be made to protect shareholders' interests and attempt to create value from the company's assets. Venaxis' management and board of directors have failed in this regard. The current management and board own a nominal amount of equity in aggregate, and as a result they are not aligned with the company's shareholders.

The first change that needs to be made is to immediately reconstitute Venaxis' board. I have proposed a five person slate of new nominees for the board, whose biographies are attached to this letter. I have called a special meeting of the shareholders so that these five experienced new nominees may stand for election and replace the existing ineffectual board for a total of six directors, with you remaining as the sixth director.

Venaxis' board has continued allowing the company to waste precious resources with no clear direction or strategy. The failed merger with Strand Life Sciences was an expensive endeavor the brunt or which was borne by your shareholders, of which the board and management represent just a tiny fraction. Had the merger proceeded it would have resulted in immense dilution for shareholders with a target that Venaxis' shareholders had not had an interest in owning. The stock's positive reaction when the merger failed speaks to how the company's actual shareholders felt about the deal.

Meanwhile, Venaxis' cash continues to dwindle while board fees and management salaries continue to be paid. On January 27, 2015, the FDA notified the company that it had determined that the APPY1 Test does not meet the criteria for market clearance as a class II device based upon data and information in your de novo submission and subsequent amendment. Just prior to this notification, as of December 31, 2014, Venaxis had approximately $24.5 million in cash and short term investments. At the most recent quarter end, as of June 30, 2016, Venaxis had approximately $16 million in cash and short term investments with a cash burn of approximately $900,000 last quarter.

More than $8 million has been burned since the FDA rejection in early 2015. Shareholders cannot continue to wait around with question marks and a board that has proven to be distracted and ineffective.

In the essence of preserving some of Venaxis' cash for its rightful owners, the shareholders, we are also asking the shareholders to authorize a special dividend of $7,500,000 as a return of capital to the shareholders. Following this dividend, the company will still have a minimum of two years of runway to pursue strategic alternatives under its current overhead structure, which I expect to continue to be reduced. The company is also in line to receive potential milestone and royalty payments under its licensing deal with Ceva Santé Animale S.A.

The cash dividend returns immediate value to shareholders and diverts a portion of Venaxis' assets away from board discretion, who only have managed to deplete the cash available for shareholders through failed strategies, while entrenching their positions with the Company instead of maximizing shareholder value.

My preference is working together with you on these courses of action to effectuate the proposals immediately with your support rather than going through the steps of voting to remove your board that we have today initiated through a special meeting. I believe working together we can most effectively protect and grow shareholders' interests. I hope that you agree.

Sincerely yours,

/s/ Barry Honig

_____

Exhibit 99.3

**BARRY HONIG**
555 South Federal Highway, #450
Boca Raton, FL 33432

September 13, 2016

<u>*By Email and UPS Overnight Service*</u>
Stephen T. Lundy
Chief Executive Officer
Venaxis, Inc.
1585 South Perry Street
Castle Rock, CO 80104

Re:   *Demand For Special Meeting of the Shareholders of Venaxis, Inc.*

Mr. Lundy:

Barry Honig (the "Holder") is the beneficial owner of shares of Venaxis, Inc., a Colorado corporation ("Venaxis" or the "Company"). The Holder beneficially owns shares representing greater than ten (10%) percent of all the votes entitled to be cast at a meeting of the shareholders of the Company. I have attached evidence of such ownership which consists of the Broker Statement and Schedule 13D filed with the Securities and Exchange Commission on September 13, 2016 and attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, respectively.

Pursuant to Section 7-107-102 of the Colorado Revised Statutes ("CRS"), the Holder hereby demands a special meeting (the "Meeting") of the shareholders of the Company be held. Notice of the Meeting should be provided by the Company to its shareholders within the timeframe allowed pursuant to the CRS and the Company's Bylaws.

Pursuant to CRS 7-108-108, shareholders may remove one or more directors with or without cause. A director may be removed by the shareholders only at a meeting called for the purpose of removing the director. The purpose of this Meeting demanded by the Holders is to vote on the removal of five (5) directors, aside from you, currently serving on the Board of Directors. Additionally, proposals for a $7,500,000 dividend, to set the size of the board at no more than six (6) directors and for the election of five (5) new directors shall take place at the Meeting. These purposes shall be described in the notice of the Meeting you are required to provide to the shareholders under applicable Colorado law, to be substantially in the form of the form of such proposals included herewith as <u>Exhibit C</u>.

Should you have any questions regarding the foregoing, please do not hesitate to contact Harvey Kesner, Esq. at (212) 930-9700.

Very truly yours,

/s/ Barry Honig

_____
Barry Honig
Shares Beneficially Owned: 389,159 (10.04%)

-1-

**Exhibit A**

Balances & Positions for customer 82963941 (GRQ CONSULTANTS INC 401K)          Page 1 of 2

## Balances & Positions

Tue, 13 Sep 2016 7:15:00 am EDT

**Account**

82963941 (GRQ CONSULTANTS INC)  ⌄

### Balance Summary

| | |
|---|---|
| **Total Account Value** | **Trading Cash** |
| **Market Value of Securities** | **Available Cash** |
| **Money Market Funds** | |

### Balance Detail

| Account Type | Trade Date Balance | Market Value | Equity | Total Account Value |
|---|---|---|---|---|

Total

### Assets

| Symbol | Description | Quantity | Price | Start of Day | Current Value | Today's G/L | Account | P |
|---|---|---|---|---|---|---|---|---|

Cash

Equities

| APPY | VENAXIS INC NEW | 389,159 | $ 4.11 | $ 1,599,443.49 | $ 1,599,443.49 | | CASH | |

https://corclearing.automatedfinancial.com/accounts/balance_page.html          9/13/2016

A-1

**<u>Exhibit B</u>**

[Omitted]

B-1

**Exhibit C**

**PROPOSAL NO. 1**

**APPROVAL OF DIVIDEND**

**RESOLVED:**

The Company shall be authorized and hereby is directed to declare and pay a special cash dividend to shareholders of record on the close of business on a date that shall be determined by the Board of Directors (not later than 30 days following shareholder authorization) such dividend to be paid on outstanding shares of the Company's common stock, in the amount of $7,500,000 .  The dividend paid shall constitute a reduction in capital of the Company.

**Vote Required**

The affirmative vote of a majority of the votes cast (either in person or by proxy) and entitled to vote on the matter is required to approve Proposal 1.

**PROPOSAL NO. 2**

**APPROVAL TO FIX THE MAXIMUM NUMBER OF DIRECTORS OF THE COMPANY AT SIX (6) DIRECTORS**

**RESOLVED:**

The Company shall be authorized and hereby is directed to establish the size of the Board of Directors and does hereupon fix the number of directors of the Company at a maximum of six (6) directors, such maximum number not to be revised except upon further shareholder authorization as provided in this resolution.

**Vote Required**

The affirmative vote of a majority of the votes cast (either in person or by proxy) and entitled to vote on the matter is required to approve Proposal 2.

PROPOSAL NO. 3

**REMOVAL FROM OFFICE OF DIRECTORS**

**RESOLVED:**

Colorado Revised Statute (C.R.S.) Section 7-108-108 states that shareholders of the Company may remove one or more directors with or without cause at a meeting called for the purpose of removing the director.  The shareholders of the Company do hereby remove at a meeting called for the purpose of removal, the following directors from the Board of Directors of the Company:

| Name | Age | Date First Elected or Appointed | Position(s) |
|------|-----|---------------------------------|-------------|
| Gail S. Schoettler | 72 | 2001 | Non-Executive Chair and Director |
| Susan A. Evans | 68 | 2012 | Director |
| Daryl J. Faulkner | 67 | 2009 | Director |
| David E. Welch | 68 | 2004 | Director |
| Stephen A. Williams | 56 | 2013 | Director |

Biographical information concerning the directors can be found in the Company's Annual Report on Form 10-K for the year ended December 31, 2015.

**Vote Required**

The number of votes cast in favor of removal exceeds the number of votes cast against removal of each named director is required for Proposal 3.

C-3

## PROPOSAL NO. 4

### ELECTION OF FIVE (5) DIRECTORS

**RESOLVED:**

The following persons are hereby nominated for election to the Board of Directors of the Company, and are hereby elected to serve as directors and to serve until their successor(s) are duly qualified and elected on or following  the 2017 annual meeting of shareholders of the Company, such directors may only be removed "for cause" or resignation. Although it is not contemplated that any person will decline or be unable to serve as a director, in such event, the remaining Board members are authorized to fill any such vacancies created.

| Name | Age |
| --- | --- |
| John Stetson | 31 |
| John O'Rourke | 31 |
| Jesse Sutton | 47 |
| Michael Beeghley | 49 |
| David Danziger | 59 |

**John Stetson** has been the Managing Member of HS Contrarian Investments LLC, a private investment firm with a focus on early stage companies since 2010. In addition, Mr. Stetson served as Executive Vice President, Chief Financial Officer, and Director of Marathon Patent Group, Inc. (NASDAQ:MARA) June 2012 to February 2015, engaged in patenting, and patent acquisition, enforcement and monetization. Mr. Stetson was President & Co-Founder of Fidelity Property Group, Inc. from April 2010 to July 2014, a real estate development group focused on acquisition, rehabilitation, and short-term disposition of single family homes. Prior, Mr. Stetson held positions at Heritage Investment Group and Toll Brothers.  Mr. Stetson also served as Chief Financial Officer, Executive Vice President and Secretary of Majesco Entertainment Company (NASDAQ:COOL) since September 2015.  Mr. Stetson received his BA in Economics from the University of Pennsylvania.

**John O'Rourke** is an analyst and investor who currently serves as Managing Member of ATG Capital LLC, an investment fund focused on small and mid-cap growth companies possessing distinct competitive advantages and superior management teams.  Mr. O'Rourke currently serves on the Board of Directors of Customer Acquisition Network Inc., a leading global performance based marketing company that reaches more than two billion users per month.  Mr. O'Rourke formerly served on the Board of Directors of Rant, Inc., an innovator in U.S. digital media, prior to its sale to a Nasdaq listed company. He was formerly CFO of Fidelity Property Group, a real estate development company with a focus in California. He received his Bachelor of Science in Accounting with Honors from the University of Maryland and a Master of Science in Finance from George Washington University.

**Jesse Sutton** is a consultant for various analytic and gaming related companies. Mr. Sutton founded Majesco Entertainment Company (NASDAQ: COOL) in 1998 and served as its Chief Executive Officer until July 2015 , as well as a director from December 17, 2003 until February 6, 2006 and again from August 23, 2006 until December 17, 2014. During this period, Mr. Sutton oversaw the successful launch and development of Zumba! Fitness which sold over $300 million in games, among many other successful brands brought to market like Cooking Mama, Jillian Michaels Fitness and Disney's Phineus and Ferb and Alvin and the Chipmunks.  Mr. Sutton consults with various online and digital companies engaged in internet commerce and game development. Mr. Sutton attended Yeshiva University in New York.

**Michael Beeghley** has been President and founder of Applied Economics LLC ("Applied Economics"), a national corporate finance and financial advisory services firm for 18 years. Mr. Beeghley has testified as an expert and provided expert opinions on numerous economic, financial and securities issues. Mr. Beeghley advises pharmaceutical, biologics and medical device companies. Recently, Mr. Beeghley served as advisor to a drug distribution company sale to a major private equity firm in a leveraged buy-out.  Prior to forming Applied Economics, Mr. Beeghley was a Manager in the Corporate Finance Group of Ernst & Young, LLP and a Senior Analyst in the Corporate Finance Group of PricewaterhouseCoopers.  Mr. Beeghley currently serves as a director of Majesco Entertainment Company (NASDAQ:COOL) since December 2015.

**David Danziger** is an Assurance Partner in MNP LLP's Toronto office. He is the Senior Vice President of Assurance for the firm as well as the National Leader of MNP's Public Companies practice. An accounting professional since 1980, Mr. Danziger is proficient in his field, serving in both the audit function and as a compliance advisor to public companies as well as to private firms looking to become public. His years of experience are a benefit to clients engaging in any form of public market transaction. Mr. Danziger also assists clients with significant transactions, complex accounting matters and regulatory issues as well as prospectus filing and other publicly filed documents. Mr. Danziger 's experience with US Reporting Issuers as well as Canadian Reporting Issuers has required him to be fluent in both IFRS and US GAAP. Mr. Danziger has served as a Director for public companies for many years and currently has significant director positions with TSX, TSXV, NYSE and AMEX-listed public companies.   Mr. Danziger graduated from the University of Toronto with a Bachelor of Commerce in 1980 and completed the School of Accountancy in 1983.

There are no family relationships between these nominees and any director or executive officer of the Company and there were no related party transactions between this nominee and the Company. No nominee has had any involvement in any legal proceedings (10 years) pursuant to Item 401 of Regulation S-K.

**Vote Required**

The affirmative vote of the holders of a plurality of the common stock present at the special meeting of stockholders is required for election of each director nominee set forth in this proposal.

Exhibit 99.4

**BARRY HONIG**
555 South Federal Highway, #450
Boca Raton, FL 33432
T:   561-961-4237
F:   561-235-5379
E:   brhonig@aol.com

September 13, 2016

*By E-Mail and Overnight UPS Mail*
Daryl Faulkner
Chair, Nominating Committee
c/o Venaxis, Inc.
1585 South Perry Street
Castle Rock, Colorado 80104

Re:   *Nomination of Five (5) Director Candidates of Venaxis, Inc.*

Dear Mr. Faulkner:

I am a record and beneficial holder of shares of Venaxis, Inc., a Colorado corporation ("Venaxis" or the "Company").  Directly and as trustee of GRQ Consultants, Inc. 401K, I beneficially own shares representing greater than ten (10%) percent of common stock, of the Company. I have attached evidence of such ownership which consists of the Broker Statement and Schedule 13D filed with the Securities and Exchange Commission on September 13, 2016 and attached hereto as Exhibit A and Exhibit B , respectively.

Pursuant to the procedures for nominating a director candidate to the Board of Directors (the "Board") of the Company, I hereby wish to nominate the following candidates to stand for election at the special meeting of the shareholders of the Company called to take place on a date of the Company's choosing within the timeframe allowed pursuant to the CRS and the Company's Bylaws:

1. John Stetson
a. 68 Fiesta Way, Boca Raton, FL 33432
b. T: 561-961-4371, F: 561-235-5379, E: stetson.john@gmail.com
c. Mr. Stetson has been the Managing Member of HS Contrarian Investments LLC, a private investment firm with a focus on early stage companies since 2010. In addition, Mr. Stetson served as Executive Vice President, Chief Financial Officer, and Director of Marathon Patent Group, Inc. (NASDAQ:MARA) June 2012 to February 2015, engaged in patenting, and patent acquisition, enforcement and monetization. Mr. Stetson was President & Co-Founder of Fidelity Property Group, Inc. from April 2010 to July 2014, a real estate development group focused on acquisition, rehabilitation, and short-term disposition of single family homes. Prior, Mr. Stetson held positions at Heritage Investment Group and Toll Brothers.  Mr. Stetson also served as Chief Financial Officer, Executive Vice President and Secretary of Majesco Entertainment Company (NASDAQ:COOL) since September 2015.  Mr. Stetson received his BA in Economics from the University of Pennsylvania.
d. There are no family relationships between this nominee and any director or executive officer of the Company.
e. No involvement in any legal proceedings (10 years).
f. This nominee's security ownership of the Company is as follows: No ownership.
g. There were no related party transactions between this nominee and the Company.

2. John O'Rourke
a. 808 Solar Isle Dr., Fort Lauderdale, FL 33301
b. T: 610-247-3917, F: 561-235-5379, E: john@atgcapitalllc.com
c. Mr. O'Rourke is an analyst and investor who currently serves as Managing Member of ATG Capital LLC, an investment fund focused on small and mid-cap growth companies possessing distinct competitive advantages and superior management teams.  Mr. O'Rourke currently serves on the Board of Directors of Customer Acquisition Network Inc., a leading global performance based marketing company that reaches more than two billion users per month.  Mr. O'Rourke formerly served on the Board of Directors of Rant, Inc., an innovator in U.S. digital media, prior to its sale to a Nasdaq listed company. He was formerly CFO of Fidelity Property Group, a real estate development company with a focus in California. He received his Bachelor of Science in Accounting with Honors from the University of Maryland and a Master of Science in Finance from George Washington University.
d. There are no family relationships between this nominee and any director or executive officer of the Company.
e. No involvement in any legal proceedings (10 years).
f. This nominee's security ownership of the Company is as follows:

| Title of Class | Amount and Nature o f Beneficial Ownership | Percent of Class |
|---|---|---|
| Common Stock | 12,500 Shares [(1)] | .32% [(2)] |

(1) Represents 12,500 shares of common stock held by ATG Capital LLC ("ATG"). Mr. O'Rourke is the sole manager and member of ATG and in such capacity holds voting and dispositive power over the securities held by ATG.
(2) Calculated based on 3,876,961 shares of the Common Stock outstanding as of August 10, 2016, as reported in the Company's Form 10-Q for the period ended June 30, 2016 filed with the SEC on August 10, 2016.
g. There were no related party transactions between this nominee and the Company.

3. <u>Jesse Sutton</u>

a. 1989 East 2nd Street, Brooklyn, NY 11223

b. T: 732-233-0436, F: 732-225-8408, E: jesutton@majescoent.com

c. Mr. Sutton is a consultant for various analytic and gaming related companies. Mr. Sutton founded Majesco Entertainment Company (NASDAQ: COOL) in 1998 and served as its Chief Executive Officer until July 2015 , as well as a director from December 5, 2003 until February 6, 2006 and again from August 23, 2006 until December 17, 2014. During this period, Mr. Sutton oversaw the successful launch and development of Zumba! Fitness which sold over $300 million in games, among many other successful brands brought to market like Cooking Mama, Jillian Michaels Fitness and Disney's Phineas and Ferb and Alvin and the Chipmunks. Mr. Sutton consults with various online and digital companies engaged in internet commerce and game development. Mr. Sutton attended Yeshiva University in New York.

d. No involvement in any legal proceedings (10 years).

e. This nominee's security ownership of the Company is as follows: No ownership.

f. There were no related party transactions between this nominee and the Company.

4. <u>Michael Beeghley</u>

a. 825 West Peachtree Street, Suite 250, Atlanta, GA 30308

b. T: 404-214-3600, F: 404 - 214 - 3601, E: michael@appliedecon.com

c. Mr. Beeghley has been President and founder of Applied Economics LLC ("Applied Economics"), a national corporate finance and financial advisory services firm for 18 years. Mr. Beeghley has testified as an expert and provided expert opinions on numerous economic, financial and securities issues. Mr. Beeghley advises pharmaceutical, biologics and medical device companies. Recently, Mr. Beeghley served as advisor to a drug distribution company sale to a major private equity firm in a leveraged buy-out. Prior to forming Applied Economics, Mr. Beeghley was a Manager in the Corporate Finance Group of Ernst & Young, LLP and a Senior Analyst in the Corporate Finance Group of PricewaterhouseCoopers. Mr. Beeghley currently serves as a director of Majesco Entertainment Company (NASDAQ:COOL) since December 2015.

d. There are no family relationships between this nominee and any director or executive officer of the Company.

e. No involvement in any legal proceedings (10 years).

f. This nominee's security ownership of the Company is as follows: No ownership.

g. There were no related party transactions between this nominee and the Company.

5. <u>David Danziger</u>

a. 903 – 10 Bellair Street, Toronto, Ontario M5R 3T8

b. T: 647-296-3658, F: n/a, E: david.danziger@mnp.ca

c. Mr. Danziger is an Assurance Partner in MNP LLP's Toronto office. He is the Senior Vice President of Assurance for the firm as well as the National Leader of MNP's Public Companies practice. An accounting professional since 1980, Mr. Danziger is proficient in his field, serving in both the audit function and as a compliance advisor to public companies as well as to private firms looking to become public. His years of experience are a benefit to clients engaging in any form of public market transaction. Mr. Danziger also assists clients with significant transactions, complex accounting matters and regulatory issues as well as prospectus filing and other publicly filed documents. Mr. Danziger 's experience with US Reporting Issuers as well as Canadian Reporting Issuers has required him to be fluent in both IFRS and US GAAP. Mr. Danziger has served as a Director for public companies for many years and currently has significant director positions with TSX, TSXV, NYSE and AMEX-listed public companies. Mr. Danziger graduated from the University of Toronto with a Bachelor of Commerce in 1980 and completed the School of Accountancy in 1983.

d. No involvement in any legal proceedings (10 years).

e. This nominee's security ownership of the Company is as follows: No ownership.

f. There were no related party transactions between this nominee and the Company.

Furthermore, attached hereto as <u>Exhibit C</u> , are the signed written consents of the nominees for election as director of the Company.

Should you have any questions regarding the foregoing, please do not hesitate to contact our counsel Harvey Kesner, Esq. at (212) 930-9700.

Very truly yours,

/s/ Barry Honig

_____
Barry Honig

**Exhibit A**

Balances & Positions for customer 82963941 (GRQ CONSULTANTS INC 401K)          Page 1 of 2

**Balances & Positions**                                                      **Account**
Tue, 13 Sep 2016 7:15:00 am EDT                          82963941 (GRQ CONSULTANTS INC) ∨

**Balance Summary**
**Total Account Value**                                                 **Trading Cash**
**Market Value of Securities**                                          **Available Cash**
**Money Market Funds**

**Balance Detail**
| Account Type | Trade Date Balance | Market Value | Equity | Total Account Value |
|---|---|---|---|---|

Total

**Assets**
| Symbol | Description | Quantity | Price | Start of Day | Current Value | Today's G/L | Account | P |
|---|---|---|---|---|---|---|---|---|

Cash

Equities

| APPY | VENAXIS INC NEW | 389,159 | $ 4.11 | $ 1,599,443.49 | $ 1,599,443.49 | | CASH | |

https://corclearing.automatedfinancial.com/accounts/balance_page.html          9/13/2016

A-1

**Exhibit B**

[Omitted]

B-1

<u>Exhibit C</u>

## <u>CONSENT TO NOMINATION AS DIRECTOR</u>

I, **John Stetson,** do hereby consent to my nomination for membership of the board of directors (the "Board") of Venaxis, Inc., a Colorado Corporation (the "Company").

1. Should I be elected to the Board, I am willing and able to serve and agree to serve for compensation not greater than that described in the Company's most recent proxy statement.

2. I am deemed to be "independent" as that word is defined by Rule 5605(a) of the NASDAQ listing standards.

3. I do hereby attest to the accuracy of the information submitted hereto.

DATED:  September 9, 2016

*John Stetson*

Name: John Stetson

C-1

## CONSENT TO NOMINATION AS DIRECTOR

I, John ORourke, do hereby consent to my nomination for membership of the board of directors (the "Board") of Venaxis, Inc., a Colorado Corporation (the "Company").

1. Should I be elected to the Board, I am willing and able to serve and agree to serve for compensation not greater than that described in the Company's most recent proxy statement.

2. I am deemed to be "independent" as that word is defined by Rule 5605(a) of the NASDAQ listing standards.

3. I do hereby attest to the accuracy of the information submitted hereto.

DATED: September 12, 2016

Name:

## CONSENT TO NOMINATION AS DIRECTOR

I, __Jesse Sutton__ , do hereby consent to my nomination for membership of the board of directors (the "Board") of Venaxis, Inc., a Colorado Corporation (the "Company").

1. Should I be elected to the Board, I am willing and able to serve and agree to serve for compensation not greater than that described in the Company's most recent proxy statement.

2. I am deemed to be "independent" as that word is defined by Rule 5605(a) of the NASDAQ listing standards.

3. I do hereby attest to the accuracy of the information submitted hereto.

DATED: September , 2016
                  12

_____
Name

## CONSENT TO NOMINATION AS DIRECTOR

I, _Michael M. Beeghley, do hereby consent to my nomination for membership of the board of directors (the "Board") of Venaxis, Inc., a Colorado Corporation (the "Company").

1. Should I be elected to the Board, I am willing and able to serve and agree to serve for compensation not greater than that described in the Company's most recent proxy statement.

2. I am deemed to be "independent" as that word is defined by Rule 5605(a) of the NASDAQ listing standards.

3. I do hereby attest to the accuracy of the information submitted hereto.

DATED:  September 8, 2016



## CONSENT TO NOMINATION AS DIRECTOR

I, **David Danziger,** do hereby consent to my nomination for membership of the board of directors (the "Board") of Venaxis, Inc., a Colorado Corporation (the "Company").

1. Should I be elected to the Board, I am willing and able to serve and agree to serve for compensation not greater than that described in the Company's most recent proxy statement.

2. I am deemed to be "independent" as that word is defined by Rule 5605(a) of the NASDAQ listing standards.

3. I do hereby attest to the accuracy of the information submitted hereto.

DATED:  September 12, 2016

_____
Name: David Danziger

# Exhibit K

JB77SEC1

1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

2   ------------------------------------x

3   SECURITIES AND EXCHANGE COMMISSION

4              Plaintiff,

5         v.               18 Civ. 8175 (ER)

6   BARRY C. HONIG, et al.,

7              Defendants.

8   ------------------------------------x

                            New York, N.Y.

9                            November 7, 2019

                            4:45 p.m.

10

   Before:

11

                  HON. EDGARDO RAMOS

12

                            District Judge

13

                   APPEARANCES

14

   NANCY BROWN

15  JACK KAUFMAN
       Attorneys for Plaintiff SEC

16

   RICHARD & RICHARD P.A.

17      Attorneys for Defendants Michael Brauser and Grader
       Holdings, Inc.

18  BY:  DENNIS RICHARD

19  COOLEY LLP
       Attorneys for Defendant Robert Ladd

20  BY:  RANDALL LEE
       MICHAEL BERKOVITZ

21

   WILMER CUTLER PICKERING HALE & DORR LLP

22      Attorneys for Defendant Robert Ladd
   BY:  CHRIS JOHNSTONE

23

24

25

JB77SEC1

 1   you have an individual or two that's identified as an

 2   appropriate person to give testimony on that particular topic.

 3        Look, I think at the end of the day even if we could

 4   formulate -- and again I don't want to carry your water -- but

 5   even if you were to formulate some sort of very limited search

 6   or limited in terms of dates, limited in terms of individuals,

 7   limited in terms of maybe even something less than 96

 8   individuals, that at the end of the day that you're going to

 9   get anything worthwhile, and therefore I find that that

10   request, given the nature of the case, is too broad, too

11   burdensome.

12        MR. LEE:  The last category -- before we get to

13   302s -- that we're seeking are additional searches of

14   communications with third parties by SEC officials about the

15   application or interpretation of Section 13.  This is again a

16   topic that we discussed a couple of days ago.  We made a

17   proposal.  We have not heard back from the SEC on their

18   response to our proposal as a way to narrow that search.  So

19   even after we filed our motion we continue to engage in a meet

20   and confer, but the SEC has not responded.

21        THE COURT:  OK.  Well, respond at some point.  OK.

22   What else?

23        MR. JOHNSTONE:  I can speak to the 302 issue

24   concisely.  As you heard from Mr. Lee, the SEC's case revolves

25   about Barry Honig, who the SEC says orchestrated a fraud

Case 3:18-cv-02293-GC-RLS Document 160-2 Filed 06/01/20 Page 420 of 669 PageID: 5866
Case 3:18-cv-00175-ERN Document 198 Filed 12/25/18 Page 220 of 38
JB77SEC1

1    against three public companies.  As such, Mr. Honig is the

2    SEC's central witness in this case.  What is interesting is

3    that he is taking the Fifth, and thus we have no access to his

4    testimony about what happened.

5            So the parties on this issue have gone through great

6    lengths to narrow the issues, and it's not a lot of distance

7    between the two of us.  We agree with the SEC -- as they said

8    in their letter brief -- that an in camera review of its notes

9    of Mr. Honig's 302s would be an appropriate step forward.  The

10   only question is where should the Court draw the line between

11   the portions of those notes that should be produced to us and

12   those that can be withheld.

13           Our request here is very narrow, that the SEC produce

14   notes of what Mr. Honig said to the government.  And we have no

15   interest in their attorney impressions or anything, ideas about

16   what he said.

17           So, in drawing the line it's helpful to kind of step

18   back and understand why the SEC has notes of Mr. Honig's 302s

19   but doesn't have the 302s themselves.  The answer is that the

20   SEC has gone through great lengths here to keep Mr. Honig's

21   statements out of this case.  They requested review of the

22   302s.  They sat down, they reviewed them, they wrote their own

23   notes about them.  They gave the 302s back to the Department of

24   Justice and then now are withholding those notes from us.

25           But Mr. Honig's statements about what happened in this

Case 3:18-cv-02293-GC-RLS Document 169-2 Filed 06/01/20 Page 421 of 669 PageID: 5867
Case 1:18-cv-08175-ER Document 198 Filed 11/25/19 Page 236 of 38
JB77SEC1

```
1    case should be produced.  We're not seeking any attorney
2    impressions, but we have a substantial need for what he said
3    about what happened, and we have exhausted all other options --
4    which is an important point.  The SEC did not take any
5    testimony of Mr. --
6              THE COURT:  What have you done?
7              MR. JOHNSTONE:  First I'll say that the SEC did not
8    take investigative testimony of Mr. Honig in this case, so we
9    don't have his statements from that.  Second, we served a
10   subpoena on the Department of Justice, with whom we have met
11   and conferred, and they have refused to produce the Honig 302
12   to us.  So we have taken that big step, served the subpoena,
13   meet and conferred with federal prosecutors, and they will not
14   give it to us.
15             THE COURT:  Are there multiple 302s?
16             MR. JOHNSTONE:  There is one 302 listed in the
17   privilege log.  I would not be surprised if there are more.
18             THE COURT:  OK.  What else?
19             MR. JOHNSTONE:  Third, we have attempted to depose him
20   in this case, and we have heard from his attorney that he
21   intends to assert his Fifth Amendment rights.  So, there is no
22   other option for us to go to get his statements about what
23   happened in the case.  All we are asking for is what the SEC
24   wrote down about what he said, that's it.
25             THE COURT:  Ms. Brown?
```

Case 3:18-cv-02293-GC-RLS Document 169-2 Filed 06/01/20 Page 422 of 669 PageID: 5868
Case 3:18-cv-00175-LER Document 196 Filed 12/25/18 Page 248 of 38
JB77SEC1

 1          MS. BROWN:  Yes, your Honor.  Mr. Honig hasn't been

 2     deposed yet, so it's news to me that he plans to assert the

 3     Fifth.  I did not know that.  And I'm not sure any of us know

 4     that until he sits in the chair or he provides the declaration.

 5     That's not to say we shouldn't discuss this issue now.

 6          THE COURT:  Remind me, is he under criminal

 7     investigation?  Has he been indicted?  Has he been convicted?

 8          MS. BROWN:  I've seen no public record of his criminal

 9     status, but he has become a cooperator.

10          THE COURT:  So he is cooperating.

11          MS. BROWN:  Yes.

12          THE COURT:  And you tell me if you -- you know more

13     about this than I do.  In such circumstances if the civil

14     related matter is not otherwise stayed, do cooperators testify

15     and give testimony, or do they ask that that deposition be

16     stayed for some period?

17          MS. BROWN:  I think it can vary with the

18     circumstances.  It depends what the status of their cooperation

19     is.  It depends upon the status of their criminal proceeding.

20     So, if they are sentenced already, they can testify.

21          So -- and I don't have any idea what he is doing to

22     cooperate, so I don't have much information to share with you.

23     All I know is he has not yet been deposed.

24          MR. JOHNSTONE:  Your Honor, Mr. Honig's attorneys have

25     represented to us that if he is deposed he will assert his

Case 3:18-cv-02293-GC-RLS Document 169-2 Filed 06/01/20 Page 423 of 669 PageID: 5869
Case 1:18-cv-08175-ER Document 198 Filed 11/25/19 Page 256 of 38
JB77SEC1

1    Fifth Amendment rights, so we know that.

2            THE COURT:  OK.  And I take it -- again this is more

3    out of curiosity -- that would not be a violation of his

4    cooperation agreement.

5            MS. BROWN:  I don't know, your Honor.  I will say so

6    that the Court is clear and so the record is clear, that our

7    notes of 302s -- which themselves as the Court knows are not

8    verbatim notes of what people say -- are highly selective

9    material.  We go in and we review the 302s, as Mr. Johnstone

10   just explained, but we don't write down everything that appears

11   in the 302, we write down what is of interest to us.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

               **Plaintiff,**

      **– against –**

BARRY C. HONIG, MICHAEL BRAUSER,
JOHN STETSON, JOHN R. O'ROURKE III,
ROBERT LADD, ELLIOT MAZA, BRIAN KELLER,
JOHN H. FORD, ATG CAPITAL LLC, GRQ
CONSULTANTS, INC., HS CONTRARIAN
INVESTMENTS, LLC, GRANDER HOLDINGS, INC.,
and STETSON CAPITAL INVESTMENTS INC.,

               **Defendants.**

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC # _____
DATE FILED: __2/26/2020__

**18 Civ. 8175 (ER)**

**ECF CASE**

## STIPULATION AND [PROPOSED] ORDER

    WHEREAS the Plaintiff Securities and Exchange Commission ("Commission") has

agreed to provide Defendant Ladd with a copy of the notes taken by an agent of the Federal

Bureau of Investigation at various interviews of witnesses in its possession (the "Notes"),

provided that Defendants agree to certain conditions;

    WHEREAS Defendant Ladd agrees to those conditions;

    NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and between

Ladd and the Commission, by and through his or its respective attorneys:

    1.    Notwithstanding paragraph 3 of the Stipulation and Confidentiality Order, entered

June 5, 2019 (DE 134) (the "Confidentiality Order"), the Commission may designate the Notes

as "Confidential" and the Notes shall thereafter be deemed "Confidential Discovery Materials"

for all purposes under the Confidentiality Order.

2.      Notwithstanding any other paragraph of the Confidentiality Order, should any

party to this Stipulation wish to share a copy of the Notes with any other person or party, he or it

must first obtain that person's or parties' agreement to abide by the terms of this Stipulation, in

addition to the Confidentiality Order, in the form appended hereto as Exhibit A.

3.      By disclosing the Notes to Ladd, the Commission has not waived, does not intend

to waive, and shall not be deemed to have waived, any of the privileges or protections it has

asserted with respect to the Notes or any like material.

Dated: New York, New York
         February 25, 2020


ROBERT LADD                                SECURITIES AND EXCHANGE
                                           COMMISSION

By:      _/s/ Randall Lee_____
              Randall Lee
Cooley LLP                                 By: _____
1333 2nd Street                                     Nancy A. Brown
Suite 400
Santa Monica, CA  90401                    200 Vesey Street
310-883-6485                               Suite 400
                                           New York, NY  10281
                                           212-336-1023
Attorneys for Defendant Robert Ladd
                                           Attorneys for Plaintiff Securities and Exchange
                                           Commission




So Ordered:


_____
Edgardo Ramos, U.S.D.J
Dated:  _2/26/2020_____
New York, New York


2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,          :
                                             :
                        Plaintiff,           :
                                             :         18 Civ. 8175 (ER)
              – against –                    :
                                             :         ECF CASE
BARRY C. HONIG, MICHAEL BRAUSER,             :
JOHN STETSON, JOHN R. O'ROURKE III,          :
ROBERT LADD, ELLIOT MAZA, BRIAN KELLER,      :
JOHN H. FORD, ATG CAPITAL LLC, GRQ           :
CONSULTANTS, INC., HS CONTRARIAN             :
INVESTMENTS, LLC, GRANDER HOLDINGS, INC.,    :
and STETSON CAPITAL INVESTMENTS INC.,        :
                                             :
                        Defendants.          :
------------------------------------------------------------------x

## EXHIBIT A

## AGREEMENT TO ABIDE BY STIPULATION AND ORDER

I have read the Stipulation and Order, entered February __, 2020. I understand its terms

and agree to be bound by them, and hereby submit to the jurisdiction of the United States District

Court for the Southern District of New York for purposes of the enforcement of the Stipulation

and Order. I further understand that failure to abide by the terms of the Stipulation and Order

may result in legal action and sanctions.


Dated: _____          Agreed: _____

3

# Exhibit M

O'ROURKE
GRQ 401K
KESNER
MARCANDY
JAMES
DEFRANCESCO
BEEGHLEY
GRANDER
ATG
RIOT
RICHARDSON
BIOZONE
MGT
STOCKWIRE
NORTHURST
STETSON CAPITAL
BRAUSER
MARATHON
HONIG
PERSHING GOLD
STETSON
ALAN HONIG
AIFOS
PARADOX
MABVAX
MUNDO
BHANSALI
POLICY NO. 2013-17
POLARITYTE
MELECHDAVID
KAPLAN
SO
KARR
JAD CAPITAL
MOLINSKY
GROUSSMAN
JONATHAN HONIG
O'BRAITIS
NAMASTE

# Exhibit N

DATE FILED: December 8, 2016 3:45 PM

DISTRICT COURT, DOUGLAS COUNTY, STATE OF
COLORADO
Douglas County Courthouse
4000 Justice Way Ste. 2009
Castle Rock, CO 80109
(720) 437-6200

**Plaintiff**:

BARRY HONIG, in his capacity as trustee of GRQ
CONSULTANTS, INC. 401K TRUST AND PLAN,

v.

**Defendant**:

BIOPTIX, INC. f/k/a VENAXIS, INC., a Colorado corporation.

|  |
|---|
| ▲ **COURT USE ONLY** ▲ |
| Case Number: |
| Div.:        Ctrm.: |

**Attorneys for Plaintiff**:
K. C. Groves, #20832
Mark E. Haynes, #12312
IRELAND STAPLETON PRYOR & PASCOE, PC
717 17th Street, Suite 2800
Denver, Colorado 80202
Telephone:    (303) 623-2700
Fax No.:       (303) 623-2062
E-mail:        kcgroves@irelandstapleton.com
                mhaynes@irelandstapleton.com

**APPLICATION FOR COURT-ORDERED SPECIAL MEETING OF
SHAREHOLDERS PURSUANT TO C.R.S. § 7-107-103(1)(b)**

Plaintiff Barry Honig, in his capacity as trustee of GRQ Consultants, Inc., 401K ("GRQ 401K"), by and through his counsel, K.C. Groves, Esq. and Mark E. Haynes, Esq. of IRELAND STAPLETON PRYOR & PASCOE, PC, seeks a summary order from this Court authorizing a special meeting of the shareholders of Bioptix, Inc. f/k/a Venaxis, Inc. ("Venaxis"), and states as follows:

Plaintiff hereby requests that this Court summarily order a special meeting of the shareholders of Venaxis, pursuant to C.R.S. § 7-107-103(1).

2521609.9

size of the Board at not more than six (6) Directors; and the election of five (5) new Directors. *See* **Ex. 1**, p. 5.

18. On September 14, 2016, Ms. DeFrancesco sent a letter to Mr. Lundy on behalf of CJD Group stating that she owned 341,176 shares of Venaxis, representing approximately 8.8% of the voting shares. Her letter was sent "in support of Barry Honig and his demand for a special meeting of the shareholders of the Company for all of the purposes set forth therein." *See* Letter from C. DeFrancesco to S. Lundy dated September 14, 2016 re: Demand For Special Meeting of the Shareholders of Venaxis, Inc. (the "***CJD September 14, 2016 Demand for Shareholder Meeting***"), attached hereto as **Exhibit 3**.

19. On September 14, 2016, CJD Group owned 341,176 shares of common stock of Venaxis, representing at least 7.6% of the votes entitled to be cast notwithstanding the dilution of Venaxis's shareholders in the Transaction.

20. On September 14, 2016, Plaintiff owned 389,159 shares of common stock of Venaxis, representing at least 8.6% of the votes entitled to be cast notwithstanding the dilution of Venaxis's shareholders in the Transaction.

21. As of September 14, 2016, Plaintiff and the CJD Group owned approximately 730,335 shares of Venaxis common stock, representing at least 16.2% of all outstanding votes entitled to be cast.

22. Accordingly, Plaintiff and CJD Group's demands for a special meeting were effective under C.R.S. § 7-107-102(1)(b), and Venaxis was required to issue the Notice of the special meeting to its shareholders within thirty days, or by October 14, 2016.

23. Venaxis refused to issue the required Notice. In refusing to issue a Notice, Venaxis, through counsel, responded to Plaintiff and CJD Group's demands in a letter dated September 19, 2016, attached hereto as **Exhibit 4**. In its letter, Venaxis claimed that a meeting was not required, because (a) GRQ lacked authority to demand a meeting since it owned less than 10% of the shares outstanding, and (b) the demand came from Mr. Honig instead of from GRQ 401K.

24. It is irrelevant if Plaintiff owed less than 10% of the shares outstanding, because C.R.S. § 7-107-102(1)(b) clearly states that a corporation is required to hold a special meeting if it "receives one or more written demands for the meeting" from "holders of shares representing at least ten percent . . . ." Venaxis is further subject to the requirements of Section 2 of its Amended and Restated Bylaws, attached hereto as **Exhibit 5**, p. 2,[1] which largely mirrors the statute and requires Venaxis to hold a special meeting if it receives one or more written demands

---

[1] This is the most recent copy of the Venaxis Bylaws of which we are aware. Venaxis was originally incorporated as AspenBio, Inc. and has since changed the name of the entity several times.

# Exhibit O

EDGAR pro
by EDGAR Online®

# RIOT BLOCKCHAIN, INC.
## Filed by
# DEFRANCESCO CATHERINE JOHANNA

## FORM SC 13D/A
(Amended Statement of Beneficial Ownership)

## Filed 09/20/16

| | |
|---|---|
| Address | 202 6TH STREET, SUITE 401 |
| | CASTLE ROCK, CO, 80104 |
| Telephone | 303-794-2000 |
| CIK | 0001167419 |
| Symbol | RIOT |
| SIC Code | 2835 - In Vitro and In Vivo Diagnostic Substances |
| Industry | Financial & Commodity Market Operators |
| Sector | Financials |
| Fiscal Year | 12/31 |

http://pro.edgar-online.com
© Copyright 2019, EDGAR Online, a division of Donnelley Financial Solutions. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, a division of Donnelley Financial Solutions, Terms of Use.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 13D/A**
**Amendment No. 2**
**Under the Securities Exchange Act of 1934**

# Venaxis, Inc.

(Name of Issuer)

**Common stock, no par value**
(Title of Class of Securities)

**92262A206**
(CUSIP Number)

Catherine Johanna DeFrancesco
365 Bay St. Suite 840
Toronto, ON M5H 2V1
Canada
Tel. (416) 362-4441

*Copies to:*

Joe Laxague, Esq.
Laxague Law, Inc.
1 East Liberty, Suite 600
Reno, NV 89501
Tel. (775) 234-5221
(Name, Address and Telephone Number of Person Authorized to
Receive Notices and Communications)

**September 20, 2016**
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Sec.Sec.240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. ☐

**Note:** Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule.13d-7 for other parties to whom copies are to be sent.

\* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

1.  Names of Reporting Persons.

Catherine Johanna DeFrancesco

2.  Check the Appropriate Box if a Member of a Group
(a) [ ]
(b) [X]

3.  SEC Use Only

4.  Source of Funds
WC

5.  Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e)

6.  Citizenship or Place of Organization
Canada

| Number of Shares Beneficially Owned by Each Reporting Person With: | 7.  Sole Voting Power 341,176 [1] |
| | 8.  Shared Voting Power 0 |
| | 9.  Sole Dispositive Power 341,176 [1] |
| | 10.  Shared Dispositive Power 0 |

11.  Aggregate Amount Beneficially Owned by Each Reporting Person
341,176 [1]

12.  Check if the Aggregate Amount in Row (11) Excludes Certain Shares
☐

13.  Percent of Class Represented by Amount in Row (11)
8.80% [2]

14.  Type of Reporting Person
IN

[1] Includes shares beneficially owned through the following entities:

DSB Capital, Ltd., a Turks & Caicos company where Ms. DeFrancesco serves as the Trustee – 64,000 shares
DeFrancesco Motorsports, Inc., an Ontario corporation where Ms. DeFrancesco serves as the President – 59,100 shares
Delavalco Holdings, Inc., an Ontario corporation where Ms. DeFrancesco serves as the President – 81,500 shares
Delavalco Holdings, Inc., an Florida corporation where Ms. DeFrancesco serves as the President – 85,466 shares
Marcandy Investments Corp., an Ontario corporation where Ms. DeFrancesco serves as the President – 5,000 shares
Namaste Gorgie, Inc., an Ontario corporation where Ms. DeFrancesco serves as the President – 46,110 shares

[2] Based on 3,876,961 shares issued and outstanding as of August 10, 2016, as reported on the issuer's Form 10-Q filed August 10, 2016.

**Explanatory Notes**

This Amendment No. 2 further amends and supplements the Schedule 13D and Schedule 13D/A filed with the Securities and Exchange Commission on September 12, 2016 (the "Original Filing") and September 14, 2016 ("Amendment No. 1), respectively, relating to the common stock, no par value (the "Common Stock"), of Venaxis, Inc. a Colorado corporation (the "Issuer"). The address of the principal executive office of the Issuer is 1585 South Perry Street, Castle Rock, Colorado 80104.

Capitalized terms not defined herein shall have the meaning ascribed to them in the Original Schedule 13D. Except as set forth herein, the Original Schedule 13D and Amendment No. 1 are unmodified.

**ITEM 4. PURPOSE OF TRANSACTION**

Item 4 of the Original Filing and Amendment No. 1 are hereby supplemented as follows:

On September 20, 2016, the Reporting Person submitted a letter to the Issuer reiterating her September 14, 2016 demand for special meeting of the Issuer's shareholders, joining in the prior demand of shareholder Barry Honig, and joining in Mr. Honig's director nominations for the Issuer.  The letter is attached as Exhibit 99.1.

**ITEM 7. MATERIAL TO BE FILED AS EXHIBITS**

| Exhibit No . | Description |
|---|---|
| 99.1 | Letter to the Issuer dated September 20, 2016 |

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.


September 20, 2016
Date


/s/ Catherin Johanna DeFrancesco
Catherine Johanna DeFrancesco

Exhibit 99.1

**CATHERINE JOHANNA DEFRANCESCO**
365 Bay St. Suite 840
Toronto, ON M5H 2V1
Canada

September 20, 2016

**By email to:** dwelch@welchconsul.com ; info@venaxis.com

Stephen T. Lundy
Chief Executive Officer
Venaxis, Inc.
1585 South Perry Street
Castle Rock, CO 80104

Re:   *Repeated Demand for Special Meeting of the Shareholders of Venaxis, Inc.*

Mr. Lundy:

I am writing to follow-up on my letter transmitted by e-mail on September 14, 2016.  As previously stated, I am the beneficial owner of shares of Venaxis, Inc., a Colorado corporation ("Venaxis" or the "Company").  I beneficially own 341,176 shares representing approximately 8.8% of all the votes entitled to be cast at a meeting of the shareholders of the Company. A copy of my most recent amended Schedule 13D filed with the Securities and Exchange Commission is attached as Exhibit A hereto and incorporated by reference.  My shares are beneficially owned through several entities, as set forth in my Schedule 13D, as amended.  The shares are held through the following broker-dealers: Richardson GMP Limited, Industrial Alliance Securities Inc., and Merrill Lynch, Pierce, Fenner, & Smith, Inc.

Pursuant to Section 7-107-102 of the Colorado Revised Statutes, I repeat my demand made September 14, 2016 for a special meeting of the shareholders of the Company (the "Meeting") and join in the demand for a special meeting of the shareholders made by Barry Honig dated September 13, 2016, a copy of which is attached as Exhibit B hereto and incorporated by reference.  The purposes of the meeting should be, as set forth in Mr. Honig's meeting demand:  (1) to vote on the removal of five (5) directors, aside from you, currently serving on the Board of Directors, (2) to vote on a $7,500,000 shareholder dividend, and (3) to set the size of the board at no more than six (6) directors and for the election of five (5) new directors as follows: John Stetson, John O'Rourke, Jesse Sutton, Michael Beeghley, and David Danziger.  I join in Mr. Honig's prior nomination of these individuals to serve as members of the board of directors, a copy of which is attached as Exhibit C hereto and incorporated by reference.

Should you have any questions regarding the foregoing, please do not hesitate to contact Joe Laxague, Esq. at (775) 234-5221.

Very truly yours,

/s/ Catherine Johanna DeFrancesco
Catherine Johanna DeFrancesco

Enclosures

# EXHIBIT A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## SCHEDULE 13D/A
**Amendment No. 1**
**Under the Securities Exchange Act of 1934**

**Venaxis, Inc.**
(Name of Issuer)

**Common stock, no par value**
(Title of Class of Securities)

**92262A206**
(CUSIP Number)

Catherine Johanna DeFrancesco

365 Bay St. Suite 840
Toronto, ON M5H 2V1
Canada
Tel. (416) 362-4441

*Copies to:*

Joe Laxague, Esq.
Laxague Law, Inc.
1 East Liberty, Suite 600
Reno, NV 89501
Tel. (775) 234-5221
(Name, Address and Telephone Number of Person Authorized to
Receive Notices and Communications)

**September 13, 2016**
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. ☐

**Note:** Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule.13d-7 for other parties to whom copies are to be sent.

\* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

| | |
|---|---|
| 1.  Names of Reporting Persons.<br><br>Catherine Johanna DeFrancesco | |
| 2.  Check the Appropriate Box if a Member of a Group<br>(a) [ ]<br>(b) [X] | |
| 3.  SEC Use Only | |
| 4.  Source of Funds<br>WC | |
| 5.  Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e)<br>☐ | |
| 6.  Citizenship or Place of Organization<br>Canada | |

| Number of Shares Beneficially Owned by Each Reporting Person With: | 7.  Sole Voting Power<br>341,176 [1] |
| | 8.  Shared Voting Power<br>0 |
| | 9.  Sole Dispositive Power<br>341,176 [1] |
| | 10.  Shared Dispositive Power<br>0 |

| | |
|---|---|
| 11.  Aggregate Amount Beneficially Owned by Each Reporting Person<br>341,176 [1] | |
| 12.  Check if the Aggregate Amount in Row (11) Excludes Certain Shares<br>☐ | |
| 13.  Percent of Class Represented by Amount in Row (11)<br>8.80% [2] | |
| 14.  Type of Reporting Person<br>IN | |

[1] Includes shares beneficially owned through the following entities:

    DSB Capital, Ltd., a Turks & Caicos company where Ms. DeFrancesco serves as the Trustee – 64,000 shares
    DeFrancesco Motorsports, Inc., an Ontario corporation where Ms. DeFrancesco serves as the President – 59,100 shares
    Delavalco Holdings, Inc., an Ontario corporation where Ms. DeFrancesco serves as the President – 81,500 shares
    Delavalco Holdings, Inc., an Florida corporation where Ms. DeFrancesco serves as the President – 85,466 shares
    Marcandy Investments Corp., an Ontario corporation where Ms. DeFrancesco serves as the President – 5,000 shares
    Namaste Gorgie, Inc., an Ontario corporation where Ms. DeFrancesco serves as the President – 46,110 shares

[2] Based on 3,876,961 shares issued and outstanding as of August 10, 2016, as reported on the issuer's Form 10-Q filed August 10, 2016.

**ITEM 1. SECURITY AND ISSUER**

(a) Name of Issuer:

Venaxis, Inc.

(b) Address of Issuer's Principal Executive Offices:

1585 South Perry Street
Castle Rock, Colorado 80104

(c) Title of the class of equity securities to which this statement relates:

Common stock, no par value

**ITEM 2. IDENTITY AND BACKGROUND**

If the person filing this statement or any person enumerated in Instruction C of this statement is a corporation, general partnership, limited partnership, syndicate or other group of persons, state its name, the state or other place of its organization, its principal business, the address of its principal office and the information required by (d) and (e) of this Item. If the person filing this statement or any person enumerated in Instruction C is a natural person, provide the information specified in (a) through (f) of this Item with respect to such person(s).

(a)   Name:

Catherine Johanna DeFrancesco

(b)   Residence or business address:

365 Bay St. Suite 840
Toronto, ON M5H 2V1
Canada

(c) Present principal occupation or employment and the name, principal business and address of any corporation or other organization in which such employment is conducted:

Ms. DeFrancesco serves as the President and Owner of Delavalco Holdings, Inc., an Ontario corporation.  Her business address is 365 Bay St. Suite 840, Toronto, ON M5H 2V1.

(d) Whether or not, during the last five years, such person has been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) and, if so, give the dates, nature of conviction, name and location of court, and penalty imposed, or other disposition of the case:

No.

(e) Whether or not, during the last five years, such person was a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws; and, if so, identify and describe such proceedings and summarize the terms of such judgment, decree or final order:

No.

(f) Citizenship:

Canada

**ITEM 3. SOURCE AND AMOUNT OF FUNDS OR OTHER CONSIDERATION**

The source of funds was the working capital of the entities, as detailed above, through which Ms. DeFrancesco holds her beneficial ownership.

**ITEM 4. PURPOSE OF TRANSACTION**

The reporting person may engage in discussions with management and security holders of the issuer and other persons with respect to the subject class of securities, the issuer, the issuer's industry, business, condition, operations, structure, governance, management, capitalization, policies, plans, and prospects and related and other matters. In particular, the reporting person may engage in discussions with management and security holders of the issuer regarding the complexion of the issuer's board of directors and options for increasing shareholder value. The reporting person plans and proposes to review and analyze such reporting person's interest in the issuer on a continuing basis and may engage in such discussions, as well as discussions with the issuer, the issuer's directors and officers and other persons related to the issuer, as the reporting person deems necessary or appropriate in connection with the reporting person's interest in the issuer.

Depending upon the factors described below and any other factor that is or becomes relevant, the reporting person plans and proposes to: (a) acquire additional amounts of the subject class of securities or different equity, debt, or other securities of the issuer, derivative securities related to securities of the issuer or other securities related to the issuer (collectively, "Issuer-Related Securities") or a combination or combinations of Issuer-Related Securities, including by purchase or other method, pursuant to open market, private, tender offer, or other transactions, using borrowed or other funds or consideration of or from any source described herein or other source or via a combination or combinations of such methods, transactions, consideration, and sources; (b) dispose of all or part of the securities covered by this statement and any other Issuer- Related Securities, including by sale or other method, pursuant to open market, private, or other transactions or via a combination or combinations of such methods and transactions; (c) engage in financing, lending, hedging, pledging, or similar transactions involving the securities covered by this statement or other Issuer-Related Securities or a combination or combinations of such transactions; (d) engage in discussions and otherwise communicate with the issuer, officers, directors, and security holders of the issuer and other persons related to the issuer with respect to Issuer-Related Securities, the issuer, the issuer's industry, business, condition, operations, structure, governance, management, capitalization, dividend policy, other policies, plans, and prospects and related and other matters; (e) suggest or recommend a transaction or transactions involving the acquisition, sale, or exchange of all or part of the Issuer-Related Securities or assets of the issuer, other actions or a combination or combinations of such actions, in any case, which relates or relate to (or could result in) a change or changes to the issuer's business, condition, operations, structure, governance, management, capitalization, policies, plans, and prospects and similar and other actions and changes; (f) make a proposal or proposals involving the acquisition or sale of all or part of the Issuer-Related Securities or assets of the issuer; (g) make a proposal or proposals to request that the issuer and/or the security holders of the issuer consider an extraordinary or other transaction, such as a merger or reorganization, or a combination or combinations of such transactions; and (h) engage in a combination or combinations of the foregoing plans and/or proposals.

Each such plan or proposal may be subject to, and depend upon, a variety of factors, including (i) current and anticipated trading prices and the expected value of applicable Issuer-Related Securities, (ii) the issuer's financial condition and position, results of operations, plans, prospects and strategies, (iii) general industry conditions, (iv) the availability, form and terms of financing and other investment and business opportunities, (v) general stock market and economic conditions, (vi) tax considerations and (vii) other factors. Each acquisition, disposition, transaction, discussion, communication, suggestion, recommendation, proposal and other action described herein may be effected, made or taken, as applicable, at any time and/or from time to time without prior notice. Although the plans and proposals described herein reflect the plans and proposals presently contemplated by the reporting person with respect to the issuer and the Issuer-Related Securities, as applicable, each such plan and proposal is subject to change at any time and from time to time dependent upon contingencies and assumed and speculative conditions and other factors, including actions taken by the issuer, the issuer's board of directors, other security holders of the issuer and other parties and the outcome of the discussions, communications, transactions and other actions described herein. There can be no assurance that any such plan or proposal will be consummated or pursued or result in any transaction described herein or other transaction or that any action contemplated by any such plan or proposal (or any similar action) will be taken. Except as otherwise described herein, no reporting person currently has any plan or proposal that relates to or would result in any of the actions specified in clause (a) through (h) of Item 4 of Schedule 13D. However, the reporting person may, at any time and from time to time, plan or propose to effect or cause an action or actions relating to or resulting in one or more of the actions specified in clause (a) through (h) of Item 4 of Schedule 13D.

**ITEM 5. INTEREST IN SECURITIES OF THE ISSUER**

(a) The aggregate number and percentage of the subject class of securities beneficially owned by the reporting person is stated (and those securities for which the reporting person has a right to acquire, if any, are identified) in items 11 and 13 on the reporting person's cover page hereto or otherwise herein, based 3,876,960 shares of Common Stock outstanding as of August 10, 2016.

(b) Number of securities for or as to which each reporting person has:

(i)     Sole power to vote or to direct the vote:

See Item 7 on the reporting person's cover page hereto.

(ii)    Shared power to vote or to direct the vote:

See Item 8 on the reporting person's cover page hereto.

(iii)   Sole power to dispose or to direct the disposition of:

See Item 9 on the reporting person's cover page hereto.

(c) During the past sixty days, the only transactions in Common Stock effected by the reporting person were the open market purchases set forth in Exhibit 1.1.

**ITEM 6. CONTRACTS, ARRANGEMENTS, UNDERSTANDINGS OR RELATIONSHIPS WITH RESPECT TO SECURITIES OF THE ISSUER**

There are currently no contracts, arrangements, understandings or relationships (legal or otherwise) between the person named in Item 2 and any other person with respect to any securities of the issuer, including but not limited to transfer or voting of any of the securities, finder's fees, joint ventures, loan or option arrangements, puts or calls, guarantees of profits, division of profits or loss, or the giving or withholding of proxies.

**ITEM 7. MATERIAL TO BE FILED AS EXHIBITS**

| Exhibit No . | Description |
|---|---|
| 1.1 | Transactions in Shares |

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

September 14, 2016
Date

/s/ Catherine Johanna DeFrancesco
Catherine Johanna DeFrancesco

**Transactions in Shares by the Reporting Person**

| Purchasing entity | Trade date | Shares | Price per Share |
|---|---|---|---|
| Delavalco Holdings, Inc. (FL) | 9/14/2016 | 10,100 | 3.78 |
| DeFrancesco Motorsports, Inc. | 9/13/2016 | 10,000 | 4.34 |
| Delavalco Holdings, Inc. | 9/13/2016 | 10,000 | 4.29 |
| Delavalco Holdings, Inc. (FL) | 9/13/2016 | 8,000 | 4.35 |
| Delavalco Holdings, Inc. (FL) | 9/12/2016 | 12,672 | 4.08 |
| Delavalco Holdings, Inc. (FL) | 9/9/2016 | 9500 | 3.91 |
| Delavalco Holdings, Inc. (FL) | 9/8/2016 | 10194 | 3.86 |
| Delavalco Holdings, Inc. (FL) | 9/2/2016 | 35000 | 3.86 |
| Namaste Gorgie, Inc. | 9/2/2016 | 39110 | 3.80 |
| DSB Capital, Ltd. | 9/2/2016 | 25000 | 3.79 |
| DeFrancesco Motorsports, Inc. | 9/2/2016 | 39100 | 3.74 |
| Delavalco Holdings, Inc. | 9/1/2016 | 2500 | 3.85 |
| Delavalco Holdings, Inc. | 9/1/2016 | 5000 | 3.89 |
| Delavalco Holdings, Inc. | 9/1/2016 | 580 | 3.89 |
| Delavalco Holdings, Inc. | 9/1/2016 | 4420 | 3.85 |
| Delavalco Holdings, Inc. | 9/1/2016 | 2443 | 3.84 |
| Delavalco Holdings, Inc. | 9/1/2016 | 2500 | 3.85 |
| Delavalco Holdings, Inc. | 9/1/2016 | 7757 | 3.85 |
| Delavalco Holdings, Inc. | 9/1/2016 | 7300 | 3.91 |
| DSB Capital, Ltd. | 9/1/2016 | 200 | 3.85 |
| Namaste Gorgie, Inc. | 8/31/2016 | 2000 | 3.37 |
| DSB Capital, Ltd. | 8/31/2016 | 724 | 3.74 |
| DSB Capital, Ltd. | 8/31/2016 | 6758 | 3.62 |
| DSB Capital, Ltd. | 8/31/2016 | 5682 | 3.67 |
| DSB Capital, Ltd. | 8/31/2016 | 6836 | 3.69 |
| Delavalco Holdings, Inc. | 8/30/2016 | 25000 | 3.52 |
| Delavalco Holdings, Inc. | 8/30/2016 | 4000 | 3.37 |
| Delavalco Holdings, Inc. | 8/30/2016 | 4000 | 3.35 |
| Delavalco Holdings, Inc. | 8/30/2016 | 1000 | 3.36 |
| Delavalco Holdings, Inc. | 8/30/2016 | 5000 | 3.67 |
| Namaste Gorgie, Inc. | 8/30/2016 | 5000 | 3.36 |
| DSB Capital, Ltd. | 8/30/2016 | 8800 | 3.52 |
| DSB Capital, Ltd. | 8/30/2016 | 6000 | 3.63 |
| DSB Capital, Ltd. | 8/30/2016 | 3000 | 3.59 |
| DSB Capital, Ltd. | 8/30/2016 | 1000 | 3.62 |
| DeFrancesco Motorsports, Inc. | 8/30/2016 | 10000 | 3.64 |
| Marcandy Investments Corp. | 8/30/2016 | 5000 | 3.36 |

# EXHIBIT B

**BARRY HONIG**
555 South Federal Highway, #450
Boca Raton, FL 33432

September 13, 2016

_By Email and UPS Overnight Service_
Stephen T. Lundy
Chief Executive Officer
Venaxis, Inc.
1585 South Perry Street
Castle Rock, CO 80104

Re:   Demand For Special Meeting of the Shareholders of Venaxis, Inc.

Mr. Lundy:

Barry Honig (the "Holder") is the beneficial owner of shares of Venaxis, Inc., a Colorado corporation ("Venaxis" or the "Company").  The Holder beneficially owns shares representing greater than ten (10%) percent of all the votes entitled to be cast at a meeting of the shareholders of the Company. I have attached evidence of such ownership which consists of the Broker Statement and Schedule 13D filed with the Securities and Exchange Commission on September 13, 2016 and attached hereto as Exhibit A and Exhibit B , respectively.

Pursuant to Section 7-107-102 of the Colorado Revised Statutes ("CRS"), the Holder hereby demands a special meeting (the "Meeting") of the shareholders of the Company be held.  Notice of the Meeting should be provided by the Company to its shareholders within the timeframe allowed pursuant to the CRS and the Company's Bylaws.

Pursuant to CRS 7-108-108, shareholders may remove one or more directors with or without cause.  A director may be removed by the shareholders only at a meeting called for the purpose of removing the director.  The purpose of this Meeting demanded by the Holders is to vote on the removal of five (5) directors, aside from you, currently serving on the Board of Directors. Additionally, proposals for a $7,500,000 dividend, to set the size of the board at no more than six (6) directors and for the election of five (5) new directors shall take place at the Meeting.  These purposes shall be described in the notice of the Meeting you are required to provide to the shareholders under applicable Colorado law, to be substantially in the form of the form of such proposals included herewith as Exhibit C .

Should you have any questions regarding the foregoing, please do not hesitate to contact Harvey Kesner, Esq.  at (212) 930-9700.

Very truly yours,

/s/ Barry Honig

_____
Barry Honig
Shares Beneficially Owned: 389,159 (10.04%)

-1-

**Exhibit A**

Balances & Positions for customer 82963941 (GRQ CONSULTANTS INC 401K)          Page 1 of 2

**Balances & Positions**                                                    **Account**

Tue, 13 Sep 2016 7:15:00 am EDT                              82963941 (GRQ CONSULTANTS INC)  ⌄

---

**Balance Summary**

| | |
|---|---|
| **Total Account Value** | **Trading Cash** |
| **Market Value of Securities** | **Available Cash** |
| **Money Market Funds** | |

---

**Balance Detail**

| Account Type | Trade Date Balance | Market Value | Equity | Total Account Value |
|---|---|---|---|---|

Total

---

**Assets**

| Symbol | Description | Quantity | Price | Start of Day | Current Value | Today's G/L | Account | P |
|---|---|---|---|---|---|---|---|---|
| Cash | | | | | | | | |

Equities

| APPY | VENAXIS INC NEW | 389,159 | $ 4.11 | $ 1,599,443.49 | $ 1,599,443.49 | | CASH | |

https://corclearing.automatedfinancial.com/accounts/balance_page.html                9/13/2016

**Exhibit B**

[Omitted]

B-1

**Exhibit C**

**PROPOSAL NO. 1**

**APPROVAL OF DIVIDEND**

**RESOLVED:**

The Company shall be authorized and hereby is directed to declare and pay a special cash dividend to shareholders of record on the close of business on a date that shall be determined by the Board of Directors (not later than 30 days following shareholder authorization) such dividend to be paid on outstanding shares of the Company's common stock, in the amount of $7,500,000 .  The dividend paid shall constitute a reduction in capital of the Company.

**Vote Required**

The affirmative vote of a majority of the votes cast (either in person or by proxy) and entitled to vote on the matter is required to approve Proposal 1.

**PROPOSAL NO. 2**

**APPROVAL TO FIX THE MAXIMUM NUMBER OF DIRECTORS OF THE COMPANY AT SIX (6) DIRECTORS**

**RESOLVED:**

The Company shall be authorized and hereby is directed to establish the size of the Board of Directors and does hereupon fix the number of directors of the Company at a maximum of six (6) directors, such maximum number not to be revised except upon further shareholder authorization as provided in this resolution.

**Vote Required**

The affirmative vote of a majority of the votes cast (either in person or by proxy) and entitled to vote on the matter is required to approve Proposal 2.

C-2

## PROPOSAL NO. 3

## REMOVAL FROM OFFICE OF DIRECTORS

**RESOLVED:**

Colorado Revised Statute (C.R.S.) Section 7-108-108 states that shareholders of the Company may remove one or more directors with or without cause at a meeting called for the purpose of removing the director. The shareholders of the Company do hereby remove at a meeting called for the purpose of removal, the following directors from the Board of Directors of the Company:

| Name | Age | Date First Elected or Appointed | Position(s) |
|------|-----|-------------------------------|-------------|
| Gail S. Schoettler | 72 | 2001 | Non-Executive Chair and Director |
| Susan A. Evans | 68 | 2012 | Director |
| Daryl J. Faulkner | 67 | 2009 | Director |
| David E. Welch | 68 | 2004 | Director |
| Stephen A. Williams | 56 | 2013 | Director |

Biographical information concerning the directors can be found in the Company's Annual Report on Form 10-K for the year ended December 31, 2015.

**Vote Required**

The number of votes cast in favor of removal exceeds the number of votes cast against removal of each named director is required for Proposal 3.

PROPOSAL NO. 4

### ELECTION OF FIVE (5) DIRECTORS

**RESOLVED:**

The following persons are hereby nominated for election to the Board of Directors of the Company, and are hereby elected to serve as directors and to serve until their successor(s) are duly qualified and elected on or following  the 2017 annual meeting of shareholders of the Company, such directors may only be removed "for cause" or resignation. Although it is not contemplated that any person will decline or be unable to serve as a director, in such event, the remaining Board members are authorized to fill any such vacancies created.

| Name | Age |
| --- | --- |
| John Stetson | 31 |
| John O'Rourke | 31 |
| Jesse Sutton | 47 |
| Michael Beeghley | 49 |
| David Danziger | 59 |

**John Stetson** has been the Managing Member of HS Contrarian Investments LLC, a private investment firm with a focus on early stage companies since 2010. In addition, Mr. Stetson served as Executive Vice President, Chief Financial Officer, and Director of Marathon Patent Group, Inc. (NASDAQ:MARA) June 2012 to February 2015, engaged in patenting, and patent acquisition, enforcement and monetization. Mr. Stetson was President & Co-Founder of Fidelity Property Group, Inc. from April 2010 to July 2014, a real estate development group focused on acquisition, rehabilitation, and short-term disposition of single family homes. Prior, Mr. Stetson held positions at Heritage Investment Group and Toll Brothers.  Mr. Stetson also served as Chief Financial Officer, Executive Vice President and Secretary of Majesco Entertainment Company (NASDAQ:COOL) since September 2015.  Mr. Stetson received his BA in Economics from the University of Pennsylvania.

**John O'Rourke** is an analyst and investor who currently serves as Managing Member of ATG Capital LLC, an investment fund focused on small and mid-cap growth companies possessing distinct competitive advantages and superior management teams.  Mr. O'Rourke currently serves on the Board of Directors of Customer Acquisition Network Inc., a leading global performance based marketing company that reaches more than two billion users per month.  Mr. O'Rourke formerly served on the Board of Directors of Rant, Inc., an innovator in U.S. digital media, prior to its sale to a Nasdaq listed company. He was formerly CFO of Fidelity Property Group, a real estate development company with a focus in California. He received his Bachelor of Science in Accounting with Honors from the University of Maryland and a Master of Science in Finance from George Washington University.

**Jesse Sutton** is a consultant for various analytic and gaming related companies. Mr. Sutton founded Majesco Entertainment Company (NASDAQ: COOL) in 1998 and served as its Chief Executive Officer until July 2015 , as well as a director from December 17, 2003 until February 6, 2006 and again from August 23, 2006 until December 17, 2014. During this period, Mr. Sutton oversaw the successful launch and development of Zumba! Fitness which sold over $300 million in games, among many other successful brands brought to market like Cooking Mama, Jillian Michaels Fitness and Disney's Phineus and Ferb and Alvin and the Chipmunks.  Mr. Sutton consults with various online and digital companies engaged in internet commerce and game development. Mr. Sutton attended Yeshiva University in New York.

**Michael Beeghley** has been President and founder of Applied Economics LLC ("Applied Economics"), a national corporate finance and financial advisory services firm for 18 years. Mr. Beeghley has testified as an expert and provided expert opinions on numerous economic, financial and securities issues. Mr. Beeghley advises pharmaceutical, biologics and medical device companies.  Recently, Mr. Beeghley served as advisor to a drug distribution company sale to a major private equity firm in a leveraged buy-out.  Prior to forming Applied Economics, Mr. Beeghley was a Manager in the Corporate Finance Group of Ernst & Young, LLP and a Senior Analyst in the Corporate Finance Group of PricewaterhouseCoopers.  Mr. Beeghley currently serves as a director of Majesco Entertainment Company (NASDAQ:COOL) since December 2015.

**David Danziger** is an Assurance Partner in MNP LLP's Toronto office. He is the Senior Vice President of Assurance for the firm as well as the National Leader of MNP's Public Companies practice. An accounting professional since 1980, Mr. Danziger is proficient in his field, serving in both the audit function and as a compliance advisor to public companies as well as to private firms looking to become public. His years of experience are a benefit to clients engaging in any form of public market transaction. Mr. Danziger also assists clients with significant transactions, complex accounting matters and regulatory issues as well as prospectus filing and other publicly filed documents. Mr. Danziger 's experience with US Reporting Issuers as well as Canadian Reporting Issuers has required him to be fluent in both IFRS and US GAAP. Mr. Danziger has served as a Director for public companies for many years and currently has significant director positions with TSX, TSXV, NYSE and AMEX-listed public companies.   Mr. Danziger graduated from the University of Toronto with a Bachelor of Commerce in 1980 and completed the School of Accountancy in 1983.

There are no family relationships between these nominees and any director or executive officer of the Company and there were no related party transactions between this nominee and the Company. No nominee has had any involvement in any legal proceedings (10 years) pursuant to Item 401 of Regulation S-K.

**Vote Required**

The affirmative vote of the holders of a plurality of the common stock present at the special meeting of stockholders is required for election of each director nominee set forth in this proposal.

# EXHIBIT C

**BARRY HONIG**

555 South Federal Highway, #450
Boca Raton, FL 33432
T:   561-961-4237
F:   561-235-5379
E:   brhonig@aol.com

September 13, 2016

*By E-Mail and Overnight UPS Mail*
Daryl Faulkner
Chair, Nominating Committee
c/o Venaxis, Inc.
1585 South Perry Street
Castle Rock, Colorado 80104

Re:   *Nomination of Five (5) Director Candidates of Venaxis, Inc.*

Dear Mr. Faulkner:

I am a record and beneficial holder of shares of Venaxis, Inc., a Colorado corporation ("Venaxis" or the "Company").  Directly and as trustee of GRQ Consultants, Inc. 401K, I beneficially own shares representing greater than ten (10%) percent of common stock, of the Company. I have attached evidence of such ownership which consists of the Broker Statement and Schedule 13D filed with the Securities and Exchange Commission on September 13, 2016 and attached hereto as Exhibit A and Exhibit B , respectively.

Pursuant to the procedures for nominating a director candidate to the Board of Directors (the "Board") of the Company, I hereby wish to nominate the following candidates to stand for election at the special meeting of the shareholders of the Company called to take place on a date of the Company's choosing within the timeframe allowed pursuant to the CRS and the Company's Bylaws:

1.  John Stetson
a.  68 Fiesta Way, Boca Raton, FL 33432
b.  T: 561-961-4371, F: 561-235-5379, E: stetson.john@gmail.com
c.  Mr. Stetson has been the Managing Member of HS Contrarian Investments LLC, a private investment firm with a focus on early stage companies since 2010. In addition, Mr. Stetson served as Executive Vice President, Chief Financial Officer, and Director of Marathon Patent Group, Inc. (NASDAQ:MARA) June 2012 to February 2015, engaged in patenting, and patent acquisition, enforcement and monetization. Mr. Stetson was President & Co-Founder of Fidelity Property Group, Inc. from April 2010 to July 2014, a real estate development group focused on acquisition, rehabilitation, and short-term disposition of single family homes. Prior, Mr. Stetson held positions at Heritage Investment Group and Toll Brothers.  Mr. Stetson also served as Chief Financial Officer, Executive Vice President and Secretary of Majesco Entertainment Company (NASDAQ:COOL) since September 2015.  Mr. Stetson received his BA in Economics from the University of Pennsylvania.
d.  There are no family relationships between this nominee and any director or executive officer of the Company.
e.  No involvement in any legal proceedings (10 years).
f.  This nominee's security ownership of the Company is as follows: No ownership.
g.  There were no related party transactions between this nominee and the Company.

2.  John O'Rourke
a.  808 Solar Isle Dr., Fort Lauderdale, FL 33301
b.  T: 610-247-3917, F: 561-235-5379, E: john@atgcapitalllc.com
c.  Mr. O'Rourke is an analyst and investor who currently serves as Managing Member of ATG Capital LLC, an investment fund focused on small and mid-cap growth companies possessing distinct competitive advantages and superior management teams.  Mr. O'Rourke currently serves on the Board of Directors of Customer Acquisition Network Inc., a leading global performance based marketing company that reaches more than two billion users per month.  Mr. O'Rourke formerly served on the Board of Directors of Rant, Inc., an innovator in U.S. digital media, prior to its sale to a Nasdaq listed company. He was formerly CFO of Fidelity Property Group, a real estate development company with a focus in California. He received his Bachelor of Science in Accounting with Honors from the University of Maryland and a Master of Science in Finance from George Washington University.
d.  There are no family relationships between this nominee and any director or executive officer of the Company.
e.  No involvement in any legal proceedings (10 years).
f.  This nominee's security ownership of the Company is as follows:

| Title of Class | Amount and Nature o f Beneficial Ownership | Percent of Class |
|---|---|---|
| Common Stock | 12,500 Shares [(1)] | .32% [(2)] |

(1)  Represents 12,500 shares of common stock held by ATG Capital LLC ("ATG").  Mr. O'Rourke is the sole manager and member of ATG and in such capacity holds voting and dispositive power over the securities held by ATG.
(2)  Calculated based on 3,876,961 shares of the Common Stock outstanding as of August 10, 2016, as reported in the Company's Form 10-Q for the period ended June 30, 2016 filed with the SEC on August 10, 2016.
g.  There were no related party transactions between this nominee and the Company.

3.  Jesse Sutton

a.  1989 East 2nd Street, Brooklyn, NY 11223

b.  T: 732-233-0436, F: 732-225-8408, E: jesutton@majescoent.com

c.  Mr. Sutton is a consultant for various analytic and gaming related companies. Mr. Sutton founded Majesco Entertainment Company (NASDAQ: COOL) in 1998 and served as its Chief Executive Officer until July 2015 , as well as a director from December 5, 2003 until February 6, 2006 and again from August 23, 2006 until December 17, 2014. During this period, Mr. Sutton oversaw the successful launch and development of Zumba! Fitness which sold over $300 million in games, among many other successful brands brought to market like Cooking Mama, Jillian Michaels Fitness and Disney's Phineus and Ferb and Alvin and the Chipmunks. Mr. Sutton consults with various online and digital companies engaged in internet commerce and game development. Mr. Sutton attended Yeshiva University in New York.

d.  No involvement in any legal proceedings (10 years).

e.  This nominee's security ownership of the Company is as follows: No ownership.

f.  There were no related party transactions between this nominee and the Company.

4.  Michael Beeghley

a.  825 West Peachtree Street, Suite 250, Atlanta, GA 30308

b.  T: 404-214-3600, F: 404 - 214 - 3601, E: michael@appliedecon.com

c.  Mr. Beeghley has been President and founder of Applied Economics LLC ("Applied Economics"), a national corporate finance and financial advisory services firm for 18 years. Mr. Beeghley has testified as an expert and provided expert opinions on numerous economic, financial and securities issues. Mr. Beeghley advises pharmaceutical, biologics and medical device companies.  Recently, Mr. Beeghley served as advisor to a drug distribution company sale to a major private equity firm in a leveraged buy-out.  Prior to forming Applied Economics, Mr. Beeghley was a Manager in the Corporate Finance Group of Ernst & Young, LLP and a Senior Analyst in the Corporate Finance Group of PricewaterhouseCoopers.  Mr. Beeghley currently serves as a director of Majesco Entertainment Company (NASDAQ:COOL) since December 2015.

d.  There are no family relationships between this nominee and any director or executive officer of the Company.

e.  No involvement in any legal proceedings (10 years).

f.  This nominee's security ownership of the Company is as follows: No ownership.

g.  There were no related party transactions between this nominee and the Company.

5.  David Danziger

a.  903 – 10 Bellair Street, Toronto, Ontario M5R 3T8

b.  T: 647-296-3658, F: n/a, E: david.danziger@mnp.ca

c.  Mr. Danziger is an Assurance Partner in MNP LLP's Toronto office. He is the Senior Vice President of Assurance for the firm as well as the National Leader of MNP's Public Companies practice. An accounting professional since 1980, Mr. Danziger is proficient in his field, serving in both the audit function and as a compliance advisor to public companies as well as to private firms looking to become public. His years of experience are a benefit to clients engaging in any form of public market transaction. Mr. Danziger also assists clients with significant transactions, complex accounting matters and regulatory issues as well as prospectus filing and other publicly filed documents. Mr. Danziger 's experience with US Reporting Issuers as well as Canadian Reporting Issuers has required him to be fluent in both IFRS and US GAAP. Mr. Danziger has served as a Director for public companies for many years and currently has significant director positions with TSX, TSXV, NYSE and AMEX-listed public companies. Mr. Danziger graduated from the University of Toronto with a Bachelor of Commerce in 1980 and completed the School of Accountancy in 1983.

d.  No involvement in any legal proceedings (10 years).

e.  This nominee's security ownership of the Company is as follows: No ownership.

f.  There were no related party transactions between this nominee and the Company.

Furthermore, attached hereto as Exhibit C , are the signed written consents of the nominees for election as director of the Company.

Should you have any questions regarding the foregoing, please do not hesitate to contact our counsel Harvey Kesner, Esq. at (212) 930-9700.

Very truly yours,

/s/ Barry Honig

_____

Barry Honig

-2-

**Exhibit A**

Balances & Positions for customer 82963941 (GRQ CONSULTANTS INC 401K)       Page 1 of 2

## Balances & Positions

Tue, 13 Sep 2016 7:15:00 am EDT

**Account**

82963941 (GRQ CONSULTANTS INC)  ∨

### Balance Summary

| | |
|---|---|
| **Total Account Value** | **Trading Cash** |
| **Market Value of Securities** | **Available Cash** |
| **Money Market Funds** | |

### Balance Detail

| Account Type | Trade Date Balance | Market Value | Equity | Total Account Value |
|---|---|---|---|---|

Total

### Assets

| Symbol | Description | Quantity | Price | Start of Day | Current Value | Today's G/L | Account | P |
|---|---|---|---|---|---|---|---|---|

Cash

Equities

| APPY | VENAXIS INC NEW | 389,159 | $ 4.11 | $ 1,599,443.49 | $ 1,599,443.49 | | CASH | |

A-1

**<u>Exhibit B</u>**

[Omitted]

B-1

<u>Exhibit C</u>

## <u>CONSENT TO NOMINATION AS DIRECTOR</u>

I, **John Stetson,** do hereby consent to my nomination for membership of the board of directors (the "Board") of Venaxis, Inc., a Colorado Corporation (the "Company").

1. Should I be elected to the Board, I am willing and able to serve and agree to serve for compensation not greater than that described in the Company's most recent proxy statement.

2. I am deemed to be "independent" as that word is defined by Rule 5605(a) of the NASDAQ listing standards.

3. I do hereby attest to the accuracy of the information submitted hereto.

DATED:  September 9, 2016

John Stetson
Name: John Stetson

C-1

## CONSENT TO NOMINATION AS DIRECTOR

I, _John O'Rourke_, do hereby consent to my nomination for membership of the board of directors (the "Board") of Venaxis, Inc., a Colorado Corporation (the "Company").

1. Should I be elected to the Board, I am willing and able to serve and agree to serve for compensation not greater than that described in the Company's most recent proxy statement.

2. I am deemed to be "independent" as that word is defined by Rule 5605(a) of the NASDAQ listing standards.

3. I do hereby attest to the accuracy of the information submitted hereto.

DATED: _September 12_, 2016

Name: _____

## CONSENT TO NOMINATION AS DIRECTOR

I,  Jesse Sutton , do hereby consent to my nomination for membership of the board of directors (the "Board") of Venaxis, Inc., a Colorado Corporation (the "Company").

1. Should I be elected to the Board, I am willing and able to serve and agree to serve for compensation not greater than that described in the Company's most recent proxy statement.

2. I am deemed to be "independent" as that word is defined by Rule 5605(a) of the NASDAQ listing standards.

3. I do hereby attest to the accuracy of the information submitted hereto.

DATED: September , 2016
           12

Name

## CONSENT TO NOMINATION AS DIRECTOR

I, _**Michael M. Beeghley,** do hereby consent to my nomination for membership of the board of directors (the "Board") of Venaxis, Inc., a Colorado Corporation (the "Company").

1. Should I be elected to the Board, I am willing and able to serve and agree to serve for compensation not greater than that described in the Company's most recent proxy statement.

2. I am deemed to be "independent" as that word is defined by Rule 5605(a) of the NASDAQ listing standards.

3. I do hereby attest to the accuracy of the information submitted hereto.

DATED:  September 8, 2016



## CONSENT TO NOMINATION AS DIRECTOR

I, **David Danziger,** do hereby consent to my nomination for membership of the board of directors (the "Board") of Venaxis, Inc., a Colorado Corporation (the "Company").

1. Should I be elected to the Board, I am willing and able to serve and agree to serve for compensation not greater than that described in the Company's most recent proxy statement.

2. I am deemed to be "independent" as that word is defined by Rule 5605(a) of the NASDAQ listing standards.

3. I do hereby attest to the accuracy of the information submitted hereto.

DATED:  September 12, 2016

Name: David Danziger

# Exhibit P

**EDGAR** pro
by EDGAR Online®

# RIOT BLOCKCHAIN, INC.
## Filed by
## HONIG BARRY C

## FORM SC 13D/A
### (Amended Statement of Beneficial Ownership)

## Filed 04/18/18

| | |
|---|---|
| Address | 202 6TH STREET, SUITE 401 |
| | CASTLE ROCK, CO, 80104 |
| Telephone | 303-794-2000 |
| CIK | 0001167419 |
| Symbol | RIOT |
| SIC Code | 2835 - In Vitro and In Vivo Diagnostic Substances |
| Industry | Financial & Commodity Market Operators |
| Sector | Financials |
| Fiscal Year | 12/31 |

http://pro.edgar-online.com
© Copyright 2020, EDGAR Online, a division of Donnelley Financial Solutions. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, a division of Donnelley Financial Solutions, Terms of Use.

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

SCHEDULE 13D/A

Under the Securities Exchange Act of 1934
(Amendment No. 7)*

---

Riot Blockchain, Inc.

(Name of Issuer)

---

Common Stock, no par value per share

(Title of Class of Securities)

---

767292105

(CUSIP Number)

---

Barry Honig
555 South Federal Highway #450
Boca Raton, FL 33432
(561) 307-2287
(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

---

See Footnote 1

(Date of Event Which Requires Filing of This Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), Rule 13d-1(f) or Rule 13d-1(g), check the following box. [ ]

(Page 1 of 9 Pages)

---

* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

(1) This Amendment No. 7 is being filed to restate Amendment No. 6 filed with the Securities and Exchange Commission on February 13, 2018. The first date of event which required the filing of an amendment to the Schedule 13D after Amendment No. 5 was March 15, 2017.

| 1 | NAME OF REPORTING PERSON<br>Barry Honig |
|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP           (a) ☐<br>                                                                    (b) ☐ |
| 3 | SEC USE ONLY |
| 4 | SOURCE OF FUNDS<br>PF, WC |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDING IS REQUIRED PURSUANT TO ITEMS 2(d) or 2(e)    ☐ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br>New York |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH: | 7 | SOLE VOTING POWER<br>200,154 shares of Common Stock (including 151,210 shares of Common Stock issuable upon conversion of shares of Series B Convertible Preferred Stock and 22,222 shares of Common Stock issuable upon exercise of the December 2017 Warrants)* |
|---|---|---|
| | 8 | SHARED VOTING POWER<br>-0- |
| | 9 | SOLE DISPOSITIVE POWER<br>200,154 shares of Common Stock (including 151,210 shares of Common Stock issuable upon conversion of shares of Series B Convertible Preferred Stock and 22,222 shares of Common Stock issuable upon exercise of the December 2017 Warrants)* |
| | 10 | SHARED DISPOSITIVE POWER<br>-0- |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH PERSON<br>200,154 shares of Common Stock (including 151,210 shares of Common Stock issuable upon conversion of shares of Series B Convertible Preferred Stock and 22,222 shares of Common Stock issuable upon exercise of the December 2017 Warrants)* |
|---|---|
| 12 | CHECK IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES    ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br>1.69%* |
| 14 | TYPE OF REPORTING PERSON<br>IN |

* This Amendment No. 7 reflects the Reporting Person's holdings as of February 13, 2018.

This Amendment No. 7 (" Amendment No. 7 ") amends and supplements the statement on Schedule 13D filed with the Securities and Exchange Commission (the " SEC ") on September 8, 2016, as amended, supplemented and restated from time to time (as amended, including, without limitation, pursuant to this Amendment No. 7, the " Schedule 13D ") with respect to the shares of Common Stock, no par value per share (the " Common Stock "), of Riot Blockchain, Inc., a Nevada corporation (the " Issuer "). This Amendment No. 7 is being filed to restate Amendment No. 6 filed with the SEC on February 13, 2018. The first date of event which required the filing of an amendment to the Schedule 13D after Amendment No. 5 was March 15, 2017. Capitalized terms used herein and not otherwise defined in this Amendment No. 7 shall have the meanings set forth in the Schedule 13D. This Amendment No. 7 amends Items 2, 3, 5, 6 and 7 as set forth below. This is the final amendment to the Schedule 13D and constitutes an "exit filing" for the Reporting Person.

**Item 2.**        **IDENTITY AND BACKGROUND.**

Item 2 of the Schedule 13D is hereby amended and restated in its entirety as follows:

(a)        This statement is filed by Barry Honig, (" Mr. Honig " or the " Reporting Person "), with respect to the shares of Common Stock held by himself and through GRQ Consultants, Inc. 401K (of which Mr. Honig is Trustee) and GRQ Consultants, Inc. Roth 401K FBO Barry Honig (of which Mr. Honig is Trustee) (collectively, the " Honig Entities ").

            Any disclosures herein with respect to persons other than the Reporting Person are made on information and belief after making inquiry to the appropriate party.

            The filing of this statement should not be construed in and of itself as an admission by the Reporting Person as to beneficial ownership of the securities reported herein.

(b)        The address of the business office of the Reporting Person is 555 South Federal Highway #450, Boca Raton, Florida 33432.

(c)        The principal business of the Reporting Person is investing in securities for his personal account.

(d)        The Reporting Person has not, during the last five years, been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors).

(e)        The Reporting Person has not, during the last five years, been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and, as a result of such proceeding, was, or is subject to, a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, Federal or State securities laws or finding any violation with respect to such laws.

(f)        Mr. Honig is a citizen of the United States.

**Item 3.        SOURCE AND AMOUNT OF FUNDS OR OTHER CONSIDERATION.**

Item 3 of the Schedule 13D is hereby amended and restated in its entirety as follows:

> The Reporting Person used a total of $499,995 to acquire the Private Placement Shares (as defined below) and the December 2017 Warrants (as defined below). The additional 4,500 shares of Common Stock held by the Reporting Person were acquired upon conversion of 45 Series A Preferred Shares (as defined below) at a conversion price of $2.50. Such Series A Preferred Shares were acquired for $11,250. The sources of the funds used to acquire the Private Placement Shares, the December 2017 Warrants and the Series A Preferred Shares are the personal funds of Mr. Honig and the working capital of the Honig Entities. The Series B Preferred Shares (as defined below) reported herein were acquired in exchange for 151,210 shares of common stock of Kairos Global Technology, Inc. ("<u>Kairos</u>") as described in Item 6.

**Item 5.        INTEREST IN SECURITIES OF THE ISSUER.**

Items 5 of the Schedule 13D is hereby amended and restated in its entirety as follows:

(a)     See rows (11) and (13) of the cover pages to this Schedule 13D for the aggregate number of shares of Common Stock and percentages of the shares of Common Stock beneficially owned by the Reporting Person as of February 13, 2018 . The percentages used in this Schedule 13D are calculated based upon 11,652,270 shares of Common Stock issued and outstanding as of February 5, 2018, as reported in the Issuer's Registration Statement on Amendment No. 1 to Form S-3 filed with the SEC on February 7, 2018 and assumes the conversion of the shares of Series B Convertible Preferred Stock and the exercise of the December 2017 Warrants.

(b)     See rows (7) through (10) of the cover pages to this Schedule 13D for the number of shares of Common Stock as to which the Reporting Person has the sole or shared power to vote or direct the vote and sole or shared power to dispose or to direct the disposition as of February 13, 2018.

(c)     Information concerning all transactions in the shares of Common Stock effected by the Reporting Person from the filing of Amendment No. 5 to the filing of Amendment No. 6 is set forth on <u>Schedule A</u> hereto and is incorporated herein by reference.

(d)     No person other than the Reporting Person and the Honig Entities is known to have the right to receive, or the power to direct the receipt of dividends from, or proceeds from the sale of, the shares of Common Stock held by Mr. Honig and the Honig Entities.

(e)     November 20, 2017.

**Item 6.**      **CONTRACTS, ARRANGEMENTS, UNDERSTANDINGS OR RELATIONSHIPS WITH RESPECT TO SECURITIES OF THE ISSUER.**

Item 6 of the Schedule 13D is hereby amended and supplemented by the addition of the following:

On March 15, 2017, the Issuer entered into separate securities purchase agreements (the " Note Purchase Agreements ") pursuant to which it agreed to sell to the Reporting Person and a certain Hong Entity $2,250,000 of principal amount of promissory notes (the " Notes ") and three year warrants (the " March 2017 Warrants ") to purchase up to 700,000 shares of Common Stock. The Notes are convertible into shares of Common Stock at an initial conversion price of $2.50. Each March 2017 Warrant is exercisable into shares of Common Stock at an exercise price equal to $3.56 per share (such sale and issuance of the Notes and March 2017 Warrants, the " Note Private Placement ").

On March 16, 2017, the Issuer satisfied all closing conditions and closed the Note Private Placement.

The Notes and the March 2017 Warrants, as well as the proceeds from the sale therefrom, were placed in escrow pending the occurrence or non-occurrence of a Qualified Transaction (as defined in the governing purchase agreements). On August 18, 2017, the lead investor in the transaction waived the requirement for the occurrence of a Qualified Transaction and gross proceeds of the Note Private Placement were released to the Issuer and the Notes and the March 2017 Warrants were released to the Reporting Person and the applicable Honig Entity.

Under the terms of the Note Purchase Agreement, the Notes were automatically, and without any further action on the part of the investors, exchanged for shares of Series A C onvertible P referred S tock of the Issuer (the " Series A Preferred Shares "). The terms of the Series A Preferred Shares are set forth in the certificate of designations for such shares (the " Certificate of Designations of the Series A Preferred Shares "). As such, and pursuant to the Note Purchase Agreements, on September 20, 2017, the Issuer issued an aggregate of 7,071.74 Series A Preferred Shares, convertible into an aggregate of 707,174 shares of Common Stock, in exchange for the Notes issued in the Note Private Placement.

In connection with the Note Private Placement, the Issuer entered into a Registration Rights Agreement (the " March 2017 Registration Rights Agreement "), with the Reporting Person and the applicable Honig Entity which required the Issuer to file a registration statement under the Securities Act of 1933, as amended (the " Securities Act "), to register the resale of the shares of Common Stock issuable upon (i) conversion of the Notes; (ii) exercise of the March 2017 Warrants and (iii) conversion of the Series A Preferred Shares.

The terms of the Note Purchase Agreement, the Notes, the March 2017 Warrant, the Certificate of Designations of the Series A Preferred Shares and the March 2017 Registration Rights Agreement are incorporated herein by reference to the texts of the agreements, which are filed as Exhibit 10.1, Exhibit 4.1. Exhibit 4.2, Exhibit 3.1 and Exhibit 10.2, respectively, of the Issuer's Current Report on Form 8-K filed by the Issuer with the SEC on March 17, 2017 (the " March 17, 2017 Form 8-K "). The Form of Note, the Form of March 2017 Warrant, the Certificate of Designations of the Series A Preferred Shares and the Form of March 2017 Registration Rights Agreement are referenced as Exhibit 1, Exhibit 2, Exhibit 3 and Exhibit 4, respectively, to this Amendment No. 7.

On November 1, 2017, the Issuer entered into a share exchange agreement (the " Exchange Agreement ") with Kairos, the Reporting Person and the other shareholders of Kairos. On November 3, 2017, pursuant to the Exchange Agreement, the shareholders of Kairos, including the Reporting Person, exchanged all outstanding shares of Kairos' common stock for shares of Series B Convertible Preferred Stock of the Issuer (the " Series B Preferred Shares "). The Reporting Person received 151,210 Series B Preferred Shares pursuant to the Exchange Agreement. The terms of the Series B Preferred Shares are set forth in the certificate of designations for such shares (the " Certificate of Designations of the Series B Preferred Shares "). The terms of the Series B Preferred Shares are incorporated herein by reference to the text of such document, which is filed as Exhibit 3.1 to the Current Report on Form 8-K filed by the Issuer with the SEC on November 3, 2017 (the " November 3, 2017 Form 8-K "). The Certificate of Designations of the Series B Preferred Shares is referenced as Exhibit 5 to this Amendment No. 7.

On December 18, 2017, a Honig Entity entered into a securities purchase agreement (the " Securities Purchase Agreement ") with the Issuer pursuant to which the Issuer issued 22,222 shares of Common Stock (the " Private Placement Shares ") and warrants exercisable into 22,222 shares of Common Stock (the " December 2017 Warrants ") to such Honig Entity for a purchase price of $22.50 per combined Private Placement Share and December 2017 Warrant. The December 2017 Warrants have an exercise price of $40.00 per share, subject to adjustment in certain events as set forth therein, and may be exercised from time to time at any time on or after June 21, 2018 through June 21, 2021.

The closing of the transactions contemplated by the Securities Purchase Agreement occurred on December 21, 2017.

In connection with the purchase of the Private Placement Shares and the December 2017 Warrants, the Issuer entered into a Registration Rights Agreement, effective as of the closing (the " December 2017 Registration Rights Agreement "), with the Honig Entity party to the Securities Purchase Agreement and other investors which required the Issuer to file a registration statement under the Securities Act to register the resale of the Private Placement Shares and the shares of Common Stock underlying the December 2017 Warrants.

The foregoing summaries of the Securities Purchase Agreement, the December 2017 Warrant and December 2017 Registration Rights Agreement are incorporated herein by reference to the texts of the agreements, which are filed as Exhibit 10.1, Exhibit 4.1 and Exhibit 10.2, respectively, of the Issuer's Current Report on Form 8-K filed by the Issuer with the SEC on December 19, 2017 (the " December 19, 2017 Form 8-K "). The Form of December 2017 Warrant and the Form of December 2017 Registration Rights Agreement are referenced as Exhibit 6 and Exhibit 7, respectively, to this Amendment No. 7.

**Item 7.**          **MATERIAL TO BE FILED AS EXHIBITS.**

Item 7 of the Schedule 13D is hereby amended and supplemented by the addition of the following:

Exhibit 1 :     Form of Note (incorporated by reference to Exhibit 4.1 to the March 17, 2017 Form 8-K).

Exhibit 2 :     Form of March 2017 Warrant (incorporated by reference to Exhibit 4.2 to the March 17, 2017 Form 8-K).

Exhibit 3 :     Certificate of Designations of the Series A Preferred Shares (incorporated by reference to Exhibit 3.1 to the March 17, 2017 Form 8-K).

Exhibit 4 :     Form of March 2017 Registration Rights Agreement (incorporated by reference to Exhibit 10.2 to the March 17, 2017 Form 8-K).

Exhibit 5 :     Certificate of Designations of the Series B Preferred Shares (incorporated by reference to Exhibit 3.1 to the November 3, 2017 Form 8-K).

Exhibit 6 :     Form of December 2017 Warrant (incorporated by reference to Exhibit 4.1 to the December 19, 2017 Form 8-K).

Exhibit 7 :     Form of December 2017 Registration Rights Agreement (incorporated by reference to Exhibit 10.2 to the December 19, 2017 Form 8-K).

## SIGNATURES

After reasonable inquiry and to the best of his or its knowledge and belief, the undersigned certifies that the information set forth in this statement is true, complete and correct.

Date: April 18, 2018

<u>/s/ Barry Honig</u>
BARRY HONIG

## SCHEDULE A

**Transactions in the Shares of Common Stock of the Issuer From the Filing of Amendment No. 5 to the Filing of Amendment No. 6**

The following table sets forth all transactions in the shares of Common Stock effected from the filing of Amendment No. 5 to the filing of Amendment No. 6 by the Reporting Person. Except as noted below, all such transactions were effected in the open market through brokers and the price per share is net of commissions.

| Trade Date | Shares Purchased (Sold) | Price Per Share ($) |
|---|---|---|
| 03/29/2017 | 35,000* | 2.25 |
| 03/31/2017 | (4,200) | 4.10 |
| 04/05/2017 | (800) | 4.10 |
| 04/13/2017 | (3,300) | 4.07 |
| 04/13/2017 | (800) | 4.08 |
| 04/18/2017 | (4,900) | 4.16 |
| 04/25/2017 | (1,200) | 3.99 |
| 04/26/2017 | (100) | 3.90 |
| 04/28/2017 | (2,100) | 3.60 |
| 05/01/2017 | (4,000) | 3.70 |
| 05/09/2017 | (5,500) | 3.82 |
| 05/10/2017 | (2,500) | 3.80 |
| 05/16/2017 | (1,000) | 3.63 |
| 05/23/2017 | (1,800) | 3.75 |
| 05/31/2017 | (7,000) | 3.82 |
| 05/31/2017 | (1,900) | 3.83 |
| 05/31/2017 | (500) | 3.86 |
| 05/31/2017 | (500) | 3.83 |
| 06/02/2017 | (1,971) | 3.85 |
| 06/05/2017 | (1,429) | 3.94 |
| 06/05/2017 | (4,871) | 3.94 |
| 06/08/2017 | (11,301) | 3.99 |
| 06/12/2017 | (1,300) | 3.94 |
| 06/13/2017 | (400) | 4.02 |
| 06/14/2017 | (3,251) | 4.00 |
| 06/15/2017 | (1,307) | 4.05 |
| 06/19/2017 | (7,412) | 3.91 |
| 06/20/2017 | (2,027) | 3.97 |
| 06/22/2017 | (744) | 3.96 |
| 06/22/2017 | (8,000) | 4.07 |
| 06/22/2017 | (1,000) | 3.95 |

| | | |
|---|---|---|
| 06/23/2017 | (5,000) | 3.94 |
| 06/30/2017 | (3,000) | 3.97 |
| 07/01/2017 | (1,000) | 4.10 |
| 07/10/2017 | (1,200) | 3.95 |
| 07/13/2017 | 1,502 | 3.77 |
| 07/17/2017 | (1,200) | 4.01 |
| 07/18/2017 | (975) | 4.05 |
| 07/19/2017 | (1,114) | 4.05 |
| 08/04/2017 | (7) | 3.90 |
| 10/04/2017 | (47,520) | 8.92 |
| 10/05/2017 | (11,400) | 7.47 |
| 10/05/2017 | 235,960** | 3.56 |
| 10/06/2017 | (10,000) | 7.29 |
| 10/06/2017 | 58,990** | 3.56 |
| 10/09/2017 | (136,028) | 8.62 |
| 10/10/2017 | (55,459) | 9.32 |
| 10/10/2017 | (11,070) | 8.43 |
| 10/11/2017 | (130,000) | 10.10 |
| 10/11/2017 | (128,916) | 10.00 |
| 10/11/2017 | (35,000) | 10.00 |
| 10/11/2018 | 128,988** | 3.56 |
| 10/11/2017 | 505,124*** | 2.50 |
| 10/12/2017 | (26,600) | 8.25 |
| 10/12/2017 | (15,000) | 8.44 |
| 10/17/2017 | (4,000) | 8.47 |
| 10/18/2017 | (3,088) | 7.68 |
| 10/19/2017 | (3,700) | 8.17 |
| 10/20/2017 | (45,000) | 8.20 |
| 11/07/2017 | (3,800) | 8.42 |
| 11/09/2017 | (800) | 7.75 |
| 11/10/2017 | (3,972) | 7.25 |
| 11/13/2017 | (9,500) | 7.25 |
| 11/14/2017 | (1,032) | 7.20 |
| 11/14/2017 | (3,968) | 7.10 |
| 11/15/2017 | (5,268) | 7.64 |
| 11/16/2017 | (61,000) | 8.31 |
| 11/17/2017 | (18,588) | 8.81 |
| 11/17/2017 | 1,500 | 8.26 |
| 11/20/2017 | (262,293) | 9.85 |
| 11/21/2017 | (143,475) | 11.64 |
| 11/21/2017 | 202,050*** | 2.50 |
| 11/24/2017 | (10,000) | 11.77 |
| 11/24/2017 | (64,235) | 11.77 |
| 11/24/2017 | (64,235) | 11.77 |
| 11/24/2017 | (64,235) | 11.77 |

| 11/24/2017 | (64,236) | 14.19 |
| 11/28/2017 | (27,907) | 16.61 |
| 11/28/2017 | (1,500) | 16.64 |
| 11/28/2017 | (58,593) | 16.64 |
| 11/29/2017 | 15,000 | 12.54 |
| 11/29/2017 | (36,587) | 16.94 |
| 11/29/2017 | (9,248) | 13.29 |
| 11/30/2017 | (5,752) | 13.13 |
| 12/19/2017 | 22,222**** | 22.50 |

* Represents shares of Common Stock acquired in a private transaction.

** Represents shares of Common Stock acquired from the Issuer upon exercise of the Reporting Person's March 2017 Warrants at an exercise price of $3.56 per share.

*** Represents shares of Common Stock acquired from the Issuer upon conversion of the Reporting Person's Series A Preferred Shares at a conversion price of $2.50 per share.

**** Represents shares of Common Stock acquired from the Issuer pursuant to the Securities Purchase Agreement as described in Item 6.

# Exhibit Q

**EDGAR** pro
by EDGAR®Online®

# RIOT BLOCKCHAIN, INC.
## Filed by
## HONIG BARRY C

# FORM SC 13D/A
### (Amended Statement of Beneficial Ownership)

# Filed 01/05/17

| | |
|---|---|
| Address | 202 6TH STREET, SUITE 401 |
| | CASTLE ROCK, CO, 80104 |
| Telephone | 303-794-2000 |
| CIK | 0001167419 |
| Symbol | RIOT |
| SIC Code | 2835 - In Vitro and In Vivo Diagnostic Substances |
| Industry | Financial & Commodity Market Operators |
| Sector | Financials |
| Fiscal Year | 12/31 |

http://pro.edgar-online.com
© Copyright 2020, EDGAR Online, a division of Donnelley Financial Solutions. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, a division of Donnelley Financial Solutions, Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# SCHEDULE 13D/A
**Amendment No.5**
**(Rule 13d-101)**

**INFORMATION TO BE INCLUDED IN STATEMENTS FILED PURSUANT
TO RULE 13d-1(a) AND AMENDMENTS THERETO FILED PURSUANT TO
RULE 13d-2(a)**

# <u>BIOPTIX, INC.</u>
(Name of Issuer)

<u>**Common Stock, no par value**</u>
(Title of Class of Securities)

<u>**09074N101**</u>
(CUSIP Number)

**Barry Honig**
**555 South Federal Highway #450**
**Boca Raton, FL 33432**

**Copy To:**
**Sichenzia Ross Ference Kesner LLP**
**61 Broadway, 32nd Floor**
**New York, NY 10006**
<u>**Attn: Harvey J. Kesner, Esq.**</u>

(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

<u>**January 4, 2017**</u>
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§ 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. [X]

**Note:** Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See § 240.13d-7 for other parties to whom copies are to be sent.

*The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

CUSIP No. 09074N101

| 1 | NAMES OF REPORTING PERSONS<br>I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY)<br><br>Barry Honig |
|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (See Instructions)<br><br>(a) [X]<br>(b) [ ] |
| 3 | SEC USE ONLY |
| 4 | SOURCE OF FUNDS (See Instructions)<br><br>PF |
| 5 | CHECK IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(D) OR 2(E)<br>[ ] |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>United States |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER:<br>29,815 |
|---|---|---|
| | 8 | SHARED VOTING POWER:<br>474,185 (1) |
| | 9 | SOLE DISPOSITIVE POWER:<br>29,815 |
| | 10 | SHARED DISPOSITIVE POWER:<br>474,185 (1) |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br>504,000 (2) |
|---|---|
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (See Instructions)<br>[ ] |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br>11.19 % (based on 4,503,971 shares of common stock outstanding as of November 11, 2016 ) |
| 14 | TYPE OF REPORTING PERSON (See Instructions)<br>IN |

(1) Includes (i) 443,585 shares of common stock held by GRQ Consultants, Inc. 401K ("401K") and (ii) 30,600 shares of common stock held by GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("Roth 401K"). Mr. Honig is the trustee of 401K and Roth 401K in such capacity holds voting and dispositive power over the securities held by such entities.

(2) Includes (i) 29,815 shares of common stock (ii) 443,585 shares of common stock held by 401K and (iii) 30,600 shares of common stock held by Roth 401K. Mr. Honig is the trustee of 401K and Roth 401K in such capacity holds voting and dispositive power over the securities held by such entities.

CUSIP No. 09074N101

| 1 | NAMES OF REPORTING PERSONS<br>I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY)<br><br>GRQ Consultants, Inc. 401K |
|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (See Instructions)<br><br>(a) [X]<br>(b) [ ] |
| 3 | SEC USE ONLY |
| 4 | SOURCE OF FUNDS (See Instructions)<br><br>WC |
| 5 | CHECK IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(D) OR 2(E)<br>[ ] |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Florida |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER:<br>0 |
|---|---|---|
| | 8 | SHARED VOTING POWER:<br>443,585 (1) |
| | 9 | SOLE DISPOSITIVE POWER:<br>0 |
| | 10 | SHARED DISPOSITIVE POWER:<br>443,585 (1) |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>443,585 (1) |
|---|---|
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (See Instructions)<br>[ ] |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br>9. 85% (based on 4,503,971 shares of common stock outstanding as of November 11, 2016) |
| 14 | TYPE OF REPORTING PERSON (See Instructions)<br>OO |

(1) Mr. Honig is the trustee of 401K and in such capacity holds voting and dispositive power over the securities held by 401K.

CUSIP No. 09074N101

| | | |
|---|---|---|
| **1** | NAMES OF REPORTING PERSONS<br>I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY)<br><br>GRQ Consultants, Inc. Roth 401K FBO Barry Honig | |
| **2** | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (See Instructions)<br><br>(a) [X]<br>(b) [ ] | |
| **3** | SEC USE ONLY | |
| **4** | SOURCE OF FUNDS (See Instructions)<br><br>WC | |
| **5** | CHECK IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(D) OR 2(E)<br>[ ] | |
| **6** | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Florida | |

| | | |
|---|---|---|
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | **7** | SOLE VOTING POWER:<br>0 |
| | **8** | SHARED VOTING POWER:<br>30,600 (1) |
| | **9** | SOLE DISPOSITIVE POWER:<br>0 |
| | **10** | SHARED DISPOSITIVE POWER:<br>30,600 (1) |

| | |
|---|---|
| **11** | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br>30,600 (1) |
| **12** | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (See Instructions)<br>[ ] |
| **13** | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br>0. 68% (based on 4,503,971 shares of common stock outstanding as of November 11, 2016) |
| **14** | TYPE OF REPORTING PERSON (See Instructions)<br>OO |

(1) Mr. Honig is the trustee of Roth 401K and in such capacity holds voting and dispositive power over the securities held by Roth 401K.

**Item 1. Security and Issuer**

The title and class of equity securities to which this Schedule 13D relates is common stock, no par value, of Bioptix, Inc., a Colorado corporation (the "Issuer"). The address of the principal executive offices of the Issuer is 1775 38 $^{th}$ Street, Boulder, Colorado 80301.

**Item 2. Identity and Background**

(a) This statement is filed on behalf of Barry Honig, 401K and Roth 401K (collectively the "Reporting Person").

(b) The Reporting Person's address is 555 South Federal Highway, #450, Boca Raton, FL 33432.

(c) Not applicable.

(d) During the last five years, the Reporting Person has not been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors).

(e) During the last five years, the Reporting Person has not been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result thereof was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws.

(f) The Reporting Person is a citizen of the United States and the State of Florida.

**Item 3. Source and Amount of Funds or Other Considerations**

All shares were purchased with the Reporting Person's personal funds or working capital.

**Item 4. Purpose of Transaction**

All of the Issuer's securities owned by the Reporting Person have been acquired for investment purposes only. Except as set forth herein and in Schedule 13D filed with the Securities and Exchange Commission (the "Commission") on September 8, 2016, Amendment No. 1 filed with the Commission on September 13, 2016, Amendment No. 2 filed with the Commission on September 14, 2016, Amendment No. 3 filed with the Commission on November 9, 2016 and Amendment No. 4 filed with the Commission on December 1, 2016, the Reporting Person has no present plans or proposals that relate to or would result in any of the actions required to be described in subsections (a) through (j) of Item 4 of Schedule 13D. The Reporting Person may, at any time, review or reconsider their positions with respect to the Issuer and formulate plans or proposals with respect to any of such matters, but has no present intention of doing so.

The Reporting Person may engage in discussions with management and security holders of the Issuer and other persons with respect to the subject class of securities, the Issuer, the Issuer's industry, business, condition, operations, structure, governance, management, capitalization, policies, plans, and prospects and related and other matters. In particular, the Reporting Person may engage in discussions with management and security holders of the Issuer regarding the complexion of the Issuer's board of directors and options for increasing shareholder value. The Reporting Person plans and proposes to review and analyze such Reporting Person's interest in the Issuer on a continuing basis and may engage in such discussions, as well as discussions with the Issuer, the Issuer's directors and officers and other persons related to the Issuer, as the Reporting Person deems necessary or appropriate in connection with the Reporting Person's interest in the Issuer.

Depending upon the factors described below and any other factor that is or becomes relevant, the Reporting Person plans and proposes to: (a) acquire additional amounts of the subject class of securities or different equity, debt, or other securities of the Issuer, derivative securities related to securities of the Issuer or other securities related to the Issuer (collectively, "Issuer-Related Securities") or a combination or combinations of Issuer-Related Securities, including by purchase or other method, pursuant to open market, private, tender offer, or other transactions, using borrowed or other funds or consideration of or from any source described herein or other source or via a combination or combinations of such methods, transactions, consideration, and sources; (b) dispose of all or part of the securities covered by this statement and any other Issuer- Related Securities, including by sale or other method, pursuant to open market, private, or other transactions or via a combination or combinations of such methods and transactions; (c) engage in financing, lending, hedging, pledging, or similar transactions involving the securities covered by this statement or other Issuer-Related Securities or a combination or combinations of such transactions; (d) engage in discussions and otherwise communicate with the Issuer, officers, directors, and security holders of the Issuer and other persons related to the Issuer with respect to Issuer-Related Securities, the Issuer, the Issuer's industry, business, condition, operations, structure, governance, management, capitalization, dividend policy, other policies, plans, and prospects and related and other matters; (e) suggest or recommend a transaction or transactions involving the acquisition, sale, or exchange of all or part of the Issuer-Related Securities or assets of the Issuer, other actions or a combination or combinations of such actions, in any case, which relates or relate to (or could result in) a change or changes to the Issuer's business, condition, operations, structure, governance, management, capitalization, policies, plans, and prospects and similar and other actions and changes; (f) make a proposal or proposals involving the acquisition or sale of all or part of the Issuer-Related Securities or assets of the Issuer; (g) make a proposal or proposals to request that the Issuer and/or the security holders of the Issuer consider an extraordinary or other transaction, such as a merger or reorganization, or a combination or combinations of such transactions; and (h) engage in a combination or combinations of the foregoing plans and/or proposals.

Each such plan or proposal may be subject to, and depend upon, a variety of factors, including (i) current and anticipated trading prices and the expected value of applicable Issuer-Related Securities, (ii) the Issuer's financial condition and position, results of operations, plans, prospects and strategies, (iii) general industry conditions, (iv) the availability, form and terms of financing and other investment and business opportunities, (v) general stock market and economic conditions, (vi) tax considerations and (vii) other factors. Each acquisition, disposition, transaction, discussion, communication, suggestion, recommendation, proposal and other action described herein may be effected, made or taken, as applicable, at any time and/or from time to time without prior notice. Although the plans and proposals described herein reflect the plans and proposals presently contemplated by the Reporting Person with respect to the Issuer and the Issuer-Related Securities, as applicable, each such plan and proposal is subject to change at any time and from time to time dependent upon contingencies and assumed and speculative conditions and other factors, including actions taken by the Issuer, the Issuer's board of directors, other security holders of the Issuer and other parties and the outcome of the discussions, communications, transactions and other actions described herein. There can be no assurance that any such plan or proposal will be consummated or pursued or result in any transaction described herein or other transaction or that any action contemplated by any such plan or proposal (or any similar action) will be taken.

## Item 5. Interest in Securities of the Issuer

(a)   Mr. Honig beneficially owns 29,815 shares of common stock, 443,585 shares of common stock held by 401K and 30,600 shares of common stock held by Roth 401K, or an aggregate of 11.19% of the Issuer's common stock. Mr. Honig is the trustee of 401K and Roth 401K, and, in such capacity, has voting and dispositive power over the securities held by such entities.

(b)   Mr. Honig may be deemed to hold sole voting and dispositive power over 29,815 shares of common stock of the Issuer and shares voting and dispositive power over 474,185 shares of common stock. 401K may be deemed to hold shared voting and dispositive power over 443,585 shares of the Issuer's common stock and Roth 401K may be deemed to hold shared voting and dispositive power over 30,600 shares of the Issuer's common stock.

(c)   On November 16, 2016, Roth 401K purchased 11,800 shares of the Issuer's common stock at a purchase price of $2.77 per share.

On November 18, 2016, 401K purchased 400 shares of the Issuer's common stock at a purchase price of $2.79 per share.

On November 28, 2016, Roth 401K purchased 5,400 shares of the Issuer's common stock at a purchase price of $2.83 per share.

On December 1, 2016, Mr. Honig purchased 7,484 shares of the Issuer's common stock at a purchase price of $4.95 per share.

On December 1, 2016, Mr. Honig purchased 1,000 shares of the Issuer's common stock at a purchase price of $5.32 per share.

On December 1, 2016, Mr. Honig purchased 1,000 shares of the Issuer's common stock at a purchase price of $5.30 per share.

On December 1, 2016, Mr. Honig purchased 1,600 shares of the Issuer's common stock at a purchase price of $5.00 per share.

On December 1, 2016, Mr. Honig purchased 18,731 shares of the Issuer's common stock at a purchase price of $5.05 per share.

On January 4, 2017, 401K purchased 4,000 shares of the Issuer's common stock at a purchase price of $4.22 per share.

(d)   To the best knowledge of the Reporting Person, except as set forth in this Schedule 13D, no person other than the Reporting Person has the right to receive, or the power to direct the receipt of, dividends from, or the proceeds from the sale of the 474,185 shares of common stock reported in Item 5(a).

(e)   Not applicable.

**Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer**

Other than as described herein, there are no contracts, arrangements, understandings or relationships (legal or otherwise) between the Reporting Person and any other person with respect to the shares.

**Item 7. Material to Be Filed as Exhibits**

| Exhibit Number | Description |
| --- | --- |
| 99.1 * | Joint Filing Agreement with GRQ Consultants, Inc. 401K and GRQ Consultants, Inc. Roth 401K FBO Barry Honig |

* Previously filed

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: January 4, 2017
/s/ *Barry Honig*
Barry Honig

Dated: January 4, 2017
GRQ CONSULTANTS, INC. 401K

By: /s/ *Barry Honig*
Barry Honig
Trustee

Dated: January 4, 2017
GRQ CONSULTANTS, INC. ROTH 401K
FBO BARRY HONIG

By: /s/ *Barry Honig*
Barry Honig
Trustee

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated, | : | Civil Action No.: 18-2293(FLW)(~~TJB~~ZNQ) |
| | : | |
| *Plaintiff,* | : | CONSOLIDATED ACTION |
| | : | |
| v. | : | ~~CORRECTED~~[PROPOSED] |
| | : | **CONSOLIDATED SECOND** |
| RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY G. MCGONEGAL, | : | **AMENDED CLASS ACTION** |
| | : | **COMPLAINT FOR VIOLATIONS OF** |
| | : | **THE FEDERAL SECURITIES LAW** |
| *Defendants.* | : | **JURY TRIAL DEMANDED** |

**LITE DEPALMA GREENBERG, LLC**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Lead Plaintiff~~Dr. Stanley Golovac~~*
*Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Lead Plaintiff Dr. Stanley Golovac*
*and Lead Counsel for the Class*

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................1

II.    JURISDICTION AND VENUE .................................................................11

III.   PARTIES .....................................................................................................12

IV.    RELEVANT NON-PARTIES .....................................................................17

V.     THE "HONIG GROUP" .............................................................................27

VI.    SUBSTANTIVE ALLEGATIONS .............................................................37

       A.     The Honig Group Has Engaged in Similar Pump-and-Dump Schemes at
              Numerous Publicly Traded Microcap Companies ...........................37

              1.     The SEC Has Sued Honig, O'Rourke, Stetson, and Brouser for Recently
                     Engaging in Pump-and-Dump Schemes at Three Companies ...............37

                     a.     Biozone Pharmaceuticals, Inc. (a/k/a "Company A") ..........38

                     b.     MGT Capital Investments Inc. (a/k/a "Company B") ...........40

                     c.     MabVax Therapeutics Holdings, Inc.  (a/k/a "Company C") .....45

              2.     YesDTC Holdings, Inc. ...............................................................49

              3.     Marathon Patent Group, Inc. ......................................................50

              4.     WPCS International Incorporated and BXT Trader ......................53

              5.     PolarityTE (f/k/a Majesco Entertainment) .................................54

              6.     Pershing Gold Corp. ...................................................................55

              7.     MUNDOmedia Ltd. .....................................................................56

       B.     In 2016, Defendants Target Venaxis, Riot's Predecessor, Using Their Typical
              Playbook ..........................................................................................58

       C.     Defendants Cause Bioptix to Register and Sell Shares of Bioptix (and Later Riot)
              Through False and Misleading Securities Registration Statements (Form S-3)..65

       D.     Nine Days After the Filing the September 25 Form S-3, Bioptix Changes Its
              Name to "Riot Blockchain," and in the Weeks That Followed Announces a
              Series of Strategic Investments, Causing Riot's Share Price to Soar ...............74

              1.     The Coinsquare Transaction .......................................................76

              2.     The Tess Transaction ..................................................................77

              3.     The Kairos Transaction ..............................................................79

       E.     October 27, 2017 Riot Disseminates an "Updated" Investor Presentation..........83

       F.     Defendant Honig's Brother, Jonathon Honig, and Defendant Groussman Attempt
              to Dispel Any Notion that Their Ownership in Riot Is Part of a Control Group..85

783086.1

G. On November 6, 2017, Riot "Names John O'Rourke as Chairman and CEO" and Announces Another Strategic Investment ........................................... 85

H. Riot Announces that It More than Tripled Its Investment in Coinsquare ........... 86

I. Riot's Board of Directors Issues A Proxy Statement That Further Enables The Honig Group To Conceal The Fraudulent Scheme ........................................... 86

J. Riot Announces a New Transaction Related to Its Investment in Tess: Riot's "Decision to Take the Company Public" in a Merger ........................................... 87

K. On December 19, 2017, Riot "Announces $37 Million Private Placement" — Defendants Honig and Defranceo Take Part But Are Not Disclosed ................. 89

L. After Defendants O'Rourke and Honig Sold Most of Their Shares, Riot Fires Its Auditor and the Company's Stock Continues to Decline ........................................... 89

M. On February 16, 2018, a CNBC Expose Partially Reveals Honig's Close Ties to Riot and O'Rourke ........................................... 93

N. Also on February 16, 2018, Riot Announces Its Purchase of "3,800 Bitcoin Mining Machines" Without Disclosing that It Was Buying These Machines from an Entity Owned by Honig and DeFranceso at Vastly Inflated Prices ............ 102

O. On February 21, 2018, Riot Enters into a "Consulting Agreement" Through Which the Company Agrees to pay $4,000,000 to "Ingenium International LLC" ........................................... 104

P. On September 7, 2018, after an Investigation, the SEC Charges Defendants Honig, O'Rourke, Stetson, and Their Associates with Engaging in Three Other Pump-and-Dump Schemes Involving Companies Connected to Riot ............. 105

VII. DEFENDANTS ENGAGED IN A MANIPULATIVE DEVICE, SCHEME, ARTIFICE, AND CONSPIRACY TO DEFRAUD RIOT'S PUBLIC SHAREDHOLDERS ........... 108

VIII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ........................................... 133

A. April 20, 2017 – Securities Registration Statement (Form S-3/A) ................. 143

B. April 27, 2017 – Annual Report (Form 10-K/A) ........................................... 160

C. July 19, 2017 – Securities Registration Statement (Form S-3/A) ................. 164

D. August 24, 2017 – Securities Registration Statement (Form S-3/A) ............ 167

E. September 25, 2017 Securities Registration Statement (Form S-3/A) ........... 170

F. October 3, 2017 – Riot Announces "Special Dividend" of $1.00 per Share ..... 177

G. October 4, 2017 – "Bioptix Changing Name to Riot Blockchain" ................. 178

H. October 5, 2017 – "Investor Presentation" ........................................... 179

I. October 6, 2017 – Defendant Beeghely Speaks to *The Denver Post* ........... 181

J. October 17, 2017 – Riot "to Acquire Majority Interest in Tess" ................. 182

K. October 23, 2017 – Riot Issues "Business Strategy Statement" ................. 182

ii

783086.1

L.    October 27, 2017—"Updated Investor Presentation"..................................183

M.    November 2-3, 2017—Riot Agrees to Acquire "1,200 Bitcoin Mining Machines" from Kairos ....................................................................................................185

N.    November 6, 2017—Riot Closes Its Deal with Kairos ...............................193

O.    November 13, 2017—Quarterly Report (Form 10-Q) ................................195

P.    November 15, 2017—O'Rourke Is Interviewed on CBS and the Company Announces "Riot Blockchain Featured in 5-Part Series on CBS"..................198

Q.    November 16, 2017—Riot Announces an Investment in Verady, LLC ........200

R.    November 17, 2017—CBS Publishes More Commentary by O'Rourke .........201

S.    December 11, 2017—Riot Announces TessPay's "Intent for Merger with Publicly Traded Cresval Capital Corp." ......................................................203

T.    December 12, 2017 Proxy Statement (Form DEF 14A) ..............................205

U.    December 19, 2017 Press Release—"Riot Blockchain Announces $37 Million Private Placement"........................................................................................211

IX.    AS TRUTH BEGINS TO EMERGE, DEFENDANTS CONTINUE TO MISLEAD THE MARKET ..............................................................................................................213

A.    December 19, 2017 CNBC Interview with Andrew Left of Citron Research ...213

B.    December 27, 2017—Riot Abruptly Cancels Its Annual Shareholder Meeting ...215

C.    December 29, 2017—O'Rourke Sells 30,383 Shares for Proceeds of $869,256.......................................................................................................217

D.    January 5, 2018 Securities Registration Statement (Form S-3) ..................219

E.    January 4-5, 2018—Riot Fires Its Independent Auditor and Files an Amended Form 8-K/A Disclosing Audited Financial Statements of Kairos Revealing that Riot Vastly Overpaid ..................................................................................221

F.    January 17, 2018—Riot Announces Tess's "Definitive Agreement for Transaction with Publicly Traded Cresval Capital Corp." ..........................221

G.    January 31, 2018—*The Wall Street Journal* Writes About Riot and Honig and Riot Again Cancels Its Annual Shareholder Meeting..................................224

H.    February 7, 2018—Securities Registration Statement (Form S-3/A) ..............225

I.    February 11, 2018—*The Denver Post* Publishes Statements by O'Rourke and Honig..............................................................................................................226

J.    February 13, 2018—Honig Files an Amended Statement of Beneficial Ownership (Form SC 13D/A)........................................................................228

K.    February 16, 2018—CNBC Publishes a Video Entitled "CNBC Investigates: Red Flags Raised Over Riot Blockchain".....................................................228

L.    February 16, 2018—"CNBC Investigates . . . Riot Blockchain" .................230

iii

M.    February 16, 2018 – Riot and O'Rourke Respond to CNBC .......................... 237

N.    Also on February 16, 2018, Riot Announces Its Purchase of "3,800 Bitcoin Mining Machines" from Prive Technologies LLC .............................................. 239

O.    March 26, 2018 – Definitive Proxy Statement (Schedule 14A) ...................... 240

P.    April 30, 2018 – Amended Annual Report (Form 10-K/A) ............................... 241

Q.    May 17, 2018 – Quarterly Report (Form 10-Q) ................................................. 242

R.    May 25, 2018 – Amended Current Report (Form 8-K/A) .................................. 242

S.    June 29, 2018 – Amended Annual Report (Form 10-K/A) ................................. 243

T.    July 10, 2018 – Securities Registration Statement (Form S-3) ......................... 245

X.    SEC FILES SUIT AGAINST DEFENDANTS HONIG, O'ROURKE, STETSON, AND OTHERS ................................................................................................................. 246

XI.   POST-CLASS PERIOD DEVELOPMENTS ......................................................... 247

XII.  ADDITIONAL SCIENTER ALLEGATIONS ........................................................ 250

XIII. LOSS CAUSATION/ECONOMIC LOSS ............................................................... 256

XIV.  CLASS ACTION ALLEGATIONS ......................................................................... 262

XV.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTION ................................................. 264

XVI.  NO SAFE HARBOR ................................................................................................. 266

COUNT I ............................................................................................................................. 267

COUNT II ............................................................................................................................ 273

COUNT III ........................................................................................................................... 274

PRAYER FOR RELIEF ...................................................................................................... 276

DEMAND FOR TRIAL BY JURY ..................................................................................... 276

I.    INTRODUCTION ...................................................................................................... 1

II.   JURISDICTION AND VENUE ................................................................................ 11

III.  PARTIES ................................................................................................................... 12

IV.   RELEVANT NON-PARTIES .................................................................................. 15

V.    BACKGROUND ON THE HONIG GROUP .......................................................... 27

      A.    The SEC Has Sued Honig, O'Rourke, Groussman, and Stetson for "Acting as an Undisclosed Control Group" in Three Previous Fraudulent Pump-and-Dump Schemes Involving the Same *Modus Operandi* They Used at Riot ......... 27

            1.    Biozone Pharmaceuticals, Inc. (a/k/a "Company A") ............................ 35

            2.    MGT Capital Investments Inc. (a/k/a "Company B") ............................ 40

            3.    MabVax Therapeutics Holdings, Inc. (a/k/a "Company C") .................. 45

783086.1

      B.     The Honig Group Co-Invested in Other Public Microcap Companies ................ 48

           1.     The PolarityTE (f/k/a Majesco Entertainment) ..................................... 48

           2.     YesDTC Holdings, Inc. ........................................................................... 49

           3.     Marathon Patent Group, Inc. ................................................................... 50

           4.     WPCS International Incorporated and BXT Trader ............................... 53

           5.     Pershing Gold Corp. ............................................................................... 55

           6.     MUNDOmedia Ltd. ................................................................................ 56

VI.    THE SELLING STOCKHOLDERS' CONNECTIONS TO THE HONIG GROUP ....... 57

VII.   FACTUAL BACKGROUND ON THE FRAUDULENT SCHEME ......................... 58

      A.     In 2016, Defendants Target Venaxis, Riot's Predecessor, Using Their
           Typical Pump-and-Dump Playbook ...................................................... 58

      B.     A Few Months After Beeghley Assumed the Role as CEO, The Company
           Announced A Special Dividend and Business Transformation to "Riot
           Blockchain" – At the Same Time, Honig Secretly Acquires and Sells
           Hundreds of Thousands of Shares of Riot ............................................. 62

      C.     Prior to the Company's Transition to Riot, Defendants O'Rourke and
           Beeghley Caused the Company to Conceal Honig's Group Status by
           Issuing False and Misleading Registration Statements ......................... 68

      D.     Honig Groups Members Honig, DeFrancesco, Groussman and Stetson Fail
           to File Schedules 13D ............................................................................ 68

      E.     O'Rourke and Beeghley Caused the Company to Conceal Related Party
           Transactions with Members of the Honig Group ................................... 69

           1.     The March 2017 Private Placement ....................................................... 71

           2.     The Coinsquare Agreement .................................................................... 72

           3.     The Kairos Transaction ......................................................................... 79

           4.     The December 2017 Private Placement .................................................. 84

      F.     October 11, 2017 – Defendant Groussman and Defendant Honig's
           Brother, Jonathon Honig, Falsely Deny that Their Ownership in Riot
           Is Part of a Control Group ..................................................................... 85

      G.     January 5, 2018 – Riot Fires Its Auditor ............................................... 89

      H.     December 29, 2017 – O'Rourke Sells 30,383 Shares for Proceeds of $869,256 90

      I.     January 4-5, 2018 –Riot Fires Its Independent Auditor and Files an
           Amended Form 8-K/A Disclosing Audited Financial Statements of
           Kairos Revealing that Riot Vastly Overpaid for Kairos's Assets ......................... 91

VIII.  THE TRUTH ABOUT HONIG'S STOCK SALES AND THE FRAUDULENT
      SCHEME BEGINS TO EMERGE ................................................................... 92

783086.1

IX.     DEFENDANTS ENGAGED IN A MANIPULATIVE DEVICE, SCHEME, ARTIFICE, AND CONSPIRACY TO DEFRAUD RIOT'S PUBLIC SHAREHOLDERS DURING THE CLASS PERIOD ....................................108

        A.     Owners and Issuers of Securities Have Well-Known Disclosure Duties Under Section 13(d), Regulation 13d, and Item 403 of Regulation S-K ...........110

        B.     Honig, O'Rourke, and Stetson Were Familiar with Section 13(d) ............114

        C.     Defendants Acted as an Undisclosed Control Group to Pump-and-Dump Riot Stock While Misrepresenting and Concealing their Beneficial Ownership in Violation of Section 13(d), Rule 13d-2, and Item 403 of Regulation S-K ........116

               1.     Honig Knowingly Engaged in the Fraudulent Scheme........................117

               2.     Groussman Knowingly Engaged in the Fraudulent Scheme .................121

               3.     Stetson Knowingly Engaged in the Fraudulent Scheme......................123

               4.     DeFrancesco Knowingly Engaged in the Fraudulent Scheme..............126

               5.     O'Rourke Knowingly Engaged in the Fraudulent Scheme...................129

               6.     Beeghley Knowingly Engaged in the Fraudulent Scheme ..................131

X.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................................................................133

        A.     Defendants' Materially False and Misleading Statements and Omissions in Beneficial Ownership Reports on Schedules 13D and 13G ...........................135

               1.     Honig's Beneficial Ownership Reports on Schedule 13D Were Materially False, Misleading, Deficient, and Untimely and Facilitated His Manipulative Trading in Riot's Common Stock ...........136

               2.     Groussman's Beneficial Ownership Reports on Schedule 13G Were Materially False, Misleading, Deficient, and Untimely......................145

               3.     DeFrancesco's Beneficial Ownership Reports on Schedule 13D Were Materially False, Misleading, Deficient, and Untimely .......149

               4.     Stetson Failed to File Beneficial Ownership Reports with the SEC Despite Co-Investing Alongside the Undisclosed Honig Group ...........153

        B.     Defendants' Materially False and Statements and Omissions Regarding the Company's Beneficial Ownership and Related-Party Transactions .................154

               1.     April 20, 2017 – Registration Statement (Form S-3/A).....................155

               2.     April 27, 2017 – Annual Report (Form 10-K/A) ................................160

               3.     July 19, 2017 – Registration Statement (Form S-3/A) ......................164

               4.     August 24, 2017 – Registration Statement (Form S-3/A)...................167

               5.     September 25, 2017 – Registration Statement (Form S-3/A)...............170

               6.     January 5, 2018 – Registration Statement (Form S-3)........................172

783086.1

7.      February 7, 2018 – Registration Statement (Form S-3/A)....................176

C.      Defendants' Materially False and Misleading Statements and Omissions
         Regarding Riot's Related-Party Transactions with Defendants .....................187

1.      March 16, 2017 – Current Report (Form 8-K) .........................................187

2.      March 31, 2017 – Annual Report (Form 10-K)........................................188

3.      October 4, 2017 – Current Report (Form 8-K) ........................................188

4.      November 3, 2017 – Current Report (Form 8-K) .....................................189

5.      November 13, 2017 – Quarterly Report (Form 10-Q)...............................195

6.      December 12, 2017 – Proxy Statement (Form DEF 14A)..........................205

7.      December 19, 2017 – Current Report (Form 8-K) and Press Release...211

8.      January 5, 2018 – Registration Statement (Form S-3)..........................219

9.      February 7, 2018 – Registration Statement (Form S-3/A)....................222

10.     February 16, 2018 – Current Report (Form 8-K)  and Shareholder Letter
         .....................................................................................................226

11.     March 26, 2018 - Proxy Statement (Form DEF 14A) ............................241

XI.     POST-CLASS PERIOD DEVELOPMENTS .........................................................246

XII.    ADDITIONAL SCIENTER ALLEGATIONS ......................................................250

XIII.   LOSS CAUSATION/ECONOMIC LOSS...............................................................256

A.      January 31 – The Wall Street Journal – "Investor Who Rode Pivot
         From Biotech to Bitcoin Sells Big Stake"..............................................258

B.      February 16, 2018 – "CNBC Investigates Red Flags Raised Over Riot
         Blockchain"...............................................................................................260

C.      April 17-18, 2018 – Riot Files Form 10-K Revealing Related Party Transactions
         .....................................................................................................260

D.      May 29, 2018 – Riot Files a Form 8-K Revising Its Disclosures
         Concerning the Coinsquare Transaction .................................................261

E.      September 7, 2018 – SEC Files Suits Against Honig, O'Rourke,
         Groussman, Stetson, and Others ..............................................................261

XIV.    CLASS ACTION ALLEGATIONS.........................................................................262

XV.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
         AND AFFILIATED UTE PRESUMPTION ...........................................................264

XVI.    NO SAFE HARBOR................................................................................................266

COUNT I......................................................................................................................267

COUNT II.....................................................................................................................269

COUNT III....................................................................................................................273

vii

PRAYER FOR RELIEF ............................................................................................276

DEMAND FOR TRIAL BY JURY ..........................................................................276

Court-appointed Lead Plaintiff Dr. Stanley Golovac ("Lead Plaintiff"), individually and on behalf of all other persons and entities similarly situated, by Lead Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review and analysis of filings by Riot Blockchain, Inc. ("Riot" or the "Company") and other public companies with the U.S. Securities and Exchange Commission ("SEC"); press releases, analyst reports, news articles, investment industry commentary, media, and other public statements about Riot and other companies; corporation registrations and filings with state governments; the corporate websites of Riot and other companies; court filings in various ligation involving Defendants (defined below), including *Securities and Exchange Commission v. Honig, et al.*, No. 1:18-cv-08175 (S.D.N.Y.) (the "*Honig* Action"); and an investigation conducted by and through Lead Plaintiff's attorneys.

The investigation of Lead Plaintiff's attorneys is continuing, yet certain additional facts supporting these allegations are known only to Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a federal securities class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule l0b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) on behalf of Lead Plaintiff and all other persons or entities who purchased or otherwise acquired the securities of Riot and/or Bioptix (NASDAQ:  RIOT, BIOP) between ~~April 20~~March 15, 2017, and September 6, 2018, inclusive (the "Class Period"), and were damaged thereby. Lead Plaintiff brings this action to pursue remedies against the Company, certain of its

1

current or former executive officers and/or directors, and several of Riot's largest shareholders, including Barry Honig ("Honig"), who as a group conspired with one another and acted in concert with ~~a wider~~an undisclosed control group of other Riot shareholders to (1) amass a controlling interest in Riot; (2) conceal their control through false and misleading statements and omissions regarding the Company's beneficial ownership in violation of Section 13(d) of the Exchange Act, Regulation 13d, and Items 403 and 404 of Regulation S-K; (3) drive up the price and trading volume of Riot stock through manipulative trading, promotional activity, and false and misleading disclosures; (4) engage in ~~fraudulent~~undisclosed related-party transactions at the expense of the Company and its shareholders; and (5) dump their shares into the artificially inflated market on unsuspecting retail investors.

2.      Defendants' pump-and-dump scheme involved the purported transformation of Riot from a biotech company into an investor and "miner" of cryptocurrency such as Bitcoin.  This scheme was orchestrated by Honig, a Florida-based investor who has been charged by the SEC for masterminding ~~numerous~~multiple other pump-and-dump schemes, John O'Rourke ("O'Rourke"), Riot's Chief Executive Officer ("CEO") during the Class Period, ~~as well as certain other Company insiders and several of their associates, and their related entities~~Michael Beeghley ("Beeghley"), also Riot's CEO during the Class Period, as well as Mark Groussman ("Groussman"), John Stetson ("Stetson"), and Catherine DeFrancesco ("DeFrancesco") – investors in Riot who participated in and facilitated the pump-and-dump scheme by misrepresenting and concealing both the Honig Group's (defined below) cooperation as an undisclosed control group over the Company, as well as their own insider stock sales in violation of their obligations under the federal securities laws.

~~3.      In early 2016, the company now known as Riot Blockchain, Inc. was an "in vitro" diagnostics company known as Venaxis, Inc. ("Venaxis").  Venaxis was a medical products~~

2

company whose executives, Board, and employees sought to develop a blood test for determining which patients suffering from abdominal pain were less likely to be suffering from acute appendicitis than from other ailment.

4.     In early 2015, the U.S. Food and Drug Administration ("FDA") denied approval for Venaxis's developmental blood test, and Venaxis, without a marketable product, found itself facing delisting from the NASDAQ because its share price had fallen below the exchange's minimum.

5.     Venaxis still had plenty of cash, however, having raised $20 million in a stock offering the previous year.  Therefore, in March 2016, Venaxis executed a 1-for-8 reverse stock split.  That reduced its outstanding shares to less than 4 million and lifted its stock price well above $1 a share — enough for Venaxis to keep its listing on the NASDAQ.  Shortly thereafter, Honig and his associates began buying stock in Venaxis.

6.     On September 12, 2016, Venaxis acquired BiOptix Diagnostics, Inc., and changed its name to Bioptix, Inc. ("Bioptix").  Shortly thereafter, Defendants Honig and DeFrancesco both wrote letters to then-CEO Stephen Lundy ("Lundy"), touting their combined 16.2% stake in the Company.  Honig also spoke several times on the telephone with members of Venaxis's then-existing Board of Directors.  During these telephone conversations, Honig implied that he had control of 40% of the Venaxis's shares through his stock ownership and the stock ownership of Honig's friends and relatives, according to a former Venaxis Board member present during the conversations.

7.     On September 13, 2016, Honig attempted to nominate his own slate of new directors of Bioptix, including Defendants O'Rourke, Beeghley, and Stetson, and several other of Honig's associates. When Venaxis's then-existing Board of Directors were considering Beeghley

as a nominee for election to the Board, Beeghley told them that he did not know Honig, according to an individual present at the time.

8.     In his September 13, 2016 letter to then-CEO Lundy, Honig wrote that Venaxis was "wast[ing] precious resources with no clear direction or strategy . . . while board fees and management salaries continue to be paid . . . ." Honig offered an alternative.  In early discussions with Venaxis's Board, Honig raised the possibility of turning Venaxis into a marijuana-related company, according to an individual present at the time.  After suing several longtime members of the Venaxis Board, Honig successfully ousted them.  Finally, Honig and his associates achieved complete control over the Company, with Beeghley becoming CEO and O'Rourke joining the Board.

9.     After abandoning their idea to pivot Bioptix into the marijuana business, Defendants instead chose a strategy they had employed (with devastating results for shareholders) at several other public companies.  Defendants set out to reinvent Bioptix as a new player in cryptocurrency.  Thus, on October 4, 2017, Bioptix announced that it had become "Riot Blockchain."

~~10.~~3.    Despite grandiose promises that Riot would be a "pure play" in cryptocurrency that would "leverage our expertise, and network, to build and support blockchain technology companies," in reality the Company had limited meaningful investments in cryptocurrency products and did not have a meaningful cryptocurrency business plan.  Rather, Defendants and their unscrupulous business associates, many whom have a history of engaging in pump and dump schemes, sought to exploit investor interest in the rapidly expanding cryptocurrency markets. Defendants' primary focus was to find ways to promote and increase the liqutity of Riot's thinly traded stock, and then once unsuspecting public investors piled in, to sell as quickly as they

4

could before the Company's public shareholders had figured out what happened.   As SEC Chairman Jay Clayton testified before Congress – in what one reporter described as a "thinly-veiled sot at Riot" – "***Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain.***"

11.4.   This, however, is precisely what Riot and its executives did.  Instead of operating a legitimate cryptocurrency business, Defendants artificially "hype[d]":  "hype" the Company's prospects by issuing a flurry of press releases, SEC filings, and interviews with television and newspaper journalists – all designed to give investors the false impression that Riot was a serious cryptocurrency company.  This was not true.  Defendants'Riot's so-called investments in crypto currencycryptocurrency were, in reality, egregiously wasteful related-party transactions with Honig and his associates and entities that were secretly owned and controlcontrolled by Defendants and their associates through a labyrinth of limited liability companies formed weeks before in Nevada, Florida, and Canada by Defendants' associateshim.  These related-party transactions, and the individuals behind them, mirrored similar schemes that Defendants and their associates have perpetrated at other public companies.  Meanwhile, Defendants and their associatesmore than 20 affiliated Selling Stockholders – each with confirmed ties to the Honig Group through past microcap stock investments – sold their Riot stock at inflated prices for millions of dollars in proceeds before the truth about their scheme was revealed  – first by investigative journalists, and ultimately by the investigators and lawyers at the SEC.

12.5.   Unbeknownst to Riot shareholders during the Class Period, Honig, O'Rourke, HonigGroussman, and other DefendantsStetson have a long history of questionable financial dealingsco-investing in dozens and joint investments.  After the scheme was partially revealed in

5

~~February~~dozens of microcap public companies.  As a result, in September 2018, ~~Defendant O'Rourke admitted that he has "a good relationship with Mr. Honig."  Defendant Honig has also weighed in publicly on his business relationship with Defendant O'Rourke stating, "at one point in time John O'Rourke had space in my office . . . we speak often."~~the SEC brought suit against these four men (and others) related to three alleged microcap pump-and-dump schemes.  Yet, during the Class Period Defendants went to great lengths to hide Honig's ties to Company insiders and other Riot shareholders by ~~flouting, for example, SEC~~violating the Exchange Act and SEC rules related to the disclosure ~~rules related to~~ beneficial ownership, stock sales, and SEC rules requiring disclosure of transactions with related parties.

~~13.~~6.   Indeed, so entrenched was Defendant Honig's control over Riot that the Company's principal executive offices were not in Colorado, as officially represented by the Company, but instead were effectively located in Boca Raton, Florida where Defendants O'Rourke, Honig, Groussman, and Stetson had recently shared the same office, which allowed them ~~and their associates effectively to control or exercise undue influence over~~to closely collaborate in controling Riot and its operations ~~and~~ affairs, and public disclosures.

~~14.~~7.   Unfortunately, as has become clear over the past few ~~months~~years, Defendants' fraudulent actions are not limited to Riot.  The SEC has charged Defendants Honig, O'Rourke, and Stetson with strickingly similar pump-and-dump schemes at several other publicly traded companies.  Describing the group as "microcap fraudsters," the SEC has alleged that "Honig was the primary strategist, calling upon other [affiliated co-investors] to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity."  The SEC further alleged that "[i]n each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse

merger or by participating in financings on terms highly unfavorable to the company."  Defendant O'Rourke resigned as Riot's CEO in the wake of these allegations and certain of the individuals charged by the SEC have already settled those charges.  As a result of the SEC's action, Honig, O'Rourke, Stetson, and Groussman have each agreed to disgorge their alleged illgotten gains, pay penalties and interest, and agree to be barred from participating in any offering of penny stock, prohibited from holding greater than 4.99% of any penny stock company, and prohibited from advertising, marketing, or otherwise promoting penny stocks.  Honig and O'Rourke's prohibitions are permanent; Stetson and Groussman's prohibitions are for ten and five years, respectively.

15.    According to the SEC, Defendant Honig had been in the process of settling these charges, but in a court filing on May 7, 2019, Honig and the SEC stated that "[t]he parties do not believe there is a possibility of prompt settlement of this case."

8.     As alleged herein, during the Class Period, each of the Defendants – pursuant to explicit or tacit agreements with each other and the Selling Stockholders – agreed to acquire, hold, vote, and/or dispose of shares they acquired in Riot in coordination with one another while knowingly or recklessly obtaining and exercising undisclosed control of the management and policies of Riot and while selling shares of Riot into the market at artificially inflated prices. Defendants did so in violation of Section 13(d) of the Exchange Act and Rule 13d-2, *et seq.*, promulgated thereunder, which required Defendants to disclose their status as a "group" (as defined by Section 13(d)(3)) on Schedule 13D and to "promptly" update any material changes in their beneficial ownership of Riot's common stock in amendments (on Schedule 13D/A) to their Section 13(d) filings.  *See* § IX.A, *infra*.

9.     Defendants Honig, O'Rourke, and Stetson were familiar with their obligations under Section 13(d) – and the materiality of their disclosures to Riot's investors regarding

7

beneficial ownership of the Company's stock – because they themselves had previously filed a lawsuit under this statute alleging that these disclosures were material to them.  *See* § IX.B, *infra*.

10.     Yet, despite this knowledge, Defendants failed to make timely and appropriate Section 13(d) filings and amendments reflecting their acquisition and disposition of Riot stock as part of scheme to defraud investors about their group's control over the management and policies of, and the magnitude of their collective investment in, Riot.  *See* § X.A, *infra*.  And having concealed their group's existence and control over Riot, Defendants proceeded to engage in manipulative trading in Riot's securities (including massive sales of Riot's common stock) while failing to make the necessary amendments to their Section 13(d) filings, which under the rules, should have promptly alerted Riot's public investors that a group of insider shareholders (indeed, an undisclosed control group) were collectively dumping their shares into the market.  *See* §§ X.A & X.A, *infra*.

11.     And as discussed below, Defendants Honig, Groussman, Stetson, and DeFrancesco's violations of Section 13(d) were made knowingly, or at least recklessly, in light of their clear knowledge that they were acting together as a group in their scheme involving Riot.  *See* §§ IX.C.1-4, *infra*.

12.     Defendants could not have accomplished their scheme, however, without the assistance of Defendants O'Rourke and Beeghley from inside the Company.  Specifically during the Class Period, Defendants O'Rourke and Beeghley, as officers and/or directors of Riot, pursuant to explicit or tacit agreements with Defendants Honig, Groussman, Stetson, and DeFrancesco, caused the Company to issue materially false and misleading public filings with the SEC – including on Forms S-3, S-3/A, and 10-K, and Schedule 14A – that materially misrepresented the Company's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K

8

by misrepresenting and concealing the fact that many of Riot's largest shareholders – including Defendants Honig, Groussman, Stetson, and DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A – were members of a group with each other (as defined by Section 13(d)(3)) through which they agreed to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  *See* § X.B, *infra*.

13.     In causing Riot to issue its materially false and misleading Forms S-3 and S-3/A, O'Rourke and Beeghley well aware that the Honig Group (including themselves) was a closely coordinated "group" that amply fit that definition under Section 13(d)(3), and which was therefore engaged in a scheme to defraud the Company's public investors.  *See* § IX.C.5-6, *infra*.

14.     Defendants O'Rourke, Beeghley, and Riot also knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by issuing materially false and misleading Forms 8-k and 10-K that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendants Honig and DeFrancesco.  *See* § X.C, *infra*.

15.     Defendants' knowledge of their roles in the Honig Group's fraudulent scheme is amply supported.  As noted above, Honig, O'Rourke, and Stetson were well aware of their legal duties under Section 13(d) because they were involved in Honig's 2015 lawsuit under that statute, yet utterly failed to comply with those duties.  Defendants clearly knew they were a "group" as defined by Section 13(d).  According to the SEC, between 2011 and August 2018, Honig invested alongside O'Rourke in ***over 75 issuers***, alongside Stetson in ***over 65 issuers***, alongside Brauser in ***over 40 issuers*** – and alongside "some combination of Stetson, Brauser, O'Rourke, [and] Groussman" in "***nearly every scheme*** . . . ."  If that were not enough, O'Rourke stated in a February 3, 2014 email that "Barry Honig is the principal investor of ***our small group***."  If O'Rourke's own

9

words were insufficient, the SEC has alleged that Honig, O'Rourke, Stetson, and often Grossman all worked together out of Honig's office in Boca Raton, Florida, which is corroborated by the fact that a letter filed with the SEC from Honig to Riot's outgoing Board indicated that O'Rourke and Stetson's fax numbers were the same fax number that Honig listed on his letterhead for his Boca Raton office.  And that is the same office where CNBC's investigative journalists discovered O'Rourke on the day of Riot's cancelled annual shareholder meeting.  Finally, emails uncovered by the SEC, and attached hereto, reveal how Honig, O'Rourke, Stetson, and Groussman coordinated their investments in numerous public microcap companies.  One such company was PolarityTE, in which Defendants Beeghley and DeFrancesco invested alongside Honig (PolarityTE's then Chairman and CEO) and Stetson (PolarityTE's then CFO), as well as O'Rourke, Groussman, and many of the same Selling Stockholders (defined below) who, through the leadership and machinations of the Honig Group, became a undisclosed Section 13(d) group of investors in Riot.

16.     Defendants' scheme was revealed through a series of disclosures that revealed to the market what Defendants had taken such great lengths to misrepresent and conceal:  that they were undisclosed control group engaging in undisclosed insider sales.  On January 31, 2018, from *The Wall Street Journal* that "Mr. Honig has sold about 500,000 shares" and only "still owns about 1% of the company."  "'When stock goes up, you take a profit,' [Honig] said."  On this news, Riot's stock fell ***14.26%*** over two days.  Then, on February 16, 2017, CNBC published the article that revealed Honig as "the man behind the Riot Blockchain curtain"; that CEO O'Rourke worked out of Honig's Boca Raton office; that the "true extent of Honig's selling" of Riot stock was "[b]uried deep in the footnotes of Riot filings"; and revealed details about Riot's suspicious related-party transactions.  In response, Riot's share price fell ***33.4%***.  Next, on April 17, 2018,

10

Riot filed an annual report disclosing the financial interests of Honig and DeFrancesco in various 2017 related-party transactions, causing Riot's stock price to fall another **5.8%**.   A May 25, 2018 disclosure of yet further related-party transactions caused Riot's shares to decline **6%**.  Finally, on September 7, 2018, the SEC filed the *Honig* Action against Defendants Honig, O'Rourke, Groussman, and Stetson, and their affiliates, revealing that, contrary to Defendants' misleading Schedules 13D and 13G, and Riot's misleading Forms S-3 and 10-K, the Honig Group was not only a "group" as defined by Section 13(d), but in fact a a highly-orchestrated and closely-knit partnership amongst Honig, O'Rourke, Groussman, and Stetson, who had been engaged in the same fraudulent *modus operandi* at Riot that they had perfected a dozens of previous including the three pump-and-dump schemes described in detail by the SEC.  On this news, Riot's stock price dropped **26.1%.**

## II.     JURISDICTION AND VENUE

~~16.~~17.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

~~17.~~18.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

~~18.~~19.   Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the misleading statements entered into and the subsequent damages took place within this district.

~~19.~~20.   In connection with the acts, conduct, and other wrongs alleged herein, Defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

11

### III.   PARTIES

20.21.   Lead Plaintiff purchased Riot common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

21.22.   Defendant Riot is a Nevada corporation with its principal executive offices purportedly located at 834-F South Perry Street, Suite 443, Castle Rock, Colorado 80104.  The Company's securities trade on NASDAQ under the symbol "RIOT," and previously traded as "BIOP."  Riot purports to invest in various blockchain technologies and mine cryptocurrencies such as Bitcoin.  As of April 13, 2018, Riot had 13,417,132 shares of common stock outstanding.

22.23.   Defendant Honig is a resident of Boca Raton, Florida, and, at all relevant times, worked at an office in Boca Raton with O'Rourke.  Defendant Stetson, and at times Defendant Groussman, also worked out of Honig's Boca Raton office.  Defendant Honig is a defendant in the *Honig* Action and has been "permanently barred from participating in any offering of penny stock."  Honig, through his ownership of Riot securities, was in a position to exercise influence over Riot's top executives, including O'Rourke and Beeghley, and Riot's Board of Directors.  Honig also was a fiduciary of Riot by, among other things, his actions calculated to dictate the structure of the Company.  Honig, through his continuous course of business dealings with Riot, acted as a control person of the Company.  Honig has been involved in dozens of small companies that issued public securities, primarily through mergers with the shells of failed or failing businesses, in return for significant amounts of stock or convertible notes.  Honig sold at least 1,583,005 shares of his stock in the Company for at least $17 million in proceeds while maintaining close ties with Company insiders who had access to material, nonpublic information about Riot.  As alleged herein, Honig has longstanding business ties and/or co-investments with O'Rourke, Beeghley, Stetson, and Groussman, and other Relevant Non-Parties listed below.  Honig is a trustee of GRQ 401K, which has been a shareholder of Riot since at least September 14, 2016.

783086.1

Honig had voting and dispositive power over GRQ 401K's securities of Riot. Honig has been a shareholder of Riot in his individual capacity since September 19, 2016. ~~Honig was formerly CEO of PolarityTE and was~~Honig was Chairman and CEO of Majesco (later called PolarityTE) from September 30, 2015, until December 1, 2016. Honig was formerly a Director of Pershing Gold.

~~23.~~24.  Defendant O'Rourke, born in 1985, is a resident of Fort Lauderdale, Florida. After being nominated by Honig, O'Rourke was a Director of the Company beginning on January 6, 2017. O'Rourke also served as Riot's President, Secretary, and Treasurer since at least ~~October 3,~~September 2017,[1] and as Riot's CEO and Chairman of the Board from November 3, 2017 until September 8, 2018, when he resigned after the SEC charged him in the *Honig* Action along with Honig, Groussman, Stetson, ~~Brouser~~Brauser, and others. ~~Defendants~~As a result of the *Honig* Action, O'Rourke ~~and Stetson reside~~has been "permanently barred from participating in ~~homes located approximately 800 feet apart.~~any offering of penny stock." O'Rourke's 2017 executive compensation included a $60,000 salary, $2,322.00 in stock awards, $609,842 in option awards, which totaled to $2,991,842 in compensation. Additionally, O'Rourke sold at least 30,383 shares of his stock for at least $869,256.35 in profit while he had access to material, nonpublic information about Riot. ~~At least as of October 3, 2017, O'Rourke was President of Riot. O'Rourke~~O'Rourke has longstanding business ties and/or co-investments with Honig, ~~Stetson,~~Groussman, and ~~Brouser~~Stetson – including working out of the same office. O'Rourke used the same fax number as Honig and Stetson. O'Rourke and Stetson reside in homes located approximately 800 feet apart. O'Rourke owns ATG.

---

[1] ~~O'Rourke listed himself as a~~ A December 20, 2017, filing by Riot with the Nevada Secretary of State ("Filing Number 20170535413-91") lists O'Rourke as Riot's "President," "Secretary," and "Treasurer" for "the filing period of Sep, 2017 to Sep, 2018." O'Rourke is also identified as "President" of "Riot Blockchain, Inc." in "Articles of Merger" that O'Rourke signed and filed with the Nevada Secretary of State on October 3, 2017.

25.    ~~Defendant Catherine DeFrancesco was the~~Defendant Groussman is a resident of Miami Beach, Florida, and worked out of the same office in Boca Raton with Honig, O'Rourke, and Stetson.  Groussman owns Melechdavid.  Groussman purchased his house in Miami Beach, Florida, with a $700,000 mortgage loan from Honig, Groussman's mortgage holder.  Groussman is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.  Groussman is a defendant in the *Honig* Action and has been barred for ten years from participating in any offering of penny stock.

26.    Defendant Stetson is a resident of Fort Lauderdale, Florida, where Defendants Stetson and O'Rourke reside in houses approximately 800 feet apart.  Stetson is the former CFO of PolarityTE.  Stetson has longstanding business ties and/or co-investments with Honig, O'Rourke, and Groussman – including working out of the same office.  Stetson used the same fax number as Honig and O'Rourke.  Stetson owns Stetson Capital.  Stetson is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.  Stetson is a defendant in the *Honig* Action and has been barred for five years from participating in any offering of penny stock.

~~24.~~27.  Defendant DeFrancesco was an 11%+ beneficial owner of shares in Riot through at least six different entities:  DSB Capital, Ltd., a Turks & Caicos company; DeFrancesco Motorsports, Inc., an Ontario corporation; Delavalco Holdings, Inc., an Ontario corporation; Delavalco Holdings, Inc., a Florida corporation; Marcandy Investments Corp., an Ontario corporation; Namaste Gorgie, Inc., an Ontario corporation.  DeFrancesco began acquiring Riot shares ~~no later than September 14,~~in August 2016.  DeFrancesco is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.

~~25.~~28.  Defendant ~~Michael~~ Beeghley ~~("Beeghley")~~ ~~was~~ a Director of the Company since at least November 30, 2016; became CEO on April 6, 2017; and became Chairman of the

14

Company's Board in January 2017.  Beeghley was Chairman and CEO until he was replaced by Defendant O'Rourke on November 3, 2017.  Beeghley was Riot's CEO from April 2017 to November 2017; Chairman of the Board from January 2017 to November 2017; and a Director from November 2016 to November 2017.  In 2017, Riot paid Beeghley $339,739 in compensation, including $9,000 of salary, $270,000 in stock awards, and $60,739 in option awards.  Beeghley was a Director of Majeso (later called PolarityTE) from December 18, 2015, until October 18, 2017.

26.   Defendant John Stetson ("Stetson") is a resident of Fort Lauderdale, Florida, where Defendants Stetson and O'Rourke reside in houses approximately 800 feet apart. Stetson is the former CFO of PolarityTE.  Stetson is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.

29.   Defendant Mark Groussman ("Groussman") is a resident of Miami Beach, Florida, and works out of the same office in Boca Raton with Honig, O'Rourke, and Stetson. Defendants Honig, O'Rourke, Groussman, Stetson, DeFrancesco, and Beeghley are collectively referred to herein as the "Honig Group."

30.   Defendants Riot, O'Rourke and Beeghley are collectively referred to herein as the "Riot Defendants."

27.   Groussman owns Melechdavid.  Groussman purchased his house in Miami Beach, Florida, with a $700,000 mortgage loan from Honig, Groussman's mortgage holder.  Groussman is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.

28.   Defendant Andrew Kaplan ("Kaplan") has been a director of the Company since May 2017 is a member of the Audit Committee and Compensation Committee, and Chair of the Governance Committee.  In 2017, Kaplan received total compensation of $88,220, including his

15

fees paid in cash of $8,000 and stock awards of $80,220.  Kaplan previously served on the board

of directors of Majesco Entertainment Company ("Majesco Entertainment") while Honig was

CEO.  Kaplan is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.

29.     Defendant Mike Dai ("Dai") has been a Director of Riot since January 2017.

30.     Defendant Jeffrey G. McGonegal ("McGonegal") was the Company's Chief

Financial Officer ("CFO") from 2003 to February 28, 2018, from which point he served solely as

the Company's Principal Accounting Officer until April 30, 2018.  McGonegal then served as a

consultant to the Company until August 30, 2018.  McGonegal was replaced as CFO by Rob Chang

("Chang").  In 2015 and 2016, McGonegal was paid $651,207 and $513,625, respectively, in total

compensation.  According to the Company's Schedule 14A filed with the SEC on March 26, 2018

(the "2017 Proxy"), effective June 30, 2017, the Company entered into a retention agreement with

McGonegal providing for McGonegal's continued service as the Company's CFO and Principal

Accounting Officer until April 30, 2018, at an annual base salary of $275,005.  Additionally, in

2017, McGonegal received $127,800 in stock awards, $140,000 from a non-equity incentive plan,

and $169,843 in supplemental compensation.  Together with his salary, this amounts to total

compensation of $709,648.  Pursuant to a modification of the retention agreement, McGonegal

served solely as the Company's Principal Accounting Officer until April 30, 2018, and continued

for four months thereafter as a consultant of the Company to provide transition services as

requested by the CEO, CFO, and Board.

31.1.   Defendant Jason Les ("Les") has been a director of the Company since November

2017 and is a member of the Company's Audit Committee and Governance Committee, and Chair

of the Compensation Committee.  According to the 2017 Proxy, Les is a professional poker player

and is qualified to serve as a director "based on the fact that he has been active in the industry as a

16

783086.1

miner, studying protocol development and evaluating a variety of crypto investment strategies." Les received total compensation of $56,625 in 2017, which includes $6,000 of fees paid in cash and $50,625 of stock awards.

32.1.   Defendant Eric So served as a director of the Company from October 2017 until February 2018, and served as Chair of the Audit Committee and a member of the Compensation Committee and the Governance Committee.   In 2017, So was paid $65,675 in compensation, including $2,000 in fees paid in cash and $63,675 in stock awards.  So was previously the chief legal and development officer at MUNDOmedia Ltd., a company in which Honig and O'Rourke have heavily invested.

## IV.   RELEVANT NON-PARTIES

31.   2330573 Ontario Inc., whose President is Theofilos, was a Selling Stockholder in Riot's January 5 and February 7, 2018 Registration Statements on Forms S-3 and S-3/A and party to the September 29, 2017 Coinsquare shareholders' agreement with Riot.

33.32.  Aifos Capital Management, LLC ("Afios") is controlled by Karr, its Managing Member.

34.33.  ATG Capital LLC ("ATG") is a Florida corporation owned and operated by Defendant O'Rourke and for which O'Rourke makes investment decisions.  ATG's principal place of business is in Florida.  ATG's was incorporated in or around 2012.

35.34.  Biozone Pharmaceuticals, Inc. ("Biozone") is a Nevada corporation with principal place of business in Pittsburg, California.  The SEC has sued Defendants Honig, O'Rourke, and Stetson in connection with their investment in Biozone.

36.   Mohit Bhansali ("Bhansali"), is a former Director of Majesco and Director and PolarityTE.   Bhansali is the co-founder of EST.   Bhansali is a former employee of Sichenzia Friedman Ference LLP and Haynes and Boone, LLP.

783086.1

37.35.  Michael Brauser ("Brauser") is a resident of Lighthouse Point, Florida.  Brauser invested in Riot through Grander Holdings, Inc. 401K.  Brauser also owned 112,499 shares of goNumerical Lftd. ("goNumerical"), a leading Canadian Blockchain company known as Coinsquare Ltd.  The SEC sued Brauser along with Honig, O'Rourke, and Stetson for their pump-and-dump schemes involving Biozone, MGT, and MabVax.

38.36.  Cresval Capital Corp. ("Cresval") a Canadian mineral exploration company based in Vancouver, British Columbia, whose President is Lee Ann Wolfin.

39.    Equity Stock Transfer ("EST") is a transfer agent financed by Kesner.  EST's COO and CEO, Bhansali, who worked Kesner's law firm.  EST handled Riot's October 3, 2017 special dividend.

37.    Mike Dai ("Dai") was a Director of Riot from January 2017 until November 3, 2017.  Dai was nominated to Riot's Board by Defendants Honig and DeFrancesco in December 2016.  Before joining Riot's Board, Dai already had established business ties with Defendant DeFrancesco's husband, Andrew, and other relatives, as well as Defendants O'Rourke and Stetson, Jonathan Honig, and other members of the Honig Group. Specifically, as of December 1, 2016, Dai "serve[d] as chief financial officer and Director of Santa Maria Petroleum Inc. (TSXV:SMQ.H) a position he ha[d] held since 2014," according to Defendant Honig's SEC filing nominating Dai to the Bioptix Board.  Dai became CFO and a Director of Santa Maria on May 22, 2014, the same day that Andrew DeFrancesco became Santa Maria's "President and CEO." According to a December 2, 2016 OTCQB Certification (which was "prepared by . . . Mike Dai, CFO" and "Andrew DeFrancesco, CEO") that was filed on behalf of Santa Maria with the OTC Markets Stock Exchange, the "beneficial owners of more than five percent" of Santa Maria's

18

"equity securities" included Jonathan Honig, ATG (i.e., O'Rourke), Stetson Capital, and several of Defendant DeFrancesco's relatives.

40.1.   Ingenium Global, Inc. ("Ingenium") is a Nevada corporation that was incorporated on October 19, 2019 by Laxague, the same day as Kairos.  He is Ingenium's President, Secretary, and Treasurer.  Pascual and Silverman are Directors of Ingenium.

41.1.   JAD Capital Inc. ("JAD") is a corporation located in Ontario, Canada, whose Director, with voting and dispositive control over JAD, is Theofiles.

42.1.   Kairos Global Technology Inc. ("Kairos") is a Nevada corporation that was incorporated on October 19, 2019 by Laxague.  He is Kairos's President, Secretary, and Treasurer.  Pascual and Silverman are Directors of Kairos.

43.   Edward M. Karr ("Karr") is a Director of both Pershing Gold and Levon, and was a Director of Majesco Entertainment prior to its merger with PolarityTE.  Karr is also the chairman and chief executive of U.S. Gold.  Karr invested in Riot through Aifos, a company Karr controls.

44.1.   Harvey Kesner ("Kesner") is the long-time lawyer of Defendant Honig.  Kesner is the owner of Paradox Capital Partners ("Paradox").  Kesner represented Honig in connection with his investments in Riot and MabVax.  Kesner and/or Paradox invested in Riot and MabVax.  Kesner is an owner and manager of EST, which Kesner financed with more than $100,000 through Paradox.  Kesner is a former partner with Haynes and Boone, LLP and Sichenzia Friedman Ference LLP ("Sichenzia").  In 2018, MabVax sued Sichenzia for malpractice due to Kesner's allegedly conflicted legal representation of both Honig and MabVax.  According to a article in *Barron's*, "nearly two dozen public companies backed by Honig, or other defendants in last month's SEC complaint, used" Kesner " until he retired . . . just before the [*Honig*] action.  These companies also happened to use [EST] . . . ."

19

45.38.  Global Bit Ventures, Inc. ("GBI") is a Nevada corporation that Marathon planned but failed to merge with in order to convert Marathon into a "blockchain" company.

46.39.  Grander Holdings, Inc. 401K ("Grander") is a Florida corporation that Brauser owns and operates as Trustee.  The SEC sued Grander with Brauser Honig, O'Rourke, and Stetson in connection pump-and-dump schemes involving Biozone, MGT, and MabVax.

47.40.  GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("GRQ 401K") is an entity for which Honig serves as Trustee.  As of September 14, 2016, GRQ owned at least 389,159 shares of common stock of Riot (then-Venaxis) (8.6% of voting stock), and later increased its stake to 9.99%.

48.41.  Michael Ho ("Ho") was the President, Secretary, and Treasurer of both Kairos and Ingenium, which were both incorporated on the same day, October 19, 2017, in Nevada.  Ho is also a Manager of Prive.  In various corporate filings in Nevada and Florida, Ho has listed his address as either Dubai, Los Angeles, or Tampa.

49.42.  Alan Honig is the father of Barry Honig.  As of at least September 25, 2017, Alan Honig personally owned 20,000 shares of Riot common stock representing approximately 0.33% of the Company's common stock beneficially owned.

50.43.  Jonathan Honig is the brother of Barry Honig and is the Manager of Titan Multi-Strategy Fund I Ltd.  As at least September 25, 2017, Jonathan Honig beneficially owned, through Titan Multi-Strategy Fund I Ltd., 597,300 shares of Riot common stock representing 9.99% of the Company's common stock beneficially owned.

44.      Ingenium Global, Inc. ("Ingenium") is a Nevada corporation that was incorporated on October 19, 2019 by Laxague, the same day as Kairos.  Ho is Ingenium's President, Secretary, and Treasurer.  Pascual and Silverman are Directors of Ingenium.

20

783086.1

45.     JAD Capital Inc. ("JAD") is a corporation located in Ontario, Canada, whose Director, with voting and dispositive control over JAD, is Theofilos.

~~51.~~ 46.  Adrian James ("James"), a stock promoter who previously touted other Honig-backed companies, including Pershing Gold, MusclePharm Inc. (the parent of Biozone), and Valor Gold Corp. ~~Adrian James ("James"), a stock promoter who previously touted other Honig-backed companies, including Pershing Gold, MusclePharm Inc. (the parent of Biozone), and Valor Gold Corp.~~ James is the President ~~&~~and CEO of Stockwire, through which James invested in Riot.

47.     Kairos Global Technology Inc. ("Kairos") is a Nevada corporation that was incorporated on October 19, 2019 by Laxague.  Ho is Kairos's President, Secretary, and Treasurer. Pascual and Silverman are Directors of Kairos.

48.     Andrew Kaplan ("Kaplan") was a director of Riot from May 5, 2017, until his resignation on October 22, 2018.  Kaplan was a member of the Audit Committee and Compensation Committee, and Chair of the Governance Committee.  In 2017, Kaplan received total compensation of $88,220, including his fees paid in cash of $8,000 and stock awards of $80,220.  Kaplan previously served on the board of directors of Majesco/PolarityTE from October 2015 until December 1, 2016, during the same time period that Honig was CEO of Majesco.

49.     Edward M. Karr ("Karr") is a Director of both Pershing Gold and Levon, and was a Director of Majesco Entertainment prior to its merger with PolarityTE.  Specifically, Karr was appointed to Majesco/PolarityTE's board on September 25, 2014, the same day as Honig, Brauser, and Kaplan.  ¶ 119.  Karr resigned as a director of Polarity on December 1, 2016, the same day that Honig and Brauser also resigned.  Karr invested in Riot through Aifos, a company that Karr controls.

50.     Harvey Kesner ("Kesner") is the long-time lawyer of Defendant Honig.  Kesner is the owner of Paradox Capital Partners ("Paradox").  Kesner represented Honig in connection with his investments in Riot and MabVax.  Kenser and/or Paradox invested in Riot and MabVax. Kesner is an owner and manager of EST, which Kesner financed with more than $100,000 through Paradox.  Kesner is a former partner with Haynes and Boone, LLP and Sichenzia Friedman Ference LLP ("Sichenzia").  In 2018, MabVax sued Sichenzia for malpractice due to Kesner's allegedly conflicted legal representation of both Honig and MabVax. According to a article in *Barron's*, "nearly two dozen public companies backed by Honig, or other defendants in last month's SEC complaint, used" Kesner " until he retired . . . just before the [*Honig*] action. Those companies also happened to use [EST] . . . ."

51.     Laxague Law Inc. ("Laxague") is a law firm in Reno, Nevada, operated by Partner Joe Laxague, which incorporated both Kairos and Ingenium on October 19, 2018.

52.     Jason Les ("Les") has been a director of the Company since November 2017 and is a member of the Company's Audit Committee and Governance Committee, and Chair of the Compensation Committee.  According to the 2017 Proxy, Les is a professional poker player and is qualified to serve as a director "based on the fact that he has been active in the industry as a miner, studying protocol development and evaluating a variety of crypto investment strategies." Les received total compensation of $56,625 in 2017, which includes $6,000 of fees paid in cash and $50,625 of stock awards.

53.     Bryan Pascual is a Director of Kairos and Ingenium Global, Inc. and a Manager of Prive.

22

54.   Levon Resources Ltd. ("Levon") is another mineral exploration company in which Defendant Honig is former Director and Karr is a current Director.  Levon was founded by Arthur Wolfin, the father of Lee Ann Wolfin, the President of Cresval.

55.   Eric So served as a director of the Company from October 2017 until February 2018, and served as Chair of the Audit Committee and a member of the Compensation Committee and the Governance Committee.  In 2017, So was paid $65,675 in compensation, including $2,000 in fees paid in cash and $63,675 in stock awards. So was previously the chief legal and development officer at MUNDOmedia Ltd., a company in which Honig and O'Rourke have heavily invested.

52.1.   Laxague Law Inc. ("Laxague") is a law firm in Reno, Nevada, operated by Partner Joe Laxague, which incorporated both Kairos and Ingenium on October 19, 2018.

53.1.   Bryan Pascual is a Director of Kairos and Ingenium Global, Inc. and a Manager of Prive.

54.1.   Levon Resources Ltd. ("Levon") is another mineral exploration company in which Defendant Honig is former Director and Karr is a current Director.  Levon was founded by Arthur Wolfin, the father of Lee Ann Wolfin, the President of Cresval.

55.56.  MabVax Therapeutics Holdings, Inc. ("MabVax") a Delaware corporation, with its principal place of business in San Diego County, California.  The SEC has sued Defendants O'Rourke, Honig, and Stetson in connection with their investments in MabVax.

56.57.  Marathon Patent Group Inc. ("Marathon") is a public company that trades on the NASDAQ that Honig, O'Rourke, Groussman, Stetson, Brauser, and others also invested in an attempted to convert into a "blockchain" company.

23

57.58.  Marcandy Investments Corp. ("Marcandy") is an Ontario corporation owned and controlled by its President, DeFrancesco.

58.59.  Melechdavid Inc. ("Melachdavid") is a Florida corporation whose principal place of business is Miami Beach, Florida, and whose President is Defendant Groussman.

59.60.  MGT Capital Investments Inc. ("MGT") is a Delaware corporation based in Durham, North Carolina.  The SEC has sued Defendants O'Rourke, Honig, and Stetson in connection with their investments in MGT.

60.61.  Richard Molinsky ("Molinksy") is a former stockbroker at D.H. Blair & Co. who was barred from the industry in 2000 after pleading guilty[2] to criminal charges related to market manipulation and fraudulent sales practices, was one such associate listed on the registration statement.  Molinsky has been an investor in numerous Honig-backed companies, including PolarityTE, Pershing Gold, Vapor Corp., and Riot.  Molinsky was a shareholder of Riot since at least September 25, 2017, when he disclosed owning 1.78% of Riot common stock.

61.62.  MUNDOmedia Ltd. ("MUNDOmedia") is a marketing company based in Toronto, Ontario, Canada founded by its CEO, Theofilos.

62.63.  Namaste Gorgie Inc. ("Namaste") is an Ontario corporation owned and controlled by its President, DeFrancesco.

63.64.  Northurst Inc. ("Northurst") is a Canadian company that owned 9.99% percent of Riot stock and was also an investor in Kairos. Northurst's controlling shareholder, Jakub Malczewski, was managing director of Ahaka Capital with David Baazov, the former CEO of an

---

[2] *See In the Matter of Breimer et al.*, No. 3-11105 (S.E.C. May 5, 2003), available at https://www.sec.gov/litigation/admin/34-47797.htm ("Molinsky pled guilty to and was convicted of the charge of Attempt to Commit the Crime of Enterprise Corruption and one count of Martin Act securities fraud (*see People of New York v. D.H. Blair, et al.*, Ind. No. 3282/00).").

online gambling company who Canadian authorities charged with insider trading and market manipulation. Through Ahaka Capital, Messrs. Malczewski and Baazov were investors in MUNDOMedia alongside Honig, O'Rourke, Stetson, and Groussman. Northurst was also an investor in GBV, which was nearly acquired by Marathon.

64.65.  Paradox Capital Partners LLC ("Paradox"). The registered address in Florida for Paradox Capital Partners (owned by Kesner) is the same Boca Raton building that Honig uses as his business address.

65.66.  Bryan Pascual ("Pascual"), a resident of Tampa, Florida, is a Director of Kairos and Ingenium, and a Manager of Prive.

66.67.  Pershing Gold Corp. ("Pershing Gold") is an emerging gold producer whose primary asset is the Relief Canyon Mine in Pershing County, Nevada. Defendant Honig was a Director of Pershing Gold.

67.68.  PolarityTE Inc. ("PolarityTE") was formerly a video game company known as Majesco Entertainment, and is now a purported biotechnology company based in Salt-Lake City, Utah. Polarity'sPolarityTE's Co-Chairmen were Defendant Honig and Brauser. Honig was also Polarity's CEO. Defendant Stetson was Polarity'sPolarityTE's CFO. Karr and Defendant Kaplan were Directors of PolarityPolarityTE.

68.69.  Prive Technologies LLC ("Prive") is a Florida limited liability corporation that was incorporated on October 31, 2017, with its Principal Address at 218 S. Audobon Avenue, Tampa, Florida 33609. Prive's Managers are Ho and Pascual.

69.70.  Robert O'Braitis ("O'Braitis"), a part-time resident of Boca Raton, Florida, owned as of at least September 25, 2017, owned 80,410 shares of Riot common stock representing 1.46% of the Company's common stock beneficially owned (the exact amount owned on that same date

25

by Theofilos through JAD Capital Inc., and by Groussman in two separate UTMA accounts). O'Braits O'Braitis has been an investor in other Honig-backed companies, including PolarityTE and Marathon, in which he was party to a "Securities Purchase Agreement with proposed Riot Board member Jesse Sutton.

70. 71.  Moses D. Silverman ("Silverman"), a resident of Miami Beach, became a Director of Kairos and Ingenium on October 19, 2018.

71. 72.  Stetson Capital Management, LLC ("Stetson Capital") is a Florida limited liability company incorporated in April 2016 whose manager and registered registered agent is Defendant Stetson.  Stetson Capital's Articles of Incorporation list Defendant Stetson's previous residence less than one mile from Defendant O'Rourke's residence in Fort Lauderdale, Florida.  Stetson Capital invested in at least 4.99% of Riot's common stock.

72. 73.  Stockwire Research Group, Inc. ("Stockwire") is a Florida corporation whose principal place of business is in Miami-Dade County, Florida, and whose President and CEO is Adrian James.

73. 74.  Tess Inc. ("Tess") is a company based in Toronto, Ontario, whose Chief Software Architect is Tanasescu.

74. 75.  Jason Theofilos ("Theofilos") is the chief executive of MUNDOmedia Ltd., a digital advertising company in which Defendant Honig, Jonathan Honig, O'Rourke, Stetson, and Groussman each held shares.  Theofilos is the Director of JAD Capital Inc. and the President of 2330573 Ontario Inc.  As of at least September 25, 2017, Theofilos owned JAD Capital Inc., which owned 80,410 shares of Riot common stock representing 1.46% of the Company's common stock beneficially owned (the exact amount owned on that same date by O'Braitis and by Groussman in two separate UTMA accounts).

26

783086.1

75. 76.  Sorin Tanasescu was Tess's Chief Software Architect and was concurrently a Director of an entity called Ingenium IT Compusoft and a Managing Director of a company called VoiceWay.

76. 77.  Titan Multi-Strategy Fund I, Ltd. ("Titan") is a Florida corporation.  Titan is owned and controlled by Jonathan Honig, who is Titan's Manager.

77.    US Commonwealth Life, A.I. Policy No. 2013-17 ("Policy No. 2013-17") is controlled by Bhansali, who caused Policy No. 2013-17 to purchase convertible notes and warrants resulting in approximately 80,000 Riot shares, which Policy No. 2013-17 sold publicly.

78.    WPCS International Incorporated ("WPCS") was a global engineering, communications, and infrastructure "with over 500 employees in 10 operations centers on three continents."  In 2012, Defendant Honig, through GRQ 401, invested in WPCS when its stock was trading in excess of $1,000 per share.  In 2013, WPCS purchased BTX Trader, a bitcoin trading platform, from Defendant O'Rourke.  In January 2018, WPCS's changed its name to "Dropcare, Inc." and is now a cloud-services-for-cares company whose stock trades on NASDAQ under the ticker "DCAR" for approximately $2.01 per share.

**V.    BACKGROUND ON THE "HONIG GROUP"**

    **A.    The SEC Has Sued Honig, O'Rourke, Groussman, and Stetson for "Acting as an Undisclosed Control Group" in Three Previous Fraudulent Pump-and-Dump Schemes Involving the Same *Modus Operandi* They Used at Riot**

79.    On September 7, 2018, the SEC filed the *Honig* Action against Defendants O'Rourke, Honig, Groussman, and Stetson (as well as related-party Brauser and others) for violating the Exchange Act and Securities Act by engaging in "three highly profitable 'pump-and-dump' schemes . . . from 2013 through 2018 in the stock of three public companies (Company A,

Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares." Cmpl. ¶ 1 (attached as Exhibit A).[3]

80.     On March 16, 2020, the SEC filed a Second Amended Complaint, which is attached hereto as Exhibit B.[4]  In its complaint the SEC alleges that Defendants Honig, O'Rourke, Stetson and related-party Brauser, individually or through their entities, invested alongside one another in at least 19 issuers at or about the same time, from 2011 to the present.  While this action concerns three of those issuers, in most cases in which Honig, Brauser, Stetson, and O'Rourke co-invested, the investments followed a pattern: Honig or Brauser would identify a target company and arrange a financing or financings that would give them and their chosen co-investors (including Stetson and O'Rourke, among others) a controlling position in the company's outstanding common stock at lower-than-market prices.  Honig, Brauser, Stetson, and O'Rourke would then exercise that control by dictating terms of the company's material management decisions and policies, and voting together to direct the company's major business decisions. When the group determined that the time had arrived to exit the investment, they would engineer a publicity-generating event that would both drive the price of the stock higher, and also create market demand and trading volume that would allow them to sell their positions.  Typically, Honig, Brauser, Stetson and O'Rourke would dictate some kind of transaction for management to undertake – for example, an acquisition or merger, or a new investment by a well-known investor, like Investor 1 – and paid writers, bloggers or other public relations professionals to write about it.  Once the publicity had its intended effect on the stock's price and trading volume, Honig, Brauser, Stetson, O'Rourke and

---

[3] Citations to "Cmpl. ¶___" are to paragraphs of the SEC's initial complaint.  *See SEC v. Honig et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 8, 2009) (ECF No. 1).
[4] Citations to "2d Am. Cmpl. ¶___" are to paragraphs of the SEC's Second Amended Complaint. *See SEC v. Honig et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 8, 2009) (ECF No. 233).

783086.1

the other hand-picked co-investors would sell their respective positions – generally staggered over a course of weeks – into the artificially inflated market.  2d Am. Cmpl. ¶ 57.

81.     Throughout these stages, Honig, Stetson, and O'Rourke were in nearly daily contact because they worked out of the same office and were in frequent email and telephone contact, at times purposefully moving their conversations to the less permanent medium of text or instant messaging.  Honig, Stetson and O'Rourke were each in frequent contact with Brauser, with whom they shared office space until late 2013.  *Id.* ¶ 58.

82.     Honig, Brauser, Stetson, and O'Rourke obtained their interests in these issuers at the same time, and agreed to act as a group in holding, disposing and voting the stock they acquired, with Honig leading the combined effort.  As O'Rourke put it in a February 3, 2014 email to the officer of a potential merger target, "Barry Honig is the principal investor of ***our small group***."  Honig carefully controlled his "small group's" participants in the financings he arranged so that shares were held only by individuals and entities that (1) permitted Honig to direct how they voted their shares and/or acquiesced in Honig's control of the management of the company, and (2) refrained from selling their shares until the optimal time for group members to profit from the planned post-pump dump.  *Id.* ¶ 59.

83.     Honig worked with Stetson to ensure that members of his groups voted their shares in unison.  At times, members of the group reached out to Stetson to find out how they should vote on various proposals.  For example, with respect to one of the issuers in which they had co-invested, in July 2015, Brauser forwarded an email request from a co-investor's staffer to Stetson, asking whether to vote for or against a proposal.  Stetson, in an email that same day, copying Honig, replied, "Yes, vote 'For.'" In a November 2016 email to members of a Honig group of

investors in another issuer, Stetson responded to a request for "instructions to vote" with "[v]oting in favor of [two named directors]. Against all other members and actions." *Id.* ¶ 60.

84.     While Honig was the primary architect of the three schemes detailed below, email traffic among Honig, Brauser, Stetson, and O'Rourke demonstrates the various key roles each of these individuals played in the typical Honig-led investment. *Id.* ¶ 61.

85.     Brauser is a long-time co-investor with Honig, investing (individually, through his entity, Grander, or through family members' accounts) alongside Honig (and/or a Honig entity) in more than *40 issuers* between approximately 2011 and mid-2018.  From at least October 2010 to approximately 2013, Brauser rented an office with Honig at 4400 Biscayne Boulevard in Miami, Florida.  Brauser's business association with Honig was sometimes noted by keen market observers:  As early as 2013, a short seller published a report on a company in which the two had invested and noted that a factor negatively affecting the value of the company's stock was the CEO's close financial ties with "two serial stock promoters," whom it identified as Honig and Brauser.  *Id.* ¶ 62.

86.     For some of the issuers in which Brauser co-invested alongside Honig, Brauser took an active role, at times directing the issuer's management, finding and negotiating transactions for the issuer or bringing in additional investors.  In others – particularly while Honig and Brauser worked through one of their periodic disputes about who owed whom money – Brauser was content to let Honig direct the steps in the scheme; since Brauser had been closely involved with respect to the other issuers in which he had co-invested with Honig, he was well-familiar with the playbook, knew that Honig would follow it and understood that Honig would signal to Brauser when it was time to sell his shares. *Id.* ¶ 63.

30

87.     Stetson shared office space with Honig and O'Rourke at all relevant times. Individually, through his entity SCI, or through HSCI (the vehicle he nominally controlled), Stetson invested alongside Honig (and/or a Honig entity) in more than *65 issuers* between 2011 and August 2018.   In connection with most of these investments, Stetson executed Honig's directions, managed the administrative aspects of the Honig group's investments, and performed pre-investment due diligence. For example, Stetson communicated with brokers to effect Honig's trades, deposited Honig's shares with brokers, communicated investment terms and wire instructions to investors Honig had lined up, tracked the ownership of each group member in a particular issuer, corralled shareholder votes from co-investors (and, in some cases, even told co-investors how to vote), prepared financial analyses of proposed investments and conveyed Honig's instructions to issuer management.  From 2012 to 2013, Stetson also frequently managed Honig's arrangements with Ford to write paid promotional articles about issuers in which Honig and his group had invested.  *Id.* ¶ 64.

88.     O'Rourke shared office space with Honig and Stetson at all relevant times, beginning in 2012.  Through his entity, ATG, or individually, O'Rourke invested alongside Honig (and/or a Honig entity) in over *75 issuers* between 2011 and August 2018.  Beginning in 2013, O'Rourke managed the Honig group's promotional efforts by working with writers and bloggers to publish favorable articles and posts about issuers the Honig group controlled.  He arranged for those writers to be compensated for their promotional pieces.  For example, in 2013 and 2014, O'Rourke compensated "Writer E" for writing positive promotional articles.  O'Rourke made the payments through personal checks and/or sham stock purchases, designed to disguise the true purpose of the compensation.  O'Rourke knew, or was reckless in not knowing, that Writer E did not disclose these payments in the promotional pieces he published on these issuers.  *Id.* ¶ 65.

89.     At times, and with Honig's knowledge and consent, or at his direction, O'Rourke wrote and published the promotional articles himself.  O'Rourke used a pseudonym for the byline and did not disclose his relationship to the issuer being promoted or the compensation Honig was paying him for the articles.  *Id.* ¶ 66.

90.     In addition to his work with promoters and his own promotional activities, in at lease on instance, O'Rourke took the lead in negotiating a transaction for Company B, in which he, Honig, Brauser and Stetson and/or certain of their entities had invested.  After about his first year with Honig, O'Rourke also began assisting Stetson with the administrative aspects of each group investment.  *Id.* ¶ 67.

91.     Stetson and O'Rourke knew that each participant in Honig's deals – Honig's "following" – had been invited to participate in these private transactions in exchange for some value each could bring to the deal, and that Ford was no different.  For example, Groussman brought needed cash and a willingness to follow Honig's directions on how to vote or when to sell.  *Id.* ¶ 80.

92.     Given his February 26, 2019 settlement with the SEC, Groussman is referred to in the SEC's Second Amended Complaint as "Affiliate 1."  However, the SEC's initial complaint, dated September 7, 2018, alleged that "*[i]n every scheme*, Honig, and some combination of Stetson, Brauser, O'Rourke, *Groussman* . . .  either explicitly or tacitly agreed to buy, hold or sell their shares in coordination with one another, knowing that a pump and dump was in the offing that would allow them all to profit handsomely."  Cmpl. at ¶ 2.  Groussman's participation in the schemes involving Biozone, MGT, and MabVax included "pre-release manipulative trading" with Honig, Brauser, O'Rourke, Melechdavid and ATG.  *Id.* ¶ 3.  "Honig, Brauser, Stetson, O'Rourke, . . . *and Groussman*, as well as certain of their entities, also violated beneficial ownership reporting

requirements of the federal securities laws by failing to disclose their group beneficial ownership of shares and the fact that as a group they were looking to exercise (and, in fact, did exercise) control over the issuers." *Id.* ¶ 4. "***Groussman*** . . . work[ed] at an office in Boca Raton with Honig, Stetson and O'Rourke." *Id.* ¶ 38.

93.    As stated in a letter[5] from counsel for the SEC filed with the court in *SEC v Honig*, the SEC recently reached additional settlements with several of the same Defendants and related parties in this case, including Defendants O'Rourke[6] and Stetson,[7] and Honig Group members Brauser,[8] ATG Capital LLC, Stetson Capital Investments Inc., and Grander Holdings, Inc.

94.    These settlements follow the SEC's previous settlement with Defendant Honig, in which he agreed, among other things, to be "permanently barred from participating in any offering of penny stock"; "permanently prohibited" from holding greater than 4.99% of any penny stock company; "permanently prohibited" from "advertising, marketing, or otherwise promoting" any

---

[5] *SEC v. Honig*, No. 1:18-cv-08175-ER (ECF No. 222) (Mar. 6, 2020) (attached as Exhibit C).

[6] *SEC v. Honig*, No. 1:18-cv-08175-ER (Mar. 6, 2020) (ECF No. 228) (Final Judgment as to Defendant John R. O'Rourke III). O'Rourke's settlement permanently bars him from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, or advertising, marketing, or promoting any penny stock, and requires him to pay $1,153,326 in disgorgement, interest, and civil penalties. *Id.*

[7] *SEC v. Honig*, No. 1:18-cv-08175-ER (Mar. 6, 2020) (ECF No. 227) (Final Judgment as to Defendant John Stetson). Stetson's settlement bars him for ten years from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, or advertising, marketing, or promoting any penny stock, and requires him to pay $1,154,669.28 in disgorgement, interest, and civil penalties. *Id.*

[8] *SEC v. Honig*, No. 1:18-cv-08175-ER (Mar. 6, 2020) (ECF No. 224) (Final Judgment as to Defendant Michael Brauser). Brauser's settlement permanently bars him from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, or advertising, marketing, or promoting any penny stock, and requires him to pay $1,175,768.16 in disgorgement, interest, and civil penalties. *Id.*

33

penny stock; and agreed to "pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty" yet to be determined upon a forthcoming motion by the SEC.[9]

95.     On February 26, 2019, Defendant Groussman's settled with the SEC.  Groussman agreed to a similar five-year ban on participating in any offering of penning stock, holding greater than 4.99% of any penny stock, or advertising, marketing, or promoting any penny stock and required him to pay $ 1,381,914.78 in disgorgement, interest, and civil penalties.[10]

96.     In connection with the *Honig* Action, the SEC filed with the court several emails among Honig, O'Rourke, Groussman, Stetson, and/or Brauser that confirm that these individuals personally coordinated their investments in numerous public companies. *See* Exs. D, E, F, G, H & I.  For example, on July 2, 2014, Defendants Honig, O'Rourke, Stetson, Groussman, and Brauser received an email from a lawyer concerning a "Share Purchase" and requesting "broker representation letters" for the "transfer agency for Musclepharm Corp" for "each transferee."  *See* Ex. D at 7 of 21.[11]  That same day, this lawyer issued an opinion letter to the transfer agent stating that each of these same individuals had "executed representation letters that such parties are not

---

[9] *SEC v. Honig*, No. 1:18-cv-08175-ER (July 7, 2019) (ECF No. 152) (Judgment as to Defendant Barry Honig).

[10] *SEC v. Honig*, No. 1:18-cv-08175-ER (Feb. 6, 2019) ("ECF No. 93) (Final Judgment as to Defendant Mark Groussman).

[11] This July 2, 2014 email clearly identifies "John Stetson" and "Mike Brauser."  Honig's email address is the same that he used in his September 13, 2016 letter to the Bioptix Board on Schedule 13D/A.  *See* Ex. J.  O'Rourke's email address is the same listed for him and his entity, ATG, in a December 17, 2013 Amended and Restated Limited Liability Company Agreement between O'Rourke and BTX Trader LLC filed with the SEC.  *See* https://www.sec.gov/Archives/edgar/data/1086745/000152153613001045/q1101368_ex10-1.htm.  Groussman's email address is the same listed for him and his entity, Melachdavid, in a November 13, 2013 Stock Purchase Agreement involving "Positive ID Corporation" signed by Groussman,         Honig,         Stetson,         and         Karr.         *See* https://www.sec.gov/Archives/edgar/data/1347022/000139843213000739/exh10_1.htm.  Hudson Bay Master Fund Ltd., a "Selling Stockholder" in Riot's January and February 2018 Forms S-3, was also a party to this 2013 Stock Purchase Agreement.

34

affiliates and were not affiliates within the three months prior to the Purchase Date."  Ex. E at 17-18 of 25.

97.    Similarly, a January 27, 2012 email from Stetson to Honig attaches a "Share Breakdown" of the shares that Honig, Stetson, Groussman, Brauser, and their affiliates would hold in IZEA Worldwide Inc after a stock split.  Ex. H.  Another January 20, 2011 email from Stetson provides a similar breakdown for himself, Honig, Brauser, and others for "Passport Potash, Inc." Ex. G.  Likewise, an October 2, 2013 letter shows how Honig, Grossman, Brauser, and Brauser's relatives allotted their co-investments in Senesco Technologies, Inc.  Ex. F.

98.    The FBI and Department of Justice ("DOJ") have also been pursuing a criminal investigation into the Honig Group's pump-and-dump schemes, pursuant to which the FBI interviewed Defendant Honig and the DOJ made those FBI Form FD-302[12] interview notes available to the SEC.[13]

### 1.    Biozone Pharmaceuticals, Inc. (a/k/a "Company A")

79.    The "Honig Group" is used herein to refer to Honig, the other Defendants, and any other current or former holders of Riot securities (including common stock, preferred stock, warrants, and notes) who had a material relationship with Honig, any of the other Defendants, and/or any other member of the Honig Group.  As alleged herein, the Honig Group included, among others and without limitation: Afios, ATG, Bhansali, Brauser, Karr, Kesner, Grander, GRQ

---

[12] "After FBI agents conduct a formal interview, they incorporate [ ] their handwritten notes into a more complete report of the interview on the FBI's Interview Report Form FD-302, known colloquially as a '302.'"  *Palermo v. United States*, 776 F. App'x 753, 754 (3d Cir. 2019) (quoting *United States v. Lloyd*, 807 F.3d 1128, 1158 n.11 (9th Cir. 2015) (alteration in original)).

[13] *See* Ex. K at 21-25 (counsel informing the court that "the SEC has notes of [Barry] Honig's [FBI Form FD-] 302s," which the SEC "requested," "reviewed," and "gave the 302s back to the [DOJ]" and counsel for the SEC confirming that the SEC had "review[ed] the 302s" from Honig's interview).  *See also* Ex. L (Stipulation and Order in *SEC v. Honig* providing for disclosure by SEC of "notes taken by the [FBI] at an April 23, 2019 interview of a witness").

783086.1

Formatted: No widow/orphan control, Don't keep with next

401K, Alan Honig, Jonathan Honig, JAD, James, Marcandy, Melechdavid, MGT, Molinsky, Namaste, Northurst, Paradox, O'Braitis, Stetson Capital, Theofilos, Titan, and Policy No. 2013-17, and other affiliated shareholders.  As alleged herein, and as illustrated below, each of the members of the Honig group has invested in one or more previous public companies affiliated with Honig and the other Defendants including, without limitation, Biozone, MGT, MabVax, Marathon WPCS, PolarityTE, Pershing Gold, and MUNDOmedia Ltd.

Honig Group                             Prior Pump-and-Dump Companies[14]

| | Biozone | MGT | MabVax | PolarityTE | Pershing Gold | Mundo | Marathon |
|---|---|---|---|---|---|---|---|
| Aifos | | | X | X | X | | |
| ATG | | X | X | X | X | | |
| Bhansali | | | | X | | | |
| Brauser | | | X | X | X | | X |
| Grander | X | X | X | X | X | | X |
| GRQ 401K | X | X | X | X | X | | X |
| Honig, Alan | | | X | | X | | X |
| Honig, Jonathan | | | X | | X | X | |
| JAD Capital Inc. | | | | | | X | |
| James | | | | | X | | |
| Karr | | | X | X | X | | X |
| Kesner | X | X | X | X | X | | X |
| Marcandy | | | | | | | |
| Melechdavid | | X | X | X | X | | X |
| Molinsky | | | | X | X | | X |
| Namaste | | | | X | | | |
| Northurst | | | | | | | X |
| O'Braitis | | | | X | | | X |
| Paradox | | | X | X | X | | X |
| Policy No. 2013-17 | | | | X | | | |
| Richardson | | | | | X | | X |
| Stetson Capital | | X | | X | X | X | X |
| Stockwire | | | | | X | | |

---

[14] The absence of a checked box is not intended to indicate the lack of a relationship.

36

VI.    SUBSTANTIVE ALLEGATIONS

A.    The Honig Group Has Engaged in Similar Pump-and-Dump Schemes at Numerous Publicly Traded Microcap Companies

80.    Numerous members of the Honig Group have engaged in prior pump and dump schemes at other publicly traded companies, at depicted by the following chart and discussed below.

**The Honig Group's Prior Target Companies[15]**

| | Biozone | MGT | MabVax | PolarityTE | Pershing Gold | Mundo | Marathon |
|---|---|---|---|---|---|---|---|
| Honig | | X | X | X | X | X | X |
| O'Rourke | | X | X | X | X | X | X |
| Brauser | X | X | X | X | X | | X |
| Stetson | X | X | X | X | X | X | X |
| Groussman | X | X | X | X | X | X | X |
| DeFrancesco | | | | X | | | |
| Beeghley | | | | X | | | |
| Kaplan | | | | X | | | |
| So | | | | | | X | |

1.    The SEC Has Sued Honig, O'Rourke, Stetson, and Brouser for Recently Engaging in Pump-and-Dump Schemes at Three Companies

81.99.  The Honig Group's three most recent schemes are also detailed in a the SEC's March 8, 2019 First Amended Complaint[16] filed by the SEC against Honig, O'Rourke, Stetson, Brouser Brauser, and related defendants.  The SEC alleged that "Honig was the primary strategist,

---

[15] The absence of a checked box is not intended to indicate the lack of a relationship.

[16] Citations to "Am. Cmpl. ¶    " are to paragraphs of the SEC's First Amended Complaint.  *See SEC v. Honig et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 8, 2009) (ECF No. 105).

calling upon other Defendants to, among other things, acquire or sell stock, arrange for the issuance

of shares, negotiate transactions, and/or engage in promotional activity." ~~SEC~~ Am. Cmpl. ¶ 2.[17]

The SEC alleged that Honig, O'Rourke, Stetson, ~~Brouser~~Brauser engaged in pump-and-dump

schemes at "Company A" (Biozone), "Company B" (MGT), and "Company C" (MabVax):

> All told, the three schemes earned Defendants and their associates millions of
> dollars:  Company A's pump and dump generated approximately $9.3 million in
> stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their
> respective entities, and affiliates.  Company B's pump and dump generated more
> than $9.5 million for Honig, Brauser, Stetson, O'Rourke, certain of their respective
> entities, affiliates, and/or certain frequent co-investors.  And, most recently, the
> pump and dump of ~~Company C~~[MabVax] brought in over $8.3 million in stock
> sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective
> entities and/or certain frequent co-investors.  These profits were made at the
> expense of investors who purchased shares in [Biozone], [MGT] and [MabVax] at
> artificially high prices based on misleading flattering articles or coverage in the
> media and matched trades that were orchestrated by the Defendants.

*Id.* ¶ 8.

### ~~a.1.    Biozone Pharmaceuticals, Inc. (a/k/a "Company A")~~

100.    ~~As alleged~~In the Biozone Scheme, Honig and Brauser generated approximately

$9.3 million in proceeds for themselves and their co-investors by secretly paying for a misleading

promotional campaign, engaging in manipulative trading, and then unlawfully selling Biozone

share into the artificially inflated market that they had generated.  *Id.* ¶ 80.

101.    In November 2010, Honig, along with his nominees, including Stetson and

Groussman, purchased one-third of a publicly traded shell company.  *Id.* ¶ 82.  Honig, Brauser,

and Stetson each disguised his role in the acquisition through an intermediary entity.  *Id.*

According to the SEC, ~~a member of~~ "[s]ince part of Stetson's role in working with Honig was to

---

[17] ~~Citations to "SEC Cmpl. ¶ ___" are to paragraph of the SEC's Complaint.   Citations to "SEC Am. Cmpl. ¶ ___" are to paragraphs of the SEC's First Amended Complaint.   *See SEC v. Honig et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 8, 2009) (ECF No. 105).~~

783086.1

Formatted: No widow/orphan control, Don't keep with next

keep track of the amount of each associated investor's holdings, and [Stetson] had reviewed [Biozone's] Form 10-K/A, setting out Honig and Brauser's ownership and the number of [Biozone's] outstanding shares, Stetson knew, or was reckless in not knowing, how much of [Biozone's] stock Honig and Brauser controlled." SEC 2d Am. Compl. ¶ board of directors 100.

102.   In late 2010, Honig and Brauser approached the management of Biozone's predecessor company to with a proposal to take the company public.  *Id.* ¶ 83.

82.103.Biozone's Chief Scientific Officer, Brian Keller, explained that "[t]he real power is with Barry Honig and Mike Brauser.  [Biozone CEO] Elliot [Maza] is just a mouthpiece," *id.* ¶ 91, but that Honig and Brauser failed to keep their promises to invest in research and development at Biozone, *id.* ¶ 93.  Instead, "Honig and Brauser used the financings they orchestrated to amass more, ever-cheaper [Biozone] shares for themselves and their associates" so that by April 1, 2013, "Honig, Brauser and other co-investors, including Stetson . had amassed 28,153,845 shares, or almost 45% of the [Biozone] shares outstanding, with Honig alone holding 5,542,654 shares, or 8.8% of the company's outstanding shares."  *Id.* ¶ 95.

83.104.To facilitate the pump and dump scheme, "[i]n September 2013, Honig directed O'Rourke to reach out to Ford to arrange for him to post his purportedly independent investment analysis of [Biozone] on the Seeking Alpha website pursuant to the understanding Honig and Ford had reached in 2012."  *Id.* ¶ 102.  In turn, "O'Rourke contacted Ford and proposed that Ford write a [Biozone] article in exchange for Ford obtaining [Biozone] shares at a below-market price." *Id.*¶ 103.

84.105.The SEC alleged that "[o]n Monday, September 23, 2013, Honig and some associates began trading [Biozone] shares to create the appearance of market activity and interest in [Biozone] in advance of the planned Ford article.  That day, the trading volume of [Biozone]

39

shares soared to 302,000 from zero volume the previous trading day." *Id.* ¶ 104.  "The September 23rd trading also gave Honig a way to pay Ford surreptitiously for his upcoming favorable article on [Biozone].  On the morning of Friday, September 20, 2013, O'Rourke called Ford and told him to put in buy orders for [Biozone] stock at $0.40 per share to ensure his order was executed against the corresponding sell order later placed by Honig." *Id.* ¶ 105.  "O'Rourke joined the trading at the end of the trading day on September 23rd to 'mark the close,' i.e., to ensure that the last price of the day would be higher, giving the false impression that [Biozone's] share price was on an upward trajectory." *Id.* ¶ 107.

~~85.~~106. As directed, "Ford published his [Biozone] article on the Seeking Alpha website less than half an hour before market close on September 26, 2013. . . .  In it, Ford presented a bullish outlook for [Biozone] and concluded that '[Biozone] should be trading for more than twice today's valuation.'" *Id.* ¶ 108.

~~86.~~107. Not surprisingly, Biozone's "share price increased from an average of about $0.48 during August 2013 to an intraday price of $0.97 on October 17, 2013." *Id.* ¶ 111.  At the same time, "[b]etween the start of the manipulative trading on September 23, 2013 and December 31, 2013, Honig and his co-investors sold shares into the inflated market for proceeds of approximately $9,350,000." *Id.* ¶ 112.

### ~~b.~~2.    MGT Capital Investments Inc. (a/k/a "Company B")

~~87.~~108. With respect to MGT, the SEC alleged:

> During 2015 and 2016, Honig and his associates used [MGT], once a publicly traded shell, as another vehicle for their pump-and-dump schemes.  Honig and his partners used many of the same tactics they had employed in the [Biozone] scheme: they bought millions of cheap shares, intending to exercise control over the management and policies of the company; exercised that control; orchestrated a misleading promotion of the company that drove up the price and the trading volume of the company's shares; and dumped their shares for a profit in the inflated market.

*Id.* ¶ 125.

~~88.~~109. As before, "Stetson, with the knowledge and consent of the Honig-led investor group, then enlisted Ford to write a promotional piece, published on the Seeking Alpha website on November 5, 2012, which touted MGT's prospects for providing a "2X near-Term Return," and predicting that MGT's stock could rise to $18 a share (nearly triple its price on the previous trading day)." *Id.* ¶ 128.

~~89.~~110. This was not sufficient for Defendant Honig, however, because "after Ford's piece was published, MGT's stock price failed to reach the level desired by the Honig-led group." *Id.* ¶ 129. Accordingly, Honig directed Stetson and/or O'Rourke to retain Ford to write another Seeking Alpha article on [MGT]." *Id.* "This time Ford's article had the desired effect, pushing [MGT's] share price from $3.50 on April 10, 2013 to almost $4.50 on April 16, 2013, and increasing trading volume significantly. MGT's market capitalization went from under $16 million on April 10, 2013 to over $20 million on April 16, 2013. Honig sold approximately 250,000 shares into the inflated market, earning $967,224." *Id.* ¶ 130.

~~90.~~111. This was not the end of the pump-and-dump scheme at MGT. The SEC alleged that, "[i]n 2015, Honig and his associates began planning a new scheme to pump and dump [MGT's] shares." *Id.* ¶ 133. As part of this, "[o]n September 27, 2015, Honig directed Stetson to send the proposal to [Robert] Ladd, [MGT's] CEO. The deal contemplated the issuance of 2.8 million MGT shares, along with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker. This deal structure allowed the investors repeatedly to convert and sell their shares while appearing individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings." *Id.* ¶ 134. Then, "[h]aving coordinated the accumulation of stock with Brauser, Stetson and O'Rourke, Honig, with his

41

partners' knowledge and consent, then arranged for a promotion that included materially misleading information." *Id.* ¶ 138.

~~91.    Following this, the SEC alleged that~~

112.    ~~On~~The SEC alleged that MGT's CEO, Robert Ladd, "knew" that Honig, O'Rourke, Stetson, and Brauser were "operating as a group" and had "acquired [MGT] shares together, and that they were collectively exercising control over the company."  2d Am. Cmpl. ¶ 140. Specifically, the SEC alleged that "[i]n an email dated September 29, 2015 to [MGT] counsel, Stetson, Honig and [MGT's] CFO – and in his October 4, 2015 email to [MGT's] Directors – Ladd referred to the potential investors as an "*investor group . . . led by Barry Honig*," and attached a "term sheet" (to the September 29 email) that defined Honig as "Lead Investor."  *Id.* (emphasis added).  Similarly, in November 2015, Ladd wrote Honig:  "As for the cap table, we have 17.2 million common shares outstanding, including *your group's* 2.8 million . . . ."  *Id.* (emphasis added).  Yet, the SEC alleged that "Ladd nonetheless failed to disclose Honig's, Brauser's, Stetson's and O'Rourke's combined interest in, and control over, the company in Company B's public filings."  *Id.*

113.    The SEC further alleged that "on or around January 21, 2016, by which time Honig, Brauser, Stetson, O'Rourke and ~~Affiliate 1~~[Groussman] through ~~Affiliate 1~~[Groussman's] Entity, had acquired at least 16.3% of [MGT's] outstanding stock~~,~~:

> Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of [MGT].  Shortly thereafter, the stock promoter paid a portion of the money he had received from [MGT] to a writer he instructed to publish a tout on [MGT].  On February 3, 2016, the writer published his piece online.  In it, he described [MGT's] rosy prospects in social and "real money" gaming sites and intellectual property relating to slot machines.  The article did not disclose that the author had been paid by [MGT] - at Honig's direction - to write the article.  After the article was published on February 3, 2016, there was a 7000% increase from [MGT's] previous day's trading volume, and an intraday price increase of over 60%.

783086.1

*Id.* ¶ 139.

~~92~~ 114. Following this, "Honig, Ladd, Stetson and O'Rourke took advantage of the promotion's boost to [MGT's] stock price and trading volume and sold over 430,000 shares into this inflated market for proceeds of approximately $198,800." *Id.* ¶ 140.

~~93~~ 115. The Honig group's third scheme at MGT occurred in 2016 and involved O'Rourke, "[a]t Honig's direction," "t[aking] the lead on arranging a deal between [MGT] and [a] Cybersecurity Innovator." *Id.* ¶ 142.

~~94~~ 116. As part of this, "[o]n May 9, 2016, at 8:30 a.m., [MGT] issued a press release announcing its merger with CI Company." *Id.* ¶ 144.  In connection with this, "[t]he press release misleadingly described the Cybersecurity Innovator's prior financial success by falsely claiming that the Cybersecurity Innovator had 'sold his antivirus company to Intel for $7.6 billion,' suggesting that [MGT] might achieve similar success.  Yet . . . the sale of the Cybersecurity Innovator's namesake company to Intel at that price had occurred over a decade after the Cybersecurity Innovator's departure from that company." *Id.*

~~95~~ 117. Honig then began trading in MGT stock "later that morning . . . to create the misleading appearance of an active market."  *Id.* ¶ 145.   A Honig affiliate at MGT "paid StockBeast.com for [an] article to ensure a wide distribution of the news of the impending merger with the CI Company." *Id.* ¶ 146.  This had the intended effect, with MGT's share price increasing and its market capitalization increasing "from just over $8 million on May 6, 2016 to over $95 million on May 17, 2016." *Id.* ¶ 147.   Honig, O'Rourke, Stetson, and Brauser, along with an affiliate, "pursuant to their tacit or explicit agreement to acquire, hold, vote, and/or disperse of their shares in concert, sold over 9.2 million [MGT] shares" and "grossed $9.4 millions from the May 2016 sales into the inflated market." *Id.* ¶ 148.

783086.1

118.    In private emails, Honig freely accepted credit for his role in MGT's strategic transactions.  On May 12, 2016, for example, Honig received an email from an investment firm congratulating him on a recent transaction involving MGT and cybersecurity businessman John McAfee:  "You're involved [sic] with [MGT]? Impressive!"  Honig responded that he was the "[l]argest shareholder, funder and [had the] relationship with [Mr. McAfee]." 2d Am. Cmpl. ¶ 157. In early August 2016, Honig celebrated his undisclosed role at MGT in a chat conversation with Stetson: "its great in [MGT] because *we are behind the scenes*." *Id.* (emphasis added).

119.    On February 24, 2020, the court in the *Honig* Action, reviewed the SEC's allegations regarding the Honig Group's activities with respect to MGT, and held that the SEC had "amply" alleged "the agreement that is necessary for a group to come into existence, as defined in the SEC rules."[18]  Specifically, the court found:

> The Amended Complaint describes a deal that came together through negotiations between Stetson and [MGT CEO] Ladd that resulted in at least four investors each owning 4.9% of the company.  Stetson pursued that deal at Honig's direction.  The deal eventually included each member of the Honig Group, including Honig and Stetson, resulting in the Honig Group owning more than 16% of the company in January 2016.  These facts alone make it plausible that at least Honig and Stetson comprised a group that triggered the need to file a Schedule 13G or 13D as a group.
>
> This finding is buttressed by the bevy of circumstantial evidence surrounding the Honig Group's manipulation of MTG and its stock, including Honig and O'Rourke's collaboration in orchestrating the McAfee deal in March 2016, the alleged coordination between Honig and Brauser to match trades and create the appearance of an active market in the early morning of the day the deal was announced, and the simultaneous negotiation between [MGT CEO] Ladd and each member of the Honig Group to allow the group to exercise their warrants immediately after the successful stock bump from the McAfee announcement. Placed in context with all of the pre-2015 conduct alleged as background, it is more than plausible that the four men [i.e., Honig, O'Rourke, Stetson, and Brauser] had agreed to work in concert on their schemes.  Ladd does not dispute whether the conduct alleged against the members of the Honig Group would otherwise be a

---

[18] *SEC v. Honig*, No. 1:18-cv-08175-ER (S.D.N.Y.) (Opinion & Order) (ECF No. 211, at 23).

44

violation of the securities laws, and so, accordingly, the SEC has properly alleged the first element of aiding and abetting liability against him.[19]

### c.3.   MabVax Therapeutics Holdings, Inc.- (a/k/a "Company C")

96.120. With respect to MabVax, the SEC alleged that "[i]n early 2014, Honig identified a publicly traded shell company that was unencumbered by debt, and sought an appropriate private company for purposes of a reverse merger and pump and dump scheme." *Id*Am. Cmpl. ¶ 159. Honig was able to do so because that company's CEO "was looking for funding for its research and development efforts in cancer therapies and diagnostic products." *Id.* ¶ 160.

97.121. Once Honig had taken control of MabVax through two entities (without disclosing his identity to MabVax), "[i]n approximately April 2014" Honig "first called up [MabVax's] CEO, [and] announced in words or substance: 'I'm the owner of your company. You better do what I tell you to do.'" *Id.* ¶ 162.

122.   In March and April 2015, Honig orchestrated two private placement financings for MabVax that would tighten Honig's, O'Rourke's, Stetson's, and Brauser's and control of the company: two Series D and Series E offerings. Honig described the deal to Stetson, Brauser, and their co-investor in a March 5, 2015 email, characterizing it as a "real good opportunity" that would allow them to "make $35 million conservatively in 4 months and our money out [in] 4 weeks. . . . *I will trade out of it for us.*" 2d Am. Cmpl. ¶ 194 (emphasis added). As MabVax's CFO understood, Honig structured both financings to avoid disclosing his, O'Rourke's, Stetson's, and Brauser's holdings on Schedule 13D or 13G. *Id.* ¶ 196.

123.   Honig's control of this financing group was clear to MabVax's management; indeed, when deciding whether a potential investor could take part in the March 2015 Series D

---

[19] *Id.*

financing round, MabVax's CEO explicitly deferred to Honig on who could participate in the deal, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might want to allow to invest along with the current group.  Viewed this as your choice not mine.  That is why I asked him to call you."  *Id.* ¶ 197.

124.    Honig's control of the financing group was clear to MabVax's management; indeed, when deciding whether a potential investor could take part in the March 2015 Series D financing round, MabVax's CEO explicitly deferred to Honig, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might want to allow to invest along with the current group. Viewed this as your choice not mine. That is why I asked him to call you."

125.    That Honig selected the investors who would be allowed to participate in MabVax's financings was demonstrated by an email to Stetson and Brauser on March 13, 2015, in which Honig laid out a more detailed list of investors as well as the proposed investment amount and the method of investment for both the Series D and Series E financings: "Southern biotech [a Neveada corporation that Stetson incorporated at Honig's direction and for which Honig was the sole officer and president, but which was co-owned by Honig, Brauser, and "Investor 1," *id.* ¶ 48] will invest 3 million to purchase [Entity H's] notes – 1 million each," and "[Investor 1] is going to lead pipe [private investment in public equity] for 1 million at .75 cents." *Id.* ¶ 205.

126.    Similarly, Honig himself demonstrated his control over the selection of investors when on April 1, 2025, Honig asked Brauser to "do [him] a favor" and forego his participation in the Series E financing because, as Honig explained, "I would like to let some of our friends do it . . . [I]t would be best if we let [Investor 1 and Investor 1 Company and an Investor 1 Company executive ("Investor 1 Co. Officer")] take their full allocation."  *Id.* ¶ 203.

783086.1

98.127. As part of the scheme at MabVax, the SEC alleges that "[o]n April 3, 2015, O'Rourke, acting at Honig's direction, circulated a press release (with input from [MabVax's] CEO, Honig and Brauser) announcing the $12 million private placement in which Investor 1 and his entities had participated, drawing on Investor 1's reputation among retail investors as a successful biopharma investor." *Id.* ¶ 185.  "Honig, with the knowledge of Brauser and Stetson, then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym 'Wall Street Advisors' on the Seeking Alpha website on April 8, 2015 at 11:13 a.m. The article, titled 'Opko Spots Another Overlooked Opportunity in MabVax Therapeutics,' highlighted Investor 1 Company's and Opko's investment in MabVax, and was designed to inspire Investor 1's retail investor devotees to follow his lead and buy MabVax stock.  Despite his involvement in facilitating the MabVax financing and his extensive business relationships with Honig, Brauser, Investor 1, and Stetson, in his article, O'Rourke knowingly and falsely claimed that '[t]he author has no business relationship with [MabVax].'  He also knowingly and falsely claimed that he was 'not receiving compensation for [writing the article].'" *Id.* ¶ 186.

99.128. Accordingly, "[a]nticipating the release of O'Rourke's Seeking Alpha article, ATG and O'Rourke engaged in early trading of [MabVax] shares on April 8, 2015 with the intention of creating a false appearance of market interest in the stock.  That trading included at least one matched trade, with a Honig associate submitting the buy order and ATG submitting the sell order for the same price at 9:38 a.m.  The share price of [MabVax] opened that day at $3.14 and reached $3.73 in the minutes before the promotional article was released." *Id.* ¶ 187.

100.129.  The SEC alleged that "[t]he promotional campaign was successful." *Id.* ¶ 188. In particular:

> The trading volume of [MabVax] shares rose almost 7500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, following the announcement of

47

the Series E private placement involving Investor 1.  The trading volume further increased to 858,709 on April 9, 2015, the day after O'Rourke's article was published. [MabVax's] share price went from a closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015, increasing the company's market capitalization by $23 million. Honig and his affiliates, listed below, acting pursuant to their agreement to acquire, hold, vote and/or dispose of their [MabVax] shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of over $5.5 million.

*Id.*

101.130.  Then, "[i]n June 2015, when the market for [MabVax] shares had cooled from over $4 per share to closing prices hovering just above $2 per share, O'Rourke recruited Ford to publish another [MabVax] tout on Ford's blog." *Id.* ¶ 189.  Ford obliged, and on July 1, 2015, "published an article titled 'MabVax: Near-Term Catalysts Could Push Shares from $2 to over $5.'  The article contained materially false statements (as Honig, Brauser, Stetson and O'Rourke knew, or were reckless in not knowing) including that a licensing deal was imminent, when it was not, and that there were near-term therapy development events that could take the share price to $5, when in fact clinical trials were only in early stages.  As before, although Honig compensated Ford for writing the blog post, Ford did not disclose that he had been paid." *Id.*

102.131.  Once again, the SEC alleged that Honig's scheme was successful:

Ford's article had the desired impact on the market: [MabVax] trading volume increased from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015. Likewise, [MabVax's] share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015.  Pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig and his affiliates sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million.

*Id.* ¶ 190.

**B.      The Honig Group Co-Invested in Other Public Microcap Companies**

**1.      The PolarityTE (f/k/a Majesco Entertainment)**

132.    PolarityTE is a biotechnology company based in Salt Lake City, Utah.  PolarityTE was previously a company known as Majesco Entertainment, a company that designed video

48

games for more than 25 years.  In October 2015, Majesco Entertainment merged with another company called PolarityTE.  At that point, Defendant Stetson, as Polarity's CFO, appointed Honig and Brauser as Co-Chairmen of the Board of Directors and named Kaplan and Karr as Directors.

133.   In August 2016, Honig, O'Rourke, GRQ 401K, Brauser, Grander, Melechdavid, Groussman, Paradox (Kesner), ATG, Stetson, and Stetson Capital were "Selling Stockholders" in an S-3 Registration Statement registering shares in PolarityTE for sale to the public.

134.   As of September 2016, Beeghley and Honig had served together for one year as Director and Chairman/CEO, respectively, of PolarityTE.  Specifically, Beeghley was a Director of Majesco from December 18, 2015 until October 18, 2017, and Honig was Chairman and CEO of Majesco from September 30, 2015 until December 1, 2016.  Thus, Beeghley joined PolarityTE's board when Honig was already Chairman and CEO of that board.

135.   On March 18, 2019, PolarityTE received a subpoena from the SEC, and its "shares tumble[d] after it says SEC is looking into possible manipulation," according to a CNBC article. The subpoena "asked about the company's lead product as well as communications and agreements between Polarity and its former CFO.

136.   In the wake of the SEC's charges against Stetson, PolarityTE immediately terminated Stetson, according to a press release by PolarityTE, stating that "the Company, management, and Board of Directors do not tolerate the behavior outlined in the complaint."[20]

**2.   YesDTC Holdings, Inc.**

103.137.  The allegations against Defendant Honig in the Honig *Action*, as well as the allegations in this case, are not one-off events.  For example, in 2014, Joseph Noel ("Noel")

---

[20] *See* PolarityTE, Inc. Issues Statement Regarding Mr. John Stetson and his Termination from the Company,  https://www.prnewswire.com/news-releases/polarityte-inc-issues-statement-regarding-mr-john-stetson-and-his-termination-from-the-company-300709106.html

783086.1

pleaded guilty to securities fraud in connection with a company named YesDTC Holdings, Inc.

("YesDTC").  As part of Noel's plea agreement, Noel stated that Defendant Honig, who arranged

a reverse merger of the company:

> wanted to use promotions to drive up the price of YesDTC shares and then sell his shares.  Honig introduced me to David Zazoff who Honig said would promote YesDTC stock.  Honig said Zazoff was a "magic maker," who could make the price of YesDTC stock rise through his services.  Honig made it clear that I should not ask questions about how Zazoff achieved his success.

<p style="text-align:center">*  *  *</p>

> **At Honig's direction I caused Sonoma Winston to send $45,000 of the proceeds to Zazoff as partial compensation for his promotion of YesDTC stock.**

> In January 2011, Zazoff conducted a second promotion of YesDTC stock.  **At Honig's direction, I caused YesDTC to compensate Zazoff as partial compensation for his promotion of YesDTC stock.**

<p style="text-align:center">*  *  *</p>

> In July 2011, Zazoff conducted a third promotion of YesDTC stock. . . .  **Honig instructed me to cause YesDTC to send compensation to Zazoff for the July 2011 promotion of its stock, but I refused.**[21]

~~104.~~138.  In December 2011, Defendant Honig filed a federal lawsuit again Noel to

recover "$150,000" that "Plaintiff Honig lent Defendant Noel" on or about August 24, 2011.[22]

### 3.   Marathon Patent Group, Inc.

~~105.~~139.  This case is also not the only time that Defendants and their allies – including

Honig, O'Rourke, Groussman, Stetson, Brauser, and others – have jointly engaged in pump-and-

dump style scheme to transform a public company into a ***cryptocurrency*** company.  Defendants

engaged in a strikingly similar "blockchain" scheme as Riot with another NASDAQ-listed

---

[21] *United States v. Noel*, No. CR 14-264 VC, ECF No. 11, at 3-5 (N.D. Cal. Nov. 19, 2014) (emphases added).

[22] *See Honig v. Noel*, No. 3:11-cv-06706-JSW, ECF No. 1 (N.D. Cal~~.) (ECF No.1).~~.).

**Formatted:** Space After:  6 pt

company called Marathon Patent Group, Inc.  Honig and his associates were among Marathon's

biggest investors, but their familiar schemes did not benefit Marathon or its public shareholders.

106.140.   Originally named "Verve Ventures, Inc.," the company changed its name in

December 2011 to "American Strategic Minerals Corporation."  During this time period, Honig,

then a Director of Pershing Gold, invested in the company.  In January 2012, the company entered

into an agreement to "to acquire certain uranium exploration rights and properties held by

Pershing."  By 2013, the company had changed its name to "Marathon Patent" and stated that it

was "an intellectual property ('IP') company that serves patent owners ranging from individual

inventors to Fortune 500 corporations."  Groussman and Stetson were Marathon's former CEO

and COO, respectively, until resigning in 2012.

107.141.   On November 2, 2017 (the exact same day that Riot announced its purchase of

1,200 bitcoin mining machines from Kairos), Marathon announced that it had agreed to acquire

Global Bit Ventures Inc. ("GBI"), a company incorporated in Nevada in August 2017.  A Uniform

Commercial Code (UCC) filing shows that Defendant Stetson, through his entity Contrarian

Investments LLC, had a security interest GBI.  GBI's CEO, Jesse Sutton (the former CEO of

Majesco Entertainment, which later morphed into PolarityTE) was later nominated by Honig to

the Board of Directors of Riot.

108.142.   On November 27, 2017, Marathon's auditor resigned.  A November 29, 2017

prospectus offering stock to the public showed that O'Rourke, through an entity he solely

controlled, Revere Investments LP, held 41% of Marathon's common stock.

109.143.   In February 2018, Marathon announced that it had purchased "1,400 of

Bitmain's Antminer S9 miners" that were "purchased by [GBV]."

110.144.   In February 2018, Marathon announced that it "Expands Cryptocurrency Mining Operations by Opening of Second Facility in Canada" where it "anticipates putting its recently purchased 1,400 Bitmain's Antminer S9 miners ("Antminer S9s") into production."

111.145.   On April 3, 2018, a merger agreement between Marathon and Global Bit Acquisition Corp. stated that a limited liability company managed by O'Rourke and registered at his home address, Azzura Holdings LLC, as holding 147,645 shares of "Series C Preferred" stock and 14,764,421 shares of "Common Underlying Series C Preferred" stock in Global Bit Ventures, Inc.  The same agreement listed Northurst holding 147,645 shares of "Series C Preferred" stock and 14,764,421 shares of "Common Underlying Series C Preferred" stock – the exact same amount as O'Rourke's entity.  The same agreement stated that Brauser, through Grander, stood to receive 131,241 shares of Marathon common stock.  "Mike Ho" stood to receive 131,241 shares of Global Bit Ventures, Inc. – the exact same amount as Brauser.  Molinksy stood to receive 78,745 shares. O'Braitis stood to receive 65,621 shares.  Erick Richardson (a 3.61% shareholder of Riot on September 25, 2018) stood to receive 65,621 shares – the exact same amount as O'Braitis.

112.146.   In March 2018, Marathon announced that its "Facility in Quebec Has Commenced Bitcoin Mining Operations."

113.147.   In June 2018, Marathon walked away from its acquisition of GBI.

114.148.   In July 2018, Marathon announced that it had "[r]eceive[d] Deficiency Letter from NASDAQ Related to Two Director Resignations . . . ."  Marathon's stock currently trades at less than $3.00 per share.

115.149.   According to an article in *Seeking Alpha* by Hindenburg Investment Research, "Marathon has multiple concerning parallels to Riot Blockchain, which recently engineered a similarly dubious pivot to the "'blockchain."'"  The article noted that Marathon's "blockchain

focus has come about through a series of rapid shifts that are eerily similar to the questionable moves" undertaken by Riot.  The article noted that "[b]oth Riot and Marathon seemingly paid above-market rates to acquire entities containing cryptomining equipment that could have been purchased directly."

4.    **WPCS International Incorporated and BXT Trader**

~~116.~~150.   Before Marathon, Honig, O'Rourke, and other associates also jointly engaged in pump-and-dump style scheme to transform another public company, WPCS International Incorporation, into a cryptocurrency operation.  Before that, WPCS was a global engineering, communications, and infrastructure "with over 500 employees in 10 operations centers on three continents."  In 2012, Defendant Honig, through GRQ 401K, invested in WPCS.  On December 17, 2013, WPCS purchased BTX Trader, a cryptocurrency company, from Defendant O'Rourke. In January 2018, WPCS's changed its name to "DropCar, Inc." and is now a cloud-services-for-cars company whose stock trades on NASDAQ under the ticker "DCAR" for approximately $2.01 per share.

~~117.~~151.   In its February 16, 2016 article, CNBC described Honig's and O'Rourke's involvement with WPCS and confirmed that both Honig and O'Rourke "acknowledge[d] the investment":

> Riot is not O'Rourke and Honig's first cryptocurrency investment.

> In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

> WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

> At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. "I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."

Honig acknowledges the investment.

~~118.~~152.   Honig's lawyer, Kesner, was a Director of WPCS in 2013 and 2014.

**~~5.1.    PolarityTE (f/k/a Majesco Entertainment)~~**

~~119.    PolarityTE is a biotechnology company based in Salt Lake City, Utah. PolarityTE was previously a company known as Majesco Entertainment, a company that designed video games for more than 25 years. Then, in October 2015, Majesco Entertainment merged with another company called PolarityTE. At that point, Defendant Stetson, Polarity's then CFO, appointed Defendants Honig and Brauser as Co-Chairmen of the Board of Directors, and named Karr and Kaplan as Directors.~~

~~120.~~1.   ~~On March 18, 2019, PolarityTE received a subpoena from the SEC, and its "shares tumble[d] after it says SEC is looking into possible manipulation," according to a CNBC article. The subpoena "asked about the company's lead product as well as communications and agreements between Polarity and its former CFO.~~

~~121.~~1.   ~~In the wake of the SEC's charges against Stetson, PolarityTE immediately terminated Stetson, according to a press release by PolarityTE, stating that "the Company, management, and Board of Directors do not tolerate the behavior outlined in the complaint."²³~~

---

~~²³ See PolarityTE, Inc. Issues Statement Regarding Mr. John Stetson and his Termination from the Company, https://www.prnewswire.com/news-releases/polarityte-inc-issues-statement-regarding-mr-john-stetson-and-his-termination-from-the-company-300709106.html~~

#### 6.5.    **Pershing Gold Corp.**

122.153.   Pershing Gold is an emerging gold producer whose primary asset is the Relief Canyon Mine in Pershing County, Nevada.  The company is listed on the NASDAQ Global Market and the Toronto Stock Exchange under the symbol PGLC.  Defendant Honig was Chairman of Pershing Gold until February 9, 2012, when he resigned but remained a Director.  As of September 19, 2018, Defendant Honig owned approximately 38% of the common stock of Pershing Gold, according to a Schedule 13S.  Karr, an investor in Riot discussed below, was also a Director of Pershing Gold and owned 33% of its common stock as of August 31, 2018.

123.154.   As of August 31, 2018, Defendants O'Rourke, Stetson, and Groussman – along with Jonathan Honig, Molinsky, and Riot shareholder Erick Richardson – were all shareholders of Pershing Gold seeking to sell their shares in an offering pursuant to a Prospectus.

124.155.   On December 13, 2017, Hindenburg Research published an article stating that "the company's key asset, Relief Canyon Mine, was purchased from a hedge fund whose executives, including Mark Nordlicht, were federal indicted for operating 'like a Ponzi Scheme,' according to prosecutors."

125.156.   On September 7, 2018, *Seeking Alpha* reported that "Thinly"[t]hinly traded nano cap Pershing Gold (PGLC -14.7%) slumps on almost an 8x surge in volume in reaction to the SEC's stock promotion charges against majority investors Phillip Frost and Barry Honig."

126.157.   According to a September 10, 2018 press release by Pershing Gold, released in response to the SEC's announcement "that it has commenced a legal action against Honig and various other parties who are alleged to have violated federal securities laws," Defendant Honig was a Director of Pershing Gold until he "resigned from the Company's Board of Directors in August 2018."

783086.1

7.6.   **MUNDOmedia Ltd.**

127.158.  MUNDOmedia is a marketing company based in Toronto, Ontario, Canada founded by its CEO, Jason Theofilos.  On September 2, 2016, MUNDOmedia announced that a Theofilos had "led a buyout of 100% of the outstanding equity of [MUNDOmedia]" and that "Barry Honig is among the notable private equity investors that participated."  On July 28, 2017, Private Capital Journal reported that MUNDOmedia had "withdrawn its proposed initial public offering" that "would have consisted of $30 million treasury offering" involving "selling shareholders" that included "Mansfield International Trade Ltd. (David Baazov/Ahaka Capital), Four Kids Investment Fund LLC, Stetson Capital Management LLC, ATG Capital LLC, Melechdavid Inc., Barry Honig, John O'Rourke and Jonathan Honig."

159.    The Honig Group's co-investments in the companies discussed above are depicted in the following chart:

**The Honig Group's Prior Target Companies[24]**

|  | Biozone | MGT | MabVax | PolarityTE | Pershing Gold | Mundo | Marathon |
|---|---|---|---|---|---|---|---|
| **Honig** | X | X | X | X | X | X | X |
| **O'Rourke** | X | X | X | X | X | X | X |
| **Groussman** | X | X | X | X | X | X | X |
| **Stetson** | X | X | X | X | X | X | X |
| **DeFrancesco** |  |  |  | X |  |  |  |
| **Beeghley** |  |  |  | X |  |  |  |

160.    The Honig Group's interconnections through these prior target companies are depicted in the diagram attached hereto as Exhibit M.

---

[24] The absence of a checked box is not intended to indicate the lack of a relationship.

## VI.     THE SELLING STOCKHOLDERS' CONNECTIONS TO THE HONIG GROUP

161.    During the Class Period, Riot filed a series of Securities Registration Statements on Forms S-3 and S-3/A that registered shares of Riot common stock for sale by certain "Selling Stockholders" to the investing public.   These Selling Stockholders included the following individuals and entities:  Afios, ATG, Brauser, Karr, Kesner, Grander, GRQ 401K, Alan Honig, Jonathan Honig, JAD, James, Marcandy, Melechdavid, MGT, Molinsky, Namaste, Northurst, Paradox, O'Braitis, Stetson Capital, Theofilos, and Titan, and other affiliated shareholders.

162.    As illustrated in the chart below, each of these Selling Stockholders that registered shares of Riot stock for sale to the public invested in one or more of public companies affiliated with Honig, including:  Biozone, MGT, MabVax, Marathon WPCS, PolarityTE, Pershing Gold, and/or MUNDOmedia Ltd.

### The Selling Stockholders' Prior Target Companies[25]

| | Biozone | MGT | MabVax | PolarityTE | Pershing Gold | Mundo | Marathon |
|---|---|---|---|---|---|---|---|
| Aifos | | | X | X | X | | |
| ATG | | X | X | X | X | | |
| Brauser | | | X | X | X | | X |
| Grander | X | X | X | X | X | | X |
| GRQ 401K | X | X | X | X | X | | X |
| Honig, Alan | | | X | | X | | X |
| Honig, Jonathan | | | X | | X | X | |
| JAD Capital Inc. | | | | | | X | |
| James | | | | | X | | |
| Karr | | | X | X | X | | X |
| Kesner | X | X | X | X | X | | X |
| Marcandy | | | | | | | |
| Melechdavid | | X | X | X | X | X | X |
| Molinsky | | | | X | X | | X |
| Namaste | | | | X | | | |
| Northurst | | | | | | | X |
| O'Braitis | | | | X | | | X |
| Paradox | | | X | X | X | | X |
| Richardson | | | | | X | | X |

_____

[25] The absence of a checked box is not intended to indicate the lack of a relationship.

57

| Stetson Capital | | X | | X | X | X | X |
|---|---|---|---|---|---|---|---|
| Stockwire | | | | | X | | |

163.   The Honig Group's interconnections through these prior target companies are depicted in the diagram attached hereto as Exhibit M.

**VII.   FACTUAL BACKGROUND ON THE FRAUDULENT SCHEME**

**~~B.~~A.   In 2016, Defendants Target Venaxis, Riot's Predecessor, Using Their Typical Pump-and-Dump Playbook**

~~128.~~164.  As noted above, Riot was once called "Venaxis."  Venaxis was a medical products company whose executives, Board, and employees sought to develop a blood test for determining which patients suffering from abdominal pain were less likely to be suffering from acute appendicitis than from other ~~ailment~~ailments.

~~129.~~165.   In early 2015, the FDA denied approval for Venaxis's developmental blood test, and Venaxis, without a marketable product, found itself facing delisting from the NASDAQ because its share price had fallen below the exchange's minimum.

~~130.~~166.   Venaxis still had plenty of cash, however, having raised $20 million in a stock offering the previous year.  Therefore, in March 2016, Venaxis executed a 1-for-8 reverse stock split.  That reduced its outstanding shares to less than 4 million and lifted its stock price well above $1 a share — enough for Venaxis to keep its listing on the NASDAQ.  Shortly thereafter, Honig and his associates began buying ~~stock in~~ Venaxis stock.

167.   On September 12, 2016, Venaxis acquired BiOptix Diagnostics, Inc., and changed its name to "Bioptix."

~~131.1.  On September 12, 2016, Venaxis acquired BiOptix Diagnostics, Inc., and changed its name to "Bioptix."~~

168.   Displeased with this acquisition, on September 13, 2016, Defendants Honig and DeFrancesco both wrote letters to then-CEO Lundy, touting their combined 16.2% stake in the

58

company.  Honig also spoke several times on the telephone with members of Venaxis's then-existing Board of Directors.  During these telephone conversations, Honig implied that he had control of 40% of the Venaxis's shares through his stock ownership and the stock ownership of Mr. Honig's friends and relatives, according to a former Venaxis Board member present during the conversations.

132.1.  Company.  Honig also spoke several times on the telephone with members of Venaxis's then-existing Board of Directors.  During these telephone conversations, Mr. Honig implied that he had control of 40% of the Venaxis's shares through his stock ownership and the stock ownership of Mr. Honig's friends and relatives, according to a former Venaxis Board member present during the conversations.

133.169.  Also on September 13, 2016, That same day, Honig attemptattempted to nominate his own slate of new directors of Bioptix, including Defendants O'Rourke, Beeghley, and Stetson, and several other of Honig's associates.

134.170.  In his September 13, 2016 letter to then-CEO Lundy, Honig wrote that Venaxis was "wast[ing] precious resources with no clear direction or strategy . . . while board fees and management salaries continue to be paid".":

> Dear Mr. Lundy,
>
> **As Venaxis' largest shareholder, it has become increasingly clear to me that changes must be made to protect shareholders' interests and attempt to create value from the company's assets.**  Venaxis' management and board of directors have failed in this regard.  The current management and board own a nominal amount of equity in aggregate, and as a result they are not aligned with the company's shareholders.
>
> The first change that needs to be made is to immediately reconstitute Venaxis' board . . . .
>
> **Venaxis' board has continued allowing the company to waste precious resources with no clear direction or strategy . . . .**

783086.1

**Meanwhile, Venaxis' cash continues to dwindle while board fees and management salaries continue to be paid . . . .**

Shareholders cannot continue to wait around with question marks and a board that has proven to be distracted and ineffective.

In the essence of preserving some of Venaxis' cash for its rightful owners, the shareholders, we are also asking the shareholders to authorize a special dividend of $7,500,000 as a return of capital to the shareholders . . . .

The cash dividend returns immediate value to shareholders and diverts a portion of ~~Venaxis '~~Venaxis' assets away from board discretion, who only have managed to deplete the cash available for shareholders through failed strategies, while entrenching their positions with the Company instead of maximizing shareholder value.

My preference is working together with you on these courses of action to effectuate the proposals immediately with your support rather than going through the steps of voting to remove your board that we have today initiated through a special meeting. **I believe working together we can most effectively <u>protect and grow shareholders' interests</u>.** I hope that you agree.

Sincerely yours,

/s/ Barry Honig

171.    ~~In~~The following day, on September 14, 2016, DeFrancesco sent a similar letter to Venaxis' CEO in support of Honig and his demand for a special meeting of the shareholders. Ex. N.  DeFrancesco followed up this demand with another letter, dated September 20, 2016 in which she "repeated [her] demand . . . for a special meeting of the shareholders" and "join[ed] in Mr. Honig's prior nomination."  Ex. O.  DeFrancesco further stated:

The purposes of the meeting should be, as set forth in Mr. Honig's meeting demand: (1) to vote on the removal of five (5) directors, aside from you, currently serving on the Board of Directors, (2) to vote on a $7,500,000 shareholder dividend, and (3) to set the size of the board at no more than six (6) directors and for the election of five (5) new directors as follows:  John Stetson, John O'Rourke, Jesse Sutton,[26] Michael Beeghley, and David Danziger.  I join in Mr. Honig's prior nomination of these individuals to serve as members of the board of directors, a copy of which is attached as Exhibit C hereto and incorporated by reference.

---

[26] Jesse Sutton is the former CEO of Majesco.

60

172.   DeFrancesco concluded by stating:  "Should you have any questions regarding the foregoing, please do not hesitate to ***contact our counsel Harvey Kesner, Esq. . . . .*"  Thus, DeFrancesco's letters made clear that she was working with Honig – and indeed, sharing the same counsel – in connection with her share ownership in Venaxis/Bioptix.

~~135.~~173.  Following these letters, in late 2016, ~~Defendant~~ Honig and DeFrancesco waged a proxy fight for control of Bioptix, demanding the removal of five of Bioptix's six directors and the payment of a $7.5 million special dividend.  ~~Defendant Honig offered five names to fill the board vacancies, including Defendants O'Rourke and Stetson.~~

~~136.~~174.  ~~To~~As part of his proposal to "protect and grow shareholders' interests," Honig offered an alternative.  In early discussions with Venaxis's Board of Directors, Honig raised the possibility of turning Venaxis into a marijuana-related company, according to an individual present at the time.

~~137.~~175.  ~~Defendant~~Honig then filed a lawsuit in state court in Colorado, seeking to force a special meeting of shareholders that would include a vote on the proposed changes.  Bioptix sought to placate Defendant Honig by appointing one of his allies – Defendant Beeghley – to its board of directors. When Venaxis's then-existing Board of Directors were considering Beeghley as a nominee for election to the Board, Beeghley told them that he did not know Honig~~,~~ – according to an individual present at the time – despite the fact that Beeghley and Honig had recently served together on the board of directors of another public company, PolarityTE.

~~138.~~176.  ~~Defendant~~Honig and DeFrancesco continued acquiring shares and held nearly 23 ~~percent~~% of Bioptix's stock ~~in~~as of January 2017 based on a 13D's they filed with the SEC that same month.  That same month, on January 6, 2017 O'Rourke and Mike Dai joined Bioptix's board of directors.  Shortly thereafter, three of Bioptix's board members resigned, on the basis that

783086.1

~~Defendant~~ Honig was likely to prevail in his legal fight and that mounting a defense would waste corporate recourses. ~~Then~~Two months later, in March 2017, a longtime Bioptix director stepped down, and ~~Defendant Honig's group~~Honig and DeFrancesco found ~~itself~~themselves aligned with ~~with~~ a majority of the seats on the board and defacto control of the company.  Using that control, in April 2017 Lundy was forced out as CEO and Beeghley was named the Company's CEO.

~~139.   Finally, Honig and his associates had obtained control over Riot.   Using that control, Beeghley became CEO of Bioptix and O'Rourke joining the company's Board.~~

~~140.   Once Defendant Honig and his allies took over, Bioptix raised an additional $7 million through two private placements.   Defendant Honig, his business partners, and other associates bought nearly all of the stock, warrants, and convertible notes sold in those placements, which were priced at a 30 percent discount to the market.   The financing transactions were completed on March 16, 2017 (the "March 2017 Placements").~~

**B.** ~~**Defendant Honig bought at least $1.75 million of the notes.   The shares underlying those notes and warrants, plus his original open-market stock purchases, gave Defendant Honig the equivalent of a 20 percent stake in Bioptix on a fully-diluted basis.**~~**A Few Months After Beeghley Assumed the Role as CEO, The Company Announced A Special Dividend and Business Transformation to "Riot Blockchain" – At the Same Time, Honig Secretly Acquires and Sells Hundreds of Thousands of Shares of Riot**

~~141.~~   Five months after Beeghley took over as CEO of Bioptix, the Company announced that it was changing its focus away from bioscience and into the burgeoning cryptocurrency business.  As part of this conversion, in a press release on October 4, 2017, Bioptix announced that the Company's name would change to "Riot Blockchain."  The press release stated, in relevant part,

~~142.   Thereafter, in April 2017, Bioptix's CEO resigned and was replaced by Defendant Beeghley.   That same month, Bioptix filed a registration statement covering the resale of 5.6 million shares.   It covered all 900,000 shares sold in the previous month's placement, plus 1.9 million shares underlying the convertible notes and 2.8 million shares underlying the warrants.~~

**Formatted:** Indent: Left:  0.75", Line spacing:  single, No bullets or numbering

62

The filing listed Bioptix's two top shareholders as Defendant Honig and Titan, a fund managed by Defendant Honig's brother, Jonathan Honig.

143.    According to the filing, Defendant Honig offered to sell just over 1.4 million shares, all of them underlying notes or warrants from the March 2017 Placements.  Titan offered to sell 1.6 million shares, also linked to the notes and warrants.  The registration statement also reported that Defendant Honig would hold 504,000 shares after those sales.  That number equaled his original open-market purchases during the proxy fight.

144.    The registration statement listed Groussman, an ally of Defendant Honig who the SEC would later charge for engaging in pump-and-dump schemes, as controlling 500,000 shares – half in common stock and half in warrants.  Groussman's share holdings included 340,000 shares and warrants owned by his company, Melechdavid, Inc., another of the defendants in the *Honig* Action.  Groussman's other 160,000 shares and warrants were held by two accounts benefitting Groussman's children.  Groussman offered to sell all 500,000 shares.

145.    The filing also listed one of Stetson's companies, Stetson Capital Management LLC, as holding 413,517 Bioptix shares.  It offered to sell 406,017 shares, nearly all of them underlying notes and warrants from the March 2017 placement.

146.    Based on the table in the registration statement, Defendant Honig, Titan, Groussman, and Stetson controlled slightly over 4.4 million shares of common stock, which amounted to more than 40 percent of the company, on a fully diluted basis.  In sum, Defendant Honig and the others were offering 4 million of their shares for resale.

147.    The other selling shareholders included Aifos, JAD, and James.

148.    In April 2017, Defendant Honig belatedly filed a belated Form 13D in which he reported that he had purchased $2.25 million of the $4.75 million in convertible notes sold in

63

March 2017. Defendant Honig amended that filing the next day, indicating he purchased only $1.75 million.

149. Registration statements also show that $500,000 in notes were acquired by Karr, Theofilos, James, and three other of Defendant Honig's allies, who also were listed as selling shareholders.

150. Molinsky, a former stockbroker at D.H. Blair & Co. who was barred from the industry in 2000 after pleading guilty to criminal charges related to market manipulation and fraudulent sales practices, was one such associate listed on the registration statement. Molinsky has been an investor in numerous Honig-backed companies, including PolarityTE, Pershing Gold, and Vapor Corp.

151. Policy No. 2013-17 purchased $500,000 in convertible notes, owning roughly 40,000 shares underlying the notes, and 40,000 shares underlying warrants. It offered all 80,000 for resale. Bhansali, the co-founder of EST and former director of PolarityTE, had investment control over the securities held in the insurance policy's name. EST is the transfer agent for PolarityTE. EST acted as transfer agent for Riot when the Bioptix paid a special dividend in 2017.

152. Financial statements that EST filed with the SEC show that it has received financing from entities connected to Kesner, who was securities counsel for Riot and PolarityTE, as well as BioZone and Mabvax, two of the companies at the center of the *Honig* Action. Kesner's former law firm, Sichenzia Ross Ference LLC, also represented the third company believed to be implicated in the pump-and-dump scheme in the *Honig* Action, MGT. Kesner abruptly retired from that firm just before the SEC announced the charges against Defendant Honig's group. Bhansali also was an employee of Kesner's previous law firm.

64

153.    Shortly before changing its name, Bioptix filed amended versions of its registration statement in July, August, and September of 2017.  The number of shares listed for Defendant Honig remained unchanged, as did those for most other selling shareholders.  Between the filing of the first registration statement in May 2017 and the filing of the fourth one in September 2017, Bioptix's average daily trading volume was well below 50,000 shares, so the ability to sell large amounts of shares was limited.

**C.    Defendants Cause Bioptix to Register and Sell Shares of Bioptix (and Later Riot) Through False and Misleading Securities Registration Statements (Form S-3)**

154.    Beginning in April 2017, Defendants caused Riot to file multiple false and misleading securities registration statements on Form S-3 in order to sell millions of shares of Riot common stock to unsuspecting retail investors.  For example, on September 25, 2017, Bioptix filed an S-3 Registration Statement (the "September 25 S-3") with the SEC disclosing that certain "selling stockholders" intend to register and potentially sell or dispose of some or all of their common stock in Bioptix.  The September 25 S-3 provided certain indemnity rights to the selling stockholders under the federal securities laws and disclosed to shareholders that "none" of the selling stockholders had a "material relationship" with "us," (i.e., the Company or its board of directors) aside from their investment in Bioptix.  The list of selling stockholders, along with their holdings as reported in the September 25 S-3 is as follows:

| Name of Selling Stockholder | Shares of Common Stock Offered in this Offering |
|---|---|
| Acquisition Group Limited | 200,000 (1) |
| Northurst Inc. | 800,000 (2) |
| Erick Richardson | 200,000 (3) |
| Melechdavid Inc. | 340,000 (4) |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) |

65

| | |
|---|---|
| Barry Honig | 402,050 (8) |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 1,005,124 (11) |
| Titan Multi-Strategy Fund I, Ltd. | 1,688,198 (13) |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,205 (14) |
| Robert R. O'Braitis | 80,410 (15) |
| Stockwire Research Group, Inc. | 40,205 (16) |
| Aifos Capital LLC | 120,615 (17) |
| Stetson Capital Management, LLC | 402,050 (19) |
| JAD Capital Inc. | 80,410 (20) |
| Richard Molinsky | 40,205 (22) |
| Alan Honig | 20,000 (23) |

155.   Significantly, nearly every shareholder listed above in fact *had* a material relationship with Defendant O'Rourke (then a Bioptix board member), Defendant Beeghley (then CEO), and/or Bioptix.  By way of example, Defendant Honig, who also controlled the entities GRQ, and through his brother Jonathan Honig, Titan Multi-Strategy Fund I, Ltd., had numerous previous co-investments with O'Rourke.

156.   Additionally, according to the SEC Complaint, Defendants Honig and O'Rourke shared an office (along with other selling stockholders) during the Class Period.  This unusual connection between a company insider and an outside large shareholder was first made public when CNBC visited Honig's office on February 16, 2018 only to find O'Rourke, who promptly closed the door.  Not to mention, Honig admitted that he and O'Rourke shared an office.  Not surprisingly, the fact that Honig and O'Rourke shared an office was not publicly disclosed until the CNBC story was published.  That same day, Riot's stock dropped by approximately 33.4%.

157.   As for Defendant Honig's ties to the Company, at the time the September 25 Form S-3 was filed Honig was both as an advisor to Bioptix and as an investor in Coinsquare, a company

in which Bioptix had been considering an investment since August 2017.  On October 2, 2017, which was only one week after the September 25 S-3 was filed, several of the selling stockholders, including Honig, signed a shareholder agreement *with Bioptix* that "govern[ed] their relationship as shareholders of [Coinsquare] and to set out the manner in which the Company and its business will be conducted and to make certain provision herein for the continuing harmonious and advantageous operation of the Company."  The following chart lists the selling stockholders who were also shareholders in Coinsquare along with share allotments:

177.

CASTLE ROCK, Colo., Oct. 4, 2017 /PRNewswire/ -- Bioptix Inc. (Nasdaq: BIOP) today announced it is changing its name to Riot Blockchain, Inc., and has reserved and plans to change its Nasdaq ticker symbol to RIOT, in line with a shift in direction of the company. The name and symbol change are subject to Nasdaq approval. Moving forward, Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem with a particular focus on the Bitcoin and Ethereum blockchains.

As part of this focus, the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.

"At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets," said Michael Beeghley, Chief Executive Officer of Riot Blockchain. "With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector."

178.    The day before, on October 3, 2017, presumably in an effort to draw in new public investors into the stock, Riot announced a special dividend valued in the aggregate at $9.5 million, to be paid to all holders of Riot as of October 13, 2017.  In a press release announcing the special dividend, Defendant Beeghley stated, "This special dividend is a positive step to return value to all Bioptix shareholders.  We continue to explore options for delivering additional value to

67

shareholders with our streamlined overhead and cash position." Following this announcement, the Company's stock price *increased by more than 25% in one trading day* from an closing price of $6.44 per share on October 2, 2017, to a closing price of $8.09 per share on October 3, 2017.

179.   Significantly, and unbeknownst to Riot's public shareholders, over the next 11 days leading up to the October 13 record date for the special dividend, Honig began selling hundreds of thousands of shares of the Company – and his first sales in more than two months. For example, on October 4, 2017, Honig sold 47,420 shares at an average of $8.92 per share, collecting approximately $424,000. Over the next two days, October 5 and 6, Honig sold 21,400 for proceeds of approximately $162,000.   Three days later, on October 9 and 10, Honig sold 202,544 shares for approximately $1.78 million. Finally, on October 11 and 12, Honig would sell over 300,000 shares for proceeds of more than $3.3 million. All told, and as set forth in a Schedule 13-D/A filed more than five months later (*see* ¶ 316, *infra*), Honig sold more than 600,000 shares during the ten-day period following the announcement of the special dividend and the Company's transition to cryptocurrency, collecting proceeds of nearly $5.7 million.

**C.   Prior to the Company's Transition to Riot, Defendants O'Rourke and Beeghley Caused the Company to Conceal Honig's Group Status by Issuing False and Misleading Registration Statements**

180.   In the lead up to Riot's transformation from bioscience to cryptocurrency, from April 2017 to Sepetmeber 2017, set forth below, Defendants O'Rourke and Beeghley caused the Company to issue registration statements with the SEC that concealed that the Honig Group was in fact acting as a "group" of shareholders with respect to their shares of Riot.

**D.   Honig Groups Members Honig, DeFrancesco, Groussman and Stetson Fail to File Schedules 13D**

181.   In order for the Honig Group to pull off their pump-and-dump scheme, and to deceive unsuspecting investors into purchasing Riot stock, the Honig Group required de facto

control of Riot.  They were able to accomplish this in two ways.  First, they needed to amass a significant number shares of the Company, giving them voting power to decide who would serve on Riot's board of directors.  Once in control of the board, the Honig Group then needed insiders to take steps to help (i) drive new public interest in the stock (thereby increasing liquidity); and (ii) increase the share price.  This is precise *modus operandi* described by SEC at "Companies A, B and C" as set forth above (*see* § V.A., *infra*) and this is what precisely what occurred at Riot, as explainer herein.

182.    Equally important as control, however, was that the Honig Group's need to operate in secret so that existing public shareholders were not privy to their stock sales or close ties to insiders.  In order to achieve this, during the Class Period and as set forth more fully herein (*see* § X.A., *infra*), Defendants Honig, Groussman, Stetson, and DeFrancesco (acting individually and/or through the investment entities they controlled) knowingly or recklessly made materially false and misleading filings under Section 13(d) – including on Schedules 13G, 13G/A, 13D, and 13D/A – and/or failed to made necessary Section 13(d) filings – *"promptly"* or at all – in order to conceal both their control over Riot's management and policies, as well as their membership in a control group.  In doing so, these Defendants knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder.

**E.    O'Rourke and Beeghley Caused the Company to Conceal Related Party Transactions with Members of the Honig Group**

183.    A related-party transaction is a deal or arrangement between two parties who are joined by a preexisting business relationship or common interest.  By way of example, a contract between a major shareholder of a corporation and that corporation, agreeing that the shareholder's company will renovate the corporation's offices would be a classic example of a related-party transaction.  While transactions like this are permitted, the SEC and Generally Accepted

69

Accounting Principles ("GAAP") require that transactions between a corporation and interested parties (such as company insiders or 5% or greater shareholders) be disclosed in financial statements.  For example, under GAAP Accounting Standards Codification ("ASC") 850, transactions between related parties, such as sales, acqusitions, purchases and transfers of real and personal property, are considered related party transactions even though they may not be given accounting recognition.

184.  Disclosure under ASC 850 includes (1) the nature of the relationship; (2) a description of the transactions including transactions to which no amounts or nominal amounts were ascribed; (3) the amounts due from the related parties as of the date of each balance sheet presented; and (4) such other information deemed necessary to understand the effects of the transaction on financial statements.  *See also*, J. David Spiceland et al., Intermediate Accounting 124 ("When related-party transactions occur companies must disclose the nature of the relationship, provide a description of the transactions, report the dollar amounts of the transactions and any amounts due from or to related parties.") (citing Related Party Disclosures, Fin. Accounting Standards Bd. FAS No. 57,superseded by ASC 850).

185.  The SEC has also adopted an integrated disclosure system for publicly traded companies known as Regulation S-K.  In promulgating Regulation S-K the agency sought to define what information is material in securities transactions and when and how such information should be disclosed to investors.  Among other information, Regulation S-K requires disclosure of "related party transactions," known as "Item 404" which requires an issuer to "[d]escribe any transaction . . . in which the registrant was or is to be a participant, and the amount exceeds $120,000, and in which any 'related person' had or will have a direct or indirect material interest."

70

17 C.F.R. § 229.404(a).  A "related person" includes company insiders and any 5% or greater shareholder in the issuer.

186.   These same related-party disclosure principles are also present in the instructions provided by the SEC for issuers who file reports on Forms 8-K.  These instructions require issuers following a completed transaction, acquisition, or other disposition of a significant transfer of assets, to "identity of the person(s) from whom the assets were acquired or to whom they were sold *and the nature of any material relationship . . . between such person(s) and the registrant* of any of its affiliates, or any director or officer of the registrant, or any associate of any such director or officer."

187.   As set forth below, during the Class Period Defendants O'Rourke and Beeghley caused the Company to conceal numerous related party transactions with Honig and members of the Honig Group, many of whom were greater than 5% shareholders of Riot.  These omissions not only violated the federal securities laws and GAAP, as set forth above, but they also worked to conceal the share ownership of members of the Honig Group because in many of these transactions Honig Group members acquired notes, warrants, or preferred shares that converted to Riot common stock.  Nevertheless, these transactions were not disclosed in the Company's SEC filings as transactions with related parties until months later when Riot filed its Form 10-K after the close of trading on April 17, 2018.  The following day, April 18, 2018, as the market learned of the Honig Group's previously undisclosed activities, the Company's stock declined significantly, closing down approximately *5.8%.*

**1.      The March 2017 Private Placement**

188.   On March 15, 2017, Riot (which at the time was still operating under the name "Bioptix") announced on a Form 8-K filed with the SEC that the Company had entered into a securities purchase agreement pursuant to sell $2,250,000 of principal amount of promissory notes

71

783086.1

and three year warrants to purchase up to 700,000 shares of common stock (the "March 2017 Private Placement Agreement"). The notes were convertible into shares of Riot common stock at an initial conversion price of $2.50 per share and each warrant was exercisable into shares of common stock at an exercise price equal to $3.56 per share.

189.    Absent from the Form 8-K and all subsequent Company SEC filings in 2017 about the March 2017 Private Placement Agreement, however, is any mention of Honig's role as a related party even though at this time he held, according to a 13D he filed in January 2017, more than 10% of Riot's outstanding shares at this time. As explained above, under applicable SEC regulations, specifically, Item 404 of Regulation S-K and ASC 850 under GAAP, the March 2017 Private Placement Agreement should have been disclosed to the Company's public shareholders in March 2017 as a related party transaction.

**2.     The Coinsquare Agreement**

190.    On September 29, 2017, the Company entered into a series of agreements including a Subscription Agreement and Amended and Restated Unanimous Shareholder Agreement (the "Coinsquare Agreement") in connection with the purchase of $3,000,000 of units of goNumerical Ltd., a privately held Canadian company known as Coinsquare Ltd. ("Coinsquare"). Each unit consisted of (i) one share of goNumerical Ltd.; and (ii) a purchase warrant exercisable into such number of shares of stock at the exercise price.

191.    At the time, then-CEO Beeghley stated the following about Riot's investment in Coinsquare, "[a]t Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets. With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector."

72

192.    Yet, undisclosed from investors – *for over six months* – was that (i) Defendant Honig received a cash payment of $50,000 from Riot for diligence services in connection with the Coinsquare transaction; and (ii) several members of the Honig Group were also among the handful of investors who were parties to the Coinsquare Agreement.  Indeed, the $50,000 payment to Honig was finally disclosed (and admitted by Riot to be related party transaction) in the Company's April 17, 2018 Form 10-K, while the Honig Group's co-investment role in Coinsquare was not disclosed to investors until May 25, 2018 in a Form 8-K/A filed after the close of trading that corrected the October 4, 2017 Form 8-K that initially announced the transaction.  The following trading day, on May 29, 2018, Riot stock declined nearly 6%.

193.    As set forth in the chart below, which was attached to Riot's May 25, 2018 Form 8-K/A, Honig Group members Honig, DeFrancesco, Groussman and Stetson – *like Riot* – were among the 23 investors in Coinsquare:

| Name | Issued Share Capital |
|---|---|
| Virgile Rostand | 10,000,000 Common Shares |
| Cole Diamond | 2,500,000 Common Shares |
| Michael Diamond | 2,765,168 Common Shares |
| Robert Furse | 375,092 Common Shares |
| Jazse Holdings Inc. | 265,168 Common Shares |
| Tread Lightly, LLC | 265,168 Common Shares |
| TWG Startup Investment 2 Corp. | 300,018 Common Shares |
| ***Bioptix Inc (a/k/a Riot),*** | ***2,249,985 Common Shares*** |
| 2330573 Ontario Inc | 918,745 Common Shares |
| Jeff Cordeiro | 11,250 Common Shares |
| Peter Simeon | 15,000 Common Shares |
| Eduardo Vivas | 149,999 Common Shares |
| Argyle LLC | 149,999 Common Shares |
| Eric So | 93,749 Common Shares |
| Ross Levinsohn | 37,500 Common Shares |

73

| | |
|---|---|
| Sean Lai | 11,250 Common Shares |
| *Michael Brauser* | *112,499 Common Shares* |
| *Barry Honig* | *112,499 Common Shares* |
| *GRQ Consultants Inc Roth 401K FBO Barry Honig* | *75,000 Common Shares* |
| *Erica and Mark Groussman Foundation* | *37,500 Common Shares* |
| *Titan Multi-Strategy Fund I, Ltd.* | *75,000 Common Shares* |
| *Stetson Capital Investments Inc.* | *37,500 Common Shares* |
| Kent Farrell | 37,500 Common Shares |

158.   Though Riot disclosed, two days later, through a Form 8-K filed with the SEC the *existence* of the Coinsquare shareholders' agreement, it was not until May 25, 2018—more than eight months after the agreement was signed—that Riot first disclosed that Honig and other of the selling shareholders referenced in the September 25 S-3 were also shareholders in Coinsquare.

**D.   Nine Days After the Filing the September 25 Form S-3, Bioptix Changes Its Name to "Riot Blockchain," and in the Weeks That Followed Announces a Series of Strategic Investments, Causing Riot's Share Price to Soar**

159.   On October 2, 2017, two days before announcing the Company's name change to Riot Blockchain, Inc., Bioptix's board (which was controlled by Defendant Honig) approved a dividend payout of more than $9.5 million.  Bioptix stated that the dividend would be payable on October 18, 2017, to shareholders of record on October 13, 2018.  Bioptix's stock increased by approximately 25 percent, from $6.44 to $8.09 per share, on a volume approximately four times the previous day's total.

160.   Defendant Honig took advantage of the price surge, selling 47,420 shares on October 4, 2017, at an average of $8.92 per share, collecting approximately $424,000.  Defendant Honig then sold an additional 21,400 shares on October 5 and October 6, 2017, for approximately $162,000.  A belated disclosure statement also shows that Defendant Honig sold 202,544 shares on October 9 and 10, 2017, for approximately $1.78 million.

74

783086.1

161. Defendant Honig then acquired more than 630,000 shares on October 11, 2017—128,988 through warrant exercises and 505,124 through the conversion of much of his preferred stock. Defendant Honig's acquisitions were offset by his sale of 293,916 shares on October 11, 2017, and 41,600 shares on October 12, 2017. The proceeds from those transactions totaled just under $3.3 million. All told, a Form 13-D shows that Defendant Honig sold more than 600,000 shares in a ten-day period, collecting nearly $5.7 million.

162. In the six weeks that followed the payment of the special dividend announced on October 2, 2017, and name change on October 4, 2017, the Company's stock price nearly tripled, as deals with two Bitcoin related businesses in which Defendant Honig and his associates had undisclosed stakes attracted investors. When Riot's stock hit $24 per share on the day after Thanksgiving 2017, the shares issued through the March 2017 Placements were worth more than $100 million.

163. During this time period, with the Company's stock price having risen dramatically, Defendant Honig sold nearly all of his remaining Riot shares, collecting more than $17 million. Defendant Honig, however, failed to report those sales promptly, as required under SEC rules for investors who own 5 percent or more of a company's stock.

164. From October 2017 to January 2018, three of Defendant Honig's associates—his brother, Jonathan Honig, and longtime partners Groussman and Stetson—likely sold more than $20 million of Riot stock. Riot's shares peaked at $46.20 per share in December 2017.

75

**ACTUAL AND POTENTIAL PROCEEDS OF HONIG GROUP'S RIOT BLOCKCHAIN SHARE SALES**

| | SHARES AT 10/2017 | SHARES AT 2/2018 | PROCEEDS AT $10 | PROCEEDS AT $15 | PROCEEDS AT $20 |
|---|---|---|---|---|---|
| Barry Honig | 1.65 million | 0 | $17.6 million (1) | NA | NA |
| Jonathan Honig | 1.45 million | 200,000 | $12.5 million | $18.7 million | $25 million |
| Mark Groussman | 400,000 | 0 | $4 million | $5.9 million | $8 million |
| John Stetson | 330,000 | 0 (2) | $3.3 million | $4.9 million | $6.6 million |
| Catherine DeFrancesco | 516,000 | 11,000 | $5 million | $7.6 million | $10.1 million |

(1)  Actual total from disclosed sales in Form 13D filing
(2)  Projection based on actions of others; no SEC disclosure

Note: Share totals at 2/18 do not include additional stock acquired through placements or acquisitions

165.    In late October of 2017, Riot adopted a new Code of Ethics and Business Conduct that included a detailed section on conflicts of interest.  The new code of ethics expressly stated that a conflict could exist if a director, officer, or employee "*lends to, borrows from, or has a material interest (equity or otherwise) in a competitor, supplier, or customer of the Company, or any entity or organization with which the Company does business or seeks to do business*." It added that any such person would require a waiver from the board.

    **1.    The Coinsquare Transaction**

166.    On October 4, 2017 Bioptix announced via a Form 8-K filed with the SEC the Company's transformation to Riot.  Attached to the filing were Articles of Merger dated October 3, 2017 that under Nevada law allowed Bioptix to officially change its corporate name.  Signing the Articles of Merger for Bioptix was Defendant Beegley; Defendant O'Rourke signed for Riot. Also attached to the 8-K was a press release describing Bioptix's official pivot away from its prior business into cryptocurrency and also touting the Company's Coinsquare transaction, which closed two days earlier:

As part of this focus [in cryptocurrency], the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for

76

trading digital currencies. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.

167. The following day, Riot filed its October 5, 2017 Investor Presentation through a Form 8-K filed with the SEC. Aside from providing an overview of cryptocurrencies and the Company new strategic direction, Riot again touted the Company's Coinsquare investment stating that "[Coinsquare] is experiencing explosive growth in a budding industry, already demonstrating strong potential." Again, as explained above, Riot made no effort in these or other public announcements — which were arguably some of the more critical public filings for Riot shareholders given that they disclose, for the first time, the Company's complete transformation away from its prior business — that several large shareholders in Riot also participated in the Coinsquare investment.

168. With the ink hardly dry on the Coinsquare shareholders agreement, Riot quickly announced another transaction with an alleged player in the cryptocurrency space.

**2. The Tess Transaction**

169. On October 17, 2017, Riot issued a press release announcing that it had acquired a majority (52%) stake in Tess, which Riot described as a company "based in Toronto, Ontario" that was "engaged in a blockchain-based payment service for wholesale telecom carriers." Riot reported that the Tess acquisition "reflects [Riot's] efforts to own or control companies who are contributing to the development of the blockchain ecosystem." Tess's CEO touted Tess's "ambitious business plans around blockchain." But like the Coinsquare investment, Riot's announcement failed to disclose that Tess and its founders (who had only recently created the

783086.1

company)[27] maintained ties to Riot and Kairos, another entity owned in part by Defendants Honig and Defranscesco and, as explained below, that Riot would invest in only two weeks later.

170.    Tess's legitimacy as a "blockchain" company is subject to question.  Tess's Chief Software Architect, Sorin Tanasescu, was concurrently a Director of an entity called Ingenium IT Compusoft ("Ingenium") and a Managing Director of a company called VoiceWay.   VoiceWay appears to have been associated with a Bitcoin phishing website.  Specifically, on a Bitcoin forum called  BitcoinTalk,  one user  conveyed  that  Google  was  displaying  advertisements  for  "mt-qox.com," a clever misspelling of the then-popular Mount Gox bitcoin trading website. That same user noted that the "mt-qox.com" website completely duplicated the real Mount Gox website.  The apparent imposter site was registered to Cristian Talle at the address 196 Judith Ave., Toronto, Canada,  which  appears  to  be  a  residence,  based  on  a  Google  Maps  search.  That  same  address houses Tanasescu's other businesses including VoiceWay and Ingenium. In addition, Talle used a VoiceWay  email  address  to  register  the  mt-qox.com  site.  Reddit  users  also  noticed  the  site  and started a thread entitled "[SCAM] watch out for mt-qox.com."  The users reported the site to Mount Gox and Google. Google subsequently took action and blocked it as a phishing website, according to the thread. (Note that the VoiceWay website itself was also registered by an individual named Cristian Talle – under a Rogers Communications email address).

171.    Tess and Tanasescu also appear to have had undisclosed ties to the individuals who formed Kairos, and thus to Riot and its controlling investors.  On the same day (October 19, 2017) that Kairos was registered as a corporation in Nevada by its registered agent, Laxague Law, that same law firm also set up an entity called Ingenium Global, Inc., which has a unique name that is similar to an entity in which Sorin Tanasescu manages:  Ingenium IT Compusoft.  According to

---

[27] The Tesspay.io website shows that it was initially registered on July 18, 2017.

the Nevada Secretary of State's website, Ingenium Global, Inc. has the exact same officers and directors as Kairos (Michael Ho of Dubai, Bryan Pascual of Tampa, Florida, and Moses D. Silverman of Miami Beach, Florida) and registered the exact same "par share count" (40,000,000), "par share value" ($0.0001 per share) and "capital amount" ($40,000.00).

194.    Of course, according to Riot's 13D filings, as of the date of this agreement and according to Forms 13D filed in January 2017, Honig and DeFrancesco were greater than 10% shareholders of Riot.  Indeed, no changes in their share ownership since January 2017 had been filed with the SEC.  Additionally, Groussman, who was also a signatory to the Coinsqare Agreement was a greater than 5% shareholder based on his Form 13D filings with the SEC.  Lastly, Stetson's name similarly appears on the Coinsqare shareholder agreement although according to Forms 13D he filed with the SEC, he held under 5% of the Company's outstanding shares.

195.    In any event, as the list above and the Honig Group's various Forms 13D makes clear, under applicable SEC regulations, specifically, Item 404 of Regulation S-K and ASC 850 under GAAP, the Coinsquare transaction should have been disclosed to Riot's public investors as a related party transaction.  In addition, Honig's role as a consultant for Riot in the in the transaction and his and the Honig Group members' participation in that transaction should have been disclosed to Riot's public shareholders.

3.    **The Kairos Transaction**

172.196.  On November 2, 2017, Riot issued a press release announcing that it had acquired "1,200 Bitcoin Mining Machines . . . consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by industry leader Bitmain."  The next day, November 3, 2017, Riot filed disclosed in a _Form 8-K disclosing that the these machines had been were purchased through a "share exchange agreement . . . with Kairos Global Technology, Inc. ("Kairos"), a Nevada corporation" formed only weeks earlier.  Riot disclosed announced that as consideration for the

79

100% interest in Kairos that the Company received it gave Kairos would pay Kairos' stockholders – instead of cash – preferred shares of Riot stock that was convertible to 1,750,001 shares of "Series B Convertible Preferred Stock."  Riot did not disclose, however, that (1) Kairos was in part owned by Defendants Honig and Defrancesco; and (2) Riot appeared to have vastly overpaid Kairos *more than seven times* the amount that Riot could have paid to acquire the same equipment directly from the original manufacturer, Bitmain.common stock.

197.    In disclosingSignificantly, at this time, Riot stock was trading at approximately $7 per share.  Thus, based on Riot's trading price on the date that the transaction with was announced the deal was valued at approximately $12,250,000.  In addition, Riot also agreed to pay "certain" undisclosed shareholders of Kairos, the Company did not disclose – in addition to preferred shares – a royalty from cash flow generated from Riot's operations, which entitled such shareholders to receive 40% of the gross profits generated on a monthly basis until they have received a total of $1,000,000, at which point the royalty would be extinguished.

173.198.  Once again, absent whatsoever from Riot's November 3, 2017 Form 8-K describing the Kairos transaction, was that Kairos was owned and controlledin part by Defendants Honig[28] and DeFrancesco.[29]  Indeed, it was not until nearly five months passed before Riot finally disclosed in the Company's April 17, 2018, that Riot disclosed Form 10-K that "[e]ach of Mr. Honig and Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the

---

[28] Honig belatedly disclosed his ownership of Kairos on April 18, 2018 in an amended SEC filing on Form 13D/A noting that on November 1, 2017, he had exchanged 151,210 shares of Kairos common stock for 151,210 shares of Riot Series B Preferred Shares.

[29] *See* Riot Blockchain, Inc., Annual Report (Form 10-Q) at 15 (Apr. 17, 2018) ("Two principal shareholders held 24.8% and 18.4%, respectively, of Prive, at the time of its acquisition by the Company.  These holders held 10.7% and 5.7%, respectively of Kairos at the time of Kairos acquisition by the Company in October 2017.").

Company, with Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned approximately 6.3% of Kairos."[30] ~~Defendants Groussman and Brauser were also reportedly owners of Kairos.[31] Kairos's registered agent in Nevada, Laxague Law, also filed the Statements of Beneficial Ownership of Bioptix stock on behalf of Catherine DeFrancesco.~~

~~174.   Further, two of Kairos's original officers and directors, Michael Ho and Moses David Silverman, also were shareholders of Global Bit Ventures.   The two, were to receive 131,241 and 98,431 Marathon shares, respectively, from the Global Bit Ventures merger, according to filings by Marathon.[32] Silverman was also an investor in Polarity, and is a former director of Therapix Biosciences Ltd.  Defendant Stetson disclosed in an SEC filing in April 2018 that he held a 5.9 percent stake in the company.  Groussman also serves on that company's board.~~

~~175.   According to Riot's January 5, 2018 Form S-3, on November 1, 2017 Riot paid $12,162,500 in stock and $1,000,000 in future royalties[33] for 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by Bitmain:~~

~~On November 1, 2017, we acquired 100% of Kairos Global Technology, Inc. ("Kairos") in consideration for the issuance of 1,750,001 shares of our Series B Convertible Preferred Stock, which are convertible into an aggregate of 1,750,001 shares of our Common Stock, which we issued to the shareholders of Kairos. Kairos is the owner of certain new computer equipment and other assets used for the mining of cryptocurrency, specifically servers consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by Bitmain.  Certain of the shareholders of Kairos also received a royalty to be paid from cash flow generated from operations,~~

---

[30] ~~*Id.*~~

[31] ~~*See* http://sharesleuth.com/investigations/2018/07/cool-mara-riot-the-big-money-bitcoin-biotech-daisy-chain.~~

[32] ~~*See* http://sharesleuth.com/investigations/2018/07/cool-mara-riot-the-big-money-bitcoin-biotech-daisy-chain.~~

[33] ~~Riot's stock price was $6.95 on November 1st. Riot purchased this mining equipment from Kairos for 1,750,001 shares of Riot stock and also $1,000,000 in future royalties to "Certain of the shareholders of Kairos." Thus, Riot paid $12,162,500 worth of Riot stock and $1,000,000 in cash for the equipment.~~

which shall entitle such shareholders to receive 40% of the gross profits generated on a monthly basis until they have received a total of $1,000,000, at which point the royalty is extinguished.

176.     Kairos paid exactly $2,089,679 for this mining equipment.[34]  However, Riot could have easily purchased this same equipment online from Bitmain.[35]  On October 29, 2017, a Bitmain Antminer S9 could be purchased for $1,265 and a Bitmain Antminer L3 could be purchased for $2,040.[36]  Below is an image of the website from which Riot could have purchased this equipment:



_____

[34]  On January 5, 2018, Riot belatedly disclosed Kairos's "financial statements . . . for the period from [Kairos's] inception (October 19, 2017) to November 3, 2017."  Riot Amended Current Report (Form 8-K/A) (Jan. 5, 2018), *available at* https://ir.riotblockchain.com/sec-filings-email/content/0001079973-18-000009/ex99x1.htm (listing "Equipment" of $"2,089,679").

[35]  *See* https://www.bitmain.com.

[36]  This can be verified by typing "https://shop.bitmain.com" into www.archive.org and viewing Bitmain's website as of October 29, 2017.

82

783086.1

177.   Thus for Riot to purchase 700 Antminer S9s (700 * $1,415) and 500 Antminer L3s (500 * $1,712) would have cost Riot $1,846,500, slightly less than Kairos paid.  Instead, Riot paid Kairos and Honig's associates more than $13 million for this equipment worth less than $2 million.

**E.      October 27, 2017 Riot Disseminates an "Updated" Investor Presentation**

178.   On October 27, 2017, the Company filed with the SEC a Form 8-K with an updated Investor Presentation attached.  The updated Investor Presentation stated that the value of the cryptocurrency market "has increased from $17.7 billion to over $170 billion in 2017" — a figure $20 billion higher than the figure presented in the Company's October 5, 2017 Investor Presentation.  In addition to providing information concerning the Company's recent investments in Coinsquare and Tess, the updated Investor Presentation also stated:

- the Company would provide "*a gateway to blockchain*" as "one of the only Nasdaq listed companies with this focus."

- "*Riot Blockchain intends to gain exposure to the blockchain ecosystem through targeted investments in the sector, with a primary focus on the Bitcoin and Ethereum blockchains.*"

- "*Our investment strategy will consist of identifying unique projects which decentralize markets; combining real world applications with an active development team, strong fundamental, and large addressable markets*."

- "Moving forward, *Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem, with a particular focus on the Bitcoin and Ethereum blockchains*."

- that Riot was a "first mover" as a "*NASDAQ listed pure play Blockchain company*."

- "*At Riot Blockchain Inc. we leverage our expertise, and network, to build and support blockchain technology companies.  We provide investment exposure to the rapidly growing blockchain ecosystem*."

- "*Riot Blockchain has made a strategic investment in Coinsquare.  This investment into a leading Canadian digital currency exchange is indicative of other Riot Blockchain will pursue, including possible acquisitions of businesses touching the blockchain ecosystem*."

83

- ~~"*The company is experiencing steady growth in a budding industry.*"~~

199.   In other words, Riot had entered into yet another transaction with related parties, namely Honig and DeFrancesco, and failed to disclose their involvement.  By any measure, under applicable SEC regulations and GAAP, the Kairos transaction should have been disclosed as a related party transaction given Honig and DeFrancesco's involvement.  Instead, Riot's public shareholders did not learn about Honig's and DeFrancesco's interest in Kairos, or the preferred shares of Riot that they received, until Riot filed its Form10-K on April 17, 2018.

**4.     The December 2017 Private Placement**

200.   On December 19, 2017, Riot filed a Form 8-K announcing that the Company had entered into private placement agreements with unnamed "accredited investors" to sell $37 million units of securities at a purchase price of $22.50 per unit.  Each unit consisted of one share of the Company's common stock and a three year warrant to purchase one share of common stock at $40.00 per share.  In a press release announcing the transaction Riot stated that "[t]he $37 million in gross proceeds from the investment will be used for the expansion of the Company's Bitcoin mining operations, strategic investments, and general working capital."

201.   Like the other related party transactions described above, the Form 8-K and press release omitted Honig's and DeFrancesco's participation as "accredited investors."  It was not until Riot's April 17, 2018 Form 10-K that the Company disclosed for the first time that Honig and DeFrancesco were parties to the December Private Placement Agreement, having invested $500,000 and $360,000, respectively.

84

F.   **October 11, 2017 – Defendant Groussman and Defendant Honig's Brother, Jonathon Honig, and Defendant Groussman Attempt to Dispel Any NotionFalsely Deny that Their Ownership in Riot Is Part of a Control Group**

179.202.   Soon after Bioptix's announcement that it had changed its name to Riot and was transitioning into a cryptocurrency business, on October 11, 2017, Jonathon Honig, who is the brother Defendant HonigHonig's brother, filed a Form 13G with the SEC disclosing his beneficial ownership of 9.5% of Riot's common stock, not including 808,198 shares of common stock that he controlled and that were issuable upon the conversion of Series A Preferred A stock.  Notably, the Form 13-G specifically disclaimed Jonathon Honig's intent to influence or control Riot or that he was otherwise acting "in connection with or as a participant in" others' attemptattempts to influence control over Riot:

> By signing below I certify that, to the best of my knowledge and belief, *the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect*.

180.203.   The same statement appeared two days later in a Form 13G signed by Defendant Groussman wherein he disclosed beneficial ownership of 5.93% of RiotRiot's common stock. Groussman, like Jonathon Honig, maintained a close financial relationship with Defendant Honig. Public records indicate that Honig is the lender on Groussman's $700,000 mortgage.  Addtionally, Groussman has a long history of investing with Defendant Honig.

G.   **On November 6, 2017, Riot "Names John O'Rourke as Chairman and CEO" and Announces Another Strategic Investment**

181.   On November 3, 2017, Riot's CEO, Defendant Beeghley, stepped down.  He was replaced by Defendant O'Rourke, who was given an annual salary of $300,000, plus 344,000 shares of restricted stock and 100,000 options exercisable at $10 each.  Defendant O'Rourke also was elevated to Chairman of the Board.

85

**II.     Riot Announces that It More than Tripled Its Investment in Coinsquare**

182.     On December 4, 2017, Riot issued a press release that was filed on a Form 8-K touting Riot's "milestone" investment in Coinsquare.  The press release stated in relevant part:

**Riot Blockchain's Coinsquare Receives Milestone Investment**

*Coinsquare closes CAD $10.5 million investment from a global asset manager at a CAD $110.5 million Post-Money Valuation*

CASTLE ROCK, Colo., Dec. 4th, 2017 — Riot Blockchain, Inc. (Nasdaq: RIOT) (the "Company") today announced that one of its strategic portfolio holdings, goNumerical Ltd (dba "Coinsquare"), has closed a CAD $10.5 million investment at a CAD $110.5 million post-money valuation.  A prominent global asset manager with over a trillion dollars under management led the round with a CAD $10 million investment.  goNumerical operates Coinsquare, a leading Canadian digital currency exchange.  ***The new valuation for Coinsquare is over 3x the valuation from Riot's investment in September, 2017.***

Coinsquare has reported profitable operations and has grown over 300% in several different financial metrics since Riot's investment in September.  Although competitor information is not widely available, Riot believes Coinsquare is one of the largest, if not the largest, Canadian digital currency exchange.

"We are thrilled with this latest sign of confidence in Coinsquare, the digital currency market, and the important role Coinsquare is playing in growing this market in Canada," commented John O'Rourke, Chairman and Chief Executive Officer of Riot Blockchain. "Coinsquare was our first strategic investment and is well-positioned to continue executing on their lofty ambitions and vision of their CEO, and Riot advisor, Cole Diamond."

**I.     Riot's Board of Directors Issues A Proxy Statement That Further Enables The Honig Group To Conceal The Fraudulent Scheme**

183.     On December 12, 2017, Riot filed its Annual Definitive Proxy Statement under Schedule 14A (the "2017 Proxy") with the SEC.  The 2017 Proxy announced that the Company's Annual Meeting would take place on December 28, 2017 and that Riot shareholders were invited to attend and encouraged to vote on (1) the re-election of the current slate of directors, including Defendants O'Rourke, Kaplan, So, and Les; (2) the ratification of a change in Riot's auditor; and (3) matters pertaining to executive compensation.

86

184.   Rather than provide Riot shareholders with the information necessary to make informed vote, however, the 2017 Proxy falsely represents that

none of the directors or named executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its common stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company.

185.   In other words, the 2017 Proxy statement, which was likely approved by Defendants O'Rourke, Kaplan, So, and Les states that—notwithstanding the various related party transactions taking place in the months leading up to this filing, including the Coinsquare, Tess, and Kairos investments, for example—"none" of the directors, officers, or 5% shareholders "has any material interest, direct or indirect, in any transaction, or in any proposed transaction." This ignores of course that Honig and various members of the Honig Group maintained financial ties to each of these transactions and that two Riot directors, Defendants Kaplan and So, were themselves investors in Coinsquare—investments that (allegedly) tripled in value in the previous two months. These are clear "direct" financial interests that should have been timely disclosed to Riot shareholders.

**J.     Riot Announces a New Transaction Related to Its Investment in Tess: Riot's "Decision to Take the Company Public" in a Merger**

186.   On December 11, 2017, Riot issued a press release announcing that Tess had signed a "letter of intent" to merge with Cresval Capital Corp. ("Cresval"), which Riot emphasized was a "Publicly Traded" company. The press release quoted Tess's CEO, Jeff Mason: "***The decision to take the company public provides us access to traditional capital markets as we continue developing our blockchain technology solution. This environment will also foster transparency and accountability moving forward, providing confidence to investors and prospective customers alike.***" Nothing could be further from the truth. In reality, Cresval was an

87

783086.1

undercapitalized, money-losing mineral exploration company that according to its 2017 annual report, was experiencing "material uncertainties may cast significant doubt on the Company's ability to continue as a going concern."

187.   Specifically, Cresval was a mineral exploration company (i.e., gold and copper mining, not bitcoin "mining") that as of 2017 had merely CAD 181,687 in assets and a "Shareholders Deficiency" or "Deficit" of CAD 2,2551,185.  In 2016 and 2017, Cresval operated at losses of CAD 111,153 and CAD 152,010, respectively.  On December 22, 2017, no shares of Cresval had publicly traded since November 1, 2017, when on that one day, 900 shares changed hands at a price of CAD 0.06 per share in a transaction valued at CAD 54.00.  Pictures from Cresval's corporate website appear to depict the company's operations:[37]



188.   It appears that Riot chose to merge Tess with Cresval not because of Cresval's assets, profitability, experience in cryptocurrency, or access to liquidity and the public markets,

___

[37] See https://www.cresval.com/properties/photo-gallery.

but instead because Defendant Honig, acting as an intermediary, introduced Defendant O'Rourke to Lee Ann Wolfin, Cresval's President. Ms. Wolfin's father, Arthur Wolfin, was Cresval's founder and chief executive. Mr. Wolfin also headed Levon, another mineral exploration company in which Honig had a "former position on board of directors." Levon did deals with other companies whose stockholders included Defendants Honig, O'Rourke, and Brauser. For example, Levon was "a former significant stockholder" of Pershing Gold Corp., a company in which Honig, O'Rourke, and Brauser were investors. Levon also did a reverse merger with SciVac Therapeutics Inc., which is now part of VBI Vaccines, in which Honig and Brauser were shareholders.

**K.    On December 19, 2017, Riot "Announces $37 Million Private Placement" Defendants Honig and Defranco Take Part But Are Not Disclosed**

189.    On December 19, 2017, the Company issued a press release announcing that Riot had entered into private placement agreements with unnamed accredited investors to sell $37 million units of securities at a purchase price of $22.50 per unit. Each unit consisted of one share of the Company's common stock and a three year warrant to purchase one share of common stock at an exercise price of $40.00 per share. The December 19, 2017 press release stated that "[t]he $37 million in gross proceeds from the Investment will be used for the expansion of the Company's Bitcoin mining operations, strategic investments, and general working capital." The press release failed to disclose, however, that two large shareholders and members of the Honig Group — Defendants Honig and Defrancesco — were among the so-called "accredited investors" who were invited to participate in the private placement, or that Defendant Honig had invested $500,000 and Defendant Defrancesco had invested $360,000.

~~L.~~**G.    After Defendants O'Rourke and Honig Sold Most of Their Shares,January 5, 2018 –** Riot Fires Its Auditor ~~and the Company's Stock Continues to Decline~~

~~190.~~204.    On January 5, 2018,~~d~~ Riot filed a Form 8-K with the SEC announcing that the Company had dismissed EisnerAmper LLP as its independent auditor and engaged MNP LLP.

89

191 205.   On January 9, 2018, *Seeking Alpha* published an article titled, "Riot Blockchain: This Crypto Clown Car Continues Hurtling Toward the Abyss."   The article highlighted the dismissal of Riot's auditor, noting that the Company had employed three different auditors over the course of a year.

**H.     On December 29, 2017 – O'Rourke Sells 30,383 Shares for Proceeds of $869,256**

206.   On December 29, 2017, after the market closed and going into a three-day holiday weekend, Defendant O'Rourke sold 30,383 shares of Riot for proceeds of $869,256.  O'Rourke's sale was quickly picked up by media outlets.[38]

207.   On January 2, 2018, *Reuters* published an article prior to the market open entitled, "BUZZ-Riot Blockchain down after CEO reports stock offering – RTRS."  The article stated that Riot's stock price was down 4.44% in pre-market trading after Defendant O'Rourke had reported his sale of over 30,000 shares.  An article published during early morning trading hours, on the popular investor website, *The Motley Fool*, entitled, "Riot Blockchain's CEO Just Sold a Lot of Stock," detailed Defendant O'Rourke's suspicious trading, stating in relevant part:

> No one knows a company better than its insiders.  For this reason, it's my view that prices at which companies and their insiders buy and sell stock give a hint about a company's true value.

<div align="center">*  *  *</div>

> **An insider dumps his shares**

> Right before a holiday weekend, and two days after the company announced it was adjourning its annual shareholders meeting until February, Riot Blockchain's chief executive officer, John R. O'Rourke III, filed a Form 4 with the SEC disclosing he and his firm, ATG Capital LLC, sold 30,383 shares of Riot on Dec. 29.

---

[38] *See, e.g., John R. O'Rourke III Sells 30,383 Shares of Riot Blockchain Inc (RIOT) Stock, American Banking and Market News* (Dec. 30, 2017) ("CEO John R. O'Rourke III sold 30,383 shares of the firm's stock in a transaction dated Friday, December 29th.  The shares were sold at an average price of $28.61, for a total transaction of $869,257.63.").

* * *

These sales are material, representing about 37% of shares he and ATG Capital owned or would soon control prior to the transactions.

O'Rourke now holds 12,500 shares through ATG Capital LLC, in addition to 39,500 shares of stock in his own name that he currently owns, or will receive over the next 60 days from his role as Riot's chief executive officer. (O'Rourke received 344,000 restricted shares that vest in 24 monthly installments when he became CEO in November.)

**Hiding bad news**

These sales were curiously timed. O'Rourke sold his shares and filed the Form 4 after market close before a major holiday weekend, when most investors would be thinking about their New Year's Eve plans rather than their investment portfolios.

Stock analysts, journalists, and political-types refer to this activity as a "Friday night dump," a common practice of releasing otherwise newsworthy information at a time when people are least likely to be paying attention. One study from 2005 found that "Friday announcements are 20 percent more likely to present negative earnings than announcements on other weekdays." Insider selling certainly fits in the "negative" category.

O'Rourke has every reason to sell quietly. When taken together with Riot's deeply discounted equity raise earlier this month, his sales suggest recent market prices are a better price at which to sell its shares than buy them. It's also interesting to me that O'Rourke is selling before a postponed annual shareholders meeting in which Riot is asking shareholders for the right to add another 750,000 shares of stock to the company's bonus pool for insiders.

208.   On this news, Riot's stock price declined $4.04 per share, or **_14.45%_**, over two trading days, from $28.40 per share on December 29, 2017, to $24.36 per share on January 3, 2018, damaging Lead Plaintiff and members of the Class.

**I.      January 4-5, 2018 –Riot Fires Its Independent Auditor and Files an Amended Form 8-K/A Disclosing Audited Financial Statements of Kairos Revealing that Riot Vastly Overpaid for Kairos's Assets**

209.   On January 5, 2018, Riot filed a Form 8-K disclosing that on January 4, 2018 it had "dismissed EisnerAmper LLP . . . as its independent registered public accounting firm" and that on January 5, 2018, Riot had engaged MNP LLP.

91

783086.1

210.   Later on January 5, 2018, Riot filed an amended Form 8-K/A that disclosed "audited financial statements of Kairos Global Technology, Inc." "as of November 3, 2017," as prepared and audited by Riot's new accountant (since the day before) MNP LLP.  These financial confirmed that Kairos had paid $2,089,679 for the mining equipment it quickly turned around and sold to Riot for more than $13 million.  The financial statements confirmed that Kairos "purchased equipment of $2,089,679 from a company controlled by the president[39] of the Company," and that this was a "[r]elated party transaction[]."  The financial statements also stated that "as at November 3, 2017 . . . the equipment purchased was not yet operational."

211.   The market reacted negatively to the January 5, 2018 news once trading began on Monday, January 8, 2018, with the Company's stock price declining $1.01 per share, or ***4.13%***, from $24.41 per share on January 5, 2018, to $23.42 per share on January 8, 2018, damaging Lead Plaintiff and members of the Class.

**VIII.   THE TRUTH ABOUT HONIG'S STOCK SALES AND THE FRAUDULENT SCHEME BEGINS TO EMERGE**

212.   On January 31, 2018, *The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."[40]  The article stated that "**Mr. Honig has sold about 500,000 shares, he said, but declined to divulge his profit.  He said he still owns about 1% of the company.**"  "'When stock goes up, you take a profit,' [Honig] said."

213.   As a result of this revelation by *The Wall Street Journal* of Honig's previously undisclosed massive (and nearly complete) divestment of his shares of Riot stock (and other revelations of Honig's role as an insider in the Company's transformation and affairs and dubious

---

[39] Michael Ho was the President of Kairos, according to the Nevada Secretary of State's website.

[40] Ianthe Jeanne Dugan, *Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake; Barry Honig pares back stake in Riot Blockchain, whose shares soared last year after a change of name*, The Wall Street Journal (Jan. 31, 2018).

783086.1

history as a penny stock investor), the Company's stock price fell from an opening price of $14.50 per share on January 31, 2018, to close at $13.75 that same day, a decline of $0.75, or ***more than 5%.***

~~192.~~214.   Later on January 31, 2018, Riot issued a press release announcing that the Company's 2017 Annual Meeting of Stockholders was being postponed for a second time, without announcing a new date and time for its annual meeting.  Riot also announced that it had received a notification from the NASDAQ that the Company had not held its annual meeting of shareholders within twelve months of the end of Riot's fiscal year-end, in accordance with NASDAQ's Listing Rules 5620(a) and 5810(c)(2)(G).

~~**M.      On February 16, 2018, a CNBC Expose Partially Reveals Honig's Close Ties to Riot and O'Rourke**~~

~~193.~~215.   On February 16, 2018, CNBC published an article titled "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket," reporting a slew of questionable practices and behavior at the Company.  ~~The article stated:~~Among other information, the February 16, 2018 CNBC expose revealed to the Riot's pubic shareholders that O'Rourke, Riot's CEO and Chairman, maintained a close business relationship with Honig, a greater than 10% shareholder of the Company.  CNBC (and the market) was suspicious about O'Rourke's previously undisclosed ties to Honig for good reason.  Only two weeks earlier Honig stated to *The Wall Street Journal* that his share holdings had decreased significantly down to 1% (from 10%) while O'Rourke announced significant inside sales in early Janaury 2018.  This suggests that the two were working in concert to manipulate Riot's shareprice for their own personal gain.

216.   The close relationship between Honig and O'Rourke was most prominently evidenced when CNBC visisted Honig's office in Florida only to find O'Rourke and not Honig.

This was also surprising given that at the time Riot listed it "principal executive offices" in its SEC filings as Castle Rock, Colorado. O'Rourke responded (after first shutting the door) that he was merely there to meet with Honig, that he did not work out of Honig's office, and that he "ha[s] a good relationship with Mr. Honig and *we speak often*."

217.    Honig, who was later interviewed for the article, was quoted as saying that "at one time John O'Rourke had space in my office." Honig also acknowledged that he and O'Rourke "speak often."

218.    In addition to the above, the article stated :

As bitcoin hit record highs in late December, a hot new stock was making news on a daily basis. Riot Blockchain's stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto.

**But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease.**

That might sound somewhat like the type of newly minted blockchain company that has gained SEC attention.

**"Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain," SEC Chairman Jay Clayton said, speaking in generalities in recent testimony to Congress. The SEC declined to comment to CNBC about Riot Blockchain.**

The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.

That purchase and the company's name change aren't Riot's only questionable moves.

**A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in.**

94

\* \* \*

Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida. The resort is known as the "pink palace" and has luxury yachts lined up on its dock.

**But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for Feb. 1. It's not clear the company ever planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity.**

**Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.**

That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton. That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose office is a short drive from the hotel. He once owned more than 11 percent of the outstanding common stock, according to SEC filings.

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone. "It was an investment where I had a return. And I sold some shares. There's nothing wrong with doing that."

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

"Typically, Barry Honig invests his hard-earned money into a company, and he also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

A visit to the site now only reveals the text: "Under construction."

95

783086.1

From the outside, Honig's office is nondescript. There does not appear to be any evidence of his company's existence on the building's directory or on the door of his office.

**When CNBC crew members walked into the office, they didn't find Honig, they found O'Rourke. That's the same O'Rourke who made headlines when — less than three months after the company changed names and business plans — he sold about $869,000 worth of shares, according to an SEC filing**. He told the crew he was there for a meeting with Honig and that we had just missed him.

O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed." Then, late the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.

He agreed to answer questions via email instead. One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.

**"I have my own office in a separate location," O'Rourke said in an email sent by his lawyer, Nick Morgan, a partner with Paul Hastings. "I do have a good relationship with Mr. Honig and we speak often."**

**"John O'Rourke does not work out of my office," Honig said. "John O'Rourke has his own office . . . at one time John O'Rourke had space in my office . . . we speak often."**

**Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information.**

**"You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or dialogue about what's appropriate for the company on a day to day basis or in the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP.**

**Despite Honig's website saying he gives advice on who should lead a company, Honig said he had nothing to do with O'Rourke becoming CEO.**

**"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.**

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

**"I see a company that has had a change of control of the board. I see a company that has had a change in business. I see a company that has had several dilutive issuances immediately following the change of the board and change of the**

*business. And I see a stock that has gone zoom," he said. "And what I understand a significant amount of insider selling. So yes, these are red flags."*

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million. On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings. Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent. After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants. His purchase price ranged from $2.77 to $5.32 per share, according to the list of trades he provided to the SEC in 2017. Honig's investment dropped below 5 percent, the threshold for SEC filing, on Nov. 28. At that point, the stock had already climbed above $20.

Honig did not disclose his dramatically reduced position in the stock until this week.

*But that may not be the true extent of Honig's selling. Buried deep in the footnotes of Riot filings, it's clear Honig also accumulated more than 700,000 new warrants that he could convert to stock at $3.56 per share and more than 700,000 promissory notes that he could convert to stock at $2.50 a share.*

*What about those warrants and promissory notes? It's not clear, as he never mentioned them in either 13D. But in another footnote from a recent Riot filing, there is no longer a mention of them.*

He declined to further clarify what happened to them.

"It's all disclosed in the public filings. And those are all the obligations I have," he said. "I'm very comfortable with what I had to do and what I was obligated to do. . . . I'm not going to talk about my personal trading history or my bank account."

*Birns questioned how Honig made his filings. "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant*

97

*amount of stock. Or has the potential to own significant amount of stock in excess of what is reported on the 13D," he said.*

This is not the first time Honig has faced questions over his actions. In 2000, he was alleged to have committed stock manipulation. Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse.

"The answer's no," Honig said when asked if he still manipulates stocks.

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to SEC filings.

When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up.

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

*One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase. Kairos' main asset was $2 million of mining equipment. Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings.*

O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.

Kairos appears to have many links to Riot. The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

783086.1

O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada. Despite the many press releases, there has been no formal mining announcement.

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining. SEC filings are silent on mining activity.

As for professional poker players advising Riot? O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social media followers. He called them "thought leaders."

***Riot is not O'Rourke and Honig's first cryptocurrency investment.***

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. ***"I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."***

Honig acknowledges the investment.

The questions continue for Riot Blockchain.

On Tuesday, Riot filed to withdraw prior SEC filings.

"It is not the result of any government inquiry," O'Rourke said in an email. "It was just corporate clean up from our securities counsel."

As for the annual shareholders' meeting, "We did not have a quorum of shareholders required for a vote," O'Rourke said in the email from his lawyer. "We are also working on other corporate action items that would require shareholder approval and a shareholder meeting as well. We did not want to waste the time and expense of potentially having two shareholder meetings within a

99

783086.1

short period of time. Thus we adjourned the meetings, which is not an uncommon practice."

There is no new date for the shareholders' meeting.

**"You see companies adjourn meetings in a context of a contested election and the like," Birns said. "I just don't think in this instance, there's any reason to adjourn their annual meeting."**

And as to O'Rourke selling stock in December?

He told CNBC in the email: "I sold less than 10 percent of my overall position to assist with covering tax obligations as a result of so-called phantom income tax from the vesting of restricted stock awards. It is common for Executives to sell stock to cover such tax obligations. I could have sold more stock in that window but chose to sell just 30,383 shares."

O'Rourke welcomes increased regulation and transparency for the cryptocurrency industry. "Unfortunately, as with many new hot sectors, it [blockchain] has attracted some bad actors trying to capitalize on the hype," he said. "Riot is all for increased transparency and properly imposed regulation."

**Honig would not disclose how much he made on his investment in Riot**, "I wasn't fortunate enough to do as well as you might think and people might speculate . . . I don't regret anything."

(Emphases added).

219.    ~~On this news,~~ Also on February 16, 2018, CNBC included the Riot Blockchain story referenced above during newscasts that day, entitled "CNBC Investigates Red Flags at Riot" which included in relevant part the following by CNBC's Michelle Caruso Cabrera:

We wanted to find out who was behind Riot Blockchain, but for weeks no one would talk to us.  So we decided to see if we could get answers here at the swanky Boca Raton Resort and Club in Florida.  That's where Riot's annual shareholders' meeting was set to take place.  It would be an upscale setting for this upstart company with red ink, as far as their most recent quarterly report shows.  But as we quickly learned, that annual meeting wasn't going to take place.  Twice Riot Blockchain announced they were going to hold their annual shareholders' meeting here at the Boca Raton Resort and Club.  Twice at the very last minute, in fact the night before, they announced that they were postponing the meeting.  ***And in fact the hotel tells us there was never a meeting room ever booked under the name Riot Blockchain.  So we drove to this nearby office building, trying to find Barry Honig.  According to SEC filings, he may be the man behind the curtain.  He was an early investor in Riot, back when it was Venaxis, a medical testing company,***

100

*and then eventually Bioptix. He led an activist move to replace the board, and he eventually won. The new board changed the name from Bioptix to Riot Blockchain. "Hello? Hi, Michelle Caruso-Cabrera." As the elevator door opened in front of us, not Barry Honig, but this man, John O'Rourke, the CEO of Riot Blockchain, the same John O'Rourke who made news in December for selling about $869,000 worth of Riot stock just two months after the company changed its name. O'Rourke quickly closed the door.* Five minutes later he emerged and agreed to talk to us, but only off camera. He said he was here for a meeting with Honig when he arrived, and that we had just missed him. O'Rourke insisted that he does not work out of Barry Honig's office, even though we found him there.

220.    The CNBC broadcast narrated their encounter with Defendant O'Rourke:

During that hour-long off-camera meeting, O'Rourke told us his Riot stock sale was merely to pay taxes on his restricted stock. And as for the sharp rise in shares of Riot, O'Rourke said that was unexpected and ridiculous. *He also said he isn't worried about the SEC because "we over-disclose."*

221.    CNBC noted that when Honig "agree[d] to talk to [CNBC] by phone", he "downplayed his influence with Riot and John O'Rourke":

"MR. HONIG:  *John O'Rourke's an adult, and he makes his own decisions, okay?*

**[MS. CARUSO-CABRERA:] In 2000 you were fined for $25,000 and suspended ten days by FINRA for stock manipulation. You're no longer a licensed broker. Do you still manipulate stocks?**

**[MR. HONIG:]** *The answer's no.* Continue. I'm a successful investor. I'm a comfortable person. I don't need to work today. I have a beautiful family that's college educated, and I'm very comfortable. **I am very comfortable.** *The truth will come out."*

222.    CNBC's Ms. Caruso-Cabrera further reported that "*Honig acknowledged he's done this before. Five years ago he and John O'Rourke were involved in another company that changed its business model to blockchain. That stock also skyrocketed.* Today it's trading around two bucks a share. Oh, and it's changed its business model again, to cloud computing for cars."

101

783086.1

223.    As CNBC's Ms. Caruso-Cabrera noted, "Just this week a new filing from Barry Honig, which shows he sold a massive amount of shares, his common stock down to little more than 173,000.  So as Riot was issuing press release after press release promising great plans for the company, Honig was selling, making millions of dollars along the way."

~~194.~~224.   On the news reported by CNBC, including revealing that "Barry Honig may be the man behind the Riot Blockchain curtain," the price per share of Riot stock at closing fell approximately *33.4%*, or $5.74 per share, on heavy volume, from closing at $17.20 per share on February 15, 2018, to close at $11.46 per share on February 16, 2018, causing damage to Lead Plaintiff and the other members of the Class.

~~N.     Also on February 16, 2018, Riot Announces Its Purchase of "3,800 Bitcoin Mining Machines" Without Disclosing that It Was Buying These Machines from an Entity Owned by Honig and DeFrancesco at Vastly Inflated Prices~~

~~195.    On Friday, February 16, 2018, at 4:54 p.m., the same day that Riot's stock price fell 33.4% in response to the above CNBC investigative report, Riot issued a Form 8-K disclosing that Riot's subsidiary Kairos had agreed to purchase "3,800 AntMiner S9s, all manufactured by industry leader Bitmain" from Prive for $11 million in cash and 1 million shares of Riot common stock, with 200,000 of the shares escrowed pending certain performance milestones.  In all, the consideration suggests a total transaction value at the time of the agreement of approximately $28.2 million or a price per machine of $7,421 ($2,895 in cash and $4,526 in stock) paid to Prive. However, as of January 13, 2018, Riot could have purchased these same machines directly from their manufacturer, Bitmain (and have them shipped fairly quickly) for only $2,320 each for a total of $8,816,000, suggesting that Riot overpaid for these machines by approximately $19 million.~~



196.   Riot's Form 8-K did not disclose that Prive was a related party that was owned and controlled by Defendants Honig, DeFrancesco, and other members of the Honig Group.  It would not be until November 19, 2018, that Riot would disclose that "[t]wo principal shareholders held 24.8% and 18.4%, respectively, of Prive, at the time of its acquisition by the Company" and that "[t]hese holders held 10.7% and 5.7%, respectively of Kairos at the time of Kairos acquisition by the Company in October 2017.[41]

197.   Furthermore, Prive's corporate registration in Florida confirms that Prive was incorporated on October 31, 2017, only two weeks after Kairos was incorporated in Nevada.  Moreover, the individuals who incorporated Kairos and Ingenium Global Inc. in Nevada on October 19, 2017—Michael Ho and Bryan Pascual—are the **same persons** who incorporated Prive in Florida on October 31, 2017.  Indeed, the same address that Bryan Pascual gave in registering

---

[41] Riot Blockchain, Inc., Quarterly Report (Form 10-Q) at 15 (Nov. 19, 2018).

103

783086.1

as a Director of Kairos—218 S. Audobon Ave, Tampa, Florida—is the address of Prive's "principal office."[42]

198.    While Riot issued a press release on September 15, 2018, touting its purchase of the 3,800 machines (without mentioning Privy by name), this same press release conveniently omitted anything about Riot's concurrent purchase of another 3,000 of those same machines from another party at a much lower price.  Indeed, in the same February 16 Form 8-K, Riot announced that it had purchased another "3,000 AntMiner S9s, all manufactured by industry leader Bitmain" from another company, Blockchain Mining Supply & Services Ltd. ("BMSS"), a corporation incorporated under the laws of the Province of Ontario ("BMSS") for $8,500,000 or only $2,833 per machine.  Thus, that Riot substantially overpaid for the 3,800 machines it purchased from Privy for $7,421 each is confirmed by the fact that it simultaneously purchased 3,000 of the same machines for $2,833 each from BMSS, which appears to have not been a related party.

**O.    On February 21, 2018, Riot Enters into a "Consulting Agreement" Through Which the Company Agrees to pay $4,000,000 to "Ingenium International LLC"**

199.    On February 21, 2018, Riot entered into a "Consulting Agreement" through which Riot agreed to pay $4,000,000 to "Ingenium International LLC" to for "consulting services . . . for a twelve-month period" involving "the installation and deployment of . . . cryptocurrency miners" purchased from Prive and BMSS, according to Riot's November 19, 2018 Form 10-Q.  Riot noted

---

[42] The address that Michael Ho gave as President, Secretary, and Treasurer of both Kairos and Ingenium Global Inc.—5709 Cayan Tower in Dubai—is *different* from the address he gave to the State of Florida in registering Prive (218 S. Audobon Avenue, Tampa, Florida), which in turn is *also different* from Mr. Ho's address in Prive's Articles of Incorporation (1217 N. Horn Avenue, Los Angeles, California).  Thus, Mr. Ho appears to use at least three different addresses to incorporate businesses in different jurisdictions.

104

783086.1

that the "controlling principals of Ingenium International LLC., are shareholders in the Company by virtue of the previous acquisitions of Kairos and Prive."

**P.     On September 7, 2018, after an Investigation, the SEC Charges Defendants Honig, O'Rourke, Stetson, and Their Associates with Engaging in Three Other Pump-and-Dump Schemes Involving Companies Connected to Riot**

200.    On April 9, 2018, the SEC issued a subpoena pursuant to a formal order of investigation.  According to Riot, the SEC's "inquires include the proper asset classification, applicability of the Investment Company Act [of] 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency."

201.    On September 7, 2018, the SEC named Defendants O'Rourke and Honig, as well as several other individuals and entities, including Groussman, Stetson, and Dr. Philip Frost ("Frost"), Opko's CEO and Chairman, as defendants in a long-running microcap "pump-and-dump" scheme.  According to the SEC, the charges relate to the manipulation of the share price in three unidentified companies (believed to be BioZone, MGT, and Mabvax), which generated over $27 million from unlawful sales and left retail investors with "virtually worthless stock."

202.    One of the unifying themes of the SEC's fraud case is that the defendants functioned as a unit and that they exerted control over the companies and their management by virtue of their combined shareholdings and the infusions of cash they provided.

203.    In response to the filing of the *Honig* Action, Defendant O'Rourke resigned as CEO and Chairman.  The Company's stock price fell approximately ***24.2%***, or $1.38 per share, on heavy volume, from closing at $5.68 per share on September 6, 2018, to closing at $4.30 per share on September 7, 2018, damaging Lead Plaintiff and members of the Class.

225.    On April 17, 2018, after trading ended that day Riot filed its Annual Report on Form 10-K.  The report included for the first time several previously undisclosed related-party transactions between Honig and/or DeFrancesco and the Company that Riot, Honig, and

DeFrancesco were required to disclose, including: (i) the March 2017 Private Placement; (ii) the $50,000 payment Riot made to Honig related to his consulting role in the Coinsquare transaction; (iii) the Kairos transaction; and (iv) the December 2017 Private Placement. When the market opened the following day, on April 18, 2018, Riot's stock dropped 5.8%. Also, on April 18, 2018, Honig filed an amended 13D/A that disclosed for the first time, certain details concerning: (i) his role in the March and December 2017 Private Placements; (ii) the preferred share conversion to common stock that occurred as part of the Kairos transaction; and (iii) his specific stock trades made during 2017. This 13D/A is incorporated by reference and attached hereto as Ex. P.

226.    After the close of trading on May 25, 2018, Riot filed its amended Form 8-K/A that disclosed for the first time that various Honig Group members, including Defendants Honig, DeFrancesco, Groussman and Stetson were parties to the Coinsquare agreement – a transaction where Riot was also a party by virtue of its $3 million investment in Coinsquare. As discussed above, Riot, Honig, Groussman, Stetson, and DeFrancesco were obligated to disclose their interest in Coinsquare. On this news, on the following trading day, May 29, 2018, Riot's stock price fell from an opening share price of $7.53 to a close of $7.08 per share, a decline of nearly 6%, damaging Class members.

227.    On September 7, 2018, the SEC filed the *Honig* Action against Defendants O'Rourke, Honig, Groussman, and Stetson (as well as Honig Group affiliate Brauser and others) for violating the Exchange Act and Securities Act by engaging in "three highly profitable 'pump-and-dump' schemes . . . from 2013 through 2018 in the stock of three public companies (Company A, Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares." Cmpl. ¶ 1.

106

228.   The SEC alleged that "Honig was the primary strategist, calling upon other Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity."  The SEC further alleged that "[i]n each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse merger or by participating in financings on terms highly unfavorable to the company."  *Id.*, ¶ 2.

229.   The SEC also alleged that "[t]o profit from their investment, in each scheme, Honig and his associates would arrange and pay for the promotion of the stock, directing their co-defendants, or a similar promoter, to write favorable and materially misleading articles about the company whose stock price they wanted to inflate.  In several instances, to magnify the intended boost to volume and price that would follow a promotional article's release, Honig, Brauser, O'Rourke, Groussman, Melechdavid, and ATG engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock, priming investor interest." *Id.*, ¶ 3.

230.   In an accompanying press release, Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement, stated that "Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets."

231.   On this news, the price of Riot's stock declined $1.38 per share, or approximately **26.1%,** from the previous day's closing price, to close at $4.30 per share on September 7, 2018, as additional corrective information that Defendants had previously failed to disclose regarding their membership in a group entered the market.

232.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Class members have suffered significant losses and damages.

**VII.IX. DEFENDANTS ENGAGED IN A MANIPULATIVE DEVICE, SCHEME, ARTIFICE, AND CONSPIRACY TO DEFRAUD RIOT'S PUBLIC SHAREDHOLDERS DURING THE CLASS PERIOD**

233.   During the Class Period, each of the Defendants – pursuant to explicit or tacit agreements with each other and the Selling Stockholders – agreed to acquire, hold, vote, and/or dispose of shares they acquired in Riot in coordination with one another while knowingly or recklessly obtaining and exercising undisclosed control of the management and policies of Riot and while selling shares of Riot into the market at artificially inflated prices.  Defendants did so in violation of Section 13(d) of the Exchange Act and Rule 13d-2, *et seq.*, promulgated thereunder, which required Defendants to disclose their status as a "group" (as defined by Section 13(d)(3)) on Schedule 13D and to "promptly" update any material changes in their beneficial ownership of Riot's common stock in amendments (on Schedule 13D/A) to their Section 13(d) filings.  *See* § IX.A, *infra*.

234.   Defendants Honig, O'Rourke, and Stetson were familiar with their obligations under Section 13(d) – and the materiality of their disclosures to Riot's investors regarding beneficial ownership of the Company's stock – because they themselves had previously filed a lawsuit under this statute alleging that these disclosures were material to them.  *See* § IX.B, *infra*.

235.   Yet, despite this knowledge, Defendants failed to make timely and appropriate Section 13(d) filings and amendments reflecting their acquisition and disposition of Riot stock as part of scheme to defraud investors about their group's control over the management and policies of, and the magnitude of their collective investment in, Riot.  *See* § IX.A, *infra*.  And having concealed their group's existence and control over Riot, Defendants proceeded to engage in

108

783086.1

manipulative trading in Riot's securities (including massive sales of Riot's common stock) while failing to make the necessary amendments to their Section 13(d) filings, which under the rules, should have promptly alerted Riot's public investors that a group of insider shareholders (indeed, an undisclosed control group) were collectively dumping their shares into the market.  *See* § X.A, *infra.*

236.    And as discussed below, Defendants Honig, Groussman, Stetson, and DeFrancesco's violations of Section 13(d) were made knowingly, or at least recklessly, in light of their clear knowledge that they were acting together as a group in their scheme involving Riot.  *See* §§ IX.C.1-4, *infra.*

237.    Defendants could not have accomplished their scheme, however, without the assistance of Defendants O'Rourke and Beeghley from inside the Company.  Specifically during the Class Period, Defendants O'Rourke and Beeghley, as officers and/or directors of Riot, pursuant to explicit or tacit agreements with Defendants Honig, Groussman, Stetson, and DeFrancesco, caused the Company to issue materially false and misleading public filings with the SEC – including on Forms S-3, S-3/A, and 10-K, and Schedule 14A – that materially misrepresented the Company's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K by misrepresenting and concealing the fact that many of Riot's largest shareholders – including Defendants Honig, Groussman, Stetson, and DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A were members of a group with each other (as defined by Section 13(d)(3)) pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  *See* § X.B, *infra.*

238.    In causing Riot to issue its materially false and misleading Forms S-3, S-3/A, 10-K, and other SEC filings, O'Rourke and Beeghley well aware that the Honig Group (including

themselves) was a closely coordinated "group" that amply fit that definition under Section 13(d)(3), and which was therefore engaged in a scheme to defraud the Company's public investors. *See* § IX.C.5-6, *infra*.

239.    Defendants O'Rourke, Beeghley, and Riot also knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by issuing materially false and misleading Forms 8-K and 10-K that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendants Honig, Groussman, and DeFrancesco. *See* § X.C, *infra*.

**A.    Owners and Issuers of Securities Have Well-Known Disclosure Duties Under Section 13(d), Regulation 13d, and Item 403 of Regulation S-K**

240.    The federal securities laws are designed to ensure transparency by requiring that investors be provided with timely, accurate information about companies and persons who own large amounts of company stock and thus are in a control relationship with the company.  The Securities Act and the Exchange Act have several provisions designed to ensure that companies, their officers, and large shareholders provide the marketplace with adequate information about their holdings and their purchases and sales of their companies' stock.  For example, when a person or group of persons acquires beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of the Exchange Act, such person (colloquially known as a Section 13(d) filer) or group is required to make a filing under Exchange Act Section 13(d) with the SEC within ten days.[43]  These rules are meant to prevent evasion of the

---

[43] Section 13(d)(1) of the Exchange Act and Rule 13d-1 thereunder require any person who acquires more than 5% of the aggregate shares of any issuer's stock to file a Schedule 13D (or 13G if permissible under the rules) within ten days.  *See* 15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d–1(a) and (c).

110

disclosure requirement when two or more persons act together but keep their individual holdings below the reporting threshold.

241.    Under Section 13(d)(3), "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."  15 U.S.C. § 78m(d)(3).  Under Rule 13d-5, "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons."  17 C.F.R. § 240.13d-5(b)(1).

242.    These rules are meant to prevent evasion of the disclosure requirement when two or more persons act together but keep their individual holdings below the reporting threshold. Indeed, the rules specifically contemplate those who would use a "plan or scheme to evade the reporting requirements of section 13(d) or (g)" by providing that "[a]ny person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose of effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security.  17 C.F.R. § 240.13d-3(b).

243.    When a group of persons agrees to act together to acquire, sell, vote or hold more than 5% in the aggregate of any issuer's stock, they must each file a disclosure, even if their

individual ownership is below 5%.[44]  When the holdings of a person or group of persons materially change, Section 13(d) and Rule 13d-2 thereunder [17 C.F.R. § 240.13d-2] require that Section 13(d) filers "promptly"[45] make an amended Schedule 13D filing to update the market about that "material change" in their holdings.[46]

244.    A person who would otherwise be obligated to file a statement on Schedule 13D may instead file a "short-form statement on Schedule 13G" if that person can attest that they "[have] not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect, including any transaction subject to § 240.13d-3(b) . . . ."  17 C.F.R. § 240.13d-1(c).

---

[44] Under Rule 13d-101, the "person" filing a Schedule 13D must "[s]tate the aggregate number and percentage of the class of securities . . . beneficially owned" by that "filing person," and this "*information should also be furnished with respect to persons who, together with any of the persons named in [the Schedule 13D], comprise a group within the meaning of section 13(d)(3) of the Act[.]*"  17 C.F.R. § 240.13d-101 ("Item 5. Interest in the Securities of the Issuer.") (emphasis added).

[45] The SEC has noted that "promptly" means that an investor must amend its disclosure as soon as "reasonably practicable."  *In the Matter of Sequa Corp.*, Release No. 26839 (May 19, 1989).  "[C]ourts have approved amendments filed within five to ten days of the material changes that triggered the need to amend."  *Standard Fin., Inc. v. LaSalle/Kross Partners, L.P.*, No. 96 C 8037, 1997 WL 80946, at *6 (N.D. Ill. Feb. 20, 1997); *see also Scott v. Multi–Amp Corp.*, 386 F.Supp. 44, 61 (D.N.J.1974) (filing within five days of material change was "prompt"); *D–Z Inv. Co. v. Holloway*, 1974 WL 440, at *3 (S.D.N.Y. Aug. 23, 1974)) (filing within "10 days" of material change was "prompt").

[46] Under Rule 13d-2(a), "If any *material change* occurs in the facts set forth in the Schedule 13D (§ 240.13d–101) required by § 240.13d–1(a), including, but not limited to, any material increase or decrease in the percentage of the class beneficially owned, the person or persons who were required to file the statement shall *promptly* file or cause to be filed with the Commission an amendment disclosing that change.  An acquisition or disposition of beneficial ownership of securities in an amount equal to *one percent* or more of the class of securities shall be deemed 'material' for purposes of this section; acquisitions or dispositions of less than those amounts may be material, depending upon the facts and circumstances."  17 C.F.R. § 240.13d-2(a) (emphases added).

112

245.    These disclosure provisions are intended to alert the company's stockholders and the marketplace to changes in securities ownership that indicate potential for changes in control of the company.  Indeed, the SEC's rules warn potential filers of Schedules 13D or Schedules 13G that the disclosures are "mandatory" and can lead to civil or criminal litigation:

> Disclosure of the information specified in this schedule is mandatory. The information will be used for the primary purpose of determining and disclosing the holdings of certain beneficial owners of certain equity securities. This statement will be made a matter of public record. Therefore, any information given will be available for inspection by any member of the public.
>
> Because of the public nature of the information, the Commission can use it for a variety of purposes, including referral to other governmental authorities or securities self-regulatory organizations for investigatory purposes or in connection with litigation involving the federal securities laws or other civil, criminal or regulatory statutes or provisions.

17 C.F.R. § 240.13d-101 (Special Instructions for Complying With Schedule 13D).

246.    Similar disclosure obligations are also imposed on issuers, such as Riot.  Exchange Act Section 13(a) requires all issuers whose securities are registered pursuant to Exchange Act Section 12 (such as Riot) to file periodic reports with the SEC, and Exchange Act Rule 13a-1 requires such issuers to file annual reports – *i.e.*, a "Form 10-K."  Exchange Act Regulation S-K at Item 10 sets out the information that must be disclosed in both Forms S-1 (Registration Statements) and 10-K.  17 C.F.R. § 229.10(1).  Item 403 of Regulation S-K, in turn, requires issuers to provide a table listing:

> any person (including any "group" as that term is used in section 13(d)(3) of the Exchange Act) who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities.

17 C.F.R. § 229.403(a).

247.    Thus, potential investors reviewing an issuer's annual report on Form 10-K or registration statement on Form S-3 can expect to see a table describing all persons – and all

783086.1

"groups" of persons – who beneficially own more than 5% of Riot's stock.  Officers who sign public filings on behalf of their companies have a duty to ensure their completeness and accuracy.

248.    Collectively, these and other provisions[47] of the federal securities laws protect investors from pump-and-dump schemes and ensure that investors understand who is controlling a company and whether any large shareholders have amassed a position that will allow them to control or influence the company and its securities.  When these required disclosures are evaded or issued in a misleading fashion, investors are deprived of material information about an issuer.

**B.    Honig, O'Rourke, and Stetson Were Familiar with Section 13(d)**

249.    Honig, O'Rourke, and Stetson all understood their respective reporting obligations under Exchange Act Section 13(d), and that the information included in such filings is material to investors.  Specifically, in February 2015, Honig and Brauser filed a lawsuit in Harris County, Texas, alleging that counter-parties had violated Exchange Act Section 13(d) by failing to make requisite Section 13(d) filings for the more than 5% position they controlled as a group, and that that failure constituted a material omission that defrauded Honig and Brauser in their purchase of securities from those defendants.  In their complaint in that lawsuit, *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct., Feb. ~~In committing the wrongful acts alleged herein, Defendants engaged in a~~26, 2015), Honig and Brauser alleged that "the beneficial ownership table"

**Formatted:** Font: Not Bold, Not Italic

---

[47] Similarly, Section 16(a) and Rule 16a–3 require people – including "persons in a group" – who have beneficial ownership of more than 10% of a company to report their ownership with the SEC in a Form 3.  15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a-3(a).  Any subsequent "change in such ownership" must also be reported in a Form 4 "before the end of the second business day following the day on which the subject transaction has been executed."  15 U.S.C. § 78p(a)(2)(C); 17 C.F.R. § 240.16a-3.  "Where persons in a group are deemed to be beneficial owners of equity securities pursuant to § 240.16a–1(a)(1) due to the aggregation of holdings, a single Form 3, 4 or 5 may be filed on behalf of all persons in the group."  17 C.F.R. § 240.16a-3.  As more than 10% shareholders, Defendants Honig and DeFrancesco were therefore required to File Forms 3 and 4 and report any changes in their ownership within two business days.  But neither Honig nor DeFrancesco ever did.

114

of a "Registration Statement on Form S-4" had failed to disclosed "material, non-public information" regarding the defendants'' "significant beneficial ownership interest" in a company in which Honig and Brauser had invested.  Honig and Brauser alleged that the "omission" of this "information" "was materially misleading":

> A significant beneficial owner's sale of shares in [an] entity . . . is a negative indication regarding the prospects of the . . . company.  Such information regarding a significant beneficial ownership interest in [the issuer's stock] was material.  It is the kind of information that the SEC requires to be disclosed in connection with solicitations for mergers and in various other filings (*e.g.*, Schedules 13D and/or 13G) precisely because of its materiality.  Defendants' failure to disclose to plaintiffs their significant beneficial ownership interest in [the issuer] . . . is a material and materially misleading omission. . . . Plaintiffs would not have purchased the Shares if they had known the undisclosed facts that [defendants] controlled such a large interest in [the issuer's] stock . . . .[48]

250.   In email exchanges leading up to filing this complaint (as alleged by the SEC in the *Honig* Action[49]) Honig and Brauser discussed drafts of their complaint, and circulated them to Stetson and O'Rourke (non-parties to the lawsuit) seeking their comments.  Honig and Brauser also discussed with Stetson and O'Rourke each of their respective understandings of the requirements imposed by Section 13(d) of the Exchange Act.  Nonetheless, and despite their understanding of what Section 13(d) required them to disclose and how and why those disclosures were material to investors, neither Honig nor Stetson made the requisite Schedule 13D filings with respect to Riot, nor did O'Rourke as CEO cause Riot to made the requisite disclosure on in the Company's Forms S-3, S-3/A, and 10-K, or its proxy statements.  This knowledge goes directly to Defendants' scienter in this action.

---

[48] *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct. Feb. 26, 2015) at ¶¶ 39-40.

[49] *See SEC v. Honig, et al.*, No. 18-cv-08175-ER (2d Am. Cmpl.) (ECF No. 233) at ¶¶ 161-62 (Exhibit B hereto).

115

**C.     Defendants Acted as an Undisclosed Control Group to Pump-and-Dump Riot Stock While Misrepresenting and Concealing their Beneficial Ownership in Violation of Section 13(d), Rule 13d-2, and Item 403 of Regulation S-K**

251.   "Pump-and-dump" schemes typically have two parts.  In the first, the fraudsters acquire a large amount of stock at little or no cost whereupon a promotion scheme is implemented to boost the price of the stock or create trading volume by stimulating market interest with false or misleading statements about the company.  Once the stock price and trading volume have been pumped up, the fraudsters move on to the second part, in which they dump their large holdings of the stock into the public market at an enormous profit for themselves.  After the fraudsters dump their shares and stop hyping the stock, the price typically falls, trading volume dries up, and investors lose their money.  Critical to the success of such a scheme is disguising the fact that the fraudsters beneficially own and control a large amount of the unrestricted stock which, if known to investors and market participants, would inform investors that control persons of the company were dumping their stock.  Similarly critical to the success of such a scheme is concealing the fact that the members of such a group are selling that large amount of stock into the market during the "dump" phase of that scheme.

~~204.~~   As discussed below, Defendants knowingly or recklessly engaged in precisely this type of manipulative device, scheme, artifice, and conspiracy to defraud Riot's public shareholders in violation of the federal securities laws.  Defendants ~~have also~~ pursued, or joined in the pursuit of, a common course of conduct, and ~~have~~ acted in concert with and conspired with one another in furtherance of their wrongdoing.  ~~Defendants have also caused the Company to misrepresent and conceal the truth and further aided and abetted and assisted each other in violating the federal securities laws.~~

~~205.   The purpose and effect of Defendants' device, scheme, artifice, conspiracy, common enterprise, and common course of conduct was, among other things, to:  (i) deceive the~~

116

783086.1

~~investing public, including stockholders of Riot, as to the Company's operations, financial condition, and compliance policies; (ii) facilitate Defendants' illicit sales of millions of dollars of their Riot shares while in possession of material, nonpublic information; and (iii) enhance certain of Defendants' executive and directorial positions at Riot and the profits, power, and prestige that the several of the Defendants enjoyed as a result of holding these positions.~~

~~206.~~   Defendants accomplished their scheme~~, conspiracy, common enterprise, and common course of conduct~~ by purposely misrepresenting and concealing (and causing the Company to misrepresent and conceal) material facts, failing to correct such misrepresentations, and violating the federal securities laws.  ~~As~~As insiders, controlling shareholders, officers, and/or directors of Riot, each of the Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

~~207.~~   Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of wrongdoing, each of the Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

~~208.~~252.   At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of Riot and was at all times acting within the course and scope of such agency.

### 1.   Honig Knowingly Engaged in the Fraudulent Scheme

253.   During the Class Period, Honig committed deceptive acts by knowingly misrepresenting and concealing that he was part of an undisclosed group (as defined by Section 13(d)(3)) while engaging in manipulative trading in Riot stock.  Defendant Honig's Section 13(d) filings during the Class Period misrepresented and omitted that his purported individual investment

117

in Riot was actually part of a larger group.  *See* § X.A.1, *infra*.  Honig also repeatedly failed to make the necessary amendments to his Section 13(d) filings disclosing that he had materially changed his beneficial ownership in Riot through either purchases or (primarily) sales of Riot's stock during the Class Period.

254.    Honig did so knowingly or at least recklessly.  *First*, as discussed above, Honig (together with Brauser) had previously brought suit against several individuals under Section 13(d) in *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct.), in which Honig alleged that a violation of Section 13(d) is "material" and that he "would not have purchased the Shares if [he] had known the undisclosed facts that [the defendants] controlled such a largest interest in [the company's] stock."  Leading up to this filing, Honig discussed drafts of this complaint with O'Rourke and Stetson, seeking their comments, and discussing their respective understandings of the requirements of Section 13(d).

255.    *Second*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that between 2011 and August 2018, Honig invested alongside O'Rourke in *over 75 issuers*, alongside Stetson in *over 65 issuers*, and alongside Brauser in *over 40 issuers*.  Because Honig was aware of his history of co-investments with O'Rourke, Stetson, and Brauser he knew that his co-investment with these same individuals with respect to Riot was again part of a coordinated "group" under Section 13(d).

256.    *Third*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by O'Rourke's statement in a February 3, 2014 email to the officer of a potential merger target that "*Barry Honig is the principal investor of our small group*," as alleged by the SEC in its Amended Complaint in the *Honig* Action.

118

783086.1

257.     *Fourth*, Honig knew that, at a minimum, O'Rourke, Stetson, and Groussman were part of his investing group with respect to Riot because Honig shared his office with them in Boca Raton.  In fact, a September 13, 2016 letter signed by Honig, in which he nominated O'Rourke and Stetson to the Company's Board, lists the ***same fax number*** (with Palm Beach County, Florida area code 561) for O'Rourke and Stetson as the fax number listed on Honig's letterhead for his office in Boca Raton, Palm Beach County, Florida.  Indeed, O'Rourke was discovered by CNBC reporters inside Honig's same Boca Raton office on or about the day of Riot's recently cancelled annual meeting of shareholders in Boca Raton.  Because they worked out of the same office, shared the same fax number from that office, and even met with O'Rourke in that office the day of Riot's cancelled annual meeting of shareholders, Honig knew that he O'Rourke, Stetson, and Groussman were a "group" under Section 13(d).

258.     *Fifth*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that, as noted above, Honig, O'Rourke, Groussman, Stetson, and/or Brauser personally coordinated their investments in numerous public companies.  *See* Exs. E, F, G, H, I & J.  Indeed, Honig, O'Rourke, Groussman, and Stetson accomplished this coordination through private email correspondence amongst each other, *see* Ex. D at 7 of 21, in which they would coordinate the precise number of shares that each of them would hold in their target companies, *see* Ex. H.

259.     *Sixth*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Defendants Groussman, Stetson, and DeFrancesco also failed – like Honig – to report their membership in the same group with respect to the same company (Riot) during the same time period in 2017 in violation of Section 13(d).

783086.1

260.    *Seventh*, that Defendant Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" that included, at a minimum, Defendant DeFrancesco is supported by the fact that Honig and DeFrancesco (both as 10%+ Riot shareholders) both engaged in an undisclosed related-party transaction in which Honig and DeFranscesco respectively owned of 8.6% and 6.3% (together 14.9%) of Kairos when Riot acquired all outstanding shares of Kairos in exchange of convertible preferred stock of Riot.  Honig and DeFrancesco's coordination of their related-party transactions with Riot O'Rourke is further supported by the fact that Riot paid more than $13 million to the owners of Kairos (including Honig and DeFrancesco) for assets worth less than $2 million.

261.    *Eighth*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Honig, Groussman, and Stetson (and Jonathan Honig, through his entity, Titan) all invested together in the October 2, 2017 related-party Coinsquare shareholders' agreement with Riot (*see* § VII.E.2, *infra*) which was not disclosed to the Company's shareholders until May 25, 2018.

262.    *Ninth*, Honig's knowledge of, and participation in, the Honig Group's pump-and-dump scheme at Riot, including his role committing Section 13(d) disclosure violations by concealing his membership in a group of affiliated Riot stockholders while engaging in massive undisclosed sales of Riot stock, is supported by the SEC's allegations in the *Honig* Action.  Indeed, as a result of that action, Honig has been "permanently barred from participating in any offering of penny stock"; "permanently prohibited" from holding greater than 4.99% of any penny stock company; "advertising, marketing, or otherwise promoting" any penny stock.

263.    *Finally*, that Honig knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling

Stockholders' investments in Riot were part of a coordinated "group" is further supported by Honig's past interconnections with the Honig Group and the Selling Stockholders, which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies" (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

**2.      Groussman Knowingly Engaged in the Fraudulent Scheme**

264.   During the Class Period, Groussman committed deceptive acts by knowingly misrepresenting and concealing that he was part of an undisclosed group (as defined by Section 13(d)(3)) while engaging in manipulative trading in Riot stock without amending his beneficial ownership disclosures as required by Section 13(d) and Rule 13d-2 thereunder.  *See* § IX.A.2, *infra*. For example, on October 13, 2017 Groussman filed with the SEC a Schedule 13G that included his signature and the following false and misleading statement:

> ***By signing below I certify that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer [i.e., Riot] of the securities*** and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect.  After reasonable inquiry and to the best of my knowledge and belief, ***I certify that the information set forth in this statement is true, complete and correct.***

265.   Given Groussman's prior connections to Honig, O'Rourke, Stetson, and other members of the Honig Group, the statement that "the securities referred to above were not acquired and are not held" in order to "change[]" or "influence[]" "control of the issuer" was false and misleading when made in violation of the federal securities laws.

266.   Groussman's knowledge of his violations of Section 13(d) and Rule 13d-2 is supported by numerous facts.  *First*, as alleged by the SEC, Groussman's participation in Honig's previous schemes involving Biozone, MGT, and MabVax included "pre-release manipulative trading" with Honig, Brauser, O'Rourke, Melechdavid, and ATG.

121

267.   *Second*, as alleged by the SEC, "Groussman . . . work[ed] at an office in Boca Raton with Honig, Stetson and O'Rourke."  Thus, Groussman knew that, at a minimum, Honig, O'Rourke, and Stetson were part of his investing group with respect to Riot because Groussman shared Honig's office with them in Boca Raton.

268.   *Third*, that Groussman knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that, as noted above, Groussman, O'Rourke, Stetson, and/or Brauser personally coordinated their investments in numerous public companies. *See* Exs. D, E, F, G, H & I.  Indeed, Groussman, Honig, O'Rourke, and Stetson accomplished this coordination through private email correspondence amongst each other.  *See* Ex. D at 7 of 21 (email among Groussman, Honig, O'Rourke, Stetson, Brauser, and others).

269.   *Fourth*, that Groussman knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Defendants Honig, Stetson, and DeFrancesco also failed – like Groussman – to report their membership in the same group with respect to the same company (Riot) during the same time period in 2017 in violation of Section 13(d).

270.   *Fifth*, that Groussman knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" with Honig, in particular, is further supported by the fact that Groussman purchased his house in Miami Beach, Florida, with a $700,000 mortgage loan from Honig, who is mortgage holder of Groussman's house.

271.   *Sixth*, that Groussman knowingly violating his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Groussman, Honig, and Stetson (and Jonathan Honig, through his entity, Titan) all invested

122

together in the October 2, 2017 related-party Coinsquare shareholders' agreement with Riot (*see* § VII.E.2, *infra*) which was not disclosed to the Company's shareholders until May 25, 2018.

272.   *Seventh*, Groussman's knowledge of, and participation in, the Honig Group's pump-and-dump scheme at Riot, including his role committing Section 13(d) disclosure violations by concealing his membership in a group of affiliated Riot stockholders while engaging (along with other group members) in massive undisclosed sales of that stock, is supported by the SEC's allegations in the *Honig* Action.  Indeed, as a result of that action, Groussman has been barred for five years from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, and from advertising, marketing, or promoting any penny stock.

273.   *Finally*, that Groussman knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by Groussman's past interconnections with the Honig Group and the Selling Stockholders, which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

### 3.   Stetson Knowingly Engaged in the Fraudulent Scheme

274.   During the Class Period, as a purported "4.99%" shareholder of Riot, Stetson committed deceptive acts by knowingly misrepresenting and concealing that he was part of an undisclosed group (as defined by Section 13(d)(3)) and was therefore obligated to file a Schedule 13D disclosing that fact and reporting any material acquisitions or dispositions of Riot's stock.  By not doing so, Stetson knowingly participated and facilitated the Honig Group's fraudulent scheme to pump and dump Riot's stock.

275.     *First*, that Stetson knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Stetson invested alongside Honig in ***over 65 issuers*** between 2011and August 2018.

276.     *Second*, as noted above, Honig (together with Brauser) – in in consultation with Stetson – previously brought suit against several individuals under Section 13(d) in *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct.).  In bringing the lawsuit, Honig alleged that a violation of Section 13(d) is "material" and that he "would not have purchased the Shares if [he] had known the undisclosed facts that [the defendants] controlled such a largest interest in [the company's] stock."  Leading up to this filing, Honig discussed drafts of this complaint with Stetson and O'Rourke, seeking their comments, and discussing their respective understandings of the requirements of Section 13(d).  Thus, Stetson was well aware of his disclosure obligations under Section 13(d).

277.     *Third*, that Stetson knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that, as noted above, Stetson, Honig, O'Rourke, Groussman, and/or Brauser personally coordinated their investments in numerous public companies. *See* Exs. D, E, F, G, H & I.  Indeed, Stetson, Honig, O'Rourke, and Groussman accomplished this coordination through private email correspondence amongst each other.  *See* Ex. D at 7 of 21 (email among Stetson, Honig, O'Rourke, Groussman, Brauser, and others).  Indeed, Stetson in particular knew that he, Honig, O'Rourke, and Groussman, accomplished this coordination through private email correspondence amongst each other, *see* Ex. D at 7 of 21, in which they would coordinate the precise number of shares that each of them would hold in companies, *see* Ex. H.  For example, a January 27, 2012 email from Stetson to Honig attached a "Share Breakdown" of the shares that Honig, Stetson, Groussman, Brauser, and their

124

783086.1

affiliates would hold in IZEA Worldwide Inc. after a stock split.  Ex. H.  Another January 20, 2011 email from Stetson provided a similar breakdown for himself, Honig, Brauser, and others for "Passport Potash, Inc."  Ex. G.

278.    Indeed, Stetson's emails corroborate the SEC's allegations that Stetson worked with (or for) Honig to ensure that members of his groups voted their shares in unison, and that members of such groups would reach out to Stetson to find out how they should vote on various proposals.  For example, in July 2015, Stetson emailed a co-investor, in response to an inquiry on how to vote, by copying Honig and replying "Yes, vote 'For."  Similarly, in November 2016, Stetson emailed members of a Honig group of investors in an issuer in response to a request for "instructions to vote" by instructing those investors:  "[v]oting in favor of [two named directors]. Against all other members and actions."  2d Am. Cmpl. ¶ 60.

279.    *Fourth*, that Stetson knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Defendants Honig, Groussman, and DeFrancesco also failed – like Stetson – to report their membership in the same group with respect to the same company (Riot) during the same time period in 2017 in violation of Section 13(d).

280.    *Fifth*, that Stetson knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Stetson, Honig and Groussman (and Jonathan Honig, through his entity, Titan) all invested together in the October 2, 2017 related-party Coinsquare shareholders' agreement with Riot (*see* § VII.E.2, *infra*), which was not disclosed to the Company's shareholders until May 25, 2018.

281.    *Sixth*, Stetson's knowledge of, and participation in, the Honig Group's pump-and-dump scheme at Riot, including his role committing Section 13(d) disclosure violations by

concealing his membership in a group of affiliated Riot stockholders who were engaging in massive undisclosed sales of that stock, is supported by the SEC's allegations in the *Honig* Action. Indeed, as a result of that action, Stetson has been barred for ten years from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, and from advertising, marketing, or promoting any penny stock.

282.    *Finally*, that Stetson knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by Stetson's past interconnections with the Honig Group and the Selling Stockholders, which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

### 4.    DeFrancesco Knowingly Engaged in the Fraudulent Scheme

283.    During the Class Period, DeFrancesco engaged in deceptive acts by knowingly misrepresenting and concealing that she was part of an undisclosed group (as defined by Section 13(d)(3)) while engaging in manipulative trading in Riot stock – including massive stock sales that she failed to disclose despite being one of the Company's largest shareholder.

284.    Several facts support that DeFrancesco knowingly violating Section 13(d) and Rule 13d-2, *et seq.*, thereunder, as part of the Honig Group's scheme.  *First*, DeFrancesco's scienter in failing to "promptly" report her changes in beneficial ownership of Riot's common stock is supported by the fact that she filed nine Schedules 13D or 13D/A between September 12, 2016 and January 10, 2017 – demonstrating that she knew it was her legal obligation, as a more than 10% Riot shareholder, to report her holdings (and changes therein) to the market.  Yet, after January 10, 2017, and to this day, DeFrancesco has never filed another Schedule 13D/A.

126

285.   *Second*, that DeFrancesco was knowingly violating her obligation to "promptly" report her changes in beneficial ownership of Riot's common stock as required by Section 13(d) and Rule 13d-2, *et seq.*, is supported by the fact that Defendant Honig, as Riot's other largest (10%+) shareholder, with whom DeFrancesco coordinated with in a proxy fight (and letter-writing campaign) for control of Riot's Board, also committed similar violations of Section 13(d) and Rule 13d-2 by failing to promptly disclose his sales of Riot stock during the same time period.

286.   *Third*, that DeFrancesco knew that her investment in Riot was part of a coordinated "group" that involved, at a minimum, Honig, Stetson, and Brauser because she invested in PolarityTE between at least January 20, 2017 and April 25, 2017, during which time Honig was a Director of PolarityTE, Stetson was a Director and CFO of PolarityTE, Beeghely was a Director of PolarityTE, and Brauser was a Director of PolarityTE.  In addition, O'Rourke and Groussman were also investors in PolarityTE, as were the majority (if not all) of the other Selling Stockholders listed in Riot's 2017/2018 Forms S-3/A.  (*See* ¶¶ 132-36, 162-63, *supra*.)

287.   *Fourth*, that DeFrancesco knowingly violated her obligation to disclose that her investment in Riot was part of a coordinated "group" is further supported by the fact that Defendants Honig, Groussman, and Stetson also failed – like DeFrancesco – to report their membership in the same group with respect to the same company (Riot) during the same time period in 2017 in violation of Section 13(d).

288.   *Fifth*, that DeFrancesco knew that she was investing alongside the Honig Group is supported by the appointment by Honig of Mike Dai to Riot's Board on December 1, 2016, and Dai's subsequent election to the Board.  Before joining Riot's Board, Dai already had established business ties with DeFrancesco's husband, Andrew, and other relatives, as well as O'Rourke and Stetson, Jonathan Honig, and other members of the Honig Group.  Specifically, as of December 1,

783086.1

2016, Dai "serve[d] as chief financial officer and Director of Santa Maria Petroleum Inc. . . . a position he ha[d] held since 2014," according to Honig's SEC filing nominating Dai to the Bioptix Board.  Dai became CFO and a Director of Santa Maria on May 22, 2014, the same day that Andrew DeFrancesco became Santa Maria's "President and CEO."  On December 2, 2016, Santa Maria filed an OTCQB Certification with the OTC Markets stock exchange.  According to Santa Maria's OTCQB Certification, the following individuals and entities were "control persons [who] are beneficial owners of more than five percent (5%) of any class of [Santa Maria's] equity securities)":  ATG Capital (i.e., O'Rourke) (6.7%); GT Capital (Andrea DeFrancesco) (10%); Jonathan Honig (6.8%); Stetson Capital (i.e., Stetson) (6%); and Sunnybrook Preemie Investments Inc. (Carmella DeFrancesco) (5.3%).  In other words, Dai was the CFO and director of the same company, Santa Maria, that DeFrancesco's husband was also the President, CEO, and Director, and whose largest shareholders were O'Rourke, Stetson, and Jonathan Honig, as wells as Selling Stockholder Carmella DeFrancesco.  Moreover, Santa Maria's OTCQB Certification was "prepared by . . . Mike Dai, CFO" and "Andrew DeFrancesco, CEO" and was signed by "/s/ MIKE DAI" as "Certifying . . . CFO."  In sum, Dai's connections to DeFrancesco and the Honig Group further support a cogent inference that DeFrancesco knew that these individuals were working together (including by selecting the Company's Board members) as a shareholder "group" (as defined by Section 13(d)) and that she needed to disclose that group as such under Section 13(d) in her beneficial ownership filings with respect to Riot.

289.  *Finally*, that DeFrancesco knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by DeFrancesco's past interconnections with the Honig Group and the Selling

128

Stockholders (including through PolarityTE), which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

**5.  O'Rourke Knowingly Engaged in the Fraudulent Scheme**

290.  During the Class Period, O'Rourke, as Riot's Director, President, Treasurer, Secretary, and, eventually, CEO, had full knowledge that Honig, DeFrancesco, Groussman, and Stetson (together with Beeghley, and other affiliated "selling stockholders") were all acting in concert to coordinate their acquisition and voting of Riot stock, and to control direction of the management and policies of Riot.  Yet, working from within the Company, O'Rourke knowingly or recklessly signed false and misleading public SEC filings that did not disclose that even the Honig Group constituted a "group" under Section 13(d)(3) and Item 403 of Regulation S-K, much less the full extent of the Honig Group's coordination control of Riot.

291.  Specifically, in signing Riot's April 20, July 19, August 24, and September 25, 2017 Forms S-3/A, and other filings, O'Rourke knew, at a minimum, that Honig, Groussman, and Stetson were investing together as a group.  Yet, O'Rourke signed the April 20, 2017 Form S-3/A without disclosing that these individuals were a group of which he himself was a member.  In doing so, O'Rourke knowingly or recklessly committed deceptive acts in furtherance of his and the Honig Group's pump-and-dump scheme with respect to Riot.

292.  *First*, as noted above, O'Rourke (together with Stetson) discussed Honig's (and Brauser's) previous lawsuit, in *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct.), which alleged that a violation of Section 13(d) is "material" and that Honig and Brauser "would not have purchased the Shares if [they] had known the undisclosed facts that [the defendants] controlled such a largest interest in [the company's] stock."

783086.1

293.    *Second*, O'Rourke knew that he and Honig were working together as a group because O'Rourke invested alongside Honig in **over 75 issuers** between 2011 and August 2018.

294.    *Third*, that O'Rourke knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's investments in Riot were part of a coordinated "group" is further supported by O'Rourke's statement in a February 3, 2014 email to the officer of a potential merger target that "**Barry Honig is the principal investor of our small group**," as alleged by the SEC in its Amended Complaint in the *Honig* Action.

295.    *Fourth*, O'Rourke knew that, at a minimum, Honig, Stetson, and Groussman were part of his investing group with respect to Riot because O'Rourke shared Honig's office with them in Boca Raton.  In fact, a September 13, 2016 letter signed by Honig, in which he nominated O'Rourke and Stetson to the Company's Board, provides the **same fax number** (with Palm Beach County, Florida area code 561) for O'Rourke and Stetson as the fax number listed on Honig's letterhead for his office in Boca Raton, Palm Beach County, Florida.  Indeed, O'Rourke was discovered by CNBC reporters inside Honig's same Boca Raton office on December 28, 2017, the day of Riot's cancelled annual meeting of shareholders in Boca Raton.  Because they worked out of the same office, shared the same fax number from that office, and O'Rourke even met with Honig (and unexpectedly, with CNBC) in that same office the day of Riot's cancelled annual meeting of shareholders, O'Rourke knew that he, Honig, Stetson, and Groussman were a "group" under Section 13(d) – a statute they had previously used to bring lawsuits against other investors.

296.    *Fifth*, that O'Rourke knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's investments in Riot were part of a coordinated "group" is further supported by the fact that, as noted above,

130

O'Rourke, Honig, Groussman, Stetson, and/or Brauser personally coordinated their investments in numerous public companies. *See* Exs. D, E, F, G, H & I. Indeed, O'Rourke, Honig, Groussman, and Stetson accomplished this coordination through private email correspondence amongst each other. *See* Ex. D at 7 of 21 (email among O'Rourke, Honig, Groussman, Stetson, Brauser, and others).

297. *Sixth*, O'Rourke's knowledge of, and participation in, the Honig Group's pump-and-dump scheme at Riot, including O'Rourke's role as CEO in disseminating false and misleading statements about related-party transactions that involve Honig while, at the same time, the Honig Group committed Section 13(d) disclosure violations by concealing their group ownership of Riot stock and massive sales of that stock. O'Rourke's scienter is also supported by the SEC's allegations in the *Honig* Action. Indeed, as a result of that action O'Rourke has been permanently barred from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, and from advertising, marketing, or promoting any penny stock.

298. *Finally*, that O'Rourke knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by O'Rourke's past interconnections with the Honig Group and the Selling Stockholders, which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, supra), and further depicted in the diagram attached hereto as Exhibit M.

**6.      Beeghley Knowingly Engaged in the Fraudulent Scheme**

299. During the Class Period, Beeghley, as Riot's CEO and Director, had full knowledge that Honig, O'Rourke, DeFrancesco Groussman, and Stetson (and other affiliated "selling stockholders") were all acting in concert to coordinate their acquisition and voting of Riot stock,

131

and to control direction of the management and policies of Riot.  Yet, working from within the Company, Beeghley knowingly or recklessly signed false and misleading public SEC filings that did not disclose that even the Honig Group constituted a "group" under Section 13(d)(3) and Item 403 of Regulation S-K, much less the full extent of the Honig Group's coordination control of Riot.

300.    Specifically, in signing Riot's April 20, July 19, August 24, and September 25, 2017 Forms S-3/As, Beeghley knew, at a minimum, that Honig, Groussman, and Stetson were investing together as a group.  Yet, Beeghley signed the April 20, 2017 Form S-3/A without disclosing that these individuals were a group of which he himself was a member.  In doing so, Beeghley knowingly or recklessly committed deceptive acts in furtherance of his and the Honig Group's pump-and-dump scheme with respect to Riot.

301.    *First*, in signing Riot's Forms S-3/As, Beeghley knew that Honig, Groussman, and Stetson, together with Aifos, Titan, Molinksy, O'Braitis, Paradox, and Stockwire, were all previously affiliated because those same individuals and/or entities had all invested in PolarityTE when Beeghley was a Director of PolarityTE, a company of which Honig had been Chairman and CEO and Stetson had been CFO.  Thus, Beeghley knew the S-3/A violated Section 13(d) and was materially false and misleading.

302.    *Second*, that Beeghley knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by Beeghley's past interconnections with the Honig Group and the Selling Stockholders (including through PolarityTE), which are set forth in the charts provided above describing the "Honig

132

Group's Prior Target Companies (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

303.   *Finally*, as the Chairman and CEO of the Company (which had only about nine employees), Beeghley would have been aware of the March 15, 2017 Private Placement in which Riot entered into agreements to sell Honig warrants and notes to purchase up to 700,000 shares of common stock.  *See* Exhibit P at 5.  Beeghley also would have been aware when, on August 18, 2017, Honig "waived the requirement for the occurrence of a Qualified Transaction and gross proceeds of the Note Private Placement were released to [Riot] and the Notes and the March 2017 Warrants were released to [Honig] . . . ."  *Id.*  Despite this fact, and the fact that the March 2017 Private Placement required Honig to file an amended Schedule 13D/A,[50] Beeghley also knew that Honig had not filed any Schedule 13D/A since January 5, 2017.  Thus, Beeghley knew that Honig was violating his disclosure obligations under Section 13(d).

## ~~VIII.~~X.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD[51]

~~209.~~304.   In connection with Defendants' efforts to defraud Riot's public shareholders during the Class Period as part of ~~a~~their fraudulent scheme ~~or~~and plan in violation of Rule 10b-5(a) and (c), Defendants also disseminated materially false and misleading statements, and otherwise violated an obligation to disclose material information in violations of Rule 10b-5(b).

---

[50]   *See*   https://www.sec.gov/divisions/corpfin/guidance/reg13d-interp.htm   ("Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting") (stating that "a Schedule 13D reporting person [is] required to file an amended Schedule 13D if it acquires warrants from an issuer," even if "not exercisable for six months" and must disclose the warrants in its "Item 6 (contracts) disclosures and file the warrant agreement as an exhibit pursuant to Item 7 of Schedule 13D.  [Sep. 14, 2009]").

[51]   In this section, statements that are ***bold and italicized*** are specifically alleged to be false and misleading.  Statements that are **only bold** are to indicate emphasis.  Statements that are neither bold nor italicized are provided for context.

Defendants' materially false and misleading statements and omissions concerned: (1) the numerous disavowed and undisclosed "material relationship[s]" among members of the Honig Group and various Company insiders, including Defendants O'Rourke, Beeghley, McGonegal, Kaplan and So, through which they exercised control and influence over the Company to accomplish their pump-and-dump scheme; (2) the Honig Group's and various Company insiders' influence over and participation in a series of related-party transactions – including multiple Form S-3 securities offerings by Riot, and Riot's investments in Coinsquare, Kairos, Tess, and Prive – that funneled funds raised away from Riot's public shareholders to the Honig Group; (3) the Company's resulting limited meaningful investments in legitimate cryptocurrency assets or operations and the absence of a legitimate cryptocurrency business plan; and (4) Defendants' undisclosed and coordinated accumulation and insider selling of Riot shares in furtherance of their pump-and-dump scheme. Below, Defendants false and misleading statements and omissions are grouped into three main categories:

305.    *First*, Defendants Honig, DeFrancesco, Groussman, and Stetson in their beneficial ownership reports filed on Schedule 13D and 13G, and amendments thereto on Schedules 13G/A and 13D/A. *See* § X.A, *infra*.

306.    *Second*, the Company – at the direction of O'Rourke and Beeghley as officers and directors – issued materially false and misleading public filings with the SEC – including on Forms S-3, S-3/A, and 10-K, and Schedule 14A – that materially misrepresented Riot's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K by misrepresenting and concealing the fact that many of Riot's largest shareholders – including Defendants Honig, Groussman, Stetson, and DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A were members of a group with each other (as defined by Section 13(d)(3)) pursuant to

134

their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  *See* § X.B, *infra.*

307.    *Third*, the Company – at the direction of O'Rourke and Beeghley as officers and directors – issued materially false and misleading statements with the SEC that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendants Honig, Groussman, and DeFrancesco. *See* § X.C, *infra.*

**A.    Defendants' Materially False and Misleading Statements and Omissions in Benificial Ownership Reports on Schedules 13D and 13G**

308.    During the Class Period, Defendants Honig, Groussman, Stetson, and DeFrancesco (acting individually and/or through the investment entities they controlled, including GRQ 401K, ATG, Melechdavid, Stetson Capital, and Namaste, among others) knowingly or recklessly made materially false and misleading filings under Section 13(d) – including on Schedules 13G, 13G/A, 13D, and 13D/A – and/or failed to made necessary Section 13(d) filings and thereby concealed both their control over Riot's management and policies, as well as their membership in a group with each other (and with the Selling Stockholders) pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  In doing so, these Defendants knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder.

309.    Defendants further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly by failing to make timely and appropriate Section 13(d) filings and amendments (i.e., on Schedule 13D/A) reporting (whether individually or as a group) their purchases and sales of Riot stock.  Defendants' disclosure violations under Section 13(d) facilitated their scheme to defraud Riot's public investors about their group's control over the

135

management and policies of, and the magnitude of the collective investment in, Riot.  While failing to make the necessary amendments to their Section 13(d) filings or disclosing their membership with each other in a "group" as defined by Section 13(d)(3), Defendants engaged in manipulative trading in Riot stock – including massive undisclosed stock sales that easily exceeded the 1% minimum threshold for materiality set forth in Rule 13d-2(a) [17 C.F.R. § 240.13d-2(a)].

**1.    Honig's Beneficial Ownership Reports on Schedule 13D Were Materially False, Misleading, Deficient, and Untimely and Facilitated His Manipulative Trading in Riot's Common Stock**

310.    During the Class Period, Defendant Honig facilitated and concealed the Honig Group's pump-and-dump scheme at Riot through material misrepresentations and omissions on Schedule 13D, and his amendments thereto on Schedule 13D/A.  Honig's violations of his duties under Section 13(d) of the Exchange Act 915 U.S.C. § 78m(d), and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)], also constituted violations Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

311.    Honig's Class Period filings on Schedule 13D/A (and lack thereof) were materially false and misleading in at least four ways.  *First*, Honig's Schedule 13D filings improperly failed to disclose his membership in a "group" (i.e., the Honig Group) as required by Section 13(d)(3) and Rules 13d-2, 13d-5,[52] and 13d-101.[53]  Because they acted in concert to control the management and policies of Riot and pursuant to an agreement to acquire, hold, vote, and/or dispose of Riot

---

[52] *See* 17 C.F.R § 240.13d-5(b)(1) ("When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the *group* formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.") (emphasis added).

[53] *See* 17 C.F.R § 240.13d-101 ("Item 5.  Interest in Securities of the Issuer") ("The above information should also be furnished with respect to persons who, together with any of the persons named in Item 2, *comprise a group within the meaning of section 13(d)(3) of the Act . . . .*") (emphasis added).

shares in coordination with one another, each of Honig, O'Rourke, Groussman, and Stetson were each members of a group that was considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of that group and disclosing the number of shares each of them beneficially owned.  However, neither Honig, O'Rourke, Groussman, nor Stetson ever made a Schedule 13D filing disclosing their respective ownership or membership in a group, acting intentionally to conceal from the market the size of their group's position and their coordination and thereby to deceive investors.  Instead, in each and every Schedule 13D/A that Honig filed before and during the Class Period, Honig only identified himself (and his closely related personal entities such as GRQ 401K) as the only relevant beneficial owner.

312.    *Second*, Section 13(d)(2) and Rule 13d-1(a) thereunder required Honig to make amended Schedule 13D/A filings "promptly" as material changes occurred in any such disclosures Honig had made.  In that regard, the acquisition or disposition of one percent or more of a company's common stock "shall be deemed 'material'" under Rule 13d-2(a).  Yet, after filing his January 5, 2017 Schedule 13D/A, and throughout 2017, Honig engaging in numerous massive acquisitions and dispositions of Riot stock – in considerable excess of 1%, whether considered collectively or looking at individual day's trading – but Honig did not file another Schedule 13D/A for the rest of 2017 and not until February 13, 2018.

313.    As background, starting before the Class Period, between April 4 and January 5, 2017, Honig filed a series of Schedule 13Gs and 13Ds disclosing his increasing stake in Riot's common stock.  During this time, Honig's filings disclosed his share holdings (and percentage stake in the Company) as follows:

783086.1

- April 4, 2016 – Schedule 13G – 335,175 shares (8.65%);
- May 16, 2016 – Schedule 13G/A – 386,581 shares (9.97%);
- September 8, 2016 – Schedule 13D – 373,899 shares (9.6%);
- September 14, 2016 – Schedule 13D/A – 389,159 shares (10.04%);
- November 9, 2016 – Schedule 13D/A – 452,585 shares (10.05%);
- December 1, 2016 – Schedule 13D/A – 500,000 shares (11.10%);
- January 5, 2017 – Schedule 13D/A – 504,000 shares (11.19%) (Exhibit Q hereto);

314.   Thereafter, Honig did not file another Schedule 13D/A for the rest of 2017. Unbeknownst to Riot's public investors, however, after January 5, 2017, and throughout the rest of 2017, Honig engaged in numerous material changes in his beneficial ownership of Riot common stock – primarily massive sales outside of the public view because Honig violated Section 13(d) and Rule 13d-2(a) by failing to disclose any of these transactions to the market.

315.   Honig's failure to file any further amendments during 2017 after his January 5, 2017 Schedule 13D/A violated Section 13(d)(2) and Rule 13d-1(a) thereunder because, as set forth below, Honig engaged in numerous transactions in which he either acquired or disposed of more 1% of Riot's then-outstanding shares based on the information he later disclosed in his January 5, 2017 Schedule 13D/A (Exhibit Q) and his next Schedule 13D/A filed on April 18, 2018 (attached hereto as Exhibit P).

316.   Honig's 2017 trading is set forth in the following chart, which details Honig's puchases and (sales) and the percent change those sales constituted in Riot's total outstanding shares during that time period:

| BARRY HONIG | | | | | |
|---|---|---|---|---|---|
| EVENT DATE | SEC/COMPANY FILING (DATE) | SHARES HELD | % OF ALL SHARES | SHARES BOUGHT/(SOLD) | % CHANGE |
| 01/04/17 | Form 4 (Jan. 4, 2017) | 443,585 | | 4,000 | N/A |
| 01/04/17 | 13D/A (Jan. 5, 2017) [54] | 504,000 | 11.19% | | +1.34% |

[54] Based on 4,403,971 shares foutstanding as of November 11, 2016 (Jan. 5, 2017 Sched. 13D/A).

138

783086.1

| BARRY HONIG | | | | | |
|---|---|---|---|---|---|
| EVENT DATE | SEC FORM ON WHICH DATE(S) | SHARES HELD | % OF ALL SHARES | SHARES BOUGHT/SOLD | % CH/OWN |
| 03/15/17[55] | 13D/A (April 18, 2018) | **March 2017 Private Placement Agreement** | | | N/A |
| 03/29/17 | 13D/A (April 18, 2018) | | | 35,000 | +0.77% |
| 03/31/17 | 13D/A (April 18, 2018) | | | (4,200) | -0.09% |
| 04/05/17 | 13D/A (April 18, 2018) | | | (800) | -0.01% |
| 04/13/17 | 13D/A (April 18, 2018) | | | (4,100) | -0.09% |
| 04/18/17 | 13D/A (April 18, 2018) | | | (4,900) | -0.09%[56] |
| 04/25/17 | 13D/A (April 18, 2018) | | | (1,200) | -0.02%[57] |
| 04/26/17 | 13D/A (April 18, 2018) | | | (100) | 0.00% |
| 04/28/17 | 13D/A (April 18, 2018) | | | (2,100) | -0.04% |
| 05/01/17 | 13D/A (April 18, 2018) | | | (4,000) | -0.08% |
| 05/09/17 | 13D/A (April 18, 2018) | | | (5,500) | -0.11% |
| 05/10/17 | 13D/A (April 18, 2018) | | | (2,500) | -0.05% |
| 05/16/17 | 13D/A (April 18, 2018) | | | (1,000) | -0.02% |
| 05/23/17 | 13D/A (April 18, 2018) | | | (1,800) | -0.03% |
| 05/31/17 | 13D/A (April 18, 2018) | | | (9,900) | -0.20% |
| 06/02/17 | 13D/A (April 18, 2018) | | | (1,971) | -0.04% |
| 06/08/17 | 13D/A (April 18, 2018) | | | (11,301) | -0.21%[58] |
| *61,672 shares sold between January 4 and June 8, 2017 = **1.14%** of 5,371,185 shares outstanding* | | | | | |
| 06/12/17 | 13D/A (April 18, 2018) | | | (1,300) | -0.02% |
| 06/13/17 | 13D/A (April 18, 2018) | | | (400) | 0.00% |
| 06/14/17 | 13D/A (April 18, 2018) | | | (3,251) | -0.06% |
| 06/15/17 | 13D/A (April 18, 2018) | | | (1,307) | -0.02% |
| 06/19/17 | 13D/A (April 18, 2018) | | | (7,412) | -0.13% |
| 06/20/17 | 13D/A (April 18, 2018) | | | (2,027) | -0.03% |
| 06/22/17 | 13D/A (April 18, 2018) | | | (9,744) | -0.18% |
| 06/23/17 | 13D/A (April 18, 2018) | | | (5,000) | -0.09% |
| 06/30/17 | 13D/A (April 18, 2018) | | | (3,000) | -0.05% |
| 07/01/17 | 13D/A (April 18, 2018) | | | (1,000) | -0.01% |
| 07/10/17 | 13D/A (April 18, 2018) | | | (1,200) | -0.02%[59] |
| 07/13/17 | 13D/A (April 18, 2018) | | | 1,502 | +0.02% |
| 07/17/17 | 13D/A (April 18, 2018) | | | (1,200) | -0.02%[60] |
| 07/18/17 | 13D/A (April 18, 2018) | | | (975) | -0.01% |
| 07/19/17 | 13D/A (April 18, 2018) | | | (1,114) | -0.02% |
| 08/04/17 | 13D/A (April 18, 2018) | | | (7) | 0.00% |

[55] "The date of event which required the filing of an amendment to the Schedule 13D after Amendment No. 5 [Honig's January 5, 2017 13D/A] was March 15, 2017," the date of the March 2017 Private Placement Agreement (Apr. 18, 2018 Sched. 13D/A).

[56] Based on 4,903,971 shares outstanding as of March 31, 2017 (Apr. 20, 2017 S-3).

[57] Based on 4,903,971 shares outstanding as of April 20, 2017 (Apr. 27, 2017 10-K/A).

[58] Based on 5,371,179 shares outstanding as of June 5, 2017 (June 6, 2017 PRER14A).

[59] Based on 5,371,170 shares outstanding as of July 3, 2017 (July 10, 2017 DEF14A).

[60] Based on 5,392,503 shares outstanding as of July 14, 2017 (July 19, 2017 Form S-3/A).

783086.1

| BARRY HONIG | | | | | |
|---|---|---|---|---|---|
| DATE SOLD | SEC FORM & DATE FILED | SHARES HELD | # OF PRE-SALE SHARES | SHARES SOLD/(PURCHASED) | OWNERSHIP % |
| 10/04/17 | 13D/A (April 18, 2018) | | | (47,250) | -0.86%[61] |
| *86,187 shares sold between June 12 and October 4, 2017 = 1.58% of Riot's 5,436,503 shares outstanding* | | | | | |
| 10/05/17 | 13D/A (April 18, 2018) | | | (11,400) \| 235,960[62] | -0.20% \| **+4.34%** |
| 10/06/17 | 13D/A (April 18, 2018) | | | (10,000) \| 58,990 | **-0.18%** \| **+1.08%** |
| 10/09/17 | 13D/A (April 18, 2018) | | | (136,028) | **-2.50%** |
| 10/10/17[63] | 13D/A (April 18, 2018) | | | (66,529) | -0.98% |
| 10/11/17 | 13D/A (April 18, 2018) | | | (293,916) \| 634,112[64] | **-4.36%** \| **+9.42%** |
| 10/12/17 | 13D/A (April 18, 2018) | | | (41,600) | -0.61% |
| 10/17/17 | 13D/A (April 18, 2018) | | | (4,000) | -0.05% |
| 10/18/17 | 13D/A (April 18, 2018) | | | (3,088) | -0.04% |
| 10/19/17 | 13D/A (April 18, 2018) | | | (3,700) | -0.05% |
| 10/20/17 | 13D/A (April 18, 2018) | | | (45,000) | -0.66% |
| *97,388 shares sold between October 12 and 20, 2017 = 1.44% of Riot's 6,730,272 shares outstanding* | | | | | |
| 11/07/17 | 13D/A (April 18, 2018) | | | (3,800) | -0.05% |
| 11/09/17 | 13D/A (April 18, 2018) | | | (800) | -0.01% |
| 11/10/17 | 13D/A (April 18, 2018) | | | (3,972) | -0.05% |
| 11/13/17 | 13D/A (April 18, 2018) | | | (9,500) | -0.11%[65] |
| 11/14/17 | 13D/A (April 18, 2018) | | | (5,000) | -0.06% |
| 11/15/17 | 13D/A (April 18, 2018) | | | (5,268) | -0.06% |
| 11/16/17 | 13D/A (April 18, 2018) | | | (61,000) | -0.73% |
| *89,340 shares sold between November 7 - 16, 2017 = 1.07% of Riot's 8,321,137 shares outstanding* | | | | | |
| 11/17/17 | 13D/A (April 18, 2018) | | | (18,588) \| 1,500 | -0.22% \| +0.01% |
| 11/20/17 | 13D/A (April 18, 2018) | | | (262,293) | **-3.15%** |
| 11/21/17 | 13D/A (April 18, 2018) | | | (143,475) \| 202,050[66] | **-1.72%** \| **+2.42%** |
| 11/24/17 | 13D/A (April 18, 2018) | | | (266,940) | **-3.20%** |
| 11/28/17 | 13D/A (April 18, 2018) | | | (88,000) | **-1.05%** |
| 11/29/17 | 13D/A (April 18, 2018) | | | 15,000 \| (45,835) | +0.18% \| -0.55% |
| 11/30/17 | 13D/A (April 18, 2018) | | | (5,752) | -0.06% |

---

[61] Based on 5,436,503 shares outstanding as of September 20, 2017 (Sept. 25, 2017 S-3/A).

[62] "Represents shares of Common Stock acquired from the Issuer upon exercise of [Honig's] March 2017 Warrants at an exercise price of $3.56 per share" (Apr. 18, 2018 Sched. 13D/A).

[63] Based on 6,730,272 shares outstanding as of October 10, 2017 (Oct. 13, 2017 Sched. 13G).

[64] "Represents [128,988] shares of Common Stock acquired from [Riot] upon exercise of [Honig's] March 2017 Warrants at an exercise price of $3.56 per share" and "[505,124] shares of Common Stock acquired from [Riot] upon conversion of [Honig's] Series A Preferred Shares at a conversion price of $2.50 per share" (Apr. 18, 2018 Sched. 13D/A).

[65] Based on 8,321,137 shares outstanding as of November 13, 2017 (Nov. 13, 2017 10-Q).

[66] "Represents shares of Common Stock acquired from the Issuer upon conversion of [Barry Honig's] Series A Preferred Shares at a conversion price of $2.50 per share" (Apr. 18, 2018 13D/A).

783086.1

317.    As set forth in the above chart, between January 4 and June 8, 2017, Honig sold 61,672 shares of Riot common stock in 16 separate transactions, which together constituted 1.14% of Riot's 5,371,185 shares outstanding as of June 5, 2017.  Between June 12 and October 4, 2017, Honig sold a further 86,187 shares in another 16 transactions, amounting to 1.58% of the Company's outstanding shares during that time period.  Yet Honig did not disclose any of these dozens sales to the market as required by Section 13(d) and Rule 13d-2(a).  Thereafter, Honig continued to sell even more stock.  Specifically, when the Company (through O'Rourke as its new CEO) announced on October 4, 2017, that it was changing its name to "Riot Blockchain," Honig's undisclosed transactions in Riot's stock skyrocketed.  For example, on the following days, Honig transacted in more than one percent of Riot's outstanding shares of common stock:

- Jan. 4 - June 8, 2017 – sales of 61,672 shares (*1.14% disposition*);
- June 12 – Oct, 4, 2017 – sales of 86,187 shares (*1.58% disposition*);
- Oct. 5, 2017 – purchases of 235,960 shares (*4.34 % acquisition* );[67]
- Oct. 6, 2017 – purchases of 58,990 shares (*1.08% acquisition*);
- Oct. 9, 2017 – sales of 136,028 shares (*2.50 % disposition* );
- Oct. 11, 2017 – sales of 293,916 shares (*4.36% disposition* );
- Oct. 11, 2017 – purchases of 634,112 shares (*9.42% acquisition*);[68]
- Nov. 7-16, 2017 – sales of 89,340 shares (*1.07% disposition*);
- Nov. 20, 2017 – sales of 262,293 shares (*3.15% disposition*);
- Nov. 21, 2017 – sales of 143,475 shares (*1.72% disposition*);
- Nov. 21, 2017 – sales of 202,050 shares (*2.42%% acquisition*);
- Nov. 24, 2017 – sales of 266,940 shares (*3.20% disposition*); and
- Nov. 28, 2017 – saless of 88,000 shares (*1.05% disposition*).

**Formatted:** Font: Not Bold, Not Italic

---

[67] Honig's purchases occurred at below market prices by exercising warrants that he obtained from the Company in an agreement on March 15, 2017, which he failed to disclose on a Schedule 13D/A.  For example, on October 5, 2017, Honig purchased 235,960 shares at $3.56 per share and sold 11,400 shares at $7.47 per share.

[68] Similarly, Honig's sales on October 11, 2017, were accomplished by exercising warrants at $3.56 per share and converting notes at $2.50 per share.  Riot's public shareholders had no way to know that this substantially increased daily trading volume was a 10%+ inside shareholder exercising warrants and notes at below market prices because Honig never disclosed his warrants, or notes, or even his trades – all in violation of Section 13(d) (and in violation of Section 16(a)).

141

318.   The market did not learn about Honig's sales until January 31, 2018, when *The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."[69]  The article stated that "**Mr. Honig has sold about 500,000 shares, he said, but declined to divulge his profit.  He said he still owns about 1% of the company.**"  "'When stock goes up, you take a profit,' [Honig] said."

319.   As a result of this revelation by *The Wall Street Journal* of Honig's previously undisclosed massive (and nearly complete) divestment of his shares of Riot stock (and other revelations of Honig's role as an insider in the Company's transformation and affairs and dubious history as a penny stock investor), the Company's stock price fell from an opening price of $14.50 per share on January 31, 2018, to close at $13.75 that same day, a decline of $0.75, or ***more than 5%.***[70]

320.   In a February 16, 2018 interview with CNBC, former SEC Chairman Harvey Pitt stated that the length of time it Honig took to disclose his stock positions was not what he would consider to be "timely" disclosure.  Former Chairman Pitt said:  "Timely is, particularly if you have a critical position with the company or have already been disclosed as an owner, you're supposed to file updates promptly, and certainly not longer than ten days at the most, so I think there is a serious problem with someone who is already over the threshold, not keeping current with his stock position movements."[71]

---

[69] Ianthe Jeanne Dugan, *Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake; Barry Honig pares back stake in Riot Blockchain, whose shares soared last year after a change of name*, The Wall Street Journal (Jan. 31, 2018).

[70] In contrast, on the same day that Riot's stock price was falling, January 31, 2018, the price of Bitcoin *increased* $112.90 (approximately 1.1%) from opening at $10,108.20 to closing at $10,221.10.

[71] Specifically, former-Chairman Pitt stated, "Timely is, particularly if you have a critical position with the company or have already been disclosed as an owner, you're supposed to file updates

321.   *Third*, as a Riot shareholder with more than 10% of the Company's outstanding shares, Honig violated his obligations under Exchange Act Section 16(a) and Rules 16a-2 and 16a-3 [17 C.F.R. § 240.16a-2 and 240.16a-2] to file Forms 4 by the end of the second business day following any day on which he transacted in Riot's common stock.  Indeed, Honig did file two Forms 4 on December 2, 2016, and January 4, 2017, but after that never filed another Form 4, despite the fact that Riot's April 27, 2017 Form 10-K/A stated that Honig was a 11.20% shareholder as of April 20, and despite the fact that Honig's April 18, 2018 Schedule 13D/A revealed that Honig had trading in Riot's common stock on March 29, March 31, April 5, April 13, April 14, and April 18, 2017.  By not disclosing these trades within two business days, Honig clearly violated Section 16(a) and the rules thereunder.

322.   *Fourth*, Honig's January 5, 2017 Schedule 13D/A stated:

**Item 6.  Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer**

~~**A.     Other April 20, 2017 – Securities Registration Statement (Form S-3/A)**~~

~~On April 20, 2017 Bioptix filed a Form S-3/A~~than as described herein, there are no contracts, arrangements, understandings or relationships (legal or otherwise) between the Reporting Person and any other person with respect to the shares.

323.   This disclosure was materially false and misleading for at least two reasons.  First, Honig failed to disclose his agreement – whether express or tacit – with the Honig Group and Selling Stockholders[72] – to to acquire, hold, vote, and/or dispose of shares they acquired in Riot in

---

promptly, and certainly not longer than 10 days at the most," Pitt said.  *See* CNBC, Former SEC chair on market manipulation and regulating cryptocurrency, available at https://www.cnbc.com/video/2018/02/16/former-sec-chair-on-market-manipulation-and-regulating-cryptocurrency.html.   *See also*  https://www.sec.gov/fast-answers/answerssched13htm.html ("Any material changes in the facts contained in the [Schedule 13D] require a prompt amendment.").

[72] Such groups are "deemed a 'person' for purposes of [Section 13(d)]."  15 U.S.C § 78m(d)(2).

coordination with one another while knowingly or recklessly obtaining and exercising undisclosed control of the management and policies of Riot and while selling shares of Riot into the market at artificially inflated prices.  Second, "a Schedule 13D reporting person [is] required to file an amended Schedule 13D if it acquires warrants from an issuer," even if "not exercisable for six months" and must disclose the warrants in its "Item 6 (contracts) disclosures and file the warrant agreement as an exhibit pursuant to Item 7 of Schedule 13D."[73]  Here, Honig has effectively admitted, in his April 18, 2018 Schedule 13D/A, that the "first date of event which required the filing of an amendment to the Schedule 13D after Amendment No. 5 (Honig's previous January 5, 2017 Schedule 13D/A) was March 15, 2017, which was the date of the March 15, 2017 Private Placement in which Riot entered into agreements with Honig to sell Honig warrants and notes to purchase up to 700,000 shares of common stock.  Yet, Honig did not disclose this agreement until April 18, 2018.  Instead, Honig's January 5, 2017 Schedule 13D/A remained operative and informed investors that "there are no contracts, arrangements, understandings or relationships (legal or otherwise) between the Reporting Person and any other person with respect to the shares."  Thus, in addition to violating his obligations to amend his Schedule 13D/A to disclose his material acquisitions and dispositions of Riot's common stock, Honig further violated Section 13(d) by failing to disclose the March 2017 Private Placement, and affirmatively disavowing that he had any "understandings or relationships" with respect to Riot's common stock when in fact he was operating a fraudulent pump-and-dump scheme with the other members of the Honig Group, and the wider group of Selling Stockholders.

---

[73]  See   https://www.sec.gov/divisions/corpfin/guidance/reg13d-interp.htm   ("Exchange   Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting").

144

**2.     Groussman's Beneficial Ownership Reports on Schedule 13G Were Materially False, Misleading, Deficient, and Untimely**

324.     During the Class Period, Defendant Groussman improperly made Schedule 13G filings that falsely represented him as a passive investor in violation of Rule 13d-1(c) and failed to disclose his membership in a "group" (i.e., the Honig Group) as required by Section 13(d)(3) and Rules 13d-2, 13d-5,[74] and 13d-101.[75]

325.     Because they acted in concert to control the management and policies of Riot and pursuant to an agreement to acquire, hold, vote, and/or dispose of Riot shares in coordination with one another, each of Honig, O'Rourke, Groussman, and Stetson were each members of a group that was considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of that group and disclosing the number of shares each of them beneficially owned.  However, Groussman never made a Schedule 13D filing disclosing his membership in a group, thus further concealing from the market the size of the Honig Group's position and coordination and thereby deceiving Riot's public investors.

326.     Not only did Groussman fail to disclose that he was investing in a group, but he also failed to file a Schedule 13D at all, instead filing only a Schedule 13G, which is reserved only for "passive" investors – which he did not qualify to do under Rule 13d-1(c).  Specifically, on

---

[74] *See* 17 C.F.R § 240.13d-5(b)(1) ("When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the ***group*** formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.") (emphasis added).

[75] *See* 17 C.F.R § 240.13d-101 ("Item 5.   Interest in Securities of the Issuer") ("The above information should also be furnished with respect to persons who, together with any of the persons named in Item 2, ***comprise a group within the meaning of section 13(d)(3) of the Act*** . . . .") (emphasis added).

October 13, 2017, Groussman filed a Schedule 13G reporting that he held 399,202 shares of Riot common stock constituting "5.93%" of shares "outstanding as of October 10, 2017." Groussman's 13G checked a box indicating that it was filed pursuant to "Rule 13d-1(c)," which is the rule allowing a Schedule 13G to be filed in lieu of a Schedule 13D provided that the person "[h]as not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect . . . ." 17. C.F.R. § 204.13d-1(c).

327.    Groussman's October 13, 2017 Schedule 13G/A also stated, above his signature, that "I certify certify that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect."

328.    In signing the Schedule 13G/As Groussman falsely identified himself as a passive 13G investor without any intention to influence or control the Company, and omitted that he was a member of a group – and not only a member of a group holding more than 5% of the Company's stock, but an undisclosed control group affiliated with O'Rourke as CEO.

329.    Similarly, on February 15, 2018, Groussman filed a Schedule 13G/A (Amendment No. 1).  Groussman's 13G/A indicated that as of "December 31, 2017," he had held 188,888 shares of Riot's common stock constituting "1.62%" of shares "outstanding as of December 31, 2017." As before, Groussman's signed the Schedule 13G/A and checked the box indicating that it was filed pursuant to "Rule 13d-1(c)," and "certif[ied] that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect

146

of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect."

330.   The chart below details Groussman's reported holdings, together with the Company's own reports of his holdings on Schedules 13G and 13G/A, and calculates the changes in his holdings as a percentage of Riot's most recently reported shares of common stock outstanding.

| MARK GROUSSMAN | | | | |
|---|---|---|---|---|
| **FILING DATE (EVENT DATE)** | **SCHEDULE/FORM (SHARES OUTSTANDING)** | **SHARES HELD** | **% OF ALL SHARES** | **% CHANGE** |
| 04/20/17 | S-3 (4,903,971 as of 03/31) | 500,000 | 9.04 % | N/A |
| 07/19/17 | S-3/A (5,392,503 as of 07/14) | 500,000 | 9.05 % | 0 |
| 08/24/17 | S-3/A (5,403,919 as of 08/21) | 500,000 | 9.05 % | 0 |
| 09/25/17 | S-3/A (5,436,503 as of 09/20) | 500,000 | 8.98 % | 0 |
| 10/13/17 (10/10/17) | 13G (6,730,272 as of 10/10) | 399,202 | 5.93 % | **- 1.49 %** |
| 01/05/18 (12/28/17) | S-3 (11,622,112 as of 01/04) | 131,945 | 1.13 % | **- 2.29 %** |
| 02/15/18 (12/31/17) | 13G/A (11,622,112 as of 12/31/17) | 188,888 | 1.62 % | **0.48 %** |

331.   As shown above, between at least April 20, 2017 and September 25, 2017, Groussman held 500,000 shares of Riot common stock, representing approximately 9% of the Company's total outstanding shares, making Groussman one of the Company's largest

147

shareholders.  Yet, during that time, Groussman never filed any report of his beneficial ownership on either Schedule 13G or 13D as required by Section 13(d) and Rule 13d-1.

332.   On October 13, 2017 (after the Company had changed its name to "Riot Blockchain" and issued a flurry of announcements about its new strategy and strategic transactions, including Coinsquare on October 2, 2017, which Groussman was an undisclosed party to a contract with Riot), Groussman finally filed a Schedule 13G disclosing that he held 399,202 of Riot stock.  But by this time, Groussman had already sold 100,798 shares of his initial 500,000 shares, which amounted to 1.49% of Riot's total outstanding common stock.

333.   Thus, Groussman should have not only already filed a Schedule 13D disclosing his original 500,000 shares, but he should have "promptly" informed investors when he sold the 100,798 as required by Rule 13d-2(a) (requiring persons to "promptly" disclose "any material increase or decrease in the percentage of the class beneficially owned" and stating that the "acquisition or disposition" of "one percent or more of the class of securities shall be deem 'material' for purposes of this section").  However, because the October 13, 2017 Schedule 13G was Groussman's first report, it is impossible to know when he sold the 100,798 shares and whether that material sale of Riot stock was reported "promptly."

334.   It is clear, however, that Groussman's subsequent sales 267,257 shares of Riot stock (representing 2.29% of Riot's total outstanding shares) between October 13, 2017, and January 5, 2018 were *not* promptly reported as required by Rule 13d-2(a).  Instead, Groussman waited until February 15, 2018 to disclose that his stake in Riot (last reported on October 13, 2017 as 5.93 % had dropped to 1.62 %.[76]  By waiting to disclose his reduced beneficial ownership *at least 49 days*

---

[76] Groussman may argue that he was allowed to file on February 15 by Rule 13d-2(b), which permits amendment of a Schedule 13G "[45] days after the end of the calendar year" but this rule

(since December 28, 2017) and likely much longer (assuming at least some of his sales occurred, like Honig's sales, in October and November 2017), Groussman violated Section 13(d) and facilitated the Honig Group's pump-and-dump scheme by concealing his stock sales from the market.

### 3. DeFrancesco's Beneficial Ownership Reports on Schedule 13D Were Materially False, Misleading, Deficient, and Untimely

335. During the Class Period, Defendant DeFrancesco facilitated and concealed the Honig Group's pump-and-dump scheme at Riot through material misrepresentations and omissions on Schedule 13D, and her amendments thereto on Schedule 13D/A, which violated not only DeFrancesco's duties under Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)], but also violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

336. DeFrancesco filed her initial Schedule 13D on September 12, 2016, reporting holding 7.49% of Riot's common stock as of September 2, 2016. DeFrancesco later filed amended Schedule 13D/As, reporting her percentage holdings of Riot's common stock up until January 10, 2017, when she reported owning 515,777 shares representing 11.45 % of Riot's outstanding common stock. From January 10, 2017 to the present day, DeFrancesco has, inexplicably, never again reported her holdings of Riot common stock.

---

only applies to persons who qualify to file a Schedule 13G because they are "passive" investors under Rule 13d-1(c). As noted above, however, Groussman was not a "passive" investor but a member of the Honig Group. Like Honig and DeFrancesco, Groussman was required to file a Schedule 13D and abide by the requirements for all 13D filers. Like Honig and DeFrancesco, Groussman failed to comply.

783086.1

337.    The chart below details DeFrancesco's reported holdings, together with the Company's own reports of her holdings, and calculates change in her holdings as a percentage of Riot's most recently reported shares of common stock outstanding.

| CATHERINE DEFRANCESCO | | | | |
|---|---|---|---|---|
| FILING DATE (EVENT DATE) | SCHEDULE/FORM (SHARES OUTSTANDING) | SHARES HELD | % OF ALL SHARES | % CHANGE |
| 09/12/16 (9/02/16) | 13D (3,876,961 as of 8/10) | 290,404 | 7.49 % | NA |
| 09/14/16 (09/13/16) | 13D/A (3,876,961 as of 8/10) | 341,176[77] | 8.80 % | 1.30 % |
| 09/20/16 (09/20/16) | 13D/A (3,876,961 as of 8/10) | 341,176[78] | 8.80 % | 0 |
| 10/07/16 | PRE 14A (4,503,971 as of 09/30) | 341,176[79] | 7.60 % | 0 |
| 10/17/16 | DEF 14A (4,503,971 as of 09/30) | 341,176[80] | 7.60 % | 0 |
| 10/20/16 (10/18/16) | 13D/A (3,876,961 as of 8/10) | 362,835 | 9.36 % | 0.55 % |
| 10/25/16 (10/25/16) | 13D/A (3,876,961 as of 8/10) | 364,435 | 9.40 % | 0.04 % |
| 12/05/16 (11/30/16) | 13D/A (4,503,971 as of 11/11) | 470,676 | 10.45 % | 2.35 % |
| 12/09/16 (12/07/16) | 13D/A (4,503,971 as of 11/11) | 475,777 | 10.56 % | 0.11 % |
| 12/13/16 | 13D/A | 478,277 | 10.62 % | 0.05 % |

[77] States that DeFrancesco's 341,176 shares "is based upon holdings reported on Schedule 13D filing and amendments, the most recent filed on September 20, 2016."

[78] Id.

[79] Id.

[80] Id.

150

783086.1

| CATHERINE DEFRANCESCO | | | | |
|---|---|---|---|---|
| **FILING DATE (EVENT DATE)** | **SCHEDULE/FORM (SHARES OUTSTANDING)** | **SHARES HELD** | **% OF ALL SHARES** | **% CHANGE** |
| (12/09/16) | (4,503,971 as of 11/11) | | | |
| 01/10/17 (01/05/17) | 13D/A (4,503,971 as of 11/11) | 515,777 | 11.45 % | 0.83 % |
| 04/27/17 | 10-K/A (4,903,971 as of 04/20) | 515,777[81] | 11.5 %[82] | 0 |
| 04/28/17 | PRE14A (4,903,971 as of 04/20) | 515,777[83] | 11.5 %[84] | 0 |
| 06/06/17 | PRER14A (5,371,179 as of 06/05) | 515,777[85] | 9.60 %[86] | 0 |
| 06/28/17 | PRER14A (5,371,179 as of 06/05) | 515,777[87] | 9.60 %[88] | 0 |
| 06/29/17 | PRER14A (5,371,179 as of 06/05) | 515,777[89] | 9.60 %[90] | 0 |
| 07/10/17 | DEF 14A (5,371,170 as of 07/03) | 515,777[91] | 9.60 %[92] | 0 |

---

[81] States that DeFrancesco's 515,777 shares "is based upon holdings reported on Schedule 13D filing and amendments, the most recent filed on January 10, 2017."

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Id.*

151

783086.1

| CATHERINE DEFRANCESCO | | | | |
|---|---|---|---|---|
| **FILING DATE (EVENT DATE)** | **SCHEDULE/FORM (SHARES OUTSTANDING)** | **SHARES HELD** | **% OF ALL SHARES** | **% CHANGE** |
| 01/05/18 (12/28/17) | S-3 (11,622,112 as of 01/04) | 155,904 | 1.3 % | - 3.09 % |
| 02/07/18 (02/05/18) | S-3/A (11,652,270 as of 02/05) | 155,904 | 1.3 % | 0 |

338.    As shown above, in each of her nine Schedule 13D or 13/D filings, DeFrancesco reported holding an increasing stake in the Company's outstanding shares of common stock.

339.    Yet, after filing her January 10, 2017 Schedule 13D/A, and reporting her 11.45% stake in Riot, DeFrancesco never filed another disclosure, despite having reported that she was a Riot major **10%+** shareholder (and thus insider) to report her subsequent holdings – or subsequent stock sales – to the market.[93]

340.    Although DeFrancesco never filed a Schedule 13D/A after January 10, 2017, she appears to have sold nearly all of her stake in Riot stock between January 10, 2017 and December 28, 2017.  Specifically, on January 5, 2018, Riot filed a Form S-3 reporting that as of December 28, 2017, DeFrancesco had only held 139,904 shares of Riot stock representing only 1.20 of Riot's outstanding shares.  Thus, between January 10, 2017, and December 28, 2017, DeFrancesco sold 375,873 shares of Riot stock, representing 3.22% of the Company's overall shares of common

---

[93] In addition, as a Riot shareholder with more than 10% of the Company's outstanding shares, DeFrancesco violated her obligations under Exchange Act Section 16(a) and Rules 16a-2 and 16a-3 [17 C.F.R. § 240.16a-2 and 240.16a-2] to file Forms 3 and 4 and to file an updated Form 4 within the end of the second business day following any day on which she transacted in Riot's common stock.

stock,[94] without ever disclosing to the market her highly material change in beneficial ownership of Riot stock (which she had last reported as 11.45%).  By failing to ever amend her January 10, 2017 Schedule 13D/A, DeFransco violated required by Section 13(d) and Rule 13d-1(a), but more importantly, actively facilitated the Honig Group's pump-and-dump scheme by denying material information to the Company's public investors she and others in Honig Group sold their shares into the market.  In sum, by violating her disclosure obligations under the federal securities laws, while engaging in manipulative trading, DeFrancesco violated Section 10(b) and Rule 10b-5.

### 4.    Stetson Failed to File Beneficial Ownership Reports with the SEC Despite Co-Investing Alongside the Undisclosed Honig Group

341.    Because Defendant Stetson acted in concert with Honig, O'Rourke, and Groussman, to control the management and policies of Riot and pursuant to an agreement to acquire, hold, vote, and/or dispose of Riot shares in coordination with one another, each of them were each members of a group that was considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of that group and disclosing the number of shares each of them beneficially owned.  However, Stetson never made a Schedule 13D filing disclosing his membership in a group, thereby concealing from the market the size of their group's position and their coordination and thereby deceiving investors.

342.    Each of Riot's April 20, July 19, August 24, and September 25, 2017 Forms S-3/A identified Stetson Capital as holding 4.99% of Riot's common stock before each of those four offerings.  Specifically, Stetson's reported shares on each date were April 20 (283,400) July 19

---

[94] This percentage is highly conservative because it uses as its denominator the 11,622,112 shares of Riot common stock outstanding as of January 4, 2018.  In contrast, when DeFrancesco last reported her 11.45% stake in Riot stock, the Company had last reported having 4,503,971 as of November 11, 2016.

153

(283,300), August 24 (283,300), and September 25 (285,150). By purportedly keeping his holdings below 4.99%, Stetson appeared to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings. In other words, by ostensibly staying close to but immediately below the 5% ownership threshold, and evading the public reporting requirements, Stetson increased the likelihood that he and his associates (including Honig, DeFrancesco, and Groussman) could conceal the millions of shares that they had amassed and thereby mask their scheme to pump up Riot's share price and trading volume in anticipation of a profitable sell-off to unsuspecting investors.

343.    Structuring his shareholding in this manner was itself misleading, however, because as a member of a group, Stetson himself was required (under Section 13(d)(3) and Rules 13d-2, 13d-5, and 13d-101) to file a Schedule 13D identifying himself a group member. Yet, Stetson never made any filing under Schedule 13G or 13D as a Riot stockholder. Because Stetson never filed a Schedule 13D or amended 13D/A, Riot's public investors were not notified when, as a group member, Stetson sold his shares into the market during the group's pump-and-dump scheme.

**B.     Defendants' Materially False and Statements and Omissions Regarding the Company's Beneficial Ownership and Related-Party Transactions**

344.    As discussed above in § IX.A, similar beneficial ownership obligations as those imposed on stockholders (such as Honig, DeFrancesco Groussman, and Stetson) are also imposed on issuers (such as Riot) pursuant to Section 13(a) and Item 403 of Regulation S-K. In violation of these obligations, Honig, O'Rourke, Groussman, Stetson, and DeFrancesco knowingly and/or recklessly concealed their concerted "group" investment in Riot from the investing public.

345.    Likewise, O'Rourke and Beeghley, as Riot executives and/or Board members who signed Riot's SEC filings, had full knowledge of that Honig, DeFrancesco Groussman, and Stetson (together O'Rourke and Beeghley, and other affiliated "selling stockholders") were all acting in

154

783086.1

concert to coordinate their acquisition and voting of Riot stock, and to control the direction of the management and policies of Riot.  Yet, working from within the Company, O'Rourke and Beeghley kept the Honig Group's scheme to control Riot a secret by signing false and misleading public SEC filings that did not disclose that even the Honig Group constituted a "group" under Section 13(d)(3) and Item 403 of Regulation S-K, much less the full extent of the Honig Group's coordination control of Riot.

346.    As discussed below, during the Class Period, O'Rourke and Beeghley knowingly caused Riot to issue materially false and misleading Securities Registration Statements on Form S-3/A, Annual Reports on Form 10-K, and Proxy Statements on Form DEF 14A.  When the true facts about the Honig Group's connections and scheme to control Riot were revealed – including O'Rourke's role (while CEO of Riot) as a key member and collaborator of the Honig Group who had been taking directions from Honig himself – Riot's shareholders sustained substantial financial losses.

**1.     April 20, 2017 – Registration Statement (Form S-3/A)**

210.    On April 20, 2017 the Company filed a Form S-3/A, signed by Defendants O'Rourke and Beeghley, registering, for sale to the investing public, 5,657,161 shares of common to be sold by the followingcertain "Selling Stockholders":

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.63% | 200,000 (1) | 0 | * |
| Andrew Schwartzberg | 549,800 (2) | 9.99% | 900,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.63% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.10% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,860 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 596,400 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 598,100 (12) | 9.99% | 1,624,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.20% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,400 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |

\* Less than 1%.
\*\* Based on 4,903,971 shares of Common Stock outstanding as of April 14, 2017.

211.  ~~—."~~  The Form S-3/A contained a "table" that purported to list "of April ~~2014~~, 2017 ~~S-3/A was signed by Defendants Beeghley, McGonegal, O'Rourke, and Dai and stated that "[n]one of . . . .~~ the ~~selling stockholders has~~ number of shares held ~~any position~~ of record or ~~office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities."~~

~~212.    The above statement in Bioptix's April 20, 2017 Form S-3/A was materially false and misleading when made because it states that "none" of the selling stockholders "has had a material relationship" with the Company when in fact, as explained herein, Defendant Honig and various members of the Honig Group maintained numerous financial ties to Defendant O'Rourke, a Bioptix Board member during this time, Defendant Beeghley, then Bioptix's CEO.~~

213.347.   ~~Additionally, according to the allegations in the Honig Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson and Groussman.  This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the Honig Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, Florida, in February 2018 and instead found Defendant O'Rourke.  These~~

156

**Formatted:** Font: Not Bold, Not Italic

**Formatted:** Font: Not Bold, Not Italic

**Formatted:** Font: Not Bold, Not Italic

~~and other personal and financial interests belie the statement that "none" of~~ beneficially by the

selling stockholders ~~in the April 20, 2017 S-3/A had a material relationship with the Company.~~ as

of such date" of Riot common stock, as the Form S-3/A was required to pursuant to Item 403 of

Regulation S-K.

~~Additionally, the April 20, 2017 S-3/A is materially false and misleading because it failed to~~

~~disclose                        that                        virtually                        *all*~~

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering** | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.63% | 200,000 (1) | 0 | * |
| Andrew Schwartzberg | 549,800 (2) | 9.99% | 900,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.63% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.10% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,860 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 596,400 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 598,100 (12) | 9.99% | 1,624,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.20% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,400 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |

\*   Less than 1%.
\*\* Based on 4,903,971 shares of Common Stock outstanding as of April 14, 2017.

348.    As noted above (*see* § IX.A, *supra*) this disclosure was required by Exchange Act

Section 13(a) and Exchange Act Regulation S-K at Item 403, which requires issues to provide a

disclosure in "tabular form" of "any person (including any 'group' as that term in used in section

13(d)(3) of the Exchange Act) who is known to the registration to be the beneficial owner of more

than five percent of any class of the registrants voting securities."  17 C.F.R. § 229.403.

349.    The disclosures relating to the Selling Stockholders in the April 20, 2017 Form S-

3/A were materially false and misleading.  *First*, the April 20, 2017 Form S-3/A listed Defendants

Honig, Groussman, and Stetson (along with their related entities including GRQ 401K,

157

Melachdavid, Groussman's two UTMA funds, and Stetson Capital) as Selling Stockholders, but did not disclose, as required by Exchange Act Section 13(a) and Exchange Act Regulation S-K at Item 403, that Honig, Groussman, and Stetson constituted a "'group' as that terms is defined and used in Section 13(d)(3) of the Exchange Act." 17 C.F.R. § 229.403(a). Specifically, although the S-3/A listed Honig as a 9.99% beneficial owner; Groussman (through Melachdavid and the two UTMA accounts) as a 9.04% beneficial owner; and Stetson (through Stetson Capital) as a 4.99% owner, it failed to disclose the combined group ownership of Honig, DeFrancesco, Groussman, and Stetson (or their entities) that formed the Honig Group.

350.   Similarly, the S-3/A misrepresented and omitted that Selling Stockholders Aifos, Titan, Molinksy, O'Braitis, Paradox (i.e., Honig's longtime lawyer, Kesner), and Stockwire were all previously affiliated with the Honig Group through investments in previous companies (*see* § X.B, *supra*) and through those prior investments and relationships, had in fact been selected and invited by the Honig Group to invest in Riot.

214.351.   *Second*, the majority (if not all) of the "selling stockholders" were members of listed in the Honig Group, April 20, 2017 Form S-3/A had invested together in multiple previous public companies, and were engaged in a common scheme and conspiracy to artificially inflate Riot's stock at the expense of other would-be public shareholders. Altogether, this group of Honig-associated stockholders accounted for at least 55% of Riot's common stock[95] (and likely more)

---

[95] Specifically, the following April 20, 2017 Selling Stockholders (and their percentage of stock owned) were associates of Honig and members of the Honig Group: Richardson (3.63%); Melechdavid (6.10%); Groussman (1.47% each in two UTMA funds for a total of 2.94%); Honig (9.99%); GRQ 401K (9.99%); Titan (9.99%); O'Braitis (1.48%); Stockwire (i.e., James) (0.75%); Aifos (i.e., Theofilos) (2.20%); Stetson Capital (i.e., Stetson) (4.99%); JAD (1.48%); and Molinsky (1.80%), and Policy No. 2013-17 (i.e., Bhansali) (0.75%).

158

without taking into count the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January 10, 2017.[96]

352.   *Third*, the Selling Stockholders operated as a centrally organized "control group" that coordinated their trades down to the single share.  In that regard, closer scrutiny of Riot's April-September 2017 Forms S-3/A reveals how various members of the Honig Group precisely coordinated shareholdings, resulting in implausibly coincidental numbers of shares these purportedly "unrelated" stockholders (and their investment entities) held.  For example, in the April 20, 2017 Form S-3/A, O'Braitis and JAD Capital (a corporation in Ontario owned by Theofilos, the CEO of MUNDOMedia Ltd., a company in which Defendant Honig, his brother, O'Rourke, Stetson, and Groussman each held shares, ***both*** reported beneficially owning "***81,204***" shares representing "***1.48%***" of the Company's common stock.  *Id.*

353.   *Fourth*, April 20, 2017 S-3/A further stated that "[u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law."  This disclosure was required by Exchange Act Section 13(a) and Exchange Act Regulation S-K at Item 403), which requires issuers to "[i]nclude such additional subcolumns or other appropriate explanation of column (3) [i.e., "Amount and Nature of Beneficial Ownership"] necessary to reflect amounts as to which the beneficial owner has (A) sole voting power, (B) shared voting power, (C) sole investment power, or (D) shared investment power."  17 C.F.R. § 229.403 (c)(2).  However, this statement in the April 20, 2017 S-3/A was materially false and misleading when made because that Honig, Groussman, Stetson, toegether with Aifos, Titan, Molinksy, O'Braitis, Paradox, and Stockwire were investing as a group and thereby and agreed,

---

[96] *See* Riot Blockchain, Inc., Amended Annual Report (Form 10-K/A) at 52 (Jun 29, 2018).

either explicitly or implicitly, to share their voting and/or investment power with respect to Riot's common stock.

354.   *Fourth*, the April 20, 2017 S-3/A also stated that "[e]ach selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock." However, this statement in the April 20, 2017 S-3/A was similarly materially false and misleading when made because that Honig, Groussman, Stetson, together with Aifos, Titan, Molinsky, O'Braitis, Paradox, and Stockwire were investing as a group and thereby and agreed, either explicitly or implicitly, to share their voting and/or investment power with respect to Riot's common stock.

355.   As discussed above, O'Rourke and Beeghley knew, at a minimum, that Honig, Groussman, and Stetson were investing together as a group, but they signed the April 20, 2017 Form S-3/A without disclosing theses individuals collective beneficial ownership of Riot.

356.   Beeghley also knew that Honig, Groussman, Stetson, together with various Selling Stockholders – including at least Aifos, Titan, Molinsky, O'Braitis, Paradox, and Stockwire – were all previously affiliated because those same individuals and/or entities had all invested in PolarityTE when Beeghley was a Director of PolarityTE, a company of which that Honig had been Chairman and CEO and Stetson had been CFO. Thus, O'Rourke and Beeghley knew the S-3/A violated Section 13(d) and was materially false and misleading.

#### ~~B.~~2.   April 27, 2017 – Annual Report (Form 10-K/A)

~~215.   On~~ Riot's 2016 Form 10-K, filed with the SEC on April 27, 2017, ~~Bioptix filed an Amended Annual report under Form 10-K/A. In a section of the Annual Report entitled, "Certain Relationships and Related Transactions and Director Independence" the report stated:~~

~~Except for the employment agreements previously entered into between the~~ and signed by O'Rourke and Beeghley contained a table that purported to "set[] forth the beneficial ownership of the Company's common stock as of April 20, 2017 by

160

> **Formatted:** Heading 4

each Company and certain of its named director, director nominee and each executive officer then serving, by all directors, director nominees and executive officers (as described in Item 11 above), since January 1, 2016, none of the directors or named executive officers of the Company, nor any as a group, and by each person who owned of record, or was known to own beneficially, more than 5% of the Company's outstanding shares of its Common Stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company.

216.357. common stock," as required by Item 403 of Regulation S-K.  The above statement in Bioptix's April 27, 2017 Form 10-K/A was materially false and misleading when made because it states that "none" of the directors, officers, or any person owning 5% or more of the company's common stock has "any material interest, direct or indirect, in any transaction, or in any proposed transaction" when, in fact, as explained herein, Defendant Honig and various members of the Honig Group and Company insiders maintained numerous financial ties to Defendants O'Rourke, a Board member during this time, and Defendant Beegley, then Bioptix's CEO. table is below

217.    Additionally, according to the allegations in the Honig Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson and Groussman.  This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the Honig Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke.  These and other personal and financial interests belie the statement in the April 27, 2017 10-K/A that "none" of the directors, officers, or any person owning 5% or more of the company's common stock has "any material interest, direct or indirect, in any transaction, or in any proposed transaction."

218.    The April 27, 2017 10-K/A was signed by Defendants O'Rourke and McGonegal.  Pursuant to §302 of SOX, and also covered by §§ 304 and 906 of SOX, Defendants O'Rourke and McGonegal certified that they had designed and evaluated effective internal and disclosure

161

783086.1

~~controls over financial reporting, which assured the reliability of financial reporting, and also that~~

~~Riot's financial statements fairly and accurately presented the financial condition of the Company.~~

~~Those SOX certifications stated as follows:~~

~~1.   I have reviewed this quarterly report on Form 10-K of Bioptix, Inc.;~~

~~2.   Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;~~

~~3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;~~

~~4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:~~

~~(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;~~

~~(b)   *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;~~

~~(c)   *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and~~

~~(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to~~

162

materially affect, the registrant's internal control over financial reporting; and

5. ~~The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):~~

(a) ~~All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and~~

(b) ~~Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.~~

219. ~~Defendant Beeghley's and McGonegal's SOX certifications in ¶ 218 were false and misleading because, as explained in ¶ 217, the statement that "none" of the directors, officers, or any person owning 5% or more of the company's common stock has "any material interest, direct or indirect, in any transaction, or in any proposed transaction" was an untrue statement that only served to advance Defendants' common scheme and conspiracy to artificially inflate Riot's stock at the expense of other would-be public shareholders. Altogether, this group of Honig-associated stockholders accounted for at least 55% of Riot's common stock (and likely more) without taking into count the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January 10, 2017.~~

| Name and Address | Number of Shares | Percent |
|---|---|---|
| Directors: | | |
| Michael M. Beeghley (1) | 14,000 | * |
| John R. O'Rourke (2) | 29,133 | * |
| Mike Dai (3) | 3,333 | * |
| Other Executive Officers: | | |
| Jeffrey G. McGonegal (4) | 89,244 | 1.9% |
| Richard J. Whitcomb (5) | 20,405 | * |
| All Directors and Officers as a Group (5 persons) (6) | 156,115 | 3.4% |
| More than 5% Shareholders: | | |
| Barry C. Honig (7) | 504,000 | 11.2% |
| Catherine Johanna DeFrancesco (8) | 515,777 | 11.5% |
| E. Jeffrey Peierls (9) | 357,744 | 7.9% |

* Holds less than 1%

163

358.   Although this table in Riot's April 27, 2017 Form 10-K disclosed Honig as a beneficial owner of 11.2% of Riot's outstanding common stock, and DeFrancesco as a beneficial owner of 11.5% of Riot's outstanding common stock, it failed to disclose the combined group ownership of Honig, DeFrancesco Groussman, and Stetson (and their entities). O'Rourke and Beeghley knew that Honig, DeFrancesco Groussman, and Stetson were working together as a group, but they failed to disclose in the Form 10-K the Honig Group's combined beneficial ownership of Riot's stock.

359.   Thus, Riot's Form 10-K concealed from Riot's public investors material information about the Honig Group's coordinated investment in Riot as a group as defined by Section 13(d)(3).  Such information is especially important to investors evaluating microcap issuers such as Riot, which are particularly susceptible to manipulation by undisclosed control persons.

360.   As discussed above, O'Rourke and Beeghley knew that Honig and DeFrancesco were investing with each others, with the other Honig Group members, and with various Selling Stockholders, which together constituted a group that required disclosure under Section 13(d).

### C.3.   July 19, 2017 – Securities Registration Statement (Form S-3/A)

220.361.   On July 19, 2017, Bioptix filed a Form S-3/A registering, for sale to the investing public, 5,657,161 shares of common to be sold by the following "Selling Stockholders":

783086.1

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northeast Inc. | 554,100 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melchdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 595,600 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 592,400 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Brattis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | 0.19% | 20,000 (23) | 0 | * |

\* Less than 1%.
\*\* Based on 5,392,503 shares of Common Stock outstanding as of July 14, 2017.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northeast Inc. | 554,100 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melchdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 595,600 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 592,400 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Brattis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | 0.19% | 20,000 (23) | 0 | * |

\* Less than 1%.
\*\* Based on 5,392,503 shares of Common Stock outstanding as of July 14, 2017.

221.362.  The July 19, 2017 Form S-3/A was signed by Defendants Beeghley, McGonegal, O'Rourke, Dai, and Kaplan and also stated that "[*n]one of the* u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law" and that "[e]ach selling *stockholders* stockholder has

165

783086.1