# Exhibit D

10-K 1 riot_10k-123117.htm FORM 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
# Washington, D.C. 20549

## FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2017

or

☐ **TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from             to

Commission file number 001-33675

# RIOT BLOCKCHAIN, INC.

(Exact name of registrant as specified in its charter)

| **Nevada** | **84-155336** |
|---|---|
| (State or other jurisdiction of Incorporation or organization) | (I.R.S. Employer Identification No.) |

| **202 6th Street, Suite 401** <br> **Castle Rock, CO** | **80104** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code **(303) 794-2000**

Securities registered under Section 12(b) of the Exchange Act:

| **Common Stock no par value per share** | **The NASDAQ Stock Market LLC** |
|---|---|
| (Title of class) | (Name of each exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Exchange Act: None.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Note - Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Exchange Act from their obligations under those Sections.

Indicate by check mark whether the registrant (1) filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was

required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers in response to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendments to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company=. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☐<br>(Do not check if a smaller reporting company) | Smaller reporting company ☒ |
| Emerging growth company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [_]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

As of June 30, 2017, the aggregate market value of the common stock, no par value, held by non-affiliates of the registrant, based on the closing sale price of the common stock, no par value per share was approximately $21.9 million.

As of April 13, 2018, the registrant had 13,417,132 shares of common stock outstanding.

DOCUMENTS INCORPORATED BY REFERENCE List hereunder the following documents if incorporated by reference and the Part of the Form 10-K (e.g., Part I, Part II, etc.) into which the document is incorporated: (1) Any annual report to security holders; (2) Any proxy or information statement; and (3) Any prospectus filed pursuant to Rule 424(b) or (c) under the Securities Act of 1933.

Not applicable.

# RIOT BLOCKCHAIN, INC.
# INDEX TO ANNUAL REPORT ON FORM 10-K

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business. | 2 |
| Item 1A. | Risk Factors. | 9 |
| Item 1B. | Unresolved Staff Comments. | 31 |
| Item 2. | Properties. | 31 |
| Item 3. | Legal Proceedings. | 32 |
| Item 4. | Mine Safety Disclosures | 32 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities. | 33 |
| Item 6. | Selected Financial Data. | 34 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations. | 34 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk. | 40 |
| Item 8. | Financial Statements and Supplementary Data. | 40 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure. | 75 |
| Item 9A. | Controls and Procedures. | 75 |
| Item 9B. | Other Information. | 76 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance. | |
| Item 11. | Executive Compensation. | 77 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters. | 77 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence. | 77 |
| Item 14. | Principal Accountant Fees and Services. | 77 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules. | 77 |

1

The Company is currently not a party to any other legal proceedings, the adverse outcome of which would, in the Company's opinion, have a material adverse effect on our business, financial condition and results of operations.

On April 9, 2018, the Company received a subpoena requesting document from the U.S. Securities and Exchange Commission. We intend to fully cooperate with the SEC inquiry.

As part of its review of the Company's public filings, the Securities and Exchange Commission ("SEC") has inquired about certain of the Company's assets' classification as, and amount of, possible Investment Company assets. The Company is responding to the SEC's inquiries. Should an ultimate determination be made that the Company was or is an inadvertent Investment Company, it could have an impact on the Company's decision to hold certain assets and / or the Company's financial reporting. The Company's position is that it was or is not subject to the Investment Company regulations.

**Note 13. Related Party Transactions**:

Per Schedules 13D filed with the Securities and Exchange Commission, each of Barry Honig (together with other group members) and Catherine Johanna DeFrancesco beneficially owned greater than 10% of the dispositive and voting power of the Company's common stock. Mr. Honig reported beneficial ownership of approximately 11.2% of the Company's common stock as of January 5, 2017 and Ms. DeFrancesco reported beneficial ownership of approximately 11.45% of the Company's common stock as of January 10, 2017. Mr. Honig invested $1,750,000 in the March 2017 Convertible Note Private Placement (see Note 7). GRQ Consultants, Inc., a related party of Mr. Honig, received a cash payment of $50,000 for diligence services in connection with the Company's investment in Coinsquare (see Note 4). Each of Mr. Honig and Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company (see Note 2), with Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned approximately 6.3% of Kairos. Each of Mr. Honig and Ms. DeFrancesco invested in the December 2017 Common Share Private Placement, with Mr. Honig investing $500,000 and Ms. DeFrancesco investing $360,000 (see Note 7).

**Note 14. Subsequent Events**:

*Bitcoin Auction*

In January 2018, through a sealed bid auction conducted by the U.S. Marshals Service, the Company acquired 500 bitcoins for approximately $5,625,000.

*Asset Purchase Agreement with Prive Technologies LLC*

On February 21, 2018, the Company and Kairos Global Technology Inc., a wholly-owned subsidiary of the Company ("Kairos"), completed an asset purchase under an agreement (the "Prive Purchase Agreement") with Prive Technologies LLC ("Prive"), on behalf of certain persons and entities who owned certain bitcoin mining machines and related equipment (the "Prive Equipment"). Pursuant to the Purchase Agreement, the aggregate consideration for the Prive Equipment consisted of (i) Eleven Million Dollars ($11,000,000) and (ii) One Million (1,000,000) shares of the Company's common stock, no par value per share (the " Prive Shares"). Upon closing of the transaction, and pursuant to the terms of the Purchase Agreement, Kairos became the owner of the Prive Equipment and other assets used for the mining of cryptocurrency, including, but not limited to, 3,800 Bitmain AntMiner S9s.

Mr. Michael Ho and Mr. Bryan Pascal were selling shareholders of Prive, with Mr. Ho owning approximately 24.8% of Prive and Mr. Pascal owning approximately 18.4% of Prive, at the time of its acquisition by the Company. In November 2017, at the time of the Kairos acquisition, (see Note 2), Mr. Ho and Mr. Pascal became Series B Preferred Shareholders of the Company having owned approximately 10.7% and 5.7%, respectively of Kairos at the time of its acquisition by the Company.

Prive Shares were deposited into an escrow account with an escrow agent to be held in escrow as provided in an escrow agreement. Under this escrow agreement, the escrowed Prive Shares will be released to the Sellers upon the later of August 21, 2018 and the date on which the Company and Kairos have generated Net Cash Flow (as defined in the Prive Purchase Agreement) of at least Ten Million Dollars ($10,000,000) from the Prive Equipment. If the Escrow Shares have not been released to the Sellers on or before February 21, 2020, then these escrowed Prive Shares shall be returned to the Company for cancellation.

The Company has commenced an evaluation of the financial reporting for this transaction considering the provisions of FASB ASU 2017-01, Business Combinations (Topic 805). The assessment is preliminary and subject to additional evaluation, with the transaction expected to be accounted for as an acquisition of assets based on the estimated fair value as of the acquisition date.

*Asset Purchase Agreement with Blockchain Mining Supply & Services Ltd.*

On February 21, 2018, the Company completed an asset purchase under an agreement (the "BMSS Purchase Agreement") with Blockchain Mining Supply & Services Ltd. ("BMSS"), which owned 3,000 AntMiner S9 bitcoin mining machines (the "BMSS Equipment"). Pursuant to the BMSS Purchase Agreement, the Company purchased the BMSS Equipment for aggregate consideration of Eight Million Five Hundred Thousand Dollars ($8,500,000).

Seven Million Dollars ($7,000,000) of the purchase price was paid at closing. The remaining One Million Five Hundred Thousand Dollars ($1,500,000) of the purchase price shall be payable on the earlier of August 20, 2018 and such time when the BMSS Equipment becomes operational.

*Ingenium International LLC Consulting Agreement.*

On February 21, 2018, the Company entered into a Consulting Agreement with Ingenium International LLC (the "Consultant") to provide consulting services related to the Company's business for a 12-month period. Certain members of the Consultant were also affiliated with Prive. Pursuant to the Consulting Agreement Consultant's services are defined as follows: complete the installation and deployment of 8,000+ ASIC cryptocurrency miners, which included the Prive Equipment and the BMSS Equipment; assist in managing and monitoring the operation of the 8,000+ cryptocurrency miners on an ongoing basis; promptly responding to and troubleshooting any issues as they arise in the management and monitoring of the operations; continuing the buildout of up to 40 Megawatts of energy capacity, with the ultimate goal to secure the power and build the location for up to 80 Megawatts of energy capacity; and to make strategic introductions to other cryptocurrency business opportunities and contacts in the sector. In connection with the Consulting Agreement the Company made a lump sum payment of $4,000,000 to the Consultant.

Mr. Michael Ho and Mr. Bryan Pascal are controlling principals of Ingenium International LLC. As disclosed in this Note 14 above and Note 2, Mr. Ho and Mr. Pascal are shareholders in the Company by virtue of the previous Kairos and Prive transactions.

73

*Oklahoma Lease Agreement.*

On February 27, 2018, Kairos ("Tenant") entered into a lease agreement (the "Lease") with 7725 Reno #1, LLC (the "Landlord"), pursuant to which the Tenant leases an approximately 107,600 square foot warehouse located in Oklahoma City, Oklahoma, including improvements thereon. Pursuant to the terms of the Lease, the initial term of one year terminates on February 15, 2019, unless terminated earlier pursuant to the terms of the Lease, subject to the Tenant's options to renew the Lease. Tenant has four one-year renewal options that may be exercised so long as Tenant is not in default, subject to increases in base rent. Tenant has the right to operate from the premises on a 24 hour/seven day a week basis. At least three months, but no more than six months, prior to the expiration of the initial Lease term or renewal term, as applicable, Tenant shall give Landlord written notice of its intent to exercise the applicable renewal option, which also includes incremental payment for additional electric capacity delivery. If Tenant does not elect to exercise a renewal option, all remaining renewal options, if any, shall terminate.

Base rent for the premises during the first 12 months is equal to $55.95/kW per month for a total of 4 Megawatts (MW) of available electrical power, or $223,800 per month. Base rent is calculated based upon the monthly electrical power made available to Tenant within the premises, and not based on Tenant's actual usage. In connection with the Lease, Parent has provided a limited guarantee of Tenant's failure to make payment of base rent or additional rent pursuant to the Lease. As soon as practicable after the effective date of the Lease, Landlord, at Landlord's expense, agreed to provide additional 12.5 kV transformer equipment to increase the electrical power available for Tenant's use by an additional 2MW, which will result in additional rent of $55.12/kW for the additional 2MW of power when it is made available. Provided that Tenant is not in default under the Lease beyond any applicable notice and cure periods, Tenant may request Landlord to further increase the electrical power available, in increments from 6.01 MW up to 12.0 MW, by giving written notice to Landlord of the requested increase. Landlord, at Landlord's expense, would then provide an additional 12.5kV of electrical transforming equipment to increase the electrical power available for Tenant's use by the additional MW requested by Tenant. Effective as of the date the additional power is made available to Tenant, base rent will increase by an amount equivalent to the additional MW requested by Tenant multiplied by $55.12 per kW. If Tenant exercises all of its renewal options, then the base rent for the first 4MW of available power would increase to $57.63 per kW in year two, $59.36 per kW in year three, $61.14 per kW in year four and $62.97 per kW in year five. In each case, available power of greater than 4MW and up to 12MW would result in base rent of $55.12 per kW.

On March 26, 2018, Kairos entered into a first amendment to the above lease (the "Lease Amendment"), whereby 7725 Reno agreed to increase the electrical power available for Kairos's use from 6MW to 12MW, and the base rent under the lease was increased to approximately $665,760 per month, effective as of the date when such additional power is available.

*Kairos Operations and Equipment Status.*

During January 2018 certain infrastructure deficiencies in the Kairos short-term rented facility in Quebec, Canada became more problematic. Kairos noted that due to storm water leakage into the facility, servers consisting of 90 AntMiner S9s and 29 AntMiner L3s had visible evidence of exposure to water. These servers were taken off line and Kairos is currently investigating the extent of possible damage and functionality of the 119 servers. Kairos has notified the landlord regarding a possible claim for damage and loss. While the extent of the damage, if in fact the units are damaged, has not been determined or quantified, the total fair value cost of the servers was approximately $426,000. Kairos' ability to recover all or any portion of the damage and loss, should the servers in fact be damaged or unusable, has not been determined.

As a result of the issues with the Kairos original rented facility and the subsequent execution of the lease of the approximate 107,600 square foot warehouse located in Oklahoma City, Oklahoma Lease with 7725 Reno #1, LLC, as discussed above, Kairos determined to take all 1,200 of the servers acquired in the Kairos November 3, 2017, acquisition off-line in Canada and relocate them to the new facility. This was completed in March 2018 for all of the servers except the 119 servers that showed visible signs of damage, which are still being evaluated at the facility in Quebec, Canada.

*Acquisition of Logical Brokerage Corp.*

On March 26, 2018, the Company entered into and closed a stock purchase agreement (the "Logical Brokerage Purchase Agreement") between the Company and Mark Bradley Fisher (the "Logical Brokerage Seller"). Pursuant to the Logical Brokerage Purchase Agreement, the Company purchased from the Logical Brokerage Seller 9.25 shares of Logical Brokerage Corp. ("Logical Brokerage"), representing 92.5% of the outstanding capital stock of Logical Brokerage, for a

cash purchase price of $600,000. Logical Brokerage, a futures introducing broker headquartered in Miami, FL is registered with the Commodity Futures Trading Commission, or CFTC, and a member of the National Futures Association, or NFA. As of the date of these financial statements the initial accounting for the business combination with Logical Brokerage is incomplete and the Company is currently not able to provide additional financial disclosures, including pro forma information, that might be required.

In connection with the closing of the Logical Brokerage Purchase Agreement, on March 26, 2018, the Company entered into a stockholders' agreement (the "Stockholders Agreement") with Logical Brokerage and Mark Bradley Fisher. The Stockholders Agreement provides, among other things, that, subject to certain exceptions, the Logical Brokerage Seller may not transfer any of his remaining shares of Logical Brokerage without the written consent of the Company. The Stockholders Agreement also provides that, subject to certain exceptions, in the event the Company proposes to transfer 35% or more of Logical Brokerage's total issued and outstanding capital stock, the Logical Brokerage Seller will be entitled to certain "tag-along" rights.

*Corporate Lease Agreement.*

On April 9, 2018 the Company entered into a commercial lease covering 1,694 rentable square feet of office space in Fort Lauderdale, FL, with a third-party. The lease is for an initial term of thirty-nine months, with one five-year option to renew. The lease requires initial monthly rent of approximately $7,000, including base rent and associated operating expenses.

74

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

There have been no disagreements between the Company and its independent accountants on any matter of accounting principles or practices, or financial statement disclosure.

On January 4, 2018, Riot Blockchain, Inc. (the "Registrant" or the "Company") dismissed EisnerAmper LLP ("EisnerAmper") as its independent registered public accounting firm.

The report of EisnerAmper on the Company's financial statements for the fiscal year ended December 31, 2016 did not contain any adverse opinion or disclaimer of opinion, nor was it qualified or modified as to audit scope or accounting principles. The report did include an explanatory paragraph relating to auditing the adjustments to the 2015 financial statements to retrospectively reflect a reverse stock split effected by the Company.

During the period of EisnerAmper's engagement as the Company's independent registered public accounting firm from February 3, 2017 through January 4, 2018 (the "Engagement Period"), there were no disagreements as defined in Item 304 of Regulation S-K with EisnerAmper on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of EisnerAmper, would have caused it to make reference in connection with any opinion to the subject matter of the disagreement. Further, during the Engagement Period, there were no reportable events (as defined in Item 304(a)(1)(v) of Regulation S-K).

On January 5, 2018, the Company engaged MNP LLP ("MNP"), an independent registered public accounting firm which is registered with, and governed by the rules of, the Public Company Accounting Oversight Board, as our independent registered public accounting firm. During our two most recent fiscal years through December 31, 2016, and the subsequent interim period through January 4, 2018 neither us nor anyone on our behalf consulted MNP regarding either (1) the application of accounting principles to a specified transaction regarding us, either completed or proposed, or the type of audit opinion that might be rendered on our financial statements; or (2) any matter regarding us that was either the subject of a disagreement (as defined in Item 304(a)(1)(iv) of Regulation S-K and related instructions to Item 304 of Regulation S-K) or a reportable event (as defined in Item 304(a)(1)(v) of Regulation S-K).

On February 3, 2017, the Company's Board of Directors appointed EisnerAmper as the Company's independent registered public accounting firm effective February 3, 2017. The decision to appoint EisnerAmper was recommended and approved by our Audit Committee following the Committee's further process to determine our independent registered accounting firm. During the fiscal years ended December 31, 2015 and 2014 and the subsequent interim period through February 3, 2017, neither we, nor anyone on our behalf, consulted with EisnerAmper regarding: (i) the application of accounting principles to a specified transaction, either completed or proposed; (ii) the type of audit opinion that might be rendered on the Company's financial statements, and EisnerAmper did not provide any written report or oral advice that Eisner concluded was an important factor considered by the Company in reaching a decision as to any such accounting, auditing or financial reporting issue; (iii) any matter that was the subject of a "disagreement" within the meaning of Item 304(a)(1)(iv) of Regulation S-K or (iv) any "reportable event" within the meaning of Item 304(a)(1)(v) of Regulation S-K.

## ITEM 9A. CONTROLS AND PROCEDURES.

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including our Chief Executive Officer (principal executive officer) and Chief Financial Officer (principal financial officer) as appropriate, to allow timely decisions regarding required disclosures. Our Chief Executive Officer and Chief Financial Officer evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2017, pursuant to Rule 13a-15(b) under the Exchange Act. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this report, the Company's disclosure controls and procedures were effective. A system of controls, no matter how well designed and operated, cannot provide absolute

assurance that the objectives of the system of controls are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected.

**Changes in Internal Control over Financial Reporting**

No changes were made to our internal control over financial reporting during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

75

**Management's Report on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) under the Exchange Act. The Exchange Act defines internal control over financial reporting as a process designed by, or under the supervision of, our principal executive and principal financial officers and effected by our board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and includes those policies and procedures that:

- Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of our assets;
- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that our receipts and expenditures are being made only in accordance with authorizations of our management and our directors; and
- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2017. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control — Integrated Framework. Based on our assessment, we determined that, as of December 31, 2017, our internal control over financial reporting was effective based on those criteria.

**ITEM 9B.  OTHER INFORMATION.**

None.

76

# PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.

The information required by this Item is incorporated by reference to the Proxy Statement or by amendment to this Form 10-K.

## ITEM 11. EXECUTIVE COMPENSATION.

The information required by this Item is incorporated by reference to the Proxy Statement or by amendment to this Form 10-K.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCK HOLDER MATTERS.

The information required by this Item is incorporated by reference to the Proxy Statement or by amendment to this Form 10-K.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

The information required by this Item is incorporated by reference to the Proxy Statement or by amendment to this Form 10-K.

## ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES.

The information required by this Item is incorporated by reference to the Proxy Statement or by amendment to this Form 10-K.

# PART IV

## ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES.

(a)     Exhibits

| No. | Exhibit |
|---|---|
| 3.1 | Articles of Incorporation filed September 20, 2017 (Incorporated by reference to Exhibit 3.1of the Current Report on Form 8-K filed September 25, 2017). |
| 3.2 | Amendment to Bylaws effective March 9, 2018 (Incorporated by reference to Exhibit 3.1 of the Current Report on Form 8-K filed March 12, 2018). |
| 3.3 | Bylaws effective September 20, 2017 (Incorporated by reference to Exhibit 3.2 of the Current Report on Form 8-K filed September 25, 2017). |
| 3.4 | Articles of Merger between Bioptix, Inc., and Riot Blockchain, Inc. (Incorporated by reference to Exhibit 3.1 of the Current Report on Form 8-K filed October 4, 2017). |
| 4.1 | Certificate of Designation of Rights, Powers, Preferences, Privileges and Restrictions of the 2% Series A Convertible Preferred Stock of Bioptix, Inc. (Incorporated by reference to Exhibit 3.3 of the Current Report on From 8-K filed September 25, 2017). |
| 4.2 | Amendment to Certificate of Designation of 0% Series B Convertible Preferred Stock (Incorporated by reference |

| | |
|---|---|
| | from Exhibit 3.1 of the Current Report on From 8-K filed December 21, 2017) |
| 4.3 | Certificate of Designations, Preferences and Rights of the 0% Series B Convertible Preferred Stock of the Company. (Incorporated by reference from Exhibit 3.1 of the Current Report on From 8-K filed November 3, 2017). |
| 10.1 | 2017 Equity Incentive Plan, as amended (Incorporated by reference to Appendix E to the Definitive Proxy Statement on Schedule DEF14A filed July 10, 2017, as amended incorporated by reference to the Definitive Proxy Statement on Schedule DEF14A filed March 26, 2018 and Schedule DEFA14A filed April 2, 2018). |
| 10.2 | Bioptix, Inc. Amended and Restated Equity Incentive Plan (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed December 2, 2016). |
| 10.3 | First Amendment to Lease Agreement, dated March 26, 2018 (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed March 27, 2018). |
| 10.4 | Lease Agreement dated as of February 27, 2018 (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed February 28, 2018). |

77

| | |
|---|---|
| 10.5 | Executive Employment Agreement dated as of January 27, 2018 by and between Company and Christopher Ensey (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed January 31, 2018). |
| 10.6 | Employment Agreement by and between the Company and John O'Rourke dated as of November 3, 2017. (Incorporated by reference to Exhibit 10.6 of the Quarterly Report on Form 10-Q for the period ended September 30, 2017 filed November 13, 2017). |
| 10.7 | Executive Employment Agreement dated as of February 27, 2018 by and between Company and Robby Chang (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed February 28, 2018). |
| 10.8 | Executive Employment Agreement dated as of January 20, 2018 by and between Riot Blockchain Canada Inc. and Jeffrey Vormittag (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed January 18, 2018). |
| 10.9 | Executive Employment Agreement dated as of January 7, 2018 by and between Digital Green Energy Corp. and Daniel Stefan Robertson (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed January 11, 2018). |
| 10.10 | Amendment No. 1 to Retention Agreement by and between the Company and Jeff McGonegal dated as of March 27, 2018 (Incorporated by reference to Exhibit 10.3 of the Current Report on Form 8-K filed March 27, 2018). |
| 10.11 | Retention Agreement by and Between the Company and Jeff McGonegal dated as of June 30, 2017 (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed July 3, 2017) |
| 10.12 | Separation Agreement by and between the Company and Michael Beeghley dated as of November 3, 2017. (Incorporated by reference to Exhibit 10.5 of the Quarterly Report on Form 10-Q for the period ended September 30, 2017 filed November 13, 2017). |
| 10.13 | Separation Agreement by and between the Company and Richard Whitcomb dated as of June 15, 2017- (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed June 15, 2017). |
| 10.14 | Separation Agreement by and between the Company and Steve Lundy dated as of April 6, 2017- (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed April 7, 2017). |
| 10.15 | Logical Brokerage Corp. Stock Purchase Agreement dated as of March 26, 2018 (Incorporated by reference to Exhibit 2.1 of the Current Report on Form 8-K filed March 27, 2018). |
| 10.16 | Stockholders Agreement dated March 26, 2018, among Logical Brokerage Corp., Riot Blockchain, Inc. and Mark Bradley Fisher (Incorporated by reference to Exhibit 10.2 of the Current Report on Form 8-K filed March 27, 2018). |
| 10.17 | Asset Purchase Agreement by and between Company and Prive Technologies LLC dated as of February 15, 2018 (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed February 16, 2018). |
| 10.18 | Form of Escrow Deposit Agreement (Incorporated by reference to Exhibit 10.2 of the Current Report on Form 8-K filed February 16, 2018). |
| 10.19 | Asset Purchase Agreement by and between Blockchain Mining Supply & Services Ltd and the Company dated February 15, 2018 (Incorporated by reference to Exhibit 10.3 of the Current Report on Form 8-K filed February 16, 2018). |
| 10.20 | Escrow Agreement by and between Blockchain Mining Supply & Services Ltd. and the Company dated February 15, 2018 (Incorporated by reference to Exhibit 10.4 of the Current Report on Form 8-K filed February 16, 2018). |
| 10.21 | Ingenium International Consulting Agreement dated as of February 21, 2018 (Incorporated by reference to Exhibit |

|       |                                                                                                                                                                                                                                                                                                  |
|-------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|       | 10.1 of the Current Report on Form 8-K filed February 23, 2018).                                                                                                                                                                                                                                 |
| 10.22 | Share Exchange Agreement by and among the Company., Kairos Global Technology, Inc., and the shareholders of Kairos Global Technology, Inc. dated as of November 1, 2017 (Incorporated by reference to Exhibit 10.4 of the Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 filed November 13, 2017). |
| 10.23 | Form of Purchase Agreement by and between the Company and Tess Inc. dated as of October 20, 2017 (Incorporated by reference to Exhibit 10.2 of the Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 filed November 13, 2017). |
| 10.24 | Registration Rights Agreement by and between the Company and Tess Inc. dated as of October 20, 2017 (Incorporated by reference to Exhibit 10.3 of the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 filed November 13, 2017). |
| 10.25 | Form of Subscription Agreement by and between the Company and goNumerical Ltd. (Coinsquare) dated as of September 29, 2017 (Incorporated by reference to Exhibit 10.1 of the Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 filed November 13, 2017). |
| 10.26 | Form of Securities Purchase Agreement (Units) dated as of December 18, 2017 (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed December 19, 2017). |
| 10.27 | Form of Registration Rights Agreement dated as of December 18, 2017 (Incorporated by reference to Exhibit 10.2 of the Current Report on Form 8-K filed December 19, 2017). |
| 10.28 | Form of Common Stock Purchase Warrant dated as of December 18, 2017 (Incorporated by reference to Exhibit 4.1 of the Current Report on Form 8-K filed December 19, 2017). |
| 10.29 | Form of Securities Purchase Agreement dated, as of March 10, 2017 (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed March 16, 2017). |
| 10.30 | Form of Amendment to Registration Rights Agreement (Units) dated as of December 21, 2017 (Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed December 21, 2017). |

78

| | |
|---|---|
| 10.31 | Form of Amendment to Registration Rights Agreement dated as of December 21, 2017 (Incorporated by reference to Exhibit 10.2 of the Current Report on Form 8-K filed December 21, 2017). |
| 10.32 | Form of Registration Rights Agreement dated as of March 10, 2017 (Incorporated by reference to Exhibit 10.2 of the Current Report on Form 8-K filed March 16, 2017). |
| 10.33 | Form of Escrow Deposit Agreement dated as of March 10, 2017 (Incorporated by reference to Exhibit 10.3 of the Current Report on Form 8-K filed March 16, 2017). |
| 10.34 | Form of Escrow Deposit Agreement (Securities) dated as of March 10, 2017 (Incorporated by reference to Exhibit 10.4 of the Current Report on Form 8-K filed March 16, 2017). |
| 10.35 | Form of Securities Purchase Agreement dated as of March 15, 2017 (Incorporated by reference to Exhibit 10.5 of the Current Report on Form 8-K, effective March 15, 2017 and filed March 17, 2017). |
| 10.36 | Form of Common Stock Purchase Warrant, dated as of March 10, 2017 (Incorporated by reference to Exhibit 4.1 of the Current Report on Form 8-K filed March 16, 2017). |
| 10.37 | Form of Common Stock Purchase Warrant Agreement dated as of May 30, 2013 (Incorporated by reference to Exhibit 4.1 of the Current Report on Form 8-K filed May 30, 2013). |
| 10.38 | Agreement by and between Barry Honig, Catherine DeFrancesco and certain related parties with respect to the Company dated January 18, 2017.(Incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed January 20, 2017). |
| 10.39 | Exclusive License Agreement between Registrant and The Washington University, dated May 1, 2004 as amended (Incorporated by reference from the Quarterly Report on Form 10-Q for the quarter ended June 30, 2010, filed August 5, 2010). |
| 14 | Code of Ethics Adopted October 23, 2017. (Incorporated by reference to Exhibit 14 of the Current Report on Form 8-K filed October 25, 2017). |
| 23.1 | Consent of MNP LLP * |
| 23.2 | Consent of EisnerAmper LLP * |
| 31.1 | Rule 13a-14(a)/15d-14(a) - Certification of Chief Executive Officer * |
| 31.2 | Rule 13a-14(a)/15d-14(a) - Certification of Principal Financial Officer. * |
| 32 | Section 1350 Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. * |
| 101 | Interactive data files pursuant to Rule 405 of Regulation S-T: (i) the Balance Sheets, (ii) the Statements of Operations, (iii) Statements of Stockholders Equity, (iv) the Statement of Cash Flows and (v) the Notes to the Financial Statements * |

---

\*     Filed herewith.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf on April 17, 2018 by the undersigned thereunto duly authorized.

**RIOT BLOCKCHAIN, INC.**

/s/ John O'Rourke
John O'Rourke,
Chief Executive Officer

/s/ Robby Chang
Robby Chang,
Chief Financial Officer

/s/ Jeffrey G McGonegal
Jeffrey G. McGonegal,
Principal Accounting Officer

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints each of John O'Rourke and Robby Chang as true and lawful attorney-in-fact and agent, with full power of substitution and re-substitution, for them and in their name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission (the "SEC"), and generally to do all such things in their names and behalf in their capacities as officers and directors to enable the Company to comply with the provisions of the Securities Exchange Act of 1934 and all requirements of the SEC, granting unto each said attorney-in-fact and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he or she might or could do in person, ratifying and confirming all that said attorney-in-fact and agent, or their or his or her substitutes or substitute, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant on April 17, 2018 in the capacities indicated.

/s/ John O'Rourke
John O'Rourke,
Chief Executive Officer and Director (principal executive officer)

/s/ Robby Chang
Robby Chang, Chief Financial Officer

/s/ Jeffrey G. McGonegal
Jeffrey G. McGonegal, Principal Financial Officer

/s/ Remo Mancini
Remo Mancini, Director

/s/ Andrew Kaplan
Andrew Kaplan, Director

/s/ Jason Les

Jason Les, Director

80