**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated, | : | Civil Action No.: 18-2293(FLW)(~~TJB~~ZNQ) |
| | : | |
| *Plaintiff,* | : | CONSOLIDATED ACTION |
| | : | |
| v. | : | ~~CORRECTED~~[PROPOSED] CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW |
| RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY G. MCGONEGAL, | : | |
| | : | |
| *Defendants.* | : | |
| | : | **JURY TRIAL DEMANDED** |

**LITE DEPALMA GREENBERG, LLC**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for* *Lead Plaintiff*~~Dr. Stanley Golovac~~
*Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for* *Lead Plaintiff* Dr. Stanley Golovac
*and Lead Counsel for the Class*

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................................1

II.    JURISDICTION AND VENUE .......................................................................................11

III.   PARTIES ...........................................................................................................................12

IV.    RELEVANT NON-PARTIES ..........................................................................................17

V.     THE "HONIG GROUP" ...................................................................................................27

VI.    SUBSTANTIVE ALLEGATIONS ..................................................................................37

       A.     The Honig Group Has Engaged in Similar Pump-and-Dump Schemes at
              Numerous Publicly Traded Microcap Companies .................................................37

              1.     The SEC Has Sued Honig, O'Rourke, Stetson, and Brouser for Recently
                     Engaging in Pump-and-Dump Schemes at Three Companies .....................37

                     a.     Biozone Pharmaceuticals, Inc. (a/k/a "Company A") ....................38

                     b.     MGT Capital Investments Inc. (a/k/a "Company B") ....................40

                     c.     MabVax Therapeutics Holdings, Inc.  (a/k/a "Company C")........45

              2.     YesDTC Holdings, Inc. ...............................................................................49

              3.     Marathon Patent Group, Inc. .......................................................................50

              4.     WPCS International Incorporated and BXT Trader .....................................53

              5.     PolarityTE (f/k/a Majesco Entertainment) ..................................................54

              6.     Pershing Gold Corp. ....................................................................................55

              7.     MUNDOmedia Ltd. .....................................................................................56

       B.     In 2016, Defendants Target Venaxis, Riot's Predecessor, Using Their Typical
              Playbook ................................................................................................................58

       C.     Defendants Cause Bioptix to Register and Sell Shares of Bioptix (and Later Riot)
              Through False and Misleading Securities Registration Statements (Form S-3)..65

       D.     Nine Days After the Filing the September 25 Form S-3, Bioptix Changes Its
              Name to "Riot Blockchain," and in the Weeks That Followed Announces a
              Series of Strategic Investments, Causing Riot's Share Price to Soar ...................74

              1.     The Coinsquare Transaction ........................................................................76

              2.     The Tess Transaction ...................................................................................77

              3.     The Kairos Transaction ................................................................................79

       E.     October 27, 2017 Riot Disseminates an "Updated" Investor Presentation..........83

       F.     Defendant Honig's Brother, Jonathon Honig, and Defendant Groussman Attempt
              to Dispel Any Notion that Their Ownership in Riot Is Part of a Control Group .85

i

G.    On November 6, 2017, Riot "Names John O'Rourke as Chairman and CEO" and Announces Another Strategic Investment ................................................. 85

H.    Riot Announces that It More than Tripled Its Investment in Coinsquare ......... 86

I.    Riot's Board of Directors Issues A Proxy Statement That Further Enables The Honig Group To Conceal The Fraudulent Scheme ........................................ 86

J.    Riot Announces a New Transaction Related to Its Investment in Tess: Riot's "Decision to Take the Company Public" in a Merger ...................................... 87

K.    On December 19, 2017, Riot "Announces $37 Million Private Placement"— Defendants Honig and Defransco Take Part But Are Not Disclosed ............... 89

L.    After Defendants O'Rourke and Honig Sold Most of Their Shares, Riot Fires Its Auditor and the Company's Stock Continues to Decline ............................... 89

M.    On February 16, 2018, a CNBC Expose Partially Reveals Honig's Close Ties to Riot and O'Rourke .................................................................................. 93

N.    Also on February 16, 2018, Riot Announces Its Purchase of "3,800 Bitcoin Mining Machines" Without Disclosing that It Was Buying These Machines from an Entity Owned by Honig and DeFrancesco at Vastly Inflated Prices ............ 102

O.    On February 21, 2018, Riot Enters into a "Consulting Agreement" Through Which the Company Agrees to pay $4,000,000 to "Ingenium International LLC" ................................................................................................... 104

P.    On September 7, 2018, after an Investigation, the SEC Charges Defendants Honig, O'Rourke, Stetson, and Their Associates with Engaging in Three Other Pump-and-Dump Schemes Involving Companies Connected to Riot ............... 105

VII.    DEFENDANTS ENGAGED IN A MANIPULATIVE DEVICE, SCHEME, ARTIFICE, AND CONSPIRACY TO DEFRAUD RIOT'S PUBLIC SHAREDHOLDERS .......... 108

VIII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .......................................................................... 133

A.    April 20, 2017—Securities Registration Statement (Form S-3/A) ................. 143

B.    April 27, 2017—Annual Report (Form 10-K/A) ........................................ 160

C.    July 19, 2017—Securities Registration Statement (Form S-3/A) .................. 164

D.    August 24, 2017—Securities Registration Statement (Form S-3/A) .............. 167

E.    September 25, 2017 Securities Registration Statement (Form S-3/A) ............ 170

F.    October 3, 2017—Riot Announces "Special Dividend" of $1.00 per Share ..... 177

G.    October 4, 2017—"Bioptix Changing Name to Riot Blockchain" ................. 178

H.    October 5, 2017—"Investor Presentation" ............................................... 179

I.    October 6, 2017—Defendant Beeghely Speaks to *The Denver Post* ............. 181

J.    October 17, 2017—Riot "to Acquire Majority Interest in Tess" ................... 182

K.    October 23, 2017—Riot Issues "Business Strategy Statement" .................... 182

ii

L.      October 27, 2017—"Updated Investor Presentation"............................183

M.      November 2-3, 2017—Riot Agrees to Acquire "1,200 Bitcoin Mining Machines" from Kairos ...............................................................................185

N.      November 6, 2017—Riot Closes Its Deal with Kairos ........................193

O.      November 13, 2017—Quarterly Report (Form 10-Q) .........................195

P.      November 15, 2017—O'Rourke Is Interviewed on CBS and the Company Announces "Riot Blockchain Featured in 5-Part Series on CBS"..........198

Q.      November 16, 2017—Riot Announces an Investment in Verady, LLC ....200

R.      November 17, 2017—CBS Publishes More Commentary by O'Rourke .........201

S.      December 11, 2017—Riot Announces TessPay's "Intent for Merger with Publicly Traded Cresval Capital Corp." ...............................................203

T.      December 12, 2017 Proxy Statement (Form DEF 14A) ......................205

U.      December 19, 2017 Press Release—"Riot Blockchain Announces $37 Million Private Placement" ..............................................................................211

IX.     AS TRUTH BEGINS TO EMERGE, DEFENDANTS CONTINUE TO MISLEAD THE MARKET...............................................................................................213

A.      December 19, 2017 CNBC Interview with Andrew Left of Citron Research ...213

B.      December 27, 2017—Riot Abruptly Cancels Its Annual Shareholder Meeting ...215

C.      December 29, 2017—O'Rourke Sells 30,383 Shares for Proceeds of $869,256. ...........................................................................................217

D.      January 5, 2018 Securities Registration Statement (Form S-3) ...........219

E.      January 4-5, 2018—Riot Fires Its Independent Auditor and Files an Amended Form 8-K/A Disclosing Audited Financial Statements of Kairos Revealing that Riot Vastly Overpaid ...........................................................................221

F.      January 17, 2018—Riot Announces Tess's "Definitive Agreement for Transaction with Publicly Traded Cresval Capital Corp." .....................221

G.      January 31, 2018—*The Wall Street Journal* Writes About Riot and Honig and Riot Again Cancels Its Annual Shareholder Meeting ...........................224

H.      February 7, 2018—Securities Registration Statement (Form S-3/A) .........225

I.      February 11, 2018—*The Denver Post* Publishes Statements by O'Rourke and Honig ...................................................................................................226

J.      February 13, 2018—Honig Files an Amended Statement of Beneficial Ownership (Form SC 13D/A) ...........................................................228

K.      February 16, 2018—CNBC Publishes a Video Entitled "CNBC Investigates: Red Flags Raised Over Riot Blockchain" ..............................................228

L.      February 16, 2018—"CNBC Investigates . . . Riot Blockchain" ...........230

iii

M.    February 16, 2018—Riot and O'Rourke Respond to CNBC ...................237

N.    Also on February 16, 2018, Riot Announces Its Purchase of "3,800 Bitcoin
      Mining Machines" from Prive Technologies LLC ...........................239

O.    March 26, 2018—Definitive Proxy Statement (Schedule 14A) ...............240

P.    April 30, 2018—Amended Annual Report (Form 10-K/A) ..................241

Q.    May 17, 2018—Quarterly Report (Form 10-Q) ..........................242

R.    May 25, 2018—Amended Current Report (Form 8-K/A) ..................242

S.    June 29, 2018—Amended Annual Report (Form 10-K/A) ................243

T.    July 10, 2018—Securities Registration Statement (Form S-3) .............245

X.    SEC FILES SUIT AGAINST DEFENDANTS HONIG, O'ROURKE, STETSON, AND
      OTHERS .............................................................246

XI.   POST-CLASS PERIOD DEVELOPMENTS .................................247

XII.  ADDITIONAL SCIENTER ALLEGATIONS ...............................250

XIII. LOSS CAUSATION/ECONOMIC LOSS .................................256

XIV.  CLASS ACTION ALLEGATIONS ......................................262

XV.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
      AND *AFFILIATED UTE* PRESUMPTION ...............................264

XVI.  NO SAFE HARBOR .................................................266

COUNT I ...................................................................267

COUNT II ..................................................................273

COUNT III .................................................................274

PRAYER FOR RELIEF .......................................................276

DEMAND FOR TRIAL BY JURY ..............................................276

I.    INTRODUCTION .....................................................1

II.   JURISDICTION AND VENUE ..........................................11

III.  PARTIES ...........................................................12

IV.   RELEVANT NON-PARTIES ...........................................15

V.    BACKGROUND ON THE HONIG GROUP ...............................27

      A.    The SEC Has Sued Honig, O'Rourke, Groussman, and Stetson for "Acting
            as an Undisclosed Control Group" in Three Previous Fraudulent Pump-and-
            Dump Schemes Involving the Same *Modus Operandi*  They Used at Riot.........27

            1.    Biozone Pharmaceuticals, Inc. (a/k/a "Company A") .............35

            2.    MGT Capital Investments Inc. (a/k/a "Company B") ............40

            3.    MabVax Therapeutics Holdings, Inc. (a/k/a "Company C").........45

iv

B.  The Honig Group Co-Invested in Other Public Microcap Companies.................48

   1.  The PolarityTE (f/k/a Majesco Entertainment)...................................48

   2.  YesDTC Holdings, Inc................................................................49

   3.  Marathon Patent Group, Inc......................................................50

   4.  WPCS International Incorporated and BXT Trader ......................53

   5.  Pershing Gold Corp...................................................................55

   6.  MUNDOmedia Ltd. ...................................................................56

VI.    THE SELLING STOCKHOLDERS' CONNECTIONS TO THE HONIG GROUP.......57

VII.   FACTUAL BACKGROUND ON THE FRAUDULENT SCHEME .........................58

   A.  In 2016, Defendants Target Venaxis, Riot's Predecessor, Using Their
       Typical Pump-and-Dump Playbook ...........................................58

   B.  A Few Months After Beeghley Assumed the Role as CEO, The Company
       Announced A Special Dividend and Business Transformation to "Riot
       Blockchain" – At the Same Time, Honig Secretly Acquires and Sells
       Hundreds of Thousands of Shares of Riot .......................................62

   C.  Prior to the Company's Transition to Riot, Defendants O'Rourke and
       Beeghley Caused the Company to Conceal Honig's Group Status by
       Issuing False and Misleading Registration Statements.........................68

   D.  Honig Groups Members Honig, DeFrancesco, Groussman and Stetson Fail
       to File Schedules 13D .............................................................68

   E.  O'Rourke and Beeghley Caused the Company to Conceal Related Party
       Transactions with Members of the Honig Group ............................69

   1.  The March 2017 Private Placement ............................................71

   2.  The Coinsquare Agreement .......................................................72

   3.  The Kairos Transaction............................................................79

   4.  The December 2017 Private Placement........................................84

   F.  October 11, 2017 – Defendant Groussman and Defendant Honig's
       Brother, Jonathon Honig, Falsely Deny that Their Ownership in Riot
       Is Part of a Control Group.......................................................85

   G.  January 5, 2018 – Riot Fires Its Auditor.......................................89

   H.  December 29, 2017 – O'Rourke Sells 30,383 Shares for Proceeds of $869,256 90

   I.  January 4-5, 2018 –Riot Fires Its Independent Auditor and Files an
       Amended Form 8-K/A Disclosing Audited Financial Statements of
       Kairos Revealing that Riot Vastly Overpaid for Kairos's Assets.........91

VIII.  THE TRUTH ABOUT HONIG'S STOCK SALES AND THE FRAUDULENT
       SCHEME BEGINS TO EMERGE .................................................92

IX.    DEFENDANTS ENGAGED IN A MANIPULATIVE DEVICE, SCHEME, ARTIFICE, AND CONSPIRACY TO DEFRAUD RIOT'S PUBLIC SHAREHOLDERS DURING THE CLASS PERIOD ...................................... 108

A.    Owners and Issuers of Securities Have Well-Known Disclosure Duties Under Section 13(d), Regulation 13d, and Item 403 of Regulation S-K ........... 110

B.    Honig, O'Rourke, and Stetson Were Familiar with Section 13(d) .................. 114

C.    Defendants Acted as an Undisclosed Control Group to Pump-and-Dump Riot Stock While Misrepresenting and Concealing their Beneficial Ownership in Violation of Section 13(d), Rule 13d-2, and Item 403 of Regulation S-K ........ 116

      1.    Honig Knowingly Engaged in the Fraudulent Scheme............................ 117

      2.    Groussman Knowingly Engaged in the Fraudulent Scheme ................. 121

      3.    Stetson Knowingly Engaged in the Fraudulent Scheme......................... 123

      4.    DeFrancesco Knowingly Engaged in the Fraudulent Scheme.............. 126

      5.    O'Rourke Knowingly Engaged in the Fraudulent Scheme.................... 129

      6.    Beeghley Knowingly Engaged in the Fraudulent Scheme .................... 131

X.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ............................................................................. 133

A.    Defendants' Materially False and Misleading Statements and Omissions in Benificial Ownership Reports on Schedules 13D and 13G ............................... 135

      1.    Honig's Beneficial Ownership Reports on Schedule 13D Were Materially False, Misleading, Deficient, and Untimely and Facilitated His Manipulative Trading in Riot's Common Stock ........... 136

      2.    Groussman's Beneficial Ownership Reports on Schedule 13G Were Materially False, Misleading, Deficient, and Untimely...................... 145

      3.    DeFrancesco's Beneficial Ownership Reports on Schedule 13D Were Materially False, Misleading, Deficient, and Untimely ....... 149

      4.    Stetson Failed to File Beneficial Ownership Reports with the SEC Despite Co-Investing Alongside the Undisclosed Honig Group ............ 153

B.    Defendants' Materially False and Statements and Omissions Regarding the Company's Beneficial Ownership and Related-Party Transactions................. 154

      1.    April 20, 2017 – Registration Statement (Form S-3/A)...................... 155

      2.    April 27, 2017 – Annual Report (Form 10-K/A) ................................ 160

      3.    July 19, 2017 – Registration Statement (Form S-3/A) ....................... 164

      4.    August 24, 2017 – Registration Statement (Form S-3/A) .................. 167

      5.    September 25, 2017 – Registration Statement (Form S-3/A)............... 170

      6.    January 5, 2018 – Registration Statement (Form S-3)........................ 172

783086.1

7.      February 7, 2018 – Registration Statement (Form S-3/A).....................176

C.      Defendants' Materially False and Misleading Statements and Omissions
        Regarding Riot's Related-Party Transactions with Defendants .....................187

1.      March 16, 2017 – Current Report (Form 8-K) ..............................187

2.      March 31, 2017 – Annual Report (Form 10-K)...............................188

3.      October 4, 2017 – Current Report (Form 8-K) ..............................188

4.      November 3, 2017 – Current Report (Form 8-K) ...........................189

5.      November 13, 2017 – Quarterly Report (Form 10-Q).....................195

6.      December 12, 2017 – Proxy Statement (Form DEF 14A)..................205

7.      December 19, 2017 – Current Report (Form 8-K) and Press Release...211

8.      January 5, 2018 – Registration Statement (Form S-3)........................219

9.      February 7, 2018 – Registration Statement (Form S-3/A)..................222

10.     February 16, 2018 – Current Report (Form 8-K)  and Shareholder Letter
        .....................................................................................................226

11.     March 26, 2018 - Proxy Statement (Form DEF 14A) ...........................241

XI.     POST-CLASS PERIOD DEVELOPMENTS ........................................................246

XII.    ADDITIONAL SCIENTER ALLEGATIONS ....................................................250

XIII.   LOSS CAUSATION/ECONOMIC LOSS ...........................................................256

A.      January 31 – *The Wall Street Journal* – "Investor Who Rode Pivot
        From Biotech to Bitcoin Sells Big Stake"..................................................258

B.      February 16, 2018 – "CNBC Investigates Red Flags Raised Over Riot
        Blockchain".....................................................................................................260

C.      April 17-18, 2018 – Riot Files Form 10-K Revealing Related Party Transactions
        .............................................................................................................260

D.      May 29, 2018 – Riot Files a Form 8-K Revising Its Disclosures
        Concerning the Coinsquare Transaction......................................................261

E.      September 7, 2018 – SEC Files Suits Against Honig, O'Rourke,
        Groussman, Stetson, and Others .................................................................261

XIV.    CLASS ACTION ALLEGATIONS.......................................................................262

XV.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
        AND *AFFILIATED UTE* PRESUMPTION ...................................................264

XVI.    NO SAFE HARBOR..............................................................................................266

COUNT I ...................................................................................................................267

COUNT II ..................................................................................................................269

COUNT III.................................................................................................................273

vii

PRAYER FOR RELIEF ................................................................................................276

DEMAND FOR TRIAL BY JURY................................................................................276

Court-appointed Lead Plaintiff Dr. Stanley Golovac ("Lead Plaintiff"), individually and on behalf of all other persons and entities similarly situated, by Lead Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review and analysis of filings by Riot Blockchain, Inc. ("Riot" or the "Company") and other public companies with the U.S. Securities and Exchange Commission ("SEC"); press releases, analyst reports, news articles, investment industry commentary, media, and other public statements about Riot and other companies; corporation registrations and filings with state governments; the corporate websites of Riot and other companies; court filings in various ligation involving Defendants (defined below), including *Securities and Exchange Commission v. Honig, et al.*, No. 1:18-cv-08175 (S.D.N.Y.) (the "*Honig* Action"); and an investigation conducted by and through Lead Plaintiff's attorneys.

The investigation of Lead Plaintiff's attorneys is continuing, yet certain additional facts supporting these allegations are known only to Defendants or are exclusively within their custody or control.  Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  INTRODUCTION

1.     This is a federal securities class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule l0b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) on behalf of Lead Plaintiff and all other persons or entities who purchased or otherwise acquired the securities of Riot and/or Bioptix (NASDAQ:  RIOT, BIOP) between ~~April 20~~March 15, 2017, and September 6, 2018, inclusive (the "Class Period"), and were damaged thereby.  Lead Plaintiff brings this action to pursue remedies against the Company, certain of its

1

current or former executive officers and/or directors, and several of Riot's largest shareholders, including Barry Honig ("Honig"), who as a group conspired with one another and acted in concert with a wideran undisclosed control group of other Riot shareholders to (1) amass a controlling interest in Riot; (2) conceal their control through false and misleading statements and omissions regarding the Company's beneficial ownership in violation of Section 13(d) of the Exchange Act, Regulation 13d, and Items 403 and 404 of Regulation S-K; (3) drive up the price and trading volume of Riot stock through manipulative trading, promotional activity, and false and misleading disclosures; (4) engage in fraudulentundisclosed related-party transactions at the expense of the Company and its shareholders; and (5) dump their shares into the artificially inflated market on unsuspecting retail investors.

2.      Defendants' pump-and-dump scheme involved the purported transformation of Riot from a biotech company into an investor and "miner" of cryptocurrency such as Bitcoin.  This scheme was orchestrated by Honig, a Florida-based investor who has been charged by the SEC for masterminding numerousmultiple other pump-and-dump schemes, John O'Rourke ("O'Rourke"), Riot's Chief Executive Officer ("CEO") during the Class Period, as well as certain other Company insiders and several of their associates, and their related entitiesMichael Beeghley ("Beeghley"), also Riot's CEO during the Class Period, as well as Mark Groussman ("Groussman"), John Stetson ("Stetson"), and Catherine DeFrancesco ("DeFrancesco") – investors in Riot who participated in and facilitated the pump-and-dump scheme by misrepresenting and concealing both the Honig Group's (defined below) cooperation as an undisclosed control group over the Company, as well as their own insider stock sales in violation of their obligations under the federal securities laws.

3.      In early 2016, the company now known as Riot Blockchain, Inc. was an "in vitro" diagnostics company known as Venaxis, Inc. ("Venaxis").  Venaxis was a medical products

783086.1

company whose executives, Board, and employees sought to develop a blood test for determining which patients suffering from abdominal pain were less likely to be suffering from acute appendicitis than from other ailment.

4.      In early 2015, the U.S. Food and Drug Administration ("FDA") denied approval for Venaxis's developmental blood test, and Venaxis, without a marketable product, found itself facing delisting from the NASDAQ because its share price had fallen below the exchange's minimum.

5.      Venaxis still had plenty of cash, however, having raised $20 million in a stock offering the previous year.  Therefore, in March 2016, Venaxis executed a 1-for-8 reverse stock split.  That reduced its outstanding shares to less than 4 million and lifted its stock price well above $1 a share — enough for Venaxis to keep its listing on the NASDAQ.  Shortly thereafter, Honig and his associates began buying stock in Venaxis.

6.      On September 12, 2016, Venaxis acquired BiOptix Diagnostics, Inc., and changed its name to Bioptix, Inc. ("Bioptix").  Shortly thereafter, Defendants Honig and DeFrancesco both wrote letters to then-CEO Stephen Lundy ("Lundy"), touting their combined 16.2% stake in the Company.  Honig also spoke several times on the telephone with members of Venaxis's then-existing Board of Directors.  During these telephone conversations, Honig implied that he had control of 40% of the Venaxis's shares through his stock ownership and the stock ownership of Honig's friends and relatives, according to a former Venaxis Board member present during the conversations.

7.      On September 13, 2016, Honig attempted to nominate his own slate of new directors of Bioptix, including Defendants O'Rourke, Beeghley, and Stetson, and several other of Honig's associates. When Venaxis's then-existing Board of Directors were considering Beeghley

3

as a nominee for election to the Board, Beeghley told them that he did not know Honig, according to an individual present at the time.

8.   In his September 13, 2016 letter to then CEO Lundy, Honig wrote that Venaxis was "wast[ing] precious resources with no clear direction or strategy . . . while board fees and management salaries continue to be paid . . . ." Honig offered an alternative.   In early discussions with Venaxis's Board, Honig raised the possibility of turning Venaxis into a marijuana-related company, according to an individual present at the time.   After suing several longtime members of the Venaxis Board, Honig successfully ousted them.   Finally, Honig and his associates achieved complete control over the Company, with Beeghley becoming CEO and O'Rourke joining the Board.

9.   After abandoning their idea to pivot Bioptix into the marijuana business, Defendants instead chose a strategy they had employed (with devastating results for shareholders) at several other public companies.   Defendants set out to reinvent Bioptix as a new player in cryptocurrency.   Thus, on October 4, 2017, Bioptix announced that it had become "Riot Blockchain."

10.3.   Despite grandiose promises that Riot would be a "pure play" in cryptocurrency that would "leverage our expertise, and network, to build and support blockchain technology companies," in reality the Company had limited meaningful investments in cryptocurrency products and did not have a meaningful cryptocurrency business plan.   Rather, Defendants and their unscrupulous business associates, many whom have a history of engaging in pump and dump schemes, sought to exploit investor interest in the rapidly expanding cryptocurrency markets.Defendants' primary focus was to find ways to promote and increase the liqutity of Riot's thinly traded stock, and then once unsuspecting public investors piled in, to sell as quickly as they

4

could before the Company's public shareholders had figured out what happened.   As SEC Chairman Jay Clayton testified before Congress – in what one reporter described as a "thinly-veiled sot at Riot" – "*Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain.*"

11.4.   This, however, is precisely what Riot and its executives did. Instead of operating a legitimate cryptocurrency business, Defendants artificially "hype[d]":   "hype" the Company's prospects by issuing a flurry of press releases, SEC filings, and interviews with television and newspaper journalists – all designed to give investors the false impression that Riot was a serious cryptocurrency company.  This was not true.  Defendants'Riot's so-called investments in crypto currencycryptocurrency were, in reality, egregiously wasteful related-party transactions with Honig and his associates and entities that were secretly owned and controlcontrolled by Defendants and their associates through a labyrinth of limited liability companies formed weeks before in Nevada, Florida, and Canada by Defendants' associateshim.  These related-party transactions, and the individuals behind them, mirrored similar schemes that Defendants and their associates have perpetrated at other public companies.  Meanwhile, Defendants and their associatesmore than 20 affiliated Selling Stockholders – each with confirmed ties to the Honig Group through past microcap stock investments – sold their Riot stock at inflated prices for millions of dollars in proceeds before the truth about their scheme was revealed – first by investigative journalists, and ultimately by the investigators and lawyers at the SEC.

12.5.   Unbeknownst to Riot shareholders during the Class Period, Honig, O'Rourke, HonigGroussman, and other DefendantsStetson have a long history of questionable financial dealingsco-investing in dozens and joint investments.  After the scheme was partially revealed in

783086.1

~~February~~dozens of microcap public companies.  As a result, in September 2018, ~~Defendant O'Rourke admitted that he has "a good relationship with Mr. Honig." Defendant Honig has also weighed in publicly on his business relationship with Defendant O'Rourke stating, "at one point in time John O'Rourke had space in my office . . . we speak often."~~the SEC brought suit against these four men (and others) related to three alleged microcap pump-and-dump schemes.  Yet, during the Class Period Defendants went to great lengths to hide Honig's ties to Company insiders and other Riot shareholders by ~~flouting, for example, SEC~~violating the Exchange Act and SEC rules related to the disclosure ~~rules related to~~ beneficial ownership, stock sales, and SEC rules requiring disclosure of transactions with related parties.

~~13.~~6.   Indeed, so entrenched was Defendant Honig's control over Riot that the Company's principal executive offices were not in Colorado, as officially represented by the Company, but instead were effectively located in Boca Raton, Florida where Defendants O'Rourke, Honig, Groussman, and Stetson had recently shared the same office, which allowed them ~~and their associates effectively to control or exercise undue influence over~~to closely collaborate in controling Riot and its operations~~and~~, affairs, and public disclosures.

~~14.~~7.   Unfortunately, as has become clear over the past few ~~months~~years, Defendants' fraudulent actions are not limited to Riot.  The SEC has charged Defendants Honig, O'Rourke, and Stetson with strickingly similar pump-and-dump schemes at several other publicly traded companies.  Describing the group as "microcap fraudsters," the SEC has alleged that "Honig was the primary strategist, calling upon other [affiliated co-investors] to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity."  The SEC further alleged that "[i]n each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse

6

merger or by participating in financings on terms highly unfavorable to the company."  Defendant O'Rourke resigned as Riot's CEO in the wake of these allegations and certain of the individuals charged by the SEC have already settled those charges.  As a result of the SEC's action, Honig, O'Rourke, Stetson, and Groussman have each agreed to disgorge their alleged illgotten gains, pay penalties and interest, and agree to be barred from participating in any offering of penny stock, prohibited from holding greater than 4.99% of any penny stock company, and prohibited from advertising, marketing, or otherwise promoting penny stocks.  Honig and O'Rourke's prohibitions are permanent; Stetson and Groussman's prohibitions are for ten and five years, respectively.

15.   According to the SEC, Defendant Honig had been in the process of settling these charges, but in a court filing on May 7, 2019, Honig and the SEC stated that "[t]he parties do not believe there is a possibility of prompt settlement of this case."

8.    As alleged herein, during the Class Period, each of the Defendants – pursuant to explicit or tacit agreements with each other and the Selling Stockholders – agreed to acquire, hold, vote, and/or dispose of shares they acquired in Riot in coordination with one another while knowingly or recklessly obtaining and exercising undisclosed control of the management and policies of Riot and while selling shares of Riot into the market at artificially inflated prices. Defendants did so in violation of Section 13(d) of the Exchange Act and Rule 13d-2, *et seq.*, promulgated thereunder, which required Defendants to disclose their status as a "group" (as defined by Section 13(d)(3)) on Schedule 13D and to "promptly" update any material changes in their beneficial ownership of Riot's common stock in amendments (on Schedule 13D/A) to their Section 13(d) filings.  *See* § IX.A, *infra*.

9.    Defendants Honig, O'Rourke, and Stetson were familiar with their obligations under Section 13(d) – and the materiality of their disclosures to Riot's investors regarding

beneficial ownership of the Company's stock – because they themselves had previously filed a lawsuit under this statute alleging that these disclosures were material to them.  *See* § IX.B, *infra*.

10.    Yet, despite this knowledge, Defendants failed to make timely and appropriate Section 13(d) filings and amendments reflecting their acquisition and disposition of Riot stock as part of scheme to defraud investors about their group's control over the management and policies of, and the magnitude of their collective investment in, Riot.  *See* § X.A, *infra*.  And having concealed their group's existence and control over Riot, Defendants proceeded to engage in manipulative trading in Riot's securities (including massive sales of Riot's common stock) while failing to make the necessary amendments to their Section 13(d) filings, which under the rules, should have promptly alerted Riot's public investors that a group of insider shareholders (indeed, an undisclosed control group) were collectively dumping their shares into the market.  *See* §§ X.A & X.A, *infra*.

11.    And as discussed below, Defendants Honig, Groussman, Stetson, and DeFrancesco's violations of Section 13(d) were made knowingly, or at least recklessly, in light of their clear knowledge that they were acting together as a group in their scheme involving Riot.  *See* §§ IX.C.1-4, *infra*.

12.    Defendants could not have accomplished their scheme, however, without the assistance of Defendants O'Rourke and Beeghley from inside the Company.  Specifically during the Class Period, Defendants O'Rourke and Beeghley, as officers and/or directors of Riot, pursuant to explicit or tacit agreements with Defendants Honig, Groussman, Stetson, and DeFrancesco, caused the Company to issue materially false and misleading public filings with the SEC – including on Forms S-3, S-3/A, and 10-K, and Schedule 14A – that materially misrepresented the Company's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K

8

783086.1

by misrepresenting and concealing the fact that many of Riot's largest shareholders – including Defendants Honig, Groussman, Stetson, and DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A – were members of a group with each other (as defined by Section 13(d)(3)) through which they agreed to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  *See* § X.B, *infra*.

13.     In causing Riot to issue its materially false and misleading Forms S-3 and S-3/A, O'Rourke and Beeghley well aware that the Honig Group (including themselves) was a closely coordinated "group" that amply fit that definition under Section 13(d)(3), and which was therefore engaged in a scheme to defraud the Company's public investors.  *See* § IX.C.5-6, *infra*.

14.     Defendants O'Rourke, Beeghley, and Riot also knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by issuing materially false and misleading Forms 8-k and 10-K that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendants Honig and DeFrancesco.  *See* § X.C, *infra*.

15.     Defendants' knowledge of their roles in the Honig Group's fraudulent scheme is amply supported.  As noted above, Honig, O'Rourke, and Stetson were well aware of their legal duties under Section 13(d) because they were involved in Honig's 2015 lawsuit under that statute, yet utterly failed to comply with those duties.  Defendants clearly knew they were a "group" as defined by Section 13(d).  According to the SEC, between 2011 and August 2018, Honig invested alongside O'Rourke in ***over 75 issuers***, alongside Stetson in ***over 65 issuers***, alongside Brauser in ***over 40 issuers*** – and alongside "some combination of Stetson, Brauser, O'Rourke, [and] Groussman" in "***nearly every scheme*** . . . ."  If that were not enough, O'Rourke stated in a February 3, 2014 email that "Barry Honig is the principal investor of ***our small group***."  If O'Rourke's own

9

words were insufficient, the SEC has alleged that Honig, O'Rourke, Stetson, and often Grossman all worked together out of Honig's office in Boca Raton, Florida, which is corroborated by the fact that a letter filed with the SEC from Honig to Riot's outgoing Board indicated that O'Rourke and Stetson's fax numbers were the same fax number that Honig listed on his letterhead for his Boca Raton office.  And that is the same office where CNBC's investigative journalists discovered O'Rourke on the day of Riot's cancelled annual shareholder meeting.  Finally, emails uncovered by the SEC, and attached hereto, reveal how Honig, O'Rourke, Stetson, and Groussman coordinated their investments in numerous public microcap companies.  One such company was PolarityTE, in which Defendants Beeghley and DeFrancesco invested alongside Honig (PolarityTE's then Chairman and CEO) and Stetson (PolarityTE's then CFO), as well as O'Rourke, Groussman, and many of the same Selling Stockholders (defined below) who, through the leadership and machinations of the Honig Group, became a undisclosed Section 13(d) group of investors in Riot.

16.    Defendants' scheme was revealed through a series of disclosures that revealed to the market what Defendants had taken such great lengths to misrepresent and conceal:  that they were undisclosed control group engaging in undisclosed insider sales.  On January 31, 2018, from *The Wall Street Journal* that "Mr. Honig has sold about 500,000 shares" and only "still owns about 1% of the company."  "'When stock goes up, you take a profit,' [Honig] said."  On this news, Riot's stock fell ***14.26%*** over two days.  Then, on February 16, 2017, CNBC published the article that revealed Honig as "the man behind the Riot Blockchain curtain"; that CEO O'Rourke worked out of Honig's Boca Raton office; that the "true extent of Honig's selling" of Riot stock was "[b]uried deep in the footnotes of Riot filings"; and revealed details about Riot's suspicious related-party transactions.  In response, Riot's share price fell ***33.4%***.  Next, on April 17, 2018,

10

Riot filed an annual report disclosing the financial interests of Honig and DeFrancesco in various 2017 related-party transactions, causing Riot's stock price to fall another *5.8%*.   A May 25, 2018 disclosure of yet further related-party transactions caused Riot's shares to decline *6%*.   Finally, on September 7, 2018, the SEC filed the *Honig* Action against Defendants Honig, O'Rourke, Groussman, and Stetson, and their affiliates, revealing that, contrary to Defendants' misleading Schedules 13D and 13G, and Riot's misleading Forms S-3 and 10-K, the Honig Group was not only a "group" as defined by Section 13(d), but in fact a highly-orchestrated and closely-knit partnership amongst Honig, O'Rourke, Groussman, and Stetson, who had been engaged in the same fraudulent *modus operandi* at Riot that they had perfected a dozens of previous including the three pump-and-dump schemes described in detail by the SEC.   On this news, Riot's stock price dropped *26.1%*.

## II.   JURISDICTION AND VENUE

16.17.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

17.18.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

18.19.   Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the misleading statements entered into and the subsequent damages took place within this district.

19.20.   In connection with the acts, conduct, and other wrongs alleged herein, Defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

11

### III.   PARTIES

~~20.~~21.  Lead Plaintiff purchased Riot common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

~~21.~~22.  Defendant Riot is a Nevada corporation with its principal executive offices purportedly located at 834-F South Perry Street, Suite 443, Castle Rock, Colorado 80104.  The Company's securities trade on NASDAQ under the symbol "RIOT," and previously traded as "BIOP."  Riot purports to invest in various blockchain technologies and mine cryptocurrencies such as Bitcoin.  As of April 13, 2018, Riot had 13,417,132 shares of common stock outstanding.

~~22.~~23.  Defendant Honig is a resident of Boca Raton, Florida, and, at all relevant times, worked at an office in Boca Raton with O'Rourke.  Defendant Stetson, and at times Defendant Groussman, also worked out of Honig's Boca Raton office.  ~~Defendant~~ Honig is a defendant in the *Honig* Action and has been "permanently barred from participating in any offering of penny stock."  Honig, through his ownership of Riot securities, was in a position to exercise influence over Riot's top executives, including O'Rourke and Beeghley, and Riot's Board of Directors.  Honig also was a fiduciary of Riot by, among other things, his actions calculated to dictate the structure of the Company.  Honig, through his continuous course of business dealings with Riot, acted as a control person of the Company.  Honig has been involved in dozens of small companies that issued public securities, primarily through mergers with the shells of failed or failing businesses, in return for significant amounts of stock or convertible notes.  Honig sold at least 1,583,005 shares of his stock in the Company for at least $17 million in proceeds while maintaining close ties with Company insiders who had access to material, nonpublic information about Riot. As alleged herein, Honig has longstanding business ties and/or co-investments with O'Rourke, Beeghley, Stetson, and Groussman, and other Relevant Non-Parties listed below.  Honig is a trustee of GRQ 401K, which has been a shareholder of Riot since at least September 14, 2016.

783086.1

Honig had voting and dispositive power over GRQ 401K's securities of Riot.  Honig has been a shareholder of Riot in his individual capacity since September 19, 2016.  ~~Honig was formerly CEO of PolarityTE and was~~ Honig was Chairman and CEO of Majesco (later called PolarityTE) from September 30, 2015, until December 1, 2016.  Honig was formerly a Director of Pershing Gold.

~~23.~~ 24.  Defendant O'Rourke, born in 1985, is a resident of Fort Lauderdale, Florida.  After being nominated by Honig, O'Rourke was a Director of the Company beginning on January 6, 2017.  O'Rourke also served as Riot's President, Secretary, and Treasurer since at least ~~October 3,~~ September 2017,[1] and as Riot's CEO and Chairman of the Board from November 3, 2017 until September 8, 2018, when he resigned after the SEC charged him in the *Honig* Action along with Honig, Groussman, Stetson, ~~Brouser~~ Brauser, and others.  ~~Defendants~~ As a result of the *Honig Action,* O'Rourke ~~and Stetson reside~~ has been "permanently barred from participating in ~~homes located approximately 800 feet apart.~~ any offering of penny stock."  O'Rourke's 2017 executive compensation included a $60,000 salary, $2,322.00 in stock awards, $609,842 in option awards, which totaled to $2,991,842 in compensation.  Additionally, O'Rourke sold at least 30,383 shares of his stock for at least $869,256.35 of profit while he had access to material, nonpublic information about Riot.  ~~At least as of October 3, 2017, O'Rourke was President of Riot.  O'Rourke~~ O'Rourke has longstanding business ties and/or co-investments with Honig, ~~Stetson,~~ Groussman, and ~~Brouser~~ Stetson – including working out of the same office.  O'Rourke used the same fax number as Honig and Stetson.  O'Rourke and Stetson reside in homes located approximately 800 feet apart.  O'Rourke owns ATG.

---

[1] ~~O'Rourke listed himself as a~~ A December 20, 2017, filing by Riot with the Nevada Secretary of State ("Filing Number 20170535413-91") lists O'Rourke as Riot's "President," "Secretary," and "Treasurer" for "the filing period of Sep, 2017 to Sep, 2018."  O'Rourke is also identified as "President" of "Riot Blockchain, Inc." in "Articles of Merger" that O'Rourke signed and filed with the Nevada Secretary of State on October 3, 2017.

783086.1

25.    ~~Defendant Catherine DeFrancesco was the~~Defendant Groussman is a resident of Miami Beach, Florida, and worked out of the same office in Boca Raton with Honig, O'Rourke, and Stetson.  Groussman owns Melechdavid.  Groussman purchased his house in Miami Beach, Florida, with a $700,000 mortgage loan from Honig, Groussman's mortgage holder.  Groussman is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period. Groussman is a defendant in the *Honig* Action and has been barred for ten years from participating in any offering of penny stock.

26.    Defendant Stetson is a resident of Fort Lauderdale, Florida, where Defendants Stetson and O'Rourke reside in houses approximately 800 feet apart.  Stetson is the former CFO of PolarityTE.  Stetson has longstanding business ties and/or co-investments with Honig, O'Rourke, and Groussman – including working out of the same office.  Stetson used the same fax number as Honig and O'Rourke.  Stetson owns Stetson Capital.  Stetson is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.  Stetson is a defendant in the *Honig* Action and has been barred for five years from participating in any offering of penny stock.

~~24.~~27.  Defendant DeFrancesco was an 11%+ beneficial owner of shares in Riot through at least six different entities:  DSB Capital, Ltd., a Turks & Caicos company; DeFrancesco Motorsports, Inc., an Ontario corporation; Delavalco Holdings, Inc., an Ontario corporation; Delavalco Holdings, Inc., a Florida corporation; Marcandy Investments Corp., an Ontario corporation; Namaste Gorgie, Inc., an Ontario corporation.  DeFrancesco began acquiring Riot shares ~~no later than September 14,~~in August 2016.  DeFrancesco is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.

~~25.~~28.  Defendant ~~Michael~~ Beeghley ~~("Beeghley")~~ was a Director of the Company since at least November 30, 2016; became CEO on April 6, 2017; and became Chairman of the

14

783086.1

Company's Board in January 2017. Beeghley was Chairman and CEO until he was replaced by Defendant O'Rourke on November 3, 2017. Beeghley was Riot's CEO from April 2017 to November 2017; Chairman of the Board from January 2017 to November 2017; and a Director from November 2016 to November 2017. In 2017, Riot paid Beeghley $339,739 in compensation, including $9,000 of salary, $270,000 in stock awards, and $60,739 in option awards. Beeghley was a Director of Majeso (later called PolarityTE) from December 18, 2015, until October 18, 2017.

26. Defendant John Stetson ("Stetson") is a resident of Fort Lauderdale, Florida, where Defendants Stetson and O'Rourke reside in houses approximately 800 feet apart. Stetson is the former CFO of PolarityTE. Stetson is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.

29. Defendant Mark Groussman ("Groussman") is a resident of Miami Beach, Florida, and works out of the same office in Boca Raton with Honig, O'Rourke, and Stetson. Defendants Honig, O'Rourke, Groussman, Stetson, DeFrancesco, and Beeghley are collectively referred to herein as the "Honig Group."

30. Defendants Riot, O'Rourke and Beeghley are collectively referred to herein as the "Riot Defendants."

27. Groussman owns Melechdavid. Groussman purchased his house in Miami Beach, Florida, with a $700,000 mortgage loan from Honig, Groussman's mortgage holder. Groussman is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.

28. Defendant Andrew Kaplan ("Kaplan") has been a director of the Company since May 2017 is a member of the Audit Committee and Compensation Committee, and Chair of the Governance Committee. In 2017, Kaplan received total compensation of $88,220, including his

783086.1

fees paid in cash of $8,000 and stock awards of $80,220.  Kaplan previously served on the board of directors of Majesco Entertainment Company ("Majesco Entertainment") while Honig was CEO.  Kaplan is a "Selling Stockholder" in numerous Riot Forms S-3 during the Class Period.

29.    Defendant Mike Dai ("Dai") has been a Director of Riot since January 2017.

30.    Defendant Jeffrey G. McGonegal ("McGonegal") was the Company's Chief Financial Officer ("CFO") from 2003 to February 28, 2018, from which point he served solely as the Company's Principal Accounting Officer until April 30, 2018.  McGonegal then served as a consultant to the Company until August 30, 2018. McGonegal was replaced as CFO by Rob Chang ("Chang").  In 2015 and 2016, McGonegal was paid $651,207 and $513,625, respectively, in total compensation.  According to the Company's Schedule 14A filed with the SEC on March 26, 2018 (the "2017 Proxy"), effective June 30, 2017, the Company entered into a retention agreement with McGonegal providing for McGonegal's continued service as the Company's CFO and Principal Accounting Officer until April 30, 2018, at an annual base salary of $275,005.  Additionally, in 2017, McGonegal received $127,800 in stock awards, $140,000 from a non-equity incentive plan, and $169,843 in supplemental compensation.  Together with his salary, this amounts to total compensation of $709,648.  Pursuant to a modification of the retention agreement, McGonegal served solely as the Company's Principal Accounting Officer until April 30, 2018, and continued for four months thereafter as a consultant of the Company to provide transition services as requested by the CEO, CFO, and Board.

31.1.   Defendant Jason Les ("Les") has been a director of the Company since November 2017 and is a member of the Company's Audit Committee and Governance Committee, and Chair of the Compensation Committee.  According to the 2017 Proxy, Les is a professional poker player and is qualified to serve as a director "based on the fact that he has been active in the industry as a

16

783086.1

~~miner, studying protocol development and evaluating a variety of crypto investment strategies."~~
~~Les received total compensation of $56,625 in 2017, which includes $6,000 of fees paid in cash~~
~~and $50,625 of stock awards.~~

~~32.~~1.   Defendant ~~Eric So served as a director of the Company from October 2017 until~~
~~February 2018, and served as Chair of the Audit Committee and a member of the Compensation~~
~~Committee and the Governance Committee.   In 2017, So was paid $65,675 in compensation,~~
~~including $2,000 in fees paid in cash and $63,675 in stock awards. So was previously the chief~~
~~legal and development officer at MUNDOmedia Ltd., a company in which Honig and O'Rourke~~
~~have heavily invested.~~

## IV.   RELEVANT NON-PARTIES

31.   2330573 Ontario Inc., whose President is Theofilos, was a Selling Stockholder in
Riot's January 5 and February 7, 2018 Registration Statements on Forms S-3 and S-3/A and party
to the September 29, 2017 Coinsquare shareholders' agreement with Riot.

~~33.~~32.  Aifos Capital Management, LLC ("Afios") is controlled by Karr, its Managing
Member.

~~34.~~33.  ATG Capital LLC ("ATG") is a Florida corporation owned and operated by
Defendant O'Rourke and for which O'Rourke makes investment decisions.  ATG's principal place
of business is in Florida.  ATG's was incorporated in or around 2012.

~~35.~~34.  Biozone Pharmaceuticals, Inc. ("Biozone") is a Nevada corporation with principal
place of business in Pittsburg, California.  The SEC has sued Defendants Honig, O'Rourke, and
Stetson in connection with their investment in Biozone.

~~36.   Mohit Bhansali ("Bhansali"), is a former Director of Majesco and Director and~~
~~PolarityTE.   Bhansali is the co-founder of EST.   Bhansali is a former employee of Sichenzia~~
~~Friedman Ference LLP and Haynes and Boone, LLP.~~

783086.1

37.35.  Michael Brauser ("Brauser") is a resident of Lighthouse Point, Florida.  Brauser invested in Riot through Grander Holdings, Inc. 401K.  Brauser also owned 112,499 shares of goNumerical Lftd. ("goNumerical"), a leading Canadian Blockchain company known as Coinsquare Ltd.  The SEC sued Brauser along with Honig, O'Rourke, and Stetson for their pump-and-dump schemes involving Biozone, MGT, and MabVax.

38.36.  Cresval Capital Corp. ("Cresval") a Canadian mineral exploration company based in Vancouver, British Columbia, whose President is Lee Ann Wolfin.

39.    Equity Stock Transfer ("EST") is a transfer agent financed by Kesner.  EST's COO and CEO, Bhansali, who worked Kenser's law firm.  EST handled Riot's October 3, 2017 special dividend.

37.    Mike Dai ("Dai") was a Director of Riot from January 2017 until November 3, 2017.  Dai was nominated to Riot's Board by Defendants Honig and DeFrancesco in December 2016.  Before joining Riot's Board, Dai already had established business ties with Defendant DeFrancesco's husband, Andrew, and other relatives, as well as Defendants O'Rourke and Stetson, Jonathan Honig, and other members of the Honig Group. Specifically, as of December 1, 2016, Dai "serve[d] as chief financial officer and Director of Santa Maria Petroleum Inc. (TSXV:SMQ.H) a position he ha[d] held since 2014," according to Defendant Honig's SEC filing nominating Dai to the Bioptix Board.  Dai became CFO and a Director of Santa Maria on May 22, 2014, the same day that Andrew DeFrancesco became Santa Maria's "President and CEO." According to a December 2, 2016 OTCQB Certification (which was "prepared by . . . Mike Dai, CFO" and "Andrew DeFrancesco, CEO") that was filed on behalf of Santa Maria with the OTC Markets Stock Exchange, the "beneficial owners of more than five percent" of Santa Maria's

18

"equity securities" included Jonathan Honig, ATG (i.e., O'Rourke), Stetson Capital, and several of Defendant DeFrancesco's relatives.

40.1.   Ingenium Global, Inc. ("Ingenium") is a Nevada corporation that was incorporated on October 19, 2019 by Laxague, the same day as Kairos.  He is Ingenium's President, Secretary, and Treasurer.  Pascual and Silverman are Directors of Ingenium.

41.1.   JAD Capital Inc. ("JAD") is a corporation located in Ontario, Canada, whose Director, with voting and dispositive control over JAD, is Theofilos.

42.1.   Kairos Global Technology Inc. ("Kairos") is a Nevada corporation that was incorporated on October 19, 2019 by Laxague.  He is Kairos's President, Secretary, and Treasurer.  Pascual and Silverman are Directors of Kairos.

43.   Edward M. Karr ("Karr") is a Director of both Pershing Gold and Levon, and was a Director of Majesco Entertainment prior to its merger with PolarityTE.  Karr is also the chairman and chief executive of U.S. Gold.  Karr invested in Riot through Aifos, a company Karr controls.

44.1.   Harvey Kesner ("Kesner") is the long-time lawyer of Defendant Honig.  Kesner is the owner of Paradox Capital Partners ("Paradox").  Kesner represented Honig in connection with his investments in Riot and MabVax.  Kesner and/or Paradox invested in Riot and MabVax.  Kesner is an owner and manager of EST, which Kesner financed with more than $100,000 through Paradox.  Kesner is a former partner with Haynes and Boone, LLP and Sichenzia Friedman Ference LLP ("Sichenzia").  In 2018, MabVax sued Sichenzia for malpractice due to Kesner's allegedly conflicted legal representation of both Honig and MabVax. According to a article in *Barron's*, "nearly two dozen public companies backed by Honig, or other defendants in last month's SEC complaint, used" Kesner " until he retired . . . just before the [*Honig*] action.  Those companies also happened to use [EST] . . . ."

19

45.38.  Global Bit Ventures, Inc. ("GBI") is a Nevada corporation that Marathon planned but failed to merge with in order to convert Marathon into a "blockchain" company.

46.39.  Grander Holdings, Inc. 401K ("Grander") is a Florida corporation that Brauser owns and operates as Trustee.  The SEC sued Grander with Brauser Honig, O'Rourke, and Stetson in connection pump-and-dump schemes involving Biozone, MGT, and MabVax.

47.40.  GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("GRQ 401K") is an entity for which Honig serves as Trustee.  As of September 14, 2016, GRQ owned at least 389,159 shares of common stock of Riot (then-Venaxis) (8.6% of voting stock), and later increased its stake to 9.99%.

48.41.  Michael Ho ("Ho") was the President, Secretary, and Treasurer of both Kairos and Ingenium, which were both incorporated on the same day, October 19, 2017, in Nevada.  Ho is also a Manager of Prive.  In various corporate filings in Nevada and Florida, Ho has listed his address as either Dubai, Los Angeles, or Tampa.

49.42.  Alan Honig is the father of Barry Honig.  As of at least September 25, 2017, Alan Honig personally owned 20,000 shares of Riot common stock representing approximately 0.33% of the Company's common stock beneficially owned.

50.43.  Jonathan Honig is the brother of Barry Honig and is the Manager of Titan Multi-Strategy Fund I Ltd.  As at least September 25, 2017, Jonathan Honig beneficially owned, through Titan Multi-Strategy Fund I Ltd., 597,300 shares of Riot common stock representing 9.99% of the Company's common stock beneficially owned.

44.    Ingenium Global, Inc. ("Ingenium") is a Nevada corporation that was incorporated on October 19, 2019 by Laxague, the same day as Kairos.  Ho is Ingenium's President, Secretary, and Treasurer.  Pascual and Silverman are Directors of Ingenium.

783086.1

45.   JAD Capital Inc. ("JAD") is a corporation located in Ontario, Canada, whose Director, with voting and dispositive control over JAD, is Theofilos.

51.46.  Adrian James ("James"), a stock promoter who previously touted other Honig-backed companies, including Pershing Gold, MusclePharm Inc. (the parent of Biozone), and Valor Gold Corp. Adrian James ("James"), a stock promoter who previously touted other Honig-backed companies, including Pershing Gold, MusclePharm Inc. (the parent of Biozone), and Valor Gold Corp. James is the President &and CEO of Stockwire, through which James invested in Riot.

47.   Kairos Global Technology Inc. ("Kairos") is a Nevada corporation that was incorporated on October 19, 2019 by Laxague.  Ho is Kairos's President, Secretary, and Treasurer. Pascual and Silverman are Directors of Kairos.

48.   Andrew Kaplan ("Kaplan") was a director of Riot from May 5, 2017, until his resignation on October 22, 2018.  Kaplan was a member of the Audit Committee and Compensation Committee, and Chair of the Governance Committee.  In 2017, Kaplan received total compensation of $88,220, including his fees paid in cash of $8,000 and stock awards of $80,220.  Kaplan previously served on the board of directors of Majesco/PolarityTE from October 2015 until December 1, 2016, during the same time period that Honig was CEO of Majesco.

49.   Edward M. Karr ("Karr") is a Director of both Pershing Gold and Levon, and was a Director of Majesco Entertainment prior to its merger with PolarityTE.  Specifically, Karr was appointed to Majesco/PolarityTE's board on September 25, 2014, the same day as Honig, Brauser, and Kaplan.  ¶ 119.  Karr resigned as a director of Polarity on December 1, 2016, the same day that Honig and Brauser also resigned.  Karr invested in Riot through Aifos, a company that Karr controls.

783086.1

50.    Harvey Kesner ("Kesner") is the long-time lawyer of Defendant Honig.  Kesner is the owner of Paradox Capital Partners ("Paradox").  Kesner represented Honig in connection with his investments in Riot and MabVax.  Kenser and/or Paradox invested in Riot and MabVax. Kesner is an owner and manager of EST, which Kesner financed with more than $100,000 through Paradox.  Kesner is a former partner with Haynes and Boone, LLP and Sichenzia Friedman Ference LLP ("Sichenzia").  In 2018, MabVax sued Sichenzia for malpractice due to Kesner's allegedly conflicted legal representation of both Honig and MabVax. Accourding to a article in *Barron's,* "nearly two dozen public companies backed by Honig, or other defendants in last month's SEC complaint, used" Kesner " until he retired . . . just before the [*Honig*] action. Those companies also happened to use [EST] . . . ."

51.    Laxague Law Inc. ("Laxague") is a law firm in Reno, Nevada, operated by Partner Joe Laxague, which incorporated both Kairos and Ingenium on October 19, 2018.

52.    Jason Les ("Les") has been a director of the Company since November 2017 and is a member of the Company's Audit Committee and Governance Committee, and Chair of the Compensation Committee.  According to the 2017 Proxy, Les is a professional poker player and is qualified to serve as a director "based on the fact that he has been active in the industry as a miner, studying protocol development and evaluating a variety of crypto investment strategies." Les received total compensation of $56,625 in 2017, which includes $6,000 of fees paid in cash and $50,625 of stock awards.

53.    Bryan Pascual is a Director of Kairos and Ingenium Global, Inc. and a Manager of Prive.

22

54.   Levon Resources Ltd. ("Levon") is another mineral exploration company in which Defendant Honig is former Director and Karr is a current Director.  Levon was founded by Arthur Wolfin, the father of Lee Ann Wolfin, the President of Cresval.

55.   Eric So served as a director of the Company from October 2017 until February 2018, and served as Chair of the Audit Committee and a member of the Compensation Committee and the Governance Committee.  In 2017, So was paid $65,675 in compensation, including $2,000 in fees paid in cash and $63,675 in stock awards. So was previously the chief legal and development officer at MUNDOmedia Ltd., a company in which Honig and O'Rourke have heavily invested.

52.1.   Laxague Law Inc. ("Laxague") is a law firm in Reno, Nevada, operated by Partner Joe Laxague, which incorporated both Kairos and Ingenium on October 19, 2018.

53.1.   Bryan Pascual is a Director of Kairos and Ingenium Global, Inc. and a Manager of Prive.

54.1.   Levon Resources Ltd. ("Levon") is another mineral exploration company in which Defendant Honig is former Director and Karr is a current Director.  Levon was founded by Arthur Wolfin, the father of Lee Ann Wolfin, the President of Cresval.

55.56.  MabVax Therapeutics Holdings, Inc. ("MabVax") a Delaware corporation, with its principal place of business in San Diego County, California.  The SEC has sued Defendants O'Rourke, Honig, and Stetson in connection with their investments in MabVax.

56.57.  Marathon Patent Group Inc. ("Marathon") is a public company that trades on the NASDAQ that Honig, O'Rourke, Groussman, Stetson, Brauser, and others also invested in an attempted to convert into a "blockchain" company.

783086.1

57.58.  Marcandy Investments Corp. ("Marcandy") is an Ontario corporation owned and controlled by its President, DeFrancesco.

58.59.  Melechdavid Inc. ("Melachdavid") is a Florida corporation whose principal place of business is Miami Beach, Florida, and whose President is Defendant Groussman.

59.60.  MGT Capital Investments Inc. ("MGT") is a Delaware corporation based in Durham, North Carolina.  The SEC has sued Defendants O'Rourke, Honig, and Stetson in connection with their investments in MGT.

60.61.  Richard Molinsky ("Molinksy") is a former stockbroker at D.H. Blair & Co. who was barred from the industry in 2000 after pleading guilty[2] to criminal charges related to market manipulation and fraudulent sales practices, was one such associate listed on the registration statement.  Molinsky has been an investor in numerous Honig-backed companies, including PolarityTE, Pershing Gold, Vapor Corp., and Riot.  Molinsky was a shareholder of Riot since at least September 25, 2017, when he disclosed owning 1.78% of Riot common stock.

61.62.  MUNDOmedia Ltd. ("MUNDOmedia") is a marketing company based in Toronto, Ontario, Canada founded by its CEO, Theofilos.

62.63.  Namaste Gorgie Inc. ("Namaste") is an Ontario corporation owned and controlled by its President, DeFrancesco.

63.64.  Northurst Inc. ("Northurst") is a Canadian company that owned 9.99% percent of Riot stock and was also an investor in Kairos. Northurst's controlling shareholder, Jakub Malczewski, was managing director of Ahaka Capital with David Baazov, the former CEO of an

---

[2] *See In the Matter of Breitner et al.*, No. 3-11105 (S.E.C. May 5, 2003), available at https://www.sec.gov/litigation/admin/34-47797.htm ("Molinsky pled guilty to and was convicted of the charge of Attempt to Commit the Crime of Enterprise Corruption and one count of Martin Act securities fraud (*see People of New York v. D.H. Blair, et al.*, Ind. No. 3282/00).").

783086.1

online gambling company who Canadian authorities charged with insider trading and market manipulation. Through Ahaka Capital, Messrs. Malczewski and Baazov were investors in MUNDOMedia alongside Honig, O'Rourke, Stetson, and Groussman. Northurst was also an investor in GBV, which was nearly acquired by Marathon.

64.65. Paradox Capital Partners LLC ("Paradox"). The registered address in Florida for Paradox Capital Partners (owned by Kesner) is the same Boca Raton building that Honig uses as his business address.

65.66. Bryan Pascual ("Pascual"), a resident of Tampa, Florida, is a Director of Kairos and Ingenium, and a Manager of Prive.

66.67. Pershing Gold Corp. ("Pershing Gold") is an emerging gold producer whose primary asset is the Relief Canyon Mine in Pershing County, Nevada. Defendant Honig was a Director of Pershing Gold.

67.68. PolarityTE Inc. ("PolarityTE") was formerly a video game company known as Majesco Entertainment, and is now a purported biotechnology company based in Salt-Lake City, Utah. Polarity'sPolarityTE's Co-Chairmen were Defendant Honig and Brauser. Honig was also Polarity's CEO. Defendant Stetson was Polarity'sPolarityTE's CFO. Karr and Defendant Kaplan were Directors of PolarityPolarityTE.

68.69. Prive Technologies LLC ("Prive") is a Florida limited liability corporation that was incorporated on October 31, 2017, with its Principal Address at 218 S. Audobon Avenue, Tampa, Florida 33609. Prive's Managers are Ho and Pascual.

69.70. Robert O'Braitis ("O'Braitis"), a part-time resident of Boca Raton, Florida, owned as of at least September 25, 2017, owned 80,410 shares of Riot common stock representing 1.46% of the Company's common stock beneficially owned (the exact amount owned on that same date

25

783086.1

by Theofilos through JAD Capital Inc., and by Groussman in two separate UTMA accounts).
O'Braits O'Braitis has been an investor in other Honig-backed companies, including PolarityTE and Marathon, in which he was party to a "Securities Purchase Agreement with proposed Riot Board member Jesse Sutton.

70.71.  Moses D. Silverman ("Silverman"), a resident of Miami Beach, became a Director of Kairos and Ingenium on October 19, 2018.

71.72.  Stetson Capital Management, LLC ("Stetson Capital") is a Florida limited liability company incorporated in April 2016 whose manager and registered registered agent is Defendant Stetson.  Stetson Capital's Articles of Incorporation list Defendant Stetson's previous residence less than one mile from Defendant O'Rourke's residence in Fort Lauderdale, Florida.  Stetson Capital invested in at least 4.99% of Riot's common stock.

72.73.  Stockwire Research Group, Inc. ("Stockwire") is a Florida corporation whose principal place of business is in Miami-Dade County, Florida, and whose President and CEO is Adrian James.

73.74.  Tess Inc. ("Tess") is a company based in Toronto, Ontario, whose Chief Software Architect is Tanasescu.

74.75.  Jason Theofilos ("Theofilos") is the chief executive of MUNDOmedia Ltd., a digital advertising company in which Defendant Honig, Jonathan Honig, O'Rourke, Stetson, and Groussman each held shares.  Theofilos is the Director of JAD Capital Inc. and the President of 2330573 Ontario Inc.  As of at least September 25, 2017, Theofilos owned JAD Capital Inc., which owned 80,410 shares of Riot common stock representing 1.46% of the Company's common stock beneficially owned (the exact amount owned on that same date by O'Braitis and by Groussman in two separate UTMA accounts).

26

75. 76.  Sorin Tanasescu was Tess's Chief Software Architect and was concurrently a Director of an entity called Ingenium IT Compusoft and a Managing Director of a company called VoiceWay.

76. 77.  Titan Multi-Strategy Fund I, Ltd. ("Titan") is a Florida corporation.  Titan is owned and controlled by Jonathan Honig, who is Titan's Manager.

77.   US Commonwealth Life, A.I. Policy No. 2013-17 ("Policy No. 2013-17") is controlled by Bhansali, who caused Policy No. 2013-17 to purchase convertible notes and warrants resulting in approximately 80,000 Riot shares, which Policy No. 2013-17 sold publicly.

78.   WPCS International Incorporated ("WPCS") was a global engineering, communications, and infrastructure "with over 500 employees in 10 operations centers on three continents."  In 2012, Defendant Honig, through GRQ 401, invested in WPCS when its stock was trading in excess of $1,000 per share.  In 2013, WPCS purchased BTX Trader, a bitcoin trading platform, from Defendant O'Rourke.  In January 2018, WPCS's changed its name to "Dropcare, Inc." and is now a cloud-services-for-cares company whose stock trades on NASDAQ under the ticker "DCAR" for approximately $2.01 per share.

**V.**     **BACKGROUND ON THE "HONIG GROUP"**

    **A.**     **The SEC Has Sued Honig, O'Rourke, Groussman, and Stetson for "Acting as an Undisclosed Control Group" in Three Previous Fraudulent Pump-and-Dump Schemes Involving the Same *Modus Operandi* They Used at Riot**

    79.     On September 7, 2018, the SEC filed the *Honig* Action against Defendants O'Rourke, Honig, Groussman, and Stetson (as well as related-party Brauser and others) for violating the Exchange Act and Securities Act by engaging in "three highly profitable 'pump-and-dump' schemes . . . from 2013 through 2018 in the stock of three public companies (Company A,

Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares." Cmpl. ¶ 1 (attached as Exhibit A).[3]

80.     On March 16, 2020, the SEC filed a Second Amended Complaint, which is attached hereto as Exhibit B.[4]  In its complaint the SEC alleges that Defendants Honig, O'Rourke, Stetson and related-party Brauser, individually or through their entities, invested alongside one another in at least 19 issuers at or about the same time, from 2011 to the present.  While this action concerns three of those issuers, in most cases in which Honig, Brauser, Stetson, and O'Rourke co-invested, the investments followed a pattern: Honig or Brauser would identify a target company and arrange a financing or financings that would give them and their chosen co-investors (including Stetson and O'Rourke, among others) a controlling position in the company's outstanding common stock at lower-than-market prices.  Honig, Brauser, Stetson, and O'Rourke would then exercise that control by dictating terms of the company's material management decisions and policies, and voting together to direct the company's major business decisions. When the group determined that the time had arrived to exit the investment, they would engineer a publicity-generating event that would both drive the price of the stock higher, and also create market demand and trading volume that would allow them to sell their positions.  Typically, Honig, Brauser, Stetson and O'Rourke would dictate some kind of transaction for management to undertake – for example, an acquisition or merger, or a new investment by a well-known investor, like Investor 1 – and paid writers, bloggers or other public relations professionals to write about it.  Once the publicity had its intended effect on the stock's price and trading volume, Honig, Brauser, Stetson, O'Rourke and

---

[3] Citations to "Cmpl. ¶ ___" are to paragraphs of the SEC's initial complaint.  *See SEC v. Honig et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 8, 2009) (ECF No. 1).
[4] Citations to "2d Am. Cmpl. ¶ ___" are to paragraphs of the SEC's Second Amended Complaint.  *See SEC v. Honig et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 8, 2009) (ECF No. 233).

783086.1

the other hand-picked co-investors would sell their respective positions – generally staggered over a course of weeks – into the artificially inflated market.  2d Am. Cmpl. ¶ 57.

81.     Throughout these stages, Honig, Stetson, and O'Rourke were in nearly daily contact because they worked out of the same office and were in frequent email and telephone contact, at times purposefully moving their conversations to the less permanent medium of text or instant messaging.  Honig, Stetson and O'Rourke were each in frequent contact with Brauser, with whom they shared office space until late 2013.  *Id.* ¶ 58.

82.     Honig, Brauser, Stetson, and O'Rourke obtained their interests in these issuers at the same time, and agreed to act as a group in holding, disposing and voting the stock they acquired, with Honig leading the combined effort.  As O'Rourke put it in a February 3, 2014 email to the officer of a potential merger target, "Barry Honig is the principal investor of ***our small group***."  Honig carefully controlled his "small group's" participants in the financings he arranged so that shares were held only by individuals and entities that (1) permitted Honig to direct how they voted their shares and/or acquiesced in Honig's control of the management of the company, and (2) refrained from selling their shares until the optimal time for group members to profit from the planned post-pump dump.  *Id.* ¶ 59.

83.     Honig worked with Stetson to ensure that members of his groups voted their shares in unison.  At times, members of the group reached out to Stetson to find out how they should vote on various proposals.  For example, with respect to one of the issuers in which they had co-invested, in July 2015, Brauser forwarded an email request from a co-investor's staffer to Stetson, asking whether to vote for or against a proposal.  Stetson, in an email that same day, copying Honig, replied, "Yes, vote 'For.'"  In a November 2016 email to members of a Honig group of

29

investors in another issuer, Stetson responded to a request for "instructions to vote" with "[v]oting in favor of [two named directors]. Against all other members and actions." *Id.* ¶ 60.

84.    While Honig was the primary architect of the three schemes detailed below, email traffic among Honig, Brauser, Stetson, and O'Rourke demonstrates the various key roles each of these individuals played in the typical Honig-led investment. *Id.* ¶ 61.

85.    Brauser is a long-time co-investor with Honig, investing (individually, through his entity, Grander, or through family members' accounts) alongside Honig (and/or a Honig entity) in more than *40 issuers* between approximately 2011 and mid-2018. From at least October 2010 to approximately 2013, Brauser rented an office with Honig at 4400 Biscayne Boulevard in Miami, Florida. Brauser's business association with Honig was sometimes noted by keen market observers: As early as 2013, a short seller published a report on a company in which the two had invested and noted that a factor negatively affecting the value of the company's stock was the CEO's close financial ties with "two serial stock promoters," whom it identified as Honig and Brauser. *Id.* ¶ 62.

86.    For some of the issuers in which Brauser co-invested alongside Honig, Brauser took an active role, at times directing the issuer's management, finding and negotiating transactions for the issuer or bringing in additional investors. In others – particularly while Honig and Brauser worked through one of their periodic disputes about who owed whom money – Brauser was content to let Honig direct the steps in the scheme; since Brauser had been closely involved with respect to the other issuers in which he had co-invested with Honig, he was well-familiar with the playbook, knew that Honig would follow it and understood that Honig would signal to Brauser when it was time to sell his shares. *Id.* ¶ 63.

30

87.     Stetson shared office space with Honig and O'Rourke at all relevant times. Individually, through his entity SCI, or through HSCI (the vehicle he nominally controlled), Stetson invested alongside Honig (and/or a Honig entity) in more than *65 issuers* between 2011 and August 2018.  In connection with most of these investments, Stetson executed Honig's directions, managed the administrative aspects of the Honig group's investments, and performed pre-investment due diligence. For example, Stetson communicated with brokers to effect Honig's trades, deposited Honig's shares with brokers, communicated investment terms and wire instructions to investors Honig had lined up, tracked the ownership of each group member in a particular issuer, corralled shareholder votes from co-investors (and, in some cases, even told co-investors how to vote), prepared financial analyses of proposed investments and conveyed Honig's instructions to issuer management.  From 2012 to 2013, Stetson also frequently managed Honig's arrangements with Ford to write paid promotional articles about issuers in which Honig and his group had invested.  *Id.* ¶ 64.

88.     O'Rourke shared office space with Honig and Stetson at all relevant times, beginning in 2012.  Through his entity, ATG, or individually, O'Rourke invested alongside Honig (and/or a Honig entity) in over *75 issuers* between 2011 and August 2018.  Beginning in 2013, O'Rourke managed the Honig group's promotional efforts by working with writers and bloggers to publish favorable articles and posts about issuers the Honig group controlled.  He arranged for those writers to be compensated for their promotional pieces.  For example, in 2013 and 2014, O'Rourke compensated "Writer E" for writing positive promotional articles.  O'Rourke made the payments through personal checks and/or sham stock purchases, designed to disguise the true purpose of the compensation.  O'Rourke knew, or was reckless in not knowing, that Writer E did not disclose these payments in the promotional pieces he published on these issuers.  *Id.* ¶ 65.

31

89.     At times, and with Honig's knowledge and consent, or at his direction, O'Rourke wrote and published the promotional articles himself.  O'Rourke used a pseudonym for the byline and did not disclose his relationship to the issuer being promoted or the compensation Honig was paying him for the articles.  *Id.* ¶ 66.

90.     In addition to his work with promoters and his own promotional activities, in at lease on instance, O'Rourke took the lead in negotiating a transaction for Company B, in which he, Honig, Brauser and Stetson and/or certain of their entities had invested.  After about his first year with Honig, O'Rourke also began assisting Stetson with the administrative aspects of each group investment.  *Id.* ¶ 67.

91.     Stetson and O'Rourke knew that each participant in Honig's deals – Honig's "following" – had been invited to participate in these private transactions in exchange for some value each could bring to the deal, and that Ford was no different.  For example, Groussman brought needed cash and a willingness to follow Honig's directions on how to vote or when to sell. *Id.* ¶ 80.

92.     Given his February 26, 2019 settlement with the SEC, Groussman is referred to in the SEC's Second Amended Complaint as "Affiliate 1."  However, the SEC's initial complaint, dated September 7, 2018, alleged that "*[i]n every scheme*, Honig, and some combination of Stetson, Brauser, O'Rourke, *Groussman . . .* either explicitly or tacitly agreed to buy, hold or sell their shares in coordination with one another, knowing that a pump and dump was in the offing that would allow them all to profit handsomely."  Cmpl. at ¶ 2.  Groussman's participation in the schemes involving Biozone, MGT, and MabVax included "pre-release manipulative trading" with Honig, Brauser, O'Rourke, Melechdavid and ATG.  *Id.* ¶ 3.  "Honig, Brauser, Stetson, O'Rourke, *. . . and Groussman*, as well as certain of their entities, also violated beneficial ownership reporting

32

requirements of the federal securities laws by failing to disclose their group beneficial ownership of shares and the fact that as a group they were looking to exercise (and, in fact, did exercise) control over the issuers." *Id.* ¶ 4. "*Groussman* . . . work[ed] at an office in Boca Raton with Honig, Stetson and O'Rourke." *Id.* ¶ 38.

93.     As stated in a letter[5] from counsel for the SEC filed with the court in *SEC v Honig*, the SEC recently reached additional settlements with several of the same Defendants and related parties in this case, including Defendants O'Rourke[6] and Stetson,[7] and Honig Group members Brauser,[8] ATG Capital LLC, Stetson Capital Investments Inc., and Grander Holdings, Inc.

94.     These settlements follow the SEC's previous settlement with Defendant Honig, in which he agreed, among other things, to be "permanently barred from participating in any offering of penny stock"; "permanently prohibited" from holding greater than 4.99% of any penny stock company; "permanently prohibited" from "advertising, marketing, or otherwise promoting" any

---

[5] *SEC v. Honig*, No. 1:18-cv-08175-ER (ECF No. 222) (Mar. 6, 2020) (attached as Exhibit C).

[6] *SEC v. Honig*, No. 1:18-cv-08175-ER (Mar. 6, 2020) (ECF No. 228) (Final Judgment as to Defendant John R. O'Rourke III). O'Rourke's settlement permanently bars him from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, or advertising, marketing, or promoting any penny stock, and requires him to pay $1,153,326 in disgorgement, interest, and civil penalties. *Id.*

[7] *SEC v. Honig*, No. 1:18-cv-08175-ER (Mar. 6, 2020) (ECF No. 227) (Final Judgment as to Defendant John Stetson). Stetson's settlement bars him for ten years from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, or advertising, marketing, or promoting any penny stock, and requires him to pay $1,154,669.28 in disgorgement, interest, and civil penalties. *Id.*

[8] *SEC v. Honig*, No. 1:18-cv-08175-ER (Mar. 6, 2020) (ECF No. 224) (Final Judgment as to Defendant Michael Brauser). Brauser's settlement permanently bars him from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, or advertising, marketing, or promoting any penny stock, and requires him to pay $1,175,768.16 in disgorgement, interest, and civil penalties. *Id.*

33

penny stock; and agreed to "pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty" yet to be determined upon a forthcoming motion by the SEC.[9]

95.     On February 26, 2019, Defendant Groussman's settled with the SEC.  Groussman agreed to a similar five-year ban on participating in any offering of penning stock, holding greater than 4.99% of any penny stock, or advertising, marketing, or promoting any penny stock and required him to pay $ 1,381,914.78 in disgorgement, interest, and civil penalties.[10]

96.     In connection with the *Honig* Action, the SEC filed with the court several emails among Honig, O'Rourke, Groussman, Stetson, and/or Brauser that confirm that these individuals personally coordinated their investments in numerous public companies. *See* Exs. D, E, F, G, H & I.  For example, on July 2, 2014, Defendants Honig, O'Rourke, Stetson, Groussman, and Brauser received an email from a lawyer concerning a "Share Purchase" and requesting "broker representation letters" for the "transfer agency for Musclepharm Corp" for "each transferee." *See* Ex. D at 7 of 21.[11]  That same day, this lawyer issued an opinion letter to the transfer agent stating that each of these same individuals had "executed representation letters that such parties are not

---

[9] *SEC v. Honig*, No. 1:18-cv-08175-ER (July 7, 2019) (ECF No. 152) (Judgment as to Defendant Barry Honig).

[10] *SEC v. Honig*, No. 1:18-cv-08175-ER (Feb. 6, 2019) ("ECF No. 93) (Final Judgment as to Defendant Mark Groussman).

[11] This July 2, 2014 email clearly identifies "John Stetson" and "Mike Brauser." Honig's email address is the same that he used in his September 13, 2016 letter to the Bioptix Board on Schedule 13D/A. *See* Ex. J. O'Rourke's email address is the same listed for him and his entity, ATG, in a December 17, 2013 Amended and Restated Limited Liability Company Agreement between O'Rourke and BTX Trader LLC filed with the SEC. *See* https://www.sec.gov/Archives/edgar/data/1086745/000152153613001045/q1101368_ex10-1.htm. Groussman's email address is the same listed for him and his entity, Melachdavid, in a November 13, 2013 Stock Purchase Agreement involving "Positive ID Corporation" signed by Groussman, Honig, Stetson, and Karr. *See* https://www.sec.gov/Archives/edgar/data/1347022/000139843213000739/exh10_1.htm. Hudson Bay Master Fund Ltd., a "Selling Stockholder" in Riot's January and February 2018 Forms S-3, was also a party to this 2013 Stock Purchase Agreement.

34

affiliates and were not affiliates within the three months prior to the Purchase Date."  Ex. E at 17-18 of 25.

97.    Similarly, a January 27, 2012 email from Stetson to Honig attaches a "Share Breakdown" of the shares that Honig, Stetson, Groussman, Brauser, and their affiliates would hold in IZEA Worldwide Inc after a stock split.  Ex. H.  Another January 20, 2011 email from Stetson provides a similar breakdown for himself, Honig, Brauser, and others for "Passport Potash, Inc."  Ex. G.  Likewise, an October 2, 2013 letter shows how Honig, Grossman, Brauser, and Brauser's relatives allotted their co-investments in Senesco Technologies, Inc.  Ex. F.

98.    The FBI and Department of Justice ("DOJ") have also been pursuing a criminal investigation into the Honig Group's pump-and-dump schemes, pursuant to which the FBI interviewed Defendant Honig and the DOJ made those FBI Form FD-302[12] interview notes available to the SEC.[13]

### 1.    Biozone Pharmaceuticals, Inc. (a/k/a "Company A")

79.    The "Honig Group" is used herein to refer to Honig, the other Defendants, and any other current or former holders of Riot securities (including common stock, preferred stock, warrants, and notes) who had a material relationship with Honig, any of the other Defendants, and/or any other member of the Honig Group.  As alleged herein, the Honig Group included, among others and without limitation:  Afios, ATG, Bhansali, Brauser, Karr, Kesner, Grander, GRQ

---

[12] "After FBI agents conduct a formal interview, they incorporate [ ] their handwritten notes into a more complete report of the interview on the FBI's Interview Report Form FD-302, known colloquially as a '302.'"  *Palermo v. United States*, 776 F. App'x 753, 754 (3d Cir. 2019) (quoting *United States v. Lloyd*, 807 F.3d 1128, 1158 n.11 (9th Cir. 2015) (alteration in original)).

[13] *See* Ex. K at 21-25 (counsel informing the court that "the SEC has notes of [Barry] Honig's [FBI Form FD-] 302s," which the SEC "requested," "reviewed," and "gave the 302s back to the [DOJ]" and counsel for the SEC confirming that the SEC had "review[ed] the 302s" from Honig's interview).  *See also* Ex. L (Stipulation and Order in *SEC v. Honig* providing for disclosure by SEC of "notes taken by the [FBI] at an April 23, 2019 interview of a witness").

783086.1

401K, Alan Honig, Jonathan Honig, JAD, James, Marcandy, Melechdavid, MGT, Molinsky, Namaste, Northurst, Paradox, O'Braitis, Stetson Capital, Theofilos, Titan, and Policy No. 2013-17, and other affiliated shareholders.  As alleged herein, and as illustrated below, each of the members of the Honig group has invested in one or more previous public companies affiliated with Honig and the other Defendants including, without limitation, Biozone, MGT, MabVax, Marathon WPCS, PolarityTE, Pershing Gold, and MUNDOmedia Ltd.

Honig Group                            Prior Pump-and-Dump Companies[44]

| | Biozone | MGT | MabVax | PolarityTE | Pershing Gold | Mundo | Marathon |
|---|---|---|---|---|---|---|---|
| Aifos | | | X | X | X | | |
| ATG | | X | X | X | X | | |
| Bhansali | | | | X | | | |
| Brauser | | | X | X | X | | X |
| Grander | X | X | X | X | X | | X |
| GRQ 401K | X | X | X | X | X | | X |
| Honig, Alan | | | X | | X | | X |
| Honig, Jonathan | | | X | | X | X | |
| JAD Capital Inc. | | | | | | X | |
| James | | | | | X | | |
| Karr | | | X | X | X | | X |
| Kesner | X | X | X | X | X | | X |
| Marcandy | | | | | | | |
| Melechdavid | | X | X | X | X | X | X |
| Molinsky | | | | X | X | | X |
| Namaste | | | | X | | | |
| Northurst | | | | | | | X |
| O'Braitis | | | | X | | | |
| Paradox | | | X | X | X | | X |
| Policy No. 2013-17 | | | | X | | | |
| Richardson | | | | | X | | X |
| Stetson Capital | | X | | X | X | X | X |
| Stockwire | | | | | X | | |

---

[44] The absence of a checked box is not intended to indicate the lack of a relationship.

36

## VI.   SUBSTANTIVE ALLEGATIONS

### A.   The Honig Group Has Engaged in Similar Pump-and-Dump Schemes at Numerous Publicly Traded Microcap Companies

80.   Numerous members of the Honig Group have engaged in prior pump-and-dump schemes at other publicly traded companies, as depicted by the following chart and discussed below.

**The Honig Group's Prior Target Companies[15]**

| | Biozone | MGT | MabVax | PolarityTE | Pershing Gold | Mundo | Marathon |
|---|---|---|---|---|---|---|---|
| Honig | | X | X | X | X | X | X |
| O'Rourke | | X | X | X | X | X | X |
| Brauser | X | X | X | X | X | | X |
| Stetson | X | X | X | X | X | X | X |
| Groussman | X | X | X | X | X | X | X |
| DeFrancesco | | | | X | | | |
| Beeghley | | | | X | | | |
| Kaplan | | | | X | | | |
| So | | | | | | X | |

#### 1.   The SEC Has Sued Honig, O'Rourke, Stetson, and Brauser for Recently Engaging in Pump-and-Dump Schemes at Three Companies

81.99.   The Honig Group's three most recent schemes are also detailed in a the SEC's March 8, 2019 First Amended Complaint[16] filed by the SEC against Honig, O'Rourke, Stetson, Brauser Brauser, and related defendants. The SEC alleged that "Honig was the primary strategist,

---

[15] The absence of a checked box is not intended to indicate the lack of a relationship.

[16] Citations to "Am. Cmpl. ¶ ___" are to paragraphs of the SEC's First Amended Complaint. *See SEC v. Honig et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 8, 2009) (ECF No. 105).

37

Formatted Table

calling upon other Defendants to, among other things, acquire or sell stock, arrange for the issuance

of shares, negotiate transactions, and/or engage in promotional activity." ~~SEC~~ Am. Cmpl. ¶ 2.[17]

The ~~SEC~~ alleged that Honig, O'Rourke, Stetson, ~~Brouser~~Brauser engaged in pump-and-dump

schemes at "Company A" (Biozone), "Company B" (MGT), and "Company C" (MabVax):

> All told, the three schemes earned Defendants and their associates millions of
> dollars:  Company A's pump and dump generated approximately $9.3 million in
> stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their
> respective entities, and affiliates.  Company B's pump and dump generated more
> than $9.5 million for Honig, Brauser, Stetson, O'Rourke, certain of their respective
> entities, affiliates, and/or certain frequent co-investors.  And, most recently, the
> pump and dump of ~~Company C~~[MabVax] brought in over $8.3 million in stock
> sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective
> entities and/or certain frequent co-investors.  These profits were made at the
> expense of investors who purchased shares in [Biozone], [MGT] and [MabVax] at
> artificially high prices based on misleading flattering articles or coverage in the
> media and matched trades that were orchestrated by the Defendants.

*Id.* ¶ 8.

### ~~a.1.     Biozone Pharmaceuticals, Inc. (a/k/a "Company A")~~

100.   ~~As alleged~~In the Biozone Scheme, Honig and Brauser generated approximately

$9.3 million in proceeds for themselves and their co-investors by secretly paying for a misleading

promotional campaign, engaging in manipulative trading, and then unlawfully selling Biozone

share into the artificially inflated market that they had generated.  *Id.* ¶ 80.

101.  In November 2010, Honig, along with his nominees, including Stetson and

Groussman, purchased one-third of a publicly traded shell company.  *Id.* ¶ 82.  Honig, Brauser,

and Stetson each disguised his role in the acquisition through an intermediary entity.  *Id.*

According to the SEC, ~~a member of~~ "[s]ince part of Stetson's role in working with Honig was to

_____

[17]  Citations to "SEC Cmpl. ¶ ___" are to paragraph of the SEC's Complaint.  Citations to "SEC Am. Cmpl. ¶ ___" are to paragraphs of the SEC's First Amended Complaint.  *See SEC v. Honig et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 8, 2009) (ECF No. 105).

783086.1

keep track of the amount of each associated investor's holdings, and [Stetson] had reviewed [Biozone's] Form 10-K/A, setting out Honig and Brauser's ownership and the number of [Biozone's] outstanding shares, Stetson knew, or was reckless in not knowing, how much of [Biozone's] stock Honig and Brauser controlled." SEC 2d Am. Compl. ¶ board of directors 100.

102. In late 2010, Honig and Brauser approached the management of Biozone's predecessor company to with a proposal to take the company public. *Id.* ¶ 83.

82. 103. Biozone's Chief Scientific Officer, Brian Keller, explained that "[t]he real power is with Barry Honig and Mike Brauser. [Biozone CEO] Elliot [Maza] is just a mouthpiece," *id.* ¶ 91, but that Honig and Brauser failed to keep their promises to invest in research and development at Biozone, *id.* ¶ 93. Instead, "Honig and Brauser used the financings they orchestrated to amass more, ever-cheaper [Biozone] shares for themselves and their associates" so that by April 1, 2013, "Honig, Brauser and other co-investors, including Stetson ., had amassed 28,153,845 shares, or almost 45% of the [Biozone] shares outstanding, with Honig alone holding 5,542,654 shares, or 8.8% of the company's outstanding shares." *Id.* ¶ 95.

83. 104. To facilitate the pump and dump scheme, "[i]n September 2013, Honig directed O'Rourke to reach out to Ford to arrange for him to post his purportedly independent investment analysis of [Biozone] on the Seeking Alpha website pursuant to the understanding Honig and Ford had reached in 2012." *Id.* ¶ 102. In turn, "O'Rourke contacted Ford and proposed that Ford write a [Biozone] article in exchange for Ford obtaining [Biozone] shares at a below-market price." *Id.* ¶ 103.

84. 105. The SEC alleged that "[o]n Monday, September 23, 2013, Honig and some associates began trading [Biozone] shares to create the appearance of market activity and interest in [Biozone] in advance of the planned Ford article. That day, the trading volume of [Biozone]

39

shares soared to 302,000 from zero volume the previous trading day." *Id.* ¶ 104. "The September

23rd trading also gave Honig a way to pay Ford surreptitiously for his upcoming favorable article

on [Biozone]. On the morning of Friday, September 20, 2013, O'Rourke called Ford and told him

to put in buy orders for [Biozone] stock at $0.40 per share to ensure his order was executed against

the corresponding sell order later placed by Honig." *Id.* ¶ 105. "O'Rourke joined the trading at

the end of the trading day on September 23rd to 'mark the close,' i.e., to ensure that the last price

of the day would be higher, giving the false impression that [Biozone's] share price was on an

upward trajectory." *Id.* ¶ 107.

85.106.As directed, "Ford published his [Biozone] article on the Seeking Alpha website

less than half an hour before market close on September 26, 2013. . . .  In it, Ford presented a

bullish outlook for [Biozone] and concluded that '[Biozone] should be trading for more than twice

today's valuation.'" *Id.* ¶ 108.

86.107.Not surprisingly, Biozone's "share price increased from an average of about $0.48

during August 2013 to an intraday price of $0.97 on October 17, 2013." *Id.* ¶ 111.  At the same

time, "[b]etween the start of the manipulative trading on September 23, 2013 and December 31,

2013, Honig and his co-investors sold shares into the inflated market for proceeds of approximately

$9,350,000." *Id.* ¶ 112.

### b.2.    MGT Capital Investments Inc. (a/k/a "Company B")

87.108.With respect to MGT, the SEC alleged:

> During 2015 and 2016, Honig and his associates used [MGT], once a publicly
> traded shell, as another vehicle for their pump-and-dump schemes.  Honig and his
> partners used many of the same tactics they had employed in the [Biozone] scheme:
> they bought millions of cheap shares, intending to exercise control over the
> management and policies of the company; exercised that control; orchestrated a
> misleading promotion of the company that drove up the price and the trading
> volume of the company's shares; and dumped their shares for a profit in the inflated
> market.

**Formatted:** No widow/orphan control, Don't keep with next

*Id.* ¶ 125.

88.109. As before, "Stetson, with the knowledge and consent of the Honig-led investor group, then enlisted Ford to write a promotional piece, published on the Seeking Alpha website on November 5, 2012, which touted MGT's prospects for providing a "2X near-Term Return," and predicting that MGT's stock could rise to $18 a share (nearly triple its price on the previous trading day)." *Id.* ¶ 128.

89.110. This was not sufficient for Defendant Honig, however, because "after Ford's piece was published, MGT's stock price failed to reach the level desired by the Honig-led group." *Id.* ¶ 129. Accordingly, Honig directed Stetson and/or O'Rourke to retain Ford to write another Seeking Alpha article on [MGT]." *Id.* "This time Ford's article had the desired effect, pushing [MGT's] share price from $3.50 on April 10, 2013 to almost $4.50 on April 16, 2013, and increasing trading volume significantly. MGT's market capitalization went from under $16 million on April 10, 2013 to over $20 million on April 16, 2013. Honig sold approximately 250,000 shares into the inflated market, earning $967,224." *Id.* ¶ 130.

90.111. This was not the end of the pump-and-dump scheme at MGT. The SEC alleged that, "[i]n 2015, Honig and his associates began planning a new scheme to pump and dump [MGT's] shares." *Id.* ¶ 133. As part of this, "[o]n September 27, 2015, Honig directed Stetson to send the proposal to [Robert] Ladd, [MGT's] CEO. The deal contemplated the issuance of 2.8 million MGT shares, along with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker. This deal structure allowed the investors repeatedly to convert and sell their shares while appearing individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings." *Id.* ¶ 134. Then, "[h]aving coordinated the accumulation of stock with Brauser, Stetson and O'Rourke, Honig, with his

partners' knowledge and consent, then arranged for a promotion that included materially misleading information." *Id.* ¶ 138.

91.     Following this, the SEC alleged that

112.    ~~On~~The SEC alleged that MGT's CEO, Robert Ladd, "knew" that Honig, O'Rourke, Stetson, and Brauser were "operating as a group" and had "acquired [MGT] shares together, and that they were collectively exercising control over the company."  2d Am. Cmpl. ¶ 140. Specifically, the SEC alleged that "[i]n an email dated September 29, 2015 to [MGT] counsel, Stetson, Honig and [MGT]'s CFO – and in his October 4, 2015 email to [MGT]'s Directors – Ladd referred to the potential investors as an "*investor group . . . led by Barry Honig*," and attached a "term sheet" (to the September 29 email) that defined Honig as "Lead Investor."  *Id.* (emphasis added).  Similarly, in November 2015, Ladd wrote Honig:  "As for the cap table, we have 17.2 million common shares outstanding, including *your group's* 2.8 million . . . ."  *Id.* (emphasis added).  Yet, the SEC alleged that "Ladd nonetheless failed to disclose Honig's, Brauser's, Stetson's and O'Rourke's combined interest in, and control over, the company in Company B's public filings."  *Id.*

113.    The SEC further alleged that "on or around January 21, 2016, by which time Honig, Brauser, Stetson, O'Rourke and ~~Affiliate 1~~[Groussman] through ~~Affiliate 1~~[Groussman's] Entity, had acquired at least 16.3% of [MGT's] outstanding stock~~.~~:

Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of [MGT].  Shortly thereafter, the stock promoter paid a portion of the money he had received from [MGT] to a writer he instructed to publish a tout on [MGT].  On February 3, 2016, the writer published his piece online.  In it, he described [MGT]'s rosy prospects in social and "real money" gaming sites and intellectual property relating to slot machines.  The article did not disclose that the author had been paid by [MGT] - at Honig's direction - to write the article.  After the article was published on February 3, 2016, there was a 7000% increase from [MGT's] previous day's trading volume, and an intraday price increase of over 60%.

42

*Id.* ¶ 139.

92.114.Following this, "Honig, Ladd, Stetson and O'Rourke took advantage of the promotion's boost to [MGT's] stock price and trading volume and sold over 430,000 shares into this inflated market for proceeds of approximately $198,800." *Id.* ¶ 140.

93.115.The Honig group's third scheme at MGT occurred in 2016 and involved O'Rourke, "[a]t Honig's direction," "t[aking] the lead on arranging a deal between [MGT] and [a] Cybersecurity Innovator." *Id.* ¶ 142.

94.116.As part of this, "[o]n May 9, 2016, at 8:30 a.m., [MGT] issued a press release announcing its merger with CI Company." *Id.* ¶ 144.  In connection with this, "[t]he press release misleadingly described the Cybersecurity Innovator's prior financial success by falsely claiming that the Cybersecurity Innovator had 'sold his antivirus company to Intel for $7.6 billion,' suggesting that [MGT] might achieve similar success.  Yet . . . the sale of the Cybersecurity Innovator's namesake company to Intel at that price had occurred over a decade after the Cybersecurity Innovator's departure from that company." *Id.*

95.117.Honig then began trading in MGT stock "later that morning . . . to create the misleading appearance of an active market." *Id.* ¶ 145.  A Honig affiliate at MGT "paid StockBeast.com for [an] article to ensure a wide distribution of the news of the impending merger with the CI Company." *Id.* ¶ 146.  This had the intended effect, with MGT's share price increasing and its market capitalization increasing "from just over $8 million on May 6, 2016 to over $95 million on May 17, 2016." *Id.* ¶ 147.  Honig, O'Rourke, Stetson, and Brauser, along with an affiliate, "pursuant to their tacit or explicit agreement to acquire, hold, vote, and/or disperse of their shares in concert, sold over 9.2 million [MGT] shares" and "grossed $9.4 millions from the May 2016 sales into the inflated market." *Id.* ¶ 148.

118.   In private emails, Honig freely accepted credit for his role in MGT's strategic transactions.  On May 12, 2016, for example, Honig received an email from an investment firm congratulating him on a recent transaction involving MGT and cybersecurity businessman John McAfee:  "You're involved [sic] with [MGT]? Impressive!"  Honig responded that he was the "[l]argest shareholder, funder and [had the] relationship with [Mr. McAfee]." 2d Am. Cmpl. ¶ 157. In early August 2016, Honig celebrated his undisclosed role at MGT in a chat conversation with Stetson: "its great in [MGT] because *we are behind the scenes*." *Id.* (emphasis added).

119.   On February 24, 2020, the court in the *Honig* Action, reviewed the SEC's allegations regarding the Honig Group's activities with respect to MGT, and held that the SEC had "amply" alleged "the agreement that is necessary for a group to come into existence, as defined in the SEC rules."[18]  Specifically, the court found:

The Amended Complaint describes a deal that came together through negotiations between Stetson and [MGT CEO] Ladd that resulted in at least four investors each owning 4.9% of the company.  Stetson pursued that deal at Honig's direction.  The deal eventually included each member of the Honig Group, including Honig and Stetson, resulting in the Honig Group owning more than 16% of the company in January 2016.  These facts alone make it plausible that at least Honig and Stetson comprised a group that triggered the need to file a Schedule 13G or 13D as a group.

This finding is buttressed by the bevy of circumstantial evidence surrounding the Honig Group's manipulation of MTG and its stock, including Honig and O'Rourke's collaboration in orchestrating the McAfee deal in March 2016, the alleged coordination between Honig and Brauser to match trades and create the appearance of an active market in the early morning of the day the deal was announced, and the simultaneous negotiation between [MGT CEO] Ladd and each member of the Honig Group to allow the group to exercise their warrants immediately after the successful stock bump from the McAfee announcement. Placed in context with all of the pre-2015 conduct alleged as background, it is more than plausible that the four men [i.e., Honig, O'Rourke, Stetson, and Brauser] had agreed to work in concert on their schemes.  Ladd does not dispute whether the conduct alleged against the members of the Honig Group would otherwise be a

---

[18] *SEC v. Honig*, No. 1:18-cv-08175-ER (S.D.N.Y.) (Opinion & Order) (ECF No. 211, at 23).

violation of the securities laws, and so, accordingly, the SEC has properly alleged the first element of aiding and abetting liability against him.[19]

**c.3.**   **MabVax Therapeutics Holdings, Inc.- (a/k/a "Company C")**

96.120. With respect to MabVax, the SEC alleged that "[i]n early 2014, Honig identified a publicly traded shell company that was unencumbered by debt, and sought an appropriate private company for purposes of a reverse merger and pump and dump scheme." *Id.*Am. Cmpl. ¶ 159. Honig was able to do so because that company's CEO "was looking for funding for its research and development efforts in cancer therapies and diagnostic products." *Id.* ¶ 160.

97.121. Once Honig had taken control of MabVax through two entities (without disclosing his identity to MabVax), "[i]n approximately April 2014" Honig "first called up [MabVax's] CEO, [and] announced in words or substance:  'I'm the owner of your company.  You better do what I tell you to do.'" *Id.* ¶ 162.

122.    In March and April 2015, Honig orchestrated two private placement financings for MabVax that would tighten Honig's, O'Rourke's, Stetson's, and Brauser's and control of the company:  two Series D and Series E offerings.  Honig described the deal to Stetson, Brauser, and their co-investor in a March 5, 2015 email, characterizing it as a "real good opportunity" that would allow them to "make $35 million conservatively in 4 months and our money out [in] 4 weeks. . . . *I will trade out of it for us.*"  2d Am. Cmpl. ¶ 194 (emphasis added).  As MabVax's CFO understood, Honig structured both financings to avoid disclosing his, O'Rourke's, Stetson's, and Brauser's holdings on Schedule 13D or 13G.  *Id.* ¶ 196.

123.    Honig's control of this financing group was clear to MabVax's management; indeed, when deciding whether a potential investor could take part in the March 2015 Series D

---

[19] *Id.*

financing round, MabVax's CEO explicitly deferred to Honig on who could participate in the deal, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might want to allow to invest along with the current group.  Viewed this as your choice not mine.  That is why I asked him to call you."  *Id.* ¶ 197.

124.    Honig's control of the financing group was clear to MabVax's management; indeed, when deciding whether a potential investor could take part in the March 2015 Series D financing round, MabVax's CEO explicitly deferred to Honig, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might want to allow to invest along with the current group. Viewed this as your choice not mine. That is why I asked him to call you."

125.    That Honig selected the investors who would be allowed to participate in MabVax's financings was demonstrated by an email to Stetson and Brauser on March 13, 2015, in which Honig laid out a more detailed list of investors as well as the proposed investment amount and the method of investment for both the Series D and Series E financings: "Southern biotech [a Neveada corporation that Stetson incorporated at Honig's direction and for which Honig was the sole officer and president, but which was co-owned by Honig, Brauser, and "Investor 1," *id.* ¶ 48] will invest 3 million to purchase [Entity H's] notes – 1 million each," and "[Investor 1] is going to lead pipe [private investment in public equity] for 1 million at .75 cents."  *Id.* ¶ 205.

126.    Similarly, Honig himself demonstrated his control over the selection of investors when on April 1, 2025, Honig asked Brauser to "do [him] a favor" and forego his participation in the Series E financing because, as Honig explained, "I would like to let some of our friends do it . . . [I]t would be best if we let [Investor 1 and Investor 1 Company and an Investor 1 Company executive ("Investor 1 Co. Officer")] take their full allocation."  *Id.* ¶ 203.

46

98.127. As part of the scheme at MabVax, the SEC alleges that "[o]n April 3, 2015, O'Rourke, acting at Honig's direction, circulated a press release (with input from [MabVax's] CEO, Honig and Brauser) announcing the $12 million private placement in which Investor 1 and his entities had participated, drawing on Investor 1's reputation among retail investors as a successful biopharma investor." *Id.* ¶ 185. "Honig, with the knowledge of Brauser and Stetson, then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym 'Wall Street Advisors' on the Seeking Alpha website on April 8, 2015 at 11:13 a.m. The article, titled 'Opko Spots Another Overlooked Opportunity in MabVax Therapeutics,' highlighted Investor 1 Company's and Opko's investment in MabVax, and was designed to inspire Investor 1's retail investor devotees to follow his lead and buy MabVax stock. Despite his involvement in facilitating the MabVax financing and his extensive business relationships with Honig, Brauser, Investor 1, and Stetson, in his article, O'Rourke knowingly and falsely claimed that '[t]he author has no business relationship with [MabVax].' He also knowingly and falsely claimed that he was 'not receiving compensation for [writing the article].'" *Id.* ¶ 186.

99.128. Accordingly, "[a]nticipating the release of O'Rourke's Seeking Alpha article, ATG and O'Rourke engaged in early trading of [MabVax] shares on April 8, 2015 with the intention of creating a false appearance of market interest in the stock. That trading included at least one matched trade, with a Honig associate submitting the buy order and ATG submitting the sell order for the same price at 9:38 a.m. The share price of [MabVax] opened that day at $3.14 and reached $3.73 in the minutes before the promotional article was released." *Id.* ¶ 187.

100.129. The SEC alleged that "[t]he promotional campaign was successful." *Id.* ¶ 188. In particular:

> The trading volume of [MabVax] shares rose almost 7500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, following the announcement of

47

the Series E private placement involving Investor 1.  The trading volume further increased to 858,709 on April 9, 2015, the day after O'Rourke's article was published. [MabVax's] share price went from a closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015, increasing the company's market capitalization by $23 million. Honig and his affiliates, listed below, acting pursuant to their agreement to acquire, hold, vote and/or dispose of their [MabVax] shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of over $5.5 million.

*Id.*

101.130.   Then, "[i]n June 2015, when the market for [MabVax] shares had cooled from

over $4 per share to closing prices hovering just above $2 per share, O'Rourke recruited Ford to

publish another [MabVax] tout on Ford's blog."  *Id.* ¶ 189.  Ford obliged, and on July 1, 2015,

"published an article titled 'MabVax: Near-Term Catalysts Could Push Shares from $2 to over

$5.'  The article contained materially false statements (as Honig, Brauser, Stetson and O'Rourke

knew, or were reckless in not knowing) including that a licensing deal was imminent, when it was

not, and that there were near-term therapy development events that could take the share price to

$5, when in fact clinical trials were only in early stages.  As before, although Honig compensated

Ford for writing the blog post, Ford did not disclose that he had been paid."  *Id.*

102.131.   Once again, the SEC alleged that Honig's scheme was successful:

Ford's article had the desired impact on the market: [MabVax] trading volume increased from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015. Likewise, [MabVax's] share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015. Pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig and his affiliates sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million.

*Id.* ¶ 190.

**B.      The Honig Group Co-Invested in Other Public Microcap Companies**

**1.      The PolarityTE (f/k/a Majesco Entertainment)**

132.   PolarityTE is a biotechnology company based in Salt Lake City, Utah.  PolarityTE

was previously a company known as Majesco Entertainment, a company that designed video

783086.1

games for more than 25 years.  In October 2015, Majesco Entertainment merged with another company called PolarityTE.  At that point, Defendant Stetson, as Polarity's CFO, appointed Honig and Brauser as Co-Chairmen of the Board of Directors and named Kaplan and Karr as Directors.

133.     In August 2016, Honig, O'Rourke, GRQ 401K, Brauser, Grander, Melechdavid, Groussman, Paradox (Kesner), ATG, Stetson, and Stetson Capital were "Selling Stockholders" in an S-3 Registration Statement registering shares in PolarityTE for sale to the public.

134.   As of September 2016, Beeghley and Honig had served together for one year as Director and Chairman/CEO, respectively, of PolarityTE.  Specifically, Beeghley was a Director of Majesco from December 18, 2015 until October 18, 2017, and Honig was Chairman and CEO of Majesco from September 30, 2015 until December 1, 2016.  Thus, Beeghley joined PolarityTE's board when Honig was already Chairman and CEO of that board.

135.   On March 18, 2019, PolarityTE received a subpoena from the SEC, and its "shares tumble[d] after it says SEC is looking into possible manipulation," according to a CNBC article. The subpoena "asked about the company's lead product as well as communications and agreements between Polarity and its former CFO.

136.   In the wake of the SEC's charges against Stetson, PolarityTE immediately terminated Stetson, according to a press release by PolarityTE, stating that "the Company, management, and Board of Directors do not tolerate the behavior outlined in the complaint."[20]

**2.     YesDTC Holdings, Inc.**

~~103.~~137.   The allegations against Defendant Honig in the Honig *Action*, as well as the allegations in this case, are not one-off events.  For example, in 2014, Joseph Noel ("Noel")

---

[20] *See* PolarityTE, Inc. Issues Statement Regarding Mr. John Stetson and his Termination from the Company,  https://www.prnewswire.com/news-releases/polarityte-inc-issues-statement-regarding-mr-john-stetson-and-his-termination-from-the-company-300709106.html

783086.1

pleaded guilty to securities fraud in connection with a company named YesDTC Holdings, Inc.

("YesDTC").  As part of Noel's plea agreement, Noel stated that Defendant Honig, who arranged

a reverse merger of the company:

> wanted to use promotions to drive up the price of YesDTC shares and then sell his shares.  Honig introduced me to David Zazoff who Honig said would promote YesDTC stock.  Honig said Zazoff was a "magic maker," who could make the price of YesDTC stock rise through his services.  Honig made it clear that I should not ask questions about how Zazoff achieved his success.

> \* \* \*

> **At Honig's direction I caused Sonoma Winston to send $45,000 of the proceeds to Zazoff as partial compensation for his promotion of YesDTC stock.**

> In January 2011, Zazoff conducted a second promotion of YesDTC stock.  **At Honig's direction, I caused YesDTC to compensate Zazoff as partial compensation for his promotion of YesDTC stock**.

> \* \* \*

> In July 2011, Zazoff conducted a third promotion of YesDTC stock. . . . **Honig instructed me to cause YesDTC to send compensation to Zazoff for the July 2011 promotion of its stock, but I refused.**[21]

~~104.~~138.  In December 2011, Defendant Honig filed a federal lawsuit again Noel to

recover "$150,000" that "Plaintiff Honig lent Defendant Noel" on or about August 24, 2011.[22]

### 3.     Marathon Patent Group, Inc.

~~105.~~139.  This case is also not the only time that Defendants and their allies – including

Honig, O'Rourke, Groussman, Stetson, Brauser, and others – have jointly engaged in pump-and-

dump style scheme to transform a public company into a ***cryptocurrency*** company.  Defendants

engaged in a strikingly similar "blockchain" scheme as Riot with another NASDAQ-listed

---

[21] *United States v. Noel*, No. CR 14-264 VC, ECF No. 11, at 3-5 (N.D. Cal. Nov. 19, 2014) (emphases added).

[22] *See Honig v. Noel*, No. 3:11-cv-06706-JSW, ECF No. 1 (N.D. Cal~~.) (ECF No.1).~~.).

company called Marathon Patent Group, Inc.  Honig and his associates were among Marathon's
biggest investors, but their familiar schemes did not benefit Marathon or its public shareholders.

106.140.   Originally named "Verve Ventures, Inc.," the company changed its name in
December 2011 to "American Strategic Minerals Corporation."  During this time period, Honig,
then a Director of Pershing Gold, invested in the company.  In January 2012, the company entered
into an agreement to "to acquire certain uranium exploration rights and properties held by
Pershing."  By 2013, the company had changed its name to "Marathon Patent" and stated that it
was "an intellectual property ('IP') company that serves patent owners ranging from individual
inventors to Fortune 500 corporations."  Groussman and Stetson were Marathon's former CEO
and COO, respectively, until resigning in 2012.

107.141.   On November 2, 2017 (the exact same day that Riot announced its purchase of
1,200 bitcoin mining machines from Kairos), Marathon announced that it had agreed to acquire
Global Bit Ventures Inc. ("GBI"), a company incorporated in Nevada in August 2017.  A Uniform
Commercial Code (UCC) filing shows that Defendant Stetson, through his entity Contrarian
Investments LLC, had a security interest GBI. GBI's CEO, Jesse Sutton (the former CEO of
Majesco Entertainment, which later morphed into PolarityTE) was later nominated by Honig to
the Board of Directors of Riot.

108.142.   On November 27, 2017, Marathon's auditor resigned.  A November 29, 2017
prospectus offering stock to the public showed that O'Rourke, through an entity he solely
controlled, Revere Investments LP, held 41% of Marathon's common stock.

109.143.   In February 2018, Marathon announced that it had purchased "1,400 of
Bitmain's Antminer S9 miners" that were "purchased by [GBV]."

51

110.144.  In February 2018, Marathon announced that it "Expands Cryptocurrency Mining Operations by Opening of Second Facility in Canada" where it "anticipates putting its recently purchased 1,400 Bitmain's Antminer S9 miners ("Antminer S9s") into production."

111.145.  On April 3, 2018, a merger agreement between Marathon and Global Bit Acquisition Corp. stated that a limited liability company managed by O'Rourke and registered at his home address, Azzura Holdings LLC, as holding 147,645 shares of "Series C Preferred" stock and 14,764,421 shares of "Common Underlying Series C Preferred" stock in Global Bit Ventures, Inc.  The same agreement listed Northurst holding 147,645 shares of "Series C Preferred" stock and 14,764,421 shares of "Common Underlying Series C Preferred" stock – the exact same amount as O'Rourke's entity.  The same agreement stated that Brauser, through Grander, stood to receive 131,241 shares of Marathon common stock.  "Mike Ho" stood to receive 131,241 shares of Global Bit Ventures, Inc.  – the exact same amount as Brauser.  Molinksy stood to receive 78,745 shares. O'Braitis stood to receive 65,621 shares.  Erick Richardson (a 3.61% shareholder of Riot on September 25, 2018) stood to receive 65,621 shares – the exact same amount as O'Braitis.

112.146.  In March 2018, Marathon announced that its "Facility in Quebec Has Commenced Bitcoin Mining Operations."

113.147.  In June 2018, Marathon walked away from its acquisition of GBI.

114.148.  In July 2018, Marathon announced that it had "[r]eceive[d] Deficiency Letter from NASDAQ Related to Two Director Resignations . . . ."  Marathon's stock currently trades at less than $3.00 per share.

115.149.  According to an article in *Seeking Alpha* by Hindenburg Investment Research, "Marathon has multiple concerning parallels to Riot Blockchain, which recently engineered a similarly dubious pivot to the "'blockchain."'"  The article noted that Marathon's "blockchain

52

focus has come about through a series of rapid shifts that are eerily similar to the questionable moves" undertaken by Riot.  The article noted that "[b]oth Riot and Marathon seemingly paid above-market rates to acquire entities containing cryptomining equipment that could have been purchased directly."

### 4.      WPCS International Incorporated and BXT Trader

116.150.   Before Marathon, Honig, O'Rourke, and other associates also jointly engaged in pump-and-dump style scheme to transform another public company, WPCS International Incorporation, into a cryptocurrency operation.  Before that, WPCS was a global engineering, communications, and infrastructure "with over 500 employees in 10 operations centers on three continents."  In 2012, Defendant Honig, through GRQ 401K, invested in WPCS.  On December 17, 2013, WPCS purchased BTX Trader, a cryptocurrency company, from Defendant O'Rourke. In January 2018, WPCS's changed its name to "DropCar, Inc." and is now a cloud-services-for-cars company whose stock trades on NASDAQ under the ticker "DCAR" for approximately $2.01 per share.

117.151.   In its February 16, 2016 article, CNBC described Honig's and O'Rourke's involvement with WPCS and confirmed that both Honig and O'Rourke "acknowledge[d] the investment":

> Riot is not O'Rourke and Honig's first cryptocurrency investment.

> In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

> WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

> At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. "I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."

Honig acknowledges the investment.

~~118.~~152.   Honig's lawyer, Kesner, was a Director of WPCS in 2013 and 2014.

~~5.1.     PolarityTE (f/k/a Majesco Entertainment)~~

~~119.    PolarityTE is a biotechnology company based in Salt Lake City, Utah. PolarityTE was previously a company known as Majesco Entertainment, a company that designed video games for more than 25 years.  Then, in October 2015, Majesco Entertainment merged with another company called PolarityTE.  At that point, Defendant Stetson, Polarity's then-CFO, appointed Defendants Honig and Brauser as Co-Chairmen of the Board of Directors, and named Karr and Kaplan as Directors.~~

~~120.1.  On March 18, 2019, PolarityTE received a subpoena from the SEC, and its "shares tumble[d] after it says SEC is looking into possible manipulation," according to a CNBC article. The subpoena "asked about the company's lead product as well as communications and agreements between Polarity and its former CFO.~~

~~121.1.  In the wake of the SEC's charges against Stetson, PolarityTE immediately terminated Stetson, according to a press release by PolarityTE, stating that "the Company, management, and Board of Directors do not tolerate the behavior outlined in the complaint."²³~~

---

~~²³ See PolarityTE, Inc. Issues Statement Regarding Mr. John Stetson and his Termination from the Company,  https://www.prnewswire.com/news-releases/polarityte-inc-issues-statement-regarding-mr-john-stetson-and-his-termination-from-the-company-300709106.html~~

783086.1

### 6.5.    Pershing Gold Corp.

122.153.   Pershing Gold is an emerging gold producer whose primary asset is the Relief Canyon Mine in Pershing County, Nevada.  The company is listed on the NASDAQ Global Market and the Toronto Stock Exchange under the symbol PGLC.  Defendant Honig was Chairman of Pershing Gold until February 9, 2012, when he resigned but remained a Director.  As of September 19, 2018, Defendant Honig owned approximately 38% of the common stock of Pershing Gold, according to a Schedule 13S.  Karr, an investor in Riot discussed below, was also a Director of Pershing Gold and owned 33% of its common stock as of August 31, 2018.

123.154.   As of August 31, 2018, Defendants O'Rourke, Stetson, and Groussman – along with Jonathan Honig, Molinsky, and Riot shareholder Erick Richardson – were all shareholders of Pershing Gold seeking to sell their shares in an offering pursuant to a Prospectus.

124.155.   On December 13, 2017, Hindenburg Research published an article stating that "the company's key asset, Relief Canyon Mine, was purchased from a hedge fund whose executives, including Mark Nordlicht, were federal indicted for operating 'like a Ponzi Scheme,' according to prosecutors."

125.156.   On September 7, 2018, *Seeking Alpha* reported that "Thinly"[t]hinly traded nano cap Pershing Gold (PGLC -14.7%) slumps on almost an 8x surge in volume in reaction to the SEC's stock promotion charges against majority investors Phillip Frost and Barry Honig."

126.157.   According to a September 10, 2018 press release by Pershing Gold, released in response to the SEC's announcement "that it has commenced a legal action against Honig and various other parties who are alleged to have violated federal securities laws," Defendant Honig was a Director of Pershing Gold until he "resigned from the Company's Board of Directors in August 2018."

7.6.    **MUNDOmedia Ltd.**

127.158.  MUNDOmedia is a marketing company based in Toronto, Ontario, Canada founded by its CEO, Jason Theofilos.  On September 2, 2016, MUNDOmedia announced that a Theofilos had "led a buyout of 100% of the outstanding equity of [MUNDOmedia]" and that "Barry Honig is among the notable private equity investors that participated."  On July 28, 2017, Private Capital Journal reported that MUNDOmedia had "withdrawn its proposed initial public offering" that "would have consisted of $30 million treasury offering" involving "selling shareholders" that included "Mansfield International Trade Ltd. (David Baazov/Ahaka Capital), Four Kids Investment Fund LLC, Stetson Capital Management LLC, ATG Capital LLC, Melechdavid Inc., Barry Honig, John O'Rourke and Jonathan Honig."

159.    The Honig Group's co-investments in the companies discussed above are depicted in the following chart:

**The Honig Group's Prior Target Companies[24]**

|  | **Biozone** | **MGT** | **MabVax** | **PolarityTE** | **Pershing Gold** | **Mundo** | **Marathon** |
|---|---|---|---|---|---|---|---|
| **Honig** | X | X | X | X | X | X | X |
| **O'Rourke** | X | X | X | X | X | X | X |
| **Groussman** | X | X | X | X | X | X | X |
| **Stetson** | X | X | X | X | X | X | X |
| **DeFrancesco** |  |  |  | X |  |  |  |
| **Beeghley** |  |  |  | X |  |  |  |

160.    The Honig Group's interconnections through these prior target companies are depicted in the diagram attached hereto as Exhibit M.

---

[24] The absence of a checked box is not intended to indicate the lack of a relationship.

## VI.      THE SELLING STOCKHOLDERS' CONNECTIONS TO THE HONIG GROUP

161.    During the Class Period, Riot filed a series of Securities Registration Statements on Forms S-3 and S-3/A that registered shares of Riot common stock for sale by certain "Selling Stockholders" to the investing public.   These Selling Stockholders included the following individuals and entities:  Afios, ATG, Brauser, Karr, Kesner, Grander, GRQ 401K, Alan Honig, Jonathan Honig, JAD, James, Marcandy, Melechdavid, MGT, Molinsky, Namaste, Northurst, Paradox, O'Braitis, Stetson Capital, Theofilos, and Titan, and other affiliated shareholders.

162.    As illustrated in the chart below, each of these Selling Stockholders that registered shares of Riot stock for sale to the public invested in one or more of public companies affiliated with Honig, including:  Biozone, MGT, MabVax, Marathon WPCS, PolarityTE, Pershing Gold, and/or MUNDOmedia Ltd.

### The Selling Stockholders' Prior Target Companies[25]

| | Biozone | MGT | MabVax | PolarityTE | Pershing Gold | Mundo | Marathon |
|---|---|---|---|---|---|---|---|
| **Aifos** | | | X | X | X | | |
| **ATG** | | X | X | X | X | | |
| **Brauser** | | | X | X | X | | X |
| **Grander** | X | X | X | X | X | | X |
| **GRQ 401K** | X | X | X | X | X | | X |
| **Honig, Alan** | | | X | | X | | X |
| **Honig, Jonathan** | | | X | | X | X | |
| **JAD Capital Inc.** | | | | | | X | |
| **James** | | | | | X | | |
| **Karr** | | | X | X | X | | X |
| **Kesner** | X | X | X | X | X | | X |
| **Marcandy** | | | | | | | |
| **Melechdavid** | | X | X | X | X | X | X |
| **Molinsky** | | | | X | X | | X |
| **Namaste** | | | | X | | | |
| **Northurst** | | | | | | | X |
| **O'Braitis** | | | | X | | | X |
| **Paradox** | | | X | X | X | | X |
| **Richardson** | | | | | X | | X |

---

[25] The absence of a checked box is not intended to indicate the lack of a relationship.

57

783086.1

| Stetson Capital | | X | | X | X | X | X |
|---|---|---|---|---|---|---|---|
| Stockwire | | | | | X | | |

163.   The Honig Group's interconnections through these prior target companies are depicted in the diagram attached hereto as Exhibit M.

**VII.    FACTUAL BACKGROUND ON THE FRAUDULENT SCHEME**

**~~B.~~A.    In 2016, Defendants Target Venaxis, Riot's Predecessor, Using Their Typical ~~Pump-and-Dump~~ Playbook**

~~128.~~164.   As noted above, Riot was once called "Venaxis."  Venaxis was a medical products company whose executives, Board, and employees sought to develop a blood test for determining which patients suffering from abdominal pain were less likely to be suffering from acute appendicitis than from other ~~ailment~~ailments.

~~129.~~165.   In early 2015, the FDA denied approval for Venaxis's developmental blood test, and Venaxis, without a marketable product, found itself facing delisting from the NASDAQ because its share price had fallen below the exchange's minimum.

~~130.~~166.   Venaxis still had plenty of cash, however, having raised $20 million in a stock offering the previous year.  Therefore, in March 2016, Venaxis executed a 1-for-8 reverse stock split.  That reduced its outstanding shares to less than 4 million and lifted its stock price well above $1 a share — enough for Venaxis to keep its listing on the NASDAQ.  Shortly thereafter, Honig and his associates began buying ~~stock in~~ Venaxis stock.

167.   On September 12, 2016, Venaxis acquired BiOptix Diagnostics, Inc., and changed its name to "Bioptix."

~~131.1.   On September 12, 2016, Venaxis acquired BiOptix Diagnostics, Inc., and changed its name to "Bioptix."~~

168.   Displeased with this acquisition, on September 13, 2016, Defendants Honig and DeFrancesco both wrote letters to then-CEO Lundy, touting their combined 16.2% stake in the

58

company.  Honig also spoke several times on the telephone with members of Venaxis's then-existing Board of Directors.  During these telephone conversations, Honig implied that he had control of 40% of the Venaxis's shares through his stock ownership and the stock ownership of Mr. Honig's friends and relatives, according to a former Venaxis Board member present during the conversations.

132.1.   Company.  Honig also spoke several times on the telephone with members of Venaxis's then-existing Board of Directors.  During these telephone conversations, Mr. Honig implied that he had control of 40% of the Venaxis's shares through his stock ownership and the stock ownership of Mr. Honig's friends and relatives, according to a former Venaxis Board member present during the conversations.

133.169.   Also on September 13, 2016,  That same day, Honig attemptattempted to nominate his own slate of new directors of Bioptix, including Defendants O'Rourke, Beeghley, and Stetson, and several other of Honig's associates.

134.170.   In his September 13, 2016 letter to then-CEO Lundy, Honig wrote that Venaxis was "wast[ing] precious resources with no clear direction or strategy . . . while board fees and management salaries continue to be paid.";":

> Dear Mr. Lundy,
>
> **As Venaxis' largest shareholder, it has become increasingly clear to me that changes must be made to protect shareholders' interests and attempt to create value from the company's assets.**  Venaxis' management and board of directors have failed in this regard.  The current management and board own a nominal amount of equity in aggregate, and as a result they are not aligned with the company's shareholders.
>
> The first change that needs to be made is to immediately reconstitute Venaxis' board . . . .
>
> **Venaxis' board has continued allowing the company to waste precious resources with no clear direction or strategy . . . .**

783086.1

**Meanwhile, Venaxis' cash continues to dwindle while board fees and management salaries continue to be paid . . . .**

Shareholders cannot continue to wait around with question marks and a board that has proven to be distracted and ineffective.

In the essence of preserving some of Venaxis' cash for its rightful owners, the shareholders, we are also asking the shareholders to authorize a special dividend of $7,500,000 as a return of capital to the shareholders . . . .

The cash dividend returns immediate value to shareholders and diverts a portion of ~~Venaxis ''~~Venaxis' assets away from board discretion, who only have managed to deplete the cash available for shareholders through failed strategies, while entrenching their positions with the Company instead of maximizing shareholder value.

My preference is working together with you on these courses of action to effectuate the proposals immediately with your support rather than going through the steps of voting to remove your board that we have today initiated through a special meeting. **I believe working together we can most effectively <u>protect and grow shareholders' interests</u>.** I hope that you agree.

Sincerely yours,

/s/ Barry Honig

171.    ~~In~~The following day, on September 14, 2016, DeFrancesco sent a similar letter to Venaxis' CEO in support of Honig and his demand for a special meeting of the shareholders. Ex. N.  DeFrancesco followed up this demand with another letter, dated September 20, 2016 in which she "repeated [her] demand . . . for a special meeting of the shareholders" and "join[ed] in Mr. Honig's prior nomination."  Ex. O.  DeFrancesco further stated:

The purposes of the meeting should be, as set forth in Mr. Honig's meeting demand: (1) to vote on the removal of five (5) directors, aside from you, currently serving on the Board of Directors, (2) to vote on a $7,500,000 shareholder dividend, and (3) to set the size of the board at no more than six (6) directors and for the election of five (5) new directors as follows:  John Stetson, John O'Rourke, Jesse Sutton,[26] Michael Beeghley, and David Danziger.  I join in Mr. Honig's prior nomination of these individuals to serve as members of the board of directors, a copy of which is attached as Exhibit C hereto and incorporated by reference.

---

[26] Jesse Sutton is the former CEO of Majesco.

60

172.   DeFrancesco concluded by stating: "Should you have any questions regarding the foregoing, please do not hesitate to ***contact our counsel Harvey Kesner, Esq. . . . .***"  Thus, DeFrancesco's letters made clear that she was working with Honig – and indeed, sharing the same counsel – in connection with her share ownership in Venaxis/Bioptix.

~~135.~~173.  Following these letters, in late 2016, ~~Defendant~~ Honig and DeFrancesco waged a proxy fight for control of Bioptix, demanding the removal of five of Bioptix's six directors and the payment of a $7.5 million special dividend.  ~~Defendant Honig offered five names to fill the board vacancies, including Defendants O'Rourke and Stetson.~~

~~136.~~174.  ~~To~~As part of his proposal to "protect and grow shareholders' interests," Honig offered an alternative.  In early discussions with Venaxis's Board of Directors, Honig raised the possibility of turning Venaxis into a marijuana-related company, according to an individual present at the time.

~~137.~~175.  ~~Defendant~~ Honig then filed a lawsuit in state court in Colorado, seeking to force a special meeting of shareholders that would include a vote on the proposed changes.  Bioptix sought to placate Defendant Honig by appointing one of his allies – Defendant Beeghley – to its board of directors. When Venaxis's then-existing Board of Directors were considering Beeghley as a nominee for election to the Board, Beeghley told them that he did not know Honig~~, –~~ according to an individual present at the time – despite the fact that Beeghley and Honig had recently served together on the board of directors of another public company, PolarityTE.

~~138.~~176.  ~~Defendant~~ Honig and DeFrancesco continued acquiring shares and held nearly 23 ~~percent~~% of Bioptix's stock ~~in~~as of January 2017 based on a 13D's they filed with the SEC that same month.  That same month, on January 6, 2017 O'Rourke and Mike Dai joined Bioptix's board of directors.  Shortly thereafter, three of Bioptix's board members resigned, on the basis that

61

783086.1

Defendant Honig was likely to prevail in his legal fight and that mounting a defense would waste corporate recourses. ThenTwo months later, in March 2017, a longtime Bioptix director stepped down, and Defendant Honig's groupHonig and DeFrancesco found itselfthemselves aligned with with a majority of the seats on the board and defacto control of the company. Using that control, in April 2017 Lundy was forced out as CEO and Beeghley was named the Company's CEO.

139.    Finally, Honig and his associates had obtained control over Riot. Using that control, Beeghley became CEO of Bioptix and O'Rourke joining the company's Board.

140.    Once Defendant Honig and his allies took over, Bioptix raised an additional $7 million through two private placements. Defendant Honig, his business partners, and other associates bought nearly all of the stock, warrants, and convertible notes sold in those placements, which were priced at a 30 percent discount to the market. The financing transactions were completed on March 16, 2017 (the "March 2017 Placements").

**B.    Defendant Honig bought at least $1.75 million of the notes. The shares underlying those notes and warrants, plus his original open-market stock purchases, gave Defendant Honig the equivalent of a 20 percent stake in Bioptix on a fully diluted basis.A Few Months After Beeghley Assumed the Role as CEO, The Company Announced A Special Dividend and Business Transformation to "Riot Blockchain" – At the Same Time, Honig Secretly Acquires and Sells Hundreds of Thousands of Shares of Riot**

141.    Five months after Beeghley took over as CEO of Bioptix, the Company announced that it was changing its focus away from bioscience and into the burgeoning cryptocurreny business. As part of this conversion, in a press release on October 4, 2017, Bioptix announced that the Company's name would change to "Riot Blockchain." The press release stated, in relevant part,

142.    Thereafter, in April 2017, Bioptix's CEO resigned and was replaced by Defendant Beeghley. That same month, Bioptix filed a registration statement covering the resale of 5.6 million shares. It covered all 900,000 shares sold in the previous month's placement, plus 1.9 million shares underlying the convertible notes and 2.8 million shares underlying the warrants.

Formatted: Indent: Left:  0.75", Line spacing:  single, No bullets or numbering

62

The filing listed Bioptix's two top shareholders as Defendant Honig and Titan, a fund managed by Defendant Honig's brother, Jonathan Honig.

143.   According to the filing, Defendant Honig offered to sell just over 1.4 million shares, all of them underlying notes or warrants from the March 2017 Placements.   Titan offered to sell 1.6 million shares, also linked to the notes and warrants.   The registration statement also reported that Defendant Honig would hold 504,000 shares after those sales.   That number equaled his original open-market purchases during the proxy fight.

144.   The registration statement listed Groussman, an ally of Defendant Honig who the SEC would later charge for engaging in pump-and-dump schemes, as controlling 500,000 shares – half in common stock and half in warrants.   Groussman's share holdings included 340,000 shares and warrants owned by his company, Melechdavid, Inc., another of the defendants in the *Honig* Action.   Groussman's other 160,000 shares and warrants were held by two accounts benefitting Groussman's children.   Groussman offered to sell all 500,000 shares.

145.   The filing also listed one of Stetson's companies, Stetson Capital Management LLC, as holding 413,517 Bioptix shares.   It offered to sell 406,017 shares, nearly all of them underlying notes and warrants from the March 2017 placement.

146.   Based on the table in the registration statement, Defendant Honig, Titan, Groussman, and Stetson controlled slightly over 4.4 million shares of common stock, which amounted to more than 40 percent of the company, on a fully diluted basis.   In sum, Defendant Honig and the others were offering 4 million of their shares for resale.

147.   The other selling shareholders included Aifos, JAD, and James.

148.   In April 2017, Defendant Honig belatedly filed a belated Form 13D in which he reported that he had purchased $2.25 million of the $4.75 million in convertible notes sold in

March 2017.   Defendant Honig amended that filing the next day, indicating he purchased only $1.75 million.

149.    Registration statements also show that $500,000 in notes were acquired by Karr, Theofilos, James, and three other of Defendant Honig's allies, who also were listed as selling shareholders.

150.    Molinsky, a former stockbroker at D.H. Blair & Co. who was barred from the industry in 2000 after pleading guilty to criminal charges related to market manipulation and fraudulent sales practices, was one such associate listed on the registration statement.  Molinsky has been an investor in numerous Honig-backed companies, including PolarityTE, Pershing Gold, and Vapor Corp.

151.    Policy No. 2013-17 purchased $500,000 in convertible notes, owning roughly 40,000 shares underlying the notes, and 40,000 shares underlying warrants.  It offered all 80,000 for resale.  Bhansali, the co-founder of EST and former director of PolarityTE, had investment control over the securities held in the insurance policy's name.   EST is the transfer agent for PolarityTE.  EST acted as transfer agent for Riot when the Bioptix paid a special dividend in 2017.

152.    Financial statements that EST filed with the SEC show that it has received financing from entities connected to Kesner, who was securities counsel for Riot and PolarityTE, as well as BioZone and Mabvax, two of the companies at the center of the *Honig* Action.  Kesner's former law firm, Sichenzia Ross Ference LLC, also represented the third company believed to be implicated in the pump-and-dump scheme in the *Honig* Action, MGT.   Kesner abruptly retired from that firm just before the SEC announced the charges against Defendant Honig's group.  Bhansali also was an employee of Kesner's previous law firm.

64

153.   Shortly before changing its name, Bioptix filed amended versions of its registration statement in July, August, and September of 2017.   The number of shares listed for Defendant Honig remained unchanged, as did those for most other selling shareholders.   Between the filing of the first registration statement in May 2017 and the filing of the fourth one in September 2017, Bioptix's average daily trading volume was well below 50,000 shares, so the ability to sell large amounts of shares was limited.

**C.     Defendants Cause Bioptix to Register and Sell Shares of Bioptix (and Later Riot) Through False and Misleading Securities Registration Statements (Form S-3)**

154.   Beginning in April 2017, Defendants caused Riot to file multiple false and misleading securities registration statements on Form S-3 in order to sell millions of shares of Riot common stock to unsuspecting retail investors.   For example, on September 25, 2017, Bioptix filed an S-3 Registration Statement (the "September 25 S-3") with the SEC disclosing that certain "selling stockholders" intend to register and potentially sell or dispose of some or all of their common stock in Bioptix.   The September 25 S-3 provided certain indemnity rights to the selling stockholders under the federal securities laws and disclosed to shareholders that "none" of the selling stockholders had a "material relationship" with "us," (i.e., the Company or its board of directors) aside from their investment in Bioptix.   The list of selling stockholders, along with their holdings as reported in the September 25 S-3 is as follows:

| Name of Selling Stockholder | Shares of Common Stock Offered in this Offering |
|---|---|
| Acquisition Group Limited | 200,000 (1) |
| Northurst Inc. | 800,000 (2) |
| Erick Richardson | 200,000 (3) |
| Melechdavid Inc. | 340,000 (4) |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) |

65

| | |
|---|---|
| Barry Honig | 402,050 (8) |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 1,005,124 (11) |
| Titan Multi-Strategy Fund I, Ltd. | 1,688,198 (13) |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,205 (14) |
| Robert R. O'Braitis | 80,410 (15) |
| Stockwire Research Group, Inc. | 40,205 (16) |
| Aifos Capital LLC | 120,615 (17) |
| Stetson Capital Management, LLC | 402,050 (19) |
| JAD Capital Inc. | 80,410 (20) |
| Richard Molinsky | 40,205 (22) |
| Alan Honig | 20,000 (23) |

155.   Significantly, nearly every shareholder listed above in fact *had* a material relationship with Defendant O'Rourke (then a Bioptix board member), Defendant Beeghley (then CEO), and/or Bioptix.  By way of example, Defendant Honig, who also controlled the entities GRQ, and through his brother Jonathan Honig, Titan Multi-Strategy Fund I, Ltd., had numerous previous co-investments with O'Rourke.

156.   Additionally, according to the SEC Complaint, Defendants Honig and O'Rourke shared an office (along with other selling stockholders) during the Class Period.  This unusual connection between a company insider and an outside large shareholder was first made public when CNBC visited Honig's office on February 16, 2018 only to find O'Rourke, who promptly closed the door.  Not to mention, Honig admitted that he and O'Rourke shared an office.  Not surprisingly, the fact that Honig and O'Rourke shared an office was not publicly disclosed until the CNBC story was published.  That same day, Riot's stock dropped by approximately 33.4%.

157.   As for Defendant Honig's ties to the Company, at the time the September 25 Form S-3 was filed Honig was both as an advisor to Bioptix and as an investor in Coinsquare, a company

66

in which Bioptix had been considering an investment since August 2017.  On October 2, 2017, which was only one week after the September 25 S-3 was filed, several of the selling stockholders, including Honig, signed a shareholder agreement *with Bioptix* that "govern[ed] their relationship as shareholders of [Coinsquare] and to set out the manner in which the Company and its business will be conducted and to make certain provision herein for the continuing harmonious and advantageous operation of the Company."  The following chart lists the selling stockholders who were also shareholders in Coinsquare along with share allotments:

177.

CASTLE ROCK, Colo., Oct. 4, 2017 /PRNewswire/ -- Bioptix Inc. (Nasdaq: BIOP) today announced it is changing its name to Riot Blockchain, Inc., and has reserved and plans to change its Nasdaq ticker symbol to RIOT, in line with a shift in direction of the company. The name and symbol change are subject to Nasdaq approval. Moving forward, Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem with a particular focus on the Bitcoin and Ethereum blockchains.

As part of this focus, the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.

"At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets," said Michael Beeghley, Chief Executive Officer of Riot Blockchain. "With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector."

178.    The day before, on October 3, 2017, presumably in an effort to draw in new public investors into the stock, Riot announced a special dividend valued in the aggregate at $9.5 million, to be paid to all holders of Riot as of October 13, 2017.  In a press release announcing the special dividend, Defendant Beeghley stated, "This special dividend is a positive step to return value to all Bioptix shareholders.  We continue to explore options for delivering additional value to

67

shareholders with our streamlined overhead and cash position." Following this announcement, the Company's stock price *increased by more than 25% in one trading day* from an closing price of $6.44 per share on October 2, 2017, to a closing price of $8.09 per share on October 3, 2017.

179.    Significantly, and unbeknownst to Riot's public shareholders, over the next 11 days leading up to the October 13 record date for the special dividend, Honig began selling hundreds of thousands of shares of the Company – and his first sales in more than two months.  For example, on October 4, 2017, Honig sold 47,420 shares at an average of $8.92 per share, collecting approximately $424,000.  Over the next two days, October 5 and 6, Honig sold 21,400 for proceeds of approximately $162,000.   Three days later, on October 9 and 10, Honig sold 202,544 shares for approximately $1.78 million.  Finally, on October 11 and 12, Honig would sell over 300,000 shares for proceeds of more than $3.3 million.  All told, and as set forth in a Schedule 13-D/A filed more than five months later (*see* ¶ 316, *infra*), Honig sold more than 600,000 shares during the ten-day period following the announcement of the special dividend and the Company's transition to cryptocurrency, collecting proceeds of nearly $5.7 million.

**C.    Prior to the Company's Transition to Riot, Defendants O'Rourke and Beeghley Caused the Company to Conceal Honig's Group Status by Issuing False and Misleading Registration Statements**

180.   In the lead up to Riot's transformation from bioscience to cryptocurrency, from April 2017 to Sepetmeber 2017, set forth below, Defendants O'Rourke and Beeghley caused the Company to issue registration statements with the SEC that concealed that the Honig Group was in fact acting as a "group" of shareholders with respect to their shares of Riot.

**D.     Honig Groups Members Honig, DeFrancesco, Groussman and Stetson Fail to File Schedules 13D**

181.   In order for the Honig Group to pull off their pump-and-dump scheme, and to deceive unsuspecting investors into purchasing Riot stock, the Honig Group required de facto

68

control of Riot.  They were able to accomplish this in two ways.  First, they needed to amass a significant number shares of the Company, giving them voting power to decide who would serve on Riot's board of directors.  Once in control of the board, the Honig Group then needed insiders to take steps to help (i) drive new public interest in the stock (thereby increasing liquidity); and (ii) increase the share price.  This is precise *modus operandi* described by SEC at "Companies A, B and C" as set forth above (*see* § V.A., *infra*) and this is what precisely what occurred at Riot, as explainer herein.

182.    Equally important as control, however, was that the Honig Group's need to operate in secret so that existing public shareholders were not privy to their stock sales or close ties to insiders.  In order to achieve this, during the Class Period and as set forth more fully herein (*see* § X.A., *infra*), Defendants Honig, Groussman, Stetson, and DeFrancesco (acting individually and/or through the investment entities they controlled) knowingly or recklessly made materially false and misleading filings under Section 13(d) – including on Schedules 13G, 13G/A, 13D, and 13D/A – and/or failed to made necessary Section 13(d) filings – *"promptly"* or at all – in order to conceal both their control over Riot's management and policies, as well as their membership in a control group.  In doing so, these Defendants knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder.

**E.    O'Rourke and Beeghley Caused the Company to Conceal Related Party Transactions with Members of the Honig Group**

183.    A related-party transaction is a deal or arrangement between two parties who are joined by a preexisting business relationship or common interest.  By way of example, a contract between a major shareholder of a corporation and that corporation, agreeing that the shareholder's company will renovate the corporation's offices would be a classic example of a related-party transaction.  While transactions like this are permitted, the SEC and Generally Accepted

69

Accounting Principles ("GAAP") require that transactions between a corporation and interested parties (such as company insiders or 5% or greater shareholders) be disclosed in financial statements. For example, under GAAP Accounting Standards Codification ("ASC") 850, transactions between related parties, such as sales, acqusitions, purchases and transfers of real and personal property, are considered related party transactions even though they may not be given accounting recognition.

184. Disclosure under ASC 850 includes (1) the nature of the relationship; (2) a description of the transactions including transactions to which no amounts or nominal amounts were ascribed; (3) the amounts due from the related parties as of the date of each balance sheet presented; and (4) such other information deemed necessary to understand the effects of the transaction on financial statements. *See also*, J. David Spiceland et al., Intermediate Accounting 124 ("When related-party transactions occur companies must disclose the nature of the relationship, provide a description of the transactions, report the dollar amounts of the transactions and any amounts due from or to related parties.") (citing Related Party Disclosures, Fin. Accounting Standards Bd. FAS No. 57,superseded by ASC 850).

185. The SEC has also adopted an integrated disclosure system for publicly traded companies known as Regulation S-K. In promulgating Regulation S-K the agency sought to define what information is material in securities transactions and when and how such information should be disclosed to investors. Among other information, Regulation S-K requires disclosure of "related party transactions," known as "Item 404" which requires an issuer to "[d]escribe any transaction . . . in which the registrant was or is to be a participant, and the amount exceeds $120,000, and in which any 'related person' had or will have a direct or indirect material interest."

70

17 C.F.R. § 229.404(a). A "related person" includes company insiders and any 5% or greater shareholder in the issuer.

186. These same related-party disclosure principles are also present in the instructions provided by the SEC for issuers who file reports on Forms 8-K. These instructions require issuers following a completed transaction, acquisition, or other disposition of a significant transfer of assets, to "identity of the person(s) from whom the assets were acquired or to whom they were sold *and the nature of any material relationship . . . between such person(s) and the registrant* of any of its affiliates, or any director or officer of the registrant, or any associate of any such director or officer."

187. As set forth below, during the Class Period Defendants O'Rourke and Beeghley caused the Company to conceal numerous related party transactions with Honig and members of the Honig Group, many of whom were greater than 5% shareholders of Riot. These omissions not only violated the federal securities laws and GAAP, as set forth above, but they also worked to conceal the share ownership of members of the Honig Group because in many of these transactions Honig Group members acquired notes, warrants, or preferred shares that converted to Riot common stock. Nevertheless, these transactions were not disclosed in the Company's SEC filings as transactions with related parties until months later when Riot filed its Form 10-K after the close of trading on April 17, 2018. The following day, April 18, 2018, as the market learned of the Honig Group's previously undisclosed activities, the Company's stock declined significantly, closing down approximately *5.8%.*

### 1. The March 2017 Private Placement

188. On March 15, 2017, Riot (which at the time was still operating under the name "Bioptix") announced on a Form 8-K filed with the SEC that the Company had entered into a securities purchase agreement pursuant to sell $2,250,000 of principal amount of promissory notes

71

783086.1

and three year warrants to purchase up to 700,000 shares of common stock (the "March 2017 Private Placement Agreement"). The notes were convertible into shares of Riot common stock at an initial conversion price of $2.50 per share and each warrant was exercisable into shares of common stock at an exercise price equal to $3.56 per share.

189.    Absent from the Form 8-K and all subsequent Company SEC filings in 2017 about the March 2017 Private Placement Agreement, however, is any mention of Honig's role as a related party even though at this time he held, according to a 13D he filed in January 2017, more than 10% of Riot's outstanding shares at this time. As explained above, under applicable SEC regulations, specifically, Item 404 of Regulation S-K and ASC 850 under GAAP, the March 2017 Private Placement Agreement should have been disclosed to the Company's public shareholders in March 2017 as a related party transaction.

   **2.     The Coinsquare Agreement**

190.    On September 29, 2017, the Company entered into a series of agreements including a Subscription Agreement and Amended and Restated Unanimous Shareholder Agreement (the "Coinsquare Agreement") in connection with the purchase of $3,000,000 of units of goNumerical Ltd., a privately held Canadian company known as Coinsquare Ltd. ("Coinsquare"). Each unit consisted of (i) one share of goNumerical Ltd.; and (ii) a purchase warrant exercisable into such number of shares of stock at the exercise price.

191.    At the time, then-CEO Beeghley stated the following about Riot's investment in Coinsquare, "[a]t Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets. With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector."

192.    Yet, undisclosed from investors – *for over six months* – was that (i) Defendant Honig received a cash payment of $50,000 from Riot for diligence services in connection with the Coinsquare transaction; and (ii) several members of the Honig Group were also among the handful of investors who were parties to the Coinsquare Agreement.  Indeed, the $50,000 payment to Honig was finally disclosed (and admitted by Riot to be related party transaction) in the Company's April 17, 2018 Form 10-K, while the Honig Group's co-investment role in Coinsquare was not disclosed to investors until May 25, 2018 in a Form 8-K/A filed after the close of trading that corrected the October 4, 2017 Form 8-K that initially announced the transaction.  The following trading day, on May 29, 2018, Riot stock declined nearly 6%.

193.    As set forth in the chart below, which was attached to Riot's May 25, 2018 Form 8-K/A, Honig Group members Honig, DeFrancesco, Groussman and Stetson – *like Riot* – were among the 23 investors in Coinsquare:

| Name | Issued Share Capital |
| --- | --- |
| Virgile Rostand | 10,000,000 Common Shares |
| Cole Diamond | 2,500,000 Common Shares |
| Michael Diamond | 2,765,168 Common Shares |
| Robert Furse | 375,092 Common Shares |
| Jazse Holdings Inc. | 265,168 Common Shares |
| Tread Lightly, LLC | 265,168 Common Shares |
| TWG Startup Investment 2 Corp. | 300,018 Common Shares |
| ***Bioptix Inc (a/k/a Riot)*** | ***2,249,985 Common Shares*** |
| 2330573 Ontario Inc | 918,745 Common Shares |
| Jeff Cordeiro | 11,250 Common Shares |
| Peter Simeon | 15,000 Common Shares |
| Eduardo Vivas | 149,999 Common Shares |
| Argyle LLC | 149,999 Common Shares |
| Eric So | 93,749 Common Shares |
| Ross Levinsohn | 37,500 Common Shares |

73

| | |
|---|---|
| Sean Lai | 11,250 Common Shares |
| *Michael Brauser* | *112,499 Common Shares* |
| *Barry Honig* | *112,499 Common Shares* |
| *GRQ Consultants Inc Roth 401K FBO Barry Honig* | *75,000 Common Shares* |
| *Erica and Mark Groussman Foundation* | *37,500 Common Shares* |
| *Titan Multi-Strategy Fund I, Ltd.* | *75,000 Common Shares* |
| *Stetson Capital Investments Inc.* | *37,500 Common Shares* |
| Kent Farrell | 37,500 Common Shares |

158.    Though Riot disclosed, two days later, through a Form 8-K filed with the SEC the existence of the Coinsquare shareholders' agreement, it was not until May 25, 2018—more than eight months after the agreement was signed—that Riot first disclosed that Honig and other of the selling shareholders referenced in the September 25 S-3 were also shareholders in Coinsquare.

**D.    Nine Days After the Filing the September 25 Form S-3, Bioptix Changes Its Name to "Riot Blockchain," and in the Weeks That Followed Announces a Series of Strategic Investments, Causing Riot's Share Price to Soar**

159.    On October 2, 2017, two days before announcing the Company's name change to Riot Blockchain, Inc., Bioptix's board (which was controlled by Defendant Honig) approved a dividend payout of more than $9.5 million. Bioptix stated that the dividend would be payable on October 18, 2017, to shareholders of record on October 13, 2018. Bioptix's stock increased by approximately 25 percent, from $6.44 to $8.09 per share, on a volume approximately four times the previous day's total.

160.    Defendant Honig took advantage of the price surge, selling 47,420 shares on October 4, 2017, at an average of $8.92 per share, collecting approximately $424,000. Defendant Honig then sold an additional 21,400 shares on October 5 and October 6, 2017, for approximately $162,000. A belated disclosure statement also shows that Defendant Honig sold 202,544 shares on October 9 and 10, 2017, for approximately $1.78 million.

783086.1

161.   Defendant Honig then acquired more than 630,000 shares on October 11, 2017—128,988 through warrant exercises and 505,124 through the conversion of much of his preferred stock.  Defendant Honig's acquisitions were offset by his sale of 293,916 shares on October 11, 2017, and 41,600 shares on October 12, 2017.  The proceeds from those transactions totaled just under $3.3 million.  All told, a Form 13-D shows that Defendant Honig sold more than 600,000 shares in a ten-day period, collecting nearly $5.7 million.

162.   In the six weeks that followed the payment of the special dividend announced on October 2, 2017, and name change on October 4, 2017, the Company's stock price nearly tripled, as deals with two Bitcoin-related businesses in which Defendant Honig and his associates had undisclosed stakes attracted investors.  When Riot's stock hit $24 per share on the day after Thanksgiving 2017, the shares issued through the March 2017 Placements were worth more than $100 million.

163.   During this time period, with the Company's stock price having risen dramatically, Defendant Honig sold nearly all of his remaining Riot shares, collecting more than $17 million.  Defendant Honig, however, failed to report those sales promptly, as required under SEC rules for investors who own 5 percent or more of a company's stock.

164.   From October 2017 to January 2018, three of Defendant Honig's associates—his brother, Jonathan Honig, and longtime partners Groussman and Stetson—likely sold more than $20 million of Riot stock.  Riot's shares peaked at $46.20 per share in December 2017.

75

**ACTUAL AND POTENTIAL PROCEEDS OF HONIG GROUP'S RIOT BLOCKCHAIN SHARE SALES**

| | SHARES AT 10/2017 | SHARES AT 2/2018 | PROCEEDS AT $10 | PROCEEDS AT $15 | PROCEEDS AT $20 |
|---|---|---|---|---|---|
| Barry Honig | 1.65 million | 0 | $17.6 million (1) | NA | NA |
| Jonathan Honig | 1.45 million | 200,000 | $12.5 million | $18.7 million | $25 million |
| Mark Groussman | 400,000 | 0 | $4 million | $5.9 million | $8 million |
| John Stetson | 330,000 | 0 (2) | $3.3 million | $4.9 million | $6.6 million |
| Catherine DeFrancesco | 516,000 | 11,000 | $5 million | $7.6 million | $10.1 million |

(1)   Actual total from disclosed sales in Form 13D filing
(2)   Projection based on actions of others; no SEC disclosure

*Note: Share totals at 2/18 do not include additional stock acquired through placements or acquisitions*

165.    In late October of 2017, Riot adopted a new Code of Ethics and Business Conduct that included a detailed section on conflicts of interest.  The new code of ethics expressly stated that a conflict could exist if a director, officer, or employee "*lends to, borrows from, or has a material interest (equity or otherwise) in a competitor, supplier, or customer of the Company, or any entity or organization with which the Company does business or seeks to do business.*"  It added that any such person would require a waiver from the board.

1.    **The Coinsquare Transaction**

166.    On October 4, 2017 Bioptix announced via a Form 8-K filed with the SEC the Company's transformation to Riot.  Attached to the filing were Articles of Merger dated October 3, 2017 that under Nevada law allowed Bioptix to officially change its corporate name.  Signing the Articles of Merger for Bioptix was Defendant Beegley; Defendant O'Rourke signed for Riot.  Also attached to the 8-K was a press release describing Bioptix's official pivot away from its prior business into cryptocurrency and also touting the Company's Coinsquare transaction, which closed two days earlier:

As part of this focus [in cryptocurrency], the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for

76

trading digital currencies. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.

167.    The following day, Riot filed its October 5, 2017 Investor Presentation through a Form 8-K filed with the SEC.  Aside from providing an overview of cryptocurrencies and the Company new strategic direction, Riot again touted the Company's Coinsquare investment stating that "[Coinsquare] is experiencing explosive growth in a budding industry, already demonstrating strong potential."  Again, as explained above, Riot made no effort in these or other public announcements — which were arguably some of the more critical public filings for Riot shareholders given that they disclose, for the first time, the Company's complete transformation away from its prior business — that several large shareholders in Riot also participated in the Coinsquare investment.

168.    With the ink hardly dry on the Coinsquare shareholders agreement, Riot quickly announced another transaction with an alleged player in the cryptocurrency space.

**2.    The Tess Transaction**

169.    On October 17, 2017, Riot issued a press release announcing that it had acquired a majority (52%) stake in Tess, which Riot described as a company "based in Toronto, Ontario" that was "engaged in a blockchain-based payment service for wholesale telecom carriers."  Riot reported that the Tess acquisition "reflects [Riot's] efforts to own or control companies who are contributing to the development of the blockchain ecosystem."  Tess's CEO touted Tess's "ambitious business plans around blockchain."  But like the Coinsquare investment, Riot's announcement failed to disclose that Tess and its founders (who had only recently created the

77

company)[22] maintained ties to Riot and Kairos, another entity owned in part by Defendants Honig and Defranscesco and, as explained below, that Riot would invest in only two weeks later.

170.    Tess's legitimacy as a "blockchain" company is subject to question.  Tess's Chief Software Architect, Sorin Tanasescu, was concurrently a Director of an entity called Ingenium IT Compusoft ("Ingenium") and a Managing Director of a company called VoiceWay.  VoiceWay appears to have been associated with a Bitcoin phishing website.  Specifically, on a Bitcoin forum called BitcoinTalk, one user conveyed that Google was displaying advertisements for "mt-qox.com," a clever misspelling of the then-popular Mount Gox bitcoin trading website. That same user noted that the "mt-qox.com" website completely duplicated the real Mount Gox website.  The apparent imposter site was registered to Cristian Talle at the address 196 Judith Ave., Toronto, Canada, which appears to be a residence, based on a Google Maps search.  That same address houses Tanasescu's other businesses including VoiceWay and Ingenium. In addition, Talle used a VoiceWay email address to register the mt-qox.com site. Reddit users also noticed the site and started a thread entitled "[SCAM] watch out for mt-qox.com."  The users reported the site to Mount Gox and Google. Google subsequently took action and blocked it as a phishing website, according to the thread. (Note that the VoiceWay website itself was also registered by an individual named Cristian Talle - under a Rogers Communications email address).

171.    Tess and Tanasescu also appear to have had undisclosed ties to the individuals who formed Kairos, and thus to Riot and its controlling investors.  On the same day (October 19, 2017) that Kairos was registered as a corporation in Nevada by its registered agent, Laxague Law, that same law firm also set up an entity called Ingenium Global, Inc., which has a unique name that is similar to an entity in which Sorin Tanasescu manages:  Ingenium IT Compusoft.  According to

---

[22] The Tesspay.io website shows that it was initially registered on July 18, 2017.

783086.1

the Nevada Secretary of State's website, Ingenium Global, Inc. has the exact same officers and directors as Kairos (Michael Ho of Dubai, Bryan Pascual of Tampa, Florida, and Moses D. Silverman of Miami Beach, Florida) and registered the exact same "par share count" (40,000,000), "par share value" ($0.0001 per share) and "capital amount" ($40,000.00).

194.   Of course, according to Riot's 13D filings, as of the date of this agreement and according to Forms 13D filed in January 2017, Honig and DeFrancesco were greater than 10% shareholders of Riot.  Indeed, no changes in their share ownership since January 2017 had been filed with the SEC.  Additionally, Groussman, who was also a signatory to the Coinsquare Agreement was a greater than 5% shareholder based on his Form 13D filings with the SEC.  Lastly, Stetson's name similarly appears on the Coinsqare shareholder agreement although according to Forms 13D he filed with the SEC, he held under 5% of the Company's outstanding shares.

195.   In any event, as the list above and the Honig Group's various Forms 13D makes clear, under applicable SEC regulations, specifically, Item 404 of Regulation S-K and ASC 850 under GAAP, the Coinsquare transaction should have been disclosed to Riot's public investors as a related party transaction.  In addition, Honig's role as a consultant for Riot in the in the transaction and his and the Honig Group members' participation in that transaction should have been disclosed to Riot's public shareholders.

### 3.   The Kairos Transaction

172.196.  On November 2, 2017, Riot issued a press release announcing that it had acquired "1,200 Bitcoin Mining Machines . . . consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by industry leader Bitmain."  The next day, November 3, 2017, Riot fileddisclosed in a _Form 8-K disclosing that thethese machines had beenwere purchased through a "share exchange agreement . . .with Kairos Global Technology, Inc. ("Kairos"), a Nevada corporation" formed only weeks earlier.  Riot disclosedannounced that as consideration for the

79

100% interest in Kairos that the Company received it gave Kairos would pay Kairos' stockholders – instead of cash – preferred shares of Riot stock that was convertible to 1,750,001 shares of "Series B Convertible Preferred Stock."  Riot did not disclose, however, that (1) Kairos was in part owned by Defendants Honig and Defrancesco; and (2) Riot appeared to have vastly overpaid Kairos ***more than seven times*** the amount that Riot could have paid to acquire the same equipment directly from the original manufacturer, Bitmain. common stock.

197.   In disclosingSignificantly, at this time, Riot stock was trading at approximately $7 per share.  Thus, based on Riot's trading price on the date that the transaction with was announced the deal was valued at approximately $12,250,000.  In addition, Riot also agreed to pay "certain" undisclosed shareholders of Kairos, the Company did not disclose – in addition to preferred shares – a royalty from cash flow generated from Riot's operations, which entitled such shareholders to receive 40% of the gross profits generated on a monthly basis until they have received a total of $1,000,000, at which point the royalty would be extinguished.

173.198.  Once again, absent whatsoever from Riot's November 3, 2017 Form 8-K describing the Kairos transaction, was that Kairos was owned and controlledin part by Defendants Honig[28] and DeFrancesco.[29]  Indeed, it was not untilnearly five months passed before Riot finally disclosed in the Company's April 17, 2018, that Riot disclosed Form 10-K that "[e]ach of Mr. Honig and Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the

---

[28] Honig belatedly disclosed his ownership of Kairos on April 18, 2018 in an amended SEC filing on Form 13D/A noting that on November 1, 2017, he had exchanged 151,210 shares of Kairos common stock for 151,210 shares of Riot Series B Preferred Shares.

[29] *See* Riot Blockchain, Inc., Annual Report (Form 10-Q) at 15 (Apr. 17, 2018) ("Two principal shareholders held 24.8% and 18.4%, respectively, of Prive, at the time of its acquisition by the Company.  These holders held 10.7% and 5.7%, respectively of Kairos at the time of Kairos acquisition by the Company in October 2017.").

80

Company, with Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned approximately 6.3% of Kairos."[30] ~~Defendants Groussman and Brauser were also reportedly owners of Kairos.[31] Kairos's registered agent in Nevada, Laxague Law, also filed the Statements of Beneficial Ownership of Bioptix stock on behalf of Catherine DeFrancesco.~~

~~174.   Further, two of Kairos's original officers and directors, Michael Ho and Moses David Silverman, also were shareholders of Global Bit Ventures.   The two, were to receive 131,241 and 98,431 Marathon shares, respectively, from the Global Bit Ventures merger, according to filings by Marathon.[32] Silverman was also an investor in Polarity, and is a former director of Therapix Biosciences Ltd.   Defendant Stetson disclosed in an SEC filing in April 2018 that he held a 5.9 percent stake in the company.   Groussman also serves on that company's board.~~

~~175.   According to Riot's January 5, 2018 Form S-3, on November 1, 2017 Riot paid $12,162,500 in stock and $1,000,000 in future royalties[33] for 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by Bitmain:~~

~~On November 1, 2017, we acquired 100% of Kairos Global Technology, Inc. ("Kairos") in consideration for the issuance of 1,750,001 shares of our Series B Convertible Preferred Stock, which are convertible into an aggregate of 1,750,001 shares of our Common Stock, which we issued to the shareholders of Kairos. Kairos is the owner of certain new computer equipment and other assets used for the mining of cryptocurrency, specifically servers consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by Bitmain.   Certain of the shareholders of Kairos also received a royalty to be paid from cash flow generated from operations,~~

---

[30] ~~Id.~~

[31] ~~See http://sharesleuth.com/investigations/2018/07/cool-mara-riot-the-big-money-bitcoin-biotech-daisy-chain.~~

[32] ~~See http://sharesleuth.com/investigations/2018/07/cool-mara-riot-the-big-money-bitcoin-biotech-daisy-chain.~~

[33] ~~Riot's stock price was $6.95 on November 1st. Riot purchased this mining equipment from Kairos for 1,750,001 shares of Riot stock and also $1,000,000 in future royalties to "Certain of the shareholders of Kairos." Thus, Riot paid $12,162,500 worth of Riot stock and $1,000,000 in cash for the equipment.~~

81

which shall entitle such shareholders to receive 40% of the gross profits generated on a monthly basis until they have received a total of $1,000,000, at which point the royalty is extinguished.

176.    Kairos paid exactly $2,089,679 for this mining equipment.[34]  However, Riot could have easily purchased this same equipment online from Bitmain.[35]  On October 29, 2017, a Bitmain Antminer S9 could be purchased for $1,265 and a Bitmain Antminer L3 could be purchased for $2,040.[36]  Below is an image of the website from which Riot could have purchased this equipment:



---

[34]  On January 5, 2018, Riot belatedly disclosed Kairos's "financial statements . . . for the period from [Kairos's] inception (October 19, 2017) to November 3, 2017."  Riot Amended Current Report (Form 8-K/A) (Jan. 5, 2018), *available at* https://ir.riotblockchain.com/sec-filings-email/content/0001079973-18-000009/ex99x1.htm (listing "Equipment" of $"2,089,679").

[35]  *See* https://www.bitmain.com.

[36]  This can be verified by typing "https://shop.bitmain.com" into www.archive.org and viewing Bitmain's website as of October 29, 2017.

82

177.    Thus for Riot to purchase 700 Antminer S9s (700 * $1,415) and 500 Antminer L3s (500 * $1,712) would have cost Riot $1,846,500, slightly less than Kairos paid.  Instead, Riot paid Kairos and Honig's associates more than $13 million for this equipment worth less than $2 million.

**E.    October 27, 2017 Riot Disseminates an "Updated" Investor Presentation**

178.    On October 27, 2017, the Company filed with the SEC a Form 8-K with an updated Investor Presentation attached.  The updated Investor Presentation stated that the value of the cryptocurrency market "has increased from $17.7 billion to over $170 billion in 2017" — a figure $20 billion higher than the figure presented in the Company's October 5, 2017 Investor Presentation.  In addition to providing information concerning the Company's recent investments in Coinsquare and Tess, the updated Investor Presentation also stated:

- the Company would provide "*a gateway to blockchain*" as "one of the only Nasdaq listed companies with this focus."

- "*Riot Blockchain intends to gain exposure to the blockchain ecosystem through targeted investments in the sector, with a primary focus on the Bitcoin and Ethereum blockchains.*"

- "*Our investment strategy will consist of identifying unique projects which decentralize markets; combining real world applications with an active development team, strong fundamental, and large addressable markets.*"

- "Moving forward, *Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem, with a particular focus on the Bitcoin and Ethereum blockchains.*"

- that Riot was a "first-mover" as a "*NASDAQ listed pure play Blockchain company.*"

- "*At Riot Blockchain Inc. we leverage our expertise, and network, to build and support blockchain technology companies.  We provide investment exposure to the rapidly growing blockchain ecosystem.*"

- "*Riot Blockchain has made a strategic investment in Coinsquare.  This investment into a leading Canadian digital currency exchange is indicative of other Riot Blockchain will pursue, including possible acquisitions of businesses touching the blockchain ecosystem.*"

83

- *"The company is experiencing steady growth in a budding industry."*

199.    In other words, Riot had entered into yet another transaction with related parties, namely Honig and DeFrancesco, and failed to disclose their involvement.  By any measure, under applicable SEC regulations and GAAP, the Kairos transaction should have been disclosed as a related party transaction given Honig and DeFrancesco's involvement.  Instead, Riot's public shareholders did not learn about Honig's and DeFrancesco's interest in Kairos, or the preferred shares of Riot that they received, until Riot filed its Form10-K on April 17, 2018.

### 4.    The December 2017 Private Placement

200.    On December 19, 2017, Riot filed a Form 8-K announcing that the Company had entered into private placement agreements with unnamed "accredited investors" to sell $37 million units of securities at a purchase price of $22.50 per unit.  Each unit consisted of one share of the Company's common stock and a three year warrant to purchase one share of common stock at $40.00 per share.  In a press release announcing the transaction Riot stated that "[t]he $37 million in gross proceeds from the investment will be used for the expansion of the Company's Bitcoin mining operations, strategic investments, and general working capital."

201.    Like the other related party transactions described above, the Form 8-K and press release omitted Honig's and DeFrancesco's participation as "accredited investors." It was not until Riot's April 17, 2018 Form 10-K that the Company disclosed for the first time that Honig and DeFrancesco were parties to the December Private Placement Agreement, having invested $500,000 and $360,000, respectively.

84

**F.** **October 11, 2017 – Defendant Groussman and Defendant Honig's Brother, Jonathon Honig, ~~and Defendant Groussman Attempt to Dispel Any Notion~~Falsely Deny that Their Ownership in Riot Is Part of a Control Group**

~~179.~~202.   Soon after Bioptix's announcement that it had changed its name to Riot and was transitioning into a cryptocurrency business, on October 11, 2017, Jonathon Honig, who is ~~the brother~~Defendant ~~Honig~~Honig's brother, filed a Form 13G with the SEC disclosing his beneficial ownership of 9.5% of Riot's common stock, not including 808,198 shares of common stock that he controlled and that were issuable upon the conversion of Series A Preferred A stock.  Notably, the Form 13-G specifically disclaimed Jonathon Honig's intent to influence or control Riot or that he was otherwise acting "in connection with or as a participant in" others' ~~attempt~~attempts to influence control over Riot:

> By signing below I certify that, to the best of my knowledge and belief, *the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect*.

~~180.~~203.   The same statement appeared two days later in a Form 13G signed by Defendant Groussman wherein he disclosed beneficial ownership of 5.93% of ~~Riot~~Riot's common stock. Groussman, like Jonathon Honig, maintained a close financial relationship with Defendant Honig. Public records indicate that Honig is the lender on Groussman's $700,000 mortgage.  Addtionally, Groussman has a long history of investing with Defendant Honig.

~~G.      On November 6, 2017, Riot "Names John O'Rourke as Chairman and CEO" and Announces Another Strategic Investment~~

~~181.     On November 3, 2017, Riot's CEO, Defendant Beeghley, stepped down.  He was replaced by Defendant O'Rourke, who was given an annual salary of $300,000, plus 344,000 shares of restricted stock and 100,000 options exercisable at $10 each.  Defendant O'Rourke also was elevated to Chairman of the Board.~~

**H.     Riot Announces that It More than Tripled Its Investment in Coinsquare**

182.   On December 4, 2017, Riot issued a press release that was filed on a Form 8-K

touting Riot's "milestone" investment in Coinsquare.  The press release stated in relevant part:

**Riot Blockchain's Coinsquare Receives Milestone Investment**

*Coinsquare closes CAD $10.5 million investment from a global asset manager at
a CAD $110.5 million Post Money Valuation*

CASTLE ROCK, Colo., Dec. 4th, 2017 — Riot Blockchain, Inc. (Nasdaq: RIOT)
(the "Company") today announced that one of its strategic portfolio holdings,
goNumerical Ltd (dba "Coinsquare"), has closed a CAD $10.5 million investment
at a CAD $110.5 million post-money valuation. A prominent global asset manager
with over a trillion dollars under management led the round with a CAD $10 million
investment. goNumerical operates Coinsquare, a leading Canadian digital currency
exchange. ***The new valuation for Coinsquare is over 3x the valuation from Riot's
investment in September, 2017.***

Coinsquare has reported profitable operations and has grown over 300% in several
different financial metrics since Riot's investment in September.   Although
competitor information is not widely available, Riot believes Coinsquare is one of
the largest, if not the largest, Canadian digital currency exchange.

"We are thrilled with this latest sign of confidence in Coinsquare, the digital
currency market, and the important role Coinsquare is playing in growing this
market in Canada," commented John O'Rourke, Chairman and Chief Executive
Officer of Riot Blockchain. "Coinsquare was our first strategic investment and is
well positioned to continue executing on their lofty ambitions and vision of their
CEO, and Riot advisor, Cole Diamond."

**I.     Riot's Board of Directors Issues A Proxy Statement That Further Enables
         The Honig Group To Conceal The Fraudulent Scheme**

183.   On December 12, 2017, Riot filed its Annual Definitive Proxy Statement under

Schedule 14A (the "2017 Proxy") with the SEC.  The 2017 Proxy announced that the Company's

Annual Meeting would take place on December 28, 2017 and that Riot shareholders were invited

to attend and encouraged to vote on (1) the re-election of the current slate of directors, including

Defendants O'Rourke, Kaplan, So, and Les; (2) the ratification of a change in Riot's auditor; and

(3) matters pertaining to executive compensation.

184.   Rather than provide Riot shareholders with the information necessary to make informed vote, however, the 2017 Proxy falsely represents that

none of the directors or named executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its common stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company.

185.   In other words, the 2017 Proxy statement, which was likely approved by Defendants O'Rourke, Kaplan, So, and Les states that—notwithstanding the various related party transactions taking place in the months leading up to this filing, including the Coinsquare, Tess, and Kairos investments, for example—"none" of the directors, officers, or 5% shareholders "has any material interest, direct or indirect, in any transaction, or in any proposed transaction."   This ignores of course that Honig and various members of the Honig Group maintained financial ties to each of these transactions and that two Riot directors, Defendants Kaplan and So, were themselves investors in Coinsquare—investments that (allegedly) tripled in value in the previous two months.   These are clear "direct" financial interests that should have been timely disclosed to Riot shareholders.

**J.     Riot Announces a New Transaction Related to Its Investment in Tess:  Riot's "Decision to Take the Company Public" in a Merger**

186.   On December 11, 2017, Riot issued a press release announcing that Tess had signed a "letter of intent" to merge with Cresval Capital Corp. ("Cresval"), which Riot emphasized was a "Publicly Traded" company.  The press release quoted Tess's CEO, Jeff Mason:  *"The decision to take the company public provides us access to traditional capital markets as we continue developing our blockchain technology solution. This environment will also foster transparency and accountability moving forward, providing confidence to investors and prospective customers alike."*   Nothing could be further from the truth.   In reality, Cresval was an

87

783086.1

undercapitalized, money-losing mineral exploration company that according to its 2017 annual report, was experiencing "material uncertainties may cast significant doubt on the Company's ability to continue as a going concern."

187.   Specifically, Cresval was a mineral exploration company (i.e., gold and copper mining, not bitcoin "mining") that as of 2017 had merely CAD 181,687 in assets and a "Shareholders Deficiency" or "Deficit" of CAD 2,2551,185.   In 2016 and 2017, Cresval operated at losses of CAD 111,153 and CAD 152,010, respectively.   On December 22, 2017, no shares of Cresval had publicly traded since November 1, 2017, when on that one day, 900 shares changed hands at a price of CAD 0.06 per share in a transaction valued at CAD 54.00.   Pictures from Cresval's corporate website appear to depict the company's operations:[32]



188.   It appears that Riot chose to merge Tess with Cresval not because of Cresval's assets, profitability, experience in cryptocurrency, or access to liquidity and the public markets,

---

[32] See https://www.cresval.com/properties/photo-gallery.

88

but instead because Defendant Honig, acting as an intermediary, introduced Defendant O'Rourke to Lee Ann Wolfin, Cresval's President. Ms. Wolfin's father, Arthur Wolfin, was Cresval's founder and chief executive. Mr. Wolfin also headed Levon, another mineral exploration company in which Honig had a "former position on board of directors." Levon did deals with other companies whose stockholders included Defendants Honig, O'Rourke, and Brauser. For example, Levon was "a former significant stockholder" of Pershing Gold Corp., a company in which Honig, O'Rourke, and Brauser were investors. Levon also did a reverse merger with SciVac Therapeutics Inc., which is now part of VBI Vaccines, in which Honig and Brauser were shareholders.

**K.   On December 19, 2017, Riot "Announces $37 Million Private Placement" – Defendants Honig and Defransco Take Part But Are Not Disclosed**

189.   On December 19, 2017, the Company issued a press release announcing that Riot had entered into private placement agreements with unnamed accredited investors to sell $37 million units of securities at a purchase price of $22.50 per unit. Each unit consisted of one share of the Company's common stock and a three year warrant to purchase one share of common stock at an exercise price of $40.00 per share. The December 19, 2017 press release stated that "[t]he $37 million in gross proceeds from the Investment will be used for the expansion of the Company's Bitcoin mining operations, strategic investments, and general working capital." The press release failed to disclose, however, that two large shareholders and members of the Honig Group – Defendants Honig and Defrancesco – were among the so-called "accredited investors" who were invited to participate in the private placement, or that Defendant Honig had invested $500,000 and Defendant Defrancesco had invested $360,000.

**L.G.   After Defendants O'Rourke and Honig Sold Most of Their Shares, January 5, 2018 – Riot Fires Its Auditor and the Company's Stock Continues to Decline**

190.204.   On January 5, 2018, d Riot filed a Form 8-K with the SEC announcing that the Company had dismissed EisnerAmper LLP as its independent auditor and engaged MNP LLP.

89

783086.1

191.205.   On January 9, 2018, *Seeking Alpha* published an article titled, "Riot Blockchain: This Crypto Clown Car Continues Hurtling Toward the Abyss."   The article highlighted the dismissal of Riot's auditor, noting that the Company had employed three different auditors over the course of a year.

**H.      OnDecember 29, 2017 – O'Rourke Sells 30,383 Shares for Proceeds of $869,256**

206.      On December 29, 2017, after the market closed and going into a three-day holiday weekend, Defendant O'Rourke sold 30,383 shares of Riot for proceeds of $869,256.  O'Rourke's sale was quickly picked up by media outlets.[38]

207.      On January 2, 2018, *Reuters* published an article prior to the market open entitled, "BUZZ-Riot Blockchain down after CEO reports stock offering – RTRS."  The article stated that Riot's stock price was down 4.44% in pre-market trading after Defendant O'Rourke had reported his sale of over 30,000 shares.  An article published during early morning trading hours, on the popular investor website, *The Motley Fool*, entitled, "Riot Blockchain's CEO Just Sold a Lot of Stock," detailed Defendant O'Rourke's suspicious trading, stating in relevant part:

> No one knows a company better than its insiders.  For this reason, in my view that prices at which companies and their insiders buy and sell stock give a hint about a company's true value.

<p style="text-align:center">* * *</p>

> **An insider dumps his shares**
>
> Right before a holiday weekend, and two days after the company announced it was adjourning its annual shareholders meeting until February, Riot Blockchain's chief executive officer, John R. O'Rourke III, filed a Form 4 with the SEC disclosing he and his firm, ATG Capital LLC, sold 30,383 shares of Riot on Dec. 29.

---

[38] *See, e.g., John R. O'Rourke III Sells 30,383 Shares of Riot Blockchain Inc (RIOT) Stock,* American Banking and Market News (Dec. 30, 2017) ("CEO John R. O'Rourke III sold 30,383 shares of the firm's stock in a transaction dated Friday, December 29th.  The shares were sold at an average price of $28.61, for a total transaction of $869,257.63.").

Formatted: Paragraph Numbered Style, Left, Indent: First line:  0", Line spacing:  single, Tab stops: Not at  1"

\*   \*   \*

These sales are material, representing about 37% of shares he and ATG Capital owned or would soon control prior to the transactions.

O'Rourke now holds 12,500 shares through ATG Capital LLC, in addition to 39,500 shares of stock in his own name that he currently owns, or will receive over the next 60 days from his role as Riot's chief executive officer. (O'Rourke received 344,000 restricted shares that vest in 24 monthly installments when he became CEO in November.)

**Hiding bad news**

These sales were curiously timed. O'Rourke sold his shares and filed the Form 4 after market close before a major holiday weekend, when most investors would be thinking about their New Year's Eve plans rather than their investment portfolios.

Stock analysts, journalists, and political-types refer to this activity as a "Friday night dump," a common practice of releasing otherwise newsworthy information at a time when people are least likely to be paying attention. One study from 2005 found that "Friday announcements are 20 percent more likely to present negative earnings than announcements on other weekdays." Insider selling certainly fits in the "negative" category.

O'Rourke has every reason to sell quietly. When taken together with Riot's deeply discounted equity raise earlier this month, his sales suggest recent market prices are a better price at which to sell its shares than buy them. It's also interesting to me that O'Rourke is selling before a postponed annual shareholders meeting in which Riot is asking shareholders for the right to add another 750,000 shares of stock to the company's bonus pool for insiders.

208.   On this news, Riot's stock price declined $4.04 per share, or **_14.45%,_** over two trading days, from $28.40 per share on December 29, 2017, to $24.36 per share on January 3, 2018, damaging Lead Plaintiff and members of the Class.

**I.      January 4-5, 2018 –Riot Fires Its Independent Auditor and Files an Amended Form 8-K/A Disclosing Audited Financial Statements of Kairos Revealing that Riot Vastly Overpaid for Kairos's Assets**

209.   On January 5, 2018, Riot filed a Form 8-K disclosing that on January 4, 2018 it had "dismissed EisnerAmper LLP . . . as its independent registered public accounting firm" and that on January 5, 2018, Riot had engaged MNP LLP.

91

783086.1

210.   Later on January 5, 2018, Riot filed an amended Form 8-K/A that disclosed "audited financial statements of Kairos Global Technology, Inc." "as of November 3, 2017," as prepared and audited by Riot's new accountant (since the day before) MNP LLP.  These financial confirmed that Kairos had paid $2,089,679 for the mining equipment it quickly turned around and sold to Riot for more than $13 million.  The financial statements confirmed that Kairos "purchased equipment of $2,089,679 from a company controlled by the president[39] of the Company," and that this was a "[r]elated party transaction[]."  The financial statements also stated that "as at November 3, 2017 . . . the equipment purchased was not yet operational."

211.   The market reacted negatively to the January 5, 2018 news once trading began on Monday, January 8, 2018, with the Company's stock price declining $1.01 per share, or *4.13%*, from $24.41 per share on January 5, 2018, to $23.42 per share on January 8, 2018, damaging Lead Plaintiff and members of the Class.

**VIII.   THE TRUTH ABOUT HONIG'S STOCK SALES AND THE FRAUDULENT SCHEME BEGINS TO EMERGE**

212.   On January 31, 2018, *The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."[40]  The article stated that "**Mr. Honig has sold about 500,000 shares, he said, but declined to divulge his profit.  He said he still owns about 1% of the company.**"  "'When stock goes up, you take a profit,' [Honig] said."

213.   As a result of this revelation by *The Wall Street Journal* of Honig's previously undisclosed massive (and nearly complete) divestment of his shares of Riot stock (and other revelations of Honig's role as an insider in the Company's transformation and affairs and dubious

---

[39] Michael Ho was the President of Kairos, according to the Nevada Secretary of State's website.
[40] Ianthe Jeanne Dugan, *Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake; Barry Honig pares back stake in Riot Blockchain, whose shares soared last year after a change of name*, The Wall Street Journal (Jan. 31, 2018).

783086.1

history as a penny stock investor), the Company's stock price fell from an opening price of $14.50 per share on January 31, 2018, to close at $13.75 that same day, a decline of $0.75, or ***more than 5%.***

192.214.  Later on January 31, 2018, Riot issued a press release announcing that the Company's 2017 Annual Meeting of Stockholders was being postponed for a second time, without announcing a new date and time for its annual meeting.  Riot also announced that it had received a notification from the NASDAQ that the Company had not held its annual meeting of shareholders within twelve months of the end of Riot's fiscal year-end, in accordance with NASDAQ's Listing Rules 5620(a) and 5810(c)(2)(G).

M.     On February 16, 2018, a CNBC Expose Partially Reveals Honig's Close Ties to Riot and O'Rourke

193.215.  On February 16, 2018, CNBC published an article titled "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket," reporting a slew of questionable practices and behavior at the Company.  The article stated:Among other information, the February 16, 2018 CNBC expose revealed to the Riot's pubic shareholders that O'Rourke, Riot's CEO and Chairman, maintained a close business relationship with Honig, a greater than 10% shareholder of the Company.  CNBC (and the market) was suspicious about O'Rourke's previously undisclosed ties to Honig for good reason.  Only two weeks earlier Honig stated to *The Wall Street Journal* that his share holdings had decreased significantly down to 1% (from 10%) while O'Rourke announced significant inside sales in early Janaury 2018.  This suggests that the two were working in concert to manipulate Riot's shareprice for their own personal gain.

216.   The close relationship between Honig and O'Rourke was most prominently evidenced when CNBC visisted Honig's office in Florida only to find O'Rourke and not Honig.

93

783086.1

This was also surprising given that at the time Riot listed it "principal executive offices" in its SEC filings as Castle Rock, Colorado.  O'Rourke responded (after first shutting the door) that he was merely there to meet with Honig, that he did not work out of Honig's office, and that he "ha[s] a good relationship with Mr. Honig and *we speak often*."

217.    Honig, who was later interviewed for the article, was quoted as saying that "at one time John O'Rourke had space in my office."  Honig also acknowledged that he and O'Rourke "speak often."

218.    In addition to the above, the article stated :

As bitcoin hit record highs in late December, a hot new stock was making news on a daily basis. Riot Blockchain's stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto.

**But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease.**

That might sound somewhat like the type of newly minted blockchain company that has gained SEC attention.

**"Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain," SEC Chairman Jay Clayton said, speaking in generalities in recent testimony to Congress. The SEC declined to comment to CNBC about Riot Blockchain.**

The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.

That purchase and the company's name change aren't Riot's only questionable moves.

**A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in.**

94

783086.1

\* \* \*

Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida. The resort is known as the "pink palace" and has luxury yachts lined up on its dock.

*But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for Feb. 1. It's not clear the company ever planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity.*

*Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.*

That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton. That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose office is a short drive from the hotel. He once owned more than 11 percent of the outstanding common stock, according to SEC filings.

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone. "It was an investment where I had a return. And I sold some shares. There's nothing wrong with doing that."

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

"Typically, Barry Honig invests his hard-earned money into a company, and he also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

A visit to the site now only reveals the text: "Under construction."

95

From the outside, Honig's office is nondescript. There does not appear to be any evidence of his company's existence on the building's directory or on the door of his office.

*When CNBC crew members walked into the office, they didn't find Honig, they found O'Rourke. That's the same O'Rourke who made headlines when — less than three months after the company changed names and business plans — he sold about $869,000 worth of shares, according to an SEC filing*. He told the crew he was there for a meeting with Honig and that we had just missed him.

O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed." Then, late the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.

He agreed to answer questions via email instead. One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.

*"I have my own office in a separate location," O'Rourke said in an email sent by his lawyer, Nick Morgan, a partner with Paul Hastings. "I do have a good relationship with Mr. Honig and we speak often."*

*"John O'Rourke does not work out of my office," Honig said. "John O'Rourke has his own office . . . at one time John O'Rourke had space in my office . . . we speak often."*

*Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information.*

*"You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or dialogue about what's appropriate for the company on a day to day basis or in the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP.*

*Despite Honig's website saying he gives advice on who should lead a company, Honig said he had nothing to do with O'Rourke becoming CEO.*

*"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.*

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

*"I see a company that has had a change of control of the board. I see a company that has had a change in business. I see a company that has had several dilutive issuances immediately following the change of the board and change of the*

96

783086.1

*business. And I see a stock that has gone zoom," he said. "And what I understand a significant amount of insider selling. So yes, these are red flags."*

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million. On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings. Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent. After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants. His purchase price ranged from $2.77 to $5.32 per share, according to the list of trades he provided to the SEC in 2017. Honig's investment dropped below 5 percent, the threshold for SEC filing, on Nov. 28. At that point, the stock had already climbed above $20.

Honig did not disclose his dramatically reduced position in the stock until this week.

*But that may not be the true extent of Honig's selling. Buried deep in the footnotes of Riot filings, it's clear Honig also accumulated more than 700,000 new warrants that he could convert to stock at $3.56 per share and more than 700,000 promissory notes that he could convert to stock at $2.50 a share.*

*What about those warrants and promissory notes? It's not clear, as he never mentioned them in either 13D. But in another footnote from a recent Riot filing, there is no longer a mention of them.*

He declined to further clarify what happened to them.

"It's all disclosed in the public filings. And those are all the obligations I have," he said. "I'm very comfortable with what I had to do and what I was obligated to do. . . . I'm not going to talk about my personal trading history or my bank account."

*Birns questioned how Honig made his filings. "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant*

*amount of stock. Or has the potential to own significant amount of stock in excess of what is reported on the 13D," he said.*

This is not the first time Honig has faced questions over his actions. In 2000, he was alleged to have committed stock manipulation. Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse.

"The answer's no," Honig said when asked if he still manipulates stocks.

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to SEC filings.

When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up.

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

*One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase. Kairos' main asset was $2 million of mining equipment. Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings.*

O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.

Kairos appears to have many links to Riot. The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada. Despite the many press releases, there has been no formal mining announcement.

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining. SEC filings are silent on mining activity.

As for professional poker players advising Riot? O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social media followers. He called them "thought leaders."

***Riot is not O'Rourke and Honig's first cryptocurrency investment.***

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. ***"I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."***

Honig acknowledges the investment.

The questions continue for Riot Blockchain.

On Tuesday, Riot filed to withdraw prior SEC filings.

"It is not the result of any government inquiry," O'Rourke said in an email. "It was just corporate clean up from our securities counsel."

As for the annual shareholders' meeting, "We did not have a quorum of shareholders required for a vote," O'Rourke said in the email from his lawyer. "We are also working on other corporate action items that would require shareholder approval and a shareholder meeting as well. We did not want to waste the time and expense of potentially having two shareholder meetings within a

short period of time. Thus we adjourned the meetings, which is not an uncommon practice."

There is no new date for the shareholders' meeting.

**"You see companies adjourn meetings in a context of a contested election and the like," Birns said. "I just don't think in this instance, there's any reason to adjourn their annual meeting."**

And as to O'Rourke selling stock in December?

He told CNBC in the email: "I sold less than 10 percent of my overall position to assist with covering tax obligations as a result of so-called phantom income tax from the vesting of restricted stock awards. It is common for Executives to sell stock to cover such tax obligations. I could have sold more stock in that window but chose to sell just 30,383 shares."

O'Rourke welcomes increased regulation and transparency for the cryptocurrency industry. "Unfortunately, as with many new hot sectors, it [blockchain] has attracted some bad actors trying to capitalize on the hype," he said. "Riot is all for increased transparency and properly imposed regulation."

**Honig would not disclose how much he made on his investment in Riot**, "I wasn't fortunate enough to do as well as you might think and people might speculate . . . I don't regret anything."

(Emphases added).

219.    On this news, Also on February 16, 2018, CNBC included the Riot Blockchain story referenced above during newscasts that day, entitled "CNBC Investigates Red Flags at Riot" which included in relevant part the following by CNBC's Michelle Caruso Cabrera:

We wanted to find out who was behind Riot Blockchain, but for weeks no one would talk to us. So we decided to see if we could get answers here at the swanky Boca Raton Resort and Club in Florida. That's where Riot's annual shareholders' meeting was set to take place. It would be an upscale setting for this upstart company with red ink, as far as their most recent quarterly report shows. But as we quickly learned, that annual meeting wasn't going to take place. Twice Riot Blockchain announced they were going to hold their annual shareholders' meeting here at the Boca Raton Resort and Club. Twice at the very last minute, in fact the night before, they announced that they were postponing the meeting. **And in fact the hotel tells us there was never a meeting room ever booked under the name Riot Blockchain. So we drove to this nearby office building, trying to find Barry Honig. According to SEC filings, he may be the man behind the curtain. He was an early investor in Riot, back when it was Venaxis, a medical testing company,**

100

*and then eventually Bioptix. He led an activist move to replace the board, and he eventually won. The new board changed the name from Bioptix to Riot Blockchain. "Hello? Hi, Michelle Caruso-Cabrera." As the elevator door opened in front of us, not Barry Honig, but this man, John O'Rourke, the CEO of Riot Blockchain, the same John O'Rourke who made news in December for selling about $869,000 worth of Riot stock just two months after the company changed its name. O'Rourke quickly closed the door.* Five minutes later he emerged and agreed to talk to us, but only off camera. He said he was here for a meeting with Honig when he arrived, and that we had just missed him. O'Rourke insisted that he does not work out of Barry Honig's office, even though we found him there.

220.    The CNBC broadcast narrated their encounter with Defendant O'Rourke:

During that hour-long off-camera meeting, O'Rourke told us his Riot stock sale was merely to pay taxes on his restricted stock. And as for the sharp rise in shares of Riot, O'Rourke said that was unexpected and ridiculous. *He also said he isn't worried about the SEC because "we over-disclose."*

221.    CNBC noted that when Honig "agree[d] to talk to [CNBC] by phone", he "downplayed his influence with Riot and John O'Rourke":

"MR. HONIG: *John O'Rourke's an adult, and he makes his own decisions, okay?*

**[MS. CARUSO-CABRERA:] In 2000 you were fined for $25,000 and suspended ten days by FINRA for stock manipulation. You're no longer a licensed broker. Do you still manipulate stocks?**

**[MR. HONIG:]** *The answer's no.* Continue. I'm a successful investor. I'm a comfortable person. I don't need to work today. I have a beautiful family that's college educated, and I'm very comfortable. **I am very comfortable.** *The truth will come out."*

222.    CNBC's Ms. Caruso-Cabrera further reported that "*Honig acknowledged he's done this before. Five years ago he and John O'Rourke were involved in another company that changed its business model to blockchain. That stock also skyrocketed.* Today it's trading around two bucks a share. Oh, and it's changed its business model again, to cloud computing for cars."

223.    As CNBC's Ms. Caruso-Cabrera noted, "Just this week a new filing from Barry Honig, which shows he sold a massive amount of shares, his common stock down to little more than 173,000.  So as Riot was issuing press release after press release promising great plans for the company, Honig was selling, making millions of dollars along the way."

~~194.~~224.   On the news reported by CNBC, including revealing that "Barry Honig may be the man behind the Riot Blockchain curtain," the price per share of Riot stock at closing fell approximately **33.4%**, or $5.74 per share, on heavy volume, from closing at $17.20 per share on February 15, 2018, to close at $11.46 per share on February 16, 2018, causing damage to Lead Plaintiff and the other members of the Class.

~~N.    Also on February 16, 2018, Riot Announces Its Purchase of "3,800 Bitcoin Mining Machines" Without Disclosing that It Was Buying These Machines from an Entity Owned by Honig and DeFrancesco at Vastly Inflated Prices~~

~~195.    On Friday, February 16, 2018, at 4:54 p.m., the same day that Riot's stock price fell 33.4% in response to the above CNBC investigative report, Riot issued a Form 8-K disclosing that Riot's subsidiary Kairos had agreed to purchase "3,800 AntMiner S9s, all manufactured by industry leader Bitmain" from Prive for $11 million in cash and 1 million shares of Riot common stock, with 200,000 of the shares escrowed pending certain performance milestones.  In all, the consideration suggests a total transaction value at the time of the agreement of approximately $28.2 million or a price per machine of $7,421 ($2,895 in cash and $4,526 in stock) paid to Prive. However, as of January 13, 2018, Riot could have purchased these same machines directly from their manufacturer, Bitmain (and have them shipped fairly quickly) for only $2,320 each for a total of $8,816,000, suggesting that Riot overpaid for these machines by approximately $19 million.~~



196.   Riot's Form 8-K did not disclose that Prive was a related party that was owned and controlled by Defendants Honig, DeFrancesco, and other members of the Honig Group.  It would not be until November 19, 2018, that Riot would disclose that "[t]wo principal shareholders held 24.8% and 18.4%, respectively, of Prive, at the time of its acquisition by the Company" and that "[t]hese holders held 10.7% and 5.7%, respectively of Kairos at the time of Kairos acquisition by the Company in October 2017.[41]

197.   Furthermore, Prive's corporate registration in Florida confirms that Prive was incorporated on October 31, 2017, only two weeks after Kairos was incorporated in Nevada.  Moreover, the individuals who incorporated Kairos and Ingenium Global Inc. in Nevada on October 19, 2017—Michael Ho and Bryan Pascual—are the **same persons** who incorporated Prive in Florida on October 31, 2017.  Indeed, the same address that Bryan Pascual gave in registering

---

[41] Riot Blockchain, Inc., Quarterly Report (Form 10-Q) at 15 (Nov. 19, 2018).

as a Director of Kairos—218 S. Audobon Ave, Tampa, Florida—is the address of Prive's "principal office."[42]

198.    While Riot issued a press release on September 15, 2018, touting its purchase of the 3,800 machines (without mentioning Privy by name), this same press release conveniently omitted anything about Riot's concurrent purchase of another 3,000 of those same machines from another party at a much lower price.  Indeed, in the same February 16 Form 8-K, Riot announced that it had purchased another "3,000 AntMiner S9s, all manufactured by industry leader Bitmain" from another company, Blockchain Mining Supply & Services Ltd. ("MBSS"), a corporation incorporated under the laws of the Province of Ontario ("BMSS") for $8,500,000 or only $2,833 per machine.  Thus, that Riot substantially overpaid for the 3,800 machines it purchased from Privy for $7,421 each is confirmed by the fact that it simultaneously purchased 3,000 of the same machines for $2,833 each from BMSS, which appears to have not been a related party.

O.    **On February 21, 2018, Riot Enters into a "Consulting Agreement" Through Which the Company Agrees to pay $4,000,000 to "Ingenium International LLC"**

199.    On February 21, 2018, Riot entered into a "Consulting Agreement" through which Riot agreed to pay $4,000,000 to "Ingenium International LLC" to for "consulting services . . . for a twelve-month period" involving "the installation and deployment of . . . cryptocurrency miners" purchased from Prive and BMSS, according to Riot's November 19, 2018 Form 10-Q.  Riot noted

---

[42]  The address that Michael Ho gave as President, Secretary, and Treasurer of both Kairos and Ingenium Global Inc.—5709 Cayan Tower in Dubai—is *different* from the address he gave to the State of Florida in registering Prive (218 S. Audobon Avenue, Tampa, Florida), which in turn is *also different* from Mr. Ho's address in Prive's Articles of Incorporation (1217 N. Horn Avenue, Los Angeles, California).  Thus, Mr. Ho appears to use at least three different addresses to incorporate businesses in different jurisdictions.

that the "controlling principals of Ingenium International LLC., are shareholders in the Company by virtue of the previous acquisitions of Kairos and Prive."

P.   On September 7, 2018, after an Investigation, the SEC Charges Defendants Honig, O'Rourke, Stetson, and Their Associates with Engaging in Three Other Pump-and-Dump Schemes Involving Companies Connected to Riot

200.   On April 9, 2018, the SEC issued a subpoena pursuant to a formal order of investigation.   According to Riot, the SEC's "inquires include the proper asset classification, applicability of the Investment Company Act [of] 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency."

201.   On September 7, 2018, the SEC named Defendants O'Rourke and Honig, as well as several other individuals and entities, including Groussman, Stetson, and Dr. Philip Frost ("Frost"), Opko's CEO and Chairman, as defendants in a long-running microcap "pump-and-dump" scheme.   According to the SEC, the charges relate to the manipulation of the share price in three unidentified companies (believed to be BioZone, MGT, and Mabvax), which generated over $27 million from unlawful sales and left retail investors with "virtually worthless stock."

202.   One of the unifying themes of the SEC's fraud case is that the defendants functioned as a unit and that they exerted control over the companies and their management by virtue of their combined shareholdings and the infusions of cash they provided.

203.   In response to the filing of the *Honig* Action, Defendant O'Rourke resigned as CEO and Chairman.   The Company's stock price fell approximately *24.2%*, or $1.38 per share, on heavy volume, from closing at $5.68 per share on September 6, 2018, to closing at $4.30 per share on September 7, 2018, damaging Lead Plaintiff and members of the Class.

225.   On April 17, 2018, after trading ended that day Riot filed its Annual Report on Form 10-K.   The report included for the first time several previously undisclosed related-party transactions between Honig and/or DeFrancesco and the Company that Riot, Honig, and

DeFrancesco were required to disclose, including: (i) the March 2017 Private Placement; (ii) the $50,000 payment Riot made to Honig related to his consulting role in the Coinsquare transaction; (iii) the Kairos transaction; and (iv) the December 2017 Private Placement. When the market opened the following day, on April 18, 2018, Riot's stock dropped 5.8%. Also, on April 18, 2018, Honig filed an amended 13D/A that disclosed for the first time, certain details concerning: (i) his role in the March and December 2017 Private Placements; (ii) the preferred share conversion to common stock that occurred as part of the Kairos transaction; and (iii) his specific stock trades made during 2017. This 13D/A is incorporated by reference and attached hereto as Ex. P.

226. After the close of trading on May 25, 2018, Riot filed its amended Form 8-K/A that disclosed for the first time that various Honig Group members, including Defendants Honig, DeFrancesco, Groussman and Stetson were parties to the Coinsquare agreement – a transaction where Riot was also a party by virtue of its $3 million investment in Coinsquare. As discussed above, Riot, Honig, Groussman, Stetson, and DeFrancesco were obligated to disclose their interest in Coinsquare. On this news, on the following trading day, May 29, 2018, Riot's stock price fell from an opening share price of $7.53 to a close of $7.08 per share, a decline of nearly 6%, damaging Class members.

227. On September 7, 2018, the SEC filed the *Honig* Action against Defendants O'Rourke, Honig, Groussman, and Stetson (as well as Honig Group affiliate Brauser and others) for violating the Exchange Act and Securities Act by engaging in "three highly profitable 'pump-and-dump' schemes . . . from 2013 through 2018 in the stock of three public companies (Company A, Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares." Cmpl. ¶ 1.

106

228.    The SEC alleged that "Honig was the primary strategist, calling upon other Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity."  The SEC further alleged that "[i]n each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse merger or by participating in financings on terms highly unfavorable to the company." *Id.*, ¶ 2.

229.    The SEC also alleged that "[t]o profit from their investment, in each scheme, Honig and his associates would arrange and pay for the promotion of the stock, directing their co-defendants, or a similar promoter, to write favorable and materially misleading articles about the company whose stock price they wanted to inflate.  In several instances, to magnify the intended boost to volume and price that would follow a promotional article's release, Honig, Brauser, O'Rourke, Groussman, Melechdavid, and ATG engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock, priming investor interest." *Id.*, ¶ 3.

230.    In an accompanying press release, Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement, stated that "Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets."

231.    On this news, the price of Riot's stock declined $1.38 per share, or approximately *26.1%*, from the previous day's closing price, to close at $4.30 per share on September 7, 2018, as additional corrective information that Defendants had previously failed to disclose regarding their membership in a group entered the market.

107

232.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Class members have suffered significant losses and damages.

**VII.IX. DEFENDANTS ENGAGED IN A MANIPULATIVE DEVICE, SCHEME, ARTIFICE, AND CONSPIRACY TO DEFRAUD RIOT'S PUBLIC SHAREHOLDERS DURING THE CLASS PERIOD**

233.   During the Class Period, each of the Defendants – pursuant to explicit or tacit agreements with each other and the Selling Stockholders – agreed to acquire, hold, vote, and/or dispose of shares they acquired in Riot in coordination with one another while knowingly or recklessly obtaining and exercising undisclosed control of the management and policies of Riot and while selling shares of Riot into the market at artificially inflated prices.  Defendants did so in violation of Section 13(d) of the Exchange Act and Rule 13d-2, *et seq.*, promulgated thereunder, which required Defendants to disclose their status as a "group" (as defined by Section 13(d)(3)) on Schedule 13D and to "promptly" update any material changes in their beneficial ownership of Riot's common stock in amendments (on Schedule 13D/A) to their Section 13(d) filings.  *See* § IX.A, *infra*.

234.   Defendants Honig, O'Rourke, and Stetson were familiar with their obligations under Section 13(d) – and the materiality of their disclosures to Riot's investors regarding beneficial ownership of the Company's stock – because they themselves had previously filed a lawsuit under this statute alleging that these disclosures were material to them.  *See* § IX.B, *infra*.

235.   Yet, despite this knowledge, Defendants failed to make timely and appropriate Section 13(d) filings and amendments reflecting their acquisition and disposition of Riot stock as part of scheme to defraud investors about their group's control over the management and policies of, and the magnitude of their collective investment in, Riot.  *See* § IX.A, *infra*.  And having concealed their group's existence and control over Riot, Defendants proceeded to engage in

108

manipulative trading in Riot's securities (including massive sales of Riot's common stock) while failing to make the necessary amendments to their Section 13(d) filings, which under the rules, should have promptly alerted Riot's public investors that a group of insider shareholders (indeed, an undisclosed control group) were collectively dumping their shares into the market.  *See* § X.A, *infra.*

236.   And as discussed below, Defendants Honig, Groussman, Stetson, and DeFrancesco's violations of Section 13(d) were made knowingly, or at least recklessly, in light of their clear knowledge that they were acting together as a group in their scheme involving Riot. *See* §§ IX.C.1-4, *infra.*

237.   Defendants could not have accomplished their scheme, however, without the assistance of Defendants O'Rourke and Beeghley from inside the Company.  Specifically during the Class Period, Defendants O'Rourke and Beeghley, as officers and/or directors of Riot, pursuant to explicit or tacit agreements with Defendants Honig, Groussman, Stetson, and DeFrancesco, caused the Company to issue materially false and misleading public filings with the SEC – including on Forms S-3, S-3/A, and 10-K, and Schedule 14A – that materially misrepresented the Company's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K by misrepresenting and concealing the fact that many of Riot's largest shareholders – including Defendants Honig, Groussman, Stetson, and DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A were members of a group with each other (as defined by Section 13(d)(3)) pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  *See* § X.B, *infra.*

238.   In causing Riot to issue its materially false and misleading Forms S-3, S-3/A, 10-K, and other SEC filings, O'Rourke and Beeghley well aware that the Honig Group (including

themselves) was a closely coordinated "group" that amply fit that definition under Section 13(d)(3), and which was therefore engaged in a scheme to defraud the Company's public investors. *See* § IX.C.5-6, *infra.*

239.    Defendants O'Rourke, Beeghley, and Riot also knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by issuing materially false and misleading Forms 8-K and 10-K that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendants Honig, Groussman, and DeFrancesco. *See* § X.C, *infra.*

**A.    Owners and Issuers of Securities Have Well-Known Disclosure Duties Under Section 13(d), Regulation 13d, and Item 403 of Regulation S-K**

240.    The federal securities laws are designed to ensure transparency by requiring that investors be provided with timely, accurate information about companies and persons who own large amounts of company stock and thus are in a control relationship with the company.  The Securities Act and the Exchange Act have several provisions designed to ensure that companies, their officers, and large shareholders provide the marketplace with adequate information about their holdings and their purchases and sales of their companies' stock.  For example, when a person or group of persons acquires beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of the Exchange Act, such person (colloquially known as a Section 13(d) filer) or group is required to make a filing under Exchange Act Section 13(d) with the SEC within ten days.[43]  These rules are meant to prevent evasion of the

---

[43] Section 13(d)(1) of the Exchange Act and Rule 13d-1 thereunder require any person who acquires more than 5% of the aggregate shares of any issuer's stock to file a Schedule 13D (or 13G if permissible under the rules) within ten days.  *See* 15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d–1(a) and (c).

disclosure requirement when two or more persons act together but keep their individual holdings below the reporting threshold.

241.    Under Section 13(d)(3), "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."  15 U.S.C. § 78m(d)(3).  Under Rule 13d-5, "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons."  17 C.F.R. § 240.13d-5(b)(1).

242.    These rules are meant to prevent evasion of the disclosure requirement when two or more persons act together but keep their individual holdings below the reporting threshold.  Indeed, the rules specifically contemplate those who would use a "plan or scheme to evade the reporting requirements of section 13(d) or (g)" by providing that "[a]ny person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose of effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security.  17 C.F.R. § 240.13d-3(b).

243.    When a group of persons agrees to act together to acquire, sell, vote or hold more than 5% in the aggregate of any issuer's stock, they must each file a disclosure, even if their

individual ownership is below 5%.[44]  When the holdings of a person or group of persons materially change, Section 13(d) and Rule 13d-2 thereunder [17 C.F.R. § 240.13d-2] require that Section 13(d) filers "promptly"[45] make an amended Schedule 13D filing to update the market about that "material change" in their holdings.[46]

244.    A person who would otherwise be obligated to file a statement on Schedule 13D may instead file a "short-form statement on Schedule 13G" if that person can attest that they "[have] not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect, including any transaction subject to § 240.13d-3(b) . . . ." 17 C.F.R. § 240.13d-1(c).

---

[44] Under Rule 13d-101, the "person" filing a Schedule 13D must "[s]tate the aggregate number and percentage of the class of securities . . . beneficially owned" by that "filing person," and this "*information should also be furnished with respect to persons who, together with any of the persons named in [the Schedule 13D], comprise a group within the meaning of section 13(d)(3) of the Act[.]*"  17 C.F.R. § 240.13d-101 ("Item 5. Interest in the Securities of the Issuer.") (emphasis added).

[45] The SEC has noted that "promptly" means that an investor must amend its disclosure as soon as "reasonably practicable."  *In the Matter of Sequa Corp.*, Release No. 26839 (May 19, 1989).  "[C]ourts have approved amendments filed within five to ten days of the material changes that triggered the need to amend."  *Standard Fin., Inc. v. LaSalle/Kross Partners, L.P.*, No. 96 C 8037, 1997 WL 80946, at *6 (N.D. Ill. Feb. 20, 1997); *see also Scott v. Multi–Amp Corp.*, 386 F.Supp. 44, 61 (D.N.J.1974) (filing within five days of material change was "prompt"); *D–Z Inv. Co. v. Holloway*, 1974 WL 440, at *3 (S.D.N.Y. Aug. 23, 1974)) (filing within "10 days" of material change was "prompt").

[46] Under Rule 13d-2(a), "If any *material change* occurs in the facts set forth in the Schedule 13D (§ 240.13d–101) required by § 240.13d–1(a), including, but not limited to, any material increase or decrease in the percentage of the class beneficially owned, the person or persons who were required to file the statement shall *promptly* file or cause to be filed with the Commission an amendment disclosing that change.  An acquisition or disposition of beneficial ownership of securities in an amount equal to *one percent* or more of the class of securities shall be deemed 'material' for purposes of this section; acquisitions or dispositions of less than those amounts may be material, depending upon the facts and circumstances."  17 C.F.R. § 240.13d-2(a) (emphases added).

245.    These disclosure provisions are intended to alert the company's stockholders and the marketplace to changes in securities ownership that indicate potential for changes in control of the company.  Indeed, the SEC's rules warn potential filers of Schedules 13D or Schedules 13G that the disclosures are "mandatory" and can lead to civil or criminal litigation:

> Disclosure of the information specified in this schedule is mandatory. The information will be used for the primary purpose of determining and disclosing the holdings of certain beneficial owners of certain equity securities. This statement will be made a matter of public record. Therefore, any information given will be available for inspection by any member of the public.

> Because of the public nature of the information, the Commission can use it for a variety of purposes, including referral to other governmental authorities or securities self-regulatory organizations for investigatory purposes or in connection with litigation involving the federal securities laws or other civil, criminal or regulatory statutes or provisions.

17 C.F.R. § 240.13d-101 (Special Instructions for Complying With Schedule 13D).

246.    Similar disclosure obligations are also imposed on issuers, such as Riot.  Exchange Act Section 13(a) requires all issuers whose securities are registered pursuant to Exchange Act Section 12 (such as Riot) to file periodic reports with the SEC, and Exchange Act Rule 13a-1 requires such issuers to file annual reports – *i.e.*, a "Form 10-K."  Exchange Act Regulation S-K at Item 10 sets out the information that must be disclosed in both Forms S-1 (Registration Statements) and 10-K.  17 C.F.R. § 229.10(1).  Item 403 of Regulation S-K, in turn, requires issuers to provide a table listing:

> any person (including any "group" as that term is used in section 13(d)(3) of the Exchange Act) who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities.

17 C.F.R. § 229.403(a).

247.    Thus, potential investors reviewing an issuer's annual report on Form 10-K or registration statement on Form S-3 can expect to see a table describing all persons – and all

113

783086.1

"groups" of persons – who beneficially own more than 5% of Riot's stock.  Officers who sign

public filings on behalf of their companies have a duty to ensure their completeness and accuracy.

248.   Collectively, these and other provisions[47] of the federal securities laws protect

investors from pump-and-dump schemes and ensure that investors understand who is controlling

a company and whether any large shareholders have amassed a position that will allow them to

control or influence the company and its securities.  When these required disclosures are evaded

or issued in a misleading fashion, investors are deprived of material information about an issuer.

**B.     Honig, O'Rourke, and Stetson Were Familiar with Section 13(d)**

249.   Honig, O'Rourke, and Stetson all understood their respective reporting obligations

under Exchange Act Section 13(d), and that the information included in such filings is material to

investors.  Specifically, in February 2015, Honig and Brauser filed a lawsuit in Harris County,

Texas, alleging that counter-parties had violated Exchange Act Section 13(d) by failing to make

requisite Section 13(d) filings for the more than 5% position they controlled as a group, and that

that failure constituted a material omission that defrauded Honig and Brauser in their purchase of

securities from those defendants.  In their complaint in that lawsuit, *Brauser v. Sanders Morris*

*Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct, Feb. In committing the wrongful acts alleged herein,

Defendants engaged in a 26, 2015), Honig and Brauser alleged that "the beneficial ownership table"

---

[47] Similarly, Section 16(a) and Rule 16a–3 require people – including "persons in a group" – who have beneficial ownership of more than 10% of a company to report their ownership with the SEC in a Form 3.  15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a-3(a).  Any subsequent "change in such ownership" must also be reported in a Form 4 "before the end of the second business day following the day on which the subject transaction has been executed."  15 U.S.C. § 78p(a)(2)(C); 17 C.F.R. § 240.16a-3.  "Where persons in a group are deemed to be beneficial owners of equity securities pursuant to § 240.16a–1(a)(1) due to the aggregation of holdings, a single Form 3, 4 or 5 may be filed on behalf of all persons in the group."  17 C.F.R. § 240.16a-3.  As more than 10% shareholders, Defendants Honig and DeFrancesco were therefore required to File Forms 3 and 4 and report any changes in their ownership within two business days.  But neither Honig nor DeFrancesco ever did.

Formatted: Font: Not Bold, Not Italic

of a "Registration Statement on Form S-4" had failed to disclosed "material, non-public information" regarding the defendants'' "significant beneficial ownership interest" in a company in which Honig and Brauser had invested.  Honig and Brauser alleged that the "omission" of this "information" "was materially misleading":

> A significant beneficial owner's sale of shares in [an] entity . . . is a negative indication regarding the prospects of the . . . company.  Such information regarding a significant beneficial ownership interest in [the issuer's stock] was material.  It is the kind of information that the SEC requires to be disclosed in connection with solicitations for mergers and in various other filings (*e.g.*, Schedules 13D and/or 13G) precisely because of its materiality.  Defendants' failure to disclose to plaintiffs their significant beneficial ownership interest in [the issuer] . . . is a material and materially misleading omission. . . .  Plaintiffs would not have purchased the Shares if they had known the undisclosed facts that [defendants] controlled such a large interest in [the issuer's] stock . . . .[48]

> 250.    In email exchanges leading up to filing this complaint (as alleged by the SEC in the *Honig* Action[49]) Honig and Brauser discussed drafts of their complaint, and circulated them to Stetson and O'Rourke (non-parties to the lawsuit) seeking their comments.  Honig and Brauser also discussed with Stetson and O'Rourke each of their respective understandings of the requirements imposed by Section 13(d) of the Exchange Act.  Nonetheless, and despite their understanding of what Section 13(d) required them to disclose and how and why those disclosures were material to investors, neither Honig nor Stetson made the requisite Schedule 13D filings with respect to Riot, nor did O'Rourke as CEO cause Riot to made the requisite disclosure on in the Company's Forms S-3, S-3/A, and 10-K, or its proxy statements.  This knowledge goes directly to Defendants' scienter in this action.

---

[48] *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct. Feb. 26, 2015) at ¶¶ 39-40.

[49] *See SEC v. Honig, et al.*, No. 18-cv-08175-ER (2d Am. Cmpl.) (ECF No. 233) at ¶¶ 161-62 (Exhibit B hereto).

783086.1

**C.      Defendants Acted as an Undisclosed Control Group to Pump-and-Dump Riot Stock While Misrepresenting and Concealing their Beneficial Ownership in Violation of Section 13(d), Rule 13d-2, and Item 403 of Regulation S-K**

251.   "Pump-and-dump" schemes typically have two parts.  In the first, the fraudsters acquire a large amount of stock at little or no cost whereupon a promotion scheme is implemented to boost the price of the stock or create trading volume by stimulating market interest with false or misleading statements about the company.  Once the stock price and trading volume have been pumped up, the fraudsters move on to the second part, in which they dump their large holdings of the stock into the public market at an enormous profit for themselves.  After the fraudsters dump their shares and stop hyping the stock, the price typically falls, trading volume dries up, and investors lose their money.  Critical to the success of such a scheme is disguising the fact that the fraudsters beneficially own and control a large amount of the unrestricted stock which, if known to investors and market participants, would inform investors that control persons of the company were dumping their stock.  Similarly critical to the success of such a scheme is concealing the fact that the members of such a group are selling that large amount of stock into the market during the "dump" phase of that scheme.

204.   As discussed below, Defendants knowingly or recklessly engaged in precisely this type of manipulative device, scheme, artifice, and conspiracy to defraud Riot's public shareholders in violation of the federal securities laws.  Defendants have also pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  Defendants have also caused the Company to misrepresent and conceal the truth and further aided and abetted and assisted each other in violating the federal securities laws.

205.   The purpose and effect of Defendants' device, scheme, artifice, conspiracy, common enterprise, and common course of conduct was, among other things, to:  (i) deceive the

116

783086.1

investing public, including stockholders of Riot, as to the Company's operations, financial condition, and compliance policies; (ii) facilitate Defendants' illicit sales of millions of dollars of their Riot shares while in possession of material, nonpublic information; and (iii) enhance certain of Defendants' executive and directorial positions at Riot and the profits, power, and prestige that the several of the Defendants enjoyed as a result of holding these positions.

206.   Defendants accomplished their scheme, conspiracy, common enterprise, and common course of conduct by purposely misrepresenting and concealing (and causing the Company to misrepresent and conceal) material facts, failing to correct such misrepresentations, and violating the federal securities laws.  AsAs insiders, controlling shareholders, officers, and/or directors of Riot, each of the Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

207.   Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of wrongdoing, each of the Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

208.252.   At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of Riot and was at all times acting within the course and scope of such agency.

### 1.   Honig Knowingly Engaged in the Fraudulent Scheme

253.  During the Class Period, Honig committed deceptive acts by knowingly misrepresenting and concealing that he was part of an undisclosed group (as defined by Section 13(d)(3)) while engaging in manipulative trading in Riot stock.  Defendant Honig's Section 13(d) filings during the Class Period misrepresented and omitted that his purported individual investment

117

783086.1

in Riot was actually part of a larger group.  *See* § X.A.1, *infra*.  Honig also repeatedly failed to make the necessary amendments to his Section 13(d) filings disclosing that he had materially changed his beneficial ownership in Riot through either purchases or (primarily) sales of Riot's stock during the Class Period.

254.  Honig did so knowingly or at least recklessly.  *First*, as discussed above, Honig (together with Brauser) had previously brought suit against several individuals under Section 13(d) in *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct.), in which Honig alleged that a violation of Section 13(d) is "material" and that he "would not have purchased the Shares if [he] had known the undisclosed facts that [the defendants] controlled such a largest interest in [the company's] stock."  Leading up to this filing, Honig discussed drafts of this complaint with O'Rourke and Stetson, seeking their comments, and discussing their respective understandings of the requirements of Section 13(d).

255.  *Second*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that between 2011 and August 2018, Honig invested alongside O'Rourke in ***over 75 issuers***, alongside Stetson in ***over 65 issuers***, and alongside Brauser in ***over 40 issuers***.  Because Honig was aware of his history of co-investments with O'Rourke, Stetson, and Brauser he knew that his co-investment with these same individuals with respect to Riot was again part of a coordinated "group" under Section 13(d).

256.  *Third*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by O'Rourke's statement in a February 3, 2014 email to the officer of a potential merger target that "***Barry Honig is the principal investor of our small group***," as alleged by the SEC in its Amended Complaint in the *Honig* Action.

257.   *Fourth*, Honig knew that, at a minimum, O'Rourke, Stetson, and Groussman were part of his investing group with respect to Riot because Honig shared his office with them in Boca Raton.  In fact, a September 13, 2016 letter signed by Honig, in which he nominated O'Rourke and Stetson to the Company's Board, lists the ***same fax number*** (with Palm Beach County, Florida area code 561) for O'Rourke and Stetson as the fax number listed on Honig's letterhead for his office in Boca Raton, Palm Beach County, Florida.  Indeed, O'Rourke was discovered by CNBC reporters inside Honig's same Boca Raton office on or about the day of Riot's recently cancelled annual meeting of shareholders in Boca Raton.  Because they worked out of the same office, shared the same fax number from that office, and even met with O'Rourke in that office the day of Riot's cancelled annual meeting of shareholders, Honig knew that he O'Rourke, Stetson, and Groussman were a "group" under Section 13(d).

258.   *Fifth*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that, as noted above, Honig, O'Rourke, Groussman, Stetson, and/or Brauser personally coordinated their investments in numerous public companies.  *See* Exs. E, F, G, H, I & J.  Indeed, Honig, O'Rourke, Groussman, and Stetson accomplished this coordination through private email correspondence amongst each other, *see* Ex. D at 7 of 21, in which they would coordinate the precise number of shares that each of them would hold in their target companies, *see* Ex. H.

259.   *Sixth*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Defendants Groussman, Stetson, and DeFrancesco also failed – like Honig – to report their membership in the same group with respect to the same company (Riot) during the same time period in 2017 in violation of Section 13(d).

119

260.    *Seventh*, that Defendant Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" that included, at a minimum, Defendant DeFrancesco is supported by the fact that Honig and DeFrancesco (both as 10%+ Riot shareholders) both engaged in an undisclosed related-party transaction in which Honig and DeFranscesco respectively owned of 8.6% and 6.3% (together 14.9%) of Kairos when Riot acquired all outstanding shares of Kairos in exchange of convertible preferred stock of Riot. Honig and DeFrancesco's coordination of their related-party transactions with Riot O'Rourke is further supported by the fact that Riot paid more than $13 million to the owners of Kairos (including Honig and DeFrancesco) for assets worth less than $2 million.

261.    *Eighth*, that Honig knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Honig, Groussman, and Stetson (and Jonathan Honig, through his entity, Titan) all invested together in the October 2, 2017 related-party Coinsquare shareholders' agreement with Riot (*see* § VII.E.2, *infra*) which was not disclosed to the Company's shareholders until May 25, 2018.

262.    *Ninth*, Honig's knowledge of, and participation in, the Honig Group's pump-and-dump scheme at Riot, including his role committing Section 13(d) disclosure violations by concealing his membership in a group of affiliated Riot stockholders while engaging in massive undisclosed sales of Riot stock, is supported by the SEC's allegations in the *Honig* Action. Indeed, as a result of that action, Honig has been "permanently barred from participating in any offering of penny stock"; "permanently prohibited" from holding greater than 4.99% of any penny stock company; "advertising, marketing, or otherwise promoting" any penny stock.

263.    *Finally*, that Honig knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling

Stockholders' investments in Riot were part of a coordinated "group" is further supported by Honig's past interconnections with the Honig Group and the Selling Stockholders, which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies" (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

### 2.     Groussman Knowingly Engaged in the Fraudulent Scheme

264.   During the Class Period, Groussman committed deceptive acts by knowingly misrepresenting and concealing that he was part of an undisclosed group (as defined by Section 13(d)(3)) while engaging in manipulative trading in Riot stock without amending his beneficial ownership disclosures as required by Section 13(d) and Rule 13d-2 thereunder.  *See* § IX.A.2, *infra*. For example, on October 13, 2017 Groussman filed with the SEC a Schedule 13G that included his signature and the following false and misleading statement:

> *By signing below I certify that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer [i.e., Riot] of the securities* and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect.  After reasonable inquiry and to the best of my knowledge and belief, *I certify that the information set forth in this statement is true, complete and correct.*

265.   Given Groussman's prior connections to Honig, O'Rourke, Stetson, and other members of the Honig Group, the statement that "the securities referred to above were not acquired and are not held" in order to "change[]" or "influence[]" "control of the issuer" was false and misleading when made in violation of the federal securities laws.

266.   Groussman's knowledge of his violations of Section 13(d) and Rule 13d-2 is supported by numerous facts.  *First*, as alleged by the SEC, Groussman's participation in Honig's previous schemes involving Biozone, MGT, and MabVax included "pre-release manipulative trading" with Honig, Brauser, O'Rourke, Melechdavid, and ATG.

267.    *Second*, as alleged by the SEC, "Groussman . . . work[ed] at an office in Boca Raton with Honig, Stetson and O'Rourke."  Thus, Groussman knew that, at a minimum, Honig, O'Rourke, and Stetson were part of his investing group with respect to Riot because Groussman shared Honig's office with them in Boca Raton.

268.    *Third*, that Groussman knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that, as noted above, Groussman, O'Rourke, Stetson, and/or Brauser personally coordinated their investments in numerous public companies. *See* Exs. D, E, F, G, H & I.  Indeed, Groussman, Honig, O'Rourke, and Stetson accomplished this coordination through private email correspondence amongst each other.  *See* Ex. D at 7 of 21 (email among Groussman, Honig, O'Rourke, Stetson, Brauser, and others).

269.    *Fourth*, that Groussman knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Defendants Honig, Stetson, and DeFrancesco also failed – like Groussman – to report their membership in the same group with respect to the same company (Riot) during the same time period in 2017 in violation of Section 13(d).

270.    *Fifth*, that Groussman knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" with Honig, in particular, is further supported by the fact that Groussman purchased his house in Miami Beach, Florida, with a $700,000 mortgage loan from Honig, who is mortgage holder of Groussman's house.

271.    *Sixth*, that Groussman knowingly violating his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Groussman, Honig, and Stetson (and Jonathan Honig, through his entity, Titan) all invested

122

783086.1

together in the October 2, 2017 related-party Coinsquare shareholders' agreement with Riot (*see* § VII.E.2, *infra*) which was not disclosed to the Company's shareholders until May 25, 2018.

272.   *Seventh*, Groussman's knowledge of, and participation in, the Honig Group's pump-and-dump scheme at Riot, including his role committing Section 13(d) disclosure violations by concealing his membership in a group of affiliated Riot stockholders while engaging (along with other group members) in massive undisclosed sales of that stock, is supported by the SEC's allegations in the *Honig* Action.  Indeed, as a result of that action, Groussman has been barred for five years from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, and from advertising, marketing, or promoting any penny stock.

273.   *Finally*, that Groussman knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by Groussman's past interconnections with the Honig Group and the Selling Stockholders, which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

### 3.   Stetson Knowingly Engaged in the Fraudulent Scheme

274.   During the Class Period, as a purported "4.99%" shareholder of Riot, Stetson committed deceptive acts by knowingly misrepresenting and concealing that he was part of an undisclosed group (as defined by Section 13(d)(3)) and was therefore obligated to file a Schedule 13D disclosing that fact and reporting any material acquisitions or dispositions of Riot's stock.  By not doing so, Stetson knowingly participated and facilitated the Honig Group's fraudulent scheme to pump and dump Riot's stock.

783086.1

275.    *First*, that Stetson knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Stetson invested alongside Honig in ***over 65 issuers*** between 2011and August 2018.

276.    *Second*, as noted above, Honig (together with Brauser) – in in consultation with Stetson – previously brought suit against several individuals under Section 13(d) in *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct.).  In bringing the lawsuit, Honig alleged that a violation of Section 13(d) is "material" and that he "would not have purchased the Shares if [he] had known the undisclosed facts that [the defendants] controlled such a largest interest in [the company's] stock."  Leading up to this filing, Honig discussed drafts of this complaint with Stetson and O'Rourke, seeking their comments, and discussing their respective understandings of the requirements of Section 13(d).  Thus, Stetson was well aware of his disclosure obligations under Section 13(d).

277.    *Third*, that Stetson knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that, as noted above, Stetson, Honig, O'Rourke, Groussman, and/or Brauser personally coordinated their investments in numerous public companies. *See* Exs. D, E, F, G, H & I.  Indeed, Stetson, Honig, O'Rourke, and Groussman accomplished this coordination through private email correspondence amongst each other.  *See* Ex. D at 7 of 21 (email among Stetson, Honig, O'Rourke, Groussman, Brauser, and others).  Indeed, Stetson in particular knew that he, Honig, O'Rourke, and Groussman, accomplished this coordination through private email correspondence amongst each other, *see* Ex. D at 7 of 21, in which they would coordinate the precise number of shares that each of them would hold in companies, *see* Ex. H.  For example, a January 27, 2012 email from Stetson to Honig attached a "Share Breakdown" of the shares that Honig, Stetson, Groussman, Brauser, and their

124

affiliates would hold in IZEA Worldwide Inc. after a stock split.  Ex. H.  Another January 20, 2011 email from Stetson provided a similar breakdown for himself, Honig, Brauser, and others for "Passport Potash, Inc."  Ex. G.

278.   Indeed, Stetson's emails corroborate the SEC's allegations that Stetson worked with (or for) Honig to ensure that members of his groups voted their shares in unison, and that members of such groups would reach out to Stetson to find out how they should vote on various proposals.  For example, in July 2015, Stetson emailed a co-investor, in response to an inquiry on how to vote, by copying Honig and replying "Yes, vote 'For.'"  Similarly, in November 2016, Stetson emailed members of a Honig group of investors in an issuer in response to a request for "instructions to vote" by instructing those investors:  "[v]oting in favor of [two named directors].  Against all other members and actions."  2d Am. Cmpl. ¶ 60.

279.   *Fourth*, that Stetson knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Defendants Honig, Groussman, and DeFrancesco also failed – like Stetson – to report their membership in the same group with respect to the same company (Riot) during the same time period in 2017 in violation of Section 13(d).

280.   *Fifth*, that Stetson knowingly violated his obligation to disclose that his investment in Riot was part of a coordinated "group" is further supported by the fact that Stetson, Honig and Groussman (and Jonathan Honig, through his entity, Titan) all invested together in the October 2, 2017 related-party Coinsquare shareholders' agreement with Riot (*see* § VII.E.2, *infra*), which was not disclosed to the Company's shareholders until May 25, 2018.

281.   *Sixth*, Stetson's knowledge of, and participation in, the Honig Group's pump-and-dump scheme at Riot, including his role committing Section 13(d) disclosure violations by

125

concealing his membership in a group of affiliated Riot stockholders who were engaging in massive undisclosed sales of that stock, is supported by the SEC's allegations in the *Honig* Action. Indeed, as a result of that action, Stetson has been barred for ten years from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, and from advertising, marketing, or promoting any penny stock.

282.   *Finally*, that Stetson knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by Stetson's past interconnections with the Honig Group and the Selling Stockholders, which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

### 4.   DeFrancesco Knowingly Engaged in the Fraudulent Scheme

283.   During the Class Period, DeFrancesco engaged in deceptive acts by knowingly misrepresenting and concealing that she was part of an undisclosed group (as defined by Section 13(d)(3)) while engaging in manipulative trading in Riot stock – including massive stock sales that she failed to disclose despite being one of the Company's largest shareholder.

284.   Several facts support that DeFrancesco knowingly violating Section 13(d) and Rule 13d-2, *et seq.*, thereunder, as part of the Honig Group's scheme.  *First*, DeFrancesco's scienter in failing to "promptly" report her changes in beneficial ownership of Riot's common stock is supported by the fact that she filed nine Schedules 13D or 13D/A between September 12, 2016 and January 10, 2017 – demonstrating that she knew it was her legal obligation, as a more than 10% Riot shareholder, to report her holdings (and changes therein) to the market.   Yet, after January 10, 2017, and to this day, DeFrancesco has never filed another Schedule 13D/A.

126

285.   *Second*, that DeFrancesco was knowingly violating her obligation to "promptly" report her changes in beneficial ownership of Riot's common stock as required by Section 13(d) and Rule 13d-2, *et seq.*, is supported by the fact that Defendant Honig, as Riot's other largest (10%+) shareholder, with whom DeFrancesco coordinated with in a proxy fight (and letter-writing campaign) for control of Riot's Board, also committed similar violations of Section 13(d) and Rule 13d-2 by failing to promptly disclose his sales of Riot stock during the same time period.

286.   *Third*, that DeFrancesco knew that her investment in Riot was part of a coordinated "group" that involved, at a minimum, Honig, Stetson, and Brauser because she invested in PolarityTE between at least January 20, 2017 and April 25, 2017, during which time Honig was a Director of PolarityTE, Stetson was a Director and CFO of PolarityTE, Beeghely was a Director of PolarityTE, and Brauser was a Director of PolarityTE.  In addition, O'Rourke and Groussman were also investors in PolarityTE, as were the majority (if not all) of the other Selling Stockholders listed in Riot's 2017/2018 Forms S-3/A.  (*See* ¶¶ 132-36, 162-63, *supra*.)

287.   *Fourth*, that DeFrancesco knowingly violated her obligation to disclose that her investment in Riot was part of a coordinated "group" is further supported by the fact that Defendants Honig, Groussman, and Stetson also failed – like DeFrancesco – to report their membership in the same group with respect to the same company (Riot) during the same time period in 2017 in violation of Section 13(d).

288.   *Fifth*, that DeFrancesco knew that she was investing alongside the Honig Group is supported by the appointment by Honig of Mike Dai to Riot's Board on December 1, 2016, and Dai's subsequent election to the Board.  Before joining Riot's Board, Dai already had established business ties with DeFrancesco's husband, Andrew, and other relatives, as well as O'Rourke and Stetson, Jonathan Honig, and other members of the Honig Group.  Specifically, as of December 1,

127

783086.1

2016, Dai "serve[d] as chief financial officer and Director of Santa Maria Petroleum Inc. . . . a position he ha[d] held since 2014," according to Honig's SEC filing nominating Dai to the Bioptix Board.  Dai became CFO and a Director of Santa Maria on May 22, 2014, the same day that Andrew DeFrancesco became Santa Maria's "President and CEO."  On December 2, 2016, Santa Maria filed an OTCQB Certification with the OTC Markets stock exchange.  According to Santa Maria's OTCQB Certification, the following individuals and entities were "control persons [who] are beneficial owners of more than five percent (5%) of any class of [Santa Maria's] equity securities":  ATG Capital (i.e., O'Rourke) (6.7%); GT Capital (Andrea DeFrancesco) (10%); Jonathan Honig (6.8%); Stetson Capital (i.e., Stetson) (6%); and Sunnybrook Preemie Investments Inc. (Carmella DeFrancesco) (5.3%).  In other words, Dai was the CFO and director of the same company, Santa Maria, that DeFrancesco's husband was also the President, CEO, and Director, and whose largest shareholders were O'Rourke, Stetson, and Jonathan Honig, as wells as Selling Stockholder Carmella DeFrancesco.  Moreover, Santa Maria's OTCQB Certification was "prepared by . . . Mike Dai, CFO" and "Andrew DeFrancesco, CEO" and was signed by "/s/ MIKE DAI" as "Certifying . . . CFO."  In sum, Dai's connections to DeFrancesco and the Honig Group further support a cogent inference that DeFrancesco knew that these individuals were working together (including by selecting the Company's Board members) as a shareholder "group" (as defined by Section 13(d)) and that she needed to disclose that group as such under Section 13(d) in her beneficial ownership filings with respect to Riot.

289.  *Finally*, that DeFrancesco knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by DeFrancesco's past interconnections with the Honig Group and the Selling

Stockholders (including through PolarityTE), which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

**5.     O'Rourke Knowingly Engaged in the Fraudulent Scheme**

290.    During the Class Period, O'Rourke, as Riot's Director, President, Treasurer, Secretary, and, eventually, CEO, had full knowledge that Honig, DeFrancesco, Groussman, and Stetson (together with Beeghley, and other affiliated "selling stockholders") were all acting in concert to coordinate their acquisition and voting of Riot stock, and to control direction of the management and policies of Riot.  Yet, working from within the Company, O'Rourke knowingly or recklessly signed false and misleading public SEC filings that did not disclose that even the Honig Group constituted a "group" under Section 13(d)(3) and Item 403 of Regulation S-K, much less the full extent of the Honig Group's coordination control of Riot.

291.    Specifically, in signing Riot's April 20, July 19, August 24, and September 25, 2017 Forms S-3/A, and other filings, O'Rourke knew, at a minimum, that Honig, Groussman, and Stetson were investing together as a group.  Yet, O'Rourke signed the April 20, 2017 Form S-3/A without disclosing that these individuals were a group of which he himself was a member.  In doing so, O'Rourke knowingly or recklessly committed deceptive acts in furtherance of his and the Honig Group's pump-and-dump scheme with respect to Riot.

292.    *First,* as noted above, O'Rourke (together with Stetson) discussed Honig's (and Brauser's) previous lawsuit, in *Brauser v. Sanders Morris Harris, Inc.,* No. 2015-11227 (Tex. Dist. Ct.), which alleged that a violation of Section 13(d) is "material" and that Honig and Brauser "would not have purchased the Shares if [they] had known the undisclosed facts that [the defendants] controlled such a largest interest in [the company's] stock."

293.   *Second,* O'Rourke knew that he and Honig were working together as a group because O'Rourke invested alongside Honig in ***over 75 issuers*** between 2011 and August 2018.

294.   *Third,* that O'Rourke knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's investments in Riot were part of a coordinated "group" is further supported by O'Rourke's statement in a February 3, 2014 email to the officer of a potential merger target that "***Barry Honig is the principal investor of our small group***," as alleged by the SEC in its Amended Complaint in the *Honig* Action.

295.   *Fourth,* O'Rourke knew that, at a minimum, Honig, Stetson, and Groussman were part of his investing group with respect to Riot because O'Rourke shared Honig's office with them in Boca Raton.  In fact, a September 13, 2016 letter signed by Honig, in which he nominated O'Rourke and Stetson to the Company's Board, provides the ***same fax number*** (with Palm Beach County, Florida area code 561) for O'Rourke and Stetson as the fax number listed on Honig's letterhead for his office in Boca Raton, Palm Beach County, Florida.  Indeed, O'Rourke was discovered by CNBC reporters inside Honig's same Boca Raton office on December 28, 2017, the day of Riot's cancelled annual meeting of shareholders in Boca Raton.  Because they worked out of the same office, shared the same fax number from that office, and O'Rourke even met with Honig (and unexpectedly, with CNBC) in that same office the day of Riot's cancelled annual meeting of shareholders, O'Rourke knew that he, Honig, Stetson, and Groussman were a "group" under Section 13(d) – a statute they had previously used to bring lawsuits against other investors.

296.   *Fifth,* that O'Rourke knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's investments in Riot were part of a coordinated "group" is further supported by the fact that, as noted above,

130

O'Rourke, Honig, Groussman, Stetson, and/or Brauser personally coordinated their investments in numerous public companies. *See* Exs. D, E, F, G, H & I.  Indeed, O'Rourke, Honig, Groussman, and Stetson accomplished this coordination through private email correspondence amongst each other.  *See* Ex. D at 7 of 21 (email among O'Rourke, Honig, Groussman, Stetson, Brauser, and others).

297.   *Sixth*, O'Rourke's knowledge of, and participation in, the Honig Group's pump-and-dump scheme at Riot, including O'Rourke's role as CEO in disseminating false and misleading statements about related-party transactions that involve Honig while, at the same time, the Honig Group committed Section 13(d) disclosure violations by concealing their group ownership of Riot stock and massive sales of that stock.  O'Rourke's scienter is also supported by the SEC's allegations in the *Honig* Action.  Indeed, as a result of that action O'Rourke has been permanently barred from participating in an offering of penning stock, holding greater than 4.99% of any penny stock, and from advertising, marketing, or promoting any penny stock.

298.   *Finally*, that O'Rourke knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by O'Rourke's past interconnections with the Honig Group and the Selling Stockholders, which are set forth in the charts provided above describing the "Honig Group's Prior Target Companies (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, supra), and further depicted in the diagram attached hereto as Exhibit M.

**6.   Beeghley Knowingly Engaged in the Fraudulent Scheme**

299.   During the Class Period, Beeghley, as Riot's CEO and Director, had full knowledge that Honig, O'Rourke, DeFrancesco Groussman, and Stetson (and other affiliated "selling stockholders") were all acting in concert to coordinate their acquisition and voting of Riot stock,

783086.1

and to control direction of the management and policies of Riot.  Yet, working from within the Company, Beeghley knowingly or recklessly signed false and misleading public SEC filings that did not disclose that even the Honig Group constituted a "group" under Section 13(d)(3) and Item 403 of Regulation S-K, much less the full extent of the Honig Group's coordination control of Riot.

300.    Specifically, in signing Riot's April 20, July 19, August 24, and September 25, 2017 Forms S-3/As, Beeghley knew, at a minimum, that Honig, Groussman, and Stetson were investing together as a group.  Yet, Beeghley signed the April 20, 2017 Form S-3/A without disclosing that these individuals were a group of which he himself was a member.  In doing so, Beeghley knowingly or recklessly committed deceptive acts in furtherance of his and the Honig Group's pump-and-dump scheme with respect to Riot.

301.    *First*, in signing Riot's Forms S-3/As, Beeghley knew that Honig, Groussman, and Stetson, together with Aifos, Titan, Molinksy, O'Braitis, Paradox, and Stockwire, were all previously affiliated because those same individuals and/or entities had all invested in PolarityTE when Beeghley was a Director of PolarityTE, a company of which Honig had been Chairman and CEO and Stetson had been CFO.  Thus, Beeghley knew the S-3/A violated Section 13(d) and was materially false and misleading.

302.    *Second*, that Beeghley knowingly caused Riot to file materially misleading Forms S-3 and other filings that misrepresented and omitted to disclose that the Honig Group's and Selling Stockholders' investments in Riot were part of a coordinated "group" is further supported by Beeghley's past interconnections with the Honig Group and the Selling Stockholders (including through PolarityTE), which are set forth in the charts provided above describing the "Honig

132

Group's Prior Target Companies (*see* ¶ 162, *supra*) and the "Selling Stockholders' Prior Target Companies" (*see* ¶ 163, *supra*), and further depicted in the diagram attached hereto as Exhibit M.

303.    *Finally*, as the Chairman and CEO of the Company (which had only about nine employees), Beeghley would have been aware of the March 15, 2017 Private Placement in which Riot entered into agreements to sell Honig warrants and notes to purchase up to 700,000 shares of common stock.  *See* Exhibit P at 5.  Beeghley also would have been aware when, on August 18, 2017, Honig "waived the requirement for the occurrence of a Qualified Transaction and gross proceeds of the Note Private Placement were released to [Riot] and the Notes and the March 2017 Warrants were released to [Honig] . . . ."  *Id.*  Despite this fact, and the fact that the March 2017 Private Placement required Honig to file an amended Schedule 13D/A,[50] Beeghley also knew that Honig had not filed any Schedule 13D/A since January 5, 2017.  Thus, Beeghley knew that Honig was violating his disclosure obligations under Section 13(d).

## ~~VIII.~~X.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD[51]

~~209.~~304.   In connection with Defendants' efforts to defraud Riot's public shareholders during the Class Period as part of ~~a~~their fraudulent scheme ~~or~~and plan in violation of Rule 10b-5(a) and (c), Defendants also disseminated materially false and misleading statements, and otherwise violated an obligation to disclose material information in violations of Rule 10b-5(b).

---

[50]  *See*  https://www.sec.gov/divisions/corpfin/guidance/reg13d-interp.htm  ("Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting") (stating that "a Schedule 13D reporting person [is] required to file an amended Schedule 13D if it acquires warrants from an issuer," even if "not exercisable for six months" and must disclose the warrants in its "Item 6 (contracts) disclosures and file the warrant agreement as an exhibit pursuant to Item 7 of Schedule 13D.  [Sep. 14, 2009]").

[51] In this section, statements that are ***bold and italicized*** are specifically alleged to be false and misleading.  Statements that are **only bold** are to indicate emphasis.  Statements that are neither bold nor italicized are provided for context.

~~Defendants' materially false and misleading statements and omissions concerned: (1) the numerous disavowed and undisclosed "material relationship[s]" among members of the Honig Group and various Company insiders, including Defendants O'Rourke, Beeghley, McGonegal, Kaplan and So, through which they exercised control and influence over the Company to accomplish their pump-and-dump scheme; (2) the Honig Group's and various Company insiders' influence over and participation in a series of related-party transactions – including multiple Form S-3 securities offerings by Riot, and Riot's investments in Coinsquare, Kairos, Tess, and Prive – that funneled funds raised away from Riot's public shareholders to the Honig Group; (3) the Company's resulting limited meaningful investments in legitimate cryptocurrency assets or operations and the absence of a legitimate cryptocurrency business plan; and (4) Defendants' undisclosed and coordinated accumulation and insider selling of Riot shares in furtherance of their pump-and-dump scheme.~~ Below, Defendants false and misleading statements and omissions are grouped into three main categories:

305.   *First*, Defendants Honig, DeFrancesco, Groussman, and Stetson in their beneficial ownership reports filed on Schedule 13D and 13G, and amendments thereto on Schedules 13G/A and 13D/A.  *See* § X.A, *infra*.

306.   *Second*, the Company – at the direction of O'Rourke and Beeghley as officers and directors – issued materially false and misleading public filings with the SEC – including on Forms S-3, S-3/A, and 10-K, and Schedule 14A – that materially misrepresented Riot's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K by misrepresenting and concealing the fact that many of Riot's largest shareholders – including Defendants Honig, Groussman, Stetson, and DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A were members of a group with each other (as defined by Section 13(d)(3)) pursuant to

134

their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  *See* § X.B, *infra.*

307.  *Third*, the Company – at the direction of O'Rourke and Beeghley as officers and directors – issued materially false and misleading statements with the SEC that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendants Honig, Groussman, and DeFrancesco. *See* § X.C, *infra.*

**A.      Defendants' Materially False and Misleading Statements and Omissions in Benificial Ownership Reports on Schedules 13D and 13G**

308.  During the Class Period, Defendants Honig, Groussman, Stetson, and DeFrancesco (acting individually and/or through the investment entities they controlled, including GRQ 401K, ATG, Melechdavid, Stetson Capital, and Namaste, among others) knowingly or recklessly made materially false and misleading filings under Section 13(d) – including on Schedules 13G, 13G/A, 13D, and 13D/A – and/or failed to made necessary Section 13(d) filings and thereby concealed both their control over Riot's management and policies, as well as their membership in a group with each other (and with the Selling Stockholders) pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  In doing so, these Defendants knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder.

309.  Defendants further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly by failing to make timely and appropriate Section 13(d) filings and amendments (i.e., on Schedule 13D/A) reporting (whether individually or as a group) their purchases and sales of Riot stock.  Defendants' disclosure violations under Section 13(d) facilitated their scheme to defraud Riot's public investors about their group's control over the

135

management and policies of, and the magnitude of the collective investment in, Riot.  While failing to make the necessary amendments to their Section 13(d) filings or disclosing their membership with each other in a "group" as defined by Section 13(d)(3), Defendants engaged in manipulative trading in Riot stock – including massive undisclosed stock sales that easily exceeded the 1% minimum threshold for materiality set forth in Rule 13d-2(a) [17 C.F.R. § 240.13d-2(a)].

### 1. Honig's Beneficial Ownership Reports on Schedule 13D Were Materially False, Misleading, Deficient, and Untimely and Facilitated His Manipulative Trading in Riot's Common Stock

310.    During the Class Period, Defendant Honig facilitated and concealed the Honig Group's pump-and-dump scheme at Riot through material misrepresentations and omissions on Schedule 13D, and his amendments thereto on Schedule 13D/A.  Honig's violations of his duties under Section 13(d) of the Exchange Act 915 U.S.C. § 78m(d), and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)], also constituted violations Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

311.    Honig's Class Period filings on Schedule 13D/A (and lack thereof) were materially false and misleading in at least four ways.  *First*, Honig's Schedule 13D filings improperly failed to disclose his membership in a "group" (i.e., the Honig Group) as required by Section 13(d)(3) and Rules 13d-2, 13d-5,[52] and 13d-101.[53]  Because they acted in concert to control the management and policies of Riot and pursuant to an agreement to acquire, hold, vote, and/or dispose of Riot

---

[52] *See* 17 C.F.R § 240.13d-5(b)(1) ("When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the *group* formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.") (emphasis added).

[53] *See* 17 C.F.R. § 240.13d-101 ("Item 5.  Interest in Securities of the Issuer") ("The above information should also be furnished with respect to persons who, together with any of the persons named in Item 2, *comprise a group within the meaning of section 13(d)(3) of the Act . . . .*") (emphasis added).

shares in coordination with one another, each of Honig, O'Rourke, Groussman, and Stetson were each members of a group that was considered a single "person" under Exchange Act Section 13(d)(3). As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of that group and disclosing the number of shares each of them beneficially owned. However, neither Honig, O'Rourke, Groussman, nor Stetson ever made a Schedule 13D filing disclosing their respective ownership or membership in a group, acting intentionally to conceal from the market the size of their group's position and their coordination and thereby to deceive investors. Instead, in each and every Schedule 13D/A that Honig filed before and during the Class Period, Honig only identified himself (and his closely related personal entities such as GRQ 401K) as the only relevant beneficial owner.

312.    *Second*, Section 13(d)(2) and Rule 13d-1(a) thereunder required Honig to make amended Schedule 13D/A filings "promptly" as material changes occurred in any such disclosures Honig had made. In that regard, the acquisition or disposition of one percent or more of a company's common stock "shall be deemed 'material'" under Rule 13d-2(a). Yet, after filing his January 5, 2017 Schedule 13D/A, and throughout 2017, Honig engaging in numerous massive acquisitions and dispositions of Riot stock – in considerable excess of 1%, whether considered collectively or looking at individual day's trading – but Honig did not file another Schedule 13D/A for the rest of 2017 and not until February 13, 2018.

313.    As background, starting before the Class Period, between April 4 and January 5, 2017, Honig filed a series of Schedule 13Gs and 13Ds disclosing his increasing stake in Riot's common stock. During this time, Honig's filings disclosed his share holdings (and percentage stake in the Company) as follows:

783086.1

- April 4, 2016 – Schedule 13G – 335,175 shares (8.65%);
- May 16, 2016 – Schedule 13G/A – 386,581 shares (9.97%);
- September 8, 2016 – Schedule 13D – 373,899 shares (9.6%);
- September 14, 2016 – Schedule 13D/A – 389,159 shares (10.04%);
- November 9, 2016 – Schedule 13D/A – 452,585 shares (10.05%);
- December 1, 2016 – Schedule 13D/A – 500,000 shares (11.10%);
- January 5, 2017 – Schedule 13D/A – 504,000 shares (11.19%) (Exhibit Q hereto);

<div style="float:right; border:1px solid #000; padding:4px;">
**Formatted:** Indent: Left:  0.75", Line spacing:  single, No bullets or numbering
</div>

314.   Thereafter, Honig did not file another Schedule 13D/A for the rest of 2017. Unbeknownst to Riot's public investors, however, after January 5, 2017, and throughout the rest of 2017, Honig engaged in numerous material changes in his beneficial ownership of Riot common stock – primarily massive sales outside of the public view because Honig violated Section 13(d) and Rule 13d-2(a) by failing to disclose any of these transactions to the market.

315.   Honig's failure to file any further amendments during 2017 after his January 5, 2017 Schedule 13D/A violated Section 13(d)(2) and Rule 13d-1(a) thereunder because, as set forth below, Honig engaged in numerous transactions in which he either acquired or disposed of more 1% of Riot's then-outstanding shares based on the information he later disclosed in his January 5, 2017 Schedule 13D/A (Exhibit Q) and his next Schedule 13D/A filed on April 18, 2018 (attached hereto as Exhibit P).

316.   Honig's 2017 trading is set forth in the following chart, which details Honig's puchases and (sales) and the percent change those sales constituted in Riot's total outstanding shares during that time period:

| BARRY HONIG | | | | | |
|---|---|---|---|---|---|
| EVENT DATE | SEC FORM (FILED DATE) | SHARES HELD | % OF ALL SHARES | SHARES BOUGHT(SOLD) | % CHANGE |
| 01/04/17 | Form 4 (Jan. 4, 2017) | 443,585 | | 4,000 | N/A |
| 01/04/17 | 13D/A (Jan. 5, 2017) [54] | 504,000 | 11.19% | | +1.34% |

---

[54] Based on 4,403,971 shares foutstanding as of November 11, 2016 (Jan. 5, 2017 Sched. 13D/A).

| BARRY HONIG | | | | | |
|---|---|---|---|---|---|
| EVENT DATE | SEC FORM (FILED DATE) | SHARES HELD | % OF ALL SHARES | SHARES BOUGHT/(SOLD) | % CHANGE |
| 03/15/17[55] | 13D/A (April 18, 2018) | | | **March 2017 Private Placement Agreement** | N/A |
| 03/29/17 | 13D/A (April 18, 2018) | | | 35,000 | +0.77% |
| 03/31/17 | 13D/A (April 18, 2018) | | | (4,200) | -0.09% |
| 04/05/17 | 13D/A (April 18, 2018) | | | (800) | -0.01% |
| 04/13/17 | 13D/A (April 18, 2018) | | | (4,100) | -0.09% |
| 04/18/17 | 13D/A (April 18, 2018) | | | (4,900) | -0.09%[56] |
| 04/25/17 | 13D/A (April 18, 2018) | | | (1,200) | -0.02%[57] |
| 04/26/17 | 13D/A (April 18, 2018) | | | (100) | 0.00% |
| 04/28/17 | 13D/A (April 18, 2018) | | | (2,100) | -0.04% |
| 05/01/17 | 13D/A (April 18, 2018) | | | (4,000) | -0.08% |
| 05/09/17 | 13D/A (April 18, 2018) | | | (5,500) | -0.11% |
| 05/10/17 | 13D/A (April 18, 2018) | | | (2,500) | -0.05% |
| 05/16/17 | 13D/A (April 18, 2018) | | | (1,000) | -0.02% |
| 05/23/17 | 13D/A (April 18, 2018) | | | (1,800) | -0.03% |
| 05/31/17 | 13D/A (April 18, 2018) | | | (9,900) | -0.20% |
| 06/02/17 | 13D/A (April 18, 2018) | | | (1,971) | -0.04% |
| 06/08/17 | 13D/A (April 18, 2018) | | | (11,301) | -0.21%[58] |
| *61,672 shares sold between January 4 and June 8, 2017 = **1.14%** of 5,371,185 shares outstanding* | | | | | |
| 06/12/17 | 13D/A (April 18, 2018) | | | (1,300) | -0.02% |
| 06/13/17 | 13D/A (April 18, 2018) | | | (400) | 0.00% |
| 06/14/17 | 13D/A (April 18, 2018) | | | (3,251) | -0.06% |
| 06/15/17 | 13D/A (April 18, 2018) | | | (1,307) | -0.02% |
| 06/19/17 | 13D/A (April 18, 2018) | | | (7,412) | -0.13% |
| 06/20/17 | 13D/A (April 18, 2018) | | | (2,027) | -0.03% |
| 06/22/17 | 13D/A (April 18, 2018) | | | (9,744) | -0.18% |
| 06/23/17 | 13D/A (April 18, 2018) | | | (5,000) | -0.09% |
| 06/30/17 | 13D/A (April 18, 2018) | | | (3,000) | -0.05% |
| 07/01/17 | 13D/A (April 18, 2018) | | | (1,000) | -0.01% |
| 07/10/17 | 13D/A (April 18, 2018) | | | (1,200) | -0.02%[59] |
| 07/13/17 | 13D/A (April 18, 2018) | | | 1,502 | +0.02% |
| 07/17/17 | 13D/A (April 18, 2018) | | | (1,200) | -0.02%[60] |
| 07/18/17 | 13D/A (April 18, 2018) | | | (975) | -0.01% |
| 07/19/17 | 13D/A (April 18, 2018) | | | (1,114) | -0.02% |
| 08/04/17 | 13D/A (April 18, 2018) | | | (7) | 0.00% |

---

[55] "The date of event which required the filing of an amendment to the Schedule 13D after Amendment No. 5 [Honig's January 5, 2017 13D/A] was March 15, 2017," the date of the March 2017 Private Placement Agreement (Apr. 18, 2018 Sched. 13D/A).

[56] Based on 4,903,971 shares outstanding as of March 31, 2017 (Apr. 20, 2017 S-3).

[57] Based on 4,903,971 shares outstanding as of April 20, 2017 (Apr. 27, 2017 10-K/A).

[58] Based on 5,371,179 shares outstanding as of June 5, 2017 (June 6, 2017 PRER14A).

[59] Based on 5,371,170 shares outstanding as of July 3, 2017 (July 10, 2017 DEF14A).

[60] Based on 5,392,503 shares outstanding as of July 14, 2017 (July 19, 2017 Form S-3/A).

783086.1

| BARRY HONIG | | | | | |
|---|---|---|---|---|---|
| EVENT DATE | SEC FORM (FILED DATE) | SHARES HELD | % OF ALL SHARES | SHARES BOUGHT\|(SOLD) | % CHANGE |
| 10/04/17 | 13D/A (April 18, 2018) | | | (47,250) | -0.86%[61] |
| *86,187 shares sold between June 12 and October 4, 2017 = **1.58%** of Riot's 5,436,503 shares outstanding* | | | | | |
| 10/05/17 | 13D/A (April 18, 2018) | | | (11,400) \| 235,960[62] | -0.20% \| **+4.34%** |
| 10/06/17 | 13D/A (April 18, 2018) | | | (10,000) \| 58,990 | **-0.18%** \| **+1.08%** |
| 10/09/17 | 13D/A (April 18, 2018) | | | (136,028) | **-2.50%** |
| 10/10/17[63] | 13D/A (April 18, 2018) | | | (66,529) | -0.98% |
| 10/11/17 | 13D/A (April 18, 2018) | | | (293,916) \| 634,112[64] | **-4.36%** \| **+9.42%** |
| 10/12/17 | 13D/A (April 18, 2018) | | | (41,600) | -0.61% |
| 10/17/17 | 13D/A (April 18, 2018) | | | (4,000) | -0.05% |
| 10/18/17 | 13D/A (April 18, 2018) | | | (3,088) | -0.04% |
| 10/19/17 | 13D/A (April 18, 2018) | | | (3,700) | -0.05% |
| 10/20/17 | 13D/A (April 18, 2018) | | | (45,000) | -0.66% |
| *97,388 shares sold between October 12 and 20, 2017 = **1.44%** of Riot's 6,730,272 shares outstanding* | | | | | |
| 11/07/17 | 13D/A (April 18, 2018) | | | (3,800) | -0.05% |
| 11/09/17 | 13D/A (April 18, 2018) | | | (800) | -0.01% |
| 11/10/17 | 13D/A (April 18, 2018) | | | (3,972) | -0.05% |
| 11/13/17 | 13D/A (April 18, 2018) | | | (9,500) | -0.11%[65] |
| 11/14/17 | 13D/A (April 18, 2018) | | | (5,000) | -0.06% |
| 11/15/17 | 13D/A (April 18, 2018) | | | (5,268) | -0.06% |
| 11/16/17 | 13D/A (April 18, 2018) | | | (61,000) | -0.73% |
| *89,340 shares sold between November 7 - 16, 2017 = **1.07%** of Riot's 8,321,137 shares outstanding* | | | | | |
| 11/17/17 | 13D/A (April 18, 2018) | | | (18,588) \| 1,500 | -0.22% \| +0.01% |
| 11/20/17 | 13D/A (April 18, 2018) | | | (262,293) | **-3.15%** |
| 11/21/17 | 13D/A (April 18, 2018) | | | (143,475) \| 202,050[66] | **-1.72%** \| **+2.42%** |
| 11/24/17 | 13D/A (April 18, 2018) | | | (266,940) | **-3.20%** |
| 11/28/17 | 13D/A (April 18, 2018) | | | (88,000) | **-1.05%** |
| 11/29/17 | 13D/A (April 18, 2018) | | | 15,000 \| (45,835) | +0.18% \| -0.55% |
| 11/30/17 | 13D/A (April 18, 2018) | | | (5,752) | -0.06% |

---

[61] Based on 5,436,503 shares outstanding as of September 20, 2017 (Sept. 25, 2017 S-3/A).

[62] "Represents shares of Common Stock acquired from the Issuer upon exercise of [Honig's] March 2017 Warrants at an exercise price of $3.56 per share" (Apr. 18, 2018 Sched. 13D/A).

[63] Based on 6,730,272 shares outstanding as of October 10, 2017 (Oct. 13, 2017 Sched. 13G).

[64] "Represents [128,988] shares of Common Stock acquired from [Riot] upon exercise of [Honig's] March 2017 Warrants at an exercise price of $3.56 per share" and "[505,124] shares of Common Stock acquired from [Riot] upon conversion of [Honig's] Series A Preferred Shares at a conversion price of $2.50 per share" (Apr. 18, 2018 Sched. 13D/A).

[65] Based on 8,321,137 shares outstanding as of November 13, 2017 (Nov. 13, 2017 10-Q).

[66] "Represents shares of Common Stock acquired from the Issuer upon conversion of [Barry Honig's] Series A Preferred Shares at a conversion price of $2.50 per share" (Apr. 18, 2018 13D/A).

140

317.    As set forth in the above chart, between January 4 and June 8, 2017, Honig sold 61,672 shares of Riot common stock in 16 separate transactions, which together constituted 1.14% of Riot's 5,371,185 shares outstanding as of June 5, 2017.  Between June 12 and October 4, 2017, Honig sold a further 86,187 shares in another 16 transactions, amounting to 1.58% of the Company's outstanding shares during that time period.  Yet Honig did not disclose any of these dozens sales to the market as required by Section 13(d) and Rule 13d-2(a).  Thereafter, Honig continued to sell even more stock.  Specifically, when the Company (through O'Rourke as its new CEO) announced on October 4, 2017, that it was changing its name to "Riot Blockchain," Honig's undisclosed transactions in Riot's stock skyrocketed.  For example, on the following days, Honig transacted in more than one percent of Riot's outstanding shares of common stock:

- Jan. 4 - June 8, 2017 – sales of 61,672 shares (*1.14% disposition*);
- June 12 – Oct, 4, 2017 – sales of 86,187 shares (*1.58% disposition*);
- Oct. 5, 2017 – purchases of 235,960 shares (*4.34 % acquisition* );[67]
- Oct. 6, 2017 – purchases of 58,990 shares (*1.08% acquisition*);
- Oct. 9, 2017 – sales of 136,028 shares (*2.50 % disposition* );
- Oct. 11, 2017 – sales of 293,916 shares (*4.36% disposition* );
- Oct. 11, 2017 – purchases of 634,112 shares (*9.42% acquisition*);[68]
- Nov. 7-16, 2017 – sales of 89,340 shares (*1.07% disposition*);
- Nov. 20, 2017 – sales of 262,293 shares (*3.15% disposition*);
- Nov. 21, 2017 – sales of 143,475 shares (*1.72% disposition*);
- Nov. 21, 2017 – sales of 202,050 shares (*2.42%% acquisition*);
- Nov. 24, 2017 – sales of 266,940 shares (*3.20% disposition*); and
- Nov. 28, 2017 – saless of 88,000 shares (*1.05% disposition*).

> **Formatted:** Font: Not Bold, Not Italic

---

[67] Honig's purchases occurred at below market prices by exercising warrants that he obtained from the Company in an agreement on March 15, 2017, which he failed to disclose on a Schedule 13D/A.  For example, on October 5, 2017, Honig purchased 235,960 shares at $3.56 per share and sold 11,400 shares at $7.47 per share.

[68] Similarly, Honig's sales on October 11, 2017, were accomplished by exercising warrants at $3.56 per share and converting notes at $2.50 per share.  Riot's public shareholders had no way to know that this substantially increased daily trading volume was a 10%+ inside shareholder exercising warrants and notes at below market prices because Honig never disclosed his warrants, or notes, or even his trades – all in violation of Section 13(d) (and in violation of Section 16(a)).

318.   The market did not learn about Honig's sales until January 31, 2018, when *The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."[69]  The article stated that **"Mr. Honig has sold about 500,000 shares, he said, but declined to divulge his profit.  He said he still owns about 1% of the company."**  "'When stock goes up, you take a profit,' [Honig] said."

319.   As a result of this revelation by *The Wall Street Journal* of Honig's previously undisclosed massive (and nearly complete) divestment of his shares of Riot stock (and other revelations of Honig's role as an insider in the Company's transformation and affairs and dubious history as a penny stock investor), the Company's stock price fell from an opening price of $14.50 per share on January 31, 2018, to close at $13.75 that same day, a decline of $0.75, or *more than 5%.*[70]

320.   In a February 16, 2018 interview with CNBC, former SEC Chairman Harvey Pitt stated that the length of time it Honig took to disclose his stock positions was not what he would consider to be "timely" disclosure.  Former Chairman Pitt said:  "Timely is, particularly if you have a critical position with the company or have already been disclosed as an owner, you're supposed to file updates promptly, and certainly not longer than ten days at the most, so I think there is a serious problem with someone who is already over the threshold, not keeping current with his stock position movements."[71]

---

[69] Ianthe Jeanne Dugan, *Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake; Barry Honig pares back stake in Riot Blockchain, whose shares soared last year after a change of name*, The Wall Street Journal (Jan. 31, 2018).

[70] In contrast, on the same day that Riot's stock price was falling, January 31, 2018, the price of Bitcoin *increased* $112.90 (approximately 1.1%) from opening at $10,108.20 to closing at $10,221.10.

[71] Specifically, former-Chairman Pitt stated, "Timely is, particularly if you have a critical position with the company or have already been disclosed as an owner, you're supposed to file updates

142

783086.1

321.   *Third*, as a Riot shareholder with more than 10% of the Company's outstanding shares, Honig violated his obligations under Exchange Act Section 16(a) and Rules 16a-2 and 16a-3 [17 C.F.R. § 240.16a-2 and 240.16a-2] to file Forms 4 by the end of the second business day following any day on which he transacted in Riot's common stock.  Indeed, Honig did file two Forms 4 on December 2, 2016, and January 4, 2017, but after that never filed another Form 4, despite the fact that Riot's April 27, 2017 Form 10-K/A stated that Honig was a 11.20% shareholder as of April 20, and despite the fact that Honig's April 18, 2018 Schedule 13D/A revealed that Honig had trading in Riot's common stock on March 29, March 31, April 5, April 13, April 14, and April 18, 2017.  By not disclosing these trades within two business days, Honig clearly violated Section 16(a) and the rules thereunder.

322.   *Fourth*, Honig's January 5, 2017 Schedule 13D/A stated:

**Item 6.  Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer**

**A.   ~~Other~~ April 20, 2017 – Securities Registration Statement (Form S-3/A)**

~~On April 20, 2017 Bioptix filed a Form S-3/A~~than as described herein, there are no contracts, arrangements, understandings or relationships (legal or otherwise) between the Reporting Person and any other person with respect to the shares.

323.   This disclosure was materially false and misleading for at least two reasons.  First, Honig failed to disclose his agreement – whether express or tacit – with the Honig Group and Selling Stockholders[72] – to to acquire, hold, vote, and/or dispose of shares they acquired in Riot in

---

promptly, and certainly not longer than 10 days at the most," Pitt said.  *See* CNBC, Former SEC chair on market manipulation and regulating cryptocurrency, available at https://www.cnbc.com/video/2018/02/16/former-sec-chair-on-market-manipulation-and-regulating-cryptocurrency.html.  *See also*  https://www.sec.gov/fast-answers/answerssched 13htm.html ("Any material changes in the facts contained in the [Schedule 13D] require a prompt amendment.").

[72] Such groups are "deemed a 'person' for purposes of [Section 13(d)]."  15 U.S.C § 78m(d)(2).

143

coordination with one another while knowingly or recklessly obtaining and exercising undisclosed control of the management and policies of Riot and while selling shares of Riot into the market at artificially inflated prices.  Second, "a Schedule 13D reporting person [is] required to file an amended Schedule 13D if it acquires warrants from an issuer," even if "not exercisable for six months" and must disclose the warrants in its "Item 6 (contracts) disclosures and file the warrant agreement as an exhibit pursuant to Item 7 of Schedule 13D."[73]  Here, Honig has effectively admitted, in his April 18, 2018 Schedule 13D/A, that the "first date of event which required the filing of an amendment to the Schedule 13D after Amendment No. 5 (Honig's previous January 5, 2017 Schedule 13D/A) was March 15, 2017, which was the date of the March 15, 2017 Private Placement in which Riot entered into agreements with Honig to sell Honig warrants and notes to purchase up to 700,000 shares of common stock.  Yet, Honig did not disclose this agreement until April 18, 2018.  Instead, Honig's January 5, 2017 Schedule 13D/A remained operative and informed investors that "there are no contracts, arrangements, understandings or relationships (legal or otherwise) between the Reporting Person and any other person with respect to the shares."  Thus, in addition to violating his obligations to amend his Schedule 13D/A to disclose his material acquisitions and dispositions of Riot's common stock, Honig further violated Section 13(d) by failing to disclose the March 2017 Private Placement, and affirmatively disavowing that he had any "understandings or relationships" with respect to Riot's common stock when in fact he was operating a fraudulent pump-and-dump scheme with the other members of the Honig Group, and the wider group of Selling Stockholders.

---

[73]  See https://www.sec.gov/divisions/corpfin/guidance/reg13d-interp.htm  ("Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting").

783086.1

## 2.     Groussman's Beneficial Ownership Reports on Schedule 13G Were Materially False, Misleading, Deficient, and Untimely

324.    During the Class Period, Defendant Groussman improperly made Schedule 13G filings that falsely represented him as a passive investor in violation of Rule 13d-1(c) and failed to disclose his membership in a "group" (i.e., the Honig Group) as required by Section 13(d)(3) and Rules 13d-2, 13d-5,[74] and 13d-101.[75]

325.    Because they acted in concert to control the management and policies of Riot and pursuant to an agreement to acquire, hold, vote, and/or dispose of Riot shares in coordination with one another, each of Honig, O'Rourke, Groussman, and Stetson were each members of a group that was considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of that group and disclosing the number of shares each of them beneficially owned.  However, Groussman never made a Schedule 13D filing disclosing his membership in a group, thus further concealing from the market the size of the Honig Group's position and coordination and thereby deceiving Riot's public investors.

326.    Not only did Groussman fail to disclose that he was investing in a group, but he also failed to file a Schedule 13D at all, instead filing only a Schedule 13G, which is reserved only for "passive" investors – which he did not qualify to do under Rule 13d-1(c).  Specifically, on

---

[74] *See* 17 C.F.R § 240.13d-5(b)(1) ("When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the ***group*** formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.") (emphasis added).

[75] *See* 17 C.F.R § 240.13d-101 ("Item 5.   Interest in Securities of the Issuer") ("The above information should also be furnished with respect to persons who, together with any of the persons named in Item 2, ***comprise a group within the meaning of section 13(d)(3) of the Act*** . . . .") (emphasis added).

October 13, 2017, Groussman filed a Schedule 13G reporting that he held 399,202 shares of Riot common stock constituting "5.93%" of shares "outstanding as of October 10, 2017." Groussman's 13G checked a box indicating that it was filed pursuant to "Rule 13d-1(c)," which is the rule allowing a Schedule 13G to be filed in lieu of a Schedule 13D provided that the person "[h]as not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect . . . ." 17. C.F.R. § 204.13d-1(c).

327.   Groussman's October 13, 2017 Schedule 13G/A also stated, above his signature, that "I certify certify that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect."

328.   In signing the Schedule 13G/As Groussman falsely identified himself as a passive 13G investor without any intention to influence or control the Company, and omitted that he was a member of a group – and not only a member of a group holding more than 5% of the Company's stock, but an undisclosed control group affiliated with O'Rourke as CEO.

329.   Similarly, on February 15, 2018, Groussman filed a Schedule 13G/A (Amendment No. 1). Groussman's 13G/A indicated that as of "December 31, 2017," he had held 188,888 shares of Riot's common stock constituting "1.62%" of shares "outstanding as of December 31, 2017." As before, Groussman's signed the Schedule 13G/A and checked the box indicating that it was filed pursuant to "Rule 13d-1(c)," and "certif[ied] that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect

146

of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect."

330.    The chart below details Groussman's reported holdings, together with the Company's own reports of his holdings on Schedules 13G and 13G/A, and calculates the changes in his holdings as a percentage of Riot's most recently reported shares of common stock outstanding.

| MARK GROUSSMAN | | | | |
| FILING DATE (EVENT DATE) | SCHEDULE/FORM (SHARES OUTSTANDING) | SHARES HELD | % OF ALL SHARES | % CHANGE |
| --- | --- | --- | --- | --- |
| 04/20/17 | S-3 (4,903,971 as of 03/31) | 500,000 | 9.04 % | N/A |
| 07/19/17 | S-3/A (5,392,503 as of 07/14) | 500,000 | 9.05 % | 0 |
| 08/24/17 | S-3/A (5,403,919 as of 08/21) | 500,000 | 9.05 % | 0 |
| 09/25/17 | S-3/A (5,436,503 as of 09/20) | 500,000 | 8.98 % | 0 |
| 10/13/17 (10/10/17) | 13G (6,730,272 as of 10/10) | 399,202 | 5.93 % | - 1.49 % |
| 01/05/18 (12/28/17) | S-3 (11,622,112 as of 01/04) | 131,945 | 1.13 % | - 2.29 % |
| 02/15/18 (12/31/17) | 13G/A (11,622,112 as of 12/31/17) | 188,888 | 1.62 % | 0.48 % |

331.    As shown above, between at least April 20, 2017 and September 25, 2017, Groussman held 500,000 shares of Riot common stock, representing approximately 9% of the Company's total outstanding shares, making Groussman one of the Company's largest

147

shareholders.  Yet, during that time, Groussman never filed any report of his beneficial ownership on either Schedule 13G or 13D as required by Section 13(d) and Rule 13d-1.

332.   On October 13, 2017 (after the Company had changed its name to "Riot Blockchain" and issued a flurry of announcements about its new strategy and strategic transactions, including Coinsquare on October 2, 2017, which Groussman was an undisclosed party to a contract with Riot), Groussman finally filed a Schedule 13G disclosing that he held 399,202 of Riot stock.  But by this time, Groussman had already sold 100,798 shares of his initial 500,000 shares, which amounted to 1.49% of Riot's total outstanding common stock.

333.   Thus, Groussman should have not only already filed a Schedule 13D disclosing his original 500,000 shares, but he should have "promptly" informed investors when he sold the 100,798 as required by Rule 13d-2(a) (requiring persons to "promptly" disclose "any material increase or decrease in the percentage of the class beneficially owned" and stating that the "acquisition or disposition" of "one percent or more of the class of securities shall be deem 'material' for purposes of this section").  However, because the October 13, 2017 Schedule 13G was Groussman's first report, it is impossible to know when he sold the 100,798 shares and whether that material sale of Riot stock was reported "promptly."

334.   It is clear, however, that Groussman's subsequent sales 267,257 shares of Riot stock (representing 2.29% of Riot's total outstanding shares) between October 13, 2017, and January 5, 2018 were *not* promptly reported as required by Rule 13d-2(a).  Instead, Groussman waited until February 15, 2018 to disclose that his stake in Riot (last reported on October 13, 2017 as 5.93 % had dropped to 1.62 %.[76]  By waiting to disclose his reduced beneficial ownership *at least 49 days*

---

[76] Groussman may argue that he was allowed to file on February 15 by Rule 13d-2(b), which permits amendment of a Schedule 13G "[45] days after the end of the calendar year" but this rule

(since December 28, 2017) and likely much longer (assuming at least some of his sales occurred, like Honig's sales, in October and November 2017), Groussman violated Section 13(d) and facilitated the Honig Group's pump-and-dump scheme by concealing his stock sales from the market.

### 3. DeFrancesco's Beneficial Ownership Reports on Schedule 13D Were Materially False, Misleading, Deficient, and Untimely

335. During the Class Period, Defendant DeFrancesco facilitated and concealed the Honig Group's pump-and-dump scheme at Riot through material misrepresentations and omissions on Schedule 13D, and her amendments thereto on Schedule 13D/A, which violated not only DeFrancesco's duties under Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)], but also violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

336. DeFrancesco filed her initial Schedule 13D on September 12, 2016, reporting holding 7.49% of Riot's common stock as of September 2, 2016. DeFrancesco later filed amended Schedule 13D/As, reporting her percentage holdings of Riot's common stock up until January 10, 2017, when she reported owning 515,777 shares representing 11.45 % of Riot's outstanding common stock. From January 10, 2017 to the present day, DeFrancesco has, inexplicably, never again reported her holdings of Riot common stock.

---

only applies to persons who qualify to file a Schedule 13G because they are "passive" investors under Rule 13d-1(c). As noted above, however, Groussman was not a "passive" investor but a member of the Honig Group. Like Honig and DeFrancesco, Groussman was required to file a Schedule 13D and abide by the requirements for all 13D filers. Like Honig and DeFrancesco, Groussman failed to comply.

783086.1

337.    The chart below details DeFrancesco's reported holdings, together with the Company's own reports of her holdings, and calculates change in her holdings as a percentage of Riot's most recently reported shares of common stock outstanding.

| CATHERINE DEFRANCESCO | | | | |
|---|---|---|---|---|
| **FILING DATE (EVENT DATE)** | **SCHEDULE/FORM (SHARES OUTSTANDING)** | **SHARES HELD** | **% OF ALL SHARES** | **% CHANGE** |
| 09/12/16 (9/02/16) | 13D (3,876,961 as of 8/10) | 290,404 | 7.49 % | NA |
| 09/14/16 (09/13/16) | 13D/A (3,876,961 as of 8/10) | 341,176[77] | 8.80 % | 1.30 % |
| 09/20/16 (09/20/16) | 13D/A (3,876,961 as of 8/10) | 341,176[78] | 8.80 % | 0 |
| 10/07/16 | PRE 14A (4,503,971 as of 09/30) | 341,176[79] | 7.60 % | 0 |
| 10/17/16 | DEF 14A (4,503,971 as of 09/30) | 341,176[80] | 7.60 % | 0 |
| 10/20/16 (10/18/16) | 13D/A (3,876,961 as of 8/10) | 362,835 | 9.36 % | 0.55 % |
| 10/25/16 (10/25/16) | 13D/A (3,876,961 as of 8/10) | 364,435 | 9.40 % | 0.04 % |
| 12/05/16 (11/30/16) | 13D/A (4,503,971 as of 11/11) | 470,676 | 10.45 % | 2.35 % |
| 12/09/16 (12/07/16) | 13D/A (4,503,971 as of 11/11) | 475,777 | 10.56 % | 0.11 % |
| 12/13/16 | 13D/A | 478,277 | 10.62 % | 0.05 % |

---

[77] States that DeFrancesco's 341,176 shares "is based upon holdings reported on Schedule 13D filing and amendments, the most recent filed on September 20, 2016."

[78] *Id.*

[79] *Id.*

[80] *Id.*

150

| CATHERINE DEFRANCESCO | | | | |
|---|---|---|---|---|
| **FILING DATE (EVENT DATE)** | **SCHEDULE/FORM (SHARES OUTSTANDING)** | **SHARES HELD** | **% OF ALL SHARES** | **% CHANGE** |
| (12/09/16) | (4,503,971 as of 11/11) | | | |
| 01/10/17 (01/05/17) | 13D/A (4,503,971 as of 11/11) | 515,777 | 11.45 % | 0.83 % |
| 04/27/17 | 10-K/A (4,903,971 as of 04/20) | 515,777[81] | 11.5 %[82] | 0 |
| 04/28/17 | PRE14A (4,903,971 as of 04/20) | 515,777[83] | 11.5 %[84] | 0 |
| 06/06/17 | PRER14A (5,371,179 as of 06/05) | 515,777[85] | 9.60 %[86] | 0 |
| 06/28/17 | PRER14A (5,371,179 as of 06/05) | 515,777[87] | 9.60 %[88] | 0 |
| 06/29/17 | PRER14A (5,371,179 as of 06/05) | 515,777[89] | 9.60 %[90] | 0 |
| 07/10/17 | DEF 14A (5,371,170 as of 07/03) | 515,777[91] | 9.60 %[92] | 0 |

---

[81] States that DeFrancesco's 515,777 shares "is based upon holdings reported on Schedule 13D filing and amendments, the most recent filed on January 10, 2017."

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Id.*

151

783086.1

| CATHERINE DEFRANCESCO | | | | |
|---|---|---|---|---|
| **FILING DATE (EVENT DATE)** | **SCHEDULE/FORM (SHARES OUTSTANDING)** | **SHARES HELD** | **% OF ALL SHARES** | **% CHANGE** |
| 01/05/18 (12/28/17) | S-3 (11,622,112 as of 01/04) | 155,904 | 1.3 % | - 3.09 % |
| 02/07/18 (02/05/18) | S-3/A (11,652,270 as of 02/05) | 155,904 | 1.3 % | 0 |

338.    As shown above, in each of her nine Schedule 13D or 13/D filings, DeFrancesco reported holding an increasing stake in the Company's outstanding shares of common stock.

339.    Yet, after filing her January 10, 2017 Schedule 13D/A, and reporting her 11.45% stake in Riot, DeFrancesco never filed another disclosure, despite having reported that she was a Riot major *10%+* shareholder (and thus insider) to report her subsequent holdings – or subsequent stock sales – to the market.[93]

340.    Although DeFrancesco never filed a Schedule 13D/A after January 10, 2017, she appears to have sold nearly all of her stake in Riot stock between January 10, 2017 and December 28, 2017.  Specifically, on January 5, 2018, Riot filed a Form S-3 reporting that as of December 28, 2017, DeFrancesco had only held 139,904 shares of Riot stock representing only 1.20 of Riot's outstanding shares.  Thus, between January 10, 2017, and December 28, 2017, DeFrancesco sold 375,873 shares of Riot stock, representing 3.22% of the Company's overall shares of common

---

[93] In addition, as a Riot shareholder with more than 10% of the Company's outstanding shares, DeFrancesco violated her obligations under Exchange Act Section 16(a) and Rules 16a-2 and 16a-3 [17 C.F.R. § 240.16a-2 and 240.16a-2] to file Forms 3 and 4 and to file an updated Form 4 within the end of the second business day following any day on which she transacted in Riot's common stock.

783086.1

stock,[94] without ever disclosing to the market her highly material change in beneficial ownership of Riot stock (which she had last reported as 11.45%).  By failing to ever amend her January 10, 2017 Schedule 13D/A, DeFransco violated required by Section 13(d) and Rule 13d-1(a), but more importantly, actively facilitated the Honig Group's pump-and-dump scheme by denying material information to the Company's public investors she and others in Honig Group sold their shares into the market.  In sum, by violating her disclosure obligations under the federal securities laws, while engaging in manipulative trading, DeFrancesco violated Section 10(b) and Rule 10b-5.

### 4.    Stetson Failed to File Beneficial Ownership Reports with the SEC Despite Co-Investing Alongside the Undisclosed Honig Group

341.    Because Defendant Stetson acted in concert with Honig, O'Rourke, and Groussman, to control the management and policies of Riot and pursuant to an agreement to acquire, hold, vote, and/or dispose of Riot shares in coordination with one another, each of them were each members of a group that was considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of that group and disclosing the number of shares each of them beneficially owned.  However, Stetson never made a Schedule 13D filing disclosing his membership in a group, thereby concealing from the market the size of their group's position and their coordination and thereby deceiving investors.

342.    Each of Riot's April 20, July 19, August 24, and September 25, 2017 Forms S-3/A identified Stetson Capital as holding 4.99% of Riot's common stock before each of those four offerings.  Specifically, Stetson's reported shares on each date were April 20 (283,400) July 19

---

[94] This percentage is highly conservative because it uses as its denominator the 11,622,112 shares of Riot common stock outstanding as of January 4, 2018.  In contrast, when DeFrancesco last reported her 11.45% stake in Riot stock, the Company had last reported having 4,503,971 as of November 11, 2016.

153

(283,300), August 24 (283,300), and September 25 (285,150).   By purportedly keeping his holdings below 4.99%, Stetson appeared to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings.  In other words, by ostensibly staying close to but immediately below the 5% ownership threshold, and evading the public reporting requirements, Stetson increased the likelihood that he and his associates (including Honig, DeFrancesco, and Groussman) could conceal the millions of shares that they had amassed and thereby mask their scheme to pump up Riot's share price and trading volume in anticipation of a profitable sell-off to unsuspecting investors.

343.   Structuring his shareholding in this manner was itself misleading, however, because as a member of a group, Stetson himself was required (under Section 13(d)(3) and Rules 13d-2, 13d-5, and 13d-101) to file a Schedule 13D identifying himself a group member.  Yet, Stetson never made any filing under Schedule 13G or 13D as a Riot stockholder.  Because Stetson never filed a Schedule 13D or amended 13D/A, Riot's public investors were not notified when, as a group member, Stetson sold his shares into the market during the group's pump-and-dump scheme.

**B.   Defendants' Materially False and Statements and Omissions Regarding the Company's Beneficial Ownership and Related-Party Transactions**

344.   As discussed above in § IX.A, similar beneficial ownership obligations as those imposed on stockholders (such as Honig, DeFrancesco Groussman, and Stetson) are also imposed on issuers (such as Riot) pursuant to Section 13(a) and Item 403 of Regulation S-K.  In violation of these obligations, Honig, O'Rourke, Groussman, Stetson, and DeFrancesco knowingly and/or recklessly concealed their concerted "group" investment in Riot from the investing public.

345.   Likewise, O'Rourke and Beeghley, as Riot executives and/or Board members who signed Riot's SEC filings, had full knowledge of that Honig, DeFrancesco Groussman, and Stetson (together O'Rourke and Beeghley, and other affiliated "selling stockholders") were all acting in

<div align="center">154</div>

concert to coordinate their acquisition and voting of Riot stock, and to control the direction of the management and policies of Riot.   Yet, working from within the Company, O'Rourke and Beeghley kept the Honig Group's scheme to control Riot a secret by signing false and misleading public SEC filings that did not disclose that even the Honig Group constituted a "group" under Section 13(d)(3) and Item 403 of Regulation S-K, much less the full extent of the Honig Group's coordination control of Riot.

346.    As discussed below, during the Class Period, O'Rourke and Beeghley knowingly caused Riot to issue materially false and misleading Securities Registration Statements on Form S-3/A, Annual Reports on Form 10-K, and Proxy Statements on Form DEF 14A.  When the true facts about the Honig Group's connections and scheme to control Riot were revealed – including O'Rourke's role (while CEO of Riot) as a key member and collaborator of the Honig Group who had been taking directions from Honig himself – Riot's shareholders sustained substantial financial losses.

**1.        April 20, 2017 – Registration Statement (Form S-3/A)**

210.   On April 20, 2017 the Company filed a Form S-3/A, signed by Defendants O'Rourke and Beeghley, registering, for sale to the investing public, 5,657,161 shares of common to be sold by the followingcertain "Selling Stockholders":

783086.1

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.63% | 200,000 (1) | 0 | * |
| Andrew Schwartzberg | 549,800 (2) | 9.99% | 900,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.63% | 200,000 (3) | 0 | * |
| Melchdavid Inc. | 340,000 (4) | 6.10% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,860 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 596,400 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 598,100 (12) | 9.99% | 1,624,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.20% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,400 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |

\* Less than 1%.
\*\* Based on 4,903,971 shares of Common Stock outstanding as of April 14, 2017.

211. ~~—.~~" The Form S-3/A contained a "table" that purported to list "of April ~~2014,~~ 2017 S-3/A was signed by Defendants Beeghley, McGonegal, O'Rourke, and Dai and stated that "[n]one of . . . the *selling stockholders has* number of shares held *any position* of record or *office,* or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities."

212. The above statement in Bioptix's April 20, 2017 Form S-3/A was materially false and misleading when made because it states that "*none*" of the selling stockholders "*has had a material relationship*" with the Company when in fact, as explained herein, Defendant Honig and various members of the Honig Group maintained numerous financial ties to Defendant O'Rourke, a Bioptix Board member during this time, Defendant Beeghley, then Bioptix's CEO.

213.347. Additionally, according to the allegations in the *Honig* Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson and Groussman. This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, Florida, in February 2018 and instead found Defendant O'Rourke. These

156

~~and other personal and financial interests belie the statement that "none" of~~ beneficially by the

selling stockholders ~~in the April 20, 2017 S-3/A had a material relationship with the Company.   as~~

of such date" of Riot common stock, as the Form S-3/A was required to pursuant to Item 403 of

Regulation S-K.

~~Additionally, the April 20, 2017 S-3/A is materially false and misleading because it failed to~~

~~disclose                                that                                virtually            *all*~~

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.63% | 200,000 (1) | 0 | * |
| Andrew Schwartzberg | 549,800 (2) | 9.99% | 900,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.63% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.10% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,860 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 596,400 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 598,100 (12) | 9.99% | 1,624,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Atfos Capital LLC | 121,805 (17) | 2.20% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,400 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |

\*    Less than 1%.
\*\* Based on 4,903,971 shares of Common Stock outstanding as of April 14, 2017.

348.    As noted above (*see* § IX.A, *supra*) this disclosure was required by Exchange Act

Section 13(a) and Exchange Act Regulation S-K at Item 403, which requires issues to provide a

disclosure in "tabular form" of "any person (including any 'group' as that term in used in section

13(d)(3) of the Exchange Act) who is known to the registration to be the beneficial owner of more

than five percent of any class of the registrants voting securities."  17 C.F.R. § 229.403.

349.    The disclosures relating to the Selling Stockholders in the April 20, 2017 Form S-

3/A were materially false and misleading.  *First*, the April 20, 2017 Form S-3/A listed Defendants

Honig, Groussman, and Stetson (along with their related entities including GRQ 401K,

157

Melachdavid, Groussman's two UTMA funds, and Stetson Capital) as Selling Stockholders, but did not disclose, as required by Exchange Act Section 13(a) and Exchange Act Regulation S-K at Item 403, that Honig, Groussman, and Stetson constituted a "'group' as that terms is defined and used in Section 13(d)(3) of the Exchange Act."  17 C.F.R. § 229.403(a).  Specifically, although the S-3/A listed Honig as a 9.99% beneficial owner; Groussman (through Melachdavid and the two UTMA accounts) as a 9.04% beneficial owner; and Stetson (through Stetson Capital) as a 4.99% owner, it failed to disclose the combined group ownership of Honig, DeFrancesco, Groussman, and Stetson (or their entities) that formed the Honig Group.

350.   Similarly, the S-3/A misrepresented and omitted that Selling Stockholders Aifos, Titan, Molinksy, O'Braitis, Paradox (i.e., Honig's longtime lawyer, Kesner), and Stockwire were all previously affiliated with the Honig Group through investments in previous companies (*see* § X.B, *supra*) and through those prior investments and relationships, had in fact been selected and invited by the Honig Group to invest in Riot.

214.351.  *Second*, the majority (if not all) of the "selling stockholders" were members of listed in the Honig Group, April 20, 2017 Form S-3/A had invested together in multiple previous public companies, and were engaged in a common scheme and conspiracy to artificially inflate Riot's stock at the expense of other would-be public shareholders.  Altogether, this group of Honig-associated stockholders accounted for at least 55% of Riot's common stock[95] (and likely more)

---

[95] Specifically, the following April 20, 2017 Selling Stockholders (and their percentage of stock owned) were associates of Honig and members of the Honig Group:  Richardson (3.63%); Melechdavid (6.10%); Groussman (1.47% each in two UTMA funds for a total of 2.94%); Honig (9.99%); GRQ 401K (9.99%); Titan (9.99%); O'Braitis (1.48%); Stockwire (i.e., James) (0.75%); Aifos (i.e., Theofilos) (2.20%); Stetson Capital (i.e., Stetson) (4.99%); JAD (1.48%); and Molinsky (1.80%), and Policy No. 2013-17 (i.e., Bhansali) (0.75%).

without taking into count the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January 10, 2017.[96]

352.    *Third*, the Selling Stockholders operated as a centrally organized "control group" that coordinated their trades down to the single share.  In that regard, closer scrutiny of Riot's April-September 2017 Forms S-3/A reveals how various members of the Honig Group precisely coordinated shareholdings, resulting in implausibly coincidental numbers of shares these purportedly "unrelated" stockholders (and their investment entities) held.  For example, in the April 20, 2017 Form S-3/A, O'Braitis and JAD Capital (a corporation in Ontario owned by Theofilos, the CEO of MUNDOMedia Ltd., a company in which Defendant Honig, his brother, O'Rourke, Stetson, and Groussman each held shares, *both* reported beneficially owning "*81,204*" shares representing "*1.48%*" of the Company's common stock.  *Id.*

353.    *Fourth*, April 20, 2017 S-3/A further stated that "[u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law."  This disclosure was required by Exchange Act Section 13(a) and Exchange Act Regulation S-K at Item 403), which requires issuers to "[i]nclude such additional subcolumns or other appropriate explanation of column (3) [i.e., "Amount and Nature of Beneficial Ownership"] necessary to reflect amounts as to which the beneficial owner has (A) sole voting power, (B) shared voting power, (C) sole investment power, or (D) shared investment power."  17 C.F.R. § 229.403 (c)(2).  However, this statement in the April 20, 2017 S-3/A was materially false and misleading when made because that Honig, Groussman, Stetson, toegether with Aifos, Titan, Molinksy, O'Braitis, Paradox, and Stockwire were investing as a group and thereby and agreed,

---

[96] *See* Riot Blockchain, Inc., Amended Annual Report (Form 10-K/A) at 52 (Jun 29, 2018).

783086.1

either explicitly or implicitly, to share their voting and/or investment power with respect to Riot's common stock.

354.   *Fourth*, the April 20, 2017 S-3/A also stated that "[e]ach selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock." However, this statement in the April 20, 2017 S-3/A was similarly materially false and misleading when made because that Honig, Groussman, Stetson, toegether with Aifos, Titan, Molinksy, O'Braitis, Paradox, and Stockwire were investing as a group and thereby and agreed, either explicitly or implicitly, to share their voting and/or investment power with respect to Riot's common stock.

355.   As discussed above, O'Rourke and Beeghley knew, at a minimum, that Honig, Groussman, and Stetson were investing together as a group, but they signed the April 20, 2017 Form S-3/A without disclosing theses individuals collective beneficial ownership of Riot.

356.   Beeghley also knew that Honig, Groussman, Stetson, toegether with various Selling Stockholders – including at least Aifos, Titan, Molinksy, O'Braitis, Paradox, and Stockwire – were all previously affiliated because those same individuals and/or entities had all invested in PolarityTE when Beeghley was a Director of PolarityTE, a company of which that Honig had been Chairman and CEO and Stetson had been CFO. Thus, O'Rourke and Beeghley knew the S-3/A violated Section 13(d) and was materially false and misleading.

### ~~B.~~2.   April 27, 2017 – Annual Report (Form 10-K/A)

~~215.   On~~ Riot's 2016 Form 10-K, filed with the SEC on April 27, 2017, ~~Bioptix filed an Amended Annual report under Form 10-K/A. In a section of the Annual Report entitled, "Certain Relationships and Related Transactions and Director Independence" the report stated:~~

~~Except for the employment agreements previously entered into between the~~ and signed by O'Rourke and Beeghley contained a table that purported to "set[] forth the beneficial ownership of the Company's common stock as of April 20, 2017 by

> **Formatted:** Heading 4

each Company and certain of its named director, director nominee and each executive officer then serving, by all directors, director nominees and executive officers (as described in Item 11 above), since January 1, 2016, none of the directors or named executive officers of the Company, nor any as a group, and by each person who owned of record, or was known to own beneficially, more than 5% of the Company's outstanding shares of its Common Stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company.

216.357. common stock," as required by Item 403 of Regulation S-K. The above statement in Bioptix's April 27, 2017 Form 10-K/A was materially false and misleading when made because it states that "none" of the directors, officers, or any person owning 5% or more of the company's common stock has "any material interest, direct or indirect, in any transaction, or in any proposed transaction" when, in fact, as explained herein, Defendant Honig and various members of the Honig Group and Company insiders maintained numerous financial ties to Defendants O'Rourke, a Board member during this time, and Defendant Beegley, then Bioptix's CEO. table is below

217. Additionally, according to the allegations in the Honig Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson and Groussman. This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the Honig Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke. These and other personal and financial interests belie the statement in the April 27, 2017 10-K/A that "none" of the directors, officers, or any person owning 5% or more of the company's common stock has "any material interest, direct or indirect, in any transaction, or in any proposed transaction."

218. The April 27, 2017 10-K/A was signed by Defendants O'Rourke and McGonegal. Pursuant to §302 of SOX, and also covered by §§ 304 and 906 of SOX, Defendants O'Rourke and McGonegal certified that they had designed and evaluated effective internal and disclosure

161

controls over financial reporting, which assured the reliability of financial reporting, and also that

Riot's financial statements fairly and accurately presented the financial condition of the Company.

Those SOX certifications stated as follows:

1.   I have reviewed this quarterly report on Form 10-K of Bioptix, Inc.;

2.   Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

(c)   *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to

162

materially affect, the registrant's internal control over financial reporting; and

5. *The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)*:

(a) *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

(b) *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

219. Defendant Beeghley's and McGonegal's SOX certifications in ¶ 218 were false and misleading because, as explained in ¶ 217, the statement that "*none*" of the directors, officers, or any person owning 5% or more of the company's common stock has "*any material interest, direct or indirect, in any transaction, or in any proposed transaction*" was an untrue statement that only served to advance Defendants' common scheme and conspiracy to artificially inflate Riot's stock at the expense of other would-be public shareholders. Altogether, this group of Honig-associated stockholders accounted for at least 55% of Riot's common stock (and likely more) without taking into count the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January 10, 2017.

| Name and Address | Number of Shares | Percent |
|---|---|---|
| Directors: | | |
| Michael M. Beeghley (1) | 14,000 | * |
| John R. O'Rourke (2) | 29,133 | * |
| Mike Dai (3) | 3,333 | * |
| Other Executive Officers: | | |
| Jeffrey G. McGonegal (4) | 89,244 | 1.9% |
| Richard J. Whitcomb (5) | 20,405 | * |
| All Directors and Officers as a Group (5 persons) (6) | 156,115 | 3.4% |
| More than 5% Shareholders: | | |
| Barry C. Honig (7) | 504,000 | 11.2% |
| Catherine Johanna DeFrancesco (8) | 515,777 | 11.5% |
| E. Jeffrey Peierls (9) | 357,744 | 7.9% |

\* Holds less than 1%

163

358.   Although this table in Riot's April 27, 2017 Form 10-K disclosed Honig as a beneficial owner of 11.2% of Riot's outstanding common stock, and DeFrancesco as a beneficial owner of 11.5% of Riot's outstanding common stock, it failed to disclose the combined group ownership of Honig, DeFrancesco Groussman, and Stetson (and their entities). O'Rourke and Beeghley knew that Honig, DeFrancesco Groussman, and Stetson were working together as a group, but they failed to disclose in the Form 10-K the Honig Group's combined beneficial ownership of Riot's stock.

359.   Thus, Riot's Form 10-K concealed from Riot's public investors material information about the Honig Group's coordinated investment in Riot as a group as defined by Section 13(d)(3).  Such information is especially important to investors evaluating microcap issuers such as Riot, which are particularly susceptible to manipulation by undisclosed control persons.

360.   As discussed above, O'Rourke and Beeghley knew that Honig and DeFrancesco were investing with each others, with the other Honig Group members, and with various Selling Stockholders, which together constituted a group that required disclosure under Section 13(d).

### C.3.   July 19, 2017 – ~~Securities~~ Registration Statement (Form S-3/A)

~~220.~~361.   On July 19, 2017, Bioptix filed a Form S-3/A registering, for sale to the investing public, 5,657,161 shares of common to be sold by the following "Selling Stockholders":

Formatted: Heading 4

164

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northnest Inc. | 554,100 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 595,600 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 592,400 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Brarits | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | 0.19% | 20,000 (23) | 0 | * |

\* Less than 1%.
\*\* Based on 5,392,503 shares of Common Stock outstanding as of July 14, 2017.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northnest Inc. | 554,100 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 595,600 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 592,400 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Brarits | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | 0.19% | 20,000 (23) | 0 | * |

\* Less than 1%.
\*\* Based on 5,392,503 shares of Common Stock outstanding as of July 14, 2017.

221.362.  The July 19, 2017 Form S-3/A ~~was signed by Defendants Beeghley, McGonegal, O'Rourke, Dai, and Kaplan and~~ also stated that "[*n]one of the* u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law" and that "[e]ach selling ~~stockholders~~stockholder has

165

Formatted: Font: Not Bold, Not Italic
Formatted: Font: Not Bold, Not Italic
Formatted: Font: Not Bold, Not Italic
Formatted: Font: Not Bold, Not Italic
Formatted: Font: Not Bold, Not Italic
Formatted: Font: Not Bold, Not Italic

*held*informed us that it does not have any *position*written or *office,*oral agreement or *has otherwise had a material relationship, with us* understanding, directly or indirectly, with any *of our subsidiaries within the past three years other than as a result of*person to distribute the *ownership of our shares or other securities."*Common Stock."

222.   The above statementdisclosures relating to the Selling Stockholders in Bioptixthe July 19, 2017 Form S-3/A was, which was signed by Defendants O'Rourke and Beeghley, were materially false and misleading when made because it states that "*none*" of the selling stockholders "*has had a material relationship*" with the Company when in fact, as explained herein, Defendant Honig and various members offor the Honig Group maintained numerous financial ties to Defendant O'Rourke, a Bioptix Board member during this time, and Defendant Beegley, then Bioptix's CEO.

223.363.   Additionally, according to same reasons discussed above for the allegations in the *Honig* Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson and Groussman.  This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke.  These and other personal and financial interests belie the statement that "none" of the selling stockholders in the July 19April 20, 2017 Form S-3/A had a material relationship with the Company.   .

224.364.   Additionally, theThe July 19, 2017 S-3/A iswas also materially false and misleading because – like the April 20, 2017 Form S-3 – it failed to disclose that virtuallythe

Formatted: Font: Not Bold, Not Italic

majority (if not all) of the "selling stockholders" were members of the Honig Group, had invested together in multiple previous public companies, and were engaged in a common scheme and

783086.1

conspiracy to artificially inflate Riot's stock at the expense of other would-be public shareholders. Altogether, this group of Honig-associated stockholders accounted for at least 55% of Riot's common stock[97] (and likely more) without taking into count the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January 10, 2017.

365.   August 24, 2017   Securities*Indeed, the Selling Stockholders operated as a centrally organized "control group" that coordinated their trades down to the single share.   For example, in the July 19, 2017 Form S-3/A, O'Braitis and Aifos **both** reported beneficially owning "**40,602**" shares representing "**0.75%**" of the Company's common stock.  ¶ 220.  Similarly, in the August 24, 2017 Form S-3/A, Stockwire, ¶ 72 (a Florida corporation owned by James, ¶ 51, a stock promoter who has touted various Honig-backed companies including Pershing Gold, MusclePharm Inc. (the parent of Biozone), and Valor Gold Corp.) and "Policy No. 2013-17," ¶ 77, **both reported owning "40,602**" shares representing "**[l]ess than 1%**" of the Company's common stock.  ¶ 220.*

### ~~D.~~4.   August 24, 2017 ~~–~~ Registration Statement (Form S-3/A)

Formatted: Heading 4

~~225.~~366.   On August 24, 2017, Bioptix filed a Form S-3/A registering, for sale to the investing public, 5,657,161 shares of common to be sold by the following "Selling Stockholders":

---

[97] Specifically, the following July 19, 2017 Selling Stockholders (and their percentage of stock owned) were associates of Honig and members of the Honig Group:  Richardson (3.64%); Melechdavid (6.11%); Groussman (1.47% each in two UTMA funds for a total of 2.94%); Honig (9.99%); GRQ 401K (9.99%); Titan (9.99%); O'Braitis (1.48%); Northurst (9.99%); Stockwire (i.e., James) (0.~~75~~73%); Aifos (i.e., Theofilos) (2.20%); Stetson Capital (i.e., Stetson) (4.99%); and JAD (1.~~48~~46%); Molinsky (1.~~80%); and Policy No. 2013-19 (i.e., Bhansali) (~0.7~~78%).

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,400 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northeast Inc. | 555,400 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600 (10) | * | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 593,650 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | * | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | * | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | * | 20,000 (23) | 0 | * |

\* Less than 1%.
\*\* Based on 5,403,919 shares of Common Stock outstanding as of August 21, 2017.

226.367.  The August 24, 2017 Form S-3/A was signed by Defendants Beeghley, McGonegal, O'Rourke, Dai and Kaplan and also stated that "[n]one of the unless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law" and that "[e]ach selling stockholders stockholder has held informed us that it does not have any position written or office, oral agreement or has otherwise had a material relationship, with us understanding, directly or indirectly, with any of our subsidiaries within the past thee years other than as a result of person to distribute the ownership of our shares or other securities." Common Stock."

227.  The above statement disclosures relating to the Selling Stockholders in Bioptix's the August 24, 2017 Form S-3/A was , which was signed by Defendants O'Rourke and Beeghley, were materially false and misleading when made because it states that "none" of the selling stockholders "has had a material relationship" with the Company when in fact, as explained herein, Defendant Honig and various members of for the Honig Group maintained numerous

783086.1

~~financial ties to Defendant O'Rourke, a Bioptix Board member during this time, and Defendant~~
~~Beegley, then Bioptix's CEO.~~

~~228.   Additionally, according to~~ same reasons discussed above for the ~~allegations in the~~
~~*Honig* Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson and~~
~~Groussman.  This highly unusual arrangement between a Company insider and outside shareholder~~
~~was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted~~
~~to interview Defendant Honig at this office in Boca Raton, FL in February 2018 and instead found~~
~~Defendant O'Rourke.  These and other personal and financial interests belie the statement that~~
~~"none" of the selling stockholders in the August 24~~April 20, 2017 Form ~~S-3/A~~ ~~had a material~~
~~relationship with the Company.~~

~~229.~~368.   ~~The August 24~~and July 19, 2017 Form ~~S-3/A~~ ~~is also materially false and~~
~~misleading because it failed to disclose that virtually *all* of the "selling stockholders" were~~
~~members of the Honig Group, had invested together in multiple previous public companies, and~~
~~were engaged in a common scheme and conspiracy to artificially inflate Riot's stock at the expense~~
~~of other would be public shareholders.  Altogether, this group of Honig-associated stockholders~~
~~accounted for at least 55% of Riot's common stock[98] (and likely more) without taking into count~~
~~the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as of January~~
~~10, 2017.~~.

---

~~[98] Specifically, the following April 20, 2017 Selling Stockholders (and their percentage of stock~~
~~owned) were associates of Honig and members of the Honig Group:  Eric Richardson (3.63%);~~
~~Melechdavid, Inc. (6.10%); Mark Groussman (1.47% each in two UTMA funds for a total of~~
~~2.94%); Honig (9.99%); GRQ Consultants, Inc. Roth 401K FBO Barry Honig (9.99%); Titan~~
~~Multi-Strategy Fund I, Ltd. (9.99%); Robert O'Braitis (1.48%); Stockwire Research Group (i.e.,~~
~~James) (0.75%); Aifos Capital Management, LLC (i.e., Theofilos) (2.20%); Stetson Capital~~
~~Management, LLC (i.e., Stetson) (4.99%); JAD Capital Inc. (1.48%); and Richard Molinsky~~
~~(1.80%).~~

169

783086.1

#### E.5.    September 25, 2017 ~~Securities~~ Registration Statement (Form S-3/A)

Formatted: Heading 4

~~230.~~369.    On September 25, 2017 Bioptix filed a Form S-3/A registering, for sale to the

investing public, 5,677,102 shares of common to be sold by the following "Selling Stockholders":

Formatted: Right: 0"

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000(1) | 3.61% | 200,000(1) | 0 | * |
| Northurst Inc. | 559,000(2) | 9.99% | 800,000(2) | 0 | * |
| Erick Richardson | 200,000(3) | 3.61% | 200,000(3) | 0 | * |
| Melechdavid Inc. | 340,000(4) | 6.06% | 340,000(4) | 0 | * |
| Mark Groussman c/f Alivia Grossman UTMA/FL | 80,000(5) | 1.46% | 80,000(5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000(6) | 1.46% | 80,000(6) | 0 | * |
| Barry Honig | 544,400(7) | 9.99% | 402,050(8) | 504,000(9) | 8.09% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600(10) | * | 1,005,124(11) | 30,600 | * |
| Titan Multi-Strategy Fund L Ltd. | 597,300(12) | 9.99% | 1,688,198(13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,205(14) | * | 40,205(14) | 0 | * |
| Robert R. O'Beirits | 80,410(15) | 1.46% | 80,410(15) | 0 | * |
| Stockwire Research Group, Inc. | 40,205(16) | * | 40,205(16) | 0 | * |
| Aifos Capital LLC | 120,615(17) | 2.17% | 120,615(17) | 0 | * |
| Stetson Capital Management, LLC | 285,150(18) | 4.99% | 402,050(19) | 7,500 | * |
| JAD Capital Inc. | 80,410(20) | 1.46% | 80,410(20) | 0 | * |
| Richard Molinsky | 97,392(21) | 1.78% | 40,205(22) | 57,187 | 1.04% |
| Alan Honig | 20,000(23) | * | 20,000(23) | 0 | * |

\*    Less than 1%.
\*\*    Based on 5,436,503 shares of Common Stock outstanding as of September 20, 2017.

~~231.    The September 25, 2017 S-3/A was signed by Defendants Beeghley, McGonegal, O'Rourke, Dai, and Kaplan and stated that "*[n]one of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities.*"~~

~~232.    The above statement in Bioptix's September 25, 2017 Form S-3/A was materially false and misleading when made because it states that "*none*" of the selling stockholders "*has had a material relationship*" "*in the past three years*" with the Company when in fact Defendant Honig and various other selling stockholders, including Honig Group members Groussman and Stetson, as well as then current Bioptix board members O'Rourke, Kaplan and So, had *existing* financial ties to Bioptix by virtue of their undisclosed investment in Coinsquare.  As investors in~~

170

Coinsquare, Defendants Kaplan and So were parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement—an agreement in which Bioptix was also a party.

370.     In addition, The September 25, 2017 Form S-3/A also stated that "[u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law" and that "[e]ach selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock."

371.     The disclosures relating to the Selling Stockholders in the September 25, 2017 Form S-3/A, which was signed by Defendants O'Rourke and Beeghley, were materially false and misleading when made for the same reasons discussed above for the April 20, 2017 Form S-3/A.

233.     Additionally, the above statement in Bioptix's September 25, 2017 Form S-3/A was materially false and misleading when made because, according to the allegations in the Honig Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson and Groussman. This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the Honig Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, Florida, in February 2018 and instead found Defendant O'Rourke.

234.372.    The September 25, 2017 S-3/A is also materially false and misleading because it failed to disclose that virtually the majority (if not all) of the "selling stockholders" were members of the Honig Group had invested together in multiple previous public companies (see charts at ¶¶ 79-80), and were engaged in a common scheme and conspiracy to artificially inflate Riot's stock

171

at the expense of other would-be public shareholders.  Altogether, this group of Honig-associated

stockholders accounted for at least 55% of Riot's common stock[99] (and likely more) without taking

into count the approximately 11.45% of percent shares that Defendant DeFrancesco had owned as

of January 10, 2017.

373.    Indeed, as in previous Forms S-3/A, the Selling Stockholders operated as a centrally

organized "control group" that coordinated their trades down to the single share.  For example, in

the September 25, 2017 Form S-3/A, O'Braitis and JAD Capital *both* reported beneficially owning

"*80,410*" shares representing "*1.46%*" of the Company's common stock.  And although Policy No.

2013-17 and Stockwire both sold all of their 40,602 shares in the August 24, 2017 Form S-3/A,

¶225, the September 25, 2017 Form S-3/A disclosed that these two "Selling Stockholders" had

returned and now both owned "*40,205*" shares representing "*[l]ess than 1%*" of the Company's

common stock, all of which they both planned to sell.

**6.    January 5, 2018 – Registration Statement (Form S-3)**

Formatted: Heading 4

374.    On January 5, 2018, after the close of trading on a Friday, leading into a weekend,

Riot filed a Securities Registration Statement on Form S-3 registering, for sale to the investing

public, 3,292,226 shares of common to be sold by the following "Selling Stockholders":

---

[99] Specifically, the following ~~April 20~~September 25, 2017 Selling Stockholders (and their percentage of stock owned) were associates of Honig and members of the Honig Group:  Northurst (9.99%);  Eric Richardson (3.63%); Melechdavid, Inc. (6.~~10~~06%); Mark Groussman (1.~~47~~46% each in two UTMA funds for a total of 2.94%); Honig (9.99%); ~~GRQ Consultants, Inc. Roth 401K FBO Barry Honig (9.99%);~~ Titan Multi-Strategy Fund I, Ltd. (9.99%); ~~Robert~~ O'Braitis (1.~~48~~46%); Stockwire ~~Research Group~~ (i.e., James) (0.75%); Aifos ~~Capital Management, LLC~~ (i.e., Theofilos) (2.~~20~~17%); Stetson Capital Management, LLC (i.e., Stetson) (4.99%); JAD Capital Inc. (1.48%); and Richard Molinsky (1.80%).

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| 2330573 Ontario Inc. | 96,444 (1) | * | 88,888 (33) | 52,000 | * |
| Acquisition Group Limited | 135,556 (2) | 1.16% | 71,112 (33) | 100,000 (34) | * |
| Armand Reale | 4,000 (3) | * | 8,000 (33) | - | * |
| Catherine DeFrancesco ITF Ava Defrancesco | 22,911 (4) | * | 7,112 (33) | 19,355 (35) | * |
| Catherine DeFrancesco ITF Devlin Defrancesco | 22,911 (5) | * | 7,112 (33) | 19,355 (36) | * |
| Catherine DeFrancesco ITF Lachlan Defrancesco | 22,911 (6) | * | 7,112 (33) | 19,355 (37) | * |
| Catherine DeFrancesco ITF Summer Defrancesco | 22,911 (7) | * | 7,112 (33) | 19,355 (38) | * |
| Clara Serruya | 266,667 (8) | 2.29% | 533,334 (33) | - | * |
| DeFrancesco Motorsports Inc. | 5,333 (9) | * | 10,666 (33) | - | * |
| Delavaco Holdings Inc. | 10,667 (10) | * | 21,334 (33) | - | * |
| Eduardo Vivas | 6,667 (11) | * | 13,334 (33) | - | * |
| First Canadian Insurance Corp | 14,000 (12) | * | 28,000 (33) | - | * |
| Glass Investments LP | 13,444 (13) | * | 26,888 (33) | - | * |
| Grander Holdings, Inc. 401K | 217,733 (14) | 1.86% | 266,666 (33) | 84,400 (39) | * |
| GRQ Consultants, Inc. | 22,222 (15) | * | 44,444 (33) | - | * |
| GT Capital Inc | 29,436 (16) | * | 26,666 (33) | 16,103 (40) | * |
| Hudson Bay Master Fund Ltd | 333,334 (17) | 2.87% | 666,668 (33) | - | * |
| Interward Capital Corp. | 4,000 (18) | * | 8,000 (33) | - | * |
| Intracoastal Capital LLC | 133,334 (19) | 1.15% | 266,668 (33) | - | * |
| LDIC Inc. ITF McGilligan Barry Investments Ltd. | 11,100 (20) | * | 22,200 (33) | - | * |
| Marcandy Investments Corp. | 5,333 (21) | * | 10,666 (33) | - | * |
| Monroe Capital, LLC | 22,000 (22) | * | 44,000 (33) | - | * |
| Melechdavid Inc. | 131,945 (23) | 1.13% | 88,890 (33) | 87,500 (41) | * |
| Michael Ference | 4,444 (24) | * | 8,888 (33) | - | * |
| Millennium Insurance Corp. | 7,000 (25) | * | 14,000 (33) | - | * |
| MMCAP International Inc. SPC | 366,667 (26) | 3.15% | 733,334 (33) | - | * |
| Namaste Gorgie, Inc. | 42,927 (27) | * | 21,334 (33) | 32,260 (42) | * |
| Northurst, Inc. | 589,317 (28) | 4.99% | 177,778 (33) | 593,996 (43) | 4.99% |
| Paradox Capital Partners LLC | 4,444 (29) | * | 8,888 (33) | - | * |
| Rockhaven Holdings Ltd. | 6,000 (30) | * | 12,000 (33) | - | * |
| Sunnybrook Preemie Investments Inc. | 11,666 (31) | * | 23,332 (33) | - | * |
| York Plains Investment Corp. | 8,900 (32) | * | 17,800 (33) | - | * |

* Less than 1%.

** Based on 11,622,112 shares of Common Stock outstanding as of January 4, 2018.

375.    The January 5, 2018 Form S-3/A also stated that "[u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law" and that "[e]ach selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock."

173

376.     The disclosures relating to the Selling Stockholders in the January 5, 2018 Form S-3, which was signed by Defendants O'Rourke and Beeghley, were materially false and misleading when made for the same reasons discussed above for the April 20, 2017 Form S-3/A.

377.     Indeed, as in previous Forms S-3/A, the Selling Stockholders operated as a centrally organized "control group" that coordinated their trades down to the single share.  In that regard, in the January 5, 2018 Form S-3 Form S-3/A, both Michael Ference (a Partner with Sichenzia, Ross Ference LLP) and Paradox Capital Partners LLC (owned by Harvey Kesner, another partner with Sichenzia, Ross Ference LLP and Defendant Honig's long-time lawyer who represented Honig and DeFrancesco in their proxy fight to gain control of Riot), both reported owning exactly "*4,444*" shares of Riot's common stock and both offered exactly "*8,888*" shares of the Company's common stock for sale to the public, resulting in zeros shares held by them after each offering.

378.     The January S-3 also provided representations and other information about the Selling Stockholders, including the following:

> *None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years* other than as a result of the ownership of our shares or other securities.

379.     Included among the list of Selling Stockholders (as depicted above) were GRQ Consultants, a Honig-controlled entity, numerous entities affiliated with DeFrancesco and her family members, and Melachdavid, an entity controlled by Groussman.  Additionally the January 5, 2018 Form S-3 stated the following about the definition of "us":  "In this prospectus, "Riot Blockchain," "the Company," "we," "us," and "our" refer to Riot Blockchain, Inc. (f/k/a: Bioptix, Inc.), a Nevada corporation, unless the context otherwise requires."

174

380.    The January 5, 2018 Form S-3 also lists several Company transactions that occurred in the fourth quarter of 2017, including the Coinsquare transaction, the Kairos transaction and the December 2017 Private Placement.

381.    The statement above from the January 5, 2018 Form S-3 that "*none* of the selling stockholders . . . has had any material relationship with us or an of our subsidiaries within the past three years" was materially false and misleading when made because several of the selling stockholders *did* in fact have a material relationship with "us or any of our subsidiaries" by virtue of their participation in at least three corporate transactions involving Riot:  Coinsquare (Honig, DeFrancesco, and Groussman, § VII.E.2), Kairos (Honig and Groussman, § VII.E.3), and the December Private Placement (Honig and DeFrancesco, § VII.E.4).  Yet, the Honig Group members' involvement in these transactions was not disclosed in the January 5, 2018 Form S-3.  Furth, with respect to the Kairos transaction, Kairos became a subsidiary of Riot as part of that transaction.

382.    O'Rourke knew or should have known that the statement above was false and misleading because he was Chairman and CEO of Riot (a company that only about nine employees at this time, and would have been involved in each of these transactions and the preparation of the January 5, 2018 Form S-3, a document that he signed.  Additionally, as set forth herein O'Rourke was a long-standing business partner of Honig (and Groussman) and by all accounts was in close contact with Honig even during his tenure as Riot's CEO and Chairman.  Thus, O'Rourke was in a position, consistent with the duties and obligations of directors under the federal securities laws, to ensure that the Company did not issue SEC filings that contained false and misleading statements or omitted material information like those included in the January S-3.

### 7. February 7, 2018 – Registration Statement (Form S-3/A)

Formatted: Heading 4

383. On February 7, 2018, after the close of trading on a Friday, leading into a weekend, Riot filed a Securities Registration Statement on Form S-3 registering, for sale to the investing public, 3,292,226 shares of common to be sold by the following "Selling Stockholders":

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| 2330573 Ontario Inc. | 96,444 (1) | * | 88,888 (33) | 52,000 | * |
| Acquisition Group Limited | 135,556 (2) | 1.16% | 71,112 (33) | 100,000 (34) | * |
| Armand Reale | 4,000 (3) | * | 8,000 (33) | - | * |
| Catherine DeFrancesco ITF Ava Defrancesco | 22,911 (4) | * | 7,112 (33) | 19,355 (35) | * |
| Catherine DeFrancesco ITF Devlin Defrancesco | 22,911 (5) | * | 7,112 (33) | 19,355 (36) | * |
| Catherine DeFrancesco ITF Lachlan Defrancesco | 22,911 (6) | * | 7,112 (33) | 19,355 (37) | * |
| Catherine DeFrancesco ITF Summer Defrancesco | 22,911 (7) | * | 7,112 (33) | 19,355 (38) | * |
| Clara Serruya | 266,667 (8) | 2.29% | 533,334 (33) | - | * |
| DeFrancesco Motorsports Inc. | 5,333 (9) | * | 10,666 (33) | - | * |
| Delavaco Holdings Inc. | 10,667 (10) | * | 21,334 (33) | - | * |
| Eduardo Vivas | 6,667 (11) | * | 13,334 (33) | - | * |
| First Canadian Insurance Corp | 14,000 (12) | * | 28,000 (33) | - | * |
| Glass Investments LP | 13,444 (13) | * | 26,888 (33) | - | * |
| Grander Holdings, Inc. 401K | 217,733 (14) | 1.86% | 266,666 (33) | 84,400 (39) | * |
| GRQ Consultants, Inc. | 22,222 (15) | * | 44,444 (33) | - | * |
| GT Capital Inc | 29,436 (16) | * | 26,666 (33) | 16,103 (40) | * |
| Hudson Bay Master Fund Ltd | 333,334 (17) | 2.87% | 666,668 (33) | - | * |
| Interward Capital Corp. | 4,000 (18) | * | 8,000 (33) | - | * |
| Intracoastal Capital LLC | 133,334 (19) | 1.15% | 266,668 (33) | - | * |
| McGilligan Barry Investment | 11,100 (20) | * | 22,200 (33) | - | * |
| Marcandy Investments Corp. | 5,333 (21) | * | 10,666 (33) | - | * |
| Monroe Capital, LLC | 22,000 (22) | * | 44,000 (33) | - | * |
| Melechdavid Inc. | 131,945 (23) | 1.12% | 88,890 (33) | 87,500 (41) | * |
| Michael Ference | 4,444 (24) | * | 8,888 (33) | - | * |
| Millennium Insurance Corp. | 7,000 (25) | * | 14,000 (33) | - | * |
| MMCAP International Inc. SPC | 366,667 (26) | 3.15% | 733,334 (33) | - | * |
| Namaste Gorgie, Inc. | 42,927 (27) | * | 21,334 (33) | 32,260 (42) | * |
| Northurst, Inc. | 592,089 (28) | 4.99% | 177,778 (33) | 612,000 (43) | 4.99% |
| Paradox Capital Partners LLC | 4,444 (29) | * | 8,888 (33) | - | * |
| Rockhaven Holdings Ltd. | 6,000 (30) | * | 12,000 (33) | - | * |
| Sunnybrook Preemie Investments Inc. | 11,666 (31) | * | 23,332 (33) | - | * |
| York Plains Investment Corp. | 8,900 (32) | * | 17,800 (33) | - | * |

\* Less than 1%.

\*\* Based on 11,652,270 shares of Common Stock outstanding as of February 5, 2018.

**F.      October 3, 2017 – Riot Announces "Special Dividend" of $1.00 per Share**

235.    On October 3, 2017, Bioptix issued a press released (the "October 3 Press Release") in which it stated that the "Board of Directors authorized a special dividend of approximately $1.00 per common share (including [preferred stock] common share equivalents) in cash, payable on or about October 18, 2017 to shareholders of record as of October 13, 2017."  The press release quoted Defendant Beeghley as stating:  "*This special dividend is a positive step to return value to all Bioptix shareholders.*  We continue to explore options for delivering additional value to shareholders with our streamlined overhead and cash position."

236.    The statement above was false and misleading when made or otherwise omitted material information because it purported "*return value to all Bioptix investors*" when, in fact, the Honig Group at this time collectively owned a controlling stake of Bioptix's outstanding shares (and likely much more) and were acting in concert—along with Defendants Beeghley, McGonegal, O'Rourke, Dai, and Kaplan—as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

237.    To be sure, this one-time special dividend predominantly benefited the Honig Group which at this time already held a majority ownership interest in Bioptix and (unlike other public shareholders) was keenly aware that the Company had plans to transition into the cryptocurrency business given that various members of the Honig Group, including Defendant Honig himself, were undisclosed parties to a October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement, a transaction that kicked off Bioptix's transformation into cryptocurrency.  This Company transformation was first disclosed to the public on October 4, 2017, the day *after* the October 3 Press Release was issued.  Yet, nothing in the October 3 Press Release discloses these facts or that the Honig's Group exercised de facto control over Bioptix

177

Formatted: Font: Not Bold, Not Italic

through beneficial ownership and insider affiliations, giving the Honig Group the ability to influence the strategic direction of the Company.

238. In response to the October 3 Press Release, Bioptix's stock price *increased by more than 25% in one trading day* from an closing price of $6.44 per share on October 2, 2017, to a closing price of $8.09 per share on October 3, 2017.

**G. October 4, 2017 – "Bioptix Changing Name to Riot Blockchain"**

239.1. On October 4, 2017, Riot issued a press release (the "October 4 Press Release"), titled "Bioptix Changing Name to Riot Blockchain as Company Shifts Focus to Strategic Investor and Operator in Blockchain Technologies." The press release commented on the name change and directional shift of the Company, stating, in relevant part:

CASTLE ROCK, Colo., Oct. 4, 2017 /PRNewswire/ — Bioptix Inc. (Nasdaq: BIOP) today announced it is changing its name to Riot Blockchain, Inc. and has reserved and plans to change its Nasdaq ticker symbol to RIOT, in line with a shift in direction of the company. The name and symbol change are subject to Nasdaq approval. Moving forward, Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem with a particular focus on the Bitcoin and Ethereum blockchains.

As part of this focus, the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.

"At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets," said Michael Beeghley, Chief Executive Officer of Riot Blockchain. "With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector."

240. The above statements in Riot's October 4 Press Release were materially false and misleading or otherwise omit material information because they fail to disclose the Honig Group's role in the Company's transformation from biotechnology to cryptocurrency or that at this time

178

the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert—along with Defendants Beeghley, McGonegal, O'Rourke, Dai and Kaplan—as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

241. The October 4 Press Release also failed to disclose the Honig Group's participation in Riot's "*strategic investment in Coinsquare*" or that members of the Honig Group had existing financial and contractual ties to Bioptix (and later Riot) through this transaction — including as parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement.

242. Additionally, the October 4 Press Release is materially false and misleading because it failed to disclose that Defendants Honig, Stetson, and Groussman shared an office with a Riot insider, namely Defendant O'Rourke, who at this time was a Riot board member and acting Company president. Indeed, Defendant O'Rouke signed the October 3, 2017 Articles of Merger on *behalf of Riot* as part of the corporate name change from Bioptix to Riot under Nevada law. This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig in his office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke.

**H.  October 5, 2017 – "Investor Presentation"**

243. On October 5, 2017, Riot filed a Form 8-K with an attached "Investor Presentation" with the SEC (the "October 5 Investor Presentation"). The Investor Presentation appeared to be authored by Defendant Beeghley and described Riot as being "part of the disruptive technology

179

783086.1

and activities revolutionizing transactions and noted a $150 billion market opportunities for companies seeking to invest in blockchain technologies." The Investor Presentation stated:

"*Our investment strategy will consist of identifying unique projects which decentralize markets; combining real world applications with an active development team, strong fundamental, and large addressable markets.*"

"Moving forward, *Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem, with a particular focus on the Bitcoin and Ethereum blockchains.*"

Riot was a "first mover" and a "*NASDAQ listed pure play Blockchain company*."

"*At Riot Blockchain Inc. we leverage our expertise, and network, to build and support blockchain technology companies.  We provide investment exposure to the rapidly growing blockchain ecosystem.*"

"*Riot Blockchain has made a strategic investment for an undisclosed % of Coinsquare.  This investment into a leading digital currency exchange is indicative of other Riot Blockchain will pursue*, including possible acquisitions of businesses touching the blockchain ecosystem."

"*The company is experiencing explosive growth in a budding industry, already demonstrating strong potential.*"

244.    The above statements in Riot's October 5, 2017 Investor Presentation were materially false and misleading when made and/or omitted material information because they failed to disclose the Honig Group's role in the Company's transformation from biotechnology to cryptocurrency or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert—along with Defendants Beeghley, McGonegal, O'Rourke, Dai, and Kaplan—as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

245.    The October 5 Investor Presentation also failed to disclose the Honig's Group's participation in Riot's "*strategic investment*" in Coinsquare or that members of the Honig Group had existing financial and contractual ties to Riot through this transaction—including as parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement.

180

246.   Additionally, the October 5 Investor Presentation was false and misleading because it failed to disclose that, according to the allegations in the *Honig* Action, Defendants Honig, Stetson, and Groussman shared an office with a Riot insider, namely Defendant O'Rourke, who at this time was a Riot board member and acting Company president.  Indeed, Defendant O'Rouke signed the October 3, 2017 Articles of Merger on *behalf of Riot* as part of the corporate name change from Bioptix to Riot under Nevada law.  This highly unusual arrangement between a Company insider and outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at this office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke.

I.   October 6, 2017—Defendant Beeghely Speaks to *The Denver Post*

247.   On October 6, 2017, the *Denver Post* published a "phone interview" that Defendant Beeghley gave to the newspaper:

*"When I got on the board, they had made an acquisition that we decided as a board did not make sense, so we closed that down and then decided to change our focus," he said in a phone interview.  "We looked at the sector and said, 'How can we participate in this, and how can our shareholders participate in this very exciting industry that's like the beginning of the internet?'"*

The company is paying a few million dollars for about a 12 percent interest in Coinsquare, and has warrants to increase its stake to 20 percent, Beeghley said.  Next, the CEO is looking to buy companies focused on bitcoin mining, blockchain and security software.[100]

248.   The above statements on October 6, 2017 made by Defendant Beeghley to the *Denver Post* were materially false and misleading when made or omitted material information because they failed to disclose the Honig Group's role in the Company's "*change [in] focus*" from biotechnology to cryptocurrency or that at this time the Honig Group beneficially owned in excess

---

[100] *Bioptix starts over; focus is on cryptocurrency,* The Denver Post (Oct. 6, 2017).

of 55% of Riot's outstanding shares (and likely much more) and were acting in concert—along with Defendants Beeghley, McGonegal, O'Rourke, Dai and Kaplan—as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

**J.   October 17, 2017 – Riot "to Acquire Majority Interest in Tess"**

249.   On October 17, 2017, the Company issued a press release announcing that it was to acquire a majority interest in Tess, a blockchain development company.   The press release provided commentary on the Tess acquisition, stating, in relevant part:

> "*Riot Blockchain is committed to building and supporting the blockchain ecosystem*," said Michael Beeghley, CEO of Riot Blockchain. "*The telecom payment platform of TESS is a prime example of how blockchain-based technologies can be leveraged to disrupt established industries.   I believe that Riot Blockchain is poised to take advantage of this revolution in digital transactions as we see increasing adoption of blockchain protocols in our everyday lives.*"

250.   The above statements in Riot's October 17, 2017 press release were materially false and misleading when made or omit material information because Riot's announcement failed to disclose that Tess and its founders (who had only created the company three months earlier)[101] maintained close ties to Kairos, an entity owned in part by members of the Honig Group, namely Defendants Honig and Defranscesco.   Two weeks after the Tess transaction was announced, Riot announced an investment in Kairos without also disclosing Defendant Honig's and Defendant Defranscesco's ownership interest.

**K.   October 23, 2017 – Riot Issues "Business Strategy Statement"**

251.   On October 23, 2017, the Company filed a Form 8-K with the SEC.   In it, Riot reported as follows: "*The Company's strategy will be to continue to pursue opportunistic*

---

[101] The Tesspay.io website shows that it was initially registered on July 18, 2017.

*investments and controlling positions in these new and emerging technologies which will continue to expose the Company to the numerous risks and volatility associated with this section.*"

252.    The Form 8-K filed on October 23, 2017 also stated:  "*The Company anticipates it will continue to increase its exposure to this industry through passive investment, majority owned or controlled investments, and organic expansion*, but does not presently intend to invest in any manner that would result in the Company being required to register as an investment company . . . .*"

253.    In the Company's "Objectives," Riot stated:  "*The Company seeks to build a diversified blockchain company through the development and ownership of operating assets in the blockchain ecosystem.*"

254.    The above "Business Strategy Statements" in Riot's October 23, 2017 Form 8-K were materially false and misleading or omitted material information because they failed to disclose the Honig Group's role in, among other things, Riot's "*development and ownership of operating assets in the blockchain ecosystem*" or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert—along with Defendants Beeghley, McGonegal, O'Rourke, Dai, and Kaplan—as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

**L.    October 27, 2017 – "Updated Investor Presentation"**

255.    On October 27, 2017, the Company filed with the SEC a Form 8-K with an "Updated Investor Presentation attached.  The Updated Investor Presentation stated that the value of the cryptocurrency market "has increased from $17.7 billion to over $170 billion in 2017"—a figure $20 billion higher than the figure presented in the Company's October 5, 2017 Investor

Presentation. In addition to providing information concerning the Company's business acquisitions, the updated Investor Presentation also stated:

- the Company would provide "*a gateway to blockchain*" as "one of the only Nasdaq listed companies with this focus."

- "*Riot Blockchain intends to gain exposure to the blockchain ecosystem through targeted investments in the sector, with a primary focus on the Bitcoin and Ethereum blockchains.*"

- "*Our investment strategy will consist of identifying unique projects which decentralize markets; combining real world applications with an active development team, strong fundamental, and large addressable markets.*"

- "Moving forward, *Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem, with a particular focus on the Bitcoin and Ethereum blockchains.*"

- described Riot as a "first mover" as a "*NASDAQ listed pure-play Blockchain company.*"

- "*At Riot Blockchain Inc. we leverage our expertise, and network, to build and support blockchain technology companies. We provide investment exposure to the rapidly growing blockchain ecosystem.*"

- "*Riot Blockchain has made a strategic investment in Coinsquare. This investment into a leading Canadian digital currency exchange is indicative of other Riot Blockchain will pursue, including possible acquisitions of businesses touching the blockchain ecosystem.*"

- "*The company is experiencing steady growth in a budding industry.*"

256. The above statements in Riot's October 27, 2017 Updated Investor Presentation filed on Form 8-K were materially false and misleading when made or omitted material information because they failed to disclose the Honig Group's role in the Company's "*strategic investment*" and "*focus [ ] as a strategic investor and operator in the blockchain ecosystem*" or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert—along with Defendants Beeghley, McGonegal,

184

O'Rourke, Dai and Kaplan—as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

257.    The October 27 Investor Presentation also failed to disclose the Honig Group's participation in Riot's "*strategic investment in Coinsquare*" or that members of the Honig Group had existing financial and contractual ties to Riot through the Coinsquare transaction—including as parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement.

258.    Additionally, the October 5 Investor Presentation was materially false and misleading because it fails to disclose that, according to the allegations in the *Honig* Action, Defendant Honig shared an office with a Riot insider, namely Defendant O'Rourke, who at this time was a Riot board member and acting Company president.  Indeed, Defendant O'Rouke signed the October 3, 2017 Articles of Merger on *behalf of Riot* as part of the corporate name change from Bioptix to Riot under Nevada law.  This highly unusual arrangement between a Company and significant outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke.

**M.    November 2-3, 2017—Riot Agrees to Acquire "1,200 Bitcoin Mining Machines" from Kairos**

259.    On November 2, 2017, Riot issued a press release announcing that it entered into an agreement for the acquisition of "1,200 Bitcoin mining machines."  In the press release, Defendant O'Rourke stated:

384.    CASTLE ROCK, Colo., The February 7, 2018 Form S-3/A also stated that "[u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent

authority is shared by their spouses under applicable law" and that "[e]ach selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock."

385.   The disclosures relating to the Selling Stockholders in the February 7, 2018 Form S-3, which was signed by Defendants O'Rourke and Beeghley, were materially false and misleading when made for the same reasons discussed above for the April 20, 2017 Form S-3/A.

386.   Indeed, as in previous Forms S-3/A, the Selling Stockholders operated as a centrally organized "control group" that *coordinated their trades down to the single share*.  In that regard, in the February 7, 2018 Form S-3 Form S-3/A, both Michael Ference (a Partner with Sichenzia, Ross Ference LLP) and Paradox Capital Partners LLC (owned by Harvey Kesner, another partner with Sichenzia, Ross Ference LLP and Defendant Honig's long-time lawyer who represented Honig and DeFrancesco in their proxy fight to gain control of Riot).both reported owning exactly "*4,444*" shares of Riot's common stock and both offered exactly "*8,888*" shares of the Company's common stock for sale to the public, resulting in zeros shares held by them after each offering.

387.   As noted above, the February 7, 2018 Form S-3/A listed Selling Stockholders GRQ Consultants, DeFrancesco, and Groussman, and also stated:

> *None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years* other than as a result of the ownership of our shares or other securities.

388.   This representation was materially false and misleading for the same reasons described above with respect to the January 5, 2018 Form S-3.

186

**C.     Defendants' Materially False and Misleading Statements and Omissions Regarding Riot's Related-Party Transactions with Defendants**

**1.     March 16, 2017 – Current Report (Form 8-K)**

389.    On March 16, 2017, Riot announced in a Form 8-K filed with the SEC that the Company had entered into a securities purchase agreement pursuant to which it agreed to sell $2,250,000 of principal amount of promissory notes and three year warrants to purchase up to 700,000 shares of common stock (referred to herein as the "March 2017 Private Placement Agreement") to certain undisclosed accredited investors.  One of these investors was later revealed to be Honig, who at the time the agreement was entered into was a greater than 10% shareholder of Riot.

390.    The March 16, 2017 Form 8-K was false and misleading to Riot's public investors because it failed to disclose, as is required by SEC Regulation S-K Item 404 and GAAP, that the March 2017 Private Placement Agreement was a transaction with a related party, namely Honig, a greater than 5% shareholder of Riot.  The omission was particularly important here as it allowed Honig's relationship with the Company, both in terms of shareholder ownership and numerous material agreements during the Class Period, to remain hidden from Riot's public shareholders in violation of the federal securities laws.

391.    Defendants O'Rourke and Beeghley would have been aware of the March 2017 Private Placement Agreement, Honig's role in the transaction, and his greater than 5% ownership in the Company at the time this 8-K was filed by virtue of their positions as members of the Riot's Board and their long-standing business relationship with Honig, as set forth herein.  Thus, O'Rourke and Beeghley were in a position, consistent with the duties and obligations of directors under the federal securities laws, to ensure that Honig's participation in the March 2017 Private Placement Agreement was properly disclosed to Riot's public shareholders.

### 2.      March 31, 2017 – Annual Report (Form 10-K)

392.    On March 31, 2017, Riot filed with the SEC its 2017 Annual Report under Form 10-K ("2017 10-K").  The 2017 10-K describes the March 2017 Private Placement Agreement and, similar to the March 16, 2017 Form 8-K, fails to disclose that Honig, a greater that 5% shareholder in the Company, was a party to that agreement.

393.    The 2017 10-K was false and misleading to Riot's public investors because it failed to disclose, as is required by SEC Regulation S-K Item 404 and GAAP, that the March 2017 Private Placement Agreement was a transaction with a related party, namely Honig, a greater than 5% shareholder of Riot.  The omission was particularly important here as it allowed Honig's relationship with the Company, both in terms of shareholder ownership and numerous material agreements during the Class Period, to remain hidden from Riot's public shareholders in violation of the federal securities laws.

394.    Defendants O'Rourke and Beeghley signed the 2017 10-K and would have been aware of the March 2017 Private Placement Agreement, Honig's role in the transaction, and his greater than 5% ownership in the Company by virtue of their positions as members of Riot's Board and their long-standing business relationship with Honig, as set forth herein.  Thus, O'Rourke and Beeghley were in a position, consistent with the duties and obligations of directors under the federal securities laws, to ensure that Honig's participation in the March 2017 Private Placement Agreement was properly disclosed to Riot's public shareholders.

### 3.      October 4, 2017 – Current Report (Form 8-K)

395.    On October 4, 2017 Riot announced in a Form 8-K and press release (attached to the 8-K) filed with the SEC that the Company had entered into the Coinsquare Agreement, a transaction involving a small, privately-held Canadian company.  As part of the Coinsquare Agreement, Riot invested $3 million alongside 22 other investors, including various members of

188

the Honig Group.  The terms of the transaction were memorialized in written agreement that was signed by all participating Coinsquare investors.  At the time the agreement was signed, O'Rourke served as Riot's President, Secretary, Treasurer, and as a member of the Company's Board.  At the time, Beeghley served as Riot's CEO and Chairman.

396.    The 2017 10-K was false and misleading to Riot's public investors because it failed to disclose, as is required by SEC Regulation S-K Item 404 and GAAP, that the Coinsquare Agreement included at least three related parties – Honig, Groussman, and DeFrancesco – each of whom were at this time greater than 5% shareholders of Riot.  The omission was particularly important here because it allowed Honig, Groussman's, and DeFrancesco's relationships with the Company, both in terms of shareholder ownership and material agreements, to remain hidden from Riot's public shareholders in violation of the federal securities laws.

397.    Defendants O'Rourke and Beeghley would have been aware of the Coinsquare Agreement, Honig and DeFrancesco's role in the transaction, and their greater than 5% ownership in the Company at the time this 8-K was filed, by virtue of their positions both as officers and members of Riot's Board, and by virtue of their long-standing business relationships with Honig, as set forth herein.  Thus, O'Rourke and Beeghley were in a position, consistent with their duties and obligations as officers and directors under the federal securities laws, to ensure that Honig's, DeFrancesco's, Groussman's and Stetson's participation in the Coinsquare Agreement was properly disclosed to Riot's public shareholders.

**4.     November 3, 2017 – Current Report (Form 8-K)**

398.    On November 3, 2017, Riot filed with the SEC a Form 8-K that announced the Company's agreement with Kairos, a transaction that involved the Company's purchase of various Bitcoin mining machines through a share exchange agreement.  The 8-K and related exhibit stated that as consideration for the Kairos acquisition (which included the Bitcoin mining machines) Riot

189

783086.1

would issue to Kairos' stockholders preferred shares of Riot stock that were convertible to 1,750,001 shares of Riot common stock.  Also, as part of the transaction Riot agreed to pay "certain" undisclosed shareholders of Kairos a royalty from cash flow generated from the Company's Bitcoin mining operations, which entitled such shareholders to receive 40% of the gross profits generated on a monthly basis until they have received a total of $1,000,000, at which point the royalty is extinguished.

399.    The November 3, 2017 Form 8-K was false and misleading because it failed to disclose, as is required by SEC Regulation S-K Item 404 and GAAP, that the Kairos transaction included two related parties, namely Defendants Honig and DeFrancesco, both of whom were at this time greater than 5% shareholders of Riot.  This omission was particularly important here because it allowed Honig's and DeFrancesco's material relationships with the Riot – both in terms of share ownership and material agreements – to remain hidden from Riot's public shareholders in violation of the federal securities laws.

400.    O'Rourke would have been aware of the details of the Kairos Agreement, Honig's and DeFrancesco's involvement in the transaction, and their greater than 5% share ownership by virtue of O'Rourke's position as President, CEO, and Chairman of the Board of Directors of Riot.  Indeed, the same day that the Kairos acquisition was publicly announced, O'Rourke (who was already the Company's President, Secretary, and Treasurer, and thus an officer as well as a Director) was named CEO and Chairman of the Board.  Additionally, O'Rourke would have been aware of Honig's involvement in these transactions given his long-standing business relationship with Honig and other members of the Honig Group.  O'Rourke's relationship with Honig was most prominently evidenced by the February 16, 2018 CNBC expose where reporters at CNBC arrived at Honig's office only to find O'Rourke.  Thus, O'Rourke was in a position, consistent

190

with his duties and obligations as an officer and director under the federal securities laws, to ensure that Honig and DeFrancesco's involvement in the Kairos transaction was properly disclosed to Riot's public shareholders.

Nov. 2, 2017 /PRNewswire/ — *Riot Blockchain Inc. (Nasdaq: RIOT) (the "Company") today announced it has entered into a definitive agreement to acquire cryptocurrency mining equipment consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by industry leader Bitmain.* Riot has secured a location for the operation of the mining equipment at a competitive electric cost, with infrastructure in place for expansion. The transaction is anticipated to close on or before November 15, 2017.

*"The acquisition positions us to launch our cryptocurrency mining operations, at a time that Bitcoin and other digital currencies are gaining increased attention and adoption," said John O'Rourke, President of Riot Blockchain. "We plan to leverage the mining technology to help realize our vision of becoming a leader in blockchain technologies. Mining bitcoin helps secure the bitcoin blockchain, while providing us direct exposure to accumulating bitcoin in the process."*

The mining equipment will be strategically located to utilize hydroelectric power to help minimize utility costs while maximizing potential efficiency and output. Riot Blockchain intends to utilize the mining equipment and lease existing datacenter infrastructure to provide all services necessary for its operations. The total hashing power of the equipment is expected to be 9.8 Petahash of SHA-256 Bitcoin mining computing power and 250,000 MH of X11 for Litecoin mining.

260.    On November 3, 2017, Riot filed a Form 8-K further describing Riot's acquisition of these 1,200 bitcoin mining machines:

On November 1, 2017, Riot Blockchain, Inc. (the "Company") entered into a share exchange agreement (the "Agreement") with Kairos Global Technology, Inc., a Nevada corporation ("Kairos"). Pursuant to the Agreement, upon satisfaction of certain closing conditions, the shareholders of Kairos agreed to exchange all outstanding shares of Kairos' common stock to the Company and the Company agreed to issue an aggregate of One Million Seven Hundred Fifty Thousand and One (1,750,001) newly designated shares of Series B Convertible Preferred Stock (the "Series B Preferred Stock") which are convertible into an aggregate of One Million Seven Hundred Fifty Thousand and One (1,750,001) shares of the Company's common stock, no par value per share (the transaction, the "Kairos Transaction") to such shareholders. On November 3, 2017, the Company closed the Kairos Transaction.

*Upon closing of the Kairos Transaction, the Company became the owner of certain computer equipment and other assets used for the mining of*

191

*cryptocurrency, specifically servers consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by industry leader Bitmain.*

261.   Riot's November 2, 2017 press release, and Defendant O'Rourke's statements therein, and Riot's November 3, 2017 Form 8-K were materially false and misleading when made and omitted material information because they failed to disclose that Kairos was in part owned by Defendants Honig[102] and DeFrancesco.[103]  Indeed, it was not until May 17, 2018 that Riot disclosed that "*[e]ach of Mr. Honig and Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company*, with Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned approximately 6.3% of Kairos."[104]

262.   The November 2, 2017 press release and November 3, 2017 Form 8-K also failed to disclose that Kairos had only been incorporated in Nevada October 19, 2017, just two weeks earlier.   Thus, Kairos had virtually no operating history at the time Riot touted this latest cryptocurrency investment.  Further, the statements above fail to disclose that Riot appears to have significantly overpaid for the "*certain computer equipment and other assets used for the mining of cryptocurrency*" that the Company acquired in this transaction.

263.   Additionally, Defendant O'Rourke's statement that "*we plan to leverage the mining technology to help realize our vision of becoming a leader in blockchain technologies*" was materially false and misleading when made and omitted material information because it failed

---

[102] Honig belatedly disclosed his ownership of Kairos on April 18, 2018 in an amended SEC filing on Form 13D/A noting that on November 1, 2017, he had exchanged 151,210 shares of Kairos common stock for 151,210 shares of Riot Series B Preferred Shares.

[103] *See* Riot Blockchain, Inc., Quarterly Report (Form 10-Q) at 15 (Nov. 19, 2018) ("Two principal shareholders held 24.8% and 18.4%, respectively, of Prive, at the time of its acquisition by the Company.   These holders held 10.7% and 5.7%, respectively of Kairos at the time of Kairos acquisition by the Company in October 2017.").

[104] Riot, Quarterly Report (Form 10-Q) at 26 (Nov. 19, 2018).

783086.1

to disclose the Honig Group's role in the Company's "*vision*" or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert—along with Defendants O'Rourke, McGonegal, Dai, and Kaplan—as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

**N.      November 6, 2017 – Riot Closes Its Deal with Kairos**

264.    On November 6, 2017, Riot issued a press release announcing that it closed the Karios transaction:

CASTLE ROCK, Colo., Nov. 6, 2017 /PRNewswire/ — *Riot Blockchain, Inc. (Nasdaq: RIOT) (the "Company") today announced that it has closed on its acquisition of cryptocurrency mining equipment consisting of 700 AntMiner S9s and 500 AntMiner L3s, all manufactured by industry leader Bitmain.* The total hashing power of the equipment is expected to be 9.8 petahash of SHA 256 Bitcoin mining computing power and 250,000 megahash of X11 Litecoin mining.

*In conjunction with the transaction, the Company announced that President John O'Rourke has been named Chairman and Chief Executive Officer of Riot Blockchain.*

*"The closing of this acquisition has positioned us to launch our cryptocurrency mining operation,"* said John O'Rourke, Chairman and CEO of Riot Blockchain. *"Cryptocurrency mining will be a focal point moving forward, gaining us leveraged exposure to bitcoin and other digital currencies while we help secure blockchains."*

265.    Riot's November 6, 2017 press release, and Defendant O'Rourke's statements therein, were materially false and misleading when made and omitted material information because they failed to disclose that Kairos was in part owned by Defendants Honig[105] and DeFrancesco.[106]

---

[105] Honig belatedly disclosed his ownership of Kairos on April 18, 2018 in an amended SEC filing on Form 13D/A noting that on November 1, 2017, he had exchanged 151,210 shares of Kairos common stock for 151,210 shares of Riot Series B Preferred Shares.

[106] *See* Riot Blockchain, Inc., Quarterly Report (Form 10-Q) at 15 (Nov. 19, 2018) ("Two principal shareholders held 24.8% and 18.4%, respectively, of Prive, at the time of its acquisition by the

193

Indeed, it was not until May 17, 2018 that Riot disclosed that "*[e]ach of Mr. Honig and Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company*, with Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned approximately 6.3% of Kairos."[107]

266.    The November 2, 2017 press release and November 3, 2017 Form 8-K also failed to disclose that Kairos had only been incorporated in Nevada weeks earlier on October 19, 2017. Thus, Kairos had virtually no operating history at the time Riot announced this investment. Moreover, the statements above failed to disclose that Riot appears to have significantly overpaid for the "*certain computer equipment and other assets used for the mining of cryptocurrency*" that the Company acquired in this transaction.  As shareholders of Kairos, this overpayment would have personally benefited Defendants Honig and Defrancesco.

267.    Additionally, Defendant O'Rourke's statement that "*we plan to leverage the mining technology to help realize our vision of becoming a leader in blockchain technologies*" was materially false and misleading when made and omitted material information because it failed to disclose the Honig Group's role in the Company's "*vision*" or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert—along with Defendants O'Rourke, McGonegal, Dai, and Kaplan—as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

268.    Finally, the November 6, 2018 press release was also false and misleading when made or otherwise omitted material information because while it discusses O'Rourke's new role

Company.  These holders held 10.7% and 5.7%, respectively of Kairos at the time of Kairos acquisition by the Company in October 2017.").

[107] Riot, Quarterly Report (Form 10-Q) at 23 (May 17, 2018).

194

as CEO of Riot it failed to disclose that Defendants Honig, Stetson, and Groussman shared an office in Florida with Defendant O'Rourke at this time.  This highly unusual arrangement between a Company CEO and significant outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, Florida, in February 2018 and instead found Defendant O'Rourke.

### O.5.   November 13, 2017 – Quarterly Report (Form 10-Q)

269.401.   On November 13, 2017, Riot filed with the SEC its quarterly report on Form November 13, 2017 10-Q (the "November 2017 10-Q") for the period that ended September 30, 2017 (the "3Q17 10-Q") with the SEC, which provided the Company's quarterly financial results and position, a document that was signed by O'Rourke.

270.402.   The 3Q17 10-Q was signed by Defendants O'Rourke and McGonegal.  Pursuant to § 302 of SOX, and also covered by §§ 304 and 906 of SOX, Defendants O'Rourke and McGonegal certified that they had designed and evaluated effective internal and disclosure controls over financial reporting, which assured the reliability of financial reporting, and also that Riot's financial statements fairly and accurately presented the financial condition of the Company. Those SOX certifications stated as follows:November 2017 10-Q was false and misleading because while it described several transactions that occurred during the reporting period, including (1) March 2017 Private Placement Agreement, (2) the Coinsquare Agreement; and (3) the Kairos transaction, it failed to disclose as required by SEC Regulation S-K Item 404 and GAAP that these transactions – which were material to the Company given their size relative to Riot's size and operations – included related parties, including Defendant Honig and others.  These omissions were particularly important here because they allowed Honig, DeFrancesco, Groussman and Stetson to take part in one or more of these transactions and, at the same time, hide from public view their material relationship with Riot as shareholders of the Company.

195

783086.1

1.  I have reviewed this quarterly report on Form 10-Q of Riot Blockchain, Inc.;

2.  Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (d)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (e)   *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

    (f)   *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

    (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  *The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the*

*registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):*

(c)     *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

(d)     *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

271.    Defendants O'Rourke and McGonegal's SOX certifications in ¶ 270 were false and misleading because Riot did not maintain an effective control environment as of the date of the filing because it allowed Defendant O'Rourke and others to engage in the pump and dump scheme.   Additionally, the SOX certifications were materially false and misleading because contrary to the representation that Riot's SEC filing did "not contain any untrue statement of a material fact" or omission, the 3Q17 10-Q contained numerous false and misleading statements, as set forth below.

272.    For example, while the 3Q17 10-Q discussed both the Coinsqaure and Kairos acquisitions, it failed to disclose that members of the Honig Group and Defendants Kaplan and So were also investors in Coinsquare or that Defendants Honig and Defrancesco were investors in Kairos.   The 3Q17 10-Q also failed to disclose that Defendant Honig, at this time a significant shareholder in Riot, received $50,000 in "due diligence" consulting fees from Bioptix related to the Company's investment in Coinsquare.

273.    The 3Q17 10-Q was also materially false and misleading and otherwise omitted material information because it failed to disclose the Honig Group's role in the Company or that at this time the Honig Group beneficially owned a controlling stake in Riot's outstanding shares (and likely much more) and were acting in concert — along with Defendants O'Rourke,

197

McGonegal, Dai, and Kaplan—as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

274.   Finally, the 3Q17 10-Q was also materially false and misleading because while it references Defendant O'Rourke as CEO of Riot it failed to disclose that Defendants Honig, Stetson and Groussman shared an office in Florida with Defendant O'Rourke.  This highly unusual arrangement between Riot's CEO and significant outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig in February 2018 and instead found Defendant O'Rourke at Honig's office.

**P.     November 15, 2017—O'Rourke Is Interviewed on CBS and the Company Announces "Riot Blockchain Featured in 5-Part Series on CBS"**

275.   On November 15, 2017, Defendant O'Rourke appeared on CBS's TechRepublic touting Riot's investment, less than a month earlier, in 52% of the stock of Tess, which O'Rourke said was "developing a blockchain technology to disrupt the telecom industry."



783086.1

**[Interviewer:]**   The blockchain is disrupting a number of industries. You mentioned real estate a moment ago, certainly Wall Street. What other industries are heavily impacted by the blockchain right now?

**[O'Rourke:]**  I would say a couple that jump to mind for me are, you know, some industries that are probably a little antiquated in how they're run.  One is the telecom industry. I think it's a good example.  *Riot Blockchain, our company, we own 52 percent of a company called Tess that is developing a blockchain technology to disrupt the telecom industry. . . . they're developing a token technology where all funds are held in a trust account and they basically have their own blockchain technology system that would allow the bypass of all these different intermediaries.[108]*

276.   The same day, Riot issued a press release titled "Riot Blockchain Featured in 5-Part Series on CBA Interactive This Week," in which the Company touted Defendant O'Rourke's appearance in [t]he segments released thus far."[109]

277.   O'Rourke's above statements during his November 15, 2017 appearance on CBS TechRepublic and in the Company's coordinated press release were materially false and misleading when made because they led the market to believe that Riot's partial ownership in Tess was part of a legitimate strategy to develop "blockchain technology" to "disrupt the telecom industry" when in fact, and unknown to investors, Riot's investment in Tess was a conflicted, related-party transaction involving some of the same individuals who set up the conflicted Kairos transaction.  Moreover, Riot had already signed a letter of intent to merge Tess with another undisclosed related party, Cresval, which was an undercapitalized and illiquid company with ties to Defendants and various members of the Honig Group.

278.   In response, Riot's stock *price increased by 11.6%* from an opening price of $7.10 per share on November 15, 2017, to a closing price of $7.93 per share on November 15, 2017.

---

[108] CBS, Tech Republic:  Why the blockchain will disrupt the enterprise (Nov. 15, 2017).

[109] Each of O'Rourke's 2-3 minute "segments" in this "5-Part Series on CBS" was clearly filmed during a single sitting.  The interview could have lasted no longer than ten minutes.

783086.1

Q.    November 16, 2017 – Riot Announces an Investment in Verady, LLC

279.    On November 16, 2017, the Company issued a press release announcing that it had made a strategic investment in Verady, LLC, a company providing accounting, audit, and verification for blockchain based assets.  In the press release, Defendant O'Rourke stated, "With recent highs in Bitcoin and other cryptocurrency valuations, there is significant market potential for blockchain and digital asset technologies.  *We will continue to increase our involvement and support of the blockchain ecosystem, as we ramp up our Bitcoin mining operations*."

280.    The above statement in Riot's November 16, 2017 press release was materially false and misleading when made and otherwise omitted material information because it failed to disclose the Honig Group's role in the Company's operations or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert—along with Defendants O'Rourke, McGonegal, O'Rourke, Dai and Kaplan—as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

281.    The November 16, 2017 press release was also false and misleading because it necessarily implied that Riot as of this time had active mining operations that it could "*ramp up*" when in fact the Company did not begin to actively mine cryptocurrencies until much later in 2018.  Indeed, the Company's April 14, 2018 Form 10-K, which was issued five months after this press release, states that as of April 2018 Riot was still in the process of "building" a cryptocurrency mining operation, "*[t]he Company is building a cryptocurrency mining operation . . .*"  Thus, Defendant O'Rourke's statement on November 14, 2017 that Riot was "ramp[ing] up" its mining operations was materially false and misleading when made.

282.   In response to the November 16, 2017 press release, Riot's stock price increased by about 2% from an opening price of $7.93 per share on November 15, 2017, to a closing price of $8.12 per share on November 16, 2017.

R.   **November 17, 2017 – CBS Publishes More Commentary by O'Rourke**

283.   On November 17, 2017, CBS TechRepublic published further footage of O'Rourke's interview, in which O'Rourke touted Riot as a means for investors to "Get Started with Blockchain Tech."



[Interviewer:]   **John O'Rourke, CEO of Riot Blockchain.  I wonder if you could leave us with some advice.  If my company is interested in investing in, or at least becoming involved with the blockchain, what are the best first steps?**

[Defendant O'Rourke:]   *I would say the best first steps to get involved in bitcoin or blockchain -- so it's kind of a difficult thing right now for the average person to get exposure to bitcoin or to blockchain technologies.  One of our driving forces at Riot Blockchain was to try to provide that access and gateway to blockchain through potential investment in Riot Blockchain.  So we have two different blockchain technology companies underneath our hood.  We're building out a cryptocurrency mining division, but -- so the goal was right now, for the average person, it's difficult to get that exposure, because whether you're trying to buy bitcoin directly, it's not an easy onboarding process.  You have to create an account with an exchange, create a wallet, there's some security issues if you don't know what you're doing.  So that's what we're attempting to solve.  That's a problem we're attempting to solve to provide, you know, one way where*

201

~~a person could potentially, you know, get exposure to the industry through a traditional capital markets company that's listed on the NASDAQ.~~

~~284.   The above statements in Riot's November 17, 2017 press release were materially false and misleading when made for the reasons articulated in Section V, and because they led the market to mistakenly believe that investing in Riot was among the "best first steps" that investors could take "to get involved in bitcoin or blockchain" because, as O'Rourke stated "[o]ne of our driving forces at Riot Blockchain was to try to provide that access and gateway to blockchain through potential investment in Riot Blockchain" so that investors could " get exposure to the industry through a traditional capital markets company that's listed on the NASDAQ." In fact, Riot was not a "traditional capital markets company listed on NASDAQ" and it did not provide investors to "access and gateway to blockchain" because at that time, Riot was not mining blockchain, and its only investments in equipment to do so had resulted in massive funneling of money to Defendants and their associates by overpaying for equipment that was available at retail prices seven times lower. Thus, an "investment in Riot" was not a "gateway to blockchain" but rather a unrecoverable gift to Defendants, their associates, and various undisclosed related parties.~~

~~285.   Following O'Rourke's second appearance on CBS, Riot's stock price continued to increase over the next three days from $8.12 per share on November 16, 2017, to a closing price of $11.26 per share on November 21, 2017—an *increase of 38.6%* on increased trading volume.~~

~~286.   On November 21, 2017, *Zack's Investment Research* commented that "[s]hares" of "the former biotech equipment company, which now focuses on buying cryptocurrency and blockchain businesses, have . . . soared nearly 50% in the past five days" and noted that "The company exploded into popularity on investing social media forums only recently. . . ."[110]~~

---

~~[110] Ryan McQueeney, *Meet Riot Blockchain, Wall Street's Latest Trendy Stock,* Zack's Investment Research (Nov. 21, 2017).~~

783086.1

S.     December 11, 2017 – Riot Announces TessPay's "Intent for Merger with Publicly Traded Cresval Capital Corp."

287.   On December 11, 2017, Riot announced that TessPay had signed a "letter of intent" for a merger with Cresval:

CASTLE ROCK, Colo., Dec. 11, 2017 /PRNewswire/— Riot Blockchain Inc. (Nasdaq: RIOT) (the "Company'") today announced that its majority owned Tess Inc. ("TessPay") has entered into a non-binding letter of intent ("LOI") to merge with Cresval Capital Corp. ("Cresval") (TSX-V: CRV). TessPay is a blockchain company developing a supply chain payment platform for businesses to attempt to guarantee payment on time and in full. After the closing of the anticipated merger, TessPay will be publicly traded on the TSX Venture Exchange (the "TSXV") and change its name to "TessPay Inc.".

The LOI provides that TessPay will be issued 80,000,000 shares of Cresval, and the present shareholders of Cresval will retain 8,400,000 shares of the combined company TessPay post-merger. Riot Blockchain will receive 41,600,000 shares resulting from its 52% ownership of TessPay.

Assuming that TessPay and Cresval enter into a definitive agreement, *the parties expect that the merger can be completed by the 2nd quarter of 2018.* No assurance can be given that a definitive agreement will be entered into, that the proposed merger will be consummated, or that the combined company will be able to obtain adequate funds needed to fund its business plan.

*The merger would be the first of Riot Blockchain's investments to become a stand-alone public company.* Haywood Securities Inc acted as a financial advisor on the transaction.

Jeff Mason, Chief Executive Officer of TessPay, stated, *"The decision to take the company public provides us access to traditional capital markets as we continue developing our blockchain technology solution. This environment will also foster transparency and accountability moving forward, providing confidence to investors and prospective customers alike."*

288.   The above statements in Riot's December 11, 2017 press release – and in particular the statements that *"[t]he decision to take [TessPay] public provides us access to traditional capital markets as we continue developing our blockchain technology solution"* and that *"[t]his environment will also foster transparency and accountability moving forward, providing confidence to investors and prospective customers alike"* – were materially false and misleading

203

when made or omitted material information because they failed to disclose the Honig Group's role in the Company or that at this time the Honig Group beneficially owned in excess of 55% of Riot's outstanding shares (and likely much more) and were acting in concert – along with Defendants Beeghley, McGonegal, O'Rourke, Dai, and Kaplan – as part of a common scheme and conspiracy to artificially inflate the price of the Company's stock at the expense of other public shareholders.

289.   The October 27 Investor Presentation also failed to disclose the Honig's Group's participation in Riot's "*strategic investment in Coinsquare*" or that members of the Honig Group had existing financial and contractual ties to Riot through this transaction – including as parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement.

290.   Additionally, the October 5 Investor Presentation was false and misleading because it failed to disclose that, according to the allegations in the *Honig* Action, Defendant Honig shared an office with a Riot insider, namely Defendant O'Rourke, who at this time was a Riot board member and acting Company president.  Indeed, Defendant O'Rouke signed the October 3, 2017 Articles of Merger on *behalf of Riot* as part of the corporate name change from Bioptix to Riot under Nevada law.  This highly unusual arrangement between the President of the Company and a significant outside shareholder was confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig in February 2018 and instead found Defendant O'Rourke at Honig's office.

291.   In response to Riot's December 11, 2017 announcement of TessPay's "intent" to merger with Cresval, Riot's stock price *increased by more than 45%*, or $7.22 per share, from an opening price of $15.86 per share on December 8, 2017, to a closing price of $23.08 per share on December 12, 2017.  Trading in Riot's stock reached all-time records, with more than *20 million*

204

*shares* of Riot stock traded on December 11 alone.  As discussed below, this merger ultimately never occurred.[111]

403.    December 12, 2017Defendant O'Rourke would have been aware of these transactions and the related parties involved, as set forth herein, by virtue of his position at this time as the President, CEO, and Chairman of the Board of Riot.  O'Rourke would also have been aware given his long-standing business relationship with Honig and other members of the Honig Group, both prior to and during his tenure at Riot.  This is most prominently evidenced by the February 16, 2018 CNBC expose where reporters at CNBC arrived at Honig's office only to find O'Rourke.  Thus, O'Rourke was in a position, consistent with his duties and obligations as an officer and director under the federal securities laws, to ensure that these related parties' involvement in the three transactions described above were properly disclosed to Riot's public shareholders.

T.6.    December 12, 2017 – **Proxy Statement (Form DEF 14A)**

404.    On December 12, 2017, Riot filed its Annual Definitive Proxy Statement under Schedule 14A (the "2017 Proxy") with the SEC.  The 2017 Proxy announced that the Company's Annual Meeting would take place on December 28, 2017 and that Riot shareholders were invited to attend and encouraged to vote.  In a letter to shareholders signed by O'Rourke and included at the beginning of the 2017 Proxy, he outlines the "primary business" of the shareholder meeting.  Notably, virtually all of this business related to events taking place in fiscal year 2017.  The letter states in relevant part:

---

[111] Ultimately, on February 15, 2018, Cresval announced that it had "terminated its proposed plan of arrangement with Tess Inc. . . . due to Tess' inability to complete the application for listing of the resulting issuer, TessPay Inc., on the TSX Venture Exchange."  *See* https://www.globenewswire.com/news-release/2019/02/15/1733509/0/en/Cresval-Capital-Corp-Terminates-Arrangement-With-Tess.html.

783086.1

**Formatted:** Heading 4

*The principal business of the meeting will be* (i) to *elect as directors the nominees named in this proxy statement to serve until 2018 Annual Meeting of Shareholders* and until their successors are duly elected and qualified, (ii) *to ratify the appointment of EisnerAmper LLP as our independent public accountant for the fiscal year ending December 31, 2017,* (iii) to advise us as to whether you approve the compensation of our named executive officers (Say-on-Pay), (iv) *to approve an amendment to the Company's 2017 Equity Incentive Plan* to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares and (v) to transact such other business as may be properly brought before the Annual Meeting and any adjournments thereof.

292.    In addition On December 12, 2017, the Company issued a Proxy Statement on Form

DEF 14A pursuant to Section 14(a) of the Exchange Act (the "2017 Proxy Statement").

405.    to the above, numerous other events taking place in fiscal year 2017 are referenced

in the 2017 Proxy including but not limited to the following:

(i)    Tables setting forth *current* share ownership of insiders (i.e., current as of December 2017);

(ii)    Tables setting forth *current* share ownership of 5% or greater shareholders;

(iii)    Information concerning the (alleged) independence of the *current* board members;

(iv)    Information concerning the Riot's "Code of Conduct" *which did not exist until November 2017*, and which was included under the "Audit Committee's Report".

406.    Also included in the 2017 Proxy is information concerning "Section 16(a)

Beneficial Ownership":

Section 16(a) of the Securities Exchange Act of 1934 requires the Company's directors, executive officers, and shareholders who own more than 10% of the Company's stock to file forms with the SEC to report their ownership of the Company's stock and any changes in ownership. . . . We have reviewed all forms provided to us. Based on that review and on written information given to us by our executive officers and directors, *we believe that all Section 16(a) filings during the past fiscal year were filed on a timely basis and that all directors, executive officers and 10% beneficial owners*

206

**Formatted:** Normal, Justified, Indent: Left:  1", Right: 0.5", Tab stops:  1", Left

*have fully complied with such requirements during the past fiscal year.*

407. Additionally, the 2017 Proxy stated the following about related party transactions:

**Certain Relationships and Related Transactions**

~~The Audit Committee[113] has responsibility for reviewing and, if appropriate, for approving any related party transactions that would be required to be disclosed pursuant to applicable SEC rules.~~ ***The Audit Committee has responsibility for reviewing and, if appropriate, for approving any related party transactions that would be required to be disclosed pursuant to applicable SEC rules.*** This includes current or proposed transactions in which the Company was or is to be a participant, the amount involved exceeds the lower of either $120,000 or 1% of the average of the Company's total assets at year-end for the last two completed fiscal years, and in which any of the Company's executive officers, directors, or greater than five percent shareholders, or any members of their immediate families, has a direct or indirect material interest. ***Apart from any transactions disclosed herein, no such transaction was entered into with any director or executive officer <u>during the last fiscal year</u>***. Such transactions will be entered into only if found to be in the best interest of the Company and approved in accordance with the Company's Code of Ethics, which are available on the Company's web site.

Except for the employment agreements previously entered into between the Company and certain of its named executive officers, <u>**since January 1, 2016**</u>, **none of the directors or named executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its common stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company.**

408. The statement above ~~statements in Riot's~~ from the 2017 Proxy ~~Statement~~ about beneficial ownership, specifically the statement that "we believe that all Section 16(a) filings during the past fiscal year were ~~materially~~ filed on a timely basis and that all directors, executive

---

[113] On December 12, 2017, Riot's Audit Committee consisted of Defendants Les, Kaplan, and So.

207

783086.1

officers and 10% beneficial owners have fully complied with such requirements during the past fiscal year" was false and misleading when made and omitted material information becauseor otherwise omits material information because O'Rourke knew or should have known, in light of Schedules 13D filed by Honig and DeFrancesco in January 2017, that they were beneficial owners of greater than 10% of Riot's outstanding shares.  He also knew that throughout 2017 Honig and DeFrancesco were acquiring additional shares without properly disclosing the transactions under the federal securities laws.

409.  For example, O'Rourke knew as set forth herein, that Honig and DeFrancesco were involved in related-party transactions during 2017 that *increased* their share ownership.  Indeed, Honig received convertible shares in both the March 2017 Private Placement and the Kairos transaction.  Likewise, DeFrancesco received convertible shares of Riot as part of the Kairos transaction.  Yet, as of the filing of the December 2017 Proxy, neither Honig nor DeFrancesco had updated their 13D filings since January 2017.

410.  As explained above, O'Rourke was aware of these transactions by virtue of his role as an officer and director of the Company, and would have known given this role that they resulted in Honig and DeFrancesco increasing their share ownership in the Company.  Of course, it stated that "*none*" of the directors, officers, or anywas not until later than Riot's public shareholders learned that – rather increase their share ownership during the Class Period (through related party transactions or otherwise) – they were instead selling shares at artificially inflated prices to unsuspecting investors.

293.411.  The statement other above about related party transactions, specifically that since "January 1, 2016 [no] person owning 5% or who owned of record or was known to own beneficially more than 5% of the company's common stockCompany's shares . . . has had "any

*Formatted: Don't keep with next*

*Formatted: Font: Not Bold, Not Italic*

208

material interest, direct or indirect, in any transaction, or in any proposed transaction" when in , which has materially affected or will affect the Company" was also false and misleading when made or otherwise omitted material information because, because several 5% or greater shareholders did in fact Defendant Honig and various members of the Honig Group and Company insiders participated in transactions completed in the months leading up to the filing of the 2017 Proxy Statement.  Most notably, as explained in Section V, above, members of the Honig Group and Defendants Kaplan and So were investors in have a material interest transactions during 2017, including the March 2017 Private Placement, the Coinsquare and parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement – an agreement in which the Company was also a party.  In addition, Defendants Honig and DeFrancesco were undisclosed shareholders of in Kairos, a Company that Riot acquired.transaction, and the Kairos transaction. O'Rourke's failure to disclose these transactions in the 2017 Proxy is both an affirmative misstatement, as explained above, and a material omission for the same or similar reasons alleged herein.

412.    FromDefendants may attempt to argue that in light of the statement below ("*the year ended, December* 11 to 12.*31, 2016*") along with the language above "*during the last fiscal year*" – that it was unambiguously clear to Riot investors that the "Section 16(a) Beneficial Ownership" and "Certain Relationships and Related Transactions" sections of the 2017  Proxy only concerns events taking place during fiscal year 2016:

> *We [Riot's* stock price *increased an additional than 22%* from a closing price of $23.08 per share on *Audit Committee] hereby report to the Board of Directors that, in connection with the financial statements for the year ended December* 11, 2017, to a closing price of $28.20 per share*31, 2016,* we have:

- reviewed and discussed the audited financial statements with management and the independent accountants;

783086.1

- approved the appointment of the independent accountants;
- discussed with the independent accountants the matters required to be discussed by SAS 61 (Codification of Statements on Auditing Standards, AU section 380), as modified by SAS 89 and SAS 90; and
- received the written disclosures and the letter from the independent accountants required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the Audit Committee concerning independence, and discussed with the independent accountant the accountant's independence.

Based on the discussions and our review discussed above, *we recommended to the Board of Directors that the audited financial statements for the year ended **December** 12-31, 2016 be included in the Company's 2016 Annual Report to Shareholders on Form 10-K for that fiscal year.*

> **Formatted:** Font: Bold, Italic, Underline

413.   However, this interpretation of "during the last fiscal year" is at best ambiguous and at worst completely off-base. Indeed, as explained above, many other 2017 fiscal year events are referenced in the 2017 <s>Trading</s> Proxy. For example, the "Code of Conduct" section of the proxy appears immediately before the "Section 16(a) Beneficial Ownership" section, which, as noted above, describes events taking place just *one month earlier during fiscal year 2017*. Additionally, among the bullet points that followed the statement "[w]e hereby report . . . in connection with the financial statements for the year that ended December 31, 2016" there is no reference whatsoever to whether the "report" included a review of related party transactions occurring during fiscal year 2016. Instead, the report plainly concerns "audited financial statements" included in Riot's <s>stock continued to reach new records, with more than *36 million shares* of Riot stock traded on December 12 alone.</s>2017 10-K, which was filed nine months earlier on March 31, 2017. In other words, the 2017 Proxy does not disclose to the Company's shareholders – either way – that these specific sections of the proxy were unambiguously intended

783086.1

to cover a period of time in 2016 and exclude all transactions that may have taken place in the eleven months since that time (i.e., during preceding eleven months in 2017).

294.414.  Given other references in the 2017 Proxy to events taking place in fiscal year 2017, and in light of the fact that O'Rourke's opening letter in the proxy states that the "principle business" of the shareholder meeting occurred during 2017 and not 2016, Riot's public shareholders would not have known that the "during the last fiscal year" language meant in plain and unambiguous terms, fiscal year 2016 rather than fiscal year 2017.

### U.7.   **December 19, 2017**  – Current Report (Form 8-K) and **Press Release** – "Riot Blockchain Announces $37 Million Private Placement"

295.  On December 19, 2017, the Company issued a press release Riot filed an 8-K announcing that Riotthe Company had entered into private placement agreements with unnamed accredited investors to sell $37 million units of securities at a purchase price of $22.50 per unit. Each unit consisted of one share of the Company's common stock and a three year warrant to purchase one share of common stock at an exercise price of $40.00 per share. The December 19, 2017 In a corresponding press release states in relevant part:

Riot **Blockchain Announces $37 Million Private Placement**

*Proceeds to be used for expansion of Bitcoin mining operations and strategic investments*

CASTLE ROCK, Colo., Dec 19, 2017 — Riot Blockchain Inc. (Nasdaq: RIOT) (the "Company") today announcedstated  that  it has entered into subscription agreements with accredited investors for the purchase of 1,644,444 restricted units of the Company at a purchase price of $22.50 per unit (the "Investment").  Each unit consists of one share of restricted common stock and one warrant to purchase one share of restricted common stock at an exercise price of $40.00 per share for a period of three years.  The closing of the Investment is subject to customary closing conditions, including approval of the listing of the securities on The NASDAQ Stock Market LLC.

783086.1

415.   *The* "[t]he $37 million in gross proceeds from the *Investment*investment will be used for the expansion of the Company's Bitcoin mining operations, strategic investments, and general working capital.*"* The December 19, 2017 Form 8-K stated in relevant part:

Canaccord Genuity Inc acted as a financial advisor to the Company on the transaction.

296.   The above statements in Riot's December 19, 2017 press release were materially false and misleading when made or omit material information because they fail to disclose that two large shareholders and members of the Honig Group, namely Defendants Honig and Defrancesco, were among the "*accredited investors*" who were invited to participate in the private placement, with Defendant Honig investing $500,000 and Defendant Defrancesco investing $360,000.

297.   The above statements in the December 19, 2017 press release were also misleading when made because when read in context with the Company's 2017 Proxy which was only filed five days earlier, they led the market to believe that "*none*" of the Company's 5% shareholders "*has any material interest, direct or indirect, in any transaction, or in any proposed transaction.*" In other words, the 2017 Proxy and the December 19, 2017 press release when read together imply that no 5% (or higher) shareholders were participating in the $37 million private placement when in fact Defendant Honig and Defendant Defrancesco were among the "*accredited investors*" in the transaction.

298.   In addition, the statement from the December 19, 2017 press release that "*[t]he $37 million in gross proceeds from the Investment will be used for the expansion of the Company's Bitcoin mining operations*" was false and misleading when made because, as explained in Section

V above, Riot had no "***mining operations***" at this time.  In fact, months later in April 2017,

Company was still "***building***" its mining operations.

IX.     AS TRUTH BEGINS TO EMERGE, DEFENDANTS CONTINUE TO MISLEAD
        THE MARKET

        A.     December 19, 2017 CNBC Interview with Andrew Left of Citron Research

        299.   On December 19, 2017, after the market closed, CNBC's *Fast Money* aired an

interview with Andrew Left ("Left"), founder of Citron Research, who made shocking revelations

about Riot:

        "Even worse than the [initial coin offerings] that you see present white papers . . .
        [Riot] ha[s] a few small investments, just enough to go ahead and put it public. And
        they roll it out, and with enough promotion, and obviously with the hype behind
        crypto and the lack of assets, there it goes. ***The whole time really misrepresenting
        the fact that nothing that they have is [ ] a real player in the crypto industry***."

        "[Riot] ha[s] a small investment in . . . Coinsquare and think it might be right now
        like ***the number 200 trader of bitcoin***, a really insignificant investment.  So you
        shouldn't be surprised . . . . ***Out of Boca Raton Florida***, buys some assets in
        Canada, do the normal shuffle, and then it goes to stock."
        Left was then asked if it was his contention that "there's actual fraud going on at
        [Riot] or that it is simply overstating its relationship to blockchain and bitcoin?"
        Left responded:  "***If you want to talk about people front running the stock before
        they make announcements, I'm sure you could look at that***."

        300.   In response, Riot's stock price fell by ***6.42%***, on continued heavy trading, from a

closing price of $38.60 per share on December 19, 2017, to a closing price of $36.12 per share on

December 20, 2017, damaging Lead Plaintiff and members of the Class.

        301.   On December 21, 2017, several articles were released that suggested that Riot's

name change to include the word "Blockchain" was a publicity stunt.  *Reuters*, for example,

reported that Riot was one of the "growing list of companies jumping onto blockchain bandwagon,

courtesy of Bitcoin's stratospheric rise."  *Zacks* also published an article entitled "Why Trendy

Bitcoin Stocks like Riot Blockchain Are Tanking – ZACKSC."  In discussing Riot's stock price,

the article stated:  "the popular biotech firm turned blockchain investor, Riot Blockchain, has

slumped about 30% from its highs. Questions about the legitimacy of Riot's business model, which sees the once-dying diagnostics machinery company invest in various firms involved in the bitcoin and Ethereum ecosystems, were exacerbated this week after the stock was targeted by Citron Research."

302.   The next day, December 22, 2017, *Business Insider* reported that Riot lacked a Chief Technology Officer with experience in cryptocurrency, and was seeking such an employee, and while technical background in cryptocurrencies was not required, Riot said such experience would be "a big plus":

It looks like Riot Blockchain put the horse before the carriage. The company, which pivoted to blockchain after operating for more than a decade as a biotech firm under the name BiOptix Diagnostics, is on the hunt for a chief technology officer, according to a job posting on LinkedIn. "Riot Blockchain is seeking a technically-experienced and highly-motivated CTO candidate with a passion for blockchain technology," the ad said. The candidate should be able to juggle a number of tasks, including the "implementation of technical aspects, recruit top developers and blockchain specialists, and build bridges and network with blockchain community." The CTO will also help build out the firm's crypto-mining operations. *Still, a technical background in cryptocurrencies is not required. "Technical experience in cryptocurrency or cryptocurrency mining is a big plus,"* the ad said.

303.   Also on December 22, 2017, *Reuters* published the article entitled, "ANALYSIS-Cryptocurrency stocks holding gains despite bitcoin pullback – RTRS." The article stated that Riot and other "crypto stocks came under pressure on Friday." Regarding such stocks, the article noted, in relevant part: "While the stocks are susceptible to price moves in bitcoin itself, analysts caution investors should make sure the company has a credible business model."

304.   As a result of the disclosures on December 19 through 22, 2017, Riot's stock price declined $11.60 per share, or ***34.75%***, on heavy trading over the course of two trading days. The Company's stock price declined from a closing price of $36.12 per share on December 20, 2017,

to a closing price of $24.52 on December 22, 2017, damaging Lead Plaintiff and members of the Class.

**B.      December 27, 2017 – Riot Abruptly Cancels Its Annual Shareholder Meeting**

305.    On December 27, 2017, the Company issued a press release, titled "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders."  The press release announced that the 2017 Annual Meeting of Stockholders, which was scheduled for the following day, had been cancelled.  The release stated, in relevant part:  "***Riot Blockchain, Inc. (Nasdaq: RIOT) (the 'Company') today announced that its 2017 Annual Meeting of Stockholders scheduled for December 28, 2017 (the 'Annual Meeting'), was adjourned to achieve a quorum on the proposals to be approved.***"

306.    These statements were also misleading because the Company never intended to hold its 2017 Annual Meeting of Shareholders scheduled for December 28, 2017.  As CNBC reported, "[i]t's not clear the company ever planned to have the meeting [scheduled for the Boca Raton Resort and Club in Florida].  Numerous employees at the hotel told CNBC it had no reservations for either name under the name of Riot Blockchain or any affiliated entity."  Moreover, when asked about the adjournment by CNBC, Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP, stated:  "I just don't think in this instance, there's any reason to adjourn their annual meeting."

307.1.  On January 2, 2018, *Reuters* published an article prior to the market open entitled, "BUZZ-Riot Blockchain down after CEO reports stock offering – RTRS."  The article stated that Riot's stock price was down 4.44% in pre-market trading after Defendant O'Rourke had reported his sale of over 30,000 shares.  An article published during early morning trading hours, on the popular investor website, *The Motley Fool*, entitled, "Riot Blockchain's CEO Just Sold a Lot of Stock," detailed Defendant O'Rourke's suspicious trading, stating in relevant part:

No one knows a company better than its insiders. For this reason, it's my view that prices at which companies and their insiders buy and sell stock give a hint about a company's true value.

\* \* \*

**An insider dumps his shares**

Right before a holiday weekend, and two days after the company announced it was adjourning its annual shareholders meeting until February, Riot Blockchain's chief executive officer, John R. O'Rourke III, filed a Form 4 with the SEC disclosing he and his firm, ATG Capital LLC, sold 30,383 shares of Riot on Dec. 29.

\* \* \*

These sales are material, representing about 37% of shares he and ATG Capital owned or would soon control prior to the transactions.

O'Rourke now holds 12,500 shares through ATG Capital LLC, in addition to 39,500 shares of stock in his own name that he currently owns, or will receive over the next 60 days from his role as Riot's chief executive officer. (O'Rourke received 344,000 restricted shares that vest in 24 monthly installments when he became CEO in November.)

**Hiding bad news**

These sales were curiously timed. O'Rourke sold his shares and filed the Form 4 after-market close before a major holiday weekend, when most investors would be thinking about their New Year's Eve plans rather than their investment portfolios.

Stock analysts, journalists, and political-types refer to this activity as a "Friday night dump," a common practice of releasing otherwise newsworthy information at a time when people are least likely to be paying attention. One study from 2005 found that "Friday announcements are 20 percent more likely to present negative earnings than announcements on other weekdays." Insider selling certainly fits in the "negative" category.

O'Rourke has every reason to sell quietly. When taken together with Riot's deeply discounted equity raise earlier this month, his sales suggest recent market prices are a better price at which to sell its shares than buy them. It's also interesting to me that O'Rourke is selling before a postponed annual shareholders meeting in which Riot is asking shareholders for the right to add another 750,000 shares of stock to the company's bonus pool for insiders.

Formatted: Indent: First line: 0.5"

216

308.1.   On this news, Riot's stock price declined $4.04 per share, or *14.45%*, over two trading days, from $28.40 per share on December 29, 2017, to $24.36 per share on January 3, 2018, damaging Lead Plaintiff and members of the Class.

C.A.   December 29, 2017 – O'Rourke Sells 30,383 Shares for Proceeds of $869,256

1.      On December 29, 2017, after the market closed and going into a three-day holiday weekend, Defendant O'Rourke sold 30,383 shares of Riot for proceeds of $869,256. O'Rourke's sale was quickly picked up by media outlets.[113]

**Formatted:** Paragraph Numbered Style, Left, Indent: First line:  0", Line spacing:  single, Tab stops: Not at  1"

On December 18, 2017, Riot Blockchain, Inc. (the "Company") entered into agreements to sell $37 million units of its securities (the "Units") pursuant to separate purchase agreements (the "Securities Purchase Agreements") with accredited investors (the "Investors"), at a purchase price of $22.50 per Unit. Each Unit consists of one share (the "Shares") of the Company's common stock, no par value per share (the "Common Stock"), and a three year warrant (the "Warrants") to purchase one share of Common Stock, at an exercise price of $40.00 per share (such sale and issuance, the "Private Placement"). The closing of the Private Placement is subject to customary closing conditions. The news release announcing the Private Placement is attached as Exhibit 99.1.

The Warrants are exercisable, at any time on or after the sixth month anniversary of the closing date of the Private Placement, at a price of $40.00 per share, subject to adjustment, and expire three years therefrom. The holders may, subject to certain limitations, exercise the Warrants on a cashless basis. The Company is prohibited from effecting an exercise of any Warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such Warrant.

The Company entered into separate registration rights agreements (the "Registration Rights Agreement") with each of the Investors, pursuant to which the Company will undertake to file a registration statement to register the Common Stock issued as part of the Units and the Common Stock issuable upon exercise of the Warrants, within fourteen days following the closing, to cause such registration statement to be declared effective by the Securities and Exchange Commission

---

[113] *See, e.g., John R. O'Rourke III Sells 30,383 Shares of Riot Blockchain Inc (RIOT) Stock*, American Banking and Market News (Dec. 30, 2017) ("CEO John R. O'Rourke III sold 30,383 shares of the firm's stock in a transaction dated Friday, December 29th. The shares were sold at an average price of $28.61, for a total transaction of $869,257.63.").

within ninety days of the filing date and to maintain the effectiveness of the registration statement until all of such shares of Common Stock registered have been sold or are otherwise able to be sold pursuant to Rule 144. In the event the Company fails to file, or obtain effectiveness of, such registration statement with the given period of time, the Company will be obligated to pay liquidated damages to the Investors for every thirty-days during which such filing is not made and/or effectiveness obtained, such fee being subject to certain exceptions.

The offering was made pursuant to an exemption from registration under Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act") and/or pursuant to Rule 903 of Regulation S promulgated under the Securities Act.

416.    The foregoing descriptions of the Securities Purchase Agreement, the Registration Rights Agreement and the Warrants are not complete and are qualified in their entireties by reference to the full text of the Form of Purchase Agreement, the Form of Registration Rights Agreement and the Form of Warrant, copies of which are filed as Exhibit 10.1, Exhibit 10.2 and Exhibit 4.1, respectively, to this Report and are incorporated by reference herein.

417.    As with other related party transactions described herein, (i) the March 2017 Private Placement; (ii) the Coinsquare transaction; and (iii) the Kairos transaction, the December 19, 2017 Form 8-K and press release failed to disclose that Honig and DeFrancesco, both of whom held greater than 5% of the outstanding shares of the Company, were among the so-called "accredited investors" invited to participate in the December 2017 Private Placement and Securities Purchase Agreement. Yet, it was not until months later, on April 17, 2018, that Riot first disclosed in a Form 10-K that Honig and DeFrancesco participated in this transaction and that they invested $500,000 and $360,000, respectively. As explained above, under SEC Regulation S-K Item 404 and GAAP Honig and DeFrancesco should have been disclosed as related parties to this transaction given their ownership interest in the Company. O'Rourke was in a position, consistent with the duties and obligations of officers and directors under the federal securities laws, and as a close

218

business associate of Honig, to ensure that Honig and DeFrancesco's participation in the December 2017 Private Placement as related parties was properly disclosed to Riot's public shareholders.

**D.1.    January 5, 2018 Securities Registration Statement (Form S-3)**

Formatted: Heading 4

309.1.   On January 5, 2018, after the close of trading on a Friday, leading into a weekend, Riot filed a Securities Registration Statement on Form S-3 registering, for sale to the investing public, 3,292,226 shares of common to be sold by the following "Selling Stockholders":

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| 2330573 Ontario Inc. | 96,444 (1) | * | 88,888 (33) | 52,000 | * |
| Acquisition Group Limited | 135,556 (2) | 1.16% | 71,112 (33) | 100,000 (34) | * |
| Armand Reale | 4,000 (3) | * | 8,000 (33) | - | * |
| Catherine DeFrancesco ITF Ava Defrancesco | 22,911 (4) | * | 7,112 (33) | 19,355 (35) | * |
| Catherine DeFrancesco ITF Devlin DeFrancesco | 22,911 (5) | * | 7,112 (33) | 19,355 (36) | * |
| Catherine DeFrancesco ITF Lachlan Defrancesco | 22,911 (6) | * | 7,112 (33) | 19,355 (37) | * |
| Catherine DeFrancesco ITF Summer Defrancesco | 22,911 (7) | * | 7,112 (33) | 19,355 (38) | * |
| Clara Serruya | 266,667 (8) | 2.29% | 533,334 (33) | - | * |
| DeFrancesco Motorsports Inc. | 5,333 (9) | * | 10,666 (33) | - | * |
| Delavaco Holdings Inc. | 10,667 (10) | * | 21,334 (33) | - | * |
| Eduardo Vivas | 6,667 (11) | * | 13,334 (33) | - | * |
| First Canadian Insurance Corp | 14,000 (12) | * | 28,000 (33) | - | * |
| Glass Investments LP | 13,444 (13) | * | 26,888 (33) | - | * |
| Grander Holdings, Inc. 401K | 217,733 (14) | 1.86% | 266,666 (33) | 84,400 (39) | * |
| GRQ Consultants, Inc. | 22,222 (15) | * | 44,444 (33) | - | * |
| GT Capital Inc | 29,436 (16) | * | 26,666 (33) | 16,103 (40) | * |
| Hudson Bay Master Fund Ltd | 333,334 (17) | 2.87% | 666,668 (33) | - | * |
| Interward Capital Corp. | 4,000 (18) | * | 8,000 (33) | - | * |
| Intracoastal Capital LLC | 133,334 (19) | 1.15% | 266,668 (33) | - | * |
| LDIC Inc. ITF McGilligan Barry Investments Ltd. | 11,100 (20) | * | 22,200 (33) | - | * |
| Marcandy Investments Corp. | 5,333 (21) | * | 10,666 (33) | - | * |
| Monroe Capital, LLC | 22,000 (22) | * | 44,000 (33) | - | * |
| Melechdavid Inc. | 131,945 (23) | 1.13% | 88,890 (33) | 87,500 (41) | * |
| Michael Ference | 4,444 (24) | * | 8,888 (33) | - | * |
| Millennium Insurance Corp. | 7,000 (25) | * | 14,000 (33) | - | * |
| MMCAP International Inc. SPC | 366,667 (26) | 3.15% | 733,334 (33) | - | * |
| Namaste Gorgie, Inc. | 42,927 (27) | * | 21,334 (33) | 32,260 (42) | * |
| Northurst, Inc. | 589,317 (28) | 4.99% | 177,778 (33) | 593,996 (43) | 4.99% |
| Paradox Capital Partners LLC | 4,444 (29) | * | 8,888 (33) | - | * |
| Rockhaven Holdings Ltd. | 6,000 (30) | * | 12,000 (33) | - | * |
| Sunnybrook Preemie Investments Inc. | 11,666 (31) | * | 23,332 (33) | - | * |
| York Plains Investment Corp. | 8,900 (32) | * | 17,800 (33) | - | * |

\*   Less than 1%.

\*\*  Based on 11,622,112 shares of Common Stock outstanding as of January 4, 2018.

219

**8.** ~~As in previous Forms~~  **Registration Statement (Form S-3_)**

418.   On January 5, 2018 Riot ~~stated~~filed Registration Statement Form S-3 signed by Defendant O'Rourke announcing that ~~"*[n]one*~~certain "Selling Stockholders" would sell from time to time shares of common stock and convertible warrants at varying prices ("January S-3").  The January S-3 provided representations and other information about the Selling Stockholders, including the following:

~~310.~~  *None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries within the past three years,* other than as a result of the ownership of our shares or other securities~~."~~.

~~311.   The above statement in Riot's January 5, 2018 Form S-3 was materially false and misleading when made because it states that "none" of the selling stockholders "has had a material relationship" "in the past three years" with the Company when in fact Defendant Honig and various other selling stockholders, including Honig Group members Groussman and Stetson, as well as then-current Riot board members Kaplan and So, had existing financial ties to Riot by virtue of their undisclosed investment in Coinsquare.  As investors in Coinsquare these Defendants were parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement—an agreement in which Riot was also a party.  Additionally, Defendants Honig and DeFrancesco were undisclosed investors in Kairos, a company that Riot acquired in November 2017.~~

~~312.   In addition, the above statement in Riot's January 5, 2018 Form S-3 was materially false and misleading when made due to Honig's relationship with Defendant O'Rourke. According to the allegations in the Honig Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson, and Groussman.  This highly unusual arrangement between a Company CEO and outside shareholder appeared to be confirmed even before the allegations appeared in the Honig Action when CNBC attempted to interview Defendant Honig at his office~~

220

in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke.  Additionally, as demonstrated by the chart in ¶¶ 79-80, Defendant O'Rourke has had several previous investments with Defendant Honig and other members of the Honig Group.

    **E.    January 4-5, 2018 – Riot Fires Its Independent Auditor and Files an Amended Form 8-K/A Disclosing Audited Financial Statements of Kairos Revealing that Riot Vastly Overpaid**

313.1.  On January 5, 2018, Riot filed a Form 8-K disclosing that on January 4, 2018 it had "dismissed EisnerAmper LLP . . . as its independent registered public accounting firm" and that on January 5, 2018, Riot had engaged MNP LLP.

314.1.  Later on January 5, 2018, Riot filed an amended Form 8-K/A that disclosed "audited financial statements of Kairos Global Technology, Inc." "as of November 3, 2017," as prepared and audited by Riot's new accountant (since the day before) MNP LLP.  These financial confirmed that Kairos had paid $2,089,679 for the mining equipment it quickly turned around and sold to Riot for more than $13 million.  The financial statements confirmed that Kairos "purchased equipment of $2,089,679 from a company controlled by the president[111] of the Company," and that this was a "[r]elated party transaction[]."  The financial statements also stated that "as at November 3, 2017 . . . the equipment purchased was not yet operational."

315.1.  The market reacted negatively to the January 5, 2018 news once trading began on Monday, January 8, 2018, with the Company's stock price declining $1.01 per share, or *4.13%*, from $24.41 per share on January 5, 2018, to $23.42 per share on January 8, 2018, damaging Lead Plaintiff and members of the Class.

    **F.    January 17, 2018 – Riot Announces Tess's "Definitive Agreement for Transaction with Publicly Traded Cresval Capital Corp."**

On January 17, 2018, Riot issued a press release

---

[111] Michael Ho was the President of Kairos, according to the Nevada Secretary of State's website.

419.   Included among the list of Selling Stockholders was GRQ Consultants, a Honig-controlled entity, numerous entities affiliated with DeFrancesco and her family members, and Melechdavid, an entity controlled by Groussman.  Additionally the Janaury S-3 included the following definition of "us":  "[i]n this prospectus, 'Riot Blockchain,' 'the Company,' 'we,' 'us,' and 'our' refer to Riot Blockchain, Inc. (f/k/a: Bioptix, Inc.), a Nevada corporation, unless the context otherwise requires."  The filing also lists several corporate transactions that occurred at Riot in the fourth quarter of 2017, including the Coinsquare transaction, the Kairos transaction and the December 2017 Private Placement.

420.   Defendant O'Rourke knew or should have known that the statement above was false and misleading because he was Chairman and CEO of Riot (a company that only had only about nine employees at this time), and would have been involved in each of these transactions and the preparation of the January S-3, a document that he signed.  Additionally, as set forth herein O'Rourke was a long-standing business partner of Honig and by all accounts was in close contact with Honig even during his tenure as Riot's CEO and Chairman.  Thus, O'Rourke was in a position, consistent with the duties and obligations of directors under the federal securities laws, to ensure that the Company did not issue SEC filings that contained false and misleading statements or omitted material information like those included in the January S-3.

**9.     February 7, 2018 – Registration Statement (Form S-3/A)**

316.   February 7, 2018 Riot filed Registration Statement on Form S-3 signed by Defendant O'Rourke announcing the Company's "majority-owned Tess Inc." had "entered into a definitive agreement . . . to complete a transaction with [Cresval]."  The press release further stated:

TessPay is a blockchain company developing a supply chain payment platform for businesses to attempt to guarantee payment on time and in full. After the closing of the anticipated transaction and subject to the terms and conditions of the Agreement, TessPay expects its that certain "Selling Stockholders" would sell from

time to time shares to be publicly traded on the TSX Venture Exchange (the "TSXV") and change its name to "TessPay Inc." ("TessPay").

The Agreement provides that each share of TessPay will be exchanged for of common shares of TessPay on the basis of 15.36 TessPay shares for every one (1) Tess share. Cresval will be issued 8,400,000 TessPay shares, which will be distributed pro rata to shareholders of Cresval as part of the transaction. Riot Blockchain will receive 41,600,000 shares resulting from its 52% ownership of TessPay. One of the conditions of the proposed transaction includes Tess completing a private placement financing of CAD $3,500,000 in the form of an unsecured stock and convertible notewarrants at CAD $0.10 per share into TessPay.

varying prices ("February S-3").  The parties expect thatFebruary S-3 contained the proposed transaction can be completed bysame language as the 2nd quarter of 2018. No assurance can be given that the proposed transaction will be consummated, or that the combined company will be able to obtain adequate funds needed to fund its business plan.

The merger would be the first of Riot Blockchain's investments to become a stand-alone public company.

317.   The above statement in Riot's January 17, 2018 press release were materially false and misleading when made forS-3 and included many of the same selling stockholders, incuding GRQ Consultants, DeFrancesco, and Groussman.  Thus, for all the reasons articulated in Sections V above, and because they led the market to believe that Riot's partial ownership in Tess was part of a legitimate strategy to develop "blockchain technology" to "disrupt the telecom industry" when in fact, and unknown to investors, Riot's investment in Tess was a conflicted, related party transaction involving some of the same individuals who set up the conflicted Kairos transaction. Moreover, Cresval was an undercapitalized and illiquid company with ties to Defendants and various members of the Honig Group.

318.   In response to Riot's announcement on the January 17, 2018, Riot's stock price increased **_11.4%_**, from $17.76 per share on January 16, 2018, to $19.80 per share on January 17, 2018.

783086.1

**G.**      **January 31, 2018—*The Wall Street Journal* Writes About Riot and Honig and Riot Again Cancels Its Annual Shareholder Meeting**

319.    On January 31, 2018, before the market opened, *The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."[115]  The article described how Defendant Honig had taken an aggressive stake in the Company when it was still in the medical diagnostics business and how he drove out Bioptix's CEO and others, replacing them with his own allies, including Defendant O'Rourke.  The article quoted Gail Schoettler, a former lieutenant governor of Colorado who was Chair and Director of Bioptix before it became Riot, regarding Defendant Honig:  "This guy trolls for small companies with cash and cheap shares . . . ."  The article also noted that "Honig . . . said in an interview that he sold a significant portion of his shares in recent weeks.  'When stock goes up, you take a profit,' he said."

320.    Also on January 31, 2018, the Company issued a second press release, titled "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders."  The press release announced that the 2017 Annual Meeting of Stockholders, which was scheduled for the following day, had again been cancelled.  The release stated, in relevant part:  "*Riot Blockchain, Inc. (Nasdaq: RIOT) (the 'Company') today announced that its 2017 Annual Meeting of Stockholders (the 'Annual Meeting') was adjourned for a second time to achieve a quorum on the proposals to be approved*."

321.    As a result of these revelations and disclosures, Riot's stock price *declined **14.26%*** ($1.98 per share) from $14.28 per share on January 30, 2018, to $12.30 per share on February 1, 2018, damaging Lead Plaintiff and members of the Class.

---

[115] Ianthe Jeanne Dugan, *Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake; Barry Honig pares back stake in Riot Blockchain, whose shares soared last year after a change of name*, The Wall Street Journal (Jan. 31, 2018).

224

#### H.1.    February 7, 2018    Securities **Registration Statement (Form S-3/A)**

Formatted: Heading 4

322.1.   On February 7, 2018, after the close of trading on a Friday, leading into a weekend, Riot filed a Securities Registration Statement on Form S-3 registering, for sale to the investing public, 3,292,226 shares of common to be sold by the following "Selling Stockholders":

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| 2330573 Ontario Inc. | 96,444 (1) | * | 88,888 (33) | 52,000 | * |
| Acquisition Group Limited | 135,556 (2) | 1.16% | 71,112 (33) | 100,000 (34) | * |
| Armand Reale | 4,000 (3) | * | 8,000 (33) | - | * |
| Catherine DeFrancesco ITF Ava Defrancesco | 22,911 (4) | * | 7,112 (33) | 19,355 (35) | * |
| Catherine DeFrancesco ITF Devlin DeFrancesco | 22,911 (5) | * | 7,112 (33) | 19,355 (36) | * |
| Catherine DeFrancesco ITF Lachlan Defrancesco | 22,911 (6) | * | 7,112 (33) | 19,355 (37) | * |
| Catherine DeFrancesco ITF Summer Defrancesco | 22,911 (7) | * | 7,112 (33) | 19,355 (38) | * |
| Clara Serruya | 266,667 (8) | 2.29% | 533,334 (33) | - | * |
| DeFrancesco Motorsports Inc. | 5,333 (9) | * | 10,666 (33) | - | * |
| Delavaco Holdings Inc. | 10,667 (10) | * | 21,334 (33) | - | * |
| Eduardo Vivas | 6,667 (11) | * | 13,334 (33) | - | * |
| First Canadian Insurance Corp | 14,000 (12) | * | 28,000 (33) | - | * |
| Glass Investments LP | 13,444 (13) | * | 26,888 (33) | - | * |
| Grander Holdings, Inc. 401K | 217,733 (14) | 1.86% | 266,666 (33) | 84,400 (39) | * |
| GRQ Consultants, Inc. | 22,222 (15) | * | 44,444 (33) | - | * |
| GT Capital Inc | 29,436 (16) | * | 26,666 (33) | 16,103 (40) | * |
| Hudson Bay Master Fund Ltd | 333,334 (17) | 2.87% | 666,668 (33) | - | * |
| Interward Capital Corp. | 4,000 (18) | * | 8,000 (33) | - | * |
| Intracoastal Capital LLC | 133,334 (19) | 1.15% | 266,668 (33) | - | * |
| McGilligan Barry Investment | 11,100 (20) | * | 22,200 (33) | - | * |
| Marcandy Investments Corp. | 5,333 (21) | * | 10,666 (33) | - | * |
| Monroe Capital, LLC | 22,000 (22) | * | 44,000 (33) | - | * |
| Melechdavid Inc. | 131,945 (23) | 1.12% | 88,890 (33) | 87,500 (41) | * |
| Michael Ference | 4,444 (24) | * | 8,888 (33) | - | * |
| Millennium Insurance Corp. | 7,000 (25) | * | 14,000 (33) | - | * |
| MMCAP International Inc. SPC | 366,667 (26) | 3.15% | 733,334 (33) | - | * |
| Namaste Gorgie, Inc. | 42,927 (27) | * | 21,334 (33) | 32,260 (42) | * |
| Northurst, Inc. | 592,089 (28) | 4.99% | 177,778 (33) | 612,000 (43) | 4.99% |
| Paradox Capital Partners LLC | 4,444 (29) | * | 8,888 (33) | - | * |
| Rockhaven Holdings Ltd. | 6,000 (30) | * | 12,000 (33) | - | * |
| Sunnybrook Preemie Investments Inc. | 11,666 (31) | * | 23,332 (33) | - | * |
| York Plains Investment Corp. | 8,900 (32) | * | 17,800 (33) | - | * |

\*   Less than 1%.

\*\*  Based on 11,652,270 shares of Common Stock outstanding as of February 5, 2018.

323.   As in previous Forms S-3, Riot stated that *"[n]one of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our*

*subsidiaries within the past three years other than as a result of the ownership of our shares or other securities."*

[Formatted: Normal, Justified, Indent: Left: 1", Right: 0.5", Tab stops: 1", Left]

324.   The above statements in Riot's February 7, 2018 Form S-3/A were materially false and misleading when made and otherwise omitted material information because it states that "*none*" of the selling stockholders "*has had a material relationship*" "*in the past three years*" with the Company when in fact Defendant Honig and various other selling stockholders, including Honig Group members Groussman and Stetson, as well as then-current Riot board members Kaplan and So, had *existing* financial ties to Riot by virtue of their undisclosed investment in Coinsquare.  As investors in Coinsquare these Defendants were parties to the October 2, 2017 Coinsquare Amended and Restated Unanimous Shareholder Agreement – an agreement in which Riot was also a party.   Additionally, Defendants Honig and Defrancesco were undisclosed investors in Kairos, a company that Riot acquired in November 2017. S-3 is

325.421.   In addition, the above statement in Riot's February 7, 2018 Form S-3 was materially false and misleading when made due to Honig's relationship with Defendant O'Rourke.  According to the allegations in the *Honig* Action, Defendant Honig shared an office with Defendants O'Rourke, Stetson, and Groussman.   This highly unusual arrangement between a Company CEO and a significant outside shareholder appeared to be confirmed even before the allegations appeared in the *Honig* Action when CNBC attempted to interview Defendant Honig at his office in Boca Raton, FL in February 2018 and instead found Defendant O'Rourke.  Additionally, as demonstrated by the charts in ¶¶ 79-80, Defendant O'Rourke has had several previous investments with Defendant Honig and other members of the Honig Group the same applies, and is alleged herein, as to the February S-3.

[Formatted: Heading 4]

### I.10.   **February 1116, 2018 – *The Denver Post* Publishes Statements by O'Rourke Current Report (Form 8-K) and Honig Shareholder Letter**

326.   On February 716, 2018, *The Denver Post* published an article based on interviews with Defendants O'Rourke and Honig.  The article quoted O'Rourke:

*"I'm a big believer in the company and in what we're working on.  We're the best situated in the space.  We're well capitalized."*

\* \* \*

*"In this day and age, there are a lot of skeptics and naysayers. People are looking to short and distort,"* O'Rourke said. *"But ultimately, there is an explanation for everything. Hopefully that's the story here."*

327.   The article also quoted Defendant Honig:

Many of Riot's current investors are newer to the company but Barry Honig, the investor who could be credited with the company's new destiny, was there in 2016 when it was called Venaxis. He said that he got involved only after a friend told him about the money losing stock. He saw that the biotech firm never quite recovered from a U.S. Food and Drug Administration rejection, still had cash and overpaid its executives.

"In two years, the stock is up five times," said Honig, who earlier had joined O'Rourke in suing another small startup run by anti-virus icon John McAfee for breach of contract. *"Myself, being involved as an early shareholder, people who followed me, they've benefited."*

\* \* \*

*"At the end of the day, the CEO of the company changed the name and direction,"* Honig said. *"Not me."*[116]

328.   Defendants O'Rourke and Honig's above statements published by *The Denver Post* were materially false and misleading when made and otherwise omitted material information because they attempted to dispel the allegation in some *"skeptics and naysayers"* in the media that Defendant Honig exercised certain influence or control over the Company's affairs, including Riot's transformation into cryptocurrency, through his and other Honig Group members' beneficial share ownership or close ties to O'Rourke and other Riot insiders. These statements were also materially false and misleading in that they attempted to rebut recent allegations of insider trading.

---

[116] Tamara Chuang, *What's all the Riot?*, The Denver Post (Feb. 11, 2018).

**J.     February 13, 2018 – Honig Files an Amended Statement of Beneficial Ownership (Form SC 13D/A)**

329.    Honig belatedly revealed that as of January 4, 2018, he had sold all but a 1.47% stake in Riot.  His previous filing, on January 5, 2017, had disclosed an 11.19% stake in Riot "as of November 11, 2016.  Thus, nearly a year had passed since Honig had closed, Riot filed a Form 13D.

330.    In an interview with CNBC, former SEC Chairman Harvey Pitt said this length of time is nowhere close to what he would consider to be "timely" disclosure.[147]

331.    Indeed, according to 17 CFR § 240.13d-2, "If any material change occurs in the facts set forth in the Schedule 13D (§ 240.13d-101) required by § 240.13d-1(a), including, but not limited to, any material increase or decrease in the percentage of the class beneficially owned, the person or persons who were required to file the statement shall promptly file or cause to be filed with the Commission an amendment disclosing that change.  An acquisition or disposition of beneficial ownership of securities in an amount equal to one percent or more of the class of securities shall be deemed "material" for purposes of this section . . . ."

**K.     February 16, 2018 – CNBC Publishes a Video Entitled "CNBC Investigates: Red Flags Raised Over Riot Blockchain"**

332.    According to CNBC's Michelle Caruso-Cabrera:

---

[147] Specifically, former Chairman Pitt stated:  "Timely is, particularly if you have a critical position with the company or have already been disclosed as an owner, you're supposed to file updates promptly, and certainly not longer than 10 days at the most," Pitt said.  *See* CNBC, Former SEC chair on market manipulation and regulating cryptocurrency, *available at* https://www.cnbc.com/video/2018/02/16/former-sec-chair-on-market-manipulation-and-regulating-cryptocurrency.html.  *See also* https://www.sec.gov/fast-answers/answerssched13htm.html ("Any material changes in the facts contained in the [Schedule 13D] require a prompt amendment."); https://en.m.wikipedia.org/wiki/Schedule_13D ("A filer must promptly update the Schedule 13D filing to reflect any material change in the facts disclosed, including, among other things, the acquisition or disposition of 1% or more of the class of securities that are the subject of the filing.").

228

~~We wanted to find out who was behind Riot Blockchain, but for weeks no one would talk to us. So we decided to see if we could get answers here at the swanky Boca Raton Resort and Club in Florida. That's where Riot's annual shareholders' meeting was set to take place. It would be an upscale setting for this upstart company with red ink, as far as their most recent quarterly report shows. But as we quickly learned, that annual meeting wasn't going to take place. Twice Riot Blockchain announced they were going to hold their annual shareholders' meeting here at the Boca Raton Resort and Club. Twice at the very last minute, in fact the night before, they announced that they were postponing the meeting.~~ *~~And in fact the hotel tells us there was never a meeting room ever booked under the name Riot Blockchain. So we drove to this nearby office building, trying to find Barry Honig. According to SEC filings, he may be the man behind the curtain. He was an early investor in Riot, back when it was Venaxis, a medical testing company, and then eventually Bioptix. He led an activist move to replace the board, and he eventually won. The new board changed the name from Bioptix to Riot Blockchain. "Hello? Hi. Michelle Caruso-Cabrera." As the elevator door opened in front of us, not Barry Honig, but this man, John O'Rourke, the CEO of Riot Blockchain, the same John O'Rourke who made news in December for selling about $869,000 worth of Riot stock just two months after the company changed its name. O'Rourke quickly closed the door.~~* ~~Five minutes later he emerged and agreed to talk to us, but only off camera. He said he was here for a meeting with Honig when he arrived, and that we had just missed him. O'Rourke insisted that he does not work out of Barry Honig's office, even though we found him there.~~



~~333.~~ 1. ~~The CNBC broadcast narrated their encounter with Defendant O'Rourke:~~

~~During that hour-long off-camera meeting, O'Rourke told us his Riot stock sale was merely to pay taxes on his restricted stock. And as for the sharp rise in shares~~

of Riot, O'Rourke said that was unexpected and ridiculous. ***He also said he isn't worried about the SEC because "we over-disclose."***

334.1.   CNBC noted that when Honig "agree[d] to talk to [CNBC] by phone", he "downplayed his influence with Riot and John O'Rourke":

"MR. HONIG:  ***John O'Rourke's an adult, and he makes his own decisions, okay?***

**[MS. CARUSO-CABRERA:]  In 2000 you were fined for $25,000 and suspended ten days by FINRA for stock manipulation.  You're no longer a licensed broker.  Do you still manipulate stocks?**

**[MR. HONIG:]**  ***The answer's no.***  Continue.  I'm a successful investor.  I'm a comfortable person.  I don't need to work today.  I have a beautiful family that's college educated, and I'm very comfortable.  **I am very comfortable.  *The truth will come out.***"

335.   CNBC's Ms. Caruso-Cabrera further reported that "***Honig acknowledged he's done this before.  Five years ago he and John O'Rourke were involved in another company that changed its business model to blockchain.  That stock also skyrocketed.***  Today it's trading around two bucks a share.  Oh, and it's changed its business model again, to cloud computing for cars.

336.1.   As CNBC's Ms. Caruso-Cabrera noted, "Just this week a new filing from Barry Honig, which shows he sold a massive amount of shares, his common stock down to little more than 173,000.  So as Riot was issuing press release after press release promising great plans for the company, Honig was selling, making millions of dollars along the way."

L.      **February 16, 2018 – "CNBC Investigates . . . Riot Blockchain"**

337.   On February 16, 2017, at 9:54 a.m., CNBC published the article "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket" regarding questionable practices at Riot, stating in relevant part:

As bitcoin hit record highs in late December, a hot new stock was making news on a daily basis. Riot Blockchain's stock shot from $8 a share to more than $40, as

230

investors wanted to cash in on the craze of all things crypto.

*But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease.*

That might sound somewhat like the type of newly minted blockchain company that has gained SEC attention.

*"Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain," SEC Chairman Jay Clayton said, speaking in generalities in recent testimony to Congress. The SEC declined to comment to CNBC about Riot Blockchain.*

The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.

That purchase and the company's name change aren't Riot's only questionable moves.

*A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in.*

\* \* \*

*Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida.* The resort is known as the "pink palace" and has luxury yachts lined up on its dock.

*But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for* 8-K with the SEC that attached letter which Feb. 1. *It's not clear the company ever planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity.*

Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.

*That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton. That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose*

783086.1

*office is a short drive from the hotel. He once owned more than 11 percent of the outstanding common stock, according to SEC filings.*

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone. "*It was an investment where I had a return. And I sold some shares. There's nothing wrong with doing that.*"

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

"Typically, Barry Honig invests his hard-earned money into a company, and he also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

A visit to the site now only reveals the text: "Under construction."

From the outside, Honig's office is nondescript. There does not appear to be any evidence of his company's existence on the building's directory or on the door of his office.

*When CNBC crew members walked into the office, they didn't find Honig, they found O'Rourke.* That's the same O'Rourke who made headlines when — less than three months after the company changed names and business plans — he sold about $869,000 worth of shares, according to an SEC filing. He told the crew he was there for a meeting with Honig and that we had just missed him.

O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed." Then, late the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.

He agreed to answer questions via email instead. One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.

232

*"I have my own office in a separate location," O'Rourke said in an email sent by his lawyer, Nick Morgan, a partner with Paul Hastings. "I do have a good relationship with Mr. Honig and we speak often."*

*"John O'Rourke does not work out of my office," Honig said. "John O'Rourke has his own office ... at one time John O'Rourke had space in my office ... we speak often."*

*Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information.*

*"You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or dialogue about what's appropriate for the company on a day to day basis or in the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP.*

Despite Honig's website saying he gives advice on who should lead a company, Honig said he had nothing to do with O'Rourke becoming CEO.

*"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.*

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

*"I see a company that has had a change of control of the board. I see a company that has had a change in business. I see a company that has had several dilutive issuances immediately following the change of the board and change of the business. And I see a stock that has gone zoom," he said. "And what I understand a significant amount of insider selling. So yes, these are red flags."*

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million. On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings. Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent. After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants. *His purchase price ranged from $2.77 to $5.32 per share, according to the list of trades he provided to the SEC in 2017. Honig's investment dropped below 5 percent, the threshold for SEC filing, on* Nov. 28. *At that point, the stock had already climbed above $20.*

Honig did not disclose his dramatically reduced position in the stock until this week.

*But that may not be the true extent of Honig's selling. Buried deep in the footnotes of Riot filings, it's clear Honig also accumulated more than 700,000 new warrants that he could convert to stock at $3.56 per share and more than 700,000 promissory notes that he could convert to stock at $2.50 a share.*

*What about those warrants and promissory notes? It's not clear, as he never mentioned them in either 13D. But in another footnote from a recent Riot filing, there is no longer a mention of them.*

He declined to further clarify what happened to them.

*"It's all disclosed in the public filings. And those are all the obligations I have,"* he said. *"I'm very comfortable with what I had to do and what I was obligated to do. ... I'm not going to talk about my personal trading history or my bank account."*

*Birns questioned how Honig made his filings. "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant amount of stock. Or has the potential to own significant amount of stock in excess of what is reported on the 13D," he said.*

*This is not the first time Honig has faced questions over his actions. In 2000, he was alleged to have committed stock manipulation. Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse.*

*"The answer's no,"* Honig said when asked if he still manipulates stocks.

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to SEC filings.

When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up.

234

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

*One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase. Kairos' main asset was $2 million of mining equipment. Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings.*

*O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.*

Kairos appears to have many links to Riot. The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

*O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada. Despite the many press releases, there has been no formal mining announcement.*

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining. *SEC filings are silent on mining activity.*

As for professional poker players advising Riot? O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social media followers. He called them "thought leaders."

Riot is not O'Rourke and Honig's first cryptocurrency investment.

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

235

At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. "*I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot*."

Honig acknowledges the investment.

The questions continue for Riot Blockchain.

On Tuesday, Riot filed to withdraw prior SEC filings.

"It is not the result of any government inquiry," O'Rourke said in an email. "It was just corporate clean up from our securities counsel."

As for the annual shareholders' meeting, "We did not have a quorum of shareholders required for a vote," O'Rourke said in the email from his lawyer. "We are also working on other corporate action items that would require shareholder approval and a shareholder meeting as well. We did not want to waste the time and expense of potentially having two shareholder meetings within a short period of time. Thus we adjourned the meetings, which is not an uncommon practice."

There is no new date for the shareholders' meeting.

"You see companies adjourn meetings in a context of a contested election and the like," Birns said. "I just don't think in this instance, there's any reason to adjourn their annual meeting."

And as to O'Rourke selling stock in December?

*He told CNBC in the email: "I sold less than 10 percent of my overall position to assist with covering tax obligations as a result of so-called phantom income tax from the vesting of restricted stock awards. It is common for Executives to sell stock to cover such tax obligations. I could have sold more stock in that window but chose to sell just 30,383 shares."*

O'Rourke welcomes increased regulation and transparency for the cryptocurrency industry. "*Unfortunately, as with many new hot sectors, it [blockchain] has attracted some bad actors trying to capitalize on the hype*," he said. "Riot is all for increased transparency and properly imposed regulation."

236

Honig would not disclose how much he made on his investment in Riot, "*I wasn't fortunate enough to do as well as you might think and people might speculate. … I don't regret anything.*"

(Emphases added).

338.    As the market reacted to CNBC's video and article regarding Riot, the Company's *share price fell 33.4%*, or $5.74 per share, from closing at $17.20 per share on February 15, 2018, to closing at $11.46 per share on February 16, 2018, damaging Lead Plaintiff and the other Class members.

339.   Other news outlets and investment analysts immediately picked up, republished, and commented on CNBC's reporting.  For example, the same day *Zacks Investment Research* published a report titled "Here's Why Riot Blockchain Stock Crashed Today."[118]

M.    February 16, 2018 – Riot and O'Rourke Respond to CNBC

340.422.   In response to the CNBC article, on February 16, 2018, Riot issued the following press release in which Defendant O'Rourke directly addressed the Company's shareholders ("Shareholder Letter").  The purpose of the Shareholder Letter was to attempt to dismiss concerns raised earlier in the day by CNBC about O'Rourke's connection to Honig, his recent insider stock sales, and the integrity of the Company's SEC filings.  The letter stated, in relevant part,

> *Dear Shareholders,*
>
> Thank you for your support in our vision to build a leading blockchain technology company. I believe we are well positioned at the forefront of this industry with many exciting opportunities on the horizon.
>
> Today, CNBC released a negative one-sided piece on companies that seek to jump on the blockchain bandwagon by changing their name and profiled our company. Had the journalist used even a modest amount of professional diligence, CNBC would have also reported on the numerous achievements we have made in becoming an early entrant in the support of blockchain and cryptocurrency technologies. To my knowledge, we were also the first Nasdaq listed

---

[118] Ryan McQueeney, *Here's Why Riot Blockchain Stock Crashed Today*, Zacks Investment Research (Feb. 16, 2018).

company to have blockchain in its name and had no idea what the market reaction would be when the transition was made.

Not to be deterred, I wish to provide an update of where Riot Blockchain stands today and respond to some of their attacks. We have made significant inroads in building a diversified portfolio of investments and to begin securing digital assets.

\*   \*   \*   \*

*At the end of 2017, I personally sold some stock that I held in our company.  I sold less than 10% of my overall position and did so to cover tax obligations.  I could have sold more stock in the same timeframe if I so desired.*  I truly believe in what we are building and the shareholder value it will create.

\*   \*   \*

*Barry Honig has been a supportive shareholder of Riot Blockchain.  Prior to my involvement with Bioptix, Mr. Honig filed a lawsuit against the company and its management as a shareholder because he believed the old management and board was not properly deploying shareholders' cash.  This led to the eventual re-examination by the board and management of the failing business, which ultimately led to the board's decision that it was in shareholders' best interest to evaluate other opportunities with its cash on hand.*

\*   \*   \*

*We take our SEC reporting obligations seriously and diligently file all reports and filings.*  We have expended enormous effort to inform investors of the risks of our foray into uncharted territory.

341.    Also on February 16, 2018, O'Rourke gave "an interview with Business Insider" during which O'Rourke "called the [CNBC] report 'one-sided' and a 'hit piece' that has 'wiped out significant shareholder value.'" [119]  During the interview, O'Rourke also stated:  "'I sold less than 10% of my overall position to assist with covering tax obligations as a result of so-called

---

[119] *See*  Graham Rapier, Riot Blockchain plummets after CNBC investigation finds no evidence of an advertised shareholders meeting (RIOT) https://markets.businessinsider.com/news/stocks/riot-blockchain-plummets-after-cnbc-investigation-2018-2-1016030467.

238

phantom income tax from the vesting of restricted stock awards,' he told Business Insider.  '*I am not wealthy and am working to build a business here.*'"

342.   Defendant O'Rourke's statements above to Riot shareholders in the Company's February 16, 2018 press release and during O'Rourke's interview with Business Insider were materially false and misleading when made because Riot not "*did diligently file all reports and filings*" prior to the CNBC report.  For example, it was not until May 2018 that Riot first disclosed in amended SEC filings that Defendant Honig and other large shareholders participated in previously undisclosed related-party transactions, including Coinsquare, Karios and Riot's December 19, 2017 Private Placement offering.  Indeed, not only did the Company fail to disclose these and other financial interests, it affirmatively represented in its 2017 Proxy Statement that no such transactions had occurred.

343.   In addition, O'Rourke's statement to Business Insider that he was "*not wealthy*" was materially misleading because in 2017, Riot paid O'Rourke $2,991,842 in compensation, during which time O'Rourke resided in a 3,955 square foot waterfront home with an assessed value of $1.4 million.

**N.     Also on February 16, 2018, Riot Announces Its Purchase of "3,800 Bitcoin Mining Machines" from Prive Technologies LLC**

344.   On Friday, February 16, 2018, at 4:54 p.m., the same day that Riot's stock price fell 33.4% in response to the above CNBC investigative report, Riot issued a Form 8-K disclosing that Riot's subsidiary Kairos had agreed to purchase "3,800 AntMiner S9s, all manufactured by industry leader Bitmain" from a company named Prive Technologies LLC ("Prive") for $11 million in cash and 1 million shares of Riot common stock, with 200,000 of the shares escrowed pending certain performance milestones.

239

345.   The above statements in Riot's February 16, 2018 Form 8-K were materially false and misleading when made for the reasons discussed above, similar to Riot's transaction with Kairos, Riot had purchased these machines from Prive at grossly inflated prices from what it could have paid in an unconflicted retail transaction at the time, and had not disclosed that Prive was in fact substantially owned by Defendants Honig and DeFrancesco.

**O.     March 26, 2018 – Definitive Proxy Statement (Schedule 14A)**

423.   O'Rourke's statement above that "Barry Honig has been a supportive shareholder of Riot Blockchain," among other statements referenced above, were false and misleading or otherwise omitted material information because while referring to Honig as "a supporting shareholder" of the Company he also failed to disclose that Honig was much than a passive shareholder.  Indeed, as explained herein Honig was involved in at least four related party transactions with the Company, none of which had been disclosed to Riot's public shareholders, in this Form 8-K or any other public filings.  In addition, O'Rourke knew or should have known as an officer and director of the Company – and as close business associate of Honig – that during 2017 Honig repeatedly acquired shares (through share conversions that occurred through various related party transactions or other purchases) and sold shares of Riot without filing the requisite Schedules 13D and 13/A.  In other words, O'Rourke's Shareholder Letter attempted to paint a false picture of Honig's true relationship and involvement with the Company.

424.   Additionally, O'Rourke's statement above that "[w]e take our SEC reporting obligations seriously and diligently file all reports and filings" was materially false and misleading and otherwise omitted material information because under O'Rourke's leadership as a director and officer of Riot, the Company did not "take its obligations seriously" or "diligently file all reports."  Indeed, at least as early as March 16, 2017 the Company omitted to tell investors about a related party transaction with a 10% shareholder, namely Honig, as part of the Company's

783086.1

announcement of the March 2017 Private Placement Agreement.  As set forth herein, several other related party transactions, with Honig and other members of the Honig Group took place in 2017 and were not disclosed until months later in April 2018.  Likewise, as set forth herein, several Registration Statements also failed to disclose information about various related party transactions and the Honig Group's participation as a group related to their share ownership in Riot.

**11.    March 26, 2018 - Proxy Statement (Form DEF 14A)**

346.   On March 26, 2018, Riot filed its Definitive Proxy ~~Statement on Schedule 14A ("statement under Form 14 DEFA.  Because both the March~~ 2018 Proxy").  ~~In its filing, which was signed by Defendants O'Rourke~~ and ~~Kaplan, Riot disavowed any undisclosed related party transactions by any "any of our executive officers, directors, or greater than five percent shareholders, or any members of their immediate families . . . *during the last fiscal year*":~~

~~**Certain Relationships and Related Transactions**~~

~~*Except*~~2017 Proxy include the same language, as referenced above, for ~~*the employment agreements previously entered into between us and certain of our named executive officers, since January 1, 2016, none of our directors or named executive officers, nor any person who owned of record or was known to own beneficially more than 5% of the  outstanding shares of our common stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect us.*~~

~~347.~~425.   ~~For~~ all the reasons ~~that~~ the ~~Company's~~ 2017 Proxy ~~Statement was~~is false and misleading, the same is true for the March 2018 Proxy.

~~**P.    April 30, 2018 – Amended Annual Report (Form 10-K/A)**~~

~~348.   On April 30, 2018, Riot filed an Amended Annual Report on Form 10-K/A.  The report stated:~~

~~**ITEM    13.    CERTAIN    RELATIONSHIPS    AND    RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.**~~

~~*Except for the employment agreements previously entered into between the*~~

*Company and certain of its named executive officers (as described in Item 11 above), since January 1, 2017, none of the directors or named executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its Common Stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company.*

349. For all the reasons that the Company's 2017 Proxy Statement was false and misleading, the same is true for the 2018 Proxy.

**Q.    May 17, 2018 – Quarterly Report (Form 10-Q)**

350. On May 17, 2018, Riot filed a quarterly report with the SEC on a Form 10-Q in which it provided additional information on the SEC investigation. The Form 10-Q stated, in relevant part:

On April 9, 2018, the Company received a subpoena requesting documents from the U.S. Securities and Exchange Commission pursuant to a formal order of investigation.

As part of its ongoing review of the Company's SEC filings, the Company has received and responded to comments from the staff of the SEC regarding certain developments and the Company's ongoing development of a blockchain/cryptocurrency business model. These inquires include the proper asset classification, applicability of the Investment Company Act of 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency. The resolution of these matters is ongoing . . . .

**R.    May 25, 2018 – Amended Current Report (Form 8-K/A)**

351. On May 25, 2018, Riot filed a Form 8-K/A in which the Company amended its Form 8-K filed on October 4, 2017, by disclosing for the first time the "Amended and Restated Unanimous Shareholder Agreement, dated October 2, 2017," pursuant to which Riot (then still called Bioptix) had invested $3 million to purchased units of Coinsquare. According to the agreement, in addition to Bioptix, the following individual were also "ISSUED SHARE CAPITAL" as part of Riot's agreement with Coinsquare:

- Barry Honig

242

- GRQ Consultants Inc Roth 401K FBO Barry Honig
- Titan Multi-Strategy Fund I, Ltd. (Jonathan Honig is the Manager)
- Michasel Brauser
- Erica and Mark Groussman Foundation
- Stetson Capital Investments Inc.
- Eric So
- Jason Theofilos, CEO of Mundo, Inc. (via "2330573 Ontario Inc.")
- Ross Levinson, Executive Chairman of Mundo, Inc.

**S.      June 29, 2018 – Amended Annual Report (Form 10-K/A)**

352.   On June 29, 2018   Amended Annual Report on Form 10-K/A whose "purpose" was "to response to certain comments made by the staff . . . of the [SEC] in a comment letter dated June 15, 2018" to "Item 1, Item 1A, Item 10 and Item 13 information."  In the June 29, 2018 Form 10-K/A, Riot admitted that it had purchased its "***specialized servers manufactured by Bitmain***" from "third parties, some of whom were shareholders in the Company" and that Riot "paid a premium over the listed retail cost from the manufacturers" to those shareholders:

**ITEM 1. BUSINESS . . .**

***The Company has acquired all of its servers from third parties, some of whom were shareholders in the Company** as well, and certain of the acquisitions have included access to operating facilities, support and related equipment for which the Company has paid a premium over the listed retail cost from the manufacturers*.

353.   The June 29, 2018 Form 10-K/A also disclosed that the above referenced third-party shareholders to whom Riot had paid premiums included Defendants Honig and DeFrancesco:

**ITEM   13.   CERTAIN   RELATIONSHIPS   AND   RELATED
TRANSACTIONS, AND DIRECTOR INDEPENDENCE.**

***The Audit Committee has responsibility for reviewing and, if appropriate, for approving any related party transactions that would be required to be disclosed pursuant to applicable SEC rules.*** This includes current or proposed transactions in which the Company was or is to be a participant, the amount involved exceeds the lower of either $120,000 or 1% of the average of the Company's total assets at year-end for the last two completed fiscal years, and in which any of the Company's executive officers, directors, or greater than five percent shareholders, or any members of their immediate families, has a direct or indirect material interest. Apart

783086.1

from any transactions disclosed herein, no such transaction was entered into with any director or executive officer during the last fiscal year. Such transactions will be entered into only if found to be in the best interest of the Company and approved in accordance with the Company's Code of Ethics, which are available on the Company's web site.

As previously reported by us, per Schedules 13D filed with the Securities and Exchange Commission, certain persons reported that they had beneficially owned greater than 10% of the dispositive and voting power of the Company's common stock.

Mr. Barry Honig reported beneficial ownership of approximately 11.2% of the Company's common stock as of January 5, 2017 (based upon 4,503,971 shares outstanding at that time).  Pursuant to Schedule 13D/A filed by Mr. Honig on February 12, 2018 Mr. Honig reported that he ceased to be the beneficial owner of more than 5% of the common stock of the Company on November 28, 2017.  Mr. Honig invested $1,750,000 in the March 2017 Convertible Note Private Placement (see Note 7 of the 10-K) and $500,000 in the December 2017 Common Shares Private Placement (see Note 7 of the 10K). GRQ Consultants, Inc., a related party of Mr. Honig, received a cash payment of $50,000 for diligence services in connection with the Company's investment in Coinsquare (see Note 4 of the 10-K).

Ms. Catherine Joanna DeFrancesco reported beneficial ownership of approximately 11.45% of the Company's common stock as of January 10, 2017 (based upon 4,503,971 shares outstanding at that time).  Per Schedule 13D/A filed by Ms. DeFrancesco with the SEC, Ms. DeFrancesco reported that she beneficially owned greater than 5% of the dispositive and voting power of the Company's common stock on January 10, 2017.  Ms. DeFrancesco reported beneficial ownership of approximately 11.45% of the Company's common stock as of January 10, 2017.  Ms. DeFrancesco invested $360,000 in the Company's December 2017 Common Shares Private Placement (see Note 7 of the 10K).

As previously disclosed, on November 1, 2017, the Company entered into a business combination share exchange agreement (the "Agreement") with Kairos Global Technology, Inc., a Nevada corporation ("Kairos") and on November 3, 2017, closed on the agreement.  Under the Agreement, the shareholders of Kairos agreed to exchange all outstanding shares of Kairos' common stock to the Company and the Company agreed to issue an aggregate of 1,750,001 shares of Series B Convertible Preferred Stock (the "Series B Preferred Stock") which are convertible into an aggregate of 1,750,001 shares of the Company's common stock(the "Kairos Transaction") to such shareholders. The shareholders of Kairos also will also be entitled to a royalty (the "Royalty") to be paid from cash flow generated from operations, which shall entitle such shareholders to receive 40% of the gross profits generated on a monthly basis until they have received a total of $1,000,000, at which point the royalty is extinguished.

244

~~Mr. Honig was a shareholder of Kairos at the time of its acquisition by the Company on November 3, 2017~~ ~~(see Note 2 of the 10-K).~~ ~~Based upon information provided by Kairos at the closing of the Kairos Transaction, Mr. Honig owned approximately 8.6% of Kairos.~~ ~~Accordingly, Mr. Honig would receive his proportionate allocation of the purchase price shares of Series B Preferred Stock and Royalty described above. As of November 3, 2017 the closing price per share of common stock of the Company as reported on NASDAQ was $6.75 per share.  Accordingly, the pro rata consideration received by Mr. Honig in the transaction would have been equal to the value of approximately 150,500 shares of common stock upon conversion of Series B Preferred Stock.~~

~~Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company on November 3, 2017~~ ~~(see Note 2 of the 10-K).~~ ~~Based upon information provided by Kairos at the closing of the Kairos Transaction Ms. DeFrancesco owned approximately 6.3% of Kairos.~~ ~~Accordingly, Ms. DeFrancesco would receive her proportionate allocation of the purchase price shares of Series B Preferred Stock and Royalty described above. As of November 3, 2017 the closing price per share of common stock of the Company as reported on NASDAQ was $6.75 per share.  The pro rata consideration received by Ms. DeFrancesco in the transaction would have been equal to the value of approximately 110,250 shares of common stock upon conversion of Series B Preferred Stock.~~

~~354.   On this news, the price of Riot's stock declined approximately *26.1%*, or $1.38 per share, from the previous day's closing price, to close at $4.30 per share on September 7, 2018.~~

~~**T.    July 10, 2018 – Securities Registration Statement (Form S-3)**~~

~~355.   On July 10, 2018, Riot filed Registered Statement on Form S-3 for the registration of up to $100,000,000 of common stock, preferred stock, warrants, and units.  The July 10, 2018 Form S-3 incorporated by reference Riot's 2017 Form 10-K, as amended; May 17, 2018 Form 10-Q; Definitive Proxy Statement and additional materials filed from March through June 2018; and various Current Reports filed between January 5, 2018 and June 15, 2018~~

~~356.   Riot's July 10, 2018 Form S-3 was materially false and misleading to the Company's public investors for the reasons discussed in Section V, above with reference to materials incorporated by reference in the Form S-3.~~

X.     SEC FILES SUIT AGAINST DEFENDANTS HONIG, O'ROURKE, STETSON, AND OTHERS

357.   On September 7, 2018, the SEC filed the *Honig* Action against Defendants O'Rourke, Honig, Stetson, and Groussman, as well as Frost, Brauser, and others, for numerous violations of the Exchange Act and Securities Act.  The *Honig* Action is captioned *Securities and Exchange Commission v. Honig, et al.*, No. 1:18-cv-08175 (S.D.N.Y.).  The SEC alleged that the defendants were involved in "three highly profitable 'pump-and-dump' schemes . . . from 2013 through 2018 in the stock of three public companies (Company A, Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares." SEC Compl. ¶ 1.

358.1.  According to the SEC, "Honig was the primary strategist, calling upon other Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity."  The SEC further alleged that "[i]n each scheme, Honig orchestrated his and his associates' acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell and executing a reverse merger or by participating in financings on terms highly unfavorable to the company."  *Id.*, ¶ 2.

359.   The *Honig* Action also alleges that, "[t]o profit from their investment, in each scheme, Honig and his associates would arrange and pay for the promotion of the stock, directing their co-defendant Ford, or a similar promoter, to write favorable and materially misleading articles about the company whose stock price they wanted to inflate.  In several instances, to magnify the intended boost to volume and price that would follow a promotional article's release, *Honig*, Brauser, *O'Rourke*, *Groussman*, Melechdavid and ATG *engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock, priming investor interest.*" *Id.*, ¶ 3 (emphases added).

246

360.   In an accompanying press release, Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement, stated that "Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets."

361.   On this news, the price of Riot's stock declined $1.38 per share, or approximately *26.1%*, from the previous day's closing price, to close at $4.30 per share on September 7, 2018.

362.1.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Class members have suffered significant losses and damages.

## XI.   POST-CLASS PERIOD DEVELOPMENTS

363.   On November 19, 2018, Riot filed a Form 10-Q with the SEC, in which Riot disclosed that it had received an "SEC Subpoena" on April 9, 2018.

364.   Riot also disclosed that Defendant Honig, "together with other group members," and Defendant DeFrancesco each "owned greated than 10% of the dispositive and voting power of the Company's common stock":

**Note 13. Related Party Transactions:**

**Per Schedules 13D filed with the Securities and Exchange Commission, each of Barry Honig (together with other group members) and Catherine Johanna DeFrancesco during a portion of 2017 beneficially owned greater than 10% of the dispositive and voting power of the Company's common stock.** Mr. Honig reported beneficial ownership of approximately 11.2% of the Company's common stock as of January 5, 2017 and Ms. DeFrancesco reported beneficial ownership of approximately 11.45% of the Company's common stock as of January 10, 2017. Mr. Honig invested $1,750,000 in the Company's March 2017 Convertible Note Private Placement. GRQ Consultants, Inc., a related party of Mr. Honig, received a cash payment of $50,000 for diligence services in connection with the Company's September 2017 investment in Coinsquare. Each of Mr. Honig and Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company, with Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned approximately 6.3% of Kairos. Each of Mr. Honig and Ms. DeFrancesco invested in the December 2017 Common Share Private

247

Placement, with Mr. Honig investing $500,000 and Ms. DeFrancesco investing $360,000. See also disclosures in Notes 3, 12 and 14.

365.   Riot also disclosed that the SEC's Division of Corporation Finance and the Division of Investment Management had issued Riot "several comment letters" concerning the "unsettled nature of accounting treatment for the Company's cryptocurrency mining and the fair value method selected by the Company . . . ."[120]

366.   Riot also disclosed that the SEC had issued an Order Directing Examination and Designating Officers Pursuant to Section 8(e)[121] of the Securities Act of 1933 with respect to the Company's Forms S-3 and S-3/A filed on (1) July 19, 2017; (2) January 5, 2018; (3) February 7, 2018; and (4) July 10, 2018, and that while SEC had terminated its Section 8(e) examination, the "SEC investigation associated with the subpoena received by the Company on April 9, 2018 is still ongoing."

367.   Riot also announced that the Company had made $2,342,508 in cryptocurrency revenue in Q3 2018 and a net loss of in excess of $6.2 million.

368.426.   On December 20, 2018, the SEC filed a letter to inform the *Honig* Action court that "certain Defendants have agreed to settlements in principle" and that "[c]ertain other

---

[120]  Riot disclosed that the SEC's comments involved the Company's disclosures in Riot's (1) Quarterly Report for the period ended March 31, 2018 (May 17, 2018 Form 10-Q); and (2) Annual Report for period ended December 31, 2017 (Apr. 17, 2018 Form 10-K); (3) Amended Annual Reports for period ended December 31, 2017, which Riot filed as Forms 10-K/A on April 30, 2018 ("Amendment No. 1") and June 29, 2018 ("Amendment No. 2"); and (4) October 4, 2017 Current Report on Form 8-K.

[121]  Under Sections 8(d)-(e), the SEC "is empowered to make an examination" and if "it appears to the [SEC] . . . that [a] registration statement includes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading," the SEC may "issue a stop order suspending the effectiveness of the registration statement." 15 U.S.C. § 77h(e)-(d).

783086.1

Defendants have approached the staff to discuss possible settlement and to share their views about the allegations in the existing Complaint."

~~369.~~427.  A week later, on December 27, 2018, the SEC announced a proposed settlement with one of the defendants, Frost, pursuant to which Frost will pay $5.5 million to the SEC and is permanently barred from participating in offerings of penny stocks (with limited exceptions).

~~370.~~428.  On January 2, 2019, Opko settled the pump-and-dump charges with the SEC in the *Honig* Action and agreed to pay a $100,000 fine.

~~371.~~429.  On January 10, 2019, the SEC filed a consent judgement of the charges against Opko.  As part of that settlement, in addition to the penalty of $100,000, Opko also agreed to the following, among other things:  (i) the establishment of a "Management Investment Committee" that will make recommendations to an "Independent Investment Committee" of the Board of Directors "to handle existing and future strategic minority investments for so long as Dr. Philip Frost ('Frost') is a shareholder in or holds any management or board-level position" at Opko; and (ii) retain an Independent Compliance Consultant to review "prior starategic minority investments by [Opko] made at the suggestion of and in tandem with Frost"; and (iii) review Opko's "existing policies and procedures to determine whether they are sufficient to ensure compliance with Exchange Act Section 13(d)."

~~372.~~430.  On January 18, 2019, Defendant Groussman settled the charges brought against him in the *Honig* Action.  As part of the settlement, Defendant Groussman was barred from participating in any offering of penny stock for five years and ordered to pay disgorgement of $1,051,360, plus prejudgment interest of $170,554.78, and a civil penalty of $160,000.  *See* No. 1:18-cv-08175-ER (S.D.N.Y.), ECF No. 93.

249

373.431.   On March 8, 2019, the SEC filed a First Amended Complaint in the *Honig* Action, which substantially built on the allegations in the original complaint.  Several weeks later, on April 26, 2019, the SEC wrote to the court to request a stay of briefing following an "agreement in principle to settle the Commission's claims for liability against Defendant Honig and his entity, GRQ Consultants, Inc."  *See* No. 1:18-cv-08175-ER (S.D.N.Y.), ECF No. 114.

**XII.   ADDITIONAL SCIENTER ALLEGATIONS**

374.432.   As alleged herein, Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Riot, their control over, and/or receipt and/or modification of Riot's allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information, participated in the fraudulent scheme alleged herein.

375.433.   Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Defendants.

376.434.   Several of the Defendants were members of Riot's executive management group during the Class Period.  Based on their roles at Riot, each of these Defendants would have been involved with, or had knowledge of, the wrongdoing alleged herein.

783086.1

377.435.   At a minimum, Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Honig was privy to this information through his relationship with, and control over, the Defendants.

378.436.   Likewise, certain of the Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  Honig was privy to this information through his relationship with, and control over, the Defendants.  Certain of the Defendants had the ultimate authority over and were involved in drafting, producing, reviewing, and/or disseminating the false and misleading  statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

379.437.   Certain of the Defendants were senior executives involved in Riot's daily operations with access to all material information regarding the Company's core operations.  These Defendants are presumed to have knowledge of all material facts regarding Riot's core business.  Honig was privy to this information through his relationship with, and control over, the Defendants.

380.438.   Defendants' scienter is further demonstrated by the fact that cryptocurrency and, in particular, Bitcoin mining was allegedly a central part of the Company's success.  Bitcoin was allegedly the cornerstone of (and critically important to) the Company's growth strategy and, as such, constituted a core operation of the Company.  The fact that the misstatements and omissions

251

at issue here pertained directly to Riot's core operations further supports a strong inference of scienter.

381.439.   When, as here, a senior officer of a company makes false and misleading public statements regarding its core operations, there is a strong inference that such officer knew the statement was materially false and misleading when made.  Stated otherwise, knowledge of falsity can be imputed to key officers who should have known of facts relating to the core operations of their company.  Moreover, as signatories to the Company's SEC filings, certain of the Defendants had an affirmative obligation to familiarize themselves with the facts relevant to Riot's core operations.

382.440.   In addition, throughout the Class Period, Riot had very few employees, further strengthening the inference of scienter.  For example, in the Company's annual report filed on April 30, 2018, Riot stated that "[a]s of March 31, 2018, we had nine employees, all of whom are full-time."

383.441.   The allegations above also establish a strong inference that Riot, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.

384.442.   Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Riot's true operating condition and present and expected financial performance from investors.  By concealing these material facts from investors, Riot maintained and/or increased its artificially inflated common stock price throughout the Class Period.

<div align="center">252</div>

783086.1

385.443.  As executives of Riot, these Defendants are all candidates for imputing corporate scienter to the Company.

386.444.  In addition, an executive's insider sales can be probative of scienter.  Here, Defendant O'Rourke's massive insider sales during the Class Period reveals his motive to commit fraud.  On December 29, 2017, Defendant O'Rouke sold 30,383 shares of Riot stock for proceeds of $869,256.35.  These sales were not made pursuant to a 10(b)5-1 trading plan, further adding to the inference of scienter.  These sales were made just days before the Company announced the dismissal of its auditor and a month before Riot canceled its annual meeting for the second time, causing the NASDAQ to inform the Company that it has violated the NASDAQ's listing requirements.  In addition, indicating that Defendant O'Rouke wanted to sell his stock with minimum attention, his sales were made on the Friday before a holiday weekend.

387.445.  Likewise, the SEC investigation and filing of the *Honig* Action and subsequent settlements add to the inference of scienter.  On April 9, 2018, the SEC issued a subpoena pursuant to a formal order of investigation.  According to Riot, the SEC's "inquires include the proper asset classification, applicability of the Investment Company Act [of] 1940, to the Company's business and affairs and accounting treatment of its cryptocurrency."

388.446.  Then, on August 14, 2018, Riot filed a Form 10-Q with the SEC, in which it provided more details about the SEC's investigation.  In particular, the Company reported that the SEC was looking into a number of Riot's registration statements, as well as its acquisition of a minority stake in Coinsquare (the entity in which Defendant Honig had a personal stake).

389.447.  As noted above, Defendants caused Riot to repeatedly issue stock to retail investors based on the misrepresentation that "none" of the "selling stockholders had a material relationship" with Riot or its subsidiaries.  *See* Section V, *supra*.  On September 10, 2018, a video

was posted on YouTube[122] showing Defendants Honig and O'Rourke together in the same room

meeting with Groussman and Harvey Kesner, Honig's longtime lawyer.  The group appear to be

recovering together in a hospital room after reportedly attending the 2014 Roth Capital

Conference.   The video depicted Riot's CEO, O'Rourke, meeting with ~~"Selling Stockholder"~~

~~Honig:~~Honig in the same room.  In the picture, Honig appears to be addressing O'Rourke.



~~390.~~448.   ~~Another image from this same meeting~~The video, posted on Twitter on October

9, 2018, ~~demonstrates shows "Selling Stockholders"~~also showed Honig and Selling Stockholder

_____

[122] *See* https://www.youtube.com/watch?v=CrCpLJ5dZYE ("During a CNBC investigation into
Riot Blockchain, attorney Harvey Kesner told reporters he didn't know anything about Barry
Honig, according to the article. This video shows otherwise. During the '14 Roth Capital
conference Barry Honig & his attorney Harvey Kesner allegedly took a bunch of edibles. They got
so high, according to our source, that Barry bugged out and called an ambulance on himself. This
is the video of the aftermath. Also making an appearance in this video are former Riot Blockchain
CEO John O'Rourke and Mark Groussman. Everyone depicted in the video (except for Kesner)
were subsequently named in an SEC-complaint on September 7th 2018 alleging that the group
(along with other individuals and entities) participated in multiple micro-cap pump & dump
schemes.").

783086.1

Kesner, who was Honig's lawyer representing Honig in his proxy fight against the Bioptix Board side by side, apparently unconscious, in the same room.



391.449.   Groussman is also depicted meeting with Honig, O'Rourke, and Kesner.  This meeting further confirm that Honig, O'Rourke, Groussman, and Kesner knew they were part of a concerted group of associates with a close "material relationship" outside the context of their being merely owners of Riot stock.

392.450.   The above allegations are specifically included to contradict Kesner's statement to CNBC:  "When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up."[123]

393.451.   In its November 13, 2018 Form 10-Q, the Company announced that the SEC's investigation was still ongoing.  According to Jake Zamansky, of the securities law firm Zamansky LLC:  "Recent disclosure shows that a cloud still hangs over this company so long as the SEC

---

[123]   *See*   https://www.cnbc.com/2018/02/16/public-company-changes-name-to-riot-blockchain-sees-shares-rocket.html.

783086.1

investigation continues.  The fact that the division of enforcement remains involved and a registration statement was withdrawn are ominous events for Riot Blockchain."  According to the Company's annual report filed on April 2, 2019, the SEC's investigation remains "ongoing."

394.452.  Finally, the fact that the SEC filed a complaint against Defendants O'Rourke, Honig, Stetson, and Groussman, as well as other Riot insiders for similar alleged wrongdoing with multiple other companies further adds to the inference of scienter.  *See* Section V, above.  That "multiple defendants"," including Groussman, have already settled with the SEC – "and cumulatively paid more than $7.8 million in disgorgement of ill-gotten gains together with prejudgment interest thereon and civil penalties"[124] – further adds to the inference of scienter.

395.453.  These facts, in conjunction with the additional indicia of scienter detailed above, particularly Defendants' specific and repeated statements and the nature of the alleged scheme, collectively support a strong inference of Honig and each Individual Defendant's scienter.

## XIII.   LOSS CAUSATION/ECONOMIC LOSS

396.454.  As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Riot's common stock and operated as a fraud or deceit on Class Period purchasers of the Company's common stock.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of Riot's common stock fell precipitously as the artificial inflation was removed.

397.455.  As a result of their purchases of Riot common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused

---

[124] *See* https://www.sec.gov/litigation/litreleases/2019/lr24431.htm.

the Company's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $46.20 per share on December 19, 2017, to close at $4.30 on September 7, 2018, after the last day of the Class Period.

398.   On December 19, 2017, CNBC's *Fast Money* aired an interview with Left, which called into question Defendants' integrity.  In response, Riot's stock price fell by *6.42%*, from a closing price of $38.60 per share on December 19, 2017, to a closing price of $36.12 per share on December 20, 2017, damaging Lead Plaintiff and members of the Class.

399.   On December 21 and 22, 2017, numerous articles were released that suggested that Riot's name change to include the word "Blockchain" was a publicity stunt and questioning the legitimacy of the Company.  As a result of the disclosures, Riot's stock price declined $11.60 per share, or *34.75%*, over the course of those two trading days, damaging Lead Plaintiff and members of the Class.

400.   On January 2, 2018, *Reuters* published an article prior to the market open entitled, "BUZZ-Riot Blockchain down after CEO reports stock offering – RTRS."  The article stated that Riot's stock price was down 4.44% in pre-market trading after Defendant O'Rourke had reported his sale of over 30,000 shares.  An article published during early morning trading hours, on the popular investor website, *The Motley Fool*, entitled, "Riot Blockchain's CEO Just Sold a Lot of Stock," detailed Defendant O'Rourke's suspicious trading.  On this news, Riot's stock price declined $4.04 per share, or *14.45%*, over two trading days, from $28.40 per share on December 29, 2017, to $24.36 per share on January 3, 2018, damaging Lead Plaintiff and members of the Class.

401.   On January 5, 2018, after the close of trading, Riot filed a registration statement on Form S-3 for the disposition of approximately 3.3 million shares and warrants.  The 1.65 million

~~common shares being registered represented over 14% of the 11.6 million outstanding common shares.  The filing also disclosed that investors who had purchased in the March 2017 Placements would be free to sell their shares once the registration statement was declared effective.  The possibility of private investors, who bought shares below market value, selling out at a premium, like Defendants Honig and O'Rourke, created a negative market response.  The registration statement also confirmed that Riot had overpaid for Kairos.  It confirmed that Kairos had purchased its equipment for $2,089,679 and the excess purchase price paid by Riot was recorded as $8,637,545, confirming that the Company paid more than four times the price for Kairos's equipment.  The Company's stock price declined $1.01 per share, or *4.13%*, from $24.41 per share on January 5, 2018, to $23.42 per share on January 8, 2018, damaging Lead Plaintiff and members of the Class.~~

A.     ~~On~~ January 31~~, 2018, before the market opened,~~  ***The Wall Street Journal*** ~~published an article entitled~~  **"Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."**  ~~The article referenced how Defendant Honig had taken an aggressive stake in the Company when it was still in the medical diagnostics business and how he drove out Bioptix's CEO and others, replacing them with his own allies, including Defendant O'Rourke.  Also on "~~

456.     On January 31, 2018, ~~Riot announced that its previously scheduled annual meeting would be adjourned for *a second time*, purportedly to allow the Company to seek a quorum.  As a result of these disclosures on~~ *The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."[125]  The article stated that **"Mr. Honig has sold about 500,000 shares, he said, but declined to divulge his profit.  He said he still owns about 1% of the company."**  "'When stock goes up, you take a profit,' [Honig] said."

---

[125] Ianthe Jeanne Dugan, *Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake; Barry Honig pares back stake in Riot Blockchain, whose shares soared last year after a change of name*, The Wall Street Journal (Jan. 31, 2018).

258

457.    These revelations corrected Honig's and Riot's material misrepresentations and omissions regarding Honig's material changes in beneficial ownership of Riot's common stock – particularly his grossly deficient Schedule 13D/A filings that failed to disclose his massive stock sales throughout 2017. *See* §§ IX.C.1 & X.A.1, *supra*.

458.    As a result of the revelation by *The Wall Street Journal* that Honig sold nearly 90% of his holdings in the Company, the Company's stock price fell from an opening price of $14.50 per share on January 31, 2018, ~~Riot's stock price declined $1.98 per share, *or 14.26%*, over the course of two trading days, from $~~to close at $13.75 that same day, a decline of $0.75, or ***more than 5%***. The Company's stock continued to decline in the following day, February 1, 2018, related to the revelations in *The Wall Street Journal* article, falling an additional 10% that day.

459.    "Later that same day, at 5:28 p.m. (after the market closed) the Company issued a second press release, titled "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders." The press release announced that the 2017 Annual Meeting of Stockholders, which was scheduled for the following day, had again been cancelled and "was adjourned for a second time . . . ."

~~402.~~460.    Together, *The Wall Street Journal's* revelations of Honig's nearly total divestment of his holdings of Riot stock, Honig's role in the Company's affairs, and Riot's abrupt cancellation (for the second time) of its annual shareholder meeting (which had been scheduled for the very next day), Riot's stock price ***declined 14.26%*** ($1.98 per share) from a closing price of $14.28 per share on January 30, 2018, to close at $12.30 per share on February 1, 2018, damaging Lead Plaintiff and other members of the Class.

**B.      February 16, 2018 – "CNBC Investigates Red Flags Raised Over Riot Blockchain"**

461.   On February 16, 2017, CNBC published the article "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket" regarding questionable practices at Riot.  The revelations in CNBC's article partially revealed the Honig Group's Class Period scheme to misrepresent and conceal their control over the Company, including through O'Rourke's connections with Honig as "the man behind the Riot Blockchain curtain."  For example, CNBC discovered O'Rourke in Honig's office in Boca Raton on the day of the cancelled annual shareholder meeting; and shed further light on Honig's 13D violations and highlighted the suspicious circumstances surrounding the Kairos transaction.

403.462.   In response, shares of Riot fell $5.74 per share, or approximately ***33.4%***, to close at $from closing at $17.20 on February 15, 2018, to closing at $11.46 per share on February 16, 2018, damaging Lead Plaintiff and Class members.  This decline in price corresponded with a more than 13-fold spike in trading volume, in which the daily shares traded increased from approximately 1.7 million shares traded on February 15, 2015, to approximately 12.2 million shares traded on February 16, 2018.

**C.      On April 17-18, 2018 – Riot Files Form 10-K Revealing Related Party Transactions**

404.463.   On April 17, 2018 after the market closed, Riot filed anits 2017 annual report on Form 10-K, belatedly disclosing that on April 9, 2018 it had received a subpoena from the SEC. On this news, various related party transactions, as set forth herein, that took place in 2017.  These include the March 2017 Private Placement, Honig's consultancy role in the Coinsquare transaction, the Kairos Agreement, and the December 2017 Private Placement.  The following trading day, April 18, 2018, the Company's stock price fell $0.3443 per share, or approximately

260

*5.08%*, from the previous day's closing price, to close at $6.87 per share on April 18, 2018, damaging Class members.

    **D.**   ~~On September 7, 2018, the SEC filed the *Honig* Action against several individuals and entities with which they were associated, including Defendants O'Rourke and Honig, for numerous violations of the Exchange Act and Securities Act.  The~~**May 29, 2018 – Riot Files a Form 8-K Revising Its Disclosures Concerning the Coinsquare Transaction**

    464.   After trading ended on May 25, 2018, Riot disclosed for the first time in an amended Form 8-K/A that several Honig Group members were – like Riot – parties to the Coinsquare transaction.  On this news, on the following trading day, May 29, 2018, Company's stock price fell from an opening share price $7.53 per share to $7.08 per share, a decline of nearly 6% and damaging Class members.

    **E.**    **September 7, 2018 – SEC Files Suits Against Honig, O'Rourke, Groussman, Stetson, and Others**

    465.   On September 7, 2018, the SEC filed the *Honig* Action against Defendants Honig, O'Rourke, Groussman, and Stetson, and several of their affiliates, finally revealing that, contrary to Defendants' misleading filings on Schedules 13D and 13G, and on Forms S-3 and 10-K, the Honig Group was not only a "group" as defined by Section 13(d), but in fact a a highly-orchestrated and closely-knit partnership among Honig, O'Rourke, Groussman, and Stetson, who together had been engaged in the same fraudulent *modus operandi* at Riot as at the previous companies at which they had operated the pump-and-dump schemes described by the SEC.

    ~~405.~~466.   On this news, the price of Riot's stock dropped $1.38 per share, or approximately *26.1%*, from the previous day's closing price, to close at $4.30 per share on September 7, 2018, damaging Class members.

    ~~406.~~467.  As shown above, the timing and magnitude of the price declines in Riot's common stock negate any inference that the losses suffered by Lead Plaintiff and the Class were

<div align="center">261</div>

caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraud.

**XIV.   CLASS ACTION ALLEGATIONS**

407.468.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those persons or entities who purchased or otherwise acquired the securities of Riot and/or Bioptix (NASDAQ:  RIOT, BIOP) during the Class Period (the "Class") and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

408.469.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class.  The Company reported that as of April 12, 2018, it had approximately 1,030 holders of record of its consumercommon stock.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

409.470.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

783086.1

410.471.  Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

411.472.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether Defendants engaged in a fraudulent scheme;

(g)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(h)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

263

412.473.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**XV.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTION**

413.474.   Lead Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine as enunciated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

414.475.   With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   the Company's common stock traded in an efficient market;

(d)   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)   Lead Plaintiff and other members of the Class purchased common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

415.476.   At all relevant times, the market for Riot's common stock was efficient for the following reasons, among others:

(a)     the Company's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Riot filed periodic public reports with the SEC and the NASDAQ;

(c)     Riot regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Riot was followed by stock analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

416.477.   As a result of the foregoing, the market for Riot's common stock promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of the common stock.   Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of such common stock at artificially inflated prices, and a presumption of reliance applies.

417.478.   In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims alleged are grounded on Defendants' material omissions.   Because this action involves

265

Defendants' failure to disclose material adverse information regarding Riot's business operations and financial performance – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.

418.479.  Moreover, when, as here, a defendant (Honig) has engaged in conduct that amounts to manipulation, that conduct creates and independent duty to disclose.  Participants in the securities markets are entitled to presume that all relevant actors are behaving legally and silence that conceals illegal activity is deemed intrinsically misleading.

419.480.  All that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XVI.   NO SAFE HARBOR

420.481.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking

266

statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## COUNT I

~~Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Riot, O'Rourke, McGonegal, Beeghley, Kaplan, and So~~

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants**

482.   Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

483.   As early as 2016, and continuing throughout the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, did: (i) deceive the investing public, including Lead Plaintiff and other members of the Class, as alleged herein; (ii) artificially inflate the price of the Company's common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Riot's common stock at artificially inflated prices.  The various elements of Defendants' devices, schemes, and artifices that operated as a fraud and deceit on Riot's public investors are laid out in detail in Section IX, *supra*, and summarized below.

484.   *First*, during the Class Period, Defendants Honig, Groussman, Stetson, and DeFrancesco (acting individually and/or through the investment entities they controlled, including GRQ 401K, ATG, Melechdavid, Stetson Capital, and Namaste, among others) and pursuant to explicit or tacit agreements with each other and the various Selling Stockholders and other affiliates to acquire, hold, vote, and/or dispose of shares they acquired in Riot in coordination with one another) knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by, among other things, directly or indirectly, with scienter obtaining and exercising undisclosed control of the management and policies of Riot and selling shares of Riot into the market at artificially high prices.  Defendants further violated Exchange Act Section 10(b) and

267

783086.1

Rule 10b-5(a) and (c) thereunder by knowingly or recklessly making materially false and misleading filings under Section 13(d) – including on Schedules 13G, 13G/A, 13D, and 13D/A – that concealed both their control over Riot's management and policies, as well as their membership in a group with each other, pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.   Defendants further violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by knowingly or recklessly by failing to make timely and appropriate Section 13(d) filings and amendments (e.g., on Schedule 13D/A) reflecting their acquisition or disposition of Riot stock (whether individuals or as a group) that facilitated their scheme to defraud investors about their group's control over the management and policies of, and the magnitude of the collective investment in, Riot.   Defendants further violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by engaging in manipulative trading in the securities of Riot while failing to make the necessary amendments to their Section 13(d) filings or disclosing their membership with each other in a "group" as defined by Section 13(d)(3).

485.   *Second*, during the Class Period, Defendants O'Rourke and Beeghley, as officers and/or directors of Riot, pursuant to explicit or tacit agreements with Defendants Honig, Groussman, Stetson, and DeFrancesco, knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by causing the Company to issue materially false and misleading public filings with the SEC – including on Forms S-3, S-3/A, and 10-K, and Schedule 14A – that materially misrepresented the Company's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K by misrepresenting and concealing the fact that many of Riot's largest shareholders – including Defendants Honig, Groussman, Stetson, and DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A were members of a group with

each other (as defined by Section 13(d)(3)) pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  Defendants O'Rourke, Beeghley, and Riot also knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by issuing materially false and misleading Forms 8-k and 10-K that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendants Honig and DeFrancesco.

486.   Each and every Defendant is sued as a primary participant in the wrongful and illegal conduct charged herein.

487.   The scheme, plan, and course of conduct alleged herein was intended to, and did, drive sales of Riot's common stock, and with it, the Company's share price.

<div align="center">

**COUNT II**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants**

</div>

~~421.~~488.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

~~422.~~489.   This Count is asserted against ~~the Company, O'Rourke, McGonegal, Beeghley, Kaplan, and So.~~all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

~~423.~~490.   During the Class Period, ~~the Company and the other~~ Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were materially misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially

<div align="center">269</div>

misleading.  Defendants violated § 10(b) of the Exchange Act and Rule 10b-5(b) thereunder in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

424.   The Company and Defendants O'Rourke, McGonegal, Beeghley, Kaplan, and So violated § 10(b) of the Exchange Act and Rule 10b-5(b) in that they:  employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and Class members in connection with their purchases of the Company's securities during the Class Period.

491.   The Company and O'Rourke, McGonegal, and Beeghley*First*, during the Class Period, Defendants Honig, Groussman, Stetson, and DeFrancesco (acting individually and/or through the investment entities they controlled, including GRQ 401K, ATG, Melechdavid, Stetson Capital, and Namaste, among others) and pursuant to explicit or tacit agreements with each other and the various Selling Stockholders and other affiliates to acquire, hold, vote, and/or dispose of shares they acquired in Riot in coordination with one another) knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by, among other things, directly or indirectly, with scienter obtaining and exercising undisclosed control of the management and policies of Riot and selling shares of Riot into the market at artificially high prices.  Defendants further violated Exchange Act Section 10(b) and Rule 10b Rule 10b-5(b) thereunder by knowingly or recklessly making materially false and misleading filings under Section 13(d) – including on Schedules 13G, 13G/A, 13D, and 13D/A – that concealed both their control over Riot's

270

management and policies, as well as their membership in a group with each other, pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  Defendants further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly by failing to make timely and appropriate Section 13(d) filings and amendments (e.g., on Schedule 13D/A) reflecting their acquisition or disposition of Riot stock (whether individuals or as a group) that facilitated their scheme to defraud investors about their group's control over the management and policies of, and the magnitude of the collective investment in, Riot.  Defendants further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by engaging in manipulative trading in the securities of Riot while failing to make the necessary amendments to their Section 13(d) filings or disclosing their membership with each other in a "group" as defined by Section 13(d)(3).

492.    *Second*, during the Class Period, Defendants O'Rourke and Beeghley, as officers and/or directors of Riot, pursuant to explicit or tacit agreements with Defendants Honig, Groussman, Stetson, and DeFrancesco, knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by causing the Company to issue materially false and misleading public filings with the SEC – including on Forms S-3, S-3/A, and 10-K, and Schedule 14A – that materially misrepresented the Company's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K by misrepresenting and concealing the fact that many of Riot's largest shareholders – including Defendants Honig, Groussman, Stetson, and DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A were members of a group with each other (as defined by Section 13(d)(3)) pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other.  Defendants O'Rourke, Beeghley, and Riot also knowingly or recklessly violated Exchange Act Section 10(b) and Rule

271

Rule 10b-5(b) thereunder by issuing materially false and misleading Forms 8-k and 10-K that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendants Honig and DeFrancesco.

425.493.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

426.494.   Defendants O'Rourke, McGonegal, and Beeghley, Kaplan, and So, who were the senior officers and/or directors of the Company during the Class Period, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Lead Plaintiff and members of the Class.

427.495.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the falsity of the Company's and

783086.1

~~O'Rourke, McGonegal, Beeghley, Kaplan, and So's~~other Defendants' statements, Lead Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and ~~O'Rourke, McGonegal, Beeghley, Kaplan, and So's~~and other Defendants' materially false and misleading statements.

~~428.~~496.   Had Lead Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and ~~the O'Rourke, McGonegal, Beeghley, Kaplan, and So's~~and other Defendants' materially misleading statements and by the material adverse information which the Company's and Defendants ~~O'Rourke, McGonegal, Beeghley, Kaplan, and So~~ did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

~~429.~~497.   As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

~~430.~~498.   By reason of the foregoing, the Company and the Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

### COUNT ~~II~~III

~~**Violation of Section 10(b) of the Exchange Act and**~~
~~**Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants**~~

~~431.1.   Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.~~

273

**Formatted:** Font: +Body (Times New Roman)

**Formatted:** Font: +Body (Times New Roman)

432.   As early as 2016, and continuing throughout the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, did:  (i) deceive the investing public, including Lead Plaintiff and other members of the Class, as alleged herein; (ii) enable Riot to artificially inflate the price of the Company's common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Riot's common stock at artificially inflated prices.  The various elements of Defendants' scheme are laid out in detail in Section V.

433.1.  Each and every Defendant is sued as a primary participant in the wrongful and illegal conduct charged herein.

434.   The scheme, plan, and course of conduct alleged herein was intended to, and did, drive sales of Riot's common stock, and with it, the Company's profits and share price.

### COUNT III

**Violation of Section 20(a) of The Exchange Act**

**Against All Defendants O'Rourke, McGonegal, Beeghley, Kaplan, and So (Other than Riot)**

435.499.   Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

436.500.   During the Class Period, Defendants O'Rourke, McGonegal, and Beeghley, Kaplan, and So participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Each of the foregoing individuals owed fiduciary duties to the Company and its shareholders.  Because of their positions and interconnected relationships, they knew the adverse non-public information regarding the Company's business practices.

437.501.   As officers, directors and/or fiduciaries of a publicly owned company, these defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public

274

statements issued by the Company which had become materially false or misleading.  They also had an obligation to act, at all times, in the best interests of the Company and its shareholders and to refrain from self-dealing for the own benefit at the expense of Riot and the Class.

438.502.  Because of their positions of control and authority, Honig and the other individualsHonig Group members named in this count were able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period.  Throughout the Class Period, Honig and the otherthese individuals named in this count exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Honig and the other individuals named in this count and, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

439.  Honig and the other individuals named on this count, therefore, acted as a controlling person of the Company.  By reason of their senior management positions and/or being directors, officers, and/or fiduciaries of the Company and/or their interconnected relationships, each of them had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  Each individual named in this count exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

440.503.  By reason of the above conduct, O'Rourke, McGonegal, Beeghley, Kaplan, and Soall Defendants (other than Riot) are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

275

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

A.      Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Motley Rice LLC as class counsel pursuant to Rule 23(g);

B.      Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.      Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E.      Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  May 9, 2019June 1, 2020            Respectfully submitted,

                                           **LITE DEPALMA GREENBERG, LLC**

                                           *By: /s/ Joseph J. DePalma*
                                           Joseph J. DePalma
                                           570 Broad Street, Suite 1201
                                           Newark, NJ 07102
                                           Telephone: (973) 623-3000
                                           Facsimile: (973) 623-0858
                                           jdepalma@litedepalma.com

                                           *Local Counsel for Lead Plaintiff*
                                           *Dr. Stanley Golovac*

                                           276

Formatted: Justified

783086.1

**Formatted:** Justified

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Lead Plaintiff Dr. Stanley Golovac*
*and Lead Counsel for the Class*

David P. Abel
**US. MARKET ADVISORS LAW GROUP PLLC**
5335 Wisconsin Ave. NW, Ste. 440
Washington, D.C.  20015
202-274-0237 Telephone
202-686-2877 Facsimile
dabel@usmarketlaw.com

*Counsel for Lead Plaintiff Dr. Stanley Golovac*

277