
# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated, | : <br> : Civil Action No.: 18-2293(FLW)(ZNQ) <br> : |
| *Plaintiff*, | : <br> : |
| v. | : **REPLY MEMORANDUM OF LAW IN** <br> : **SUPPORT OF MOTION FOR LEAVE** <br> : **TO FILE [PROPOSED]** |
| RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY G. MCGONEGAL, | : **CONSOLIDATED SECOND** <br> : **AMENDED CLASS ACTION** <br> : **COMPLAINT FOR VIOLATIONS OF** <br> : **THE FEDERAL SECURITIES LAW** |
| *Defendants*. | : <br> : |

**LITE DEPALMA GREENBERG, LLC**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Lead Plaintiff*
*Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Lead Plaintiff Dr. Stanley*
*Golovac and Lead Counsel for the Class*

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ................................................................................... 1

II. ARGUMENT ................................................................................................................ 2

    A. Plaintiff's Motion to Amend Is Not Futile as to Honig ..................................... 2

    B. Plaintiff's Motion to Amend Is Not Futile as to the Riot Defendants .............. 5

        1. O'Rourke and Beeghley Issued Materially False and Misleading Statements Regarding the Company's Beneficial Ownership .............. 5

        2. The SAC Alleges the Riot Defendants Made False and Misleading Statements and Omissions Regarding Related-Party Transactions .... 8

III. CONCLUSION ........................................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

*Berkery v. Equifax Info Servs.*, 429 F. Supp. 3d 24 (E.D. Pa. 2019) ............................................... 3

*Coleman v. Metzger*, 2020 WL 3452993 (D. Del. June 24, 2020) ............................................... 11

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
  95 F. Supp. 2d 169 (S.D.N.Y. 2000) ........................................................................................ 7

*In re Hienergy Techs., Inc.*, 2005 WL 3071250 (C.D. Cal. Oct. 25, 2005) .................................... 6

*In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................ 5

*In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005) ................................................... 4

*Lerner v. Millenco, LP*, 23 F. Supp. 2d 337 (S.D.N.Y. 1998) ........................................................ 7

*Morales v. Quintel Entm't, Inc.*, 249 F.3d 115 (2d Cir. 2001) ........................................................ 7

*SEC v. Apolant*, 411 F. Supp. 2d 271 (E.D.N.Y. 2006) .................................................................. 6

*SEC v. Honig*, 2020 WL 906383 (S.D.N.Y. Feb. 25, 2020) ....................................................... 6, 8

*SEC. v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379 (S.D.N.Y. 2014) ....... 9, 10

*Siemers v. Wells Fargo & Co.*, No. C 05 04518 WHA, 2007 WL 1456047
  (N.D. Cal. May 17, 2007) ......................................................................................................... 5

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) .............................................................. 5

*United States v. Scarfo*, 2013 WL 632228 (D.N.J. Feb. 19, 2013) ................................................ 6

*W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165 (3d Cir. 2013) ....... 3

*Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705 (N.D. Tex. 2008) ..................... 9, 11

**Other Authorities**

FASB ASC 850 ........................................................................................................................ 9, 11

**Regulations**

17 C.F.R § 229.404(a) .................................................................................................................. 10

17 C.F.R. § 229.403(a) ................................................................................................................. 6

17 C.F.R. § 229.404, Instruction 6 ............................................................................................. 10

Case 3:18-cv-02293-GC-RLS   Document 180   Filed 06/29/20   Page 4 of 17 PageID: 6690

Lead Plaintiff Dr. Stanley Golovac ("Plaintiff") respectfully submits this reply memorandum of law in support of his motion (ECF No. 169) for leave to file his [Proposed] Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Law (the "SAC")[1] (ECF No. 169-2) and in response to the oppositions of Defendants Honig (ECF No. 173); O'Rourke, Beeghley and Riot (the "Riot Defendants") (ECF No. 171); Stetson (ECF No. 174); Groussman (ECF No. 175, 177); and DeFrancesco (ECF No. 172, 176).

## I.  PRELIMINARY STATEMENT

Confronted with a proposed SAC that cures the infirmities of the pleading previously dismissed by the Court, Defendants strike a strategic, but unsurprising, stance: they largely ignore and rewrite the proposed SAC's new allegations as to their liability and loss causation in an attempt to relitigate the previous complaint and thus attack irrelevant strawmen. *First*, the SAC clarifies how the revelation of Honig's stock sales caused Plaintiff's economic losses – the only element the Court found lacking in the previous complaint as to Honig. *See* SAC § XIII. *Second*, the SAC provides a new focus on how the Riot Defendants facilitated the fraudulent scheme by failing to disclose the Honig Group's beneficial ownership as required by Item 403 of Regulation S-K. *See* SAC §§ IX.A-B & X.B. *Third*, the SAC provides a new focus on how the Riot Defendants violated Item 404 and ASC 850 by failing to disclose the Honig Group's related-party transactions with Riot. *See* SAC § X.C. *Fourth*, the SAC more fully alleges how Honig, Stetson, Groussman, and DeFrancesco each knowingly facilitated the scheme by acquiring, holding, and disposing of Riot's stock while failing to disclose, in violation of Section 13(d) and Rule 13d-2, their acquisitions

---

[1] Cites to "¶ __" are to paragraphs of the SAC. Cites to "Honig Br. __" are to Honig's opposition brief (ECF No. 173). Cites to "Riot Br. __" are to the Riot Defendants' brief (ECF No. 171).

and/or dispositions of Riot stock and that they were working as an undisclosed "group" under Section 13(d)(3).  *See* SAC § X.C.1-4.[2]

## II.   ARGUMENT

### A.   Plaintiff's Motion to Amend Is Not Futile as to Honig

In granting Defendants' motions to dismiss, the Court held that Plaintiff had adequately pleaded Honig's liability for participating in a false scheme and that he did so with scienter. *See* ECF No. 166 at 32, 36 ("I find that Plaintiff has sufficiently alleged a deceptive or manipulative act by Honig" and "the Court concludes that the allegations in the Complaint against Honig are sufficient to support the requisite strong inference of scienter."). The only issue before the Court with respect to Honig, therefore, is whether the SAC adequately alleges loss causation.[3]

Instead of substantively addressing Plaintiff's new allegations, Honig first complains that Plaintiff "filed only a partial version of a 'redlined' form of his proposed SAC" that "force[d]" his counsel to "sift through" the SAC to determine the changes to Plaintiff's allegations.  Honig Br. 2.[4]  Honig's purported concern could have been addressed easily (avoiding unnecessary briefing) if Honig's counsel had simply reached out to Plaintiff's counsel to request a complete copy. Instead, Honig made the strategic choice to brief this issue.  That Honig leads with this as his "[f]irst" argument tells the Court all it needs to know about the merits of his other arguments.

---

[2] Only Honig and the Riot Defendants have filed substantive oppositions to Plaintiff's motion. Stetson joined in the Riot Defendants' opposition (ECF No. 174). Groussman and DeFrancesco joined in the responses of the Riot Defendants and Honig (ECF No. 172, 175-77).  For the same reasons stated herein in response to Honig and the Riot Defendants, the SAC is also not futile as to Stetson, Groussman, and DeFrancesco.  *See* SAC §§ IX.C.2-4, X.A.2-3.

[3] The SAC is not, as Honig asserts, "Plaintiff's proposed <u>fourth</u> version of his complaint." Honig Br. 2.  Plaintiff did not file the complaints that preceded his appointment as Lead Plaintiff.

[4] Plaintiff did file a complete "redline," but the latter pages were inadvertently deleted by the electronic filing system, apparently due to file-size limitations.  On June 26, 2020, Plaintiff refiled a complete version of the redline (ECF No. 178).

2

Turning to the SAC's loss causation allegations, Honig contends that Plaintiff "alleges zero new facts addressing loss causation." Honig Br. 3. This is demonstrably false. For example, the SAC alleges that the truth of Honig's insider selling was first revealed on January 31, 2018, by *The Wall Street Journal*, causing a substantial decline in Riot's stock price. ¶¶ 456-460; *see also* ECF No. 169-1 at 3. Later, on February 16, 2018, CNBC disclosed that Honig's sales could be part of a broader pump-and-dump scheme involving Company insiders, including O'Rourke. ¶¶ 461-62. The Court did not previously address these loss causation allegations specifically in connection with Honig, let alone find them "insufficient to allege loss causation." Honig Br. 3.[5]

Lacking substantive arguments to address Plaintiff's new loss causations allegations, Honig claims he has certain undisclosed "additional arguments regarding Plaintiff's failure to allege loss causation that [he] would raise in a motion to dismiss." Honig Br. 4. To the extent these arguments exist, Honig should have included them here if he had a genuine basis to believe they have any bearing on whether Plaintiff's new allegations are futile. Instead, Honig contends that "the far more likely cause of the rapid rise and decline in Riot's stock price was the nearly identical and concurrent swings in the value of Bitcoin." Honig Br. 5. Honig fails to cite any support of this contention because the stock drops accompanying the corrective disclosures were *not* "concurrent" with the price of Bitcoin, but were caused by revelations of Defendants' fraud.

---

[5] Honig contends that Plaintiff's "theory" that he "act[ed] as a group" in the alleged "pump-and-dump scheme" is "patently ridiculous." Honig Br. 4. While it is disappointing that Honig would choose to label as "ridiculous" allegations that this Court has already ruled are adequately pleaded under the rigorous requirements of the PSLRA, the SAC's additional allegations are neither novel nor ridiculous. Rather, the SAC expands on the theories put forward previously and readily cures the deficiencies identified by the Court. Even where the SAC does put forward new theories, this is entirely proper. *See Berkery v. Equifax Info Servs.*, 429 F. Supp. 3d 24, 32 (E.D. Pa. 2019) ("[P]laintiffs routinely correct factual inadequacies in response to motions to dismiss, even by amending complaints in a manner that 'flatly contradicts the initial allegation.'" (quoting *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 172 (3d Cir. 2013))).

3

*First*, Plaintiff alleges that Riot's stock price fell by approximately 5% on January 31, 2018. ¶¶ 456-58. According to Honig's chart of Bitcoin prices, the price of Bitcoin *increased* from an opening price of $10,107.40 on January 31, 2018, to close at $10,226.86 that same day. *See* ECF No. 118-14 at 13. The following day, Riot's stock price fell further, resulting in a two-day loss of ***14.26%*** from the January 30, 2018, to February 1, 2018 closing prices. ¶ 460. During this same time period, Bitcoin fell from a closing price of $10,107.26 to a closing price of $9,114.72 – a much smaller drop of only 9.82%. *See* ECF No. 118-14 at 13. *Second*, Riot's stock price fell by approximately ***33.4%*** from its closing price on February 15, 2018, to its closing price on February 16, 2018. ¶ 462. By contrast, the price of Bitcoin *increased* from a closing price of $10,033.75 on February 15, 2018, to close at $10,188.73 the following day. ECF No. 118-14 at 13. *Third*, Plaintiff's next alleged corrective disclosure – a 5.8% drop from the closing price on April 17, 2018, to the closing price on April 18, 2018, ¶ 463 – occurred during the same time period that the price of Bitcoin *increased*, from a closing price of $8,189.96 to a closing price of $8,301.82. ECF No. 118-14 at 13. *Fourth*, on May 29, 2018, Riot's stock price declined by nearly 6% in response to a corrective disclosure. ¶ 464. In contrast, Bitcoin only decreased by 1.09% that day, from an opening price of $7,474.75 to close at $7,393.02. ECF No. 118-14 at 15. *Finally*, Riot's stock price fell by approximately ***26.1%*** from the closing price on September 6, 2018, to the closing price on September 7, 2018. ¶¶ 465-66. Bitcoin fell by less than 1% over that same period, from a closing price of $6,529.17 on September 6, 2018, to close at $6,467.07 on September 7, 2018. *See* Ex. A hereto.[6] Whether considered individually or overall, there can be no dispute that,

---

[6] Because the chart submitted by Honig ends with the price of Bitcoin on September 6, 2018, Plaintiff is attaching as Exhibit A to the accompanying Declaration of Joseph J. DePalma a chart of historic Bitcoin prices taken from the Yahoo! Finance website that shows the price of Bitcoin on September 7, 2018. Such historic market prices are subject to judicial notice. *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 264 (3d Cir. 2005) ("We can take judicial notice of Merck's

4

contrary to Honig's argument, the price of Riot's stock was far from "identical and concurrent" with the "swings in the value of Bitcoin." Honig Br. 5. Thus, Plaintiff has more than satisfied the notice pleading standards of Rule 8.[7]

### B. Plaintiff's Motion to Amend Is Not Futile as to the Riot Defendants

#### 1. O'Rourke and Beeghley Issued Materially False and Misleading Statements Regarding the Company's Beneficial Ownership

The Riot Defendants' primary argument for "futility" is to attack a strawman by asserting that "Plaintiff alleges that [the Riot] Defendants violated Section 13(d)" and arguing that "Riot cannot be liable for failing to disclose a 'group' under Section 13(d)." *See* Riot Br. 2, 6, 8. This "Section 13(d)" argument is a red herring that misstates Plaintiff's allegations. Specifically, Plaintiff does not allege that the Riot Defendants directly violated Section 13(d), but that as an issuer of public securities, Riot's "disclosure obligations" were "imposed" by "Item 403 of Regulation S-K," which required Riot to disclose in its Forms S-3 and 10-K "any 'group' as that term is used in section 13(d)(3)."[8] *See* ¶¶ 246-47. Defendants cannot "rewrite[e] the [SAC] in a way that they believe favors dismissal" because they "must take the [SAC] as [it is] written." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 332-33 (S.D.N.Y. 2003).

---

stock prices even on a motion to dismiss"). *See also Siemers v. Wells Fargo & Co.*, No. C 05 04518 WHA, 2007 WL 1456047, at *2 (N.D. Cal. May 17, 2007) (taking "judicial notice of the Yahoo Finance quotes for the per share price").

[7] Honig's misplaced arguments about the correlation between the declines of Riot's stock price alleged in the SAC and the price of Bitcoin are surprising given that **Honig** himself previously submitted – and requested judicial notice of – Riot's historical stock prices, ECF Nos. 67-8 & 118-14, and the historical price of Bitcoin, ECF No. 118-14. While Honig's chart did not include the price of Bitcoin on September 7, 2018, it did list a closing price of $6,411.78 on September 6, 2018. ECF No. 118-14 at 18.

[8] "Section 13(d)'s purpose is to alert investors to potential changes in corporate control so that they [can] properly evaluate the company in which they had invested or were investing." *United States v. Bilzerian*, 926 F.2d 1285, 1297 (2d Cir. 1991) (internal quotations omitted).

Courts have acknowledged that Item 403 of Regulation S-K, together with Section 13(d) and the antifraud provisions of Section 10(b) and Rule 10b-5, exist to afford investors adequate information regarding who actually controls a public company, and to protect them from potential pump-and-dump schemes. *See* ¶¶ 240-50. For example, in the SEC's lawsuit against Honig, O'Rourke, Stetson, and Groussman, the court allowed the SEC to replead its claims under Item 403 and acknowledged that "Item 403 of Regulation S-K . . . requires that a filer disclose any 'person' or 'group' 'who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities.'" *SEC v. Honig*, 2020 WL 906383, at *10 (S.D.N.Y. Feb. 25, 2020) (citing 17 C.F.R. § 229.403(a)). *See also United States v. Scarfo*, 2013 WL 632228, at *1 (D.N.J. Feb. 19, 2013) (denying dismissal and noting that the "essence of the Government's Section 10(b)-based contentions is that . . . FPFG failed to 'fully and accurately disclose in its applicable SEC filings, the identities of individuals who exercised control over FPFG and its subsidiaries, as well as the identities of individuals involved in related party transactions'").[9]

Defendants acknowledge that "Item 403 . . . applies to issuers"[10] but argue that "Plaintiff provides no allegations to suggest that Defendants knew Honig, DeFrancesco, Groussman, and Stetson acted as a group." Riot Br. 3. Yet Defendants entirely ignore many of Plaintiff's scienter

---

[9] *See also In re Hienergy Techs., Inc.*, 2005 WL 3071250, at *12 (C.D. Cal. Oct. 25, 2005) ("Plaintiffs have properly pled that [HiEnergy] violated Section 10(b) and Rule 10b-5 by failing to disclose the secret control group and market manipulation, as well as failing to disclose the negative histories of certain officers, major shareholders, and directors"); *SEC v. Apolant*, 411 F. Supp. 2d 271, 277–78 (E.D.N.Y. 2006) (holding fraudulent scheme "concealing the true controlling force behind the company" adequately pled and noting that "[p]otential investors had the right to know that the company they were funding was surreptitiously controlled or unlawfully influenced by a group of convicted felons").

[10] Given that Riot's duties arise under Item 403, the Riot Defendants are misplaced in arguing that "it is Honig's, not Mr. Beeghley's, responsibility to comply with Section 13(d)." Riot Br. 24.

6

allegations, which are set forth in SAC §§ IX.C.5 (for O'Rourke) and IX.C.6 (for Beeghley). For example, O'Rourke knew in signing Riot's Forms S-3/A, ¶ 291, that Honig, Stetson, Groussman, and DeFrancesco constituted a Section 13(d) "group" requiring disclosure under Item 403 because:

- O'Rourke invested with Honig in over 75 issuers between 2011 and 2018, ¶ 293;[11]
- O'Rourke said "***Barry Honig is the principal investor of <u>our small group</u>***," ¶ 294;
- O'Rourke, Stetson, Groussman, and Honig shared Honig's office (and used the same fax number) in Boca Raton, Florida, where CNBC filmed O'Rourke, ¶ 295;
- O'Rourke was involved in Honig's 2015 lawsuit alleging violations of § 13(d), in which Honig alleged that § 13(d) violations are "material" to investors, ¶ 292;
- O'Rourke, Honig, Groussman, Stetson, and/or Brauser personally coordinated their investments in numerous public companies, *see* ECF No. 162-2 at Exs. D, E, F, G, H & I; and O'Rourke, Honig, Groussman, and Stetson accomplished this coordination through private email correspondence amongst each other, *see id.* at Ex. D at 7 of 21 (email among O'Rourke, Honig, Groussman, and Stetson);
- As a result of O'Rourke's securities laws violations perpetrated in coordination with Honig, Groussman, and Stetson, O'Rourke has been permanently barred from participating in an offering of penny stock, from holding greater than 4.99% of any penny stock, and from advertising, marketing, or promoting any penny stock; and
- O'Rourke's past connections with the Honig Group and the Selling Stockholders, as set forth in the SAC's charts describing the "Honig Group's Prior Target Companies," *see* ¶ 162, and the "Selling Stockholders' Prior Target Companies," *see* ¶ 163, and further depicted in the diagram attached to the SAC as Exhibit M.

Similarly, Beeghley knew, in signing Riot's Forms S-3/A, that Honig, Stetson, Groussman, and DeFrancesco were an undisclosed "group" requiring disclosure because:

---

[11] Defendants argue that O'Rourke and Beeghley's history of co-investments with Honig, Stetson, Groussman, and DeFrancesco "does not provide a plausible inference" that they knew they were a "Section 13(d) group." Riot Br. 9. To the contrary, courts frequently consider individuals' history of co-investment in determining whether an alleged "group" exists under Section 13(d). *See, e.g.*, *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 127 (2d Cir. 2001) (affirming finding of Section 13(d) group where members had a pre-existing relationship as shareholders of a corporation); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 173 (S.D.N.Y. 2000) (denying motion to dismiss allegations that "all of the defendants have violated Section 13(d) in a variety of respects" and noting defendants' "prior investments" and "long-standing personal relationships"); *Lerner v. Millenco, LP*, 23 F. Supp. 2d 337, 344 (S.D.N.Y. 1998) (Section 13(d) group adequately pled based where defendant had "coordinated its investments" with "other members" of the alleged group "on numerous prior occasions").

- Beeghley knew that Honig, Groussman, and Stetson were all affiliated because they had all invested together in PolarityTE when Beeghley was a Director of PolarityTE, Honig was Chairman and CEO, and Stetson was CFO, ¶ 301;
- Beeghley's even more extensive past interconnections with the Honig Group and the Selling Stockholders (including through PolarityTE), as set forth in the SAC's charts describing the "Honig Group's Prior Target Companies," ¶ 162, and "Selling Stockholders' Prior Target Companies," ¶ 163; *see also* SAC Ex. M; and
- As Riot's CEO, Beeghley was in a position to know about the March 2017 Private Placement in which Riot sold Honig warrants and notes to purchase up to 700,000 shares of stock, *see* SAC Ex. P at 5, and when, on August 18, 2017, the March 2017 Warrants were released to [Honig]," *id.*, but who filed no Schedule 13D/A.

Finally, in *SEC v. Honig*, the court held that "it is more than plausible that the four men [i.e., Honig, O'Rourke, Stetson, and Brauser] "had agreed to work in concert on their schemes." 2020 WL 906383, at *12. The court further found that the SEC had "amply" pleaded that these "four men" had formed a "group" as "defined by SEC rules" and that was "buttressed by the bevy of circumstantial evidence surrounding the Honig Group's manipulation of MTG and its stock, including Honig and O'Rourke's collaboration in orchestrating" a "deal in March 2016." *Id.* Here, as in *SEC v. Honig*, Plaintiff has amply alleged why O'Rourke and Beeghley knew that Honig, Stetson, Groussman, and DeFrancesco constituted a group under Section 13(d)(3) and, therefore, knowingly violated Item 403 by failing to disclose that group in Riot's Forms S-3 and 10-K.[12]

### 2. The SAC Alleges the Riot Defendants Made False and Misleading Statements and Omissions Regarding Related-Party Transactions

---

[12] The Riot Defendants accuse Plaintiff of "deliberately distort[ing]" Riot's statement (which Plaintiff quotes fully and accurately, ¶ 354) that "[e]ach selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock," Riot Br. 10. n.3, which Defendants argue supports that they were unaware that the Selling Stockholders were a group, *id.* at 9. But it was precisely because O'Rourke and Beeghley obviously knew about (and were members of) the Honig Group that this statement was misleading to Riot's public investors by concealing that same group.

8

The Riot Defendants claim that all of the related-party transactions alleged in the SAC "were either fully disclosed by the Company or did not need to be disclosed under Item 404 of Regulation S-K." Riot Br. 20. As explained below, these arguments fail.

The Riot Defendants had a duty to disclose related-party transactions and material transactions between the Company and its insiders or controllers (such as a 5% or greater shareholders) under Item 404 and ASC 850. *See SEC. v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 393-94 (S.D.N.Y. 2014) ("FAS 57 [now known as FASB ASC 850] requires disclosures of material related-party transactions . . . Item 404 requires disclosures of related-party transactions when 'the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest.'").[13]

In response, the Riot Defendants argue that the March 2017 Private Placement allegations (¶¶ 183-89; 389-94) were "false" because Riot fully disclosed that the Company had entered into a $2,250,000 private placement agreement with Honig. *See* Riot Br. 15. While the Riot Defendants attach three exhibits in support – the March 2017 Securities Purchase Agreement (Carlton Decl., Ex. A at 22, ECF No. 171-3), a March 22, 2017 Form D filed by Riot (Carlton Decl., Ex. B at 4, ECF No. 171-4), and Riot's July 19, 2017 Amended Registration Statement on Form S-3/A (Carlton Decl., Ex. C at 2-4, ECF No. 171-5) – none of these exhibits discloses that *Honig* was an investor in this transaction. Rather, these exhibits merely refer to investors in generic terms rather than by name, such as "purchaser" (Securities Purchase Agreement at 22), "accredited investors" (Form D at 4), and "certain of the selling stockholders" (S-3/A at 3-4). This

---

[13] *See also Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705, 711 (N.D. Tex. 2008) ("[D]isclosure is the overriding principle" governing related-party transactions, because while they are "not inherently bad, they have proven to be an easy and effective way . . . to misstate the economic substance and reality of financial transactions . . . [and] are difficult to measure economically because they may not be comparable[.]").

9

falls far short of the duties imposed by Item 404, which requires: (1) "***the name** of the related person* and basis on which the person is a related person"; (2) "the related person's *interest in the transaction*"; and (3) "[a]ny other information regarding the transaction . . . that is material to investors in light of the circumstances . . . ." 17 C.F.R § 229.404(a) (emphases added).[14]

The Riot Defendants' arguments about the Coinsquare, Kairos, and the December Private Placement transactions are similarly unavailing. Regarding Coinsquare and Kairos, the Riot Defendants misconstrue the instructions to Item 404 to mean that the related party must own 10% or more of the entity in question for any interest to be considered a "material interest" to be disclosed. *See* Defs.' Br. 4, 18. Setting aside the fact that this interpretation would effectively allow the *instructions* to the regulation to supersede the express language of the regulation itself,[15] those same instructions <u>only</u> make reference to an "*indirect* material interest" as opposed to a *direct* material interest. *See* 17 C.F.R. § 229.404, Instruction 6 ("A person who has a position or relationship with a firm, corporation, or other entity that engages in a transaction with the registrant ***shall not be deemed to have an <u>indirect</u> material interest*** . . . where . . . [t]he interest arises only . . . [f]rom the direct or indirect ownership by such person . . . . of less than ten percent of the equity interest in another person (other than a partnership) which is a party to the transaction." (emphasis added)). While the regulations and instructions do not define "indirect material interest," common

---

[14] ASC 850 has similar disclosure requirements. *China Northeast*, 27 F. Supp. 3d at 393-94. While Honig's involvement in the March 2017 Private Placement was eventually disclosed to Riot's public shareholders (more than a year later on April 18, 2018, ¶ 463), this disclosure caused Riot's stock price to decline by 5.8%. That Plaintiff did not purchase shares of the Company until after the March 2017 Private Placement occurred is a red herring. *See* Riot Br. 16-17. Even as late as December 2017, the SAC alleges that Riot had not disclosed, ***by name or otherwise***, that was Honig was an investor in this transaction. ¶¶ 225, 323. Thus, Plaintiff purchased at a time when Defendants continued to conceal material information required by Item 404.

[15] Indeed, if Defendants' strained reading were correct, related-party transactions involving more than the $120,000 threshold imposed by Item 404 would routinely evade disclosure.

sense dictates that an indirect interest would more likely include, for example, a loan or personal guarantee to an entity involved in the transaction, as opposed to a direct ownership interest in that same entity. *See Coleman v. Metzger*, 2020 WL 3452993, at *2 (D. Del. June 24, 2020) ("Deciding whether a claim is plausible will be a 'context-specific task that requires the reviewing court to draw on its judicial experience *and common sense*.'" (emphasis added)).

Here, the SAC alleges that Honig, Groussman, Stetson, *and* Riot together, ¶¶ 190-95, participated in the Coinsquare transaction, a multimillion-dollar investment that all of these parties *directly* participated in and signed onto as co-investors. *Id*. Likewise, the SAC alleges that Honig and DeFrancesco *directly* received preferred shares of Riot for their 14.9% ownership interest in Kairos, an amount that easily exceeded the $120,000 threshold under Item 404. ¶¶ 196-99. Under Item 404 and ASC 850, these transactions should have been disclosed to Riot investors so they could properly analyze the "economic substance and reality of [these] financial transactions" when they occurred. *Zagami*, 540 F. Supp. 2d at 711. When their participation was belatedly disclosed more than five months later, on April 18, 2017, Riot's stock price declined 5.8%. ¶ 463.[16]

Defendants also attach certain SEC filings to suggest Riot "disclosed" Honig and DeFrancesco's participation in this $37 million December 2017 Private Placement. *See* Riot Br. 19-20. Like the March 2017 Private Placement, these filings merely referenced nameless "Purchasers" (*see, e.g.*, Carlton Decl., Ex. F at 11, ECF No. 171-8) while failing to identify Honig or DeFrancesco by "name" as required by Item 404 despite their "having invested $500,000 and

---

[16] The Riot Defendants state repeatedly that "despite having no obligation to do so," Riot Br. 17-19 nn.10-12, they nevertheless disclosed the Coinsquare and Kairos, albeit belatedly. Defendants cannot have it both ways. When they eventually did disclose these transactions in their SEC filings, they did so under the heading "Related Party Transactions." *See, e.g.*, Carlton Decl., Ex. D at 125, ECF No. 171-6. Yet, Defendants now argue these were *not* related-party transactions.

11

$360,000, respectively." ¶ 201.[17] Accordingly, by failing to properly disclose the related-party transactions described above, Riot's SEC filings were materially false and misleading.

## III. CONCLUSION

Plaintiff respectfully submits that the Court should grant leave to file the proposed SAC.

Dated: June 29, 2020

Respectfully submitted,

**LITE DEPALMA GREENBERG, LLC**

By: /s/ Joseph J. DePalma
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Lead Plaintiff
Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Lead Plaintiff Dr. Stanley Golovac
and Lead Counsel for the Class*

---

[17] Defendants also argue that the proxy statements in the SAC are not false and misleading because those statements refer to events taking place during 2016. *See* Riot Br. 22. The SAC alleges why those proxy statements were ambiguous as to time period. ¶¶ 404-12, 425.

12

David P. Abel
**U.S. MARKET ADVISORS LAW GROUP PLLC**
5335 Wisconsin Ave. NW, Ste. 440
Washington, D.C. 20015
202-274-0237 Telephone
202-686-2877 Facsimile
dabel@usmarketlaw.com

*Counsel for Lead Plaintiff Dr. Stanley Golovac*

13