# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>   v.<br><br>RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY G. McGONEGAL,<br><br>        Defendants. | Civil No. 3:18-CV-02293(FLW)(ZNQ)<br><br>MOTION DATE:  May 3, 2021<br><br>**ORAL ARGUMENT REQUESTED** |

---

## MEMORANDUM OF LAW IN SUPPORT OF RIOT BLOCKCHAIN INC.'S MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

---

THOMAS A. ZACCARO
*thomaszaccaro@paulhastings.com*
D. SCOTT CARLTON
*scottcarlton@paulhastings.com*
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071-2228
Telephone:  1(213) 683-6000
Facsimile:  1(213) 627-0705

CHAD J. PETERMAN
*chadpeterman@paulhastings.com*
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone:  1(212) 318-6000
Facsimile:  1(212) 319-4090

*Attorneys for Defendants*
*RIOT BLOCKCHAIN, INC., JOHN O'ROURKE, AND MICHAEL BEEGHLEY*

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION.................................................................................... 1

II. FACTUAL ALLEGATIONS ................................................................ 4

    A.  Riot Blockchain, Inc.................................................................. 4

    B.  Riot's Investments in the Cryptocurrency Business ........................... 4

    C.  Allegations Concerning the Riot Defendants .................................... 5

III. RELEVANT PROCEDURAL HISTORY ........................................... 7

IV. THE SECTION 10(B) CLAIM AGAINST RIOT SHOULD BE DISMISSED ............. 9

    A.  The Reform Act and Rule 9(b)'s Heightened Pleading Standards...................... 9

    B.  The SAC Fails to Plead Any Actionable Misrepresentations or Omissions
as to Riot ...................................................................................10

        1.  Riot Did Not Violate Section 10(b) by Failing to Disclose the
Existence of the Honig Group ..............................................11

            a.  Riot Complied With the Requirements of Item 403 of
Regulation S-K..................................................................11

            b.  The SAC Fails to Allege Riot's Knowledge of the Honig
Group...............................................................................18

        2.  Riot Did Not Make Any False or Misleading Statements Regarding
Related-Party Transactions ...................................................20

            a.  Riot Did Not Engage in Any Undisclosed Related-Party
Transactions ......................................................................20

            b.  Riot's SEC Filings Concerning the Company's Related-
Party Transactions Were Not False or Misleading.....................26

    C.  Lead Plaintiff Does Not Adequately Allege "Scheme Liability" Under
Section 10(b) ...............................................................................29

    D.  The SAC Does Not Allege That Riot Acted With Scienter................................32

    E.  The SAC Does Not Allege Corrective Disclosures Establishing Loss
Causation....................................................................................33

        1.  Disclosures Made *After* This Action Was Filed Are Not Corrective
Disclosures......................................................................34

            a.  The SEC Suit Filed Against Certain Defendants for
Conduct Wholly Unrelated to Riot is Not a Corrective
Disclosure (September 7, 2018) .............................................35

            b.  Riot's Form 8-K is Not a Corrective Disclosure Regarding
the Coinsquare Transaction (May 25, 2018)..............................36

**TABLE OF CONTENTS**
(continued)

**Page**

c.    Riot's Form 10-K is Not a Corrective Disclosure
      Concerning Related Party Transactions (April 17, 2018)............36

2.    Disclosures Unconnected to Allegations of Fraud Are Not
      Corrective Disclosures .........................................................................37

      a.    CNBC News Article (February 16, 2018) ...................................37

      b.    Riot's Press Release and Wall Street Journal Article
            (January 31, 2018) ...................................................................38

V.    CONCLUSION...........................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Able Labs. Sec. Litig.*,
   2008 WL 1967509 19 (D.N.J. Mar. 24, 2008) ...................................................29

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013) ...............................................................34

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)...........................................................................................2

*Bond Opportunity Fund v. Unilab Corp.*,
   87 F. App'x 772 (2d Cir. 2004) .......................................................................30

*Burt v. Maasberg*,
   No. CIV.A. ELH-12-0464, 2013 WL 1314160 (D. Md. Mar. 31, 2013) .......................13, 15

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994).........................................................................................30

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
   713 F. Supp. 2d 378 (D. Del. 2010) ..............................................................3, 32

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).............................................................................9, 21, 33

*Fan v. StoneMor Partners LP*,
   927 F.3d 710 (3d Cir. 2019) .............................................................................26

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) .............................................................................10

*Litzler v. CC Invs., L.D.C.*,
   411 F. Supp. 2d 411 (S.D.N.Y. 2006) .............................................................15

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*,
   223 F. Supp. 2d 435 (S.D.N.Y. 2001) ...................................................13, 14, 17

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020) .............................................................21

*Lorenzo v. SEC*,
   587 U.S. __, (2019).........................................................................................31

*Lowinger v. Morgan Stanley & Co. LLC*,
   841 F.3d 122 (2d Cir. 2016) .............................................................................17

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*McCabe v. Ernst & Young, LLP*,
   494 F.3d 418 (3d Cir. 2007) ........................................................................ 33

*In re Merck & Co., Inc. Sec. Litig.*,
   432 F.3d 261 (3d Cir. 2005) ........................................................................ 34

*In re Merck*,
   432 F.3d 270 ................................................................................................ 36

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ................................................................... 34

*Nat'l Junior Baseball League v. Pharmanet Development Group, Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) ......................................................... 33, 35

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) .......................................................................... 2

*In re Progress Energy, Inc. Sec. Litig.*,
   371 F. Supp. 2d 548 (S.D.N.Y. 2005) ......................................................... 26

*In re Rockefeller Ctr. Props., Inc. Secs. Litig.*,
   311 F.3d 198 (3d Cir. 2002) .......................................................................... 9

*In re Royal Dutch/Shell Transp.*,
   2006 WL 2355402 (D.N.J. Aug. 14, 2006) .................................................. 29

*Rubenstein v. Int'l Value Advisers, LLC*,
   363 F. Supp. 3d 379 (S.D.N.Y. 2019), *aff'd*, 959 F.3d 541 (2d Cir. 2020) ........................... 13

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ........................................................................ 26

*Scott v. Multi-Amp Corp.*,
   386 F. Supp. 44 (D.N.J. 1974) ..................................................................... 16

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000) ........................................................................ 33

*Stephens v. Uranium Energy Corp.*,
   No. CV H-15-1862, 2016 WL 3855860 (S.D. Tex. July 15, 2016) ................. 21

*In re Suprema Specialties, Inc. Secs. Litig.*,
   438 F.3d 256 (3d Cir. 2006) .............................................................. 9, 19, 30

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................10

*Torchmark Corp. v. Bixby*,
    708 F. Supp. 1070 (W.D. Mo. 1988)..........................................13, 14

*Trustcash Holdings, Inc. v. Moss*,
    668 F. Supp. 2d 650 (D.N.J. 2009) ...............................................29

*Unite Here v. Cintas Corp*,
    No. 06 CIV 7061 DLC, 2006 WL 2859279 (S.D.N.Y. Oct. 6, 2006) ....................................23

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) .............................................21

*Vladimir v. Bioenvision Inc.*,
    606 F. Supp. 2d 473 (S.D.N.Y. 2009), *aff'd sub nom. Thesling v. Bioenvision,*
    *Inc.*, 374 F. App'x 141 (2d Cir. 2010) ...........................................15

*Warner Commc'ns, Inc. v. Murdoch*,
    581 F. Supp. 1482 (D. Del. 1984) ..................................................12

*Warren v. Fisher*,
    No. CIV.A. 10-5343 JBS, 2013 WL 1164492 (D.N.J. Mar. 19, 2013) ...................................8

*In re Williams Sec. Litig.-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) .....................................................37

**Statutes**

15 U.S.C.
    § 78m...................................................................................12
    § 78u-4(b) ............................................................................10
    § 78u-4(b)(2)(A)...................................................................29

Private Securities Litigation Reform Act of 1995
    § 10(b) ........................................................................*passim*
    § 20(a)............................................................................1, 3, 38

Securities Exchange Act of 1934 § 13(d) .........................................*passim*

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Other Authorities**

17 C.F.R.
    § 229.403 .................................................................................................. 12, 18
    § 229.403(a) .................................................................................................. 11
    § 229.404 .................................................................................................... 23
    § 229.404(a) .................................................................................................. 22
    § 240.10b–5 ............................................................................................... 2, 4, 8
    § 240.10b-5(a) ......................................................................................... 29, 31
    § 240.10b-5(b) ............................................................................................. 21
    § 240.10b-5(c) ............................................................................................. 31
    § 240.13d-5(b)(1) ....................................................................................... 12, 13

CNBC News Article (February 16, 2018) ............................................................... 37

Fed. R. Civ. P. Rule 9(b) ....................................................................... 9, 10, 29, 31

*Wall Street Journal* Article (January 31, 2018) ................................................. 37, 38

## I.   __INTRODUCTION__

The Consolidated Second Amended Class Action Complaint ("SAC") is the *fourth* attempt by Lead Plaintiff Dr. Stanley Golovac ("Lead Plaintiff") to state actionable claims against Riot Blockchain, Inc. ("Riot" or the "Company").[1]  The SAC merely dresses up the same set of deficient allegations premised on different, but equally unsustainable theories of securities fraud.  No attempt by Lead Plaintiff to manufacture allegations supporting Section 10(b) and 20(a) claims, however, will come close to meeting the pleading requirement under the Private Securities Litigation Reform Act of 1995 (the "Reform Act").

First, and perhaps most telling, Lead Plaintiff is unable to allege any actionable misrepresentation, omission, or other form of deception by Riot.  The SAC, yet again, asserts that the Riot (1) knew that the "Honig Group" was operating as investment group, and therefore misrepresented Riot's beneficial ownership; and (2) the Coinsquare Ltd. ("Coinsquare") and Kairos Global Technology, Inc. ("Kairos") transactions were related-party transactions that required disclosure.  (*See* SAC ¶¶ 190, 196, 308–09.)  However, the Court already

---

[1] John O'Rourke ("O'Rourke") and Michael Beeghley ("Beeghley") have filed a separate motion to dismiss against the SAC to address Lead Plaintiff's scienter allegations against them.  Riot, O'Rourke, and Beeghley are collectively referred to herein as the "Riot Defendants."  Riot hereby incorporates by reference the arguments made in Messrs. O'Rourke and Beeghley's separately filed motion to dismiss.  Barry Honig ("Honig"), Mark Groussman ("Groussman"), John Stetson ("Stetson"), and Catherine DeFrancesco ("DeFrancesco") are separately represented defendants.

rejected Lead Plaintiff's attempt to conflate allegations regarding group activity at other companies with the Defendants' purported misconduct *at Riot*. (*See* Memorandum Opinion Granting Defendants' Motions to Dismiss the Complaint (Dkt. No. 166) (the "Opinion") at 7, 14–27.)

The SAC does nothing to cure the deficient allegations. Instead, Lead Plaintiff constructs similar allegations concerning Honig, DeFrancesco, Groussman, and Stetson's disclosure obligations under Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act") and related-party transactions. These allegations are premised on a duty to disclose that simply does not exist under federal securities law. *See Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."); *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000) ("Even non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information.").

Second, the Court should also dismiss the SAC because Lead Plaintiff does not allege facts raising a strong inference that O'Rourke and Beeghley—who are the only former officers of Riot accused of wrongdoing in the SAC—acted with

scienter.[2]  Lead Plaintiff thus fails to allege that Riot acted with the requisite scienter.[3]

Lastly, loss causation provides yet another independent basis for the Court to dismiss the SAC.  The SAC absurdly relies on several "corrective disclosures" that were made ***after*** this litigation was filed.  And the other disclosures cited in the SAC fail to "correct" any of the alleged omissions made by the Company, but simply mention negative news followed by an alleged drop in Riot's stock price.[4] Riot therefore requests that the Court dismiss all the claims against it in their entirety with prejudice.

---

[2] The SAC does not accuse any of Riot's current officers or directors of any wrongdoing.

[3] Riot joins and incorporates the arguments raised in O'Rourke and Beeghley's (the "Individual Defendants") concurrently filed Motion to Dismiss the SAC.  Because the Individual Defendants demonstrated that Lead Plaintiff's scienter allegations against them are insufficient, Lead Plaintiff's scienter allegations are also insufficient as to Riot.  *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 402 (D. Del. 2010).

[4] Since the SAC fails to adequately allege a primary violation under Section 10(b) against Riot, the claim for control person liability against the Individual Defendants under Section 20(a) must also be dismissed.

## II.   FACTUAL ALLEGATIONS

### A.   Riot Blockchain, Inc.

Riot is a corporation headquartered in Castle Rock, Colorado, and is listed on NASDAQ under the symbol "RIOT."  (SAC ¶ 22.)  Riot builds and supports various blockchain technologies.  (*Id.*)[5]

### B.   Riot's Investments in the Cryptocurrency Business

Riot was formerly known as Bioptix, Inc. ("Bioptix"), with a business focus on biotechnology.  (SAC ¶ 120.)  On September 29, 2017, Bioptix made a $3 million investment in goNumerical Ltd., a Canadian cryptocurrency exchange that does business as Coinsquare.  (SAC ¶ 190.)  The next day, Bioptix announced that it was changing its name to Riot Blockchain, Inc. (RIOT) and that its new focus would be as a "strategic investor and operator in the blockchain ecosystems with a particular focus on the Bitcoin and Ethereum blockchains."  (*See* Declaration of D. Scott Carlton In Support of Motion to Dismiss SAC filed concurrently herewith ("Carlton Decl."), Ex. A, October 4, 2017 Form 8-K, Exhibit No. 99.1.)  On November 3, 2017, Riot announced that it acquired 1,200 Bitcoin mining machines from Kairos, a Nevada-based cryptocurrency mining company, through a share exchange agreement.  (SAC ¶ 196.)

---

[5] The SAC was filed on behalf of "all purchasers of the common stock of Riot, between March 15, 2017, and September 6, 2018, inclusive (the 'Class Period') . . . ."  (SAC ¶ 1.)

Riot's transformation to a blockchain company proved to be highly successful for its shareholders.  On October 2, 2017, the Monday following Riot's announcement that its new focus was on blockchain technologies, Riot's stock price closed at $6.45 per share.  But by the end of February 5, 2021, Riot's stock price closed at $23.38 per share.  (*Compare* Carlton Decl., Ex. M (attaching Riot's stock price chart from March 15, 2017 until September 10, 2018) *with id.*, Ex. O (attaching Riot's February stock price chart).)

### C.   Allegations Concerning the Riot Defendants

Lead Plaintiff alleges that Riot's new focus on blockchain technology was an attempt to "give investors the false impression that Riot was a serious cryptocurrency company," as part of a pump-and-dump scheme orchestrated by Honig.  (SAC ¶ 4.)  Lead Plaintiff claims that the "Honig Group," which he defines as Honig, Groussman, Stetson, DeFrancesco, O'Rourke, and Beeghley, acted as an undisclosed investor group to manipulate Riot's stock while concealing their beneficial ownership interests.  (*Id.* ¶¶ 29, 251.)  Lead Plaintiff also characterizes Riot's investments in the cryptocurrency business as "related-party transactions with Honig and his associates and entities that were secretly owned and controlled by him."  (*Id.* ¶ 4.)  Lead Plaintiff offers the following as "proof" of the Honig Group's concerted activity at Riot:

(1)     The SEC's unproven accusations in its lawsuit against Honig, O'Rourke, Groussman, and Stetson that they acted as an investor group at three companies **other than Riot** (SAC ¶¶ 79–131);[6]

(2)     The allegation that some of the purported members of the Honig Group had previously co-invested in numerous companies besides Riot (*id.* ¶¶ 132–60);

(3)     The SEC's claim that in 2014, O'Rourke had described Honig in an email as the principal investor of their "small group" (*id.* ¶ 294);

(4)     The allegations that some investors, none of whom are alleged to be members of the Honig Group, had owned the same amount of Riot's stock at certain points in time (*id.* ¶¶ 352, 386);

(5)     The SEC's assertion that Honig and Stetson had coordinated the votes of co-investors at different companies (*id.* ¶ 60); and

(6)     That O'Rourke, Honig, Groussman, and Stetson had purportedly shared an office in Boca Raton, Florida (*id.* ¶ 295).

All of these allegations, however, are either irrelevant or too tenuous to meet the rigorous pleading requirements of the Reform Act.

---

[6] Notably, Beeghley is not mentioned in any of these allegations made by Lead Plaintiff.

## III.    **RELEVANT PROCEDURAL HISTORY**

Lead Plaintiff filed his Consolidated Class Action Complaint (Dkt. No. 52) on January 15, 2019. Then, on March 18, 2019, the Riot Blockchain Defendants and Jeffrey McGonegal filed a Motion to Dismiss against Lead Plaintiff's complaint. (Dkt. No. 66.) On April 18, 2019, however, before the Court ruled on the pending Motion to Dismiss, Lead Plaintiff sought leave to amend his complaint. (*See* Dkt. No. 69.) On April 24, 2019, the Court granted Lead Plaintiff leave to amend his complaint.

On May 9, 2019, Lead Plaintiff filed his Corrected Consolidated Amended Class Action Complaint against the Riot Blockchain Defendants, Jeffrey McGonegal, Andrew Kaplan, Jason Les, and Eric So (collectively, "Defendants") (Dkt. No. 73) (the "CCAC"). Lead Plaintiff alleged three categories of false or misleading statements against the Defendants: (1) that Riot's registration statements inaccurately stated that there were "material relationships" between the Company and certain selling stockholders; (2) that Riot's proxy statements falsely stated that the Company did not engage in any related-party transactions; and (3) that Riot's press releases and other public statements touting the Company's investments in blockchain technologies were false and misleading. Defendants, in response, filed separate motions to dismiss Lead Plaintiff's CCAC.

On April 30, 2020, the Court ruled that Lead Plaintiff failed to adequately allege that any of these statements were false or misleading or otherwise actionable under Rule 10b-5, and granted the Defendants' motions to dismiss. (Dkt. No. 166, at 15.) The Court also noted that the CCAC "does not appear to sufficiently allege *particularized* facts that would support a strong inference of scienter with respect to several of the individual Defendants." (*Id.* at 28 n.16 (emphasis in the original).) The Court then dismissed the CCAC without prejudice, and permitted Lead Plaintiff to file a motion seeking leave to file an amended complaint.

On June 1, 2020, Lead Plaintiff filed a Motion for Leave to File the SAC. (Dkt. No. 169.) While the Riot Blockchain Defendants[7] opposed Lead Plaintiff's motion, Hon. Quraishi granted Lead Plaintiff leave to file the SAC after he found that the proposed amendment would not be futile.[8] (*See* Memo. Opinion and Order (Dkt. No. 187), at 13.) Lead Plaintiff filed the SAC on the following day.

---

[7] Unlike the CCAC, the SAC does not accuse Jeffrey McGonegal, Andrew Kaplan, Jason Les, and Eric So of any wrongdoing.

[8] Respectfully, Hon. Quraishi's findings are not the law of the case. *See Warren v. Fisher*, No. CIV.A. 10-5343 JBS, 2013 WL 1164492, at *6 (D.N.J. Mar. 19, 2013) ("[A] 'defendant's right to have a district judge decide any dispositive motion on a *de novo* basis must be protected,' even if a magistrate judge's decision permitted amendments to a complaint and the complaint later became subject to a motion to dismiss.") (quoting *Florian Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 525 (D.N.J. 1998)). The Court should thus consider Riot's motion to dismiss on a *de novo* basis.

IV.    **THE SECTION 10(B) CLAIM AGAINST RIOT SHOULD BE
DISMISSED**

A.    **The Reform Act and Rule 9(b)'s Heightened Pleading Standards**

To properly state a claim under Section 10(b), Lead Plaintiff must allege

that:  (1) Defendants made material misrepresentations or omissions;

(2) Defendants acted with scienter for each alleged misrepresentation or omission;

(3) there was a connection with the purchase or sale of a security; (4) Lead Plaintiff

relied on each alleged misrepresentation or omission; (5) Lead Plaintiff suffered

economic loss; and (6) the alleged misrepresentation or omission caused the loss

from which Lead Plaintiff seeks to recover damages.  *See Dura Pharms., Inc. v.*

*Broudo*, 544 U.S. 336, 341 (2005).  Securities fraud claims are also subject to

"heightened pleading requirements of Rule 9(b)," requiring Lead Plaintiff to

support all of his allegations of security fraud with the essential factual background

that would accompany "the first paragraph of any newspaper story—that is, the

who, what, when, where and how of the events at issue."  *In re Suprema*

*Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (internal

quotation marks omitted).

In addition to Rule 9(b), the Reform Act imposes "another layer of factual

particularity to allegations of securities fraud."  *In re Rockefeller Ctr. Props., Inc.*

*Secs. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002).  The Reform Act requires that "the

complaint shall specify each statement alleged to have been misleading, the reason

or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b).

Furthermore, the Reform Act makes a "sharp break with Rule 9(b)," requiring a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). Thus, to survive a motion to dismiss, a plaintiff must plead that the defendant acted with a "mental state intent to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). But a "strong inference" exists "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw . . . ." *Id.* at 324. Hence, courts cannot examine any one allegation of scienter in isolation, but rather, after evaluating all the facts as alleged, consider any plausible opposing inferences. *Id.*

## B. The SAC Fails to Plead Any Actionable Misrepresentations or Omissions as to Riot

Lead Plaintiff asserts a Section 10(b) claim against Riot on two separate grounds. First, Lead Plaintiff alleges that Riot failed to disclose that Honig, O'Rourke, Groussman, Stetson, DeFrancesco, and Beeghley were all members of the "Honig Group" which purportedly agreed to secretly acquire, hold, vote, and/or dispose of Riot's shares in coordination with one another. (SAC ¶¶ 29, 233.)

Second, Lead Plaintiff asserts that Riot failed to disclose related-party transactions pertaining to Riot.  Both theories fail to establish that Riot made any material misstatement or omissions.

>  1.  **Riot Did Not Violate Section 10(b) by Failing to Disclose the Existence of the Honig Group**
>
>     a.  **Riot Complied With the Requirements of Item 403 of Regulation S-K**

Lead Plaintiff contends that Riot violated Section 10(b) by filing Form S-3s, Form 10-Ks, and proxy statements that did not comply with Item 403 of Regulation S-K, because those documents allegedly failed to disclose the existence of the purported Honig Group.  (*Id.* ¶ 346.)  This contention is meritless.  Riot fully complied with Item 403 of Regulation S-K's requirements to disclose information regarding any persons who are known to the Company to be the beneficial owner of more than five percent of any class of the Company's voting securities.  17 C.F.R. § 229.403(a).  To the extent that Riot was aware of the purported Honig Group members' greater than five percent ownership interests in the Company, Riot disclosed those interests.  Indeed, Lead Plaintiff concedes that Riot disclosed that Honig, DeFrancesco, and Groussman had a greater than five percent ownership interest in the Company's voting securities.[9]  (*See, e.g.*, SAC ¶¶ 349

---

[9] Meanwhile, Lead Plaintiff alleges that Riot disclosed Stetson's 4.99% interest in the Company.  (*See, e.g.*, *id.* ¶ 349.)  But Lead Plaintiff does not allege that Riot

(alleging that Riot's April 20, 2017 Form S-3/A disclosed Honig and Groussman's beneficial interests were 9.99% and 9.04%, respectively); ¶ 357 (alleging that Riot's Form 10-K for FY 2016 disclosed Honig and DeFrancesco's beneficial interests as 11.2% and 11.5%, respectively).)

Moreover, Riot did not have any obligation under Item 403 to disclose that the purported Honig Group was an investor group at the Company, because the SAC does not establish the existence of any group whatsoever.[10]   Item 403 requires issuers to disclose any investor group, as defined under Section 13(d) of the Exchange Act, that are known to the registrants to own more than five percent of the registrant's voting securities.   17 C.F.R. § 229.403.   Meanwhile, Section 13(d) defines a "group" as two or more persons who act "as a partnership, limited partnership, syndicate, or other group *for the purpose of acquiring, holding, or disposing of securities of an issuer* . . . ."   15 U.S.C. § 78m (emphasis added). Also, Rule 13d-5(b)(1) provides that when "two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired

---

failed to disclose O'Rourke and Beeghley's interests in the Company pursuant to Item 403(b) of Regulation S-K.

[10] Lead Plaintiff also suggests that Riot had violated Section 13(d) by failing to disclose the existence of the Honig Group.   (*See, e.g.*, SAC ¶¶ 299, 484–85.) Section 13(d), however, only applies to investors—not issuers.   *Warner Commc'ns, Inc. v. Murdoch*, 581 F. Supp. 1482, 1500 (D. Del. 1984).   Indeed, Lead Plaintiff concedes in his Corrected Reply in support of his Motion for Leave to Amend that the Riot Blockchain Defendants did not violate Section 13(d).   (Dkt. No. 182, at 5.)

beneficial ownership . . . of all equity securities *of that issuer beneficially owned by any such persons*." 17 C.F.R. 240.13d-5(b)(1) (emphasis added).

These provisions thus require the "members of the 'group' to have agreed to act together for the purpose of acquiring not just any security, but *securities of a particular issuer*." *Rubenstein v. Int'l Value Advisers, LLC*, 363 F. Supp. 3d 379, 392 (S.D.N.Y. 2019), *aff'd*, 959 F.3d 541 (2d Cir. 2020) (emphasis added) (finding that plaintiff failed to allege the existence of a Section 13(d) group because allegations that defendants shared common investment objectives did not imply an intent to pool their voting interests in the issuer).  Also, the "existence of personal or professional relationships between individuals does not establish a 'group' under § 13(d)." *Burt v. Maasberg*, No. CIV.A. ELH-12-0464, 2013 WL 1314160, at *17 (D. Md. Mar. 31, 2013) (finding that plaintiffs' allegations that defendants had acted as a group to take control over the issuer was too speculative to meet the stringent pleading standards of the Reform Act).[11]  Rather, to allege the existence of a Section 13(d) group, Lead Plaintiff must allege that purported Honig Group members had acted together, with a common objective, to acquire, hold, vote, or dispose of securities of the issuer—*i.e.*, Riot.  *See Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 448 (S.D.N.Y. 2001) (holding

---

[11] *See also Torchmark Corp. v. Bixby*, 708 F. Supp. 1070, 1083 (W.D. Mo. 1988) ("The mere fact that defendants were related through blood, marriage, business or social relationships is insufficient to warrant the finding that a 'group' existed within the definition of § 13(d) of the Act.").

allegations that (i) the two investors had jointly invested in companies in the past; (ii) on information and belief, the investors used the same law firm; and (iii) certain of the defendants had engaged in similar unlawful and fraudulent conduct in connection with similar transactions with other companies did not sufficiently allege the existence of a group).

Yet the crux of Lead Plaintiff's allegations establishing the existence of an investor group at Riot concerns the purported Honig Group's prior dealings *at companies other than Riot*. (*See* SAC ¶¶ 79–131 (describing the SEC's lawsuit that involved allegations of the Honig Group's actions at Biozone Pharmaceuticals, Inc., MGT Capital Investments Inc., and MabVax Therapeutics Holdings, Inc.); *id.* ¶¶ 132–160 (alleging that members of the Honig Group were co-investors in numerous companies besides Riot); *id.* ¶ 294 (incorporating the SEC's allegation that in 2014—over three years before he was involved with Riot—O'Rourke had emailed an officer of a company other than Riot that described Honig as the principal investor of "our small group").) These allegations do not establish the existence of an investor group at Riot. *See, e.g.*, *Bixby*, 708 F. Supp. at 1083 (finding the existence of prior relationships between defendants were insufficient to warrant the finding of a group under Section 13(d)); *Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d at 449 (same).

-14-

The SAC contains only one allegation of the Honig Group's concerted activities at Riot involving any of the Riot Defendants:[12]  Honig, O'Rourke, and Stetson worked out of the same office, shared the same fax number, and had met during the Class Period.  (SAC ¶ 295.)  This, however, falls woefully short of the exacting pleading requirements of the Reform Act.  "[T]he existence of a group will not be inferred solely because defendants explored business dealings or exchanged information related to the issuer."  *Maasberg*, 2013 WL 1314160, at *17 (citing *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 493–94 (S.D.N.Y. 2009), *aff'd sub nom. Thesling v. Bioenvision, Inc.*, 374 F. App'x 141 (2d Cir. 2010)) (finding that allegations were not sufficient to establish the existence of a Section 13(d) group when defendants (1) had held daily conference calls to discuss and make decisions on their investments, (2) had previously stated that they had jointly managed their investments, and (3) were all members of the same family). At most, Lead Plaintiff's allegations establishes that O'Rourke may have had a

---

[12] Lead Plaintiff also alleges that other investors, none of whom are alleged to be members of the Honig Group, had owned exactly the same amount of Riot's shares at one point.  For example, Lead Plaintiff alleges that Michael Ference and Paradox Capital Partners LLC ("Paradox") had both reported owning exactly 4,444 of the Company's shares at one point.  (SAC ¶ 386.)  According to Lead Plaintiff, Ference was a partner at Sichenzia Ross Ference LLP ("SRF"), and Paradox, was owned by Harvey Kesner, who was also a partner at SRF, and Defendant Honig's attorney.  (*Id.*)  Again, these connections would not even prove that any of these investors had acted as a group, let alone prove that O'Rourke and Beeghley were involved with the Honig Group at Riot.  *See Litzler v. CC Inves., L.D.C.*, 411 F. Supp. 2d 411, 415 (S.D.N.Y. 2006) (finding allegations of "parallel investments" insufficient to plead the existence of a "group").

personal and/or professional relationship with certain members of the purported

Honig Group.  But again, "[m]ere relationship, among person[s] or entities,

whether family, personal or business, is insufficient to create a group which is

deemed to be a statutory person.  There must be agreement to act in concert."

*Scott v. Multi-Amp Corp.*, 386 F. Supp. 44, 70 (D.N.J. 1974).

Furthermore, while Lead Plaintiff asserts that the purported Honig Group

coordinated their acquisition and disposition of Riot's stock (*see* SAC ¶ 325), the

SAC is bereft of any details concerning this alleged coordination.  Lead Plaintiff

pleads no particularized facts to allow a plausible inference that the members of the

purported Honig Group coordinated their trades at Riot with one another.  Indeed,

the SAC suggests the exact opposite.  Lead Plaintiff provides trading data only for

Honig and O'Rourke.  Even so, this trading data do not suggest that Honig and

O'Rourke's trades were coordinated. [13]  As for the remaining purported Honig

Group members, Lead Plaintiff does not allege the date, time, or quantities of any

trades.  Rather, the SAC only provides ownership data for the remaining members

of the purported Honig Group that indicates that they did not act in concert to

---

[13] Lead Plaintiff alleges that O'Rourke sold 30,383 shares of Riot on December 29, 2017.  (SAC ¶ 206.)  However, even though Lead Plaintiff alleges that Honig had made various purchases and sales of Riot's shares from January 2017 to November 2017, Lead Plaintiff does not allege that Honig had sold any Riot shares in December 2017.  (*Id.* ¶ 317.)  Lead Plaintiff's allegations thus do not show that O'Rourke and Honig had coordinated their acquisition or disposition of Riot's securities.

acquire, hold, or dispose of Riot's securities with any other purported member. (SAC ¶ 330 (showing Groussman's purchases of stock from April 2017 to September 2017, and sales occurring in October 2017 and January 2018); *id.* ¶ 337 (describing DeFrancesco's purchases from September 2016 to January 2017, then a sale in January 2018); *id.* ¶ 342 (alleging that Stetson had kept his holdings steadily from April 2017 until September 2017); *see also id.* ¶ 316 (claiming that Honig had steadily sold Riot stock from March 2017 until October 2017, then had made a few large purchases of stock in October and November 2017); *id.* ¶ 444 (alleging that O'Rourke had sold shares in December 2017); *see generally id.* ¶¶ 299–303 (containing no allegations that Beeghley had sold or acquired any Riot shares).)

Nor does the SAC provide any allegations that suggest that the purported Honig Group had coordinated votes at Riot. (*See id.* ¶¶ 83, 278 (relying on the SEC's allegations in the unrelated *Honig* action to suggest that Honig had worked with Stetson to vote with their shares in unison at a company other than Riot).) The absence of any concerted activity whatsoever by the purported members of the Honig Group is fatal to Lead Plaintiff's claim. *See Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122, 132 (2d Cir. 2016) (affirming finding that there was no Section 13(d) group, even though there was evidence of a lock-up agreement between the defendants, as there was no other evidence of any concerted activity amongst the defendants).

Lead Plaintiff thus fails to allege that there was any Section 13(d) group at Riot. *Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d at 449 (holding plaintiff's lack of specificity of how defendants acted together with a common objective to acquire, hold, vote, or dispose of the issuer's stock could not support the allegation that a Section 13(d) group existed). Consequently, Riot's Registration Statements (Form S-3s), Annual Reports (Form 10-Ks), and Proxy Statements (Form DEF 14A), accurately reflected the beneficial ownership of Riot's common stock at the time those statements were issued. (*See, e.g.*, SAC ¶¶ 344–88.)

### b.   The SAC Fails to Allege Riot's Knowledge of the Honig Group

Even if the Court finds that Lead Plaintiff adequately alleges that there was an undisclosed investor group, Lead Plaintiff's claim would still fail because the SAC is bereft of any allegations demonstrating the Riot Defendants' knowledge of, or participation with, the Honig Group's concerted activities at Riot. Again, Item 403 of Regulation S-K requires Riot to disclose only investing groups that are actually ***known*** to the company. 17 C.F.R. § 229.403. Typically, an investor's Schedule 13D will inform a registrant of the existence of a group, which, in turn, would trigger the registrant's disclosure duties under Item 403. *Biofrontera AG v. Deutsche Balaton AG*, No. 18 CIV. 5237 (LAP), 2020 WL 1489788, at *7 (S.D.N.Y. Mar. 27, 2020) (describing Section 13(d) as an alert system forcing investors to report disclosing information to issuers). And yet, Lead Plaintiff

claims that Honig, DeFrancesco, Groussman, and Stetson failed to disclose their group status to Riot in their Schedule 13Ds, as required under Section 13(d).  (SAC ¶¶ 311, 325, 341, 484 (alleging that Honig, DeFrancesco, Groussman, and Stetson failed to file Schedule 13Ds disclosing their group status).)  Consequently, Lead Plaintiff cannot allege Riot's knowledge of the purported Honig Group's existence or activities at the Company.

Nor can Lead Plaintiff establish Riot's knowledge of the Honig Group through his allegations against O'Rourke or Beeghley.  Lead Plaintiff fails to offer any details—let alone with the requisite particularity—concerning O'Rourke or Beeghley's participation in, or knowledge of, the Honig Group's concerted activities at Riot.  The SAC does not provide any of the essential details regarding O'Rourke and Beeghley's participation in the Honig Group's activities at Riot, such as when they agreed to participate, and how they supported the Honig Group. *In re Suprema*, 438 F.3d at 276 (requiring plaintiffs bringing securities fraud claims to allege the "who, what, when, where and how" of the fraud at issue).  Therefore, Lead Plaintiff cannot allege a Section 10(b) claim based on the violation of Item 403 of Regulation S-K.

**2.**  **Riot Did Not Make Any False or Misleading Statements Regarding Related-Party Transactions**

**a.**  **Riot Did Not Engage in Any Undisclosed Related-Party Transactions**

The SAC asserts that Riot failed to disclose the following related-party transactions pertaining to the Company:  (1) a March 2017 private placement; (2) the Coinsquare Agreement; (3) the Kairos Transaction; and (4) a December 2017 private placement.  (SAC ¶¶ 188–201.)  However, none of these transactions provides a basis for an actionable securities fraud claim because there was either no duty to disclose or the transactions were adequately disclosed by Riot.

(1)  **The March 2017 Private Placement**

Lead Plaintiff alleges that Riot had failed to disclose that the Company had entered into a private placement offering with Honig, a related-party, on March 15, 2017.  (*Id.* ¶¶ 188–89.)  This is false.  Riot's Form 8-K attached as an exhibit the Securities Purchase Agreement that was entered into by the Company and Honig, which informed investors that the transaction was with a related-party.  (*See* Carlton Decl., Ex. B, Bioptix's March 16, 2017 Form 8-K, Ex. 10.1 at 22.)  The agreement specifically disclosed that the "Purchaser represents and warrants that: (i) Purchaser has *a prior substantial pre-existing relationship* with the Company .

. . ." (*Id.* (emphasis added).)[14]  Riot then identified Honig as an investor who had

participated in the March 2017 private placement offerings in the Company's July

19, 2017 Registration Statement.  (*See* Carlton Decl., Ex. C, Bioptix's July 19,

2017 Form S-3 (Amendment No. 1) at 2–4.)  Thus, Riot adequately disclosed that

the March 2017 private placement involved a related party.

　　　　To the extent that Lead Plaintiff contends that Riot's Form 8-K regarding the

March 2017 private placement is deficient because it did not expressly name Honig

as the related party—even though the initial disclosure revealed a related party's

involvement in the private placement and the approximate dollar value of the

amount involved—Lead Plaintiff is mistaken.  Honig's name itself is "not material

and cannot support a Rule 10b-5(b) claim against [the Riot Defendants]." *Stephens*

*v. Uranium Energy Corp.*, No. CV H-15-1862, 2016 WL 3855860, at *21 (S.D.

Tex. July 15, 2016) (holding that the omission of the name of the related party

from defendant's Item 404 disclosure was immaterial, and granting defendant's

motion to dismiss with prejudice); *see Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d

774, 794 (S.D.N.Y. 2020) (finding defendant's later disclosure identifying the

---

[14] Moreover, mere days following this disclosure, Riot filed a Notice of Exempt
Offering of Securities on Form D that disclosed that the private placement of
$2,250,000 in promissory notes and purchase warrants was sold to an inside
investor.  (*See* Carlton Decl., Ex. D, Bioptix's Form D filed on March 22, 2017 at
4.)

previously unnamed principal shareholder in a related-party transaction rendered defendant's initial failure to identify the shareholder immaterial).

But even if the Court finds this disclosure to be insufficient (it should not), Lead Plaintiff cannot establish reliance. *Dura*, 544 U.S. at 341. Lead Plaintiff first began purchasing Riot shares in December 2017—nearly *five months* after Riot's July 2017 registration statement disclosed Honig's participation in the private placement. (*See* Decl. of Joseph J. DePalma In Support of Dr. Stanley Golovac's Motion for Appointment As Lead Plaintiff (Dkt. No. 17-2).) Riot's disclosures concerning the March 2017 private placement could not have mislead Lead Plaintiff as a matter of law. *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 650 (E.D. Pa. 2015) ("An alleged misstatement or omission concerning a fact already made publicly available cannot be materially misleading, because 'reasonable investors . . . exercise due investment diligence.'").

### (2)   **Coinsquare**

Lead Plaintiff's allegation that Riot failed to disclose Honig's involvement in the Coinsquare transaction is similarly unavailing. Lead Plaintiff contends that Riot failed to disclose that it paid $50,000 to Honig for consulting fees related to the Coinsquare transaction. (SAC ¶ 225.) However, Item 404 of Regulation S-K does not require ***all*** related-party transactions to be disclosed. Rather, Item 404 requires only disclosure of ***material*** related-party transactions—*i.e.*, those that

involve an amount that exceeds $120,000, and in which any related person has or will have a direct or indirect material interest.  17 C.F.R. § 229.404(a).  Because Honig received only $50,000 in consulting fees, the Coinsquare deal was not a material related-party transaction requiring disclosure under Item 404(a).[15]

Lead Plaintiff also claims that Honig, Groussman, DeFrancesco, and Stetson were related parties to the Coinsquare transactions since they were Coinsquare investors.  (SAC ¶ 193.)  But the "Instructions to Item 404(a) also set forth certain exclusions from Item 404(a)'s disclosure requirements.  These include ten percent participation thresholds where the [related party] has less than a ten percent interest in the entity receiving money from the corporation."  *Unite Here v. Cintas Corp*, No. 06 CIV 7061 DLC, 2006 WL 2859279, at *6 (S.D.N.Y. Oct. 6, 2006); *see* 17 C.F.R. § 229.404 (stating that a "person who has a position or relationship with a firm, corporation, or other entity that engages in a transaction with the registrant shall not be deemed to have an indirect material interest . . . where . . . [t]he interest arises only . . . [f]rom the direct or indirect ownership by such person . . . , in the aggregate, of less than ***ten percent*** equity interest in another person (other than a partnership) which is a party to the transaction") (emphasis and alterations added).

---

[15] Although having no obligation to do so, Riot disclosed on April 17, 2018 in the Company's Form 10-K for FY 2017 that the Coinsquare transaction involved a $50,000 payment to a company that was related to Honig.  (Carlton Decl., Ex. E, Riot's Form 10-K for FY 2017 at 73 ("GRQ consultants, Inc., a related party of Honig received a cash payment of $50,000 for diligence services in connection with the Company's investment in Coinsquare.").)

According to the SAC, Honig, Groussman, and Stetson owned only 0.9%, 0.3%, and 0.1%, respectively, of Coinsquare's equity.  (SAC ¶ 193; *see also* Carlton Decl., Ex. F, Exhibit 10.1 of Riot's Form 8-K/A filed on May 25, 2018 at 4 (stating that Coinsquare's authorized capital was 20,595,589 shares total).) Meanwhile, Lead Plaintiff does not allege that DeFrancesco owned any shares in Coinsquare.  (SAC ¶ 193.)  Thus, Riot was not required to disclose Honig, Groussman, DeFrancesco, and Stetson's interests in Coinsquare, since their interests were less than ten percent, and were immaterial for purposes of Item 404.

### (3)   **Kairos**

Likewise, Lead Plaintiff's reliance on the Kairos transaction is misplaced. Lead Plaintiff alleges that Riot's November 2, 2017 Form 8-K failed to disclose that Honig and DeFrancesco owned 8.6% and 6.3% of Kairos, respectively.[16] (SAC ¶ 198.)  Riot, however, was not required to disclose Honig and DeFrancesco's interests in Kairos, because they owned less than 10% of Kairos at the time of the transaction.[17]  (*Id.*)

---

[16] Lead Plaintiff cannot rely on the contention that Honig and DeFrancesco has a "group" interest in Kairos that exceeds 10% to revive his Item 404 claim.  The SAC does not provide any allegations whatsoever that suggest that Honig and DeFrancesco acted as a group at Kairos.  Moreover, the SAC also does not provide any allegations that demonstrates Riot's knowledge of Honig and DeFrancesco's group activities at Kairos.

[17] Like the Coinsquare transaction, despite having no obligation to do so, Riot still disclosed Honig and DeFrancesco's interests in Kairos in the Company's Form 10-K for FY 2017.  (Carlton Decl., Ex. E, at 73.)

(4)   **The December 2017 Private Placement**

Lastly, Lead Plaintiff alleges that Riot had failed to disclose that the Company's December 19, 2017 private placement was a related-party transaction involving Honig and DeFrancesco. (SAC ¶¶ 200–01.)  Lead Plaintiff again ignores the fact that the Company's Form 8-K disclosed that the December private placement involved related-parties.  Riot's Form 8-K attached as an exhibit a Securities Purchase Agreement that disclosed that the "Purchaser represents and warrants that: (i) the Purchaser has *a prior substantial pre-existing relationship with the Company* . . . ."  (Carlton Decl., Ex. G, Exhibit 10.1 of Riot's Form 8-K filed on Dec. 19, 2017 at 11 (attaching Exhibit 10.1 of the Form 8-K filed on December 19, 2017) (emphasis added).)[18]  Then, on April 17, 2018, Riot identified both Honig and DeFrancesco as participants in the December 2017 private placement in the Company's Form 10-K for FY 2017.  (*See* Carlton Decl., Ex. E, at 73.)  Accordingly, all of Riot's related-party transactions were either fully and timely disclosed by the Company or did not need to be disclosed under Item 404 of Regulation S-K.

---

[18] Again, similar to the Coinsquare transaction, mere days following this disclosure, Riot filed a Notice of Exempt Offering of Securities on Form D that disclosed that $37,037,528 in equity and options were sold to inside investors. (*See* Carlton Decl., Ex. H, Riot's Form D filed on Dec. 27, 2017 at 4.)

> **b.** **Riot's SEC Filings Concerning the Company's Related-Party Transactions Were Not False or Misleading**

Lead Plaintiff asserts that Riot's Form 10-K filed on March 31, 2017 was false and misleading because it failed to disclose that the "March Private Placement Agreement was a transaction with a related party, namely Honig, a greater than 5% shareholder of Riot." (SAC ¶ 393.) It did not. Riot's Form 10-K "[i]ncorporated by reference from the Registrant's Report on Form 8-K, effective March 15, 2017 and filed March 17, 2017," which contained the disclosure that the March 2017 private placement involved a related party. (Carlton Decl., Ex. I, Riot's Form 10-K for FY 2016 at 51.)

Lead Plaintiff also argues that Riot's Form 10-Q, filed on November 13, 2017, was false or misleading because it briefly mentioned the March 2017 private placement, without disclosing that it involved a related party. (SAC ¶ 402.) Of course, the March 2017 private placement had already been disclosed eight months earlier in Riot's March 15, 2017 Form 8-K. In any event, Lead Plaintiff ignores the fact that the reporting period for this Form 10-Q was for the quarterly period from July 1, 2017 to September 30, 2017, and did not require disclosure of a transaction that occurred several months before that period. (Carlton Decl., Ex. J, Riot's Nov. 13, 2017 Form 10-Q at 1.)

Moreover, because Riot already disclosed that the March 2017 private placement involved a related party, additional disclosures of the same were unnecessary. "It is well-established law that the securities laws do not require disclosure of information that is publicly known . . . ." *In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552–53 (S.D.N.Y. 2005) (listing cases). Riot's previous disclosures rendered any purported omission of the same information immaterial.[19]

According to Lead Plaintiff, Riot's 2017 Proxy Statements, filed on December 12, 2017 and again on March 16, 2018, were misleading because the Audit Committee's report—which clearly indicated that it was based on its review of the Company's financials in the fiscal year ending on December 31, 2016— stated that Riot did not engage in any related-party transactions.[20] (SAC ¶ 412.) Lead Plaintiff argues that this disclosure was false or misleading, because the Proxy Statements elsewhere reference events that occurred during FY 2017. (*Id.* ¶ 413.) But the Court has already considered—and rejected—the Lead Plaintiff's

---

[19] *See Fan v. StoneMor Partners LP*, 927 F.3d 710, 716–17 (3d Cir. 2019) (finding that the company's public disclosures rendered the challenged misstatements and omissions immaterial); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 547 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) ("Although the complete disclosures were important when made in the first instance, a reasonable investor would not expect repetition at every opportunity. And the securities laws do not require such regurgitation . . . .").

[20] Also, Beeghley was no longer with the Company when these proxy statements were filed. (SAC ¶ 28.)

argument. (Opinion at 20 ("The proxy statements unambiguously state that the challenged statements only refer to transactions that occurred 'during the last fiscal year.'").) And the section in the Proxy Statements discussing related-party transactions explicitly describes the Audit Committee's findings, which were based on its review of the Company's FY 2016 financials. (Carlton Decl., Ex. K, Riot's Dec. 12, 2017 Form DEF 14A at 12, 15.)

Furthermore, while Lead Plaintiff points to the fact that the Audit Committee's report briefly mentioned that Riot's Code of Conduct was amended in October 2017, the vast majority of the Audit Committee's report—including the section on related transactions in particular—overwhelmingly concerns events occurring in FY 2016.[21]

Finally, Lead Plaintiff claims that Riot's January 5, 2018 and February 7, 2018 Registration Statements were false or misleading because they stated that the selling stockholders (including Honig) did not have a "material relationship, with us or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities." (SAC ¶¶ 418, 421.) Riot's statement

---

[21] (*See, e.g.*, Carlton Decl., Ex. K at 15 ("Except for the employment agreements previously entered into between the Company and certain of its named executives, *since January 1, 2016*, none of the directors or named executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its common stock . . . has any material interest, direct or indirect, in any transaction . . . which has materially affected or will affect the Company.") (emphasis added).)

is indeed accurate:  Honig's material relationship with the Company stems from his ownership of Riot's common stock.  (*See* Opinion at 18 (finding that the "challenged statements in Riot's registration statements convey no message regarding the relationship between the ***officers or directors*** of Riot and the selling stockholders," and were not false or misleading) (emphasis in the original).)

### C.   Lead Plaintiff Does Not Adequately Allege "Scheme Liability" Under Section 10(b)

Lead Plaintiff's scheme liability  claim fails for the same reasons the Court previously dismissed the claim against the Riot Defendants—the claim is plainly meritless.  (*See* SAC ¶¶ 482-87; Opinion at 34.)  Running the same flawed playbook, Lead Plaintiff simply repackages the fatally deficient allegations  made regarding Riot's purported omissions.  (*See* Opinion at 31 n.17 (where Lead Plaintiff "has failed to adequately allege that any statements or omissions . . .  were false or misleading[,] . . .those alleged  misrepresentations and omissions cannot independently serve as 'deceptive or manipulative' acts to support Plaintiff's claim").)  The Court therefore should again dismiss Lead Plaintiff's scheme liability  claim, but this time with prejudice.

To state a claim for scheme liability,  Lead Plaintiff must allege that Riot "(1) committed a manipulative or deceptive act (2) in furtherance of the alleged  scheme to defraud [investors], (3) scienter, (4) and reliance." *Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 661–62 (D.N.J. 2009) (enumerating pleading

requirements to state a claim under Rule 10b-5(a) and/or (c)).[22]   Scheme liability

claims must comply with the heightened pleading requirements of the Federal Rule

of Civil Procedure 9(b) and with the specificity requirements of the Reform Act for

scienter.  (*See* Opinion at 29–30 (citing 15 U.S.C. § 78u- 4(b)(2)(A) and *In re Able*

*Labs. Sec. Litig.*, 2008 WL 1967509, at *19 (D.N.J. Mar. 24, 2008)).)

Consequently, Lead Plaintiff must set forth, with specificity, "what

manipulative acts were performed, which defendants performed them, when the

manipulative acts were performed and what effect the scheme had on the securities

at issue."  *In re Royal Dutch/Shell Transp.*, 2006 WL 2355402, at *7 (D.N.J. Aug.

14, 2006) (quoting *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (S.D.N.Y.

2006)).  Lead Plaintiff nevertheless fails to allege any manipulative acts that were

performed by Riot—let alone which Defendant performed them.  (*See* SAC ¶ 485;

Opinion at 34 ("Plaintiff fails to identify any allegations in the Complaint of

specific acts of deception or manipulation that are attributable to the other

Defendants").)

None of Lead Plaintiff's scheme liability allegations against Riot involves

any inherently deceptive or manipulative act.  *Cent. Bank of Denver, N.A. v. First*

*Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177–78 (1994) ("We cannot amend

---

[22] Or similarly, as the Court articulated, "Plaintiff must allege that Defendants
'committed a deceptive or manipulative act,' in addition to the other standard
elements of a Section 10(b) violation: scienter; connection with the purchase or
sale of securities; reliance; economic loss; and loss causation."  (Opinion at 39.)

[section 10(b)] to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute."). For example, as argued above, Riot's purported "deception" of the investing public amounts to little more than a failure to disclose information that they were not required to disclose by any applicable law or regulation. (*See supra*, Section III(B).) Moreover, Lead Plaintiff does not allege any specific facts that show when and how Defendants Groussman, Stetson, and DeFrancesco actually entered into any "explicit or tacit agreements" with the Riot Defendants to issue false or misleading statements. *See Suprema Specialties, Inc.*, 438 F.3d at 276 (requiring plaintiffs bringing securities fraud claims to allege the "who, what, when, where and how" of the events at issue); *Bond Opportunity Fund v. Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004) (holding that "mere speculation is insufficient to satisfy the PSLRA pleading standard"). Simply asserting that the Riot Defendants entered into tacit agreements with third parties to influence Riot's common stock is emblematic of conclusory allegations that Rule 9(b) and the Reform Act uniformly reject.

Riot's purported "inflation" of the Company's common stock consisted of either truthful statements regarding Riot's cryptocurrency business, including the Company's meaningful investments in cryptocurrency, or the rise in bitcoin prices. (*See supra*, Sections II(B), III(B).) The "scheme liability" claim amounts to nothing more than a repackaging of the faulty material misrepresentation and/or

omission claims.  (*See* SAC ¶ 485 (alleging that Riot violated "Rule 10b-5(a) and (c) thereunder by issuing materially false and misleading Forms 8-k and 10-K").) Lead Plaintiff therefore fails to state a scheme liability claim against Riot.

To the extent that Lead Plaintiff argues that the Supreme Court's decision in *Lorenzo v. SEC*, 587 U.S. __, 139 S. Ct. 1094 (2019) permits a private plaintiff to assert a scheme liability claim based on a material misrepresentation or omission, that reliance is misplaced.  In *Lorenzo*, the defendant was found liable for Rule 10b-5(a) and (c) violations when he knowingly disseminated admittedly false statements to investors.  *Id.* at 1111.  The Supreme Court did not consider the falsity of defendant's representations (which defendant did not appeal), and therefore did not address whether scheme liability applies when a private plaintiff fails to adequately allege—with particularity—actionable misrepresentations or omissions, or other deceptive conduct.  Here, Lead Plaintiff has not adequately alleged that Riot committed any deceptive or manipulative acts, whether by misrepresentation or omission, or some other form of deceptive conduct, and thus, his scheme liability claim must be dismissed.

### D.    The SAC Does Not Allege That Riot Acted With Scienter

For the same reasons argued in the Individual Defendants' concurrently filed Motion to Dismiss, Lead Plaintiff fails to allege that O'Rourke and Beeghley acted

with scienter.[23]   Lead Plaintiff instead provides only generalized and conclusory allegations that suggest O'Rourke and Beeghley's purported failure to disclose the existence of the Honig Group and the related-party transactions were, at most, a negligent error.   And, because Lead Plaintiff does not plead with particularity facts giving rise to a strong inference that any of Riot's officers or directors acted with an intent to deceive or with a reckless state of mind, Lead Plaintiff thus fails to allege that Riot acted with scienter.   *See City of Roseville*, 713 F. Supp. 2d at 403 (dismissing claims against a corporate defendant for lack of scienter, where the plaintiff failed to plead that any of the company's officers acted with scienter).

### E.   The SAC Does Not Allege Corrective Disclosures Establishing Loss Causation

Even if Lead Plaintiff sufficiently alleges that Riot made an actionable omission or misrepresentation (which he does not), the Section 10(b) claims are not supported by cognizable allegations of loss causation.   To do so, Lead Plaintiff is required to "plead that the very misrepresentation at issue proximately caused them an economic loss."   *Nat'l Junior Baseball League v. Pharmanet Development Group, Inc.*, 720 F. Supp. 2d 517, 559 (D.N.J. 2010) (citing *Dura*, 544 U.S. at 345); *see also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007) ("The loss causation inquiry asks whether the misrepresentation or omission

---

[23] O'Rourke and Beeghley are former officers of Riot.   The SAC does not accuse any other Riot officer (former or current) of any wrongdoing.

proximately caused the economic loss."). This SAC must contain sufficient allegations showing the purported fraudulent omissions were a "substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 186–87 (3d Cir. 2000).

Lead Plaintiff's loss causation allegations are emblematic of the SAC's scattershot pleading tactics. Lead Plaintiff identifies several media reports and SEC filings, which allegedly contained information causing Riot's share price to drop. (SAC ¶¶ 454–67.) The disclosures, however, come nowhere near satisfying the pleading requirements because they are unconnected to any alleged fraud.

### 1.   Disclosures Made *After* This Action Was Filed Are Not Corrective Disclosures

Lead Plaintiff relies on three public disclosures that occurred well ***after*** investors filed this litigation. (SAC ¶¶ 463–67; *see also* Dkt. No. 1.) Since the marketplace was well aware of this litigation months prior to these disclosures, none of these disclosures can serve as the basis to establish loss causation. *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270–71 (3d Cir. 2005) (newspaper's analysis of previously available information was not a corrective disclosure); *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) ("the mere repackaging of already-public information . . . is simply insufficient to constitute a corrective disclosure."); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp.

2d 564, 577 (S.D.N.Y. 2013) (where "similar information" regarding potential litigation was disseminated in news articles, failure to disclose further details of an imminent lawsuit could not have caused plaintiffs' loss). Furthermore, none of the three disclosures contains information actually correcting the allegedly false or misleading information.

### a. The SEC Suit Filed Against Certain Defendants for Conduct Wholly Unrelated to Riot is Not a Corrective Disclosure (September 7, 2018)

Lead Plaintiff contends that a SEC complaint—filed over six months after the complaint in this action was filed—against certain Defendants, involving *conduct entirely unrelated* to Riot, reveals undisclosed fraud occurring at Riot. (*See* SAC ¶¶ 465-66.) The contention is meritless. Lead Plaintiff is simply alleging a disclosure followed by a subsequent price drop in Riot's stock. Courts uniformly reject this method of pleading loss causation. *See Nat'l Junior Baseball*, 720 F. Supp. 2d at 561 ("This is type of pleading has been rejected to show loss causation because it does not adequately demonstrate a market correction of the artificial inflation caused by Defendants' misrepresentations.").[24]

---

[24] Lead Plaintiff also fails to state whether the filing of and information contained in the SEC complaint was publicly disseminated into the marketplace before or after the stock market closed on September 7, 2018. (*See* SAC ¶¶ 465-66.) If the SEC complaint was publicly disseminated after the stock market closed, it could not serve as a basis of loss causation since Riot's stock price increased the following trading day. (*See* Carlton Decl., Ex. M.)

### b. Riot's Form 8-K is Not a Corrective Disclosure Regarding the Coinsquare Transaction (May 25, 2018)

Similarly, Lead Plaintiff relies on a May 25, 2018 Form 8-K that purportedly revealed for the first time "several Honig Group members were – like Riot – parties to the Coinsquare transaction." (SAC ¶ 464.) The allegation does not identify which undisclosed "Honig Group members" were parties to the Coinsquare transaction that caused the stock price drop. (*Id.*) More importantly, the disclosure does not correct any allegedly fraudulent omitted information. As explained *supra*, Honig, Groussman, and Stetson owned only 0.9%, 0.3%, and 0.1%, respectively, of Coinsquare. Riot was under no obligation to disclose this information at any particular time, nor can Lead Plaintiff credibly argue that this information would be material to an investor.

### c. Riot's Form 10-K is Not a Corrective Disclosure Concerning Related Party Transactions (April 17, 2018)

Lead Plaintiff's reliance on Riot Form 10-K filed April 17, 2018 is also unavailing. (*See* SAC ¶ 463.) As discussed above, Riot had already disclosed the information to the market. For example, Riot specifically identified Honig as an investor that participated in the March 2017 private placement offerings in the Company's July 19, 2017 Registration Statement, well before purported corrective disclosure in the Form 10-K. *See In re Merck*, 432 F.3d at 270–71 (previously

available information is not a corrective disclosure).[25]  And Riot had already

disclosed that the March 2017 and December 2017 private placement offerings

were related-party transactions.[26]

### 2. Disclosures Unconnected to Allegations of Fraud Are Not Corrective Disclosures

#### a. CNBC News Article (February 16, 2018)

Lead Plaintiff contends that a February 16, 2018 CNBC news article

revealed O'Rourke's connections with Honig as the "man behind the Riot

Blockchain curtain." (*See* SAC ¶¶ 461–62.)  Nowhere does Lead Plaintiff allege

any fraud revealed by the news article; instead, the SAC vaguely states that the

article "shed[s] further light on Honig's 13D violations and highlighted" suspicions

regarding the Kairos transaction. (*Id.* ¶ 461.)[27]  Honig's investment connection

with Riot was well known ***before*** the publication of the February 2018 CNBC

article and "suspicions" regarding a legitimate Kairos transaction are not a

corrective disclosure. *See In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d

---

[25] (*See* Carlton Decl., Ex. C.)  Moreover, Honig's participation in the March 2017 private placement was discussed in a *Seeking Alpha* article on December 11, 2017. (*See id.*, Ex. N (*Riot Blockchain: Sudden Business Pivot, Suspicious Acquisitions, Questionable Special Dividend* (Seeking Alpha).)

[26] As detailed above, Riot had no obligation to make the purportedly omitted disclosures regarding the Coinsquare and the Kairos transactions.

[27] Lead Plaintiff appears to have recycled the same CNBC article that the Court previously determined was not a corrective disclosure. (*See* Opinion at 19–21; CCAC ¶¶ 337–39.)

1130, 1140 (10th Cir. 2009) ("[The disclosure] must at least relate back to the misrepresentation and not to some other negative information about the company.").

### b. Riot's Press Release and Wall Street Journal Article (January 31, 2018)

Lead Plaintiff contends that Riot's press release on January 31, 2018 announcing that the Company adjourned its 2017 annual meeting is a corrective disclosure because Riot's stock price dropped thereafter.  (*See* SAC ¶¶ 459–60.) Yet, the SAC does not allege  that Riot made any misleading statements about the 2017 annual meeting, so the press release could not have served as corrective disclosure.  Likewise, Lead Plaintiff asserts that a January 31, 2018 Wall Street Journal article revealed Honig's large stock sales.  (*Id.* ¶¶ 456–57.)  Riot, however, never had an obligation to disclose Honig's stock sales.

## V.   CONCLUSION

For the reasons stated above, Riot respectfully requests that the Court dismiss the Section 10(b) and Section 20(a) claims brought against it with prejudice.

DATED:      February 8, 2021                    PAUL HASTINGS LLP


By:  /s/ *Chad J. Peterman*
         CHAD J. PETERMAN

*chadpeterman@paulhastings.com*
200 Park Avenue
New York, NY 10166
Telephone:  1(212) 318-6000
Facsimile:   1(212) 319-4090

THOMAS A. ZACCARO
thomaszaccaro@paulhastings.com
D. SCOTT CARLTON
scottcarlton@paulhastings.com
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA  90071
Telephone:  1(213) 683-6000
Facsimile:   1(213) 627-0705

Attorneys for Defendants
RIOT BLOCKCHAIN, INC., JOHN
O'ROURKE, AND MICHAEL
BEEGHLEY