# EXHIBIT A

# EXHIBIT A

8-K 1 bioptix_8k htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 8-K

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported): October 4, 2017 (September 29, 2017)**

# Riot Blockchain, Inc.

**(Exact name of Registrant as specified in its charter)**

| Nevada | 001-33675 | 84-1553387 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

| 834-F South Perry Street, Suite 443 Castle Rock, CO | 80104 |
|---|---|
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code:** **(303) 794-2000**

# Bioptix, Inc.
**(Former name or former address, if changed since last report.)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[_] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[_] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[_] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[_] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b2 of the Securities Exchange Act of 1934 (§240.12b2 of this chapter).

Emerging growth company [_]

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [_]

**Item 1.01**

*goNumerical Ltd Investment*

On September 29, 2017, Bioptix, Inc. (the "Company") entered into a series of agreements including a Subscription Agreement and Amended and Restated Unanimous Shareholder Agreement in connection with the purchase of $3,000,000 of units of goNumerical Ltd. ("goNumerical"), a leading Canadian Blockchain company known as Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies. Each unit consists of (i) one share of goNumerical and (ii) a purchase warrant exercisable into such number of shares of stock at the exercise price and with such other terms and conditions as are acceptable to the Company The news release announcing the strategic investment is attached as Exhibit 99.1.

**Item 5.03. Amendments to Articles of Incorporation or Bylaws; Changes in Fiscal Year.**

On October 2, 2017 the Board of Directors of the Company approved a merger (the "Merger") of the Company with its wholly-owned subsidiary, Riot Blockchain, Inc., a Nevada corporation (the "Merger Sub"), solely for the purpose of changing the name of the Company. Upon consummation of the Merger, the separate existence of Merger Sub ceased.

As permitted by Chapter 92A.180 of Nevada Revised Statutes, the purpose of the Merger was to effect a change of the Company's name to Riot Blockchain, Inc. from Bioptix, Inc. Upon the filing of Articles of Merger (the "Articles of Merger") with the Secretary of State of Nevada on October 4, 2017, the Company's Articles of Incorporation were amended to reflect the change in the Company's corporate name to Riot Blockchain, Inc.

**Item 8.01  Other Events**

*Cash Dividend*

On October 2, 2017, the Company's Board of Directors approved a cash dividend pursuant to which, the holders of the Company's common stock, no par value per share (the "Common Stock"), and Series A Convertible Preferred Stock, no par value per share (the "Series A Preferred Stock"), as of the close of business on October 13, 2017 shall receive $1.00 for each share of Common Stock, including each share of Common Stock that would be issuable upon conversion of the Series A Preferred Stock, on an as converted basis. .  The payment date for the special cash dividend shall be on or about October 18, 2017, or such other date or dates as are authorized by the Board of Directors, as required for approval by NASDAQ.  Equity Stock Transfer has been appointed payment agent for purposes of overseeing payment of the dividend.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits.

The exhibits listed in the following Exhibit Index are filed as part of this Current Report on Form 8-K.

| Exhibit No. | Description |
|---|---|
| 3.1 | Articles of Merger, as filed with the Secretary of State of the State of Nevada |
| 99.1 | Press Release dated October 4, 2017 |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Bioptix, Inc.
(Registrant)

October 4, 2017                                    By:   /s/ Jeffrey G. McGonegal
                                                         Name:   Jeffrey G. McGonegal
                                                         Title:   Chief Financial Officer

EX-99.1 3 ex99x1 htm EXHIBIT 99.1

Exhibit 99.1

# Bioptix Changing Name to Riot Blockchain as Company Shifts Focus to Strategic Investor and Operator in Blockchain Technologies

### Riot Blockchain Announces Strategic Investment in Coinsquare, a Leading Canadian Digital Currency Exchange

CASTLE ROCK, Colo., Oct. 4, 2017 -- Bioptix Inc. (Nasdaq: BIOP) today announced it is changing its name to Riot Blockchain, Inc., and has reserved and plans to change its Nasdaq ticker symbol RIOT, in line with a shift in direction of the company. The name and symbol change are subject to Nasdaq approval. Moving forward, Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem with a particular focus on the Bitcoin and Ethereum blockchains.

As part of this focus, the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.

"At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets," said Michael Beeghley, Chief Executive Officer of Riot Blockchain. "With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector."

Blockchain protocols offer a secure way to store and relay information without the need for middlemen. It uses a decentralized and encrypted ledger that offers a secure, efficient, verifiable, and permanent way of storing records and other information. Blockchain protocols are the backbone of numerous digital cryptocurrencies including Bitcoin, Ethereum and Litecoin. They have a wide range of potential applications including use in processing transactions, managing medical records, recording votes, and proof of ownership across a far-reaching spectrum of applications.

### About Riot Blockchain

Riot Blockchain Inc. (formerly Bioptix, Inc.) leverages its expertise and network to build and support blockchain technology companies. It is establishing an Advisory Board with technical experience intending to become a leading authority and supporter of blockchain and provides investment exposure to the rapidly growing blockchain ecosystem. For more information, visit http://www.riotblockchain.com/.

The company continues to maintain its existing Bioptix business line and its royalty license stemming from an Exclusive License Agreement with Ceva Santé Animale S.A. ("Licensee"), providing an exclusive worldwide royalty-bearing license, until December 31, 2028, to develop, seek regulatory approval for and offer to sell, market, distribute, import and export luteinizing hormone ("LH") and/or follicle-stimulating hormone ("FSH") products for cattle, equine and swine for the assistance and facilitation of reproduction.

### Safe Harbor

*The information provided in this press release may include forward-looking statements relating to future events or the future financial performance of the Company. Because such statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by such forward-looking statements. Words such as "anticipates," "plans," "expects," "intends," "will," "potential," "hope" and similar expressions are intended to identify forward-looking statements. These forward-looking statements are based upon current expectations of the Company and involve assumptions that may never materialize or may prove to be incorrect. Actual results and the timing of events could differ materially from those anticipated in such forward-looking statements as a result of various risks and uncertainties. Detailed information regarding factors that may cause actual results to differ materially from the results expressed or implied by statements in this press release relating to the Company may be found in the Company's periodic filings with the Securities and Exchange Commission, including the factors described in the sections entitled "Risk Factors", copies of which may be obtained from the SEC's website at www.sec.gov. The parties do not undertake any obligation to update forward-looking statements contained in this press release.*

### Media Contacts
Karen Chase or Travis Kruse
Russo Partners, LLC
(646) 942-5627
(212) 845-4272

karen.chase@russopartnersllc.com
travis.kruse@russopartnersllc.com

# EXHIBIT B

# EXHIBIT B

8-K 1 bioptix_8k htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 8-K

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported): March 10, 2017**

# Bioptix, Inc.

**(Exact name of Registrant as specified in its charter)**

| Colorado | 001-33675 | 84-155337 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

| 1775 38th Street Boulder, Colorado | 80301 |
|---|---|
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code:**          **(303) 545-5550**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[_] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[_] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[_] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[_] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into a Material Definitive Agreement.**

*Private Placement of Units*

On March 10, 2017, Bioptix, Inc. (the "Company") sold $2,250,000 of units of its securities (the "Units"), pursuant to separate purchase agreements (the "Purchase Agreements") with accredited investors (the "Investors"), at a purchase price of $2.50 per Unit. Each Unit consists of one share (the "Shares") of the Company's common stock, no par value per share (the "Common Stock"), and a three year warrant (the "Warrants") to purchase one share of Common Stock, at an exercise price of $3.50 per share (such sale and issuance, the "Private Placement").

The Warrants are exercisable, at any time on or after the sixth month anniversary of the closing date of the Private Placement, at a price of $3.50 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the Warrants on a cashless basis. The Company is prohibited from effecting an exercise of any Warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such Warrant.

The offering was made pursuant to an exemption from registration under Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act").  The Company entered into separate registration rights agreements (the "Registration Rights Agreement") with each of the Investors, pursuant to which the Company will undertake to file a registration statement to register the Common Stock issued as part of the Units and the Common Stock issuable upon exercise of the Warrants, within forty-five days following the closing, to cause such registration statement to be declared effective by the Securities and Exchange Commission within one hundred and twenty days of the filing date and to maintain the effectiveness of the registration statement until all of such shares of Common Stock registered have been sold or are otherwise able to be sold pursuant to Rule 144.  In the event the Company fails to file, or obtain effectiveness of, such registration statement with the given period of time, the Company will be obligated to pay liquidated damages to the Investors for every thirty-days during which such filing is not made and/or effectiveness obtained, such fee being subject to certain exceptions.

The proceeds of the Private Placement were deposited into an escrow account with Signature Bank, as escrow agent (the "Escrow Agent") pursuant to an escrow agreement (the "Escrow Agreement"), entered into by and between the Company, the Lead Investor (as defined in the Purchase Agreement) and the Escrow Agent. Certificates representing 55.5556% of the Warrants and 55.5556% of the Shares sold in the Private Placement were deposited and recorded with Corporate Stock Transfer, Inc., as securities escrow agent (the "Securities Escrow Agent") to be held in escrow pursuant to an escrow agreement (the "Securities Escrow Agreement"), entered into by and between the Company, the Lead Investor and the Securities Escrow Agent. The certificates representing 55.5556% of the Shares and of the Warrants may not be transferred, pledged or hypothecated and the retained Warrants will not be exercisable except as provided in the Escrow Agreement and the Securities Escrow Agreement. The Securities Escrow Agent will retain in escrow and not release to the Company 55.5556% of each Investor's subscription amount pending the occurrence or non-occurrence of a Qualified Transaction (as defined in the Purchase Agreement) in all respects which shall be governed by the terms of the Escrow Agreement and Securities Escrow Agreement. One Million Dollars ($1,000,000) of gross proceeds of the Private Placement was released to the Company upon closing and the corresponding Units were issued to the Investors upon closing.

The foregoing descriptions of the Purchase Agreement, the Registration Rights Agreement, the Escrow Agreement, the Securities Escrow Agreement and the Warrants are not complete and are qualified in their entireties by reference to the full text of the Form of Purchase Agreement, the Form of Registration Rights Agreement, the Form of Escrow Agreement, the Form of Securities Escrow Agreement and the Form of Warrant, copies of which are filed as Exhibit 10.1, Exhibit 10.2, Exhibit 10.3, Exhibit 10.4 and Exhibit 4.1, respectively, to this Report and are incorporated by reference herein.

*Private Placement of Notes*

On March 15, 2017, the Company entered into separate securities purchase agreements (the "Note Purchase Agreements") pursuant to which it agreed to sell up to  $4,750,000 of principal amount of promissory notes (the "Notes") and three year warrants (the "Purchase Warrants") to accredited investors (the "Note Investors").  The Notes shall be issued to each Note Investor in such Note Investor's subscription amount and shall be convertible into shares of Common Stock at an initial conversion price of $2.50 (the "Conversion Price").  Each Purchase Warrant shall be exercisable into shares of Common Stock at an exercise price equal to $3.56 per share (such sale and issuance of the Notes and Purchase Warrants, the "Note Private Placement").

The Notes are convertible at the Conversion Price at any time after the Company has received (i) NASDAQ Approval (as defined in the Note Purchase Agreement) and (ii) Shareholder Approval (as defined in the Notes).  The Company is prohibited from effecting a conversion of any Note to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon conversion of such Note.

Pursuant to the Note Purchase Agreement, within 45 days of closing, the Company shall file a preliminary proxy statement for a special meeting of its stockholders, in order to submit to its stockholders a proposal to approve an amendment to the Company's Articles of Incorporation authorizing the creation of 15,000,000 shares of "blank check" preferred stock and, thereafter, the Company shall designate  shares of preferred stock as "Series A Preferred Stock" by filing a Certificate of Designations, Preferences and Rights of 0% Series A Convertible Preferred Stock with the Secretary of State (such date of filing, the "Filing Date"). On the Filing Date, the Notes shall automatically, and without any further action on the part of the Note Investors, be exchanged for shares of Series A Convertible Preferred Stock (the "Preferred Shares") based on a ratio of $1.00 of Stated Value of Preferred Share for each $1.00 of then outstanding principal amount plus any accrued but unpaid interest thereon, pursuant to Section 3(a)(9) of the Securities Act.

The Purchase Warrants are exercisable,  at a price of $3.56 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the Purchase Warrants on a cashless basis. The Company is prohibited from effecting an exercise of any Purchase Warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such Purchase Warrant.

The conversion of the Notes and exercise of the Purchase Warrants are subject to the approval of the Company's stockholders pursuant to rules of The NASDAQ Stock Market LLC.

The offering was made pursuant to an exemption from registration under Section 4(a)(2) of the Securities Act.  Upon closing, the Company will enter into separate registration rights agreements with each of the Note Investors, pursuant to which the Company will undertake to file a registration statement to register the shares of Common Stock issuable upon (i) conversion of the Notes; (ii) exercise of the  Purchase Warrants and (iii) conversion of the Preferred Shares issued pursuant to the Note Purchase Agreement, within forty-five days following the date of closing, to cause such registration statement to be declared effective by the Securities and Exchange Commission within one hundred and twenty days of the filing date and to maintain the effectiveness of the registration statement until all of such shares of Common Stock registered have been sold or are otherwise able to be sold pursuant to Rule 144.  In the event the Company fails to file, or obtain effectiveness of, such registration statement with the given period of time, the Company will be obligated to pay liquidated damages to the Investors for every thirty-days during which such filing is not made and/or effectiveness obtained, such fee being subject to certain exceptions.

The proceeds of the Note Private Placement will be deposited into an escrow account and the Notes, Purchase Warrants and Preferred Shares (when exchanged for the Notes) will be deposited and recorded with a securities escrow agent to be held in escrow pending the occurrence or non-occurrence of a Qualified Transaction (as defined in the Note Purchase Agreement).

The foregoing description of the Note Purchase Agreement is not complete and is qualified in its entirety by reference to the full text of the Form of Note Purchase Agreement, a copy of which is filed as Exhibit 10.5 to this Report and is incorporated by reference herein.

**Item 3.02 Unregistered Sales of Equity Securities**

***Private Placement of Units***

      On March 10, 2017, the Company completed the closing of the Private Placement and issued the Units, consisting of a total of 900,000 Shares and Warrants to purchase 900,000 shares of Common Stock, in consideration for aggregate gross proceeds of $2,250,000. $1,250,000 million, or 55.5556%, of proceeds along with the corresponding Shares and Warrants, are being held in escrow, as further described herein. The details of this transaction are described in Item 1.01, which is incorporated by reference, in its entirety, into this Item 3.02.

      The Units, the Shares, the Warrants and the shares of Common Stock issuable upon exercise of the Warrants have not been registered under the Securities Act, or the securities laws of any state, and were offered and issued in reliance on the exemption from registration under the Securities Act, afforded by Section 4(a)(2).

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| | |
|---|---|
| 4.1 | Form of Warrant |
| 10.1 | Form of Purchase Agreement |
| 10.2 | Form of Registration Rights Agreement |
| 10.3 | Form of Escrow Agreement |
| 10.4 | Form of Securities Escrow Agreement |
| 10.5 | Form of Note Purchase Agreement |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Bioptix, Inc.
(Registrant)

March 16, 2017                              By:   /s/ Jeffrey G. McGonegal
                                                  _____
                                                  Name:   Jeffrey G. McGonegal
                                                  Title:    Chief Financial Officer

EX-10.1 3 ex10x1 htm EXHIBIT 10.1

Exhibit 10.1

## SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement (this "<u>Agreement</u>") is dated as of    __, 2017, between Bioptix, Inc., a Colorado corporation (the "<u>Company</u>"), and each purchaser identified on the signature pages hereto (each, including its successors and permitted assigns, a "<u>Purchaser</u>" and collectively, the "<u>Purchasers</u>").

## PREAMBLE

WHEREAS, subject to the terms and conditions set forth in this Agreement and pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and Rule 506 promulgated thereunder, the Company desires to issue and sell to each Purchaser, and each Purchaser, severally and not jointly, desires to purchase from the Company, securities of the Company as more fully described in this Agreement (the "<u>Offering</u>").

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and each Purchaser agree as follows:

## ARTICLE I.
## DEFINITIONS

1.1    <u>Definitions</u>. In addition to the terms defined elsewhere in this Agreement, for all purposes of this Agreement, the following terms have the meanings set forth in this Section 1.1:

"<u>Accredited Investor</u>" shall have the meaning ascribed to it in Section 3.2(c).

"<u>Acquiring Person</u>" shall have the meaning ascribed to such term in Section 4.17.

"<u>Action</u>" shall have the meaning ascribed to such term in Section 3.1(j).

"<u>Affiliate</u>" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 405 under the Securities Act.

"<u>Board of Directors</u>" means the board of directors of the Company.

"<u>Business Day</u>" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"<u>Buy-In</u>" shall have the meaning ascribed to such term in Section 4.1(g).

"<u>Closing</u>" means the closing of the purchase and sale of the Securities pursuant to Section 2.1.

"<u>Closing Date</u>" means the Trading Day on which all of the Transaction Documents have been executed and delivered by the applicable parties thereto, and all conditions precedent to (i) the Purchasers' obligations to pay the Subscription Amount at such Closing  and (ii) the Company's obligations to deliver the Securities to be issued and sold at such Closing, in each case, have been satisfied or waived, but in no event later than the third Trading Day following the date hereof in the case of such Closing.

(j)      Certain Transactions and Confidentiality.   Other than consummating the transactions contemplated hereunder, such Purchaser has not directly or indirectly, nor has any Person acting on behalf of or pursuant to any understanding with such Purchaser, executed any purchases or sales, including Short Sales, of the securities of the Company during the period commencing as of the time that such Purchaser first received a written term sheet of the Offering from the Company setting forth the material terms of the transactions contemplated hereunder and ending immediately prior to the execution hereof. Notwithstanding the foregoing, in the case of a Purchaser that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Purchaser's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Purchaser's assets, the representation set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement.   Other than to other Persons party to this Agreement, such Purchaser has maintained the confidentiality of all disclosures made to it in connection with this transaction (including the existence and terms of this transaction).   Notwithstanding the foregoing, for avoidance of doubt, nothing contained herein shall constitute a representation or warranty, or preclude any actions, with respect to the identification of the availability of, or securing of, available shares to borrow in order to effect Short Sales or similar transactions after the Closing Date.

(k)      Pre-Existing Relationships.   The Purchaser represents and warrants that: (i) the Purchaser has a prior substantial pre-existing relationship with the Company, the Purchaser is not investing in the Offering in connection with or as a result of any registration statement filed with the SEC by the Company and (ii) no Securities were offered or sold to it by means of any form of general solicitation or general advertising, and in connection therewith, the Purchaser did not (A) receive or review any advertisement, article, notice or other communication published in a newspaper or magazine or similar media or broadcast over television or radio, whether closed circuit, or generally available; or (B) attend any seminar meeting or industry investor conference whose attendees were invited by any general solicitation or general advertising; or (C) observe any website or filing of the Company with the SEC in which any offering of securities by the Company was described and as a result learned of any offering of securities by the Company.

(l)      Survival. The foregoing representations and warranties shall survive the Closing Date.

(m)      Special Acknowledgement regarding Canaccord Genuity, Inc.   Purchaser acknowledges the following disclosure with respect to the Company's financial advisor:  On March 24, 2016, the Commission, Division of Corporation Finance, pursuant to delegated authority, granted a waiver to Canaccord Genuity Inc. ("Canaccord") from the bad actor provisions of Rule 506(d) of Regulation D and Rule 262 of Regulation A under the Securities Act of 1933 ("Securities Act") that would otherwise apply to Canaccord due to an SEC administrative order issued on the same day.  In the administrative order, Canaccord, without admitting or denying any allegations, was ordered to cease and desist from violations of Section 5 of the Securities Act based on the initiation of research coverage for an issuer after Canaccord had been invited by the issuer to participate as an underwriter for a secondary stock offering that was planned for at least one month later.  Canaccord also was ordered to pay $407,481 in disgorgement, $42,717 in prejudgment interest and $100,000 in civil money penalties.

The Company acknowledges and agrees that the representations contained in Section 3.2 shall not modify, amend or affect such Purchaser's right to rely on the Company's representations and warranties contained in this Agreement or any representations and warranties contained in any other Transaction Document or any other document or instrument executed and/or delivered in connection with this Agreement or the consummation of the transaction contemplated hereby.

22

# EXHIBIT C

# EXHIBIT C

S-3/A 1 bioptix_s3.htm FORM S-3 AMENDMENT NO 1

**As filed with the Securities and Exchange Commission on July 19, 2017**

Registration No. 333-217397

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM S-3**
**(Amendment No. 1)**

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# BIOPTIX, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Colorado** | **84-155337** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

**Jeffrey G. McGonegal**
**Chief Financial Officer**
**834-F South Perry Street, Suite 443**
**Castle Rock, CO 80104**
**(303) 794-2000**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

**Approximate date of commencement of proposed sale to the public:** From time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box.   ☐

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of " *large accelerated filer* ", " *accelerated filer* " and " *smaller reporting company* " in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐    Accelerated filer ☐    Non-accelerated filer ☐ (do not check if smaller reporting company)    Smaller reporting company ☒    Emerging growth company ☐

---

### CALCULATION OF REGISTRATION FEE

| Title of each class of securities to be registered | Amount to be Registered(1) | Proposed maximum offering price per share | Proposed maximum aggregate offering price | Amount of registration fee |
|---|---|---|---|---|
| Common stock, no par value per share | 900,000 | $ 4.16 (2) | $ 3,739,500 | $ 433.41 |
| Common stock, no par value per share, issuable upon conversion of convertible promissory notes (3) | 1,957,161 | $ 4.16 (2) | $ 8,132,004 | $ 942.50 |
| Common stock, no par value per share, issuable upon exercise of warrants | 2,800,000 | $ 4.16 (2) | $ 11,634,000 | $ 1,348.38 |
| TOTAL | **5,657,161** | $ 4.16 | $ 23,505,504 | $ 2,724.29* |

(1) Pursuant to Rule 416 under the Securities Act of 1933, as amended, this registration statement also covers such additional shares as may hereafter be issued resulting from stock splits, stock dividends, recapitalizations or certain other capital adjustments.

(2) Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(c) under the Securities Act of 1933, as amended.  In accordance with Rule 457(c) of the Securities Act of 1933, as amended, the price shown is the average of the high and low sales prices of the Common Stock on April 17, 2017 as reported on The NASDAQ Capital Market.

(3) Includes shares of Common Stock issuable for accrued interest under the terms of the promissory notes, computed to the maturity date.

(4) Previously Paid.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment that specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until this Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

The information in this prospectus is not complete and may be changed. We may not sell these securities or accept an offer to buy these securities until the Securities and Exchange Commission declares our registration statement effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

SUBJECT TO COMPLETION, DATED July 19, 2017

PROSPECTUS

BIOPTIX, INC.

900,000 Shares of Common Stock Offered by the Selling Stockholders

1,957,161  Shares of Common Stock Issuable Upon Conversion of 2% Convertible Promissory Notes Offered by the Selling Stockholders

2,800,000 Shares of Common Stock Issuable Upon Exercise of Warrants Offered by the Selling Stockholders

This prospectus relates to the disposition from time to time of 5,657,161 shares of common stock, no par value per share (the "Common Stock"), which includes (i) 900,000 shares of Common Stock, (ii) 1,957,161 shares of Common Stock issuable upon the conversion of outstanding 2% convertible promissory notes (the "Notes") and (iii) 2,800,000 shares of Common Stock issuable upon the exercise of outstanding warrants held by the selling stockholders named in this prospectus.  We will not receive any of the proceeds from the sale of shares by the selling stockholders.

The selling stockholders may sell the shares of Common Stock described in this prospectus in a number of different ways and at varying prices. We provide more information about how the selling stockholders may sell their shares of Common Stock in the section entitled "Plan of Distribution" on page 8. The selling stockholders will bear all commissions and discounts, if any, attributable to the sale or disposition of the shares, or interests therein. We will bear all costs, expenses and fees in connection with the registration of the shares. We will not be paying any underwriting discounts or commissions in this offering.

Our Common Stock is presently listed on The NASDAQ Capital Market under the symbol "BIOP."  On July 17, 2017 the last reported sale price of our Common Stock was $4.00. The applicable prospectus supplement will contain information, where applicable, as to any other listing on The NASDAQ Capital Market or any securities market or other exchange of the securities, if any, covered by the prospectus supplement .

Investing in our securities involves various risks.  See "Risk Factors" contained herein for more information on these risks.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities, or passed upon the adequacy or accuracy of this prospectus or any accompanying prospectus supplement.  Any representation to the contrary is a criminal offense.

The date of this Prospectus is July 19, 2017.

**TABLE OF CONTENTS**

| | **Page** |
|---|---|
| OUR BUSINESS | **1** |
| RISK FACTORS | **2** |
| FORWARD-LOOKING STATEMENTS | **3** |
| USE OF PROCEEDS | **3** |
| SELLING STOCKHOLDERS | **4** |
| PLAN OF DISTRIBUTION | **8** |
| DESCRIPTION OF CAPITAL STOCK | **9** |
| LEGAL MATTERS | **12** |
| EXPERTS | **12** |
| WHERE YOU CAN FIND MORE INFORMATION | **13** |
| INCORPORATION OF DOCUMENTS BY REFERENCE | **13** |

i

**Company References**

In this prospectus, "Bioptix," "the Company," "we," "us," and "our" refer to Bioptix, Inc., a Colorado corporation, unless the context otherwise requires.

## OUR BUSINESS

Through our wholly owned subsidiary, BiOptix Diagnostics, Inc. ("BDI"), which we acquired in September 2016, we have developed a proprietary Enhanced Surface Plasmon Resonance technology platform for the detection of molecular interactions. We acquired a Surface Plasma Resonance (SPR) platform which seeks to combine high sensitivity with microarray detection capability to allow researchers to understand whether their target molecules have functionality against the disease targeted. SPR is an advanced and highly sensitive optical technology that can measure refractive index changes on a sensor chip's gold surface due to a change in mass that occurs during a binding event. This change can be used to monitor biological interactions such as the concentration of target molecules, kinetic rates and affinity constants.

BDI is a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions. BDI manufactures, sells and services instruments and consumables to pharmaceutical researchers allowing them to develop new drugs faster than by using older technologies such as enzyme-linked immunosorbent assay or "ELISA". BDI was originally established with technology developed in conjunction with Dr. John L. "Jan" Hall, Adjoint Professor, JILA (University of Colorado), who shared the Nobel Prize for Physics in 2005 for his work on laser-based precision spectroscopy and the optical frequency comb technique. SPR is the core of the BDI products and intellectual property. Dr. Hall, in conjunction with the scientists at BDI, created a common path interferometer that was commercialized to become the 404pi instrument.

When it was acquired by us in September 2016, BDI was in the initial stages of rolling out its first commercial product, the 404pi system. BDI's initial revenue was generated in 2014 with first sales to customers including sales to leading academic researchers and biotech companies. BDI did not experience any significant seasonality to its business and provided normal terms to its customers, generally 30-60 days, net. Currently there is no back-log of orders.

Following the September 2016 acquisition of BDI, we began hiring sales, marketing and operational employees, adding a total of eight employees to the twelve hired in connection with the acquisition.

The BDI products include a reader instrument (404pi) and the consumable test products consisting of test chips (cassettes) and packaging. The instrument is assembled in-house using primarily off the shelf parts and certain customized components. Consumable test product components are manufactured at the BDI facility using certain sub-assemblies processed by third-party contractors. Raw materials and certain sub-components are acquired from a number of suppliers.

1

**Recent Developments**

Effective January 14, 2017, the Company adopted a plan to exit the business of BDI and commenced a significant reduction in the workforce. The decision to adopt this plan was made following an evaluation by the Company's Board of Directors in January 2017, of the estimated results of operations projected during the near to mid-term period for BDI, including consideration of product development required and updated sales forecasts, and estimated additional cash resources required. Accordingly, the historical results of BDI have been classified as discontinued operations for all periods presented.

Following the recent decision to exit the BDI business, we have begun evaluating potential strategic alternatives. We expect, in the near term, to establish the primary criteria we will consider as we evaluate our next steps and strategic path forward with the goal of maximizing value for our stockholders. Additionally, we will focus on attempting to locate an acquirer or partner for the BDI operations as well as continuing to attempt to locate an interested party for the appendicitis assets.

**Historical Operations**

We also hold an exclusive license agreement with Washington University ("WU") in St. Louis which granted us an exclusive license and right to sublicense its technology for veterinary products worldwide, subject to certain exceptions.  In July 2012, we granted Ceva Sante Animale S.A. ("Ceva") an exclusive royalty-bearing license to our intellectual property and other assets, relating to recombinant single chain reproductive hormone technology for use in non-human mammals.  This license includes a sublicense of the technology licensed to us by WU.  Ceva continues to advance development of the bovine rFSH product and cumulative cash payments received to date by us from Ceva have been approximately $2 million.

On February 25, 2016, we completed the sale of our corporate headquarters, land and building, to a third party at a purchase price of $4,053,000.  The sale generated approximately $1.8 million in net cash after expenses and mortgage payoffs. In addition to agreeing to the sale, we rented back space in the building under short-term lease agreements that provide storage space required for our current level of operations.

**Company Information**

We were incorporated on July 24, 2000 in the state of Colorado under the name "AspenBio, Inc.", which was subsequently changed to AspenBio Pharma, Inc.  In December 2012, we changed our name to "Venaxis, Inc." and in 2016, in connection with our acquisition of BiOptix Diagnostics, Inc., we changed our name to "Bioptix, Inc."  Our principal executive offices are located at 834-F South Perry Street, Suite 443, Castle Rock, CO 80104 and our telephone number is (303) 794-2000. Our website address is www.venaxis.com. The information contained on, or accessible through, our website is not part of this prospectus or any prospectus supplement.

## RISK FACTORS

Investing in our securities involves a high degree of risk. Before making an investment decision, you should carefully consider the risks, uncertainties and forward-looking statements described under "Risk Factors" in Item 1A of our most recent Annual Report on Form 10-K for the fiscal year ended December 31, 2016 filed with the Securities and Exchange Commission (the "SEC") on March 31, 2017, as well as information incorporated by reference into this prospectus and the additional risk factor set forth below. If any of these risks were to occur, our business, financial condition or results of operations would likely suffer. In that event, the value of our securities could decline, and you could lose part or all of your investment. The risks and uncertainties we describe are not the only ones facing us. Additional risks not presently known to us or that we currently deem immaterial may also impair our business operations. In addition, our past financial performance may not be a reliable indicator of future performance, and historical trends should not be used to anticipate results in the future.  See "Forward-Looking Statements" below.

*Our March 2017 note financing grants certain rights to the Lead Investor in the financing.  As such, the Lead Investor may waive defaults and amend terms with or without the consent of the additional investors in the March 2017 note financing.*

The Notes and proceeds from our March 2017 note financing are currently being held in escrow pursuant to an Escrow Agreement we have entered with the investors and the escrow agent.  Unless the conditions to release of escrow have been satisfied, or waived, the Notes and proceeds may be released only upon the execution of definitive documents for a Qualified Transaction (as defined in the note purchase agreement). Barry Honig, as the Lead Investor, has the right among other things, to waive the investor conditions to release of the escrow (and delivery of the Notes to the investors and funds to the Company).  No other investor has the

ability to waive conditions for the escrow release.  If we fail to execute definitive documents for a Qualified Transaction within the required timeframe, and Mr. Honig does not waive such requirement, we may not receive the proceeds from the sale of the notes.

2

## FORWARD-LOOKING STATEMENTS

This prospectus, including the documents that we incorporate by reference, contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Exchange Act. Such forward-looking statements include those that express plans, anticipation, intent, contingency, goals, targets or future development and/or otherwise are not statements of historical fact. These forward-looking statements are based on our current expectations and projections about future events and they are subject to risks and uncertainties known and unknown that could cause actual results and developments to differ materially from those expressed or implied in such statements.

In some cases, you can identify forward-looking statements by terminology, such as "expects," "anticipates," "intends," "estimates," "plans," "believes," "seeks," "may," "should," "could" or the negative of such terms or other similar expressions. Accordingly, these statements involve estimates, assumptions and uncertainties that could cause actual results to differ materially from those expressed in them. Any forward-looking statements are qualified in their entirety by reference to the factors discussed throughout this prospectus.

You should read this prospectus and the documents that we reference herein and therein and have filed as exhibits to the registration statement, of which this prospectus is part, completely and with the understanding that our actual future results may be materially different from what we expect. You should assume that the information appearing in this prospectus is accurate as of the date on the front cover of this prospectus or such prospectus supplement only. Because the risk factors referred to above, as well as the risk factors referred to on page 4 of this prospectus and incorporated herein by reference, could cause actual results or outcomes to differ materially from those expressed in any forward-looking statements made by us or on our behalf, you should not place undue reliance on any forward-looking statements. Further, any forward-looking statement speaks only as of the date on which it is made, and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which the statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict which factors will arise. In addition, we cannot assess the impact of each factor on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. We qualify all of the information presented in this prospectus and any accompanying prospectus supplement, and particularly our forward-looking statements, by these cautionary statements.

## USE OF PROCEEDS

The net proceeds from any disposition of the shares covered hereby would be received by the selling stockholders. We will not receive any of the proceeds from the sale of our Common Stock by the selling stockholders other than the net proceeds of any warrants exercised for cash.

## DESCRIPTION OF TRANSACTIONS

On March 10, 2017, we sold $2,250,000 of units of our securities, pursuant to separate purchase agreements with certain of the selling stockholders, at a purchase price of $2.50 per unit.  Each unit consists of one share of our Common Stock and a three year warrant to purchase one share of Common Stock, at an exercise price of $3.50 per share.

The warrants are exercisable, at any time on or after the sixth month anniversary of the date of issuance, at a price of $3.50 per share, subject to adjustment, and expire three years from the date of issuance. The holders may, subject to certain limitations, exercise the warrants on a cashless basis. We are prohibited from effecting an exercise of any warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such warrant.

On May 25, 2017, the Lead Investor (as defined below) waived the requirement that the securities and purchase price remain in escrow subject to the occurrence of a "Qualified Transaction" and the Common Stock and warrants and the proceeds from the sale of the Common Stock and warrants were released from escrow to the investors and the Company, respectively .

On March 15, 2017, we entered into separate securities purchase agreements pursuant to which we agreed to sell up to $4,750,000 of principal amount of Notes and three year warrants to certain of the selling stockholders.  On March 16, 2017, we satisfied all closing conditions and closed the transaction. The Notes are convertible into shares of Common Stock at an initial conversion price of $2.50.  Each warrant is exercisable into shares of Common Stock at an exercise price equal to $3.56 per share.

At any time, a selling stockholder may submit a conversion or exercise notice indicated their intent to convert its Note or exercise its warrant. However, the Company may not issue any shares of its Common Stock upon such conversion to the extent such issuance (when aggregate with all other applicable issuances) would exceed 19.99% of the Company's issued and outstanding Common Stock, until after the Company has received approval from NASDAQ and holders of its Common Stock, in order to remain compliant with NASDAQ Listing Rule 5635. We are also prohibited from effecting a conversion of any Note or exercise of any warrant to the extent that, as a result of any such conversion or exercise, the holder would beneficially own more than 4.99% or 9.99%, respectively, of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon conversion of such Note or exercise of such warrant, as the case may be.

We agreed to file a preliminary proxy statement within 45 days of closing of the March 16, 2017 transaction, which preliminary proxy statement was filed on April 28, 2017, for a special meeting of our stockholders, in order to submit to our stockholders a proposal to approve an amendment to our Articles of Incorporation authorizing the creation of 15,000,000 shares of "blank check" preferred stock and, thereafter, we shall designate  shares of preferred stock as "Series A Preferred Stock" by filing a Certificate of Designations, Preferences and Rights of 0% Series A Convertible Preferred Stock with the Secretary of State (such date of filing, the "Filing Date"). On the Filing Date, the Notes shall automatically, and without any further action on the part of the holders, be exchanged for shares of Series A Preferred Stock based on a ratio of $1.00 of stated value of Series A Preferred Stock for each $1.00 of then outstanding principal amount plus any accrued but unpaid interest thereon, pursuant to Section 3(a)(9) of the Securities Act.

As of the date hereof, the Notes and proceeds from the Notes remain in escrow.  During this time, the selling stockholders are at market risk inasmuch as the price of the Company's Common Stock may fall below the purchase price of the Notes on or before such securities are released from escrow, if at all.  The Notes and corresponding proceeds would be released upon the execution of definitive documents for a Qualified Transaction (as defined in the securities purchase agreement).  The selling stockholders are not irrevocably bound to receive the Notes as a Qualified Transaction may never be consummated. In the event the Company fails to execute such definitive documents within the proscribed time period, the Lead Investor (as defined as defined below) has the right to waive such requirement and may approve the release of escrow in writing.  The selling stockholders (other than the Lead Investor) do not have the ability to determine satisfaction of the escrow release.

The Lead Investor is Barry Honig, who is also a selling stockholder, both individually and through GRQ Consultants, Inc. Roth 401K FBO Barry Honig, for which Mr. Honig is trustee.

## SELLING STOCKHOLDERS

This prospectus relates to the sale or other disposition of up to 5,657,161 shares of our Common Stock by the selling stockholders named below, and their donees, pledgees, transferees or other successors-in-interest selling shares of Common Stock or interests in shares of Common Stock received after the date of this prospectus from a selling stockholder as a gift, pledge, partnership distribution or other transfer, which includes:

   i)      900,000 shares of Common Stock;

   ii)     1,957,161 shares of Common Stock issuable upon the conversion of outstanding convertible promissory notes; and;

   iii)    2,800,000 shares of Common Stock issuable upon the exercise of outstanding warrants.

The following table, based upon information currently known by us, sets forth as of July 14, 2017, (i) the number of shares held of record or beneficially by the selling stockholders as of such date (as determined below) and (ii) the number of shares that may be sold or otherwise disposed of under this prospectus by each selling stockholder. Percentage ownership is based on 5,392,503 shares of Common Stock outstanding as of July 14, 2017, plus securities deemed to be outstanding with respect to individual stockholders pursuant to Rule 13d-3(d)(1) under the Exchange Act. Beneficial ownership includes shares of Common Stock plus any securities held

# EXHIBIT D

# EXHIBIT D

> The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
> The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4 00 |

---

### 1. Issuer's Identity

CIK (Filer ID Number)

0001167419

Name of Issuer

Bioptix, Inc.

Jurisdiction of Incorporation/Organization

COLORADO

Year of Incorporation/Organization

[X] Over Five Years Ago
[ ] Within Last Five Years (Specify Year)
[ ] Yet to Be Formed

Previous Names   [ ] None

Venaxis, Inc.

AspenBio Pharma, Inc.

ASPENBIO INC

Entity Type

[X] Corporation
[ ] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

---

### 2. Principal Place of Business and Contact Information

Name of Issuer

Bioptix, Inc.

| Street Address 1 | Street Address 2 | | |
| --- | --- | --- | --- |
| 1775 38TH STREET | | | |
| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
| BOULDER | COLORADO | 80301 | 303-545-5550 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
| --- | --- | --- |
| Lundy | Stephen | T. |
| Street Address 1 | Street Address 2 | |
| c/o Bioptix, Inc. | 1775 38th Street | |
| City | State/Province/Country | ZIP/PostalCode |
| Boulder | COLORADO | 80301 |

Relationship: [X] Executive Officer  [X] Director  [ ] Promoter

Clarification of Response (if Necessary):

Chief Executive Officer, President

---

| Last Name | First Name | Middle Name |
| --- | --- | --- |

McGonegal                     Jeffrey                           G.

Street Address 1              Street Address 2

c/o Bioptix, Inc.             1775 38th Street

City                          State/Province/Country            ZIP/PostalCode

Boulder                       COLORADO                          80301

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Chief Financial Officer

---

Last Name                     First Name                        Middle Name

O'Rourke                      John                              R.

Street Address 1              Street Address 2

c/o Bioptix, Inc.             1775 38th Street

City                          State/Province/Country            ZIP/PostalCode

Boulder                       COLORADO                          80301

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

Last Name                     First Name                        Middle Name

Beeghley                      Michael                           M.

Street Address 1              Street Address 2

c/o Bioptix, Inc.             1775 38th Street

City                          State/Province/Country            ZIP/PostalCode

Boulder                       COLORADO                          80301

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

Last Name                     First Name                        Middle Name

Dai                           Mike                              T.

Street Address 1              Street Address 2

c/o Bioptix, Inc.             1775 38th Street

City                          State/Province/Country            ZIP/PostalCode

Boulder                       COLORADO                          80301

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

## 4. Industry Group

[ ] Agriculture

Banking & Financial Services

  [ ] Commercial Banking

  [ ] Insurance

  [ ] Investing

  [ ] Investment Banking

  [ ]

Health Care

  [X] Biotechnology

  [ ] Health Insurance

  [ ] Hospitals & Physicians

  [ ] Pharmaceuticals

  [ ]

[ ] Retailing

[ ] Restaurants

Technology

  [ ] Computers

  [ ] Telecommunications

  [ ]

☐ Pooled Investment Fund

Is the issuer registered as an investment company under the Investment Company Act of 1940?

☐ Yes          ☐ No

☐ Other Banking & Financial Services

☐ Business Services

Energy

☐ Coal Mining

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

☐ Other Health Care

☐ Manufacturing

Real Estate

☐ Commercial

☐ Construction

☐ REITS & Finance

☐ Residential

☐ Other Real Estate

☐ Other Technology

Travel

☐ Airlines & Airports

☐ Lodging & Conventions

☐ Tourism & Travel Services

☐ Other Travel

☐ Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | | ☐ Over $100,000,000 |
| ☒ Decline to Disclose | | ☐ Decline to Disclose |
| ☐ Not Applicable | | ☐ Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))

☐ Rule 504 (b)(1)(i)

☐ Rule 504 (b)(1)(ii)

☐ Rule 504 (b)(1)(iii)

☐ Rule 505

☒ Rule 506(b)

☐ Rule 506(c)

☐ Securities Act Section 4(a)(5)

☐ Investment Company Act Section 3(c)

☐ Section 3(c)(1)

☐ Section 3(c)(2)

☐ Section 3(c)(3)

☐ Section 3(c)(4)

☐ Section 3(c)(5)

☐ Section 3(c)(6)

☐ Section 3(c)(7)

☐ Section 3(c)(9)

☐ Section 3(c)(10)

☐ Section 3(c)(11)

☐ Section 3(c)(12)

☐ Section 3(c)(13)

☐ Section 3(c)(14)

## 7. Type of Filing

[X] New Notice   Date of First Sale 2017-03-10   [ ] First Sale Yet to Occur
[ ] Amendment

---

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year?   [ ] Yes [X] No

---

**9. Type(s) of Securities Offered (select all that apply)**

[X] Equity                                                    [ ] Pooled Investment Fund Interests
[ ] Debt                                                      [ ] Tenant-in-Common Securities
[X] Option, Warrant or Other Right to Acquire Another Security   [ ] Mineral Property Securities
[ ] Security to be Acquired Upon Exercise of Option, Warrant   [ ] Other (describe)
    or Other Right to Acquire Security

---

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction,   [ ] Yes [X] No
such as a merger, acquisition or exchange offer?

Clarification of Response (if Necessary):

---

**11. Minimum Investment**

Minimum investment accepted from any outside investor $0 USD

---

**12. Sales Compensation**

Recipient                                          Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None             (Associated) Broker or Dealer CRD   [X] None
                                                   Number

Street Address 1                                   Street Address 2

City                                               State/Province/Country              ZIP/Postal
                                                                                       Code

State(s) of Solicitation (select all that          [ ] All        [ ] Foreign/non-US
apply)                                                 States
Check "All States" or check individual
States

---

**13. Offering and Sales Amounts**

Total Offering Amount       $2,250,000 USD  or [ ] Indefinite
Total Amount Sold           $2,250,000 USD
Total Remaining to be Sold         $0 USD  or [ ] Indefinite

Clarification of Response (if Necessary):

---

**14. Investors**

[ ]  Select if securities in the offering have been or may be sold to persons who do not qualify as accredited
     investors, and enter the number of such non-accredited investors who already have invested in the
     offering.

     Regardless of whether securities in the offering have been or may be sold to persons who do not        6
     qualify as accredited investors, enter the total number of investors who already have invested in the

offering:

---

**15. Sales Commissions & Finder's Fees Expenses**

---

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finder ' Fee $0 USD ☐ E timate

Clarification of Response (if Necessary):

---

**16. Use of Proceeds**

---

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD ☐ Estimate

Clarification of Response (if Necessary):

---

**Signature and Submission**

---

**Plea e verify the information you have entered and review the Term of Submi ion below before igning and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the i uer maintain it principal place of bu ine and any State in which thi notice i filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the juri diction of the United State , if the action, proceeding or arbitration (a) ari e out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of the e tatute , or (ii) the law of the State in which the i uer maintain it principal place of bu ine or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Regulation D for one of the reasons stated in Rule 505(b)(2)(iii) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Bioptix, Inc. | /s/ Jeffrey McGonegal | Jeffrey McGonegal | Chief Financial Officer | 2017-03-22 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number*

* This undertaking does not affect any limits Section 102(a) of the National Securies Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of tates to require information As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of N MIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under his undertaking or otherwise and can require offering materials only to the extent N MIA permits them to do so under N MIA's preservation of their anti fraud authority

# EXHIBIT E

# EXHIBIT E

10-K 1 riot_10k-123117.htm FORM 10-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-K**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2017**
**or**

☐ **TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to**

**Commission file number** 001-33675

# RIOT BLOCKCHAIN, INC.

(Exact name of registrant as specified in its charter)

| **Nevada** | **84-155336** |
|---|---|
| (State or other jurisdiction of Incorporation or organization) | (I.R.S. Employer Identification No.) |

| **202 6th Street, Suite 401** | |
| **Castle Rock, CO** | **80104** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code **(303) 794-2000**

Securities registered under Section 12(b) of the Exchange Act:

| **Common Stock no par value per share** | **The NASDAQ Stock Market LLC** |
|---|---|
| (Title of class) | (Name of each exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Exchange Act: None.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Note - Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Exchange Act from their obligations under those Sections.

Indicate by check mark whether the registrant (1) filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was

required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers in response to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendments to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company=. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                        Accelerated filer ☐

Non-accelerated filer ☐                                        Smaller reporting company ☒
(Do not check if a smaller reporting
company)

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [_]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐  No ☒

As of June 30, 2017, the aggregate market value of the common stock, no par value, held by non-affiliates of the registrant, based on the closing sale price of the common stock, no par value per share was approximately $21.9 million.

As of April 13, 2018, the registrant had 13,417,132 shares of common stock outstanding.

DOCUMENTS INCORPORATED BY REFERENCE List hereunder the following documents if incorporated by reference and the Part of the Form 10-K (e.g., Part I, Part II, etc.) into which the document is incorporated: (1) Any annual report to security holders; (2) Any proxy or information statement; and (3) Any prospectus filed pursuant to Rule 424(b) or (c) under the Securities Act of 1933.

Not applicable.

**RIOT BLOCKCHAIN, INC.**
**INDEX TO ANNUAL REPORT ON FORM 10-K**

<u>Page</u>

PART I

| | | |
|---|---|---|
| Item 1. | Business. | 2 |
| Item 1A. | Risk Factors. | 9 |
| Item 1B. | Unresolved Staff Comments. | 31 |
| Item 2. | Properties. | 31 |
| Item 3. | Legal Proceedings. | 32 |
| Item 4. | Mine Safety Disclosures | 32 |

PART II

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities. | 33 |
| Item 6. | Selected Financial Data. | 34 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations. | 34 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk. | 40 |
| Item 8. | Financial Statements and Supplementary Data. | 40 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure. | 75 |
| Item 9A. | Controls and Procedures. | 75 |
| Item 9B. | Other Information. | 76 |

PART III

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance. | |
| Item 11. | Executive Compensation. | 77 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters. | 77 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence. | 77 |
| Item 14. | Principal Accountant Fees and Services. | 77 |

PART IV

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules. | 77 |

**RIOT BLOCKCHAIN, INC.**

As used in this Annual Report on Form 10-K, the terms "we", "us", "our", the "Company", "Riot Blockchain, Inc." and "RIOT" mean Riot Blockchain, Inc. and its consolidated subsidiaries, unless otherwise indicated.

## FORWARD LOOKING STATEMENTS

This Annual Report on Form 10-K and other written and oral statements made from time to time by us may contain so-called "forward-looking statements," all of which are subject to risks and uncertainties. Forward-looking statements can be identified by the use of words such as "expects," "anticipates," "plans," "will," "should," "could," "forecasts," "projects," "intends," "estimates," and other words of similar meaning. One can identify them by the fact that they do not relate strictly to historical or current facts. These statements are likely to address our growth strategy, financial results and product and development programs. One must carefully consider any such statement and should understand that many factors could cause actual results to differ from our forward looking statements  These factors may include inaccurate assumptions and a broad variety of other risks and uncertainties, including some that are known and some that are not. No forward-looking statement can be guaranteed and actual future results may vary materially.

These statements are only predictions and involve known and unknown risks, uncertainties and other factors, including the risks in the section entitled "Risk Factors" and the risks set out below, any of which may cause our or our industry's actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by these forward-looking statements. These risks include, by way of example and not in limitation

- The uncertainty of profitability;
- High volatility in the value attributable to our business model and assets;
- Rapid change in the regulatory and legal environment in which we operate with many unknown future challenges to operating our business in a lawful manner or which will require our business or the businesses in which we invest to be subjected to added costs and/or uncertainty regarding the ability to operate;
- Risks related to failure to obtain adequate financing on a timely basis and on acceptable terms; and
- Other risks and uncertainties related to our business plan and business strategy.

This list is not an exhaustive list of the factors that may affect any of our forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on our forward-looking statements. Forward looking statements are made based on management's beliefs, estimates and opinions on the date the statements are made and we undertake no obligation to update forward-looking statements if these beliefs, estimates and opinions or other circumstances should change, except as may be required under applicable law. We cannot guarantee future results, levels of activity, performance or achievements.

INDUSTRY AND MARKET DATA

Information regarding market and industry statistics contained in this Annual Report on Form 10-K has been obtained from industry and other publications that we believe to be reliable, but that are not produced for purposes of securities filings. We have not independently verified any market, industry or similar data presented in this Annual Report and cannot assure you of its accuracy or completeness.  Further, we have not reviewed or included data from all sources. Forecasts and other forward-looking information obtained from third-party sources are subject to the same qualifications and the additional uncertainties accompanying any estimates of future market size, revenue and market acceptance of products and services. As a result, investors should not place undue reliance on any such forecasts and other forward-looking information.

The Company is currently not a party to any other legal proceedings, the adverse outcome of which would, in the Company's opinion, have a material adverse effect on our business, financial condition and results of operations.

On April 9, 2018, the Company received a subpoena requesting document from the U.S. Securities and Exchange Commission. We intend to fully cooperate with the SEC inquiry.

As part of its review of the Company's public filings, the Securities and Exchange Commission ("SEC") has inquired about certain of the Company's assets' classification as, and amount of, possible Investment Company assets. The Company is responding to the SEC's inquiries. Should an ultimate determination be made that the Company was or is an inadvertent Investment Company, it could have an impact on the Company's decision to hold certain assets and / or the Company's financial reporting. The Company's position is that it was or is not subject to the Investment Company regulations.

**Note 13.  Related Party Transactions**:

Per Schedules 13D filed with the Securities and Exchange Commission, each of Barry Honig (together with other group members) and Catherine Johanna DeFrancesco beneficially owned greater than 10% of the dispositive and voting power of the Company's common stock. Mr. Honig reported beneficial ownership of approximately 11.2% of the Company's common stock as of January 5, 2017 and Ms. DeFrancesco reported beneficial ownership of approximately 11.45% of the Company's common stock as of January 10, 2017. Mr. Honig invested $1,750,000 in the March 2017 Convertible Note Private Placement (see Note 7). GRQ Consultants, Inc., a related party of Mr. Honig, received a cash payment of $50,000 for diligence services in connection with the Company's investment in Coinsquare (see Note 4). Each of Mr. Honig and Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company (see Note 2), with Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned approximately 6.3% of Kairos. Each of Mr. Honig and Ms. DeFrancesco invested in the December 2017 Common Share Private Placement, with Mr. Honig investing $500,000 and Ms. DeFrancesco investing $360,000 (see Note 7).

**Note 14.  Subsequent Events**:

***Bitcoin Auction***

In January 2018, through a sealed bid auction conducted by the U.S. Marshals Service, the Company acquired 500 bitcoins for approximately $5,625,000.

***Asset Purchase Agreement with Prive Technologies LLC***

On February 21, 2018, the Company and Kairos Global Technology Inc., a wholly-owned subsidiary of the Company ("Kairos"), completed an asset purchase under an agreement (the "Prive Purchase Agreement") with Prive Technologies LLC ("Prive"), on behalf of certain persons and entities who owned certain bitcoin mining machines and related equipment (the "Prive Equipment"). Pursuant to the Purchase Agreement, the aggregate consideration for the Prive Equipment consisted of (i) Eleven Million Dollars ($11,000,000) and (ii) One Million (1,000,000) shares of the Company's common stock, no par value per share (the " Prive Shares"). Upon closing of the transaction, and pursuant to the terms of the Purchase Agreement, Kairos became the owner of the Prive Equipment and other assets used for the mining of cryptocurrency, including, but not limited to, 3,800 Bitmain AntMiner S9s.

Mr. Michael Ho and Mr. Bryan Pascal were selling shareholders of Prive, with Mr. Ho owning approximately 24.8% of Prive and Mr. Pascal owning approximately 18.4% of Prive, at the time of its acquisition by the Company. In November 2017, at the time of the Kairos acquisition, (see Note 2), Mr. Ho and Mr. Pascal became Series B Preferred Shareholders of the Company having owned approximately 10.7% and 5.7%, respectively of Kairos at the time of its acquisition by the Company.

Prive Shares were deposited into an escrow account with an escrow agent to be held in escrow as provided in an escrow agreement. Under this escrow agreement, the escrowed Prive Shares will be released to the Sellers upon the later of August 21, 2018 and the date on which the Company and Kairos have generated Net Cash Flow (as defined in the Prive Purchase Agreement) of at least Ten Million Dollars ($10,000,000) from the Prive Equipment. If the Escrow Shares have not been released to the Sellers on or before February 21, 2020, then these escrowed Prive Shares shall be returned to the Company for cancellation.

# EXHIBIT F

# EXHIBIT F

8-K/A 1 riot_8ka.htm FORM 8-KA

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 8-K/A**
**(Amendment No. 1)**

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): October 4, 2017 (September 29, 2017)

**Riot Blockchain, Inc.**
(Exact name of registrant as specified in its charter)

| **Nevada** | **001-33675** | **84-1553387** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification Number) |

**202 6th Street, Suite 401**
**Castle Rock, CO 80104**
(Address of principal executive offices) (zip code)

**(303) 794-2000**
(Registrant's telephone number, including area code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b2 of the Securities Exchange Act of 1934 (§240.12b2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Explanatory Note**

This Current Report on Form 8-K/A amends the Current Report on Form 8-K filed by Riot Blockchain, Inc. (the "Company') with the Securities and Exchange Commission on October 4, 2017, solely to add as an exhibit the Amended and Restated Unanimous Shareholder Agreement, dated October 2, 2017, among the Company, goNumerical Ltd., and the other parties named therein.

**Item 9.01**     **Financial Statements and Exhibits.**

(d)     Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Articles of Merger, as filed with the Secretary of State of the State of Nevada (previously filed) |
| 10.1† | Amended and Restated Unanimous Shareholder Agreement, dated October 2, 2017, among the Company, goNumerical Ltd., and the other parties named therein |
| 99.1 | Press Release, dated October 4, 2017 (previously filed) |

†     Confidential treatment is requested for certain confidential portions of this exhibit pursuant to Rule 24b-2 under the Exchange Act. In accordance with Rule 24b-2, these confidential portions have been omitted from this exhibit and filed separately with the Commission

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**RIOT BLOCKCHAIN, INC.**

Dated: May 25, 2018                    By:   /s/ John O'Rourke
                                             Name: John O'Rourke
                                             Title: Chief Executive Officer

EX-10.1 2 ex10x1.htm EXHIBIT 10.1

Exhibit 10.1

**CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS AGREEMENT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO THE CONFIDENTIALITY REQUEST. A COMPLETE VERSION OF THIS AGREEMENT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.**

**Execution Version**

## AMENDED AND RESTATED UNANIMOUS SHAREHOLDER AGREEMENT

# GONUMERICAL LTD.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | INTERPRETATION | 4 |
| 2. | MANAGEMENT AND OPERATION | 7 |
| 3. | FINANCIAL MATTERS | 11 |
| 4. | EMPLOYEE STOCK OPTION PLAN | 13 |
| 5. | PRE-EMPTIVE RIGHTS | 13 |
| 6. | ACCESS TO INFORMATION/CONFIDENTIALITY | 14 |
| 7. | RESTRICTIONS ON TRANSFERS OF SHARES | 14 |
| 8. | VOLUNTARY TRANSFERS OF SHARES | 15 |
| 9. | MANDATORY TRANSFERS OF SHARES | 17 |
| 10. | THE FAIR MARKET VALUE OF SHARES | 17 |
| 11. | CLOSING TERMS | 17 |
| 12. | HOLDING CORPORATIONS | 18 |
| 13. | KEY MAN LIFE INSURANCE | 19 |
| 14. | NON-COMPETITION/NON-SOLICITATION | 19 |
| 15. | NOTATION ON EACH SHARE CERTIFICATE | 20 |
| 16. | ARBITRATION | 20 |
| 17. | GENERAL | 22 |
| SCHEDULE "A" GONUMERICAL LTD.  ISSUED SHARE CAPITAL | | 29 |
| SCHEDULE "B" ADDRESSES FOR NOTICES | | 1 |
| SCHEDULE "C" ADOPTION AGREEMENT | | 7 |
| SCHEDULE "D" TEMPORARILY FROZEN EXECUTIVE COMPENSATION | | 8 |

# AMENDED AND RESTATED UNANIMOUS SHAREHOLDER AGREEMENT

**THIS AMENDED AND RESTATED UNANIMOUS SHAREHOLDER AGREEMENT** (this "**Agreement**") is made as of the 2nd day of October, 2017 between:

> **COLE DIAMOND**, an individual residing in the Province of Ontario (hereinafter referred to as "**Cole**")

> \- and -

> **MICHAEL DIAMOND**, an individual residing in the Province of Ontario (hereinafter referred to as "**Michael**")

> \- and -

> **VIRGILE ROSTAND,** an individual residing in the Province of Ontario (hereinafter referred to as "**Virgile**")

> \- and -

> **ROBERT FURSE**, an individual residing in the Province of Ontario (hereinafter referred to as "**Robert**")

> \- and -

> **JAZSE HOLDINGS INC.**, a corporation incorporated and validly existing under the laws of the Province of Ontario (hereinafter referred to as "**Jazse**")

> \- and -

> **TREAD LIGHTLY, LLC**, a corporation incorporated and validly existing under the laws of the State of Maine (hereinafter referred to as "**Tread**")

> \- and -

> **TWG STARTUP INVESTMENT 2 CORP.**, a corporation incorporated and validly existing under the laws of Ontario (hereinafter referred to as "**TWG**")

> \- and -

> **BIOPTIX INC.**, a corporation incorporated and validly existing under the laws of Nevada (hereinafter referred to as "**Bioptix**")

2

- and -

**2330573 ONTARIO INC.,** a corporation incorporated and validly existing under the laws of Ontario (hereinafter referred to as "**233**")

- and -

**JEFF CORDEIRO**, an individual residing in the State of Florida (hereinafter referred to as "**Jeff**")

- and -

**PETER SIMEON,** an individual residing in the Province of Ontario (hereinafter referred to as "**Peter**")

- and -

**EDUARDO VIVAS**, an individual residing in the State of California (hereinafter referred to as "**Eduardo**")

- and -

**ARGYLE LLC,** a corporation incorporated and validly existing under the laws of Indiana (hereinafter referred to as "**Argyle**")

- and -

**ERIC SO**, an individual residing in the Province of Ontario (hereinafter referred to as "**Eric**")

- and -

**ROSS LEVINSOHN,** an individual residing in the State of California (hereinafter referred to as "**Ross**")

- and -

**SEAN LAI**, an individual residing in the Province of Ontario (hereinafter referred to as "**Sean**")

- and -

**MICHAEL BRAUSER**, an individual residing in the State of Florida (hereinafter referred to as "**Michael**")

- and -

3

**RECITALS:**

**BARRY HONIG,** an individual residing in the State of Florida (hereinafter referred to as "**Barry**")

- and -

**GRQ CONSULTANTS INC. ROTH 401K FBO BARRY HONIG**, a corporation incorporated and validly existing under the laws of Florida (hereinafter referred to as "**GRQ**")

- and -

**ERICA AND MARK GROUSSMAN FOUNDATION,** formed and validly existing under the laws of Florida (hereinafter referred to as "**Groussman Foundation**")

- and -

**TITAN MULTI STRATEGY FUND I, LTD.,** a corporation incorporated and validly existing under the laws of Florida (hereinafter referred to as "**Titan**")

and

**STETSON CAPITAL INVESTMENTS INC.,** a corporation incorporated and validly existing under the laws of Florida (hereinafter referred to as "**Stetson**")

and

**KENT FARRELL,** an individual residing in the Province of Ontario (hereinafter referred to as "**Kent**")

- and -

**GONUMERICAL LTD.,** a corporation incorporated and validly existing under the federal laws of Canada (hereinafter referred to as the "**Company**")

A.     **WHEREAS** the Company was incorporated by articles of incorporation on October 19, 2009, which were amended September 26, 2017;

B.     **AND WHEREAS** the authorized capital of the Company consists of an unlimited amount of Common Shares of which twenty million five hundred and ninety five thousand five hundred and eighty nine (20,595,589) Common Shares are issued as of the date hereof and are registered on the Company's books as set out in Schedule "A" hereto;

4

# EXHIBIT G

# EXHIBIT G

8-K 1 riot_8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

## FORM 8-K

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported): December 18, 2017**

## Riot Blockchain, Inc.

**(Exact name of Registrant as specified in its charter)**

| Colorado | 001-33675 | 84-155337 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

| 202 6th Street, Suite 401 Castle Rock, CO | 80104 |
|---|---|
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code:**    **(303) 545-5550**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[_] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[_] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[_] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[_] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b2 of the Securities Exchange Act of 1934 (§240.12b2 of this chapter).

Emerging growth company [_]

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [_]

**Item 1.01 Entry into a Material Definitive Agreement.**

On December 18, 2017, Riot Blockchain, Inc. (the "Company") entered into agreements to sell $37 million units of its securities (the "Units") pursuant to separate purchase agreements (the "Securities Purchase Agreements") with accredited investors (the "Investors"), at a purchase price of $22.50 per Unit.  Each Unit consists of one share (the "Shares") of the Company's common stock, no par value per share (the "Common Stock"), and a three year warrant (the "Warrants") to purchase one share of Common Stock, at an exercise price of $40.00 per share (such sale and issuance, the "Private Placement").  The closing of the Private Placement is subject to customary closing conditions. The news release announcing the Private Placement is attached as Exhibit 99.1.

The Warrants are exercisable, at any time on or after the sixth month anniversary of the closing date of the Private Placement, at a price of $40.00 per share, subject to adjustment, and expire three years therefrom. The holders may, subject to certain limitations, exercise the Warrants on a cashless basis. The Company is prohibited from effecting an exercise of any Warrant to the extent that, as a result of any such exercise, the holder would beneficially own more than 9.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of such Warrant.

The Company entered into separate registration rights agreements (the "Registration Rights Agreement") with each of the Investors, pursuant to which the Company will undertake to file a registration statement to register the Common Stock issued as part of the Units and the Common Stock issuable upon exercise of the Warrants, within fourteen days following the closing, to cause such registration statement to be declared effective by the Securities and Exchange Commission within ninety days of the filing date and to maintain the effectiveness of the registration statement until all of such shares of Common Stock registered have been sold or are otherwise able to be sold pursuant to Rule 144.  In the event the Company fails to file, or obtain effectiveness of, such registration statement with the given period of time, the Company will be obligated to pay liquidated damages to the Investors for every thirty-days during which such filing is not made and/or effectiveness obtained, such fee being subject to certain exceptions.

The offering was made pursuant to an exemption from registration under Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act") and/or pursuant to Rule 903 of Regulation S promulgated under the Securities Act.

The foregoing descriptions of the Securities Purchase Agreement, the Registration Rights Agreement and the Warrants are not complete and are qualified in their entireties by reference to the full text of the Form of Purchase Agreement, the Form of Registration Rights Agreement and the Form of Warrant, copies of which are filed as Exhibit 10.1, Exhibit 10.2 and Exhibit 4.1, respectively, to this Report and are incorporated by reference herein.

Canaccord Genuity, Inc. acted as financial advisor to the Company in the financing.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| | |
|---|---|
| 4.1 | Form of Warrant |
| 10.1 | Form of Securities Purchase Agreement |
| 10.2 | Form of Registration Rights Agreement |
| 99.1 | Press release dated December 19, 2017 |

**SIGNATURES**

       Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Riot Blockchain, Inc.
(Registrant)

December 19, 2017           By:    /s/ Jeffrey G. McGonegal

                          Name:    Jeffrey G. McGonegal
                          Title:     Chief Financial Officer

EX-10.1 3 ex10x1.htm

Exhibit 10.1

## SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement (this "<u>Agreement</u>") is dated as of   December__, 2017, between Riot Blockchain, Inc., a Nevada corporation (the "<u>Company</u>"), and each purchaser identified on the signature pages hereto (each, including its successors and permitted assigns, a "<u>Purchaser</u>" and collectively, the "<u>Purchasers</u>").

### PREAMBLE

WHEREAS, subject to the terms and conditions set forth in this Agreement and pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and Rule 506 promulgated thereunder or Regulation S promulgated under the Securities Act, the Company desires to issue and sell to each Purchaser, and each Purchaser, severally and not jointly, desires to purchase from the Company, securities of the Company as more fully described in this Agreement (the "<u>Offering</u>").

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and each Purchaser agree as follows:

### ARTICLE I.
### DEFINITIONS

1.1      <u>Definitions</u>. In addition to the terms defined elsewhere in this Agreement, for all purposes of this Agreement, the following terms have the meanings set forth in this Section 1.1:

"<u>Accredited Investor</u>" shall have the meaning ascribed to it in Section 3.2(c).

"<u>Affiliate</u>" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 405 under the Securities Act.

"<u>Board of Directors</u>" means the board of directors of the Company.

"<u>Business Day</u>" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"<u>Closing</u>" means the closing of the purchase and sale of the Securities pursuant to Section 2.1.

"<u>Closing Date</u>" means the Trading Day on which all of the Transaction Documents have been executed and delivered by the applicable parties thereto, and all conditions precedent to (i) the Purchasers' obligations to pay the Subscription Amount at such Closing  and (ii) the Company's obligations to deliver the Securities to be issued and sold at such Closing, in each case, have been satisfied or waived, but in no event later than the third Trading Day following the date hereof in the case of such Closing.

"<u>Commission</u>" means the United States Securities and Exchange Commission.

"<u>Common Stock</u>" means the common stock of the Company, no par value, and any other class of securities into which such securities may hereafter be reclassified or changed.

(k)      Pre-Existing Relationships.  The Purchaser represents and warrants that: (i) the Purchaser has a prior substantial pre-existing relationship with the Company, the Purchaser is not investing in the Offering in connection with or as a result of any registration statement filed with the SEC by the Company and (ii) no Securities were offered or sold to it by means of any form of general solicitation or general advertising, and in connection therewith, the Purchaser did not (A) receive or review any advertisement, article, notice or other communication published in a newspaper or magazine or similar media or broadcast over television or radio, whether closed circuit, or generally available; or (B) attend any seminar meeting or industry investor conference whose attendees were invited by any general solicitation or general advertising; or (C) observe any website or filing of the Company with the Commission in which any offering of securities by the Company was described and as a result learned of any offering of securities by the Company.

(l)      Non-U.S. Person.  To the extent the Purchaser is not a U.S. Person (a "Reg S Person"), such Purchaser hereby represents that the representations contained in paragraphs (1) through (6) of this Section 3.2(l) are true and correct with respect to such Purchaser.

(1)      (i) the issuance and sale to such Reg S Person of the Securities is intended to be exempt from the registration requirements of the Securities Act, pursuant to the provisions of Regulation S; (ii) it is not a "U.S. Person," as such term is defined in Regulation S, and is not acquiring the Securities for the account or benefit of any U.S. Person; and (iii) the offer and sale of the Securities has not taken place, and is not taking place, within the United States of America or its territories or possessions.  Such Reg S Person acknowledges that the offer and sale of the Securities has taken place, and is taking place in an "offshore transaction," as such term is defined in Regulation S.

(2)      Such Reg S Person acknowledges and agrees that, pursuant to the provisions of Regulation S, the Securities cannot be sold, assigned, transferred, conveyed, pledged or otherwise disposed of to any U.S. Person or within the United States of America or its territories or possessions for a period of one year from and after the Closing Date, unless such Securities are registered for sale in the United States pursuant to an effective registration statement under the Securities Act or another exemption from such registration is available.  Such Reg S Person acknowledges that it has not engaged in any hedging transactions with regard to the Securities.

(3)      Such Reg S Person consents to the placement of a legend on any certificate, note or other document evidencing the Securities and understands that the Company shall be required to refuse to register any transfer of securities not made in accordance with applicable U.S. securities laws.

(4)      Such Reg S Person is not a "distributor" of securities, as that term is defined in Regulation S, nor a dealer in securities.

(5)      Such Reg S Person understands that the Securities have not been registered under the Securities Act, or the securities laws of any state and are subject to substantial restrictions on resale or transfer.  The Securities are "restricted securities" within the meaning of Regulation S and Rule 144, promulgated under the Securities Act.

(6)      Such Reg S Person makes the representations, declarations and warranties as contained in this Section 3.2(l) with the intent that the same shall be relied upon by the Company in determining its suitability as a purchaser of such Securities.

(m)      Survival. The foregoing representations and warranties shall survive the Closing Date.

# EXHIBIT H

# EXHIBIT H

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
### FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4 00 |

---

### 1. Issuer's Identity

**CIK (Filer ID Number)**
0001167419

**Name of Issuer**
Riot Blockchain, Inc.

**Jurisdiction of Incorporation/Organization**
NEVADA

**Year of Incorporation/Organization**
[X] Over Five Years Ago
[ ] Within Last Five Years (Specify Year)
[ ] Yet to Be Formed

**Previous Names** [ ] None
Bioptix, Inc.
Venaxis, Inc.
AspenBio Pharma, Inc.

**Entity Type**
[X] Corporation
[ ] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

---

### 2. Principal Place of Business and Contact Information

**Name of Issuer**
Riot Blockchain, Inc.

**Street Address 1**
202 6TH STREET, SUITE 401

**Street Address 2**

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| CASTLE ROCK | COLORADO | 80104 | 303-794-2000 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| O'Rourke | John | R. |

**Street Address 1**
202 6th Street

**Street Address 2**
Suite 401

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Castle Rock | COLORADO | 80104 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

**Clarification of Response (if Necessary):**
Chief Executive Officer, President

| Last Name | First Name | Middle Name |
|---|---|---|
| | | |

McGonegal                    Jeffrey                         G.
Street Address 1             Street Address 2
202 6th Street               Suite 401
City                         State/Province/Country          ZIP/PostalCode
Castle Rock                  COLORADO                        80104

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Chief Financial Officer

---

Last Name                    First Name                      Middle Name
Kaplan                       Andrew
Street Address 1             Street Address 2
202 6th Street               Suite 401
City                         State/Province/Country          ZIP/PostalCode
Castle Rock                  COLORADO                        80104

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

Last Name                    First Name                      Middle Name
So                           Eric
Street Address 1             Street Address 2
202 6th Street               Suite 401
City                         State/Province/Country          ZIP/PostalCode
Castle Rock                  COLORADO                        80104

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

Last Name                    First Name                      Middle Name
Les                          Jason
Street Address 1             Street Address 2
202 6th Street               Suite 401
City                         State/Province/Country          ZIP/PostalCode
Castle Rock                  COLORADO                        80104

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

**4. Industry Group**

[ ] Agriculture                      Health Care                      [ ] Retailing
Banking & Financial Services         [ ] Biotechnology                [ ] Restaurants
   [ ] Commercial Banking            [ ] Health Insurance             Technology
   [ ] Insurance                     [ ] Hospitals & Physicians       [ ] Computers
   [ ] Investing                     [ ] Pharmaceuticals              [ ] Telecommunications
   [ ] Investment Banking
   [ ]                              [ ]                              [ ]

☐ Pooled Investment Fund

Is the issuer registered as an investment company under the Investment Company Act of 1940?

☐ Yes          ☐ No

☐ Other Banking & Financial Services

☐ Business Services

Energy

☐ Coal Mining

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

☐ Other Health Care

☐ Manufacturing

Real Estate

☐ Commercial

☐ Construction

☐ REITS & Finance

☐ Residential

☐ Other Real Estate

Other Technology

Travel

☐ Airlines & Airports

☐ Lodging & Conventions

☐ Tourism & Travel Services

☐ Other Travel

☒ Other

---

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | | ☐ Over $100,000,000 |
| ☒ Decline to Disclose | | ☐ Decline to Disclose |
| ☐ Not Applicable | | ☐ Not Applicable |

---

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ Investment Company Act Section 3(c)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))

☐ Rule 504 (b)(1)(i)

☐ Rule 504 (b)(1)(ii)

☐ Rule 504 (b)(1)(iii)

☒ Rule 506(b)

☐ Rule 506(c)

☐ Securities Act Section 4(a)(5)

☐ Section 3(c)(1)          ☐ Section 3(c)(9)

☐ Section 3(c)(2)          ☐ Section 3(c)(10)

☐ Section 3(c)(3)          ☐ Section 3(c)(11)

☐ Section 3(c)(4)          ☐ Section 3(c)(12)

☐ Section 3(c)(5)          ☐ Section 3(c)(13)

☐ Section 3(c)(6)          ☐ Section 3(c)(14)

☐ Section 3(c)(7)

---

## 7. Type of Filing

[X] New Notice   Date of First Sale 2017-12-21   [ ] First Sale Yet to Occur

[ ] Amendment

---

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year?   [ ] Yes [X] No

---

**9. Type(s) of Securities Offered (select all that apply)**

[X] Equity                                                      [ ] Pooled Investment Fund Interests

[ ] Debt                                                        [ ] Tenant-in-Common Securities

[X] Option, Warrant or Other Right to Acquire Another Security  [ ] Mineral Property Securities

[X] Security to be Acquired Upon Exercise of Option, Warrant    [ ] Other (describe)
    or Other Right to Acquire Security

---

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction,   [ ] Yes [X] No
such as a merger, acquisition or exchange offer?

Clarification of Response (if Necessary):

---

**11. Minimum Investment**

Minimum investment accepted from any outside investor $0 USD

---

**12. Sales Compensation**

Recipient                                        Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None           (Associated) Broker or Dealer CRD          [X] None
                                                 Number

Street Address 1                                 Street Address 2

City                                             State/Province/Country                     ZIP/Postal
                                                                                            Code

State(s) of Solicitation (select all that        [ ] All      [ ] Foreign/non-US
apply)                                               States
Check "All States" or check individual
States

---

**13. Offering and Sales Amounts**

Total Offering Amount      $37,037,528 USD  or [ ] ndefinite

Total Amount Sold          $37,037,528 USD

Total Remaining to be Sold        $0 USD  or [ ] ndefinite

Clarification of Response (if Necessary):

---

**14. Investors**

[ ]  Select if securities in the offering have been or may be sold to persons who do not qualify as accredited
     investors, and enter the number of such non-accredited investors who already have invested in the
     offering.

     Regardless of whether securities in the offering have been or may be sold to persons who do not          [32]
     qualify as accredited investors, enter the total number of investors who already have invested in the

offering:

---

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

| Sales Commissions | $0 USD | ☐ Estimate |

| Finder ' Fee | $500,000 USD | ☐ E timate |

Clarification of Response (if Necessary):

Financial Advisory Fee to Canaccord Genuity Inc.

---

## 16. Use of Proceeds

Provide the amount of the gro   proceed   of the offering that ha   been or i   propo ed to be u ed for payment   to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD   ☐ Estimate

Clarification of Response (if Necessary):

---

## Signature and Submi   ion

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file thi   notice**

**Term  of Submi  ion**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, a  it  agent  for  ervice of proce  , and agreeing that the  e per  on  may accept  ervice on it  behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of  ecuritie  that i  the  ubject of thi  notice, and (b) i  founded, directly or indirectly, upon the provi ion of:  (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which thi  notice i  filed

- Certifying that, if the i  uer i  claiming a Regulation D e emption for the offering, the i  uer i  not di qualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|--------|-----------|----------------|-------|------|
| Riot Blockchain, Inc | /s/ Jeffrey G  McGonegal | Jeffrey G  McGonegal | Chief Financial Officer | 2017 12 27 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of  he National Securi ies Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under  his undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

# EXHIBIT I

# EXHIBIT I

10-K 1 bioptix_10k-123116 htm FORM 10-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-K**

(Mark One)

☒      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2016**

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from _____ to _____**

**Commission file number: 001-33675**

# Bioptix, Inc.

(Exact name of registrant as specified in charter)

| | |
|---|---|
| **Colorado** | **84-1553387** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

| | |
|---|---|
| **834-F South Perry Street, Suite 443** | |
| **Castle Rock, CO** | **80104** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:  **(303) 794-2000**

Securities registered under Section 12(b) of the Act:

| <u>Title of Each Class</u> | <u>Name of each exchange on which registered</u> |
|---|---|
| Common Stock, No Par Value | NASDAQ Capital Market |

Securities registered under Section 12(g) of the Act:  <u>None</u>

Indicate by check mark if the registrant is a well-known, seasoned issuer, as defined in Rule 405 of the Securities Act:
Yes ☐    No ☒

Indicate by check mark whether the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act:
Yes ☐    No ☒

Indicate by check mark whether the registrant (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past twelve (12) months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).
Yes ☒    No ☐

Indicate by check mark if there is no disclosure of delinquent filers in response to Item 405 of Regulation S-K contained in this form, and no disclosure will be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by

reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company (as defined in Exchange Act Rule 12b-2).

Large accelerated filer ☐                         Accelerated filer ☐

Non-accelerated filer ☐                    Smaller reporting company ☒
(Do not check if smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act):

Yes ☐    No ☒

The aggregate market value of Common Stock held by non-affiliates of the registrant as of June 30, 2016, computed by reference to the closing price on that date was $13,602,000.

The number of shares outstanding of the registrant's common stock at March 24, 2017, was 5,403,971.

**BIOPTIX, INC.**
**INDEX TO ANNUAL REPORT ON FORM 10-K**

**Page**

PART I

| Item 1. | Business. | 2 |
| Item 1A. | Risk Factors. | 8 |
| Item 1B. | Unresolved Staff Comments. | 13 |
| Item 2. | Properties. | 13 |
| Item 3. | Legal Proceedings. | 13 |
| Item 4. | Mine Safety Disclosures | 13 |

PART II

| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities. | 14 |
| Item 6. | Selected Financial Data. | 15 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations. | 15 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk. | 21 |
| Item 8. | Financial Statements and Supplementary Data. | 22 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure. | 47 |
| Item 9A. | Controls and Procedures. | 47 |
| Item 9B. | Other Information. | 48 |

PART III

| Item 10. | Directors, Executive Officers and Corporate Governance. | 49 |
| Item 11. | Executive Compensation. | 49 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters. | 49 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence. | 49 |
| Item 14. | Principal Accountant Fees and Services. | 49 |

PART IV

| Item 15. | Exhibits, Financial Statement Schedules. | 50 |

**DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS**

Certain statements contained in this Report that are not historical facts constitute forward-looking statements, within the meaning of the Private Securities Litigation Reform Act of 1995, and are intended to be covered by the safe harbors created by that Act. Reliance should not be placed on forward-looking statements because they involve known and unknown risks, uncertainties, and other factors, which may cause actual results, performance, or achievements to differ materially from those expressed or implied. Any forward-looking statement speaks only as of the date made. We undertake no obligation to update any forward-looking statements to reflect events or circumstances after the date on which they are made.

These forward-looking statements are not guarantees of the future as there are a number of meaningful factors that could cause Bioptix Inc.'s actual results to vary materially from those indicated by such forward-looking statements. These statements are based on certain assumptions made based on experience, expected future developments and other factors Bioptix believes are appropriate in the circumstances. Factors which could cause actual results to differ from expectations, many of which are beyond the control of Bioptix, include, but are not limited to, our ability to: successfully identify a new strategic opportunity following the decision to exit the BiOptix Diagnostics, Inc., business, including negotiating a definitive agreement with such alternative target and, if applicable, obtain all necessary approvals, including shareholder approval, retain the necessary management team to advance the Company's strategic process, complete the orderly disposition of the BiOptix Diagnostics, Inc., assets and business, including settling any disputes or liabilities as they may arise, overcome adverse changes in market conditions, maintain, obtain and enforce intellectual property rights, realize value of intangible assets and deal with general business conditions; and other factors referenced herein in "Risk Factors."

4.3    Form of Warrant between the Registrant and the underwriter under each of an Underwriting Agreement dated June 19, 2012, November 14, 2012 and November 15, 2012, respectively (Incorporated by reference to Exhibit A-13 of the Underwriting Agreement from the Registrant's Report on Form 8-K, dated June 19, 2012 and filed June 20, 2012).

4.4    Common Stock Purchase Warrant Agreement by and between Registrant and Corporate Stock Transfer, Inc. dated May 30, 2013 (Incorporated by reference from the Registrant's Report on Form 8-K dated May 30, 2013, filed on May 30, 2013).

4.5    Form of Warrant, as of March 10, 2017 (Incorporated by reference from the Registrant's Report on Form 8-K, effective March 10, 2017 and filed March 16, 2017).

4.6    Form of Note, as of March 15, 2017 (Incorporated by reference from the Registrant's Report on Form 8-K, effective March 15, 2017 and filed March 17, 2017).

4.7    Form of Warrant, as of March 15, 2017 (Incorporated by reference from the Registrant's Report on Form 8-K, effective March 15, 2017 and filed March 17, 2017).

10.1    2002 Stock Incentive Plan, as amended and restated effective July 1, 2007 (Incorporated by reference from the Registrant's Registration Statement on Form S-8, filed June 22, 2007).

10.1.1    Amendment to 2002 Stock Incentive Plan, effective June 9, 2008 (Incorporated by reference from the Registrant's Report on Form 10-K for the year ended December 31, 2009, filed March 9, 2010).

10.1.2    Amendment to Amended and Restated 2002 Stock Incentive Plan, effective November 20, 2009 (Incorporated by reference from the Registrant's Report on Form 10-K for the year ended December 31, 2009, filed March 9, 2010).

10.1.3    Amendment to Amended and Restated 2002 Stock Incentive Plan, effective November 22, 2010 (Incorporated by reference from the Registrant's Report on Form 8-K, effective November 22, 2010 and filed November 29, 2010).

10.1.4    Amendment to Amended and Restated 2002 Stock Incentive Plan, effective July 8, 2011 (Incorporated by reference from the Registrant's Report on Form 8-K, effective July 8, 2011 and filed July 13, 2011).

10.1.5    Amendment to Amended and Restated 2002 Stock Incentive Plan, effective May 22, 2012 (Incorporated by reference from the Registrant's Report on Form 8-K, dated May 22, 2012 and filed May 24, 2012).

10.1.6    Amendment to Amended and Restated 2002 Stock Incentive Plan, effective December 11, 2012 (Incorporated by reference from the Registrant's Report on Form 8-K, dated December 11, 2012 and filed December 13, 2012).

10.1.7    Amendment to Amended and Restated 2002 Stock Incentive Plan, effective June 11, 2013 (Incorporated by reference from the Registrant's Report on Form 8-K dated June 11, 2013, filed on June 13, 2013).

10.1.8    Amendment to Amended and Restated 2002 Stock Incentive Plan, effective June 25, 2014 (Incorporated by reference from the Registrant's Report on Form 8-K dated June 25, 2014, filed on June 26, 2014).

10.1.9    Amendment to the Bioptix, Inc. Amended and Restated 2002 Stock Incentive Plan, as amended, effective September 1, 2015 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated September 1, 2015 and filed with the SEC on September 3, 2015).

# EXHIBIT J

# EXHIBIT J

10-Q 1 riot_10q-093017 htm FORM 10-Q FOR THE PERIOD ENDED 9/30/2017

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-Q**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the quarterly period ended September 30, 2017**

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

Commission file number: 001-33675

# Riot Blockchain, Inc.

(Exact name of registrant as specified in its charter)

| **Nevada** | **84-1553387** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**202 6th Street, Suite 401  Castle Rock, CO  80104**

(Address of principal executive offices) (Zip Code)

**(303) 794-2000**

(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).     Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐      Accelerated filer ☐      Non-accelerated filer ☐    Smaller reporting company ☒    Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐   No ☒

The number of shares of no par value common stock outstanding as of November 13, 2017 was 8,321,137.

## RIOT BLOCKCHAIN, INC.

| | | **Page** |
|---|---|---|
| | PART I - Financial Information | |
| Item 1. | Consolidated Financial Statements | |
| | Consolidated Balance Sheets as of September 30, 2017 (unaudited) and December 31, 2016 | 3 |
| | Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2017 and 2016 (unaudited) | 4 |
| | Consolidated Statement of Stockholders' Equity for the Nine Months Ended September 30, 2017 (unaudited) | 5 |
| | Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2017 and 2016 (unaudited) | 6 |
| | Notes to Consolidated Financial Statements (unaudited) | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 29 |
| Item 4. | Controls and Procedures | 29 |
| | PART II - Other Information | |
| Item 1. | Legal Proceedings | 30 |
| Item 1A. | Risk Factors | 30 |
| Item 6. | Exhibits | 38 |
| | Signatures | 39 |

### CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION AND STATEMENTS

Certain statements in this Quarterly Report on Form 10-Q, including in Management's Discussion and Analysis of Financial Condition and Results of Operations, are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended, and are subject to the safe harbor created thereby. These statements relate to future events or the Company's future financial performance and involve known and unknown risks, uncertainties and other factors that may cause the actual results, levels of activity, performance or achievements of the Company or its industry to be materially different from those expressed or implied by any forward-looking statements. In some cases, forward-looking statements can be identified by terminology such as "may," "will," "could," "would," "should," "expect," "plan," "anticipate," "intend," "believe," "estimate," "predict," "potential" or other comparable terminology. Please see the "Risk Factors" in Part II, Item 1A of this Quarterly Report on Form 10-Q and in Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2016 for a discussion of certain important factors that relate to forward-looking statements contained in this report. Although the Company believes that the expectations reflected in these forward-looking statements are reasonable, it can give no assurance that such expectations will prove to be correct. Unless otherwise required by applicable securities laws, the Company disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

# EXHIBIT K

# EXHIBIT K

DEF 14A 1 riot_def14a htm DEFINITIVE 14A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**

**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**

Filed by the Registrant [X]
Filed by a Party other than the Registrant [  ]

Check the appropriate box:

       [_]      Preliminary Proxy Statement

       [_]      **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

       [X]      Definitive Proxy Statement

       [_]      Definitive Additional Materials

       [_]      Soliciting Material Pursuant to Rule Sec.240.14a-12

**RIOT BLOCKCHAIN, INC.**
**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

[X]  No fee required

[_]  Fee computed on table below per Exchange Act Rules 14a-6(i) (1) and 0-11.

(1)    Title of each class of securities to which transaction applies:

(2)    Aggregate number of securities to which transaction applies:

(3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4)    Proposed maximum aggregate value of transaction:

(5)    Total fee paid:

[_]  Fee paid previously with preliminary materials:

[_]  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)    Amount previously paid:

(2)    Form, Schedule or Registration Statement No.:

(3)    Filing Party:

(4)    Date Filed:

**RIOT BLOCKCHAIN, INC.**
202 6th Street, Suite 401
Castle Rock, CO 80104
(303) 794-2000

Dear Shareholder,

You are cordially invited to attend the 2017 Annual Meeting of Shareholders (the "Annual Meeting") of Riot Blockchain, Inc. to be held at 10:00 a.m. (local time) on December 28, 2017, aat the Boca Raton Resort and Club, 501 East Camino Real, Boca Raton, FL 33422. The attached notice of Annual Meeting and proxy statement describe the matters to be presented at the Annual Meeting and provide information about us that you should consider when you vote your shares.

The principal business of the meeting will be (i) to elect as directors the nominees named in this proxy statement to serve until 2018 Annual Meeting of Shareholders and until their successors are duly elected and qualified, (ii) to ratify the appointment of EisnerAmper LLP as our independent public accountant for the fiscal year ending December 31, 2017, (iii) to advise us as to whether you approve the compensation of our named executive officers (Say-on-Pay), (iv) to approve an amendment to the Company's 2017 Equity Incentive Plan to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares and (v) to transact such other business as may be properly brought before the Annual Meeting and any adjournments thereof.

We hope you will be able to attend the Annual Meeting. Whether you plan to attend the Annual Meeting or not, it is important that your shares are represented. Therefore, when you have finished reading the proxy statement, you are urged to complete, sign, date and return the enclosed proxy card promptly in accordance with the instructions set forth on the card. This will ensure your proper representation at the Annual Meeting, whether or not you can attend.

Sincerely,

*John O'Rourke*
*President and Chief Executive Officer, Chairman*

**YOUR VOTE IS IMPORTANT.**
**PLEASE RETURN YOUR PROXY PROMPTLY.**

**RIOT BLOCKCHAIN, INC.**
202 6th Street, Suite 401
Castle Rock, CO 80104
(303) 794-2000

**NOTICE OF ANNUAL MEETING OF SHAREHOLDERS**
**To be Held December 28, 2017**

To the Shareholders of Riot Blockchain, Inc.:

NOTICE IS HEREBY GIVEN that the 2017 Annual Meeting of Shareholders (the "Annual Meeting") of Riot Blockchain, Inc., a Nevada corporation (the "Company"), will be held at 10:00 a.m. (local time) on December 28, 2017, or such later date or dates as such Annual Meeting date may be adjourned, at the Boca Raton Resort and Club, 501 East Camino Real, Boca Raton, FL 33422, for the purpose of considering and taking action on the following proposals:

1. Elect as directors the nominees named in the proxy statement;
2. To ratify the appointment of EisnerAmper LLP as our independent public accountant for the fiscal year ending December 31, 2017;
3. To advise us as to whether you approve the compensation of our named executive officers (Say-on-Pay);
4. To approve an amendment to the Company's 2017 Equity Incentive Plan to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares; and
5. To transact such other business as may be properly brought before the Annual Meeting and any adjournments thereof.

The foregoing business items are more fully described in the following pages, which are made part of this notice.

The Board recommends that you vote as follows:

- **"FOR"** for the election of the Board nominees as directors;
- **"FOR"** ratification of the selection of EisnerAmper LLP as our independent public accountant for our fiscal year ending December 31, 2017;
- **"FOR"** the compensation of our named executive officers as set forth in this proxy statement; and
- **"FOR"** an amendment to the Company's 2017 Equity Incentive Plan to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares.

You may vote if you were the record owner of the Company's common stock at the close of business on December 11, 2017. The Board of Directors of the Company has fixed the close of business on December 11, 2017 as the record date (the "Record Date") for the determination of shareholders entitled to notice of and to vote at the Annual Meeting and at any adjournments thereof.

As of the Record Date, there were 9,659,919 shares of common stock outstanding entitled to vote at the Annual Meeting. The foregoing shares are referred to herein as the "Shares." A list of shareholders of record will be available at the meeting and, during the 10 days prior to the meeting, at the office of the Secretary of the Company at 202 6th Street, Suite 401, Castle Rock, CO 80104.

All shareholders are cordially invited to attend the Annual Meeting. Whether you plan to attend the Annual Meeting or not, you are requested to complete, sign, date and return the enclosed proxy card as soon as possible in accordance with the instructions on the proxy card. A pre-addressed, postage prepaid return envelope is enclosed for your convenience.

By Order of the Board of Directors of Riot Blockchain, Inc.,

Sincerely,

John O' Rourke
*President and Chief Executive Officer, Chairman*

**Audit Committee**

The Audit Committee is responsible for, among other things:

- appointing; approving the compensation of; overseeing the work of; and assessing the independence, qualifications, and performance of the independent auditor;
- reviewing the internal audit function, including its independence, plans, and budget;
- approving, in advance, audit and any permissible non-audit services performed by our independent auditor;
- reviewing our internal controls with the independent auditor, the internal auditor, and management;
- reviewing the adequacy of our accounting and financial controls as reported by the independent auditor, the internal auditor, and management;
- overseeing our financial compliance system; and
- overseeing our major risk exposures regarding the Company's accounting and financial reporting policies, the activities of our internal audit function, and information technology.

The Audi Committee has reviewed and discussed the Company's audited financial statements for the year ended December 31, 2016 with management of the Company and has discussed with EisnerAmper LLP the matters required to be discussed by the statement on Auditing Standards No. 61, as amended, as adopted by the Public Company Accounting Oversight Board in Rule 3200T.

The Board has affirmatively determined that each member of the Audit Committee meets the additional independence criteria applicable to audit committee members under SEC rules and the Stock Market Rules. The Board of Directors has adopted a written charter setting forth the authority and responsibilities of the Audit Committee. The Board has affirmatively determined that Eric So meets the qualifications of an Audit Committee financial expert. The Company's Audit Committee currently consists of the following members: Andrew Kaplan, Eric So and Jason Les. Mr. So serves as Chairman of the Audit Committee.

### REPORT OF THE AUDIT COMMITTEE

To the Board of Directors of Riot Blockchain, Inc.

Management is responsible for our internal controls and the financial reporting process. The independent accountants are responsible for performing an independent audit of our financial statements in accordance with generally accepted auditing standards and to issue a report on our financial statements. Our responsibility is to monitor and oversee those processes. We hereby report to the Board of Directors that, in connection with the financial statements for the year ended December 31, 2016, we have:

- reviewed and discussed the audited financial statements with management and the independent accountants;
- approved the appointment of the independent accountants;
- discussed with the independent accountants the matters required to be discussed by SAS 61 (Codification of Statements on Auditing Standards, AU section 380), as modified by SAS 89 and SAS 90; and
- received the written disclosures and the letter from the independent accountants required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the Audit Committee concerning independence, and discussed with the independent accountant the accountant's independence.

Based on the discussions and our review discussed above, we recommended to the Board of Directors that the audited financial statements for the year ended December 31, 2016 be included in the Company's 2016 Annual Report to Shareholders on Form 10-K for that fiscal year.

Respectfully submitted,
The Audit Committee of Riot Blockchain, Inc.
Jason Les
Andrew Kaplan
Eric So

**Compensation Committee**

The Compensation Committee is responsible for, among other things:

- reviewing and making recommendations to the Board with respect to the compensation of our officers and directors, including the CEO;
- overseeing and administering the Company's executive compensation plans, including equity-based awards;
- negotiating and overseeing employment agreements with officers and directors; and
- overseeing how the Company's compensation policies and practices may affect the Company's risk management practices and/or risk-taking incentives.

The Board has adopted a written charter setting forth the authority and responsibilities of the Compensation Committee.

When evaluating the compensation of our executive officers, the Compensation Committee evaluates factors including the executive's responsibilities, experience and the competitive marketplace.  The Compensation Committee may also invite the senior executives and other members of management to participate in their deliberations, or to provide information to the Compensation Committee for its consideration with respect to such deliberations, except that the Chief Executive Officer may not be present for the deliberation of or the voting on compensation for the Chief Executive Officer.  The Chief Executive Officer may, however, be present for the deliberation of or the voting on compensation for any other officer.

The Compensation Committee has authority to retain such compensation consultants, outside counsel and other advisors as the Compensation Committee in its sole discretion deems appropriate.  The Compensation Committee did not retain any such advisor for 2016. The Compensation Committee held six meetings and took two actions by written consent during the year ended December 31, 2016.The Company's Compensation Committee currently consists of the following members: Andrew Kaplan, Eric So and Jason Les. Mr. Les serves as Chairman of the Compensation Committee. The Board has affirmatively determined that each member of the Compensation Committee meets the additional independence criteria applicable to compensation committee members under SEC rules and the Stock Market Rules.

**Nominating and Corporate Governance Committee**

The Nominating and Corporate Governance Committee, among other things, is responsible for:

- reviewing and assessing the development of the executive officers, and considering and making recommendations to the Board regarding promotion and succession issues;
- evaluating and reporting to the Board on the performance and effectiveness of the directors, committees, and the Board as a whole;
- working with the Board to determine the appropriate and desirable mix of characteristics, skills, expertise, and experience, including diversity considerations, for the full Board and each committee;
- annually presenting to the Board a list of individuals recommended to be nominated for election to the Board;
- reviewing, evaluating, and recommending changes to the Company's Corporate Governance Principles and committee Charters;
- recommending to the Board individuals to be elected to fill vacancies and newly created directorships;
- overseeing the Company's compliance program, including the Code of Conduct; and
- overseeing and evaluating how the Company's corporate governance and legal and regulatory compliance policies and practices, including leadership, structure, and succession planning, may affect the Company's major risk exposures.

The Board of Directors has adopted a written charter setting forth the authority and responsibilities of the Corporate Governance/Nominating Committee. The Company's Nominating and Corporate Governance Committee currently consists of the following members: Andrew Kaplan, Eric So and Jason Les. Mr. Kaplan serves as Chairman of the Nominating and Corporate Governance Committee.

**Consideration of Director Nominees**

As specified in our Corporate Governance Principles, we seek directors with the highest standards of ethics and integrity, sound business judgment, and the willingness to make a strong commitment to the Company and its success. The Nominating and Corporate Governance Committee works with the Board on an annual basis to determine the appropriate and desirable mix of characteristics, skills, expertise, and experience for the full Board and each committee, taking into account both existing directors and all nominees for election as directors, as well as any diversity considerations and the membership criteria reflected in the Corporate Governance Principles. The Nominating and Corporate Governance Committee and the Board, which do not have a formal diversity policy, consider diversity in a broad sense when evaluating board composition and nominations; and they seek to include directors with a diversity of experience, professions, viewpoints, skills, and backgrounds that will enable them to make significant contributions to the Board and the Company, both as individuals and as part of a group of directors. The Board evaluates each individual in the context of the full Board, with the objective of recommending a group that can best contribute to the success of the business and represent shareholder interests through the exercise of sound judgment. In determining whether to recommend a director for re-election, the Nominating and Corporate Governance Committee also considers the director's attendance at meetings and participation in and contributions to the activities of the Board and its committees.

The Nominating and Corporate Governance Committee will consider director candidates recommended by shareholders, and its process for considering such recommendations is no different than its process for screening and evaluating candidates suggested by directors, management of the Company, or third parties.

**Corporate Governance Matters**

We are committed to maintaining strong corporate governance practices that benefit the long-term interests of our shareholders by providing for effective oversight and management of the Company. Our governance policies, including our Corporate Governance Principles, Code of Conduct, and Committee Charters can be found on our website at *www.riotblockchain.com* by following the link to "Investors" and then to "Governance."

The Nominating and Corporate Governance Committee regularly reviews our Corporate Governance Principles, Code of Conduct, and Committee Charters to ensure that they take into account developments at the Company, changes in regulations and listing requirements, and the continuing evolution of best practices in the area of corporate governance.

The Board conducts an annual self-evaluation in order to assess whether the directors, the committees, and the Board are functioning effectively.

**Code of Conduct**

Our Code of Conduct (the "Code"), which was amended and restated as of October 2017, applies to the Company's employees, directors, officers, contractors, consultants, and persons performing similar functions ("Covered Persons"). This includes our CEO and Chairman, our CFO, and our controller/treasurer. We require that they avoid conflicts of interest, comply with applicable laws, protect Company assets, and conduct business in an ethical and responsible manner and in accordance with the Code. The Code prohibits employees from taking unfair advantage of our business partners, competitors, and employees through manipulation, concealment, misuse of confidential or privileged information, misrepresentation of material facts, or any other practice of unfair dealing or improper use of information. The Code requires employees to comply with all applicable laws, rules, and regulations wherever in the world we conduct business. This includes applicable laws on privacy and data protection, anti-corruption and anti-bribery, and trade sanctions. Our Code was amended and restated in October 2017 to better reflect our expanding global operations and diverse employee base, enhance its clarity and general readability, and to make other stylistic changes to more closely align the Code with our overall brand. Our Code is publicly available and can be found on our website at *www.riotblockchain.com* by following the link to "Investors" and then to "Governance."

If we make substantive amendments to the Code, or grant any waiver, including any implicit waiver, from a provision of the Code to our CEO and Chairman, CFO, controller/treasurer, and any of our other officers, financial professionals, and persons performing similar functions, we will disclose the nature of such amendment or waiver on our website or in a report filed with the SEC on Form 8-K.

**Communications with the Board of Directors**

Shareholders and other parties may communicate directly with the Board of Directors or the relevant board member by addressing communications to:

> Riot Blockchain, Inc.
> c/o Corporate Secretary
> 202 6th Street, Suite 401
> Castle Rock, CO 80104

All shareholder correspondence will be compiled by our corporate secretary and forwarded as appropriate.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934 requires the Company's directors, executive officers, and shareholders who own more than 10% of the Company's stock to file forms with the SEC to report their ownership of the Company's stock and any changes in ownership. The Company assists its directors and executives by identifying reportable transactions of which it is aware and preparing and filing the forms on their behalf. All persons required to file forms with the SEC must also send copies of the forms to the Company. We have reviewed all forms provided to us. Based on that review and on written information given to us by our executive officers and directors, we believe that all Section 16(a) filings during the past fiscal year were filed on a timely basis and that all directors, executive officers and 10% beneficial owners have fully complied with such requirements during the past fiscal year.

**Certain Relationships and Related Transactions**

The Audit Committee has responsibility for reviewing and, if appropriate, for approving any related party transactions that would be required to be disclosed pursuant to applicable SEC rules. This includes current or proposed transactions in which the Company was or is to be a participant, the amount involved exceeds the lower of either $120,000 or 1% of the average of the Company's total assets at year-end for the last two completed fiscal years, and in which any of the Company's executive officers, directors, or greater than five percent shareholders, or any members of their immediate families, has a direct or indirect material interest. Apart from any transactions disclosed herein, no such transaction was entered into with any director or executive officer during the last fiscal year. Such transactions will be entered into only if found to be in the best interest of the Company and approved in accordance with the Company's Code of Ethics, which are available on the Company's web site.

Except for the employment agreements previously entered into between the Company and certain of its named executive officers, since January 1, 2016, none of the directors or named executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its common stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction, or in any proposed transaction, which has materially affected or will affect the Company.

## EXECUTIVE OFFICERS AND MANAGEMENT

The following persons are our executive officers and hold the offices set forth opposite their names.

| Name | Age | Principal Occupation | Officer Since |
|------|-----|----------------------|---------------|
| John R  O'Rourke | 32 | Chief Executive Officer, President and Chairman | 2017 |
| Jeffrey G  McGonegal | 66 | Chief Financial Officer | 2003 |

**John R  O'Rourke**   The biography of Mr  O'Rourke is contained in the information disclosures relating to the Company's nominees for director

**Jeffrey G  McGonegal** became Chief Financial Officer of the Company in June 2003, was appointed Corporate Secretary in January 2010 and served as interim President in December 2004 and January 2005  Mr  McGonegal served from 2003 to January 1, 2011 as Chief Financial Officer of PepperBall Technologies, Inc  Until his resignation in September 2013, Mr  McGonegal served on a limited part time basis as Senior Vice President    Finance of Cambridge Holdings, Ltd , a small publicly held company with limited business activities  Mr  McGonegal served as Chief Financial Officer of Bactolac Pharmaceutical, Inc  and had been associated with its predecessors through October 2006, a company (publicly held until September 2006) engaged in manufacturing and marketing of vitamins and nutritional supplements  From 1974 to 1997, Mr  McGonegal was an accountant with BDO Seidman LLP  While at BDO Seidman LLP, Mr  McGonegal served as Managing Partner of the Denver, Colorado office  Until his resignation in March 2012, Mr  McGonegal was elected in 2005 to serve on the board of Imagenetix, Inc , a publicly held company in the nutritional supplements industry  He received a B A  degree in accounting from Florida State University

15

# EXHIBIT L

# EXHIBIT L

8-K 1 riot_8k.htm FORM 8-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C.  20549**

**FORM 8-K**

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): February 3, 2020 (January 29, 2020)

**Riot Blockchain, Inc.**
(Exact name of registrant as specified in its charter)

| Nevada | 001-33675 | 84-1553387 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**202 6th Street, Suite 401,**
**Castle Rock, CO  80104**
(Address of principal executive offices)

**(303) 794-2000**
(Registrant's telephone number, including area code)

(Former name, former address, and former fiscal year, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | RIOT | NASDAQ Capital Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

## Item 8.01 – Other Events.

On January 30, 2020, Riot Blockchain, Inc. ("**Riot**" the "**Company**") issued a press release announcing that on January 29, 2020, it had received written notice from the Division of Enforcement of the Securities and Exchange Commission (the "**SEC**") that the SEC had concluded its investigation of Riot (the "**SEC Investigation**"). The SEC Investigation was previously disclosed by Riot on its current report on Form 8-K filed on April 9, 2018. According to the letter, the SEC has concluded its investigation of Riot and, based on the information the SEC had as of the date of the letter, the SEC does not intend to recommend an enforcement action against Riot, with respect to the matters investigated by the SEC.

### About Riot Blockchain

Information reported in this Current Report on Form 8-K is limited to the scope of the information reportable under a Current Report on Form 8-K under the rules and regulations of the Commission. Please refer to the additional information concerning the Corporation referenced in the following notices and safe harbor provision for material risks and other uncertainties.

### Investor Notice

An investment in the Corporation's common stock involves a high degree of risk, and an investor should only purchase the Corporation's securities if he or she can afford to suffer the loss of his or her entire investment. In determining whether to purchase the Corporation's common stock, an investor should carefully consider all of the material risks described in this Current Report on Form 8-K below, together with the factors described under Item 1A under the heading "Risk Factors" in our most recent Annual Report on Form 10-K for the year ended December 31, 2019, filed with the Securities and Exchange Commission (the "SEC") on April 2, 2019, as amended on Form 10-K/A, filed with the SEC on April 23, 2019, as supplemented and updated by subsequent Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, together with the financial or other information contained or incorporated by reference in such reports. In addition to the risks discussed below, other risks not presently known to us or that we currently believe to be immaterial may also adversely affect our business, financial condition and results of operations, perhaps materially. The risks discussed below also include forward-looking statements, and actual results and events may differ substantially from those discussed or highlighted in those forward-looking statements. See also the Section entitled "Forward-Looking Statements" herein.

### Safe Harbor

The information provided in this report may include forward -looking statements relating to future events or the future financial performance of the Corporation. Because such statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by such forward-looking statements. Words such as "anticipates," "plans," "expects," "intends," "will," "potential," "hope" and similar expressions are intended to identify forward-looking statements. These forward-looking statements are based upon current expectations of the Corporation and involve assumptions that may never materialize or may prove to be incorrect. Actual results and the timing of events could differ materially from those anticipated in such forward-looking statements as a result of various risks and uncertainties. Detailed information regarding factors that may cause actual results to differ materially from the results expressed or implied by statements in report relating to the Corporation may be found in the Corporation's periodic filings with the Commission, including the factors described in the sections entitled "Risk Factors", copies of which may be obtained from the SEC's website at www.sec.gov. The Corporation does not undertake any obligation to update forward-looking statements contained in this report.

**Item 9.01.**          **Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release, issued by Riot Blockchain, Inc. on January 30, 2020 (furnished pursuant to Item 8.01 of this Current Report on Form 8-K).* |

* The information contained in this Press Release is furnished but not filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.


**S I G N A T U R E**


          Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.


                                   RIOT BLOCKCHAIN, INC.


                                   By: */s/ Jeffrey McGonegal*
                                        Jeffrey McGonegal
                                        Chief Executive Officer


Date: February 3, 2020

EX-99.1 2 ex99x1 htm EXHIBIT 99.1

Exhibit 99.1

### Riot Blockchain Announces Termination of SEC Investigation

*No Enforcement Action Recommended*

CASTLE ROCK, CO. / PRNewswire / January 30, 2020 / Riot Blockchain, Inc. (NASDAQ: RIOT) ("Riot" or the "Company"), one of the few Nasdaq listed public cryptocurrency mining companies in the United States, received a written notification from the Division of Enforcement of the Securities and Exchange Commission (the "SEC") on January 29, 2020. According to the letter, the SEC has concluded its investigation of Riot, which was originally announced on April 9, 2018, and based on the information the SEC has as of the date of the letter, it does not intend to recommend an enforcement action against Riot, with respect to the matters investigated by the SEC.

The Board of Directors and Management of Riot are pleased the SEC has concluded its investigation without recommending any enforcement action. Riot remains focused on the cryptocurrency sector with the goal of creating added shareholder value.

**About Riot Blockchain**

Riot Blockchain is focused on building, operating, and supporting blockchain technologies. Its primary operations consist of cryptocurrency mining, targeted development of a cryptocurrency exchange, and the identification and support of innovations within the sector. For more information, visit http://www.RiotBlockchain.com/.

**Investor Notice**

Investing in our securities involves a high degree of risk. Before making an investment decision, you should carefully consider the risks, uncertainties and forward-looking statements described under "Risk Factors" in Item 1A of our most recent Form 10-K for the fiscal year ended December 31, 2018 filed with the Securities and Exchange Commission (the "SEC") on April 2, 2019, as amended by Amendment No. 1 on Form 10-K/A on April 23, 2019, as well as those risk factors disclosed in any periodic reports we file with the SEC. If any of these risks were to occur, our business, financial condition or results of operations would likely suffer. In that event, the value of our securities could decline, and you could lose part or all of your investment. The risks and uncertainties we describe are not the only ones facing us.

Additional risks not presently known to us or that we currently deem immaterial may also impair our business operations. In addition, our past financial performance may not be a reliable indicator of future performance, and historical trends should not be used to anticipate results in the future. See "Safe Harbor" below.

**Safe Harbor**

The information provided in this press release may include forward-looking statements relating to future events or the future financial performance of the Company. Because such statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by such forward-looking statements. Words such as "anticipates," "plans," "expects," "intends," "will," "potential," "hope" and similar expressions are intended to identify forward-looking statements. These forward-looking statements are based upon current expectations of the Company and involve assumptions that may never materialize or may prove to be incorrect. Actual results and the timing of events could differ materially from those anticipated in such forward-looking statements as a result of various risks and uncertainties. Detailed information regarding factors that may cause actual results to differ materially from the results expressed or implied by statements in this press release relating to the Company may be found in the Company's periodic filings with the Securities and Exchange Commission, including the factors described in the sections entitled "Risk Factors," copies of which may be obtained from the SEC's website at www.sec.gov. The Company does not undertake any obligation to update forward-looking statements contained in this press release.

**CONTACT:**

Media Contact:

PR@RiotBlockchain.com

Investor Contact:

IR@RiotBlockchain.com

SOURCE: Riot Blockchain, Inc.

# EXHIBIT M

# EXHIBIT M

| Date | Open | High | Low | Close | Adj Close | Volume |
|------|------|------|-----|-------|-----------|--------|
| 3/15/2017 | 3.45 | 3.63 | 3.4 | 3.56 | 3.174719 | 15500 |
| 3/16/2017 | 3.5 | 3.639 | 3.5 | 3.56 | 3.174719 | 12300 |
| 3/17/2017 | 3.49 | 3.5 | 3.193 | 3.34 | 2.978528 | 80100 |
| 3/20/2017 | 3.25 | 3.31 | 3.24 | 3.31 | 2.951775 | 3100 |
| 3/21/2017 | 3.31 | 3.31 | 3.2 | 3.2 | 2.85368 | 600 |
| 3/22/2017 | 3.19 | 3.49 | 3.06 | 3.49 | 3.112294 | 7300 |
| 3/23/2017 | 3.57 | 3.57 | 3.26 | 3.33 | 2.96961 | 8900 |
| 3/24/2017 | 3.305 | 3.5 | 3.305 | 3.37 | 3.005281 | 10100 |
| 3/27/2017 | 3.41 | 3.55 | 3.37 | 3.48 | 3.103377 | 38800 |
| 3/28/2017 | 3.48 | 3.57 | 3.48 | 3.51 | 3.13013 | 1200 |
| 3/29/2017 | 3.495 | 4.1 | 3.495 | 4.013 | 3.578693 | 123700 |
| 3/30/2017 | 3.85 | 4.409 | 3.85 | 3.95 | 3.522511 | 96600 |
| 3/31/2017 | 3.92 | 4.19 | 3.92 | 4 | 3.5671 | 19700 |
| 4/3/2017 | 4 | 4 | 3.82 | 3.87 | 3.451169 | 15800 |
| 4/4/2017 | 3.95 | 4.066 | 3.71 | 3.91 | 3.48684 | 18000 |
| 4/5/2017 | 3.82 | 4.2 | 3.81 | 3.81 | 3.397662 | 17700 |
| 4/6/2017 | 4.01 | 4.15 | 3.85 | 4.14 | 3.691948 | 18500 |
| 4/7/2017 | 4.14 | 4.19 | 4 | 4.02 | 3.584935 | 15200 |
| 4/10/2017 | 4.02 | 4.195 | 3.64 | 4.18 | 3.727619 | 12300 |
| 4/11/2017 | 3.9 | 4.199 | 3.9 | 4.13 | 3.68303 | 9300 |
| 4/12/2017 | 4.13 | 4.24 | 4.07 | 4.13 | 3.68303 | 15400 |
| 4/13/2017 | 4.06 | 4.15 | 3.85 | 4.02 | 3.584935 | 16100 |
| 4/17/2017 | 4.16 | 4.23 | 4.08 | 4.15 | 3.700866 | 19700 |
| 4/18/2017 | 4.17 | 4.28 | 3.93 | 3.93 | 3.504675 | 23100 |
| 4/19/2017 | 3.97 | 4.04 | 3.87 | 3.99 | 3.558182 | 16600 |
| 4/20/2017 | 4.03 | 4.03 | 3.78 | 3.86 | 3.442251 | 9800 |
| 4/21/2017 | 3.85 | 3.981 | 3.77 | 3.81 | 3.397662 | 31200 |
| 4/24/2017 | 3.83 | 4.21 | 3.83 | 3.85 | 3.433333 | 12700 |
| 4/25/2017 | 3.68 | 4.05 | 3.68 | 3.76 | 3.353074 | 12500 |
| 4/26/2017 | 3.8 | 4.04 | 3.71 | 3.76 | 3.353074 | 24900 |
| 4/27/2017 | 3.73 | 3.9 | 3.72 | 3.72 | 3.317403 | 12100 |
| 4/28/2017 | 3.68 | 3.75 | 3.54 | 3.65 | 3.254978 | 18300 |
| 5/1/2017 | 3.7 | 3.75 | 3.63 | 3.66 | 3.263896 | 26500 |
| 5/2/2017 | 3.7 | 3.77 | 3.6 | 3.76 | 3.353074 | 21700 |
| 5/3/2017 | 3.76 | 3.81 | 3.62 | 3.75 | 3.344156 | 17100 |
| 5/4/2017 | 3.71 | 3.73 | 3.65 | 3.71 | 3.308485 | 17600 |
| 5/5/2017 | 3.62 | 3.76 | 3.47 | 3.76 | 3.353074 | 17300 |
| 5/8/2017 | 3.6 | 4.15 | 3.6 | 3.74 | 3.335238 | 36800 |
| 5/9/2017 | 3.86 | 4.1 | 3.68 | 3.79 | 3.379827 | 51000 |
| 5/10/2017 | 3.82 | 3.828 | 3.5 | 3.65 | 3.254978 | 30500 |
| 5/11/2017 | 3.6 | 3.62 | 3.518 | 3.54 | 3.156883 | 10400 |
| 5/12/2017 | 3.53 | 3.769 | 3.4 | 3.62 | 3.228225 | 28200 |
| 5/15/2017 | 3.63 | 3.778 | 3.63 | 3.7 | 3.299567 | 4800 |
| 5/16/2017 | 3.5 | 3.65 | 3.45 | 3.5 | 3.121212 | 8200 |
| 5/17/2017 | 3.43 | 3.56 | 3.41 | 3.42 | 3.04987 | 13500 |
| 5/18/2017 | 3.42 | 3.7 | 3.41 | 3.63 | 3.237143 | 11000 |

| 5/19/2017 | 3.457 | 3.63 | 3.457 | 3.63 | 3.237143 | 3100 |
|---|---|---|---|---|---|---|
| 5/22/2017 | 3.933 | 3.933 | 3.56 | 3.65 | 3.254978 | 4600 |
| 5/23/2017 | 3.75 | 3.75 | 3.551 | 3.59 | 3.201472 | 6100 |
| 5/24/2017 | 3.56 | 3.65 | 3.51 | 3.52 | 3.139048 | 2800 |
| 5/25/2017 | 3.59 | 3.79 | 3.58 | 3.63 | 3.237143 | 2700 |
| 5/26/2017 | 3.48 | 3.69 | 3.48 | 3.62 | 3.228225 | 29400 |
| 5/30/2017 | 3.697 | 3.71 | 3.61 | 3.705 | 3.304026 | 1200 |
| 5/31/2017 | 3.6 | 3.94 | 3.6 | 3.89 | 3.469004 | 59400 |
| 6/1/2017 | 3.844 | 3.9 | 3.8 | 3.8 | 3.388745 | 1100 |
| 6/2/2017 | 3.85 | 3.95 | 3.781 | 3.91 | 3.48684 | 14600 |
| 6/5/2017 | 3.89 | 3.96 | 3.88 | 3.95 | 3.522511 | 11600 |
| 6/6/2017 | 3.93 | 3.94 | 3.8 | 3.93 | 3.504675 | 24000 |
| 6/7/2017 | 3.98 | 3.99 | 3.776 | 3.95 | 3.522511 | 11100 |
| 6/8/2017 | 3.98 | 4.04 | 3.9 | 4.01 | 3.576018 | 20500 |
| 6/9/2017 | 3.98 | 4 | 3.94 | 4 | 3.5671 | 6500 |
| 6/12/2017 | 4 | 4 | 3.8 | 3.98 | 3.549264 | 7300 |
| 6/13/2017 | 3.797 | 4.04 | 3.797 | 4.02 | 3.584935 | 6300 |
| 6/14/2017 | 3.99 | 4 | 3.93 | 3.93 | 3.504675 | 7000 |
| 6/15/2017 | 3.965 | 4.12 | 3.95 | 4.03 | 3.593853 | 21600 |
| 6/16/2017 | 4.1 | 4.11 | 3.59 | 3.59 | 3.201472 | 37900 |
| 6/19/2017 | 3.84 | 4.1 | 3.75 | 4 | 3.5671 | 19100 |
| 6/20/2017 | 3.93 | 4.05 | 3.89 | 4.01 | 3.576018 | 9300 |
| 6/21/2017 | 4.05 | 4.07 | 3.901 | 3.901 | 3.478814 | 28800 |
| 6/22/2017 | 3.84 | 4.1 | 3.84 | 3.94 | 3.513593 | 18900 |
| 6/23/2017 | 3.99 | 4 | 3.91 | 3.94 | 3.513593 | 22300 |
| 6/26/2017 | 4 | 4.012 | 3.9 | 4.009 | 3.575125 | 15500 |
| 6/27/2017 | 3.91 | 4.05 | 3.91 | 4 | 3.5671 | 6200 |
| 6/28/2017 | 3.97 | 4.01 | 3.93 | 3.99 | 3.558182 | 6000 |
| 6/29/2017 | 3.96 | 4.04 | 3.95 | 3.99 | 3.558182 | 4600 |
| 6/30/2017 | 3.95 | 4.09 | 3.71 | 4.08 | 3.638442 | 17800 |
| 7/3/2017 | 4.03 | 4.03 | 3.65 | 3.87 | 3.451169 | 17500 |
| 7/5/2017 | 4.098 | 4.098 | 3.9 | 3.92 | 3.495758 | 2600 |
| 7/6/2017 | 3.9 | 3.9 | 3.9 | 3.9 | 3.477922 | 3300 |
| 7/7/2017 | 3.91 | 4.037 | 3.91 | 3.96 | 3.531429 | 18500 |
| 7/10/2017 | 4.04 | 4.04 | 3.84 | 3.84 | 3.424416 | 7400 |
| 7/11/2017 | 3.75 | 3.83 | 3.72 | 3.75 | 3.344156 | 4600 |
| 7/12/2017 | 3.8 | 3.8 | 3.65 | 3.65 | 3.254978 | 25300 |
| 7/13/2017 | 3.61 | 4.042 | 3.61 | 3.83 | 3.415498 | 50400 |
| 7/14/2017 | 4 | 4.12 | 3.83 | 3.91 | 3.48684 | 33100 |
| 7/17/2017 | 3.97 | 4.09 | 3.97 | 4 | 3.5671 | 7500 |
| 7/18/2017 | 3.96 | 4.06 | 3.96 | 4.02 | 3.584935 | 4600 |
| 7/19/2017 | 4.02 | 4.09 | 3.935 | 4.02 | 3.584935 | 5500 |
| 7/20/2017 | 3.94 | 3.95 | 3.94 | 3.95 | 3.522511 | 800 |
| 7/21/2017 | 3.977 | 3.98 | 3.86 | 3.86 | 3.442251 | 13000 |
| 7/24/2017 | 3.94 | 3.97 | 3.7 | 3.91 | 3.48684 | 11400 |
| 7/25/2017 | 3.816 | 3.91 | 3.71 | 3.81 | 3.397662 | 9600 |
| 7/26/2017 | 3.78 | 3.78 | 3.54 | 3.7 | 3.299567 | 22600 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/27/2017 | 3.52 | 3.65 | 3.52 | 3.62 | 3.228225 | 12500 |
| 7/28/2017 | 3.5 | 3.8 | 3.5 | 3.77 | 3.361991 | 20600 |
| 7/31/2017 | 3.78 | 3.78 | 3.561 | 3.74 | 3.335238 | 11000 |
| 8/1/2017 | 3.68 | 3.72 | 3.61 | 3.71 | 3.308485 | 10200 |
| 8/2/2017 | 3.73 | 3.73 | 3.69 | 3.69 | 3.290649 | 1500 |
| 8/3/2017 | 3.75 | 3.89 | 3.71 | 3.74 | 3.335238 | 6300 |
| 8/4/2017 | 3.73 | 4.02 | 3.67 | 3.83 | 3.415498 | 12500 |
| 8/7/2017 | 3.81 | 3.98 | 3.81 | 3.979 | 3.548372 | 4000 |
| 8/8/2017 | 3.89 | 3.949 | 3.82 | 3.86 | 3.442251 | 8900 |
| 8/9/2017 | 3.856 | 3.856 | 3.68 | 3.72 | 3.317403 | 7500 |
| 8/10/2017 | 3.77 | 3.81 | 3.77 | 3.77 | 3.361991 | 2100 |
| 8/11/2017 | 3.68 | 3.75 | 3.68 | 3.68 | 3.281732 | 2200 |
| 8/14/2017 | 3.68 | 3.72 | 3.67 | 3.72 | 3.317403 | 2100 |
| 8/15/2017 | 3.69 | 3.75 | 3.67 | 3.68 | 3.281732 | 4800 |
| 8/16/2017 | 3.67 | 3.68 | 3.52 | 3.65 | 3.254978 | 2900 |
| 8/17/2017 | 3.53 | 3.7 | 3.53 | 3.7 | 3.299567 | 600 |
| 8/18/2017 | 3.455 | 3.656 | 3.455 | 3.62 | 3.228225 | 2800 |
| 8/21/2017 | 3.497 | 3.51 | 3.45 | 3.51 | 3.13013 | 7000 |
| 8/22/2017 | 3.702 | 3.702 | 3.49 | 3.55 | 3.165801 | 8500 |
| 8/23/2017 | 3.6 | 3.684 | 3.49 | 3.51 | 3.13013 | 9700 |
| 8/24/2017 | 3.493 | 3.61 | 3.493 | 3.6 | 3.21039 | 6400 |
| 8/25/2017 | 3.5 | 3.6 | 3.477 | 3.48 | 3.103377 | 10100 |
| 8/28/2017 | 3.48 | 3.64 | 3.478 | 3.55 | 3.165801 | 8600 |
| 8/29/2017 | 3.54 | 3.65 | 3.54 | 3.62 | 3.228225 | 2000 |
| 8/30/2017 | 3.63 | 3.71 | 3.58 | 3.61 | 3.219307 | 10400 |
| 8/31/2017 | 3.66 | 4 | 3.626 | 3.96 | 3.531429 | 22400 |
| 9/1/2017 | 4 | 4 | 3.85 | 3.85 | 3.433333 | 4900 |
| 9/5/2017 | 3.71 | 3.93 | 3.71 | 3.92 | 3.495758 | 8500 |
| 9/6/2017 | 3.95 | 3.98 | 3.85 | 3.96 | 3.531429 | 7300 |
| 9/7/2017 | 3.85 | 3.9 | 3.771 | 3.9 | 3.477922 | 55600 |
| 9/8/2017 | 3.82 | 4.013 | 3.69 | 3.97 | 3.540346 | 8300 |
| 9/11/2017 | 3.91 | 3.98 | 3.75 | 3.8 | 3.388745 | 8100 |
| 9/12/2017 | 3.85 | 4.1 | 3.825 | 3.97 | 3.540346 | 50200 |
| 9/13/2017 | 3.98 | 4.25 | 3.97 | 4.13 | 3.68303 | 41200 |
| 9/14/2017 | 4.03 | 4.17 | 4.01 | 4.08 | 3.638442 | 10600 |
| 9/15/2017 | 4 | 4.25 | 3.95 | 4.25 | 3.790043 | 50400 |
| 9/18/2017 | 4.05 | 4.4 | 4.001 | 4.3 | 3.834632 | 17700 |
| 9/19/2017 | 4.286 | 4.67 | 4.286 | 4.6 | 4.102164 | 21500 |
| 9/20/2017 | 4.48 | 4.48 | 4.38 | 4.4 | 3.92381 | 5600 |
| 9/21/2017 | 4.4 | 4.57 | 4.29 | 4.29 | 3.825714 | 51500 |
| 9/22/2017 | 4.01 | 4.31 | 4.01 | 4.27 | 3.807879 | 5700 |
| 9/25/2017 | 4.27 | 4.28 | 3.97 | 4.11 | 3.665195 | 16400 |
| 9/26/2017 | 4.11 | 4.52 | 4.11 | 4.3 | 3.834632 | 17100 |
| 9/27/2017 | 4.4 | 4.6 | 4.28 | 4.5 | 4.012987 | 7200 |
| 9/28/2017 | 4.572 | 5 | 4.572 | 4.98 | 4.441039 | 18300 |
| 9/29/2017 | 4.878 | 5.31 | 4.878 | 5.16 | 4.601558 | 38800 |
| 10/2/2017 | 5.39 | 7.235 | 5.06 | 6.445 | 5.747489 | 66700 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 10/3/2017 | 6.8 | 8.25 | 6.51 | 8.09 | 7.214459 | 277000 |
| 10/4/2017 | 9.45 | 9.5 | 8 | 8.18 | 7.294719 | 567400 |
| 10/5/2017 | 7.99 | 8.06 | 7.01 | 7.3 | 6.509957 | 318100 |
| 10/6/2017 | 7.72 | 7.85 | 7.02 | 7.4 | 6.599134 | 123500 |
| 10/9/2017 | 7.88 | 9.156 | 7.49 | 8.74 | 7.794112 | 1031600 |
| 10/10/2017 | 8.8 | 9.6 | 8.25 | 8.75 | 7.80303 | 993300 |
| 10/11/2017 | 8.75 | 11.17 | 8.75 | 9.24 | 8.24 | 2456200 |
| 10/12/2017 | 9.35 | 9.35 | 7.4 | 8.2 | 8.2 | 910300 |
| 10/13/2017 | 8.01 | 8.24 | 7.2 | 7.9 | 7.9 | 665200 |
| 10/16/2017 | 7.89 | 7.99 | 7.293 | 7.55 | 7.55 | 275800 |
| 10/17/2017 | 8 | 8.7 | 7.467 | 8.13 | 8.13 | 1093400 |
| 10/18/2017 | 8.04 | 8.1 | 7.14 | 7.67 | 7.67 | 391600 |
| 10/19/2017 | 7.68 | 8.4 | 7.52 | 7.789 | 7.789 | 221400 |
| 10/20/2017 | 7.99 | 8.5 | 7.16 | 8.49 | 8.49 | 886100 |
| 10/23/2017 | 8.84 | 9.5 | 8.3 | 8.75 | 8.75 | 1362700 |
| 10/24/2017 | 8.73 | 8.755 | 7.6 | 7.9 | 7.9 | 681300 |
| 10/25/2017 | 7.99 | 7.99 | 6.73 | 7.2 | 7.2 | 634400 |
| 10/26/2017 | 7.35 | 7.6 | 6.74 | 7.26 | 7.26 | 392400 |
| 10/27/2017 | 7.53 | 7.53 | 6.79 | 6.91 | 6.91 | 336500 |
| 10/30/2017 | 7.06 | 7.44 | 6.91 | 7.05 | 7.05 | 227000 |
| 10/31/2017 | 7.1 | 7.34 | 6.5 | 6.8 | 6.8 | 296700 |
| 11/1/2017 | 6.98 | 7.2 | 6.75 | 6.95 | 6.95 | 323500 |
| 11/2/2017 | 7.75 | 7.989 | 6.331 | 6.96 | 6.96 | 1084100 |
| 11/3/2017 | 7.03 | 7.03 | 6.61 | 6.75 | 6.75 | 247300 |
| 11/6/2017 | 7 | 7.9 | 6.8 | 7.64 | 7.64 | 913400 |
| 11/7/2017 | 7.89 | 8.98 | 7.4 | 8.3 | 8.3 | 1236300 |
| 11/8/2017 | 8.8 | 8.8 | 7.6 | 7.78 | 7.78 | 577100 |
| 11/9/2017 | 7.65 | 7.824 | 7.3 | 7.5 | 7.5 | 423900 |
| 11/10/2017 | 7.5 | 7.5 | 6.8 | 7.16 | 7.16 | 398800 |
| 11/13/2017 | 7.1 | 7.4 | 7 | 7.25 | 7.25 | 329000 |
| 11/14/2017 | 7.1 | 7.28 | 6.89 | 7.02 | 7.02 | 291900 |
| 11/15/2017 | 7.1 | 8.017 | 7.02 | 7.93 | 7.93 | 815500 |
| 11/16/2017 | 8.2 | 8.43 | 7.6 | 8.12 | 8.12 | 1199600 |
| 11/17/2017 | 8.3 | 9.2 | 7.99 | 8.13 | 8.13 | 1505800 |
| 11/20/2017 | 8.46 | 10.5 | 8.06 | 10.35 | 10.35 | 4995100 |
| 11/21/2017 | 10.35 | 12.89 | 10.2 | 11.26 | 11.26 | 12113000 |
| 11/22/2017 | 12.3 | 16.14 | 11.4 | 15.99 | 15.99 | 13679300 |
| 11/24/2017 | 18.45 | 24 | 18.39 | 23.6 | 23.6 | 19192100 |
| 11/27/2017 | 21.5 | 21.77 | 15.54 | 15.6 | 15.6 | 17360400 |
| 11/28/2017 | 15.95 | 17.1 | 12.97 | 15.25 | 15.25 | 12540800 |
| 11/29/2017 | 17.28 | 17.42 | 12.3 | 13.18 | 13.18 | 8082000 |
| 11/30/2017 | 12.24 | 14.2 | 12.01 | 13.5 | 13.5 | 4652100 |
| 12/1/2017 | 14.85 | 15.48 | 13.87 | 15 | 15 | 6026500 |
| 12/4/2017 | 16.5 | 16.72 | 14.95 | 15.07 | 15.07 | 5423100 |
| 12/5/2017 | 14.72 | 14.75 | 13.5 | 14.14 | 14.14 | 2979100 |
| 12/6/2017 | 14.6 | 14.88 | 13.53 | 13.702 | 13.702 | 2228100 |
| 12/7/2017 | 14.25 | 16.11 | 13.8 | 14.6 | 14.6 | 5686300 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/8/2017 | 14.6 | 16.23 | 14.5 | 15.86 | 15.86 | 3894100 |
| 12/11/2017 | 19.06 | 23.67 | 17.75 | 23.08 | 23.08 | 20292700 |
| 12/12/2017 | 26.25 | 33.27 | 25 | 28.2 | 28.2 | 36521100 |
| 12/13/2017 | 24.2 | 26.627 | 22.1 | 23.03 | 23.03 | 13532800 |
| 12/14/2017 | 24.355 | 26.14 | 23.8 | 24.98 | 24.98 | 8212400 |
| 12/15/2017 | 28 | 29.49 | 26.79 | 28.5 | 28.5 | 12417300 |
| 12/18/2017 | 32.2 | 45.99 | 31.54 | 36.47 | 36.47 | 29520000 |
| 12/19/2017 | 36.15 | 46.2 | 36 | 38.6 | 38.6 | 30962600 |
| 12/20/2017 | 40.75 | 41.75 | 33.05 | 36.12 | 36.12 | 13993000 |
| 12/21/2017 | 35.5 | 36.07 | 26.25 | 27.6 | 27.6 | 12707500 |
| 12/22/2017 | 22.52 | 26.46 | 20.2 | 24.52 | 24.52 | 13191500 |
| 12/26/2017 | 28.52 | 31.94 | 27.55 | 31.22 | 31.22 | 11406600 |
| 12/27/2017 | 31.18 | 33.28 | 28.55 | 29.8 | 29.8 | 8561900 |
| 12/28/2017 | 27.2 | 28.8 | 26.74 | 27.23 | 27.23 | 3767100 |
| 12/29/2017 | 28.72 | 29.59 | 27.701 | 28.4 | 28.4 | 4757400 |
| 1/2/2018 | 28.5 | 28.7 | 26 | 27.9 | 27.9 | 4169100 |
| 1/3/2018 | 27.55 | 27.68 | 23.35 | 24.36 | 24.36 | 5281200 |
| 1/4/2018 | 24.87 | 25.48 | 22.53 | 24.27 | 24.27 | 4474100 |
| 1/5/2018 | 26.2 | 26.3 | 24.2 | 24.43 | 24.43 | 3485000 |
| 1/8/2018 | 25.14 | 25.15 | 22.75 | 23.42 | 23.42 | 2933000 |
| 1/9/2018 | 24.99 | 25.77 | 23.45 | 24.02 | 24.02 | 4632200 |
| 1/10/2018 | 23.9 | 24.195 | 22.7 | 22.94 | 22.94 | 1993100 |
| 1/11/2018 | 22.2 | 22.5 | 20.63 | 20.85 | 20.85 | 2843000 |
| 1/12/2018 | 21.16 | 22.075 | 20.92 | 21.88 | 21.88 | 1679500 |
| 1/16/2018 | 20 | 20.5 | 17.8 | 18.28 | 18.28 | 2898200 |
| 1/17/2018 | 17.5 | 18.1 | 16.04 | 17.76 | 17.76 | 4031700 |
| 1/18/2018 | 18.64 | 21.44 | 18.5 | 19.8 | 19.8 | 5540800 |
| 1/19/2018 | 20.39 | 20.48 | 19.5 | 19.91 | 19.91 | 1567000 |
| 1/22/2018 | 19.39 | 20.73 | 19 | 19.48 | 19.48 | 1671900 |
| 1/23/2018 | 19.51 | 20.11 | 18.63 | 19.6 | 19.6 | 1416900 |
| 1/24/2018 | 19.88 | 20 | 18.91 | 19.24 | 19.24 | 1038900 |
| 1/25/2018 | 18.95 | 19.15 | 17.8 | 17.91 | 17.91 | 1026500 |
| 1/26/2018 | 17.56 | 17.98 | 17.06 | 17.13 | 17.13 | 1056200 |
| 1/29/2018 | 16.85 | 17 | 15.1 | 15.23 | 15.23 | 1656600 |
| 1/30/2018 | 14.87 | 14.9 | 13.75 | 14.28 | 14.28 | 1665300 |
| 1/31/2018 | 14.5 | 15.67 | 13.36 | 13.75 | 13.75 | 1701600 |
| 2/1/2018 | 12.91 | 13 | 12.1 | 12.3 | 12.3 | 1953400 |
| 2/2/2018 | 12.08 | 12.75 | 11.6 | 12.16 | 12.16 | 1793400 |
| 2/5/2018 | 11.4 | 12.19 | 10.55 | 10.7 | 10.7 | 1493900 |
| 2/6/2018 | 10.4 | 13.49 | 10.4 | 12.95 | 12.95 | 2756700 |
| 2/7/2018 | 15.32 | 16.41 | 13.88 | 14.32 | 14.32 | 7206500 |
| 2/8/2018 | 15.8 | 15.9 | 14.25 | 14.89 | 14.89 | 2144100 |
| 2/9/2018 | 15.03 | 16.34 | 14.8 | 16.05 | 16.05 | 2522200 |
| 2/12/2018 | 16.57 | 18.14 | 16.57 | 17.54 | 17.54 | 3972600 |
| 2/13/2018 | 16.75 | 17.49 | 15.21 | 16.06 | 16.06 | 2853900 |
| 2/14/2018 | 17.2 | 17.4 | 16.5 | 16.59 | 16.59 | 1643900 |
| 2/15/2018 | 17.6 | 18.4 | 16.7 | 17.2 | 17.2 | 2700100 |

| 2/16/2018 | 14.09 | 15.2 | 10.55 | 11.46 | 11.46 | 12278400 |
| 2/20/2018 | 10.5 | 12.4 | 9.77 | 10.92 | 10.92 | 4636000 |
| 2/21/2018 | 10.7 | 11.39 | 10.5 | 10.6 | 10.6 | 1551700 |
| 2/22/2018 | 10.76 | 10.77 | 9.52 | 9.98 | 9.98 | 1809500 |
| 2/23/2018 | 9.85 | 10.44 | 9.816 | 10.27 | 10.27 | 1084200 |
| 2/26/2018 | 9.95 | 10.26 | 9.7 | 9.9 | 9.9 | 921100 |
| 2/27/2018 | 9.95 | 10.12 | 9.651 | 9.96 | 9.96 | 567900 |
| 2/28/2018 | 9.76 | 10.75 | 9.76 | 10.58 | 10.58 | 1229000 |
| 3/1/2018 | 9.93 | 10.72 | 9.91 | 10.13 | 10.13 | 1134100 |
| 3/2/2018 | 9.89 | 10.69 | 9.89 | 10.58 | 10.58 | 732400 |
| 3/5/2018 | 10.67 | 10.85 | 10.25 | 10.83 | 10.83 | 716900 |
| 3/6/2018 | 10.65 | 10.8 | 10.25 | 10.39 | 10.39 | 586400 |
| 3/7/2018 | 10.09 | 10.37 | 10.02 | 10.08 | 10.08 | 578600 |
| 3/8/2018 | 9.94 | 10.179 | 9.56 | 9.57 | 9.57 | 709700 |
| 3/9/2018 | 9.55 | 9.78 | 9.05 | 9.24 | 9.24 | 746700 |
| 3/12/2018 | 9.11 | 9.243 | 8.6 | 8.97 | 8.97 | 1322100 |
| 3/13/2018 | 8.83 | 8.92 | 8.54 | 8.7 | 8.7 | 565900 |
| 3/14/2018 | 8.3 | 8.7 | 8.05 | 8.15 | 8.15 | 727400 |
| 3/15/2018 | 8.12 | 8.29 | 7.33 | 7.51 | 7.51 | 1024000 |
| 3/16/2018 | 7.31 | 8.45 | 7.3 | 8.29 | 8.29 | 1203800 |
| 3/19/2018 | 8.12 | 8.75 | 7.85 | 8.42 | 8.42 | 1029600 |
| 3/20/2018 | 8.75 | 8.75 | 7.83 | 8.02 | 8.02 | 633900 |
| 3/21/2018 | 8.15 | 8.43 | 7.74 | 7.94 | 7.94 | 477300 |
| 3/22/2018 | 7.75 | 7.96 | 7.58 | 7.63 | 7.63 | 362400 |
| 3/23/2018 | 7.65 | 7.76 | 7.4 | 7.5 | 7.5 | 426900 |
| 3/26/2018 | 7.67 | 7.76 | 7.05 | 7.36 | 7.36 | 627100 |
| 3/27/2018 | 7.34 | 7.55 | 6.83 | 6.95 | 6.95 | 310000 |
| 3/28/2018 | 6.88 | 6.91 | 6.03 | 6.28 | 6.28 | 701400 |
| 3/29/2018 | 6.25 | 6.65 | 6 | 6.62 | 6.62 | 512300 |
| 4/2/2018 | 6.51 | 6.599 | 6.17 | 6.36 | 6.36 | 296500 |
| 4/3/2018 | 6.39 | 6.89 | 6.231 | 6.53 | 6.53 | 474500 |
| 4/4/2018 | 6.25 | 6.6 | 6.2 | 6.42 | 6.42 | 311000 |
| 4/5/2018 | 6.4 | 7.81 | 6.38 | 7.22 | 7.22 | 3419600 |
| 4/6/2018 | 7.18 | 7.77 | 6.53 | 6.64 | 6.64 | 1654500 |
| 4/9/2018 | 6.58 | 6.78 | 6.25 | 6.4 | 6.4 | 525200 |
| 4/10/2018 | 6.41 | 6.727 | 6.353 | 6.49 | 6.49 | 432200 |
| 4/11/2018 | 6.35 | 7.1 | 6.35 | 6.62 | 6.62 | 564700 |
| 4/12/2018 | 7.35 | 8.2 | 7.12 | 7.47 | 7.47 | 4072800 |
| 4/13/2018 | 8.04 | 8.36 | 7.5 | 7.75 | 7.75 | 1567600 |
| 4/16/2018 | 7.7 | 7.7 | 7.06 | 7.31 | 7.31 | 595400 |
| 4/17/2018 | 7.32 | 7.87 | 7.29 | 7.3 | 7.3 | 635300 |
| 4/18/2018 | 6.95 | 7.19 | 6.84 | 6.87 | 6.87 | 745700 |
| 4/19/2018 | 6.75 | 6.75 | 6.25 | 6.7 | 6.7 | 745000 |
| 4/20/2018 | 6.66 | 6.95 | 6.561 | 6.65 | 6.65 | 454100 |
| 4/23/2018 | 6.66 | 6.899 | 6.46 | 6.55 | 6.55 | 356800 |
| 4/24/2018 | 6.9 | 7.655 | 6.64 | 7.58 | 7.58 | 1451300 |
| 4/25/2018 | 7.3 | 7.48 | 7 | 7.36 | 7.36 | 673500 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 4/26/2018 | 7.32 | 7.88 | 7.241 | 7.47 | 7.47 | 658200 |
| 4/27/2018 | 7.55 | 7.66 | 7.36 | 7.49 | 7.49 | 350400 |
| 4/30/2018 | 7.46 | 7.49 | 7.13 | 7.22 | 7.22 | 409800 |
| 5/1/2018 | 7.14 | 7.47 | 7.02 | 7.32 | 7.32 | 262300 |
| 5/2/2018 | 7.37 | 7.37 | 7.143 | 7.24 | 7.24 | 215600 |
| 5/3/2018 | 7.36 | 7.67 | 7.11 | 7.64 | 7.64 | 362000 |
| 5/4/2018 | 7.9 | 8.15 | 7.411 | 7.56 | 7.56 | 672300 |
| 5/7/2018 | 7.31 | 7.8 | 7.31 | 7.58 | 7.58 | 428700 |
| 5/8/2018 | 7.56 | 7.774 | 7.34 | 7.4 | 7.4 | 280800 |
| 5/9/2018 | 7.4 | 7.59 | 7.32 | 7.44 | 7.44 | 369800 |
| 5/10/2018 | 7.41 | 7.65 | 7.15 | 7.23 | 7.23 | 430400 |
| 5/11/2018 | 7.44 | 7.55 | 7.27 | 7.38 | 7.38 | 544400 |
| 5/14/2018 | 7.4 | 7.73 | 7.38 | 7.63 | 7.63 | 374900 |
| 5/15/2018 | 7.6 | 7.95 | 7.58 | 7.83 | 7.83 | 297400 |
| 5/16/2018 | 7.8 | 8.64 | 7.65 | 8.5 | 8.5 | 998300 |
| 5/17/2018 | 8.5 | 9.75 | 8.15 | 9.51 | 9.51 | 1868000 |
| 5/18/2018 | 9.48 | 9.48 | 8.57 | 9 | 9 | 1467100 |
| 5/21/2018 | 8.85 | 9.1 | 8.11 | 8.28 | 8.28 | 806500 |
| 5/22/2018 | 8.06 | 8.5 | 7.84 | 7.85 | 7.85 | 617100 |
| 5/23/2018 | 7.78 | 8.05 | 7.5 | 7.89 | 7.89 | 634400 |
| 5/24/2018 | 7.79 | 7.88 | 7.6 | 7.79 | 7.79 | 327600 |
| 5/25/2018 | 7.73 | 7.76 | 7.55 | 7.59 | 7.59 | 224400 |
| 5/29/2018 | 7.53 | 7.56 | 7 | 7.08 | 7.08 | 516300 |
| 5/30/2018 | 7.08 | 7.15 | 6.82 | 6.97 | 6.97 | 409100 |
| 5/31/2018 | 6.97 | 7.11 | 6.82 | 6.98 | 6.98 | 238100 |
| 6/1/2018 | 6.93 | 7.7 | 6.93 | 7.39 | 7.39 | 1010600 |
| 6/4/2018 | 7.59 | 8.15 | 7.5 | 7.73 | 7.73 | 689000 |
| 6/5/2018 | 7.73 | 8.03 | 7.61 | 7.8 | 7.8 | 298300 |
| 6/6/2018 | 7.79 | 8 | 7.75 | 7.78 | 7.78 | 325700 |
| 6/7/2018 | 7.71 | 7.92 | 7.5 | 7.65 | 7.65 | 220400 |
| 6/8/2018 | 7.61 | 7.875 | 7.41 | 7.71 | 7.71 | 188500 |
| 6/11/2018 | 7.61 | 7.68 | 7.2 | 7.44 | 7.44 | 336000 |
| 6/12/2018 | 7.5 | 7.745 | 7.35 | 7.36 | 7.36 | 245300 |
| 6/13/2018 | 7.31 | 7.474 | 7.21 | 7.26 | 7.26 | 232700 |
| 6/14/2018 | 7.25 | 7.7 | 7.25 | 7.54 | 7.54 | 283300 |
| 6/15/2018 | 7.41 | 7.57 | 7.26 | 7.4 | 7.4 | 248200 |
| 6/18/2018 | 7.26 | 7.52 | 7.26 | 7.38 | 7.38 | 214100 |
| 6/19/2018 | 7.33 | 7.48 | 7.16 | 7.32 | 7.32 | 163400 |
| 6/20/2018 | 7.23 | 7.6 | 7.22 | 7.35 | 7.35 | 245900 |
| 6/21/2018 | 7.67 | 7.75 | 7.01 | 7.27 | 7.27 | 426600 |
| 6/22/2018 | 7.15 | 7.239 | 6.82 | 6.88 | 6.88 | 539100 |
| 6/25/2018 | 6.8 | 6.85 | 6.41 | 6.57 | 6.57 | 509400 |
| 6/26/2018 | 6.58 | 7.11 | 6.54 | 6.8 | 6.8 | 343600 |
| 6/27/2018 | 6.8 | 6.93 | 6.53 | 6.59 | 6.59 | 226700 |
| 6/28/2018 | 6.55 | 6.72 | 6.381 | 6.56 | 6.56 | 239000 |
| 6/29/2018 | 6.65 | 6.75 | 6.28 | 6.34 | 6.34 | 316800 |
| 7/2/2018 | 6.28 | 6.88 | 6.28 | 6.38 | 6.38 | 482000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/3/2018 | 6.46 | 6.489 | 6.111 | 6.25 | 6.25 | 272800 |
| 7/5/2018 | 6.28 | 6.399 | 6 | 6.01 | 6.01 | 510700 |
| 7/6/2018 | 6.01 | 6.08 | 5.036 | 5.15 | 5.15 | 1242000 |
| 7/9/2018 | 5.29 | 5.29 | 4.8 | 4.865 | 4.865 | 902300 |
| 7/10/2018 | 4.92 | 4.945 | 4.49 | 4.65 | 4.65 | 779700 |
| 7/11/2018 | 4.55 | 4.9 | 4.41 | 4.68 | 4.68 | 490400 |
| 7/12/2018 | 4.73 | 4.807 | 4.47 | 4.57 | 4.57 | 295900 |
| 7/13/2018 | 4.6 | 4.799 | 4.43 | 4.66 | 4.66 | 237100 |
| 7/16/2018 | 4.64 | 4.789 | 4.55 | 4.57 | 4.57 | 200400 |
| 7/17/2018 | 4.6 | 6.6 | 4.57 | 6.29 | 6.29 | 8344400 |
| 7/18/2018 | 6.13 | 6.46 | 5.6 | 5.73 | 5.73 | 5603600 |
| 7/19/2018 | 5.77 | 6.3 | 5.77 | 6.07 | 6.07 | 2385000 |
| 7/20/2018 | 6.06 | 6.64 | 5.81 | 5.9 | 5.9 | 2510500 |
| 7/23/2018 | 6.29 | 6.7 | 6.07 | 6.59 | 6.59 | 3070500 |
| 7/24/2018 | 7.59 | 8.555 | 7.15 | 8.4 | 8.4 | 13595300 |
| 7/25/2018 | 7.88 | 8.27 | 7.38 | 7.98 | 7.98 | 3911300 |
| 7/26/2018 | 7.92 | 8.18 | 7.8 | 7.9 | 7.9 | 1115200 |
| 7/27/2018 | 7.49 | 7.81 | 7.03 | 7.59 | 7.59 | 2144400 |
| 7/30/2018 | 7.6 | 7.64 | 7.17 | 7.62 | 7.62 | 870400 |
| 7/31/2018 | 7.37 | 7.52 | 6.46 | 6.49 | 6.49 | 1569000 |
| 8/1/2018 | 6.68 | 6.68 | 6.3 | 6.43 | 6.43 | 760000 |
| 8/2/2018 | 6.33 | 6.8 | 6.3 | 6.79 | 6.79 | 1270700 |
| 8/3/2018 | 6.33 | 7.17 | 6.33 | 6.83 | 6.83 | 1245100 |
| 8/6/2018 | 6.81 | 6.97 | 6.52 | 6.8 | 6.8 | 564300 |
| 8/7/2018 | 7.15 | 7.15 | 6.861 | 6.93 | 6.93 | 643900 |
| 8/8/2018 | 6.63 | 6.8 | 6.553 | 6.73 | 6.73 | 612500 |
| 8/9/2018 | 6.6 | 7.05 | 6.6 | 6.8 | 6.8 | 511700 |
| 8/10/2018 | 6.87 | 7.3 | 6.8 | 6.96 | 6.96 | 762400 |
| 8/13/2018 | 6.88 | 6.949 | 6.63 | 6.71 | 6.71 | 385100 |
| 8/14/2018 | 6.65 | 6.94 | 6.61 | 6.65 | 6.65 | 341300 |
| 8/15/2018 | 6.5 | 6.63 | 5.34 | 5.35 | 5.35 | 1468300 |
| 8/16/2018 | 5.07 | 5.53 | 4.76 | 5.39 | 5.39 | 1032300 |
| 8/17/2018 | 5.51 | 5.59 | 5.3 | 5.37 | 5.37 | 255900 |
| 8/20/2018 | 5.36 | 5.45 | 4.95 | 5.31 | 5.31 | 425100 |
| 8/21/2018 | 5.34 | 5.45 | 5.22 | 5.31 | 5.31 | 366100 |
| 8/22/2018 | 5.36 | 5.88 | 5.36 | 5.63 | 5.63 | 604600 |
| 8/23/2018 | 5.63 | 5.69 | 5.45 | 5.47 | 5.47 | 390200 |
| 8/24/2018 | 5.43 | 5.73 | 5.4 | 5.5 | 5.5 | 330500 |
| 8/27/2018 | 5.63 | 6.07 | 5.55 | 5.76 | 5.76 | 980900 |
| 8/28/2018 | 6.18 | 6.47 | 6.01 | 6.31 | 6.31 | 1369300 |
| 8/29/2018 | 6.43 | 6.437 | 6.05 | 6.22 | 6.22 | 508400 |
| 8/30/2018 | 6.1 | 6.25 | 5.94 | 6.1 | 6.1 | 365000 |
| 8/31/2018 | 6.07 | 6.439 | 6.05 | 6.3 | 6.3 | 412400 |
| 9/4/2018 | 6.54 | 6.79 | 6.13 | 6.19 | 6.19 | 871300 |
| 9/5/2018 | 6.05 | 6.05 | 5.57 | 5.71 | 5.71 | 558900 |
| 9/6/2018 | 5.74 | 5.8 | 5.56 | 5.68 | 5.68 | 285800 |
| 9/7/2018 | 5.65 | 5.82 | 4.28 | 4.3 | 4.3 | 1781200 |

9/10/2018     4.36     4.65     4.35     4.5     4.5   697000

# EXHIBIT N

# EXHIBIT N

Cryptocurrency    Market Outlook    Editors' Picks    

# Riot Blockchain: Sudden Business Pivot, Suspicious Acquisitions, Questionable Special Dividend

Dec. 11, 2017 9:39 AM ET | COIN, GBTC... | BTC-USD | 194 Comments

**Hindenburg Investment Research**
2.49K Followers | Bio                                    [Follow]

## Summary

- Riot made a dramatic pivot from a "life science tools" business to a blockchain company mere months ago.

- The company paid approximately $12 million for a two-week-old crypo-mining entity that owned only about $1.9 million in crypto mining assets.

- A second acquisition raises additional red flags.

- Riot depleted an estimated 63% of company cash through a special dividend that appears to have disproportionately advantaged insiders.

- Regardless of one's views on blockchain technology, we believe Riot is a name that should be avoided.

With "blockchain mania" in full swing, a new self-described leader has emerged. Riot Blockchain (NASDAQ:RIOT) purports to be "a Leading Blockchain Company & Only Nasdaq Listed Pure Play Blockchain Company." With share prices nearly quadrupling in the past three months, we decided to examine the name more closely.

The company's blockchain focus has come about through a series of rapid moves. Mere months ago, Riot was known as Bioptix, Inc. and operated "a life science tools company that provides an affordable solution for drug discovery scientists who require label-free, real-time detection of bio-molecular interactions."

On October 4th of this year, Bioptix announced that it was changing its name and ticker from Bioptix. Inc. (BIOP) to Riot Blockchain (RIOT), and indicated that it would be pursuing a completely different business model focused on strategic investment and operations in the blockchain ecosystem.

We find such a dramatic pivot in business operations to be concerning in its own right, but we believe it is even more questionable given that the seismic shift has come about in conjunction with a series of

dubious transactions.

**Riot Paid Approximately $12 million To Acquire Kairos Global Technology - A *Two-Week-Old* Crypto-Mining Company That Owned Only About $1.9 Million in Crypto Mining Assets**

On November 2, 2017, the company announced via press release that it had "entered into a definitive agreement to acquire cryptocurrency mining equipment consisting of 700 Antminer S9s and 500 Antminer L3s, all manufactured by industry leader Bitmain." Upon closing of the purchase the company issued another press release on November 6, 2017, stating that "it has closed on its acquisition of cryptocurrency mining equipment". A basic reading of the press releases might lead a reader to believe that the company had purchased the equipment directly.

However, a reading of the November 1, 2017, Form 8-K that described the transaction leaves us with a different impression. The 8-K clarified that Riot had actually acquired a corporate *entity* called Kairos Global Technology ("Kairos") that held the cryptocurrency mining equipment described above.

The form 8-K described a share exchange agreement with Kairos whereby the company exchanged Convertible Preferred Stock (convertible into 1,750,001 common shares of Riot) for all outstanding shares of Kairos's common stock. Given that Riot's stock closed at $6.95 per share on November 1, 2017, we estimate the share transaction value at approximately $12.1 million (As of this writing those same shares would be worth an estimated $27 million.) In addition, Riot included a potential $1 million royalty sweetener for Kairos's shareholders:

> The shareholders of Kairos also will receive a royalty to be paid from cash flow generated from operations, which shall entitle such shareholders to receive 40% of the gross profits generated on a monthly basis until they have received a total of $1,000,000, at which point the royalty is extinguished.

All told, we estimate the transaction provided anywhere from $12-13 million in value to Kairos's shareholders on the day of closing. Our belief is that Riot grossly overpaid. As above, Riot's stated motive for the transaction was to acquire 700 Antminer S9s and 500 Antminer L3s used to mine cryptocurrency.

However, if Riot had simply purchased the above servers directly from Bitmain, we estimate that the price would have been $1,905,000. In order to arrive at this number, we checked a historical capture of the Bitmain website as of October 16th, 2017, and found that Antminer S9 servers were selling for $1,265 and that Antminer L3s were selling for $2,040.

We contacted Bitmain to see if it was experiencing massive backlogs or any other scenario that could justify an overpayment of roughly $10 million for $1.9 million of machines. We have not heard back from Bitmain as of this writing. The historical capture of the Bitmain website from October 16th shows that machines would have been expected to ship in just over one month from that date (November 21st-November 30th).

Adding to our skepticism of the Kairos deal is the fact that Kairos appears to have had no operations and/or website (despite registering a domain name) and that the entity was formed on October 19, 2017 - less than two weeks prior to its announced acquisition by Riot. We believe the fact pattern indicates that Riot's acquisition of Kairos's assets is highly irregular.

Furthermore, it is unclear to us who ultimately benefited from the apparent generous payment terms for Kairos. The entity was registered to the address of a believed one-man law firm called Laxague Law, Inc. ("Laxague Law"). Its officers consisted of a Dubai resident and its directors consisted of two Floridians, though the underlying shareholder structure was not publicly disclosed.

## Riot's Acquisition of a Majority Stake in Another Blockchain Technology Company Raises Additional Questions

Riot's acquisition of newly-established Tess, Inc. raises additional red flags. On October 20, 2017, Riot announced that it had acquired a majority (52%) stake in Tess, which Riot described as a company that was "developing blockchain solutions for telecommunications companies." A "whois" search of the Tesspay.io website shows that it was initially registered on July 18, 2017. Tess then released a seven-page whitepaper in August 2017 describing (i) its plans for an initial coin offering ("ICO"); and (ii) the role its coins intend to play in telecommunications transactions. Those representations aside, the resumes of Tess's principals leave us skeptical of Tess's odds of success:

- Tess's CEO, Jeff Mason, concurrently holds the same CEO position at two other companies, according to his LinkedIn profile: PowerCases and Wiztel;

- Tess's CFO, Fraser Mason, concurrently hold the position of Senior Vice President of PowerCases, according to his LinkedIn profile; and

- Tess's Chief Software Architect, Sorin Tanasescu, concurrently holds various senior roles at other companies, including: (A) Managing Director of VoiceWay; (B) Director of Middleware Integration for Rogers Communications; and (C) Director of an entity called Ingenium IT Compusoft ("Ingenium").

Tanasescu's other companies give us additional cause for concern. Namely, VoiceWay appears to

have been associated with a Bitcoin phishing website.

On a Bitcoin forum called *BitcoinTalk*, one user conveyed that Google was displaying advertisements for "mt-**q**ox.com," a clever misspelling of the then-popular Mount Gox bitcoin trading website. That same user noted that the "mt-qox.com" website completely duplicated the real Mount Gox website.

The apparent imposter site was registered to Cristian Talle at the address 196 Judith Ave., Toronto, Canada, which appears to be a residence, based on a Google Maps search. That same address houses Tanasescu's other businesses including VoiceWay and Ingenium. In addition, Talle used a VoiceWay email address to register the mt-qox.com site. *Reddit* users also noticed the site and started a thread entitled "[SCAM] watch out for mt-qox.com". The users reported the site to Mount Gox and Google. Google subsequently took action and blocked it as a phishing website, according to the thread. (Note that the VoiceWay website itself was also registered by an individual named Cristian Talle - under a Rogers Communications email address).

Furthermore on the subject of Tess: On the same day that Laxague Law set up Kairos (October 19, 2017), the same law firm also set up an entity called Ingenium Global, Inc., which has a unique name that is similar to an entity  n which Tanasescu manages (Ingenium IT Compusoft). Even more interestingly, Ingenium Global, Inc. listed the exact same officers/directors as Kairos (an individual in Dubai and two from Florida) and registered the exact same par value and share count. Given that Riot announced the acquisition of Tess the very next day (October 20, 2017), we cannot help but wonder whether the selling parties in the Kairos transactions were in any way related to the shareholders of Ingenium, and ultimately to the selling parties in the Tess transaction.

## Riot Depleted An Estimated 63% of the Company's Cash Through a Special Dividend That Appears To Have Disproportionately Advantaged Company Insiders

Bioptix/Riot recently engineered a "special cash dividend" that stripped the fledgling company of approximately 63% of its cash, seemingly handing a significant portion of those funds to company insiders. That kind of cash giveaway - announced one day ahead of a shift to a new, speculative business model - gives us significant concerns. The sequence of events was as follows:

In March 2017, Bioptix announced the completion of private placements that included a convertible note financing and also included warrants to purchase 1,900,000 shares of common stock.

On September 25, 2017, Bioptix made the following disclosures:

1.  Bioptix filed a Form 8-K stating, in part, that notes from the March 2017 Offerings had been

exchanged for shares of Series A Convertible Preferred Stock.

2. Bioptix filed an amended Registration Statement Form S-3 which described how holders of Series A Convertible Preferred Stock "are entitled to receive dividends if and when declared by the Company's board of directors. The Series A Preferred Stock will participate *on an 'as converted' basis*, with all dividends declared on the Company's Common Stock."

Then on October 4, 2017, the newly-named Riot filed a Form 8-K stating that the company had approved a cash dividend:

> Pursuant to which, the holders of the Company's common stock, no par value per share (the 'Common Stock'), and Series A Convertible Preferred Stock, no par value per share (the 'Series A Preferred Stock'), as of the close of business on October 13, 2017, shall receive $1.00 for each share of Common Stock, including each share of Common Stock that would be issuable upon conversion of the Series A Preferred Stock, *on an as converted basis*.

The magnitude of the dividend is significant. The payout "totaled approximately $9,562,000" whereas Riot's financial statements reflected that at the close of Q3 2017 - two days before the October 2017 dividend was approved - the company had only $13,139,722 in cash and cash equivalents. When factoring in an added $1.86 million in cash proceeds from warrant conversion, the October 2017 dividend depleted an estimated 63% of the company's cash and cash equivalents balance. Consequently, we find its size relative to Riot's available cash to be troubling.

The timing of related warrant conversions is similarly concerning. Riot's quarterly filing prior to the October 2017 dividend indicates that 2,060,000 warrants from the March offering were converted into 1,228,690 common shares on a cashless basis. In addition, 620,000 warrants were exercised for cash during a period where Riot's board of directors authorized on October 10th a "temporary reduction in exercise price" of convertible securities from the March 2017 private offerings. Given that the record date of the October 2017 dividend was October 13, 2017 (with a payment date of October 18, 2017), both the cashless warrant conversion and the conversion from the reduction in exercise price of the March 2017 securities appear to have conspicuously occurred just prior to the payment of the October 2017 dividend.

## Who Benefited From the Special Dividend?

In the press release announcing the special dividend, the company's CEO stated: "This special dividend is a positive step to return value to all Bioptix shareholders." Despite this pronouncement, we believe Riot insiders and participants in the March 2017 private placements benefited disproportionately.

The amended Form S-3 detailing the convertible and warrant offerings prominently mentioned one individual in particular. Per the filing, "The Lead Investor is Barry Honig who is also a selling stockholder." Moreover, Honig-related entities, as well as Honig's family members including brother

Jonathan and father Alan, also participated in the transactions.

Later, in two Schedule 13G filings filed as of an event date of October 10th - just days prior to the dividend ex-date - Jonathan Honig and an individual named Mark Groussman reported common stock ownership stakes of 9.51% and 5.93% respectively. Jonathan Honig's filing also mentioned that the 9.51% figure "does not include 808,198 shares of common stock issuable upon conversion of Series A Preferred Stock." it is unclear from the filings where Barry Honig's ownership on a common stock and on a convertible/exercised basis stands currently.

Note that the same filing mentioned that there were only 5,436,503 shares of common stock outstanding as of September 20th. By November 13th, the number of common shares had spiked up to 8,321,137, a roughly 53% increase in common shares in less than two months. Such a jump indicates that a significant amount of dilution has affected common stockholders in a short amount of time.

## Conclusion

We have no strong bearish or bullish view on the future of blockchain. We genuinely hope the technology is implemented broadly and that currency and information can be effectively decentralized through its use. Regardless of one's views on blockchain technology however, we think Riot is a name that investors should avoid. We urge cautious investing to all.

Editor's Note: This article covers one or more microcap stocks. Please be aware of the risks associated with these stocks.

**Disclosure:** I am/we are short RIOT. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it. I have no business relationship with any company whose stock is mentioned in this article.

**Additional disclosure:** Use of Hindenburg Research's research is at your own risk. In no event should Hindenburg Research or any affiliated party be liable for any direct or indirect trading losses caused by any information in this report. You further agree to do your own research and due diligence, consult your own financial, legal, and tax advisors before making any investment decision with respect to transacting in any securities covered herein. You should assume that as of the publication date of any short-biased report

# EXHIBIT O

# EXHIBIT O

| Date | Open | High | Low | Close | Adj Close | Volume |
|------|------|------|-----|-------|-----------|--------|
| 2/1/2021 | 20.17 | 20.48 | 18.69 | 19.98 | 19.98 | 13088900 |
| 2/2/2021 | 20.56 | 22.18 | 19.62 | 21.49 | 21.49 | 15361800 |
| 2/3/2021 | 22.14 | 23.64 | 21.72 | 22.85 | 22.85 | 18199900 |
| 2/4/2021 | 23.47 | 23.5 | 21.42 | 23.08 | 23.08 | 12936700 |
| 2/5/2021 | 23.58 | 24.388 | 22.93 | 23.38 | 23.38 | 12216000 |

# EXHIBIT P

# EXHIBIT P

Search SEC Documents    Go

Company Filings | More Search Options

**U.S. SECURITIES AND EXCHANGE COMMISSION**

ABOUT     DIVISIONS & OFFICES     ENFORCEMENT     REGULATION     EDUCATION     FILINGS     NEWS

**ENFORCEMENT**

Accounting and Auditing Enforcement Releases

Administrative Proceedings

ALJ Initial Decisions

ALJ Orders

Amicus / Friend of the Court Briefs

Delinquent Filings

Fair Funds

Information for Harmed Investors

Litigation Releases

Opinions and Adjudicatory Orders

Receiverships

Stop Orders

Trading Suspensions

# Additional Key South Florida-Based Microcap Fraudsters Settle with SEC in Multi-Defendant Litigation

## Litigation Release No. 24765 / March 11, 2020

### *Securities and Exchange Commission v. Barry Honig, et al.*, 18 Civ. 08175 (S.D.N.Y. filed September 7, 2018)

On March 9, 2020, the U.S. District Court for the Southern District of New York entered final consent judgments against defendants Michael Brauser, John O'Rourke III, John Stetson, Grander Holdings, Inc., ATG Capital LLC and Stetson Capital Investments Inc. (SCI) and a partial consent judgment against HS Contrarian Investments LLC (HSCI) in an ongoing civil action in which the SEC alleges that numerous individuals and associated entities participated in microcap schemes that generated over $27 million from unlawful stock sales.

According to the SEC's complaint, filed September 2018 and amended on March 8, 2019, a group of South Florida-based microcap fraudsters led by Barry Honig, who entered into a bifurcated settlement with the SEC in July 2019, along with his close associates O'Rourke and Stetson, and longtime co-investor Brauser, manipulated the stock of three public companies in classic pump-and-dump schemes. The complaint alleges that the defendants repeatedly artificially boosted the stock price of these companies and then profited when they dumped their shares into the inflated market. Brauser, O'Rourke and Stetson also used their corporate entities Grander, ATG, SCI and HSCI in these schemes.

The court entered consent judgments enjoining Brauser, Stetson, O'Rourke, Grander, ATG, SCI and HSCI from violating the antifraud provisions of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, as well as the reporting provisions of Section 13(d) of the Exchange Act and Rule 13d-1(a) thereunder. In addition, the judgments enjoin Brauser and Grander from violating the securities registration provisions of Sections 5(a) and (c) of the Securities Act, and enjoin O'Rourke and ATG from violating the anti-manipulation provisions of Sections 9(a)(1) and 9(a)(2) of the Exchange Act. Further, the judgments include permanent penny stock bars and conduct-based injunctions for Brauser, Grander, O'Rourke and ATG and 10-year penny stock bars and conduct-based injunctions for Stetson, SCI and HSCI. Finally, the judgments order Brauser, O'Rourke and Stetson to pay disgorgement, prejudgment interest and civil penalties totaling $1,175,176, $1,153,326, and $1,154,669, respectively. Monetary remedies against HSCI will be determined by the court at a later date upon motion of the SEC. The defendants neither admitted nor denied the SEC's allegations.

For further information, see Press Release No. 2018-182, September 7, 2018, Litigation Release No. 24262, September 7, 2018, Litigation Release No. 24431, March 22, 2019 and Litigation Release No. 24529, July 12, 2019.

*Modified: March 11, 2020*