**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CREIGHTON TAKATA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY G. MCGONEGAL,<br><br>Defendants. | Case No. 18-cv-2293 (FLW) (ZNQ)<br><br>***Document Electronically Filed***<br><br>*ORAL ARGUMENT REQUESTED*<br><br>**DEFENDANT MARK GROUSSMAN'S MEMORANDUM OF POINTS AND AUTHORITY IN SUPPORT OF HIS MOTION TO DISMISS LEAD PLAINTIFF'S CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

| | |
|---|---|
| KEVIN G. WALSH<br>kwalsh@gibbonslaw.com<br>KATE E. JANUKOWICZ<br>kjanukowicz@gibbonslaw.com<br>**GIBBONS P.C.**<br>One Gateway Center<br>Newark, New Jersey 07102<br>Tel:    973.596.4769<br>Fax:    973.639.6470 | PERRIE M. WEINER (*pro hac vice*)<br>perrie.weiner@bakermckenzie.com<br>EDWARD D. TOTINO (*pro hac vice*)<br>edward.totino@bakermckenzie.com<br>**BAKER & MCKENZIE LLP**<br>10250 Constellation Blvd., Suite 1850<br>Los Angeles, California 90067<br>Tel:    310.201.4728<br>Fax:    310.201.4721 |

Attorneys for Defendant
MARK GROUSSMAN

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

I.      INTRODUCTION ................................................................................. 1

II.     FACTUAL AND PROCEDURAL BACKGROUND .................................. 4

    A.   The Parties ......................................................................................... 4

    B.   Riot's Pivot To Blockchain Technologies ............................................ 5

    C.   Plaintiff Attempts To Plead An Alleged Stock Manipulation Scheme That Does Not In Any Way Involve Groussman.................................... 6

    D.   Procedural History .............................................................................. 8

III.    LEGAL STANDARD ............................................................................. 8

IV.     PLAINTIFF FAILS TO STATE A CLAIM UNDER 10b-5......................... 9

    A.   Plaintiff Fails To Allege Loss Causation ............................................ 10

    B.   Plaintiff Fails To Allege That Groussman Misrepresented A Material Fact In Violation of 10b-5(b)........................................................... 13

        1.   *The Purpose Of A Schedule 13D Is To Disclose Potential Takeover Bidders, Not Individual Investors Like Groussman* ........................ 13

        2.   *Groussman's Filing Of Schedule 13Gs Did Not Constitute A Material Misrepresentation* ........................................................... 15

        3.   *Even If "Group Investing" Alone Triggered Schedule 13D Filing Obligations, Plaintiff Fails To Plead Facts Establishing That Groussman Was Part Of An Investor Group In Riot* .................... 18

        4.   *The Alleged, Hypertechnical Violation Of Regulations Under Section 13(d) Cannot Act As A Predicate For A 10(b)(5) Claim* .......... 20

    C.   Plaintiff Fails To Allege That Groussman Engaged In A "Deceptive Or Manipulative" Act In Violation Of 10b-5(a) Or (c).......................... 22

        1.   *Plaintiff Cannot Predicate Scheme Liability On An Alleged Misrepresentation Or Omission* ......................................................... 22

        2.   *Groussman's Publicly-Disclosed Trading In Riot Does Not Constitute A "Deceptive" or "Manipulative" Act* .......................... 23

        3.   *The Coinsquare Transaction Is Not Actionable Against Groussman Under 10-b5* .. 25

    D.   Plaintiff Fails To Adequately Allege That Groussman Acted With Scienter .............. 25

    E.   Plaintiff Fails To Adequately Allege Reliance ........................................... 28

V.      PLAINTIFF'S SECTION 20 CLAIM FALLS WITH HIS 10b-5 CLAIMS................ 29

VI.     THE SAC SHOULD BE DISMISSED WITH PREJUDICE ........................ 30

VII.    CONCLUSION.................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Able Labs. Sec. Litig.*,
    No. 05-2681, 2008 U.S. Dist. LEXIS 23538 (D.N.J. 2008) ....................................................22

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972) ...............................................................................................................28

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................................................8

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988) ...............................................................................................................29

*Belmont v. MB Inv. Partners, Inc.*,
    708 F.3d 470 (3d Cir. 2013)....................................................................................................29

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975) ...............................................................................................................21

*In re Cendant Corp. Sec. Litig.*,
    76 F. Supp. 2d 539 (D. N.J. 1999) .........................................................................................29

*Central Bank, N.A. v. First Interstate Bank of Denver*,
    511 U.S. 164 (1994)................................................................................................................23

*In re Charter Commc'ns, Inc., Sec. Litig.*,
    443 F.3d 987 (8th Cir. 2006) ..................................................................................................20

*Cortina v. Anavex Life Scis. Corp.*,
    No. 15-CV-10162, 2016 U.S. Dist. LEXIS 179905 (S.D.N.Y. Dec. 29, 2016) .....................27

*In re Digital Island Sec. Litig.*,
    223 F. Supp. 2d 546 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004) ..............................30

*Dolan v. PHL Variable Ins. Co.*,
    No. 3:15-CV-01987, 2016 U.S. Dist. LEXIS 161414 (M.D. Penn. 2016) ..............................22

*Dreiling v. Am. Online Inc.*,
    578 F.3d 995 (9th Cir. 2009) ..................................................................................................20

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005).............................................................................................................9, 10

*In re DVI, Inc. Sec. Litig.*,
 639 F.3d 623 (3d Cir. 2011)........................................................................10

*GAF Corp. v. Milstein*,
 453 F.2d 709 (2d Cir. 1971)...............................................................14, 17

*GFL Advantage Fund, Ltd. v. Colkitt*,
 272 F.3d 189 (3d Cir. 2001)........................................................................24

*Greenfield v. Criterion Capital Mgmt., LLC*,
 No. 15-CV-3583-PJH, 2017 WL 2720208 (N.D. Cal. June 23, 2017)..................................19

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
 286 F.3d 613 (2d Cir. 2002)........................................................................20

*Huppe v. Guez*,
 Case No. CV 04–07609, 2005 WL 8154782 (C.D. Cal. April 18, 2005)..............................18

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
 131 F. Supp. 2d 680 (E.D. Pa. 2001) ..............................................................11

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
 564 F.3d 242 (3d Cir. 2009)........................................................................27

*In re Intelligroup Sec. Litig.*,
 527 F. Supp. 2d 262 (D.N.J. 2007) ................................................................12

*Kamerman v. Steinberg*,
 891 F.2d 424 (2d Cir. 1989)........................................................................22

*Kemp v. Univ. Am. Fin. Corp.*,
 No. 05 Civ. 9883, 2007 WL 86942 (S.D.N.Y. Jan. 10, 2007)....................................25

*Liberty Nat. Ins. Holding Co. v. Charter Co.*,
 734 F.2d 545 (11th Cir. 1984) ....................................................................21

*Limantour v. Cray Inc.*,
 432 F. Supp. 2d 1129 (W.D. Wash. 2006)............................................................26

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*,
 223 F. Supp. 2d 435 (S.D.N.Y. 2001)..............................................................18

*In re Luxottica Grp. S.p.A., Sec. Litig.*,
 293 F. Supp. 2d 224 (E.D.N.Y. 2003) ..............................................................28

*Martin v. GNC Holdings, Inc.*,
 2017 U.S. Dist. LEXIS 145530 (W.D. Pa. Sept. 8, 2017)........................................12

*McCabe v. Ernst & Young, LLP*,
   494 F.3d 418 (3d Cir. 2007)..........................................................................10

*Morales v. Quintel Entm't, Inc.*,
   249 F.3d 115 (2d Cir. 2001)..........................................................................13

*Motient Corp. v. Dondero*,
   529 F.3d 532 (5th Cir. 2008) .......................................................................20

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002)........................................................................30

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) ..............................................................10

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000)..........................................................................13

*In re Parmalat Sec. Litig.*,
   376 F. Supp. 2d 472 (S.D.N.Y. 2005)...........................................................24

*Pub. Pension Fund Grp. v. KV Pharma. Co.*,
   679 F.3d 972 (8th Cir. 2012) .......................................................................23

*Rabin v. NASDAQ OMS PHLX LLC*,
   712 Fed. Appx. 188 (3d Cir. 2017)..........................................................24, 28

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
   311 F.3d 198 (3d Cir. 2002)............................................................................9

*Rondeau v. Mosinee Paper Corp.*,
   422 U.S. 49 (1975).........................................................................................14

*Rosenberg v. XM Ventures*,
   129 F. Supp. 2d 681 (D. Del.), *aff'd*, 274 F.3d 137 (3d Cir. 2001) ...........19

*Rubenstein v. Int'l Value Advisers, LLC*,
   363 F. Supp. 3d 379 (S.D.N.Y. 2019), aff'd, 959 F.3d 541 (2d Cir. 2020)............19

*Rubin v. Posner*,
   701 F. Supp. 1041 (D. Del. 1988)..................................................................20

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977).......................................................................................24

*SEC v. Lucent Techs., Inc.*,
   610 F. Supp. 2d 342 (D.N.J. 2009) .................................................................9

*Segal v. Gordon*,
   467 F.2d 602 (2d Cir. 1972)..................................................................................18, 19

*Siegmund v. Xuelian Bian*,
   No. 16-62506-CIV, 2018 WL 1611197 (S.D. Fla. Apr. 2, 2018).............................................21

*Stichting Pensioenfonds ABP v. Merck & Co.*,
   No. 05-5060, 2012 U.S. Dist. LEXIS 113813 (D.N.J. Aug. 1, 2012) ....................................23

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
   552 U.S. 148 (2008)..................................................................................................3, 9

*Strauss v. American Holdings, Inc.*
   902 F. Supp. 475 (S.D.N.Y. 1995) ............................................................................19

*In re Synchronoss Sec. Litig.*,
   705 F. Supp. 2d 367 (D.N.J. 2010)............................................................................28

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
   551 U.S. 308 (2007)..............................................................................................25, 26

*United States Football League v. NFL*,
   634 F. Supp. 1155 (S.D.N.Y. 1986)..........................................................................27

*United States SEC v. Wey*,
   246 F. Supp. 3d 894 (S.D.N.Y. 2017)........................................................................23

*Vladimir v. Bioenvision Inc.*,
   606 F. Supp. 2d 473 (S.D.N.Y. 2009).......................................................................21

*Winer Family Trust v. Queen*,
   503 F.3d 319 (3d Cir. 2007)..................................................................................9, 25

**Statutes**

15 U.S.C. § 78u-4(b)(1) ..................................................................................................9

15 U.S.C. § 78u-4(b)(2) ..................................................................................................9

28 U.S.C. § 636(b)(1)(A) ...............................................................................................8

Act of Dec. 22, 1970, Pub. L. No. 91-567, § 1, 84 Stat. 1497, 1497 (codified at 15
   U.S.C. § 78m(d)(5))..................................................................................................14

Securities and Exchange Act § 10(b) ................................................................. *passim*

Williams Act. Williams Act, Pub. L. No. 90-439, 82 Stat. 454 (1968) (codified at
   15 U.S.C. § 78) ..................................................................................................13, 14

**Other Authorities**

17 C.F.R. § 240.12(b)-2(f) ................................................................................................16

17 C.F.R. § 240.13d-1(a)-(c). Schedule 13D ..................................................................... *passim*

17 C.F.R § 240.13d-5(b)(1) .............................................................................................14

17 C.F.R § 240.13d-101 ..................................................................................................14

17 CFR 240.13d-1(b)-(c) ................................................................................................14

Fed. R. Civ. P. 8(a) ..........................................................................................................8

Fed. R. Civ. P. 9(b) .......................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)................................................................................................1, 30

Defendant Mark Groussman submits this memorandum of law in support of his Motion to Dismiss the Consolidated Second Amended Class Action Complaint ("SAC") filed by Lead Plaintiff Dr. Stanley Golovac ("Plaintiff") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(b) ("PSLRA").

## I.      INTRODUCTION

Plaintiff's fifth attempt to state a claim arising out of his investment in Riot Blockchain, Inc. ("Riot" or the "Company") fares no better than the last four.  Riot is a publicly-traded corporation on NASDAQ that transitioned from a failing biotech company with no viable product to a developer of blockchain technologies and a cryptocurrency miner.  That pivot turned out to be prescient and incredibly rewarding for both the company and its shareholders.  Cryptocurrencies have climbed to record highs, and regulators and mainstream financial companies have made cryptocurrencies safe and more accessible.  Led by institutional, long-term investors, including Blackrock and the Endowments of Harvard, Yale, and Brown, cryptocurrencies have surged in value and are now viewed by many as analogous to precious metals, like gold.  Riot's stock price roughly correlates with the price of cryptocurrencies.  A single bitcoin is now worth more than $43,000, and Riot's stock price, as of the filing of this motion, now trades at more than $32, an increase of more than 460% since the end of the alleged class period in this action.

Notwithstanding this incredible surge in shareholder value, Plaintiff alleges that the Company's transition to cryptocurrency never truly occurred.  Instead, Plaintiff claims it was merely a smokescreen so that a few individual investors could "pump and dump" the Company's stock.  Plaintiff focuses the bulk of his allegations regarding this scheme against Defendant Barry Honig, an individual investor who never acquired more than a minority stake in Riot.  Plaintiff

accuses Honig of orchestrating a vast, secret conspiracy to artificially inflate Riot's stock price and profit from fraudulent "related-party" cross-border transactions.  Plaintiff's efforts to sweep Groussman – another individual investor who was never an employee, director, or officer at Riot – into this alleged international conspiracy fails, yet again.

In the SAC, Plaintiff adds no new factual allegations to cure the series of defects in the First Amended Complaint ("FAC").  The trading activity described by Plaintiff – of seeking to sell Riot shares to the public in S-3 registration statements, and selling those shares, over the course of nearly a year as Riot's stock declined with the early 2018 crash of Bitcoin – is entirely unremarkable.  Plaintiff again relies almost exclusively on inflammatory background allegations about Groussman's prior investment history with Honig in companies *that have nothing to do with Riot*.  Plaintiff still fails to allege a single fact to plausibly suggest that Groussman entered into any agreement with Honig to coordinate trades in Riot with Honig's alleged "group," took direction from Honig in trading Riot shares, engaged in any manipulative trading or promotional activities to influence Riot's stock price, or attempted to influence Riot's management.  And even if Plaintiff could allege a manipulative act -- and he cannot -- he still fails to identify any corrective disclosure to establish loss causation.  Instead, the SAC simply refers to two news articles that have nothing to do with Groussman or any alleged manipulation, and an SEC enforcement action involving companies other than Riot.

Unable to plead any factual allegations to establish Groussman's participation in a purported stock manipulation scheme, the SAC offers a completely new theory of liability.  The SAC now alleges that hypertechnical, purported violations of SEC rules promulgated under Section 13(d) of the Exchange Act can support a claim under Rule 10b-5.  Under this theory, Plaintiff contends that Groussman violated such rules by filing Schedule 13Gs -- which already

fully disclosed his equity position in Riot -- instead of Schedule 13Ds.  Plaintiff is wrong for several reasons.  As a threshold matter, Groussman did not violate Section 13(d) or any related rules to begin with.  The purpose of a Section 13(d) disclosure is to alert the marketplace to takeover attempts or other efforts to effect a change of control in the issuer.  If an investor has no such intent, he or she may instead file a short-form Schedule 13G.  The SAC pleads no facts suggesting that Groussman, a passive investor, ever intended to acquire control of Riot, influence its management, or even communicated with management.

Accordingly, the filing of Groussman's Schedule 13Gs violated no rules, and the statements contained within those filings -- that merely satisfied the standard for filing them -- made no misrepresentations.  Plaintiff tries to confuse the issue by claiming that Groussman was a member of an "investor group" in Riot.  But even if membership in an "investor group" alone sufficed to trigger Schedule 13D filing obligations, Plaintiff's new theory would still fail.  The SAC offers no factual allegations, consistent with Plaintiff's obligations under the PSLRA, to plausibly establish that Groussman was a member of any such group.  Plaintiff alleges no agreement, no coordinated trading, and no communications, concerning Riot, between Groussman and Honig or any of the other individual investor defendant.  Further, it is settled law that Section 13(d) provides no private right of action for shareholders.  Plaintiff should not be permitted to make an end run around that bar by attempting to transform an alleged Section 13(d) violation into a Rule 10b-5 violation.  Indeed, to do so would contravene the Supreme Court's teaching that the scope of Rule 10b-5 should not be extended "beyond its present boundaries."  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 165 (2008).

Unable to even plead either a misrepresentation under Rule 10b-5(b) or a "deceptive" or "manipulative" act under Rule 10b-5(a) or (c), the SAC predictably also falls short of adequately

pleading several other essential elements of a Rule 10b-5 claim.  For instance, Plaintiff fails to plead the requisite "strong inference" of scienter, as the SAC does not so much as mention Groussman's intent.  Even if it did, there is no plausible inference of scienter to draw based on Groussman's unremarkable and perfectly legal trading history alleged by Plaintiff and Groussman's past dealings with Honig.  In an effort to establish reliance, the SAC invokes two doctrines that allow presumptions of reliance when there has been a material misrepresentation or omission.  As Groussman is not alleged to have made any representations other than those in a fully accurate Schedule 13G, those doctrines have no applicability to him.

For all these reasons, as set forth in further detail below, the SAC should be dismissed as to Groussman.  Given that the SAC is the fifth separate complaint filed in this action, and Plaintiff has had more than three years to investigate his claims and perfect his allegations, such dismissal should be with prejudice.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Parties

Plaintiff was an investor in Riot who sold his position before the most recent climb in cryptocurrency values.  *See* Dkt. No. 17-2 (Ex. C).  The putative "Class" consists of "all purchasers of the common stock of Riot, between March 15, 2017, and September 6, 2018, inclusive."  SAC ¶ 1.

Defendant Michael Beeghley was Riot's Chairman and CEO from April 2017 until November 3, 2017, leaving the Company before Plaintiff ever invested in Riot.  SAC ¶ 28. Defendant John O'Rourke was Riot's Chairman and CEO from November 3, 2017 until September 8, 2018.  *Id.* ¶ 24.

Plaintiff has also sued several individual investors who were never officers, directors, or employees in Riot, and who never held more than a minority stake in Riot. The SAC focuses its claims on one of those investors in particular, Defendant Barry Honig, who first acquired a position in Riot in 2016 when it was a biomedical company called Venaxis, Inc. ("Venaxis"). SAC ¶¶ 164, 168. Plaintiff alleges that, as Riot transitioned from a failing medical research business to a provider of blockchain technologies, Honig led a group of other individual investors, including Defendants Catherine DeFrancesco, into acquiring a minority stake in the Company. Plaintiff alleges that these individuals – which Plaintiff calls the "Honig Group" – then, via "manipulative" trading strategies that the he never identifies or explains, somehow inflated the price of Riot shares. Finally, Plaintiff alleges that the "Honig Group" then sold their holdings as Riot's stock began to fall with the crash in cryptocurrencies in early 2018. *See* SAC ¶¶ 1, 2, 4, 176, 181-82.

## B.   Riot's Pivot To Blockchain Technologies

In 2015, when Riot was still a biomedical company, the FDA denied approval of its sole product. SAC ¶ 165. The Company, however, still had a $20 million cash war chest from a public offering it conducted the year before. *Id*. ¶ 166. As it searched for a new business model, in September 2016, Honig and DeFrancesco wrote a letter to the Company's then-CEO, Stephen Lundy, "touting their combined 16.2%" stake and expressing their dissatisfaction with the Company's direction. *Id.* ¶¶ 168-70. In late 2016, Honig initiated a proxy fight, and filed a lawsuit to force a shareholder meeting. *Id.* ¶¶ 173,-75. Three of the Company's directors resigned in early January 2017. *Id.* ¶ 176. In April of 2017, Lundy resigned as CEO and was replaced by Beeghley. *Id*. The SAC does not allege that Groussman participated in any way in the proxy fight, held stock in the Company during this period, or ever had prior dealings (or even knew) Beeghley, Dai, or DeFrancesco.

5

On October 4, 2017, as cryptocurrencies like Bitcoin began to gain traction, the Company announced that it would pivot its business to blockchain and cryptocurrency technologies. *Id.* ¶ 177. The Company simultaneously announced that it was changing its name to "Riot Blockchain" to reflect its new business focus. *Id.* The Company stated that it would pursue its new strategy for building shareholder value and future prospects by pursuing "acquisitions of businesses serving the blockchain ecosystem." *Id.* The Company then did precisely that, using a portion of its cash holdings and stock to acquire or invest in companies in the blockchain space and to purchase computer equipment necessary to perform Bitcoin mining. *See* SAC ¶¶ 177, 190-91, 196.

### C. Plaintiff Attempts To Plead An Alleged Stock Manipulation Scheme That Does Not In Any Way Involve Groussman

Among more than five hundred paragraphs and 170 pages, Plaintiff's latest pleading still offers few details to explain why Groussman should be a defendant in this case. New allegations regarding Groussman's trading do no more than reaffirm an unremarkable pattern: Groussman bought shares in Riot, and then slowly sold his position over the course of nearly a year. *See* SAC ¶ 330. According to Plaintiff, Groussman listed shares for sale in a registered offering as early as April 2017, and had fully sold off his holdings in Riot by February of 2018 – again, around the time that cryptocurrencies had crashed. *Id*. This trading history does not evidence any "pump and dump" scheme. It does not evidence "manipulation." Instead, if anything, the alleged trading strategy would have left millions of dollars on the table by not increasing the equity position through the cryptocurrency crash and its later resurgence.

This hardly suffices to establish participation in an allegedly secret trading group coordinating trades to "pump and dump" Riot stock. Absent from the SAC are any factual allegations that Groussman: (1) entered into an illegal agreement with Honig regarding Riot's stock; (2) coordinated his trading in Riot with Honig; (3) traded Riot stock at Honig's direction;

6

(4) engaged in promotional activities to "pump" the price of Riot stock; (5) voted his shares with Honig; (6) "dumped" the stock by rapidly liquidating all of his positions; or (7) engaged in any other concerted activity with Honig in any way related to Riot.  Far from alleging how Groussman was part of any purported "control group" with specific facts showing held, sold, and voted Riot shares in connection with others, the SAC devotes many paragraphs purporting to detail Groussman's activities *outside of Riot*.  SAC ¶¶ 5, 266-71.  Activities not involving Riot are, of course, irrelevant.

Plaintiff invents a new theory of liability in the SAC based on disclosure rules for potential tender offers and other takeovers.  In connection with his investments in Riot, Groussman filed with the SEC various Schedule 13Gs disclosing his equity positions in the Company.  The SAC alleges that Groussman should have instead filed Schedule 13Ds because he was investing as a "group" holding beneficial ownership together of greater than 5% of a company.  SAC ¶¶ 324-26.  But this theory is based on a misreading of the relevant regulations, rules, and laws governing Schedule 13Ds and Schedule 13Gs.  As discussed in detail below, Groussman was under no obligation to file a Schedule 13D because he was a passive investor, not someone attempting to acquire control of the Company or influence its management.

Plaintiff further speculates that Groussman may have made his 13Gs filings late, depending on when exactly Groussman sold shares in Riot.  Id. ¶ 333.  But Plaintiff does not explain how allegedly late-filed 13Gs would be material to any investor, or why filing them late would have furthered any purported stock manipulation scheme.  Among other things, a Schedule 13D or 13G is filed *after* the stock has been sold, not before.  Significantly, Plaintiff does not allege -- and cannot allege -- that the SEC ever charged Groussman with any securities law violations based on

his investments or Schedule 13G filings in Riot.  Nor does Plaintiff allege that Riot's stock price

fell on the dates Groussman filed his supposedly "late" Schedule 13Gs.

       The Schedule 13Gs remain the only alleged representation by Groussman.  That filing, and

its amendment, contain a statement that Groussman did not acquire his stake in Riot in an effort to

"chang[e] or influenc[e] the control" of the Company.  *Id*. ¶¶ 179-80.  As Groussman made no

effort to engage in a takeover of the Company or otherwise assume control of it – and Plaintiff

himself alleges no facts to suggest otherwise – nothing about that certification was in any way

false.

### D.      Procedural History

       The SAC is this action's ***fifth*** operative complaint.  Creighton Takata filed the original

complaint on February 17, 2018.  Dkt. No. 1.  Plaintiff filed the FAC on May 8, 2019.  Dkt. Nos.

72, 73.  On April 30, 2020, the Court granted Groussman's motion to dismiss, as well as the

motions to dismiss of other Defendants. Dkt. No. 167.  On December 23, 2020, the magistrate

judge granted Plaintiff's motion for leave to amend.  Dkt. No. 187.[1]  On December 24, 2020

Plaintiff filed the SAC, alleging violations of 10b-5(a) and (c) against all Defendants (Count I);

10b-5(b) against all Defendants (Count II); and Section 20 against all Defendants other than Riot

(Count III).  Dkt. No. 188.

## III.    LEGAL STANDARD

       To survive a motion to dismiss, a complaint must satisfy Rule 8(a) by stating a claim for

relief that is plausible on its face.  Fed. R. Civ. P. 8(a); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Because Plaintiff's allegations sound in fraud, each alleged misrepresentation, and each alleged

---

[1] In concluding that Plaintiff "adequately states his claims against all Defendants . . . ," Opinion at
15, the Magistrate Judge made a dispositive determination that is this Court's alone to make.  *See*
28 U.S.C. § 636(b)(1)(A).

act of deception or manipulation, must also meet the heightened pleading standards of Rule 9(b), which requires Plaintiff to, among other things, identify each actor and explain why each act by that individual was fraudulent, deceptive, or manipulative.  Fed. R. Civ. P. 9(b); *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002).  Plaintiff's claim is also subject to the heightened pleading standard of the PSLRA, which has two distinct requirements.  First, under 15 U.S.C. § 78u-4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity."  *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u-4(b)(1)).  Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

## IV.    PLAINTIFF FAILS TO STATE A CLAIM UNDER 10b-5

Plaintiff's first claim against Groussman is for alleged stock manipulation in violation of Section 10(b) and Rule 10b-5(a) and (c).  To state a valid claim under Rule 10b-5(a) or (c), the plaintiff must allege that the defendant "committed a deceptive or manipulative act," in addition to the standard elements of a Section 10(b) violation: (1) scienter; (2) connection with the purchase or sale of securities; (3) reliance; (4) economic loss; and (5) loss causation.  *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 350 (D.N.J. 2009); *Stoneridge Inv. Partners*, 552 U.S. at 158.  Plaintiff's second claim against Groussman is for violation of Rule 10b-5(b), which has all of the same elements as the first claim but, instead of a "deceptive or manipulative act," Plaintiff must adequately plead a material misrepresentation or omission.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).

A.      **Plaintiff Fails To Allege Loss Causation**

The essential element of loss causation requires "a causal connection between the material misrepresentation and the loss." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 632 (3d Cir. 2011) (quoting *Dura Pharms.*, 544 U.S. at 342). "If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price might mean a later loss. But that is far from inevitably so." *Dura Pharms.*, 544 U.S. at 342. "Although a drop in a security's price may be a result of the correction of a previous misrepresentation, it may also have been caused by changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Id.* (quoting *Dura Pharms*, 544 U.S. at 343). And "where the price of a security declines for reasons unrelated to the fraud, the investor has no right to recovery." *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 559 (D.N.J. 2010).

Rather, Plaintiff must "show that the revelation of th[e] misrepresentation or omission [for which Plaintiff sues] was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d Cir. 2007). The requirement ensures "that the individual allegedly responsible for the misrepresentation or omission does not become an insurer against all the risks associated with the investment." *Id.* at 425 n.3. That is especially true in this case because the rise and fall of Riot's stock price closely correlates to the rise and fall of cryptocurrency values. And cryptocurrencies plummeted at the very same time as Riot's stock price at the end of the class period in 2018.

Plaintiff fails to identify any corrective disclosure to establish loss causation. The SAC references various public events, most of which occurred **after** the Complaint was filed in February of 2018: (1) a January 31, 2018 Wall Street Journal article profiling Honig and his past investments; (2) a January 31, 2018 press release from Riot announcing that its shareholder

10

meeting was delayed; (3) a February 16, 2018 CNBC article about Honig's "close relationship" with O'Rourke; (4) Riot's April 17, 2018 10-K which disclosed "related-party" transactions between Riot, Honig, and DeFrancesco; (4) Riot's May 25, 2018 Form 8-K/A that disclosed Groussman and others were parties to the Coinsquare agreement; and (5) the September 7, 2018 SEC enforcement action against Honig, Groussman, and other individuals in connection with investments in three other companies that did not involve Riot whatsoever.  SAC ¶¶ 181-231.

None of these disclosures support Plaintiff's obligation to show that "the share price fell significantly after the truth became known."  *See Dura*, 544 U.S. at 347; *see also In re Ikon Office Solutions, Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 687 (E.D. Pa. 2001) (stating that to prove loss causation in the Third Circuit, plaintiff must show that he/she purchased a security at an inflated price due to the alleged misrepresentation, and that the stock price dropped in response to disclosure of the alleged misrepresentation).  As a threshold matter, disclosures that postdate the filing of this action cannot possibly be "corrective."  A corrective disclosure "must reveal ***new*** information to the market."  *In re DVI*, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2010) (emphasis added).  Because the commencement of this action "disclosed" the alleged fraudulent manipulation scheme, disclosures after that date did not reveal anything "new."  *See* Dkt. No. 1 (quoting CNBC article regarding Honig at length).

In any event, none of these disclosures "relate back" to ***Groussman's*** alleged misrepresentations.  *See In re DVI*, 2010 U.S. Dist. LEXIS 92888, at *24-26 (D.N.J. Sep. 3., 2010) ("[The disclosure] must at least relate back to the misrepresentation and not to some other negative information about the company.") (quoting *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)).  The Wall Street Journal and CNBC reports do not even reference Groussman.  Nor do they reveal any new "truth."  Instead they simply involve: (1) a profile of

Honig as a successful investor; (2) punditry opining on the "legitimacy" of the known fact of Riot's pivot to blockchain; and (3) descriptions of O'Rourke's trading activity. Not a single one of those articles reveals a previously undisclosed material fact, let alone one concerning Groussman.

Equally unavailing are the filings of Riot's 10-K, 8-K/A, and the SEC action. The 10-K makes no disclosure about Groussman. The 8-K/A concerns the acquisition of Coinsquare, which has nothing to do with Groussman's alleged participation in a stock manipulation scheme or his 13G filings. Further, Groussman was never an officer, director, or employee of Riot, and had no control over whether, when, or how the Company would disclose the Coinsquare acquisition. Finally, the SEC's action merely constitutes "allegations of unproven misconduct," which "is not a corrective disclosure which revealed" any "fraudulent conduct to the market." *Martin v. GNC Holdings, Inc.*, 2017 U.S. Dist. LEXIS 145530, at *54 (W.D. Pa. Sept. 8, 2017). But even more fundamentally, the SEC's enforcement action involves companies other than Riot, and an alleged investment group different from the one alleged in this case. The SEC's press release and Complaint do not mention Riot or any alleged misrepresentation by Groussman with respect to Riot. Thus, it cannot possibly reveal the "truth" of any of the alleged misrepresentations at issue here.[2]

"[T]he plaintiff is required to plead that the decline in the stock price was caused by the market's discovery of ***defendant's*** fraud." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 295 (D.N.J. 2007) (emphasis added). None of the alleged disclosures even remotely relates to: (1) Groussman's alleged participation in a scheme to unlawfully manipulate Riot's stock price; (2) any alleged agreement between Groussman and Honig to coordinate trading in Riot; or (3) or any

---

[2] While the SEC's complaint refers to the companies at issue as only "Company A," "Company B," and "Company C," the FAC identifies the three companies as "'Company A' (Biozone), 'Company B' (MGT), and 'Company C' (MabVax)." FAC ¶ 81.

alleged misrepresentation by Groussman.  Plaintiff does not allege that Groussman or Riot ever issued new SEC filings to "correct" Groussman's 13G filings.  Plaintiff does not allege that Groussman, Riot, the SEC, the media, or any other source later "disclosed" that Groussman was a purported member of a 13D group in Riot with Honig.  And Plaintiff does not allege that the SEC commenced an enforcement action against Groussman arising out of his trading in Riot.

**B.    Plaintiff Fails To Allege That Groussman Misrepresented A Material Fact In Violation of 10b-5(b)**

*1.    The Purpose Of A Schedule 13D Is To Disclose Potential Takeover Bidders, Not Individual Investors Like Groussman*

Plaintiff's 10b-5 claims are hinged to disclosure requirements under Section 13(d) of the Exchange Act.  But "[e]ven non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information." *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000).  The duty to disclose arises "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Id*. at 285-86.  Section 13(d) does mandate the disclosure Plaintiff contends it does.

Under the Exchange Act, stockholders who own more than 5% of an issuer's shares must report their ownership on a Schedule 13D or 13G.  *See* 17 C.F.R. § 240.13d-1(a)-(c).  Schedule 13D is the original standard form, and is designed to "requir[e] the disclosure of information by a potential takeover bidder." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 122-23 (2d Cir. 2001).  These disclosure requirements derive from Section 13(d), which was never intended to be "an ownership reporting provision of general application." *See* Filing and Disclosure Requirements Relating to Beneficial Ownership, Exchange Act Release No. 15348, 16 SEC Docket 228, 229 (Nov. 22, 1978).  Congress added Section 13(d) to the Exchange Act as an amendment that was part of the Williams Act.  Williams Act, Pub. L. No. 90-439, 82 Stat. 454 (1968) (codified at 15 U.S.C. § 78).  The purpose of Section 13(d), and the rest of the Williams Act, was "to insure that

13

public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information . . . ." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58 (1975).  Thus, the specific purpose of a Rule 13(d) disclosure is "to alert the marketplace to every large, rapid aggregation or accumulation of securities . . . which might represent *a potential shift in corporate control* . . . .".  *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971) (emphasis added).

Recognizing that continually filing burdensome Schedule 13Ds was unnecessary in the absence of any intent to effect a change in control, Congress passed another amendment in 1970 to include section 13(d)(5).  *See* Act of Dec. 22, 1970, Pub. L. No. 91-567, § 1, 84 Stat. 1497, 1497 (codified at 15 U.S.C. § 78m(d)(5)).  Section 13(d)(5) allows the SEC to promulgate a short-form filing option which, in its current version, is Schedule 13G.  This short-form filing is available to investors who did not acquire the securities to "chang[e] or influenc[e] the control of the issuer." 17 CFR 240.13d-1(b)-(c).  In amendments to expand the use of Schedule 13G, the SEC explained, "[t]he existing reporting scheme imposed **<u>unnecessary</u>** disclosure obligations on persons whose acquisitions do not affect the control of issuers."  *See* Amendments to Beneficial Ownership Reporting Requirements, Exchange Act Release No. 39538, 66 SEC Docket 596, 597 (Jan. 12, 1998) (emphasis added).

In sum, no rule requires a group of investors, who simply buy or sell shares of an issuer together, without any aspirations to acquire control over the issuer, to disclose their group under a Schedule 13D.  In support of Plaintiff's far-fetched theory that participation in an investor group alone triggers obligations to file a Schedule 13D, the SAC cites to 17 C.F.R § 240.13d-5(b)(1) and 17 C.F.R § 240.13d-101.  SAC ¶ 324 n.57-58.  The former expressly permits a "group" to file a 13G.  *See* 17 C.F.R § 240.13d-5(b)(1) ("the group formed thereby shall be deemed to have acquired

beneficial ownership, for purposes of sections 13(d) *and (g)* of the Act") (emphasis added).  And

the latter sets forth "information to be included in statements filed pursuant to § 240.13d-1(a),"

which, as noted above, permits a person to, "in lieu" of filing a Schedule 13D, file "a short-form

statement on Schedule 13G" if they are a passive investor and did not acquire the securities "with

the purpose nor with the effect of changing or influencing the control of the issuer."  Accordingly,

these regulations only underscore that intent to "control" is the dispositive factor in determining

whether an investor must file a Schedule 13D or 13G.  It is not enough, as the SAC alleges, that

Groussman was simply "a member of a group."  SAC ¶ 328.

> If Plaintiff's theory were correct -- that simply participating in an "investor group" alone
triggered burdensome disclosure obligations under Section 13(d) -- the legal and regulatory
landscape, and the alleged facts of this case, would be much different.  Riot and/or Groussman
would have been required to file corrective disclosures consistent with Section 13(d).  The SEC
would have commenced an enforcement action for violations of Section 13(d) with respect to Riot.
Retail investors of large online communities such as Reddit, who agreed to trade shares in issuers
together and take positions that represented far greater than 5% of the issuer, would be subject to
Section 13(d).  And there would be parallel SEC regulations requiring the disclosure of massive
short positions in issuers because, under Plaintiff's theory, such a group could just as easily
manipulate an issuer's stock as a group of long investors.  But none of this is true, and Plaintiff's
efforts to manufacture securities law violations by contorting the language and purpose of Rule
13(d) fail.

> ### 2. *Groussman's Filing Of Schedule 13Gs Did Not Constitute A Material Misrepresentation*

The only alleged statement Plaintiff attributes to Groussman is contained in his Schedule

13G filings disclosing Groussman's beneficial ownership of Riot common stock.  Groussman's

filing of a Schedule 13G in lieu of a Schedule 13D is not a material misrepresentation, nor a violation of any securities law or regulation.

First, as explained in Section IV.B.1, a Schedule 13D is only required if the investor holds the securities for the purpose of effecting change or influencing the control of the issuer.  Lest there be any doubt, the SEC has explicitly stated in guidance to investors that a Schedule 13G is the proper form when the investor's involvement is limited to "[e]ngagement on corporate governance topics," but it is inappropriate if the investor "engages with the issuer's management on matters that specifically call for the sale of the issuer to another company, the sale of a significant amount of the issuer's assets, the restructuring of the issuer, or a contested election of directors."  SEC, *Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting* (July 14, 2016);[3] *see also* 17 C.F.R. § 240.12(b)-2(f) (defining control as the power to "direct or cause the direction of the management and policies" of a company).

Nowhere in the SAC does Plaintiff allege that Groussman acquired Riot shares for such purposes.  In particular, the SAC does not allege that Groussman was ever involved in any of Riot's corporate decision-making, ever intended to effect a takeover of the Company, or ever spoke once to Riot management.  Indeed, Groussman could not have possibly acquired Riot shares for purposes of a takeover, given Plaintiff's contention that Honig had already obtained "de facto control" of Riot by March of 2017 *and* installed Beeghly as Honig's preferred CEO (SAC ¶ 176), several months *before* Groussman filed the Schedule 13G.  Further, any allegation that Groussman was somehow attempting to engineer a takeover or otherwise gain control of Riot in October of 2017 would not be credible in light of Plaintiff's allegations that Groussman was, between April and September of 2017, selling hundreds of thousands of shares in Riot.  SAC ¶ 330.

---

[3] Available at https://www.sec.gov/divisions/corpfin/guidance/reg13d-interp.htm#103.11.

Second, for essentially the same reasons, nothing about Groussman's specific certification in his 13G filings was false.  Groussman simply states that he satisfies the standard for filing a Schedule 13G -- that the securities "were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect."  SAC ¶¶ 179-80.  Plaintiff offers only conclusory allegations that this statement was false (*id.* ¶ 328), but does not allege any actual facts demonstrating that it was false.

The SAC also alleges that the allegedly "delayed" timing of the Schedule 13G filings "concealed" Groussman's sales of Riot stock.  But, as noted above, the purpose of a Section 13(d) disclosure is to "alert" the market to a rapid ***aggregation*** of an issuer's stock in connection with a potential takeover.  *See GAF Corp.* 453 F.2d at 717.  The SAC does not allege, and cannot allege, that one of the purposes of a Schedule 13D or Schedule 13G disclosure is to "alert" the market that an investor is slowly selling off his position over the course of a year.  Indeed, it would make little sense to rely on a Schedule 13D or 13G as a mechanism for alerting the marketplace to "pump and dump" schemes and preventing beneficial owners from "concealing" their sales.  An updated schedule is filed days or weeks ***after*** the investor has already sold the shares.  By the time the Schedule 13D or 13G is filed, the "damage" from such a scheme would already have been done.

In any case, from the face of the SAC itself, no sales were "concealed."  An S-3 was issued in September of 2017 showing that Groussman was a "selling stockholder" who then held 500,000 shares.  A few weeks later in October of 2017, Groussman filed a Schedule 13G showing he then held 399,202 shares.  Then in January of 2018, the Company issued a new S-3 showing that Groussman, again as a "selling stockholder," held 131,945 shares.  And in February of 2018 Groussman filed an amended Schedule 13G showing he had 188,888 shares.  *See* FAC ¶ 330.

Accordingly, the fact that Groussman was a "selling stockholder" and that he had been selling shares, was repeatedly and regularly disclosed in public filings.

>    3.    *Even If "Group Investing" Alone Triggered Schedule 13D Filing Obligations, Plaintiff Fails To Plead Facts Establishing That Groussman Was Part Of An Investor Group In Riot*

A "[p]laintiff must allege facts demonstrating that a group exists." *Huppe v. Guez*, Case No. CV 04–07609, 2005 WL 8154782, at *6 (C.D. Cal. April 18, 2005). Such facts show how "the defendants acted together in furtherance of a common objective with regard to acquiring, holding, voting or disposing of securities of the [issuer]." *Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 448 (S.D.N.Y. 2001). An "unadorned allegation that defendants are acting as a group is not adequate" is insufficient to sustain a claim. *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972).

Plaintiff offers no specific facts to show that Groussman acted with others "in furtherance of a common objective" with respect to Riot stock. Plaintiff's repeated, conclusory incantations of a "control group" do no satisfy his pleading burden. Plaintiff adds no factual allegations explaining how Groussman was in any way involved with the group, what actions Groussman took to further any of its purported objectives, or even that Groussman was in any way involved in Riot's business. The only factual allegations Plaintiff pleads to support his conclusion that Groussman was part of a secret 13(d) group are that Groussman: (1) had "prior connections" to Honig and other Defendants in investments completely unrelated to Riot; (2) once shared office space with Honig, Stetson, and O'Rourke during some irrelevant time period predating Groussman's investment in Riot; (3) Honig loaned Groussman money to buy a house; and (4) Groussman was also a defendant in the SEC action against Honig which, again, involved companies other than Riot. *See* SAC ¶¶ 264-73.

None of these allegations demonstrate that Groussman entered an agreement with Honig to hold, vote, or dispose of shares in Riot.  Indeed, none of these alleged facts have anything to do with Riot at all.  Plaintiff cannot evade his pleading burden by simply alleging that Groussman purchased and sold shares of Riot around the same time as Honig, Stetson, and thousands of other individual investors.  "Allegations of parallel investment activity . . ., are insufficient to allege an 'agreement' to combine efforts in furtherance of a commonly held objective."  *Greenfield v. Criterion Capital Mgmt., LLC*, No. 15-CV-3583-PJH, 2017 WL 2720208, at *7 (N.D. Cal. June 23, 2017).

Simply put, Plaintiff's conclusory allegations of a "group" do not pass muster.  *See Segal*, 467 F.2d at 608  (rejecting claim that defendant formed a group for purposes of Section 13(d) that was "founded on unmitigated speculation"); *Rosenberg v. XM Ventures*, 129 F. Supp. 2d 681, 688 (D. Del.), *aff'd*, 274 F.3d 137 (3d Cir. 2001) (rejecting section 16(b) claim based on allegations that defendants "created a group which acted together for the purpose of acquiring, holding or voting the Company's equity securities within the meaning of Section 13(d)" because "these averments are nothing more than unsupported, conclusory allegations"); *Rubenstein v. Int'l Value Advisers, LLC*, 363 F. Supp. 3d 379, 392 (S.D.N.Y. 2019), *aff'd*, 959 F.3d 541 (2d Cir. 2020) (rejecting group allegations that failed to allege that one purported member "invested knowing of [the other member's] positions in [the issuer] or of a particular investment strategy by [the other member] regarding [thee issuer]"); *Strauss v. American Holdings, Inc.* 902 F. Supp. 475, 479 (S.D.N.Y. 1995) (stating that a "group" characterization, unsupported by specific facts, would not constitute the sort of legal conclusion that cannot survive a motion to dismiss).

19

       *4.   The Alleged, Hypertechnical Violation Of Regulations Under Section 13(d) Cannot Act As A Predicate For A 10(b)(5) Claim*

Courts have repeatedly held that Section 13(d) was "not devised to provide private litigants with another means of litigating securities fraud." *Dreiling v. Am. Online Inc.*, 578 F.3d 995, 1003 (9th Cir. 2009); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 619 (2d Cir. 2002) ("Courts in this circuit have consistently declined to imply a cause of action for shareholders under § 13(d).") (collecting cases); *Motient Corp. v. Dondero*, 529 F.3d 532, 536 (5th Cir. 2008) ("there is no private cause of action for money damages under Section 13(d)"); *Rubin v. Posner*, 701 F. Supp. 1041, 1051 (D. Del. 1988) ("no implied cause of action for money damages exists under § 13(d)"). Section 13(d) "neither confers rights on private parties nor proscribes any conduct as unlawful. It simply requires persons acquiring a substantial interest in a firm to report their acquisition to the Commission, the exchanges, and the issuer." *Liberty Nat. Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 564 (11th Cir. 1984).

      There are numerous grounds for concluding that Section 13(d) does not confer shareholders a private right of action. These include that (1) "the relevant legislative history reveals 'an absence of legislative intent to imply a right of action under § 13(d);'" (2) "§ 13(d) does not contain rights-creating language; it simply requires investors to file certain statements;" and (3) there is already "an express remedy under § 18(a) of the Williams Act, available to those shareholders who can prove reliance on misleading filings." *Hallwood Realty Partners*, 286 F.3d at 620 (2d Cir. 2002). Indeed, given that the purpose of Section 13(d) disclosures concerns potential shifts in corporate control, the issuer "unquestionably is in the best position to enforce section § 13(d)." *Id*. "The statute requires a copy of the statement to be sent by registered mail to the issuer ... and the issuer, in the course of constantly monitoring transactions in its stock, better than anyone else will know when there has been a failure to file." *Id*.

Expanding 10b-5 liability as Plaintiff posits here is incompatible with both the purpose of Section 13(d) and the myriad of reasons why courts have already refused to recognize a private right of action for shareholders under the statute.  Such an expansion would also contravene the Supreme Court's teaching that "allegations of deception unmoored from the purported harm do not state a cognizable claim under Rule 10b-5."  *See S*iegmund v. Xuelian Bian*, No. 16-62506-CIV, 2018 WL 1611197, at *9 (S.D. Fla. Apr. 2, 2018) (citing *Stoneridge Inv. Partners,*, 552 U.S. 148).  In light of the purpose of Section 13(d) disclosures, the alleged "deception" here would have to concern a rapid aggregation of shares in Riot for the purpose of effecting a change in control of Riot.  But the purported harm arises out of a purported "pump and dump" scheme, not an attempt to conceal a takeover of Riot.  And while some federal district courts have stated incorrectly that a violation of Section 13(d) can serve as a predicate for a 10b(5) claim, *see, e.g., Vladimir v. Bioenvision Inc*., 606 F. Supp. 2d 473, 491 (S.D.N.Y. 2009), Defendant is unaware of any controlling Third Circuit decision holding the same.

No compelling legal precedent or policy underlying Section 13(d) supports such an expansion of 10b-5 liability.  By contrast, rejection of Plaintiff's novel theory "is consistent with the narrow dimensions [courts] must give to a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law."  *Stoneridge Inv. Partners*, 552 U.S. at 167.  The Supreme Court has long cautioned that the private right of action for Rule 10b-5 violations must be limited to avoid the explosion of "vexatious litigation . . . from a widely expanded class of plaintiffs."  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740 (1975).  The private right of action under §10(b) and Rule 10b-5 is a "judicial construct that Congress did not enact in the text of the relevant statutes."  *Stoneridge Inv. Partners*, 552 U.S. at 164 (citation omitted).  Accordingly, any "decision to extend the implied cause of action is for Congress," not

for the courts.  *Id.* at 165.  And Congress has already spoken on the issue by making Section 18 the exclusive remedy for a claim for money damages for a violation of Section 13(d).  *See Kamerman v. Steinberg*, 891 F.2d 424, 430 (2d Cir. 1989).  As such, the scope of the Rule 10b-5 private right of action should not be extended "beyond its present boundaries." *Stoneridge Inv. Partners*, 552 U.S. at 165.

### C.   Plaintiff Fails To Allege That Groussman Engaged In A "Deceptive Or Manipulative" Act In Violation Of 10b-5(a) Or (c).

To satisfy Rule 9(b), a fraud claim based on alleged market manipulation must set forth "to the extent possible, [1] what manipulative acts were performed, [2] which defendants performed them, [3] when the manipulative acts were performed, and [4] what effect the scheme had on the market for the securities at issue."  *In re Able Labs. Sec. Litig.*, No. 05-2681, 2008 U.S. Dist. LEXIS 23538, *73 (D.N.J. 2008).  Where, as here, a complaint asserts claims against more than one defendant, Rule 9(b) "require[s] plaintiffs to differentiate their allegations . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Dolan v. PHL Variable Ins. Co.*, 3:15-CV-01987, 2016 U.S. Dist. LEXIS 161414, *15 (M.D. Penn. 2016).

The SAC contains no particularized allegations that Groussman performed any manipulative or deceptive acts in connection with the alleged stock manipulation scheme.  Instead, the SAC contains background allegations that: (1) Groussman sold shares of Riot's common stock; (2) was a passive investor in another company with which Riot dealt; and (3) filed a Schedule 13G that accurately and fully reflected the number of shares that Groussman held in Riot during the class period.  None of these acts could support liability under Rule 10b-5(a) or (c).

### 1.   Plaintiff Cannot Predicate Scheme Liability On An Alleged Misrepresentation Or Omission

Claims brought under Rule 10b-5(a) and (c) are referred to as "scheme liability" claims, because they "make deceptive conduct actionable, ***as opposed to*** . . . deceptive statements." *In re*

*DVI, Inc. Sec. Litig.*, 639 F.3d 623, 643 n.29 (3d Cir. 2011) (emphasis added).  Thus courts in the Third and other Circuits generally premise scheme liability on misconduct separate from misrepresentations and omissions violating Rule 10b-5(b).  *See Stichting Pensioenfonds ABP v. Merck & Co.*, No. 05-5060, 2012 U.S. Dist. LEXIS 113813, at *25 (D.N.J. Aug. 1, 2012) ("scheme liability [] cannot . . . be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim"); *Pub. Pension Fund Grp. v. KV Pharma. Co*., 679 F.3d 972, 987 (8th Cir. 2012) ("We join the Second and Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b).").  As such, under existing Third Circuit precedent, any effort by Plaintiff to predicate scheme liability on an alleged misrepresentation by Groussman fails as a matter of law.

2.     *Groussman's Publicly-Disclosed Trading In Riot Does Not Constitute A "Deceptive" or "Manipulative" Act*

To state a scheme liability claim based on allegations that multiple defendants collectively acted, Plaintiff must show that ***each*** defendant committed a manipulative or deceptive act in furtherance of the scheme.  *Central Bank, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 191 (1994).  There is no private "aiding and abetting" or "conspiracy" liability under § 10(b) of the Securities and Exchange Act, or Rule 10b-5 promulgated thereunder.  *See Id*.  Accordingly, Groussman may only be liable as a primary actor; meaning Plaintiff must plead that ***Groussman*** committed a deceptive or manipulative act in furtherance of the scheme upon which Plaintiff relied.  *See Stoneridge Inv. Partners*, 552 U.S. at 639-40.  As claims of fraud, these allegations are also subject to the heightened pleading requirements of Rule 9(b).  *United States SEC v. Wey*, 246 F. Supp. 3d 894, 916 (S.D.N.Y. 2017).

Plaintiff alleges neither deception nor manipulation.  "[D]eception, at a minimum, has to involve an act that gives the victims a false impression."  *Lucent*, 610 F. Supp. 2d at 360 (citing

*United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008)).  "Manipulation" by contrast, is "virtually a term of art when used in connection with securities markets.'" *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).  The term refers to "practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.'" *Rabin v. NASDAQ OMS PHLX LLC*, 712 F. App'x. 188, 193 n.7 (3d Cir. 2017).

The only trading in which Groussman is alleged to have engaged is the slow disposition of his holdings in Riot over the course of nearly a year.  There is nothing inherently deceptive or manipulative in selling common stock in the open market, and Plaintiff does not allege facts demonstrating that Groussman concealed trades, coordinated his trades with other Defendants, misrepresented anything regarding his trading, or engaged in trades in a way that otherwise artificially altered Riot's stock price.  *See GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 207 (3d Cir. 2001) (manipulation involves "artificially depressing or inflating the price of the security").  Nor were Grossman's stock sales in any way deceptive, particularly where, as here, Plaintiff alleges that his trading was public knowledge.  *See* SAC ¶ 330.

"Participation in a legitimate transaction, which does not have a deceptive purpose or effect, would not allow for a primary violation even if the defendant knew or intended that another party would manipulate the transaction to effectuate a fraud."  *See In re Charter Commc'ns, Inc., Sec. Litig.*, 443 F.3d 987, 992 (8th Cir. 2006) (refusing to impose primary liability "on a business that entered into [a] . . . transaction with an entity that then used the transaction to publish false and misleading statements to its investors and analysts"); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 505 (S.D.N.Y. 2005) ("At worst, the banks designed and entered into the transactions knowing or even intending that Parmalat or its auditors would misrepresent the nature of the arrangements.  That is, they substantially assisted fraud with culpable knowledge – in other words,

they aided and abetted it.").  Groussman's unremarkable – and fully disclosed – trading history in Riot does not constitute a "manipulative" or "deceptive" act, and is not a primary violation of the securities laws.

       *3.*       *The Coinsquare Transaction Is Not Actionable Against Groussman Under 10-b5*

To the extent Plaintiff purports to rely on the Coinsquare transaction, Plaintiff does not allege that Groussman had any actual role in that transaction, other than as a passive investor. Plaintiff does not allege that Groussman exercised control or influence over whether Riot would complete that transaction, nor had any role in drafting the press releases and SEC filings describing the acquisition.  Plaintiff thus fails to allege that Groussman – in being an alleged passive investor in Coinsquare – engaged in any "'act, scheme, or course of conduct' to defraud investors." *See Kemp v. Univ. Am. Fin. Corp.*, No. 05 Civ. 9883, 2007 WL 86942, at *17 (S.D.N.Y. Jan. 10, 2007). Indeed, Plaintiff does not even allege that the Coinsquare transaction was carried out in furtherance of the alleged stock manipulation scheme.

       **D.**       **Plaintiff Fails To Adequately Allege That Groussman Acted With Scienter**

The PSLRA requires Plaintiff to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Winer Family Trust*, 503 F.3d at 335 (citing 15 U.S.C. § 78u-4(b)(2)).  Determining whether an inference is "strong" involves a comparative inquiry, and "plausible, nonculpable explanations for the defendant's conduct" must be considered in addition to any inferences favoring the plaintiff.  *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 323-24 (2007).  An "inference of scienter must be more than merely 'reasonable' or 'permissible.'"  *Id.* at 324.  It must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*

Plaintiff alleges no facts, let alone any facts with particularity, supporting a strong inference that Groussman committed any act with an intent to deceive, manipulate or defraud.  Plaintiff offers no witnesses, sources, or any contemporaneous documents to show that Groussman was ever in league with any "group" to artificially inflate Riot's stock.  *See Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1152 (W.D. Wash. 2006) (plaintiffs failed to allege scienter because they alleged no witnesses or facts to support assertion that defendants intended to inflate the company's stock in furtherance of a pump-and-dump scheme).  Plaintiff does not even allege that Groussman purposefully timed his trading to coincide with the trading of any member of the so-called "Honig Group."  Plaintiff also does not allege that, unlike other Defendants, Groussman was "familiar with [his] obligations under Section 13(d)."  SAC ¶ 234.

Plaintiff's only specific references to Groussman's purported scienter is his *prior* relationship with Honig, involving companies other than Riot.  *See* SAC ¶¶ 264-73.  In evaluating scienter, "the reviewing court must ask: when the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Tellabs,* 551 U.S. at 326.  Here, the facts alleged give rise to a far more compelling "opposing inference of nonfraudulent intent," *id. at* 314: that Groussman believed his trading strategy was perfectly legal.  Plaintiff alleges Groussman and others "have a long history of co-investing in dozens and dozens of microcap public companies."  SAC ¶ 5.  If true, that history would have already been known to the market, and publicly-available in the filings of those "dozens and dozens" of issuers.  And, notwithstanding a "long history" in "dozens and dozens" of such companies, the SEC only brought an action in 2018, with respect to three issuers that were not Riot.  According to the SAC itself, there was no overt agreement to buy, hold, or sell shares in

concert with other Defendants, and Groussman's trading in Riot never triggered any SEC enforcement action, and never required Riot to restate its SEC filings.

Unable to plead scienter with particularity, Plaintiff again invites the Court to assume scienter based on allegations that Groussman was subject to an SEC action that did not involve Riot and was settled before it was ever litigated.  More compelling is the absence of any SEC enforcement action with respect to Riot.  Plaintiff's efforts to establish scienter in this case, based on unproven allegations of scienter from a complaint in another case involving other companies, fails as a matter of law.  *Cortina v. Anavex Life Scis. Corp.*, No. 15-CV-10162, 2016 U.S. Dist. LEXIS 179905, *25 (S.D.N.Y. Dec. 29, 2016) ("the fact that Anavex had a history of involvement in stock promotion schemes does not come close to suggesting that Defendants had knowledge of the alleged scheme during the Class Period"); *United States Football League v. NFL*, 634 F. Supp. 1155, 1173 (S.D.N.Y. 1986) (striking allegations of prior judgments against defendant which would have permitted plaintiff to "create an 'aura of guilt' or to imply new wrongdoing from past wrongdoing.").

To the extent Plaintiff seeks to establish Groussman's scienter through motive and opportunity – and he pleads no such facts as to Groussman – the Third Circuit has rejected the proposition that motive, even when coupled with opportunity, may give rise to a strong inference of scienter.  "It cannot be said that, in every conceivable situation in which an individual makes a false or misleading statement and has a strong motive and opportunity to do so, the nonculpable explanations will necessarily not be more compelling than the culpable ones.  And if that is true, then allegations of motive and opportunity are not entitled to a special, independent status." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 277 (3d Cir. 2009).  Here, the inference is equally strong – if not stronger – that Groussman believed his fully-disclosed trading in Riot shares

was a completely legal trading strategy.  Plaintiff does not allege facts showing that Groussman knew or should have known to file a Schedule 13D instead of 13G.  Plaintiff does not allege what proceeds, if any, Groussman supposedly earned from his sales.  Nor does Groussman's allegedly "late-filed" Schedule 13G demonstrate scienter.

### E.        Plaintiff Fails To Adequately Allege Reliance

To survive a motion to dismiss, Plaintiff must also plead reliance, subject to the heightened pleading standards of the PSLRA and Rule 9(b).  *See In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 397 (D.N.J. 2010); *In re Luxottica Grp. S.p.A., Sec. Litig.*, 293 F. Supp. 2d 224, 236 (E.D.N.Y. 2003) ("[P]laintiffs have failed to allege that defendants' failure to file a Schedule 13D was an omission upon which they relied when they tendered their shares.").  Plaintiff alleges he is entitled to a presumption of reliance under both *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and the fraud-on-the-market doctrine.  SAC ¶¶ 474-80.  Neither presumption is applicable.

The presumption of reliance recognized in *Affiliated Ute* requires an allegation that the defendant made a material omission or misstatement.  *See id.* at 153-54.  The only alleged representation Plaintiff attributes to Groussman are Schedule 13G filings, which accurately disclosed Groussman's beneficial ownership of Riot common stock.  As explained above, the SAC pleads no facts to show that Groussman's Schedule 13G misrepresented or omitted any material fact, as a Schedule 13G is merely a short-form statement reporting a 5% or more stake in an issuer, acquired without the intent to attempt a takeover or otherwise exercise control over the company.  Nor is Plaintiff entitled to an *Affiliated Ute* presumption based on Groussman's trading strategy.  In the Third Circuit, "those engaged in manipulation have [no] duty to disclose such conduct to other market participants."  *Rabin*, 712 F. App'x. at 194.

28

Plaintiff's reliance on the "fraud-on-the-market" presumption of reliance is also unavailing.  This presumption is based on the hypothesis that the price of a stock "in an open and developed securities market . . . is determined by the available material information regarding the company and its business."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 241 (1988).  Accordingly, "the presumption is usually available only if there are material omissions or misrepresentations concerning an actively traded security."  *Rabin*, 712 F. App'x. at 194-95.  Because Plaintiff cannot plausibly allege any material omission or misrepresentation attributable to Groussman, this theory of reliance is inapplicable.

## V.    PLAINTIFF'S SECTION 20 CLAIM FALLS WITH HIS 10B-5 CLAIMS

As discussed above and in the concurrently-filed motion to dismiss of Riot, the SAC fails to allege sufficient facts to establish a primary violation of the securities laws by Riot.  Therefore, the Section 20(a) claim necessarily fails and should be dismissed.  *See In re Digital*, 223 F. Supp. 2d at 561-63 (dismissing Section 20(a) claims where the plaintiffs failed to state claims for underlying violations of the securities laws).   But even if Plaintiff could establish a primary violation by Riot, his Section 20(a) claim against Groussman would still fail.

First, Groussman "must also have been a 'culpable participant' in the 'act or acts constituting the violation or cause of action.'"  *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013) (citing *SEC v. J.W. Barclay & Co.*, 442 F.3d 834, 841 n. 8) (3d Cir. 2006).  The PSLRA requires plaintiffs alleging Section 20(a) claims to "plead the 'particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud.'"  *In re Cendant Corp. Sec. Litig.*, 76 F. Supp. 2d 539, 549 n.5 (D.N.J. 1999).  The SAC pleads no particularized facts to show that Groussman was a "culpable participant," such as that he affirmatively entered into an illegal stock manipulation agreement with Honig.  Instead, the SAC merely pleads an

unremarkable trading pattern in Riot, Schedule 13G filings that were accurate and fully complied with Section 13(d), and an investing history with Honig regarding companies other than Riot.

Second, "to establish controlling person liability under [Section 20(a)], a defendant must possess 'actual control over the transactions in question.'" *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d at 561. The SAC alleges only that Honig and other investor Defendants "were able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period." SAC ¶ 502. But the SAC fails to allege how Groussman, in particular, had any control over such actions, or that he even played any role in them. The SAC does not allege that Groussman ever voted his shares in a particular way, had the authority to direct Riot to issue press releases or issue SEC filings, played any role in the management of Riot, or even communicated with Riot management.

## VI.   THE SAC SHOULD BE DISMISSED WITH PREJUDICE

Plaintiff has had the benefit of multiple motions to dismiss, detailed guidance by this Court in an exhaustive order granting all of Defendants' motions to dismiss, and months of additional time. Yet the most Plaintiff can add are alleged technical violations of SEC rules that Plaintiff has misinterpreted and, in any event, cannot support an independent cause of action. Because the legal defects in the SAC cannot be cured, and because Groussman would be unduly prejudiced by having to respond to yet another pleading in this case, the claims should be dismissed as to Groussman with prejudice. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332-33 (3d Cir. 2002) (noting that PSLRA's objective would be thwarted if "plaintiffs were liberally permitted leave to amend").

### VII.   CONCLUSION

For the foregoing reasons, the Court should dismiss the SAC with prejudice for failure to state a claim pursuant to Rules of Civil Procedure 9(b) and 12(b)(6), and the PSRLA.

Dated: February 8, 2021

By:   s/ Kate Janukowicz
       Kevin G. Walsh, Esq.
       Kate E. Janukowicz, Esq.
       **GIBBONS P.C.**
       One Gateway Center
       Newark, New Jersey 07102-5310
       Telephone: (973) 596-4500
       kwalsh@gibbonslaw.com
       kjanukowicz@gibbonslaw.com

       **BAKER & MCKENZIE LLP**
       Perrie M. Weiner (*pro hac vice*)
       perrie.weiner@bakermckenzie.com
       Edward D. Totino (*pro hac vice*)
       Edward.totino@bakermckenzie.com
       **BAKER & MCKENZIE LLP**
       10250 Constellation Blvd., Suite 1850
       Los Angeles, CA 90067
       Tel:    310.201.4728
       Fax:    310.201.4721

       *Attorneys for Defendant Mark Groussman*

31