**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY MCGONEGAL,<br><br>Defendants. | Civil Action No.: 18-2293(FLW)(TJB)<br><br>*ORAL ARGUMENT REQUESTED* |

**DEFENDANT BARRY C. HONIG'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

*Attorneys for Defendant Barry C. Honig*

Dated: February 8, 2021

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ... 1

ARGUMENT ... 3

I. FACTUAL BACKGROUND ... 3

II. APPLICABLE LEGAL STANDARDS ... 5

A. Implausible Claims Should Be Dismissed Pursuant to Rule 12(b)(6). ... 5

B. Complaints Alleging Securities Fraud Must Be Dismissed Unless They Satisfy The Heightened Pleading Standards Of Rule 9(b) And The PSLRA. ... 6

III. THE SAC'S FIRST CAUSE OF ACTION AGAINST MR. HONIG ALLEGING HIS PARTICIPATION IN A "SCHEME" SHOULD BE DISMISSED. ... 8

A. The Alleged Scheme – That Mr. Honig "Pumped" Up The Market Price of Riot Stock Ten-Fold By Remaining Silent – Is Completely Implausible. ... 9

B. Mr. Honig Did Not "Conceal" His Membership In An "Investment Group" –There Was No Group, And The SAC Itself Reveals The Lack of Group Activity. ... 11

C. The SAC Itself Reveals That Mr. Honig's Ongoing Stock Sales Were Publicly Disclosed, And Those Sales Had No Impact Upon Riot's Stock Price. ... 14

D. Plaintiff Fails to Allege Loss Causation. ... 16

E. The Contradictory Facts Alleged in the SAC Negate Any Inference That Mr. Honig Acted With Scienter. ... 19

IV. THE SAC'S SECOND CAUSE OF ACTION AGAINST MR. HONIG FOR VIOLATION OF SECTION 10(B) AND RULE 10b-5 SHOULD BE DISMISSED. ... 20

V. LEAD PLAINTIFF'S SECTION 20(A) CLAIM AGAINST MR. HONIG SHOULD BE DISMISSED BECAUSE THE SAC ALLEGES NO FACTS WHICH PLAUSIBLY SHOW MR. HONIG'S "CONTROL" OVER ANY INSIDER. ... 23

CONCLUSION ... 27

APPENDIX ... 28

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*In re Able Labs. Sec. Litig.*
No. 05-cv-02681, 2008 WL 1967509 (D.N.J. Mar. 24, 2008) .......... 8, 16

*In re Alstom SA Sec. Litig.*
406 F. Supp. 2d 433 (S.D.N.Y. 2005) .......... 24, 25

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) .......... 5, 6, 25

*Barker v. Henderson, Franklin, Starnes & Holt*
797 F.2d 490 (7th Cir. 1986) .......... 24

*Basic Inc. v. Levinson*
485 U.S. 224 (1988) .......... 22

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) .......... 6, 25

*In re BioScrip*
95 F. Supp. 3d 711 (S.D.N.Y. 2015) .......... 24, 25

*In re Burlington Coat Factory Sec. Litig.*
114 F.3d 1410 (3d Cir. 1997) .......... 6

*California Public Employees' Ret. Sys. v. Chubb Corp.*
394 F.3d 126 (3d Cir. 2004) .......... 27

*Carmack v. Amaya Inc.*
258 F. Supp. 3d 454 (D.N.J. 2017) .......... 25

*Castlerock Management v. Ultralife Batteries*
68 F. Supp. 2d 480 (D.N.J. 1999) .......... 21

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*
511 U.S. 164 (1994) .......... 8

*CSX Corporation v. Children's Investment Fund Mgt.*
654 F.3d 276 (2d. Cir. 2011) .......... 12

*De Vito v. Liquid Holdings Grp., Inc.*
No. 15-cv-06969, 2018 WL 6891832 (D.N.J. Dec. 31, 2018) .......... 9

*Dura Pharm., Inc. v. Broudo*
544 U.S. 336 (2005) .......... 16

*EcoShelf Group, Inc. v. Horn*
No. 10–2171, 2010 WL 11570285 (D.N.J. Sept. 21, 2010) ....................25

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*
352 F. Supp. 2d 429 (S.D.N.Y. 2005) ....................24

*Fowler v. UPMC Shadyside*
578 F.3d 203 (3d Cir. 2009) ....................6

*Francis v. Giacomelli*
588 F.3d 186 (4th Cir. 2009) ....................6, 25, 26

*Frederico v. Home Depot*
507 F.3d 188 (3d Cir. 2007) ....................7

*Greenfield v. Criterion Capital Mgmt., LLC*
No. 15-cv-3583-PJH, 2017 U.S. Dist. LEXIS 97638 (N.D. Cal. June 23, 2017) ....................12

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*
286 F.3d 613 (2d Cir. 2002) ....................23

*Huppe v. Guez*
No. 04-cv-07609, 2005 WL 8154782 (C.D. Cal. April 18, 2005) ....................12

*In Jones v. Intelli-Check, Inc.*
274 F. Supp. 2d 615 (D.N.J. 2003) ....................23

*Institutional Investors Group v. Avaya, Inc.*
564 F.3d 242 (3d Cir. 2009) ....................7

*Issen v. GSC Enterprises, Inc.*
522 F. Supp. 390 (N.D. Ill. 1981) ....................22, 23

*Janus Capital Grp., Inc. v. First Derivative Traders*
564 U.S. 135 (2011) ....................21

*Kuhns v. Ledger*
202 F. Supp. 3d 433 (S.D.N.Y. 2016) ....................24

*Liberty Nat. Ins. Holding Co. v. Charter*
734 F.2d 545 (11th Cir.1984) ....................23

*Log On America, Inc. v. Promethean Asset Management L.L.C.*
223 F. Supp. 2d 435 (S.D.N.Y. 2001) ....................12, 13

*Mathews v. Centex Telemanagement, Inc.*
1994 WL 269734 (N.D. Cal. June 8, 1994) ....................20

*In re Merck & Co., Inc. Sec. Litig.*
432 F.3d 261 (3d Cir. 2005) ....................17, 18

*In re Merck & Co., Inc. Sec. Litig.*
No. 02-cv-3185, 2004 U.S. Dist. LEXIS 28930 (D.N.J. July 6, 2004)....21

*In re MobileMedia Sec. Litig.*
28 F. Supp. 2d 901 (D.N.J. 1998)....24

*Monk v. Johnson & Johnson*
C.A. No. 10–4841 (FLW), 2012 WL 1884037 (D.N.J. May 22, 2012)....23

*Motient Corp. v. Dondero*
529 F.3d 532 (5th Cir. 2008)....23

*In re MRU Holdings Sec. Litig.*
769 F. Supp. 2d 500 (S.D.N.Y. 2011)....20

*Oppenheimer v. Novell, Inc.*
851 F. Supp. 412 (D. Utah 1994)....20

*Portsmouth Square v. Shareholders Prot. Comm*
770 F.2d 866 (9th Cir. 1985)....12

*Rochez Bros., Inc. v. Rhoades*
527 F.2d 880 (3d Cir. 1975)....23

*Rockefeller Ctr. Props. Sec. Litig. .v Rockefeller*
311 F.3d 198 (3d Cir. 2002)....6, 7

*In re Royal Dutch/Shell Transp.*
No. 04-374, 2006 WL 2355402 (D.N.J. Aug. 14, 2006)....8

*Rubin v. Posner*
701 F. Supp. 1041 (D. Del. 1988)....22

*S.E.C. v. Lucent Techs., Inc.*
610 F. Supp. 2d 342 (D.N.J. 2009)....8, 9

*Segal v. Gordon*
467 F.2d 602 (2d Cir. 1972)....12

*Silsby v. Icahn*
17 F. Supp. 3d 348 (S.D.N.Y. 2014)....24

*Stichting Pensioenfonds ABP v. Merck & Co.*
No. 05-5060 (SRC), 2012 WL 3235783 (D.N.J. Aug. 1, 2012)....8

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*
552 U.S. 148 (2008)....16

*In re Suprema Specialties, Inc. Sec. Litig.*
438 F.3d 256 (3d Cir. 2006)....7

*In re Synchronoss Sec. Litig.*
705 F. Supp. 2d 367 (D.N.J. 2010) ....................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
551 U.S. 308 (2007) ....................7

*U.S. v. Zolp*
479 F.3d 715 (9th Cir. 2007) ....................10

*In re Vivendi Universal, S.A. Securities Litigation*
605 F. Supp. 2d 586 (S.D.N.Y. 2009) ....................16

*VT Investors v. R & D Funding Corp.*
733 F. Supp. 823 (D.N.J. 1990) ....................23, 25

*Wellman v. Dickinson*
497 F. Supp. 824 (S.D.N.Y.1980) ....................22

*Winer Family Trust v. Queen*
503 F.3d 319 (3d Cir. 2007) ....................7

**Federal: Statutes, Rules, Regulations**

17 C.F.R. § 230.405 ....................24

17 C.F.R. § 240.10b-5, SEC Rule 10b-5 ....................2, 9, 16, 20, 22

15 U.S.C. § 78m ....................11, 22

15 U.S.C. § 78u-4 ....................1

15 U.S.C. § 78u–4(b)(1) ....................7, 20

15 U.S.C. § 78u–4(b)(2) ....................7

15 U.S.C. § 78u–4(b)(3)(A) ....................8

15 U.S.C. § 78u–4(b)(4) ....................8

Fed. R. Civ. P. 8 ....................6

Fed. R. Civ. P. 9(b) .................... 1, 2, 6, 7, 27

Fed. R. Civ. P. 12(b)(6) .................... 1, 5, 6, 7, 27

Private Securities Litigation Reform Act of 1995 .................... 1, 2, 6, 7, 20

Securities Exchange Act § 10 ....................2, 8, 16, 20, 22

Securities Exchange Act § 13(d) ....................11, 12, 13, 22, 23

Securities Exchange Act § 18(a)....................................................................................22

Securities Exchange Act § 20(a)..............................................................2, 23, 24, 25, 26

Defendant Barry C. Honig ("**Mr. Honig**") submits this memorandum in support of his Motion to Dismiss Lead Plaintiff Dr. Stanley Golovac's ("**Lead Plaintiff**") Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Law (the "**SAC**"), for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act of 1995 ("**PSLRA**"), 15 U.S.C. § 78u-4, et seq. Mr. Honig also joins the concurrently filed motion to dismiss of Riot Blockchain, Inc. ("**Riot**" or the "**Company**"), and expressly incorporates herein the arguments made in its brief.

## INTRODUCTION

Riot's Board and Management had great timing. They moved the Company into the cryptocurrency business just days after Bitcoin commenced a rapid price rise, gaining over 400% during the last three months of 2017. Riot's shareholders enjoyed a parallel rise in the market price of Riot's stock.

Lead Plaintiff had poor timing. He started buying Riot stock the day after it, and Bitcoin, reached then-record highs, bought more shares over the next two months as the price declined, and then sold before Riot's stock price rebounded.

This lawsuit is an attempt by Lead Plaintiff to cast blame upon others for his unfortunately-timed trades. In the earlier iterations of his complaints, he imagined that Riot's stock price had been fraudulently "pumped" through a promotional campaign that falsely "hyped" the benefits of the Company's transition to the cryptocurrency sector. This Court rejected that theory and dismissed Lead Plaintiff's prior complaint.

Lead Plaintiff returns with an overhauled case theory that is completely implausible. The SAC alleges that what drove the price of Riot's stock upwards by a factor of ten in less than three months was not the promotion of false hype, but rather, the non-disclosure that four minority shareholders were operating as an "undisclosed group" and selling their shares. The

notion that the silence of four outside shareholders could cause a massive swing in Riot's stock price either upwards or downwards is patently ludicrous, and is not supported by any allegations of fact in the SAC. Indeed, despite its great length, the SAC fails to state a claim against Mr. Honig for the simplest of reasons.

First, Lead Plaintiff's cause of action for violation of Section 10(b) and Rule 10b-5 fails because the SAC does not identify a single statement made by Mr. Honig during the Class Period.

Second, Lead Plaintiff's "scheme liability" claim fails for failure to allege loss causation. This Court dismissed Lead Plaintiff's prior complaint against Mr. Honig upon an explicit finding that the complaint failed to plead loss causation, but the SAC does not make a single material change to those deficient allegations. Significantly, facts establish that when Mr. Honig disclosed his stock sales, Riot's stock price went up, not down, which eviscerates the allegation that the "revelation" of those sales are what caused Lead Plaintiff's loss.

Third, Lead Plaintiff's Section 20(a) controlling person liability claim asserted against Mr. Honig fails because the SAC does not allege a single fact showing how Mr. Honig asserted actual control over Riot or its management. Indeed, as was the case with Lead Plaintiff's earlier complaints, the SAC still does not identify a single communication that Mr. Honig had with any Riot director or officer during the Class Period.

Most of the "new" material added to this version of the complaint concerns Mr. Honig's investments in other companies that have nothing to do with Riot. That Lead Plaintiff would double down on cribbing allegations from unrelated lawsuits, rather than state facts regarding Mr. Honig's investment in Riot, strongly suggests he cannot plead a claim sufficient to meet the heightened pleading requirements for securities fraud under Rule 9(b) and the PSLRA. As this is

now Lead Plaintiff's **fourth** failed attempt at pleading a cause of action,[1] Mr. Honig respectfully asks the Court to dismiss the SAC with prejudice.

## ARGUMENT

### I.     FACTUAL BACKGROUND

Defendant Riot is a technology company that operates and owns stakes in several blockchain and cryptocurrency-related businesses. [SAC ¶ 22]. Defendant Michael Beeghley was the Company's Chairman and Chief Executive Officer from April 6, 2017 until November 3, 2017. [SAC ¶ 28]. Following Beeghley's resignation, Riot's independent Board appointed John O'Rourke as a replacement, and he served as the company's CEO and Chairman until September 8, 2018. [SAC ¶ 24]. Defendant Barry Honig is a successful private investor who has provided growth capital to hundreds of companies over the past two decades. He was a minority shareholder of Riot during the putative Class Period who never served as an officer, director or employee of the Company.

The Company began its existence in the early 2000s as a biomedical company that tried to develop a blood test for use in the diagnosis and treatment of acute appendicitis. [SAC ¶ 164]. By 2015, the FDA had rejected the Company's test, leaving the Company with no viable product. [SAC ¶ 165]. Following the turnover of several legacy members of the Company's Board of Directors [SAC ¶ 176], on October 4, 2017, the Company announced that it was changing its strategic direction to become an investor in, and operator of, blockchain and cryptocurrency businesses. [SAC ¶ 177]. The Company simultaneously announced that it was changing its name to "Riot Blockchain" to reflect its new business focus. *Id.* The Company then

---

[1] The original complaint was filed in this matter on February 17, 2018 [Dkt. 1]. Following appointment of the Lead Plaintiff, a Consolidated Complaint was filed on January 15, 2019 [Dkt. 52], a Consolidated Amended Complaint was filed on May 8, 2019 [Dkt. 72], a Corrected Consolidated Amended Complaint was filed on May 9, 2019 [Dkt. 73] and the current operative Consolidated Second Amended Complaint was filed on December 24, 2020 [Dkt. 188].

pursued its new strategy by acquiring interests in businesses serving the blockchain ecosystem, including  (1) a minority interest in a cryptocurrency exchange called Coinsquare,[2] (2) a 52% stake in blockchain-based payment solutions company Tess, Inc.,[3] and, (3) three companies that collectively owned 8,000 specialized Bitcoin mining servers that Riot used to build its own Bitcoin mining operation.[4]

The strategic change proved wildly successful. Riot was transformed from a near-dead business that had earned less than $500,000 in the three years prior to the business pivot, to one that has reported over $21,000,000 in revenue since[5] – a more than **forty-fold increase**. Riot's market capitalization increased from $25 million just prior to the business change announcement to over $1.6 **billion** as of the date this motion was filed. Moving the business into the blockchain and cryptocurrency sector has proven very fruitful for long-term shareholders.

One side effect of Riot's involvement in Bitcoin mining is that doing so exposed the market price of Riot stock to periodic momentum swings in the underlying price of Bitcoin, both up and down. As can be seen below, Riot's market price since October 2020 has moved in tandem with that of Bitcoin:

---

[2] SAC ¶¶ 190-91. Through several subsequent transactions, Riot ultimately came to own approximately 12.9% of Coinsquare. *See* Riot's 2017 Form 10-K at 57, attached as Exhibit A to the concurrently filed Declaration of Robert D. Weber ("**Weber Declaration**" or "**Weber Decl.**").

[3] *See* Riot's 2017 Form 10-K [Weber Decl. Ex. A at 55].

[4] The companies were Kairos Global Technology, Inc., Prive Technologies, Inc., and Blockchain Mining Supply & Services Ltd. *See* Riot's 2017 Form 10-K [Weber Decl. Ex. A at 56, 73].

[5] The Company's revenues for the twelve quarters from Fourth Quarter 2014 through the Third Quarter 2017 totaled $480,000. The Company's revenues for the twelve quarters from Fourth Quarter 2017 through the Third Quarter 2020 totaled $21,352,000.

**Riot Blockchain Inc. (RIOT) and Bitcoin – USD (BTCUSD) Price[6]**
**October 3, 2017 – December 31, 2020**




Lead Plaintiff poorly timed his purchase of Riot stock. As shown by his Certification [Dkt. 191], he began purchasing Riot stock on December 19, 2017, two days after Bitcoin hit its (then) all-time high of $19,870, [Weber Decl. Ex. C], and he continued to buy Riot shares through January 2018 as Bitcoin and Riot stock lost over half their respective values.

## II. APPLICABLE LEGAL STANDARDS

### A. Implausible Claims Should Be Dismissed Pursuant to Rule 12(b)(6).

To survive a 12(b)(6) motion, a complaint must state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim for relief is facially plausible when the plaintiff pleads enough facts, taken as true, to allow a court to draw a reasonable inference that the defendant is liable for the alleged conduct. *Id.* If the facts only allow a court to draw a reasonable inference that the defendant is possibly liable, then the complaint must be dismissed. *Id.* "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has

[6] This visual line chart represents a comparison of the price of Riot stock (represented by the red line) and Bitcoin (represented by the blue line) for the period October 3, 2017 through December 31, 2020, downloaded from www.barchart.com on February 5, 2021, and is also incorporated into Exhibit B of the concurrently filed Weber Declaration.

to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

Mere speculation is not enough. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Moreover, the Court need not accept wholly conclusory assertions as factual allegations, and "a formulaic recitation of the elements of a cause of action will not do." *Id.*; *see also Iqbal*, 556 U.S. at 678 (to state a claim, a plaintiff must plead more than an "unadorned, the-defendant-unlawfully-harmed-me accusation"). "[I]t is only by taking care to require allegations" that state a plausible claim for relief that the Court can "hope to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence"' to support a claim. *Twombly*, 550 U.S. at 559 (citation omitted); *see also Iqbal,* 556 U.S. at 678-79 (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"). Thus, if after applying its "judicial experience and common sense" the Court at most can infer only "the mere possibility of misconduct," then the Complaint "has not 'show[n] . . . that the pleader is entitled to relief."' *Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679) (alteration in original) (citation omitted).

**B. Complaints Alleging Securities Fraud Must Be Dismissed Unless They Satisfy The Heightened Pleading Standards Of Rule 9(b) And The PSLRA.**

"Independent of the standard applicable to Rule 12(b)(6) motions," Federal Rule of Civil Procedure 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *Rockefeller Ctr. Props. Sec. Litig. v. Rockefeller*, 311 F.3d 198, 216 (3d Cir. 2002). The particularity requirement is rigorously applied to complaints alleging securities fraud. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). To satisfy this heightened pleading standard, a plaintiff must state the circumstances of his alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise

misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004)). Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* (citing *Lum*, 361 F.3d at 224). The Third Circuit has further advised that, at a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 217).

In addition to the Rule 12(b)(6) plausibility analysis described by *Twombly* and *Iqbal*, and Rule 9(b)'s heightened pleading requirements, Congress enacted the PSLRA to require an even higher pleading standard for plaintiffs bringing private securities fraud actions. *Suprema Specialties*, 311 F.3d at 276. This heightened pleading standard is targeted at preventing abusive securities litigation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA "imposes another layer of factual particularity to allegations of securities fraud" (*Rockefeller*, 311 F.3d at 217) by providing two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, under 15 U.S.C. § 78u–4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u–4(b)(1)). Second, the complaint must, "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). These pleading requirements specifically apply

to "scheme" liability claims such as those asserted against Mr. Honig here. *Stichting Pensioenfonds ABP v. Merck & Co.*, Civil Action No. 05-5060 (SRC), 2012 WL 3235783, at *7 (D.N.J. Aug. 1, 2012). A complaint's failure to comply with any of these specific pleading requirements mandates dismissal. 15 U.S.C. § 78u–4(b)(3)(A).

## III. THE SAC'S FIRST CAUSE OF ACTION AGAINST MR. HONIG ALLEGING HIS PARTICIPATION IN A "SCHEME" SHOULD BE DISMISSED.

There exist two bases for liability under Section 10 of the Exchange Act: the "making of a material misstatement (or omission)" and, "the commission of a manipulative act." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994). The SAC's First Cause of Action alleges that Mr. Honig perpetrated a "scheme" to manipulate Riot's stock price, in violation of Section 10(b) and Rule 10b–5(a) and (c). The elements of a "scheme liability" claim are: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *S.E.C. v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 350 (D.N.J. 2009). A complaint must also plead loss causation and economic loss. *See In re Able Labs. Sec. Litig.*, No. 05-cv-02681, 2008 WL 1967509, at *18 (D.N.J. Mar. 24, 2008) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)); *see also* 15 U.S.C. § 78u–4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). To avoid dismissal, each of these elements must be pleaded with factual particularity including "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue." *In re Royal Dutch/Shell Transp.*, No. 04-374(JAP), 2006 WL 2355402, at *7 (D.N.J. Aug. 14, 2006) (citing *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (S.D.N.Y. 2006)).

A "manipulative act" is an act that goes beyond a misrepresentation or omission and generally is "intended to mislead investors by artificially affecting market activity" "such as wash sales, matched orders, or rigged prices." *See De Vito v. Liquid Holdings Grp., Inc.*, No. 15-cv-06969, 2018 WL 6891832, at *41-43 (D.N.J. Dec. 31, 2018) (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977)). For a "scheme liability" claim to survive dismissal, a plaintiff must identify deceptive or manipulative acts that are separate and apart from any alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim. *See Lucent Techs.*, 610 F. Supp. 2d at 359-61.

### A. The Alleged Scheme – That Mr. Honig "Pumped" Up The Market Price of Riot Stock Ten-Fold By Remaining Silent – Is Completely Implausible.

Under *Twombly* and *Iqbal*, the Court must first assess whether the facts Lead Plaintiff alleges support the existence of a "scheme" that is plausible, and not merely "conceivable" or "possible." The Court may recall that Lead Plaintiff's prior case theory, asserted in his earlier complaints, posited that the defendants collectively perpetrated a "pump-and-dump scheme" upon Riot shareholders by "artificially 'hyping' the Company's prospects" through a "flurry" of positive disclosures "designed to give investors the false impression that Riot was a serious cryptocurrency company."[7] After the Court found the CCAC's allegations lacking and dismissed it, Lead Plaintiff jettisoned that theory.

Lead Plaintiff's amended case theory, set forth in the SAC, deviates so far from his original theory that it has become literally non-sensical. Lead Plaintiff continues to allege a scheme to "pump up" the price of Riot's stock, but no longer claims that Riot's rising stock price was caused by false "hype" disclosed by Riot's management. Instead, Lead Plaintiff now posits that the massive increase in Riot's stock price was the result of four outside investors **not**

---

[7] Corrected Consolidated Amended Complaint ("**CCAC**") at ¶ 9.

**disclosing** that they allegedly were "acting as a group" and were selling shares. This new theory is implausible in at least three ways.

First, the conduct of which the SAC accuses Mr. Honig is actually the opposite of a "pump." In a prototypical "pump and dump" scheme, a fraudster who owns stock in a publicly traded company hypes that company's prospects via a public campaign of false statements to the marketplace made for the purpose of artificially "pumping up" the value of that stock; after the price rises, the fraudster profits by selling ("dumping") his holdings at the inflated price. *See U.S. v. Zolp*, 479 F.3d 715, 717 at fn. 1 (9th Cir. 2007). The SAC itself confirms that a "pump and dump" scheme requires implementation of "a promotion scheme . . . to boost the price of the stock or create trading volume by stimulating market interest with false or misleading statements about the company." SAC ¶ 251. But Mr. Honig did not participate in a promotional campaign touting Riot's prospects; rather, he is alleged to have been silent. Lead Plaintiff does not attempt to explain how a minority outside shareholder's silence can increase the market price of a company's stock ten-fold, [8] because he cannot; the notion is completely implausible.

Second, Lead Plaintiff's new scheme theory is implausible because it relies on the false allegation that Mr. Honig's sales were "hidden" from the investing public. As will be shown below in Section III.C., it was publicly disclosed on a half-dozen occasions that Mr. Honig was selling Riot shares throughout 2017.

Third, Lead Plaintiff's new scheme theory is temporally implausible. Specifically, while the SAC alleges that the "scheme" of concealment began in March 2017, a look at a stock chart

---

[8] The market price of Riot stock closed at $3.56/share on March 15, 2017, the first day of the alleged class period. *See* Historical Stock Price Chart [Weber Decl. Ex. D]. Over the next five months, the Company's stock traded in a narrow band between $3.06 and $4.50. In short, price data definitively shows that Defendants' alleged "manipulative" activities, that allegedly started in March 2017 did not "pump" the price of Riot's stock at all. Riot announced its pivot to cryptocurrency on October 4, 2017, and less than three months later, on December 19, 2017, its stock reached a high of $46.20/share.

reveals that the market price of Riot's stock did not budge for the next five-and-a-half months. [Weber Decl. Ex. D]. So, Lead Plaintiff is asking the Court to accept that (a) the "scheme" had no effect for five months, and (b) it is only a coincidence that Riot's market price did start rocketing towards the moon immediately after the Company widely promoted that Riot would become a cryptocurrency company. This, of course, is silly and implausible. The far more obvious and plausible explanation for the swings in Riot's stock price is that the market price of a Bitcoin mining company closely follows the market price of the Bitcoin that it mines, much like the market price of gold mining companies move with the underlying price of gold.

### B. Mr. Honig Did Not "Conceal" His Membership In An "Investment Group" – There Was No Group, And The SAC Itself Reveals The Lack of Group Activity.

The SAC's assertion that Mr. Honig manipulated the market in Riot stock by "concealing" that he was a member of an "undisclosed control group" is also nonsense, both legally and factually. Mr. Honig was not part of any "group" involving investment in Riot shares, and thus had no obligation to "disclose" that he was a member of any such group.

The applicable legal provision here is Section 13 of the Securities Exchange Act of 1934, which requires any person or group of persons who possesses beneficial ownership of more than 5% of a class of an issuer's securities to report such beneficial ownership in an SEC filing.[9] Case law makes clear that a collection of individual investors who happen to invest in the same company may be considered a group, and should aggregate their holdings for reporting purposes, only if all the group members:

(1) agree to vote their shares in a similar manner,

(2) coordinate transactions in the securities, or

[9] A "group" is defined as two or more persons who act "as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer . . . ." 15 U.S.C. § 78m.

(3) otherwise act in unison to affect the control or management of the issuer.

*See Portsmouth Square v. Shareholders Prot. Comm*, 770 F.2d 866, 874 (9th Cir. 1985) (rejecting group liability where the defendants "ha[d] not agreed to vote their shares in any particular way"); *Greenfield v. Criterion Capital Mgmt., LLC*, No. 15-cv-3583-PJH, 2017 U.S. Dist. LEXIS 97638, at *19-20 (N.D. Cal. June 23, 2017) (rejecting a group reporting argument and stating that "a plaintiff must still plead sufficient facts supporting such an agreement, given that threadbare recitals of the elements of the claim for relief, supported by mere conclusory statements, are not taken as true") (internal quotations omitted). Conversely, general allegations that a collection of shareholders acted "in concert" are not sufficient for them to be deemed a "group" which must be disclosed. Co-investors in a public company may freely discuss their investment and share information and ideas with each other without being deemed a "group," because those activities are far short of an agreement to transact in the securities in lockstep. *See, e.g., CSX Corporation v. Children's Investment Fund Mgt.*, 654 F.3d 276, 309 (2d. Cir. 2011) (Winter, C.J., concurring) ("There is no evidence that [defendant's] purchases at this time were more than the result of this sharing of information, which hardly amounts to an agreement to buy CSX shares.").

Mr. Honig did not disclose or report that he was part of a "group" transacting in Riot securities, <u>because there was no "group"</u> as defined by SEC regulation and court guidance, and thus there was nothing to disclose. The SAC does not allege facts sufficient to establish that Mr. Honig operated as a "group" with any other Defendant in regards to their respective investments in Riot. A "[p]laintiff must allege facts demonstrating that a group exists." *Huppe v. Guez*, Case No. CV 04–07609, 2005 WL 8154782, at *6 (C.D. Cal. April 18, 2005). An "unadorned allegation that defendants are acting as a group is not adequate to sustain a Section 13(d) claim." *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972); *Log On America, Inc. v. Promethean Asset*

*Management L.L.C.*, 223 F. Supp. 2d 435, 449 (S.D.N.Y. 2001). The SAC bases its "group" allegations entirely upon the facts that certain of the defendants had previously co-invested with each other in connection with companies other than Riot, and silly irrelevancies such as the allegation that at one time Mr. Honig shared an office with defendant O'Rourke. But "conclusory allegations of fraud and of the Defendants' previous investments . . . cannot serve as the basis for a claimed violation of Section 13(d)." *Id.* at 448.

The SAC does not allege any facts showing that Mr. Honig coordinated with others during the Class Period in connection with his Riot investments. There are no particularized allegations in the SAC showing that, during the Class Period, Mr. Honig agreed to vote his Riot shares in coordination with anyone. Likewise, there are no particularized allegations in the SAC showing that Mr. Honig coordinated his transactions in Riot stock with other defendants, and facts contained in the SAC itself point to the opposite. For example, Lead Plaintiff acknowledges that Mr. Honig sold over 80,000 of his Riot shares in 26 separate transactions between April 20 and September 25, 2017 [*see* SAC ¶ 316], while over the same five-month period defendants Groussman and DeFrancesco sold none of their shares [*see* SAC ¶¶ 330, 337]. Similarly, Mr. Honig is alleged to have bought a total of 75,490 shares in three purchases during October and November 2017, shortly after Riot announced its business pivot [*see* SAC ¶ 316], while the SAC does not allege any purchases by the other defendants during those months.

In short, Lead Plaintiff does not allege a single fact showing that the defendants were a "group" in regards to their individual investments in Riot securities, and thus Lead Plaintiff's assertion that Mr. Honig defrauded him by not identifying himself as a member of a (non-existent) group fails to state a fraud claim.

**C. <u>The SAC Itself Reveals That Mr. Honig's Ongoing Stock Sales Were Publicly Disclosed, And Those Sales Had No Impact Upon Riot's Stock Price.</u>**

Lead Plaintiff's contention that Mr. Honig's sales were "concealed" from the market until January 31, 2018 [SAC ¶ 16] is flatly wrong. The fact that Mr. Honig was selling shares was disclosed in six public filings throughout 2017 and early January 2018. Lead Plaintiff baselessly argues that the sales were "hidden" despite embedding screenshots in his own SAC which evidence Mr. Honig's selling activity. To wit:

- On April 20, 2017, Riot filed a Form S-3/A Registration Statement disclosing that Mr. Honig and his investment vehicle GRQ Consultants beneficially owned 543,860 and 596,400 shares, respectively, and intended to <u>sell</u> hundreds of thousands of those shares in an anticipated offering [shown in SAC ¶ 347]:

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Barry Honig | 543,860 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 596,400 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |

- On July 19, 2017, Riot filed an amendment to its prior S-3/A, indicating that Mr. Honig had <u>sold</u> some shares, reducing his holdings from 543,860 to 543,000 and GRQ's holdings from 596,400 to 595,600 [shown in SAC ¶ 361]:

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 595,600 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |

- On August 24 and September 25, 2017, Riot filed two more amendments to its S-3/A, indicating that GRQ had sold shares, reducing its holdings to 30,600 [SAC ¶ 366, 369]. The filings reported that Mr. Honig beneficially owned 9.99% of Riot's common stock, and still intended to sell hundreds of thousands of shares [*Id.*]:

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600 (10) | * | 1,015,042 (11) | 30,600 | * |

- On December 12, 2017, a proxy statement was filed with the SEC on Form DEF14, listing persons who beneficially owned five percent (5%) or more of Riot's stock.[10] Mr. Honig was not listed, revealing that he had sold a substantial portion of his Riot stock:

| Name and Address | Number of Shares | Percent |
|---|---|---|
| Directors: | | |
| John R. O'Rourke (1) | 202,555 | 2.1% |
| Eric So (2) | 937 | * |
| Jason Les (3) | 15,937 | * |
| Andrew J. Kaplan(4) | 6,583 | * |
| Other Executive Officers: | | |
| Jeffrey G. McGonegal (5) | 3,929 | * |
| All Directors and Officers as a Group (5 persons) (6) | 229,941 | 2.4% |

* Holds less than 1%

- On January 5, 2018, a new Form S-3 was filed with the SEC, listing prospective selling shareholders. Mr. Honig was not identified, and GRQ was listed as a "less than 1%" shareholder, information that again disclosed that Mr. Honig had sold Riot shares [SAC ¶ 374]:

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| GRQ Consultants, Inc. | 22,222 (15) | * | 44,444 (33) | - | * |

[10] *See* [Weber Decl. Ex. E, at 8].

Mr. Honig's sales were not "concealed." The market knew that Mr. Honig intended to, and did, sell hundreds of thousands of Riot shares throughout 2017. These facts were disclosed before Lead Plaintiff started buying Riot stock in late December 2017. When the information was disclosed, the market shrugged.[11]

In sum, Mr. Honig's sales were not concealed, and the "revelation" that he did sell certainly was not the proximate cause of a 70% decline in the price of Riot's stock and Plaintiff's claimed loss, as discussed next.

**D. Plaintiff Fails to Allege Loss Causation.**

Perhaps the most obvious defect of the SAC is Lead Plaintiff's continuing failure to plead that Mr. Honig's alleged actions caused Lead Plaintiff's loss. In *Dura Pharmaceuticals, Inc. v. Broudo*, the Supreme Court held that to adequately plead a Section 10(b) claim, a plaintiff must allege that the defendant's misrepresentation or other fraudulent conduct proximately caused the plaintiff's economic loss. 544 U.S. 336, 346 (2005). A plaintiff must also allege that he in fact relied upon a defendant's deceptive conduct. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008); *In re Vivendi Universal, S.A. Securities Litigation*, 605 F. Supp. 2d 586, 600 (S.D.N.Y. 2009) ("[P]laintiffs seeking to prove loss causation must establish two causal connections: a connection between the alleged false or misleading statements and one or more events disclosing the truth concealed by that fraud, and a connection between these events and actual share price declines."). This court has confirmed these requirements must be met when alleging a Rule 10b-5(a) and (c) claim. *See In re Able Labs. Sec. Litig.*, No. 05-cv-02681, 2008 WL 1967509, at *18 (D.N.J. Mar. 24, 2008).

[11] Citing two examples, following the April 20, 2017 Form S-3/A disclosure that Mr. Honig intended to sell hundreds of thousands of shares, the Company's stock price dropped only a penny over two days, on light volume. *See* Historical Stock Price Chart [Weber Decl. Ex. D]. Following the September 25, 2017 Form S-3/A, the price of Riot stock <u>rose</u> 25% over five consecutive days. *Id.*

In its previous order dismissing Lead Plaintiff's claims against Mr. Honig, the Court pointedly found the CCAC to be "***devoid of any allegation that [the disclosure of Mr. Honig's stock sales] was a 'substantial cause' of shareholders' economic losses or otherwise contributed in any way to a decline in Riot's stock price***." Opinion [Dkt. 166] at 39.

The SAC does not allege any new facts to address the deficient loss causation allegations flagged by the Court. Not a single one. The paragraphs of the SAC which set forth Lead Plaintiff's loss causation theory reference the very same disclosures identified in the CCAC, which the Court previously found to be deficient.[12] All that Lead Plaintiff has done is rearrange those allegations, and made some non-material grammatical revisions. For the Court's convenience, a comparison of the loss causation allegations of the CCAC and SAC, showing the non-material revisions made by Lead Plaintiff, is attached as an Appendix to this brief.

The most notable change from the CCAC to SAC actually is the deletion of references to several negative third-party media reports and public disclosures [specifically, CCAC ¶¶ 398-401]. Lead Plaintiff previously alleged that those disclosures caused precipitous declines in the price of Riot's stock, but now wishes to hide those facts because they are directly contrary to the notion that the decline in Riot's stock price was proximately caused by the "revelation" of Mr. Honig's supposedly "concealed" stock sales, rather than those third-party reports.

The few remaining "disclosures" to which Lead Plaintiff now points [SAC ⁋⁋ 454-64], fail to constitute corrective disclosures of fraud that suffice to show loss causation. Several of the alleged "corrective disclosures" were made after this lawsuit was filed [SAC ¶¶ 463-65], and thus well after the time that the alleged "truth was revealed" regarding defendants' "concealment." *See e.g., In re Merck & Co., Inc. Sec. Litig.,* 432 F.3d 261, 270–71 (3d Cir. 2005)

---

[12] *Compare* SAC ¶¶ 456-460 *with* CCAC ¶¶ 319, 402; SAC ¶¶ 461-462 *with* CCAC ¶¶ 193-94, 403; SAC ¶ 463 *with* CCAC ¶¶ 173, 404; SAC ¶ 464 *with* CCAC ¶¶ 158, 351; and SAC ¶ 465 *with* CCAC ¶¶ 201-202, 405.

(newspaper's analysis of previously available information was not a corrective disclosure). Other "disclosures" simply represent reporters' personal opinions or negative commentary and speculation regarding already-disclosed information. *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270–71 (3d Cir. 2005) (holding that the *Wall Street Journal*'s analysis of previously available information is not a corrective disclosure).

Furthermore, Lead Plaintiff also fails to note the inconvenient coincidence that on some of the days he flags, the drop in the price of Riot stock was virtually identical to a simultaneous decline in the market price of Bitcoin. This suggests that Lead Plaintiff's alleged "loss" had nothing to do with news about Riot and everything to do with swings in the price of Bitcoin. For instance, the SAC avers that a 14.26% decline in Riot's stock price on January 31, 2018 was caused by a *Wall Street Journal* article [SAC ¶ 460], without mentioning that what likely moved Riot's stock price that day was a concurrent 13.65% drop in the price of Bitcoin. [Weber Decl. Ex. D].

Most damning to Lead Plaintiff's loss causation theory is that when it was disclosed that Mr. Honig intended to sell his Riot shares, or had actually sold most of them, Riot's stock price <u>went up</u>. For instance, when it was disclosed in a S-3/A filing on September 25, 2017 that Mr. Honig intended to sell hundreds of thousands of shares [SAC ¶ 369], Riot's stock price reacted by going up.[13] Later, after Mr. Honig filed a Schedule 13D/A Amendment on February 13, 2018 disclosing that he indeed had sold most of his Riot shares,[14] the market price of Riot stock again <u>rose</u> for the following two days.[15] These facts directly contradict Lead Plaintiff's contentions that the disclosure of Mr. Honig's selling caused the price of Riot stock to go down. "On a motion to dismiss, '[c]onclusory allegations and unwarranted deductions of fact are not admitted as true.' .

---

[13] *See* Historical Stock Price Chart [Weber Decl. Ex. D].

[14] SAC ¶ 312; *see also* Weber Decl. Ex. F.

[15] *See* Historical Stock Price Chart [Weber Decl. Ex. D].

. . This is particularly true when the conclusory allegations contradict the other facts alleged in the complaint.") (internal citation omitted).

Lead Plaintiff cannot plead facts establishing loss causation, and the reason why is simple: Mr. Honig's alleged non-disclosures did not cause the price of Riot stock to rise and fall. Riot's business alignment with an underlying asset that experienced volatile price movements is what caused the rises and falls of Riot stock price. This Court previously found Lead Plaintiff's loss causation allegations to be insufficient to support a fraud cause of action. Lead Plaintiff did not bolster his prior allegations in any way. Lead Plaintiff's loss causation allegations remain as factually deficient as before and have become even more implausible. Accordingly, the Court should dismiss the fraud claims against Mr. Honig due to Lead Plaintiff's failure to plead the element of loss causation.

**E. The Contradictory Facts Alleged in the SAC Negate Any Inference That Mr. Honig Acted With Scienter.**

Lead Plaintiff's overhaul of his complaint, which alleges new facts coupled with an implausible case theory, provides an opportunity for the Court to reconsider whether the present SAC adequately alleges a strong inference of Mr. Honig's scienter. Mr. Honig respectfully suggests that the following facts significantly negate any inference of scienter.

First, the Securities Exchange Commission terminated its investigation concerning Riot, including any involvement by Mr. Honig. [Weber Decl. Exs. G and H]. If, as Lead Plaintiff contends, the commencement of an SEC investigation supports an inference of fraudulent scienter on the part of Mr. Honig [SAC ¶¶ 445-46, 451], then the termination of that investigation without the regulator taking action should negate any such inference.

Second, as shown in Section III.C. above, Riot repeatedly disclosed to the public that Mr. Honig was selling Riot stock throughout 2017. While not explicitly alleged in the SAC, it is fair for the Court to infer that the only way that Riot could know and report that Mr. Honig intended

to sell hundreds of thousands of his Riot shares is by Mr. Honig disclosing his intention to Riot. That is not "concealment." One should not infer that Mr. Honig was "concealing" his stock sales, at the same time that his intention to sell was being widely broadcast by Riot.

Lastly, Mr. Honig's transactions in Riot stock tend to negate an inference that he acted with scienter. Specifically, Lead Plaintiff acknowledges that Mr. Honig sold 80,000 shares of his Riot stock during the summer of 2017, before Riot announced its business pivot and the stock price took off. [SAC ¶ 316]. Likewise, Mr. Honig then bought $500,000 of Riot shares in December 2017 as the stock price neared its all-time high. *Id.*  These are not the actions of a person who supposedly is running a scheme to fraudulently inflate the market price of a security and take advantage of that inflation. Transactions that are inconsistent with a complaint's allegations that the defendant "fraudulently inflated" the market price of those securities tend to negate any inference of the defendant's scienter. *See In re MRU Holdings Sec. Litig.*, 769 F.Supp.2d 500, 516 (S.D.N.Y. 2011); *Oppenheimer v. Novell, Inc.,* 851 F.Supp. 412, 417 (D. Utah 1994); *Mathews v. Centex Telemanagement, Inc.,* 1994 WL 269734, at *8 (N.D. Cal. June 8, 1994) ("It would have made no sense to purchase [the] stock if defendants knew the prices to be inflated.").

## IV.   THE SAC'S SECOND CAUSE OF ACTION AGAINST MR. HONIG FOR VIOLATION OF SECTION 10(B) AND RULE 10b-5 SHOULD BE DISMISSED.

Lead Plaintiff's cause of action against Mr. Honig alleging that he made a materially false or misleading statement in violation of Section 10(b) and Rule 10b-5 must be dismissed for the simple reason that the SAC does not identify a single statement made by Mr. Honig during the putative Class Period that is alleged to be false or misleading.

The PSLRA requires Lead Plaintiff in his complaint to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1). The SAC identifies twenty allegedly misleading statements during the

Class Period – eighteen made by defendants Riot, O'Rourke and Beeghly, and two by defendant Groussman [SAC ¶¶ 326, 329]. But Lead Plaintiff alleges no facts indicating that Mr. Honig had any role in the "making" or dissemination of any of those statements. For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. *Id.*

The SAC identifies only one statement attributable to Mr. Honig that is alleged to be misleading – his January 5, 2017 Schedule 13D/A – but that statement is not actionable for two reasons. First, it was made over two months before the Class Period. Courts in this District have repeatedly recognized that statements made before an alleged Class Period are not actionable. *In re Merck & Co., Inc. Sec. Litig.*, No. 02-CV-3185 (SRC), 2004 U.S. Dist. LEXIS 28930, at *46 (D.N.J. July 6, 2004) ("'A[s] the class period defines the time during which defendants' fraud was allegedly alive in the market, statements made . . . before or after the purported class period are irrelevant to plaintiffs' fraud claims.") (quoting *In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995)); *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 405 n.50 (D.N.J. 2010) ("It is self-evident that challenges to statements made outside the Class Period cannot be validly made by Plaintiffs."); *Castlerock Management v. Ultralife Batteries*, 68 F. Supp. 2d 480, 484 n.6 (D.N.J. 1999) ("[O]nly those statements made during the class period are being considered by the court."). Second, even if the statement had been made during the Class Period it is not actionable because there was nothing omitted from the statement that renders it misleading. Lead Plaintiff argues that Mr. Honig's filing "omitted" that he was acting as a member of an undisclosed group, but as explained in Section III.B above, no such agreement existed, Lead Plaintiff fails to allege any facts showing the existence of such an agreement, and

certain facts that are alleged in the SAC clearly show that Mr. Honig did not coordinate his transactions in Riot securities with other defendants.

Lead Plaintiff repeatedly incants that Mr. Honig "failed to disclose" certain information during the Class Period, but it is axiomatic that there cannot be any liability for an omission without any statement having been made. Rule 10b-5 makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the **statements made**, in the light of the circumstances under which they **were made**, not misleading." 17 C.F.R. § 240.10b-5 (emphasis added). "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).

Lead Plaintiff asserts that Mr. Honig violated an alleged duty under Section 13(d) of the Exchange Act by not "promptly" filing an amendment to his January 2017 Schedule 13D/A. But the exclusive remedy available to a shareholder for another shareholder's alleged violation of Section 13 lies in Section 18(a) of the Exchange Act, not Section 10. *Wellman v. Dickinson*, 497 F. Supp. 824, 835 (S.D.N.Y.1980), *aff'd*, 647 F.2d 163 (2d Cir.1982) ("[T]his court has held consistently that no implied private cause of action for damages exists under 13(d) . . . .") (citing *In re Penn Central Sec. Litig.*, 494 F.2d 528, 540 (3d Cir.1974) (holding that Section 18(a) is the exclusive remedy for alleged violations of an analogous provision requiring the filing of reports with the SEC, Section 13(a), 15 U.S.C. 78m(a))); *Rubin v. Posner*, 701 F. Supp. 1041, 1051 (D. Del. 1988); *accord Issen v. GSC Enterprises, Inc.,* 522 F. Supp. 390, 397 (N.D. Ill. 1981) ("[Plaintiff] may not . . . state a claim for relief pursuant to section 10(b) or Rule 10b-5. . . . This Court and others have stated that the exclusive remedy for misrepresentations or omissions in

SEC filings is under section 18(a) of the Securities Exchange Act of 1934, 15 U.S.C. s 78r(a).").[16]

## V. LEAD PLAINTIFF'S SECTION 20(A) CLAIM AGAINST MR. HONIG SHOULD BE DISMISSED BECAUSE THE SAC ALLEGES NO FACTS WHICH PLAUSIBLY SHOW MR. HONIG'S "CONTROL" OVER ANY INSIDER.

To state a claim under Section 20(a), a plaintiff "must plead facts showing: (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions." *In Jones v. Intelli-Check, Inc.,* 274 F. Supp. 2d 615, 644-45 (D.N.J. 2003). As explained in the Riot Defendants' Motion to Dismiss, Lead Plaintiff has not stated a primary violation of the securities laws against any Riot Defendant; accordingly, Lead Plaintiff's Section 20(a) claims fail. But even if the Court were to find that a primary violation is adequately pleaded against a Riot Defendant, Lead Plaintiff's Section 20(a) against Mr. Honig still fails because the SAC does not allege facts which plausibly establish that Mr. Honig controlled any Riot Defendant.

To survive dismissal, "a claim under Section 20(a) must state with particularity the circumstances of the defendant's control of the primary violator." *VT Investors v. R & D Funding Corp.,* 733 F. Supp. 823, 841 (D.N.J. 1990); *Monk v. Johnson & Johnson*, C.A. No. 10–4841 (FLW), 2012 WL 1884037, *2 (D.N.J. May 22, 2012). While Congress did not define "control" for purposes of Section 20(a), courts frequently look to the SEC's definition of "control" for guidance. *See e.g., Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975) (quoting 17 C.F.R. § 240.12(b)–2(f)). Under the SEC's definition, control requires the possession of power:

---

[16] Three Federal Courts of Appeal have separately considered the issue, and all of them concluded that a shareholder does not have a private right of action against another shareholder who allegedly violates Section 13(d). *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,* 286 F.3d 613, 620 (2d Cir. 2002); *Motient Corp. v. Dondero*, 529 F.3d 532, 536 (5th Cir. 2008); *Liberty Nat. Ins. Holding Co. v. Charter*, 734 F.2d 545, 564 n. 41 (11th Cir.1984).

> The term control … means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 230.405 (emphasis added).

"To establish that a defendant is a control person, a plaintiff must demonstrate that 'the defendant had actual power or influence over the allegedly controlled person.'" *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 940 (D.N.J. 1998) (quoting *Kersh v. General Council of Assemblies of God*, 804 F.2d 546, 548 (9th Cir. 1986)) (emphasis added). Because "actual control is required, the mere power to influence, without also the power to direct, is not enough." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 487 n.50 (S.D.N.Y. 2005); *see also In re BioScrip*, 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015) ("Substantial influence is not the same as actual control, and '[a]ctual control is essential to control person liability.'") (quoting *In re Blech Secs. Litig.*, 961 F. Supp. 569, 586 n.50 (S.D.N.Y. 1997)). Likewise, allegations suggesting the ability merely to persuade, advise, or sway do not suffice. *See Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir. 1986) ("[A]bility to persuade and give counsel is not the same thing as 'control,' which almost always means the practical ability to direct the actions of the people who issue or sell the securities.") (emphasis in original); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 459 (S.D.N.Y. 2005) ("The 'control person' provisions . . . were not created to allow a plaintiff to sue an entity merely because that entity convinced a primary violator to enter into unwise business transactions.").

Courts routinely hold that minority stockholders, like Mr. Honig, lack the formal power to be a control person under the securities laws. *See, e.g., Kuhns v. Ledger*, 202 F. Supp. 3d 433, 441 (S.D.N.Y. 2016) (dismissing Section 20(a) claim against stockholder who held 47% of common stock and who claimed to act on behalf of the stockholders because, as a minority stockholder, he did "not have the formal ability to control [the] company"); *Silsby v. Icahn*, 17 F.

Supp. 3d 348, 371 (S.D.N.Y. 2014) (court rejected as "without merit" plaintiffs' argument that

Carl Icahn's status both as the largest stockholder of Dynegy, holding 14.8% of its common

stock, and as the employer of two directors he nominated to the Dynegy board was sufficient to

show control); *In re Alstom*, 406 F. Supp. 2d at 489 ("Minority stock ownership is not enough to

establish control person liability, since minority ownership does not give the owner the power to

direct the primary violator."); *In re BioScrip,* 95 F. Supp. 3d at 740 (investment fund that owned

26% of company's stock and had ability to appoint a quarter of company's board did not have

power to direct company).

Lead Plaintiff cannot rely on mere conclusions and speculation to state a claim for control

person liability under Section 20(a). *See, e.g., VT Investors,* 733 F. Supp. at 841; *Carmack v.

Amaya Inc.,* 258 F. Supp. 3d 454, 469 (D.N.J. 2017); *EcoShelf Group, Inc. v. Horn*, Case No.

10–2171, 2010 WL 11570285, at *4 (D.N.J. Sept. 21, 2010). Lead Plaintiff must plead facts

making it plausible, and not merely possible, that Mr. Honig actually controlled the Riot

Defendants. *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678. "'[N]aked assertions' of

wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line

between possibility and plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d

186, 193 (4th Cir. 2009) (citing *Twombly*, 550 U.S. at 557) (internal quotations omitted).

But the SAC contains nothing more than conclusory and purely speculative allegations

that Mr. Honig was a control person of the Riot Defendants. In prior iterations of the complaint,

Mr. Honig was not named at all in Plaintiff's Section 20(a) count. Bizarrely, Lead Plaintiff now

adds Mr. Honig to the Section 20(a) count after removing prior allegations of Mr. Honig's

alleged control and replacing those with . . . nothing.[17] The Section 20(a) claim asserted against

---

[17] For example, paragraph 139 explicitly alleged that in March 2017, "Honig and his associates had obtained control of Riot." That paragraph was deleted in its entirety.

Mr. Honig seemingly relies solely upon the factual claim that Mr. Honig had "a close relationship" with Riot's CEO O'Rourke (SAC ¶ 216), and then leaps to the conclusion that due to his "position[] of control and authority . . . [Honig was] able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated . . . and cause[d] the Company to engage in" wrongful acts. SAC ¶ 502. The SAC contains no particulars showing that Mr. Honig was involved in the Company's day-to-day management or possessed the actual power to direct anyone at the Company, including the other defendants.

Plaintiff's "naked assertions" of control by Mr. Honig fail to cross "the line between possibility and plausibility of entitlement to relief" necessary to state a claim under Section 20(a). *Francis*, 588 F.3d at 193 (quoting *Twombly*, 550 U.S. at 557). The Section 20(a) claim alleged against Mr. Honig is utterly deficient and should be dismissed with prejudice.

---

Plaintiff previously alleged that, when, "in March 2017, a longtime Bioptix director stepped down … Defendant Honig's group found itself with a majority of the seats on the board and control of the company." (CCAC ¶ 138). In the SAC, Plaintiff backs away from the prior allegation of <u>actual control</u>, and now alleges: "a longtime Bioptix director stepped down, and Honig and DeFrancesco *found themselves aligned with* a majority of the seats on the board and *defacto* control of the company." (SAC ¶ 176) (emphasis added).

## CONCLUSION

For the foregoing reasons, Mr. Honig respectfully asks the Court to grant his motion to dismiss the Consolidated Second Amended Class Action Complaint for failure to state a claim pursuant to Rules of Civil Procedure 9(b) and 12(b)(6), and the PSRLA. As the SAC is the fourth failed attempt to plead a claim against Mr. Honig, further leave to amend would be futile, so Mr. Honig accordingly asks that the dismissal be made with prejudice. *See California Public Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 166 n. 28 (3d Cir. 2004) (district court properly dismissed claims with prejudice where the district court found that further amendment would be futile).

Respectfully submitted,

Dated: February 8, 2020

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700

By: /s/ *Tyler E. Baker*
Tyler E. Baker, ESQ.
New Jersey Bar No. 44392011
tbaker@sheppardmullin.com

and

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Robert D. Weber (*pro hac vice*)
1901 Avenue of the Stars, 16th Floor
Los Angeles, CA 90067
(310) 228-3700

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Christopher Bosch (*pro hac vice*)
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700

# APPENDIX

## COMPARISON OF LOSS CAUSATION ALLEGATIONS IN CCAC AND SAC

### A. Non-Material Revisions

| CCAC ALLEGATION | REVISION IN SAC |
|---|---|
| **Allegations regarding January 31, 2018 *Wall Street Journal* Article** | |
| 319. On January 31, 2018, before the market opened, The Wall Street Journal published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake." The article described how Defendant Honig had taken an aggressive stake in the Company when it was still in the medical diagnostics business and how he drove out Bioptix's CEO and others, replacing them with his own allies, including Defendant O'Rourke. The article quoted Gail Schoettler, a former lieutenant governor of Colorado who was Chair and Director of Bioptix before it became Riot, regarding Defendant Honig: "This guy trolls for small companies with cash and cheap shares . . . ." The article also noted that "Honig . . . said in an interview that he sold a significant portion of his shares in recent weeks. 'When stock goes up, you take a profit,' he said." | 456. On January 31, 2018, The Wall Street Journal published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake." The article stated that "Mr. Honig has sold about 500,000 shares, he said, but declined to divulge his profit. He said he still owns about 1% of the company." "'When stock goes up, you take a profit,' [Honig] said." |
| | 458. As a result of the revelation by *The Wall Street Journal* that Honig sold nearly 90% of his holdings in the Company, the Company's stock price fell from an opening price of $14.50 per share on January 31, 2019, to close at $13.75 that same day, a decline of $0.75, or more than **5%.** The Company's stock continued to decline in the following day, February 1, 2018, related to revelations in *The Wall Street Journal* article, falling an additional 10% that day. |
| 402. Also on January 31, 2018, Riot announced that its previously scheduled annual meeting would be adjourned for ***a second time***, purportedly to allow the Company to seek a quorum . . . | 459. Later that same day, at 5:28 p.m. (after the market closed) the Company issued a second press release, titled "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders." The press release announced that the 2017 Annual Meeting of Stockholders, which was scheduled for the |

| CCAC ALLEGATION | REVISION IN SAC |
|---|---|
| | following day, had again been cancelled and "was adjourned for a second time . . . ." |
| (402. cont.) . . . As a result of these disclosures on January 31, 2018, Riot's stock price declined $1.98 per share, or **14.26%,** over the course of two trading days, from $14.28 per share on January 30, 2018, to $12.30 per share on February 1, 2018, damaging Lead Plaintiff and members of the Class. | 460. Together, *The Wall Street Journal's* revelations of Honig's nearly total divestment of his holdings of Riot stock, Honig's role in the Company's affairs, and Riot's abrupt cancellation (for the second time) of its annual shareholder meeting (which had been scheduled for the very next day), Riot's stock price ***declined 14.26%*** ($1.98 per share) from a closing price of $14.28 per share on January 30, 2018, to close at $12.30 per share on February 1, 2018, damaging Lead Plaintiff and other members of the Class. |
| **Allegations Regarding February 16, 2018, CNBC Article** | |
| 193. On February 16, 2018, CNBC published an article titled "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket," reporting a slew of questionable practices and behavior at the Company. The article stated:. . . Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain . . . From the outside, Honig's office is nondescript. . . When CNBC crew members walked into the office, they didn't find Honig, they found O'Rourke. . . . | 461. On February 16, 2018, CNBC published the article "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket" regarding questionable practices at Riot. The revelations in CNBC's article partially revealed the Honig Group's Class Period scheme to misrepresent and conceal their control over the Company, including through O'Rourke's connections with Honig as "the man behind the Riot Blockchain curtain." For example, CNBC discovered O'Rourke in Honig's office in Boca Raton on the day of the cancelled annual shareholder meeting; and shed further light on Honig's 13D violations and highlighted the suspicious circumstances surrounding the Kairos transaction. |
| 194. On this news, the price per share of Riot stock at closing fell approximately 33.4%, or $5.74 per share, on heavy volume, from closing at $17.20 per share on February 15, 2018, to close at $11.46 per share on February 16, 2018, causing damage to Lead Plaintiff and the other members of the Class | 462. In response, shares of Riot fell $5.74 per share, or approximately 33.4%, from closing at $17.20 on February 15, 2018, to closing at $11.46 per share on February 16, 2018, damaging Lead Plaintiff and Class members. This decline in price corresponded with a more than 13-fold spike in trading volume, in which the daily shares traded increased from approximately 1.7 million shares traded on February 15, 2015, to approximately 12.2 million shares traded on February 16, 2018. |
| **Allegations Regarding April 17, 2018 Form 10-K** | |
| 173. . . . [On] April 17, 2018, that Riot | 463. On April 17, 2018 after the market |

| CCAC ALLEGATION | REVISION IN SAC |
|---|---|
| disclosed that "[e]ach of Mr. Honig and Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company . . . .<br><br>404. On April 17, 2018, Riot filed an annual report on Form 10-K, disclosing that on April 9, 2018 it had received a subpoena from the SEC. On this news, the Company's stock price fell $0.34 per share, or approximately 5.9%, from the previous day's closing price, to close at $6.87 per share on April 18, 2018, damaging Class members. | closed, Riot filed its 2017 annual report on Form 10-K, belatedly disclosing various related party transactions, as set forth herein, that took place in 2017. These include the March 2017 Private Placement, Honig's consultancy role in the Coinsquare transaction, the Kairos Agreement, and the December 2017 Private Placement. The following trading day, April 18, 2018, the Company's stock price fell $0.43 per share, or approximately 5.8%, from the previous day's closing price, to close at $6.87 per share on April 18, 2018, damaging Class members. |
| **Allegations Regarding May 25, 2018 Form 8-K/A** | |
| 351. On May 25, 2018, Riot filed a Form 8-K/A in which the Company amended its Form 8-K filed on October 4, 2017, by disclosing for the first time the "Amended and Restated Unanimous Shareholder Agreement, dated October 2, 2017," pursuant to which Riot (then still called Bioptix) had invested $3 million to purchased units of Coinsquare. According to the agreement, in addition to Bioptix, the following individual were also "ISSUED SHARE CAPITAL" as part of Riot's agreement with Coinsquare:<br>• Barry Honig<br>• GRQ Consultants Inc Roth 401K FBO Barry Honig<br>• Titan Multi-Strategy Fund I, Ltd. (Jonathan Honig is the Manager)<br>• Michasel Brauser<br>• Erica and Mark Groussman Foundation<br>• Stetson Capital Investments Inc. . . . | 464. After trading ended on May 25, 2018, Riot disclosed for the first time in an amended Form 8-K/A that several Honig Group members were – like Riot – parties to the Coinsquare transaction. On this news, on the following trading day, May 29, 2018, Company's stock price fell from an opening share price $7.53 per share to $7.08 per share, a decline of nearly 6% and damaging Class members. |
| **Allegations Regarding Sept. 7. 2018 Lawsuit Filing** | |
| 357. On September 7, 2018, the SEC filed the Honig Action against Defendants O'Rourke, Honig, Stetson, and Groussman, as well as Frost, Brauser, and others, for numerous violations of the Exchange Act and Securities Act. | 465. On September 7, 2018, the SEC filed the Honig Action against Defendants Honig, O'Rourke, Groussman, and Stetson, and several of their affiliates, finally revealing that, contrary<br>to Defendants' misleading filings on Schedules 13D and 13G, and on Forms S-3 and 10-K, the Honig Group was not only a |

| CCAC ALLEGATION | REVISION IN SAC |
| --- | --- |
| | "group" as defined by Section 13(d), but in fact a a highly-orchestrated and closely-knit partnership among Honig, O'Rourke, Groussman, and Stetson, who together had been engaged in the same fraudulent modus operandi at Riot as at the previous companies at which they had operated the pump-and-dump schemes described by the SEC. |
| 361. On this news, the price of Riot's stock declined $1.38 per share, or approximately 26.1%, from the previous day's closing price, to close at $4.30 per share on September 7, 2018. | 466. On this news, the price of Riot's stock dropped $1.38 per share, or approximately 26.1%, from the previous day's closing price, to close at $4.30 per share on September 7, 2018, damaging Class members. |

**B. Deleted Allegations**

The following "loss causation" allegations contained in Plaintiff's Corrected Consolidated Class Action Complaint [Dkt. No. 73] were deleted, and are not included in Plaintiff's Second Consolidated Class Action Complaint:

398. On December 19, 2017, CNBC's Fast Money aired an interview with Left, which called into question Defendants' integrity. In response, Riot's stock price fell by **6.42%**, from a closing price of $38.60 per share on December 19, 2017, to a closing price of $36.12 per share on December 20, 2017, damaging Lead Plaintiff and members of the Class.

399. On December 21 and 22, 2017, numerous articles were released that suggested that Riot's name change to include the word "Blockchain" was a publicity stunt and questioning the legitimacy of the Company. As a result of the disclosures, Riot's stock price declined $11.60 per share, or **34.75%**, over the course of those two trading days, damaging Lead Plaintiff and members of the Class.

400. On January 2, 2018, Reuters published an article prior to the market open entitled, "BUZZ-Riot Blockchain down after CEO reports stock offering – RTRS." The article stated that Riot's stock price was down 4.44% in pre-market trading after Defendant O'Rourke had reported his sale of over 30,000 shares. An article published during early morning trading hours, on the popular investor website, The Motley Fool, entitled, "Riot Blockchain's CEO Just Sold a Lot of Stock," detailed Defendant O'Rourke's suspicious trading. On this news, Riot's stock price declined $4.04 per share, or **14.45%**, over two trading days, from $28.40 per share on December 29, 2017, to $24.36 per share on January 3, 2018, damaging Lead Plaintiff and members of the Class.

401. On January 5, 2018, after the close of trading, Riot filed a registration statement on Form S-3 for the disposition of approximately 3.3 million shares and warrants. The 1.65 million common shares being registered represented over 14% of the 11.6 million outstanding common shares. The filing also disclosed that investors who had purchased in the March 2017 Placements

would be free to sell their shares once the registration statement was declared effective. The possibility of private investors, who bought shares below market value, selling out at a premium, like Defendants Honig and O'Rourke, created a negative market response. The registration statement also confirmed that Riot had overpaid for Kairos. It confirmed that Kairos had purchased its equipment for $2,089,679 and the excess purchase price paid by Riot was recorded as $8,637,545, confirming that the Company paid more than four times the price for Kairos's equipment. The Company's stock price declined $1.01 per share, or **4.13%**, from $24.41 per share on January 5, 2018, to $23.42 per share on January 8, 2018, damaging Lead Plaintiff and members of the Class.