# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CREIGHTON TAKATA, Individually and on behalf of all others similarly situated,

      *Plaintiff*,

      v.

RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY G. MCGONEGAL,

      *Defendants*.

Civil Action No.: 18-2293(FLW)(ZNQ)

**LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**

**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for Dr. Stanley Golovac and Lead Counsel for the Class*

## TABLE OF CONTENTS

I.     INTRODUCTION AND PROCEDURAL BACKGROUND .........................................1

II.    STATEMENT OF FACTS ...........................................................................................5

    A.    The Honig Group Engaged in a Fraudulent Pump-and-Dump Scheme at Riot.......5

        1.    Honig Knowingly Engaged in the Scheme................................................9

        2.    O'Rourke (and Thus Riot) Knowingly Engaged in the Scheme...............11

        3.    Beeghley (and Thus Riot) Knowingly Engaged in the Scheme ...............12

        4.    Groussman Knowingly Engaged in the Scheme.......................................13

        5.    Stetson Knowingly Engaged in the Scheme ............................................14

        6.    DeFrancesco Knowingly Engaged in the Scheme ...................................15

    B.    When the Scheme Was Revealed, Riot's Public Investors Were Damaged.........16

III.   ARGUMENT ..............................................................................................................17

    A.    The Complaint Adequately Pleads Count I (Violation of Section 10(b) and Rules 10b-5(a) and (c)) by Alleging Defendants' Manipulative and Deceptive Acts in Furtherance of Their Scheme to Defraud Riot's Public Investors ........................18

        1.    Each of the Defendants Had Well-Known Disclosure Duties Section 13(d), Regulation 13d-G, and Item 403 ...................................................20

        2.    The Individual Defendants Acted as an Undisclosed Control Group to Pump-and-Dump Riot Stock While Misrepresenting and Concealing their Beneficial Ownership in Violation of Section 13(d), Regulation 13d-G, and Item 403 ............................................................................................24

        3.    The Complaint Alleges a Strong Inference that Each Defendant Knowingly Engaged in the Scheme to Defraud Riot's Public Investors ...29

    B.    The Complaint Adequately Pleads Count II (Violation of Section 10(b) and Rule 10b-5(b)) by Alleging Defendants' Materially False and Misleading Statements and Omissions to Riot's Public Investors ............................................................34

        1.    Honig, Groussman, DeFrancesco, and Stetson's Statements and Omissions Regarding Their Beneficial Ownership of Riot Stock on Schedules 13D and 13G Were False and Misleading ......................................................35

        a.    Honig's False Statements and Omissions ..................................36

        b.    Groussman's False and Misleading Statements and Omissions ...............38

        c.    DeFrancesco's False and Misleading Statements and Omissions ............40

        d.    Stetson's False and Misleading Statements and Omissions ....................41

        2.    Riot's Statements Signed by O'Rourke and/or Beeghley Regarding Beneficial Ownership on Forms S-3/A and 10-K Were False and Misleading....................................................................................................42

        3.    Riot, O'Rourke, and Beeghley's Statements and Omissions Regarding the Company's Related-Party Transactions Were False and Misleading........45

C.     The Complaint Adequately Pleads Loss Causation ...............................................50

    1.     January 31, 2018 – *The Wall Street Journal* Reveals Honig's Sales.........52

    2.     February 16, 2018 – CNBC Publishes Exposé on Riot and Honig ...........55

    3.     April 17, 2018 – For the First Time Riot Discloses Numerous Related-Party Transactions....................................................................................56

    4.     May 25, 2018 – Coinsquare Disclosed as Related-Party Transaction.......58

    5.     September 7, 2018 – SEC Files the *Honig Action* ...................................58

D.     The Complaint Adequately Pleads Count III (Violation of Section 20(a)) ...........60

**IV.     CONCLUSION ..............................................................................................................60**

## TABLE OF AUTHORITIES

### CASES

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ................................. 18, 59

*Americbanc Investors Grp. v. Zwart*, 706 F. Supp. 1248 (E.D. Va. 1989) ................................ 35

*Azurite Corp. v. Amster & Co.*, 52 F.3d 15 (2d Cir. 1995) ........................................................ 23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................... 17

*Berkery v. Equifax Info Servs.*, 429 F. Supp. 3d 24 (E.D. Pa. 2019) ........................................ 51

*Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256 (D.N.J. Mar. 2, 2016) ............................... 60

*Brendon v. Allegiant Travel Co.*, 2019 WL 4255051 (D. Nev. Sept. 9, 2019) ........................... 33

*Burt v. Maasberg*, 2013 WL 1314160 (D. Md. Mar. 31, 2013) ................................................. 29

*Burt v. Maasberg*, 2014 WL 1291834 (D. Md. Mar. 28, 2014) ........................................... *passim*

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) ................................. 34

*Cassin v. Prudential Ins. Co. of Am., Inc.*, 2004 WL 2360023 (S.D.N.Y. Oct. 19, 2004) .......... 51

*Cf. United States v. O'Hagan*, 139 F.3d 641 (8th Cir. 1998) ..................................................... 34

*Coleman v. Metzger*, 2020 WL 3452993 (D. Del. June 24, 2020) ............................................. 50

*Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807 (S.D.N.Y. 2006) .......................................... 19

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) .................................................................. 50

*EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865 (3d Cir. 2000) ................................. 35, 51

*Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ...................................... 35

*Fin. Gen. Bankshares, Inc. v. Lance*, 1978 WL 1082 (D.D.C. Apr. 27, 1978) .......................... 25

*Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) .............................. 53

*GAF Corp. v. Milstein*, 453 F.2d 709 (2d Cir. 1971) ............................................................ 23, 38

*Geiger v. Solomon-Page Grp., Ltd.*, 933 F. Supp. 1180 (S.D.N.Y. 1996) ................................. 42

*GFL Advantage Fund, Ltd., v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) ......................................... 18

*Glazer v. Formica Corp.*, 964 F.2d 149 (2d Cir. 1992) ............................................................. 37

*Grand Union Supermarkets of the V.I., Inc. v. Lockhart Realty, Inc.*,
    493 F. App'x 248 (3d Cir. 2012) ............................................................................................ 37

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
    286 F.3d 613 (2d Cir. 2002) ................................................................................... 21, 23, 24

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
    95 F. Supp. 2d 169 (S.D.N.Y. 2000) ..................................................................................... 26

*Harriman v. E.I. DuPont De Nemours & Co.*, 372 F. Supp. 101 (D. Del. 1974) ........................ 37

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ........................................................ 19

*In re Able Labs. Sec. Litig.*, 2008 WL 1967509 (D.N.J. Mar. 24, 2008) .................................... 18

*In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004).................................................. 41

*In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004)...................................................... 33

*In re Apple Computer Sec. Litig.*, 886 F.2d 1109 (9th Cir. 1989) ............................................... 57

*In re Bank of America AIG Disclosure Securities Litigation* ,
980 F. Supp. 2d 564 (S.D.N.Y. 2013) ........................................................................................ 57

*In re Bradley Pharm., Inc. Sec. Litig.*, 2006 WL 740793 (D.N.J. Mar. 23, 2006) ...................... 59

*In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004 (D.N.J. Aug. 17, 2005) ................... 53

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 141016 (3d Cir. 1997) ........................ 17, 18

*In re Cephalon Sec. Litig.*, 1997 WL 570918 (E.D. Pa. Aug. 29, 1997) ...................................... 18

*In re Enzymotec Sec. Litig.*, 2015 WL 8784065 (D.N.J. Dec. 15, 2015)...................................... 33

*In re EQT Corp. Sec. Litig.*, 2020 WL 7059556 (W.D. Pa. Dec. 2, 2020) ................................... 57

*In re Galena Biopharma, Inc. Sec. Litig.*, 2021 WL 50227 (D.N.J. Jan. 5, 2021) ...................... 53

*In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519 (D. Del. 2012)....................................... 32

*In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13-7050, 2015 WL 4469143
(D.N.J. July 22, 2015)................................................................................................................ 33

*In re Hienergy Techs., Inc.*, 2005 WL 3071250 (C.D. Cal. Oct. 25, 2005)................................... 42

*In re Initial Pub. Offering Sec. Litig.* ("*In re IPO*"), 241 F. Supp. 2d 281
(S.D.N.Y. 2003) .................................................................................................................... 37, 56

*In re Majesco Sec. Litig.*, 2006 WL 2846281 (D.N.J. Sept. 29, 2006)......................................... 35

*In re Merck & Co., Inc. Securities Litigation*, 432 F.3d 261 (3d Cir. 2005) .............................. 57

*In re StockerYale*, 453 F. Supp. 2d 345 (D.N.H. 2006).............................................................. 54

*In re Suprema Specialities, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) ............................ 19, 30

*In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008) ........................... 17

*In re Tyson Foods, Inc. Sec. Litig.*, 2004 WL 1396269 (D. Del. June 17, 2004) ........................ 51

*In re Unisys Corp. Sec. Litig.*, 2000 WL 1367951 (E.D. Pa. Sept. 21, 2000) ............................. 18

*Institutional Inv'rs Grp. V. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) ............................. 29, 30, 33

*Jaroslawicz v. Engelhard Corp.*, 1989 WL 32864 (D.N.J. Apr. 5, 1989) .................................... 17

*Jewelcor Inc. v. Pearlman*, 397 F. Supp. 221 (S.D.N.Y. 1975) .................................................. 25

*Jones v. Intelli-Check, Inc.*, 274 F.Supp.2d 615 (D.N.J. Jul 30, 2003) (Wolfson, J.)................. 19

*Kamerman v. Steinberg*, 891 F.2d 424 (2d Cir. 1989)................................................................. 38

*Lerner v. Millenco, LP*, 23 F. Supp. 2d 337 (S.D.N.Y. 1998) ..................................................... 26

*Liberty Nat'l Ins. Holding Co. v. Charter Co.*, 734 F.2d 545 (11th Cir. 1984).......................... 23

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) ......................................................................... 51

*Log On America, Inc. v. Promethean Asset Management L.L.C.*,
223 F. Supp. 2d 435 (S.D.N.Y. 2001) ....................................................................................... 29

*Lorenzo v. SEC*, 139 S.Ct. 1094 (2019) ................................................................. 19

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ................................ 17

*McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007) ............................. 53

*Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013)................................................. 57

*Morales v. Quintel Entm't, Inc.*, 249 F.3d 115 (2d Cir. 2001) ............................. 26

*Motient Corp. v. Dondero*, 529 F.3d 532 (5th Cir. 2008)...................................... 23

*Nathanson v. Polycom, Inc.*, 87 F.Supp. 3d 966 (N.D. Cal. 2015)........................ 56

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) ..................................................... 41

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008).................................. 18

*Rosen*, 113 F. Supp. 2d ........................................................................................ 25

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) .................................................... 24

*Rubin v. Posner*, 701 F. Supp. 1041 (D. Del. 1988) ............................................ 23

*S.E.C. v. First City Fin. Corp., Ltd.*, 688 F. Supp. 705 (D.D.C. 1988)................. 25

*Scott v. Multi-Amp Corp.*, 386 F. Supp. 44 (D.N.J. 1974)................................... 28

*Se. Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 466958
   (M.D. Pa. Feb. 8, 2016) .................................................................................... 32

*SEC v. Honig*, 2021 WL 276155 (S.D.N.Y. Jan. 27, 2021)................................ *passim*

*SEC v. Jammin Java Corp.*, 2016 WL 6595133 (C.D. Cal. July 18, 2016)........... 22, 25

*SEC v. Lucent Techs. Inc.*, 610 F. Supp. 2d at 342 (D.N.J. 2009) ....................... 18

*SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 923 (S.D. Ohio 2009),
   *aff'd*, 712 F.3d 321 (6th Cir. 2013)................................................................... 22

*SEC v. Strebinger*, 114 F. Supp. 3d 1321 (N.D. Ga. 2015) ................................ 22

*SEC v. Teo*, 2010 WL 3184349 (D.N.J. Aug. 10, 2010)...................................... 22

*SEC. v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379 (S.D.N.Y. 2014) .......... 45

*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) ................................. 51

*Shaev v. Saper*, 320 F.3d 373 (3d Cir. 2003)....................................................... 42

*Stephens v. Uranium Energy Corp.*, 2016 WL 3855860 (S.D. Tex. July 15, 2016) .............. 46, 47

*Stumpf v. Garvey*, 2005 WL 2127674 (D.N.H. Sept. 2, 2005) ............................ 54

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............... 17, 29, 30, 32

*The Winer Family Trust v. Queen*, 2004 WL 2203709 (E.D. Pa. Sept. 27, 2004) ..................... 60

*Torchmark Corp. v. Bixby*, 708 F. Supp. 1070 (W.D. Mo. 1988) ....................... 28

*Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650 (D.N.J. 2009) ............... 18

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)................................... 22, 38

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*, 2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014) ....... 45

*Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473 (S.D.N.Y. 2009)................... *passim*

*W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165 (3d Cir. 2013)..... 51

*Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705 (N.D. Tex. 2008).................. 46, 50

**STATUTES**

15 U.S.C. § 78j.................................................................................................................. 20

15 U.S.C. § 78m................................................................................................................. 22

15 U.S.C. § 78m(d)(3)............................................................................................. 21, 24, 42

15 U.S.C. § 78z.................................................................................................................. 31

**OTHER AUTHORITIES**

FASB ASC 850......................................................................................................... 2, 8, 45

H.R.Rep. No. 90–1711 (1968), reprinted in 1968 U.S.C.C.A.N. 2811, 2814 ............................ 21

**RULES**

Fed. R. Evid. 201(b)(2)...................................................................................................... 55

**REGULATIONS**

17 C.F.R. § 229.10(1) ....................................................................................................... 22

17 C.F.R. § 229.403 (c)(2).................................................................................................. 44

17 C.F.R. § 229.403(a)................................................................................................... 22, 43

17 C.F.R. § 229.404 ............................................................................................................ 2

17 C.F.R. § 229.404, Instruction 6...................................................................................... 49

17 C.F.R. § 240.10b-5....................................................................................................... 18

17 C.F.R. § 240.10b–5......................................................................................................... 1

17 C.F.R. § 240.10b-5(b)................................................................................................... 34

17 C.F.R. § 240.13d-1.......................................................................................................... 3

17 C.F.R. § 240.13d1(a)..................................................................................................... 21

17 C.F.R. § 240.13d-101.................................................................................................... 35

17 C.F.R. § 240.13d–101.................................................................................................... 21

17 C.F.R. § 240.13d-3(a).................................................................................................... 42

17 C.F.R. § 240.13d–5(b)(1).............................................................................................. 21

17 CFR § 240.13a-1........................................................................................................... 22

Court-appointed Lead Plaintiff Dr. Stanley Golovac ("Plaintiff") respectfully submits this omnibus memorandum of law in opposition to the motions to dismiss the Consolidated Second Amended Class Action Complaint (the "Complaint" or "SAC") filed by Defendants Riot Blockchain, Inc., Barry C. Honig, John O'Rourke, Michael Beeghley, Catherine DeFrancesco, John Stetson, and Mark Groussman (the "Individual Defendants," and together with Riot, "Defendants").[1]

## I.    INTRODUCTION AND PROCEDURAL BACKGROUND

The Complaint cures the deficiencies identified by the Court in its April 30, 2020 Opinion (ECF No. 166 ("*Riot I*")), by "clearly identify[ing] the particularized allegations that support each element of the claims" and making "scienter allegations that are particularized as to each defendant." *Id.* at 40 n.19, 41 n.20. **_First_**, the Complaint sets forth new and more particularized allegations showing how Honig, DeFrancesco, Groussman, and Stetson each committed deceptive and manipulative acts in furtherance of the Honig Group's pump-and-dump scheme by concealing that they were a control "group" of Riot shareholders while also failing to promptly disclose their covert sales of Riot stock in plain violation of Exchange Act Section 13(d), 15 U.S.C. § 78m(d), Regulation 13d-G, 17 C.F.R. § 240.13d–1 *et seq.*; Section 10(b), 15 U.S.C. § 78j(b); and Rule 10b–5, 17 C.F.R. § 240.10b–5. *See* §§ III.A-B. **_Second_**, the Complaint alleges how O'Rourke

---

[1] Capitalized terms herein have the same meanings as in the Complaint (ECF No. 188), paragraphs of which are cited as "¶ __," exhibits to which are cited as "SAC Ex. __," and sections of which are cited as "SAC § __." References to "Ex. __" are to exhibits to the DePalma Declaration filed herewith. Defendants' memoranda of law in support of their motions are cited as follows: Riot's (ECF No. 192-1) as "Riot Br. __"; O'Rourke and Beeghley's (ECF No. 193-1) as "Indiv. Br. __"; Groussman's (ECF No. 194-1) as "Groussman Br. __"; DeFrancesco's (ECF No. 195-1) as "DeFrancesco Br. __"; Honig's (ECF No. 196-1) as "Honig Br. __"; and Stetson's (ECF No. 197-1) as "Stetson Br. __." Riot, O'Rourke, and Beeghley are sometimes referred to herein as "the Riot Defendants." All emphasis is added and internal quotations and citations are omitted, unless otherwise noted.

and Beeghley, as Riot's CEOs, facilitated the fraudulent scheme from within the Company by signing false and misleading Forms S-3, S-3/A, and 10-K that failed to disclose, as required by Item 403 of Regulation S-K, 17 C.F.R. § 229.403 ("Item 403"), that the Honig Group was acting as a "group" under Section 13(d). *See* § III.B.2. ***Third***, the Complaint alleges how O'Rourke and Beeghley caused the Company to violate Item 404 of Regulation S-K, 17 C.F.R. § 229.404 ("Item 404") and FASB ASC 850 ("ASC 850") by failing to disclose the Honig Group's lucrative related-party transactions with Riot. *See* § III.B.3. ***Fourth***, the Complaint is bolstered by new and more particularized allegations as to each Defendant, supporting a strong inference of each individual's scienter in committing those deceptive, manipulative, and misleading acts. *See* §§ II.A-B & III.A. ***Fifth***, the Complaint clarifies how *The Wall Street Journal's* January 31, 2018 revelation of Honig's massive covert stock sales, followed by further revelations by CNBC, the SEC, and in Riot's SEC filings of details of the Honig Group's pump-and-dump scheme at Riot and *modus operandi* caused the losses incurred by Plaintiff and other Class Members. *See* § III.C.

In *Riot I*, this Court held that Plaintiff's prior complaint (ECF No. 73) had "adequately alleged a 'deceptive and manipulative' act by Honig that is actionable under Section 10(b)," *Riot I* at 34, and that Plaintiff's "allegations . . . against Honig are sufficient to support the requisite strong inference of scienter" given Honig's "motive and opportunity to profit from the concealment of his stock sales," which are "estimated to have made [him] at least $17.6 million," *id.* at 36-37. The Court found that Honig's "deceptive act" involved "Honig violat[ing] his obligations—as one of Riot's largest shareholders—under SEC reporting requirements to 'promptly' disclose material changes in his ownership of Riot's stock during the Class Period," which the Court held "was deceptive when viewed in the wider context of Plaintiff's allegations that Honig did so in order to conceal his sales from the public as part of a scheme to pump-and-

2

dump Riot's stock." *Id.* at 33-34 (citing Exchange Act Section 13(d) and Rule 13d-1 thereunder, 17 C.F.R. § 240.13d-1).  However, the Court concluded that Plaintiff had not adequately pleaded loss causation with respect to the disclosure of Honig's concealed sales of Riot stock.  *Riot I* at 39.

While the Court did not find that Plaintiff's prior pleading adequately stated claims under Section 10(b) against the other defendants, *id.* at 27, 30, the Court noted that "Plaintiff suggests in his opposition papers that several of Defendants sold significant shares of stock in Riot during the Class Period without disclosing those sales," and that "these accusations are similar to the allegations made against Honig," but found that the "facts to support" these accusations "[were] not alleged in the [prior complaint], but rather appear to be referred to for the first time only in Plaintiff's opposition papers," *id.* at 34.  The Court granted Plaintiff leave to file a "motion to amend in a manner consistent with this Opinion" by filing a "proposed pleading" that "clearly identif[ies] the particularized allegations that support each element of the claims" and which also includes "scienter allegations that are particularized as to each defendant."  *Id.* at 40 n.19, 41 n.20.

On June 1, 2020, Plaintiff moved to amend (ECF No. 169) based on his proposed new, operative Complaint.[2]  Following substantive oppositions filed by Riot, O'Rourke, Beeghley, and Honig (ECF Nos. 171, 173) and joinders filed by DeFrancesco, Stetson, and Groussman (ECF Nos. 172, 174-77), the Court (Quraishi, M.J.) granted Plaintiff permission to file the Complaint and found that "Plaintiff's [Complaint] adequately states his claims against all Defendants by pleading more particularized facts as to each Defendant to support every element of each of his claims."  (ECF No. 187 at 15 (Quraishi, M.J.) ("*Riot II*").)  In so ruling, Judge Quraishi found the allegations "sufficient for a rational trier of fact to find that the Riot Defendants

---

[2]  The Complaint is not Plaintiff's "fourth" or "fifth" pleading.  Honig Br. 2-3; Groussman Br. 1. Plaintiff did not file the initial complaint (ECF No. 1), which preceded his appointment as Lead Plaintiff.

knew Honig, DeFrancesco, Groussman, and Stetson acted as a group" and held that "Plaintiff has sufficiently pleaded that the Riot Defendants either filed a false and misleading statement by a material omission, or engaged in a deceptive act, under Rule 10b of the Exchange Act." *Id*. at 11.[3]

"As to the related-party transactions," Judge Quraishi found that "Plaintiff has sufficiently alleged that the Riot Defendants filed a false or misleading statement, or deceptive act, by leaving out specific details such as the investors' (Honig's) name and that his investment was a related-party transaction . . . ." *Id.* at 11-12.   Judge Quraishi also found that "Plaintiff has alleged a strong inference of scienter" and "sufficiently alleges loss causation" as to the Riot Defendants. *Id.*

Reviewing Plaintiff's allegations regarding Honig's Schedule 13D filings, Judge Quraishi found that "that Plaintiff has sufficiently alleged that Honig made a material misrepresentation and/or omission by, at the very least, not filing a Schedule [13D] or [13D/A] throughout 2017 and promptly disclosing his material acquisitions or dispositions of Riot stock" and that  "[t]he same allegations Plaintiff made in the [prior complaint] against Honig regarding a deceptive act, which were found sufficient in the Court's [April 30, 2020] Opinion, are made in the [operative Complaint] regarding a false statement and material misrepresentation or omission." *Id.* at 13 (citing *Riot I* at 33-34).   Judge Quraishi further found that "Honig's failure to promptly disclose, when taken together with Plaintiff's allegations that Honig knew of his obligation to promptly file a Schedule [13D], [13D/A], and 13G as evidenced by his 2016 practice and his apparent motives

---

[3] The Court noted that "Riot's 'disclosure obligations' were 'imposed' by '[Item 403],' which required Riot to disclose in its Forms S-3 and 10-K 'any 'group' as that term is used in section 13(d)(3).'" *Id.* at 10.  The same conclusion was recently reached in *SEC v. Honig*, 2021 WL 276155 (S.D.N.Y. Jan. 27, 2021), which held that the CEO of another of the Honig Group's pump-and-dump target companies—MGT, ¶¶ 108-19—could be held liable for signing "S-1 and 10-K filings [that] failed to comply with Item 403" for failing "to disclose the collective beneficial ownership of the Honig Group, which [the SEC] allege[d] was a 'person' under Item 403" and "Section 13(d)." *SEC v. Honig*, 2021 WL 276155, at *6-7.

to profit, gives rise to a strong inference that Honig acted with scienter." *Id.* at 14.

Judge Quraishi also concluded allegations that DeFrancesco and Groussman's Schedule 13D filings "were materially false, misleading, deficient, and untimely" and found that "[t]hese are the same allegations the Court found to be similar to the allegations Plaintiff made against Honig, which are now properly pleaded in Plaintiff's [Complaint]" and "taken together with Plaintiff's allegations as a whole against Defendants who are part of the Honig group, . . . give rise to a strong inference of scienter on the part of Defendants DeFrancesco and Groussman." *Id.* at 14. "[A]s to Defendant Stetson," Judge Quraishi held that "Plaintiff's allegations . . . sufficiently plead that Stetson failed to report he was part of a group in a Schedule 13D, which he allegedly never filed," and "that this could lead to an inference that Stetson's consistent 4.99% ownership interest was a deceptive act," and that "in the broader context of Plaintiff's allegations against all Defendants and for the purposes of this Motion, Stetson acted with requisite scienter." *Id.* at 14-15.

Judge Quraishi also found that "under the liberal approach applied to pleading loss causation," the Complaint adequately alleges that element  against *all* defendants. *Id.* at 12, 15. Finally, Judge Quraishi held that the Complaint adequately alleges Count III. *Id.* at 15. "In summary, the Court [found] that Plaintiff's [Complaint] adequately states his claims against all Defendants by pleading more particularized facts as to each Defendant to support every element of each of his claims." *Id.* Plaintiff filed the Complaint on December 24, 2020. (ECF No. 188).

## II.     STATEMENT OF FACTS

### A.     The Honig Group Engaged in a Fraudulent Pump-and-Dump Scheme at Riot

The Complaint alleges in detail how each of the Individual Defendants conspired with one another and acted in concert with an undisclosed control group of other Riot shareholders to (1) amass a controlling interest in Riot and gain control of the Company's Board through a proxy

fight, *see* SAC § VII.A; (2) conceal their group's control through false and misleading statements and omissions regarding the Company's beneficial ownership in violation of Section 13(d) of the Exchange Act, Regulation 13d, and Item 403, *see* SAC §§ VII.D, IX.C, X.A; (3) pump up the price and trading volume of Riot stock through false, misleading, and incomplete disclosures regarding various corporate transactions, ¶¶ 177, 188-201, as well as misleading registration statements on Forms S-3 and S-3/A, *e.g.*, ¶¶ 347, 361, 366, 369, 374; (4) engage in undisclosed related-party transactions at the expense of the Company and its shareholders in violation of Item 403 and ASC 850, *see* SAC §§ VII.E (¶¶ 183-201) & X.C (¶¶ 389-425); and (5) dump their shares into the artificially inflated market on unsuspecting retail investors, *e.g.*, ¶¶ 179, 206, 317, 333, 340.

Honig, DeFrancesco, Groussman, and Stetson could not have accomplished their scheme, however, without the assistance of O'Rourke and Beeghley from inside the Company.  ¶ 237.  To this end, one of O'Rourke, Beeghley, and Stetson's first concerted actions with Honig and DeFrancesco was to sign three "Consent[s] to Nomination as Director" (SAC Ex. O at 459-65), which Honig and DeFrancesco enclosed with their letters to the Company's outgoing Board on September 13 and 20, 2016, in which Honig and DeFrancesco nominated O'Rourke, Beeghley, and Stetson to that Board.  ¶¶ 170-71; *see also* SAC Ex. O.  Honig's September 13 letter to the Board (attaching O'Rourke, Beeghley, and Stetson's signatures) stated that they all were represented by "our counsel Harvey Kesner, Esq."  SAC Ex. O at 456.[4]  DeFrancesco's September 20 letter attached Honig's letter and O'Rourke, Beeghley, and Stetson's signed "Consent[s]."  *Id.*

---

[4] Kesner had also been a Selling Stockholder in PolarityTE, ¶ 133, and would likewise be a Selling Stockholder of Riot stock through Kesner's entity Paradox, ¶¶ 50, 162, 374, 383.  Additionally, every other member of the Honig Group was either a director, officer, or investor in PolarityTE. ¶¶ 15, 23, 26, 28, 68, 132-36, 159, 162.

Honig and DeFrancesco then pursued a proxy fight that included a lawsuit filed by Honig against the Board, ¶ 175. In one telephone call, a former Board member recalled Honig implying that he had control of 40% of the Company's shares through the stock ownership of his friends and relatives. ¶ 168. According to an individual present at the time, Beeghley falsely told the outgoing Board that "he did not know Honig," ¶ 175, despite the fact that Beeghley was a "Director of PolarityTE," ¶ 286, another microcap company, during the same time period that Honig was PolarityTE's "Chairman and CEO," ¶ 23—overlapping senior positions they held at the same public company for more than one year, ¶ 134. The efforts were successful, and Beeghley and O'Rourke joined the Board with Beeghley becoming CEO. ¶¶ 24, 28, 176.

Having become directors and officers of Riot, O'Rourke, and Beeghley caused the Company to issue materially false and misleading public filings that misrepresented and concealed the fact that many of Riot's largest shareholders—including Honig, Groussman, Stetson, DeFrancesco, and the Selling Stockholders listed in Riot's Forms S-3 and S-3/A—were members of a group (as defined by Section 13(d)(3)) through which they agreed to acquire, hold, vote, and/or dispose of their shares in coordination with one other. ¶¶ 344-88.

A close review of Riot's Forms S-3 and S-3/A reveals that the Honig Group, together with the Selling Stockholders,[5] who together amassed a 55%+ stake in the Company, ¶¶ 351 n.78, 364 n.80, **_coordinated their trading in Riot stock down to the single share_**, resulting in implausibly

---

[5] The Riot Defendants argue that these "other investors" are not "alleged to be members of the Honig Group." Riot Br. 15 n.12. This misses the point. The "Honig Group" is merely a collective reference to "Defendants," ¶ 29, to emphasize that Honig was (per O'Rourke) the "principal investor of our small group," ¶ 82. The other "20 affiliated Selling Stockholders," ¶ 4—many of which are entities owned by Defendants, ¶¶ 27, 33, 40, 58-59, 63, 72, 161-62—each have "confirmed ties to the Honig Group through past microcap stock investments," ¶ 4. Defendants had "explicit or tacit agreements with each other and the Selling Stockholders." ¶¶ 8, 233. Hence, Defendants and their affiliated Selling Stockholders were an undisclosed Section 13(d) control group. ¶ 15.

coincidental numbers of shares these purportedly "unrelated" stockholders held.  *See* ¶¶ 352, 365, 373-74, 377, 383, 386.

With the Honig Group's existence as a group concealed by the misleading Forms S-3, S-3/A, and 10-K/A signed by O'Rourke and Beeghley, the rest of the Honig Group—Honig (¶¶ 313-23), DeFrancesco (¶¶ 335-40), Groussman (¶¶ 324-34), and Stetson (¶¶ 341-43)—proceeded to acquire and dispose of Riot stock while failing to fulfill their own legal duties to make timely and appropriate Section 13(d) filings and amendments reflecting their acquisitions and dispositions of Riot stock and their "group" membership under Section 13(d).  *See* SAC § X.A (¶¶ 305-43).

Meanwhile, from within the Company, O'Rourke and Beeghley signed Riot's SEC filings that misrepresented and helped to conceal the Honig Group's related-party transactions with the Company in violation of Item 404 and GAAP (particularly, ASC 850).  ¶¶ 183-201.  For example, Beeghley was Chairman, ¶ 28, and O'Rourke was a Director, ¶ 24, when they both signed the Form 10-K that described Riot's March 2017 Private Placement Agreement but which concealed Honig's role as a related party to that transaction.  ¶¶ 188-89, 389-94.  Similarly, Beeghley was CEO and O'Rourke was President when Riot issued a statement by Beeghley announcing the Coinsquare Agreement, ¶¶ 190-91, but which omitted and concealed that this was a related-party transaction in which Riot, Honig, Stetson, Groussman, and Brauser were all parties, ¶ 193, and in which Honig received a cash payment of $50,000, ¶ 192.  Likewise, Beeghley was CEO and O'Rourke was President when Riot publicly announced the Kairos Transaction, ¶¶ 196-99, without disclosing (for another five months) that Kairos was a related-party transaction with Kairos's part-owners, Honig and DeFrancesco, ¶ 198.  *See also* ¶¶ 183-201, 398-425; § III.B.3.  As CEO, O'Rourke also signed Riot's November 2017 Form 10-Q, which described the March 2017 Private Placement Agreement, the Coinsquare Agreement, and the Kairos Transaction, ¶¶ 401-03, but

failed to disclose (as required by Item 404 and ASC 850) that each of these transactions involved related parties including, in each instance, Honig, ¶ 402.

As discussed below, the Complaint includes particularized allegations that amply support the scienter of each Defendant in fulfilling his or her role in the fraudulent scheme.

### 1.    Honig Knowingly Engaged in the Scheme

During the Class Period, Honig committed deceptive acts by knowingly misrepresenting and concealing that he was part of an undisclosed group through false and misleading Section 13(d) filings, and by failing to make the necessary amendments to those filings, thereby concealing his manipulative trading in Riot stock—including massive undisclosed stock sales yielding him at least $17 million (¶ 23).  *See* SAC §§ IX.C.1, X.A.1.  In *Riot I*, this Court "conclude[d] that the allegations in [Plaintiff's previous] Complaint against Honig [were] sufficient to support the requisite strong inference of scienter."  *Riot I* at 36.  The Complaint includes these same allegations—*and adds more*—supporting an even stronger inference that Honig "knew that concealing his stock sales was deceptive . . . ."  *Id.* at 36-37.  Specifically, the Complaint alleges:

a.  Honig, O'Rourke, and Stetson were personally familiar with their obligations under Section 13(d)—and the materiality to Riot's public investors of their disclosures regarding beneficial ownership of the Company's stock—because they each had reviewed and discussed Honig and Brauser's 2015 lawsuit (the "*Honig 13(d) Action*") in which they alleged violations of Section 13(d).  ¶¶ 249-50; Ex. 1.

b.  Between 2011 and August 2018, Honig invested alongside O'Rourke in over *75 issuers*, alongside Stetson in over *65 issuers*, and alongside Brauser in over *40 issuers*. Honig therefore knew that his co-investment with these individuals with respect to Riot was again part of a coordinated "group" under Section 13(d), ¶ 255;

c.  O'Rourke's statement in a February 3, 2014 email to the officer of a potential merger target that "Barry Honig is the principal investor of *our small group*," as alleged by the SEC in the *Honig Action*, ¶¶ 82, 256;

d.  Honig knew that O'Rourke, Stetson, and Groussman were part of his investing group with respect to Riot because *Honig shared his office with them* in Boca Raton, ¶¶ 81, 257; and *Honig even shared his same fax number with O'Rourke and Stetson*, ¶¶ 24, 26; *see also* SAC Ex. O at 454; and indeed, CNBC journalists

discovered O'Rourke inside Honig's same Boca Raton office **on the very day** of Riot's recently cancelled annual shareholder meeting in Boca Raton, ¶¶ 218, 257;[6]

e. Internal emails (filed by the SEC in the *Honig Action*) demonstrate how Honig, O'Rourke, Groussman, Stetson, and/or Brauser closely coordinated their investments in numerous public companies through email correspondence, ¶¶ 96-97; *see also* SAC Exs. D, E, F, G, H & I. Honig's team coordinated down to the precise number of shares that each of them would hold in their target companies, *see* SAC Ex. H; *see also* ¶ 258;

f. Honig, Groussman, DeFrancesco, and Stetson all failed to report their membership in the **same group** and their undisclosed sales of stock in the **same company** (Riot) during the **same time period** in violation of the **same statute**, Section 13(d), ¶ 259;

g. Honig and DeFrancesco (as 10%+ Riot shareholders) both engaged in an undisclosed related-party transaction in which Honig and DeFrancesco respectively owned 8.6% and 6.3% (together 14.9%) of Kairos when Riot acquired it in exchange for convertible preferred stock of Riot valued at more than $13 million, in exchange for assets worth less than $2 million, ¶¶ 196-99, 210, 260;[7]

h. Honig, Groussman, and Stetson all invested together in the October 2, 2017 related-party Coinsquare Agreement with Riot, *see* ¶¶ 190-95, which was not disclosed to the Company's shareholders until May 25, 2018, ¶¶ 226, 261, 464;

i. As a result of the *Honig Action*, Honig has been "permanently barred from participating in any offering of penny stock," "permanently prohibited" from holding greater than 4.99% of any penny stock company and from "advertising, marketing, or otherwise promoting" any penny stock, ¶¶ 94 n.9, 262; and

j. Honig's past interconnections with the Honig Group and the Selling Stockholders, as depicted by the Complaint's charts of the "Honig Group's Prior Target Companies," ¶ 159, and the "Selling Stockholders' Prior Target Companies," ¶¶ 161-62, and as further depicted by SAC Ex. M. ¶¶ 160, 163, 263.

---

[6] The SEC further alleged that "**Honig, Stetson, and O'Rourke were in nearly daily contact**" and "were in frequent email and telephone contact, at times purposefully moving their conversations to the less permanent medium of text or instant messaging." ¶ 81 (citing SAC Ex. B (SEC's initial complaint) ¶ 58).

[7] Indeed, part of the Honig Group's established *modus operandi* is to use its undisclosed control to negotiate profitable related-party transactions with the target public company. *See SEC v. Honig*, 2021 WL 276155, at *8 ("[T]he Honig Group's undisclosed beneficial ownership enabled it to exercise control over MGT policies in fact, such as through negotiating the McAfee transaction, from which they reaped significant profits.").

### 2.   O'Rourke (and Thus Riot) Knowingly Engaged in the Scheme

That O'Rourke knew that Honig, Stetson, Groussman, and DeFrancesco constituted a "group" under Section 13(d) when he signed Riot's Forms S-3/A, ¶ 291, is supported by the following allegations:

a.   O'Rourke invested with Honig in over **75 issuers** between 2011 and 2018, ¶ 293;

b.   O'Rourke said "**Barry Honig is the principal investor of _our small group_**," ¶ 294;

c.   O'Rourke, Stetson, Groussman, and Honig shared Honig's office (and shared the same fax number) in Boca Raton, Florida, in which CNBC's reporters discovered and filmed O'Rourke after a meeting with Honig on the very same day that the Company's annual shareholder meeting had been cancelled, ¶¶218-19, 295;

d.   O'Rourke reviewed drafts of the pleadings in the _Honig 13(d) Action_, which alleged violations of Section 13(d), and O'Rourke discussed his understanding of the duties imposed by Section 13(d) with Honig, Stetson, and Brauser, ¶¶ 249-50, 292;

e.   O'Rourke, Honig, Groussman, Stetson, and/or Brauser personally coordinated their investments in numerous public companies, _see_ SAC Exs. D, E, F, G, H & I; and they accomplished this coordination through private email correspondence amongst each other, _see_ SAC Ex. D at 7 of 21 (email among these individuals);

f.   As of August 2016, O'Rourke, Honig, Beeghley, Groussman, and Stetson were mutual investors in PolarityTE at the same time that Beeghley was a Director of PolarityTE, Honig was Chairman and CEO, and Stetson was CFO, ¶¶ 133-34, 301;

g.   As a result of O'Rourke's securities laws violations committed in coordination with Honig, Groussman, and Stetson, O'Rourke is permanently barred from participating in an offering of penny stock, holding greater than 4.99% of any penny stock, and from advertising, marketing, or promoting any penny stock, ¶ 93 n.6;[8]

h.   O'Rourke's past connections with the Honig Group and the Selling Stockholders, as set forth in the Complaint's charts describing the "Honig Group's Prior Target Companies," ¶ 159, and the "Selling Stockholders' Prior Target Companies," _see_ ¶ 162, and further depicted in the diagram attached to the SAC as Ex. M;

---

[8] Notably, O'Rourke and Honig are the two members of the Honig Group who have been **permanently** barred from future involvement in penny stocks.  ¶¶ 23-24.

i. O'Rourke, Honig, and Beeghley were jointly represented by "*our counsel*, Harvey Kesner," ¶ 172, in waging their proxy fight to gain seats on the Company's board of directors, *see also* SAC Ex. O at 456.[9]

### 3.   Beeghley (and Thus Riot) Knowingly Engaged in the Scheme

Beeghley knew, in signing Riot's Forms S-3/A, that Honig, Stetson, Groussman, and

DeFrancesco were an undisclosed "group" requiring disclosure because:

a. Beeghley, Honig, O'Rourke, Groussman, Stetson, and DeFrancesco were all previously affiliated because each of them had invested together in PolarityTE when Beeghley was a Director of PolarityTE, Honig was Chairman and CEO of PolarityTE, Stetson was CFO of PolarityTE, and DeFrancesco (through her entity Namaste, ¶ 63) was a shareholder of PolarityTE, ¶¶ 133-34, 162, 286, 301;

b. Beeghley shared further interconnections with the Selling Stockholders—including Aifos, ATG, Brauser, Titan, Namaste, Molinsky, O'Braitis, and Paradox—through their shared involvement in PolarityTE, ¶¶ 161-63; *see also* SAC Ex. M;

c. As Riot's then-CEO, Beeghley was in a position to know about the March 2017 Private Placement in which Riot sold Honig warrants and notes to purchase up to 700,000 shares of stock, *see* SAC Ex. P at 5, and when, on August 18, 2017, "the March 2017 Warrants were released to [Honig]," who did not disclose that fact under Schedule 13D/A, *id.*, *see also* ¶ 303;

d. As CEO and Chairman of Riot (a nine-person company), Beeghley signed the Forms S-3/A and 10-K that did not disclose that the Honig Group (together with the Selling Stockholders) constituted a "group" under Section 13(d)(3) and Item 403, much less the full extent of the Honig Group's coordination and control of Riot, ¶ 299; *see, e.g.*, ¶¶ 354, 357, 363, 368, 371; and

e. As CEO and Chairman, Beeghley would have been aware (1) when on March 15, 2017, Honig paid Riot $2,250,000 in the March 2017 Private Placement for warrants and notes giving Honig the right to purchase up to 700,000 shares of Riot common stock; (2) when on August 18, 2017, Honig "waived the requirement for

---

[9] Kesner was not only O'Rourke, Honig, and Beeghley's "counsel," ¶ 172, but was also a Selling Stockholder through his entity Paradox, ¶¶ 50, 65, and had longstanding personal ties to O'Rourke, Honig, and Groussman, ¶¶ 447-48, and had previously co-invested with O'Rourke, Beeghley, and the Honig Group in previous companies such as PolarityTE, MabVax, Pershing Gold, and Marathon, ¶¶ 133, 161-62. Yet, "[W]hen [CNBC] reached [Kesner] by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up." ¶ 218. Hence, while O'Rourke and Beeghley attempt to downplay Kesner's relationship with them as merely "personal," Indiv. Br. 6, 14, Kesner had an *attorney-client* relationship with O'Rourke, Beeghley, and Honig, which specifically pertained to their activities *at Riot. See* ¶¶ 50, 374, 377, 383, 386.

the occurrence of a Qualified Transaction and gross proceeds of the [March 2017 Private Placement] were released to [Riot] and the Notes and the March 2017 Warrants were released to [Honig]," ¶ 303; *see also* SAC Ex. P at 5; and (3) that despite these transactions with Riot, Honig never filed any Schedule 13D/A after January 5, 2017, until Beeghley resigned from Riot on November 3, 2017, ¶ 28.

### 4.   Groussman Knowingly Engaged in the Scheme

During the Class Period, Groussman committed deceptive acts by knowingly misrepresenting and concealing that he was part of an undisclosed group by signing a false and misleading Schedule 13G while engaging in manipulative trading in Riot stock without amending his beneficial ownership disclosures as required by Section 13(d) and Rule 13d-2 thereunder. ¶¶ 240-48. For example, on October 13, 2017, Groussman signed and filed a Schedule 13G that falsely claimed that his shares "were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer [i.e., Riot] of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect," ¶ 264, when, in fact, Groussman had acquired his Riot shares as part of an undisclosed control group consisting of the Honig Group and the Selling Stockholders, ¶ 265. The following allegations support a strong inference that Groussman knowingly concealed his group investment with the Honig Group—and his stock sales—in violation of Section 13(d):

a.  Groussman participated in Honig and O'Rourke's previous schemes at Biozone, MGT, and MabVax, by engaging in "pre-release manipulative trading" and by "violat[ing] beneficial ownership reporting requirements," ¶¶ 92, 266;

b.  "Groussman . . . work[ed] at an office in Boca Raton with Honig, Stetson, and O'Rourke" and he therefore knew that, at a minimum, Honig, O'Rourke, and Stetson were part of his investing group with respect to Riot, ¶¶ 92, 267;

c.  Groussman, O'Rourke, Honig, Stetson, and/or Brauser personally coordinated their investments in numerous public companies, ¶ 268; *see also* SAC Exs. D, E, F, G, H & I; and Groussman, Honig, O'Rourke, and Stetson coordinated their investments through private email correspondence amongst each other, *see, e.g.*, SAC Ex. D at 7 of 21 (email among Groussman, O'Rourke, Stetson, Honig, and Brauser);

d. Groussman, Honig, DeFrancesco, and Stetson all failed to report their membership in the *same group* and their undisclosed sales of stock in the *same company* (Riot) during the *same time period* in violation of the *same statute*, Section 13(d), ¶ 269;

e. Groussman purchased his house in Miami Beach with a $700,000 mortgage loan from Honig, who holds the mortgage on Groussman's house, ¶¶ 25, 270;

f. Groussman, Honig, and Stetson invested together in the October 2, 2017 related-party Coinsquare transaction, ¶¶ 192-93, 271;

g. As a result of his conduct with Honig, O'Rourke, Stetson, and Brauser in the *Honig Action*, Groussman has been barred for five years from participating in an offering of penny stock, holding greater than 4.99% of any penny stock, and from advertising, marketing, or promoting any penny stock, ¶¶ 272, 430;

h. Groussman's past interconnections with the Honig Group and the Selling Stockholders, ¶¶ 159-63; *see also* SAC Ex. M.

### 5.   Stetson Knowingly Engaged in the Scheme

During the Class Period, Stetson purported to be a "4.99%" shareholder of Riot.  ¶ 274.  In so doing, Stetson committed deceptive acts by knowingly misrepresenting and concealing that he was part of an undisclosed group and was therefore required to file a Schedule 13D disclosing that fact and reporting any material acquisitions or dispositions of Riot's stock.   The following allegations support a strong inference that Stetson did so knowingly and to facilitate the Honig Group's fraudulent scheme to pump-and-dump Riot's stock:

a. Stetson invested alongside Honig in *over 65 issuers* between 2011 and 2018, ¶ 275;

b. Stetson reviewed the draft pleadings in the *Honig 13(d) Action*, which alleged violations of Section 13(d), and Stetson discussed his understanding of the duties imposed by Section 13(d) with Honig, O'Rourke, and Brauser, ¶¶ 249-50, 276;

c. Stetson, Honig, O'Rourke, Groussman, and/or Brauser personally coordinated their investments in numerous public companies, ¶ 277; *see* SAC Exs. D, E, F, G, H & I; and accomplished their coordination through private email correspondence amongst each other, *see, e.g.*, SAC Ex. D at 7 of 21 (email among Stetson, Honig, O'Rourke, Groussman, and Brauser), in which they would coordinate the precise number of shares that each of them would hold in each company such as in a January 27, 2012 email that Stetson wrote to Honig attaching a "Share Breakdown" of the shares that Honig, Stetson, Groussman, Brauser, and their affiliates would hold in IZEA Worldwide Inc. after a stock split, *see* SAC Ex. H, and in a January

20, 2011 email that Stetson wrote providing a similar breakdown for himself, Honig, Brauser, and others for "Passport Potash, Inc.," SAC Ex. G;

d.   Stetson, Honig, Groussman, and DeFrancesco all failed to report their membership in the ***same group*** and their undisclosed sales of stock in the ***same company*** (Riot) during the ***same time period*** in violation of the ***same statute***, Section 13(d), ¶ 279;

e.   Stetson, Honig, and Groussman, invested together in the October 2, 2017 related-party Coinsquare transaction, ¶ 280;

f.   Stetson's knowledge of, and participation in, the Honig Group's pump-and-dump scheme at Riot, including his role committing Section 13(d) disclosure violations by concealing his membership in a group of affiliated Riot stockholders, is supported by the SEC's allegations in the *Honig Action*, as a result of which Stetson has been barred for ten years from participating in an offering of penny stock, holding greater than 4.99% of any penny stock, and from advertising, marketing, or promoting any penny stock, ¶¶ 93 n.7, 281; and

g.   Stetson's past interconnections with the Honig Group and the Selling Stockholders, ¶¶ 159-63; *see also* SAC Ex. M.

### 6.   DeFrancesco Knowingly Engaged in the Scheme

During the Class Period, DeFrancesco engaged in deceptive acts by knowingly misrepresenting and concealing that she was part of an undisclosed group while engaging in manipulative trading in Riot stock—including massive stock sales that she failed to disclose despite being one of the Company's largest shareholders.   The following allegations support a strong inference that DeFrancesco knowingly violated Section 13(d) and Rule 13d-2:

a.   DeFrancesco filed nine Schedules 13D or 13D/A between September 12, 2016 and January 10, 2017—demonstrating that she knew it was her legal obligation, as a more than 10% Riot shareholder, to report her holdings (and changes therein) to the market. Yet, after January 10, 2017, and to this day, DeFrancesco has never filed another Schedule 13D/A, ¶ 284;

b.   Honig, as Riot's other largest (10%+) shareholder, with whom DeFrancesco joined with in a proxy fight for control of Riot's Board, also committed similar violations of Section 13(d) and Rule 13d-2 by failing to promptly disclose his sales of Riot stock during the same time period, ¶ 285;

c.   DeFrancesco (through her entity Namaste, ¶ 63), was a shareholder of PolarityTE, between at least January 20, 2017 and April 25, 2017, during which time Honig was a Director of PolarityTE, Stetson was a Director and CFO of PolarityTE,

Beeghley was a Director of PolarityTE, and Brauser was a Director of PolarityTE, and O'Rourke and Groussman were also investors in PolarityTE, as were the majority (if not all) of the other Selling Stockholders listed in Riot's 2017/2018 Forms S-3/A, ¶¶ 132-36, 159-63, 286; *see also* SAC Ex. M;

d.  DeFrancesco, Honig, Groussman, and Stetson all failed to report their membership in the *same group* and their undisclosed sales of stock in the *same company* (Riot) during the *same time period* in violation of the *same statute*, Section 13(d), ¶ 287;

e.  Honig's appointment of Mike Dai ("Dai") to Riot's Board on December 1, 2016, and Dai's subsequent election to the Board given that before joining Riot's board, Dai already had established business ties with DeFrancesco's husband and other relatives, as well as O'Rourke and Stetson and other members of the Honig Group, ¶ 288; and

f.  DeFrancesco participated in the related-party Kairos Transaction, in which the entity, Kairos, was incorporated by DeFrancesco's personal lawyer, Laxague (¶ 51; SAC Ex. O at 436) and served as a shell through which Riot paid $13 million for $2 million of equipment, ¶¶ 210, 218, for the benefit of DeFrancesco and Honig, who owned, respectively, 6.3% and 8.6% (together, 14.9%) of Kairos.

## B.  When the Scheme Was Revealed, Riot's Public Investors Were Damaged

Defendants' scheme was revealed through a series of disclosures that revealed that they were an undisclosed control group and had engaged in undisclosed insider sales—both hallmarks of a classic pump-and-dump scheme.  First, on January 31, 2018, *The Wall Street Journal* reported that "Mr. Honig has sold about 500,000 shares" and only "still owns about 1% of the company." ¶ 456.  On this news, Riot's stock fell *14.26%* over two days.  ¶ 460.  Then, on February 16, 2017, CNBC published the article that revealed Honig as "the man behind the Riot Blockchain curtain"; that CEO O'Rourke worked out of Honig's Boca Raton office; that the "true extent of Honig's selling" of Riot stock was "[b]uried deep in the footnotes of Riot filings"; and revealed details about Riot's suspicious related-party transactions.  ¶¶ 16, 218, 461.  In response, Riot's share price fell *33.4%*.  ¶ 462.  Next, on April 17, 2018, Riot filed an annual report disclosing the financial interests of Honig and DeFrancesco in various 2017 related-party transactions, causing Riot's stock price to fall another *5.8%*.  ¶ 463.  On May 25, 2018, Riot disclosed yet further related-party

16

transactions, causing Riot's share price to decline **6%**. ¶ 464.  Finally, on September 7, 2018, the SEC filed the *Honig Action* against Honig, O'Rourke, Groussman, Stetson, and their affiliates, revealing that, contrary to the Individual Defendants' misleading Schedules 13D and 13G, and Riot's misleading Forms S-3 and 10-K, the Honig Group was not only a "group" as defined by Section 13(d), but in fact a highly orchestrated and closely knit partnership amongst Honig, O'Rourke, Groussman, and Stetson, who together engaged in the same fraudulent *modus operandi* at Riot that they had perfected at dozens of previous microcap companies.  ¶ 465.  On this news, Riot's stock price dropped **26.1%**.  ¶ 466.[10]

## III.   ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  A court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007). Dismissal is inappropriate even where "it appears unlikely that a plaintiff can prove those facts or

---

[10] Defendants imply that the recent trading prices of Riot's stock and of "cryptocurrencies" in 2021 are relevant to whether they engaged in a fraudulent scheme during the Class Period. *See, e.g.*, Riot Br. 5; Honig Br. 4-5; Groussman Br. 1.  To the contrary, events in 2021—years after O'Rourke had left the Company amidst scandal, ¶¶ 24, 93 n.6—do not alter or mitigate Defendants' misrepresentations and omissions regarding Riot's beneficial ownership and their undisclosed transactions of Riot stock **during the Class Period**.  Indeed, such "*ex post* justification[s]" for Defendants' scheme are unavailing because the "[s]ecurities laws approach matters from an *ex ante* perspective."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 n.16 (3d Cir. 1997).  *See also Jaroslawicz v. Engelhard Corp.*, 1989 WL 32864, at *5 (D.N.J. Apr. 5, 1989) (finding that evidence of post-class period events are "inadmissible to prove the pre-event intentions of [corporate defendant's] management"); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 272 (S.D.N.Y. 2008) (issue that arose after the class period "says little about any individual defendant's knowledge, at a date several months earlier").

will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir.

2008).  Despite Rule 9(b)'s requirements, the Third Circuit has cautioned, "'in applying [that rule],

courts should be 'sensitive' to situations in which 'sophisticated defrauders' may 'successfully

conceal the details of their fraud.'" *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *11 (D.N.J.

Mar. 24, 2008) (quoting *In re Burlington Coat Factory*, 114 F.3d at 1418).[11]

### A.    The Complaint Adequately Pleads Count I (Violation of Section 10(b) and Rules 10b-5(a) and (c)) by Alleging Defendants' Manipulative and Deceptive Acts in Furtherance of Their Scheme to Defraud Riot's Public Investors

The "gravamen of manipulation is deception of investors into believing that prices at which

they purchase and sell securities are determined by the natural interplay of supply and demand,

not rigged by manipulators." *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir.

2001).  Such deception can be related to "*any*" "course of business," "device, scheme, or artifice."

17 C.F.R. § 240.10b-5; *see also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151

(1972) ("proscriptions [in §10(b) and Rule 10b-5] are broad and, by repeated use of the word 'any,'

are obviously meant to be inclusive").

To plead a fraudulent "device, scheme, or artifice" under Rules 10b-5 (a) and (c), *SEC v.

Lucent Techs. Inc.*, 610 F. Supp. 2d at 342, 361 (D.N.J. 2009), courts in this District recognize that

a plaintiff must allege that one or more defendants "(1) committed a manipulative or deceptive act,

(2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance," *Trustcash

Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 661-62 (D.N.J. 2009).  "[C]ourts should be 'sensitive'

to situations in which 'sophisticated defrauders' may "successfully conceal the details of their

fraud" and if certain facts are in the control of Defendants "the strict requirements of Rule 9(b)

---

[11] The PSLRA "does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim."  *In re Cephalon Sec. Litig.*, 1997 WL 570918, at *2 (E.D. Pa. Aug. 29, 1997); *see also In re Unisys Corp. Sec. Litig.*, 2000 WL 1367951, at *4 (E.D. Pa. Sept. 21, 2000) (PSLRA "was not intended to create an insurmountable pleading hurdle for plaintiffs in such cases").

may be relaxed." *Jones v. Intelli-Check, Inc.*, 274 F.Supp.2d 615, 628 (D.N.J. Jul 30, 2003) (Wolfson, J.)   More recently, in *Lorenzo v. SEC*, 139 S.Ct. 1094 (2019), the Supreme Court expanded the range of manipulative or deceptive conduct that can give rise to liability under subsections (a) and (c).   In *Lorenzo*, the defendant-employee of a registered broker-dealer, Lorenzo, sent emails to prospective investors that included language in a prospectus—authored by Lorenzo's boss—that Lorenzo knew contained false and misleading statements.  *Id.* at 1099.  The SEC ultimately held that in disseminating the prospectus to investors Lorenzo ran afoul of subsections (a), (b), and (c) of Rule 10b-5.  *Id.* at 1099-1100.  Lorenzo appealed the SEC's findings to the Second Circuit.   As to the SEC's manipulation claim under subsections (a) and (c), the Second Circuit ruled that Lorenzo's conduct—even if it did not give rise to liability under subsection (b)—was nevertheless deceptive.  *Id.*  The Supreme Court affirmed, explaining that a claim for market manipulation under subsections (a) and (c) "***[c]apture[s] a wide range of conduct***" (*id*. at 1101), including instances where the claim may have "considerable overlap" with a claim brought under subsection (b) of Rule 10b-5.  *Id.* at 1100-02 ("[I]t is hardly a novel proposition that" different portions of the securities laws prohibit the same conduct." (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983))).

Here, the Complaint sufficiently alleges a "distinct cause of action" against each Defendant under Rules 10b-5(a) and (c) for committing a deceptive or manipulative act.  *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 821 (S.D.N.Y. 2006).  Plaintiff alleges "all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue," *In re Suprema Specialities, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006), by describing how Defendants (1) gained de facto control over Riot through "coordinated" share purchases, *e.g.*, ¶ 176; (2) waged a proxy fight and placed

close affiliates on Riot's Board and in management positions at the Company, *e.g.*, ¶¶ 173-75; (3) concealed their control by ignoring their statutory reporting requirements, *e.g.*, ¶¶ 181-82; (4) disseminated false and misleading statements and omissions regarding Riot's beneficial ownership in Schedules 13D and 13G and in Riot's Forms S-3, S-3/A and 10-K, *see* §§ III.B.1 & 2; and (5) surreptitiously sold their shares at inflated prices to unsuspecting public investors, *e.g.*, ¶¶ 177-79.[12]

In response, Riot argues that Plaintiff "fails to allege any manipulative acts that were performed by Riot—let alone which Defendant performed them." Riot Br. 30. But as this Court has acknowledged, "Section 10(b) prohibits not only 'manipulative' acts, but also 'deceptive' acts." *Riot I* at 32 (citing 15 U.S.C. § 78j). The Complaint clearly alleges that O'Rourke and Beeghley knowingly engaged in deceptive acts as Riot's CEOs and directors by approving and signing Riot's misleading SEC filings that violated Item 403 and Section 13(d) by failing to disclose that the other Defendants—as well as other members of the Honig Group—were operating as an undisclosed group as defined by Section 13(d) and Rule 13d. Additionally, O'Rourke and Beeghley signed SEC filings that allowed related-party transactions with Honig Group members to remain hidden from view in violation of Item 404 and ASC 850.

> **1.    Each of the Defendants Had Well-Known Disclosure Duties Section 13(d), Regulation 13d-G, and Item 403**

Section 13(d) of the Exchange Act requires any investor or group of investors holding or acquiring beneficial ownership of more than five percent of an issuer's stock to file a Schedule 13D, disclosing any plans with respect to the stock, including any intent to assume control of the

---

[12] O'Rourke and Beeghley's deceptive acts also included signing SEC filings that failed to disclose Riot's related-party transactions in violation of Item 404 and ASC 850, *see* § III.B.3, and "'hyp[ing]' [Riot's] prospects by issuing a flurry of press releases, SEC filings, and interviews with television and newspaper journalists," ¶ 4. *See* Honig Br. 9-10 (ignoring these allegations).

company.  *See* 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d–101.  Schedule 13D's disclosure obligations are triggered by a person's initial acquisition of beneficial ownership of more than five percent of an issuer's securities, in which case a Schedule 13D must be filed within ten days of the acquisition.  15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d1(a).  If a person already holds beneficial ownership of more than five percent of an issuer's securities, an amended Schedule 13D must be filed "promptly" upon any material change in the purpose of ownership.  17 C.F.R. § 240.13d–2(a).  "Promptly" generally means within five to ten days.  *See* ¶ 243 n.28.  A "material change" means "one percent or more of the class of securities."  17 C.F.R. § 240.13d–2(a).

Section 13(d)(3) codifies the "group" concept, extending the definition of "person" to any two or more persons or institutions who act as a group "for the purpose of acquiring, holding or disposing of securities of an issuer." 15 U.S.C. § 78m(d)(3).  This "prevent[s] a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provision of the statute because no one individual owns more than [5 percent] of the securities." H.R.Rep. No. 90–1711 (1968), reprinted in 1968 U.S.C.C.A.N. 2811, 2814.  "Beneficial ownership" of the securities held by any group member will be attributed to all members of the group.  17 C.F.R. § 240.13d–5(b)(1).  Thus, Section 13(d) "requires a group that has acquired, directly or indirectly, beneficial ownership of more than five percent of a class of registered equity securities, to file a [Schedule] 13D . . .  with the issuer, with the exchanges on which the security is traded, and with the SEC, disclosing, among other things, the identity of its members and the purpose of its acquisition."  *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 617 (2d Cir. 2002) (citing 15 U.S.C. § 78m(d)(3)).

The Exchange Act and its implementing regulations impose similar obligations on issuers of publicly traded securities, including Riot.  All issuers of registered securities (including Riot)

must file with the SEC registration statements on Form S-1 and periodic reports on Form 10-K. 15 U.S.C. § 78m; 17 CFR § 240.13a-1.  Exchange Act Regulation S-K at Item 10 sets out the information that must be disclosed on these Forms S-1 and 10-K. 17 C.F.R. § 229.10(1).  Item 403, in turn, requires issuers to provide a table listing "any person (including any 'group' as that term is used in section 13(d)(3) of the Exchange Act) who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities."  17 C.F.R. § 229.403(a).  *See also SEC v. Honig*, 2021 WL 276155, at *6 ("Item 403 sets forth instructions for the disclosure of security ownership of certain beneficial owners, and its provisions are applicable to parties making 10-K and S-1 filings" and that "S-1 and 10-K filings [that] failed to comply with Item 403 of SEC Regulation S-K . . . thus violated a regulatory duty").[13]

Courts acknowledge that Item 403, together with Section 13(d) and the antifraud provisions of Section 10(b) and Rule 10b-5, exist to afford investors adequate information regarding who actually controls a public company, and to protect them from potential pump-and-dump schemes. *See* ¶¶ 240-50.  Accordingly, "[a] false or misleading statement made on a Schedule 13D may be actionable under the antifraud provision of [Section] 10(b)."  *SEC v. Teo*, 2010 WL 3184349, at *9 (D.N.J. Aug. 10, 2010) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1297 (2d Cir. 1991) (affirming "§ 10(b) convictions [that] were largely based on misrepresentations made on Schedules 13D and 14D–1")).  *See also SEC v. Honig*, 2021 WL 276155, at *5-8 (predicating liability under "Section 10(b)" and "Rule 10b-5" on violation off "regulatory duty" to "furnish information" regarding "beneficial ownership" required by "section 13(d)(3)" and "Item 403"); *Burt v.*

---

[13] Violations of Section 13(d) are frequently found to have facilitated pump-and-dump schemes by helping the fraudsters avoid detection.  *See, e.g.*, *SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 956-60 (S.D. Ohio 2009), *aff'd*, 712 F.3d 321 (6th Cir. 2013); *SEC v. Jammin Java Corp.*, 2016 WL 6595133, at *18 (C.D. Cal. July 18, 2016); *SEC v. Strebinger*, 114 F. Supp. 3d 1321, 1325 (N.D. Ga. 2015).

22

*Maasberg* ("*Burt II*"), 2014 WL 1291834, at \*17 (D. Md. Mar. 28, 2014) ("The failure to file or amend a Schedule 13D, as required, serves as a predicate for liability under § 10(b) and Rule 10b–5(b)." (citing *Azurite Corp. v. Amster & Co.*, 52 F.3d 15, 18 (2d Cir. 1995) (acknowledging that a "section 10(b) claim [may be] founded solely upon an alleged section 13(d) violation"))); *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 491 (S.D.N.Y. 2009) ("a plaintiff can point to a violation of section 13(d) as the predicate for a 10b–5 claim" (citing *GAF Corp. v. Milstein*, 453 F.2d 709, 720 n.22 (2d Cir. 1971) (persons subject to Section 13(d) have the "obligation to file *truthful* statements" and that "[i]f there is a purchase or sale of securities, section 10(b) will apply"))).[14]

Here, Honig, O'Rourke, and Stetson were each well versed in the reporting obligations that Section 13(d) imposes on 5% shareholders and issuers.  Indeed, in February 2015 they discussed their respective understandings of the requirements imposed by Section 13(d) via emails with each other when they exchanged drafts of a complaint in the *Honig 13(d) Action*.  ¶ 250.  These drafts

---

[14] Defendants argue that Plaintiff has no "remedy" under "Section 10" for violations of duties under Section 13(d) because there is no "private cause of action" under Section 13(d).  *See, e.g.*, Honig Br. 22; Groussman Br. 13-14, 20-22; Stetson Br. 5-7.  Honig's own authority proves this is incorrect.  *See* Honig Br. 22 (citing *Rubin v. Posner*, 701 F. Supp. 1041, 1046-48 (D. Del. 1988) (denying motion to dismiss action under "§ 10(b) and Rule 10b–5" where company's CEO and 13.4% shareholder, Ivan Boesky, allegedly "fil[ed] false and misleading . . . [Schedule] 13D and [Form] 10–Q statements [that] did not reveal the alleged 'secret agreement' between [them]" and "Boesky knew [the CEO] was filing false financials when Boesky was filing his 13D's")).  Plaintiff's Counts I and II are not brought under Section 13(d) but under Section 10(b) and Rule 10b-5.  ¶¶ 482-98.  *See also Burt II*, 2014 WL 1291834, at \*17; *Vladimir*, 606 F. Supp. 2d at 491; *SEC v. Honig*, 2021 WL 276155, at \*5-8; *Azurite*, 52 F.3d at 18.  In arguing to the contrary, Honig grossly mischaracterizes three cases by claiming they held "that a shareholder does not have a private right of action against another shareholder who allegedly violates Section 13(d)." Honig Br. 23 n.16.  But none of those cases so hold.  Rather, each case held that Section 13(d) does not provide a private "damages remedy to *issuers*" against groups of shareholders.  *See Motient Corp. v. Dondero*, 529 F.3d 532, 536 (5th Cir. 2008) (holding § 13(d) does not provide "damages remedy to issuers"); *Hallwood*, 286 F.3d at 620 (same); *Liberty Nat'l Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 555 (11th Cir. 1984) (distinguishing the "implied right of action" provided by "rule 10b–5" which is available to "one who has been defrauded in connection with the purchase or sale of securities" with "imply[ing] an *issuer* right of action to obtain the ouster of a shareholder who has made a false schedule 13D filing").

included allegations that "the beneficial ownership table" of a public company's "Registration Statement on Form S-4" had failed to disclose "material, non-public information" regarding the defendants' "significant beneficial ownership interest" in a company in which Honig and Brauser had invested; that this was a "materially misleading omission" to them because "[a] significant beneficial owner's sale of shares in [an] entity . . . is a negative indication regarding the prospects of the . . . company"; "is the kind of information that the SEC requires to be disclosed . . . in various . . . filings (e.g., Schedules 13D and/or 13G) precisely because of its materiality"; and that they "would not have purchased the Shares if they had known the undisclosed facts that [defendants] controlled such a large interest in [the issuer's] stock."  ¶ 249.

### 2. The Individual Defendants Acted as an Undisclosed Control Group to Pump-and-Dump Riot Stock While Misrepresenting and Concealing their Beneficial Ownership in Violation of Section 13(d), Regulation 13d-G, and Item 403

A "group" exists when "two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer."  15 U.S.C. § 78m(d)(3).  "The touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective."  *Roth v. Jennings*, 489 F.3d 499, 508 (2d Cir. 2007).  Under § 13(d), "a court evaluating an allegation of the existence of a group must 'determine whether there is sufficient direct or circumstantial evidence to support the inference of a formal or informal understanding between [the defendants]' for the purpose of acquiring, holding, or disposing of securities."  *Hallwood*, 286 F.3d at 617 ("Whether the requisite agreement exists is a question of fact.").

"To be sure, a group need not formally memorialize its objective in writing, and direct evidence, let alone a 'smoking gun,' is not required."  *Burt II*, 2014 WL 1291834, at *18.  "Rather, the existence of a group may be shown by circumstantial evidence, including 'prior relationships

and trading patterns,' 'discussions between the defendants,' and evidence of 'a particular *modus operandi*.'" *Id.* (emphasis in original). Courts have also recognized that "[m]atters of group purpose are . . . difficult to discern, for intent may not always be fully formed, but may mature and manifest at any point in a continuum." *Rosen*, 113 F. Supp. 2d at 632 ("Nor do all members of a group always think in sync or march lockstep."). To this end, a plaintiff need not allege "every term of a 13D filer's plan or purpose." *Vladimir*, 606 F. Supp. 2d at 491. Further, at the motion to dismiss stage, "courts may find that 'purpose and intent may not be divined without some investigation and discovery.'" *Id.*

To establish the existence of a common purpose, a formal agreement is not necessary; rather, "a section 13(d) group may be proven without evidence of a written agreement or other direct evidence of an agreement between the group's members." *Fin. Gen. Bankshares, Inc. v. Lance*, 1978 WL 1082, at *9 (D.D.C. Apr. 27, 1978). The existence of a common purpose may be "piece[d] . . . together by drawing inferences from the acts" and testimony of defendants. *Jewelcor Inc. v. Pearlman*, 397 F. Supp. 221, 250 (S.D.N.Y. 1975); *see also S.E.C. v. First City Fin. Corp., Ltd.*, 688 F. Supp. 705, 723 (D.D.C. 1988) ("Courts have routinely relied on circumstantial evidence and inferences . . . to determine 'beneficial ownership.'").[15]

Here, O'Rourke and Beeghley caused the Company to issue materially false and misleading Forms S-3, S-3/A, and 10-K that misrepresented Riot's beneficial ownership in violation of Section 13(d) and Item 403 by misrepresenting and concealing the fact that Honig, DeFrancesco, Stetson, Groussman, and the other Selling Stockholders were members of a hidden control group with each other pursuant to their explicit or tacit agreement to acquire, hold, vote,

---

[15] *See also Jammin Java*, 2016 WL 6595133, at *18 ("It is rare for the members of a group to reduce to writing then plans. Consequently, a group's existence may be shown through circumstantial evidence").

and/or dispose of their shares in coordination with each other in the same *modus operandi* they had fashioned at numerous previous public companies. ¶ 162. With the Honig Group's existence concealed by O'Rourke and Beeghley, the rest of the group (Honig, DeFrancesco, Groussman, and Stetson) acquired and sold large blocks of Riot stock while each of them failed to make the Schedule 13D disclosures required by Section 13(d). ¶¶ 305, 308-43. *See also* SAC § IX.C.

The Riot Defendants argue that the Honig Group's history as "co-investors" is insufficient "to allege the existence of a Section 13(d) group." Riot Br. 13. *See also* Groussman Br. 18-19; DeFrancesco Br. 8-9; Stetson Br. 10 (each making similar arguments). To the contrary, courts frequently consider individuals' history of co-investment in determining whether an alleged "group" exists under Section 13(d). *See, e.g.*, *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 127 (2d Cir. 2001) (Section 13(d) group where members had a pre-existing relationship as shareholders of a corporation); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 173 (S.D.N.Y. 2000) (denying motion to dismiss allegations that "all of the defendants have violated Section 13(d) in a variety of respects" and noting defendants' "prior investments" and "long-standing personal relationships"); *Lerner v. Millenco, LP*, 23 F. Supp. 2d 337, 344 (S.D.N.Y. 1998) (Section 13(d) group adequately pled based where defendant had "coordinated its investments" with "other members" of the alleged group "on numerous prior occasions").

Riot argues that the Complaint "contains only one allegation of the Honig Group's concerted activities at Riot involving any of the Riot Defendants: Honig, O'Rourke, and Stetson worked out of the same office, shared the same fax number, and had met during the Class Period." Riot Br. 15. While these are examples of O'Rourke, Honig, and Stetson's "concerted activities at Riot," they are by far their only ones. *See supra* §§ II.A.1, 2, 5. Likewise, Riot's argument that the Complaint is "bereft of any details" on how the "Honig Group coordinated their acquisition

and disposition of Riot's stock," Riot Br. 16, is unavailing.  For example, on October 4 2017, the Company issued a press release quoting Beeghley and announcing that "Bioptix" was "changing its name to Riot Blockchain" and had invested in Coinsquare, ¶ 177.  On that same day, Honig immediately embarked on a massive series of undisclosed stock sales (while simultaneously exercising warrants for nearly a million Riot shares, ¶ 316 nn.45, 47) in violation of Section 13(d). ¶¶ 179, 316.  In total, "Honig sold more than 600,000 shares during the ten-day period following the announcement of the special dividend and the Company's transition to cryptocurrency, collecting proceeds of nearly $5.7 million."  *Id.*

Similarly, while their lack of "prompt" disclosure, ¶ 243 n.28, makes it impossible (as they intended) to know exactly when DeFrancesco, ¶ 339,[16] Groussman, ¶ 333, and Stetson, ¶ 341, sold their shares, their available filings support that Groussman, ¶ 330, and DeFrancesco, ¶337, sold the bulk of their shares during the Class Period after Riot (under O'Rourke and Beeghley's leadership) had begun touting its transition to cryptocurrency, ¶¶ 177-78, through related-party transactions with the Honig Group, ¶¶183-201, while concealing that the Honig Group was an undisclosed control group in violation of Section 13(d) and Item 403, ¶¶ 181-82.[17]

---

[16] DeFrancesco has not filed another Schedule 13D updating her trades in Riot stock since reporting that she was an 11.45% shareholder in the Company on January 10, 2017.  ¶ 339.  And even after former SEC Chairman Harvey Pitt publicly commented on the "serious problem" with Honig's lack of "'timely' disclosure" in violation of Section 13(d), ¶ 320, and even after Honig filed his own amended Schedule 13D/A on April 18, 2018, DeFrancesco still has "never filed another disclosure," ¶ 339, thereby keeping the details of her stock sales obscured from view.

[17] Defendants argue that the Complaint lacks allegations that members of the Honig Group coordinated their voting at Riot.  *See* Riot Br. 17; Stetson Br. 6; Groussman Br. 19, 30.  This is incorrect.  Honig, O'Rourke, Stetson, and Groussman have a documented history of coordinating their votes via emails instructing members to "[v]ot[e] in favor" of some directors and "[a]gainst all other members and actions."  ¶ 83.  Indeed, Groussman has a history of "willingness to follow Honig's directions on how to vote or when to sell." ¶ 91.  *See also* SAC Ex. D at 7 of 21.  At Riot, DeFrancesco told the Company's outgoing Board that her and Honig's purpose was to "vote on the removal of five (5) directors" and she "join[ed]" in "Honig's prior nomination" of O'Rourke, Stetson, and Beeghley "to serve as members of the board of directors."  ¶ 171.  And in this process,

Riot quotes *Scott v. Multi-Amp Corp.*, 386 F. Supp. 44, 70 (D.N.J. 1974) for the proposition that "[m]ere relationship, among persons or entities, whether family, personal or business, is insufficient to create a group" under Section 13(d).  Riot Br. 16.  But in *Scott*, the court held that the plaintiffs (two shareholders of a public company) had offered "factual detail" that the defendants (the company's CEO and several directors, officers and shareholders) had violated their "statutory obligation to file a Schedule 13D" after they had formed a group to purchase the company's assets in a transaction one shareholder said "looked like an inside steal." 386 F. Supp. at 51-61, 71 ("That the organizing of the 'group' was not evidenced by a written agreement between its members, that negotiations . . . were barely under way, and that a purchase price was not set . . . do not alter that conclusion.").  Having found that the "[p]laintiffs have the better of the dispute" and that defendants were an undisclosed "'control group[]," the court rejected the defendants' "counterclaim" that "plaintiffs and others [who opposed defendants' acquisition plans] became a 'group' under § 13(d)(3) . . . ."  *Id.* at 70.[18]

---

Honig, O'Rourke, Stetson, and Beeghley shared the same counsel:  "*our counsel* Harvey Kesner, Esq."  ¶ 172; SAC Ex. O at 456; *see also* ¶¶ 50, 447 (describing in-person meeting among Kesner, Honig, O'Rourke, and Groussman).  Further, Honig filed a lawsuit to "force a special meeting" and a "vote" to elect Stetson, O'Rourke, and Beeghley to the Board.  ¶ 175.  Moreover, in Honig's September 13, 2016 letter nominating O'Rourke, Stetson, and Beeghley to the Board, O'Rourke and Stetson listed for each the same Palm Beach, Florida fax number as Honig.  ¶ 257; *see also* SAC Ex. O at 454.  In addition, the fact that the 21 Selling Stockholders each have interconnected investment ties with each other and Honig Group, ¶ 162, SAC Ex. M, strengthens the inference that they coordinated their voting.

[18] Riot also cites *Torchmark Corp. v. Bixby*, 708 F. Supp. 1070 (W.D. Mo. 1988), to argue that the "mere fact that defendants were related through blood, marriage, business or social relationships is insufficient to warrant the finding that a 'group' existed within the definition of § 13(d)."  *Id.* at 1083; *see* Riot Br. 13.  But consistent with this Court's guidance, the Complaint details how "Riot [and] its officers and directors had . . . financial [and] contractual . . . relationship[s] with [the Honig Group and] the selling stockholders."  *Riot I* at 19 n.10.  *See* ¶ 82 ("agreed to act as a group in holding, disposing and voting the stock they acquired"); ¶ 25 (Honig owns $700,000 mortgage on Groussman's house); ¶ 85 (Brauser rented an office with Honig); ¶ 86 (disputes over who owed money); ¶ 92 ("[i]n every scheme, Honig, and some combination of Stetson, Brauser, O'Rourke,

Riot also relies on *Log On America, Inc. v. Promethean Asset Management L.L.C.*, 223 F. Supp. 2d 435 (S.D.N.Y. 2001), *see* Riot Br. 13-14, which is readily distinguishable because the court found that the "Plaintiff [did] not specify how Defendants acted together with a common objective to acquire, hold, vote, or dispose of [the company's] stock" and "fail[ed] to identify which individual Defendants joined in the alleged group activity(ies)," 223 F. Supp. 2d at 449 n.23.  Riot relies on *Burt v. Maasberg*, 2013 WL 1314160 (D. Md. Mar. 31, 2013), *see* Riot Br. 13, but conveniently ignores *Burt II*, in which the court found that the plaintiffs "adequately alleged[d] the existence of a group," that it was "undisputed that none of the defendants disclosed on Schedule 13Ds their membership in the group," and that "[a]ccordingly, plaintiffs have adequately alleged that each defendant made a misrepresentation or omission that would subject him/it to liability under Rule 10b–5(b)."  2014 WL 1291834, at *22.

### 3. The Complaint Alleges a Strong Inference that Each Defendant Knowingly Engaged in the Scheme to Defraud Riot's Public Investors

To plead scienter in the Third Circuit, a plaintiff must "allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'"  *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009).  The pertinent question is "'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'"  *Id.* at 272 (quoting *Tellabs*, 551 U.S. at 323).  As the Supreme Court has explained, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but merely "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324; *see also Avaya*, 564 F.3d at 269 (scienter analysis "will ultimately rest . . . on a practical

---

[and] Groussman . . . either explicitly or tacitly agreed to buy, hold or sell their shares in coordination with one another").

judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter"). "[A]llegations of scienter 'need not be irrefutable, *i.e.*, of the 'smoking-gun' genre.'" *Id.* (citing *Tellabs*, 551 U.S. at 330). Allegations that a defendant "willfully turned a blind eye to[] the fraud" adequately pleads scienter. *In re Suprema Specialties*, 438 F.3d at 281.

Here, consistent with these standards, and as directed by this Court, the Complaint sets forth "scienter allegations that are particularized as to each defendant" and "identif[ies] . . . which allegations specifically relate to each defendant's scienter." *Riot I* at 36, 40 n.19. *See* § II.A. Indeed, Judge Quraishi's December 23, 2020 order found that the Complaint alleged "a strong inference of scienter" as to each Defendant. *See Riot II* at 12, 14-15.

First, as to Honig, this Court already correctly found that the prior complaint (ECF No. 73) "support the requisite strong inference of scienter" based on allegations that "Honig and other members of the Honig Group have been implicated in multiple pump-and-dump schemes at other companies" and "that Honig had a motive and opportunity to profit from the concealment of his stock sales." *Riot I* at 36-37. The Complaint contains these same allegations, which the Court found sufficient, and builds upon them with new allegations that strengthen the inference that, like Honig, the other defendants knew they were violating securities laws to the detriment of Riot's public shareholders. For example, Honig, O'Rourke, and Stetson each were specifically aware of his disclosure obligations under Section 13(d) because Honig filed a lawsuit (with Brauser, a Selling Stockholder and *Honig Action* co-defendant, ¶¶ 15, 24, 35) alleging that violations of Section 13(d) caused a "Registration Statement on Form S-4" to be "materially misleading"; that "[a] significant beneficial owner's sale of shares in [an] entity . . . is a negative indication regarding the prospects of the . . . company"; and that Honig "would not have purchased the Shares if [he]

had known the undisclosed facts . . . ." ¶¶ 249-50.  These allegations further support the inference that Honig knowingly deceived Riot's public investors by violating the same statute, Section 13(d), that Honig and Brauser (in consultation with O'Rourke and Stetson) publicly accused other investors of violating to their own detriment.  *Id.*[19]

In *SEC v. Honig*, the court held that "it is more than plausible" that Honig, O'Rourke, Stetson, and Brauser "had agreed to work in concert on their schemes."  2020 WL 906383, at *12.  The court further found that the SEC had "amply" pleaded that these "four men" had formed a "group" as "defined by SEC rules" and that was "buttressed by the bevy of circumstantial evidence surrounding the Honig Group's manipulation of MTG and its stock, including Honig and O'Rourke's collaboration in orchestrating" a "deal in March 2016."  *Id.*  Here, as in *SEC v. Honig*, Plaintiff has amply alleged why O'Rourke and Beeghley knew that Honig, Stetson, Groussman, and DeFrancesco constituted a group under Section 13(d)(3) and, therefore, knowingly violated Item 403 by failing to disclose that group in Riot's Forms S-3 and 10-K.

Riot acknowledges that "Item 403 . . . applies to issuers,"[20] but argues that "Plaintiff

---

[19] Riot attached a Form 8-K announcing that the SEC had concluded its investigation into Riot.  *See* Riot Ex. L.  Honig attaches a similar letter.  *See* Honig Br. 19.  This Court previously noted that "[t]he status of the SEC's investigation does not factor into the Court's analysis in this Opinion."  *Riot I* at 9 n.6.  Indeed, the SEC's boilerplate letters advised Riot and Honig that "We are providing this notice under the guidelines set out in the final paragraph of Securities Act Release No. 5310, which states in part that the notice '***must in no way be construed as indicating that the party has been exonerated*** or that no action may ultimately result from the staff's investigation.'"  Ex. 2; Honig Ex. H.  Indeed, it is well established that a defendant cannot rely upon or otherwise invoke the SEC's inaction as a defense to securities fraud.  *See, e.g.*, 15 U.S.C. § 78z ("No action or failure to act [by the SEC] with regard to any statement or report filed with or examined by [the SEC pursuant to the Exchange Act] or rules and regulations thereunder [shall] be deemed a finding by such authority that such statement or report is true and accurate on its face or that it is not false or misleading.").  In any event, the SEC has already obtained lifetime bans preventing Honig and O'Rourke from promoting penny stocks, ¶¶ 93-94, and the interests of Riot's public investors are represented by Lead Plaintiff through this action.

[20] Given that Riot's duties arise under Item 403, Riot's argument that "it is Honig's, not [Beeghley's], responsibility to comply with Section 13(d)," Riot Br. 24, is without merit.

provides no allegations to suggest that Defendants knew Honig, DeFrancesco, Groussman, and Stetson acted as a group." Riot Br. 3. Yet Riot entirely ignores many of Plaintiff's scienter allegations. *See* SAC §§ IX.C.5 (O'Rourke) and IX.C.6 (Beeghley).

The circumstances of O'Rourke's sudden departure as CEO further supports the inference of his scienter. ¶¶ 24, 227. Courts routinely hold that the suspicious circumstances and timing of high-level employee departures contribute to an inference of scienter. *See Se. Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 466958, at *5 (M.D. Pa. Feb. 8, 2016) (relying on "allegations regarding the timing of the resignation of senior management" in finding inference of scienter); *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 541 (D. Del. 2012) (same); *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *10 (same). Here, O'Rourke resigned on September 8, 2018, *the day after* the SEC named him and others, including Honig, as defendants in a long-running microcap pump-and-dump scheme. ¶¶ 24, 227. Riot did not provide an explanation for this unexpected announcement and Defendants remain conspicuously silent on the issue now. The most cogent inference is that O'Rourke resigned in response to the SEC's serious allegations.[21]

O'Rourke's stock sales also strengthen the inference of his scienter. ¶ 444. Although a securities plaintiff is not required to plead motive, *see Tellabs*, 551 U.S. at 325, if "'stock sales

---

[21] Riot contends that because "Honig, DeFrancesco, Groussman, and Stetson failed to disclose their group status to Riot in their Schedule 13Ds . . . Plaintiff cannot allege Riot's knowledge of the purported Honig Group's existence or activities at the Company." Riot Br. 18-19. However, "Riot's knowledge of the Honig Group" is "establish[ed]" by "O'Rourke [and] Beeghley's participation in, [and] knowledge of, the Honig Group's concerted activities at Riot." *Id.* *See* §§ II.A.2-3. The Riot Defendants argue that the Complaint does not allege "when [O'Rourke and Beeghley] agreed to participate, and how they supported the Honig Group." Riot Br. 19. While pleading such evidence is not required, *Burt II*, 2014 WL 1291834, at *18, the Complaint alleges that O'Rourke and Beeghley agreed to partake in the scheme no later than when they each signed a "Consent to Nomination as Director" on September 8-9, 2016, which Honig attached to his letter to Riot's outgoing Board, and filed with the SEC. *See* SAC Ex. O at 461, 465. Once inside the Company, O'Rourke and Beeghley cooperated by co-signing misleading SEC filings. ¶¶ 347, 357.

were unusual in scope *or* timing, they may support an inference of scienter,'" *Avaya*, 564 F.3d at 279.[22]  Here, O'Rourke's Class Period sales of Riot stock were unusual in timing.  On December 29, 2017, O'Rourke sold 30,383 shares for proceeds of $869,256.35, just before the Company announced the dismissal of its auditor and a month before Riot canceled its annual meeting for the second time, causing the NASDAQ to inform the Company that it had violated the NASDAQ's listing requirements.  ¶ 444.  Those sales were *not* made pursuant to a 10(b)5-1 trading plan, further adding to the inference of scienter.  *See Brendon v. Allegiant Travel Co.*, 2019 WL 4255051, at *8 (D. Nev. Sept. 9, 2019) (only "[s]tock sales conducted pursuant to a pre-determined Rule 10b5-1 trading plan may 'rebut [ ] an inference of scienter'").  O'Rourke made his sales after the market closed on the day before New Year's holiday weekend, suggesting he sought to avoid raising attention.  ¶ 444.[23]

---

[22] The factors bearing on whether such sales are unusual in scope include "the amount of profit made, . . . whether the sales were 'normal and routine,' and whether the profits were substantial relative to the seller's ordinary compensation."  *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at *20 (D.N.J. July 22, 2015).  Stock sales are unusually timed when they are incongruous with "the timing of past trades," *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 152 (3d Cir. 2004), or when they take place "at a time when the price of the stock was allegedly artificially inflated due to Defendants' misrepresentations," and the executive knew, or should have known, the "severe negative impact" that would be caused by the disclosure of the truth, *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *19 (D.N.J. Dec. 15, 2015).

[23] Plaintiff has also alleged unusual (and undisclosed, § 13(d)) insider sales by Honig, ¶¶ 23, 316-17 (sales of 1,583,005 shares for proceeds of $17 million); DeFrancesco, ¶¶ 337-40 (sales of 375,873 shares representing 3.22% of all common stock); and Groussman, ¶¶ 330-34 (sales of 267,257 shares representing 2.29% of all common stock).  *See Riot I* at 37 (finding Honig's $17.6 million in stock sales "alleges facts showing Honig had a motive and opportunity to profit from the concealment of his stock sales").  Honig argues that his sales "<u>before</u> Riot announced its business pivot" negate the inference of his scienter, Honig Br. 19, but the more cogent explanation for Honig's methodical, clockwork-like sales of between 0.01% and 0.09% of his Riot shares on 31 separate days from March to August 2018, ¶ 316, was "pre-release manipulative trading," ¶ 92, to create liquidity and "prim[e] investor interest," ¶ 229, before the "pump" phase of the scheme.  Honig also argues that his shares purchases "when the stock price neared its all-time high" negate his scienter, Honig Br. 20, but this is misleading because Honig acquired these shares at below-market prices of $3.56 and $2.50 without disclosing his participation in the March and December 2017 Private Placements.  ¶¶ 188-89, 316 nn.45-49, 323.

DeFrancesco argues that "[t]he more compelling inference" is that she violated her statutory duty to report her divestment (of more than ten percent of a NASDAQ-traded public company) because she "*misconstrued* the reporting requirements" and was not "aware that amended Schedules 13D were required upon the *sale* of . . . stock." DeFrancesco Br. 14 (second emphasis in original). The stronger inference is that DeFrancesco purposely hid her stock sales and membership in the Honig Group in order to reap the financial benefits of selling her stock into an artificially inflated and liquid market for Riot stock. Notwithstanding, DeFrancesco ignores the "general rule that ignorance of the law or a mistake of law is no defense to [a] criminal prosecution," which applies *a fortiori* to a *civil* action for securities fraud. *Cf. United States v. O'Hagan*, 139 F.3d 641, 647 (8th Cir. 1998) ("'willfully' simply requires the intentional doing of the wrongful acts—no knowledge of the rule or regulation is required").[24]

### B. The Complaint Adequately Pleads Count II (Violation of Section 10(b) and Rule 10b-5(b)) by Alleging Defendants' Materially False and Misleading Statements and Omissions to Riot's Public Investors

Rule 10b-5(b) prohibits "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). A complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). A misrepresentation or omission "is material if there is a substantial likelihood that a reasonable shareholder would consider it

---

[24] As a frequent filer of Schedule 13Ds, ¶ 337, DeFrancesco's feigned ignorance of Section 13(d)'s well-known requirements falls flat. *See, e.g.*, https://en.wikipedia.org/wiki/Schedule_13D ("A filer must promptly update the Schedule 13D filing to reflect any material change in the facts disclosed, including, among other things, the acquisition or *disposition of 1% or more of the class of securities* that are the subject of the filing.").

important in deciding how to [act]." *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000) (alteration in original).[25]   Courts ***do not*** require "an exhaustive cataloging of facts "to satisfy the PSLRA's particularity requirement," and do "not require plaintiffs to plead issues that may have been concealed by the defendants." *In re Majesco Sec. Litig.*, 2006 WL 2846281, at *6 (D.N.J. Sept. 29, 2006) (particularity requires facts "sufficient to provide assurance that plaintiffs have investigated the alleged fraud and reasonably believe that a wrong has occurred").

Here, Plaintiff alleges that Defendants made materially false and misleading statements and omissions regarding:  (i) their beneficial ownership of Riot in their Schedule 13D filings (Honig, Groussman, Stetson, and DeFrancesco); (ii) Riot's beneficial ownership and related-party transactions in Forms S-3 and 10-K (Riot, O'Rourke, and Beeghley); and (iii) Riot's related-party transactions in Forms 8-K, 10-K, 10-Q, DEF 14A, and S-3 (Riot, O'Rourke, and Beeghley).

      **1.**      **Honig, Groussman, DeFrancesco, and Stetson's Statements and Omissions Regarding Their Beneficial Ownership of Riot Stock on Schedules 13D and 13G Were False and Misleading**

Schedule 13D "require[s] the filer to . . . state the purpose of the acquisition of the covered securities, including any purpose to acquire control." *Vladimir*, 606 F. Supp. 2d at 491.  Schedule 13D also requires that the filer "[d]escribe any plans or proposals which the reporting persons may have which relate to or would result in . . . [t]he acquisition by any person of additional securities of the issuer."  17 C.F.R. § 240.13d-101.  Section 13(d)'s disclosure mandate extends to both individuals and groups.  *See Americbanc Investors Grp. v. Zwart*, 706 F. Supp. 1248, 1250 n.4 (E.D. Va. 1989) (obligation to file Schedule 13D extends to any "two or more persons who act together for a common purpose").  "The failure to file or amend a Schedule 13D, as required, serves as a predicate for liability under § 10(b) and Rule 10b–5(b). . . . If a duty to disclose arises

---

[25] A "[p]laintiff can survive a motion to dismiss by alleging a single material misrepresentation." *Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409, at *4 n.2 (C.D. Cal. Mar. 5, 2013).

under the Williams Act, the failure to file or disclose information in a Schedule 13D is actionable." *Burt II*, 2014 WL 1291834, at *17.  *See also Vladimir*, 606 F. Supp. 2d at 490-91 ("a plaintiff can point to a violation of section 13(d) as the predicate for a 10b–5 claim.").[26]

### a.      Honig's False Statements and Omissions

In addition to failing to disclose his membership of a group, Honig did not update his January 5, 2017 Schedule 13D until February 13, 2018, despite selling massive quantities of Riot stock during this period.  ¶¶ 310.  Honig's failure to file any amendments during the Class Period violated Section 13(d)(2) and Rule 13d-1(a).[27]  Indeed, the falsity (and materiality) of Honig's pattern of Section 13(d) violations is underscored by former SEC Chairman Harvey Pitt's televised comments on February 16, 2018, in which Mr. Pitt stated that the length of time it Honig took to disclose his stock sales was not what Mr. Pitt considered to be "timely" disclosure.  ¶ 320.[28]

---

[26] In determining the presence of a group, "a group need not formally memorialize its objective in writing, and direct evidence, let alone a 'smoking gun,' is not required. . . . Rather, the existence of a group may be shown by circumstantial evidence, including 'prior relationships and trading patterns,' 'discussions between the defendants,' and evidence of 'a particular *modus operandi.*'" *Burt II*, 2014 WL 1291834, at *18.

[27] The market did not learn about Honig's sales until January 31, 2018, when *The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."  *See* ¶ 318 ("Mr. Honig has sold about 500,000 shares, he said, but declined to divulge his profit.  He said he still owns about 1% of the company.").

[28] Honig and Groussman argue that their stock sales were publicly disclosed in Riot's Forms S-3/A.  *See* Honig Br. 14-15; Groussman Br. 17.  This is incorrect:  the Forms S-3/A merely "*offered*" shares for sale and advised that "[t]he inclusion of any shares in this table *does not constitute an admission of beneficial ownership for the selling stockholder* named below.  *We do not know when or in what amounts a selling stockholder may sell* or otherwise dispose of the shares of Common Stock covered hereby" and further advised that "*[t]he selling stockholders may not sell* or otherwise dispose of any or all of the shares offered by this prospectus" and that "*there are currently no agreements, arrangements or understandings with respect to the sale of any shares.*"  Stetson Ex. 2 at 4.  Thus, Riot's Forms S-3/A did not tell the market that Honig or Groussman or anyone else had actually sold any shares and did not absolve Honig, Groussman, and others of their statutory duties to report their own sales on a Schedule 13D.

Furthermore, Honig's January 5, 2017 Schedule 13D/A stated that "there are no contracts, arrangements, understandings or relationships (legal or otherwise) between the Reporting Person and any other person with respect to the shares."  ¶ 322.  This disclosure was materially false and misleading because Honig failed to disclose his agreement with the Honig Group and Selling Stockholders to acquire, hold, vote, and/or dispose of shares they acquired in Riot in coordination with one another.  *See Burt II*, 2014 WL 1291834, at *22.

In response, Honig argues that the Complaint "does not identify a single statement made by [Honig] during the putative Class Period that is alleged to be false or misleading."  Honig Br. 20.  While Honig's January 5, 2017 Schedule 13D was filed before the start of the Class Period, Honig had a statutory duty to update that Schedule 13D during the Class Period.  *See Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) (a duty to disclose may arise when there is a "statute of regulation requiring disclosure").[29]  By failing to do so, Honig made a material misrepresentation or omission.  *See Riot II* at 13 ("The Court finds that Plaintiff has sufficiently alleged that Honig made a material misrepresentation and/or omission by, at the very least, not filing a Schedule 13(d) or 13A throughout 2017 and promptly disclosing his material acquisitions

---

[29] By virtue of Honig's fiduciary relationship with the Company (through which he controlled Riot's operations), a duty to disclose existed.  *See Grand Union Supermarkets of the V.I., Inc. v. Lockhart Realty, Inc.*, 493 F. App'x 248, 252 (3d Cir. 2012) ("A duty to disclose arises where there is a fiduciary relationship between the parties."); *Harriman v. E.I. DuPont De Nemours & Co.*, 372 F. Supp. 101, 105-06 (D. Del. 1974) ("[W]hen a person affirmatively undertakes to dictate the destiny of the corporation . . . he assumes such a fiduciary duty.").  Honig also assumed a duty to disclose because "[w]here a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b–5(a) or (c), that misconduct creates an independent duty to disclose. . . . This is so because participants in the securities markets are entitled to presume that all of the actors are behaving legally; silence that conceals illegal activity is therefore intrinsically misleading . . . ."  *In re Initial Pub. Offering Sec. Litig.* ("*In re IPO*"), 241 F. Supp. 2d 281, 332-33 (S.D.N.Y. 2003).

or dispositions of Riot stock.").[30]

    **b.**  **Groussman's False and Misleading Statements and Omissions**

   As a member of the Honig Group, Groussman was required to file a Schedule 13D.  Instead of doing so, Groussman improperly made Schedule 13G filings during the Class Period that falsely represented him as a passive investor, in violation of Rule 13d-1(c), Section 13(d)(3) and Rules 13d-2, 13d-5, 57 and 13d-101.  ¶ 324.  These filings—which may serve as a predicate for liability under Section 10(b)—were therefore false and misleading.

   In response, Groussman contends that he was not required to file a Schedule 13D because "a Schedule 13D is only required if the investor holds the securities for the purpose of effecting change or influencing the control of the issuer."  Groussman Br. 16.  That is precisely the case here.[31]  Indeed, Groussman acknowledges that a Schedule 13G "is ***inappropriate*** if the investor 'engages with the issuer's management on matters that specifically call for the sale of the issuer to another company, the sale of a significant amount of the issuer's assets, the restructuring of the issuer, or a contested election of directors.'"  Groussman Br. 16.

---

[30] Honig's argument "that there cannot be any liability for an omission without any statement having been made," Honig Br. 22, fails because Honig was required to amend and correct his Schedule D during the Class Period.

[31] Groussman suggests the "purpose of a Schedule 13D is to disclose potential takeover bidders" and when "public shareholders are confronted by a cash tender offer."  Groussman Br. 13-14.  This is incorrect.  "Section 13(d)'s purpose is to alert investors to potential changes in corporate control so that they [can] properly evaluate the company in which they had invested or were investing." *Bilzerian*, 926 F.2d at 1297.  Groussman argues that Plaintiff seeks to "[e]xpand[] 10b-5 liability . . . beyond its present boundaries," but his own case law shows otherwise.  *See* Groussman Br. 21-22 (citing *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989) (noting how a plaintiff may "recover upon . . . a claim" that "false statements of purpose in . . . Schedule 13D filings constituted violations of Rule 10b–5").  Indeed, for at least the past 50 years courts have recognized that a violation of "Section 13(d)" can trigger liability under "section 10(b)."  *GAF Corp.*, 453 F.2d at 720 n.22.

Groussman next argues that "nothing about Groussman's specific certification in his 13G filings was false." *Id.* at 17.  Groussman is wrong because he certified that "to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect," ¶¶ 202-03, when they were held for precisely this purpose.

Likewise, Groussman's argument that "no rule requires a group of investors, who simply buy or sell shares of an issuer together, without any aspirations to acquire control over the issuer, to disclose their group under a Schedule 13D," Groussman Br. 14, is a far cry from the case here.[32] First, "[a] complaint need not plead . . . every term of a 13D filer's plan or purpose to allege control." *Vladimir*, 606 F. Supp. 2d at 491.  Second, contrary to Groussman's argument, Plaintiff has offered "specific facts to show that Groussman acted with others 'in furtherance of a common objective' with respect to Riot stock." Groussman Br.18.  *See supra* II.A.4.

Groussman further contends it would be "incompatible" to find that a violation of Schedule 13D can "serve as a predicate for a 10b(5) claim," Groussman Br. 21, yet provides ***no*** authority that specifically holds that such violations cannot serve as a predicate basis for liability under Section 10(b) of the Exchange Act (while Plaintiff has cited to numerous examples in this brief). Indeed, Groussman begrudgingly acknowledges that "some federal courts" have held that violations of Schedule D reporting requirements can serve as a predicate basis for liability under Rule 10b-5.  *Id.*  Groussman does not attempt to engage with or distinguish those cases.[33]

---

[32]  In support of his argument, Groussman engages in misplaced speculation by arguing that if Plaintiff's theory is correct, "[t]he SEC would have commenced an enforcement action for violations of Section 13(d) with respect to Riot." Groussman Br. 15.  What the SEC may or may not have done is irrelevant to Plaintiff's allegations.

[33] Groussman's argument is incorrect for the reasons discussed *supra* at n.14.

c.       **DeFrancesco's False and Misleading Statements and Omissions**

DeFrancesco filed her initial Schedule 13D on September 12, 2016, reporting holding 7.49% of Riot's common stock as of September 2, 2016.  ¶ 336.  DeFrancesco later filed amended Schedule 13D/As, up until January 10, 2017, when she reported owning 515,777 shares representing 11.45% of Riot's outstanding common stock.  *Id.*  Thereafter, DeFrancesco failed to update her holdings of Riot common stock, despite selling nearly all of her stake in Riot stock between January 10, 2017 and December 28, 2017.  By failing to do so, DeFrancesco violated Section 13(d) and Rule 13d-1(a).

Tellingly, DeFrancesco does not argue (nor could she) that Plaintiff's allegations regarding her holdings are incorrect or that she did in fact file a Schedule D when she sold her shares in Riot. Rather, DeFrancesco argues that "Plaintiff alleges no facts that Ms. DeFrancesco made any *express* agreement with any member of the Honig Group concerning RBI stock—much less to effectuate a pump-and-dump scheme."  DeFrancesco Br. 8.  But as Plaintiff has already explained, he is not required to plead an "express agreement."  DeFrancesco's undisputed prior parallel investments readily demonstrate her membership in the Honig Group.  *See Riot II* at 11 ("[O]ther Courts have similarly imputed the knowledge of a group on a corporation based on knowledge of the alleged group's prior parallel investments and the defendant's involvement in those prior parallel investments."); *Burt II*, 2014 WL 1291834, at *18 ("the existence of a group may be shown by circumstantial evidence, including 'prior relationships and trading patterns,' 'discussions between the defendants,' and evidence of 'a particular *modus operandi.*'").  DeFrancesco was joined at the hip with Honig, telling Riot's outgoing Board that their joint purpose was to "vote on the removal of five (5) directors" and "the election of five (5) new directors," including Stetson, O'Rourke, and Beeghley.  *See, e.g.*, ¶ 171 ("I join in Mr. Honig's prior nomination of these individuals to

serves as members of the board of directors.").  There can be no dispute that DeFrancesco's sales were made as part of the Honig Group's coordinated scheme.  *See supra* II.A.G.

### d.    Stetson's False and Misleading Statements and Omissions

While Stetson kept his Riot holdings (suspiciously) below the 5% reporting threshold (at 4.99%), his SEC filings were false and misleading because he was required (under Section 13(d)(3) and Rules 13d-2, 13d-5, and 13d-101) to file a Schedule 13D identifying himself as a member of the Honig Group.  ¶ 343.  In response, Stetson argues the disclosure of his sales before they took place "eliminates the possibility of deception."  Stetson Br. 4.  Whatever disclosure(s) Stetson did make did not relieve him of his obligation to report that he was a member of the Honig Group— something he failed to disclose.[34]

Stetson further contends that "where a purpose to effect a change of control is lacking, an alleged group member's failure to file a Schedule 13D is not a material omission."  Stetson Br. 7.  As a preliminary matter, whether an omission is material is inappropriate for resolution on a motion to dismiss.  *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004) ("Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal.").  Only "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality it is appropriate for the district court to rule that the allegations are inactionable as a matter of law."  *Id.* at 275.

Apart from the foregoing, Stetson's failure to file a Schedule 13D ***was*** a material omission as investors would have found the Honig Group's coordinated holdings and sales material.  *See Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[U]ndisclosed information is considered

---

[34] Stetson also argues that he was not required to file a Schedule 13D because Plaintiff fails to allege that "Stetson agreed with anyone to do *anything* in relation to Riot."  Stetson Br. 5.  As explained repeatedly herein, this contention is without merit.

material if 'there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having 'significantly altered the 'total mix' of information' available to that investor.'"). *SEC v. Honig* is instructive. There, "Ladd argue[d] that the SEC insufficiently alleges that any omission of the Honig Group's beneficial ownership was material." 2021 WL 276155, at *8. Ladd added that the "allegations are insufficient because they do not set forth why the existence of an undisclosed control group would be significant to a reasonable investor. Ladd also argued that the mere fact that a particular disclosure is required under the securities laws does not necessarily make it 'material' for the purposes of securities fraud liability under Section 10b or Section 17(a)(2)." *Id.* The court rejected these arguments, holding the complaint "alleges that this information would be material to investors" and "decline[d] to take the position that this degree of undisclosed ownership was immaterial as a matter of law, such that it could have been important to a reasonable investor." *Id. See also Geiger v. Solomon-Page Grp., Ltd.*, 933 F. Supp. 1180, 1188 (S.D.N.Y. 1996) (SEC's "expert view" on when disclosure required is evidence of materiality).

### 2. Riot's Statements Signed by O'Rourke and/or Beeghley Regarding Beneficial Ownership on Forms S-3/A and 10-K Were False and Misleading

A stock issuer's "disclosures . . . should inform, not challenge the reader's critical wits." *Shaev v. Saper*, 320 F.3d 373, 379 (3d Cir. 2003). Under Item 403 and Section 13(d), Riot was required to disclose the Honig Group's beneficial ownership of the Company.[35]  ¶¶ 246-47. *See also In re Hienergy Techs., Inc.*, 2005 WL 3071250, at *12 (C.D. Cal. Oct. 25, 2005) ("Plaintiffs

---

[35] A "beneficial owner" refers to anyone who, directly or indirectly, holds shares permitting them to exercise voting or investment power. 17 C.F.R. § 240.13d-3(a). Section 13(d) refers to a "group" to include "two or more persons act[ing] as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer . . . ." 15 U.S.C. § 78m(d)(3).

have properly pled that [HiEnergy] violated Section 10(b) and Rule 10b-5 by failing to disclose the secret control group and market manipulation, as well as failing to disclose the negative histories of certain officers, major shareholders, and directors").[36]

*SEC v. Honig*, 2021 WL 276155, is instructive.  There, the court found that the SEC had adequately alleged that MGT (another Honig pump-and-dump target company, ¶¶ 108-19) and its CEO filed misleading "S-1 and 10-K filings [that] failed to comply with Item 403 of SEC Regulation S-K" by "not reveal[ing] the full extent of Honig's beneficial ownership, or the total beneficial ownership of all of the Honig Group's members." *Id.* at *7.

Here, as discussed above, O'Rourke was personally aware that a "group" under Section 13(d) must be disclosed on the "beneficial ownership table" of a "Registration Statement" such as a "Form S-4" because he had reviewed and discussed the *Honig 13(d) Action*, which alleged just that.  ¶¶ 249-50; *see also* Ex. 1.  Nevertheless, O'Rourke and Beeghley signed Riot's SEC filings

---

[36] Recently, the court in *SEC v. Honig* found that the SEC had adequately alleged that the CEO of MGT (a/k/a, "Company B," ¶¶ 108-19) was liable under Rule 10b-5 for causing MGT to make "S-1 and 10-K filings [that] failed to comply with [Item 403], and thus violated a regulatory duty." 2021 WL 276155, at *6 (citing 17 C.F.R. § 229.403).  The court acknowledged that "Item 403 sets forth instructions for the disclosure of security ownership of certain beneficial owners, and its provisions are applicable to parties making 10-K or S-1 filings" and "requires that the issuer furnish information—such as the beneficial owner's name, address, and percent beneficial ownership—regarding anyone known to be a beneficial owner of more than 5% of any class of a company's stock." *Id.*  "The provision seeks this information 'with respect to any *person* (including any 'group' as that term is used in section 13(d)(3) of the Exchange Act) . . . .'" *Id.* (quoting 17 C.F.R. § 229.403(a)).  "Therefore, Item 403's disclosure requirements apply both to individuals and to people acting as a 'group.'"  *Id.*  The court found that "[a]t base, . . . the SEC alleges that the disclosures did not reveal the full extent of Honig's beneficial ownership, or the total beneficial ownership of all of the Honig Group's members," and that the SEC's "allegations sufficiently set forth the regulatory duty that [MGT's CEO] allegedly breached:  his duty to disclose the collective beneficial ownership of the Honig Group, which it alleges was a 'person' under Item 403." *Id.*  Thus, the court concluded that "it is clear that the SEC states a claim." *Id.* at *7 ("Moreover, the SEC has pleaded that Item 403 created a duty for the Honig Group to disclose its collective beneficial ownership when such ownership exceeded five percent of any class of MGT's securities."  (citing 17 C.F.R. § 229.403(a)).

as CEO and Chairman and thereby caused the Company to issue materially false and misleading Forms S-3/A and 10-K filings that did not disclose that the Honig Group constituted a "group" under Section 13(d)(3) and Item 403, much less the full extent of the Honig Group's coordinated control of Riot.  *See, e.g.*, ¶¶ 347-49, 357-60.  For example, Riot's April 20, 2017 S-3/A stated that (i) "[u]nless otherwise indicated below, to our knowledge, all persons named in the table have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by their spouses under applicable law"; and (ii) "[e]ach selling stockholder has informed us that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock."  ¶ 354.[37]  This was materially false and misleading because members of the Honig Group invested as a group and thereby agreed, either explicitly or implicitly, to share their voting and/or investment power with respect to Riot's common stock.  Numerous other Class Period filings were false and misleading for the same reason.  *See* ¶¶ 362, 367, 370, 375, 384.

In response, Riot acknowledges that "Item 403 requires issuers to disclose any investor group, as defined under Section 13(d) of the Exchange Act, that are known to the registrants to own more than five percent of the registrant's voting securities" but contends "Riot did not have any obligation under Item 403 to disclose that the purported Honig Group was an investor group at the Company, because the SAC does not establish the existence of any group whatsoever."  Riot Br. 12.  This argument has been addressed previously.  *See supra* §§ II.A., III.A.2.  Riot also contends that "to allege the existence of a Section 13(d) group, Lead Plaintiff must allege that

---

[37] This disclosure was required by Exchange Act Section 13(a) and Item 403, which require issuers to "[i]nclude such additional subcolumns or other appropriate explanation of column (3) [i.e., "Amount and Nature of Beneficial Ownership"] necessary to reflect amounts as to which the beneficial owner has (A) sole voting power, (B) shared voting power, (C) sole investment power, or (D) shared investment power."  17 C.F.R. § 229.403 (c)(2).

purported Honig Group members had acted together, with a common objective, to acquire, hold, vote, or dispose of securities of the issuer—*i.e.*, Riot," Riot Br. 13, and asserts the Honig Group was not known to it, *see id.* at 18-19.  Plaintiff has alleged just that, as Judge Quraishi rightly noted. *See Riot II* at 11 ("Plaintiff argues that the [Complaint] alleges that O'Rourke shared an office and fax number with members of the alleged group, O'Rourke's involvement in the prior parallel investments, and Beeghley's involvement in prior parallel investments with the alleged group, among other allegations. . . . ***The Court finds that these allegations are sufficient for a rational trier of fact to find that the Riot Defendants knew Honig, DeFrancesco, Groussman, and Stetson acted as a group***.").  *See also supra* §§ II.A., III.A.2.[38]

### 3. Riot, O'Rourke, and Beeghley's Statements and Omissions Regarding the Company's Related-Party Transactions Were False and Misleading

Riot, O'Rourke, and Beeghley had a duty to disclose the Company's related-party transactions and material transactions between the Company and its insiders or controllers under Item 404 and ASC 850.  *See SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 393-94 (S.D.N.Y. 2014) ("FAS 57 [now known as FASB ASC 850] requires disclosures of material related-party transactions . . . Item 404 requires disclosures of related-party transactions when 'the amount involved exceeds $120,000, ***and*** in which any related person had or will have a direct or indirect material interest.'").[39]

---

[38] Riot's argument that "Lead Plaintiff pleads no particularized facts to allow a plausible inference that the members of the purported Honig Group coordinated their trades at Riot with one another" and that there is an "absence of any concerted activity whatsoever by the purported members of the Honig Group" is demonstrably wrong.  Riot Br. 16-17.  The Complaint includes numerous particularized allegations of coordinated trading.  *See, e.g.*, ¶¶ 96, 111, 365, 386.

[39] *See also Vanleeuwen v. Keyuan Petrochemicals, Inc.*, 2014 WL 3891351, at *3 (S.D.N.Y. Aug. 8, 2014) (Defendant "signed and certified various registration statements . . . during the Public Class period that failed to disclose the [related-party] transactions and therefore constituted a 'maker' of these statements or omissions."); *Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d

During the Class Period, the Company filed, and O'Rourke and Beeghley signed, SEC filings that misrepresented and concealed the Honig Group's related-party transactions with the Company in violation of Item 404 and ASC 850. *See, e.g.*, ¶¶ 392-94 (Form 10-K describing the March 2017 Private Placement, but concealed Honig's role as a related party to that transaction); ¶¶ 395-97 (announcing the Coinsquare Agreement, but omitting that it was a related-party transaction in which Riot, Honig, Stetson, Groussman, and Brauser were all parties and in which Honig received a cash payment); ¶¶ 398-400 (announcing the Kairos Transaction but omitting it was a related-party transaction with Honig and DeFrancesco, who were part-owners of Kairos).  It is therefore no surprise that Judge Quraishi held that "Plaintiff has sufficiently alleged that the Riot Defendants filed a false or misleading statement, or deceptive act, by leaving out specific details such as the investor's (Honig's) name and that his investment was a related party transaction in their Item 404 of Registration S-K forms." *Riot II* at 12.  Accordingly, Riot's argument that all of the related-party transactions alleged in the Complaint "were either fully disclosed by [Riot] or did not need to be disclosed under Item 404" is simply wrong.  Riot Br. 20.

Riot next argues that "Honig's name itself is 'not material'" and that the March 2017 Private Placement was not deficient by not identifying Honig by name.  *Id.* at 21.  As explained above, materiality is rarely appropriate for resolution on a motion to dismiss.  Notwithstanding, it is hard to think of anything more material than Honig's identity in the March 2017 Private Placement.[40]  In support of its argument, Riot quotes from a "Form of Purchase Agreement"

---

705, 711 (N.D. Tex. 2008) ("[D]isclosure is the overriding principle" governing related-party transactions, because while they are "not inherently bad, they have proven to be an easy and effective way . . . to misstate the economic substance and reality of financial transactions . . . [and] are difficult to measure economically because they may not be comparable[.]").

[40] Riot cites *Stephens v. Uranium Energy Corp.*, 2016 WL 3855860 (S.D. Tex. July 15, 2016), to argue that "Honig's name itself is not material[.]"  Riot Br. 21.  But in *Stephens*, the defendant company's "Item 404 disclosures" told investors that the transactions involved "certain officers

attached to Riot's March 16, 2017 Form 8-K, which stated under the "Representations and Warranties of the Purchasers" section:   "Purchaser has ***a prior substantial pre-existing relationship*** with the Company."   Riot Br. 20.   Based on this boilerplate contractual language buried within a blank contract written for anonymous would-be purchasers of Riot's "Private Placement Units," Riot claims it "disclosed that the March 2017 private placement involved a related party."   *Id.* at 27.   This argument is not supported by a closer review of other portions of the Form 8-K that the Riot Defendants elected not to attach to their exhibits, no doubt in the hope Plaintiff and the Court would not notice it.   *See* Ex. 3.   Attached to this same "Purchase Agreement" was an "Accredited Investor Questionnaire," which asked:   "Do you have a 'pre-existing relationship' with the Company or any of the officers of the Company?" and indicated for would-be investors to check either "Yes" or "No."   *See id*. at 3.   The "Questionnaire" clarified that "[f]or purposes hereof, 'pre-existing relationship' means any relationship consisting of personal or business contacts of a nature and duration such as would enable a reasonably prudent investor to be aware of the character, business acumen, and general business and financial circumstances of the person with whom such relationship exists."   *Id.*   The "Questionnaire" then instructed, "[i]f so, please name the individual or other person with whom you have a pre-existing relationship and describe the relationship."   *Id.*   Later in the Form 8-K, another "Selling Security Holding Notice and Questionnaire" stated that "[t]he undersigned beneficial owner (the 'Selling Securityholder') of Registrable Securities . . . hereby provides the following information to the Company and represents and warrants that such information is accurate: . . .

---

and directors" and "stated the value of each related-party transaction and identified which payments were made to a company controlled by a direct family member of a current officer." *Stephens*, 2016 WL 3855860, at *7, 21.  Here, by contrast, Riot did not disclose that any of the transactions at issue required any such "Item 404 disclosures," much less any details that would render Honig's name immaterial.

5.  Relationships with the Company:

*Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equity holders (owners of 5% of more of the equity securities of the undersigned) has held any position or office or has had any other material relationship with the Company (or its predecessors or affiliates) during the past three years.*

State any exceptions here:

*Id*. at 6 (emphasis in original).  Thus, rather than inform investors that "the March 2017 Private Placement involved a related party," Riot Br. 27, a closer reading of Riot's March 16, 2017 Form 8-K reveals that the contracts and questionnaires attached did not specify whether the parties to the agreement had any "pre-existing relationship' with the Company or any of the officers of the Company," Ex. 3 at 3, much less any "*material* relationship with the Company," *Id*. at 6.  Since the Form 8-K defined "pre-existing relationship" as merely allowing "a reasonably prudent investor to be aware of the character of Riot's business," *id.*, the Form 8-K clearly did not inform investors whether the March 2017 Private Placement was being transacted with more-than-5% shareholders requiring disclosure under Item 404 and ASC 850.  If anything, the Form 8-K's questionnaire invited would be "Note Investors" to disclaim any "material relationship" with Riot absent "any exceptions."  *Id*.[41]

With respect to the December 2017 Private Placement, Riot quotes the boilerplate

---

[41] Riot asserts that the Company's March 22, 2017 Form D "disclosed" that the securities in the March 2017 Private Placement were "sold to an inside investor."  Riot Br. 21 n.14.  But the Form D disclosed nothing of the sort; rather, it disclosed that the "[m]inimum investment accepted from any outside investor" was "$0 USD," Riot Ex. D at 4, which, according to the SEC's instructions for Form D, merely indicates that "there [was] no minimum investment amount" for "outside investors."  Ex. 4 at 7.  Beyond this, Riot's Form D does not indicate whether the "6" "investors who already have invested in the offering" were such "outside investors" and does not mention anything at all about an "inside investor."  Riot Ex. D at 4.  Riot's similar argument regarding the Form D concerning the December 2017 Private Placement, Riot Br. 25 n.18, fails for the same reason.  *See* Riot Ex. H at 4.

"Representations and Warranties" language from the "Securities Purchase Agreement" attached to Riot's Form 8-K announcing the December 2017 Private Placement, which stated that "the Purchaser has a prior substantial pre-existing relationship with the Company" and asserts that "the Company's Form 8-K disclosed that the December private placement involved related parties." Riot Br. 25.  But as with the March 2017 Private Placement, the Form 8-K attached a "Selling Securityholder Notice and Questionnaire" stating that "[t]he undersigned beneficial owner of common stock . . . of [Riot] . . . represents and warrants that . . . *[e]xcept as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equity holders (owners of 5% of more of the equity securities of the undersigned) has held any position or office or has had any other material relationship with the Company (or its predecessors or affiliates) during the past three years.*"  Ex. 5 at 2-4.

Regarding Coinsquare and Kairos, Riot misconstrues the instructions to Item 404 to mean that the related party must own 10% or more of the entity in question for any interest to be considered a "material interest" to be disclosed.  *See* Riot Br. 23, 24.  Setting aside the fact that this interpretation would effectively allow the *instructions* to the regulation to supersede the express language of the regulation itself,[42] those same instructions *only* make reference to an "*indirect* material interest" as opposed to a *direct* material interest.  *See* 17 C.F.R. § 229.404, Instruction 6 ("A person who has a position or relationship with a firm, corporation, or other entity that engages in a transaction with the registrant ***shall not be deemed to have an <u>indirect</u> material interest*** . . . where . . . [t]he interest arises only . . . [f]rom the direct or indirect ownership by such person . . . of less than ten percent of the equity interest in another person (other than a partnership)

---

[42] Indeed, if Riot's strained reading were correct, related-party transactions involving more than the $120,000 threshold imposed by Item 404 would routinely evade disclosure.

which is a party to the transaction.").  While the regulations and instructions do not define "indirect material interest," common sense dictates that an indirect interest would more likely include, for example, a loan or personal guarantee to an entity involved in the transaction, as opposed to a direct ownership interest in that same entity.  *See Coleman v. Metzger*, 2020 WL 3452993, at *2 (D. Del. June 24, 2020) ("Deciding whether a claim is plausible will be a 'context-specific task that requires the reviewing court to draw on its judicial experience ***and common sense***.'").  By contrast, Honig and DeFrancesco ***directly*** received preferred shares of Riot for their 14.9% ownership interest in Kairos, an amount that easily exceeded the $120,000 threshold under Item 404.  ¶¶ 196-99.  Under Item 404 and ASC 850, these transactions should have been disclosed to Riot investors so they could properly analyze the "economic substance and reality of [these] financial transactions" when they occurred.  *Zagami*, 540 F. Supp. 2d at 711.[43, 44, 45]

## C.  The Complaint Adequately Pleads Loss Causation

A complaint need only allege a "short and plain statement . . . provid[ing] the defendant with fair notice" of plaintiffs' loss causation theory.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (applying "ordinary pleading rules" of Rule 8(a)(2), which should not "impose a great burden upon a plaintiff.")  Under *Dura*, a plaintiff need merely "provide a defendant with

---

[43] Riot states repeatedly that "despite having no obligation to do so," Riot Br. 23 n.15, 24 n.17, it nevertheless disclosed the Coinsquare and Kairos transactions (albeit belatedly).  Riot cannot have it both ways.  When the Company eventually did disclose these transactions in its SEC filings, it did so under the heading "Related Party Transactions."  *See, e.g.*, Riot Ex. E at 38 (ECF No. 192-3).  Yet, Riot now argues these were *not* related-party transactions.

[44] Riot argues that the proxy statements are not false and misleading because those statements refer to events taking place during 2016.  *See* Riot Br. 22.  The Complaint now more fully alleges why those proxy statements were ambiguous as to the time period.  *See* ¶¶ 404-12, 425.

[45] DeFrancesco argues that the "economics of the Kairos transaction had been public since . . . November 3, 2017," DeFrancesco Br. 16, but ignores that it was not until April 17, 2018, that DeFrancesco and Honig's economic interest in the transaction was revealed to investors. ¶ 198.

some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347.

The complaint need not show that "a misrepresentation was the sole reason for the investments' decline in value." *In re Tyson Foods, Inc. Sec. Litig.*, 2004 WL 1396269, at *12-13 (D. Del. June 17, 2004). Rather, "[s]o long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 186-87 (3d Cir. 2000). Moreover, the issue of loss causation is typically not resolved on a motion to dismiss. *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) ("Whether the plaintiff has proven [loss] causation is usually reserved for the trier of fact.").

Plaintiff has alleged loss causation under these standards. Specifically, the Complaint identifies five substantial declines in the price of Riot's stock in response to revelations of details of the Honig Group's fraudulent scheme to pump-and-dump Riot stock using the same *modus operandi* they had used at previous public companies. These price declines occurred following disclosures of new information on (1) January 31, 2018, ¶¶ 456-60 (*14.26%* decline); (2) February 16, 2018, ¶¶ 461-62 (*33.4%* decline); (3) April 17, 2018, ¶ 463 (*5.8%* decline); (4) May 25, 2018, ¶ 464 (*6%* decline); and (5) September 7, 2018, ¶ 465 (*26.1%* decline). Each is discussed below.[46]

---

[46] Honig undertakes a "comparison of the loss causation allegation of the [previous complaint, ECF No. 73] and the [operative Complaint]" to suggest that Plaintiff has engaged in the "deletion of references" in order "to hide those facts." Honig Br. 17. Nothing could be further from the truth and there is no merit to Honig's insinuation that there is anything nefarious about reframing allegations to strengthen an amended pleading. *See Berkery v. Equifax Info Servs.*, 429 F. Supp. 3d 24, 32 (E.D. Pa. 2019) ("[P]laintiffs routinely correct factual inadequacies in response to motions to dismiss, even by amending complaints in a manner that 'flatly contradicts the initial allegation.'" (quoting *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 172 (3d Cir. 2013))). In any event, "[a]n amended complaint supersedes an original complaint and the allegations in plaintiff's original complaint cannot be used to dismiss the plaintiff's amended complaint." *Cassin v. Prudential Ins. Co. of Am., Inc.*, 2004 WL 2360023, at *2 (S.D.N.Y. Oct. 19, 2004); *see also Limone v. Condon*, 372 F.3d 39, 46 (1st Cir. 2004) ("Courts must be . . . careful . . . not to permit a defendant to hijack the plaintiff's complaint and recharacterize its allegations

### 1.    January 31, 2018 – *The Wall Street Journal* Reveals Honig's Sales

In its April 30, 2020 Opinion, the Court found that "on February 13, 2018, Honig disclosed in an amended filing with the SEC that he had sold all but 1.47% of his shares in Riot" but that "the Complaint is devoid of any allegation that this 'corrective disclosure' was a 'substantial cause of shareholders' economic losses or otherwise contributed in any way to a decline in Riot's stock price." It further held that "[i]n the absence of any allegation of a causal link between the 'corrective disclosure' by Honig on February 13, 2018 of his sock sales and an economic loss that Plaintiff allegedly suffered, I find that Plaintiff has failed to adequately allege the element of loss causation." *Riot I* at 39; *see also id.* at 9 (noting that "the Complaint does not allege whether there was any drop in Riot's share price in response to [Honig's February 13, 2018] disclosure").

The Complaint directly addresses the Court's concerns by clarifying that the market did not first learn on February 13, 2018, that Honig had previously sold all but 1% of his Riot stock. ***To the contrary, Honig's covert sales were first revealed on January 31, 2018 (at "8:00 a.m. ET,"*** Ex. 6), when *The Wall Street Journal* published an article titled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake," which reported:  "Mr. Honig has sold about 500,000 shares, he said, but declined to divulge his profit.  He said he still owns about 1% of the company." "When stock goes up, you take a profit, [Honig] said."  ¶¶ 212, 456.  As a direct result of *The Wall Street Journal's* January 31 revelation that Honig had already sold all but 1% of the Company—without disclosing those sales on a Schedule 13D in violation of Section 13(d)—Riot's stock declined more than 5% that same day.  ¶¶ 213, 458.  Later that same day (January 31), after the market had closed, Riot issued a press release announcing that it had "Adjourned" the Company's "Annual Meeting of Stockholders," which had been schedule for the very next day.  ¶¶ 214, 459.

---

so as to minimize his or her liability.").

Together, *The Wall Street Journal's* revelation of Honig's nearly total divestment of his holdings of Riot stock, ¶¶ 456-58, alongside Riot's immediate cancellation ("for a second time," ¶ 459) of its annual shareholder meeting, which had been scheduled to occur just hours later, caused Riot's stock price to decline ***14.26%*** from its closing price on January 30, 2018, to its closing price on February 1, 2018.  ¶ 460.

Riot argues that these revelations are not "corrective" because the Company "never had an obligation to disclose Honig's stock sales" and made no misleading statements about its annual meeting.  Riot Br. 38.  But courts have repeatedly rejected the notion that to establish loss causation, a plaintiff must show a stock drop following an explicit disclosure (e.g., a confession that a fraud has occurred) that "mirrors, with precision, the alleged fraud."  *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *18-20 (D.N.J. Aug. 17, 2005) (rejecting contention "that a plaintiff must show that the loss was caused by a corrective disclosure that mirrors, with precision, the alleged fraud" and noting that "[t]his theory of loss causation is flawed . . . it does not follow from the precedent cited, or any precedent of which the Court is aware").[47]

Moreover, "Plaintiffs can utilize the 'materialization of the risk' approach to demonstrate when a misrepresentation or omission 'proximately causes' the economic loss in the context of an undisclosed risk."  *In re Galena Biopharma, Inc. Sec. Litig.*, 2021 WL 50227, at *7 (D.N.J. Jan. 5, 2021) (citing *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007)).  "Under the 'materialization of the risk' approach, Plaintiffs must prove that 'the materialization of the undisclosed risk caused the alleged loss.'"  *Id.* (quoting *McCabe*, 494 F.3d at 429 ("We believe [the materialization of risk] approach is consistent with our loss causation jurisprudence")).  Here,

---

[47] *See also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) ("[N]either the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure be a 'mirror image' tantamount to a confession of fraud.").

for example, the Riot Defendants created the risk by signing and filing Forms S-3 and 10-K that violated Item 403 and Section 13(d) by concealing that the members of the Honig Group—O'Rourke's co-conspirators in prior pump-and-dump schemes—were again engaged in undisclosed Section 13(d) group conduct and stock sales.  The risk that the Riot Defendants created began to partially materialize on January 31, 2018, when *The Wall Street Journal* reported that Honig had been engaging in exactly the kind of undisclosed § 13(d) group conduct and stock sales that the Riot Defendants had helped to conceal.

Honig argues that "the Complaint avers that a 14.26% decline in Riot's stock price" occurred "on January 31, 2018" and that there was "a concurrent 13.65% drop in the price of Bitcoin" on "that day."  Honig Br. 18.  This contention is without merit.  The 14.26% decline occurred between January 30 and February 1, 2018.  ¶ 460.  On January 31, 2018—the day of *The Wall Street Journal's* 8:00 a.m. article—Riot's stock ***dropped*** 5.17%, ¶ 458, while the price of Bitcoin ***increased*** 1.18%, from an opening price of $10,107.40 on January 31, 2018, to close at $10,226.86 that same day.  *See* ECF No. 118-14 at 13.[48]

Honig next argues that the fact that Riot's stock "went up" on September 25, 2017, the day Riot filed a Form S-3/A that was false and misleading by concealing the Honig Group's status

---

[48] Thus, on January 31, 2018, the price of Riot stock ***declined five times as much*** (in percentage terms) ***as the price of Bitcoin*** ***increased***.  The following day, Riot's stock price fell further, resulting in a two-day loss of ***14.26%*** from the January 30, 2018, to February 1, 2018 closing prices.  ¶ 460.  During this same time period, Bitcoin fell from a closing price of $10,107.26 to a closing price of $9,114.72—a much smaller decline of only 9.82%.  *See* ECF No. 118-14 at 13. In any event, it is not appropriate at this stage to engage in factual determinations of whether other conditions or events were responsible for Riot's stock-price decline.  *See, e.g.*, *Stumpf v. Garvey*, 2005 WL 2127674, at *12-13 (D.N.H. Sept. 2, 2005) (rejecting, on a motion to dismiss, defendant's factual argument that the "decline in price during the class period was caused by the crash of the telecommunications market"); *In re StockerYale*, 453 F. Supp. 2d 345, 359 (D.N.H. 2006) ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to a decline in [the] price of [their] shares raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal [now].").

as a control group under Section 13(d), ¶¶ 369-73—"directly contradict[s]" that "the disclosure of [Honig's] selling caused the price of Riot stock to go down." Honig Br. 18. But the September 25, 2017 Form S-3/A reassured investors that Honig would still have 8.09% of Riot's outstanding shares "[a]fter this Offering," ¶ 369, and thus offered no clue that he planned to covertly dump the stock in violation of Section 13(d).[49]

Ultimately, because the price of Bitcoin *increased* on January 31, 2018 while Riot's stock *decreased* by more than 5% on news from *The Wall Street Journal* of Honig's selling, the only plausible inference is of a "causal link between the 'corrective disclosure'" of Honig's "stock sales and [the] economic loss that . . . Plaintiff suffered." *Riot I* at 39.[50]

### 2. February 16, 2018 – CNBC Publishes Exposé on Riot and Honig

On February 16, 2018, CNBC published its exposé on Riot, revealing O'Rourke's close business ties to Honig after "CNBC crew members walked into [Honig's] office" and "found

---

[49] Honig also omits that as of September 25, 2017, he had already been engaged in months of undisclosed sales of Riot stock in excess of the 1% threshold for disclosure under Section 13(d). ¶ 316. Honig asserts that Riot's stock "rose for the following two days" after he filed his Schedule 13D/A on February 13, 2018, *see* Honig Br. 18, but that is unremarkable given that two weeks earlier, *The Wall Street Journal* had already revealed that Honig had "sold about 500,000 shares" and still owned only "1% of the company." ¶¶ 212, 456. And, the price of Bitcoin also rose on those same two days. *See* Honig Ex. C at 13; Honig Br. 4 (arguing the prices "moved in tandem").

[50] The exact trading price of Bitcoin on any historical date is "subject to reasonable dispute" and cannot "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). In that regard, Honig's chart of historical Bitcoin prices attached as his Exhibit C (ECF No. 196-7), which was generated from https://finance.yahoo.com on March 15, 2019 (*see* ECF No. 196-3 at 3) lists *different* prices for Bitcoin compared to the chart Plaintiff's counsel generated from the same website on March 19, 2021. *Compare* ECF No. 196-7 at 14 (on 1/31/2018, Bitcoin opened at $10,107.40 and closed at $10,226.86) *with* Ex. 7 (stating on 1/31/2018, Bitcoin opened at $10,108.20 and closed at $10,221.10). *See also* https://www.cnbc.com/2017/12/12/why-bitcoin-prices-are-different-on-each-exchange.html ("Bitcoin prices vary depending on the exchange they're trading on. . . . [T]here's no established common way to price bitcoin, which means nobody knows what it's 'supposed' to cost"). Plaintiff does not otherwise oppose the requests for judicial notice by the Riot Defendants (ECF No. 192-4), Honig (ECF No. 196-3), and Stetson (ECF No. 197-7).

O'Rourke" on the day of Riot's cancelled annual shareholder meeting without "any reason"; raised questions about "Honig's selling" and "what is reported" on Honig's "13D"; and questioned how Riot could have paid $11.9 million to Kairos for "$2 million in mining equipment" given that "Kairos appears to have many links to Riot." ¶¶ 215-224, 461-62. On this news, Riot's stock price *declined 33.4%*, ¶¶ 224, 462, while the price of Bitcoin was *increasing*, Honig Ex. C at 13.

Riot argues that the Complaint does not "allege any fraud revealed by this article," Riot Br. 37, but Defendants cannot "rewrite[e] the [SAC] in a way that they believe favors dismissal" because they "must take the [SAC] as [it is] written." *In re IPO*, 241 F. Supp. 2d at 332-33. The Complaint clearly alleges that CNBC's investigative reporting—including previously unknown facts tying together O'Rourke, Honig, Kesner, Paradox, Kairos, and Laxague, and detailing "the true extent of Honig's selling" being "[b]uried deep in the footnotes of Riot filings," ¶ 218—all served to "partially reveal the Honig Group's Class Period scheme . . . ." ¶ 461. And, here again, a *mea culpa* is not required. *See, e.g.*, *Nathanson v. Polycom, Inc.*, 87 F.Supp. 3d 966, 985 (N.D. Cal. 2015) ("a corrective disclosure need not precisely mirror the misstatement or admit fraud").

### 3.    April 17, 2018 – For the First Time Riot Discloses Numerous Related-Party Transactions

On April 17, 2018, after the market closed, Riot filed its 2017 Form 10-K, revealing that members of the Honig Group had been related parties to three strategic transactions that Riot had previously touted as part of its pivot to cryptocurrency. ¶¶ 188-201, 225, 463. On this news, Riot's stock price *declined 5.8%*, ¶ 463, while the price of Bitcoin rose, Honig Ex. C at 14-15.

In response, Riot argues that "disclosures made *after* this action was filed"—i.e., after an individual investor filed an initial 22-page complaint in this action (ECF No. 1)—"are not corrective disclosures." Riot Br. 34 (emphasis in original). This argument is wholly unsupported

by Riot's legal authority.[51]  Riot does not (and cannot) suggest that this complaint (which focused

on the February 16, 2017 CNBC article, *see* ECF No. 1 at ¶ 22) revealed the same facts and

information detailed by the SEC in its September 7, 2018 complaint.  ¶¶ 227-31, 465; *see also*

SAC Ex. A.  To the extent Riot and Honig are attempting to assert a "truth-on-the-market" defense

by arguing that the "truth was revealed" when "this lawsuit was filed," Honig Br. 17-18, such an

"intensely fact-specific truth-on-the-market defense" "cannot [be] resolve[d] . . . at this juncture."

*In re EQT Corp. Sec. Litig.*, 2020 WL 7059556, at *13 (W.D. Pa. Dec. 2, 2020).[52]

---

[51] Riot and Honig rely on *In re Merck & Co., Inc. Securities Litigation*, 432 F.3d 261 (3d Cir. 2005), *see* Riot Br. 34, Honig Br. 18, but *Merck* involved a journalist's "mathematical calculations" of "facts" that had already been "disclosed" in a securities filing "over two months" earlier.  432 F.3d at 270-71.  Riot also cites *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013), *see* Riot Br. 34, in which a short-seller's presentation contained "information . . . obtained from publicly available sources" that was "previously known to the market." 710 F.3d at 1198-99.  Here, Riot does not (and cannot) argue that information revealed to the market on April 17, May 25, and September 7, 2018, was previously disclosed or known to the market.  Riot also cites *In re Bank of America AIG Disclosure Securities Litigation*, 980 F. Supp. 2d 564 (S.D.N.Y. 2013), *see* Riot Br. 34-35, in which the court found that a newspaper's report that another company was merely "considering" or "planned" to file a lawsuit against the defendant was immaterial given the "total mix of public information" about that company.  980 F. Supp. 2d at 577.  Here, in contrast, rather than merely "considering" a lawsuit, the SEC filed a 53-page complaint (*see* SAC Ex. A) of entirely new, previously unreleased allegations that Riot's CEO, O'Rourke, had conspired with Riot's largest shareholder, Honig, in a series of pump-and-dump schemes using the same *modus operandi* as their conduct at Riot—revelations that so much altered the total mix of information that Riot's stock price declined more than *26%* in a single day.  ¶ 465.

[52] DeFrancesco argues that her "fail[ure] to amend her prior Schedules 13D . . . was disclosed to the market" by Riot's January 5, 2018 Form S-3 without causing market losses.  DeFrancesco Br. 15.  But the purpose of a Form S-3 is not to disclose stock sales—that is the function of a Schedule 13D/A.  ¶¶ 240-45, 249.  Hence, the January 5, 2018 Form S-3 merely stated that as of December 28, 2017, DeFrancesco held shares representing 1.3% of Riot's outstanding stock but that "[t]he inclusion of [those] shares in this table ***does not constitute an admission of beneficial ownership for the selling stockholder*** named below."  Ex. 8 at 6.  *See also* ¶ 36 n.28, *supra*.  Thus, as a qualified *non*-admission, the Form S-3 did not absolve DeFrancesco of *her own duty*—as a 5%+ Riot shareholder—to "promptly" report her material sales of Riot stock to the market.  *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989) ("Ordinarily, omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public.").  Moreover, it was not merely DeFrancesco's failure to disclose her stock sales—a deceptive act under Rule 10b-5(c)—but her membership in the Honig Group and her undisclosed related-party transactions with Riot and Honig that caused Riot's stock price to be

### 4.     May 25, 2018 – Coinsquare Disclosed as Related-Party Transaction

On May 25, 2018, after trading ended, Riot disclosed for the first time that several members of the Honig Group (Honig, Groussman, and Stetson), as well as certain Selling Stockholders, were all parties to the Coinsquare transaction.  ¶¶ 193, 226, 464.  On this news, the next day, Riot's stock price declined nearly ***6%***.  ¶ 464.  Riot argues that the Complaint "does not identify which undisclosed 'Honig Group members' were parties to the Coinsquare transaction that caused the stock price drop," Riot Br. 36, but ignores that the Complaint does just that, ¶ 193.

### 5.     September 7, 2018 – SEC Files the ***Honig Action***

On September 7, 2018, the SEC filed the *Honig Action* against O'Rourke, Honig, Groussman, Stetson, and others, alleging they had engaged in "three highly profitable 'pump-and-dump' schemes . . . from 2013 through 2018" at "three public companies."  ¶¶ 227-31, 465-66; *see also* SAC Ex. A (SEC's 53-page Complaint).  The SEC described how "Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets."  ¶ 230.  On this news, Riot's stock price declined by approximately ***26.1%***, ¶¶ 231, 466, while the price of Bitcoin fell less than 1%, Ex. 7.[53]

---

artificially inflated until the truth was revealed, first partially on February 16, 2018, when CNBC revealed that Kairos "was incorporated" by DeFrancesco's lawyer, "Laxague," "the same lawyer who . . . represented another major investor in Riot who has owned more than 7.49 percent of the company," ¶ 218—a clear reference to DeFrancesco, ¶ 337 (noting DeFrancesco's "7.49%" of shares); and more fully on April 17, 2018, when Riot revealed DeFrancesco and Honig's participation as related parties to the Kairos Transaction and December 2017 Private Placement, ¶¶ 201, 463.  In any event, as DeFrancesco acknowledges, the Complaint does in fact allege a 4.13% decline in Riot's stock price after Kairos revealed on January 5, 2018, to be a "[r]elated party transaction[]."  ¶¶ 209-11.

[53] Honig argues that "Riot's business alignment with an underlying asset that experienced volatile price movements is what caused the rises and falls of Riot stock price" and asserts that the "notion" that his group "could cause" a "swing in Riot's stock price is patently ludicrous."  Honig Br. 2, 19; *see also* Groussman Br. 1 (arguing "Riot's stock price roughly correlates with the price of

Riot asserts that the *Honig Action* "involve[ed] conduct entirely unrelated to Riot."  Riot Br. 35.  This argument is belied by the host of investors who believed otherwise and sold their shares, driving down the price of Riot's stock by 26.1%.  To the extent Riot suggests that the allegations in the *Honig Action* cannot be corrective of the scheme, that is not the law.  *See In re Bradley Pharm., Inc. Sec. Litig.*, 2006 WL 740793, at *5-6 (D.N.J. Mar. 23, 2006) (rejecting argument that disclosure of informal SEC inquiry could not be "corrective" of prior misrepresentation because it did not specifically mention the subject of the misrepresentation).[54, 55]

---

cryptocurrencies.").  Honig and Groussman ignore Riot's substantial, Company-specific price movements related to the disclosure of the Honig Group's scheme.  For example, upon the disclosure of the *Honig Action*, Riot's stock price fell by approximately ***26.1%*** from the closing price on September 6, 2018, to the closing price on September 7, 2018.  ¶¶ 465-66.  During that same time period, the price of Bitcoin fell by less than ***1%***.  *See* Ex. 7.

[54] Groussman argues that Plaintiff is not "entitled to an *Affiliated Ute* presumption" of reliance based on his "Schedule 13G filings" and "trading strategy."  Groussman Br. 28.  This "argument is unpersuasive" because Groussman "had a duty to 'promptly' disclose his sales of Riot's stock by filing an amended schedule with the SEC," *Riot I* at 39 n.18, yet Groussman failed to do so, ¶¶ 330-34.  Thus, for the same reasons that this Court found that Plaintiff has properly "invoked a presumption of reliance, under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-154 (1972)" against Honig, *see Riot I* at 39 n.18, this same presumption applies to Groussman and the other Defendants for their violations of Section 13(d), Items 403 and 404, and ASC 850.

[55] Groussman also argues that "none" of the Complaint's corrective "disclosures 'relate back' to [his] alleged misrepresentations," Groussman Br. 11, but ignores that the SEC's complaint in the *Honig Action* contained extensive allegations making clear to the market that Groussman, Honig, and O'Rourke were the same close group of co-investors with respect to Riot that had recently used the same pump-and-dump *modus operandi* at several other companies.  ¶¶ 227-31; *see, e.g.*, SAC Ex. A at ¶¶ 1-4, 79 (alleging Groussman, Honig, and O'Rourke engaged in pump-and-dump schemes at three public companies including by "engag[ing] in a series of coordinated trades" only "two minutes" apart "to enhance the false picture of an active market for the stock").  Similarly, Stetson argues that the Complaint "alleges zero 'corrective disclosures' regarding the existence of an investment group at Riot," Stetson Br. 11, but ignores that CNBC's February 16, 2018 exposé revealed numerous "red flags" that Honig was "manipulat[ing]" Riot's stock with the involvement of O'Rourke, DeFrancesco, and others.  ¶ 218.  That Stetson was part of this group became clear on September 7, 2018, when the SEC filed the *Honig Action*.  *See* SAC Ex. A.

### D.     The Complaint Adequately Pleads Count III (Violation of Section 20(a))

To plead a claim under Section 20(a), "plaintiffs must establish '(1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions.'" *Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256, at *4 (D.N.J. Mar. 2, 2016).  Claims under Section 20(a) are subject only to Rule 8's notice pleading standards.  *The Winer Family Trust v. Queen*, 2004 WL 2203709, at *22 (E.D. Pa. Sept. 27, 2004).  "[T]he 'overwhelming trend in this circuit' is that culpable participation does not have to be plead in order to survive a motion to dismiss." *Intelli-Check*, 274 F. Supp. 2d at 645; *see also Bing*, 2016 WL 827256, at *4 (same).

Here, O'Rourke and Beeghley were Riot's CEOs and, as such, had the authority to, and in fact did, frequently make public statements, sign SEC filings on Riot's behalf, and approve related-party transactions.  ¶¶ 177-78, 191, 345, 347, 357, 363, 368, 371, 376, 385, 394.  These allegations are adequate to plead the requisite control.  *Intelli-Check*, 274 F. Supp. 2d at 645.  DeFrancesco, Groussman, and Stetson also exercised control as members of the Honig Group, who represented an undisclosed control group that beneficially owned and controlled more than 55% of Riot's common stock during the Class Period.  *See* ¶¶ 351 n.78, 364 n.80, 372 n.81.[56]

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motions should be denied in their entireties.

---

[56] Honig argues that the Complaint alleges "nothing more than conclusory and purely speculative allegations" with respect to his control of Riot, Honig Br. 25, but ignores that through his leadership of a control group of 55%+ Selling Stockholders, he was able to engage in multiple lucrative related-party transactions, ¶¶ 183-201, and undisclosed stock sales, ¶¶ 310-23, which illegally generated at least ***$17 million*** for Honig, and which no retail shareholder could have accomplished without undisclosed control from inside the Company.  DeFrancesco similarly challenges the Complaint's Section 20(a) allegations, DeFrancesco Br. 17, but ignores that through her control, DeFrancesco was able to participate in the related-party Kairos Transaction and to thereby benefit from a ***$1,000,000*** payment from Riot to Kairos shareholders.  ¶ 197.

Dated:  March 25, 2021

Respectfully submitted,

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

By:  */s/ Joseph J. DePalma*
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Lead Plaintiff*
*Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Lead Plaintiff Dr. Stanley Golovac*
*and Lead Counsel for the Class*

David P. Abel
**US. MARKET ADVISORS LAW GROUP PLLC**
5335 Wisconsin Ave. NW, Ste. 440
Washington, D.C.  20015
202-274-0237 Telephone
202-686-2877 Facsimile
dabel@usmarketlaw.com

*Counsel for Lead Plaintiff Dr. Stanley Golovac*