# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated,<br><br>           Plaintiff,<br><br>   v.<br><br>RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY G. McGONEGAL,<br><br>          Defendants. | Civil No. 3:18-CV-02293(FLW)(ZNQ)<br><br>MOTION DATE:  May 3, 2021<br><br>**ORAL ARGUMENT REQUESTED** |

## REPLY IN SUPPORT OF RIOT BLOCKCHAIN INC.'S MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

THOMAS A. ZACCARO
*thomaszaccaro@paulhastings.com*
D. SCOTT CARLTON
*scottcarlton@paulhastings.com*
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071-2228
Telephone:  1(213) 683-6000
Facsimile:  1(213) 627-0705

CHAD J. PETERMAN
*chadpeterman@paulhastings.com*
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone:  1(212) 318-6000
Facsimile:  1(212) 319-4090

*Attorneys for Defendants*
*RIOT BLOCKCHAIN, INC., JOHN O'ROURKE, AND MICHAEL BEEGHLEY*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..........................................................................1

II.     THE SECTION 10(B) CLAIM SHOULD BE DISMISSED........................2

     A.      Riot Did Not Fail to Disclose a Section 13(d) Group Pursuant to Item 403 of Regulation S-K .....................................................2

           1.      The SAC Does Not Allege That Riot Was Aware of the Purported Group's Section 13(d) Activities ..............................2

           2.      The SAC Does Not Sufficiently Allege the Existence of Any Section 13(d) Group at Riot.................................................3

     B.      Riot Did Not Make Any False or Misleading Statements or Omissions Regarding Related-Party Transactions.............................9

           1.      The March 2017 Private Placement...........................................9

           2.      The Coinsquare and Kairos Transactions ................................12

           3.      The December 2017 Private Placement....................................14

     C.      The SAC Does Not Allege That Riot Acted with Scienter...............14

     D.      The SAC Does Not Allege Loss Causation ....................................15

           1.      The January 31, 2018 *Wall Street Journal* Article .................15

           2.      The February 16, 2018 *CNBC* Article ....................................17

           3.      Riot's Form 10-K for FY 2017 ................................................18

           4.      Riot's May 25, 2018 Form 8-K ...............................................20

           5.      The SEC's Filing of the *Honig* Action ...................................20

     E.      Lead Plaintiff Does Not Adequately Allege a "Scheme Liability" Claim Against Riot ........................................................21

III.     CONCLUSION...........................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Biofrontera AG v. Deutsche Balaton AG*,
  No. 18 Civ. 5237 (LAP), 2020 WL 1489788 (S.D.N.Y. Mar. 27,
  2020) ......................................................................................................... 3

*In re Bristol-Myers Squibb Sec. Litig.*,
  No. CIV.A. 00-1990(SRC),
  2005 WL 2007004 (D.N.J. Aug. 17, 2005) ....................................................... 22

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ............................................................................ 2

*Burt v. Maasberg*,
  CIV. A. No. ELH-12-0464, 2013 WL 1314160 (D. Md. Mar. 31,
  2013) ......................................................................................................... 9

*Chechele v. Scheetz*,
  819 F. Supp. 2d 342 (S.D.N.Y. 2011), *aff'd*, 466 F. App'x 39 (2d
  Cir. 2012) ......................................................................................................... 6

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
  713 F. Supp. 2d 378 (D. Del. 2010), *aff'd*, 442 F. A'ppx 672 (3d
  Cir. 2011) ......................................................................................................... 15

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
  654 F.3d 276 (2d Cir. 2011) .............................................................................. 8

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) .......................................................................................... 12

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  43 F. Supp. 3d 369 (S.D.N.Y. 2014), *aff'd sub nom. Lowinger v.
  Morgan Stanley & Co. LLC*, 841 F.3d 122 (2d Cir. 2016) .................................. 8

*In re Galena Biopharma, Inc. Sec. Litig.*,
  Civ. A. No. 17-929, 2021 WL 50227 (D.N.J. Jan. 5, 2021) ............................... 22

*Gordon v. Royal Palm Real Est. Inv. Fund I, LLLP*,
  No. 09-11770, 2020 WL 2836312 (E.D. Mich. May 31, 2020) ......................... 23

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
  95 F. Supp. 2d 169 (S.D.N.Y. 2000) ...................................................4

*Kelley v. Rambus, Inc.*,
  No. C 07-1238 JF (HRL), 2008 WL 5170598 (N.D. Cal. Dec. 9,
  2008), *aff'd*, 384 F. App'x 570 (9th Cir. 2010) .................................19

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) .............................................................17

*Lerner v. Millenco, L.P.*,
  23 F. Supp. 2d 337 (S.D.N.Y. 1998) ..................................................5

*Litzler v. CC Invs., L.D.C.*,
  411 F. Supp. 2d 411 (S.D.N.Y. 2006) .................................................7

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*,
  223 F. Supp. 2d 435 (S.D.N.Y. 2001) .............................................4, 8

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020) ...............................................11

*Lorenzo v. SEC*,
  139 S. Ct. 1094 (2019).................................................................23, 24

*Martin v. GNC Holdings, Inc.*,
  No. 2:15-cv-01522, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017),
  *aff'd*, 757 F. A'ppx 151 (3d Cir. 2018)..............................................21

*McCabe v. Ernst & Young, LLP*,
  494 F.3d 418 (3d Cir. 2007) .............................................................22

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  568 F. Supp. 2d 349 (S.D.N.Y. 2008) ...............................................16

*Miller Inv. Tr. v. Morgan Stanley & Co., LLC*,
  308 F. Supp. 3d 411 (D. Mass. 2018).................................................22

*Morales v. Quintel Entm't, Inc.*,
  249 F.3d 115 (2d Cir. 2001) ...............................................................4

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ..................................................20

*Puddu v. 6D Glob. Techs., Inc.*,
  No. 15-CV-8061 (AJN), 2021 WL 1198566 (S.D.N.Y. Mar. 30,
  2021) ...............................................................................................24

*Rubenstein v. Int'l Value Advisers, LLC*,
  363 F. Supp. 3d 379 (S.D.N.Y. 2019), *aff'd*, 959 F.3d 541 (2d Cir.
  2020) .................................................................................................4

*Salvani v. ADVFN PLC*,
  50 F. Supp. 3d 459 (S.D.N.Y. 2014), *aff'd sub nom. Salvani v.
  InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015)...........21, 22

*SEC v. First City Fin. Corp., Ltd.*,
  688 F. Supp. 705 (D.D.C. 1988), *aff'd*, 890 F.2d 1215 (D.C. Cir.
  1989) ..................................................................................................5

*SEC v. Jammin Java Corp.*,
  No. 2:15-CV-08921-SVW-MRW, 2016 WL 6595133 (C.D. Cal.
  July 18, 2016)......................................................................................5

*SEC v. Rio Tinto PLC*,
  No. 17 Civ. 7994, 2021 WL 818745 (S.D.N.Y. Mar. 3, 2021) .........23

*Stephens v. Uranium Energy Corp.*,
  Civ. A. No. H-15-1862, 2016 WL 3855860 (S.D. Tex. July 15,
  2016) ................................................................................................11

*Texasgulf, Inc. v. Can. Dev. Corp.*,
  366 F. Supp. 374 (S.D. Tex. 1973) .....................................................7

*Torchmark Corp. v. Bixby*,
  708 F. Supp. 1070 (W.D. Mo. 1988) ...................................................9

*Unite Here v. Cintas Corp*,
  No. 06 CIV 7061 (DLC), 2006 WL 2859279 (S.D.N.Y. Oct. 6,
  2006) ...........................................................................................13, 14

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) ................................................................12

*Warren v. Fisher*,
  CIV. A. No. 10-5343, 2013 WL 1164492 (D.N.J. Mar. 19, 2013) ......................2

**Statutes**

PSLRA ...............................................................................................................1, 5

**Other Authorities**

17 C.F.R.
  § 229.403(a) .......................................................................................................2
  § 229.404(a) .................................................................................................13, 14
  § 240.13d-101 ....................................................................................................6

Rule
  R. 10b-5(a) ...................................................................................................23, 24
  R. 10b-5(c) ...................................................................................................23, 24
  R. 15 ...................................................................................................................1

## I.   __INTRODUCTION__

Lead Plaintiff's Opposition fails to rescue the deficiently pled claims in the

SAC.[1]   Critically, Lead Plaintiff is unable to establish:

- Riot failed to disclose a Section 13(d) group pursuant to Item 403 of Regulation S-K because (i) Riot knew that there was a Section 13(d) group at the Company and (ii) that such a group even existed at Riot;

- Riot failed to disclose any related-party transactions requiring disclosure under Item 404 of Regulation S-K;

- Riot acted with scienter;

- loss causation; and

- Riot committed a manipulative or deceptive act to defraud investors.[2]

The Court should therefore again dismiss Lead Plaintiff's claims against Riot, but

this time with prejudice.[3]

---

[1] Riot uses the defined terms set forth in their Motion (*see* Dkt. No. 192-1.)  Riot refers to Lead Plaintiff's Omnibus Memo. of Law in Opposition to Defendants' Motions to Dismiss the SAC (Dkt. No. 201) herein as the "Opposition" or "Opp."

[2] O'Rourke and Beeghley filed a separate motion to dismiss against the SAC to address Lead Plaintiff's scienter allegations against them, and have filed a separate reply brief in support of this motion.  Riot hereby incorporates by reference the arguments made in Messrs. O'Rourke and Beeghley's separately filed reply brief.  Honig, Groussman, Stetson, and DeFrancesco are separately represented defendants.

[3] Throughout his Opposition, Lead Plaintiff relies on Hon. Zahid N. Quraishi's opinion regarding Lead Plaintiff's motion for leave to file the SAC.  Respectfully, Hon. Quraishi's opinion was premised on the more liberal Rule 15 standard and is not binding on the Court's analysis of the Motion to Dismiss, which should be decided on a *de novo* basis.  *Warren v. Fisher*, CIV. A. No. 10-5343 (JBS/KMW), 2013 WL 1164492, at *1 (D.N.J. Mar. 19, 2013) (rejecting argument that

## II.     THE SECTION 10(B) CLAIM SHOULD BE DISMISSED

### A.     Riot Did Not Fail to Disclose a Section 13(d) Group Pursuant to Item 403 of Regulation S-K

#### 1.     The SAC Does Not Allege That Riot Was Aware of the Purported Group's Section 13(d) Activities

Lead Plaintiff concedes that issuers, like Riot, are only required to disclose any Section 13(d) groups "who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities." (17 C.F.R. § 229.403(a); Opp. at 22.)  Although Lead Plaintiff argues that Riot knew that some members of the Honig Group acted as a Section 13(d) group, the SAC does not include the required details of Riot's alleged knowledge of the group's concerted activities at the Company, such as when or how either O'Rourke or Beeghley participated in, or knew of, the group's activities at Riot.[4]  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997) (holding that, at minimum, the requirement that scienter be pleaded with particularity requires plaintiffs to allege the "who, what, when, where, and how" of the fraud at issue).  Indeed, Lead Plaintiff admits that Honig, DeFrancesco, Groussman, and Stetson all failed to file Schedule 13Ds that would have disclosed their purported

---

magistrate judge's decision to permit amendments to a complaint are binding on a motion to dismiss that complaint).

[4] Since Lead Plaintiff can only establish Riot's corporate knowledge of wrongdoing through O'Rourke and Beeghley, Riot incorporates by reference the arguments in O'Rourke and Beeghley's reply briefs addressing scienter.

"group" status, which would have appropriately alerted Riot about the issue.[5]
(Opp. at 26; *see Biofrontera AG v. Deutsche Balaton AG*, No. 18 Civ. 5237 (LAP),
2020 WL 1489788, at *7 (S.D.N.Y. Mar. 27, 2020) (describing Section 13(d) as an
alert system forcing investors to report disclosing information to issuers).)
Consequently, Lead Plaintiff fails to allege that Riot violated Item 403 by failing to
disclose a Section 13(d) group.

### 2. The SAC Does Not Sufficiently Allege the Existence of Any Section 13(d) Group at Riot

Lead Plaintiff's Section 10(b) claim (premised on a purported violation of
Item 403) also fails because he does not allege the existence of any Section 13(d)
group at Riot.  Instead, the SAC relies on (1) allegations regarding the purported
Honig Group's activities at companies *other than Riot*; (2) allegations that other
selling shareholders—not any of the Honig Group members—had coordinated
their trades of Riot's stock; (3) allegations that DeFrancesco and Honig had
nominated O'Rourke, Stetson, Beeghley, and others to the board of Riot; and (4)
allegations that Honig, O'Rourke, and Stetson had shared an office and met during
the Class Period.  None of these allegations, however, establish the existence of
any investor group at Riot requiring disclosure under Item 403.  *See Rubenstein v.*

---

[5] As an issuer, Riot did not need to file a Schedule 13D, and Lead Plaintiff does not allege that O'Rourke nor Beeghley had any obligation to file their own Schedule 13Ds.  Thus, Honig, DeFrancesco, Groussman, and Stetson are the only purported Honig Group members that had any obligation to file Schedule 13Ds that would have disclosed the existence of a Section 13(d) group to Riot.

*Int'l Value Advisers, LLC*, 363 F. Supp. 3d 379, 390 (S.D.N.Y. 2019) (holding that the definition of a Section 13(d) group requires a plaintiff to allege that the parties had acted together for the purpose of acquiring, holding, voting, or disposing of the relevant issuer's common stock), *aff'd*, 959 F.3d 541 (2d Cir. 2020).

First, the SAC leans heavily on allegations regarding certain members of the purported Honig Group members' activities at companies other than Riot.  (*See* SAC ¶¶ 93–95, 96, 293, 294.)  Lead Plaintiff insists that the existence of a Section 13(d) group can be shown by allegations of prior relationships and trading patterns.  (Opp. at 24–25.)  But Lead Plaintiff misconstrues the law.  None of the cases relied upon by Lead Plaintiff have determined that prior relationships alone are sufficient to allege the existence of a group.  *See Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 449 (S.D.N.Y. 2001) (finding allegations that defendants had (1) jointly invested in companies in the past; (2) used the same law firm to represent them; and (3) engaged the same fraudulent conduct with similar transactions at other companies to be insufficient to allege the existence of a Section 13(d) group).[6]  These cases instead show that courts have considered prior

---

[6] *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 126 (2d Cir. 2001) (considering evidence that defendants had all entered into a lock-up agreement for their shares with the issuer and deposited those shares on the same date with the same trustee and concluding that "this is not a case in which the assertion of existing shareholder rights or a mere business relationship is alleged as a basis for group membership" at summary judgment) (citation omitted); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 175 (S.D.N.Y. 2000)

relationships only in addition to—and not in lieu of—specific allegations regarding the purported group members' activities at the issuer.

Second, Lead Plaintiff argues that that certain members of the Honig Group, together with selling stockholders, had "***coordinated their trading in Riot down to the single share*** . . . ." (Opp. at 7–8 (emphasis in the original).) Instead of providing any specific allegations of the purported group members' coordinated trades, Lead Plaintiff vaguely concludes that Honig, DeFrancesco, Groussman, and Stetson all "sold the bulk of their shares during the Class Period . . . ."[7] (Opp. at

_____

(considering defendant's own admissions in a separate state action it filed against the plaintiff afforded a "clear and persuasive basis for plaintiff's assertion that [defendant's] goal is to capture control of [plaintiff]" for purposes of a Section 13(d), but not Section 10(b), claim); *Lerner v. Millenco, L.P.*, 23 F. Supp. 2d 337, 344 (S.D.N.Y. 1998) (pointing to allegations that the defendants had divested shares of the issuer in the exact same percentages over the same time period). Lead Plaintiff also relies on cases brought by the SEC, a party that is not subject to the rigors of the PSLRA, which still rely on specific allegations and evidence regarding the group's concerted activities at the issuer. *See SEC v. First City Fin. Corp., Ltd.*, 688 F. Supp. 705, 724 (D.D.C. 1988) ("Commission [was] not merely relying on the relations between [defendants] . . . . It has proffered extensive and concrete evidence showing that [defendant] intended to commence a takeover effort . . . and had reached an understanding . . . to begin accumulating stock towards achieving this goal."), *aff'd*, 890 F.2d 1215 (D.C. Cir. 1989); *SEC v. Jammin Java Corp.*, No. 2:15-CV-08921-SVW-MRW, 2016 WL 6595133, at *19 (C.D. Cal. July 18, 2016) (finding that plaintiff sufficiently alleged a Section 13(d) group because plaintiff showed that defendants' trades coincided with similar sales from other group members, among other facts that were specific to the issuer). In fact, these cases all underscore the SAC's lack of specific allegations regarding the purported Honig Group's concerted activities at Riot.

[7] Lead Plaintiff faults DeFrancesco, Groussman, and Stetson for failing to timely file Schedule 13Ds, which could provide additional trading information. (Opp. at 27.) Even so, their purported failure to file Schedule 13Ds is wholly unconnected

27.)  However, the SAC provides trading data from Honig and O'Rourke, and Riot

stock ownership data for Groussman, DeFrancesco, and Stetson, that demonstrates

that their trades were highly divergent within this time frame.[8]  Lead Plaintiff's

vague allegations that are contradicted by the SAC cannot show the purported

Honig Group members' coordinated trades of Riot stock.  *See Chechele v. Scheetz*,

819 F. Supp. 2d 342, 350 (S.D.N.Y. 2011) (dismissing with prejudice plaintiff's

Section 13(d) claim for failing to allege defendants' coordinated activity with

specificity), *aff'd*, 466 F. App'x 39 (2d Cir. 2012); *Texasgulf, Inc. v. Can. Dev.*

*Corp.*, 366 F. Supp. 374, 404–05 (S.D. Tex. 1973) ("Without some indication of

concerted activity . . . this Court is compelled to find that no group exists within

the meaning of Section 13(d).").

Lead Plaintiff's reliance on "selling stockholders" coordinated trades is

similarly unavailing.  (Opp. at 7–8.)  These selling stockholders are not members

to Riot's conduct.  It is the investor's—not the issuer's—duty to file a Schedule
13D.  *See* 17 CFR § 240.13d-101.  Moreover, Lead Plaintiff does not specifically
allege that O'Rourke or Beeghley were involved in DeFrancesco, Groussman, or
Stetson's purported failure to timely file Schedule 13Ds.

[8] *See* SAC ¶ 330 (showing Groussman's purchases of stock from April 2017 to
September 2017, and sales occurring in October 2017 and January 2018); *id.* ¶ 337
(describing DeFrancesco's purchases from September 2016 to January 2017, then a
sale in January 2018); *id.* ¶ 342 (alleging that Stetson had kept his holdings steadily
from April 2017 until September 2017); *see also id.* ¶ 316 (claiming that Honig
had steadily sold Riot stock from March 2017 until October 2017, then had made a
few large purchases of stock in October and November 2017); *id.* ¶ 444 (alleging
that O'Rourke had sold shares in December 2017); *see generally id.* ¶¶ 299–303
(containing no allegations that Beeghley had sold or acquired any Riot shares).

of the Honig Group and thus cannot show the purported Honig Group's coordinated trades. *See Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 415 (S.D.N.Y. 2006) ("General allegations of parallel investments by institutional investors do not suffice to plead a 'group.'") (citation omitted). Moreover, these selling stockholders have, at most, a tangential relationship with any of the purported Honig Group members.[9]

Third, Lead Plaintiff also fails to provide any specific allegations of any coordination among the purported group members' voting at Riot. Lead Plaintiff argues that the allegation that Honig had requested that Riot's Board of Directors hold a shareholder meeting, and nominated O'Rourke, Stetson, and Beeghley, among others, to Riot's Board, and DeFrancesco's joining in this request, shows the Honig Group's coordination of votes at Riot. (Opp. at 27 n.17.) However, the allegation that Honig and DeFrancesco agreed on who should be nominated to Riot's Board does not mean they had a preexisting intention to coordinate votes when they made their nomination. Indeed, it would merely show they were "similarly situated in goals or interests," which is insufficient to plead the existence

---

[9] For instance, Lead Plaintiff touts Riot's Form S-3/A filed on April 20, 2017, which showed Robert O'Braitis and JAD Capital both owning 1.48% of Riot's common stock. (SAC ¶ 352.) Lead Plaintiff concludes that this is an example of coordinated trades by the Honig Group because JAD Capital is owned by Jason Theofilos, the CEO of MundoMedia Ltd., and Honig, O'Rourke, Stetson, and Groussman had invested in MundoMedia. (*Id.*) In Lead Plaintiff's other examples, the selling stockholders' connection to any of the purported members of the Honig Group are even more attenuated. (*See* SAC ¶¶ 373-74, 377, 383, 386.)

of a Section 13(d) group. *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 43 F. Supp. 3d 369, 376 (S.D.N.Y. 2014), *aff'd sub nom. Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122 (2d Cir. 2016); *see CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 284 (2d Cir. 2011) ("Even if many of the parties' 'activities' were the result of group action, two or more entities do not become a group within the meaning of section 13(d)(3) unless they 'act as a group for the purpose of acquiring . . . securities of an issuer.'") (quoting 15 U.S.C. 78m(d)(3)). Nor would it suggest that any of the rest of the purported Honig Group members had coordinated votes at Riot either.[10]

Fourth, Lead Plaintiff's claim that O'Rourke, Honig, and Stetson had shared an office and met during the Class Period also is insufficient to support that they acted as a Section 13(d) group at Riot. (Opp. at 26.)  Again, without any specific allegations regarding how O'Rourke, Honig, and Stetson acted together to further a common objective to acquire, hold, vote, or dispose of Riot securities, the generalized allegation that they had a business relationship to one another is not sufficient to allege their involvement with a Section 13(d) group at Riot.  *See Torchmark Corp. v. Bixby*, 708 F. Supp. 1070, 1083 (W.D. Mo. 1988); *Burt v. Maasberg*, CIV. A. No. ELH-12-0464, 2013 WL 1314160, at *18 (D. Md. Mar. 31,

---

[10] Lead Plaintiff also asserts that Honig, O'Rourke, Stetson, and Beeghley shared the same counsel at this time.  (Opp. at 27 n.17.)  Even if they did share the same counsel, it still would not suggest that they were part of a Section 13(d) group at Riot.  *Promethean*, 223 F. Supp. 2d at 449.

2013) ("*Burt I*")[11] (finding that allegations were not sufficient to establish the existence of a Section 13(d) group even though the defendants allegedly (1) held daily conference calls to discuss and make decisions on their investments, (2) stated that they had jointly managed their investments, (3) were all members of the same family, and (4) were business partners in other investments besides the issuer).

### B.   Riot Did Not Make Any False or Misleading Statements or Omissions Regarding Related-Party Transactions

#### 1.   The March 2017 Private Placement

Although Lead Plaintiff concedes that Riot disclosed that a buyer in the March 2017 private placement had a "prior substantial pre-existing relationship" with Riot, Lead Plaintiff argues the disclosure was too vague.  (Opp. at 47–48.)

---

[11] Lead Plaintiff argues that the district court's later decision finding that the plaintiff's Section 13(d) claims were adequately plead in an amended complaint supports his reliance on the generalized allegations regarding the Honig Group's prior relationships.  (Opp. at 29 (citing *Burt v. Maasberg*, CIV. A. No. ELH-12-0464, 2014 WL 1291834, at *18 (D. Md. Mar. 28, 2014) ("*Burt II*")).)  However, in *Burt II*, the court found that the plaintiff rectified their previously deficient complaint by including specific allegations as to how the defendants purportedly worked together to depress the value of the company, including specific actions and statements by the "leader" to control and direct the activities of the group as to the company, and even specific admissions by a defendant to the plaintiff that he required another defendant's direction on how to structure a deal regarding the company.  *See id.* at **9–10, 18–19; *see also id.* at *20 ("Although a 'smoking gun' is not required to plead the existence of a group, plaintiffs included one in the Amended Complaint.").  By contrast, the SAC's allegations regarding the purported Honig Group's coordinated activities at Riot are less specific than those dismissed by *Burt I*, and come nowhere close to the specificity of the allegations that were determined to be adequately plead in *Burt II*.

Lead Plaintiff relies a form accredited investor questionnaire that was attached as an exhibit to a Securities Purchase Agreement ("SPA").  (*Id.*)  Since the form questionnaire was blank, Lead Plaintiff concludes that Riot's disclosure was inadequate.  (*Id.*)  The argument is unavailing.

The SPA explicitly disclosed that the purchaser had a substantial pre-existing relationship with Riot.  The blank-form questionnaire that was attached to the Agreement was exactly what it appeared to be—a blank template that the purchaser would complete at a future time.  (*See generally*, Declaration of D. Scott Carlton in Support of Riot's Reply Brief ("Carlton Reply Decl."), filed concurrently herewith, Ex. A (attaching Ex. 10.1 of Bioptix's March 16, 2017 Form 8-K).)

Lead Plaintiff also claims that Riot's disclosure was deficient because it does not disclose the identity of Honig as the related party.  (Opp. at 46.)  Rather than addressing with precedent showing that Honig's name is immaterial, Lead Plaintiff asserts, without explanation, that "it is hard to think of anything more material than Honig's identity," and that materiality is "rarely appropriate for resolution on a motion to dismiss."  (*Id.*)  However, Lead Plaintiff ignores the fact that the Court can (and should) consider Riot's purported failure to disclose Honig's name immaterial at this stage of the litigation.  *See Stephens v. Uranium Energy Corp.*,

Civ. A. No. H-15-1862, 2016 WL 3855860, at *21 (S.D. Tex. July 15, 2016)[12]

(holding that the omission of the name of the related party from defendant's Item

404 disclosure was immaterial, and granting defendant's motion to dismiss with

prejudice); *see Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 794 (S.D.N.Y.

2020) (finding defendant's later disclosure identifying the previously unnamed

principal shareholder in a related-party transaction rendered defendant's initial

failure to identify the shareholder immaterial, and granting defendants' motion to

dismiss).

In any event, even if Riot's disclosures concerning the March 2017 private

placement were somehow deficient, Lead Plaintiff cannot establish reliance, an

essential element to any Section 10(b) claim.  *See Dura Pharms., Inc. v. Broudo*,

544 U.S. 336, 341–42 (2005) (enumerating elements of Section 10(b) violations).[13]

Honig was publicly identified as the investor who participated in the March 2017

---

[12] Lead Plaintiff attempts to distinguish *Stephens* by claiming that the district court's decision specifically involved a Form 10-Q that contained an "Item 404 disclosure."  (Opp. at 46, n.40.)  This is erroneous, and elevates form over substance.  The court's analysis in *Stephens* focused on the materiality of the related party's name—and not on whether the disclosure was prefaced by a heading which identified it as an "Item 404 disclosure."  And to that end, the court rejected the plaintiff's argument that by failing to disclosing the family members name it prevented investors from learning that the related-party transactions were part of a longstanding fraudulent effort to inflate the company's stock as too conclusory and speculative.  *Stephens*, 2016 WL 3855860, at *21.

[13] Notably, the Opposition does not address Lead Plaintiff's failure to allege reliance on any purported misstatements or omissions in Riot's March 16, 2017 Form 8-K.

private placement by as early as July 19, 2017.  (*See* Declaration of D. Scott Carlton In Support of Riot's Motion to Dismiss (Dkt. No. 192-2) ("Carlton MTD Decl."), Ex. C at 2–4.)  Lead Plaintiff began purchasing Riot stock in December 2017—nearly *five months* after it was publicly disclosed that Honig was the related party in the March 2017 private placement.  (*See* Decl. of Joseph J. DePalma In Support of Dr. Stanley Golovac's Motion for Appointment As Lead Plaintiff (Dkt. No. 17-2).)  Consequently, Lead Plaintiff cannot state a claim concerning the March 2017 private placement as a matter of law.  *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 650 (E.D. Pa. 2015).

### 2.    The Coinsquare and Kairos Transactions

Lead Plaintiff contends that Riot was required to disclose that the Coinsquare and Kairos transactions involved related parties under Item 404 of Regulation S-K, even though both transactions fell under Item 404's materiality threshold set forth under Instruction 6.[14]  (Opp. at 49–50.)  Lead Plaintiff argues that the Instructions to Item 404 should be disregarded, but even if the Instructions are relevant, Lead Plaintiff suggests that the Instructions actually require the disclosure of less than ten-percent interest in a party to the transaction.  (*Id.*)  Since the Instructions only make reference to an "indirect material interest," Lead

---

[14] According to the SAC, Honig, Groussman, and Stetson each had less than a ten percent interest in Coinsquare, and Honig and DeFrancesco each had less than a ten percent interest in Kairos.  (*See* SAC ¶¶ 193, 198.)

Plaintiff contends that Riot was still required to disclose Honig and DeFrancesco's "direct material interests" that fall below the ten-percent threshold.  (*Id.*)

Lead Plaintiff's interpretation of Item 404 is plainly contradicted by law. *See Unite Here v. Cintas Corp*, No. 06 CIV 7061 (DLC), 2006 WL 2859279, at *6 (S.D.N.Y. Oct. 6, 2006) (interpreting Instructions 6 and 8 of 17 C.F.R. § 229.404(a) as not requiring disclosure of less than ten-percent equity interest in a party to the transaction).  Whether Honig and DeFrancesco received shares directly from an issuer or indirectly through an intermediary is irrelevant, since the threshold requirement of Instruction 6 of Item 404 focuses on the total amount of shares Honig and DeFrancesco owned in the entity receiving money from the issuer.  *See id.*; 17 C.F.R. § 229.404(a).  As such, Riot was not required to disclose that the Coinsquare and Kairos transactions involved related parties under Item 404.[15]

Furthermore, Lead Plaintiff's assertion that the value of Honig and DeFrancesco's shares in Kairos exceeded $120,000 is unavailing.  Again, Item 404

---

[15] Item 404 does not require the disclosure of ***all*** related-party transactions; it only requires the disclosure of related-party transactions that exceed $120,000, and that involve a direct or indirect material interest.  Nevertheless, Riot voluntarily disclosed that the Coinsquare and Kairos transactions involved related parties. Lead Plaintiff contends that Riot's voluntary disclosures show that Item 404 required the Company to disclose that the Coinsquare and Kairos transactions were related-party transactions at an earlier date.  (Opp. at 50, n.43.)  This is nonsensical, because both the Coinsquare and Kairos transactions did not meet the materiality threshold of Item 404 and thus did not require disclosure.

only requires the disclosure of related-party transactions that involve an amount that exceeds $120,000 **and** where the related party has a direct or indirect material interest (which is in turn defined by Instruction 6 of Item 404).  17 C.F.R. § 229.404(a).  The Court should reject Lead Plaintiff's attempt to conflate the two threshold requirements of Item 404.

### 3.   The December 2017 Private Placement

Like the March 2017 private placement, Riot adequately disclosed that the December 2017 private placement involved related parties.  Riot disclosed the SPA for the December 2017 private placement, which provided that a buyer with a "substantial pre-existing relationship" with Riot was involved in the transaction. (Carlton Reply Decl., Ex. B (attaching Exhibit 10.1 of Riot's Form 8-K filed on Dec. 19, 2017) at 11.)  Then, on April 17, 2018, Riot identified both Honig and DeFrancesco as participants in the December 2017 private placement in the Company's Form 10-K for FY 2017.  (*See* Carlton MTD Decl., Ex. E, at 73.)[16]

### C.   The SAC Does Not Allege That Riot Acted with Scienter

For the same reasons argued in O'Rourke and Beeghley's concurrently filed Reply in support of their Motion to Dismiss, Lead Plaintiff fails to allege that O'Rourke and Beeghley acted with scienter.  *See City of Roseville Emps.' Ret. Sys.*

---

[16] Unlike the March 2017 private placement, the SPA for the December 2017 private placement did not contain any form accredited questionnaire.  (*See generally*, Carlton Reply Decl., Ex. B.)

*v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 403 (D. Del. 2010) (dismissing claims against a corporate defendant for lack of scienter, where the plaintiff failed to plead that any of the company's officers acted with scienter), *aff'd*, 442 F. A'ppx 672 (3d Cir. 2011).[17]

### D.    The SAC Does Not Allege Loss Causation

Finally, even if Lead Plaintiff sufficiently alleges that Riot made an actionable omission or misrepresentation while acting with scienter, the Court should still dismiss the SAC for failure to adequately allege loss causation.  Lead Plaintiff instead relies on purported "corrective disclosures" that do not reveal an alleged misstatement's falsity or reveal that material information has been omitted, followed by a negative reaction by the market.  (Opp. at 51; *see In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 365 (S.D.N.Y. 2008) (dismissing Section 10(b) claim for failing to plead loss causation after determining that plaintiff failed to show that the drop in share prices were proximately caused by disclosure of fraud).)

### 1.    The January 31, 2018 *Wall Street Journal* Article

Lead Plaintiff claims *The Wall Street Journal*'s January 31, 2018 article—which only discussed Honig's sale of 500,000 shares of Riot and that Riot had adjourned its annual shareholder meeting—shows loss causation because it

---

[17] O'Rourke and Beeghley are former officers of Riot.  The SAC does not accuse any other Riot officer (former or current) of any wrongdoing.

revealed Riot's involvement with the purported Honig Group's fraudulent scheme, followed by a drop in Riot's stock price.  (Opp. at 51–52.)  This article, however, cannot serve as a corrective disclosure since it does not reveal to the market the falsity of any of Riot's prior statements.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) (dismissing plaintiffs' corrective disclosure allegations for failing to provide the necessary "causal link" between defendant's purported fraud and plaintiffs' losses).  Riot had no obligation to disclose Honig's trades.  Nor does the SAC allege that Riot made any false or misleading statements about its shareholder meeting.

Lead Plaintiff's reliance on *The Wall Street Journal* article is not rescued by the "materialization of the risk" theory.  (*See* Opp. at 53.)  Pleading loss causation under the materialization of risk theory requires that the newly revealed information must have been "previously concealed and fall within the 'zone of risk' concealed so that the events were foreseeable consequences of the fraud." *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 475 (S.D.N.Y. 2014), *aff'd sub nom. Salvani v. InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015) (citation omitted).  Here, the new information purportedly revealed by *The Wall Street Journal*—that Honig sold 500,000 shares of Riot stock and Riot adjourned its shareholder meeting—was not previously concealed by Riot because it had no obligation to disclose this information.  *Id.* at 476 (holding plaintiffs failed to plead

loss causation under a materialization of risk theory when they failed to identify a risk that was previously concealed).

Moreover, a reasonable investor reading the article would not suspect that Riot's previously-filed Forms S-3 and 10-K violated Item 403 by failing to disclose a Section 13(d) group, and that failure to disclose was somehow tied to the purported loss.  *See Miller Inv. Tr. v. Morgan Stanley & Co., LLC*, 308 F. Supp. 3d 411, 448 (D. Mass. 2018) (dismissing loss causation arguments because plaintiff's material risk theory failed to demonstrate a sufficient causal relationship between the omission and the loss).  In fact, none of the cases cited by Lead Plaintiff support his attempt to use the materialization of risk theory to allege loss causation by revealing a "risk" that is unconnected with the fraud at issue.[18]

### 2.   The February 16, 2018 *CNBC* Article

Lead Plaintiff contends that a February 16, 2018 *CNBC* article—which the Court had already determined was not a corrective disclosure (*see* Opinion at 19–

---

[18] *See In re Galena Biopharma, Inc. Sec. Litig.*, Civ. A. No. 17-929, 2021 WL 50227, at *8 (D.N.J. Jan. 5, 2021) (finding that plaintiffs failed to adequately allege the risk of a company's liability materialized when the company's former CEO, President, and member of the board of directors resigned without admitting to any wrongdoing, even though plaintiffs claimed that his resignation revealed the risk of the company's involvement in a criminal investigation); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 438 (3d Cir. 2007) (affirming district court's summary adjudication that the plaintiffs failed to create a genuine issue as to loss causation); *In re Bristol-Myers Squibb Sec. Litig.*, No. CIV.A. 00-1990(SRC), 2005 WL 2007004, at *22 (D.N.J. Aug. 17, 2005) (finding that the corrective disclosure does more than "touch upon" the fraud, and relates to the fraud directly).

21)—is a corrective disclosure because it reveals "previously unknown facts tying together O'Rourke, Honig, Kesner, Paradox, Kairos, and Laxague," and how Honig's selling were buried "deep in the footnotes of Riot filings . . . ." (Opp. at 56.) But these facts are unconnected to any allegations of fraud. The Kairos Transaction was not a related-party transaction requiring disclosure, so any "connections" revealed regarding the transaction cannot serve as a corrective disclosure. (*See supra*, Section III(B)(2).) Similarly, Riot had no obligation to disclose the purported connections between O'Rourke, Honig, Kesner, Paradox, Kairos, and Laxague. (*See id.*, Section III(A)(1).) In fact, the *CNBC* article itself relies on previously disclosed facts because it observes that Riot disclosed Honig's trades in the footnotes of the Company's SEC filings. (Opp. at 56.) The *CNBC* article thus cannot serve as a corrective disclosure.

### 3.   Riot's Form 10-K for FY 2017

On April 17, 2018, Riot filed a Form 10-K for FY 2017, which identified Honig as the related party who had participated in the March 2017 private placement, identified DeFrancesco and Honig as the related parties who had participated in the December 2017 private placement, and noted that the Coinsquare and Kairos transactions involved related parties. (SAC ¶¶ 188–95, 201.) Lead Plaintiff believes that this Form 10-K is a corrective disclosure, since it disclosed for the first time that "members of the Honig Group had been related

parties" to those transactions.  (Opp. at 56.)  But this Form 10-K cannot serve as a corrective disclosure for any misrepresentation or omission, since Riot had already previously disclosed that the March 2017 and December 2017 private placements involved related parties, and the Coinsquare and Kairos transactions were not related-party transactions requiring disclosure under Item 404.  (*See supra*, Section III(B).)

Moreover, Lead Plaintiff's own prior pleadings contradicts the notion that Riot's Form 10-K for FY 2017 can serve as a corrective disclosure.  Previously, Lead Plaintiff alleged that the Form 10-K was a corrective disclosure because it disclosed that Riot had received a SEC subpoena, and Riot's stock price fell shortly after this disclosure.[19]  (*See* Corrected Consolidated Amended Class Action Complaint, Dkt. No. 73, ¶ 404.)  And yet, Lead Plaintiff now relies on a new and inconsistent theory of why the Form 10-K was a corrective disclosure:  it allegedly revealed that members of the Honig Group were related parties to transactions involving Riot.  (Opp. at 56.)  Lead Plaintiff provides no explanation as to why the market purportedly reacted to Riot's disclosures regarding related-party transactions, and did not react to Riot's disclosure that it received an SEC subpoena.  Lead Plaintiff's contradictory theories of loss causation precludes his

---

[19] On January 29, 2020, however, the SEC announced that it terminated its investigation of Riot and did not intend to recommend an enforcement action by the SEC against the Company.  (*See* Dkt. Nos. 161, 162.)

ability to rely on the Form 10-K as a corrective disclosure.  *See Kelley v. Rambus, Inc.*, No. C 07-1238 JF (HRL), 2008 WL 5170598, at *16 (N.D. Cal. Dec. 9, 2008) (emphasizing that there were "numerous internal inconsistencies" in the plaintiffs' loss causation theories in the multiple iterations of their pleadings and denying plaintiffs leave to file an amended complaint), *aff'd*, 384 F. App'x 570 (9th Cir. 2010).

### 4.    Riot's May 25, 2018 Form 8-K

Lead Plaintiff argues that Riot's Form 8-K filed on May 25, 2018 is a corrective disclosure because it disclosed that Honig, Groussman, and Stetson were involved in the Coinsquare transaction.  (Opp. at 58.)  But this disclosure does not correct any misrepresentations or omitted information.  As explained above, Honig, Groussman, and Stetson each owned less than 10% of Coinsquare, and thus Riot was under no obligation to disclose their interests in the Coinsquare transaction under Item 404 of Regulation S-K.  (*See supra*, Section III(B)(2).)

### 5.    The SEC's Filing of the *Honig* Action

Finally, Lead Plaintiff relies on the *Honig* action not involving Riot to serve as a corrective disclosure of the Honig Group's allegedly fraudulent activities at Riot.  (Opp. at 58–59.)  The *Honig* action did not pertain to Riot whatsoever—let alone disclose any wrongdoing regarding the Company—it thus cannot serve as a corrective disclosure, regardless of what Lead Plaintiff thinks some investors may

have believed.[20]  *See Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,

720 F. Supp. 2d 517, 561 (D.N.J. 2010) (finding plaintiff failed to plead loss

causation since there was no wrongdoing that was disclosed to the market); *Martin*

*v. GNC Holdings, Inc.*, No. 2:15-cv-01522, 2017 WL 3974002, at *18 (W.D. Pa.

Sept. 8, 2017), *aff'd*, 757 F. A'ppx 151 (3d Cir. 2018).

### E.     Lead Plaintiff Does Not Adequately Allege a "Scheme Liability" Claim Against Riot

Lead Plaintiff contends that the SAC adequately alleges a Rule 10b-5(a) and

(c) claim because "O'Rourke and Beeghley knowingly engaged in deceptive acts

as Riot's CEOs and directors by approving and signing misleading SEC filings"

that failed to disclose that certain members of Honig Group operated as an

undisclosed Section 13(d) group and failed to disclose related-party transactions.

(Opp. at 20.)  In other words, Lead Plaintiff's scheme liability claim is entirely

duplicative of his misrepresentation and/or omission claims.  District courts

interpreting the Supreme Court's decision in *Lorenzo* have found that "omissions

and misrepresentations alone cannot form the basis of a fraudulent scheme."

---

[20] Lead Plaintiff also argues that SEC inquiries may serve as a corrective disclosure.  (Opp. at 59.)  However, Lead Plaintiff does not cite any authority which supports his attempt to use an SEC inquiry regarding a defendant's conduct at one company to serve as a corrective disclosure for defendant's conduct at an entirely different company.

*Gordon v. Royal Palm Real Est. Inv. Fund I, LLLP*, No. 09-11770, 2020 WL
2836312, at *5 (E.D. Mich. May 31, 2020); *see also SEC v. Rio Tinto PLC*, No. 17
Civ. 7994 (AT) (DCF), 2021 WL 818745, at *2 (S.D.N.Y. Mar. 3, 2021)
(interpreting *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), and denying motion for
reconsideration of dismissal of scheme liability claim since the SEC's scheme
liability allegations were limited to misstatements or omissions by the defendant).
Consequently, to the extent that the Court determines that *Lorenzo* is applicable to
this matter, the Court should still dismiss Lead Plaintiff's scheme liability claim for
failing to allege any deceptive act besides Riot's purported misrepresentations
and/or omissions.[21]

But even if the Court is not inclined to interpret *Lorenzo* in accordance with
these decisions, the Court should still dismiss Lead Plaintiff's scheme liability

_____

[21] Lead Plaintiff argues that *Lorenzo* permits him to assert his misrepresentations
and/or omissions claims to serve as the basis for his scheme liability claim.  (Opp.
at 19.)  But *Lorenzo* is distinguishable because the defendant had knowingly
transmitted statements that he knew were false to investors.  139 S. Ct. at 1099.
Moreover, *Lorenzo* merely stands for the proposition that those who disseminate
false or misleading statements with the intent to defraud can be liable for scheme
liability, not that those misstatements alone are sufficient to trigger scheme
liability.  *Id.*  Also, Lead Plaintiff's reliance on *Puddu v. 6D Glob. Techs., Inc.*, No.
15-CV-8061 (AJN), 2021 WL 1198566, at *5 (S.D.N.Y. Mar. 30, 2021) is
similarly misplaced.  (ECF No. 202.)  In *Puddu*, the court found that the plaintiffs
had adequately alleged scheme liability against a purported controlling shareholder
for failing to file a Schedule 13(d), after already finding that the plaintiffs had
alleged the existence of allegedly false statements and omissions.  2021 WL
1198566, at *11.  Whereas here, Riot did not make any false statements or
omissions.

claim.  As shown above, Riot did not fail to disclose any information that it was required to disclose under any applicable law or regulation.  (*See supra*, Section III(B).)  And, even if it did make any false or misleading statements, Riot did not do so with scienter (*see supra*, Section III(C)), and Lead Plaintiff has not shown any loss caused by these purported false or misleading statements.  (*See supra*, Section III(D).)  Lead Plaintiff thus fails to allege a Rule 10b-5(a) or (c) claim against Riot.

## III.   <u>CONCLUSION</u>

For the reasons stated above, Riot respectfully requests that the Court dismiss the Section 10(b) claims brought against it with prejudice.

DATED:      April 26, 2021                      PAUL HASTINGS LLP


By:  /s/ *Chad J. Peterman*
         CHAD J. PETERMAN

*chadpeterman@paulhastings.com*
200 Park Avenue
New York, NY 10166
Telephone:  1(212) 318-6000
Facsimile:  1(212) 319-4090

THOMAS A. ZACCARO
thomaszaccaro@paulhastings.com
D. SCOTT CARLTON
scottcarlton@paulhastings.com
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA  90071

-23-

Telephone:  1(213) 683-6000
Facsimile:  1(213) 627-0705

Attorneys for Defendants
RIOT BLOCKCHAIN, INC., JOHN
O'ROURKE, AND MICHAEL
BEEGHLEY