# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CREIGHTON TAKATA, Individually and on behalf of all others similarly situated,

               Plaintiff,

    vs.

RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY MCGONEGAL,

             Defendants.

Civil Action No.: 18-2293(FLW)(ZNQ)

*ORAL ARGUMENT REQUESTED*

Motion Return Date: May 3, 2021

## DEFENDANT BARRY C. HONIG'S REPLY BRIEF IN FURTHER SUPPORT OF HIS MOTION TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

*Attorneys for Defendant Barry C. Honig*

Dated:  April 26, 2021

SMRH:4828-4076-8486.7

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

ARGUMENT ..........................................................................................4

I.   THE SAC'S FAILURE TO PLEAD LOSS CAUSATION DOOMS
     BOTH OF LEAD PLAINTIFF'S SECTION 10 CAUSES OF
     ACTION AGAINST MR. HONIG. ..................................................4

     A.   The Substantial Cause of the Meteoric Rise in Riot's Stock
          Price Was Its Management's Decision To Enter The
          Cryptocurrency Business, Not Any Non-Disclosure of Stock
          Sales by a Few Outside Shareholders. ....................................5

     B.   The Substantial Cause of the Decline In Riot's Stock Was the
          Decline of the Price of Bitcoin, Not Any "Corrective
          Disclosure." ...........................................................................7

II.  THE SAC'S SECOND CAUSE OF ACTION AGAINST MR.
     HONIG FOR VIOLATION OF SECTION 10(B) AND RULE 10b-5
     SHOULD BE DISMISSED..............................................................14

     A.   Mr. Honig Was Not Required To Disclose A Non-Existent
          "Group." ................................................................................14

     B.   Mr. Honig Did Not Breach Any Duty to the Public to Disclose
          His Sales. ..............................................................................17

III. LEAD PLAINTIFF'S SECTION 20(A) CLAIM AGAINST MR.
     HONIG SHOULD BE DISMISSED BECAUSE THE SAC
     ALLEGES NO FACTS WHICH PLAUSIBLY SHOW MR.
     HONIG'S "CONTROL" OVER ANY INSIDER.........................21

CONCLUSION .....................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>Cases</u>

*Blue Chip Stamps v. Manor Drug Stores*
421 U.S. 723 (1975).................................................................14

*Castlerock Management v. Ultralife Batteries*
68 F. Supp. 2d 480 (D.N.J. 1999).......................................18

*CSX Corporation v. Children's Investment Fund Mgt.*
654 F.3d 276 (2d. Cir. 2011) ...............................................15

*Greenfield v. Criterion Capital Mgmt., LLC*
No. 15-cv-3583-PJH, 2017 U.S. Dist. LEXIS 97638 (N.D. Cal.
June 23, 2017).........................................................................15

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*
95 F. Supp. 2d 169 (S.D.N.Y. 2000) ..........................16, 18

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*
286 F.3d 613 (2d Cir. 2002) ...............................................18

*Jones v. Intelli-Check, Inc.*
274 F. Supp. 2d 615 (D.N.J. 2003)....................................21

*In re Merck & Co., Inc. Sec. Litig.*
No. 02-cv-3185, 2004 U.S. Dist. LEXIS 28930 (D.N.J. July 6,
2004) .......................................................................................18

*Portsmouth Square v. Shareholders Prot. Comm*
770 F.2d 866 (9th Cir. 1985) ........................................ 14-15

*Puddu v. 6D Glob. Techs., Inc.*
No. 15-cv-08061, 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) .....................20

*In re Synchronoss Sec. Litig.*
705 F. Supp. 2d 367 (D.N.J. 2010)....................................18

## <u>Statutes, Rules, Regulations, Constitutional Provisions</u>

Securities Exchange Act Section 10, 15 U.S.C. § 78j ...................................4, 14, 17

Securities Exchange Act Section 13, 15 U.S.C. § 78m .........................15, 16, 18, 19

Securities Exchange Act Section 18, 15 U.S.C. § 78r .......................................18, 19

Securities Exchange Act Section 20, 15 U.S.C. § 78t ..................................3, 21, 22

SEC Rule 10b-5, 17 C.F.R. § 240.10b5..........................................................14, 18

SEC Rule 13d-5, 17 C.F.R. § 240.13d-5 ................................................................16

# INTRODUCTION

Lead Plaintiff's Consolidated Second Amended Class Action Complaint (the "**SAC**") should be dismissed primarily because it does not adequately allege loss causation. This Court correctly dismissed Lead Plaintiff's previous complaint because it was "**devoid of any allegation that [the disclosure of Mr. Honig's stock sales] was a 'substantial cause' of shareholders' economic losses or otherwise contributed in any way to a decline in Riot's stock price**." Opinion [Dkt. 166] at 39 (emphasis added). Nothing has changed in the SAC; Mr. Honig vividly demonstrates in the Appendix to his Motion to Dismiss [Dkt. 196] ("**MTD**") that Lead Plaintiff did not add a single factual allegation regarding loss causation.

Lead Plaintiff's failure to supplement his loss causation allegations, alone, provides reason to dismiss the SAC. This is because the Court was correct in finding a lack of any causal connection between Mr. Honig's alleged omissions and the massive fluctuations in the price of Riot's stock. Distilled to its essence, the 160-page SAC alleges that Mr. Honig defrauded all Riot Blockchain shareholders by selling his Riot shares without promptly and personally disclosing that he was doing so. To plead loss causation, Lead Plaintiff must set forth facts in his complaint showing that this "omission" caused the price of Riot's stock to rocket up, and that a revelation of the omitted facts caused Riot's stock price to crash down.

The SAC pleads neither. Lead Plaintiff does not even try to plausibly establish that Mr. Honig's public silence about his stock ownership and sales was a substantial cause of the remarkable **tenfold** increase in the price of Riot stock during the fourth quarter of 2017. A minority outside shareholder boosting a company's market price over one-thousand percent in just ten months, by saying nothing, would be an historic first. The SAC also fails to show that the revelation of Mr. Honig's supposedly "covert" sales was a substantial cause of the decline of Riot's stock price. To the contrary, over seventy-five percent of the decline in Riot's stock price occurred **before** the first so-called "corrective disclosure" occurred on January 31, 2018. Two weeks later, when Mr. Honig filed a Form 13D/A disclosing the full details of every one of his prior year's sales the market reacted by sending Riot's stock price **up**, not down.

Moreover, the *Wall Street Journal* ("*WSJ*") article that Lead Plaintiff labels a "corrective disclosure" was nothing of the sort; as explained in Mr. Honig's opening brief, six SEC filings that predated the *WSJ* article disclosed that Mr. Honig planned to, and did, sell off most of his Riot stock. And the alleged agreement amongst certain outsider shareholders to act as a "group" in regards to their Riot investments had no impact upon Riot's stock price, up or down, because the so-called group never existed, and the non-existence was never "revealed" in any of the disclosures identified in the SAC. These facts affirmatively disprove

any notion that the omission/disclosure of Mr. Honig's stock sales was a "cause" of Riot's stock price going up or down, much less a **substantial** cause.

Lastly, Lead Plaintiff's Section 20(a) controlling person liability claim asserted against Mr. Honig fails because the SAC does not allege a single fact showing that Mr. Honig asserted actual control over Riot or its management. Lead Plaintiff's entire rebuttal to this point is limited to a single conclusory sentence contained in a footnote at the bottom of the last page of the Opposition brief [Dkt. 201] ("**Opp.**"), which simply regurgitates the SAC's conclusory statement of "control," without pointing to a single alleged fact showing how Mr. Honig actually possessed power to control Riot or how he used such power.

Lead Plaintiff has not, and cannot, allege facts showing that anything done by Mr. Honig was a substantial cause of the movement of Riot's stock price, and Lead Plaintiff's alleged loss. A cursory look at the price charts, along with common sense, reveal that volatility in the price of Bitcoin was the substantial cause of the meteoric rise and fall of Riot's stock. Mr. Honig's stock sales into a rising market had a *de minimis* effect upon the tidal wave of market forces that rocked Riot's market price. Mr. Honig respectfully asks the Court to dismiss the SAC with prejudice.[1]

---

[1] The Opposition's repeated references to Magistrate Judge Quraishi's order granting leave to amend are misplaced. Motions to amend are treated as non-dispositive matters in this Court. *Gutierrez v. Johnson & Johnson*, 227 F.R.D. 255

## ARGUMENT

**I.    THE SAC'S FAILURE TO PLEAD LOSS CAUSATION DOOMS BOTH OF LEAD PLAINTIFF'S SECTION 10 CAUSES OF ACTION AGAINST MR. HONIG.**

The Opposition reveals a fundamental misunderstanding of what Lead Plaintiff is required to plead regarding "loss causation" in order to state an adequate claim and avoid dismissal. As the Court noted in its prior order, a plaintiff must allege that each defendant's misstatements or omissions were a "substantial cause" of **both** "the inflation in the price of a security **and** in its subsequent decline in value . . . ." [Dkt. 166 at 36] (*citing Semerenko v. Cendant Corp.*, 223 F.3d 165, 186-87 (3d Cir. 2000)) (emphasis added)). Put into the context of Lead Plaintiff's "pump-and-dump" case theory, this means that the SAC needs to plead facts which plausibly show that both (a) Mr. Honig's alleged omissions were a <u>substantial cause</u> of the rise in Riot's stock price, and (b) a subsequent disclosure of the supposedly omitted information was a <u>substantial cause</u> of Riot's stock price decline. The SAC does not allege either, and numerous facts that it does contain actually disprove the notion that Mr. Honig's omissions had anything to do with the price movement of Riot's stock.

---

(D.N.J. 2005).  The present motion seeks a dispositive determination, which this Court must make. 28 U.S.C. § 636(b)(1)(A)

A.    **The Substantial Cause of the Meteoric Rise in Riot's Stock Price Was Its Management's Decision To Enter The Cryptocurrency Business, Not Any Non-Disclosure of Stock Sales by a Few Outside Shareholders.**

First, there is nothing alleged in the SAC or argued in the Opposition which plausibly ties Mr. Honig's alleged omissions to the tenfold rise in Riot's stock price during the fourth quarter of 2017. On the other hand, there are ample facts stated throughout the SAC which show that the explosive rise of Riot's stock price was driven almost entirely by its management's decision to change the Company's business strategy to one focused upon cryptocurrencies, specifically Bitcoin.

This is revealed by observing how the market price of Riot stock reacted to key events alleged in the SAC. The putative Class Period commenced on March 15, 2017, when Riot released a Form 8-K that allegedly did not disclose that Mr. Honig and certain other outside shareholders were operating as a "group." [*See* SAC ¶¶ 1, 188]. According to Lead Plaintiff's theory of the case, that non-disclosure – and five similar non-disclosures in subsequent SEC filings made in April, July and August 2017 – caused "artificial inflation" to the price of Riot stock. [*See* SAC ¶¶ 347, 392 357, 361, 366, 454-55].

But a cursory look at the price chart for Riot's stock shows that, in reality, the non-disclosures from mid-March to mid-August 2017 caused <u>no</u> meaningful price inflation: Riot's stock closed at $3.56/share on the first day of the class period. Five months later, on August 24, 2017, the closing price stood at

$3.60/share.[2] After more than five months of an alleged "scheme," which included the release of six "misleading" SEC filings "omitting" material facts, Riot's stock price was "fraudulently inflated" by four cents.

By contrast, immediately after Riot announced its pivot to cryptocurrency on October 4, 2017 [SAC ¶ 177], its stock price rocketed up tenfold to $46.20/share, in just ten weeks.[3] All while Mr. Honig remained silent, just as he had done for the prior months.

This objective price data definitively shows that Mr. Honig's alleged non-disclosure of his "group" membership and sale of Riot stock had no impact at all upon the increase in Riot's stock price. Lead Plaintiff does not, and cannot, explain why for the first five months of the Class Period, the alleged "scheme" (*i.e.*, Mr. Honig's non-disclosures) only boosted Riot's stock price by a meager one-percent. Lead Plaintiff also makes no attempt to allege how the subsequent tenfold price increase was "substantially caused" by Mr. Honig's continuing silence, rather than by the notable intervening event of the Company entering into the cryptocurrency business.

Fortunately, the Court does not need to leave its common sense at the door when evaluating Lead Plaintiff's loss causation allegations. Indeed, *Twombly* and *Iqbal* direct a court to assess whether a plaintiff's loss causation theory is plausible,

---

[2] *See* Historical Stock Price Chart [Weber Decl. Ex. D].

[3] Riot's stock price hit a high of $46.20 on December 19, 2017.  *See* Historical Stock Price Chart [Weber Decl. Ex. D].

and not merely "conceivable" or "possible."  It is clear that what drove Riot's stock price to the moon in the fourth quarter of 2017 was the Company's pivot into a cryptocurrency business at precisely the same time that the price of Bitcoin experienced an exponential increase in value. The chart and price data submitted by Mr. Honig with his opening brief showed that the percentage increase in Riot's stock price <u>precisely</u> matched the increase in Bitcoin prices at the end of 2017.[4] The decision to change business strategy was made by Riot's Board and management; there is no allegation that Mr. Honig played any role in that decision. The SAC fails to show that Mr. Honig played any part in the alleged "inflation" of Riot's stock price, and certainly fails to show that his alleged non-disclosures were a "substantial cause" of the alleged price inflation.

### B. <u>The Substantial Cause of the Decline In Riot's Stock Was the Decline of the Price of Bitcoin, Not Any "Corrective Disclosure."</u>

On the flip side, it is equally clear that the rapid, thirty-dollar decline in Riot's stock price in January 2018 was caused by a parallel decline in the price of Bitcoin, not by any "disclosure" concerning Mr. Honig's investment in the Company. This can be seen by the uncontroverted fact[5] that over seventy-five

---

[4] The chart and price data further establish that Riot's stock price remained highly correlated with the price of Bitcoin through the end of the Class Period, and continuing into this year. *See* Opening Brief, p. 5.

[5] The decline in Riot stock price is shown both in the historical price chart [Weber Decl. Ex. D] which Mr. Honig asked the Court to judicially notice, and Plaintiff's own PSLRA Certification [Dkt. 191].

percent of the "loss" that Lead Plaintiff claims occurred **before** even the first so-called "corrective disclosure" happened.

Lead Plaintiff first purchased Riot stock on December 19, 2017, at a price of $45.12 per share. *See* Lead Plaintiff's PSLRA Certification [Dkt. 191] at 2. Over the next month, the price of Bitcoin cratered, and along with it, so did the market price of Riot stock. By January 31, 2018, the date of the *WSJ* article, Riot's stock price had dropped to $14.50 per share [SAC ¶¶ 212-13]. At the end of the putative Class Period, eight months later, Riot's stock price was $5.68/share. *See* Declaration of Robert D. Weber [Dkt. 196] ("**Weber Decl.**"), Exhibit D. Thus, by Lead Plaintiff's own allegations, over thirty dollars of the ultimate forty-dollar decline in Riot's stock price – over 75% of Lead Plaintiff's "loss" – happened **before** any "disclosure" was made.

Judicially-noticeable stock price data further reveals that the January 31 *WSJ* article had a negligible impact upon Riot's stock price,[6] and when, two weeks later, Mr. Honig fully disclosed in detail every single one of his Riot stock transactions

---

[6] Lead Plaintiff trumpets that Riot's stock price declined 14.26% following publication of the *WSJ* article, but that particular decline happened over two days, not just one. On the actual date on which the article was published at 8:00 a.m., [Oppo. at 52], Riot's price declined only 3.71% following a full day of market activity, which simple arithmetic will show is 1.48% less than the average daily fluctuation of Riot's stock price during the month of January 2018. Lead Plaintiff alleges a larger decline only by cherry-picking a second day of decline, which coincided with the price of Bitcoin similarly declining 9.69% over the same two days. [Weber Decl. Ex. D].

over the previous year, Riot's stock price <u>rose</u> on the following two days.[7] Once the news of Mr. Honig's February 13, 2018 disclosure was promptly incorporated into Riot's stock price,[8] none of the subsequent six-and-a-half month price decline could be attributable to the revelation of his sales; this is because the full details of his sales were disclosed, and there could be no later "corrective" disclosure. Riot's price decline over the last six-and-a-half months of the putative Class Period must have been caused by something else; most likely, a concurrent decline in the price of Bitcoin.

That the precipitous drop of Riot's stock price preceded the so-called "corrective disclosure" of the *WSJ* article is fatal to Lead Plaintiff's loss causation theory. Several courts evaluating securities fraud claims following remarkably similar situations dismissed those complaints due to a failure to allege loss causation. In *60223 Trust v. Goldman, Sachs & Company*, 540 F. Supp. 2d 449

---

[7] Over the course of the next seven trading days from February 1, 2018 through February 12, 2018, Riot's stock price rose <u>42.6%</u> to $17.54, well above the $14.28 closing price the day before the *WSJ* Article. Mr. Honig then filed a Schedule 13D/A Amendment on February 13, 2018 disclosing that he indeed had sold most of his Riot stock [SAC ¶ 312; *see also* Weber Decl. Ex. F], and the market price of Riot stock continued to <u>rise</u> on the two following days. [*See* Weber Decl. Ex. D]. All of this shows that a two-day blip in the price of Riot's stock had nothing to do with the "disclosure" that Mr. Honig was selling stock; the market did not care.

[8] Plaintiff alleges that "at all relevant times, the market for Riot's common stock was efficient . . . [and] promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of the common stock." [SAC ¶¶ 476-77]. This requires the Court to accept that once Mr. Honig's sales were disclosed, the import of the sales was digested by the market and promptly reflected in Riot's stock price.

(S.D.N.Y. 2007), a plaintiff investor alleged that the defendants' revelation that they had issued fraudulent research reports resulted in a drop in the price of the stock in which plaintiff had invested. In that case, however, as here, the stock price had already sharply dropped in the months prior to the alleged "corrective disclosure." In holding that the plaintiff had failed to plead loss causation, the court reasoned:

> By the time of the disclosures which allegedly caused the economic loss (as defined by the loss causation doctrine) the stock had already lost almost all its value—declining from 24.75 on January 25 to 5.01 on June 14. The conclusion from all these circumstances is that the events of June 14 to June 21, which are said in the complaint to have brought about the economic loss, did not do so. The loss in value of the stock occurred gradually over the course of the entire class period, and the stock had lost most of its value before the June 14–21 events. . . . The complaint does not even refer to the phenomenon of the gradual loss of the stock's value, much less attempt to explain it as related to loss causation.

*60223 Trust,* 540 F. Supp. 2d at 461; *see also In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) (complaint failed to plead loss causation, as it "does not address the ten-month decline of CMGI's stock price and does not attempt to explain how the decline of the stock price following the issuance of the October 4, 2000 report was attributable to the alleged fraud, rather than simply a continuation of the loss in value that afflicted CMGI during the Internet sector's collapse"). "'[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,'" and a

plaintiff's claim fails when "'it has not adequately [pled] facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'" *In re Tellium, Inc. Sec. Litig.,* No. 02-cv-05878 (FLW), 2005 WL 2090254 at *4 (D.N.J. August 26, 2005) (*quoting Lentell v. Merrill Lynch & Co., Inc.* 396 F.3d 161 (2nd Cir. 2006)).

In addition, the January 31, 2018 *WSJ* article did not provide any "corrective disclosure" about Mr. Honig's stock sales. As explained in Mr. Honig's opening brief, on at least six occasions prior to the publication of that article it was disclosed to the public that Mr. Honig intended to sell, and then <u>did</u> sell his Riot stock, and the price of Riot stock zoomed up despite those disclosures:

- On April 20, July 19, August 24 and September 25, 2017, it was disclosed to the public that Mr. Honig owned 9.99% of Riot's outstanding common stock and that he intended to sell hundreds of thousands of those shares.[9]

- On December 12, 2017, it was disclosed that Mr. Honig had reduced his holdings to less than five percent (5%) of Riot's stock.[10]

---

[9]  *See* SAC ¶¶ 347, 361, 366 and 369 (*citing* Riot's Forms S-3/A filed with the SEC on those dates).

[10] *See* Weber Decl. Ex. E at 8.

- On January 5, 2018, it was disclosed that Mr. Honig had further reduced his holdings to less than one percent (1%) of Riot's outstanding stock.[11]

The Forms S-3/As each mentioned the phrase "Selling Stockholders" over fifty times, and identified Mr. Honig as one of those sellers. Regardless of whether Mr. Honig's stock sales were material to any other Riot investor, it is undeniable that the fact he intended to reduce his position was publicly disclosed to anyone who cared to look.[12]

Thus, the *WSJ* Article was not a "corrective disclosure." It merely reiterated the already-public knowledge that Mr. Honig was selling Riot stock. An article that merely confirms information already known to the market is not a corrective disclosure. *See National Junior Baseball League v. Pharmanet Development Group Inc.*, 720 F. Supp. 2d 517, 561 n.34 (D.N.J. 2010) (*citing In re Retek Inc.*

---

[11] *See* SAC ¶ 374 (*citing* Riot's Form S-3 filed with the SEC on that date). While the market price of Riot's stock declined a modest 4.13% following the publication of this Form S-3, the SAC pointedly does not allege that any of that decline was caused by the revelation that Mr. Honig had sold most of his Riot shares. Rather, the SAC alleges that the modest price decline was caused by revelations that Riot (a) had fired its auditor, and (b) had overpaid for equipment purchased from Kairos. *See* SAC ¶¶ 209-11.

[12] Each Form S-3/A also stated: "We do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby . . .[but] because there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares, . . .we have assumed that all of the shares covered hereby are sold by the selling stockholders pursuant to this prospectus."

*Sec. Litig.*, 621 F. Supp. 2d 690, 705 (D. Minn. 2009)).  Given the reaction of

Riot's stock price, which (according to Lead Plaintiff) "promptly digested current

information  . . . from publicly available sources and reflected such information in

the price of the common stock" [SAC ¶ 477], the market did not care about Mr.

Honig's stock sales. The majority of the times it was disclosed that Mr. Honig

intended to sell, or did sell, the price of Riot's stock went **up**.

Lead Plaintiff asks the Court to ignore that the price of Riot stock's rose

almost perfectly in tandem with Bitcoin's explosive price increase. Instead, Lead

Plaintiff implores the Court to accept that an outside shareholder of Riot who

owned less than 10% of the Company's shares, and who was not an officer,

director or employee of the Company, somehow caused the Company's stock price

to increase **tenfold** in the span of about three months all by allegedly disclosing . . .

nothing. This is silly. *Twombly*, *Iqbal* and *Dura* direct courts to dismiss complaints

based upon implausible theories such as this. *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009);  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A]llowing a

plaintiff to forgo giving any indication of the economic loss and proximate cause

that the plaintiff has in mind would bring about harm of the very sort the [PSLRA]

seek[s] to avoid. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347 (2005) (*citing*

H.R. Conf. Rep. No. 104–369, p. 31 (1995); U.S. Code Cong. & Admin. News

1995, pp. 679, 730) (criticizing "abusive" practices including "the routine filing of

lawsuits . . . with only [a] faint hope that the discovery process might lead

eventually to some plausible cause of action")). It would permit a plaintiff "with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence." *Id.* (*citing Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975)).

Lead Plaintiff cannot plead facts establishing loss causation, and the reason why is simple: Mr. Honig's alleged non-disclosures did not cause the price of Riot stock to rise and fall. Riot's business alignment with an underlying asset that experienced volatile price movements is what caused the rises and falls of Riot's stock price.

## II.  THE SAC'S SECOND CAUSE OF ACTION AGAINST MR. HONIG FOR VIOLATION OF SECTION 10(B) AND RULE 10b-5 SHOULD BE DISMISSED.

### A.  Mr. Honig Was Not Required To Disclose A Non-Existent "Group."

Mr. Honig was not part of any "group" involving investment in Riot shares, and thus had no obligation to "disclose" that he was a member of any such group. As explained in Mr. Honig's opening brief, and elaborated upon by other defendants, a collection of individual investors who happen to invest in the same company may be considered a group <u>only</u> if all the group members: (1) agree to vote their shares in a similar manner, (2) coordinate transactions in the securities, or (3) otherwise act in unison to affect the control or management of the issuer. *See*

*Portsmouth Square v. Shareholders Prot. Comm.*, 770 F.2d 866, 874 (9th Cir. 1985); *Greenfield v. Criterion Capital Mgmt., LLC*, No. 15-cv-3583-PJH, 2017 U.S. Dist. LEXIS 97638, at *19-20 (N.D. Cal. June 23, 2017); *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP,* 654 F.3d 276, 309 (2d Cir. 2011).

While the SAC expends nearly fifty pages describing various defendants' past investments in a host of different companies, it does not allege specific facts showing that they coordinated transactions or acted in unison to control Riot during the putative Class Period. Mr. Honig did not disclose or report that he was part of a "group" transacting in Riot securities, <u>because there was no "group"</u> as defined by SEC regulation and court guidance, and thus there was nothing to disclose. Allegations of "group" activity in connection with other investments cannot form the basis for an allegation of group activity in regards to Riot. *See e.g.*, *Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 448 (S.D.N.Y. 2001) ("[C]onclusory allegations of fraud and of the Defendants' previous investments . . . cannot serve as the basis for a claimed violation of Section 13(d).").

Case law cited in Lead Plaintiff's Opposition fails to salvage Lead Plaintiff's claim. Lead Plaintiff cites to *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115 (2d Cir. 2001) as a case where individuals were deemed part of a Section 13(d) group merely because they had a pre-existing relationship as shareholders of a corporation. However, the Second Circuit made clear *Morales* was precisely *not*

that type of case: "[t]his is not a case in which the assertion of existing shareholder rights or a mere business relationship is alleged as a basis for group membership." *Id.* at 126.  Rather, plaintiff in *Morales* alleged that the defendant shareholders: (1) jointly entered into a written agreement governing the holding and disposing of their stock, barring them from selling for two years except under certain circumstances,[13] (2) deposited their holdings in identical trusts under the same trustee on the same day, and (3) had their holdings redeemed by the company on the same day. *Morales*, 249 F.3d at 120-21, 127. Nothing like those facts is alleged in the SAC here. Instead, Lead Plaintiff hangs his hat on a shared office [SAC ¶¶ 6, 15, 16, 23-26, 81, 87, 88, 92, 216-19, 257, 267, 295, 400, 403, 461], and allegations entirely unrelated to Riot. Such a basis, *Morales* holds, is insufficient.[14]

Lead Plaintiff also cites to *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169 (S.D.N.Y. 2000) in support of the proposition that courts sometimes "consider" the history of parties' co-investment in determining whether an alleged "group" exists. [Opp. at 26]. The question here is

---

[13] Such an agreement exemplifies the kind of agreement to "act together for the purpose of acquiring, <u>holding</u>, voting or <u>disposing</u> of equity securities of an issuer" Rule 13d-5 contemplates. 17 C.F.R. § 240.13d-5(b)(1) (emphasis added).

[14] Plaintiff also asserts that Honig's stock sales following publication of a press release announcing Bioptix's name change to Riot Blockchain somehow satisfies Section 13(d)'s requirement that there be an agreement to act together for the purpose of acquiring, holding, voting, or disposing of Riot stock. [Opp. at 26-27]. It does not.  Similarly, the assertion that DeFrancesco and Groussman allegedly sold the bulk of their shares during the class period says nothing about coordinated Rule 13(d) group activity. [Opp. at 27].

not what a court may consider, but whether a "group" is adequately pled with

nothing more than allegations of certain investors' past involvement in investments

<u>other than Riot</u>. The answer is no. Here, Lead Plaintiff's allegations fail to

demonstrate any agreement to coordinate trading and, instead, demonstrate

significant disparities in trading activity.[15]  [*See* MTD Section III.B.]. In short,

Lead Plaintiff does not allege a single fact showing that the defendants were a

"group" in regards to their individual investments in Riot securities, and thus Lead

Plaintiff's assertion that Mr. Honig defrauded him by not identifying himself as a

member of a (non-existent) group fails to state a fraud claim.

**B.** **<u>Mr. Honig Did Not Breach Any Duty to the Public to Disclose His Sales.</u>**

The Opposition concedes that Mr. Honig did not make any affirmative

statement during the Class Period. (Opp. at 37, admitting that the <u>lone</u> statement

attributable to Mr. Honig, his allegedly defective Schedule 13D/A "was filed

before the start of the Class Period."). This concession, alone, should be enough for

the Court to dismiss the SAC's cause of action against Mr. Honig alleging that he

made a materially false or misleading statement in violation of Section 10(b) and

---

[15] This distinguishes the SAC from the allegations *Lerner v. Millenco, L.P.*, 23 F. Supp. 2d 337, 342 (S.D.N.Y.1998), cited by Lead Plaintiff as an example of pleading sufficient to establish the existence of a "group." In that case, the plaintiff alleged that certain defendants had coordinated trades to reduce their holdings by precisely the same amounts at the same times, and pleaded that all members of the alleged group had agreed in writing to modify certain debentures that they each held. Nothing close to that level of coordination is alleged regarding any of the Defendants' Riot investments during the Class Period.

Rule 10b-5. Statements made before an alleged Class Period are not actionable. *In re Merck & Co., Inc. Sec. Litig.*, No. 02-cv-03185 (SRC), 2004 U.S. Dist. LEXIS 28930, at *46 (D.N.J. July 6, 2004) (*quoting In re Clearly Canadian Sec. Litig*., 875 F. Supp. 1410, 1420 (N.D. Cal. 1995)); *In re Synchronoss Sec. Litig*., 705 F. Supp. 2d 367, 405 n.50 (D.N.J. 2010); *Castlerock Mgmt. v. Ultralife Batteries, Inc.*, 68 F. Supp. 2d 480, 484 n.6 (D.N.J. 1999). "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).

Section 13, 15 U.S.C. § 78m, does not explicitly create a cause of action for damages. Courts repeatedly have held that no such right of recovery may be inferred under Section 13 in favor of shareholders who rely to their detriment on false or misleading statements contained in, or material omissions from, filings under that statute. *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, No. 00–cv–1115, 2001 WL 46978, at *1 (S.D.N.Y. Jan. 19, 2001), *aff'd*, 286 F.3d 613 (2d Cir. 2002). The court held that Hallwood had "no colorable claim for damages under Section 13 of the Exchange Act," and noted that "[s]hareholders do benefit from the existence of an express cause of action for damages for Section 13 violations under Section 18 of the Exchange Act." *Id.* at *1, n.5.  The holding was confirmed on appeal to the Second Circuit. *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 619 (2d Cir. 2002) ("Courts in this circuit have consistently declined to imply a cause of action for shareholders under §

13(d).”). “One complaining of a false or misleading statement in a Schedule 13D may seek damages only under Section 18(a) of the Act.” *Kamerman v. Steinberg*, 891 F.2d 424, 430 (2d Cir.1989); *see also* MTD at pp. 22-23 (*citing* additional precedent, including from the Third Circuit, supporting the proposition that Lead Plaintiff possesses no implied cause of action predicated upon a Section 13(d) violation and his sole and exclusive remedy lies under Section 18(a)).

While Lead Plaintiff asserts that Mr. Honig violated an alleged duty under Section 13(d) of the Exchange Act by not “promptly” filing an amendment to his January 2017 Schedule 13D/A, the Opposition offers no authority to support the proposition that Mr. Honig owed a duty <u>to the general public</u> to quickly amend his pre-Class Period 13D filing when circumstances materially changed during the Class Period. “The purpose of Section 13(d) is to alert the marketplace to large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control.” *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971). That is why, when Mr. Honig considered a proxy fight months before the Class Period, he filed a Form 13D. When Mr. Honig ended any intention to potentially affect Riot’s corporate control by <u>selling off</u> his position, and that intention to sell was well-documented in Riot’s Form S-3 filings, the marketplace was alerted that there no longer was a risk of a change in corporate control; the purpose behind Section 13 was fulfilled.

The decision in *Puddu v. 6D Glob. Techs., Inc.*, No. 15-cv-08061 (AJN), 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) is distinguishable.  In *Puddu*, plaintiffs alleged that a defendant failed to disclose his control of a company in a Schedule 13D filing despite having allegedly admitted in a meeting that he, in fact, controlled the company. The defendant then argued that an alleged failure to disclose his control was of no consequence because there were articles stating that he controlled the company, despite allegations that defendant himself made numerous public pronouncements disclaiming his control, thus clouding the public record on the subject. *Id.* at *7. By contrast, in the instant action, there is no alleged admission of company control or coordinated group trading activity. The market had at its disposal numerous filings revealing that Honig intended to sell his shares, [MTD Section III.C.], Honig made no public pronouncements contradicting those disclosures, and then, as Lead Plaintiff acknowledges, Mr. Honig did in fact proceed to sell.

Further, the *Puddu* decision found that the defendant's failure to file a Form 13D to be deceptive only because the failure to file was coupled with <u>other</u> deceptive conduct. The notion that a mere failure to update a Form 13D can alone form the basis of a private right of action for violation of securities laws is *dicta*. Here, Mr. Honig's only alleged "deceptive" conduct is his alleged failure to timely <u>update</u> a previously-filed Form 13D to disclose stock sales, and the "deceptiveness" of that omission is mitigated by the fact that the sales were

disclosed in other public filings. Further the reason why the Company was able to disclose that Mr. Honig intended to, and then did, sell his stock, is <u>because Mr. Honig told Riot</u> that he was selling, and then Riot publicly disclosed that fact. That information flow eviscerates Lead Plaintiff's theory that Mr. Honig was trying to "deceive" anyone about his intention to sell his Riot stock.

**III.   LEAD PLAINTIFF'S SECTION 20(A) CLAIM AGAINST MR. HONIG SHOULD BE DISMISSED BECAUSE THE SAC ALLEGES NO FACTS WHICH PLAUSIBLY SHOW MR. HONIG'S "CONTROL" OVER ANY INSIDER.**

To state a claim under Section 20(a), a plaintiff must plead facts showing (1) an underlying violation of securities laws by the company, and, most relevant to the allegations against outside shareholder Mr. Honig, (2) "circumstances establishing defendant's control over the company's actions." *Jones v. Intelli-Check, Inc.,* 274 F. Supp. 2d 615, 644-45 (D.N.J. 2003) (emphasis added). To adequately allege control, a plaintiff must "demonstrate [that] 'the defendant had <u>actual power</u> or influence over the allegedly controlled person.'" *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 940 (D.N.J. 1998) (*quoting Kersh v. General Council of Assemblies of God*, 804 F.2d 546, 548 (9th Cir. 1986)) (emphasis added). Conclusory allegations of control are insufficient to plead a Section 20(a) claim, and should be dismissed. *In re Celgene Corp. Sec. Litig*., No. 18-cv-4772, 2019 WL 6909463, at *23 (D.N.J. Dec. 19, 2019) (granting motion to dismiss Section 20(a) claim based on insufficient conclusory allegations of

influence and control over the decision-making of the company); *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 469 (D.N.J. 2017) (granting motion to dismiss Section 20(a) claim based on insufficient conclusory allegations that defendant was "able to, and did, control the contents of various reports, press releases, and public filings") (internal citation omitted).

All the SAC offers are conclusory and purely speculative allegations that Mr. Honig "must have" controlled Riot. The SAC alleges absolutely no particular facts showing that Mr. Honig was involved in the Company's day-to-day management, or how he exerted actual power over anyone at the Company. Lead Plaintiff's obvious lack of faith in his Section 20(a) claim is revealed by his half-hearted response to Mr. Honig's motion to dismiss. In a footnote, on the final page of his sixty-page tome, Lead Plaintiff simply regurgitates the same conclusory allegations contained in the SAC, positing that "no retail shareholder could have accomplished" Honig's alleged stock sales and participation in alleged related-party transactions "without undisclosed control from inside the Company." [*See* Opp. at 60, n. 56.]. This is precisely the type of conclusory pleading that courts find insufficient to plead a defendant's actual control over a company. And the allegation against Mr. Honig also is facially untrue -- obviously, outside shareholder Mr. Honig could sell his stock at any time without the necessity of having to "control" Riot. Lead Plaintiff's Section 20(a) claim alleged against Mr. Honig should be dismissed with prejudice.

## **CONCLUSION**

For the foregoing reasons, Mr. Honig respectfully asks the Court to grant his motion to dismiss the Consolidated Second Amended Class Action Complaint, with prejudice.

Respectfully submitted,

Dated:  April 26, 2021

SHEPPARD, MULLIN,
RICHTER & HAMPTON LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700

By: /s/ *Tyler E. Baker*
   Tyler E. Baker, Esq.
   New Jersey Bar No. 44392011
   tbaker@sheppardmullin.com

and

SHEPPARD, MULLIN,
RICHTER & HAMPTON LLP
Robert D. Weber (*pro hac vice*)
1901 Avenue of the Stars, 16th Fl.
Los Angeles, CA 90067
(310) 228-3700

SHEPPARD, MULLIN,
RICHTER & HAMPTON LLP
Christopher Bosch (*pro hac vice*)
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700

*Attorneys for Defendant Barry C. Honig*