# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TAKATA, | : |
| | : Civil Action No.: 18-2293-GC-RLS |
| *Plaintiff*, | : |
| | : CONSOLIDATED ACTION |
| v. | : |
| | : **CONSOLIDATED THIRD AMENDED** |
| RIOT BLOCKCHAIN, INC., et al., | : **CLASS ACTION COMPLAINT FOR** |
| | : **VIOLATIONS OF THE FEDERAL** |
| *Defendants*. | : **SECURITIES LAWS** |
| | : |
| | : **JURY TRIAL DEMANDED** |

**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Joseph J. DePalma
Jeremy N. Nash
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com
jnash@litedepalma.com

*Local Counsel for Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for Dr. Stanley Golovac and Lead Counsel for the Class*

# TABLE OF CONTENTS

Table of Exhibits ........................................................................................................ iii

I.    Introduction ........................................................................................................ 1

II.   Jurisdiction and Venue ...................................................................................... 4

III.  Parties ................................................................................................................ 4

IV.   Relevant Non-Parties ........................................................................................ 6

V.    Background on Honig, O'Rourke, Beeghley, and the "Selling Stockholders" ............... 13

   A. Honig, O'Rourke, and Other "Selling Stockholders" Engaged in Three Prior
      "Pump-and-Dump" Schemes Resulting in an SEC Enforcement Action ........................ 13

   B. Beeghley Co-Invested with Honig and O'Rourke in PolarityTE ..................................... 22

   C. The Selling Stockholders' Prior Co-Investments with O'Rourke, Honig,
      and Beeghley ............................................................................................................. 23

VI.   Factual Background on the Fraudulent Scheme at The Company .................................... 25

   A. Honig, O'Rourke, and Other Selling Stockholders Obtain Control of the Company ....... 25

   B. March 2017 – the Company Announces a $2.25 Million "Private Placement
      Agreement" But Conceals that this Agreement Is Solely with Honig .......................... 27

   C. October 2017 – the Company Announces It Is "Changing Its Name to Riot
      Blockchain, Inc." and Its New "Focus" Will Be "Bitcoin and Ethereum" ....................... 28

   D. The October 2017 Coinsquare Agreement ..................................................................... 29

   E. The November 2017 Kairos Transaction ........................................................................ 33

   F. Starting in April 2017, the Company Registered More Than 29 Million Shares
      for Public Sale on Behalf of Honig and His Affiliated "Selling Stockholders" ............... 34

   G. Beginning in January 2017, Honig Engages in Undisclosed Insider Selling,
      Which He Conceals in Violation of Duties Under Section 13(d) and Rule 13d ............... 37

   H. December 29, 2017 – O'Rourke Sells 30,383 Shares for Proceeds of $869,256 ............ 38

   I. January 5, 2018 – Riot Discloses That It Vastly Overpaid for Kairos ............................ 39

   J. January 5, 2018 – Riot Fires Its Auditor ......................................................................... 40

VII.  The Truth of the Fraudulent Scheme Begins to Emerge .................................................. 40

VIII. Defendants Engaged in a Manipulative Scheme to Deceive Riot's Public Investors ....... 51

   A. Honig Knowingly Engaged in Deceptive Acts as Part of a Fraudulent Scheme ............. 51

   B. O'Rourke and Beeghley Knowingly Engaged in Deceptive Acts as Part of
      a Fraudulent Scheme ................................................................................................... 55

      1. O'Rourke's Scienter ................................................................................................. 56

      2. Beeghley's Scienter ................................................................................................. 57

i

IX.  Defendants' False and Misleading Statements and Omissions During the Class Period . 58

   A.  March 16, 2017 – Form 8-K – March 2017 Private Placement........................................ 61

   B.  March 31, 2017 – Annual Report (Form 10-K)........................................................... 63

   C.  April 20, 2017 – Registration Statement (Form S-3)..................................................... 63

   D.  April 27, 2017 – Form 10-K/A ................................................................................ 67

   E.  July 19, 2017 – Form S-3/A .................................................................................... 68

   F.  August 24, 2017 – Form S-3/A ................................................................................ 69

   G.  September 25, 2017 – Form S-3/A ........................................................................... 71

   H.  October 4, 2017 – Form 8-K – the Coinsquare Agreement .............................................. 72

   I.  November 3, 2017 – Form 8-K – the Kairos Transaction ................................................ 75

   J.  January 5, 2018 – Form S-3 .................................................................................... 76

   K.  February 7, 2018 – Form S-3/A ................................................................................ 79

   L.  February 16, 2018 – *CNBC* Publishes O'Rourke's Statements Concerning Riot ........... 81

   M.  February 16, 2018 – Form 8-K – O'Rourke's Letter to Riot's Shareholders.................. 82

X.  Additional Scienter Allegations................................................................................ 84

XI.  Loss Causation..................................................................................................... 86

   A.  The January 31, 2018 Stock Drop – *The Wall Street Journal* – "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake" ................................................. 87

   B.  The February 16, 2018 Stock Drop – "CNBC Investigates . . . Riot Blockchain"........... 88

   C.  The April 18, 2018 Stock Drop – Riot Files Form 10-K Revealing Related Party Transactions ................................................................................... 89

   D.  The May 29, 2018 Stock Drop – Riot Files a Form 8-K Revising Its Disclosures Concerning the Coinsquare Transaction....................................................................... 89

   E.  The September 7, 2018 Stock Drop – SEC Files Suit Against Honig, O'Rourke, and Several Other "Selling Stockholders"........................................................................ 89

XII.  Class Action Allegations........................................................................................ 90

XIII.  Applicability of The Fraud-on-the-Market and *Affiliated Ute* Presumptions of Reliance ......................................................................................... 92

XIV.  No Safe Harbor ................................................................................................... 94

COUNT I ................................................................................................................... 95

COUNT II .................................................................................................................. 96

COUNT III ................................................................................................................. 98

PRAYER FOR RELIEF ................................................................................................ 99

DEMAND FOR TRIAL BY JURY.................................................................................. 99

**Table of Exhibits**

Exhibit A    Complaint and Jury Demand filed in *SEC v. Barry C. Honig, et al.*, No. 1:18-cv-08175-ER (SDNY September 7, 2018) (ECF No. 1).

Exhibit B    First Amended Complaint and Jury Demand filed in *SEC v. Barry C. Honig, et al.*, No. 1:18-cv-08175-ER (SDNY March 8, 2019) (ECF No. 105).

Exhibit C    Second Amended Complaint and Jury Demand filed in *SEC v. Barry C. Honig, et al.*, No. 1:18-cv-08175-ER (SDNY March 16, 2020) (ECF No. 233).

Exhibit D    Email from John Stetson to Barry Honig re: Izea Worldwide Inc., attaching Shares Breakdown, dated January 27, 2012.

Exhibit E    Email from John Stetson re: Subscriber List, attaching Subscriber List for Passport Potash, Inc., dated January 20, 2011.

Exhibit F    Letter from Morgan Lewis & Bockius LLP to American Stock Transfer & Trust Company re: Senesco Technologies, Inc., dated October 2, 2013.

Exhibit G    SEC Form 8-K—Current Report (SEC 873 (02-21)), available at https://www.sec.gov/files/form8-k.pdf.

Exhibit H    Barry Honig, Amended Statement of Beneficial Ownership (Schedule 13 D/A) in regard to Riot Blockchain, Inc., filed with the SEC on and dated April 18, 2018.

Court-appointed Lead Plaintiff Dr. Stanley Golovac ("Plaintiff"), individually and on behalf of all other persons and entities similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review and analysis of filings by Riot Blockchain, Inc., formerly known as Bioptix, Inc. and Venaxis, Inc. ("Riot" or the "Company") and other public companies with the U.S. Securities and Exchange Commission ("SEC"); press releases, analyst reports, news articles, investment industry commentary, media, and other public statements about Riot and other companies; corporation registrations and filings with state governments; the corporate websites of Riot and other companies; and court filings in various ligation involving the Defendants, including *Securities and Exchange Commission v. Honig, et al.*, No. 1:18-cv-08175 (S.D.N.Y.) (the "*SEC v. Honig* Action").

## I.   INTRODUCTION

1.     This  is a federal securities class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act"), and Rule l0b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Plaintiff and all other persons or entities who purchased or otherwise acquired the securities of Riot and/or Bioptix (NASDAQ:  RIOT, BIOP) between March 15, 2017, and September 6, 2018, inclusive (the "Class Period"), and were damaged thereby.  Plaintiff brings this action to pursue remedies against the Company, certain of its former executive officers and/or directors, and one of Riot's largest shareholders, Barry Honig ("Honig"), who Plaintiff contents acted in concert with an undisclosed investor group (the "Selling Stockholders," as described herein) and Riot insiders to commit deceptive acts and otherwise disseminate false and misleading statements and omissions under the federal securities laws.

1

2.      Defendants' manipulative scheme—which is remarkably similar to three fraudulent "pump and dump" schemes identified by the U.S. Securities and Exchange Commission ("SEC")—involved misrepresentations and omissions that helped to conceal Honig's massive sales of Riot stock.  Honig's sales were planned and coordinated with the Selling Stockholders, who constituted an investor "group" as defined by Section 13(d) of the Exchange Act, Regulation 13d, and Item 403 of Regulation S-K.  This group was known to Defendants O'Rourke and Beeghley, who both served as Chief Executive Officer ("CEO"), Chairman, and members of the Company's Board of Directors (the "Board") during the Class Period.

3.      Item 403 of Regulation S-K and Section 13(d) of the Exchange Act require publicly traded companies to disclose when large beneficial owners (i.e., greater than 5% shareholders), like Honig, coordinate their trading as part of a larger investor group, like the Selling Stockholders.  O'Rourke and Beeghley caused the Company to omit and materially misrepresent Honig's and the Selling Stockholders' group status—facilitating their stock manipulation—even though O'Rourke and Beeghley were keenly aware of Honig's prior investment history and *modus operandi*.  Indeed, according to the SEC, Honig and O'Rourke have a long history of co-investing together as a group in dozens of other companies, including the three "pump-and-dump" schemes described by the SEC in the *SEC v. Honig* Action.  The SEC settled with Honig and O'Rourke in exchange for their agreement to be "permanently barred from participating in an offering of penny stock" (like Riot) and to pay millions of dollars in disgorgement and fines.  Defendant Beeghley also has prior business affiliations with Honig through his role on the Board of Directors of another publicly traded company, PolarityTE, when Honig was serving as Chairman and CEO and O'Rourke was a stockholder.

4.      In addition to concealing Honig and the Selling Stockholders' group status, O'Rourke and Beeghley deceived the Riot's public investors by announcing and promoting corporate transactions at the Company in which Honig was a related party but failed to disclose his involvement.  The federal securities laws and regulations, including the SEC Instructions for Item 1.01(a) of Form 8-K and Item 404 of Regulation S-K, *require* companies to disclose transactions with related parties—including transactions with large shareholders—within four business days.  O'Rourke and Beeghley failed to cause the Company to disclose Honig's role in these investments until long after Honig and the Selling Stockholders had already generated made millions of dollars for themselves by selling stock to unsuspecting public investors at artificially inflated prices.

5.      Defendants' scheme was revealed through a series of corrective disclosures that finally revealed to Riot's public investors, *inter alia*, (i) Honig's massive stock sales, (ii) his status as part of a previously undisclosed investor group (with other Selling Stockholders), (iii) Honig's involvement in several related-party transactions, and (iv) Honig's close-coordination with O'Rourke, Beeghley, and other Selling Stockholders.  For example, on January 31, 2018, *The Wall Street Journal* published an article stating that "Mr. Honig has sold about 500,000 shares" and only "still owns about 1% of the company."  On this news, Riot's stock price fell ***14.26%*** over two days.  Then, on February 16, 2018, *CNBC* published an article revealing that Honig may be "the man behind the Riot Blockchain curtain"; that O'Rourke had been working out of Honig's office; and that Honig was involved in a previously undisclosed related party transaction with the Company.  In response to *CNBC*'s article, Riot's share price fell ***33.4%***.

6.      Finally, on September 7, 2018, the SEC filed the *SEC v. Honig* Action against Honig, O'Rourke, and other Selling Stockholders revealing that they were acting as a highly-

orchestrated and closely-knit group of investors at three other public traded companies in order to artificially inflate and sell—or as the SEC described it, to "pump-and-dump"—those companies' stocks at the expense of their public investors.  On this news, the Riot's stock price declined a further *26.1%*.

## II.    JURISDICTION AND VENUE

7.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9.    Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the misleading statements entered into and the subsequent damages took place within this district.

10.    In connection with the acts, conduct, and other wrongs alleged herein, Defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

11.    **Plaintiff** purchased Riot common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

12.    **Defendant Riot** is a Nevada corporation with its principal executive offices purportedly located at 834-F South Perry Street, Suite 443, Castle Rock, Colorado 80104.  The Company's securities trade on NASDAQ under the symbol "RIOT," and previously traded as "BIOP."  As of April 13, 2018, Riot had 13,417,132 shares of common stock outstanding.

4

13.     **Defendant Honig** is a resident of Boca Raton, Florida, and worked at an office in Boca Raton with O'Rourke, Stetson, and Groussman.  Honig was an 11%+ shareholder of the Company during the Class Period.  Honig coordinated his stockholdings of the Company with the other Selling Stockholders.  Honig was an undisclosed related party to several of the Company's material strategic transactions.  During the Class Period, Honig sold at least 1,583,005 shares of his stock in the Company for at least $17 million in proceeds while maintaining close ties with Company insiders who had access to material, nonpublic information about Riot.  As alleged herein, Honig has longstanding business ties and/or co-investments with O'Rourke, Beeghley, Stetson, and Groussman, and other Relevant Non-Parties listed below.  Honig was a trustee of GRQ 401K, which has been a shareholder of Riot since at least September 14, 2016.  Honig had voting and dispositive power over GRQ 401K's securities of Riot during the Class Period.  Honig and GRQ 401K were defendants in the *SEC v. Honig* Action and have each been "permanently barred from participating in an offering of penny stock."  Honig was chairman and CEO of Majesco Entertainment Company ("Majesco") (later called PolarityTE) from September 30, 2015 until December 1, 2016.  Honig was formerly a director of Pershing.

14.     **Defendant O'Rourke** is a resident of Florida.  After being nominated by Honig, O'Rourke became a Director of the Company on January 6, 2017.  O'Rourke also served as Riot's President, Secretary, and Treasurer since at least September 2017,[1] and as Riot's CEO and Board Chairman from November 3, 2017 until September 8, 2018, when he resigned after the SEC charged him in the *SEC v. Honig* Action along with Honig, Groussman, Stetson, Brauser, and

---

[1] A December 20, 2017 filing by Riot with the Nevada Secretary of State lists O'Rourke as Riot's "President," "Secretary," and "Treasurer" for "the filing period of SEP, 2017 to SEP, 2018." O'Rourke is also identified as "President" of "Riot Blockchain, Inc." in the "Articles of Merger" that he signed on October 3, 2017, and filed with the Nevada Secretary of State on October 4, 2017.

others.  O'Rourke's 2017 executive compensation from the Company totaled to $2,991,842.  Additionally, O'Rourke sold at least 30,383 shares of his Riot stock for a profit of at least $869,256.35 while he had access to material, nonpublic information about Riot.  O'Rourke has longstanding business ties and/or co-investments with Honig, Groussman, and Stetson—including working out of the same office with them.  O'Rourke used the same fax number as Honig and Stetson.  O'Rourke and Stetson reside in homes located approximately 800 feet apart.  O'Rourke owns ATG.

15.    **Defendant Beeghley** was a Director of the Company from November 30, 2016 to November 2017.  Beeghley was the Company's CEO from April 6, 2017 until he was replaced by O'Rourke on November 3, 2017.  Beeghley was Chairman of the Company's Board from January 2017 to November 2017.  In 2017, Riot paid Beeghley $339,739 in compensation, including a $9,000 salary, $270,000 in stock awards, and $60,739 in option awards.  Beeghley was a director of Majesco (later called PolarityTE) from December 18, 2015 until October 18, 2017.

## IV.    RELEVANT NON-PARTIES

16.    **2330573 Ontario Inc. ("2330573 Ontario")** is a company whose President is Jason Theofilos ("Theofilos").  2330573 Ontario was a party to the Coinsquare Agreement with Riot, *infra* ¶¶ 98, and was a Selling Stockholder in Riot's Forms S-3 and S-3/A during the Class Period.

17.    **Aifos Capital LLC ("Aifos")** is a company controlled by Edward Karr, its Managing Member.  Aifos was a Selling Stockholder of Riot.

18.    **ATG Capital LLC ("ATG")** is a Florida corporation owned, operated, and controlled by O'Rourke.

19.     **Biozone Pharmaceuticals, Inc. ("Biozone")** is a Nevada corporation with its principal place of business in Pittsburg, California.  The SEC has sued Honig, O'Rourke, Stetson, and Brauser for engaging in a "pump-and-dump" scheme involving Biozone.

20.     **Michael Brauser ("Brauser")** invested in Riot through Grander Holdings, Inc. 401K.  Brauser also owned 112,499 shares of goNumerical Ltd. ("goNumerical"), also known as Coinsquare Ltd. ("Coinsquare").  The SEC sued Brauser along with Honig, O'Rourke, and Stetson in the *SEC v. Honig* Action for their "pump-and-dump" schemes involving Biozone, MGT, and MabVax; as a result, Brauser was permanently barred from participating in an offering of penny stock.

21.     **Catherine DeFrancesco ("DeFrancesco")** was an 11%+ beneficial owner of shares in Riot through at least six different entities:  DSB Capital, Ltd., a Turks & Caicos company; DeFrancesco Motorsports, Inc., an Ontario corporation; Delavalco Holdings, Inc., an Ontario corporation; Delavalco Holdings, Inc., a Florida corporation; Marcandy Investments Corp., an Ontario corporation; and Namaste Gorgie, Inc., an Ontario corporation.  DeFrancesco began acquiring Riot shares in August 2016, and, through different entities, was a Selling Stockholder in numerous Riot Forms S-3 and S-3/A.  During the Class Period, DeFrancesco sold substantially all of her Riot stock without disclosing her sales to the public pursuant to Exchange Act Section 13(d) or Rule 13d.

22.     **Grander Holdings, Inc. 401K ("Grander")** is a Florida corporation that Brauser owns and operates as Trustee.  The SEC sued Grander—along with Brauser, Honig, O'Rourke, and Stetson—in the *SEC v. Honig* Action for operating "pump-and-dump" schemes involving Biozone, MGT, and MabVax.  Grander was a Selling Stockholder in Riot's January 5 and February 7, 2018 Forms S-3 and S-3/A.

23.     **Mark Groussman ("Groussman")** worked out of the same Boca Raton office with Honig, O'Rourke, and Stetson.  Groussman purchased his house in Miami Beach, Florida, with a $700,000 mortgage loan from Honig, Groussman's mortgage holder.  Groussman was a Selling Stockholder in numerous Riot Forms S-3 and S-3/A during the Class Period.  Groussman owns Melechdavid, both of which were defendants in the *SEC v. Honig* Action and have been barred for five years from participating in any offering of penny stock.

24.     **GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("GRQ 401K")** is an entity for which Honig served as Trustee and through which he invested in the Company, and was a Selling Stockholder.

25.     **Alan Honig** is the father of Barry Honig and was a Selling Stockholder.

26.     **Jonathan Honig** is the brother of Barry Honig and is the Manager of Titan Multi-Strategy Fund I Ltd., which was a Selling Stockholder.

27.     **JAD Capital Inc. ("JAD")** is a corporation located in Ontario, Canada, whose Director is Theofilos.  JAD was a Selling Stockholder in several of Riot's Forms S-3 and S-3/A.

28.     **Kairos Global Technology Inc. ("Kairos")** is a Nevada corporation that was incorporated on October 19, 2019.  Honig and DeFrancesco were 8.6% and 6.3% shareholders of Kairos, respectively.

29.     **Edward M. Karr ("Karr")** was a director of Pershing Gold and  Majesco before its merger with PolarityTE.  Karr was appointed to Majesco/PolarityTE's board on September 25, 2014, the same day as Honig and Brauser.  Karr resigned as a director of PolarityTE on December 1, 2016, the same day that Honig and Brauser also resigned.  Karr invested in Riot through his company, Aifos, which was a Selling Stockholder.

30.  **Harvey Kesner ("Kesner")** was Honig's long-time lawyer.  Kesner was the owner of Paradox Capital Partners LLC ("Paradox").  Through Paradox, Kesner invested with Honig and O'Rourke in MabVax, PolarityTE, Pershing Gold, and Marathon, and was a Selling Stockholder of Riot.

31.  **MabVax Therapeutics Holdings, Inc. ("MabVax")** is a Delaware corporation, based in San Diego County, California.  The SEC sued O'Rourke, Honig, Stetson and Brauser for engaging in a "pump-and-dump" scheme involving MabVax.

32.  **Marathon Digital Holdings, Inc. ("Marathon")** (formerly, Marathon Patent Group Inc.) is a public company that Honig, O'Rourke, Groussman, Stetson, Brauser, and certain other Selling Stockholders co-invested in, controlled, and sought to convert into a cryptocurrency company through related-party transactions.  Honig invested in Marathon around December 2011.  O'Rourke held 41% of Marathon's common stock according to a November 29, 2017 prospectus.  Groussman and Stetson were Marathon's CEO and COO, respectively, until resigning in 2012.  In January 2012, Marathon agreed "to acquire certain uranium exploration rights and properties held by Pershing" when Honig was Pershing's chairman.  On November 2, 2017, Marathon announced that it had agreed to acquire Global Bit Ventures Inc. ("GBV"), a company in which Stetson had a security interest, in order to convert Marathon into a "blockchain" company.  GBV's CEO, Jesse Sutton (former CEO of PolarityTE) was nominated to Riot's Board by Honig.

33.  **Marcandy Investments Corp. ("Marcandy")** is an Ontario corporation owned and controlled by DeFrancesco.  Marcandy was a Selling Stockholder of Riot.

34.  **Melechdavid Inc. ("Melechdavid")** is a Florida corporation owned and controlled by Groussman.  Melechdavid was a Selling Stockholder of Riot.

35.     **MGT Capital Investments Inc. ("MGT")** is a Delaware corporation based in Durham, North Carolina.  The SEC sued O'Rourke, Honig, Stetson, and Brauser for engaging in a "pump-and-dump" scheme involving MGT.

36.     **Richard Molinsky ("Molinsky")** is a former stockbroker at D.H. Blair & Co., who was barred from the industry in 2000 after pleading guilty[2] to criminal charges related to market manipulation and fraudulent sales practices, and was a Selling Stockholder in several of Riot's Forms S-3 and S-3/A.  Molinsky has been an investor in various Honig-and-O'Rourke-backed companies, including PolarityTE, Pershing Gold, Marathon, and Riot.

37.     **MUNDOmedia Ltd. ("Mundo")** was a marketing company based in Toronto, Ontario, founded by its former CEO, Theofilos.  On September 2, 2016, Mundo announced that Theofilos had "led a buyout of 100% of the outstanding equity of [Mundo]," and that "Barry Honig is among the notable private equity investors that participated."  On July 28, 2017, *Private Capital Journal* reported that Mundo had "withdrawn its proposed initial public offering" that "would have consisted of $30 million treasury offering" involving "selling shareholders which include … David Baazov ("Baazov") / Ahaka Capital … [Stetson Capital], [ATG, i.e., O'Rourke], [Melechdavid, i.e., Groussman], Barry Honig, [O'Rourke] and Jonathan Honig."[3]  Mundo shut down in April 2019.

---

[2] *See In the Matter of Breitner*, No. 3-11105 (S.E.C. May 5, 2003) (noting "Molinsky pled guilty to and was convicted of … one count of Martin Act securities fraud" and ordering him "barred from association with any broker or dealer"), available at https://www.sec.gov/litigation/admin/34-47797.htm.

[3] *See* Ted Liu, "Mundo pulls $30M IPO," Private Capital Journal (July 28, 2017), available at https://privatecapitaljournal.com/mundo-pulls-30m-ipo/.

38.     **Namaste Gorgie Inc. ("Namaste")** is an Ontario corporation owned and controlled by its President, DeFrancesco, and was a Selling Stockholder in Riot's January 5 and February 7, 2018 Forms S-3 and S-3/A.

39.     **Northurst Inc. ("Northurst")** is a Canadian company that owned 9.99% percent of Riot stock, was a Selling Stockholder in several Forms S-3 and S-3/A, and was also an investor in Kairos and Marathon.  Northurst's controlling shareholder, Jakub Malczewski ("Malczewski"), was managing director of Ahaka Capital with Baazov, the former CEO of an online gambling company who Canadian authorities charged with insider trading and market manipulation. Through Ahaka Capital, Malczewski and Baazov were investors in Mundo alongside Honig, O'Rourke, Stetson, and Groussman.

40.     **Robert O'Braitis ("O'Braitis")** was an investor in PolarityTE and Marathon and was a Selling Stockholder of Riot.

41.     **Paradox Capital Partners LLC ("Paradox")** is an investment management company owned by Kesner. Paradox's registered address in Florida was the same address as the Boca Raton office building that Honig used as his business address where he shared an office with O'Rourke, Stetson, and Groussman.  Paradox was a Selling Stockholder of Riot.

42.     **Pershing Gold Corp. ("Pershing")** was a publicly traded company whose primary asset was the Relief Canyon Mine in Pershing County, Nevada.  Honig was chairman of Pershing until February 9, 2012, and was a director until August 2018.  As of September 19, 2018, Honig owned approximately 38% of Pershing's common stock.  Karr (an investor in Riot through his entity, Aifos) was also a director of Pershing and owned 33% of its common stock as of August 31, 2018; as of the same date, O'Rourke, Jonathan Honig, Groussman, Molinsky, Richardson, and Stetson were all shareholders of Pershing.

11

43.     **PolarityTE Inc. ("PolarityTE")** was a public company known, previously known as Majesco, based in Salt-Lake City, Utah.  PolarityTE's former co-chairmen were Honig and Brauser.  Honig was also Polarity's CEO.  Stetson was PolarityTE's CFO.  Karr was a director of PolarityTE.

44.     **Erick Richardson ("Richardson")** was a shareholder of Pershing Gold and Marathon, both of which companies he invested alongside Honig, O'Rourke, Stetson, Groussman, Brauser, and other Selling Stockholders.  Richardson was a Selling Stockholder of Riot in numerous Forms S-3 and S-3/A during the Class Period.

45.     **John Stetson ("Stetson")** is a resident of Florida, and was the former CFO of PolarityTE.  Stetson has longstanding business ties and/or co-investments with Honig, O'Rourke, and Groussman—including by working together out of the same office.  Stetson used the same fax number as Honig and O'Rourke.  Stetson owns Stetson Capital.  Stetson was a Selling Stockholder through Stetson Capital in numerous Riot Forms S-3 and S-3/A during the Class Period.  Stetson and Stetson Capital were defendants in the *SEC v. Honig* Action and have each been barred for ten years from participating in any offering of penny stock.

46.     **Stetson Capital Management, LLC ("Stetson Capital")** is a Florida limited liability company whose manager and registered agent is Stetson.  Stetson Capital was a Selling Stockholder during the Class Period.

47.     **Jason Theofilos ("Theofilos")** was the chief executive of Mundo, the director of JAD, and the president of 2330573 Ontario.  Theofilos was a Selling Stockholder of Riot shares through both 2330573 Ontario and JAD in different Forms S-3 and S-3/A.

48.     **Titan Multi-Strategy Fund I, Ltd. ("Titan")** is a Florida corporation that is owned and controlled by its Manager Jonathan Honig.  Titan was a Selling Stockholder of Riot.

## V.      Background on Honig, O'Rourke, Beeghley, and the "Selling Stockholders"

### A.      Honig, O'Rourke, and Other "Selling Stockholders" Engaged in Three Prior "Pump-and-Dump" Schemes Resulting in an SEC Enforcement Action

49.      The SEC has sued O'Rourke and Honig for "acting as an undisclosed control group" in three previous fraudulent pump-and-dump schemes involving the same *modus operandi* that Plaintiff alleges they used at Riot. Specifically, on September 7, 2018, the SEC filed its initial complaint in the *SEC v. Honig* Action against O'Rourke and Honig, (as well as related-non-parties Brauser, Groussman, Stetson  and others) for violating the Exchange Act and Securities Act by engaging in "three highly profitable 'pump-and-dump' schemes . . . from 2013 through 2018 in the stock of three public companies ([Biozone], [MGT], and [MabVax]) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares." Cmpl. ¶ 1 (attached as Exhibit A).[4]

50.      The SEC alleged that "[i]n every scheme, Honig, and some combination of Stetson, Brauser, O'Rourke, Groussman . . . either explicitly or tacitly agreed to buy, hold or sell their shares in coordination with one another, knowing that a pump and dump was in the offing that would allow them all to profit handsomely." *Id.* ¶ 2. "Honig, Brauser, Stetson, O'Rourke, . . . and Groussman, as well as certain of their entities, also violated beneficial ownership reporting requirements of the federal securities laws by failing to disclose their group beneficial ownership of shares and the fact that as a group they were looking to exercise (and, in fact, did exercise) control over the issuers." *Id.* ¶ 4.

---

[4] Citations to "Cmpl. ¶ __" are to paragraphs of the SEC's initial complaint in the *SEC v. Honig* Action.  *See SEC v. Honig et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Sept. 7, 2018) (ECF No. 1).

51.     On March 8, 2019, the SEC filed an amended complaint in the *SEC v. Honig* Action (attached as Exhibit B).[5]  In its amended complaint, the SEC alleged that O'Rourke, Honig, Stetson and Brauser invested as a group in **at least 19 companies** from 2011 to the present.  In most cases, the investments followed a similar pattern:  Honig would identify a target company and arrange a financing or financing that would give himself, O'Rourke, and their group of chosen co-investors (including Stetson and Brauser) a controlling position in a company's outstanding common stock at lower-than-market prices.  Am. Cmpl. ¶ 55.

52.     Honig, O'Rourke, Brauser, and Stetson, and others in their group would then exercise that control by dictating management decisions and policies, and voting together to direct that company's major business decisions.  When the group determined that the time had arrived to exit their investment, they would engineer and promote a corporate event that would both drive the price of the stock higher, and also create market demand and trading volume that would allow them to sell their positions.  *Id.*

53.     Typically, the event would be a corporate transaction that management would undertake—for example, an acquisition or merger, or a new investment by a well-known investor; then the group paid writers, bloggers, or other public relations professionals to write about the transaction.  These promotional activities would bring new buyers into the stock, thereby allowing the group to begin selling their stock in the companies.  Once the publicity had its intended effect on the stock's price and trading volume, Honig, O'Rourke, Brauser, and Stetson, together with their hand-picked co-investors, would sell their respective positions—generally staggered over a course of weeks—into the artificially inflated market.  *Id.*

---

[5] Citations to "Am. Cmpl. ¶ __" are to paragraphs of the SEC's First Amended Complaint.  *See SEC v. Honig, et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 8, 2019) (ECF No. 105).

54.     Throughout this process, Honig and O'Rourke were in nearly daily contact because they worked out of the ***same office*** and were in frequent email and telephone contact, at times purposefully moving their conversations to the less permanent media of text or instant messaging. Honig and O'Rourke were also in frequent contact with Stetson, with whom they shared the same office space until late 2013. *Id*. ¶ 56.

55.     Honig, O'Rourke, Brauser, and Stetson invested in the companies at the same time, and agreed to act as a group in holding, disposing, and voting the stock they acquired, with Honig leading the effort.  As O'Rourke stated in a February 3, 2014 email to the officer of a potential merger target, "***Barry Honig is the principal investor of <u>our</u> small group***."  Honig carefully controlled each of his "small group's" participants in financing(s) that he arranged so that shares were held only by individuals and entities that (1) permitted Honig to direct how they voted their shares and/or acquiesced to Honig's control of the management of the company, and (2) would strategically refrain from selling their shares until it was the optimal time for Honig and his group participants to profit from the planned post-pump dump. *Id*. ¶ 57.

56.     Honig worked with other group members to ensure that members of his group voted their shares in unison.  At times, members of the group reached out to Stetson to find out how they should vote on various proposals.  For example, with respect to one of the companies in which they had co-invested, in July 2015, Brauser forwarded an email request from a co-investor's staffer to Stetson, asking whether to vote for or against a proposal.  Stetson, in an email that same day, copying Honig, replied, "Yes, vote 'For.'"  "In a November 2016 email to members of a Honig group of investors in another [company], Stetson responded to a request for 'instructions to vote' with '[v]oting in favor of [two named directors]. Against all other members and actions.'" *Id*. ¶ 58.

57.     While Honig was the primary architect of the three schemes detailed below, email traffic obtained by the SEC among Honig, O'Rourke, Brauser, Stetson, and others demonstrated the various key roles each of these individuals played in the scores of Honig-led investments.  *Id.* ¶ 59.  For example, through his entity, ATG, or individually, O'Rourke invested alongside Honig (and/or a Honig entity) in over **75 companies** between 2011 and August 2018.  ¶63

58.     Beginning in 2013, O'Rourke managed the group's promotional efforts by working with writers and bloggers to publish favorable articles and posts about issuers that the group controlled.  O'Rourke arranged for those writers to be compensated for their promotional articles.  O'Rourke made the payments to such writers through personal checks and/or sham stock purchases, designed to disguise the true purpose of the compensation.  2d Am. Cmpl. ¶ 65 (attached as Exhibit C).[6]

59.     At times, with Honig's knowledge and consent, or at Honig's direction, O'Rourke wrote and published the promotional articles himself.  In these instances, he used a pseudonym for the byline and did not disclose his relationship with the company being promoted or the compensation Honig was paying him for the articles.  *Id.* ¶ 66.

60.     Similarly, Stetson invested alongside Honig (and/or a Honig entity) in more than **65 companies** between 2011 and August 2018.  In most instances, Stetson executed Honig's directives, managed the administrative aspects of Honig and his group's investments, and performed pre-investment due diligence. For example, Stetson communicated with brokers to complete Honig's trades, deposited Honig's shares with brokers, communicated investment terms and wire instructions to investors Honig had lined up, tracked the ownership of each group member

---

[6] The SEC filed its second amended complaint in the *SEC v. Honig* Action on March 16, 2020. Citations to "2d Am. Cmpl. ¶ __" are to paragraphs of the SEC's Second Amended Complaint, *see SEC v. Honig, et al.*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 16, 2020) (ECF No.233).

in a particular issuer, corralled shareholder votes from co-investors (and, in some cases, even told co-investors how to vote), prepared financial analyses of proposed investments and conveyed Honig's instructions to issuer management. *Id*. ¶ 64.[7]

61.     In connection with the *SEC v. Honig* Action, the SEC has obtained numerous internal documents confirming that Honig, O'Rourke, Stetson and others have a long history of coordinating their investments as a group. For example, a January 27, 2012 email from Stetson to Honig that attaches a "Share Breakdown" of the shares that Honig, Stetson, Groussman, Brauser, and their affiliates would hold in a company called IZEA Worldwide Inc. following a stock split (attached as Exhibit D). Another email from Stetson, dated January 20, 2011, provides a similar breakdown for himself, Honig, Brauser, and others for "Passport Potash, Inc." (attached as Exhibit E). Likewise, an October 2, 2013 letter shows how Honig, Groussman, Brauser, and Brauser's relatives allotted their co-investments in Senesco Technologies, Inc. (attached as Exhibit F).

62.     The companies where Honig and O'Rourke engaged in manipulative schemes are also detailed in the SEC's First Amended Complaint. *See supra* note 5. Referring to Honig as the "primary strategist," the First Amended Complaint alleges, among other things, that Honig and O'Rourke acquired or sold stock, arranged for the issuance of shares, negotiate transactions, and/or engaged in promotional activity at "Company A" (Biozone), "Company B" (MGT), and "Company C" (MabVax):

> All told, the three schemes earned Defendants and their associates millions of
> dollars: [Biozone's] pump and dump generated approximately $9.3 million in stock
> sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective
> entities, and affiliates. [MGT's] pump and dump generated more than $9.5 million
> for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities, affiliates,
> and/or certain frequent co-investors. And, most recently, the pump and dump of

---

[7] Brauser also invested (individually, through his entity, Grander, or through family members' accounts) alongside Honig (and/or a Honig entity), in ***40 companies*** between approximately 2011 and mid-2018. *Id*. ¶ 62.

> [MabVax] brought in over $8.3 million in stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities and/or certain frequent co-investors. These profits were made at the expense of investors who purchased shares in [Biozone], [MGT] and [MabVax] at artificially high prices based on misleading flattering articles or coverage in the media and matched trades that were orchestrated by the Defendants.

Am. Cmpl. ¶ 8.

63.     Regarding MGT (Company B), the SEC alleged that "[d]uring 2015 and 2016, Honig and his associates used [MGT], once a publicly traded shell, as [a] vehicle for their pump-and-dump schemes":

> Honig and his partners used many of the same tactics they had employed in the [Biozone] scheme: they bought millions of cheap shares, intending to exercise control over the management and policies of the company; exercised that control; orchestrated a misleading promotion of the company that drove up the price and the trading volume of the company's shares; and dumped their shares for a profit in the inflated market.

*Id.* ¶ 125.

64.     The SEC alleged that MGT's CEO, Robert Ladd, "knew" that Honig, O'Rourke, Stetson, and Brauser were "operating as a group" and had "acquired [MGT] shares together, and that they were collectively exercising control over the company." 2d Am. Cmpl. ¶ 140. As the SEC explained "[i]n an email dated September 29, 2015 to [MGT] counsel, Stetson, Honig and [MGT's] CFO – and in his October 4, 2015 email to [MGT's] Directors – Ladd referred to the potential investors as an '***investor group . . . led by Barry Honig***,' and attached a 'term sheet' (to the September 29 email) that defined Honig as 'Lead Investor.'" *Id.* (emphasis added).

65.     Similarly, in November 2015, Ladd wrote Honig: "As for the cap table, we have 17.2 million common shares outstanding, including ***your group's*** 2.8 million . . . ." *Id.* (emphasis added). Yet, the SEC alleged that "Ladd nonetheless failed to disclose Honig's, Brauser's, Stetson's and O'Rourke's combined interest in, and control over, the company in [MGT's] public filings." *Id.* In a chat conversation with Stetson, Honig celebrated the group's undisclosed "behind

the scenes" investment involvement in MGT, and stated that "its great in [MGT] because **we are behind the scenes**." *Id*. ¶ 157.

66.    Regarding MabVax (Company C), the SEC alleged that "[o]n April 3, 2015, O'Rourke, acting at Honig's direction, circulated a press release (with input from [MabVax's] CEO, Honig and Brauser) announcing the $12 million private placement in which Investor 1 and his entities had participated, drawing on Investor 1's reputation among retail investors as a successful biopharma investor." *Id*. ¶ 212.  "Honig, with the knowledge of Brauser and Stetson, then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym 'Wall Street Advisors' on the *Seeking Alpha* website on April 8, 2015 at 11:13 a.m. The article, titled '[Opko Health, Inc. ("Opko")] Spots Another Overlooked Opportunity in [MabVax],' highlighted [Opko's] and Investor 1's investment in [MabVax], and was designed to inspire Investor 1's retail investor devotees to follow his lead and buy [MabVax] stock." *Id*. ¶ 213.

67.    The SEC also alleged that O'Rourke's secret "promotional campaign was successful":[8]

> The trading volume of [MabVax] shares rose almost 7500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, following the announcement of the Series E private placement involving Investor 1.  The trading volume further increased to 858,709 on April 9, 2015, the day after O'Rourke's article was published. [MabVax's] share price went from a closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015, increasing the company's market capitalization by $23 million. Honig and his affiliates, listed below, acting pursuant to their agreement to acquire, hold, vote and/or dispose of their [MabVax] shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of over $5.5 million.

68.    On February 24, 2020, the court in *SEC v. Honig* denied a motion to dismiss the action and noted that the SEC had "amply" alleged "the agreement that is necessary for a group to

---

[8] *Id*. ¶ 215.

come into existence, as defined in SEC rules."[9] "Placed in context with all of the pre-2015 conduct alleged as background, it is more than plausible that the four men [i.e., Honig, O'Rourke, Stetson, and Brauser] had agreed to work in concert on their schemes." *Id*.

69.     In July 2019, the SEC reached a settlement with Honig in the *SEC v. Honig* Action, in which Honig agreed, among other things, to be "permanently barred from participating in an offering of penny stock"; "permanently prohibited" from holding greater than 4.99% of any penny stock company; "permanently prohibited" from "advertising, marketing, or otherwise promoting" any penny stock company; and agreed to "pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty" yet to be determined upon a forthcoming motion by the SEC.[10]

70.     The SEC also reached settlements with O'Rourke,[11] Stetson,[12] Brauser,[13] ATG,[14]

---

[9] *SEC v. Honig*, No. 1:18-cv-08175-ER (S.D.N.Y. Feb. 24, 2020) (ECF No. 211) (Opinion & Order) at 23.

[10] *SEC v. Honig*, No. 1:18-cv-08175-ER (S.D.N.Y. July 7, 2019) (ECF No. 152) (Judgment as to Defendant Barry C. Honig).  *See also*, ¶ 13, *supra*.

[11] *SEC v. Honig*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 6, 2020) (ECF No. 228) (Final Judgment as to Defendant John R. O'Rourke III).  O'Rourke's settlement permanently bars him from participating in any offering of penny stock; holding greater than 4.99% of any penny stock; or advertising, marketing, or promoting any penny stock company; and requires him to pay $1,153,326.00 in disgorgement, interest, and civil penalties.  *Id*.  *See also*, ¶ 18, *supra*.

[12] *SEC v. Honig*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 6, 2020) (ECF No. 227) (Final Judgment as to Defendant John Stetson).  Stetson's settlement bars him for ten years from participating in an offering of penny stock; holding greater than 4.99% of any penny stock; or advertising, marketing, or promoting any penny stock company; and requires him to pay $1,154,669.28 in disgorgement, interest, and civil penalties.  *Id. See also*, ¶ 46, *supra*.

[13] *SEC v. Honig*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 6, 2020) (ECF No. 224) (Final Judgment as to Defendant Michael Brauser).  Brauser's settlement permanently bars him from participating in an offering of penny stock; holding greater than 4.99% of any penny stock; or advertising, marketing, or promoting any penny stock company; and requires him to pay $1,175,768.16 in disgorgement, interest, and civil penalties.  *Id*.  *See also*, ¶ 20, *supra*.

[14] *SEC v. Honig*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 6, 2020) (ECF No. 229) (Final Judgment as to Defendant ATG Capital LLC).  *See* ¶ 18, *supra*.

Stetson Capital,[15] and Grander[16] in connection with the *SEC v. Honig* Action, requiring them to pay millions of dollars in disgorgement, interest, and civil penalties, and barring these individuals and entities from participating in penny stock offerings.

71.     On February 26, 2019, Groussman settled with the SEC, and agreed to a similar five-year bar from participating in an offering of penny stock; holding greater than 4.99% of any penny stock; or advertising, marketing, or promoting any penny stock company; and required him to pay $1,381,914.78 in disgorgement, interest, and civil penalties.[17]

72.     More recently, on March 22, 2022, the Securities Division of the Office of the Secretary of State of the Commonwealth of Massachusetts (the "Securities Division") issued a Consent Order against U.S. Data Mining Group, Inc. ("DMG"), a company formed in December 2020 "with material assistance from Stetson, Groussman, and [Jonathan] Honig," who together "held 100% of DMG's debt" and "at least 80% of DMG's stock."[18]  The Securities Division found that "Stetson and Groussman introduced investors to DMG" and thus were "promoters of [DMG]." *Id.* at ¶¶ 27-28.  It was also found that Stetson and Groussman were "'bad actors' under the securities laws given their prior business dealings with each other and [Jonathan] Honig's brother, Barry Honig, in a series of schemes to defraud innocent investors." *Id.* at ¶ 29.

73.     In that regard, the Securities Division noted that "[p]rior to DMG's founding, Barry Honig conspired with Groussman, Stetson, Melechdavid, [Stetson Capital], and others to commit

---

[15] *SEC v. Honig*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 6, 2020) (ECF No. 226) (Final Judgment as to Defendant Stetson Capital Investments Inc.).  *See* ¶ 46, *supra*.

[16] *SEC v. Honig*, No. 1:18-cv-08175-ER (S.D.N.Y. Mar. 6, 2020) (ECF No. 225) (Final Judgment as to Defendant Grander Holdings, Inc.).  *See* ¶ 22, *supra*.

[17] *SEC v. Honig*, No. 1:18-cv-08175-ER (S.D.N.Y. Feb. 6, 2019) (ECF No. 93) (Final Judgment as to Defendant Mark Groussman).  *See* ¶ 23, *supra*.

[18] *See* Consent Order, No. E-2022-0011, at ¶¶ 6, 9, 12, 15, 18-19 (Mar. 22, 2022), available at https://www.sec.state.ma.us/sct/current/sctdatamininggroup/20220322090340072.pdf.

securities fraud." *Id.* at ¶ 14.  The Securities Division further found that in March 2021, DMG "rais[ed] nearly $25 million" in a "Series A stock offering," but "failed to make the appropriate filings with the [Securities Division]" given "the 'bad actor' issue with DMG." *Id.* at ¶¶ 42-44, 55-56.  It was further found that "DMG's management authorized DMG to pay $9.3 million—over 37% of the capital raised in the Series A round—to be given to Stetson and Groussman's wives . . . ." *Id.* at ¶ 62.  In the Consent Order, the Securities Division ordered DMG, among other things, to "permanently cease and desist from committing further violations of the [Massachusetts Uniform Securities Act]"; to "furnish a written offer of rescission" to DMG's investors; and to pay a fine of $1,000,000.  *Id.* at 11.

## B.     Beeghley Co-Invested with Honig and O'Rourke in PolarityTE

74.     Beeghley also has a history of co-investing with O'Rourke and Honig through PolarityTE, a company previously known as Majesco.  In September 2015, while Majesco was merging with PolarityTE, Stetson, as Majesco's then-CFO, appointed Honig and Brauser as Co-Chairmen of PolarityTE's board of directors.

75.     In August 2016, Honig, O'Rourke, Stetson, Brauser, among others, were listed as "Selling Stockholder[s]" in a Form S-3/A Registration Statement that registered shares in then-Majesco for sale to public investors.[19]

76.     Beeghley was a director of Majesco/PolarityTE from December 18, 2015 until October 18, 2017, and Honig was Chairman and CEO of Majesco/PolarityTE from September 25, 2015 until December 1, 2016.  Thus, Beeghley joined PolarityTE's board of directors when Honig was already chairman and CEO of that board.

---

[19] PolarityTE, Inc., Registration Statement Amendment No. 2 (Form S-3/A) at 10-16 (Aug. 3, 2016).

77.     On March 1, 2019, PolarityTE received a subpoena from the SEC,[20] and, according to *CNBC*, its "shares tumble[d]" on news that the "SEC is looking into possible manipulation."[21]

78.     In the wake of the SEC announcing charges against Stetson in September 2018, PolarityTE immediately terminated Stetson, stating that "the Company, management, and Board of Directors do not tolerate the behavior outlined in the complaint."[22]

**C.     The Selling Stockholders' Prior Co-Investments with O'Rourke, Honig, and Beeghley**

79.     As discussed below, during the Class Period, Riot filed a series of Securities Registration Statements on Forms S-3 and S-3/A that registered more than 29 million shares of Riot common stock for sale by certain "Selling Stockholders" to the investing public. *See* ¶¶ 109-115, *infra*. These Selling Stockholders included the following individuals and entities: 2330573 Ontario, Aifos, ATG, Brauser, DeFrancesco, Grander, Groussman, GRQ 401K, Alan Honig, Barry Honig, Jonathan Honig, JAD, Karr, Kesner, Melechdavid, Molinsky, Namaste, Northurst, Paradox, O'Braitis, Stetson Capital, Theofilos, and Titan, and other affiliated shareholders.

80.     Based on information compiled by Plaintiff's counsel and as illustrated in the chart below, each of these individuals or entities has also invested in one or more public companies affiliated with O'Rourke, Honig, Stetson, Groussman and/or Beeghley. In addition, the majority of the Selling Stockholders invested in one of the three pump-and-dump schemes—companies

---

[20] PolarityTE, Inc., Annual Transition Report (Form 10-KT) at 43, 48 (Mar. 18, 2019).

[21] *See* https://www.cnbc.com/2019/03/18/biotechs-shares-tumble-after-it-says-sec-is-looking-into-possible-manipulation.html.

[22] *See* PolarityTE, Inc. Issues Statement Regarding Mr. John Stetson and his Termination from the Company, https://www.prnewswire.com/news-releases/polarityte-inc-issues-statement-regarding-mr-john-stetson-and-his-termination-from-the-company-300709106.html.

Biozone, MGT and MabVax—described in the *SEC v. Honig* Action. *See* ¶¶ 49-73, *supra*. Most Selling Stockholders also invested alongside O'Rourke, Honig, Stetson, Groussman and/or Beeghley in Marathon, PolarityTE, Pershing, and/or Mundo.

**The Selling Stockholders' Prior Co-Investments with O'Rourke, Honig, and Beeghley[23]**

| Selling Stockholders | Biozone | MGT | MabVax | PolarityTE | Pershing | Mundo | Marathon |
|---|---|---|---|---|---|---|---|
| 2330573 Ontario | | | | | | X | |
| Aifos | | | X | X | X | | |
| ATG | | X | X | X | X | | |
| Beeghley | | | | X | | | |
| Brauser | X | X | X | X | X | | X |
| DeFrancesco | | | | X | | | |
| Grander | X | X | X | X | X | | X |
| Groussman | X | X | X | X | X | X | X |
| GRQ 401K | X | X | X | X | X | | X |
| Honig, Alan | | | X | | X | | X |
| Honig, Barry | X | X | X | X | X | X | X |
| Honig, Jonathan | | | X | | X | X | |
| JAD | | | | | | X | |
| Karr | | | X | X | X | | X |
| Kesner | X | X | X | X | X | | X |
| Melechdavid | | X | X | X | X | X | X |
| Molinsky | | | | X | X | | X |
| Namaste | | | | X | | | |
| Northurst | | | | | | | X |
| O'Braitis | | | | X | | | X |
| O'Rourke | X | X | X | X | X | X | X |
| Paradox | | X | X | X | X | | X |
| Richardson | | | | | X | | X |
| Stetson | X | X | X | X | X | X | X |
| Stetson Capital | | X | | X | X | X | X |

---

[23] The absence of a checked box is not intended to admit the lack of a relationship with any company.

## VI.    FACTUAL BACKGROUND ON THE FRAUDULENT SCHEME AT THE COMPANY

### A.    Honig, O'Rourke, and Other Selling Stockholders Obtain Control of the Company

81.    Riot was originally called "Venaxis" and was a medical products company whose executives, Board, and employees sought to develop a blood test for determining which patients suffering from abdominal pain were less likely to be suffering from acute appendicitis than from other ailments.

82.    In or around March 2016, Honig and his friends and relatives began buying Venaxis stock.

83.    On September 12, 2016, Venaxis acquired BiOptix Diagnostics, Inc. ("Bioptix"), and changed its name to "Bioptix."

84.    On September 14, 2016, Honig and DeFrancesco both sent letters to the Company's then-CEO Stephen T. Lundy ("Lundy"), touting their combined 16.2% stake in the Company. Honig also spoke several times on the telephone with members of Venaxis's then-existing Board. According to a former Venaxis Board member who was present during these telephone conversations, Honig implied that he had control of 40% of Venaxis's shares through his stock ownership and the stock ownership of a group of Honig's "friends and relatives."

85.    That same day, Honig wrote a letter to the Chair of Venaxis's Nominating Committee attempting to nominate his own slate of new directors of the Company, including O'Rourke and Beeghley, and several other of Honig's associates.[24]

---

[24] *See* Barry Honig, Amended Statement of Beneficial Ownership (Schedule 13D/A) at Ex. 99.4 (Sept. 13, 2016).

86.     In his September 13, 2016 letter to Lundy, Honig, who was the Company's "largest shareholder," wrote that Venaxis was "wast[ing] precious resources with no clear direction or strategy. . . . while board fees and management salaries continue to be paid." *Id*. at 99.2.  Honig told Lundy that "[t]he first change that needs to be made is to immediately reconstitute Venaxis' board." *Id*.

87.     The following day, on September 14, 2016, DeFrancesco sent a similar letter to Venaxis's CEO in support of Honig and his demand for a special meeting of the shareholders. DeFrancesco sent a follow-up letter on September 20, 2016, in which she "repeat[ed] [her] demand . . . for a special meeting of the shareholders" and "join[ed] in Mr. Honig's prior nomination."[25]

88.     Following these letters, in late 2016, Honig and DeFrancesco waged a proxy fight for control of Bioptix, demanding the removal of five of Bioptix's six directors and the payment of a $7.5 million special dividend.  For example, a letter dated and filed on September 13, 2016, on Schedule 13D/A, from Honig to Daryl Faulkner, Chair of the Company's Nominating Committee, nominated O'Rourke, Stetson, Beeghley, and others to the Board, and stated:  "Should you have any questions regarding the foregoing, please do not hesitate to ***contact our counsel Harvey Kesner, Esq***. . . ." *See supra* note 24.

89.     Also, on December 8, 2016, Honig filed a lawsuit in state court in Colorado, seeking to force a special meeting of shareholders that would include a vote on the proposed changes.  Bioptix sought to placate Honig by appointing one of his allies—Beeghley—to its Board. When Bioptix's then-existing Board was considering Beeghley as a nominee for election, Beeghley told the Board that he did not know Honig—according to an individual present at the

---

[25] *See* Catherine DeFrancesco, Amended Statement of Beneficial Ownership (Schedule 13D/A) at Ex. 99.1 (Sept. 20, 2016).

time—despite the fact that Beeghley and Honig had recently served together as co-chairmen on the board of PolarityTE.

90.     Honig and DeFrancesco continued acquiring shares and held nearly 23% of the Company's stock as of January 2017 based on their Schedules 13D and 13D/A filed with the SEC that same month.  On January 6, 2017, O'Rourke joined Bioptix's Board.  Shortly thereafter, three of Bioptix's Board members resigned on the basis that Honig was likely to prevail in his legal fight and that mounting a defense would waste corporate recourses.

91.     Two months later, in March 2017, a long-time Bioptix director stepped down, giving Honig de facto control of the Company.

**B.     March 2017 – the Company Announces a $2.25 Million "Private Placement Agreement" But Conceals that this Agreement Is Solely with Honig**

92.     The Class Period began when on March 16, 2017, Riot issued a Current Report on Form 8-K filed with the SEC (the "March 16, 2017 Form 8-K") announcing the Company's "[e]ntry into a [m]aterial [d]efinitive [a]greement" with certain "accredited investors" to sell "$2,250,000 of units of its securities" (the "March 2017 Private Placement"):[26]

**Item 1.01 Entry into a Material Definitive Agreement.**

*Private Placement of Units*

*On March 10, 2017, Bioptix, Inc. (the "Company") sold $2,250,000 of units of its securities (the "Units"), pursuant to separate purchase agreements (the "Purchase Agreements") with <u>accredited investors</u> (the "Investors"), at a purchase price of $2.50 per Unit.* Each Unit consists of one share (the "Shares") of the Company's common stock, no par value per share (the "Common Stock"), and a three year warrant (the "Warrants") to purchase one share of Common Stock, at an exercise price of $3.50 per share (such sale and issuance, the "Private Placement").

---

[26] Riot Blockchain, Inc., Current Report (Form 8-K) (Mar. 16, 2017).

93.     Notably, the March 16, 2017 Form 8-K failed to disclose that Honig was the ***only*** "accredited investor[ ]"participating in the March 2017 Private Placement.  This information was required to be disclosed to the Company's public shareholders under SEC Instructions for Item 1.01 of Form 8-K, which states that when a company enters into a "material definitive agreement" not in the ordinary course of business, it must "disclose" within ***four business days*** on Form 8–K "***the identity of the parties to the agreement*** or amendment and ***a brief description of any material relationship between the registrant or its affiliates*** and any of the parties, . . ."[27]

### C.     October 2017 – the Company Announces It Is "Changing Its Name to Riot Blockchain, Inc." and Its New "Focus" Will Be "Bitcoin and Ethereum"

94.     In April 2017, Beeghley, who at the time served on the board of PolarityTE along with Honig, was named the Company's new CEO.  Five months later, on October 3, 2017, O'Rourke, the Company's President, publicly announced that Bioptix was changing its focus away from bioscience to the burgeoning business of cryptocurrency.  As part of this transition, in a press release on October 4, 2017, Bioptix announced that the Company's name would change to "Riot Blockchain" and "ha[d] made a strategic investment in [Coinsquare]."  The Company's press release lauded Coinsquare as an investment that would allow the Company to capitalize on other opportunities, and stated:[28]

---

[27] *See* Form 8-K § 1.01, available at https://www.sec.gov/files/form8-k.pdf ("Item 1.01 Entry into a Material Definitive Agreement. (a) If the registrant has entered into a material definitive agreement not made in the ordinary course of business of the registrant, or into any amendment of such agreement that is material to the registrant, disclose the following information: (1) the date on which the agreement was entered into or amended, ***the identity of the parties to the agreement or amendment and a brief description of any material relationship between the registrant or its affiliates and any of the parties***, other than in respect of the material definitive agreement or amendment; …").

[28] Riot Blockchain, Inc., Press Release: "Bioptix Changing Name to Riot Blockchain as Company Shifts Focus to Strategic Investor and Operator in Blockchain Technologies" (Oct. 4, 2017),

CASTLE ROCK, Colo., Oct. 4, 2017 /PRNewswire/ -- Bioptix Inc. (Nasdaq: BIOP) today announced it is changing its name to Riot Blockchain, Inc., and has reserved and plans to change its Nasdaq ticker symbol to RIOT, in line with a shift in direction of the company. The name and symbol change are subject to Nasdaq approval. Moving forward, Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem with a particular focus on the Bitcoin and Ethereum blockchains.

As part of this focus, the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.

"At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets," said Michael Beeghley, Chief Executive Officer of Riot Blockchain. "With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector."

95.    Following these announcements on October 3 and 4, 2017, the Company's stock price rapidly **increased by 26.8% over two trading days** from a closing price of $6.45 per share on October 2, 2017 (the day before the announcement), to a closing price of $8.18 per share on October 4, 2017, the date of Riot's press release.[29]

**D.    The October 2017 Coinsquare Agreement**

96.    Also on October 4, 2017, the Company filed a Current Report on Form 8-K (the "October 4, 2017 Form 8-K") announcing its investment in Coinsquare, stating that Riot had entered into a series of agreements including a Subscription Agreement and Amended and Restated Unanimous Shareholder Agreement (the "Coinsquare Agreement") to purchase $3,000,000 of

---

available at https://www.riotblockchain.com/investors/news-events/press-releases/detail/10/bioptix-changing-name-to-riot-blockchain-as-company-shifts.

[29] *See* https://finance.yahoo.com/quote/RIOT/history?period1=1459382400&period2=1651795200&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true.

units of goNumerical, a privately held Canadian company known as Coinsquare.[30]   Each unit consisted of (i) one share of Coinsquare; and (ii) a purchase warrant exercisable into shares of Riot stock.  *Id*.

97.     Riot's October 4, 2017 Form 8-K referenced the Coinsquare Agreement as an "Item 1.01" corporate event (i.e., a material definitive agreement).  *Id*.  Significantly, the Form 8-K failed to identify Honig, Groussman, Stetson, Brauser, GRQ 401K, Titan (i.e., Jonathan Honig), and 2330573 Ontario, (all of whom had a history of group co-investments, ¶¶ 51; 57-60; 80, and were Selling Stockholders in the Company's recent Forms S-3 and S-3/A) as co-investors in Coinsquare. The Form 8-K also failed to disclose a $50,000 consulting fee that Riot paid to Honig related to the transaction.

98.     According to SEC regulations, when a public company enters into a "Material Definitive Agreement" (like the Coinsquare Agreement), Item 1.01 of Form 8-K *requires* the registrant to disclose material information about the agreement ***within four business days***,[31] including "the identity of the parties to the agreement or amendment and a brief description of any material relationship between the registrant or its affiliates and any of the parties, other than in respect of the material definitive agreement or amendment."[32]

99.     Additionally, the final implementing rule in the Code of Federal Regulations for Item 1.01 is clear that failing to disclose material information required under Item 1.01 can give rise to liability under Section 10(b) and Rule 10b-5:

---

[30] Riot Blockchain, Inc., Current Report (Form 8-K) (Oct. 4, 2017).

[31] *See* SEC Form 8-K—Current Report ("SEC 873" (02-21)), at 2, available at https://www.sec.gov/files/form8-k.pdf ("a report is to be filed or furnished within four business days after the occurrence of the event.") (attached as Exhibit G).

[32] *Id*. at 4.

The safe harbor for [Item 1.01] states that no failure to file a report on Form 8–K that is required solely pursuant to the provisions of Form 8–K shall be deemed to be a violation of Section 10(b) and Rule 10b–5 under the Exchange Act. The safe harbor only applies to a failure to file a report on Form 8–K. ***Thus, material misstatements or omissions in a Form 8–K will continue to be subject to Section 10(b) and Rule 10b–5 liability***.[33]

100.    In light of the above, O'Rourke and Beeghley had an affirmative duty under Item 1.01 and were therefore *required*[34] within four business days to identify Honig—an 11%+ shareholder of the Company—as an investor in Coinsquare.  Yet, the Company delayed this disclosure until May 25, 2018, or more than six months after the Coinsquare Agreement was announced.  The parties to the Coinsquare Agreement are set forth in the chart below, which was attached to Riot's May 25, 2018 Form 8-K/A filing:

| Name | Issued Share Capital |
| --- | --- |
| Virgile Rostand | 10,000,000 Common Shares |
| Cole Diamond | 2,500,000 Common Shares |
| Michael Diamond | 2,765,168 Common Shares |
| Robert Furse | 375,092 Common Shares |
| Jazse Holdings Inc. | 265,168 Common Shares |
| Tread Lightly, LLC | 265,168 Common Shares |
| TWG Startup Investment 2 Corp. | 300,018 Common Shares |
| ***Bioptix Inc (a/k/a Riot)*** | ***2,249,985 Common Shares*** |
| ***2330573 Ontario Inc*** | ***918,745 Common Shares*** |
| Jeff Cordeiro | 11,250 Common Shares |
| Peter Simeon | 15,000 Common Shares |
| Eduardo Vivas | 149,999 Common Shares |
| Argyle LLC | 149,999 Common Shares |
| Eric So | 93,749 Common Shares |

---

[33] 69 Fed. Reg. at 15607 (emphasis added) available at https://www.govinfo.gov/content/pkg/FR-2004-03-25/pdf/04-6332.

[34] *See Oran v. Stafford*, 226 F.3d 275, 285-286 (3rd Cir. 2000) ("a duty to disclose [a material omission] may arise when there is insider trading, *a statute requiring disclosure*, or an inaccurate, incomplete or misleading prior disclosure.") (emphasis added).

| | |
|---|---|
| Ross Levinsohn | 37,500 Common Shares |
| Sean Lai | 11,250 Common Shares |
| *Michael Brauser* | *112,499 Common Shares* |
| *Barry Honig* | *112,499 Common Shares* |
| *GRQ Consultants Inc Roth 401K FBO Barry Honig* | *75,000 Common Shares* |
| *Erica and Mark Groussman Foundation* | *37,500 Common Shares* |
| *Titan Multi-Strategy Fund I, Ltd.* | *75,000 Common Shares* |
| *Stetson Capital Investments Inc.* | *37,500 Common Shares* |
| Kent Farrell | 37,500 Common Shares |

101.    Honig's (and his co-investors') role in the Coinsquare Agreement—had it been disclosed months earlier as was required by Item 1.01—would have alerted the Company's public investors that a greater than 11% shareholder was registering for sale a significant number of shares *at the same time* that he (and members of his investor group) had a side investment with the Company.  In other words, as Riot's stock price was rapidly increasing following the Company's announcements of its abrupt business transition to cryptocurrency and the Coinsquare transaction, Honig was aggressively selling significant amounts of Riot stock.

102.    For example, on October 4, 2017, Honig sold 47,520 shares at an average of $8.92 per share, collecting approximately $424,000.  Over the next two days, on October 5 and 6, Honig sold 21,400 shares for proceeds of approximately $158,000.  Three days later, on October 9 and 10, Honig sold 202,557 shares for approximately $1.78 million.  And, on October 11 and 12, Honig sold over 300,000 shares for proceeds of more than $3.2 million.[35]

---

[35] Honig's sales were not disclosed until months later in an amended Schedule 13D/A filing on April 18, 2018.  *See* Barry Honig, Amended Statement of Beneficial Ownership (Schedule 13D/A) (Apr. 18, 2018), attached as Exhibit H.  Notably, at the same time that Honig was aggressively selling shares of Riot in October 2017, he was also exercising warrants that he received—unbeknownst to Riot's public shareholders—in the March 2017 Private Placement.  ¶¶ 92-93.

103.     All told, Honig sold more than 600,000 shares during the ten-day period following the filing of Riot's October 4, 2017 Form 8-K, collecting proceeds of nearly $5.7 million.  *Id.*

104.     Given Honig's substantial ownership in Riot, he was required to "promptly" disclose these sales to other Riot investors in a Section 13(d) filing with the SEC.  *See supra*, ¶¶ 119; 142-147.  Yet, for months these and other trades—along with Honig's investment in Coinsquare—were not disclosed to Riot's public investors.

105.     In addition to the affirmative duty required by Item 1.01 of Form 8-K, the Company had a duty to disclose Honig's Coinsquare investment under Item 404 of Regulation S-K, which requires companies to disclose transactions with related parties.  A related party under Item 404 includes "[a]ny person" who is "[a] security holder covered by Item 403(a) [of Regulation S-K]."[36] This includes individuals, like Honig, acting as part of a group and individuals who own greater than 5% of the registrant:

> (a)     Security ownership of certain beneficial owners. Furnish the following information, as of the most recent practicable date, substantially in the tabular form indicated, with respect to ***any person (including any "group" as that term is used in section 13(d)(3) of the Exchange Act) who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities***.[37]

### E.     The November 2017 Kairos Transaction

106.     On November 3, 2017, the Company announced a "share exchange agreement" under Item 1.01 of Form 8-K with Kairos, a newly formed private company that supposedly owned computer equipment and other assets used for mining cryptocurrency.[38]  In exchange for a 100% ownership interest in Kairos, Riot agreed to pay Kairos shareholders 1,750,001 preferred shares

---

[36] *See* subsection (b) to "Instructions to Item 404(a)," 17 C.F.R. § 229.404 (Item 404).

[37] 17 C.F.R. § 229.403 (Item 403).

[38] Riot Blockchain, Inc., Current Report (Form 8-K) (Nov. 3, 2017).

that were convertible to 1,750,001 shares of Riot common stock.  *Id*.  In total, Riot paid more than $12.2 million for the Kairos assets based on Riot's share price at the time.

107.    In addition to paying Kairos shareholders preferred shares valued at more than $12.2 million, Riot agreed to pay certain Kairos shareholders a royalty from cash flows generated from the Company's operations, entitling them to 40% of the gross profits generated by Riot on a monthly basis until a total of $1,000,000 had been paid to Kairos shareholders, at which point the royalty would be extinguished.[39]

108.    Similar to the October 4, 2017 Form 8-K, Riot's November 3, 2017 Form 8-K failed to disclose that Honig and another Selling Stockholder, DeFrancesco, were shareholders in Kairos. Indeed, it wasn't until April 17, 2018, or ***more than five months later***, that the Company disclosed that Honig and DeFrancesco were significant shareholders in Kairos:  "[e]ach of Mr. Honig and Ms. DeFrancesco was a shareholder of Kairos at the time of its acquisition by the Company … with Mr. Honig having owned approximately 8.6% of Kairos and Ms. DeFrancesco having owned approximately 6.3% of Kairos."  *Id*. at 73.

**F.    Starting in April 2017, the Company Registered More Than 29 Million Shares for Public Sale on Behalf of Honig and His Affiliated "Selling Stockholders"**

109.    Starting in April 2017, the Company (under the control of O'Rourke and Beeghley) issued six Registration Statements (Forms S-3 and S-3/A) that registered approximately 29 million shares of common stock for sale to the public on behalf of a group of "Selling Stockholders."  *See* ¶¶ 165-169; 181-188; 191-199; 209-217, *infra*.    However, these Forms S-3 and S-3/A misrepresented and concealed material facts about the Selling Stockholders, the majority of whom had a myriad of prior co-investments with O'Rourke, Honig, and in some cases, Beeghley.

---

[39] Riot Blockchain, Inc., Annual Report (Form 10-K) at 57 (Apr. 17, 2018).

Therefore, O'Rourke and Beeghley knew that these individuals—who were essentially O'Rourke and Honig's close business associates, friends, relatives, and family members of their friends and business associates—were investing as part of a closely organized "group" as defined by the federal securities laws.  Indeed, O'Rourke and Beeghley knew these Selling Stockholders were acting as a group because both O'Rourke and Beeghley previously invested as a group with Honig.  *See* ¶¶ 51-60; 74-78, *supra*.  Thus, O'Rourke and Beeghley knew that the Forms S-3 and S-3/A filed in April, July, August and September 2017[40] should have disclosed to Riot's public investors that Honig was acting as a group along with Groussman, Stetson, DeFrancesco, and others, related to their ownership of Riot stock.

110.    Regulation S-K at Item 10 sets out the information that must be disclosed in both Forms S-3 and S-3/A (Registration Statements) and Form 10-K (Annual Report).  17 C.F.R. §§ 229.10(a)(1) and (2).  Item 403 of Regulation S-K requires issuers to provide a table in a Form S-3 or S-3/A or a Form 10-K listing the following information:

> *any person (including any "group" as that term is used in section 13(d)(3) of the Exchange Act) who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities.*[41]

111.    Thus, under Item 403 of Regulation S-K, Riot was *required* to disclose to the Company's public investors that Honig and other Selling Stockholders were coordinating their trading in Riot stock.  O'Rourke and Beeghley signed the April, July, August and September 2017 Forms S-3 and S-3/A and had an affirmative duty to ensure the Selling Stockholders' group status was accurately disclosed.

---

[40] Each Form S-3 and S-3/A is identified and described in Section IX, *infra*.

[41] 17 C.F.R. § 229.403(a).

112.    Yet, not only did the Company not disclose the group (itself a violation of its duties under Item 403 and a material omission under Section 10(b) and Rule 10b-5), but the Company also, in each of the Forms S-3 and S-3/A, affirmatively misrepresented that "***there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares***" among the Selling Stockholders, and further stated that "***the selling stockholders may sell or otherwise dispose of some, all or none of the shares covered hereby . . . .***"  *See* ¶¶ 109, *supra*.

113.    In addition to concealing the Selling Stockholders' group status, in signing the later-filed January and February 2018 Forms S-3 and S-3/A, Defendant O'Rourke caused the Company to affirmatively misrepresent Honig's relationship with Riot.  Specifically, the January and February 2018 Forms S-3 and S-3/A included the following statement:

> ***None of the selling stockholders has held any position or office, or has otherwise had a material relationship, with us or any of our subsidiaries <u>within the past three years</u> other than as a result of the ownership of our shares or other securities***.[42]

114.    The statement that "***[n]one*** of the selling stockholders … had a material relationship, with [the Company]" in the "past three years", *id.*, was false and misleading because in early 2018 Honig ***did*** in fact have a "material relationship" with Riot in the past three years by virtue of his substantial investments in Coinsquare and Kairos, two companies where Riot was a co-investor.

115.    Given their knowledge of Honig's pattern of acting with the Selling Stockholders in numerous other investments, and given their positions in Riot's executive management and as Board members, O'Rourke and Beeghley had an affirmative duty to disclose in Riot's SEC filings that Honig was acting with other Selling Stockholders as a group with respect to his investment in

---

[42] Riot Blockchain, Inc., Registration Statement (Form S-3) at 6 (Jan. 5, 2018); *see also* Riot Blockchain, Inc., Amendment No. 1 to Registration Statement (Form S-3/A) at 6 (Feb. 7, 2018).

Riot.  In addition, O'Rourke had an affirmative obligation under the federal securities laws not to misrepresent Honig's relationship with the Company by falsely claiming in January and February 2018 that "*[n]one*" of the Selling Stockholders, which included Honig, had a "material relationship with [the Company]."

### G.   Beginning in January 2017, Honig Engages in Undisclosed Insider Selling, Which He Conceals in Violation of Duties Under Section 13(d) and Rule 13d

116.   In order to pull off the fraudulent scheme, aside from concealing his group status and co-investments in Riot, Honig needed to conceal his trading activity so that would-be investors could not track his or other group members' sales.  This was critical because if other shareholders became aware that one of Riot's largest shareholders was aggressively selling shares, it might have dissuaded potential buyers of the stock (who were necessary to drive the price higher) as it could have suggested that the large shareholder was motivated to sell because he may be aware of negative information about the Company that public investors did not have.  Thus, Riot's public shareholders had a misleading picture of the market because they did not have access to information that was required under the federal securities laws.

117.   In addition to O'Rourke and Beeghley hiding Honig's group status and co-investments with Riot, and Honig's refusal to disclose his trades, Honig needed Riot's stock price to increase rapidly so that he and other group members could sell their shares at artificially inflated prices.

118.   To be sure, the events touted by O'Rourke and Beeghley in October and November 2017, including the special dividend, the transition to cryptocurrency, the Coinsquare Agreement and the Kairos transaction, were intended to (and clearly did) significantly increase Riot's stock price in a short period of time.  Indeed, in response to the Company's October 3 and 4, 2017, press releases (announcing the Company's special cash dividend and name-change to "Riot

Blockchain") the Company's stock price increased a staggering **_43%_** from October 3 to 11, 2017. During this time period, Honig covertly sold more than **_600,000_** shares for proceeds in excess of **_$5.7 million_**. *Supra* ¶¶ 146-147.

119.    Yet, Honig and the other group members' sales were not disclosed to Riot's public investors—including Class members here—who were buying Riot stock as Honig and the Selling Stockholders were selling their shares of Riot stock. Honig's sales were required to be disclosed "promptly" under Section 13(d) of the Exchange Act and SEC Rule 13d, given Honig's status as a greater than 5% shareholder.[43]

### H.    December 29, 2017 – O'Rourke Sells 30,383 Shares for Proceeds of $869,256

120.    On December 29, 2017, after the market closed and going into a three-day weekend, O'Rourke sold 30,383 shares of Riot stock for proceeds of $869,256. O'Rourke's trading activity was quickly picked up by media outlets.[44]

121.    On January 2, 2018, *Reuters* published an article prior to the market open entitled, "BUZZ-Riot Blockchain down after CEO reports stock offering – RTRS." The article stated that Riot's stock price was down 4.44% in pre-market trading after Defendant O'Rourke had reported his sale of over 30,000 shares. An article published during early morning trading hours on *The Motley Fool*, entitled, "Riot Blockchain's CEO Just Sold a Lot of Stock," detailed Defendant O'Rourke's suspicious trading, stating in relevant part:

---

[43] *Takata v. Riot Blockchain, Inc.*, Civ. No. 18-02293-FLW, 2020 WL 2079375 at *15 (D.N.J. Apr. 30, 2020) (Wolfson J.) ("under SEC Rule 13d-2, when [a 5% or greater] investor's holdings materially change . . . the investor is **_required to 'promptly' file an amended schedule to update the market about the change in his holdings_**.") (emphasis added).

[44] *See, e.g., John R. O'[R]ourke III Sells 30,383 Shares of Riot Blockchain Inc. (RIOT) Stock*, American Banking and Market News (Dec. 30, 2017) ("CEO John R. O'[R]ourke III sold 30,383 shares of the firm's stock in a transaction dated Friday, December 29th. The shares were sold at an average price of $28.61, for a total transaction of $869,257.63.").

No one knows a company better than its insiders.  For this reason, it's my view that prices at which companies and their insiders buy and sell stock give a hint about a company's true value.

\*     \*     \*

**An insider dumps his shares**

Right before a holiday weekend, and two days after the company announced it was adjourning its annual shareholders meeting until February, [Riot's] chief executive officer, [O'Rourke], filed a Form 4 with the SEC disclosing he and his firm, [ATG], sold 30,383 shares of Riot on Dec. 29.

\*     \*     \*

These sales are material, representing about 37% of shares he and [ATG] owned or would soon control prior to the transactions.

O'Rourke now holds 12,500 shares through [ATG], in addition to 39,500 shares of stock in his own name that he currently owns, or will receive over the next 60 days from his role as Riot's chief executive officer.  (O'Rourke received 344,000 restricted shares that vest in 24 monthly installments when he became CEO in November.)

**Hiding bad news**

These sales were curiously timed. O'Rourke sold his shares and filed the Form 4 after market close before a major holiday weekend, when most investors would be thinking about their New Year's Eve plans rather than their investment portfolios.

Stock analysts, journalists, and political-types refer to this activity as a "Friday night dump," a common practice of releasing otherwise newsworthy information at a time when people are least likely to be paying attention.  One study from 2005 found that "Friday announcements are 20 percent more likely to present negative earnings than announcements on other weekdays."  Insider selling certainly fits in the "negative" category.

O'Rourke has every reason to sell quietly.  When taken together with Riot's deeply discounted equity raise earlier this month, his sales suggest recent market prices are a better price at which to sell its shares than buy them.  It's also interesting to me that O'Rourke is selling before a postponed annual shareholders meeting in which Riot is asking shareholders for the right to add another 750,000 shares of stock to the company's bonus pool for insiders.

**I.**     **January 5, 2018 – Riot Discloses That It Vastly Overpaid for Kairos**

122.    On January 5, 2018, Riot filed a Form 8-K/A that disclosed "audited financial statements of [Kairos]" as of "November 3, 2017," prepared and audited by Riot's new accountant,

MNP LLP.[45]   The audit confirmed that Kairos had paid only $2,089,679 for the computer equipment that it sold to Riot for more than $12.2 million.  The auditor also confirmed that "as at November 3, 2017 . . . [t]he equipment purchased was not yet operational …"[46]

123.    Like the Company's previous disclosure about the Kairos Transaction, ¶¶ 106-108; 206-208, the January 5, 2018 Form 8-K/A did not disclose that Honig and DeFrancesco were substantial investors in Kairos.

### J.    January 5, 2018 – Riot Fires Its Auditor

124.    Also, on January 5, 2018, Riot filed a Form 8-K with the SEC announcing that the Company had dismissed Eisner Amper LLP as its independent auditor and engaged MNP LLP.  On January 9, 2018, *Seeking Alpha* published an article titled, "Riot Blockchain: This Crypto Clown Car Continues Hurtling Toward the Abyss."  The article highlighted the dismissal of Riot's auditor, noting that the Company had employed three different auditors over the course of one calendar year.

## VII.    THE TRUTH OF THE FRAUDULENT SCHEME BEGINS TO EMERGE

125.    On January 31, 2018, *The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."[47]  The article stated that "**Mr. Honig has sold about 500,000 shares**, he said, but declined to divulge his profit.  **He said he still owns about 1% of the company** …"  "'When stock goes up, you take a profit,' [Honig] said." *Id.*

---

[45] Riot Blockchain, Inc., Current Report Amendment No. 1 (Form 8-K/A) (Jan. 5, 2018).

[46] *Id*. at F-9.

[47] Ianthe Jeanne Dugan, *Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake; Barry Honig pares back stake in Riot Blockchain, whose shares soared last year after a change of name*, The Wall Street Journal (Jan. 31, 2018).

126.    As a result of this revelation of Honig's stock sales by *The Wall Street Journal*, the Company's stock price fell from an opening price of $14.50 per share on January 31, 2018, to close at $13.75 that same day, a decline of $0.75, or ***more than 5%***.

127.    Later, on January 31, 2018, Riot issued a press release announcing that the Company's 2017 Annual Meeting of Stockholders was postponed for a second time, without announcing a new date and time.  Riot also announced that it had received a notification from NASDAQ that the Company had not held its annual meeting of shareholders within twelve months of the end of Riot's fiscal year-end, in accordance with NASDAQ's Listing Rules 5620(a) and 5810(c)(2)(G).

128.    Two weeks later, on February 16, 2018, *CNBC* published scathing articles about Riot, one being titled "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket,"[48] reporting a slew of questionable practices and behavior at the Company.  Among other information, the February 16, 2018 *CNBC* exposés revealed to Riot's pubic shareholders that O'Rourke, who at the time was Riot's CEO and Chairman, maintained an unusually close business relationship with Honig, a greater than 10% shareholder of the Company, which included shared office space in Florida, though Riot was supposedly headquartered in Colorado.

129.    The exposés included what occurred when *CNBC* attempted to visit Honig's office in Florida.  O'Rourke allegedly stated (after first shutting the door on the camera) that he was merely there to meet with Honig; that he did not work out of that office. O'Rourke also stated that he "ha[s] a good relationship with Mr. Honig and we speak often." *Id*.

---

[48] *See* https://www.cnbc.com/2018/02/16/public-company-changes-name-to-riot-blockchain-sees-shares-rocket.html.

130.     Honig, who was later interviewed by *CNBC*, was quoted as saying that "at one time John O'Rourke had space in my office."  Honig also acknowledged that he and O'Rourke "speak often."  *Id*.

131.     In addition to the above, the *CNBC* article stated:

As bitcoin hit record highs in late December, a hot new stock was making news on a daily basis. Riot Blockchain's stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto.

**But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease.**

That might sound somewhat like the type of newly minted blockchain company that has gained SEC attention.

**"Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain," SEC Chairman Jay Clayton said, speaking in generalities in recent testimony to Congress. The SEC declined to comment to CNBC about Riot Blockchain.**

The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.

That purchase and the company's name change aren't Riot's only questionable moves.

**A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in.**

\*     \*     \*

Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida. The resort is known as the "pink palace" and has luxury yachts lined up on its dock.

**But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for Feb. 1. It's not clear the company ever**

*planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity.*

*Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.*

That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton. That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose office is a short drive from the hotel. He once owned more than 11 percent of the outstanding common stock, according to SEC filings.

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone. "It was an investment where I had a return. And I sold some shares. There's nothing wrong with doing that."

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

"Typically, Barry Honig invests his hard-earned money into a company, and he also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

A visit to the site now only reveals the text: "Under construction."

From the outside, Honig's office is nondescript. There does not appear to be any evidence of his company's existence on the building's directory or on the door of his office.

*When CNBC crew members walked into the office, they didn't find Honig, they found O'Rourke. That's the same O'Rourke who made headlines when — less than three months after the company changed names and business plans — he sold about $869,000 worth of shares, according to an SEC filing.* He told the crew he was there for a meeting with Honig and that we had just missed him.

43

O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed." Then, late the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.

He agreed to answer questions via email instead. One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.

*"I have my own office in a separate location," O'Rourke said in an email sent by his lawyer, Nick Morgan, a partner with Paul Hastings. "I do have a good relationship with Mr. Honig and we speak often."*

*"John O'Rourke does not work out of my office," Honig said. "John O'Rourke has his own office . . . at one time John O'Rourke had space in my office . . . we speak often."*

*Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information.*

*"You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or dialogue about what's appropriate for the company on a day to day basis or in the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP.*

*Despite Honig's website saying he gives advice on who should lead a company, Honig said he had nothing to do with O'Rourke becoming CEO.*

*"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.*

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

*"I see a company that has had a change of control of the board. I see a company that has had a change in business. I see a company that has had several dilutive issuances immediately following the change of the board and change of the business. And I see a stock that has gone zoom," he said. "And what I understand a significant amount of insider selling. So yes, these are red flags."*

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

44

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million. On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings. Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent. After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants. His purchase price ranged from $2.77 to $5.32 per share, according to the list of trades he provided to the SEC in 2017. Honig's investment dropped below 5 percent, the threshold for SEC filing, on Nov. 28. At that point, the stock had already climbed above $20.

Honig did not disclose his dramatically reduced position in the stock until this week.

***But that may not be the true extent of Honig's selling. Buried deep in the footnotes of Riot filings, it's clear Honig also accumulated more than 700,000 new warrants that he could convert to stock at $3.56 per share and more than 700,000 promissory notes that he could convert to stock at $2.50 a share.***

***What about those warrants and promissory notes? It's not clear, as he never mentioned them in either 13D. But in another footnote from a recent Riot filing, there is no longer a mention of them.***

He declined to further clarify what happened to them.

"It's all disclosed in the public filings. And those are all the obligations I have," he said. "I'm very comfortable with what I had to do and what I was obligated to do. . . . I'm not going to talk about my personal trading history or my bank account."

***Birns questioned how Honig made his filings. "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant amount of stock. Or has the potential to own significant amount of stock in excess of what is reported on the 13D," he said.***

This is not the first time Honig has faced questions over his actions. In 2000, he was alleged to have committed stock manipulation. Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse.

"The answer's no," Honig said when asked if he still manipulates stocks.

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to SEC filings.

When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up.

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

***One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase. Kairos' main asset was $2 million of mining equipment. Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings.***

O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.

Kairos appears to have many links to Riot. The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada. Despite the many press releases, there has been no formal mining announcement.

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining. SEC filings are silent on mining activity.

As for professional poker players advising Riot? O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social media followers. He called them "thought leaders."

***Riot is not O'Rourke and Honig's first cryptocurrency investment.***

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. *"I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."*

Honig acknowledges the investment.

The questions continue for Riot Blockchain.

On Tuesday, Riot filed to withdraw prior SEC filings.

"It is not the result of any government inquiry," O'Rourke said in an email. "It was just corporate clean up from our securities counsel."

As for the annual shareholders' meeting, "We did not have a quorum of shareholders required for a vote," O'Rourke said in the email from his lawyer. "We are also working on other corporate action items that would require shareholder approval and a shareholder meeting as well. We did not want to waste the time and expense of potentially having two shareholder meetings within a short period of time. Thus we adjourned the meetings, which is not an uncommon practice."

There is no new date for the shareholders' meeting.

*"You see companies adjourn meetings in a context of a contested election and the like," Birns said. "I just don't think in this instance, there's any reason to adjourn their annual meeting."*

And as to O'Rourke selling stock in December?

He told CNBC in the email: "I sold less than 10 percent of my overall position to assist with covering tax obligations as a result of so-called phantom income tax from the vesting of restricted stock awards. It is common for Executives to sell stock to cover such tax obligations. I could have sold more stock in that window but chose to sell just 30,383 shares."

47

O'Rourke welcomes increased regulation and transparency for the cryptocurrency industry. "Unfortunately, as with many new hot sectors, it [blockchain] has attracted some bad actors trying to capitalize on the hype," he said. "Riot is all for increased transparency and properly imposed regulation."

**Honig would not disclose how much he made on his investment in Riot,** "I wasn't fortunate enough to do as well as you might think and people might speculate . . . I don't regret anything."

(Emphases added).

132.    That same day, *CNBC* released a news broadcast entitled "CNBC Investigates: Red Flags raised over Riot Blockchain" in which *CNBC*'s Michelle Caruso-Cabrera stated, in relevant part, the following:[49]

**We wanted to find out who was behind Riot Blockchain, but for weeks no one would talk to us.** So we decided to see if we could get answers here at the swanky Boca Raton Resort and Club in Florida. That's where Riot's annual shareholders' meeting was set to take place. It would be an upscale setting for this upstart company with red ink, as far as their most recent quarterly report shows. But as we quickly learned, that annual meeting wasn't going to take place. Twice Riot Blockchain announced they were going to hold their annual shareholders' meeting here at the Boca Raton Resort and Club. Twice at the very last minute, in fact the night before, they announced that they were postponing the meeting. **And in fact the hotel tells us there was never a meeting room ever booked under the name Riot Blockchain. So we drove to this nearby office building, trying to find Barry Honig. According to SEC filings, he may be the man behind the curtain. He was an early investor in Riot, back when it was Venaxis, a medical testing company, and then eventually Bioptix. He led an activist move to replace the board, and he eventually won. The new board changed the name from Bioptix to Riot Blockchain. "Hello? Hi. Michelle Caruso-Cabrera." As the elevator door opened in front of us, not Barry Honig, but this man, John O'Rourke, the CEO of Riot Blockchain, the same John O'Rourke who made news in December for selling about $869,000 worth of Riot stock just two months after the company changed its name. O'Rourke quickly closed the door.** Five minutes later he emerged and agreed to talk to us, but only off camera. He said he was here for a meeting with Honig when he arrived, and that we had just missed him. **O'Rourke insisted that he does not work out of Barry Honig's office, even though we found him there**.

---

[49] *See* https://www.cnbc.com/video/2018/02/16/crypto-investigation.html?__source=cnbcembedplayer.

133.     The broadcast narrated *CNBC*'s encounter with O'Rourke:

During that hour-long off-camera meeting, O'Rourke told us his Riot stock sale was merely to pay taxes on his restricted stock.  And as for the sharp rise in shares of Riot, O'Rourke said that was unexpected and ridiculous.  ***He also said he isn't worried about the SEC because "we over-disclose."***

*Id*.

134.     *CNBC* noted that when Honig "agree[d] to talk to [*CNBC*] by phone", he "downplayed his influence with Riot and John O'Rourke":

[MR. HONIG:] ***John O'Rourke's an adult, and he makes his own decisions, okay?***

**[MS. CARUSO-CABRERA:]** In 2000 you were fined for $25,000 and suspended ten days by FINRA for stock manipulation.  You're no longer a licensed broker.  ***Do you still manipulate stocks?***

**[MR. HONIG:]** ***The answer's no***.  Continue.  I'm a successful investor.  I'm a comfortable person.  I don't need to work today.  I have a beautiful family that's college educated, and I'm very comfortable.  ***I am very comfortable.  The truth will come out.***

*Id*.

135.     On the news reported by *CNBC* on February 16, 2018, including revealing that "Barry Honig may be the man behind the Riot Blockchain curtain," *supra* note 54, the price per share of Riot stock ***declined 33.4%,*** or $5.74 per share, on heavy volume, from closing at $17.20 per share on February 15, 2018, to close at $11.46 per share, causing damage to Plaintiff and the other members of the Class.

136.     On April 17, 2018, after the market closed, Riot filed its 2017 Annual Report on Form 10-K. [50]  The Form 10-K included for the first time several previously undisclosed related-party transactions between Honig and Riot, including:  (i) the March 2017 Private Placement; (ii) a $50,000 payment to Honig from Riot in connection with the Coinsquare Agreement; and (iii) the

---

[50] Riot Blockchain, Inc., Annual Report (Form 10-K) (Apr. 17, 2018).

Kairos transaction.  *Id*. at 73.  Additionally, the April 17, 2018 Form 10-K disclosed that DeFrancesco was a related party to the Kairos Transaction.  *Id*.

137.    The following day, April 18, 2018, Honig filed an amended Schedule 13D/A that finally disclosed all of his stock sales in 2017.  *See* Ex. H.  The Schedule 13D/A also disclosed Honig's investment in the March 2017 Private Placement (and related exercises of warrants) and that Honig was a related party to the Kairos Transaction.  *Id*.  That same day, the Company's share price declined ***5.8%***.

138.    Several weeks later in a Form 8-K/A filed with the SEC on May 25, 2018,[51] Riot finally disclosed for the first time that Honig and Selling Stockholders Groussman, Stetson, Brauser, GRQ 401K, Titan (i.e., Jonathan Honig), and 2330573 Ontario were all parties to the Coinsquare Agreement—a $3 million investment for the Company.  The following trading day, May 29, 2018, Riot's stock price fell from an opening share price of $7.53 to a close of $7.08 per share, a decline of nearly ***6%***.

139.    Finally, on September 7, 2018, the SEC filed the *SEC v. Honig* Action against Honig, O'Rourke, Groussman, and Stetson for violating the Exchange Act and Securities Act by engaging in "three highly profitable 'pump-and-dump' schemes . . . from 2013 through 2018 in the stock of three public companies ([Biozone], [MGT], and [MabVax]) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares."  *See also*, *supra* ¶¶ 49-73.

140.    In an accompanying press release, Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement, stated that "***Honig and his associates engaged in brazen***

---

[51] Riot Blockchain, Inc., Current Report Amendment No. 1 (Form 8-K/A) (May 25, 2018).

*market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets.*"[52]

141.     On this news, the price of Riot's stock declined $1.38 per share, or approximately **26.1%**, from the previous day's closing price, to close at $4.30 per share on September 7, 2018, as additional corrective information entered the market.

## VIII.   DEFENDANTS ENGAGED IN A MANIPULATIVE SCHEME TO DECEIVE RIOT'S PUBLIC INVESTORS

### A.     Honig Knowingly Engaged in Deceptive Acts as Part of a Fraudulent Scheme

142.     During the Class Period, Defendant Honig—pursuant to explicit or tacit agreements with the other Selling Stockholders—and following the same pattern described by the SEC in the *SEC v. Honig* Action, ¶¶ 49-73, secretly coordinated his investments in Riot as part of a group in order to artificially inflate the price of the Company's stock—and sell those shares at inflated prices.

143.     Honig accomplished this by, *inter alia*, failing to promptly file public reports with the SEC that are required by Section 13(d) of the Exchange Act and Rule 13d-2.  These reports would have alerted Riot's public investors that a large shareholder of the Company was aggressively selling his shares.  Additionally, they would have disclosed to the market that Honig and certain Selling Stockholders were acting as a "group" (as defined by Section 13(d)(3)) with respect to their investments in Riot.

144.     Under Section 13(d) of the Exchange Act, when a person acquires beneficial ownership of more than 5% of a voting class of a company's equity securities, such person (colloquially known as a Section 13(d) filer) or group is required to publicly update—through a

---

[52] *See* https://www.sec.gov/news/press-release/2018-182.

Section 13(d) filing with the SEC—his or her ownership interest within ten days.  Also, after an investor reaches the 5% ownership threshold and becomes a Section 13(d) filer, he or she must report additional purchases or sales *promptly* on Schedule 13D or 13D/A so that public shareholders and the SEC are aware of the transactions.

145.    Additionally, under Section 13(d)(3), "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."  15 U.S.C. § 78m(d)(3).  Under Rule 13d-5, "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons."  17 C.F.R. § 240.13d-5(b)(1).

146.    As explained above, Honig failed to promptly disclose his Riot stock trades and group status in violation of Section 13(d).  In the wider context of this case, including the pattern of misconduct described in *SEC v. Honig*, *supra* ¶¶ 49-73, and Honig's close business relationship with O'Rourke and Beeghley, *supra* ¶¶ *Id.*; 74-78, Honig's stock sales and failure to file Schedules 13D and 13D/A were deceptive acts under Section 10(b) and Rule 10b-5 (a) and (c) of the federal securities laws.

147.    Specifically, between January 4 and June 8, 2017, Honig sold 61,672 shares of Riot common stock in 21 separate transactions, which together constituted 1.14% of Riot's 5,371,185 shares outstanding as of June 5, 2017.  Between June 12 and October 4, 2017, Honig sold a further 86,457 shares in another 19 transactions, amounting to 1.58% of the Company's outstanding shares

during that time period.  Honig sold even more shares in October and November 2017—often several hundred thousand in one day.  Honig's stock sales were not disclosed until he filed his April 18, 2018 Schedule 13D/A, which confirmed the following previously undisclosed trading:

- Jan. 4 - June 8, 2017 – sales of 61,672 shares (*1.14% disposition*);
- June 12 – Oct, 4, 2017 – sales of 86,457 shares (*1.58% disposition*);
- Oct. 5, 2017 – purchase of 235,960 shares (*4.34 % acquisition*);[53]
- Oct. 6, 2017 – purchase of 58,990 shares (*1.08% acquisition*);
- Oct. 9, 2017 – sale of 136,028 shares (*2.50 % disposition*);
- Oct. 11, 2017 – sales of 293,916 shares (*4.36% disposition*);
- Oct. 11, 2017 – purchases of 634,112 shares (*9.42% acquisition*);[54]
- Nov. 7-16, 2017 – sales of 89,340 shares (*1.07% disposition*);
- Nov. 20, 2017 – sale of 262,293 shares (*3.15% disposition*);
- Nov. 21, 2017 – sale of 143,475 shares (*1.72% disposition*);
- Nov. 21, 2017 – purchase of 202,050 shares (*2.42%% acquisition*);
- Nov. 24, 2017 – sales of 266,941 shares (*3.20% disposition*); and
- Nov. 28, 2017 – sales of 88,000 shares (*1.05% disposition*).

*See* Ex. H.

148.    Honig committed these deceptive acts knowingly or at least recklessly.  *First*, Honig previously brought suit against several individuals under Section 13(d) in *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct.), in which Honig alleged that a violation of Section 13(d) is "material" and that he "would not have purchased the Shares if [he] had known the undisclosed facts that [the defendants] controlled such a largest interest in [the company's] stock."  Thus, Honig was aware that his sales (and acquisitions through warrants) should have been promptly disclosed to the Company's shareholders through a Section 13(d) filing

---

[53] These acquisitions occurred at below market prices because Honig was exercising warrants that he obtained from the March 2017 Private Placement.  As explained in ¶¶ 92-93, Honig's involvement in the March 2017 Private Placement was not disclosed to Riot's public shareholders.

[54] *Similarly, Honig's purchases on October 11, 2017, were accomplished by exercising warrants at $3.56 per share and converting notes at $2.50 per share.  Riot's public shareholders had no way to know that this substantially increased daily trading.*

because he previously alleged that another shareholder at another company should have promptly disclosed his trades.

149. *Second*, Honig's scienter is also supported by the fact that between 2011 and August 2018, Honig invested alongside O'Rourke in *over 75 companies*, alongside Stetson in *over 65 companies*, and alongside Brauser in *over 40 companies*. Because Honig was aware of his history of co-investments with O'Rourke, Stetson, and Brauser he knew that his investment at Riot was again part of a coordinated "group" with these same individuals that should have been disclosed under Section 13(d).

150. *Third*, O'Rourke stated in a February 3, 2014 email to the officer of a potential merger target that "*Barry Honig is the principal investor of our small group*," as alleged in the SEC's Amended Complaint in the *SEC v. Honig* Action. Am. Cmpl. ¶ 57.

151. *Fourth*, Honig knew that, at a minimum, O'Rourke, Stetson, and Groussman were part of his investing group with respect to Riot because Honig shared his office with them in Boca Raton, Florida. In fact, a September 13, 2016 letter signed by Honig, in which he nominated O'Rourke and Stetson to the Company's Board, lists the *same fax number* (with Palm Beach County, Florida area code 561) for O'Rourke and Stetson as the fax number listed on Honig's letterhead for his office in Boca Raton, Florida. Indeed, O'Rourke was discovered by *CNBC* reporters inside Honig's same Boca Raton office. Because they worked out of the same office, shared the same fax number from that office, and even met with O'Rourke in that office on the day of Riot's cancelled annual meeting of shareholders, Honig knew that he, O'Rourke, Stetson, and Groussman were a "group" as defined by Section 13(d)(3).

152. *Finally*, Honig's knowledge is supported by the SEC's allegations in the *SEC v. Honig* Action as discussed herein, ¶¶ 49-73. As a result of that action, Honig has been

"permanently barred from participating in an offering of penny stock"; "permanently prohibited" from holding greater than 4.99% of any penny stock company; "advertising, marketing, or otherwise promoting" any penny stock.  *Supra* ¶ 69.

**B.     O'Rourke and Beeghley Knowingly Engaged in Deceptive Acts as Part of a Fraudulent Scheme**

153.     During the Class Period, O'Rourke and Beeghley also engaged in deceptive acts as part of the fraudulent scheme.  Specifically, as officers and directors of Riot, O'Rourke and Beeghley caused the Company to issue materially false and misleading Forms S-3 and S-3/A, Forms 8-K, and other public filings.  For example, Section 13(d) and Item 403 of Regulation S-K *requires* company executives to disclose the group status of shareholders coordinating their investments—like Honig and the other Selling Stockholders.  O'Rourke and Beeghley each signed filings with the SEC that failed to disclose this information to Riot's public shareholders.

154.     As explained above, *supra* ¶¶ 50-54, Honig and O'Rourke have a lengthy history of acting as an investor group.  This includes coordinating with other investors and company insiders to promote the stock price through special dividends, press releases, and other corporate transactions.  Given their prior history working with Honig, O'Rourke and Beeghley were aware of Honig's *modus operandi*, which included secretly coordinating stock sales and voting with other group members.

155.     Despite this knowledge, during the Class Period O'Rourke and Beeghley signed numerous public filings with the SEC, including Forms S-3 and S-3/A that failed to disclose the group status of Honig and certain Selling Stockholders.  O'Rourke and Beeghley had an affirmative duty to disclose this information under Item 403 of Regulation S-K, and not doing so was a deceptive act under Section 10(b) of the Exchange Act and Rule 10b-5 (a) and (c), particularly when viewed in wider context of Plaintiff's allegations.

156.    O'Rourke and Beeghley also engaged in deceptive acts by issuing Forms 8-K and 10-K that concealed Honig's (and certain other Selling Stockholders') substantial investments in Coinsquare and Kairos, two transactions where the Company was also an investor, *supra* ¶¶ 96-101; 106-108.  As officers and directors of Riot, O'Rourke and Beeghley had an affirmative duty to disclose this information to the Company's public shareholders because it was required by SEC Instructions for Item 1.01 of Form 8-K and Item 404 of Regulation S-K.  *Id*.

157.    Finally, in addition to failing to disclose the Coinsquare and Kairos transactions as related-party transactions, O'Rourke affirmatively misrepresented Honig's relationship with the Company by signing Forms S-3 and S-3/A in January and February 2018 stating that Honig has had no material relationship with Riot "in the past three years," when in fact, the Coinsquare and Kairos transactions occurred only months earlier, *see infra* ¶¶ 209-217.

### 1.    O'Rourke's Scienter

158.    During the Class Period, O'Rourke, as Riot's Director, President, Treasurer, Secretary, and CEO, had knowledge that Honig and other Selling Stockholders were acting in concert to coordinate their trading and voting of Riot stock.  Yet, working from within the Company, O'Rourke knowingly or recklessly signed false and misleading SEC filings that failed to disclose that Honig and other Selling Stockholders were acting as a "group" under Item 403 of Regulation S-K and Section(d)(3).

159.    Specifically, in signing Riot's April 20, July 19, August 24, and September 25, 2017 Forms S-3 and S-3/A, and other filings, O'Rourke knew, at a minimum, that Honig, Groussman, Stetson, and Brauser were investing together as a group.  Yet, O'Rourke signed the April 20, 2017 Form S-3 without disclosing this information.  In doing so, O'Rourke knowingly or recklessly committed deceptive acts in furtherance of the fraudulent scheme described herein.

160.     Numerous other allegations further support O'Rourke's knowledge of the deceptive and manipulative scheme described herein.  *First*, O'Rourke knew that he and Honig were working together as a group because O'Rourke invested alongside Honig in over 75 companies between 2011 and August 2018.  ¶¶ 51; 57.

161.     *Second*, O'Rourke stated in an email on February 3, 2014, that "Barry Honig is the principal investor of our small group."  ¶¶ 55; 151.

162.     *Third*, O'Rourke knew that, at a minimum, Honig, Stetson, and Groussman were part of Honig's investing group because O'Rourke and Honig shared an office in Boca Raton, FL. In fact, a September 13, 2016 letter signed by Honig, in which he nominated O'Rourke and Stetson to the Company's Board, provides the same fax number (with Palm Beach County, Florida area code 561) for O'Rourke and Stetson as the fax number listed on Honig's letterhead for his office in Boca Raton.  Indeed, O'Rourke was discovered by *CNBC* reporters inside Honig's Boca Raton office.  ¶¶ 128-133.

163.     Finally, O'Rourke's scienter is supported by the SEC's allegations in the *SEC v. Honig* Action.  Indeed, as a result of that action, O'Rourke has been "permanently barred from participating in an offering of penny stock"; "permanently prohibited" from holding greater than 4.99% of any penny stock company; "advertising, marketing, or otherwise promoting" any penny stock.  ¶¶ 14, 70.

### 2.  Beeghley's Scienter

164.     During the Class Period, as Riot's CEO and as a Board member, Beeghley knowingly or recklessly signed false and misleading SEC filings that failed to disclose that Honig was acting as a group with other Selling Stockholders under Section 13(d)(3) and Item 403 of Regulation S-K.  Specifically, in signing Riot's April 20, July 19, August 24, and September 25,

2017 Forms S-3 and S-3/A, Beeghley knew that Honig was investing as a group given his prior involvement with Honig in other investments, *see supra* ¶¶ 74-78.  Yet, Beeghley signed the Forms S-3 and S-3/A without disclosing this information in violation of Item 403 of Regulation S-K.  In doing so, Beeghley knowingly or recklessly committed deceptive acts in furtherance of the fraudulent scheme described herein.

165.    Additionally, as CEO of a Company with only nine employees, Beeghley would have been aware of the March 2017 Private Placement where Honig was *the* accredited investor that received warrants to acquire up to 700,000 shares of Riot stock and aware of the terms and investor agreement related to Coinsquare.  Yet, Beeghley failed to disclose Honig's involvement in those transactions or that Honig was acting as part of a group.

## IX.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD[55]

166.    During the Class Period and as described below, Defendants O'Rourke and Beeghley made materially false and misleading statements and omissions in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

167.    *First*, the Company, under the management and direction of O'Rourke and Beeghley (serving as CEO, Chairman, and Director) issued public filings with the SEC (on Forms S-3, S-3/A, 10-K, 8-K, and 8-K/A) that misrepresented and concealed material facts concerning Riot's beneficial ownership by failing to disclose Honig and other Selling Stockholders' coordinated efforts to aggressively acquire and sell Riot stock at the expense of the Company's public investors.  ¶¶ 109-115, *supra*.  Specifically, despite being required by Item 403 of Regulation S-K to disclose "any 'group' as that term is used in section 13(d)(3) of the Exchange

---

[55] In this section, statements that are ***bold and italicized*** are specifically alleged to be false and misleading.

Act," 17 C.F.R. § 229.403(a), Riot's SEC filings during the Class Period omitted that Honig, Groussman, Stetson, and DeFrancesco, and the other Selling Stockholders listed in the Company's Forms S-3 and S-3/A were members of a group pursuant to their agreements, arrangements, or understandings to acquire, hold, vote, and sell off their Riot shares in coordination with each other. ¶¶ 109-115, *supra*.

168.    Moreover, rather than disclose that these Selling Stockholders were operating as a group, the Company's Forms S-3 and S-3/A affirmatively stated just the opposite:  "***there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares***"; "*[w]e do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby*"; and "*[t]he selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus . . . .*"  *Id.*

169.    As discussed below, these statements were knowingly false when made because O'Rourke and Beeghley knew that the Selling Stockholders—including Honig, Groussman, Stetson, and DeFrancesco—were working as a group to buy and sell Riot's stock as part of a scheme to artificially inflate the price of Company's stock.  Indeed, as an investor alongside Honig in over 75 other companies and now permanently barred from participating in future penny stock offerings, *see* ¶¶ 57; 70, *supra*—O'Rourke was aware (or recklessly disregarded) that Honig and other Selling Stockholders were acting as a group and had an agreement, arrangement, or understanding to sell (i.e., dump) ***some*** amount of shares at ***some*** pre-arranged time, and without providing the public markets with the notice legally required by Item 403 of Regulation S-K.

170.    ***Second***, Riot also issued materially false and misleading Forms 8-K and 8-K/A that failed to disclose (1) the March 2017 Private Placement, *see* ¶¶ 92-93, *supra*; (2) the Coinsquare transaction, *see* ¶¶ 96-101, *supra*; and (3) the Kairos Transaction, *see* ¶¶ 106-108, *supra*.  These

filings were false and misleading because in disclosing each transaction, the Company failed to disclose—as required by Item 1.01 of Form 8-K and Item 404 of Regulation S-K—that they involved Honig, a greater than 5% shareholder of the Company.

171.   ***Third***, on February 16, 2018, *CNBC* published an article and broadcast (*see* ¶¶ 128-135, *supra*) in which *CNBC* published statements made by O'Rourke and Honig in interviews they gave to *CNBC*.   In their statements, O'Rourke and Honig both denied that O'Rourke worked out of Honig's office; downplayed Honig's influence over Riot and over O'Rourke as CEO of Riot; denied that Riot was engaged in disclosure violations; and Honig specifically denied that he was engaged in stock manipulation.  *See* ¶¶ 218-223, *infra*.

172.   ***Fourth***, later that same day (February 16, 2018), Riot filed a Form 8-K attaching a letter from O'Rourke addressed to Riot's "Dear Shareholders."  *See* § M, *infra*.   In his letter, O'Rourke stated that "***[w]e take our SEC reporting obligations seriously and diligently file all reports and filings***."   In choosing to respond to *CNBC*'s article, O'Rourke had a duty to speak truthfully and to not omit material facts that would render his statements inaccurate, incomplete, or misleading.[56]   But this is exactly what O'Rourke did by continuing to downplay and deny *CNBC*'s allegations and concealing Honig's true relationship with O'Rourke, the Company, and the Selling Stockholders.

---

[56] "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) (citing *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490–91 (3d Cir. 1994) ("[E]ncompassed within that general obligation [to speak truthfully] is also an obligation or 'duty' to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated.") (internal citation omitted)). *See also Oran*, 226 F.3d at 285–86 ("[A] duty to disclose may arise when there is . . . an inaccurate, incomplete or misleading prior disclosure.").

### A.    March 16, 2017 – Form 8-K – March 2017 Private Placement

173.    On March 16, 2017, Riot issued a Current Report filed with the SEC on Form 8-K (the "March 16, 2017 Form 8-K") announcing the Company's [e]ntry into a [m]aterial [d]efinitive [a]greement" with certain "accredited investors" to sell "$2,250,000 of units of its securities":[57]

**Item 1.01 Entry into a Material Definitive Agreement.**

*Private Placement of Units*

***On March 10, 2017, Bioptix, Inc. (the "Company") sold $2,250,000 of units of its securities (the "Units"), pursuant to separate purchase agreements (the "Purchase Agreements") with <u>accredited investors</u> (the "Investors"), at a purchase price of $2.50 per Unit.*** Each Unit consists of one share (the "Shares") of the Company's common stock, no par value per share (the "Common Stock"), and a three year warrant (the "Warrants") to purchase one share of Common Stock, at an exercise price of $3.50 per share (such sale and issuance, the "Private Placement").

174.    **False and Misleading Statements**.  The above statements in the March 16, 2017 Form 8-K were materially false and misleading when made because they failed to disclose, as required by Item 404 of Regulation S-K, that the March 2017 Private Placement "***with accredited investors***" was actually a transaction ***with only <u>one</u> individual***—Honig—who as of January 5, 2017, was an 11.19% shareholder of Riot, and as of April 27, 2017, was a 11.2% shareholder of Riot, and was therefore a related party requiring disclosure as a related party under Item 404 of Regulation S-K.

175.    **Material Omissions**.  The March 16, 2017 Form 8-K's failure to disclose Honig as the only participant in the March 2017 Private Placement also violated the SEC's Instructions for Form 8-K (Item 1.01) which state that when a company enters into a "material definitive agreement" not in the ordinary course of business, it must "disclose" within four business days on a Form 8–K "***the identity of the parties to the agreement*** or amendment and ***a brief description***

---

[57] Riot Blockchain, Inc., Current Report (Form 8-K) (Mar. 16, 2017).

*of any material relationship between the registrant or its affiliates* and any of the parties . . . ."[58] Here, Riot's omission violated these SEC Instructions and allowed Honig's relationship with the Company during the Class Period to remain hidden from Riot's public shareholders, allowing Honig and his affiliates to surreptitiously sell to public investors at artificially inflated prices.

176.    Riot's public investors would not have known that Honig was the true underlying participant in the March 2017 Private Placement until Honig belatedly filed his Schedule 13D/A *more than a year later* on April 18, 2018 (*see supra*, ¶¶ 35; 142-147).   Thus, unbeknownst to Riot's public investors, Honig was in fact the accredited investor referenced in the March 2017 Private Placement which public investors did not learn until long after Honig had already sold virtually all his stock in the Company.  *Id*.

177.    O'Rourke and Beeghley—who were both Directors of the Company at this time— would have been aware of Honig's exclusive role in the March 2017 Private Placement, and Honig's greater than 5% (and indeed, *11%+*) ownership in the Company, by virtue of their positions as Riot Board members and their long-standing business relationships with Honig.  *See supra*, ¶¶ 13-24.  Although O'Rourke and Beeghley had an affirmative duty under the applicable regulations to disclose Honig's role to Riot's public investors, they failed to do so.

---

[58] *See* Form 8–K § 1.01, available at https://www.sec.gov/files/form8-k.pdf ("Item 1.01 Entry into a Material Definitive Agreement. (a) If the registrant has entered into a material definitive agreement not made in the ordinary course of business of the registrant, or into any amendment of such agreement that is material to the registrant, disclose the following information: (1) the date on which the agreement was entered into or amended, *the identity of the parties to the agreement or amendment and a brief description of any material relationship between the registrant or its affiliates and any of the parties*, other than in respect of the material definitive agreement or amendment . . . .").

### B.     March 31, 2017 – Annual Report (Form 10-K)

178.    On March 31, 2017, Riot filed its 2016 Annual Report with the SEC on Form 10-K (the "2016 Form 10-K"), which was signed by O'Rourke and Beeghley.  The 2016 Form 10-K described the March 2017 Private Placement:

> *In March 2017, the Company completed private placements totaling $7,000,000. Included was a common stock unit financing for $2,250,000 with certain accredited investors, $1,000,000 of which has been released to the Company, with the balance in escrow pending completion of release conditions.*[59]

179.    **False and Misleading Statements.**  The 2016 Form 10-K described the March 2017 Private Placement, but, like the March 16, 2017 Form 8-K, failed to disclose that Honig, a greater that 5% shareholder in the Company, was *the sole accredited investor* to that agreement. Thus, the statements concerning the March 2017 Private Placement quoted in ¶ 178, above, were false and misleading when made for the same reasons discussed above for the March 16, 2017 Form 8-K.  *See* ¶¶ 173-177, *supra*.

180.    **Material Omissions.**  The 2016 Form 10-K was false and misleading when it was filed because it failed to disclose, as required by Item 404 of SEC Regulation S-K, that the March 2017 Private Placement was a transaction with a related party, namely Honig, a greater than 5% shareholder of Riot.  Thus, for all the same reasons discussed above in ¶¶ 175-177, the 2016 Form 10-K was false and misleading because it omitted material information about Honig's role in the March 2017 Private Placement.

### C.     April 20, 2017 – Registration Statement (Form S-3)

181.    On April 20, 2017, Riot issued a Registration Statement filed with the SEC on Form S-3 (the "April 20, 2017 Form S-3"),[60] which was signed by O'Rourke and Beeghley, and which

---

[59] Riot Blockchain, Inc., Annual Report (Form 10-K) at 3 (Mar. 31, 2017).

[60] Riot Blockchain, Inc., Registration Statement (Form S-3) (Apr. 20, 2017).

registered for sale to the public 5,657,161 shares of Riot common to be sold by the certain "Selling Stockholder[s]." The April 20, 2017 Form S-3 described the "Selling Stockholders" and contained a "table" that purported to list "as of April 14, 2017, . . . the number of shares held of record or beneficially by the selling stockholders":[61]

> We do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby. The selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus and may sell or otherwise dispose of shares covered hereby in transactions exempt from the registration requirements of the Securities Act. Because *the selling stockholders may sell or otherwise dispose of some, all or none of the shares covered hereby*, and because *there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares*, we cannot estimate the number of the shares that will be held by the selling stockholders after completion of the offering.

<p align="center">* * *</p>

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.63% | 200,000 (1) | 0 | * |
| Andrew Schwartzberg | 549,800 (2) | 9.99% | 900,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.63% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.10% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,860 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 596,400 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 598,100 (12) | 9.99% | 1,624,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.20% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,400 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |

\* Less than 1%.
\*\* Based on 4,903,971 shares of Common Stock outstanding as of April 14, 2017.

---

[61] As noted above (*see* ¶¶ 109-113, *supra*), this disclosure was required by Item 403 of Regulation S-K, which requires issuers to disclose in "information . . . in . . . tabular form . . . with respect to any person (including any 'group' as that term in used in section 13(d)(3) of the Exchange Act) who is known to the registration to be the beneficial owner of more than five percent of any class of the registrants voting securities."  17 C.F.R. § 229.403.

<p align="center">64</p>

182.   **False and Misleading Statements.**   The statements identified in ¶ 181, above, were false and misleading when made because they misrepresented material facts about the "Selling Stockholders."   ***First***, the statement that "***there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares***" was materially false and misleading when made because O'Rourke and Beeghley knew or were reckless in knowing that Honig, Groussman, Stetson, and the other Selling Stockholders were in all likelihood continuing the same *modus operandi* as described in the *SEC v. Honig* Action.   ¶¶ 49-73.

183.   ***Second***, the statement that "***[t]he selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus***" was materially false and misleading when made because O'Rourke and Beeghley knew that Honig, Groussman, Stetson, and the other Selling Stockholders ***did*** in fact intend to sell their shares given these individuals' pattern of using this same *modus operandi* as described in the *SEC v. Honig* Action.   *Id.*

184.   ***Third***, the statement that "***the selling stockholders may sell or otherwise dispose of some, all or none of the shares covered hereby***" was materially false and misleading when made because O'Rourke and Beeghley knew that Honig, Groussman, Stetson, and the other Selling Stockholders did in fact plan ***to sell at least some***—and most likely all or nearly all—of their shares as part of their usual *modus operandi* to artificially inflate the stock price at other publicly traded companies.   Hence, it was misleading for the Company to tell investors that the Selling Stockholders "may sell . . . none of the shares"; O'Rourke and Beeghley knew that such a scenario was implausible given the scheme then underway.

185.   **Material Omissions.** The disclosures relating to the Selling Stockholders in the above table in the April 20, 2017 Form S-3 were also materially false and misleading when made because they contained material omissions that violated affirmative duties of disclosure created by

Item 403 of Regulation S-K.  *First*, the April 20, 2017 Form S-3 listed Honig, Groussman, and Stetson (and their related entities including GRQ 401K, Melechdavid, Groussman's two UTMA/FL funds, and Stetson Capital) as Selling Stockholders, but did not disclose, as required by Item 403 of Regulation S-K, that Honig, Groussman, and Stetson constituted a "'group' as that term is used in Section 13(d)(3)[.]"  17 C.F.R. § 229.403(a).

186.    Specifically, although the April 20, 2017 Form S-3 listed Honig as a 9.99% beneficial owner; Groussman (through Melechdavid and the two UTMA accounts) as a 9.04% beneficial owner; and Stetson (through Stetson Capital) as a 4.99% owner—the April 20, 2017 Form S-3 failed to disclose that Honig, Groussman, Stetson (and their entities and the other affiliated Selling Stockholders, as discussed below) were investing together as a coordinated group as defined by Section 13(d) and as described by the SEC in the *SEC v. Honig* action.  Indeed, the SEC alleged that Honig, Stetson, Groussman, and other Selling Stockholders artificially inflated the stock price at three other publicly traded companies as part of a deceptive and manipulative scheme.  *See supra*, ¶¶ 49-73.

187.    ***Second***, many of the other "Selling Stockholders" listed in the April 20, 2017 Form S-3 had also invested with O'Rourke previously, further supporting that O'Rourke knew that Honig and other Selling Stockholders were acting as a group, yet failed to disclose this fact to Riot's public shareholders.  O'Rourke had an affirmative duty to disclose this information under Item 403 of Regulation S-K.  Additionally, the information was material because (1) Honig alone was a greater than 5% shareholder in Riot; and (2) the Selling Stockholders accounted for the majority of Riot's common stock.[62]

---

[62] Specifically, the following April 20, 2017 Selling Stockholders all previously invested alongside O'Rourke and Honig:  Aifos (i.e., Theofilos), Melechdavid, Groussman, GRQ 401K, JAD,

188.   **Third**, that the Selling Stockholders were coordinating their investment as a group is further supported by the fact that, upon closer inspection, several of them coordinated their shareholdings down to the single share.  For example, the April 20, 2017 Form S-3 states that O'Braitis and JAD (investors with previous ties to Honig and O'Rourke, *see* ¶ 80, *supra*) **both** reported owning "**81,204**" Riot shares representing "**1.48%**" of the Company's common stock.[63]

### D.    April 27, 2017 – Form 10-K/A

189.   On April 27, 2017, Riot filed "Amendment No. 1" to its 2016 Annual Report on Form 10-K/A (the "April 27, 2017 Form 10-K/A"), which was signed by O'Rourke (as "Director") and Beeghley (as "[CEO], Chairman, and Director").  The April 27, 2017 Form 10-K/A contained a "Beneficial Ownership Table" that purported to "set[] forth the beneficial ownership of the Company's common stock as of April 20, 2017," as required by Item 403 of Regulation S-K.  This "Beneficial Ownership Table" is depicted below:

**Beneficial Ownership Table**

| Name and Address | Number of Shares | Percent |
|---|---|---|
| Directors: | | |
| Michael M. Beeghley (1) | 14,000 | * |
| John R. O'Rourke (2) | 29,133 | * |
| Mike Dai (3) | 3,333 | * |
| Other Executive Officers: | | |
| Jeffrey G. McGonegal (4) | 89,244 | 1.9% |
| Richard J. Whitcomb (5) | 20,405 | * |
| All Directors and Officers as a Group (5 persons) (6) | 156,115 | 3.4% |
| More than 5% Shareholders: | | |
| Barry C. Honig (7) | 504,000 | 11.2% |
| Catherine Johanna DeFrancesco (8) | 515,777 | 11.5% |
| E. Jeffrey Peierls (9) | 357,744 | 7.9% |

\* Holds less than 1%

190.   <u>**Material Omission.**</u>  Although this table disclosed Honig as a beneficial owner of 11.2% of Riot's outstanding common stock, it failed to disclose that Honig and the other Selling Stockholders were in fact investing in Riot as a group as defined by Section 13(d)(3) and as

---

Molinsky, O'Braitis, Stetson Capital (i.e., Stetson), and Titan (i.e., Jonathan Honig).  *See* ¶ 80, *supra*.

[63] Riot Blockchain, Inc., Registration Statement (Form S-3) at 5 (Apr. 20, 2017).

described in the *SEC v. Honig* Action.  Because O'Rourke had an affirmative duty under the applicable regulations to disclose Honig's group status and failed to do so, the April 27, 2017 Form 10-K/A was false and misleading when it was filed.

**E.     July 19, 2017 – Form S-3/A**

191.    On July 19, 2017, the Company filed a Registration Statement on a Form S-3/A (the "July 19, 2017 Form S-3/A"), which was signed by O'Rourke and Beeghley, and which registered for sale to the public 5,657,161 shares of common stock to be sold by the certain "Selling Stockholders."  The July 19, 2017 Form S-3/A described the "Selling Stockholders" and contained a "table" that purported to list "as of July 14, 2017, . . . the number of shares held of record or beneficially by the selling stockholders":

> We do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby.
>
> The selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus and may sell or otherwise dispose of shares covered hereby in transactions exempt from the registration requirements of the Securities Act. Because ***the selling stockholders may sell or otherwise dispose of some, all or none of the shares covered hereby***, and because ***there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares***, we cannot estimate the number of the shares that will be held by the selling stockholders after completion of the offering.

<div align="center">* * *</div>

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northurst Inc. | 554,100 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melechdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 595,600 (10) | 9.99% | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 592,400 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | 0.75% | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | 0.75% | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | 0.19% | 20,000 (23) | 0 | * |

\* Less than 1%.
\*\* Based on 5,392,503 shares of Common Stock outstanding as of July 14, 2017.

192. **False and Misleading Statements.** The statements concerning the Selling Stockholders in ¶ 191, above, were materially false and misleading when made for the same reasons discussed above for the April 20, 2017 Form S-3. ¶¶ 181-184, *supra*.

193. **Material Omissions.** The disclosures concerning the Selling Stockholders in ¶ 191, above, omitted material information that was required to be disclosed for the same reasons that the April 20, 2017 Form S-3 required disclosure. *See* ¶¶ 185-188, *supra*.[64]

F.     **August 24, 2017 – Form S-3/A**

194. On August 24, 2017, the Company filed a Registration Statement on a Form S-3/A (the "August 24, 2017 Form S-3/A"), which was signed by O'Rourke and Beeghley, and which registered for sale to the public 5,657,161 shares of common to be sold by the certain "Selling Stockholders." The August 24, 2017 Form S-3/A described the "Selling Stockholders" and

---

[64] As with the April 20, 2017 Form S-3, the majority of the Selling Stockholders listed in the July 19, 2017 Form S-3/A (which held the majority of Riot's stock)—including Aifos (i.e., Theofilos), Groussman, GRQ 401K, Honig, Alan Honig, JAD, O'Rourke, O'Braitis, Stetson Capital (i.e., Stetson), Titan (i.e., Jonathan Honig), Melechdavid, Molinsky, Northurst—had invested with O'Rourke and Honig in one or more previous public companies, further supporting that these Selling Stockholders were investing in Riot as a Section 13(d) "group" requiring disclosure under Item 403 of Regulation S-K. *See* ¶ 80, *supra*.

contained a "table" that purported to list "as of July 14, 2017, . . . the number of shares held of record or beneficially by the selling stockholders":

> We do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby.
>
> The selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus and may sell or otherwise dispose of shares covered hereby in transactions exempt from the registration requirements of the Securities Act. Because **the selling stockholders may sell or otherwise dispose of some, all or none of the shares covered hereby**, and because **there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares**, we cannot estimate the number of the shares that will be held by the selling stockholders after completion of the offering.

<p align="center">* * *</p>

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000 (1) | 3.64% | 200,000 (1) | 0 | * |
| Northurst Inc. | 555,400 (2) | 9.99% | 800,000 (2) | 0 | * |
| Erick Richardson | 200,000 (3) | 3.64% | 200,000 (3) | 0 | * |
| Melchdavid Inc. | 340,000 (4) | 6.11% | 340,000 (4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000 (5) | 1.47% | 80,000 (5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000 (6) | 1.47% | 80,000 (6) | 0 | * |
| Barry Honig | 543,000 (7) | 9.99% | 406,017 (8) | 504,000 (9) | 8.53% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600 (10) | * | 1,015,042 (11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 593,650 (12) | 9.99% | 1,704,066 (13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,602 (14) | * | 40,602 (14) | 0 | * |
| Robert R. O'Braitis | 81,204 (15) | 1.48% | 81,204 (15) | 0 | * |
| Stockwire Research Group, Inc. | 40,602 (16) | * | 40,602 (16) | 0 | * |
| Aifos Capital LLC | 121,805 (17) | 2.21% | 121,805 (17) | 0 | * |
| Stetson Capital Management, LLC | 283,300 (18) | 4.99% | 406,017 (19) | 7,500 | * |
| JAD Capital Inc. | 81,204 (20) | 1.48% | 81,204 (20) | 0 | * |
| Richard Molinsky | 97,789 (21) | 1.80% | 40,602 (22) | 57,187 | 1.05% |
| Alan Honig | 20,000 (23) | * | 20,000 (23) | 0 | * |

\*    Less than 1%.
\*\*   Based on 5,403,919 shares of Common Stock outstanding as of August 21, 2017.

195.    **False and Misleading Statements.** The statements concerning the Selling Stockholders in ¶ 194, above, were materially false and misleading when made for the same reasons that the April 20, 2017 Form S-3 was false and misleading. *See* ¶¶ 181-184, *supra*.

196.   **Material Omissions.** The disclosures concerning the Selling Stockholders in ¶ 194, above, omitted material information that was required to be disclosed for the same reasons that the April 20, 2017 Form S-3 required disclosure.  *See* ¶¶ 180-188, *supra*.[65]

### G.   September 25, 2017 – Form S-3/A

197.   On September 25, 2017, the Company filed a Form S-3/A (the "September 25, 2017 Form S-3/A"), which was signed by O'Rourke and Beeghley, and which registering for sale to the public 5,677,102 shares of common stock to be sold by the certain "Selling Stockholders."  The September 25, 2017 Form S-3/A described the "Selling Stockholders" and contained a "table" that purported to list "as of September 20, 2017, . . . the number of shares held of record or beneficially by the selling stockholders":

> We do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby[.]
>
> The selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus and may sell or otherwise dispose of shares covered hereby in transactions exempt from the registration requirements of the Securities Act. Because ***the selling stockholders may sell or otherwise dispose of some, all or none of the shares covered hereby***, and because ***there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares***, we cannot estimate the number of the shares that will be held by the selling stockholders after completion of the offering.

<p align="center">* * *</p>

---

[65] As in the April 20, 2017 Form S-3, the majority of the Selling Stockholders listed in the August 24, 2017 Form S-3/A (which together held the majority of Riot's stock)—including Aifos (i.e., Theofilos), Groussman, GRQ 401K, Honig, Alan Honig, JAD, Melechdavid, Molinsky, Northurst, O'Braitis, Stetson Capital (i.e., Stetson), and Titan (i.e., Jonathan Honig)—had invested with O'Rourke and Honig in one or more previous public companies, further supporting that these Selling Stockholders were investing in Riot as a Section 13(d) "group" requiring disclosure under Item 403 of Regulation S-K.  *See* ¶ 80, *supra*.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| Acquisition Group Limited | 200,000(1) | 3.61% | 200,000(1) | 0 | * |
| Northurst Inc. | 559,000(2) | 9.99% | 800,000(2) | 0 | * |
| Erick Richardson | 200,000(3) | 3.61% | 200,000(3) | 0 | * |
| Melechdavid Inc. | 340,000(4) | 6.06% | 340,000(4) | 0 | * |
| Mark Groussman c/f Alivia Groussman UTMA/FL | 80,000(5) | 1.46% | 80,000(5) | 0 | * |
| Mark Groussman c/f Asher Groussman UTMA/FL | 80,000(6) | 1.46% | 80,000(6) | 0 | * |
| Barry Honig | 544,400(7) | 9.99% | 402,050(8) | 504,000(9) | 8.09% |
| GRQ Consultants, Inc. Roth 401K FBO Barry Honig | 30,600(10) | * | 1,005,124(11) | 30,600 | * |
| Titan Multi-Strategy Fund I, Ltd. | 597,300(12) | 9.99% | 1,688,198(13) | 15,000 | * |
| US Commonwealth Life, A.I. Policy No. 2013-17 | 40,205(14) | * | 40,205(14) | 0 | * |
| Robert R. O'Braitis | 80,410(15) | 1.46% | 80,410(15) | 0 | * |
| Stockwire Research Group, Inc. | 40,205(16) | * | 40,205(16) | 0 | * |
| Aifos Capital LLC | 120,615(17) | 2.17% | 120,615(17) | 0 | * |
| Stetson Capital Management, LLC | 285,150(18) | 4.99% | 402,050(19) | 7,500 | * |
| JAD Capital Inc. | 80,410(20) | 1.46% | 80,410(20) | 0 | * |
| Richard Molinsky | 97,392(21) | 1.78% | 40,205(22) | 57,187 | 1.04% |
| Alan Honig | 20,000(23) | * | 20,000(23) | 0 | * |

\* Less than 1%.
\*\* Based on 5,436,503 shares of Common Stock outstanding as of September 20, 2017.

198. **False and Misleading Statements.** The statements concerning the Selling Stockholders in ¶ 197, above, were materially false and misleading when made for the same reasons that the April 20, 2017 Form S-3 was false and misleading. *See* ¶¶ 181-184, *supra.*

199. **Material Omissions.** The disclosures concerning the Selling Stockholders in ¶ 197, above, omitted material information that was required to be disclosed for the same reasons that the April 20, 2017 Form S-3 required disclosure. *See* ¶¶ 185-188, *supra.*[66]

**H.   October 4, 2017 – Form 8-K – the Coinsquare Agreement**

200. On October 4, 2017, Riot filed a Current Report on Form 8-K (the "October 4, 2017 Form 8-K"), signed by Beeghley, that attached a press release announcing that Company had entered into a transaction with Coinsquare, a privately-held Canadian company. As part of the

---

[66] As in the April 20, 2017 Form S-3, the majority of the Selling Stockholders listed in the August 24, 2017 Form S-3/A (which together held the majority of Riot's stock)—including Aifos (i.e., Theofilos), Groussman, GRQ 401K, Honig, Alan Honig, JAD, Melechdavid, Molinsky, Northurst, O'Braitis, Stetson Capital (i.e., Stetson), and Titan (i.e., Jonathan Honig)—had invested with O'Rourke and Honig in one or more previous public companies, further supporting that these Selling Stockholders were investing in Riot as a Section 13(d) "group" requiring disclosure under Item 403 of Regulation S-K. *See* ¶ 80, *supra.*

72


Coinsquare transaction, Riot invested $3 million alongside 22 other investors, including Honig and other Selling Stockholders.  At the time the Coinsquare Agreement was signed, and the October 4, 2017 Form 8-K was issued, O'Rourke was Riot's President, Secretary, Treasurer, as well as a Director on Riot's Board, and Beeghley was Riot's CEO and Chairman.

201.    Specifically, the October 4, 2017 Form 8-K stated:

**Item 1.01**

*goNumerical Ltd Investment*

**On September 29, 2017, Bioptix, Inc. (the "Company") entered into a series of agreements including a Subscription Agreement and Amended and Restated Unanimous Shareholder Agreement in connection with the purchase of $3,000,000 of units of goNumerical Ltd. ("goNumerical"), a leading Canadian Blockchain company known as Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies. Each unit consists of (i) one share of goNumerical and (ii) a purchase warrant exercisable into such number of shares of stock at the exercise price and with such other terms and conditions as are acceptable to the Company The news release announcing the strategic investment is attached as Exhibit 99.1.**

202.    **Material Omissions.**  The October 4, 2017 Form 8-K was false and misleading when filed because it failed to disclose information that was required to be disclosed, under the final implementing rule in the Code of Federal Regulations for Item 1.01(a) of Form 8-K.  When a registrant enters into a "Material Definitive Agreement" (like the one here), Item 1.01 *requires* the registrant to disclose material information about the agreement *within four business days*, including "the identity the of parties to the agreement or amendment and a brief description of any material relationship between the registrant or its affiliates and any of the parties, other than in respect of the material definitive agreement or amendment."  *See* Ex. G at 2; *see also supra* ¶¶ 98-99.

203.     Significantly, the Code of Federal Regulations expressly acknowledges that failing to disclose material information required under Item 1.01 can give rise to liability under Section 10(b) and Rule 10b-5:[67]

> The safe harbor for [Item 1.02] states that no failure to file a report on Form 8–K that is required solely pursuant to the provisions of Form 8–K shall be deemed to be a violation of Section 10(b) and Rule 10b–5 under the Exchange Act. The safe harbor only applies to a failure to file a report on Form 8–K. ***Thus, material misstatements or omissions in a Form 8–K will continue to be subject to Section 10(b) and Rule 10b–5 liability.***

204.     Thus, under Item 1.01 of Form 8-K, O'Rourke and Beeghley had an affirmative duty to disclose Honig's investment in Coinsquare.  Additionally, Honig and other Selling Stockholders who invested in Coinsquare were related parties under Item 404 of Regulation S-K, which requires companies to disclose transactions with related parties.  A related party under Item 404 includes "[a]ny person" who is "[a] security holder covered by Item 403(a) [of Regulation S-K]."

205.     O'Rourke and Beeghley would have been aware of the Coinsquare Agreement, Honig's (and other Selling Stockholders') role in the transaction, and his greater than 5% ownership in the Company at the time the October 4, 2017 Form 8-K was filed, by virtue of their positions as officers and members of Riot's Board, and by virtue of their long-standing business relationships with Honig, ¶¶ 51-57; 74-78.  Thus, O'Rourke and Beeghley had an affirmative duty consistent with their responsibilities as officers and directors under the federal securities laws to ensure that Honig's investment in Coinsquare was promptly disclosed to Riot's public shareholders.

---

[67] *See* 69 Fed. Reg. at 15606 (emphasis added).

**I.**     **November 3, 2017 – Form 8-K – the Kairos Transaction**

206.     On November 3, 2017, Riot filed a Current Report on Form 8-K (the "November 3, 2017 Form 8-K"), signed by Defendant Beeghley, announcing the Kairos Transaction, an acquisition that involved the Company's purchase of various Bitcoin mining machines through a share exchange agreement.  *See* ¶¶ 106-108, *supra*.  The November 3, 2017 Form 8-K stated that as consideration for the Kairos Transaction Riot would issue certain undisclosed "***shareholders of Kairos***" preferred shares of Riot stock that were convertible to 1,750,001 shares of Riot common stock.  Specifically, the November 3, 2017 Form 8-K stated:

**Item 1.01. Entry into a Material Definitive Agreement.**

*On November 1, 2017, Riot Blockchain, Inc. (the "Company") entered into a share exchange agreement (the "Agreement") with Kairos Global Technology, Inc., a Nevada corporation ("Kairos"). Pursuant to the Agreement, upon satisfaction of certain closing conditions, the <u>shareholders of Kairos</u> agreed to exchange all outstanding shares of Kairos' common stock to the Company and the Company agreed to issue an aggregate of One Million Seven Hundred Fifty Thousand and One (1,750,001) newly designated shares of Series B Convertible Preferred Stock (the "Series B Preferred Stock") which are convertible into an aggregate of One Million Seven Hundred Fifty Thousand and One (1,750,001) shares of the Company's common stock, no par value per share (the transaction, the "Kairos Transaction") to such shareholders. On November 3, 2017, the Company closed the Kairos Transaction.*

207.     **Material Omissions.**  The November 3, 2017 Form 8-K was false and misleading when filed because—similar to Coinsquare—it failed to disclose Honig's and DeFrancesco's participation in the investment, both of whom were greater than 5% shareholders in Riot.

208.     Thus, Riot's November 3, 2017 Form 8-K was false and misleading (i.e., it omitted Honig's involvement in the transaction—material information that was required to be disclosed) for all the same reasons that the Company's October 4, 2017 Form 8-K describing the Coinsquare transaction was false and misleading.

**J.      January 5, 2018 – Form S-3**

209.    On January 5, 2018, the Company filed a filed a Registration Statement on a Form S-3 (the "January 5, 2018 Form S-3"), which was signed by O'Rourke, and which registered for sale to the investing public 3,292,226 shares of common to be sold by the certain "Selling Stockholders."  The January 5, 2018 Form S-3 described the "Selling Stockholders" and contained a "table" that purported to list "as December 28, 2017, . . . the number of shares held of record or beneficially by the selling stockholders":

> We do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby.
>
> The selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus and may sell or otherwise dispose of shares covered hereby in transactions exempt from the registration requirements of the Securities Act. Because *the selling stockholders may sell or otherwise dispose of some, all or none of the shares covered hereby*, and because *there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares*, we cannot estimate the number of the shares that will be held by the selling stockholders after completion of the offering.

<p align="center">* * *</p>

<p align="center">76</p>

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| 2330573 Ontario Inc. | 96,444 (1) | * | 88,888 (33) | 52,000 | * |
| Acquisition Group Limited | 135,556 (2) | 1.16% | 71,112 (33) | 100,000 (34) | * |
| Armand Reale | 4,000 (3) | * | 8,000 (33) | - | * |
| Catherine DeFrancesco ITF Ava Defrancesco | 22,911 (4) | * | 7,112 (33) | 19,355 (35) | * |
| Catherine DeFrancesco ITF Devlin DeFrancesco | 22,911 (5) | * | 7,112 (33) | 19,355 (36) | * |
| Catherine DeFrancesco ITF Lachlan Defrancesco | 22,911 (6) | * | 7,112 (33) | 19,355 (37) | * |
| Catherine DeFrancesco ITF Summer Defrancesco | 22,911 (7) | * | 7,112 (33) | 19,355 (38) | * |
| Clara Serruya | 266,667 (8) | 2.29% | 533,334 (33) | - | * |
| DeFrancesco Motorsports Inc. | 5,333 (9) | * | 10,666 (33) | - | * |
| Delavaco Holdings Inc. | 10,667 (10) | * | 21,334 (33) | - | * |
| Eduardo Vivas | 6,667 (11) | * | 13,334 (33) | - | * |
| First Canadian Insurance Corp | 14,000 (12) | * | 28,000 (33) | - | * |
| Glass Investments LP | 13,444 (13) | * | 26,888 (33) | - | * |
| Grander Holdings, Inc. 401K | 217,733 (14) | 1.86% | 266,666 (33) | 84,400 (39) | * |
| GRQ Consultants, Inc. | 22,222 (15) | * | 44,444 (33) | - | * |
| GT Capital Inc | 29,436 (16) | * | 26,666 (33) | 16,103 (40) | * |
| Hudson Bay Master Fund Ltd | 333,334 (17) | 2.87% | 666,668 (33) | - | * |
| Interward Capital Corp. | 4,000 (18) | * | 8,000 (33) | - | * |
| Intracoastal Capital LLC | 133,334 (19) | 1.15% | 266,668 (33) | - | * |
| LDIC Inc. ITF McGilligan Barry Investments Ltd. | 11,100 (20) | * | 22,200 (33) | - | * |
| Marcandy Investments Corp. | 5,333 (21) | * | 10,666 (33) | - | * |
| Monroe Capital, LLC | 22,000 (22) | * | 44,000 (33) | - | * |
| Melechdavid Inc. | 131,945 (23) | 1.13% | 88,890 (33) | 87,500 (41) | * |
| Michael Ference | 4,444 (24) | * | 8,888 (33) | - | * |
| Millennium Insurance Corp. | 7,000 (25) | * | 14,000 (33) | - | * |
| MMCAP International Inc. SPC | 366,667 (26) | 3.15% | 733,334 (33) | - | * |
| Namaste Gorgie, Inc. | 42,927 (27) | * | 21,334 (33) | 32,260 (42) | * |
| Northurst, Inc. | 589,317 (28) | 4.99% | 177,778 (33) | 593,996 (43) | 4.99% |
| Paradox Capital Partners LLC | 4,444 (29) | * | 8,888 (33) | - | * |
| Rockhaven Holdings Ltd. | 6,000 (30) | * | 12,000 (33) | - | * |
| Sunnybrook Preemie Investments Inc. | 11,666 (31) | * | 23,332 (33) | - | * |
| York Plains Investment Corp. | 8,900 (32) | * | 17,800 (33) | - | * |

\* Less than 1%.

\*\* Based on 11,622,112 shares of Common Stock outstanding as of January 4, 2018.

210. **False and Misleading Statements.** The statements concerning the Selling Stockholders in ¶ 209, above, were materially false and misleading when made for the same reasons that the April 20, 2017 Form S-3 was false and misleading. *See* ¶¶ 181-184, *supra*.

211. **False and Misleading Statement.** The January 5, 2018 Form S-3 was also false and misleading because it stated that "[n]one" of the Selling Stockholders had a "material relationship" with the Company during the past three years:

> ***None of the selling stockholders has held any position or office, or has otherwise
> had a material relationship, with us or any of our subsidiaries within the past
> three years*** other than as a result of the ownership of our shares or other securities.

212.    The statement in the January 5, 2018 Form S-3 in ¶ 211 above that "***[n]one of the***

***selling stockholders . . . has had any material relationship with us or an of our subsidiaries***

***within the past three years***" was materially false and misleading when made because several of

the Selling Stockholders ***did*** in fact have a material relationship with "us or any of our subsidiaries"

by virtue of their participation in at least three corporate transactions involving Riot:  Coinsquare

(Honig, DeFrancesco, and Groussman, *see* ¶¶ 96-101, *supra*) Kairos (Honig and DeFrancesco, *see*

¶¶ 106-108, *supra*), and the March 2017 Private Placement (Honig, *see* ¶¶ 92-93, *supra*).  Yet,

Honig and other Selling Stockholders' participation in these transactions was not disclosed by the

Company.  Further, with respect to Kairos, this company became a subsidiary of Riot as part of

that transaction and was therefore part of Riot's corporate structure in January 2018.

213.    O'Rourke knew or should have known that the statement above was false and

misleading because he was Chairman and CEO of Riot, and would have been involved in each of

these transactions and the preparation of the January 5, 2018 Form S-3, a document that he signed.

Thus, O'Rourke was in a position, consistent with the duties and obligations of directors under the

federal securities laws, to ensure that the Company did not make false and misleading statements

in its public filings.

214.    **Material Omissions.** The disclosures concerning the Selling Stockholders in

¶¶ 209 and 211, above, omitted material information that was required to be disclosed for the same

reasons that the April 20, 2017 Form S-3 required disclosure.  *See* ¶¶ 185-188, *supra*.[68]

---

[68] As with the April 20, 2017 Form S-3, the many of the Selling Stockholders listed in the July 19, 2017 Form S-3/A—including 2330573 Ontario, DeFrancesco, Grander, GRQ, Marcandy, Melechdavid, Namaste, Northurst, and Paradox—had invested with O'Rourke and Honig in one or more previous public companies, further supporting that these Selling Stockholders were

### K.    February 7, 2018 – Form S-3/A

215.    On February 7, 2018, the Company filed a filed a Registration Statement on a Form S-3/A (the "February 7, 2018 Form S-3/A"), which was signed by O'Rourke, and which registered for sale to the investing public 3,292,226 shares of common to be sold by the certain "Selling Stockholders."   The February 7, 2018 Form S-3/A described the "Selling Stockholders" and contained a "table" that purported to list "as of February 5, 2018, . . . the number of shares held of record or beneficially by the selling stockholders":

> We do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby.
>
> The selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus and may sell or otherwise dispose of shares covered hereby in transactions exempt from the registration requirements of the Securities Act. Because *the selling stockholders may sell or otherwise dispose of some, all or none of the shares covered hereby*, and because *there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares*, we cannot estimate the number of the shares that will be held by the selling stockholders after completion of the offering.

<p align="center">* * *</p>

---

investing in Riot as a Section 13(d) "group" requiring disclosure under Item 403 of Regulation S-K.  *See* ¶ 80, *supra*.

| Name of Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Before this Offering | Percentage of Common Stock Beneficially Owned Before this Offering** | Shares of Common Stock Offered in this Offering | Shares of Common Stock Beneficially Owned After this Offering | Percentage of Common Stock Beneficially Owned After this Offering** |
|---|---|---|---|---|---|
| 2330573 Ontario Inc. | 96,444 (1) | * | 88,888 (33) | 52,000 | * |
| Acquisition Group Limited | 135,556 (2) | 1.16% | 71,112 (33) | 100,000 (34) | * |
| Armand Reale | 4,000 (3) | * | 8,000 (33) | - | * |
| Catherine DeFrancesco ITF Ava Defrancesco | 22,911 (4) | * | 7,112 (33) | 19,355 (35) | * |
| Catherine DeFrancesco ITF Devlin DeFrancesco | 22,911 (5) | * | 7,112 (33) | 19,355 (36) | * |
| Catherine DeFrancesco ITF Lachlan Defrancesco | 22,911 (6) | * | 7,112 (33) | 19,355 (37) | * |
| Catherine DeFrancesco ITF Summer Defrancesco | 22,911 (7) | * | 7,112 (33) | 19,355 (38) | * |
| Clara Serruya | 266,667 (8) | 2.29% | 533,334 (33) | - | * |
| DeFrancesco Motorsports Inc. | 5,333 (9) | * | 10,666 (33) | - | * |
| Delavaco Holdings Inc. | 10,667 (10) | * | 21,334 (33) | - | * |
| Eduardo Vivas | 6,667 (11) | * | 13,334 (33) | - | * |
| First Canadian Insurance Corp | 14,000 (12) | * | 28,000 (33) | - | * |
| Glass Investments LP | 13,444 (13) | * | 26,888 (33) | - | * |
| Grander Holdings, Inc. 401K | 217,733 (14) | 1.86% | 266,666 (33) | 84,400 (39) | * |
| GRQ Consultants, Inc. | 22,222 (15) | * | 44,444 (33) | - | * |
| GT Capital Inc | 29,436 (16) | * | 26,666 (33) | 16,103 (40) | * |
| Hudson Bay Master Fund Ltd | 333,334 (17) | 2.87% | 666,668 (33) | - | * |
| Interward Capital Corp. | 4,000 (18) | * | 8,000 (33) | - | * |
| Intracoastal Capital LLC | 133,334 (19) | 1.15% | 266,668 (33) | - | * |
| McGilligan Barry Investment | 11,100 (20) | * | 22,200 (33) | - | * |
| Marcandy Investments Corp. | 5,333 (21) | * | 10,666 (33) | - | * |
| Monroe Capital, LLC | 22,000 (22) | * | 44,000 (33) | - | * |
| Melechdavid Inc. | 131,945 (23) | 1.12% | 88,890 (33) | 87,500 (41) | * |
| Michael Ference | 4,444 (24) | * | 8,888 (33) | - | * |
| Millennium Insurance Corp. | 7,000 (25) | * | 14,000 (33) | - | * |
| MMCAP International Inc. SPC | 366,667 (26) | 3.15% | 733,334 (33) | - | * |
| Namaste Gorgie, Inc. | 42,927 (27) | * | 21,334 (33) | 32,260 (42) | * |
| Northurst, Inc. | 592,089 (28) | 4.99% | 177,778 (33) | 612,000 (43) | 4.99% |
| Paradox Capital Partners LLC | 4,444 (29) | * | 8,888 (33) | - | * |
| Rockhaven Holdings Ltd. | 6,000 (30) | * | 12,000 (33) | - | * |
| Sunnybrook Preemie Investments Inc. | 11,666 (31) | * | 23,332 (33) | - | * |
| York Plains Investment Corp. | 8,900 (32) | * | 17,800 (33) | - | * |

\* Less than 1%.

\*\* Based on 11,652,270 shares of Common Stock outstanding as of February 5, 2018.

216. **False and Misleading Statements.** The statements concerning the Selling Stockholders quoted in ¶ 215, above, were materially false and misleading when made for the same reasons that the April 20, 2017 Form S-3 was false and misleading. *See* ¶¶ 181-184, *supra*. Also, the statement in the February 7, 2018 Form S-3/A that "[n]one of the selling stockholders" had a "relationship with us" was false and misleading when made for all the reasons that the January 5, 2018 Form S-3 was false and misleading. ¶¶ 212-213, *supra*.

217.   **Material Omissions.** The disclosures concerning the Selling Stockholders in ¶ 215 above omitted material information that was required to be disclosed for the same reasons that the April 20, 2017 Form S-3 required disclosure.  *See* ¶¶ 185-188, *supra*.[69]

**L.    February 16, 2018 –** *CNBC* **Publishes O'Rourke's Statements Concerning Riot**

218.   On February 16, 2018, *CNBC* published the article "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket," that revealed new details about Defendants' fraudulent scheme.  However, the article also published statements by O'Rourke and Honig, who *CNBC* interviewed for the article, and whose false and misleading statements served to downplay and perpetuate the fraudulent scheme and delaying the revelation of the full truth about the extent of O'Rourke and Honig's involvement in deceiving Riot's public investors.

219.   **False and Misleading Statement.**   From its interview with O'Rourke, *CNBC* quoted O'Rourke as stating that "*[O'Rourke] isn't worried about the SEC because 'we over-disclose'*"; "*Mr. Honig . . . has been a supportive shareholder of Riot*"; and "*O'Rourke insisted that he does not work out of Barry Honig's office, even though we found him there*."  *See supra* ¶¶ 132-133.

220.   O'Rourke's statement to *CNBC* that he "isn't worried about the SEC because 'we over-disclose'" was materially false and misleading when made because as set forth herein, the Company failed to disclose critical information in numerous SEC filings related to Honig (and

---

[69] As with the April 20, 2017 Form S-3, the many of the Selling Stockholders listed in the July 19, 2017 Form S-3/A—including 2330573 Ontario, DeFrancesco, Grander, GRQ, Marcandy, Melechdavid, Namaste, Northurst, and Paradox—had invested with O'Rourke and Honig in one or more previous public companies, further supporting that these Selling Stockholders were investing in Riot as a Section 13(d) "group" requiring disclosure under Item 403 of Regulation S-K.  *See* ¶ 80, *supra*.

other Selling Stockholders), including Honig's (1) group status; (2) his participation in the March

2017 Private Placement; and (3) his investments in Coinsquare and Kairos.

**M.      February 16, 2018 – Form 8-K – O'Rourke's Letter to Riot's Shareholders**

221.      On February 16, 2018, after trading closed, Riot filed a Form 8-K with the SEC that

attached letter which O'Rourke directly addressed the Company's shareholders ("Shareholder

Letter").  The purpose of the Shareholder Letter was to attempt to dismiss concerns raised earlier

in the day by *CNBC* about O'Rourke's connection to Honig, his recent insider stock sales, and the

integrity of the Company's SEC filings.  The letter stated, in relevant part,

> *Dear Shareholders*,
>
> Thank you for your support in our vision to build a leading blockchain technology company. I believe we are well positioned at the forefront of this industry with many exciting opportunities on the horizon.
>
> Today, CNBC released a negative one-sided piece on companies that seek to jump on the blockchain bandwagon by changing their name and profiled our company. Had the journalist used even a modest amount of professional diligence, CNBC would have also reported on the numerous achievements we have made in becoming an early entrant in the support of blockchain and cryptocurrency technologies. To my knowledge, we were also the first Nasdaq listed company to have blockchain in its name and had no idea what the market reaction would be when the transition was made.
>
> Not to be deterred, I wish to provide an update of where Riot Blockchain stands today and respond to some of their attacks. We have made significant inroads in building a diversified portfolio of investments and to begin securing digital assets.
>
> *            *            *
>
> *At the end of 2017, I personally sold some stock that I held in our company.  I sold less than 10% of my overall position and did so to cover tax obligations.  I could have sold more stock in the same timeframe if I so desired.*  I truly believe in what we are building and the shareholder value it will create.
>
> *            *            *
>
> *Barry Honig has been a supportive shareholder of Riot Blockchain.  Prior to my involvement with Bioptix, Mr. Honig filed a lawsuit against the company and its management as a shareholder because he believed the old management and*

82

*board was not properly deploying shareholders' cash.  This led to the eventual re-examination by the board and management of the failing business, which ultimately led to the board's decision that it was in shareholders' best interest to evaluate other opportunities with its cash on hand.*

<div align="center">*      *      *</div>

*Part of the further thesis around forming Riot Blockchain was to provide investors . . . with the transparency and disclosure obligations that come with operating a Nasdaq listed and fully SEC reporting company.*

<div align="center">*      *      *</div>

*We take our SEC reporting obligations seriously and diligently file all reports and filings.  We have expended enormous effort to inform investors of the risks of our foray into uncharted territory.* We have an open and expansive dialogue with the SEC Division of Corporation Finance about our registration statements and other filings with a goal to satisfy the collective sentiment of the staff of the various divisions of the SEC that are struggling to find common ground around how best to regulate our industry. *We support full disclosure* and will continue to work with the staff of the SEC whenever new regulations provide definition to this emerging sector.

222.   **False and Misleading Statement.**   O'Rourke's February 16, 2018 Shareholder Letter was false and misleading when it was filed because, far from supporting "full disclosure," and "taking [their SEC] reporting obligations seriously" and "diligently" filing all reports, O'Rourke caused Riot to withhold information that painted a false picture to Riot's public shareholders, including (1) Honig's group status; (2) his participation in the March 2017 Private Placement; and (3) his substantial investments in Coinsquare and Kairos – related party transactions that involved Riot.

223.   Additionally, notwithstanding O'Rourke's lengthy history investing alongside Honig, O'Rourke failed to disclose that Honig was acting with a group of shareholders related to his investment in Riot.  This lack of disclosure, combined with prompt disclosure of Honig's stock sales, would have alerted shareholders that a large group of Riot shareholders were aggressively selling shares while public shareholders were buying.

<div align="center">83</div>

## X.  ADDITIONAL SCIENTER ALLEGATIONS

224.  As alleged herein, Defendants O'Rourke and Beeghley acted with scienter because they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading or omitted material information; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws.

225.  O'Rourke and Beeghley knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the O'Rourke and Beeghley.

226.  O'Rourke and Beeghley were members of Riot's executive management group during the Class Period.  Based on their roles at Riot, these Defendants would have been involved with, or had knowledge of, the wrongdoing alleged herein.

227.  Likewise, O'Rourke and Beeghley, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  Honig was also privy to this information through his relationship with O'Rourke and Beeghley and by virtue of his co-investments with Riot, specifically, the March 2017 Private Placement, the Coinsquare transaction and the Kairos Transaction.

84

228.    O'Rourke and Beeghley were senior executives involved in Riot's daily operations with access to all material information regarding the Company's core operations.   These Defendants are presumed to have knowledge of all material facts regarding Riot's core business.

229.    O'Rourke's and Beeghley's scienter is further demonstrated by the fact that cryptocurrency and, in particular, Bitcoin mining was allegedly a central part of the Company's success.   Bitcoin was allegedly the cornerstone of (and critically important to) the Company's growth strategy and, as such, constituted a core operation of the Company.   The fact that the misstatements and omissions at issue here pertained directly to Riot's core operations further supports a strong inference of scienter.

230.    When, as here, a senior officer of a company makes false and misleading public statements regarding its core operations, there is a strong inference that such officer knew the statement was materially false and misleading when made.   Stated otherwise, knowledge of falsity can be imputed to key officers who should have known of facts relating to the core operations of their company.   Moreover, as signatories to the Company's SEC filings, certain of the Defendants had an affirmative obligation to familiarize themselves with the facts relevant to Riot's core operations.

231.    Additionally, throughout the Class Period, Riot had very few employees, further strengthening the inference of scienter.   For example, in the Company's amended annual report filed on April 30, 2018, Riot stated that "[a]s of March 31, 2018, we had nine employees, all of whom are full-time."   Thus, O'Rourke and Beeghley were among a handful of individuals who would have knowledge about Riot's operations.

232.    The allegations above also establish a strong inference that Riot, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents

had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.

233.    Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Honig's and other Selling Stockholders' affiliations with the Company from investors in violation of the federal securities laws.   By concealing these material facts from investors, Riot maintained and/or increased its artificially inflated common stock price throughout the Class Period.

234.    In addition, an executive's insider sales can be probative of scienter.   Here, O'Rourke's significant and suspiciously-timed insider sales during the Class Period reveals his motive to commit fraud.   On December 29, 2017, O'Rourke sold 30,383 shares of Riot stock for proceeds of $869,256.35.   These sales were not made pursuant to a 10(b)5-1 trading plan, further adding to the inference of scienter, and were made just days before the Company announced the dismissal of its auditor and a month before Riot canceled its annual meeting for the second time, causing the NASDAQ to inform the Company that it has violated the NASDAQ's listing requirements.   In addition, O'Rourke wanted to sell his stock with minimum attention, as the sales were made on the Friday before a holiday weekend.

235.    Likewise, the SEC investigation and filing of the *SEC v. Honig* Action and subsequent settlements add to the inference of scienter.   *See supra* ¶¶ 49-73.

## XI.   LOSS CAUSATION

236.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Riot's common stock and operated as a fraud or deceit on Class Period purchasers of the Company's common stock.   When Defendants' prior

misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of Riot's common stock fell precipitously as the artificial inflation was removed.

237.   As a result of their purchases of Riot common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused the Company's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $46.20 per share on December 19, 2017, to close at $4.30 on September 7, 2018, after the last day of the Class Period.

**A.**      **The January 31, 2018 Stock Drop –** *The Wall Street Journal* **– "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake"**

238.   On January 31, 2018*, The Wall Street Journal* published an article entitled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake."[70]  The article stated that "**Mr. Honig has sold about 500,000 shares, he said, but declined to divulge his profit.  He said he still owns about 1% of the company**."  "'When stock goes up, you take a profit,' [Honig] said."

239.   These revelations corrected in part Honig's and Riot's material misrepresentations and omissions regarding Honig's material changes in beneficial ownership of Riot's common stock—particularly his failure to disclose his massive stock sales throughout 2017.  *Supra* ¶¶ 142-147.

240.   As a result of the revelation by *The Wall Street Journal* that Honig sold nearly 90% of his holdings in the Company, the Company's stock price fell from an opening price of $14.50 per share on January 31, 2018, to close at $13.75 that same day, a decline of $0.75, or ***more than***

---

[70] Ianthe Jeanne Dugan, *Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake; Barry Honig pares back stake in Riot Blockchain, whose shares soared last year after a change of name*, The Wall Street Journal (Jan. 31, 2018).

*5%*.  The Company's stock continued to decline in the following day, February 1, 2018, related to the revelations in *The Wall Street Journal* article, falling an additional *10%* that day.

241.    Also on January 31, 2018, after the market closed, the Company issued a press release titled "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders." The press release announced that the 2017 Annual Meeting of Stockholders, which was scheduled for the following day, had again been cancelled.

242.    Together, *The Wall Street Journal's* revelations of Honig's nearly total divestment of his holdings of Riot stock and Riot's abrupt cancellation (for the second time) of its annual shareholder meeting (which had been scheduled for the very next day), caused Riot's stock price to decline ***14.26%*** ($1.98 per share) from a closing price of $14.28 per share on January 30, 2018, to close at $12.30 per share on February 1, 2018, damaging Plaintiff and other members of the Class.

**B.      The February 16, 2018 Stock Drop – "CNBC Investigates . . . Riot Blockchain"**

243.    On February 16, 2017, *CNBC* published the article "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket" regarding questionable practices at Riot.  The revelations in *CNBC*'s article partially revealed that Honig was acting with others with respect to his investments in the Company ("the man acting behind the Riot Blockchain curtain") including O'Rourke.  For example, *CNBC* discovered O'Rourke in Honig's office in Boca Raton on the day of the cancelled annual shareholder meeting; and shed further light on Honig's failure to file Schedules 13D and 13D/A and the suspicious circumstances surrounding the Kairos Transaction.

244.    In response, shares of Riot fell $5.74 per share, or approximately ***33.4%***, from closing at $17.20 on February 15, 2018, to closing at $11.46 per share on February 16, 2018, damaging Plaintiff and Class members.

### C.    The April 18, 2018 Stock Drop – Riot Files Form 10-K Revealing Related Party Transactions

245.    On April 17, 2018 after the market closed, Riot filed its 2017 annual report on Form 10-K, belatedly disclosing various related party transactions, as set forth herein, that took place in 2017.   These included the March 2017 Private Placement, Honig's consultancy role in the Coinsquare transaction, and the Kairos Transaction.   The following trading day, April 18, 2018, Honig finally disclosed the full details of his stock trades in 2017 in an amended Schedule 13D/A. That same day, the Company's stock price declined $0.43 per share, or approximately ***5.89%***, from the previous day's closing price.  *See* Ex. H.

### D.    The May 29, 2018 Stock Drop – Riot Files a Form 8-K Revising Its Disclosures Concerning the Coinsquare Transaction

246.    After trading ended on May 25, 2018, Riot disclosed for the first time in an amended Form 8-K/A that several Honig Group members were—like Riot—parties to the Coinsquare transaction.  On this news, on the following trading day, May 29, 2018, the Company's stock price fell from an opening share price $7.53 per share to $7.08 per share, a decline of nearly ***6%*** and damaging Class members.

### E.    The September 7, 2018 Stock Drop – SEC Files Suit Against Honig, O'Rourke, and Several Other "Selling Stockholders"

247.    Finally, on September 7, 2018, the SEC filed the *SEC v. Honig* Action against Honig, O'Rourke, Groussman, and Stetson, and several of their affiliates, finally revealing that they had been engaged in the same fraudulent *modus operandi* at Riot as at the previous companies at which they had operated the pump-and-dump schemes described by the SEC.  Supra ¶¶ 49-73.

248.    On this news, the price of Riot's stock dropped $1.38 per share, or approximately **_26.1%_**, from the previous day's closing price, to close at $4.30 per share on September 7, 2018.

249.    As shown above, the timing and magnitude of the price declines in Riot's common stock negate any inference that the losses suffered by Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraud.

## XII.    CLASS ACTION ALLEGATIONS

250.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those persons or entities who purchased or otherwise acquired the securities of Riot and/or Bioptix (NASDAQ: RIOT, BIOP) during the Class Period (the "Class") and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

251.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  The Company reported that as of April 12, 2018, it had approximately 1,030 holders of record of its common stock.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

252.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

253.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

254.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)      whether Defendants' acts as alleged violated the federal securities laws;

(b)      whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)      whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)      whether Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)      whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)      whether Defendants engaged in a fraudulent scheme;

(g)      whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(h)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

255.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.   APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

256.   Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine as enunciated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

257.   With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   the Company's common stock traded in an efficient market;

(d)   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)   Plaintiff and other members of the Class purchased common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

258.     At all relevant times, the market for Riot's common stock was efficient for the following reasons, among others:

(a)     the Company's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Riot filed periodic public reports with the SEC and the NASDAQ;

(c)     Riot regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Riot was followed by stock analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

259.     As a result of the foregoing, the market for Riot's common stock promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of the common stock.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of such common stock at artificially inflated prices, and a presumption of reliance applies.

260.     In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims alleged are grounded on Defendants' material omissions.  Because this action involves

Defendants' failure to disclose material adverse information regarding Riot's business operations and financial performance—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.

261.    Moreover, when, as here, a defendant has engaged in conduct that amounts to manipulation, that conduct creates and independent duty to disclose.  Participants in the securities markets are entitled to presume that all relevant actors are behaving legally and silence that conceals illegal activity is deemed intrinsically misleading.

262.    All that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIV.    NO SAFE HARBOR

263.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants**

264.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

265.    As early as 2016, and continuing throughout the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, did:  (i) deceive the investing public, including Plaintiff and other members of the Class, as alleged herein; (ii) artificially inflate the price of the Company's common stock; and (iii) cause Plaintiff and other members of the Class to purchase Riot's common stock at artificially inflated prices.   The various elements of Defendants' devices, schemes, and artifices that operated as a fraud and deceit on Riot's public investors are laid out in detail in Section IX, *supra*, and summarized below.

266.    ***First***, during the Class Period, Defendants O'Rourke and Beeghley, as officers and/or directors of Riot, pursuant to explicit or tacit agreements with Defendant Honig, knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder committed a deceptive act by causing the Company to issue materially false and misleading public filings with the SEC—including on Forms S-3, S-3/A, 8-K, 8-K/A, and 10-K and Schedule 14A— that materially misrepresented the Company's beneficial ownership in violations Item 403 of Regulation S-K by misrepresenting and concealing the fact that many of Riot's largest shareholders—including Honig, and other Selling Stockholders were members of a group (as defined by Section 13(d)(3)).   Defendants O'Rourke, Beeghley, and Riot also knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by issuing materially false and misleading Forms 8-K and 10-K that misrepresented and concealed various

material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendant Honig.

267.    **Second**, during the Class Period, Defendant Honig (acting individually and/or through the investment entities he controlled) and pursuant to explicit or tacit agreements with other Selling Stockholders and other affiliates to acquire, hold, vote, and/or dispose of shares they acquired in Riot in coordination with one another knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder by, among other things, directly or indirectly, to artificially inflate the Company's stock price by failing to disclose information that was required to be disclosed and that absent full disclosure caused public shareholders to have a false picture of the market.

268.    Each and every Defendant is sued as a primary participant in the wrongful and illegal conduct charged herein.

269.    The scheme, plan, and course of conduct alleged herein was intended to, and did, drive sales of Riot's common stock, and with it, the Company's share price.

## COUNT II

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants

270.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

271.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

272.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were materially misleading in that they contained misrepresentations and

failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

273.    During the Class Period, Defendants O'Rourke and Beeghley, as officers and/or directors of Riot, caused the Company to issue materially false and misleading public filings with the SEC—including on Forms S-3, S-3/A, 8-K, 8-K/A, 10-K, and Schedule 14A—that materially misrepresented the Company's beneficial ownership in violations of Section 13(d) and Item 403 of Regulation S-K by misrepresenting and concealing the fact that many of Riot's largest shareholders—including Defendant Honig and the Selling Stockholders, were members of a group with each other (as defined by Section 13(d)(3)) pursuant to their explicit or tacit agreement to acquire, hold, vote, and/or dispose of their shares in coordination with each other. Defendants O'Rourke, Beeghley, and Riot also knowingly or recklessly violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by issuing materially false and misleading Forms 8-K and 10-K that misrepresented and concealed various material related-party transactions between and among the Company and greater-than-5% shareholders of Riot including Defendant Honig.

274.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and other Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the

Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and other Defendants' materially false and misleading statements.

275.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and other Defendants' materially misleading statements and by the material adverse information which the Company's and Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

276.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

277.    By reason of the foregoing, the Company and the Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT III

### Violation of Section 20(a) of The Exchange Act
### Against All Defendants (Other Than Riot)

278.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

279.    During the Class Period, Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Each of the foregoing individuals owed fiduciary duties to the Company and its shareholders.  Because of their positions and interconnected relationships, they knew the adverse non-public information regarding the Company's business practices.

280.    As officers, directors and/or fiduciaries of a publicly owned company, these Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.  They also had an obligation to act, at all times, in the best interests of the Company and its shareholders and to refrain from self-dealing for the own benefit at the expense of Riot and the Class.

281.    By reason of the above conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

A.    Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as class representative, and appointing Motley Rice LLC as class counsel pursuant to Rule 23(g);

B.    Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.    Awarding Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E.    Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  May 27, 2022

Respectfully submitted,
LITE DEPALMA GREENBERG &
AFANADOR, LLC

 */s/ Joseph J. DePalma*

Joseph J. DePalma
Jeremy N. Nash
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com
jnash@litedepalma.com

*Local Counsel for Plaintiff*
*Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Plaintiff Dr. Stanley Golovac and*
*Lead Counsel for the Class*

**US MARKET ADVISORS LAW GROUP PLLC**
David P. Abel
5335 Wisconsin Ave. NW, Ste. 440
Washington, D.C.  20015
202-274-0237 Telephone
202-686-2877 Facsimile
dabel@usmarketlaw.com

*Counsel for Plaintiff Dr. Stanley Golovac*