# Exhibit A

**SANJAY WADHWA**
**SENIOR ASSOCIATE REGIONAL DIRECTOR**
**Michael Paley**
**Charu Chandrasekhar**
**Nancy Brown**
**Katherine Bromberg**
**Jon Daniels**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-1023 (Brown)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
**SECURITIES AND EXCHANGE COMMISSION,** :
                                                        :
        **Plaintiff,** :
                                                        :     **18 Civ. _____ (   )**
    **-- against --** :
                                                        :     **ECF CASE**
**BARRY C. HONIG, JOHN STETSON,** :
**MICHAEL BRAUSER, JOHN R. O'ROURKE III,** :
**MARK GROUSSMAN, PHILLIP FROST,** :
**ROBERT LADD, ELLIOT MAZA, BRIAN KELLER,** :  **COMPLAINT**
**JOHN H. FORD, ALPHA CAPITAL ANSTALT, ATG** : **AND JURY DEMAND**
**CAPITAL LLC, FROST GAMMA INVESTMENTS** :
**TRUST, GRQ CONSULTANTS, INC.,** :
**HS CONTRARIAN INVESTMENTS, LLC,** :
**GRANDER HOLDINGS, INC., MELECHDAVID,** :
**INC., OPKO HEALTH, INC.,** :
**SOUTHERN BIOTECH, INC., and** :
**STETSON CAPITAL INVESTMENTS INC.,** :
                                                        :
        **Defendants.** :
------------------------------------------------------------ x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Barry C. Honig ("Honig"), John Stetson ("Stetson"), Michael Brauser ("Brauser"),

John R. O'Rourke III ("O'Rourke"), Mark Groussman ("Groussman"), Phillip Frost ("Frost"),

Robert Ladd ("Ladd"), Elliot Maza ("Maza"), Brian Keller ("Keller"), John H. Ford ("Ford"),

Case 3:18-cv-02293-GC-RLS Document Filed 03/27/18 Page 2 of 153

Alpha Capital Anstalt ("Alpha"), ATG Capital LLC ("ATG"), Frost Gamma Investments Trust

("FGIT"), GRQ Consultants, Inc. ("GRQ"), HS Contrarian Investments, LLC ("HSCI"), Grander

Holdings, Inc. ("Grander"), Melechdavid, Inc. ("Melechdavid"), OPKO Health, Inc. ("Opko"),

Southern Biotech, Inc. ("Southern Biotech"), and Stetson Capital Investments Inc. ("SCI")

(collectively, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This case involves three highly profitable "pump-and-dump" schemes

perpetrated by Honig, Stetson, Brauser, O'Rourke, Groussman, and Frost, and their entities

GRQ, SCI, Grander, HSCI, Melechdavid, ATG, Opko, FGIT, and Southern Biotech from 2013

through 2018 in the stock of three public companies (Company A, Company B, and Company C)

that, while enriching Defendants by millions of dollars, left retail investors holding virtually

worthless shares.

2.      Across all three schemes, Honig was the primary strategist, calling upon other

Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or

engage in promotional activity.  In each scheme, Honig orchestrated his and his associates'

acquisition of a large quantity of the issuer's stock at steep discounts, either by acquiring a shell

and executing a reverse merger or by participating in financings on terms highly unfavorable to

the company.  In every scheme, Honig, and some combination of Stetson, Brauser, O'Rourke,

Groussman and Frost, either explicitly or tacitly agreed to buy, hold or sell their shares in

coordination with one another, knowing that a pump and dump was in the offing that would

allow them all to profit handsomely.  Once Honig and his associates had secured substantial

ownership of the issuer, they acted as an undisclosed control group, directing the issuer's

management for their benefit, including orchestrating transactions designed to create market

Case 3:18-cv-02293-CR-LHG   Document 1   Filed 09/07/18   Page 3 of 53

interest in the company or to solidify their control.

3.      To profit from their investment, in each scheme, Honig and his associates would arrange and pay for the promotion of the stock, directing their co-defendant Ford, or a similar promoter, to write favorable and materially misleading articles about the company whose stock price they wanted to inflate.  In several instances, to magnify the intended boost to volume and price that would follow a promotional article's release, Honig, Brauser, O'Rourke, Groussman, Melechdavid and ATG engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock, priming investor interest.

4.      In connection with the Company B and Company C schemes, Honig, Brauser, Stetson, O'Rourke, Frost and Groussman, as well as certain of their entities, also violated beneficial ownership reporting requirements of the federal securities laws by failing to disclose their group beneficial ownership of shares and the fact that as a group they were looking to exercise (and, in fact, did exercise) control over the issuers.

5.      Management of both Company A and Company B acted to further the schemes.  Defendants Maza (Company A's CEO), Keller (Company A's Chief Scientific Officer and a Director) and Ladd (Company B's CEO), acted separately at the direction of Honig and his confederates to take steps beneficial to that group at the expense of each company's public shareholders, and signed public filings they knew to be false to hide the group's beneficial ownership and existence.

6.      Maza and Keller signed Company A's public filings, in which they knowingly or recklessly omitted to disclose the share ownership as a group of Honig, Brauser, Frost, Stetson, and Groussman, or the size of each of their holdings.  Similarly, Company B's CEO, Ladd, also signed false public filings, making material misstatements in them about the

3

substantial group ownership of Company B shares held by Honig, Brauser, Stetson, O'Rourke, and Groussman.

7.      All told, the three schemes brought Defendants millions of dollars:  Company A's pump and dump generated for the Defendants more than $9.25 million in stock sales proceeds, and Company B's pump and dump generated more than $9.5 million.  And their most recent venture, the pump and dump scheme with respect to Company C, brought in over $8.3 million in stock sales proceeds.  In the wake of these schemes, public investors were left holding virtually worthless stock.

## **VIOLATIONS**

8.      By virtue of the conduct alleged herein, each of the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws as follows:

9.      Honig violated:

- Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Sections 9(a)(1) and (2) of the Securities Exchange Act of 1934 ("Exchange Act") [15.U.S.C. §§ 78i(a)(1) and (2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

10.     Stetson violated:

Case 3:18-cv-02293-GC-RLS Document 1 Filed 02/07/18 Page 5 of 53

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

11.     Brauser violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 9(a)(1) of the Exchange Act [15.U.S.C. § 78i(a)(1)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

12.     O'Rourke violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Sections 9(a)(1) and (2) of the Exchange Act [15.U.S.C. §§ 78i(a)(1) and (2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

13.     Groussman violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

14.     Frost violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

15.     Ladd violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

Case 3:18-cv-02293-MAS-LHG   Document 1   Filed 03/27/18   Page 7 of 53

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] and by aiding and abetting Company B's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1 thereunder [17 C.F.R. § 240.13a-1].

16.     Maza violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

17.     Keller violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], and by aiding and abetting Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

18.     Ford violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]; and

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

19.     Alpha violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

20.     ATG violated:

- Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)];

- Sections 9(a)(1) and (2) of the Exchange Act [15.U.S.C. §§ 78i(a)(1) and (2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

21.    GRQ violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5

    thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a)

    thereunder [17 C.F.R. § 240.13d-1(a)].

22.    HSCI violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5

    thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a)

    thereunder [17 C.F.R. § 240.13d-1(a)].

23.    Grander violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5

    thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a)

    thereunder [17 C.F.R. § 240.13d-1(a)].

24.    Melechdavid violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 9(a)(1) of the Exchange Act [15.U.S.C. § 78i(a)(1)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

25.     Opko violated:

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

26.     FGIT violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)]; and

Case 3:18-cv-02293-GC-RLS Document 1 Filed 09/07/18 Page 12 of 53

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

27.     Southern Biotech violated:

- Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

28.     SCI violated:

- Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

29.     The Commission seeks final judgments permanently enjoining Defendants from violating the federal securities laws, requiring each Defendant to disgorge his or its ill-gotten gains and to pay prejudgment interest on those amounts; requiring Defendants to pay civil

Case 3:18-cv-02293-GC-RLS Document 1 Filed 05/27/18 Page 22 of 53

monetary penalties; barring Defendants from participating in future penny stock offerings;
barring Defendants Ladd, Maza, and Keller from serving as officers or directors of publicly
traded companies; and seeking any other relief that the Court deems just and appropriate.

30.     Unless Defendants are permanently restrained and enjoined, they each will
again engage in the acts, practices, and courses of business set forth in this Complaint, or in acts
and transactions of similar type and object.

## JURISDICTION AND VENUE

31.     The Commission brings this action pursuant to the authority conferred by
Sections 20(b) and (d) of the Securities Act [15 U.S.C. §§ 77t(b) and (d)], and Sections 21(d) and
(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

32.     This Court has jurisdiction over this action pursuant to Sections 22(a) and (c)
of the Securities Act [15 U.S.C. §§ 77v(a) and 77v(c)], and Section 27 of the Exchange Act [15
U.S.C. § 78aa]. Defendants, directly or indirectly, singly or in concert, have made use of the
means or instrumentalities of transportation or communication in, interstate commerce, or of the
mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

33.     Venue lies in this district pursuant to Sections 22(a) and (c) of the Securities
Act [15 U.S.C. §§ 77v(a) and (c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].
Certain of the transactions, acts, practices and courses of business constituting the violations
alleged herein occurred within the Southern District of New York. Among other things, at all
relevant times, Company B's principal place of business was in Harrison, New York, within this
District, and Defendants solicited investments in securities from investors in this District and
sold securities through a broker-dealer located in this District.

Case 3:18-cv-02293-CR Document Filed 05/07/18 Page 28 of 158

## THE DEFENDANTS

### Individual Defendants

34.     **Honig**, born in 1971, is a resident of Boca Raton, Florida and currently works at an office in Boca Raton with Stetson and O'Rourke, and at times, Groussman.  Honig owns GRQ, and co-owns, with Stetson, HSCI, and co-owns, with Brauser and Frost, Southern Biotech.

35.     **Stetson**, born in 1985, is a resident of Fort Lauderdale, Florida and currently works at an office there with Honig and O'Rourke, and at times, Groussman.  Stetson owns SCI, and co-owns, with Honig, HSCI, of which he is the managing member.

36.     **O'Rourke,** born in 1985, is a resident of Fort Lauderdale, Florida and currently works at an office in Boca Raton with Honig and Stetson, and at times, Groussman.  O'Rourke owns ATG.

37.     **Brauser**, born in 1956, is a resident of Lighthouse Point, Florida and currently works in an office in Miami in the same building as Frost.  Brauser owns Grander.

38.     **Groussman**, born in 1973, is a resident of Miami Beach, Florida and occasionally works at an office in Boca Raton with Honig, Stetson and O'Rourke.  Groussman owns Melechdavid.

39.     **Frost**, born in 1936, is a resident of Miami Beach, Florida.  Frost founded Opko, and is its CEO.  Frost is also the trustee for FGIT.  Frost enjoys a reputation as a successful biotech investor.

40.     **Maza**, born in 1955, is a resident of New York, New York.  He was the CEO of Company A from June 2011 to January 2014.  He is a CPA licensed in New York, as well as an attorney licensed in New York.

41.     **Keller**, born in 1956, is a resident of California.  He was Chief Scientific Officer of Company A from about March 2011 to January 2014, and was a member of its board

Case 3:18-cv-02293-GC-RLS Document Filed 05/27/18 Page 24 of 53

of directors.  He currently works as President of Sales and Senior Vice President of Research and Development at Company A's successor company.

42.    **Ladd**, born in 1959, is a resident of Raleigh, North Carolina.  At all relevant times, he was a resident of New York, New York.  He has been the CEO of Company B since February 10, 2011.

43.    **Ford**, born in 1956, is a resident of Bolinas, California.

**Entity Defendants**

44.    **Alpha** is a Lichtenstein corporation and hedge fund, managed by an unregistered investment adviser located in New York, New York.

45.    **ATG** is a Florida corporation that O'Rourke owns and operates with its principal place of business in Florida.  ATG was incorporated in or around 2012.

46.    **FGIT** is a Florida trust that was formed in or around 2002.  Frost is FGIT's Trustee.

47.    **GRQ** is a Florida corporation that Honig owns and operates with its principal place of business in Florida.  GRQ was incorporated in or around 2004.

48.    **Grander** is a Florida corporation that Brauser owns and operates with its principal place of business in Florida.  Grander was incorporated in or around 2010.

49.    **HSCI** is a Delaware corporation that Honig and Stetson co-own and of which Stetson is the managing member, with its principal place of business in Florida.  HSCI was established in or around 2011.

50.    **Melechdavid** is a Florida corporation that Groussman owns and operates with its principal place of business in Florida.  Melechdavid was incorporated in or around 2006.

51.    **Opko** is a Delaware corporation.  Its principal place of business is in Florida.

Frost is Opko's CEO. Opko was incorporated in or around 2007.

52. **Southern Biotech** is a Nevada corporation that Honig operates and co-owns with Brauser and Frost with its principal place of business in Florida. Southern Biotech was incorporated in or around 2014.

53. **SCI** is a Florida corporation that Stetson owns and operates with its principal place of business in Florida. SCI was incorporated in or around 2011.

## OTHER RELEVANT PERSONS AND ENTITIES

54. **Company A** is a Delaware corporation headquartered in Georgia. Company A was controlled by Honig, Frost, and Brauser between March 2011 and December 2013. It was incorporated in Nevada in 2006. The company filed periodic reports, including Forms 10-K and 10-Q with the Commission. Company A's stock was quoted on OTC Link (formerly known as the "Pink Sheets"), an electronic interdealer quotation system operated by OTC Markets Group, Inc. In early 2014, Company A engaged in a reverse merger with a company associated with Honig and his associates. The successor company is currently quoted on OTC Link. At all relevant times, Company A's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)], and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

55. **Company B** is a Delaware corporation headquartered in Harrison, New York. Its common stock is registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and it files periodic reports, including Forms 10-K and 10-Q with the Commission. Company B's common stock was listed on NYSE MKT from 2007 until its October 19, 2016 delisting. Its stock is currently quoted on OTC Link. At all relevant times, Company B's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

Case 3:18-cv-02293-GC-RLS Document 1 Filed 09/07/18 Page 16 of 153

56.     **Company C** is a Delaware corporation headquartered in San Diego, California, and was incorporated in 1988. Company C's common stock is registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and its common stock is listed on NASDAQ. At all relevant times, Company C's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

## FACTS

### A. The Company A Scheme

#### 1.     *Honig, Frost and Brauser Obtain Control of Company A*

57.     In the Company A scheme, Honig and Brauser teamed up with Frost, a frequent collaborator in Honig and Brauser deals involving biotech issuers. As alleged below, the three men caused the company to issue shares to themselves and their associates through a series of so-called "private investments in public equities," or "PIPE" financings, drove the price of the stock higher by secretly paying for a misleading promotional campaign and by virtue of Honig's and Brauser's manipulative trading, and then unlawfully sold their Company A shares into the inflated market for proceeds of approximately $9,260,000.

58.     In November 2010, Honig, along with his nominees including Stetson and Groussman, purchased one-third of a publicly-traded shell company. In December 2010, Brauser and Frost each purchased one-half of the remaining two-thirds of the publicly-traded shell company. Each of Honig, Stetson, Groussman, Brauser, and Frost, disguised their role in the acquisition by purchasing the shares from an entity used to make the purchase of the shell company. Soon after they acquired the shell, Honig, Brauser, and Frost installed a Frost associate as the sole disclosed director of the company.

59.     In late 2010, Honig, Brauser, and Frost approached management of a private

16

biotech company ("Company A Labs"), including Keller, the Chief Scientific Officer and Director, and Company A Labs then-CEO ("Company A Labs CEO") with a proposal for taking the company public. Honig, Brauser, and Frost proposed a reverse merger, by which Company A Labs, a privately-held California company then in the business of manufacturing over-the-counter pharmaceutical products, would be merged into Honig's, Brauser's, and Frost's publicly-traded shell. At the time, Company A Labs and Keller were working on developing a formulation using a patented technology called "Qusomes" that Company A Labs hoped to use in large-scale drug markets, and the management of Company A Labs saw the deal as creating financing possibilities to fund the company's research.

60.     Indeed, Honig, Brauser, and Frost told Keller and Company A Labs CEO that the public company deal would include raising $8 to $15 million dollars to support research and development ("R&D") into Qusomes. And they further persuaded Company A Labs CEO to go along with the merger by promising him 6,650,000 shares of the newly created public company.

61.     The proposed merger hit a snag, however, in March 2011. Pursuant to a $3 million credit line Company A Labs had with a San Francisco bank, the bank had authority to approve all major transactions, and, in March 2011, it declined to approve the proposed merger. The merger nonetheless closed in June 2011, and the bank thereafter sent a default notice. On September 8, 2011, Maza, who had been installed as the CFO and director of Company A Labs by Honig and Brauser, completed the payoff of the credit line thereby removing the obstacle to the merger, but saddling Company A Labs with short-term, high-interest rate notes that included a conversion option into equity of the company.

62.     In connection with the reverse merger, Honig, Brauser, and Frost arranged the sale of certain unprofitable Frost assets to the public company in exchange for 8,345,310 shares

17

and the obligation of the company to file a registration statement for these shares, providing further value to Frost.

63.     After the closing of the reverse merger of Company A Labs into the shell company in June 2011, the surviving public company became Company A.  Honig, Brauser, Frost, Groussman, and Stetson controlled the vast majority of the Company A's stock and were affiliates of Company A.

64.     After the merger, Company A listed its corporate address at 4400 Biscayne Boulevard in Miami, the same business address then shared by Honig, Brauser and Frost.

65.     In addition to controlling the vast majority of Company A's outstanding shares, Honig, Brauser, and Frost exercised control over the management of Company A.  Before the deal closed, Honig and Brauser, acting with the knowledge and consent of Frost, Stetson and Groussman, had installed their associate, Maza, as the CFO and a director of Company A Labs. After the merger, Maza became the CEO of Company A.  Thereafter, Maza sought approval from Honig and Brauser for every business decision. For example, at the direction of Honig and Brauser, Maza agreed to divert funds from Company A to pay rent for the office of an unrelated entity co-owned by Honig and Brauser.

66.     In their capacity as the three board members of Company A, Keller, Maza, and the Frost associate concealed Honig's and Brauser's control of Company A by signing off on public filings that failed to disclose the involvement of Honig, Brauser, Stetson and Groussman, omissions that made those filings materially misleading.  These filings included Company A's Form 10-K filed on April 16, 2012.

67.     At the time they signed these filings, Keller and Maza understood that Honig and Brauser, with Frost's knowledge and consent, controlled Company A's management, and not

Maza. As Keller explained in a February 12, 2012 email to a Company A colleague, "[t]he real power is with Barry Honig and Mike Brauser. Elliot [Maza] is just a mouth piece." Following the merger, Company A's filings nonetheless identified only Frost, but not Honig or Brauser, as a control person.

68.     Honig, Brauser, and Frost failed to keep their promises to invest money in Company A for R&D. Instead, in a series of PIPE financings, which included warrants for additional shares, done between February 24 and March 12, 2012, they limited their investment to keep the business operating at a minimal level and to fund Maza's and Keller's generous compensation, forcing Company A to abandon its R&D efforts entirely by mid-2012. Keller's compensation more than doubled once he began working with Honig and Honig's associates, whereas Maza's annual compensation ranged from $300,000 to $600,000.

69.     Honig, Brauser, and Frost also used the financings to amass more, ever-cheaper Company A shares, and although the financings did nothing to enhance Company A's continued growth, Maza and Keller went along with them because both were promised, and ultimately awarded, substantial salaries as well as millions of Company A shares, by Company A's real control persons, which included Honig, Brauser, Frost, Stetson and Groussman.

70.     By April 1, 2013, and pursuant to an agreement to acquire, hold or sell their shares in concert, Honig, Frost, Brauser, Maza, Keller, and the Frost associate had amassed 44,818,312 shares, or almost 71% of the Company A shares outstanding, with Honig alone holding 5,542,654 shares, or 8.8% of the company's outstanding shares. Yet, even though Company A filed an amendment to its Form 10-K annual report for the 2012 fiscal year on September 13, 2013, signed by Maza, Keller, and the third board member, for the specific purpose of updating the beneficial ownership table, the annual report failed to disclose the

Case 3:18-cv-02293-GC-RLS   Document 1   Filed 05/27/18   Page 20 of 53

existence of the Honig-allied group, which beneficially owned nearly three-quarters of Company A's outstanding shares.

71.     On July 16, 2012, Company A Labs CEO – who had been ousted from Company A by Honig and Brauser with Keller's assistance – sued Company A, Honig, Brauser, Maza, and Frost.  Brauser, who was not an officer or director of Company A, took the lead in negotiating a settlement on behalf of Company A, frequently updating Honig and Frost on his negotiations.  In September 2013, Brauser and Honig came to terms with Company A Labs CEO, agreeing to pay him $2 million in return for his relinquishing his claim to the Company A shares he had been promised in the merger, and that he had never received.  Maza then ratified the settlement terms on September 5, 2013.

### 2.     *The Company A Pump and Dump*

72.     In preparation for the Company A pump and dump, during August and September, 2013, Stetson, at Honig's direction, deposited in a brokerage account almost 4 million Company A shares that had been issued to Honig.  Stetson worked closely with Honig, Brauser, and Frost and knew how much Company A stock they controlled, and that Honig and Brauser were directing Company A's management and policies.  In connection with the deposit of these shares, Stetson submitted Honig's signed answers to the broker's questionnaire, falsely denying any relationship between Honig and Company A or its affiliates.  At the time that Stetson made that submission, and Honig signed it, each knew, or was reckless in not knowing, that Honig was an affiliate of Company A because Company A was under Honig's control.

73.     On September 4, 2013, Stetson facilitated the issuance of false attorney opinion letters to Company A's transfer agent in order to remove restrictive legends from Honig's share certificates.  These opinion letters contained the material misrepresentation that Honig was not

an affiliate of Company A, a representation that Stetson knew, or was reckless in not knowing, was false, given what he knew about Honig's control over Company A's management and polices.

74.     As part of the process for depositing Honig's shares with a broker, and in preparation for the pump and dump, CEO Maza was also required to issue a letter to confirm the authenticity of the stock certificates.  In a letter to the broker-dealer, dated September 10, 2013, Maza wrote "[w]e further acknowledge and agree that there is no other agreement or understanding between Barry Honig and [Company A] that would preclude Barry Honig from selling or otherwise disposing of shares represented above."  Maza knew, or was reckless in not knowing, that this statement was false because Honig was an affiliate of Company A, and that, as an affiliate, Honig's ability to sell his Company A shares would be subject, under the federal securities laws, to volume limitations.

75.     Once the restrictions were lifted from Honig's shares and the shares were deposited into a brokerage account, Honig was ready to sell them.  In September 2013, Honig directed his associate, O'Rourke, to reach out to Ford, a seasoned stock promoter who used his platform on the *Seeking Alpha* website to share his purportedly independent investment analysis of selected companies.  O'Rourke contacted Ford and proposed that Ford write an article on the *Seeking Alpha* website promoting Company A in exchange for below-market price Company A shares.  At that time, Honig, Frost, Brauser, Stetson, Groussman, O'Rourke, Keller, Maza, and the Frost associate board member owned about 71% of the outstanding Company A shares, and the market for Company A was virtually nonexistent (with zero volume on September 20, 2013).  O'Rourke instructed Ford to write a favorable article about Company A emphasizing Frost's involvement (because Frost was known as a billionaire and successful biotech investor) and the

supposed rosy prospects of Company A's R&D.

76.     On September 23, 2013, Honig and some associates began trading Company A shares to create the appearance of market activity and interest in Company A in advance of the planned Ford article.  That day, the trading volume of Company A shares soared to 302,000 from zero volume the previous day.

77.     The September 23rd trading also gave Honig a way to surreptitiously pay Ford for his upcoming favorable article on Company A.  O'Rourke called Ford and told him to put in buy orders for Company A stock at $0.40 in order to ensure his order was executed against the corresponding sell order placed by Honig. Honig then sold 180,000 Company A shares to Ford at $0.40 in a coordinated trade, a price well below the price at which these shares otherwise traded during that day.

78.     O'Rourke joined the trading at the end of the trading day on September 23rd to "mark the close," *i.e.,* to ensure that the last price of the day would be higher, giving the false impression that Company A's share price was on an upward trajectory.  Specifically, at 3:58 pm that day, O'Rourke, through his entity ATG, placed a bid to buy Company A shares at $0.68, a significantly higher price than the prior buy order at $0.55, which had been entered at about 3:06 pm.  Another Honig associate, who had purchased shares from Honig earlier in the day, placed a corresponding sell order to complete the transaction at the inflated price.

79.     In further preparation for the publication of the Ford article touting Company A, and to enhance the false picture of an active market for the stock, near the end of the trading day on September 26th, Honig and his associates engaged in a series of coordinated trades.  For example, the Barry & Renee Honig Charitable Foundation, controlled by Honig, sold Company A shares to a Honig associate at $0.68, and two minutes later Groussman's entity Melechdavid

executed a transaction against ATG, O'Rourke's entity, at $0.68.

80.    Less than half an hour before market close on September 26, 2013, as directed by O'Rourke and Honig, and after review by Keller, Ford published a materially misleading promotional article on *Seeking Alpha*, titled "Opko and Its Billionaire CEO Invested in Company A." Ford presented a bullish outlook for Company A and concluded that "Company A should be trading for more than twice today's valuation." In the article, which included a question and answer interview of Keller, Ford quoted Keller touting the benefits of Company A's Qusomes technology. Keller misleadingly stated that Company A had a formulation ready for testing to be brought to the billion-dollar injectable drug market. Yet, as Keller knew, as of summer 2012, all R&D efforts had been shut down without the successful formulation of an injectable drug and Company A had ceased all efforts to develop this technology in mid-2012.

81.    Ford's article failed to disclose that he had been compensated by Honig for writing the article, through Honig's sale to him of below-market Company A shares on September 23, a material omission. Instead, Ford included a disclaimer that merely disclosed "I am long [Company A]. I wrote this article myself, and it expresses my own opinions. <u>I am not receiving compensation for it (other than from Seeking Alpha)</u>. I have no business relationship with any company whose stock is mentioned in this article." (Emphasis added.)

82.    The market reacted strongly to the Company A promotion: the trading volume of Company A stock rose from approximately 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013 and to more than 6 million shares on October 2, 2013. The share price increased from an average of about $0.48 during August 2013 to an intraday price of $0.97 on October 17, 2013.

83.    Between the start of the promotion following the publication of Ford's article

23

Case 3:18-cv-02293-GC-RLS   Document 1   Filed 09/07/18   Page 24 of 153

on September 26, 2013 and December 31, 2013, Honig and his associates sold shares into the

inflated market for proceeds of approximately $9,260,000:

| Company A Pump and Dump Proceeds | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2013)** | **Net Quantity Sold** | **Proceeds** |
| **Honig** | 9/23 – 12/16 | (5,892,689) | $3,416,455.17 |
| **Brauser** and **Grander** | 9/27 – 12/23 | (2,128,316) | $1,137,775.46 |
| **Frost** | 10/1 – 10/4 | (1,987,991) | $1,085,321.74 |
| **Groussman** and **Melechdavid** | 9/26 – 10/14 | (1,229,166) | $677,272.37 |
| **Stetson** and **SCI** | 9/27 – 12/18 | (500,000) | $279,859.68 |
| **O'Rourke** and **ATG** | 9/23 – 12/27 | (250,000) | $148,443.68 |
| **Alpha Capital** | 10/3 – 11/27 | (3,772,200) | $2,513,724.08 |
| **Total** | | **(15,760,362)** | **$9,258,852.18** |

84.     No registration statement was then in effect for any of Honig's, Brauser's,

Frost's or Groussman's sales in the September through December 2013 period.  No exemption

from registration was available to any of them, or their entities.  Moreover, since Company A did

not trade on a national securities exchange, as affiliates of Company A, these Defendants could

only lawfully sell 1% of the company's total shares outstanding in any three-month period.  As

of September 2013, Company A had approximately 63 million shares outstanding, and as of

November 15, 2013, it had approximately 75 million shares outstanding.  Because Honig,

Brauser, Frost, and Groussman, and their respective entities, were under common control with

Company A, each was an affiliate of Company A, and each sold shares in excess of the

applicable volume limitations.

### 3.     *Alpha's Company A Sales*

85.     Alpha frequently co-invested with Honig, and participated in several rounds of

the Company A PIPE financings, resulting in Company A's issuance of millions of shares to

Alpha at steeply discounted prices in January 2012, April 2013 and September 2013.

86.     On September 5, 2013, when Honig and Brauser reached their settlement with

Case 3:18-cv-02293-CM Document 1 Filed 09/07/18 Page 25 of 53

Company A's CEO, by which he disavowed his ownership of the 6,650,000 shares to which he had been entitled, Alpha purchased 1.5 million of those shares at $0.15 per share, with the intention of selling the shares into the inflated market created by the Honig-orchestrated promotion. Company A issued the shares to Alpha on September 23, 2013, days before the Ford article appeared on *Seeking Alpha*. On October 29, 2013, Alpha obtained an attorney opinion letter that it supplied to Company A's transfer agent so that the transfer agent would remove the restrictive legend from the share certificate. The attorney opinion letter – as Alpha knew or was reckless in not knowing – falsely represented that Alpha had held the shares for at least 6 months and that the shares could be sold in accordance with the Securities Act Rule 144 safe harbor, as exempt from the registration provisions.

87.     Between October 3, 2013 and November 18, 2013, Alpha, in lockstep with Honig, Brauser, Frost, Groussman, O'Rourke, and Stetson (and their respective entities), sold 3.7 million Company A shares for proceeds of $2,513,724, including virtually all of the shares Alpha had obtained in September 2013.

## B. The Company B Scheme

### 1. *Honig and Associates Secretly Obtain Company B Shares*

88.     During 2015 and 2016, Honig and his associates used Company B, a publicly traded shell, as another vehicle for a pump-and-dump scheme. Honig and his partners used many of the same tactics they had employed in the Company A scheme: they bought cheap shares, intending to exercise control over the management and polices of the company; exercised that control; orchestrated a misleading promotion of the company that drove up the stock price and the trading volume of the company's shares; and dumped their shares for a profit in the inflated market. Despite their control over various actions taken by Company B, and their agreement to buy, hold and/or sell their shares in concert, Honig and his associates – this time

including Groussman, Brauser, Stetson and O'Rourke – took numerous steps to conceal their
involvement, and to perpetuate the false appearance that the company was actually being
controlled by its CEO.

89.     In 2015, Honig and his associates began planning the pump-and-dump of
Company B's shares. Honig set the scheme in motion on September 26, 2015 when he informed
Stetson that "[w]e need to put together a term sheet for Company B," and outlined proposed
terms of the arrangement. Honig directed Stetson to send the proposal to Ladd, Company B's
CEO. The deal contemplated the issuance of 2.8 million Company B shares, along with warrants
to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker. This deal
structure allowed the investors repeatedly to convert and sell their shares while appearing
individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d)
required public disclosure of holdings. By ostensibly staying below the 5% ownership threshold,
and evading the public reporting requirements, Honig and his associates increased the likelihood
that they could disguise their scheme to pump up the price of Company B's shares in anticipation
of a profitable sell-off to unsuspecting investors.

90.     Ladd was fully aware of Honig and his associates' combined interest in, and
control over, the company, but failed to disclose it in Company B's public filings. On October 1,
2015, Ladd emailed Honig that "NYSE MKT wants to know the buyers. $175,000 x 4 investors
will be each at 4.9%. . . ." Honig replied that same day, copying Brauser and Stetson, that he
would "get back to you with names shortly for now use Barry Honig Mike Brauser OBAN [an
LLC created by Stetson]." On October 5, 2015, Stetson provided Company B with the investors
who would participate in the financing, which included GRQ (Honig), Melechdavid
(Groussman), Grander (Brauser), ATG (O'Rourke) and SCI (Stetson).

Case 3:18-cv-02293-CR   Document 1   Filed 03/27/18   Page 27 of 153

91.     The Honig-led financing ultimately provided $700,000 to Company B (the "October 2015 Company B Financing").  On October 8, 2015, Company B filed a Form 8-K disclosing that the company had "entered into separate subscription agreements . . . with accredited investors . . . relating to the issuance and sale of $700,000 of units . . ."  In keeping with Honig's desire to conceal the large ownership stake of his team, Ladd did not disclose the investors' names in the Form 8-K.

### 2.     The Company B Pump and Dump in February 2016

92.     Having coordinated the accumulation of stock with Groussman, Brauser, Stetson and O'Rourke, Honig, with his partners' knowledge and consent, then secretly paid for a promotion that included materially misleading information and was supported by his own manipulative trading activity.

93.     On or around January 21, 2016, by which time Honig, Groussman, Brauser, Stetson and O'Rourke had acquired at least 16.3% of Company B's outstanding stock, Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of Company B.  Shortly after the payment for the stock promotion, on February 3, 2016, an article was published online touting Company B's positive prospects in social and real money gaming sites and intellectual property relating to slot machines. The article did not disclose that the author had been paid by Company B – at Honig's direction – to write the article. After the article was published on February 3, 2016, there was a 7000% increase from the previous day's trading volume, and an intraday price increase of over 60%.  Honig, Ladd, Stetson, and O'Rourke sold over 430,000 shares into this inflated market for proceeds of approximately $198,800.

| Company B Pump and Dump Proceeds, Following February 2016 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2016) | Net Quantity Sold | Proceeds |
| **Honig** and **GRQ** | 2/3 – 4/6 | (231,050) | $123,154.87 |
| Stetson | 2/3 – 2/11 | (40,000) | $20,483.33 |
| **O'Rourke** and **ATG** | 2/3 – 2/9 | (64,366) | $15,960.72 |
| Ladd | 2/3 – 5/3 | (96,072) | $39,204.12 |
| Total | | **(431,488)** | **$198,803.04** |

### 3. The Company B Pump and Dump in May 2016

94.     Honig soon identified a potential acquisition target for Company B that would
give Honig and his associates another way to profit from their interest in Company B. The
proposed deal involved a well-known cybersecurity innovator who had created a popular
antivirus software bearing his name ("the Cybersecurity Innovator"). O'Rourke took the lead at
Honig's direction (and with the knowledge and consent of Groussman, Brauser and Stetson) in
arranging a deal between Company B and the Cybersecurity Innovator. On March 29, 2016,
O'Rourke sent the Cybersecurity Innovator a term sheet for the asset purchase of Cybersecurity
Innovator's company, "CI Company," by an "NYSE listed company." The CI Company
indicated interest on April 3, 2016. O'Rourke wrote to Honig on April 3, 2016 and asked Honig
if he would "still want to pursue [Cybersecurity Innovator] deal." After Honig replied to
O'Rourke that same day "Yea!", O'Rourke introduced Ladd to the Cybersecurity Innovator on
April 4, 2016, to begin negotiating a transaction between Company B and the Cybersecurity
Innovator's various business interests.

95.     Subsequent correspondence between Ladd and O'Rourke and between
O'Rourke and Honig, reflect the ongoing and significant role Honig and O'Rourke played in
orchestrating the deal. Company B and the Cybersecurity Innovator agreed to terms on May 8,
2016.

96.     On May 9, 2016, at 8:30 a.m., Company B issued a press release announcing

Case 3:18-cv-01779-GC-LHG Document 1 Filed 05/27/18 Page 29 of 53

its merger with CI Company. In the release, Ladd misleadingly described the Cybersecurity Innovator's prior financial success. He falsely claimed that the Cybersecurity Innovator had "sold his anti-virus company to Intel for $7.6 billion," suggesting that Company B might achieve similar success. Yet, as Ladd knew or was reckless in not knowing, the sale of the Cybersecurity Innovator's namesake company to Intel at that price had occurred over a decade after the Cybersecurity Innovator's departure from that company.

97.     Knowing that Ladd's misleading announcement of the deal would be released later that morning, on May 9, 2016, Honig traded in Company B stock to create the misleading appearance of market liquidity. In pre-market trading that morning, Honig bought and sold small quantities of Company B stock dozens of times. Joining the effort to paint a false picture of legitimate market interest in the stock, Brauser, as well as Groussman, and his entity, Melechdavid, engaged in coordinated trades in Company B stock with Honig in pre-market trading that morning.

98.     That same day, StockBeast.com, a well-known internet stock promotion website, published an article by an unnamed author entitled "[Company B] Beastmode engaged – [Cybersecurity Innovator] driving the Bus." The StockBeast.com article touted Company B and highlighted the Cybersecurity Innovator's involvement, repeating Ladd's materially false claim that the Cybersecurity Innovator had "sold his startup company to Intel for $7.6BB," and proclaiming: "This is big big big!"

99.     This promotion and Honig's, Brauser's and Groussman's manipulative trading on May 9 were effective in driving up both volume and price: on May 6, 2016 (the last day of trading prior to the promotion), Company B had trading volume of 71,005 shares and a closing price of $0.36. On May 9, 2016, the stock closed at $0.49 (representing an increase of 34

Case 3:18-cv-02293-GC-RLS Document 1 Filed 09/07/18 Page 30 of 153

percent over the prior day's close) with trading volume of more than 10 million shares. The trading volume for Company B stock peaked at 109,384,614 on May 17, 2016 with a closing price of $4.15.

100.     In the days immediately following the announcement of the CI Company acquisition, Honig, Brauser, Stetson, Groussman and O'Rourke, pursuant to their agreement to buy, hold and/or sell their shares in concert, sold over 9.3 million Company B shares, resulting in total proceeds of over $9.4 million:

| Company B Pump and Dump Proceeds, Following May 2016 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2016) | Net Quantity Sold | Proceeds |
| **Honig** and **GRQ** | 5/9 – 5/20 | (3,783,001) | $2,393,915.52 |
| **Brauser** and **Grander** | 5/9 – 5/18 | (2,137,668) | $3,839,295.64 |
| **Groussman** and Melechdavid | 5/9 – 5/11 | (1,415,870) | $999,873.56 |
| **Stetson** and **SCI** | 5/9 – 5/12 | (750,000) | $660,798.20 |
| **O'Rourke** and **ATG** | 5/9 – 5/16 | (750,000) | $990,661.97 |
| **Ladd** | 5/9 – 5/31 | (471,000) | $516,554.08 |
| **Total** | | **(9,307,539)** | **$9,401,098.97** |

### 4.     *False Statements by Honig, Frost, Brauser, Stetson, Groussman, O'Rourke, and Ladd in Beneficial Ownership and Company B Filings*

101.     Although they were acting in concert, and pursuant to an agreement to do so, Honig, Frost, Brauser, Stetson, Groussman and O'Rourke knowingly or recklessly concealed their concerted efforts from the investing public. Ladd, with full knowledge of both the Honig group's ownership and their direction of the management and policies of Company B, also kept their control a secret, signing Company B public filings that did not disclose the full extent of their ownership or control. After the October 2015 Company B Financing closed, Honig, Groussman, Brauser, Stetson and O'Rourke as a group collectively owned at least 2.6 million shares, or over 16% of the shares outstanding after the issuance, and their obligation to file a Schedule 13D under Exchange Act Section 13(d) arose as of October 8, 2015. Moreover, they

30

Case 3:18-cv-02293-GC-RLS Document 17 Filed 05/27/18 Page 31 of 53

each had warrants to obtain a total of an additional 4.6 million Company B shares, which, if they were all converted, would have resulted in Honig, Groussman, Brauser, Stetson and O'Rourke controlling at least 42% of the total common shares outstanding at that time.

102.     Honig, Groussman, Brauser, Stetson and O'Rourke exercised control over Ladd and the management and policies of Company B.  For example, on October 1, 2015, Ladd asked for and received Honig's direction with respect to how to disclose Honig's group's stock acquisitions to the NYSE MKT exchange.  O'Rourke, at Honig's direction, negotiated on Company B's behalf the terms on which the Cybersecurity Innovator would sell CI Company to Company B.  Indeed, in emails after the CI Company acquisition, Honig freely accepted credit for his role in the transaction.  On May 12, 2016, for example, Honig received an email from an investment firm congratulating him on the recent transaction: "You're invovlved [sic] with [Company B]? Impressive!" Honig responded that he was the "[l]argest shareholder, fund and relationship with [the Cybersecurity Innovator]."  In early August 2016, Honig also admitted his undisclosed role at Company B in a chat conversation with Stetson: "its great in [Company B] because we are behind the scenes."

103.     Because they acted in concert for the purpose of acquiring, holding and disposing of Company B shares, each of Honig, Groussman, Brauser, Stetson and O'Rourke was a member of a group and considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of the group and disclosing the number of shares each of them beneficially owned.  However, none of Honig, Groussman, Brauser, Stetson or O'Rourke ever made a Schedule 13D filing disclosing their respective ownership or membership in a group, acting intentionally to conceal from the market the size of

their group's position and their coordination and thereby to deceive investors.

104. Instead, on October 19, 2015, Honig filed a Schedule 13G, claiming only his own 6.59% beneficial ownership and falsely stating that the securities "are not held for the purpose of or with the effect of changing or influencing the control of the issuer" – a representation he knew, or was reckless in not knowing, to be false. Indeed, because Honig and his associates exercised control over Company B's management and policies – as Honig candidly acknowledged in emails – he was disqualified from making a 13G filing. In February 2016, Honig filed an amended Schedule 13G disclosing an ownership percentage of 9.1%. Brauser filed a Schedule 13G on May 4, 2016, in which he claimed 7.4 % beneficial ownership via his entity Grander. In each of these filings, Honig and Brauser also falsely claimed that they were passive investors without any intention to influence or change control of the company and omitted the fact that each was a member of a group.

105. Similarly, in Company B's 2015 Form 10-K filed on April 11, 2016, only Honig was disclosed as a beneficial owner, holding 8.6%. Notwithstanding that Ladd knew that Honig, Groussman, Brauser, Stetson and O'Rourke were working together, he signed the 2015 Form 10-K failing to disclose their group beneficial ownership. Ladd also signed a materially misleading S-1/A registration statement filed on January 13, 2016 for the 8,400,000 Company B shares issued in the October 2015 Company B Financing, failing to disclose the group beneficial ownership of GRQ, Grander, Melechdavid, ATG and SCI.

## C. The Company C Scheme

### 1. *Honig and Stetson Obtain Control of Company C*

106. In early 2014, Honig identified a publicly-traded shell company that was unencumbered by debt or pre-existing convertible debt, and sought an appropriate private company for purposes of a reverse merger and pump-and-dump scheme.

Case 3:18-cv-02293-GC-RLS   Document 1   Filed 09/07/18   Page 33 of 153

107.     At or about the same time, the CEO of Company C ("Company C's CEO") was introduced to "Entity H," a frequent co-investor alongside Honig and Brauser.  At the time, Company C, a private company developing cancer therapies and diagnostic products, was looking for funding for its research and development efforts, and Entity H suggested to Company C's CEO that he turn Company C into a public company.  On July 8, 2014, Company C executed a reverse merger of Company C into the shell company Honig had identified.  Company C's CEO understood that the two lead investors in the transaction were Entity H and HSCI, both of which had signed the deal documents.  Stetson had described HSCI to Company C's CEO as his own investment vehicle.  In fact, while Stetson was the sole managing member of HSCI, Honig actually owned at least 94% of HSCI, a fact that Stetson did not disclose to Company C's CEO or the market.

108.     In an initial $3 million capital raise in February 2014, in connection with the contemplated merger, HSCI invested $1 million and Entity H invested $1.7 million in return for a substantial position in the shell. As a result, the stake of Entity H and HSCI (including conversion of all warrants) amounted to about 67% of the authorized shares of the newly public Company C. The terms of the merger included granting a "Consent Right" to Entity H and its affiliates, by which Entity H could block or approve many kinds of Company C transactions, including issuing additional shares, any change of control and other basic corporate actions.

109.     In March and April 2015, Honig orchestrated two private placement financings for Company C: Series D and Series E.  Honig determined the amount, source and structure of, and participants in, these financings.  For example, when deciding whether a potential investor could take part in the March 2015 financing round, Company C's CEO explicitly deferred to Honig, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might

33

want to allow to invest along with the current group.  Viewed this as your choice not mine.  That is why I asked him to call you."

110.     The Series D financing closed in late March 2015 and included a buyout of Entity H's notes, including the Consent Right, at a favorable purchase price.  The investors who purchased the notes included various entities owned and controlled by Honig, Stetson, O'Rourke, Brauser, Frost, and Groussman: HSCI, Southern Biotech, GRQ, ATG, Grander, and Melechdavid.

111.     The Series E financing, which closed April 6, 2015, included warrants, and raised $12 million for Company C on terms highly favorable to Honig and his chosen investors, including Southern Biotech, and Frost's FGIT and Opko.

### 2.     *The Company C Pump and Dump in April 2015*

112.     One of the goals of the private placement financings, as Honig, Stetson, O'Rourke, Brauser, Frost, and Groussman knew, was to generate market interest in Company C stock in preparation for a planned stock promotion.  On April 3, 2015, O'Rourke, acting at Honig's direction, drafted a press release (with input from Company C's CEO, Honig and Brauser) announcing the $12 million private placement in which Frost's entities had participated.  Honig then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym "Wall Street Advisors" on *Seeking Alpha* on April 8, 2015 at 11:13 a.m.  The article, titled "Opko Spots Another Overlooked Opportunity in Company C Therapeutics," highlighted Opko's and Frost's investment in Company C.  Despite his involvement in facilitating the Company C financing and his extensive business relationships with Honig, Stetson, Brauser, and Frost, in his article, O'Rourke knowingly and falsely claimed that "[t]he author has no business relationship with [Company C]."  He also knowingly and falsely claimed

that he was "not receiving compensation for [writing the article]."

113.    Anticipating the release of O'Rourke's *Seeking Alpha* article, ATG,

Melechdavid, and O'Rourke engaged in early trading of Company C shares on April 8, 2015

with the intention of creating a false appearance of market interest in the stock.  That trading

included at least one matched trade, with Melechdavid submitting the buy order and ATG

submitting the sell order for the same price at 9:38 a.m.  The share price of Company C opened

that day at $3.14 and reached $3.73 in the minutes before the promotion was released.

114.    The promotion was successful. The trading volume of Company C shares rose

almost 7500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, following

the announcement of the Series E private placement.  The volume increased to 858,709 on April

9, 2015, the day after O'Rourke's article was published.  Company C's share price went from a

closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015.  The

Defendants listed below, acting pursuant to their agreement to buy, hold or sell their Company C

shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of

over $5.5 million, as detailed below:

| Company C Pump and Dump Proceeds, Following April 2015 Promotion | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2015)** | **Net Quantity Sold** | **Proceeds** |
| **Brauser** | 4/13 – 6/30 | (576,400) | $1,600,826.76 |
| **Groussman** and **Melechdavid** | 4/6 – 6/23 | (99,616) | $342,984.59 |
| **Stetson** and **HSCI** | 4/6 – 6/30 | (1,080,379) | $3,607,248.91 |
| **O'Rourke** and **ATG** | 4/8 – 6/30 | (30,064) | $69,744.51 |
| **Total** | | **(1,786,459)** | **$5,620,804.77** |

### 3.    *The Company C Pump and Dump in June/July 2015*

115.    In June 2015, when the market for Company C shares had cooled, O'Rourke

recruited Ford to publish another Company C tout on Ford's blog.  On July 1, 2015, Ford

published an article titled "[Company C]: Near-Term Catalysts Could Push Shares from $2 to

Case 3:18-cv-02293-GC-RLS  Document 1  Filed 03/27/18  Page 36 of 153

over $5." The article contained materially false statements, including that a licensing deal was imminent, when it was not, and that there were near-term therapy development events that could take the share price to $5, when in fact clinical trials were in early stages. Although, as before, Honig compensated Ford for writing the blog post, Ford did not disclose that he had been paid.

116.     Ford's article had the desired impact on the market: Company C trading volume increased from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015. Likewise Company C's share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015. Pursuant to their agreement to buy, hold or dispose of their shares in concert, the Defendants listed below sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million, as detailed below.

| Company C Pump and Dump Proceeds, Following June 2015 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2015) | Net Quantity Sold | Proceeds |
| Brauser | 7/1 – 10/7 | (363,050) | $749,025.45 |
| Groussman and Melechdavid | 7/15 – 12/18 | (212,034) | $243,250.96 |
| Stetson and HSCI | 7/1 – 12/7 | (682,539) | $1,525,588.49 |
| O'Rourke and ATG | 7/1 – 12/31 | (179,690) | $235,253.20 |
| Total | | (1,437,313) | $2,753,118.10 |

117.     Honig and Stetson continued to invest in Company C and directed critical business choices for Company C.  For example, on more than one occasion, Honig or Stetson directed Company C's CEO to name Honig's choice to Company C's board.  On January 15, 2015, Honig and Stetson decided that Company C needed to employ different attorneys and shortly thereafter directed Company C's CEO which counsel to retain in connection with Company C's corporate filings.  And on August 15, 2016, at Honig's and Stetson's direction, as a condition to HSCI providing additional financing to Company C, HSCI and Company C's CEO executed a letter agreement requiring Company C to hire the public relations firm that Honig and Stetson had selected.

### 4.    False Beneficial Ownership Reports by Honig and Associates

118.    Given the agreement among Honig, Brauser, Groussman, Frost, Stetson, and

O'Rourke to buy, hold and/or dispose of their Company C shares in concert; the group's

direction of Company C management and policies; and their combined share ownership, all of

the members of the group were required to make Schedule 13D filings that they did not make.

They did not make the appropriate filings so that the investing public would not discover their

control over Company C, and to obscure from investors their planned pump-and-dump scheme.

119.    Stetson and HSCI were obligated to make a Schedule 13D filing as of July

2014, after Company C became public and they acquired beneficial ownership of more than 5%

of Company C shares.  Similarly, as of the closing of the private placement financings in April

2015, Groussman (Melechdavid) and O'Rourke (ATG) were each obligated to make a Schedule

13D filing, disclosing their own respective holdings and that each was a member of the group

because they were acting with one another and with Stetson, Honig, and Frost for the purpose of

acquiring, holding or disposing of Company C shares, and collectively owned greater than 5% of

Company C's outstanding shares.

120.    Even though Frost and FGIT acquired the Company C shares with an intention

to control management, Frost and FGIT made a Schedule 13G filing on April 10, 2015

incorrectly indicating that they were passive investors.  Moreover, the Schedule 13G stated that

Frost and FGIT had a 6.86% ownership percentage, and did not disclose they were working with

Honig, Stetson, O'Rourke, Brauser, and Groussman, and that they, with the other members of

their group, sought to direct and control management.  Nor did Frost file a Schedule 13D for

Opko or Southern Biotech, in which those companies should have disclosed both their own

holdings and that they, too, were each a member of the group.  Instead, Frost improperly made

four Schedule 13G/A filings on April 10, 2015, February 8, 2016, February 3, 2017, and January
18, 2018, ignoring the fact that he was ineligible to file a Schedule 13G because he was not a
passive investor.

121. Other Defendants who invested in Company C also improperly made Schedule
13G filings, notwithstanding that these Defendants were not passive investors, and also failed to
disclose their membership in the group, in violation of an express disclosure requirement. For
example, Honig filed a Schedule 13G on February 17, 2017 disclosing only his 6.22% ownership
through GRQ; Stetson filed a Schedule 13G on September 19, 2017, disclosing only his 5.64%
ownership through HSCI, Brauser filed a Schedule 13G on February 2, 2017, disclosing only his
5.44% ownership through Grander. Each of these Defendants should have made Schedule 13D
filings because they were not passive investors, and each should have disclosed the existence of a
group. Additionally, a Schedule 13D filed by Stetson on February 12, 2018, a Schedule 13D
filed by Honig on February 13, 2018, and a Schedule 13D/A filed by Honig on February 16,
2018 also failed to disclose the existence of a group.

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza)**

122. The Commission realleges and incorporates by reference herein each and every
allegation contained in paragraphs 1 through 121 of this Complaint.

123. By engaging in the acts and conduct described in this Complaint, Defendants
Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza, with scienter, directly or
indirectly, singly or in concert, by use of the means or instruments of transportation or
communication in interstate commerce, or of the mails, or of the facilities of a national securities
exchange, in connection with the purchase or sale of Company A, Company B and/or Company

Case 3:18-cv-02293-CRR Document 1 Filed 05/27/18 Page 39 of 53

C securities, have: (a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not

misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would

operate as a fraud or deceit upon any person.

124.     By reason of the foregoing, Honig, Stetson, Brauser, O'Rourke, GRQ,

Grander, HSCI, and Maza, directly or indirectly, singly or in concert, violated Section 10(b) of

the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a)(1)-(3) of the Securities Act
### (Against Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza)

125.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

126.     By engaging in the acts and conduct described in this Complaint, Defendants

Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza, directly or indirectly,

singly or in concert, by use of the means or instruments of transportation or communication in

interstate commerce, in the offer or sale of Company A, Company B, and/or Company C

securities, have: (a) with scienter, employed devices, schemes, and artifices to defraud; (b)

knowingly, recklessly or negligently obtained money or property by means of any untrue

statements of a material fact or omitted to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading;

or (c) knowingly, recklessly or negligently engaged in transactions, practices, or courses of

business which operated or would operate as a fraud or deceit upon purchasers of securities of

Company A, Company B, and/or Company C.

Case 3:18-cv-02293-CR   Document 1   Filed 03/27/18   Page 40 of 53

127.    By reason of the foregoing, Honig, Stetson, Brauser, O'Rourke, GRQ, Grander, HSCI, and Maza, directly or indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined, will continue to violate Sections 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)-(3)].

### THIRD CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against Frost, FGIT, Ford, Ladd, and Keller)**

128.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

129.    By engaging in the acts and conduct described in this Complaint, Defendants Frost, FGIT, Ford, Ladd, and Keller, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130.    By reason of the foregoing, Frost, FGIT, Ford, Ladd, and Keller, directly or indirectly, singly or in concert, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### FOURTH CLAIM FOR RELIEF
**Violations of Section 17(a)(2) of the Securities Act**
**(Against Frost, FGIT, Ford, Ladd, and Keller)**

131.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

132.    By engaging in the acts and conduct described in this Complaint, Defendants

Case 3:18-cv-02293-GC-RLS   Document 1   Filed 05/27/18   Page 42 of 53

Frost, FGIT, Ford, Ladd, and Keller, knowingly, recklessly or negligently, directly or indirectly, singly or in concert,  by use of the means or instruments of transportation or communication in interstate commerce,  in the offer or sale of Company A, Company B, and/or Company C securities, have obtained money or property by means of any untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

133.      By reason of the foregoing, Frost, FGIT, Ford, Ladd, and Keller, directly or indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**FIFTH CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)**
**(Against ATG, Southern Biotech, and SCI)**

134.      The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

135.      By engaging in the acts and conduct described in this Complaint, Defendants ATG, Southern Biotech, and SCI, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have: (a) employed devices, schemes, or artifices to defraud; or (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

136.      By reason of the foregoing, ATG, Southern Biotech, and SCI, directly or indirectly, singly or in concert, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

41

Case 3:18-cv-02293-GC-RLS   Document 1   Filed 05/27/18   Page 42 of 153

## SIXTH CLAIM FOR RELIEF
### Violations of Sections 17(a)(1) and (3) of the Securities Act
### (Against ATG, Southern Biotech, and SCI)

137.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

138.     By engaging in the acts and conduct described in this Complaint, Defendants

ATG, Southern Biotech, and SCI directly or indirectly,  singly or in concert, by use of the means

or instruments of transportation or communication in interstate commerce,  in the offer or sale of

Company A, Company B, and/or Company C securities, have (a) with scienter, employed

devices, schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in

transactions, practices, or courses of business which operated or would operate as a fraud or

deceit upon purchasers of securities of Company A, Company B, and/or Company C.

139.     By reason of the foregoing, ATG, Southern Biotech, and SCI, directly or

indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined,

will continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)

and (3)].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section
### 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder
### (Against Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller)

140.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

141.     By engaging in the acts and conduct described in this Complaint, Defendants

Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller directly or indirectly, singly or

in concert, provided knowing and substantial assistance to Honig, Stetson, Brauser, and

O'Rourke, who, directly or indirectly, singly or in concert with others, in connection with the

42

Case 3:18-cv-02293-GC-RLS Document 1 Filed 09/07/18 Page 43 of 53

purchase or sale of a security, with scienter, used the means or instrumentalities of interstate

commerce or of the mails or of a facility of a national securities exchange to (a) employ devices,

schemes, or artifices to defraud; and (b) engage in acts, practices, or courses of business which

operated or would operate as a fraud or deceit upon others.

142.     By reason of the foregoing, Frost, Groussman, FGIT, Melechdavid, Opko,

Ladd, and Keller, aided and abetted, and unless restrained and enjoined, will continue aiding and

abetting, Honig's, Stetson's, Brauser's, and O'Rourke's violations of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-

5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

### EIGHTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Sections 17(a)(1) and (3) of the Securities Act
(Against Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller)**

143.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

144.     By engaging in the acts and conduct described in this Complaint, Defendants

Frost, Groussman, FGIT, Melechdavid, Opko, Ladd, and Keller directly or indirectly, singly or

in concert, provided knowing and substantial assistance to Honig, Stetson, Brauser, and

O'Rourke, who, directly or indirectly, singly or in concert with others, in the offer or sale of a

security,  used the means or instruments of transportation or communication in interstate

commerce or used the mails to (a) with scienter employed devices schemes, and artifices to

defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses

of business which operated or would operate as a fraud or deceit upon purchasers of securities of

Company A, Company B, and/or Company C.

145.     By reason of the foregoing, Frost, Groussman, FGIT, Melechdavid, Opko,

Case 3:18-cv-02193-CCR   Document 1   Filed 05/27/18   Page 44 of 53

Ladd, and Keller, aided and abetted, and unless restrained and enjoined, will continue aiding and abetting Honig's, Stetson's, Brauser's, and O'Rourke's violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

<div align="center">

**NINTH CLAIM FOR RELIEF**
**Violations of Section 9(a)(1) of the Exchange Act**
**(Against Honig, Brauser, O'Rourke, Groussman, ATG, and Melechdavid)**

</div>

146.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

147.    By engaging in the acts and conduct described in this Complaint, Defendants Honig, Brauser, O'Rourke, Groussman, ATG, and Melechdavid, directly or indirectly, singly or in concert , by use of the mails or the means or instrumentalities of interstate commerce, or of a facility of a national securities exchange for the purpose of creating a false or misleading appearance of active trading in Company A, Company B and/or Company C securities, or a false or misleading appearance with respect to the market for Company A, Company B and/or Company C securities, entered an order or orders for the purchase and/or sale of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time and substantially the same price, for the sale and/or purchase of such security, had been or would be entered by or for the same or different parties.

148.    By virtue of the foregoing, Honig, Stetson, Brauser, O'Rourke, Groussman, ATG, and Melechdavid violated, and unless restrained and enjoined, will continue violating Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)].

Case 3:18-cv-02293-GC-RLS   Document 1   Filed 05/27/18   Page 45 of 53

## TENTH CLAIM FOR RELIEF
### Violations of Section 9(a)(2) of the Exchange Act
### (Against Honig, O'Rourke, and ATG)

149.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

150.    By engaging in the acts and conduct described in this Complaint, Defendants

Honig, O'Rourke, and ATG, directly or indirectly, singly or in concert , by use of the mails or

the means or instrumentalities of interstate commerce, or of a facility of a national securities

exchange effected, alone or with one or more other persons, a series of transactions in the

securities of Company A and/or Company B creating actual or apparent active trading in such

security, or raising or depressing the price of such security, for the purpose of inducing the

purchase or sale of such security by others.

151.    By virtue of the foregoing, Honig, O'Rourke, and ATG violated, and unless

restrained and enjoined, will continue violating Section 9(a)(2) of the Exchange Act [15 U.S.C. §

78i(a)(2)].

## ELEVENTH CLAIM FOR RELIEF
### Sale of Unregistered Securities in Violation of Sections 5(a) and (c) of the Securities Act
### (Against Honig, Brauser, Groussman, Frost, Grander, Melechdavid, and Alpha)

152.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

153.    By engaging in the acts and conduct described in this Complaint, Defendants

Honig, Brauser, Groussman, Frost, Grander, Melechdavid, and Alpha, directly or indirectly,

singly or in concert, made use of the means or instruments of transportation or communication in

interstate commerce or of the mails to offer or sell securities through the use or medium of a

prospectus or otherwise, or carried or caused to be carried through the mails or in interstate

Case 3:18-cv-02293-GC-RLS  Document 1  Filed 09/07/18  Page 46 of 153

commerce, by means or instruments of transportation, securities for the purpose of sale or for

delivery after sale, when no registration statement had been filed or was in effect as to such

securities, and when no exemption from registration was applicable.  The shares of Company A

that Honig, Brauser, Groussman, Frost, Grander, Melechdavid, and Alpha offered and sold as

alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

154.     By reason of the foregoing, Honig, Brauser, Groussman, Frost, Grander,

Melechdavid, and Alpha have violated and unless restrained and enjoined will continue to violate

Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)].

## TWELTH CLAIM FOR RELIEF
### Violations of Section 13(d) of the Exchange Act and Rule 13d-1(a) Thereunder
### (Against Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI)

155.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

156.     Pursuant to Exchange Act Section 13(d)(1) and Rule 13d-1(a) thereunder,

persons who directly or indirectly acquire beneficial ownership of more than 5% of a Section 12-

registered class of equity securities are required to file a Schedule 13D, or, in limited

circumstances, a Schedule 13G. Section 13(d)(3) plainly states that "act[ing] as a ... group" in

furtherance of acquiring, holding, or disposing of equity securities is enough to establish the

group as a single "person." When a group is required to make a Schedule 13D filing, that group

must "identify all members of the group."

157.     Defendants Honig, Stetson, Brauser, O'Rourke, Groussman, ATG, GRQ,

Grander, Melechdavid, and SCI acquired and held beneficial ownership of more than 5% shares

in Company B from on or about October 8, 2015 to at least on or about May 20, 2016.

158.     Honig, Stetson, and HSCI acquired and held beneficial ownership of more than

46

5% shares in Company C from on or about February 2014.

159.     Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI acquired and held beneficial ownership of more than 5% shares in Company C from on or about April 2015 to at least on or about December 2015.

160.     Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI were sufficiently interrelated that they constituted a group for the purposes of Exchange Act Section 13(d).

161.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI were each under an obligation to file with the Commission true and accurate reports with respect to their ownership of the Company B and Company C securities, and failed to do so.

162.     By reason of the foregoing, Honig, Stetson, Brauser, O'Rourke, Groussman, Frost, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI violated, and unless enjoined and restrained will continue to violate, Section 13(d)(1) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

### THIRTEENTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 13(a) of the Exchange Act and
Rules 12b-20 and 13a-1 Thereunder
(Against Ladd)**

163.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 121 of this Complaint.

164.     By engaging in the acts and conduct described in this Complaint, Company B violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R. §

Case 3:18-cv-02293-GC-RLS   Document 1   Filed 05/17/18   Page 48 of 53

240.12b-20] and 13a-1 [17 C.F.R. § 240.13a-1(a)] thereunder, which require issuers of registered

securities under the Exchange Act to file annual reports on Form 10-K with the Commission that,

among other things, do not contain untrue statements of material fact or omit to state material

information necessary in order to make the required statements, in the light of the circumstances

under which they are made, not misleading.

165.     By engaging in the acts and conduct described in this Complaint, Defendant

Ladd provided knowing and substantial assistance to Company B's filing of a materially false

and misleading annual report on Form 10-K.

166.     By reason of the foregoing, Ladd aided and abetted, and unless restrained and

enjoined, will continue aiding and abetting, Company B's violations of Section 13(a) of the

Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1(a)

thereunder [17 C.F.R. § 240.13a-1(a)], in violation of Section 20(e) of the Exchange Act [15

U.S.C. § 78t(e)].

## FOURTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 15(d) of the Exchange Act and
### Rule 15d-1 Thereunder
### (Against Maza and Keller)

167.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

168.     By engaging in the acts and conduct described in this Complaint, Company A

violated Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17

C.F.R. § 240.15d-1], which require issuers of registered securities under the Securities Act to file

annual reports on Form 10-K with the Commission that, among other things, do not contain

untrue statements of material fact or omit to state material information necessary in order to

make the required statements, in the light of the circumstances under which they are made, not

Case 3:18-cv-02293-CR-LHG   Document 1   Filed 02/27/18   Page 49 of 53

misleading.

169.     By engaging in the acts and conduct described in this Complaint, Defendants

Maza and Keller provided knowing and substantial assistance to Company A's filing of a

materially false and misleading annual report on Form 10-K.

170.     By reason of the foregoing, Maza and Keller aided and abetted, and unless

restrained and enjoined, will continue aiding and abetting, Company A's violations of Section

15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17 C.F.R. §

240.15d-1], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## FIFTEENTH CLAIM FOR RELIEF
### Violations of Section 17(b) of the Securities Act
### (Against Ford)

171.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 121 of this Complaint.

172.     By engaging in the acts and conduct described in this Complaint, Defendant

Ford directly or indirectly, singly or in concert,  by use of the means or instruments of

transportation or communication in interstate commerce, or by the use of the mails, in the offer

or sale of Company A, and/or Company C securities, has published, given publicity to, or

circulated any notice, circular, advertisement, newspaper, article, letter, investment service, or

communication which, though not purporting to offer a security for sale, described such security

for a consideration received or to be received, directly or indirectly, from an issuer, underwriter,

or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration

and the amount thereof.

173.     By reason of the foregoing, Ford, directly or indirectly, has violated, is

violating, and unless restrained and enjoined, will continue to violate Section 17(b) of the

Case 3:18-cv-01791-ER Document 1 Filed 03/27/18 Page 90 of 153

Securities Act [15 U.S.C. § 77q(b)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following

relief, in a Final Judgment:

### I.

Finding that Defendants violated the federal securities laws and rules promulgated

thereunder as alleged against them herein;

### II.

Permanently restraining and enjoining Honig, Brauser, Frost, Groussman, Grander,

Melechdavid, and Alpha, their agents, servants, employees and attorneys and all persons in

active concert or participation with them who receive actual notice of the injunction by personal

service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a) and

(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

### III.

Permanently restraining and enjoining Honig, Stetson, Brauser, O'Rourke, Frost,

Groussman, Ladd, Maza, Keller, Ford, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko,

Southern Biotech, and SCI, their agents, servants, employees and attorneys and all persons in

active concert or participation with them who receive actual notice of the injunction by personal

service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)];

Case 3:18-cv-02293-GC-RLS Document 1 Filed 09/07/18 Page 51 of 53

## IV.

Permanently restraining and enjoining Ford, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)];

## V.

Permanently restraining and enjoining Honig, Brauser, O'Rourke, Groussman, ATG, and Melechdavid, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

## VI.

Permanently restraining and enjoining Honig, Stetson, Brauser, O'Rourke, Frost, Groussman, Ladd, Maza, Keller, Ford, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## VII.

Permanently restraining and enjoining Honig, Stetson, Brauser, O'Rourke, Frost, Groussman, ATG, FGIT, GRQ, Grander, HSCI, Melechdavid, Opko, Southern Biotech, and SCI, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or

Case 3:18-cv-02293-GC-RLS Document 1 Filed 05/27/18 Page 52 of 53

otherwise, and each of them, from future violations of Section 13(d) of the Exchange Act [15

U.S.C. § 78m(d)] and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)];

## VIII.

Permanently restraining and enjoining Ladd, his respective agents, servants, employees

and attorneys and all persons in active concert or participation with them, who receive actual

notice of the injunction by personal service or otherwise, and each of them, from future

violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17

C.F.R. § 240.12b-20] and 13a-1 thereunder [17 C.F.R. § 240.13a-1];

## IX.

Permanently restraining and enjoining Maza and Keller, their respective agents, servants,

employees and attorneys and all persons in active concert or participation with them, who

receive actual notice of the injunction by personal service or otherwise, and each of them, from

aiding and abetting future violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]

and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1];

## X.

Permanently barring Ladd, Maza and Keller from acting as an officer or director of a

public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## XI.

Permanently prohibiting all Defendants from participating in any offering of penny stock

pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the

Exchange Act [15 U.S.C. § 78u(d)(6)].

## XII.

Ordering Defendants to disgorge all of the ill-gotten gains from the violations alleged in this complaint, and ordering them to pay prejudgment interest thereon;

## XIII.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

## XIV.

Granting such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury as to all issues so triable.

Dated:  September 7, 2018
        New York, New York

By: _Sanjay Wadhwa_____

Sanjay Wadhwa
Michael Paley
Charu Chandrasekhar
Nancy Brown
Katherine Bromberg
Jon Daniels
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

53

# Exhibit B

**SANJAY WADHWA**
**SENIOR ASSOCIATE REGIONAL DIRECTOR**
**Michael Paley**
**Charu Chandrasekhar**
**Nancy Brown**
**Katherine Bromberg**
**Jon Daniels**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-1023 (Brown)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**          :
                                                 :
                        **Plaintiff,**           :
                                                 :      **18 Civ. 8175 (ER)**
            **– against –**                      :
                                                 :      **ECF CASE**
**BARRY C. HONIG, MICHAEL BRAUSER,**             :
**JOHN STETSON, JOHN R. O'ROURKE III,**          :
**ROBERT LADD, ELLIOT MAZA, BRIAN KELLER,**      :
**JOHN H. FORD, ATG CAPITAL LLC, GRQ**           :      **FIRST AMENDED**
**CONSULTANTS, INC., HS CONTRARIAN**             :      **COMPLAINT**
**INVESTMENTS, LLC, GRANDER HOLDINGS, INC.,**    :      **AND JURY DEMAND**
**and STETSON CAPITAL INVESTMENTS INC.,**        :
                                                 :
                        **Defendants.**          :

------------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its first Amended

Complaint against Defendants Barry C. Honig ("Honig"), Michael Brauser ("Brauser"), John

Stetson ("Stetson"), John R. O'Rourke III ("O'Rourke"), Robert Ladd ("Ladd"), Elliot Maza

("Maza"), Brian Keller ("Keller"), John H. Ford ("Ford")[1], ATG Capital LLC ("ATG"), GRQ

---

[1]      Defendant Ford has consented to entry of a judgment imposing permanent injunctions
against him on the charges stated in the Commission's original Complaint, and leaving his

Consultants, Inc. ("GRQ"), HS Contrarian Investments, LLC ("HSCI"), Grander Holdings, Inc. ("Grander") and Stetson Capital Investments Inc. ("SCI") (collectively, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This case involves a series of highly profitable "pump-and-dump" schemes involving the stock of three public companies, "Company A," "Company B" and "Company C." At the center of all three schemes were Defendants Honig, Brauser, Stetson and O'Rourke, as well as some combination of their entities, Defendants GRQ, Grander, SCI, HSCI and ATG.  In all three schemes, these Defendants amassed a controlling interest in the issuer, concealed their control, drove up the price and trading volume of the stock through manipulative trading and/or paid promotional activity, and then dumped their shares into the artificially inflated market on unsuspecting retail investors.

2.      Across all three schemes, Honig was the primary strategist, calling upon other Defendants to, among other things, acquire or sell stock, arrange for the issuance of shares, negotiate transactions, and/or engage in promotional activity.  In each scheme, Honig and some combination of Brauser, Stetson and O'Rourke (and often other individuals), either explicitly or tacitly agreed to acquire, hold, vote and/or dispose of their shares in coordination with one another.  Once Honig and his associates had secured substantial ownership of the issuer, they acted as an undisclosed control group.  Honig and/or other members of the particular investor group, with the knowledge and consent of the other group members, directed the issuer's management for their benefit, including orchestrating transactions designed to create market

---

liability for monetary relief for further resolution.  (Docket Entry 28.)  The Commission states no new charges against him in this Amended Complaint.

interest in the company or to solidify their control.

3.     Honig and his associates needed to create liquidity so they could sell their
stock and profit from their investments in Company A, Company B and Company C.  To
accomplish this goal, in each scheme, Honig and his associates would arrange and pay for the
promotion of the relevant stock by directing Ford or a similar promoter to write favorable and
materially misleading articles about the company whose trading volume and stock price they
wanted to inflate.  In several instances, to magnify the intended boost to the trading volume and
stock price that would follow a promotional article's release, Honig, Brauser, O'Rourke and
ATG and their associates engaged in pre-release manipulative trading to generate a misleading
picture of market interest in the company's stock.

4.     Honig and his associates had to conceal their plan to promote and dump stock
for each scheme to work.  They accomplished this concealment by, among other things, evading
their reporting obligations under the federal securities laws and ensuring that the executives of
Company A, Company B and Company C did not accurately report Defendants' collective
control.

5.     Specifically, Honig, Brauser, Stetson and O'Rourke, as well as certain of their
entities and other associates, violated provisions of the federal securities laws that require
individuals and groups who hold more than a five percent ownership interest in a publicly traded
company to notify the Commission and inform the investing public by filing a form that
accurately reflects their ownership interest and that of all members of any group in which they
are a member.  Honig, Brauser, Stetson, O'Rourke, their entities and certain of their associates
failed to make their required disclosures while acting as a group in the acquisition, holding,
voting and/or disposition of their shares in Company B and Company C.  They also failed

appropriately to disclose their intention to exercise (and their actual exercise of) control over Company B and Company C.

6.     Defendants Maza (Company A's CEO), Keller (Company A's Chief Scientific Officer and a director) and Ladd (Company B's CEO), acted separately at the direction of Honig and his confederates to take steps beneficial to the respective Honig-led group at the expense of each company's public shareholders, and signed public filings they knew, or were reckless in not knowing, to be false, to hide the respective group's beneficial ownership and existence.

7.     Maza and Keller signed Company A's public filings, in which they knowingly or recklessly failed to disclose that Honig, Brauser, Stetson, their affiliates, and/or their respective entities, owned shares of Company A as a group.  Company A's filings similarly failed to disclose the size of each member of the Honig group's holdings and thereby concealed the extent of their control over the company from other shareholders and the public.  Similarly, Company B's CEO, Ladd, signed false public filings, making material omissions about Honig's, Brauser's, Stetson's, O'Rourke's, their associates' and their respective entities' group ownership.

8.     All told, the three schemes earned Defendants and their associates millions of dollars:  Company A's pump and dump generated approximately $9.3 million in stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities, and affiliates.  Company B's pump and dump generated more than $9.5 million for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities, affiliates, and/or certain frequent co-investors.  And, most recently, the pump and dump of Company C brought in over $8.3 million in stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities and/or certain frequent co-investors.  These profits were made at the expense of investors who purchased shares in Company A, Company B and Company C at artificially high prices based on

misleading flattering articles or coverage in the media and matched trades that were orchestrated by the Defendants.

## **VIOLATIONS**

9.     By virtue of the conduct alleged herein, each of the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws as follows:

10.    Honig violated:

- Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Sections 9(a)(1) and (a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") [15.U.S.C. §§ 78i(a)(1) and (a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

11.    Brauser violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 9(a)(1) of the Exchange Act [15.U.S.C. § 78i(a)(1)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

12.      Stetson violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

13.      O'Rourke violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Sections 9(a)(1) and (a)(2) of the Exchange Act [15.U.S.C. §§ 78i(a)(1) and (a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

14.      Ladd violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e) by aiding and abetting Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Sections 17(a)(1)

and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)] and
Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a)
and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] and by aiding and
abetting Company B's violations of Section 13(a) of the Exchange Act [15
U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1
thereunder [17 C.F.R. § 240.13a-1].

15.     Maza violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5
  thereunder [17 C.F.R. § 240.10b-5]; and

- Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting
  Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. §
  78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

16.     Keller violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b)
  thereunder [17 C.F.R. § 240.10b-5(b)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of
  the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's,
  Brauser's, Stetson's, O'Rourke's and others' violations of Sections 17(a)(1)
  and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)] and
  Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a)
  and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], and by aiding and

abetting Company A's violations of Section 15(d) of the Exchange Act [15

U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

17.     Ford violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]; and

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b)

  thereunder [17 C.F.R. § 240.10b-5(b)].

18.     ATG violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and

  (a)(3)];

- Sections 9(a)(1) and (a)(2) of the Exchange Act [15.U.S.C. §§ 78i(a)(1) and

  (a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a)

  and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a)

  thereunder [17 C.F.R. § 240.13d-1(a)].

19.     GRQ violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5

  thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a)

  thereunder [17 C.F.R. § 240.13d-1(a)].

20.     HSCI violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5
  thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a)
  thereunder [17 C.F.R. § 240.13d-1(a)].

21.     Grander violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5
  thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a)
  thereunder [17 C.F.R. § 240.13d-1(a)].

22.     SCI violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and
  (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a)
  and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a)
  thereunder [17 C.F.R. § 240.13d-1(a)].

23.     The Commission seeks final judgments permanently enjoining Defendants

from violating the federal securities laws, requiring each Defendant to disgorge his or its ill-

gotten gains and to pay prejudgment interest on those amounts; requiring Defendants to pay civil

monetary penalties; barring Defendants from participating in future penny stock offerings;
barring Defendants Ladd, Maza and Keller from serving as officers or directors of publicly
traded companies; and seeking any other relief that the Court deems just and appropriate.

24.     Unless Defendants are permanently restrained and enjoined, they each will
again engage in the acts, practices, and courses of business set forth in this Complaint, or in acts
and transactions of similar type and object.

## JURISDICTION AND VENUE

25.     The Commission brings this action pursuant to the authority conferred by
Sections 20(b) and (d) of the Securities Act [15 U.S.C. §§ 77t(b) and (d)], and Sections 21(d) and
(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

26.     This Court has jurisdiction over this action pursuant to Sections 22(a) and (c)
of the Securities Act [15 U.S.C. §§ 77v(a) and 77v(c)], and Section 27 of the Exchange Act [15
U.S.C. § 78aa.  Defendants, directly or indirectly, singly or in concert, have made use of the
means or instrumentalities of transportation or communication in, interstate commerce, or of the
mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

27.     Venue lies in this district pursuant to Sections 22(a) and (c) of the Securities
Act [15 U.S.C. §§ 77v(a) and (c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].
Certain of the transactions, acts, practices and courses of business constituting the violations
alleged herein occurred within the Southern District of New York.  Among other things, at all
relevant times, Company B's principal place of business was in Harrison, New York, within this
District, and certain Defendants solicited investments in securities from investors in this District
and sold securities through a broker-dealer located in this District.

## THE DEFENDANTS

### Individual Defendants

28.      **Honig**, born in 1971, is a resident of Boca Raton, Florida and, at all relevant times, worked at an office in Boca Raton with Stetson and O'Rourke.  Honig owns GRQ.  Honig also owns a majority stake in HSCI, as to which Stetson is the named managing member.  Honig was also the president and one-third owner of Southern Biotech, Inc. ("Southern Biotech"), a now-dissolved Nevada entity.

29.      **Brauser**, born in 1956, is a resident of Lighthouse Point, Florida.  He owns Grander, and owned one third of Southern Biotech.

30.      **Stetson**, born in 1985, is a resident of Fort Lauderdale, Florida and, at all relevant times, worked at an office in Boca Raton with Honig and O'Rourke.  Stetson owns SCI, and has a minority investment in HSCI, of which he is the named managing member.

31.      **O'Rourke**, born in 1985, is a resident of Fort Lauderdale, Florida and, at all relevant times, worked at an office in Boca Raton with Honig and Stetson.  O'Rourke owns ATG.

32.      **Maza**, born in 1955, is a resident of New York, New York.  He was the CEO of Company A from June 2011 to January 2014.  He is a CPA licensed in New York, as well as an attorney licensed in New York.

33.      **Keller**, born in 1956, is a resident of California.  He was Chief Scientific Officer of Company A from about March 2011 to January 2014, and was a member of its board of directors.  He currently works as President of Sales and Senior Vice President of Research and Development at Company A's successor company.

34.      **Ladd**, born in 1959, is a resident of Raleigh, North Carolina.  At all relevant times, he was a resident of New York, New York.  He has been the CEO of Company B since

February 10, 2011.

35.     **Ford**, born in 1956, is a resident of Bolinas, California.

**Entity Defendants**

36.     **ATG** is a Florida corporation owned and operated by Defendant O'Rourke and
for which O'Rourke makes investment decisions.  Its principal place of business is in Florida.
ATG was incorporated in or around 2012.

37.     **GRQ** is a Florida corporation owned and operated by Defendant Honig and for
which Honig makes investment decisions.  Its principal place of business is in Florida.  GRQ was
incorporated in or around 2004.

38.     **Grander** is a Florida corporation owned and operated by Defendant Brauser
and for which Brauser makes investment decisions.  Its principal place of business is in Florida.
Grander was incorporated in or around 2010.

39.     **HSCI** is a Delaware corporation incorporated in 2011.  Its principal place of
business is in Florida.

40.     **SCI** is a Florida corporation owned and operated by Defendant Stetson and for
which Stetson makes investment decisions.  Its principal place of business is in Florida.  SCI was
incorporated in or around 2011.

**OTHER RELEVANT PERSONS AND ENTITIES**

41.     **Company A** is a Delaware corporation headquartered in Georgia.  It was
incorporated in Nevada in 2006.  Company A was controlled by Honig and Brauser between
March 2011 and early 2014.  The company filed periodic reports, including Forms 10-K and 10-
Q with the Commission.  Company A's stock was quoted on OTC Link (formerly known as the
"Pink Sheets"), an electronic interdealer quotation system operated by OTC Markets Group, Inc.
In early 2014, Company A engaged in a reverse merger with a company associated with Honig

12

and his associates.  The successor company is currently quoted on OTC Link.  At all relevant times, Company A's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)], and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

42.    **Company B** is a Delaware corporation headquartered in Durham, North Carolina, formerly headquartered in Harrison, New York, and was incorporated in 2000.  Its common stock is registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and it files periodic reports, including Forms 10-K and 10-Q with the Commission.  Company B's common stock was listed on NYSE MKT from 2007 until its October 19, 2016 delisting.  Its stock is currently quoted on OTC Link.

43.    **Company C** is a Delaware corporation headquartered in San Diego, California, and was incorporated in 1988.  Company C's common stock is registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and its common stock has been listed on NASDAQ since August 2016.  At relevant times, Company C's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

44.    **Investor 1** was a frequent co-investor with Honig and other Defendants.  He is a large shareholder, CEO and Chairman of a public company (referred to herein as **"Investor 1 Company"**), trustee and indirect beneficiary of a trust (referred to herein as **"Investor 1 Trust"**) and president of a limited liability company (referred to herein as **"Investor 1 Group"**), and he sometimes used Southern Biotech to co-invest with Honig and Brauser.  He enjoys a reputation as a successful biopharmaceutical investor and has a substantial following among retail investors.

45.    **Affiliate 1** occasionally works at Honig's office in Boca Raton.  Affiliate 1

was a frequent co-investor with Honig, Brauser, Stetson and O'Rourke, investing in at least 36 issuers alongside Honig (and/or a Honig entity) from 2011 through August 2018, either individually, or through his entity, "**Affiliate 1 Entity**." Affiliate 1 invested in each of Company A, Company B and Company C alongside Honig, Brauser, Stetson and O'Rourke.

46.     **Affiliate 2** is a foreign corporation and hedge fund that invested alongside Honig in many issuers since 2011.  Affiliate 2 invested in Company A alongside Honig, Brauser, Stetson and O'Rourke.

47.     **Southern Biotech** was a Nevada corporation that Stetson incorporated at Honig's direction in 2014.  It was dissolved in 2017.  Honig was listed as the sole officer and president.  Southern Biotech was co-owned by Honig, Brauser, and Investor 1.  It made investments in multiple public companies, often in addition to investments each co-owner made separately.  At Honig's direction, with Brauser's knowledge and approval, and Stetson's help in executing the investment, Southern Biotech made investments in Company C.

## BACKGROUND

48.     "Pump-and-dump" schemes typically have two parts.  In the first, the fraudsters acquire a large amount of stock at little or no cost whereupon a promotion scheme is implemented to boost the price of the stock or create trading volume by stimulating market interest with false or misleading statements about the company.  Once the stock price and trading volume have been pumped up, fraudsters move on to the second part, in which they dump their large holdings of the stock into the public market at an enormous profit for themselves.  After these fraudsters dump their shares and stop hyping the stock, the price typically falls, trading volume dries up, and investors lose their money.  Critical to the success of such a scheme is disguising the fact that the fraudsters beneficially own and control a large amount of the

14

unrestricted stock which, if known to investors and market participants, would inform investors that control persons of the company were dumping their stock.

49.     The federal securities laws are designed to ensure transparency by requiring that investors be provided with timely, accurate information about companies and persons who own large amounts of company stock and thus are in a control relationship with the company. The Securities Act and the Exchange Act have several provisions designed to ensure that companies, their officers, and large shareholders provide the marketplace with adequate information.  For example, when a person or group of persons acquires beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of the Exchange Act, the person or group is required to make a filing under Exchange Act 13(d) with the Commission.  When a group of persons agrees to act together to acquire, sell, vote or hold more than 5% in the aggregate of any issuer's stock, they must each file a disclosure, even if their individual ownership is below 5%.  These disclosure provisions are intended to alert the company's stockholders and the marketplace to dramatic changes in securities ownership that indicate potential for changes in control of the company.

50.     Similarly, the Exchange Act requires that issuers with registered securities file annual reports called Form 10-K with the Commission.  The Form 10-K provides investors with key information about an issuer's business, its finances, management and the securities beneficially owned by management and certain large shareholders.

51.     The registration provisions of the Securities Act are also designed to ensure that investors have key information when the company or its control persons seek to sell securities.  Companies are generally required to disclose important financial information in a registration statement filed with the Commission, which is available to the public.  When

participants in a pump-and-dump scheme sell large blocks of stock to the investing public without registering the transaction, the offer or sale of that stock can violate the registration requirements of the Securities Act.

52.     Fraudulent promotion or manipulative trading used to pump the company's stock price and trading volume can violate the antifraud provisions of the Securities Act and the Exchange Act.  For example, fraudsters may use online newsletters, bulletin boards, or social media to disseminate false and misleading statements to the public in order to encourage investors to purchase their undisclosed stake at inflated prices.  Promoters may falsely claim to offer independent, unbiased recommendations in newsletters and other touts when they stand to profit from convincing others to buy or sell certain stocks – often, but not always, penny stocks. Fraudsters frequently use this ploy with small, thinly traded companies because it is easier to manipulate a stock when there is little or no information available about the company, and where fraudsters can obtain control of a substantial portion of the company's unrestricted shares.  To help investors evaluate a stock promotion, promoters are required to disclose any compensation they receive from an issuer, underwriter or dealer for touting a security in any media.

53.     In addition to false promotional pieces, fraudsters sometimes use matched trades to drive up the price of a security.  Members of a scheme will trade shares between themselves, gradually inflating the price.  A rising stock price creates the false impression that there is investor demand for the security, and thus serves to encourage other investors to buy.  If the fraudsters have disguised their ownership and control of securities being traded, investors are deceived into believing that the matched trades are by outside market participants seeking to invest in the company.  For this reason, the Exchange Act prohibits entering an order for the purchase or sale of a security with knowledge that an order or orders of substantially the same

size, at substantially the same time and substantially the same price, for the sale or purchase of a security, had been or would be entered.

54.    Collectively, these and other provisions of the federal securities laws protect investors from pump-and-dump schemes and ensure that investors understand who is controlling a company and whether any large shareholders have amassed a position that will allow them to control or influence the company and its securities.  When these required disclosures are evaded or issued in a misleading fashion, investors are deprived of material information about an issuer.

## FACTS

### A.  Overview of Defendants' Pattern of Investments

#### 1.    The Partnership Among Honig, Brauser, Stetson and O'Rourke

55.    Honig, Brauser, Stetson and O'Rourke, individually or through their entities, invested alongside one another in at least 19 issuers at or about the same time, from 2011 to the present.  While this action concerns three of those issuers, in most cases in which Honig, Brauser, Stetson and O'Rourke co-invested, the investments followed a pattern:  Honig or Brauser would identify a target company and arrange a financing or financings that would give them and their chosen co-investors (including Stetson and O'Rourke, among others) a controlling position in the company's outstanding common stock at lower-than-market prices.  Honig, Brauser, Stetson and O'Rourke would then exercise that control by dictating terms of the company's material management decisions and policies, and voting together to direct the company's major business decisions.  When the group determined that the time had arrived to exit the investment, they would engineer a publicity-generating event that would both drive the price of the stock higher, and also create market demand and trading volume that would allow them to sell their positions.  Typically, Honig, Brauser, Stetson and O'Rourke would dictate some kind of transaction for management to undertake – for example, an acquisition or merger,

or a new investment by a well-known investor, like Investor 1 – and paid writers, bloggers or other public relations professionals to write about it. Once the publicity had its intended effect on the stock's price and trading volume, Honig, Brauser, Stetson, O'Rourke and the other hand-picked co-investors would sell their respective positions – generally staggered over a course of weeks – into the artificially inflated market.

56.     Throughout these stages, Honig, Stetson and O'Rourke were in nearly daily contact because they worked out of the same office and were in frequent email and telephone contact, at times purposefully moving their conversations to the less permanent medium of text or instant messaging. Honig, Stetson and O'Rourke were each in frequent contact with Brauser, with whom they shared office space until late 2013.

57.     Honig, Brauser, Stetson and O'Rourke obtained their interests in these issuers at the same time, and agreed to act as a group in holding, disposing and voting the stock they acquired, with Honig leading the combined effort. As O'Rourke put it in a February 3, 2014 email to the officer of a potential merger target, "Barry Honig is the principal investor of our small group." Honig carefully controlled his "small group's" participants in the financings he arranged so that shares were held only by individuals and entities that (1) permitted Honig to direct how they voted their shares and/or acquiesced in Honig's control of the management of the company, and (2) refrained from selling their shares until the optimal time for group members to profit from the planned post-pump dump.

58.     Honig worked with Stetson to ensure that members of his groups voted their shares in unison. At times, members of the group reached out to Stetson to find out how they should vote on various proposals. For example, with respect to one of the issuers in which they had co-invested, in July 2015, Brauser forwarded an email request from a co-investor's staffer to

Stetson, asking whether to vote for or against a proposal. Stetson, in an email that same day, copying Honig, replied "Yes, vote 'For.'" In a November 2016 email to members of a Honig group of investors in another issuer, Stetson responded to a request for "instructions to vote" with "[v]oting in favor of [two named directors]. Against all other members and actions."

59.     While Honig was the primary architect of the three schemes detailed below, email traffic among Honig, Brauser, Stetson and O'Rourke demonstrates the various key roles each of these Defendants played in the typical Honig-led investment.

60.     Brauser is a long-time co-investor with Honig, investing (individually, through his entity, Grander, or through family members' accounts) alongside Honig (and/or a Honig entity) in more than 40 issuers between approximately 2011 and mid-2018. From at least October 2010 to approximately 2013, Brauser rented an office with Honig at 4400 Biscayne Boulevard in Miami, Florida. Brauser's business association with Honig was sometimes noted by keen market observers: As early as 2013, a short seller published a report on a company in which the two had invested and noted that a factor negatively affecting the value of the company's stock was the CEO's close financial ties with "two serial stock promoters," whom it identified as Honig and Brauser.

61.     For some of the issuers in which Brauser co-invested alongside Honig, Brauser took an active role, at times directing the issuer's management, finding and negotiating transactions for the issuer or bringing in additional investors. In others – particularly while Honig and Brauser worked through one of their periodic disputes about who owed whom money – Brauser was content to let Honig direct the steps in the scheme; since Brauser had been closely involved with respect to the other issuers in which he had co-invested with Honig, he was well-familiar with the playbook, knew that Honig would follow it and understood that Honig would

signal to Brauser when it was time to sell his shares.

62.     Stetson shared office space with Honig and O'Rourke at all relevant times. Individually, through his entity SCI, or through HSCI (the vehicle he nominally controlled), Stetson invested alongside Honig (and/or a Honig entity) in more than 65 issuers between 2011 and August 2018.  In connection with most of these investments, Stetson executed Honig's directions, managed the administrative aspects of the Honig group's investments, and performed pre-investment due diligence.  For example, Stetson communicated with brokers to effect Honig's trades, deposited Honig's shares with brokers, communicated investment terms and wire instructions to investors Honig had lined up, tracked the ownership of each group member in a particular issuer, corralled shareholder votes from co-investors (and, in some cases, even told co-investors how to vote), prepared financial analysis of proposed investments and conveyed Honig's instructions to issuer management.  From 2012 to 2013, Stetson also frequently managed Honig's arrangements with Ford to write paid promotional articles about issuers in which Honig and his group had invested.

63.     O'Rourke shared office space with Honig and Stetson at all relevant times, beginning in 2012.  Through his entity, ATG, or individually, O'Rourke invested alongside Honig (and/or a Honig entity) in over 75 issuers between 2011 and August 2018.  Beginning in 2013, O'Rourke managed the Honig group's promotional efforts by working with writers and bloggers to publish favorable articles and posts about issuers the Honig group controlled.  He arranged for those writers to be compensated for their promotional pieces.  For example, in 2013 and 2014, O'Rourke compensated "Writer E" for writing positive promotional articles. O'Rourke made the payments through personal checks and/or sham stock purchases, designed to disguise the true purpose of the compensation.  O'Rourke knew, or was reckless in not knowing,

that Writer E did not disclose these payments in the promotional pieces he published on these issuers.

64.    At times, and with Honig's knowledge and consent, or at his direction, O'Rourke wrote and published the promotional articles himself.  O'Rourke used a pseudonym for the byline and did not disclose his relationship to the issuer being promoted or the compensation Honig was paying him for the articles.

65.    In addition to his work with promoters and his own promotional activities, in at least one instance, O'Rourke took the lead in negotiating a transaction for Company B, in which he, Honig, Brauser and Stetson and/or certain of their entities had invested.  After about his first year with Honig, O'Rourke also began assisting Stetson with the administrative aspects of each group investment.

66.    Investor 1 invested alongside Honig (or a Honig entity) in several issuers from 2011.  For Honig and his co-investors, Investor 1's participation in a deal brought an aura of legitimacy, important publicity for the issuer, and – most helpful in creating market interest in the particular issuer – his substantial following among retail investors.  As a consequence, Honig and Brauser frequently sought to persuade Investor 1 to invest alongside them.  As Stetson put it in a 2015 email to the CEO of Company C, the "following of [Investor 1] is worth its weight and [sic] gold."

## 2.    Honig's Efforts to Conceal the Extent of His Investments

67.    Honig sought to conceal the size of his investments in issuers.  To that end, Honig set up various investment vehicles through which he could invest indirectly and surreptitiously.

68.    One such Honig investment vehicle was HSCI, a limited liability company that Honig and Stetson set up in 2011.  While Honig and Stetson named Stetson as HSCI's sole

managing member, Honig controlled 94% of its membership interests and directed many of

HSCI's investment decisions, including the size of the allocation HSCI would take in a particular

financing, the timing of when HSCI would deposit shares or sell its position, and the brokers

HSCI would use for its transactions. For example, in a November 20, 2013 email, Honig

directed Stetson to "convert, deposit and purchase [shares in a particular issuer]. . . from

HS[CI]." In a January 5, 2014 email, Honig directed Stetson to wire $1,700,000 from HSCI to

accounts at his broker and bank. In a June 1, 2014 email in which Honig laid out a list of tasks

for Stetson, he directed Stetson to "change warrant to HS[CI]. Have HS[CI] buy it for $1000."

On June 17, 2014, Honig instructed Stetson to "wire out of hs[ci] and then get money wired bacl

[sic] to me." In July 2015, Honig directed Stetson to transfer Honig's Company C shares and

those held by HSCI to an investment relations consultant he wanted involved in the promotion of

Company C. And, more recently, in October 2016, Honig negotiated terms for an investment in

an issuer, which, according to an October 7, 2016 Honig email, included a "$650,000 investment

from me and or my assignees and I get 100,000 shares for due diligence and structuring fee."

Stetson had no part in the negotiations. When the issuer sent the final deal documents, both the

subscription agreement, and the consulting agreement for "due diligence services" were in the

name of HSCI, and Stetson signed them both on behalf of HSCI.

> 69.      Honig treated HSCI as his own entity in other ways as well. For example,

Honig directed Stetson to pay through HSCI certain of Honig's own expenses, including airfare,

a private jet rental, and a 2015 $75,000 payment to one of the boxers in the stable of professional

boxers Honig sponsored.

> 70.      Stetson understood that HSCI was Honig's investment vehicle. When Honig

asked Stetson to list Honig's various positions in issuers, Stetson would reply with a list that

included HSCI's position. But both Stetson and Honig worked to hide that fact from others. In a March 9, 2011 application to open a brokerage account for HSCI, where the questionnaire asked Stetson for "a list of all principals and beneficial ownership percentage," Stetson failed to identify Honig at all, writing, instead: "John Stetson 100%."

71.     HSCI was not the only vehicle Honig used to conceal his investments. Honig used Southern Biotech as an entity through which he, Brauser and Investor 1 could each funnel their investments in issuers, including Company C, thus shielding the size of their individual investments from disclosure. That Honig was using these vehicles to disguise the extent of his and others' investments was a goal he acknowledged in 2016 in connection with his efforts to set up yet another corporate investment vehicle. In a November 2016 email among Honig, O'Rourke and others, including Honig's brother, concerning the setup of a corporation as an investment vehicle, Honig agreed that "[t]he goal is to stop people from knowing what Barry invests in and avoiding them blogging on the Internet."

### 3.     The Concealed Agreement with Stock Promoter Ford

72.     Honig first met Ford in the summer of 2012 in San Francisco after having read articles Ford had written promoting investments in public companies. By 2012, Ford had developed an investor following for his reports on various issuers posted on the *Seeking Alpha* website, a popular investor forum. During their meeting, Honig asked Ford how much he was paid to write an article about a publicly traded company. Ford answered that his rate was $45,000 per article. Honig proposed that he could compensate Ford to write articles for his issuers by inviting him to participate in the private placement financings with his chosen group of investors that he negotiated with issuers. Ford understood the value of that opportunity since Honig hand-picked the investors invited to participate, the private placement shares were valued below market, and Honig's track record of "successful" investments meant that the shares Ford

obtained would likely rise in value. Ford also understood that Honig's invitation to participate in his group of investors would be contingent on Ford's agreement to write favorable articles about issuers at Honig's, Stetson's and O'Rourke's requests. By the end of the meeting, Honig and Ford had agreed that Honig would secretly compensate Ford to write about companies that Honig introduced to him, and that Ford would not publicly disclose that compensation so that investors would believe Ford's articles to be the product of his independent analysis and free from any conflict of interest.

73.     During their first meeting, Honig presented Ford with a riskless transaction that Ford understood was Honig's way of enticing Ford to participate in the scheme. Honig proposed that Ford purchase securities of issuer S ("Issuer S") (an issuer in which Honig, Stetson and O'Rourke were also invested) in a private transaction with a designated third party, and then immediately sell the securities at a higher price to another designated party.

74.     Ford agreed to participate in the transaction and coordinated the specific details over email with Stetson in July 2012. In an email on July 27, 2012, Stetson told Ford the amount of the purchase wires and the information Ford should put in the reference line for the purchase wires. In that same email, Stetson informed Ford that a $125,000 wire had been deposited into Ford's account, even though Ford had yet to purchase the stock for which he was receiving the funds. On August 7, 2012, Stetson sent Ford the purchase agreements for the Issuer S shares he had "purchased two weeks ago." Ultimately, Ford earned profits of approximately $90,000.

75.     Pursuant to the agreement Ford and Honig reached in their summer 2012 meeting in California, Ford began writing articles at Honig's behest, with assistance initially provided by Stetson, and later by O'Rourke. For example, in September 2012, Stetson arranged for Ford to conduct an interview for a promotional article Ford was writing on Investor 1

24

Company.  Also, in 2012, as described more fully below, at Honig's direction, Stetson arranged to sell some of his Company B shares at a discount to Ford in exchange for Ford writing two favorable articles about Company B.  Stetson knew, or was reckless in not knowing, that Ford was being compensated to write these articles, and that Ford was not disclosing the arrangement in the disclaimers he included with his posts.

76.     During the period 2012-2015, Ford wrote and published seemingly independent articles about various companies in which Honig and his co-investors had an interest.  He did so at Honig's direction – often communicated through Stetson or O'Rourke – and in return for the right to participate in off-market securities transactions or Honig-led private placements.  He also received at least $125,000 in cash payments during this period.  Honig structured the cash payments to Ford to disguise their source by enlisting third-party Honig associates to enter into sham consulting agreements with Ford, and funneling the payments to Ford through the associates, ostensibly pursuant to those agreements.

77.     Ford communicated with Honig, Stetson and O'Rourke about the companies, compensation, and articles.  Honig, Stetson and O'Rourke knew that Ford was writing the favorable articles because he was being compensated for doing so, and all three knew that Ford was not disclosing this compensation to the public readership; indeed, all three understood that if Ford had disclosed that he was being paid, investors would have discounted the independence of his analysis and would have been less likely to follow Ford's recommendations.

78.     Brauser, too, knew, or was reckless in not knowing, that Honig was paying Ford to write promotional pieces without disclosing their arrangement.  For example, in November 2013, Honig copied Brauser and O'Rourke on an email outlining a promotional plan for Investor 1 Company, which included the publication of a Ford article.  Honig noted in this

25

email that "we are assisting" on the drafting of the "John Ford article." In December 2013, O'Rourke sent Brauser an email linking Ford's Investor 1 Company article, which did not disclose that Ford had been paid to write it. More basically, Brauser (like Stetson and O'Rourke) knew, or was reckless in not knowing, that each participant in Honig private placement deals – Honig's "following" – had been invited to participate in these private transactions in exchange for some value each could bring to the deal, and that Ford was no different. Brauser understood, for example, that Investor 1 brought his retail investor following and reputation as a successful investor to provide liquidity when the participants wished to sell. Brauser knew that others, like Affiliates 1 and 2, brought needed cash and a willingness to follow Honig's directions on how to vote or when to sell. Because Honig was inviting Ford to participate in these transactions, Brauser knew, or was reckless in not knowing, that Ford was providing value to the group in authoring favorable articles on the issuers in which the group was invested.

79.     Brauser, like Honig, Stetson and O'Rourke, also regularly followed news and articles written about the companies in which they were invested. As a result, each of them knew, or was reckless in not knowing, that Ford's promotional articles did not disclose his compensation arrangement with Honig.

**B. The Company A Scheme**

*1.    Honig and Brauser Obtain Control of Company A*

80.     In the Company A scheme, Honig and Brauser generated approximately $9.3 million in proceeds for themselves and their co-investors by secretly paying for a misleading promotional campaign, engaging in manipulative trading, and then unlawfully selling Company A shares into the artificially inflated trading volume and stock prices that they had generated.

81.     To acquire control of Company A, Honig and Brauser, acting with Investor 1, caused the company to issue shares to them, certain of their entities, and certain of their

associates through a series of so-called "private investments in public equities," or "PIPE" financings.

82.     In November 2010, Honig, along with his nominees, including Stetson and Affiliate 1, purchased one-third of a publicly traded shell company.  In December 2010, Brauser and Investor 1 each purchased one-half of the remaining two-thirds of the company.  Honig, Brauser and Stetson each disguised his role in the acquisition by purchasing the shares of an intermediary entity that owned a majority of the shell company shares.  The shell company disclosed only the ownership interest of the intermediate entity in its public filings, allowing Honig, Brauser and Stetson to conceal their respective ownership interests.  Soon after they acquired the shell, Honig, Brauser and Investor 1 installed an associate of Investor 1 (the "Investor 1 Associate") as the sole director of the company.

83.     In late 2010, Honig and Brauser approached management of a private biotech company then in the business of manufacturing over-the-counter pharmaceutical products ("Company A Labs") with a proposal to take the company public.

84.     At the time, Company A Labs and Keller, its Chief Scientific Officer and a director, were working on developing a formulation using a patented technology called "Qusomes" that Company A Labs hoped to use in large-scale drug markets, but lacked funding to support its development.  Honig and Brauser promised Keller and the CEO of Company A Labs (the "Company A Labs CEO") that the public company deal would include raising $11-$13 million to support research and development ("R&D") of the Qusomes technology.

85.     On "Honig, Brauser, [Investor 1] Group" letterhead, Brauser sent Company A Labs management a Letter of Intent in late January 2011, and Company A Labs management countersigned the agreement, as amended, on February 1, 2011.  Pursuant to that Letter of Intent,

Company A Labs agreed to a reverse merger into the publicly traded shell controlled by Honig, Brauser and Investor 1. Company A Labs CEO, Keller, and a research scientist employed by Company A Labs were each promised 6,650,000 shares of the newly created public company.

86.    The proposed merger of Company A Labs into the publicly traded shell hit a snag in March 2011. Pursuant to a $3 million credit line Company A Labs had with a San Francisco community bank (the "Community Bank"), the Community Bank had authority to approve all major transactions. In a letter sent on March 14, 2011, it declined to approve the reverse merger, as well as the $2 million bridge financing contemplated to pay for that reverse merger, among other things.

87.    According to its letter, the Community Bank declined to approve the reverse merger for two reasons: First, "[u]nder the proposed new transaction, persons who are not known to the Bank . . . would assume control of [Company A Labs]. . . ." As its second reason, the Community Bank noted:

> The proposed acquisition creates enormous conflicts of interest. There is substantial reason to believe that the resulting entity would act for the benefit of [the Honig investor group] as a whole, rather than the interests of [Company A Labs].

In conclusion, the Community Bank warned that if Company A Labs nonetheless proceeded with the transactions, they would constitute events of default, and the full amount owing under the credit line would become immediately due and payable.

88.    Despite these warnings, Company A Labs completed the reverse merger and the $2 million bridge financing. The Community Bank thereafter sent a default notice. After the merger, on September 8, 2011, Maza, who had been installed as the CFO and a director of the newly created Company A by Honig and Brauser, authorized the company to pay off the credit line.

89.     After the merger, Company A listed its corporate address at 4400 Biscayne Boulevard in Miami, the same business address then shared by Honig, Brauser and Investor 1.

90.     As a result of the reverse merger, Honig, Brauser and Investor 1 controlled the vast majority of Company A's outstanding shares. In addition, Honig and Brauser, with the knowledge and approval of Stetson and other co-investors, also exercised control over the management of Company A. After the merger, for example, Honig and Brauser, acting with the knowledge and consent of Stetson and other co-investors, elevated Maza from CFO to CEO of Company A. Thereafter, Maza sought approval from Honig, Brauser and sometimes Investor 1 for material business decisions. For example, at the direction of Honig and Brauser, Maza agreed to divert funds from Company A to pay rent for the office of an unrelated entity co-owned by Honig and Brauser, also located at 4400 Biscayne Boulevard. Maza also sought the permission of Honig and Brauser to take on financing from outside sources. In one email to Brauser on February 28, 2013, copying Honig, Maza reported that Honig and Investor 1 were on board with the proposals from two separate lenders and sought Brauser's concurrence: "[Investor 1] is OK if you're OK with it. Work for u?" Maza also sent Honig, Brauser and Investor 1 updates at least every month providing details on business operations and business opportunities, as well as seeking their approval for material business decisions. For example, in June 2013, Maza sent Honig and Brauser, among others, a "business memo for your consideration," which outlined "an approach to stabilize the company" and set out "priority initiatives." In its first public filing after the merger, Company A disclosed that it had retained new corporate counsel ("Issuer's Counsel") – the same firm as well as the same partner at that firm ("Issuer's Counsel Partner") that Honig had insisted other issuers in which he was invested retain.

91.      In their capacity as two of the three board members of Company A, Keller and
Maza concealed Honig's and Brauser's control of Company A by signing off on public filings
that failed to disclose the involvement of Honig, Brauser, Stetson, and Affiliate 1, omissions that
made those filings materially misleading.  At the time they signed these filings, Keller and Maza
understood that Honig and Brauser substantially controlled Company A's management, and not
Maza.  As Keller explained in a February 12, 2012 email to a Company A colleague, "[t]he real
power is with Barry Honig and Mike Brauser.  Elliot [Maza] is just a mouth piece."  Following
the merger, Company A's filings nonetheless identified only Investor 1, but not Honig, Brauser,
or the group of Honig, Brauser, and others, including Stetson and Affiliate 1, as owning a greater
than 5% interest in Company A.

92.      Post-closing, Honig and Brauser orchestrated a series of additional PIPE
financings between March 2011 and June 2012 on very attractive terms for themselves, including
debt convertible at pennies per share into millions of shares, and warrants for the cheap
acquisition of even more shares.  Some of these financings allowed Company A to refinance debt
it had amassed both in order to close the reverse merger into the public shell and as a result of
defaulting on the Community Bank loan.

93.      Honig and Brauser failed to keep their promises to invest money in Company
A for R&D.  Instead, they limited their personal investments to whatever minimum amount was
necessary to keep Company A's business operating and to fund Maza's and Keller's generous
compensation.  Keller's compensation substantially increased once he began working with Honig
and Brauser, and Maza's annual compensation ranged from $300,000 to $600,000.  As a result of
the failure to invest money and the high executive compensation payouts, however, Company A
lacked funds for R&D, and it was forced to abandon its R&D efforts entirely by mid-2012.

94.     Honig and Brauser used the financings they orchestrated to amass more, ever-cheaper Company A shares for themselves and their associates. Honig and Brauser also sold some of their convertible debt to their associates, including to Affiliate 1, on September 23, 2013, and to both Stetson and O'Rourke on October 3, 2013, giving them conversion rights to purchase Company A shares for $0.20 a share. Although these financings did nothing to enhance Company A's continued growth, Maza and Keller went along with them. Over the course of their respective tenures at Company A, Maza and Keller received millions of shares of Company A stock.

95.     By April 1, 2013, and pursuant to their tacit or explicit agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig, Brauser and other co-investors, including Stetson, Investor 1 Company, Investor 1 Group and Investor 1 Trust, had amassed 28,153,845 shares, or almost 45% of the Company A shares outstanding, with Honig alone holding 5,542,654 shares, or 8.8% of the company's outstanding shares. But Company A did not disclose the group's combined ownership. On September 11, 2013, Stetson notified management that the beneficial ownership table should be amended to reflect Honig's substantial share ownership, and on September 12, 2013, Stetson provided Maza with the green light to file an Amended Form 10-K annual report for the 2012 fiscal year. Nonetheless, even though Company A's September 13, 2013 Form 10-K/A, signed by Maza, Keller, and the Investor 1 Associate, disclosed that Company A's amendment was to update the beneficial ownership table, the annual report failed to disclose the existence of the Honig-allied group, which beneficially owned slightly less than half of Company A's outstanding shares.

96.     On July 16, 2012, Company A Labs' CEO – who had been ousted from Company A by Honig and Brauser – sued Company A, Honig, Brauser, Maza, and Investor 1,

31

among other defendants, seeking, in part, the 6.65 million shares he had been promised, but which had never been delivered to him out of escrow. Company A, acting at Honig's and Brauser's direction (on behalf of the Honig-led investor group), or with their consent, counter-sued the CEO. In public filings about the suit, Company A represented that the CEO had breached his contract with the Company, and reported that the Company was seeking damages and cancellation of the escrowed shares.

97.     Brauser, who was not an officer or director of Company A, took the lead in negotiating a settlement of the dispute with Company A Labs' CEO on behalf of Company A, frequently updating Honig on his negotiations, and soliciting his views on settlement proposals over email. In September 2013, Brauser and Honig reached settlement terms with Company A Labs' CEO, agreeing to pay him $2 million in return for his relinquishing his claim to the Company A shares he had been promised, and that he had never received. Maza ratified the settlement terms on September 5, 2013.

### 2.     *The Company A Pump and Dump*

98.     In preparation for the Company A pump and dump, during August and September, 2013, Stetson, at Honig's direction, deposited in a brokerage account almost 4 million Company A shares that had been issued to Honig. Stetson worked closely with Honig and Brauser and each of their brokers, Company A, and Company A's transfer agent to help Honig and Brauser ready their Company A shares for sale into the public market. Since part of Stetson's role in working with Honig was to keep track of the amount of each associated investor's holdings, and he had reviewed Company A's Form 10-K/A, setting out Honig's and Brauser's ownership and the number of Company A's outstanding shares, Stetson knew, or was reckless in not knowing, how much of Company A's stock Honig and Brauser controlled.

Stetson also knew, or was reckless in not knowing, that Honig and Brauser were directing Company A's management and policies.

99.     Nonetheless, in connection with the deposit of Honig's shares, on at least two occasions, on August 19 and August 30, 2013, Stetson submitted Honig's signed answers to the broker's questionnaire that both he and Honig knew were false.  Honig's answers falsely denied any relationship between him and Company A or its affiliates, and also falsely denied that Honig was an affiliate.  At the time that Stetson made that submission, and Honig signed it, each knew, or was reckless in not knowing, that Honig was an affiliate of Company A because of the control Honig exerted over Company A.

100.     On September 6, 2013, Stetson was copied on the transmittal of false attorney opinion letters to Company A's transfer agent in order to remove restrictive legends from Honig's Company A share certificates.  These opinion letters were sought by Honig because both he and Stetson knew that removal of the restrictive legend was a necessary step in readying Honig's Company A shares for sale to the public.  Each of the letters contained the material misrepresentation that Honig was not an affiliate of Company A, a representation that Stetson and Honig knew, or were reckless in not knowing, was false, given what each knew about Honig's control over Company A.

101.     As part of the process for depositing Honig's shares with a broker – another necessary step, as Honig and Stetson knew, in selling Honig's shares to the public –  CEO Maza was also required to issue a representation letter concerning the stock certificates.  In a letter to the broker-dealer, dated September 10, 2013, Maza wrote "[w]e further acknowledge and agree that there is no other agreement or understanding between Barry Honig and [Company A] that would preclude Barry Honig from selling or otherwise disposing of shares represented above."

Maza knew, or was reckless in not knowing, that this statement was false because Honig was an affiliate of Company A, and that, as an affiliate, Honig's ability to sell his Company A shares would be subject, under the federal securities laws, to volume limitations.

102.    Once the restrictive legends were lifted from Honig's shares and the shares were deposited into a brokerage account, Honig was ready to sell them.  In September 2013, Honig directed O'Rourke to reach out to Ford to arrange for him to post his purportedly independent investment analysis of Company A on the *Seeking Alpha* website pursuant to the understanding Honig and Ford had reached in 2012.

103.    O'Rourke contacted Ford and proposed that Ford write a Company A article in exchange for Ford obtaining Company A shares at a below-market price.  At that time, Honig, Brauser, Investor 1, Investor 1 Company and other co-investors, including Stetson, owned about 45% of the outstanding Company A shares, and the market for Company A stock was virtually nonexistent (with zero trading volume on Friday, September 20, 2013).  O'Rourke instructed Ford to focus his article on Investor 1's involvement, and the supposed rosy prospects of Company A's R&D.

104.    On Monday, September 23, 2013, Honig and some associates began trading Company A shares to create the appearance of market activity and interest in Company A in advance of the planned Ford article.  That day, the trading volume of Company A shares soared to 302,000 from zero volume the previous trading day.

105.    The September 23rd trading also gave Honig a way to pay Ford surreptitiously for his upcoming favorable article on Company A.  On the morning of Friday, September 20, 2013, O'Rourke called Ford and told him to put in buy orders for Company A stock at $0.40 per share to ensure his order was executed against the corresponding sell order later placed by

Honig. Because there was so little trading at that time in Company A shares, O'Rourke and

Honig knew that Ford's bid would be hit by Honig on the following Monday, September 23,

2013. In that transaction, Honig sold 180,000 Company A shares to Ford at $0.40 per share, a

price well below the price at which these shares otherwise traded during that day.

106.     O'Rourke joined the trading at the end of the trading day on September 23rd to

"mark the close," *i.e.*, to ensure that the last price of the day would be higher, giving the false

impression that Company A's share price was on an upward trajectory. Specifically, at 3:58 p.m.

that day, O'Rourke, through his entity ATG, placed a bid to buy Company A shares at $0.68 per

share, a significantly higher price than the prior buy order at $0.55 per share, which had been

entered at about 3:06 p.m. Another Honig associate, who had purchased shares from Honig

earlier in the day, placed a corresponding sell order to complete the transaction at the inflated

price.

107.     In further preparation for the publication of the Ford article touting Company

A, and to enhance the false picture of an active market for the stock, near the end of the trading

day on September 26th, Honig and his associates engaged in a series of coordinated trades. For

example, the Barry & Renee Honig Charitable Foundation, controlled by Honig, sold Company

A shares to a Honig associate at $0.68 per share, and two minutes later another entity affiliated

with Honig executed a transaction against ATG, O'Rourke's entity, at $0.68 per share.

108.     Ford published his Company A article on the *Seeking Alpha* website less than

half an hour before market close on September 26, 2013. That article, touting Investor 1's

investment in Company A, bore the title Honig and O'Rourke had supplied to Ford: "[Investor 1

Company] and Its Billionaire CEO Invested in [Company A]." In it, Ford presented a bullish

outlook for Company A and concluded that "Company A should be trading for more than twice

35

today's valuation."

109.     Keller reviewed Ford's Company A article prior to its publication, and knew, or was reckless in not knowing, that Ford was preparing a promotional article.  Ford's article included a question and answer interview of Keller, which O'Rourke had arranged earlier in September.  Ford quoted Keller touting the benefits of Company A's Qusomes technology.  Specifically, Ford quoted Keller's misleading statement that Company A had a formulation ready for testing to be brought to the billion-dollar injectable drug market.  Yet, as Keller knew, as of summer 2012, Company A had shut down all R&D efforts without the successful formulation of an injectable drug and Company A had ceased all efforts to develop this technology in mid-2012.

110.     Ford's article was also materially false and misleading in failing to disclose that Ford had been compensated by Honig for writing the article through Honig's sale to him of below-market Company A shares on September 23.  Instead, Ford included a disclaimer that was itself false and misleading:  "I am long [Company A].  I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article."

111.     The market reacted strongly to the Company A promotion:  the trading volume of Company A stock rose from approximately 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013 and to more than 6 million shares on October 2, 2013.  The share price increased from an average of about $0.48 during August 2013 to an intraday price of $0.97 on October 17, 2013.  Because many of the Defendants had acquired their shares so cheaply, they did not need to capture the immediate post-publication price jump in order to

profit handsomely, and thus they sold their shares in transactions staggered over a three month period. Staggering their sales over a longer period of time allowed them to avoid pushing the stock price lower and the scrutiny that might have resulted from the Honig group's simultaneous selling.

112.     Between the start of the manipulative trading on September 23, 2013 and December 31, 2013, Honig and his co-investors sold shares into the inflated market for proceeds of approximately $9,350,000:

| Company A Pump and Dump Proceeds | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2013)** | **Net Quantity Sold** | **Proceeds** |
| **Honig** | 9/23 – 12/16 | (5,892,689) | $3,416,455.17 |
| **Brauser and Grander** | 9/27 – 12/23 | (2,259,770) | $1,234,630.77 |
| **Affiliates (including Investor 1 Trust, Investor 1 Group, Affiliate 1 and Affiliate 1 Entity, and Affiliate 2)** | 9/26 – 11/27 | (6,989,357) | $4,276,318.19 |
| **Stetson and SCI** | 9/27 – 12/18 | (500,000) | $279,859.68 |
| **O'Rourke and ATG** | 9/23 – 12/27 | (250,000) | $148,443.68 |
| **Total** | | **(15,891,816)** | **$9,355,707.49** |

113.     To compensate O'Rourke for his work, including working with Ford on the promotional piece, on October 4, 2013, Honig sold to O'Rourke's ATG one of Honig's Company A notes, with a face value of $50,000, which O'Rourke immediately converted into 250,000 Company A shares. Despite the fact that Company A shares were trading at a price as high as $0.58, pursuant to the terms of the Company A note he bought from Honig, O'Rourke paid less than half that price at $0.20 a share when he converted through ATG. O'Rourke then sold his ATG shares into the market at the much higher average price of about $0.59 per share between September 26, 2013 and December 27, 2013.

### 3. The Unlawful Distribution of Company A Shares by Honig and Brauser

114.　Honig and Brauser obtained the Company A shares directly from Company A or a Company A affiliate in transactions not involving any public offering.  Therefore, the Company A shares these Defendants sold were restricted securities as defined in Securities Act Rule 144(a)(3)(i).  No registration statement was in effect for any of the Company A stock sales by Honig or Brauser in the September through December 2013 period.  No exemption from registration was available to either of them, or their entities, with respect to these shares.

115.　Honig and Brauser were also statutory underwriters under Securities Act Section 2(a)(11) because they acquired these securities from the issuer or an affiliate of the issuer with a view to public distribution.  As statutory underwriters, in order to resell the securities to the public in reliance on Securities Act Section 4(a)(1), they were required to comply with the applicable conditions of Securities Act Rule 144, which they did not.

116.　Each of Honig and Brauser, and their respective relevant entities, were under common control with Company A, making each of these Defendants an affiliate of Company A under Securities Act Rule 144(a)(1).  The beneficial ownership of almost 45% of the outstanding stock of Company A by Honig, Brauser and Grander, and other co-investors including Affiliate 1, Affiliate 1 Entity, Stetson, SCI, Investor 1 Company, Investor 1 Trust and Investor 1 Group, gave them collective control over the issuer – control they exercised as demonstrated by the active involvement of Honig and Brauser, with the knowledge and consent of Stetson, in the operations and promotion of Company A.

117.　As affiliates, Honig and Brauser did not comply with the conditions of Securities Act Rule 144 in connection with their distribution of Company A securities.  Because Company A did not trade on a national securities exchange, as affiliates of Company A, these

Defendants could only lawfully sell 1% of the company's total shares outstanding in any three-month period pursuant to Securities Act Rule 144(e). As of September 2013, Company A had approximately 69 million shares outstanding, and as of November 15, 2013, it had approximately 75 million shares outstanding. Honig and Brauser each sold shares in excess of 1% of the total outstanding shares during the September through December period.

### 4. Honig's, Brauser's, Stetson's and O'Rourke's Post-Promotion Use of Company A's Assets and Marketable Securities for Their Personal Benefit

118.    After profiting on their sales of Company A stock into the inflated market they had created with their paid promotion, Honig, Brauser, Stetson and O'Rourke continued to use their control over Company A for their own enrichment. Throughout the period preceding the September 2013 pump and dump, behind the scenes Honig, Brauser, Stetson and O'Rourke conspired to sell Company A's assets to another issuer they controlled ("Company M").

119.    Each of Honig, Brauser, Stetson and O'Rourke had invested in Company M by the fall of 2013. Honig and another frequent co-investor each also held a lucrative consulting contract with Company M at least through July 2013.

120.    Honig and Brauser exercised influence over the management decisions of Company M. Using that influence, Honig and Brauser arranged for Company M to make a $2,000,000 investment in Company A on August 26, 2013 through the purchase of a convertible promissory note with a one-year term and a 10% interest rate. The terms of this note also included a warrant to purchase 10,000,000 Company A shares for either $0.40 per share or on a cashless basis in the event that the Company A shares were not registered. Under Company A's analysis, the value of the warrant alone was almost $2,500,000, even without including the capacity for the conversion of the value of the note plus interest into shares, making this deal

extraordinarily favorable to Company M at the expense of Company A shareholders.

121.    On November 12, 2013, after Honig, Brauser, Stetson and O'Rourke had sold Company A shares for millions of dollars, Company A announced that it would sell its assets, including its intellectual property and manufacturing facility, to Company M in return for 1,200,000 shares of Company M's stock. Maza, Company A's titular CEO, did not learn of this extraordinary transaction until it was announced.

122.    With Company A now stripped of its assets and rendered a public shell, and less than two months after Ford had been compensated to laud Company A's prospects, Honig and Brauser arranged a reverse merger of Company A with a private company (the "Private Company") in which some of their close co-investor associates had a substantial ownership interest. Under the terms of the merger agreement, Company A shareholders would own 40% of the newly combined entity and the owners of the Private Company would own 60% of the shares.

123.    On December 26, 2013, Company A filed a Form 8-K in which it disclosed a conversion of notes held by Honig and Brauser into newly issued Company A common stock.

124.    On or about January 2, 2014, the reverse merger of Company A and the Private Company closed. Through that merger, Honig and Brauser were able to enhance the value of their investments in Company A stock, which, pre-merger, had essentially become an investment in a public shell. Post-merger, the value of Honig's and Brauser's Company A stock was supported by the newly acquired Private Company assets, and Honig and Brauser monetized those investments in subsequent post-merger sales of their Company A shares to public market investors.

### C. The Company B Scheme

125.    During 2015 and 2016, Honig and his associates used Company B, once a

publicly traded shell, as another vehicle for their pump-and-dump schemes. Honig and his partners used many of the same tactics they had employed in the Company A scheme: they bought millions of cheap shares, intending to exercise control over the management and policies of the company; exercised that control; orchestrated a misleading promotion of the company that drove up the price and the trading volume of the company's shares; and dumped their shares for a profit in the inflated market. As with Company A, Company B engaged Issuer's Counsel as company counsel. Despite their control over various actions taken by Company B, and their tacit or explicit agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig, Brauser, Stetson and O'Rourke took numerous steps to conceal their involvement, and to perpetuate the false appearance that the company was actually being controlled by its CEO.

### 1. *Pre-2015 Investments in Company B by Honig, Brauser, Stetson and O'Rourke*

126. By 2015, Company B was well-known to Honig, Brauser, Stetson and O'Rourke – and they were well known to Company B's CEO Ladd – from an earlier pump and dump perpetrated by Honig and his associates in 2012-2013.

127. In October 2012, Honig, Affiliate 1 and Stetson had purchased cheap Company B convertible preferred shares and 5 year warrants through a $4.5 million PIPE transaction. Honig made the transaction contingent on Company B using $300,000 from the capital raise to promote Company B's stock. As was Honig's practice, he dictated the group of investors who would join him, including Affiliate 1 and Stetson.

128. Stetson, with the knowledge and consent of the Honig-led investor group, then enlisted Ford to write a promotional piece, published on the *Seeking Alpha* website on November 5, 2012, which touted Company B's prospects for providing a "2X near-Term Return," and predicting that Company B's stock could rise to $18 a share (nearly triple its price on the

41

previous trading day). Ford's promotional piece failed to disclose the compensation he had received from Honig, instead assuring investors that he was "express[ing] his own opinions," and was not "receiving compensation for it (other than from Seeking Alpha)."

129. When, after Ford's piece was published, Company B's stock price failed to reach the level desired by the Honig-led group, Honig directed Stetson and/or O'Rourke to retain Ford to write another *Seeking Alpha* article on Company B. At Honig's direction, in November 2012, Stetson sold Ford Company B shares and warrants at a discount in payment for Ford's planned articles on Company B. Ladd knew that Ford held these shares, and had obtained them from someone who had participated in the PIPE transaction, because Ford was listed as one of the selling shareholders of Company B's stock in its November 30, 2012 Form S-3 Registration Statement, signed by Ladd.

130. In his second *Seeking Alpha* article, published on April 11, 2013, Ford touted Company B's imminent settlement of a patent enforcement action that would bring Company B a substantial recovery. Ford again predicted a significant stock price jump and again failed to disclose that he had been compensated pursuant to his agreement with Honig. Ladd knew that Ford's prediction was false, since Company B's patent enforcement action was not on the brink of settlement. This time Ford's article had the desired effect, pushing Company B's share price from $3.50 on April 10, 2013 to almost $4.50 on April 16, 2013, and increasing trading volume significantly. Company B's market capitalization went from under $16 million on April 10, 2013 to over $20 million on April 16, 2013. Honig sold approximately 250,000 shares into the inflated market, earning $967,224.

131. Ladd was aware of the promotional efforts of the Honig-led group. He even agreed to be interviewed by Ford for the November 2012 *Seeking Alpha* article, and spoke to

Ford several times before the article's publication.  He also knew, or was reckless in not
knowing, that Ford had a connection to Honig and his group because he received emails about
Ford's Company B investment from Stetson in early 2013.  Ladd knew that Ford's April 2013
article had successfully boosted Company B's stock price.  And Ladd knew, or was reckless in
not knowing, that Ford was being compensated by Honig and his associates and that he was
concealing that fact from his *Seeking Alpha* readers in the April 2013 article, just as he had
concealed it in his November 2012 article.

132.     Honig, Stetson and O'Rourke also knew, or were reckless in not knowing, that
Ford's April 2013 article failed to disclose the compensation he was receiving from Honig.  They
each also knew, or were reckless in not knowing, that the article falsely claimed that Company B
was in settlement talks and on the brink of a lucrative settlement when it was not.  Indeed, the
only settlement Company B reached in its patent lawsuits was a single $100,000 recovery many
months after the April 11, 2013 Ford article had been published.

### 2.     *Honig and Associates Amass Company B Shares in 2015-2016*

133.     In 2015, Honig and his associates began planning a new scheme to pump and
dump Company B's shares.  Honig set the scheme in motion on September 26, 2015 when he
emailed Stetson: "We need to put together a term sheet for [Company B]. . . similar one to the
[Company B] one we used the first time" and outlined proposed terms of an investment deal.
The terms included specific provisions designed for Honig and his investor group to have access
to shares quickly, warrants for more shares on favorable terms, and the ability to restrict
Company B's ability to raise other funds.

134.     On September 27, 2015, Honig directed Stetson to send the proposal to Ladd,
Company B's CEO.  The deal contemplated the issuance of 2.8 million Company B shares, along

with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker. This deal structure allowed the investors repeatedly to convert and sell their shares while appearing individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings. By ostensibly staying below the 5% ownership threshold, and evading the public reporting requirements, Honig and his associates increased the likelihood that they could conceal the millions of shares that they had amassed and thereby mask their scheme to pump up the Company B share price and trading volume in anticipation of a profitable sell-off to unsuspecting investors.

135. On October 1, 2015, Ladd emailed Honig that "NYSE MKT wants to know the buyers. $175,000 x 4 investors will be each at 4.9%. . . ." Honig replied that same day, copying Brauser and Stetson, that he would "get back to you with names shortly for now use Barry Honig Mike Brauser [and] OBAN [an LLC created by Stetson]." On October 5, 2015, Stetson provided Company B with the investors Honig had selected to participate in the financing, which included GRQ (Honig), Grander (Brauser), SCI (Stetson) and ATG (O'Rourke), as well as other Honig-approved investors. Over the next few days, Honig continued to negotiate the terms of his and his investors' deal with Ladd.

136. The Honig-led financing ultimately provided $700,000 to Company B (the "October 2015 Company B Financing"). On October 8, 2015, Company B filed a Form 8-K with the Commission disclosing that the company had "entered into separate subscription agreements . . . with accredited investors . . . relating to the issuance and sale of $700,000 of units . . . ." The Form 8-K did not disclose the investors' identities.

137. Ladd knew that Honig (through GRQ), Brauser (through Grander), Stetson (through SCI) and O'Rourke (through ATG) and other Honig affiliates were operating as a

group, that they had acquired Company B shares together, and that they were collectively exercising control over the company.  In November 2015, Ladd wrote Honig:  "As for the cap table, we have 17.2 million common shares outstanding, including **your group's** 2.8 million . . . ." (emphasis added).  Ladd nonetheless failed to disclose Honig's, Brauser's, Stetson's and O'Rourke's combined interest in, and control over, the company in Company B's public filings.

### 3.  The Company B Pump and Dump in February 2016

138.    Having coordinated the accumulation of stock with Brauser, Stetson and O'Rourke, Honig, with his partners' knowledge and consent, then arranged for a promotion that included materially misleading information.

139.    On or around January 21, 2016, by which time Honig, Brauser, Stetson, O'Rourke and Affiliate 1 through Affiliate 1 Entity, had acquired at least 16.3% of Company B's outstanding stock, Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of Company B.  Shortly thereafter, the stock promoter paid a portion of the money he had received from Company B to a writer he instructed to publish a tout on Company B.  On February 3, 2016, the writer published his piece online.  In it, he described Company B's rosy prospects in social and "real money" gaming sites and intellectual property relating to slot machines. The article did not disclose that the author had been paid by Company B – at Honig's direction – to write the article.  After the article was published on February 3, 2016, there was a 7000% increase from Company B's previous day's trading volume, and an intraday price increase of over 60%.

140.    Honig, Ladd, Stetson and O'Rourke knew the promotional article was slated to appear, and each either knew, or was reckless in not knowing, that the article's author failed to disclose that he was being compensated by Company B to write it.  Honig, Ladd, Stetson and

O'Rourke took advantage of the promotion's boost to Company B's stock price and trading volume and sold over 430,000 shares into this inflated market for proceeds of approximately $198,800.

| Company B Pump and Dump Proceeds, Following February 2016 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2016) | Net Quantity Sold | Proceeds |
| Honig and GRQ | 2/3 – 4/6 | (231,050) | $123,154.87 |
| Stetson | 2/3 – 2/11 | (40,000) | $20,483.33 |
| O'Rourke (and through ATG) | 2/3 – 2/9 | (64,366) | $15,960.72 |
| Ladd | 2/3 – 5/3 | (96,072) | $39,204.12 |
| Total | | (431,488) | $198,803.04 |

### 4. The Company B Pump and Dump in May 2016

141.    Honig soon identified a potential acquisition target for Company B that would give Honig and his associates another way to profit from their interest in Company B. The proposed deal involved a well-known cybersecurity innovator who had created a popular antivirus software bearing his name (the "Cybersecurity Innovator").

142.    At Honig's direction (and with the knowledge and consent of Brauser and Stetson), O'Rourke took the lead in arranging a deal between Company B and the Cybersecurity Innovator. On March 29, 2016, O'Rourke sent the Cybersecurity Innovator a term sheet for the asset purchase of Cybersecurity Innovator's company ("CI Company") by a "NYSE listed company." After CI Company indicated interest on April 3, 2016, O'Rourke wrote to Honig on April 3, 2016 and asked Honig if he would "still want to pursue [Cybersecurity Innovator] deal." Honig replied to O'Rourke that same day: "Yea!" O'Rourke introduced Ladd to the Cybersecurity Innovator on April 4, 2016 to begin negotiating a transaction between Company B and the Cybersecurity Innovator's various business interests.

143.    Subsequent correspondence between Ladd and O'Rourke, and between O'Rourke and Honig, reflect the ongoing and significant role Honig and O'Rourke played in

orchestrating the deal. Company B and the Cybersecurity Innovator agreed to terms on May 8, 2016.

144. On May 9, 2016, at 8:30 a.m., Company B issued a press release announcing its merger with CI Company, and attached it to a Form 8-K, signed by Ladd, filed that same day with the Commission. The press release misleadingly described the Cybersecurity Innovator's prior financial success by falsely claiming that the Cybersecurity Innovator had "sold his anti-virus company to Intel for $7.6 billion," suggesting that Company B might achieve similar success. Yet, as Ladd knew or was reckless in not knowing, the sale of the Cybersecurity Innovator's namesake company to Intel at that price had occurred over a decade after the Cybersecurity Innovator's departure from that company.

145. Knowing that Company B's misleading announcement of the deal would be disseminated later that morning, on May 9, 2016, Honig traded in Company B stock to create the misleading appearance of an active market. In pre-market trading that morning, Honig bought and sold small quantities of Company B stock dozens of times. Joining the effort to paint a false picture of legitimate market interest in the stock, Brauser engaged in coordinated trades in Company B stock with Honig in trading early that morning.

146. That same day, StockBeast.com, a well-known internet stock promotion website, published an article by an unnamed author entitled "[Company B] Beastmode engaged – [Cybersecurity Innovator] driving the Bus." Ladd, through Company B, had paid StockBeast.com for the article to ensure a wide distribution of the news of the impending merger with the CI Company. The StockBeast.com article touted Company B and highlighted the Cybersecurity Innovator's involvement, proclaiming: "This is big big big!" It also repeated Ladd's materially false claim contained in Company B's press release that the Cybersecurity

47

Innovator had "sold his startup company to Intel for $7.6BB."

147.     This promotion and Honig's and Brauser's manipulative trading on May 9 were effective in driving up both Company B's trading volume and stock price: on May 6, 2016 (the last day of trading prior to the promotion), Company B had trading volume of 71,005 shares and a closing share price of $0.36. On May 9, 2016, the stock closed at $0.49 (representing an increase of 34 percent over the prior day's close) with trading volume of more than 10 million shares. The trading volume for Company B stock peaked at 109,384,614 shares on May 17, 2016 with a closing share price of $4.15. Company B's market capitalization went from just over $8 million on May 6, 2016 to over $95 million on May 17, 2016.

148.     In the days immediately following the announcement of the CI Company acquisition, Honig, Brauser, Stetson and O'Rourke, along with Affiliate 1, pursuant to their tacit or explicit agreement to acquire, hold, vote, and/or dispose of their shares in concert, sold over 9.2 million Company B shares. In order to maximize their Company B profits, Honig, Brauser, Stetson and O'Rourke each negotiated with Ladd from May 10 to May 12, 2016 in order to exercise their warrants early, giving them more shares to sell into the inflated market. Ladd facilitated this warrant exercise and Honig, Brauser, Stetson and O'Rourke were able to dump millions more shares than they otherwise could have. Ladd joined them in selling shares during this period, capitalizing on the false publicity he had knowingly or recklessly helped to create. All told, Honig, Brauser, Stetson, O'Rourke, Ladd and Affiliate 1 grossed $9.4 million from their May 2016 sales into the inflated market:

| Company B Pump and Dump Proceeds, Following May 2016 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2016) | Net Quantity Sold | Proceeds |
| Honig and GRQ | 5/9 – 5/20 | (3,783,001) | $2,393,915.52 |
| Brauser and Grander | 5/9 – 5/18 | (2,137,668) | $3,839,295.64 |
| Stetson (through SCI) | 5/9 – 5/12 | (750,000) | $660,798.20 |
| O'Rourke (through ATG) | 5/9 – 5/16 | (750,000) | $990,661.97 |
| Ladd | 5/9 – 5/31 | (471,000) | $516,554.08 |
| Affiliate 1 (through Affiliate 1 Entity) | 5/9 – 5/11 | (1,415,870) | $999,873.56 |
| Total | | (9,307,539) | $9,401,098.97 |

149.     After successfully capitalizing on the promotions, Ladd purported to clarify his own false statements that had worked to create the market enthusiasm and that had pushed up the price and trading volume of Company B's stock.  In its May 23, 2016 Form 10-Q, signed by Ladd and filed with the Commission, Company B stated:  "[The Cybersecurity Innovator] founded [Cybersecurity Innovator's company] in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010."  While the new disclosure omitted the prior false claim that the Cybersecurity Innovator had sold his company to Intel, the May 23 Form 10-Q failed to acknowledge the prior misstatement in the Company's May 9, 2016 Form 8-K and press release, and failed to disclose that the Cybersecurity Innovator had left his company years prior to its multi-billion dollar sale to Intel.  In any event, the purportedly clarifying disclosure came well after the Honig-associated investors and Ladd himself had already profited from the misleading press release.  By that time, Honig (GRQ), Brauser (Grander), Stetson (SCI), O'Rourke (ATG) and Ladd, had already sold their Company B shares into the inflated market.

### 5.     False Statements by Honig, Brauser, Stetson, O'Rourke and Ladd in Beneficial Ownership Reports and Company B Filings

150.     Although they were acting in concert, and pursuant to an agreement to do so, Honig, Brauser, Stetson and O'Rourke knowingly or recklessly concealed their concerted efforts

from the investing public. Ladd, with full knowledge of both the Honig investors' stock ownership and their collective direction of the management and policies of Company B, also kept their control a secret, signing Company B public filings that did not disclose the full extent of their ownership or control.

151.    After the October 2015 Company B Financing closed, Honig, Brauser, Stetson and O'Rourke collectively owned at least 1.7 million shares, or over 12% of the shares outstanding (as reported in Company B's August 14, 2015 Form 10-Q) after the issuance, and their obligation to file a Schedule 13D under Exchange Act Section 13(d) arose as of October 8, 2015. Moreover, Honig, Brauser, Stetson and O'Rourke each had warrants to obtain a total of an additional 3.4 million Company B shares, which, if they were all converted, would have resulted in Honig, Brauser, Stetson and O'Rourke collectively controlling at least 36% of the total common shares outstanding at that time.

152.    Honig, Brauser, Stetson and O'Rourke collectively exercised control over Ladd and the management and policies of Company B. For example, on October 1, 2015, Ladd asked for and received Honig's direction with respect to how to disclose the Honig group's stock acquisitions to the NYSE MKT exchange. O'Rourke, at Honig's direction, negotiated on Company B's behalf the terms on which the Cybersecurity Innovator would sell CI Company to Company B. Indeed, in emails after the CI Company acquisition, Honig freely accepted credit for his role in the transaction. On May 12, 2016, for example, Honig received an email from an investment firm congratulating him on the recent transaction: "You're invovlved [sic] with [Company B]? Impressive!" Honig responded that he was the "[l]argest shareholder, funder and [had the] relationship with [the Cybersecurity Innovator]." In early August 2016, Honig celebrated his undisclosed role at Company B in a chat conversation with Stetson: "its great in

[Company B] because we are behind the scenes."

153.    Brauser, too, sought to keep his involvement behind the scenes, going so far as to lie about his relationship to Honig and Company B in a published interview.  In a May 18, 2016 article in *Business Insider*, the author quoted Brauser and reported:  "'I had no idea whatsoever about any deal at [Company B] or with [the Cybersecurity Innovator] . . . [G]ot lucky I guess' as to the moves at [Company B] since he has never had any contact with anyone at [Company B] or Ladd himself . . .  [and] has had no contact with Honing [sic] regarding [Company B] or anything else in some time."  In fact, as Brauser knew, Brauser had been in contact with Ladd by email on multiple occasions, including on October 1, 2015 in connection with Grander's investment in the October 2015 financing, and in connection with his attempt to convert his warrants into more Company B shares on May 10, 2016.  And while the CI Company transaction was being negotiated, Brauser was in frequent contact with Honig about their co-investments, by phone and by email.  Indeed, in a May 10, 2016 email between Brauser and Honig, Honig acknowledged his understanding that Brauser had recently sold $1,000,000 in Company B shares following the May 2016 promotion.

154.    Because they acted in concert to control the management and policies of Company B and pursuant to an agreement to acquire, hold, vote, and/or dispose  of Company B shares in coordination with one another, each of Honig, Brauser, Stetson and O'Rourke was a member of a group and considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of the group and disclosing the number of shares each of them beneficially owned.  However, none of Honig, Brauser, Stetson or O'Rourke ever made a Schedule 13D filing disclosing their respective ownership or

membership in a group, acting intentionally to conceal from the market the size of their group's
position and their coordination and thereby to deceive investors.

155.    Instead, on October 19, 2015, Honig filed a Schedule 13G, claiming only his
own 6.59% beneficial ownership and falsely stating that the securities "are not held for the
purpose of or with the effect of changing or influencing the control of the issuer" – a
representation he knew, or was reckless in not knowing, to be false.  Indeed, because Honig and
his associates exercised control over Company B's management and policies – as Honig
candidly acknowledged in emails – he was disqualified from making a 13G filing.  In February
2016, Honig filed an amended Schedule 13G disclosing an ownership percentage of 9.1%.
Brauser filed a Schedule 13G on May 4, 2016, in which he claimed 7.4 % beneficial ownership
via his entity Grander.  In each of these filings, Honig and Brauser also falsely claimed that they
were passive investors without any intention to influence or change control of the company and
omitted the fact that each was a member of a group.

156.    By October 2015, if not before then, Honig, Brauser, Stetson and O'Rourke all
understood what their respective reporting obligations were under Exchange Act Section 13(d),
and that the information included in such filings was material to investors.  Indeed, a mere seven
months earlier, in February 2015, Honig and Brauser had filed a lawsuit in Harris County, Texas,
alleging that counter-parties had violated Exchange Act Section 13(d) by failing to make
requisite 13G filings for the more than 5% position they controlled as a group, and that that
failure constituted a material omission that defrauded Honig and Brauser in their purchase of
securities from those defendants.  In their Complaint in that lawsuit, *Brauser v. Sanders Morris
Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct.) (filed February 26, 2015), Honig and Brauser
alleged:

> [I]nformation regarding a significant beneficial ownership interest in [the issuer's stock] was material. It is the kind of information that the SEC requires to be disclosed in connection with solicitations for mergers and in various other filings (*e.g.*, Schedules 13D and/or 13G) precisely because of its materiality. Defendants' failure to disclose to plaintiffs their significant beneficial ownership interest in [the issuer] . . . is a material and materially misleading omission. . . . Plaintiffs would not have purchased the Shares if they had known the undisclosed facts that [defendants] controlled such a large interest in [the issuer's] stock. . . .

157. In email exchanges leading up to its filing, Honig and Brauser discussed drafts of the Complaint, and circulated them to Stetson and O'Rourke – non-parties to the lawsuit – seeking their comments. Honig and Brauser also discussed with Stetson and O'Rourke each of their respective understandings of the requirements imposed by Exchange Act Section 13(d). Nonetheless, and despite their understanding of what Section 13(d) required them to disclose and how and why those disclosures were material to investors, neither Honig, nor Brauser, Stetson or O'Rourke made the requisite filings with respect to Company B.

158. Similarly, Company B's 2015 Form 10-K filed with the Commission on April 11, 2016 disclosed only Honig as a beneficial owner, holding 8.6%. Notwithstanding that Ladd knew that Honig, Brauser, Stetson and O'Rourke were working together as a group, he signed the 2015 Form 10-K, failing to disclose their group's beneficial ownership. Ladd also signed a materially misleading November 6, 2015 Form S-1 registration statement, filed with the Commission, for the 8,400,000 Company B shares issued in the October 2015 Company B Financing, failing to disclose the group beneficial ownership of GRQ, Grander, ATG and SCI.

**D. The Company C Scheme**

**1. *Honig and Stetson Obtain Control of Company C***

159. In early 2014, Honig identified a publicly traded shell company that was unencumbered by debt, and sought an appropriate private company for purposes of a reverse merger and pump and dump scheme. While Honig preferred "'33 Act shells" – namely, public

53

companies that would not be subject to Exchange Act Section 13(d) reporting obligations – in later years, those shells became too expensive, and the shell he identified in early 2014 was a "'34 Act shell," subject to Section 13(d) reporting.

160.     At or about the same time as Honig identified the shell, the CEO of privately-held Company C ("Company C's CEO") was looking for funding for its research and development efforts in cancer therapies and diagnostic products. Company C's CEO was introduced to "Entity H," a hedge fund that frequently invested alongside Honig and Brauser. Entity H suggested to Company C's CEO that he turn Company C into a public company by engaging in a reverse merger with a public shell. Although Company C's CEO did not know it, the public shell Entity H had in mind was one that Honig had identified. Company C's CEO agreed to proceed with the reverse merger Entity H had suggested.

161.     In an initial $3 million capital raise in February 2014, in connection with the contemplated merger with Company C, HSCI – a company Stetson falsely identified as his own to Company C's CEO – invested $1 million and Entity H invested $1.7 million in return for a substantial position in the shell. In fact, while Stetson was the sole named managing member of HSCI, Honig actually directed and controlled HSCI's investment decisions, a fact that Stetson did not disclose to Company C's CEO or to the market.

162.     Soon after Stetson had introduced HSCI as his company, however, Company C's CEO learned that Honig was actually behind the HSCI investment. In approximately April 2014, when Honig first called up Company C's CEO, Honig announced in words or substance: "I'm the owner of your company. You better do what I tell you to do." Thereafter, Honig began peppering Company C's CEO with frequent telephone calls demanding various corporate actions, including directing changes to the composition of the Company C Board, the

engagement of Issuer's Counsel, and the retention of public relations consultants favored by Honig, as described below. Company C's CEO, in need of funding for his company, took those calls and often acceded to Honig's demands.

163.     Sometimes Honig worked with Stetson to exert his influence over management. As early as May 18, 2014, for example, Stetson emailed Company C's CEO to get updates on "IR and PR." Stetson was referring to investor relations ("IR") and public relations ("PR"), and was pressing his and Honig's demand that Company C begin aggressively marketing itself and paying promoters to do so. Honig added to the discussion the topic of future financings: "[a]nd the money raise."

164.     On June 1, 2014, Brauser and Affiliate 1 each committed to make a substantial investment in the public shell, before the merger into Company C was finalized. As the ringleaders for the investor group in Company C, Honig and Stetson led the merger negotiations on the group's behalf.

165.     On July 8, 2014, Company C executed the reverse merger of the company into the public shell controlled by Entity H, HSCI, and, by then, Brauser and Affiliate 1 Entity. At or around the time the merger closed, ATG, Brauser and Affiliate 1 Entity also made investments in Company C. After the merger, the stake of Entity H, HSCI, Brauser, Affiliate 1 Entity and ATG (including conversion of all warrants) amounted to almost 48% of the authorized shares of the newly public Company C. The terms of the merger included granting a "Consent Right" to Entity H and its affiliates, by which Entity H could block or approve many kinds of transactions by Company C, including the issuance of additional shares, any change of control and other significant corporate actions.

166.     In connection with the July 2014 reverse merger, the merger investors obtained

warrants that they agreed would not be exercisable until July 8, 2015.  However, on September 3,

2014, Company C agreed to allow merger investors to exercise warrants for additional Company

C shares before the previously agreed-upon July 8, 2015 exercise date.  This warrant exercise

allowed investors to exchange warrants for shares cheaply.  In connection with that exercise,

Stetson submitted warrants on behalf of several investors, including ATG and Affiliate 1 Entity.

In a September 15, 2014 email, Company C's CFO asked Stetson which entities were his or

HSCI's affiliates.  Stetson answered falsely that he was "not affiliated with any of those entities,"

and that he "just made private sales for my warrants."

### 2.     *The Series D and Series E Financings*

167.     In March and April, 2015, Honig orchestrated two private placement

financings for Company C that would tighten Honig's, Brauser's, Stetson's and O'Rourke's

control of the company: the Series D and Series E offerings.  Honig described the deal to

Stetson, Brauser and Investor 1 in a March 5, 2015 email, characterizing it as a "real good

opportunity" that would allow them to "make $35 million conservatively in 4 months and our

money out [in] 4 weeks. . . . I will trade out of it for us."

168.     Honig and Stetson pitched the first of these financings, the Series D financing,

to Company C management as a way to buy out Entity H's position and repackage the financing

on more favorable terms to Company C.

169.     As Company C's CFO understood, Honig structured both financings to avoid

disclosing his, Brauser's, Stetson's and O'Rourke's holdings on Schedule 13D or 13G.  Since the

requirement to make those filings is triggered by voting control of securities, Honig insisted that

the Series D and Series E offerings consist of preferred, convertible and non-voting shares with

blocker provisions.  Pursuant to those blocker provisions, Company C was prohibited from

converting any holder's preferred shares that would give him or it more than 4.99% voting control of the total outstanding common shares.

170.     Honig's control of the financing group was clear to Company C's management; indeed, when deciding whether a potential investor could take part in the March 2015 Series D financing round, Company C's CEO explicitly deferred to Honig, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might want to allow to invest along with the current group.  Viewed this as your choice not mine.  That is why I asked him to call you."

171.     Stetson kept up the pressure on Company C to close the financings on the terms he and Honig dictated.  On March 10, 2015, Stetson told Company C's CEO in an email that he needed to reach an understanding by the next day to proceed with the buyout of the Entity H notes and fund the company.

172.     Honig and Stetson also made it a condition of the March 2015 Series D financing round that Company C retain Issuer's Counsel and Issuer's Counsel Partner after the closing – the law firm and partner that they had required Company A to retain, and the same law firm retained by Company B.  Not only did Honig and Stetson insist that Issuer's Counsel represent Company C, in a March 12, 2015 email to Company C's CFO, Stetson also demanded that Company C set aside a year of prepaid legal fees as an additional condition to doing the deal.

173.     Stetson managed the financing process with the investors and lawyers, as though he were Company C management, and told Company C management about substantive decisions, including, but not limited to, sending a March 18, 2015 email to Company C management informing them which bank would be used for a contemplated escrow agreement.

174.     Stetson introduced Company C management to his and Honig's chosen IR consultant on March 14, 2015, and at Honig's direction, insisted that the financing include a grant of 300,000 Company C shares as payment to the consultant.  On March 23, 2015, Honig directed Stetson to engage another IR consultant for Company C, who was also granted Company C shares.

175.     Honig and his associates recognized that the participation of Investor 1 was critical to the success of the transaction by creating the market demand necessary for them to sell their shares after the planned promotion. As Stetson explained in an email to Company C leadership on March 9, 2015, the "following of [Investor 1] is worth its weight and [sic] gold . . . ."

176.     To that end, Honig again demonstrated his control over the selection of investors when he asked Brauser to "do [him] a favor" on April 1, 2015 and forego his participation in the Series E financing because, as Honig explained, "I would like to let some of our friends do it . . . [I]t would be best if we let [Investor 1 and Investor 1 Company and an Investor 1 Company executive ("Investor 1 Co. Officer")] take their full allocation."

177.     At the same time, Honig and Brauser understood that public market investors might not want to follow Investor 1 into a company dominated by Honig and Brauser, and their group.  Thus, like Honig's decision to conceal his initial investment by making it through HSCI, Honig and Brauser determined to disguise the full extent of their participation in the financings by funneling some of their share acquisitions through a company they co-owned, Southern Biotech.  Honig informed Stetson and Brauser in early March 2015, "I would like us to do [the investment] through Southern Biotech."

178.     In an email to Stetson and Brauser on March 13, 2015, Honig laid out a more

detailed list of investors as well as the proposed investment amount and the method of investment for both the Series D and Series E financings: "Southern biotech will invest 3 million to purchase [Entity H's] notes – 1 million each," and "[Investor 1] is going to lead pipe [private investment in public equity] for 1 million at .75 cents."

179.    Issuer's Counsel also understood the importance of keeping Honig's and Brauser's investment through Southern Biotech undisclosed.  Right before the closing of the Series D financing, different counsel involved in the transaction sent proposed Form 8-K language to Issuer's Counsel (which was not yet counsel to Company C and was acting as placement agent's counsel) in which Company C's then-counsel named Southern Biotech as an investor in a footnote.  Immediately, on March 25, 2015, Issuer's Counsel Partner and another lawyer from Issuer's Counsel wrote back that "[n]o stockholder [investor] should be named." Further, at Stetson's and Honig's direction, Issuer's Counsel changed the beneficial ownership blocker requirement to 2.49% to create an artificial and deceptive "cap" on the amount of common stock that could be held at one time.  Stetson explained in a March 24, 2015 email to Company C's CFO that the requirement was "due to Barry being the beneficial owner of both GRQ [] and Southern Bio."  While that 2.49% cap prevented GRQ and Southern Biotech from collectively owning more than 5%, it did nothing to prevent their aggregate group ownership with other associates from exceeding 5% – the reporting threshold – even if their individual common stock ownership was kept to 2.49% or below.

180.    In an April 2015 email to his Board, Company C's CEO detailed the demands of the Honig investors, including that Investor 1 Co. Officer be granted a lucrative consulting agreement, and that a new board member, satisfactory to Investor 1 Co. Officer, be appointed at a later date.  The Board capitulated and pursuant to the consulting agreement, Investor 1 Co.

Officer was granted 200,000 Company C shares – worth more than $400,000 at the time – in exchange for his services. In fact, Investor 1 Co. Officer never provided any services to Company C.

181. The Series D financing closed in late March 2015 and included a buyout of Entity H's notes, including the Consent Right, at a favorable purchase price to the investors who purchased the notes. The investors who purchased the notes included various entities owned and controlled by Defendants Honig, Brauser, Stetson and O'Rourke: HSCI (Honig and Stetson), GRQ (Honig), Grander (Brauser) and ATG (O'Rourke). After this transaction closed, Company C had 5,827,327 shares of common stock outstanding, and the Series D investors had preferred shares convertible into over 23,764,700 shares of common stock. Southern Biotech held only 145,000 common stock shares at the time, but had conversion rights to as many as 13,376,382 common shares – more than twice as many common shares than Company C had outstanding at the time of the financing.

182. The Series E financing, which closed April 6, 2015, included warrants, and raised $12 million for Company C on terms highly favorable to Investor 1, Investor 1 Trust and Investor 1 Company. Honig and his associates managed the Investor 1, Investor 1 Trust and Investor 1 Company investments through the Series E financing. For example, Investor 1 Company's investment documentation was transmitted to and discussed with Stetson and Brauser rather than any individuals at Company C, reflecting the fact that Honig and his co-investors were orchestrating the deal rather than Company C itself.

183. Investor 1's participation gave Honig, Brauser, Stetson and O'Rourke leverage in negotiating with Company C, including in solidifying the group's control over Company C's board. When negotiating the final terms of the Series E financing, including Investor 1

Company's right to designate replacement board members, Stetson sought reassurance from Issuer's Counsel Partner in an April 3, 2015 email, asking: "Are you comfortable that we will get control of the board with this language?"

184.     After the financings closed, Honig attempted to further exert his control over Company C. For example, Honig spoke with Company C's CEO about changing the composition of the company's Board and suggested a specific individual as a candidate. After Company C's CEO interviewed the candidate, Issuer's Counsel Partner sent the candidate a letter containing the signature line of Company C's CEO inviting him to join the Board on April 1, 2015. When Company C's CEO learned of the offer, he contacted Issuer's Counsel Partner in an April 14, 2015 email and instructed him to rescind the offer because it had not been authorized by the Board. Issuer's Counsel Partner agreed to do so, explaining to Company C's CEO that he had been following Honig's directions in sending the offer letter on behalf of Company C's CEO.

### 3.     The Company C Pump and Dump in April 2015

185.     One of the goals of the private placement financings, as Honig, Brauser, Stetson and O'Rourke knew, was to generate market interest and boost trading volume in Company C stock in preparation for a planned stock promotion. On April 3, 2015, O'Rourke, acting at Honig's direction, circulated a press release (with input from Company C's CEO, Honig and Brauser) announcing the $12 million private placement in which Investor 1 and his entities had participated, drawing on Investor 1's reputation among retail investors as a successful biopharma investor.

186.     Honig, with the knowledge of Brauser and Stetson, then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym "Wall Street

Advisors" on the *Seeking Alpha* website on April 8, 2015 at 11:13 a.m. The article, titled "[Investor 1 Company] Spots Another Overlooked Opportunity in [Company C]," highlighted Investor 1 Company's and Investor 1's investment in Company C, and was designed to inspire Investor 1's retail investor devotees to follow his lead and buy Company C stock. Despite his involvement in facilitating the Company C financing and his extensive business relationships with Honig, Brauser, Investor 1 and Stetson, in his article, O'Rourke knowingly and falsely claimed that "[t]he author has no business relationship with [Company C]." He also knowingly and falsely claimed that he was "not receiving compensation for [writing the article]."

187.    Anticipating the release of O'Rourke's *Seeking Alpha* article, ATG and O'Rourke engaged in early trading of Company C shares on April 8, 2015 with the intention of creating a false appearance of market interest in the stock. That trading included at least one matched trade, with a Honig associate submitting the buy order and ATG submitting the sell order for the same price at 9:38 a.m. The share price of Company C opened that day at $3.14 and reached $3.73 in the minutes before the promotional article was released.

188.    The promotional campaign was successful. The trading volume of Company C shares rose almost 7500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, following the announcement of the Series E private placement involving Investor 1. The trading volume further increased to 858,709 on April 9, 2015, the day after O'Rourke's article was published. Company C's share price went from a closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015, increasing the company's market capitalization by $23 million. Honig and his affiliates, listed below, acting pursuant to their agreement to acquire, hold, vote and/or dispose of their Company C shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of over $5.5 million, as detailed below:

| Company C Pump and Dump Proceeds, Following April 2015 Promotion | | | |
|---|---|---|---|
| **Defendants** | **Trade Dates (2015)** | **Net Quantity Sold** | **Proceeds** |
| **Brauser** | 4/13 – 6/30 | (576,400) | $1,600,826.76 |
| **Stetson and Honig (through HSCI)** | 4/6 – 6/30 | (1,080,379) | $3,607,248.91 |
| **O'Rourke and ATG** | 4/8 – 6/30 | (30,064) | $69,744.51 |
| **Affiliate 1 (through Affiliate 1 Entity)** | 4/6 – 6/23 | (99,616) | $342,984.59 |
| **Total** | | **(1,786,459)** | **$5,620,804.77** |

### 4. The Company C Pump and Dump in June/July 2015

189.     In June 2015, when the market for Company C shares had cooled from over $4 per share to closing prices hovering just above $2 per share, O'Rourke recruited Ford to publish another Company C tout on Ford's blog.  On July 1, 2015, Ford published an article titled "[Company C]: Near-Term Catalysts Could Push Shares from $2 to over $5."  The article contained materially false statements (as Honig, Brauser, Stetson and O'Rourke knew, or were reckless in not knowing) including that a licensing deal was imminent, when it was not, and that there were near-term therapy development events that could take the share price to $5, when in fact clinical trials were only in early stages.  As before, although Honig compensated Ford for writing the blog post, Ford did not disclose that he had been paid.

190.     Ford's article had the desired impact on the market:  Company C trading volume increased from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015.  Likewise, Company C's share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015.  Pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig and his affiliates sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million, as detailed below:

| Company C Pump and Dump Proceeds, Following June 2015 Promotion | | | |
|---|---|---|---|
| Defendants | Trade Dates (2015) | Net Quantity Sold | Proceeds |
| Brauser | 7/1 – 10/7 | (363,050) | $749,025.45 |
| Stetson and Honig (through HSCI) | 7/1 – 12/7 | (682,539) | $1,525,588.49 |
| O'Rourke and ATG | 7/1 – 12/31 | (179,690) | $235,253.20 |
| Affiliate 1 (through Affiliate 1 Entity) | 7/15 – 12/18 | (212,034) | $243,250.96 |
| Total | | (1,437,313) | $2,753,118.10 |

191.     Honig and Stetson thereafter continued to invest in Company C and conferred

benefits on members of their group and directed critical business decisions for Company C.  For

example, on more than one occasion, Honig or Stetson directed Company C's CEO to appoint

Honig's candidate to Company C's board.  And on August 15, 2016, at Honig's and Stetson's

direction, as a condition to HSCI providing additional financing to Company C, HSCI and

Company C's CEO executed a letter agreement requiring Company C to hire the public relations

firm that Honig and Stetson had selected.  Honig even prevailed on Company C to pay Affiliate

1 Entity a six-figure "Investor Due Diligence" fee in August 2016.

### 5.     *False Beneficial Ownership Reports by Honig, Brauser, Stetson and O'Rourke*

192.      Given the agreement among Honig, Brauser, Stetson and O'Rourke to acquire,

hold, vote and/or dispose of their Company C shares in concert; the group's direction of

Company C management and policies; and their combined share ownership, all of the members

of the group were required to make Schedule 13D filings that they did not make.  They did not

make the appropriate filings so that the investing public would not discover their control, much

less the extent of their control, over Company C, and to obscure from investors that they were

positioning themselves for a pump-and-dump scheme.

193.     By the end of April 2015 after the closing of the private placement financings,

Stetson, HSCI, Brauser (through Grander) and O'Rourke (through ATG) all had substantial deposits of Company C shares in their brokerage accounts. Therefore, they were all individually obligated to make a Schedule 13D filing, disclosing their own holdings and that they were members of the group because they were acting together for the purpose of acquiring, holding, voting and/or disposing of Company C shares, and collectively owned greater than 5% of Company C's outstanding shares.

194.     Other Defendants who invested in Company C also improperly made Schedule 13G filings, by which they falsely represented themselves as passive investors, and also failed to disclose their membership in the group, in violation of disclosure requirements. For example, Honig filed a Schedule 13G on February 17, 2017 disclosing only his 6.22% ownership through GRQ; Stetson filed a Schedule 13G on September 19, 2017, disclosing only his 5.64% (nominal) ownership through HSCI; Brauser filed a Schedule 13G on February 2, 2017, disclosing only his 5.44% ownership through Grander. Each of these Defendants should have made Schedule 13D filings because they were not passive investors, and each should have disclosed the existence of, and membership in, a group. Nor were the eventual Schedule 13D filings made by Stetson on February 12, 2018, Honig on February 13, 2018, and a Schedule 13D/A filed by Honig on February 16, 2018 (all filed after they became aware of a pending regulatory investigation), compliant with the federal securities laws since none of them disclosed the existence of a group or their membership in it.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Honig, Brauser, Stetson, O'Rourke, GRQ, Grander, HSCI and Maza)

195.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

196.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, Brauser, Stetson, O'Rourke, GRQ, Grander, HSCI and Maza, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

197.     Honig (acting individually and/or through the entities he controlled, including GRQ and HSCI, and pursuant to tacit or explicit agreements with Brauser, Stetson, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices.  Honig further violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by engaging in manipulative trading in the securities of Company A and Company B.  With respect to Company A, Honig further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, directly or indirectly, knowingly or recklessly making materially false statements to

brokers and submitting materially false attorney opinion letters to transfer agents, relating to his relationship to Company A. With respect to Company B, Honig further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making materially false and misleading Schedule 13G filings, concealing both his control over Company B's management and policies, as well as his membership in a group with Brauser, Stetson and O'Rourke, and other affiliates, pursuant to their tacit or explicit agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another. With respect to Company C, Honig further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making both a materially false and misleading Schedule 13G filing (by which he concealed his control over Company C's management and policies as well as his membership in a group with Brauser, Stetson, O'Rourke, and offer affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another), and a materially false and misleading Schedule 13D filing (by which he concealed his membership in a group with Brauser, Stetson, O'Rourke, and offer affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another) Honig's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

198.     Brauser (acting individually and/or through the entities he controlled, including Grander, and pursuant to tacit or explicit agreements with Honig, Stetson, O'Rourke and other

affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; and selling shares of Company A, Company B and Company C into the market into trading volume and at prices he knew or was reckless in not knowing were artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for and orchestrated. Brauser further violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by engaging in coordinated trading in the securities of Company B. With respect to Company B and Company C, Brauser further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making materially false and misleading Schedule 13G filings, concealing both his control over Company B's and Company C's management and policies through his agreement with Honig and other affiliates to acquire, hold, vote and/or dispose of Company B and Company C securities in coordination with one another, as well as his membership in a group with Honig, Stetson, O'Rourke and other affiliates pursuant to that agreement. Brauser's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

199. Stetson (acting individually and/or through the entities he ostensibly and actually controlled, including HSCI, and pursuant to tacit or explicit agreements with Honig,

Brauser, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices.  With respect to Company A, Stetson further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, knowingly or recklessly submitting materially false statements to brokers, and Company A's transfer agent, relating to Honig's relationship to Company A.  With respect to Company C, Stetson further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making materially false and misleading Schedule 13G and Schedule 13D filings, concealing (with respect to his Schedule 13G filings) his control over Company C's management and policies, and (with respect to his Schedule 13D and 13G filings) his membership in a group with Honig, Brauser, O'Rourke and other affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another.  Stetson's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

200.    O'Rourke (acting individually and/or through the entities he controlled,

including ATG, and pursuant to tacit or explicit agreements with Honig, Brauser, Stetson and

other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A,

Company B and Company C in coordination with one another) violated Exchange Act Section

10(b) and Rule 10b-5 thereunder by, among other things, directly or indirectly, with scienter:

obtaining and exercising undisclosed control of the management and policies of Company A,

Company B and Company C; paying undisclosed compensation to writers and bloggers to write

enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock

price, and, on at least one occasion, writing and publishing his own materially false and

misleading article about Company C; and selling shares of each company into the market at

artificially high prices.  With respect to Company A, O'Rourke further violated Exchange Act

Section 10(b) and Rule 10b-5 thereunder by intentionally engaging through his entity, ATG, in

manipulative trading in Company A securities to mark the close on September 23, 2013, and

intentionally engaging in matched trading in Company A securities through his entity, ATG on

September 26, 2013.  O'Rourke further violated Exchange Act Section 10(b) and Rule 10b-5

thereunder by intentionally engaging, through ATG, in matched trading of Company C stock on

April 8, 2015.  O'Rourke further violated Exchange Act Section 10(b) and Rule 10b-5(b)

thereunder by writing and publishing a promotional article about Company C in which he

knowingly and falsely disclaimed any business relationship with Company C or that he had

received any compensation for writing the article, both material misstatements.  O'Rourke's

intentional or reckless failure to make timely and appropriate filings under Exchange Act Section

13(d) with respect to his and his group's holdings of Company B and Company C shares also

violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that

facilitated his scheme to defraud investors about his and his group's control of the management

and policies of, and the magnitude of their individual and collective investment in, both companies.

201.     Maza, pursuant to a tacit or explicit agreement with Honig, Brauser, Stetson and O'Rourke, with respect to Company A, violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by intentionally or recklessly omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies.  Maza further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly submitting materially false statements to Company A's transfer agent about Honig's relationship to Company A in connection with Honig's preparation to sell his Company A shares.

202.     By reason of the foregoing, Honig, Brauser, Stetson, O'Rourke, GRQ, Grander, HSCI and Maza, directly or indirectly, singly or in concert, violated, are violating, and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a)(1)-(3) of the Securities Act
### (Against Honig, Brauser, Stetson, O'Rourke, GRQ, Grander, HSCI and Maza)

203.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

204.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, Brauser, Stetson, O'Rourke, GRQ, Grander, HSCI and Maza, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, in the offer or sale of Company A, Company B, and/or Company C securities, have: (a) with scienter, employed devices, schemes, and artifices to defraud; (b)

knowingly, recklessly or negligently obtained money or property by means of any untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Company A, Company B and/or Company C.

205.    Honig (acting individually and/or through the entities he controlled, including GRQ and HSCI, and pursuant to tacit or explicit agreements with Brauser, Stetson, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices.  Honig further violated Securities Act Sections 17(a)(1) and (a)(3) by engaging in manipulative trading in the securities of Company A and Company B.  With respect to Company A, Honig also violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by, among other things, directly or indirectly, knowingly or recklessly, making materially false statements to brokers, and knowingly or recklessly submitting materially false attorney opinion letters to transfer agents, relating to his relationship to Company A, and subsequently sold shares in Company A by means of those false statements. With respect to Company B, Honig further violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly making materially false and misleading Schedule 13G filings,

concealing both his control over Company B's management and policies, as well as his membership in a group with Brauser, Stetson, O'Rourke and other affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another. With respect to Company C, Honig violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly making both a materially false and misleading Schedule 13G filing, and materially false and misleading Schedule 13D filings, concealing (with respect to his Schedule 13G filings) his control over Company C's management and policies, and (with respect to his Schedule 13D and 13G filings) his membership in a group with Brauser, Stetson, O'Rourke and other affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another. By means of Honig's false and misleading filings under Exchange Act Section 13(d) with respect to his stock ownership of Company B and Company C, Honig was able to acquire additional shares of both companies, and was able to sell his shares in the dump into artificially inflated trading volume and stock price. Alternatively, Honig violated Securities Act Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances. Honig's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies. Alternatively, Honig violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

206.      Brauser (acting individually and/or through the entities he controlled, including

Grander, and pursuant to tacit or explicit agreements with Honig, Stetson, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; and selling shares of Company A, Company B and Company C into the market into trading volume and at prices he knew or was reckless in not knowing were artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for and orchestrated. Brauser further violated Securities Act Sections 17(a)(1) and (a)(3) by engaging in coordinated trading in the securities of Company B.  With respect to Company B and Company C, Brauser further violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly making materially false and misleading Schedule 13G filings, concealing both his control over Company B's and Company C's management and policies through his agreement with Honig and other affiliates to acquire, hold, vote and/or dispose of Company B and Company C securities in coordination with one another, as well as his membership in a group with Honig, Stetson, O'Rourke and other affiliates pursuant to that agreement.  By means of Brauser's false and misleading filings under Exchange Act Section 13(d) with respect to his stock ownership of Company B and Company C, Brauser was able to acquire additional shares of both companies, and was able to sell his shares in the dump into an artificially inflated trading volume and stock price.  Alternatively, Brauser violated Securities Act Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.  Brauser's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B

and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material
omissions that facilitated his scheme to defraud investors about his and his group's control of the
management and policies of, and the magnitude of their individual and collective investment in,
both companies.  Alternatively, Brauser violated Securities Act Section 17(a)(3) by failing to use
the degree of care in this conduct that a reasonably careful person would use under like
circumstances.

207.     Stetson (acting individually and/or through the entities he ostensibly and
actually controlled, including HSCI, and pursuant to tacit or explicit agreements with Honig,
Brauser, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they
acquired in Company A, Company B and Company C in coordination with one another) violated
Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with
scienter: obtaining and exercising undisclosed control of the management and policies of
Company A, Company B and Company C; paying undisclosed compensation to writers and
bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading
volume and stock price; and selling shares of each company into the market at artificially high
prices.  With respect to Company A, Stetson also violated Securities Act Sections 17(a)(1), (a)(2)
and (a)(3) by knowingly or recklessly submitting materially false statements to brokers, and
Company A's transfer agent, relating to Honig's relationship to Company A, and Honig
subsequently sold shares in Company A by means of those false statements.  With respect to
Company C, Stetson violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or
recklessly making materially false and misleading Schedule 13G and Schedule 13D filings,
concealing (with respect to his Schedule 13G filings) his control over Company C's management
and policies, and (with respect to his Schedule 13D and 13G filings) his membership in a group

with Honig, Brauser, O'Rourke and other affiliates, pursuant to their agreement to acquire, hold,

vote and/or dispose of their shares in coordination with one another. By means of Stetson's false

and misleading filings under Exchange Act Section 13(d) with respect to his stock ownership of

Company C, Stetson was able to acquire additional shares, and was able to sell his shares into the

artificially inflated trading volume and stock price. Alternatively, Stetson violated Securities Act

Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct that a reasonably

careful person would use under like circumstances. Stetson's intentional or reckless failure to

make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and

his group's holdings of Company B and Company C shares also violated Securities Act Sections

17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about

his and his group's control of the management and policies of, and the magnitude of their

individual and collective investment in, both companies. Alternatively, Stetson violated

Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a

reasonably careful person would use under like circumstances.

208. O'Rourke (acting individually and/or through the entities he controlled,

including ATG, and pursuant to tacit or explicit agreements with Honig, Brauser, Stetson and

other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A,

Company B and Company C in coordination with one another) violated Securities Act Sections

17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and

exercising undisclosed control of the management and policies of Company A, Company B and

Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and

deceptive articles on each issuer to artificially boost trading volume and stock price, and, on at

least one occasion, writing and publishing his own materially false and misleading article about

Company C; and selling shares of each company into the market at artificially high prices. With respect to Company A, O'Rourke further violated Securities Act Sections 17(a)(1) and (a)(3) by intentionally engaging through his entity, ATG, in manipulative trading in Company A securities to mark the close on September 23, 2013, and intentionally engaging in coordinated trading in Company A securities through his entity, ATG, with another affiliate on September 26, 2013. O'Rourke further violated Securities Act Sections 17(a)(1) and (a)(3) by intentionally engaging, through his entity, ATG, in matched trading of Company C stock with another affiliate on April 8, 2015. O'Rourke also violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by writing and publishing a promotional article about Company C in which he knowingly and falsely disclaimed any business relationship with Company C or that he had received any compensation for writing the article, both material misstatements, and O'Rourke, and his entity, ATG, subsequently sold shares in Company C by means of those false statements. Alternatively, O'Rourke violated Securities Act Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances. O'Rourke's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies. Alternatively, O'Rourke violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

209.    Maza, pursuant to a tacit or explicit agreement with Honig, Brauser, Stetson and O'Rourke, with respect to Company A, violated Securities Act Sections 17(a)(1), (a)(2) and

(a)(3) by intentionally or recklessly omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies. Maza further violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly submitting materially false statements to Company A's transfer agent about Honig's relationship to Company A in connection with Honig's efforts to remove the restrictive legends from his Company A shares, and Honig subsequently sold shares in Company A by means of those false statements. Alternatively, Maza violated Securities Act Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

210.     By reason of the foregoing, Honig, Brauser, Stetson, O'Rourke, GRQ, Grander, HSCI and Maza, directly or indirectly, singly or in concert, violated, are violating, and, unless restrained and enjoined, will continue to violate Sections 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)-(3)].

### THIRD CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against Ford, Ladd and Keller)**

211.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

212.     By engaging in the acts and conduct described in this Complaint, Defendants Ford, Ladd and Keller, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have made untrue statements of material

facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

213.     Ford violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, knowingly or recklessly making material misstatements in the articles Honig and his affiliates paid him to write about Company A and Company C, including that he was not being paid by anyone other than *Seeking Alpha*.

214.     Ladd violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, knowingly or recklessly authoring and issuing Company B's May 9, 2016 press release in which he made materially false statements about the sale of Cybersecurity Innovator's former company to Intel.  Ladd further violated Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly failing to disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company B's management and policies, in Company B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed.

215.     Keller violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, intentionally or recklessly omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies.  Keller further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making materially false statements to Ford – which he knew (or was reckless in not knowing) were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.

216.     By reason of the foregoing, Ford, Ladd and Keller, directly or indirectly, singly

or in concert, violated, are violating, and, unless restrained and enjoined, will continue to violate

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R.

§ 240.10b-5(b)].

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**Violations of Section 17(a)(2) of the Securities Act**
**(Against Ford, Ladd and Keller)**

</div>

217.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 194 of this Complaint.

218.     By engaging in the acts and conduct described in this Complaint, Defendants

Ford, Ladd and Keller, knowingly, recklessly or negligently, directly or indirectly, singly or in

concert, by use of the means or instruments of transportation or communication in interstate

commerce, in the offer or sale of Company A, Company B and/or Company C securities, have

obtained money or property by means of any untrue statements of a material fact or omitted to

state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading.

219.     Ford violated Securities Act Section 17(a)(2) by, among other things,

knowingly, recklessly or negligently making material misstatements in the articles Honig and his

affiliates paid him to write about Company A and Company C, including that he was not being

paid by anyone other than *Seeking Alpha*.

220.     Ladd violated Securities Act Section 17(a)(2) by, among other things,

knowingly, recklessly or negligently authoring and issuing Company B's May 9, 2016 press

release in which he made materially false statements about the sale of Cybersecurity Innovator's

former company to Intel.  Ladd further violated Section 17(a)(2) by knowingly, recklessly or

negligently failing to disclose the true extent of the stock ownership of Honig, Brauser, Stetson,

<div align="center">80</div>

O'Rourke and other affiliates, and their collective control over Company B's management and policies in Company B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed.  By means of those false statements, Ladd, along with Honig, Brauser, Stetson and O'Rourke, sold shares in Company B.

221.     Keller violated Securities Act Section 17(a)(2) by, among other things, intentionally, recklessly or negligently omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies.  Keller further violated Securities Act Section 17(a)(2) thereunder by knowingly, recklessly or negligently making materially false statements to Ford – which he knew (or was reckless or negligent in not knowing) were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.  By means of those false statements, Honig, Brauser, Stetson and O'Rourke sold shares in Company A.

222.     By reason of the foregoing, Ford, Ladd and Keller, directly or indirectly, singly or in concert, violated, are violating, and, unless restrained and enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## FIFTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Against SCI and ATG)

223.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

224.     By engaging in the acts and conduct described in this Complaint, Defendants SCI and ATG, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the

facilities of a national securities exchange, in connection with the purchase or sale of Company
A, Company B and/or Company C securities, have: (a) employed devices, schemes, or artifices
to defraud; or (b) engaged in acts, practices, or courses of business which operated or would
operate as a fraud or deceit upon any person.

225.    SCI, acting through its owner, Stetson, and pursuant to tacit or explicit
agreements with Honig, Brauser, O'Rourke and other affiliates to acquire, hold, vote and/or
dispose of shares they acquired in Company A, Company B and Company C in coordination
with one another, violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) by, among
other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of
the management and policies of Company A, Company B and Company C; and selling its shares
into the market into trading volume and at prices it knew or was reckless in not knowing were
artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for
and orchestrated.  SCI's intentional or reckless failure to make timely and appropriate filings
under Exchange Act Section 13(d) with respect to its and its group's holdings of Company B and
Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as
material omissions that facilitated the scheme to defraud investors about the group's control of
the management and policies of, and the magnitude of their individual and collective investment
in, both companies.

226.    ATG, acting through its owner, O'Rourke, and pursuant to tacit or explicit
agreements with Honig, Brauser, Stetson and other affiliates to acquire, hold, vote and/or dispose
of shares they acquired in Company A, Company B and Company C in coordination with one
another, violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) by, among other things,
directly or indirectly, with scienter: obtaining and exercising undisclosed control of the

management and policies of Company A, Company B and Company C; and selling its shares into the market into trading volume and at prices it knew or was reckless in not knowing were artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for and orchestrated. With respect to Company A, ATG further violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) by intentionally engaging in coordinated trading in Company A securities to mark the close on September 23, 2013, and intentionally engaging in manipulative trading in Company A securities on September 26, 2013. ATG further violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) by intentionally engaging in manipulative trading of Company C stock on April 8, 2015. ATG's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to its and its group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated the scheme to defraud investors about the group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

227.     By reason of the foregoing, SCI and ATG, directly or indirectly, singly or in concert, violated, are violating, and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## SIXTH CLAIM FOR RELIEF
### Violations of Sections 17(a)(1) and (a)(3) of the Securities Act
### (Against SCI and ATG)

228.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

229.     By engaging in the acts and conduct described in this Complaint, Defendants

SCI and ATG directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, in the offer or sale of Company A, Company B, and/or Company C securities, have (a) with scienter, employed devices, schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Company A, Company B and/or Company C.

230.    SCI, acting through its owner, Stetson, and pursuant to tacit or explicit agreements with Honig, Brauser, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another, violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; and selling its shares into the market into trading volume and at prices it knew or was reckless in not knowing were artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for and orchestrated.  Alternatively, SCI violated Securities Act Section 17(a)(3) because SCI, acting through Stetson, failed to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.  SCI's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to its and its group's holdings of Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated the scheme to defraud investors about the group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.  Alternatively, SCI, acting through Stetson, violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person

would use under like circumstances.

231.     ATG, acting through its owner, O'Rourke, and pursuant to tacit or explicit
agreements with Honig, Brauser, Stetson and other affiliates to acquire, hold, vote and/or dispose
of shares they acquired in Company A, Company B and Company C in coordination with one
another, violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or
indirectly, with scienter:  obtaining and exercising undisclosed control of the management and
policies of Company A, Company B and Company C; and selling its shares into the market into
trading volume and at prices it knew or was reckless in not knowing were artificially inflated by
promotional articles that Honig had directly or indirectly secretly paid for and orchestrated.
Alternatively, ATG violated Securities Act Section 17(a)(3) because ATG, acting through
O'Rourke, failed to use the degree of care in this conduct that a reasonably careful person would
use under like circumstances.  With respect to Company A, ATG further violated Securities Act
Sections 17(a)(1) and (a)(3) by intentionally engaging in coordinated trading in Company A
securities to mark the close on September 23, 2013, and intentionally engaging in manipulative
trading in Company A securities on September 26, 2013.  ATG further violated Securities Act
Sections 17(a)(1) and (a)(3) by intentionally engaging in manipulative trading of Company C
stock on April 8, 2015.  ATG's intentional or reckless failure to make timely and appropriate
filings under Exchange Act Section 13(d) with respect to its and its group's holdings of
Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as
material omissions that facilitated the scheme to defraud investors about the group's control of
the management and policies of, and the magnitude of their individual and collective investment
in, both companies.  Alternatively, ATG, acting through O'Rourke, violated Securities Act
Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful

person would use under like circumstances.

232.     By reason of the foregoing, SCI and ATG, directly or indirectly, singly or in

concert, violated, are violating, and, unless restrained and enjoined, will continue to violate

Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)].

<u>SEVENTH CLAIM FOR RELIEF</u>
**Aiding and Abetting Violations of Section**
**10(b) of the Exchange Act and Rules 10b-5(a) and (c)**
**(Against Ladd and Keller)**

233.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 194 of this Complaint.

234.     By engaging in the acts and conduct described in this Complaint, Defendants

Ladd and Keller directly or indirectly, singly or in concert, provided knowing and substantial

assistance to Honig, Brauser, Stetson and O'Rourke, and others, who, directly or indirectly,

singly or in concert with others, in connection with the purchase or sale of a security, with

scienter, used the means or instrumentalities of interstate commerce or of the mails or of a

facility of a national securities exchange to (a) employ devices, schemes, or artifices to defraud;

and (b) engage in acts, practices, or courses of business which operated or would operate as a

fraud or deceit upon others.

235.     Ladd provided knowing and substantial assistance to Honig's, Brauser's,

Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act, and Rules

10b-5(a) and (c), as alleged above in the First Claim for Relief, by, among other things,

authoring and issuing Company B's May 9, 2016 press release in which he made materially false

statements about the sale of Cybersecurity Innovator's former company to Intel.  Ladd provided

further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and

others' violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) by

knowingly or recklessly failing to disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company B's management and policies, in Company B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed.

236.     Keller provided knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c), as alleged above in the First Claim for Relief, by, among other things, omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company A's management and policies.  Keller provided further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) by making materially false statements to Ford – which he knew were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.

237.     By reason of the foregoing, Ladd and Keller, aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting, Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## EIGHTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Sections 17(a)(1) and (a)(3) of the Securities Act
### (Ladd and Keller)

238.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

239.    By engaging in the acts and conduct described in this Complaint, Defendants Ladd and Keller directly or indirectly, singly or in concert, provided knowing and substantial assistance to Honig, Brauser, Stetson, O'Rourke and others, who, directly or indirectly, singly or in concert with others, in the offer or sale of a security, used the means or instruments of transportation or communication in interstate commerce or used the mails to (a) with scienter employed devices schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Company A or Company B.

240.    Ladd provided knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act, as alleged in the Second Claim for Relief above, by, among other things, authoring and issuing Company B's May 9, 2016 press release in which he made materially false statements about the sale of Cybersecurity Innovator's former company to Intel.  Ladd provided further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act by knowingly or recklessly failing to disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company B's management and policies, in Company B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed.

241.    Keller provided knowing and substantial assistance to Honig's, Brauser's, Stetson's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act, as alleged in the Second Claim for Relief above, by, among other things, omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company A's management and policies.

Keller provided further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act by making materially false statements to Ford – which he knew were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.

242.     By reason of the foregoing, Ladd and Keller, aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting Honig's, Brauser's, Stetson's and O'Rourke's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

<div align="center">

**NINTH CLAIM FOR RELIEF**
**Violations of Section 9(a)(1) of the Exchange Act**
**(Against Honig, Brauser, O'Rourke and ATG)**

</div>

243.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

244.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, Brauser, O'Rourke and ATG, directly or indirectly, singly or in concert, by use of the mails or the means or instrumentalities of interstate commerce, or of a facility of a national securities exchange for the purpose of creating a false or misleading appearance of active trading in Company A, Company B and/or Company C securities, or a false or misleading appearance with respect to the market for Company A, Company B and/or Company C securities, entered an order or orders for the purchase and/or sale of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time and substantially the same price, for the sale and/or purchase of such security, had been or would be entered by or for the

same or different parties.

245.     Honig violated Section 9(a)(1) of the Exchange Act by, among other things, engaging with scienter, through the Barry & Renee Honig Foundation, which he controlled, in matched trading of Company A shares on September 26, 2013.  Honig further violated Section 9(a)(1) by engaging with scienter in matched trading of Company B shares on May 9, 2016 with Brauser and another associate.

246.     Brauser violated Section 9(a)(1) of the Exchange Act by, among other things, engaging with scienter, in matched trading of Company B shares with Honig and another associate on May 9, 2016.

247.     O'Rourke, through ATG, and ATG violated Section 9(a)(1) of the Exchange Act by, among other things, engaging with scienter in matched trading of Company C shares on April 8, 2015.

248.     By virtue of the foregoing, Honig, Brauser, O'Rourke and ATG violated, and, unless restrained and enjoined, will continue violating Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)].

## TENTH CLAIM FOR RELIEF
### Violations of Section 9(a)(2) of the Exchange Act
### (Against Honig, O'Rourke and ATG)

249.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

250.     By engaging in the acts and conduct described in this Complaint, Defendants Honig, O'Rourke and ATG, directly or indirectly, singly or in concert, by use of the mails or the means or instrumentalities of interstate commerce, or of a facility of a national securities exchange effected, alone or with one or more other persons, a series of transactions in the

securities of Company A and/or Company B creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

251.      Honig violated Exchange Act Section 9(a)(2) by, among other things, intentionally entering dozens of small buy and sell orders of Company B shares on the morning of May 9, 2016 for the purpose of creating actual or apparent active trading in Company B shares for the purpose of inducing the purchase of Company B shares by other market participants.

252.      O'Rourke, through ATG, and ATG violated Exchange Act Section 9(a)(2) by, among other things, intentionally placing a bid at the end of the trading day on September 23, 2013 to buy Company A shares at a price significantly higher than the prior buy order in order to give the market the false impression that Company A's share price was moving higher.

253.      By virtue of the foregoing, Honig, O'Rourke and ATG violated, and, unless restrained and enjoined, will continue violating Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

## ELEVENTH CLAIM FOR RELIEF
### Unregistered Offering or Sale of Securities in Violation of Sections 5(a) and (c) of the Securities Act
### (Against Honig, Brauser and Grander)

254.      The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

255.      By engaging in the acts and conduct described in this Complaint, Defendants Honig, Brauser and Grander, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer or sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation,

securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.  The shares of Company A that Honig, Brauser and Grander offered and sold as alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

256.     Honig violated Securities Act Sections 5(a) and (c) with respect to his offer and sale of Company A shares, by, among other things, selling Company A shares into the public market from September through December 2013 while no registration statement was in effect for any of the sales, and no exemption from registration was available.

257.     Brauser and the entity he controlled, Grander, violated Securities Act Sections 5(a) and (c) with respect to his and/or its offer and sale of Company A shares, by, among other things, selling Company A shares into the public market from September through December 2013 while no registration statement was in effect for any of the sales, and no exemption from registration was available.

258.     By reason of the foregoing, Honig, Brauser and Grander have violated, and, unless restrained and enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## TWELFTH CLAIM FOR RELIEF
### Violations of Section 13(d) of the Exchange Act and Rule 13d-1(a)
### (Against Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI)

259.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

260.     Pursuant to Exchange Act Section 13(d)(1) and Rule 13d-1(a) thereunder, persons who directly or indirectly acquire beneficial ownership of more than 5% of a Section 12-registered class of equity securities are required to make a Schedule 13D filing, or, in limited

circumstances, a Schedule 13G filing. Section 13(d)(3) states that "act[ing] as a . . .  group" in furtherance of acquiring, holding, voting and/or disposing of equity securities is enough to establish the group as a single "person." When a group is required to make a Schedule 13D filing, that group must "identify all members of the group."

261.     Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander and SCI acquired and held beneficial ownership of more than 5% shares in Company B from on or about October 8, 2015 through at least on or about May 20, 2016, and collectively controlled the management and policies of that company throughout this period.  Each of them acquired, held, voted and/or disposed of those shares pursuant to an agreement among them to do so.

262.     Honig, Stetson and HSCI acquired and held beneficial ownership of more than 5% shares in Company C from on or about February 2014, and collectively controlled the management and policies of that company from that time.  Each of them acquired, held, voted and/or disposed of those shares pursuant to an agreement among them to do so.

263.     Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI acquired and held beneficial ownership of more than 5% shares in Company C from on or about April 2015 through at least on or about December 2015, and collectively controlled the management and policies of that company throughout this period.  Each of them acquired, held, voted and/or disposed of those shares pursuant to an agreement among them to do so.

264.     Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI were each under an obligation to file with the Commission true and accurate reports with respect to their ownership of the Company B and Company C securities, and failed to do so, thereby violating Exchange Act Section 13(d) and Rule 13d-1(a) thereunder.

265.     By reason of the foregoing, Honig, Brauser, Stetson, O'Rourke, ATG, GRQ,

Grander, HSCI and SCI violated, and, unless enjoined and restrained, will continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

<div align="center">

### THIRTEENTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 13(a) of the Exchange Act and
Rules 12b-20 and 13a-1 (Against Ladd)**

</div>

266.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194 of this Complaint.

267.     By engaging in the acts and conduct described in this Complaint, Company B violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1 [17 C.F.R. § 240.13a-1(a)] thereunder, which require issuers of registered securities under the Exchange Act to file annual reports on Form 10-K with the Commission that, among other things, do not contain untrue statements of material fact or omit to state material information necessary in order to make the required statements, in the light of the circumstances under which they are made, not misleading.

268.     Ladd aided and abetted Company B's violation of Exchange Act Section 13(a) and Rule 12b-20 and 13a-1 thereunder, by, among other things, providing knowing and substantial assistance to Company B's filing of a materially false and misleading annual report in signing its 2015 Form 10-K that failed to disclose the group ownership of Company B stock by Honig, Brauser, Stetson, O'Rourke and others.

269.     By reason of the foregoing, Ladd aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting, Company B's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1(a) thereunder [17 C.F.R. § 240.13a-1(a)], in violation of Section 20(e) of the Exchange Act [15

<div align="center">94</div>

U.S.C. § 78t(e)].

<div align="center">

**FOURTEENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 15(d) of the Exchange Act and**
**Rule 15d-1 (Against Maza and Keller)**

</div>

270.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 194 of this Complaint.

271.     By engaging in the acts and conduct described in this Complaint, Company A

violated Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17

C.F.R. § 240.15d-1], which require issuers of registered securities under the Securities Act to file

annual reports on Form 10-K with the Commission that, among other things, do not contain

untrue statements of material fact or omit to state material information necessary in order to

make the required statements, in the light of the circumstances under which they are made, not

misleading.

272.     Maza and Keller aided and abetted Company A's violation of Exchange Act

Section 15(d) and Rule 15d-1 thereunder, by, among other things, providing knowing and

substantial assistance to Company A's filing of a materially false and misleading annual report in

signing its 2012 amended Form 10-K that failed to disclose the group ownership of Company A

stock by Honig, Brauser, Stetson and other affiliates.

273.     By reason of the foregoing, Maza and Keller aided and abetted, and, unless

restrained and enjoined, will continue aiding and abetting, Company A's violations of Section

15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17 C.F.R. §

240.15d-1], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## FIFTEENTH CLAIM FOR RELIEF
### Violations of Section 17(b) of the Securities Act
### (Against Ford)

274.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 194 of this Complaint.

275.     By engaging in the acts and conduct described in this Complaint, Defendant

Ford directly or indirectly, singly or in concert, by use of the means or instruments of

transportation or communication in interstate commerce, or by the use of the mails, in the offer

or sale of Company A and/or Company C securities, has published, given publicity to, or

circulated any notice, circular, advertisement, newspaper, article, letter, investment service, or

communication which, though not purporting to offer a security for sale, described such security

for a consideration received or to be received, directly or indirectly, from an issuer, underwriter,

or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration

and the amount thereof.

276.     Ford violated Securities Act Section 17(b) by, among other things, obtaining

compensation directly or indirectly from Honig, Brauser, Stetson and/or O'Rourke – each a

statutory underwriter of Company A and Company C – and/or from certain of Honig's,

Brauser's, Stetson's and/or O'Rourke's associates– for writing the promotional articles he

published on Company A and Company C without disclosing his receipt or the amount of that

compensation.

277.     By reason of the foregoing, Ford, directly or indirectly, violated, is violating,

and, unless restrained and enjoined, will continue to violate Section 17(b) of the Securities Act

[15 U.S.C. § 77q(b)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief, in a Final Judgment:

### I.

Finding that Defendants violated the federal securities laws and rules promulgated thereunder as alleged against them herein;

### II.

Permanently restraining and enjoining Honig, Brauser, Grander, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

### III.

Permanently restraining and enjoining Honig, Brauser, Stetson, O'Rourke, Ladd, Maza, Keller, Ford, ATG, GRQ, Grander, HSCI and SCI, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### IV.

Permanently restraining and enjoining Ford, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)];

## V.

Permanently restraining and enjoining Honig, Brauser, O'Rourke and ATG, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

## VI.

Permanently restraining and enjoining Honig, Brauser, Stetson, O'Rourke, Ladd, Maza, Keller, Ford, ATG, GRQ, Grander, HSCI and SCI, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## VII.

Permanently restraining and enjoining Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)];

## VIII.

Permanently restraining and enjoining Ladd, his respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and

abetting future violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules

12b-20 [17 C.F.R. § 240.12b-20] and 13a-1 thereunder [17 C.F.R. § 240.13a-1];

## IX.

Permanently restraining and enjoining Maza and Keller, their respective agents, servants,

employees and attorneys and all persons in active concert or participation with them, who

receive actual notice of the injunction by personal service or otherwise, and each of them, from

aiding and abetting future violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]

and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1];

## X.

Permanently barring Ladd, Maza and Keller from acting as an officer or director of a

public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## XI.

Permanently prohibiting all Defendants from participating in any offering of penny stock

pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the

Exchange Act [15 U.S.C. § 78u(d)(6)].

## XII.

Ordering Defendants to disgorge all of the ill-gotten gains from the violations alleged in

this complaint, and ordering them to pay prejudgment interest thereon;

## XIII.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d)(2) of the

Securities Act [15 U.S.C. § 77t(d)(2)] and Section 21(d)(3) of the Exchange Act [15 U.S.C.

§78u(d)(3)]; and

## XIV.

Granting such other and further relief as this Court deems just and proper.

### **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury as to all issues so triable.

Dated: March 8, 2019
     New York, New York

By:    *Sanjay Wadhwa*

    Sanjay Wadhwa
    Michael Paley
    Charu Chandrasekhar
    Nancy Brown
    Katherine Bromberg
    Jon Daniels
    Attorneys for Plaintiff
    SECURITIES AND EXCHANGE COMMISSION
    New York Regional Office
    200 Vesey Street, Suite 400
    New York, New York 10281-1022
    (212) 336-1023 (Brown)
    Email: BrownN@sec.gov

# Exhibit C

**SANJAY WADHWA**
**SENIOR ASSOCIATE REGIONAL DIRECTOR**
**Michael Paley**
**Charu Chandrasekhar**
**Nancy Brown**
**Jack Kaufman**
**Katherine Bromberg**
**Jon Daniels**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-1023 (Brown)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
**SECURITIES AND EXCHANGE COMMISSION,**   :
     :
     **Plaintiff,**   :
     :     **18 Civ. 8175 (ER)**
   **– against –**   :
     :     **ECF CASE**
**BARRY C. HONIG, ROBERT LADD,**   :
**ELLIOT MAZA, BRIAN KELLER,**   :
**JOHN H. FORD, GRQ CONSULTANTS, INC.**   :     **SECOND AMENDED**
**and HS CONTRARIAN INVESTMENTS, LLC,**   :     **COMPLAINT**
     :     **AND JURY DEMAND**
     **Defendants.**   :
-------------------------------------------------------------------x

     Plaintiff Securities and Exchange Commission ("Commission"), for its Second Amended

Complaint against Defendants Barry C. Honig ("Honig"), Robert Ladd ("Ladd"), Elliot Maza

("Maza"), Brian Keller ("Keller"), John H. Ford ("Ford"), GRQ Consultants, Inc. ("GRQ"), and

HS Contrarian Investments, LLC ("HSCI") (collectively, "Defendants"),[1] alleges as follows:

---

[1]      Since the filing of the First Amended Complaint (DE 105), Defendants Michael Brauser
("Brauser"), Grander Holdings, Inc. ("Grander"), John R. O'Rourke ("O'Rourke"), ATG Capital
LLC ("ATG"), John Stetson ("Stetson"), and Stetson Capital Investments Inc. ("SCI") have each
consented to the entry of final judgments against them in this case. (DE 224-229.) As such, they

# SUMMARY OF ALLEGATIONS

1.     This case involves a series of highly profitable "pump-and-dump" schemes

involving the stock of three public companies, "Company A," "Company B" and "Company C."

At the center of all three schemes were Defendants (and former Defendants)[2] Honig, Brauser,

Stetson and O'Rourke, as well as some combination of their entities, Defendants GRQ and HSCI

and former Defendants, Grander, SCI and ATG.  In all three schemes, these Defendants amassed

a controlling interest in the issuer, concealed their control, drove up the price and trading volume

of the stock through manipulative trading and/or paid promotional activity, and then dumped

their shares into the artificially inflated market on unsuspecting retail investors.

2.     Across all three schemes, Honig was the primary strategist, calling upon other

Defendants to, among other things, acquire or sell stock, arrange for the issuance of shares,

negotiate transactions, and/or engage in promotional activity.  In each scheme, Honig and some

combination of Brauser, Stetson and O'Rourke (and often other individuals), either explicitly or

tacitly agreed to acquire, hold, vote and/or dispose of their shares in coordination with one

another.  Once Honig and his associates had secured substantial ownership of the issuer, they

acted as an undisclosed control group.  Honig and/or other members of the particular investor

group, with the knowledge and consent of the other group members, directed the issuer's

management for their benefit, including orchestrating transactions designed to create market

are no longer Defendants in this action.  Defendants Honig (DE 152), GRQ (DE 151), Keller
(DE 113), Maza (DE 110), Ford (DE 28), and HSCI (DE 230) have each consented to entry of
partial judgments imposing certain injunctive relief against them, and leaving their respective
liability for monetary relief for further resolution.  The Commission, while including them as
named parties in this action, states no new charges against any of these Defendants in this
Second Amended Complaint.

[2]      Unless otherwise expressly noted, the terms "Defendants" and "Defendant" in this
Second Amended Complaint refers to both current and former Defendants in this case.

interest in the company or to solidify their control.

3.    Honig and his associates needed to create liquidity so they could sell their stock and profit from their investments in Company A, Company B and Company C.  To accomplish this goal, in each scheme, Honig and his associates would arrange and pay for the promotion of the relevant stock by directing Ford or a similar promoter to write favorable and materially misleading articles about the company whose trading volume and stock price they wanted to inflate.  In several instances, to magnify the intended boost to the trading volume and stock price that would follow a promotional article's release, Honig, O'Rourke and ATG and their associates engaged in pre-release manipulative trading to generate a misleading picture of market interest in the company's stock.

4.    Honig and his associates had to conceal their plan to promote and dump stock for each scheme to work.  They accomplished this concealment by, among other things, evading their reporting obligations under the federal securities laws and ensuring that the executives of Company A, Company B and Company C did not accurately report Defendants' collective control.

5.    Specifically, Honig, Brauser, Stetson and O'Rourke, as well as certain of their entities and other associates, violated provisions of the federal securities laws that require individuals and groups who hold more than a five percent ownership interest in a publicly traded company to notify the Commission and inform the investing public by filing a form that accurately reflects their ownership interest and that of all members of any group in which they are a member.  Honig, Brauser, Stetson, O'Rourke, their entities and certain of their associates failed to make their required disclosures while acting as a group in the acquisition, holding, voting and/or disposition of their shares in Company B and Company C.  They also failed

appropriately to disclose their intention to exercise (and their actual exercise of) control over Company B and Company C.

6.      Defendants Maza (Company A's CEO), Keller (Company A's Chief Scientific Officer and a director) and Ladd (Company B's CEO), acted separately at the direction of Honig and his confederates to take steps beneficial to the respective Honig-led group at the expense of each company's public shareholders, and signed public filings they knew, or were reckless in not knowing, to be false, to hide the respective group's beneficial ownership and existence.

7.      Maza and Keller signed Company A's public filings, in which they knowingly or recklessly failed to disclose that Honig, Brauser, Stetson, their affiliates, and/or their respective entities, owned shares of Company A as a group.  Company A's filings similarly failed to disclose the size of each member of the Honig group's holdings and thereby concealed the extent of their control over the company from other shareholders and the public.  Similarly, Company B's CEO, Ladd, signed false public filings, making material omissions about Honig's, Brauser's, Stetson's, O'Rourke's, their associates' and their respective entities' group ownership.

8.      All told, the three schemes earned Defendants and their associates millions of dollars:  Company A's pump and dump generated approximately $9.3 million in stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities, and affiliates.  Company B's pump and dump generated more than $9.5 million for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities, affiliates, and/or certain frequent co-investors.  And, most recently, the pump and dump of Company C brought in over $8.3 million in stock sales proceeds for Honig, Brauser, Stetson, O'Rourke, certain of their respective entities and/or certain frequent co-investors.  These profits were made at the expense of investors who purchased shares in Company A, Company B and Company C at artificially high prices based on

misleading flattering articles or coverage in the media and matched trades that were orchestrated by the Defendants.

9.     In addition to his other violations alleged herein, Defendant Ladd (i) in May 2016, violated the stock sale registration requirements of the federal securities laws by engaging in unregistered sales of Company B stock – for which no registration exemption existed – in accounts held both in his own name and in the names of two immediate family members, "Relative A" and "Relative B" (collectively, the "Relatives"); (ii) in 2015 and 2016, as CEO of Company B, repeatedly violated the stock purchase and sales reporting requirements of the federal securities laws – and anti-fraud provisions – by failing to file with the Commission required public reports and fully and accurately disclosing his purchases and sales of Company B stock in his own account, and by filing false SEC Forms 144 regarding stock sales in his and his Relatives' accounts; and (iii) from 2012 to 2016, repeatedly violated the beneficial ownership reporting requirements of the federal securities laws by failing to file with the Commission required public reports regarding material changes in his beneficial ownership of Company B stock.

## **VIOLATIONS**

10.     By virtue of the conduct alleged herein, each of the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws as follows:

11.     Honig violated:

- Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

5

- Sections 9(a)(1) and (a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") [15.U.S.C. §§ 78i(a)(1) and (a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

12.    Brauser violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

13.    Stetson violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

14.    O'Rourke violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

15.     Ladd violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] and by aiding and abetting Company B's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1 thereunder [17 C.F.R. § 240.13a-1];

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 13(d) of the Exchange Act, [15 U.S.C. § 78m(d)], and Rule 13d-2 thereunder [17 C.F.R. § 240.13d-2]; and

- Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)], and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3].

16.     Maza violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

17.     Keller violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and

- Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], and by aiding and abetting Company A's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o], and Rule 15d-1 thereunder [17 C.F.R. § 240.15d-1].

18.     Ford violated:

- Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

- Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]; and

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

19.     ATG violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

20.    GRQ violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

21.    HSCI violated:

- Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

22.    Grander violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

23. SCI violated:

- Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)];

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

- Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

24. The Commission seeks final judgments permanently enjoining Defendant Ladd from violating the federal securities laws; requiring each of Defendants Ladd, Honig, GRQ, Keller, Maza, Ford, and HSCI to disgorge his or its ill-gotten gains and to pay prejudgment interest on those amounts; requiring Defendants Ladd, Honig, GRQ, Keller, Maza, Ford, and HSCI to pay civil monetary penalties; barring Defendants Ladd and Maza from participating in future penny stock offerings; barring Defendants Ladd and Maza from serving as officers or directors of publicly traded companies; and seeking any other relief that the Court deems just and appropriate.

25. Unless Defendants Ladd and Maza are permanently restrained and enjoined as requested herein, they each will again engage in the acts, practices, and courses of business set forth in this Complaint, or in acts and transactions of similar type and object.

## JURISDICTION AND VENUE

26. The Commission brings this action pursuant to the authority conferred by Sections 20(b) and (d) of the Securities Act [15 U.S.C. §§ 77t(b) and (d)], and Sections 21(d) and

(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

27.     This Court has jurisdiction over this action pursuant to Sections 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77v(a) and 77v(c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

28.     Venue lies in this district pursuant to Sections 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77v(a) and (c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York. Among other things, at all relevant times, Company B's principal place of business was in Harrison, New York, within this District, and certain Defendants solicited investments in securities from investors in this District and sold securities through a broker-dealer located in this District.

## THE DEFENDANTS

### Individual Defendants

29.     **Honig**, born in 1971, is a resident of Boca Raton, Florida and, at all relevant times, worked at an office in Boca Raton with Stetson and O'Rourke. Honig owns GRQ. Honig also owns a majority stake in HSCI, as to which Stetson is the named managing member. Honig was also the president and one-third owner of Southern Biotech, Inc. ("Southern Biotech"), a now-dissolved Nevada entity.

30.     **Maza**, born in 1955, is a resident of New York, New York. He was the CEO of Company A from June 2011 to January 2014. He is a CPA licensed in New York, as well as an attorney licensed in New York.

31.     **Keller**, born in 1956, is a resident of California. He was Chief Scientific Officer

of Company A from about March 2011 to January 2014, and was a member of its board of

directors.  He currently works as President of Sales and Senior Vice President of Research and

Development at Company A's successor company.

      32.     **Ladd**, born in 1958, is a resident of Raleigh, North Carolina.  At all relevant

times, he was a resident of Chappaqua, New York.  According to Company B Commission

filings, Ladd is currently the CEO and a director of Company B, and he has served as its  CEO

since February 10, 2011 (except for the following time periods: November 2016 through August

2017; and September 10, 2018 through April 30, 2019).

      33.     **Ford**, born in 1956, is a resident of Bolinas, California.

    **Entity Defendants**

      34.     **GRQ** is a Florida corporation owned and operated by Defendant Honig and for

which Honig makes investment decisions.  Its principal place of business is in Florida.  GRQ was

incorporated in or around 2004.

      35.     **HSCI** is a Delaware corporation incorporated in 2011.  Its principal place of

business is in Florida.

    **Previously Charged but Fully Settled Individual and Entity Defendants**

      36.     **Brauser**, born in 1956, is a resident of Lighthouse Point, Florida.  He owns

Grander, and owned one third of Southern Biotech.

      37.     **Stetson**, born in 1985, is a resident of Fort Lauderdale, Florida and, at all relevant

times, worked at an office in Boca Raton with Honig and O'Rourke.  Stetson owns SCI, and has

a minority investment in HSCI, of which he is the named managing member.

      38.     **O'Rourke**, born in 1985, is a resident of Fort Lauderdale, Florida and, at all

relevant times, worked at an office in Boca Raton with Honig and Stetson.  O'Rourke owns

ATG.

39.   **ATG** is a Florida corporation owned and operated by Defendant O'Rourke and for which O'Rourke makes investment decisions.  Its principal place of business is in Florida. ATG was incorporated in or around 2012.

40.   **Grander** is a Florida corporation owned and operated by Defendant Brauser and for which Brauser makes investment decisions.  Its principal place of business is in Florida. Grander was incorporated in or around 2010.

41.   **SCI** is a Florida corporation owned and operated by Defendant Stetson and for which Stetson makes investment decisions.  Its principal place of business is in Florida.  SCI was incorporated in or around 2011.

## OTHER RELEVANT PERSONS AND ENTITIES

42.   **Company A** is a Delaware corporation headquartered in Georgia.  It was incorporated in Nevada in 2006.  Company A was controlled by Honig and Brauser between March 2011 and early 2014.  The company filed periodic reports, including Forms 10-K and 10-Q with the Commission.  Company A's stock was quoted on OTC Link (formerly known as the "Pink Sheets"), an electronic interdealer quotation system operated by OTC Markets Group, Inc. In early 2014, Company A engaged in a reverse merger with a company associated with Honig and his associates.  The successor company is currently quoted on OTC Link.  At all relevant times, Company A's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)], and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

43.   **Company B** is a Delaware corporation headquartered in Durham, North Carolina, formerly headquartered in Harrison, New York, and was incorporated in 2000.  At all relevant times, its common stock was registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and it is now registered under Exchange Act Section 12(g) [15 U.S.C. 78l(g)].  It files periodic reports, including Forms 10-K and 10-Q with the Commission.

Company B's common stock was listed on NYSE-MKT from 2007 until its October 19, 2016 delisting.  Its stock is currently quoted on OTC Link.

44.    **Company C** is a Delaware corporation headquartered in San Diego, California, and was incorporated in 1988.  At all relevant times, Company C's common stock was registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)], and it was listed on NASDAQ from August 2016 until July 11, 2018, when it was suspended and later delisted.  Company C's common stock is currently quoted on OTC Link.  At relevant times, Company C's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

45.    **Investor 1** was a frequent co-investor with Honig and other Defendants.  He is a large shareholder, CEO and Chairman of a public company (referred to herein as **"Investor 1 Company"**), trustee and indirect beneficiary of a trust (referred to herein as **"Investor 1 Trust"**) and president of a limited liability company (referred to herein as **"Investor 1 Group"**), and he sometimes used Southern Biotech to co-invest with Honig and Brauser.  He enjoys a reputation as a successful biopharmaceutical investor and has a substantial following among retail investors.

46.    **Affiliate 1** occasionally works at Honig's office in Boca Raton.  Affiliate 1 was a frequent co-investor with Honig, Brauser, Stetson and O'Rourke, investing in at least 36 issuers alongside Honig (and/or a Honig entity) from 2011 through August 2018, either individually, or through his entity, "**Affiliate 1 Entity**." Affiliate 1 invested in each of Company A, Company B and Company C alongside Honig, Brauser, Stetson and O'Rourke.

47.    **Affiliate 2** is a foreign corporation and hedge fund that invested alongside Honig in many issuers since 2011.  Affiliate 2 invested in Company A alongside Honig, Brauser,

Stetson and O'Rourke.

48.  **Southern Biotech** was a Nevada corporation that Stetson incorporated at Honig's direction in 2014.  It was dissolved in 2017.  Honig was listed as the sole officer and president.  Southern Biotech was co-owned by Honig, Brauser, and Investor 1.  It made investments in multiple public companies, often in addition to investments each co-owner made separately.  At Honig's direction, with Brauser's knowledge and approval, and Stetson's help in executing the investment, Southern Biotech made investments in Company C.

## BACKGROUND

49.  "Pump-and-dump" schemes typically have two parts.  In the first, the fraudsters acquire a large amount of stock at little or no cost whereupon a promotion scheme is implemented to boost the price of the stock or create trading volume by stimulating market interest with false or misleading statements about the company.  Once the stock price and trading volume have been pumped up, fraudsters move on to the second part, in which they dump their large holdings of the stock into the public market at an enormous profit for themselves.  After these fraudsters dump their shares and stop hyping the stock, the price typically falls, trading volume dries up, and investors lose their money.  Critical to the success of such a scheme is disguising the fact that the fraudsters beneficially own and control a large amount of the unrestricted stock which, if known to investors and market participants, would inform investors that control persons of the company were dumping their stock.

50.  The federal securities laws are designed to ensure transparency by requiring that investors be provided with timely, accurate information about companies and persons who own large amounts of company stock and thus are in a control relationship with the company.  The Securities Act and the Exchange Act have several provisions designed to ensure that companies,

their officers, and large shareholders provide the marketplace with adequate information about their holdings and their purchases and sales of their companies' stock.  For example, when a person or group of persons acquires beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of the Exchange Act, such person (colloquially known as a Section 13(d) filer) or group is required to make a filing under Exchange Act Section 13(d) with the Commission.  When a group of persons agrees to act together to acquire, sell, vote or hold more than 5% in the aggregate of any issuer's stock, they must each file a disclosure, even if their individual ownership is below 5%.  When their holdings materially change, Section 13(d) and Rule 13d-2 thereunder, [17 C.F.R. § 240.13d-2], require that Section 13(d) filers make an amended Schedule 13D filing to update the market about the change in their holdings.  These disclosure provisions are intended to alert the company's stockholders and the marketplace to changes in securities ownership that indicate potential for changes in control of the company.

51.     That kind of disclosure obligation is imposed on issuers, as well.  Exchange Act Section 13(a) requires all issuers whose securities are registered pursuant to Exchange Act Section 12 (such as Company B) to file periodic reports with the Commission, and Exchange Act Rule 13a-1 requires such issuers to file annual reports – *i.e.,* a "Form 10-K."  Exchange Act Regulation S-K at Item 10 sets out the information that must be disclosed in both Forms S-1 (Registration Statements) and 10-K.  17 C.F.R. § 229.10(a).  Item 403 of Regulation S-K, in turn, requires issuers to provide a table listing:

> any person (including any "group" as that term is used in section 13(d)(3) of the Exchange Act) who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities.

17 C.F.R. § 229.403(a).  Thus, potential investors reading an issuer's Form 10-K or registration

statement on Form S-1 can expect to see a table describing all persons – and all "groups" of persons – who beneficially own more than 5% of Company B's stock.  Officers who sign public filings on behalf of their companies have a duty to ensure their completeness and accuracy.

52.      The federal securities laws require disclosure about the holdings of company officers and directors, too.  Exchange Act Section 16(a) and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3] require periodic reporting by officers and directors of their purchases and sales of their company's stock.  As reflected in the legislative history of the enactment of Exchange Act Section 16(a), "the most potent weapon against the abuse of inside information is full and prompt publicity."  H.R. Rep. 73-1383, at 13, 24 (1934).  Disclosure of an insider's purchases and sales gives investors an indication of the insider's private opinion as to the prospects of the company.

53.      The registration provisions of the Securities Act are also designed to ensure that investors have key information when the company or its control persons seek to sell securities. Companies are generally required to disclose important financial information in a registration statement filed with the Commission, which is available to the public.  When participants in a pump-and-dump scheme sell large blocks of stock to the investing public without registering the transaction, the offer or sale of that stock can violate the registration requirements of the Securities Act.

54.      Fraudulent promotion or manipulative trading used to pump the company's stock price and trading volume can violate the antifraud provisions of the Securities Act and the Exchange Act.  For example, fraudsters may use online newsletters, bulletin boards, or social media to disseminate false and misleading statements to the public in order to encourage investors to purchase their undisclosed stake at inflated prices.  Promoters may falsely claim to offer independent, unbiased recommendations in newsletters and other touts when they stand to

17

profit from convincing others to buy or sell certain stocks – often, but not always, penny stocks. Fraudsters frequently use this ploy with small, thinly traded companies because it is easier to manipulate a stock when there is little or no information available about the company, and where fraudsters can obtain control of a substantial portion of the company's unrestricted shares. To help investors evaluate a stock promotion, promoters are required to disclose any compensation they receive from an issuer, underwriter or dealer for touting a security in any media.

55.     In addition to false promotional pieces, fraudsters sometimes use matched trades to drive up the price of a security. Members of a scheme will trade shares between themselves, gradually inflating the price. A rising stock price creates the false impression that there is investor demand for the security, and thus serves to encourage other investors to buy. If the fraudsters have disguised their ownership and control of securities being traded, investors are deceived into believing that the matched trades are by outside market participants seeking to invest in the company. For this reason, the Exchange Act prohibits entering an order for the purchase or sale of a security with knowledge that an order or orders of substantially the same size, at substantially the same time and substantially the same price, for the sale or purchase of a security, had been or would be entered.

56.     Collectively, these and other provisions of the federal securities laws protect investors from pump-and-dump schemes and ensure that investors understand who is controlling a company and whether any large shareholders have amassed a position that will allow them to control or influence the company and its securities. When these required disclosures are evaded or issued in a misleading fashion, investors are deprived of material information about an issuer.

## FACTS

**A. Overview of Honig's, Brauser's, Stetson's and O'Rourke's Pattern of Investments**

**1. The Partnership Among Honig, Brauser, Stetson and O'Rourke**

57.    Honig, Brauser, Stetson and O'Rourke, individually or through their entities, invested alongside one another in at least 19 issuers at or about the same time, from 2011 to the present.  While this action concerns three of those issuers, in most cases in which Honig, Brauser, Stetson and O'Rourke co-invested, the investments followed a pattern:  Honig or Brauser would identify a target company and arrange a financing or financings that would give them and their chosen co-investors (including Stetson and O'Rourke, among others) a controlling position in the company's outstanding common stock at lower-than-market prices. Honig, Brauser, Stetson and O'Rourke would then exercise that control by dictating terms of the company's material management decisions and policies, and voting together to direct the company's major business decisions.  When the group determined that the time had arrived to exit the investment, they would engineer a publicity-generating event that would both drive the price of the stock higher, and also create market demand and trading volume that would allow them to sell their positions.  Typically, Honig, Brauser, Stetson and O'Rourke would dictate some kind of transaction for management to undertake – for example, an acquisition or merger, or a new investment by a well-known investor, like Investor 1 – and paid writers, bloggers or other public relations professionals to write about it.  Once the publicity had its intended effect on the stock's price and trading volume, Honig, Brauser, Stetson, O'Rourke and the other hand-picked co-investors would sell their respective positions – generally staggered over a course of weeks – into the artificially inflated market.

58.    Throughout these stages, Honig, Stetson and O'Rourke were in nearly daily

contact because they worked out of the same office and were in frequent email and telephone
contact, at times purposefully moving their conversations to the less permanent medium of text
or instant messaging. Honig, Stetson and O'Rourke were each in frequent contact with Brauser,
with whom they shared office space until late 2013.

59. Honig, Brauser, Stetson and O'Rourke obtained their interests in these issuers at
the same time, and agreed to act as a group in holding, disposing and voting the stock they
acquired, with Honig leading the combined effort. As O'Rourke put it in a February 3, 2014
email to the officer of a potential merger target, "Barry Honig is the principal investor of our
small group." Honig carefully controlled his "small group's" participants in the financings he
arranged so that shares were held only by individuals and entities that (1) permitted Honig to
direct how they voted their shares and/or acquiesced in Honig's control of the management of
the company, and (2) refrained from selling their shares until the optimal time for group
members to profit from the planned post-pump dump.

60. Honig worked with Stetson to ensure that members of his groups voted their
shares in unison. At times, members of the group reached out to Stetson to find out how they
should vote on various proposals. For example, with respect to one of the issuers in which they
had co-invested, in July 2015, Brauser forwarded an email request from a co-investor's staffer to
Stetson, asking whether to vote for or against a proposal. Stetson, in an email that same day,
copying Honig, replied, "Yes, vote 'For.'" In a November 2016 email to members of a Honig
group of investors in another issuer, Stetson responded to a request for "instructions to vote"
with "[v]oting in favor of [two named directors]. Against all other members and actions."

61. While Honig was the primary architect of the three schemes detailed below, email
traffic among Honig, Brauser, Stetson and O'Rourke demonstrates the various key roles each of

these Defendants played in the typical Honig-led investment.

62.     Brauser is a long-time co-investor with Honig, investing (individually, through his
entity, Grander, or through family members' accounts) alongside Honig (and/or a Honig entity)
in more than 40 issuers between approximately 2011 and mid-2018.  From at least October 2010
to approximately 2013, Brauser rented an office with Honig at 4400 Biscayne Boulevard in
Miami, Florida.  Brauser's business association with Honig was sometimes noted by keen market
observers:  As early as 2013, a short seller published a report on a company in which the two had
invested and noted that a factor negatively affecting the value of the company's stock was the
CEO's close financial ties with "two serial stock promoters," whom it identified as Honig and
Brauser.

63.     For some of the issuers in which Brauser co-invested alongside Honig, Brauser
took an active role, at times directing the issuer's management, finding and negotiating
transactions for the issuer or bringing in additional investors.  In others – particularly while
Honig and Brauser worked through one of their periodic disputes about who owed whom money
– Brauser was content to let Honig direct the steps in the scheme; since Brauser had been closely
involved with respect to the other issuers in which he had co-invested with Honig, he was well-
familiar with the playbook, knew that Honig would follow it and understood that Honig would
signal to Brauser when it was time to sell his shares.

64.     Stetson shared office space with Honig and O'Rourke at all relevant times.
Individually, through his entity SCI, or through HSCI (the vehicle he nominally controlled),
Stetson invested alongside Honig (and/or a Honig entity) in more than 65 issuers between 2011
and August 2018.  In connection with most of these investments, Stetson executed Honig's
directions, managed the administrative aspects of the Honig group's investments, and performed

pre-investment due diligence.  For example, Stetson communicated with brokers to effect Honig's trades, deposited Honig's shares with brokers, communicated investment terms and wire instructions to investors Honig had lined up, tracked the ownership of each group member in a particular issuer, corralled shareholder votes from co-investors (and, in some cases, even told co-investors how to vote), prepared financial analysis of proposed investments and conveyed Honig's instructions to issuer management.  From 2012 to 2013, Stetson also frequently managed Honig's arrangements with Ford to write paid promotional articles about issuers in which Honig and his group had invested.

65.     O'Rourke shared office space with Honig and Stetson at all relevant times, beginning in 2012.  Through his entity, ATG, or individually, O'Rourke invested alongside Honig (and/or a Honig entity) in over 75 issuers between 2011 and August 2018.  Beginning in 2013, O'Rourke managed the Honig group's promotional efforts by working with writers and bloggers to publish favorable articles and posts about issuers the Honig group controlled.  He arranged for those writers to be compensated for their promotional pieces.  For example, in 2013 and 2014, O'Rourke compensated "Writer E" for writing positive promotional articles. O'Rourke made the payments through personal checks and/or sham stock purchases, designed to disguise the true purpose of the compensation.  O'Rourke knew, or was reckless in not knowing, that Writer E did not disclose these payments in the promotional pieces he published on these issuers.

66.     At times, and with Honig's knowledge and consent, or at his direction, O'Rourke wrote and published the promotional articles himself.  O'Rourke used a pseudonym for the byline and did not disclose his relationship to the issuer being promoted or the compensation Honig was paying him for the articles.

67.     In addition to his work with promoters and his own promotional activities, in at least one instance, O'Rourke took the lead in negotiating a transaction for Company B, in which he, Honig, Brauser and Stetson and/or certain of their entities had invested.  After about his first year with Honig, O'Rourke also began assisting Stetson with the administrative aspects of each group investment.

68.     Investor 1 invested alongside Honig (or a Honig entity) in several issuers from 2011.  For Honig and his co-investors, Investor 1's participation in a deal brought an aura of legitimacy, important publicity for the issuer, and – most helpful in creating market interest in the particular issuer – his substantial following among retail investors.  As a consequence, Honig and Brauser frequently sought to persuade Investor 1 to invest alongside them.  As Stetson put it in a 2015 email to the CEO of Company C, the "following of [Investor 1] is worth its weight and [sic] gold."

### 2.    Honig's Efforts to Conceal the Extent of His Investments

69.     Honig typically sought to conceal the size of his and his group's investments in issuers.  To that end, Honig set up various investment vehicles through which he could invest indirectly and surreptitiously.

70.     One such Honig investment vehicle was HSCI, a limited liability company that Honig and Stetson set up in 2011.  While Honig and Stetson named Stetson as HSCI's sole managing member, Honig controlled 94% of its membership interests and directed many of HSCI's investment decisions, including the size of the allocation HSCI would take in a particular financing, the timing of when HSCI would deposit shares or sell its position, and the brokers HSCI would use for its transactions.  For example, in a November 20, 2013 email, Honig directed Stetson to "convert, deposit and purchase [shares in a particular issuer]. . . from HS[CI]."  In a January 5, 2014 email, Honig directed Stetson to wire $1,700,000 from HSCI to

accounts at his broker and bank.  In a June 1, 2014 email in which Honig laid out a list of tasks

for Stetson, he directed Stetson to "change warrant to HS[CI].  Have HS[CI] buy it for $1000."

On June 17, 2014, Honig instructed Stetson to "wire out of hs[ci] and then get money wired bacl

[sic] to me."  In July 2015, Honig directed Stetson to transfer Honig's Company C shares and

those held by HSCI to an investment relations consultant he wanted involved in the promotion of

Company C.  And, more recently, in October 2016, Honig negotiated terms for an investment in

an issuer, which, according to an October 7, 2016 Honig email, included a "$650,000 investment

from me and or my assignees and I get 100,000 shares for due diligence and structuring fee."

Stetson had no part in the negotiations.  When the issuer sent the final deal documents, both the

subscription agreement, and the consulting agreement for "due diligence services" were in the

name of HSCI, and Stetson signed them both on behalf of HSCI.

71.     Honig treated HSCI as his own entity in other ways as well.  For example, Honig

directed Stetson to pay through HSCI certain of Honig's own expenses, including airfare, a

private jet rental, and a 2015 $75,000 payment to one of the boxers in the stable of professional

boxers Honig sponsored.

72.     Stetson understood that HSCI was Honig's investment vehicle.  When Honig

asked Stetson to list Honig's various positions in issuers, Stetson would reply with a list that

included HSCI's position.  But both Stetson and Honig worked to hide that fact from others.  In a

March 9, 2011 application to open a brokerage account for HSCI, where the questionnaire asked

Stetson for "a list of all principals and beneficial ownership percentage," Stetson failed to

identify Honig at all, writing, instead:  "John Stetson 100%."

73.     HSCI was not the only vehicle Honig used to conceal his investments.  Honig

used Southern Biotech as an entity through which he, Brauser and Investor 1 could each funnel

their investments in issuers, including Company C, thus shielding the size of their individual investments from disclosure. That Honig was using these vehicles to disguise the extent of his and others' investments was a goal he acknowledged in 2016 in connection with his efforts to set up yet another corporate investment vehicle. In a November 2016 email among Honig, O'Rourke and others, including Honig's brother, concerning the setup of a corporation as an investment vehicle, Honig agreed that "[t]he goal is to stop people from knowing what Barry invests in and avoiding them blogging on the Internet."

### 3. The Concealed Agreement with Stock Promoter Ford

74. Honig first met Ford in the summer of 2012 in San Francisco after having read articles Ford had written promoting investments in public companies. By 2012, Ford had developed an investor following for his reports on various issuers posted on the *Seeking Alpha* website, a popular investor forum. During their meeting, Honig asked Ford how much he was paid to write an article about a publicly traded company. Ford answered that his rate was $45,000 per article. Honig proposed that he could compensate Ford to write articles for his issuers by inviting him to participate in the private placement financings with his chosen group of investors that he negotiated with issuers. Ford understood the value of that opportunity since Honig hand-picked the investors invited to participate, the private placement shares were valued below market, and Honig's track record of "successful" investments meant that the shares Ford obtained would likely rise in value. Ford also understood that Honig's invitation to participate in his group of investors would be contingent on Ford's agreement to write favorable articles about issuers at Honig's, Stetson's and O'Rourke's requests. By the end of the meeting, Honig and Ford had agreed that Honig would secretly compensate Ford to write about companies that Honig introduced to him, and that Ford would not publicly disclose that compensation so that investors would believe Ford's articles to be the product of his independent analysis and free

25

from any conflict of interest.

75.     During their first meeting, Honig presented Ford with a riskless transaction that Ford understood was Honig's way of enticing Ford to participate in the scheme.  Honig proposed that Ford purchase securities of issuer S ("Issuer S") (an issuer in which Honig, Stetson and O'Rourke were also invested) in a private transaction with a designated third party, and then immediately sell the securities at a higher price to another designated party.

76.     Ford agreed to participate in the transaction and coordinated the specific details over email with Stetson in July 2012.  In an email on July 27, 2012, Stetson told Ford the amount of the purchase wires and the information Ford should put in the reference line for the purchase wires.  In that same email, Stetson informed Ford that a $125,000 wire had been deposited into Ford's account, even though Ford had yet to purchase the stock for which he was receiving the funds.  On August 7, 2012, Stetson sent Ford the purchase agreements for the Issuer S shares he had "purchased two weeks ago."  Ultimately, Ford earned profits of approximately $90,000.

77.     Pursuant to the agreement Ford and Honig reached in their summer 2012 meeting in California, Ford began writing articles at Honig's behest, with assistance initially provided by Stetson, and later by O'Rourke.  For example, in September 2012, Stetson arranged for Ford to conduct an interview for a promotional article Ford was writing on Investor 1 Company.  Also, in 2012, as described more fully below, at Honig's direction, Stetson arranged to sell some of his Company B shares at a discount to Ford in exchange for Ford writing two favorable articles about Company B.  Stetson knew, or was reckless in not knowing, that Ford was being compensated to write these articles, and that Ford was not disclosing the arrangement in the disclaimers he included with his posts.

78.     During the period 2012-2015, Ford wrote and published seemingly independent

articles about various companies in which Honig and his co-investors had an interest.  He did so
at Honig's direction – often communicated through Stetson or O'Rourke – and in return for the
right to participate in off-market securities transactions or Honig-led private placements.  He also
received at least $125,000 in cash payments during this period.  Honig structured the cash
payments to Ford to disguise their source by enlisting third-party Honig associates to enter into
sham consulting agreements with Ford, and funneling the payments to Ford through the
associates, ostensibly pursuant to those agreements.

79.     Ford communicated with Honig, Stetson and O'Rourke about the companies,
compensation, and articles.  Honig, Stetson and O'Rourke knew that Ford was writing the
favorable articles because he was being compensated for doing so, and all three knew that Ford
was not disclosing this compensation to the public readership; indeed, all three understood that if
Ford had disclosed that he was being paid, investors would have discounted the independence of
his analysis and would have been less likely to follow Ford's recommendations.

80.     Brauser, too, knew, or was reckless in not knowing, that Honig was paying Ford
to write promotional pieces without disclosing their arrangement.  For example, in November
2013, Honig copied Brauser and O'Rourke on an email outlining a promotional plan for Investor
1 Company, which included the publication of a Ford article.  Honig noted in this email that "we
are assisting" on the drafting of the "John Ford article."  In December 2013, O'Rourke sent
Brauser an email linking Ford's Investor 1 Company article, which did not disclose that Ford had
been paid to write it.  More basically, Brauser (like Stetson and O'Rourke) knew, or was reckless
in not knowing, that each participant in Honig private placement deals – Honig's "following" –
had been invited to participate in these private transactions in exchange for some value each
could bring to the deal, and that Ford was no different.  Brauser understood, for example, that

27

Investor 1 brought his retail investor following and reputation as a successful investor to provide liquidity when the participants wished to sell. Brauser knew that others, like Affiliates 1 and 2, brought needed cash and a willingness to follow Honig's directions on how to vote or when to sell. Because Honig was inviting Ford to participate in these transactions, Brauser knew, or was reckless in not knowing, that Ford was providing value to the group in authoring favorable articles on the issuers in which the group was invested.

81. Brauser, like Honig, Stetson and O'Rourke, also regularly followed news and articles written about the companies in which they were invested. As a result, each of them knew, or was reckless in not knowing, that Ford's promotional articles did not disclose his compensation arrangement with Honig.

## B. The Company A Scheme

### 1. *Honig and Brauser Obtain Control of Company A*

82. In the Company A scheme, Honig and Brauser generated approximately $9.3 million in proceeds for themselves and their co-investors by secretly paying for a misleading promotional campaign, engaging in manipulative trading, and then unlawfully selling Company A shares into the artificially inflated trading volume and stock prices that they had generated.

83. To acquire control of Company A, Honig and Brauser, acting with Investor 1, caused the company to issue shares to them, certain of their entities, and certain of their associates through a series of so-called "private investments in public equities," or "PIPE" financings.

84. In November 2010, Honig, along with his nominees, including Stetson and Affiliate 1, purchased one-third of a publicly traded shell company. In December 2010, Brauser and Investor 1 each purchased one-half of the remaining two-thirds of the company. Honig, Brauser and Stetson each disguised his role in the acquisition by purchasing the shares of an

28

intermediary entity that owned a majority of the shell company shares.  The shell company disclosed only the ownership interest of the intermediate entity in its public filings, allowing Honig, Brauser and Stetson to conceal their respective ownership interests.  Soon after they acquired the shell, Honig, Brauser and Investor 1 installed an associate of Investor 1 (the "Investor 1 Associate") as the sole director of the company.

85.     In late 2010, Honig and Brauser approached management of a private biotech company then in the business of manufacturing over-the-counter pharmaceutical products ("Company A Labs") with a proposal to take the company public.

86.     At the time, Company A Labs and Keller, its Chief Scientific Officer and a director, were working on developing a formulation using a patented technology called "Qusomes" that Company A Labs hoped to use in large-scale drug markets, but lacked funding to support its development.  Honig and Brauser promised Keller and the CEO of Company A Labs (the "Company A Labs CEO") that the public company deal would include raising $11-$13 million to support research and development ("R&D") of the Qusomes technology.

87.     On "Honig, Brauser, [Investor 1] Group" letterhead, Brauser sent Company A Labs management a Letter of Intent in late January 2011, and Company A Labs management countersigned the agreement, as amended, on February 1, 2011.  Pursuant to that Letter of Intent, Company A Labs agreed to a reverse merger into the publicly traded shell controlled by Honig, Brauser and Investor 1.  Company A Labs CEO, Keller, and a research scientist employed by Company A Labs were each promised 6,650,000 shares of the newly created public company.

88.     The proposed merger of Company A Labs into the publicly traded shell hit a snag in March 2011.  Pursuant to a $3 million credit line Company A Labs had with a San Francisco community bank (the "Community Bank"), the Community Bank had authority to approve all

major transactions.  In a letter sent on March 14, 2011, it declined to approve the reverse merger, as well as the $2 million bridge financing contemplated to pay for that reverse merger, among other things.

89.     According to its letter, the Community Bank declined to approve the reverse merger for two reasons:  First, "[u]nder the proposed new transaction, persons who are not known to the Bank . . . would assume control of [Company A Labs]. . . ."  As its second reason, the Community Bank noted:

> The proposed acquisition creates enormous conflicts of interest.  There is substantial reason to believe that the resulting entity would act for the benefit of [the Honig investor group] as a whole, rather than the interests of [Company A Labs].

In conclusion, the Community Bank warned that if Company A Labs nonetheless proceeded with the transactions, they would constitute events of default, and the full amount owing under the credit line would become immediately due and payable.

90.     Despite these warnings, Company A Labs completed the reverse merger and the $2 million bridge financing.  The Community Bank thereafter sent a default notice.  After the merger, on September 8, 2011, Maza, who had been installed as the CFO and a director of the newly created Company A by Honig and Brauser, authorized the company to pay off the credit line.

91.     After the merger, Company A listed its corporate address at 4400 Biscayne Boulevard in Miami, the same business address then shared by Honig, Brauser and Investor 1.

92.     As a result of the reverse merger, Honig, Brauser and Investor 1 controlled the vast majority of Company A's outstanding shares.  In addition, Honig and Brauser, with the knowledge and approval of Stetson and other co-investors, also exercised control over the management of Company A.  After the merger, for example, Honig and Brauser, acting with the

30

knowledge and consent of Stetson and other co-investors, elevated Maza from CFO to CEO of

Company A. Thereafter, Maza sought approval from Honig, Brauser and sometimes Investor 1

for material business decisions. For example, at the direction of Honig and Brauser, Maza

agreed to divert funds from Company A to pay rent for the office of an unrelated entity co-

owned by Honig and Brauser, also located at 4400 Biscayne Boulevard. Maza also sought the

permission of Honig and Brauser to take on financing from outside sources. In one email to

Brauser on February 28, 2013, copying Honig, Maza reported that Honig and Investor 1 were on

board with the proposals from two separate lenders and sought Brauser's concurrence:

"[Investor 1] is OK if you're OK with it. Work for u?" Maza also sent Honig, Brauser and

Investor 1 updates at least every month providing details on business operations and business

opportunities, as well as seeking their approval for material business decisions. For example, in

June 2013, Maza sent Honig and Brauser, among others, a "business memo for your

consideration," which outlined "an approach to stabilize the company" and set out "priority

initiatives." In its first public filing after the merger, Company A disclosed that it had retained

new corporate counsel ("Issuer's Counsel") – the same firm as well as the same partner at that

firm ("Issuer's Counsel Partner") that Honig had insisted other issuers in which he was invested

retain.

       93.     In their capacity as two of the three board members of Company A, Keller and

Maza concealed Honig's and Brauser's control of Company A by signing off on public filings

that failed to disclose the involvement of Honig, Brauser, Stetson, and Affiliate 1, omissions that

made those filings materially misleading. At the time they signed these filings, Keller and Maza

understood that Honig and Brauser substantially controlled Company A's management, and not

Maza. As Keller explained in a February 12, 2012 email to a Company A colleague, "[t]he real

power is with Barry Honig and Mike Brauser.  Elliot [Maza] is just a mouth piece."  Following the merger, Company A's filings nonetheless identified only Investor 1, but not Honig, Brauser, or the group of Honig, Brauser, and others, including Stetson and Affiliate 1, as owning a greater than 5% interest in Company A.

94.     Post-closing, Honig and Brauser orchestrated a series of additional PIPE financings between March 2011 and June 2012 on very attractive terms for themselves, including debt convertible at pennies per share into millions of shares, and warrants for the cheap acquisition of even more shares.  Some of these financings allowed Company A to refinance debt it had amassed both in order to close the reverse merger into the public shell and as a result of defaulting on the Community Bank loan.

95.     Honig and Brauser failed to keep their promises to invest money in Company A for R&D.  Instead, they limited their personal investments to whatever minimum amount was necessary to keep Company A's business operating and to fund Maza's and Keller's generous compensation.  Keller's compensation substantially increased once he began working with Honig and Brauser, and Maza's annual compensation ranged from $300,000 to $600,000.  As a result of the failure to invest money and the high executive compensation payouts, however, Company A lacked funds for R&D, and it was forced to abandon its R&D efforts entirely by mid-2012.

96.     Honig and Brauser used the financings they orchestrated to amass more, ever-cheaper Company A shares for themselves and their associates.  Honig and Brauser also sold some of their convertible debt to their associates, including to Affiliate 1, on September 23, 2013, and to both Stetson and O'Rourke on October 3, 2013, giving them conversion rights to purchase Company A shares for $0.20 a share.  Although these financings did nothing to enhance Company A's continued growth, Maza and Keller went along with them.  Over the

course of their respective tenures at Company A, Maza and Keller received millions of shares of Company A stock.

97.     By April 1, 2013, and pursuant to their tacit or explicit agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig, Brauser and other co-investors, including Stetson, Investor 1 Company, Investor 1 Group and Investor 1 Trust, had amassed 28,153,845 shares, or almost 45% of the Company A shares outstanding, with Honig alone holding 5,542,654 shares, or 8.8% of the company's outstanding shares.  But Company A did not disclose the group's combined ownership.  On September 11, 2013, Stetson notified management that the beneficial ownership table should be amended to reflect Honig's substantial share ownership, and on September 12, 2013, Stetson provided Maza with the green light to file an Amended Form 10-K annual report for the 2012 fiscal year.  Nonetheless, even though Company A's September 13, 2013 Form 10-K/A, signed by Maza, Keller, and the Investor 1 Associate, disclosed that Company A's amendment was to update the beneficial ownership table, the annual report failed to disclose the existence of the Honig-allied group, which beneficially owned slightly less than half of Company A's outstanding shares.

98.     On July 16, 2012, Company A Labs' CEO – who had been ousted from Company A by Honig and Brauser – sued Company A, Honig, Brauser, Maza, and Investor 1, among other defendants, seeking, in part, the 6.65 million shares he had been promised, but which had never been delivered to him out of escrow.  Company A, acting at Honig's and Brauser's direction (on behalf of the Honig-led investor group), or with their consent, counter-sued the CEO.  In public filings about the suit, Company A represented that the CEO had breached his contract with the Company, and reported that the Company was seeking damages and cancellation of the escrowed shares.

99.     Brauser, who was not an officer or director of Company A, took the lead in
negotiating a settlement of the dispute with Company A Labs' CEO on behalf of Company A,
frequently updating Honig on his negotiations, and soliciting his views on settlement proposals
over email.  In September 2013, Brauser and Honig reached settlement terms with Company A
Labs' CEO, agreeing to pay him $2 million in return for his relinquishing his claim to the
Company A shares he had been promised, and that he had never received.  Maza ratified the
settlement terms on September 5, 2013.

### 2.     *The Company A Pump and Dump*

100.     In preparation for the Company A pump and dump, during August and
September, 2013, Stetson, at Honig's direction, deposited in a brokerage account almost 4
million Company A shares that had been issued to Honig.  Stetson worked closely with Honig
and Brauser and each of their brokers, Company A, and Company A's transfer agent to help
Honig and Brauser ready their Company A shares for sale into the public market.  Since part of
Stetson's role in working with Honig was to keep track of the amount of each associated
investor's holdings, and he had reviewed Company A's Form 10-K/A, setting out Honig's and
Brauser's ownership and the number of Company A's outstanding shares, Stetson knew, or was
reckless in not knowing, how much of Company A's stock Honig and Brauser controlled.
Stetson also knew, or was reckless in not knowing, that Honig and Brauser were directing
Company A's management and policies.

101.     Nonetheless, in connection with the deposit of Honig's shares, on at least two
occasions, on August 19 and August 30, 2013, Stetson submitted Honig's signed answers to the
broker's questionnaire that both he and Honig knew were false.  Honig's answers falsely denied
any relationship between him and Company A or its affiliates, and also falsely denied that Honig

was an affiliate.  At the time that Stetson made that submission, and Honig signed it, each knew, or was reckless in not knowing, that Honig was an affiliate of Company A because of the control Honig exerted over Company A.

102.    On September 6, 2013, Stetson was copied on the transmittal of false attorney opinion letters to Company A's transfer agent in order to remove restrictive legends from Honig's Company A share certificates.  These opinion letters were sought by Honig because both he and Stetson knew that removal of the restrictive legend was a necessary step in readying Honig's Company A shares for sale to the public.  Each of the letters contained the material misrepresentation that Honig was not an affiliate of Company A, a representation that Stetson and Honig knew, or were reckless in not knowing, was false, given what each knew about Honig's control over Company A.

103.    As part of the process for depositing Honig's shares with a broker – another necessary step, as Honig and Stetson knew, in selling Honig's shares to the public –  CEO Maza was also required to issue a representation letter concerning the stock certificates.  In a letter to the broker-dealer, dated September 10, 2013, Maza wrote "[w]e further acknowledge and agree that there is no other agreement or understanding between Barry Honig and [Company A] that would preclude Barry Honig from selling or otherwise disposing of shares represented above." Maza knew, or was reckless in not knowing, that this statement was false because Honig was an affiliate of Company A, and that, as an affiliate, Honig's ability to sell his Company A shares would be subject, under the federal securities laws, to volume limitations.

104.    Once the restrictive legends were lifted from Honig's shares and the shares were deposited into a brokerage account, Honig was ready to sell them.  In September 2013, Honig directed O'Rourke to reach out to Ford to arrange for him to post his purportedly independent

investment analysis of Company A on the *Seeking Alpha* website pursuant to the understanding Honig and Ford had reached in 2012.

105.    O'Rourke contacted Ford and proposed that Ford write a Company A article in exchange for Ford obtaining Company A shares at a below-market price.  At that time, Honig, Brauser, Investor 1, Investor 1 Company and other co-investors, including Stetson, owned about 45% of the outstanding Company A shares, and the market for Company A stock was virtually nonexistent (with zero trading volume on Friday, September 20, 2013).  O'Rourke instructed Ford to focus his article on Investor 1's involvement, and the supposed rosy prospects of Company A's R&D.

106.    On Monday, September 23, 2013, Honig and some associates began trading Company A shares to create the appearance of market activity and interest in Company A in advance of the planned Ford article.  That day, the trading volume of Company A shares soared to 302,000 from zero volume the previous trading day.

107.    The September 23rd trading also gave Honig a way to pay Ford surreptitiously for his upcoming favorable article on Company A.  On the morning of Friday, September 20, 2013, O'Rourke called Ford and told him to put in buy orders for Company A stock at $0.40 per share to ensure his order was executed against the corresponding sell order later placed by Honig. Because there was so little trading at that time in Company A shares, O'Rourke and Honig knew that Ford's bid would be hit by Honig on the following Monday, September 23, 2013.  In that transaction, Honig sold 180,000 Company A shares to Ford at $0.40 per share, a price well below the price at which these shares otherwise traded during that day.

108.    O'Rourke joined the trading at the end of the trading day on September 23rd to "mark the close," *i.e.,* to ensure that the last price of the day would be higher, giving the false

impression that Company A's share price was on an upward trajectory.  Specifically, at 3:58 p.m. that day, O'Rourke, through his entity ATG, placed a bid to buy Company A shares at $0.68 per share, a significantly higher price than the prior buy order at $0.55 per share, which had been entered at about 3:06 p.m.  Another Honig associate, who had purchased shares from Honig earlier in the day, placed a corresponding sell order to complete the transaction at the inflated price.

109.    In further preparation for the publication of the Ford article touting Company A, and to enhance the false picture of an active market for the stock, near the end of the trading day on September 26th, Honig and his associates engaged in a series of coordinated trades.  For example, the Barry & Renee Honig Charitable Foundation, controlled by Honig, sold Company A shares to a Honig associate at $0.68 per share, and two minutes later another entity affiliated with Honig executed a transaction against ATG, O'Rourke's entity, at $0.68 per share.

110.    Ford published his Company A article on the *Seeking Alpha* website less than half an hour before market close on September 26, 2013.  That article, touting Investor 1's investment in Company A, bore the title Honig and O'Rourke had supplied to Ford:  "[Investor 1 Company] and Its Billionaire CEO Invested in [Company A]."  In it, Ford presented a bullish outlook for Company A and concluded that "Company A should be trading for more than twice today's valuation."

111.    Keller reviewed Ford's Company A article prior to its publication, and knew, or was reckless in not knowing, that Ford was preparing a promotional article.  Ford's article included a question and answer interview of Keller, which O'Rourke had arranged earlier in September.  Ford quoted Keller touting the benefits of Company A's Qusomes technology.  Specifically, Ford quoted Keller's misleading statement that Company A had a formulation

ready for testing to be brought to the billion-dollar injectable drug market.  Yet, as Keller knew, as of summer 2012, Company A had shut down all R&D efforts without the successful formulation of an injectable drug and Company A had ceased all efforts to develop this technology in mid-2012.

112.    Ford's article was also materially false and misleading in failing to disclose that Ford had been compensated by Honig for writing the article through Honig's sale to him of below-market Company A shares on September 23.  Instead, Ford included a disclaimer that was itself false and misleading:  "I am long [Company A].  I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article."

113.    The market reacted strongly to the Company A promotion:  the trading volume of Company A stock rose from approximately 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013 and to more than 6 million shares on October 2, 2013. The share price increased from an average of about $0.48 during August 2013 to an intraday price of $0.97 on October 17, 2013.  Because many of the Defendants had acquired their shares so cheaply, they did not need to capture the immediate post-publication price jump in order to profit handsomely, and thus they sold their shares in transactions staggered over a three month period.  Staggering their sales over a longer period of time allowed them to avoid pushing the stock price lower and the scrutiny that might have resulted from the Honig group's simultaneous selling.

114.    Between the start of the manipulative trading on September 23, 2013 and December 31, 2013, Honig and his co-investors sold shares into the inflated market for proceeds

of approximately $9,350,000. Between September 23 and December 16, 2013, Honig sold

5,892,679 shares for proceeds of $3,416,455.17.

115.    To compensate O'Rourke for his work, including working with Ford on the

promotional piece, on October 4, 2013, Honig sold to O'Rourke's ATG one of Honig's

Company A notes, with a face value of $50,000, which O'Rourke immediately converted into

250,000 Company A shares. Despite the fact that Company A shares were trading at a price as

high as $0.58, pursuant to the terms of the Company A note he bought from Honig, O'Rourke

paid less than half that price at $0.20 a share when he converted through ATG. O'Rourke then

sold his ATG shares into the market at the much higher average price of about $0.59 per share

between September 26, 2013 and December 27, 2013.

### 3.    The Unlawful Distribution of Company A Shares by Honig and Brauser

116.    Honig and Brauser obtained the Company A shares directly from Company A or a

Company A affiliate in transactions not involving any public offering. Therefore, the Company

A shares these Defendants sold were restricted securities as defined in Securities Act Rule

144(a)(3)(i). No registration statement was in effect for any of the Company A stock sales by

Honig or Brauser in the September through December 2013 period. No exemption from

registration was available to either of them, or their entities, with respect to these shares.

117.    Honig and Brauser were also statutory underwriters under Securities Act Section

2(a)(11) because they acquired these securities from the issuer or an affiliate of the issuer with a

view to public distribution. As statutory underwriters, in order to resell the securities to the

public in reliance on Securities Act Section 4(a)(1), they were required to comply with the

applicable conditions of Securities Act Rule 144, which they did not.

118.    Each of Honig and Brauser, and their respective relevant entities, were under

common control with Company A, making each of these Defendants an affiliate of Company A under Securities Act Rule 144(a)(1). The beneficial ownership of almost 45% of the outstanding stock of Company A by Honig, Brauser and Grander, and other co-investors including Affiliate 1, Affiliate 1 Entity, Stetson, SCI, Investor 1 Company, Investor 1 Trust and Investor 1 Group, gave them collective control over the issuer – control they exercised as demonstrated by the active involvement of Honig and Brauser, with the knowledge and consent of Stetson, in the operations and promotion of Company A.

119.    As affiliates, Honig and Brauser did not comply with the conditions of Securities Act Rule 144 in connection with their distribution of Company A securities. Because Company A did not trade on a national securities exchange, as affiliates of Company A, these Defendants could only lawfully sell 1% of the company's total shares outstanding in any three-month period pursuant to Securities Act Rule 144(e). As of September 2013, Company A had approximately 69 million shares outstanding, and as of November 15, 2013, it had approximately 75 million shares outstanding. Honig and Brauser each sold shares in excess of 1% of the total outstanding shares during the September through December period.

### 4.    *Honig's, Brauser's, Stetson's and O'Rourke's Post-Promotion Use of Company A's Assets and Marketable Securities for Their Personal Benefit*

120.    After profiting on their sales of Company A stock into the inflated market they had created with their paid promotion, Honig, Brauser, Stetson and O'Rourke continued to use their control over Company A for their own enrichment. Throughout the period preceding the September 2013 pump and dump, behind the scenes Honig, Brauser, Stetson and O'Rourke conspired to sell Company A's assets to another issuer they controlled ("Company M").

121.    Each of Honig, Brauser, Stetson and O'Rourke had invested in Company M by

the fall of 2013.  Honig and another frequent co-investor each also held a lucrative consulting contract with Company M at least through July 2013.

122.    Honig and Brauser exercised influence over the management decisions of Company M.  Using that influence, Honig and Brauser arranged for Company M to make a $2,000,000 investment in Company A on August 26, 2013 through the purchase of a convertible promissory note with a one-year term and a 10% interest rate.  The terms of this note also included a warrant to purchase 10,000,000 Company A shares for either $0.40 per share or on a cashless basis in the event that the Company A shares were not registered.  Under Company A's analysis, the value of the warrant alone was almost $2,500,000, even without including the capacity for the conversion of the value of the note plus interest into shares, making this deal extraordinarily favorable to Company M at the expense of Company A shareholders.

123.    On November 12, 2013, after Honig, Brauser, Stetson and O'Rourke had sold Company A shares for millions of dollars, Company A announced that it would sell its assets, including its intellectual property and manufacturing facility, to Company M in return for 1,200,000 shares of Company M's stock.  Maza, Company A's titular CEO, did not learn of this extraordinary transaction until it was announced.

124.    With Company A now stripped of its assets and rendered a public shell, and less than two months after Ford had been compensated to laud Company A's prospects, Honig and Brauser arranged a reverse merger of Company A with a private company (the "Private Company") in which some of their close co-investor associates had a substantial ownership interest.  Under the terms of the merger agreement, Company A shareholders would own 40% of the newly combined entity and the owners of the Private Company would own 60% of the shares.

41

125.    On December 26, 2013, Company A filed a Form 8-K in which it disclosed a

conversion of notes held by Honig and Brauser into newly issued Company A common stock.

126.    On or about January 2, 2014, the reverse merger of Company A and the Private

Company closed.  Through that merger, Honig and Brauser were able to enhance the value of

their investments in Company A stock, which, pre-merger, had essentially become an investment

in a public shell.  Post-merger, the value of Honig's and Brauser's Company A stock was

supported by the newly acquired Private Company assets, and Honig and Brauser monetized

those investments in subsequent post-merger sales of their Company A shares to public market

investors.

### C.  The Company B Scheme

127.    During 2015 and 2016, Honig and his associates used Company B, once a

publicly traded shell, as another vehicle for their pump-and-dump schemes.  Honig and his

partners used many of the same tactics they had employed in the Company A scheme:  they

bought millions of cheap shares, intending to exercise control over the management and policies

of the company; exercised that control; orchestrated a misleading promotion of the company that

drove up the price and the trading volume of the company's shares; and dumped their shares for

a profit in the inflated market.  As with Company A, Company B engaged Issuer's Counsel as

company counsel.  Despite their control over various actions taken by Company B, and their tacit

or explicit agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig,

Brauser, Stetson and O'Rourke took numerous steps to conceal their involvement, and to

perpetuate the false appearance that the company was actually being controlled by its CEO.

### 1.    *Pre-2015 Investments in Company B by Honig, Brauser, Stetson and O'Rourke*

128.    By 2015, Company B was well-known to Honig, Brauser, Stetson and O'Rourke

– and they were well known to Company B's CEO Ladd – from an earlier pump and dump perpetrated by Honig and his associates in 2012-2013.

129.    In October 2012, Honig, Affiliate 1 and Stetson had purchased cheap Company B convertible preferred shares and 5 year warrants through a $4.5 million PIPE transaction.  Honig made the transaction contingent on Company B using $300,000 from the capital raise to promote Company B's stock, and required that the company segregate $2 million in cash.  As was Honig's practice, he dictated the group of investors who would join him, and notified Ladd in an October 11, 2012 email that Ford would be among them.

130.    Stetson, with the knowledge and consent of the Honig-led investor group, then enlisted Ford to write a promotional piece, published on the *Seeking Alpha* website on November 5, 2012, which touted Company B's prospects for providing a "2X near-Term Return," and predicting that Company B's stock could rise to $18 a share (nearly triple its price on the previous trading day).  Ford's promotional piece failed to disclose the compensation he had received from Honig, instead assuring investors that he was "express[ing] his own opinions," and was not "receiving compensation for it (other than from Seeking Alpha)."

131.    When, after Ford's piece was published, Company B's stock price failed to reach the level desired by the Honig-led group, Honig directed Stetson and/or O'Rourke to retain Ford to write another *Seeking Alpha* article on Company B.  At Honig's direction, in November 2012, Stetson sold Ford Company B shares and warrants at a discount in payment for Ford's planned articles on Company B.  Ladd knew that Ford held these shares, and had obtained them from someone who had participated in the PIPE transaction, because Ford was listed as one of the selling shareholders of Company B's stock in its November 30, 2012 Form S-3 Registration Statement, signed by Ladd.

132.     In his second *Seeking Alpha* article, published on April 11, 2013, Ford touted

Company B's imminent settlement of a patent enforcement action that would bring Company B a

substantial recovery.  Ford again predicted a significant stock price jump and again failed to

disclose that he had been compensated pursuant to his agreement with Honig.  Ladd knew that

Ford's prediction was false, since Company B's patent enforcement action was not on the brink

of settlement.  This time Ford's article had the desired effect, pushing Company B's share price

from $3.50 on April 10, 2013 to almost $4.50 on April 16, 2013, and increasing trading volume

significantly.  Company B's market capitalization went from under $16 million on April 10,

2013 to over $20 million on April 16, 2013.  Honig sold approximately 250,000 shares into the

inflated market, earning $967,224.

133.     Ladd was aware of the promotional efforts of the Honig-led group.  He even

agreed to be interviewed by Ford for the November 2012 *Seeking Alpha* article, and spoke to

Ford several times before the article's publication.  He also knew, or was reckless in not

knowing, that Ford had a connection to Honig and his group because he had been told that Ford

would be part of Honig's investment group in October 2012, and he received emails about Ford's

Company B investment from Stetson in early 2013.  Ladd knew that Ford's April 2013 article

had successfully boosted Company B's stock price.  And Ladd knew, or was reckless in not

knowing, that Ford was being compensated by Honig and his associates and that he was

concealing that fact from his *Seeking Alpha* readers in the April 2013 article, just as he had

concealed it in his November 2012 article.

134.     Honig, Stetson and O'Rourke also knew, or were reckless in not knowing, that

Ford's April 2013 article failed to disclose the compensation he was receiving from Honig.  They

each also knew, or were reckless in not knowing, that the article falsely claimed that Company B

44

was in settlement talks and on the brink of a lucrative settlement when it was not. Indeed, the only settlement Company B reached in its patent lawsuits was a single $100,000 recovery many months after the April 11, 2013 Ford article had been published.

### 2. *Honig and Associates Amass Company B Shares in 2015-2016*

135.    In 2015, Honig and his associates began planning a new scheme to pump and dump Company B's shares. At the time, Company B was running out of cash to continue its operations, and Ladd and the Board were discussing ways to keep the company going long enough to find a reverse merger partner who would be interested in Company B's clean balance sheet and listing on the NYSE-MKT. Honig set the scheme in motion on September 26, 2015 when he emailed Stetson: "We need to put together a term sheet for [Company B]. . . similar one to the [Company B] one we used the first time" and outlined proposed terms of an investment deal. The terms included specific provisions designed for Honig and his investor group to have access to shares quickly, warrants for more shares on favorable terms, and the ability to restrict Company B's ability to raise other funds.

136.    On September 27, 2015, Honig directed Stetson to send the proposal to Ladd, Company B's CEO. The deal contemplated the issuance of 2.8 million Company B shares, along with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker. This deal structure allowed the investors repeatedly to convert and sell their shares while appearing individually to stay below the 5% threshold ownership at which Exchange Act Section 13(d) required public disclosure of holdings. By ostensibly staying below the 5% ownership threshold, and evading the public reporting requirements, Honig and his associates increased the likelihood that they could conceal the millions of shares that they had amassed and thereby mask their scheme to pump up the Company B share price and trading volume in anticipation of a

profitable sell-off to unsuspecting investors.

137.    On October 1, 2015, Ladd emailed Honig that "NYSE MKT wants to know the buyers. $175,000 x 4 investors will be each at 4.9%. . . ." Honig replied that same day, copying Brauser and Stetson, that he would "get back to you with names shortly for now use Barry Honig Mike Brauser [and] OBAN [an LLC created by Stetson]." On October 5, 2015, Stetson provided Company B with the investors Honig had selected to participate in the financing, which included GRQ (Honig), Grander (Brauser), SCI (Stetson) and ATG (O'Rourke), as well as other Honig-approved investors. Over the next few days, Honig continued to negotiate the terms of his and his investors' deal with Ladd.

138.    Ladd obtained his Board's approval of the financing by touting Honig's "m.o." as being able to make "the share price go[] up." In an October 4, 2015 email to Company B's Directors, Ladd also told them that the company could "expect [Honig's] help in finding a reverse takeover candidate" for the company.

139.    The Honig-led financing ultimately provided $700,000 to Company B (the "October 2015 Company B Financing"). On October 8, 2015, Company B filed a Form 8-K with the Commission disclosing that the company had "entered into separate subscription agreements . . . with accredited investors . . . relating to the issuance and sale of $700,000 of units . . . ." The Form 8-K did not disclose the investors' identities, but acknowledged that the "investment was led by Barry Honig, a private investor and a specialist in corporate finance," and listed selected successful investments in microcap companies with which Honig had been associated.

140.    Ladd knew that Honig (through GRQ), Brauser (through Grander), Stetson (through SCI) and O'Rourke (through ATG) and other Honig affiliates were operating as a

46

group, that they had acquired Company B shares together, and that they were collectively exercising control over the company. In an email dated September 29, 2015 to Company B counsel, Stetson, Honig and Company B's CFO – and in his October 4, 2015 email to Company B's Directors – Ladd referred to the potential investors as an "investor group . . . led by Barry Honig," and attached a "term sheet" (to the September 29 email) that defined Honig as "Lead Investor." Similarly, in November 2015, Ladd wrote Honig: "As for the cap table, we have 17.2 million common shares outstanding, including **your group's** 2.8 million . . . ." (emphasis added). Ladd nonetheless failed to disclose Honig's, Brauser's, Stetson's and O'Rourke's combined interest in, and control over, the company in Company B's public filings.

141. By September 2015, Ladd was well versed in the requirements of Section 13(d). In connection with a 2014 proxy fight with another investor who sought to oust Ladd and seat new directors, Company B's CFO, writing on behalf of the company, accused that investor firm of violating Section 13(d) by failing to make appropriate Schedule 13D filings that disclosed the investor's affiliate relationship with another investor in Company B. In that July 3, 2014 letter, which Ladd reviewed and approved, the CFO called the omission a "concealment . . . of the ownership interests and trading activity of [the affiliate], not only to [Company B] . . . but to the SEC," and asserted that it "creates a materially misleading communication to [Company B's] stockholders."

142. In late November 2015, and in anticipation of Honig's delivery of a reverse takeover candidate that would boost Company B's stock price, Ladd began accumulating Company B stock in a newly-opened account at E*Trade. In opening that account, as detailed in paragraph 166 below, Ladd lied about his affiliation to Company B and failed to disclose his purchases, as required in a Form 4 filed with the Commission.

### 3. *The Company B Pump and Dump in February 2016*

143.    Having coordinated the accumulation of stock with Brauser, Stetson and O'Rourke, Honig, with his partners' knowledge and consent, then arranged for a promotion that included materially misleading information.

144.    On or around January 21, 2016, by which time Honig, Brauser, Stetson, O'Rourke and Affiliate 1 through Affiliate 1 Entity, had acquired at least 16.3% of Company B's outstanding stock, Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment for the promotion of Company B.  Shortly thereafter, the stock promoter paid a portion of the money he had received from Company B to a writer he instructed to publish a tout on Company B.  On February 3, 2016, the writer published his piece online.  In it, he described Company B's rosy prospects in social and "real money" gaming sites and intellectual property relating to slot machines. The article did not disclose that the author had been paid by Company B – at Honig's direction – to write the article.  After the article was published on February 3, 2016, there was a 7000% increase from Company B's previous day's trading volume, and an intraday price increase of over 60%.

145.    Honig, Ladd, Stetson and O'Rourke knew the promotional article was slated to appear, and each either knew, or was reckless in not knowing, that the article's author failed to disclose that he was being compensated by Company B to write it.  Honig, Ladd, Stetson and O'Rourke took advantage of the promotion's boost to Company B's stock price and trading volume and sold over 430,000 shares into this inflated market for proceeds of approximately $198,800.  Honig and GRQ sold 231,050 Company B shares between February 3 and April 6, 2016 for proceeds of $123,154.87.  Ladd sold 96,072 Company B shares for proceeds of $39,204.12.

#### 4. *The Company B Pump and Dump in May 2016*

146.     Honig soon identified a potential acquisition target for Company B that would give Honig and his associates another way to profit from their interest in Company B.  The proposed deal involved a well-known cybersecurity innovator who had created a popular antivirus software bearing his name (the "Cybersecurity Innovator").

147.     At Honig's direction (and with the knowledge and consent of Brauser and Stetson), O'Rourke took the lead in arranging a deal between Company B and the Cybersecurity Innovator.  On March 29, 2016, O'Rourke sent the Cybersecurity Innovator a term sheet for the asset purchase of Cybersecurity Innovator's company ("CI Company") by a "NYSE listed company."  After CI Company indicated interest on April 3, 2016, O'Rourke wrote to Honig on April 3, 2016 and asked Honig if he would "still want to pursue [Cybersecurity Innovator] deal."  Honig replied to O'Rourke that same day: "Yea!"  O'Rourke introduced Ladd to the Cybersecurity Innovator on April 4, 2016 to begin negotiating a transaction between Company B and the Cybersecurity Innovator's various business interests.

148.     Subsequent correspondence between Ladd and O'Rourke, and between O'Rourke and Honig, reflect the ongoing and significant role Honig and O'Rourke played in orchestrating the deal.  Company B and the Cybersecurity Innovator agreed to terms on May 8, 2016.

149.     On May 9, 2016, at 8:30 a.m., Company B issued a press release announcing its merger with CI Company, and attached it to a Form 8-K, signed by Ladd, filed that same day with the Commission.  The press release misleadingly described the Cybersecurity Innovator's prior financial success by falsely claiming that the Cybersecurity Innovator had "sold his anti-virus company to Intel for $7.6 billion," suggesting that Company B might achieve similar success.  Yet, as Ladd knew or was reckless in not knowing, the sale of the Cybersecurity

Innovator's namesake company to Intel at that price had occurred over a decade after the

Cybersecurity Innovator's departure from that company.

150.    Knowing that Company B's misleading announcement of the deal would be

disseminated later that morning, on May 9, 2016, Honig traded in Company B stock to create the

misleading appearance of an active market.  In pre-market trading that morning, Honig bought

and sold small quantities of Company B stock dozens of times.  In addition, and also during the

pre-market hours that morning, Honig engaged in matched trades with an associate in an effort to

artificially increase Company B's stock price.

151.    That same day, StockBeast.com, a well-known internet stock promotion website,

published an article by an unnamed author entitled "[Company B] Beastmode engaged –

[Cybersecurity Innovator] driving the Bus."  Ladd, through Company B, had paid

StockBeast.com for the article to ensure a wide distribution of the news of the impending merger

with the CI Company.  The StockBeast.com article touted Company B and highlighted the

Cybersecurity Innovator's involvement, proclaiming:  "This is big big big!"  It also repeated

Ladd's materially false claim contained in Company B's press release that the Cybersecurity

Innovator had "sold his startup company to Intel for $7.6BB."

152.    This promotion and Honig's manipulative trading on May 9 were effective in

driving up both Company B's trading volume and stock price: on May 6, 2016 (the last day of

trading prior to the promotion), Company B had trading volume of 71,005 shares and a closing

share price of $0.36.  On May 9, 2016, the stock closed at $0.49 (representing an increase of 34

percent over the prior day's close) with trading volume of more than 10 million shares.  The

trading volume for Company B stock peaked at 109,384,614 shares on May 17, 2016 with a

closing share price of $4.15.   Company B's market capitalization went from just over $8 million

on May 6, 2016 to over $95 million on May 17, 2016.

153.    In the days immediately following the announcement of the CI Company acquisition, Honig, Brauser, Stetson and O'Rourke, along with Affiliate 1, pursuant to their tacit or explicit agreement to acquire, hold, vote, and/or dispose of their shares in concert, sold over 9.2 million Company B shares.  In order to maximize their Company B profits, Honig, Brauser, Stetson and O'Rourke each negotiated with Ladd from May 10 to May 12, 2016 in order to exercise their warrants early, giving them more shares to sell into the inflated market.  Ladd facilitated this warrant exercise and Honig, Brauser, Stetson and O'Rourke were able to dump millions more shares than they otherwise could have.  Ladd joined them in selling shares during this period, capitalizing on the false publicity he had knowingly or recklessly helped to create. All told, Honig, Brauser, Stetson, O'Rourke, Ladd and Affiliate 1 grossed $9.4 million from their May 2016 sales into the inflated market.  Honig and GRQ sold 3,783,001 Company B shares between May 9 and May 20, 2016 for proceeds of $2,393,915.52.  Ladd sold 852,863 Company B shares between May 9 and May 31, 2016 for proceeds of $1,184,662.68, including shares he sold through his own accounts and through an account in the name of his Relatives.

154.    After successfully capitalizing on the promotions, Ladd purported to clarify his own false statements that had worked to create the market enthusiasm and that had pushed up the price and trading volume of Company B's stock.  In its May 23, 2016 Form 10-Q, signed by Ladd and filed with the Commission, Company B stated:  "[The Cybersecurity Innovator] founded [Cybersecurity Innovator's company] in 1987, which was acquired by Intel Corporation for $7.6 billion in 2010."  While the new disclosure omitted the prior false claim that the Cybersecurity Innovator had sold his company to Intel, the May 23 Form 10-Q failed to acknowledge the prior misstatement in the Company's May 9, 2016 Form 8-K and press release,

and failed to disclose that the Cybersecurity Innovator had left his company years prior to its
multi-billion dollar sale to Intel.  In any event, the purportedly clarifying disclosure came well
after the Honig-associated investors and Ladd himself had already profited from the misleading
press release.  By that time, Honig (GRQ), Brauser (Grander), Stetson (SCI), O'Rourke (ATG)
and Ladd, had already sold their Company B shares into the inflated market.

> **5.**      *False Statements by Honig, Brauser, Stetson, O'Rourke and Ladd in
> Beneficial Ownership Reports and Company B Filings*

155.    Although they were acting in concert, and pursuant to an agreement to do so,
Honig, Brauser, Stetson and O'Rourke knowingly or recklessly concealed their concerted efforts
from the investing public.  Ladd, with full knowledge of both the Honig investors' stock
ownership and their collective direction of the management and policies of Company B, also
kept their control a secret, signing Company B public filings that did not disclose the full extent
of their ownership or control.

156.    After the October 2015 Company B Financing closed, Honig, Brauser, Stetson
and O'Rourke collectively owned at least 1.7 million shares, or over 12% of the shares
outstanding (as reported in Company B's August 14, 2015 Form 10-Q) after the issuance, and
their obligation to file a Schedule 13D under Exchange Act Section 13(d) arose as of October 8,
2015.  Moreover, Honig, Brauser, Stetson and O'Rourke each had warrants to obtain a total of an
additional 3.4 million Company B shares, which, if they were all converted, would have resulted
in Honig, Brauser, Stetson and O'Rourke collectively controlling at least 36% of the total
common shares outstanding at that time.

157.    Honig, Brauser, Stetson and O'Rourke collectively exercised control over Ladd
and the management and policies of Company B.  For example, on October 1, 2015, Ladd asked
for and received Honig's direction with respect to how to disclose the Honig group's stock

acquisitions to the NYSE-MKT exchange. O'Rourke, at Honig's direction, negotiated on Company B's behalf the terms on which the Cybersecurity Innovator would sell CI Company to Company B. Indeed, in emails after the CI Company acquisition, Honig freely accepted credit for his role in the transaction. On May 12, 2016, for example, Honig received an email from an investment firm congratulating him on the recent transaction: "You're invovlved [sic] with [Company B]? Impressive!" Honig responded that he was the "[l]argest shareholder, funder and [had the] relationship with [the Cybersecurity Innovator]." In early August 2016, Honig celebrated his undisclosed role at Company B in a chat conversation with Stetson: "its great in [Company B] because we are behind the scenes."

158. Brauser, too, sought to keep his involvement behind the scenes, going so far as to lie about his relationship to Honig and Company B in a published interview. In a May 18, 2016 article in *Business Insider*, the author quoted Brauser and reported: "'I had no idea whatsoever about any deal at [Company B] or with [the Cybersecurity Innovator] . . . [G]ot lucky I guess' as to the moves at [Company B] since he has never had any contact with anyone at [Company B] or Ladd himself . . . [and] has had no contact with Honing [sic] regarding [Company B] or anything else in some time." In fact, as Brauser knew, Brauser had been in contact with Ladd by email on multiple occasions, including on October 1, 2015 in connection with Grander's investment in the October 2015 financing, and in connection with his attempt to convert his warrants into more Company B shares on May 10, 2016. And while the CI Company transaction was being negotiated, Brauser was in frequent contact with Honig about their co-investments, by phone and by email. Indeed, in a May 10, 2016 email between Brauser and Honig, Honig acknowledged his understanding that Brauser had recently sold $1,000,000 in Company B shares following the May 2016 promotion.

159.    Because they acted in concert to control the management and policies of Company B and pursuant to an agreement to acquire, hold, vote, and/or dispose of Company B shares in coordination with one another, each of Honig, Brauser, Stetson and O'Rourke was a member of a group and considered a single "person" under Exchange Act Section 13(d)(3).  As group members, each individual was required to satisfy the group's reporting obligation by making a Schedule 13D filing disclosing that each was a member of the group and disclosing the number of shares each of them beneficially owned.  However, none of Honig, Brauser, Stetson or O'Rourke ever made a Schedule 13D filing disclosing their respective ownership or membership in a group, acting intentionally to conceal from the market the size of their group's position and their coordination and thereby to deceive investors.

160.    Instead, on October 19, 2015, Honig filed a Schedule 13G, claiming only his own 6.59% beneficial ownership and falsely stating that the securities "are not held for the purpose of or with the effect of changing or influencing the control of the issuer" – a representation he knew, or was reckless in not knowing, to be false.  Indeed, because Honig and his associates exercised control over Company B's management and policies – as Honig candidly acknowledged in emails – he was disqualified from making a 13G filing.  In February 2016, Honig filed an amended Schedule 13G disclosing an ownership percentage of 9.1%.  Brauser filed a Schedule 13G on May 4, 2016, in which he claimed 7.4 % beneficial ownership via his entity Grander.  In each of these filings, Honig and Brauser also falsely claimed that they were passive investors without any intention to influence or change control of the company and omitted the fact that each was a member of a group.

161.    By October 2015, if not before then, Honig, Brauser, Stetson and O'Rourke all understood what their respective reporting obligations were under Exchange Act Section 13(d),

and that the information included in such filings was material to investors.  Indeed, a mere seven

months earlier, in February 2015, Honig and Brauser had filed a lawsuit in Harris County, Texas,

alleging that counter-parties had violated Exchange Act Section 13(d) by failing to make

requisite 13G filings for the more than 5% position they controlled as a group, and that that

failure constituted a material omission that defrauded Honig and Brauser in their purchase of

securities from those defendants.  In their Complaint in that lawsuit, *Brauser v. Sanders Morris

Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct.) (filed February 26, 2015), Honig and Brauser

alleged:

> [I]nformation regarding a significant beneficial ownership interest in [the issuer's
> stock] was material.  It is the kind of information that the SEC requires to be disclosed
> in connection with solicitations for mergers and in various other filings (*e.g.*,
> Schedules 13D and/or 13G) precisely because of its materiality.  Defendants' failure to
> disclose to plaintiffs their significant beneficial ownership interest in [the issuer] . . . is
> a material and materially misleading omission.  . . . Plaintiffs would not have
> purchased the Shares if they had known the undisclosed facts that [defendants]
> controlled such a large interest in [the issuer's] stock. . . .

162.    In email exchanges leading up to its filing, Honig and Brauser discussed drafts of

the Complaint, and circulated them to Stetson and O'Rourke – non-parties to the lawsuit –

seeking their comments.  Honig and Brauser also discussed with Stetson and O'Rourke each of

their respective understandings of the requirements imposed by Exchange Act Section 13(d).

Nonetheless, and despite their understanding of what Section 13(d) required them to disclose and

how and why those disclosures were material to investors, neither Honig, nor Brauser, Stetson or

O'Rourke made the requisite filings with respect to Company B.

163.    Nor did Ladd ensure that Company B made the required disclosure of Honig's,

Brauser's, Stetson's and O'Rourke's group stock ownership in Company B's filings with the

Commission.  On November 6, 2015, Company B filed a Form S-1 registration statement with

the Commission – signed by Ladd as its President, CEO, and a Director – for the 8,400,000

Company B shares issued in the October 2015 Company B Financing. The Form S-1 purported to list "each person known by [Company B] to be the beneficial owner of more than 5% of the outstanding Common stock" of Company B, as it was required to pursuant to Item 403 of Regulation S-K. Although the table listed Honig as a 5% beneficial owner, it failed to disclose the combined group ownership of Honig, Brauser, Stetson and O'Rourke (or their entities). Ladd knew that Honig, Brauser, Stetson and O'Rourke were working together as a group, but he signed the November 2015 Form S-1 without disclosing the Honig group's collective beneficial ownership of Company B stock, which amounted to more than 12% of Company B's outstanding stock.

164.    Likewise, Company B's 2015 Form 10-K, filed with the Commission on April 14, 2016 and signed by Ladd, contained a table that purported to disclose "each person known by [Company B] to be the beneficial owner of more than 5% of the outstanding Common stock" of Company B as of April 11, 2016, also as required by Item 403 of Regulation S-K. Although the table disclosed Honig as a beneficial owner of 8.6%, it failed to disclose the combined group ownership of Honig, Brauser, Stetson and O'Rourke (or their entities). Ladd knew that Honig, Brauser, Stetson and O'Rourke were working together as a group, but he failed to disclose in the Form 10-K their group's beneficial ownership of Company B's stock, which amounted to more than 16% of Company B's stock.

165.    Company B's Form S-1 and Form 10-K thus hid from Company B investors material information regarding potential corporate control of Company B. Such information is especially important to investors evaluating microcap issuers such as Company B, which are particularly susceptible to manipulation by undisclosed control persons.

**6.    *Ladd's Unregistered May 2016 Company B Stock Sales in His and His Relatives' Accounts***

166.    During the relevant period, Ladd held at least three brokerage accounts in his own name through which he traded Company B securities:  an IRA account at TD Ameritrade that he opened in December 2008 ("TD IRA Account"); another TD Ameritrade account that he opened in January 2013 ("TD Account"); and an account at E*Trade that he opened in November 2015 ("E*Trade Account").  On his new account application for his TD Account, Ladd disclosed that he was the president of Company B.  Consequently, TD Ameritrade designated both Ladd's TD Account and previously opened TD IRA Account as associated with an "affiliate" of Company B.  However, on his new account application for his E*Trade Account, filled out in November 2015, Ladd hid his association with Company B, falsely describing his "Occupation" as "Retired," and falsely answering "No" to the question, "Director, or policy-making office of publicly-owned company?"  In November 2015, Ladd transferred all of his Company B stock from his TD Account to his newly-opened E*Trade Account, telling TD Ameritrade customer service personnel on November 25, 2015 that he was doing so because he "did not like SEC 144 form handling" at TD Ameritrade.

167.    Ladd's Relatives held a separate brokerage account at TD Ameritrade in their names ("Ladd's Relatives' Account"), opened on January 2, 2015.  On June 9, 2015, Ladd and his Relatives executed a Full Trading Authorization for the Ladd's Relatives' Account, giving Ladd full trading authority in the account and appointing him as his Relatives' agent and "attorney-in-fact for the purchase and sale of securities."  On that Trading Authorization, Ladd and his Relatives also disclosed Ladd's affiliation to Company B (as TD Ameritrade already knew from the new account form Ladd had filled out for his own TD Account).  As a result, TD Ameritrade designated the Ladd's Relatives' Account as having "affiliate" status with respect to

trading in Company B securities.

168.     Between May 9 and May 12, 2016, Ladd sold 435,000 Company B shares in his

E*Trade Account, for proceeds of $414,448.39.  During that same week, on May 12, 2016, Ladd

sold an additional 340,000 Company B shares in the Ladd's Relatives' Account, for additional

proceeds of $551,979.44.  Thus, during the time period May 9-12, 2016, Ladd sold 775,000

shares of Company B, which generated total proceeds of $966,427.83.

169.     In addition to the proceeds of his May 2016 Company B stock sales in the

E*Trade Account, Ladd also received a portion of the proceeds from the May 12, 2016 Company

B stock he sold from the Ladd's Relatives' Account.  On May 13, 2016, Relative A wrote a

$325,000 check on Relative A's personal bank account made payable to Ladd, which was

deposited into Ladd's bank account on May 18, 2016.  On May 17, 2016, after the Company B

stock sales in the Ladd's Relatives' Account had cleared – acting at either Ladd's Relatives' or

Ladd's direction – TD Ameritrade issued to Ladd's Relatives a $325,000 check from the Ladd's

Relatives' Account.  Thus, Ladd's Relatives transferred to Ladd $325,000 of the proceeds from

the May 12, 2016 Company B stock sales in the Ladd's Relatives' Account.  Ladd's Relatives

kept for themselves the remaining $226,979.44 from Ladd's May 12 Company B stock sales in

the Ladd's Relatives' Account.

170.      No registration statement was in effect for any of Ladd's May 9-12, 2016,

Company B stock sales in the E*Trade Account or the Ladd's Relatives' Account, and no

applicable exemption from registration existed.  For example, Ladd could not rely upon the

Securities Act Rule 144 "safe harbor" exemption for his May 2016 Company B stock sales

because those sales exceeded the volume limitations of Rule 144(e).

171.      Securities Act Rule 144(e) sets volume limitations for sales of a company's stock

by its affiliates, including by its officers and directors (such as its CEO). Thus, a CEO cannot

rely upon the Rule 144 safe harbor unless the volume of the CEO's stock sales during any three

month period does not exceed the greater of: (a) 1% of the company's shares outstanding; or (b)

the stock's average weekly reported trading volume during the four calendar weeks preceding

the CEO's stock sales. Therefore, as Company B's CEO, Ladd could not rely upon the Rule 144

safe harbor during the time period May 9-12, 2016, if his Company B stock sales exceeded the

greater of 180,982 shares (representing 1% of Company B's total outstanding shares as reported

in its then most recent filing, its April 14, 2016 Form 10-K) or 392,109 shares (representing

Company B's average weekly trading volume during the four weeks prior to May 9, 2016).

Ladd well exceeded that trading volume limit. Through his combined Company B stock sales in

his E*Trade Account and the Ladd's Relatives' Account from May 9-12, 2016, Ladd sold

Company B shares that he owned, controlled, or which are aggregated for the purposes of Rule

144(e), totaling 775,000 shares, for total sales proceeds of $966,427.83.

    172.    The following chart summarizes Ladd's Company B stock trading from May 9-

12, 2016, in the E*Trade Account and the Ladd's Relatives' Account, and the amount by which

Ladd's trading exceeded the Rule 144(e) volume limitation:

| Summary of Volume Restrictions and Trading in Excess of Rule 144 in the E*Trade and Ladd's Relatives' Accounts | | | | |
|---|---|---|---|---|
| Date/Totals | Company B Shares Sold | Account Holder | Account | Proceeds |
| May 9, 2016 | 40,000 | Robert B. Ladd | E*TRADE Account | $24,766.47 |
| May 10, 2016 | 120,000 | Robert B. Ladd | E*TRADE Account | $86,003.15 |
| May 11, 2016 | 230,000 | Robert B. Ladd | E*TRADE Account | $233,248.97 |
| May 12, 2016 | 340,000 | Ladd's Relatives | Ladd's Relatives' Account | $551,979.44 |
| May 12, 2016 | 45,000 | Robert B. Ladd | E*TRADE Account | $70,429.80 |
| Total Shares Sold | 775,000 | | | |
| Total Proceeds | | | | $966,427.83 |
| Excess of Volume Limitations | 382,891 | | | $618,802.85 |

173.    During the week of May 9, 2016, due largely to Company B's announcement of its pending transaction with CI Company, average trading volume in Company B stock exploded to approximately 31 million shares for that week.  Consequently, the number of shares Ladd could sell pursuant to Rule 144 in the weeks beginning May 16, 2016 grew exponentially.

### 7.    *Ladd's Failure to Submit Appropriate and Accurate SEC Forms 144*

174.    Under Securities Act Rule 144(h), as CEO and a director of Company B, Ladd was required to file with the Commission a notification form ("Form 144") regarding Ladd's intent to sell Company B stock in reliance on Rule 144 whenever the volume of such sales during any three-month period exceeded 5,000 shares, or whenever such sales had an aggregate

sales price in excess of $50,000.[3]  Rule 144(h) further provides:

> The Form 144 shall be signed by the person for whose account the
> securities are to be sold and shall be transmitted for filing concurrently
> with either the placing with a broker of an order to execute a sale of
> securities in reliance upon this rule or the execution directly with a market
> maker of such a sale. . . . The person filing the notice required by this
> paragraph shall have a bona fide intention to sell the securities referred to
> in the notice within a reasonable time after the filing of such notice.

Thus, when Ladd relied upon Rule 144 for his Company B stock sales, he was required to file a

Form 144 notifying the Commission and the NYSE-MKT of his intent to sell his Company B

stock.  The Form 144 required Ladd to state, among other things: (1) the number of shares he

intended to sell; (2) the date of the intended sale(s); and (3) the date and amounts of any

Company B stock sales that Ladd had made during the prior three months.  The Form 144 also

contained a bolded footer: "**ATTENTION:  Intentional misstatements or omission of facts**

**constitute Federal Criminal Violations (See 18 U.S.C. § 1001).**"  Pursuant to TD Ameritrade's

policies and procedures, prior to making any sales of affiliate-owned stock, TD Ameritrade

required the customer to submit a Form 144 to it, and it agreed to file the Form with the

Commission on the customer's behalf.

175.     By at least May 9, 2016, Ladd understood the Company B stock held in the

Ladd's Relatives' Account had been coded for "no sales without approval because of Affiliate

status," due to Ladd's Relatives' relationship to Ladd and the trading authorization the three had

signed.  On May 10, 2016, and at TD Ameritrade's request, Ladd signed (purportedly as Relative

B's "attorney") and submitted to TD Ameritrade a Form 144 stating Relative B's intent to sell by

May 30, 2016, 382,863 Company B shares from the Ladd's Relatives' Account (the "Relative

---

[3]     During the time period that Company B was admitted to trading on the NYSE-MKT,
Rule 144(h) also required Ladd to transmit a copy of the Form 144 to the NYSE-MKT, and
regarding each Form 144 alleged herein, Ladd submitted the form to TD Ameritrade.

B's Form 144").  The Form 144 required Ladd to state Ladd's Relatives' "relationship to issuer."

On Relative B's Form 144, however, Ladd falsely responded "NONE" to that question, despite

the form's express instruction to include "[s]uch person's relationship to the issuer (e.g., officer,

director, 10% stockholder, *or member of immediate family of any of the foregoing*)" (emphasis

added).  Moreover, notwithstanding that Ladd stated in Relative B's Form 144 that the

approximate date of sale would be May 30, 2016, Ladd placed his order to sell the 382,863

Company B shares in the Ladd's Relatives' Account on May 12, 2016.  In addition, Form 144

requires disclosure of all sales by persons whose sales are required to be aggregated under Rule

144(e), which, under Rule 144(e)(3)(vi), includes those who "agree to act in concert for the

purpose of selling securities of an issuer," as Ladd and his Relatives had agreed to do.

Nonetheless, Ladd failed to disclose any of the sales he had made in his own E*Trade Account in

the prior three months.

176.    Ladd filed no Form 144 regarding his intent to sell Company B stock from May

9-12, 2016, from either his E*Trade Account or his TD IRA Account, even though he sold a

substantial number of shares from his E*Trade Account during the week of May 9.  Two weeks

later, however, Ladd knowingly or recklessly filed a false Form 144 regarding those sales –

which falsely indicated that Ladd was selling that Company B stock later in May and, thus,

created the false appearance that his May 2016 Company B stock sales satisfied Rule 144(e)'s

volume restrictions.

177.    On or about May 25, 2016, Ladd signed and submitted to TD Ameritrade a

second Form 144 (the "Ladd Form 144") falsely stating his intent to sell by May 25, 2016,

41,000 Company B shares from his TD IRA Account and 465,171 Company B shares from his

E*Trade Account.  Those statements were knowingly false, however, because Ladd already had

sold 435,000 Company B shares out of his E*Trade account (between May 9 and May 12, 2016),

and he sold only 11,000 Company B shares after May 25, 2016 (from his TD IRA Account, but

not until May 31, 2016).

178.    The Ladd Form 144 also falsely stated the amount of Company B stock that Ladd

had sold during the prior three months.  The Ladd Form 144 disclosed Ladd's May 12, 2016

sales of Company B stock from the Ladd's Relatives' Account.  However, as Ladd knew or

recklessly disregarded, the Ladd Form 144 failed to disclose that from his E*Trade Account: (a)

Ladd had sold 435,000 Company B shares from May 9-12, 2016; (b) Ladd had sold an additional

25,000 Company B shares between May 16 and May 17, 2016; and (c) Ladd had sold 79,072

shares of Company B stock between February 26 and May 3, 2016.  Thus, the Ladd Form 144

failed to disclose total Ladd sales of 539,072 Company B shares in the prior three months (which

had generated for Ladd total sales proceeds of $512,471.78).

179.    On or about May 31, 2016, Ladd filed a Form 4 with the Commission, in which

he knowingly or recklessly falsely attested that he had sold a total of 157,300 Company B shares

on May 25, 2016 for which he acknowledged beneficial ownership.  As Ladd knew, he made no

Company B stock sales on or about May 25, 2016.

180.    By failing to file a Form 144 that accurately reflected his May 9-12, 2016,

Company B stock sales in the E*Trade Account – combined with his false May 10 Relative B's

Form 144, his false May 25 Ladd Form 144, and his false May 31 Form 4 – Ladd knowingly or

recklessly stated falsely that his May 2016 Company B stock sales were in compliance with the

stock sale volume limitations of Securities Act Rule 144(e) when they were not.

> **8.    *Ladd's Failure to File SEC Forms 4 and the False and Misleading
> Form 4 He Did File***

181.    Under Exchange Act Section 16(a) and Rule 16a-3 thereunder, Company B's

officers (including Ladd) were required periodically to file certain forms with the Commission disclosing their Company B stock holdings and any of their purchases or sales of Company B stock. Thus, within 10 days of becoming a Company B officer, Ladd was required to file a Form 3 disclosing all Company B stock in which he had a direct or indirect pecuniary interest. To keep that information current, Ladd also was required (with limited exceptions not relevant to this Complaint) to file Form 4 reports disclosing any Company B stock transactions that resulted in a change in Ladd's beneficial ownership of Company B stock within two business days following the execution date of any such transaction. Finally, Ladd was required to file with the Commission an annual "clean up" statement on Form 5 within 45 days after Company B's fiscal year-end to report any transactions or holdings that should have been reported on Forms 3 or 4 during the issuer's most recent fiscal year, but were not, and any transactions eligible for deferred reporting (unless Ladd had previously reported all such transactions).

182.    Ladd did not disclose most of the open market Company B stock purchases and sales he made in his own brokerage accounts in 2015 and 2016. Ladd filed Forms 4 on October 7, 2015 and December 1, 2015, in which he failed to disclose over twelve open market purchases of Company B stock he made between August 20 and December 1, 2015. Ladd also failed to file the required Form 4 for any of the over twenty Company B open market purchases and sales he made in the E*Trade Account between December 2, 2015 and May 17, 2016 – including the 435,000 Company B shares that Ladd sold in the E*Trade Account in the May 9-12, 2016, period immediately following the May 9, 2016 press release about Company B's transaction with the CI Company.

183.    After receiving a May 22, 2016 NYSE inquiry into sales of Company B stock by company officers, Ladd finally filed a Form 4 on May 31, 2016, but, in it, he knowingly or

recklessly falsely disclosed the extent of his trading. In his May 31, 2016 Form 4, Ladd disclosed a sale of 157,300 Company B shares on May 25, 2016, and a sale of 33,603 shares on May 31, 2016. Ladd made no sales at all on May 25, 2016 and the Form 4 he filed omitted the rest of his trading in Company B shares since December 1, 2015, the date of his prior Form 4.

### 9. *Ladd's Failure to File Amended Schedules 13D*

184. Under Exchange Act Section 13(d)(1), Ladd was required to file a Schedule 13D disclosure statement with the Commission regarding his beneficial ownership of more than 5% of Company B stock within 10 days of acquiring that stock and, under Exchange Act Section 13(d)(2) and Rule 13d-2(a) thereunder, to make amended Schedule 13D filings "promptly" as material changes occurred in any such disclosures Ladd previously had made. An acquisition or disposition of 1% or more of Company B's stock is material for purposes of Rule 13d-2.

185. In 2012, Ladd reported to the Commission that he possessed beneficial ownership of over 30% of Company B's stock in a Schedule 13D/A filed January 10, 2012. However, Ladd has filed no amendments to his Schedule 13D filings since 2012. Company B's 2015 Form 10-K (filed April 14, 2016) stated that Ladd beneficially owned 5% of Company B's stock as of April 11, 2016. However, Ladd did not file a Schedule 13D/A to disclose any of the changes in his beneficial ownership. Nor did he file a Schedule 13D/A when he sold 435,000 Company B shares between May 9 and May 12, 2016, an amount that constituted 2.6% of Company B's outstanding shares, as reported in its April 14, 2016 Form 10-K.

### D. The Company C Scheme

### 1. *Honig and Stetson Obtain Control of Company C*

186. In early 2014, Honig identified a publicly traded shell company that was unencumbered by debt, and sought an appropriate private company for purposes of a reverse merger and pump and dump scheme. While Honig preferred "'33 Act shells" – namely, public companies

that would not be subject to Exchange Act Section 13(d) reporting obligations – in later years, those shells became too expensive, and the shell he identified in early 2014 was a "'34 Act shell," subject to Section 13(d) reporting.

187.    At or about the same time as Honig identified the shell, the CEO of privately held Company C ("Company C's CEO") was looking for funding for its research and development efforts in cancer therapies and diagnostic products.  Company C's CEO was introduced to "Entity H," a hedge fund that frequently invested alongside Honig and Brauser.  Entity H suggested to Company C's CEO that he turn Company C into a public company by engaging in a reverse merger with a public shell.  Although Company C's CEO did not know it, the public shell Entity H had in mind was one that Honig had identified.  Company C's CEO agreed to proceed with the reverse merger Entity H had suggested.

188.    In an initial $3 million capital raise in February 2014, in connection with the contemplated merger with Company C, HSCI – a company Stetson falsely identified as his own to Company C's CEO – invested $1 million and Entity H invested $1.7 million in return for a substantial position in the shell.  In fact, while Stetson was the sole named managing member of HSCI, Honig actually directed and controlled HSCI's investment decisions, a fact that Stetson did not disclose to Company C's CEO or to the market.

189.    Soon after Stetson had introduced HSCI as his company, however, Company C's CEO learned that Honig was actually behind the HSCI investment.  In approximately April 2014, when Honig first called up Company C's CEO, Honig announced in words or substance:  "I'm the owner of your company.  You better do what I tell you to do."  Thereafter, Honig began peppering Company C's CEO with frequent telephone calls demanding various corporate actions, including directing changes to the composition of the Company C Board, the

engagement of Issuer's Counsel, and the retention of public relations consultants favored by Honig, as described below. Company C's CEO, in need of funding for his company, took those calls and often acceded to Honig's demands.

190. Sometimes Honig worked with Stetson to exert his influence over management. As early as May 18, 2014, for example, Stetson emailed Company C's CEO to get updates on "IR and PR." Stetson was referring to investor relations ("IR") and public relations ("PR"), and was pressing his and Honig's demand that Company C begin aggressively marketing itself and paying promoters to do so. Honig added to the discussion the topic of future financings: "[a]nd the money raise."

191. On June 1, 2014, Brauser and Affiliate 1 each committed to make a substantial investment in the public shell, before the merger into Company C was finalized. As the ringleaders for the investor group in Company C, Honig and Stetson led the merger negotiations on the group's behalf.

192. On July 8, 2014, Company C executed the reverse merger of the company into the public shell controlled by Entity H, HSCI, and, by then, Brauser and Affiliate 1 Entity. At or around the time the merger closed, ATG, Brauser and Affiliate 1 Entity also made investments in Company C. After the merger, the stake of Entity H, HSCI, Brauser, Affiliate 1 Entity and ATG (including conversion of all warrants) amounted to almost 48% of the authorized shares of the newly public Company C. The terms of the merger included granting a "Consent Right" to Entity H and its affiliates, by which Entity H could block or approve many kinds of transactions by Company C, including the issuance of additional shares, any change of control and other significant corporate actions.

193. In connection with the July 2014 reverse merger, the merger investors obtained

warrants that they agreed would not be exercisable until July 8, 2015. However, on September 3, 2014, Company C agreed to allow merger investors to exercise warrants for additional Company C shares before the previously agreed-upon July 8, 2015 exercise date. This warrant exercise allowed investors to exchange warrants for shares cheaply. In connection with that exercise, Stetson submitted warrants on behalf of several investors, including ATG and Affiliate 1 Entity. In a September 15, 2014 email, Company C's CFO asked Stetson which entities were his or HSCI's affiliates. Stetson answered falsely that he was "not affiliated with any of those entities," and that he "just made private sales for my warrants."

### 2.    *The Series D and Series E Financings*

194.    In March and April 2015, Honig orchestrated two private placement financings for Company C that would tighten Honig's, Brauser's, Stetson's and O'Rourke's control of the company: the Series D and Series E offerings. Honig described the deal to Stetson, Brauser and Investor 1 in a March 5, 2015 email, characterizing it as a "real good opportunity" that would allow them to "make $35 million conservatively in 4 months and our money out [in] 4 weeks. . . . I will trade out of it for us."

195.    Honig and Stetson pitched the first of these financings, the Series D financing, to Company C management as a way to buy out Entity H's position and repackage the financing on more favorable terms to Company C.

196.    As Company C's CFO understood, Honig structured both financings to avoid disclosing his, Brauser's, Stetson's and O'Rourke's holdings on Schedule 13D or 13G. Since the requirement to make those filings is triggered by voting control of securities, Honig insisted that the Series D and Series E offerings consist of preferred, convertible and non-voting shares with blocker provisions. Pursuant to those blocker provisions, Company C was prohibited from

converting any holder's preferred shares that would give him or it more than 4.99% voting control of the total outstanding common shares.

197.    Honig's control of the financing group was clear to Company C's management; indeed, when deciding whether a potential investor could take part in the March 2015 Series D financing round, Company C's CEO explicitly deferred to Honig, writing in an email to Honig on March 19, 2015, "[h]e might be another party you might want to allow to invest along with the current group.  Viewed this as your choice not mine.  That is why I asked him to call you."

198.    Stetson kept up the pressure on Company C to close the financings on the terms he and Honig dictated.  On March 10, 2015, Stetson told Company C's CEO in an email that he needed to reach an understanding by the next day to proceed with the buyout of the Entity H notes and fund the company.

199.    Honig and Stetson also made it a condition of the March 2015 Series D financing round that Company C retain Issuer's Counsel and Issuer's Counsel Partner after the closing – the law firm and partner that they had required Company A to retain, and the same law firm retained by Company B.  Not only did Honig and Stetson insist that Issuer's Counsel represent Company C, in a March 12, 2015 email to Company C's CFO, Stetson also demanded that Company C set aside a year of prepaid legal fees as an additional condition to doing the deal.

200.    Stetson managed the financing process with the investors and lawyers, as though he were Company C management, and told Company C management about substantive decisions, including, but not limited to, sending a March 18, 2015 email to Company C management informing them which bank would be used for a contemplated escrow agreement.

201.    Stetson introduced Company C management to his and Honig's chosen IR consultant on March 14, 2015, and at Honig's direction, insisted that the financing include a

grant of 300,000 Company C shares as payment to the consultant. On March 23, 2015, Honig directed Stetson to engage another IR consultant for Company C, who was also granted Company C shares.

202.    Honig and his associates recognized that the participation of Investor 1 was critical to the success of the transaction by creating the market demand necessary for them to sell their shares after the planned promotion. As Stetson explained in an email to Company C leadership on March 9, 2015, the "following of [Investor 1] is worth its weight and [sic] gold . . . ."

203.    To that end, Honig again demonstrated his control over the selection of investors when he asked Brauser to "do [him] a favor" on April 1, 2015 and forego his participation in the Series E financing because, as Honig explained, "I would like to let some of our friends do it . . . [I]t would be best if we let [Investor 1 and Investor 1 Company and an Investor 1 Company executive ("Investor 1 Co. Officer")] take their full allocation."

204.    At the same time, Honig and Brauser understood that public market investors might not want to follow Investor 1 into a company dominated by Honig and Brauser, and their group. Thus, like Honig's decision to conceal his initial investment by making it through HSCI, Honig and Brauser determined to disguise the full extent of their participation in the financings by funneling some of their share acquisitions through a company they co-owned, Southern Biotech. Honig informed Stetson and Brauser in early March 2015, "I would like us to do [the investment] through Southern Biotech."

205.    In an email to Stetson and Brauser on March 13, 2015, Honig laid out a more detailed list of investors as well as the proposed investment amount and the method of investment for both the Series D and Series E financings: "Southern biotech will invest 3 million

to purchase [Entity H's] notes – 1 million each," and "[Investor 1] is going to lead pipe [private investment in public equity] for 1 million at .75 cents."

206.    Issuer's Counsel also understood the importance of keeping Honig's and Brauser's investment through Southern Biotech undisclosed.  Right before the closing of the Series D financing, different counsel involved in the transaction sent proposed Form 8-K language to Issuer's Counsel (which was not yet counsel to Company C and was acting as placement agent's counsel) in which Company C's then-counsel named Southern Biotech as an investor in a footnote.  Immediately, on March 25, 2015, Issuer's Counsel Partner and another lawyer from Issuer's Counsel wrote back that "[n]o stockholder [investor] should be named." Further, at Stetson's and Honig's direction, Issuer's Counsel changed the beneficial ownership blocker requirement to 2.49% to create an artificial and deceptive "cap" on the amount of common stock that could be held at one time.  Stetson explained in a March 24, 2015 email to Company C's CFO that the requirement was "due to Barry being the beneficial owner of both GRQ [] and Southern Bio."  While that 2.49% cap prevented GRQ and Southern Biotech from collectively owning more than 5%, it did nothing to prevent their aggregate group ownership with other associates from exceeding 5% – the reporting threshold – even if their individual common stock ownership was kept to 2.49% or below.

207.    In an April 2015 email to his Board, Company C's CEO detailed the demands of the Honig investors, including that Investor 1 Co. Officer be granted a lucrative consulting agreement, and that a new board member, satisfactory to Investor 1 Co. Officer, be appointed at a later date.  The Board capitulated and pursuant to the consulting agreement, Investor 1 Co. Officer was granted 200,000 Company C shares – worth more than $400,000 at the time – in exchange for his services.  In fact, Investor 1 Co. Officer never provided any services to

Company C.

208.    The Series D financing closed in late March 2015 and included a buyout of Entity

H's notes, including the Consent Right, at a favorable purchase price to the investors who

purchased the notes.  The investors who purchased the notes included various entities owned and

controlled by Defendants Honig, Brauser, Stetson and O'Rourke:  HSCI (Honig and Stetson),

GRQ (Honig), Grander (Brauser) and ATG (O'Rourke).  After this transaction closed, Company

C had 5,827,327 shares of common stock outstanding, and the Series D investors had preferred

shares convertible into over 23,764,700 shares of common stock.  Southern Biotech held only

145,000 common stock shares at the time, but had conversion rights to as many as 13,376,382

common shares – more than twice as many common shares than Company C had outstanding at

the time of the financing.

209.    The Series E financing, which closed April 6, 2015, included warrants, and raised

$12 million for Company C on terms highly favorable to Investor 1, Investor 1 Trust and

Investor 1 Company.  Honig and his associates managed the Investor 1, Investor 1 Trust and

Investor 1 Company investments through the Series E financing.  For example, Investor 1

Company's investment documentation was transmitted to and discussed with Stetson and

Brauser rather than any individuals at Company C, reflecting the fact that Honig and his co-

investors were orchestrating the deal rather than Company C itself.

210.    Investor 1's participation gave Honig, Brauser, Stetson and O'Rourke leverage in

negotiating with Company C, including in solidifying the group's control over Company C's

board.  When negotiating the final terms of the Series E financing, including Investor 1

Company's right to designate replacement board members, Stetson sought reassurance from

Issuer's Counsel Partner in an April 3, 2015 email, asking:  "Are you comfortable that we will

get control of the board with this language?"

211.    After the financings closed, Honig attempted to further exert his control over Company C.  For example, Honig spoke with Company C's CEO about changing the composition of the company's Board and suggested a specific individual as a candidate.  After Company C's CEO interviewed the candidate, Issuer's Counsel Partner sent the candidate a letter containing the signature line of Company C's CEO inviting him to join the Board on April 1, 2015.  When Company C's CEO learned of the offer, he contacted Issuer's Counsel Partner in an April 14, 2015 email and instructed him to rescind the offer because it had not been authorized by the Board.  Issuer's Counsel Partner agreed to do so, explaining to Company C's CEO that he had been following Honig's directions in sending the offer letter on behalf of Company C's CEO.

### 3.    The Company C Pump and Dump in April 2015

212.    One of the goals of the private placement financings, as Honig, Brauser, Stetson and O'Rourke knew, was to generate market interest and boost trading volume in Company C stock in preparation for a planned stock promotion.  On April 3, 2015, O'Rourke, acting at Honig's direction, circulated a press release (with input from Company C's CEO, Honig and Brauser) announcing the $12 million private placement in which Investor 1 and his entities had participated, drawing on Investor 1's reputation among retail investors as a successful biopharma investor.

213.    Honig, with the knowledge of Brauser and Stetson, then directed O'Rourke to write a promotional article, which O'Rourke published under the pseudonym "Wall Street Advisors" on the *Seeking Alpha* website on April 8, 2015 at 11:13 a.m.  The article, titled "[Investor 1 Company] Spots Another Overlooked Opportunity in [Company C]," highlighted

Investor 1 Company's and Investor 1's investment in Company C, and was designed to inspire Investor 1's retail investor devotees to follow his lead and buy Company C stock. Despite his involvement in facilitating the Company C financing and his extensive business relationships with Honig, Brauser, Investor 1 and Stetson, in his article, O'Rourke knowingly and falsely claimed that "[t]he author has no business relationship with [Company C]." He also knowingly and falsely claimed that he was "not receiving compensation for [writing the article]."

214.     Anticipating the release of O'Rourke's *Seeking Alpha* article, ATG and O'Rourke engaged in early trading of Company C shares on April 8, 2015 with the intention of creating a false appearance of market interest in the stock. That trading included at least one matched trade, with a Honig associate submitting the buy order and ATG submitting the sell order for the same price at 9:38 a.m. The share price of Company C opened that day at $3.14 and reached $3.73 in the minutes before the promotional article was released.

215.     The promotional campaign was successful. The trading volume of Company C shares rose almost 7500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, following the announcement of the Series E private placement involving Investor 1. The trading volume further increased to 858,709 on April 9, 2015, the day after O'Rourke's article was published. Company C's share price went from a closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015, increasing the company's market capitalization by $23 million. Honig and his affiliates, acting pursuant to their agreement to acquire, hold, vote and/or dispose of their Company C shares in concert, sold shares into the market from April 6 to June 30, 2015 for total proceeds of over $5.5 million. HSCI, controlled by Stetson and Honig, sold 1,080,379 Company C shares between April 6 and June 30, 2015 for proceeds of $3,607,248.91.

### 4. The Company C Pump and Dump in June/July 2015

216.     In June 2015, when the market for Company C shares had cooled from over $4 per share to closing prices hovering just above $2 per share, O'Rourke recruited Ford to publish another Company C tout on Ford's blog.  On July 1, 2015, Ford published an article titled "[Company C]: Near-Term Catalysts Could Push Shares from $2 to over $5."  The article contained materially false statements (as Honig, Brauser, Stetson and O'Rourke knew, or were reckless in not knowing) including that a licensing deal was imminent, when it was not, and that there were near-term therapy development events that could take the share price to $5, when in fact clinical trials were only in early stages.  As before, although Honig compensated Ford for writing the blog post, Ford did not disclose that he had been paid.

217.     Ford's article had the desired impact on the market:  Company C trading volume increased from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015. Likewise, Company C's share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015.  Pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig and his affiliates sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million.  HSCI, controlled by Stetson and Honig, sold 682,539 Company C shares between July 1 and December 7, 2015 for proceeds of $1,525,588.49.

218.     Honig and Stetson thereafter continued to invest in Company C and conferred benefits on members of their group and directed critical business decisions for Company C.  For example, on more than one occasion, Honig or Stetson directed Company C's CEO to appoint Honig's candidate to Company C's board.  And on August 15, 2016, at Honig's and Stetson's direction, as a condition to HSCI providing additional financing to Company C, HSCI and Company C's CEO executed a letter agreement requiring Company C to hire the public relations

firm that Honig and Stetson had selected.  Honig even prevailed on Company C to pay Affiliate

1 Entity a six-figure "Investor Due Diligence" fee in August 2016.

>   **5.**     ***False Beneficial Ownership Reports by Honig, Brauser, Stetson and O'Rourke***

219.     Given the agreement among Honig, Brauser, Stetson and O'Rourke to acquire,

hold, vote and/or dispose of their Company C shares in concert; the group's direction of

Company C management and policies; and their combined share ownership, all of the members

of the group were required to make Schedule 13D filings that they did not make.  They did not

make the appropriate filings so that the investing public would not discover their control, much

less the extent of their control, over Company C, and to obscure from investors that they were

positioning themselves for a pump-and-dump scheme.

220.     By the end of April 2015 after the closing of the private placement financings,

Stetson, HSCI, Brauser (through Grander) and O'Rourke (through ATG) all had substantial

deposits of Company C shares in their brokerage accounts.  Therefore, they were all individually

obligated to make a Schedule 13D filing, disclosing their own holdings and that they were

members of the group because they were acting together for the purpose of acquiring, holding,

voting and/or disposing of Company C shares, and collectively owned greater than 5% of

Company C's outstanding shares.

221.     Other Defendants who invested in Company C also improperly made Schedule

13G filings, by which they falsely represented themselves as passive investors, and also failed to

disclose their membership in the group, in violation of disclosure requirements.  For example,

Honig filed a Schedule 13G on February 17, 2017 disclosing only his 6.22% ownership through

GRQ; Stetson filed a Schedule 13G on September 19, 2017, disclosing only his 5.64% (nominal)

ownership through HSCI; Brauser filed a Schedule 13G on February 2, 2017, disclosing only his

5.44% ownership through Grander. Each of these Defendants should have made Schedule 13D filings because they were not passive investors, and each should have disclosed the existence of, and membership in, a group. Nor were the eventual Schedule 13D filings made by Stetson on February 12, 2018, Honig on February 13, 2018, and a Schedule 13D/A filed by Honig on February 16, 2018 (all filed after they became aware of a pending regulatory investigation), compliant with the federal securities laws since none of them disclosed the existence of a group or their membership in it.

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against Honig, GRQ, HSCI and Maza)**

222.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

223.    By engaging in the acts and conduct described in this Complaint, Defendants Honig, GRQ, HSCI and Maza, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

224.    Honig (acting individually and/or through the entities he controlled, including GRQ and HSCI, and pursuant to tacit or explicit agreements with Brauser, Stetson, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A,

Company B and Company C in coordination with one another) violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices.  Honig further violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by engaging in manipulative trading in the securities of Company A and Company B.  With respect to Company A, Honig further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, directly or indirectly, knowingly or recklessly making materially false statements to brokers and submitting materially false attorney opinion letters to transfer agents, relating to his relationship to Company A.  With respect to Company B, Honig further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making materially false and misleading Schedule 13G filings, concealing both his control over Company B's management and policies, as well as his membership in a group with Brauser, Stetson and O'Rourke, and other affiliates, pursuant to their tacit or explicit agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another.  With respect to Company C, Honig further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making both a materially false and misleading Schedule 13G filing (by which he concealed his control over Company C's management and policies as well as his membership in a group with Brauser, Stetson, O'Rourke, and offer affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another), and a materially false and misleading Schedule 13D filing (by which he concealed his membership in a

group with Brauser, Stetson, O'Rourke, and offer affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another) Honig's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

225.    Maza, pursuant to a tacit or explicit agreement with Honig, Brauser, Stetson and O'Rourke, with respect to Company A, violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by intentionally or recklessly omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies.  Maza further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly submitting materially false statements to Company A's transfer agent about Honig's relationship to Company A in connection with Honig's preparation to sell his Company A shares.

226.    By reason of the foregoing, Honig, GRQ, HSCI and Maza, directly or indirectly, singly or in concert, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)**
**(Against Brauser, Stetson, O'Rourke, Grander, SCI and ATG)**

227.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

228. By engaging in the acts and conduct described in this Complaint, Defendants Brauser, Stetson, O'Rourke, Grander, SCI and ATG, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Company A, Company B and/or Company C securities, have: (a) employed devices, schemes, or artifices to defraud; and/or (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

229. Brauser (acting individually and/or through the entities he controlled, including Grander, and pursuant to tacit or explicit agreements with Honig, Stetson, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) thereunder by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; and selling shares of Company A, Company B and Company C into the market into trading volume and at prices he knew or was reckless in not knowing were artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for and orchestrated. Brauser's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

230. Stetson (acting individually and/or through the entities he ostensibly and actually

controlled, including SCI and HSCI, and pursuant to tacit or explicit agreements with Honig, Brauser, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) thereunder by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices. Stetson's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

231.    O'Rourke (acting individually and/or through the entities he controlled, including ATG, and pursuant to tacit or explicit agreements with Honig, Brauser, Stetson and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) thereunder by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price, and, on at least one occasion, writing and publishing his own materially false and

misleading article about Company C; and selling shares of each company into the market at artificially high prices.  O'Rourke's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.

232.    By reason of the foregoing, Brauser, Stetson, O'Rourke, Grander, SCI and ATG directly or indirectly, singly or in concert, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

<div align="center">

**THIRD CLAIM FOR RELIEF**
**Violations of Section 17(a)(1)-(3) of the Securities Act**
**(Against Honig, GRQ, HSCI and Maza)**

</div>

233.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

234.    By engaging in the acts and conduct described in this Complaint, Defendants Honig, GRQ, HSCI and Maza, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, in the offer or sale of Company A, Company B, and/or Company C securities, have: (a) with scienter, employed devices, schemes, and artifices to defraud; (b) knowingly, recklessly or negligently obtained money or property by means of any untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon

purchasers of securities of Company A, Company B and/or Company C.

235. Honig (acting individually and/or through the entities he controlled, including GRQ and HSCI, and pursuant to tacit or explicit agreements with Brauser, Stetson, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices. Honig further violated Securities Act Sections 17(a)(1) and (a)(3) by engaging in manipulative trading in the securities of Company A and Company B. With respect to Company A, Honig also violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by, among other things, directly or indirectly, knowingly or recklessly, making materially false statements to brokers, and knowingly or recklessly submitting materially false attorney opinion letters to transfer agents, relating to his relationship to Company A, and subsequently sold shares in Company A by means of those false statements. With respect to Company B, Honig further violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly making materially false and misleading Schedule 13G filings, concealing both his control over Company B's management and policies, as well as his membership in a group with Brauser, Stetson, O'Rourke and other affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another. With respect to Company C, Honig violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly making both a materially false and misleading Schedule 13G filing, and

materially false and misleading Schedule 13D filings, concealing (with respect to his Schedule 13G filings) his control over Company C's management and policies, and (with respect to his Schedule 13D and 13G filings) his membership in a group with Brauser, Stetson, O'Rourke and other affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another.  By means of Honig's false and misleading filings under Exchange Act Section 13(d) with respect to his stock ownership of Company B and Company C, Honig was able to acquire additional shares of both companies, and was able to sell his shares in the dump into artificially inflated trading volume and stock price.  Alternatively, Honig violated Securities Act Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.  Honig's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.  Alternatively, Honig violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

236.    Maza, pursuant to a tacit or explicit agreement with Honig, Brauser, Stetson and O'Rourke, with respect to Company A, violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by intentionally or recklessly omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies.  Maza further violated Securities Act Sections 17(a)(1), (a)(2) and (a)(3) by knowingly or recklessly submitting

materially false statements to Company A's transfer agent about Honig's relationship to Company A in connection with Honig's efforts to remove the restrictive legends from his Company A shares, and Honig subsequently sold shares in Company A by means of those false statements. Alternatively, Maza violated Securities Act Sections 17(a)(2) and (a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

237.    By reason of the foregoing, Honig, GRQ, HSCI and Maza, directly or indirectly, singly or in concert, violated Sections 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)-(3)].

### FOURTH CLAIM FOR RELIEF
**Violations of Sections 17(a)(1) and (3) of the Securities Act**
**(Against Brauser, Stetson, O'Rourke, Grander, SCI and ATG)**

238.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

239.    By engaging in the acts and conduct described in this Complaint, Defendants Brauser, Stetson, O'Rourke, Grander, SCI and ATG directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, in the offer or sale of Company A, Company B, and/or Company C securities, have: (a) with scienter, employed devices, schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Company A, Company B and/or Company C.

240.    Brauser (acting individually and/or through the entities he controlled, including Grander, and pursuant to tacit or explicit agreements with Honig, Stetson, O'Rourke and other

affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; and selling shares of Company A, Company B and Company C into the market into trading volume and at prices he knew or was reckless in not knowing were artificially inflated by promotional articles that Honig had directly or indirectly secretly paid for and orchestrated. With respect to Company B and Company C, Brauser further violated Securities Act Sections 17(a)(1) and (a)(3) by knowingly or recklessly making materially false and misleading Schedule 13G filings, concealing both his control over Company B's and Company C's management and policies through his agreement with Honig and other affiliates to acquire, hold, vote and/or dispose of Company B and Company C securities in coordination with one another, as well as his membership in a group with Honig, Stetson, O'Rourke and other affiliates pursuant to that agreement.  Alternatively, Brauser violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.  Brauser's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies.  Alternatively, Brauser violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

241.     Stetson (acting individually and/or through the entities he ostensibly and actually controlled, including SCI and HSCI, and pursuant to tacit or explicit agreements with Honig, Brauser, O'Rourke and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price; and selling shares of each company into the market at artificially high prices.  With respect to Company C, Stetson violated Securities Act Sections 17(a)(1) and (a)(3) by knowingly or recklessly making materially false and misleading Schedule 13G and Schedule 13D filings, concealing (with respect to his Schedule 13G filings) his control over Company C's management and policies, and (with respect to his Schedule 13D and 13G filings) his membership in a group with Honig, Brauser, O'Rourke and other affiliates, pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in coordination with one another. Alternatively, Stetson violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.  Stetson's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies. Alternatively, Stetson violated Securities Act Section 17(a)(3) by failing to use the degree of care

in this conduct that a reasonably careful person would use under like circumstances.

242. O'Rourke (acting individually and/or through the entities he controlled, including ATG, and pursuant to tacit or explicit agreements with Honig, Brauser, Stetson and other affiliates to acquire, hold, vote and/or dispose of shares they acquired in Company A, Company B and Company C in coordination with one another) violated Securities Act Sections 17(a)(1) and (a)(3) by, among other things, directly or indirectly, with scienter: obtaining and exercising undisclosed control of the management and policies of Company A, Company B and Company C; paying undisclosed compensation to writers and bloggers to write enthusiastic and deceptive articles on each issuer to artificially boost trading volume and stock price, and, on at least one occasion, writing and publishing his own materially false and misleading article about Company C; and selling shares of each company into the market at artificially high prices. Alternatively, O'Rourke violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances. O'Rourke's intentional or reckless failure to make timely and appropriate filings under Exchange Act Section 13(d) with respect to his and his group's holdings of Company B and Company C shares also violated Securities Act Sections 17(a)(1) and (a)(3) as material omissions that facilitated his scheme to defraud investors about his and his group's control of the management and policies of, and the magnitude of their individual and collective investment in, both companies. Alternatively, O'Rourke violated Securities Act Section 17(a)(3) by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

243. By reason of the foregoing, Brauser, Stetson, O'Rourke, Grander, SCI and ATG directly or indirectly, singly or in concert, violated Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)].

## FIFTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against Ford, Ladd and Keller)

244.    The Commission realleges and incorporates by reference herein each and every
allegation contained in paragraphs 1 through 221 of this Complaint.

245.    By engaging in the acts and conduct described in this Complaint, Defendants
Ford, Ladd and Keller, with scienter, directly or indirectly, singly or in concert, by use of the
means or instruments of transportation or communication in interstate commerce, or of the mails,
or of the facilities of a national securities exchange, in connection with the purchase or sale of
Company A, Company B and/or Company C securities, have made untrue statements of material
facts or omitted to state material facts necessary in order to make the statements made, in light of
the circumstances under which they were made, not misleading.

246.    Ford violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by,
among other things, knowingly or recklessly making material misstatements in the articles Honig
and his affiliates paid him to write about Company A and Company C, including that he was not
being paid by anyone other than *Seeking Alpha*.

247.    Ladd violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by,
among other things, knowingly or recklessly authoring and issuing Company B's May 9, 2016
press release in which he made materially false statements about the sale of Cybersecurity
Innovator's former company to Intel.  Ladd further violated Section 10(b) and Rule 10b-5(b)
thereunder by knowingly or recklessly failing to disclose the true extent of the stock ownership
of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over
Company B's management and policies, in Company B's 2015 Form 10-K and November 6,
2015 Form S-1, both of which Ladd signed.  Ladd further violated Section 10(b) and Rule 10b-

5(b) thereunder by knowingly or recklessly (1) stating falsely on Relative B's Form 144 that Relative B had no relationship to Company B (as "relationship" is defined on Relative B's Form 144) and failing to disclose his own sales of Company B stock in the prior three months; (2) stating falsely on the Ladd Form 144 that Ladd intended to sell Company B stock that day, and falsely omitting his Company B stock sales during the previous three months totaling 539,072 shares; (3) falsely attesting on a Form 4 filed May 31, 2016 that Ladd had sold 157,300 shares of Company B stock on May 25, 2016 over which he acknowledged beneficial ownership and omitting the additional shares purchased and sold in his accounts since the last Form 4 filing; and (4) filing Forms 4 on October 7, 2015 and December 1, 2015 regarding Ladd's Company B stock transactions that omitted over twelve open market purchases of Company B stock between August 20, 2015 and December 1, 2015.

248.    Keller violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by, among other things, intentionally or recklessly omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates, and their collective control over Company A's management and policies.  Keller further violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder by knowingly or recklessly making materially false statements to Ford – which he knew (or was reckless in not knowing) were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.

249.    By reason of the foregoing, Ford, Ladd and Keller, directly or indirectly, singly or in concert, violated, and Ladd, unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## SIXTH CLAIM FOR RELIEF
### Violations of Section 17(a)(2) of the Securities Act
### (Against Ford, Ladd and Keller)

250.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 221 of this Complaint.

251.    By engaging in the acts and conduct described in this Complaint, Defendants

Ford, Ladd and Keller, knowingly, recklessly or negligently, directly or indirectly, singly or in

concert, by use of the means or instruments of transportation or communication in interstate

commerce, in the offer or sale of Company A, Company B and/or Company C securities, have

obtained money or property by means of any untrue statements of a material fact or omitted to state

a material fact necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading.

252.    Ford violated Securities Act Section 17(a)(2) by, among other things, knowingly,

recklessly or negligently making material misstatements in the articles Honig and his affiliates

paid him to write about Company A and Company C, including that he was not being paid by

anyone other than *Seeking Alpha*.

253.    Ladd violated Securities Act Section 17(a)(2) by, among other things, knowingly,

recklessly or negligently authoring and issuing Company B's May 9, 2016 press release in which

he made materially false statements about the sale of Cybersecurity Innovator's former company

to Intel.  Ladd further violated Section 17(a)(2) by knowingly, recklessly or negligently failing to

disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other

affiliates, and their collective control over Company B's management and policies in Company

B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed.  By means of

those false statements, Ladd, along with Honig, Brauser, Stetson and O'Rourke, sold shares in

Company B.  Ladd further violated Section 17(a)(2) by knowingly,  recklessly, or negligently:
(1) stating falsely on Relative B's Form 144 that Relative B had no relationship to Company B
(as "relationship" is defined on Relative B's Form 144), and failing to disclose his own sales of
Company B stock in the prior three months; (2) stating falsely on the Ladd Form 144 that Ladd
intended to sell Company B stock that day, and falsely omitting his Company B stock sales
during the previous three months totaling 539,072 shares; (3) falsely attesting on a Form 4 filed
May 31, 2016 that Ladd had sold 157,300 shares of Company B stock on May 25, 2016 over
which he acknowledged beneficial ownership, and omitting the additional shares purchased and
sold in his accounts since the last Form 4 filing; and (4) filing Forms 4 on October 7, 2015 and
December 1, 2015 regarding Ladd's Company B stock transactions that omitted over twelve
open market purchases of Company B stock between August 20, 2015 and December 1, 2015.

254.    Keller violated Securities Act Section 17(a)(2) by, among other things,
intentionally, recklessly or negligently omitting from Company A filings with the Commission
the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and other affiliates,
and their collective control over Company A's management and policies.  Keller further violated
Securities Act Section 17(a)(2) thereunder by knowingly, recklessly or negligently making
materially false statements to Ford – which he knew (or was reckless or negligent in not
knowing) were to appear in a published promotional article on Company A – about the status of
Company A's development of Qusomes technology.  By means of those false statements, Honig,
Brauser, Stetson and O'Rourke sold shares in Company A.

255.    By reason of the foregoing, Ford, Ladd and Keller, directly or indirectly, singly or
in concert, violated, and Ladd, unless restrained and enjoined, will continue to violate, Section
17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section
### 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Against Ladd and Keller)

256. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

257. By engaging in the acts and conduct described in this Complaint, Defendants Ladd and Keller directly or indirectly, singly or in concert, provided knowing and substantial assistance to Honig, Brauser, Stetson and O'Rourke, and others, who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to (a) employ devices, schemes, or artifices to defraud; and (b) engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

258. Ladd provided knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c), as alleged above in the Second Claim for Relief, by, among other things, authoring and issuing Company B's May 9, 2016 press release in which he made materially false statements about the sale of Cybersecurity Innovator's former company to Intel. Ladd provided further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) by knowingly or recklessly failing to disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company B's management and policies, in Company B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed.

259.     Keller provided knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c), as alleged above in the Second Claim for Relief, by, among other things, omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company A's management and policies.  Keller provided further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) by making materially false statements to Ford – which he knew were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.

260.     By reason of the foregoing, Ladd and Keller aided and abetted Honig's, Brauser's, Stetson's, O'Rourke's and others' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], and Ladd, unless restrained and enjoined, will continue aiding and abetting others' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

### EIGHTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Sections 17(a)(1) and (a)(3) of the Securities Act
(Against Ladd and Keller)**

261.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

262.     By engaging in the acts and conduct described in this Complaint, Defendants Ladd and Keller directly or indirectly, singly or in concert, provided knowing and substantial

assistance to Honig, Brauser, Stetson, O'Rourke and others, who, directly or indirectly, singly or in concert with others, in the offer or sale of a security, used the means or instruments of transportation or communication in interstate commerce or used the mails to (a) with scienter employed devices schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Company A or Company B.

263.    Ladd provided knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act, as alleged in the Fourth Claim for Relief above, by, among other things, authoring and issuing Company B's May 9, 2016 press release in which he made materially false statements about the sale of Cybersecurity Innovator's former company to Intel.  Ladd provided further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act by knowingly or recklessly failing to disclose the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company B's management and policies, in Company B's 2015 Form 10-K and November 6, 2015 Form S-1, both of which Ladd signed.

264.    Keller provided knowing and substantial assistance to Honig's, Brauser's, Stetson's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act, as alleged in the Fourth Claim for Relief above, by, among other things, omitting from Company A filings with the Commission the true extent of the stock ownership of Honig, Brauser, Stetson, O'Rourke and others, and their collective control over Company A's management and policies. Keller provided further knowing and substantial assistance to Honig's, Brauser's, Stetson's, O'Rourke's  and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act by

making materially false statements to Ford – which he knew were to appear in a published promotional article on Company A – about the status of Company A's development of Qusomes technology.

265.    By reason of the foregoing, Ladd and Keller aided and abetted Honig's, Brauser's, Stetson's and O'Rourke's, and others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], and Ladd, unless restrained and enjoined, will continue aiding and abetting others' violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

### NINTH CLAIM FOR RELIEF
**Violations of Section 9(a)(1) of the Exchange Act**
**(Against Honig)**

266.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

267.    By engaging in the acts and conduct described in this Complaint, Defendant Honig, directly or indirectly, singly or in concert, by use of the mails or the means or instrumentalities of interstate commerce, or of a facility of a national securities exchange for the purpose of creating a false or misleading appearance of active trading in Company A, Company B and/or Company C securities, or a false or misleading appearance with respect to the market for Company A, Company B and/or Company C securities, entered an order or orders for the purchase and/or sale of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time and substantially the same price, for the sale and/or purchase of such security, had been or would be entered by or for the same or different parties.

268.     Honig violated Section 9(a)(1) of the Exchange Act by, among other things,

engaging with scienter, through the Barry & Renee Honig Foundation, which he controlled, in

matched trading of Company A shares on September 26, 2013.  Honig further violated Section

9(a)(1) by engaging with scienter in matched trading of Company B shares on May 9, 2016 with

an associate.

269.     By virtue of the foregoing, Honig violated Section 9(a)(1) of the Exchange Act

[15 U.S.C. § 78i(a)(1)].

### TENTH CLAIM FOR RELIEF
### Violations of Section 9(a)(2) of the Exchange Act
### (Against Honig)

270.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 221 of this Complaint.

271.     By engaging in the acts and conduct described in this Complaint, Defendant

Honig, directly or indirectly, singly or in concert, by use of the mails or the means or

instrumentalities of interstate commerce, or of a facility of a national securities exchange

effected, alone or with one or more other persons, a series of transactions in the securities of

Company A and/or Company B creating actual or apparent active trading in such security, or

raising or depressing the price of such security, for the purpose of inducing the purchase or sale

of such security by others.

272.     Honig violated Exchange Act Section 9(a)(2) by, among other things,

intentionally entering dozens of small buy and sell orders of Company B shares on the morning

of May 9, 2016 for the purpose of creating actual or apparent active trading in Company B shares

for the purpose of inducing the purchase of Company B shares by other market participants.

273.     By virtue of the foregoing, Honig violated Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

## ELEVENTH CLAIM FOR RELIEF
### Unregistered Offering or Sale of Securities in Violation of Sections 5(a) and (c) of the Securities Act
### (Against Honig and Ladd)

274.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

275.     By engaging in the acts and conduct described in this Complaint, Defendants Honig and Ladd, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer or sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.  The shares of Company A that Honig offered and sold, and the shares of Company B that Ladd offered and sold, as alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

276.     Honig violated Securities Act Sections 5(a) and (c) with respect to his offer and sale of Company A shares, by, among other things, selling Company A shares into the public market from September through December 2013 while no registration statement was in effect for any of the sales, and no exemption from registration was available.

277.     Ladd violated Securities Act Sections 5(a) and (c) with respect to his offer and sale of Company B shares in May 2016, by, among other things, selling Company B shares into the public market from May 9-12, 2016 while no registration statement was in effect for any of

the sales, and no exemption from registration was available for the sale of shares in excess of the volume limitations imposed upon him as an affiliate of Company B.

278.     By reason of the foregoing, Honig and Ladd violated, and Ladd, unless restrained and enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## TWELFTH CLAIM FOR RELIEF
### Violations of Section 13(d) of the Exchange Act and Rule 13d-1(a)
### (Against Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI)

279.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

280.     Pursuant to Exchange Act Section 13(d)(1) and Rule 13d-1(a) thereunder, persons who directly or indirectly acquire beneficial ownership of more than 5% of a Section 12-registered class of equity securities are required to make a Schedule 13D filing, or, in limited circumstances, a Schedule 13G filing. Section 13(d)(3) states that "act[ing] as a . . . group" in furtherance of acquiring, holding, voting and/or disposing of equity securities is enough to establish the group as a single "person." When a group is required to make a Schedule 13D filing, that group must "identify all members of the group."

281.     Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander and SCI acquired and held beneficial ownership of more than 5% shares in Company B from on or about October 8, 2015 through at least on or about May 20, 2016, and collectively controlled the management and policies of that company throughout this period.  Each of them acquired, held, voted and/or disposed of those shares pursuant to an agreement among them to do so.

282.     Honig, Stetson and HSCI acquired and held beneficial ownership of more than 5% shares in Company C from on or about February 2014, and collectively controlled the

management and policies of that company from that time.  Each of them acquired, held, voted and/or disposed of those shares pursuant to an agreement among them to do so.

283.    Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI acquired and held beneficial ownership of more than 5% shares in Company C from on or about April 2015 through at least on or about December 2015, and collectively controlled the management and policies of that company throughout this period.  Each of them acquired, held, voted and/or disposed of those shares pursuant to an agreement among them to do so.

284.    Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI were each under an obligation to file with the Commission true and accurate reports with respect to their ownership of the Company B and Company C securities, and failed to do so, thereby violating Exchange Act Section 13(d) and Rule 13d-1(a) thereunder.

285.    By reason of the foregoing, Honig, Brauser, Stetson, O'Rourke, ATG, GRQ, Grander, HSCI and SCI violated  Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

### THIRTEENTH CLAIM FOR RELIEF
### Violations of Section 13(d) of the Exchange Act and Rule 13d-2
### (Against Ladd)

286.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

287.    By engaging in the acts and conduct described in this Complaint, Ladd violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-2 [17 C.F.R. § 240.13d-2] thereunder, which require persons who directly or indirectly acquire beneficial ownership of more than 5% of a Section 12-registered class of equity securities to make a Schedule 13D filing, or, in limited circumstances, a Schedule 13G filing.  Exchange Act Section 13(d)(2) and Rule

13d-2(a) thereunder require persons to make amended Schedule 13D filings "promptly" as material changes occur in previously made disclosures. An acquisition or disposition of 1% or more of Company B's stock is material for purposes of Rule 13d-2.

288. Ladd violated Exchange Act Section 13(d) and Rule 13d-2 thereunder by failing to make any Schedule 13D/A filings after January 10, 2012 despite the material changes to his beneficial ownership of Company B stock in the interim.

289. By reason of the foregoing, Ladd violated, and, unless enjoined and restrained, will continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)], and Rule 13d-2 thereunder [17 C.F.R. § 240.13d-2].

<div align="center">

**FOURTEENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 13(a) of the Exchange Act and**
**Rules 12b-20 and 13a-1**
**(Against Ladd)**

</div>

290. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

291. By engaging in the acts and conduct described in this Complaint, Company B violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1 [17 C.F.R. § 240.13a-1(a)] thereunder, which require issuers of registered securities under the Exchange Act to file annual reports on Form 10-K with the Commission that, among other things, do not contain untrue statements of material fact or omit to state material information necessary in order to make the required statements, in the light of the circumstances under which they are made, not misleading.

292. Ladd aided and abetted Company B's violation of Exchange Act Section 13(a) and Rule 12b-20 and 13a-1 thereunder, by, among other things, providing knowing and substantial assistance to Company B's filing of a materially false and misleading annual report in

<div align="center">101</div>

signing its 2015 Form 10-K that failed to disclose the group ownership of Company B stock by

Honig, Brauser, Stetson, O'Rourke and others; and failing properly to disclose his own beneficial

ownership of Company B securities.

293.     By reason of the foregoing, Ladd aided and abetted, and, unless restrained and

enjoined, will continue aiding and abetting, Company B's violations of Section 13(a) of the

Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 [17 C.F.R. § 240.12b-20] and 13a-1(a)

thereunder [17 C.F.R. § 240.13a-1(a)], in violation of Section 20(e) of the Exchange Act [15

U.S.C. § 78t(e)].

<div align="center">

**FIFTEENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 15(d) of the Exchange Act and**
**Rule 15d-1**
**(Against Maza and Keller)**

</div>

294.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 221 of this Complaint.

295.     By engaging in the acts and conduct described in this Complaint, Company A

violated Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder [17

C.F.R. § 240.15d-1], which require issuers of registered securities under the Securities Act to file

annual reports on Form 10-K with the Commission that, among other things, do not contain

untrue statements of material fact or omit to state material information necessary in order to

make the required statements, in the light of the circumstances under which they are made, not

misleading.

296.     Maza and Keller aided and abetted Company A's violation of Exchange Act

Section 15(d) and Rule 15d-1 thereunder, by, among other things, providing knowing and

substantial assistance to Company A's filing of a materially false and misleading annual report in

signing its 2012 amended Form 10-K that failed to disclose the group ownership of Company A

stock by Honig, Brauser, Stetson and other affiliates.

297.    By reason of the foregoing, Maza and Keller aided and abetted Company A's

violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rule 15d-1 thereunder

[17 C.F.R. § 240.15d-1], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

### SIXTEENTH CLAIM FOR RELIEF
### Violations of Section 17(b) of the Securities Act
### (Against Ford)

298.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 221 of this Complaint.

299.    By engaging in the acts and conduct described in this Complaint, Defendant Ford

directly or indirectly, singly or in concert, by use of the means or instruments of transportation or

communication in interstate commerce, or by the use of the mails, in the offer or sale of

Company A and/or Company C securities, has published, given publicity to, or circulated any

notice, circular, advertisement, newspaper, article, letter, investment service, or communication

which, though not purporting to offer a security for sale, described such security for a

consideration received or to be received, directly or indirectly, from an issuer, underwriter, or

dealer, without fully disclosing the receipt, whether past or prospective, of such consideration

and the amount thereof.

300.    Ford violated Securities Act Section 17(b) by, among other things, obtaining

compensation directly or indirectly from Honig, Brauser, Stetson and/or O'Rourke – each a

statutory underwriter of Company A and Company C – and/or from certain of Honig's,

Brauser's, Stetson's and/or O'Rourke's associates– for writing the promotional articles he

published on Company A and Company C without disclosing his receipt or the amount of that

compensation.

301.    By reason of the foregoing, Ford, directly or indirectly, violated Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## SEVENTEENTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 16(a) and Rule 16a-3 Thereunder
### (Against Ladd)

302.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 221 of this Complaint.

303.    By engaging in the acts and conduct described in this Complaint, Defendant Ladd failed to file statements, and filed inaccurate statements, with the Commission required to be filed by Exchange Act Section 16(a) and Rule 16a-3 thereunder regarding certain of Ladd's purchases and sales of Company B stock in his E*Trade Account, TD IRA Account and TD Account.

304.    By virtue of the foregoing, Defendant Ladd violated and, unless restrained and enjoined, will continue violating, Exchange Act Section 16(a), [15 U.S.C. § 78p(a)], and Rule 16a-3 thereunder, [17 C.F.R. § 240.16a-3].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief, in a Final Judgment:

### I.

Finding that Defendants violated the federal securities laws and rules promulgated thereunder as alleged against them herein;

### II.

Permanently restraining and enjoining Ladd his agents, servants, employees and attorneys and all persons in active concert or participation with him who receive actual notice of the

injunction by personal service or otherwise, and each of them, from violating, directly or

indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a) and (c), and

77q(a)]; and Sections 10(b), 13(a) and (d), and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b),

78m(a) and (d), and 78p(a)] and Rules 10b-5, 12b-20, 13a-1, 13d-2, and 16a-3 thereunder [17

C.F.R. §§ 240.10b-5, 12b-20, 13a-1, 13d-2, and 16a-3].

## III.

Permanently barring each of Ladd and Maza from acting as an officer or director of a

public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## IV.

Permanently prohibiting Ladd and Maza from participating in any offering of penny

stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of

the Exchange Act [15 U.S.C. § 78u(d)(6)].

## V.

Ordering Defendants Ladd, Honig, GRQ, Keller, Maza, Ford, and HSCI, to disgorge all

of the ill-gotten gains from the violations alleged in this complaint, and ordering them to pay

prejudgment interest thereon;

## VI.

Ordering Defendants Ladd, Honig, GRQ, Keller, Maza, Ford, and HSCI to pay civil

money penalties pursuant to Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)] and

Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

## VII.

Granting such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury as to all issues so triable.

Dated: March 16, 2020
New York, New York

By: _____

Sanjay Wadhwa
Michael Paley
Charu Chandrasekhar
Nancy Brown
Jack Kaufman
Katherine Bromberg
Jon Daniels
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

# Exhibit D

| **From:** | John Stetson [stetson.john@gmail.com] |
|---|---|
| **Sent:** | 1/27/2012 10:05:16 AM |
| **To:** | BRHonig@aol.com [brhonig@aol.com] |
| **Subject:** | Izea |
| **Attachments:** | Breakdown(1).xlsx |

**IZEA Share Breakdown**

| Entity | Post Split Shares |
|---|---|
| Mike Brauser | 3,250,000 |
| Melechdavid (Mark Groussman) | |
| Barry Honig | 1,940,023 |
| HS Contrarian Investments LLC (John Stetson) | 1,400,000 |
| | |
| Ben Brauser | 250,001 |
| John Stetson | 225,000 |
| Frost Gamma Investments Trust | |
| | |
| | |
| Josh Brauser | 84,444 |
| Dan Brauser | 84,444 |
| | |
| **TOTAL** | **12,500,000** |

# Exhibit E

| From: | John Stetson [stetson.john@gmail.com] |
|---|---|
| Sent: | 1/20/2011 12:58:59 PM |
| To: | Tanya [tanya@tarmacmanagement.com] |
| Subject: | Subscriber List |
| Attachments: | Subscriber List.xlsx |

Hi Tanya,

Here is the subscriber list. I have checked off the docs from which I forwarded and wires that you received based on what you told me. Please update with anything missing.

As of yesterday, here were the currency rates we were given:

50,356 - 50,000 CAD
75,521 - 75,000
100,681 - 100,000
201,329 - 200,000
301,993 - 300,000

Thanks,

John

Confidential Treatment Requested by JS/SCI/HSCI

Case 1:19-mc-24587-MGC Document 4-1 Entered on FLSD Docket 11/18/2019 Page 22 of 25

**Passport Potash, Inc.**

| Entity Name | Subscription $ | | Doc's Rec'd? | Wire Rec'd? | |
|---|---|---|---|---|---|
| Frost Gamma Investments Trust | $ | | Yes | Yes | |
| GRQ Consultants, Inc. 401K | $ | 300,000 | Yes | | |
| Barry Honig | $ | 200,000 | Yes | Yes | |
| Michael Brauser | $ | 711,079 | Yes | Yes | *Michael Brauser wire |
| Josh Brauser | $ | 10,000 | Yes | Yes | Wire included in Micha |
| Ben Brauser | $ | 10,000 | Yes | Yes | Wire included in Micha |
| Dan Brauser | $ | 10,000 | Yes | Yes | Wire included in Micha |
| Brauser Family Trust | $ | 70,296 | Yes | Yes | |
| Grander Holdings | $ | 22,000 | Yes | Yes | |
| | **$** | **5,513,375** | | | |

d for Michael, Josh, Ben, Dan, ▮ + a portion of Grandor 401K
ael's
ael's
ael's
ael's

# Exhibit F

Morgan, Lewis & Bockius LLP
502 Carnegie Center
Princeton, NJ 08540
Tel: 609.919.6600
Fax: 609.919.6701
www.morganlewis.com

# Morgan Lewis

COUNSELORS AT LAW
A Pennsylvania Limited Liability Partnership

RANDALL B. SUNBERG
Partner-in-Charge

October 2, 2013

Via Email (opinions@amstock.com)
American Stock Transfer & Trust Company
6201 15th Avenue
Brooklyn, NY 11219

       Re:    <u>Senesco Technologies, Inc.</u>

Ladies and Gentlemen:

We have acted as counsel for Senesco Technologies, Inc., a Delaware corporation (the "Company"), in connection with the issuance by the Company of an aggregate of 69,000,000 shares (the "Shares") of the Company's common stock, par value $0.01 per share (the "Common Stock"), to be issued pursuant to the Securities Purchase Agreement, dated September 30, 2013 (the "Purchase Agreement"), by and among the Company and the investors named on <u>Exhibit A</u> attached hereto (collectively, the "Holders") pursuant to which the Company is issuing to the Holders the Shares, and, in such capacity, have been requested by the Company to furnish you with this opinion with respect to the Shares.

As a basis for this opinion, we have examined and are familiar with and have relied upon the Company's Amended and Restated Certificate of Incorporation, as amended, and its Amended and Restated By-Laws, records of meetings of the Board of Directors of the Company as provided to us by the Company, corporate proceedings of the Company in connection with the authorization and issuance of the Shares, the Purchase Agreement, the Registration Statement on Form S-1 (File No. 333-189998) filed by the Company with the U.S. Securities and Exchange Commission (the "Commission") (the "Registration Statement"), the effectiveness order posted by the Commission on its Electronic Data Gathering and Retrieval System indicating that as of 4:00 P.M., Washington, D.C. time, on September 30, 2013 the Registration Statement had been declared effective and such other documents as we have deemed necessary as a basis for the opinions hereinafter expressed.

In our examination of the foregoing documents, we have made no independent investigation, and we have assumed the genuineness of all signatures, the completeness of all corporate and stock records provided to us, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as copies, the authenticity of the originals of such latter documents and the legal competence of all signatories to such documents.

Almaty  Beijing  Boston  Brussels  Chicago  Dallas  Frankfurt  Harrisburg  Houston  Irvine  London  Los Angeles  Miami
Moscow  New York  Palo Alto  Paris  Philadelphia  Pittsburgh  Princeton  San Francisco  Tokyo  Washington  Wilmington

American Stock Transfer & Trust Company
October 2, 2013
Page 2

**Morgan Lewis**
COUNSELORS AT LAW
A Pennsylvania Limited Liability Partnership

We express no opinion herein as to the laws of any state or jurisdiction other than the state laws of the State of New Jersey, the Delaware General Corporation Law statute and the federal laws of the United States of America. To the extent that any other laws are applicable to the matters as to which we are opining herein, we have assumed with your permission and without independent investigation that such laws are identical to the state laws of the State of New Jersey, and we express no opinion as to whether such assumption is reasonable or correct. We express no opinion with respect to the compliance or noncompliance with the "blue sky" laws of any state, or with the antifraud provisions of state and federal laws, rules and regulations concerning the issuance of securities.

Based upon and subject to the foregoing, we are of the opinion that as of the date of this opinion the Shares are registered for sale under the Securities Act under the effective Registration Statement and may be issued without a restrictive legend.

Based upon and subject to the foregoing, we are of the opinion that the Shares have been duly authorized for issuance and, when the Shares are issued in accordance with the terms and conditions of the Purchase Agreement, the Shares will be validly issued, fully paid and nonassessable.

This opinion is based upon currently existing statutes, rules, regulations and judicial decisions and is rendered as of the date hereof, and we disclaim any obligation to advise you of any change in any of the foregoing sources of law or subsequent developments in law or changes in facts or circumstances which might affect any matters or opinions set forth herein.

Please note that we are opining only as to the matters expressly set forth herein, and no opinion should be inferred as to any other matters. This opinion is being delivered to you solely in connection with your service as the Transfer Agent and Registrar of the Common Stock, and may not be relied upon by any other party or used for any other purpose without our prior written consent.

Very truly yours,

Morgan, Lewis & Bockius LLP



## EXHIBIT A

List of Holders and Number of Shares Purchased

| Holder | Number of Shares |
|---|---|
| Barry Honig | 30,000,000 |
| Michael Brauser | 16,000,000 |
| ███████████ | |
| Daniel Brauser | 1,000,000 |
| Ben Brauser | 1,000,000 |
| ███████████ | |
| Joshua Brauser | 1,000,000 |
| Melechdavid Inc. Retirement Plan | ████ |
| Erica Groussman C/F Alicia Groussman UTMA/FL | ████ |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

# Exhibit G

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

| OMB APPROVAL |
|---|
| OMB Number:     3235-0060 |
| Expires:     October 31, 2024 |
| Estimated average burden |
| hours per response........9.21 |

## FORM 8-K

## CURRENT REPORT
**Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported) _____

_____

(Exact name of registrant as specified in its charter)

_____

| (State or other jurisdiction | (Commission | (IRS Employer |
| of incorporation) | File Number) | Identification No.) |

_____

(Address of principal executive offices)                              (Zip Code)

Registrant's telephone number, including area code _____

_____

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| | | |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

SEC 873 (02-21)

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

1 of 22

## GENERAL INSTRUCTIONS

**A. Rule as to Use of Form 8-K.**

1. Form 8-K shall be used for current reports under Section 13 or 15(d) of the Securities Exchange Act of 1934, filed pursuant to Rule 13a-11 or Rule 15d-11 and for reports of nonpublic information required to be disclosed by Regulation FD (17 CFR 243.100 and 243.101).

2. Form 8-K may be used by a registrant to satisfy its filing obligations pursuant to Rule 425 under the Securities Act, regarding written communications related to business combination transactions, or Rules 14a-12(b) or Rule 14d-2(b) under the Exchange Act, relating to soliciting materials and pre-commencement communications pursuant to tender offers, respectively, provided that the Form 8-K filing satisfies all the substantive requirements of those rules (other than the Rule 425(c) requirement to include certain specified information in any prospectus filed pursuant to such rule). Such filing is also deemed to be filed pursuant to any rule for which the box is checked. A registrant is not required to check the box in connection with Rule 14a-12(b) or Rule 14d-2(b) if the communication is filed pursuant to Rule 425. Communications filed pursuant to Rule 425 are deemed filed under the other applicable sections. See Note 2 to Rule 425, Rule 14a-12(b) and Instruction 2 to Rule 14d-2(b)(2).

## B. Events to be Reported and Time for Filing of Reports.

1. A report on this form is required to be filed or furnished, as applicable, upon the occurrence of any one or more of the events specified in the items in Sections 1 - 6 and 9 of this form. Unless otherwise specified, a report is to be filed or furnished within four business days after occurrence of the event. If the event occurs on a Saturday, Sunday or holiday on which the Commission is not open for business, then the four business day period shall begin to run on, and include, the first business day thereafter. A registrant either furnishing a report on this form under Item 7.01 (Regulation FD Disclosure) or electing to file a report on this form under Item 8.01 (Other Events) solely to satisfy its obligations under Regulation FD (17 CFR 243.100 and 243.101) must furnish such report or make such filing, as applicable, in accordance with the requirements of Rule 100(a) of Regulation FD (17 CFR 243.100(a)), including the deadline for furnishing or filing such report. A report pursuant to Item 5.08 is to be filed within four business days after the registrant determines the anticipated meeting date.

2. The information in a report furnished pursuant to Item 2.02 (Results of Operations and Financial Condition) or Item 7.01 (Regulation FD Disclosure) shall not be deemed to be "filed" for purposes of Section 18 of the Exchange Act or otherwise subject to the liabilities of that section, unless the registrant specifically states that the information is to be considered "filed" under the Exchange Act or incorporates it by reference into a filing under the Securities Act or the Exchange Act. If a report on Form 8-K contains disclosures under Item 2.02 or Item 7.01, whether or not the report contains disclosures regarding other items, all exhibits to such report relating to Item 2.02 or Item 7.01 will be deemed furnished, and not filed, unless the registrant specifies, under Item 9.01 (Financial Statements and Exhibits), which exhibits, or portions of exhibits, are intended to be deemed filed rather than furnished pursuant to this instruction.

3. If the registrant previously has reported substantially the same information as required by this form, the registrant need not make an additional report of the information on this form. To the extent that an item calls for disclosure of developments concerning a previously reported event or transaction, any information required in the new report or amendment about the previously reported event or transaction may be provided by incorporation by reference to the previously filed report. The term underlined previously reported is defined in Rule 12b-2 (17 CFR 240.12b-2).

4. Copies of agreements, amendments or other documents or instruments required to be filed pursuant to Form 8-K are not required to be filed or furnished as exhibits to the Form 8-K unless specifically required to be filed or furnished by the applicable Item. This instruction does not affect the requirement to otherwise file such agreements, amendments or other documents or instruments, including as exhibits to registration statements and periodic reports pursuant to the requirements of Item 601 of Regulation S-K.

5. When considering current reporting on this form, particularly of other events of material importance pursuant to Item 7.01 (Regulation FD Disclosure) and Item 8.01(Other Events), registrants should have due regard for the accuracy, completeness and currency of the information in registration statements filed under the Securities Act which incorporate by reference information in reports filed pursuant to the Exchange Act, including reports on this form.

6. A registrant's report under Item 7.01 (Regulation FD Disclosure) or Item 8.01 (Other Events) will not be deemed an admission as to the materiality of any information in the report that is required to be disclosed solely by Regulation FD.

**C. Application of General Rules and Regulations.**

1. The General Rules and Regulations under the Act (17 CFR Part 240) contain certain general requirements which are applicable to reports on any form. These general requirements should be carefully read and observed in the preparation and filing of reports on this form.

2. Particular attention is directed to Regulation 12B (17 CFR 240.12b-1 et seq.) which contains general requirements regarding matters such as the kind and size of paper to be used, the legibility of the report, the information to be given whenever the title of securities is required to be stated, and the filing of the report. The definitions contained in Rule 12b-2 should be especially noted. See also Regulations 13A (17 CFR 240.13a-1 et seq.) and 15D (17 CFR 240.1 5d-1 et seq.).

**D. Preparation of Report.**

This form is not to be used as a blank form to be filled in, but only as a guide in the preparation of the report on paper meeting the requirements of Rule 12b-12 (17 CFR 240.12b-12). The report shall contain the number and caption of the applicable item, but the text of such item may be omitted, provided the answers thereto are prepared in the manner specified in Rule 12b-13 (17 CFR 240.12b-13). To the extent that Item 1.01 and one or more other items of the form are applicable, registrants need not provide the number and caption of Item 1.01 so long as the substantive disclosure required by Item 1.01 is disclosed in the report and the number and caption of the other applicable item(s) are provided. All items that are not required to be answered in a particular report may be omitted and no reference thereto need be made in the report. All instructions should also be omitted.

**E. Signature and Filing of Report.**

Three complete copies of the report, including any financial statements, exhibits or other papers or documents filed as a part thereof, and five additional copies which need not include exhibits, shall be filed with the Commission. At least one complete copy of the report, including any financial statements, exhibits or other papers or documents filed as a part thereof, shall be filed, with each exchange on which any class of securities of the registrant is registered. At least one complete copy of the report filed with the Commission and one such copy filed with each exchange shall be manually signed. Copies not manually signed shall bear typed or printed signatures.

**F. Incorporation by Reference.**

If the registrant makes available to its stockholders or otherwise publishes, within the period prescribed for filing the report, a press release or other document or statement containing information meeting some or all of the requirements of this form, the information called for may be incorporated by reference to such published document or statement, in answer or partial answer to any item or items of this form, provided copies thereof are filed as an exhibit to the report on this form.

**G. Use of this Form by Asset-Backed Issuers.**

The following applies to registrants that are asset-backed issuers. Terms used in this General Instruction G. have the same meaning as in Item 1101 of Regulation AB (17 CFR 229.1101).

1. *Reportable Events That May Be Omitted.*

The registrant need not file a report on this Form upon the occurrence of any one or more of the events specified in the following:

(a) Item 2.01, Completion of Acquisition or Disposition of Assets;

(b) Item 2.02, Results of Operations and Financial Condition;

(c) Item 2.03, Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant;

(d) Item 2.05, Costs Associated with Exit or Disposal Activities;

(e) Item 2.06, Material Impairments;

(f) Item 3.01, Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing;

(g) Item 3.02, Unregistered Sales of Equity Securities;

(h) Item 4.01, Changes in Registrant's Certifying Accountant;

(i) Item 4.02, Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review;

(j) Item 5.01, Changes in Control of Registrant;

(k) Item 5.02, Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers;

(*l*) Item 5.04, Temporary Suspension of Trading Under Registrant's Employee Benefit Plans; and

(m) Item 5.05, Amendments to the Registrant's Code of Ethics, or Waiver of a Provision of the Code of Ethics.

2. *Additional Disclosure for the Form 8-K Cover Page*.

Immediately after the name of the issuing entity on the cover page of the Form 8-K, as separate line items, identify the exact name of the depositor as specified in its charter and the exact name of the sponsor as specified in its charter. Include a Central Index Key number for the depositor and the issuing entity, and if available, the sponsor.

3. *Signatures*.

The Form 8-K must be signed by the depositor. In the alternative, the Form 8-K may be signed on behalf of the issuing entity by a duly authorized representative of the servicer. If multiple servicers are involved in servicing the pool assets, a duly authorized representative of the master servicer (or entity performing the equivalent function) must sign if a representative of the servicer is to sign the report on behalf of the issuing entity.

## INFORMATION TO BE INCLUDED IN THE REPORT

**Section 1 - Registrant's Business and Operations**

**Item 1.01 Entry into a Material Definitive Agreement.**

(a) If the registrant has entered into a material definitive agreement not made in the ordinary course of business of the registrant, or into any amendment of such agreement that is material to the registrant, disclose the following information:

(1) the date on which the agreement was entered into or amended, the identity of the parties to the agreement or amendment and a brief description of any material relationship between the registrant or its affiliates and any of the parties, other than in respect of the material definitive agreement or amendment; and

(2) a brief description of the terms and conditions of the agreement or amendment that are material to the registrant.

(b) For purposes of this Item 1.01, a material definitive agreement means an agreement that provides for obligations that are material to and enforceable against the registrant, or rights that are material to the registrant and enforceable by the registrant against one or more other parties to the agreement, in each case whether or not subject to conditions.

Instructions.

1. Any material definitive agreement of the registrant not made in the ordinary course of the registrant's business must be disclosed under this Item 1.01. An agreement is deemed to be not made in the ordinary course of a registrant's business even if the agreement is such as ordinarily accompanies the kind of business conducted by the registrant if it involves the subject matter identified in Item 601(b)(10)(ii) (A) - (D) of Regulation S-K (17 CFR 229.601(b)(10)(ii)(A) - (D)). An agreement involving the subject matter identified in Item 601(b) (10)(iii)(A) or (B)  need not be disclosed under this Item.

2. A registrant must provide disclosure under this Item 1.01 if the registrant succeeds as a party to the agreement or amendment to the

agreement by assumption or assignment (other than in connection with a merger or acquisition or similar transaction).

3. With respect to asset-backed securities, as defined in Item 1101 of Regulation AB (17 CFR 229.1101), disclosure is required under this Item 1.01 regarding the entry into or an amendment to a definitive agreement that is material to the asset-backed securities transaction, even if the registrant is not a party to such agreement (*e.g.*, a servicing agreement with a servicer contemplated by Item 1108(a)(3) of Regulation AB (17 CFR 229.1108(a)(3)).

4. To the extent a material definitive agreement is filed as an exhibit under this Item 1.01, schedules (or similar attachments) to the exhibits are not required to be filed unless they contain information material to an investment or voting decision and that information is not otherwise disclosed in the exhibit or the disclosure document. Each exhibit filed must contain a list briefly identifying the contents of all omitted schedules. Registrants need not prepare a separate list of omitted information if such information is already included within the exhibit in a manner that conveys the subject matter of the omitted schedules and attachments. In addition, the registrant must provide a copy of any omitted schedule to the Commission or its staff upon request.

5. To the extent a material definitive agreement is filed as an exhibit under this Item 1.01, the registrant may redact information from the exhibit if disclosure of such information would constitute a clearly unwarranted invasion of personal privacy (e.g., disclosure of bank account numbers, social security numbers, home addresses and similar information).

6. To the extent a material definitive agreement is filed as an exhibit under this Item 1.01, the registrant may redact provisions or terms of the exhibit if those provisions or terms are both (i) not material and (ii) would likely cause competitive harm to the registrant if publicly disclosed, provided that the registrant intends to incorporate by reference this filing into its future periodic reports or registration statements, as applicable, in satisfaction of Item 601(b)(10) of Regulation S-K. If it chooses to redact information pursuant to this instruction, the registrant should mark the exhibit index to indicate that portions of the exhibit or exhibits have been omitted and include a prominent statement on the first page of the redacted exhibit that certain identified information has been excluded from the exhibit because it is both (i) not material and (ii) would likely cause competitive harm to the registrant if publicly disclosed. The registrant also must indicate by brackets where the information is omitted from the filed version of the exhibit.

If requested by the Commission or its staff, the registrant must promptly provide an unredacted copy of the exhibit on a supplemental basis. The Commission or its staff also may request the registrant to provide its materiality and competitive harm analyses on a supplemental basis. Upon evaluation of the registrant's supplemental materials, the Commission or its staff may request the registrant to amend its filing to include in the exhibit any previously redacted information that is not adequately supported by the registrant's materiality and competitive harm analyses.

The registrant may request confidential treatment of the supplemental material submitted under Instruction 6 of this Item pursuant to Rule 83 (§ 200.83 of this chapter) while it is in the possession of the Commission or its staff. After completing its review of the supplemental information, the Commission or its staff will return or destroy it at the request of the registrant, if the registrant complies with the procedures outlined in Rules 418 or 12b-4 (§ 230.418 or 240.12b-4 of this chapter).

**Item 1.02 Termination of a Material Definitive Agreement.**

(a) If a material definitive agreement which was not made in the ordinary course of business of the registrant and to which the registrant is a party is terminated otherwise than by expiration of the agreement on its stated termination date, or as a result of all parties completing their obligations under such agreement, and such termination of the agreement is material to the registrant, disclose the following information:

(1) the date of the termination of the material definitive agreement, the identity of the parties to the agreement and a brief description of any material relationship between the registrant or its affiliates and any of the parties other than in respect of the material definitive agreement;

(2) a brief description of the terms and conditions of the agreement that are material to the registrant;

(3) a brief description of the material circumstances surrounding the termination; and

(4) any material early termination penalties incurred by the registrant.

(b) For purposes of this Item 1.02, the term material definitive agreement shall have the same meaning as set forth in Item 1.01(b).

Instructions.

1. No disclosure is required solely by reason of this Item 1.02 during negotiations or discussions regarding termination of a material definitive agreement unless and until the agreement has been terminated.

2. No disclosure is required solely by reason of this Item 1.02 if the registrant believes in good faith that the material definitive agreement has not been terminated, unless the registrant has received a notice of termination pursuant to the terms of agreement.

3. With respect to asset-backed securities, as defined in Item 1101 of Regulation AB (17 CFR 229.1101), disclosure is required under this Item 1.02 regarding the termination of a definitive agreement that is material to the asset-backed securities transaction (otherwise than by expiration of the agreement on its stated termination date or as a result of all parties completing their obligations under such agreement), even if the registrant is not a party to such agreement (*e.g.*, a servicing agreement with a servicer contemplated by Item 1108(a)(3) of Regulation AB (17 CFR 229.1108(a)(3)).

**Item 1.03 Bankruptcy or Receivership.**

(a) If a receiver, fiscal agent or similar officer has been appointed for a registrant or its parent, in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the registrant or its parent, or if such jurisdiction has been assumed by leaving the existing directors and officers in possession but subject to the supervision and orders of a court or governmental authority, disclose the following information:

(1) the name or other identification of the proceeding;

(2) the identity of the court or governmental authority;

(3) the date that jurisdiction was assumed; and

(4) the identity of the receiver, fiscal agent or similar officer and the date of his or her appointment.

(b) If an order confirming a plan of reorganization, arrangement or liquidation has been entered by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the registrant or its parent, disclose the following;

(1) the identity of the court or governmental authority;

(2) the date that the order confirming the plan was entered by the court or governmental authority;

(3) a summary of the material features of the plan and, pursuant to Item 9.01 (Financial Statements and Exhibits), a copy of the plan as confirmed;

(4) the number of shares or other units of the registrant or its parent issued and outstanding, the number reserved for future issuance in respect of claims and interests filed and allowed under the plan, and the aggregate total of such numbers; and

(5) information as to the assets and liabilities of the registrant or its parent as of the date that the order confirming the plan was entered, or a date as close thereto as practicable.

Instructions.

1. The information called for in paragraph (b)(5) of this Item 1.03 may be presented in the form in which it was furnished to the court or governmental authority.

2. With respect to asset-backed securities, disclosure also is required under this Item 1.03 if the depositor (or servicer if the servicer signs the report on Form 10-K (17 CFR 249.310) of the issuing entity) becomes aware of any instances described in paragraph (a) or (b) of this Item with respect to the sponsor, depositor, servicer contemplated by Item 1108(a)(3) of Regulation AB (17 CFR 229.1108(a) (3)), trustee, significant obligor, enhancement or support provider contemplated by Items 1114(b) or 1115 of Regulation AB (17 CFR 229.1114(b) or 229.1115) or other material party contemplated by Item 1101(d)(1) of Regulation AB (17 CFR 1101(d)(1)). Terms used in this Instruction 2 have the same meaning as in Item 1101 of Regulation AB (17 CFR 229.1101).

**Item 1.04 Mine Safety – Reporting of Shutdowns and Patterns of Violations.**

(a) If the registrant or a subsidiary of the registrant has received, with respect to a coal or other mine of which the registrant or a subsidiary of the registrant is an operator
 • an imminent danger order issued under section 107(a) of the Federal Mine Safety and Health Act of 1977 (30 U.S.C. 817(a));

 • a written notice from the Mine Safety and Health Administration that the coal or other mine has a pattern of violations of mandatory health or safety standards that are of such nature as could have significantly and substantially contributed to the cause and effect of coal or other mine health or safety hazards under section 104(e) of such Act (30 U.S.C. 814(e)); or

 • a written notice from the Mine Safety and Health Administration that the coal or other mine has the potential  to have such a pattern, disclose the following information:

(1) The date of receipt by the issuer or a subsidiary of such order or notice.

(2) The category of the order or notice.

(3) The name and location of the mine involved.

*Instructions to Item 1.04.*

1. The term "coal or other mine" means a coal or other mine, as defined in section 3 of the Federal Mine Safety and Health Act of 1977 (30 U.S.C. 802), that is subject to the provisions of such Act (30 U.S.C. 801 et seq).

2. The term "operator" has the meaning given the term in section 3 of the Federal Mine Safety and Health Act of 1977 (30 U.S.C. 802).

**Section 2 - Financial Information**

**Item 2.01 Completion of Acquisition or Disposition of Assets.**

If the registrant or any of its subsidiaries consolidated has completed the acquisition or disposition of a significant amount of assets, otherwise than in the ordinary course of business, or the acquisition or disposition of a significant amount of assets that constitute a real estate operation as defined in § 210.3-14(a)(2) disclose the following information:

(a) the date of completion of the transaction;

(b) a brief description of the assets involved;

(c) the identity of the person(s) from whom the assets were acquired or to whom they were sold and the nature of any material relationship, other than in respect of the transaction, between such person(s) and the registrant or any of its affiliates, or any director or officer of the registrant, or any associate of any such director or officer;

(d) the nature and amount of consideration given or received for the assets and, if any material relationship is disclosed pursuant to paragraph (c) of this Item 2.01, the formula or principle followed in determining the amount of such consideration;

(e) if the transaction being reported is an acquisition and if a material relationship exists between the registrant or any of its affiliates and the source(s) of the funds used in the acquisition, the identity of the source(s) of the funds unless all or any part of the consideration used is a loan made in the ordinary course of business by a bank as defined by Section 3(a)(6) of the Act, in which case the identity of such bank may be omitted provided the registrant:

(1) has made a request for confidentiality pursuant to Section 13(d)(1)(B) of the Act; and

(2) states in the report that the identity of the bank has been so omitted and filed separately with the Commission; and

(f) if the registrant was a shell company, other than a business combination related shell company, as those terms are defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), immediately before the transaction, the information that would be required if the registrant were filing a general form for registration of securities on Form 10 under the Exchange Act reflecting all classes of the registrant's securities subject to the reporting requirements of Section 13 (15 U.S.C. 78m) or Section 15(d) (15 U.S.C. 78o(d)) of such Act upon consummation of the transaction. Notwithstanding General Instruction B.3. to Form 8-K, if any disclosure required by this Item 2.01(f) is previously reported, as that term is defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), the registrant may identify the filing in which that disclosure is included instead of including that disclosure in this report.

Instructions.

1. No information need be given as to:

(i) any transaction between any person and any wholly-owned subsidiary of such person;

(ii) any transaction between two or more wholly-owned subsidiaries of any person; or

(iii) the redemption or other acquisition of securities from the public, or the sale or other disposition of securities to the public, by the issuer of such securities or by a wholly-owned subsidiary of that issuer.

2. The term acquisition includes every purchase, acquisition by lease, exchange, merger, consolidation, succession or other acquisition, except that the term does not include the construction or development of property by or for the registrant or its subsidiaries or the acquisition

of materials for such purpose. The term <u>disposition</u> includes every sale, disposition by lease, exchange, merger, consolidation, mortgage, assignment or hypothecation of assets, whether for the benefit of creditors or otherwise, abandonment, destruction, or other disposition.

3. The information called for by this Item 2.01 is to be given as to each transaction or series of related transactions of the size indicated. The acquisition or disposition of securities is deemed the indirect acquisition or disposition of the assets represented by such securities if it results in the acquisition or disposition of control of such assets.

4. An acquisition or disposition will be deemed to involve a significant amount of assets:

(i) if the registrant's and its other subsidiaries' equity in the net book value of such assets or the amount paid or received for the assets upon such acquisition or disposition exceeded 10 percent of the total assets of the registrant and its consolidated subsidiaries;

(ii) if it involved a business (see 17 CFR 210.11-01(d)) that is significant (see 17 CFR 210.11-01(b)). The acquisition of a business encompasses the acquisition of an interest in a business accounted for by the registrant under the equity method or, in lieu of the equity method, the fair value option; or

(iii) in the case of a business development company, if the amount paid for such assets exceeded 10 percent of the value of the total investments of the registrant and its consolidated subsidiaries.

The aggregate impact of acquired businesses are not required to be reported pursuant to this Item 2.01 unless they are related businesses (see 17 CFR 210.3-05(a)(3)), related real estate operations (see 17 CFR 210.3-14(a)(3)), or related funds (see 17 CFR 210.6-11(a)(3)), and are significant in the aggregate.

5. Attention is directed to the requirements in Item 9.01 (Financial Statements and Exhibits) with respect to the filing of:

(i) financial statements of businesses or funds acquired;

(ii) <u>pro forma</u> financial information; and

(iii) copies of the plans of acquisition or disposition as exhibits to the report.


**Item 2.02 Results of Operations and Financial Condition.**

(a) If a registrant, or any person acting on its behalf, makes any public announcement or release (including any update of an earlier announcement or release) disclosing material non-public information regarding the registrant's results of operations or financial condition for a completed quarterly or annual fiscal period, the registrant shall disclose the date of the announcement or release, briefly identify the announcement or release and include the text of that announcement or release as an exhibit.

(b) A Form 8-K is not required to be furnished to the Commission under this Item 2.02 in the case of disclosure of material non-public information that is disclosed orally, telephonically, by webcast, by broadcast, or by similar means if:

(1) the information is provided as part of a presentation that is complementary to, and initially occurs within 48 hours after, a related, written announcement or release that has been furnished on Form 8-K pursuant to this Item 2.02 prior to the presentation;

(2) the presentation is broadly accessible to the public by dial-in conference call, by webcast, by broadcast or by similar means;

(3) the financial and other statistical information contained in the presentation is provided on the registrant's website, together with any information that would be required under 17 CFR 244.100; and

(4) the presentation was announced by a widely disseminated press release, that included instructions as to when and how to access the presentation and the location on the registrant's website where the information would be available.

<u>Instructions</u>.

1. The requirements of this Item 2.02 are triggered by the disclosure of material non-public information regarding a completed fiscal year or quarter. Release of additional or updated material non-public information regarding a completed fiscal year or quarter would trigger an additional Item 2.02 requirement.

2. The requirements of paragraph (e)(1)(i) of Item 10 of Regulation S-K (17 CFR 229.10(e)(1)(i))  shall apply to disclosures under this Item 2.02.

8

3. Issuers that make earnings announcements or other disclosures of material non-public information regarding a completed fiscal year or quarter in an interim or annual report to shareholders are permitted to specify which portion of the report contains the information required to be furnished under this Item 2.02.

4. This Item 2.02 does not apply in the case of a disclosure that is made in a quarterly report filed with the Commission on Form 10-Q (17 CFR 249.308a) or an annual report filed with the Commission on Form 10-K (17 CFR 249.310).

**Item 2.03 Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

(a) If the registrant becomes obligated on a direct financial obligation that is material to the registrant, disclose the following information:

(1) the date on which the registrant becomes obligated on the direct financial obligation and a brief description of the transaction or agreement creating the obligation;

(2) the amount of the obligation, including the terms of its payment and, if applicable, a brief description of the material terms under which it may be accelerated or increased and the nature of any recourse provisions that would enable the registrant to recover from third parties; and

(3) a brief description of the other terms and conditions of the transaction or agreement that are material to the registrant.

(b) If the registrant becomes directly or contingently liable for an obligation that is material to the registrant arising out of an off-balance sheet arrangement, disclose the following information:

(1) the date on which the registrant becomes directly or contingently liable on the obligation and a brief description of the transaction or agreement creating the arrangement and obligation;

(2) a brief description of the nature and amount of the obligation of the registrant under the arrangement, including the material terms whereby it may become a direct obligation, if applicable, or may be accelerated or increased and the nature of any recourse provisions that would enable the registrant to recover from third parties;

(3) the maximum potential amount of future payments (undiscounted) that the registrant may be required to make, if different; and

(4) a brief description of the other terms and conditions of the obligation or arrangement that are material to the registrant.

(c) For purposes of this Item 2.03, <u>direct</u> <u>financial</u> <u>obligation</u> means any of the following:

(1) a <u>long-term debt obligation</u> means a payment obligation under long-term borrowings referenced in FASB ASC paragraph 470-10-50-1 (Debt Topic) as may be modified or supplemented;

(2) a <u>finance lease obligation</u> means a payment obligation under a lease that would be classified as a finance lease pursuant to FASB ASC Topic 842, Leases, as may be modified or supplemented;

(3) an <u>operating lease obligation</u> means a payment obligation under a lease that would be classified as an operating lease pursuant to FASB ASC Topic 840, as may be modified or supplemented; or

(4) a short-term debt obligation that arises other than in the ordinary course of business.

(d) For purposes of this Item 2.03, <u>off-balance sheet arrangement</u> means any transaction, agreement or other contractual arrangement to which an entity unconsolidated with the registrant is a party, under which the registrant has:

(1) Any obligation under a guarantee contract that has any of the characteristics identified in FASB  ASC paragraph 460-10-15-4 (Guarantees Topic), as may be modified or supplemented, and that is not excluded from the initial recognition and measurement provisions of FASB ASC paragraphs 460-10-15-7, 460-10-25-1, and 460-10-30-1.

(2) A retained or contingent interest in assets transferred to an unconsolidated entity or similar arrangement that serves as credit, liquidity or market risk support to such entity for such assets;

(3) Any obligation, including a contingent obligation, under a contract that would be accounted for as a derivative instrument, except that it is both indexed to the registrant's own stock and classified in stockholders' equity in the registrant's statement of financial position, and therefore excluded from the scope of FASB ASC Topic 815, Derivatives and Hedging, pursuant to FASB ASC subparagraph

815-10-15-74(a), as may be modified or supplemented; or

(4) Any obligation, including a contingent obligation, arising out of a variable interest (as  defined in the FASB ASC Master Glossary), as may be modified or supplemented) in an unconsolidated entity that is held by, and material to, the registrant, where such entity provides financing, liquidity, market risk or credit risk support to, or engages in leasing, hedging or research and development services with, the registrant.

(e) For purposes of this Item 2.03, short-term debt obligation means a payment obligation under a borrowing arrangement that is scheduled to mature within one year, or, for those registrants that use the operating cycle concept of working capital, within a registrant's operating cycle that is longer than one year, as discussed in FASB ASC paragraph 210-10-45-3 (Balance Sheet Topic).

Instructions.

1. A registrant has no obligation to disclose information under this Item 2.03 until the registrant enters into an agreement enforceable against the registrant, whether or not subject to conditions, under which the direct financial obligation will arise or be created or issued. If there is no such agreement, the registrant must provide the disclosure within four business days after the occurrence of the closing or settlement of the transaction or arrangement under which the direct financial obligation arises or is created.

2. A registrant must provide the disclosure required by paragraph (b) of this Item 2.03 whether or not the registrant is also a party to the transaction or agreement creating the contingent obligation arising under the off-balance sheet arrangement. In the event that neither the registrant nor any affiliate of the registrant is also a party to the transaction or agreement creating the contingent obligation arising under the off-balance sheet arrangement in question, the four business day period for reporting the event under this Item 2.03 shall begin on the earlier of (i) the fourth business day after the contingent obligation is created or arises, and (ii) the day on which an executive officer, as defined in 17 CFR 240.3b-7, of the registrant becomes aware of the contingent obligation.

3. In the event that an agreement, transaction or arrangement requiring disclosure under this Item 2.03 comprises a facility, program or similar arrangement that creates or may give rise to direct financial obligations of the registrant in connection with multiple transactions, the registrant shall:

(i) disclose the entering into of the facility, program or similar arrangement if the entering into of the facility is material to the registrant; and

(ii) as direct financial obligations arise or are created under the facility or program, disclose the required information under this Item 2.03 to the extent that the obligations are material to the registrant (including when a series of previously undisclosed individually immaterial obligations become material in the aggregate).

4. For purposes of Item 2.03(b)(3), the maximum amount of future payments shall not be reduced by the effect of any amounts that may possibly be recovered by the registrant under recourse or collateralization provisions in any guarantee agreement, transaction or arrangement.

5. If the obligation required to be disclosed under this Item 2.03 is a security, or a term of a security, that has been or will be sold pursuant to an effective registration statement of the registrant, the registrant is not required to file a Form 8-K pursuant to this Item 2.03, provided that the prospectus relating to that sale contains the information required by this Item 2.03 and is filed within the required time period under Securities Act Rule 424 (§230.424 of this chapter).

**Item 2.04 Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement.**

(a) If a triggering event causing the increase or acceleration of a direct financial obligation of the registrant occurs and the consequences of the event, taking into account those described in paragraph (a)(4) of this Item 2.04, are material to the registrant, disclose the following information:

(1) the date of the triggering event and a brief description of the agreement or transaction under which the direct financial obligation was created and is increased or accelerated;

(2) a brief description of the triggering event;

(3) the amount of the direct financial obligation, as increased if applicable, and the terms of payment or acceleration that apply; and

(4) any other material obligations of the registrant that may arise, increase, be accelerated or become direct financial obligations as a result of the triggering event or the increase or acceleration of the direct financial obligation.

(b) If a triggering event occurs causing an obligation of the registrant under an off-balance sheet arrangement to increase or be accelerated, or causing a contingent obligation of the registrant under an off-balance sheet arrangement to become a direct financial

obligation of the registrant, and the consequences of the event, taking into account those described in paragraph (b)(4) of this Item 2.04, are material to the registrant, disclose the following information:

(1) the date of the triggering event and a brief description of the off-balance sheet arrangement;

(2) a brief description of the triggering event;

(3) the nature and amount of the obligation, as increased if applicable, and the terms of payment or acceleration that apply; and

(4) any other material obligations of the registrant that may arise, increase, be accelerated or become direct financial obligations as a result of the triggering event or the increase or acceleration of the obligation under the off-balance sheet arrangement or its becoming a direct financial obligation of the registrant.

(c) For purposes of this Item 2.04, the term direct financial obligation has the meaning provided in Item 2.03 of this form, but shall also include an obligation arising out of an off-balance sheet arrangement that is accrued under FASB ASC Section 450-20-25, Contingencies - Loss Contingencies - Recognition.

(d) For purposes of this Item 2.04, the term off-balance sheet arrangement has the meaning provided in Item 2.03 of this form.

(e) For purposes of this Item 2.04, a triggering event is an event, including an event of default, event of acceleration or similar event, as a result of which a direct financial obligation of the registrant or an obligation of the registrant arising under an off-balance sheet arrangement is increased or becomes accelerated or as a result of which a contingent obligation of the registrant arising out of an off-balance sheet arrangement becomes a direct financial obligation of the registrant.

Instructions.

1. Disclosure is required if a triggering event occurs in respect of an obligation of the registrant under an off-balance sheet arrangement and the consequences are material to the registrant, whether or not the registrant is also a party to the transaction or agreement under which the triggering event occurs.

2. No disclosure is required under this Item 2.04 unless and until a triggering event has occurred in accordance with the terms of the relevant agreement, transaction or arrangement, including, if required, the sending to the registrant of notice of the occurrence of a triggering event pursuant to the terms of the agreement, transaction or arrangement and the satisfaction of all conditions to such occurrence, except the passage of time.

3. No disclosure is required solely by reason of this Item 2.04 if the registrant believes in good faith that no triggering event has occurred, unless the registrant has received a notice described in Instruction 2 to this Item 2.04.

4. Where a registrant is subject to an obligation arising out of an off-balance sheet arrangement, whether or not disclosed pursuant to Item 2.03 of this form, if a triggering event occurs as a result of which under that obligation an accrual for a probable loss is required under FASB ASC Section 450-20-25, the obligation arising out of the off-balance sheet arrangement becomes a direct financial obligation as defined in this Item 2.04. In that situation, if the consequences as determined under Item 2.04(b) are material to the registrant, disclosure is required under this Item 2.04.

5. With respect to asset-backed securities, as defined in 17 CFR 229.1101, disclosure also is required under this Item 2.04 if an early amortization, performance trigger or other event, including an event of default, has occurred under the transaction agreements for the asset-backed securities that would materially alter the payment priority or distribution of cash flows regarding the asset-backed securities or the amortization schedule for the asset-backed securities. In providing the disclosure required by this Item, identify the changes to the payment priorities, flow of funds or asset-backed securities as a result. Disclosure is required under this Item whether or not the registrant is a party to the transaction agreement that results in the occurrence identified.

**Item 2.05 Costs Associated with Exit or Disposal Activities.**

If the registrant's board of directors, a committee of the board of directors or the officer or officers of the registrant authorized to take such action if board action is not required, commits the registrant to an exit or disposal plan, or otherwise disposes of a long-lived asset or terminates employees under a plan of termination described in FASB ASC paragraph 420-10-25-4 (Exit or Disposal Cost Obligations Topic), under which material charges will be incurred under generally accepted accounting principles applicable to the registrant, disclose the following information:

(a) the date of the commitment to the course of action and a description of the course of action, including the facts and circumstances leading to the expected action and the expected completion date;

(b) for each major type of cost associated with the course of action (for example, one-time termination benefits, contract termination

11

costs and other associated costs), an estimate of the total amount or range of amounts expected to be incurred in connection with the action;

(c) an estimate of the total amount or range of amounts expected to be incurred in connection with the action; and

(d) the registrant's estimate of the amount or range of amounts of the charge that will result in future cash expenditures, provided, however, that if the registrant determines that at the time of filing it is unable in good faith to make a determination of an estimate required by paragraphs (b), (c) or (d) of this Item 2.05, no disclosure of such estimate shall be required; provided further, however, that in any such event, the registrant shall file an amended report on Form 8-K under this Item 2.05 within four business days after it makes a determination of such an estimate or range of estimates.

**Item 2.06 Material Impairments.**

If the registrant's board of directors, a committee of the board of directors or the officer or officers of the registrant authorized to take such action if board action is not required, concludes that a material charge for impairment to one or more of its assets, including, without limitation, impairments of securities or goodwill, is required under generally accepted accounting principles applicable to the registrant, disclose the following information:

(a) the date of the conclusion that a material charge is required and a description of the impaired asset or assets and the facts and circumstances leading to the conclusion that the charge for impairment is required;

(b) the registrant's estimate of the amount or range of amounts of the impairment charge; and

(c) the registrant's estimate of the amount or range of amounts of the impairment charge that will result in future cash expenditures, provided, however, that if the registrant determines that at the time of filing it is unable in good faith to make a determination of an estimate required by paragraphs (b) or (c) of this Item 2.06, no disclosure of such estimate shall be required; provided further, however, that in any such event, the registrant shall file an amended report on Form 8-K under this Item 2.06 within four business days after it makes a determination of such an estimate or range of estimates.

Instruction.

No filing is required under this Item 2.06 if the conclusion is made in connection with the preparation, review or audit of financial statements required to be included in the next periodic report due to be filed under the Exchange Act, the periodic report is filed on a timely basis and such conclusion is disclosed in the report.

**Section 3 - Securities and Trading Markets**

**Item 3.01 Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

(a) If the registrant has received notice from the national securities exchange or national securities association (or a facility thereof) that maintains the principal listing for any class of the registrant's common equity (as defined in Exchange Act Rule 12b-2 (17 CFR 240.12b-2)) that:

- the registrant or such class of the registrant's securities does not satisfy a rule or standard for continued listing on the exchange or association;
- the exchange has submitted an application under Exchange Act Rule 12d2-2 (17 CFR 240.12d2-2) to the Commission to delist such class of the registrant's securities; or
- the association has taken all necessary steps under its rules to delist the security from its automated inter-dealer quotation system,

the registrant must disclose:

(i) the date that the registrant received the notice;

(ii) the a rule or standard for continued listing on the national securities exchange or national securities association that the registrant fails, or has failed to, satisfy; and

(iii) any action or response that, at the time of filing, the registrant has determined to take in response to the notice.

(b) If the registrant has notified the national securities exchange or national securities association (or a facility thereof) that maintains the principal listing for any class of the registrant's common equity (as defined in Exchange Act Rule 12b-2 (17 CFR 240.12b-2) that

the registrant is aware of any material noncompliance with a rule or standard for continued listing on the exchange or association, the registrant must disclose:

(i) the date that the registrant provided such notice to the exchange or association;

(ii) the rule or standard for continued listing on the exchange or association that the registrant fails, or has failed, to satisfy; and

(iii) any action or response that, at the time of filing, the registrant has determined to take regarding its noncompliance.

(c) If the national securities exchange or national securities association (or a facility thereof) that maintains the principal listing for any class of the registrant's common equity (as defined in Exchange Act Rule 12b-2 (17 CFR 240.12b-2)), in lieu of suspending trading in or delisting such class of the registrant's securities, issues a public reprimand letter or similar communication indicating that the registrant has violated a rule or standard for continued listing on the exchange or association, the registrant must state the date, and summarize the contents of the letter or communication.

(d) If the registrant's board of directors, a committee of the board of directors or the officer or officers of the registrant authorized to take such action if board action is not required, has taken definitive action to cause the listing of a class of its common equity to be withdrawn from the national securities exchange, or terminated from the automated inter-dealer quotation system of a registered national securities association, where such exchange or association maintains the principal listing for such class of securities, including by reason of a transfer of the listing or quotation to another securities exchange or quotation system, describe the action taken and state the date of the action.

Instructions.

1. The registrant is not required to disclose any information required by paragraph (a) of this Item 3.01 where the delisting is a result of one of the following:

- the entire class of the security has been called for redemption, maturity or retirement; appropriate notice thereof has been given; if required by the terms of the securities, funds sufficient for the payment of all such securities have been deposited with an agency authorized to make such payments; and such funds have been made available to security holders;
- the entire class of the security has been redeemed or paid at maturity or retirement;
- the instruments representing the entire class of securities have come to evidence, by operation of law or otherwise, other securities in substitution therefor and represent no other right, except, if true, the right to receive an immediate cash payment (the right of dissenters to receive the appraised or fair value of their holdings shall not prevent the application of this provision); or
- all rights pertaining to the entire class of the security have been extinguished; provided, however, that where such an event occurs as the result of an order of a court or other governmental authority, the order shall be final, all applicable appeal periods shall have expired and no appeals shall be pending.

2. A registrant must provide the disclosure required by paragraph (a) or (b) of this Item 3.01, as applicable, regarding any failure to satisfy a rule or standard for continued listing on the national securities exchange or national securities association (or a facility thereof) that maintains the principal listing for any class of the registrant's common equity (as defined in Exchange Act Rule 12b-2 (17 CFR 240.12b-2)) even if the registrant has the benefit of a grace period or similar extension period during which it may cure the deficiency that triggers the disclosure requirement.

3. Notices or other communications subsequent to an initial notice sent to, or by, a registrant under Item 3.01(a), (b) or (c) that continue to indicate that the registrant does not comply with the same rule or standard for continued listing that was the subject of the initial notice are not required to be filed, but may be filed voluntarily.

4. Registrants whose securities are quoted exclusively (i.e., the securities are not otherwise listed on an exchange or association) on automated inter-dealer quotation systems are not subject to this Item 3.01 and such registrants are thus not required to file a Form 8-K pursuant to this Item 3.01 if the securities are no longer quoted on such quotation system. If a security is listed on an exchange or association and is also quoted on an automated inter-dealer quotation system, the registrant is subject to the disclosure obligations of Item 3.01 if any of the events specified in Item 3.01 occur.

**Item 3.02 Unregistered Sales of Equity Securities.**

(a) If the registrant sells equity securities in a transaction that is not registered under the Securities Act, furnish the information set forth in paragraphs (a) and (c) through (e) of Item 701 of Regulation S-K (17 CFR 229.701(a) and (c) through (e). For purposes of determining the required filing date for the Form 8-K under this Item 3.02(a), the registrant has no obligation to disclose information under this Item 3.02 until the registrant enters into an agreement enforceable against the registrant, whether or not subject to conditions, under which the equity securities are to be sold. If there is no such agreement, the registrant must provide the disclosure within four business days after the occurrence of the closing or settlement of the transaction or arrangement under which the equity securities are to be sold.

13

(b) No report need be filed under this Item 3.02 if the equity securities sold, in the aggregate since its last report filed under this Item 3.02 or its last periodic report, whichever is more recent, constitute less than 1% of the number of shares outstanding of the class of equity securities sold. In the case of a smaller reporting company, no report need be filed if the equity securities sold, in the aggregate since its last report filed under this Item 3.02 or its last periodic report, whichever is more recent, constitute less than 5% of the number of shares outstanding of the class of equity securities sold.

Instructions.

1. For purposes of this Item 3.02, "the number of shares outstanding" refers to the actual number of shares of equity securities of the class outstanding and does not include outstanding securities convertible into or exchangeable for such equity securities.

2. A smaller reporting company is defined under Item 10(f)(1) of Regulation S-K (17 CFR 229.10(f)(1)).

**Item 3.03 Material Modification to Rights of Security Holders.**

(a) If the constituent instruments defining the rights of the holders of any class of registered securities of the registrant have been materially modified, disclose the date of the modification, the title of the class of securities involved and briefly describe the general effect of such modification upon the rights of holders of such securities.

(b) If the rights evidenced by any class of registered securities have been materially limited or qualified by the issuance or modification of any other class of securities by the registrant, briefly disclose the date of the issuance or modification, the general effect of the issuance or modification of such other class of securities upon the rights of the holders of the registered securities.

Instruction.

Working capital restrictions and other limitations upon the payment of dividends must be reported pursuant to this Item 3.03.

**Section 4 - Matters Related to Accountants and Financial Statements**

**Item 4.01 Changes in Registrant's Certifying Accountant.**

(a) If an independent accountant who was previously engaged as the principal accountant to audit the registrant's financial statements, or an independent accountant upon whom the principal accountant expressed reliance in its report regarding a significant subsidiary, resigns (or indicates that it declines to stand for re-appointment after completion of the current audit) or is dismissed, disclose the information required by Item 304(a)(1) of Regulation S-K (17 CFR  229.304(a)(1) of this chapter),  including compliance with Item 304(a)(3) of Regulation S-K (17 CFR  229.304(a)(3) of this chapter) .

(b) If a new independent accountant has been engaged as either the principal accountant to audit the registrant's financial statements or as an independent accountant on whom the principal accountant is expected to express reliance in its report regarding a significant subsidiary, the registrant must disclose the information required by Item 304(a)(2) of Regulation S-K (17 CFR 229.304(a)(2)).

Instruction.

The resignation or dismissal of an independent accountant, or its refusal to stand for re-appointment, is a reportable event separate from the engagement of a new independent accountant. On some occasions, two reports on Form 8-K are required for a single change in accountants, the first on the resignation (or refusal to stand for re-appointment ) or dismissal of the former accountant and the second when the new accountant is engaged. Information required in the second Form 8-K in such situations need not be provided to the extent that it has been reported previously in the first Form 8-K.

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

(a) If the registrant's board of directors, a committee of the board of directors or the officer or officers of the registrant authorized to take such action if board action is not required, concludes that any previously issued financial statements, covering one or more years or interim periods for which the registrant is required to provide financial statements under Regulation S-X (17 CFR 210) should no longer be relied upon because of an error in such financial statements as addressed in FASB ASC Topic 250, Accounting Changes and Error Corrections, as may be modified, supplemented or succeeded, disclose the following information:

(1) the date of the conclusion regarding the non-reliance and an identification of the financial statements and years or periods covered that should no longer be relied upon;

(2) a brief description of the facts underlying the conclusion to the extent known to the registrant at the time of filing; and

(3) a statement of whether the audit committee, or the board of directors in the absence of an audit committee, or authorized officer or officers, discussed with the registrant's independent accountant the matters disclosed in the filing pursuant to this Item 4.02(a).

(b) If the registrant is advised by, or receives notice from, its independent accountant that disclosure should be made or action should be taken to prevent future reliance on a previously issued audit report or completed interim review related to previously issued financial statements, disclose the following information:

(1) the date on which the registrant was so advised or notified;

(2) identification of the financial statements that should no longer be relied upon;

(3) a brief description of the information provided by the accountant; and

(4) a statement of whether the audit committee, or the board of directors in the absence of an audit committee, or authorized officer or officers, discussed with the independent accountant the matters disclosed in the filing pursuant to this Item 4.02(b).

(c) If the registrant receives advisement or notice from its independent accountant requiring disclosure under paragraph (b) of this Item 4.02, the registrant must:

(1) provide the independent accountant with a copy of the disclosures it is making in response to this Item 4.02 that the independent accountant shall receive no later than the day that the disclosures are filed with the Commission;

(2) request the independent accountant to furnish to the registrant as promptly as possible a letter addressed to the Commission stating whether the independent accountant agrees with the statements made by the registrant in response to this Item 4.02 and, if not, stating the respects in which it does not agree; and

(3) amend the registrant's previously filed Form 8-K by filing the independent accountant's letter as an exhibit to the filed Form 8-K no later than two business days after the registrant's receipt of the letter.

## Section 5 - Corporate Governance and Management

## Item 5.01 Changes in Control of Registrant.

(a) If, to the knowledge of the registrant's board of directors, a committee of the board of directors or authorized officer or officers of the registrant, a change in control of the registrant has occurred, furnish the following information:

(1) the identity of the person(s) who acquired such control;

(2) the date and a description of the transaction(s) which resulted in the change in control;

(3) the basis of the control, including the percentage of voting securities of the registrant now beneficially owned directly or indirectly by the person(s) who acquired control;

(4) the amount of the consideration used by such person(s);

(5) the source(s) of funds used by the person(s), <u>unless</u> all or any part of the consideration used is a loan made in the ordinary course of business by a bank as defined by Section 3(a)(6) of the Act, in which case the identity of such bank may be omitted provided the person who acquired control:

(i) has made a request for confidentiality pursuant to Section 13(d)(1)(B) of the Act; and

(ii) states in the report that the identity of the bank has been so omitted and filed separately with the Commission.

(6) the identity of the person(s) from whom control was assumed;

(7) any arrangements or understandings among members of both the former and new control groups and their associates with respect to election of directors or other matters; and

(8) if the registrant was a shell company, other than a business combination related shell company, as those terms

are defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), immediately before the change in control, the information that would be required if the registrant were filing a general form for registration of securities on Form 10 under the Exchange Act reflecting all classes of the registrant's securities subject to the reporting requirements of Section 13 (15 U.S.C. 78m) or Section 15(d) (15 U.S.C. 78o(d)) of such Act upon consummation of the change in control, with such information reflecting the registrant and its securities upon consummation of the transaction. Notwithstanding General Instruction B.3. to Form 8-K, if any disclosure required by this Item 5.01(a)(8) is previously reported, as that term is defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), the registrant may identify the filing in which that disclosure is included instead of including that disclosure in this report.

(b) Furnish the information required by Item 403(c) of Regulation S-K (17 CFR 229.403(c)).

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

(a)(1) If a director has resigned or refuses to stand for re-election to the board of directors since the date of the last annual meeting of shareholders because of a disagreement with the registrant, known to an executive officer of the registrant, as defined in 17 CFR 240.3b-7, on any matter relating to the registrant's operations, policies or practices, or if a director has been removed for cause from the board of directors, disclose the following information:

(i) the date of such resignation, refusal to stand for re-election or removal;

(ii) any positions held by the director on any committee of the board of directors at the time of the director's resignation, refusal to stand for re-election or removal; and

(iii) a brief description of the circumstances representing the disagreement that the registrant believes caused, in whole or in part, the director's resignation, refusal to stand for re-election or removal.

(2) If the director has furnished the registrant with any written correspondence concerning the circumstances surrounding his or her resignation, refusal or removal, the registrant shall file a copy of the document as an exhibit to the report on Form 8-K.

(3) The registrant also must:

(i) provide the director with a copy of the disclosures it is making in response to this Item 5.02 no later than the day the registrant file the disclosures with the Commission;

(ii) provide the director with the opportunity to furnish the registrant as promptly as possible with a letter addressed to the registrant stating whether he or she agrees with the statements made by the registrant in response to this Item 5.02 and, if not, stating the respects in which he or she does not agree; and

(iii) file any letter received by the registrant from the director with the Commission as an exhibit by an amendment to the previously filed Form 8-K within two business days after receipt by the registrant.

(b) If the registrant's principal executive officer, president, principal financial officer, principal accounting officer, principal operating officer, or any person performing similar functions, or any named executive officer, retires, resigns or is terminated from that position, or if a director retires, resigns, is removed, or refuses to stand for re-election (except in circumstances described in paragraph (a) of this Item 5.02), disclose the fact that the event has occurred and the date of the event.

(c) If the registrant appoints a new principal executive officer, president, principal financial officer, principal accounting officer, principal operating officer, or person performing similar functions, disclose the following information with respect to the newly appointed officer:

(1) the name and position of the newly appointed officer and the date of the appointment;

(2) the information required by Items 401(b), (d), (e) and Item 404(a) of Regulation S-K (17 CFR 229.401(b), (d), (e) and 229.404(a)); and

(3) a brief description of any material plan, contract or arrangement (whether or not written) to which a covered officer is a party or in which he or she participates that is entered into or material amendment in connection with the triggering event or any grant or award to any such covered person or modification thereto, under any such plan, contract or arrangement in connection with any such event.

Instruction to paragraph (c).

If the registrant intends to make a public announcement of the appointment other than by means of a report on Form 8-K, the registrant may delay filing the Form 8-K containing the disclosures required by this Item 5.02(c) until the day on which the registrant otherwise

15

makes public announcement of the appointment of such officer.

(d) If the registrant elects a new director, except by a vote of security holders at an annual meeting or special meeting convened for such purpose, disclose the following information:

(1) the name of the newly elected director and the date of election;

(2) a brief description of any arrangement or understanding between the new director and any other persons, naming such persons, pursuant to which such director was selected as a director;

(3) the committees of the board of directors to which the new director has been, or at the time of this disclosure is expected to be, named; and

(4) the information required by Item 404(a) of Regulation S-K  (17 CFR 229.404(a)).

(5) a brief description of any material plan, contract or arrangement (whether or not written) to which the director is a party or in which he or she participates that is entered into or material amendment in connection with the triggering event or any grant or award to any such covered person or modification thereto, under any such plan, contract or arrangement in connection with any such event.

(e) If the registrant enters into, adopts, or otherwise commences a material compensatory plan, contract or arrangement (whether or not written), as to which the registrant's principal executive officer, principal financial officer, or a named executive officer participates or is a party, or such compensatory plan, contract or arrangement is materially amended or modified, or a material grant or award under any such plan, contract or arrangement to any such person is made or materially modified, then the registrant shall provide a brief description of the terms and conditions of the plan, contract or arrangement and the amounts payable to the officer thereunder.

Instructions to paragraph (e).

1. Disclosure under this Item 5.02(e) shall be required whether or not the specified event is in connection with events otherwise triggering disclosure pursuant to this Item 5.02.

2. Grants or awards (or modifications thereto) made pursuant to a plan, contract or arrangement (whether involving cash or equity), that are materially consistent with the previously disclosed terms of such plan, contract or arrangement, need not be disclosed under this Item 5.02(e), provided the registrant has previously disclosed such terms and the grant, award or modification is disclosed when Item 402 of Regulation S-K (17 CFR 229.402) requires such disclosure.

(f)(1) If the salary or bonus of a named executive officer cannot be calculated as of the most recent practicable date and is omitted from the Summary Compensation Table as specified in Instruction 1 to Item 402(c)(2)(iii) and (iv) of Regulation S-K, disclose the appropriate information under this Item 5.02(f) when there is a payment, grant, award, decision or other occurrence as a result of which such amounts become calculable in whole or part. Disclosure under this Item 5.02(f) shall include a new total compensation figure for the named executive officer, using the new salary or bonus information to recalculate the information that was previously provided with respect to the named executive officer in the registrant's Summary Compensation Table for which the salary and bonus information was omitted in reliance on Instruction 1 to Item 402(c)(2)(iii) and (iv) of Regulation S-K (17 CFR 229.402(c)(2)(iii) and (iv)).

(2) As specified in Instruction 6 to Item 402(u) of Regulation S-K (17 CFR 229.402(u)), disclosure under this Item 5.02(f) with respect to the salary or bonus of a principal executive officer shall include pay ratio disclosure pursuant to Item 402(u) of Regulation S-K calculated using the new total compensation figure for the principal executive officer. Pay ratio disclosure is not required under this Item 5.02(f) until the omitted salary or bonus amounts for such principal executive officer become calculable in whole.

Instructions to Item 5.02.

1. The disclosure requirements of this Item 5.02 do not apply to a registrant that is a wholly-owned subsidiary of an issuer with a class of securities registered under Section 12 of the Exchange Act (15 U.S.C. 78l), or that is required to file reports under Section 15(d) of the Exchange Act (15 U.S.C. 78o(d)).

2. To the extent that any information called for in Item 5.02(c)(3) or Item 5.02(d)(3) or Item 5.02(d)(4) is not determined or is unavailable at the time of the required filing, the registrant shall include a statement this effect in the filing and then must file an amendment to its Form 8-K filing under this Item 5.02 containing such information within four business days after the information is determined or becomes available.

16

3. The registrant need not provide information with respect to plans, contracts, and arrangements to the extent they do not discriminate in scope, terms or operation, in favor of executive officers or directors of the registrant and that are available generally to all salaried employees.

4. For purposes of this Item, the term "named executive officer" shall refer to those executive officers for whom disclosure was required in the registrant's most recent filing with the Commission under the Securities Act (15 U.S.C. 77a et seq.) or Exchange Act (15 U.S.C. 78a et seq.) that required disclosure pursuant to Item 402(c) of Regulation S-K (17 CFR 229.402(c)).

**Item 5.03 Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

(a) If a registrant with a class of equity securities registered under Section 12 of the Exchange Act (15 U.S.C. 78l) amends its articles of incorporation or bylaws and a proposal for the amendment was not disclosed in a proxy statement or information statement filed by the registrant, disclose the following information:

    (1) the effective date of the amendment; and

    (2) a description of the provision adopted or changed by amendment and, if applicable, the previous provision.

(b) If the registrant determines to change the fiscal year from that used in its most recent filing with the Commission other than by means of:

    (1) a submission to a vote of security holders through the solicitation of proxies or otherwise; or

    (2) an amendment to its articles of incorporation or bylaws,

disclose the date of such determination, the date of the new fiscal year end and the form (for example, Form 10-K or Form 10-Q) on which the report covering the transition period will be filed.

Instructions to Item 5.03.

1. Refer to Item 601(b)(3) of Regulation S-K (17 CFR 229.601(b)(3) regarding the filing of exhibits to this Item 5.03.

2. With respect to asset-backed securities, as defined in 17 CFR 229.1101, disclosure is required under this Item 5.03 regarding any amendment to the governing documents of the issuing entity, regardless of whether the class of asset-backed securities is reporting under Section 13 or 15(d) of the Exchange Act.

**Item 5.04 Temporary Suspension of Trading Under Registrant's Employee Benefit Plans.**

(a) No later than the fourth business day after which the registrant receives the notice required by section 101(i)(2)(E) of the Employment Retirement Income Security Act of 1974 (29 U.S.C. 1021(i)(2)(E)), or, if such notice is not received by the registrant, on the same date by which the registrant transmits a timely notice to an affected officer or director within the time period prescribed by Rule 104(b)(2)(i)(B) or 104(b)(2)(ii) of Regulation BTR (17 CFR 245.104(b)(2)(i)(B) or 17 CFR 245.104(b)(2)(ii)), provide the information specified in Rule 104(b) (17 CFR 245.104(b)) and the date the registrant received the notice required by section 101(i)(2)(E) of the Employment Retirement Income Security Act of 1974 (29 U.S.C. 1021(i)(2)(E)), if applicable.

(b) On the same date by which the registrant transmits a timely updated notice to an affected officer or director, as required by the time period under Rule 104(b)(2)(iii) of Regulation BTR (17 CFR 245.104(b)(2)(iii)), provide the information specified in Rule 104(b)(3)(iii) (17 CFR 245.104(b)(2)(iii)).

**Item 5.05 Amendments to the Registrant's Code of Ethics, or Waiver of a Provision of the Code of Ethics.**

    (a) Briefly describe the date and nature of any amendment to a provision of the registrant's code of ethics that applies to the registrant's principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions and that relates to any element of the code of ethics definition enumerated in Item 406(b) of Regulations S-K (17 CFR 228.406(b)).

    (b) If the registrant has granted a waiver, including an implicit waiver, from a provision of the code of ethics to an officer or person described in paragraph (a) of this Item 5.05, and the waiver relates to one or more of the elements of the code of ethics definition referred to in paragraph (a) of this Item 5.05, briefly describe the nature of the waiver, the name of the person to whom the waiver was granted, and the date of the waiver.

    (c) The registrant does not need to provide any information pursuant to this Item 5.05 if it discloses the required information on

its Internet website within four business days following the date of the amendment or waiver and the registrant has disclosed in its most recently filed annual report its Internet address and intention to provide disclosure in this manner. If the registrant elects to disclose the information required by this Item 5.05 through its website, such information must remain available on the website for at least a 12-month period. Following the 12-month period, the registrant must retain the information for a period of not less than five years. Upon request, the registrant must furnish to the Commission or its staff a copy of any or all information retained pursuant to this requirement.

Instructions.

1. The registrant does not need to disclose technical, administrative or other non-substantive amendments to its code of ethics.

2. For purposes of this Item 5.05:

   (i) The term waiver means the approval by the registrant of a material departure from a provision of the code of ethics; and

   (ii) The term implicit waiver means the registrant's failure to take action within a reasonable period of time regarding a material departure from a provision of the code of ethics that has been made known to an executive officer, as defined in Rule 3b-7 (17 CFR 240.3b-7) of the registrant.

**Section 5.06 -Change in Shell Company Status.**

If a registrant that was a shell company, other than a business combination related shell company, as those terms are defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), has completed a transaction that has the effect of causing it to cease being a shell company, as defined in Rule 12b-2, disclose the material terms of the transaction. Notwithstanding General Instruction B.3. to Form 8-K, if any disclosure required by this Item 5.06 is previously reported, as that term is defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), the registrant may identify the filing in which that disclosure is included instead of including that disclosure in this report.

**Item 5.07 Submission of Matters to a Vote of Security Holders.**

If any matter was submitted to a vote of security holders, through the solicitation of proxies or otherwise, provide the following information:

   (a) The date of the meeting and whether it was an annual or special meeting. This information must be provided only if a meeting of security holders was held.

   (b) If the meeting involved the election of directors, the name of each director elected at the meeting, as well as a brief description of each other matter voted upon at the meeting; and state the number of votes cast for, against or withheld, as well as the number of abstentions and broker non-votes as to each such matter, including a separate tabulation with respect to each nominee for office. For the vote on the frequency of shareholder advisory votes on executive compensation required by section 14A(a)(2) of the Securities Exchange Act of 1934 (15 U.S.C. 78n-1) and §240.14a-21(b), state the number of votes cast for each of 1 year, 2 years, and 3 years, as well as the number of abstentions.

   (c) A description of the terms of any settlement between the registrant and any other participant (as defined in Instruction 3 to Item 4 of Schedule 14A (17 CFR 240.14a-101)) terminating any solicitation subject to Rule 14a-12(c), including the cost or anticipated cost to the registrant.

   (d) No later than one hundred fifty calendar days after the end of the annual or other meeting of shareholders at which shareholders voted on the frequency of shareholder votes on the compensation of executives as required by section 14A(a)(2) of the Securities Exchange Act of 1934 (15 U.S.C. 78n-1), but in no event later than sixty calendar days prior to the deadline for submission of shareholder proposals under §240.14a-8, as disclosed in the registrant's most recent proxy statement for an annual or other meeting of shareholders relating to the election of directors at which shareholders voted on the frequency of shareholder votes on the compensation of executives as required by section 14A(a)(2) of the Securities Exchange Act of 1934 (15 U.S.C. 78n-1(a)(2)), by amendment to the most recent Form 8-K filed pursuant to (b) of this Item, disclose the company's decision in light of such vote as to how frequently the company will include a shareholder vote on the compensation of executives in its proxy materials until the next required vote on the frequency of shareholder votes on the compensation of executives.

Instruction 1 to Item 5.07. The four business day period for reporting the event under this Item 5.07, other than with respect to Item 5.07(d), shall begin to run on the day on which the meeting ended. The registrant shall disclose on Form 8-K under this Item 5.07 the preliminary voting results. The registrant shall file an amended report on Form 8-K under this Item 5.07 to disclose the final voting results within four business days after the final voting results are known. However, no preliminary voting results need be disclosed under this Item 5.07 if the registrant has disclosed final voting results on Form 8-K under this Item.

Instruction 2 to Item 5.07. If any matter has been submitted to a vote of security holders otherwise than at a meeting of such security

18

holders, corresponding information with respect to such submission shall be provided. The solicitation of any authorization or consent (other than a proxy to vote at a stockholders' meeting) with respect to any matter shall be deemed a submission of such matter to a vote of security holders within the meaning of this item.

Instruction 3 to Item 5.07. If the registrant did not solicit proxies and the board of directors as previously reported to the Commission was re-elected in its entirety, a statement to that effect in answer to paragraph (b) will suffice as an answer thereto regarding the election of directors.

Instruction 4 to Item 5.07. If the registrant has furnished to its security holders proxy soliciting material containing the information called for by paragraph (c), the paragraph may be answered by reference to the information contained in such material.

 Instruction 5 to Item 5.07. A registrant may omit the information called for by this Item 5.07 if, on the date of the filing of its report on Form 8-K, the registrant meets the following conditions:

      1. All of the registrant's equity securities are owned, either directly or indirectly, by a single person which is a reporting company under the Exchange Act and which has filed all the material required to be filed pursuant to Section 13, 14 or 15(d) thereof, as applicable; and

      2. During the preceding thirty-six calendar months and any subsequent period of days, there has not been any material default in the payment of principal, interest, a sinking or purchase fund installment, or any other material default not cured within thirty days, with respect to any indebtedness of the registrant or its subsidiaries, and there has not been any material default in the payment of rentals under material long-term leases.

**Item 5.08 Shareholder Director Nominations**

    (a) If the registrant did not hold an annual meeting the previous year, or if the date of this year's annual meeting has been changed by more than 30 calendar days from the date of the previous year's meeting, then the registrant is required to disclose the date by which a nominating shareholder or nominating shareholder group must submit the notice on Schedule 14N (§ 240.14n–101) required pursuant to § 240.14a–11(b)(10), which date shall be a reasonable time before the registrant mails its proxy materials for the meeting. Where a registrant is required to include shareholder director nominees in the registrant's proxy materials pursuant to either an applicable state or foreign law provision, or a provision in the registrant's governing documents, then the registrant is required to disclose the date by which a nominating shareholder or nominating shareholder group must submit the notice on Schedule 14N required pursuant to § 240.14a–18.

    (b) If the registrant is a series company as defined in Rule 18f–2(a) under the Investment Company Act of 1940 (§ 270.18f–2 of this chapter), then the registrant is required to disclose in connection with the election of directors at an annual meeting of shareholders (or, in lieu of such an annual meeting, a special meeting of shareholders) the total number of shares of the registrant outstanding and entitled to be voted (or if the votes are to be cast on a basis other than one vote per share, then the total number of votes entitled to be voted and the basis for allocating such votes) on the election of directors at such meeting of shareholders as of the end of the most recent calendar quarter.

**Section 6 -Asset-Backed Securities**

The Items in this Section 6 apply only to asset-backed securities. Terms used in this Section 6 have the same meaning as in Item 1101 of Regulation AB (17 CFR 229.1101).

**Item 6.01 ABS Informational and Computational Material.**

Report under this Item any ABS informational and computational material filed in, or as an exhibit to, this report.

**Item 6.02 Change of Servicer or Trustee.**

If a servicer contemplated by Item 1108(a)(2) of Regulation AB (17 CFR 229.1108(a)(2)) or a trustee has resigned or has been removed, replaced or substituted, or if a new servicer contemplated by Item 1108(a)(2) of Regulation AB or trustee has been appointed, state the date the event occurred and the circumstances surrounding the change. In addition, provide the disclosure required by Item 1108(d) of Regulation AB (17 CFR 229.1108(c)), as applicable, regarding the servicer or trustee change. If a new servicer contemplated by Item 1108(a)(3) of this Regulation AB or a new trustee has been appointed, provide the information required by Item 1108(b) through (d) of Regulation AB regarding such servicer or Item 1109 of Regulation AB (17 CFR 229.1109) regarding such trustee, as applicable.

*Instruction.*

To the extent that any information called for by this Item regarding such servicer or trustee is not determined or is unavailable at the time of the required filing, the registrant shall include a statement to this effect in the filing and then must file an amendment to its Form 8-K filing under this Item 6.02 containing such information within four business days after the information is determined or becomes available.

**Item 6.03 Change in Credit Enhancement or Other External Support.**

(a) *Loss of existing enhancement or support*. If the depositor (or servicer if the servicer signs the report on Form 10-K (17 CFR 249.310) of the issuing entity) becomes aware that any material enhancement or support specified in Item 1114(a)(1) through (3) of Regulation AB (17 CFR 229.1114(a)(1) through (3)) or Item 1115 of Regulation AB (17 CFR 229.1115) that was previously applicable regarding one or more classes of the asset-backed securities has terminated other than by expiration of the contract on its stated termination date or as a result of all parties completing their obligations under such agreement, then disclose:

(1) the date of the termination of the enhancement;

(2) the identity of the parties to the agreement relating to the enhancement or support;

(3) a brief description of the terms and conditions of the enhancement or support that are material to security holders;

(4) a brief description of the material circumstances surrounding the termination; and

(5) any material early termination penalties paid or to be paid out of the cash flows backing the asset-backed securities.

(b) *Addition of new enhancement or support*. If the depositor (or servicer if the servicer signs the report on Form 10-K (17 CFR 249.310) of the issuing entity) becomes aware that any material enhancement specified in Item 1114(a)(1) through (3) of Regulation AB (17 CFR 229.1114(a)(1) through (3)) or Item 1115 of Regulation AB (17 CFR 229.1115) has been added with respect to one or more classes of the asset-backed securities, then provide the date of addition of the new enhancement or support and the disclosure required by Items 1114 or 1115 of Regulation AB, as applicable, with respect to such new enhancement or support.

(c) *Material change to enhancement or support*. If the depositor (or servicer if the servicer signs the report on Form 10-K (17 CFR 249.310) of the issuing entity) becomes aware that any existing material enhancement or support specified in Item 1114(a)(1) through (3) of Regulation AB or Item 1115 of Regulation AB with respect to one or more classes of the asset-backed securities has been materially amended or modified, disclose:

(1) the date on which the agreement or agreements relating to the enhancement or support was amended or modified;

(2) the identity of the parties to the agreement or agreements relating to the amendment or modification; and

(3) a brief description of the material terms and conditions of the amendment or modification.

*Instructions.*

1. Disclosure is required under this Item whether or not the registrant is a party to any agreement regarding the enhancement or support if the loss, addition or modification of such enhancement or support materially affects, directly or indirectly, the asset-backed securities, the pool assets or the cash flow underlying the asset-backed securities.

2. To the extent that any information called for by this Item regarding the enhancement or support is not determined or is unavailable at the time of the required filing, the registrant shall include a statement to this effect in the filing and then must file an amendment to its Form 8-K filing under this Item 6.03 containing such information within four business days after the information is determined or becomes available.

3. The instructions to Items 1.01 and 1.02 of this Form apply to this Item.

4. Notwithstanding Items 1.01 and 1.02 of this Form, disclosure regarding changes to material enhancement or support is to be reported under this Item 6.03 in lieu of those Items.

**Item 6.04 Failure to Make a Required Distribution.**

If a required distribution to holders of the asset-backed securities is not made as of the required distribution date under the transaction

documents, and such failure is material, identify the failure and state the nature of the failure to make the timely distribution.

**Item 6.05 Securities Act Updating Disclosure.**

Regarding an offering of asset-backed securities registered on Form SF-3 (17 CFR 239.45), if any material pool characteristic of the actual asset pool at the time of issuance of the asset-backed securities differs by 5% or more (other than as a result of the pool assets converting into cash in accordance with their terms) from the description of the asset pool in the prospectus filed for the offering pursuant to Securities Act Rule 424 (17 CFR 230.424), disclose the information required by Items 1111 and 1112 of Regulation AB (17 CFR 229.1111 and 17 CFR 229.1112) regarding the characteristics of the actual asset pool. If applicable, also provide information required by Items 1108 and 1110 of Regulation AB (17 CFR 229.1108 and 17 CFR 229.1110) regarding any new servicers or originators that would be required to be disclosed under those items regarding the pool assets.

*Instruction*.

No report is required under this Item if substantially the same information is provided in a post-effective amendment to the Securities Act registration statement or in a subsequent prospectus filed pursuant to Securities Act Rule 424 (17 CFR 230.424).

**Item 6.06 Static Pool.**

Regarding an offering of asset-backed securities registered on Form SF-1 (17 CFR 239.44) or Form SF-3 (17 CFR 239.45), in lieu of providing the static pool information as required by Item 1105 of Regulation AB (17 CFR 229.1105) in a form of prospectus or prospectus, an issuer may file the required information in this report or as an exhibit to this report. The static pool disclosure must be filed by the time of effectiveness of a registration statement on Form SF-1, by the same date of the filing of a form of prospectus, as required by Rule 424(h) (17 CFR 230.424(h)), and by the same date of the filing of a final prospectus meeting the requirements of section 10(a) of the Securities Act (15 U.S.C. 77j(a)) filed in accordance with Rule 424(b) (17 CFR 230.424(b)).

Instructions.
1. Refer to Item 601(b)(106) of Regulation S-K (17 CFR 229.601(b)(106)) regarding the filing of exhibits to this Item 6.06.
2. Refer to Item 10 of Form SF-1 (17 CFR 239.44) or Item 10 of Form SF-3 (17 CFR 239.45) regarding incorporation by reference.

## Section 7 - Regulation FD

**Item 7.01 Regulation FD Disclosure.**

Unless filed under Item 8.01, disclose under this item only information that the registrant elects to disclose through Form 8-K pursuant to Regulation FD (17 CFR 243.100 through 243.103).

## Section 8 - Other Events

**Item 8.01 Other Events.**

The registrant may, at its option, disclose under this Item 8.01 any events, with respect to which information is not otherwise called for by this form, that the registrant deems of importance to security holders. The registrant may, at its option, file a report under this Item 8.01 disclosing the nonpublic information required to be disclosed by Regulation FD (17 CFR 243.100 through 243.103).

**Section 9 - Financial Statements and Exhibits**

**Item 9.01 Financial Statements and Exhibits.**

List below the financial statements, pro forma financial information and exhibits, if any, filed as a part of this report.

(a) *Financial statements of businesses or funds acquired*.
(1) For any business acquisition or fund acquisition required to be described in answer to Item 2.01 of this form, file financial statements and any applicable supplemental information, of the business acquired specified in Rules 3-05 or 3-14 of Regulation S-X (17 CFR 210.3-05 and 210.3-14), or Rules 8-04 or 8-06 of Regulation S-X (17 CFR 210.8-04 and 210.8-06) for smaller reporting companies, or of the fund acquired specified in Rule 6-11 of Regulation S-X (17 CFR 210.6-11).
(2) The financial statements must be prepared pursuant to Regulation S-X except that supporting schedules need not be filed unless required by Rule 6-11 of Regulation S-X (17 CFR 210.6-11). A manually signed accountant's report should be provided pursuant to Rule 2-02 of Regulation S-X (17 CFR 210.2-02).
(3) Financial statements required by this item may be filed with the initial report, or by amendment not later than 71 calendar days after the date that the initial report on Form 8-K must be filed. If the financial statements are not included in the initial

report, the registrant should so indicate in the Form 8-K report and state when the required financial statements will be filed.

The registrant may, at its option, include unaudited financial statements in the initial report on Form 8-K.

    (b) *Pro forma financial information.*
        (1) For any transaction required to be described in answer to Item 2.01 of this form, file any pro forma financial information that would be required pursuant to Article 11 of Regulation S-X (17 CFR 210) or Rule 8-05 of Regulation S-X (17 CFR 210.8-05) for smaller reporting companies unless it involves the acquisition of a fund subject to Rule 6-11 of Regulation S-X (17 CFR 210.6-11).
        (2) The provisions of paragraph (a)(3) of this Item 9.01 must also apply to pro forma financial information relative to the acquired business.

    (c) *Shell company transactions.*  The provisions of paragraph (a)(3) and (b)(2) of this Item do not apply to the financial statements or pro forma financial information required to be filed under this Item with regard to any transaction required to be described in answer to Item 2.01 of this Form by a registrant that was a shell company, other than a business combination related shell company, as those terms are defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), immediately before that transaction.  Accordingly, with regard to any transaction required to be described in answer to Item 2.01 of this Form by a registrant that was a shell company, other than a business combination related shell company, immediately before that transaction, the financial statements and pro forma financial information required by this Item must be filed in the initial report.  Notwithstanding General Instruction B.3. to Form 8-K, if any financial statement or any financial information required to be filed in the initial report by this Item 9.01(c) is previously reported, as that term is defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), the registrant may identify the filing in which that disclosure is included instead of including that disclosure in the initial report.

    (d) *Exhibits*. The exhibits shall be deemed to be  filed or furnished, depending on the relevant item requiring such exhibit, in accordance with the provisions of Item 601 of Regulation S-K (17 CFR 229.601)and Instruction B.2 to this form.

<u>Instruction</u>.

During the period after a registrant has reported an acquisition pursuant to Item 2.01 of this form, until the date on which the financial statements specified by this Item 9.01 must be filed, the registrant will be deemed current for purposes of its reporting obligations under Section 13(a) or 15(d) of the Exchange Act (15 U.S.C. 78m or 78o(d)).  With respect to filings under the Securities Act, however, registration statements will not be declared effective and post-effective amendments to registration statements will not be declared effective unless financial statements meeting the requirements of Rule 3-05, Rule 3-14, Rule 6-11, Rule 8-04, and Rule 8-06 of Regulation S-X (17 CFR 210.3-05, 210.3-14, 210.6-11, 210.8-04, and 210.8-06), as applicable, are provided.  In addition, offerings should not be made pursuant to effective registration statements, or pursuant to Rule 506 of Regulation D (17 CFR 230.506) where any purchasers are not accredited investors under Rule 501(a) of that Regulation, until the audited financial statements required by Rule 3-05, Rule 3-14, Rule 6-11, Rule 8-04, and Rule 8-06 of Regulation S-X (17 CFR 210.3-05, 210.3-14, 210.6-11, 210.8-04, and 210.8-06), as applicable, are filed; provided, however, that the following offerings or sales of securities may proceed notwithstanding that financial statements of the acquired business have not been filed:

    (a) offerings or sales of securities upon the conversion of outstanding convertible securities or upon the exercise of outstanding warrants or rights;

    (b) dividend or interest reinvestment plans;

    (c) employee benefit plans;

    (d) transactions involving secondary offerings; or

    (e) sales of securities pursuant to Rule 144 (17 CFR 230.144).

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

<div style="text-align: right">

_____

(Registrant)

</div>

Date _____

<div style="text-align: right">

_____

(Signature)*

</div>

*Print name and title of the signing officer under his signature.

# Exhibit H

EDGAR pro
by EDGAR Online®

# RIOT BLOCKCHAIN, INC.

## Filed by
## HONIG BARRY C

## FORM SC 13D/A
(Amended Statement of Beneficial Ownership)

## Filed 04/18/18

| | |
|---|---|
| Address | 202 6TH STREET, SUITE 401 |
| | CASTLE ROCK, CO, 80104 |
| Telephone | 303-794-2000 |
| CIK | 0001167419 |
| Symbol | RIOT |
| SIC Code | 2835 - In Vitro and In Vivo Diagnostic Substances |
| Industry | Financial & Commodity Market Operators |
| Sector | Financials |
| Fiscal Year | 12/31 |

http://pro.edgar-online.com
© Copyright 2020, EDGAR Online, a division of Donnelley Financial Solutions. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, a division of Donnelley Financial Solutions, Terms of Use.

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

SCHEDULE 13D/A

Under the Securities Exchange Act of 1934
(Amendment No. 7)*

Riot Blockchain, Inc.

(Name of Issuer)

Common Stock, no par value per share

(Title of Class of Securities)

767292105

(CUSIP Number)

Barry Honig
555 South Federal Highway #450
Boca Raton, FL 33432
(561) 307-2287
(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

See Footnote 1

(Date of Event Which Requires Filing of This Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), Rule 13d-1(f) or Rule 13d-1(g), check the following box. [ ]

(Page 1 of 9 Pages)

_____
* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

(1) This Amendment No. 7 is being filed to restate Amendment No. 6 filed with the Securities and Exchange Commission on February 13, 2018. The first date of event which required the filing of an amendment to the Schedule 13D after Amendment No. 5 was March 15, 2017.

| 1 | NAME OF REPORTING PERSON<br>Barry Honig | |
|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP | (a) ☐<br>(b) ☐ |
| 3 | SEC USE ONLY | |
| 4 | SOURCE OF FUNDS<br>PF, WC | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDING IS REQUIRED PURSUANT TO ITEMS 2(d) or 2(e) | ☐ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br>New York | |

| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON WITH: | 7 | SOLE VOTING POWER<br>200,154 shares of Common Stock (including 151,210 shares of Common Stock issuable upon conversion of shares of Series B Convertible Preferred Stock and 22,222 shares of Common Stock issuable upon exercise of the December 2017 Warrants)* |
|---|---|---|
| | 8 | SHARED VOTING POWER<br>-0- |
| | 9 | SOLE DISPOSITIVE POWER<br>200,154 shares of Common Stock (including 151,210 shares of Common Stock issuable upon conversion of shares of Series B Convertible Preferred Stock and 22,222 shares of Common Stock issuable upon exercise of the December 2017 Warrants)* |
| | 10 | SHARED DISPOSITIVE POWER<br>-0- |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH PERSON<br>200,154 shares of Common Stock (including 151,210 shares of Common Stock issuable upon conversion of shares of Series B Convertible Preferred Stock and 22,222 shares of Common Stock issuable upon exercise of the December 2017 Warrants)* | |
|---|---|---|
| 12 | CHECK IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES | ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br>1.69%* | |
| 14 | TYPE OF REPORTING PERSON<br>IN | |

* This Amendment No. 7 reflects the Reporting Person's holdings as of February 13, 2018.

This Amendment No. 7 ("Amendment No. 7") amends and supplements the statement on Schedule 13D filed with the Securities and Exchange Commission (the "SEC") on September 8, 2016, as amended, supplemented and restated from time to time (as amended, including, without limitation, pursuant to this Amendment No. 7, the "Schedule 13D") with respect to the shares of Common Stock, no par value per share (the "Common Stock"), of Riot Blockchain, Inc., a Nevada corporation (the "Issuer"). This Amendment No. 7 is being filed to restate Amendment No. 6 filed with the SEC on February 13, 2018. The first date of event which required the filing of an amendment to the Schedule 13D after Amendment No. 5 was March 15, 2017. Capitalized terms used herein and not otherwise defined in this Amendment No. 7 shall have the meanings set forth in the Schedule 13D. This Amendment No. 7 amends Items 2, 3, 5, 6 and 7 as set forth below. This is the final amendment to the Schedule 13D and constitutes an "exit filing" for the Reporting Person.

**Item 2.**       **IDENTITY AND BACKGROUND.**

Item 2 of the Schedule 13D is hereby amended and restated in its entirety as follows:

(a)       This statement is filed by Barry Honig, ("Mr. Honig" or the "Reporting Person"), with respect to the shares of Common Stock held by himself and through GRQ Consultants, Inc. 401K (of which Mr. Honig is Trustee) and GRQ Consultants, Inc. Roth 401K FBO Barry Honig (of which Mr. Honig is Trustee) (collectively, the "Honig Entities").

Any disclosures herein with respect to persons other than the Reporting Person are made on information and belief after making inquiry to the appropriate party.

The filing of this statement should not be construed in and of itself as an admission by the Reporting Person as to beneficial ownership of the securities reported herein.

(b)       The address of the business office of the Reporting Person is 555 South Federal Highway #450, Boca Raton, Florida 33432.

(c)       The principal business of the Reporting Person is investing in securities for his personal account.

(d)       The Reporting Person has not, during the last five years, been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors).

(e)       The Reporting Person has not, during the last five years, been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and, as a result of such proceeding, was, or is subject to, a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, Federal or State securities laws or finding any violation with respect to such laws.

(f)       Mr. Honig is a citizen of the United States.

**Item 3.**　　　**SOURCE AND AMOUNT OF FUNDS OR OTHER CONSIDERATION.**

Item 3 of the Schedule 13D is hereby amended and restated in its entirety as follows:

> The Reporting Person used a total of $499,995 to acquire the Private Placement Shares (as defined below) and the December 2017 Warrants (as defined below). The additional 4,500 shares of Common Stock held by the Reporting Person were acquired upon conversion of 45 Series A Preferred Shares (as defined below) at a conversion price of $2.50. Such Series A Preferred Shares were acquired for $11,250. The sources of the funds used to acquire the Private Placement Shares, the December 2017 Warrants and the Series A Preferred Shares are the personal funds of Mr. Honig and the working capital of the Honig Entities. The Series B Preferred Shares (as defined below) reported herein were acquired in exchange for 151,210 shares of common stock of Kairos Global Technology, Inc. ("Kairos") as described in Item 6.

**Item 5.**　　　**INTEREST IN SECURITIES OF THE ISSUER.**

Items 5 of the Schedule 13D is hereby amended and restated in its entirety as follows:

(a)　　　See rows (11) and (13) of the cover pages to this Schedule 13D for the aggregate number of shares of Common Stock and percentages of the shares of Common Stock beneficially owned by the Reporting Person as of February 13, 2018 . The percentages used in this Schedule 13D are calculated based upon 11,652,270 shares of Common Stock issued and outstanding as of February 5, 2018, as reported in the Issuer's Registration Statement on Amendment No. 1 to Form S-3 filed with the SEC on February 7, 2018 and assumes the conversion of the shares of Series B Convertible Preferred Stock and the exercise of the December 2017 Warrants.

(b)　　　See rows (7) through (10) of the cover pages to this Schedule 13D for the number of shares of Common Stock as to which the Reporting Person has the sole or shared power to vote or direct the vote and sole or shared power to dispose or to direct the disposition as of February 13, 2018.

(c)　　　Information concerning all transactions in the shares of Common Stock effected by the Reporting Person from the filing of Amendment No. 5 to the filing of Amendment No. 6 is set forth on Schedule A hereto and is incorporated herein by reference.

(d)　　　No person other than the Reporting Person and the Honig Entities is known to have the right to receive, or the power to direct the receipt of dividends from, or proceeds from the sale of, the shares of Common Stock held by Mr. Honig and the Honig Entities.

(e)　　　November 20, 2017.

**Item 6.**        **CONTRACTS, ARRANGEMENTS, UNDERSTANDINGS OR RELATIONSHIPS WITH RESPECT TO SECURITIES OF THE ISSUER.**

Item 6 of the Schedule 13D is hereby amended and supplemented by the addition of the following:

On March 15, 2017, the Issuer entered into separate securities purchase agreements (the " Note Purchase Agreements ") pursuant to which it agreed to sell to the Reporting Person and a certain Hong Entity $2,250,000 of principal amount of promissory notes (the " Notes ") and three year warrants (the " March 2017 Warrants ") to purchase up to 700,000 shares of Common Stock. The Notes are convertible into shares of Common Stock at an initial conversion price of $2.50. Each March 2017 Warrant is exercisable into shares of Common Stock at an exercise price equal to $3.56 per share (such sale and issuance of the Notes and March 2017 Warrants, the " Note Private Placement ").

On March 16, 2017, the Issuer satisfied all closing conditions and closed the Note Private Placement.

The Notes and the March 2017 Warrants, as well as the proceeds from the sale therefrom, were placed in escrow pending the occurrence or non-occurrence of a Qualified Transaction (as defined in the governing purchase agreements). On August 18, 2017, the lead investor in the transaction waived the requirement for the occurrence of a Qualified Transaction and gross proceeds of the Note Private Placement were released to the Issuer and the Notes and the March 2017 Warrants were released to the Reporting Person and the applicable Honig Entity.

Under the terms of the Note Purchase Agreement, the Notes were automatically, and without any further action on the part of the investors, exchanged for shares of Series A C onvertible P referred S tock of the Issuer (the " Series A Preferred Shares "). The terms of the Series A Preferred Shares are set forth in the certificate of designations for such shares (the " Certificate of Designations of the Series A Preferred Shares "). As such, and pursuant to the Note Purchase Agreements, on September 20, 2017, the Issuer issued an aggregate of 7,071.74 Series A Preferred Shares, convertible into an aggregate of 707,174 shares of Common Stock, in exchange for the Notes issued in the Note Private Placement.

In connection with the Note Private Placement, the Issuer entered into a Registration Rights Agreement (the " March 2017 Registration Rights Agreement "), with the Reporting Person and the applicable Honig Entity which required the Issuer to file a registration statement under the Securities Act of 1933, as amended (the " Securities Act "), to register the resale of the shares of Common Stock issuable upon (i) conversion of the Notes; (ii) exercise of the March 2017 Warrants and (iii) conversion of the Series A Preferred Shares.

Case 3:18-cv-02293-GC-RLS    Document 231-1    Filed 05/27/22    Page 306 of 311 PageID: 9561

The terms of the Note Purchase Agreement, the Notes, the March 2017 Warrant, the Certificate of Designations of the Series A Preferred Shares and the March 2017 Registration Rights Agreement are incorporated herein by reference to the texts of the agreements, which are filed as Exhibit 10.1, Exhibit 4.1. Exhibit 4.2, Exhibit 3.1 and Exhibit 10.2, respectively, of the Issuer's Current Report on Form 8-K filed by the Issuer with the SEC on March 17, 2017 (the " March 17, 2017 Form 8-K "). The Form of Note, the Form of March 2017 Warrant, the Certificate of Designations of the Series A Preferred Shares and the Form of March 2017 Registration Rights Agreement are referenced as Exhibit 1, Exhibit 2, Exhibit 3 and Exhibit 4, respectively, to this Amendment No. 7.

On November 1, 2017, the Issuer entered into a share exchange agreement (the " Exchange Agreement ") with Kairos, the Reporting Person and the other shareholders of Kairos. On November 3, 2017, pursuant to the Exchange Agreement, the shareholders of Kairos, including the Reporting Person, exchanged all outstanding shares of Kairos' common stock for shares of Series B Convertible Preferred Stock of the Issuer (the " Series B Preferred Shares "). The Reporting Person received 151,210 Series B Preferred Shares pursuant to the Exchange Agreement. The terms of the Series B Preferred Shares are set forth in the certificate of designations for such shares (the " Certificate of Designations of the Series B Preferred Shares "). The terms of the Series B Preferred Shares are incorporated herein by reference to the text of such document, which is filed as Exhibit 3.1 to the Current Report on Form 8-K filed by the Issuer with the SEC on November 3, 2017 (the " November 3, 2017 Form 8-K "). The Certificate of Designations of the Series B Preferred Shares is referenced as Exhibit 5 to this Amendment No. 7.

On December 18, 2017, a Honig Entity entered into a securities purchase agreement (the " Securities Purchase Agreement ") with the Issuer pursuant to which the Issuer issued 22,222 shares of Common Stock (the " Private Placement Shares ") and warrants exercisable into 22,222 shares of Common Stock (the " December 2017 Warrants ") to such Honig Entity for a purchase price of $22.50 per combined Private Placement Share and December 2017 Warrant. The December 2017 Warrants have an exercise price of $40.00 per share, subject to adjustment in certain events as set forth therein, and may be exercised from time to time at any time on or after June 21, 2018 through June 21, 2021.

The closing of the transactions contemplated by the Securities Purchase Agreement occurred on December 21, 2017.

In connection with the purchase of the Private Placement Shares and the December 2017 Warrants, the Issuer entered into a Registration Rights Agreement, effective as of the closing (the " December 2017 Registration Rights Agreement "), with the Honig Entity party to the Securities Purchase Agreement and other investors which required the Issuer to file a registration statement under the Securities Act to register the resale of the Private Placement Shares and the shares of Common Stock underlying the December 2017 Warrants.

The foregoing summaries of the Securities Purchase Agreement, the December 2017 Warrant and December 2017 Registration Rights Agreement are incorporated herein by reference to the texts of the agreements, which are filed as Exhibit 10.1, Exhibit 4.1 and Exhibit 10.2, respectively, of the Issuer's Current Report on Form 8-K filed by the Issuer with the SEC on December 19, 2017 (the " December 19, 2017 Form 8-K "). The Form of December 2017 Warrant and the Form of December 2017 Registration Rights Agreement are referenced as Exhibit 6 and Exhibit 7, respectively, to this Amendment No. 7.

**Item 7.**         **MATERIAL TO BE FILED AS EXHIBITS.**

Item 7 of the Schedule 13D is hereby amended and supplemented by the addition of the following:

Exhibit 1 :    Form of Note (incorporated by reference to Exhibit 4.1 to the March 17, 2017 Form 8-K).

Exhibit 2 :    Form of March 2017 Warrant (incorporated by reference to Exhibit 4.2 to the March 17, 2017 Form 8-K).

Exhibit 3 :    Certificate of Designations of the Series A Preferred Shares (incorporated by reference to Exhibit 3.1 to the March 17, 2017 Form 8-K).

Exhibit 4 :    Form of March 2017 Registration Rights Agreement (incorporated by reference to Exhibit 10.2 to the March 17, 2017 Form 8-K).

Exhibit 5 :    Certificate of Designations of the Series B Preferred Shares (incorporated by reference to Exhibit 3.1 to the November 3, 2017 Form 8-K).

Exhibit 6 :    Form of December 2017 Warrant (incorporated by reference to Exhibit 4.1 to the December 19, 2017 Form 8-K).

Exhibit 7 :    Form of December 2017 Registration Rights Agreement (incorporated by reference to Exhibit 10.2 to the December 19, 2017 Form 8-K).

Case 3:18-cv-02293-GC-RLS   Document 231-1   Filed 05/27/22   Page 308 of 311 PageID: 9563

## SIGNATURES

After reasonable inquiry and to the best of his or its knowledge and belief, the undersigned certifies that the information set forth in this statement is true, complete and correct.

Date: April 18, 2018


/s/ Barry Honig
BARRY HONIG

Case 3:18-cv-02293-GC-RLS   Document 231-1   Filed 05/27/22   Page 309 of 311 PageID: 9564

## SCHEDULE A

**Transactions in the Shares of Common Stock of the Issuer From the Filing of Amendment No. 5 to the Filing of Amendment No. 6**

The following table sets forth all transactions in the shares of Common Stock effected from the filing of Amendment No. 5 to the filing of Amendment No. 6 by the Reporting Person. Except as noted below, all such transactions were effected in the open market through brokers and the price per share is net of commissions.

| Trade Date | Shares Purchased (Sold) | Price Per Share ($) |
|---|---|---|
| 03/29/2017 | 35,000* | 2.25 |
| 03/31/2017 | (4,200) | 4.10 |
| 04/05/2017 | (800) | 4.10 |
| 04/13/2017 | (3,300) | 4.07 |
| 04/13/2017 | (800) | 4.08 |
| 04/18/2017 | (4,900) | 4.16 |
| 04/25/2017 | (1,200) | 3.99 |
| 04/26/2017 | (100) | 3.90 |
| 04/28/2017 | (2,100) | 3.60 |
| 05/01/2017 | (4,000) | 3.70 |
| 05/09/2017 | (5,500) | 3.82 |
| 05/10/2017 | (2,500) | 3.80 |
| 05/16/2017 | (1,000) | 3.63 |
| 05/23/2017 | (1,800) | 3.75 |
| 05/31/2017 | (7,000) | 3.82 |
| 05/31/2017 | (1,900) | 3.83 |
| 05/31/2017 | (500) | 3.86 |
| 05/31/2017 | (500) | 3.83 |
| 06/02/2017 | (1,971) | 3.85 |
| 06/05/2017 | (1,429) | 3.94 |
| 06/05/2017 | (4,871) | 3.94 |
| 06/08/2017 | (11,301) | 3.99 |
| 06/12/2017 | (1,300) | 3.94 |
| 06/13/2017 | (400) | 4.02 |
| 06/14/2017 | (3,251) | 4.00 |
| 06/15/2017 | (1,307) | 4.05 |
| 06/19/2017 | (7,412) | 3.91 |
| 06/20/2017 | (2,027) | 3.97 |
| 06/22/2017 | (744) | 3.96 |
| 06/22/2017 | (8,000) | 4.07 |
| 06/22/2017 | (1,000) | 3.95 |

| | | |
|---|---|---|
| 06/23/2017 | (5,000) | 3.94 |
| 06/30/2017 | (3,000) | 3.97 |
| 07/01/2017 | (1,000) | 4.10 |
| 07/10/2017 | (1,200) | 3.95 |
| 07/13/2017 | 1,502 | 3.77 |
| 07/17/2017 | (1,200) | 4.01 |
| 07/18/2017 | (975) | 4.05 |
| 07/19/2017 | (1,114) | 4.05 |
| 08/04/2017 | (7) | 3.90 |
| 10/04/2017 | (47,520) | 8.92 |
| 10/05/2017 | (11,400) | 7.47 |
| 10/05/2017 | 235,960** | 3.56 |
| 10/06/2017 | (10,000) | 7.29 |
| 10/06/2017 | 58,990** | 3.56 |
| 10/09/2017 | (136,028) | 8.62 |
| 10/10/2017 | (55,459) | 9.32 |
| 10/10/2017 | (11,070) | 8.43 |
| 10/11/2017 | (130,000) | 10.10 |
| 10/11/2017 | (128,916) | 10.00 |
| 10/11/2017 | (35,000) | 10.00 |
| 10/11/2018 | 128,988** | 3.56 |
| 10/11/2017 | 505,124*** | 2.50 |
| 10/12/2017 | (26,600) | 8.25 |
| 10/12/2017 | (15,000) | 8.44 |
| 10/17/2017 | (4,000) | 8.47 |
| 10/18/2017 | (3,088) | 7.68 |
| 10/19/2017 | (3,700) | 8.17 |
| 10/20/2017 | (45,000) | 8.20 |
| 11/07/2017 | (3,800) | 8.42 |
| 11/09/2017 | (800) | 7.75 |
| 11/10/2017 | (3,972) | 7.25 |
| 11/13/2017 | (9,500) | 7.25 |
| 11/14/2017 | (1,032) | 7.20 |
| 11/14/2017 | (3,968) | 7.10 |
| 11/15/2017 | (5,268) | 7.64 |
| 11/16/2017 | (61,000) | 8.31 |
| 11/17/2017 | (18,588) | 8.81 |
| 11/17/2017 | 1,500 | 8.26 |
| 11/20/2017 | (262,293) | 9.85 |
| 11/21/2017 | (143,475) | 11.64 |
| 11/21/2017 | 202,050*** | 2.50 |
| 11/24/2017 | (10,000) | 11.77 |
| 11/24/2017 | (64,235) | 11.77 |
| 11/24/2017 | (64,235) | 11.77 |
| 11/24/2017 | (64,235) | 11.77 |

| | | |
|---|---|---|
| 11/24/2017 | (64,236) | 14.19 |
| 11/28/2017 | (27,907) | 16.61 |
| 11/28/2017 | (1,500) | 16.64 |
| 11/28/2017 | (58,593) | 16.64 |
| 11/29/2017 | 15,000 | 12.54 |
| 11/29/2017 | (36,587) | 16.94 |
| 11/29/2017 | (9,248) | 13.29 |
| 11/30/2017 | (5,752) | 13.13 |
| 12/19/2017 | 22,222**** | 22.50 |

* Represents shares of Common Stock acquired in a private transaction.

** Represents shares of Common Stock acquired from the Issuer upon exercise of the Reporting Person's March 2017 Warrants at an exercise price of $3.56 per share.

*** Represents shares of Common Stock acquired from the Issuer upon conversion of the Reporting Person's Series A Preferred Shares at a conversion price of $2.50 per share.

**** Represents shares of Common Stock acquired from the Issuer pursuant to the Securities Purchase Agreement as described in Item 6.