# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TAKATA, | : Civil Action No.: 3:18-cv-02293(GC)(RLS) |
| | : |
| *Plaintiff,* | : |
| | : |
| v. | : |
| | : |
| RIOT BLOCKCHAIN, INC., et al. | : |
| | : |
| *Defendants.* | : |
| | : |
| | : |

---

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE INDIVIDUAL DEFENDANTS' JOINDER AND MOTION TO DISMISS THE CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

---

**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for*
*Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Dr. Stanley Golovac*
*and Lead Counsel for the Class*

**TABLE OF CONTENTS**

I.   INTRODUCTION AND SUMMARY OF ALLEGATIONS ........................1

II.  ARGUMENT..................................................................................6

   A.   Legal Standards ..................................................................6

   B.   O'Rourke and Beeghley Made Materially False and
        Misleading Statements and Omissions in Violation
        Rule 10b-5(b) (Count II) ......................................................7

        1.   O'Rourke and Beeghley Signed Riot's Materially False
             and Misleading Forms S-3, S-3/A, and 10-K ............................8

        2.   O'Rourke's February 16, 2018 Statements to *CNBC*
             Were Materially False and Misleading by Denying
             and Perpetuating the Scheme ....................................................10

        3.   O'Rourke's February 16, 2018 Shareholder Letter
             Was Materially False and Misleading by Denying
             and Perpetuating the Scheme ....................................................12

   C.   The Complaint Adequately Pleads O'Rourke and
        Beeghley's Scheme Liability Under Rule 10b-5(a)
        and (c) (Count I) ...............................................................15

        1.   Legal Standard for Pleading Scheme Liability .........................15

        2.   O'Rourke and Beeghley Engaged in the
             Fraudulent Scheme................................................................17

   D.   The Complaint Pleads a Strong Inference of
        Defendants' Scienter ...........................................................25

        1.   The Legal Standard for Pleading Scienter ...............................25

        2.   O'Rourke Knowingly Engaged in the Fraud ...........................26

        a.   O'Rourke Had *Actual Knowledge* that
             Riot's Public Disclosures Were Materially
             False and Misleading ...............................................................26

        b.   O'Rourke's Sudden Resignation as CEO—One Day
             After the SEC Sued Him—Adds to the Inference
             of His Scienter......................................................................30

        c.   O'Rourke's Stock Sales Were Unusual in Scope
             and Timing and Add to the Inference of His Scienter .............31

        3.   Beeghley Knowingly Engaged in the Fraud ............................36

i

E.    The Complaint Adequately Pleads O'Rourke
and Beeghley's Liability Under Section 20(a) as
Control Persons of Riot (Count III) ......................................................38

III.    CONCLUSION.................................................................................................39

# TABLE OF AUTHORITIES

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) ........................................................................15

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   568 U.S. 455 (2013) ..........................................................................6

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ..........................................................................8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................. 6, 25

*Belmont v. MB Inv. Partners, Inc.*,
   708 F.3d 470 (3d Cir. 2013) ..........................................................10

*Bing Li v. Aeterna Zentaris, Inc.*,
   2016 WL 827256 (D.N.J. Mar. 2, 2016) .................................. 38, 39

*Bogosian v. Gulf Oil Corp.*,
   561 F.2d 434 (3d Cir. 1977) ..........................................................25

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ............................................................8

*de la Fuente v. DCI Telecomms.*,
   259 F. Supp. 2d 250 (S.D.N.Y. 2003) ...........................................22

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ..........................................................................6

*GFL Advantage Fund, Ltd., v. Colkitt*,
   272 F.3d 189 (3d Cir. 2001) ..........................................................15

*Gordon v. Dailey*,
   2018 WL 1509080 (D.N.J. Mar. 27, 2018) .....................................25

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ........................................................................16

*In re Able Labs. Sec. Litig.*,
   2008 WL 1967509 (D.N.J. Mar. 24, 2008) .......................................7

*In re Advanta*,
   180 F.3d 525 (3d Cir.1999) ............................................................31

*In re Burlington Coat Factory*,
   114 F.3d 1410 (3d Cir. 1997) .............................................. 7, 25, 31

*In re Cephalon Sec. Litig.*,
  1997 WL 570918 (E.D. Pa. Aug. 29, 1997)........................................................7

*In re Cognizant Technology Solutions Corp. Litig.*,
  Civ. No. 1606509 (ES), 2020 WL 3026564 (D.N.J. Jun. 5, 2020)............... 17, 20

*In re Egalet Corp. Sec. Litig.*,
  340 F. Supp. 3d 479 (E.D. Pa. 2018)..................................................................34

*In re Heckmann Corp. Sec. Litig.*,
  869 F. Supp. 2d 519 (D. Del. 2012) ....................................................................30

*In re Hertz Glob. Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018) .......................................................................... 26, 35

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007)......................................................................25

*In re Par Pharm. Sec. Litig.*,
  2009 WL 3234273 (D.N.J. Sept. 30, 2009)..........................................................30

*In re Providian Fin. Corp. Sec. Litig.*,
  152 F. Supp. 2d 814 (E.D. Pa. 2001)....................................................................8

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) .......................................................................... 31, 32

*In re Tronox, Inc. Sec. Litig.*,
  2010 WL 2835545 (S.D.N.Y. June 28, 2010).......................................................21

*In re Unisys Corp. Sec. Litig.*,
  2000 WL 1367951 (E.D. Pa. Sept. 21, 2000)........................................................7

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003) ..................................................................36

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ....................................................................... 9, 25, 26

*Johns v. Bayer Corp.*,
  2010 WL 2573493 (S.D. Cal. June 24, 2010) .......................................................21

*Jones v. Intelli-Check, Inc.*,
  274 F.Supp.2d 615 (D.N.J. Jul 30, 2003) (Wolfson, J.)......................... 16, 38, 39

*Lorenzo v. S.E.C.*,
  139 S.Ct. 1094 (2019) ................................................................................. 16, 19

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ................................................................................9

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011) ................................................................................6

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
  547 U.S. 71 (2006) ................................................................................7

*Paxton v. Provention Bio, Inc.,*
  2022 WL 3098236 (Aug. 4, 2022) .............................................. *passim*

*Phillips v. Cty. of Allegheny,*
  515 F.3d 224 (3d Cir. 2008) ..................................................................7

*S.E.C. v. Lee,*
  720 F. Supp. 2d 305 (S.D.N.Y. 2010) ................................................21

*S.E.C. v. Lucent Techs. Inc.,*
  610 F. Supp. 2d at 342 (D.N.J. 2009) ................................................15

*S.E.C. v. Teo,*
  746 F.3d 90 (3d Cir. 2014) ....................................................................6

*Se. Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.,*
  2016 WL 466958 (M.D. Pa. Feb. 8, 2016) ..........................................30

*Springer v. Kilhefner,*
  2019 WL 3816839 (E.D. Pa. Aug. 14, 2019) ........................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ........................................................................ 7, 26

*The Winer Family Trust v. Queen,*
  2004 WL 2203709 (E.D. Pa. Sept. 27, 2004) ......................................38

*Trustcash Holdings, Inc. v. Moss,*
  668 F. Supp. 2d 650 (D.N.J. 2009) ......................................................15

*Williams v. Globus Med., Inc.,*
  869 F.3d 235 (3d Cir. 2017) ................................................................11

*Wilson v. Bernstock,*
  195 F. Supp. 2d 619 (D.N.J.2002) ......................................................31

## REGULATIONS

17 C.F.R. § 240.10b-5 ................................................................................15

Court-appointed Lead Plaintiff Dr. Stanley Golovac ("Plaintiff") respectfully submits this memorandum of law in opposition to the motions to dismiss (the "Motions")[1] the Consolidated Third Amended Class Action Complaint (the "Complaint" or "TAC") filed by John O'Rourke ("O'Rourke") and Michael Beeghley ("Beeghley") (the "Individual Defendants").[2]

## I.  INTRODUCTION AND SUMMARY OF ALLEGATIONS

This case involves a highly-orchestrated and closely-knit group of investors—led by Defendants O'Rourke, Honig, and several of the Selling Stockholders, ¶ 80,

---

[1] Plaintiff incorporates by reference his memoranda, concurrently filed herewith, in response to the motions to dismiss filed by Riot Blockchain, Inc. ("Riot" or the "Company") and Barry C. Honig ("Honig") (and together with the Individual Defendants, "Defendants").  Capitalized terms herein have the same meanings as in the TAC (ECF No. 231), paragraphs of which are cited as "¶ __," exhibits to which are cited as "TAC Ex. __."  Defendants' memoranda of law in support of their motions are cited as follows:  Riot's (ECF No. 232-1) as "Riot Br. __"; O'Rourke and Beeghley's (ECF No. 233-1) as "Indiv. Br. __"; and Honig's (ECF No. 234-1) as "Honig Br. __."  Riot, O'Rourke, and Beeghley are referred to herein as "the Riot Defendants."  References to the "SAC" are to Plaintiff's previous Consolidated Second Amended Complaint (ECF No. 188).  All emphasis is added and internal quotations and citations are omitted unless otherwise noted.

[2] Plaintiff does not object to Defendants' requests for judicial notice (ECF Nos. 232-4, 234-16) of Riot's SEC filings because they are documents that Riot was "required to file with the SEC" and "to which the public has 'unqualified access" and "are matters of public record[.]" *Paxton v. Provention Bio, Inc.*, 2022 WL 3098236, at *1 n.1 (Aug. 4, 2022).  Indeed, Riot's SEC filings are "integral to" the TAC because they were quoted and incorporated by reference therein.  *Id.* However, to the extent that Defendants sometimes selectively quote from Riot's SEC filings, Plaintiff provides additional quotes herein to provide the Court with their full and accurate context.

who are alleged in the Complaint as "Relevant Non-Parties," ¶¶ 16-48.  This self-described "small group," ¶ 55 (quoting O'Rourke) invested in the Company together, as a group, in order to gain control of the Company by taking over its Board and placing a members of their group—Defendants O'Rourke and Beeghley—as the Company's CEOs and Chairmen.  In their role as Riot CEOs and Chairman, O'Rourke and Beeghley caused the Company to issue materially false and misleading SEC filings that allowed Honig and the Selling Stockholders to register millions of shares of Riot stock for sale to the investing public while misrepresenting and concealing the fact that Honig and the Selling Stockholders were investing in the Company together, and meanwhile engaging in multiple multi-million-dollar related-party transactions—all without disclosing their group's involvement in those insider transactions—and all in order to "pump-and-dump" Riot's stock at the expense of the Company's public investors.  When the public learned—through CNBC's investigative journalism and a lawsuit by the SEC—that O'Rourke, Honig, and the Selling Stockholders had to this same basic pump-and-dump *modus operandi* at multiple previous public companies, Riot's stock price declined precipitously, damaging Riot's public investors.

   ***First***, during the Class Period, both O'Rourke and Beeghley signed the Riot's SEC filings—including Riot's Forms S-3, S-3/A, and 10-K—which the TAC alleges were materially false and misleading.  *See* § II.B.1 *infra*.  These SEC filings were

false and misleading for the reasons set forth in Plaintiff's memorandum, filed herewith, in opposition to Defendant Riot's motion to dismiss. Defendant O'Rourke also personally made statements and wrote a letter to Riot's shareholder published on a Form 8-K. *See* § II.B.3 *infra*. O'Rourke and Beeghley's false and misleading statements violated Rule 10b-5(b).

*Second*, their roles as the Company's CEOs and Chairmen, and in causing Riot to file materially false and misleading SEC filings, and to enter into undisclosed related-party transactions with Honig and the Selling Stockholders, and doing so while Honig and the Selling Stockholders engaged in massive undisclosed insider trading, O'Rourke and Beeghley thereby engaged in deceptive acts in furtherance of a fraudulent scheme in violation of Rule 10b-5(a) and (c). In doing so Complaint adequately alleges that Defendants' scheme liability falls within the "***wide range of conduct***" that the Supreme Court recently confirmed is prohibited by Rules 10b-5(a) and (c). *See Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1101 (2019). *See* § II.C.1 *infra*.

*Third*, the allegations in the Complaint raise a strong, cogent, and compelling inference that O'Rourke's violations of Rule 10b-5(a), (b), and (c) were done knowingly and consciously. *See* § II.D *infra*. While discussed in greater detail below, O'Rourke's knowledge is supported by the facts that O'Rourke: (1) O'Rourke had invested alongside Honig in over 75 companies

between 2011 and August 2018, ¶¶ 57, 160, and because "O'Rourke, Honig, Stetson and Brauser invested as a group in at least 19 companies from 2011 to present," ¶ 51; (2) stated in an email on February 3, 2014, that "Barry Honig is the principal investor of our small group." ¶¶ 55, 151, 161; (3) shared an office with Honig in Boca Raton, FL *while O'Rourke was CEO of Riot*, ¶ 162; (4) shared the same fax number with Honig (and Selling Stockholder Stetson), which O'Rourke, Honig, and Stetson was used for their business dealings with Riot's Board, ¶ 151; (5)  suddenly resigned as CEO on September 8, 2018, ¶ 14—the very next day after the SEC sued him in the *SEC v. Honig* Action and accused him of engaging in three fraudulent pump-and-dump schemes with Honig and several other Selling Stockholders, ¶ 49, 139-40; and (6) on Friday, December 29, 2017—less than two months after become CEO—and while Riot's fraud and Honig's insider trading still remained undisclosed to the market, O'Rourke sold "30,383 shares of Riot stock" to the public "for proceeds of $869,256.350," which represented about *37%* of shares he "owned or would soon control prior" and about 70% of the shares that he actually owned and controlled (and thus had the actual ability to sell) at that time.

    ***Fourth***, the Complaint's allegations raise a strong, cogent, and compelling inference that Beeghley's violations were done knowingly, or at the very least, recklessly.  *See* § II.D.3 *infra*.  Like O'Rourke, As CEO and Chairman, Beeghley knowingly or recklessly signed false and misleading SEC filings—including Riot's

April 20, July 19, August 24, and September 25, 2017 Form S-3s—that affirmatively misrepresented and failed to disclose that Honig and the Selling Stockholders were coordinating their shareholding in Riot as group in violation of the Company's disclosure obligations under Item 403 of Regulation S-K and Section 13(d)(3). Beeghley's knew, or at the very least recklessly disregarded, the falsity of these filings and the fraudulent scheme being perpetrated by O'Rourke and Honig together with the Selling Stockholders. The strong inference of Beeghley knowledge or recklessness toward this scheme is support by the fact that (1) Beeghley himself had co-invested with O'Rourke, Honig, Stetson, Groussman, Brauser, DeFrancesco, and the *15 other* Selling Stockholders when he was a member the board of directors of PolarityTE, a public company whose board Beeghley joined when Honig was already Chairman and CEO of PolarityTE, ¶¶ 74-78; (2) yet, when Honig nominated Beeghley in December 2016 to serve on the Company's Board, Beeghley told the outgoing Board that that he "did not know Honig," according to an individual present at the time who spoke with Plaintiff's counsel during their investigation of this case, ¶ 89; and (3) was CEO of Riot—a Company with only nine employees—Beeghley would have been aware of the March 2017 Private Placement and aware of the terms and investor agreement related to Coinsquare, and yet failed to disclose Honig's involvement in those transactions or that Honig was acting as part of a group, ¶ 165.

*Finally*, the Complaint adequately alleges claims against O'Rourke and Beeghley—Riot's CEOs and Chairmen—under Section 20(a) as control persons of Riot.

For the reasons discussed herein, the Court should deny the Individual Defendants' Motion in its entirety.

## II.   ARGUMENT

### A.   Legal Standards

"Congress, the Executive Branch, and [the Supreme] Court . . . have 'recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement [by the SEC].'" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 478 (2013). "All civil enforcement actions, whether initiated by the SEC or by a private party through an implied right of action share the same general goal: 'to maintain public confidence in the marketplace.'" *S.E.C. v. Teo*, 746 F.3d 90, 101 (3d Cir. 2014) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). A court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine

whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007) (noting "private securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses'—a matter crucial to the integrity of domestic capital markets") (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006)). Dismissal is inappropriate even where "it appears unlikely that a plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). Despite Rule 9(b)'s requirements, the Third Circuit has cautioned, "in applying [that rule], courts should be 'sensitive' to situations in which 'sophisticated defrauders' may 'successfully conceal the details of their fraud.'" *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *11 (D.N.J. Mar. 24, 2008) (quoting *In re Burlington Coat Factory*, 114 F.3d 1410, 1418 (3d Cir. 1997)).[3]

### B.    O'Rourke and Beeghley Made Materially False and Misleading Statements and Omissions in Violation Rule 10b-5(b) (Count II)

Under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Cal.*

---

[3] The PSLRA "does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim." *In re Cephalon Sec. Litig.*, 1997 WL 570918, at *2 (E.D. Pa. Aug. 29, 1997); *see also In re Unisys Corp. Sec. Litig.*, 2000 WL 1367951, at *4 (E.D. Pa. Sept. 21, 2000) (PSLRA "was not intended to create an insurmountable pleading hurdle for plaintiffs in such cases").

*Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004) (citation omitted); *see also In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 821 (E.D. Pa. 2001) (a securities fraud complaint adequately alleges falsity if it specifies "the who, what, when, where, and how; the first paragraph of any newspaper story"). A misstatement or omission of fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

### 1.    O'Rourke and Beeghley Signed Riot's Materially False and Misleading Forms S-3, S-3/A, and 10-K

During the Class Period, both O'Rourke and Beeghley signed Riot's SEC filings—including Riot's Forms S-3, S-3/A, and 10-K—which the TAC alleges were materially false and misleading.[4]  As alleged in the Complaint, "O'Rourke and Beeghley caused the Company to issue [these] materially false and misleading Forms S-3 and S-3/A, Forms 8-K, and other public filings." ¶ 153.  In that regard, Plaintiff incorporates by reference the arguments, points, and authorities set forth in

---

[4] *See* ¶ 178 (March 31, 2017 Form 10-K "signed by O'Rourke and Beeghley"); ¶ 181 (April 20, 2017 Form S-3 "signed by O'Rourke and Beeghley"); ¶ 189 (April 27, 2017 Form 10-K/A "signed by O'Rourke (as 'Director') and Beeghley (as '[CEO], Chairman, and Director')"); ¶ 191 (July 19, 2017 Form S-3/A "signed by O'Rourke and Beeghley"); ¶ 194 (August 24, 2017 Form S-3/A "signed by O'Rourke and Beeghley"); ¶ 197 (September 25, 2017 Form S-3 "signed by O'Rourke and Beeghley"); ¶ 209 (January 5, 2018 Form S-3 "signed by O'Rourke"); ¶ 215 (February 7, 2018 Form S-3/A "signed by O'Rourke").

Plaintiff's memorandum, filed herewith, in opposition to Riot's motion to dismiss, which O'Rourke and Beeghley, as Riot's former CEOs, incorporated by reference in their own motion. *See* Indiv. Br. 1 n.1. As discussed below, O'Rourke also personally made statements and wrote a letter to Riot's shareholders published on a Form 8-K.

In their brief, the Individual Defendants argue that they cannot personally be held liable for Riot's false statements in the Company's October 4 and November 3, 2017 Form 8-Ks, ¶¶ 200-08, because they did not personally sign those Form 8-Ks. *See* Indiv. Br. 10-11, 31 n.20. They argue this despite acknowledging that Beeghley was Riot's CEO when the October 4, 2017 Form 8-K was filed, ¶ 15, and O'Rourke became CEO on the same day the November 3, 2017 Form 8-K was filed, ¶ 14. Nevertheless, Riot's CFO, Jeffrey McGonegal, did sign both of these Form 8-Ks. *See* Riot Exs. H, I. This is sufficient for Riot, at a bare minimum, to be held liable for any material false statements and omissions in these Form 8-Ks because "[a] corporation is liable for statements by employees who have apparent authority to make them." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008)). *See also Springer v. Kilhefner*, 2019 WL 3816839, at *6 (E.D. Pa. Aug. 14, 2019) ("Because 'a corporation can speak and act only through its agents[,]' it 'must be accountable for any acts committed by one of its agents within his actual or

apparent scope of authority and while transacting corporate business.'") (quoting *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 494 (3d Cir. 2013)).  Thus, Riot and the Individual Defendants' attempt to parse their personal and corporate knowledge by claiming they didn't personally sign certain filings should not allow this ***nine-employee*** public company (¶ 165) of which they were CEOs and Chairmen to escape liability on such technicalities.

### 2.    O'Rourke's February 16, 2018 Statements to *CNBC* Were Materially False and Misleading by Denying and Perpetuating the Scheme

On February 16, 2018, *CNBC* published its article quoting O'Rourke as stating that he "isn't worried about the SEC because 'we over-disclose'"; "Mr. Honig . . . has been a supportive shareholder of Riot"; and "O'Rourke insisted that he does not work out of Barry Honig's office, even though we found him there." ¶¶ 132-133, 218.

Of course, as CEO, O'Rourke "had no independent duty," *Paxton*, 2022 WL 3098236, at *10, to speak with *CNBC*—nor tell *CNBC* whether as CEO, he was "worried about the SEC," whether Riot "over-disclose[d]" in its filings with the SEC, or whether he "work[ed] out of [Honig's] office."  ¶¶ 128-33.  But by "'cho[osing] to speak on [these] issue[s],'" O'Rourke "'[could not] omit material facts related to [these] issue[s] so as to make [his] disclosure[s] misleading.'" *Paxton*, 2022 WL 3098236, at *10 (quoting *Williams v. Globus Med., Inc.*, 869 F.3d

235, 241 (3d Cir. 2017)).   But by "speaking on [them]," O'Rourke "put [these] issue[s] 'in play.'"   *Id.* at *10 n.10.   It was therefore misleading for O'Rourke, during the same interview, to simultaneously "insist[] that he does not work out of Barry Honig's office" when he knew this was not true.   ¶¶ 132, 219.   In that regard, the *SEC v. Honig* Action would later reveal this statement—in light of the fact that *CNBC* "found" O'Rourke in Honig's office, ¶¶ 219, 132—to be obviously (and knowingly) false.   *See* ¶ 54 (quoting TAC Ex. B ¶ 56 ("Honig, Stetson and O'Rourke were in nearly daily contact because ***they worked out of the same office***")).

Riot argues that O'Rourke's false denial of working out of Honig's office was not "pertinent" to investors and thus not "materially misleading."   Riot Br. 33 n.30.[5] Riot omits, however, that as of February 16, 2018, Riot's investors had already learned that (1) Honig (previously a 11%+ Riot shareholder) had sold all but 1% of his Riot stock without timely disclosing the sales to the market, ¶¶ 125-26, 238-40; and (2) O'Rourke, as CEO, had also sold the majority of his Riot stock he then had a right to sell, ¶¶ 120-21, 234.   It was thus highly relevant to Riot's investors whether Riot's CEO had been working out of the same office as Riot's largest shareholder. Indeed, on September 7, 2018, the SEC's lawsuit against O'Rourke and Honig

---

[5] Contrary to Riot's argument (Riot Br. 33 n.30), it was ***O'Rourke*** who worked out of ***Honig's*** office.   ¶ 54.

corroborated that O'Rourke had in fact been working out of Honig's office.  ¶¶ 54, 139, 247.

Riot also argues that O'Rourke's statement to *CNBC* that "we over-disclose" was immaterial "puffery."   Riot Br. 33.   But Riot omits that O'Rourke's full statement to *CNBC* was that he "***isn't worried about the SEC because* 'we over-disclose.'***"   ¶¶ 133, 219.   Hence, O'Rourke was refuting *CNBC*'s negative allegations about Riot's lack of disclosure to investors by denying that Riot (and by extension, O'Rourke) could face an SEC enforcement proceeding for its obfuscations.  ¶¶ 128-33.  This context made O'Rourke's statement about Riot's practices regarding SEC disclosure material to investors.

### 3.   O'Rourke's February 16, 2018 Shareholder Letter Was Materially False and Misleading by Denying and Perpetuating the Scheme

Later on February 16, 2018, O'Rourke caused Riot to publish a letter to Riot's Shareholders ("Dear Shareholders") in which O'Rourke denied and downplayed *CNBC*'s article earlier that day.  ¶ 221.  O'Rourke's statements in his letter were materially false and misleading.

***First***, O'Rourke's statement that he "sold less than 10% of [his] overall position" at "the end of 2017" was demonstrably false.  ¶ 221.  As *Reuters* reported on January 2, 2018, O'Rourke's December 29 stock sales "represented about ***37%*** of [the] shares [that] [O'Rourke] owned or would soon control prior to the

transactions." ¶ 121.  But even this "37%" number *underestimates* the proportion of his stock that O'Rourke sold because it counted stock that he did not, at that time, actually yet control—and instead merely stood to "receive over the next 60 days," ¶ 121, and thus *could not* have sold on that day even if he wanted to.  If one excludes stock that O'Rourke did not at that time actually control (and was actually able to sell) on December 29, then O'Rourke actually sold *70.8%* of his then-existing position.  ¶ 121.[6]  Hence, O'Rourke's statement that he had "sold less than 10% of my overall position" ¶ 221, was a grossly misleading understatement.

*Second*, O'Rourke's statement that "[p]art of the further thesis around forming Riot Blockchain was to provide investors . . . with the transparency and disclosure obligations that come with operating a Nasdaq listed and fully SEC reporting company" was materially false and misleading for the same reasons as his statement to *CNBC* that he was not "worried about the SEC because 'we over-disclose,'" ¶¶ 133, 219, and because Riot quite literally was not a "fully SEC reporting company" and had not complied with its "disclosure obligations." ¶¶ 222-23.

---

[6] Specifically, on December 29, 2017, O'Rourke sold 30,383 shares of stock. ¶ 121. After his sale, O'Rourke held "12,500 shares through [ATG], in addition to 39,500 shares of stock in his own name that he currently owns, or will receive over the next 60 days . . . ." ¶ 121.  If one excludes the stock that O'Rourke did not actually own, and only stood to receive "over the next 60 days," then O'Rourke's sale of 30,383 shares was 70.8% of the 42,883 shares (30,383 + 12,500) that he held on December 29 before selling. ¶ 121.

*Third*, O'Rourke's statements that "[w]e take our SEC reporting obligations seriously and diligently file all reports and filings"; "[w]e have expended enormous effort to inform investors of the risks of our foray into uncharted territory"; and "[w]e support full disclosure" were materially false and misleading because far from supporting "full disclosure" and "taking [their SEC] reporting obligations seriously" and "diligently fil[ing] all reports," Riot had engaged in a lack of disclosure, failed in its SEC reporting obligations, and knew that several of its largest shareholders—including Honig and DeFrancesco—had failed to "diligently file all reports" required by law. ¶¶ 21, 142-47.

The Riot Defendants argue that "Plaintiff's premise" for these statements' "falsity rises and falls with [Plaintiff's] allegations regarding (1) Honig's group status; (2) the March 2017 Placement; and (3) Coinsquare and Kairos." Riot Br. 33-34. This misses the mark. O'Rourke's statements were false because of the gestalt of Riot's disclosure violations alleged in the Complaint. O'Rourke "had no independent duty," *Paxton*, 2022 WL 3098236, at *10, to tell investors the percentage of stock he had sold, or to discuss whether Riot took its "SEC reporting obligations seriously and diligently file[d] all reports and filings" or had engaged in "full disclosure," or to praise Honig as a "supportive shareholder" who had "shareholders' best interest" in mind. ¶ 221. But once O'Rourke "put [these] issue[s] 'in play," *Paxton*, 2022 WL 3098236, at *10 n.10, by telling Riot's

shareholders that Honig was acting "in shareholders' best interests," ¶ 221, O'Rourke could not "omit material facts" related to Honig's massive undisclosed insider trading "so as to make [O'Rourke's] disclosure [about Honig's true actions and motivations] misleading," *Paxton*, 2022 WL 3098236, at *10 n.10.

### C. The Complaint Adequately Pleads O'Rourke and Beeghley's Scheme Liability Under Rule 10b-5(a) and (c) (Count I)

#### 1. Legal Standard for Pleading Scheme Liability

The "gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001). Such deception can be related to "*any*" "course of business," "device, scheme, or artifice." 17 C.F.R. § 240.10b-5; *see also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) ("proscriptions [in §10(b) and Rule 10b-5] are broad and, by repeated use of the word 'any,' are obviously meant to be inclusive").

To plead a fraudulent "device, scheme, or artifice" under Rules 10b-5 (a) and (c), *S.E.C. v. Lucent Techs. Inc.*, 610 F. Supp. 2d at 342, 361 (D.N.J. 2009), courts in this District recognize that a plaintiff must allege that one or more defendants "(1) committed a manipulative or deceptive act, (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance," *Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 661-62 (D.N.J. 2009). "[C]ourts should be 'sensitive' to situations in

which 'sophisticated defrauders' may 'successfully conceal the details of their fraud'" and if certain facts are in the control of Defendants, "the strict requirements of Rule 9(b) may be relaxed." *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 628 (D.N.J. Jul 30, 2003) (Wolfson, J.).  In *Lorenzo v. S.E.C.*, 139 S.Ct. 1094 (2019), the Supreme Court expanded the range of manipulative or deceptive conduct that can give rise to liability under subsections (a) and (c).  The defendant-employee of a registered broker-dealer, Lorenzo, sent emails to prospective investors that included language in a prospectus—authored by Lorenzo's boss—that Lorenzo knew contained false and misleading statements. *Id*. at 1099.  The SEC ultimately held that in disseminating the prospectus to investors, Lorenzo ran afoul of subsections (a), (b), and (c) of Rule 10b-5. *Id.* at 1099-1100.  Lorenzo appealed the SEC's findings to the Second Circuit.  As to the SEC's manipulation claim under subsections (a) and (c), the Second Circuit ruled that Lorenzo's conduct—even if it did not give rise to liability under subsection (b)—was nevertheless deceptive. *Id*. The Supreme Court affirmed, explaining that a claim for market manipulation under subsections (a) and (c) "*[c]apture[s] a wide range of conduct*," *id*. at 1101, including instances where the claim may have "considerable overlap" with a claim brought under subsection (b) of Rule 10b-5. *Id*. at 1100-02 ("[I]t is hardly a novel proposition that different portions of the securities laws prohibit the same conduct." (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983))); *see also In re*

*Cognizant Tech. Sols. Corp. Litig.*, 2020 WL 3026564, at *17 (D.N.J. June 5, 2020) (a plaintiff alleging manipulation claim under Sections (a) and (c) need not allege deceptive conduct beyond the alleged misstatement itself in order to prove a deceptive scheme).

### 2.    O'Rourke and Beeghley Engaged in the Fraudulent Scheme

Here, during the Class Period, O'Rourke and Beeghley engaged in deceptive acts in furtherance of a fraudulent scheme.  Specifically, as Riot's CEOs, O'Rourke and Beeghley caused the Company to issue materially false and misleading Forms S-3, S-3/A, 8-K, 10-K, and other public filings.  ¶¶ 153, 166-223.  For example, Item 403 of Regulation S-K requires company executives to disclose any shareholders group (as defined by Section 13(d)) that coordinated their investments—like Honig and the other Selling Stockholders.  *See* ¶¶ 144-45, 167, 185-88.  O'Rourke and Beeghley each signed filings with the SEC that failed to disclose this information to Riot's public shareholders.  ¶¶ 153, 181, 189, 191, 194, 197, 200, 206, 209, 215.

O'Rourke and Defendant Honig have a lengthy history of acting as an investor group.  ¶¶ 50-80, 154. This includes coordinating with other investors and company insiders to promote the stock price through special dividends, press releases, and other corporate transactions.  *Id.*  Given their prior history working with Honig, O'Rourke and Beeghley were aware of Honig's *modus operandi*, which included coordinating stock sales and voting with other group members.  *Id.*

17

Despite this knowledge, during the Class Period, O'Rourke and Beeghley signed numerous public filings with the SEC, including Forms S-3 and S-3/A that failed to disclose the group status of Honig and certain Selling Stockholders. ¶ 155. O'Rourke and Beeghley had an affirmative duty to disclose this information under Item 403 of Regulation S-K, and not doing so was a deceptive act under Section 10(b) of the Exchange Act and Rule 10b-5 (a) and (c), particularly when viewed in wider context of Plaintiff's allegations. *Id.*

O'Rourke and Beeghley also engaged in deceptive acts by issuing Forms 8-K and 10-K that concealed Honig's (and certain other Selling Stockholders') substantial investments in Coinsquare and Kairos, two transactions where the Company was also an investor. ¶¶ 96-101, 106-08, 156. As Riot's CEOs, O'Rourke and Beeghley had an affirmative duty to disclose this information to the Company's public shareholders because it was required by Item 404 of Regulation S-K and the SEC Instructions for Item 1.01 of Form 8-K.[7]

---

[7] The Individual Defendants argue that none of the TAC's "group" allegations include specific facts that O'Rourke or Beeghley would have been aware of Honig's and the Selling Stockholders' group activities at Riot. *See* Indiv. Br. 22-23. Not so. In addition to allegations concerning Honig and the Selling Stockholders in the Form S-3s addressed at length in the TAC, ¶ 80, the TAC alleges specific facts showing that Honig and other Selling Stockholders were parties to the Coinsquare Agreement, a transaction where Riot was also a party, and at a time when Beeghley was the Company's CEO and when O'Rourke was the Company's President and a member of the Board of Directors. ¶¶ 14-15. These well-pled allegations are based on Riot's own corporate filings. ¶ 14 n.1. The more plausible inference than any non-culpable inference, given the size of the Company at this time (only nine

Finally, in addition to failing to disclose the Coinsquare and Kairos transactions as related-party transactions, O'Rourke affirmatively misrepresented Honig's relationship with the Company by signing Forms S-3 and S-3/A in January and February 2018 stating that Honig has had no "material relationship" with Riot "in the past three years," ¶¶ 211-12, 216, when in fact, the Coinsquare Agreement, Kairos Transaction, and March 2017 Private Placement—transactions involving Honig—had occurred only months earlier, ¶¶ 173-77, 200-205, 206-208.

In its brief, Riot acknowledges that *Lorenzo* held that "the dissemination of misstatements with the intent to defraud can fall within the scope of Rules 10b-5(a) and (c)."  Riot Br. 38.  Yet, Riot argues that "scheme liability depends on conduct that is distinct from a misstatement" and that Plaintiff has alleged no such conduct here.  *Id.* at 38-39.  The Individual Defendants incorporate Riot's scheme-related arguments by reference without making any of their own substantive arguments refuting their scheme liability under Rule 10b-5(a) and (c).  *See* Indiv. Br. *passim.*

However, this reading is inconsistent with *Lorenzo* and other cases in this District.  For example, in *In re Cognizant Technology Solutions Corp. Litig.,* Judge Salas recently addressed the issue of whether deceptive conduct under sections (a)

employees, ¶ 165), the value of Riot's investment $3,000,000, and Honig's role in providing paid "consulting" services to Riot, ¶¶ 97, 136, is that Beeghley and O'Rourke were aware of Honig and the other Selling Stockholders' investment in Coinsquare.

and (c) can also relate to an alleged misstatement.  2020 WL 3026564, at *17 (D.N.J. June 5, 2020).   The court acknowledged that it could, explaining that "[u]nder *Lorenzo*, unlike prior precedent, a plaintiff need not necessarily allege deceptive conduct that extends beyond the alleged misstatement itself."  *Id.*

In any event, the Individual Defendants ignore that the TAC not only alleges deceptive acts consistent with *Lorenzo* and *Cognizant*, but that it also alleges conduct distinct from false statements and omissions, including for example, O'Rourke and Beeghley causing Riot to (1) enter into the Coinsquare Agreement and Kairos Transactions, ¶¶ 96-108; (2) register and issue more than 29 million shares for sale to the public by Honig and the Selling Stockholders, ¶¶ 109-110; and otherwise (3) conceal Honig's group status at the same time that he was engaged in massive selling of Riot stock.  ¶¶ 21, 147.

Riot asserts that the Complaint merely "borrows" from the "allegations in *SEC v. Honig* without any indication that [Plaintiff] has any first-hand knowledge of, or conducted any investigation to verify, these allegations."  Riot Br. 27.  This too is incorrect and ignores that Plaintiff's counsel did, in fact, conduct their own painstaking investigation to corroborate his allegations.  *See* TAC at 1.  As part of this investigation, Plaintiff's counsel obtained firsthand confirmations of Honig and Beeghley's private actions from a member of the Company's prior Board, ¶¶ 84, 89; obtained emails and correspondence corroborating Defendants' prior group conduct,

¶ 61 (discussing TAC Exs. D, E, and F); drew upon allegations from other legal actions, ¶¶ 89, 148, including an action in 2022 by the Massachusetts Securities Division, ¶¶ 72-73; corroborated the SEC's allegations by reviewing SEC filings confirming that Honig, O'Rourke, Beeghley, and the Selling Stockholders actually co-invested the companies alleged in *SEC v. Honig*, including Biozone, MGT, and MabVax, ¶¶ 62-67; and in the case of O'Rourke, co-invested in dozens of companies with Honig *beyond* those alleged by the SEC. *See* ¶¶ 57, 80 (chart of public co-investments "based on information compiled by Plaintiff's counsel").

Courts routinely hold that where a plaintiff does her own investigation, allegations relied on from other litigants in other cases can be considered. *See Johns v. Bayer Corp.*, 2010 WL 2573493, at *2 (S.D. Cal. June 24, 2010) (permitting such pleading when plaintiff averred that he had "conducted an independent investigation and . . . provided the sources for publicly available information supporting [the] claims"); *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *7 (S.D.N.Y. June 28, 2010) (noting "[w]hen viewed in tandem with the other sources of information relied upon by plaintiffs, the [related] Complaint is sufficiently reliable" for pleading purposes). And even if Plaintiff's counsel had not conducted such a meticulous and thorough investigation, "[t]here is no absolute rule barring a private plaintiff from relying on government pleadings and proceedings" in order to meet the applicable pleading burden. *S.E.C. v. Lee*, 720 F. Supp. 2d 305, 340 (S.D.N.Y. 2010); *see also*

21

*de la Fuente v. DCI Telecomms.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003) ("I agree with plaintiff that there is nothing improper about utilizing information from [a government case] as evidence to support private claims. . . . [It is] not require[d] that a plaintiff re-invent the wheel before filing a complaint; and one could argue that a complaint predicated on the results of [a government] investigation has far more 'evidentiary support' than one based on rumor and innuendo.").

Individual Defendants repeatedly claim the allegations in the TAC are merely "tenuous and conclusory," Indiv. Br. 2, and rely only on "a handful of circumstantial allegations" that are routinely dismissed under the Reform Act.  Indiv. Br. 4.  This too misses the mark.

When viewed holistically and in a light most favorable to the Plaintiff, the TAC maps out a series of misstatements, omissions, and deceptive acts attributable to the Individual Defendants that easily passes muster.  Take the TAC's related-party allegations as an example.  The TAC alleges three specific transactions and parties involved, ¶¶ 92-93, 96-108; the financial terms and other details of the transaction, including Riot's and Honig's direct financial interest, ¶ 100; specific allegations for why Honig is a "related person" under Item 404 of Regulation S-K, ¶ 105; specific facts regarding how O'Rourke and Beeghley would have been aware of the details of Honig's interest in these transaction, ¶¶ 205; and specific facts showing that

significant stock drops occurred when the transactions were eventually disclosed to the market, ¶¶ 245-46.

Such specificity can hardly be said to be conclusory or boilerplate, and Defendants' steady cadence to the contrary does nothing to change this.  And yet, the TAC alleges so much more.  Indeed, not only does Plaintiff allege that O'Rourke and Beeghley failed to disclosed Honig's role in the transactions, the TAC specifically alleges that on two occasions, in January and February 2018, O'Rourke signed documents filed with the SEC stating that "***[n]one*** of the selling stockholders . . . . has had a material relationship with ***us*** or any of our subsidiaries within the past three years." ¶¶ 211-12, 216.  This statement is demonstrably false.  Indeed, Honig *did* in fact have a material relationship with Riot as a party to three corporate transactions with the Company.  ¶¶ 92-93, 96-108.  Two of these (Coinsquare and Kairos) occurred just months earlier and at a time when O'Rourke was Riot's President and a Director.[8]  *Id.*  O'Rourke's failure to ensure that Riot disclosed Honig's role, when considered together with his statement two months later that Honig had no material relationship with "us" was deceptive conduct under Rule 10b-5 sections (a) and (c).

---

[8]  At the time of the Coinsquare transaction, Beeghley was Riot's CEO, ¶ 15. Beeghley was quoted in Riot's press release touting the transaction, ¶ 94.

Finally, the Individual Defendants argue that none of the TAC's "group" allegations include specific facts that O'Rourke or Beeghley would have been aware of Honig's group activities at Riot.  Indiv. Br. 34. Not so.  In addition to group allegations concerning Honig and the Selling Stockholders discussed in Plaintiff's brief responding to Riot (filed herewith and incorporated by reference here), the TAC also alleges facts demonstrating that Honig and other Selling Stockholders were parties to the Coinsquare Agreement, a transaction where Riot was a party and that occurred at a time when Beeghley was the Company's CEO and O'Rourke was Riot's President, Secretary and Treasurer.  ¶¶ 200, 204-205.  Not to mention, as Riot readily admits, Riot Br. 15 n.13, Honig provided "diligence services" to the Company in connection with the transaction and was paid $50,000 for his services. *Id*.

The more plausible inference, given the small size of the Company, merely *nine* employees, ¶ 231, the substantial value of Riot's Coinsquare investment, ¶ 200, and Honig's role in providing "consulting" services to Riot in exchange for $50,000, ¶¶ 97, 136, is that Beeghley and O'Rourke,[9] by virtue of their positions, were keenly aware of the fact that Honig and other Selling Stockholders participated in this transaction or otherwise were reckless in not knowing.

---

[9] Beeghley and O'Rourke were also Directors during this time, ¶¶ 14-15, 200.

Thus, the TAC plainly details with particularity "the who, what, when, where and how" of the events at issue and "present[s] clear facts verifying [his] deductions with respect to defendant's state of mind." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 285 (D.N.J. 2007) (citing *In re Burlington*, 114 F.3d at 1422).

In sum, the best the Individual Defendants can muster in response to the TAC's well-pled allegations is that Plaintiff's allegations fail to rely on internal company documents or other evidence from insiders at Riot.  Indiv. Br. 2.  But "[i]t is not necessary for the plaintiff to plead evidence," *Gordon v. Dailey*, 2018 WL 1509080, at *2 (D.N.J. Mar. 27, 2018) (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977)), particularly in PSLRA cases like this where discovery is stayed pending the outcome of any motion to dismiss.  *See id.* at *1 (denying motion to dismiss § 10(b) claims where "plaintiff articulated "enough facts to state a claim to relief that is plausible on its face") (quoting *Twombly*, 550 U.S. at 570).  The Individual Defendants' attempt to raise Plaintiff's burden far beyond what is required at this stage should be rejected.

### D.    The Complaint Pleads a Strong Inference of Defendants' Scienter

#### 1.    The Legal Standard for Pleading Scienter

To plead scienter in the Third Circuit, a plaintiff must "allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'"  *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009).  The pertinent question

is "'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.* at 272 (quoting *Tellabs*, 551 U.S. at 323). As the Supreme Court has explained, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but merely "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *see also Avaya*, 564 F.3d at 269 (scienter analysis "will ultimately rest . . . on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter"). "[A] plaintiff does not need to come forward with "smoking-gun" evidence to meet the PSLRA's pleading requirements." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018) (quoting *Tellabs*, 551 U.S. at 324). "Rather, in conducting the scienter analysis, courts must analyze the complaint holistically to determine whether its allegations, 'taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.* (quoting *Tellabs*, 551 U.S. at 323).

### 2. O'Rourke Knowingly Engaged in the Fraud

#### a. O'Rourke Had *Actual Knowledge* that Riot's Public Disclosures Were Materially False and Misleading

As explained below, during the Class Period, O'Rourke knowingly misled Riot's public investors by misrepresenting and concealing certain related party

transactions and Honig's participation in an undisclosed group of investors under Section 13(d). These misstatements and omissions allowed Honig to sell massive amounts of stock without alerting Riot's public shareholders to information to which they otherwise should have been privy to under Items 403 and 404 of Regulation S-K.[10]

O'Rourke, as Riot's Director, President, Treasurer, Secretary, and CEO, had knowledge that Honig was a greater than 5% shareholder of Riot. ¶¶ 158-163. Yet, working from within the Company, as explained above, O'Rourke knowingly or recklessly failed to disclose, and affirmatively misrepresented, that Honig participated in three related party transactions with Riot. *Supra* at 18. Additionally, he signed SEC filings that both omitted and affirmatively misrepresented that Honig was acting as part of a group in connection with his investment in Riot. *Supra*, n.11. Specifically, O'Rourke signed several S-3's in 2017 and 2018 stating that "there are currently no agreements, arrangements, or understandings with respect to the sale of any shares" among Honig and the Selling Stockholders. *See generally* ¶¶ 178-99. As Plaintiff explained in his opposition to Riot's motion to dismiss, filed herewith, O'Rourke, by virtue of his close affiliation with Honig, both past and present, and as alleged in the TAC, knew or was reckless in not knowing that Honig was acting

---

[10] Plaintiff addresses Items 403 and 404 in his opposition to Riot's motion to dismiss, filed herewith and incorporated by reference herein.

27

as a "group" under Item 403 of Regulation S-K and Section(d)(3) with respect to his investment in Riot. *Id.*

In doing so, O'Rourke knowingly or recklessly committed deceptive acts in furtherance of a scheme to allow Honig, a greater than 5% stockholder of Riot, to sell Riot stock without disclosing his sales to the market. *Id.*

Numerous other allegations further support O'Rourke's scienter. ***First***, O'Rourke knew that he, Honig and the other Selling Stockholders were working together as a group because O'Rourke had invested alongside Honig in over 75 companies between 2011 and August 2018, ¶¶ 57, 160, and because "O'Rourke, Honig, Stetson and Brauser invested as a group in at least 19 companies from 2011 to present," ¶ 51.

***Second***, O'Rourke stated in an email on February 3, 2014, that "Barry Honig is the principal investor of our small group." ¶¶ 55, 151, 161.  In response, the Individual Defendants argue that "[t]his allegation does not suggest that O'Rourke knew, years later, that Honig was part of a group at Riot that was subject to the disclosure requirements of Section 13(d)."  Indiv. Br. 20 n.12.  But this argument ignores the TAC's allegations that during the Class Period, Honig and other individuals who previously invested with him as a group were also "Selling Stockholders" at Riot, ¶¶ 16-48, 79-80, and that many of these same individuals were

28

investors in Coinsquare and received similar share allocations.  ¶ 100.[11]  The fact that the Selling Stockholders were issued the exact same share counts while others (who were not Selling Stockholders) were not, further suggests that Honig's "small group" was alive and well during the Class Period.  *Id.*

      ***Third***, O'Rourke knew that, at a minimum, Honig was part of an investing group because O'Rourke and Honig shared an office in Boca Raton, FL *while O'Rourke was CEO of Riot*.  ¶ 162.  In fact, a September 13, 2016 letter signed by Honig, in which he nominated O'Rourke and Stetson to the Company's Board, provides the same fax number (with Palm Beach County, Florida area code 561) for O'Rourke and Stetson as the fax number listed on Honig's letterhead for his office in Boca Raton.  Indeed, O'Rourke was discovered by *CNBC* reporters inside Honig's Boca Raton office. ¶¶ 128-33, 162.

      In response, O'Rourke argues that the TAC "fails to draw even a remote connection between any personal relationship [between O'Rourke and Honig] and the alleged scheme in the TAC."  Indiv. Br. 23-24.  This is simply untrue.  As reported by *CNBC*, and later confirmed by the SEC, ¶ 54, O'Rourke and Honig shared the same office while O'Rourke was CEO of Riot and met in that office the day that the Company cancelled its shareholder meeting.  ¶¶ 129-32.  And the fax

---

[11] Indeed, both Honig and Brauser (¶¶ 20, n.7) were issued 112,499 shares while Groussman (¶ 23) and Stetson (¶ 60, 46) each received 37,500 shares.

number that O'Rourke, Honig, and Stetson shared was used for their business dealings with Riot's Board.  ¶ 151.  Thus, these were more than mere "personal" relationships but were *business* relationships *with respect to Riot*.

> **b.**   **O'Rourke's Sudden Resignation as CEO—One Day After the SEC Sued Him—Adds to the Inference of His Scienter**

The circumstances of O'Rourke's sudden departure as CEO on September 8, 2018, ¶ 14—the very next day after the SEC sued him in the *SEC v. Honig* Action and accused him of engaging in three fraudulent pump-and-dump schemes with Honig and several other Selling Stockholders—¶¶ 49, 139-40—further supports the inference of O'Rourke's scienter.  In that regard, courts routinely hold that the suspicious circumstances and timing of high-level employee departures contribute to an inference of scienter.  *See Se. Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 466958, at *5 (M.D. Pa. Feb. 8, 2016) (relying on "allegations regarding the timing of the resignation of senior management" in finding inference of scienter); *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 541 (D. Del. 2012) (same); *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *10 (D.N.J. Sept. 30, 2009) (same).  Here, O'Rourke resigned on September 8, 2018, *the day after* the SEC named him and others, including Honig, as defendants in a long-running microcap pump-and-dump scheme.  ¶¶ 14, 139-41.  The most cogent and compelling inference is that O'Rourke resigned in response to the SEC's serious allegations.

### c.  O'Rourke's Stock Sales Were Unusual in Scope and Timing and Add to the Inference of His Scienter

"[S]ales of company stock by insiders that are 'unusual in scope or timing … may support an inference of scienter.'" *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) (*In re Advanta*, 180 F.3d 525, 540 (3d Cir.1999)). "Whether a sale is 'unusual in scope' depends on factors such as 'the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved.'" *Id.* (quoting *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 635 (D.N.J.2002)). "Other factors relevant to scope and timing are whether the sales were 'normal and routine,' and whether the profits were substantial relative to the seller's ordinary compensation." *Id.* (quoting *In re Burlington*, 114 F.3d at 1423).

Here, on Friday, December 29, 2017—less than two months after becoming CEO—O'Rourke sold "30,383 shares of Riot stock" to the public "for proceeds of $869,256.350." ¶ 234.  On January 2, 2018, *The Motley Fool* reported that O'Rourke's "Form 4 filed with the SEC" disclosed that "O'Rourke now holds 12,500 shares through [ATG], in addition to 39,500 shares of stock in his own name that he currently owns, or will receive over the next 60 days from his role as Riot's chief executive officer" and noted that "O'Rourke received 344,000 restricted shares that vest in 24 monthly installments when he became CEO in November." ¶ 121. Based on these numbers, *The Motley Fool* concluded that O'Rourke's "sales [were]

material, representing about *37%* of shares he and [ATG] owned ***or would soon
control*** prior to the transactions." *Id.   The Motley Fool* also concluded that the
timing of O'Rourke's sales was suspicious because he "dump[ed] his shares . . .
[r]ight before a holiday weekend, and two days after the company announced it was
adjourning its annual shareholders meeting until February . . . ." *Id.*

*The Motley Fool*'s calculation that O'Rourke had sold 37% of his stock was
correct, but it did not tell the whole story.  According to his Form 4, after O'Rourke
sold his 30,383 shares, he only had 52,500 shares remaining.  ¶ 121.  But of these
52,500 remaining shares, 39,500 were shares that O'Rourke either "own[ed], or
[would] *receive* over the next 60 days" because those shares were "restricted shares
that vest in 24 monthly installments . . . ."  ¶ 121.  Because O'Rourke had not yet
received those shares, he did not yet "control" those shares, ¶ 121, and thus, he could
not have sold those shares on December 29, 2017, even if he had wanted to.  Rather,
the only remaining shares that O'Rourke definitely could have sold were the "12,500
shares" that O'Rourke held "through [ATG]."  ¶ 121.  Stated differently, of the
42,883 shares that O'Rourke held through his entity, ATG, he sold of 30,383 shares
representing *70.8%* of the total shares that O'Rourke actually owned and controlled
and thus was actually able to sell as of December 29, 2017.  ¶ 121.  Thus, the amount
of O'Rourke's stock sales were highly unusual—and indeed, suspicious—in scope.
*In re Suprema*, 438 F.3d at 277.

O'Rourke's stock sales were also suspiciously timed.  In that regard, O'Rourke sold his 30,383 shares on December 29, 2017, only ***after*** Honig (an 11%+ shareholder of Riot, ¶ 13) had already completed his ten-month run of massive undisclosed insider sales of more than 10% of Riot's total outstanding shares, ¶ 147,[12] and ***before*** Honig's sales were ultimately disclosed to the market, which would cause Riot's stock price to drop substantially.  ¶¶ 238-48.  By waiting to sell, O'Rourke avoided depressing Riot's stock price while his officemate was secretly selling his shares.  Later, when the full circumstances surrounding Honig's sales were revealed by *CNBC*, the facts would implicate O'Rourke himself and his relationship with Honig.  *See* ¶¶128-29, 133-34, 139-40.

O'Rourke's sales were also suspiciously-timed because they "were made just days before the Company announced the dismissal of its auditor and a month before Riot (on January 31, 2018) canceled its annual meeting for the second time, ¶ 241-

---

[12] During this same time period in 2017 that Honig was selling his "11%+" stake in Riot, ¶ 13, Catherine DeFrancesco, another Selling Stockholder and "11%+ beneficial owner of shares in Riot," also "sold substantially all of her Riot stock without disclosing her sales to the public," ¶ 21.  *See also* ¶ 189 (April 27, 2017 Form 10-K/A noting DeFrancesco's 515,777 shares of Riot stock representing 11.5% of Riot stock); ¶ 209 (January 5, 2018 Form S-3/A revealing that DeFrancesco held "less than 1%" of Riot stock).  Thus, O'Rourke's stock sales occurred before the market learned that these two insiders had dumped essentially all of their holdings of "nearly 23%" (¶ 90) of Riot's entire outstanding shares into the unsuspecting public market.

42,[13] causing the NASDAQ to inform the Company that it has violated the NASDAQ's listing requirements," ¶ 234, and resulting in a 14.26% decline in stock price, ¶ 242.[14]

O'Rourke argues that the "timing and scope" of his stock sales "cuts against any suggestion of motive." Indiv. Br. 17. Individual Defendants quote O'Rourke's explanation of his stock sales (several months later on February 16, 2018), that in selling his 30,383 shares on December 29, 2017, he had sold "less than 10% of my overall position." Indiv. Br. 14. O'Rourke's statement was misleading. By claiming to have sold "less than 10%" of his Riot shares, O'Rourke vastly understated the true proportion of his shares that he sold on December 29, 2017, by counting shares of stock that he did not yet own, did not control—and thus *could not* have sold—on that date even if he had wanted to. The true facts and percentages of O'Rourke's stock sales was discussed in an article published by *The Motley Fool* on January 2, 2018 titled "Riot Blockchain's CEO Just Sold a Lot of Stock." ¶ 121.[15] That article

[13] *CNBC* discovered O'Rourke in Honig's office in Boca Raton on the day of the cancelled annual shareholder meeting. ¶ 243.

[14] O'Rourke's sales were not made pursuant to a 10b5-1 trading plan, further adding to the inference of scienter by eliminating such a plan as a defense. *See In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 507 (E.D. Pa. 2018) (noting that "large and unusually-timed stock sales . . . not made pursuant to 10b5-1 trading plans" can support an inference of scienter).

[15] *See* https://www.fool.com/investing/2018/01/02/riot-blockchains-ceo-just-sold-a-lot-stock.aspx.

stated that O'Rourke's December 29 stock sales "represented about **37%** of [the] shares [that] [O'Rourke] owned or would soon control prior to the transactions." ¶ 121.   But as the article itself acknowledged that the "**37%**" number actually **underestimated** the true proportion of stock that O'Rourke sold because it counted stock that O'Rourke did not actually control on December 29, and only stood to "receive over the next 60 days." ¶ 121.  If one excludes the stock that O'Rourke did not yet actually own or control (and thus was not even able to sell) on December 29, then O'Rourke actually sold **70.8%** of his then-existing position. ¶ 121.  Ultimately, whether O'Rourke sold 37% or 70% of his stock, "[a]s a pure percentage of stock holdings sold, those percentages are supportive of an inference of scienter." *In re Hertz*, 905 F.3d at 120.

O'Rourke also asserted, without any support, that his stock sales were merely "to cover tax obligations."  Indiv. Br. 15 (quoting ¶ 221).  At most, this unsupported assertion creates a factual question that cannot be resolved at this stage in these proceedings.

O'Rourke next argues that he could have timed his stock price slightly better by selling just one week earlier on December 19, 2017,[16] at "$46.20 per share," which O'Rourke suggests would have been more suspiciously timed.  Indiv. Br. 16.

---

[16] On December 19, 2017, Riot's stock price traded at a high of $46.20 and a low of $36.00 per share.  *See* Honig Ex. D at 8 (ECF No. 234-6).

However, whether insider trading is suspicious (or not) does not depend on whether the insider sold at the absolute peak of the market.  Rather, courts consider other events and the potential that the insider was in possession of material non-public information at the time of the trade.  *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 419 (S.D.N.Y. 2003) (finding stock sales to be sufficient to create a strong inference of scienter even though defendant's "sales of stock did not occur at or near the peak price for WorldCom's stock.").  As Riot's CEO, O'Rourke would very likely have known that the Company's auditor planned to resign and that the shareholder meeting would be delayed at the time of his trading.

### 3.  Beeghley Knowingly Engaged in the Fraud

During the Class Period, Beeghley served as Riot's CEO and Chairman of its Board before O'Rourke took over as CEO and Chairman on November 3, 2017. ¶¶ 14-15.  As CEO and Chairman, Beeghley knowingly or recklessly signed false and misleading SEC filings—including Riot's April 20, July 19, August 24, and September 25, 2017 Form S-3s—that affirmatively misrepresented and failed to disclose that Honig and the Selling Stockholders were coordinating their shareholding in Riot as group in violation of the Company's disclosure obligations under Item 403 of Regulation S-K and Section 13(d)(3). ¶ 164.  Specifically, in signing these Form S-3s, Beeghley knew or recklessly disregard that Honig and other Selling Stockholders were investing together as an undisclosed group because

Beeghley himself had co-invested with O'Rourke, Honig, Stetson, Groussman, Brauser, DeFrancesco, and *15 other* Selling Stockholders when he was a member the board of directors of PolarityTE, a public company whose board Beeghley joined when Honig was already Chairman and CEO of PolarityTE. *See* ¶¶ 74-78, *see also* ¶ 80 (listing the Selling Stockholders that co-invested with Beeghley, Honig, and O'Rourke in PolarityTE). Yet, inexplicably, when Honig nominated Beeghley in December 2016 to serve on the Company's Board, Beeghley told the outgoing Board that that he "did not know Honig," according to an individual present at the time who spoke with Plaintiff's counsel during their investigation of this case. ¶ 89. In privately denying his affiliation with Honig, and then in publicly denying Honig and the Selling Stockholders' affiliation—which was obvious to Beeghley given PolarityTE—Beeghley was either knowingly or recklessly misleading Riot's investors for the benefit of his co-Defendants.

Additionally, as CEO of a Company with only *nine* employees, Beeghley would have been aware of the March 2017 Private Placement and aware of the terms and investor agreement related to Coinsquare. ¶ 165. Yet, Beeghley failed to disclose Honig's involvement in those transactions or that Honig was acting as part of a group. *Id.*

In defense, Beeghley first argues that Plaintiff's 2019 pleading (the CCAC, ECF No. 73) was insufficient. Indiv. Br. 29. This is irrelevant. Next, Beeghley

acknowledges Plaintiff's argument that "Beeghley and Honig overlapped" at PolarityTE but does not (and cannot) refute this fact. Beeghley then argues that "the TAC pleads little else" while completely ignoring that the TAC alleges that Beeghley also "overlapped" as an investor of PolarityTE with O'Rourke, Stetson, Groussman, Brauser, DeFrancesco, and those same *15 other* Selling Stockholders who invested alongside with Beeghley when he was on that company's Board. ¶ 80.

### E.   The Complaint Adequately Pleads O'Rourke and Beeghley's Liability Under Section 20(a) as Control Persons of Riot (Count III)

To plead a claim under Section 20(a), "plaintiffs must establish '(1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions.'" *Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256, at *4 (D.N.J. Mar. 2, 2016). Claims under Section 20(a) are subject only to Rule 8's notice pleading standards. *The Winer Family Trust v. Queen*, 2004 WL 2203709, at *22 (E.D. Pa. Sept. 27, 2004).

Here, O'Rourke and Beeghley both were Riot's CEOs and, as such, had the authority to, and in fact did, frequently make public statements, sign SEC filings on Riot's behalf, approve related-party transactions, and write correspondence (in O'Rourke's case) directed to Riot's shareholders. ¶¶ 111, 153, 155, 158, 164, 178, 181, 215, 218, 221. These allegations are adequate to plead the requisite control. *Intelli-Check*, 274 F. Supp. 2d at 645.

In opposition, O'Rourke and Beeghley argue only that if Plaintiff has not pled "either a primary violation . . . or culpable participation . . . the Section 20(a) claim must be dismissed."  Indiv. Br. 36-37.  As discussed above, Plaintiff has pled a primary violation.  Moreover, "the 'overwhelming trend in this circuit' is that culpable participation does not have to be [pled] in order to survive a motion to dismiss." *Intelli-Check*, 274 F. Supp. 2d at 645; *see also Bing*, 2016 WL 827256, at *4 (same).  In any event, Plaintiff has pled O'Rourke and Beeghley's culpable participation by pleading that they engaged in deceptive acts with a strong inference of scienter.  ¶¶ 153-65.

## III.   CONCLUSION

For the reasons set forth above, the Individual Defendants' Motion should be denied in their entirety.

Respectfully submitted,

**LITE DEPALMA GREENBERG
& AFANADOR, LLC**

Dated:   September 1, 2022      */s/ Joseph J. DePalma*
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Plaintiff
Dr. Stanley Golovac*

39

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Plaintiff Dr. Stanley Golovac and
Lead Counsel for the Class*

**US. MARKET ADVISORS LAW GROUP PLLC**
David P. Abel
5335 Wisconsin Ave. NW, Ste. 440
Washington, D.C. 20015
Telephone: (202) 274-0237
Facsimile: (202) 686-2877
dabel@usmarketlaw.com

*Counsel for Plaintiff Dr. Stanley Golovac*