# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TAKATA, | : Civil Action No.: 3:18-cv-02293(GC)(RLS) |
| | : |
| *Plaintiff,* | : |
| | : |
| v. | : |
| | : |
| RIOT BLOCKCHAIN, INC., et al. | : |
| | : |
| *Defendants.* | : |
| | : |
| | : |

---

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT RIOT BLOCKCHAIN INC.'S MOTION TO DISMISS THE CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

---

**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for
Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Dr. Stanley Golovac
and Lead Counsel for the Class*

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................1

II.   SUMMARY OF FACTUAL ALLEGATIONS .............................................4

    A.    O'Rourke, Honig, and the Selling Stockholders Have
        a History of Coordinating Their Investments as a Group ....................4

    B.    Honig and His "Friends and Relatives" Wage A
        Proxy Fight to Obtain Control of Riot ..................................................6

    C.    Honig and Selling Stockholders' Engaged in Undisclosed
        Related-Party Transactions with Riot While O'Rourke
        and Beeghley Were CEO ......................................................................7

    D.    Honig Engaged in Months of Significant Stock Sales Without
        Disclosing The Trades To Investors ....................................................9

    E.    O'Rourke and Beeghley, as CEOs and Directors,
        Misrepresented and Concealed Honig's Group Status
        and Related-Party Transactions............................................................11

    F.    As the Truth Was Revealed, Riot's Investors Were Damaged..........13

III.  ARGUMENT...........................................................................................15

    A.    Legal Standards ..................................................................................15

    B.    The Complaint Adequately Alleges the Riot Defendants
        Made Materially False and Misleading Statements and
        Omissions During the Class Period.....................................................16

        1.    Riot's 2017 and 2018 Form S-3s Falsely Stated that the
            Selling Stockholders Had No "Agreements, Arrangements
            or Understandings with Respect to the Sale"...........................17

        2.    Riot's 2018 Form S-3's Falsely Stated that "None of
            the Selling Stockholders . . . Has Had Any Material
            Relationship with Us" ...............................................................19

        3.    O'Rourke's February 16, 2018 Statements to *CNBC*
            And Shareholder Letter Were Materially False and
            Misleading by Denying and Perpetuating the Scheme.............23

        4.    Riot Had an Affirmative Duty to Disclose—Under *Oran*
            and Item 403—that Honig and the Selling Stockholders
            Were a "Group" ........................................................................25

        5.    Riot Breached Its Duty Under Item 404 to Disclose
            Honig as a Related Party to the Coinsquare Agreement
            and Kairos Transaction .............................................................30

i

6.      Riot Breached Its Affirmative Duty to Disclose Honing
as the Sole Beneficial Investor in the March 2017
Private Placement.....................................................................33

C.      The Complaint Pleads a Strong Inference of the
Riot Defendants' Scienter ....................................................35

D.      The Complaint Adequately Pleads Loss Causation ...........................35

IV.   CONCLUSION..............................................................................40

## TABLE OF AUTHORITIES

<u>C<small>ASES</small></u>

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ........................................................................ 17, 28

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ...................................................................16

*Chiarella v. United States*,
   445 U.S. 222 (1980) ...............................................................................30

*Dura Pharm., Inc., v. Broudo*,
   544 U.S. 336 (2005) ...............................................................................38

*Garcia v. J2 Global, Inc.*,
   Civ. No. 2:20-cv-06096, 2021 WL 1558331 (C.D. Cal. Mar. 5, 2021)...............32

*Glazer v. Formica Corp.*,
   964 F.2d 149 (2d Cir. 1992) ...................................................................30

*Hall v. Johnson & Johnson*,
   No. 18-CV-01833, 2019 WL 7207491 (D.N.J. Dec. 27, 2019) ..........................38

*In re Able Labs. Sec. Litig.*,
   2008 WL 1967509 (D.N.J. Mar. 24, 2008) .........................................................16

*In re Bradley Pharm., Inc. Sec. Litig.*,
   2006 WL 740793 (D.N.J. Mar. 23, 2006) ..........................................................39

*In re Bristol-Myers Squibb Sec. Litig.*,
   2005 WL 2007004 (D.N.J. Aug. 17, 2005) ..........................................................35

*In re Cephalon Sec. Litig.*,
   1997 WL 570918, at *2 (E.D. Pa. Aug. 29, 1997) ...............................................16

*In re EQT Corp. Sec. Litig.*,
   2020 WL 7059556 (W.D. Pa. Dec. 2, 2020) .........................................................38

*In re Galena Biopharma, Inc. Sec. Litig.*,
   336 F. Supp. 3d 378 (D.N.J. 2018) .......................................................... 27, 35

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) .................................................................35

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
   2011 WL 3444199 (D.N.J. Aug. 8, 2011) .................................................... 26, 37

*In re Providian Fin. Corp. Sec. Litig.*,
   152 F. Supp. 2d 814 (E.D. Pa. 2001) .................................................................16

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ...........................................................15

*McCabe v. Ernst & Young, LLP*,
   494 F.3d 418 (3d Cir. 2007) ...........................................36

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
   547 U.S. 71 (2006) ...........................................................16

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) ........................... 25, 27, 30, 33

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ...........................................16

*Puddu v. 6D Glob. Techs., Inc.*,
   742 F. App'x 553 (2d Cir. 2018) .....................................28

*S.E.C. v. Levy*,
   706 F. Supp. 61 (D.D.C. 1989) .......................................29

*SEC v. China Northeast Petroleum Holdings Ltd.*,
   27 F. Supp. 3d 379 (S.D.N.Y. 2014) ...............................30

*SEC v. Honig*,
   2021 WL 276155 (S.D.N.Y. Jan. 27, 2021) ......................29

*Shapiro v. UJB Fin. Corp.*,
   964 F .2d 272 (3d Cir. 1992) ...........................................26

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) ..............................................28

*Takata v. Riot Blockchain, Inc.*,
   Civ. No. 18-02293-FLW, 2020 WL 2079375
   (D.N.J. Apr. 30, 2020) (Wolfson J.) .................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .........................................................15

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ..........................................29

*United States v. Schiff*,
   602 F.3d 152 (3d Cir. 2010) ...................................... 25, 30

*Williams v. Globus Med., Inc.*,
   869 F.3d 235 (3d Cir. 2017) ............................................24

*Winer Family Trust v. Queen*,
   503 F.3d 319 (3d Cir. 2007) ............................................25

## REGULATIONS

17 C.F.R. § 229.403 ........................................................................... 27, 29

17 C.F.R. § 229.403(a)............................................................................28

17 C.F.R. § 229.404 ................................................................................30

17 C.F.R. § 240.13d-1..............................................................................29

Court-appointed Lead Plaintiff Dr. Stanley Golovac ("Plaintiff") respectfully submits this memorandum of law in opposition to the motion to dismiss (the "Motion")[1] the Consolidated Third Amended Class Action Complaint (the "Complaint" or "TAC") filed by Defendant Riot Blockchain, Inc. ("Riot" or the "Company").

## I.       INTRODUCTION

During the Class Period, the Riot Defendants participated in a deceptive scheme to conceal from the Company's public investors that its largest shareholder, Defendant Honig, was the leader of an undisclosed investor group, the Selling Stockholders, who together with Honig were engaged in lucrative related-party transactions and undisclosed stock sales at the expense of Riot's public investors. The Riot Defendants understood the importance of keeping Honig's role as leader of this investor group, and his participation in these strategic corporate transactions,

---

[1] Plaintiff incorporates by reference his memoranda, concurrently filed herewith, in response to the motions to dismiss filed by John O'Rourke ("O'Rourke") and Michael Beeghley ("Beeghley") (the "Individual Defendants") and Barry C. Honig ("Honig"). Riot and the Individual Defendants are the "Riot Defendants." The Riot Defendants and Honig are the "Defendants." Capitalized terms herein have the same meanings as in the TAC (ECF No. 231), paragraphs of which are cited as "¶ __," exhibits to which are cited as "TAC Ex. __." Defendants' memoranda of law in support of their motions are cited as follows: Riot's (ECF No. 232-1) as "Riot Br. __"; O'Rourke and Beeghley's (ECF No. 233-1) as "Indiv. Br. __"; and Honig's (ECF No. 234-1) as "Honig Br. __." Riot, O'Rourke, and Beeghley are referred to herein as "the Riot Defendants." References to the "SAC" are to Plaintiff's previous Consolidated Second Amended Complaint (ECF No. 188). All emphasis is added and internal quotations and citations are omitted unless otherwise noted.

a secret because it would allow Honig and his group to sell their stock at artificially inflated prices.  This is why the Individual Defendants caused the Company to issue false and misleading statements and omissions that created the false impression with Riot investors that Honig (and other the Selling Stockholders) had no material relationship with the Company and that Honig was *not* acting as a part of any investor group.  For example, Defendant O'Rourke signed filings with the SEC stating that neither Honig nor any of the Selling Stockholders had a material relationship with "*us*," (i.e., the Company).  This was not true.  Indeed, as the TAC makes clear Honig and other Selling Stockholders participated ***directly*** in a series of multi-million dollar corporate transactions ***with Riot*** in 2017.  The Riot Defendants had an affirmative duty to disclose Honig's participation (including specifically, his name) under Item 404 of Regulation S-K given Honig's direct (and substantial) financial interest in those transactions.  They failed to do so.  Meanwhile, Honig and the Selling Stockholders violated Section 13(d) by similarly failing to disclose both their group status and their massive stock sales.

On the issue of groups, both Defendants O'Rourke and Beeghley signed SEC filings that included the following statement: "there are currently ***no agreements, arrangements, or understandings*** with respect to the sale of any shares [of Riot]."  This too was false and O'Rourke and Beeghley knew it.  Indeed, O'Rourke had a long history of "group" investing with Honig and other Selling Stockholders,

including over **75 companies** with Honig in just seven years.  While he was CEO of Riot, O'Rourke worked out of Honig's **same office**.  O'Rourke and Honig shared the **same fax number**.  As O'Rourke previously admitted, "Barry Honig is the principal of **our small group**."  In 2016, before obtaining full control of Riot, Honig himself confided to a Board member that he controlled 40% of the Company's shares through **Honig's "friends and family."**

Stock sales by any 5% shareholder (Honig was an **11%+** shareholder) or group of 5% shareholders requires disclosure to the market and the SEC under Item 403 of Regulation S-K.  According to the SEC, however, O'Rourke and Honig have a history of **not** disclosing their group activity.  As the TAC makes clear, O'Rourke and Honig repeated their *modus operandi* at Riot, as the Company's shareholders were not told that Honig was investing as a group with other Selling Stockholders and instead affirmatively denied that fact in SEC filings.

Through a series of partial disclosures the truth began to leak out.  First, on January 31, 2018, *The Wall Street Journal* reported that Honig had been actively selling (without disclosing) nearly all of his Riot 11%+ position in Riot stock, even though Section 13(d) requires "prompt[]" disclosure of such sales by any 5%+ shareholder.  As further details about Honig's relationship with Riot were made public, Riot's share price continued to decline substantially.  The full details of the fraud were not disclosed until September 7, 2018, when the SEC sued Honig,

3

O'Rourke and other Selling Stockholders for engaging multiple "pump-and-dump" schemes involving what the agency described as "brazen market manipulation."

Instead of squarely confronting Plaintiff's well-pled allegations, the Riot Defendants ignore many of the alleged facts concerning their affirmative false and misleading statements and omissions. Where they do address the allegations, they raise factual disputes that cannot be resolved at this stage. This is not surprising given that the TAC pleads facts establishing each element of Plaintiff's claims.

For the reasons discussed below, Riot's Motion should be denied.

## II.   SUMMARY OF FACTUAL ALLEGATIONS

### A.   O'Rourke, Honig, and the Selling Stockholders Have a History of Coordinating Their Investments as a Group

O'Rourke, Honig, and the Selling Stockholders have a long history of coordinating their investments as a group. In O'Rourke's own words, "Barry Honig is the principal investor of our small group." ¶ 150. Additionally, O'Rourke, Honig, Groussman, and Stetson shared the same office and (for O'Rourke, Honig, and Stetson) the same fax number, which they used for the proxy fight to obtain control of Riot. ¶¶ 13-14, 23, 45, 54, 151. So close were they that O'Rourke and Stetson were neighbors, ¶ 14, and Honig held the mortgage on Groussman's house. ¶ 23. This closeness was not merely personal but business, as reflected by the numerous interlocking co-investments that these individuals engaged in with literally dozens of publicly traded companies. For example, O'Rourke invested alongside Honig in

over 75 companies between 2011 and 2018.   ¶ 57; *see also* ¶ 80 (chart listing the Selling Stockholders' Prior Co-Investments with O'Rourke, Honig, and Beeghley).

The group's investing activities resulted in the 2018 *SEC v. Honig* Action against Honig, O'Rourke, Groussman, Stetson, Brauser, and others.  ¶¶ 49-70.[2] SEC has obtained numerous internal documents confirming that O'Rourke and Honig—together with Selling Stockholders Stetson, Groussman, and Brauser—and others have a long history of coordinating their investments as a group to engage in manipulative pump-and-dump schemes.  ¶¶ 49-73; *see also* ¶ 61 (discussing internal emails and correspondence, attached to the TAC as Exhibits D, E, and F, which illustrate how Honig, O'Rourke, Stetson, Groussman, Brauser, their relatives, and others would coordinate their investments in each public company by allocating specific numbers of shares to each person).   The SEC alleged that "[i]n every scheme, Honig, and some combination of Stetson, Brauser, O'Rourke, Groussman . . . either explicitly or tacitly agreed to buy, hold or sell their shares in coordination with one another, knowing that a pump and dump was in the offing that would allow them all to profit handsomely."  ¶ 50 (quoting TAC Ex. A ¶ 2).

As a result of the *SEC v. Honig* Action, O'Rourke, Honig, and Brauser have each been permanently barred from participating in an offering of penny stock" (like

---

[2] In March 2022, the Massachusetts Securities Division also issued a Consent Order against Stetson, Groussman, and Jonathan Honig alleging that they were "bad actors."  ¶¶ 72-73.

Riot), ¶¶ 3, 13, 20, and Groussman and Stetson have been similarly barred for five and ten years, respectively, ¶¶ 23.

During the Class Period, Honig—pursuant to explicit or tacit agreements with other Selling Stockholders—and following the same pattern described by the SEC in the *SEC v. Honig Action*, ¶¶ 49-73, the TAC alleges Honig that coordinated his investments in Riot with other Selling Stockholders , and at the same time, failed to disclose his stock sales, so that he could sell in large stake in the Company at artificially inflated prices.  ¶¶ 116-119, 142-147.

### B.    Honig and His "Friends and Relatives" Wage A Proxy Fight to Obtain Control of Riot

On September 13 and 14, 2016, or seven months before the start of the Class Period, Honig and DeFrancesco both sent letters to the Company's then-CEO Stephen T. Lundy ("Lundy"), touting their combined 16.2% stake in the Company and nominate O'Rourke, Beeghley, Stetson, and others to the Board.  ¶¶ 84-85, 151. Honig's September 13, 2016 letter, in which he nominated O'Rourke and Stetson to the Board, lists the same fax number for O'Rourke and Stetson as the fax number listed on Honig's letterhead for his office in Boca Raton, Florida.  ¶ 151.

The same month, Honig spoke several times on the telephone with members of the Company's then-existing Board.  According to a former Company Board member who was present during these telephone conversations—and who spoke with Plaintiff's counsel—"Honig stated that he had control of 40% of [the

Company's] shares through his stock ownership and the stock ownership of a group of ***Honig's 'friends and relatives.*'"   ¶ 84.[3]

### C. Honig and Selling Stockholders' Engaged in Undisclosed Related-Party Transactions with Riot While O'Rourke and Beeghley Were CEO

The Company's transformation from Bioptix into "Riot Blockchain" was accomplished through a series of strategic transactions—including Riot's "Subscription Agreement and Amended and Restated Unanimous Shareholder Agreement" (the "Coinsquare Agreement"), ¶¶ 94-105, and the Kairos Transaction, ¶¶ 106-08.   The Company publicly touted these corporate events to potential investors without disclosing that Honig was a related person with a personal financial interest at stake.   ¶¶ 97, 108.   For example, Riot used the October 4, 2017 announcement of its $3,000,000 "strategic investment in Coinsquare," ¶ 94, to justify "changing its name to Riot Blockchain, Inc."   ¶ 94.   In the announcement, Beeghley as CEO told investors:  "We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on

---

[3] Defendants assert that the TAC does not cite "confidential witness statements from people who . . . interacted with the Individual Defendants." Indiv. Br. 2.  This is incorrect.  Plaintiff's counsel spoke with a "former [Company] Board member who was present" in September 2016 "during [the] telephone conversations" when "Honig implied that he had control of 40% of Venaxis's shares through his stock ownership and the stock ownership of a group of Honig's 'friends and relatives.'" ¶ 84.  Plaintiff's counsel also spoke with the "individual present at the time" when "Beeghley told the Board that he did not know Honig" despite Beeghley's serving with Honig on PolarityTE's board of directors.  ¶ 89.

the opportunity of this sector," ¶ 94, while concealing the identities of the other "partner[s]" with whom Riot had "led [that] investment"—who included Honig and some of the same Selling Stockholders who Riot would later tell investors it had no "material relationship" with at all.   ¶¶ 211-12, 216.   Specifically, the Selling Stockholders who (along with Riot) invested *directly* in Coinsquare included Honig, Groussman, Stetson, Brauser, GRQ (i.e., Honig), 2330573 Ontario, and Titan (i.e., Jonathan Honig).  ¶ 100.  At the time of the transaction Honig was a greater than 5% shareholder of Riot, an important ownership threshold under Item 404 of Regulation S-K, an SEC regulation that requires publicly traded companies to disclose transactions with related persons.  ¶¶ 203-204.

Less than one month later, on November 3, 2017, Riot announced a "share exchange agreement" through which Riot paid $12.2 million to Kairos shareholders, a newly formed private company that (allegedly) owned computer equipment and other assets used for mining cryptocurrency.  ¶ 106.

However, Riot did not disclose until April 17, 2018, that Honig participated in the Kairos share exchange or that the transaction included Honig-affiliate DeFrancesco.  ¶ 108.  At the time of the transaction, both Honig and DeFrancesco were 11% shareholders of Riot, and significant owners of Kairos, owning 8.6% and 6.3% of respectively.  ¶ 108.  Riot also did not disclose until January 5, 2018, that

by paying Kairos shareholders $12.2 million in preferred Riot stock, Riot purchased computer equipment that Kairos had purchased for only $2.0 million.  ¶ 122.

### D.   Honig Engaged in Months of Significant Stock Sales Without Disclosing The Trades To Investors

In order to accomplish the alleged scheme, aside from concealing his group status and related party transactions, Honig needed to conceal his trading activity (and the activity of the other Selling Stockholders) so that would-be investors could not track his or other group members' sales.  ¶¶ 116-119.  Indeed, if the market became aware that a group of Riot's largest shareholders were aggressively selling their shares soon after the Company had changed its name and its business strategy, it could have dissuaded potential buyers of the stock (who were necessary to drive the share price higher and to buy the same shares that Honig and other Selling Stockholders planned to sell) as it would have suggested that insiders were aware of negative information that public investors did not have.  *Id.*

For their part, O'Rourke and Beeghley took steps to help Honig conceal his group status (¶¶ 158-165, 181-182, 185-188) and related party transactions (¶¶ 173-177, 200-205, 206-208), either of which could have alerted investors that Riot's stock price was overvalued because it was subject to the whims and control of a small group.  ¶¶ 116-118.

Not to mention, Honig needed Riot's share price to increase quickly so that he and other group members could sell their shares at artificially inflated prices.

¶ 117.  Specifically, the Company's transition to cryptocurrency—facilitated by the October 2017 Coinsquare Agreement and November 2017 Kairos Transaction— were intended to (and clearly did) significantly increase Riot's stock price in a short period of time.  Indeed, in response to the Company's October 4, 2017, press releases announcing the Company's name-change to "Riot Blockchain," the Company's stock price increased a staggering 43% from October 3 to 11, 2017.  ¶ 118.  During this same period, Honig sold more than 600,000 shares of Riot stock for proceeds in excess of $5.7 million.  ¶¶ 118, 146-147.

Yet, Honig and the other group members' sales were not disclosed to Riot's public investors—including Class members here—who, based on the rapid increase of the Company's stock price, were buying Riot stock as Honig and the Selling Stockholders were selling.  Honig's sales were required to be disclosed "promptly" under Section 13(d) of the Exchange Act and SEC Rule 13d, given Honig's status as a greater than 5% shareholder.  ¶ 119.[4]

Several other Selling Stockholders also sold large amounts of Riot stock during the Class Period without making the disclosures required by law.  For example, DeFrancesco—an 11%+ beneficial owner of shares in Riot through at least

---

[4] *See also Takata v. Riot Blockchain, Inc.*, Civ. No. 18-02293-FLW, 2020 WL 2079375 at *15 (D.N.J. Apr. 30, 2020) (Wolfson J.) ("under SEC Rule 13d-2, when [a 5% or greater] investor's holdings materially change . . . *the investor is required to 'promptly' file an amended schedule to update the market about the change in his holdings*.") (emphasis added).

six different entities—sold substantially all of her Riot stock without disclosing her sales to the public or that she was investing as a group with Honig and others. ¶¶ 169, 212, 214 n.69.  ¶ 21.

### E.   O'Rourke and Beeghley, as CEOs and Directors, Misrepresented and Concealed Honig's Group Status and Related-Party Transactions

During the Class Period, O'Rourke and Beeghley caused Riot to publish materially false and misleading statements and omissions to investors.  *See generally* ¶¶ 166-223.  ***First***, rather than disclose that these Selling Stockholders were operating as a group, Riot's Forms 2017 and 2018 Form S-3s affirmatively stated just the opposite: "there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares"; "[w]e do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby"; and "[t]he selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus . . . ." ¶¶ 181-84, 191-93, 194-96, 197-99, 209-10, 215-16.

***Second***, O'Rourke and Beeghley failed to disclose, in violation of Item 404 of Regulation S-K and Item 1.01 to Form 8-K, that Honig was a related person with a greater than $120,000 financial interest in three corporate transactions with Riot, the Coinsquare, Kairos and the March 2017 Private Placement transactions.  ¶¶ 173-177, 200-205, 206-208.

**Third**, Riot's January 5 and February 7, 2018 Form S-3s, documents filed with the SEC after the Coinsquare, Kairos and March Private Placement transactions, affirmatively stated that "[n]one" of the Selling Stockholders had a "material relationship" with "us"—i.e., the Company—during the past three years. ¶¶ 211-13, 216. Honig was among the Selling Stockholders. *Id*.

**Fourth**, on February 16, 2018, *CNBC* published an article and broadcast titled "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket," ¶¶ 128-35, in which *CNBC* that quoted O'Rourke as stating that he "isn't worried about the SEC because 'we over-disclose'"; "Mr. Honig . . . has been a supportive shareholder of Riot"; and "O'Rourke insisted that he does not work out of Barry Honig's office, even though we found him there." ¶¶ 132-33, 218.

**Fifth**, also on February 16, 2018, O'Rourke published a letter to Riot's shareholders (filed on Form 8-K) denying and downplaying *CNBC*'s allegations. O'Rourke stated (1) "[a]t the end of 2017, I personally sold some stock that I held in our company. I sold less than 10% of my overall position . . . ."; (2) "Barry Honig has been a supportive shareholder of Riot Blockchain"; (3) "[p]art of the further thesis around forming Riot Blockchain was to provide investors . . . with the transparency and disclosure obligations that come with operating a Nasdaq listed and fully SEC reporting company"; and (4) "[w]e take our SEC reporting obligations

seriously and diligently file all reports and filings. We have expended enormous effort to inform investors of the risks of our foray into uncharted territory. . . . We support full disclosure . . . . ." ¶ 221.

### F.    As the Truth Was Revealed, Riot's Investors Were Damaged

The Riot Defendants' misstatements, omissions and scheme were revealed through a series of disclosures that eventually exposed Honig as a group and that he was engaged in undisclosed stock sales—the hallmarks of a classic pump-and-dump scheme.

Honig's massive and undisclosed stock sales occurred over ten months during 2017 and was first revealed to the market on January 31, 2018, when *The Wall Street Journal* published an article titled "Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake," which reported: "Mr. Honig has sold about 500,000 shares, he said, but declined to divulge his profit. He said he still owns about 1% of the company." ¶¶ 125, 238. As a direct result of *The Wall Street Journal's* January 31 revelation that Honig had already sold all but 1% of the Company—without disclosing those sales on a Schedule 13D in violation of Section 13(d)—Riot's stock declined more than 5% that same day. ¶ 126. Over the next two days, Riot's stock fell and additional ***14.26%***. ¶¶ 240-42.

Later on January 31, 2018, after the market had closed, Riot issued a press release announcing that it had "Adjourned" the Company's "Annual Meeting of

Stockholders," which had been schedule for the very next day.  ¶ 127.  Together, *The Wall Street Journal's* revelation of Honig's nearly total divestment of his holdings of Riot stock, ¶ 242, alongside Riot's last-minute cancellation of its annual shareholder meeting ("for a second time," ¶ 127), caused Riot's stock price to decline ***14.26%*** from January 30, 2018 to February 1, 2018.  ¶ 242.

On February 16, 2018, *CNBC* published its exposé on Riot, revealing O'Rourke's close business ties to Honig after "CNBC crew members walked into [Honig's] office" and "found O'Rourke" on the day of Riot's cancelled annual shareholder meeting without "any reason," ¶ 131; raised questions about "Honig's selling" and "what is reported" on Honig's "13D," ¶ 131; and questioned how Riot could have paid $11.9 million to Kairos for "$2 million in mining equipment" given that "Kairos appears to have many links to Riot,"  ¶ 131; *see also* ¶¶ 125-35, 243-44.  On this news, Riot's stock price ***declined 33.4%***, ¶¶ 135, 244.  On this same trading day, the price of Bitcoin was ***increasing***, *see* Honig Ex. C at 13.

On April 17, 2018, Riot filed an annual report disclosing the financial interests of Honig and DeFrancesco in various 2017 related-party transactions, causing Riot's stock price to fall another ***5.8%***.  ¶ 137.

On May 25, 2018, Riot disclosed yet further information about Honig's role in related-party transactions, causing Riot's share price to decline ***6%***.  ¶ 138.

Finally, on September 7, 2018, the SEC filed the *SEC v. Honig* Action against

Honig, O'Rourke, Groussman, Stetson, Brauser, and others, alleging they had engaged in "three highly profitable 'pump-and-dump' schemes . . . from 2013 through 2018" at "three public companies." ¶¶ 49-73, 139, 247; *see also* TAC Ex. A. The SEC described how "Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets." ¶ 40.

On this news, Riot's stock price declined by approximately ***26.1%***, ¶¶ 6, 141, 248, while the price of Bitcoin fell less than 1%. *See* ECF No. 201-1 at 60.

## III.   ARGUMENT

### A.   Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). A court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007) (noting "private securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses'—a matter crucial to the integrity of domestic capital markets") (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v.*

*Dabit*, 547 U.S. 71, 81 (2006)).  Dismissal is inappropriate even where "it appears unlikely that a plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  Despite Rule 9(b)'s requirements, the Third Circuit has cautioned, "'in applying [that rule], courts should be 'sensitive' to situations in which 'sophisticated defrauders' may 'successfully conceal the details of their fraud.'" *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *11 (D.N.J. Mar. 24, 2008) (quoting *In re Burlington Coat Factory*, 114 F.3d at 1418).[5]

### B.   The Complaint Adequately Alleges the Riot Defendants Made Materially False and Misleading Statements and Omissions During the Class Period

Under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004) (citation omitted); *see also In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 821 (E.D. Pa. 2001) (a securities fraud complaint adequately alleges falsity if it specifies "the who, what, when, where, and how; the first paragraph of any newspaper story").  A misstatement or omission of fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor

---

[5] The PSLRA "does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim." *In re Cephalon Sec. Litig.*, 1997 WL 570918, at *2 (E.D. Pa. Aug. 29, 1997).

as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

### 1. Riot's 2017 and 2018 Form S-3s Falsely Stated that the Selling Stockholders Had No "Agreements, Arrangements or Understandings with Respect to the Sale"

Each of Riot's 2017 and 2018 Form S-3s (which O'Rourke signed) stated:

> We do not know when or in what amounts a selling stockholder may sell or otherwise dispose of the shares of Common Stock covered hereby. ***The selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus*** and may sell or otherwise dispose of shares covered hereby in transactions exempt from the registration requirements of the Securities Act. Because ***the selling stockholders may sell or otherwise dispose of some, all or none of the shares covered hereby***, and because ***there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares***, we cannot estimate the number of the shares that will be held by the selling stockholders after completion of the offering.

¶¶ 181-84, 191-93, 194-96, 197-99, 209-10, 215-16.   The Complaint alleges that each of the emphasized statements above were materially false and misleading when made.  *See* ¶¶ 182-84.

*First*, the statement that "there are currently no agreements, arrangements or understandings with respect to the sale of any of the shares" was materially false and misleading when made because O'Rourke knew that—as his longtime co-investor in over 75 companies, ¶ 57—that Honig and other Selling Stockholders were continuing the same *modus operandi* as described in the *SEC v. Honig* Action.  This would necessarily include—at a minimum—an "arrangement" or "understanding"

that they intended to sell their shares without promptly disclosing those shares—or that they were doing so as a group—as they had done in the past.  ¶¶ 49-73, 182.

***Second***, the statement that "[t]he selling stockholders may not sell or otherwise dispose of any or all of the shares offered by this prospectus" was materially false and misleading when made because O'Rourke knew that Honig did in fact intend to sell their Riot shares given these individuals' pattern of using this same *modus operandi* as described in the *SEC v. Honig* Action.  ¶¶ 49-73, 183.

In defense, Riot argues that "the TAC fails to allege the existence of an agreement to sell Riot's shares or that Riot knew of any such agreement."  Riot Br. 32-33.  However, Riot ignores that the express language in the Form S-3s denied not merely any "agreement" but also even any "arrangements or understandings" among the Selling Stockholders to sell their shares.  ¶¶ 181-84.  Riot also ignores the TAC's allegations that O'Rourke—who shared an office with Honig and invested with him in dozens of other companies (¶ 57) as a member of "our small group."  ¶¶ 55-57. As a participant in the group, O'Rourke also knew that this "small group['s]" *modus operandi* necessarily required precisely such "arrangements or understandings" to succeed in its schemes.  *Id*.

Riot next argues that "these statements do nothing more than set forth the potential outcomes of the public offering—i.e., stockholders may sell their shares, they may not sell their shares, or they may sell some of their shares," and that

"[s]imply because certain stockholders would sell all of their shares, does not mean the rest of the statement is false or misleading."  Riot Br. 33.  However, Riot overlooks that the TAC alleges that the Selling Stockholders' sales were not merely "potential" but sales that actually occurred.  ¶ 147.  Indeed, the TAC alleges that during 2017, Honig (an 11%+ stockholder) and DeFrancesco (another an 11%+ stockholder) *together* sold approximately *23%* of Riot's total outstanding stock without either disclosing their sales as required by Section 13(d).  ¶¶ 147, 21.  Not to mention, the SEC alleged that O'Rourke and Honig were involved in at least three trading schemes similar to the one alleged in the TAC.  ¶ 62.  Given this backdrop, the more plausible inference, when compared to any non-culpable inference, is that O'Rourke knew or should have known that Honig planned to sell his substantial stake in Riot.

### 2.  Riot's 2018 Form S-3's Falsely Stated that "None of the Selling Stockholders . . . Has Had Any Material Relationship with Us"

Riot's January 5 and February 7, 2018 Form S-3s (signed by O'Rourke) stated that "[n]one of the selling stockholders has held any position or office, or has otherwise had a *material relationship, with us* or any of our subsidiaries within the past three years other than as a result of the ownership of our shares or other securities."  ¶¶ 211-213.  This statement was false because, as of January 5, 2018, Honig (and several other Selling Stockholders) did in fact have a material

19

relationship with Riot by virtue of their (undisclosed) participation in three corporate transactions involving Riot:  (1) the Coinsquare Agreement, ¶¶ 96-101, 200-05; (2) the Kairos Transaction, ¶¶ 106-108, 122-23, 206-08; and (3) the March 2017 Private Placement, ¶¶ 92-93, 173-77.

For example, in the Coinsquare Agreement, Honig and several other Selling Stockholders—including DeFrancesco, Groussman (i.e., Melechdavid, *see* ¶¶ 23, 34), Grander (i.e., Brauser, *see* ¶¶ 20, 22), Honig (i.e., GRQ, *see* ¶¶ 13, 24), and 2330573 Ontario, *see* ¶ 16)—all directly participated as "co-investors . . . in the Coinsquare Agreement" (a written contract they personally signed) with the Company in October 2017, ¶ 97.

In its brief, Riot ***admits*** that on March 16, 2017, it disclosed that the "Purchaser" who participated in the March 2017 Private Placement—whose actual identity Riot did not disclose, was Honig—had "***a prior substantial pre-existing relationship with the Company***."  Riot Br. 16 (quoting Riot Ex. A at 22).  And yet, Riot's Form S-3s stated that "[n]one" of the Selling Stockholders—which included Honig and his entity GRQ (¶¶ 13, 24)—had a "material relationship" with the Company.  ¶¶ 211-13, 216.  This blatant contradiction tells the Court everything it needs to know:  on the one hand, Riot admitted that it had a "***prior substantial pre-existing relationship***" with Honig, on the other hand, Riot affirmatively denied "any . . . material relationship" with Honig, ¶¶ 211.  Riot cannot have it both ways.

Riot argues that Plaintiff is trying to "revive" these misstatements and asserts that they were previously "expressly dismissed" by the Court. *See* Riot Br. 31 (citing 4/30/20 Opinion at 18). However, with respect to these misstatements, the TAC now alleges a ***different*** theory of falsity for a ***different*** set of SEC filings during a ***different*** period of time than the allegations that Judge Wolfson considered in her 4/30/20 Opinion. (ECF No. 73). The current, operative TAC now ***only*** alleges that Riot's ***January and February 2018*** Form S-3s (¶¶ 211-213, 216) were false because, by this date, Honig and numerous other Selling Stockholders had already participated in the three 2017 related-party transactions discussed above. In contrast, Plaintiff previously alleged (in ECF No. 73) that Riot's Form S-3s were misleading due to O'Rourke and Beeghley's prior relationships, as CEOs of Riot, with Honig and the other Selling Stockholders. *See* 4/30/20 Opinion at 16-19.

Riot argues that it had already disclosed Honig's participation in the March 2017 Private Placement. Riot Br. 16. But this disclosure was itself misleading because Riot did not disclose Honig's identity. ¶¶ 92-93. And while Riot did, months later, disclose Honig as the "Lead Investor" in the March 2017 Private Placement, *see* Riot Ex. C at 2, Riot did not disclose—and the market did not learn until April 18, 2018—that Honig was in fact the ***only*** beneficial investor in the March 2017 Private Placement—a disclosure that contributed to Riot's stock price decline of ***5.8%***. ¶¶ 137, 165, 173-80, 245.

21

Riot also argues that it was not misleading for the 2018 Form S-3s to affirmatively state that Honig and the Selling Stockholders had no "material relationship" with the Company because "Plaintiff blatantly ignores the remaining part of that disclosure which said "other than as a result of the ownership of our shares or other securities." Riot Br. 32 n.29. But the TAC does **not** ignore this language: it fully and accurately quotes it. *See* ¶ 211. Moreover, the Selling Stockholders' participation in the Coinsquare Agreement was not merely the "result of the [their] ownership of [Riot's] shares or other securities." Riot Br. 32. n.29. Rather, the Coinsquare Agreement was a "material definitive agreement," ¶¶ 97-98—voluntarily entered into by each of its "parties"/"co-investors," ¶ 100—that allowed those co-investors to participate in the "purchase of $3,000,000 of units of goNumerical, a privately held Canadian company known as Coinsquare." ¶ 96.[6]

Next, Riot claims that it is "unreasonable" to conclude that "Honig had a relationship with Riot through his investments in Coinsquare and Kairos . . . in light of the references to 'subsidiaries,' 'shares, and securities." Riot Br. 32. But again, the TAC plainly alleges that Honig and the Selling Stockholders invested **directly** in Coinsquare by contracting **directly** with Riot (and with each other as a group). ¶¶ 97-

---

[6] The Coinsquare Agreement was "made . . . between" Riot and each of the "**undersigned parties**" listed in ¶ 100. *See* https://www.sec.gov/Archives/edgar/data/0001167419/000107997318000350/ex10x1.htm (Oct. 2, 2017 Coinsquare Agreement attached to May 25, 2018 Form 8-K as quoted in ¶ 100). *See also Paxton*, 2022 WL 3098236, at *1 n.1 (taking judicial notice of SEC filings).

101.  Regarding the Kairos Transaction, the TAC includes similar allegations of a ***direct*** and substantial financial interest:  "***[p]ursuant to the Agreement*** . . . ***the shareholders of Kairos agreed to exchange***" their shares of Kairos for $12.2 million in preferred shares of Riot.  ¶ 206.  Because Honig owned 8.6% of Kairos, he personally received 8.6% of $12.2 million (or $1,049,200) *from Riot* for his Kairos shares.[7]

### 3.   O'Rourke's February 16, 2018 Statements to *CNBC* And Shareholder Letter Were Materially False and Misleading by Denying and Perpetuating the Scheme

On February 16, 2018, *CNBC* published its article quoting O'Rourke as stating that he "isn't worried about the SEC because 'we over-disclose'"; "Mr. Honig . . . has been a supportive shareholder of Riot"; and "O'Rourke insisted that he does not work out of Barry Honig's office, even though we found him there." ¶¶ 132-133, 218.

Of course, as CEO, O'Rourke "had no independent duty," *Paxton*, 2022 WL 3098236, at *10, to speak with *CNBC*—nor tell *CNBC* whether as CEO was "worried about the SEC," whether Riot "over-disclose[d]" in its filings with the SEC, or whether he "work[ed] out of [Honig's] office."  ¶¶ 128-33.  But by "'cho[osing] to speak on [these] issue[s],'" O'Rourke "'[could not] omit material

---

[7] Riot erroneously argues that Honig's interest in Coinsquare and Kairos were, at most, indirect, Riot 13-14. These arguments are addressed *supra* at 30.

facts related to [these] issue[s] so as to make [his] disclosure[s] misleading.'" *Paxton*, 2022 WL 3098236, at \*10 (quoting *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017)).   And in "speaking on [them]," O'Rourke "put [these] issue[s] 'in play.'"   *Id.* at \*10 n.10.   It was therefore misleading for O'Rourke, during the same interview, to simultaneously "insist[] that he does not work out of Barry Honig's office" when he knew this was not true.   ¶¶ 132, 219.   In that regard, the *SEC v. Honig* Action would later reveal this statement—in light of the fact that CNBC "found" O'Rourke in Honig's office, ¶¶ 219, 132, to be obviously (and knowingly) false.   *See* ¶ 54 (quoting TAC Ex. B ¶ 56 ("Honig, Stetson and O'Rourke were in nearly daily contact because ***they worked out of the same office***").

Riot argues that O'Rourke's statement to *CNBC* that "we over-disclose" was immaterial "puffery."   Riot Br. 33.   But Riot omits that O'Rourke's full statement to *CNBC* was that he "***isn't worried about the SEC because 'we over-disclose.***'"   ¶¶ 133, 219.   Hence, O'Rourke was refuting *CNBC*'s negative allegations about Riot's lack of disclosure to investors by denying that Riot (and by extension, O'Rourke) could face an SEC enforcement proceeding for its obfuscations.   ¶¶ 128-33.   This context made O'Rourke's statement about Riot's practices regarding SEC disclosure material to investors.

Later on February 16, 2018, O'Rourke caused Riot to publish a letter to Riot's shareholders ("Dear Shareholders") in which O'Rourke denied and downplayed

*CNBC*'s article earlier that day.  ¶ 221.  O'Rourke's statements that "[w]e take our SEC reporting obligations seriously and diligently file all reports and filings"; "[w]e have expended enormous effort to inform investors of the risks of our foray into uncharted territory"; and "[w]e support full disclosure" were materially false and misleading because far from supporting "full disclosure" and "taking [their SEC] reporting obligations seriously" and "diligently fil[ing] all reports," Riot had engaged in a lack of disclosure, failed in its SEC reporting obligations, and knew that Honig—one of its largest shareholders—had failed to "diligently file all reports" required by law.  ¶¶ 21, 142-47.

### 4. Riot Had an Affirmative Duty to Disclose—Under *Oran* and Item 403—that Honig and the Selling Stockholders Were a "Group"

The Third Circuit "explained in *Oran v. Stafford* that a duty to disclose under Rule 10b–5 may arise in three circumstances: 'when there is [1] insider trading, [2] a statute requiring disclosure, or [3] an inaccurate, incomplete or misleading prior disclosure.'" *United States v. Schiff*, 602 F.3d 152, 162 (3d Cir. 2010) (quoting *Oran v. Stafford*, 226 F.3d 275, 285-286 (3d Cir. 2000) (alteration in original).  *See also* ¶ 100 n.34 (citing *Oran*, 226 F.3d at 285-286) (same).  "[A]n affirmative duty [to disclose] arises only when [one of *Oran's* three prongs]' are triggered." *Id.* at 163 (quoting *Winer Family Trust v. Queen*, 503 F.3d 319, 329 (3d Cir. 2007)) (second alteration in original).  Here, as discussed below, each of "*Oran's* three prongs," *id.*,

supports that Riot had a duty to disclose that Honig and the Selling Stockholders were investing together in Riot as a group.

**First**, Riot had a duty to disclose that Honig and the other Selling Stockholders were investing together in Riot as a group because, as discussed above, Riot had already made "inaccurate, incomplete or misleading prior disclosure[s] . . . ." *Id.* "Once a defendant makes an affirmative statement or characterization about its business, it puts that subject "in play" and assumes a duty, under the securities laws, to speak truthfully about that subject." *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011) (quoting *Shapiro v. UJB Fin. Corp.*, 964 F .2d 272, 282 (3d Cir. 1992)). Here, Riot falsely stated the Selling Stockholders had no any "agreements, arrangements or understandings with respect to the sale of any of [their] shares," ¶¶ 181, 191, 194, 197, 209, 215, and had no "material relationship" with Riot, ¶¶ 211-12. Yet, Riot's CEO, O'Rourke, knew that he, Honig, and the Selling Stockholder's were clearly operating as a group just as they had in dozens of prior investments, ¶ 80, and also knew that Honig (the largest of the Selling Stockholders) had engaged in related-party transactions with Riot, ¶¶ 96-108. And when *CNBC* published its exposé raising questions about O'Rourke and Honig's roles at Riot, O'Rourke publicly denied *CNBC*'s allegations. ¶¶ 218-23. Riot and O'Rourke had an affirmative duty to correct their affirmative

misstatements by disclosing that the Selling Stockholders were a group as independently required by Item 403, 17 C.F.R. § 229.403.[8]

**Second**, Riot had an affirmative duty to disclose that Honig and the other Selling Stockholders were investing together in Riot as a group under Item 403 of Regulation S-K, which is "a regulation impos[ing] an affirmative duty of disclosure that, if violated, would constitute a material omission under Rule 10b-5." 4/8/22 Opinion at 21 (noting that "[t]he Third Circuit" in *Oran* recognized "liability under Section 10(b) for . . . Regulation S-K items") (citing *Oran*, 226 F.3d at 287). In *Oran*, the Third Circuit held that "'a violation of [Item 303 of Regulation S-K's] reporting requirements does not *automatically* give rise' to a private right of action, but omissions from Item 303 disclosures could form the basis of a private securities suit if '[s]uch a duty to disclose [is] separately shown." *In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378, 391 (D.N.J. 2018) (emphasis in original) (quoting *Oran*, 226 F.3d at 288). "Under *Oran*, an omission in the context of Item 303 can give rise to a Rule 10b-5 claim if the Item 303 omission renders other statements materially misleading." *Id.* "*Oran* actually suggested, without deciding, that in certain instances a violation of Item 303 [of Regulation S-K] could give rise

---

[8] Riot argues that "Plaintiff's allegations rest on purported **omissions**." Riot Br. 9-10. This misreads the Complaint and ignores that Plaintiff's allegations do **not** merely rely on Defendants' omissions but on also on Defendants' affirmative "False and Misleading Statements . . . During the Class Period," *see* TAC § IX (¶¶ 166-223), which make their contrasting omissions actionable.

to a material 10b–5 omission." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 103-04 (2d Cir. 2015) ("*Oran* is consistent with our decision that failure to comply with Item 303 in a Form 10–Q can give rise to liability under Rule 10b–5 so long as the omission is material under [*Basic v. Levinson*, 485 U.S. 224 (1988)] and the other elements of Rule 10b–5 have been established.").

The *Oran* court's analysis of Item 303 applies to other Regulation S-K items such as Item 403, 17 C.F.R. § 229.403(a), which courts have frequently found to create an affirmative duty of disclosure, which if violated, constitutes a material omission giving rise to liability under Section 10(b). *See, e.g.*, *Puddu v. 6D Glob. Techs., Inc.*, 742 F. App'x 553, 555 (2d Cir. 2018) (holding that complaint "adequately alleges that Defendants made misstatements or omissions of material fact during the class period," and that under Item 403 of Regulation S-K, "[i]ssuers are required to disclose the beneficial owners of more than 5% of their securities" and that "6D was required, but failed, to disclose Wey's beneficial ownership of 45% of the common stock of 6D") (citing 17 C.F.R. § 229.403(a)).

Here, Riot was required under Item 403 of Regulation S-K to disclose that Honig and the other Selling Stockholders were coordinating their trading in Riot stock as a Section 13(d) "group." ¶¶ 109-15. Indeed, this group held "the ***majority*** of Riot's common stock." ¶¶ 187, 193 n.64.

Riot argues that "Item 403" and "Rule 10b-5" have "disparate materiality considerations" and a violation of Item 403's disclosure requirement "does not create Rule 10b-5 liability."  Riot Br. 23.  But numerous courts have held that the information that Section 13(d) requires to be disclosed to the market by investors (through Rule 13d, 17 C.F.R. § 240.13d-1) and by public companies (through Item 403 of Regulation S-K, 17 C.F.R. § 229.403) is of material importance to investors. *See, e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) ("[T]the fact that the information is required to be revealed under § 13(d) is evidence of its materiality."); *S.E.C. v. Levy*, 706 F. Supp. 61, 72 (D.D.C. 1989) ("The fact that this information is required to be disclosed under section 13(d) of the Exchange Act is strong evidence that it is material for the purposes of section 10(b) of that Act."); *SEC v. Honig*, 2021 WL 276155, at *8 (S.D.N.Y. Jan. 27, 2021) ("[T]he SEC's disclosure requirements may . . . be considered as 'evidence of [the omission's] materiality.'") (quoting *Bilzerian*, 926 F.2d at 1298).[9]

***Third***, Riot had a duty to disclose that Honig and the Selling Stockholders were investing together in Riot as a group because while Riot was misrepresenting and concealing Honig and the Selling Stockholders relationships with themselves

---

[9] ***Honig himself*** has publicly stated—in a civil lawsuit that he filed in Texas alleging that he was damaged by violations of Section 13(d)—that a violation of Section 13(d) is "material" to him and he "would not have purchased the Shares if [he] had known the undisclosed facts that [the defendants] controlled such a largest interest in [the company's] stock."  ¶ 148.

and the Company (in violation of Item 403), Honig and other Selling Stockholders were engaged in massive undisclosed sales of Riot stock.  *See Oran*, 226 F.3d at 285-86 (holding that "a duty to disclose may arise when there is ***insider trading***") (citing *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) ("One situation in which there is a duty to disclose is ***when a corporate insider trades*** on confidential information")); *see also Schiff*, 602 F.3d 152, 166 (3d Cir. 2010) ("explain[ing] that corporate insiders must 'abstain from trading in the shares of [the] corporation until the disclosure of material information' because of 'the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure'"") (quoting *Chiarella v. United States*, 445 U.S. 222, 232 (1980)).

### 5. Riot Breached Its Duty Under Item 404 to Disclose Honig as a Related Party to the Coinsquare Agreement and Kairos Transaction

The federal securities laws require publicly traded companies to disclose material transactions with related persons.  *SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 393-94 (S.D.N.Y. 2014); *see also* 17 C.F.R. § 229.404 (Item 404 of Regulation S-K).  Defendants do not dispute this.  *See* Riot Br. 11 ("Item 404 *requires* disclosure of transactions over $120,000 in which the related party has a material interest).  Instead, Defendants invoke various exemptions and thresholds to excuse their nondisclosure.  First, Defendants claim that "at most" Honig had an "indirect" interest in the transactions.  *Id*. at 13-15.  Second, they argue

that the transactions in question do not meet the $120,000 threshold required by Item 404(a). *Id*. at 15.  Third, Riot argues that "*per se* violation[s]" of Item 404 do not "automatically give rise to a material omission under Rule 10b-5." *Id*. at 12.  As explained below, these arguments fail.

Defendants argue that Honig's financial interest in the transactions was merely "***indirect***" thereby placing these transactions within an "exclusion" contained in Instruction 6 to Item 404 and thereby exempting these transactions (and their participants) from any "disclosure duty."  Riot Br. 13-15.

However, Defendants ignore the TAC's well-pled allegations that Riot, Honig, and various Selling Stockholders were ***direct*** parties to the Coinsquare Agreement, ¶ 100,[10] and that in the case of the Kairos Transaction, Honig as a Kairos Shareholder transacted ***directly*** with Riot other rather than through an indirect channel such as a family member, affiliate, or other entity.  ¶ 206 ("pursuant to the Agreement . . . . the shareholders of Kairos agreed to exchange")  Defendants' attempt at misdirection on this point (*see* Riot Br. 13 ("[the] transactions were not *with a Riot security holder - i.e. Honig*" and "Honig was not a party to these agreements")) is belied by Riot's own SEC filings and the TAC's well-pled allegations regarding Coinsquare, ¶¶ 96-101, and Kairos, ¶¶ 106-08, which at this stage must be accepted as true.

---

[10] *See* supra n.7.

Not to mention, Riot did eventually disclose that Honig was a party to the Coinsquare Agreement, ¶ 100, and that the Kairos Transaction was in fact a "Related Party Transaction, ¶ 245. These long-delayed disclosures confirm Riot has understood all along that Honig was a related person to these transactions.[11]

**Second**, Riot argues that Honig's interest in these transactions did not meet the $120,000 threshold. This argument fails. As to the Coinsquare Agreement, Riot was issued 2,249,985 shares of Coinsquare in exchange for $3,000,000. ¶¶ 96, 100. Thus, Riot paid $1.33 per share for its Coinsquare shares.[12] For his part, Honig received 112,499 Coinsquare shares and Honig's entity, GRQ (¶ 24), received an additional 75,000 Coinsquare shares—for a total of 187,499. ¶ 100. Relying on the $1.33 per share that Riot paid for Coinsquare, Honig's financial interest in the transaction was $249,373.67[13]—***more than twice $120,000 threshold*** set by Item 404.

As to Kairos, Riot exchanged $12.2 million in preferred shares to Kairos shareholders, including Honig, allegedly for certain computer equipment (which

---

[11] At a minimum, Defendants' argument that Honig was not a related person under Item 404(a) creates a question of fact that cannot be resolved at this stage in the litigation. *See Garcia v. J2 Global, Inc.*, Civ. No. 2:20-cv-06096, 2021 WL 1558331, *13 (C.D. Cal. Mar. 5, 2021) ("van der Weijden's status as a 'related party' is a question of fact").

[12] $3,000,000 divided by 2,249,985 shares = $1.33 per share.

[13] $1.33 per share x 187,499 shares = $249,373.67.

Kairos bought for only $2.0 million).  ¶¶ 106-07, 123.  Honig owned 8.6% of Kairos.

¶ 108.  Thus, Honig's interest in Kairos (8.6% of $12.2 million) was $1,049,200—

***more than eight times*** the $120,000 threshold set by Item 404.

***Third***, Riot argues that a violation of Item 404 does not "automatically" give

rise to a material omission under Rule 10b-5.  Riot Br. 12.  Riot cannot dispute,

however, that "[t]he Third Circuit has held that" one can "show liability under

Regulation S-K items," 4/8/2 Opinion at 21, such as Item 404, "where there is an

affirmative duty of disclosure that, if violated, would constitute a material omission

under Rule 10b-5." *Oran*, 226 F.3d 275, 287 (3d Cir. 2000).  Here, Riot's violations

of Item 404 were "material omissions," *id.*, when viewed holistically with the TAC's

other allegations including, (1) Honig's substantial insider stock sales, ¶¶ 116-119,

147; (2) Honig's long-standing ties with O'Rourke and Beeghley, ¶¶ 51, 57, 160-62,

74-78; and (3) the significant decline in Riot's stock price that resulted when

Honig's interest in these transactions was belatedly disclosed, ¶¶ 245-46.

### 6.     Riot Breached Its Affirmative Duty to Disclose Honing as the Sole Beneficial Investor in the March 2017 Private Placement

Riot argues that it "fully disclosed" Honig as a related party to the March 2017

Private Placement, Riot Br. 16, in which Riot agreed to sell notes to Honig valued

at $2,250,000.  ¶¶ 92-93, 173-77.  In support, Riot asserts that its March 16, 2017

Form 8-K stated that the "Purchaser" of the private placement has a "prior substantial

pre-existing relationship with the Company."   Riot Br. 16 nn.14-15.   However, simply disclosing an anonymous "Purchaser" was insufficient, told investors nothing, and violated Form 8-K's Instructions explicitly required Riot to disclose the "***identity of the parties*** to the agreement or amendment and a brief description of any material relationship . . . ." ¶ 175 n. 58 (quoting Form 8-K § 1.01).[14]

Riot also argues that the March 2017 Private Placement was disclosed to the market in a July 17, 2017 Form S-3, which was filed four months ***after*** the March 2017 Private Placement.   Riot Br. 16 (citing Riot Ex. C).   However, while the S-3 referred to Honig as "the Lead Investor" in "our March 2017 note financing," it also referred to other "investor***s***," the "delivery of the Notes to [those] investor***s***," and stated that "[n]o ***other investor*** has the ability to waive conditions for the escrow release."   Riot Ex. C at 2.   This was misleading because, in reality, Honig was the *sole* beneficial investor the March 2017 Private Placement.   ¶¶ 137, 165, 173-80, 245; *see also* TAC Ex. H at Item 6 (disclosing Honig's sole involvement in March 2017 Private Placement).

---

[14] Rather than disclose Honig's identity as required by law, ***Riot instead contractually agreed not to disclose his identity***.  *See* [Riot Blockchain, Inc.], Current Report (Form 8-K) (Mar. 16, 2017) at Ex. 10.1 at 26 ("[Riot] shall not publicly disclose the name of any Purchaser, or include the name of any Purchaser in any filing with the [SEC] or any regulatory agency or Trading Market . . . ."), available at https://www.sec.gov/Archives/edgar/data/1167419/000107997317000154/ex10x1.htm.

### C. The Complaint Pleads a Strong Inference of the Riot Defendants' Scienter

Plaintiff incorporates by reference his opposition to the Individual Defendants' concurrently filed motion to dismiss (ECF No. 233-1). *See In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("A corporate defendant's scienter is necessarily derived from its employees.").

### D. The Complaint Adequately Pleads Loss Causation

On January 31, 2018, while Riot's stock ***decreased*** by more than 5% on news from *The Wall Street Journal* of Honig's selling, ¶¶ 238-40, the price of Bitcoin simultaneously ***increased***, *see* Honig Ex. B (ECF No. 234-5 at 13), thus showing a "causal link between the 'corrective disclosure'" of Honig's "stock sales and [the] economic loss that . . . Plaintiff suffered." 4/30/20 Opinion at 39.  Ignoring this fact, Riot argues that these revelations are not "corrective" because Riot "never had an obligation to disclose Honig's stock sales" and made no misleading statements about its annual meeting.  Riot Br. 38.  But a Rule 10b-5 plaintiff is not required to plead a stock drop following a disclosure that "mirrors, with precision, the alleged fraud." *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *18-20 (D.N.J. Aug. 17, 2005).  Rather, "Plaintiffs can utilize the 'materialization of the risk' approach to demonstrate when a misrepresentation or omission 'proximately causes' the economic loss in the context of an undisclosed risk." *In re Galena Biopharma, Inc. Sec. Litig.*, 2021 WL 50227, at *7 (D.N.J. Jan. 5, 2021) (citing *McCabe v. Ernst &*

*Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007)).   Here, Riot created the risk by signing and filing false and misleading statements and omissions that violated Item 403, Item 404 and Section 13(d) and allowing Honig to conceal his stock trades from Riot's public investors.   The risk that Riot created began to partially materialize on January 31, 2018, when *The Wall Street Journal* reported that Honig had been engaging in exactly the kind of undisclosed § 13(d) group conduct and stock sales that Riot had misrepresented and concealed.

**Second**, on February 16, 2018, *CNBC* published its exposé on Riot, discussing O'Rourke and Honig's close ties, dubious history, that they worked out of the same office, and the suspicious details of the Kairos Agreement.   ¶ 131. On this news, Riot's stock price **declined 33.4%**, ¶¶ 135, 244, while the price of Bitcoin was simultaneously **increasing**.   *See* Honig Ex. C at 13.   Riot argues that the Complaint "fails to allege how such article corrected any of the purported from in the TAC," Riot Br. 36, but this ignores the TAC's allegations of how *CNBC*'s investigative reporting—including previously unknown facts tying together O'Rourke, Honig, Kesner, Paradox, Kairos, and Laxague, and detailing "the true extent of Honig's selling" being "[b]uried deep in the footnotes of Riot filings," ¶ 131, and how "[t]he revelations in CNBC's article partially revealed that O'Rourke and Honig were acting with others in their group with Honig as "the man acting behind the Riot Blockchain curtain," ¶ 243.

***Third***, on April 17, 2018, Riot filed a Form 10-K revealing that Honig was a related party to the Kairos and March 2017 Private Placement, two corporate transactions that Riot previously disclosed but omitted Honig's involvement.  ¶¶ 136-37, 245.  On this news, Riot's stock price ***declined 5.8***%, ¶¶ 137, 245, while the price of Bitcoin was ***rising***.  See Honig Ex. C at 14-15.[15]  In response, Riot argues that "disclosures made after this action was filed"—i.e., the barebones 22-page complaint filed by another party on February 17, 2018 (ECF No. 1)—"are not corrective disclosures" because "[i]nvestors were well aware of any purported omissions, because the litigation was already public."  Riot Br. 36 (citing ECF No. 1).  This argument is unsupported by Riot's legal authority and by common sense.[16]  Riot does not (and cannot) suggest that the initial February 17, 2018 complaint (which focused on the February 16, 2017 *CNBC* article, *see* ECF No. 1 at

---

[15] Plaintiff does not object to Honig's request for judicial notice of historical Bitcoin prices, ECF No. 234-16, but respectfully requests to similarly rely upon the chart of Bitcoin prices covering the entire Class Period that was previously filed in this case. *See* ECF No. 201-1 at 42-60.

[16] Riot relies on *In re Merck & Co., Inc. Securities Litigation*, 432 F.3d 261 (3d Cir. 2005), Riot Br. 36, but *Merck* involved a journalist's "mathematical calculations" of "facts" that had already been "disclosed" in a securities filing "over two months" earlier.  432 F.3d at 270-71.  Here, in contrast, the SEC's a 53-page complaint (*see* TAC Ex. A) was not a "newspaper's analysis of available information," Riot Br. 36, but contained new, previously unreleased allegations that O'Rourke, Honig, and other Selling Stockholders had orchestrated a series of pump-and-dump schemes with a similar *modus operandi* as their investment in Riot. These disclosures so startled investors that Riot's stock price declined more than ***26%*** in a single day. ¶¶ 141, 248.

¶ 22) revealed related party transactions with Honig that were not disclosed until months later in April and May 2019 or that it disclosed the same facts and information detailed in the SEC's September 7, 2018 complaint.  ¶¶ 139-41, 247-49; *see also* TAC Ex. A.  To the extent Riot and Honig are attempting to assert a "truth-on-the-market" defense by arguing that the "truth was revealed" when "this lawsuit was filed," Honig Br. 21, such an "intensely fact-specific truth-on-the-market defense" "cannot [be] resolve[d] . . . at this juncture."  *In re EQT Corp. Sec. Litig.*, 2020 WL 7059556, at *13 (W.D. Pa. Dec. 2, 2020).   Courts in this district consistently analyze loss causation under Rule 8(a), rather than the more stringent requirements of Rule 9(b).  *See Hall v. Johnson & Johnson*, No. 18-CV-01833, 2019 WL 7207491, at *27 (D.N.J. Dec. 27, 2019); *see also  Dura Pharm., Inc., v. Broudo*, 544 U.S. 336, at 346 (2005).

*Fourth*, on Friday, May 25, 2018, after the market closed, Riot disclosed for the first time that Honig and various Selling Stockholders were parties to the Coinsquare Agreement.  ¶¶ 100, 138, 246.  On this news, the next trading day, Riot's stock price declined nearly *6%*.  ¶¶ 138, 246.  Riot argues that "the 'Honig Group' is not . . . alleged" in the TAC, Riot Br. 37, but this ignores that the undisclosed parties to the Coinsquare Agreement—who were all direct "co-investors" with Riot, and therefore parties to the same Coinsquare contract as Riot, *see* ¶ 100—were *the same Selling Stockholders* listed in Riot's Forms S-3 and S-3/A, *see* ¶¶ 16-48, 181,

189, 191, 194, 197, 209, 215. These were also the same Selling Stockholders that in January 5, 2018, the Company told investors—in a Form S-3 signed by O'Rourke and Beeghley—that "[n]one" . . . has had any material relations with us or any of our subsidiaries within the past three years." ¶ 212.

*Finally*, on September 7, 2018, the SEC filed the *SEC v. Honig* Action against Honig, O'Rourke, and several Selling Stockholders, alleging their joint involvement in several "'pump-and-dump' schemes . . . ." ¶¶ 49-73, 139, 247. On this news, Riot's stock price declined by approximately ***26.1%***, ¶¶ 6, 141, 248, while the price of Bitcoin fell less than 1%. *See* ECF No. 201-1 at 60 (showing trading prices of Bitcoin on Sept. 7-8, 2018). Riot argues that the *Honig Action* as "unrelated" and asserts that it "strains reason to hold that allegations of conduct at other companies could correct any purported fraud that occurred at Riot." Riot Br. 38. This argument is belied by the host of investors who believed otherwise and sold their shares, driving down the price of Riot's stock by 26.1%. To the extent Riot suggests that the allegations in the *Honig Action* cannot be corrective of the scheme, that is not the law. *See In re Bradley Pharm., Inc. Sec. Litig.*, 2006 WL 740793, at *5-6 (D.N.J. Mar. 23, 2006) (rejecting argument that disclosure of informal SEC inquiry could not be "corrective" of prior misrepresentation because it did not specifically mention the subject of the misrepresentation).

## IV.    CONCLUSION

For the reasons set forth above, Riot's Motion should be denied in its entirety.


Respectfully submitted,

**LITE DEPALMA GREENBERG
& AFANADOR, LLC**

Dated:    September 1, 2022      */s/ Joseph J. DePalma*
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Plaintiff
Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Plaintiff Dr. Stanley Golovac and
Lead Counsel for the Class*

**US. MARKET ADVISORS LAW GROUP PLLC**
David P. Abel
5335 Wisconsin Ave. NW, Ste. 440
Washington, D.C. 20015
Telephone: (202) 274-0237
Facsimile: (202) 686-2877
dabel@usmarketlaw.com

*Counsel for Plaintiff Dr. Stanley Golovac*