# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TAKATA, | : Civil Action No.: 3:18-cv-02293(GC)(RLS) |
| *Plaintiff,* | : |
| v. | : |
| RIOT BLOCKCHAIN, INC., et al. | : |
| *Defendants.* | : |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO BARRY C. HONIG'S MOTION TO DISMISS THE CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for
Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Dr. Stanley Golovac
and Lead Counsel for the Class*

# TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF ALLEGATIONS ........................1

II. ARGUMENT..............................................................................................5

    A. Legal Standards ....................................................................................5

    B. The Complaint Adequately Pleads that Honig Engaged in the
       Fraudulent Scheme in Violation of Rule 10b-5(a) and (c)...................7

        1. Legal Standard for Pleading Scheme Liability...........................7

        2. Honig Engaged in the Fraudulent, Deceptive, and
           Manipulative Acts in Furtherance of the Scheme......................8

        3. Honig Made Materially False and Misleading
           Statements to Investors in Violation of Rule 10b-5(b)............21

    C. The Complaint Pleads a Strong Inference of
       Defendant Honig's Scienter ...............................................................21

        1. The Standard for Pleading Scienter ..........................................21

        2. Honig Knowingly Engaged in the Fraud ...................................22

    D. The Complaint Adequately Pleads Loss Causation ...........................26

        1. January 31, 2018 – *The Wall Street Journal* –
           "Investor Who Rode Pivot from Biotech to Bitcoin
           Sells Big Stake" ........................................................................26

        2. February 16, 2018 – *CNBC* Investigates Riot..........................32

        3. April 18, 2018 – Riot Files Form 10-K Revealing
           Related-Party Transactions .......................................................33

        4. May 29, 2018 – Riot Files Form 8-K Revising
           Its Disclosures Concerning the Coinsquare Transaction.........33

        5. September 7, 2018 – SEC Files Suit Against Honig,
           O'Rourke, and Several Other "Selling Stockholders"..............34

    E. The Complaint Adequately Pleads Defendant Honig's
       Liability Under Section 20(a) as a Control Person of Riot.................35

III. CONCLUSION........................................................................................37

# TABLE OF AUTHORITIES

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ...................................................................7

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) ...................................................................5

*Amida Cap. Mgmt. II, LLC v. Cerberus Cap. Mgmt.*, L.P.,
  669 F. Supp. 2d 430 (S.D.N.Y. 2009) .....................................18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................5

*Bing Li v. Aeterna Zentaris, Inc.*,
  2016 WL 827256 (D.N.J. Mar. 2, 2016) ..................................35

*Burt v. Maasberg*,
  2014 WL 1291834 (D. Md. Mar. 28, 2014) .............................17

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336, 345 (2005) ...........................................................5

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154, 167 (2d Cir. 2000) ............................................18

*GFL Advantage Fund, Ltd., v. Colkitt*,
  272 F.3d 189 (3d Cir. 2001) .......................................................7

*Gruber v. Gilbertson*,
  2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) .........................15

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ...................................................................8

*In re Able Labs. Sec. Litig.*,
  2008 WL 1967509 (D.N.J. Mar. 24, 2008) ................................6

*In re Adelphia Commc'ns Corp. Secs. & Derivative Litig.*,
  398 F.Supp.2d 244, 262 (S.D.N.Y. 2005) ...............................37

*In re Burlington Coat Factory Securities Litigation*,
  114 F.3d 1410 (3d Cir. 1997) ...................................................14

*In re Cephalon Sec. Litig.*,
  1997 WL 570918 (E.D. Pa. Aug. 29, 1997) ...............................6

*In re Galena Biopharma, Inc. Sec. Litig.*,
  2021 WL 50227 (D.N.J. Jan. 5, 2021) .....................................28

*In re Hertz Glob. Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018) ...................................................................22

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281, 332-33 (S.D.N.Y. 2003)......................................32

*In re Leslie Fay Cos., Inc. Sec. Litig.*,
  918 F. Supp. 749 (S.D.N.Y. 1996) .........................................................37

*In re Luxottica Group S.p.A. Sec. Litig.*,
  293 F. Supp. 2d 224 (E.D.N.Y. 2003).....................................................18

*In re Merck & Co., Inc. Securities Litigation*,
  432 F.3d 261 (3d Cir. 2005) ...................................................................27

*In re Phillips Petroleum Sec. Litig.*,
  881 F.2d 1236 (3d Cir. 1989) ........................................................... 14, 15

*In re StockerYale*,
  453 F. Supp. 2d 345 (D.N.H. 2006) ........................................................30

*In re Unisys Corp. Sec. Litig.*,
  2000 WL 1367951 (E.D. Pa. Sept. 21, 2000)...................................... 6, 20

*In re: Enzymotec Sec. Litig.*,
  2015 WL 8784065 (D.N.J. Dec. 15, 2015) .............................................18

*Jones v. Intelli-Check, Inc.*,
  274 F.Supp.2d 615 (D.N.J. Jul 30, 2003) (Wolfson, J.)............................7

*Kraft v. Third Coast Mistream*,
  2021 WL 860987 (S.D.N.Y. Mar. 8, 2021) ............................................17

*Laborers Loc. No. 231 Pension Fund v. Cowan*,
  837 F. App'x 886 (3d Cir. 2020)..............................................................13

*Levie v. Sears Roebuck & Co.*,
  2006 WL 1886223 (N.D. Ill. July 5, 2006) ........................................ 16, 17

*Lorenzo v. SEC*,
  139 S.Ct. 1094 (2019) ...............................................................................8

*Lovallo v. Pacira Pharms., Inc.*,
  No. CV 14-06172 (WHW), 2015 WL 7300492 (D.N.J. Nov. 18, 2015)............20

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ....................................................................................5

*McCabe v. Ernst & Young, LLP*,
  494 F.3d 418 (3d Cir. 2007)....................................................................28

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
   547 U.S. 71 (2006) ................................................................................6

*MTB Investment Partners, LP v. Siemens Hearing Instruments, Inc.*,
   Civ. No. 12-00340, 2013 WL 12149253 (D.N.J. Feb. 19, 2013)........................15

*Park v. Veasie*,
   No. 3:09-CV-2177, 2013 WL 1149241 (M.D. Pa. Mar. 19, 2013) ....................13

*Paxton v. Provention Bio, Inc.*,
   2022 WL 3098236 (Aug. 4, 2022) ............................................................... 1, 21

*Phillips v. Cty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ......................................................................6

*Puddu v. 6D Glob. Techs., Inc.*,
   2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ....................................................16

*Romero v. Allstate Ins. Co.*,
   No. 01-6764, 2017 WL 3881215 (E.D. Pa. Sept. 5, 2017) ..................................14

*Rondeau v. Mosinee Paper Corp.*,
   422 U.S. 49 (1975) ..................................................................................18

*S.E.C. v. Teo*,
   746 F.3d 90 (3d Cir. 2014) ........................................................................5

*SEC v. Lucent Techs. Inc.*,
   610 F. Supp. 2d at 342 (D.N.J. 2009)..........................................................7

*SEC v. Savoy Indus., Inc.*,
   587 F.2d 1149 (D.C. Cir. 1978) ................................................................13

*SEC v. Savoy Indus., Inc.*,
   665 F.2d 1310 (D.C. Cir. 1981) ................................................................13

*Stumpf v. Garvey*,
   2005 WL 2127674 (D.N.H. Sept. 2, 2005) ......................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ..................................................................................6

*The Winer Family Trust v. Queen*,
   2004 WL 2203709 (E.D. Pa. Sept. 27, 2004)....................................................36

*Trustcash Holdings, Inc. v. Moss*,
   668 F. Supp. 2d 650 (D.N.J. 2009)..............................................................7

*United States ex rel. Petratos v. Genentech, Inc.*,
   855 F.3d 481 (3d Cir. 2017) ....................................................................13

*United States v. Wey*,
  2017 WL 237651 (S.D.N.Y. Jan. 18, 2017)........................................................16

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017) ...............................................................................21

## STATUTES

15 U.S.C. § 78m(d)(3) ................................................................................................10

## REGULATIONS

17 C.F.R. § 240.10b-5.................................................................................................7

17 C.F.R. § 240.13d–1 .................................................................................... 14, 15

17 C.F.R. § 240.13d5(b)(1).......................................................................................10

Court-appointed Lead Plaintiff Dr. Stanley Golovac ("Plaintiff") respectfully submits this memorandum of law in opposition to the motion to dismiss (the "Motion")[1] the Consolidated Third Amended Class Action Complaint (the "Complaint" or "TAC") filed by Defendant Barry C. Honig ("Honig"). [2]

## I.    INTRODUCTION AND SUMMARY OF ALLEGATIONS

This case involves a highly-orchestrated and closely-knit group of investors—led by Defendant Honig, together with his longtime colleague, co-investor, and

---

[1] Plaintiff incorporates by reference his memoranda, concurrently filed herewith, in response to the motions to dismiss filed by Defendant Riot Blockchain, Inc. ("Riot" or the "Company"), John O'Rourke ("O'Rourke"), and Michael Beeghley ("Beeghley") (the "Individual Defendants," and together with Honig, "Defendants"). Capitalized terms herein have the same meanings as in the TAC (ECF No. 231), paragraphs of which are cited as "¶ __," exhibits to which are cited as "TAC Ex. __." Defendants' memoranda of law in support of their motions are cited as follows: Riot's (ECF No. 232-1) as "Riot Br. __"; O'Rourke and Beeghley's (ECF No. 233-1) as "Indiv. Br. __"; and Honig's (ECF No. 234-1) as "Honig Br. __." Riot, O'Rourke, and Beeghley are referred to herein as "the Riot Defendants." References to the "SAC" are to Plaintiff's previous Consolidated Second Amended Complaint (ECF No. 188). Judge Wolfson's April 30, 2020 Opinion (ECF No. 166) and Judge Quraishi's April 8, 2022 Opinion (ECF No. 223) are cited herein as the "4/30/20 Opinion" and the "4/8/22 Opinion," respectively. All emphasis is added and internal quotations and citations are omitted unless otherwise noted.

[2] Plaintiff does not object to Honig's request for judicial notice (ECF No. 234-16) of Riot's SEC filings because they are documents that Riot was "required to file with the SEC" and "to which the public has 'unqualified access'" and are "matters of public record[.]" *Paxton v. Prevention Bio, Inc.*, 2022 WL 3098236, at *1 n.1 (Aug. 4, 2022). Indeed, Riot's SEC filings are "integral to" the TAC because they were quoted and incorporated by reference therein. *Id.* However, to the extent that Honig sometimes selectively quotes from Riot's SEC filings, Plaintiff provides additional quotes herein to provide the Court with their full and accurate context.

officemate, Defendant O'Rourke, and several of the Selling Stockholders, ¶ 80, who are alleged in the Complaint as "Relevant Non-Parties," ¶¶ 16-48, with whom Honig invested in Riot together, as a group, in order to gain control of the Company by taking over its Board and placing Honig's associates, O'Rourke and Beeghley, as CEOs and Chairmen, in order to issue materially false and misleading filings that allowed these same Selling Stockholders to register shares for sale to the public while misrepresenting and concealing the fact that they were investing in the Company together, and engaging in related-party transactions without disclosing their group's involvement in those transactions. Their goal was to "pump-and-dump" Riot's stock at the expense of its public investors pursuant to the same basic *modus operandi* that Honig, O'Rourke, and many of the Selling Stockholders had used at previous companies that would become the subject of an SEC enforcement action against Honig, O'Rourke, and several of the Selling Stockholders. ¶¶ 49-71.

The Complaint's relevant factual allegations against Honig are summarized in Plaintiff's opposition to Riot's motion to dismiss, which is filed herewith and is hereby incorporated by reference herein.

In her 4/30/20 Opinion, Judge Wolfson held that Plaintiffs had adequately alleged that Plaintiff had "adequately alleged" that Honig had committed a "'deceptive and manipulative' act . . . that is actionable under Section 10(b)" and

that Plaintiff had alleged "a strong inference that Honig acted with scienter." 4/30/20 Opinion at 34, 36.

*First*, the Complaint's well-pled allegations continue to adequately allege Honig violated Rule 10b-5(a) and (c) by engaging in deceptive and manipulative conduct towards Riot's public investors. *See* § II.B *infra*. Pursuant to this scheme, Honig secretly coordinated his investments in Riot with the Selling Stockholders as part of a group to artificially inflate the price of the Company's stock and sell his shares at inflated prices while failing to promptly file public reports with the SEC that are required by Section 13(d) of the Exchange Act and Rule 13d-2. Ample precedent both within the Third Circuit and across the country supports that a private securities fraud action for damages under Section 10(b) based—in all or in part—on a violation of the affirmative duty to disclosure created by Section 13(d). This makes sense because the vast majority of pump-and-dump scheme rely on undisclosed— and thereby manipulative—stock sales in violation of the federal securities law as the second phase of such a scheme. Indeed, such a scheme falls within the "***wide range of conduct***" that the Supreme Court recently confirmed is prohibited by Rules 10b-5(a) and (c). *See Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1101 (2019).

*Second*, Complaint also continues to adequately allege a strong, cogent, and compelling inference that Honig engaged in his scheme knowingly. *See* § II.C *infra*.

3

For example, the Complaint alleges that Honig:  (1) has publicly admitted that Section 13(d) is "material" to him and that he "would not have purchased" shares in a public company "if [he] had known the undisclosed facts that" a undisclosed group of investors "controlled such a largest interest in [that company's] stock," ¶ 148;  (2) invested alongside O'Rourke in over 75 companies, alongside Stetson in over 65 companies, and alongside Brauser in over 40 companies and thus knew that his investment at Riot with these individual was again part of a coordinated "group," ¶¶ 57, 149; (3) was acknowledged by Riot's CEO, O'Rourke, as "the principal investor of our small group," as alleged in the *SEC v. Honig* Action, ¶ 150; (4) shared his office in Boca Raton and a fax number with Riot's CEO, O'Rourke, and Selling Stockholder Stetson, ¶ 151; (5) has been sued by the SEC and agreed to be "permanently barred from participating in an offering of penny stock" due to perpetrating similar pump-and-dump schemes at other companies using the same modus operandi; and (6) told a member of Riot's former Board (in September 2016 while in the midst of his proxy fight to obtain control of the Company) that he controlled of 40% of the Company's shares through his stock ownership and the stock ownership of a group of ***Honig's "friends and relatives,"***  ¶ 84.

*Third*, the Complaint adequately pleads that Honig's scheme—and the revelation of that scheme—proximately caused the losses suffered by Riot's public investors.  *See* § II.D *infra*.

***Finally***, the Complaint adequately alleges a claim against Honig as Riot's one-time largest shareholder and the de-facto leader of the Selling Stockholders—an undisclosed ***majority*** shareholder control group—under Section 20(a) as a control person of Riot.  *See* § II.E *infra*.

As discussed herein, the Court should deny Honig's Motion in its entirety.

## II.   ARGUMENT

### A.   Legal Standards

"Congress, the Executive Branch, and [the Supreme] Court . . . have 'recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement [by the SEC].'"  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 478 (2013).  "All civil enforcement actions, whether initiated by the SEC or by a private party through an implied right of action share the same general goal: 'to maintain public confidence in the marketplace.'"  *S.E.C. v. Teo*, 746 F.3d 90, 101 (3d Cir. 2014) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  A court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine

whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007) (noting "private securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses'—a matter crucial to the integrity of domestic capital markets") (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006)).  Dismissal is inappropriate even where "it appears unlikely that a plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  Despite Rule 9(b)'s requirements, the Third Circuit has cautioned, "'in applying [that rule], courts should be 'sensitive' to situations in which 'sophisticated defrauders' may 'successfully conceal the details of their fraud.'"  *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *11 (D.N.J. Mar. 24, 2008) (quoting *In re Burlington Coat Factory*, 114 F.3d at 1418).[3]

---

[3] The PSLRA "does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim." *In re Cephalon Sec. Litig.*, 1997 WL 570918, at *2 (E.D. Pa. Aug. 29, 1997); *see also In re Unisys Corp. Sec. Litig.*, 2000 WL 1367951, at *4 (E.D. Pa. Sept. 21, 2000) (PSLRA "was not intended to create an insurmountable pleading hurdle for plaintiffs in such cases").

**B.    The Complaint Adequately Pleads that Honig Engaged in the Fraudulent Scheme in Violation of Rule 10b-5(a) and (c)**

**1.    Legal Standard for Pleading Scheme Liability**

The "gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001).  Such deception can be related to "*any*" "course of business," "device, scheme, or artifice."   17 C.F.R. § 240.10b-5; *see also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) ("proscriptions [in §10(b) and Rule 10b-5] are broad and, by repeated use of the word 'any,' are obviously meant to be inclusive").

To plead a fraudulent "device, scheme, or artifice" under Rules 10b-5 (a) and (c), *SEC v. Lucent Techs. Inc.*, 610 F. Supp. 2d at 342, 361 (D.N.J. 2009), courts in this District recognize that a plaintiff must allege that one or more defendants "(1) committed a manipulative or deceptive act, (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance," *Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 661-62 (D.N.J. 2009).   "[C]ourts should be 'sensitive' to situations in which 'sophisticated defrauders' may 'successfully conceal the details of their fraud' and if certain facts are in the control of Defendants, "the strict requirements of Rule 9(b) may be relaxed." *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 628 (D.N.J. Jul 30, 2003) (Wolfson, J.).  More recently, in *Lorenzo v. SEC*,

139 S.Ct. 1094 (2019), the Supreme Court expanded the range of manipulative or deceptive conduct that can give rise to liability under subsections (a) and (c). In *Lorenzo*, the defendant-employee of a registered broker-dealer, Lorenzo, sent emails to prospective investors that included language in a prospectus—authored by Lorenzo's boss—that Lorenzo knew contained false and misleading statements. *Id*. at 1099. The SEC ultimately held that in disseminating the prospectus to investors, Lorenzo ran afoul of subsections (a), (b), and (c) of Rule 10b-5. *Id.* at 1099-1100. Lorenzo appealed the SEC's findings to the Second Circuit. As to the SEC's manipulation claim under subsections (a) and (c), the Second Circuit ruled that Lorenzo's conduct—even if it did not give rise to liability under subsection (b)—was nevertheless deceptive. *Id*. The Supreme Court affirmed, explaining that a claim for market manipulation under subsections (a) and (c) "***[c]apture[s] a wide range of conduct***" (*id*. at 1101), including instances where the claim may have "considerable overlap" with a claim brought under subsection (b) of Rule 10b-5. *Id*. at 1100-02 ("'[I]t is hardly a novel proposition that' different portions of the securities laws 'prohibit the same conduct.'" (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983))).

### 2.  Honig Engaged in the Fraudulent, Deceptive, and Manipulative Acts in Furtherance of the Scheme

In the 4/30/20 Opinion, Judge Wolfson held that Plaintiffs had "plausibly allege[d]" that Honig had "fail[e]d to 'promptly' disclose his material decrease in

stock holdings," which "was deceptive when viewed in the wider context of Plaintiff's allegations that Honig did so in order to conceal his sales from the public as part of a scheme to pump-and-dump Riot's stock." 4/30/20 Opinion at 34. "Thus, [Judge Wolfson found] that Plaintiff has adequately alleged a 'deceptive and manipulative' act by Honig that is actionable under Section 10(b)." *Id.*

In the TAC, Plaintiff repeats all the allegations against Honig that Judge Wolfson found "actionable under Section 10(b)," *id.*, and bolsters those allegations with further evidence of Honig's malfeasance. In that regard, during the Class Period, Honig—pursuant to explicit or tacit agreements with the other Selling Stockholders—and following the same pattern described by the SEC in the *SEC v. Honig* Action, ¶¶ 49-73, secretly coordinated his investments in Riot as part of a group to artificially inflate the price of the Company's stock and sell his shares at inflated prices. ¶ 142.

Honig accomplished his scheme, in part, by failing to promptly file public reports with the SEC that are required by Section 13(d) of the Exchange Act and Rule 13d-2. ¶ 143. Such reports (if Honig had filed them) would have alerted Riot's public investors that the Company's largest (**11%+**) shareholder (¶¶ 13, 90, 143, 189) was aggressively selling the same shares the public were buying. ¶¶ 143, 223. Such reports (if filed) also would have disclosed to the market that Honig and

certain Selling Stockholders were acting as a "group" (as defined by Section 13(d)(3)) with respect to their investments in Riot.  ¶ 143.

Under Section 13(d) of the Exchange Act, when a person acquires beneficial ownership of more than 5% of a voting class of a company's equity securities, such person (colloquially known as a Section 13(d) filer) or group is required to publicly update—through a Section 13(d) filing with the SEC—his or her ownership interest within ten days.  ¶ 144.  Also, after an investor reaches the 5% ownership threshold and becomes a Section 13(d) filer, he or she must report additional purchases or sales promptly on Schedule 13D or 13D/A so that public shareholders and the SEC are aware of the transactions.  *Id.*

Additionally, under Section 13(d)(3), "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."  15 U.S.C. § 78m(d)(3).  Under Rule 13d-5, "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons." 17 C.F.R. § 240.13d5(b)(1).  *See also* ¶ 145.

As explained above, Honig failed to promptly disclose his Riot stock trades and group status in violation of Section 13(d).  ¶ 146.  In the wider context of this case, including the pattern of misconduct described in *SEC v. Honig*, *see* ¶¶ 49-73, 145, and Honig's close business relationship with O'Rourke and Beeghley, *see* ¶¶ 74-78, 145, Honig's stock sales and failure to file Schedules 13D and 13D/A were deceptive acts under Section 10(b) and Rule 10b-5 (a) and (c) of the federal securities laws.  ¶ 145.  Honig doubled down on his manipulation when he "agree[d] to talk to [*CNBC*] by phone" and "downplay[ed] his influence with Riot and [O'Rourke]" and when *CNBC* asked Honig, "do you still manipulate stocks?" he replied:  "***This answer's no.***"  ¶¶ 131, 134.

This was untrue because between January 4 and June 8, 2017, Honig sold 61,672 shares of Riot common stock in 21 separate transactions, which together constituted 1.14% of Riot's 5,371,185 shares outstanding as of June 5, 2017—all without disclosing his sales as required by law. ¶ 147.  Similarly, between June 12 and October 4, 2017, Honig covertly sold a further 86,457 shares in another 19 transactions, amounting to 1.58% of the Company's outstanding shares during that time period.  *Id.*  Honig sold even more shares in October and November 2017— often several hundred thousand in one day—all without disclosing his sales to the market.  *Id.* Honig's stock sales were not disclosed until he filed his April 18, 2018 Schedule 13D/A, which confirmed the following previously undisclosed insider

trading.  ¶¶ 102 n.35, 137, 147, 176, 245.  *See* also TAC Ex. H (Honig's Apr. 18, 2018 Schedule 13 D/A).

In response, Honig argues that the Complaint "violates" Judge Quraishi's April 8, 2022 opinion which found that a "Section 13(d) violation may not give rise to a private right of action or damages under Section 10(b)."  Honig Br. 9 (quoting 4/8/22 Opinion at 22).  But as the TAC now clarifies in response to the 4/8/22 Opinion, Honig's conduct in this case did not involve merely a technical "Section 13(d) violation" or a "defective Schedule 13D."  4/8/22 Opinion at 18, 20.  Rather, Honig engaged in wholesale market manipulation.  Honig conspired with the other Defendants and the Selling Stockholders to manipulate Riot's stock price by "secretly coordinat[ing] his investments in Riot as part of a group in order to artificially inflate the price of the Company's stock—and sell those shares at inflated prices."  ¶ 142.

Judge Wolfson found that Honig's conduct was "deceptive when viewed in the wider context of Plaintiff's allegations that Honig did so in order to conceal his sales from the public as part of a pump and dump scheme."  4/30/20 Opinion at 34.  In 1978, the D.C. Circuit described a scheme that could just as easily refer to Honig's and Riot's by transposing the names:

> [W]e are unable to view [Honig's] violations of [Section 13(d)'s] disclosure requirements as mere technical or inconsequential violations.  In the case at bar, the fact of [Honig's] participation, in view of his past troubles with the securities laws, is just the type of datum

> that is contemplated by the requirements of Schedule 13D, 17 C.F.R.
> 240.13d-101.   The group that included [Honig], by replacing the
> president of the corporation and three of four directors, was obviously
> making a bid for control and management of [Riot].   In our view, the
> investors and prospective investors were entitled to know of [Honig's]
> identity as a member of the group, and the information attendant
> thereto.

*SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1165–66 (D.C. Cir. 1978); *see also SEC v. Savoy Indus., Inc.*, 665 F.2d 1310, 1319 (D.C. Cir. 1981) (affirming finding that defendant violated both Section 13(d) and Section 10(b) based on same conduct related to the same filings).

Importantly, nothing in Judge Quraishi's 12/23/20 Opinion expressly rejected or overruled Judge Wolfson's findings of fact or conclusions of law in the 4/30/20 Opinion.[4]   Nor did Judge Quraishi cite any case holding that a private securities

---

[4] To the extent the 4/8/22 Opinion could be read as departing from or overruling any part of Judge Wolfson's 4/30/20 Opinion, it is further precedent that this Court has the same authority to overrule the 4/8/22 Opinion and reinstate any part of the 4/30/20 Opinion this Court see fit. In that regard, "[t]he law-of-the-case doctrine 'does not limit the power of trial judges to reconsider their [own] prior decisions' and 'does not limit the power of trial judges from reconsidering issues previously decided by a predecessor judge from the same court." *Laborers Loc. No. 231 Pension Fund v. Cowan*, 837 F. App'x 886, 892 n.5 (3d Cir. 2020) (quoting *United States ex rel. Petratos v. Genentech, Inc.*, 855 F.3d 481, 493 (3d Cir. 2017)). "Further, 'interlocutory orders,'" such as Judge  Quraishi's opinion dismissing without prejudice to amend,[4] "remain open to trial court reconsideration, and do not constitute the law of the case[.]" *Cowan*, 837 F. App'x at 892 n.5 (quoting *Petratos*, 855 F.3d at 494).  Rather, "if the earlier decision is clearly erroneous, it is the duty of the district court to ensure that the previous holding does not work a manifest injustice." *Park v. Veasie*, 2013 WL 1149241, at *1 (M.D. Pa. Mar. 19, 2013).  *See also Romero v. Allstate Ins. Co.*, No. 01-6764, 2017 WL 3881215, at *6 (E.D. Pa.

action for damages under Section 10(b) could not be based, in part, on the violation of a duty to disclose arising for Section 13(d) if that violation was materially misleading and otherwise satisfied the elements of Section 10(b).  To the contrary, "[a]fter reviewing the cases cited," Judge Quraishi "did not find an express prohibition for private monetary damages claims under Section 10(b) predicated on a Section 13(d) violation."  12/23/20 Opinion at 18.

In addition to finding no "express" authority for a "prohibition" on private actions under Rule 10(b) predicated on a violation of Section 13(d), the 4/8/22 Opinion also cited ample legal authority—including from the Third Circuit—to support that a defendant *can* be held liable under Section 10(b) for deceptive and manipulative conduct that includes violations of Section 13(d).  For example, the 4/8/22 Opinion correctly recognized that "*In re Phillips* . . . implies that a duty to update . . . will arise . . . if the company undergoes a fundamental change in its course."  4/8/22 Opinion at 12-13 (citing *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236 (3d Cir. 1989) and *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1433–34 (3d Cir. 1997) (noting that "the source of the 'duty to update' requirement in *Phillips* was a *specific regulation*," 17 C.F.R. § 240.13d–1) (emphasis in original)).  Both *In re Phillips* and *In re Burlington Coat* acknowledged

---

Sept. 5, 2017) (holding that it "is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work manifest injustice").

that liability in a private action under Section 10(b) can arise if such a duty to update is violated.   In that regard, the court in *In re Phillips* held that "[t]here can be no doubt that a duty exists to correct prior statements, if the prior statements were true when made but misleading if left unrevised." *In re Phillips*, 881 F.2d at 1245.  The *In re Phillips* court acknowledged that under Rule 13d–2, 17 C.F.R. § 240.13d–1, if "'any material change occurs in the facts set forth' in a Schedule 13D," the "person required to file the Schedule 13D" must "'promptly' file "an amendment disclosing such change." *Id*. Yet, Judge Quraishi concluded that these cases did "not answer whether a private plaintiff may sustain a suit for damages under this same theory." 4/8/22 Opinion at 13.  But these cases—which both recognized "this same theory" as viable—were themselves private suits for damages under Section 10(b).

Moreover, the 4/8/22 Opinion reviewed numerous recent cases in which courts across the country have held that a private action for damages under Section 10(b) **can** be based on violations of the affirmative duty to disclose created by Section 13(d) and Rule 13d.  These cases (which are cited in the 4/8/22 Opinion at 14-16) include:  *MTB Investment Partners, LP v. Siemens Hearing Instruments, Inc.*, Civ. No. 12-00340, 2013 WL 12149253, at *1-2 (D.N.J. Feb. 19, 2013) (allowing private action under Section 10(b) alleging "damag[es] to MTB" for defendants' "materially false or misleading" "misstatements or omissions" in "Schedule 13D filings"); *Gruber v. Gilbertson*, 2018 WL 1418188, at *13 (S.D.N.Y. Mar. 20, 2018)

(allowing private securities class action under Section 10(b) based on violations of Section 13(d) and noting that "[t]he omission concerning [defendants'] ownership interest is actionable because they had a duty to disclose it.  Section 13(d) . . . requires 'certain disclosures to be filed on a Schedule 13D by a person that acquires an interest in more than 5% of certain classes of securities'"; and finding that the defendants' "intentional failure to disclose beneficial ownership information when disclosure was expressly required was . . . both a communicative and deceptive act: it signaled falsely to investors that there was no such ownership to disclose") (quoting *United States v. Wey*, 2017 WL 237651, at *8 (S.D.N.Y. Jan. 18, 2017)); *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *6 (S.D.N.Y. Mar. 30, 2021) (holding that "the allegation that Wey was obligated to file the Schedule 13D—and opted not to do so—is enough to adequately plead a material omission for purposes of Plaintiffs' 10(b) claim" and observing that "[b]ecause Plaintiffs plead sufficient facts at this juncture to support their contention that Wey had a duty to disclose, they have also plausibly established that Wey's failure to file a Schedule 13D was a material omission that can give rise to liability"); *Levie v. Sears Roebuck & Co.*, 2006 WL 1886223, at *2-3 (N.D. Ill. July 5, 2006) (noting that court denied motion to dismiss where plaintiff alleged that the defendants had "violated § 10(b) and Rule 10b-5 by failing to amend" and rejecting defendants' argument that "there is no private right of action for damages under § 13(d), and that the exclusive remedy for

16

a violation of § 13(d) is a claim under § 18(a)" and holding that "plaintiff's claims that defendants 'failed to file' the required schedules fall outside of § 18(a), which provides a remedy to persons who purchased or sold securities in reliance on statements in an SEC filing that was false or misleading at the time it was made" and observing that "Plaintiff is not alleging that the Schedule 13D . . . was misleading when made, but rather that defendants 'failed to file' required amendments or updated documents." *Id.* at *3.

Considered together, the above cases provide ample precedent for a private securities action for damages under Section 10(b) based on a violation of the affirmative duty to disclosure created by Section 13(d). Numerous other cases have similarly held that private suits for damages under Section 10(b) may be premised on violations of the disclosures duties created by Section 13(d). *See, e.g.*, *Kraft v. Third Coast Mistream*, 2021 WL 860987, at *17 (S.D.N.Y. Mar. 8, 2021) (holding that "[defendant] can be liable under Section 10(b) for a failure to disclose information on [defendant's] 13D Form . . . if Schedule 13D required that information to be disclosed"); *Burt v. Maasberg*, 2014 WL 1291834, at *17 (D. Md. Mar. 28, 2014) (holding that "[t]he failure to file or amend a Schedule 13D, as required, serves as a predicate for liability under § 10(b) and Rule 10b-5(b)" and "the failure to file or disclose information in a Schedule 13D is actionable"); *Amida Cap. Mgmt. II, LLC v. Cerberus Cap. Mgmt., L.P.*, 669 F. Supp. 2d 430, 439

17

(S.D.N.Y. 2009) ("The parties agree that liability under § 10(b) may be imposed for failure to amend a Schedule 13D as required by § 13(d) and the rules thereunder."); *In re Luxottica Grp. S.p.A. Sec. Litig.*, 293 F. Supp. 2d 224, 235 (E.D.N.Y. 2003) (noting where "if an individual files a Schedule 13D in an untimely manner . . . injured parties still have a remedy because those individuals 'who allegedly sold at an unfairly depressed price have an adequate remedy by way of an action for damages'" and holding that "defendants have not demonstrated that, as a matter of law, the failure to file a Schedule 13D regarding their April 19, 2000 purchases, was not in violation of Section 10(b)'s prohibition on false and misleading statements") (quoting *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 60 (1975)).

In defense, Honig further argues that "[t]he fact that [he] was selling shares was disclosed in six public filings throughout 2017 and early January 2-18."  Honig Br. 17-18.  As an initial matter, such a "truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."  *In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at \*16 (D.N.J. Dec. 15, 2015) (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000)).

Moreover, none of these SEC filings actually disclosed to the market that Honig had "sold" (or purchased) any shares at all.  To the contrary, the Forms S-3 stated that Honig and the other Selling Stockholders "may sell . . . none of [their]

shares" and had "no agreements, arrangements or understandings with respect to the sale of any of [their] shares."  ¶ 181.  And each Form S-3 until the September 25, 2017 Form S-3, continued to state that Honig beneficially owned "9.99%" of Riot's common stock.  Honig Br. 18; *see also* ¶¶ 191, 194, 197.

Honig also argues that Riot's December 12, 2017 proxy statement and January 5, 2018 Form S-3 "disclosed that Mr. Honig had <u>sold</u> Riot shares."  Honig Br. 19.  To the contrary, neither of these documents stated that Honig had "sold" any shares or even purported to disclose Honig's shareholdings.  *See* Honig Br. Exs. I at 8, J at 7-8.  In fact, the December 12, 2017 proxy statement did not mention Honig at all.  *See* Honig Ex. I.  The January 5, 2018 Form S-3 did not include Honig in the list of "selling stockholders" or purport to list his shareholdings; rather, it only listed "GRQ" and its holdings.  *See* Honig Ex. J at 7-8.  Investors reading these filings would have no reason to think about Honig—much less to contemplate the inferences that could be drawn from his absence.  If an investor reading the January 5, 2018 S-3 did inexplicably ponder what Honig's absence meant, the most obvious assumption would be that he simply was not registering shares sale through that registration statement or participating in the offering—i.e., that Honig was ***not selling*** his Riot stock.[5]

---

[5] The December 12, 2017 proxy statement stated "Section 16(a) of the Securities Exchange Act of 1934 requires the Company's directors, executive officers, and shareholders who own more than 10% of the Company's stock to file forms with the

Ultimately, whether any investor could have deciphered and reconciled the conflicting false statement of "full[] compli[ance]" with Honig and DeFrancesco's absence from the proxy statement is a question of fact that is inappropriate for disposition at this stage. *See Lovallo v. Pacira Pharms., Inc.*, No. CV 14-06172 (WHW), 2015 WL 7300492, at *9 (D.N.J. Nov. 18, 2015) ("To invoke the [truth-on-the-market] defense, Defendants must demonstrate that true information was 'transmitted to the public with the degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations.'") (quoting *In re Unisys Corp. Sec. Litig.*, 2000 WL 1367951, at *4 (E.D. Pa. Sept. 21, 2000)).  Here, the more likely inference is that the market was unaware of Honig's stock sales until they were first reported by *The Wall Street Journal* on January 31, 2018, causing Riot's stock price to decline.  ¶¶ 125, 238.

---

SEC to report their ownership of the Company's stock and any changes in ownership. The Company assists its directors and executives by identifying reportable transactions of which it is aware and preparing and filing the forms on their behalf. All persons required to file forms with the SEC must also send copies of the forms to the Company. ***We have reviewed all forms provided to us. Based on that review and on written information given to us by our executive officers and directors, we believe that all Section 16(a) filings during the past fiscal year were filed on a timely basis and that all directors, executive officers and 10% beneficial owners have fully complied with such requirements during the past fiscal year.***" Honig Ex. I at 24.  Thus, any investor reading this statement in the December 12, 2017 proxy statement would assume that Honig and DeFrancesco—who Riot had recently disclosed as 10%+ beneficial owners—had complied with their "requirements" under the "Exchange Act" to "report their ownership of the Company's stock and any changes in ownership." *Id.*  But in reality, they had not; investors reading this statement were being misled.

### 3.  Honig Made Materially False and Misleading Statements to Investors in Violation of Rule 10b-5(b)

As noted above, on or around February 16, 2016, Honig doubled down on his manipulation when he "agree[d] to talk to [*CNBC*] by phone" and "downplay[ed] his influence with Riot and [O'Rourke]" and when *CNBC* asked Honig, "do you still manipulate stocks?" he replied:  "***This answer's no.***"  ¶¶ 131, 134.  Honig "had no independent duty," *Paxton*, 2022 WL 3098236, at *10, to speak with *CNBC*—nor to discuss with *CNBC*—as Riot's (until recently) largest shareholder whether he manipulated stocks.  ¶¶ 131, 134.   But by "'cho[osing] to speak on this issue,'" Honig "'[could not] omit material facts related to [these] issue[s] so as to make [his] disclosure[s] misleading.'"  *Paxton*, 2022 WL 3098236, at *10 (quoting *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017)).  But by "speaking on [them]," Honig "put [these] issue[s] 'in play'" and subjected himself to liability under Section 10(b) and 10(b)-5 for misleading investors on this subject.  *Id.* at *10 n.10.

### C.  The Complaint Pleads a Strong Inference of Defendant Honig's Scienter

### 1.  The Standard for Pleading Scienter

To plead scienter in the Third Circuit, a plaintiff must "allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'"  *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009).  The pertinent question is "'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

standard.'" *Id.* at 272 (quoting *Tellabs*, 551 U.S. at 323). As the Supreme Court has explained, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but merely "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *see also Avaya*, 564 F.3d at 269 (scienter analysis "will ultimately rest . . . on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter"). "[A] plaintiff does not need to come forward with "smoking-gun" evidence to meet the PSLRA's pleading requirements." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018) (quoting *Tellabs*, 551 U.S. at 324). "Rather, in conducting the scienter analysis, courts must analyze the complaint holistically to determine whether its allegations, 'taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.* (quoting *Tellabs*, 551 U.S. at 323).

### 2.   Honig Knowingly Engaged in the Fraud

In her 4/30/20 Opinion, Judge Wolfson held that "two categories of particularized allegations" in the Complaint were "sufficient to support the requisite strong inference of scienter" and "that Honig acted with an intent to deceive." 4/30/20 Opinion at 36. "First, the Complaint alleges that Honig and other members of the Honig Group have been implicated in multiple pump-and-dump schemes at

other companies." *Id.* "More specifically," Judge Wolfson noted that "Plaintiff alleges that 'Honig was the primary strategist' in the other schemes, and 'call[ed] upon other [d]efendants to, among other things, acquire or sell stock, arrange for the issuance of shares, negotiate transactions, and/or engage in promotional activity.'" *Id.* Judge Wolfson held that "[t]hese allegations, which involve conduct at companies other than Riot, do not independently support an inference that Honig acted with scienter when committing the conduct at issue in this action." *Id.* "However," Judge Wolfson held that these allegations "do suggest a pattern of fraud that lends considerable support to an inference that Honig knew that concealing his stock sales was deceptive (or, at the very least, that he was reckless in not knowing)." *Id.* Thus, "[t]aking these allegations together and with all inferences construed in favor of Plaintiff," Judge Wolfson found "that the Complaint gives rise to a strong inference that Honig acted with scienter." *Id.* (internal citations omitted).

Here, the operative Complaint continues to allege the same allegations that Judge Wolfson found supported a "strong inference . . . that Honig acted with an intent to deceive." *Id.* In that regard, Honig knew or was at least reckless in disregarding that he was part of a group under Section 13(d) that required to be disclosed—but that he was concealing through his own violations of Section 13(d), and that O'Rourke and Beeghley, as CEO, were concealing through their (and Riot's) violations of Item 403. ***First***, Honig previously brought suit against several

individuals under Section 13(d) in *Brauser v. Sanders Morris Harris, Inc.*, No. 2015-11227 (Tex. Dist. Ct.), in which Honig alleged that a violation of Section 13(d) is "material" and that he "would not have purchased the Shares if [he] had known the undisclosed facts that [the defendants] controlled such a largest interest in [the company's] stock." ¶ 148.  Thus, Honig was aware that his sales (and acquisitions through warrants) should have been promptly disclosed to the Company's shareholders through a Section 13(d) filing because he previously alleged that another shareholder at another company should have promptly disclosed his trades. *Id.*

**Second**, Honig's scienter is also supported by the fact that between 2011 and August 2018, Honig invested alongside O'Rourke in over 75 companies, alongside Stetson in over 65 companies, and alongside Brauser in over 40 companies.  ¶¶ 57, 149.  Because Honig was aware of his history of co-investments with O'Rourke, Stetson, and Brauser, Honig knew that his investment at Riot was again part of a coordinated "group" with these same individuals that should have been disclosed under Section 13(d).  *Id.*

**Third**, O'Rourke stated in a February 3, 2014 email to the officer of a potential merger target that "Barry Honig is the principal investor of our small group," as alleged in the *SEC v. Honig* Action.  ¶ 150.

**Fourth**, Honig knew that, at a minimum, O'Rourke, Stetson, and Groussman were part of his investing group with respect to Riot because Honig shared his office with them in Boca Raton, Florida.  In fact, a September 13, 2016 letter signed by Honig, in which he nominated O'Rourke and Stetson to the Company's Board, lists the same fax number (with Palm Beach County, Florida area code 561) for O'Rourke and Stetson as the fax number listed on Honig's letterhead for his office in Boca Raton, Florida.   Indeed, O'Rourke was discovered by *CNBC* reporters inside Honig's same Boca Raton office.   ¶ 151.   Because they worked out of the same office, shared the same fax number from that office, and even met with O'Rourke in that office on the day of Riot's cancelled annual meeting of shareholders, Honig knew that he, O'Rourke, Stetson, and Groussman were a "group" as defined by Section 13(d)(3).  *Id.*

**Fifth**, Honig's knowledge is supported by the SEC's allegations in the *SEC v. Honig* Action.   ¶¶ 49-73, 152.   As a result of that action, Honig has been "permanently barred from participating in an offering of penny stock"; "permanently prohibited" from holding greater than 4.99% of any penny stock company; "advertising, marketing, or otherwise promoting" any penny stock. ¶¶ 69, 152.

**Finally**, Honig himself told a member of the Company's Board (in September 2016 while in the middle of his proxy fight to obtain control of the Company) that Honig controlled of 40% of the Company's shares through his stock ownership and

the stock ownership of a group of **Honig's "friends and relatives**." ¶ 84. Thus, Honig effectively admitted (privately) that he and his friends and relatives constituted an (undisclosed) control group.

### D. The Complaint Adequately Pleads Loss Causation

#### 1. January 31, 2018 – *The Wall Street Journal* – "Investor Who Rode Pivot from Biotech to Bitcoin Sells Big Stake"

In its April 30, 2020 Opinion, the Court found that "on February 13, 2018, Honig disclosed in an amended filing with the SEC that he had sold all but 1.47% of his shares in Riot" but that "the Complaint is devoid of any allegation that this 'corrective disclosure' was a 'substantial cause of shareholders' economic losses or otherwise contributed in any way to a decline in Riot's stock price." It further held that "[i]n the absence of any allegation of a causal link between the 'corrective disclosure' by Honig on February 13, 2018 of his sock sales and an economic loss that Plaintiff allegedly suffered, I find that Plaintiff has failed to adequately allege the element of loss causation." *Riot I* at 39; *see also id.* at 9 (noting that "the Complaint does not allege whether there was any drop in Riot's share price in response to [Honig's February 13, 2018] disclosure").

The Complaint directly addresses the Court's concerns by clarifying that the market did not first learn on February 13, 2018, that Honig had previously sold all but 1% of his Riot stock. ***To the contrary, Honig's covert sales were first revealed on January 31, 2018***, when *The Wall Street Journal* published an article titled

"Investor Who Rode Pivot From Biotech to Bitcoin Sells Big Stake," which reported: "Mr. Honig has sold about 500,000 shares, he said, but declined to divulge his profit.  He said he still owns about 1% of the company."  ¶¶ 125, 238.  "When stock goes up, you take a profit, [Honig] said."  ¶¶ 125, 238.  As a direct result of *The Wall Street Journal's* January 31, 2018 revelation that Honig had already sold all but 1% of the Company—without disclosing those sales on a Schedule 13D in violation of Section 13(d)—Riot's stock declined more than 5% that same day. ¶ 126.  Later that same day (January 31), after the market had closed, Riot issued a press release announcing that it had "Adjourned" the Company's "Annual Meeting of Stockholders," which had been scheduled for the very next day.  ¶ 127.  Together, *The Wall Street Journal's* revelation of Honig's nearly total divestment of his holdings of Riot stock, ¶ 242, alongside Riot's immediate cancellation ("for a second time," ¶ 127) of its annual shareholder meeting, which had been scheduled to occur just hours later, caused Riot's stock price to decline ***14.26%*** from its closing price on January 30, 2018, to its closing price on February 1, 2018.  ¶ 242.

Honig relies on *In re Merck & Co., Inc. Securities Litigation*, 432 F.3d 261 (3d Cir. 2005), to suggest that "a newspaper's analysis" cannot be "a corrective disclosure."  Honig Br. 21.  *Merck* was nothing like this case.  *Merck* involved a journalist's "mathematical calculations" of "facts" that had already been "disclosed" in a securities filing "over two months" earlier.  432 F.3d at 270-71.  Here, in

27

contrast, the SEC's 53-page complaint (*see* TAC Ex. A) was not a "newspaper's analysis of available information," Riot Br. 36, but was entirely new, previously unreleased trove of allegations by the government that Riot's CEO, O'Rourke, had conspired with Riot's largest shareholder, Honig, in a series of pump-and-dump schemes that Riot's investors could immediately see were fundamentally the same *modus operandi* as O'Rourke and Honig's conduct at Riot (particularly in the wake of *CNBC's* recent revelations). These new disclosures so much altered the total mix of information that Riot's stock price declined more than *26%* in a single day. ¶¶ 141, 248.

Moreover, "Plaintiffs can utilize the 'materialization of the risk' approach to demonstrate when a misrepresentation or omission 'proximately causes' the economic loss in the context of an undisclosed risk." *In re Galena Biopharma, Inc. Sec. Litig.*, 2021 WL 50227, at *7 (D.N.J. Jan. 5, 2021) (citing *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007)). "Under the 'materialization of the risk' approach, Plaintiffs must prove that 'the materialization of the undisclosed risk caused the alleged loss.'" *Id.* (quoting *McCabe*, 494 F.3d at 429 ("We believe [the materialization of risk] approach is consistent with our loss causation jurisprudence")). Here, for example, the Riot Defendants created the risk by signing and filing Forms S-3 and 10-K that violated Item 403 and Section 13(d) by concealing that the members of the Honig Group—O'Rourke's co-conspirators in

prior pump-and-dump schemes—were again engaged in undisclosed Section 13(d) group conduct and stock sales.  The risk that the Riot Defendants created began to partially materialize on January 31, 2018, when *The Wall Street Journal* reported that Honig had been engaging in exactly the kind of undisclosed § 13(d) group conduct and stock sales that the Riot Defendants had helped to conceal.

Honig argues that the "14.26% decline in Riot's stock price on January 31, 2018" was "likely" caused by "a concurrent 13.65% drop in the price of Bitcoin" on "that day."  Honig Br. 22.  This argument is misleading because it ignores that on January 31, 2018, Riot's stock price and the price of Bitcoin actually moved in *opposite directions.*  In that regard, the "14.26% decline" in Riot's stock price actually occurred over three days:  from a closing price on January 30 and to a closing price on February 1, 2018.  ¶ 242.  But on January 31, 2018—the same day *The Wall Street Journal* published its article at 8:00 a.m.—Riot's stock dropped "more than 5%," ¶ 240, while on that same day, the price of Bitcoin *increased* 1.18%, from an opening price of $10,107.40 on January 31, 2018, to close at $10,226.86 that same day.  *See* Honig Ex. C (ECF No. 234-5) at 13.

Thus, on January 31, 2018, Riot's stock price ***declined five times more*** (as a percentage) ***than the price of Bitcoin*** ***increased***.  The following day, Riot's stock price fell further, resulting in a two-day loss of ***14.26%*** from the January 30, 2018, to February 1, 2018 closing prices.  ¶ 460.  During this same time period, Bitcoin

29

fell from a closing price of $10,107.26 to a closing price of $9,114.72—a much smaller decline of only 9.82%.  *See* Honig Ex. C (ECF No. 234-5) at 13.  In any event, it is not appropriate at this stage to engage in factual determinations of whether other conditions or events were responsible for Riot's stock-price decline.  *See, e.g.*, *Stumpf v. Garvey*, 2005 WL 2127674, at *12-13 (D.N.H. Sept. 2, 2005) (rejecting, on a motion to dismiss, defendant's factual argument that the "decline in price during the class period was caused by the crash of the telecommunications market"); *In re StockerYale*, 453 F. Supp. 2d 345, 359 (D.N.H. 2006) ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to a decline in [the] price of [their] shares raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal [now].").

Honig next argues that the fact that Riot's stock "went up" on September 25, 2017, is "damning to Lead Plaintiff's loss causation theory" because Honig asserts that the Form S-3/A that Riot filed on this day "disclosed that Mr. Honig intended to sell his Riot shares, or had actually sold most of them . . . ."  Honig Br. 22.  But the September 25, 2017 Form S-3/A reassured investors that Honig would still have 8.09% of Riot's outstanding shares "[a]fter this Offering," ¶ 197, and further told that market that Honig and the rest of the Selling Stockholders "may sell . . . some, all, *or none* of [their] shares" and had "*no agreements, arrangements or understandings with respect to the sale of any of [their] shares*." ¶ 197.  However,

this S-3/A provided no clue to the market that Honig planned to covertly dump stock without disclosing it to the market.

The Form S-3/A also omitted that as of September 25, 2017, Honig had already been engaged in months of undisclosed sales of Riot stock in excess of the 1% threshold for disclosure under Section 13(d).  ¶ 147.  Honig asserts that Riot's stock "<u>rose</u> for the following two days" after he filed his Schedule 13D/A on February 13, 2018, *see* Honig Br. 22, but that is unremarkable given that two weeks earlier, *The Wall Street Journal* had already revealed that Honig had "sold about 500,000 shares" and still owned only "1% of the company." ¶¶ 125, 238.  And, the price of Bitcoin also rose on those same two days.  *See* Honig Ex. C at 13.

Honig accuses Plaintiff of "delet[ing]" certain "screenshots" of the Company's 2017 Form S-3s that Honig says were "previously embedded in [Plaintiff's] prior complaint" but were "problematic."  Honig Br. 18, 20.  This is incorrect:  these ***same screenshots*** appear unchanged in both the SAC ***and*** TAC.  *Compare* SAC ¶¶ 347, 361, 366, 369, 374, 383 *with* TAC ¶¶ 181, 191, 194, 197, 209, 215.  The TAC did exclude from its falsity allegations Riot's December 12, 2017 proxy statement but the previous complaint never included an embedded screenshot of this documents in the first place.  *See* SAC ¶¶ 404-14.  Plaintiff submits that narrowing the previous 179-page SAC to the current 100-page TAC was intended to focus and streamline the allegations, and not, as Honig insinuates, "to

pretend" that certain "facts don't exist."  Honig Br. 19.  *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 332-33 (S.D.N.Y. 2003) (noting that "Defendants must take the [amended complaint] as [it is] written" and not "rewrite[e] the [amended complaint] in a way that they believe favors dismissal").

Ultimately, because the price of Bitcoin ***increased*** on January 31, 2018, while Riot's stock ***decreased*** by more than 5% on news from *The Wall Street Journal* of Honig's selling, the only plausible inference is of a "causal link between the 'corrective disclosure'" of Honig's "stock sales and [the] economic loss that . . . Plaintiff suffered."  *Riot I* at 39.

## 2.   February 16, 2018 – *CNBC* Investigates Riot

On February 16, 2018, *CNBC* published its exposé on Riot, revealing O'Rourke's close business ties to Honig after "CNBC crew members walked into [Honig's] office" and "found O'Rourke" on the day of Riot's cancelled annual shareholder meeting without "any reason," ¶ 131; raised questions about "Honig's selling" and "what is reported" on Honig's "13D," ¶ 131; and questioned how Riot could have paid $11.9 million to Kairos for "$2 million in mining equipment" given that "Kairos appears to have many links to Riot,"  ¶ 131; *see also* ¶¶ 125-35, 243-44.  On this news, Riot's stock price ***declined 33.4%***, ¶¶ 135, 244—while, in contrast, the price of Bitcoin was ***increasing***, *see* Honig Ex. C at 13.

### 3. April 18, 2018 – Riot Files Form 10-K Revealing Related-Party Transactions

On April 17, 2018, after the market closed, Riot filed its 2017 Form 10-K, revealing that members of the Honig Group had been related parties to three strategic transactions that Riot had previously touted as part of its pivot to cryptocurrency. ¶¶ 136-37, 245. On this news, Riot's stock price *declined 5.8%*, ¶¶ 137, 245. In contrast, during this same time period, the price of Bitcoin was *rising*. Honig Ex. C at 14-15.

### 4. May 29, 2018 – Riot Files Form 8-K Revising Its Disclosures Concerning the Coinsquare Transaction

On Friday, May 25, 2018, after the market closed, Riot "disclosed for the first time that *Honig and Selling Stockholders* Groussman, Stetson, Brauser, GRQ 401K, Titan (i.e., Jonathan Honig), and 2330573 Ontario were all parties to the Coinsquare Agreement—a $3 million investment for the Company." ¶¶ 100, 138, 246. On this news, the next trading day (Monday, May 29, 2018), Riot's stock price declined nearly *6%*. ¶¶ 138, 246.

Importantly, these were the same Selling Stockholders that in January 5, 2018, the Company told investors—in a Form S-3 signed by O'Rourke and Beeghley—that "[n]one" . . . has had any material relations with us or any of our subsidiaries within the past three years." ¶ 212.

33

These were also the same Selling Stockholders that had invested together with Honig as an undisclosed control group of Riot but had been described as having no "agreements, arrangements, or understandings with respect to the sale of any of [their] shares." *See, e.g.*, ¶¶ 181, 191, 194, 197. Yet, under the Coinsquare Agreement, these same individuals were all party to the same agreement that gave them "a purchase warrant exercisable into shares of Riot stock." ¶ 96. It is unsurprising, therefore, that as the market realized that these same Selling Stockholders had a previously-undisclosed agreement concerning Riot stock, that the price of Riot's stock would decline. ¶¶ 138, 246.

### 5. September 7, 2018 – SEC Files Suit Against Honig, O'Rourke, and Several Other "Selling Stockholders"

On September 7, 2018, the SEC filed the *SEC v. Honig* Action against Honig, O'Rourke, Groussman, Stetson, Brauser, and others, alleging they had engaged in "three highly profitable 'pump-and-dump' schemes . . . from 2013 through 2018" at "three public companies." ¶¶ 49-73, 139, 247; *see also* TAC Ex. A ¶ 1. The SEC described how "Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets." ¶ 40. On this news, Riot's stock price declined by approximately *26.1%*, ¶¶ 6, 141, 248, while the price of

Bitcoin fell less than 1%.  *See* ECF No. 201-1 at 60.[6]

Honig argues that "Riot's business alignment with an underlying asset that experienced volatile price movements is what caused the rises and falls of Riot stock price" and asserts that the "notion" that his group "could cause" a "swing in Riot's stock price is patently ludicrous."  Honig Br 23.  Honig ignores Riot's substantial, Company-specific price movements related to the disclosure of Defendants' scheme.  For example, upon the disclosure of the *Honig Action*, Riot's stock price fell by approximately ***26.1%*** from the closing price on September 6, 2018, to the closing price on September 7, 2018.  ¶¶ 6, 141, 248.  During that same time period, the price of Bitcoin fell by less than ***1%***.  *See* ECF No. 201-1 at 60.

### E. The Complaint Adequately Pleads Defendant Honig's Liability Under Section 20(a) as a Control Person of Riot

To plead a claim under Section 20(a), "plaintiffs must establish (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions."  *Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256, at *4 (D.N.J. Mar. 2, 2016).  Claims under Section 20(a) are

---

[6] Plaintiff does not object to Honig's request that the Court take judicial notice of historical Bitcoin prices.  ECF No. 234-16. However, Plaintiff respectfully requests permission to similarly rely upon a similar chart of Bitcoin prices covering the full Class Period that Plaintiff previously filed in this case.  *See* ECF No. 201-1 at 42-60.

subject only to Rule 8's notice pleading standards. *The Winer Family Trust v. Queen*, 2004 WL 2203709, at *22 (E.D. Pa. Sept. 27, 2004).

Here, Defendant Honig is liable under Section 20(a) because he exercised control over Riot as the de-factor leader of the Selling Stockholders, an undisclosed control group that together beneficially owned and controlled "the ***majority*** of Riot's common stock" during the Class Period. *See* ¶ 187 & n.62; ¶ 193 n.64 (alleging that "the majority of the Selling Stockholders listed in the July 19, 2017 Form S-3/A . . . held the majority of Riot's stock"); ¶ 196 & n.65 (same); ¶ 199 & n.66. Indeed, by Honig's own admission, in September 2016, Honig told a former Board member that Honig "had control of 40% of [the Company's] shares through his stock ownership and the stock ownership of a group of Honig's 'friends and relatives.'" ¶ 84. In fact, Honig's control over these "friends and relatives" allowed him to win his proxy fight and gained control of the Company's Board by putting his own chosen directors and CEOs in charge of the Company. ¶¶ 85-91. Honig also ignores that through most of 2017, these same "friends and relatives"—i.e., the Selling Stockholders, *see* ¶¶ 16-48, 80—held a majority of the Company's shares. *See* ¶ 187 & n.62; ¶ 193 n.64; ¶ 196 & n.65; ¶ 199 & n.66. And through his control, he was able to engage in multiple lucrative related-party transactions, ¶¶ 96-115, and undisclosed stock sales, ¶¶ 142-47, which illegally generated at least ***$17 million*** for Honig, ¶ 13, and which no retail shareholder could have accomplished without undisclosed control

from inside the Company.

In seeking dismissal of Plaintiff's Section 20(a) claim, Honig argues that Plaintiff "[relies] on mere conclusions and speculations" that Honig controlled Riot. Honig Br. 29.  But Honig ignores each of the allegations discussed in the paragraph above.

Honig argues that "minority stockholders" lack the formal power to be a control person under the securities laws."  Honig Br. 28.  But courts have found that stockholders with less than 50% of shares can still be "controlling stockholders." *See, e.g.*, *In re Adelphia Commc'ns Corp. Secs. & Derivative Litig.*, 398 F.Supp.2d 244, 262 (S.D.N.Y. 2005) (rejecting argument that director who "owned 17% of [company's] stock" could not be a control person); *In re Leslie Fay Cos., Inc. Sec. Litig.*, 918 F. Supp. 749, 763 (S.D.N.Y. 1996) (finding allegations of control sufficient in the case of outside directors who held only 12% of stock).

## III.  CONCLUSION

For the reasons set forth above, Defendant Honig's Motion should be denied.

Respectfully submitted,

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

Dated:   September 1, 2022

*/s/ Joseph J. DePalma*
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com

*Local Counsel for Plaintiff
Dr. Stanley Golovac*

**MOTLEY RICE LLC**
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
bnorton@motelyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Lead Counsel for Plaintiff Dr. Stanley Golovac and
Lead Counsel for the Class*

**US. MARKET ADVISORS LAW GROUP PLLC**
David P. Abel
5335 Wisconsin Ave. NW, Ste. 440
Washington, D.C. 20015
Telephone: (202) 274-0237
Facsimile: (202) 686-2877
dabel@usmarketlaw.com

*Counsel for Plaintiff Dr. Stanley Golovac*

38