## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CREIGHTON TAKATA, Individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>      v.<br><br>RIOT BLOCKCHAIN, INC., et al.,<br><br>              Defendants. | Civil No. 3:18-CV-02293(GC)(RLS)<br><br>MOTION DATE:  October 17, 2022<br><br>**ORAL ARGUMENT REQUESTED** |

## REPLY MEMORANDUM IN SUPPORT OF THE INDIVIDUAL DEFENDANTS' JOINDER AND MOTION TO DISMISS THE CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

THOMAS A. ZACCARO
*thomaszaccaro@paulhastings.com*
D. SCOTT CARLTON
*scottcarlton@paulhastings.com*
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071-2228
Telephone:  1(213) 683-6000
Facsimile:  1(213) 627-0705

CHAD J. PETERMAN
*chadpeterman@paulhastings.com*
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone:  1(212) 318-6000
Facsimile:  1(212) 319-4090

*Attorneys for Defendants*
*RIOT BLOCKCHAIN, INC., JOHN O'ROURKE, AND MICHAEL BEEGHLEY*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...............................................................................1

II.   THE SECTION 10(B) CLAIM SHOULD BE DISMISSED.........................2

    A.    The Individual Defendants Cannot be Liable for Statements Made in Riot's Form 8-Ks. ........................................................2

    B.    The TAC Fails to Adequately Allege a Strong Inference of Scienter as to Beeghley. ..........................................................3

    C.    The TAC Fails to Adequately Allege a Strong Inference of Scienter as to O'Rourke. ........................................................4

        1.    O'Rourke's Departure from Riot Does Not Support a Strong Inference of Scienter. ..................................................4

        2.    O'Rourke's Stock Sales Do Not Establish a Strong Inference of Scienter. ...............................................................6

            a.    O'Rourke Sold a Smaller Percentage of His Shares Than Alleged. ...............................................6

            b.    The Timing of O'Rourke's Stock Sale is Not Unusual or Suspicious. ..............................................8

        3.    Lead Plaintiff's Other Circumstantial Allegations Against O'Rourke Do Not Support a Strong Inference of Scienter......11

    D.    Lead Plaintiff Has Not Alleged Deceptive Conduct that Would Support Scheme Liability.................................................14

III.  CONCLUSION................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999) ..........................................................................2, 12

*In re Alpharma Sec. Litig.*,
    372 F.3d 137 (3d Cir. 2004) ..................................................................................15

*Belmont v. MB Inv. Partners, Inc.*,
    708 F.3d 470 (3d Cir. 2013) ..................................................................................15

*Burbrink v. Campbell*,
    734 F. App'x 416 (9th Cir. 2018) ............................................................................8

*Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*,
    519 F.3d 778 (8th Cir. 2008) ..................................................................................8

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
    2020 WL 3026564 (D.N.J. June 5, 2020)..............................................................14

*Cortina v. Anavex Life Scis. Corp.*,
    2016 U.S. Dist. LEXIS 179905 (S.D.N.Y. Dec. 29, 2016) ..................................12

*Cozzarelli v. Inspire Pharms., Inc.*,
    549 F.3d 618 (4th Cir. 2008) ..................................................................................8

*Fain v. USA Techs., Inc.*,
    707 F. App'x 91 (3d Cir. 2017) ............................................................................13

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ....................................................................9

*GSC Partners CDO Fund v. Washington*,
    368 F.3d 228 (3d Cir. 2004) ....................................................................................3

*In re Heckmann Corp. Sec. Litig.*,
    869 F. Supp. 2d 519 (D. Del. 2012)........................................................................5

*In re Hertz Glob. Holdings, Inc.*,
    905 F.3d 106 (3d Cir. 2018) ................................................................................5, 7

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 *(*D.N.J. 2007) ....................................................................11

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
  564 U.S. 135 (2011)..............................................................................................2

*Marks v. Struble*,
  347 F. Supp. 2d 136 (D.N.J. 2004) ......................................................................8

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .............................................................................6

*Oran v. Stafford*,
  34 F. Supp. 2d 906 (D.N.J. 1999), ....................................................................11

*In re Radian Sec. Litig.*,
  612 F. Supp. 2d 594 (E.D. Pa. 2009)..................................................................11

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
  No. 1:12-CV-00993, 2016 WL 466958 (M.D. Pa. Feb. 8, 2016)........................5

*In re Silicon Graphics inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ............................................................................6, 8

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) ...................................................................4, 10, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..............................................................................................2

*In re Teva Sec. Litig.*,
  3:17-cv-558 (SRU), 2021 WL 1197805 (D. Conn. Mar. 30, 2021) ..................14

*Vogel v. Sands Bros. & Co., Ltd.*,
  126 F. Supp. 2d 730 (S.D.N.Y. 2001) ...............................................................13

*Winer Family Trust v. Queen*,
  503 F.3d 319 (3d Cir. 2007) .................................................................................1

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Woolgar v. Kingstone Cos.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020) ................................................................9

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...........................................................................11

**Statutes**

15 U.S.C.
    § 10(b).........................................................................................................2, 15
    § 20(a).............................................................................................................15
    § 78j *et seq.* .....................................................................................................4

**Other Authorities**

17 C.F.R.
    § 240 10b-5(b)...............................................................................................14

I.    **INTRODUCTION**

Lead Plaintiff's Opposition confirms that he cannot overcome the TAC's fatal pleading deficiencies.[1]  The opening Motion highlighted the glaring absence of particularized facts supporting his twice-dismissed claims, particularly with respect to establishing a strong inference of scienter.  Tellingly, the Opposition doubles down on the same deficient allegations found throughout the TAC, fails to articulate particularized facts to support a strong inference of scienter, and incorrectly directs arguments toward Riot instead of the Individual Defendants.

After the Court dismissed Lead Plaintiff's original theory that the Individual Defendants defrauded investors by facilitating a "pump-and-dump" scheme, Lead Plaintiff's new theory seeks to create a cloud of ambiguous wrong-doing premised on the thinnest of circumstantial allegations.  Allegations as to O'Rourke – a single stock sale, his resignation, a 2014 email, past investments unrelated to Riot as far back as 2011, a shared office space, an unrelated case – not only are insufficient individually and in the aggregate, but are pled deficiently without the particularity required for claims of securities fraud.  Separately, both the TAC and the Opposition repeatedly lump together O'Rourke and Beeghley to disguise the TAC's pleading deficiencies and the striking absence of distinct, particularized

---

[1] Unless otherwise indicated, the Individual Defendants utilize the same defined terms as used in their opening Motion.

facts, particularly as to Beeghley.  Accordingly, in addition to all the other fatal flaws in the TAC that each provides independent grounds for dismissal, Lead Plaintiff's failure to establish a strong inference of scienter that is more cogent and compelling than any non-culpable inference stands out and requires dismissal of all claims against the Individual Defendants with prejudice.

## II.   THE SECTION 10(B) CLAIM SHOULD BE DISMISSED.

### A.   The Individual Defendants Cannot be Liable for Statements Made in Riot's Form 8-Ks.

Lead Plaintiff concedes that the Individual Defendants did not sign the three Form 8-Ks underlying allegations relating to related-party transactions and, thus, concedes that they are not liable for them.  (*See* Opp. at 9-10.)  Accordingly, as a matter of law, the Individual Defendants' liability based on the Form 8-Ks fails because they are not the "makers" of alleged misstatements contained therein.  *See Janus Cap. Grp., Inc. v. First Deriv. Traders,* 564 U.S. 135, 142 (2011).[2]

---

[2] Lead Plaintiff's only response is that "Beeghley was Riot's CEO when the October 4, 2017 Form 8-K was filed, ¶ 15, and O'Rourke became CEO on the same day the November 3, 2017 Form 8-K was filed, ¶ 14."  (Opp. at 9.)  However, their officer status is insufficient to support Lead Plaintiff's claim.  *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999), *abrogated on other grounds by Tellabs v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007) (citation omitted) (allegations of scienter based on positions in a company "are 'precisely the types of inferences which [courts] … have determined to be inadequate to withstand Rule 9(b) scrutiny.'")  Moreover, the Opposition does not even address the March 16, 2017 Form 8-K relating to a private placement, which marks the starting date of the Class Period.  (*See* TAC ¶ 92.)

## B.   The TAC Fails to Adequately Allege a Strong Inference of Scienter as to Beeghley.

The dearth of allegations relating to Beeghley is noteworthy and precludes any inference of scienter, let alone a strong one.  Similar to the TAC, Lead Plaintiff's Opposition has little to say about Beeghley, echoing Judge Wolfson's past statement that Lead Plaintiff's previous opposition "barely addresses the scienter of defendant Beeghley."  (Apr. 30, 2020 Order at 28 n.16.)  The scant allegations follow the same pattern of deficient statements relating to O'Rourke that fail to establish any inference of scienter that can sustain Lead Plaintiff's fraud claims.  With no allegations of Beeghley's motive, Lead Plaintiff must allege specific "facts that constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'"  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (citation omitted).  Lead Plaintiff fails to do so.

Rather than presenting particularized facts to support his scienter allegations, Lead Plaintiff draws impermissible inferences from Beeghley's title to allege that he knew or recklessly disregarded purported investor group activity and related-party transactions.  (*See* Opp. at 36-37.)  Lead Plaintiff also points to past investments in an entirely separate, unrelated company, before Beeghley's employment at Riot, as proof that Beeghley supposedly knew about certain alleged misstatements at Riot.  But Lead Plaintiff fails to provide any semblance of a plausible explanation connecting past activities involving a separate company with

any allegedly fraudulent scheme at Riot.[3]  Lead Plaintiff can only muster unrelated, conclusory statements that fail to satisfy the demanding pleading standards courts have crafted for circumstantial allegations.  *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006 (circumstantial allegations must represent an "extreme departure from the standards of ordinary care").

### C.  The TAC Fails to Adequately Allege a Strong Inference of Scienter as to O'Rourke.

#### 1.  O'Rourke's Departure from Riot Does Not Support a Strong Inference of Scienter.

Lead Plaintiff argues that O'Rourke's departure from Riot was caused by his involvement in *SEC v. Honig*, No. 1:18-cv-08175 (S.D.N.Y.).  But *SEC v. Honig* did not involve Riot and was settled before it was ever litigated without any admission of liability.[4]  Plaintiff's reliance on unproven allegations from a complaint in another case involving other companies to infer scienter in this matter has no merit.

---

[3] Lead Plaintiff highlights Beeghley's alleged statement to the Board that he did not know Honig.  (*See* Opp. at 37.)  Yet, it is unclear how this statement relates to Beeghley's scienter for any alleged misstatements made afterwards.  Lead Plaintiff alleges that "Beeghley was either knowingly or recklessly misleading Riot's investors for the benefit of his co-Defendants," but fails to explain how that private statement made to one board member, but not made publicly, affected Riot's investors.  (*Id.*)

[4] *See* Declaration of Daniel Scott Carlton In Support of Riot Defendants' Motions to Dismiss ("Carlton MTD Decl."), Ex. J.  Moreover, unlike here, the SEC was not required to comply with the strict pleading standards of the Private Securities Litigation Reform Act, 15 U.S.C. § 78j *et seq.* (the "PSLRA") in *SEC v. Honig*.

The Third Circuit has made clear that "[f]or a resignation to add to an inference of scienter, a pleading must set forth allegations suggesting a compelling inference that the resignation was the result of something other than 'the reasonable assumption that the resignation occurred as a result of' the release of bad news" – which is precisely what Lead Plaintiff fails to do here. *In re Hertz Glob. Holdings Inc*., 905 F.3d 106, 118 (3d Cir. 2018) (citation omitted). Lead Plaintiff must plead "particularized allegations connecting the departures ***to the alleged fraud***." *Id.* (emphasis added). But *SEC v. Honig* had nothing to do with Riot, which Lead Plaintiff concedes. The more plausible inference is that O'Rourke resigned to focus on the defense of the SEC matter and not allow it to distract from Riot's operations.[5]

---

[5] Lead Plaintiff cites to three cases as support, but in all three, the plaintiff had already alleged sufficient facts supporting a strong inference of scienter, and was able to connect resignations to the purported fraud. *See Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 1:12-CV-00993, 2016 WL 466958, at *5 (M.D. Pa. Feb. 8, 2016) (plaintiff presented confidential witnesses who alleged observations about the failures of internal controls, the company's own admission regarding those failures, and the timing and remedies required by enforcement actions); *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 541 (D. Del. 2012) (court found a strong inference of scienter because defendants were aware of reporting discrepancies, and resignation only added to it); *In re Par Pharm. Sec. Litig.*,  No. 06-cv-3226 (PGS), 2009 WL 3234273, at *7 (D.N.J. Sept. 30, 2009) (confidential informants established that defendants elected to use Excel sheets that were manipulated by defendants rather than the more accurate reports).

2. **O'Rourke's Stock Sales Do Not Establish a Strong Inference of Scienter.**

   a. **O'Rourke Sold a Smaller Percentage of His Shares Than Alleged.**

Lead Plaintiff vainly tries to bolster his weak scienter allegations by pointing to O'Rourke's solitary stock sale during the nearly eighteen month class period and arguing that O'Rourke must have known of the alleged fraud because he supposedly sold 37% of his Riot shares. The amount O'Rourke sold is not only irrelevant to scienter but also simply incorrect and easily debunked by publicly available information as discussed below. But even if Lead Plaintiff's figure were correct, courts have held that higher percentages of stock sales failed to raise a strong inference of scienter. *See, e.g., In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987-88 (9th Cir. 1999) (no scienter inference when stocks sales were in excess of 75.3% of stock holdings).[6]

Lead Plaintiff relies on a Motley Fool article alleging that O'Rourke's December 29, 2017 sale of 30,383 shares of Riot stock purportedly represented

---

[6] *See also Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (holding no scienter even when one defendant sold 37% of his stock holdings and another sold 100%). Moreover, in evaluating the adequacy of scienter allegations, courts will look at several factors related to a stock sale and not just at the amount sold as Lead Plaintiff does here. Other factors, such as selling stock to pay taxes, a long class period, not selling at the high point, and other executives not selling any shares (such as Beeghley), undercut an inference of scienter, and each of these is present in this case. (*See* Mem. of Law in Support of Individual Defendants' Joinder and Motion to Dismiss at 14-17, Dkt. 233-1.)

37% of shares O'Rourke "owned or would soon control."[7]  (Opp. at 32.)  But

Riot's SEC filings clearly show that O'Rourke owned or controlled far more shares

– and, thus, sold a much smaller percentage of his total shares – than the Motley

Fool and Lead Plaintiff incorrectly assumed.[8]  For example, Riot's Form 10-K/A

for fiscal year 2017 outlines in detail O'Rourke's compensation package pursuant

to his employment agreement to serve as CEO, which included an option to

purchase 100,000 shares of Riot stock granted in November 2017 that immediately

vested.[9]  But the Motley Fool article improperly excludes O'Rourke's options to

purchase 100,000 shares, which "fully vested as of the date of grant."  (*See* Carlton

Reply Decl., Ex. A.)  The Third Circuit has made clear that options must also be

included in the sales percentage calculation to provide a more accurate measure of

---

[7] Lead Plaintiff argues that O'Rourke and his related entity held or would soon hold 82,383 shares on December 29, 2017, of which he sold 30,383 shares.  (*See* Opp. at 13 n.6.)

[8] Notably, the Motley Fool includes substantial disclaimers that readers should not rely on any information presented on its website.  *See* The Motley Fool: *Disclaimer,* https://www.fool.com/legal/the-motley-fool-disclaimer/ (last visited Oct. 3, 2022) ("The [Motley] Fool makes no claims or representations as to the accuracy, completeness, or truth of any material contained in our areas.").

[9] (*See* Declaration of Daniel Scott Carlton in Support of Riot Defendants' Reply Memorandums ("Carlton Reply Decl."), Ex. A) ("On November 3, 2017, we entered into an employment agreement with Mr. O'Rourke to serve as Chief Executive Officer. The employment agreement with Mr. O'Rourke shall … provide[] for (i) a monthly salary of $25,000, (ii) a restricted stock award of 344,000 shares … which shall vest in 24 equal monthly installments … and (iii) **an option to purchase up to 100,000 shares of the Company's common stock**, at an exercise price of $10.00.") (emphasis added).

an individual's share ownership. *See In re Hertz*, 905 F.3d at 120 n.5 (alterations in original) ("However, '[i]n calculating the percent of holdings sold, … it is appropriate to consider not only the shares of stock that [a defendant] held prior to [his] sales, but also the shares that [he] could have sold through the exercise of options[.]") (citation omitted).[10]  Accordingly, the 37% figure cited by Lead Plaintiff fails to include O'Rourke's options for 100,000 additional shares and is, therefore, wildly inaccurate.[11]

**b.    The Timing of O'Rourke's Stock Sale is Not Unusual or Suspicious.**

Lead Plaintiff's attempt to premise any inference of scienter on the timing of O'Rourke stock sale is meritless.  *First*, Lead Plaintiff puts forth a puzzling claim for the first time in his Opposition that O'Rourke waited to sell his shares *after*

---

[10] *See also In re Silicon Graphics*, 183 F.3d at 986-87 ("Actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone."), *superseded by statute on other grounds, Burbrink v. Campbell*, 734 F. App'x 416 (9th Cir. 2018); *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 628 (4th Cir. 2008) (same); and *Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*, 519 F.3d 778, 783 (8th Cir. 2008) (same).

[11] Lead Plaintiff attempts to argue for the first time in his Opposition that O'Rourke's sale actually represented 70.8% of his total shares.  (*See* Opp. at 32.) Not only does Lead Plaintiff's flawed calculation fail to include O'Rourke's options, the argument itself is inappropriate as courts will not consider such first-time allegations not contained in the complaint.  (*See* Apr. 30, 2020 Order at 34-35) (Court will not consider first-time allegations) (citing *Marks v. Struble,* 347 F. Supp. 2d 136, 148 (D.N.J. 2004) (refusing to consider allegations made for the first time in response to a defendant's motion to dismiss).).

Honig completed his "ten-month run" of sales to "avoid[] depressing Riot's stock price while his officemate was secretly selling his shares."[12]  (Opp. at 33.)  The bizarre claim, even if true, would cut against any inference of scienter as it alleges that O'Rourke "avoided depressing Riot's stock price" by intentionally passing on selling shares at a higher price in order to sell at a lower price.[13]  *See Woolgar v. Kingstone Cos.,* 477 F. Supp. 3d 193, 236 (S.D.N.Y. 2020) (Stock sales are suspicious only when it is "dramatically out of line with prior trading practices at times ***calculated to maximize*** the personal benefit from undisclosed inside information.") (emphasis added) (citation omitted).

*Second,* Lead Plaintiff tries to bolster his scienter claim by asserting that O'Rourke's sale came days before the dismissal of Riot's auditor and a month before Riot had canceled its annual meeting.  (*Id.*)  But Lead Plaintiff fails to allege any connection between these events or how each relates to O'Rourke's knowledge of any alleged misstatements.  *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) ("whether a particular stock sale qualifies as 'unusual' depends on a number of factors, including . . . whether sales occurred shortly before corrective

---

[12] Courts will not consider allegations made for the first time in oppositions.  *See supra,* Section II.C.2.a., n. 10.

[13] The claim also undercuts Lead Plaintiff's allegation that "Honig "secretly coordinated his investments in Riot as part of a group in order to artificially inflate the price of the Company's stock—and sell those shares at inflated prices."  (TAC ¶ 142.)

disclosures or materialization of the alleged risk"). The TAC includes no allegations that Riot's dismissal of its auditor supports any specific claims or relates to any alleged fraud or misstatement.[14] Whether or not O'Rourke knew of Riot's plan to change auditors at the time of his sale has no bearing on whether he had scienter for the unrelated fraud alleged in the TAC. The TAC also contains no allegations concerning how O'Rourke could have known in December 2017 that Riot would adjourn its annual meeting at the end of January 2018. Lead Plaintiff also fails to allege how the adjournment itself is related to any alleged misstatement or how it supports any claim in the TAC. Lead Plaintiff cannot simply pick unrelated events after a stock sale without explaining how those events had any connection to any alleged misstatements. *See id.*

To determine whether stock sales are "unusual in scope" as to timing, courts will look at whether the sales were "normal and routine," *i.e.*, whether the sale was an unusual departure from an individual's past trading history. *In re Suprema*, 438 F.3d at 277. Lead Plaintiff points to one sale by O'Rourke for tax purposes, but fails to provide the necessary context of O'Rourke's trading history to judge properly whether the single sale was in any way unusual.[15] *See Oran v. Stafford*,

---

[14] Lead Plaintiff highlights Riot's January 5, 2018 Form 8-K announcing the dismissal of its auditor, but ignores the other half of that same announcement about its simultaneous engagement of a new auditor. (*See* Carlton Reply Decl., Ex. B.)

[15] Lead Plaintiff objects to the assertion that O'Rourke's sale was to cover tax obligations, alleging that it raises a factual question not appropriate at this stage.

226 F.3d 275, 289 (3d Cr. 2000) (finding an "absence of . . . information" about

"whether the trades were normal and routine for each executive" fatal to plaintiffs'

case); *see also See Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 1005

(9th Cir. 2009) (same).

### 3.    Lead Plaintiff's Other Circumstantial Allegations Against O'Rourke Do Not Support a Strong Inference of Scienter.

Lead Plaintiff's remaining circumstantial allegations regarding O'Rourke

(*see* Opp. at 28-30) can only provide an inference of scienter if they collectively

represent an "extreme departure from the standards of ordinary care," which is

clearly not the case here.  *In re Suprema*, 438 F.3d at 276.  Because the TAC

contains a dearth of allegations, the Opposition resorts to providing only a cursory

review of these allegations.  Without allegations of a clear motive, the strength of

the circumstantial allegations of conscious misbehavior or recklessness "must be

[correspondingly] greater."  *In re Intelligroup Sec. Litig.,* 527 F. Supp. 2d 262, 285

(D.N.J. 2007) (alteration added) (citation omitted).  None of these allegations,

---

(*See* Opp. at 35.)  But courts have ruled that "on a motion to dismiss a securities fraud complaint, the Court must consider competing inferences offered by defendants."  *In re Radian Sec. Litig*., 612 F. Supp. 2d 594, 612 n. 18 (E.D. Pa. 2009); *see also Tellabs,* 551 U.S. at 323 ("in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences[]" and "must consider plausible, nonculpable explanations…"); *Winer Family Trust v. Queen,* 503 F.3d 319, 328-29 (3d Cir. 2007) (same).  The reference to tax obligations comes from the TAC itself (TAC ¶ 221), and it provides a plausible, non-culpable inference that is more cogent and compelling that Lead Plaintiff's unsubstantiated inference.

-11-

taken individually or in the aggregate, provide the strong inference necessary to adequately allege scienter.

*First,* Lead Plaintiff insists that O'Rourke's past investments with Honig and others provide an inference of O'Rourke's scienter for alleged misstatements at Riot years later.  (Opp. at 28.)  But investment activity involving other companies unrelated to Riot has no bearing on scienter, let alone a strong inference of one, and Lead Plaintiff has never provided a plausible explanation connecting investments in unrelated companies with O'Rourke's alleged misstatements at Riot.  *Cf. Cortina v. Anavex Life Scis. Corp.,* 2016 U.S. Dist. LEXIS 179905, at *25 (S.D.N.Y. Dec. 29, 2016) ("the fact that Anavex had a history of involvement in stock promotion schemes does not come close to suggesting that Defendants had knowledge of the alleged scheme during the Class Period").

*Second,* despite the overwhelming weight of authority prohibiting it, Lead Plaintiff continues to rely on O'Rourke's officer positions to infer scienter.  (*See* Opp. at 27, 36.)  As discussed above, however, "allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'"  *In re Advanta*, 180 F.3d at 539 (citation omitted); *see also*

-12-

*Fain v. USA Techs., Inc.*, 707 F. App'x 91, 96 (3d Cir. 2017) ("That Defendants were in top positions at USA Technologies, alone, is not enough.").

*Third,* allegations of O'Rourke's past interactions and relationship with Honig do not establish scienter. Lead Plaintiff continues to insist that allegations that O'Rourke shared an office with Honig, might have shared a fax number with Honig based only on a September 2016 letter, and once sent an email in 2014 that referred to a small group, demonstrate scienter for alleged misstatements made in 2017 and 2018. (*See* Opp. at 28-29.) But Plaintiff provides no plausible explanation connecting such circumstantial evidence to specific misstatements attributed to O'Rourke and relating to Riot.[16] Instead, Lead Plaintiff argues in conclusory fashion that, "O'Rourke, by virtue of his close affiliation with Honig, both past and present, and as alleged in the TAC, knew or was reckless in not knowing that Honig was acting as a 'group,'" (Opp. at 27) in violation of the heightened pleading standards relating to circumstantial evidence. *See Vogel v. Sands Bros. & Co., Ltd.*, 126 F. Supp. 2d 730, 743 (S.D.N.Y. 2001 ("allegations of a close relationship fail to establish the kind of circumstantial evidence necessary to support a claim of fraudulent or reckless intent.") (citation omitted).

---

[16] Lead Plaintiff argues that O'Rourke and Honig shared office space, but this is based solely on the allegation in a CNBC article in which CNBC crew members visited Honig's office and ran into O'Rourke who was visiting that day. (*See* TAC ¶ 129.) Needless to say, this fact does not permit an inference that O'Rourke and Honig shared offices.

**D.   Lead Plaintiff Has Not Alleged Deceptive Conduct that Would Support Scheme Liability.[17]**

Rather than substantively challenge Riot's position that Lead Plaintiff's scheme liability claim is entirely duplicative of his Rule 10b-5(b) claim, Lead Plaintiff returns to a substantial discussion about the same misstatements and omissions, drawing attention to the fact that Lead Plaintiff has not and cannot allege deceptive conduct in support of a scheme.  (Dkt. 239 at 15-19.)  Lead Plaintiff offers no analysis to refute Riot's authority that where, as here, "the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission," courts have routinely rejected a plaintiff's repurpose of a misstatement for scheme liability (Mot. at 39-40 (*In re Teva Sec. Litig.*, 3:17-cv-558 (SRU), 2021 WL 1197805, at *2 (D. Conn. Mar. 30, 2021), and other authority)).[18]

---

[17] Riot addressed Lead Plaintiff's scheme liability argument in its opening brief, but Lead Plaintiff responded in its Opposition to the Individual Defendants' brief.

[18] Lead Plaintiff cites just one case, but even that case fails to demonstrate that the Court can rely on the very same alleged misrepresentation without any deceptive conduct to find scheme liability.  While scheme liability was found in *In re Cognizant Tech. Sols. Corp. Sec. Litig.,* the court emphasized the plenitude of allegations demonstrating the defendant's direct participation in devising and perpetuating the scheme, in addition to the alleged misstatements and omissions.  2020 WL 3026564, at *17 (D.N.J. June 5, 2020) (unpublished), *motion to certify appeal denied*, 2021 WL 1016111 (D.N.J. Mar. 17, 2021).  Indeed, even the quote Lead Plaintiff relies on, which says a "plaintiff need not *necessarily* allege" other deceptive acts, suggests that sometimes such allegations *are* necessary – for example, where there are not other allegations giving rise to

Lead Plaintiff's attempts to point to other deceptive conduct are equally futile.  (Opp. at 20.)  Concealing Honig's group status is simply another way of stating that Riot should have disclosed Honig's group status on its Forms S-3.  (*Id.*)  Likewise, Lead Plaintiff cannot argue that entering into the Coinsquare and Kairos Agreements was deceptive in its own right.  (*Id.*)  Rather, it is again directly tied to Riot's alleged disclosure duties for purported related party transactions.  And Lead Plaintiff does not explain (nor can he) how registering and issuing securities—as an issuer—is a deceptive act on its own.[19]  (*Id.*)

## III.   **CONCLUSION**

For the reasons stated above and set forth in the Individual Defendants' moving papers and Riot's moving papers and reply, the Individual Defendants respectfully request that the Court dismiss the Section 10(b) with prejudice, which, in turn, requires dismissal of the Section 20(a) claim as well.  *See In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004), *abrogated on other grounds by Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470 (3d Cir. 2013).

---

participation in the scheme.  Such allegations existed in *In re Cognizant*.  Here, of course, such additional facts are markedly absent.

[19] To the extent Lead Plaintiff points to other allegations regarding O'Rourke's previous personal ties to Honig and others, such allegations need not be accepted because such allegations of unrelated conduct cannot constitute facts to establish a scheme at Riot.

DATED:     October 3, 2022          PAUL HASTINGS LLP


By:  /s/ *Chad J. Peterman*
             CHAD J. PETERMAN

*chadpeterman@paulhastings.com*
200 Park Avenue
New York, NY 10166
Telephone:  1(212) 318-6000
Facsimile:  1(212) 319-4090

THOMAS A. ZACCARO
*thomaszaccaro@paulhastings.com*
D. SCOTT CARLTON
*scottcarlton@paulhastings.com*
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA  90071
Telephone:  1(213) 683-6000
Facsimile:  1(213) 627-0705

*Attorneys for Defendants*
RIOT BLOCKCHAIN, INC., JOHN
O'ROURKE, AND MICHAEL
BEEGHLEY